# Exhibit 61

**Exhibit 3.3A2**

<u>GenOn Mid-Atlantic, LLC</u>

**Second Amended and Restated
Limited Liability Company Agreement**

This Second Amended and Restated Limited Liability Company Agreement (this "Agreement") of GenOn Mid-Atlantic, LLC (formerly known as Mirant Mid-Atlantic, LLC) (the "Company"), a limited liability company formed under the Delaware Limited Liability Company Act, is entered into this 20th day of January, 2011, between the Company and GenOn North America, LLC, its sole member (the "Member").

WHEREAS, the Member desires to amend and restate the Company's limited liability company agreement currently in effect, including all amendments and/or restatements thereof (the "Existing LLC Agreement"), in its entirety and to enter into this Agreement to set forth the terms and conditions of such amendment and restatement;

NOW, THEREFORE, for and in consideration of the mutual premises and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree that the Existing LLC Agreement shall be amended and restated as follows:

1. <u>Definitions</u>. For purposes of this Agreement, the following terms shall have the following meanings:

(a) "<u>Act</u>" shall mean the Delaware Limited Liability Company Act, Del. Code Ann. Tit. 6 §§ 18-101 <u>et seq</u>., as it may hereafter be amended or supplemented.

(b) "<u>Certificate</u>" shall mean the Certificate of Formation of the Company filed with the Secretary of State of Delaware pursuant to § 266 of the General Corporation Law of Delaware, as may be amended from time to time by the Member (as hereinafter defined).

(c) "<u>Effective Date</u>" shall mean the date this Agreement is entered into by the Company and the Member.

(d) "<u>Interest</u>" shall mean the interest of the Member in the Company, which includes, without limitation, the Member's interest in the profits and losses of the Company, the Member's right to receive distributions of the Company's assets, and the Member's other rights and interests in respect of the Company under this Agreement and the Act, and which as of the date hereof, expressed as a percentage of all such interests in the Company, is 100%.

(e) "<u>Member</u>" shall mean the Member as identified above, any successor or assign, and any additional members of the Company admitted pursuant to Section 14 of this Agreement. As of the date hereof, the Member is the sole member of the Company with its principal place of business at 1155 Perimeter Center West, Atlanta, Georgia 30338.

(f) "<u>Officers</u>" shall have the meaning set forth in Section 10(l) hereof.

(g) "<u>Secretary of State</u>" shall mean the Secretary of State of Delaware.

1

2. <u>Formation</u>.

(a) In accordance with the Act, the Company was formed upon the filing of the Certificate of Formation with the Secretary of State (the "Effective Time"). Except as otherwise provided herein, the rights and liabilities of the Member in respect of the Company shall be as provided in the Act.

(b) The Member is the sole member of the Company, and the Member's Interest in the Company has been duly authorized and validly issued. At the sole option of the Member, the Interest may be represented by a certificate.

(c) Notwithstanding any other provision contained herein to the contrary, the Company shall not permit non-voting membership interests.

3. <u>Name</u>. The name of the Company is GenOn Mid-Atlantic, LLC.

4. <u>Purpose and Powers</u>. The purpose of the Company is, and the Company shall have the power and authority, to engage in and carry on any lawful business, purpose or activity for which a limited liability company may be formed under the Act. The Company may, and shall have all power and authority to, take any and all actions as may be necessary, appropriate, proper, advisable, incidental, convenient to or in furtherance of the foregoing purpose.

5. <u>Principal Office; Registered Office and Agent</u>. The Company's principal office is located at 1155 Perimeter Center West, Atlanta, Georgia 30338 and its registered office is located at 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle, 19808. The name of its registered agent is Corporation Service Company. The Company may change its principal office, registered office, and registered agent from time to time.

6. <u>Term</u>. The term of existence of the Company commenced at the Effective Time and shall continue until the filing of a certificate of cancellation of the Company in accordance with the Act.

7. <u>Qualification in Other Jurisdictions</u>. The Officers shall have the power and authority, and shall be and hereby are authorized and empowered, to cause the Company to be qualified or registered to conduct business in any jurisdiction in which the Company transacts business and to be registered under any assumed or fictitious names under applicable law. The Officers shall have power and authority, and shall be and hereby are authorized and empowered, to execute, deliver and file any certificates (including, without limitation, any amendments and/or restatements thereof) necessary for the Company to qualify or register to do business in a jurisdiction in which the Company may wish to conduct business.

8. <u>Accounting Period and Tax Year</u>. Unless otherwise determined by the Member, the Company's accounting period and tax year shall be the calendar year.

9. <u>Records to be Maintained</u>.

(a) The Company shall maintain the following records at its principal office:

2

(i) A copy of this Agreement and the Certificates and all amendments to any of such documents, and executed copies of the powers of attorney, if any, pursuant to which this Agreement, the Certificates, or any amendments to any of such documents have been executed;

(ii) Copies of such records as would enable the Member to determine the business and financial condition of the Company, the members of the Company, the date upon which each member became a member, each member's last known mailing address and the voting rights of the members, as applicable;

(iii) Copies of the Company's federal, foreign, state, and local income tax returns and reports, if any, for each year;

(iv) The financial statements of the Company for each year;

(v) True and full information regarding the amount of cash and other property or services (including the value thereof) contributed by each Member and that each Member agreed to contribute in the future; and

(vi) Any other information required by § 18-305 of the Act.

(b) The Member may, at the Member's own expense, inspect and copy any Company record upon reasonable request during ordinary business hours.

10. <u>Management of the Company</u>.

(a) <u>Management by Board of Managers</u>. The business and operations of the Company shall be managed by or under the direction of a Board of Managers, who shall be elected in accordance with this Section 10 (the "Board"). For purposes of this Agreement, each member of the Board shall be considered a "Manager" (as defined in § 18-101(10) of the Act); provided, however, that no Manager acting individually in his or her capacity as a Manager shall have the authority to bind the Board or the Company. Except as otherwise specifically set forth in this Agreement, the Board (without the consent or approval of the Member) shall have the right, authority, power and discretion to control, direct, manage and administer the business and affairs of the Company and to do all things necessary to carry on the businesses and purpose of the Company. The acts of the Board shall bind the Company when taken within the scope of the Board's authority and discretion expressly granted hereunder.

(b) <u>Authority of Member</u>. The Member shall have authority to bind or take any action on behalf of or in the name of the Company, or enter into any commitment or obligation binding upon the Company. Notwithstanding anything to the contrary in this Agreement, without first obtaining the consent of the Member, the Company shall not and the Board shall not authorize the Company to:

(i) sell all or substantially all of the assets of the Company;

(ii) merge, combine or consolidate the Company with or into any other corporation, partnership, limited liability company or other entity;

(iii) dissolve, liquidate and/or terminate the Company;

(iv) take any action in contravention of this Agreement;

(v) admit any additional member;

(vi) institute a case or other proceeding under any section or chapter of the Federal Bankruptcy Code as it may be hereafter amended or supplemented; or

(vii) take any action or fail to take any action that the Member, by written notice to the Board from time to time, directs that the Company may not take or fail to take without the Member's prior consent.

(c) Powers and Duties of the Board. Except as otherwise explicitly provided herein and subject to Section 10(b), the Board shall have the power on behalf and in the name of the Company to implement any and all of the objectives of the Company and to exercise any and all rights and powers the Company may possess. Without limiting the foregoing general powers and duties and except as may be expressly provided otherwise by the Member by prior written notice to the Board from time to time, the Board is hereby authorized and empowered on behalf and in the name of the Company to:

(i) direct the formulation of investment policies and strategies for the Company and select and approve the investment of Company funds;

(ii) administer, negotiate, enforce and/or oversee employee compensation, employee benefit plans and arrangements and collective bargaining agreements and negotiations;

(iii) open, maintain and close bank accounts and draw checks or other orders for the payment of money and open, maintain and close brokerage, mutual fund and other accounts;

(iv) engage and terminate consultants, attorneys, accountants and such other agents, employees and representatives for itself and for the Company as it may deem necessary or advisable, and authorize any such agent, employee or representative to act for or on behalf of the Company;

(v) negotiate and enter into contracts or agreements with vendors, customers, partners and suppliers;

(vi) subject to its ultimate responsibility for the management of the Company, delegate any of its duties hereunder to any other person, entity or committee, and in furtherance of any such delegation, to appoint, employ, or contract with any person or entity it may in its sole discretion deem necessary or desirable for the transaction of the business of the Company, which person or entity may administer the day-to-day operations of the Company;

4

_____

(vii) institute, prosecute, settle, compromise or defend any claim, proceeding, trial, hearing, or other civil or criminal activity instituted by, on behalf of or against the Company;

(viii) make any tax election or decision to be made by the Company under the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder; and

(ix) make and perform such other agreements and undertakings as may be necessary or advisable to the carrying out of any of the foregoing powers, objects or purposes.

(d) <u>Number, Election and Term of Office; Chairman</u>. The Board shall consist of no less than three (3) and no more than fifteen (15) Managers, as determined by the Member from time to time. The Managers shall be appointed by the Member. Each Manager (except in the case of death, resignation, retirement, disqualification or removal) shall serve for a period of one (1) year or until his or her successor shall have been duly appointed and qualified. The Member or the Board shall appoint from among the Managers a chairman (the "Chairman"). The Chairman shall preside at all meetings when present. A majority of Managers present at any meeting at which a quorum is present shall elect an alternate chairman to preside at such meeting if the Chairman is not present. The number of members of the Board is hereby set at three (3) and each of the individuals listed on <u>Exhibit A</u> attached hereto is hereby appointed, effective as of the date indicated thereon, as a member of the Board, to serve until his or her successor shall have been duly appointed and qualified. The Chairman identified on <u>Exhibit A</u> is hereby appointed to serve in the capacity of Chairman, effective as of the date indicated thereon.

(e) <u>Removal</u>. Any Manager may be removed from office (with or without cause) by the Member in its sole and absolute discretion. Removal action may be taken at any time, and a removed Manager's successor may be appointed to serve for the remainder of the unexpired term.

(f) <u>Vacancies</u>. A vacancy occurring in the Board may be filled for the unexpired term by the Member or, alternatively, the Board by an affirmative vote of a majority of the Managers remaining in office unless and until the Member appoints a successor.

(g) <u>Compensation</u>. Managers may receive such reasonable compensation for their services as may from time to time be approved by the Member. Managers may receive reimbursement of expenses, as fixed or determined by the Member. A Manager may also serve the Company in any capacity other than that of Manager and receive compensation, as determined by the Member or the Board, for services rendered in that other capacity.

(h) <u>Meetings of the Board</u>. Regular meetings of the Board may be held without notice at such times and at such places as shall from time to time be determined by the Board. Special meetings of the Board may be called by or at the request of the Member, the Chairman or at least two (2) Managers. Reasonable notice thereof shall be given by the person or persons calling the meeting. Attendance by a Manager at a meeting shall constitute waiver of

notice of such meeting, except where a Manager attends a meeting for the express purpose of objecting at the beginning of the meeting to the transaction of business at the meeting. At meetings of the Board, the presence of at least one half (1/2) of the Managers then in office (but not less than two (2) Managers) shall be necessary to constitute a quorum for the transaction of business at such meeting. The act of a majority of the Managers present at a meeting at which a quorum is present at the time shall be the act of the Board.

(i) <u>Action by Managers Without a Meeting.</u> Any action required or permitted to be taken at any meeting of the Board or any committee thereof may be taken without a meeting upon approval of a majority of the members of the Board or such committee. Such approval shall have the same force and effect as a majority vote at a meeting of the Board or such committee at which a quorum is present and may be evidenced by one (1) or more written consents describing the action taken.

(j) <u>Participation in Board Meetings</u>. Members of the Board or any committee thereof may participate in a meeting of the Board or such committee by means of conference telephone or similar communications equipment which allows all persons participating in the meeting to hear and communicate with each other, and such participation in a meeting shall constitute presence in person at the meeting.

(k) <u>Committees</u>. The Member or the Board may designate one or more committees, each committee to consist of one or more Managers or individuals who are not Managers. The Member or the Board may designate one or more individuals as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee. Any such committee, to the extent provided in the authorization of the Member or the Board, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Company, and may authorize the seal of the Company to be affixed to all instruments that may require it; but no such committee shall have the power or authority to amend the Certificates, adopt an agreement of merger, combination or consolidation, recommend to the Member the sale, lease or exchange of all or substantially all of the Company's property and assets, recommend to the Member a dissolution of the Company, or amend this Agreement, and, unless the authorization expressly so provides, no such committee shall have the power or authority to authorize a distribution, to authorize the issuance of ownership or membership interests in the Company or to adopt a certificate of merger. Such committee or committees shall have such name or names as may be determined from time to time by the Member or the Board. Unless otherwise specifically determined by the Member or the Board, the provisions of this Agreement that govern meetings, actions without meetings, notice and waiver of notice, and quorum and voting requirements of the Board, shall also apply to meetings of committees and their members.

(l) <u>Officers</u>. The Board shall have power and authority, and is hereby authorized and empowered, in the name and on behalf of the Company, to appoint one or more officers (the "Officers") with such titles as the Board may provide, who shall have and may exercise and perform such rights, duties, powers and authority in the management and affairs of the Company as generally pertain to his or her respective office and to delegate to one or more of such Officers or other persons the Board's rights and powers to manage and control the business and affairs of the Company, including, without limitation, to delegate to agents and employees of

6

the Member or the Company and to delegate by a management agreement or other agreement with, or otherwise to, other persons. Each of the individuals listed on Exhibit B attached hereto is hereby appointed, effective as of the date indicated thereon, as an officer of the Company to serve in the office set forth opposite his or her respective name thereon and shall have and may exercise and perform such rights, duties, powers and authority in the management and affairs of the Company as generally pertain to his or her respective office, until his or her respective successor is duly appointed or until he or she resigns or is removed from office.

(m) Liability of Member, Managers and Officers. Neither the Member nor any Manager or Officer shall be personally liable for the debts, obligations or liabilities ("Liabilities") of the Company, whether arising in contract, tort or otherwise. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the Member or any Manager or Officer for Liabilities of the Company. The Member's and each Manager's and Officer's liability shall be limited to the fullest extent not prohibited by the Act and other applicable law.

(n) Power Facilities and Wholesale Power Sales. Notwithstanding anything to the contrary in this Agreement, to the extent that the Company owns and/or operates power generating facilities ("Power Facilities") and/or engages in wholesale sales from Power Facilities ("Wholesale Power Sales"), (1) this Agreement and the Managers' management of the Company thereunder does not (i) result in a transfer of authority or control over the Power Facilities owned and/or operated by the Company or (ii) provide the Managers with the authority to engage in (or refrain from engaging in) Wholesale Power Sales from the Company's Power Facilities, except when acting on behalf of the Company; (2) to the extent that the Managers, Member or its officers take any action pursuant to this Agreement affecting (i) Wholesale Power Sales and/or the sale of related products from the Company's Power Facilities, (ii) the dispatch of such Power Facilities, or (iii) the ability of the Power Facilities to produce power, such actions are to be only taken on the Company's behalf, and the Company retains ultimate authority and control over its Power Facilities and Wholesale Power Sales.

11. Capital Contributions.

(a) Capital contributions were made to the Company pursuant to the initial limited liability company agreement of the Company and such capital contributions are reflected on the books of the Company. The Member may make additional capital contributions to the Company as determined from time to time by the Member.

(b) The above capital contribution is the only capital contribution required to be made by the Member. Unless the Member otherwise agrees, the Member shall not be required to contribute any additional capital to the Company.

12. Allocation of Net Profit and Net Loss. The Company's net profit or net loss for each fiscal year for federal and state income tax purposes shall be allocated to the Member in accordance with its Interest in the Company.

13. <u>Distributions</u>. Distributions shall be made to the Member in accordance with its Interest at the time and in the amounts determined by the Member. Notwithstanding the preceding sentence or any other provision to the contrary contained in this Agreement, no distribution shall be made to the Member if such distribution is prohibited by the Act.

14. <u>New Members</u>. Additional members may be admitted to the Company only upon the prior consent of the Member. In the event that the Member desires to admit any new members to the Company, the Member shall amend and restate this Agreement in its entirety to reflect the management, business and affairs of the Company after the admission of any such new member.

15. <u>Dissolution</u>. The Company shall be dissolved and its affairs wound up only upon the occurrence of any of the following events:

(a) The Member votes to dissolve the Company;

(b) There are no members; or

(c) The entry of a decree of judicial dissolution under Section 18-802 of the Act.

The bankruptcy (as defined in the Act) of a person (as defined in the Act) that is a Member of the Company shall not cause such person to cease to be a member. Upon dissolution of the Company, the Member shall have power and authority, and shall be and hereby is authorized and empowered to, and shall, wind up the Company's affairs.

16. <u>Winding Up, Liquidation and Distribution of Assets</u>. Upon dissolution of the Company pursuant to Section 15, the Member or a liquidator shall distribute the assets of the Company in the following order of priority:

(a) The payment of, or adequate provision for, the debts and obligations of the Company to its creditors (not including amounts owed to the Member);

(b) The establishment of such reserves as the Member or liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company;

(c) The payment of loans made to the Company by the Member; and

(d) The distribution to the Member of the balance of the assets of the Company.

Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated. The Member shall comply with any applicable requirements of the Act or other applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

17. <u>Effect of Dissolution</u>. Upon dissolution, the Company shall cease to carry on its business, and its affairs shall be wound up in accordance with Section 16 hereof and the Act.

18. <u>Certificate of Cancellation</u>. When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Member, a Certificate of Cancellation shall be executed and filed with the Secretary of State in accordance with Section 18-203 of the Act.

19. <u>Amendment</u>. This Agreement may be amended or modified from time to time only by a written instrument signed by the Member. The Certificate of Formation may be amended or modified from time to time only with the prior consent of the Member.

20. <u>Miscellaneous Provisions</u>.

(a) <u>Entire Agreement</u>. This Agreement represents the entire agreement between the Company and the Member concerning the subject matter hereof.

(b) <u>Application of Delaware Law</u>. This Agreement and the rights, remedies, duties, powers, authority, and authorization of the parties hereto and the Company hereunder shall be governed by and interpreted in accordance with the laws of the State of Delaware without regard to its conflict of law principles.

(c) <u>Banking</u>. All funds of the Company shall be deposited in its name in an account or accounts as shall be designated from time to time by the Officers. The Officers are hereby authorized and directed to open such accounts with such banks as may be selected as depositories for the Company in the discretion of any of the Officers, and to deposit therein funds of the Company, drafts, checks and notes of the Company, payments on said accounts to be made in the Company name. Any such Officer is hereby authorized to execute and deliver resolutions on such forms as may be presented or required by such banks, said forms to be completed with such information as the executing Officers may deem to be in the best interest of the Company. All such resolutions which may be required by banks hereafter selected by the Company dealing with the designation of such banks as depositories are hereby adopted as resolutions of the Board, and the Secretary or Assistant Secretary of the Company may hereafter attest to and execute such bank resolutions and/or forms without additional action of the Member or the Board.

(d) <u>No Third Party Beneficiaries</u>. Nothing in this Agreement shall be construed to create any duty, standard of care or liability of the Company, any Member, any Manager, or any affiliate or associate of the Company, any Member or any Manager, to or for the benefit of any person or entity not a party to this Agreement. Furthermore, the rights of the Company or of the Member under this Agreement to require any contributions to the capital of the Company shall not confer, nor shall they be construed as conferring, any rights or benefits to or upon any person or entity other than the Company and the Member, including, without limitation, any person or entity who has entered into any instrument of or binding upon the Company or any of its property.

(e) <u>No Conflict of Interest</u>. The Member and Managers shall not be required to act hereunder as their sole and exclusive business activity and the Member and Managers may have other business interests and engage in other activities in addition to those relating to the Company. Neither the Company, the Member nor the Managers shall have any right by virtue of this Agreement in or to any other interests or activities or to the income or proceeds derived therefrom. The Member and Managers may transact business with the Company and, subject to applicable laws, shall have the same rights and obligations with respect thereto as any other person. No transaction between the Member and the Company shall be voidable solely because the Member has a direct or indirect interest in the transaction if the transaction is fair and reasonable to the Company.

(f) <u>Execution of Additional Instruments</u>. The Member and Managers hereby agree to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

(g) <u>Construction</u>. Whenever the singular form is used in this Agreement, and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

(h) <u>Headings</u>. The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of the Agreement or any provision hereof.

(i) <u>Waivers</u>. The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

(j) <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. Any signature page of any such counterpart, or any electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart to this Agreement and any telecopy or other facsimile transmission of any signature page shall be deemed an original and shall bind such party.

(k) <u>Determination of Matters Not Provided for in this Agreement</u>. The Member shall, pursuant to Section 10, decide any questions arising with respect to the Company and this Agreement which are not specifically or expressly provided for in this Agreement.

(l) <u>Further Assurances</u>. The Member agrees to cooperate, and to execute and deliver in a timely fashion any and all additional documents necessary to effectuate the purposes of the Company and this Agreement.

(m) <u>Indemnification</u>. The Company shall indemnify to the full extent permitted by the Limited Liability Company Act of the State of Delaware or any other applicable laws as now or hereinafter in effect any person made or threatened to be made a party to any action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of

the fact that such person or such person's testator or intestate is or was a Manager or an Officer of the Company or serves or served at the request of the Company or any other enterprise as a Manager or an Officer. Expenses, including attorneys' fees, incurred by any such person in defending any such action, suit or proceeding shall be paid or reimbursed by the Company promptly upon receipt by it of an undertaking of or on behalf of such person to repay such amounts if it shall ultimately be determined that such person is not entitled to be indemnified by the Company. The rights provided to any person by this Section shall be enforceable against the Company by such person who shall be presumed to have relied upon it in serving or continuing to serve as a Manager or an Officer as provided above. No amendment of this Section shall impair the rights of any person arising at any time with respect to events occurring prior to such amendment. For purposes of this Section, the term "Company" shall include any predecessor of the Company and any constituent company (including any constituent of a constituent) absorbed by the Company in a consolidation or merger; the term "other enterprise," shall include any corporation, limited liability company, partnership, joint venture, trust or employee benefit plan; service "at the request of the Company" shall include service as a Manager or an Officer of the Company which imposes duties on, or involves services by, such Manager or Officer with respect to an employee benefit plan, its participants or beneficiaries; any excise taxes assessed on a person with respect to an employee benefit plan shall be deemed to be indemnifiable expenses; and action by a person with respect to an employee benefit plan which such person reasonably believes to be in the interest of the participants and beneficiaries of such plan shall be deemed to be action not opposed to the best interests of the Company. Notwithstanding the foregoing, no Manager or Officer shall be indemnified against liability for any intentional misconduct, any knowing violation of the law or any transaction in which such Manager or Officer receives a personal benefit in violation or breach of the Act or this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed on the date first above written.

[SIGNATURES BEGIN ON THE FOLLOWING PAGE]

11

GenOn Mid-Atlantic, LLC

/s/ J. William Holden III
Name:   J. William Holden III
Title:    Executive Vice President and Chief Financial
Officer

GenOn North America, LLC, as Member

/s/ Steven B. Nickerson
Name:  Steven B. Nickerson
Title:   Senior Vice President

12

Second Amended and Restated Limited Liability Company Agreements*
Exhibit A

Managers

| Name | Effective Date |
| --- | --- |
| Mark M. Jacobs, Chairman | December 3, 2010 |
| J. William Holden III | December 3, 2010 |
| Michael L. Jines | December 3, 2010 |

NOTE: Any current Managers not named above are hereby removed.

---

\*     GenOn Americas Generation, LLC
      GenOn Mid-Atlantic, LLC

13

Second Amended and Restated Limited Liability Company Agreements*

Exhibit B

Officers

| Name | Office | Effective Date |
|---|---|---|
| Mark M. Jacobs | President and Chief Executive Officer | December 3, 2010 |
| J. William Holden III | Executive Vice President and Chief Financial Officer | December 3, 2010 |
| Michael L. Jines | Executive Vice President, General Counsel, Secretary and Chief Compliance Officer | December 3, 2010 |
| Robert J. Gaudette | Senior Vice President and Chief Commercial Officer | December 3, 2010 |
| David S. Freysinger | Senior Vice President, Plant Operations | December 3, 2010 |
| Anne M. Cleary | Senior Vice President, Asset Management | December 3, 2010 |
| G. Gary Garcia | Senior Vice President and Treasurer | December 3, 2010 |
| Thomas C. Livengood | Senior Vice President and Controller | December 3, 2010 |
| Steven B. Nickerson | Senior Vice President and Deputy General Counsel, Corporate | December 3, 2010 |
| David Sladic | Senior Vice President and Deputy General Counsel, Assets | December 3, 2010 |
| Karen D. Taylor | Senior Vice President, Human Resources and Administration | December 3, 2010 |
| Mark R. Ogle | Vice President and Assistant Treasurer | December 3, 2010 |
| Donna Benefield | Vice President and Chief Information Officer | December 3, 2010 |
| Mat Parker | Vice President and Chief Risk Officer | December 3, 2010 |
| Phil Williamson | Vice President, Tax | December 3, 2010 |
| Bob Mickits | Vice President, Internal Audit | December 3, 2010 |
| Debra Raggio | Vice President and Assistant General Counsel, Government and Regulatory Affairs | December 3, 2010 |
| Walter Stone | Vice President and Assistant General Counsel, Environmental Policy | December 3, 2010 |
| Kevin Boudreaux | Vice President | December 3, 2010 |
| Kathy Tedore | Assistant Secretary | December 3, 2010 |
| Allison Cunningham | Assistant Secretary | December 3, 2010 |
| Lloyd Whittington | Assistant Treasurer | December 3, 2010 |

NOTE: Any current Officers not named above are hereby removed.

---

\*      GenOn Mid-Atlantic, LLC

14

# Exhibit 62

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549
# Form 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the Fiscal Year ended December 31, 2012.**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the Transition period from           to           .**

# GenOn Energy, Inc.
(Exact name of registrant as specified in its charter)

75-0655566 (I.R.S. Employer Identification No.)

Commission File Number: 001-16455

# GenOn Americas Generation, LLC
(Exact name of registrant as specified in its charter)

51-0390520 (I.R.S. Employer Identification No.)

Commission File Number: 333-63240

# GenOn Mid-Atlantic, LLC
(Exact name of registrant as specified in its charter)

58-2574140 (I.R.S. Employer Identification No.)

Commission File Number: 333-61668

**Delaware**
*(State or other jurisdiction of incorporation or organization)*

**211 Carnegie Center Princeton, New Jersey**                    **08540**
*(Address of principal executive offices)*                    *(Zip Code)*

**(609) 524-4500**
*(Registrants' telephone number, including area code)*
**Securities registered pursuant to Section 12(b) of the Act:**
**None**
**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined by Rule 405 of the Securities Act.

| | Yes | No |
|---|---|---|
| GenOn Energy, Inc. | ☐ | ☒ |
| GenOn Americas Generation, LLC | ☐ | ☒ |
| GenOn Mid-Atlantic, LLC | ☐ | ☒ |

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act.

| | Yes | No |
|---|---|---|
| GenOn Energy, Inc. | ☒ | ☐ |
| GenOn Americas Generation, LLC | ☒ | ☐ |
| GenOn Mid-Atlantic, LLC | ☒ | ☐ |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. (As a voluntary filer not subject to filing requirements, the registrant nevertheless filed all reports which would have been required to be filed by Section 15(d) of the Exchange Act during the preceding 12 months had the registrant been required to file reports pursuant to Section 15(d) of the Securities Exchange Act of 1934 solely as a result of having registered debt securities under the Securities Act of 1933.)

GenOn Energy, Inc.                         ☐ Yes     ☐ No

GenOn Americas Generation, LLC             ☐ Yes     ☐ No

GenOn Mid-Atlantic, LLC                    ☐ Yes     ☐ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

GenOn Energy, Inc.                         ☒ Yes     ☐ No

GenOn Americas Generation, LLC             ☒ Yes     ☐ No

GenOn Mid-Atlantic, LLC                    ☒ Yes     ☐ No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

GenOn Energy, Inc.                         ☒

GenOn Americas Generation, LLC             ☒

GenOn Mid-Atlantic, LLC                    ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

|  | Large accelerated filer | Accelerated filer | Non-accelerated filer | Smaller reporting company |
|---|---|---|---|---|
| GenOn Energy, Inc. | ☐ | ☐ | ☒ | ☐ |
| GenOn Americas Generation, LLC | ☐ | ☐ | ☒ | ☐ |
| GenOn Mid-Atlantic, LLC | ☐ | ☐ | ☒ | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).

GenOn Energy, Inc.                         ☐ Yes     ☒ No

GenOn Americas Generation, LLC             ☐ Yes     ☒ No

GenOn Mid-Atlantic, LLC                    ☐ Yes     ☒ No

Each Registrant's outstanding equity interests are held by its respective parent and there are no equity interests held by nonaffiliates.

| Registrant | Parent |
|---|---|
| GenOn Energy, Inc. | NRG Energy, Inc. |
| GenOn Americas Generation, LLC | GenOn Americas, Inc. |
| GenOn Mid-Atlantic, LLC | GenOn North America, LLC |

This combined Form 10-K is separately filed by GenOn Energy, Inc., GenOn Americas Generation, LLC and GenOn Mid-Atlantic, LLC. Information contained in this combined Form 10-K relating to GenOn Energy, Inc., GenOn Americas Generation, LLC and GenOn Mid-Atlantic, LLC is filed by such registrant on its own behalf and each registrant makes no representation as to information relating to registrants other than itself.

The registrants have not incorporated by reference any information into this Form 10-K from any annual report to securities holders, proxy statement or prospectus filed pursuant to 424(b) or (c) of the Securities Act.

NOTE: WHEREAS GENON ENERGY, INC., GENON AMERICAS GENERATION, LLC AND GENON MID-ATLANTIC, LLC MEET THE CONDITIONS SET FORTH IN GENERAL INSTRUCTION I(1)(a) AND (b) OF FORM 10-K, THIS COMBINED FORM 10-K IS BEING FILED WITH THE REDUCED DISCLOSURE FORMAT PURSUANT TO GENERAL INSTRUCTION I(2).

**TABLE OF CONTENTS**

| | |
|---|---|
| Glossary of Terms | 2 |
| PART I | 5 |
| Item 1 — Business | 5 |
| Item 1A — Risk Factors Related to the Registrants | 7 |
| Item 2 — Properties | 19 |
| Item 3 — Legal Proceedings | 21 |
| Item 4 — Mine Safety Disclosures | 21 |
| PART II | 22 |
| Item 5 — Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 22 |
| Item 6 — Selected Financial Data | 22 |
| Item 7 — Management's Narrative Analysis of the Results of Operations and Financial Condition | 22 |
| Item 7A — Quantitative and Qualitative Disclosures About Market Risk | 36 |
| Item 8 — Financial Statements and Supplementary Data | 40 |
| Item 9 — Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 40 |
| Item 9A — Controls and Procedures | 41 |
| Item 9B — Other Information | 41 |
| PART III | 42 |
| Item 10 — Directors, Executive Officers and Corporate Governance | 42 |
| Item 11 — Executive Compensation | 42 |
| Item 12 — Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 42 |
| Item 13 — Certain Relationships and Related Transactions, and Director Independence | 42 |
| Item 14 — Principal Accounting Fees and Services | 42 |
| PART IV | 43 |
| Item 15 — Exhibits, Financial Statement Schedules | 43 |
| EXHIBIT INDEX | 160 |

l

.

## Glossary of Terms

When the following terms and abbreviations appear in the text of this report, they have the meanings indicated below:

| | |
|---|---|
| Ancillary Services | Services that ensure reliability and support the transmission of electricity from generation sites to customer loads. Such services include regulation service, reserves and voltage support |
| ARO | Asset retirement obligation |
| ASC | The FASB Accounting Standards Codification, which the FASB established as the source of authoritative U.S. GAAP |
| ASU | Accounting Standards Updates – updates to the ASC |
| Bankruptcy Court | United States, Bankruptcy Court for the Northern District of Texas, Fort Worth Division |
| Baseload | Units expected to satisfy minimum baseload requirements of the system and produce electricity at an essentially constant rate and run continuously |
| CAA | Federal Clean Air Act |
| CAIR | Clean Air Interstate Rule |
| CAISO | California Independent System Operator |
| CCGT | Combined Cycle Gas Turbine |
| CenterPoint | CenterPoint Energy, Inc. and its subsidiaries, on and after August 31, 2002, and Reliant Energy, Incorporated and its subsidiaries, prior to August 31, 2002 |
| CFTC | U.S. Commodity Futures Trading Commission |
| Clean Water Act | Federal Water Pollution Control Act |
| $CO_2$ | Carbon dioxide |
| CSAPR | Cross-State Air Pollution Rule |
| Deactivation | Includes retirement, mothballing and long-term protective layup. In each instance, the deactivated unit cannot be currently called upon to generate electricity. |
| Dodd-Frank Act | Dodd-Frank Wall Street Reform and Consumer Protection Act |
| EPA | United States Environmental Protection Agency |
| EPC | Engineering, Procurement and Construction |
| Exchange Act | The Securities Exchange Act of 1934, as amended |
| FASB | Financial Accounting Standards Board |
| FERC | Federal Energy Regulatory Commission |
| GenOn | GenOn Energy, Inc. (formerly known as RRI Energy, Inc.) and, except where the context indicates otherwise, its subsidiaries |
| GenOn Americas | GenOn Americas, Inc. |
| GenOn Americas Generation | GenOn Americas Generation, LLC and, except where the context indicates otherwise, its subsidiaries |
| GenOn Energy Holdings | GenOn Energy Holdings, Inc. (formerly known as Mirant Corporation) and, except where the context indicates otherwise, its subsidiaries |
| GenOn Marsh Landing | GenOn Marsh Landing, LLC |
| GenOn Mid-Atlantic | GenOn Mid-Atlantic, LLC and, except where the context indicates otherwise, its subsidiaries, which include the coal generation units at two generating facilities under operating leases |
| GenOn North America | GenOn North America, LLC |
| GenOn Plans | Collectively, the NRG GenOn LTIP, The GenOn Energy, Inc. 2002 Long-Term Incentive Plan, the GenOn Energy, Inc. 2002 Stock Plan and the Mirant Corporation 2005 Omnibus Incentive Compensation Plan |
| Intermediate | Units expected to satisfy system requirements that are greater than baseload and less than peaking |

.

| | |
|---|---|
| IRC | Internal Revenue Code of 1986, as amended |
| IRC § | IRC section |
| ISO | Independent System Operator, also referred to as RTO |
| ISO-NE | ISO New England Inc. |
| Kiewit | Kiewit Power Constructors Co. |
| kWh | Kilowatt-hours |
| LIBOR | London Inter-Bank Offered Rate |
| Long-term protective layup | A descriptive term for GenOn's plans with respect to the Shawville coal-fired units, including retiring the units from service in accordance with the PJM tariff, maintenance of the units in accordance with the lease requirements and continued payment of the lease rent. Although the units are not decommissioned and reactivation remains a technical possibility, GenOn does not expect to make any further investment in environmental controls for the units. Further, reactivation after the long-term protective layup would likely involve numerous new permits and substantial additional investment. |
| MC Asset Recovery | MC Asset Recovery, LLC |
| MDE | Maryland Department of the Environment |
| Merit Order | A term used for the ranking of power stations in order of ascending marginal cost |
| Mirant | GenOn Energy Holdings, Inc. (formerly known as Mirant Corporation) and, except where the context indcates otherwise, its subsidiaries |
| Mirant/RRI Merger | The merger completed on December 3, 2010 pursuant to the Mirant/RRI Merger Agreement |
| Mirant/RRI Merger Agreement | The agreement by and among Mirant Corporation, RRI Energy, Inc. and RRI Energy Holdings, Inc. dated as of April 11, 2010 |
| Mirant/RRI Merger Exchange Ratio | The right of Mirant Corporation stockholders to receive 2.835 shares of common stock of RRI Energy, Inc. in the Mirant/RRI Merger |
| Mirant Debtors | GenOn Energy Holdings, Inc. (formerly known as Mirant Corporation) and certain of its subsidiaries |
| MISO | Midwest Independent Transmission System Operator |
| MMBtu | Million British Thermal Units |
| Mothballed | The unit has been removed from service and is unavailable for service, but has been laid up in a manner such that it can be brought back into service with an appropriate amount of notification, typically weeks or months |
| MW | Megawatts |
| MWh | Saleable megawatt hours net of internal/parasitic load megawatt-hours |
| NAAQS | National Ambient Air Quality Standards |
| Net Exposure | Counterparty credit exposure to GenOn, GenOn Americas Generation or GenOn Mid-Atlantic, as applicable, net of collateral |
| Net Generation | The net amount of electricity produced, expressed in kWhs or MWhs, that is the total amount of electricity generated (gross) minus the amount of electricity used during generation. |
| NERC | North American Electric Reliability Corporation |
| NJDEP | New Jersey Department of Environmental Protection |
| NOL | Net Operating Loss |
| NOV | Notice of violation |
| NO$_x$ | Nitrogen oxide |
| NPDES | National pollutant discharge elimination system |
| NPNS | Normal Purchase Normal Sale |
| NRG | NRG Energy, Inc. and, except where the context indicates otherwise, its subsidiaries |
| NRG GenOn LTIP | NRG 2010 Stock Plan for GenOn employees |

3

| | |
|---|---|
| NRG Merger | The merger completed on December 14, 2012 pursuant to the NRG Merger Agreement |
| NRG Merger Agreement | The agreement by and among NRG, GenOn and Plus Merger Corporation (a direct wholly-owned subsidiary of NRG) dated as of July 20, 2012 |
| NRG Merger Exchange Ratio | The right of GenOn Energy, Inc. stockholders to receive 0.1216 shares of common stock of NRG Energy, Inc. in the NRG Merger |
| NYISO | New York Independent System Operator |
| NYMEX | New York Mercantile Exchange |
| OCI | Other comprehensive income |
| PADEP | Pennsylvania Department of Environmental Protection |
| Peaking | Units expected to satisfy demand requirements during the periods of greatest or peak load on the system |
| PG&E | Pacific Gas & Electric |
| PJM | PJM Interconnection, LLC |
| PJM market | The wholesale and retail electric market operated by PJM primarily in all or parts of Delaware, the District of Columbia, Illinois, Maryland, New Jersey, Ohio, Pennsylvania, Virginia and West Virginia |
| Plan | The plan of reorganization that was approved in conjunction with Mirant Corporation's emergence from bankruptcy protection on January 3, 2006 |
| PPA | Power Purchase Agreement |
| Registrants | GenOn, GenOn Americas Generation and GenOn Mid-Atlantic, collectively |
| REMA | GenOn REMA, LLC and its subsidiaries, which include three generating facilities under operating leases |
| Repowering | Technologies utilized to replace, rebuild, or redevelop major portions of an existing electrical generating facility, not only to achieve a substantial emission reduction, but also to increase facility capacity, and improve system efficiency |
| Retirement | The unit has been removed from service and is unavailable for service and not expected to return to service in the future. |
| RGGI | Regional Greenhouse Gas Initiative |
| RMR | Reliability Must-Run |
| RRI Energy | RRI Energy, Inc. |
| RTO | Regional Transmission Organization |
| SEC | United States Securities and Exchange Commission |
| Securities Act | The Securities Act of 1933, as amended |
| $SO_2$ | Sulfur dioxide |
| Southern Company | The Southern Company |
| Stone & Webster | Stone & Webster, Inc. |
| U.S. | United States of America |
| U.S. GAAP | U.S. Generally accepted accounting principles |
| VIE | Variable Interest Entity |

PART I

**Item 1 — Business (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

**General**

The Registrants are wholesale power generation subsidiaries of NRG, which aspires to be a leader in the way the industry and consumers think about, use, produce and deliver energy and energy services in major competitive power markets in the United States. GenOn is an indirect wholly-owned subsidiary of NRG. GenOn Americas Generation and GenOn Mid-Atlantic are indirect wholly-owned subsidiaries of GenOn. GenOn Mid-Atlantic is a wholly-owned subsidiary of GenOn North America and an indirect wholly-owned subsidiary of GenOn Americas Generation. The Registrants are engaged in the ownership and operation of power generation facilities; the trading of energy, capacity and related products; and the transacting in and trading of fuel and transportation services**.**

The Registrants' generation facilities are located in the U.S. and comprise generation facilities across the merit order. The sale of capacity and power from baseload and intermediate generation facilities accounts for a majority of the Registrants' generation revenues. In addition, the Registrants' generation portfolio provides each with opportunities to capture additional revenues by selling power during periods of peak demand, offering capacity or similar products, and providing ancillary services to support system reliability.

GenOn previously had the following segments: Eastern PJM, Western PJM/MISO, California, Energy Marketing and Other Operations. GenOn Americas Generation previously had the following segments: Eastern PJM, Northeast, California, Energy Marketing and Other Operations. In the fourth quarter of 2012, in conjunction with the NRG Merger, GenOn and GenOn Americas Generation began reporting the following segments: East, South Central, West and Corporate, with GenOn Mid-Atlantic operating only in the East.

The following table summarizes GenOn's generation portfolio as of December 31, 2012, by operating segment. Also included is one natural gas plant currently under construction.

| Generation Type | East | South Central | West | Total |
|---|---|---|---|---|
| | | **(In MW)** | | |
| Natural gas | 6,390 | 1,200 | 5,390 | 12,980 |
| Coal | 6,380 | — | — | 6,380 |
| Oil | 2,080 | — | — | 2,080 |
| Total generation capacity | 14,850 | 1,200 | 5,390 | 21,440 |
| | | | | |
| **Under Construction** | | | | |
| Natural gas | — | — | 720 | 720 |

The following table summarizes GenOn Americas Generation's generation portfolio as of December 31, 2012, by operating segment.

| Generation Type | East | West | Total |
|---|---|---|---|
| | | **(In MW)** | |
| Natural gas | 2,940 | 1,985 | 4,925 |
| Coal | 2,430 | — | 2,430 |
| Oil | 1,450 | — | 1,450 |
| Total generation capacity | 6,820 | 1,985 | 8,805 |

5

.

The following table summarizes GenOn Mid-Atlantic's generation portfolio as of December 31, 2012.

| | (In MW) |
|---|---|
| **Generation Type** | **East** |
| Natural gas | 1,945 |
| Coal | 2,430 |
| Oil | 305 |
| Total generation capacity | 4,680 |

## NRG Merger

On December 14, 2012, NRG completed the acquisition of GenOn.  NRG issued, as consideration for the acquisition, 0.1216 shares of NRG common stock for each outstanding share of GenOn, including restricted stock units outstanding, on the acquisition date, except for fractional shares which were paid in cash.  See Item 15- Note 3, *NRG Merger,* to the Consolidated Financial Statements.

## Competition

Wholesale power generation is a capital-intensive, commodity-driven business with numerous industry participants. The Registrants compete on the basis of the location of their plants and ownership of portfolios of plants in various regions, which increases the stability and reliability of its energy revenues. Wholesale power generation is a regional business that is currently highly fragmented and diverse in terms of industry structure. As such, there is a wide variation in terms of the capabilities, resources, nature and identity of the companies the Registrants compete with depending on the market. Competitors include regulated utilities, other independent power producers, and power marketers or trading companies, including those owned by financial institutions, municipalities and cooperatives.

## Competitive Strengths

The Registrants' power generation assets are diversified by fuel-type, dispatch level and region, which helps mitigate the risks associated with fuel price volatility and market demand cycles. The Registrants' baseload and intermediate facilities provide each with a significant source of cash flow, while the peaking facilities provide the Registrants with opportunities to capture upside potential that can arise from time to time during periods of high demand.

Many of the Registrants' generation assets are located within densely populated areas, which tend to have more robust wholesale pricing as a result of relatively favorable local supply-demand balance. The Registrants have generation assets located in or near the New York City, Washington, D.C., Baltimore, Pittsburgh, Los Angeles and San Francisco metropolitan areas and New Jersey. These facilities are often ideally situated for repowering or the addition of new capacity, because their location and existing infrastructure give them significant advantages over undeveloped sites.

## On-going Development Project — Conventional Power Development

GenOn is continuing construction of its Marsh Landing project, a 720 MW natural gas-fired peaking generation facility adjacent to GenOn's Contra Costa generation facility near Antioch, California. The Marsh Landing project is being constructed pursuant to a 10-year PPA with PG&E. GenOn expects a commercial operation date in mid-2013.

## Regulatory Matters

As operators of power plants and participants in wholesale energy markets, certain of the Registrants' entities are subject to regulation by various federal and state government agencies. These include the Commodities Futures Trading Commission and the FERC, as well as other public utility commissions in certain states where the Registrants' generating assets are located. In addition, the Registrants are subject to the market rules, procedures and protocols of the various ISO markets in which they participate. The Registrants must also comply with the mandatory reliability requirements imposed by NERC and the regional reliability entities in the regions where they operate.

**Environmental Matters**

The Registrants are subject to a wide range of federal, state and local environmental laws in the development, ownership, construction and operation of projects. These laws generally require that governmental permits and approvals be obtained before construction and maintained during the operation of power plants. Environmental laws have become increasingly stringent and the Registrants expect this trend to continue. The electric generation industry will face new requirements to address air emissions, climate change, ash (and other waste), water use, water discharges, and threatened and endangered species. In general, future laws are expected to require adding emission controls or other environmental controls or impose restrictions on the Registrants' operations. Complying with environmental requirements involves significant capital and operating expenses. The Registrants decide to invest capital for environmental controls based on relative certainty of the requirements, an evaluation of compliance options, and the expected economic returns on capital.

**Environmental Capital Expenditures**

Based on current rules, technology and plans as well as preliminary plans based on proposed rules, GenOn estimates that environmental capital expenditures from 2013 through 2017 required to meet GenOn's regulatory environmental commitments will be approximately $232 million for GenOn, which includes $46 million for GenOn Americas Generation. The $46 million for GenOn Americas Generation includes $4 million for GenOn Mid-Atlantic. These costs are primarily associated with controls to satisfy mercury and air toxics standards as well as $NO_x$ controls. The Registrants continue to explore cost effective compliance alternatives to reduce costs.

If market conditions and/or environmental and regulatory factors or assumptions change in the future, forecasted returns on investments necessary to comply with environmental regulations could change resulting in possible incremental investments if returns improve or deactivation of additional generating units or facilities if returns deteriorate. Such deactivations could result in additional charges, including impairments, severance costs and other plant shutdown costs. See Item 15- Note 9, *Retirements, Mothballing or Long-Term Protective Layup of Generating Facilities,* to the Consolidated Financial Statements.

**Employees**

As of December 31, 2012, GenOn had 2,932 employees of which 899 employees were part of GenOn Americas Generation and 585 employees were part of GenOn Mid-Atlantic, approximately 50%, 63% and 70%, respectively, of whom were covered by bargaining agreements. During 2012, the Registrants did not experience any labor stoppages or labor disputes at any of their facilities.

***Available Information***

The Registrants' annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports filed or furnished pursuant to section 13(a) or 15(d) of the Exchange Act are available free of charge through NRG's website, www.nrgenergy.com, as soon as reasonably practicable after they are electronically filed with, or furnished to the SEC.

**Item 1A — Risk Factors (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

The Registrants are subject to the following factors that could have a material adverse effect on their future performance, results of operations, financial condition and cash flows. In addition, such factors could affect their ability to service indebtedness and other obligations, to raise capital and could affect their future growth opportunities. Also, see "Cautionary Statement Regarding Forward-Looking Information" and "Management's Narrative Analysis of the Results of Operations and Financial Condition" in Item 7 of this Annual Report on Form 10-K.

**Risks Related to the Operation of the Registrants' Businesses**

***GenOn is a wholly-owned subsidiary of NRG and is highly dependent on NRG for services under a master services agreement. (GenOn)***

   GenOn relies on NRG for its administrative and management functions and services including human resources-related functions, accounting, tax administration, information systems, legal services, treasury and planning, operations and asset management, risk and commercial operations, and other support services under a management services agreement. GenOn anticipates continuing to rely upon NRG to provide many of these services. If NRG terminates the management services agreement or defaults in the performance of its obligations under the agreement, GenOn may be unable to contract with a substitute service provider on similar terms or at all, and the costs of substituting service providers may be substantial. In addition, in light of NRG's familiarity with GenOn's assets, a substitute service provider may not be able to provide the same level of service due to lack of preexisting synergies. If GenOn cannot locate a service provider that is able to provide it with substantially similar services as NRG does under the management services agreement on similar terms, it would likely have a material adverse effect on GenOn's business, financial condition, results of operation and cash flows.

***The Registrants' financial results are unpredictable because most of their generating facilities operate without long-term power sales agreements, and their revenues and results of operations depend on market and competitive forces that are beyond their control.***

   The Registrants provide energy, capacity, ancillary and other energy services from their generating facilities in a variety of markets and to bilateral counterparties, including participating in wholesale energy markets, entering into tolling agreements, sales of resource adequacy and participation in capacity auctions. The Registrants revenues from selling capacity are a significant part of their overall revenues. The Registrants are not guaranteed recovery of their costs or any return on their capital investments through mandated rates.

   The market for wholesale electric energy and energy services reflects various market conditions beyond the Registrants' control, including the balance of supply and demand, transmission congestion, competitors' marginal and long-term costs of production, the price of fuel, and the effect of market regulation. The price at which the Registrants can sell their output may fluctuate on a day-to-day basis, and their ability to transact may be affected by the overall liquidity in the markets in which the Registrants operate. These markets remain subject to regulations that limit their ability to raise prices during periods of shortage to the degree that would occur in a fully deregulated market. In addition, unlike most other commodities, electric energy can be stored only on a very limited basis and generally must be produced at the time of use. As a result, the wholesale power markets are subject to substantial price fluctuations over relatively short periods of time and can be unpredictable.

   The Registrants' revenues, results of operations and cash flows are influenced by factors that are beyond their control, including those set forth above, as well as:

   • the failure of market regulators to develop and maintain efficient mechanisms to compensate merchant generators for the value of providing capacity needed to meet demand;

   • actions by regulators, ISOs, RTOs and other bodies that may artificially modify supply and demand levels and prevent capacity and energy prices from rising to the level necessary for recovery of the Registrants' costs, investment and an adequate return on investment;

   • legal and political challenges to or changes in the rules used to calculate capacity payments in the markets in which the Registrants operate or the establishment of bifurcated markets, incentives, other market design changes or bidding requirements that give preferential treatment to new generating facilities over existing generating facilities or otherwise reduce capacity payments to existing generating facilities;

   • the ability of wholesale purchasers of power to make timely payment for energy or capacity, which may be adversely affected by factors such as retail rate caps, refusals by regulators to allow utilities to recover fully their wholesale power costs and investments through rates, catastrophic losses and losses from investments by utilities in unregulated businesses;

   • increases in prevailing market prices for fuel oil, coal, natural gas and emission allowances that may not be reflected in prices the Registrants receive for sales of energy;

- increases in electricity supply as a result of actions of the Registrants' current competitors or new market entrants, including the development of new generating facilities or alternative energy sources that may be able to produce electricity less expensively than the Registrants' generating facilities and improvements in transmission that allow additional supply to reach their markets;

- increases in credit standards, margin requirements, market volatility or other market conditions that could increase the Registrants' obligations to post collateral beyond amounts that are expected, including additional collateral costs associated with OTC hedging activities as a result of future OTC regulations adopted pursuant to the Dodd-Frank Act;

- decreases in energy consumption resulting from demand-side management programs such as automated demand response, which may alter the amount and timing of consumer energy use;

- the competitive advantages of certain competitors, including continued operation of older power facilities in strategic locations after recovery of historic capital costs from ratepayers;

- existing or future regulation of the markets in which the Registrants operate by the FERC, ISOs and RTOs, including any price limitations and other mechanisms to address some of the price volatility or illiquidity in these markets or the physical stability of the system;

- the Registrants' obligation under any default sharing mechanisms in RTO and ISO markets, such mechanisms exist to spread the risk of defaults by transmission owning companies or other RTO members across all market participants;

- regulatory policies of state agencies that affect the willingness of the Registrants' customers to enter into long-term contracts generally, and contracts for capacity in particular;

- access to contractors and equipment;

- changes in the rate of growth in electricity usage as a result of such factors as national and regional economic conditions and implementation of conservation programs;

- seasonal variations in energy and natural gas prices, and capacity payments; and

- seasonal fluctuations in weather, in particular abnormal weather conditions.

The Registrants expect that higher earnings from price increases resulting from industry retirements will more than offset reduced earnings from unit deactivations. However, as discussed above, the market for wholesale electric energy and energy services reflects various market conditions beyond the Registrants' control, including the balance of supply and demand, the Registrants' competitors' marginal and long-term costs of production, and the effect of market regulation. The Registrants cannot ensure that higher earnings or price increases will result from industry retirements of coal-fired generating facilities or that higher earnings from their remaining facilities will offset or more than offset reduced earnings from facility deactivations.

***Changes in the wholesale energy markets or in the Registrants generating facility operations as a result of increased environmental requirements could result in impairments or other charges.***

If the ongoing evaluation of the Registrants' business results in decisions to deactivate or dispose of additional facilities, the Registrants could have impairments or other charges. These evaluations involve significant judgments about the future. Actual future market prices, project costs and other factors could be materially different from current estimates.

***GenOn's Marsh Landing development project is subject to construction risks and, if GenOn is unsuccessful in addressing those risks, it may not recover its investment in the project or its return on the project may be lower than expected. (GenOn)***

GenOn's return on the Marsh Landing development project may be lower than expected if GenOn Marsh Landing does not complete construction of the generating facility by the required completion date under its long-term PPA with PG&E. Should the facility fail to be operational or not perform as required under the terms of the PPA, PG&E may have the right to terminate the PPA. Not reaching a commercial operation date by December 31, 2013 would trigger an event of default under the GenOn Marsh Landing credit facility. In addition, a termination of the PPA would trigger an event of default under the GenOn Marsh Landing credit facility. As there is currently no wholesale capacity market in California, if PG&E were to terminate the PPA, the ability to refinance the project would likely be limited. GenOn Marsh Landing's contingent obligations for delay damages or termination payments under the PPA were $80 million at December 31, 2012. See Item 15 — Note 23, *Guarantees*, to the Consolidated Financial Statements for a discussion of letters of credit issued and surety bonds posted to secure GenOn Marsh Landing's obligations to PG&E in connection with the Marsh Landing development project.

***The Registrants are exposed to the risk of fuel cost volatility because they must pre-purchase coal and oil.***

Most of the Registrants fuel contracts are at fixed prices with terms of two years or less. Although the Registrants purchase coal and oil based on expected requirements, they still face the risks of fuel price volatility if they require more fuel than expected.

The Registrants cost of fuel may not reflect changes in energy and fuel prices in part because they must pre-purchase inventories of coal and oil for reliability and dispatch requirements, and thus the price of fuel may have been determined at an earlier date than the price of energy generated from the fuel. Similarly, the price the Registrants can obtain from the sale of energy may not rise at the same rate, or may not rise at all, to match a rise in fuel costs.

***The Registrants are exposed to the risk of their fuel providers and fuel transportation providers failing to perform.***

For the Registrants coal-fired generating facilities, they purchase most of their coal from a limited number of suppliers. Because of a variety of operational issues, the Registrants' coal suppliers may not provide the contractual quantities on the dates specified within the agreements, or the deliveries may be carried over to future periods. Also, interruptions to planned or contracted deliveries to the Registrants' generating facilities can result from a lack of, or constraints in, coal transportation because of rail, river or road system disruptions, adverse weather conditions and other factors.

If the Registrants' coal suppliers do not perform in accordance with the agreements, they may have to procure higher priced coal in the market to meet their needs, or higher priced power in the market to meet their obligations. In addition, generally the Registrants coal suppliers do not have investment grade credit ratings nor do they post collateral with the Registrants and, accordingly, the Registrants may have limited ability to collect damages in the event of default by such suppliers.

For the Registrants' oil-fired generating facilities, the Registrants typically purchase fuel from a limited number of suppliers. If the Registrants' oil suppliers do not perform in accordance with the agreements, they may have to procure higher priced oil in the market to meet their needs, or higher priced power in the market to meet their obligations. For the Registrants' gas-fired generating facilities, any curtailments or interruptions on transporting pipelines could result in curtailment of operations or increased fuel supply costs.

***Operation of the Registrants' generating facilities involve risks that could result in disruption, curtailment or inefficiencies in their operations.***

The operation of the Registrants' generating facilities involves various operating risks, including, but not limited to:

- the output and efficiency levels at which those generating facilities perform;
- interruptions in fuel supply and quality of available fuel;
- disruptions in the delivery of electricity;
- adverse zoning;
- breakdowns or equipment failures (whether a result of age or otherwise);
- violations of permit requirements or changes in the terms of, or revocation of, permits;
- releases of pollutants and hazardous substances to air, soil, surface water or groundwater;
- ability to transport and dispose of coal ash at reasonable prices;
- curtailments or other interruptions in natural gas supply;
- shortages of equipment or spare parts;
- labor disputes, including strikes, work stoppages and slowdowns;
- the aging workforce at many of the Registrants' facilities;
- operator errors;
- curtailment of operations because of transmission constraints;
- failures in the electricity transmission system which may cause large energy blackouts;
- implementation of unproven technologies in connection with environmental improvements; and
- catastrophic events such as fires, explosions, floods, earthquakes, hurricanes or other similar occurrences.

These factors could result in a material decrease, or the elimination of, the revenues generated by the Registrants' facilities or a material increase in the Registrants' costs of operations.

***The Registrants operate in a limited number of markets and a significant portion of revenues are derived from the PJM market. The effect of adverse developments in the markets, especially the PJM market, may be greater on the Registrants than on more geographically diversified competitors.***

GenOn's generating capacity is 57% in PJM, 25% in CAISO, 10% in NYISO and ISO-NE, 6% in the Southeast and 2% in MISO. GenOn Americas Generation's generating capacity is 53% in PJM, 23% in CAISO and 24% in NYISO and ISO-NE. All of GenOn Mid-Atlantic's generating capacity is in PJM. Approximately 78% of GenOn's gross margin during 2012 was attributable to the East operating segment. Adverse developments in these regions, especially in the PJM market, may adversely affect the Registrants. Further, the effect of such adverse regional developments may be greater on the Registrants than on more geographically diversified competitors.

***The Registrants are exposed to possible losses that may occur from the failure of a counterparty to perform according to the terms of a contractual arrangement, particularly in connection with GenOn Mid-Atlantic's non-collateralized power hedges with financial institutions.***

Non-collateralized power hedges with financial institutions represent 24% of the net notional power position for GenOn, 35% of the net notional power position for GenOn Americas Generation and 35% of the net notional power position for GenOn Mid-Atlantic at December 31, 2012. Such hedges are senior unsecured obligations of GenOn Mid-Atlantic and the counterparties, and do not require either party to post cash collateral for initial margin or for securing exposure as a result of changes in power or natural gas prices. Deterioration in the financial condition of such counterparties could result in their failure to pay amounts owed to GenOn Mid-Atlantic or to perform obligations or services owed to GenOn Mid-Atlantic beyond collateral posted.

***Changes in technology may significantly affect the Registrants' generating business by making their generating facilities less competitive.***

The Registrants generate electricity using fossil fuels at large central facilities. This method results in economies of scale and lower costs than newer technologies such as fuel cells, microturbines, windmills and photovoltaic solar cells. It is possible that advances in those technologies, or governmental incentives for renewable energies, will reduce their costs to levels that are equal to or below that of most central station electricity production.

***The expected decommissioning and/or site remediation obligations of certain of the Registrants' generating facilities may negatively affect their cash flows.***

Some of the Registrants' generating facilities and related properties are subject to decommissioning and/or site remediation obligations that may require material expenditures. Furthermore, laws and regulations may change to impose material additional decommissioning and remediation obligations on the Registrants in the future.

***Terrorist attacks and/or cyber-attacks may result in the Registrants' inability to operate and fulfill their obligations, and could result in material repair costs.***

As power generators, the Registrants face heightened risk of terrorism, including cyber terrorism, either by a direct act against one or more of their generating facilities or an act against the transmission and distribution infrastructure that is used to transport the power. Although the entire industry is exposed to these risks, the Registrants' generating facilities and the transmission and distribution infrastructure located in the PJM market are particularly at risk because of the proximity to major population centers, including governmental and commerce centers.

The Registrants rely on information technology networks and systems to operate their generating facilities, engage in asset management activities, and process, transmit and store electronic information. Security breaches of this information technology infrastructure, including cyber-attacks and cyber terrorism, could lead to system disruptions, generating facility shutdowns or unauthorized disclosure of confidential information related to their employees, vendors and counterparties. Confidential information includes banking, vendor, counterparty and personal identity information.

Systemic damage to one or more of the Registrants' generating facilities and/or to the transmission and distribution infrastructure could result in the inability to operate in one or all of the markets the Registrants serve for an extended period of time. If the Registrants' generating facilities are shut down, they would be unable to respond to the ISOs and RTOs or fulfill their obligations under various energy and/or capacity arrangements, resulting in lost revenues and potential fines, penalties and other liabilities. Pervasive cyber-attacks across the industry could affect the ability of ISOs and RTOs to function in some regions. The cost to restore the Registrants' generating facilities after such an occurrence could be material.

***The Registrants' operations are subject to hazards customary to the power generating industry. The Registrants may not have adequate insurance to cover all of these hazards.***

Power generation involves hazardous activities, including acquiring, transporting and unloading fuel, operating large pieces of high-speed rotating equipment and delivering electricity to transmission and distribution systems. In addition to natural risks (such as earthquake, flood, storm surge, lightning, hurricane, tornado and wind), hazards (such as fire, explosion, collapse and machinery failure) are inherent risks in the Registrants' operations. The Registrants are also susceptible to terrorist attacks, including cyber-attacks, against their generating facilities or the transmission and distribution infrastructure that is used to transport their power. These hazards can cause significant injury to personnel or loss of life, severe damage to and destruction of property, plant and equipment, contamination of, or damage to, the environment and suspension of operations. The occurrence of any one of these events may result in one or more of the Registrants being named as a defendant in lawsuits asserting claims for substantial damages, environmental cleanup costs, personal injury and fines and/or penalties. The Registrants do not maintain specialized insurance for possible liability resulting from a cyber-attack on their systems that may shut down all or part of the transmission and distribution system. However, the Registrants maintain an amount of insurance protection that they consider adequate and customary for merchant power producers. The Registrants cannot assure that their insurance will be sufficient or effective under all circumstances and against all hazards or liabilities to which they may be subject.

***Lawsuits, regulatory proceedings and tax proceedings could adversely affect the Registrants' future financial results.***

From time to time, the Registrants are named as a party to, or their property is the subject of, lawsuits, regulatory proceedings or tax proceedings. The Registrants are currently involved in various proceedings which involve highly subjective matters with complex factual and legal questions. Their outcome is uncertain. Any claim that is successfully asserted against the Registrants could require significant expenditures by them. Even if the Registrants prevail, any proceedings could be costly and time-consuming, could divert the attention of management and key personnel from their business operations and could result in adverse changes in their insurance costs. See Item 15 — Note 17, *Income Taxes*, Note 20, *Commitments and Contingencies*, Note 21, *Regulatory Matters*, and Note 22, *Environmental Matters*, to the Consolidated Financial Statements.

### Risks Related to Economic and Financial Market Conditions

***The Registrants are exposed to systemic risk of the financial markets and institutions and the risk of non-performance of the individual lenders under GenOn's undrawn credit facilities.***

Maintaining sufficient liquidity in the Registrants' business for maintenance and operating expenditures, capital expenditures and collateral is crucial in order to mitigate the risk of future financial distress to the Registrants. Accordingly, GenOn maintains a revolving credit facility with NRG to manage its expected liquidity needs and contingencies.

GenOn Marsh Landing has significant undrawn availability under the GenOn Marsh Landing credit facility. A significant portion of the remaining Marsh Landing project costs are expected to be funded through drawings under the GenOn Marsh Landing credit facility. The failure of the lenders to perform under the Marsh Landing credit facility could have a material adverse effect on the ability to complete construction of the Marsh Landing facility.

***A negative market perception of the Registrants' value could impair their ability to issue or refinance debt.***

A sustained downturn in general economic conditions, including low power and commodity prices, could result in a perceived weakness in the Registrants' overall financial health.

A negative market perception of the Registrants' value could result in their inability to obtain and maintain an appropriate credit rating. In this event, they may be unable to access debt markets or refinance future debt maturities, or they may be required to post additional collateral to operate their business.

***As financial institutions consolidate and operate under more restrictive capital constraints and regulations, including the Dodd-Frank Act, there could be less liquidity in the energy and commodity markets for hedge transactions and fewer creditworthy counterparties.***

The Registrants hedge economically a substantial portion of their PJM coal-fired generation and certain of their other generation. A significant portion of their hedges are financial swap transactions between GenOn Mid-Atlantic and financial counterparties that are senior unsecured obligations of such parties and do not require either party to post cash collateral, either for initial margin or for securing exposure as a result of changes in power or natural gas prices. Global financial institutions have been active participants in these energy and commodity markets. As global financial institutions consolidate and operate under more restrictive capital constraints and regulations, including the Dodd-Frank Act, there could be less liquidity in the energy and commodity markets, which could have a material adverse effect on the Registrants' ability to hedge economically and transact with creditworthy counterparties.

***The Registrants' business is subject to substantial governmental regulation and may be adversely affected by legislative or regulatory changes, as well as liability under, or any future inability to comply with, existing or future regulations or requirements.***

The CFTC, among other things, has regulatory authority over the trading of physical commodities, futures and other derivatives under the Commodity Exchange Act. On July 21, 2010, President Obama signed the Dodd-Frank Act, which, among other things, aims to improve transparency and accountability in the futures and derivatives markets. The Dodd-Frank Act increased the CFTC's regulatory authority on matters related to futures and over-the-counter derivatives trading, including, but not limited to, trading practices, trade clearance, transaction reporting and recordkeeping, position limits, and market participant capital and margin requirements. The Dodd-Frank Act further defined several new categories of regulated market participants, including swap dealers and major swap participants, both of which must meet extensive compliance requirements. The Registrants have reached the conclusion that they are neither a swap dealer nor a major swap participant and have taken and will continue to take measures to otherwise comply with the Dodd-Frank Act.

The Registrants expect that, in 2013 and thereafter, the CFTC will further clarify the scope of the Dodd-Frank Act and publish additional rules concerning central clearing requirements, position limits, margin requirements, the definition of a "swap" and other issues that will affect futures and over-the-counter derivatives trading. Because there are many details that remain to be addressed through CFTC rulemaking proceedings, at this time, the Registrants cannot fully measure the impact on their current operations or collateral requirements.

***Many of the factors that cause changes in commodity prices are outside the Registrants' control and may materially increase their cost of producing power or lower the price at which they are able to sell their power.***

The Registrants' generating business is subject to changes in power prices and fuel and emission costs, and these commodity prices are influenced by many factors outside the Registrants' control, including weather, seasonal variation in supply and demand, market liquidity, transmission and transportation inefficiencies, availability of competitively priced alternative energy sources, demand for energy commodities, production of natural gas, coal and crude oil, natural disasters, wars, embargoes and other catastrophic events, and federal, state and environmental regulation and legislation. In addition, significant fluctuations in the price of natural gas may cause significant fluctuations in the price of electricity. Significant fluctuations in commodity prices may affect the financial results and financial position by increasing the cost of producing power and decreasing the amounts the Registrants receive from the sale of power.

***The Registrants' hedging activities will not fully protect them from fluctuations in commodity prices.***

The Registrants engage in hedging activities related to sales of electricity and purchases of fuel and emission allowances. The income and losses from these activities are recorded as operating revenues and cost of operations. The Registrants may use forward contracts and other derivative financial instruments to manage market risk and exposure to volatility in prices of electricity, coal, natural gas, emissions and oil. The effectiveness of these hedges is dependent upon the correlation between the forward contracts and the other derivative financial instruments used as a hedge and the market risk of the asset or assets being hedged. The Registrants cannot provide assurance that these strategies will be successful in managing their price risks, or that they will not result in net losses to the Registrants as a result of future volatility in electricity, fuel and emission markets. Actual power prices and fuel costs may differ from expectations.

The Registrants hedging activities include natural gas derivative financial instruments that they use to hedge economically power prices for their baseload generation. The effectiveness of these hedges is dependent upon the correlation between power and natural gas prices in the markets where the Registrants operate. If those prices are not sufficiently correlated, the Registrants' financial results and financial position could be adversely affected.

Additionally, GenOn and GenOn Americas Generation expect to have an open position in the market, within their established guidelines, resulting from their fuel and emissions management activities. To the extent open positions exist, fluctuating commodity prices can affect their financial results and financial position, either favorably or unfavorably. As a result of these and other factors, the Registrants cannot predict the outcome that risk management decisions may have on their business, operating results or financial position. Although management devotes considerable attention to these issues, their outcome is uncertain.

***The Registrants' policies and procedures cannot eliminate the risks associated with their hedging activities.***

The risk management procedures the Registrants have in place may not always be followed or may not always work as planned. If any of the employees were able to violate the system of internal controls, including the risk management policy, and engage in unauthorized hedging and related activities, it could result in significant penalties and financial losses. In addition, risk management tools and metrics such as value at risk, gross margin at risk, and stress testing are partially based on historic price movements. If price movements significantly or persistently deviate from historical behavior, risk limits may not fully protect the Registrants from significant losses.

***The Registrants' hedging and GenOn Americas Generation's fuel oil management activities may increase the volatility of the U.S. GAAP financial results.***

Derivatives from the Registrants' hedging and GenOn Americas Generation's fuel oil management activities are recorded on the balance sheets at fair value pursuant to the accounting guidance for derivative financial instruments. Other than interest rate swaps into which GenOn entered to manage its interest rate risk associated with the GenOn Marsh Landing project financing, none of the Registrants' other derivatives recorded at fair value is designated as a hedge under this guidance, and changes in their fair values currently are recognized in earnings as unrealized gains or losses. As a result, the Registrants' U.S. GAAP financial results-including gross margin, operating income and balance sheet ratios-will, at times, be volatile and subject to fluctuations in value primarily because of changes in forward electricity and fuel prices.

### Risks Related to Governmental Regulation and Laws

***The Registrants costs of compliance with environmental laws are significant and can affect their future operations and financial results.***

The Registrants are subject to extensive and evolving environmental regulations, particularly in regard to their coal- and oil-fired facilities. Environmental laws, particularly with respect to air emissions, disposal of ash, wastewater discharge and cooling water systems, are generally becoming more stringent, which may require the Registrants to make additional facility upgrades or restrict their operations. Failure to comply with environmental requirements could require the Registrants to shut down or reduce production at their facilities or create liabilities. The Registrants incur significant costs in complying with these regulations and, if they fail to comply, could incur significant penalties. The Registrants cost estimates for environmental compliance are based on existing regulations or their view of reasonably likely regulations, and their assessment of the costs of labor and materials and the state of evolving technologies. The Registrants decision to make these investments is often subject to future market conditions. Changes to the preceding factors, new or revised environmental regulations, litigation and new legislation and/or regulations, as well as other factors, could cause their actual costs to vary outside the range of their estimates, further constrain their operations, increase their environmental compliance costs and/or make it uneconomical to operate some of their facilities.

Federal, state and regional initiatives to regulate greenhouse gas emissions could have a material impact on the Registrants' financial performance and condition. The actual impact will depend on a number of factors, including the overall level of greenhouse gas reductions required under any such regulations, the final form of the regulations or legislation, and the price and availability of emission allowances if allowances are a part of any final regulatory framework.

The Registrants are required to surrender emission allowances equal to emissions of specific substances to operate their facilities. Surrender requirements may require purchase of allowances, which may be unavailable or only available at costs that would make it uneconomical to operate their facilities.

Certain environmental laws, including Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 and comparable state laws, impose strict and, in many circumstances, joint and several liability for costs of remediating contamination. Some of the Registrants' facilities have areas with known soil and/or groundwater contamination. The Registrants could be required to spend significant sums to remediate contamination, regardless of whether they caused such contamination, (a) if there are releases or discoveries of hazardous substances at their generating facilities, at disposal sites they currently use or have used, or at other locations for which they may be liable, or (b) if parties contractually responsible to them for contamination fail to or are unable to respond when claims or obligations regarding such contamination arise.

***Under current and forecasted market conditions, capital expenditures required by GenOn's permit for the Shawville facility are not economic. (GenOn)***

GenOn's NPDES permit requires installation of cooling towers or reduction in plant operation by July 2015 at its leased Shawville facility. Accordingly, GenOn plan's to place the coal-fired units at the Shawville facility, which is leased, in a long-term protective layup in April 2015. Under the lease agreement for Shawville, GenOn's obligations generally are to pay the required rent and to maintain the leased assets in accordance with the lease documentation, including in compliance with prudent competitive electric generating industry practice and applicable laws. GenOn will continue to evaluate its options under the lease, including termination of the lease for economic obsolescence and/or keeping the facility in long-term protective layup during the term of the lease. In the event of an early termination, GenOn would seek a termination for obsolescence under the lease agreement and could be required to make a termination payment equal to the difference between the termination value and the proceeds received in connection with the sale of the facility to a third-party, together with such other amounts, if any, required under the lease. At December 31, 2012, the total notional minimum lease payments for the remaining terms of the lease aggregated $193 million and the termination value for the lease was $220 million.

***The Registrants' coal-fired generating units produce certain byproducts that involve extensive handling and disposal costs and are subject to government regulation. Changes in these regulations, or their administration, by legislatures, state and federal regulatory agencies, or other bodies may affect the costs of handling and disposing of these byproducts.***

As a result of the coal combustion process, the Registrants produce significant quantities of ash at their coal-fired generating units that must be disposed of at sites permitted to handle ash. One of the Registrants' landfills in Maryland has reached design capacity and it is expected that another site in Maryland may reach full capacity in the next few years. As a result, the Registrants are developing new ash management facilities and have constructed a facility to prepare ash from certain of the Maryland facilities for beneficial uses. However, the costs associated with developing new ash management facilities could be material, and the amount of time to complete such developments could extend beyond the time when new facilities are needed. Likewise, the new facility for preparing ash for beneficial uses may not operate as expected; or the ash may not be marketed and sold as expected. Additionally, costs associated with third-party ash handling and disposal are material and could have an adverse effect on the Registrants' financial performance and condition.

The Registrants also produce gypsum as a byproduct of the $SO_2$ scrubbing process at their coal-fired generating facilities, much of which is sold to third parties for use in drywall production. Should their ability to sell such gypsum to third parties be restricted as a result of the lack of demand or otherwise, their gypsum disposal costs could rise materially.

The EPA has proposed two alternatives for regulating byproducts such as ash and gypsum. One of these alternatives would regulate these byproducts as "special wastes" in a manner similar to the regulation of hazardous wastes. If these byproducts are regulated as special wastes, the cost of disposing of these byproducts would increase materially and may limit the Registrants' ability to recycle them for beneficial use.

***The Registrants' business is subject to complex government regulations. Changes in these regulations, or their administration, by legislatures, state and federal regulatory agencies, or other bodies may affect the prices at which the Registrants are able to sell the electricity they produce, the costs of operating their generating facilities or their ability to operate their facilities.***

The majority of the Registrants' generation is sold at market prices under market-based rate authority granted by the FERC. If certain conditions are not met, the FERC has the authority to withhold or rescind market-based rate authority and require sales to be made based on cost-of-service rates. A loss of the Registrants' market-based rate authority could have a materially negative impact on their generating business.

Even when market-based rate authority has been granted, the FERC may impose various forms of market mitigation measures, including price caps and operating restrictions, when it determines that potential market power might exist and that the public interest requires such potential market power to be mitigated. In addition to direct regulation by the FERC, most of the Registrants' facilities are subject to rules and terms of participation imposed and administered by various ISOs and RTOs. Although these entities are themselves ultimately regulated by the FERC, they can impose rules, restrictions and terms of service that are quasi-regulatory in nature and can have a material adverse impact on the Registrants' business. For example, ISOs and RTOs may impose bidding and scheduling rules, both to curb the potential exercise of market power and to ensure market functions. Such actions may materially affect the Registrants' ability to sell and the price they receive for their energy, capacity and ancillary services.

To conduct the Registrants' business, they must obtain and periodically renew licenses, permits and approvals for their facilities. These licenses, permits and approvals can be in addition to any required environmental permits. No assurance can be provided that they will be able to obtain and comply with all necessary licenses, permits and approvals for these facilities.

Conflicts may occur between reliability needs and environmental rules, particularly with increasingly stringent environmental restrictions. Without a consent decree or adjustments to permit requirements, which require long lead times to obtain, the Registrants remain subject to environmental penalties or liabilities that may occur as a result of operating in compliance with reliability requirements. Further, the Registrants could be subject to citizen suits in these types of circumstances, even if they have received a consent decree or permit adjustment exempting them from environmental requirements.

The Registrants cannot predict whether the federal or state legislatures will adopt legislation relating to the restructuring of the energy industry. There are proposals in many jurisdictions that would either roll back or advance the movement toward competitive markets for the supply of electricity, at both the wholesale and retail levels. In addition, any future legislation favoring large, vertically integrated utilities and a concentration of ownership of such utilities could affect the Registrants' ability to compete successfully, and their business and results of operations could be adversely affected. Similarly, any regulations or laws that favor new generation over existing generation could adversely affect their business.

**Risks Related to Level of Indebtedness**

*The Registrants' substantial indebtedness and operating lease obligations could limit their ability to react to changes in the economy or the industry and prevent them from meeting or refinancing their obligations.*

At December 31, 2012, GenOn's consolidated indebtedness was $4.2 billion, GenOn Americas Generation's consolidated indebtedness was $960 million and GenOn Mid-Atlantic's consolidated indebtedness was $14 million. In addition, the present values of lease payments under the respective GenOn Mid-Atlantic and REMA operating leases were approximately $833 million and $450 million, respectively (assuming a 10% and 9.4% discount rate, respectively) and the termination values of the respective GenOn Mid-Atlantic and REMA operating leases were $1.2 billion and $722 million, respectively.

The Registrants' substantial indebtedness and operating lease obligations could have important consequences for their liquidity, results of operations, financial position and prospects, including their ability to grow in accordance with their strategies. These consequences include the following:

- they may limit their ability to obtain additional debt for working capital, capital expenditures, debt service requirements, acquisitions and general corporate or other purposes;

- a substantial portion of their cash flows from operations must be dedicated to the payment of rent and principal and interest on their indebtedness and will not be available for other purposes, including for working capital, capital expenditures, acquisitions and other general corporate purposes;

- the debt service requirements of their indebtedness and their lease obligations could make it difficult for them to satisfy or refinance their financial obligations;

- certain of the Registrants' borrowings, including borrowings under the NRG credit agreement, are at variable rates of interest, exposing the Registrants to the risk of increased interest rates;

- they may limit their flexibility in planning for and reacting to changes in the industry;

- they may place the Registrants at a competitive disadvantage compared to other, less leveraged competitors;

- GenOn's and GenOn Americas Generation's credit agreement with NRG contains restrictive covenants that limit their ability to engage in activities that may be in their long-term best interest; and

- the Registrants may be more vulnerable in a downturn in general economic conditions or in their business and they may be unable to carry out capital expenditures that are important to their long-term growth or necessary to comply with environmental regulations.

*GenOn and its subsidiaries that are holding companies, including GenOn Americas Generation, may not have access to sufficient cash to meet their obligations if their subsidiaries, in particular GenOn Mid-Atlantic, are unable to make distributions.*

GenOn and certain of its subsidiaries, including GenOn Americas Generation and GenOn Americas, are holding companies and, as a result, are dependent upon dividends, distributions and other payments from their operating subsidiaries to generate the funds necessary to meet their obligations. In particular, a substantial portion of the cash from their operations is generated by GenOn Mid-Atlantic. The ability of certain of their subsidiaries to pay dividends and make distributions is restricted under the terms of their debt or other agreements, including the operating leases of GenOn Mid-Atlantic and REMA. Under their respective operating leases, GenOn Mid-Atlantic and REMA are not permitted to make any distributions and other restricted payments unless: (a) they satisfy the fixed charge coverage ratio for the most recently ended period of four fiscal quarters; (b) they are projected to satisfy the fixed charge coverage ratio for each of the two following periods of four fiscal quarters, commencing with the fiscal quarter in which such payment is proposed to be made; and (c) no significant lease default or event of default has occurred and is continuing. In the event of a default under the respective operating leases or if the respective restricted payment tests are not satisfied, GenOn Mid-Atlantic and REMA would not be able to distribute cash. At December 31, 2012, GenOn Mid-Atlantic satisfied the restricted payments test. At December 31, 2012, REMA did not satisfy the restricted payments test.

*The Registrants may be unable to generate sufficient cash to service their debt and leases and to post required amounts of cash collateral necessary to hedge economically market risk. (GenOn and GenOn Americas Generation)*

The Registrants' ability to pay principal and interest on their debt and the rent on their leases depends on their future operating performance. If their cash flows and capital resources are insufficient to allow them to make scheduled payments on their debt, the Registrants may have to reduce or delay capital expenditures, sell assets, restructure or refinance. There can be no assurance that the terms of their debt or leases will allow these alternative measures, that the financial markets will be available to them on acceptable terms or that such measures would satisfy their scheduled debt service and lease rent obligations. If the Registrants do not comply with the payment and other material covenants under their debt and lease agreements, they could default under their debt or leases.

Their asset management activities may require them to post collateral either in the form of cash or letters of credit. At December 31, 2012, GenOn and GenOn Americas Generation had $148 million and $91 million, respectively, of posted cash collateral. At December 31, 2012, GenOn had $261 million of letters of credit issued under the NRG credit agreement to support its asset management activities, trading activities, rent reserve requirements and other commercial arrangements. Although the Registrants seek to structure transactions in a way that reduces their potential liquidity needs for collateral, they may be unable to execute their hedging strategy successfully if they are unable to post the amount of collateral required to enter into and support hedging contracts.

GenOn and GenOn Americas Generation are active participants in energy exchange and clearing markets, which require a per-contract initial margin to be posted. The initial margins are determined by the exchanges through the use of proprietary models that rely on a variety of inputs and factors, including market conditions. They have limited notice of any changes to the margin rates. Consequently, they are exposed to changes in the per unit margin rates required by the exchanges and could be required to post additional collateral on short notice.

***The terms of the Registrants' credit facilities and leases restrict their current and future operations, particularly their ability to respond to changes or take certain actions.***

The Registrants' credit facilities and leases contain a number of restrictive covenants that impose significant operating and financial restrictions on them and may limit their ability to engage in acts that may be in their long-term best interest, including restrictions on their ability to:

- incur additional indebtedness;
- pay dividends or make other distributions;
- prepay, redeem or repurchase certain debt;
- make loans and investments;
- sell assets;
- incur liens;
- enter into transactions with affiliates;
- enter into sale-leaseback transactions; and
- consolidate, merge or sell all or substantially all of their assets.

**Cautionary Statement Regarding Forward Looking Information (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

This Annual Report on Form 10-K includes forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. The words "believe", "project", "anticipate", "plan", "expect", "intend", "estimate" and similar expressions are intended to identify forward-looking statements. These forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the Registrants' actual results, performance and achievements, or industry results, to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. These factors, risks and uncertainties include the following:

- General economic conditions, changes in the wholesale power markets and fluctuations in the cost of fuel;

- Volatile power supply costs and demand for power;

- Hazards customary to the power production industry and power generation operations such as fuel and electricity price volatility, unusual weather conditions, catastrophic weather-related or other damage to facilities, unscheduled generation outages, maintenance or repairs, unanticipated changes to fuel supply costs or availability due to higher demand, shortages, transportation problems or other developments, environmental incidents, or electric transmission or gas pipeline system constraints and the possibility that the Registrants may not have adequate insurance to cover losses as a result of such hazards;

- The effectiveness of the Registrants' risk management policies and procedures, and the ability of the Registrants' counterparties to satisfy their financial commitments;

- Counterparties' collateral demands and other factors affecting the Registrants' liquidity position and financial condition;

- The Registrants' ability to operate their businesses efficiently, manage capital expenditures and costs tightly, and generate earnings and cash flows from their asset-based businesses in relation to their debt and other obligations;

- The Registrants' ability to enter into contracts to sell power and procure fuel on acceptable terms and prices;

- The liquidity and competitiveness of wholesale markets for energy commodities;

- Government regulation, including compliance with regulatory requirements and changes in market rules, rates, tariffs and environmental laws and increased regulation of carbon dioxide and other greenhouse gas emissions;

- Price mitigation strategies and other market structures employed by ISOs or RTOs that result in a failure to adequately compensate the Registrants' generation units for all of their costs;

- The Registrants' ability to borrow additional funds and access capital markets, as well as GenOn's substantial indebtedness and the possibility that the Registrants may incur additional indebtedness going forward;

- Operating and financial restrictions placed on the Registrants and their subsidiaries that are contained in the indentures governing GenOn's outstanding notes, and in debt and other agreements of certain of the Registrants' subsidiaries and project affiliates generally;

- The Registrants' ability to implement their strategy of developing and building new power generation facilities;

- The Registrants' ability to implement their strategy of finding ways to meet the challenges of climate change, clean air and protecting natural resources while taking advantage of business opportunities;

- The Registrants' ability to implement their strategy of increasing the return on invested capital through operational performance improvements and a range of initiatives at plants and corporate offices to reduce costs or generate revenues;

- The Registrants' ability to successfully evaluate investments in new business and growth initiatives;

- The Registrants' ability to successfully integrate and manage any acquired businesses;

- The Registrants' ability to integrate the businesses and realize cost savings related to the NRG Merger; and

- The Registrants' ability to develop and maintain successful partnering relationships.

Forward-looking statements speak only as of the date they were made, and the Registrants undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. The foregoing review of factors that could cause the Registrants' actual results to differ materially from those contemplated in any forward-looking statements included in this Annual Report on Form 10-K should not be construed as exhaustive.

**Item 2 — Properties (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

    Listed below are descriptions of Registrants' interests in facilities, operations and/or projects owned or leased as of December 31, 2012. The MW figures provided represent nominal summer net megawatt capacity of power generated as adjusted for the Registrants' ownership position excluding capacity from inactive/mothballed units as of December 31, 2012. The following table summarizes the Registrants' power production and cogeneration facilities by region:

| Name and Location of Facility | Power Market | % Owned | Net Generation Capacity (MW) (a) | Primary Fuel-type |
|---|---|---|---|---|
| **East Region:** | | | | |
| Chalk Point, Aquasco, MD | PJM | 100.00 | 665 | Coal |
| Chalk Point, Aquasco, MD | PJM | 100.00 | 1,690 | Natural Gas |
| Dickerson, MD | PJM | 100.00 (b) | 535 | Coal |
| Dickerson, MD | PJM | 100.00 (b) | 310 | Natural Gas |
| Morgantown, Newburg, MD | PJM | 100.00 (b) | 1,230 | Coal |
| Morgantown, Newburg, MD | PJM | 100.00 (b) | 250 | Oil |
| | | **Total GenOn Mid-Atlantic:** | **4,680** | |
| **East Region:** | | | | |
| Bowline, West Haverstraw, NY | NYISO | 100.00 | 755 | Natural Gas |
| Canal, Sandwich, MA | ISO-NE | 100.00 | 1,110 | Oil |
| Kendall, Cambridge, MA | ISO-NE | 100.00 | 260 | Natural Gas |
| Martha's Vineyard, MA | ISO-NE | 100.00 | 15 | Oil |
| **West Region:** | | | | |
| Contra Costa, Antioch, CA (c) | CAISO | 100.00 | 675 | Natural Gas |
| Pittsburg, CA | CAISO | 100.00 | 1,310 | Natural Gas |
| | | **Total GenOn Americas Generation:** | **8,805** | |
| **East Region:** | | | | |
| Aurora, IL | PJM | 100.00 | 880 | Natural Gas |
| Avon Lake, OH (c) | PJM | 100.00 | 730 | Coal |
| Avon Lake, OH | PJM | 100.00 | 20 | Oil |
| Blossburg, PA | PJM | 100.00 | 20 | Natural Gas |
| Brunot Island, Pittsburgh, PA | PJM | 100.00 | 260 | Natural Gas |
| Cheswick, Springdale, PA | PJM | 100.00 | 565 | Coal |
| Conemaugh, New Florence, PA (d) | PJM | 16.45 | 280 | Coal |
| Conemaugh, New Florence, PA (d) | PJM | 16.45 | 5 | Oil |
| Gilbert, Milford, NJ (c) | PJM | 100.00 | 535 | Natural Gas |
| Glen Gardner, NJ (c) | PJM | 100.00 | 160 | Natural Gas |
| Hamilton, East Berlin, PA | PJM | 100.00 | 20 | Oil |
| Hunterstown CCGT, Gettysburg, PA | PJM | 100.00 | 810 | Natural Gas |
| Hunterstown CTS, Gettysburg, PA | PJM | 100.00 | 60 | Natural Gas |
| Keystone, Shelocta, PA (d) | PJM | 16.67 | 280 | Coal |
| Keystone, Shelocta, PA (d) | PJM | 16.67 | 5 | Oil |
| Mountain, Mount Holly Springs, PA | PJM | 100.00 | 40 | Oil |
| New Castle, West Pittsburg, PA (c) | PJM | 100.00 | 325 | Coal |
| New Castle, West Pittsburg, PA (c) | PJM | 100.00 | 5 | Oil |
| Niles, OH | PJM | 100.00 | 25 | Oil |
| Orrtanna, PA | PJM | 100.00 | 20 | Oil |

.

| | | | | |
|---|---|---|---|---|
| Osceola, Holopaw, FL | FRCC | 100.00 | 460 | Natural Gas |
| Portland, Mouth Bethel, PA [c] | PJM | 100.00 | 400 | Coal |
| Portland, Mouth Bethel, PA | PJM | 100.00 | 170 | Oil |
| Sayreville, NJ | PJM | 100.00 | 225 | Natural Gas |
| Seward, New Florence, PA | PJM | 100.00 | 525 | Coal |
| Shawnee, East Stoudsburg, PA | PJM | 100.00 | 20 | Oil |
| Shawville, PA [d] [e] | PJM | 100.00 | 600 | Coal |
| Shawville, PA [d] | PJM | 100.00 | 5 | Oil |
| Titus, Birdsboro, PA [c] | PJM | 100.00 | 245 | Coal |
| Titus, Birdsboro, PA | PJM | 100.00 | 30 | Oil |
| Tolna, Stewartstown, PA | PJM | 100.00 | 40 | Oil |
| Warren, PA | PJM | 100.00 | 55 | Natural Gas |
| Werner, South Amboy, NJ [c] | PJM | 100.00 | 210 | Oil |
| **South Central Region:** | | | | |
| Choctaw, French Camp, MS | SERC-Entergy | 100.00 | 800 | Natural Gas |
| Sabine, Orange, TX [f] | SERC-Entergy | 50.00 | 55 | Natural Gas |
| Shelby County, Neoga, IL | MISO | 100.00 | 345 | Natural Gas |
| **West Region:** | | | | |
| Coolwater, Dagget, CA | CAISO | 100.00 | 635 | Natural Gas |
| Ellwood, Goleta, CA | CAISO | 100.00 | 55 | Natural Gas |
| Etiwanda, Rancho Cucamonga, CA | CAISO | 100.00 | 640 | Natural Gas |
| Mandalay, Oxnard, CA | CAISO | 100.00 | 560 | Natural Gas |
| Ormond Beach, Oxnard, CA | CAISO | 100.00 | 1,515 | Natural Gas |
| | | **Total GenOn:** | **21,440** | |

(a)   Net generation capacity is approximate and actual capacity can vary depending on factors including weather conditions, operational conditions, and other factors.

(b)   GenOn Mid-Atlantic leases 100% interests in the Dickerson and Morgantown coal generation units through facility lease agreements expiring in 2029 and 2034, respectively. GenOn Mid-Atlantic owns 310 MW and 250 MW of peaking capacity at the Dickerson and Morgantown generating facilities, respectively. GenOn Mid-Atlantic operates the Dickerson and Morgantown facilities.

(c)   GenOn expects to deactivate net generation capacity at the following facilities:

| Facility | Expected Deactivation Date | Net Generation Capacity (MW) |
|---|---|---|
| Avon Lake | April 2015 | 730 |
| Contra Costa | May 2013 | 675 |
| Gilbert | May 2015 | 190 |
| Glen Gardner | May 2015 | 160 |
| New Castle | April 2015 | 330 |
| Portland | January 2015 | 400 |
| Titus | April 2015 | 245 |
| Werner | May 2015 | 210 |

(d)   GenOn leases 100%, 16.67% and 16.45% interests in three Pennsylvania facilities (Shawville, Keystone and Conemaugh, respectively) through facility lease agreements expiring in 2026, 2034 and 2034, respectively. GenOn operates the Shawville, Keystone and Conemaugh facilities. The table includes GenOn's net share of the capacity of these facilities.

(e)   GenOn expects to place the coal-fired units at the Shawville generating facility (600 MW of the 605 MW) in long-term protective layup in April 2015.

(f)   GenOn owns a 50% equity interest in the Sabine facility located in east Texas having a net generating capacity of 110 MW. An unaffiliated party owns the other 50% and an affiliated party to the other owner operates the facility. The table includes GenOn's net share of the capacity of this facility.

**Other Properties**

The Registrants own or lease oil and gas pipelines that serve its generating facilities. GenOn leases offices at 1000 Main Street, Houston, Texas 77002, which are leased through 2018, subject to two five-year renewal options. GenOn also leases other offices. The Registrants believe that their properties are adequate for their present needs. Except for the Conemaugh, Keystone and Sabine facilities, the Registrants' interest as of December 31, 2012 is 100% for each property. The Registrants have satisfactory title, rights and possession to their owned facilities, subject to exceptions, which, in their opinion, would not have a material adverse effect on the use or value of the facilities.

**Item 3 — Legal Proceedings (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

See Item 15 — Note 20, *Commitments and Contingencies,* to the Consolidated Financial Statements for discussion of the material legal proceedings to which the Registrants are a party.

**Item 4 — Mine Safety Disclosures (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Not applicable.

**PART II**

**Item 5 — Market for Registrants' Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

As a result of the NRG Merger, GenOn is a wholly-owned subsidiary of NRG. All of GenOn's common stock is held by its parent, NRG, and GenOn's common stock is not publicly traded. GenOn Americas Generation and GenOn Mid‑Atlantic are indirect wholly-owned subsidiaries of NRG. All of GenOn Americas Generation's membership interests are held by its parent, GenOn Americas. All of GenOn Mid‑Atlantic's membership interests are held by its parent, GenOn North America. GenOn Americas Generation's and GenOn Mid‑Atlantic's membership interests are not publicly traded.

**Item 6 — Selected Financial Data (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Item 6 has been omitted from this report pursuant to the reduced disclosure format permitted by General Instruction I to Form 10-K.

**Item 7 — Management's Narrative Analysis of the Results of Operations and Financial Condition (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Reference is made to the Registrants' Consolidated Statements of Operations to this Annual Report on Form 10-K, which presents the results of the Registrants' operations for the periods from December 15, 2012 through December 31, 2012 and from January 1, 2012 through December 14, 2012 and the years ended December 31, 2011 and 2010, and also refer to Item I to this Form 10-K for additional discussion about the Registrants' business.

### NRG Merger

On July 20, 2012, GenOn entered into the NRG Merger Agreement with NRG and a direct wholly-owned subsidiary of NRG. Upon the terms and subject to the conditions set forth in the NRG Merger Agreement, which was approved by the boards of directors of GenOn and NRG, a wholly-owned subsidiary of NRG merged with and into GenOn, with GenOn continuing as the surviving corporation and a wholly-owned subsidiary of NRG.

On December 14, 2012, NRG completed the acquisition of GenOn.  NRG issued, as consideration for the acquisition, 0.1216 shares of NRG common stock for each outstanding share of GenOn, including restricted stock units outstanding, on the acquisition date, except for fractional shares which were paid in cash. See Item 15 — Note 3, *NRG Merger*, to the Consolidated Financial Statements.

### Predecessor and Successor Reporting

As a result of the impact of pushdown accounting, the financial statements and certain note presentations separate GenOn's, GenOn Americas Generation's and GenOn Mid-Atlantic's presentations into two distinct periods, the period before the consummation of the NRG Merger (labeled predecessor) and the period after that date (labeled successor), to indicate the application of different basis of accounting between the periods presented.

For comparison purposes, the discussion of results of operations below is based on the mathematical combination of the 2012 successor (December 15, 2012 through December 31, 2012) period and the 2012 predecessor (January 1, 2012 through December 14, 2012) period compared to the predecessor year ended December 31, 2011.

### Environmental Matters, Regulatory Matters and Legal Proceedings

Details of environmental matters are presented in Item 15 — Note 22, *Environmental Matters*, to the Consolidated Financial Statements. Details of regulatory matters are presented in Item 15 — Note 21, *Regulatory Matters*, to the Consolidated Financial Statements. Details of legal proceedings are presented in Item 15 — Note 20, *Commitments and Contingencies*, to the Consolidated Financial Statements. Some of this information relates to costs that may be material to the Registrants' financial results.

23

**Consolidated Results of Operations**

*GenOn*

### 2012 Compared to 2011

The following table provides selected financial information for GenOn:

| (In millions except otherwise noted) | Successor<br>December 15, 2012<br>through<br>December 31, 2012 | Predecessor<br>January 1, 2012<br>through<br>December 14, 2012 | 2011 | Change % [a] |
|---|---|---|---|---|
| **Operating Revenues** | | | | |
| Energy revenue [b] | $ 59 | $ 1,766 | $ 2,164 | (16)% |
| Capacity revenue [b] | 30 | 818 | 915 | (7)% |
| Mark-to-market for economic hedging activities | (16) | (157) | 225 | N/A |
| Contract amortization | — | (10) | (23) | (57)% |
| Other revenues [c] | — | 147 | 333 | (56)% |
| Total operating revenues | 73 | 2,564 | 3,614 | (27)% |
| **Operating Costs and Expenses** | | | | |
| Generation cost of sales [b] | 41 | 1,219 | 1,630 | (23)% |
| Mark-to-market for economic hedging activities | (7) | (16) | 3 | N/A |
| Contract and emissions credit amortization | (4) | (23) | (23) | 17 % |
| Other cost of operations | 36 | 893 | 1,032 | (10)% |
| Total cost of operations | 66 | 2,073 | 2,642 | (19)% |
| Depreciation and amortization | 10 | 339 | 375 | (7)% |
| Impairment losses | — | 47 | 133 | (65)% |
| Selling, general and administrative | 61 | 177 | 255 | (7)% |
| Total operating costs and expenses | 137 | 2,636 | 3,405 | (19)% |
| **Operating Income/(Loss)** | (64) | (72) | 209 | N/A |
| **Other Income/(Expense)** | | | | |
| Other income, net | — | 3 | 4 | (25)% |
| Interest expense | (8) | (330) | (379) | (11)% |
| Loss on debt extinguishment | — | — | (23) | (100)% |
| Total other expense | (8) | (327) | (398) | (16)% |
| **Loss before income tax expense** | (72) | (399) | (189) | 149 % |
| Income tax expense | — | 15 | — | 100 % |
| **Net Loss** | $ (72) | $ (414) | $ (189) | N/A |
| **Business Metrics** | | | | |
| Average natural gas price — Henry Hub ($/MMBtu) | 2.79 | 2.79 | 4.04 | (31)% |
| MWh sold (in thousands) | 985 | 30,389 | 35,357 | |
| MWh generated (in thousands) | 993 | 31,688 | 34,997 | |

(a)  This column represents the difference between (a) the mathematical combination of the 2012 successor period and the 2012 predecessor period and (b) the 2011 predecessor period and (c) divided by the 2011 predecessor period.

(b)  Includes realized gains and losses from financially settled transactions.

(c)  Includes unrealized trading gains and losses.

N/A - Not Applicable

*Generation Gross Margin*

| (In millions) | Successor | | Predecessor | | Change % [a] |
| | December 15, 2012 through December 31, 2012 | | January 1, 2012 through December 14, 2012 | 2011 | |
|---|---|---|---|---|---|
| Energy revenue | $ | 59 | $ 1,766 | $ 2,164 | (16)% |
| Capacity revenue | | 30 | 818 | 915 | (7)% |
| Other revenues | | — | 147 | 333 | (56)% |
| Generation revenue | | 89 | 2,731 | 3,412 | (17)% |
| Generation cost of sales | | 41 | 1,219 | 1,630 | (23)% |
| Generation gross margin | $ | 48 | $ 1,512 | $ 1,782 | (12)% |

(a)   This column represents the difference between (a) the mathematical combination of the 2012 successor period and the 2012 predecessor period and (b) the 2011 predecessor period and (c) divided by the 2011 predecessor period.

Generation gross margin decreased by $222 million for the 2012 combined successor period and predecessor period compared to 2011 due to:

| | (In millions) |
|---|---|
| Lower gross margin from coal plants due to decrease in generation primarily as a result of lower power prices | $ (399) |
| Lower capacity revenue primarily resulting from lower capacity prices | (67) |
| Lower gross margin primarily due to decreases in income from propriety trading and fuel oil management activities | (38) |
| Higher gross margin primarily due to increase in power hedges resulting from lower prices | 175 |
| Higher gross margin from gas plants due to increase in generation primarily as a result of lower gas prices | 73 |
| Advanced settlement of an out-of-market contract obligation [a] | 20 |
| Other, net | 14 |
| | $ (222) |

(a)   This $20 million in income for the advance settlement of an out-of-market contract obligation relates to GenOn's successful permanent assignment of a long-term contract that was out-of-market and revalued as of the date of the Mirant/RRI Merger and recorded as a $20 million liability. GenOn had no further obligations under the contract and did not need it to support GenOn's ongoing operations and therefore reversed the liability in 2012.

*Mark-to-market for Economic Hedging Activities*

Mark-to-market for economic hedging activities includes asset-backed hedges that have not been designated as cash flow hedges. Total net mark-to-market results decreased by $372 million for the 2012 combined successor period and predecessor period compared to 2011.

The breakdown of gains and losses included in operating revenues and operating costs and expenses are as follows:

| (In millions) | Successor | Predecessor | |
|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 |
| **Mark-to-market results in operating revenues** | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (13) | $ (456) | $ (277) |
| Net unrealized gains/(losses) on open positions related to economic hedges | (3) | 299 | 502 |
| **Total mark-to-market gains/(losses) in operating revenues** | $ (16) | $ (157) | $ 225 |
| **Mark-to-market results in operating costs and expenses** | | | |
| Reversal of previously recognized unrealized losses on settled positions related to economic hedges | 9 | 149 | 34 |
| Net unrealized losses on open positions related to economic hedges | (2) | (133) | (37) |
| **Total mark-to-market gains/(losses) in operating costs and expenses** | $ 7 | $ 16 | $ (3) |

Mark-to-market results consist of unrealized gains and losses. The settlement of these transactions is reflected in the same caption as the items being hedged.

For the period from December 15, 2012 through December 31, 2012, the $16 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period and a decrease in the value of forward sales of electricity and natural gas contracts as a result of increases in forward power and natural gas prices. The $7 million gain in operating costs and expenses from economic hedge positions was primarily driven by the reversal of previously recognized unrealized losses from fuel contracts that settled during the period.  The gain was partially offset by a decrease in the value of forward purchases of fuel contracts as a result of decreases in forward coal prices.

For the period from January 1, 2012 through December 14, 2012, the $157 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period.  The loss was partially offset by an increase in the value of forward sales of electricity and natural gas contracts as a result of decreases in forward power and natural gas prices. The $16 million gain in operating costs and expenses from economic hedge positions was driven by the reversal of previously recognized unrealized losses from fuel contracts that settled during the period.  The gain was partially offset by a decrease in the value of forward purchases of fuel contracts, primarily as a result of decreases in forward coal prices.

For 2011, the $225 million gain in operating revenues from economic hedge positions was primarily driven by an increase in the value of forward sales of electricity and natural gas contracts as a result of decreases in forward power and natural gas prices. The gain was partially offset by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period. The $3 million loss in operating costs and expenses from economic hedge positions was primarily driven by a decrease in the value of forward purchases of fuel contracts, primarily as a result of decreases in forward fuel prices.
The loss was partially offset by the reversal of previously recognized unrealized losses from fuel contracts that settled during the period.

In accordance with ASC 815, the following table represents the results of GenOn's financial and physical trading of energy commodities. The realized and unrealized financial and physical trading results are included in other operating revenues. GenOn's trading activities are subject to limits within the risk management policy.

| (In millions) | Successor | Predecessor | |
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 |
| --- | --- | --- | --- |
| Trading gains/(losses) | | | |
| Realized | $ 3 | $ 7 | $ 48 |
| Unrealized | (4) | (2) | 2 |
| Total trading gains/(losses) | $ (1) | $ 5 | $ 50 |

### *Other Cost of Operations*

Other cost of operations decreased by $103 million for the 2012 combined successor period and predecessor period compared to 2011 due to:

| | (In millions) |
| --- | --- |
| Decrease in large scale remediation and settlement costs | $ (64) |
| Decrease in project, outage and maintenance expenses | (50) |
| Reversal of the previously recorded Potomac River obligation | (32) |
| Decrease in major litigation costs, net of recoveries | (11) |
| Increase in costs to deactivate generating facilities | 45 |
| Increase due to changes in asset retirement obligation assumptions | 17 |
| Other, net | (8) |
| | $ (103) |

### *Depreciation and Amortization*

Depreciation and amortization expense decreased by $26 million for the 2012 combined successor period and predecessor period compared to 2011 due to:

| | (In millions) |
| --- | --- |
| Accelerated depreciation related to the abandonment of a pipeline recognized in 2011 | $ (12) |
| Leasehold improvements write-off and software retirements recognized in 2011 | (12) |
| Other, net | (2) |
| | $ (26) |

### *Impairment Losses*

Impairment losses decreased $86 million for the 2012 combined successor period and predecessor period compared to 2011 due to (a) $47 million recorded in 2012 relating to property, plant and equipment at two generating facilities compared to (b) $133 million recorded in 2011 for the write-off of excess $NO_x$ and $SO_2$ emission allowances as a result of the CSAPR.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses decreased by $17 million for the 2012 combined successor period and predecessor period compared to 2011 due to:

|  | (In millions) |
|---|---|
| Mirant/RRI Merger-related costs | $ (65) |
| Reduced rent expense as a result of completion of the Mirant/RRI Merger integration | (8) |
| Lower professional fees and contracted services | (6) |
| NRG Merger-related costs | 64 |
| Other, net | (2) |
|  | $ (17) |

*Loss on Debt Extinguishment*

A loss on debt extinguishment of $23 million was recorded in 2011, which primarily consisted of the premium paid on redemptions and the write-off of previously deferred financing costs related to the redemptions of the GenOn North America senior notes.

*Interest Expense*

Interest expense decreased by $41 million for the 2012 combined successor period and predecessor period compared to 2011 due to:

|  | (In millions) |
|---|---|
| Decrease for higher capitalized interest | $ (22) |
| Decrease for GenOn Americas Generation senior notes repaid in 2011 | (15) |
| Decrease for Pennsylvania Economic Development Financing Authority bonds redeemed in 2011 | (10) |
| Increase for GenOn Marsh Landing senior term loans | 7 |
| Other, net | (1) |
|  | $ (41) |

*GenOn Americas Generation*

### 2012 Compared to 2011

The following table provides selected financial information for GenOn Americas Generation:

| (In millions except otherwise noted) | Successor | Predecessor | | Change % [a] |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | |
| **Operating Revenues** | | | | |
| Energy revenue [b] | $ 59 | $ 1,718 | $ 1,946 | (9)% |
| Capacity revenue [b] | 28 | 739 | 772 | (1)% |
| Mark-to-market for economic hedging activities | (12) | (151) | 138 | N/A |
| Other revenues [c] | 2 | 288 | 82 | N/A |
| Total operating revenues | 77 | 2,594 | 2,938 | (9)% |
| **Operating Costs and Expenses** | | | | |
| Generation cost of sales [b] | 59 | 1,944 | 1,868 | 7 % |
| Mark-to-market for economic hedging activities | (4) | (19) | 2 | N/A |
| Contract and emissions credit amortization | — | 22 | 27 | (19)% |
| Other cost of operations | 14 | 424 | 515 | (15)% |
| Total cost of operations | 69 | 2,371 | 2,412 | 1 % |
| Depreciation and amortization | 5 | 155 | 177 | (10)% |
| Impairment losses | — | — | 128 | (100)% |
| Selling, general and administrative | 3 | 73 | 88 | (14)% |
| Total operating costs and expenses | 77 | 2,599 | 2,805 | (5)% |
| **Operating Income/(Loss)** | — | (5) | 133 | (104)% |
| **Other Income/(Expense)** | | | | |
| Other expense, net | — | — | (1) | (100)% |
| Interest expense | (3) | (75) | (93) | (16)% |
| Loss on debt extinguishment | — | — | (23) | (100)% |
| Total other expense | (3) | (75) | (117) | (33)% |
| **(Loss)/Income before income tax expense** | (3) | (80) | 16 | N/A |
| Income tax (benefit)/expense | — | — | — | — % |
| **Net (Loss)/Income** | $ (3) | $ (80) | $ 16 | N/A |
| **Business Metrics** | | | | |
| Average natural gas price — Henry Hub ($/MMBtu) | 2.79 | 2.79 | 4.04 | (31)% |
| MWh sold (in thousands) | 421 | 12,730 | 13,713 | |
| MWh generated (in thousands) | 423 | 13,014 | 13,686 | |

(a)   This column represents the difference between (a) the mathematical combination of the 2012 successor period and the 2012 predecessor period and (b) the 2011 predecessor period and (c) divided by the 2011 predecessor period.

(b)   Includes realized gains and losses from financially settled transactions.

(c)   Includes unrealized trading gains and losses.

N/A - Not Applicable

*Generation Gross Margin*

| (In millions) | Successor | Predecessor | | Change % [a] |
| --- | --- | --- | --- | --- |
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | |
| Energy revenue | $ 59 | $ 1,718 | $ 1,946 | (9)% |
| Capacity revenue | 28 | 739 | 772 | (1)% |
| Other revenues | 2 | 288 | 82 | N/A |
| Generation revenue | 89 | 2,745 | 2,800 | 1 % |
| Generation cost of sales | 59 | 1,944 | 1,868 | 7 % |
| Generation gross margin | $ 30 | $ 801 | $ 932 | (11)% |

(a)   This column represents the difference between (a) the mathematical combination of the 2012 successor period and the 2012 predecessor period and (b) the 2011 predecessor period and (c) divided by the 2011 predecessor period.

Generation gross margin decreased by $101 million for the 2012 combined successor period and predecessor period compared to 2011 due to:

| | (In millions) |
| --- | --- |
| Lower gross margin from coal plants due to decrease in generation primarily as a result of lower power prices | $ (178) |
| Lower gross margin primarily due to decreases in income from propriety trading and fuel oil management activities | (36) |
| Lower capacity revenue primarily resulting from lower capacity prices | (5) |
| Higher gross margin primarily due to increase in power hedges resulting from lower prices | 77 |
| Higher gross margin from gas plants due to increase in generation primarily as a result of lower gas prices | 13 |
| Higher gross margin primarily due to a decrease in fuel handling costs | 11 |
| Other, net | 17 |
| | $ (101) |

*Mark-to-market for Economic Hedging Activities*

Mark-to-market for economic hedging activities includes asset-backed hedges that have not been designated as cash flow hedges. Total net mark-to-market results decreased by $276 million for the 2012 combined successor period and predecessor period compared to 2011.

The breakdown of gains and losses included in operating revenues and operating costs and expenses are as follows:

| (In millions) | Successor | Predecessor | |
| --- | --- | --- | --- |
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 |
| **Mark-to-market results in operating revenues** | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (8) | $ (368) | $ (254) |
| Net unrealized gains/(losses) on open positions related to economic hedges | (4) | 217 | 392 |
| **Total mark-to-market gains/(losses) in operating revenues** | (12) | (151) | 138 |
| **Mark-to-market results in operating costs and expenses** | | | |
| Reversal of previously recognized unrealized losses on settled positions related to economic hedges | 6 | 127 | 34 |
| Net unrealized losses on open positions related to economic hedges | (2) | (108) | (36) |
| **Total mark-to-market gains/(losses) in operating costs and expenses** | $ 4 | $ 19 | $ (2) |

Mark-to-market results consist of unrealized gains and losses. The settlement of these transactions is reflected in the same caption as the items being hedged.

For the period from December 15, 2012 through December 31, 2012, the $12 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period and a decrease in the value of forward sales of electricity and natural gas contracts as a result of increases in forward power and natural gas prices. The $4 million gain in operating costs and expenses from economic hedge positions was primarily driven by the reversal of previously recognized unrealized losses from fuel contracts that settled during the period. The gain was partially offset by a decrease in the value of forward purchases of fuel contracts as a result of decreases in forward coal prices.

For the period from January 1, 2012 through December 14, 2012, the $151 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period. The loss was partially offset by an increase in the value of forward sales of electricity and natural gas contracts as a result of decreases in forward power and natural gas prices. The $19 million gain in operating costs and expenses from economic hedge positions was driven by the reversal of previously recognized unrealized losses from fuel contracts that settled during the period. The gain was partially offset by a decrease in the value of forward purchases of fuel contracts, primarily as a result of decreases in forward coal prices.

For 2011, the $138 million gain in operating revenues from economic hedge positions was primarily driven by an increase in the value of forward sales of electricity and natural gas contracts as a result of decreases in forward power and natural gas prices. The gain was partially offset by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period. The $2 million loss in operating costs and expenses from economic hedge positions was primarily driven by a decrease in the value of forward purchases of fuel contracts, primarily as a result of decreases in forward fuel prices.
The loss was partially offset by the reversal of previously recognized unrealized losses from fuel contracts that settled during the period.

In accordance with ASC 815, the following table represents the results of GenOn Americas Generation's financial and physical trading of energy commodities. The realized and unrealized financial and physical trading results are included in other operating revenues. GenOn Americas Generation's trading activities are subject to limits within the risk management policy.

| (In millions) | Successor | Predecessors | |
| --- | --- | --- | --- |
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 |
| Trading gains/(losses) | | | |
| Realized | $          3 | $          7 | $          46 |
| Unrealized | (4) | (2) | 2 |
| Total trading gains/(losses) | $         (1) | $          5 | $          48 |

### Other Cost of Operations

Other cost of operations decreased by $77 million for the 2012 combined successor period and predecessor period compared to 2011 due to:

| | (In millions) |
| --- | --- |
| Decrease in large scale remediation and settlement costs | $          (64) |
| Reversal of the previously recorded Potomac River obligation | (32) |
| Decrease in major litigation costs, net of recoveries | (11) |
| Increase in costs to deactivate generating facilities | 16 |
| Increase due to the reversal of Montgomery County carbon levy assessment recorded in 2011 | 8 |
| Increase due to changes in asset retirement obligation assumptions | 7 |
| Other, net | (1) |
| | $          (77) |

### Depreciation and Amortization

Depreciation and amortization expense decreased by $17 million for the 2012 combined successor period and predecessor period compared to 2011 due primarily to the accelerated depreciation recognized in 2011 related to the abandonment of a pipeline.

### Impairment Losses

Impairment losses of $128 million were recorded in 2011 due to the write-off of excess $NO_x$ and $SO_2$ emission allowances as a result of the CSAPR.

### Selling, General and Administrative Expenses

Selling, general and administrative expenses decreased by $12 million for the 2012 combined successor period and predecessor period compared to 2011 due to decreased allocation of corporate overhead costs primarily as a result of the completion of the Mirant/RRI Merger integration (including (i) the reduction in Mirant/RRI Merger-related costs and (ii) Mirant/RRI Merger cost savings).

### Loss on Debt Extinguishment

A loss on debt extinguishment of $23 million was recorded in 2011, which primarily consisted of the premium paid on redemptions and the write-off of previously deferred financing costs related to the redemptions of the GenOn North America senior notes.

### Interest Expense

Interest expense decreased by $15 million for the 2012 combined successor period and predecessor period compared to 2011 due to a decrease for GenOn Americas Generation senior notes repaid in 2011.

*GenOn Mid-Atlantic*

### 2012 Compared to 2011

The following table provides selected financial information for GenOn Mid-Atlantic:

| (In millions except otherwise noted) | Successor | Predecessor | | Change % [a] |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | |
| **Operating Revenues** | | | | |
| Energy revenue [b] | $ 30 | $ 897 | $ 980 | (5)% |
| Capacity revenue [b] | 10 | 197 | 232 | (11)% |
| Mark-to-market for economic hedging activities | (12) | (120) | 119 | N/A |
| Other revenues | — | 15 | 16 | (6)% |
| Total operating revenues | 28 | 989 | 1,347 | (24)% |
| **Operating Costs and Expenses** | | | | |
| Generation cost of sales [b] | 15 | 465 | 520 | (8)% |
| Mark-to-market for economic hedging activities | (5) | (5) | (1) | N/A |
| Contract and emissions credit amortization | — | 20 | 26 | (23)% |
| Other cost of operations | 11 | 314 | 410 | (21)% |
| Total cost of operations | 21 | 794 | 955 | (15)% |
| Depreciation and amortization | 4 | 114 | 131 | (10)% |
| Impairment losses | — | — | 94 | (100)% |
| Selling, general and administrative | 2 | 46 | 57 | (16)% |
| Total operating costs and expenses | 27 | 954 | 1,237 | (21)% |
| **Operating Income** | 1 | 35 | 110 | (67)% |
| **Other Income/(Expense)** | | | | |
| Interest expense | — | (4) | (5) | (20)% |
| Total other expense | — | (4) | (5) | (20)% |
| **Income before income tax expense** | 1 | 31 | 105 | (70)% |
| Income tax (benefit)/expense | — | — | — | — % |
| **Net Income** | $ 1 | $ 31 | $ 105 | (70)% |
| **Business Metrics** | | | | |
| Average natural gas price — Henry Hub ($/MMBtu) | 2.79 | 2.79 | 4.04 | (31)% |
| MWh sold (in thousands) | 387 | 10,948 | 12,267 | |
| MWh generated (in thousands) | 387 | 10,948 | 12,267 | |

(a)   This column represents the difference between (a) the mathematical combination of the 2012 successor period and the 2012 predecessor period and (b) the 2011 predecessor period and (c) divided by the 2011 predecessor period.

(b)   Includes realized gains and losses from financially settled transactions.

N/A - Not Applicable

33
-

*Generation Gross Margin*

| (In millions) | Successor | Predecessor | | Change % (a) |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | |
| Energy revenue | $ 30 | $ 897 | $ 980 | (5)% |
| Capacity revenue | 10 | 197 | 232 | (11)% |
| Other revenues | — | 15 | 16 | (6)% |
| Generation revenue | 40 | 1,109 | 1,228 | (6)% |
| Generation cost of sales | 15 | 465 | 520 | (8)% |
| Generation gross margin | $ 25 | $ 644 | $ 708 | (6)% |

(a) This column represents the difference between (a) the mathematical combination of the 2012 successor period and the 2012 predecessor period and (b) the 2011 predecessor period and (c) divided by the 2011 predecessor period.

Generation gross margin decreased by $39 million for the 2012 combined successor period and predecessor period compared to 2011 due to:

| | (In millions) |
|---|---|
| Lower gross margin from coal plants due to decrease in generation primarily as a result of lower power prices | $ (174) |
| Lower capacity revenue primarily resulting from lower capacity prices | (25) |
| Higher gross margin primarily due to increase in power hedges resulting from lower prices | 118 |
| Higher gross margin from gas plants due to increase in generation primarily as a result of lower gas prices | 27 |
| Higher gross margin primarily due to a decrease in fuel handling costs | 12 |
| Other, net | 3 |
| | $ (39) |

34
-

*Mark-to-market for Economic Hedging Activities*

Mark-to-market for economic hedging activities includes asset-backed hedges that have not been designated as cash flow hedges. Total net mark-to-market results decreased by $242 million for the 2012 combined successor period and predecessor period compared to 2011.

The breakdown of gains and losses included in operating revenues and operating costs and expenses are as follows:

| (In millions) | Successor | Predecessor | |
|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 |
| **Mark-to-market results in operating revenues** | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $       (8) | $       (355) | $       (239) |
| Net unrealized gains/(losses) on open positions related to economic hedges | (4) | 235 | 358 |
| **Total mark-to-market gains/(losses) in operating revenues** | (12) | (120) | 119 |
| **Mark-to-market results in operating costs and expenses** | | | |
| Reversal of previously recognized unrealized losses on settled positions related to economic hedges | 6 | 109 | 24 |
| Net unrealized losses on open positions related to economic hedges | (1) | (104) | (23) |
| **Total mark-to-market gains in operating costs and expenses** | $       5 | $       5 | $       1 |

Mark-to-market results consist of unrealized gains and losses. The settlement of these transactions is reflected in the same caption as the items being hedged.

For the period from December 15, 2012 through December 31, 2012, the $12 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period and a decrease in the value of forward sales of electricity and natural gas contracts as a result of increases in forward power and natural gas prices. The $5 million gain in operating costs and expenses from economic hedge positions was primarily driven by the reversal of previously recognized unrealized losses from fuel contracts that settled during the period.  The gain was partially offset by a decrease in the value of forward purchases of fuel contracts as a result of decreases in forward coal prices.

For the period from January 1, 2012 through December 14, 2012, the $120 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period.  The loss was partially offset by an increase in the value of forward sales of electricity and natural gas contracts as a result of decreases in forward power and natural gas prices. The $5 million gain in operating costs and expenses from economic hedge positions was driven by the reversal of previously recognized unrealized losses from fuel contracts that settled during the period.  The gain was partially offset by a decrease in the value of forward purchases of fuel contracts, primarily as a result of decreases in forward coal prices.

For 2011, the $119 million gain in operating revenues from economic hedge positions was primarily driven by an increase in the value of forward sales of electricity and natural gas contracts as a result of decreases in forward power and natural gas prices. The gain was partially offset by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period. The $1 million gain in operating costs and expenses from economic hedge positions was primarily driven by the reversal of previously recognized unrealized losses from fuel contracts that settled during the period. The gain was offset by a decrease in the value of forward purchases of fuel contracts as a result of decreases in forward fuel prices.

*Other Cost of Operations*

Other cost of operations decreased by $85 million for the 2012 combined successor period and predecessor period compared to 2011 due to:

|  | (In millions) |
|---|---|
| Decrease in large scale remediation and settlement costs | $ (64) |
| Reversal of the previously recorded Potomac River obligation | (32) |
| Decrease in major litigation costs, net of recoveries | (11) |
| Increase in costs to deactivate generating facilities | 14 |
| Increase due to the reversal of Montgomery County carbon levy assessment recorded in 2011 | 8 |
| Increase due to changes in asset retirement obligation assumptions | 7 |
| Other, net | (7) |
|  | $ (85) |

*Depreciation and Amortization*

 Depreciation and amortization expense decreased by $13 million for the 2012 combined successor period and predecessor period compared to 2011 due primarily to the accelerated depreciation recognized in 2011 related to the abandonment of a pipeline.

*Impairment Losses*

Impairment losses of $94 million were recorded in 2011 due to the write-off of excess $NO_x$ and $SO_2$ emission allowances as a result of the CSAPR.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses decreased by $9 million for the 2012 combined successor period and predecessor period compared to 2011 due to decreased allocation of corporate overhead costs primarily as a result of the completion of the Mirant/RRI Merger integration (including (i) the reduction in Mirant/RRI Merger-related costs and (ii) Mirant/RRI Merger cost savings).

**Item 7A — Quantitative and Qualitative Disclosures About Market Risk (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

The Registrants are exposed to several market risks in their normal business activities. Market risk is the potential loss that may result from market changes associated with the Registrants' merchant power generation or with an existing or forecasted financial or commodity transaction. The types of risks the Registrants are exposed to are commodity price risk, interest rate risk and credit and performance risk. In order to manage commodity price and interest rate risks, the Registrants use various fixed-price forward purchase and sales contracts, futures and option contracts traded on NYMEX, and swaps and options traded in the over-the-counter financial markets to:

- Manage and hedge fixed-price purchase and sales commitments;

- Manage and hedge exposure to variable rate debt obligations;

- Reduce exposure to the volatility of cash market prices; and

- Hedge fuel requirements for the Registrants' generating facilities.

*Commodity Price Risk*

Commodity price risks result from exposures to changes in spot prices, forward prices, volatilities, and correlations between various commodities, such as natural gas, electricity, coal, oil, and emission credits. The Registrants manage the commodity price risk of their merchant generation operations by entering into various derivative or non-derivative instruments to hedge the variability in future cash flows from forecasted sales and purchases of electricity and fuel. These instruments include forwards, futures, swaps, and option contracts traded on various exchanges, such as NYMEX and Intercontinental Exchange, or ICE, as well as over-the-counter markets. The portion of forecasted transactions hedged may vary based upon management's assessment of market, weather, operation and other factors.

While some of the contracts the Registrants use to manage risk represent commodities or instruments for which prices are available from external sources, other commodities and certain contracts are not actively traded and are valued using other pricing sources and modeling techniques to determine expected future market prices, contract quantities, or both. The Registrants use their best estimates to determine the fair value of those derivative contracts. However, it is likely that future market prices could vary from those used in recording mark-to-market derivative instrument valuation, and such variations could be material.

*Interest Rate Risk*

The Registrants are also subject to interest rate risk when discounting to account for time value in determining the fair value of their derivative contract assets and liabilities. The nominal value of their derivative contract assets and liabilities is discounted using a LIBOR forward interest rate curve based on the tenor of their transactions. It is estimated that a one percentage point change in market interest rates would result in a change of $9 million to GenOn's derivative contract assets and a change of $2 million to GenOn's derivative contract liabilities at December 31, 2012. It is estimated that a one percentage point change in market interest rates would result in a change of $9 million to GenOn Americas Generation's derivative contract assets and a change of $1 million to GenOn Americas Generation's derivative contract liabilities at December 31, 2012. It is estimated that a one percentage point change in market interest rates would result in a change of $9 million to the GenOn Mid-Atlantic's derivative contract assets and a change of $1 million to GenOn Mid-Atlantic's derivative contract liabilities at December 31, 2012.

The GenOn Marsh Landing credit agreement is also subject to variable interest rates. The credit facility consists of a $155 million tranche A senior secured term loan facility, a $345 million tranche B senior secured term loan facility, a $50 million senior secured letter of credit facility to support GenOn Marsh Landing's debt service reserve requirements and a $100 million senior secured letter of credit facility to support GenOn Marsh Landing's collateral requirements under its PPA with PG&E. The interest rate swaps cover 100% of the expected outstanding term loans' balances during the operating period and a substantial portion of the expected outstanding term loans balances during the construction period. The remaining borrowings during the construction period are still subject to variability in interest rates. At the projected peak borrowing levels during the construction period, a one percentage point change in market interest rates would result in a change in GenOn Marsh Landing's annual interest cost of less than $1 million.

*Counterparty Credit Risk*

Credit risk relates to the risk of loss resulting from non-performance or non-payment by counterparties pursuant to the terms of their contractual obligations. The Registrants monitor and manage credit risk through credit policies that include: (i) an established credit approval process; (ii) a daily monitoring of counterparties' credit limits; (iii) the use of credit mitigation measures such as margin, collateral, prepayment arrangements, or volumetric limits; (iv) the use of payment netting agreements; and (v) the use of master netting agreements that allow for the netting of positive and negative exposures of various contracts associated with a single counterparty. Risks surrounding counterparty performance and credit could ultimately impact the amount and timing of expected cash flows. The Registrants seek to mitigate counterparty risk by having a diversified portfolio of counterparties. The Registrants also have credit protection within various agreements to call on additional collateral support if and when necessary. Cash margin is collected and held at the Registrants to cover the credit risk of the counterparty until positions settle.

As of December 31, 2012, counterparty credit exposure to a significant portion of GenOn's counterparties was $833 million and GenOn held collateral (cash and letters of credit) against those positions of $59 million, resulting in a net exposure of $774 million. Approximately 90% of GenOn's exposure before collateral is expected to roll off by the end of 2014. GenOn Americas Generation's counterparty credit exposure to a significant portion of counterparties was $801 million and GenOn Americas Generation held collateral (cash and letters of credit) against those positions of $59 million, resulting in a net exposure of $742 million. Approximately 90% of GenOn Americas Generation's exposure before collateral is expected to roll off by the end of 2014. GenOn Mid-Atlantic's counterparty credit exposure to a significant portion of counterparties was $641 million and GenOn Mid-Atlantic held collateral (cash and letters of credit) against those positions of $57 million, resulting in a net exposure of $584 million. Approximately 91% of GenOn Mid-Atlantic's exposure before collateral is expected to roll off by the end of 2014.

The following tables highlight the credit quality and the net counterparty credit exposure by industry sector. Net counterparty credit exposure is defined as the aggregate net asset position for the Registrants with counterparties where netting is permitted under the enabling agreement and includes all cash flow, mark-to-market and NPNS, and non-derivative transactions. As of December 31, 2012, the exposure is shown net of collateral held and includes amounts net of receivables or payables.

*GenOn*

| Category | Net Exposure [a] (% of Total) |
| --- | --- |
| Financial institutions | 76% |
| Utilities, energy merchants, marketers and other | 14% |
| ISOs | 10% |
| Total | 100% |

| Category | Net Exposure [a] (% of Total) |
| --- | --- |
| Investment grade | 99% |
| Non-rated | 1% |
| Total | 100% |

(a)   Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

GenOn has counterparty credit risk exposure to certain counterparties representing more than 10% of total net exposure discussed above and the aggregate of such counterparties was $522 million. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, GenOn does not anticipate a material impact on its financial position or results of operations from nonperformance by any of its counterparties.

*GenOn Americas Generation*

| **Category** | **Net Exposure** [a]<br>**(% of Total)** |
| --- | --- |
| Financial institutions | 80% |
| Utilities, energy merchants, marketers and other | 14% |
| ISOs | 6% |
| Total | 100% |

| **Category** | **Net Exposure** [a]<br>**(% of Total)** |
| --- | --- |
| Investment grade | 99% |
| Non-rated | 1% |
| Total | 100% |

(a)   Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

GenOn Americas Generation has counterparty credit risk exposure to certain counterparties representing more than 10% of total net exposure discussed above and the aggregate of such counterparties was $522 million. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, GenOn Americas Generation does not anticipate a material impact on its financial position or results of operations from nonperformance by any of its counterparties.

*GenOn Mid-Atlantic*

| **Category** | **Net Exposure** [a]<br>**(% of Total)** |
| --- | --- |
| Financial institutions | 100% |

| **Category** | **Net Exposure** [a]<br>**(% of Total)** |
| --- | --- |
| Investment grade | 100% |

(a)   Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

GenOn Mid-Atlantic has counterparty credit risk exposure to certain counterparties representing more than 10% of total net exposure discussed above and the aggregate of such counterparties was $505 million. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, GenOn Mid-Atlantic does not anticipate a material impact on its financial position or results of operations from nonperformance by any of its counterparties.

### Credit Risk Related Contingent Features

Certain of the Registrants' hedging agreements contain provisions that require the Registrants to post additional collateral if the counterparty determines that there has been deterioration in credit quality, generally termed "adequate assurance" under the agreements, or require the Registrants to post additional collateral if there were a one notch downgrade in the Registrants' credit rating. The collateral required for contracts that have adequate assurance clauses that are in net liability positions as of December 31, 2012, was $5 million for GenOn and GenOn Americas Generation. The collateral required for contracts with credit rating contingent features that are in a net liability position as of December 31, 2012, was $3 million for GenOn and GenOn Americas Generation. In addition, GenOn and GenOn Americas Generation are parties to certain marginable agreements under which they have net liability positions, but the counterparties have not called for collateral due, which is approximately $1 million as of December 31, 2012. As of December 31, 2012, GenOn Mid-Atlantic did not have any financial instruments with credit risk related contingent features.

*Coal Agreement Risk*

In addition, the Registrants have non-performance risk associated with their coal agreements. There is risk that their coal suppliers may not provide the contractual quantities on the dates specified within the agreements, or the deliveries may be carried over to future periods. If their coal suppliers do not perform in accordance with the agreements, the Registrants may have to procure coal in the market to meet their needs, or power in the market to meet their obligations. In addition, generally the Registrants' coal suppliers do not have investment grade credit ratings nor do they post collateral with the Registrants and, accordingly, the Registrants may have limited ability to collect damages in the event of default by such suppliers. The Registrants seek to mitigate this risk through diversification of coal suppliers, to the extent possible, and through guarantees. Despite this, there can be no assurance that these efforts will be successful in mitigating credit risk from coal suppliers. Non-performance or default risk by the Registrants' coal suppliers could have a material adverse effect on their future results of operations, financial condition and cash flows.

Certain of the Registrants' coal contracts are not required to be recorded at fair value under the accounting guidance for derivative financial instruments. As such, these contracts are not included in derivative contract assets and liabilities in the consolidated balance sheets. For GenOn, these contracts contain pricing terms that are unfavorable compared to forward market prices at December 31, 2012, and are projected to result in a $2 million expense to GenOn's realized value of hedges through 2014 as the coal is utilized in the production of electricity. For GenOn Americas Generation and GenOn Mid-Atlantic, these contracts contain pricing terms that are favorable compared to forward market prices at December 31, 2012, and are projected to provide a $1 million benefit to their realized value of hedges through 2013 as the coal is utilized in the production of electricity.

**Item 8 — Financial Statements and Supplementary Data (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

The financial statements and schedules of the Registrants are listed in Part IV, Item 15 of this Form 10-K.

**Item 9 — Changes in and Disagreements with Accountants on Accounting and Financial Disclosure (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

None.

**Item 9A — Controls and Procedures (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

**Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures and Internal Control Over Financial Reporting**

Under the supervision and with the participation of the Registrants' management, including principal executive officer, principal financial officer and principal accounting officer, the Registrants conducted an evaluation of the effectiveness of the design and operation of disclosure controls and procedures, as such term is defined in Rules 13a-15(e) or 15d-15(e) of the Exchange Act. Based on this evaluation, the Registrants' principal executive officer, principal financial officer and principal accounting officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this annual report on Form 10-K. Management's reports on the Registrants' internal control over financial reporting are incorporated under the caption "Management's Report on Internal Control over Financial Reporting" of the Registrants' Annual Report on Form 10-K for the fiscal year ended December 31, 2012.

**Changes in Internal Control over Financial Reporting**

On December 14, 2012, NRG acquired the Registrants as described in Item 15- Note 3, *NRG Merger,* to the Consolidated Financial Statements. Prior to the acquisition date, there were no changes in either NRG's or the Registrants' internal control over financial reporting (as such term is defined in Rule 13a-15(f) under the Exchange Act) that occurred in the fourth quarter of 2012 that materially affected, or are reasonably likely to materially affect, the Registrants' internal control over financial reporting.

Post acquisition, management maintained the effectiveness of the Registrants' legacy controls over the design and operation of their disclosure controls and procedures.  In addition, management designed and tested additional controls over the financial reporting process, which support the preparation of the consolidated financial statements in accordance with U.S. GAAP.

The Registrants plan to further integrate into NRG's internal control over financial reporting in 2013.

**Inherent Limitations over Internal Controls**

The Registrants' internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with U.S. GAAP. The Registrants' internal control over financial reporting includes those policies and procedures that:

1.  Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Registrants' assets;

2.  Provide reasonable assurance that transactions are recorded as necessary to permit preparation of consolidated financial statements in accordance with U.S. GAAP, and that the Registrants' receipts and expenditures are being made only in accordance with authorizations of management and directors; and

3.  Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Registrants' assets that could have a material effect on the consolidated financial statements.

Internal control over financial reporting cannot provide absolute assurance of achieving financial reporting objectives because of its inherent limitations, including the possibility of human error and circumvention by collusion or overriding of controls. Accordingly, even an effective internal control system may not prevent or detect material misstatements on a timely basis. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate.

**Item 9B — Other Information (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

None.

PART III

**Item 10 — Directors, Executive Officers and Corporate Governance**

**Item 11 — Executive Compensation**

**Item 12 — Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

**Item 13 — Certain Relationships and Related Transactions, and Director Independence**

Each of Items 10 through 13 has been omitted from this report for the Registrants pursuant to the reduced disclosure format permitted by General Instruction I to Form 10-K.

**Item 14 — Principal Accounting Fees and Services (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

KPMG LLP conducts an integrated audit of NRG and its subsidiaries. Professional audit services and other services rendered by KPMG LLP subsequent to December 14, 2012 were allocated to the Registrants through the Services Agreement with NRG as described in Note 19, *Related Party Transactions*, to the Registrants' consolidated financial statements. Prior to the NRG Merger, the GenOn Audit Committee pre-approved all audit services and permissible non-audit services provided by the independent auditor. As provided in the NRG Audit Committee Charter, the NRG Audit Committee pre-approved all audit services and permissible non-audit services provided by the independent auditor from the time of the NRG Merger and for the remainder of fiscal year 2012.

The following table shows the aggregate fees related to the audit and other services provided by KPMG LLP for fiscal years 2012 and 2011. Amounts in the table for periods prior to the consummation of the NRG Merger on December 14, 2012 reflect amounts paid by the Registrants to KPMG LLP.

|  | 2012 | | 2011 | |
| --- | --- | --- | --- | --- |
|  | (in thousands) | | | |
| Audit Fees[a] | $ | 4,840 | $ | 5,390 |
| Audit-Related Fees[b] | | 197 | | 25 |
| Total | $ | 5,037 | $ | 5,415 |

(a)  Includes fees and expenses related to the audits of the Registrants' consolidated financial statements for 2012 and 2011 and the effectiveness of GenOn's internal controls over financial reporting for 2011. This category also includes the review of financial statements included in the Registrants' Quarterly Reports on Form 10-Q, the audits of various subsidiary financial statements required by statute or regulation, and services that are normally provided by the independent auditors in connection with regulatory filings or engagements, consultations provided on audit and accounting matters that arose during, or as a result of, the audits or the reviews of interim financial statements, and the preparation of any written communications on internal control matters.

(b)  Consists of accounting consulting, assurance and related services that are reasonably related to the performance of the audit or review of the Registrants' financial statements, which during 2012 related to the NRG Merger, and are not reported above under "Audit Fees."

**PART IV**

**Item 15 — Exhibits, Financial Statement Schedules (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

(a)(1) Financial Statements

The following consolidated financial statements of GenOn Energy, Inc., GenOn Americas Generation, LLC and GenOn Mid-Atlantic, LLC and related notes thereto, together with the reports thereon of KPMG LLP, are included herein:

GenOn Energy, Inc.

Consolidated Statements of Operations

Consolidated Statements of Comprehensive Loss

Consolidated Balance Sheets

Consolidated Statements of Cash Flows

Consolidated Statement of Stockholder's Equity

GenOn Americas Generation, LLC

Consolidated Statements of Operations

Consolidated Balance Sheets

Consolidated Statements of Cash Flows

Consolidated Statement of Member's Equity

GenOn Mid-Atlantic, LLC

Consolidated Statements of Operations

Consolidated Balance Sheets

Consolidated Statements of Cash Flows

Consolidated Statement of Member's Equity

Combined Notes to Consolidated Financial Statements

(a)(2) Financial Statement Schedules

The following Consolidated Financial Statement Schedules of GenOn Energy, Inc., GenOn Americas Generation, LLC and GenOn Mid-Atlantic, LLC are filed as part of Item 15(d) of this report and should be read in conjunction with the Consolidated Financial Statements.

Schedule I — GenOn Energy, Inc. Financial Statements

Schedule I — GenOn Americas Generation, LLC Financial Statements

Schedule II — Valuation and Qualifying Accounts

All other schedules for which provision is made in the applicable accounting regulation of the Securities and Exchange Commission are not required under the related instructions or are inapplicable, and therefore, have been omitted.

(a)(3) Exhibits: See Exhibit Index submitted as a separate section of this report.

(b) Exhibits

See Exhibit Index submitted as a separate section of this report.

(c) Not applicable

**MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

The Registrants' management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of the Registrants' management, including their principal executive officer, principal financial officer and principal accounting officer, the Registrants conducted an evaluation of the effectiveness of their internal control over financial reporting based on the framework in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on the Registrants' evaluation under the framework in Internal Control — Integrated Framework, the Registrants' management concluded that their internal control over financial reporting was effective as of December 31, 2012.

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Stockholder
GenOn Energy, Inc.:

We have audited the accompanying consolidated balance sheets of GenOn Energy, Inc. and subsidiaries as of December 31, 2012 (Successor) and December 31, 2011 (Predecessor), and the related consolidated statements of operations, comprehensive loss, stockholder's equity and cash flows for the periods from December 15, 2012 to December 31, 2012 (Successor period), and from January 1, 2012 to December 14, 2012 (Predecessor period) and for each of the years in the two-year period ended December 31, 2011 (Predecessor periods). These consolidated financial statements are the responsibility of the Companies' management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the aforementioned Successor consolidated financial statements present fairly, in all material respects, the financial position of GenOn Energy, Inc. and subsidiaries as of December 31, 2012, and the results of their operations and their cash flows for the Successor period, in conformity with U.S. generally accepted accounting principles. Further, in our opinion, the aforementioned Predecessor consolidated financial statements present fairly, in all material respects, the financial position of GenOn Energy, Inc. and subsidiaries as of December 31, 2011, and the results of their operations and their cash flows for the Predecessor periods, in conformity with U.S. generally accepted accounting principles.

As discussed in note 3 to the consolidated financial statements, effective December 15, 2012, NRG Energy, Inc. acquired all of the outstanding stock of GenOn Energy, Inc. in a business combination accounted for as a purchase. As a result of the acquisition, the consolidated financial information for the periods after the acquisition is presented on a different cost basis than that for the periods before the acquisition and, therefore, is not comparable.

/s/ KPMG LLP

KPMG LLP

Houston, Texas
February 27, 2013

45

.

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Member
GenOn Americas Generation, LLC:

We have audited the accompanying consolidated balance sheets of GenOn Americas Generation, LLC and subsidiaries as of December 31, 2012 (Successor) and December 31, 2011 (Predecessor), and the related consolidated statements of operations, member's equity and cash flows for the periods from December 15, 2012 to December 31, 2012 (Successor period), and from January 1, 2012 to December 14, 2012 (Predecessor period) and for each of the years in the two-year period ended December 31, 2011 (Predecessor periods). These consolidated financial statements are the responsibility of the Companies' management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the aforementioned Successor consolidated financial statements present fairly, in all material respects, the financial position of GenOn Americas Generation, LLC and subsidiaries as of December 31, 2012, and the results of their operations and their cash flows for the Successor period, in conformity with U.S. generally accepted accounting principles. Further, in our opinion, the aforementioned Predecessor consolidated financial statements present fairly, in all material respects, the financial position of GenOn Americas Generation, LLC and subsidiaries as of December 31, 2011, and the results of their operations and their cash flows for the Predecessor periods, in conformity with U.S. generally accepted accounting principles.

As discussed in note 3 to the consolidated financial statements, effective December 15, 2012, NRG Energy, Inc. acquired all of the outstanding stock of GenOn Energy, Inc., parent company of GenOn Americas Generation, LLC, in a business combination accounted for as a purchase. As a result of the acquisition, the consolidated financial information for the periods after the acquisition is presented on a different cost basis than that for the periods before the acquisition and, therefore, is not comparable.

/s/ KPMG LLP

KPMG LLP

Houston, Texas
February 27, 2013

46

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Member
GenOn Mid-Atlantic, LLC:

We have audited the accompanying consolidated balance sheets of GenOn Mid-Atlantic, LLC and subsidiaries as of December 31, 2012 (Successor) and December 31, 2011 (Predecessor), and the related consolidated statements of operations, member's equity and cash flows for the periods from December 15, 2012 to December 31, 2012 (Successor period), and from January 1, 2012 to December 14, 2012 (Predecessor period) and for each of the years in the two-year period ended December 31, 2011 (Predecessor periods). These consolidated financial statements are the responsibility of the Companies' management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the aforementioned Successor consolidated financial statements present fairly, in all material respects, the financial position of GenOn Mid-Atlantic, LLC and subsidiaries as of December 31, 2012, and the results of their operations and their cash flows for the Successor period, in conformity with U.S. generally accepted accounting principles. Further, in our opinion, the aforementioned Predecessor consolidated financial statements present fairly, in all material respects, the financial position of GenOn Mid-Atlantic, LLC and subsidiaries as of December 31, 2011, and the results of their operations and their cash flows for the Predecessor periods, in conformity with U.S. generally accepted accounting principles.

As discussed in note 3 to the consolidated financial statements, effective December 15, 2012, NRG Energy, Inc. acquired all of the outstanding stock of GenOn Energy, Inc., parent company of GenOn Mid-Atlantic, LLC, in a business combination accounted for as a purchase. As a result of the acquisition, the consolidated financial information for the periods after the acquisition is presented on a different cost basis than that for the periods before the acquisition and, therefore, is not comparable.

/s/ KPMG LLP

KPMG LLP

Houston, Texas
February 27, 2013

47

GENON ENERGY, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | (In millions) | | |
| **Operating Revenues** | | | | |
| Total operating revenues | $ 73 | $ 2,564 | $ 3,614 | $ 2,270 |
| **Operating Costs and Expenses** | | | | |
| Cost of operations | 66 | 2,073 | 2,642 | 1,528 |
| Depreciation and amortization | 10 | 339 | 375 | 224 |
| Impairment losses | — | 47 | 133 | 565 |
| Selling, general and administrative | 61 | 177 | 255 | 277 |
| Total operating costs and expenses | 137 | 2,636 | 3,405 | 2,594 |
| **Operating Income/(Loss)** | (64) | (72) | 209 | (324) |
| **Other Income/(Expense)** | | | | |
| Other income, net | — | 3 | 4 | 16 |
| Gain on bargain purchase | — | — | — | 335 |
| Interest expense | (8) | (330) | (379) | (253) |
| Loss on debt extinguishment and refinancing expense | — | — | (23) | (9) |
| Total other income/(expense) | (8) | (327) | (398) | 89 |
| **Loss Before Income Taxes** | (72) | (399) | (189) | (235) |
| Income tax expense/(benefit) | — | 15 | — | (2) |
| **Net Loss** | $ (72) | $ (414) | $ (189) | $ (233) |

See notes to Consolidated Financial Statements.

48

**GENON ENERGY, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS**

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | (In millions) | | |
| **Net Loss** | $ (72) | $ (414) | $ (189) | $ (233) |
| **Other Comprehensive Income/(Loss), net of reclassifications, net of tax of $0:** | | | | |
| Unrealized gain/(loss) on derivatives | 1 | (18) | (55) | 21 |
| Available-for-sale securities | — | — | (1) | 1 |
| Defined benefit plans | 1 | (8) | (89) | 6 |
| Other, net | — | 1 | — | — |
| **Other Comprehensive Income/(Loss)** | 2 | (25) | (145) | 28 |
| **Comprehensive Loss** | $ (70) | $ (439) | $ (334) | $ (205) |

See notes to Consolidated Financial Statements.

49

**GENON ENERGY, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

| | Successor | Predecessor |
|---|---|---|
| | As of December 31, 2012 | As of December 31, 2011 |
| | (In millions) | (In millions) |
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 825 | $ 1,539 |
| Funds deposited by counterparties | 140 | 129 |
| Restricted cash | 18 | 201 |
| Accounts receivable — trade | 138 | 357 |
| Inventory | 450 | 563 |
| Derivative instruments | 596 | 999 |
| Derivative instruments — affiliate | 8 | — |
| Cash collateral paid in support of energy risk management activities | 148 | 185 |
| Prepayments | 85 | 167 |
| Taxes receivable and other current assets | 131 | 36 |
| Total current assets | 2,539 | 4,176 |
| **Property, Plant and Equipment** | | |
| In service | 3,321 | 6,956 |
| Under construction | 634 | 395 |
| Total property, plant and equipment | 3,955 | 7,351 |
| Less accumulated depreciation | (9) | (1,160) |
| Net property, plant and equipment | 3,946 | 6,191 |
| **Other Assets** | | |
| Intangible assets, net of accumulated amortization of $1 and $36 | 68 | 48 |
| Derivative instruments | 511 | 733 |
| Derivative instruments — affiliate | 1 | — |
| Deferred income taxes | 209 | 294 |
| Prepaid rent | — | 386 |
| Other non-current assets | 232 | 441 |
| Total other assets | 1,021 | 1,902 |
| **Total Assets** | $ 7,506 | $ 12,269 |

See notes to Consolidated Financial Statements.

**GENON ENERGY, INC. AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS (Continued)**

| | Successor | Predecessor |
|---|---|---|
| | As of December 31, 2012 | As of December 31, 2011 |
| | (In millions) | (In millions) |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| **Current Liabilities** | | |
| Current portion of long-term debt and capital leases | $ 32 | $ 10 |
| Accounts payable | 188 | 448 |
| Accounts payable — affiliate | 6 | — |
| Derivative instruments | 237 | 720 |
| Derivative instruments — affiliate | 8 | — |
| Deferred income taxes | 209 | 294 |
| Cash collateral received in support of energy risk management activities | 140 | 129 |
| Accrued payroll | 151 | 120 |
| Accrued taxes | 93 | 116 |
| Accrued expenses and other current liabilities | 102 | 107 |
| Total current liabilities | 1,166 | 1,944 |
| **Other Liabilities** | | |
| Long-term debt and capital leases | 4,167 | 4,122 |
| Postretirement and other benefit obligations | 324 | 259 |
| Derivative instruments | 123 | 131 |
| Derivative instruments — affiliate | 1 | — |
| Out-of-market contracts | 1,062 | 398 |
| Other non-current liabilities | 250 | 298 |
| Total non-current liabilities | 5,927 | 5,208 |
| **Total Liabilities** | 7,093 | 7,152 |
| **Commitments and Contingencies** | | |
| **Stockholder's Equity** | | |
| Preferred stock: no shares authorized and issued at December 31, 2012; $0.001 par value, 125,000,000 shares authorized, no shares issued at December 31, 2011 | — | — |
| Common stock: $0.001 par value, 1 share authorized and issued at December 31, 2012; $0.001 par value, 2.0 billion shares authorized, 771,692,734 shares issued at December 31, 2011 | — | 1 |
| Additional paid-in capital | 483 | 7,449 |
| Accumulated deficit | (72) | (2,163) |
| Accumulated other comprehensive income/(loss) | 2 | (170) |
| Total Stockholder's Equity | 413 | 5,117 |
| **Total Liabilities and Stockholder's Equity** | $ 7,506 | $ 12,269 |

See notes to Consolidated Financial Statements.

51

**GENON ENERGY, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | (In millions) | | |
| **Cash Flows from Operating Activities** | | | | |
| Net loss | $ (72) | $ (414) | $ (189) | $ (233) |
| Adjustments to reconcile net loss to net cash provided/(used) by operating activities: | | | | |
| Depreciation and amortization | 10 | 339 | 375 | 224 |
| Amortization of financing costs and debt discount/premiums | (4) | 16 | 15 | 10 |
| Loss on debt extinguishment | — | — | 23 | — |
| Amortization of acquired and out-of-market contracts | (2) | (45) | (33) | — |
| Amortization of unearned equity compensation | 6 | 19 | 14 | 41 |
| Gain on disposals and sales of assets | — | (9) | (6) | (4) |
| Impairment losses | — | 47 | 133 | 565 |
| Changes in derivative instruments | 13 | 143 | (224) | 42 |
| Gain on bargain purchase | — | — | — | (335) |
| Postretirement benefits curtailment (gain) loss | — | 2 | — | (37) |
| Excess materials and supplies inventory reserve | — | 35 | — | — |
| Lower of cost or market inventory adjustments | — | 108 | 13 | 22 |
| Advance settlement of out-of-market contract obligation | — | (20) | — | — |
| Potomac River settlement obligation and reversal | — | (32) | — | 32 |
| Large scale remediation and settlement costs | — | (3) | 59 | — |
| Other, net | — | 3 | (5) | 23 |
| Cash provided/(used) by changes in other working capital, net of acquisition and disposition effects: | | | | |
| Accounts receivable - trade | (10) | 164 | 204 | (10) |
| Inventory | (1) | (56) | (21) | (65) |
| Prepayments and other current assets | (27) | (31) | (38) | (42) |
| Accounts payable | (67) | (111) | (183) | 176 |
| Accrued expenses and other current liabilities | 18 | 36 | 14 | (157) |
| Other assets and liabilities | (16) | 17 | (8) | (31) |
| Net Cash Provided/(Used) by Operating Activities of Continuing Operations | (152) | 208 | 143 | 221 |
| Net Cash Provided by Operating Activities of Discontinued Operations | — | — | — | 6 |
| **Net Cash Provided/(Used) by Operating Activities** | (152) | 208 | 143 | 227 |
| **Cash Flows from Investing Activities** | | | | |
| Acquisition of businesses, net of cash acquired | — | — | — | 717 |
| Capital expenditures | (12) | (557) | (450) | (304) |
| Proceeds from sale of assets, net | — | 14 | 18 | 4 |
| (Increase)/decrease in restricted cash, net | 6 | 189 | 1,424 | (1,545) |
| Other | — | 2 | (21) | (43) |
| **Net Cash Provided/(Used) by Investing Activities** | (6) | (352) | 971 | (1,171) |
| **Cash Flows from Financing Activities** | | | | |
| Payment for treasury stock | — | — | — | (11) |
| Proceeds from issuance of long-term debt | — | 283 | 107 | 1,896 |
| Payment of debt issuance costs | — | — | (2) | (92) |
| Payments for short and long-term debt | — | (695) | (2,078) | (379) |
| Proceeds from exercises of stock options | — | — | 3 | 1 |

| | | | | | | | |
|---|---:|---|---:|---|---:|---|---:|
| **Net Cash Provided/(Used) by Financing Activities** | | — | | (412) | | (1,970) | 1,415 |
| **Net (Decrease)/Increase in Cash and Cash Equivalents** | | (158) | | (556) | | (856) | 471 |
| **Cash and Cash Equivalents at Beginning of Period** | | 983 | | 1,539 | | 2,395 | 1,924 |
| **Cash and Cash Equivalents at End of Period** | $ | 825 | $ | 983 | $ | 1,539 | $ 2,395 |
| **Supplemental Disclosures** | | | | | | | |
| Interest paid, net of amount capitalized | $ | 51 | $ | 279 | $ | 382 | $ 244 |
| Income taxes paid, net of refunds received | $ | — | $ | 11 | $ | (9) | $ (1) |
| **Non-cash investing and financing activities** | | | | | | | |
| Issuance of common stock to affect the Mirant/RRI Merger | $ | — | $ | — | $ | — | $ 1,305 |

See notes to Consolidated Financial Statements.

52

GENON ENERGY, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENT OF STOCKHOLDER'S EQUITY

| | Common Stock | | Additional Paid-In Capital | | Accumulated Deficit | | Treasury Stock | | Accumulated Other Comprehensive Income/(Loss) | | Total Stockholder's Equity |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (In millions) | | | | | | |
| **Predecessor** | | | | | | | | | | | |
| **Balances as of December 31, 2009** | $ | — | $ | 6,085 | $ | (1,741) | $ | 11 | $ | (53) | $ | 4,302 |
| Net loss | | — | | — | | (233) | | — | | — | | (233) |
| Other comprehensive income | | — | | — | | — | | — | | 28 | | 28 |
| Purchase of treasury stock | | — | | — | | — | | (11) | | — | | (11) |
| Equity-based compensation | | — | | 43 | | — | | — | | — | | 43 |
| Shares issued pursuant to the Mirant/RRI Merger | | 1 | | 1,304 | | — | | — | | — | | 1,305 |
| **Balances as of December 31, 2010** | $ | 1 | $ | 7,432 | $ | (1,974) | $ | — | $ | (25) | $ | 5,434 |
| Net loss | | — | | — | | (189) | | — | | — | | (189) |
| Other comprehensive loss | | — | | — | | — | | — | | (145) | | (145) |
| Equity-based compensation | | — | | 17 | | — | | — | | — | | 17 |
| **Balances as of December 31, 2011** | $ | 1 | $ | 7,449 | $ | (2,163) | $ | — | $ | (170) | $ | 5,117 |
| Net loss | | — | | — | | (414) | | — | | — | | (414) |
| Other comprehensive loss | | — | | — | | — | | — | | (25) | | (25) |
| Equity-based compensation | | — | | 14 | | — | | — | | — | | 14 |
| **Balances as of December 14, 2012**[a] | $ | 1 | $ | 7,463 | $ | (2,577) | $ | — | $ | (195) | $ | 4,692 |
| **Successor** | | | | | | | | | | | |
| **Balances as of December 15, 2012**[a] | $ | — | $ | 483 | $ | — | $ | — | $ | — | $ | 483 |
| Net loss | | — | | — | | (72) | | — | | — | | (72) |
| Other comprehensive income | | — | | — | | — | | — | | 2 | | 2 |
| **Balances as of December 31, 2012** | $ | — | $ | 483 | $ | (72) | $ | — | $ | 2 | $ | 413 |

(a)   The differences in equity balances at December 14, 2012 and December 15, 2012 are due to the application of pushdown accounting reflecting the NRG Merger.

See notes to Consolidated Financial Statements.

53

**GENON AMERICAS GENERATION, LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | (In millions) | | |
| **Operating Revenues** | | | | |
| Operating revenues | $ 74 | $ 2,405 | $ 3,015 | $ 2,102 |
| Operating revenues — affiliate | 3 | 189 | (77) | 3 |
| Total operating revenues | 77 | 2,594 | 2,938 | 2,105 |
| **Operating Costs and Expenses** | | | | |
| Cost of operations | 28 | 1,064 | 1,038 | 1,217 |
| Cost of operations — affiliate | 41 | 1,307 | 1,374 | 231 |
| Depreciation and amortization | 5 | 155 | 177 | 199 |
| Impairment losses | — | — | 128 | 565 |
| Selling, general and administrative | 1 | 11 | 12 | 15 |
| Selling, general and administrative — affiliate | 2 | 62 | 76 | 65 |
| Total operating costs and expenses | 77 | 2,599 | 2,805 | 2,292 |
| **Operating Income/(Loss)** | — | (5) | 133 | (187) |
| **Other Income/(Expense)** | | | | |
| Other expense, net | — | — | (1) | — |
| Interest expense | (3) | (70) | (88) | (200) |
| Interest expense — affiliate | — | (5) | (5) | — |
| Loss on debt extinguishment and refinancing expense | — | — | (23) | (9) |
| Total other expense | (3) | (75) | (117) | (209) |
| **Income/(Loss) Before Income Taxes** | (3) | (80) | 16 | (396) |
| Income tax expense/(benefit) | — | — | — | — |
| **Net Income/(Loss)** | $ (3) | $ (80) | $ 16 | $ (396) |

See notes to Consolidated Financial Statements.

**GENON AMERICAS GENERATION, LLC AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

| | Successor | Predecessor |
|---|---|---|
| | As of December 31, 2012 | As of December 31, 2011 |
| | (In millions) | (In millions) |
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 148 | $ 267 |
| Restricted cash | — | 198 |
| Accounts receivable — trade | 125 | 288 |
| Accounts receivable — affiliate | — | 22 |
| Note receivable — affiliate | 198 | 181 |
| Inventory | 239 | 257 |
| Derivative instruments | 596 | 977 |
| Derivative instruments — affiliate | 60 | 44 |
| Cash collateral paid in support of energy risk management activities | 91 | 118 |
| Prepayments and other current assets | 62 | 113 |
| Total current assets | 1,519 | 2,465 |
| **Property, Plant and Equipment** | | |
| In service | 1,313 | 3,818 |
| Under construction | 18 | 76 |
| Total property, plant and equipment | 1,331 | 3,894 |
| Less accumulated depreciation | (4) | (960) |
| Net property, plant and equipment | 1,327 | 2,934 |
| **Other Assets** | | |
| Intangible assets, net of accumulated amortization of $1 and $16 | 66 | 28 |
| Derivative instruments | 511 | 731 |
| Derivative instruments — affiliate | 25 | 29 |
| Prepaid rent | — | 386 |
| Other non-current assets | 13 | 16 |
| Total other assets | 615 | 1,190 |
| **Total Assets** | $ 3,461 | $ 6,589 |

See notes to Consolidated Financial Statements.

GENON AMERICAS GENERATION, LLC AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS (Continued)

| | Successor | Predecessor |
|---|---|---|
| | As of December 31, 2012 | As of December 31, 2011 |
| | (In millions) | (In millions) |
| **LIABILITIES AND MEMBER'S EQUITY** | | |
| **Current Liabilities** | | |
| Current portion of long-term debt and capital leases | $ 5 | $ 4 |
| Accounts payable | 69 | 322 |
| Accounts payable — affiliate | 71 | 93 |
| Note payable — affiliate | — | 47 |
| Derivative instruments | 228 | 700 |
| Derivative instruments — affiliate | 134 | 76 |
| Cash collateral received in support of energy risk management activities | 140 | 129 |
| Accrued expenses and other current liabilities | 72 | 83 |
| Total current liabilities | 719 | 1,454 |
| **Other Liabilities** | | |
| Long-term debt and capital leases | 955 | 862 |
| Derivative instruments | 82 | 100 |
| Derivative instruments — affiliate | 51 | 89 |
| Out-of-market contracts | 539 | — |
| Other non-current liabilities | 103 | 119 |
| Total non-current liabilities | 1,730 | 1,170 |
| **Total Liabilities** | 2,449 | 2,624 |
| **Commitments and Contingencies** | | |
| **Member's Equity** | | |
| Member's interest | 1,012 | 3,965 |
| Total Member's Equity | 1,012 | 3,965 |
| **Total Liabilities and Member's Equity** | $ 3,461 | $ 6,589 |

See notes to Consolidated Financial Statements.

56

**GENON AMERICAS GENERATION, LLC AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | (In millions) | | |
| **Cash Flows from Operating Activities** | | | | |
| Net income/(loss) | $ (3) | $ (80) | $ 16 | $ (396) |
| Adjustments to reconcile net income/(loss) to net cash provided/ (used) by operating activities: | | | | |
| Depreciation and amortization | 5 | 155 | 177 | 199 |
| Amortization of financing costs and debt discount/premiums | — | — | (1) | 8 |
| Loss on debt extinguishment | — | — | 23 | — |
| Gain on disposals and sales of assets | — | — | (3) | (9) |
| Impairment losses | — | — | 128 | 565 |
| Changes in derivative instruments | 12 | 134 | (138) | 17 |
| Excess materials and supplies inventory reserve | — | 6 | — | — |
| Lower of cost or market inventory adjustments | — | 65 | 8 | 22 |
| Potomac River settlement obligation and reversal | — | (32) | — | 32 |
| Large scale remediation and settlement costs | — | (3) | 59 | — |
| Other, net | — | — | — | 10 |
| Cash provided/(used) by changes in other working capital, net of acquisition and disposition effects: | | | | |
| Accounts receivable - trade | (16) | 127 | 75 | 38 |
| Accounts receivable – affiliate | — | (9) | (20) | (2) |
| Inventory | (4) | (67) | 30 | (76) |
| Prepayments and other current assets | (19) | (23) | (27) | (39) |
| Accounts payable | (50) | (56) | 39 | 95 |
| Accounts payable - affiliate | (40) | 47 | 39 | — |
| Accrued expenses and other current liabilities | 20 | 8 | 25 | (108) |
| Other assets and liabilities | (19) | (2) | (66) | 88 |
| **Net Cash Provided/(Used) by Operating Activities** | (114) | 270 | 364 | 444 |
| **Cash Flows from Investing Activities** | | | | |
| Capital expenditures | (4) | (190) | (159) | (252) |
| Proceeds from sale of assets, net | — | 2 | 9 | 8 |
| (Increase)/decrease in restricted cash, net | — | 197 | 702 | (866) |
| (Increase)/decrease in notes receivable - affiliate | 95 | (211) | (181) | — |
| **Net Cash Provided/(Used) by Investing Activities** | 91 | (202) | 371 | (1,110) |
| **Cash Flows from Financing Activities** | | | | |
| Payments for short and long-term debt | — | (4) | (1,405) | (376) |
| Increase/(decrease) of notes payable-affiliate | — | 52 | 49 | — |
| Capital contributions | — | 18 | 474 | 1,079 |
| Distributions to member | — | (230) | (100) | (222) |
| Redemption of preferred stock in affiliate | — | — | — | 295 |
| **Net Cash Provided/(Used) by Financing Activities** | — | (164) | (982) | 776 |
| **Net (Decrease)/Increase in Cash and Cash Equivalents** | (23) | (96) | (247) | 110 |
| **Cash and Cash Equivalents at Beginning of Period** | 171 | 267 | 514 | 404 |
| **Cash and Cash Equivalents at End of Period** | $ 148 | $ 171 | $ 267 | $ 514 |
| **Supplemental Disclosures** | | | | |
| Interest paid, net of amount capitalized | $ — | $ 72 | $ 94 | $ 185 |
| Cash refunds received for income taxes | $ — | $ — | $ 1 | $ — |

**Non-cash investing and financing activities**

| Conversion to equity of notes payable to affiliate | $ | — | $ | — | $ | 2 | $ | — |

See notes to Consolidated Financial Statements.

GENON AMERICAS GENERATION, LLC SUBSIDIARIES

CONSOLIDATED STATEMENT OF MEMBER'S EQUITY

| | Member's Interest | | Preferred Stock in Affiliate | | Total Member's Equity | |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| **Predecessor** | | | | | | |
| **Balances as of December 31, 2009** | $ | 3,097 | $ | (280) | $ | 2,817 |
| Net loss | | (396) | | — | | (396) |
| Amortization of discount on preferred stock in affiliate | | 15 | | (15) | | — |
| Redemption of preferred stock in affiliate | | — | | 295 | | 295 |
| Distributions to member | | (222) | | — | | (222) |
| Capital contributions | | 1,079 | | — | | 1,079 |
| **Balances as of December 31, 2010** | $ | 3,573 | $ | — | $ | 3,573 |
| Net income | | 16 | | — | | 16 |
| Distributions to member | | (100) | | — | | (100) |
| Capital contributions | | 476 | | — | | 476 |
| **Balances as of December 31, 2011** | $ | 3,965 | $ | — | $ | 3,965 |
| Net loss | | (80) | | — | | (80) |
| Distributions to member | | (230) | | — | | (230) |
| Capital contributions | | 18 | | — | | 18 |
| **Balances as of December 14, 2012**[a] | $ | 3,673 | $ | — | $ | 3,673 |
| **Successor** | | | | | | |
| **Balances as of December 15, 2012**[a] | $ | 1,015 | $ | — | $ | 1,015 |
| Net loss | | (3) | | — | | (3) |
| **Balances as of December 31, 2012** | $ | 1,012 | $ | — | $ | 1,012 |

(a)   The differences in equity balances at December 14, 2012 and December 15, 2012 are due to the application of pushdown accounting reflecting the NRG Merger.

See notes to Consolidated Financial Statements.

58

GENON MID-ATLANTIC, LLC AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | (In millions) | | |
| **Operating Revenues** | | | | |
| Operating revenues | $ (3) | $ 143 | $ 260 | $ 347 |
| Operating revenues — affiliate | 31 | 846 | 1,087 | 1,357 |
| Total operating revenues | 28 | 989 | 1,347 | 1,704 |
| **Operating Costs and Expenses** | | | | |
| Cost of operations | 8 | 202 | 311 | 310 |
| Cost of operations — affiliate | 13 | 592 | 644 | 825 |
| Depreciation and amortization | 4 | 114 | 131 | 141 |
| Impairment losses | — | — | 94 | 1,153 |
| Selling, general and administrative | — | 7 | 8 | 7 |
| Selling, general and administrative — affiliate | 2 | 39 | 49 | 46 |
| Total operating costs and expenses | 27 | 954 | 1,237 | 2,482 |
| **Operating Income/(Loss)** | 1 | 35 | 110 | (778) |
| **Other Income/(Expense)** | | | | |
| Other expense, net | — | — | — | (1) |
| Interest expense | — | (1) | (1) | (3) |
| Interest expense — affiliate | — | (3) | (4) | — |
| Total other expense | — | (4) | (5) | (4) |
| **Income/(Loss) Before Income Taxes** | 1 | 31 | 105 | (782) |
| Income tax benefit | — | — | — | (1) |
| **Net Income/(Loss)** | $ 1 | $ 31 | $ 105 | $ (781) |

See notes to Consolidated Financial Statements.

**GENON MID-ATLANTIC, LLC AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

| | Successor | Predecessor |
|---|---|---|
| | As of December 31, 2012 | As of December 31, 2011 |
| | (In millions) | (In millions) |
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 135 | $ 68 |
| Restricted cash | — | 198 |
| Accounts receivable — trade | 4 | 25 |
| Accounts receivable — affiliate | — | 44 |
| Inventory | 150 | 167 |
| Derivative instruments | 285 | 208 |
| Derivative instruments — affiliate | 109 | 191 |
| Prepayments and other current assets | 44 | 100 |
| Total current assets | 727 | 1,001 |
| **Property, Plant and Equipment** | | |
| In service | 1,210 | 2,990 |
| Under construction | 14 | 64 |
| Total property, plant and equipment | 1,224 | 3,054 |
| Less accumulated depreciation | (4) | (610) |
| Net property, plant and equipment | 1,220 | 2,444 |
| **Other Assets** | | |
| Intangible assets, net of accumulated amortization of $0 and $4 | 1 | 16 |
| Derivative instruments | 351 | 526 |
| Derivative instruments — affiliate | 104 | 105 |
| Prepaid rent | — | 386 |
| Total other assets | 456 | 1,033 |
| **Total Assets** | $ 2,403 | $ 4,478 |

See notes to Consolidated Financial Statements.

**GENON MID-ATLANTIC, LLC AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS (Continued)**

| | Successor | Predecessor |
|---|---|---|
| | As of December 31, 2012 | As of December 31, 2011 |
| | (In millions) | (In millions) |
| **LIABILITIES AND MEMBER'S EQUITY** | | |
| **Current Liabilities** | | |
| Current portion of long-term debt and capital leases | $ 5 | $ 4 |
| Accounts payable | 16 | 51 |
| Accounts payable — affiliate | 2 | 44 |
| Derivative instruments | 3 | — |
| Derivative instruments — affiliate | 97 | 168 |
| Cash collateral received in support of energy risk management activities | 57 | — |
| Contract retention liability | — | 69 |
| Accrued taxes and other current liabilities | 38 | 55 |
| Total current liabilities | 218 | 391 |
| **Other Liabilities** | | |
| Long-term debt and capital leases | 9 | 14 |
| Derivative instruments — affiliate | 55 | 68 |
| Out-of-market contracts | 539 | — |
| Other non-current liabilities | 56 | 78 |
| Total non-current liabilities | 659 | 160 |
| **Total Liabilities** | 877 | 551 |
| **Commitments and Contingencies** | | |
| **Member's Equity** | | |
| Member's interest | 1,526 | 3,927 |
| Total Member's Equity | 1,526 | 3,927 |
| **Total Liabilities and Member's Equity** | $ 2,403 | $ 4,478 |

See notes to Consolidated Financial Statements.

61

GENON MID-ATLANTIC, LLC AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | (In millions) | | |
| **Cash Flows from Operating Activities** | | | | |
| Net income/(loss) | $ 1 | $ 31 | $ 105 | $ (781) |
| Adjustments to reconcile net income/(loss) to net cash provided/ (used) by operating activities: | | | | |
| Depreciation and amortization | 4 | 114 | 131 | 141 |
| Gain on disposals and sales of assets | — | — | — | (3) |
| Impairment losses | — | — | 94 | 1,153 |
| Changes in derivative instruments | 7 | 115 | (120) | (7) |
| Excess materials and supplies inventory reserve | — | 4 | — | — |
| Lower of cost or market inventory adjustments | — | 65 | 8 | 13 |
| Potomac River settlement obligation and reversal | — | (32) | — | 32 |
| Large scale remediation and settlement costs | — | (3) | 59 | — |
| Cash provided/(used) by changes in other working capital, net of acquisition and disposition effects: | | | | |
| Accounts receivable - trade | (2) | 22 | (4) | 6 |
| Accounts receivable - affiliate | — | 10 | 125 | 18 |
| Inventory | (4) | (46) | (53) | (18) |
| Prepayments and other current assets | (32) | (16) | (31) | (38) |
| Accounts payable | 2 | 44 | 19 | 138 |
| Accounts payable - affiliate | — | (7) | (70) | (17) |
| Accrued expenses and other current liabilities | 15 | — | 24 | (126) |
| Other assets and liabilities | (16) | (11) | (35) | 2 |
| **Net Cash Provided/(Used) by Operating Activities** | (25) | 290 | 252 | 513 |
| **Cash Flows from Investing Activities** | | | | |
| Capital expenditures | (3) | (159) | (147) | (233) |
| Proceeds from the sales of assets | — | 1 | 1 | 4 |
| (Increase)/decrease in restricted cash, net | — | 197 | (166) | 1 |
| **Net Cash Provided/(Used) by Investing Activities** | (3) | 39 | (312) | (228) |
| **Cash Flows from Financing Activities** | | | | |
| Payments for short and long-term debt | — | (4) | (4) | (3) |
| Capital contributions | — | — | 30 | — |
| Distributions to member | — | (230) | (100) | (350) |
| Redemption of preferred stock in affiliate | — | — | — | 145 |
| **Net Cash Used by Financing Activities** | — | (234) | (74) | (208) |
| **Net (Decrease)/Increase in Cash and Cash Equivalents** | (28) | 95 | (134) | 77 |
| **Cash and Cash Equivalents at Beginning of Period** | 163 | 68 | 202 | 125 |
| **Cash and Cash Equivalents at End of Period** | $ 135 | $ 163 | $ 68 | $ 202 |
| **Supplemental Disclosures** | | | | |
| Interest paid, net of amount capitalized | $ — | $ — | $ — | $ 2 |
| Cash refunds received for income taxes | $ — | $ — | $ 1 | $ — |

See notes to Consolidated Financial Statements.

62

GENON MID-ATLANTIC, LLC AND SUBSIDIARIES

CONSOLIDATED STATEMENT OF MEMBER'S EQUITY

| | Member's Interest | | Preferred Stock in Affiliate | | Total Member's Equity | |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| **Predecessor** | | | | | | |
| **Balances as of December 31, 2009** | $ | 5,016 | $ | (138) | $ | 4,878 |
| Net loss | | (781) | | — | | (781) |
| Amortization of discount on preferred stock in affiliate | | 7 | | (7) | | — |
| Redemption of preferred stock in affiliate | | — | | 145 | | 145 |
| Distributions to member | | (350) | | — | | (350) |
| **Balances as of December 31, 2010** | $ | 3,892 | $ | — | $ | 3,892 |
| Net income | | 105 | | — | | 105 |
| Distributions to member | | (100) | | — | | (100) |
| Capital contributions | | 30 | | — | | 30 |
| **Balances as of December 31, 2011** | $ | 3,927 | $ | — | $ | 3,927 |
| Net income | | 31 | | — | | 31 |
| Distributions to member | | (230) | | — | | (230) |
| **Balances as of December 14, 2012**[(a)] | $ | 3,728 | $ | — | $ | 3,728 |
| **Successor** | | | | | | |
| **Balances as of December 15, 2012**[(a)] | $ | 1,525 | $ | — | $ | 1,525 |
| Net income | | 1 | | — | | 1 |
| **Balances as of December 31, 2012** | $ | 1,526 | $ | — | $ | 1,526 |

(a)   The differences in equity balances at December 14, 2012 and December 15, 2012 are due to the application of pushdown accounting reflecting the NRG Merger.

See notes to Consolidated Financial Statements.

COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Note 1 — Nature of Business (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*General*

GenOn is a wholesale generator with approximately 21,440 MW of net electric generating capacity located in the U.S.

RRI Energy (a Delaware corporation) changed its name from Reliant Energy, Inc. effective May 2009 in connection with the sale of its retail business. GenOn changed its name from RRI Energy effective December 3, 2010 in connection with the merger with Mirant. "GenOn" refers to GenOn Energy, Inc. and, except where the context indicates otherwise, its subsidiaries, after giving effect to the Mirant/RRI Merger.

GenOn Americas Generation is a wholesale generator with approximately 8,805 MW of net electric generating capacity located, in many cases, near major metropolitan areas. GenOn Americas Generation's electric generating capacity is part of the 21,440 MW of net electric generating capacity of GenOn.

GenOn Mid-Atlantic operates and owns or leases 4,680 MW of net electric generating capacity in the Washington, D.C. and Baltimore areas. GenOn Mid-Atlantic's electric generating capacity is part of the 8,805 MW of net electric generating capacity of GenOn Americas Generation. GenOn Mid-Atlantic's generating facilities serve the Eastern PJM markets.

GenOn Americas Generation and GenOn Mid-Atlantic are Delaware limited liability companies and indirect wholly-owned subsidiaries of GenOn. GenOn Mid-Atlantic is a wholly-owned subsidiary of GenOn North America and an indirect wholly-owned subsidiary of GenOn Americas Generation.

GenOn's generation facilities consist of baseload, intermediate and peaking power generation facilities. The following table summarizes GenOn's generation portfolio by operating segment.

| Generation Type | East | South Central | West | Total |
|---|---|---|---|---|
| | **(In MW)** | | | |
| Natural gas | 6,390 | 1,200 | 5,390 | 12,980 |
| Coal | 6,380 | — | — | 6,380 |
| Oil | 2,080 | — | — | 2,080 |
| Total generation capacity | 14,850 | 1,200 | 5,390 | 21,440 |
| | | | | |
| **Under Construction** | | | | |
| Natural gas | — | — | 720 | 720 |

GenOn Americas Generation facilities consist of baseload, intermediate and peaking power generation facilities. The following table summarizes GenOn Americas Generation's portfolio by operating segment.

| Generation Type | East | West | Total |
|---|---|---|---|
| | **(In MW)** | | |
| Natural gas | 2,940 | 1,985 | 4,925 |
| Coal | 2,430 | — | 2,430 |
| Oil | 1,450 | — | 1,450 |
| Total generation capacity | 6,820 | 1,985 | 8,805 |

GenOn Mid-Atlantic facilities consist of baseload, intermediate and peaking power generation facilities. The following table summarizes GenOn Mid-Atlantic's portfolio in the East region.

| Generation Type | East |
|---|---|
| | **(In MW)** |
| Natural gas | 1,945 |
| Coal | 2,430 |
| Oil | 305 |
| Total generation capacity | 4,680 |

The Registrants sell power from their generation portfolio and offer capacity or similar products to retail electric providers and others, and provide ancillary services to support system reliability.

*NRG Merger*

On July 20, 2012, GenOn entered into the NRG Merger Agreement with NRG and a direct wholly-owned subsidiary of NRG. Upon the terms and subject to the conditions set forth in the NRG Merger Agreement, which was approved by the boards of directors of GenOn and NRG, a wholly-owned subsidiary of NRG merged with and into GenOn, with GenOn continuing as the surviving corporation and a wholly-owned subsidiary of NRG.

Upon closing of the NRG Merger, each issued and outstanding share of GenOn's common stock automatically converted into the right to receive 0.1216 shares of common stock of NRG based on the NRG Merger Exchange Ratio. All outstanding stock options (other than options granted in 2012) immediately vested and all outstanding stock options generally converted upon completion of the NRG Merger into stock options with respect to NRG common stock, after giving effect to the NRG Merger Exchange Ratio. In addition, all outstanding restricted stock units (other than restricted stock units granted in 2012) immediately vested and all outstanding restricted stock units were exchanged for the NRG Merger consideration. All outstanding stock options and unvested restricted stock units granted in 2012 will vest per the terms and conditions of the grant, and if the holder is terminated, upon the holder's termination date if the termination is as a result of the NRG Merger and within two years of the closing date. See Note 3, *NRG Merger,* and Note 18, *Stock-Based Compensation.*

The NRG Merger qualified as a tax-free reorganization under the IRC, as amended, so that none of GenOn, NRG or any of the stockholders generally recognized any gain or loss in the transaction, except that the stockholders will recognize gain with respect to cash received in lieu of fractional shares of NRG common stock.

*Mirant/RRI Merger (GenOn)*

On December 3, 2010, Mirant and RRI Energy completed the Mirant/RRI Merger. Upon completion of the Mirant/RRI Merger, RRI Energy Holdings, Inc., a direct and wholly-owned subsidiary of RRI Energy merged with and into Mirant, with Mirant continuing as the surviving corporation and a wholly-owned subsidiary of RRI Energy. Each of Mirant and RRI Energy received legal opinions that the Merger qualified as a tax-free reorganization under the IRC. Upon the closing of the Mirant/RRI Merger, each issued and outstanding share of Mirant common stock, including grants of restricted common stock, automatically converted into 2.835 shares of common stock of RRI Energy based on the Mirant/RRI Merger Exchange Ratio. Approximately 417 million shares of RRI Energy common stock were issued. Additionally, upon the closing of the Mirant/RRI Merger, RRI Energy was renamed GenOn. Mirant stock options and other equity awards converted upon completion of the Mirant/RRI Merger into stock options and equity awards with respect to GenOn common stock, after giving effect to the Mirant/RRI Merger Exchange Ratio. See Note 4, *Mirant/RRI Merger.*

**Note 2 — Summary of Significant Accounting Policies (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*Principles of Consolidation and Basis of Presentation*

This is a combined annual report of the Registrants. The notes to the consolidated financial statements apply to the Registrants as indicated parenthetically next to each corresponding disclosure.

The Registrants' consolidated financial statements have been prepared in accordance with U.S. GAAP. The FASB or ASC is the source of authoritative U.S. GAAP to be applied by nongovernmental entities. In addition, the rules and interpretative releases of the SEC under authority of federal securities laws are also sources of authoritative U.S. GAAP for SEC registrants.

The consolidated financial statements include the Registrants' accounts and operations and those of their subsidiaries in which they have a controlling interest. All significant intercompany transactions and balances have been eliminated in consolidation. The usual condition for a controlling financial interest is ownership of a majority of the voting interests of an entity. However, a controlling financial interest may also exist through arrangements that do not involve controlling voting interests. As such, the Registrants apply the guidance of ASC 810, *Consolidations,* or ASC 810, to determine when an entity that is insufficiently capitalized or not controlled through its voting interests, referred to as a VIE, should be consolidated.

*Predecessor and Successor Reporting*

Upon completion of the NRG Merger, NRG stockholders had a majority of the voting interest in the combined company. The NRG Merger is accounted for under the acquisition method of accounting. Under the acquisition method of accounting, NRG is treated as the accounting acquirer and GenOn is treated as the acquired company for financial reporting purposes. As such, the assets and liabilities of the Registrants were provisionally recorded at their respective fair values as of the NRG Merger date. Fair value adjustments related to the NRG Merger have been pushed down to GenOn, GenOn Americas Generation and GenOn Mid-Atlantic, resulting in certain assets and liabilities of the Registrants being recorded at fair value at December 15, 2012. See Note 3, *NRG Merger,* for further discussion.

The Registrants' consolidated statements of operations subsequent to the NRG Merger include amortization expense relating to fair value adjustments and depreciation expense based on the fair value of the Registrants' property, plant and equipment. In addition, effective with the NRG Merger, the Registrants adopted accounting policies of NRG. Therefore, the Registrants' financial information prior to the NRG Merger is not comparable to its financial information subsequent to the NRG Merger.

As a result of the impact of pushdown accounting, the financial statements and certain note presentations separate the Registrants' presentations into two distinct periods, the period before the consummation of the NRG Merger (labeled predecessor) and the period after that date (labeled successor), to indicate the application of different basis of accounting between the periods presented.

### Cash and Cash Equivalents

Cash and cash equivalents include highly liquid investments with an original maturity of three months or less at the time of purchase.

### Funds Deposited by Counterparties (GenOn)

Funds deposited by counterparties consist of cash held by GenOn as a result of collateral posting obligations from GenOn's counterparties with positions in GenOn's hedging programs. These amounts are not contractually restricted, but based on GenOn's intentions, are not available for the payment of GenOn's general corporate obligations. Depending on market fluctuations and the settlement of the underlying contracts, GenOn will refund this collateral to the hedge counterparties pursuant to the terms and conditions of the underlying trades. Since collateral requirements fluctuate daily and GenOn cannot predict if any collateral will be held for more than twelve months, the funds deposited by counterparties are classified as a current asset on GenOn's balance sheets, with an offsetting liability for this cash collateral received within current liabilities. Changes in funds deposited by counterparties are closely associated with GenOn's operating activities and are classified as an operating activity in GenOn's consolidated statements of cash flows.

### Restricted Cash

Restricted cash consists of funds held within the Registrants' projects that are restricted in their use. Restricted cash at December 31, 2011 included (a) $166 million of cash reserved in respect of interlocutory liens related to the scrubber contract litigation, which settled in 2012 and (b) $32 million related to the Potomac River settlement, which was released in 2012.  See Note 9, *Retirements, Mothballing or Long-Term Protective Lay-Up of Generating Facilities* and Note 20, *Commitments and Contingencies*.

### Inventory

Inventory is valued at the lower of weighted average cost or market, and consists principally of fuel oil, coal and raw materials used to generate electricity or steam. The Registrants remove these inventories as they are used in the production of electricity or steam. Spare parts inventory is valued at a weighted average cost, since the Registrants expect to recover these costs in the ordinary course of business. The Registrants remove these inventories when they are used for repairs, maintenance or capital projects. Sales of inventory are classified as an operating activity in the consolidated statements of cash flows.

### Property, Plant and Equipment

Property, plant and equipment are stated at cost; however impairment adjustments are recorded whenever events or changes in circumstances indicate that their carrying values may not be recoverable. Significant additions or improvements extending asset lives are capitalized as incurred, while repairs and maintenance that do not improve or extend the life of the respective asset are charged to expense as incurred. Depreciation is computed using the straight-line method over the estimated useful lives. Certain assets and their related accumulated depreciation amounts are adjusted for asset retirements and disposals with the resulting gain or loss included in cost of operations in the consolidated statements of operations.

### Asset Impairments

Long-lived assets that are held and used are reviewed for impairment whenever events or changes in circumstances indicate carrying values may not be recoverable. Such reviews are performed in accordance with ASC 360. An impairment loss is recognized if the total future estimated undiscounted cash flows expected from an asset are less than its carrying value. An impairment charge is measured by the difference between an asset's carrying amount and fair value with the difference recorded in operating costs and expenses in the statements of operations. Fair values are determined by a variety of valuation methods, including appraisals, sales prices of similar assets and present value techniques.

*Project Development Costs and Capitalized Interest (GenOn and GenOn Americas Generation)*

Project development costs are expensed in the preliminary stages of a project and capitalized when the project is deemed to be commercially viable. Commercial viability is determined by one or a series of actions including, among others, Board of Director approval pursuant to a formal project plan that subjects the Registrants to significant future obligations that can only be discharged by the use of an asset of the Registrants.

Interest incurred on funds borrowed to finance capital projects is capitalized until the project under construction is ready for its intended use. Capitalized interest amounts were as follows:

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | (In millions) | | |
| GenOn | $ 2 | $ 35 | $ 15 | $ 6 |
| GenOn Americas Generation | — | 3 | 3 | 5 |

When a project is available for operations, capitalized interest and project development costs are reclassified to property, plant and equipment and amortized on a straight-line basis over the estimated useful life of the project's related assets. Capitalized costs are charged to expense if a project is abandoned or management otherwise determines the costs to be unrecoverable.

*Debt Issuance Costs (GenOn and GenOn Americas Generation)*

Debt issuance costs are capitalized and amortized as interest expense on a basis which approximates the effective interest method over the term of the related debt. These costs were eliminated as a result of pushdown accounting.

*Intangible Assets*

Intangible assets represent contractual rights held by the Registrants. The Registrants recognize specifically identifiable intangible assets including trading rights, development rights and emission allowances when specific rights and contracts are acquired. As a result of the Mirant/RRI Merger, GenOn also established fair values for acquired contracts under the acquisition method of accounting. Upon the NRG Merger, the Registrants' acquired contracts were established as a result of pushdown accounting. Intangible assets are amortized based on expected volumes, expected delivery, straight line or units of production basis.

Intangible assets determined to have indefinite lives are not amortized, but rather are tested for impairment at least annually or more frequently if events or changes in circumstances indicate that such acquired intangible assets have been determined to have finite lives and should now be amortized over their useful lives. The Registrants had no intangible assets with indefinite lives recorded as of December 31, 2012.

Emission allowances held-for-sale, which are included in other non-current assets on the Registrants' consolidated balance sheets, are not amortized; they are carried at the lower of cost or fair value and reviewed for impairment in accordance with ASC 360, *Property, Plant, and Equipment.*

*Income Taxes*

*GenOn*

GenOn is a wholly-owned subsidiary of NRG that exists as a corporate regarded entity for income tax purposes. As a result, GenOn, GenOn Americas and NRG have direct liability for the majority of the federal and state income taxes resulting from GenOn's operations. GenOn has allocated current and deferred income taxes as if it were a single consolidated taxpayer utilizing the asset and liability method to account for income taxes. To the extent GenOn provides current tax expense or benefit, any related tax payable or receivable to NRG is reclassified to equity in the same period since GenOn does not have a tax sharing agreement with NRG.

GenOn's deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. When necessary, deferred tax assets are reduced by a valuation allowance to reflect the amount that is estimated to be recoverable. In assessing the recoverability of the deferred tax assets, GenOn considers whether it is likely that some portion or all of the deferred tax assets will be realized. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

The determination of a valuation allowance requires significant judgment as to the generation of taxable income during future periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn's past and anticipated future performance, the reversal of deferred tax liabilities and the implementation of tax planning strategies.

Additionally, GenOn has not recognized any tax benefits relating to tax uncertainties arising in the ordinary course of business that are less than or subject to the measurement threshold of the more-likely-than-not standard prescribed under the accounting guidance for determining the uncertainty of income taxes. These unrecognized tax benefits may be either a tax liability or an adjustment to NOLs based on the specific facts of each tax uncertainty. GenOn periodically assesses its tax uncertainties based on the latest information available. The amount of the unrecognized tax benefit requires management to make significant assumptions about the expected outcomes of certain tax positions included in their filed or yet to be filed tax returns.

*GenOn Americas Generation*

GenOn Americas Generation and most of its subsidiaries are limited liability companies that are treated as branches of GenOn Americas for income tax purposes. As a result, GenOn Americas, GenOn and NRG have direct liability for the majority of the federal and state income taxes relating to GenOn Americas Generation's operations. Several of GenOn Americas Generation's subsidiaries exist as regarded corporate entities for income tax purposes. For the subsidiaries that continue to exist as corporate regarded entities, GenOn Americas Generation allocates current and deferred income taxes to each corporate regarded entity as if such entity were a single taxpayer utilizing the asset and liability method to account for income taxes. To the extent GenOn Americas Generation provides tax expense or benefit, any related tax payable or receivable to NRG is reclassified to equity in the same period since GenOn Americas Generation does not have a tax sharing agreement with NRG.

Deferred tax assets and liabilities are recognized for the regarded corporate entities for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. When necessary, deferred tax assets are reduced by a valuation allowance to reflect the amount that is estimated to be recoverable. In assessing the recoverability of the deferred tax assets, GenOn Americas Generation considers whether it is likely that some portion or all of the deferred tax assets will be realized. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities from a change in tax rates is recognized in income in the period that includes the enactment date.

The determination of a valuation allowance requires significant judgment as to the generation of taxable income during future periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn Americas Generation's past and anticipated future performance, the reversal of deferred tax liabilities and the implementation of tax planning strategies.

Additionally, GenOn Americas Generation has not recognized any tax benefits relating to tax uncertainties arising in the ordinary course of business that are less than or subject to the measurement threshold of the more-likely-than-not standard prescribed under the accounting guidance for accounting for uncertainty of income taxes. These unrecognized tax benefits may be either a tax liability or an adjustment to their NOLs based on the specific facts of each tax uncertainty. GenOn Americas Generation periodically assesses its tax uncertainties based on the latest information available. The amount of the unrecognized tax benefit requires management to make significant assumptions about the expected outcomes of certain tax positions included in their filed or yet to be filed tax returns.

*GenOn Mid-Atlantic*

GenOn Mid-Atlantic and GenOn Mid-Atlantic's subsidiaries are limited liability companies that are treated as branches of GenOn Americas for income tax purposes. As such, GenOn, GenOn Americas and NRG have direct liability for the majority of the federal and state income taxes relating to GenOn Mid-Atlantic's operations.

### Revenue Recognition

*Energy* — Both physical and financial transactions are entered into to optimize the financial performance of the Registrants' generating facilities. Electric energy revenue is recognized upon transmission to the customer. Physical transactions, or the sale of generated electricity to meet supply and demand, are recorded on a gross basis in the Registrants' consolidated statements of operations. Financial transactions, or the buying and selling of energy for trading purposes, are recorded net within operating revenues in the consolidated statements of operations in accordance with ASC 815.

*Capacity* — Capacity revenues are recognized when contractually earned, and consist of revenues billed to a third party at either the market or a negotiated contract price for making installed generation capacity available in order to satisfy system integrity and reliability requirements.

*Natural Gas Sales (GenOn and GenOn Americas Generation)* — GenOn and GenOn Americas Generation record revenues from the sales of natural gas under the accrual method.  These sales are sold at market-based prices.  Sales that have been delivered but not billed by period end are estimated.

*PPAs  (GenOn and GenOn Americas Generation)* — GenOn and GenOn Americas Generation's revenues are currently obtained through PPAs or other contractual arrangements. All of these PPAs are accounted for as operating leases in accordance with ASC 840, *Leases*, or ASC 840. ASC 840 requires minimum lease payments received to be amortized over the term of the lease and contingent rentals are recorded when the achievement of the contingency becomes probable. These leases have no minimum lease payments and all the rent is recorded as contingent rent on an actual basis when the electricity is delivered.

### Derivative Financial Instruments

The Registrants account for derivative financial instruments under ASC 815, which requires the Registrants to record all derivatives on the balance sheet at fair value unless they qualify for a NPNS exception. Changes in the fair value of non-hedge derivatives are immediately recognized in earnings.

If certain criteria are met, a derivative financial instrument may be designated as a fair value hedge or cash flow hedge. In 2010, GenOn Marsh Landing entered into interest rate protection agreements (interest rate swaps) in connection with its project financing, which have been designated as cash flow hedges. GenOn Marsh Landing entered into the interest rate swaps to reduce the risks with respect to the variability of the interest rates for the term loans. With the exception of these interest rate swaps, the Registrants did not have any other derivative financial instruments designated as fair value or cash flow hedges for accounting purposes during 2012, 2011, or 2010. Changes in the fair value of derivatives accounted for as cash flow hedges, if elected for hedge accounting, are deferred and recorded as a component of accumulated OCI until the hedged transactions occur and are recognized in earnings.

The Registrants' primary derivative instruments are financial power and natural gas contracts, fuels purchase contracts, other energy related commodities, and interest rate instruments used to mitigate variability in earnings due to fluctuations in market prices and interest rates. On an ongoing basis, the Registrants assess the effectiveness of all derivatives that are designated as cash flow hedges for accounting purposes in order to determine that each derivative continues to be highly effective in offsetting changes in cash flows of hedged items. If it is determined that the derivative instrument is not highly effective as a hedge, hedge accounting will be discontinued prospectively. If the derivative instrument is terminated, the effective portion of this derivative deferred in accumulated OCI will be frozen until the underlying hedged item is delivered.

Revenues and expenses on contracts that qualify for the NPNS exception are recognized when the underlying physical transaction is delivered. While the Registrants can elect to consider these contracts as derivative financial instruments under ASC 815, they are not recorded at fair value, but on an accrual basis of accounting. If it is determined that a transaction designated as NPNS no longer meets the scope exception, the fair value of the related contract is recorded on the balance sheet and immediately recognized through earnings.

The Registrants' trading activities are subject to limits in accordance with the risk management policy. These contracts are recognized on the balance sheet at fair value and changes in the fair value of these derivative financial instruments are recognized in earnings.

### *Concentrations of Credit Risk*

Financial instruments which potentially subject the Registrants to concentrations of credit risk consist primarily of accounts receivable and derivatives. Certain accounts receivable and derivative instruments are concentrated within entities engaged in the energy industry. These industry concentrations may impact the Registrants' overall exposure to credit risk, either positively or negatively, in that the customers may be similarly affected by changes in economic, industry or other conditions. Receivables and other contractual arrangements are subject to collateral requirements under the terms of enabling agreements. However, the Registrants believe that the credit risk posed by industry concentration is offset by the diversification and creditworthiness of the Registrants' customer base. See Note 5, *Fair Value of Financial Instruments,* for a further discussion of derivative concentrations.

### *Fair Value of Financial Instruments*

The carrying amount of cash and cash equivalents, funds deposited by counterparties, receivables, accounts payables, and accrued liabilities approximate fair value because of the short-term maturity of these instruments. See Note 5, *Fair Value of Financial Instruments*, for a further discussion of fair value of financial instruments.

### *Coal Supplier Concentration Risk*

### *GenOn*

GenOn's coal supply comes primarily from the Northern Appalachian and Central Appalachian coal regions. GenOn enters into contracts of varying tenors to secure appropriate quantities of fuel that meet the varying specifications of its generating facilities. For the coal-fired generating facilities, GenOn purchases most of its coal from a small number of suppliers under contracts with terms of varying lengths, some of which extend to 2015 and one that extends to 2020. Excluding the Keystone and Conemaugh generating facilities (which are not 100% owned by GenOn) and excluding the Seward generating facility (which burns waste coal supplied by an all‑requirements contract), GenOn had exposure to two counterparties at December 31, 2012, and exposure to three counterparties at December 31, 2011, that each represented an exposure of more than 10% of its total coal commitments, by volume, and in aggregate represented approximately 63% and 62% of its total coal commitments at December 31, 2012 and 2011, respectively. At December 31, 2012 and 2011, the single largest counterparty represented an exposure of 41% and 38%, respectively, of these total coal commitments, by volume.

### *GenOn Americas Generation and GenOn Mid-Atlantic*

GenOn Americas Generation and GenOn Mid-Atlantic's coal supply primarily comes from the Northern Appalachian and Central Appalachian coal regions. GenOn Americas Generation enters into contracts of varying tenors on behalf of GenOn Mid‑Atlantic to secure appropriate quantities of fuel that meet the varying specifications of GenOn Mid-Atlantic's generating facilities. For the coal-fired generating facilities, GenOn Americas Generation purchases most of its coal from a small number of suppliers under contracts with terms of varying lengths, some of which extend to 2015. GenOn Americas Generation had exposure to two counterparties at December 31, 2012, and exposure to three counterparties at December 31, 2011, that each represented an exposure of more than 10% of GenOn Americas Generation's total coal commitments, by volume, and in aggregate represented approximately 63% and 62% of its total coal commitments at December 31, 2012 and 2011, respectively. At December 31, 2012 and 2011, the single largest counterparty represented an exposure of 41% and 38%, respectively, of these total coal commitments, by volume.

### *Coal Transportation Concentration Risk*

### *GenOn*

The coal to operate GenOn's coal-fired facilities is delivered primarily by train with a limited number of railroads transporting such coal. For 2012, one railroad represented 74% of coal transportation costs and another railroad represented 15% of coal transportation costs.

### *GenOn Americas Generation and GenOn Mid-Atlantic*

The coal to operate GenOn Americas Generation and GenOn Mid-Atlantic's coal-fired facilities (all of which are owned or leased by GenOn Mid-Atlantic) is delivered primarily by train and with a limited number of railroads transporting such coal. For 2012, one railroad represented 98% of coal transportation costs.

### Asset Retirement Obligations

The Registrants account for their AROs in accordance with ASC 410-20, *Asset Retirement Obligations,* or ASC 410-20. Retirement obligations associated with long-lived assets included within the scope of ASC 410-20 are those for which a legal obligation exists under enacted laws, statutes, and written or oral contracts, including obligations arising under the doctrine of promissory estoppel, and for which the timing and/or method of settlement may be conditional on a future event. ASC 410-20 requires an entity to recognize the fair value of a liability for an ARO in the period in which it is incurred and a reasonable estimate of fair value can be made.

Upon initial recognition of a liability for an ARO, the Registrants capitalize the asset retirement cost by increasing the carrying amount of the related long-lived asset by the same amount. Over time, the liability is accreted to its future value, while the capitalized cost is depreciated over the useful life of the related asset. See Note 13, *Asset Retirement Obligations,* for a further discussion of AROs.

### Pensions (GenOn)

GenOn offers pension benefits through defined benefit pension plans. In addition, GenOn provides postretirement health and welfare benefits for certain groups of employees. GenOn accounts for pension and other postretirement benefits in accordance with ASC 715, *Compensation — Retirement Benefits.* GenOn recognizes the funded status of its defined benefit plans in the consolidated balance sheets and records an offset to other comprehensive income/loss. In addition, GenOn also recognizes on an after-tax basis, as a component of other comprehensive income/loss, gains and losses as well as all prior service costs and credits that have not been included as part of GenOn's net periodic benefit cost/credit. The determination of GenOn's obligation and expenses for pension benefits is dependent on the selection of certain assumptions. These assumptions determined by management include the discount rate, the expected rate of return on plan assets and the rate of future compensation increases. GenOn's actuarial consultants determine assumptions for such items as retirement age.

GenOn measures the fair value of its pension assets in accordance with ASC 820, *Fair Value Measurements and Disclosures,* or ASC 820.

### Business Combinations

The Registrants account for the business combinations in accordance with ASC 805, *Business Combinations,* or ASC 805. ASC 805 requires an acquirer to recognize and measure in its financial statements the identifiable assets acquired, the liabilities assumed, and any noncontrolling interest in the acquiree at fair value at the acquisition date. It also recognizes and measures the goodwill acquired or a gain from a bargain purchase in the business combination and determines what information to disclose to enable users of an entity's financial statements to evaluate the nature and financial effects of the business combination. In addition, transaction costs are expensed as incurred.

### Use of Estimates

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements, disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from these estimates.

In recording transactions and balances resulting from business operations, the Registrants use estimates based on the best information available. Estimates are used for such items as plant depreciable lives, tax provisions, actuarially determined benefit costs, the valuation of energy commodity contracts, environmental liabilities, legal costs incurred in connection with recorded loss contingencies, and pushdown accounting in connection with the NRG Merger relative to the assets acquired and liabilities assumed by NRG, among others. In addition, estimates are used to test long-lived assets for impairment and to determine the fair value of impaired assets. As better information becomes available or actual amounts are determinable, the recorded estimates are revised. Consequently, operating results can be affected by revisions to prior accounting estimates.

*Reclassifications*

Certain prior-year amounts have been reclassified for comparative purposes. The reclassifications did not affect net income/loss or cash flows from operating activities, cash flows from investing activities or cash flows from financing activities.

*Recently Adopted Accounting Guidance*

*ASU 2011-05 (GenOn)* — In June 2011, the FASB issued ASU No. 2011-05, *Comprehensive Income (Topic 220) Presentation of Comprehensive Income*, or ASU No. 2011-05, which was further amended by ASU No. 2011-12, *Comprehensive Income (Topic 220) Deferral of the Effective Date for Amendments to the Presentation of Reclassifications of Items Out of Accumulated Other Comprehensive Income in Accounting Standards Update No. 2011-05,* issued in December 2011. The amendments in ASU No. 2011-05 require GenOn to present the total of comprehensive income, the components of net income and the components of other comprehensive income either in a single statement of comprehensive income or in two separate but consecutive statements. GenOn is required to present, in either option, each component of net income, total net income, each component of other comprehensive income, total other comprehensive income and total comprehensive income. Effective January 1, 2012, GenOn adopted the provisions of ASU No. 2011-05 and began presenting the total of comprehensive income, the components of net income and the components of other comprehensive income in two separate but consecutive statements. The provisions of ASU No. 2011-05 are required to be adopted retroactively. As this guidance provides only presentation requirements, the adoption of this standard did not impact GenOn's results of operations, cash flows or financial position.

*New Accounting Guidance Not Yet Adopted as of December 31, 2012*

*ASU 2011-11* — In December 2011, the FASB issued ASU No. 2011-11, *Balance Sheet (Topic 210) Disclosures about Offsetting Assets and Liabilities*, or ASU No. 2011-11. The guidance provides enhanced disclosure requirements to evaluate the effect or potential effect of netting arrangements on an entity's financial position by improving information about financial instruments and derivative instruments that either (1) offset in accordance with either ASC 210-20-45 or ASC 810-20-45 or (2) are subject to an enforceable master netting arrangement or similar agreement, irrespective of whether they are offset. Reporting entities will be required to disclose both gross and net information about both instruments and transactions eligible for offset in the statement of financial position and instruments and transactions subject to an agreement similar to a master netting arrangement. The disclosures required by ASU No. 2011-10 are required to be adopted retroactively. The Registrants adopted this standard on January 1, 2013. As this guidance provides only disclosure requirements, the adoption of this standard did not impact the Registrants' results of operations, cash flows or financial position.

*ASU 2013-02 (GenOn)* - In February 2013, the FASB issued ASU No. 2013-02, *Other Comprehensive Income (Topic 220) Reporting of Amounts Reclassified Out of Accumulated Other Comprehensive Income*, or ASU No. 2013-02. The amendments in ASU No. 2013-02 require GenOn to report the effect of significant reclassifications out of accumulated other comprehensive income on the respective line items in net income either on the face of the statement of operations or in the notes if the amount being reclassified is required under U.S. GAAP to be reclassified in its entirety to net income in the same reporting period. For other amounts not required by U.S. GAAP to be reclassified in their entirety to net income in the same reporting period, an entity is required to cross-reference other disclosures which provide additional information about the amounts. GenOn adopted this standard on January 1, 2013. As this guidance provides only presentation requirements, the adoption of this standard did not impact GenOn's results of operations, cash flows or financial position.

**Note 3 — NRG Merger (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

On December 14, 2012, NRG completed the acquisition of GenOn. NRG issued, as consideration for the acquisition, 0.1216 shares of NRG common stock for each outstanding share of GenOn, including restricted stock units outstanding, on the acquisition date, except for fractional shares which were paid in cash.

The acquisition was recorded as a business combination under ASC 805, with identifiable assets acquired and liabilities assumed provisionally recorded at their estimated fair values on the acquisition date. As discussed in Note 2, *Summary of Significant Accounting Policies*, the acquisition method of accounting impacts have been pushed down to the Registrants, resulting in certain assets and liabilities of the Registrants being recorded at provisional fair value as of December 14, 2012.

The provisional allocation of assets and liabilities is as follows:

| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| | | (In millions) | |
| **Assets** | | | |
| Cash | $ 983 | $ 171 | $ 163 |
| Other current and non-current assets | 1,385 | 849 | 163 |
| Property, plant and equipment | 3,936 | 1,329 | 1,221 |
| Derivative assets | 1,157 | 1,238 | 863 |
| Deferred income taxes | 220 | — | — |
| Total assets | 7,681 | 3,587 | 2,410 |
| | | | |
| **Liabilities** | | | |
| Other current and non-current liabilities | 1,312 | 542 | 169 |
| Out-of-market contracts and leases | 1,064 | 540 | 540 |
| Derivative liabilities | 399 | 529 | 162 |
| Deferred income taxes | 220 | — | — |
| Long-term debt and capital leases | 4,203 | 961 | 14 |
| Total liabilities | 7,198 | 2,572 | 885 |
| Net assets | $ 483 | $ 1,015 | $ 1,525 |

The initial pushdown accounting for the NRG Merger is not complete because the evaluation necessary to assess the fair values of certain net assets acquired is still in process. The provisional amounts are subject to revision until the evaluations are completed to the extent that additional information is obtained about the facts and circumstances that existed as of the acquisition date. Any changes to the fair value assessments will affect the Registrants' additional paid in capital. The allocation of the purchase price may be modified up to one year from the date of the acquisition as more information is obtained about the fair value of assets acquired and liabilities assumed by NRG.

GenOn incurred $11 million and $53 million of NRG Merger-related costs during the period from January 1, 2012 through December 14, 2012 and the period from December 15, 2012 through December 31, 2012, respectively. Of the total incurred, $40 million is personnel related costs and is included in accrued payroll in current liabilities at December 31, 2012 for GenOn.

Current and non-current assets include accounts receivable with preliminary fair values of $221 million, $110 million and $2 million and contractual amounts of $222 million, $110 million and $2 million for GenOn, GenOn Americas Generation and GenOn Mid-Atlantic, respectively, at the time of the NRG Merger.

**Fair Value Measurements**

The provisional fair values of the property, plant and equipment, commodity, transportation and storage contracts and operating leases at the acquisition date were measured primarily based on significant inputs that are not observable in the market and thus represent a Level 3 measurement as defined in ASC 820. Significant inputs were as follows:

- *Property, Plant and Equipment* - The estimated fair values were determined based on consideration of both an income method using discounted cash flows and a market approach based on recent transactions of comparable assets. The income approach was primarily relied upon as the forecasted cash flows as it more appropriately incorporates differences in regional markets, plant type, age, useful life, equipment condition and environmental controls of each asset. Furthermore, the income approach allows for a more accurate reflection of current and expected market dynamics such as supply and demand, commodity prices, and regulatory environment as of the valuation date. Under this approach, the expected future cash flows associated with each plant were estimated and then discounted to present value at the weighted average cost of capital derived from an independent power producer peer group and risk adjusted to reflect the individual characteristics of each plant. The market approach was computed based on data for transactions announced proximate to the valuation date and analyzed on a $/kW basis for fuel/dispatch type and region. Due to the limited volume of recent transactions and amount of financial and operating characteristics that are publicly disclosed, that market approach was given less weight.

- *Contracts* - The estimated fair values of contracts were determined based on a form of the income approach which measures the contract relative to a replacement contract or the current market with consideration of the counterparty risk. Contracts such as long-term natural gas transportation contracts were determined to have an unfavorable fair value compared to the original contract terms and were recorded in out-of-market commodity contracts.

- *Operating leases* - The estimated fair values of the leases for REMA and GenOn Mid-Atlantic were determined utilizing a variation of the income approach under which the fair value of the lease was determined by discounting the future lease payments at an appropriate discount rate and comparing it to the fair value of the property, plant and equipment being leased.

The fair values of derivative assets and liabilities and long-term debt and capital leases as of the acquisition date were determined in accordance with ASC 820. The breakdown of Level 1, 2 and 3 is as follows:

*GenOn*

| | Fair Value | | | | | | |
| | Level 1 | | Level 2 | | Level 3 | | Total |
|---|---|---|---|---|---|---|---|
| | | | (In millions) | | | | |
| **Assets** | | | | | | | |
| Derivative assets | $ | 146 | $ | 978 | $ | 33 | $ | 1,157 |
| **Liabilities** | | | | | | | |
| Derivative liabilities | $ | 50 | $ | 334 | $ | 15 | $ | 399 |
| Long-term debt and capital leases | | 3,799 | | — | | 404 | | 4,203 |

*GenOn Americas Generation*

| | Fair Value | | | | | | |
| | Level 1 | | Level 2 | | Level 3 | | Total |
|---|---|---|---|---|---|---|---|
| | | | (In millions) | | | | |
| **Assets** | | | | | | | |
| Derivative assets | $ | 175 | $ | 1,030 | $ | 33 | $ | 1,238 |
| **Liabilities** | | | | | | | |
| Derivative liabilities | $ | 124 | $ | 391 | $ | 14 | $ | 529 |
| Long-term debt and capital leases | | 947 | | — | | 14 | | 961 |

*GenOn Mid-Atlantic*

| | | Fair Value | | | |
|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | | Total |
| | | | (In millions) | | |
| **Assets** | | | | | |
| Derivative assets | $ 67 | $ 787 | $ 9 | $ | 863 |
| **Liabilities** | | | | | |
| Derivative liabilities | $ 16 | $ 145 | $ 1 | $ | 162 |
| Long-term debt and capital leases | — | — | 14 | | 14 |

### Deferred Income Taxes

In connection with the accounting for the acquisition, the Registrants recorded the realizable deferred tax assets and liabilities, primarily consisting of net operating losses and other temporary differences. In addition, the excess of the Registrants' historical tax basis of assets and liabilities over the amounts assigned to the fair value of the assets acquired and liabilities assumed generated deferred tax assets and liabilities, adjusted for the valuation allowance, that were recorded on the acquisition date.

### Note 4 — Mirant/RRI Merger (GenOn)

On December 3, 2010, Mirant and RRI Energy completed the Mirant/RRI Merger.  Because the Mirant/RRI Merger is accounted for as a reverse acquisition with Mirant as the accounting acquirer, the purchase price was computed based on shares of Mirant common stock that would have been issued to RRI Energy's stockholders on the date of the Mirant/RRI Merger to give RRI Energy an equivalent ownership interest in Mirant as it had in the combined company (approximately 46%). The purchase price was calculated as follows (in millions, except closing stock price):

| | | |
|---|---|---|
| Number of shares of Mirant common stock that would have been issued to RRI Energy stockholders | | 125 |
| Closing price of Mirant common stock on December 3, 2010 | $ | 10.39 |
| Total | | 1,302 |
| RRI Energy stock options | | 3 |
| Total purchase price | $ | 1,305 |

The Mirant/RRI Merger is accounted for under the acquisition method of accounting for business combinations. Accordingly, GenOn has conducted an assessment of the net assets acquired and recognized amounts for identifiable assets acquired and liabilities assumed at their estimated acquisition date fair values, while transaction and integration costs associated with the acquisition are expensed as incurred. GenOn finalized its assessment of fair value during 2011. The final allocation of the purchase price as of December 3, 2010 is as follows (in millions):

| | | |
|---|---|---|
| Cash and cash equivalents | $ | 717 |
| Other current assets | | 736 |
| Property, plant and equipment | | 3,070 [a] |
| Intangible assets | | 47 |
| Other long-term assets | | 275 |
| Total assets | | 4,845 |
| | | |
| Current liabilities | | (557) |
| Debt | | (1,931) |
| Other non-current liabilities | | (717) |
| Total liabilities | | (3,205) |
| Fair value of net assets acquired | | 1,640 |
| Purchase price | | 1,305 |
| Gain on bargain purchase | $ | 335 [b] |

(a)   The valuations of the acquired long-lived assets were primarily based on the income approach, and in particular, discounted cash flow analyses. The income approach was employed for the generating facilities because of the differing age, geographic location, market conditions, asset life, equipment condition and status of environmental controls of the assets. The discounted cash flows incorporated information based on observable market prices to the extent available and long-term prices derived from proprietary fundamental market modeling. For the generating facilities that were not valued using the income approach, the cost approach was used. The market approach was considered, but was ultimately given no weighting because of many of the factors listed as the primary reasons for application of the income approach as well as a lack of proximity of the observed transactions to the valuation date.

(b)   The acquisition is treated as a nontaxable merger for federal income tax purposes and there is no tax deductible goodwill resulting from the Mirant/RRI Merger.

75
-

The unaudited pro forma results give effect to the Mirant/RRI Merger as if it had occurred on January 1, 2010. The unaudited pro forma financial information is not necessarily indicative of either future results of operations or results that might have been achieved had the acquisition been consummated as of January 1, 2010. The unaudited pro forma results for 2010 are as follows:

|  | 2010 |
|---|---|
|  | (In millions) |
| Revenues | $ 4,166 |
| Loss from continuing operations | (746) |
| Net loss | (740) |

The unaudited pro forma information primarily includes the following adjustments, among others:

- amortization of fair value adjustments related to energy-related contracts;

- additional fuel expense related to fair value adjustments of fuel inventories;

- effects of fair value adjustments of property, plant and equipment;

- effects of fair value adjustments of debt and the issuance of a new revolving credit facility, new senior secured term loan and new senior unsecured notes; and

- adjustments to income taxes for a zero percent rate applied to the pro forma adjustments and historical federal and state deferred tax expense (benefit).

### Note 5 — Fair Value of Financial Instruments (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)

For cash and cash equivalents, funds deposited by counterparties, accounts receivable, accounts payable, accrued liabilities, restricted cash, and cash collateral paid and received in support of energy risk management activities, the carrying amount approximates fair value because of the short-term maturity of those instruments and are classified as Level 1 within the fair value hierarchy.

The estimated carrying values and fair values of GenOn and GenOn Americas Generation's debt are as follows:

*GenOn*

| | Carrying Amount | Level 1 | Level 2[a] | Level 3[a] | Total Fair Value |
|---|---|---|---|---|---|
| **Successor** | | | (In millions) | | |
| **December 31, 2012** | | | | | |
| Liabilities: | | | | | |
| Long and short-term debt | $ 4,199 | $ — | $ 3,819 | $ 390 | $ 4,209 |
| **Predecessor** | | | | | |
| **December 31, 2011** | | | | | |
| Liabilities: | | | | | |
| Long and short-term debt | $ 4,132 | $ — | $ 3,969 | $ 97 | $ 4,066 |

(a) The fair value of long and short-term debt is estimated using reported market prices for instruments that are publicly traded or estimated based on the income approach valuation technique for non-publicly traded debt using current interest rates for similar instruments with equivalent credit quality.

*GenOn Americas Generation*

| | Carrying Amount | | Level 1 | | Level 2[a] | | Level 3[a] | | Total Fair Value |
|---|---|---|---|---|---|---|---|---|---|
| **Successor** | | | | | **(In millions)** | | | | |
| **December 31, 2012** | | | | | | | | | |
| Liabilities: | | | | | | | | | |
| Long and short-term debt | $ | 960 | $ | — | $ | 967 | $ | — | $ | 967 |
| | | | | | | | | | |
| **Predecessor** | | | | | | | | | |
| **December 31, 2011** | | | | | | | | | |
| Liabilities: | | | | | | | | | |
| Long and short-term debt | $ | 866 | $ | — | $ | 797 | $ | — | $ | 797 |

(a)   The fair value of long and short-term debt is estimated using reported market prices for instruments that are publicly traded.

### Fair Value Accounting under ASC 820

ASC 820 establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value into three levels as follows:

- Level 1 — quoted prices (unadjusted) in active markets for identical assets or liabilities that the Registrants have the ability to access as of the measurement date. The Registrants' financial assets and liabilities utilizing Level 1 inputs include active exchange-traded securities, energy derivatives and interest-bearing funds.

- Level 2 — inputs other than quoted prices included within Level 1 that are directly observable for the asset or liability or indirectly observable through corroboration with observable market data. The Registrants' financial assets and liabilities utilizing Level 2 inputs include exchange-based derivatives, and over the counter derivatives such as swaps, options and forward contracts.

- Level 3 — unobservable inputs for the asset or liability only used when there is little, if any, market activity for the asset or liability at the measurement date. The Registrants' financial assets and liabilities utilizing Level 3 inputs include infrequently-traded and non-exchange-based derivatives which are measured using present value pricing models.

In accordance with ASC 820, the Registrants determine the level in the fair value hierarchy within which each fair value measurement in its entirety falls, based on the lowest level input that is significant to the fair value measurement in its entirety.

### Recurring Fair Value Measurements

Derivative assets and liabilities are carried at fair market value.

*GenOn*

The following tables present assets and liabilities measured and recorded at fair value on GenOn's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

| | As of December 31, 2012 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Fair Value | | | | | | | |
| | Level 1[a] | | Level 2[a] | | Level 3 | | Total | |
| **Successor** | | | **(In millions)** | | | | | |
| Derivative assets: | | | | | | | | |
| Commodity contracts | $ | 139 | $ | 946 | $ | 31 | $ | 1,116 |
| Derivative liabilities: | | | | | | | | |
| Commodity contracts | $ | 52 | $ | 253 | $ | 14 | $ | 319 |
| Interest rate contracts | | — | | 50 | | — | | 50 |
| Total liabilities | $ | 52 | $ | 303 | $ | 14 | $ | 369 |
| | | | | | | | | |
| Other assets [b] | $ | 21 | $ | — | $ | — | $ | 21 |

(a)   There have been no transfers during 2012 between Levels 1 and 2.

(b)   Relates to mutual funds held in a rabbi trust for non-qualified deferred compensation plans for some key and highly compensated employees.

|  | As of December 31, 2011 | | | |
|  | Fair Value | | | |
| **Predecessor** | **Level 1 [(a)]** | **Level 2 [(a)]** | **Level 3** | **Total** |
|  | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 228 | $ 1,438 | $ 66 | $ 1,732 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 206 | $ 516 | $ 97 | $ 819 |
| Interest rate contracts | — | 32 | — | 32 |
| Total liabilities | $ 206 | $ 548 | $ 97 | $ 851 |
|  | | | | |
| Other assets [(b)] | $ 20 | $ — | $ — | $ 20 |

(a)   There were no transfers during the year ended December 31, 2011 between Levels 1 and 2.

(b)   Relates to mutual funds held in a rabbi trust for non-qualified deferred compensation plans for some key and highly compensated employees.

The following tables reconcile the beginning and ending balances for derivatives that are recognized at fair value in GenOn's consolidated financial statements at least annually using significant unobservable inputs for the periods from December 15, 2012 through December 31, 2012 and from January 1, 2012 through December 14, 2012 and for the year ended December 31, 2011:

|  | Successor | Predecessor | |
|  | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 |
|  | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) |
|  | Derivatives [(a)] | Derivatives [(a)] | |
|  | (In millions) | (In millions) | |
| Balance as of beginning of period [(b)] | $ 18 | $ (31) | $ (68) |
| Total gains and losses (realized/unrealized) included in earnings [(c)] | 2 | (117) | 24 |
| Purchases | 2 | — | — |
| Settlements | (5) | 80 | 1 |
| Transfers into Level 3 [(d)] | — | — | — |
| Transfers out of Level 3 [(d)] | — | — | 12 |
| Balance as of end of period | $ 17 | $ (68) | $ (31) |
| The amount of the total gains/(losses) for the period included in earnings attributable to the change in unrealized derivatives relating to assets still held at end of period | $ 4 | $ (80) | $ 42 |

(a)   Consists of derivatives assets and liabilities, net.

(b)   The change in Level 3 balance is primarily driven by the change in accounting policy at the NRG Merger date to include all curves with broker-quoted coal contracts within the Level 2 designation.

(c)   Contracts entered into are reported with total gains and losses included in earnings in the predecessor periods.

(d) Transfers in/out of Level 3 are related to the availability of external broker quotes and are valued as of the end of the reporting period.

*GenOn Americas Generation*

The following tables present assets and liabilities (including amounts with affiliates) measured and recorded at fair value on GenOn Americas Generation's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

|  | As of December 31, 2012 | | | |
|  | Fair Value | | | |
| **Successor** | Level 1[a] | Level 2[a] | Level 3 | Total |
|  | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 170 | $ 991 | $ 31 | $ 1,192 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 123 | $ 358 | $ 14 | $ 495 |

(a)   There have been no transfers during 2012 between Levels 1 and 2.

|  | As of December 31, 2011 | | | |
|  | Fair Value | | | |
| **Predecessor** | Level 1[a] | Level 2[a] | Level 3 | Total |
|  | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 244 | $ 1,471 | $ 66 | $ 1,781 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 269 | $ 598 | $ 98 | $ 965 |

(a)   There were no transfers during the year ended December 31, 2011 between Levels 1 and 2.

The following tables reconcile the beginning and ending balances for GenOn Americas Generation's derivatives that are recognized at fair value in the consolidated financial statements at least annually using significant unobservable inputs for the periods from December 15, 2012 through December 31, 2012 and from January 1, 2012 through December 14, 2012 and for the year ended December 31, 2011:

|  | Successor | Predecessor | |
|  | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 |
|  | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) |
|  | Derivatives[a] | Derivatives[a] | |
|  | (In millions) | (In millions) | |
| Balance as of beginning of period[b] | $ 18 | $ (32) | $ (66) |
| Total gains and losses (realized/unrealized) included in earnings[c] | 2 | (101) | 10 |
| Purchases | 2 | — | — |
| Settlements | (5) | 68 | 12 |
| Transfers into Level 3[d] | — | — | — |
| Transfers out of Level 3[d] | — | — | 12 |
| Balance as of end of period | $ 17 | $ (65) | $ (32) |
| The amount of the total gains/(losses) for the period included in earnings attributable to the change in unrealized derivatives relating to assets still held at end of period | $ 4 | $ (70) | $ 38 |

(a)   Consists of derivatives assets and liabilities, net.

(b)   The change in Level 3 balance is primarily driven by the change in accounting policy at the NRG Merger date to include all curves with broker-quoted coal contracts within the Level 2 designation.

(c)   Contracts entered into are reported with total gains and losses included in earnings in the predecessor periods.

(d) Transfers in/out of Level 3 are related to the availability of external broker quotes and are valued as of the end of the reporting period.

79

*GenOn Mid-Atlantic*

The following tables present assets and liabilities (including amounts with affiliates) measured and recorded at fair value on GenOn Mid-Atlantic's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

| | As of December 31, 2012 | | | |
| | Fair Value | | | |
| **Successor** | Level 1 [a] | Level 2 [a] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $       63 | $       778 | $       8 | $       849 |
| Derivative liabilities: | | | | |
| Commodity contracts | $       16 | $       138 | $       1 | $       155 |

(a)   There have been no transfers during 2012 between Levels 1 and 2.

| | As of December 31, 2011 | | | |
| | Fair Value | | | |
| **Predecessor** | Level 1 [a] | Level 2 [a] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $       39 | $       982 | $       9 | $       1,030 |
| Derivative liabilities: | | | | |
| Commodity contracts | $       32 | $       131 | $       73 | $       236 |

(a)   There were no transfers during the year ended December 31, 2011 between Levels 1 and 2.

The following tables reconcile the beginning and ending balances for GenOn Mid-Atlantic's derivatives that are recognized at fair value in the consolidated financial statements at least annually using significant unobservable inputs for the periods from December 15, 2012 through December 31, 2012 and from January 1, 2012 through December 14, 2012 and for the year ended December 31, 2011:

| | Successor | Predecessor | |
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 |
| | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) |
| | Derivatives [a] | Derivatives [a] | |
| | (In millions) | (In millions) | |
| Balance as of beginning of period [b] | $       8 | $       (64) | $       (69) |
| Total gains and losses (realized/unrealized) included in earnings [c] | 2 | (110) | (31) |
| Purchases | — | — | — |
| Settlements | (3) | 113 | 24 |
| Transfers into Level 3 [d] | — | — | — |
| Transfers out of Level 3 [d] | — | — | 12 |
| Balance as of end of period | $       7 | $       (61) | $       (64) |
| The amount of the total gains/(losses) for the period included in earnings attributable to the change in unrealized derivatives relating to assets still held at end of period | $       1 | $       (36) | $       4 |

(a)   Consists of derivatives assets and liabilities, net.
(b)   The change in Level 3 balance is primarily driven by the change in accounting policy at the NRG Merger date to include all curves with broker-quoted coal contracts within the Level 2 designation.
(c)   Contracts entered into are reported with total gains and losses included in earnings in the predecessor periods.
(d) Transfers in/out of Level 3 are related to the availability of external broker quotes and are valued as of the end of the reporting period.

80

Realized and unrealized gains and losses included in earnings that are related to energy derivatives are recorded in operating revenues and cost of operations.

*Derivative Fair Value Measurements*

A majority of the Registrants' contracts are exchange-traded contracts with readily available quoted market prices. A portion of the Registrants' contracts are non-exchange-traded contracts valued using prices provided by external sources, primarily price quotations available through brokers or over-the-counter and on-line exchanges. For the majority of the Registrants' markets, quotes are from multiple sources. To the extent that the Registrants receive multiple quotes, prices reflect the average of the bid-ask mid-point prices obtained from all sources that the Registrants believe provide the most liquid market for the commodity. If the Registrants receive one quote, then the mid-point of the bid-ask spread for that quote is used. The terms for which such price information is available vary by commodity, region and product. A significant portion of the fair value of the Registrants' derivative portfolio is based on price quotes from brokers in active markets who regularly facilitate those transactions and the Registrants believe such price quotes are executable. The Registrants do not use third party sources that derive price based on proprietary models or market surveys. The remainder of the assets and liabilities represents contracts for which external sources or observable market quotes are not available. These contracts are valued based on various valuation techniques including but not limited to internal models based on a fundamental analysis of the market and extrapolation of observable market data with similar characteristics. Contracts valued with prices provided by models and other valuation techniques make up 3% of GenOn's derivative assets and 4% of GenOn's derivative liabilities, 3% of GenOn Americas Generation's derivative assets and 3% of GenOn Americas Generation's derivative liabilities and 1% of GenOn Mid-Atlantic's derivative assets and 1% of GenOn Mid-Atlantic's derivative liabilities.

The fair value of each contract is discounted using a risk free interest rate. In addition, the Registrants apply a credit reserve to reflect credit risk which is calculated based on published default probabilities. To the extent that the Registrants' net exposure under a specific master agreement is an asset, the Registrants use the counterparty's default swap rate. If the exposure under a specific master agreement is a liability, the Registrants use their default swap rate. The credit reserve is added to the discounted fair value to reflect the exit price that a market participant would be willing to receive to assume the Registrants' liabilities or that a market participant would be willing to pay for the Registrants' assets. The Registrants' credit reserves were as follows:

|  | Successor | Predecessor |
| --- | --- | --- |
|  | As of December 31, 2012 | As of December 31, 2011 |
|  | (In millions) | (In millions) |
| GenOn | $          4 | $          48 |
| Genon Americas Generation | 4 | 47 |
| GenOn Mid-Atlantic | 4 | 47 |

The fair values in each category reflect the level of forward prices and volatility factors as of December 31, 2012, and may change as a result of changes in these factors. Management uses its best estimates to determine the fair value of commodity and derivative contracts the Registrants hold and sell. These estimates consider various factors including closing exchange and over-the-counter price quotations, time value, volatility factors and credit exposure. It is possible however, that future market prices could vary from those used in recording assets and liabilities from energy marketing and trading activities and such variations could be material.

Under the guidance of ASC 815, entities may choose to offset cash collateral paid or received against the fair value of derivative positions executed with the same counterparties under the same master netting agreements. The Registrants have chosen not to offset positions as defined in ASC 815. As of December 31, 2012, GenOn recorded $148 million of cash collateral paid and $140 million of cash collateral received on its balance sheet. As of December 31, 2012, GenOn Americas Generation recorded $91 million of cash collateral paid and $140 million of cash collateral received on its balance sheet. As of December 31, 2012, GenOn Mid-Atlantic had no outstanding cash collateral paid and $57 million of cash collateral received on its balance sheet.

*Concentration of Credit Risk*

In addition to the credit risk discussion as disclosed in Note 2, *Summary of Significant Accounting Policies*, the following item is a discussion of the concentration of credit risk for the Registrants' financial instruments. Credit risk relates to the risk of loss resulting from non-performance or non-payment by counterparties pursuant to the terms of their contractual obligations. The Registrants monitor and manage credit risk through credit policies that include: (i) an established credit approval process; (ii) a daily monitoring of counterparties' credit limits; (iii) the use of credit mitigation measures such as margin, collateral, prepayment arrangements, or volumetric limits (iv) the use of payment netting agreements; and (v) the use of master netting agreements that allow for the netting of positive and negative exposures of various contracts associated with a single counterparty. Risks surrounding counterparty performance and credit could ultimately impact the amount and timing of expected cash flows. The Registrants seek to mitigate counterparty risk by having a diversified portfolio of counterparties. The Registrants also have credit protection within various agreements to call on additional collateral support if and when necessary. Cash margin is collected and held at the Registrants to cover the credit risk of the counterparty until positions settle.

As of December 31, 2012, counterparty credit exposure to a significant portion of GenOn's counterparties was $833 million and GenOn held collateral (cash and letters of credit) against those positions of $59 million, resulting in a net exposure of $774 million. Approximately 90% of GenOn's exposure before collateral is expected to roll off by the end of 2014. GenOn Americas Generation's counterparty credit exposure to a significant portion of counterparties was $801 million and GenOn Americas Generation held collateral (cash and letters of credit) against those positions of $59 million, resulting in a net exposure of $742 million. Approximately 90% of GenOn Americas Generation's exposure before collateral is expected to roll off by the end of 2014. GenOn Mid-Atlantic's counterparty credit exposure to a significant portion of counterparties was $641 million and GenOn Mid-Atlantic held collateral (cash and letters of credit) against those positions of $57 million, resulting in a net exposure of $584 million. Approximately 91% of GenOn Mid-Atlantic's exposure before collateral is expected to roll off by the end of 2014.

The following tables highlight the counterparty credit quality and the net counterparty credit exposure by industry sector. Net counterparty credit exposure is defined as the aggregate net asset position for the Registrants with counterparties where netting is permitted under the enabling agreement and includes all cash flow, mark-to-market and NPNS, and non-derivative transactions. As of December 31, 2012, the exposure is shown net of collateral held and includes amounts net of receivables or payables.

*GenOn*

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Financial institutions | 76% |
| Utilities, energy merchants, marketers and other | 14% |
| ISOs | 10% |
| Total | 100% |

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Investment grade | 99% |
| Non-rated | 1% |
| Total | 100% |

(a)   Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

GenOn has counterparty credit risk exposure to certain counterparties representing more than 10% of total net exposure discussed above and the aggregate of such counterparties was $522 million. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, GenOn does not anticipate a material impact on its financial position or results of operations from nonperformance by any of its counterparties.

*GenOn Americas Generation*

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Financial institutions | 80% |
| Utilities, energy merchants, marketers and other | 14% |
| ISOs | 6% |
| Total | 100% |

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Investment grade | 99% |
| Non-rated | 1% |
| Total | 100% |

(a)     Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

GenOn Americas Generation has counterparty credit risk exposure to certain counterparties representing more than 10% of total net exposure discussed above and the aggregate of such counterparties was $522 million. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, GenOn Americas Generation does not anticipate a material impact on its financial position or results of operations from nonperformance by any of its counterparties.

*GenOn Mid-Atlantic*

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Financial institutions | 100% |

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Investment grade | 100% |

(a)     Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

GenOn Mid-Atlantic has counterparty credit risk exposure to certain counterparties representing more than 10% of total net exposure discussed above and the aggregate of such counterparties was $505 million. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, GenOn Mid-Atlantic does not anticipate a material impact on its financial position or results of operations from nonperformance by any of its counterparties.

### Note 6 — Accounting for Derivative Instruments and Hedging Activities (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)

ASC 815 requires the Registrants to recognize all derivative instruments on the balance sheet as either assets or liabilities and to measure them at fair value each reporting period unless they qualify for a NPNS exception. The Registrants may elect to designate certain derivatives as cash flow hedges, if certain conditions are met, and defer the effective portion of the change in fair value of the derivatives to accumulated OCI, until the hedged transactions occur and are recognized in earnings. The ineffective portion of a cash flow hedge is immediately recognized in earnings.

For derivatives that are not designated as cash flow hedges, the changes in the fair value will be immediately recognized in earnings. Certain derivative instruments may qualify for the NPNS exception and are therefore exempt from fair value accounting treatment. ASC 815 applies to the Registrants' energy related commodity contracts and interest rate swaps.

#### Energy-Related Commodities

To manage the commodity price risk associated with the Registrants' competitive supply activities and the price risk associated with wholesale power sales from the Registrants' electric generation facilities, the Registrants enter into a variety of derivative and non-derivative hedging instruments, utilizing the following:

• Forward contracts, which commit the Registrants to purchase or sell energy commodities or purchase fuels in the future.

- Futures contracts, which are exchange-traded standardized commitments to purchase or sell a commodity or financial instrument.
- Swap agreements, which require payments to or from counterparties based upon the differential between two prices for a predetermined contractual, or notional, quantity.
- Financial and non-financial option contracts, which convey to the option holder the right but not the obligation to purchase or sell a commodity.

The objectives for entering into derivative contracts used for economic hedging include:

- Fixing the price for a portion of anticipated future electricity sales that provides an acceptable return on the Registrants' electric generation operations.
- Fixing the price of a portion of anticipated fuel purchases for the operation of the Registrants' power plants.

GenOn, GenOn Americas Generation and GenOn Mid-Atlantic's trading and hedging activities are subject to limits within the risk management policy. These contracts are recognized on the balance sheet at fair value and changes in the fair value of these derivative financial instruments are recognized in earnings.

*GenOn*

As of December 31, 2012, GenOn's derivative assets and liabilities consisted primarily of the following:

- Forward and financial contracts for the purchase/sale of electricity and related products economically hedging GenOn's generation assets' forecasted output through 2017.
- Forward and financial contracts for the purchase of fuel commodities relating to the forecasted usage of GenOn's generation assets through 2015.

Also, as of December 31, 2012, GenOn had other energy-related contracts that did not meet the definition of a derivative instrument as follows:

- Power tolling contracts through 2023;
- Bituminous coal purchase contracts through 2020;
- Natural gas transportation contracts and storage agreements through 2023; and
- Coal transportation contracts through 2016.


*GenOn Americas Generation*

As of December 31, 2012, GenOn Americas Generation's derivative assets and liabilities consisted primarily of the following:

- Forward and financial contracts for the purchase/sale of electricity and related products economically hedging GenOn Americas Generation's generation assets' forecasted output through 2017.
- Forward and financial contracts for the purchase of fuel commodities relating to the forecasted usage of GenOn Americas Generation's generation assets through 2015.

Also, as of December 31, 2012, GenOn Americas Generation had other energy-related contracts that did not meet the definition of a derivative instrument as follows:

- Power tolling contracts through 2014;
- Natural gas transportation contracts and storage agreements through 2023; and
- Coal transportation contracts through 2016.

*GenOn Mid-Atlantic*

As of December 31, 2012, GenOn Mid-Atlantic's derivative assets and liabilities consisted primarily of the following:

- Forward and financial contracts for the purchase/sale of electricity and related products economically hedging GenOn Mid-Atlantic's generation assets' forecasted output through 2017.
- Forward and financial contracts for the purchase of fuel commodities relating to the forecasted usage of GenOn Mid-Atlantic's generation assets through 2015.

Also, as of December 31, 2012, GenOn Mid-Atlantic had other energy-related contracts that did not meet the definition of a derivative instrument as follows:

- Natural gas transportation contracts and storage agreements through 2023; and
- Coal transportation contracts through 2016.

### Interest Rate Swaps (GenOn)

In 2010, GenOn Marsh Landing entered into interest rate protection agreements (interest rate swaps) in connection with its project financing, which have been designated as cash flow hedges. GenOn Marsh Landing entered into the interest rate swaps to reduce the risks with respect to the variability of the interest rates for the term loans. As of December 31, 2012, the maximum length of time GenOn is hedging its exposure to the variability in future cash flows that may result from changes in interest rates is 11 years.

### Volumetric Underlying Derivative Transactions

The following table summarizes the net notional volume buy/(sell) of the Registrants' open derivative transactions broken out by commodity, excluding those derivatives that qualified for the NPNS exception as of December 31, 2012, and December 31, 2011. Option contracts are reflected using delta volume. Delta volume equals the notional volume of an option adjusted for the probability that the option will be in-the-money at its expiration date.

| | | GenOn | | GenOn Americas Generation | | GenOn Mid-Atlantic | |
|---|---|---|---|---|---|---|---|
| | | Total Volume | | Total Volume | | Total Volume | |
| | | Successor | Predecessor | Successor | Predecessor | Successor | Predecessor |
| | | As of December 31, 2012 | As of December 31, 2011 | As of December 31, 2012 | As of December 31, 2011 | As of December 31, 2012 | As of December 31, 2011 |
| | | (In millions) | (In millions) | (In millions) | (In millions) | (In millions) | (In millions) |
| **Commodity** | **Units** | | | | | | |
| Coal | Short Ton | 5 | 6 | 4 | 4 | 4 | 4 |
| Natural Gas | MMBtu | (194) | (182) | (150) | (167) | (150) | (172) |
| Power | MWh | (43) | (38) | (22) | (19) | (22) | (20) |
| Interest | Dollars | $ 475 | $ 475 | $ — | $ — | $ — | $ — |

### Fair Value of Derivative Instruments

The Registrants have elected to disclose derivative assets and liabilities on a trade-by-trade basis and do not offset amounts at the counterparty master agreement level. Also, collateral received or paid on the Registrants' derivative assets or liabilities are recorded on a separate line item on the balance sheet. The Registrants have chosen not to offset positions as permitted in ASC 815. As of December 31, 2012, GenOn recorded $148 million of cash collateral paid and $140 million of cash collateral received on its balance sheet. As of December 31, 2012, GenOn Americas Generation recorded $91 million of cash collateral paid and $140 million of cash collateral received on its balance sheet. As of December 31, 2012, GenOn Mid-Atlantic had no outstanding cash collateral paid and $57 million of cash collateral received on its balance sheet.

The following tables summarize the fair value within the derivative instrument valuation on the balance sheet:

*GenOn*

| | Fair Value | | | |
|---|---|---|---|---|
| | Derivative Assets | | Derivative Liabilities | |
| | Successor | Predecessor | Successor | Predecessor |
| | As of December 31, 2012 | As of December 31, 2011 | As of December 31, 2012 | As of December 31, 2011 |
| | (In millions) | (In millions) | (In millions) | (In millions) |
| **Derivatives Designated as Cash Flow Hedges**: | | | | |
| Interest rate contracts current | $ — | $ — | $ (9) | $ (1) |
| Interest rate contracts long-term | — | — | (41) | (31) |
| **Total Derivatives Designated as Cash Flow Hedges** | — | — | (50) | (32) |
| **Derivatives Not Designated as Cash Flow Hedges:** | | | | |
| Commodity contracts current | 604 | 999 | (236) | (719) |
| Commodity contracts long-term | 512 | 733 | (83) | (100) |
| **Total Derivatives Not Designated as Cash Flow Hedges** | 1,116 | 1,732 | (319) | (819) |
| **Total Derivatives** | $ 1,116 | $ 1,732 | $ (369) | $ (851) |

*GenOn Americas Generation*

| | Fair Value | | | |
|---|---|---|---|---|
| | Derivative Assets | | Derivative Liabilities | |
| | Successor | Predecessor | Successor | Predecessor |
| | As of December 31, 2012 | As of December 31, 2011 | As of December 31, 2012 | As of December 31, 2011 |
| | (In millions) | (In millions) | (In millions) | (In millions) |
| **Derivatives Not Designated as Cash Flow Hedges**: | | | | |
| Commodity contracts current | $ 656 | $ 1,021 | $ (362) | $ (776) |
| Commodity contracts long-term | 536 | 760 | (133) | (189) |
| **Total Derivatives Not Designated as Cash Flow Hedges** | $ 1,192 | $ 1,781 | $ (495) | $ (965) |

*GenOn Mid-Atlantic*

| | Fair Value | | | |
|---|---|---|---|---|
| | Derivative Assets | | Derivative Liabilities | |
| | Successor | Predecessor | Successor | Predecessor |
| | As of December 31, 2012 | As of December 31, 2011 | As of December 31, 2012 | As of December 31, 2011 |
| | (In millions) | (In millions) | (In millions) | (In millions) |
| **Derivatives Not Designated as Cash Flow Hedges**: | | | | |
| Commodity contracts current | $ 394 | $ 399 | $ (100) | $ (168) |
| Commodity contracts long-term | 455 | 631 | (55) | (68) |
| **Total Derivatives Not Designated as Cash Flow Hedges** | $ 849 | $ 1,030 | $ (155) | $ (236) |

*Accumulated Other Comprehensive Loss (GenOn)*

The following table summarize the effects on GenOn's accumulated OCI balance attributable to cash flow hedge derivatives, net of tax of $0:

| | Successor | Predecessor | | | | |
|---|---|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | | 2011 | | 2010 |
| | (In millions) | (In millions) | | | | |
| Accumulated OCI balance, beginning of period | $ — | $ (34) | $ 21 | | $ — | |
| Recognized in OCI on interest rate derivatives | 1 | (16) | (55) | | 21 | |
| Reclassified from accumulated OCI into earnings[a][b] | — | (2) | — | | — | |
| Accumulated OCI balance, end of period | $ 1 | $ (52) | $ (34) | | $ 21 | |
| Valuation adjustments | $ — | $ — | $ 4 [c] | $ (2) [c] | | |

(a) Amounts reclassified from accumulated OCI into income and amounts recognized in income from the ineffective portion of cash flow hedges are recorded in interest expense.

(b) All of the forecasted transactions (future interest payments) were deemed probable of occurring; therefore, no cash flow hedges were discontinued and no amount was recognized in GenOn's results of operations as a result of discontinued cash flow hedges.

(c) Represents the default risk of the counterparties to these transactions and GenOn's own non-performance risk. The effect of these valuation adjustments is recorded in interest expense.

Because a significant portion of the interest expense incurred by GenOn Marsh Landing during construction will be capitalized, amounts included in accumulated other comprehensive loss associated with construction period interest payments will be reclassified to property, plant and equipment and depreciated over the expected useful life of the Marsh Landing generating facility once it commences commercial operations in mid-2013. Actual amounts reclassified into earnings could vary from the amounts currently recorded as a result of future changes in interest rates.

*Impact of Derivative Instruments on the Statement of Operations*

Unrealized gains and losses associated with changes in the fair value of derivative instruments not accounted for as cash flow hedges are reflected in current period earnings.

The following tables summarize the pre-tax effects of economic hedges that have not been designated as cash flow hedges and trading activity on the Registrants' statements of operations. These amounts are included within operating revenues and cost of operations.

*GenOn*

|  | Successor | Predecessor | | |
|---|---|---|---|---|
|  | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
|  | (In millions) | (In millions) | | |
| **Unrealized mark-to-market results** | | | | |
| Reversal of previously recognized unrealized losses/ (gains) on settled positions related to economic hedges | $ (4) | $ (307) | $ (243) | $ (338) |
| Net unrealized (losses)/gains on open positions related to economic hedges | (5) | 166 | 465 | 301 |
| Total unrealized mark-to-market gains/(losses) for economic hedging activities | (9) | (141) | 222 | (37) |
| Reversal of previously recognized unrealized losses/ (gains) on settled positions related to trading activity | (4) | (8) | 6 | (50) |
| Net unrealized gains/(losses) on open positions related to trading activity | — | 6 | (4) | 45 |
| Total unrealized mark-to-market gains/(losses) for trading activity | (4) | (2) | 2 | (5) |
| **Total unrealized gains/(losses)** | $ (13) | $ (143) | $ 224 | $ (42) |

|  | Successor | Predecessor | | |
|---|---|---|---|---|
|  | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
|  | (In millions) | (In millions) | | |
| Revenue from operations — energy commodities | $ (20) | $ (159) | $ 227 | $ 45 |
| Cost of operations | 7 | 16 | (3) | (87) |
| **Total impact to statement of operations** | $ (13) | $ (143) | $ 224 | $ (42) |

*GenOn Americas Generation*

|  | Successor | Predecessor | | |
|---|---|---|---|---|
|  | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
|  | (In millions) | (In millions) | | |
| **Unrealized mark-to-market results** | | | | |
| Reversal of previously recognized unrealized losses/ (gains) on settled positions related to economic hedges | $ (2) | $ (241) | $ (220) | $ (338) |
| Net unrealized (losses)/gains on open positions related to economic hedges | (6) | 109 | 356 | 326 |
| Total unrealized mark-to-market gains/(losses) for economic hedging activities | (8) | (132) | 136 | (12) |
| Reversal of previously recognized unrealized losses/ (gains) on settled positions related to trading activity | (4) | (8) | 6 | (50) |
| Net unrealized gains/(losses) on open positions related to trading activity | — | 6 | (4) | 45 |
| Total unrealized mark-to-market gains/(losses) for trading activity | (4) | (2) | 2 | (5) |
| **Total unrealized gains/(losses)** | $ (12) | $ (134) | $ 138 | $ (17) |

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | | (In millions) | |
| Revenue from operations — energy commodities | $ (16) | $ (153) | $ 140 | $ 72 |
| Cost of operations | 4 | 19 | (2) | (89) |
| **Total impact to statement of operations** | $ (12) | $ (134) | $ 138 | $ (17) |

*GenOn Mid-Atlantic*

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | | (In millions) | |
| **Unrealized mark-to-market results** | | | | |
| Reversal of previously recognized unrealized losses/ (gains) on settled positions related to economic hedges | $ (2) | $ (246) | $ (215) | $ (319) |
| Net unrealized (losses)/gains on open positions related to economic hedges | (5) | 131 | 335 | 326 |
| **Total unrealized gains/(losses)** | $ (7) | $ (115) | $ 120 | $ 7 |

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | | (In millions) | |
| Revenue from operations — energy commodities | $ (12) | $ (120) | $ 119 | $ 80 |
| Cost of operations | 5 | 5 | 1 | (73) |
| **Total impact to statement of operations** | $ (7) | $ (115) | $ 120 | $ 7 |

**Credit Risk Related Contingent Features (GenOn and GenOn Americas Generation)**

Certain of GenOn and GenOn Americas Generation's hedging agreements contain provisions that require the Registrants to post additional collateral if the counterparty determines that there has been deterioration in credit quality, generally termed "adequate assurance" under the agreements, or require the Registrants to post additional collateral if there were a one notch downgrade in the Registrants' credit rating. The collateral required for contracts that have adequate assurance clauses that are in net liability positions as of December 31, 2012, was $5 million for GenOn and GenOn Americas Generation. The collateral required for contracts with credit rating contingent features that are in a net liability position as of December 31, 2012, was $3 million for GenOn and GenOn Americas Generation. In addition, GenOn and GenOn Americas Generation are parties to certain marginable agreements under which they have net liability positions, but the counterparties have not called for collateral due, which is approximately $1 million as of December 31, 2012. At December 31, 2012, GenOn Mid-Atlantic did not have any financial instruments with credit-risk-related contingent features.

See Note 5, *Fair Value of Financial Instruments,* for discussion regarding concentration of credit risk.

**Note 7 — Inventory (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Inventory consisted of:

*GenOn*

| | Successor | Predecessor |
|---|---|---|
| | As of December 31, 2012 | As of December 31, 2011 |
| | (In millions) | (In millions) |
| Fuel oil | $ 120 | $ 108 |
| Coal | 170 | 229 |
| Natural gas | 1 | 1 |
| Spare parts | 157 | 201 |
| Purchased emissions allowances [a] | — | 19 |
| Other | 2 | 5 |
| Total Inventory | $ 450 | $ 563 |

(a)   Effective with the NRG Merger, GenOn classifies purchased emission allowances in intangible assets.

*GenOn Americas Generation*

| | Successor | Predecessor |
|---|---|---|
| | As of December 31, 2012 | As of December 31, 2011 |
| | (In millions) | (In millions) |
| Fuel oil | $ 91 | $ 68 |
| Coal | 77 | 92 |
| Natural gas | 1 | 1 |
| Spare parts | 70 | 74 |
| Purchased emissions allowances [a] | — | 19 |
| Other | — | 3 |
| Total Inventory | $ 239 | $ 257 |

(a)   Effective with the NRG Merger, GenOn Americas Generation classifies purchased emission allowances in intangible assets.

*GenOn Mid-Atlantic*

| | Successor | Predecessor |
|---|---|---|
| | As of December 31, 2012 | As of December 31, 2011 |
| | (In millions) | (In millions) |
| Fuel oil | $ 23 | $ 20 |
| Coal | 77 | 92 |
| Spare parts | 50 | 52 |
| Other | — | 3 |
| Total Inventory | $ 150 | $ 167 |

**Note 8 — Property, Plant, and Equipment (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Major classes of property, plant, and equipment were as follows:

*GenOn*

| | Successor | Predecessor | Successor |
|---|---|---|---|
| | As of December 31, 2012 | As of December 31, 2011 | Depreciable Lives |
| | (In millions) | (In millions) | |
| Facilities and equipment | $ 3,086 | $ 6,648 | 3 - 34 Years |
| Land and improvements | 152 | 194 | |
| Office furnishings and equipment | 83 | 114 | 2 -19 Years |
| Construction in progress | 634 | 395 | |
| Total property, plant and equipment | 3,955 | 7,351 | |
| Accumulated depreciation | (9) | (1,160) | |
| Net property, plant and equipment | $ 3,946 | $ 6,191 | |

*GenOn Americas Generation*

| | Successor | Predecessor | Successor |
|---|---|---|---|
| | As of December 31, 2012 | As of December 31, 2011 | Depreciable Lives |
| | (In millions) | (In millions) | |
| Facilities and equipment | $ 1,261 | $ 3,759 | 5 - 34 Years |
| Land and improvements | 40 | 46 | |
| Office furnishings and equipment | 12 | 13 | 2 - 12 Years |
| Construction in progress | 18 | 76 | |
| Total property, plant and equipment | 1,331 | 3,894 | |
| Accumulated depreciation | (4) | (960) | |
| Net property, plant and equipment | $ 1,327 | $ 2,934 | |

*GenOn Mid-Atlantic*

| | Successor | Predecessor | Successor |
|---|---|---|---|
| | As of December 31, 2012 | As of December 31, 2011 | Depreciable Lives |
| | (In millions) | (In millions) | |
| Facilities and equipment | $ 1,181 | $ 2,965 | 5 - 34 Years |
| Land and improvements | 22 | 19 | |
| Office furnishings and equipment | 7 | 6 | 2 - 12 Years |
| Construction in progress | 14 | 64 | |
| Total property, plant and equipment | 1,224 | 3,054 | |
| Accumulated depreciation | (4) | (610) | |
| Net property, plant and equipment | $ 1,220 | $ 2,444 | |

**Note 9 — Retirements, Mothballing or Long-Term Protective Layup of Generating Facilities (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*Facilities Announced for Deactivation Due to Returns on Investment (GenOn)*

The Registrants are subject to extensive environmental regulation by federal, state and local authorities under a variety of statutes, regulations and permits that address discharges into the air, water and soil, and the proper handling of solid, hazardous and toxic materials and waste. Complying with increasingly stringent environmental requirements involves significant capital and operating expenses. To the extent forecasted returns on investments necessary to comply with environmental regulations are insufficient for a particular facility, the Registrants plan to deactivate that facility. In determining the forecasted returns on investments, the Registrants factor in forecasted energy and capacity prices, expected capital expenditures, operating costs, property taxes and other factors. GenOn deactivated the following coal-fired units at the referenced times: Elrama units 1-3 (290 MW) June 2012, Niles unit 2 (110 MW) June 2012, Elrama unit 4 (170 MW) October 2012 and Niles unit 1 (110 MW) October 2012. The Registrants expect to deactivate the following generating capacity, primarily coal-fired units, at the referenced times: Portland (400 MW) January 2015, Avon Lake (730 MW) April 2015, New Castle (330 MW) April 2015, Titus (245 MW) April 2015, Shawville (600 MW) place in long-term protective layup in April 2015, Gilbert (190 MW) May 2015, Glen Gardner (160 MW) May 2015 and Werner (210 MW) May 2015.

*Potomac River Generating Facility*

During 2011, GenOn Mid-Atlantic entered into an agreement with the City of Alexandria, Virginia to remove permanently from service its 480 MW Potomac River generating facility. The agreement, which amends the Project Schedule and Agreement, dated July 2008 with the City of Alexandria, provides for the retirement of the Potomac River generating facility on October 1, 2012, subject to the determination of PJM that the retirement of the facility will not affect reliability and the consent of Potomac Electric Power Company. PJM made the necessary determination and in June 2012 Potomac Electric Power Company gave its consent. As a result, the Potomac River generating facility was retired in October 2012. Upon retirement of the Potomac River generating facility, all funds in the escrow account ($32 million) established under the July 2008 agreement were distributed to GenOn Mid-Atlantic in October 2012. GenOn Mid-Atlantic therefore reversed $32 million of the previously recorded obligation under the 2008 agreement with the City of Alexandria as a reduction in cost of operations during the period from January 1, 2012 through December 14, 2012.

*Contra Costa Generating Facility (GenOn and GenOn Americas Generation)*

GenOn Americas Generation entered into an agreement with PG&E in September 2009 for 675 MW at Contra Costa for the period from November 2011 through April 2013. At the end of the agreement, and subject to any necessary regulatory approvals, GenOn Americas Generation has agreed to retire the Contra Costa facility.

*Expenses, Property, Plant and Equipment, and Materials and Supplies Inventory Related to Deactivations*

In connection with the decision to deactivate the generating facilities, the Registrants evaluated their spare parts inventory and determined that there was excess inventory. GenOn, GenOn Americas Generation and GenOn Mid-Atlantic established a reserve of $35 million, $6 million and $4 million, respectively, recorded to operations and maintenance expense during the first quarter of 2012 relating to their excess inventory. In addition to the excess spare parts inventory reserve recorded in the first quarter of 2012, GenOn, GenOn Americas Generation and GenOn Mid-Atlantic incurred $18 million, $10 million and $9 million, respectively, during the period from January 1, 2012 through December 14, 2012 for costs to deactivate generating facilities, which is included in cost of operations. During the period from December 15, 2012 through December 31, 2012, GenOn, GenOn Americas Generation and GenOn Mid-Atlantic incurred $1 million, $1 million and $1 million, respectively, for these costs. At December 31, 2012, the aggregate carrying value of property, plant and equipment, net and spare parts for the generating facilities with an aggregate of 3,540 MW, and are expected to be deactivated in 2013, 2014 or 2015, was $115 million and $17 million, respectively, for GenOn.

If market conditions and/or environmental and regulatory factors or assumptions change in the future, forecasted returns on investments necessary to comply with environmental regulations could change resulting in possible incremental investments if returns improve or deactivation of additional generating units or facilities if returns deteriorate. Such deactivations could result in additional charges, including impairments, severance costs and other plant shutdown costs.

**Note 10 — Intangible Assets (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

The Registrants' intangible assets are primarily comprised of the following:

- *Acquired contracts* — At December 31, 2011, these represented contracts acquired in connection with the Mirant/RRI Merger (with positive fair values), which primarily consisted of certain long-term natural gas transportation and storage contracts and coal contracts. These acquired contracts were amortized to cost of operations over their contractual lives. As a result of the NRG Merger, these balances resulted in negative fair values that were pushed down to the Registrants as out-of-market contracts. See *Out-of-market contracts* discussion below.

- *Emission allowances* — At December 31, 2011, these represented $SO_2$ emission allowances granted for the GenOn Mid-Atlantic generating facilities. See Note 11, *Impairments,* for discussion of the impairment of excess emission allowances during 2011. Effective with the NRG Merger, the Registrants classify purchased emission allowances in intangible assets. For GenOn and GenOn Americas Generation, purchased emission allowances consist of $CO_2$ emission credits for compliance with the RGGI. At December 31, 2012, the balance primarily consists of RGGI emission credits. These emission allowances are held-for-use with $SO_2$ allowances amortized on a straight-line basis to depreciation and amortization and RGGI credits amortized based on units of production to cost of operations.

- *Trading rights (GenOn and GenOn Americas Generation)* — At December 31, 2011, these were intangible assets recognized in connection with assets purchased by GenOn Americas Generation and represented GenOn Americas Generation's ability to generate additional cash flows by incorporating its trading activities with the acquired generating facilities. Trading rights were amortized to depreciation and amortization on a straight-line basis. Effective with the NRG Merger, these balances were eliminated from intangible assets and incorporated into the fair value calculation of the respective generating facility.

- *Development rights* — At December 31, 2011, these represented the right to expand capacity at certain acquired generating facilities. The existing infrastructure, including storage facilities, transmission interconnections and fuel delivery systems, and contractual rights acquired, provided the opportunity to expand or repower certain generating facilities. Development rights were amortized to depreciation and amortization on a straight-line basis. Effective with the NRG Merger, these balances were eliminated from intangible assets and incorporated into the fair value calculation of the respective generating facility.

The following tables summarize the components of the Registrants' intangible assets:

*GenOn*

| | Successor | | | | Predecessor | | | |
| | As of December 31, 2012 | | | | As of December 31, 2011 | | | |
| | Gross Carrying Amount | | Accumulated Amortization | | Gross Carrying Amount | | Accumulated Amortization | |
| | (In millions) | | | | (In millions) | | | |
|---|---|---|---|---|---|---|---|---|
| Acquired contracts | $ | — | $ | — | $ | 33 | $ | (16) |
| Emission allowances | | 69 [a] | | (1) [a] | | 19 [b] | | (7) [b] |
| Trading rights | | — | | — | | 15 | | (8) |
| Development rights | | — | | — | | 13 | | (3) |
| Other | | — | | — | | 4 | | (2) |
| Total intangible assets | $ | 69 | $ | (1) | $ | 84 | $ | (36) |

(a)   Effective with the NRG Merger, GenOn classifies purchased emission allowances in intangible assets. Prior to December 15, 2012, GenOn purchased $16 million of emission allowances, which were received during the period from December 15, 2012 to December 31, 2012 and recorded to intangible assets.

(b)   During 2011, GenOn recorded a $75 million impairment charge on emissions allowances recorded in intangible assets.

*GenOn Americas Generation*

| | Successor | | | Predecessor | | |
|---|---|---|---|---|---|---|
| | As of December 31, 2012 | | | As of December 31, 2011 | | |
| | Gross Carrying Amount | | Accumulated Amortization | Gross Carrying Amount | | Accumulated Amortization |
| | (In millions) | | | (In millions) | | |
| Emission allowances | $ | 67 (a) | $ | (1) (a) | $ | 11 (b) | $ | (3) (b) |
| Trading rights | | — | | — | | 15 | | (8) |
| Development rights | | — | | — | | 13 | | (3) |
| Other | | — | | — | | 5 | | (2) |
| Total intangible assets | $ | 67 | $ | (1) | $ | 44 | $ | (16) |

(a) Effective with the NRG Merger, GenOn Americas Generation classifies purchased emission allowances in intangible assets. Prior to December 15, 2012, GenOn Americas Generation purchased $16 million of emission allowances, which were received during the period from December 15, 2012 to December 31, 2012 and recorded to intangible assets.
(b) During 2011, GenOn Americas Generation recorded a $70 million impairment charge on emission allowances recorded in intangible assets.

*GenOn Mid-Atlantic*

| | Successor | | | Predecessor | | |
|---|---|---|---|---|---|---|
| | As of December 31, 2012 | | | As of December 31, 2011 | | |
| | Gross Carrying Amount | | Accumulated Amortization | Gross Carrying Amount | | Accumulated Amortization |
| | (In millions) | | | (In millions) | | |
| Emission allowances | $ | 1 | $ | — | $ | 10 (a) | $ | (2) (a) |
| Development rights | | — | | — | | 6 | | — |
| Other | | — | | — | | 4 | | (2) |
| Total intangible assets | $ | 1 | $ | — | $ | 20 | $ | (4) |

(a) During 2011, GenOn Mid-Atlantic recorded a $56 million impairment charge on emission allowances recorded in intangible assets.

The following tables present the Registrants' amortization of intangible assets for each of the past three years:

*GenOn*

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | (In millions) | | |
| Acquired contracts | $ | — | $ | 2 | $ | 9 | $ | 7 |
| Emission allowances | | 1 | | — | | 9 | | 5 |
| Trading rights | | — | | 2 | | 2 | | 2 |
| Development rights | | — | | 1 | | 1 | | 2 |
| Other | | — | | — | | 2 | | 3 |
| Total amortization | $ | 1 | $ | 5 | $ | 23 | $ | 19 |

*GenOn Americas Generation*

| | Successor | | Predecessor | | |
|---|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | | (In millions) | | |
| Emission allowances | $ 1 | | $ — | $ 4 | $ 5 |
| Trading rights | — | | 2 | 2 | 2 |
| Development rights | — | | 1 | 1 | 2 |
| Other | — | | — | 2 | — |
| Total amortization | $ 1 | | $ 3 | $ 9 | $ 9 |

*GenOn Mid-Atlantic*

| | Successor | | Predecessor | | |
|---|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | | (In millions) | | |
| Emission allowances | $ — | | $ — | $ 3 | $ 4 |
| Development rights | — | | — | — | 2 |
| Other | — | | — | 2 | — |
| Total amortization | $ — | | $ — | $ 5 | $ 6 |

The following table presents estimated amortization of the Registrants' intangible assets for each of the next five years:

*GenOn*

| | Emission Allowances |
|---|---|
| | (In millions) |
| 2013 | $ 28 |
| 2014 | 23 |
| 2015 | 12 |
| 2016 | 5 |
| 2017 | — |

*GenOn Americas Generation*

| | Emission Allowances |
|---|---|
| | (In millions) |
| 2013 | $ 27 |
| 2014 | 23 |
| 2015 | 12 |
| 2016 | 4 |
| 2017 | — |

95

The following table presents the weighted average remaining amortization period related to the Registrants' intangible assets as of December 31, 2012:

| | Emission Allowances |
|---|---|
| | (In years) |
| GenOn | 3 |
| GenOn Americas Generation | 3 |
| GenOn Mid-Atlantic | 12 |

*Out-of-market contracts* — As a result of the Mirant/RRI Merger, GenOn acquired out-of-market contracts (acquired contracts with negative fair values) related to certain long-term tolling contracts, long-term natural gas transportation and storage contracts, coal contracts and REMA leases. These out-of-market contracts were amortized to operating revenues and cost of operations, as applicable, based on the nature of the contracts and over their contractual lives. For the period from January 1, 2012 to December 14, 2012 and for the years ended December 31, 2011 and December 31, 2010, amortization of out-of-market contracts was $67 million, $45 million and $3 million, respectively. In connection with the NRG Merger, acquired out-of-market contracts were pushed down to the Registrants, as applicable, and primarily relate to GenOn Mid-Atlantic and REMA leases and long-term natural gas transportation and storage contracts. These out-of-market contracts are amortized to operating revenues and cost of operations, as applicable, based on the nature of the contracts and over their contractual lives. For the period from December 15, 2012 to December 31, 2012, amortization of out-of-market contracts was $2 million, $1 million and $1 million for GenOn, GenOn Americas Generation and GenOn Mid-Atlantic, respectively. Out-of-market contracts are classified as non-current liabilities on the Registrants' respective balance sheets.

The following table summarizes the estimated amortization related to the Registrants' out-of-market contracts:

| | GenOn | | GenOn Americas Generation | | GenOn Mid-Atlantic | |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| 2013 | $ | 72 | $ | 23 | $ | 23 |
| 2014 | | 71 | | 23 | | 23 |
| 2015 | | 72 | | 23 | | 23 |
| 2016 | | 77 | | 23 | | 23 |
| 2017 | | 73 | | 23 | | 23 |

**Note 11 — Impairments (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

**2012 Impairments**

*Long-Lived Assets Impairments (GenOn)*

On July 20, 2012, GenOn entered into the NRG Merger Agreement with NRG Energy and a direct wholly-owned subsidiary of NRG. GenOn viewed the execution of the NRG Merger Agreement as a triggering event under accounting guidance and evaluated its long-lived assets for impairment.

For purposes of impairment testing, a long-lived asset must be grouped at the lowest level of identifiable cash flows. Each of GenOn's generating facilities is viewed as an individual asset group. Upon completion of the assessment, GenOn determined that the Portland and Titus generating facilities were impaired as of September 30, 2012, as the carrying values exceeded the undiscounted cash flows

GenOn's review of the long-lived assets included assumptions about the following: (a) electricity, fuel and emissions prices, (b) capacity prices, (c) impact of environmental regulations, including costs of $CO_2$ allowances under a potential cap-and-trade program, (d) timing and extent of generating capacity additions and retirements and (e) future capital expenditure requirements related to the generating facilities.

GenOn's assumptions related to future prices of electricity, fuel, emission allowances, and capacity were based on observable market prices to the extent available. Longer term power and capacity prices were derived from proprietary fundamental market modeling and analysis. The long-term capacity prices were based on estimated revenue requirements needed to incentivize new generation when needed to maintain reliability standards. For markets with established capacity markets, such as PJM, these estimates are generally consistent with the current structures. The assumptions regarding electricity demand were based on forecasts available from each ISO or NERC region, as applicable. Assumptions for generating capacity additions and retirements included publicly available announcements, which take into account renewable sources of electricity, as well as the need for capacity to maintain reliability in the longer term. In addition, GenOn previously announced its plans for deactivation of the Portland and Titus generating facilities. See Note 9, *Retirements, Mothballing or Long-Term Protective Layup of Generating Facilities.*

GenOn recorded impairment losses of $37 million and $10 million during the third quarter of 2012 in the consolidated statement of operations to reduce the carrying values of the Portland and Titus generating facilities, respectively, to their estimated fair values.

The following table sets forth by level within the fair value hierarchy GenOn's assets that were accounted for at fair value on a non-recurring basis. All of GenOn's assets that were measured at fair value as a result of impairment losses were categorized in Level 3 as of September 30, 2012:

| | Fair Value as of September 30, 2012 | | | | |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Other Unobservable Inputs (Level 3) | Total | Loss Included in Earnings |
|---|---|---|---|---|---|
| | (In millions) | | | | |
| Portland | $          — | $          — | $          17 | $          17 | $          37 |
| Titus | — | — | 15 | 15 | 10 |
| Total | $          — | $          — | $          32 | $          32 | $          47 |

## 2011 Impairments

### *Granted Emission Credits*

In August 2011, the EPA finalized the CSAPR, which was intended to replace the CAIR starting in 2012. Under the CSAPR program, the EPA established new allowances for all of the new CSAPR programs and did not permit any carryover Acid Rain Program or CAIR allowances into the CSAPR trading programs. As a result, the $NO_x$ allowances from the CAIR program would not have been used. Accordingly, the Registrants thought that the CAIR $NO_x$ allowances would have no value after 2011. Similarly, the $SO_2$ allowances used for compliance in the CAIR program (which used the already existing Acid Rain Program allowances that would have continued to be usable for compliance with the Acid Rain Program) would not have been usable for compliance with the CSAPR $SO_2$ program and the Registrants thought they would have negligible value after 2011.

As a result of the CSAPR, GenOn, GenOn Americas Generation and GenOn Mid-Atlantic recorded impairment losses of $133 million, $128 million and $94 million, respectively, for the write-off of excess $NO_x$ and $SO_2$ emissions allowances during 2011.

As GenOn thought that CAIR $NO_x$ emissions allowances of $45 million would have no value after 2011, such allowances were fully impaired. The excess Acid Rain Program $SO_2$ emissions allowances of $91 million were impaired to their estimated fair value of $3 million based on their current market prices obtained from brokers. The excess Acid Rain Program $SO_2$ emission allowances were categorized in Level 3 in the fair value hierarchy.

As GenOn Americas Generation thought that CAIR $NO_x$ emission allowances of $43 million would have no value after 2011, such allowances were fully impaired. The excess Acid Rain Program $SO_2$ emission allowances of $86 million were impaired to their estimated fair value of $1 million based on their current market prices obtained from brokers. The excess Acid Rain Program $SO_2$ emission allowances were categorized in Level 3 in the fair value hierarchy.

As GenOn Mid-Atlantic thought that CAIR $NO_x$ emission allowances of $43 million would have no value after 2011, such allowances were fully impaired. The excess Acid Rain Program $SO_2$ emission allowances of $52 million were impaired to their estimated fair value of $1 million based on their current market prices obtained from brokers. The excess Acid Rain Program $SO_2$ emission allowances were categorized in Level 3 in the fair value hierarchy.

**2010 Impairments**

*Long-Lived Assets Impairments*

In December 2010, PJM published an updated load forecast, which depicted a decrease in the expected demand because of lower economic growth expectations. As a result of the load forecast, the Registrants' expectation was that there would be a decrease in the clearing prices for future capacity auctions in certain years. As a result of the decrease in projected capacity revenue, the Registrants evaluated GenOn Mid-Atlantic's long-lived assets for impairment.

The Registrants' assumptions related to future electricity and fuel prices were based on observable market prices to the extent available and long-term prices derived from proprietary fundamental market modeling. The assumptions regarding electricity demand were based on forecasts from PJM and assumptions for generating capacity additions and retirements included publicly-announced projects, which take into account renewable sources of electricity.

GenOn and GenOn Americas Generation recorded impairment losses of $523 million and $42 million on the consolidated statements of operations to reduce the carrying values of the Dickerson and Potomac River generating facilities, respectively, to their estimated fair values. GenOn Mid-Atlantic recorded impairment losses of $497 million and $40 million on the consolidated statement of operations to reduce the carrying values of the Dickerson and Potomac River generating facilities, respectively, to their estimated fair values. In addition, as a result of the impairment of the Potomac River generating facility, the Registrants recorded $32 million in cost of operations and corresponding liabilities associated with GenOn Mid-Atlantic's commitment at the time to reduce particulate emissions as part of the agreement with the City of Alexandria, Virginia. The planned capital investment would not have been recovered in future periods based on the projected cash flows of the Potomac River generating facility. See Note 9, *Retirements, Mothballing or Long-Term Protective Layup of Generating Facilities.*

*Goodwill Impairment (GenOn Mid-Atlantic)*

GenOn Mid-Atlantic performed its annual test for goodwill impairment effective October 31, 2010. GenOn Mid-Atlantic utilized multiple valuation approaches in arriving at a fair value of GenOn Mid-Atlantic's reporting unit for purposes of the test, including an income approach involving discounted cash flows and a market approach involving trading multiples of peer companies. The annual evaluation of goodwill for 2010 indicated that the carrying value of the reporting unit exceeded the fair value, requiring the second step of the goodwill analysis to be performed.

GenOn Mid-Atlantic then performed the second step of the goodwill impairment test, which required an allocation of the fair value as the purchase price in a hypothetical acquisition of the reporting unit. The fair value of the reporting unit was compared to the fair value of the tangible and intangible assets and the remaining value was the implied goodwill. For 2010, as a result of this analysis, GenOn Mid-Atlantic recorded an impairment loss of $616 million on its consolidated statement of operations to reduce the carrying value of goodwill to its implied fair value, which was zero. Goodwill was recorded at GenOn Mid-Atlantic on its standalone balance sheet. The goodwill did not exist at GenOn Americas Generation's balance sheet. As such, the goodwill impairment loss and related goodwill balance were eliminated upon consolidation at GenOn North America.

GenOn Mid-Atlantic's assumptions related to future electricity and fuel prices were based on observable market prices to the extent available and long-term prices derived from proprietary fundamental market modeling. The assumptions regarding electricity demand were based on forecasts from PJM and assumptions for generating capacity additions and retirements included publicly-announced projects, which take into account renewable sources of electricity.

GenOn Mid-Atlantic's estimates of future cash flows did not include contracts entered into to hedge economically the expected generation of GenOn Mid-Atlantic's generating facilities. The cash flows related to these contracts were excluded because they were not directly attributable to the generating facilities.

**Note 12 — Debt and Capital Leases (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Long-term debt and capital leases consisted of the following:

| | Successor | Predecessor | |
|---|---|---|---|
| | As of December 31, 2012 | As of December 31, 2011 | Interest Rate |
| | (In millions, except rates) | (In millions, except rates) | |
| **GenOn Mid-Atlantic:** | | | |
| Chalk Point capital lease, due 2015 | $ 14 | $ 18 | 8.190 |
| Subtotal GenOn Mid-Atlantic | 14 | 18 | |
| **GenOn Americas Generation:** | | | |
| Senior unsecured notes, due 2021 | 450 | 450 | 8.500 |
| Senior unsecured notes, due 2031 | 400 | 400 | 9.125 |
| Adjustments to fair value of debt [a] | 96 | — | |
| Unamortized debt discounts [b] | — | (2) | |
| Subtotal GenOn Americas Generation [c] | 960 | 866 | |
| **GenOn Energy:** | | | |
| Senior unsecured notes, due 2014 | 575 | 575 | 7.625 |
| Senior unsecured notes, due 2017 | 725 | 725 | 7.875 |
| Senior unsecured notes, due 2018 | 675 | 675 | 9.500 |
| Senior unsecured notes, due 2020 | 550 | 550 | 9.875 |
| Capital leases | — | 1 | 7.375 |
| Adjustments to fair value of debt [a] | 324 | (32) | |
| Unamortized debt discounts [b] | — | (20) | |
| Subtotal GenOn Energy | 2,849 | 2,474 | |
| **GenOn Americas:** | | | |
| Senior secured term loan, due 2017 | — | 691 | 6.000 |
| Unamortized debt discounts [b] | — | (6) | |
| Subtotal GenOn Americas | — | 685 | |
| **GenOn Marsh Landing:** | | | |
| Senior secured term loan, due 2017 | 121 | 33 | L+2.50 [d] |
| Senior secured term loan, due 2023 | 269 | 74 | L+2.75 [d] |
| Subtotal GenOn Marsh Landing | 390 | 107 | |
| Subtotal | 4,199 | 4,132 | |
| Less current maturities | 32 | 10 | |
| Total long-term debt and capital leases | $ 4,167 | $ 4,122 | |

(a)   As of December 31, 2012, adjustments to fair value of debt represent adjustments recorded in connection with the NRG Merger. As of December 31, 2011, adjustments to fair value of debt represent adjustments recorded in connection with the Mirant/RRI Merger which were eliminated in conjunction with pushdown accounting for the NRG Merger.

(b)   Unamortized debt discounts were eliminated in conjunction with pushdown accounting for the NRG Merger.

(c) This amount includes the GenOn Mid-Atlantic capital lease.

(d)   L+ equals LIBOR plus x%.

Long-term debt includes the following premiums/(discounts):

| | Successor | Predecessor |
|---|---|---|
| | As of December 31, 2012 [a] | As of December 31, 2011 |
| | (In millions) | (In millions) |
| **GenOn Americas Generation:** | | |
| Senior unsecured notes, due 2021 | $ 59 | $ — |
| Senior unsecured notes, due 2031 | 37 | (2) |
| **GenOn Energy:** | | |
| Senior unsecured notes, due 2014 | 42 | 5 [b] |
| Senior unsecured notes, due 2017 | 75 | (37) [b] |
| Senior unsecured notes, due 2018 | 126 | (8) |
| Senior unsecured notes, due 2020 | 81 | (12) |
| **GenOn Americas:** | | |
| Senior secured notes, due 2017 | — | (6) |
| Total premium/(discount) | $ 420 | $ (60) |

(a)   As of December 31, 2012, adjustments to fair value of debt represent adjustments recorded in connection with the NRG Merger.

(b)   As of December 31, 2011, adjustments to fair value of debt represent adjustments recorded in connection with the Mirant/RRI Merger, which were eliminated in conjunction with pushdown accounting for the NRG Merger.

### GenOn Energy (GenOn)

*Senior Secured Term Loan Facility and Revolving Credit Facility.* In connection with the NRG Merger, the senior secured term loan was paid off and the revolving credit facility was terminated. See Note 19, *Related Party Transactions*, for discussion of GenOn's credit agreement with NRG.

Under the senior notes and the related indentures, the senior notes are the sole obligation of GenOn and are not guaranteed by any subsidiary or affiliate of GenOn. The senior notes are senior unsecured obligations of GenOn having no recourse to any subsidiary or affiliate of GenOn. The senior notes restrict the ability of GenOn and its subsidiaries to encumber their assets.

*Senior Unsecured Notes, Due 2018 and 2020.* The senior notes and the related indentures restrict the ability of GenOn to incur additional liens and make certain restricted payments, including dividends and purchases of capital stock. At December 31, 2012, GenOn did not meet the consolidated debt ratio component of the restricted payments test and, therefore, the ability of GenOn to make restricted payments is limited to specified exclusions from the covenant, including up to $250 million of such restricted payments. The senior notes are subject to acceleration of GenOn's obligations thereunder upon the occurrence of certain events of default, including: (a) default in interest payment for 30 days, (b) default in the payment of principal or premium, if any, (c) failure after 90 days of specified notice to comply with any other agreements in the indenture, (d) certain cross-acceleration events, (e) failure by GenOn or its significant subsidiaries to pay certain final and non-appealable judgments after 90 days and (f) certain events of bankruptcy and insolvency.

The senior notes due 2018 and 2020 were recorded at their fair values of $802 million and $632 million, respectively, on the NRG Merger date. The $127 million and $82 million premiums, respectively, are being amortized to interest expense over the life of the related notes.

Prior to October 15, 2018, GenOn may redeem the senior notes due 2018, in whole or in part, at a redemption price equal to 100% of the principal amount plus a premium and accrued and unpaid interest. The premium is the greater of: (i) 1% of the principal amount of the notes; or (ii) the excess of the following: the present value of 100% of the note, plus interest payments due on the note through maturity, discounted at a Treasury rate plus 0.50% over the principal amount of the note.

Prior to October 15, 2015, GenOn may redeem the senior notes due 2020, in whole or in part, at a redemption price equal to 100% of the principal amount of the notes plus a premium and accrued and unpaid interest. The premium is the greater of: (i) 1% of the principal amount of the notes; or (ii) the excess of the following: the present value of 100% of the note, plus interest payments due on the note through maturity, discounted at a Treasury rate plus 0.50% over the principal amount of the note. In addition, on or after October 15, 2015, GenOn may redeem some or all of the notes at redemption prices expressed as percentages of principal amount as set forth in the following table, plus accrued and unpaid interest on the notes redeemed to the first applicable redemption rate:

| Redemption Period | Redemption Percentage |
|---|---|
| October 15, 2015 to October 14, 2016 | 104.938% |
| October 15, 2016 to October 14, 2017 | 103.292% |
| October 15, 2017 to October 14, 2018 | 101.646% |
| October 15, 2018 and thereafter | 100.000% |

*Senior Unsecured Notes, Due 2014 and 2017.* The senior notes due 2014 and 2017 of GenOn were recorded at their fair values of $618 million and $800 million, respectively, on the NRG Merger date. The $43 million and $75 million premiums, respectively, are being amortized to interest expense over the life of the related notes.

Prior to maturity, GenOn may redeem all or a part of the senior notes due 2014 and 2017 at a redemption price equal to 100% of the notes plus a premium and accrued and unpaid interest. The premium is the greater of: (i) 1% of the principal amount of the notes; or (ii) the excess of the following: the present value of 100% of the note, plus interest payments due on the note through maturity, discounted at a Treasury rate plus 0.50% over the principal amount of the note.

### GenOn Americas Generation (GenOn and GenOn Americas Generation)

*Senior Unsecured Notes.* The senior notes due 2021 and 2031 are senior unsecured obligations of GenOn Americas Generation having no recourse to any subsidiary or affiliate of GenOn Americas Generation. The senior notes due 2021 and 2031 of GenOn Americas Generation were recorded at their fair values of $510 million and $437 million, respectively, on the NRG Merger date. The $60 million and $37 million premiums, respectively, are being amortized to interest expense over the life of the related notes.

Prior to maturity, GenOn Americas Generation may redeem all or a part of the senior notes due 2021 and 2031 at a redemption price equal to 100% of the notes plus a premium and accrued and unpaid interest. The premium is the greater of: (i) the discounted present value of the then-remaining scheduled payments of principal and interest on the outstanding notes, discounted at a Treasury rate plus 0.375%, less the unpaid principal amount; and (ii) zero.

### GenOn Marsh Landing (GenOn)

*Credit Facility.* In October 2010, GenOn Marsh Landing entered into a credit agreement for up to approximately $650 million of commitments to provide construction and permanent financing for the Marsh Landing generating facility. The credit facility consists of a $155 million tranche A senior secured term loan facility, due 2017, a $345 million tranche B senior secured term loan facility, due 2023, a $50 million senior secured letter of credit facility to support GenOn Marsh Landing's debt service reserve requirements and a $100 million senior secured letter of credit facility to support GenOn Marsh Landing's collateral requirements under its PPA with PG&E. Prior to the commercial operation date of the project, the collateral requirements under the PPA and construction contracts are being met by a $165 million cash collateralized letter of credit facility entered into by GenOn Energy Holdings on behalf of GenOn Marsh Landing in September 2010. As of December 31, 2012 and 2011, $80 million and $131 million, respectively, of cash collateral was posted by GenOn Energy Holdings in support of the Marsh Landing project. At or near the commercial operation date of the project, the GenOn Energy Holdings cash collateralized letter of credit facility will terminate. During the second quarter of 2011, GenOn Energy Holdings satisfied the required initial equity contributions of $147 million and GenOn Marsh Landing began borrowing under its credit facility.

The term loans are to be fully amortized by their maturity dates. The tranche A term loan matures on December 31, 2017 and the tranche B term loan matures on the date that is the earlier of the last day of the first fiscal quarter following the tenth anniversary of the conversion of the credit facility from a construction facility to a permanent facility upon commercial operation of the Marsh Landing project and December 31, 2023. The expiry date of the letters of credit is December 31, 2017. Interest on the tranche A term loan is based on a base rate or a LIBOR rate plus an initial applicable margin of 1.5% for base rate loans and 2.5% for LIBOR loans (with such margin increasing 0.25% every three years). Interest on the tranche B term loan is based on a base rate or a LIBOR rate plus an initial applicable margin of 1.75% for base rate loans and 2.75% for LIBOR loans (with such margin increasing 0.25% every three years). Fees on lenders' exposure under the letters of credit accrue at a rate equal to the applicable margin payable on the tranche A term loan that are based on the LIBOR rate. An undrawn commitment fee applies at a rate of 0.75%. GenOn Marsh Landing entered into interest rate protection agreements (interest rate swaps) in connection with its project financing. See Note 6, *Accounting for Derivative Instruments and Hedging Activities.*

Loans under the credit facility will be subject to mandatory prepayment upon the occurrence of certain events, including an event of damage or an event of taking, the receipt of the proceeds of any claim under any document executed in connection with the Marsh Landing project and any amounts payable as a result of termination of the PPA. The credit facility includes customary affirmative and negative covenants and events of default. Negative covenants include limitations on additional debt, liens, negative pledges, investments, distributions, business activities, stock repurchases, asset dispositions, accounting changes, change orders and affiliate transactions. Events of default include non-performance of covenants, breach of representations, cross-acceleration of other material indebtedness, bankruptcy and insolvency, undischarged material judgments, a change in control and a failure to achieve commercial operation of the Marsh Landing project by December 31, 2013.

### Capital Leases (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)

Capital leases include a lease at GenOn Mid-Atlantic's Chalk Point generating facility for an 80 MW peaking unit. The annual principal payments under this lease are $4 million in 2013 and $5 million in 2014 and 2015.

### Restricted Net Assets (GenOn and GenOn Americas Generation)

GenOn and GenOn Americas Generation and certain of their subsidiaries are holding companies and, as a result, GenOn and GenOn Americas Generation and such subsidiaries are dependent upon dividends, distributions and other payments from their respective subsidiaries to generate the funds necessary to meet their obligations. In particular, a substantial portion of the cash from GenOn's and GenOn Americas Generation's operations is generated by GenOn Mid-Atlantic. The ability of certain of GenOn's and GenOn Americas Generation's subsidiaries to pay dividends and make distributions is restricted under the terms of their debt or other agreements, including the operating leases of GenOn Mid-Atlantic for GenOn and GenOn Americas Generation and REMA for GenOn. Under their respective operating leases, GenOn Mid-Atlantic and REMA are not permitted to make any distributions and other restricted payments unless: (a) they satisfy the fixed charge coverage ratio for the most recently ended period of four fiscal quarters; (b) they are projected to satisfy the fixed charge coverage ratio for each of the two following periods of four fiscal quarters, commencing with the fiscal quarter in which such payment is proposed to be made; and (c) no significant lease default or event of default has occurred and is continuing. In the event of a default under the respective operating leases or if the respective restricted payment tests are not satisfied, GenOn Mid-Atlantic and REMA would not be able to distribute cash. At December 31, 2012, GenOn Mid-Atlantic satisfied the restricted payments tests. At December 31, 2012, REMA did not satisfy the restricted payments test.

Pursuant to the terms of their respective lease and debt documents, GenOn Mid-Atlantic, REMA and GenOn Marsh Landing are restricted from, among other actions, (a) encumbering assets, (b) entering into business combinations or divesting assets, (c) incurring additional debt, (d) entering into transactions with affiliates on other than an arm's length basis or (e) materially changing their business. Therefore, at December 31, 2012, all of GenOn Mid-Atlantic's, REMA's and GenOn Marsh Landing's net assets (excluding cash) were deemed restricted for purposes of Rule 4-08(e)(3)(iii) of Regulation S-X.

The amounts of restricted net assets were as follows:

| | Successor | Predecessor |
|---|---|---|
| | As of December 31, 2012 | As of December 31, 2011 |
| | (In millions) | (In millions) |
| GenOn Mid-Atlantic | $ 1,391 | $ 3,859 |
| Total GenOn Americas Generation restricted net assets | 1,391 | 3,859 |
| REMA | 50 | 534 |
| GenOn Marsh Landing | 66 | 107 |
| Total GenOn restricted net assets | $ 1,507 | $ 4,500 |

*Consolidated Annual Maturities (GenOn and GenOn Americas Generation)*

Annual payments based on the maturities of GenOn's debt for the years ending after December 31, 2012 are as follows:

| | (In millions) |
|---|---|
| 2013 | $ 32 |
| 2014 | 622 |
| 2015 | 48 |
| 2016 | 41 |
| 2017 | 742 |
| Thereafter | 2,294 |
| Total | $ 3,779 (a) |

(a) Includes $390 million outstanding at December 31, 2012 under the $500 million GenOn Marsh Landing senior secured term loan facility. However, the balance outstanding on the commercial operation date will be fully amortized by the maturity dates in accordance with the GenOn Marsh Landing credit agreement repayment schedules, with such amortization commencing one quarter following the commercial operation of the Marsh Landing generating facility, expected in mid-2013.

Annual payments based on the maturities of GenOn Americas Generation's debt for the years ending after December 31, 2012 are as follows:

| | (In millions) |
|---|---|
| 2013 | $ 4 |
| 2014 | 5 |
| 2015 | 5 |
| 2016 | — |
| 2017 | — |
| Thereafter | 850 |
| Total | $ 864 |

## Note 13 — Asset Retirement Obligations (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)

The Registrants' AROs are primarily related to the future dismantlement of equipment on leased property and environmental obligations related to ash disposal, site closures and fuel storage facilities. In addition, the Registrants have also identified conditional AROs for asbestos removal and disposal, which are specific to certain power generation operations.

The following table represents the balance of ARO obligations as of December 31, 2012, December 14, 2012 and December 31, 2011, along with the additions, reductions and accretion related to the Registrants' ARO obligations for the periods from December 15, 2012 through December 31, 2012 and from January 1, 2012 through December 14, 2012:

| | GenOn | | GenOn Americas Generation | | GenOn Mid-Atlantic | |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| **Predecessor** | | | | | | |
| **Balance as of December 31, 2011** | $ | 132 | $ | 57 | $ | 18 |
| Revisions in estimates for current obligations | | 8 | | — | | — |
| Spending for current obligations and other settlements | | (8) | | (1) | | (1) |
| Accretion — expense | | 12 | | 5 | | 2 |
| **Balance as of December 14, 2012(a)** | $ | 144 | $ | 61 | $ | 19 |
| **Successor** | | | | | | |
| **Balance as of December 15, 2012(a)** | $ | 175 | $ | 72 | $ | 25 |
| **Balance as of December 31, 2012** | $ | 175 | $ | 72 | $ | 25 |

(a) As a result of the application of pushdown accounting, the Registrants remeasured their AROs at the time of the NRG Merger.

**Note 14 — Benefit Plans and Other Postretirement Benefits (GenOn)**

*Defined Benefit Plans*

GenOn provides pension benefits to eligible non-union and union employees through various defined benefit pension plans. These benefits are based on pay, service history and age at retirement. Most pension benefits are provided through tax-qualified plans that are funded in accordance with the Employee Retirement Income Security Act of 1974 and Internal Revenue Service requirements. Certain executive pension benefits that cannot be provided by the tax-qualified plans are provided through unfunded non-tax-qualified plans. The measurement date for the defined benefit plans was December 31 for all periods presented unless otherwise noted. GenOn also provides certain medical care and life insurance benefits for eligible retired employees. The measurement date for these postretirement benefit plans was December 31 for all periods presented unless otherwise noted.

As a result of the application of pushdown accounting, GenOn's benefit plan obligations were remeasured at the time of the NRG Merger. See Note 3, *NRG Merger*.

The net periodic pension cost/credit related to GenOn's pension and other postretirement benefit plans include the following components:

| | Pension Benefits | | | |
| --- | --- | --- | --- | --- |
| | Successor | Predecessor | | |
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | (In millions) | | |
| Service cost benefits earned | $ 1 | $ 12 | $ 12 | $ 8 |
| Interest cost on benefit obligation | 1 | 23 | 23 | 18 |
| Expected return on plan assets | (1) | (30) | (29) | (23) |
| Net reclassifications from accumulated other comprehensive loss[a] | — | 9 | 4 | 1 |
| Curtailments | — | 1 | — | — |
| Special termination benefits | — | 1 | — | — |
| Net periodic benefit cost | $ 1 | $ 16 | $ 10 | $ 4 |

(a) Net reclassifications include actuarial loss and prior service cost.

| | Other Postretirement Benefits | | | |
| --- | --- | --- | --- | --- |
| | Successor | Predecessor | | |
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | (In millions) | | |
| Service cost benefits earned | $ — | $ 1 | $ 1 | $ 1 |
| Interest cost on benefit obligation | — | 3 | 3 | 2 |
| Net reclassifications from accumulated other comprehensive loss[a] | — | (3) | (4) | (7) |
| Curtailments | — | 1 | — | (37) |
| Plan amendments | — | (3) | — | — |
| Net periodic benefit credit | $ — | $ (1) | $ — | $ (41) |

(a) Net reclassifications include actuarial gain/loss and prior service credit.

104

A comparison of the pension benefit obligation, other postretirement benefit obligations and related plan assets for GenOn plans on a combined basis is as follows:

| | Tax-Qualified Pension Benefits | | | | Non-Tax-Qualified Pension Benefits | | |
| | Successor | Predecessor | | | Successor | Predecessor | |
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 |
| | (In millions) | (In millions) | | | (In millions) | (In millions) | |
| Benefit obligation at beginning of period | $ 582 (a) | $ 523 | $ 448 | | $ 14 (a) | $ 10 | $ 10 |
| Service cost | 1 | 12 | 12 | | — | — | — |
| Interest cost | 1 | 22 | 23 | | — | 1 | — |
| Actuarial loss | 1 | 12 | 59 | | — | — | 1 |
| Benefit payments | — | (18) | (16) | | — | (1) | (1) |
| Curtailments | — | 1 | (3) | | — | — | — |
| Special termination benefits | — | 1 | — | | — | — | — |
| Benefit obligation at end of period | 585 | 553 (a) | 523 | | 14 | 10 (a) | 10 |
| Fair value of plan assets at beginning of period | 402 (a) | 353 | 359 | | — | — | — |
| Actual return on plan assets | 4 | 32 | 5 | | — | — | — |
| Employer contributions | — | 20 | 5 | | — | 1 | 1 |
| Benefit payments | — | (18) | (16) | | — | (1) | (1) |
| Fair value of plan assets at end of period | 406 | 387 (a) | 353 | | — | — | — |
| Funded status at end of period — excess of obligation over assets | $ (179) | $ (166) | $ (170) | | $ (14) | $ (10) | $ (10) |

(a)   As a result of the application of pushdown accounting, GenOn remeasured its pension benefit obligation and related plan assets at the time of the NRG Merger.

| | Other Postretirement Benefits | | | | |
|---|---|---|---|---|---|
| | Successor | | Predecessor | | |
| | December 15, 2012 through December 31, 2012 | | January 1, 2012 through December 14, 2012 | | 2011 |
| | (In millions) | | (In millions) | | |
| Benefit obligation at beginning of period | $ | 87 [a] | $ | 84 | $ | 78 |
| Service cost | | — | | 1 | | 1 |
| Interest cost | | — | | 3 | | 3 |
| Participant contributions | | — | | 2 | | 2 |
| Actuarial loss | | — | | 4 | | 7 |
| Benefit payments | | — | | (7) | | (7) |
| Curtailments | | — | | 1 | | — |
| Plan amendments | | — | | (3) | | — |
|    Benefit obligation at end of period | | 87 | | 85 [a] | | 84 |
| Fair value of plan assets at beginning of period | | — | | — | | — |
| Employer contributions | | — | | 5 | | 5 |
| Participant contributions | | — | | 2 | | 2 |
| Benefit payments | | — | | (7) | | (7) |
|    Fair value of plan assets at end of period | | — | | — | | — |
| Funded status at end of period — excess of obligation over assets | $ | (87) | $ | (85) | $ | (84) |

(a)   As a result of the application of pushdown accounting, GenOn remeasured its postretirement benefit obligations at the time of the NRG Merger.

Amounts recognized in GenOn's balance sheets were as follows:

| | As of December 31, | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tax-Qualified Pension Benefits | | | | Non-Tax-Qualified Pension Benefits | | | | Other Postretirement Benefits | | |
| | Successor | | Predecessor | | Successor | | Predecessor | | Successor | | Predecessor |
| | 2012 | | 2011 | | 2012 | | 2011 | | 2012 | | 2011 |
| | (In millions) | | (In millions) | | (In millions) | | (In millions) | | (In millions) | | (In millions) |
| Current liabilities | $ — | $ — | $ (1) | $ (1) | $ (6) | $ (6) |
| Non-current liabilities | $ (179) | $ (170) | $ (13) | $ (9) | $ (81) | $ (78) |

The accumulated benefit obligation exceeded the fair value of plan assets at December 31, 2012 and 2011 for the tax-qualified defined benefit pension plans. The total accumulated benefit obligation for the tax-qualified plans at December 31, 2012 and 2011 was $543 million and $480 million, respectively.

Amounts recognized in GenOn's other comprehensive income/loss and accumulated other comprehensive income/loss for the pension and other postretirement benefit plans were as follows:

| | Tax-Qualified Pension Benefits | | Non-Tax-Qualified Pension Benefits | | Other Postretirement Benefits | |
| | Net Actuarial (Loss) Gain | Prior Service Cost | Net Actuarial Loss | Prior Service Cost | Net Actuarial (Loss) Gain | Prior Service Credit |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| **Predecessor** | | | | | | |
| Balance at December 31, 2010 | $ (58) | $ (3) | $ (2) | $ (1) | $ 3 | $ 15 |
| Unrealized loss | (81) | — | (1) | — | (6) | (1) |
| Reclassification to net periodic benefit cost/credit | 3 | 1 | — | — | — | (4) |
| Total recognized in other comprehensive loss for the period | (78) | 1 | (1) | — | (6) | (5) |
| Balance at December 31, 2011 | $ (136) | $ (2) | $ (3) | $ (1) | $ (3) | $ 10 |
| Unrealized loss | (10) | — | — | — | (4) | — |
| Reclassification to net periodic benefit cost/credit | 8 | 1 | — | — | — | (3) |
| Total recognized in other comprehensive loss for the period | (2) | 1 | — | — | (4) | (3) |
| Balance at December 14, 2012[a] | $ (138) | $ (1) | $ (3) | $ (1) | $ (7) | $ 7 |
| | | | | | | |
| **Successor** | | | | | | |
| Balance at December 15, 2012[a] | $ — | $ — | $ — | $ — | $ — | $ — |
| Unrealized gain | 1 | — | — | — | — | — |
| Total recognized in other comprehensive income for the period | 1 | — | — | — | — | — |
| Balance at December 31, 2012 | $ 1 | $ — | $ — | $ — | $ — | $ — |

(a)   As a result of the application of pushdown accounting, the amounts remaining in accumulated other comprehensive loss at the time of the NRG Merger were eliminated.

The total net loss recognized in net periodic benefit cost and other comprehensive income/loss for the pension plans for the period from December 15, 2012 through December 31, 2012, the period from January 1, 2012 through December 14, 2012 and the years ended December 31, 2011 and 2010 was $0, $17 million, $88 million and $3 million, respectively. The total net (gain) loss recognized in net periodic benefit credit and other comprehensive income/loss for the other postretirement benefit plans for the period from December 15, 2012 through December 31, 2012, the period from January 1, 2012 through December 14, 2012 and the years ended December 31, 2011 and 2010 was $0, $6 million, $11 million and $(46) million, respectively.

No unrecognized gain or loss for the pension and other postretirement benefit plans is expected to be amortized from accumulated other comprehensive loss to net period benefit cost/credit during 2013.

*Fair Value Hierarchy of Plan Assets*

GenOn's market-related value of its plan assets is the fair value of the assets. The fair values of GenOn's pension plan assets by asset category and their level within the fair value hierarchy are as follows:

| **Successor** | Fair Value Measurements as of December 31, 2012 | | |
|---|---|---|---|
| | **Quoted Prices in Active Markets for Identical Assets (Level 1)** | **Significant Other Observable Inputs (Level 2)** | **Total** |
| | (In millions) | | |
| **Asset Categories:** | | | |
| Cash and cash equivalents | $ — | $ — | $ — |
| Investment Funds: | | | |
|     U.S. equities | 26 | 147 | 173 |
|     Non-U.S. equities | 44 | 74 | 118 |
|     Fixed income securities | 32 | 83 | 115 |
| Total | $ 102 | $ 304 | $ 406 |

| **Predecessor** | Fair Value Measurements as of December 31, 2011 | | |
|---|---|---|---|
| | **Quoted Prices in Active Markets for Identical Assets (Level 1)** | **Significant Other Observable Inputs (Level 2)** | **Total** |
| | (In millions) | | |
| **Asset Categories:** | | | |
| Cash and cash equivalents | $ 7 | $ — | $ 7 |
| Investment Funds: | | | |
|     U.S. equities | 23 | 127 | 150 |
|     Non-U.S. equities | 20 | 74 | 94 |
|     Fixed income securities | 30 | 72 | 102 |
| Total | $ 80 | $ 273 | $ 353 |

In accordance with ASC 820, GenOn determines the level in the fair value hierarchy within which each fair value measurement in its entirety falls, based on the lowest level input that is significant to the fair value measurement in its entirety. GenOn's assets are classified within Level 1 and Level 2 of the fair value hierarchy. GenOn's plan assets classified within Level 1 consist of exchange-traded investment funds with readily observable prices. GenOn's assets classified within Level 2 consist of non-exchange-traded investment funds whose fair values reflect the net asset value of the funds based on the fair value of the fund's underlying securities. The underlying securities held by these funds are valued using quoted prices in active markets for identical or similar assets. GenOn elected the practical expedient under the accounting guidance to measure the fair value of certain funds that use net asset value per share. Certain investment funds require redemption notification of 30 days or less for which no adjustment was made to their net asset value. There are no investments categorized as Level 3.

*Assumptions*

The discount rates used at December 31, 2012, December 15, 2012 and December 31, 2011, were determined based on individual bond-matching models comprised of portfolios of high quality corporate bonds with projected cash flows and maturity dates reflecting the expected time horizon during which that benefit will be paid. Bonds included in the model portfolios are from a cross-section of different issuers, are AA-rated or better, and are non-callable so that the yield to maturity can be attained without intervening calls.

In determining the long-term rate of return for plan assets, GenOn evaluates historic and current market factors such as inflation and interest rates before determining long-term capital market assumptions. GenOn also considers the effects of diversification and portfolio rebalancing. To check for reasonableness and appropriateness, GenOn reviews data about other companies, including their historic returns.

For purposes of expense recognition prior to the NRG Merger, GenOn used a market-related value of assets that recognizes the difference between the expected return and the actual return on plan assets over a five-year period. Unrecognized asset gains or losses associated with GenOn's plan assets were recognized in the calculation of the market-related value of assets and subject to amortization in future periods.

The following table presents the significant assumptions used to calculate GenOn's benefit obligations:

| | Pension Benefits | | |
| | Successor | | Predecessor |
| Weighted–Average Assumptions | As of December 31, 2012 | As of December 15, 2012 | As of December 31, 2011 |
|---|---|---|---|
| Discount rate | 4.22% | 4.25% | 4.56% |
| Rate of compensation increase | 2.82% | 2.82% | 2.79% |

| | Other Postretirement Benefits | | |
| | Successor | | Predecessor |
| Weighted–Average Assumptions | As of December 31, 2012 | As of December 15, 2012 | As of December 31, 2011 |
|---|---|---|---|
| Discount rate | 3.99% | 4.01% | 4.26% |

GenOn's assumed healthcare cost trend rates used for other postretirement benefit obligations are:

| | Other Postretirement Benefit Plans | | |
| | Successor | | Predecessor |
| Weighted–Average Assumptions | As of December 31, 2012 | As of December 15, 2012 | As of December 31, 2011 |
|---|---|---|---|
| Assumed medical inflation for next year: | | | |
| Before age 65 | 8.50% | 8.50% | 7.50% |
| Age 65 and after | 8.67% | 8.67% | 7.71% |
| Assumed ultimate medical inflation rate | 5.50% | 5.50% | 5.50% |
| Year in which ultimate rate is reached | 2018 | 2018 | 2018 |

An annual increase or decrease of 1% in the assumed healthcare cost trend rates would correspondingly increase or decrease the postretirement benefit obligation at December 31, 2012 by $7 million.

The following table presents the significant assumptions used to calculate GenOn's benefit expense/credit:

| | Pension Plans | | | |
| | Successor | Predecessor | | |
| Weighted–Average Assumptions | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
|---|---|---|---|---|
| Discount rate | 4.25% | 4.56% | 5.12% | 5.36% |
| Rate of compensation increase | 2.82% | 2.79% | 2.81% | 2.98% |
| Expected return on plan assets | 7.50% | 8.25% | 8.25% | 8.20% |

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | | | Other Postretirement Benefit Plans | |
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| **Weighted–Average Assumptions** | | | | |
| Discount rate | 4.01% | 4.26% | 4.80% | 5.03% |
| Rate of compensation increase | N/A | N/A | 3.00% | 3.23% |

GenOn's assumed healthcare cost trend rates used for other postretirement benefit net periodic benefit expense/credit are:

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| **Weighted–Average Assumptions** | | | | |
| Assumed medical inflation for next year: | | | | |
| Before age 65 | 8.50% | 7.50% | 8.00% | 8.40% |
| Age 65 and after | 8.67% | 7.71% | 8.20% | 8.20% |
| Assumed ultimate medical inflation rate | 5.50% | 5.50% | 5.50% | 5.30% |
| Year in which ultimate rate is reached | 2018 | 2018 | 2018 | 2017 |

An annual increase or decrease of 1% in the assumed healthcare cost trend rates would correspondingly increase or decrease the total annual service and interest cost components of net period benefit credit during 2012 by $1 million.

*Pension Plan Assets*

Pension plans' assets are managed solely in the interest of the plans' participants and their beneficiaries and are invested with the objective of earning the necessary returns to meet the time horizons of the accumulated and projected retirement benefit obligations. GenOn uses a mix of equities and fixed income investments intended to manage risk to a reasonable and prudent level. GenOn's risk tolerance is established through consideration of the plans' liabilities and funded status as well as corporate financial condition. Equity investments are diversified across U.S. and non-U.S. stocks. For U.S. stocks, GenOn employs both a passive and active approach by investing in index funds and actively managed funds. For non-U.S. stocks, GenOn is invested in both developed and emerging market equity funds. Fixed income investments are comprised of long-term U.S. government and corporate securities. Derivative securities can be used for diversification, risk-control and return enhancement purposes but may not be used for the purpose of leverage.

In the fourth quarter of 2011, GenOn adopted a new pension asset allocation methodology based on the results of a study completed by a third-party investment consulting firm. The methodology divides the pension plan assets into two primary portfolios: (i) return seeking assets, those assets intended to generate returns in excess of pension liability growth (U.S. and Non-U.S. equities) and (ii) liability-hedging assets, those assets intended to have characteristics similar to pension liabilities (fixed income securities). As GenOn's pension plans' funded status improves, the methodology actively moves the plan assets from return seeking assets toward liability-hedging assets.

The following table shows the target allocations for GenOn's plans and the percentage of fair value of plan assets by asset fund category (based on the nature of the underlying funds) for GenOn's qualified pension plans at December 31, 2012 and 2011:

| | Target Allocations | Percentage of Fair Value of Plan Assets as of December 31, | |
|---|---|---|---|
| | | Successor | Predecessor |
| | | 2012 | 2011 |
| U.S. equities | 42% | 43% | 42% |
| Non-U.S. equities | 28 | 29 | 27 |
| Fixed income securities | 30 | 28 | 29 |
| Cash | — | — | 2 |
| Total | 100% | 100% | 100% |

Investment risk and performance are monitored on an ongoing basis through quarterly portfolio reviews of each asset fund class to a related performance benchmark, if applicable, and annual pension liability measurements. Performance benchmarks adopted in the fourth quarter of 2011 are composed of the following indices:

| Asset Class | Index |
| --- | --- |
| U.S. equities | Dow Jones U.S. Total Stock Market Index |
| Non-U.S. equities | MSCI All Country World Ex-U.S. IMI Index |
| Fixed income securities | Barclays Capital Long Term Government/Credit Index |

*Expected Contributions and Benefit Payments*

GenOn expects to contribute approximately $13 million to the tax-qualified pension plans during 2013. In addition, GenOn expects to contribute approximately $1 million to the non-tax-qualified pension plans during 2013. As of December 31, 2012, GenOn has related rabbi trust investments of $12 million to fund future benefit payments of the non-tax-qualified pension plans.

GenOn's expected future benefit payments for each of the next five years, and in the aggregate for the five years thereafter, are as follows:

| | Pension Benefit Payments | | Other Postretirement Benefit | |
| --- | --- | --- | --- | --- |
| | Tax-Qualified | Non-Tax-Qualified | Benefit Payments | Medicare Prescription Drug Reimbursements |
| | (In millions) | | | |
| 2013 | $         20 | $          1 | $          6 | $          — |
| 2014 | 21 | 1 | 6 | — |
| 2015 | 24 | 1 | 7 | — |
| 2016 | 26 | 1 | 6 | — |
| 2017 | 28 | 2 | 6 | — |
| 2018 through 2022 | 178 | 5 | 29 | 2 |

*Employee Savings and Profit Sharing Plan*

GenOn has employee savings plans under Sections 401(a) and 401(k) of the IRC whereby employees may contribute a portion of their eligible compensation to the employee savings plan, subject to limits under the IRC. GenOn also historically provided for a profit sharing arrangement for non-bargaining employees and some bargaining employees not accruing a benefit under the defined benefit pension plans, whereby GenOn contributed a fixed contribution of 2% of eligible pay per pay period and could make an annual discretionary contribution up to 3% of eligible pay based on GenOn's performance. Upon completion of the NRG Merger, NRG assumed GenOn's defined contribution 401(k) plans and amended the plan for the non-bargaining employees with NRG 401(k) plan features, effective January 1, 2013. During 2013, the GenOn defined contribution 401 (k) plans will be merged into the NRG 401(k) plans.

GenOn also sponsors non-qualified deferred compensation plans for key and highly compensated employees. GenOn's obligations under these plans were $31 million and the related rabbi trust investments were $31 million at December 31, 2012 and 2011, respectively. Upon completion of the NRG Merger, NRG assumed GenOn's non-qualified plans and their respective obligations.

Expense recognized for the matching, fixed profit sharing and discretionary profit sharing contributions for the period from December 15, 2012 through December 31, 2012, the period from January 1, 2012 through December 14, 2012 and the years ended December 31, 2011 and 2010 were $1 million, $30 million, $30 million and $12 million, respectively.

**Note 15— Capital Structure (GenOn)**

On December 14, 2012, NRG and GenOn completed the NRG Merger. Upon closing, each issued and outstanding share of GenOn's common stock automatically converted into the right to receive 0.1216 shares of common stock of NRG based on the NRG Merger Exchange Ratio. See Note 3, *NRG Merger*.

On December 3, 2010, RRI Energy and Mirant completed the Mirant/RRI Merger. Upon closing, each issued and outstanding share of Mirant common stock automatically converted into 2.835 shares of common stock of RRI Energy, with cash paid in lieu of fractional shares. See Note 4, *Mirant/RRI Merger*.

|  | Common Stock |
|---|---|
|  | (Shares in millions) |
| As of December 31, 2009 | 411 |
| Shares repurchased | (3) |
| Transactions under stock plans | 8 |
| Issued in connection with the Mirant/RRI Merger[a] | 355 |
| As of December 31, 2010 | 771 |
| Transactions under stock plans | 1 |
| As of December 31, 2011 | 772 |
| Transactions under stock plans | 2 |
| As of December 14, 2012 | 774 |
| Impact of NRG Merger | (774) |
| As of December 31, 2012 | — |

(a)  Represents RRI Energy's outstanding common stock including restricted stock awards which vested upon completion of the Mirant/RRI Merger.

**Note 16— Segment Reporting (GenOn and GenOn Americas Generation)**

GenOn previously had the following segments: Eastern PJM, Western PJM/MISO, California, Energy Marketing and Other Operations. GenOn Americas Generation previously had the following segments: Eastern PJM, Northeast, California, Energy Marketing and Other Operations. In the fourth quarter of 2012, in conjunction with the NRG Merger, GenOn and GenOn Americas Generation began reporting the following segments: East, South Central, West and Corporate. There are distinct components with separate operating results and management structures for each segment, which are based on the geographical location of the power generation operations. GenOn and GenOn Americas Generation reclassified amounts for the period from January 1, 2012 through December 14, 2012 and for the years ended December 31, 2011 and 2010 to conform to the current segment presentation. The measure of profit or loss for the reportable segments is net income/loss.

*GenOn*

| Successor | December 15, 2012 through December 31, 2012 | | | | | |
|---|---|---|---|---|---|---|
|  | East | South Central | West | Corporate | Elimination | Total |
|  | (In millions) | | | | | |
| **Operating revenues** | $ 66 | $ — | $ 7 | $ — | $ — | $ 73 |
| Operating expenses | 67 | 1 | 6 | 53 | — | 127 |
| Depreciation and amortization | 8 | — | 2 | — | — | 10 |
| Operating loss | (9) | (1) | (1) | (53) | — | (64) |
| Interest expense | — | — | — | (8) | — | (8) |
| Loss before income taxes | (9) | (1) | (1) | (61) | — | (72) |
| Income tax expense/(benefit) | — | — | — | — | — | — |
| **Net loss** | $ (9) | $ (1) | $ (1) | $ (61) | $ — | $ (72) |
| **Balance sheet** | | | | | | |
| Equity investment in affiliate | $ — | $ 19 | $ — | $ — | $ — | 19 |
| Capital expenditures[a] | $ 17 | $ 8 | $ 21 | $ 1 | $ — | $ 47 |
| **Total assets** | $ 4,624 | $ 218 | $ 906 | $ 2,396 | $ (638) | $ 7,506 |

(a)  Includes accruals.

112

**Predecessor**

| | January 1, 2012 through December 14, 2012 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | East | South Central | West | Corporate | Elimination | Total |
| | (In millions) | | | | | |
| **Operating revenues** | $ 2,153 | $ 29 | $ 379 | $ 3 | $ — | $ 2,564 |
| Operating expenses | 1,994 | 16 | 226 | 14 | — | 2,250 |
| Depreciation and amortization | 267 | 9 | 43 | 20 | — | 339 |
| Impairment losses | 47 | — | — | — | — | 47 |
| Operating income/(loss) | (155) | 4 | 110 | (31) | — | (72) |
| Other income, net | — | 2 | — | 1 | — | 3 |
| Interest expense | (1) | — | — | (329) | — | (330) |
| Income/(loss) before income taxes | (156) | 6 | 110 | (359) | — | (399) |
| Income tax expense | — | — | — | 15 | — | 15 |
| **Net income/(loss)** | $ (156) | $ 6 | $ 110 | $ (374) | $ — | $ (414) |
| | | | | | | |
| Capital expenditures[a] | $ 251 | $ 8 | $ 284 | $ 10 | $ — | $ 553 |

(a)   Includes accruals.

**Predecessor**

| | 2011 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | East | South Central | West | Corporate | Elimination | Total |
| | (In millions) | | | | | |
| **Operating revenues** | $ 3,125 | $ 37 | $ 449 | $ 3 | $ — | $ 3,614 |
| Operating expenses | 2,428 | 36 | 371 | 62 | — | 2,897 |
| Depreciation and amortization | 291 | 7 | 44 | 33 | — | 375 |
| Impairment losses | 119 | — | 14 | — | — | 133 |
| Operating income/(loss) | 287 | (6) | 20 | (92) | — | 209 |
| Other income/(loss), net | — | 6 | — | (2) | — | 4 |
| Interest (expense)/income | (12) | — | 4 | (371) | — | (379) |
| Loss on debt extinguishment and refinancing expense | — | — | — | (23) | — | (23) |
| Income/(loss) before income taxes | 275 | — | 24 | (488) | — | (189) |
| Income tax expense/(benefit) | — | — | — | — | — | — |
| **Net income/(loss)** | $ 275 | $ — | $ 24 | $ (488) | $ — | $ (189) |
| **Balance sheet** | | | | | | |
| Equity investment in affiliate | $ — | $ 22 | $ — | $ — | $ — | $ 22 |
| Capital expenditures | $ 230 | $ — | $ 191 | $ 29 | $ — | $ 450 |
| **Total assets** | $ 8,616 | $ 272 | $ 856 | $ 5,022 | $ (2,497) | $ 12,269 |

**Predecessor**

| | 2010 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | East | South Central | West | Corporate | Elimination | Total |
| | (In millions) | | | | | |
| **Operating revenues** | $ 2,113 | $ — | $ 157 | $ — | $ — | $ 2,270 |
| Operating expenses | 1,568 | 1 | 118 | 118 | — | 1,805 |
| Depreciation and amortization | 174 | 2 | 31 | 17 | — | 224 |
| Impairment losses | 1,153 | — | — | 28 | (616) | 565 |
| Operating income/(loss) | (782) | (3) | 8 | (163) | 616 | (324) |
| Other income/(loss), net | (1) | — | 1 | 16 | — | 16 |
| Gain on bargain purchase | — | — | — | 335 | — | 335 |
| Interest expense | (6) | — | (5) | (242) | — | (253) |
| Loss on debt extinguishment and refinancing expense | — | — | — | (9) | — | (9) |
| Income/(loss) before income taxes | (789) | (3) | 4 | (63) | 616 | (235) |
| Income tax expense/(benefit) | 4 | — | (1) | (5) | — | (2) |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Net income/(loss) | $ | (795) | $ | (3) | $ | (58) | $ | 616 | $ | (233) |

*GenOn Americas Generation*

**Successor**

| | December 15, 2012 through December 31, 2012 | | | | | |
|---|---|---|---|---|---|---|
| | **East** | **South Central** | **West** | **Corporate** | **Elimination** | **Total** |
| | (In millions) | | | | | |
| **Operating revenues** | $ 70 | $ — | $ 4 | $ — | $ — | $ 74 |
| Operating revenues—affiliate | 3 | — | — | — | — | 3 |
| Operating expenses | 29 | — | — | — | — | 29 |
| Operating expenses—affiliate | 42 | — | 1 | — | — | 43 |
| Depreciation and amortization | 4 | — | 1 | — | — | 5 |
| Operating income/(loss) | (2) | — | 2 | — | — | — |
| Other income/(loss), net | — | — | — | — | — | — |
| Interest expense | — | — | — | (3) | — | (3) |
| Income/(loss) before income taxes | (2) | — | 2 | (3) | — | (3) |
| Income tax expense/(benefit) | — | — | — | — | — | — |
| **Net income/(loss)** | $ (2) | $ — | $ 2 | $ (3) | $ — | $ (3) |
| **Balance sheet** | | | | | | |
| Capital expenditures[a] | $ 6 | $ — | $ — | $ — | $ — | 6 |
| **Total assets** | $ 2,507 | $ — | $ 153 | $ 1,188 | $ (387) | $ 3,461 |

(a)   Includes accruals.

**Predecessor**

| | January 1, 2012 through December 14, 2012 | | | | | |
|---|---|---|---|---|---|---|
| | **East** | **South Central** | **West** | **Corporate** | **Elimination** | **Total** |
| | (In millions) | | | | | |
| **Operating revenues** | $ 2,060 | $ 24 | $ 321 | $ — | $ — | $ 2,405 |
| Operating revenues—affiliate | 137 | 22 | 30 | — | — | 189 |
| Operating expenses | 950 | — | 123 | 2 | — | 1,075 |
| Operating expenses—affiliate | 1,143 | 30 | 195 | 1 | — | 1,369 |
| Depreciation and amortization | 136 | — | 14 | 5 | — | 155 |
| Impairment losses | — | — | — | — | — | — |
| Operating income/(loss) | (32) | 16 | 19 | (8) | — | (5) |
| Other income/(loss), net | — | — | — | — | — | — |
| Interest expense | (5) | — | — | (70) | — | (75) |
| Income/(loss) before income taxes | (37) | 16 | 19 | (78) | — | (80) |
| Income tax expense/(benefit) | — | — | — | — | — | — |
| **Net income/(loss)** | $ (37) | $ 16 | $ 19 | $ (78) | $ — | $ (80) |
| | | | | | | |
| Capital expenditures[a] | $ 190 | $ — | $ — | $ — | $ — | $ 190 |

(a)   Includes accruals.

114

**Predecessor**

| | 2011 | | | | | |
|---|---|---|---|---|---|---|
| | East | South Central | West | Corporate | Elimination | Total |
| | (In millions) | | | | | |
| **Operating revenues** | $ 2,793 | $ 22 | $ 200 | $ — | $ — | $ 3,015 |
| Operating revenues—affiliate | (87) | — | 10 | — | — | (77) |
| Operating expenses | 1,005 | — | 36 | 9 | — | 1,050 |
| Operating expenses—affiliate | 1,306 | 22 | 129 | (7) | — | 1,450 |
| Depreciation and amortization | 155 | — | 15 | 7 | — | 177 |
| Impairment losses | 114 | — | 14 | — | — | 128 |
| Operating income/(loss) | 126 | — | 16 | (9) | — | 133 |
| Other loss, net | — | — | (1) | — | — | (1) |
| Interest expense | (5) | — | (1) | (87) | — | (93) |
| Loss on debt extinguishment and refinancing expense | — | — | — | (23) | — | (23) |
| Income/(loss) before income taxes | 121 | — | 14 | (119) | — | 16 |
| Income tax expense/(benefit) | — | — | — | — | — | — |
| **Net income/(loss)** | $ 121 | $ — | $ 14 | $ (119) | $ — | $ 16 |
| **Balance sheet** | | | | | | |
| Capital expenditures | $ 155 | $ — | $ 1 | $ 3 | $ — | $ 159 |
| **Total assets** | $ 4,932 | $ — | $ 135 | $ 2,189 | $ (667) | $ 6,589 |

**Predecessor**

| | 2010 | | | | | |
|---|---|---|---|---|---|---|
| | East | South Central | West | Corporate | Elimination | Total |
| | (In millions) | | | | | |
| **Operating revenues** | $ 1,962 | $ — | $ 140 | $ — | $ — | $ 2,102 |
| Operating revenues—affiliate | (46) | — | 49 | — | — | 3 |
| Operating expenses | 1,174 | — | 52 | 9 | (3) | 1,232 |
| Operating expenses—affiliate | 205 | — | 87 | 1 | 3 | 296 |
| Depreciation and amortization | 164 | — | 28 | 7 | — | 199 |
| Impairment losses | 1,153 | — | — | 28 | (616) | 565 |
| Operating income/(loss) | (780) | — | 22 | (45) | 616 | (187) |
| Interest expense | (4) | — | (2) | (194) | — | (200) |
| Loss on debt extinguishment and refinancing expense | — | — | — | (9) | — | (9) |
| Income/(loss) before income taxes | (784) | — | 20 | (248) | 616 | (396) |
| Income tax expense/(benefit) | — | — | — | — | — | — |
| **Net income/(loss)** | $ (784) | $ — | $ 20 | $ (248) | $ 616 | $ (396) |

115

**Note 17 — Income Taxes (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*Income Taxes*

*GenOn*

GenOn's income tax provision (benefit) consisted of the following:

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | (In millions) | | |
| Current tax provision (benefit): | | | | |
| Federal | $ — | $ 15 | $ (1) | $ — |
| State | — | — | 1 | (2) |
| Total current provision (benefit) for income taxes | $ — | $ 15 | $ — | $ (2) |

A reconciliation of GenOn's federal statutory income tax provision to the effective income tax provision/benefit adjusted for permanent and other items during 2012, 2011 and 2010, is as follows:

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions, except percentages) | (In millions, except percentages) | | |
| Provision for income taxes based on U.S. federal statutory income tax rate | $ (25) | $ (140) | $ (66) | $ (82) |
| State and local income tax provision, net of federal income taxes | (1) | (9) | (8) | 2 |
| Change in deferred tax asset valuation allowance | 23 | 166 | 183 | (772) |
| Effect of equity-related transactions | 1 | (5) | (49) | 22 |
| Tax settlements | — | 6 [b] | (25) [a] | — |
| NRG Merger-related costs | 2 | — | — | — |
| Mirant/RRI Merger-related costs | — | — | (15) | 24 |
| Mirant/RRI Merger-related write-off of NOL and state and local income tax provision, net of federal income taxes | — | — | (3) | 168 |
| Mirant/RRI Merger-related write-off of NOL and other deferred tax assets | — | — | (21) | 748 |
| Reorganization adjustments | — | — | — | 2 |
| Gain on bargain purchase | — | — | — | (117) |
| Other, net | — | (3) | 4 | 3 |
| Income tax (benefit)/provision | $ — | $ 15 | $ — | $ (2) |

(a)  Settlements of tax disputes increased GenOn's tax basis in depreciable assets that had previously been written off as a result of Mirant's emergence from bankruptcy in 2006.

(b)  Deferred tax attribute changes from 2002-2003 audit changes including effect of the CenterPoint tax allocation agreement.

The tax effects of temporary differences between the carrying amounts of assets and liabilities in GenOn's financial statements and their respective tax bases which give rise to deferred tax assets and liabilities are as follows:

| | Successor | Predecessor |
| | As of December 31, 2012 | As of December 31, 2011 |
|---|---|---|
| | (In millions) | (In millions) |
| **Deferred Tax Assets:** | | |
| Employee benefits | $ 199 | $ 185 |
| Contingencies and other liabilities | 42 | 64 |
| Loss carryforwards | 451 | 1,209 |
| Property and intangible assets | 1,297 | 537 |
| Out-of-market contracts fair value adjustment | 422 | 160 |
| Debt premium, net | 160 | — |
| Other | 53 | 31 |
| Subtotal | 2,624 | 2,186 |
| Valuation allowance [a] | (2,324) | (1,819) |
| Net deferred tax assets | 300 | 367 |
| **Deferred Tax Liabilities:** | | |
| Derivative contracts | (297) | (339) |
| Debt discount, net | — | (11) |
| Other | (3) | (17) |
| Net deferred tax liabilities | (300) | (367) |
| Net deferred taxes | $ — | $ — |

(a) The NRG Merger resulted in net additions to deferred tax assets requiring an increase in the valuation allowance of $316 million.

### NOLs

As a result of the NRG Merger, GenOn experienced an ownership change as defined in IRC § 382. IRC § 382 provides, in general, that an ownership change occurs when there is a greater than 50-percentage point increase in ownership of a company's stock by new or existing stockholders who own (or are deemed to own under IRC § 382) 5% or more of the loss company's stock over a three year testing period. IRC § 382 limits the amount of pre-merger NOLs and built-in losses that can be used during any post-ownership change year to offset taxable income. GenOn has reduced by $2.3 billion the amount of GenOn federal NOLs that would have been available to offset post-merger taxable income based on a $62 million annual limit determined in accordance with IRC § 382. GenOn also reduced the amount of state NOLs by $4.1 billion for state jurisdictions that also follow IRC § 382. In addition, based on the allocation of the provisional fair values in connection with the NRG Merger, GenOn reduced its tax basis in depreciable assets by $707 million for financial reporting purposes due to the inability to utilize future tax depreciation deductions that are limited as built-in losses under IRC § 382.

At December 31, 2012, GenOn's federal NOL carryforward for financial reporting was $939 million with expiration dates from 2022 to 2032. Similarly, there is an aggregate amount of $1.6 billion of state NOL carryforwards with various expiration dates (based on a review of the application of apportionment factors and other state tax limitations).

The guidance related to accounting for income taxes requires that a valuation allowance be established when it is more-likely-than-not that all or a portion of a deferred tax asset will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn's past and anticipated future performance, the reversal of deferred tax liabilities and the implementation of tax planning strategies.

At December 31, 2012, GenOn's deferred tax assets reduced by a valuation allowance are completely offset by GenOn's deferred tax liabilities. Objective positive evidence is necessary to support a conclusion that a valuation allowance is not needed for all or a portion of deferred tax assets when significant negative evidence exists. GenOn evaluates this position quarterly and makes judgments based on the facts and circumstances at that time. GenOn thinks that the realization of future taxable income sufficient to utilize existing deferred tax assets is less than more-likely-than-not at this time. The primary factors related to this conclusion are that prices for power and natural gas are low compared to several years ago and the effect of these lower prices on the projected gross margin and weak market conditions have resulted in a decrease in the forecasted gross margin of GenOn's generating facilities.

### Tax Uncertainties

The recognition of contingent losses for tax uncertainties requires management to make significant assumptions about the expected outcomes of certain tax contingencies. Under the accounting guidance, GenOn must reflect in its income tax provision the full benefit of all positions that will be taken in GenOn's income tax returns, except to the extent that such positions are uncertain and fall below the benefit recognition requirements. In the event that GenOn determines that a tax position meets the uncertainty criteria, an additional liability or an adjustment to GenOn's NOLs, determined under the measurement criteria, will result. GenOn periodically reassesses the tax positions in its tax returns for open years based on the latest information available and determines whether any portion of the tax benefits reflected should be treated as unrecognized. A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows:

| | Successor | Predecessor | |
| --- | --- | --- | --- |
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 |
| | (In millions) | (In millions) | |
| Unrecognized tax benefits, beginning of period | $ 6 | $ 5 | $ 7 |
| Increase based on tax positions related to the prior years | — | 3 | 1 |
| Decrease due to settlements and payments | — | (2) | — |
| Decrease as a result of lapse in the statute of limitations | — | — | (3) |
| Unrecognized tax benefits, end of period | $ 6 | $ 6 | $ 5 |

The unrecognized tax benefits included the review of tax positions relating to open tax years beginning in 2002 and continuing to the present. GenOn's major tax jurisdictions are the U.S. at the federal level and multiple state and local jurisdictions. Both the federal and state NOL carryforwards from any closed year are subject to examination until the year that such NOL carryforwards are utilized and that utilization year is closed for audit. GenOn does not anticipate any significant changes in its unrecognized tax benefits over the next 12 months. GenOn has not recognized any tax benefits for certain filing positions for which the outcome is uncertain and the effect is estimable.

Included in the unrecognized tax benefits balance at December 31, 2012 and 2011, GenOn had $5 million and $4 million, respectively, of unrecognized tax benefits that would affect the effective tax rate if they were recognized. GenOn's tax provision in each period includes an insignificant amount for interest and penalties related to unrecognized tax benefits. The amounts recorded in GenOn's consolidated balance sheet for interest and penalties related to the unrecognized tax benefits at December 31, 2012 and 2011 are $1 million and $3 million, respectively.

GenOn continues to be subject to audit for multiple years by taxing authorities in various jurisdictions. Considerable judgment is required to determine the tax treatment of particular items that involve interpretations of complex tax laws. A tax liability is recorded for filing positions with respect to which the outcome is uncertain and the recognition criteria under the accounting guidance for uncertainty in income taxes has been met. Such liabilities are based on judgment and it can take many years to resolve a recorded liability such that the related filing position is no longer subject to question. GenOn has not recorded a liability for those proposed tax adjustments related to the current tax audits when GenOn continues to think its filing position meets the more-likely-than-not threshold prescribed in the accounting guidance related to accounting for uncertainty in income taxes. Any adverse outcomes arising from these matters could result in a material change in the amount of GenOn's deferred taxes.

GenOn ceased being a member of the CenterPoint consolidated tax group at September 30, 2002 and has been limited in GenOn's ability to use tax attributes generated during periods through that date. The Internal Revenue Service's audits of CenterPoint's federal income tax returns for the 1997 to 2002 tax reporting periods have been closed, subject to a review by the Internal Revenue Service of certain claims formally submitted by GenOn for the 2002 tax year. GenOn has a tax allocation agreement that addresses the allocation of taxes pertaining to GenOn's separation from CenterPoint. This agreement provides that GenOn may carryback net operating losses generated subsequent to September 30, 2002 to tax years when GenOn was part of CenterPoint's consolidated tax group. Any such carryback is subject to CenterPoint's consent and any existing statutory carryback limitations. For items relating to periods prior to September 30, 2002, GenOn will (a) recognize any net costs incurred by CenterPoint for settlement of temporary differences up to $15 million (of which zero had been recognized through December 31, 2012 and 2011) as an equity contribution and (b) recognize any net benefits realized by CenterPoint for settlement of temporary differences up to $1 million as an equity distribution. Generally, amounts for temporary differences in excess of the $15 million and $1 million thresholds will be settled in cash between GenOn and CenterPoint. Pursuant to this agreement, generally, taxes related to permanent differences are the responsibility of CenterPoint.

*GenOn Americas Generation*

As a result of the NRG Merger, GenOn experienced an ownership change as defined in IRC § 382. IRC § 382 provides, in general, that an ownership change occurs when there is a greater than 50-percentage point increase in ownership of a company's stock by new or existing stockholders who own (or are deemed to own under IRC § 382) 5% or more of the loss company's stock over a three year testing period. IRC § 382 limits the amount of pre-merger NOLs and built-in losses that can be used during any post-ownership change year to offset taxable income. The annual limitation on the amount of taxable income that can be offset by GenOn's pre-NRG Merger NOLs has been redetermined as of the date of the NRG Merger. GenOn Americas Generation's annual limitation on the amount of taxable income that can be offset by its pre-merger NOLs has also been redetermined as a consequence of the GenOn ownership change that resulted from the NRG Merger. GenOn Americas Generation has reduced to zero the amount of its pre-NRG Merger NOLs available to offset post-NRG Merger taxable income based on the expected limits determined in accordance with IRC § 382. In addition, based on the allocation of the provisional fair values in connection with the NRG Merger, GenOn Americas Generation reduced its tax basis in depreciable assets by $4 million for financial reporting purposes due to the inability to utilize future tax depreciation deductions that are limited as built-in losses under IRC § 382.

GenOn Americas Generation's income tax provision (benefit) consisted of the following:

| | Successor | | Predecessor | | | | |
|---|---|---|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | | January 1, 2012 through December 14, 2012 | | 2011 | | 2010 |
| | (In millions) | | (In millions) | | | | |
| Current benefit: | | | | | | | |
| Federal | $ | — | $ | — | $ | — | $ | — |
| State | | — | | — | | — | | (1) |
| Deferred provision: | | | | | | | |
| Federal | | — | | — | | — | | 1 |
| State | | — | | — | | — | | — |
| Total provision (benefit) for income taxes | $ | — | $ | — | $ | — | $ | — |

119

A reconciliation of GenOn Americas Generation's expected federal statutory income tax provision to the effective income tax provision adjusted for permanent and other items during 2012, 2011 and 2010, is as follows:

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions, except percentages) | (In millions, except percentages) | | |
| Provision (benefit) for income taxes based on U.S. federal statutory income tax rate | $ (1) | $ (28) | $ 5 | $ (139) |
| State and local income tax provision, net of federal income taxes | — | (4) | 5 | 12 |
| LLC income not subject to taxation | 1 | 32 | (10) | 136 |
| Change in deferred tax asset valuation allowance | — | — | — | (105) |
| Conversion of GenOn Kendall, LLC to disregarded entity | — | — | — | 58 |
| Mirant/RRI Merger-related write-off of NOLs | — | — | — | 38 |
| Income tax (benefit)/provision | $ — | $ — | $ — | $ — |

In 2010, GenOn Americas Generation recognized a change in its valuation allowance of $(105) million related to its net deferred tax assets. At December 31, 2012 and 2011, no valuation allowance is recorded.

GenOn Kendall, LLC, which had previously existed as a taxable entity, was converted to a disregarded entity and is treated as a branch of GenOn Americas for income tax purposes. As a result of the conversion, GenOn Kendall, LLC's net deferred tax assets of $58 million and corresponding valuation allowance were written off in 2010.

The tax effects of GenOn Americas Generation's temporary differences between the carrying amounts of assets and liabilities in the consolidated financial statements and its tax bases which give rise to deferred tax assets and liabilities for continuing operations are as follows:

| | Successor | Predecessor |
|---|---|---|
| | As of December 31, 2012 | As of December 31, 2011 |
| | (In millions) | (In millions) |
| **Deferred Tax Assets:** | | |
| Loss carryforwards | $ — | $ 2 |
| Net deferred tax assets | — | 2 |
| **Deferred Tax Liabilities:** | | |
| Property and intangible assets | — | (2) |
| Net deferred tax liabilities | — | (2) |
| Net deferred taxes | $ — | $ — |

*Tax Uncertainties*

The recognition of contingent losses for tax uncertainties requires management to make significant assumptions about the expected outcomes of certain tax contingencies. Under the accounting guidance, GenOn Americas Generation must reflect in its income tax provision the full benefit of all positions that will be taken in GenOn Americas Generation's income tax returns, except to the extent that such positions are uncertain and fall below the benefit recognition requirements. In the event that GenOn Americas Generation determines that a tax position meets the uncertainty criteria, an additional liability or an adjustment to GenOn Americas Generation's NOLs, determined under the measurement criteria, will result. GenOn Americas Generation periodically reassesses the tax positions in its tax returns for open years based on the latest information available and determines whether any portion of the tax benefits reflected should be treated as unrecognized.

Both the federal and state NOL carryforwards from any closed year are subject to examination until the year that such NOL carryforwards are utilized and that utilization year is closed for audit. GenOn Americas Generation has not recorded any uncertain tax benefits.

***Pro Forma Income Tax Disclosures***

*GenOn Americas Generation*

GenOn Americas Generation is not subject to income taxes except for those subsidiaries of GenOn Americas Generation that are separate taxpayers. GenOn Americas, GenOn and NRG are otherwise directly responsible for income taxes related to GenOn Americas Generation's operations.

The following reflects a pro forma disclosure of the income tax provision that would be reported if GenOn Americas Generation were to be allocated income taxes attributable to its operations. Pro forma income tax provision attributable to income before tax would consist of the following:

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | (In millions) | | |
| Current income tax provision: | | | | |
| Federal | $ 1 | $ — | $ — | $ 7 |
| State | — | — | — | 2 |
| Provision (benefit) for income taxes | $ 1 | $ — | $ — | $ 9 |

The following table presents the pro forma reconciliation of GenOn Americas Generation's federal statutory income tax provision for continuing operations adjusted for reorganization items to the pro forma effective tax provision:

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions, except percentages) | (In millions, except percentages) | | |
| Provision (benefit) for income taxes based on U.S. federal statutory income tax rate | $ (1) | $ (28) | $ 5 | $ (139) |
| State and local income tax provision (benefit), net of federal income taxes | — | (4) | 5 | 42 |
| Change in deferred tax asset valuation allowance | 2 | 32 | (74) | 55 |
| Mirant/RRI Merger-related write-off of NOLs | — | — | 83 | 61 |
| Tax settlement | — | — | (23) [a] | — |
| Other, net | — | — | 4 | (10) |
| Income tax provision | $ 1 | $ — | $ — | $ 9 |

(a) Settlement of tax disputes increased GenOn Americas Generation's tax basis in depreciable assets that previously had been written off as a result of Mirant's emergence from bankruptcy in 2006.

The tax effects of temporary differences between the carrying amounts of assets and liabilities in the consolidated balance sheets and their respective tax bases which give rise to the pro forma deferred tax assets and liabilities would be as follows:

| | Successor | Predecessor |
|---|---|---|
| | As of December 31, 2012 | As of December 31, 2011 |
| | (In millions) | (In millions) |
| **Deferred Tax Assets:** | | |
| Reserves | $ 23 | $ 41 |
| Loss carryforwards | 176 | 220 |
| Property and intangible assets | 817 | 237 |
| Out-of-market contracts fair value adjustment | 212 | — |
| Debt premium | 39 | — |
| Other, net | — | 5 |
| Subtotal | 1,267 | 503 |
| Valuation allowance | (990) | (179) |
| Net deferred tax assets | 277 | 324 |
| **Deferred Tax Liabilities:** | | |
| Derivative contract assets and liabilities | (276) | (321) |
| Other, net | (1) | (3) |
| Net deferred tax liabilities | (277) | (324) |
| Net deferred taxes | $ — | $ — |

The guidance related to accounting for income taxes requires that a valuation allowance be established when it is more-likely-than-not that all or a portion of a deferred tax asset will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn Americas Generation's past and anticipated future performance, the reversal of deferred tax liabilities and the implementation of tax planning strategies.

Objective positive evidence is necessary to support a conclusion that a valuation allowance is not needed for all or a portion of deferred tax assets when significant negative evidence exists. GenOn Americas Generation evaluates this position quarterly and makes its judgment based on the facts and circumstances at that time.

As a result of the NRG Merger, GenOn experienced an ownership change as defined in IRC § 382. IRC § 382 provides, in general, that an ownership change occurs when there is a greater than 50-percentage point increase in ownership of a company's stock by new or existing stockholders who own (or are deemed to own under IRC § 382) 5% or more of the loss company's stock over a three year testing period. IRC § 382 limits the amount of pre-merger NOLs that can be used during any post-ownership change year to offset taxable income. The annual limitation on the amount of taxable income that can be offset by GenOn's pre-NRG Merger NOLs has been redetermined as of the date of the NRG Merger. GenOn Americas Generation's annual limitation on the amount of taxable income that can be offset by its pre-merger pro forma NOLs has also been redetermined as a consequence of the GenOn ownership change that resulted from the NRG Merger. GenOn Americas Generation has reduced the amount of its pre-NRG Merger pro forma NOLs available to offset post-NRG Merger taxable income based on the expected limits determined in accordance with IRC § 382. In addition, based on the allocation of the provisional fair values in connection with the NRG Merger, GenOn Americas Generation reduced its tax basis in depreciable assets by $331 million for financial reporting purposes due to the inability to utilize future tax depreciation deductions that are limited as built-in losses under IRC § 382.

*GenOn Mid-Atlantic*

The following reflects a pro forma disclosure of the income tax provision that would be reported if GenOn Mid-Atlantic was to be allocated income taxes attributable to its operations. Pro forma income tax provision attributable to income before tax would consist of the following:

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | (In millions) | | |
| Current provision (benefit): | | | | |
| Federal | $ 1 | $ 10 | $ 3 | $ 108 |
| State | — | 1 | 1 | 21 |
| Deferred provision: | | | | |
| Federal | (1) | 3 | 21 | (159) |
| State | — | — | 5 | (39) |
| Total provision (benefit) for income taxes | $ — | $ 14 | $ 30 | $ (69) |

The following table presents the pro forma reconciliation of GenOn Mid-Atlantic's federal statutory income tax provision for continuing operations adjusted for reorganization items to the pro forma effective tax provision:

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions, except percentages) | (In millions, except percentages) | | |
| Provision (benefit) for income taxes based on U.S. federal statutory income tax rate | $ — | $ 11 | $ 37 | $ (274) |
| State and local income taxes | — | 1 | 4 | (11) |
| Tax settlement | — | — | (11) [a] | — |
| Impairment of non-deductible goodwill | — | — | — | 216 |
| Other, net | — | 2 | — | — |
| Income tax (benefit)/provision | $ — | $ 14 | $ 30 | $ (69) |

(a) Settlement of tax disputes increased GenOn Mid-Atlantic's tax basis in depreciable assets that previously had been written off as a result of Mirant's emergence from bankruptcy in 2006.

The tax effects of temporary differences between the carrying amounts of assets and liabilities in the consolidated balance sheets and their respective tax bases which give rise to the pro forma deferred tax assets and liabilities would be as follows:

| | Successor | Predecessor |
|---|---|---|
| | As of December 31, 2012 | As of December 31, 2011 |
| | (In millions) | (In millions) |
| **Deferred Tax Assets:** | | |
| Reserves | $ 19 | $ 35 |
| Loss carryforwards | 1 | — |
| Property and intangible assets | 632 | 27 |
| Out-of-market contracts fair value adjustment | 212 | — |
| Other, net | 8 | 4 |
| Net deferred tax assets | 872 | 66 |
| **Deferred Tax Liabilities:** | | |
| Derivative contracts | (274) | (313) |
| Other, net | — | (1) |
| Net deferred tax liabilities | (274) | (314) |
| Net deferred taxes | $ 598 | $ (248) |

### Pro Forma Tax Uncertainties

GenOn Mid-Atlantic has not recorded any uncertain tax benefits.

### Note 18 — Stock-Based Compensation (GenOn)

#### Impact of NRG Merger

Effective December 14, 2012, in connection with the consummation of the NRG Merger, the name of the GenOn Energy, Inc. 2010 Omnibus Incentive Plan was changed to NRG 2010 Stock Plan for GenOn Employees, or NRG GenOn LTIP. Pursuant to the NRG Merger Agreement, upon completion of the NRG Merger, the following occurred to GenOn's stock-based incentive awards:

i.   each outstanding GenOn stock option that was granted under the NRG GenOn LTIP, the GenOn Energy, Inc. 2002 Long-Term Incentive Plan, the GenOn Energy, Inc. 2002 Stock Plan and the Mirant Corporation 2005 Omnibus Incentive Compensation Plan, collectively, the GenOn Plans, before 2012 vested in full (to the extent not already vested) and was converted into an option to purchase NRG common stock (with the number of shares and per share exercise price appropriately adjusted based on the NRG Merger Exchange Ratio), on the terms and conditions otherwise applicable to those options prior to the NRG Merger;

ii.  each outstanding GenOn stock option that was granted under the GenOn Plans during 2012 was converted into an option to purchase NRG common stock (with the number of shares and per share exercise price appropriately adjusted based on the NRG Merger Exchange Ratio), on the terms and conditions (including vesting schedules and conditions) otherwise applicable to those options prior to the NRG Merger;

iii. each outstanding restricted stock unit that was granted under the GenOn Plans before 2012 has vested in full (to the extent not already vested) and was exchanged for shares of NRG common stock in the NRG Merger based on the NRG Merger Exchange Ratio; and

iv.  each outstanding restricted stock unit that was granted under the GenOn Plans in 2012, to the extent it remained unvested immediately prior to the NRG Merger, was converted into unvested restricted stock units of NRG (with the number of shares subject to such restricted stock unit appropriately adjusted based on the NRG Merger Exchange Ratio), on the terms and conditions otherwise applicable to those restricted stock units.

As of December 31, 2012, all unvested stock options that were converted to options to purchase NRG common stock and restricted stock units that were converted to NRG restricted stock units were recorded in NRG's consolidated balance sheet.

The following disclosures relate to the predecessor periods and the conversion of GenOn stock options and restricted stock units only. All information regarding weighted average exercise price of stock options, weighted average grant date fair value of stock options granted and weighted average grant date fair value for restricted stock units is based on historical GenOn stock prices and includes no adjustments for the NRG Merger Exchange Ratio.

***Non-Qualified Stock Options***

GenOn granted service condition stock option awards to certain employees. Historically, stock options vested 33.33% per year for the three years and had a term of five to ten years. GenOn recognized the related compensation expense on a straight-line basis over the requisite service period.

The following table summarizes GenOn's non-qualified stock option activity and changes during the period:

| | Shares | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value |
|---|---|---|---|---|---|
| | (In whole) | | | (In years) | (In millions) |
| Outstanding as of December 31, 2011 | 14,389,424 | $ | 6.89 | 5.4 $ | — |
| Granted | 5,897,990 | | 2.44 | | |
| Exercised | (9,365) | | 2.44 | | |
| Forfeited | (161,415) | | 2.62 | | |
| Expired | (2,268,921) | | 10.21 | | |
| Converted into stock options covering NRG common stock | 17,847,713 (a) | | 5.04 (b) | | |

(a)   In connection with the NRG Merger, 17,847,713 outstanding GenOn stock options were converted into 2,169,689 options to purchase NRG common stock based on the NRG Merger Exchange Ratio of 0.1216 shares of NRG common stock for each outstanding share of GenOn.

(b)   Represents the weighted average exercise price of the outstanding GenOn stock options immediately prior to conversion to options to purchase NRG common stock. In connection with the NRG Merger, the per share exercise price of the GenOn stock options was adjusted based on the NRG Merger Exchange Ratio of 0.1216 shares of NRG common stock for each outstanding share of GenOn.

The following table summarizes the weighted average grant date fair value of options granted, the total intrinsic value of options exercised, and the cash received from the exercises of options:

| | January 1, 2012 through December 14, 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|
| | (In millions, except for weighted average) | | | | |
| Weighted average grant date fair value per option granted | $ 1.07 | $ | 1.68 | $ | 1.99 |
| Total intrinsic value of options exercised | — | | — | | — |
| Cash received from the exercise of options | — | | 3 | | 1 |
| Tax benefits realized | — (a) | | — (a) | | — (a) |

(a)   None realized as a result of net operating loss carryforwards.

125
.

The fair value of GenOn's non-qualified stock options was estimated on the date of grant using the Black-Scholes option-pricing model. Significant assumptions used in the fair value model with respect to the GenOn's non-qualified stock options are summarized below:

| | January 1, 2012 through December 14, 2012 | | 2011 | | 2010 | |
| --- | --- | --- | --- | --- | --- | --- |
| | Range | Weighted Average | Range | Weighted Average | Range | Weighted Average |
| Expected volatility[a] | 50.5% | 50.5% | 45-55% | 47.2% | 39.3% | 39.3% |
| Expected dividends | —% | —% | —% | —% | —% | —% |
| Expected term (in years)[b] | 5 | 5 | 5 | 5 | 6 | 6 |
| Risk-free rate[c] | 0.89% | 0.89% | 1.0-2.2% | 2.1% | 3.1% | 3.1% |

(a)  After the Mirant/RRI Merger, GenOn estimated volatility based on historical and implied volatility (as applicable) of its common stock after the Mirant/RRI Merger date and Mirant and RRI Energy common stock prior to the Mirant/RRI Merger date. Prior to the Mirant/RRI Merger, GenOn utilized its own implied volatility of its traded options.

(b)  After the Mirant/RRI Merger, the expected term is based on a binomial lattice model. Prior to the Mirant/RRI Merger, as a result of the lack of exercise history for Mirant, the simplified method for estimating expected term was used in accordance with the accounting guidance related to share-based payments.

(c)  The risk-free rate for periods within the contractual term of the stock option is based on the U.S. Treasury yield curve in effect at the time of the grant.

### Time-based Restricted Stock Units and Performance-based Restricted Stock Units

*Time-based Awards.* GenOn granted time-based restricted stock units to certain employees. These restricted stock units generally vested in three equal installments on each of the first, second and third anniversaries of the grant date. GenOn recognized the related compensation expense on a straight-line basis over the requisite service period. In addition, GenOn granted time-based restricted stock units to non-management members of the Board of Directors. These awards vested on the grant date and delivery of the underlying shares was deferred until the directorship terminated. During the period from January 1, 2012 to December 14, 2012, GenOn granted 3.2 million time-based restricted stock units.

*Performance-based Awards.* During the period from January 1, 2012 to December 14, 2012, GenOn granted 2.6 million performance-based restricted stock units to certain employees. These restricted stock units were linked to the 2012 short-term incentive plan performance goals, with performance measured in December 2012 to determine a multiplier between 0% and 200% of the targeted grant. These restricted stock units generally vested in three equal installments over a three-year period. GenOn recognized the related compensation expense on a straight-line basis over the requisite service period. In December 2012, the performance multiplier was determined to be 183% for the performance-based awards granted in 2012 and one-third of the restricted stock units vested at that time with the remaining unvested restricted stock units to vest in December 2013 and December 2014.

*General.* The grant date fair value of time-based and performance-based restricted stock units was equal to GenOn's closing stock price on the grant date. The following table summarizes GenOn's time-based and performance-based restricted stock unit activity and changes during the period:

| | Number of Shares | | Weighted Average Grant Date Fair Value |
| --- | --- | --- | --- |
| | (In whole) | | |
| Outstanding as of December 31, 2011 | 6,425,316 | $ | 3.79 |
| Granted | 5,809,699 | | 2.43 |
| Vested | (3,088,285) | | 3.22 |
| Forfeited | (145,797) | | 2.68 |
| Performance factor adjustments[a] | 2,078,565 | | 2.44 |
| Converted into restricted stock units covering NRG common stock | 11,079,498 | [b] | 2.99 [c] |

(a)  In December 2012, the Compensation Committee of the GenOn Board of Directors determined the performance results applicable to the 2012 performance-based award shares based on actual results at such time and a good faith estimate of the performance results for the remainder of 2012.

(b)  In connection with the NRG Merger, 2,853,015 outstanding GenOn restricted stock units vested in full and were exchanged for shares of NRG common stock in the NRG Merger based on the NRG Merger Exchange Ratio and 8,226,483 outstanding GenOn restricted stock units were converted into unvested restricted stock units of NRG (with the number of shares subject to such restricted stock units appropriately adjusted based on the NRG Merger Exchange Ratio of 0.1216 shares of NRG common stock for each outstanding share of GenOn).

(c)  Represents the weighted average grant date fair value for restricted stock units based on historical GenOn stock prices and includes no adjustments for the NRG Merger Exchange Ratio.

The following table summarizes the weighted average grant date fair value of time-based and performance-based restricted stock units granted and the total intrinsic value of units vested:

| | January 1, 2012 through December 14, 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|
| | (In millions, except per unit amounts) | | | | |
| Weighted average grant date fair value per restricted stock unit granted | $ | 2.43 | $ | 3.81 | $ | 4.22 |
| Fair value of vested restricted stock units | | 8 | | — | | 27 |

### Compensation Expense

GenOn recognized compensation expense in selling, general and administrative expense in the consolidated statements of operations related to stock-based compensation. The following table summarizes GenOn's total stock-based compensation expense recognized for the periods presented:

| | January 1, 2012 through December 14, 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|
| | (In millions) | | | | |
| Compensation expense from accelerated vesting of Mirant's stock-based compensation awards upon closing of the Mirant/RRI Merger | $ | — | $ | — | $ | 24 |
| Service and performance condition stock-based compensation expense | | 19 | | 14 | | 16 |
| Modification expense | | — | | — | | 1 (a) |
| Total compensation expense (pre-tax) | $ | 19 | $ | 14 | $ | 41 |
| Income tax effect (includes effect of the valuation allowance) | $ | — | $ | — | $ | — |

(a)   Represents modification expense for the vested stock options for Edward R. Muller, former Chairman and Chief Executive Officer of GenOn, which were modified such that the exercise period for the awards coincides with the expiration date.

### Note 19 - Related Party Transactions (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)

#### Services Agreement with NRG (GenOn)

Subsequent to the NRG Merger (for the successor period), NRG provides GenOn, with various management, personnel and other services, which include human resources, regulatory and public affairs, accounting, tax, legal, information systems, treasury, risk management, commercial operations, and asset management, as set forth in the Services Agreement. The initial term of the Services Agreement is through December 31, 2013, with an automatic renewal absent a request for termination. The fee charged is determined based on a fixed amount as described in the Services Agreement and was calculated based on historical GenOn expenses prior to the NRG Merger. The annual fees under the Services Agreement are approximately $193 million. NRG charges these fees on a monthly basis, less amounts incurred directly by GenOn. Management has concluded that this method of charging overhead costs is reasonable.

#### Administrative Services Provided by NRG for the Successor Period and Provided by GenOn Energy for the Predecessor Periods (GenOn Americas Generation and GenOn Mid-Atlantic)

Prior to the NRG Merger, GenOn provided GenOn Americas Generation and GenOn Mid-Atlantic with various management, personnel and other services directly relating to their facilities. GenOn Americas Generation and GenOn Mid-Atlantic reimbursed GenOn for amounts equal to the costs of providing such services. In addition, GenOn's corporate overhead costs were allocated to its subsidiaries based on each operating subsidiary's planned operating expenses relative to all operating subsidiaries of GenOn. Subsequent to the NRG Merger, NRG provides GenOn Americas Generation and GenOn Mid-Atlantic with various management, personnel and other services consistent with those set forth in the Services Agreement discussed above between NRG and GenOn. GenOn's costs incurred under the Services Agreement with NRG are allocated to its subsidiaries based on each operating subsidiary's planned operating expenses relative to all operating subsidiaries of GenOn. These allocations and charges are not necessarily indicative of what would have been incurred had GenOn Americas Generation and GenOn Mid-Atlantic been unaffiliated entities. Management has concluded that this method of charging overhead costs is reasonable.

The following costs were incurred under these arrangements:

*GenOn Americas Generation*

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | (In millions) | | |
| Direct costs: | | | | |
| Cost of operations — affiliate | $ 1 | $ 130 | $ 137 | $ 171 |
| Allocated costs: | | | | |
| Cost of operations — affiliate | 2 | 50 | 48 | 65 |
| Selling, general and administrative — affiliate | 2 | 62 | 76 | 65 |
| Total | $ 5 | $ 242 | $ 261 | $ 301 |

*GenOn Mid-Atlantic*

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | (In millions) | | |
| Direct costs: | | | | |
| Cost of operations — affiliate | $ 1 | $ 85 | $ 83 | $ 100 |
| Allocated costs: | | | | |
| Cost of operations — affiliate | 1 | 32 | 32 | 37 |
| Selling, general and administrative — affiliate | 2 | 39 | 49 | 46 |
| Total | $ 4 | $ 156 | $ 164 | $ 183 |

***Services Provided by GenOn Energy Management for the Predecessor Periods (GenOn Americas Generation and GenOn Mid-Atlantic)***

*GenOn Americas Generation*

Prior to the NRG Merger, GenOn Energy Management provided services to certain of GenOn's indirect operating subsidiaries through power, fuel supply and services agreements. The services included the bidding and dispatch of the generating units, fuel procurement and the execution of contracts, including economic hedges, to reduce price risk. These transactions were recorded as operating revenues — affiliate and cost of operations — affiliate, as appropriate, in the consolidated statements of operations. Amounts due from and to GenOn's indirect operating subsidiaries were recorded as accounts receivable — affiliate or accounts payables — affiliate, as appropriate. Substantially all energy marketing overhead expenses were allocated to GenOn's operating subsidiaries. For the period from January 1, 2012 through December 14, 2012 and for the years ended December 31, 2011 and 2010, GenOn Americas Generation recorded a reduction to cost of operations — affiliate of $22 million, $25 million and $0, respectively, related to the allocations of energy marketing overhead expenses to affiliates that are not included in the GenOn Americas Generation consolidated statements of operations.

*GenOn Mid-Atlantic*

Prior to the NRG Merger, GenOn Mid-Atlantic received services from GenOn Energy Management which included the bidding and dispatch of the generating units, procurement of fuel and other products and the execution of contracts, including economic hedges, to reduce price risk. These transactions were recorded as operating revenues — affiliate and cost of operations — affiliate, as appropriate, in the consolidated statements of operations. Amounts due to and from GenOn Energy Management under the power, fuel supply and services agreements were recorded as accounts payables — affiliate or accounts receivables — affiliate, as appropriate. Under these agreements, GenOn Energy Management resold GenOn Mid-Atlantic's energy products in the PJM spot and forward markets and to other third parties. GenOn Mid-Atlantic was paid the amount received by GenOn Energy Management for such capacity and energy. GenOn Mid-Atlantic had counterparty credit risk in the event that GenOn Energy Management was unable to collect amounts owed from third parties for the resale of GenOn Mid-Atlantic's energy products. Substantially all energy marketing overhead expenses were allocated to GenOn's operating subsidiaries. For the period from January 1, 2012 through December 14, 2012 and for the years ended December 31, 2011 and 2010, GenOn Mid-Atlantic incurred $4 million, $4 million and $13 million, respectively, of energy marketing overhead expense. These costs are included in cost of operations — affiliate in GenOn Mid-Atlantic's consolidated statements of operations.

### Credit Agreement with NRG (GenOn)

In connection with the closing of the NRG Merger, GenOn and GenOn Americas entered into a secured intercompany revolving credit agreement with NRG. This credit agreement provides for a $500 million revolving credit facility, all of which is available for revolving loans and letters of credit. At December 14, 2012, the letters of credit outstanding under GenOn's revolving credit facility, which was terminated in connection with the NRG Merger, were transferred to the NRG credit agreement. At December 31, 2012, $261 million of letters of credit were outstanding under the NRG credit agreement for GenOn and of this amount, $166 million were issued on behalf of GenOn Americas Generation. See Note 12, *Debt and Capital Leases*. At December 31, 2012, no loans were outstanding under this credit agreement. In connection with the execution of the agreement, certain of GenOn's subsidiaries (guarantors) entered into a guarantee agreement pursuant to which these guarantors guaranteed amounts borrowed and obligations incurred under the credit agreement. The credit agreement has a three year maturity and is payable at maturity, subject to certain exceptions primarily related to asset sales not in the ordinary course of business and borrowings of debt. In addition, they are restricted from incurring additional liens on their assets. At GenOn's election, the interest rate per year applicable to the loans under the credit agreement will be determined by reference to either (i) the base rate plus 2.50% per year or (ii) the LIBOR rate plus 3.50% per year. In addition, the credit agreement contains customary covenants and events of default.

### Intercompany Cash Management Program (GenOn Americas Generation)

In January 2011, GenOn Americas Generation and certain of its subsidiaries began participating in separate intercompany cash management programs whereby cash balances at GenOn Americas Generation and the respective participating subsidiaries were transferred to central concentration accounts to fund working capital and other needs of the respective participants. The balances under this program are reflected as notes receivable — affiliate or notes payable — affiliate, as appropriate. The notes are due on demand and accrue interest on the net position, which is payable quarterly, at the short term yield of the Federated Investors Treasury Obligation Fund or such other fund designated by GenOn Energy Holdings. At December 31, 2012 and 2011, GenOn Americas Generation had a net current notes receivable from GenOn Energy Holdings of $198 million and $129 million, respectively, related to its intercompany cash management program. For the periods from December 15, 2012 through December 31, 2012 and January 1, 2012 through December 14, 2012 and for the year ended December 31, 2011, GenOn Americas Generation earned an insignificant amount of net interest income related to these notes.

### Purchased Emission Allowances (GenOn Mid-Atlantic)

GenOn Energy Management maintains on behalf of GenOn Mid-Atlantic an inventory of certain purchased emission allowances related to the Regional Greenhouse Gas Initiative. The emission allowances are sold by GenOn Energy Management to GenOn Mid-Atlantic as they are needed for operations. GenOn Mid-Atlantic purchases emission allowances from GenOn Energy Management at GenOn Energy Management's original cost to purchase the allowances. For allowances that have been purchased by GenOn Energy Management from a GenOn Energy affiliate, the price paid by GenOn Energy Management is determined by market indices.

Emission allowances purchased from GenOn Energy Management that were utilized during the periods from December 15, 2012 through December 31, 2012 and January 1, 2012 through December 14, 2012 and during the years ended December 31, 2011 and 2010, were $1 million, $20 million, $26 million and $32 million, respectively, and are recorded in cost of operations — affiliate in GenOn Mid-Atlantic's consolidated statements of operations.

### Operator of Leased Facilities (GenOn)

See Note 20, *Commitments and Contingencies*, for a discussion of the GenOn leased facilities (Conemaugh and Keystone) that GenOn also operates.

**Note 20 — Commitments and Contingencies (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

**Commitments**

*GenOn Mid-Atlantic Operating Leases*

GenOn Mid-Atlantic leases a 100% interest in the Dickerson and Morgantown coal generation units and associated property through 2029 and 2034, respectively. GenOn Mid-Atlantic has an option to extend the leases. Any extensions of the respective leases would be for less than 75% of the economic useful life of the facility, as measured from the beginning of the original lease term through the end of the proposed remaining lease term. GenOn Mid-Atlantic accounts for these leases as operating leases and recognizes rent expense on a straight-line basis over the lease term. Rent expense totaled $3 million and $92 million for the period from December 15, 2012 through December 31, 2012 and for the period from January 1, 2012 through December 14, 2012, respectively, and totaled $96 million for the years ended December 31, 2011 and 2010. Rent expense is included in cost of operations. As of December 31, 2012 and 2011, GenOn Mid-Atlantic has paid $30 million and $482 million, respectively, of lease payments in excess of rent expense recognized, which is included in prepaid rent on the consolidated balance sheets. Of these amounts, $30 million and $96 million, respectively, is included in prepayments and other current assets (prepayments for GenOn).

For restrictions under these leases, see Note 12, *Debt and Capital Leases.*

As further described in Note 3, *NRG Merger*, as a result of pushdown accounting, GenOn Mid-Atlantic recorded the acquisition date fair value of the leasehold improvements of $493 million, classified in property, plant and equipment. In addition, GenOn Mid-Atlantic recorded the acquisition date fair value of the leasehold interests, net of the present value of the lease obligation, equal to an out-of-market liability of $540 million, classified in out-of-market contracts.

Future minimum lease commitments under the GenOn Mid-Atlantic operating leases for the years ending after December 31, 2012, are as follows:

|  | (In millions) |
|---|---|
| 2013 | $ 138 |
| 2014 | 131 |
| 2015 | 110 |
| 2016 | 150 |
| 2017 | 144 |
| Thereafter | 791 |
| Total | $ 1,464 |

*REMA Operating Leases (GenOn)*

GenOn, through its subsidiary, REMA, leases a 100% interest in the Shawville coal generation facility through 2026, and expects to make payments under the Shawville lease through that date, and leases 16.45% and 16.67% interest in the Keystone and Conemaugh coal generation facilities, respectively, through 2034, and expects to make payments under the Keystone and Conemaugh leases through 2029. At the expiration of these leases, there are several renewal options related to fair value. GenOn accounts for these leases as operating leases and records lease expense on a straight-line basis over the lease term. Rent expense totaled $2 million, $33 million, $35 million and $3 million for the period from December 15, 2012 through December 31, 2012, for the period from January 1, 2012 through December 14, 2012, for the years ended December 31, 2011 and 2010, respectively, and is included in cost of operations. As of December 31, 2012 and 2011, GenOn has paid $0 and $18 million, respectively, of lease payments in excess of rent expense recognized, which is included in prepayments on the consolidated balance sheets.

GenOn operates the Conemaugh and Keystone generating facilities under five–year agreements that expire in December 2015 that, subject to certain provisions and notifications, could be terminated annually with one year's notice. GenOn is reimbursed by the other owners for the cost of direct services provided to the Conemaugh and Keystone facilities. Additionally, GenOn received fees of $1 million, $9 million, $10 million and $1 million for the period from December 15, 2012 through December 31, 2012, for the period from January 1, 2012 through December 14, 2012, for the years ended December 31, 2011 and 2010, respectively. These fees received, which are recorded as a reductions in cost of operations, are primarily used to cover REMA's administrative support costs of providing these services.

For restrictions under these leases, see Note 12, *Debt and Capital Leases.*

As further described in Note 3, *NRG Merger*, as a result of pushdown accounting, GenOn recorded the acquisition date fair value of the leasehold improvements of $79 million, classified in property, plant and equipment. In addition, GenOn recorded the acquisition date fair value of the leasehold interests, net of the present value of the lease obligation, equal to an out-of-market liability of $188 million, classified in out-of-market contracts.

Future minimum lease commitments under the REMA operating leases for the years ending after December 31, 2012, are as follows:

|  | (In millions) |
|---|---|
| 2013 | $    64 |
| 2014 | 63 |
| 2015 | 56 |
| 2016 | 61 |
| 2017 | 63 |
| Thereafter | 455 |
| Total | $    762 |

During 2011, GenOn completed an analysis of the cost of environmental controls required for the Shawville generating facility, including the installation of cooling towers. After evaluation of the forecasted energy and capacity prices, expected capital expenditures, operating costs, property taxes and other factors, GenOn concluded that the forecasted returns on investments necessary to comply with the environmental regulations are insufficient. Accordingly, GenOn plans to place the coal-fired units at the Shawville generating facility, which are leased, in a long-term protective layup in April 2015. Under the lease agreement for Shawville, GenOn's obligations generally are to pay the required rent and to maintain the leased assets in accordance with the lease documentation, including in compliance with prudent competitive electric generating industry practice and applicable laws. GenOn will continue to evaluate options under the lease, including termination of the lease for economic obsolescence, keeping the facility in long-term protective layup during the term of the lease, or continuing operations with a different fuel. See Note 9, *Retirements, Mothballing or Long-Term Protective Layup of Generating Facilities*, for a discussion of other generating facilities that GenOn expects to deactivate in 2013, 2014 or 2015.

*Other Operating Leases*

The Registrants have commitments under other operating leases with various terms and expiration dates. Included in other operating leases is GenOn's long-term lease for its corporate headquarters in Houston, Texas which expires in 2018. GenOn Mid-Atlantic has other operating leases which primarily relate to the Chalk Point generating facility. Rent expense for other operating leases is recorded to cost of operations or selling, general and administrative, as applicable, based on the nature of the lease.

The Registrants' rent expense associated with other operating leases was as follows:

| | Successor | Predecessor | | |
| --- | --- | --- | --- | --- |
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | (In millions) | | |
| GenOn | $ 1 | $ 15 | $ 20 | $ 10 |
| GenOn Americas Generation | $ — | $ 3 | $ 7 | $ 6 |
| GenOn Mid-Atlantic | $ — | $ 3 | $ 7 | $ 6 |

Future minimum lease commitments under the Registrants' other operating leases for the years ending after December 31, 2012, are as follows:

| | GenOn[a] | GenOn Americas Generation | GenOn Mid-Atlantic |
| --- | --- | --- | --- |
| | | (In millions) | |
| 2013 | $ 23 | $ 3 | $ 3 |
| 2014 | 20 | 3 | 3 |
| 2015 | 18 | 3 | 3 |
| 2016 | 19 | 3 | 3 |
| 2017 | 17 | 3 | 2 |
| Thereafter | 21 | 9 | 9 |
| Total | $ 118 | $ 24 | $ 23 |

(a)   Amounts in the table exclude future sublease income of $24 million associated with GenOn's long-term lease for its corporate headquarters in Houston, Texas.

*Fuel and Commodity Transportation Commitments*

The Registrants have commitments under coal agreements and commodity transportation contracts, primarily related to natural gas and coal, of various quantities and durations. At December 31, 2012, the maximum remaining term under any individual fuel supply contract is 5 years and any transportation contract is 12 years.

As of December 31, 2012, the Registrants' commitments under such outstanding agreements are estimated as follows:

| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
| --- | --- | --- | --- |
| | | (In millions) | |
| 2013 | $ 470 | $ 243 | $ 242 |
| 2014 | 195 | 50 | 50 |
| 2015 | 138 | 18 | 17 |
| 2016 | 125 | 5 | 4 |
| 2017 | 116 | 1 | — |
| Thereafter | 171 | 5 | — |
| Total | $ 1,215 | $ 322 | $ 313 |

132

**LTSA Commitments (GenOn and GenOn Americas Generation)**

LTSA commitments primarily relate to long-term service agreements that cover some periodic maintenance, including parts, on power generation turbines. The long-term maintenance agreements terminate from 2014 to 2038 based on turbine usage.

As of December 31, 2012, GenOn's and GenOn Americas Generation's commitments under such outstanding agreements are estimated as follows:

|  | GenOn | | GenOn Americas Generation | |
| --- | --- | --- | --- | --- |
|  | | | (In millions) | |
| 2013 | $ | 19 | $ | 2 |
| 2014 | | 21 | | 2 |
| 2015 | | 24 | | 2 |
| 2016 | | 31 | | 2 |
| 2017 | | 41 | | 1 |
| Thereafter | | 337 | | 33 |
| Total | $ | 473 | $ | 42 |

**GenOn Marsh Landing (GenOn)**

In May 2010, GenOn Marsh Landing entered into an EPC agreement with Kiewit for the construction of the Marsh Landing generating facility. Under the EPC agreement, Kiewit is to design and construct the Marsh Landing generating facility on a turnkey basis, including all engineering, procurement, construction, commissioning, training, start-up and testing. The lump sum cost of the EPC agreement is $511 million (including the $212 million total cost under the Siemens Turbine Generator Supply and Services Agreement which was assigned to Kiewit in connection with the execution of the EPC agreement). The lump sum cost excludes the reimbursement of California sales and use taxes due under the Siemens Turbine Generator Supply and Services Agreement. As of December 31, 2012, total cost incurred to date under the EPC agreement was $464 million. Remaining cost under the EPC agreement is $47 million and is expected to be incurred in 2013.

**Other Commitments**

The Registrants have other commitments under contractual arrangements with various terms and expiration dates. The Registrants' other commitments primarily include the operation and maintenance agreement and the fly ash sales agreement entered into by GenOn Mid-Atlantic in connection with its ash beneficiation facility. The ash beneficiation facility agreements will expire in 2031. GenOn Mid-Atlantic has other similar agreements for gypsum. In addition to the GenOn Mid-Atlantic agreements, GenOn has other commitments which primarily relate to its southern California generating facilities.

As of December 31, 2012, the Registrants' other commitments are estimated as follows:

|  | GenOn | | GenOn Americas Generation | | GenOn Mid-Atlantic | |
| --- | --- | --- | --- | --- | --- | --- |
|  | | | (In millions) | | | |
| 2013 | $ | 25 | $ | 11 | $ | 11 |
| 2014 | | 19 | | 12 | | 12 |
| 2015 | | 15 | | 12 | | 12 |
| 2016 | | 14 | | 12 | | 12 |
| 2017 | | 14 | | 13 | | 13 |
| Thereafter | | 116 | | 114 | | 114 |
| Total | $ | 203 | $ | 174 | $ | 174 |

**Contingencies**

Set forth below is a description of the Registrants' material legal proceedings. The Registrants believe that they have valid defenses to these legal proceedings and intend to defend them vigorously. Pursuant to the requirements of ASC 450, *Contingencies,* and related guidance, the Registrants record reserves for estimated losses from contingencies when information available indicates that a loss is probable and the amount of the loss, or range of loss, can be reasonably estimated. In addition, legal costs are expensed as incurred. Management has assessed each of the following matters based on current information and made a judgment concerning its potential outcome, considering the nature of the claim, the amount and nature of damages sought, and the probability of success. Unless specified below, the Registrants are unable to predict the outcome of these legal proceedings or reasonably estimate the scope or amount of any associated costs and potential liabilities. As additional information becomes available, management adjusts its assessment and estimates of such contingencies accordingly. Because litigation is subject to inherent uncertainties and unfavorable rulings or developments, it is possible that the ultimate resolution of the Registrants' liabilities and contingencies could be at amounts that are different from currently recorded reserves and that such difference could be material.

In addition to the legal proceedings noted below, the Registrants are party to other litigation or legal proceedings arising in the ordinary course of business. In management's opinion, the disposition of these ordinary course matters will not materially adversely affect the Registrants' respective consolidated financial position, results of operations, or cash flows.

### Scrubber Contract Litigation

In January 2011, Stone & Webster, the EPC contractor for the scrubber projects at the Chalk Point, Dickerson and Morgantown generating facilities, filed two suits against GenOn Mid-Atlantic and one suit against GenOn Chalk Point (a subsidiary of GenOn Mid-Atlantic) in the U.S. District Court for the District of Maryland. Stone & Webster claimed that it had not been paid in accordance with the terms of the EPC agreements for the scrubber projects and sought liens against the properties, which the court granted. GenOn Mid-Atlantic disputed Stone & Webster's allegations and in February 2011 filed a related action against Stone &Webster in the U.S. District Court for the Southern District of New York. The proceedings in Maryland were stayed pending resolution of the proceeding in New York.

In June 2012, GenOn Mid-Atlantic executed a settlement agreement with Stone & Webster. Under the terms of the settlement agreement, GenOn Mid-Atlantic agreed to pay Stone & Webster $107.1 million in settlement of all outstanding invoices and amounts claimed to be owed by Stone & Webster in connection with the construction of the scrubber projects. As part of the settlement, Stone & Webster released the $165.6 million in interlocutory liens that had been filed by Stone & Webster on the Chalk Point, Dickerson and Morgantown generating facilities. As a result of the release of the liens, GenOn Mid-Atlantic released the $165.6 million in reserved cash during June 2012. In connection with the settlement agreement, GenOn Mid-Atlantic dismissed the dispute filed in the U.S. District Court for the Southern District of New York.

GenOn Mid-Atlantic incurred $1.7 billion in capital expenditures from 2007 to 2012 for compliance with the Maryland Healthy Air Act.

### Pending Natural Gas Litigation (GenOn)

GenOn is party to five lawsuits, several of which are class action lawsuits, in state and federal courts in Kansas, Missouri, Nevada and Wisconsin. These lawsuits were filed in the aftermath of the California energy crisis in 2000 and 2001 and the resulting FERC investigations and relate to alleged conduct to increase natural gas prices in violation of antitrust and similar laws. The lawsuits seek treble or punitive damages, restitution and/or expenses. The lawsuits also name a number of unaffiliated energy companies as parties. In July 2011, the judge in the U.S. District Court for the District of Nevada handling four of the five cases granted the defendants' motion for summary judgment dismissing all claims against GenOn in those cases. The plaintiffs have appealed to the U.S. Court of Appeals for the Ninth Circuit. In September 2012, the State of Nevada Supreme Court handling one of the five cases affirmed dismissal by the Eighth Judicial District Court for Clark County, Nevada of all plaintiffs' claims against GenOn. In February 2013, the plaintiffs filed a petition for certiorari to the U.S. Supreme Court. GenOn has agreed to indemnify CenterPoint against certain losses relating to these lawsuits.

### Global Warming (GenOn)

In February 2008, the Native Village of Kivalina and the City of Kivalina, Alaska filed a suit in the U.S. District Court for the Northern District of California against GenOn and 23 other electric generating and oil and gas companies. The lawsuit sought damages of up to $400 million for the cost of relocating the village allegedly because of global warming caused by the greenhouse gas emissions of the defendants. In late 2009, the District Court ordered that the case be dismissed and the plaintiffs appealed. In September 2012, the U.S. Court of Appeals for the Ninth Circuit dismissed plaintiffs' appeal. In October 2012, the plaintiffs petitioned for *en banc* rehearing of the case; which petition was denied in November 2012. In February 2013, plaintiffs filed a petition with the U.S. Supreme Court seeking review of the decision from the U.S. Court of Appeals. GenOn believes claims such as this lack legal merit.

### New Source Review Matters

The EPA and various states are investigating compliance of coal-fueled electric generating facilities with the pre-construction permitting requirements of the CAA known as "new source review." Since 2000, the EPA has made information requests concerning the Avon Lake, Chalk Point, Cheswick, Conemaugh, Dickerson, Elrama, Keystone, Morgantown, New Castle, Niles, Portland, Potomac River, Shawville and Titus generating facilities. The Registrants continue to correspond with the EPA regarding some of these requests. The EPA agreed to share information relating to its investigations with state environmental agencies. In January 2009, GenOn received an NOV from the EPA alleging that past work at its Shawville, Portland and Keystone generating facilities violated regulations regarding new source review. In June 2011, GenOn received an NOV from the EPA alleging that past work at its Niles and Avon Lake generating facilities violated regulations regarding new source review.

In December 2007, the NJDEP sued GenOn in the U.S. District Court for the Eastern District of Pennsylvania, alleging that new source review violations occurred at the Portland generating facility. The suit seeks installation of "best available" control technologies for each pollutant, to enjoin GenOn from operating the generating facility if it is not in compliance with the CAA and civil penalties. The suit also names past owners of the plant as defendants. In March 2009, the Connecticut Department of Environmental Protection became an intervening party to the suit. GenOn thinks that the work listed by the EPA and the work subject to the NJDEP suit were conducted in compliance with applicable regulations. However, any final finding that GenOn violated the new source review requirements could result in fines or penalties. The case is currently scheduled for a liability trial on April 22, 2013.

In addition, the NJDEP filed two administrative petitions with the EPA in 2010 alleging that the Portland generating facility's emissions were significantly contributing to nonattainment and/or interfering with the maintenance of certain NAAQS in New Jersey. In November 2011, the EPA published a final rule in response to one of the petitions that will require GenOn to reduce maximum allowable $SO_2$ emissions from the two coal-fired units by about 60% starting in January 2013 and by about 80% starting in January 2015. In January 2012, GenOn challenged the rule in the U.S. Court of Appeals for the Third Circuit. In 2013 and 2014, GenOn has several compliance options that include using lower sulfur coals (although this may at times reduce how much GenOn is able to generate) or running just one unit at a time. Starting in January 2015, these units will be subject to more stringent rate limits, which will require either material capital expenditures and higher operating costs or the retirement of these two units.

See Note 9, *Retirements, Mothballing or Long-Term Protective Layup of Generating Facilities*, for a discussion of the coal-fired units that GenOn expects to deactivate.

### Cheswick Class Action Complaint (GenOn)

In April 2012, a putative class action lawsuit was filed against GenOn in the Court of Common Pleas of Allegheny County, Pennsylvania alleging that emissions from the Cheswick generating facility have damaged the property of neighboring residents. GenOn disputes these allegations. Plaintiffs have brought nuisance, negligence, trespass and strict liability claims seeking both damages and injunctive relief. Plaintiffs seek to certify a class that consists of people who own property or live within one mile of the plant. In July 2012, GenOn removed the lawsuit to the U.S. District Court for the Western District of Pennsylvania. In October 2012, the court granted GenOn's motion to dismiss, which Plaintiffs have appealed to the U.S. Court of Appeals for the Third Circuit.

### Cheswick Monarch Mine NOV (GenOn)

In 2008, the PADEP issued an NOV related to the Monarch mine located near the Cheswick generating facility. It has not been mined for many years. GenOn uses it for disposal of low-volume wastewater from the Cheswick generating facility and for disposal of leachate collected from ash disposal facilities. The NOV addresses the alleged requirement to maintain a minimum pumping volume from the mine. The PADEP indicated it may assess a civil penalty in excess of $100,000 GenOn contests the allegations in the NOV and has not agreed to such penalty. GenOn is currently planning capital expenditures in connection with wastewater from Cheswick and leachate from ash disposal facilities.

*Conemaugh Alleged Clean Streams Law Violations (GenOn)*

In September 2012, the PADEP filed a lawsuit in the Commonwealth Court of Pennsylvania alleging that several violations of the Pennsylvania Clean Streams Law occurred at the Conemaugh generating facility. GenOn agreed to a consent decree to resolve the allegations and paid a civil penalty of $500,000. GenOn was responsible for 16.45% of this amount.

*Ormond Beach Alleged Federal Clean Water Act Violations (GenOn)*

In October 2012, the Wishtoyo Foundation, a California-based cultural and environmental advocacy organization, through its Ventura Coastkeeper Program, filed suit in the U.S. District Court for the Central District of California regarding alleged violations of the Clean Water Act associated with discharges of stormwater from the Ormond Beach generating facility. The Wishtoyo Foundation alleges that elevated concentrations of pollutants in stormwater discharged from the Ormond Beach generating facility are affecting adjacent aquatic resources in violation of (i) the Statewide General Industrial Stormwater permit (a general National Pollution Discharge Elimination System permit issued by the California State Water Resources Control Board that authorizes stormwater discharges from industrial facilities in California) and (ii) the state's Porter-Cologne Water Quality Control Act. The Wishtoyo Foundation further alleges that GenOn has not implemented effective stormwater control and treatment measures and that GenOn has not complied with the sampling and reporting requirements of the General Industrial Stormwater permit. GenOn disputes these allegations.

*Notice of Intent to File Citizens Suit*

On January 25, 2013, Food & Water Watch, the Patuxent Riverkeeper and the Potomac Riverkeeper (Citizens Group) sent GenOn Mid-Atlantic a letter alleging that the Chalk Point, Dickerson and Morgantown generating facilities were violating the terms of three National Pollution Discharge Elimination System Permits by discharging nitrogen and phosphorous into the waters of the U.S. in excess of the limits in each permit. The Citizens Group threatens to bring a lawsuit if GenOn Mid-Atlantic does not bring itself into compliance within 60 days of the letter. The Citizens Group intends to seek civil penalties and injunctive relief against GenOn Mid-Atlantic if they file a lawsuit.

*Maryland Fly Ash Facilities*

GenOn Mid-Atlantic has three fly ash facilities in Maryland: Faulkner, Westland and Brandywine. GenOn Mid-Atlantic disposes of fly ash from the Morgantown and Chalk Point generating facilities at Brandywine. GenOn Mid-Atlantic disposes of fly ash from the Dickerson generating facility at Westland. GenOn Mid-Atlantic no longer disposes of fly ash at the Faulkner facility. As described below, the MDE has sued GenOn Mid-Atlantic regarding Faulkner, Brandywine and Westland. The MDE also had threatened not to renew the water discharge permits for all three facilities.

*Faulkner Litigation.* In May 2008, the MDE sued GenOn Mid-Atlantic in the Circuit Court for Charles County, Maryland alleging violations of Maryland's water pollution laws at Faulkner. The MDE contended that the operation of Faulkner had resulted in the discharge of pollutants that exceeded Maryland's water quality criteria and without the appropriate NPDES permit. The MDE also alleged that GenOn Mid-Atlantic failed to perform certain sampling and reporting required under an applicable NPDES permit. The MDE complaint requested that the court (i) prohibit continuation of the alleged unpermitted discharges, (ii) require GenOn Mid-Atlantic to cease from further disposal of any coal combustion byproducts at Faulkner and close and cap the existing disposal cells and (iii) assess civil penalties. In July 2008, GenOn Mid-Atlantic filed a motion to dismiss the complaint, arguing that the discharges are permitted by a December 2000 Consent Order. In January 2011, the MDE dismissed without prejudice its complaint and informed GenOn Mid-Atlantic that it intended to file a similar lawsuit in federal court. In May 2011, the MDE filed a complaint against GenOn Mid-Atlantic in the U.S. District Court for the District of Maryland alleging violations at Faulkner of the Clean Water Act and Maryland's Water Pollution Control Law. The MDE contends that (i) certain of GenOn Mid-Atlantic's water discharges are not authorized by the existing permit and (ii) operation of the Faulkner facility has resulted in discharges of pollutants that violate water quality criteria. The complaint asks the court to, among other things, (i) enjoin further disposal of coal ash; (ii) enjoin discharges that are not authorized by the existing permit; (iii) require numerous technical studies; (iv) impose civil penalties and (v) award MDE attorneys' fees. GenOn Mid-Atlantic disputes the allegations.

*Brandywine Litigation.* In April 2010, the MDE filed a complaint against GenOn Mid-Atlantic in the U.S. District Court for the District of Maryland asserting violations at Brandywine of the Clean Water Act and Maryland's Water Pollution Control Law. The MDE contends that the operation of Brandywine has resulted in discharges of pollutants that violate Maryland's water quality criteria. The complaint requests that the court, among other things, (i) enjoin further disposal of coal combustion waste at Brandywine, (ii) require GenOn Mid-Atlantic to close and cap the existing open disposal cells within one year, (iii) impose civil penalties and (iv) award MDE attorneys' fees. GenOn Mid-Atlantic disputes the allegations. In September 2010, four environmental advocacy groups became intervening parties in the proceeding.

*Westland Litigation.* In January 2011, the MDE informed GenOn Mid-Atlantic that it intended to sue for alleged violations at Westland of Maryland's water pollution laws, which suit was filed in the U.S. District Court for the District of Maryland in December 2012.

*Permit Renewals.* In March 2011, the MDE tentatively determined to deny GenOn Mid-Atlantic's application for the renewal of the water discharge permit for Brandywine, which could result in a significant increase in operating expenses for the Chalk Point and Morgantown generating facilities. The MDE also had indicated that it was planning to deny GenOn Mid-Atlantic's applications for the renewal of the water discharge permits for Faulkner and Westland. Denial of the renewal of the water discharge permit for the latter facility could result in a significant increase in operating expenses for GenOn Mid-Atlantic's Dickerson generating facility.

*Settlement.* In June 2011, the MDE agreed to stay the litigation related to Faulkner and Brandywine while GenOn Mid-Atlantic pursued settlement of allegations related to the three Maryland ash facilities. MDE also agreed not to pursue its tentative denial of GenOn Mid-Atlantic's application to renew the water discharge permit at Brandywine and agreed not to act on GenOn Mid-Atlantic's renewal applications for Faulkner or Westland while GenOn Mid-Atlantic was discussing settlement. As a condition to obtaining the stay, GenOn Mid-Atlantic agreed in principle to pay a civil penalty of $1.9 million (for alleged past violations) to the MDE if GenOn Mid-Atlantic reaches a comprehensive settlement regarding all of the allegations related to the three Maryland ash facilities. GenOn Mid-Atlantic accrued $1.9 million during 2011 and an additional $0.6 million (for agreed prospective penalties while GenOn Mid-Atlantic implements the settlement) during the second quarter of 2012 for a total of $2.5 million. GenOn Mid-Atlantic also developed a technical solution, which includes installing synthetic caps on the closed cells of each of the three ash facilities. During 2011, GenOn Mid-Atlantic accrued $47 million for the estimated cost of the technical solution. GenOn Mid-Atlantic concluded settlement discussions with the MDE and signed a consent decree that when entered by the court will resolve these issues. In January 2013, the intervenors in the Brandywine case opposed entry of the consent decree. At this time, GenOn Mid-Atlantic cannot reasonably estimate the upper range of its obligations for remediating the sites because GenOn Mid-Atlantic has not (i) finished assessing each site including identifying the full impacts to both ground and surface water and the impacts to the surrounding habitat; (ii) finalized with the MDE the standards to which it must remediate; and (iii) identified the technologies required, if any, to meet the yet to be determined remediation standards at each site nor the timing of the design and installation of such technologies.

### Brandywine Storm Damage and Ash Recovery

As a result of Hurricane Irene and Tropical Storm Lee in August and September 2011, an estimated 8,800 cubic yards of coal fly ash stored in one of the cells at the Brandywine ash disposal site flowed onto 18 acres of private property adjacent to the site. During 2011, GenOn Mid-Atlantic accrued $10 million for the estimated costs to remove and clean up the ash. GenOn Mid-Atlantic has removed the released ash from the private property and completed the remaining clean-up activities. GenOn Mid-Atlantic adjusted the estimate and reversed $4 million during the second quarter of 2012. During the third quarter of 2012, GenOn Mid-Atlantic received $2 million of insurance proceeds in connection with claims associated with the costs to remove and clean up the ash.

*Brandywine Filling of Wetlands.* While expanding and installing a liner at the Brandywine ash disposal site, GenOn Mid-Atlantic inadvertently filled wetlands without having all of the requisite permits. The MDE also has alleged that GenOn Mid-Atlantic violated the notice requirements of its sediment and erosion control plan. In July 2012, the MDE filed a complaint in the Circuit Court for Prince George's County, Maryland for civil penalties and injunctive relief in connection with the storm damage and the filling of the wetlands. GenOn Mid-Atlantic settled these matters by paying a fine of $300,000 in December 2012.

*Ash Disposal Facility Closures*

The Registrants are responsible for environmental costs related to the future closures of several ash disposal facilities. The Registrants have accrued the following estimated discounted costs associated with these environmental liabilities as part of its asset retirement obligations:

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | As of December 31, 2012 | | As of December 31, 2011 | |
| GenOn[a] | $ | 55 | $ | 38 |
| GenOn Americas Generation | $ | 19 | $ | 14 |
| GenOn Mid-Atlantic | $ | 17 | $ | 12 |

(a) GenOn has deposits for the benefit of the State of Pennsylvania to guarantee its obligations related to future closures of certain coal ash landfill sites, of $28 million and $26 million as of December 31, 2012 and 2011, respectively.

These amounts are exclusive of the $47 million accrual for the technical solution for the three ash facilities in Maryland discussed above.

*New Jersey Remediation Obligations (GenOn)*

GenOn is responsible under the Industrial Site Recovery Act for environmental costs related to site contamination investigations and remediation requirements at four generating facilities in New Jersey. GenOn has accrued the estimated long-term liability for the remediation costs of $6 million at December 31, 2012 and 2011, respectively.

GenOn has deposits for the benefit of the State of New Jersey to satisfy its obligations to remediate site contamination under the Industrial Site Recovery Act of $8 million as of December 31, 2012 and 2011, respectively.

*Chapter 11 Proceedings (GenOn and GenOn Americas Generation)*

In July 2003, and various dates thereafter, the Mirant Debtors filed voluntary petitions in the Bankruptcy Court for relief under Chapter 11 of the U.S. Bankruptcy Code. GenOn Energy Holdings and most of the other Mirant Debtors emerged from bankruptcy on January 3, 2006, when the Plan became effective. The remaining Mirant Debtors emerged from bankruptcy on various dates in 2007. Approximately 461,000 of the shares of GenOn Energy Holdings common stock to be distributed under the Plan have not yet been distributed and have been reserved for distribution with respect to claims disputed by the Mirant Debtors that have not been resolved. Upon the Mirant/RRI Merger, those reserved shares converted into a reserve for approximately 1.3 million shares of GenOn common stock. Upon the NRG Merger, those reserved shares converted into a reserve for approximately 159,000 shares of NRG common stock. Under the terms of the Plan, upon the resolution of such a disputed claim, the claimant will receive the same pro rata distributions of common stock, cash, or both as previously allowed claims, regardless of the price at which the common stock is trading at the time the claim is resolved. If the aggregate amount of any such payouts results in the number of reserved shares being insufficient, additional shares of common stock may be issued to address the shortfall.

*Actions Pursued by MC Asset Recovery (GenOn)*

Under the Plan, the rights to certain actions filed by GenOn Energy Holdings and some of its subsidiaries against third parties were transferred to MC Asset Recovery, a wholly owned subsidiary of GenOn Energy Holdings. MC Asset Recovery is now governed by a manager who is independent of GenOn. Under the Plan, any cash recoveries obtained by MC Asset Recovery from the actions transferred to it, net of fees and costs incurred in prosecuting the actions, are to be paid to the unsecured creditors of GenOn Energy Holdings in the Chapter 11 proceedings and the holders of the equity interests in GenOn Energy Holdings immediately prior to the effective date of the Plan except where such a recovery results in an allowed claim in the bankruptcy proceedings, as described below. MC Asset Recovery is a disregarded entity for income tax purposes; NRG, GenOn and GenOn Energy Holdings are responsible for income taxes related to its operations. The Plan provides that GenOn Energy Holdings may not reduce payments to be made to unsecured creditors and former holders of equity interests from recoveries obtained by MC Asset Recovery for the taxes owed by GenOn Energy Holdings, if any, on any net recoveries up to $175 million. If the aggregate recoveries exceed $175 million net of costs, then GenOn Energy Holdings may reduce the payments by the amount of any taxes it will owe or NOLs it may utilize with respect to taxable income resulting from the amount in excess of $175 million.

The Plan and the MC Asset Recovery Limited Liability Company Agreement also obligate GenOn Energy Holdings to make contributions to MC Asset Recovery as necessary to pay professional fees and certain other costs. In June 2008, GenOn Energy Holdings and MC Asset Recovery, with the approval of the Bankruptcy Court, agreed to limit the total amount of funding to be provided by GenOn Energy Holdings to MC Asset Recovery to $68 million, and the amount of such funding obligation not already incurred by GenOn Energy Holdings at that time was fully accrued. GenOn Energy Holdings was entitled to be repaid the amounts it funded from any recoveries obtained by MC Asset Recovery before any distribution was made from such recoveries to the unsecured creditors of GenOn Energy Holdings and the former holders of equity interests.

In March 2009, Southern Company and MC Asset Recovery entered into a settlement agreement resolving claims asserted by MC Asset Recovery in a suit that was pending in the U.S. District Court for the Northern District of Georgia. Southern Company paid $202 million to MC Asset Recovery in settlement of all claims asserted in the litigation. MC Asset Recovery used a portion of that payment to pay fees owed to the managers of MC Asset Recovery and other expenses of MC Asset Recovery not previously funded by GenOn Energy Holdings, and it retained $47 million from that payment to fund future expenses and to apply against unpaid expenditures. MC Asset Recovery distributed the remaining $155 million to GenOn Energy Holdings. In accordance with the Plan, GenOn Energy Holdings retained approximately $52 million of that distribution as reimbursement for the funds it had provided to MC Asset Recovery and costs it incurred related to MC Asset Recovery that had not been previously reimbursed. GenOn Energy Holdings recognized the $52 million as a reduction of operations and maintenance expense during 2009. Pursuant to MC Asset Recovery's Limited Liability Company Agreement and an order of the Bankruptcy Court dated October 31, 2006, GenOn Energy Holdings distributed $2 million to the managers of MC Asset Recovery. In September 2009, the remaining approximately $101 million of the amount recovered by MC Asset Recovery was distributed pursuant to the terms of the Plan. Following these distributions, GenOn Energy Holdings has no further obligation to provide funding to MC Asset Recovery. As a result, GenOn Energy Holdings reversed its remaining accrual of $10 million of funding obligations as a reduction in operations and maintenance expense for 2009. GenOn does not expect to owe any taxes related to the MC Asset Recovery settlement with Southern Company.

Based on a stipulation entered by the Bankruptcy Court in December 2011 and pursuant to the terms of the Plan and the MC Asset Recovery Limited Liability Company Agreement, during March 2012, GenOn Energy Holdings distributed $26 million of the $47 million in funds that had been previously retained by MC Asset Recovery.

One of the two remaining actions transferred to MC Asset Recovery seeks to recover damages from Commerzbank AG and various other banks (the Commerzbank Defendants) for alleged fraudulent transfers that occurred prior to the filing of GenOn Energy Holdings' bankruptcy proceedings. In its amended complaint, MC Asset Recovery alleges that the Commerzbank Defendants in 2002 and 2003 received payments totaling approximately 153 million Euros directly or indirectly from GenOn Energy Holdings under a guarantee provided by GenOn Energy Holdings in 2001 of certain equipment purchase obligations. MC Asset Recovery alleges that at the time GenOn Energy Holdings provided the guarantee and made the payments to the Commerzbank Defendants, GenOn Energy Holdings was insolvent and did not receive fair value for those transactions. In December 2010, the U.S. District Court for the Northern District of Texas dismissed MC Asset Recovery's complaint against the Commerzbank Defendants. In January 2011, MC Asset Recovery appealed the U.S. District Court's dismissal of its complaint against the Commerzbank Defendants to the U.S. Court of Appeals for the Fifth Circuit. In March 2012, the U.S. Court of Appeals for the Fifth Circuit reversed the U.S. District Court's dismissal and reinstated MC Asset Recovery's amended complaint against the Commerzbank Defendants. If MC Asset Recovery succeeds in obtaining any recoveries on these avoidance claims, the Commerzbank Defendants have asserted that they will seek to file claims in GenOn Energy Holdings' bankruptcy proceedings for the amount of those recoveries. GenOn Energy Holdings would vigorously contest the allowance of any such claims on the ground that, among other things, the recovery of such amounts by MC Asset Recovery does not reinstate any enforceable pre-petition obligation that could give rise to a claim. If such a claim were to be allowed by the Bankruptcy Court as a result of a recovery by MC Asset Recovery, then the Plan provides that the Commerzbank Defendants are entitled to the same distributions as previously made under the Plan to holders of similar allowed claims. Holders of previously allowed claims similar in nature to the claims that the Commerzbank Defendants would seek to assert have received 43.87 shares of GenOn Energy Holdings common stock for each $1,000 of claim allowed by the Bankruptcy Court. If the Commerzbank Defendants were to receive an allowed claim as a result of a recovery by MC Asset Recovery on its claims against them, the order entered by the Bankruptcy Court in December 2005, confirming the Plan provides that GenOn Energy Holdings would retain from the net amount recovered by MC Asset Recovery an amount equal to the dollar amount of the resulting allowed claim rather than distribute such amount to the unsecured creditors and former equity holders as described above.

*Texas Franchise Audit (GenOn)*

In 2008 and 2009, the State of Texas, as a result of its audit, issued franchise tax assessments against GenOn indicating an underpayment of franchise tax of $72 million (including interest and penalties through December 31, 2012 of $29 million). These assessments are related primarily to a claim by Texas that would change the sourcing of intercompany receipts for the years 2000 through 2006, thereby increasing the amount of tax due to Texas. GenOn disagrees with most of the State's assessment and its determination of the related tax liability. Given the disagreement with the State's position, GenOn has accrued a portion of the liability but has protested the entire assessment and is currently in the administrative appeals process. If GenOn does not fully resolve or come to satisfactory settlement of the protested issues, then GenOn could pay up to the entire amount of the assessed tax, penalties and interest. GenOn intends to defend fully its position in the administrative appeals process and if such defense requires litigation, would be required to pay the full assessment and sue for refund.

*Purported Class Actions related to July 22, 2012 Announcement of NRG Merger Agreement (GenOn)*

GenOn has been named as a defendant in eight purported class actions pending in Texas and Delaware, related to its announcement of its agreement for NRG to acquire all outstanding shares of GenOn. These cases have been consolidated into one state court case in each of Delaware and Texas and a federal court case in Texas. The plaintiffs generally allege breach of fiduciary duties, as well as conspiracy, aiding and abetting breaches of fiduciary duties. Plaintiffs are generally seeking to: be certified as a class; enjoin the merger; direct the defendant to exercise their fiduciary duties; rescind the acquisition and be awarded attorneys' fees and costs and other relief that the court deems appropriate. Plaintiffs have demanded that there be additional disclosures regarding the merger terms. On October 24, 2012, the parties to the Delaware state court case executed a Memorandum of Understanding to resolve the Delaware purported class action lawsuit.

140

**Note 21 — Regulatory Matters (GenOn, GenOn Americas Generation, GenOn Mid-Atlantic)**

The Registrants operate in a highly regulated industry and are subject to regulation by various federal and state agencies. As such, the Registrants are affected by regulatory developments at both the federal and state levels and in the regions in which they operate. In addition, the Registrants are subject to the market rules, procedures, and protocols of the various ISO markets in which they participate. These power markets are subject to ongoing legislative and regulatory changes that may impact the Registrants.

In addition to the regulatory proceedings noted below, the Registrants are a party to other regulatory proceedings arising in the ordinary course of business or have other regulatory exposure. In management's opinion, the disposition of these ordinary course matters will not materially adversely affect the Registrants' respective consolidated financial position, results of operations, or cash flows.

*East Region (GenOn)*

*Reliability Must Run Agreements for Elrama and Niles* — In May 2012, GenOn filed with the FERC an RMR rate schedule governing operation of unit 4 of the Elrama generating facility and unit 1 of the Niles generating facility.  PJM determined that each of these units was needed past their planned deactivation date of June 1, 2012 to maintain transmission system reliability on the PJM system pending the completion of transmission upgrades.  The RMR rate schedule sets forth the terms, conditions and cost-based rates under which GenOn operated the units for reliability purposes through September 30, 2012, the date PJM indicated the units would no longer be needed for reliability.  In July 2012, the FERC accepted GenOn's RMR rate schedule subject to hearing and settlement procedures.  In the settlement discussions ordered by the FERC or in any subsequent hearing, GenOn's RMR rate schedule may be modified from that which was filed.  The rates GenOn charged are subject to refund pending a ruling or settlement.

**Note 22 — Environmental Matters (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

The Registrants are subject to a wide range of federal, state and local environmental laws in the development, ownership, construction and operation of projects. These laws generally require that governmental permits and approvals be obtained before construction and maintained during the operation of power plants. Environmental laws have become increasingly stringent and the Registrants expect this trend to continue. The electric generation industry will face new requirements to address air emissions, climate change, ash (and other waste), water use, water discharges, and threatened and endangered species. In general, future laws are expected to require adding emission controls or other environmental controls or impose restrictions on the Registrants' operations. Complying with environmental requirements involves significant capital and operating expenses. The Registrants decide to invest capital for environmental controls based on relative certainty of the requirements, an evaluation of compliance options, and the expected economic returns on capital.

**Environmental Capital Expenditures**

Based on current rules, technology and plans as well as preliminary plans based on proposed rules, GenOn estimates that environmental capital expenditures from 2013 through 2017 required to meet GenOn's regulatory environmental commitments will be approximately $232 million for GenOn, which includes $46 million for GenOn Americas Generation. The amount for GenOn Americas Generation includes $4 million for GenOn Mid-Atlantic. These costs are primarily associated with controls to satisfy mercury and air toxics standards as well as $NO_x$ controls. The Registrants continue to explore cost effective compliance alternatives to reduce costs.

**Environmental Litigation**

See Note 20, *Commitments and Contingencies – Contingencies*, for additional legal proceedings and further discussion of the Registrants' environmental contingencies.

**Note 23 — Guarantees (GenOn and GenOn Americas Generation)**

GenOn and GenOn Americas Generation and their respective subsidiaries enter into various contracts that include indemnification and guarantee provisions as a routine part of their business activities. Examples of these contracts include asset purchases and sale agreements, commodity sale and purchase agreements, retail contracts, EPC agreements, operation and maintenance agreements, service agreements, settlement agreements, and other types of contractual agreements with vendors and other third parties, as well as affiliates. These contracts generally indemnify the counterparty for tax, environmental liability, litigation and other matters, as well as breaches of representations, warranties and covenants set forth in these agreements. In some cases, GenOn's and GenOn Americas Generation's maximum potential liability cannot be estimated, since the underlying agreements contain no limits on potential liability.

The following table summarizes the maximum potential exposures that can be estimated for guarantees, indemnities, and other contingent liabilities by maturity:

*GenOn*

| Guarantees | Under 1 Year | 1-3 Years | 3-5 Years | Over 5 Years | Total | Total |
|---|---|---|---|---|---|---|
| | | | | | Successor | Predecessor |
| | | By Remaining Maturity at December 31, | | | | December 31, |
| | | 2012 | | | | 2011 |
| | (In millions) | | | | | (In millions) |
| Letters of credit and surety bonds | $ 132 | $ — | $ — | $ — | $ 132 | $ 442 |
| Commercial sales arrangements | 101 | 51 | — | 137 | 289 | 401 |
| Other guarantees | — | — | — | 117 | 117 | 182 |
| Total guarantees | $ 233 | $ 51 | $ — | $ 254 | $ 538 | $ 1,025 |

*GenOn Americas Generation*

| Guarantees | Under 1 Year | 1-3 Years | 3-5 Years | Over 5 Years | Total | Total |
|---|---|---|---|---|---|---|
| | | | | | Successor | Predecessor |
| | | By Remaining Maturity at December 31, | | | | December 31, |
| | | 2012 | | | | 2011 |
| | (In millions) | | | | | (In millions) |
| Surety bonds | $ 7 | $ — | $ — | $ — | $ 7 | $ 6 |
| Commercial sales arrangements | 8 | 8 | — | — | 16 | 24 |
| Other guarantees | — | — | — | — | — | 63 |
| Total guarantees | $ 15 | $ 8 | $ — | $ — | $ 23 | $ 93 |

*Letters of credit and surety bonds* — As of December 31, 2012, GenOn and GenOn Americas Generation and their respective subsidiaries were contingently obligated for a total of $52 million and $7 million under surety bonds, respectively. In addition, $261 million of letters of credit were issued under the NRG credit agreement with GenOn. See Note 19, *Related Party Transactions*. Of those letters of credit, $166 million were issued on behalf of GenOn Americas Generation's subsidiaries and $51 million were issued in support of the GenOn Marsh Landing project. Most of these letters of credit are issued in support of their obligations to perform under commodity agreements and surety bonds are issued for financing or other arrangements. A majority of these surety bonds expire within one year of issuance, and it is typical for GenOn and GenOn Americas Generation to renew them on similar terms. At December 31, 2012, GenOn Energy Holdings has issued $80 million of cash-collateralized letters of credit in support of the Marsh Landing project. GenOn Marsh Landing also entered into a credit agreement which includes a $50 million senior secured letter of credit facility to support GenOn Marsh Landing's debt service reserve requirements and a $100 million senior secured letter of credit facility to support GenOn Marsh Landing's contractual requirements under its PPA with PG&E, under which no letters of credit were outstanding at December 31, 2012. At December 31, 2012 and 2011, $4 million and $1 million, respectively, of GenOn's surety bonds are related to credit support for the transmission upgrades PG&E will be making in order to connect the Marsh Landing generating facility to the power grid.

*Commercial sales arrangements* — In connection with the purchase and sale of fuel, emission allowances and power generation products to and from third parties with respect to the operation of some of GenOn's and GenOn Americas Generation's generation facilities in the U.S., they may be required to guarantee a portion of the obligations of certain of their subsidiaries. These obligations may include liquidated damages payments or other unscheduled payments. At December 31, 2012, GenOn is contingently obligated for a total of $122 million under such guarantees issued on behalf of GenOn Americas Generation's subsidiaries. GenOn and GenOn Americas Generation do not believe that they will be required to make any material payments under these commercial sales agreements.

*Other guarantees* — GenOn and GenOn Americas Generation have issued guarantees of obligations that their subsidiaries may incur as a provision for environmental site remediation, payment of debt obligations, rail car leases, performance under purchase, EPC and operating and maintenance agreements. In addition, at December 31, 2012, GenOn Energy Holdings has issued $18 million of guarantees on behalf of a GenOn Americas Generation subsidiary related to settlement agreement obligations. GenOn has also guaranteed some non-qualified benefits of CenterPoint's existing retirees at September 20, 2002. The estimated maximum potential amount of future payments under the CenterPoint guarantee is $56 million at December 31, 2012 (included in the table above) and $3 million is recorded in the GenOn balance sheet for this item. GenOn and GenOn Americas Generation do not believe that they will be required to make any material payments under these guarantees.

*Other indemnities* — Other indemnifications GenOn and GenOn Americas Generation have provided cover operational, tax, litigation and breaches of representations, warranties and covenants. GenOn and GenOn Americas Generation have also indemnified, on a routine basis in the ordinary course of business, financing parties, consultants or other vendors who have provided services to them. GenOn's and GenOn Americas Generation's maximum potential exposure under these indemnifications can range from a specified dollar amount to an indeterminate amount, depending on the nature of the transaction. Total maximum potential exposure under these indemnifications is not estimable due to uncertainty as to whether claims will be made or how they will be resolved. GenOn and GenOn Americas Generation do not believe that they will be required to make any material payments under these indemnity provisions.

Because many of the guarantees and indemnities GenOn and GenOn Americas Generation issue to third parties and affiliates do not limit the amount or duration of their obligations to perform under them, there exists a risk that GenOn or GenOn Americas Generation may have obligations in excess of the amounts described above. For those guarantees and indemnities that do not limit the liability exposure, it may not be possible to estimate what GenOn's or GenOn Americas Generation's liability would be, until a claim is made for payment or performance, due to the contingent nature of these contracts.

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Stockholder
GenOn Energy, Inc.:

Under date of February 27, 2013, we reported on the consolidated balance sheets of GenOn Energy, Inc. and subsidiaries as of December 31, 2012 (Successor) and December 31, 2011 (Predecessor), and the related consolidated statements of operations, comprehensive loss, stockholder's equity and cash flows for the periods from December 15, 2012 to December 31, 2012 (Successor period), and from January 1, 2012 to December 14, 2012 (Predecessor period) and for each of the years in the two-year period ended December 31, 2011 (Predecessor periods). These consolidated financial statements are the responsibility of the Companies' management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

In our opinion, such financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

As discussed in note 3 to the consolidated financial statements, effective December 15, 2012, NRG Energy, Inc. acquired all of the outstanding stock of GenOn Energy, Inc. in a business combination accounted for as a purchase. As a result of the acquisition, the consolidated financial information for the periods after the acquisition is presented on a different cost basis than that for the periods before the acquisition and, therefore, is not comparable.

/s/ KPMG LLP

Houston, Texas
February 27, 2013

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Member
GenOn Americas Generation, LLC:

Under date of February 27, 2013, we reported on the consolidated balance sheets of GenOn Americas Generation, LLC and subsidiaries as of December 31, 2012 (Successor) and December 31, 2011 (Predecessor), and the related consolidated statements of operations, member's equity and cash flows for the periods from December 15, 2012 to December 31, 2012 (Successor period), and from January 1, 2012 to December 14, 2012 (Predecessor period) and for each of the years in the two-year period ended December 31, 2011 (Predecessor periods). These consolidated financial statements are the responsibility of the Companies' management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

In our opinion, such financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

As discussed in note 3 to the consolidated financial statements, effective December 15, 2012, NRG Energy, Inc. acquired all of the outstanding stock of GenOn Energy, Inc., parent company of GenOn Americas Generation, LLC, in a business combination accounted for as a purchase. As a result of the acquisition, the consolidated financial information for the periods after the acquisition is presented on a different cost basis than that for the periods before the acquisition and, therefore, is not comparable.

/s/ KPMG LLP

Houston, Texas
February 27, 2013

145

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Member
GenOn Mid-Atlantic, LLC:

Under date of February 27, 2013, we reported on the consolidated balance sheets of GenOn Mid-Atlantic, LLC and subsidiaries as of December 31, 2012 (Successor) and December 31, 2011 (Predecessor), and the related consolidated statements of operations, member's equity and cash flows for the periods from December 15, 2012 to December 31, 2012 (Successor period), and from January 1, 2012 to December 14, 2012 (Predecessor period) and for each of the years in the two-year period ended December 31, 2011 (Predecessor periods). These consolidated financial statements are the responsibility of the Companies' management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

In our opinion, such financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

As discussed in note 3 to the consolidated financial statements, effective December 15, 2012, NRG Energy, Inc. acquired all of the outstanding stock of GenOn Energy, Inc., parent company of GenOn Mid-Atlantic, LLC, in a business combination accounted for as a purchase. As a result of the acquisition, the consolidated financial information for the periods after the acquisition is presented on a different cost basis than that for the periods before the acquisition and, therefore, is not comparable.

/s/ KPMG LLP

Houston, Texas
February 27, 2013

146

**Schedule I**

**GENON ENERGY, INC. (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED STATEMENTS OF OPERATIONS**

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** | **2011** | **2010** |
| | **(In millions)** | | **(In millions)** | |
| Operating Income/(Loss) | $  — | $  — | $  — | $  — |
| Other Income/(Expense) | | | | |
| Equity in earnings of consolidated subsidiaries | (69) | (260) | (44) | (226) |
| Other income/(expense), net | 4 | 79 | (1) | — |
| Interest expense | (7) | (217) | (144) | (9) |
| Total other expense | (72) | (398) | (189) | (235) |
| Loss before income taxes | (72) | (398) | (189) | (235) |
| Income tax expense/(benefit) | — | 16 | — | (2) |
| Net loss | $ (72) | $ (414) | $ (189) | $ (233) |

The accompanying notes are an integral part of GenOn Energy, Inc.'s condensed financial information.

147

**Schedule I**

**GENON ENERGY, INC. (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**

**CONDENSED BALANCE SHEETS**

| | Successor | Predecessor |
|---|---|---|
| | As of December 31, 2012 | As of December 31, 2011 |
| | (In millions) | (In millions) |
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 530 | $ 659 |
| Accounts receivable — affiliate | 10 | 86 |
| Notes receivable — affiliate | 1,119 | 1,190 |
| Interest receivable — affiliate | 125 | — |
| Taxes receivable and other current assets | 124 | 33 |
| Total current assets | 1,908 | 1,968 |
| **Other Assets** | | |
| Investment in subsidiaries | 424 | 4,590 |
| Notes receivable — affiliate | 1,003 | 1,003 |
| Other non-current assets | — | 104 |
| Total other assets | 1,427 | 5,697 |
| **Total Assets** | $ 3,335 | $ 7,665 |
| | | |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| **Current Liabilities** | | |
| Current portion of long-term debt | $ — | $ (2) |
| Accrued taxes | 41 | 25 |
| Accrued expenses and other current liabilities | 31 | 50 |
| Total current liabilities | 72 | 73 |
| **Other Liabilities** | | |
| Long-term debt, net of current portion | 2,849 | 2,475 |
| Other non-current liabilities | 1 | — |
| Total non-current liabilities | 2,850 | 2,475 |
| **Total Liabilities** | 2,922 | 2,548 |
| **Commitments and Contingencies** | | |
| **Stockholder's Equity:** | | |
| Preferred stock: no shares authorized and issued at December 31, 2012; $0.001 par value, 125,000,000 shares authorized, no shares issued at December 31, 2011 | — | — |
| Common stock: $0.001 par value, 1 share authorized and issued at December 31, 2012; $0.001 par value, 2.0 billion shares authorized, 771,692,734 shares issued at December 31, 2011 | — | 1 |
| Additional paid-in capital | 483 | 7,449 |
| Accumulated deficit | (72) | (2,163) |
| Accumulated other comprehensive income/(loss) | 2 | (170) |
| **Total Stockholder's Equity** | 413 | 5,117 |
| **Total Liabilities and Stockholder's Equity** | $ 3,335 | $ 7,665 |

The accompanying notes are an integral part of GenOn Energy, Inc.'s condensed financial information.

Schedule I

**GENON ENERGY, INC. (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED STATEMENTS OF CASH FLOWS**

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | (In millions) | | |
| **Cash Flows from Operating Activities** | | | | |
| Net cash used by operating activities | $ (66) | $ (134) | $ (59) | $ (39) |
| **Cash Flows from Investing Activities** | | | | |
| Acquisition of businesses, net of cash acquired | — | — | — | 689 |
| Issuance/(payment) of notes receivables–affiliate | 25 | 46 | 137 | (1,049) |
| Cash retained by GenOn Energy Holdings | — | — | — | (1,432) |
| Restricted funds on deposit, net | — | — | 286 | (286) |
| Net cash provided/(used) by investing activities | 25 | 46 | 423 | (2,078) |
| **Cash Flows from Financing Activities** | | | | |
| Payment for treasury stock | — | — | — | (11) |
| Proceeds from exercises of stock options | — | — | 3 | 1 |
| Proceeds from issuance of long-term debt | — | — | — | 1,203 |
| Proceeds from issuance of debt–affiliate | — | — | — | 3 |
| Payment of deferred debt issuance costs | — | — | — | (25) |
| Payments of short and long-term debt | — | — | (285) | — |
| Net cash provided/(used) by financing activities | — | — | (282) | 1,171 |
| **Net Increase/(Decrease) in Cash and Cash Equivalents** | (41) | (88) | 82 | (946) |
| **Cash and Cash Equivalents at Beginning of Period** | 571 | 659 | 577 | 1,523 |
| **Cash and Cash Equivalents at End of Period** | $ 530 | $ 571 | $ 659 | $ 577 |
| | | | | |
| **Supplemental Disclosures** | | | | |
| Cash paid for interest, net of amounts capitalized | $ 50 | $ 169 | $ 224 | $ 60 |
| Cash paid for income taxes (net of refunds received) | $ — | $ 34 | $ (3) | $ (1) |
| | | | | |
| **Supplemental Disclosures for Non–Cash Investing and Financing Activities** | | | | |
| Conversion to equity of notes receivables from subsidiaries | $ — | $ — | $ — | $ (87) |
| Conversion to equity of notes payable to subsidiaries | $ — | $ — | $ — | $ 3 |

The accompanying notes are an integral part of GenOn Energy, Inc.'s condensed financial information.

149

.

## GENON ENERGY, INC. (PARENT)
## NOTES TO REGISTRANTS' CONDENSED FINANCIAL STATEMENTS

**1.     Background and Basis of Presentation**

*Background*

The condensed parent company financial statements have been prepared in accordance with Rule 12–04, Schedule I of Regulation S–X, as the restricted net assets of GenOn Energy Inc.'s subsidiaries exceed 25 percent of the consolidated net assets of GenOn Energy, Inc. These statements should be read in conjunction with the consolidated statements and notes thereto of the Registrants.

RRI Energy (a Delaware corporation) changed its name from Reliant Energy, Inc. effective May 2009 in connection with the sale of its retail business. GenOn changed its name from RRI Energy effective December 3, 2010 in connection with the merger with Mirant. "GenOn" refers to GenOn Energy, Inc. and, except where the context indicates otherwise, its subsidiaries, after giving effect to the Mirant/RRI Merger.

*NRG Merger*

On July 20, 2012, GenOn entered into the NRG Merger Agreement with NRG and a direct wholly-owned subsidiary of NRG. Upon the terms and subject to the conditions set forth in the NRG Merger Agreement, which was approved by the boards of directors of GenOn and NRG, a wholly-owned subsidiary of NRG merged with and into GenOn, with GenOn continuing as the surviving corporation and a wholly-owned subsidiary of NRG.

Upon closing of the NRG Merger, each issued and outstanding share of GenOn's common stock automatically converted into the right to receive 0.1216 shares of common stock of NRG based on the NRG Merger Exchange Ratio. All outstanding stock options (other than options granted in 2012) immediately vested and all outstanding stock options generally converted upon completion of the NRG Merger into stock options with respect to NRG common stock, after giving effect to the NRG Merger Exchange Ratio. In addition, all outstanding restricted stock units (other than restricted stock units granted in 2012) immediately vested and all outstanding restricted stock units were exchanged for the NRG Merger consideration. All outstanding stock options and unvested restricted stock units granted in 2012 will vest per the terms and conditions of the grant, and if the holder is terminated, upon the holder's termination date if the termination is as a result of the NRG Merger and within two years of the closing date. See Note 3, *NRG Merger,* to the Registrants' consolidated financial statements.

*Mirant/RRI Merger*

On December 3, 2010, Mirant and RRI Energy completed the Mirant/RRI Merger. Upon completion of the Mirant/RRI Merger, RRI Energy Holdings, Inc., a direct and wholly-owned subsidiary of RRI Energy merged with and into Mirant, with Mirant continuing as the surviving corporation and a wholly-owned subsidiary of RRI Energy. Additionally, upon the closing of the Mirant/RRI Merger, RRI Energy was renamed GenOn. See Note 4, *Mirant/RRI Merger* in the consolidated financial statements of the Registrants.

*Basis of Presentation*

Upon completion of the Mirant/RRI Merger, Mirant stockholders had a majority of the voting interest in the combined company. Although RRI Energy issued shares of RRI Energy common stock to Mirant stockholders to effect the Mirant/RRI Merger, the Mirant/RRI Merger was accounted for as a reverse acquisition under the acquisition method of accounting. Under the acquisition method of accounting, Mirant is treated as the accounting acquirer and RRI Energy is treated as the acquired company for financial reporting purposes. As such, the condensed financial statements of GenOn Energy, Inc. (parent) include the results of GenOn Energy, Inc. for the periods from December 3, 2010, and include the results of GenOn Energy Holdings (former parent) through December 2, 2010. The condensed financial statements presented herein for periods ended prior to the closing of the Mirant/RRI Merger (and any other financial information presented herein with respect to such pre–merger dates, unless otherwise specified) are the condensed financial statements and other financial information of Mirant.

Equity in income/loss of affiliates consists of earnings of direct subsidiaries of GenOn Energy, Inc. (parent).

150

.

*Predecessor and Successor Reporting*

Upon completion of the NRG Merger, NRG stockholders had a majority of the voting interest in the combined company. The NRG Merger is accounted for under the acquisition method of accounting. Under the acquisition method of accounting, NRG is treated as the accounting acquirer and GenOn is treated as the acquired company for financial reporting purposes. As such, the assets and liabilities of GenOn Energy, Inc. were recorded at their respective fair values as of the NRG Merger date. Fair value adjustments related to the NRG Merger have been pushed down to GenOn Energy, Inc., resulting in certain assets and liabilities of the Registrants being recorded at fair value at December 15, 2012. See Note 3, *NRG Merger,* to the Registrants' consolidated financial statements for further discussion.

As a result of the impact of pushdown accounting, the financial statements and certain note presentations separate GenOn Energy, Inc.'s presentations into two distinct periods, the period before the consummation of the NRG Merger (labeled predecessor) and the period after that date (labeled successor), to indicate the application of different basis of accounting between the periods presented.

*Cash Dividends Received*

During the periods from December 15, 2012 through December 31, 2012 and January 1, 2012 through December 14, 2012, GenOn Energy, Inc. did not receive any cash dividends from its subsidiaries. For the years ended December 31, 2011 and 2010, GenOn Energy, Inc. received cash dividends from its subsidiaries of $100 million and $112 million, respectively.

2.   **Long-Term Debt**

For a discussion of GenOn Energy, Inc.'s long-term debt, see Note 12, *Debt and Capital Leases,* to the Registrants' consolidated financial statements.

Debt maturities of GenOn Energy, Inc. as of December 31, 2012 are (in millions):

| | | |
|---|---|---|
| 2013 | $ | — |
| 2014 | | 575 |
| 2015 | | — |
| 2016 | | — |
| 2017 | | 725 |
| Thereafter | | 1,225 |
| Total | $ | 2,525 |

3.   **Commitments, Contingencies and Guarantees**

See Notes 17, *Income Taxes* and 20, *Commitments and Contingencies* to the Registrants' consolidated financial statements for a detailed discussion of GenOn Energy, Inc.'s contingencies.

As of December 31, 2012, GenOn Energy, Inc. had $322 million of guarantees, which are included in Note 23, *Guarantees,* to the Registrants' consolidated financial statements.

**SCHEDULE II. VALUATION AND QUALIFYING ACCOUNTS**
**GENON ENERGY, INC. AND SUBSIDIARIES**

**For the Periods from December 15, 2012 through December 31, 2012 and from January 1, 2012 through December 14, 2012 and for the Years Ended December 31, 2011 and 2010**

| | Balance at Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Provision for uncollectible accounts** [a] | | | | | |
| <u>Successor</u> | | | | | |
| December 15, 2012 through December 31, 2012 | $ 4 | $ — | $ — | $ — | $ 4 |
| <u>Predecessor</u> | | | | | |
| January 1, 2012 through December 14, 2012 | 48 | — | — | (43) [b] | 5 |
| 2011 | 21 | 42 | — | (15) [b] | 48 |
| 2010 | 13 | 27 | — | (19) [b] | 21 |
| | | | | | |
| **Income tax valuation allowance, deducted from deferred tax assets** | | | | | |
| <u>Successor</u> | | | | | |
| December 15, 2012 through December 31, 2012 | $ 2,300 | $ — | $ 24 | $ — | $ 2,324 |
| <u>Predecessor</u> | | | | | |
| January 1, 2012 through December 14, 2012 | 1,819 | — | 165 | — | 1,984 |
| 2011 | 1,636 | — | 183 | — | 1,819 |
| 2010 | 1,088 | — | 548 | — | 1,636 |

(a)  Provision for uncollectible accounts represents credit reserves for derivative contract assets.

(b)  Deductions consisted primarily of reversals of credit reserves for derivative contract assets.

Schedule I

**GENON AMERICAS GENERATION, LLC (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED STATEMENTS OF OPERATIONS**

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | (In millions) | | |
| Operating Income | $    — | $    — | $    — | $    — |
| Other Income/(Expense) | | | | |
| Equity in earnings of consolidated subsidiaries | — | (11) | 102 | (276) |
| Other expense, net | — | — | — | (120) |
| Interest expense | (3) | (69) | (86) | 1 |
| Total other income/(expense) | (3) | (80) | 16 | (395) |
| Income/(Loss) before income taxes | (3) | (80) | 16 | (395) |
| Income tax expense | — | — | — | 1 |
| Net income/(loss) | $    (3) | $    (80) | $    16 | $    (396) |

The accompanying notes are an integral part of GenOn Americas Generation, LLC's condensed financial information.

153

Schedule I

**GENON AMERICAS GENERATION, LLC (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED BALANCE SHEETS**

| | Successor | Predecessor |
|---|---|---|
| | As of December 31, 2012 | As of December 31, 2011 |
| | (In millions) | (In millions) |
| **ASSETS** | | |
| **Current Assets** | | |
| Accounts receivable | $ 1 | $ — |
| Total current assets | 1 | — |
| **Property, Plant and Equipment** | | |
| In service | 11 | 6 |
| Under construction | 1 | 3 |
| Total property, plant and equipment | 12 | 9 |
| Less accumulated depreciation | (1) | (1) |
| Net property, plant and equipment | 11 | 8 |
| **Other Assets** | | |
| Investment in subsidiaries | 1,872 | 4,827 |
| Other non-current assets | 5 | 6 |
| Total other assets | 1,877 | 4,833 |
| **Total Assets** | $ 1,889 | $ 4,841 |
| **LIABILITIES AND MEMBER'S EQUITY** | | |
| **Current Liabilities** | | |
| Accounts payable — affiliate | $ 1 | $ — |
| Note payable — affiliate | 12 | 12 |
| Accrued expenses and other current liabilities | 16 | 16 |
| Total current liabilities | 29 | 28 |
| **Other Liabilities** | | |
| Long-term debt | 848 | 848 |
| Total non-current liabilities | 848 | 848 |
| **Total Liabilities** | 877 | 876 |
| **Commitments and Contingencies** | | |
| **Member's Equity** | | |
| Member's interest | 1,012 | 3,965 |
| Total member's equity | 1,012 | 3,965 |
| **Total Liabilities and Member's Equity** | $ 1,889 | $ 4,841 |

The accompanying notes are an integral part of GenOn Americas Generation, LLC's condensed financial information.

154
-

**Schedule I**

**GENON AMERICAS GENERATION, LLC (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED STATEMENTS OF CASH FLOWS**

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 | 2010 |
| | (In millions) | (In millions) | | |
| **Cash Flows from Operating Activities** | | | | |
| Net cash provided by operating activities | $ — | $ 215 | $ 32 | $ 221 |
| **Cash Flows from Investing Activities** | | | | |
| Capitalized interest | — | (3) | (3) | — |
| Capital contributions | — | — | (30) | (1,079) |
| Net cash used by investing activities | — | (3) | (33) | (1,079) |
| **Cash Flows from Financing Activities** | | | | |
| Issuance of notes payable–affiliate | — | — | 12 | |
| Redemption of preferred stock in affiliate | — | — | — | 150 |
| Capital contributions | — | 18 | 474 | 1,079 |
| Distributions to member | — | (230) | (100) | (222) |
| Payments of short and long-term debt | — | — | (535) | — |
| Net cash provided/(used) by financing activities | — | (212) | (149) | 1,007 |
| **Net Increase/(Decrease) in Cash and Cash Equivalents** | — | — | (150) | 149 |
| **Cash and Cash Equivalents at Beginning of Period** | — | — | 150 | 1 |
| **Cash and Cash Equivalents at End of Period** | $ — | $ — | $ — | $ 150 |
| | | | | |
| **Supplemental Disclosures** | | | | |
| Cash paid for interest, net of amounts capitalized | $ — | $ 72 | $ 94 | $ 119 |
| | | | | |
| **Supplemental Disclosures for Non–Cash Investing and Financing Activities** | | | | |
| Conversion to equity of notes payable to subsidiaries | $ — | $ — | $ 2 | $ 93 |

The accompanying notes are an integral part of GenOn Americas Generation, LLC's condensed financial information.

155

**GENON AMERICAS GENERATION, LLC (PARENT)**
**NOTES TO REGISTRANTS' CONDENSED FINANCIAL STATEMENTS**

## 1. Background and Basis of Presentation

### Background

The condensed parent company financial statements have been prepared in accordance with Rule 12‐04, Schedule I of Regulation S‐X, as the restricted net assets of GenOn Americas Generation, LLC's subsidiaries exceed 25 percent of the consolidated net assets of GenOn Americas Generation, LLC. These statements should be read in conjunction with the consolidated statements and notes thereto of the Registrants.

GenOn Americas Generation, LLC is a Delaware limited liability company and indirect wholly‐owned subsidiary of GenOn Energy, Inc.

RRI Energy (a Delaware corporation) changed its name from Reliant Energy, Inc. effective May 2009 in connection with the sale of its retail business. GenOn changed its name from RRI Energy effective December 3, 2010 in connection with the merger with Mirant. "GenOn" refers to GenOn Energy, Inc. and, except where the context indicates otherwise, its subsidiaries, after giving effect to the Mirant/RRI Merger.

### NRG Merger

On July 20, 2012, GenOn entered into the NRG Merger Agreement with NRG and a direct wholly-owned subsidiary of NRG. Upon the terms and subject to the conditions set forth in the NRG Merger Agreement, which was approved by the boards of directors of GenOn and NRG, a wholly-owned subsidiary of NRG merged with and into GenOn, with GenOn continuing as the surviving corporation and a wholly-owned subsidiary of NRG.

Upon closing of the NRG Merger, each issued and outstanding share of GenOn's common stock automatically converted into the right to receive 0.1216 shares of common stock of NRG based on the NRG Merger Exchange Ratio. All outstanding stock options (other than options granted in 2012) immediately vested and all outstanding stock options generally converted upon completion of the NRG Merger into stock options with respect to NRG common stock, after giving effect to the NRG Merger Exchange Ratio. In addition, all outstanding restricted stock units (other than restricted stock units granted in 2012) immediately vested and all outstanding restricted stock units were exchanged for the NRG Merger consideration. All outstanding stock options and unvested restricted stock units granted in 2012 will vest per the terms and conditions of the grant, and if the holder is terminated, upon the holder's termination date if the termination is as a result of the NRG Merger and within two years of the closing date. See Note 3, *NRG Merger,* to the Registrants' consolidated financial statements.

### Mirant/RRI Merger

On December 3, 2010, Mirant and RRI Energy completed the Mirant/RRI Merger. Upon completion of the Mirant/RRI Merger, RRI Energy Holdings, Inc., a direct and wholly-owned subsidiary of RRI Energy merged with and into Mirant, with Mirant continuing as the surviving corporation and a wholly-owned subsidiary of RRI Energy. Additionally, upon the closing of the Mirant/RRI Merger, RRI Energy was renamed GenOn. See Note 4, *Mirant/RRI Merger,* in the consolidated financial statements of the Registrants.

### Basis of Presentation

The condensed financial statements presented herein are the condensed financial statements and other financial information of GenOn Americas Generation, LLC.

Equity in income/loss of affiliates consists of earnings of direct subsidiaries of GenOn Americas Generation, LLC (parent).

*Predecessor and Successor Reporting*

Upon completion of the NRG Merger, NRG stockholders had a majority of the voting interest in the combined company. The NRG Merger is accounted for under the acquisition method of accounting. Under the acquisition method of accounting, NRG is treated as the accounting acquirer and GenOn is treated as the acquired company for financial reporting purposes. As such, the assets and liabilities of GenOn Americas Generation, LLC were recorded at their respective fair values as of the NRG Merger date. Fair value adjustments related to the NRG Merger have been pushed down to GenOn Americas Generation, LLC resulting in certain assets and liabilities of the Registrants being recorded at fair value at December 15, 2012. See Note 3, *NRG Merger,* to the Registrants' consolidated financial statements for further discussion.

As a result of the impact of pushdown accounting, the financial statements and certain note presentations separate GenOn Americas Generation's presentations into two distinct periods, the period before the consummation of the NRG Merger (labeled predecessor) and the period after that date (labeled successor), to indicate the application of different basis of accounting between the periods presented.

*Cash Dividends Received*

During the period from December 15, 2012 through December 31, 2012, GenOn Americas Generation, LLC did not receive any cash dividends from its subsidiaries. During the period from January 1, 2012 through December 14, 2012 and for the years ended December 31, 2011 and 2010, GenOn Americas Generation, LLC received cash dividends from its subsidiaries of $286 million, $137 million and $341 million, respectively.

## 2.    Long-Term Debt

For a discussion of GenOn Americas Generation, LLC's long-term debt, see Note 12, *Debt and Capital Leases,* to the Registrants' consolidated financial statements.

Debt maturities of GenOn Americas Generation, LLC as of December 31, 2012 are (in millions):

| | | |
|---|---|---:|
| 2013 | $ | — |
| 2014 | | — |
| 2015 | | — |
| 2016 | | — |
| 2017 | | — |
| Thereafter | | 850 |
| Total | $ | 850 |

## 3.    Commitments, Contingencies and Guarantees

See Note 20, *Commitments and Contingencies,* to the Registrants' consolidated financial statements for a detailed discussion of GenOn Americas Generation, LLC's contingencies.

At December 31, 2012, GenOn Americas Generation, LLC did not have any guarantees.

**SCHEDULE II. VALUATION AND QUALIFYING ACCOUNTS**
**GENON AMERICAS GENERATION, LLC AND SUBSIDIARIES**

**For the Periods from December 15, 2012 through December 31, 2012 and from January 1, 2012 through December 14, 2012 and for the Years Ended December 31, 2011 and 2010**

| | Balance at Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Provision for uncollectible accounts** [a] | | | | | |
| **Successor** | | | | | |
| December 15, 2012 through December 31, 2012 | $ 4 | $ — | $ — | $ — | $ 4 |
| **Predecessor** | | | | | |
| January 1, 2012 through December 14, 2012 | 47 | — | — | (42) [b] | 5 |
| 2011 | 19 | 41 | — | (13) [b] | 47 |
| 2010 | 13 | 24 | — | (18) [b] | 19 |

(a)   Provision for uncollectible accounts represents credit reserves for derivative contract assets.

(b)   Deductions consisted primarily of reversals of credit reserves for derivative contract assets.

**SCHEDULE II. VALUATION AND QUALIFYING ACCOUNTS**
**GENON MID-ATLANTIC, LLC AND SUBSIDIARIES**
**For the Periods from December 15, 2012 through December 31, 2012 and from January 1, 2012 through December 14, 2012 and for the Years Ended December 31, 2011 and 2010**

| | Balance at Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Provision for uncollectible accounts** [a] | | | | | |
| **Successor** | | | | | |
| December 15, 2012 through December 31, 2012 | $    4 | $    — | $    — | $    — | $    4 |
| **Predecessor** | | | | | |
| January 1, 2012 through December 14, 2012 | 47 | — | — | (42) [b] | 5 |
| 2011 | 19 | 43 | — | (15) [b] | 47 |
| 2010 | 13 | 24 | — | (18) [b] | 19 |

(a)   Provision for uncollectible accounts represents credit reserves for derivative contract assets.

(b)   Deductions consisted primarily of reversals of credit reserves for derivative contract assets.

159

**GenOn Energy, Inc. Exhibit Index**

| Exhibit No. | Exhibit Name |
|---|---|
| 2.1 | Stock and Note Purchase Agreement by and among Mirant Asia-Pacific Ventures, Inc., Mirant Asia-Pacific Holdings, Inc., Mirant Sweden International AB (publ), and Tokyo Crimson Energy Holdings Corporation, dated at December 11, 2006 (Incorporated herein by reference to Exhibit 2.1 to the Mirant Corporation Current Report on Form 8-K filed December 13, 2006) |
| 2.3** | Agreement and Plan of Merger, dated as of July 20, 2012, by and among NRG Energy, Inc., Plus Energy Corporation and GenOn Energy, Inc. (Incorporated herein by reference to Exhibit 2.1 to the Registrant's Form 8-K filed July 23, 2012) |
| 3.1 | Fourth Amended and Restated Certificate of Incorporation of GenOn Energy, Inc., effective as of December 14, 2012 (Incorporated herein by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8 K filed December 14, 2012) |
| 3.2 | Eighth Amended and Restated By-Laws of GenOn Energy, Inc., effective at December 14, 2012 (Incorporated herein by reference to Exhibit 3.2 to the Registrant's Current Report on Form 8 K filed December 14, 2012) |
| 4.1 | Form of Stock Certificate (Incorporated herein by reference to Exhibit 4.1 to the Registrant's Quarterly Report on Form 10-Q filed May 10, 2012) |
| 4.2 | Form of Rights Agreement between Reliant Resources, Inc. and The Chase Manhattan Bank, as Rights Agent, including a form of Rights Certificate, dated at January 15, 2001 (Incorporated herein by reference to Exhibit 4.2 to the Registrant's Registration Statement on Form S-1/A Amendment No. 8, Registration No. 333–48038) |
| 4.3 | Amendment No. 1 to Rights Agreement, by and between RRI Energy, JPMorgan Chase Bank, N.A., and Computershare Trust Company, N.A., dated at November 23, 2010 (Incorporated herein by reference to Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed November 24, 2010) |
| 4.4 | Senior Indenture among Reliant Energy, Inc. and Wilmington Trust Company, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 4.1 to the Registrant's Current Report on Form 8–K filed December 27, 2004) |
| 4.5 | First Supplemental Indenture relating to the 6.75% Senior Secured notes due 2014, among Reliant Energy, Inc., the Guarantors listed therein and Wilmington Trust Company, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed December 27, 2004) |
| 4.6 | Second Supplemental Indenture relating to the 6.75% Senior Secured notes due 2014, among Reliant Energy, Inc., the Guarantors listed therein and Wilmington Trust Company, dated at September 21, 2006 (Incorporated herein by reference to Exhibit 4.18 to the Registrant's Annual Report on Form 10-K filed February 28, 2007) |
| 4.7 | Third Supplemental Indenture relating to the 6.75% Senior Secured notes due 2014, among Reliant Energy, Inc., the Guarantors listed therein and Wilmington Trust Company, dated at December 1, 2006 (Incorporated herein by reference to Exhibit 4.3 to the Registrant's Current Report on Form 8-K filed December 7, 2006) |
| 4.8 | Sixth Supplemental Indenture relating to the 6.75% Senior Secured notes due 2014, among RRI Energy, Inc., The Guarantors listed therein and Wilmington Trust Company, dated at June 1, 2009 (Incorporated herein by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q filed November 5, 2009) |
| 4.9 | Seventh Supplemental Indenture relating to the 6.75% Senior Secured notes due 2014, among RRI Energy, Inc., the Guarantors listed therein and Wilmington Trust Company, dated at August 20, 2009 (Incorporated herein by reference to Exhibit 99.1 to the Registrant's Current Report on Form 8-K filed August 24, 2009) |
| 4.10 | Eighth Supplemental Indenture relating to the 6.75% Senior Secured notes due 2014, among RRI Energy, Inc., the Guarantors listed therein and Wilmington Trust Company, dated at December 1, 2009 (Incorporated herein by reference to Exhibit 4.9 to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |

| | |
|---|---|
| 4.11 | Indenture between Orion Power Holdings, Inc. and Wilmington Trust Company, dated at April 27, 2000 (Incorporated herein by reference to Exhibit 4.1 to the Orion Power Holdings, Inc. Registration Statement on Form S-1, Registration No. 333‑44118) |
| 4.12 | Fourth Supplemental Indenture relating to the 7.625% Senior notes due 2014, among Reliant Energy, Inc., the Guarantors listed therein and Wilmington Trust Company, dated at June 13, 2007 (Incorporated herein by reference to Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed June 15, 2007) |
| 4.13 | Fifth Supplemental Indenture relating to the 7.875% Senior notes due 2017, among Reliant Energy, Inc., the Guarantors listed therein and Wilmington Trust Company, dated at June 13, 2007 (Incorporated herein by reference to Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed June 15, 2007) |
| 4.14 | Indenture between Mirant Americas Generation, Inc. and Bankers Trust Company, as trustee, relating to Senior Notes, dated at May 1, 2001 (Incorporated herein by reference to Exhibit 4.1 to the Mirant Americas Generation, Inc. Registration Statement on Form S-4, Registration No. 333-63240) |
| 4.15 | Second Supplemental Indenture relating to Senior Notes 8.300% due 2011, dated at May 1, 2001 (Incorporated herein by reference to Exhibit 4.3 to the Mirant Americas Generation, Inc. Registration Statement on Form S-4, Registration No. 333‑63240) |
| 4.16 | Third Supplemental Indenture from Mirant Americas Generation, Inc. to Bankers Trust Company, relating to 9.125 % Senior Notes due 2031, dated at May 1, 2001 (Incorporated herein by reference to Exhibit 4.4 to the Mirant Americas Generation, Inc. Registration Statement on Form S-4, Registration No. 333-63240) |
| 4.17 | Fifth Supplemental Indenture from Mirant Americas Generation, Inc. to Bankers Trust Company, dated at October 9, 2001 (Incorporated herein by reference to Exhibit 4.6 to the Mirant Americas Generation, Inc. Registration Statement on Form S-4/A Amendment No. 1, Registration No. 333-85124) |
| 4.18 | Form of Sixth Supplemental Indenture from Mirant Americas Generation LLC to Bankers Trust Company, dated at November 1, 2001 (Incorporated herein by reference to Exhibit 4.6 to the Mirant Corporation Annual Report on Form 10‑K filed February 27, 2009) |
| 4.19 | Form of Seventh Supplemental Indenture from Mirant Americas Generation LLC to Wells Fargo Bank National Association, dated at January 3, 2006 (Incorporated herein by reference to Exhibit 4.1 to the Mirant Americas Generation, LLC Quarterly Report on Form 10-Q filed May 14, 2007) |
| 4.20 | Form of Senior Note Indenture between Mirant North America, LLC, Mirant North America Escrow, LLC, MNA Finance Corp. and Law Debenture Trust Company of New York, as trustee (Incorporated herein by reference to Exhibit 4.2 to the Mirant Corporation Annual Report on Form 10-K filed March 14, 2006) |
| 4.21 | Form of 8.625% Series A Pass Through Certificate (Incorporated herein by reference to Exhibit 4.1 to the Mirant Mid‑Atlantic, LLC Registration Statement on Form S-4, Registration No. 333‑61668) |
| 4.22 | Form of 9.125% Series B Pass Through Certificate (Incorporated herein by reference to Exhibit 4.2 to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333‑61668) |
| 4.23 | Form of 10.060% Series C Pass Through Certificate (Incorporated herein by reference to Exhibit 4.3 to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333‑61668) |
| 4.24(a) | Pass Through Trust Agreement A between Southern Energy Mid-Atlantic, LLC and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.4(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.24(b) | Schedule identifying substantially identical agreement to Pass Through Trust Agreement A (Incorporated herein by reference to Exhibit 4.4(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |

| | |
|---|---|
| 4.25(a) | Participation Agreement (L1) among Southern Energy Mid-Atlantic, LLC, as Lessee, Dickerson OL1 LLC, as Owner Lessor, Wilmington Trust Company, as Owner Manager, SEMA OP3 LLC, as Owner Participant and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee and as Pass Through Trustee, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.5(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.25(b) | Schedule identifying substantially identical agreements to Participation Agreement (Incorporated herein by reference to Exhibit 4.5(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.26(a) | Participation Agreement (L1) among Southern Energy Mid-Atlantic, LLC, as Lessee, Morgantown OL1 LLC, as Owner Lessor, Wilmington Trust Company, as Owner Manager, SEMA OP1 LLC, as Owner Participant and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee and as Pass Through Trustee, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.6 (a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.26(b) | Schedule identifying substantially identical agreement to Participation Agreement (Incorporated herein by reference to Exhibit 4.6(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.27(a) | Facility Lease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, as Facility Lessee, and Dickerson OL1 LLC, as Owner Lessor, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.7(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.27(b) | Schedule identifying substantially identical agreement to Facility Lease Agreement (Incorporated herein by reference to Exhibit 4.7(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.28(a) | Facility Lease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, as Facility Lessee, and Morgantown OL1 LLC, as Owner Lessor, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.8(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.28(b) | Schedule identifying substantially identical agreement to Facility Lease Agreement (Incorporated herein by reference to Exhibit 4.8(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.29(a) | Indenture of Trust, Mortgage and Security Agreement (L1) between Dickerson OL1 LLC, as Lessor, and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.9(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.29(b) | Schedule identifying substantially identical agreement to Indenture of Trust, Mortgage and Security Agreement (Incorporated herein by reference to Exhibit 4.9(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.30(a) | Indenture of Trust, Mortgage and Security Agreement (L1) between Morgantown OL1 LLC, as Lessor, and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.10(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.30(b) | Schedule identifying substantially identical agreement to Indenture of Trust, Mortgage and Security Agreement (Incorporated herein by reference to Exhibit 4.10(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.31(a) | Series A Lessor Note Due June 20, 2012 for Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.11(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |

| | |
|---|---|
| 4.31(b) | Schedule identifying substantially identical notes to Lessor Notes (Incorporated herein by reference to Exhibit 4.11(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.32(a) | Series A Lessor Note Due June 30, 2008, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.12(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.32(b) | Schedule identifying substantially identical notes to Series A Lessor Notes (Incorporated herein by reference to Exhibit 4.12(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.33(a) | Series B Lessor Note Due June 30, 2015, for Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.13(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.33(b) | Schedule identifying substantially identical notes to Lessor Note (Incorporated herein by reference to Exhibit 4.13(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.34(a) | Series B Lessor Note Due June 30, 2017, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.14(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.34(b) | Schedule identifying substantially identical notes to Lessor Notes (Incorporated herein by reference to Exhibit 4.14(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.35(a) | Series C Lessor Note Due June 30, 2020, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.15(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.35(b) | Schedule identifying substantially identical notes to Lessor Notes (Incorporated herein by reference to Exhibit 4.15(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.36(a) | Supplemental Pass Through Trust Agreement A between Mirant Mid-Atlantic, LLC, and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at June 29, 2001 (Incorporated herein by reference to Exhibit 4.17(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4/A Registration No. 333-61668) |
| 4.36(b) | Schedule identifying substantially identical agreements to Supplemental Pass Through Trust Agreement constituting Exhibit 4.36(a) for Supplemental Pass Through Trust Agreement B between Mirant Mid-Atlantic, LLC and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at June 29, 2001, and Supplemental Pass Through Trust Agreement C between Mirant Mid-Atlantic, LLC and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at June 29, 2001 (Incorporated herein by reference to Exhibit 4.17(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4/A, Registration No. 333-61668) |
| 4.37 | Senior Notes Indenture, relating to the 9.5% Senior Notes Due 2018 and the 9.875% Senior Notes Due 2020, by GenOn Escrow Corp. and Wilmington Trust Company as trustee, dated at October 4, 2010 (Incorporated by reference to Exhibit 4.4 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 5, 2010) |
| 4.38 | Supplemental Indenture, relating to the 9.5% Senior Notes due 2018 and the 9.875% Senior Notes Due 2020, by GenOn Energy, Inc. and Wilmington Trust Company as trustee, dated at December 3, 2010 (Incorporated by reference to Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed December 7, 2010) |
| 4.39 | Amendment No. 2, dated as of December 14, 2012, to the Rights Agreement dated as of January 15, 2001 between RRI Energy and Computershare Trust Company, N.A., as successor rights agent (Incorporated herein by reference to Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed December 14, 2012) |

| | |
|---|---|
| 10.1.1(a) | Master Separation Agreement between Reliant Resources, Inc. and Reliant Energy, Incorporated, dated at December 31, 2000 (Incorporated herein by reference to Exhibit 10.1 to the CenterPoint Energy Houston Electric, LLC Quarterly Report on Form 10-Q filed May 14, 2001) |
| 10.1.1(b) | Schedule to Master Separation Agreement between Reliant Resources, Inc. and Reliant Energy, Incorporated, dated at December 31, 2000 (Incorporated herein by reference to Exhibit 10.1B to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.2(a) | Tax Allocation Agreement between Reliant Resources, Inc. and Reliant Energy, Incorporated, dated at December 31, 2000 (Incorporated herein by reference to Exhibit 10.8 to the CenterPoint Energy Houston Electric, LLC Quarterly Report on Form 10-Q filed May 14, 2001) |
| 10.1.2(b) | Exhibit to Tax Allocation Agreement between Reliant Resources, Inc. and Reliant Energy, Incorporated, dated at December 31, 2000 (Incorporated herein by reference to Exhibit 10.2B to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.3 | Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2001A, Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed December 27, 2004) |
| 10.1.4(a) | Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed December 27, 2004) |
| 10.1.4(b) | Exhibit C Form of Supplement to Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.5B to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.5(a) | Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002B, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed December 27, 2004) |
| 10.1.5(b) | Exhibit C Form of Supplement to Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002B, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.6B to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.6(a) | Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2003A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed December 27, 2004) |

| | |
|---|---|
| 10.1.6(b) | Exhibit C Form of Supplement to Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2003A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.7B to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.7(a) | Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.6 to the Registrant's Current Report on Form 8-K filed December 27, 2004) |
| 10.1.7(b) | Exhibit C Form of Supplement to Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.8B to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.8 | Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2001A, among Reliant Energy Power Supply, LLC, Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and J.P. Morgan Trust Company, National Association, as trustee, dated at September 21, 2006 (Incorporated herein by reference to Exhibit 10.14 to the Registrant's Annual Report on Form 10-K filed February 28, 2007) |
| 10.1.9 | Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002A, among Reliant Energy Power Supply, LLC, Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and J.P. Morgan Trust Company, National Association, as trustee, dated at September 21, 2006 (Incorporated herein by reference to Exhibit 10.15 to the Registrant's Annual Report on Form 10-K filed February 28, 2007) |
| 10.1.10 | Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002B, among Reliant Energy Power Supply, LLC, Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and J.P. Morgan Trust Company, National Association, as trustee, dated at September 21, 2006 (Incorporated herein by reference to Exhibit 10.16 to the Registrant's Annual Report on Form 10-K filed February 28, 2007) |
| 10.1.11 | Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2003A, among Reliant Energy Power Supply, LLC, Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and J.P. Morgan Trust Company, National Association, as trustee, dated at September 21, 2006 (Incorporated herein by reference to Exhibit 10.17 to the Registrant's Annual Report on Form 10-K filed February 28, 2007) |
| 10.1.12 | Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among Reliant Energy Power Supply, LLC, Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and J.P. Morgan Trust Company, as trustee, dated at September 21, 2006 (Incorporated herein by reference to Exhibit 10.18 to the Registrant's Annual Report on Form 10-K filed February 28, 2007) |

| | |
|---|---|
| 10.1.13 | Second Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2001A, among Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at December 1, 2006 (Incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed December 7, 2006) |
| 10.1.14 | Second Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002A, among Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at December 1, 2006 (Incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed December 7, 2006) |
| 10.1.15 | Second Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002B, among Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at December 1, 2006 (Incorporated herein by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed December 7, 2006) |
| 10.1.16 | Second Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2003A, among Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at December 1, 2006 (Incorporated herein by reference to Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed December 7, 2006) |
| 10.1.17 | Third Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at December 1, 2006 (Incorporated herein by reference to Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed December 7, 2006) |
| 10.1.18 | Third Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2001A, among RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at June 1, 2009 (Incorporated herein by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q filed November 5, 2009) |
| 10.1.19 | Third Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002A, among RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at June 1, 2009 (Incorporated herein by reference to Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q filed November 5, 2009) |
| 10.1.20 | Third Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002B, among RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at June 1, 2009 (Incorporated herein by reference to Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q filed November 5, 2009) |
| 10.1.21 | Third Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2003A, among RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at June 1, 2009 (Incorporated herein by reference to Exhibit 10.5 to the Registrant's Quarterly Report on Form 10-Q filed November 5, 2009) |

| 10.1.22 | Fourth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at June 1, 2009 (Incorporated herein by reference to Exhibit 10.6 to the Registrant's Quarterly Report on Form 10-Q filed November 5, 2009) |
|---|---|
| 10.1.23 | Fourth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenues Bonds (Reliant Energy Seward, LLC Project), Series 2002A, among RRI Energy, Inc. the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at August 20, 2009 (Incorporated herein by reference to Exhibit 99.3 to the Registrant's Current Report on Form 8-K filed August 24, 2009) |
| 10.1.24 | Fourth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenues Bonds (Reliant Energy Seward, LLC Project), Series 2002B, among RRI Energy, Inc. the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at August 20, 2009 (Incorporated herein by reference to Exhibit 99.4 to the Registrant's Current Report on Form 8-K filed August 24, 2009) |
| 10.1.25 | Fourth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenues Bonds (Reliant Energy Seward, LLC Project), Series 2003A, among RRI Energy, Inc. the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at August 20, 2009 (Incorporated herein by reference to Exhibit 99.5 to the Registrant's Current Report on Form 8-K filed August 24, 2009) |
| 10.1.26 | Fifth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenues Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among RRI Energy, Inc. the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at August 20, 2009 (Incorporated herein by reference to Exhibit 99.6 to the Registrant's Current Report on Form 8-K filed August 24, 2009) |
| 10.1.27 | Fifth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenues Bonds (Reliant Energy Seward, LLC Project), Series 2001A, among RRI Energy, Inc. the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at December 1, 2009 (Incorporated herein by reference to Exhibit 10.29 to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.28 | Fifth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenues Bonds (Reliant Energy Seward, LLC Project), Series 2002A, among RRI Energy, Inc. the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at December 1, 2009 (Incorporated herein by reference to Exhibit 10.30 to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.29 | Fifth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenues Bonds (Reliant Energy Seward, LLC Project), Series 2002B, among RRI Energy, Inc. the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at December 1, 2009 (Incorporated herein by reference to Exhibit 10.31 to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.30 | Fifth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenues Bonds (Reliant Energy Seward, LLC Project), Series 2003A, among RRI Energy, Inc. the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at December 1, 2009 (Incorporated herein by reference to Exhibit 10.32 to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |

| 10.1.31 | Sixth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenues Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among RRI Energy, Inc. the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at December 1, 2009 (Incorporated herein by reference to Exhibit 10.33 to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
|---|---|
| 10.1.32(a) | Credit and Guaranty Agreement among Reliant Energy, Inc., as Borrower, the Other Loan Parties referred to therein as guarantors, the lenders party thereto, Deutsche Bank AG New York Branch, as Administrative Agent and Collateral Agent, Deutsche Bank Securities Inc. and J.P. Morgan Securities Inc., as Joint Lead Arrangers, Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch Capital Corporation, and ABN AMRO Bank N.V., as Joint Bookrunners with respect to the Revolving Credit Facility and Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch Capital Corporation and Bear Stearns & Co. Inc., as Joint Bookrunners with respect to the Pre-Funded L/C Facility, dated at June 12, 2007 (Incorporated herein by reference to Exhibit 1.1 to the Registrant's Current Report on Form 8-K filed June 15, 2007) |
| 10.1.32(b)† | Exhibits and Schedules to Credit and Guaranty Agreement among Reliant Energy, Inc., as Borrower, the Other Loan Parties referred to therein as guarantors, the lenders party thereto, Deutsche Bank AG New York Branch, as Administrative Agent and Collateral Agent, Deutsche Bank Securities Inc. and J.P. Morgan Securities Inc., as Joint Lead Arrangers, Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch Capital Corporation and ABN AMRO Bank N.V., as Joint Bookrunners with respect to the Revolving Credit Facility and Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch Capital Corporation, and Bear Stearns & Co. Inc., as Joint Bookrunners with respect to the Pre-Funded L/C Facility, dated at June 12, 2007 (Incorporated herein by reference to Exhibit 10.34B to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.33(a) | Pass Through Trust Agreement between Reliant Energy Mid-Atlantic Power Holdings, LLC and Bankers Trust Company, made with respect to the formation of the Series A Pass Through Trust and the issuance of 8.554% Series A Pass Through Certificates, dated as of August 24, 2000 (Incorporated herein by reference to Exhibit 4.4a to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464) |
| 10.1.33(b) | Schedule identifying substantially identical agreements to Pass Through Trust Agreement constituting Exhibit 10.1.33(a) (Incorporated herein by reference to Exhibit 4.4b to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464) |
| 10.1.34 | Participation Agreement among  Conemaugh Lessor Genco LLC, as Owner Lessor, Reliant Energy Mid–Atlantic Power Holdings, LLC, as Facility Lessee, Wilmington Trust Company, as Lessor Manager, PSEGR Conemaugh Generation, LLC, as Owner Participant, Bankers Trust Company, as Lease Indenture Trustee, and Bankers Trust Company, as Pass Through Trustee, dated at August 24, 2000 (Incorporated herein by reference to Exhibit 4.5a to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464) |
| 10.1.35 | Schedule identifying substantially identical agreements to Participation Agreement constituting Exhibit 10.1.34 (Incorporated herein by reference to Exhibit 4.5b to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464) |
| 10.1.36(a) | First Amendment to Participation Agreement constituting Exhibit 10.1.34, dated at November 15, 2001 (Incorporated herein by reference to Exhibit 10.20 to the Registrant's Annual Report on Form 10-K filed March 15, 2006) |
| 10.1.36(b) | Exhibit M to First Amendment to Participation Agreement constituting Exhibit 10.1.36(a), dated at November 15, 2001 (Incorporated herein by reference to Exhibit 10.41B to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.37 | Schedule identifying substantially identical agreements to First Amendment to Participation Agreement constituting Exhibit 10.1.36(a) (Incorporated herein by reference to Exhibit 10.21 to the Registrant's Annual Report on Form 10-K filed March 15, 2006) |

| | |
|---|---|
| 10.1.38 | Second Amendment to Participation Agreement, dated at June 18, 2003 (Incorporated herein by reference to Exhibit 10.22 to the Registrant's Annual Report on Form 10-K filed March 15, 2006) |
| 10.1.39 | Schedule identifying substantially identical agreements to Second Amendment to Participation Agreement constituting Exhibit 10.1.38 (Incorporated herein by reference to Exhibit 10.23 to the Registrant's Annual Report on Form 10-K filed March 15, 2006) |
| 10.1.40 | Guarantee by NRG Energy, Inc., as Guarantor, in favor of Reliant Energy, Inc., dated at February 28, 2009 (Incorporated herein by reference to Exhibit 10.84 to the Registrant's Annual Report on Form 10-K filed March 2, 2009) |
| 10.1.41 | Credit Agreement among Mirant North America, LLC, JPMorgan Chase Bank, N.A as administrative agent and Deutsche Bank Securities Inc. and Goldman Sachs Credit Partners L.P., as co-syndication agents, dated at January 3, 2006 (Incorporated herein by reference to Exhibit 10.2 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 6, 2009) |
| 10.1.42(a) | Guaranty Agreement (Dickerson L1) between Southern Energy, Inc. and Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.21(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.1.42(b) | Schedule identifying substantially identical agreements to Guaranty Agreement constituting Exhibit 10.1.42(a) (Incorporated herein by reference to Exhibit 10.21(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.1.43(a) | Guaranty Agreement (Morgantown L1) between Southern Energy, Inc. and Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.22(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.1.43(b) | Schedule identifying substantially identical agreements to Guaranty Agreement constituting Exhibit 10.1.43(a)  (Incorporated herein by reference to Exhibit 10.22(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.1.44 | Credit Agreement by and among RRI Energy, Inc., JPMorgan Chase Bank, N.A., as administrative agent, Credit Suisse Securities (USA) LLC, Deutsche Bank Securities, Inc., Goldman Sachs Bank USA, Morgan Stanley Senior Funding, Inc., Royal Bank of Canada, The Royal Bank of Scotland plc, the other lenders from time to time party thereto and, from and after the closing date of the merger, Mirant Americas, Inc. (to be renamed GenOn Americas, Inc. on the closing date of the merger), dated at September 20, 2010 (Incorporated herein by reference to Exhibit 10.1 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 5, 2010) |
| 10.1.45 | Purchase Agreement by and among RRI Energy, Inc., Mirant Corporation, GenOn Escrow Corp. and J.P. Morgan Securities LLC, as representative of the several initial purchasers, dated at September 20, 2010 (Incorporated herein by reference to Exhibit 10.2 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 5, 2010) |
| 10.1.46 | Credit Agreement among Mirant Marsh Landing, LLC, the Royal Bank of Scotland PLC, as administrative agent and Deutsche Bank Trust Company Americas, as Collateral Agent and Depository Bank, dated as of October 8, 2010 |
| 10.1.47 | Security Agreement between Mirant Marsh Landing, LLC and Deutsche Bank Trust Company Americas, as Collateral Agent, dated at October 8, 2010 |
| 10.1.48 | Pledge Agreement among Marsh Landing Holdings, LLC, Mirant Marsh Landing, LLC and Deutsche Bank Trust Company Americas, as Collateral Agent, dated at October 8, 2010 |
| 10.1.49 | Collateral Agency and Intercreditor Agreement among Mirant Marsh Landing, LLC, The Royal Bank of Scotland PLC, as administrative agent, and Deutsche Bank Trust Company Americas, as Collateral Agent and Depository Bank, dated at October 8, 2010 |
| 10.1.50 | Equity Contribution Agreement among Mirant Corporation, Mirant Marsh Landing, LLC, The Royal Bank of Scotland PLC, as administrative agent, and Deutsche Bank Trust Company Americas, as Collateral Agent, dated as of October 8, 2010 |

| | |
|---|---|
| 10.1.51 | Revolving Credit Agreement among GenOn Energy, Inc., as Borrower, GenOn Americas, Inc., as Borrower, the several lenders from time to time parties hereto, and NRG Energy, Inc., as Administrative Agent, dated as of December 14, 2012 |
| 10.3.1 | Facility Lease Agreement between Conemaugh Lessor Genco LLC and Reliant Energy Mid-Atlantic Power Holdings, LLC, dated at August 24, 2000 (Incorporated herein by reference to Exhibit 4.6a to the RRI Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464) |
| 10.3.2 | Schedule identifying substantially identical agreements to Facility Lease Agreement constituting Exhibit 10.3.1 (Incorporated herein by reference to Exhibit 4.6b to the RRI Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464) |
| 10.3.3 | Lease Indenture of Trust, Mortgage and Security Agreement between Conemaugh Lessor Genco LLC, as Owner Lessor, and Bankers Trust Company, as Lease Indenture Trustee, dated at August 24, 2000 (Incorporated herein by reference to Exhibit 4.8a to the RRI Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464) |
| 10.3.4 | Schedule identifying substantially identical agreements to Lease Indenture of Trust constituting Exhibit 10.3.3 (Incorporated herein by reference to Exhibit 4.8b to the RRI Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464) |
| 10.3.5(a) | Facility Site Lease Agreement and Easement Agreement (L1) between Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC and Southern Energy MD Ash Management, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.5(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.5(b) | Schedule identifying substantially identical agreements to Facility Site Lease Agreement constituting Exhibit 10.3.12(a) (Incorporated herein by reference to Exhibit 10.5(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.6(a) | Facility Site Lease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC and Southern Energy MD Ash Management, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.6(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.6(b) | Schedule identifying substantially identical agreements to Facility Site Lease Agreement constituting Exhibit 10.3.13(a) (Incorporated herein by reference to Exhibit 10.6(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.7(a) | Facility Site Sublease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.7(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.7(b) | Schedule identifying substantially identical agreements to Facility Site Sublease Agreement constituting Exhibit 10.3.14(a) (Incorporated herein by reference to Exhibit 10.7b to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.8(a) | Facility Site Sublease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.8a to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.8(b) | Schedule identifying substantially identical agreements to Facility Site Sublease Agreement constituting Exhibit 10.3.15(a) (Incorporated herein by reference to Exhibit 10.8(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.9(a) | Shared Facilities Agreement between Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC, and Dickerson OL4 LLC, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 10.15a to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |

| | |
|---|---|
| 10.3.9(b) | Shared Facilities Agreement between Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC, and Morgantown OL7 LLC, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 10.15(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.10(a) | Assignment and Assumption Agreement between Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC, and Dickerson OL4 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.16(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.10(b) | Assignment and Assumption Agreement between Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC, and Morgantown OL7 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.16(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.11(a) | Ownership and Operation Agreement between Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC, Dickerson OL4 LLC, and Southern Energy Mid-Atlantic, LLC, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 10.17(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.11(b) | Ownership and Operation Agreement between Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC, Morgantown OL7 LLC, and Southern Energy Mid-Atlantic, LLC, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 10.17 (b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.12(a) | Facility Site Lease Agreement and Easement Agreement (L1) between Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC and Southern Energy MD Ash Management, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.5(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.12(b) | Schedule identifying substantially identical agreements to Facility Site Lease Agreement constituting Exhibit 10.3.12(a) (Incorporated herein by reference to Exhibit 10.5(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.13(a) | Facility Site Lease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC and Southern Energy MD Ash Management, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.6(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.13(b) | Schedule identifying substantially identical agreements to Facility Site Lease Agreement constituting Exhibit 10.3.13(a) (Incorporated herein by reference to Exhibit 10.6(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.14(a) | Facility Site Sublease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.7(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.14(b) | Schedule identifying substantially identical agreements to Facility Site Sublease Agreement constituting Exhibit 10.3.14(a) (Incorporated herein by reference to Exhibit 10.7b to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.15(a) | Facility Site Sublease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.8a to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.15(b) | Schedule identifying substantially identical agreements to Facility Site Sublease Agreement constituting Exhibit 10.3.15(a) (Incorporated herein by reference to Exhibit 10.8(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |

| 10.4.1 | Agreement Regarding Prosecution of Litigation by and among Merrill Lynch Commodities, Inc., Merrill Lynch & Co., Inc., Reliant Energy Power Supply, LLC, RERH Holdings, LLC, Reliant Energy Retail Holdings, LLC, Reliant Energy Retail Services, LLC, RE Retail Receivables, LLC and Reliant Energy Solutions East, LLC, dated at February 28, 2009 (Incorporated herein by reference to Exhibit 10.85 to the Registrant's Annual Report on Form 10-K filed March 2, 2009) |
| 10.4.2† | Engineering, Procurement and Construction Agreement, dated at July 30, 2007, between Mirant Mid-Atlantic, LLC, Mirant Chalk Point, LLC and Stone & Webster, Inc. (Incorporated herein by reference to Exhibit 10.1 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 6, 2009) |
| 10.4.3 | Settlement Agreement and Release by and between Mirant Corporation and PEPCO, dated at May 30, 2006 (Incorporated herein by reference to Exhibit 10.1 to the Mirant Corporation Current Report on Form 8-K filed May 31, 2006) |
| 10.4.4 | Engineering, Procurement and Construction Agreement between Mirant Marsh Landing, LLC and Kiewit Power Constructors Co., dated at May 6, 2010 (Incorporated herein by reference to Exhibit 10.2 to the Mirant Corporation Quarterly Report on Form 10-Q filed August 6, 2010) |
| 31.1A1* | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.2A1* | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.3A1* | Certification of Chief Accounting Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 32.A1* | Section 1350 Certification |
| 101* | Interactive Data File |

_____

\* Asterisk indicates exhibits filed herewith.

\*\* This filing excludes schedules and exhibits pursuant to Item 601(b)(2) of Regulation S-K, which the registrant agrees to furnish supplementally to the Securities and Exchange Commission upon request by the Commission.

† The Registrant has requested confidential treatment for certain portions of this Exhibit pursuant to Rule 24b-2 under the Exchange Act.

### GenOn Americas Generation Exhibit Index

| Exhibit No. | Exhibit Name |
| --- | --- |
| 1.1 | Purchase Agreement, dated at October 3, 2001, among Mirant Americas Generation, Inc. and Salomon Smith Barney Inc., Banc of America Securities LLC, Blaylock & Partners, L.P., Scotia Capital (USA) Inc., TD Securities (USA) Inc. and Tokyo-Mitsubishi International plc, as Initial Purchaser (Incorporated herein by reference to Exhibit 1.1 to Registrant's Registration Statement on Form S-4/A Amendment No. 1, Registration No. 333-85124) |
| 2.1 | Purchase and Sale Agreement by and between Mirant Americas, Inc. and LS Power Acquisition Co. I, LLC, dated at January 15, 2007 (Incorporated herein by reference to Exhibit 2.1 to the Mirant Corporation Current Report on Form 8-K filed January 18, 2007) |
| 3.1 | Certificate of Formation for Mirant Americas Generation, LLC, filed with the Delaware Secretary of State dated at November 1, 2001 (Incorporated herein by reference to Exhibit 3.1 to Registrant's Quarterly Report on Form 10-Q filed November 9, 2001) |
| 3.2 | Certificate of Amendment to Certificate of Formation of Mirant Americas Generation, LLC, filed with the Delaware Secretary of State dated at December 3, 2010 (Incorporated herein by reference to Exhibit 3.2A1 to Registrant's Annual Report on Form 10-K filed March 1, 2011) |

| 3.3 | Second Amended and Restated Limited Liability Agreement for GenOn Americas Generation, LLC dated December 3, 2010 (Incorporated herein by reference to Exhibit 3.3A1 to Registrant's Annual Report on Form 10-K filed March 1, 2011) |
|---|---|
| 4.1 | Indenture between Mirant Americas Generation, Inc. and Bankers Trust Company, as trustee, relating to Senior Notes, dated at May 1, 2001 (Incorporated herein by reference to Exhibit 4.1 to the Registrant's Registration Statement on Form S-4, Registration No. 333-63240) |
| 4.2 | Second Supplemental Indenture relating to Senior Notes 8.300% due 2011, dated at May 1, 2001 (Incorporated herein by reference to Exhibit 4.3 to Registrant's Registration Statement on Form S-4, Registration No. 333-63240) |
| 4.3 | Third Supplemental Indenture from Mirant Americas Generation, Inc. to Bankers Trust Company, relating to 9.125 % Senior Notes due 2031, dated at May 1, 2001 (Incorporated herein by reference to Exhibit 4.4 to Registrant's Registration Statement on Form S-4, Registration No. 333-63240) |
| 4.4 | Fifth Supplemental Indenture from Mirant Americas Generation, Inc. to Bankers Trust Company, dated at October 9, 2001 (Incorporated herein by reference to Exhibit 4.6 to Registrant's Registration Statement on Form S-4/A Amendment No. 1, Registration No. 333-85124) |
| 4.5 | Form of Sixth Supplemental Indenture from Mirant Americas Generation LLC to Bankers Trust Company, dated at November 1, 2001 (Incorporated herein by reference to Exhibit 4.6 to the Mirant Corporation Annual Report on Form 10-K filed February 27, 2009) |
| 4.6 | Form of Seventh Supplemental Indenture from Mirant Americas Generation LLC to Wells Fargo Bank National Association, dated at January 3, 2006 (Incorporated herein by reference to Exhibit 4.1 to Registrant's Quarterly Report on Form 10-Q filed May 14, 2007) |
| 4.7 | Senior Note Indenture between Mirant North America, LLC, Mirant North America Escrow, LLC, MNA Finance Corp. and Law Debenture Trust Company of New York, as trustee (Incorporated herein by reference to Exhibit 4.2 to Mirant Corporation Annual Report on Form 10-K filed March 14, 2006) |
| 4.8 | Registration Rights Agreement, dated at October 9, 2001, among Mirant Americas Generation, Inc., Salomon Smith Barney Inc. and Banc of America Securities LLC, Blaylock & Partners, L.P., Scotia Capital (USA) Inc., TD Securities (USA) Inc. and Tokyo-Mitsubishi International plc, as Initial Purchasers (Incorporated herein by reference to Exhibit 4.8 to Registrant's Registration Statement on Form S-4/A Amendment No. 1, Registration No. 333-85124) |
| 10.1† | Engineering, Procurement and Construction Agreement, dated at July 30, 2007, between Mirant Mid-Atlantic, LLC, Mirant Chalk Point, LLC and Stone & Webster, Inc. (Incorporated herein by reference to Exhibit 10.1 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 6, 2009) |
| 10.2 | Membership Interest Purchase and Sale Agreement, dated at January 31, 2007, between Mirant New York, Inc. and Alliance Energy Renewables, LLC (Incorporated herein by reference to Exhibit 10.1 to Registrant's Quarterly Report on Form 10-Q filed May 14, 2007) |
| 10.3 | Settlement and Release of Claims Agreement, by and among the Mirant Parties, the California Parties and OMOI, dated at January 13, 2005 (Incorporated herein by reference to Exhibit 10.39 to the Mirant Corporation Annual Report on Form 10-K filed March 15, 2005) |
| 10.4 | Credit Agreement among Mirant North America, LLC, JPMorgan Chase Bank, N.A as administrative agent and Deutsche Bank Securities Inc. and Goldman Sachs Credit Partners L.P., as co-syndication agents, dated at January 3, 2006 (Incorporated herein by reference to Exhibit 10.2 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 6, 2009) |
| 10.5 | Administrative Services Agreement dated at January 3, 2006 by and between Mirant Americas Generation, Inc. and Mirant Services, LLC (Incorporated herein by reference to Exhibit 10.5 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.6 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 among Mirant Americas Energy Marketing, LP, Mirant Bowline, LLC, Mirant Lovett, LLC, and Mirant NY-Gen, LLC (Incorporated herein by reference to Exhibit 10.6 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |

| | |
|---|---|
| 10.7 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 among Mirant Americas Energy Marketing, LP, Mirant Canal, LLC, and Mirant Kendall, LLC (Incorporated herein by reference to Exhibit 10.7 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.8 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Chalk Point, LLC (Incorporated herein by reference to Exhibit 10.8 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.9 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Mid-Atlantic, LLC (Incorporated herein by reference to Exhibit 10.9 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.10 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Potomac River, LLC (Incorporated herein by reference to Exhibit 10.10 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.11 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 among Mirant Americas Energy Marketing, LP, Mirant Delta, LLC, and Mirant Potrero, LLC (Incorporated herein by reference to Exhibit 10.12 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.12 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Zeeland, LLC (Incorporated herein by reference to Exhibit 10.13 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.13 | Mirant Corporation 2005 Omnibus Incentive Compensation Plan, effective December 2005 (Incorporated herein by reference to Exhibit 10.1 to the Mirant Corporation Current Report on Form 8-K filed January 3, 2006) |
| 12.1 | Statement of Ratio Earnings to Fixed Charges (Incorporated herein by reference to Exhibit 12.1 to Registrant's Registration Statement on Form S-4/A Amendment No. 1, Registration No. 333-85124) |
| 31.1A2* | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.2A2* | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.3A2* | Certification of Chief Accounting Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 32.A2* | Section 1350 Certification |
| 101* | Interactive Data File |

_____

\* Asterisk indicates exhibits filed herewith.

† The Registrant has requested confidential treatment for certain portions of this Exhibit pursuant to Rule 24b-2 under the Exchange Act.

## GenOn Mid-Atlantic Exhibit Index

| Exhibit No. | Exhibit Name |
|---|---|
| 3.1 | Certificate of Formation of Southern Energy Mid-Atlantic, LLC, dated at July 12, 2000 (Incorporated herein by reference to Exhibit 3.1 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 3.2 | Certificate of Amendment to Certificate of Formation of Mirant Mid-Atlantic, LLC, filed with the Delaware Secretary of State dated at January 20, 2011 (Incorporated herein by reference to Exhibit 3.2A2 to Registrant's Annual Report on Form 10-K filed March 1, 2011) |

| | |
|---|---|
| 3.3 | Second Amended and Restated Limited Liability Company Agreement of GenOn Mid-Atlantic, LLC dated January 20, 2011 (Incorporated herein by reference to Exhibit 3.3A2 to Registrant's Annual Report on Form 10-K filed March 1, 2011) |
| 4.1 | Form of 8.625% Series A Pass Through Certificate (Incorporated herein by reference to Exhibit 4.1 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.2 | Form of 9.125% Series B Pass Through Certificate (Incorporated herein by reference to Exhibit 4.2 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.3 | Form of 10.060% Series C Pass Through Certificate (Incorporated herein by reference to Exhibit 4.3 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.4(a) | Pass Through Trust Agreement A between Southern Energy Mid-Atlantic, LLC and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.4(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.4(b) | Schedule identifying substantially identical agreement to Pass Through Trust Agreement A constituting Exhibit 4.4(a) (Incorporated herein by reference to Exhibit 4.4(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.5(a) | Participation Agreement (L1) among Southern Energy Mid-Atlantic, LLC, as Lessee, Dickerson OL1 LLC, as Owner Lessor, Wilmington Trust Company, as Owner Manager, SEMA OP3 LLC, as Owner Participant and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee and as Pass Through Trustee, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.5(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.5(b) | Schedule identifying substantially identical agreements to Participation Agreement constituting Exhibit 4.5(a) (Incorporated herein by reference to Exhibit 4.5(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.6(a) | Participation Agreement (Morgantown L1) among Southern Energy Mid-Atlantic, LLC, as Lessee, Morgantown OL1 LLC, as Owner Lessor, Wilmington Trust Company, as Owner Manager, SEMA OP1, as Owner Participant and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee and as Pass Through Trustee, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.6(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.6(b) | Schedule identifying substantially identical agreements to Participation Agreement constituting Exhibit 4.6(a) hereto (Incorporated herein by reference to Exhibit 4.6(b) to Registrant's Form S-4 in Registration No. 333-61668) |
| 4.7(a) | Facility Lease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, as Facility Lessee, and Dickerson OL1 LLC, as Owner Lessor, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.7(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.7(b) | Schedule identifying substantially identical agreement to Facility Lease Agreement constituting Exhibit 4.7(a) (Incorporated herein by reference to Exhibit 4.7(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.8(a) | Facility Lease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, as Facility Lessee, and Morgantown OL1 LLC, as Owner Lessor, dated December 19, 2000 (Incorporated herein by reference to Exhibit 4.8(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.8(b) | Schedule identifying substantially identical agreement to Facility Lease Agreement constituting Exhibit 4.8(a) (Incorporated herein by reference to Exhibit 4.8(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |

| | |
|---|---|
| 4.9(a) | Indenture of Trust, Mortgage and Security Agreement (L1) between Dickerson OL1 LLC, as Lessor, and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.9(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.9(b) | Schedule identifying substantially identical agreement to Indenture of Trust, Mortgage and Security Agreement constituting Exhibit 4.9(a) (Incorporated herein by reference to Exhibit 4.9 (b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.10(a) | Indenture of Trust, Mortgage and Security Agreement (L1) between Morgantown OL1 LLC, as Lessor, and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.10(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.10(b) | Schedule identifying substantially identical agreement to Indenture of Trust, Mortgage and Security Agreement constituting Exhibit 4.10(a) (Incorporated herein by reference to Exhibit 4.10 (b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.11(a) | Series A Lessor Note Due June 20, 2012 for Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.11(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.11(b) | Schedule identifying substantially identical notes to Lessor Notes constituting Exhibit 4.11(a) (Incorporated herein by reference to Exhibit 4.11(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.12(a) | Series A Lessor Note Due June 30, 2008, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.12(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.12(b) | Schedule identifying substantially identical notes to Series A Lessor Notes constituting Exhibit 4.12(a) (Incorporated herein by reference to Exhibit 4.12(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.13(a) | Series B Lessor Note Due June 30, 2015, for Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.13(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.13(b) | Schedule identifying substantially identical notes to Lessor Note constituting Exhibit 4.13(a) (Incorporated herein by reference to Exhibit 4.13(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.14(a) | Series B Lessor Note Due June 30, 2017, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.14(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.14(b) | Schedule identifying substantially identical notes to Lessor Notes constituting Exhibit 4.14(a) (Incorporated herein by reference to Exhibit 4.14(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.15(a) | Series C Lessor Note Due June 30, 2020, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.15(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.15(b) | Schedule identifying substantially identical notes to Lessor Notes constituting Exhibit 4.15 (a) (Incorporated herein by reference to Exhibit 4.15(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.16 | Registration Rights Agreement, between Southern Energy Mid-Atlantic, LLC and Credit Suisse First Boston, acting for itself on behalf of the Purchasers, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.16 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.17(a) | Supplemental Pass Through Trust Agreement A between Mirant Mid-Atlantic, LLC, and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at June 29, 2001 (Incorporated herein by reference to Exhibit 4.17(a) to Registrant's Registration Statement on Form S-4/A Registration No. 333-61668) |

| 4.17(b) | Schedule identifying substantially identical agreements to Supplemental Pass Through Trust Agreement for Supplemental Pass Through Trust Agreement B between Mirant Mid-Atlantic, LLC and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at June 29, 2001, and Supplemental Pass Through Trust Agreement C between Mirant Mid-Atlantic, LLC and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at June 29, 2001 constituting Exhibit 4.17 (a) (Incorporated herein by reference to Exhibit 4.17(b) to Registrant's Registration Statement on Form S-4/A, Registration No. 333-61668) |
|---|---|
| 10.1† | Engineering, Procurement and Construction Agreement, dated at July 30, 2007, between Mirant Mid-Atlantic, LLC, Mirant Chalk Point, LLC and Stone & Webster, Inc. (Incorporated herein by reference to Exhibit 10.1 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 6, 2009) |
| 10.2 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Services, LP and Mirant Mid-Atlantic, LLC (Incorporated herein by reference to Exhibit 10.17 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.3 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Chalk Point, LLC (Incorporated herein by reference to Exhibit 10.18 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.4 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Potomac River, LLC (Incorporated herein by reference to Exhibit 10.19 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.5 | Administrative Services Agreement dated at January 3, 2006 by and between Mirant Mid-Atlantic, LLC and Mirant Services, LLC (Incorporated herein by reference to Exhibit 10.20 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.6(a) | Asset Purchase and Sale Agreement for Generating Plants and Related Assets by and between Potomac Electric Power Company and Southern Energy, Inc. dated at June 7, 2000 (Incorporated herein by reference to Exhibit 10.1(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.6(b) | Amendment No. 1 to Asset Purchase and Sale Agreement by and between Potomac Electric Power Company and Southern Energy, Inc. dated at September 18, 2000 (Incorporated herein by reference to Exhibit 10.1(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.6(c) | Amendment No. 2 to Asset Purchase and Sale Agreement by and between Potomac Electric Power Company and Southern Energy, Inc. dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.1(c) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.7(a) | Interconnection Agreement (Dickerson) by and between Potomac Electric Power Company and Southern Energy Mid-Atlantic, LLC dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.2(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.7(b) | Schedule identifying substantially identical agreements to Interconnection Agreement constituting Exhibit 10.7(a) hereto (Incorporated herein by reference to Exhibit 10.2(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.8(a) | Easement, License and Attachment Agreement (Dickerson Station) by and between Potomac Electric Power Company, Southern Energy Mid-Atlantic, LLC and Southern Energy MD Ash Management, LLC dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.3 (a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.8(b) | Schedule identifying substantially identical agreements to Easement, License and Attachment Agreement constituting Exhibit 10.8(a) (Incorporated herein by reference to Exhibit 10.3(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.9(a) | Bill of Sale (SEMA: Dickerson; Morgantown; RR Spur; Production Service Center) by Potomac Electric Power Company, for the benefit of Southern Energy Mid-Atlantic, LLC dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.4(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |

| | |
|---|---|
| 10.9(b) | Schedule identifying substantially identical documents to Bill of Sale constituting Exhibit 10.9 (a) hereto (Incorporated herein by reference to Exhibit 10.4b to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.10(a) | Facility Site Lease Agreement and Easement Agreement (L1) between Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC and Southern Energy MD Ash Management, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.5(a) Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.10(b) | Schedule identifying substantially identical agreements to Facility Site Lease Agreement constituting Exhibit 10.10(a) (Incorporated herein by reference to Exhibit 10.5(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.11(a) | Facility Site Lease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC and Southern Energy MD Ash Management, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.6(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.11(b) | Schedule identifying substantially identical agreements to Facility Site Lease Agreement constituting Exhibit 10.11(a) (Incorporated herein by reference to Exhibit 10.6(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.12(a) | Facility Site Sublease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.7(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.12(b) | Schedule identifying substantially identical agreements to Facility Site Sublease Agreement constituting Exhibit 10.12(a) (Incorporated herein by reference to Exhibit 10.7b to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.13(a) | Facility Site Sublease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.8a to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.13(b) | Schedule identifying substantially identical agreements to Facility Site Sublease Agreement constituting Exhibit 10.13(a) (Incorporated herein by reference to Exhibit 10.8(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.14 | Capital Contribution Agreement by and between Southern Energy, Inc. and Southern Energy Mid-Atlantic, LLC dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.12 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.15 | Promissory Note between Southern Energy Mid-Atlantic, LLC and Southern Energy Peaker, LLC in the original principal amount of $71,110,000 dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.13 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.16 | Promissory Note between Southern Energy Mid-Atlantic, LLC and Southern Energy Potomac River, LLC in the original principal amount of $152,165,000 dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.14 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.17(a) | Shared Facilities Agreement between Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC, and Dickerson OL4 LLC, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 10.15(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.17(b) | Shared Facilities Agreement between Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC, and Morgantown OL7 LLC, dated at December 18, 2000 constituting Exhibit 10.17(a) (Incorporated herein by reference to Exhibit 10.15(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |

| | |
|---|---|
| 10.18(a) | Assignment and Assumption Agreement between Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC, and Dickerson OL4 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.16(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.18(b) | Assignment and Assumption Agreement between Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC, and Morgantown OL7 LLC, dated at December 18, 2000 constituting Exhibit 10.18(a) (Incorporated herein by reference to Exhibit 10.16(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.19(a) | Ownership and Operation Agreement between Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC, Dickerson OL4 LLC, and Southern Energy Mid-Atlantic, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.17(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.19(b) | Ownership and Operation Agreement between Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC, Morgantown OL7 LLC, and Southern Energy Mid-Atlantic, LLC, dated at December 18, 2000 constituting Exhibit 10.19(a) (Incorporated herein by reference to Exhibit 10.17(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.20(a) | Guaranty Agreement (Dickerson L1) between Southern Energy, Inc. and Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.21(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.20(b) | Schedule identifying substantially identical agreements to Guaranty Agreement constituting Exhibit 10.20(a) (Incorporated herein by reference to Exhibit 10.21(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.21(a) | Guaranty Agreement (Morgantown L1) between Southern Energy, Inc. and Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.22(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.21(b) | Schedule identifying substantially identical agreements to Guaranty Agreement constituting Exhibit 10.21(a) (Incorporated herein by reference to Exhibit 10.22(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.22 | Credit Agreement among Mirant North America, LLC, JPMorgan Chase Bank, N.A. as administrative agent and Deutsche Bank Securities Inc. and Goldman Sachs Credit Partners L.P., as co-syndication agents, dated at January 3, 2006 (Incorporated herein by reference to Exhibit 10.2 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 6, 2009) |
| 31.1A3* | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.2A3* | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.3A3* | Certification of Chief Accounting Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 32.A3* | Section 1350 Certification |
| 101* | Interactive Data File |

_____

\* Asterisk indicates exhibits filed herewith.

† The Registrant has requested confidential treatment for certain portions of this Exhibit pursuant to Rule 24b-2 under the Exchange Act.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

GENON ENERGY, INC.
(Registrant)

By:      /s/ DAVID W. CRANE

David W. Crane
*Chief Executive Officer*

Date: February 27, 2013

## GENON ENERGY, INC.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| <u>Signatures</u> | <u>Title</u> |
|---|---|
| /s/ DAVID W. CRANE | President and Chief Executive Officer and Director |
| David W. Crane | of GenOn Energy, Inc. (Principal Executive Officer) |
| Date: February 27, 2013 | |
| | Executive Vice President and Chief Financial Officer |
| /s/ KIRKLAND B. ANDREWS | |
| Kirkland B. Andrews | of GenOn Energy, Inc. (Principal Financial Officer) |
| Date: February 27, 2013 | |
| /s/ RONALD B. STARK | Vice President and Chief Accounting Officer |
| Ronald B. Stark | of GenOn Energy, Inc. (Principal Accounting Officer) |
| Date: February 27, 2013 | |

180
-

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

GENON AMERICAS GENERATION, LLC
(Registrant)

By:                          /s/ DAVID W. CRANE
_____

David W. Crane
*Chief Executive Officer*

Date: February 27, 2013

### GENON AMERICAS GENERATION, LLC

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| <u>Signatures</u> | <u>Title</u> |
|---|---|
| /s/ DAVID W. CRANE | President and Chief Executive Officer and Manager |
| David W. Crane | of GenOn Americas Generation, LLC |
| Date: February 27, 2013 | (Principal Executive Officer) |
| | |
| | Executive Vice President and Chief Financial Officer |
| /s/ KIRKLAND B. ANDREWS | |
| Kirkland B. Andrews | and Manager of GenOn Americas Generation, LLC |
| Date: February 27, 2013 | (Principal Financial Officer) |
| | |
| /s/ RONALD B. STARK | Vice President and Chief Accounting Officer |
| Ronald B. Stark | of GenOn Americas Generation, LLC |
| Date: February 27, 2013 | (Principal Accounting Officer) |

181

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

<div align="right">

GENON MID-ATLANTIC, LLC
(Registrant)

By:　　　　　/s/ DAVID W. CRANE

David W. Crane
*Chief Executive Officer*

</div>

Date: February 27, 2013

## GENON MID-ATLANTIC, LLC

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signatures | Title |
| --- | --- |
| /s/ DAVID W. CRANE | President and Chief Executive Officer and Manager |
| David W. Crane | of GenOn Mid-Atlantic, LLC |
| Date: February 27, 2013 | (Principal Executive Officer) |
| | |
| | Executive Vice President and Chief Financial Officer |
| /s/ KIRKLAND B. ANDREWS | |
| Kirkland B. Andrews | and Manager of GenOn Mid-Atlantic, LLC |
| Date: February 27, 2013 | (Principal Financial Officer) |
| | |
| /s/ RONALD B. STARK | Vice President and Chief Accounting Officer |
| Ronald B. Stark | of GenOn Mid-Atlantic, LLC |
| Date: February 27, 2013 | (Principal Accounting Officer) |

**Supplemental Information to be Furnished with Reports Filed Pursuant to**
**Section 15(d) of the Act by Registrants Which Have Not Registered**
**Securities Pursuant to Section 12 of the Act**

No annual report or proxy materials has been sent to securities holders and no such report or proxy material is to be furnished to securities holders subsequent to the filing of the annual report on this Form 10‑K.

183

**EXHIBIT 10.1.51**

$500,000,000.00

REVOLVING CREDIT AGREEMENT

among

GENON ENERGY, INC.,

as a Borrower,

GENON AMERICAS, INC.,
as a Borrower,

The Several Lenders from Time to Time Parties Hereto,

NRG ENERGY, INC.,

as Administrative Agent

Dated as of December 14, 2012

_____

$500,000,000.00 Revolving Facility

1

## TABLE OF CONTENTS

| | | |
|---|---|---:|
| Section 1. | DEFINITIONS | 6 |
| | 1.1 Defined Terms | 6 |
| | 1.2 Other Definitional Provisions | 24 |
| Section 2 | AMOUNT AND TERMS OF COMMITMENTS | 24 |
| | 2.1 Existing Obligations | 24 |
| | 2.2 [Reserved] | 24 |
| | 2.3 [Reserved] | 24 |
| | 2.4 Commitments | 24 |
| | 2.5 Procedure for Loan Borrowing | 25 |
| | 2.6 Commitment Fees, etc. | 25 |
| | 2.7 Termination or Reduction of Commitments | 26 |
| | 2.8 Optional Prepayments | 26 |
| | 2.9 Mandatory Prepayments | 26 |
| | 2.10 Conversion and Continuation Options | 27 |
| | 2.11 Limitations on Eurodollar Tranches | 27 |
| | 2.12 Interest Rates and Payment Dates | 27 |
| | 2.13 Computation of Interest and Fees | 28 |
| | 2.14 Inability to Determine Interest Rate | 28 |
| | 2.15 Pro Rata Treatment and Payments | 28 |
| | 2.16 Requirements of Law | 29 |
| | 2.17 Taxes | 30 |
| | 2.18 Indemnity | 32 |
| | 2.19 Joint and Several Liability | 32 |
| Section 3 | LETTERS OF CREDIT | 32 |
| | 3.1 L/C Commitment | 32 |
| | 3.2 Procedure for Issuance of Letters of Credit | 33 |
| | 3.3 L/C Fees and Other Charges | 33 |
| | 3.4 L/C Participations | 33 |
| | 3.5 L/C Reimbursement Obligation of the Borrowers | 34 |
| | 3.6 Obligations Absolute | 34 |
| | 3.7 Letter of Credit Payments | 35 |
| | 3.8 Applications | 35 |
| | 3.9 Existing Letters of Credit | 35 |
| Section 4 | REPRESENTATIONS AND WARRANTIES | 35 |
| | 4.1 Organization; Power and Authority | 35 |
| | 4.2 Due Authorization | 36 |
| | 4.3 Governmental Approval | 36 |
| | 4.4 Binding and Enforceable | 36 |
| | 4.5 No Violation | 36 |
| | 4.6 No Default | 36 |
| | 4.7 Litigation | 36 |
| | 4.8 [Reserved] | 36 |
| | 4.9 Material Adverse Change | 36 |
| | 4.10 Investment Company Act | 36 |

|  |  |  |
|---|---|---|
|  | 4.11 Environmental Matters | 36 |
|  | 4.12 Accuracy of Information, etc. | 37 |
|  | 4.13 Employee Benefit Plans | 37 |
|  | 4.14 Tax Returns and Payments | 37 |
|  | 4.15 Security Documents | 37 |
|  | 4.16 Ownership of Property | 37 |
| Section 5 | CONDITIONS PRECEDENT | 37 |
|  | 5.1 Conditions of Initial Extension of Credit | 37 |
|  | 5.2 Conditions to Each Extension of Credit | 39 |
| Section 6 | AFFIRMATIVE COVENANTS | 40 |
|  | 6.1 Compliance with Law; Maintenance of Existence | 40 |
|  | 6.2 [Reserved] | 40 |
|  | 6.3 Certificates; Other Information | 40 |
|  | 6.4 Notices | 40 |
|  | 6.5 Inspection | 41 |
|  | 6.6 Maintenance of Property; Insurance | 41 |
|  | 6.7 [Subsequent Acquired Property; New Subsidiaries | 41 |
|  | 6.8 Collateral Information | 43 |
|  | 6.9 Further Assurances | 43 |
|  | 6.10 Use of Proceeds | 43 |
| Section 7 | [RESERVED] | 43 |
| Section 8 | NEGATIVE COVENANTS | 43 |
|  | 8.1 Debt | 43 |
|  | 8.2 Restricted Payments | 43 |
|  | 8.3 Liens | 44 |
|  | 8.4 Mergers | 47 |
|  | 8.5 Asset sales | 47 |
|  | 8.6 Investments | 47 |
|  | 8.7 Transactions with Affiliates | 49 |
|  | 8.8 Sales and Leasebacks | 49 |
|  | 8.9 Changes in Fiscal Periods | 49 |
|  | 8.10 NRG Credit Agreement | 49 |
| Section 9 | EVENTS OF DEFAULT | 50 |
| Section 10 | THE ADMINISTRATIVE AGENT | 52 |
|  | 10.1 Appointment | 52 |
|  | 10.2 Delegation of Duties | 53 |
|  | 10.3 Exculpatory Provisions | 53 |
|  | 10.4 Reliance by Administrative Agent | 53 |
|  | 10.5 Notice of Default | 54 |
|  | 10.6 Non-Reliance on Administrative Agent and Other Lenders | 54 |
|  | 10.7 Indemnification | 54 |
|  | 10.8 Agent in Its Individual Capacity | 55 |
|  | 10.9 Successor Administrative Agent | 55 |
| Section 11 | MISCELLANEOUS | 55 |
|  | 11.1 Amendments and Waivers | 55 |
|  | 11.2 Notices | 56 |

11.3 No Waiver; Cumulative Remedies                                        58
11.4 Survival of Representations and Warranties                            58
11.5 Payment of Expenses and Taxes                                         58
11.6 Successors and Assigns; Participations and Assignments               60
11.7 Adjustment and Set-Off                                                63
11.8 Counterparts                                                          63
11.9 Severability                                                          63
11.10 Integration                                                          64
11.11 Governing Law                                                        64
11.12 Submission To Jurisdiction; Waivers                                  64
11.13 Acknowledgements                                                     64
11.14 Releases of Guarantees and Liens                                     65
11.15 Confidentiality                                                      65
11.16 WAIVERS OF JURY TRIAL                                                65
11.17 Delivery of Addenda                                                  65

SCHEDULES

1.1A        Commitments
1.1B        Mortgaged Property
1.1D        Unrestricted Subsidiaries

EXHIBITS:

A          Form of Guarantee Agreement
B          Form of Joinder, Acknowledgment, and Reaffirmation of Security Agreement
C          Form of Accession Agreement to Collateral Trust Agreement
D          Form of Closing Certificate
E          Form of Assignment and Assumption
F          Form of Lender Addendum

4
.

REVOLVING CREDIT AGREEMENT (this "Agreement"), dated as of December 14, 2012, among GENON ENERGY, INC., a Delaware corporation (the "Company"), GENON AMERICAS, INC., a Delaware corporation ("GAI", each of GAI and the Company, a "Borrower" and, together, the "Borrowers"), the banks, financial institutions and/or other financial or non-financial entities or other Persons from time to time parties to this Agreement (the "Lenders"), and NRG ENERGY, INC., a Delaware corporation, ("NRG") as administrative agent for the Lenders under this Agreement and the other Loan Documents, or any successor thereto ( "Administrative Agent").

RECITALS

WHEREAS, the Company, NRG, and Plus Merger Corporation ("Merger Sub") have entered into that certain Agreement and Plan of Merger dated as of July 20, 2012 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Merger Agreement") whereby NRG will acquire 100% of the capital stock of the Company by means of a merger between Merger Sub and the Company, with the Company as the surviving corporation (the "Merger");

WHEREAS, until immediately prior to the effective time of the Merger and this Agreement, the Borrowers are parties to that certain Credit Agreement dated as of September 20, 2010 by and among the Borrowers, the several banks and other financial institutions or entities from time to time parties thereto, Credit Suisse Securities (USA) LLC and Deutsche Bank Securities Inc., as co-syndication agents, Goldman Sachs Bank USA and Morgan Stanley Senior Funding, Inc., as co-documentation agents, and JPMorgan Chase Bank, N.A., as administrative agent (as amended, amended and restated, extended, supplemented or otherwise modified from time to time, the "Existing Credit Agreement") and the Loan Documents (as such term is defined in the Existing Credit Agreement) (as amended, amended and restated, extended, supplemented or otherwise modified from time to time, the "Existing Loan Documents");

WHEREAS, concurrently with the Merger, the Borrowers desire to (i) repay, discharge and satisfy in full all principal, interest, fees, expenses and other Obligations (as such term is defined in the Existing Credit Agreement) outstanding under the Existing Credit Agreement and Existing Loan Documents (the "Existing Obligations") and (ii) terminate all commitments under the Existing Loan Documents (clauses (i) and (ii), the "Pay-Off");

WHEREAS, the Borrowers desire to Refinance (as such term is defined in the Collateral Trust Agreement) the Existing Obligations substantially concurrently with the Pay-Off (the "Refinancing" and together with the Merger and the Pay-Off, the "Transactions") in order to finance certain working capital and other general corporate purposes (including, without limitation, acquisitions and distributions permitted hereunder and the providing of credit support in the form of Letters of Credit) of the Borrower and its Subsidiaries from time to time;

WHEREAS, the Borrowers have requested that the Lenders make Loans and other extensions of credit available to them to achieve the Refinancing;

WHEREAS, the Lenders have agreed to extend such Loans and extensions of credits subject to the terms and conditions set forth herein and in the other Loan Documents;

WHEREAS, the parties hereto acknowledge and agree that this Agreement constitutes a Refinancing (as defined in the Collateral Trust Agreement) of the Existing Credit Obligations and a Replacement Credit Agreement (as such term is defined in the Collateral Trust Agreement) for all purposes under the Collateral Trust Agreement and that the Obligations hereunder and under the other Loan Documents constitute Credit Agreement Obligations (as such term is defined in the Collateral Trust Agreement) secured

by a First Lien (as such term is defined in the Collateral Trust Agreement) in all of the Collateral (as such term is defined in the Collateral Trust Agreement);

Accordingly, in consideration of the mutual agreements contained herein and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto hereby agree as follows:

## SECTION 1. DEFINITIONS

1.1 <u>Defined Terms</u>. As used in this Agreement, the terms listed in this <u>Section 1.1</u> shall have the respective meanings set forth in this <u>Section 1.1</u>.

"<u>ABR</u>": for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day <u>plus</u> ½ of 1% and (c) the Eurodollar Rate for a one-month Interest Period beginning on such day (or if such day is not a Business Day, the immediately preceding Business Day) <u>plus</u> 1%. For purposes hereof, "<u>Prime Rate</u>" shall mean the rate of interest per annum publicly announced from time to time by one or more New York-based banks (as determined by the Administrative Agent in its sole discretion), as its prime rate in effect at its principal office in New York City (the Prime Rate not being intended to be the lowest rate of interest charged by such banks, in connection with extensions of credit to debtors). Any change in the ABR due to a change in the Prime Rate, the Federal Funds Effective Rate or the Eurodollar Rate shall be effective as of the opening of business on the effective day of such change in the Prime Rate, the Federal Funds Effective Rate or the Eurodollar Rate, respectively.

"<u>ABR Loans</u>": Loans the rate of interest applicable to which is based upon the ABR.

"<u>Addendum</u>": an instrument, substantially in the form of Exhibit F, by which a Lender becomes a party to this Agreement on or prior to or as of the Closing Date.

"<u>Administrative Agent</u>": as defined in the Preamble hereto.

"<u>Affiliate</u>": as to any Person (other than an individual), any other Person (other than an individual) that, directly or indirectly through one or more intermediaries, is in Control of, is Controlled by, or is under common Control with, such Person.

"<u>Agent Indemnitee</u>": as defined in <u>Section 10.7</u>.

"<u>Aggregate Exposure</u>": with respect to any Lender at any time, an amount equal to the amount of such Lender's Commitment then in effect or, if the Commitments have been terminated, the amount of such Lender's Extensions of Credit then outstanding.

"<u>Aggregate Exposure Percentage</u>": with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's Aggregate Exposure at such time to the Aggregate Exposure of all Lenders at such time.

"<u>Agreement</u>": as defined in the Preamble hereto.

"<u>Applicable Margin</u>": with respect to each Type of Loan, the rate per annum set forth under the relevant column heading below:

|  | ABR Loans | Eurodollar Loans |
|---|---|---|
| Loans | 2.50% | 3.50% |

6
.

"<u>Application</u>": with respect to any Lender, an application in such form as such Lender may specify from time to time in connection with any request for a Letter of Credit.

"<u>Approved Fund</u>": as defined in <u>Section 11.6(b)</u>.

"<u>Asset Sale</u>": any Disposition or series of related Dispositions other than any Excluded Asset Sale.

"<u>Assignee</u>": as defined in <u>Section 11.6(b)</u>.

"<u>Assignment and Assumption</u>": an Assignment and Assumption, substantially in the form of Exhibit E.

"<u>Attributable Debt</u>": on any date, (a) in respect of a sale and leaseback transaction, the present value of the obligation of the lessee for net rental payments during the remaining term of the lease included in such sale and leaseback transaction including any period for which such lease has been extended or may, at the option of the lessor, be extended (such present value to be calculated using a discount rate equal to the rate of interest implicit in such transaction, determined in accordance with GAAP; <u>provided</u>, that if such sale and leaseback transaction results in a Capital Lease Obligation, the amount of Debt represented thereby will be determined in accordance with the definition of "Capital Lease Obligation") and (b) in respect of any Synthetic Lease Obligation or financing lease, the amount of the remaining lease payments under the relevant lease that would as of such date be required to be capitalized on a balance sheet in accordance with GAAP if such lease were accounted for as a Capital Lease Obligation.

"<u>Available Commitment</u>": as to any Lender at any time, an amount equal to the excess, if any, of (a) such Lender's Commitment then in effect <u>over</u> (b) such Lender's Extensions of Credit then outstanding.

"<u>Bankruptcy Event</u>": with respect to any Person, such Person becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment.

"<u>Benefitted Lender</u>": as defined in <u>Section 11.7(a)</u>.

"<u>Board</u>": the Board of Governors of the Federal Reserve System of the United States (or any successor).

"<u>Borrower</u>" and "<u>Borrowers</u>": as defined in the Preamble hereto.

"<u>Borrowing Date</u>": any Business Day specified by the Company as a date on which the Company requests the relevant Lenders to make Loans hereunder.

"<u>Business Day</u>": a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close, <u>provided</u>, that with respect to notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, such day is also a day for trading by and between banks in Dollar deposits in the interbank eurodollar market.

"<u>Capital Expenditures</u>": for any period, with respect to any Person, the aggregate of all expenditures by such Person and its Subsidiaries for the acquisition or leasing (pursuant to a capital lease) of fixed or capital assets or additions to equipment (including replacements, repairs and improvements during such period) that should be capitalized under GAAP on a consolidated balance sheet of such Person and its Subsidiaries. For purposes of this definition, the purchase price of equipment that is purchased simultaneously

with the trade-in of existing equipment or with insurance proceeds shall be included in Capital Expenditures only to the extent of the gross amount of such purchase price less the credit granted by the seller of such equipment for the equipment being traded in at such time or the amount of such proceeds, as the case may be.

"Capital Lease Obligation": as applied to any Person, at the time any determination is to be made, the amount of the liability in respect of a capital lease that would at that time be required to be capitalized on a balance sheet of such Person in accordance with GAAP in the reasonable judgment of such Person, and the stated maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be prepaid by the lessee without payment of a penalty.

"Capital Stock": any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Cash Equivalents": (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-1 by S&P or P-1 by Moody's, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days, with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; (g) money market mutual or similar funds that invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition; or (h) money market funds that (i) (x) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended and are rated A by S&P and A by Moody's or (y) are rated AAA by S&P and Aaa by Moody's and (ii) have portfolio assets of at least $2,500,000,000.

"Change of Control": the occurrence after the Closing Date of any of the following:

(i)      the direct or indirect sale, transfer, conveyance or other Disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the assets of the Company and its Subsidiaries taken as a whole to any "person" (as that term is used in Section 13(d) of the Exchange Act, but excluding any employee benefit plan of the Company or any of the Restricted Subsidiaries, and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) that is not 100% owned, directly or indirectly, by NRG (other than the Company and its Subsidiaries); or

(ii)    the consummation of any transaction (including any merger or consolidation) the result of which is that any "person" (as defined above) that is not 100% owned, directly or indirectly, by NRG (other than the Company and its Subsidiaries) becomes the beneficial owner, directly or indirectly, of more than 50% of the voting stock of the Company, measured by voting power rather than number of shares.

"Closing Date": the date designated as the Closing Date by the Company and the Administrative Agent, on which the conditions precedent set forth in Section 5.1 shall have been satisfied or waived.

"Code": the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder.

"Collateral": all property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document.

"Collateral Trust Agreement": the Collateral Trust Agreement dated on or about December 3, 2010 by and among the Borrowers, the Subsidiary Guarantors, the Administrative Agent, the Collateral Trustee, and the other parties named therein, as amended, amended and restated, supplemented or otherwise in effect from time to time.

"Collateral Trustee": U.S. Bank National Association or any successor thereto and, as the context may require, any co-trustee appointed pursuant to the terms of the Collateral Trust Agreement.

"Commitment": as to any Lender, the obligation of such Lender, if any, to make Loans and participate in Letters of Credit in an aggregate principal and/or face amount not to exceed the amount set forth under the heading "Commitment" opposite such Lender's name on Schedule 1.1A or in the Assignment and Assumption pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof.

"Commitment Fee Rate": 0.750% per annum.

"Commitment Period": the period from and including the Closing Date to the Termination Date.

"Commodity Agreement": any contract for commercial and trading activities (including any option, exchange, swap, forward contract or futures contract, whether for physical delivery or financial settlement) for the purchase, transmission, transportation, distribution, sale, lease or hedge of any emissions or fuel-related or energy- or capacity-related commodity or service.

"Common Stock": with respect to any Person, any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or non-voting) of such Person's common stock whether or not outstanding on the Closing Date, including all series and classes of such common stock.

"Company": as defined in the Preamble hereto.

"Contractual Obligation": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

9

"Control": with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; and the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"Debt": with respect to any specified Person, any indebtedness of such Person (excluding accrued expenses or trade payables), whether or not contingent (without duplication):

(i)     in respect of borrowed money;

(ii)    evidenced by bonds, notes, debentures or similar instruments or letters of credit or reimbursement agreements in respect thereof;

(iii)   in respect of banker's acceptances;

(iv)    representing Capital Lease Obligations or Attributable Debt in respect of sale and leaseback transactions (excluding the REMA Lease and the GMA Lease which shall not constitute Debt), Synthetic Lease Obligations or financing leases;

(v)     representing all obligations of such Person in respect of the deferred purchase price of property or services due more than six months after such property is acquired or such services are completed;

(vi)    representing any Hedging Obligations; or

(vii)   consisting of Disqualified Stock;

whether or not any of the preceding items appear as a liability on a balance sheet of the specified Person prepared in accordance with GAAP, provided, however, "Debt" shall not include indebtedness which has been irrevocably defeased. In addition, the term "Debt" includes all Debt of others secured by a Lien on any asset of the specified Person (whether or not such Debt is assumed by the specified Person, but excluding Liens securing Project Finance Debt and Liens on Capital Stock of any Unrestricted Subsidiary) and, to the extent not otherwise included, the Guarantee by the specified Person of any Debt of any other Person.

The amount of any Debt outstanding as of any date will be:

(i)     the accreted value of the Debt, in the case of any Debt issued with original issue discount;

(ii)    the principal amount of and premium (if any) on the Debt, in the case of any other Debt;

(iii)   in respect of Debt of other Persons secured by a Lien on the assets of the specified Person, the lesser of: (A) the Fair Market Value of such asset at such date of determination, and (B) the amount of such Debt of such other Persons;

(iv) in respect of any Guarantee, an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith;

(v) zero for undrawn letters of credit and undrawn revolvers; and

(vi) in respect of any Hedging Obligations, the amount, if any, which is then due and payable thereunder.

"Default": any of the events specified in Section 9, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Designated Party": has the meaning set forth in Section 9(i).

"Disposition": (a) with respect to any assets, any sale, lease (other than an operating lease), conveyance or other disposition thereof and (b) the sale or issuance of Capital Stock in any of the Restricted Subsidiaries (other than to another Restricted Subsidiary or the Company). The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Disqualified Stock": with respect to any Person, any Capital Stock of such Person which, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case, at the option of the holder of such Capital Stock), (i) matures or is subject to a scheduled redemption, pursuant to a sinking fund obligation or otherwise, on or prior to the date that is 91 days after the Termination Date or (ii) matures or is subject to mandatory redemption upon the happening of any event unless such maturity or mandatory redemption is conditioned on the prior repayment in full of the Facilities. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement shall be equal to the maximum amount that the Borrowers and the Restricted Subsidiaries may become obligated to pay upon the maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock, exclusive of accrued dividends.

"Dollars" and "$": dollars in lawful currency of the United States.

"Domestic Subsidiary": any Subsidiary of the Company organized in or under the laws of the United States, any state thereof or the District of Columbia other than (1) a Subsidiary in which a Foreign Subsidiary directly or indirectly owns a majority of the voting equity interests or (2) a Subsidiary that owns no material assets other than the equity interests of one or more Foreign Subsidiaries.

"Eligible Assignee": any assignee permitted under Section 11.6.

"Eligible Commodity Hedging Agreement": any Commodity Agreement entered into by any Loan Party from time to time which (i) is intended to reduce risk to the Company or any Restricted Subsidiary associated with fluctuations in the price or availability of any emission or fuel-related or energy- or capacity-related commodity or service ("commodity"), and (ii) is structured such that the net mark-to-market credit exposure of (a) the counterparties to such Commodity Agreements (taken as a whole) to (b) the Company or any other Loan Party, is (x) positively correlated with the price of the relevant commodity or (y) positively correlated with changes in the relevant fuel to energy spread.

"Eligible Commodity Hedging Obligations": with respect to any Loan Party, the obligations of such Person under an Eligible Commodity Hedging Agreement. For purposes of designating obligations as Eligible Commodity Hedging Obligations secured by the Collateral pursuant to the Security Agreement, such designation shall be deemed effective if accompanied by a certification by the Company representing that such obligations meet the definition of Eligible Commodity Hedging Obligations.

"Environmental Capital Expenditures": Capital Expenditures required by, or reasonably related to the Company's or its Subsidiaries' compliance with, Environmental Laws.

"Environmental Laws": any and all foreign, Federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of human health or the environment, as now or may at any time hereafter be in effect.

"ERISA": the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated thereunder.

"ERISA Affiliate": all members of a group of corporations and all members of a group of trades or businesses (whether or not incorporated) under common control which, together with the Company, are treated as a single employer under Section 414(b) or (c) of the Code.

"ERISA Event": any of the following events: (i) the appointment of a trustee to administer or terminate any Plan, (ii) the termination of a Plan, (iii) any failure by any Plan to satisfy the minimum funding standards (within the meaning of Sections 412 or 430 of the Code or Section 302 of ERISA), whether or not waived, (iv) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan or the failure by the Company or any of its ERISA Affiliates to make any required contribution to a Multiemployer Plan, (v) a determination that any Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA), (vi) the imposition of a Lien under the Code or ERISA on the assets of the Company on account of any Plan, (vii) the occurrence of a reportable event described in Section 4043(c) of ERISA (other than those events as to which the 30-day notice period is waived) with respect to a Plan, or (viii) the incurrence by the Company of any liability in connection with a withdrawal from a Multiemployer Plan, or the determination that a Multiemployer Plan is, or is expected to be, insolvent (within the meaning of Section 4245 of ERISA), in reorganization (within the meaning of Section 4241 of ERISA) or in endangered or critical status (within the meaning of Section 432 of the Code or Section 305 or Title IV of ERISA).

"Eurocurrency Reserve Requirements": for any day as applied to a Eurodollar Loan, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including basic, supplemental, marginal and emergency reserves) under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System.

"Eurodollar Loans": Loans the rate of interest applicable to which is based upon the Eurodollar Rate.

"Eurodollar Rate": with respect to each day during each Interest Period pertaining to a Eurodollar Loan, the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on the Reuters Screen LIBOR01 Page (or any successor page as determined by the Administrative Agent) as of 11:00 A.M., London time, two Business Days prior to the beginning of such Interest Period; provided, that in no event shall the Eurodollar Rate (including for the purpose of determining ABR) be less than 1.75% per annum. In the event that such rate does not appear on such page (or otherwise on such screen), the "Eurodollar Rate" shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by the Administrative Agent or, in the absence of such availability, by reference to the rate at which the Administrative Agent is offered Dollar deposits at or about 11:00 A.M., New York City time, two Business Days prior to the beginning of such Interest Period in the interbank eurodollar market where its eurodollar and foreign currency and exchange operations are then being conducted for delivery on the first day of such Interest Period for the number of days comprised therein.

"Eurodollar Tranche": the collective reference to Eurodollar Loans the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"Event of Default": any of the events specified in Section 9, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Exchange Act": the Securities Exchange Act of 1934, as amended from time to time.

"Excluded Asset Sale": each of the following transactions:

(i)    the Disposition of damaged, obsolete, uneconomic or worn out property, or property which in the good faith judgment of the Company is no longer useful in its or the Restricted Subsidiaries' business, in each case, in the ordinary course of business;

(ii)   Dispositions (a) among the Company and Restricted Subsidiaries, (b) among Restricted Subsidiaries, or (c) to the NRG Parent Group;

(iii)  Dispositions of Cash Equivalents or other short-term investments;

(iv)   Dispositions by the Company or any Restricted Subsidiary of fuel or emission or environmental credits;

(v)    any Disposition or series of related Dispositions resulting in proceeds not in excess of $50,000,000;

(vi)   Restricted Payments permitted by Section 8.2;

(vii)  any Disposition in connection with a foreclosure, transfer or deed in lieu of foreclosure or other exercise of remedial action;

(viii) Dispositions, not resulting in the Disposing of all or substantially all of the assets of the Company and the Restricted Subsidiaries, of inventory, products, electric energy, commodities, capacity, ancillary services, fuel, rights, services or accounts receivable;

(ix) Investments permitted by Section 8.6;

(x)    a Disposition resulting from any condemnation; provided, if such Disposition involves assets with gross cash proceeds in excess of $50,000,000, that any cash proceeds received in connection therewith are treated as Net Cash Proceeds of an Asset Sale;

(xi)   compromises and settlements of claims against third-parties and Dispositions of assets in connection with the settlement of claims and litigation; and

(xii)  grants by the Company or any of its Subsidiaries of licenses, sublicenses, leases or subleases or easements to other Persons not materially interfering with the conduct by the Company or such Subsidiary of its business on or at the property that is the subject of such license, sublicense, lease or sublease or easement.

"Excluded Proceeds": Net Cash Proceeds from Asset Sales or Recovery Events in an amount not to exceed $300,000,000 in the aggregate in any fiscal year and $1,000,000,000 in the aggregate during the term of this Agreement.

"Existing Credit Agreement": as defined in the Recitals hereto.

"Existing Letters of Credit": the letters of credit assigned from the Borrowers to NRG pursuant to those certain L/C Assignment and Assumption Agreements.

"Existing Loan Documents": as defined in the Recitals hereto.

"Existing Obligations": as defined in the Recitals hereto.

"Expected Net Proceeds": the Net Cash Proceeds that the Company expects to receive in connection with a pending and binding Asset Sale or issuance or sale of Capital Stock.

"Extensions of Credit": as to any Lender at any time, an amount equal to the sum of (a) the aggregate principal amount of all Loans held by such Lender then outstanding and (b) such Lender's Revolving Percentage of the L/C Obligations then outstanding.

"Facility": the Commitments and the extensions of credit made thereunder.

"Fair Market Value": the value that would be paid by a willing buyer to a willing seller in a transaction not involving distress or necessity of either party, determined in good faith by the chief financial officer, treasurer, assistant treasurer, controller or board of directors of the Company or the selling entity.

"FATCA": Sections 1471 through 1474 of the Code, as of the date of this Agreement.

"Federal Funds Effective Rate": for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by Administrative Agent from three federal funds brokers of recognized standing selected by it.

"Fee Payment Date": (a) the third Business Day following the last day of each March, June, September and December and (b) the last day of the Commitment Period.

"Foreign Subsidiary": any Subsidiary of the Company that is not a Domestic Subsidiary.

"Foundation": RRI Energy Foundation, Inc, a Texas non-profit corporation, or any successor thereto.

"Funding Office": the office of the Administrative Agent specified in Section 11.2 or such other office as may be specified from time to time by the Administrative Agent as its funding office by written notice to the Company and the Lenders.

"GAAP": those generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect from time to time.

"GAI": as defined in the Preamble hereto.

"GEM": GenOn Energy Management, LLC, a Delaware limited liability company, or any successor thereto.

"GMA": GenOn Mid-Atlantic, LLC, a Delaware limited liability company, or any successor thereto.

"GMA Lease": collectively, the obligations of GMA as facility lessee under the eleven facility lease agreements, each dated as of December 19, 2000, and under the related participation agreements and other documents executed in connection therewith, in each case as amended, modified or supplemented from time to time.

14

"GMGEN": GenOn Americas Generation, LLC, a Delaware limited liability company.

"Governmental Authority": any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Group Members": the collective reference to the Company and the Restricted Subsidiaries.

"Guarantee": a guarantee other than by endorsement of negotiable instruments for collection in the ordinary course of business, direct or indirect, in any manner including by way of a pledge of assets or through letters of credit or reimbursement agreements in respect thereof, of all or any part of any Debt (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take or pay or to maintain financial statement conditions or otherwise). The term "Guarantee" as a verb has a corresponding meaning.

"Guarantee Agreement": the Guarantee Agreement dated as of the date hereof executed and delivered by the Subsidiary Guarantors in favor of the Administrative Agent, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Hedging Agreement": any agreement or arrangement referred to in the definition of "Hedging Obligations" entered into between any Loan Party and any Hedging Counterparty.

"Hedging Counterparties": with respect to any Hedging Agreement, any Specified Hedging Counterparty or Non-Specified Hedging Counterparty thereunder.

"Hedging Obligations": with respect to any Loan Party, the net obligations of such Person under: (a) interest rate swap agreements (whether from fixed to floating or from floating to fixed), interest rate cap agreements and interest rate collar agreements; (b) other agreements or arrangements designed to manage interest rate risk; and (c) other agreements or arrangements designed to protect such Person against fluctuations in currency exchange rates.

"Joinder to Security Agreement": as defined in Section 5.1(a).

"Indemnified Liabilities": as defined in Section 11.5(a).

"Indemnitee": as defined in Section 11.5(a).

"Interest Payment Date": (a) as to any ABR Loan, the last day of each March, June, September and December to occur while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Eurodollar Loan having an Interest Period of three months or less, the last day of such Interest Period, (c) as to any Eurodollar Loan having an Interest Period longer than three months, each day that is three months, or a whole multiple thereof, after the first day of such Interest Period and the last day of such Interest Period and (d) as to any Loan (other than any Loan that is an ABR Loan), the date of any repayment or prepayment made in respect thereof.

"Interest Period": as to any Eurodollar Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Loan and ending one, two, three or six months thereafter (or such other period as the Company and all Lenders may agree), as selected by the Company in its notice of borrowing or notice of conversion, as the case may be, given with respect thereto; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one, two, three or six months (or such other period as the Company and all Lenders may agree) thereafter, as selected by the Company by irrevocable notice to the Administrative Agent not later than 11:00 A.M., New York City time, on the date that is three Business Days prior to the last day of the then current Interest Period with respect thereto; provided that, all of the foregoing provisions relating to Interest Periods are subject to the following:

(i) if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii) the Borrowers may not select an Interest Period that would extend beyond the Termination Date; and

(iii) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month.

"Investments": as defined in Section 8.6.

"Issuing Bank": with respect to (a) the Existing Letters of Credit, JPMorgan Chase Bank, N.A., Deutsche Bank AG New York Branch or any of their Affiliates and (b) each Letter of Credit issued on or after the date hereof, each of Bank of America, N.A., Citibank, N.A., Deutsche Bank, AG New York, Morgan Stanley Bank, and each of their Affiliates, in each case, as long as qualifying as "Issuing Banks" pursuant to the NRG Credit Agreement, and any Lender, any other financial institution from time to time designated by the Company as an Issuing Bank with the consent of the Administrative Agent, and/or any Affiliate, in each case, in its capacity as issuer of any Letter of Credit; collectively, the "Issuing Banks".

"L/C Assignment and Assumption Agreements": that certain (a) Assignment and Assumption Agreement dated on or about the date hereof by and among the Borrowers, NRG and JPMorgan Chase Bank, N.A. and (b) Assignment and Assumption Agreement dated on or about the date hereof by and among the Borrowers, NRG and Deutsche Bank AG New York Branch.

"L/C Commitment": at any time, the aggregate amount of the Commitments then in effect.

"L/C Obligations": at any time, an amount equal to the sum of (a) the aggregate then undrawn and unexpired amount of the then outstanding Letters of Credit pursuant to Section 3 herein and (b) the aggregate amount of drawings under Letters of Credit that have not then been reimbursed pursuant to Section 3.5.

"L/C Participants": as to any Letter of Credit, the collective reference to all the Lenders other than the Lender that caused an Issuing Bank to issue such Letter of Credit.

"Lenders": as defined in the Preamble hereto.

"Letters of Credit": any letter of credit issued pursuant to this Agreement. As of the Closing Date, each Existing Letter of Credit shall be deemed to be a Letter of Credit hereunder as though issued hereunder on the Closing Date and the Company shall be the account party thereunder.

"Lien": any mortgage, pledge, lien, hypothecation, security interest or other charge, encumbrance or other arrangement in the nature of a security interest in property; provided, however, that the term "Lien" shall not mean any easements, survey exceptions, reservations (including those for, rights-of-way, sewers, electric lines, telegraph and telephone lines, other utilities, mineral reservations and rights), zoning restrictions, encroachments, minor title deficiencies, leases, subleases, licenses, sublicenses, or other restrictions on the use of property or other similar encumbrances.

"Loan": any loan made by any Lender pursuant to Section 2.4(a) of this Agreement, including, without limitation, the loans made on the Closing Date.

"Loan Documents": this Agreement, the Guarantee Agreement, the Security Documents, the Notes and any amendment, amendment and restatement, waiver, supplement or other modification to any of the foregoing.

"Loan Parties": the Borrowers and each of the Subsidiary Guarantors.

"Majority Lenders": at any time, the holders of more than 50% of the Total Commitments then in effect or, if the Commitments have been terminated, the Total Extensions of Credit then outstanding.

"Material Adverse Effect": a material adverse change in, or material adverse effect on, (i) the financial condition, operations, business or assets of the Company or its Subsidiaries, taken as a whole, which would have a material adverse effect on the ability of the Borrowers to pay amounts owed by it from time to time under the Facilities, or (ii) the validity or enforceability of this Agreement or any of the other Loan Documents against the Company or any Subsidiary Guarantor which would have a material adverse effect on the rights, remedies and benefits available to, or conferred upon, the Administrative Agent or the Lenders, taken as a whole.

"Material Agreement": a Contractual Obligation to which a Loan Party is a party or affecting a Loan Party or the properties of a Loan Party or its Subsidiaries (y) where such Contractual Obligation is identified in the exhibit list from time to time in filings made by the Company with the SEC as material to the Company or (z) the termination or suspension of which, without its prompt replacement, or the failure of any party thereto to perform its obligations thereunder, without prompt cure, in each case, would reasonably be expected to have a Material Adverse Effect.

"Merger": as defined in the Recitals hereto.

"Merger Agreement": as defined in the Recitals hereto.

"Merger Sub": as defined in the Recitals hereto.

"Moody's": Moody's Investors Service, Inc. or any successor thereto.

"Mortgaged Properties": the real properties listed on Schedule 1.1B and designated as properties for which a Mortgage will be delivered.

"Mortgages": each of the mortgages and deeds of trust made by any Loan Party in favor of, or for the benefit of, the Collateral Trustee for the benefit of the Secured Parties, in form and substance reasonably satisfactory to the Administrative Agent.

"Multiemployer Plan": as defined in Section 4001(a)(3) of ERISA.

"Net Cash Proceeds": (a) in connection with any Asset Sale or any Recovery Event, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received), net of attorneys' fees, accountants' fees, investment banking fees, amounts required to be applied to the repayment of Debt secured by a Lien expressly permitted hereunder on any asset that is the subject of such Asset Sale or Recovery Event (other than any Lien pursuant to a Security Document) and other customary fees and expenses actually incurred in connection therewith and net of Taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements) and (b) in connection with any issuance or sale of Capital Stock or any incurrence of Debt, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith.

"Non-Excluded Taxes": as defined in Section 2.17(a).

"Non-Specified Hedging Counterparty": with respect to any Hedging Agreement, any counterparty thereto other than a Specified Hedging Counterparty.

"Notes": the collective reference to any promissory note evidencing Loans.

"NRG": as defined in the Recitals hereto.

"NRG Credit Agreement": that certain Amended and Restated Credit Agreement, dated as of July 1, 2011, among NRG, the lenders from time to time party thereto, Citicorp North America, Inc., Bank of America, N.A., Deutsche Bank AG New York Branch, Morgan Stanley Bank, N.A., Morgan Stanley Senior Funding, Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Barclays Capital, The Investment Banking Division of Barclays Bank PLC, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Goldman Sachs Bank USA, J.P. Morgan Securities LLC, RBS Securities Inc., The Bank of Tokyo-Mitsubishi UFJ, Ltd. and Union Bank, N.A., as amended, amended and restated, refinanced, extended, supplemented or otherwise modified or replaced from time to time.

"NRG Parent Group": NRG and its Subsidiaries from time to time (other than the Company and its Subsidiaries).

"Obligations": the unpaid principal of and interest on (including interest accruing after the maturity of the Loans and Reimbursement Obligations and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to either Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans and all other obligations (including guarantee obligations) and liabilities of the Borrowers or any other Loan Party to the Administrative Agent or to any Lender (or, in the case of Hedging Agreements, any Specified Hedging Counterparty), whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, the Guarantee Agreement, any other Loan Document, the Letters of Credit, any Hedging Agreement or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by either Borrower pursuant hereto) or otherwise.

"Other Taxes": any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, including any interest, additions to tax or penalties applicable thereto.

"Participant": as defined in Section 11.6(c).

"Participant Register": as defined in Section 11.6(c).

"Patriot Act": The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended.

"Pay-Off": as defined in the Recitals.

"Permitted Debt":

(i) (A) the Loans and other obligations of any Loan Party under any Loan Document and (B) Debt of the Borrowers and the Restricted Subsidiaries (which may be secured as to the extent currently secured) existing on the Closing Date and not refinanced with the proceeds of the Debt referred to in clause (v) below;

(ii) up to $800,000,000 of additional Debt;

(iii) [reserved];

(iv) Debt incurred to finance environmental Capital Expenditures and other Capital Expenditures made to comply with law and, additionally, with respect to GMA and its Subsidiaries and REMA and its Subsidiaries, to finance Required Improvements (which may be secured by the capital assets or Required Improvements and related assets) of such Persons;

(v) new senior unsecured notes in an amount not exceeding $1,200,000,000;

(vi) Hedging Obligations consistent with industry practice;

(vii) Debt in respect of workers' compensation claims, self-insurance obligations, bankers' acceptances, performance and surety bonds;

(viii) Debt arising from overdrafts, so long as such Debt is repaid within five Business Days;

(ix) Debt arising from agreements providing for indemnification, adjustment of purchase price or similar obligations incurred in connection with the sales of assets, provided that the maximum aggregate liability in respect of all such debt shall not exceed the gross proceeds (including non-cash proceeds) actually received;

(x) Debt of REMA and its Subsidiaries of up to $60,000,000;

(xi) Debt of a Person existing at the time such Person first became a Subsidiary of the Company; provided that such Debt was not incurred in contemplation of such acquisition (it being agreed that, in the case of a fluctuating balance facility, the Debt permitted hereunder will include amounts later drawn on unfunded commitments existing at the time such Person first became a Subsidiary of the Company);

(xii) Project Finance Debt;

19

(xiii) Debt between or among the Company and any of its Subsidiaries; provided, that (A) any such Debt of a Loan Party owed to an Unrestricted Subsidiary shall be subordinated to the prior payment in full in cash of the obligations under this Agreement in a customary manner (it being agreed that no blockage of payments will apply except after written notice by the Administrative Agent given while an Event of Default has occurred and is continuing); and (B) (x) any subsequent issuance or transfer of Capital Stock that results, (1) in any such Debt of a Restricted Subsidiary that is not a Subsidiary Guarantor being held by a Person other than the Company or a Restricted Subsidiary or (2) in any such Debt of any Subsidiary Guarantor being held by a Person other than the Company or any Subsidiary and (y) any sale or other transfer of any such Debt (1) of a Restricted Subsidiary that is not a Subsidiary Guarantor to a Person other than the Company or a Restricted Subsidiary or (2) of a Loan Party to a Person other than the Company or any other Subsidiary shall be deemed, in each case, to constitute an incurrence of such Debt by the Company or such Restricted Subsidiary, as the case may be, that was not permitted by this clause;

(xiv) Debt secured by Liens permitted under clauses (f) and (g) of Section 8.3; and

(xv) Debt owing to any entity of the NRG Parent Group;

(xvi) Refinancing, renewals or replacements of Debt permitted under this Agreement (which may be secured by the same assets as the refinanced or renewed Debt); provided, that any such refinancing, renewal or replacement of Debt (A) is either in an amount not in excess of the principal amount outstanding or committed under the Debt being refinanced, renewed or replaced immediately prior to such refinancing, renewal or replacement (plus, in each case, any applicable fees or expenses and redemption or repurchase premiums or penalties), or such excess amount is otherwise permitted to be incurred under this Agreement without reference to this clause (xvi), (B) provides for a final maturity date no earlier than the existing scheduled maturity date of the Debt being refinanced or renewed and (C) if the Debt refinanced, renewed or replaced is subordinated to the Obligations, is subordinated in a like manner and extent.

"Person": an individual, company, corporation, firm, partnership, joint venture, undertaking, association, organization, trust, state or agency of a state or limited liability company (in each case whether or not having separate legal personality).

"Plan": any plan described in Section 3(2) of ERISA that is subject to Title IV of ERISA, maintained or contributed to by the Company or any ERISA Affiliate.

"Proceedings": as defined in Section 11.5(b).

"Project Finance Debt": Debt (not exceeding the cost of the acquisition, construction or creation of the relevant asset or project) of the Company or a Restricted Subsidiary incurred or existing in connection with the financing or refinancing of any asset or project, the repayment of which Debt is to be made from the revenues arising out of, or other proceeds of realization from, the acquired or created asset or project, with recourse to those revenues and proceeds and assets forming the subject matter of such asset or project (including, without limitation, insurance, contracts and shares or other rights of ownership in the entity(ies) which own the relevant assets or project) and other assets ancillary thereto but without substantial recourse to any other asset or otherwise to any Person other than the borrower under such Project Finance Debt; provided that substantial recourse shall not be deemed to exist by reason of (i) normal and customary sponsor support arrangements, including, without limitation, services and operational and administrative support, (ii) recourse against any Project Subsidiary including any direct or indirect parent entity of any

Project Subsidiary, substantially all of the assets of which consist of the equity of one or more Project Subsidiaries, or (iii) recourse against the equity of a Project Subsidiary pledged by the Company or any of the Restricted Subsidiaries to secure the debt of such Project Subsidiary or any Subsidiary of such Project Subsidiary.

"Project Subsidiary": any Person other than the Company obligated in respect of any Project Finance Debt.

"Recovery Event": any settlement of or payment in respect of any insurance or indemnity claim or any condemnation proceeding relating to any asset of any Group Member.

"Refinancing": as defined in the Recitals hereto.

"Register": as defined in Section 11.6(b).

"Regulation U": Regulation U of the Board as in effect from time to time.

"Reimbursement Obligation": the obligation of the Borrowers to reimburse the Administrative Agent or any Lender pursuant to Section 3.5 for amounts drawn under Letters of Credit.

"Reimbursement Payment": as defined in Section 2.5(b).

"Reinvestment Event": any Asset Sale or Recovery Event in respect of which the Company has delivered a Reinvestment Notice.

"Reinvestment Notice": a written notice executed by a Responsible Officer stating (i) in the case of an Asset Sale only, that no Event of Default has occurred and is continuing and (ii) that the Company (directly or indirectly through a Restricted Subsidiary) intends and expects to use all or a specified portion of the Net Cash Proceeds of an Asset Sale or Recovery Event to acquire or repair assets useful in its business.

"REMA": GenOn REMA, LLC, a Delaware limited liability company, or any successor thereto.

"REMA Lease": collectively, the obligations of REMA as facility lessee under the three facility lease agreements, each dated as of August 24, 2000, and under the related participation agreements and other documents executed in connection therewith, in each case as amended, amended and restated, modified or supplemented from time to time.

"Required Improvements": modifications, alterations, additions or improvements to any GMA or REMA owned or leased project facility required (x) by Requirements of Law or by any Governmental Authority having jurisdiction thereon, (y) by any insurance policy required to be maintained by GMA or REMA, as applicable, under any document related to the GMA Lease or REMA Lease, as applicable, or (z) by the terms of any document related to the GMA Lease or REMA Lease, as applicable.

"Requirement of Law": as to any Person, any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"RES": RRI Energy Services, Inc., a Delaware corporation, or any successor thereto.

"Responsible Officer": as to each Borrower, the chief executive officer, president, chief financial officer, treasurer, assistant treasurer or controller of such Borrower.

"Restricted Payments": as defined in Section 8.2.

"Restricted Subsidiaries": all Subsidiaries of the Company other than Unrestricted Subsidiaries.

"Returns": as defined in Section 4.14.

"Revolving Percentage": as to any Lender at any time, the percentage which such Lender's Commitment then constitutes of the Total Commitments or, at any time after the Commitments shall have expired or terminated, the percentage which the aggregate principal amount of such Lender's Loans then outstanding constitutes of the aggregate principal amount of the Loans then outstanding, provided, that, in the event that the Loans are paid in full prior to the reduction to zero of the Total Extensions of Credit, the Revolving Percentages shall be determined in a manner designed to ensure that the other outstanding Extensions of Credit shall be held by the Lenders on a comparable basis.

"S&P": Standard & Poor's Ratings Services, a division of the McGraw Hill Companies, Inc., or any successor thereto.

"SEC": the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"Secured Parties": as defined in the Security Agreement.

"Security Agreement": the Security Agreement dated as of September 20, 2010 executed and delivered by the Borrowers and each Subsidiary Guarantor in favor of Collateral Trustee, as amended, amended and restated, supplemented or otherwise modified from time to time (including, without limitation, pursuant to that certain Joinder to Security Agreement).

"Security Documents": the collective reference to the Security Agreement, the Collateral Trust Agreement, the Mortgages, any intercreditor agreement in respect of second-lien or subordinated Debt and all other security documents delivered to the Collateral Trustee granting a Lien on any property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document.

"Specified Hedging Counterparty": with respect to any Hedging Agreement, any counterparty thereto that, at the time any such Hedging Agreement was entered into, was a Lender or an Affiliate of a Lender.

"Subsidiary": as to any Person, any corporation, partnership, joint venture, limited liability company, trust or estate of which (or in which) more than 50% of (a) the voting stock, (b) the interest in the capital or profits of such limited liability company, partnership or joint venture or (c) the beneficial interest in such trust or estate is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more of its Subsidiaries or by one or more of such Person's other Subsidiaries. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Company.

"Subsidiary Guarantor": each Restricted Subsidiary of the Company other than (a) any Foreign Subsidiary, (b) GEM, (c) GMA, (d) REMA, (e) MC Asset Recovery, LLC, (f) RES and (g) GMGEN (including, with respect to the Persons referred to in clauses (b) through (g), each of their respective Subsidiaries) and (h) each of the entities from time to time designated to Administrative Agent (so long as after the date hereof, such Subsidiary does not acquire any material assets), attached hereto; provided, however, that Subsidiaries of GMGEN (other than GEM and GMA and their respective Subsidiaries, which shall not be Subsidiary Guarantors), shall be Subsidiary Guarantors to the extent permitted by Section 102 of that certain Seventh Supplemental Indenture, dated as of January 3, 2006, between GMGEN and Wells Fargo Bank, National Association.

"Swap Agreement": any agreement, including any Hedging Agreement, with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Company or any of its Subsidiaries shall be a "Swap Agreement".

"Synthetic Lease Obligation": the monetary obligation of a Person under a so-called synthetic, off-balance sheet or tax retention lease.

"Taxes": any present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date": the third anniversary of the Closing Date.

"Total Commitments": at any time, the aggregate amount of the Commitments then in effect. The original amount of the Total Commitments is $500,000,000.00.

"Total Extensions of Credit": at any time, the aggregate amount of the Extensions of Credit of the Lenders outstanding at such time.

"Tranche": the respective Facility and commitments utilized in making Loans hereunder.

"Transaction": as defined in the Recitals.

"Transferee": any Assignee or Participant.

"Type": as to any Loan, its nature as an ABR Loan or a Eurodollar Loan.

"United States": the United States of America.

"Unrestricted Subsidiaries": The entities listed on Schedule 1.1D and any Subsidiary of the Company that is designated by the Company as an Unrestricted Subsidiary, but only to the extent that such Subsidiary (i) has no Debt with substantial recourse to the Company or a Restricted Subsidiary; provided that substantial recourse shall not be deemed to exist by reason of normal and customary sponsor support arrangements, including, without limitation, services and operational and administrative support, (ii) except as permitted under Section 8.7, is not party to any agreement or contract with the Company or a Restricted Subsidiary unless the terms of such agreement are no less favorable to the Company or such Restricted Subsidiary than those that might be obtained from an unaffiliated third-party, and (iii) is a Person with respect to which neither the Company nor any Restricted Subsidiary has any direct or indirect obligation to make capital contributions or to maintain such Subsidiary's financial condition.

"Weighted Average Life to Maturity": when applied to any Debt at any date, the number of years obtained by dividing:

(i) the sum of the products obtained by multiplying (A) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect of the Debt, by (B) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by

(ii) the then outstanding principal amount of such Debt.

"Withholding Agent": any Loan Party and the Administrative Agent.

1.2 <u>Other Definitional Provisions</u>. (a)  Unless otherwise specified therein, all terms defined in this Agreement shall have the same defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b) As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, accounting terms relating to any Group Member not defined in <u>Section 1.1</u> and accounting terms partly defined in <u>Section 1.1</u>, to the extent not defined, shall have the respective meanings given to them under GAAP. Unless otherwise specified, all accounting determinations and computations made hereunder shall be made in accordance with GAAP.

(c) As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (ii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iii) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, accounts, leasehold interests and contract rights, and (iv) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

(d) The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(e) The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(f) Notwithstanding any other provision contained herein, all computations of amounts and ratios referred to in this Agreement shall be made without giving effect to any election under FASB ASC Topic 825 "Financial Instruments" (or any other financial accounting standard having a similar result or effect) to value any Debt or other liabilities of the Borrowers at "fair value" as defined therein.

## SECTION 2. AMOUNT AND TERMS OF COMMITMENTS

2.1 <u>Existing Obligations</u>. Each of the Borrowers hereby acknowledges and confirms that (a) immediately prior to giving effect to this Agreement, the Existing Obligations equaled an aggregate amount of principal and interest of $694,384,379.67, (b) substantially concurrent with giving effect to this Agreement, Borrowers repaid, discharged and satisfied in full the Existing Obligations, and (c) except for indemnities and other contingent obligations not due and payable or for which no claims have been made, no Existing Obligations exist and all underlying commitments have been terminated.

2.2 [Reserved].

2.3 [Reserved].

2.4 <u>Commitments</u>. (a) Subject to the terms and conditions hereof, each Lender severally agrees to make revolving credit loans to each Borrower from time to time during the Commitment Period in an aggregate principal amount at any one time outstanding which, when added to such Lender's Revolving Percentage of the L/C Obligations then outstanding, does not exceed the amount of such Lender's Commitment. During the Commitment Period each Borrower may use the Commitments by borrowing, prepaying the Loans in whole or in part, and reborrowing, all in accordance with the terms and conditions hereof. The Loans may

from time to time be Eurodollar Loans or ABR Loans, as determined by the Company and notified to the Administrative Agent in accordance with Sections 2.5 and 2.10.

(b) The Borrowers shall repay all outstanding Loans on the Termination Date.

2.5. <u>Procedure for Loan Borrowing</u>. (a) The Borrowers may borrow under the Commitments during the Commitment Period on any Business Day, provided the Company shall give the Administrative Agent irrevocable notice (which notice must be received by the Administrative Agent (i) prior to 12:00 Noon, New York City time, five Business Days (or such later time as may be agreed to by Administrative Agent in its sole discretion) prior to the requested Borrowing Date, in the case of Eurodollar Loans, or (ii) prior to 12:00 Noon, New York City time three Business Days (or such later time as may be agreed to by Administrative Agent in its sole discretion) prior to the requested Borrowing Date, in the case of ABR Loans (including for purposes of financing payments required by Section 3.5), specifying (A) the amount and Type of Loans to be borrowed, (B) the requested Borrowing Date, (C) the account to which such Borrowing should be credited or wired, and (D) in the case of Eurodollar Loans, the respective amounts of each such Type of Loan and the respective lengths of the initial Interest Period therefor. Notwithstanding the foregoing, the Borrowers may notify Administrative Agent by telephone or electronic communication of any such request within the time periods set forth herein as long as Borrower thereafter promptly sends written notice containing the information specified in this Section 2.5. Any Loans made on the Closing Date shall initially be ABR Loans. Each borrowing under the Commitments shall be in an amount equal to $5,000,000 or a whole multiple of $1,000,000 in excess thereof (or, if the then aggregate Available Commitments are less than $1,000,000, such lesser amount). Upon receipt of any such notice from a Borrower, the Administrative Agent shall promptly notify each Lender thereof. Each Lender will make the amount of its pro rata share of each borrowing available to the Administrative Agent for the account of the Borrowers at the Funding Office prior to 12:00 Noon, New York City time, on the Borrowing Date (or such later time as may be agreed to by Administrative Agent in its sole discretion) requested by the Company in funds immediately available to the Administrative Agent. The Administrative Agent will then make the borrowings available to the Borrowers in accordance with this Section in such amounts as made available to the Administrative Agent by the Lenders and in like funds as received by the Administrative Agent from the Lenders.

(b) In the event that either Borrower fails to reimburse any Lender in accordance with Section 3.5 for the amount of any draft paid by such Lender under any Letter of Credit issued by it, and for all other amounts due in connection therewith pursuant to Section 3.5 (the "Reimbursement Payment"), then on the date that the Reimbursement Payment is due, the Borrowers shall be deemed to have made a request for a borrowing of ABR Loans in an amount equal to the Reimbursement Payment, which deemed request shall not be subject to any condition precedent set forth in Section 5.2 and shall be irrevocable. Each Lender acknowledges and agrees that its obligation to make its pro rata share of any such borrowing available to the Administrative Agent is absolute and unconditional and shall not be affected by any event, happening or circumstance whatsoever, including the failure of any condition precedent set forth in Section 5.2 to be satisfied at the time of such deemed request.

2.6 <u>Commitment Fees, etc.</u> The Company agrees to pay to the Administrative Agent for the account of each Lender a commitment fee for the period from and including the Closing Date to the Termination Date, computed at the Commitment Fee Rate on the average daily amount of the Available Commitment of such Lender during the period for which payment is made, payable quarterly in arrears on each Fee Payment Date, commencing on the first such date to occur after the Closing Date..

2.7 <u>Termination or Reduction of Commitments</u>. The Company shall have the right, upon not less than three Business Days'(or such shorter period as may be agreed to by Administrative Agent in its sole discretion) notice to the Administrative Agent, to terminate the Commitments or, from time to time, to reduce the amount of the Commitments; <u>provided</u> that no such termination or reduction of Commitments shall be

permitted if, after giving effect thereto and to any prepayments of the Loans made on the effective date thereof, the Total Extensions of Credit would exceed the Total Commitments. Any such reduction shall be in an amount equal to $1,000,000, or a whole multiple thereof, and shall reduce permanently the Commitments then in effect.

2.8 <u>Optional Prepayments</u>. The Borrowers may at any time and from time to time prepay the Loans, in whole or in part, without premium or penalty, upon irrevocable notice delivered to the Administrative Agent no later than 11:00 A.M., New York City time, one Business Day prior thereto, in the case of Eurodollar Loans (or such shorter time as Administrative Agent accepts in its sole discretion), and no later than 11:00 A.M., New York City time, on the same Business Day, in the case of ABR Loans (or such shorter time as Administrative Agent accepts in its sole discretion), which notice shall specify the date and amount of prepayment and whether the prepayment is of Eurodollar Loans or ABR Loans; <u>provided</u>, that if a Eurodollar Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrowers shall also pay any amounts owing pursuant to <u>Section 2.18</u>. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with (except in the case of Loans that are ABR Loans) accrued interest to such date on the amount prepaid, unless, in each case, such notice is rescinded in writing. Partial prepayments of Loans shall be in an aggregate principal amount of $1,000,000 or a whole multiple thereof.

2.9 <u>Mandatory Prepayments</u>. (a) (i) If within ten (10) Business Days of any date the Company or any Restricted Subsidiary shall receive Net Cash Proceeds from any Asset Sale or Recovery Event (other than Excluded Proceeds), then, if the Company shall not have delivered a Reinvestment Notice in respect thereof on or prior to such date, the Company shall apply such Net Cash Proceeds on such date to the prepayment of the Loans as set forth in <u>Section 2.9(c)</u>. If the Company shall have delivered a Reinvestment Notice in respect thereof, then on the tenth (10th) Business Day after the date of receipt of such Net Cash Proceeds, the Borrowers shall apply the portion thereof, if any, that neither the Company nor any Restricted Subsidiary intends to use to acquire or repair assets useful in its business to such prepayment.

(ii) If on or prior to the date falling 365 days after the receipt of Net Cash Proceeds (other than Excluded Proceeds) from a Reinvestment Event, the Company shall not have delivered a Reinvestment Commitment Notice in respect of the Net Cash Proceeds described in clause (i) above not constituting Excluded Proceeds, the Borrowers shall apply such Net Cash Proceeds on such date (to the extent not previously so applied or expended) to the prepayment of the Loans as set forth in <u>Section 2.9(c)</u>. If on or prior to the date falling 365 days after the receipt of Net Cash Proceeds (other than Excluded Proceeds) from a Reinvestment Event, the Company shall have delivered a Reinvestment Commitment Notice in respect of the Net Cash Proceeds not constituting Excluded Proceeds described in clause (i) above, then (x) on the date of such notice, the Borrowers shall apply (to the extent not previously so applied or expended) the portion, if any, of such Net Cash Proceeds that the Company or any Restricted Subsidiary has not committed in such notice to use to acquire or repair assets useful in its business to such prepayment and (y) on the date falling 18 months from the date of receipt of such Net Cash Proceeds, the Borrowers shall apply any Net Cash Proceeds not applied to the acquisition or repair of assets useful in its business to such prepayment as set forth in <u>Section 2.9(c)</u> (to the extent not previously so applied).

(b) If any Debt shall be issued or incurred by any Loan Party (other than Debt permitted to be issued or incurred under <u>Section 8.1</u>), an amount equal to 100% of the Net Cash Proceeds thereof shall be applied on the date of such issuance or incurrence toward the prepayment of the Loans as set forth in <u>Section 2.9(c)</u>.

(c) Amounts to be applied in connection with prepayments made pursuant to <u>Section 2.9</u> shall be applied to the prepayment of the Loans in accordance with <u>Section 2.15(c)</u>, with a permanent reduction in the Commitments thereof. The application of any prepayment pursuant to <u>Section 2.9</u> shall be made, <u>first</u>,

26

to ABR Loans and, second, to Eurodollar Loans. Each prepayment of the Loans under Section 2.9 shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid.

2.10 Conversion and Continuation Options. (a) The Borrowers may elect from time to time to convert Eurodollar Loans to ABR Loans by the Company giving the Administrative Agent prior irrevocable notice of such election no later than 11:00 A.M., New York City time, on the Business Day (or such later time as may be agreed to by Administrative Agent in its sole discretion) immediately preceding the proposed conversion date, provided that any such conversion of Eurodollar Loans may only be made on the last day of an Interest Period with respect thereto. The Company may elect from time to time to convert ABR Loans to Eurodollar Loans by the Company giving the Administrative Agent prior irrevocable notice of such election no later than 11:00 A.M., New York City time, on the third Business Day (or such later time as may be agreed to be Administrative Agent in its sole discretion) immediately preceding the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor), provided that no ABR Loan may be converted into a Eurodollar Loan when any Event of Default has occurred and is continuing and the Administrative Agent or the Majority Lenders have determined in its or their sole discretion not to permit such conversions. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b) Any Eurodollar Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Company giving irrevocable notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1, of the length of the next Interest Period to be applicable to such Loans, provided that no Eurodollar Loan may be continued as such when any Event of Default has occurred and is continuing and the Administrative Agent has or the Majority Lenders have determined in its or their sole discretion not to permit such continuations, and provided, further, that if the Company shall fail to give any required notice as described above in this paragraph or if such continuation is not permitted pursuant to the preceding proviso such Loans shall be automatically converted to ABR Loans on the last day of such then expiring Interest Period. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

2.11 Limitations on Eurodollar Tranches. Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions and continuations of Eurodollar Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that, (a) after giving effect thereto, the aggregate principal amount of the Eurodollar Loans comprising each Eurodollar Tranche shall be equal to $5,000,000 or a whole multiple of $1,000,000 in excess thereof and (b) no more than ten Eurodollar Tranches shall be outstanding at any one time.

2.12 Interest Rates and Payment Dates. (a) Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such day plus the Applicable Margin.

(b)Each ABR Loan shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.

(c) (i) If (x) all or a portion of the principal amount of any Loan or Reimbursement Obligation shall not be paid when due (whether at the stated maturity, by acceleration or otherwise) or (y) all or a portion of any interest payable on any Loan or Reimbursement Obligation or any commitment fee or other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amounts shall bear interest at a rate per annum equal to the rate that would otherwise be applicable thereto under this Agreement plus 2%, in each case, with respect to sub-clauses (x) and (y) above, from the date of such non-payment until such amount is paid in full (as well after as before judgment).

(d) Interest shall be payable in arrears on each Interest Payment Date, provided that interest accruing pursuant to paragraph (c) of this Section shall be payable from time to time on demand.

2.13 Computation of Interest and Fees. (a) Interest and fees payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that, with respect to ABR Loans the rate of interest on which is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed. The Administrative Agent shall promptly upon the Company's or any Lender's written request notify the Company and the relevant Lenders of each determination of a Eurocurrency Rate. Any change in the interest rate on a Loan resulting from a change in the ABR or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective. The Administrative Agent shall promptly upon the Company's or any Lender's written request notify the Company and Lenders of the effective date and the amount of each such change in interest rate.

(b) Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrowers and the Lenders in the absence of manifest error. The Administrative Agent shall, at the request of the Company, deliver to the Company a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.12(a).

2.14 Inability to Determine Interest Rate. If prior to the first day of any Interest Period:

(a) the Administrative Agent shall have determined (which determination shall be conclusive and binding upon the Borrowers) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

(b) the Administrative Agent shall have received notice from the Majority Lenders that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining their affected Loans during such Interest Period,

the Administrative Agent shall give telecopy or telephonic notice thereof to the Company and Lenders promptly thereafter. If such notice is given (x) any Eurodollar Loans requested to be made on the first day of such Interest Period shall be made as ABR Loans, (y) any Loans that were to have been converted on the first day of such Interest Period to Eurodollar Loans shall be continued as ABR Loans and (z) any outstanding Eurodollar Loans shall be converted, on the last day of the then-current Interest Period, to ABR Loans. Until such notice has been withdrawn by the Administrative Agent, no further Eurodollar Loans shall be made or continued as such, nor shall the Borrowers have the right to convert Loans to Eurodollar Loans.

2.15 Pro Rata Treatment and Payments. (a) Each borrowing by the Borrowers from the Lenders hereunder, each payment by the Company on account of any commitment fee and any reduction of the Commitments of the Lenders shall be made pro rata according to the respective Revolving Percentages of the relevant Lenders.

(b) [Reserved].

(c) Each payment (including each prepayment) by the Borrowers on account of principal of and interest on the Loans shall be made pro rata according to the respective outstanding principal amounts of the Loans then held by the Lenders.

(d) All payments (including prepayments) to be made by the Borrowers hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior

to 2:00 p.m., New York City time, on the due date thereof to the Administrative Agent, for the account of the Lenders, at the Funding Office, in Dollars and in immediately available funds. The Administrative Agent shall distribute such payments to the Lenders promptly upon receipt in like funds as received. If any payment hereunder (other than payments on the Eurodollar Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(e) Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the relevant Borrower a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon, at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be conclusive in the absence of manifest error. If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to ABR Loans under the relevant Facility, on demand, from the Borrowers.

(f) Unless the Administrative Agent shall have been notified in writing by the Company prior to the date of any payment due to be made by the Borrowers hereunder that the Borrowers will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrowers are making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective pro rata shares of a corresponding amount. If such payment is not made to the Administrative Agent by the Borrowers within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrowers.

2.16  Requirements of Law. (a) If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

    (i)     shall change the basis of taxation of payments to such Lender in respect of this Agreement, any Letter of Credit, any Application or any Eurodollar Loan made by it (except for changes in the rate of tax on, or determined by reference to, the overall net income or gross income of such Lender); or

    (ii)    shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of,

advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender that is not otherwise included in the determination of the Eurodollar Rate

and the result of any of the foregoing is to increase the cost to such Lender, of making, converting into, continuing or maintaining Eurodollar Loans or issuing or participating in Letters of Credit, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrowers shall promptly pay such Lender, upon its demand, any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable. If any Lender becomes entitled to claim any additional amounts pursuant to this paragraph, it shall promptly notify the Company (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b) If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder or under or in respect of any Letter of Credit to a level below that which such Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy) by an amount deemed by such Lender to be material, then from time to time, after submission by such Lender to the Company (with a copy to the Administrative Agent) of a written request therefor, the Borrowers shall pay to such Lender such additional amount or amounts as will compensate such Lender or such corporation for such reduction.

(c) A certificate as to any additional amounts payable pursuant to this Section submitted by any Lender to the Company (with a copy to the Administrative Agent) shall be conclusive in the absence of manifest error. Notwithstanding anything to the contrary in this Section, the Borrowers shall not be required to compensate a Lender pursuant to this Section for any amounts incurred more than four months prior to the date that such Lender notifies the Company of such Lender's intention to claim compensation therefor; provided that, if the circumstances giving rise to such claim have a retroactive effect, then such four-month period shall be extended to include the period of such retroactive effect. The obligations of the Borrowers pursuant to this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.17 Taxes. (a) All payments made by or on account of any Loan Party under this Agreement or any other Loan Document shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding any tax imposed on or measured by the net income or net profits or capital (or any franchise or similar tax imposed in lieu thereof) of the Administrative Agent or any Lender as a result of a present or former connection between the Administrative Agent or such Lender or the principal office or applicable lending office of such Lender or any subdivision thereof or therein and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the Administrative Agent or such Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document); provided that, if any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("Non-Excluded Taxes") or Other Taxes are required to be withheld or deducted from any amounts payable to the Administrative Agent or any Lender hereunder (as determined by the applicable Withholding Agent in good faith), (i) the applicable Withholding Agent shall deduct such amounts and (ii) the amounts so payable by the applicable Loan Party to the Administrative Agent or such Lender

shall be increased to the extent necessary to yield to the Administrative Agent or such Lender (including any Non-Excluded Taxes and Other Taxes imposed on additional amounts payable pursuant to this <u>Section 2.17(a)</u>) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement as if such withholding or deduction had not been made, <u>provided</u>, <u>further</u>, <u>however</u>, that no Loan Party shall be required to increase any such amounts payable to any Lender with respect to any Non-Excluded Taxes that are United States withholding taxes resulting from any Requirement of Law in effect (including FATCA) on (and, in the case of FATCA, including any regulations or official interpretations thereof issued after) the date such Lender becomes a party to this Agreement, except to the extent that such Lender's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from the Loan Party with respect to such Non-Excluded Taxes pursuant to this <u>Section 2.17(a)</u>.

(b) In addition, the Borrowers shall pay, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c) Whenever any Non-Excluded Taxes or Other Taxes are payable by a Loan Party, within thirty (30) days (or such longer period of time as agreed to by the Administrative Agent in its sole discretion) thereafter such Loan Party shall send to the Administrative Agent for its own account or for the account of the relevant Lender, as the case may be, a certified copy of a tax receipt received by such Loan Party showing payment thereof or such other document reasonably satisfactory to the Administrative Agent showing payment thereof. If (i) any Non-Excluded Taxes or Other Taxes are imposed directly on the Administrative Agent or any Lender, (ii) a Loan Party fails to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate Governmental Authority or (iii) a Loan Party fails to remit to the Administrative Agent the required receipts or other required documentary evidence, the applicable Loan Party shall indemnify the Administrative Agent and the Lenders upon their written request for such amounts, incremental taxes, interest, penalties and reasonable expenses arising therefrom or with respect thereto that may become payable by the Administrative Agent or any Lender as a result of any such failure in the case of (ii) or (iii), or any such direct imposition in the case of (i).

(d) Each Lender shall severally indemnify the Administrative Agent for any Taxes (but in the case of Non-Excluded Taxes, only to the extent that the Borrowers have not already indemnified the Administrative Agent for any such Non-Excluded Taxes and without limiting the obligation of the Borrowers to do so) attributable to such Lender that are paid or payable by the Administrative Agent in connection with this Agreement and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. The indemnity under this <u>Section 2.17(d)</u> shall be paid within 10 days after the Administrative Agent delivers to the applicable Lender a certificate stating the amount of Taxes so paid or payable by the Administrative Agent. Such certificate shall be conclusive of the amount so paid or payable absent manifest error.

(e) [Reserved].

(f) [Reserved].

(g) [Reserved].

(h) The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.18 <u>Indemnity</u>. Each Borrower agrees, jointly and severally, to indemnify each Lender for, and to hold each Lender harmless from, any actual and documented loss or expense determined in accordance with this <u>Section 2.18</u> that such Lender may sustain or incur as a consequence of (a) default by either Borrower in making a borrowing of, conversion into or continuation of Eurodollar Loans after the Company has given

a notice requesting the same in accordance with the provisions of this Agreement, (b) default by either Borrower in making any prepayment of or conversion from Eurodollar Loans after the Company has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Eurodollar Loans on a day that is not the last day of an Interest Period with respect thereto. Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, converted or continued, for the period from the date of such prepayment or of such failure to borrow, convert or continue to the last day of such Interest Period (or, in the case of a failure to borrow, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market. A certificate as to any amounts payable pursuant to this Section submitted to the Company by any Lender shall be conclusive in the absence of manifest error. Notwithstanding anything to the contrary in this Section, neither Borrower shall be required to compensate a Lender pursuant to this Section for any loss or expense resulting from any event set forth in clauses (a), (b) or (c) of the first sentence of this Section if such event occurred more than sixty (60) days prior to any demand for indemnification by such Lender. This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.19 <u>Joint and Several Liability</u>. The Borrowers shall be jointly and severally liable for the Obligations.

SECTION 3. LETTERS OF CREDIT

3.1 <u>L/C Commitment</u>. (a) Subject to the terms and conditions hereof, each Lender, in reliance on the agreements of the other Lenders set forth in <u>Section 3.4(a)</u>, agrees to cause one or more of the Issuing Banks to issue Letters of Credit for the account of one or more of the Borrowers on any Business Day during the Commitment Period in such form as may be approved from time to time by such Lender and such Issuing Bank; <u>provided</u> that any Lender is entitled to conclusively rely on advice from the Administrative Agent that causing the Issuing Bank to issue the Letters of Credit is permitted under the Agreement without further inquiry; and <u>provided</u>, <u>further</u>, that no Lender shall have any obligation to cause any Issuing Bank to issue any Letter of Credit if, after giving effect to such issuance, (i) the L/C Obligations would exceed the L/C Commitment, (ii) the aggregate amount of the Available Commitments would be less than zero or (iii) the L/C Obligations with respect to all Letters of Credit issued on behalf of such Lender by any Issuing Bank would exceed such Lender's Commitment. Each Letter of Credit shall (i) be denominated in Dollars and payable on an "at sight" basis and (ii) expire no later than the earlier of (x) the first anniversary of its date of issuance and (y) the date that is five Business Days prior to the Termination Date; <u>provided</u>, <u>however</u>, that any Letter of Credit, whether newly requested or an existing Letter of Credit that is extended or automatically renewed, may have an expiration date up to 90 days after the Termination Date so long as the Borrowers cash collateralize such Letter of Credit for the benefit of the applicable Lender or for the benefit of the Issuing Bank (as determined by such Lender in its sole discretion) on or prior to the date which is five Business Days prior to the Termination Date and the relevant Lender shall have agreed in its sole discretion to cause an Issuing Bank to provide such Letter of Credit (and an Issuing Bank shall have so agreed in its sole discretion) at the time such Letter of Credit or extension is requested or at the time such existing Letter of Credit is to be automatically renewed, as applicable; <u>provided</u>, <u>further</u>, that any Letter of Credit with a one-year term may provide for the automatic renewal thereof for additional one-year periods (which shall only extend beyond the date referred to in clause (y) above if the condition described in the first proviso of this sentence is satisfied). In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of Application or other agreement submitted by the Company to, or entered

into by the Company with, the Lender relating to any Letter of Credit, the terms and conditions of this Agreement shall control.

(b) No Lender shall at any time be obligated to cause any Issuing Bank to issue any Letter of Credit if such issuance would conflict with, or cause such Lender, any L/C Participant or any Issuing Bank to exceed any limits imposed by, any applicable Requirement of Law.

3.2 Procedure for Issuance of Letters of Credit. The Company may from time to time request that the relevant Lender cause an Issuing Bank to issue a Letter of Credit by delivering to such Lender at its address for notices specified herein an Application therefor. Upon receipt of a duly completed and executed Application and any certificates, documents and other papers and information (referred to herein or in the Application) delivered to the Lender in connection therewith, the relevant Lender shall (and shall cause the applicable Issuing Bank to) process such Application in accordance with their respective customary procedures and cause the applicable Issuing Bank to promptly issue the Letter of Credit requested thereby (but in no event shall any Lender be required to cause an Issuing Bank to issue any Letter of Credit earlier than three (3) Business Days (or such shorter period as such Lender may agree in its sole discretion) after its receipt of the duly completed and executed Application therefor and all such other certificates, documents and other papers and information referred to herein and therein and relating thereto) by issuing the original of such Letter of Credit to the beneficiary thereof or as otherwise may be agreed to by such Lender and the Company. Such Lender shall furnish a copy of such Letter of Credit to the Borrowers promptly following the issuance thereof. Each Lender shall promptly furnish to the Administrative Agent, which shall in turn promptly furnish to the Lenders, notice of the issuance of each Letter of Credit (including the amount thereof).

3.3 L/C Fees and Other Charges. (a) The Borrowers shall pay a fee on all the average daily aggregate maximum amount available to be drawn under all outstanding Letters of Credit at a per annum rate equal to the Applicable Margin then in effect with respect to Eurodollar Loans shared ratably among the Lenders and payable quarterly in arrears on each Fee Payment Date after the issuance date. In addition, the Borrowers shall pay to each Lender for its own account a fronting fee in an amount to be agreed by the Company and the relevant Lender not to exceed 0.125% per annum on the stated amount of each Letter of Credit caused to be issued by such Lender, payable quarterly in arrears on each Fee Payment Date after the issuance date; provided that such fronting fee shall be at least $100 per quarter for each Letter of Credit.

(b) In addition to the foregoing fees, the Borrowers shall pay or reimburse the Lender for such normal and customary costs and expenses as are incurred or charged by such Lender (or incurred or charged by any Issuing Bank and charged to Lender) in issuing, negotiating, effecting payment under, amending or otherwise administering any Letter of Credit.

3.4 L/C Participations. (a) Each Lender irrevocably agrees to grant and hereby grants to each L/C Participant, and, to induce such Lender to cause an Issuing Bank to issue Letters of Credit, each L/C Participant irrevocably agrees to accept and purchase and hereby accepts and purchases from such Lender, on the terms and conditions set forth below, for such L/C Participant's own account and risk an undivided interest equal to such L/C Participant's Revolving Percentage in such Lender's obligations and rights under and in respect of each Letter of Credit caused to be issued by such Lender and the amount of each draft paid by such Lender thereunder. Each L/C Participant agrees with each Lender that, if a draft is paid under any Letter of Credit caused to be issued by such Lender for which such Lender is not reimbursed in full by the Borrowers in accordance with the terms of this Agreement, the Administrative Agent (acting at the direction of the relevant Lender) shall make a demand on such L/C Participant to pay to such Lender upon demand at such Lender's address for notices specified herein an amount equal to such L/C Participant's Revolving Percentage of the amount of such draft, or any part thereof, that is not so reimbursed. Each L/C Participant's obligation to pay such amount shall be absolute and unconditional and shall not be affected by any circumstance, including (i) any setoff, counterclaim, recoupment, defense or other right that such L/C Participant may have against

33

any Lender, either Borrower or any other Person for any reason whatsoever, (ii) the occurrence or continuance of a Default or an Event of Default or the failure to satisfy any of the other conditions specified in Section 5, (iii) any adverse change in the condition (financial or otherwise) of either Borrower, (iv) any breach of this Agreement or any other Loan Document by either Borrower, any other Loan Party or any other L/C Participant or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.

(b) If any amount required to be paid by any L/C Participant to any Lender pursuant to Section 3.4(a) in respect of any unreimbursed portion of any payment made by such Lender under any Letter of Credit is paid to such Lender within three Business Days after the date such payment is due, such L/C Participant shall pay to such Lender on demand an amount equal to the product of (i) such amount, times (ii) the daily average Federal Funds Effective Rate during the period from and including the date such payment is required to the date on which such payment is immediately available to such Lender, times (iii) a fraction the numerator of which is the number of days that elapse during such period and the denominator of which is 360. If any such amount required to be paid by any L/C Participant pursuant to Section 3.4(a) is not made available to the relevant Lender by such L/C Participant within three Business Days after the date such payment is due, such Lender shall be entitled to recover from such L/C Participant, on demand, such amount with interest thereon calculated from such due date at the rate per annum applicable to ABR Loans under the Facility. A certificate of the relevant Lender submitted to any L/C Participant with respect to any amounts owing under this Section shall be conclusive in the absence of manifest error.

(c) Whenever, at any time after any Lender has made payment under any Letter of Credit and has received from any L/C Participant its pro rata share of such payment in accordance with Section 3.4(a), such Lender receives any payment related to such Letter of Credit (whether directly from a Borrower or otherwise, including proceeds of collateral applied thereto by such Lender), or any payment of interest on account thereof, such Lender will distribute to such L/C Participant its pro rata share thereof; provided, however, that in the event that any such payment received by such Lender shall be required to be returned by such Lender, such L/C Participant shall return to such Lender the portion thereof previously distributed by such Lender to it.

3.5 L/C Reimbursement Obligation of the Borrowers. If any draft is paid under any Letter of Credit, the Borrowers shall reimburse the Lender for the amount of (a) the draft so paid and (b) any Taxes, fees, charges or other costs or expenses incurred by such Lender (or incurred by Issuing Bank and charged to such Lender) in connection with such payment, not later than 12:00 Noon, New York City time, on the Business Day that the Company receives notice of such draft. Each such payment shall be made to the relevant Lender at its address for notices referred to herein in Dollars and in immediately available funds. Interest shall be payable on any such amounts from the date on which the relevant draft is paid until payment in full at the rate set forth in (x) until the Business Day next succeeding the date of the relevant notice, Section 2.12(b) and (y) thereafter, Section 2.12(c). If the Borrowers fail to reimburse any Lender in accordance with this Section 3.5, the Borrowers shall be deemed to have made a request for a borrowing of ABR Loans pursuant to Section 2.5(b) as provided in such Section.

3.6 Obligations Absolute. The Borrowers' obligations under this Section 3 shall be absolute, unconditional and irrevocable under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment that either Borrower may have or have had against any Lender, any beneficiary of a Letter of Credit or any other Person. Each Borrower also agrees with each Lender that such Lender shall not be responsible for, and the Borrowers' Reimbursement Obligations under Section 3.5 shall not be affected by, among other things, the validity, genuineness or enforceability of drafts, documents, Letters of Credit or this Agreement, or any term or provision therein or of any endorsements thereon, even though such drafts or documents shall in fact prove to be invalid, fraudulent or forged in any respect or any statement therein

being untrue or inaccurate in any respect, any dispute between or among either Borrower and any beneficiary of any Letter of Credit or any other party to which such Letter of Credit may be transferred or any claims whatsoever of either Borrower against any beneficiary of such Letter of Credit or any such transferee or any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, any Borrowers' obligations hereunder. No Lender shall be liable for any error, omission, interruption or delay in transmission, dispatch or delivery of any message or advice, however transmitted, in connection with any Letter of Credit, except for errors or omissions found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Lender. Each Borrower agrees that any action taken or omitted by any Lender under or in connection with any Letter of Credit or the related drafts or documents, if done in the absence of gross negligence or willful misconduct, shall be binding on the Borrowers and shall not result in any liability of such Lender to the Borrowers.

3.7 <u>Letter of Credit Payments</u>. If any draft shall be presented for payment under any Letter of Credit, the Lender that caused such Letter of Credit to be issued shall promptly upon receiving notice from the applicable Issuing Bank notify the Company of the date and amount thereof. The responsibility of each Lender to the Borrowers in connection with any draft presented for payment under any Letter of Credit shall, in addition to any payment obligation expressly provided for in such Letter of Credit, be limited to causing the applicable Issuing Bank to determine that the documents (including each draft) delivered under such Letter of Credit in connection with such presentment are substantially in conformity with such Letter of Credit.

3.8 <u>Applications</u>. To the extent that any provision of any Application related to any Letter of Credit is inconsistent with the relevant provisions of this <u>Section 3</u>, the provisions of this <u>Section 3</u> shall apply.

3.9 <u>Existing Letters of Credit</u>. On the Closing Date, each Existing Letter of Credit shall, automatically and without further action, as between Borrower and the Lender, be deemed to be a Letter of Credit that has been issued hereunder as of the Closing Date for all purposes hereunder and under the other Loan Documents. Without limiting the foregoing, (i) each such Existing Letter of Credit shall be included in the calculation of L/C Obligations, (ii) all liabilities of the Borrowers and the other Loan Parties with respect to such Existing Letters of Credit shall constitute Obligations and shall be secured by a First Lien (as such term is defined in the Collateral Trust Agreement) in all of the Collateral (as such term is defined in the Collateral Trust Agreement), and (iii) each Lender shall have reimbursement obligations with respect to such Existing Letters of Credit as provided in <u>Section 3.4</u>.

## SECTION 4. REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent and the Lenders to enter into this Agreement and to make the Loans and issue or participate in the Letters of Credit, each of the Company and GAI hereby represents and warrants to the Administrative Agent and each Lender that:

4.1 <u>Organization; Power and Authority</u>. The Company and each Restricted Subsidiary (a) is duly organized, validly existing and in good standing under the laws of the state of its organization and (b) has all requisite corporate, limited partnership or limited liability company power and authority to own its assets and to carry on its business as now conducted and as proposed to be conducted and is qualified to do business, and is in good standing in every jurisdiction where such qualification is required, except where the failure to have such power and authority and so to qualify would not reasonably be expected to result in a Material Adverse Effect. Each Loan Party has the corporate, limited partnership or limited liability company power to execute, deliver and perform its obligations under each Loan Document to which it is a party, and each

Loan Party has the corporate, limited partnership or limited liability company power to take all action necessary to consummate the transactions contemplated by the Loan Documents to which it is a party.

4.2 <u>Due Authorization</u>. The execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party has been duly authorized by all necessary corporate, limited partnership or limited liability company action, as applicable. The Loan Documents have been duly executed and delivered by each Loan Party party thereto.

4.3 <u>Governmental Approval</u>. Except as would not reasonably be expected to have a Material Adverse Effect, no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required for the due execution, delivery and performance by any Loan Party of any Loan Document to which it is a party or the conduct by any Loan Party of its business as conducted on the date such representation is made or deemed made, except, in any such case, for those which have been duly obtained or made and are in full force and effect.

4.4 <u>Binding and Enforceable</u>. This Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of each Loan Party party thereto, enforceable against each such Loan Party in accordance with its terms subject to applicable bankruptcy, insolvency, fraudulent conveyance, moratorium, reorganization or similar laws affecting the enforcement of creditors' rights generally and to general principles of equity.

4.5 <u>No Violation</u>. The execution, delivery and performance by any Loan Party of this Agreement and the other Loan Documents to which it is a party, the borrowings hereunder and the use of the proceeds thereof does not violate (i) its organizational documents or (ii) any Material Agreement, in any manner which has had or would reasonably be expected to have a Material Adverse Effect.

4.6 <u>No Default</u>. No Default or Event of Default has occurred and is continuing, other than any Default or Event of Default which has been waived pursuant to <u>Section 11.1</u>. As of the Closing Date, no Loan Party is in default in any material respect under or with respect to any Material Agreement binding on it that would reasonably be expected to have a Material Adverse Effect.

4.7 <u>Litigation</u>. No litigation, arbitration or administrative proceeding is currently pending or, to such Borrower's knowledge, threatened against it or any Restricted Subsidiary (i) to restrain the entry by any Loan Party into, the enforcement of or exercise of any rights by the Lenders or the Administrative Agent under, or the performance or compliance by any Loan Party with any obligations under, the Loan Documents to which it is a party or (ii) which has had or would reasonably be expected to have a Material Adverse Effect.

4.8 [Reserved].

4.9 <u>Material Adverse Change</u>. Since December 31, 2011, there has been no Material Adverse Effect.

4.10 <u>Investment Company Act</u>. No Loan Party is an "investment company" required to be registered as such under the Investment Company Act of 1940, as amended.

4.11 <u>Environmental Matters</u>. There has been no matter with respect to environmental compliance which has had or would reasonably be expected to have a Material Adverse Effect.

4.12 <u>Accuracy of Information, etc</u>. No written information, report, financial statement, exhibit or schedule furnished by or on behalf of the Borrowers or any Restricted Subsidiary to Administrative Agent or any Lender for use in connection with the Refinancing or the other transactions contemplated by the Loan Documents or in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto contained, contains or will, when furnished, contain any material misstatement of fact or omitted, omits or will, when furnished, omit to state any material fact necessary to make the statements

therein, in the light of the circumstances under which they were, are or will be made, not misleading; provided that to the extent any such written information, report, financial statement, exhibit or schedule is based upon or constitutes a forecast or projection (including pro forma financial statements) or is information of a general economic or industry nature, the Borrowers represent only that they acted in good faith and upon assumptions believed to be reasonable at the time made and at the time such information, report, financial statement, exhibit or schedule is made available to Administrative Agent or any Lender (it being understood that (i) projections and forecasts are subject to significant uncertainties and contingencies, many of which are beyond the control of the Borrowers and their Restricted Subsidiaries, (ii) no assurance can be given that such projections or forecasts will be realized, and (iii) actual results may differ and such differences may be material)..

4.13 Employee Benefit Plans. Each Plan is in compliance in all material respects with the applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder,except as would not reasonably be expected to result in a Material Adverse Effect. No ERISA Event has occurred that, when taken together with all other such ERISA Events, would reasonably be expected to result in a Material Adverse Effect.

4.14 Tax Returns and Payments. Except as would not reasonably be expected to have a Material Adverse Effect, each of the Company and its Restricted Subsidiaries has filed or caused to be filed with the appropriate taxing authority, all tax returns, statements, forms and reports for taxes (the "Returns") that are required to be filed by, or with respect to the income, properties or operations of, the Company and/or any of its Restricted Subsidiaries, and all such Returns are complete and accurate, and have paid or caused to be paid all taxes shown to be due and payable on said Returns (other than those the amount or validity of which is contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books and records of the relevant entities).

4.15 Security Documents. The provisions of the Security Documents are effective to create a legal, valid and enforceable security interest in all right, title and interest of the Borrowers and each Subsidiary Guarantor in the assets subject thereto subject to no other Liens (except Liens permitted by Section 8.3) which, upon completion of the filings and other actions required by the Loan Documents, will constitute valid perfected security interests in such of the Collateral as to which such perfection is required under the Loan Documents in favor of the Collateral Trustee for the ratable benefit of the Secured Parties.

4.16 Ownership of Property. Except as would not reasonably be expected to have a Material Adverse Effect, such Borrower and each Restricted Subsidiary has good and marketable title to, or a subsisting leasehold interest in or right to use, all material real property necessary for its operations free and clear of all Liens, except as permitted by Section 8.3.

## SECTION 5. CONDITIONS PRECEDENT

5.1 Conditions to Initial Extension of Credit. The agreement of each Lender to make the initial extension of credit (including, in the case of any Lender, to cause an Issuing Bank to issue any Letters of Credit or to accept assignment of the Existing Letters of Credit pursuant to the L/C Assignment and Assumption Agreement) on the Closing Date is subject to the satisfaction or waiver, prior to or concurrently with the making of such extension of credit or issuance of a Letter of Credit on the Closing Date, of the following conditions precedent:

(a) Credit Agreement; Guarantee Agreement, etc. The Administrative Agent shall have received (i) this Agreement or, in the case of the Lenders, an Addendum, executed and delivered by the Administrative Agent, the Borrowers and each Person listed on Schedule 1.1A, (ii) a Guarantee Agreement, substantially in the form of Exhibit A, executed and delivered by each Subsidiary Guarantor, (iii) a Joinder, Acknowledgement, and Reaffirmation of the Security Agreement,

substantially in the form of Exhibit B, executed and delivered by the Borrowers, each Subsidiary Guarantor, the Administrative Agent, and Collateral Trustee ("Joinder to Security Agreement"), (iv) evidence that the notice required by Section 5.6(b)(2) of the Collateral Trust Agreement, in form and substance reasonably satisfactory to the Administrative Agent, has been executed and delivered by the Company to the Collateral Trustee, and (iv) an Accession Agreement to the Collateral Trust Agreement, substantially in the form of Exhibit C, executed and delivered by the Borrowers, each Subsidiary Guarantor, the Administrative Agent, and Collateral Trustee.

(b)      Closing Certificate. The Company shall have executed and delivered to the Administrative Agent a certificate, substantially in the form of Exhibit D, which shall include a customary certification by the chief financial officer as to the solvency of the Company and its Subsidiaries, on a consolidated basis, after giving effect to the Transactions.

(c)      Representations and Warranties. Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects (provided that, any representation and warranty that is qualified by "materiality," "Material Adverse Effect" or similar language shall be true and correct in all respects (after giving effect to any such qualification therein)) on and as of the Closing Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (provided that, any representation and warranty that is qualified by "materiality," "Material Adverse Effect" or similar language shall be true and correct in all respects (after giving effect to any such qualification therein)) as of such earlier date.

(d)      No Default or Event of Default. No Default or Event of Default shall have occurred and be continuing on the Closing Date or would result immediately after giving effect to the Transactions and the extensions of credit requested to be made on the Closing Date and the application of proceeds therefrom.

(e)      Transactions. The Transactions shall be consummated substantially concurrent with the initial funding hereunder in accordance in all material respects with applicable law.

(f)      Fees. The Lenders and the Administrative Agent shall have received all fees required in accordance with any Loan Document to be paid on or before the Closing Date, and the Administrative Agent shall have received reimbursement for all of its documented out-of-pocket expenses payable by the Company in accordance with this Agreement and billed prior to the Closing Date (it being understood and agreed that any such amounts may be paid with proceeds of Loans made on the Closing Date).

(g)      Payment of Debt. All amounts due or outstanding in respect of the Debt outstanding under the Existing Credit Agreement shall have been (or substantially simultaneously with the initial funding hereunder shall be) paid in full and all commitments (if any) in respect thereof terminated.

(h)      [Reserved].

(i)      Governmental Approvals. Except as would not reasonably be expected to have a Material Adverse Effect, all governmental and third party approvals necessary in connection with the Transaction shall have been obtained and be in full force and effect.

(j)      Lien Searches. The Lenders shall have received the results of a recent Lien search in each relevant jurisdiction with respect to the Loan Parties, and such search shall reveal no Liens on any of the assets of the Loan Parties except for Liens permitted by the Loan Documents or Liens to

38

be discharged on or prior to the Closing Date pursuant to documentation reasonably satisfactory to the Administrative Agent.

(k)        _Filings, Registrations and Recordings_. Each document (including, without limitation, any Uniform Commercial Code financing statement) required by the Loan Documents to be filed, registered, recorded or delivered to the Collateral Trustee in order to create in favor of the Collateral Trustee, for the benefit of the Secured Parties, a perfected Lien on the Collateral described therein shall, on or prior to the date hereof, have been filed, registered or recorded or delivered to such Collateral Trustee in proper form for filing, registration or recordation, including, without limitation: (i) if certificated, the certificates representing the Capital Sock pledged pursuant to the Security Documents, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof, and (ii) in connection with Collateral consisting of real estate, customary documentation (including Mortgages with respect to the Mortgaged Properties) to the extent reasonably requested by the Administrative Agent, in each case as and to the extent required by the Loan Documents; _provided_, _however_, to the extent, after the exercise by the Company of its commercially reasonable efforts without undue burden or expense, any Collateral cannot be granted or perfected on the Closing Date (other than the grant of security interests in, and delivery of items required for perfection with respect to, (i) material assets with respect to which a Lien may be perfected solely by the filing of a financing statement under the Uniform Commercial Code and (ii) Capital Stock issued by any Domestic Subsidiary required to be pledged under the terms of the Security Agreement with respect to which a Lien may be perfected by the delivery of a stock certificate ), then the provision of such Collateral shall not constitute a condition precedent, but may instead be provided after the Closing Date pursuant to arrangements reasonably satisfactory to the Administrative Agent.

(l)        [Reserved].

(m)        _No Material Adverse Effect_. Since December 31, 2011, there shall not have occurred any event, development, condition or circumstance that has had a Material Adverse Effect.

5.2 _Conditions to Each Extension of Credit_. The agreement of each Lender to make any extension of credit and to cause the Issuing Banks to issue Letters of Credit (other than, in each case, continuations or conversions of Interest Periods and the funding of drawings under Letters of Credit) requested to be made by it on any date (including its initial extension of credit) is subject to the satisfaction or waiver of the following conditions precedent:

(a) _Representations and Warranties_. Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects (_provided_ that, any representation and warranty that is qualified by "materiality," "Material Adverse Effect" or similar language shall be true and correct in all respects (after giving effect to any such qualification therein)) on and as of such date as if made on and as of such date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (_provided_ that, any representation and warranty that is qualified by "materiality," "Material Adverse Effect" or similar language shall be true and correct in all respects (after giving effect to any such qualification therein)) as of such earlier date.

(b) _No Default_. No Default or Event of Default shall have occurred and be continuing on such date or immediately after giving effect to the extensions of credit requested to be made on such date and the application of proceeds therefrom.

39

Each borrowing by and issuance of a Letter of Credit on behalf of a Borrower hereunder shall constitute a representation and warranty by the Borrowers as of the date of such extension of credit that the conditions contained in this Section 5.2 have been satisfied.

## SECTION 6 AFFIRMATIVE COVENANTS

Each Borrower hereby agrees that, from and after the Closing Date and so long as the Commitments remain in effect, any Letter of Credit remains outstanding (if neither (x) cash collateralized in accordance with the terms of this Agreement nor (y) supported with a back-to-back letter of credit reasonably acceptable to the relevant Lender and Issuing Bank) or any Loan is due and owing to any Lender or the Administrative Agent hereunder:

6.1 Compliance with Law; Maintenance of Existence. (a) Each Loan Party and its Subsidiaries shall comply with all Requirements of Law (including Environmental Laws) applicable to such Loan Party and such Subsidiaries in the conduct of their respective businesses except where (x) such requirements are being contested in good faith by appropriate proceedings diligently conducted or (y) the failure to do so would not reasonably be expected to have a Material Adverse Effect; and (b) each Loan Party shall preserve, renew and keep in full force and effect its organizational existence except as otherwise permitted by Section 8.4.

6.2 [Reserved].

6.3 Certificates; Other Information. The Company shall furnish to the Administrative Agent:

(a)      [reserved]

(b)      [reserved]

(c)      promptly after the request by any Lender, all documentation and other information that such Lender reasonably requests in order to comply with applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act;

(d)      as soon as reasonably practicable, such additional financial and other information relating to the then existing financial condition of the Company and the Restricted Subsidiaries as the Administrative Agent may from time to time reasonably request; and

(e)       upon reasonable request of the Administrative Agent, the Loan Parties shall, or shall cause any of their ERISA Affiliates, to promptly make a request for documents described in Sections 101(k) or 101(l) of ERISA with respect to any Multiemployer Plan from the applicable administrator or sponsor and the Company shall provide copies of such documents and notices to the Administrative Agent (on behalf of each Lender) promptly after receipt thereof.

6.4 Notices. The Company shall, after a Responsible Officer obtains knowledge thereof (and, in any case, within 10 Business Days of obtaining such knowledge (or such longer period as the Administrative Agent may agree to in its sole discretion)), promptly give notice to the Administrative Agent of:

(a) the occurrence of any Default or Event of Default that is continuing;

(b) the occurrence of any ERISA Event that, alone or together with any other ERISA Event, would reasonably be expected to have a Material Adverse Effect;

(c) any litigation, investigation or proceeding affecting any Loan Party that may exist at any time that would reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this <u>Section 6.4</u> shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the Company proposes to take or cause to be taken with respect thereto.

6.5 <u>Inspection</u>. Each Borrower shall permit the Administrative Agent or any other Lender or any agents or representatives thereof, to examine and make copies of and abstracts from records and books of, and visit the properties of, such Borrower to discuss the affairs, finances and accounts of such Borrower with any of its officers or directors and with its independent certified public accountants (in the presence of such Borrower) from time to time during normal business hours upon reasonable advance notice; <u>provided</u> that as long as no Default or Event of Default has occurred and is continuing, the Borrowers shall not bear the cost of more than one such examination and visit during any 12-month period. The Administrative Agent and the Lenders agree to coordinate and consolidate their visits (and their agents' and representatives' visits) pursuant to this <u>Section 6.5</u> (including the examination of books and records and the making of copies and abstracts of books and records) at mutually convenient times and in such a manner so as to cause minimum disruption to the operations of the Borrower and to minimize costs associated with such visits.

6.6 <u>Maintenance of Property; Insurance</u>. The Company shall, and shall cause each Restricted Subsidiary to (a) keep all material property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted except (x) if in the good faith business judgment of the Company it is in its economic interest not to preserve and maintain such property or (y) the failure to do so would not reasonably be expected to have a Material Adverse Effect and (b) maintain with financially sound and reputable insurance companies (or through prudent self-insurance programs or prudent captive insurance arrangements) insurance on all its property in at least such amounts and against at least such risks as are usually insured against in the same general area by companies engaged in the same or a similar business to the extent available on commercially reasonable terms.

6.7 <u>Subsequent Acquired Property; New Subsidiaries</u>. (a) The Company shall with respect to any material property acquired after the date hereof by the Company or any other Loan Party (other than to the extent (i) the applicable Loan Party is prohibited from granting such Lien by applicable law or any contractual limitation applicable to such Loan Party not incurred in contemplation of such acquisition or (ii) such property constitutes an Excluded Asset (as such term is defined in the Security Agreement) ) as to which the Collateral Trustee, for the benefit of the Secured Parties, does not have a perfected Lien, to the extent required by the Security Agreement, promptly (or on the Closing Date, if acquired before the Closing Date) (i) execute and deliver to the Collateral Trustee (with copies to the Administrative Agent) such amendments to the Security Documents or such other documents as the Administrative Agent reasonably deems necessary or advisable to grant to the Collateral Trustee, for the benefit of the Secured Parties, a security interest in such property and (ii) take all actions necessary or advisable or reasonably requested by the Administrative Agent to grant to the Collateral Trustee, for the benefit of the Secured Parties, a perfected first priority security interest in such property, including, without limitation, the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Security Documents or by law or as may be requested by the Administrative Agent); <u>provided</u> that the Company and its Subsidiaries shall not be required to take any action to (A) perfect the security interests in deposit and investment accounts; (B) perfect any security interest in vehicles; (C) perfect any security interest in government contracts or commercial tort claims; (D) perfect any security interests in any Collateral (other than Capital Stock of Subsidiaries that is certificated) by possession; (E) grant or perfect any security interest under any law other than the laws of the United States, any state thereof or the District of Columbia; or (F) take any other steps to perfect security interests where the cost of perfection is not reasonably justified by the practical value of the Collateral (as reasonably agreed to by the Administrative Agent).

41

(b) The Company shall, with respect to any fee interest in any real property having a value (together with improvements thereof) of at least $25,000,000 acquired after the date hereof by any Loan Party (other than to the extent the applicable Loan Party is prohibited from granting such Lien by applicable law or any contractual limitation applicable to such Subsidiary Guarantor not incurred in contemplation of such acquisition), promptly (and, in any event, within 120 days of acquisition thereof) (or such later time as the Administrative Agent may agree to in its sole discretion)) (i) execute and deliver a first priority Mortgage in favor of the Collateral Trustee, for the benefit of the Secured Parties, covering such real property and (ii) if reasonably requested by the Administrative Agent, provide the Lenders with title and extended coverage insurance covering such real property in an amount at least equal to the purchase price of such real property (or such other amount as shall be reasonably specified by the Administrative Agent); <u>provided</u>, that no environmental surveys or assessments will be required in connection with any Mortgages. Administrative Agent agrees to cooperate with the Company to reduce mortgage recording taxes in states with high recording taxes.

(c) If any additional Subsidiary is formed or acquired after the date hereof or any Subsidiary ceases to be an Unrestricted Subsidiary or a Foreign Subsidiary, the Company shall promptly notify the Administrative Agent thereof (and, in any event, within 15 days of the date thereof or such later time as the Administrative Agent may agree to in its sole discretion)). The Company shall with respect to any new Subsidiary (other than a Foreign Subsidiary or a new Subsidiary prohibited from granting such Lien by applicable law or any contractual limitation applicable to such Subsidiary Guarantor at the time it becomes a Subsidiary and not incurred in contemplation thereof) created or acquired directly after the date hereof by any Loan Party (which, for the purposes of this paragraph _c_), shall be deemed to include (x) any existing Subsidiary that ceases to be a Foreign Subsidiary and (y) any existing Domestic Subsidiary that is no longer an Unrestricted Subsidiary), promptly (and, in any event, within 30 days of the date of creation or acquisition thereof or such later time as the Administrative Agent may agree to in its sole discretion)) (i) execute and deliver to the Collateral Trustee (with copies to the Administrative Agent) such amendments to the Security Agreement as the Administrative Agent reasonably deems necessary or advisable to grant to the Collateral Trustee, for the benefit of the Secured Parties, a perfected first priority security interest in the Capital Stock of such Subsidiary that is owned by any Loan Party (<u>provided</u>, <u>however</u>, that (A) in the case of a Foreign Subsidiary, in no event shall more than 65% of the total outstanding voting Capital Stock of any such new Subsidiary be required to be so pledged and (B) no such grant or perfection of security interests shall be required to be made under any law other than laws of the United States, any state thereof or the District of Columbia), (ii) deliver to the Collateral Trustee (with copies to the Administrative Agent) any certificates representing such Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the relevant Loan Party, (iii) if such new Subsidiary is a Restricted Subsidiary (other than any new Subsidiary of GMA, GEM, or REMA), cause such new Restricted Subsidiary (A) to execute an Assumption Agreement in the form attached as Annex 1 to the Guarantee Agreement, (B) to take such actions as are required by the Security Agreement to grant to the Collateral Trustee for the benefit of the Secured Parties a perfected first priority security interest in the Collateral described in the Security Agreement with respect to such new Restricted Subsidiary, including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Security Agreement or by law or as may be reasonably requested by the Administrative Agent and (C) [reserved], and (iv) if such new Subsidiary is a Foreign Subsidiary, subject to the proviso in clause (i) above, cause such new Subsidiary to take such other action as the Administrative Agent may reasonably request necessary or, in the opinion of the Administrative Agent, desirable to perfect the Collateral Trustee's security interest therein.

(d) The Company shall promptly (i) notify the Administrative Agent in writing of the designation of any Subsidiary as an "Unrestricted Subsidiary" and (ii) deliver to the Administrative Agent a certificate signed by a Responsible Officer certifying that such designation complied with the conditions set forth in the definition of "Unrestricted Subsidiary".

6.8 <u>Collateral Information</u>. The Company shall, and shall cause each Restricted Subsidiary to, furnish to the Administrative Agent five (5) Business Days (or such shorter period of time as may be agreed to by the Administrative Agent in its sole discretion) prior written notice of any change (i) in any Loan Party's corporate name, (ii) in the jurisdiction of organization or formation of any Loan Party from that referred to in <u>Section 3.2</u> of the Security Agreement, or (iii) in any Loan Party's Federal Taxpayer Identification Number.

6.9 <u>Further Assurances</u>. The Company shall, and shall cause each Restricted Subsidiary to, execute any and all further documents, financing statements, agreements and instruments, and take all further action (including filing Uniform Commercial Code and other financing statements, Mortgages and deeds of trust and delivering to the Collateral Trustee (with copies to the Administrative Agent) certificates representing securities pledged under the Security Documents) that may be required under applicable law, or that the Majority Lenders or the Administrative Agent may reasonably request, in order to grant, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the Security Documents.

6.10 <u>Use of Proceeds</u>. The proceeds of the Loans and the Letters of Credit shall be used for working capital and general corporate purposes (including, without limitation, acquisitions and distributions permitted hereunder). No part of the proceeds of any Loan or other extension of credit under this Agreement, shall be used for any purpose that violates the provisions of the Regulation T, U or X of the Board.

<div align="center">SECTION 7. [RESERVED]</div>

SECTION 8 NEGATIVE COVENANTS

Each of the Company and GAI hereby agrees that, from and after the Closing Date and so long as the Commitments remain in effect, any Letter of Credit remains outstanding (if neither (x) cash collateralized in accordance with the terms of this Agreement nor (y) supported with a back-to-back letter of credit reasonably acceptable to the relevant Lender and Issuing Bank) or any Loan is due and owing to any Lender or the Administrative Agent hereunder:

8.1 <u>Debt</u>. The Borrowers shall not, and shall not permit any Restricted Subsidiary to incur in respect of or suffer to exist any Debt, except Permitted Debt.

8.2 <u>Restricted Payments</u>. The Borrowers shall not, and shall not permit any Restricted Subsidiary, to (i) declare or make any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any shares of any class of Capital Stock of such Borrower or such Restricted Subsidiary, (ii) make any pre-payments with respect to principal of, or redemption or repurchase of, any Debt that is subordinated to the Obligations, or (iii) purchase, redeem or otherwise acquire for value any shares of any class of Capital Stock of the Company or any Subsidiary of the Company or any warrants, rights or options to acquire any such shares, now or hereafter outstanding, or reduce its capital (collectively, "<u>Restricted Payments</u>"); provided, however, that the foregoing shall not prohibit:

(a)        the declaration and making of any dividend payment or other distribution by either Borrower or any Restricted Subsidiary payable in Common Stock of such Borrower or such Restricted Subsidiary, as applicable;

(b)        with respect to any Restricted Subsidiary, the declaration and making of any dividend payment or other distribution (A) payable to either Borrower or any Restricted Subsidiary (provided, that, if the payor is a Loan Party, such dividend payment or distribution must be payable to either Borrower or a Subsidiary Guarantor), or (B) where the Borrowers or the Restricted Subsidiary which owns the Capital Stock in the payor receives at least its proportionate share thereof (after giving effect to the relative rights and preferences of the various classes of Capital Stock of such payor);

(c)        the payment of any dividend or other distribution within 60 days after the date of declaration of the dividend or other distribution, if at the date of declaration the dividend or distribution would have complied with the provisions of this Agreement;

(d)        so long as no Default or Event of Default has occurred and is continuing or would be caused thereby, the making of any Restricted Payment in exchange for, or out of the Net Cash Proceeds of, the substantially concurrent sale (other than to a Subsidiary of the Company) of, Capital Stock of the Company (other than Disqualified Stock) or of the substantially concurrent contribution of common equity capital or surplus to the Company;

(e)        [reserved];

(f)        so long as no Default or Event of Default has occurred and is continuing or would be caused thereby, the repurchase, redemption or other acquisition or retirement for value of any Capital Stock of the Company or any Restricted Subsidiary in connection with any management equity subscription agreement, stock option agreement, shareholders' agreement, severance agreement, employee benefit plan or agreement or similar agreement;

(g)        the repurchase of Capital Stock deemed to occur upon the exercise of stock options to the extent such Capital Stock represents a portion of the exercise price of those stock options;

(h)        the purchase by the Company of fractional shares upon conversion of any securities of the Company into Capital Stock of the Company;

(i)        so long as no Default or Event of Default has occurred and is continuing or would be caused thereby, the declaration and payment of dividends to holders of any class or series of Disqualified Stock;

(j)        the issuance of Capital Stock of the Company (other than Disqualified Stock) for other Capital Stock of the Company in connection with any rights offering and payments for the redemption of fractional shares in connection with any rights offering;

(k)        dividends, distributions, redemptions, repurchases and prepayments of Capital Stock and Debt as contemplated by the Merger Agreement; and

(l)        any Restricted Payments to the NRG Parent Group.

8.3 Liens. The Borrowers shall not, and shall not permit any Restricted Subsidiary to, create or have outstanding any Lien upon any of its property, whether now owned or hereafter acquired, except:

(a)        Liens arising solely by operation of law;

(b)        Liens in respect of overdue amounts not constituting Debt which either (A) have not been overdue for more than thirty (30) days or (B) are being contested in good faith;

(c)        Liens securing (x) up to $500,000,000 of Debt described in clause (ii) of the definition of Permitted Debt, which may be secured on a basis pari passu with the obligations under this Agreement, and (y) Debt described in clauses (iv) or (viii) of the definition of Permitted Debt;

(d)        Liens arising out of title retention or like provisions in relation to the acquisition of goods or equipment relating only to such goods or equipment;

(e)        Liens on deposits to secure, or any Lien otherwise securing, the performance of bids, contracts (other than for borrowed money or commodity hedging obligations and Hedging

44

Obligations), leases, statutory obligations, surety bonds, appeal bonds, performance bonds, reimbursement or indemnity obligations arising out of surety, performance, or other similar bonds, and other obligations of a like nature;

(f)       Liens granted over any asset which is acquired, constructed, created or improved by the Company or a Restricted Subsidiary, but only if (x) such Lien secures only principal amounts (not exceeding the cost of such acquisition, construction or creation) raised for the purposes of such acquisition, construction or creation, together with any costs, expenses, interest and fees incurred in relation thereto or a guarantee given in respect thereof (including amounts constituting Attributable Debt in respect of sale leaseback transactions, Capital Lease Obligations and Synthetic Lease Obligations), (y) such Lien is created or arises on or before ninety (90) days after the completion of such acquisition, construction, creation or improvement (provided that in the case of tax exempt financing, such time limitation shall not apply) and (z) such Lien is confined solely to the property so acquired, constructed, created or improved;

(g)       Liens (x) outstanding on or over any asset acquired after the Closing Date, (y) in existence at the date of such acquisition but not incurred in contemplation of such acquisition (including, without limitation, existing Liens on the category of the asset acquired which automatically attach upon such acquisition) and (z) where neither the Company nor any Restricted Subsidiary takes any step to increase the principal amount secured thereby from that so secured and outstanding at the time of such acquisition (it being agreed that, in the case of a fluctuating balance facility, the Liens permitted hereunder will include Liens in existence at the time of the acquisition securing amounts later drawn on unfunded commitments existing at the time of acquisition);

(h)       Liens on cash and Cash Equivalents (a) deposited by the Company or any of the Restricted Subsidiaries in margin accounts with or on behalf of futures contract brokers or paid over to other counterparties or (b) pledged or deposited as collateral to a contract counterparty or issuer of surety bonds or issuer of letters of credit by the Company or any of the Restricted Subsidiaries, in each case to secure obligations with respect to (x) Commodity Agreements and (y) Hedging Agreements;

(i)       Liens on assets of REMA and its Subsidiaries securing Debt of REMA and its Subsidiaries permitted to be incurred pursuant to clause (x) of the definition of Permitted Debt;

(j)       Liens in favor of a plaintiff or defendant in any action before a court or tribunal as security for costs or expenses where such action is being prosecuted or defended in the bona fide interest of the Company or any of its Restricted Subsidiaries;

(k)       [reserved];

(l)       Liens on the property of a Person existing at the time such Person is merged into or consolidated with, or acquired by, the Company or a Restricted Subsidiary and not incurred in contemplation with such merger, consolidation or acquisition (including, without limitation, Liens on a category of assets which may automatically attach to assets in such category acquired after such merger, consolidation or acquisition);

(m)       Liens created pursuant to the Security Agreement, including Liens securing Eligible Commodity Hedging Obligations and Hedging Agreements;

(n)       pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation, or to secure the payment or performance of statutory

45

or public obligations (including environmental, municipal and public utility commission obligations and requirements);

(o)        Liens for Taxes not yet delinquent or that are being contested in good faith by appropriate proceedings, <u>provided</u> that adequate reserves with respect thereto are maintained on the books and records of the Company or the Restricted Subsidiaries, as the case may be, in conformity with GAAP;

(p)        Liens securing Project Finance Debt and Liens on Capital Stock of any Unrestricted Subsidiary;

(q)        Liens arising under Section 9.343 of the Texas Uniform Commercial Code or similar statutes of states other than Texas;

(r)        [reserved];

(s)        Liens to secure any Debt permitted under this Agreement that refinances, extends, renews or replaces any secured Debt; <u>provided</u>, that: (a) the new Lien shall be limited to all or part of the same categories of property and assets that secured or, under the written agreements pursuant to which the original Lien arose, could secure the original Debt (plus improvements and accessions to, such property or proceeds or distributions thereof); and (b) the Debt secured by the new Lien is not increased to any amount greater than the sum of (i) the outstanding principal amount plus undrawn commitments of the Debt that is refinanced, extended, renewed or replaced (including any fees, interests and expenses capitalized thereon), (ii) an amount necessary to pay any fees and expenses, including premiums, related to such refinancings, extension, renewal or replacement and (iii) any protective advances with respect to the property and assets that secure such Debt;

(t)        financing statements (including precautionary statements) filed in connection with a Capital Lease Obligation, financing lease, Synthetic Lease Obligation or an operating lease, in each case, not prohibited hereunder; <u>provided</u>, that no such financing statement extends to, covers or refers to as collateral, any property or assets of such Borrower or a Restricted Subsidiary, other than the property or assets which are subject to such Capital Lease Obligation, financing lease, Synthetic Lease Obligation, or operating lease;

(u)        banker's liens, rights of set off or similar rights, contractual rights of setoff or netting arrangements and similar rights with respect to deposit accounts, commodity accounts and/or securities accounts;

(v)        Liens granted in favor of a commercial counterparty or system operator pursuant to a netting agreement or right of setoff, which Liens encumber rights under agreements and tariffs that are subject to such netting agreement or right of setoff and which Liens secure such Person's obligations to such counterparty or system operator under such netting agreement or right of setoff; <u>provided</u>, that such Liens, when granted, do not secure obligations which are past due;

(w)        Liens in favor of such Borrower, any other Loan Party or any member of the NRG Parent Group;

(x)        Liens on cash deposited, escrowed or entrusted in connection with the defeasance or discharge of any Debt; <u>provided</u> that such defeasance or discharge is not otherwise prohibited under this Agreement;

(y)        Liens on cash and Cash Equivalents not exceeding $150,000,000 in the aggregate pledged or deposited as collateral to an issuer of letters of credit by the Company or any of the Restricted Subsidiaries, in each case to secure obligations with respect to such letters of credit; and

(z)        Liens securing Debt or other obligations that do not exceed $50,000,000 in the aggregate at any one time outstanding.

8.4  Mergers.  The Borrowers shall not, and shall not permit any Restricted Subsidiary to, merge, consolidate or amalgamate, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its assets, except that:

(a) the Merger and all other transactions contemplated by the Merger Agreement shall be permitted;

(b) any Loan Party may merge, consolidate or amalgamate with, or liquidate, wind up, or dissolve itself into, or Dispose of all or substantially all of its assets to, another Loan Party or any Person which, immediately following such transaction, shall be a Loan Party;

(c) any Restricted Subsidiary (other than a Subsidiary Guarantor) may merge, consolidate or amalgamate with, or liquidate, wind up, or dissolve itself into, or Dispose of all or substantially all of its assets to, the Company or any other Restricted Subsidiary; and

(d) Any transaction which does not violate Section 8.5.

8.5  Asset Sales.  The Borrowers shall not, and shall not permit any Restricted Subsidiary to, conduct any Asset Sale other than:

(a) asset swaps for Fair Market Value not exceeding $500,000,000; and

(b) the Disposition of assets for Fair Market Value and for which at least 75% of the consideration received (excluding any Debt or liabilities as shown on the most recent consolidated balance sheet of the Company assumed in connection with any such sale or Disposition) is in cash (which, for purposes of this Section 8.5, shall include liabilities, securities, notes or other obligations received by such Borrower or any Restricted Subsidiary that are convertible into cash (to the extent are so converted within 180 days after the completion of the Asset Sale), reserves for indemnities and purchase price adjustments, and certain replacement and other capital assets and operating assets received by such Borrower or a Restricted Subsidiary).

8.6  Investments.  The Borrowers shall not, and shall not permit any Restricted Subsidiary to, make any advance, loan, extension of credit (by way of Guarantee or otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, any other Person (all of the foregoing, "Investments"), except:

(a) extensions of trade credit in the ordinary course of business;

(b) Investments in cash and Cash Equivalents;

(c) Guarantee Obligations of Debt permitted to be incurred under Section 8.1;

(d) loans and advances to employees of the Company or any Subsidiary in the ordinary course of business (including for travel, entertainment and relocation expenses) up to $10,000,000 in the aggregate at any time outstanding;

(e) Investments useful in the business of the Company and the Restricted Subsidiaries made by such Borrower or any of the Restricted Subsidiaries with the Net Cash Proceeds of any Recovery Event or Disposition permitted under Section 8.5;

(f) Investments which constitute proceeds of any Disposition permitted under Section 8.5;

(g) Investments by the Company or any Restricted Subsidiary in the Company, a Restricted Subsidiary or MML, including, without limitation, the purchase of any outstanding Debt of any such Person; provided, that, any such Investment made in a Restricted Subsidiary other than a Subsidiary Guarantor or MML pursuant to this clause (g) shall not take the form of a contribution of power generation assets, or Capital Stock of any Person owning power generation assets;

(h) any acquisition of assets or Capital Stock solely in exchange for the issuance of Capital Stock (other than Disqualified Stock) of the Company;

(i) Investments represented by obligations under Hedging Agreements or Commodity Agreements;

(j) any Investment in a Person, if as a result of such Investment, such Person is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its assets to, or is liquidated, dissolved, or wound up into, the Company or a Restricted Subsidiary or will immediately following such Investment be a Restricted Subsidiary;

(k) any Investments received (i) in compromise or resolution of obligations of trade creditors or customers, including (A) obligations of financially troubled account debtors to the extent reasonably expected to prevent or limit loss as determined by the Company in its good faith business judgment and (B) pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer, (ii) in compromise or resolution of litigation, arbitration or other disputes, or (iii) on account of any claim against, or an interest in, any other Person (A) acquired in good faith in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of such other Person or (B) as a result of a bona fide foreclosure by the Company or any of the Restricted Subsidiaries with respect to any claim against any other Person;

(l) [reserved];

(m) Investments in the form of, or pursuant to, working interests, royalty interests, mineral leases, processing agreements, farm-out agreements, unitization agreements, pooling agreements, area of mutual interest agreements, production sharing agreements or other similar or customary agreements, transactions, properties, interests or arrangements, and Investments and expenditures in connection therewith or pursuant thereto in each case, made or entered into in the ordinary course of business;

(n) [reserved];

(o) payment of consolidated Taxes pursuant to tax allocation agreements among the Company and its Subsidiaries;

(p) Investments consisting of assets contributed to any joint venture in an aggregate amount not to exceed $500,000,000 at any time outstanding; provided that promptly and in any event within thirty (30) Business Days after the making of such Investments (or such longer period as may be agreed to by Administrative Agent in its sole discretion), the equity interests in such joint venture held by the Company or any Restricted Subsidiary making such Investment shall be pledged to secure the Obligations of the Loan Parties under the Loan Documents;

(q) [reserved];

(r) in addition to Investments otherwise expressly permitted by this Section 8.6, Investments by the Company or any of the Restricted Subsidiaries in an aggregate amount (valued at cost) not to exceed $500,000,000 at any time outstanding;

(s) Investments in Foundation or any other Person for charitable purposes in an aggregate amount not to exceed $25,000,000 in the aggregate over the term hereof;

(t) [reserved]; and

(u) Investments in the NRG Parent Group.

8.7 Transactions with Affiliates. The Borrowers shall not, and shall not permit any Restricted Subsidiary to, enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than the Company, any Restricted Subsidiary or any member of the NRG Parent Group) unless such transaction is (i) otherwise permitted under this Agreement or (ii) either (x) upon fair and reasonable terms no less favorable to the Company or such Restricted Subsidiary, as the case may be, than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate or (y) structured as a commercially reasonable and fair allocation of costs, including corporate overhead costs; provided, however, that the foregoing shall not prohibit (a) any employment agreement or director's engagement agreement, employee benefit plan, officer and director indemnification agreement or any similar arrangement entered into by the Company or any of the Restricted Subsidiaries in the ordinary course of business or approved by the board of directors of the Company or such Restricted Subsidiary; (b) transactions between or among the Company and/or the Restricted Subsidiaries that are evidenced or contemplated by licensing, servicing or trust agreements in effect on the Closing Date; (c) payment of reasonable directors' fees; (d) any issuance of Capital Stock (other than Disqualified Stock) of the Company to Affiliates of the Company; (e) Restricted Payments permitted under Section 8.2; (f) loans or advances to employees in the ordinary course of business not to exceed $10,000,000 in the aggregate outstanding at any time; (g) any agreement, instrument or arrangement as in effect as of the Closing Date, or any amendment thereto or any transaction contemplated thereby (including pursuant to any amendment thereto) in any replacement agreement thereto so long as any such amendment or replacement agreement is not more disadvantageous to the Lenders in any material respect than the original agreement as in effect on the Closing Date as reasonably determined by the Company; (h) any pro rata distribution (including a rights offering) to all holders of a class of Capital Stock or Debt of the Company or any of the Restricted Subsidiaries, including Persons who are Affiliates of the Company or any of the Restricted Subsidiaries and (i) transactions otherwise expressly permitted hereunder.

8.8 Sales and Leasebacks. The Borrowers shall not, and shall not permit any Restricted Subsidiaries to, directly or indirectly lease any property as lessee in connection with a sale and leaseback transaction except to the extent that the sale of the relevant Assets is permitted under Section 8.5, if then applicable, and such lease, to the extent treated as Debt, does not violate Section 8.1 and, to the extent treated as a Lien, does not violate Section 8.3.

8.9 Changes in Fiscal Periods. The Company shall not change its fiscal year.

8.10 NRG Credit Agreement. The Borrowers shall not, and shall not permit any Restricted Subsidiary, to (a) become a borrower under the NRG Credit Agreement, (b) guarantee or otherwise directly or indirectly provide credit support for, or with respect to, any of the Obligations (as such term is defined in the NRG Credit Agreement), (c) grant a Lien in any of its property or assets to secure any of the Obligations (as such term is defined in the NRG Credit Agreement), or (d) allow any of the Capital Stock or equity interests issued by it or owned by it to be pledged in favor of the Collateral Trustee (as such term is defined in the NRG Credit Agreement).

49
.

## SECTION 9. EVENTS OF DEFAULT

If any of the following events shall occur and be continuing on or after the Closing Date:

(a)       either Borrower shall fail to pay any principal of any Loan or Reimbursement Obligation when due in accordance with the terms hereof; or either Borrower shall fail to pay any interest on any Loan or Reimbursement Obligation, or any other amount payable hereunder, within three (3) Business Days after any such interest becomes due in accordance with the terms hereof or five (5) Business Days after any such other amount becomes due in accordance with the terms hereof; or

(b)       (i) any Loan Party shall default in the observance or performance of any agreement contained in Section 8 of this Agreement (other than Section 8.3) or (ii) any Loan Party shall default in the observance or performance of any agreement contained in Section 8.3, and, in each case, such default shall continue unremedied for a period of 15 days after written notice to the Company from the Administrative Agent or the Majority Lenders; or

(c)       [reserved]; or

(d)       any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or in any certificate delivered or required to be delivered pursuant hereto or thereto shall prove to have been inaccurate in any material respect on or as of the date made or deemed made and, in the case of any representation or warranty made in any such certificate, such inaccuracy could reasonably be expected to have a Material Adverse Effect; or

(e)       any Loan Party shall default in the observance or performance in any material respect of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (d) of this Section), and such default shall continue unremedied for a period of 30 days after written notice to the Company from the Administrative Agent or the Majority Lenders; or

(f)       the Company or any of its material Restricted Subsidiaries shall fail to pay any principal of or premium or interest on any Debt of such entity that is outstanding in a principal or notional amount equal to or in excess of $20,000,000 when the same becomes due and payable (whether by maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or any other event shall occur or condition shall exist under the agreement or instrument relating to any such Debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the holders thereof (or a trustee or other representative on their behalf) to accelerate, the maturity of such Debt by reason of default; or

(g)       the Company or any of the Restricted Subsidiaries shall fail to pay an amount which is due and not subject to a good faith dispute in excess of $20,000,000 in respect of Eligible Commodity Hedging Obligations secured by pari passu Liens on the Collateral and, as a result of such failure, the counterparty thereunder shall be entitled to and shall have given notice of its intent to exercise any remedies against the Company or any of the Restricted Subsidiaries in respect of the Collateral as a result of such failure; or

(h)       any judgment or order for the payment of money in excess of $20,000,000 shall be rendered against the Company or any of its material Restricted Subsidiaries and there shall be any

period of sixty (60) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(i)        the Company or any of its material Restricted Subsidiaries (each a "<u>Designated Party</u>") shall (i) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property, (ii) make a general assignment for the benefit of its creditors, (iii) commence a voluntary case under the U.S. Bankruptcy Code (as now or hereafter in effect) or any similar law of any applicable jurisdiction, (iv) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding-up, or composition or readjustment of debts, or (v) fail to controvert in a timely and appropriate manner, or acquiesce in writing to, any petition filed against it in an involuntary case under the U.S. Bankruptcy Code or any similar law of any applicable jurisdiction; or a proceeding or case shall be commenced, without the application or consent of such Designated Party, in any court of competent jurisdiction, seeking (x) its liquidation, reorganization, dissolution or winding up, or the composition or readjustment of its debts, (y) the appointment of a trustee, receiver, custodian, liquidator or the like of such Designated Party or of all or any substantial part of its assets, or (z) similar relief in respect of such Designated Party under any law relating to bankruptcy, insolvency, reorganization, winding-up, or composition or adjustment of debts, and such proceeding or case shall continue unstayed and in effect for a period of sixty (60) or more days; or

(j)        any Change of Control occurs; or

(k)        (i) any Security Document shall for any reason be asserted in writing by the Company or any material Subsidiary Guarantor not to be a legal, valid and binding obligation of any party thereto, (ii) any security interest purported to be created by any Security Document and to extend to assets that are material to the Company and its Subsidiaries on a consolidated basis shall cease to be, or shall be asserted in writing by the Company or any other Loan Party not to be, a valid and perfected security interest (having the priority required by this Agreement or the relevant Security Document) in the securities, assets or properties covered thereby, except to the extent that any such loss of perfection or priority results from the failure of the Administrative Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Security Documents or from a transaction otherwise permitted hereunder; or (iii) the Collateral Trust Agreement or any intercreditor agreement or subordination agreement in respect of second-lien Debt or Debt that is subordinated to the Obligations shall for any reason be asserted in writing by the Company or any material Subsidiary Guarantor not to be a legal, valid and binding obligation of any party thereto or shall otherwise cease to be enforceable; or

(l)        the guarantee contained in <u>Section 2</u> of the Guarantee Agreement of any Subsidiary Guarantor that holds material assets shall cease, for any reason, to be in full force and effect (other than as a result of a transaction permitted hereunder) or any Loan Party shall so assert in writing; or

(m)        an ERISA Event shall occur and be continuing that, when taken together with all other such ERISA Events, would result in a Material Adverse Effect.

then, and in any such event, (A) if such event is an Event of Default specified in paragraph (i) above with respect to either Borrower, automatically the Commitments shall immediately terminate and the Loans (with accrued and unpaid interest thereon) and all other amounts owing under this Agreement and the other Loan Documents (including all amounts of L/C Obligations, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder) shall immediately become due and payable, and (B) if such event is any other Event of Default, either or both of the following actions may be taken: (i) with the consent of the Majority Lenders, the Administrative Agent may, or upon

51

the request of the Majority Lenders, the Administrative Agent shall, by notice to the Company declare the Commitments to be terminated forthwith, whereupon the Commitments shall immediately terminate; and (ii) with the consent of the Majority Lenders, the Administrative Agent may, or upon the request of the Majority Lenders, the Administrative Agent shall, by notice to the Company, declare the Loans (with accrued and unpaid interest thereon) and all other amounts owing under this Agreement and the other Loan Documents (including all amounts of L/C Obligations, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder) to be due and payable forthwith, whereupon the same shall immediately become due and payable. With respect to all Letters of Credit with respect to which presentment for honor shall not have occurred at the time of an acceleration pursuant to this paragraph, the Company shall at such time deposit in a cash collateral account opened by the Administrative Agent an amount equal to 103% of the aggregate then undrawn and unexpired amount of such Letters of Credit plus any accrued and unpaid interest thereon and fees with respect thereto. Amounts held in such cash collateral account shall be applied by the Administrative Agent to the payment of drafts drawn under such Letters of Credit, and the unused portion thereof after all such Letters of Credit shall have expired or been fully drawn upon, if any, shall be applied to repay other Obligations of the Borrowers hereunder and under the other Loan Documents. After all such Letters of Credit shall have expired or been fully drawn upon, all Reimbursement Obligations shall have been satisfied and all other Obligations of the Borrowers hereunder and under the other Loan Documents shall have been paid in full, the balance, if any, in such cash collateral account shall be returned to the Company (or such other Person as may be lawfully entitled thereto). Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrowers.

## SECTION 10. THE ADMINISTRATIVE AGENT

10.1 <u>Appointment</u>. (a) Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.

(b) The Administrative Agent and each Lender hereby irrevocably (I) designates and appoints the Collateral Trustee as its agent under the Collateral Trust Agreement and the other Loan Documents, and irrevocably authorizes the Collateral Trustee, in such capacity, to (i) take such action on its behalf under the provisions of the Collateral Trust Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Collateral Trustee by the terms of the Collateral Trust Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto and (ii) enter into any and all Security Documents and the Collateral Trust Agreement and such other documents and instruments as shall be necessary to give effect to (A) the ranking and priority of Debt and other extensions of credit and obligations contemplated hereunder and under the Collateral Trust Agreement, (B) the security interests in the Collateral purported to be created by the Security Documents and (C) the other terms and conditions of the Collateral Trust Agreement and (II) ratifies, approves and affirms any and all such actions described in foregoing clause (I)(ii) that occurred prior to the date. Each Lender further hereby agrees to be bound by the terms of the Collateral Trust Agreement and such other documents and instruments to the same extent as if it were a party thereto and authorizes the Administrative Agent to enter

into the Collateral Trust Agreement and such other documents and instruments on its behalf. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Collateral Trustee shall not have any duties or responsibilities, except those expressly set forth herein, in the Collateral Trust Agreement or in any other Loan Document to which it is a party, or any fiduciary relationship with the Administrative Agent or any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement, the Collateral Trust Agreement or any other Loan Document or otherwise exist against the Collateral Trustee.

10.2 <u>Delegation of Duties</u>. The Administrative Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Administrative Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

10.3 <u>Exculpatory Provisions</u>. Neither the Administrative Agent nor any of its Affiliates (other than the Company and its Subsidiaries) nor any of its or their respective officers, directors, employees, agents, advisors, attorneys-in-fact or controlling persons shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any Recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party a party thereto to perform its obligations hereunder or thereunder. The Administrative Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.

10.4 <u>Reliance by Administrative Agent</u>. The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, email message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons or upon advice and statements of legal counsel (including counsel to the Borrowers), independent accountants and other experts selected by the Administrative Agent. The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent. The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Majority Lenders (or, if so specified by this Agreement, all Lenders) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Majority Lenders (or, if so specified by this Agreement, all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

10.5 <u>Notice of Default</u>. The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Administrative Agent has received notice from a Lender or a Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Majority Lenders (or, if so specified by this Agreement, all Lenders); <u>provided</u> that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

10.6 <u>Non-Reliance on Administrative Agent and Other Lenders</u>. Each Lender expressly acknowledges that neither the Administrative Agent nor any of its Affiliates (other than the Company and its Subsidiaries) nor any of its or their respective officers, directors, employees, agents, advisors, attorneys-in-fact or controlling persons have made any representations or warranties to it and that no act by Administrative Agent hereafter taken, including any review of the affairs of a Loan Party or any Affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by Administrative Agent to any Lender. Each Lender represents to Administrative Agent that it has, independently and without reliance upon Administrative Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon Administrative Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any Affiliate of a Loan Party that may come into the possession of the Administrative Agent or its Affiliates or any of its or their officers, directors, employees, agents, advisors, attorneys-in-fact or controlling persons.

10.7 <u>Indemnification</u>. The Lenders agree to indemnify Administrative Agent in its capacity as such, its Affiliates (other than the Company and its Subsidiaries) and its and such Affiliates' officers, directors, employees, agents, advisors, attorneys-in-fact and controlling persons (each, an "<u>Agent Indemnitee</u>") (to the extent not reimbursed by the Borrowers and without limiting the obligation of the Borrowers to do so), ratably according to their respective Aggregate Exposure Percentages in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Aggregate Exposure Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against any Agent Indemnitee in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent Indemnitee under or in connection with any of the foregoing; <u>provided</u> that no Lender shall be liable for the payment of any portion of such liabilities, obligations,

losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent Indemnitee's gross negligence or willful misconduct. The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

10.8 <u>Agent in Its Individual Capacity</u>. The Administrative Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though Administrative Agent were not the Administrative Agent. With respect to its Loans made or renewed by it and with respect to any Letter of Credit issued or participated in by it, Administrative Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not the Administrative Agent, and the terms "Lender" and "Lenders" shall include Administrative Agent in its individual capacity.

10.9 <u>Successor Administrative Agent</u>. The Administrative Agent may resign as Administrative Agent upon 10 days' notice to the Lenders and the Company. If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents, then the Majority Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall (unless an Event of Default under <u>Section 9(a)</u> or <u>Section 9(i)</u> with respect to a Borrower shall have occurred and be continuing) be subject to approval by the Company (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "Administrative Agent" shall mean such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans. If no successor agent has accepted appointment as Administrative Agent by the date that is ten (10) days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Majority Lenders appoint a successor agent as provided for above. After any retiring Administrative Agent's resignation as Administrative Agent, the provisions of this <u>Section 10</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement and the other Loan Documents.

## SECTION 11. MISCELLANEOUS

11.1 <u>Amendments and Waivers</u>. Neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this <u>Section 11.1</u>. The Majority Lenders and each Loan Party party to the relevant Loan Document may, or, with the written consent of the Majority Lenders, the Administrative Agent and each Loan Party party to the relevant Loan Document may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of changing any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Loan Parties hereunder or thereunder or (b) waive, on such terms and conditions as the Majority Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; <u>provided</u>, <u>however</u>, that no such waiver and no such amendment, supplement or modification shall (i) forgive the principal amount or extend the final scheduled date of maturity of any Loan, reduce the stated rate of any interest or fees payable hereunder (except (x) in connection with any reduction in the post-default rate of interest set forth in <u>Section 2.12(c)</u>; (y) in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective with the consent of the Majority

Lenders); and (z) that any amendment or modification of defined terms used in the financial covenants in this Agreement shall not constitute a reduction in the rate of interest or fees for purposes of this clause (i)) or extend the scheduled date of any payment thereof, or increase the amount or extend the expiration date of any Lender's Commitment, or otherwise change the time, place or the currency of payments to be made on the Loans, in each case without the written consent of each Lender directly affected thereby; (ii) reduce any percentage specified in the definition of Majority Lenders without the written consent of all Lenders, (iii) except to the extent contemplated by the Loan Documents, release all or substantially all of the Collateral or release a Subsidiary Guarantor or Subsidiary Guarantors owning all or substantially all of the Collateral from their obligations under the Security Agreement or Guarantee Agreement, respectively, in each case without the written consent of all Lenders; (iv) [reserved]; (v) [reserved], (vi) amend, modify or waive any provision of Section 10 without the written consent of the Administrative Agent; or (vii) amend, modify or waive any provision of Sections 2.5(b), 3, 11.1, 11.5, or 11.6(b)(i)(B), or extend the Termination Date without the written consent of each Lender affected thereby. Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Administrative Agent and all future holders of the Loans. In the case of any waiver, the Loan Parties, the Lenders and the Administrative Agent shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

Notwithstanding anything to the contrary contained in this Section 11.1:

(a)     the Guarantee Agreement, the Security Documents and related documents executed by the Borrowers or Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended, supplemented and waived with the consent of the Administrative Agent at the request of the Company without the need to obtain the consent of any other Lender if such amendment, supplement or waiver is delivered in order to (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities, omissions, mistakes or defects or (iii) to cause the Guarantee Agreement, any Security Document or any related document to be consistent with this Agreement and the other Loan Documents; and

(b)     this Agreement may be amended (or amended and restated) with the written consent of the Majority Lenders, the Administrative Agent and the Borrowers (i) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Loans and the accrued interest and fees in respect thereof and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Majority Lenders.

11.2 Notices. All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received, addressed as follows in the case of the Borrowers, the Administrative Agent and the Lenders identified below, and as set forth in an administrative questionnaire delivered to the Administrative Agent in the case of the Lenders, or to such other address as may be hereafter notified by the respective parties hereto:

56

| | |
|---|---|
| Company and GAI: | GenOn Energy, Inc. |
| | GenOn Americas, Inc. |
| | Subsidiary Guarantors |
| | c/o NRG Energy, Inc. |
| | 211 Carnegie Center |
| | Princeton, NJ 08540 |
| | Facsimile No.:  609-524-4501 |
| | Telephone No.: 609-524-4500 |
| | |
| | Attention:   Treasurer, Chief Financial Officer and General Counsel |
| | |
| Administrative Agent: | NRG Energy, Inc. |
| | 211 Carnegie Center |
| | Princeton, NJ 08540 |
| | Facsimile No.: 609-524-4501 |
| | Telephone No.: 609-524-4500 |
| | Attention of Treasurer, Chief Financial Officer and General Counsel |
| | With a copy to: |
| | Kirkland & Ellis LLP |
| | 601 Lexington Avenue |
| | New York, NY 10022 |
| | Facsimile No.:  212-446-6460 |
| | Telephone No.: 212-446-4737 |
| | Attention: Andres Mena |
| | With a copy to: |
| | Kirkland & Ellis LLP |
| | 300 North LaSalle St. |
| | Chicago, IL 60654 |
| | Facsimile No.:  312-862-2200 |
| | Telephone No.: 312-862-2075 |
| | Attention: Gerald Nowak |

NRG, as Lender:  NRG Energy, Inc.

211 Carnegie Center

Princeton, NJ 08540

Facsimile No.: 609-524-4501
Telephone No.: 609-524-4500

Attention of Treasurer, Chief Financial Officer and General Counsel

With a copy to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Facsimile No.:  212-446-6460
Telephone No.: 212-446-4737

Attention: Andres Mena

With a copy to:

Kirkland & Ellis LLP
300 North LaSalle St.
Chicago, IL 60654
Facsimile No.:  312-862-2200
Telephone No.: 312-862-2075

Attention: Gerald Nowak

provided that any notice, request or demand to or upon the Administrative Agent or any Lender shall not be effective until received.

Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic or telephonic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Administrative Agent and the applicable Lender or otherwise provided for therein. The Administrative Agent or the Company may, in its discretion, agree to accept notices and other communications to it hereunder by electronic or telephonic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

11.3 No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising, on the part of the Administrative Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

11.4 Survival of Representations and Warranties. All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

11.5 Payment of Expenses and Taxes. (a) The Company agrees, if the Closing Date occurs, (i) to pay or reimburse the Administrative Agent and each Lender (A) for all their out-of-pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the

transactions contemplated hereby and thereby, including the reasonable fees and disbursements of counsel to the Administrative Agent and each Lender and filing and recording fees and expenses and (B) for all of its costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any such other documents, including the fees and disbursements of counsel to the Administrative Agent, (ii) to pay or reimburse the Administrative Agent, Collateral Trustee, and each Lender for all their costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any such other documents, in each case, during the continuance of a Default or an Event of Default, including the fees and disbursements of counsel (including the allocated fees and expenses of in-house counsel) to each Lender, (iii) to pay, indemnify, and hold each Lender and the Administrative Agent harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other taxes, if any, that may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (iv) to pay, indemnify, and hold each Lender, the Administrative Agent, their Affiliates (other than the Company and its Subsidiaries) and each of their respective officers, directors, trustees, employees, agents, advisors and controlling persons (each, an "Indemnitee") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents, including any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of the Company or any of its Subsidiaries or any real property currently or formerly owned, leased, operated or otherwise used (including properties to which wastes or other materials were sent for treatment, storage or disposal) by the Company or any of its Subsidiaries or any of their predecessors and the reasonable fees and expenses of legal counsel in connection with claims, actions or proceedings by any Indemnitee against any Loan Party under any Loan Document (all the foregoing in this clause (iv), collectively, the "Indemnified Liabilities"), provided, that the Company shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee. Without limiting the foregoing, and to the extent permitted by applicable law, the Company agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee.

(b)    Promptly after receipt by an Indemnitee of notice of the commencement of any claim, litigation, investigation, responding to or proceedings against it relating to any Indemnified Liability ("Proceedings"), such Indemnitee will, if a claim is to be made hereunder against the Company in respect thereof, notify the Company in writing of the commencement thereof; provided, however, that (i) the omission so to notify the Company will not relieve it from any liability that it may have hereunder and (ii) the omission so to notify the Company will not relieve the Company from any liability that it may have to an Indemnitee otherwise than on account hereof. Thereafter, the Indemnitee and the Company shall consult, to the extent appropriate, with a view to minimizing the (A) cost to the Company of the obligations under this Section 11.5 and (B) potential liabilities with respect to such Proceedings. In case any such Proceedings are brought against any Indemnitee and it notifies the Company of the commencement thereof, the Company will be entitled to participate therein, and, to the extent that it may elect by written notice delivered to such Indemnitee, to

59

assume the defense thereof, with counsel reasonably satisfactory to such Indemnitee, provided that if the defendants in any such Proceedings include both such Indemnitee and the Company and such Indemnitee shall have concluded that there may be legal defenses available to it that are different from or additional to those available to the Company, such Indemnitee shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Proceedings on behalf of such Indemnitee(it being understood that the Company shall be liable for the expenses of such separate counsel representing the Indemnitees who are parties to such Proceedings).

(c) The Company shall not be liable for any settlement of any Proceedings effected without its written consent (which consent shall not be unreasonably withheld, delayed or conditioned). If any settlement of any Proceeding is consummated with the written consent of the Company or if there is a final judgment for the plaintiff in any such Proceedings, the Company agrees to indemnify and hold harmless each Indemnitee from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with the provisions of this Section 11.5(c). Notwithstanding anything in this Section 11.5(c) to the contrary, if at any time an Indemnitee shall have requested the Company to reimburse such Indemnitee for legal or other expenses in connection with investigating, responding to or defending any Proceedings as contemplated by this Section 11.5(c), the Company shall be liable for any settlement of any Proceedings effected without its written consent if (i) such settlement is entered into more than 30 days after receipt by the Company of such request for reimbursement and (ii) the Company shall not have reimbursed such Indemnitee in accordance with such request prior to the date of such settlement. The Company shall not, without the prior written consent of an Indemnitee (which consent shall not be unreasonably withheld, delayed or conditioned), effect any settlement of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such Indemnitee unless such settlement (i) includes an unconditional release of such Indemnitee in form and substance satisfactory to such Indemnitee from all liability on claims that are the subject matter of such Proceedings and (ii) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnitee.

(d) All amounts due under this Section 11.5 shall be payable not later than 10 days after written demand therefor (or such later date as Administrative Agent may agree to in its sole discretion). Statements payable by the Company pursuant to this Section 11.5 shall be submitted to the Treasurer, Chief Financial Officer or General Counsel of Agent (Telephone No. 609-524-4500, Telecopy No. 609-524-4501), at the address of the Company set forth in Section 11.2, or to such other Person or address as may be hereafter designated by the Company in a written notice to the Administrative Agent. The agreements in this Section 11.5 shall survive repayment of the Loans and all other amounts payable hereunder.

11.6 Successors and Assigns; Participations and Assignments. (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) no Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Company without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.

(b) (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (each, an "Assignee") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it) with the prior written consent of:

(A) the Company (such consent not to be unreasonably withheld, delayed or conditioned), provided that no consent of the Company shall be required for an assignment

60

to a Lender, an Affiliate of a Lender or an Approved Fund (as defined below) or, if an Event of Default has occurred and is continuing, to any other Person; and

(B) the Administrative Agent and each Lender (such consent not to be unreasonably withheld, delayed or conditioned), provided that no consent of the Administrative Agent shall be required for assignments of Commitments and/or Loans among Lenders, Affiliates of Lenders or Approved Funds.

(ii) Assignments shall be subject to the following additional conditions:

(A) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitments or Loans, the amount of the Commitments or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $10,000,000, unless each of the Company and the Administrative Agent otherwise consent (such consent, in the case of the Company, not to be unreasonably withheld, delayed or conditioned); provided that such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(B) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 (unless waived by the Administrative Agent in its sole discretion); provided that only one such fee shall be payable to the Administrative Agent in connection with simultaneous assignments by a Lender to two or more related Approved Funds;

(C) the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire; and

(D) without the prior written consent of the Administrative Agent, no assignment shall be made to a prospective Assignee that bears a relationship to the Company described in Section 108(e)(4) of the Code, except to any member of the NRG Parent Group.

For the purposes of this Section 11.6, "Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender or (d) the Company or any of its Affiliates.

(iii) Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) below, from and after the effective date specified in each Assignment and Assumption the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.16, 2.17, 2.18 and 11.5 with respect to facts and circumstances occurring prior to the effective date of such assignment). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 11.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv) The Administrative Agent, acting for this purpose as an agent of the Borrowers, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount of the Loans and L/C Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent, and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. With respect to any Lender, the transfer of the Commitments of such Lender and the rights to the principal of, and the interest on, any Loan made pursuant to such Commitments shall not be effective until such transfer is recorded on the Register maintained by the Administrative Agent with respect to ownership of such Commitments and Loans. The Register shall be available for inspection by the Borrowers and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v) Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee, the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section (to the extent required) and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c) (i) Any Lender may, without the consent of either Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (C) the Borrowers, the Administrative Agent, and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and (D) without the prior written consent of the Administrative Agent, no assignment shall be made to a prospective Assignee that bears a relationship to a Borrower described in Section 108(e)(4) of the Code (other than any member of the NRG Parent Group). Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly affected thereby pursuant to the proviso to the second sentence of Section 11.1 and directly affects such Participant or (2) requires the consent of all Lenders. Subject to paragraph (c)(ii) of this Section, each Borrower agrees that each Participant shall be entitled to the benefits of, and subject to the limitations of, Sections 2.16 and 2.17 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrowers, maintain a register on which it enters the name and address of each Participant to whom such Lender sells participations and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"). As between the Lender and such Participant, the entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(ii) A Participant shall not be entitled to receive any greater payment under Section 2.16 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such

Participant, unless the sale of the participation to such Participant is made with the Borrowers' prior written consent.

(d) Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(e) Each Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in paragraph (d) above.

11.7 Adjustment and Set-Off. (a) Except to the extent that this Agreement expressly permits for payments to be made, directed or allocated to a particular Lender, if any Lender (a "Benefitted Lender") shall receive any payment of all or part of the Obligations owing to it, or receive any Collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 9(i), or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of the Obligations owing to such other Lender, such Benefitted Lender shall purchase for cash from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefitted Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefitted Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b) In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to either Borrower, any such notice being expressly waived by each Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrowers hereunder (whether at the stated maturity, by acceleration or otherwise), to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, Debt or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrowers, as the case may be. Each Lender agrees promptly to notify the Company and the Administrative Agent after any such setoff and application made by such Lender, provided that the failure to give such notice shall not affect the validity of such setoff and application.

11.8 Counterparts. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. A set of the copies of this Agreement signed by all the parties shall be lodged with the Company and the Administrative Agent.

11.9 Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

11.10 <u>Integration</u>. This Agreement and the other Loan Documents represent the entire agreement of the Borrowers, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

11.11 **<u>GOVERNING LAW</u>. THIS AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

11.12 <u>Submission To Jurisdiction; Waivers</u>. Each Borrower hereby irrevocably and unconditionally:

(a) submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York, the courts of the United States for the Southern District of New York, and appellate courts from any thereof;

(b) consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Borrower at its address set forth in <u>Section 11.2</u> or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e) waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

11.13 <u>Acknowledgements</u>. Each Borrower hereby acknowledges that:

(a) it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b) neither the Administrative Agent nor any Lender has any fiduciary relationship with or duty to either Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between Administrative Agent and Lenders, on one hand, and the Borrowers, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c) no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrowers and the Lenders.

11.14 <u>Releases of Guarantees and Liens</u>. (a) Notwithstanding anything to the contrary contained herein or in any other Loan Document, each of the Administrative Agent and the Collateral Trustee are hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender except as expressly required by <u>Section 11.1</u>) to take any action requested by the Company having the effect of releasing any Collateral or guarantee obligations (i) to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document (it being agreed, without limiting the foregoing, that such release shall be permitted with respect to any Subsidiary Guarantor if, after giving effect to any such transaction or designation as an Unrestricted Subsidiary, such Person would not be required to become a Guarantor Subsidiary pursuant to <u>Section 6.7</u>) or that has been consented to in accordance with <u>Section 11.1</u> or (ii) under the circumstances described in paragraph <u>(b)</u> below. The Administrative Agent and the Collateral Trustee agree to take such actions as are reasonably requested by the Company and permitted by this <u>Section 11.14</u>, at the Company's sole expense.

(b) At such time as the Loans, the Reimbursement Obligations and the other obligations under the Loan Documents shall have been paid in full, the Commitments have been terminated and no Letters of Credit shall be outstanding (or any outstanding Letters of Credit shall have been fully cash collateralized), the Collateral shall be released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of the Administrative Agent, the Collateral Trustee and each Loan Party under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

11.15 <u>Confidentiality</u>. Each of the Administrative Agent and each Lender agrees to keep confidential all non-public information provided to it by any Loan Party, the Administrative Agent or any Lender pursuant to or in connection with this Agreement that is designated by the provider thereof as confidential; <u>provided</u> that nothing herein shall prevent the Administrative Agent or any Lender from disclosing any such information (a) to the Administrative Agent, any other Lender or any Affiliate thereof, (b) subject to an agreement to comply with the provisions of this Section, to any actual or prospective Transferee or any direct or indirect counterparty to any Swap Agreement (or any professional advisor to such counterparty), (c) to its and its Affiliates' employees, officers, directors, shareholders, trustees, agents, attorneys, accountants and other professional advisors, (d) upon the request or demand of any Governmental Authority, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (f) if requested or required to do so in connection with any litigation or similar proceeding, (g) that has been publicly disclosed, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender, or (i) in connection with the exercise of any remedy hereunder or under any other Loan Document.

11.16 <u>**WAIVERS OF JURY TRIAL**</u>**. EACH BORROWER, THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.**

11.17 <u>Delivery of Addenda</u>. Each initial Lender shall become a party to this Agreement by delivering to the Administrative Agent an Addendum duly executed by such Lender.

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

GENON ENERGY, INC.


By:  /s/ G. Gary Garcia
Name: G. Gary Garcia
Title: Treasurer

66

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be duly executed and delivered by its proper and duly authorized officers as of the Closing Date.

GENON AMERICAS, INC.

By:   /s/ G. Gary Garcia
Name: G. Gary Garcia
Title:   Treasurer

67

NRG Energy, Inc., as Administrative Agent


By:   /s/ G. Gary Garcia
Name: G. Gary Garcia
Title:    Senior Vice President and Treasurer


68

**EXHIBIT 31.1 A1**

<div align="center">

**CERTIFICATION**

</div>

I, David W. Crane, certify that:

1.  I have reviewed this annual report on Form 10-K of GenOn Energy, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2013

/s/ DAVID W. CRANE
_____
David W. Crane
*Chief Executive Officer*
*(Principal Executive Officer)*

**EXHIBIT 31.1 A2**

**CERTIFICATION**

I, David W. Crane, certify that:

1.      I have reviewed this annual report on Form 10-K of GenOn Americas Generation, LLC;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2013

By:      /s/ DAVID W. CRANE
_____
         David W. Crane
         *Chief Executive Officer*
         *(Principal Executive Officer)*

**EXHIBIT 31.1 A3**

<p align="center"><strong>CERTIFICATION</strong></p>

I, David W. Crane, certify that:

1.      I have reviewed this annual report on Form 10-K of GenOn Mid-Atlantic, LLC;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2013

By:    /s/ DAVID W. CRANE
        David W. Crane
        *Chief Executive Officer*
        *(Principal Executive Officer)*

**EXHIBIT 31.2 A1**

## CERTIFICATION

I, Kirkland B. Andrews, certify that:

1.  I have reviewed this annual report on Form 10-K of GenOn Energy, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2013

By:    /s/ KIRKLAND B. ANDREWS
       _____
       *Kirkland B. Andrews*
       *Chief Financial Officer*
       *(Principal Financial Officer)*

**EXHIBIT 31.2 A2**

**CERTIFICATION**

I, Kirkland B. Andrews, certify that:

1.  I have reviewed this annual report on Form 10-K of GenOn Americas Generation, LLC;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2013

By:      /s/ KIRKLAND B. ANDREWS
         _____
         *Kirkland B. Andrews*
         *Chief Financial Officer*
         *(Principal Financial Officer)*

**EXHIBIT 31.2 A3**

## CERTIFICATION

I, Kirkland B. Andrews, certify that:

1.   I have reviewed this annual report on Form 10-K of GenOn Mid-Atlantic, LLC;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2013

By:   /s/ KIRKLAND B. ANDREWS
_____

*Kirkland B. Andrews*
*Chief Financial Officer*
*(Principal Financial Officer)*

**EXHIBIT 31.3A1**

<div align="center">

**CERTIFICATION**

</div>

I, Ronald B. Stark, certify that:

1.     I have reviewed this annual report on Form 10-K of GenOn Energy, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

  (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

  (b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

  (c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

  (d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

  (a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

  (b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2013

By:     _____/s/ RONALD B. STARK_____

  Ronald B. Stark
  *Chief Accounting Officer*
  *(Principal Accounting Officer)*

**EXHIBIT 31.3A2**

**CERTIFICATION**

I, Ronald B. Stark, certify that:

1. I have reviewed this annual report on Form 10-K of GenOn Americas Generation, LLC;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

 (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

 (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

 (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

 (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

 (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

 (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2013

By: /s/ RONALD B. STARK
   Ronald B. Stark
   *Chief Accounting Officer*
   *(Principal Accounting Officer)*

**EXHIBIT 31.3A3**

**CERTIFICATION**

I, Ronald B. Stark, certify that:

1.    I have reviewed this annual report on Form 10-K of GenOn Mid-Atlantic, LLC;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2013

By:    /s/ RONALD B. STARK
_____
       Ronald B. Stark
       *Chief Accounting Officer*
       *(Principal Accounting Officer)*

**EXHIBIT 32.A1**

<div align="center">

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

</div>

In connection with the Annual Report of GenOn Energy, Inc. on Form 10-K for the year ended December 31, 2012, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), each of the undersigned officers of the Company certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1) The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date: February 27, 2013

/s/ DAVID W. CRANE
_____
David W. Crane
*Chief Executive Officer*
*(Principal Executive Officer)*

/s/ KIRKLAND B. ANDREWS
_____
Kirkland B. Andrews
*Chief Financial Officer*
*(Principal Financial Officer)*

/s/ RONALD B. STARK
_____
Ronald B. Stark
*Chief Accounting Officer*
*(Principal Accounting Officer)*

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of this Form 10-K or as a separate disclosure document.

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to GenOn Energy, Inc. and will be retained by GenOn Energy, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

EXHIBIT 32.A2

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of GenOn Americas Generation, LLC on Form 10-K for the year ended December 31, 2012, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), each of the undersigned officers of the Company certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1) The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date: February 27, 2013

/s/ DAVID W. CRANE
David W. Crane
*Chief Executive Officer*
*(Principal Executive Officer)*

/s/ KIRKLAND B. ANDREWS
Kirkland B. Andrews
Chief Financial Officer
*(Principal Financial Officer)*

/s/ RONALD B. STARK
Ronald B. Stark
Chief Accounting Officer
*(Principal Accounting Officer)*

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of this Form 10-K or as a separate disclosure document.

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to GenOn Americas Generation, LLC and will be retained by GenOn Americas Generation, LLC and furnished to the Securities and Exchange Commission or its staff upon request.

EXHIBIT 32.A3

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of GenOn Mid-Atlantic, LLC on Form 10-K for the year ended December 31, 2012, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), each of the undersigned officers of the Company certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)  The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)  The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date: February 27, 2013

/s/ DAVID W. CRANE
David W. Crane
*Chief Executive Officer*
*(Principal Executive Officer)*

/s/ KIRKLAND B. ANDREWS
Kirkland B. Andrews
Chief Financial Officer
*(Principal Financial Officer)*

/s/ RONALD B. STARK
Ronald B. Stark
Chief Accounting Officer
*(Principal Accounting Officer)*

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of this Form 10-K or as a separate disclosure document.

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to GenOn Mid-Atlantic, LLC and will be retained by GenOn Mid-Atlantic, LLC and furnished to the Securities and Exchange Commission or its staff upon request.

# Exhibit 63

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# Form 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the Fiscal Year ended December 31, 2013.**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the Transition period from            to            .**

# GenOn Energy, Inc.

(Exact name of registrant as specified in its charter)

75-0655566 (I.R.S. Employer Identification No.)

Commission File Number: 001-16455

# GenOn Americas Generation, LLC

(Exact name of registrant as specified in its charter)

51-0390520 (I.R.S. Employer Identification No.)

Commission File Number: 333-63240

# GenOn Mid-Atlantic, LLC

(Exact name of registrant as specified in its charter)

58-2574140 (I.R.S. Employer Identification No.)

Commission File Number: 333-61668

**Delaware**
*(State or other jurisdiction of incorporation or organization)*

**211 Carnegie Center Princeton, New Jersey**              **08540**
*(Address of principal executive offices)*                    *(Zip Code)*

**(609) 524-4500**
*(Registrants' telephone number, including area code)*

**Securities registered pursuant to Section 12(b) of the Act:**
**None**

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined by Rule 405 of the Securities Act.

| | | |
|---|---|---|
| GenOn Energy, Inc. | ☐ Yes | ☒ No |
| GenOn Americas Generation, LLC | ☐ Yes | ☒ No |
| GenOn Mid-Atlantic, LLC | ☐ Yes | ☒ No |

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act.

| | | |
|---|---|---|
| GenOn Energy, Inc. | ☒ Yes | ☐ No |
| GenOn Americas Generation, LLC | ☒ Yes | ☐ No |
| GenOn Mid-Atlantic, LLC | ☒ Yes | ☐ No |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. (As a voluntary filer not subject to filing requirements, the registrant nevertheless filed all reports which would have been required to be filed by Section 15(d) of the Exchange Act during the preceding 12 months had the registrant been required to file reports pursuant to Section 15(d) of the Securities Exchange Act of 1934 solely as a result of having registered debt securities under the Securities Act of 1933.)

| | | |
|---|---|---|
| GenOn Energy, Inc. | ☐ Yes | ☐ No |
| GenOn Americas Generation, LLC | ☐ Yes | ☐ No |
| GenOn Mid-Atlantic, LLC | ☐ Yes | ☐ No |

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

| | | |
|---|---|---|
| GenOn Energy, Inc. | ☒ Yes | ☐ No |
| GenOn Americas Generation, LLC | ☒ Yes | ☐ No |
| GenOn Mid-Atlantic, LLC | ☒ Yes | ☐ No |

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

| | |
|---|---|
| GenOn Energy, Inc. | ☒ |
| GenOn Americas Generation, LLC | ☒ |
| GenOn Mid-Atlantic, LLC | ☒ |

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | Large accelerated filer | Accelerated filer | Non-accelerated filer | Smaller reporting company |
|---|---|---|---|---|
| GenOn Energy, Inc. | ☐ | ☐ | ☒ | ☐ |
| GenOn Americas Generation, LLC | ☐ | ☐ | ☒ | ☐ |
| GenOn Mid-Atlantic, LLC | ☐ | ☐ | ☒ | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).

| | | |
|---|---|---|
| GenOn Energy, Inc. | ☐ Yes | ☒ No |
| GenOn Americas Generation, LLC | ☐ Yes | ☒ No |
| GenOn Mid-Atlantic, LLC | ☐ Yes | ☒ No |

Each Registrant's outstanding equity interests are held by its respective parent and there are no equity interests held by nonaffiliates.

| Registrant | Parent |
|---|---|
| GenOn Energy, Inc. | NRG Energy, Inc. |
| GenOn Americas Generation, LLC | GenOn Americas, Inc. |
| GenOn Mid-Atlantic, LLC | GenOn North America, LLC |

This combined Form 10-K is separately filed by GenOn Energy, Inc., GenOn Americas Generation, LLC and GenOn Mid-Atlantic, LLC. Information contained in this combined Form 10-K relating to GenOn Energy, Inc., GenOn Americas Generation, LLC and GenOn Mid-Atlantic, LLC is filed by such registrant on its own behalf and each registrant makes no representation as to information relating to registrants other than itself.

The registrants have not incorporated by reference any information into this Form 10-K from any annual report to securities holders, proxy statement or prospectus filed pursuant to 424(b) or (c) of the Securities Act.

NOTE: WHEREAS GENON ENERGY, INC., GENON AMERICAS GENERATION, LLC AND GENON MID-ATLANTIC, LLC MEET THE CONDITIONS SET FORTH IN GENERAL INSTRUCTION I(1)(a) AND (b) OF FORM 10-K, THIS COMBINED FORM 10-K IS BEING FILED WITH THE REDUCED DISCLOSURE FORMAT PURSUANT TO GENERAL INSTRUCTION I(2).

**TABLE OF CONTENTS**

| | |
|---|---|
| Glossary of Terms | 2 |
| PART I | 5 |
| Item 1 — Business | 5 |
| Item 1A — Risk Factors Related to the Registrants | 11 |
| Item 1B — Unresolved Staff Comments | 22 |
| Item 2 — Properties | 23 |
| Item 3 — Legal Proceedings | 25 |
| Item 4 — Mine Safety Disclosures | 25 |
| PART II | 26 |
| Item 5 — Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 26 |
| Item 6 — Selected Financial Data | 26 |
| Item 7 — Management's Narrative Analysis of the Results of Operations and Financial Condition | 27 |
| Item 7A — Quantitative and Qualitative Disclosures About Market Risk | 40 |
| Item 8 — Financial Statements and Supplementary Data | 42 |
| Item 9 — Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 43 |
| Item 9A — Controls and Procedures | 43 |
| Item 9B — Other Information | 43 |
| PART III | 44 |
| Item 10 — Directors, Executive Officers and Corporate Governance | 44 |
| Item 11 — Executive Compensation | 44 |
| Item 12 — Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 44 |
| Item 13 — Certain Relationships and Related Transactions, and Director Independence | 44 |
| Item 14 — Principal Accounting Fees and Services | 44 |
| PART IV | 45 |
| Item 15 — Exhibits, Financial Statement Schedules | 45 |
| EXHIBIT INDEX | 144 |

1

.

## Glossary of Terms

When the following terms and abbreviations appear in the text of this report, they have the meanings indicated below:

| | |
|---|---|
| Ancillary Services | Services that ensure reliability and support the transmission of electricity from generation sites to customer loads. Such services include regulation service, reserves and voltage support |
| ARO | Asset retirement obligation |
| ASC | The FASB Accounting Standards Codification, which the FASB established as the source of authoritative U.S. GAAP |
| ASU | Accounting Standards Updates – updates to the ASC |
| Bankruptcy Court | United States, Bankruptcy Court for the Northern District of Texas, Fort Worth Division |
| Baseload | Units expected to satisfy minimum baseload requirements of the system and produce electricity at an essentially constant rate and run continuously |
| CAA | Federal Clean Air Act |
| CAIR | Clean Air Interstate Rule |
| CAISO | California Independent System Operator |
| CCGT | Combined Cycle Gas Turbine |
| CenterPoint | CenterPoint Energy, Inc. and its subsidiaries, on and after August 31, 2002, and Reliant Energy, Incorporated and its subsidiaries, prior to August 31, 2002 |
| CFTC | U.S. Commodity Futures Trading Commission |
| Clean Water Act | Federal Water Pollution Control Act |
| $CO_2$ | Carbon dioxide |
| CSAPR | Cross-State Air Pollution Rule |
| Deactivation | Includes retirement, mothballing and long-term protective layup. In each instance, the deactivated unit cannot be currently called upon to generate electricity. |
| Dodd-Frank Act | Dodd-Frank Wall Street Reform and Consumer Protection Act |
| EPA | United States Environmental Protection Agency |
| EPC | Engineering, Procurement and Construction |
| Exchange Act | The Securities Exchange Act of 1934, as amended |
| FASB | Financial Accounting Standards Board |
| FERC | Federal Energy Regulatory Commission |
| GenOn | GenOn Energy, Inc. (formerly known as RRI Energy, Inc.) and, except where the context indicates otherwise, its subsidiaries |
| GenOn Americas | GenOn Americas, Inc. |
| GenOn Americas Generation | GenOn Americas Generation, LLC and, except where the context indicates otherwise, its subsidiaries |
| GenOn Energy Holdings | GenOn Energy Holdings, Inc. (formerly known as Mirant Corporation) and, except where the context indicates otherwise, its subsidiaries |
| GenOn Mid-Atlantic | GenOn Mid-Atlantic, LLC and, except where the context indicates otherwise, its subsidiaries, which include the coal generation units at two generating facilities under operating leases |
| GenOn North America | GenOn North America, LLC |
| GenOn Plans | Collectively, the NRG GenOn LTIP, The GenOn Energy, Inc. 2002 Long-Term Incentive Plan, the GenOn Energy, Inc. 2002 Stock Plan and the Mirant Corporation 2005 Omnibus Incentive Compensation Plan |
| IRC | Internal Revenue Code of 1986, as amended |
| IRC § | IRC section |
| ISO | Independent System Operator, also referred to as RTO |
| ISO-NE | ISO New England Inc. |
| kWh | Kilowatt-hours |
| LIBOR | London Inter-Bank Offered Rate |

| | |
|---|---|
| Long-term protective layup | A descriptive term for GenOn's plans with respect to the Shawville coal-fired units, including retiring the units from service in accordance with the PJM tariff, maintenance of the units in accordance with the lease requirements and continued payment of the lease rent. Although the units are not decommissioned and reactivation remains a technical possibility, GenOn does not expect to make any further investment in environmental controls for the units. Further, reactivation after the long-term protective layup would likely involve numerous new permits and substantial additional investment. |
| Marsh Landing | NRG Marsh Landing, LLC (formerly known as GenOn Marsh Landing, LLC) |
| MC Asset Recovery | MC Asset Recovery, LLC |
| MDE | Maryland Department of the Environment |
| Merit Order | A term used for the ranking of power stations in order of ascending marginal cost |
| Mirant | GenOn Energy Holdings, Inc. (formerly known as Mirant Corporation) and, except where the context indicates otherwise, its subsidiaries |
| Mirant/RRI Merger | The merger completed on December 3, 2010 pursuant to the Mirant/RRI Merger Agreement |
| Mirant/RRI Merger Agreement | The agreement by and among Mirant Corporation, RRI Energy, Inc. and RRI Energy Holdings, Inc. dated as of April 11, 2010 |
| Mirant Debtors | GenOn Energy Holdings, Inc. (formerly known as Mirant Corporation) and certain of its subsidiaries |
| MISO | Midcontinent Independent System Operator, Inc. |
| MMBtu | Million British Thermal Units |
| Mothballed | The unit has been removed from service and is unavailable for service, but has been laid up in a manner such that it can be brought back into service with an appropriate amount of notification, typically weeks or months |
| MW | Megawatts |
| MWh | Saleable megawatt hours net of internal/parasitic load megawatt-hours |
| Net Exposure | Counterparty credit exposure to GenOn, GenOn Americas Generation or GenOn Mid-Atlantic, as applicable, net of collateral |
| Net Generation | The net amount of electricity produced, expressed in kWhs or MWhs, that is the total amount of electricity generated (gross) minus the amount of electricity used during generation. |
| NERC | North American Electric Reliability Corporation |
| NJDEP | New Jersey Department of Environmental Protection |
| NOL | Net Operating Loss |
| NOV | Notice of violation |
| NO$_x$ | Nitrogen oxide |
| NPDES | National pollutant discharge elimination system |
| NPNS | Normal Purchase Normal Sale |
| NRG | NRG Energy, Inc. and, except where the context indicates otherwise, its subsidiaries |
| NRG GenOn LTIP | NRG 2010 Stock Plan for GenOn employees |
| NRG Merger | The merger completed on December 14, 2012 pursuant to the NRG Merger Agreement |
| NRG Merger Agreement | The agreement by and among NRG, GenOn and Plus Merger Corporation (a direct wholly-owned subsidiary of NRG) dated as of July 20, 2012 |
| NRG Merger Exchange Ratio | The right of GenOn Energy, Inc. stockholders to receive 0.1216 shares of common stock of NRG Energy, Inc. in the NRG Merger |
| NYISO | New York Independent System Operator |
| NYMEX | New York Mercantile Exchange |
| NYSPSC | New York State Public Service Commission |
| OCI | Other comprehensive income |
| PADEP | Pennsylvania Department of Environmental Protection |
| Peaking | Units expected to satisfy demand requirements during the periods of greatest or peak load on the system |
| PG&E | Pacific Gas & Electric |

| | |
|---|---|
| PJM | PJM Interconnection, LLC |
| PJM market | The wholesale and retail electric market operated by PJM primarily in all or parts of Delaware, the District of Columbia, Illinois, Maryland, New Jersey, Ohio, Pennsylvania, Virginia and West Virginia |
| Plan | The plan of reorganization that was approved in conjunction with Mirant Corporation's emergence from bankruptcy protection on January 3, 2006 |
| PPA | Power Purchase Agreement |
| Registrants | GenOn, GenOn Americas Generation and GenOn Mid-Atlantic, collectively |
| REMA | GenOn REMA, LLC and its subsidiaries, which include three generating facilities under operating leases |
| Repowering | Technologies utilized to replace, rebuild, or redevelop major portions of an existing electrical generating facility, not only to achieve a substantial emission reduction, but also to increase facility capacity, and improve system efficiency |
| RGGI | Regional Greenhouse Gas Initiative |
| RMR | Reliability Must-Run |
| RRI Energy | RRI Energy, Inc. |
| RTO | Regional Transmission Organization |
| SCR | Selective Catalytic Reduction |
| SEC | United States Securities and Exchange Commission |
| Securities Act | The Securities Act of 1933, as amended |
| $SO_2$ | Sulfur dioxide |
| U.S. | United States of America |
| U.S. GAAP | U.S. Generally accepted accounting principles |
| VIE | Variable Interest Entity |

4

## PART I

**Item 1 — Business (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

### General

The Registrants are wholesale power generation subsidiaries of NRG, which aspires to be a leader in the way the industry and consumers think about, use, produce and deliver energy and energy services in major competitive power markets in the United States. GenOn is an indirect wholly-owned subsidiary of NRG. GenOn Americas Generation and GenOn Mid-Atlantic are indirect wholly-owned subsidiaries of GenOn. GenOn Mid-Atlantic is a wholly-owned subsidiary of GenOn North America and an indirect wholly-owned subsidiary of GenOn Americas Generation. The Registrants are engaged in the ownership and operation of power generation facilities; the trading of energy, capacity and related products; and the transacting in and trading of fuel and transportation services.

The Registrants' generation facilities are located in the U.S. and comprise generation facilities across the merit order. The sale of capacity and power from baseload and intermediate generation facilities accounts for a majority of the Registrants' generation revenues. In addition, the Registrants' generation portfolio provides each with opportunities to capture additional revenues by selling power during periods of peak demand, offering capacity or similar products, and providing ancillary services to support system reliability.

GenOn previously had the following segments: Eastern PJM, Western PJM/MISO, California, Energy Marketing and Other Operations. GenOn Americas Generation previously had the following segments: Eastern PJM, Northeast, California, Energy Marketing and Other Operations. In the fourth quarter of 2012, in conjunction with the NRG Merger, GenOn and GenOn Americas Generation began reporting the following segments: East, South Central, West and Corporate, with GenOn Mid-Atlantic operating only in the East.

The following table summarizes GenOn's generation portfolio as of December 31, 2013, by operating segment.

| Generation Type | (In MW) | | | |
| --- | --- | --- | --- | --- |
| | East | South Central | West | Total |
| Natural gas | 6,389 | 1,198 | 4,435 | 12,022 |
| Coal | 5,898 | — | — | 5,898 |
| Oil | 2,077 | — | — | 2,077 |
| Total generation capacity | 14,364 | 1,198 | 4,435 | 19,997 |

The following table summarizes GenOn Americas Generation's generation portfolio as of December 31, 2013, by operating segment.

| Generation Type | (In MW) | | |
| --- | --- | --- | --- |
| | East | West | Total |
| Natural gas | 2,938 | 1,029 | 3,967 |
| Coal | 2,433 | — | 2,433 |
| Oil | 1,452 | — | 1,452 |
| Total generation capacity | 6,823 | 1,029 | 7,852 |

The following table summarizes GenOn Mid-Atlantic's generation portfolio as of December 31, 2013.

| Generation Type | (In MW) |
| --- | --- |
| | East |
| Natural gas | 2,433 |
| Coal | 1,942 |
| Oil | 308 |
| Total generation capacity | 4,683 |

5

.

**NRG Merger**

On December 14, 2012, NRG completed the acquisition of GenOn. NRG issued, as consideration for the acquisition, 0.1216 shares of NRG common stock for each outstanding share of GenOn, including restricted stock units outstanding on the acquisition date, except for fractional shares which were paid in cash. See Item 15 — Note 3, *NRG Merger and Dispositions,* to the Consolidated Financial Statements for additional discussion.

The NRG Merger was accounted for by NRG using acquisition accounting and through the application of "push-down" accounting, the purchase price paid by NRG was allocated to the Registrants' assets, liabilities and equity as of the acquisition date. Accordingly, the successor financial statements reflect a new basis of accounting and predecessor and successor period financial results are presented, but not comparable.

The most significant impacts of the new basis of accounting during the successor periods were (i) reduced depreciation expense due to the step-down of depreciable assets, (ii) lower interest expense for the remaining life of long-term debt due to its revaluation and related debt premium amortization along with the repayment of the senior secured term loan due 2017, and (iii) reduced cost of operations due to the amortization of lease obligations and out-of-market contracts.

The results of operations for successor periods included herein reflect certain acquisition-related transaction and integration costs which are not expected to have a continuing impact on the results going forward, and those amounts are included within a separate line within the Registrants' consolidated results of operations.

**Competition**

Wholesale power generation is a capital-intensive, commodity-driven business with numerous industry participants. The Registrants compete on the basis of the location of their plants and ownership of portfolios of plants in various regions, which increases the stability and reliability of its energy revenues. Wholesale power generation is a regional business that is currently highly fragmented and diverse in terms of industry structure. As such, there is a wide variation in terms of the capabilities, resources, nature and identity of the companies the Registrants compete with depending on the market. Competitors include regulated utilities, other independent power producers, and power marketers or trading companies, including those owned by financial institutions, municipalities and cooperatives.

**Competitive Strengths**

The Registrants' power generation assets are diversified by fuel-type, dispatch level and region, which helps mitigate the risks associated with fuel price volatility and market demand cycles. The Registrants' baseload and intermediate facilities provide each with a significant source of cash flow, while the peaking facilities provide the Registrants with opportunities to capture upside potential that can arise from time to time during periods of high demand.

Many of the Registrants' generation assets are located within densely populated areas, which tend to have more robust wholesale pricing as a result of relatively favorable local supply-demand balance. The Registrants have generation assets located in or near the New York City, Washington, D.C., Baltimore, Pittsburgh, Los Angeles and San Francisco metropolitan areas and New Jersey. These facilities are often ideally situated for repowering or the addition of new capacity, because their location and existing infrastructure provide significant advantages over undeveloped sites.

**New and On-going Company Initiatives**

**Operational Improvement Activities**

The Registrants announced their intention to continue operations at the Avon Lake and New Castle facilities, which are currently in operation and had been scheduled for deactivation in April 2015. The Registrants intend to add natural gas capabilities at these facilities, with such capabilities expected to be completed by the summer of 2016.

**Coal Operations**

The following table summarizes GenOn's U.S. Coal capacity and the corresponding revenues and average natural gas prices and positions resulting from Coal hedge agreements extending beyond December 31, 2013, and through 2018 for the East region:

| East | 2014 | 2015 | 2016 | 2017 | 2018 | Annual Average for 2014-2018 |
|---|---|---|---|---|---|---|
| | (Dollars in millions unless otherwise stated) | | | | | |
| Net Coal Capacity (MW) [a] | 5,806 | 5,317 | 4,526 | 4,086 | 4,086 | 4,764 |
| Forecasted Coal Capacity (MW) [b] | 2,898 | 2,074 | 1,577 | 1,496 | 1,525 | 1,914 |
| Total Coal Sales (MW) [c] | 2,378 | 852 | 433 | 368 | — | 806 |
| Percentage Coal Capacity Sold Forward [d] | 82% | 41% | 27% | 25% | —% | 42% |
| Total Forward Hedged Revenues [e] | $ 1,247 | $ 434 | $ 235 | $ 166 | $ — | |
| Weighted Average Hedged Price ($ per MWh) [e] | $ 59.88 | $ 58.17 | $ 62.00 | $ 51.27 | $ — | |
| Average Equivalent Natural Gas Price ($ per MMBtu) | $ 5.73 | $ 5.29 | $ 5.46 | $ 4.54 | $ — | |
| Gas Price Sensitivity Up $0.50/MMBtu on Coal Units | $ 81 | $ 100 | $ 84 | $ 88 | $ 104 | |
| Gas Price Sensitivity Down $0.50/MMBtu on Coal Units | $ (38) | $ (59) | $ (48) | $ (48) | $ (65) | |
| Heat Rate Sensitivity Up 1 MMBtu/MWh on Coal Units | $ 72 | $ 113 | $ 88 | $ 89 | $ 90 | |
| Heat Rate Sensitivity Down 1 MMBtu/MWh on Coal Units | $ (33) | $ (77) | $ (61) | $ (59) | $ (58) | |

(a)   Net Coal capacity represents nominal summer net MW capacity of power generated as adjusted for the Company's ownership position excluding capacity from inactive/mothballed units, see Item 2 - *Properties* for units scheduled to be deactivated.

(b)   Forecasted generation dispatch output (MWh) based on forward price curves as of December 31, 2013, which is then divided by number of hours in a given year to arrive at MW capacity. The dispatch takes into account planned and unplanned outage assumptions.

(c)   Includes amounts under power sales contracts and natural gas hedges. The forward natural gas quantities are reflected in equivalent MWh based on forward market implied heat rate as of December 31, 2013, and then combined with power sales to arrive at equivalent MWh hedged which is then divided by number of hours in given year to arrive at MW hedged. The Coal Sales include swaps and delta of options sold which is subject to change. For detailed information on the Company's hedging methodology through use of derivative instruments, see discussion in Item 15 - Note 5, *Accounting for Derivative Instruments and Hedging Activities*, to the Consolidated Financial Statements.

(d)   Percentage hedged is based on total Coal sales as described in (c) above divided by the forecasted Coal capacity.

(e)   Represents all U.S. Coal sales, including energy revenue and demand charges, excluding revenues derived from capacity auctions.

**Regulatory Matters**

As operators of power plants and participants in wholesale energy markets, certain of the Registrants' entities are subject to regulation by various federal and state government agencies. These include the Commodities Futures Trading Commission and FERC, as well as other public utility commissions in certain states where the Registrants' generating assets are located. In addition, the Registrants are subject to the market rules, procedures and protocols of the various ISO markets in which they participate. The Registrants must also comply with the mandatory reliability requirements imposed by NERC and the regional reliability entities in the regions where they operate.

***East Region***

*New York*

*Demand Curve Reset* — On November 29, 2013, the NYISO filed at FERC its triennial adjustment of its capacity market parameters for the 2014-2017 periods. The NYISO installed capacity requirement is determined by an administratively-set demand curve reflecting, among other things, the estimated net cost of new entry, or CONE, or a proxy generating unit. In its filing, the NYISO proposes to utilize a frame unit, without selective catalytic reduction, or SCR, for the Rest of State region, and a Frame unit with a SCR for Lower Hudson Valley, New York City and Long Island zones as its proxy generating unit. The use of this proxy unit is expected to decrease capacity prices in the New York City and Lower Hudson Valley zones. FERC accepted the filing on January 28, 2014, with a May 1, 2014 effective date for the new demand curves. The Registrants filed for rehearing on certain aspects of FERC's rules.

*NYSPSC Order Rescinding Danskammer Retirement* — On October 29, 2013, the NYSPSC took emergency action to rescind its approval for the 530 MW Danskammer facility to retire on October 30, 2013.  The NYSPSC's stated goal was to allow the facility to return to service in order to constrain rate increases in New York. The NYPSC approved the emergency Order and granted an extension until March 17, 2014 for Helios Capital LLC to file its plan to operate or retire the unit. The return to service of this facility may affect capacity prices received by the Registrants for their resource in the Lower Hudson Valley capacity zone.

*Independent Power Producers of New York Complaint* — On May 10, 2013, generators in New York filed a complaint at FERC against the NYISO. The generators asked FERC to direct the NYISO to require that capacity from existing generation resources that would have exited the market but for out-of-market payments under RMR type agreements be excluded from the capacity market altogether or be offered at levels no lower than the resources' going-forward costs. The generators point to the recent reliability services agreements entered into between the NYSPSC and generators, including Dunkirk Power, and seek to prevent below-cost offers from artificially suppressing prices in the New York Control Area Installed Capacity Spot Market Auction. A number of New York Transmission Owners protested the filing and the case is pending.

*PJM*

*Maryland Environmental Regulations* — MDE has announced that it intends to promulgate more stringent regulations regarding NOx emissions, which could negatively affect some of the Company's coal units in Maryland. Accordingly, on November 29, 2013, NRG submitted a notice of deactivation to retire Chalk Point Units 1 and 2 and Dickerson Units 1, 2, and 3 on May 31, 2017.  The deactivation is based on draft environmental regulations that, if adopted, could require uneconomic capital investment and render the units uneconomic to operate going forward.

*Import Limits* — On November 29, 2013, PJM filed at FERC to add a limit on the amount of capacity from external resources that PJM can reliably import into the PJM Region. If approved by FERC, the capacity import limit may decrease the amount of capacity imports allowed into PJM, as compared to recent auctions. The Registrants support this filing, which is still pending at FERC. The outcome of this proceeding could have a material impact on future PJM capacity prices.

*Limited Demand Response Caps & Demand Response Operability Filings* — On November 29, 2013, PJM proposed at FERC changes to the way in which it procures demand response resources, including placing a ceiling, or hard cap, on the amount of limited and extended summer demand response resources that can clear the auction, but are available for only part of the delivery year. The PJM proposal also removes the *de facto* ceiling on the amount of annual demand response resources procured in the auction, which are resources required to participate in the PJM markets on a year-round basis. The intent of these changes is to drive price separation between the three demand response products, and ensure that the annual product receives the highest payment from the market. The Registrants supported the filing at FERC and the matter is still pending rehearing. The eventual outcome of this proceeding could have a material impact on future PJM capacity prices.

Additionally, on December 24, 2013, PJM filed at FERC to implement changes governing demand response resources' participation in the PJM capacity market in an attempt to enhance the operational flexibility of demand response resources during the operating day.  The host of changes proposed by PJM included proposals to require most demand response resources to respond in 30 minutes and reduce the minimum call time from two hours to one hour. Approval of these changes would likely limit the amount of demand response resources eligible to participate in the PJM capacity market. The Registrants filed a limited protest that, among other things, sought clarification on the exemptions offered to the 30 minute notification time and challenging the exemption offered to behind-the-meter generation. The matter is pending at FERC and again the outcome of this proceeding could have a material impact on future PJM capacity prices.

*MOPR Litigation* — On April 12, 2011, FERC issued an order addressing a complaint filed by PJM Power Providers Group seeking to require PJM to address the potential adverse impacts of out-of-market generation on the PJM Reliability Pricing Model, capacity market, as well as PJM's subsequent submission seeking revisions to the capacity market design, in particular the MOPR. In its order, FERC generally strengthened the MOPR and the protections against market price distortion from out-of-market generation. On November 17, 2011, FERC largely denied rehearing of its April 12, 2011 order. Several parties have appealed FERC's decision to federal court, and those appeals have been consolidated in the Third Circuit Court of Appeals. Oral arguments were held on September 10, 2013. The outcome of this proceeding could also have a material impact on the future PJM capacity prices.

*MOPR Revisions* — On December 7, 2012, PJM filed comprehensive revisions to its MOPR rules at FERC. On May 2, 2013, FERC accepted PJM's proposal in part and rejected it in part. Among other things, FERC approved the portions of the PJM proposal that exempt many new entrants from MOPR rules, including projects proposed by merchant generators, public power entities and certain self-supply entities. This exemption is subject to certain conditions designed to limit the financial incentive of such entities to suppress market prices. However, FERC rejected PJM's proposal to eliminate the unit specific review process, and instead directed PJM to continue allowing units to demonstrate their actual costs and revenues and bid into the auction at that price. On June 3, 2013, NRG filed a request for rehearing of the FERC order and subsequently protested the manner in which PJM proposed to implement the FERC order. These challenges are both pending.

*New Jersey and Maryland's Generator Contracting Programs* — In 2011, the New Jersey Board of Public Utilities, or NJBPU, awarded three Standard Offer Capacity Agreements, or SOCAs as part of New Jersey's Long-Term Capacity Agreement Pilot Program. The stated goal of the program was to encourage the construction of new generation capacity in New Jersey. One of the SOCAs was awarded to an NRG affiliate, which has since been terminated. In late 2011, the MD PSC awarded a similar contract to another generation developer.

The constitutionality of the SOCAs awarded by the NJBPU to NRG and other entities were challenged in the U.S. District Court for the District of New Jersey. On October 11, 2013, the New Jersey Federal Court held that the SOCAs violated the Supremacy Clause of the U.S. Constitution because they intruded on the authority Congress had granted to FERC under the Federal Power Act to set wholesale energy prices, which authority FERC had expressed through the PJM capacity auction. Additionally, the Court found that the SOCA poses an obstacle to FERC's implementation of the PJM capacity auction. Based on these findings, the New Jersey Federal Court found the SOCAs to be null and void.

In a similar challenge lodged in the U.S. District Court for the District of Maryland against the Maryland contract, the Maryland Court ruled on September 30, 2013, the Maryland contract violated the Supremacy Clause of the U.S. Constitution and was preempted. The Court based this holding on its finding that the compensation under the Maryland contract amounted to the MD PSC effectively setting the wholesale price when Congress had vested that authority in FERC, thus preempting state regulatory action to establish the wholesale price.

Both the New Jersey and Maryland decisions have been appealed to the United States Court of Appeals for the Third Circuit and the United States Court of Appeals for the Fourth Circuit, respectively. On January 24, 2014, NRG filed an amicus brief in the Third Circuit case in support of the petitioners and challenging the District Court holdings that the contracts violated the U.S. Constitution. On February 11, 2014, NRG filed a similar amicus brief in the Fourth Circuit.

### New England (GenOn and GenOn Americas Generation)

*Performance Incentive Proposal* — On January 17, 2014, ISO-NE filed at FERC to fundamentally revamp its forward capacity market, or FCM, by making a resource's forward capacity market compensation dependent on resource output during short intervals of operating reserve scarcity. The ISO-NE proposal would replace the existing shortage event penalty structure with a new performance incentive, or PI, mechanism, resulting in capacity payments to resources that would be the combination of two components: (1) a base capacity payment and (2) a performance payment or charge. The performance payment or charge would be entirely dependent upon the resource's delivery of energy or operating reserves during scarcity conditions, and could be larger than the base payment.

NEPOOL, the ISO-NE stakeholder group, filed an alternative proposal to ISO-NE's PI proposal at FERC, under which the market rules would be revised to maintain the FCM capacity product as a tool to ensure resource adequacy, and would place real-time performance incentive-related improvements directly into the energy and reserve markets. The Company supports the NEPOOL alternative. The matter is pending at FERC.

*FCM Rules for 2014 Forward Capacity Auction* — On January 24, 2014, FERC accepted ISO-NE's proposal to revamp its Insufficient Supply and Insufficient Competition rules, which resulted in a declaration of the Insufficient Competition condition and a $7.025/kW-month price to all existing resources. Rehearing of the order remains pending.

### South Central Region (GenOn)

On July 5, 2013, AmerenEnergy Resources Generating Company, or Ameren, filed a complaint against MISO pertaining to the compensation for generators asked by MISO to provide service past their retirement date due to reliability concerns. Ameren asked FERC to require MISO to provide such generators their full cost of service as compensation and not merely cover the generator's incremental costs of operation going-forward costs. GenOn supports the Ameren complaint. The matter remains pending.

**Environmental Matters**

The Registrants are subject to a wide range of environmental regulations in the development, ownership, construction and operation of projects. These laws and regulations generally require that governmental permits and approvals be obtained before construction and maintained during operation of power plants. Environmental regulations have become increasingly stringent and the Registrants expect this trend to continue. The electric generation industry is likely to face new requirements to address various emissions, including greenhouse gases, as well as combustion byproducts, water discharge and use, and threatened and endangered species. In general, future laws and regulations are expected to require the addition of emissions controls or other environmental quality equipment or the imposition of certain restrictions on the operations of the Registrants' facilities, which could have a material effect on the Registrants' operations. Complying with environmental requirements involves significant capital and operating expenses. The Registrants decide to invest capital for environmental controls based on the relative certainty of the requirements, an evaluation of compliance options, and the expected economic returns on capital.

See Item 15- Note 19, *Regulatory Matters*, Note 20, *Environmental Matters*, and Note 21, *Guarantees*, to the Consolidated Financial Statements.

### Environmental Capital Expenditures

Based on current rules, technology and plans based on proposed rules, GenOn estimates that environmental capital expenditures from 2014 through 2018 required to meet GenOn's regulatory environmental laws will be approximately $120 million for GenOn, which includes $12 million for GenOn Americas Generation, which was adjusted for the sale of Kendall on January 31, 2014. The estimate for GenOn Americas Generation includes $6 million for GenOn Mid-Atlantic. These costs are primarily associated with controls to satisfy MATS at Conemaugh and $NO_x$ controls for Sayreville and Gilbert. In addition, although GenOn expects to place Shawville in long-term protective layup and reactivation remains a technical possibility, GenOn does not expect to make any further investment in environmental controls for this facility. Reactivation after a long-term protective layup would likely involve numerous new permits and substantial additional investment. The Registrants continue to explore cost effective compliance alternatives to further reduce costs.

See Item 15- Note 8, *Retirements, Mothballing or Long-Term Protective Layup of Generating Facilities*, to the Consolidated Financial Statements.

### East Region

*RGGI* — In 2013, each of the RGGI member states finalized a rule that collectively reduced the $CO_2$ emissions cap from 165 million tons to 91 million tons in 2014 with a 2.5% reduction each year from 2015 to 2020. The Registrants expect earnings at their plants in Massachusetts, New York, and particularly those in Maryland, to be negatively affected. The extent to which they would be negatively affected depends on the price of the $CO_2$ emissions allowances, which in turn will be significantly influenced by future natural gas prices, power prices, generation resource mix, dispatch order, and any nuclear plant retirements.

**Employees**

As of December 31, 2013, GenOn had 2,255 employees of which 675 employees were part of GenOn Americas Generation and 464 employees were part of GenOn Mid-Atlantic, approximately 54.6%, 67.5% and 70.0%, respectively, of whom were covered by bargaining agreements. During 2013, the Registrants did not experience any labor stoppages or labor disputes at any of their facilities.

*Available Information*

The Registrants' annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports filed or furnished pursuant to section 13(a) or 15(d) of the Exchange Act are available free of charge through NRG's website, www.nrgenergy.com, as soon as reasonably practicable after they are electronically filed with, or furnished to the SEC.

**Item 1A — Risk Factors**

The Registrants are subject to the following factors that could have a material adverse effect on their future performance, results of operations, financial condition and cash flows. In addition, such factors could affect their ability to service indebtedness and other obligations, to raise capital and could affect their future growth opportunities. Also, see *Cautionary Statement Regarding Forward-Looking Information* and Item 7 — *Management's Narrative Analysis of the Results of Operations and Financial Condition* of this Form 10-K.

**Risks Related to the Operation of the Registrants' Businesses**

***GenOn is a wholly-owned subsidiary of NRG and is highly dependent on NRG for services under a master services agreement.***

GenOn relies on NRG for its administrative and management functions and services including human resources-related functions, accounting, tax administration, information systems, legal services, treasury and planning, operations and asset management, risk and commercial operations, and other support services under a management services agreement. GenOn anticipates continuing to rely upon NRG to provide many of these services. If NRG terminates the management services agreement or defaults in the performance of its obligations under the agreement, GenOn may be unable to contract with a substitute service provider on similar terms or at all, and the costs of substituting service providers may be substantial. In addition, in light of NRG's familiarity with GenOn's assets, a substitute service provider may not be able to provide the same level of service due to lack of preexisting synergies. If GenOn cannot locate a service provider that is able to provide it with substantially similar services as NRG does under the management services agreement on similar terms, it would likely have a material adverse effect on GenOn's business, financial condition, results of operation and cash flows.

***The interests of NRG as GenOn's equity holder may conflict with the interests of holders of debt.***

GenOn is owned and controlled by NRG. The interests of NRG may not in all cases be aligned with the interests of the holders of GenOn's debt or the debt and lease obligations of GenOn's subsidiaries. If GenOn encounters financial difficulties or becomes unable to pay its debts as they mature, NRG does not have any liability for any obligations under the GenOn notes or the notes and lease obligations of the GenOn subsidiaries. In addition, NRG may have an interest in pursuing acquisitions, divestitures, financings or other transactions that, in its judgment, could enhance its equity investments, even though such transactions might involve risks to GenOn's business or the holders of GenOn's and its subsidiaries' debt. Furthermore, NRG may own businesses that directly or indirectly compete with GenOn. NRG also may pursue acquisition opportunities that may be complementary to NRG's business, and as a result, those acquisition opportunities may not be available to GenOn.

***The Registrants' financial results are unpredictable because most of their generating facilities operate without long-term power sales agreements, and their revenues and results of operations depend on market and competitive forces that are beyond their control.***

The Registrants provide energy, capacity, ancillary and other energy services from their generating facilities in a variety of markets and to bi-lateral counterparties, including participating in wholesale energy markets, entering into tolling agreements, sales of resource adequacy and participation in capacity auctions. The Registrants revenues from selling capacity are a significant part of their overall revenues. The Registrants are not guaranteed recovery of their costs or any return on their capital investments through mandated rates.

The market for wholesale electric energy and energy services reflects various market conditions beyond the Registrants' control, including the balance of supply and demand, transmission congestion, competitors' marginal and long-term costs of production, the price of fuel, and the effect of market regulation. The price at which the Registrants can sell their output may fluctuate on a day-to-day basis, and their ability to transact may be affected by the overall liquidity in the markets in which the Registrants operate. These markets remain subject to regulations that limit their ability to raise prices during periods of shortage to the degree that would occur in a fully deregulated market. In addition, unlike most other commodities, electric energy can be stored only on a very limited basis and generally must be produced at the time of use. As a result, the wholesale power markets are subject to substantial price fluctuations over relatively short periods of time and can be unpredictable.

The Registrants' revenues, results of operations and cash flows are influenced by factors that are beyond their control, including those set forth above, as well as:

- the failure of market regulators to develop and maintain efficient mechanisms to compensate merchant generators for the value of providing capacity needed to meet demand;

- actions by regulators, ISOs, RTOs and other bodies that may artificially modify supply and demand levels and prevent capacity and energy prices from rising to the level necessary for recovery of the Registrants' costs, investment and an adequate return on investment;

- legal and political challenges to or changes in the rules used to calculate capacity payments in the markets in which the Registrants operate or the establishment of bifurcated markets, incentives, other market design changes or bidding requirements that give preferential treatment to new generating facilities over existing generating facilities or otherwise reduce capacity payments to existing generating facilities;

- the ability of wholesale purchasers of power to make timely payment for energy or capacity, which may be adversely affected by factors such as retail rate caps, refusals by regulators to allow utilities to recover fully their wholesale power costs and investments through rates, catastrophic losses and losses from investments by utilities in unregulated businesses;

- increases in prevailing market prices for fuel oil, coal, natural gas and emission allowances that may not be reflected in prices the Registrants receive for sales of energy;

- increases in electricity supply as a result of actions of the Registrants' current competitors or new market entrants, including the development of new generating facilities or alternative energy sources that may be able to produce electricity less expensively than the Registrants' generating facilities and improvements in transmission that allow additional supply to reach their markets;

- increases in credit standards, margin requirements, market volatility or other market conditions that could increase the Registrants' obligations to post collateral beyond amounts that are expected, including additional collateral costs associated with OTC hedging activities as a result of future OTC regulations adopted pursuant to the Dodd-Frank Act;

- decreases in energy consumption resulting from demand-side management programs such as automated demand response, which may alter the amount and timing of consumer energy use;

- the competitive advantages of certain competitors, including continued operation of older power facilities in strategic locations after recovery of historic capital costs from ratepayers;

- existing or future regulation of the markets in which the Registrants operate by the FERC, ISOs and RTOs, including any price limitations and other mechanisms to address some of the price volatility or illiquidity in these markets or the physical stability of the system;

- the Registrants' obligation under any default sharing mechanisms in RTO and ISO markets, such mechanisms exist to spread the risk of defaults by transmission owning companies or other RTO members across all market participants;

- regulatory policies of state agencies that affect the willingness of the Registrants' customers to enter into long-term contracts generally, and contracts for capacity in particular;

- access to contractors and equipment;

- changes in the rate of growth in electricity usage as a result of such factors as national and regional economic conditions and implementation of conservation programs;

- seasonal variations in energy and natural gas prices, and capacity payments; and

- seasonal fluctuations in weather, in particular abnormal weather conditions.

As discussed above, the market for wholesale electric energy and energy services reflects various market conditions beyond the Registrants' control, including the balance of supply and demand, the Registrants' competitors' marginal and long-term costs of production, and the effect of market regulation. The Registrants cannot ensure that higher earnings or price increases will result from industry retirements of coal-fired generating facilities or that higher earnings from their remaining facilities will offset or more than offset reduced earnings from facility deactivations.

***Changes in the wholesale energy markets or in the Registrants generating facility operations could result in impairments or other charges.***

If the ongoing evaluation of the Registrants' business results in decisions to deactivate or dispose of additional facilities, the Registrants could have impairments or other charges. These evaluations involve significant judgments about the future. Actual future market prices, project costs and other factors could be materially different from current estimates.

***The Registrants are exposed to the risk of fuel cost volatility because they must pre-purchase coal and oil.***

Most of the Registrants' fuel contracts are at fixed prices with terms of two years or less. Although the Registrants purchase coal and oil based on expected requirements, they still face the risks of fuel price volatility if they require more or less fuel than expected.

The Registrants' cost of fuel may not reflect changes in energy and fuel prices in part because they must pre-purchase inventories of coal and oil for reliability and dispatch requirements, and thus the price of fuel may have been determined at an earlier date than the price of energy generated from the fuel. Similarly, the price the Registrants can obtain from the sale of energy may not rise at the same rate, or may not rise at all, to match a rise in fuel costs.

***The Registrants are exposed to the risk of their fuel providers and fuel transportation providers failing to perform.***

The Registrants purchase most of their coal from a limited number of suppliers. Because of a variety of operational issues, the Registrants' coal suppliers may not provide the contractual quantities on the dates specified within the agreements, or the deliveries may be carried over to future periods. Also, interruptions to planned or contracted deliveries to the Registrants' generating facilities can result from a lack of, or constraints in, coal transportation because of rail, river or road system disruptions, adverse weather conditions and other factors.

If the Registrants' coal suppliers do not perform in accordance with the agreements, the Registrants may have to procure higher priced coal in the market to meet their needs, or higher priced power in the market to meet their obligations. In addition, generally the Registrants coal suppliers do not have investment grade credit ratings nor do they post collateral with the Registrants and, accordingly, the Registrants may have limited ability to collect damages in the event of default by such suppliers.

For the Registrants' oil-fired generating facilities, the Registrants typically purchase fuel from a limited number of suppliers. If the Registrants' oil suppliers do not perform in accordance with the agreements, the Registrants may have to procure higher priced oil in the market to meet their needs, or higher priced power in the market to meet their obligations. For the Registrants' gas-fired generating facilities, any curtailments or interruptions on transporting pipelines could result in curtailment of operations or increased fuel supply costs.

***Operation of the Registrants' generating facilities involve risks that could result in disruption, curtailment or inefficiencies in their operations.***

The operation of the Registrants' generating facilities involves various operating risks, including, but not limited to:

- the output and efficiency levels at which those generating facilities perform;
- interruptions in fuel supply and quality of available fuel;
- disruptions in the delivery of electricity;
- adverse zoning;
- breakdowns or equipment failures (whether a result of age or otherwise);
- violations of permit requirements or changes in the terms of, or revocation of, permits;
- releases of pollutants to air, soil, surface water or groundwater;
- ability to transport and dispose of coal ash at reasonable prices;
- curtailments or other interruptions in natural gas supply;
- shortages of equipment or spare parts;
- labor disputes, including strikes, work stoppages and slowdowns;
- the aging workforce at many of the Registrants' facilities;
- operator errors;
- curtailment of operations because of transmission constraints;
- failures in the electricity transmission system, which may cause large energy blackouts;
- implementation of unproven technologies in connection with environmental improvements; and
- catastrophic events such as fires, explosions, floods, earthquakes, hurricanes or other similar occurrences.

These factors could result in a material decrease, or the elimination of, the revenues generated by the Registrants' facilities or a material increase in the Registrants' costs of operations.

13

*The Registrants operate in a limited number of markets and a significant portion of revenues are derived from the PJM market. The effect of adverse developments in the markets, especially the PJM market, may be greater on the Registrants than on more geographically diversified competitors.*

As of December 31, 2013, GenOn's generating capacity is 57% in PJM, 25% in CAISO, 10% in NYISO and ISO-NE, 6% in the Southeast and 2% in MISO, and GenOn Americas Generation's generating capacity is 53% in PJM, 23% in CAISO and 24% in NYISO and ISO-NE. As of December 31, 2013, all of GenOn Mid-Atlantic's generating capacity is in PJM. Approximately 78% of GenOn's gross margin during 2013 was attributable to the East operating segment. Adverse developments in these regions, especially in the PJM market, may adversely affect the Registrants. Further, the effect of such adverse regional developments may be greater on the Registrants than on more geographically diversified competitors.

*The Registrants are exposed to possible losses that may occur from the failure of a counterparty to perform according to the terms of a contractual arrangement, particularly in connection with GenOn Mid-Atlantic's non-collateralized power hedges with financial institutions.*

Non-collateralized power hedges with financial institutions represent 24% of the net notional power position for GenOn, 35% of the net notional power position for GenOn Americas Generation and 35% of the net notional power position for GenOn Mid-Atlantic at December 31, 2013. Such hedges are senior unsecured obligations of GenOn Mid-Atlantic and the counterparties, and do not require either party to post cash collateral for initial margin or for securing exposure as a result of changes in power or natural gas prices. Deterioration in the financial condition of such counterparties could result in their failure to pay amounts owed to GenOn Mid-Atlantic or to perform obligations or services owed to GenOn Mid-Atlantic beyond collateral posted.

*Policies at the national, regional and state levels to regulate GHG emissions, as well as climate change, could adversely impact the Registrants' results of operations, financial condition and cash flows.*

The impact of further legislation or regulation of GHGs on the Registrants' financial performance will depend on a number of factors, including the level of GHG standards, the extent to which mitigation is required, the applicability of offsets, and the extent to which the Registrants would be entitled to receive $CO_2$ emissions credits without having to purchase them in an auction or on the open market.

The Registrants operate generating units in Maryland, Massachusetts, and New York that are subject to RGGI, which is a regional cap and trade system. In February 2013, RGGI, Inc. released a model rule that when adopted by the member states will reduce the number of allowances available and potentially increase the price of each allowance. Each of these states has finalized a rule that reduces the number of allowances, which the Registrants believe would increase the price of each allowance. These new rules could adversely impact the Registrants' results of operations, financial condition and cash flows.

The California $CO_2$ cap and trade program for electric generating units greater than 25 MW commenced in 2013. The impact on the Registrants depends on the cost of the allowances and the ability to pass these costs through to customers.

GHG emissions from power plants are regulated under various section of the Clean Air Act. In 2012, EPA proposed stringent standards for GHG emissions from certain new fossil-fueled electric generating units (simple-cycle CTs are not covered). The proposed standard is in effect until the rule is finalized or re-proposed. EPA has released a pre-publication version of its re-proposed rule for new units, which the Registrants expect will be published in the first quarter of 2014. The re-proposal is expected to include simple cycle CTs that exceed a certain capacity factor and is expected to create a different but still stringent standard for coal-fired units. EPA intends to issue another rule in 2014 that will require states to develop $CO_2$ standards that would apply to existing fossil-fueled generating facilities. This rule could adversely impact the Registrants' results of operations, financial condition and cash flows.

Hazards customary to the power production industry include the potential for unusual weather conditions, which could affect fuel pricing and availability, the Registrants' route to market or access to customers, i.e., transmission and distribution lines, or critical plant assets. To the extent that climate change contributes to the frequency or intensity of weather related events, the Registrants' operations and planning process could be affected.

*Changes in technology may significantly affect the Registrants' generating business by making their generating facilities less competitive.*

The Registrants generate electricity using fossil fuels at large central facilities. This method results in economies of scale and lower costs than newer technologies such as fuel cells, microturbines, windmills and photovoltaic solar cells. It is possible that advances in those technologies, or governmental incentives for renewable energies, will reduce their costs to levels that are equal to or below that of most central station electricity production.

14

***The expected decommissioning and/or site remediation obligations of certain of the Registrants' generating facilities may negatively affect their cash flows.***

Some of the Registrants' generating facilities and related properties are subject to decommissioning and/or site remediation obligations that may require material expenditures. Furthermore, laws and regulations may change to impose material additional decommissioning and remediation obligations on the Registrants in the future.

***Terrorist attacks and/or cyber-attacks may result in the Registrants' inability to operate and fulfill their obligations, and could result in material repair costs.***

As power generators, the Registrants face heightened risk of terrorism, including cyber terrorism, either by a direct act against one or more of their generating facilities or an act against the transmission and distribution infrastructure that is used to transport the power. Although the entire industry is exposed to these risks, the Registrants' generating facilities and the transmission and distribution infrastructure located in the PJM market are particularly at risk because of the proximity to major population centers, including governmental and commerce centers.

The Registrants rely on information technology networks and systems to operate their generating facilities, engage in asset management activities, and process, transmit and store electronic information. Security breaches of this information technology infrastructure, including cyber-attacks and cyber terrorism, could lead to system disruptions, generating facility shutdowns or unauthorized disclosure of confidential information related to their employees, vendors and counterparties. Confidential information includes banking, vendor, counterparty and personal identity information.

Systemic damage to one or more of the Registrants' generating facilities and/or to the transmission and distribution infrastructure could result in the inability to operate in one or all of the markets the Registrants serve for an extended period of time. If the Registrants' generating facilities are shut down, they would be unable to respond to the ISOs and RTOs or fulfill their obligations under various energy and/or capacity arrangements, resulting in lost revenues and potential fines, penalties and other liabilities. Pervasive cyber-attacks across the industry could affect the ability of ISOs and RTOs to function in some regions. The cost to restore the Registrants' generating facilities after such an occurrence could be material.

***The Registrants' operations are subject to hazards customary to the power generating industry. The Registrants may not have adequate insurance to cover all of these hazards.***

Power generation involves hazardous activities, including acquiring, transporting and unloading fuel, operating large pieces of high-speed rotating equipment and delivering electricity to transmission and distribution systems. In addition to natural risks (such as earthquake, flood, storm surge, lightning, hurricane, tornado and wind), hazards (such as fire, explosion, collapse and machinery failure) are inherent risks in the Registrants' operations. The Registrants are also susceptible to terrorist attacks, including cyber-attacks, against their generating facilities or the transmission and distribution infrastructure that is used to transport their power. These hazards can cause significant injury to personnel or loss of life, severe damage to or destruction of property, plant and equipment, contamination of, or damage to, the environment and suspension of operations. The occurrence of any one of these events may result in one or more of the Registrants being named as a defendant in lawsuits asserting claims for substantial damages, environmental cleanup costs, personal injury and fines and/or penalties. The Registrants do not maintain specialized insurance for possible liability resulting from a cyber-attack on their systems that may shut down all or part of the transmission and distribution system. However, the Registrants maintain an amount of insurance protection that they consider adequate and customary for merchant power producers. The Registrants cannot assure that their insurance will be sufficient or effective under all circumstances and against all hazards or liabilities to which they may be subject.

***Lawsuits, regulatory proceedings and tax proceedings could adversely affect the Registrants' future financial results.***

From time to time, the Registrants are named as a party to, or their property is the subject of, lawsuits, regulatory proceedings or tax proceedings. The Registrants are currently involved in various proceedings which involve highly subjective matters with complex factual and legal questions. Their outcome is uncertain. Any claim that is successfully asserted against the Registrants could require significant expenditures by them. Even if the Registrants prevail, any proceedings could be costly and time-consuming, could divert the attention of management and key personnel from their business operations and could result in adverse changes in their insurance costs.

**Risks Related to Economic and Financial Market Conditions**

*The Registrants are exposed to systemic risk of the financial markets and institutions and the risk of non-performance of the individual lenders under GenOn's undrawn credit facilities.*

Maintaining sufficient liquidity in the Registrants' business for maintenance and operating expenditures, capital expenditures and collateral is crucial in order to mitigate the risk of future financial distress to the Registrants. Accordingly, GenOn maintains a revolving credit facility with NRG to manage its expected liquidity needs and contingencies.

*A negative market perception of the Registrants' value could impair their ability to issue or refinance debt.*

A sustained downturn in general economic conditions, including low power and commodity prices, could result in an actual or perceived weakness in the Registrants' overall financial health.

A negative market perception of the Registrants' value could result in their inability to obtain and maintain an appropriate credit rating. In this event, they may be unable to access debt markets or refinance future debt maturities, or they may be required to post additional collateral to operate their business.

*As financial institutions consolidate and operate under more restrictive capital constraints and regulations, including the Dodd-Frank Act, there could be less liquidity in the energy and commodity markets for hedge transactions and fewer creditworthy counterparties.*

The Registrants hedge economically a substantial portion of their PJM coal-fired generation and certain of their other generation. A significant portion of their hedges are financial swap transactions between GenOn Mid-Atlantic and financial counterparties that are senior unsecured obligations of such parties and do not require either party to post cash collateral, either for initial margin or for securing exposure as a result of changes in power or natural gas prices. Global financial institutions have been active participants in these energy and commodity markets. As global financial institutions consolidate and operate under more restrictive capital constraints and regulations, including the Dodd-Frank Act, there could be less liquidity in the energy and commodity markets, which could have a material adverse effect on the Registrants' ability to hedge economically and transact with creditworthy counterparties.

*The Registrants' business is subject to substantial governmental regulation and may be adversely affected by legislative or regulatory changes, as well as liability under, or any future inability to comply with, existing or future regulations or requirements.*

The CFTC, among other things, has regulatory authority over the trading of physical commodities, futures and other derivatives under the Commodity Exchange Act. On July 21, 2010, President Obama signed the Dodd-Frank Act, which, among other things, aims to improve transparency and accountability in the futures and derivatives markets. The Dodd-Frank Act increased the CFTC's regulatory authority on matters related to futures and over-the-counter derivatives trading, including, but not limited to, trading practices, trade clearance, transaction reporting and recordkeeping, position limits, and market participant capital and margin requirements. The Dodd-Frank Act further defined several new categories of regulated market participants, including swap dealers and major swap participants, both of which must meet extensive compliance requirements. The Registrants have reached the conclusion that they are neither a swap dealer nor a major swap participant and have taken and will continue to take measures to otherwise comply with the Dodd-Frank Act.

The Registrants continuously monitors the ongoing efforts of the CFTC to implement the Dodd-Frank Act and to otherwise revise the rules and regulations applicable to the futures and over-the-counter derivatives markets. The CFTC's remaining efforts in this regard concern, among other things, the implementation of the Volcker rule and of other new rules relating to margin collateral and position limits for futures and other derivatives. Such changes could negatively impact the Registrants' ability to hedge their portfolio in an efficient, cost-effective manner by, among other things, potentially limiting the Registrants' ability to utilize liens as collateral for derivatives transactions and decreasing liquidity in the forward commodity and derivatives markets. The Registrants expects that, in 2014, the CFTC will further clarify the scope of the Dodd-Frank Act and issue additional final rules.

16

***Many of the factors that cause changes in commodity prices are outside the Registrants' control and may materially increase their cost of producing power or lower the price at which they are able to sell their power.***

The Registrants' generating business is subject to changes in power prices and fuel and emission costs, and these commodity prices are influenced by many factors outside the Registrants' control, including weather, seasonal variation in supply and demand, market liquidity, transmission and transportation inefficiencies, availability of competitively priced alternative energy sources, demand for energy commodities, production of natural gas, coal and crude oil, natural disasters, wars, embargoes and other catastrophic events, and federal, state and environmental regulation and legislation. In addition, significant fluctuations in the price of natural gas may cause significant fluctuations in the price of electricity. Significant fluctuations in commodity prices may affect the financial results and financial position by increasing the cost of producing power and decreasing the amounts the Registrants receive from the sale of power.

***The Registrants' hedging activities will not fully protect them from fluctuations in commodity prices.***

The Registrants engage in hedging activities related to sales of electricity and purchases of fuel and emission allowances. The income and losses from these activities are recorded as operating revenues and cost of operations. The Registrants may use forward contracts and other derivative financial instruments to manage market risk and exposure to volatility in prices of electricity, coal, natural gas, emissions and oil. The effectiveness of these hedges is dependent upon the correlation between the forward contracts and the other derivative financial instruments used as a hedge and the market risk of the asset or assets being hedged. The Registrants cannot provide assurance that these strategies will be successful in managing their price risks, or that they will not result in net losses to the Registrants as a result of future volatility in electricity, fuel and emission markets. Actual power prices and fuel costs may differ from expectations.

The Registrants hedging activities include natural gas derivative financial instruments that they use to hedge economically power prices for their baseload generation. The effectiveness of these hedges is dependent upon the correlation between power and natural gas prices in the markets where the Registrants operate. If those prices are not sufficiently correlated, the Registrants' financial results and financial position could be adversely affected.

Additionally, GenOn and GenOn Americas Generation expect to have an open position in the market, within their established guidelines, resulting from their fuel and emissions management activities. To the extent open positions exist, fluctuating commodity prices can affect their financial results and financial position, either favorably or unfavorably. As a result of these and other factors, the Registrants cannot predict the outcome that risk management decisions may have on their business, operating results or financial position. Although management devotes considerable attention to these issues, their outcome is uncertain.

***The Registrants' policies and procedures cannot eliminate the risks associated with their hedging activities.***

The risk management procedures the Registrants have in place may not always be followed or may not always work as planned. If any of the employees were able to violate the system of internal controls, including the risk management policy, and engage in unauthorized hedging and related activities, it could result in significant penalties and financial losses. In addition, risk management tools and metrics such as value at risk, gross margin at risk, and stress testing are partially based on historic price movements. If price movements significantly or persistently deviate from historical behavior, risk limits may not fully protect the Registrants from significant losses.

***The Registrants' hedging and GenOn Americas Generation's fuel oil management activities may increase the volatility of the U.S. GAAP financial results.***

Derivatives from the Registrants' hedging and GenOn Americas Generation's fuel oil management activities are recorded on the balance sheets at fair value pursuant to the accounting guidance for derivative financial instruments. None of the Registrants' derivatives that are recorded at fair value are designated as hedges under this guidance, and changes in their fair values currently are recognized in earnings as unrealized gains or losses. As a result, the Registrants' U.S. GAAP financial results-including gross margin, operating income and balance sheet ratios-will, at times, be volatile and subject to fluctuations in value primarily because of changes in forward electricity and fuel prices.

17

**Risks Related to Governmental Regulation and Laws**

***The Registrants costs of compliance with environmental laws are significant and can affect their future operations and financial results.***

The Registrants are subject to extensive and evolving environmental laws, particularly in regard to their coal-fired facilities. Environmental laws, particularly with respect to air emissions, disposal of ash, wastewater discharge and cooling water systems, are generally becoming more stringent, which may require the Registrants to install controls or restrict their operations. Failure to comply with environmental requirements could require the Registrants to shut down or reduce production at their facilities or create liabilities. The Registrants incur significant costs in complying with these regulations and, if they fail to comply, could incur significant penalties. The Registrants' cost estimates for environmental compliance are based on existing regulations or their view of reasonably likely regulations, and their assessment of the costs of labor and materials and the state of evolving technologies. The Registrants' decision to make these investments is often subject to future market conditions. Changes to the preceding factors, new or revised environmental regulations, litigation and new legislation and/or regulations, as well as other factors, could cause their actual costs to vary outside the range of their estimates, further constrain their operations, increase their environmental compliance costs and/or make it uneconomical to operate some of their facilities.

Federal, state and regional initiatives to regulate greenhouse gas emissions could have a material impact on the Registrants' financial performance and condition. The actual impact will depend on a number of factors, including the overall level of greenhouse gas reductions required under any such regulations, the final form of the regulations or legislation, and the price and availability of emission allowances if allowances are a part of any final regulatory framework.

The Registrants are required to surrender emission allowances equal to emissions of specific substances to operate their facilities. Surrender requirements may require purchase of allowances, which may be unavailable or only available at costs that would make it uneconomical to operate their facilities.

Certain environmental laws, including the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 and comparable state laws, impose strict and, in many circumstances, joint and several liability for costs of remediating contamination. Some of the Registrants' facilities have areas with known soil and/or groundwater contamination. The Registrants could be required to spend significant sums to remediate contamination, regardless of whether they caused such contamination, (a) if there are releases or discoveries of hazardous substances at their generating facilities, at disposal sites they currently use or have used, or at other locations for which they may be liable, or (b) if parties contractually responsible to them for contamination fail to or are unable to respond when claims or obligations regarding such contamination arise.

***Under current and forecasted market conditions, capital expenditures required by GenOn's permit for the Shawville facility are not economic.***

GenOn's NPDES permit requires installation of cooling towers or reduction in plant operation by July 2015 at its leased Shawville facility. Accordingly, GenOn plans to place the coal-fired units at the Shawville facility, which is leased, in a long-term protective layup in April 2015. Under the lease agreement for Shawville, GenOn's obligations generally are to pay the required rent and to maintain the leased assets in accordance with the lease documentation, including in compliance with prudent competitive electric generating industry practice and applicable laws. GenOn will continue to evaluate its options under the lease, including termination of the lease for economic obsolescence and/or keeping the facility in long-term protective layup during the term of the lease. In the event of an early termination, GenOn would seek a termination for obsolescence under the lease agreement and could be required to make a termination payment equal to the difference between the termination value and the proceeds received in connection with the sale of the facility to a third-party, together with such other amounts, if any, required under the lease. At December 31, 2013, the total notional minimum lease payments for the remaining terms of the lease aggregated $184 million and the termination value for the lease was $221 million.

18

*The Registrants' coal-fired generating units produce certain byproducts that involve extensive handling and disposal costs and are subject to government regulation. Changes in these regulations, or their administration, by legislatures, state and federal regulatory agencies, or other bodies may affect the costs of handling and disposing of these byproducts.*

As a result of the coal combustion process, the Registrants produce significant quantities of ash at their coal-fired generating units that must be disposed of at sites permitted to handle ash. One of the Registrants' landfills in Maryland has reached design capacity and it is expected that another site in Maryland may reach full capacity in the next few years. As a result, the Registrants are developing new ash management facilities and have constructed a facility to prepare ash from certain of the Maryland facilities for beneficial uses. However, the costs associated with developing new ash management facilities could be material, and the amount of time to complete such developments could extend beyond the time when new facilities are needed. Likewise, the new facility for preparing ash for beneficial uses may not operate as expected; or the ash may not be marketed and sold as expected. Additionally, costs associated with third-party ash handling and disposal are material and could have an adverse effect on the Registrants' financial performance and condition.

The Registrants also produce gypsum as a byproduct of the $SO_2$ scrubbing process at their coal-fired generating facilities, much of which is sold to third parties for use in drywall production. Should their ability to sell such gypsum to third parties be restricted as a result of the lack of demand or otherwise, their gypsum disposal costs could rise materially.

The EPA has proposed two alternatives for regulating byproducts such as ash and gypsum. One of these alternatives would regulate these byproducts as "special wastes" in a manner similar to the regulation of hazardous wastes. If these byproducts are regulated as special wastes, the cost of disposing of these byproducts would increase materially and may limit the Registrants' ability to recycle them for beneficial use.

*The Registrants' business is subject to complex government regulations. Changes in these regulations, or their administration, by legislatures, state and federal regulatory agencies, or other bodies may affect the prices at which the Registrants are able to sell the electricity they produce, the costs of operating their generating facilities or their ability to operate their facilities.*

The majority of the Registrants' generation is sold at market prices under market-based rate authority granted by the FERC. If certain conditions are not met, the FERC has the authority to withhold or rescind market-based rate authority and require sales to be made based on cost-of-service rates. A loss of the Registrants' market-based rate authority could have a materially negative impact on their generating business.

Even when market-based rate authority has been granted, the FERC may impose various forms of market mitigation measures, including price caps and operating restrictions, when it determines that potential market power might exist and that the public interest requires such potential market power to be mitigated. In addition to direct regulation by the FERC, most of the Registrants' facilities are subject to rules and terms of participation imposed and administered by various ISOs and RTOs. Although these entities are themselves ultimately regulated by the FERC, they can impose rules, restrictions and terms of service that are quasi-regulatory in nature and can have a material adverse impact on the Registrants' business. For example, ISOs and RTOs may impose bidding and scheduling rules, both to curb the potential exercise of market power and to ensure market functions. Such actions may materially affect the Registrants' ability to sell and the price they receive for their energy, capacity and ancillary services.

To conduct the Registrants' business, they must obtain and periodically renew licenses, permits and approvals for their facilities. These licenses, permits and approvals can be in addition to any required environmental permits. No assurance can be provided that they will be able to obtain and comply with all necessary licenses, permits and approvals for these facilities.

Conflicts may occur between reliability needs and environmental rules, particularly with increasingly stringent environmental restrictions. Without a consent decree or adjustments to permit requirements, which require long lead times to obtain, the Registrants remain subject to environmental penalties or liabilities that may occur as a result of operating in compliance with reliability requirements. Further, the Registrants could be subject to citizen suits in these types of circumstances, even if they have received a consent decree or permit adjustment exempting them from environmental requirements.

The Registrants cannot predict whether the federal or state legislatures will adopt legislation relating to the restructuring of the energy industry. There are proposals in many jurisdictions that would either roll back or advance the movement toward competitive markets for the supply of electricity, at both the wholesale and retail levels. In addition, any future legislation favoring large, vertically integrated utilities and a concentration of ownership of such utilities could affect the Registrants' ability to compete successfully, and their business and results of operations could be adversely affected. Similarly, any regulations or laws that favor new generation over existing generation could adversely affect their business.

**Risks Related to Level of Indebtedness**

*The Registrants' substantial indebtedness and operating lease obligations could limit their ability to react to changes in the economy or the industry and prevent them from meeting or refinancing their obligations.*

At December 31, 2013, GenOn's consolidated indebtedness was $3.1 billion, GenOn Americas Generation's consolidated indebtedness was $948 million and GenOn Mid-Atlantic's consolidated indebtedness was $10 million. In addition, the present values of lease payments under the respective GenOn Mid-Atlantic and REMA operating leases were approximately $1.1 billion and $592 million, respectively (assuming a 10% and 9% discount rate, respectively) and the termination values of the respective GenOn Mid-Atlantic and REMA operating leases were $1.2 billion and $698 million, respectively.

The Registrants' substantial indebtedness and operating lease obligations could have important consequences for their liquidity, results of operations, financial position and prospects, including their ability to grow in accordance with their strategies. These consequences include the following:

- they may limit their ability to obtain additional debt for working capital, capital expenditures, debt service requirements, acquisitions and general corporate or other purposes;

- a substantial portion of their cash flows from operations must be dedicated to the payment of rent and principal and interest on their indebtedness and will not be available for other purposes, including for working capital, capital expenditures, acquisitions and other general corporate purposes;

- the debt service requirements of their indebtedness and their lease obligations could make it difficult for them to satisfy or refinance their financial obligations;

- certain of the Registrants' borrowings, including borrowings under the NRG credit agreement, are at variable rates of interest, exposing the Registrants to the risk of increased interest rates;

- they may limit their flexibility in planning for and reacting to changes in the industry;

- they may place the Registrants at a competitive disadvantage compared to other, less leveraged competitors;

- GenOn's and GenOn Americas Generation's credit agreement with NRG contains restrictive covenants that limit their ability to engage in activities that may be in their long-term best interest; and

- the Registrants may be more vulnerable in a downturn in general economic conditions or in their business and they may be unable to carry out capital expenditures that are important to their long-term growth or necessary to comply with environmental regulations.

*GenOn and its subsidiaries that are holding companies, including GenOn Americas Generation, may not have access to sufficient cash to meet their obligations if their subsidiaries, in particular GenOn Mid-Atlantic, are unable to make distributions.*

GenOn and certain of its subsidiaries, including GenOn Americas Generation and GenOn Americas, are holding companies and, as a result, are dependent upon dividends, distributions and other payments from their operating subsidiaries to generate the funds necessary to meet their obligations. In particular, a substantial portion of the cash from their operations is generated by GenOn Mid-Atlantic. The ability of certain of their subsidiaries to pay dividends and make distributions is restricted under the terms of their debt or other agreements, including the operating leases of GenOn Mid-Atlantic and REMA. Under their respective operating leases, GenOn Mid-Atlantic and REMA are not permitted to make any distributions and other restricted payments unless: (a) they satisfy the fixed charge coverage ratio for the most recently ended period of four fiscal quarters; (b) they are projected to satisfy the fixed charge coverage ratio for each of the two following periods of four fiscal quarters, commencing with the fiscal quarter in which such payment is proposed to be made; and (c) no significant lease default or event of default has occurred and is continuing. In the event of a default under the respective operating leases or if the respective restricted payment tests are not satisfied, GenOn Mid-Atlantic and REMA would not be able to distribute cash. At December 31, 2013, GenOn Mid-Atlantic and REMA did not satisfy the restricted payments test.

*Each of GenOn and GenOn Americas Generation may be unable to generate sufficient cash to service their debt and leases and to post required amounts of cash collateral necessary to hedge economically market risk.*

The ability of each of GenOn or GenOn Americas Generation to pay principal and interest on their debt and the rent on their leases depends on their future operating performance. If their cash flows and capital resources are insufficient to allow them to make scheduled payments on their debt, GenOn or GenOn Americas Generation may have to reduce or delay capital expenditures, sell assets, restructure or refinance. There can be no assurance that the terms of their debt or leases will allow these alternative measures, that the financial markets will be available to them on acceptable terms or that such measures would satisfy their scheduled debt service and lease rent obligations. If either GenOn or GenOn Americas Generation do not comply with the payment and other material covenants under their debt and lease agreements, they could default under their debt or leases.

Their asset management activities may require them to post collateral either in the form of cash or letters of credit. At December 31, 2013, GenOn and GenOn Americas Generation had posted no cash collateral. At December 31, 2013, GenOn had no of letters of credit issued under the NRG credit agreement to support its asset management activities, trading activities, rent reserve requirements and other commercial arrangements. Although the Registrants seek to structure transactions in a way that reduces their potential liquidity needs for collateral, they may be unable to execute their hedging strategy successfully if they are unable to post the amount of collateral required to enter into and support hedging contracts.

GenOn and GenOn Americas Generation are active participants in energy exchange and clearing markets, which require a per-contract initial margin to be posted. The initial margins are determined by the exchanges through the use of proprietary models that rely on a variety of inputs and factors, including market conditions. They have limited notice of any changes to the margin rates. Consequently, they are exposed to changes in the per unit margin rates required by the exchanges and could be required to post additional collateral on short notice.

***The terms of the Registrants' credit facilities and leases restrict their current and future operations, particularly their ability to respond to changes or take certain actions.***

The Registrants' credit facilities and leases contain a number of restrictive covenants that impose significant operating and financial restrictions on them and may limit their ability to engage in acts that may be in their long-term best interest, including restrictions on their ability to:

- incur additional indebtedness;
- pay dividends or make other distributions;
- prepay, redeem or repurchase certain debt;
- make loans and investments;
- sell assets;
- incur liens;
- enter into transactions with affiliates;
- enter into sale-leaseback transactions; and
- consolidate, merge or sell all or substantially all of their assets.

21

**Cautionary Statement Regarding Forward Looking Information**

This Annual Report on Form 10-K includes forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. The words "believe", "project", "anticipate", "plan", "expect", "intend", "estimate" and similar expressions are intended to identify forward-looking statements. These forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the Registrants' actual results, performance and achievements, or industry results, to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. These factors, risks and uncertainties include the following:

- General economic conditions, changes in the wholesale power markets and fluctuations in the cost of fuel;

- Volatile power supply costs and demand for power;

- Hazards customary to the power production industry and power generation operations such as fuel and electricity price volatility, unusual weather conditions, catastrophic weather-related or other damage to facilities, unscheduled generation outages, maintenance or repairs, unanticipated changes to fuel supply costs or availability due to higher demand, shortages, transportation problems or other developments, environmental incidents, or electric transmission or gas pipeline system constraints and the possibility that the Registrants may not have adequate insurance to cover losses as a result of such hazards;

- The effectiveness of the Registrants' risk management policies and procedures, and the ability of the Registrants' counterparties to satisfy their financial commitments;

- Counterparties' collateral demands and other factors affecting the Registrants' liquidity position and financial condition;

- The Registrants' ability to operate their businesses efficiently, manage capital expenditures and costs tightly, and generate earnings and cash flows from their asset-based businesses in relation to their debt and other obligations;

- The Registrants' ability to enter into contracts to sell power and procure fuel on acceptable terms and prices;

- The liquidity and competitiveness of wholesale markets for energy commodities;

- Government regulation, including compliance with regulatory requirements and changes in market rules, rates, tariffs and environmental laws and increased regulation of carbon dioxide and other greenhouse gas emissions;

- Price mitigation strategies and other market structures employed by ISOs or RTOs that result in a failure to adequately compensate the Registrants' generation units for all of their costs;

- The Registrants' ability to borrow additional funds and access capital markets, as well as GenOn's substantial indebtedness and the possibility that the Registrants may incur additional indebtedness going forward;

- Operating and financial restrictions placed on the Registrants and their subsidiaries that are contained in the indentures governing GenOn's outstanding notes, and in debt and other agreements of certain of the Registrants' subsidiaries and project affiliates generally;

- The Registrants' ability to implement their strategy of developing and building new power generation facilities;

- The Registrants' ability to implement their strategy of finding ways to meet the challenges of climate change, clean air and protecting natural resources while taking advantage of business opportunities;

- The Registrants' ability to implement their strategy of increasing the return on invested capital through operational performance improvements and a range of initiatives at plants and corporate offices to reduce costs or generate revenues;

- The Registrants' ability to successfully evaluate investments in new business and growth initiatives;

- The Registrants' ability to successfully integrate and manage any acquired businesses; and

- The Registrants' ability to develop and maintain successful partnering relationships.

Forward-looking statements speak only as of the date they were made, and the Registrants undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. The foregoing review of factors that could cause the Registrants' actual results to differ materially from those contemplated in any forward-looking statements included in this Annual Report on Form 10-K should not be construed as exhaustive.

**Item 1B — Unresolved Staff Comments**

None.

**Item 2 — Properties (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Listed below are descriptions of Registrants' interests in facilities, operations and/or projects owned or leased as of December 31, 2013. The MW figures provided represent nominal summer net megawatt capacity of power generated as adjusted for the Registrants' ownership position excluding capacity from inactive/mothballed units as of December 31, 2013. The following table summarizes the Registrants' power production and cogeneration facilities by region:

| Name and Location of Facility | Power Market | % Owned | Net Generation Capacity (MW) [a] | Primary Fuel-type |
|---|---|---|---|---|
| **East Region:** | | | | |
| Chalk Point, Aquasco, MD [b] | PJM | 100.00 | 667 | Coal |
| Chalk Point, Aquasco, MD | PJM | 100.00 | 1,690 | Natural Gas |
| Dickerson, MD [b] | PJM | 100.00 [c] | 537 | Coal |
| Dickerson, MD | PJM | 100.00 [c] | 312 | Natural Gas |
| Morgantown, Newburg, MD | PJM | 100.00 [c] | 1,229 | Coal |
| Morgantown, Newburg, MD | PJM | 100.00 [c] | 248 | Oil |
| | **Total GenOn Mid-Atlantic:** | | **4,683** | |
| **East Region:** | | | | |
| Bowline, West Haverstraw, NY | NYISO | 100.00 | 758 | Natural Gas |
| Canal, Sandwich, MA | ISO-NE | 100.00 | 1,112 | Oil |
| Kendall, Cambridge, MA | ISO-NE | 100.00 | 256 | Natural Gas |
| Martha's Vineyard, MA | ISO-NE | 100.00 | 14 | Oil |
| **West Region:** | | | | |
| Pittsburg, CA | CAISO | 100.00 | 1,029 | Natural Gas |
| | **Total GenOn Americas Generation:** | | **7,852** | |
| **East Region:** | | | | |
| Aurora, IL | PJM | 100.00 | 878 | Natural Gas |
| Avon Lake, OH [d] | PJM | 100.00 | 732 | Coal |
| Avon Lake, OH | PJM | 100.00 | 21 | Oil |
| Blossburg, PA | PJM | 100.00 | 19 | Natural Gas |
| Brunot Island, Pittsburgh, PA | PJM | 100.00 | 259 | Natural Gas |
| Cheswick, Springdale, PA | PJM | 100.00 | 565 | Coal |
| Conemaugh, New Florence, PA [e] | PJM | 16.45 | 280 | Coal |
| Conemaugh, New Florence, PA [e] | PJM | 16.45 | 2 | Oil |
| Gilbert, Milford, NJ [f] | PJM | 100.00 | 536 | Natural Gas |
| Glen Gardner, NJ [f] | PJM | 100.00 | 160 | Natural Gas |
| Hamilton, East Berlin, PA | PJM | 100.00 | 20 | Oil |
| Hunterstown CCGT, Gettysburg, PA | PJM | 100.00 | 810 | Natural Gas |
| Hunterstown CTS, Gettysburg, PA | PJM | 100.00 | 60 | Natural Gas |
| Keystone, Shelocta, PA [e] | PJM | 16.67 | 283 | Coal |
| Keystone, Shelocta, PA [e] | PJM | 16.67 | 2 | Oil |
| Mountain, Mount Holly Springs, PA | PJM | 100.00 | 40 | Oil |
| New Castle, West Pittsburg, PA [d] | PJM | 100.00 | 325 | Coal |
| New Castle, West Pittsburg, PA | PJM | 100.00 | 3 | Oil |
| Niles, OH | PJM | 100.00 | 25 | Coal |
| Orrtana, PA | PJM | 100.00 | 20 | Oil |
| Osceola, Holopaw, FL | FRCC | 100.00 | 463 | Natural Gas |
| Portland, Mount Bethel, PA [f] | PJM | 100.00 | 158 | Coal |

23

.

| | | | | |
|---|---|---|---|---|
| Portland, Mount Bethel, PA | PJM | 100.00 | 169 | Oil |
| Sayreville, NJ | PJM | 100.00 | 224 | Natural Gas |
| Seward, New Florence, PA | PJM | 100.00 | 525 | Coal |
| Shawnee, East Stroudsburg, PA | PJM | 100.00 | 20 | Oil |
| Shawville, PA [(e) (g)] | PJM | 100.00 | 597 | Coal |
| Shawville, PA [(e)] | PJM | 100.00 | 6 | Oil |
| Titus, Birdsboro, PA | PJM | 100.00 | 31 | Oil |
| Tolna, Stewartstown, PA | PJM | 100.00 | 39 | Oil |
| Warren, PA | PJM | 100.00 | 57 | Natural Gas |
| Werner, South Amboy, NJ [(f)] | PJM | 100.00 | 212 | Oil |
| **South Central Region:** | | | | |
| Choctaw, French Camp, MS | SERC-Entergy | 100.00 | 800 | Natural Gas |
| Sabine, Orange, TX [(h)] | SERC-Entergy | 50.00 | 54 | Natural Gas |
| Shelby County, Neoga, IL | MISO | 100.00 | 344 | Natural Gas |
| **West Region:** | | | | |
| Coolwater, Dagget, CA | CAISO | 100.00 | 636 | Natural Gas |
| Ellwood, Goleta, CA | CAISO | 100.00 | 54 | Natural Gas |
| Etiwanda, Rancho Cucamonga, CA | CAISO | 100.00 | 640 | Natural Gas |
| Mandalay, Oxnard, CA | CAISO | 100.00 | 560 | Natural Gas |
| Ormond Beach, Oxnard, CA | CAISO | 100.00 | 1,516 | Natural Gas |
| | **Total GenOn:** | | **19,997** | |

(a)  Net generation capacity is approximate and actual capacity can vary depending on factors including weather conditions, operational conditions, and other factors.

(b)  On November 29, 2013, NRG submitted a notice of deactivation to retire Chalk Point Units 1 and 2 and Dickerson Units 1, 2, and 3 on May 31, 2017. The deactivation is based on draft environmental regulations that, if adopted, could require uneconomic capital investment and render the units uneconomic to operate going forward.

(c)  GenOn Mid-Atlantic leases 100% interests in the Dickerson and Morgantown coal generation units through facility lease agreements expiring in 2029 and 2034, respectively. GenOn Mid-Atlantic owns 312 MW and 248 MW of peaking capacity at the Dickerson and Morgantown generating facilities, respectively. GenOn Mid-Atlantic operates the Dickerson and Morgantown facilities.

(d)  NRG has announced its intention to continue operations at the Avon Lake and New Castle facilities, which are currently in operation and had been scheduled for deactivation in April 2015. NRG intends to add natural gas capabilities at these facilities, which is expected to be completed by the summer of 2016.

(e)  GenOn leases 100%, 16.67% and 16.45% interests in three Pennsylvania facilities (Shawville, Keystone and Conemaugh, respectively) through facility lease agreements expiring in 2026, 2034 and 2034, respectively. GenOn operates the Shawville, Keystone and Conemaugh facilities. The table includes GenOn's net share of the capacity of these facilities.

(f)  GenOn intends to deactivate net generation capacity at the following facilities:

| Facility | Expected Deactivation Date | Net Generation Capacity (MW) |
|---|---|---|
| Gilbert | May 2015 | 98 |
| Glen Gardner | May 2015 | 160 |
| Portland | June 2014 | 158 |
| Werner | May 2015 | 210 |

(g)  GenOn expects to place the coal-fired units at the Shawville generating facility (597 MW of the 603 MW) in long-term protective layup in April 2015.

(h)  GenOn owns a 50% equity interest in the Sabine facility located in east Texas having a net generating capacity of 110 MW. An unaffiliated party owns the other 50% and an affiliated party to the other owner operates the facility. The table includes GenOn's net share of the capacity of this facility.

**Other Properties**

The Registrants own or lease oil and gas pipelines that serve its generating facilities. GenOn leases other offices. The Registrants believe that their properties are adequate for their present needs. Except for the Conemaugh, Keystone and Sabine facilities, the Registrants' interest as of December 31, 2013 is 100% for each property. The Registrants have satisfactory title, rights and possession to their owned facilities, subject to exceptions, which, in their opinion, would not have a material adverse effect on the use or value of the facilities.

**Item 3 — Legal Proceedings (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

See Item 15 — Note 18, *Commitments and Contingencies,* to the Consolidated Financial Statements for discussion of the material legal proceedings to which the Registrants are a party.

**Item 4 — Mine Safety Disclosures (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Not applicable.

**PART II**

**Item 5 — Market for Registrants' Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

As a result of the NRG Merger, GenOn is a wholly-owned subsidiary of NRG. All of GenOn's common stock is held by its parent, NRG, and GenOn's common stock is not publicly traded. GenOn Americas Generation and GenOn Mid-Atlantic are indirect wholly-owned subsidiaries of NRG. All of GenOn Americas Generation's membership interests are held by its parent, GenOn Americas. All of GenOn Mid-Atlantic's membership interests are held by its parent, GenOn North America. GenOn Americas Generation's and GenOn Mid-Atlantic's membership interests are not publicly traded.

**Item 6 — Selected Financial Data (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Item 6 has been omitted from this report pursuant to the reduced disclosure format permitted by General Instruction I to Form 10-K.

**Item 7 — Management's Narrative Analysis of the Results of Operations and Financial Condition (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Reference is made to the Registrants' Consolidated Statements of Operations to this Annual Report on Form 10-K, which presents the results of the Registrants' operations for the year ended 2013, the periods from December 15, 2012 through December 31, 2012 and from January 1, 2012 through December 14, 2012 and the year ended December 31, 2011, and also refer to Item 1 to this Form 10-K for additional discussion about the Registrants' business.

### NRG Merger

On July 20, 2012, GenOn entered into the NRG Merger Agreement with NRG and a direct wholly-owned subsidiary of NRG. Upon the terms and subject to the conditions set forth in the NRG Merger Agreement, which was approved by the boards of directors of GenOn and NRG, a wholly-owned subsidiary of NRG merged with and into GenOn, with GenOn continuing as the surviving corporation and a wholly-owned subsidiary of NRG.

On December 14, 2012, NRG completed the acquisition of GenOn.  NRG issued, as consideration for the acquisition, 0.1216 shares of NRG common stock for each outstanding share of GenOn, including restricted stock units outstanding, on the acquisition date, except for fractional shares which were paid in cash. See Item 15 — Note 3, *NRG Merger and Dispositions*, to the Consolidated Financial Statements.

The NRG Merger was accounted for by NRG using acquisition accounting and through the application of "push-down" accounting, the purchase price paid by NRG was allocated to the Registrants' assets, liabilities and equity as of the acquisition date based upon preliminary estimates. Accordingly, the successor financial statements reflect a new basis of accounting and predecessor and successor period financial results are presented, but not comparable.

The most significant impacts of the new basis of accounting during the successor periods were (i) reduced depreciation expense due to the step-down of depreciable assets, (ii) lower interest expense for the remaining life of long-term debt due to its revaluation and related debt premium amortization along with the repayment of the senior secured term loan due 2017, and (iii) reduced cost of operations due to the amortization of lease obligations and out-of-market contracts.

The results of operations for successor periods included herein reflect certain acquisition-related transaction and integration costs which are not expected to have a continuing impact on the results going forward, and those amounts are included within a separate line within the Registrants' consolidated results of operations.

### Predecessor and Successor Reporting

As a result of the impact of pushdown accounting, the financial statements and certain note presentations separate each of the Registrants' presentations into two distinct periods, the period before the consummation of the NRG Merger (labeled predecessor) and the period after that date (labeled successor), to indicate the application of different basis of accounting between the periods presented.

### Environmental Matters, Regulatory Matters and Legal Proceedings

Details of environmental matters are presented in Item 15 — Note 20, *Environmental Matters*, to the Consolidated Financial Statements. Details of regulatory matters are presented in Item 15 — Note 19, *Regulatory Matters*, to the Consolidated Financial Statements. Details of legal proceedings are presented in Item 15 — Note 18, *Commitments and Contingencies*, to the Consolidated Financial Statements. Some of this information relates to costs that may be material to the Registrants' financial results.

27

**Consolidated Results of Operations**

*GenOn*

**2013 Compared to 2012**

The following table provides selected financial information for GenOn:

| | Successor | | Predecessor | |
|---|---|---|---|---|
| (In millions except otherwise noted) | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Change % [a] |
| **Operating Revenues** | | | | |
| Energy revenue [b] | $ 1,960 | $ 59 | $ 1,766 | 7 % |
| Capacity revenue [b] | 936 | 30 | 818 | 10 % |
| Mark-to-market for economic hedging activities | (356) | (16) | (157) | 106 % |
| Contract amortization | — | — | (10) | (100)% |
| Other revenues [c] | 64 | — | 147 | (56)% |
| Total operating revenues | 2,604 | 73 | 2,564 | (1)% |
| **Operating Costs and Expenses** | | | | |
| Generation cost of sales [b] | 1,142 | 41 | 1,219 | (9)% |
| Mark-to-market for economic hedging activities | (29) | (7) | (16) | 26 % |
| Contract and emissions credit amortization | (14) | (4) | (23) | (48)% |
| Other cost of operations | 809 | 36 | 893 | (13)% |
| Total cost of operations | 1,908 | 66 | 2,073 | (11)% |
| Depreciation and amortization | 249 | 10 | 339 | (29)% |
| Impairment losses | — | — | 47 | (100)% |
| Selling, general and administrative | 214 | 8 | 166 | 23 % |
| Acquisition-related transaction and integration costs | 70 | 53 | 11 | |
| Total operating costs and expenses | 2,441 | 137 | 2,636 | (12)% |
| **Operating Income/(Loss)** | 163 | (64) | (72) | N/A |
| **Other Income/(Expense)** | | | | |
| Other income, net | 1 | — | 3 | N/A |
| Interest expense | (205) | (8) | (330) | (39)% |
| Equity in earnings of unconsolidated affiliates | 4 | — | — | N/A |
| Loss on debt extinguishment | (11) | — | — | N/A |
| Total other expense | (211) | (8) | (327) | (37)% |
| Loss before income tax expense | (48) | (72) | (399) | (90)% |
| Income tax(benefit)/expense | (6) | — | 15 | (140)% |
| **Net Loss** | $ (42) | $ (72) | $ (414) | (91)% |
| **Business Metrics** | | | | |
| Average natural gas price — Henry Hub ($/MMBtu) | 3.65 | 2.79 | 2.79 | (35)% |
| MWh sold (in thousands) | 28,649 | 985 | 30,389 | |
| MWh generated (in thousands) | | 993 | 31,688 | |

(a)   This column represents the difference between (a) the 2013 successor period and (b) the mathematical combination of the 2012 successor period and the 2012 predecessor period and (c) divided by the combination of the 2012 predecessor and successor periods.

(b)   Includes realized gains and losses from financially settled transactions.

(c)   Includes unrealized trading gains and losses.

N/A - Not Applicable

*Generation Gross Margin*

| (In millions) | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Change % [(a)] |
| Energy revenue | $ 1,960 | $ 59 | $ 1,766 | 7 % |
| Capacity revenue | 936 | 30 | 818 | 10 % |
| Other revenues | 64 | — | 147 | (56)% |
| Generation revenue | 2,960 | 89 | 2,731 | 5 % |
| Generation cost of sales | 1,142 | 41 | 1,219 | (9)% |
| Generation gross margin | $ 1,818 | $ 48 | $ 1,512 | 17 % |

(a)   This column represents the difference between (a) the 2013 successor period and (b) the mathematical combination of the 2012 successor period and the 2012 predecessor period and (c) divided by the combination of the 2012 predecessor and successor periods.

Generation gross margin was $1,818 million for the year ended December 31, 2013, $48 million for the period from December 15, 2012 through December 31, 2012 and $1,512 million for the period from January 1, 2012 through December 14, 2012. The changes during the period relate to:

| | (In millions) |
|---|---|
| Higher gross margin due to a 10% increase in realized energy prices and a 5% decrease in fuel prices, partially offset by a small decrease in generation. | $ 240 |
| Higher gross margin due to a 22% increase in capacity volumes, primarily in PJM, and a 15% increase in capacity prices. | 198 |
| Lower gross margin due to the expiration of the RMR contracts in Western PJM and the deactivation of Contra Costa and lower prices and volumes on Resource Adequacy contracts in California | (132) |
| Changes in unrealized commercial optimization activities as well as trading activity and natural gas purchases that transitioned to NRG in the current year. | (62) |
| Higher gross margin as Marsh Landing reached commercial operations in May 2013 and was subsequently sold to NRG Yield LLC in July 2013 | 22 |
| Other | (8) |
| | $ 258 |

*Mark-to-market for Economic Hedging Activities*

Mark-to-market for economic hedging activities includes asset-backed hedges that have not been designated as cash flow hedges. The breakdown of gains and losses included in operating revenues and operating costs and expenses are as follows:

| (In millions) | Successor | | Predecessor |
|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| **Mark-to-market results in operating revenues** | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (409) | $ (13) | $ (456) |
| Net unrealized gains/(losses) on open positions related to economic hedges | 53 | (3) | 299 |
| **Total mark-to-market losses in operating revenues** | $ (356) | $ (16) | $ (157) |
| **Mark-to-market results in operating costs and expenses** | | | |
| Reversal of previously recognized unrealized losses on settled positions related to economic hedges | 42 | 9 | 149 |
| Net unrealized losses on open positions related to economic hedges | (13) | (2) | (133) |
| **Total mark-to-market gains in operating costs and expenses** | $ 29 | $ 7 | $ 16 |

Mark-to-market results consist of unrealized gains and losses. The settlement of these transactions is reflected in the same caption as the items being hedged.

For the year ended December 31, 2013, the $356 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period slightly offset by an increase in the value of forward sales of electricity and natural gas contracts as a result of decreases in forward power and natural gas prices. The $29 million gain in operating costs and expenses from economic hedge positions was driven by the reversal of previously recognized unrealized loss from fuel contracts that settled during the period partially offset by a decrease in the value of forward purchases of fuel contracts as a result of decreases in forward fuel prices.

For the period from December 15, 2012 through December 31, 2012, the $16 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period and a decrease in the value of forward sales of electricity and natural gas contracts as a result of increases in forward power and natural gas prices. The $7 million gain in operating costs and expenses from economic hedge positions was primarily driven by the reversal of previously recognized unrealized losses from fuel contracts that settled during the period. The gain was partially offset by a decrease in the value of forward purchases of fuel contracts as a result of decreases in forward coal prices.

For the period from January 1, 2012 through December 14, 2012, the $157 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period. The loss was partially offset by an increase in the value of forward sales of electricity and natural gas contracts as a result of decreases in forward power and natural gas prices. The $16 million gain in operating costs and expenses from economic hedge positions was driven by the reversal of previously recognized unrealized losses from fuel contracts that settled during the period. The gain was partially offset by a decrease in the value of forward purchases of fuel contracts, primarily as a result of decreases in forward coal prices.

In accordance with ASC 815, the following table represents the results of GenOn's financial and physical trading of energy commodities. The realized and unrealized financial and physical trading results are included in other operating revenues. GenOn's trading activities are subject to limits within the risk management policy.

| | Successor | | Predecessor |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
|---|---|---|---|
| (In millions) | | | |
| Trading gains/(losses) | | | |
| Realized | $        10 | $         3 | $         7 |
| Unrealized | — | (4) | (2) |
| Total trading gains/(losses) | $        10 | $        (1) | $         5 |

#### Other Cost of Operations

Other cost of operations were $809 million for the year ended December 31, 2013, $36 million for the period from December 15, 2012 through December 31, 2012 and $893 million for the period from January 1, 2012 through December 14, 2012. The changes during the period relate to:

| | (In millions) |
|---|---|
| Decrease due to the revaluation of operating lease liabilities in acquisition accounting in December 2012 | $        (56) |
| Decrease as prior year included inventory reserves for units already deactivated or scheduled to be deactivated | (35) |
| Reversal of liability in prior year for Potomac River in connection with deactivation | 31 |
| Decrease in other costs primarily related to timing of maintenance and outage work, as well as certain allocated costs classified in general and administrative expense | (60) |
| | $       (120) |

30

*Depreciation and Amortization*

Depreciation and amortization expense was $249 million for the year ended December 31, 2013, $10 million for the period from December 15, 2012 through December 31, 2012 and $339 million for the period from January 1, 2012 through December 14, 2012. The current year expense reflects the revaluation of the property, plant and equipment recorded in acquisition accounting in December 2012.

*Impairment Losses*

Impairment losses of $47 million in the 2012 predecessor period reflect the impairment of property, plant and equipment at the Portland and Titus generating facilities in 2012.

*Loss on Debt Extinguishment*

A loss on debt extinguishment of $11 million was recorded in 2013, related to the redemption of the 2014 GenOn Senior Notes and consisted of a make whole premium payment offset by the write-off of the remaining unamortized premium.

*Interest Expense*

Interest expense was $205 million for the year ended December 31, 2013, $8 million for the period from December 15, 2012 through December 31, 2012 and $330 million for the period from January 1, 2012 through December 14, 2012. The changes in the period were due to:

|  | (In millions) |
| --- | --- |
| Amortization of adjustments to fair value of debt | $ (72) |
| Decrease for GenOn senior term loan | (39) |
| Decrease for GenOn Senior unsecured notes, 2014 | (23) |
| Decrease for lower bank fees | (14) |
| Increase for lower capitalized interest | 17 |
| Other | (2) |
|  | $ (133) |

31

.

*GenOn Americas Generation*

### *2013 Compared to 2012*

The following table provides selected financial information for GenOn Americas Generation:

| (In millions except otherwise noted) | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Change % [a] |
| **Operating Revenues** | | | | |
| Energy revenue [b] | $ 1,899 | $ 59 | $ 1,718 | 7 % |
| Capacity revenue [b] | 869 | 28 | 739 | 13 % |
| Mark-to-market for economic hedging activities | (302) | (12) | (151) | 85 % |
| Other revenues [c] | 95 | 2 | 288 | (67)% |
| Total operating revenues | 2,561 | 77 | 2,594 | (4)% |
| **Operating Costs and Expenses** | | | | |
| Generation cost of sales [b] | 1,870 | 59 | 1,944 | (7)% |
| Mark-to-market for economic hedging activities | (31) | (4) | (19) | 35 % |
| Contract and emissions credit amortization | 20 | — | 22 | (9)% |
| Other cost of operations | 387 | 14 | 424 | (12)% |
| Total cost of operations | 2,246 | 69 | 2,371 | (8)% |
| Depreciation and amortization | 95 | 5 | 155 | (41)% |
| Selling, general and administrative | 89 | 3 | 73 | 17 % |
| Total operating costs and expenses | 2,430 | 77 | 2,599 | (9)% |
| **Operating Income/(Loss)** | 131 | — | (5) | N/A |
| **Other Income/(Expense)** | | | | |
| Other expense, net | 1 | — | — | N/A |
| Interest expense | (73) | (3) | (75) | (6)% |
| Total other expense | (72) | (3) | (75) | (8)% |
| **Income/(Loss) before income tax expense** | 59 | (3) | (80) | N/A |
| Income tax | — | — | — | N/A |
| **Net Income/(Loss)** | $ 59 | $ (3) | $ (80) | N/A |
| **Business Metrics** | | | | |
| Average natural gas price — Henry Hub ($/MMBtu) | 3.65 | 2.79 | 2.79 | (35)% |
| MWh sold (in thousands) | 8,884 | 421 | 12,730 | |
| MWh generated (in thousands) | 10,056 | 423 | 13,014 | |

(a)   This column represents the difference between (a) the 2013 successor period and (b) the mathematical combination of the 2012 successor period and the 2012 predecessor period and (c) divided by the combination of the 2012 predecessor and successor periods.

(b)   Includes realized gains and losses from financially settled transactions.

(c)   Includes unrealized trading gains and losses.

N/A - Not Applicable

32

.

*Generation Gross Margin*

| (In millions) | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Change % [a] |
| Energy revenue | $ 1,899 | $ 59 | $ 1,718 | 7 % |
| Capacity revenue | 869 | 28 | 739 | 13 % |
| Other revenues | 95 | 2 | 288 | (67)% |
| Generation revenue | 2,863 | 89 | 2,745 | 1 % |
| Generation cost of sales | 1,870 | 59 | 1,944 | (7)% |
| Generation gross margin | $ 993 | $ 30 | $ 801 | 19 % |

(a)   This column represents the difference between (a) the 2013 successor period and (b) the mathematical combination of the 2012 successor period and the 2012 predecessor period and (c) divided by the combination of the 2012 predecessor and successor periods.

Generation gross margin was $993 million for the year ended December 31, 2013, $30 million for the period from December 15, 2012 through December 31, 2012 and $801 million for the period from January 1, 2012 through December 14, 2012. The changes during the period relate to:

| | (In millions) |
| --- | --- |
| Higher gross margin due primarily to a 33% increase in realized energy prices and increased generation at Bowline, offset by a 30% decrease in generation resulting from the deactivation of Potomac River and lower generation at Morgantown and Chalk Point | $ 80 |
| Higher gross margin due primarily to higher capacity revenues, which increased 23% in volume and 10% in price, slightly offset by a decrease in contract capacity revenues due to the deactivation of Contra Costa | 74 |
| Primarily reflects prior year trading activities and natural gas purchases that were transitioned to NRG or affiliated companies in the current year | 13 |
| Other | (5) |
| | $ 162 |

*Mark-to-market for Economic Hedging Activities*

Mark-to-market for economic hedging activities includes asset-backed hedges that have not been designated as cash flow hedges. The breakdown of gains and losses included in operating revenues and operating costs and expenses are as follows:

| (In millions) | Successor | | Predecessor |
| --- | --- | --- | --- |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| **Mark-to-market results in operating revenues** | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (336) | $ (8) | $ (368) |
| Net unrealized gains/(losses) on open positions related to economic hedges | 34 | (4) | 217 |
| **Total mark-to-market losses in operating revenues** | (302) | (12) | (151) |
| **Mark-to-market results in operating costs and expenses** | | | |
| Reversal of previously recognized unrealized losses on settled positions related to economic hedges | 40 | 6 | 127 |
| Net unrealized losses on open positions related to economic hedges | (9) | (2) | (108) |
| **Total mark-to-market gains in operating costs and expenses** | $ 31 | $ 4 | $ 19 |

Mark-to-market results consist of unrealized gains and losses. The settlement of these transactions is reflected in the same caption as the items being hedged.

For the year ended December 31, 2013, the $302 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period slightly offset by an increase in the value of forward sales of electricity and natural gas contracts as a result of decreases in forward power and natural gas prices. The $31 million gain in operating costs and expenses from economic hedge positions was driven by the reversal of previously recognized unrealized loss from fuel contracts that settled during the period partially offset by a decrease in the value of forward purchases of fuel contracts as a result of decreases in forward fuel prices.

For the period from December 15, 2012 through December 31, 2012, the $12 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period and a decrease in the value of forward sales of electricity and natural gas contracts as a result of increases in forward power and natural gas prices. The $4 million gain in operating costs and expenses from economic hedge positions was primarily driven by the reversal of previously recognized unrealized losses from fuel contracts that settled during the period. The gain was partially offset by a decrease in the value of forward purchases of fuel contracts as a result of decreases in forward coal prices.

For the period from January 1, 2012 through December 14, 2012, the $151 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period. The loss was partially offset by an increase in the value of forward sales of electricity and natural gas contracts as a result of decreases in forward power and natural gas prices. The $19 million gain in operating costs and expenses from economic hedge positions was driven by the reversal of previously recognized unrealized losses from fuel contracts that settled during the period. The gain was partially offset by a decrease in the value of forward purchases of fuel contracts, primarily as a result of decreases in forward coal prices.

In accordance with ASC 815, the following table represents the results of GenOn Americas Generation's financial and physical trading of energy commodities. The realized and unrealized financial and physical trading results are included in other operating revenues. GenOn Americas Generation's trading activities are subject to limits within the risk management policy.

| | Successor | | Predecessors |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| (In millions) | | | |
|---|---|---|---|
| Trading gains/(losses) | | | |
| Realized | $ 10 | $ 3 | $ 7 |
| Unrealized | — | (4) | (2) |
| Total trading gains/(losses) | $ 10 | $ (1) | $ 5 |

### Other Cost of Operations

Other cost of operations were $387 million for the year ended December 31, 2013, $14 million for the period from December 15, 2012 through December 31, 2012 and $424 million for the period from January 1, 2012 through December 14, 2012. The changes during the period relate to:

| | (In millions) |
|---|---|
| Decrease due to the revaluation of operating lease liabilities in acquisition accounting in December 2012 | $ (51) |
| Reversal of liability in prior year for Potomac in connection with its deactivation | 31 |
| Decrease in other costs primarily related to timing of maintenance and outage work, as well as certain allocated costs classified in general and administrative expense | (31) |
| | $ (51) |

### Depreciation and Amortization

Depreciation and amortization expense was $95 million for the year ended December 31, 2013, $5 million for the period from December 15, 2012 through December 31, 2012 and $155 million for the period from January 1, 2012 through December 14, 2012. The current year expense reflects the revaluation of the property, plant and equipment recorded in acquisition accounting in December 2012.

*GenOn Mid-Atlantic*

### *2013 Compared to 2012*

The following table provides selected financial information for GenOn Mid-Atlantic:

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| (In millions except otherwise noted) | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Change % [a] |
| **Operating Revenues** | | | | |
| Energy revenue [b] | $ 863 | $ 30 | $ 897 | (7)% |
| Capacity revenue [b] | 305 | 10 | 197 | 47 % |
| Mark-to-market for economic hedging activities | (292) | (12) | (120) | 121 % |
| Other revenues | 3 | — | 15 | (80)% |
| Total operating revenues | 879 | 28 | 989 | (14)% |
| **Operating Costs and Expenses** | | | | |
| Generation cost of sales [b] | 340 | 15 | 465 | (29)% |
| Mark-to-market for economic hedging activities | (31) | (5) | (5) | N/A |
| Contract and emissions credit amortization | 18 | — | 20 | (10)% |
| Other cost of operations | 277 | 11 | 314 | (15)% |
| Total cost of operations | 604 | 21 | 794 | (26)% |
| Depreciation and amortization | 77 | 4 | 114 | (35)% |
| Selling, general and administrative | 66 | 2 | 46 | 38 % |
| Total operating costs and expenses | 747 | 27 | 954 | (24)% |
| **Operating Income** | 132 | 1 | 35 | N/A |
| **Other Income/(Expense)** | | | | |
| Interest expense | (4) | — | (4) | — % |
| Total other expense | (4) | — | (4) | — % |
| **Income before income tax expense** | 128 | 1 | 31 | N/A |
| Income tax | — | — | — | N/A |
| **Net Income** | $ 128 | $ 1 | $ 31 | N/A |
| **Business Metrics** | | | | |
| Average natural gas price — Henry Hub ($/MMBtu) | 3.65 | 2.79 | 2.79 | (35)% |
| MWh sold (in thousands) | 6,903 | 387 | 10,948 | |
| MWh generated (in thousands) | 7,950 | 387 | 10,948 | |

(a)  This column represents the difference between (a) the 2013 successor period and (b) the mathematical combination of the 2012 successor period and the 2012 predecessor period and (c) divided by the combination of the 2012 predecessor and successor periods.

(b)  Includes realized gains and losses from financially settled transactions.

N/A - Not Applicable

35

.

*Generation Gross Margin*

| (In millions) | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Change % [a] |
| Energy revenue | $ 863 | $ 30 | $ 897 | (7)% |
| Capacity revenue | 305 | 10 | 197 | 47 % |
| Other revenues | 3 | — | 15 | (80)% |
| Generation revenue | 1,171 | 40 | 1,109 | 2 % |
| Generation cost of sales | 340 | 15 | 465 | (29)% |
| Generation gross margin | $ 831 | $ 25 | $ 644 | 24 % |

(a)   This column represents the difference between (a) the 2013 successor period and (b) the mathematical combination of the 2012 successor period and the 2012 predecessor period and (c) divided by the combination of the 2012 predecessor and successor periods.

Generation gross margin was $831 million for the year ended December 31, 2013, $25 million for the period from December 15, 2012 through December 31, 2012 and $644 million for the period from January 1, 2012 through December 14, 2012. The change during the period due to:

| | (In millions) |
|---|---|
| Higher capacity revenues due to a 10% increase incapacity prices and a 34% increase in volume as Morgantown covered certain capacity obligations at Potomac River, which was deactivated | $ 98 |
| Higher gross margin due to a 33% increase in realized energy prices and increased generation at Bowline, offset by a 30% decrease in generation resulting from the deactivation of Potomac River and lower generation at Morgantown and Chalk Point. | 72 |
| Other | (8) |
| | $ 162 |

*Mark-to-market for Economic Hedging Activities*

Mark-to-market for economic hedging activities includes asset-backed hedges that have not been designated as cash flow hedges. The breakdown of gains and losses included in operating revenues and operating costs and expenses are as follows:

| (In millions) | Successor | | Predecessor |
|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| **Mark-to-market results in operating revenues** | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (336) | $ (8) | $ (355) |
| Net unrealized gains/(losses) on open positions related to economic hedges | 44 | (4) | 235 |
| Total mark-to-market losses in operating revenues | (292) | (12) | (120) |
| **Mark-to-market results in operating costs and expenses** | | | |
| Reversal of previously recognized unrealized losses on settled positions related to economic hedges | 40 | 6 | 109 |
| Net unrealized losses on open positions related to economic hedges | (9) | (1) | (104) |
| Total mark-to-market gains in operating costs and expenses | $ 31 | $ 5 | $ 5 |

Mark-to-market results consist of unrealized gains and losses. The settlement of these transactions is reflected in the same caption as the items being hedged.

For the year ended December 31, 2013, the $292 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period slightly offset by an increase in the value of forward sales of electricity and natural gas contracts as a result of decreases in forward power and natural gas prices. The $31 million gain in operating costs and expenses from economic hedge positions was driven by the reversal of previously recognized unrealized loss from fuel contracts that settled during the period partially offset by a decrease in the value of forward purchases of fuel contracts as a result of decreases in forward fuel prices.

For the period from December 15, 2012 through December 31, 2012, the $12 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period and a decrease in the value of forward sales of electricity and natural gas contracts as a result of increases in forward power and natural gas prices. The $5 million gain in operating costs and expenses from economic hedge positions was primarily driven by the reversal of previously recognized unrealized losses from fuel contracts that settled during the period.  The gain was partially offset by a decrease in the value of forward purchases of fuel contracts as a result of decreases in forward coal prices.

For the period from January 1, 2012 through December 14, 2012, the $120 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period.  The loss was partially offset by an increase in the value of forward sales of electricity and natural gas contracts as a result of decreases in forward power and natural gas prices. The $5 million gain in operating costs and expenses from economic hedge positions was driven by the reversal of previously recognized unrealized losses from fuel contracts that settled during the period.  The gain was partially offset by a decrease in the value of forward purchases of fuel contracts, primarily as a result of decreases in forward coal prices.

### Other Cost of Operations

Other cost of operations were $277 million for the year ended December 31, 2013, $11 million for the period from December 15, 2012 through December 31, 2012 and $314 million for the period from January 1, 2012 through December 14, 2012. The changes during the period were due to:

|  | (In millions) |
|---|---|
| Decrease due to the reevaluation of operating lease liabilities in acquisition accounting in December 2012 | $ (51) |
| Decrease in other costs primarily related to timing of maintenance and outage work, as well as certain allocated costs classified in general and administrative expense | (28) |
| Reversal of liability in prior year for Potomac River in connection with its deactivation | 31 |
|  | $ (48) |

### Depreciation and Amortization

Depreciation and amortization expense was $77 million for the year ended December 31, 2013, $4 million for the period from December 15, 2012 through December 31, 2012 and $114 million for the period from January 1, 2012 through December 14, 2012. The current year expense reflects the revaluation of the property, plant and equipment recorded in acquisition accounting in December 2012.

## Liquidity and Capital Resources

### Liquidity Position

As of December 31, 2013, and 2012, the Registrants' liquidity was comprised of the following:

|  | As of December 31, | |
|---|---|---|
|  | 2013 | 2012 |
|  | (In millions) | |
| Cash and cash equivalents (GenOn excluding GenOn Mid-Atlantic and REMA) | $ 566 | $ 662 |
| Cash and cash equivalents (GenOn Mid-Atlantic) [1] | 64 | 135 |
| Cash and cash equivalents (REMA) [1] | 130 | 28 |
| Restricted cash | — | 18 |
| Total | 760 | 843 |
| Credit facility availability | 151 | 239 |
| Total liquidity | $ 911 | $ 1,082 |

(1) At December 31, 2013, GenOn Mid-Atlantic and REMA did not satisfy the restricted payment tests and therefore, could not use such funds to distribute cash and make other restricted payments.

Management believes that the Registrants' liquidity position and cash flows from operations will be adequate to finance operating, maintenance and capital expenditures, to fund debt service obligations and other liquidity commitments. Management continues to regularly monitor the Company's ability to finance the needs of its operating, financing and investing activity within the dictates of prudent balance sheet management. See additional information related to the Registrants' debt in Item 15 - Note 10, *Debt and Capital Leases*, to the Consolidated Financial Statements.

*Credit Ratings*

Credit rating agencies rate a firm's public debt securities. These ratings are utilized by the debt markets in evaluating a firm's credit risk. Ratings influence the price paid to issue new debt securities by indicating to the market the Registrants' ability to pay principal and interest. Rating agencies evaluate a firm's industry, cash flow, leverage, liquidity, and hedge profile, among other factors, in their credit analysis of a firm's credit risk.

The following table summarizes the Registrants' credit ratings as of December 31, 2013:

| | S&P | Moody's[a] |
|---|---|---|
| GenOn 7.875% Senior Notes, due 2017 | B | B3 |
| GenOn 9.500% Senior Notes, due 2018 | B | B3 |
| GenOn 9.875% Senior Notes, due 2020 | B | B3 |
| GenOn Americas Generation 8.500% Senior Notes, due 2021 | BB- | B3 |
| GenOn Americas Generation 9.125% Senior Notes, due 2031 | BB- | B3 |

(a) On January 24, 2014, Moody's placed GenOn's ratings under review for downgrade

*Source of Liquidity*

The principal sources of liquidity for the Registrants' future operating and capital expenditures are expected to be derived existing cash on hand and cash flows from operations. The Registrants' operating cash flows may be effected by, among other things, demand for electricity, the difference between the cost of fuel used to generate electricity and the market value of the electricity generated, commodity prices (including prices for electricity, emissions allowances, natural gas, coal and oil), operations and maintenance expenses in the ordinary course, planned and unplanned outages, terms with trade creditors, cash requirements for capital expenditures relating to certain facilities (including those necessary to comply with environmental regulations) and the potential impact of future environmental regulations.

*Uses of Liquidity*

The Registrants' requirements for liquidity and capital resources, other than for operating its facilities, can generally be categorized by the following: (i) debt service obligations, as described more fully in Item 15 — Note 10, *Debt and Capital Leases*, to the Consolidated Financial Statements; (ii) capital expenditures, including maintenance and environmental and (iii) payments under the GenOn Mid-Atlantic and REMA operating leases.

**Capital Expenditures**

The following tables and descriptions summarize the Registrant's capital expenditures, excluding accruals, for maintenance, environmental, and growth for the year ended December 31, 2013, and the estimated capital expenditure forecast for 2014.

| | Maintenance | Environmental | Growth | Total |
|---|---|---|---|---|
| | | (in millions) | | |
| *2013:* | | | | |
| GenOn | 147 | 63 | 91 | 301 |
| GenOn Americas Generation | 53 | 2 | — | 55 |
| GenOn Mid-Atlantic | 44 | — | — | 44 |
| *2014 Forecast:* | | | | |
| GenOn | 99 | 84 | 117 | 300 |
| GenOn Americas Generation | 47 | 8 | 44 | 99 |
| GenOn Mid-Atlantic | 37 | 6 | 44 | 87 |

The following table summarizes the Registrants' estimated environmental capital expenditures for the referenced periods by region:

|  | GenOn | | GenOn Americas Generation | | GenOn Mid-Atlantic | |
|---|---|---|---|---|---|---|
| 2014 | $ | 84 | $ | 8 | $ | 6 |
| 2015 | | 27 | | 1 | | — |
| 2016 | | 4 | | 3 | | — |
| 2017 | | 1 | | — | | — |
| 2018 | | 4 | | — | | — |
| Total | $ | 120 | $ | 12 | $ | 6 |

**Operating Leases**

GenOn Mid-Atlantic leases 100% interest in both the Dickerson and Morgantown coal units and associated property through 2029 and 2034, respectively, and has an option to extend the leases. Any extensions of the respective leases would be for less than 75% of the economic useful life of the facility, as measured from the beginning of the original lease term through the end of the proposed remaining lease term. The leases are accounted for as operating leases. Although there is variability in the scheduled payment amounts over the lease term, rent expense is recognized for these leases on a straight-line basis. The scheduled payment amounts for the leases are $131 million and $110 million for 2014 and 2015, respectively. At December 31, 2013, the total notional minimum lease payments for the remaining term of the leases aggregated $1.3 billion and the aggregate termination value for the leases was approximately $1.2 billion and generally decreases over time. In addition, the present value of lease payments at December 31, 2013 was approximately $1.1 billion (assuming a 10% discount rate). NRG provides letters of credit in support of GenOn Mid-Atlantic's lease obligations in an aggregate amount equal to the greatest of the next six months scheduled rent payments, 50% of the next 12 months scheduled rent payments or $75 million.

REMA leases 16.45% and 16.67% interests in the Conemaugh and Keystone coal facilities, respectively through 2034 and expects to make payments through 2029. REMA also leases a 100% interest in the Shawville coal facility through 2026 and expects to make payments through that date. At the expiration of these leases, there are several renewal options related to fair value. The leases are accounted for as operating leases. The scheduled payment amounts for the REMA leases are $63 million and $56 million for 2014 and 2015, respectively. At December 31, 2013, the total notional minimum lease payments for the remaining term of the leases aggregated $698 million and the aggregate termination value for the leases was approximately $698 million and generally decreases over time. In addition, the present value of lease payments at December 31, 2011 was approximately $592 million (assuming a 9.4% discount rate). NRG provides letters of credit in support of REMA's lease obligations to post rent reserves in an aggregate amount equal to the greater of the next six months scheduled rent payment or 50% of the next 12 months scheduled rent payments.

**Item 7A — Quantitative and Qualitative Disclosures About Market Risk (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

The Registrants are exposed to several market risks in their normal business activities. Market risk is the potential loss that may result from market changes associated with the Registrants' merchant power generation or with an existing or forecasted financial or commodity transaction. The types of risks the Registrants are exposed to are commodity price risk, interest rate risk and credit and performance risk. In order to manage commodity price and interest rate risks, the Registrants use various fixed-price forward purchase and sales contracts, futures and option contracts traded on NYMEX, and swaps and options traded in the over-the-counter financial markets to:

- Manage and hedge fixed-price purchase and sales commitments;
- Manage and hedge exposure to variable rate debt obligations;
- Reduce exposure to the volatility of cash market prices; and
- Hedge fuel requirements for the Registrants' generating facilities.

*Commodity Price Risk*

Commodity price risks result from exposures to changes in spot prices, forward prices, volatilities, and correlations between various commodities, such as natural gas, electricity, coal, oil, and emission credits. The Registrants manage the commodity price risk of their merchant generation operations by entering into various derivative or non-derivative instruments to hedge the variability in future cash flows from forecasted sales and purchases of electricity and fuel. These instruments include forwards, futures, swaps, and option contracts traded on various exchanges, such as NYMEX and Intercontinental Exchange, or ICE, as well as over-the-counter markets. The portion of forecasted transactions hedged may vary based upon management's assessment of market, weather, operation and other factors.

While some of the contracts the Registrants use to manage risk represent commodities or instruments for which prices are available from external sources, other commodities and certain contracts are not actively traded and are valued using other pricing sources and modeling techniques to determine expected future market prices, contract quantities, or both. The Registrants use their best estimates to determine the fair value of those derivative contracts. However, it is likely that future market prices could vary from those used in recording mark-to-market derivative instrument valuation, and such variations could be material.

*Interest Rate Risk*

As of December 31, 2013, GenOn's debt fair value was $3.1 billion and the carrying value was $3.1 billion. GenOn estimates that a 1% decrease in market interest rates would have increased the fair value of its long-term debt by $221 million. As of December 31, 2013, GenOn Americas Generation's debt fair value was $883 million and the carrying value was $938 million. GenOn Americas Generation estimates that a 1% decrease in market interest rates would have increased the fair value of its long-term debt by $120 million.

*Counterparty Credit Risk*

Credit risk relates to the risk of loss resulting from non-performance or non-payment by counterparties pursuant to the terms of their contractual obligations. The Registrants monitor and manage credit risk through credit policies that include: (i) an established credit approval process; (ii) a daily monitoring of counterparties' credit limits; (iii) the use of credit mitigation measures such as margin, collateral, prepayment arrangements, or volumetric limits; (iv) the use of payment netting agreements; and (v) the use of master netting agreements that allow for the netting of positive and negative exposures of various contracts associated with a single counterparty. Risks surrounding counterparty performance and credit could ultimately impact the amount and timing of expected cash flows. The Registrants seek to mitigate counterparty risk by having a diversified portfolio of counterparties. The Registrants also have credit protection within various agreements to call on additional collateral support if and when necessary. Cash margin is collected and held at the Registrants to cover the credit risk of the counterparty until positions settle.

As of December 31, 2013, counterparty credit exposure to a significant portion of GenOn's counterparties was $538 million and GenOn held no collateral (cash or letters of credit) against those positions, resulting in a net exposure of $538 million. Approximately 99% of GenOn's exposure before collateral is expected to roll off by the end of 2015. GenOn Americas Generation's counterparty credit exposure to a significant portion of counterparties was $527 million and GenOn Americas Generation held no collateral (cash or letters of credit) against those positions, resulting in a net exposure of $527 million. Approximately 100% of GenOn Americas Generation's exposure before collateral is expected to roll off by the end of 2015. GenOn Mid-Atlantic's counterparty credit exposure to a significant portion of counterparties was $361 million and GenOn Mid-Atlantic held no collateral (cash or letters of credit) against those positions, resulting in a net exposure of $361 million. Approximately 100% of GenOn Mid-Atlantic's exposure before collateral is expected to roll off by the end of 2015.

The following tables highlight the credit quality and the net counterparty credit exposure by industry sector. Net counterparty credit exposure is defined as the aggregate net asset position for the Registrants with counterparties where netting is permitted under the enabling agreement and includes all cash flow, mark-to-market and NPNS, and non-derivative transactions. As of December 31, 2013, the exposure is shown net of collateral held and includes amounts net of receivables or payables.

*GenOn*

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Financial institutions | 68% |
| Utilities, energy merchants, marketers and other | 12% |
| ISOs | 20% |
| Total | 100% |

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Investment grade | 98% |
| Non-rated | 2% |
| Total | 100% |

(a)  Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

GenOn has counterparty credit risk exposure to certain counterparties representing more than 10% of total net exposure discussed above and the aggregate of such counterparties was $326 million. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, GenOn does not anticipate a material impact on its financial position or results of operations from nonperformance by any of its counterparties.

*GenOn Americas Generation*

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Financial institutions | 69% |
| Utilities, energy merchants, marketers and other | 11% |
| ISOs | 20% |
| Total | 100% |

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Investment grade | 98% |
| Non-rated | 2% |
| Total | 100% |

(a)  Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

GenOn Americas Generation has counterparty credit risk exposure to certain counterparties representing more than 10% of total net exposure discussed above and the aggregate of such counterparties was $377 million. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, GenOn Americas Generation does not anticipate a material impact on its financial position or results of operations from nonperformance by any of its counterparties.

*GenOn Mid-Atlantic*

| Category | Net Exposure [a] (% of Total) |
|---|---:|
| Financial institutions | 100% |

| Category | Net Exposure [a] (% of Total) |
|---|---:|
| Investment grade | 100% |

(a)   Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

GenOn Mid-Atlantic has counterparty credit risk exposure to certain counterparties representing more than 10% of total net exposure discussed above and the aggregate of such counterparties was $335 million. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, GenOn Mid-Atlantic does not anticipate a material impact on its financial position or results of operations from nonperformance by any of its counterparties.

### *Credit Risk Related Contingent Features*

Certain of the Registrants' hedging agreements contain provisions that require the Registrants to post additional collateral if the counterparty determines that there has been deterioration in credit quality, generally termed "adequate assurance" under the agreements, or require the Registrants to post additional collateral if there were a one notch downgrade in the Registrants' credit rating. The collateral required for contracts that have adequate assurance clauses that are in net liability positions as of December 31, 2013, was $33 million for GenOn and GenOn Americas Generation. The collateral required for contracts with credit rating contingent features that are in a net liability position as of December 31, 2013, was $0.5 million for GenOn and GenOn Americas Generation. In addition, GenOn and GenOn Americas Generation are parties to certain marginable agreements under which they have net liability positions, but the counterparties have not called for collateral due, which is approximately $4 million as of December 31, 2013. As of December 31, 2013, GenOn Mid-Atlantic did not have any financial instruments with credit risk related contingent features.

### Item 8 — Financial Statements and Supplementary Data (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)

The financial statements and schedules of the Registrants are listed in Part IV, Item 15 of this Form 10-K.

**Item 9 — Changes in and Disagreements with Accountants on Accounting and Financial Disclosure (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

None.

**Item 9A — Controls and Procedures (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

**Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures and Internal Control Over Financial Reporting**

Under the supervision and with the participation of the Registrants' management, including principal executive officer, principal financial officer and principal accounting officer, the Registrants conducted an evaluation of the effectiveness of the design and operation of disclosure controls and procedures, as such term is defined in Rules 13a-15(e) or 15d-15(e) of the Exchange Act. Based on this evaluation, the Registrants' principal executive officer, principal financial officer and principal accounting officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this annual report on Form 10-K. Management's reports on the Registrants' internal control over financial reporting are incorporated under the caption "Management's Report on Internal Control over Financial Reporting" of the Registrants' Annual Report on Form 10-K for the fiscal year ended December 31, 2013.

**Changes in Internal Control over Financial Reporting**

There were no changes in the Registrants' internal control over financial reporting (as such term is defined in Rule 13a-15(f) under the Exchange Act) that occurred in the fourth quarter of 2013 that materially affected, or are reasonably likely to materially affect, the Registrants' internal control over financial reporting.

**Inherent Limitations over Internal Controls**

The Registrants' internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with U.S. GAAP. The Registrants' internal control over financial reporting includes those policies and procedures that:

1.  Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Registrants' assets;

2.  Provide reasonable assurance that transactions are recorded as necessary to permit preparation of consolidated financial statements in accordance with U.S. GAAP, and that the Registrants' receipts and expenditures are being made only in accordance with authorizations of management and directors; and

3.  Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Registrants' assets that could have a material effect on the consolidated financial statements.

Internal control over financial reporting cannot provide absolute assurance of achieving financial reporting objectives because of its inherent limitations, including the possibility of human error and circumvention by collusion or overriding of controls. Accordingly, even an effective internal control system may not prevent or detect material misstatements on a timely basis. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate.

**Item 9B — Other Information (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

None.

**PART III**

### Item 10 — Directors, Executive Officers and Corporate Governance

Item 10 has been omitted from this report for the Registrants pursuant to the reduced disclosure format permitted by General Instruction I to Form 10-K.

### Item 11 — Executive Compensation

Item 11 has been omitted from this report for the Registrants pursuant to the reduced disclosure format permitted by General Instruction I to Form 10-K.

### Item 12 — Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

Item 12 has been omitted from this report for the Registrants pursuant to the reduced disclosure format permitted by General Instruction I to Form 10-K.

### Item 13 — Certain Relationships and Related Transactions, and Director Independence

Item 13 has been omitted from this report for the Registrants pursuant to the reduced disclosure format permitted by General Instruction I to Form 10-K.

### Item 14 — Principal Accounting Fees and Services (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)

KPMG LLP conducts an integrated audit of NRG and its subsidiaries. Professional audit services and other services rendered by KPMG LLP subsequent to December 14, 2012 were allocated to the Registrants through the Services Agreement with NRG as described in Note 18, *Commitments and Contingencies*, to the Registrants' consolidated financial statements. Prior to the NRG Merger, the GenOn Audit Committee pre-approved all audit services and permissible non-audit services provided by the independent auditor. As provided in the NRG Audit Committee Charter, the NRG Audit Committee pre-approved all audit services and permissible non-audit services provided by the independent auditor from the time of the NRG Merger and for the remainder of fiscal year 2012 as well as fiscal 2013.

The following table shows the aggregate fees related to the audit and other services provided by KPMG LLP for fiscal years 2013 and 2012. Amounts in the table for periods prior to the consummation of the NRG Merger on December 14, 2012 reflect amounts paid by the Registrants to KPMG LLP.

|  | 2013 | 2012 |
|---|---|---|
|  | (in thousands) | |
| Audit Fees[a] | $ 3,450 | $ 4,840 |
| Audit-Related Fees[b] | — | 197 |
| Total | $ 3,450 | $ 5,037 |

(a)  Includes fees and expenses related to the audits of the Registrants' consolidated financial statements for 2013 and 2012 and the effectiveness of GenOn's internal controls over financial reporting for 2012. This category also includes the review of financial statements included in the Registrants' Quarterly Reports on Form 10-Q, the audits of various subsidiary financial statements required by statute or regulation, and services that are normally provided by the independent auditors in connection with regulatory filings or engagements, consultations provided on audit and accounting matters that arose during, or as a result of, the audits or the reviews of interim financial statements, and the preparation of any written communications on internal control matters.

(b)  Consists of accounting consulting, assurance and related services that are reasonably related to the performance of the audit or review of the Registrants' financial statements, which during 2012 related to the NRG Merger, and are not reported above under "Audit Fees."

## PART IV

**Item 15 — Exhibits, Financial Statement Schedules (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

(a)(1) Financial Statements

The following consolidated financial statements of GenOn Energy, Inc., GenOn Americas Generation, LLC and GenOn Mid-Atlantic, LLC and related notes thereto, together with the reports thereon of KPMG LLP, are included herein:

GenOn Energy, Inc.

Consolidated Statements of Operations

Consolidated Statements of Comprehensive Loss

Consolidated Balance Sheets

Consolidated Statements of Cash Flows

Consolidated Statement of Stockholder's Equity

GenOn Americas Generation, LLC

Consolidated Statements of Operations

Consolidated Balance Sheets

Consolidated Statements of Cash Flows

Consolidated Statement of Member's Equity

GenOn Mid-Atlantic, LLC

Consolidated Statements of Operations

Consolidated Balance Sheets

Consolidated Statements of Cash Flows

Consolidated Statement of Member's Equity

Combined Notes to Consolidated Financial Statements

(a)(2) Financial Statement Schedules

The following Consolidated Financial Statement Schedules of GenOn Energy, Inc., GenOn Americas Generation, LLC and GenOn Mid-Atlantic, LLC are filed as part of Item 15(d) of this report and should be read in conjunction with the Consolidated Financial Statements.

Schedule I — GenOn Energy, Inc. Financial Statements

Schedule I — GenOn Americas Generation, LLC Financial Statements

Schedule II — Valuation and Qualifying Accounts

All other schedules for which provision is made in the applicable accounting regulation of the Securities and Exchange Commission are not required under the related instructions or are inapplicable, and therefore, have been omitted.

(a)(3) Exhibits: See Exhibit Index submitted as a separate section of this report.

(b) Exhibits

See Exhibit Index submitted as a separate section of this report.

(c) Not applicable

**MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

The Registrants' management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of the Registrants' management, including their principal executive officer, principal financial officer and principal accounting officer, the Registrants conducted an evaluation of the effectiveness of their internal control over financial reporting based on the framework in Internal Control — Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on the Registrants' evaluation under the framework in Internal Control — Integrated Framework (1992), the Registrants' management concluded that their internal control over financial reporting was effective as of December 31, 2013.

The effectiveness of the Registrants' internal control over financial reporting as of December 31, 2013, has been audited by KPMG LLP, the Registrants' independent registered public accounting firm, as stated in its report which is included in this Form 10-K.

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors
GenOn Energy, Inc.:

We have audited the accompanying consolidated balance sheets of GenOn Energy, Inc. and subsidiaries as of December 31, 2013 and 2012, and the related consolidated statements of operations, comprehensive income/ (loss), cash flows, and stockholder's equity for the year ended December 31, 2013 and the periods from December 15, 2012 through December 31, 2012 (Successor) and January 1, 2012 through December 14, 2012 and for the year ended December 31, 2011 (Predecessor). In connection with our audits of the consolidated financial statements, we also have audited financial statement schedules "Schedule I. Condensed Financial Information of Registrant and Schedule II. Valuation and Qualifying Accounts for the year ended December 31, 2013 and the periods from December 15, 2012 through December 31, 2012 (Successor) and January 1, 2012 through December 14, 2012 and for the year ended December 31, 2011 (Predecessor)." These consolidated financial statements and financial statement schedules are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedules based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of GenOn Energy, Inc. and subsidiaries as of December 31, 2013 and 2012 (Successor), and the results of their operations and their cash flows for the year ended December 31, 2013 and for the periods from December 15, 2012 through December 31, 2012 (Successor) and January 1, 2012 through December 14, 2012 and for the year ended December 31, 2011 (Predecessor) in conformity with U.S generally accepted accounting principles. Also in our opinion, the related financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

/s/ KPMG LLP

KPMG LLP

Philadelphia, Pennsylvania
February 28, 2014

47

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors
GenOn Americas Generation, LLC:

We have audited the accompanying consolidated balance sheets of GenOn Americas Generation, LLC and subsidiaries as of December 31, 2013 and 2012, and the related consolidated statements of operations, cash flows, and member's equity for the year ended December 31, 2013 and the periods from December 15, 2012 through December 31, 2012 (Successor) and January 1, 2012 through December 14, 2012 and for the year ended December 31, 2011 (Predecessor). In connection with our audits of the consolidated financial statements, we also have audited financial statement schedules "Schedule I. Condensed Financial Information of Registrant and Schedule II. Valuation and Qualifying Accounts for the year ended December 31, 2013 and the periods from December 15, 2012 through December 31, 2012 (Successor) and January 1, 2012 through December 14, 2012 and for the year ended December 31, 2011 (Predecessor)." These consolidated financial statements and financial statement schedules are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedules based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of GenOn Americas Generation, LLC and subsidiaries as of December 31, 2013 and 2012 (Successor), and the results of their operations and their cash flows for the year ended December 31, 2013 and for the periods from December 15, 2012 through December 31, 2012 (Successor) and January 1, 2012 through December 14, 2012 and for the year ended December 31, 2011 (Predecessor) in conformity with U.S generally accepted accounting principles. Also in our opinion, the related financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

/s/ KPMG LLP

KPMG LLP

Philadelphia, Pennsylvania
February 28, 2014

48

.

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors
GenOn Mid-Atlantic, LLC:

We have audited the accompanying consolidated balance sheets of GenOn Mid-Atlantic, LLC and subsidiaries as of December 31, 2013 and 2012, and the related consolidated statements of operations, cash flows, and member's equity for the year ended December 31, 2013 and the periods from December 15, 2012 through December 31, 2012 (Successor) and January 1, 2012 through December 14, 2012 and for the year ended December 31, 2011 (Predecessor). In connection with our audits of the consolidated financial statements, we also have audited financial statement schedule "Schedule II. Valuation and Qualifying Accounts for the year ended December 31, 2013 and the periods from December 15, 2012 through December 31, 2012 (Successor) and January 1, 2012 through December 14, 2012 and for the year ended December 31, 2011 (Predecessor)." These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of GenOn Mid-Atlantic, LLC and subsidiaries as of December 31, 2013 and 2012 (Successor), and the results of their operations and their cash flows for the year ended December 31, 2013 and for the periods from December 15, 2012 through December 31, 2012 (Successor) and January 1, 2012 through December 14, 2012 and for the year ended December 31, 2011 (Predecessor) in conformity with U.S generally accepted accounting principles. Also in our opinion, the related financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

/s/ KPMG LLP

KPMG LLP

Philadelphia, Pennsylvania
February 28, 2014

49

.

**GENON ENERGY, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | For the Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | For the Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| **Operating Revenues** | | | | |
| Operating revenue | $    2,556 | $    73 | $    2,564 | $    3,614 |
| Operating revenues - affiliate | 48 | — | — | — |
| Total operating revenues | 2,604 | 73 | 2,564 | 3,614 |
| **Operating Costs and Expenses** | | | | |
| Cost of operations | 1,715 | 66 | 2,073 | 2,642 |
| Cost of operations - affiliate | 193 | — | | |
| Depreciation and amortization | 249 | 10 | 339 | 375 |
| Impairment losses | — | — | 47 | 133 |
| Selling, general and administrative | 203 | 8 | 166 | 255 |
| Selling, general and administrative - affiliate | 11 | — | — | |
| Acquisition-related transaction and integration costs | 70 | 53 | 11 | — |
| Total operating costs and expenses | 2,441 | 137 | 2,636 | 3,405 |
| **Operating Income/(Loss)** | 163 | (64) | (72) | 209 |
| **Other Income/(Expense)** | | | | |
| Equity in earnings of unconsolidated affiliates | 4 | — | — | — |
| Other income, net | 1 | — | 3 | 4 |
| Interest expense | (193) | (8) | (330) | (379) |
| Interest expense - affiliate | (12) | — | — | — |
| Loss on debt extinguishment and refinancing expense | (11) | — | — | (23) |
| Total other expense | (211) | (8) | (327) | (398) |
| **Loss Before Income Taxes** | (48) | (72) | (399) | (189) |
| Income tax(benefit)/expense | (6) | — | 15 | — |
| **Net Loss** | $    (42) | $    (72) | $    (414) | $    (189) |

See notes to Consolidated Financial Statements.

50

.

**GENON ENERGY, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME/(LOSS)**

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | For the Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | For the Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| Net Loss | $ (42) | $ (72) | $ (414) | $ (189) |
| Other Comprehensive Income/(Loss), net of reclassifications, net of tax of $0: | | | | |
| Unrealized (loss)/gain on derivatives | (1) | 1 | (18) | (55) |
| Available-for-sale securities | — | — | — | (1) |
| Defined benefit plans | 101 | 1 | (8) | (89) |
| Other, net | — | — | 1 | — |
| Other Comprehensive Income/(Loss) | 100 | 2 | (25) | (145) |
| Comprehensive Income/(Loss) | $ 58 | $ (70) | $ (439) | $ (334) |

See notes to Consolidated Financial Statements.

51

**GENON ENERGY, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

| | As of December 31, | |
| --- | --- | --- |
| | **2013** | **2012** |
| | (In millions) | |
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 760 | $ 825 |
| Funds deposited by counterparties | 56 | 140 |
| Restricted cash | — | 18 |
| Accounts receivable — trade | 178 | 138 |
| Inventory | 443 | 422 |
| Derivative instruments | 464 | 596 |
| Derivative instruments — affiliate | 5 | 8 |
| Cash collateral paid in support of energy risk management activities | 62 | 148 |
| Prepayments and other current assets | 194 | 261 |
| Total current assets | 2,162 | 2,556 |
| **Property, Plant and Equipment** | | |
| In service | 3,311 | 3,138 |
| Under construction | 113 | 693 |
| Total property, plant and equipment | 3,424 | 3,831 |
| Less accumulated depreciation | (248) | (1) |
| Net property, plant and equipment | 3,176 | 3,830 |
| **Other Assets** | | |
| Intangible assets, net of accumulated amortization of $34 and $1 | 65 | 78 |
| Derivative instruments | 181 | 511 |
| Derivative instruments — affiliate | 1 | 1 |
| Deferred income taxes | — | 209 |
| Other non-current assets | 149 | 234 |
| Total other assets | 396 | 1,033 |
| **Total Assets** | $ 5,734 | $ 7,419 |

See notes to Consolidated Financial Statements.

52

.

**GENON ENERGY, INC. AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS (Continued)**

| | As of December 31, | |
|---|---|---|
| | **2013** | **2012** |
| | (In millions) | |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| **Current Liabilities** | | |
| Current portion of long-term debt and capital leases | $ 5 | $ 32 |
| Accounts payable | 187 | 190 |
| Accounts payable — affiliate | 72 | 6 |
| Derivative instruments | 160 | 237 |
| Derivative instruments — affiliate | 3 | 8 |
| Deferred income taxes | — | 209 |
| Cash collateral received in support of energy risk management activities | 56 | 140 |
| Accrued payroll | 103 | 155 |
| Accrued taxes | 39 | 62 |
| Accrued interest expense | 44 | 46 |
| Accrued expenses and other current liabilities | 80 | 75 |
| Total current liabilities | 749 | 1,160 |
| **Other Liabilities** | | |
| Long-term debt and capital leases | 3,128 | 4,170 |
| Postretirement and other benefit obligations | 185 | 324 |
| Derivative instruments | 18 | 123 |
| Derivative instruments — affiliate | — | 1 |
| Out-of-market contracts | 1,045 | 1,124 |
| Other non-current liabilities | 296 | 310 |
| Total non-current liabilities | 4,672 | 6,052 |
| **Total Liabilities** | 5,421 | 7,212 |
| **Commitments and Contingencies** | | |
| **Stockholder's Equity** | | |
| Common stock: $0.001 par value, 1 share authorized and issued at December 31, 2012 and 2013 | — | — |
| Additional paid-in capital | 325 | 277 |
| Accumulated deficit | (114) | (72) |
| Accumulated other comprehensive income | 102 | 2 |
| Total Stockholder's Equity | 313 | 207 |
| **Total Liabilities and Stockholder's Equity** | $ 5,734 | $ 7,419 |

See notes to Consolidated Financial Statements.

53

.

GENON ENERGY, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | For the Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | For the Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| **Cash Flows from Operating Activities** | | | | |
| Net loss | $ (42) | $ (72) | $ (414) | $ (189) |
| Adjustments to reconcile net loss to net cash provided/(used) by operating activities: | | | | |
| Depreciation and amortization | 249 | 10 | 339 | 375 |
| Amortization of financing costs and debt discount/premiums | (72) | (4) | 16 | 15 |
| Loss on debt extinguishment | (28) | — | — | 23 |
| Amortization of out-of-market contracts and emission allowances | (45) | (2) | (45) | (33) |
| Amortization of unearned equity compensation | 9 | 6 | 19 | 14 |
| Gain on disposals and sales of assets | — | — | (9) | (6) |
| Impairment losses | — | — | 47 | 133 |
| Changes in derivative instruments | 310 | 13 | 143 | (224) |
| Changes in collateral deposits supporting energy risk management activities | — | — | — | — |
| Postretirement benefits curtailment (gain) loss | — | — | 2 | — |
| Excess materials and supplies inventory reserve | — | — | 35 | — |
| Lower of cost or market inventory adjustments | — | — | 108 | 13 |
| Advance settlement of out-of-market contract obligation | — | — | (20) | — |
| Potomac River settlement obligation and reversal | — | — | (32) | — |
| Large scale remediation and settlement costs | — | — | (3) | 59 |
| Other, net | 86 | — | 3 | (5) |
| Cash provided/(used) by changes in other working capital, net of acquisition and disposition effects: | | | | |
| Accounts receivable - trade | (59) | (10) | 164 | 204 |
| Inventory | (25) | (1) | (56) | (21) |
| Prepayments and other current assets | 61 | (27) | (31) | (38) |
| Accounts payable | 118 | (67) | (111) | (183) |
| Accrued expenses and other current liabilities | (71) | 18 | 36 | 14 |
| Other assets and liabilities | 41 | (16) | 17 | (8) |
| **Net Cash Provided/(Used) by Operating Activities** | 532 | (152) | 208 | 143 |
| **Cash Flows from Investing Activities** | | | | |
| Net proceeds from sale of NRG Marsh Landing | 175 | — | — | — |
| Capital expenditures | (301) | (12) | (557) | (450) |
| Proceeds from sale of assets, net | — | — | 14 | 18 |
| (Increase)/decrease in restricted cash, net | 18 | 6 | 189 | 1,424 |
| Other | (21) | — | 2 | (21) |
| **Net Cash (Used)/Provided by Investing Activities** | (129) | (6) | (352) | 971 |
| **Cash Flows from Financing Activities** | | | | |
| Payment for treasury stock | — | — | — | — |
| Proceeds from issuance of long-term debt | 110 | — | 283 | 107 |
| Payment of debt issuance costs | — | — | — | (2) |
| Payments for short and long-term debt | (578) | — | (695) | (2,078) |
| Proceeds from exercises of stock options | — | — | — | 3 |
| **Net Cash (Used)/Provided by Financing Activities** | (468) | — | (412) | (1,970) |
| **Net (Decrease)/Increase in Cash and Cash Equivalents** | (65) | (158) | (556) | (856) |
| **Cash and Cash Equivalents at Beginning of Period** | 825 | 983 | 1,539 | 2,395 |

| Cash and Cash Equivalents at End of Period | $ | 760 | $ | 825 | $ | 983 | $ | 1,539 |
|---|---|---|---|---|---|---|---|---|
| **Supplemental Disclosures** | | | | | | | | |
| Interest paid, net of amount capitalized | $ | 259 | $ | 51 | $ | 279 | $ | 382 |
| Income taxes (received)/paid, net | $ | (75) | $ | — | $ | 11 | $ | (9) |

See notes to Consolidated Financial Statements.

**GENON ENERGY, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENT OF STOCKHOLDER'S EQUITY**

| | Common Stock | | Additional Paid-In Capital | | Accumulated Deficit | | Accumulated Other Comprehensive Income/(Loss) | | Total Stockholder's Equity | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (In millions) | | | | | |
| **Predecessor** | | | | | | | | | | |
| **Balances as of December 31, 2010** | $ | 1 | $ | 7,432 | $ | (1,974) | $ | (25) | $ | 5,434 |
| Net loss | | — | | — | | (189) | | — | | (189) |
| Other comprehensive loss | | — | | — | | — | | (145) | | (145) |
| Equity-based compensation | | — | | 17 | | — | | — | | 17 |
| **Balances as of December 31, 2011** | $ | 1 | $ | 7,449 | $ | (2,163) | $ | (170) | $ | 5,117 |
| Net loss | | — | | — | | (414) | | — | | (414) |
| Other comprehensive loss | | — | | — | | — | | (25) | | (25) |
| Equity-based compensation | | — | | 14 | | — | | — | | 14 |
| **Balances as of December 14, 2012**(a) | $ | 1 | $ | 7,463 | $ | (2,577) | $ | (195) | $ | 4,692 |
| **Successor** | | | | | | | | | | |
| **Balances as of December 15, 2012**(a) | $ | — | $ | 277 | $ | — | $ | — | $ | 277 |
| Net loss | | — | | — | | (72) | | — | | (72) |
| Other comprehensive income | | — | | — | | — | | 2 | | 2 |
| **Balances as of December 31, 2012** | $ | — | $ | 277 | $ | (72) | $ | 2 | $ | 207 |
| Net income | | — | | — | | (42) | | — | | (42) |
| Other comprehensive loss | | — | | — | | — | | 100 | | 100 |
| Sale of Marsh Landing to NRG | | — | | 48 | | — | | — | | 48 |
| **Balances as of December 31, 2013** | $ | — | $ | 325 | $ | (114) | $ | 102 | $ | 313 |

(a)   The differences in equity balances at December 14, 2012 and December 15, 2012 are due to the application of pushdown accounting reflecting the NRG Merger.

See notes to Consolidated Financial Statements.

55

**GENON AMERICAS GENERATION, LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | For the Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | For the Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| **Operating Revenues** | | | | |
| Operating revenues | $ 2,428 | $ 74 | $ 2,405 | $ 3,015 |
| Operating revenues - affiliate | 133 | 3 | 189 | (77) |
| Total operating revenues | 2,561 | 77 | 2,594 | 2,938 |
| **Operating Costs and Expenses** | | | | |
| Cost of operations | 890 | 28 | 1,064 | 1,038 |
| Cost of operations - affiliate | 1,356 | 41 | 1,307 | 1,374 |
| Depreciation and amortization | 95 | 5 | 155 | 177 |
| Impairment losses | — | — | — | 128 |
| Selling, general and administrative | 15 | 1 | 11 | 12 |
| Selling, general and administrative - affiliate | 74 | 2 | 62 | 76 |
| Total operating costs and expenses | 2,430 | 77 | 2,599 | 2,805 |
| **Operating Income/(Loss)** | 131 | — | (5) | 133 |
| **Other Income/(Expense)** | | | | |
| Other expense, net | 1 | — | — | (1) |
| Interest expense | (66) | (3) | (70) | (88) |
| Interest expense — affiliate | (7) | — | (5) | (5) |
| Loss on debt extinguishment and refinancing expense | — | — | — | (23) |
| Total other expense | (72) | (3) | (75) | (117) |
| **Income/(Loss) Before Income Taxes** | 59 | (3) | (80) | 16 |
| Income tax | — | — | — | — |
| **Net Income/(Loss)** | $ 59 | $ (3) | $ (80) | $ 16 |

See notes to Consolidated Financial Statements.

56

**GENON AMERICAS GENERATION, LLC AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2013 | | 2012 |
| | (In millions) | | |
| **ASSETS** | | | |
| **Current Assets** | | | |
| Cash and cash equivalents | $ | 63 | $ | 148 |
| Accounts receivable — trade, less allowance for doubtful accounts of $2 and $0 | | 151 | | 125 |
| Note receivable — affiliate | | 299 | | 198 |
| Inventory | | 270 | | 223 |
| Derivative instruments | | 462 | | 596 |
| Derivative instruments — affiliate | | 84 | | 60 |
| Cash collateral paid in support of energy risk management activities | | 50 | | 91 |
| Prepayments and other current assets | | 105 | | 99 |
|     Total current assets | | 1,484 | | 1,540 |
| **Property, Plant and Equipment** | | | |
| In service | | 1,287 | | 1,213 |
| Under construction | | 3 | | 9 |
|     Total property, plant and equipment | | 1,290 | | 1,222 |
| Less accumulated depreciation | | (96) | | (1) |
|     Net property, plant and equipment | | 1,194 | | 1,221 |
| **Other Assets** | | | |
| Intangible assets, net of accumulated amortization of $34 and $1 | | 64 | | 76 |
| Derivative instruments | | 181 | | 511 |
| Derivative instruments — affiliate | | 8 | | 25 |
| Other non-current assets | | 32 | | 13 |
|     Total other assets | | 285 | | 625 |
| **Total Assets** | $ | 2,963 | $ | 3,386 |

See notes to Consolidated Financial Statements.

57

.

**GENON AMERICAS GENERATION, LLC AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS (Continued)**

| | As of December 31, | |
| --- | ---: | ---: |
| | **2013** | **2012** |
| | (In millions) | |
| **LIABILITIES AND MEMBER'S EQUITY** | | |
| **Current Liabilities** | | |
| Current portion of long-term debt and capital leases | $ 5 | $ 5 |
| Accounts payable | 90 | 69 |
| Accounts payable — affiliate | 86 | 71 |
| Derivative instruments | 160 | 228 |
| Derivative instruments — affiliate | 107 | 134 |
| Cash collateral received in support of energy risk management activities | 56 | 140 |
| Accrued expenses and other current liabilities | 93 | 87 |
| Total current liabilities | 597 | 734 |
| **Other Liabilities** | | |
| Long-term debt and capital leases | 943 | 955 |
| Derivative instruments | 18 | 82 |
| Derivative instruments — affiliate | 23 | 51 |
| Out-of-market contracts | 575 | 603 |
| Other non-current liabilities | 116 | 120 |
| Total non-current liabilities | 1,675 | 1,811 |
| **Total Liabilities** | 2,272 | 2,545 |
| **Commitments and Contingencies** | | |
| **Member's Equity** | | |
| Member's interest | 691 | 841 |
| **Total Member's Equity** | 691 | 841 |
| **Total Liabilities and Member's Equity** | $ 2,963 | $ 3,386 |

See notes to Consolidated Financial Statements.

58

.

GENON AMERICAS GENERATION, LLC AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | For the Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | For the Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| **Cash Flows from Operating Activities** | | | | |
| Net income/(loss) | $ 59 | $ (3) | $ (80) | $ 16 |
| Adjustments to reconcile net income/(loss) to net cash provided/ (used) by operating activities: | | | | |
| Depreciation and amortization | 95 | 5 | 155 | 177 |
| Amortization of financing costs and debt discount/premiums | (8) | — | — | (1) |
| Loss on debt extinguishment | — | — | — | 23 |
| Amortization of out-of-market contracts and emission allowances | (9) | — | — | 0 |
| Gain on disposals and sales of assets | — | — | — | (3) |
| Impairment losses | — | — | — | 128 |
| Changes in derivative instruments | 270 | 12 | 134 | (138) |
| Excess materials and supplies inventory reserve | — | — | 6 | — |
| Lower of cost or market inventory adjustments | — | — | 65 | 8 |
| Potomac River settlement obligation and reversal | — | — | (32) | — |
| Large scale remediation and settlement costs | — | — | (3) | 59 |
| Other, net | (36) | — | — | — |
| Cash provided/(used) by changes in other working capital, net of acquisition and disposition effects: | | | | |
| Accounts receivable – trade | (26) | (16) | 127 | 75 |
| Accounts receivable – affiliate | — | — | (9) | (20) |
| Inventory | (47) | (4) | (67) | 30 |
| Prepayments and other current assets | (6) | (19) | (23) | (27) |
| Accounts payable | 1 | (50) | (56) | 39 |
| Accounts payable - affiliate | 15 | (40) | 47 | 39 |
| Accrued expenses and other current liabilities | 6 | 20 | 8 | 25 |
| Other assets and liabilities | (4) | (19) | (2) | (66) |
| **Net Cash Provided/(Used) by Operating Activities** | 310 | (114) | 270 | 364 |
| **Cash Flows from Investing Activities** | | | | |
| Capital expenditures | (55) | (4) | (190) | (159) |
| Proceeds from sale of assets, net | | — | 2 | 9 |
| Purchase of emission allowances, net of proceeds | (21) | | | |
| Decrease in restricted cash, net | | — | 197 | 702 |
| (Increase)/decrease in notes receivable - affiliate | (101) | 95 | (211) | (181) |
| **Net Cash Provided/(Used) by Investing Activities** | (177) | 91 | (202) | 371 |
| **Cash Flows from Financing Activities** | | | | |
| Payments for short and long-term debt | (3) | — | (4) | (1,405) |
| Increase of notes payable-affiliate | — | — | 52 | 49 |
| Capital contributions | 70 | — | 18 | 474 |
| Distributions to member | (285) | — | (230) | (100) |
| Redemption of preferred stock in affiliate | — | — | — | — |
| **Net Cash (Used)/Provided by Financing Activities** | (218) | — | (164) | (982) |
| **Net (Decrease)/Increase in Cash and Cash Equivalents** | (85) | (23) | (96) | (247) |
| **Cash and Cash Equivalents at Beginning of Period** | 148 | 171 | 267 | 514 |
| **Cash and Cash Equivalents at End of Period** | $ 63 | $ 148 | $ 171 | $ 267 |

**Supplemental Disclosures**

| | | | | | | |
|---|---|---|---|---|---|---|
| Interest paid, net of amount capitalized | $ | 73 | $ | — | $ | 94 |
| | | | | | 72 | |
| Cash refunds received for income taxes | $ | — | $ | — | $ | 1 |
| **Non-cash investing and financing activities** | | | | | | |
| Conversion to equity of notes payable to affiliate | $ | — | $ | — | $ | 2 |

See notes to Consolidated Financial Statements.

59

**GENON AMERICAS GENERATION, LLC SUBSIDIARIES**

**CONSOLIDATED STATEMENT OF MEMBER'S EQUITY**

| | Member's Interest | | Preferred Stock in Affiliate | | Total Member's Equity | |
|---|---|---|---|---|---|---|
| | | | **(In millions)** | | | |
| **Predecessor** | | | | | | |
| **Balances as of December 31, 2010** | $ | 3,573 | $ | — | $ | 3,573 |
| Net income | | 16 | | — | | 16 |
| Distributions to member | | (100) | | — | | (100) |
| Capital contributions | | 476 | | — | | 476 |
| **Balances as of December 31, 2011** | $ | 3,965 | $ | — | $ | 3,965 |
| Net loss | | (80) | | — | | (80) |
| Distributions to member | | (230) | | — | | (230) |
| Capital contributions | | 18 | | — | | 18 |
| **Balances as of December 14, 2012**[(a)] | $ | 3,673 | $ | — | $ | 3,673 |
| **Successor** | | | | | | |
| **Balances as of December 15, 2012**[(a)] | $ | 844 | $ | — | $ | 844 |
| Net loss | | (3) | | — | | (3) |
| **Balances as of December 31, 2012** | $ | 841 | $ | — | $ | 841 |
| Net income | | 59 | | — | | 59 |
| Distributions to member | | (209) | | — | | (209) |
| **Balances as of December 31, 2013** | $ | 691 | $ | — | $ | 691 |

(a)   The differences in equity balances at December 14, 2012 and December 15, 2012 are due to the application of pushdown accounting reflecting the NRG Merger.

See notes to Consolidated Financial Statements.

60

.

## GENON MID-ATLANTIC, LLC AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF OPERATIONS

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | For the Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | For the Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| **Operating Revenues** | | | | |
| Operating revenues | $ 7 | $ (3) | $ 143 | $ 260 |
| Operating revenues — affiliate | 872 | 31 | 846 | 1,087 |
| Total operating revenues | 879 | 28 | 989 | 1,347 |
| **Operating Costs and Expenses** | | | | |
| Cost of operations | 583 | 8 | 202 | 311 |
| Cost of operations — affiliate | 21 | 13 | 592 | 644 |
| Depreciation and amortization | 77 | 4 | 114 | 131 |
| Impairment losses | — | — | — | 94 |
| Selling, general and administrative | 2 | — | 7 | 8 |
| Selling, general and administrative — affiliate | 64 | 2 | 39 | 49 |
| Total operating costs and expenses | 747 | 27 | 954 | 1,237 |
| **Operating Income** | 132 | 1 | 35 | 110 |
| **Other Expense** | | | | |
| Interest expense | (1) | — | (1) | (1) |
| Interest expense — affiliate | (3) | — | (3) | (4) |
| Total other expense | (4) | — | (4) | (5) |
| **Income Before Income Taxes** | 128 | 1 | 31 | 105 |
| Income tax | — | — | — | — |
| **Net Income** | $ 128 | $ 1 | $ 31 | $ 105 |

See notes to Consolidated Financial Statements.

61

.

**GENON MID-ATLANTIC, LLC AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**

| | As of December 31, | | |
| --- | --- | --- | --- |
| | **2013** | | **2012** |
| | (In millions) | | |
| **ASSETS** | | | |
| **Current Assets** | | | |
| Cash and cash equivalents | $ | 64 | $ | 135 |
| Accounts receivable — trade | | 4 | | 4 |
| Accounts receivable — affiliate | | 35 | | — |
| Inventory | | 158 | | 137 |
| Derivative instruments | | 298 | | 285 |
| Derivative instruments — affiliate | | 53 | | 109 |
| Prepayments and other current assets | | 81 | | 46 |
| Total current assets | | 693 | | 716 |
| **Property, Plant and Equipment** | | | |
| In service | | 1,061 | | 1,017 |
| Under construction | | 3 | | 5 |
| Total property, plant and equipment | | 1,064 | | 1,022 |
| Less accumulated depreciation | | (77) | | (1) |
| Net property, plant and equipment | | 987 | | 1,021 |
| **Other Assets** | | | |
| Intangible assets, net of accumulated amortization of $0 and $0 | | 11 | | 11 |
| Derivative instruments | | 60 | | 351 |
| Derivative instruments — affiliate | | 96 | | 104 |
| Prepaid rent | | 25 | | — |
| Total other assets | | 192 | | 466 |
| **Total Assets** | $ | 1,872 | $ | 2,203 |

See notes to Consolidated Financial Statements.

.

**GENON MID-ATLANTIC, LLC AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS (Continued)**

|  | As of December 31, | |
| --- | --- | --- |
|  | **2013** | **2012** |
|  | (In millions) | |
| **LIABILITIES AND MEMBER'S EQUITY** | | |
| **Current Liabilities** | | |
| Current portion of long-term debt and capital leases | $ 5 | $ 5 |
| Accounts payable | 16 | 16 |
| Accounts payable — affiliate | — | 2 |
| Derivative instruments | — | 3 |
| Derivative instruments — affiliate | 64 | 97 |
| Cash collateral received in support of energy risk management activities | — | 57 |
| Accrued taxes and other current liabilities | 49 | 46 |
| Total current liabilities | 134 | 226 |
| **Other Liabilities** | | |
| Long-term debt and capital leases | 5 | 9 |
| Derivative instruments — affiliate | 9 | 55 |
| Out-of-market contracts | 575 | 603 |
| Other non-current liabilities | 71 | 75 |
| Total non-current liabilities | 660 | 742 |
| **Total Liabilities** | 794 | 968 |
| **Commitments and Contingencies** | | |
| **Member's Equity** | | |
| Member's interest | 1,078 | 1,235 |
| **Total Member's Equity** | 1,078 | 1,235 |
| **Total Liabilities and Member's Equity** | $ 1,872 | $ 2,203 |

See notes to Consolidated Financial Statements.

.

**GENON MID-ATLANTIC, LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | For the Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | For the Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| **Cash Flows from Operating Activities** | | | | |
| Net income | $ 128 | $ 1 | $ 31 | $ 105 |
| Adjustments to reconcile net income to net cash provided/ (used) by operating activities: | | | | |
| Depreciation and amortization | 77 | 4 | 114 | 131 |
| Loss on disposals and sales of assets | 7 | — | — | — |
| Amortization of out-of-market contracts and emission allowances | (11) | — | — | — |
| Impairment losses | — | — | — | 94 |
| Changes in derivative instruments | 260 | 7 | 115 | (120) |
| Excess materials and supplies inventory reserve | — | — | 4 | — |
| Lower of cost or market inventory adjustments | — | — | 65 | 8 |
| Potomac River settlement obligation and reversal | — | — | (32) | — |
| Large scale remediation and settlement costs | — | — | (3) | 59 |
| Cash provided/(used) by changes in other working capital, net of acquisition and disposition effects: | | | | |
| Accounts receivable - trade | — | (2) | 22 | (4) |
| Accounts receivable - affiliate | — | — | 10 | 125 |
| Inventory | (21) | (4) | (46) | (53) |
| Prepayments and other current assets | (69) | (32) | (16) | (31) |
| Accounts payable | — | 2 | 44 | 19 |
| Accounts payable - affiliate | — | — | (7) | (70) |
| Accrued expenses and other current liabilities | (8) | 15 | — | 24 |
| Other assets and liabilities | (102) | (16) | (11) | (35) |
| **Net Cash Provided/(Used) by Operating Activities** | 261 | (25) | 290 | 252 |
| **Cash Flows from Investing Activities** | | | | |
| Capital expenditures | (44) | (3) | (159) | (147) |
| Proceeds from the sales of assets | — | — | 1 | 1 |
| Decrease/(increase) in restricted cash, net | — | — | 197 | (166) |
| **Net Cash (Used)/Provided by Investing Activities** | (44) | (3) | 39 | (312) |
| **Cash Flows from Financing Activities** | | | | |
| Payments for short and long-term debt | (3) | — | (4) | (4) |
| Capital contributions | — | — | — | 30 |
| Distributions to member | (285) | — | (230) | (100) |
| **Net Cash Used by Financing Activities** | (288) | — | (234) | (74) |
| **Net (Decrease)/Increase in Cash and Cash Equivalents** | (71) | (28) | 95 | (134) |
| **Cash and Cash Equivalents at Beginning of Period** | 135 | 163 | 68 | 202 |
| **Cash and Cash Equivalents at End of Period** | $ 64 | $ 135 | $ 163 | $ 68 |
| **Supplemental Disclosures** | | | | |
| Cash refunds received for income taxes | $ — | $ — | $ — | $ 1 |

See notes to Consolidated Financial Statements.

**GENON MID-ATLANTIC, LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENT OF MEMBER'S EQUITY**

| | Member's Interest | Preferred Stock in Affiliate | Total Member's Equity |
|---|---|---|---|
| | | (In millions) | |
| **Predecessor** | | | |
| **Balances as of December 31, 2010** | $ 3,892 | $ — | $ 3,892 |
| Net income | 105 | — | 105 |
| Distributions to member | (100) | — | (100) |
| Capital contributions | 30 | — | 30 |
| **Balances as of December 31, 2011** | $ 3,927 | $ — | $ 3,927 |
| Net income | 31 | — | 31 |
| Distributions to member | (230) | | (230) |
| **Balances as of December 14, 2012**[a] | $ 3,728 | $ — | $ 3,728 |
| **Successor** | | | |
| **Balances as of December 15, 2012**[a] | $ 1,234 | $ — | $ 1,234 |
| Net income | 1 | — | 1 |
| **Balances as of December 31, 2012** | $ 1,235 | $ — | $ 1,235 |
| Net income | 128 | — | 128 |
| Distributions to member | (285) | — | (285) |
| **Balances as of December 31, 2013** | $ 1,078 | $ — | $ 1,078 |

(a)   The differences in equity balances at December 14, 2012 and December 15, 2012 are due to the application of pushdown accounting reflecting the NRG Merger.

See notes to Consolidated Financial Statements.

65

.

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1 — Nature of Business (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*General*

GenOn is a wholesale generator with approximately 19,997 MW of net electric generating capacity located in the U.S.

GenOn Americas Generation is a wholesale generator with approximately 7,852 MW of net electric generating capacity located, in many cases, near major metropolitan areas. GenOn Americas Generation's electric generating capacity is part of the 19,997 MW of net electric generating capacity of GenOn.

GenOn Mid-Atlantic operates and owns or leases 4,683 MW of net electric generating capacity in Maryland, near Washington, D.C. GenOn Mid-Atlantic's electric generating capacity is part of the 7,852 MW of net electric generating capacity of GenOn Americas Generation. GenOn Mid-Atlantic's generating facilities serve the Eastern PJM markets.

GenOn Americas Generation and GenOn Mid-Atlantic are Delaware limited liability companies and indirect wholly-owned subsidiaries of GenOn. GenOn Mid-Atlantic is a wholly-owned subsidiary of GenOn North America and an indirect wholly-owned subsidiary of GenOn Americas Generation.

GenOn's generation facilities consist of baseload, intermediate and peaking power generation facilities. The following table summarizes GenOn's generation portfolio by operating segment.

| Generation Type | (In MW) | | | |
| --- | --- | --- | --- | --- |
| | East | South Central | West | Total |
| Natural gas | 6,389 | 1,198 | 4,435 | 12,022 |
| Coal | 5,898 | — | — | 5,898 |
| Oil | 2,077 | — | — | 2,077 |
| Total generation capacity | 14,364 | 1,198 | 4,435 | 19,997 |

GenOn Americas Generation facilities consist of baseload, intermediate and peaking power generation facilities. The following table summarizes GenOn Americas Generation's portfolio by operating segment.

| Generation Type | (In MW) | | |
| --- | --- | --- | --- |
| | East | West | Total |
| Natural gas | 2,938 | 1,029 | 3,967 |
| Coal | 2,433 | — | 2,433 |
| Oil | 1,452 | — | 1,452 |
| Total generation capacity | 6,823 | 1,029 | 7,852 |

GenOn Mid-Atlantic facilities consist of baseload, intermediate and peaking power generation facilities. The following table summarizes GenOn Mid-Atlantic's portfolio in the East region.

| Generation Type | (In MW) |
| --- | --- |
| | East |
| Natural gas | 2,433 |
| Coal | 1,942 |
| Oil | 308 |
| Total generation capacity | 4,683 |

The Registrants sell power from their generation portfolio and offer capacity or similar products to retail electric providers and others, and provide ancillary services to support system reliability.

*NRG Merger*

On December 14, 2012, NRG completed the acquisition of GenOn with GenOn continuing as a wholly-owned subsidiary of NRG. The NRG Merger is accounted for under the acquisition method of accounting. Fair value adjustments related to the NRG Merger have been pushed down to GenOn, GenOn Americas Generation and GenOn Mid-Atlantic, resulting in certain assets and liabilities of the Registrants being recorded at fair value at December 15, 2012. See Note 3, *NRG Merger and Dispositions,* for further discussion.

The Registrants' consolidated statements of operations subsequent to the NRG Merger include amortization expense relating to fair value adjustments and depreciation expense based on the fair value of the Registrants' property, plant and equipment. In addition, effective with the NRG Merger, the Registrants adopted accounting policies of NRG. Therefore, the Registrants' financial information prior to the NRG Merger is not comparable to its financial information subsequent to the NRG Merger.

As a result of the impact of pushdown accounting, the financial statements and certain note presentations separate the Registrants' presentations into two distinct periods, the period before the consummation of the NRG Merger (labeled predecessor) and the period after that date (labeled successor), to indicate the application of different basis of accounting between the periods presented.

**Note 2 — Summary of Significant Accounting Policies (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

### Basis of Presentation and Principles of Consolidation

This is a combined annual report of the Registrants. The notes to the consolidated financial statements apply to the Registrants as indicated parenthetically next to each corresponding disclosure.

The Registrants' consolidated financial statements have been prepared in accordance with U.S. GAAP. The ASC, established by the FASB, is the source of authoritative U.S. GAAP to be applied by nongovernmental entities. In addition, the rules and interpretative releases of the SEC under authority of federal securities laws are also sources of authoritative U.S. GAAP for SEC registrants.

The consolidated financial statements include the Registrants' accounts and operations and those of their subsidiaries in which the Registrants have a controlling interest. All significant intercompany transactions and balances have been eliminated in consolidation. The usual condition for a controlling financial interest is ownership of a majority of the voting interests of an entity. However, a controlling financial interest may also exist through arrangements that do not involve controlling voting interests. As such, the Registrants apply the guidance of ASC 810, *Consolidations,* or ASC 810, to determine when an entity that is insufficiently capitalized or not controlled through its voting interests, referred to as a VIE, should be consolidated.

### Predecessor and Successor Reporting

On December 14, 2012, NRG completed the acquisition of GenOn with GenOn continuing as a wholly-owned subsidiary of NRG. The NRG Merger is accounted for under the acquisition method of accounting. Fair value adjustments related to the NRG Merger have been pushed down to GenOn, GenOn Americas Generation, and GenOn Mid-Atlantic, resulting in certain assets and liabilities of the Registrants being recorded at fair value at December 15, 2012. See Note 3, *NRG Merger and Dispositions,* for further discussion.

The Registrants' consolidated statements of operations subsequent to the NRG Merger include amortization expense relating to fair value adjustments and depreciation expense based on the fair value of the Registrants' property, plant and equipment. In addition, effective with the NRG Merger, the Registrants adopted accounting policies of NRG. Therefore, the Registrants' financial information prior to the NRG Merger is not comparable to its financial information subsequent to the NRG Merger.

As a result of the impact of pushdown accounting, the financial statements and certain note presentations separate the Registrants' presentations into two distinct periods, the period before the consummation of the NRG Merger (labeled predecessor) and the period after that date (labeled successor), to indicate the application of different basis of accounting between the periods presented.

### Cash and Cash Equivalents

Cash and cash equivalents include highly liquid investments with an original maturity of three months or less at the time of purchase.

### Funds Deposited by Counterparties (GenOn)

Funds deposited by counterparties consist of cash held by GenOn as a result of collateral posting obligations from GenOn's counterparties. Some amounts are segregated into separate accounts that are not contractually restricted but, based on GenOn's intentions, are not available for the payment of general corporate obligations. Depending on market fluctuations and the settlement of the underlying contracts, GenOn will refund this collateral to the hedge counterparties pursuant to the terms and conditions of the underlying trades. Since collateral requirements fluctuate daily and GenOn cannot predict if any collateral will be held for more than twelve months, the funds deposited by counterparties are classified as a current asset on GenOn's balance sheets, with an offsetting liability for this cash collateral received within current liabilities. Changes in funds deposited by counterparties are closely associated with GenOn's operating activities and are classified as an operating activity in GenOn's consolidated statements of cash flows.

### Restricted Cash

Restricted cash consists primarily of funds held to satisfy the requirements of certain debt agreements and funds held within the Registrants' projects that are restricted in their use. These funds are used to pay for current operating expenses and current debt service payments.

### Inventory

Inventory is valued at the lower of weighted average cost or market, and consists principally of fuel oil, coal and raw materials used to generate electricity or steam. The Registrants remove these inventories as they are used in the production of electricity or steam. Spare parts inventory is valued at a weighted average cost, since the Registrants expect to recover these costs in the ordinary course of business. The Registrants remove these inventories when they are used for repairs, maintenance or capital projects. Sales of inventory are classified as an operating activity in the consolidated statements of cash flows.

### Property, Plant and Equipment

Property, plant and equipment are stated at cost; however impairment adjustments are recorded whenever events or changes in circumstances indicate that their carrying values may not be recoverable. Significant additions or improvements extending asset lives are capitalized as incurred, while repairs and maintenance that do not improve or extend the life of the respective asset are charged to expense as incurred. Depreciation is computed using the straight-line method over the estimated useful lives. Certain assets and their related accumulated depreciation amounts are adjusted for asset retirements and disposals with the resulting gain or loss included in cost of operations in the consolidated statements of operations.

### Asset Impairments

Long-lived assets that are held and used are reviewed for impairment whenever events or changes in circumstances indicate carrying values may not be recoverable. Such reviews are performed in accordance with ASC 360. An impairment loss is recognized if the total future estimated undiscounted cash flows expected from an asset are less than its carrying value. An impairment charge is measured by the difference between an asset's carrying amount and fair value with the difference recorded in operating costs and expenses in the statements of operations. Fair values are determined by a variety of valuation methods, including appraisals, sales prices of similar assets and present value techniques.

### Project Development Costs and Capitalized Interest (GenOn and GenOn Americas Generation)

Project development costs are expensed in the preliminary stages of a project and capitalized when the project is deemed to be commercially viable. Commercial viability is determined by one or a series of actions including, among others, Board of Director approval pursuant to a formal project plan that subjects the Registrants to significant future obligations that can only be discharged by the use of an asset of the Registrants.

Interest incurred on funds borrowed to finance capital projects is capitalized until the project under construction is ready for its intended use. The amounts of interest capitalized were as follows:

|  | Successor | | Predecessor | |
|  | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
|  | (In millions) | | (In millions) | |
| GenOn | $ 21 | $ 2 | $ 35 | $ 15 |
| GenOn Americas Generation | 2 | — | 3 | 3 |

When a project is available for operations, capitalized interest and project development costs are reclassified to property, plant and equipment and amortized on a straight-line basis over the estimated useful life of the project's related assets. Capitalized costs are charged to expense if a project is abandoned or management otherwise determines the costs to be unrecoverable.

*Intangible Assets*

Intangible assets represent contractual rights held by the Registrants. The Registrants recognize specifically identifiable intangible assets when specific rights and contracts are acquired. As of December 31, 2013 and 2012, the Registrants' intangible assets are comprised of $SO_2$ emission allowances and $CO_2$ emission credits held for compliance with RGGI that are held-for-use and are amortized to cost of operations based on straight line or units of production basis. The following table presents the Registrants' amortization of intangible assets for each of the past three years:

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| GenOn | $ 25 | $ 1 | $ 5 | $ 23 |
| GenOn Americas Generation | 21 | 1 | 3 | 9 |
| GenOn Mid-Atlantic | 18 | — | — | 5 |

The following table presents estimated amortization of the Registrants' intangible assets for each of the next five years:

| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
| --- | --- | --- | --- |
| | | (In millions) | |
| 2014 | $ 24 | $ 24 | $ 22 |
| 2015 | 19 | 19 | 17 |
| 2016 | 22 | 22 | 19 |
| 2017 | 22 | 22 | 21 |
| 2018 | 27 | 27 | 25 |

Intangible assets determined to have indefinite lives are not amortized, but rather are tested for impairment at least annually or more frequently if events or changes in circumstances indicate that such acquired intangible assets have been determined to have finite lives and should now be amortized over their useful lives. The Registrants had no intangible assets with indefinite lives recorded as of December 31, 2013.

Emission allowances held-for-sale, which are included in other non-current assets on the Registrants' consolidated balance sheets, are not amortized; they are carried at the lower of cost or fair value and reviewed for impairment in accordance with ASC 360, *Property, Plant, and Equipment*.

*Out of Market Contracts*

In connection with the NRG Merger, acquired out-of-market contracts were pushed down to the Registrants, as applicable, and primarily relate to GenOn Mid-Atlantic and REMA leases and long-term natural gas transportation and storage contracts. These out-of-market contracts are amortized to operating revenues and cost of operations, as applicable, based on the nature of the contracts and over their contractual lives. The following table presents the Registrants' amortization of out-of-market contracts for each of the past three years:

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| GenOn | $ 75 | $ 2 | $ 67 | $ 45 |
| GenOn Americas Generation | 28 | 1 | — | — |
| GenOn Mid-Atlantic | 28 | 1 | — | — |

The following table summarizes the estimated amortization related to the Registrants' out-of-market contracts:

| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
| --- | --- | --- | --- |
| | | (In millions) | |
| 2014 | $ 75 | $ 28 | $ 28 |
| 2015 | 76 | 28 | 28 |
| 2016 | 81 | 28 | 28 |
| 2017 | 76 | 28 | 28 |
| 2018 | 71 | 28 | 28 |

69

### Income Taxes

#### GenOn

GenOn is a wholly-owned subsidiary of NRG that exists as a corporate regarded entity for income tax purposes. As a result, GenOn, GenOn Americas and NRG have direct liability for the majority of the federal and state income taxes resulting from GenOn's operations. GenOn has allocated income taxes as if it were a single consolidated taxpayer using the liability method in accordance with ASC 740, which requires that GenOn use the asset and liability method of accounting for deferred income taxes and provide deferred income taxes for all significant temporary differences.

GenOn has two categories of income tax expense or benefit - current and deferred, as follows:

•   Current income tax expense or benefit consists solely of current taxes payable less applicable tax credits, and

•   Deferred income tax expense or benefit is the change in the net deferred income tax asset or liability, excluding amounts charged or credited to accumulated other comprehensive income.

To the extent that GenOn provides current tax expense or benefit, any related tax payable or receivable to NRG is reclassified to equity in the same period since GenOn does not have a tax sharing agreement with NRG.

GenOn reports some of its revenues and expenses differently for financial statement purposes than for income tax return purposes, resulting in temporary and permanent differences between GenOn's financial statements and income tax returns. The tax effects of such temporary differences are recorded as either deferred income tax assets or deferred income tax liabilities in GenOn's consolidated balance sheets. When necessary, deferred tax assets are reduced by a valuation allowance to reflect the amount that is estimated to be recoverable. In assessing the recoverability of the deferred tax assets, GenOn considers whether it is likely that some portion or all of the deferred tax assets will be realized.

The determination of a valuation allowance requires significant judgment as to the generation of taxable income during future periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn's past and anticipated future performance, the reversal of deferred tax liabilities and the implementation of tax planning strategies.

GenOn accounts for uncertain tax positions in accordance with ASC 740, which applies to all tax positions related to income taxes. Under ASC 740, tax benefits are recognized when it is more-likely-than-not that a tax position will be sustained upon examination by the authorities. The benefit recognized from a position that has surpassed the more-likely-than-not threshold is the largest amount of benefit that is more than 50% likely to be realized upon settlement. The Company recognizes interest and penalties accrued related to uncertain tax benefits as a component of income tax expense.

#### GenOn Americas Generation

GenOn Americas Generation and most of its subsidiaries are limited liability companies that are treated as branches of GenOn Americas for income tax purposes. As a result, GenOn Americas, GenOn and NRG have direct liability for the majority of the federal and state income taxes relating to GenOn Americas Generation's operations. Several of GenOn Americas Generation's subsidiaries exist as regarded corporate entities for income tax purposes. For the subsidiaries that continue to exist as corporate regarded entities, GenOn Americas Generation allocates current and deferred income taxes to each corporate regarded entity as if such entity were a single taxpayer utilizing the asset and liability method to account for income taxes. To the extent GenOn Americas Generation provides tax expense or benefit, any related tax payable or receivable to NRG is reclassified to equity in the same period since GenOn Americas Generation does not have a tax sharing agreement with NRG.

GenOn Americas Generation reports some of its revenues and expenses differently for financial statement purposes than for income tax return purposes for the regarded corporate entities, resulting in temporary and permanent differences between GenOn Americas Generation's financial statements and income tax returns. The tax effects of such temporary differences are recorded as either deferred income tax assets or deferred income tax liabilities in GenOn Americas Generation's consolidated balance sheet. GenOn Americas Generation measures its deferred income tax assets and deferred income tax liabilities using income tax rates that are currently in effect. When necessary, deferred tax assets are reduced by a valuation allowance to reflect the amount that is estimated to be recoverable. In assessing the recoverability of the deferred tax assets, GenOn Americas Generation considers whether it is likely that some portion or all of the deferred tax assets will be realized. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities from a change in tax rates is recognized in income in the period that includes the enactment date.

The determination of a valuation allowance requires significant judgment as to the generation of taxable income during future periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn Americas Generation's past and anticipated future performance, the reversal of deferred tax liabilities and the implementation of tax planning strategies.

GenOn Americas Generation accounts for uncertain tax positions in accordance with ASC 740, which applies to all tax positions related to income taxes for the regarded corporate entities. Under ASC 740, tax benefits are recognized when it is more-likely-than-not that a tax position will be sustained upon examination by the authorities. The benefit recognized from a position that has surpassed the more-likely-than-not threshold is the largest amount of benefit that is more than 50% likely to be realized upon settlement. The Company recognizes interest and penalties accrued related to uncertain tax benefits as a component of income tax expense.

*GenOn Mid-Atlantic*

GenOn Mid-Atlantic and GenOn Mid-Atlantic's subsidiaries are limited liability companies that are treated as branches of GenOn Americas for income tax purposes. As such, GenOn, GenOn Americas and NRG have direct liability for the majority of the federal and state income taxes relating to GenOn Mid-Atlantic's operations.

### Revenue Recognition

*Energy* — Both physical and financial transactions are entered into to optimize the financial performance of the Registrants' generating facilities. Electric energy revenue is recognized upon transmission to the customer. Physical transactions, or the sale of generated electricity to meet supply and demand, are recorded on a gross basis in the Registrants' consolidated statements of operations. Financial transactions, or the buying and selling of energy for trading purposes, are recorded net within operating revenues in the consolidated statements of operations in accordance with ASC 815.

*Capacity* — Capacity revenues are recognized when contractually earned, and consist of revenues billed to a third party at either the market or a negotiated contract price for making installed generation capacity available in order to satisfy system integrity and reliability requirements.

*Natural Gas Sales (GenOn and GenOn Americas Generation)* — GenOn and GenOn Americas Generation record revenues from the sales of natural gas under the accrual method.  These sales are sold at market-based prices.  Sales that have been delivered but not billed by period end are estimated.

*PPAs (GenOn and GenOn Americas Generation)* — Certain of GenOn and GenOn Americas Generation's revenues are currently obtained through PPAs or other contractual arrangements. All of these PPAs are accounted for as operating leases in accordance with ASC 840, *Leases*, or ASC 840. ASC 840 requires minimum lease payments received to be amortized over the term of the lease and contingent rentals are recorded when the achievement of the contingency becomes probable. These leases have no minimum lease payments and all the rent is recorded as contingent rent on an actual basis when the electricity is delivered.

### Derivative Financial Instruments

The Registrants account for derivative financial instruments under ASC 815, which requires the Registrants to record all derivatives on the balance sheet at fair value unless they qualify for a NPNS exception. Changes in the fair value of non-hedge derivatives are immediately recognized in earnings. Changes in the fair value of derivatives accounted for as hedges, if elected for hedge accounting, are either:

- Recognized in earnings as an offset to the changes in the fair value of the related hedged assets, liabilities and firm commitments; and

- Deferred and recorded as a component of accumulated OCI until the hedge transactions occur and are recognized in earnings.

The Registrants' primary derivative instruments are financial power and natural gas contracts, fuels purchase contracts, other energy related commodities, and interest rate instruments used to mitigate variability in earnings due to fluctuations in market prices and interest rates. On an ongoing basis, the Registrants assess the effectiveness of all derivatives that are designated as hedges for accounting purposes in order to determine that each derivative continues to be highly effective in offsetting changes in fair values or cash flows of hedged items. Internal analyses that measure the statistical correlation between the derivative and the associated hedged item determine the effectiveness of such an energy contract designated as a hedge. If it is determined that the derivative instrument is not highly effective as a hedge, hedge accounting will be discontinued prospectively. If the derivative instrument is terminated, the effective portion of this derivative deferred in accumulated OCI will be frozen until the underlying hedged item is delivered

71

Revenues and expenses on contracts that qualify for the NPNS exception are recognized when the underlying physical transaction is delivered. While these contracts are considered derivative financial instruments under ASC 815, they are not recorded at fair value, but on an accrual basis of accounting. If it is determined that a transaction designated as NPNS no longer meets the scope exception, the fair value of the related contract is recorded on the balance sheet and immediately recognized through earnings.

The Registrants' trading activities are subject to limits in accordance with the Risk Management Policy. These contracts are recognized on the balance sheet at fair value and changes in the fair value of these derivative financial instruments are recognized in earnings.

### Concentrations of Credit Risk

Financial instruments which potentially subject the Registrants to concentrations of credit risk consist primarily of accounts receivable and derivatives. Certain accounts receivable and derivative instruments are concentrated within entities engaged in the energy industry. These industry concentrations may impact the Registrants' overall exposure to credit risk, either positively or negatively, in that the customers may be similarly affected by changes in economic, industry or other conditions. Receivables and other contractual arrangements are subject to collateral requirements under the terms of enabling agreements. However, the Registrants believe that the credit risk posed by industry concentration is offset by the diversification and creditworthiness of the Registrants' customer base. See Note 4, *Fair Value of Financial Instruments,* for a further discussion of derivative concentrations.

### Fair Value of Financial Instruments

The carrying amount of cash and cash equivalents, funds deposited by counterparties, receivables, accounts payables, and accrued liabilities approximate fair value because of the short-term maturity of these instruments. See Note 4, *Fair Value of Financial Instruments*, for a further discussion of fair value of financial instruments.

### Asset Retirement Obligations

The Registrants account for their AROs in accordance with ASC 410-20, *Asset Retirement Obligations,* or ASC 410-20. Retirement obligations associated with long-lived assets included within the scope of ASC 410-20 are those for which a legal obligation exists under enacted laws, statutes, and written or oral contracts, including obligations arising under the doctrine of promissory estoppel, and for which the timing and/or method of settlement may be conditional on a future event. ASC 410-20 requires an entity to recognize the fair value of a liability for an ARO in the period in which it is incurred and a reasonable estimate of fair value can be made.

Upon initial recognition of a liability for an ARO, the Registrants capitalize the asset retirement cost by increasing the carrying amount of the related long-lived asset by the same amount. Over time, the liability is accreted to its future value, while the capitalized cost is depreciated over the useful life of the related asset. See Note 11, *Asset Retirement Obligations,* for a further discussion of AROs.

### Pensions (GenOn)

GenOn offers pension benefits through defined benefit pension plans. In addition, GenOn provides postretirement health and welfare benefits for certain groups of employees. GenOn accounts for pension and other postretirement benefits in accordance with ASC 715, *Compensation — Retirement Benefits.* GenOn recognizes the funded status of its defined benefit plans in the statement of financial position and records an offset for gains and losses as well as all prior service costs that have not been included as part of GenOn's net periodic benefit cost to other comprehensive income. The determination of GenOn's obligation and expenses for pension benefits is dependent on the selection of certain assumptions. These assumptions determined by management include the discount rate, the expected rate of return on plan assets and the rate of future compensation increases. GenOn's actuarial consultants determine assumptions for such items as retirement age. The assumptions used may differ materially from actual results, which may result in a significant impact to the amount of pension obligation or expense recorded by GenOn.

GenOn measures the fair value of its pension assets in accordance with ASC 820, *Fair Value Measurements and Disclosures,* or ASC 820.

### Business Combinations

The Registrants account for the business combinations in accordance with ASC 805, *Business Combinations,* or ASC 805. ASC 805 requires an acquirer to recognize and measure in its financial statements the identifiable assets acquired, the liabilities assumed, and any noncontrolling interest in the acquiree at fair value at the acquisition date. It also recognizes and measures the goodwill acquired or a gain from a bargain purchase in the business combination and determines what information to disclose to enable users of an entity's financial statements to evaluate the nature and financial effects of the business combination. In addition, transaction costs are expensed as incurred.

72

### Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements, disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from these estimates.

In recording transactions and balances resulting from business operations, the Registrants use estimates based on the best information available. Estimates are used for such items as plant depreciable lives, tax provisions, actuarially determined benefit costs, the valuation of energy commodity contracts, environmental liabilities, legal costs incurred in connection with recorded loss contingencies, and assets acquired and liabilities assumed in business combinations, among others. In addition, estimates are used to test long-lived assets for impairment and to determine the fair value of impaired assets. As better information becomes available or actual amounts are determinable, the recorded estimates are revised. Consequently, operating results can be affected by revisions to prior accounting estimates.

### Reclassifications

Certain prior-year amounts have been reclassified for comparative purposes. The reclassifications did not affect results from operations. The Registrants reclassified certain balances from cash and cash equivalents to funds deposited by counterparties, which impacted cash flows from operations in the prior years.

### Recent Accounting Developments

*ASU 2011-11* — Effective January 1, 2013, the Registrants adopted the provisions of ASU No. 2011-11, *Balance Sheet (Topic 210) Disclosures about Offsetting Assets and Liabilities*, or ASU No. 2011-11, and began providing enhanced disclosures regarding the effect or potential effect of netting arrangements on an entity's financial position by improving information about financial instruments and derivative instruments that either (1) offset in accordance with either ASC 210-20-45 or ASC 810-20-45 or (2) are subject to an enforceable master netting arrangement or similar agreement, irrespective of whether they are offset. Reporting entities are required to disclose both gross and net information about both instruments and transactions eligible for offset in the statement of financial position and instruments and transactions subject to an agreement similar to a master netting arrangement. The disclosures required by ASU No. 2011-10 are required to be adopted retroactively. As this guidance provides only disclosure requirements, the adoption of this standard did not impact the Registrants' results of operations, cash flows or financial position.

*ASU 2013-02 (GenOn)* - Effective January 1, 2013, the Company adopted the provisions of ASU No. 2013-02, *Other Comprehensive Income (Topic 220) Reporting of Amounts Reclassified Out of Accumulated Other Comprehensive Income*, or ASU No. 2013-02, and began reporting the effect of significant reclassifications out of accumulated other comprehensive income on the respective line items in net income within the notes to the financial statements if the amount being reclassified is required under U.S. GAAP to be reclassified in its entirety to net income in the same reporting period. For other amounts not required by U.S. GAAP to be reclassified in their entirety to net income in the same reporting period, an entity is required to cross-reference other disclosures which provide additional information about the amounts. The provisions of ASU No. 2013-02 are required to be adopted prospectively. As this guidance provides only presentation requirements, the adoption of this standard did not impact GenOn's results of operations, cash flows or financial position.

*Other* - The following accounting standard was issued in 2013 and was adopted January 1, 2014:

•   *ASU 2013-11* - In July 2013, the FASB issued ASU No. 2013-11, *Income Taxes (Topic 740) Presentation of an Unrecognized Tax Benefit When a Net Operating Loss Carryforward, a Similar Tax Loss, or a Tax Credit Carryforward Exists*, or ASU No. 2013-11. The amendments of ASU 2013-11 requires an entity to present an unrecognized tax benefit, or a portion of an unrecognized tax benefit, as a reduction of a deferred tax asset for a net operating loss, or NOL, a similar tax loss or tax credit carryforwards rather than a liability when the uncertain tax position would reduce the NOL or other carryforward under the tax law of the applicable jurisdiction and the entity intends to use the deferred tax asset for that purpose.  The guidance is effective for fiscal years, and interim periods within those years, beginning after December 15, 2013 with early adoption permitted. The adoption of this standard will not impact the Company's results of operations or cash flows.

**Note 3 — NRG Merger and Dispositions (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*Kendall Disposition (GenOn and GenOn Americas Generation)*

On January, 31, 2014, NRG North America LLC, a wholly owned subsidiary of GenOn Americas Generations, completed the sale of NRG Kendall LLC to Veolia Energy North America Holdings, Inc. for cash consideration of $50 million. There was no significant gain or loss recorded in results of operations of GenOn or GenOn Americas Generation during the first quarter of 2014 as the carrying value of the net assets of NRG Kendall LLC approximated fair value upon disposition.

*NRG Merger (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)*

On December 14, 2012, NRG completed the acquisition of GenOn.  Consideration for the acquisition was valued at $2.2 billion and was comprised of 0.1216 shares of NRG common stock for each outstanding share of GenOn, including restricted stock units outstanding on the acquisition date, except for fractional shares which were paid in cash.

The acquisition was recorded as a business combination, with identifiable assets acquired and liabilities assumed provisionally recorded at their estimated fair values on the acquisition date. The accounting for the business combination has been completed as of December 13, 2013. See Note 3, *NRG Merger*, in the Registrants' 2012 Form 10-K for additional information related to the NRG Merger.

The following tables summarize the historical carrying amounts, the acquisition accounting adjustments, the preliminary acquisition-date fair value and the measurement period adjustments through December 13, 2013 to the provisional allocation for assets acquired and liabilities assumed initially recorded in 2012 due to the ongoing evaluation of initial estimates during the measurement period.

*GenOn*

| | Historical carrying amount | | Acquisition accounting adjustment | | Acquisition-date fair value as reported in 2012 10-K | | Measurement period adjustments | | Revised acquisition-date fair value | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (In millions) | | | | | |
| **Assets** | | | | | | | | | | |
| Cash | $ | 983 | $ | — | $ | 983 | $ | — | $ | 983 |
| Other current and non-current assets | | 2,049 | | (664) | | 1,385 | | 28 | | 1,413 |
| Property, plant and equipment | | 6,286 | | (2,350) | | 3,936 | | (115) | | 3,821 |
| Derivative assets | | 1,143 | | 14 | | 1,157 | | — | | 1,157 |
| Deferred income taxes | | 220 | | — | | 220 | | — | | 220 |
| Total assets | $ | 10,681 | $ | (3,000) | $ | 7,681 | $ | (87) | $ | 7,594 |
| **Liabilities** | | | | | | | | | | |
| Other current and non-current liabilities | $ | 1,299 | $ | 13 | $ | 1,312 | $ | 54 | $ | 1,366 |
| Out-of-market contracts and leases | | 331 | | 733 | | 1,064 | | 62 | | 1,126 |
| Derivative liabilities | | 414 | | (15) | | 399 | | — | | 399 |
| Deferred income taxes | | 220 | | — | | 220 | | — | | 220 |
| Long-term debt and capital leases | | 3,725 | | 478 | | 4,203 | | 3 | | 4,206 |
| Total liabilities | $ | 5,989 | $ | 1,209 | $ | 7,198 | $ | 119 | $ | 7,317 |
| Net assets | $ | 4,692 | $ | (4,209) | $ | 483 | $ | (206) | $ | 277 |

74

*GenOn Americas Generation*

| | Historical carrying amount | | Acquisition accounting adjustment | | Acquisition-date fair value as reported in 2012 10-K | | Measurement period adjustments | | Revised acquisition-date fair value | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (In millions) | | | | | |
| **Assets** | | | | | | | | | | |
| Cash | $ | 171 | $ | — | $ | 171 | $ | — | $ | 171 |
| Other current and non-current assets | | 1,509 | | (531) | | 978 | | 31 | | 1,009 |
| Property, plant and equipment | | 2,875 | | (1,546) | | 1,329 | | (106) | | 1,223 |
| Derivative assets | | 1,226 | | 12 | | 1,238 | | — | | 1,238 |
| Total assets | $ | 5,781 | $ | (2,065) | $ | 3,716 | $ | (75) | $ | 3,641 |
| **Liabilities** | | | | | | | | | | |
| Other current and non-current liabilities | $ | 705 | $ | (34) | $ | 671 | $ | 32 | $ | 703 |
| Out-of-market contracts and leases | | — | | 540 | | 540 | | 64 | | 604 |
| Derivative liabilities | | 539 | | (10) | | 529 | | — | | 529 |
| Long-term debt and capital leases | | 862 | | 99 | | 961 | | — | | 961 |
| Total liabilities | $ | 2,106 | $ | 595 | $ | 2,701 | $ | 96 | $ | 2,797 |
| Net assets | $ | 3,675 | $ | (2,660) | $ | 1,015 | $ | (171) | $ | 844 |

*GenOn Mid-Atlantic*

| | Historical carrying amount | | Acquisition accounting adjustment | | Acquisition-date fair value as reported in 2012 10-K | | Measurement period adjustments | | Revised acquisition-date fair value | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (In millions) | | | | | |
| **Assets** | | | | | | | | | | |
| Cash | $ | 163 | $ | — | $ | 163 | $ | — | $ | 163 |
| Other current and non-current assets | | 700 | | (502) | | 198 | | (1) | | 197 |
| Property, plant and equipment | | 2,399 | | (1,178) | | 1,221 | | (199) | | 1,022 |
| Derivative assets | | 851 | | 12 | | 863 | | — | | 863 |
| Total assets | $ | 4,113 | $ | (1,668) | $ | 2,445 | $ | (200) | $ | 2,245 |
| **Liabilities** | | | | | | | | | | |
| Other current and non-current liabilities | $ | 198 | $ | 6 | $ | 204 | $ | 27 | $ | 231 |
| Out-of-market contracts and leases | | — | | 540 | | 540 | | 64 | | 604 |
| Derivative liabilities | | 172 | | (10) | | 162 | | — | | 162 |
| Long-term debt and capital leases | | 14 | | — | | 14 | | — | | 14 |
| Total liabilities | $ | 384 | $ | 536 | $ | 920 | $ | 91 | $ | 1,011 |
| Net assets | $ | 3,729 | $ | (2,204) | $ | 1,525 | $ | (291) | $ | 1,234 |

The estimated fair values of the property, plant and equipment were significantly lower than the book value, which reflects changes to expected market dynamics, including commodity prices, resulting in lower estimated cash flows and in some cases, shorter useful lives of the underlying assets. The measurement period adjustments for property, plant and equipment and out-of-market liabilities primarily reflect revisions of various estimates based on additional information available. In addition, measurement period adjustments were recorded for additional environmental reserves resulting from further review and revisions to various estimates. The difference between the historical tax basis of the assets and liabilities over the net amount assigned to the assets and liabilities in acquisition accounting was recorded as a net deferred tax asset. Based on cumulative pre-tax losses, a valuation allowance for the full amount of the net deferred tax assets was also recorded.

**Note 4 — Fair Value of Financial Instruments (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

For cash and cash equivalents, funds deposited by counterparties, accounts receivable, accounts payable, accrued liabilities, restricted cash, and cash collateral paid and received in support of energy risk management activities, the carrying amount approximates fair value because of the short-term maturity of those instruments and are classified as Level 1 within the fair value hierarchy.

The estimated carrying values and fair values of GenOn and GenOn Americas Generation's debt are as follows:

*GenOn*

| | As of December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2013 | | 2012 | |
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| | (In millions) | | | |
| **Liabilities** | | | | |
| Long and short-term debt | $ 3,120 | $ 3,058 | $ 4,185 | $ 4,209 |

The fair value of long and short-term debt that is estimated using reported market prices for instruments that are publicly traded is classified as Level 2 within the fair value hierarchy. The fair value of non-publicly traded debt is based on the income approach valuation technique using current interest rates for similar instruments with equivalent credit quality and is classified as Level 3 within the fair value hierarchy.

*GenOn Americas Generation*

| | As of December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2013 | | 2012 | |
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| | (In millions) | | | |
| **Liabilities** | | | | |
| Long and short-term debt | $ 938 | $ 883 | $ 946 | $ 967 |

The fair value of long and short-term debt is estimated using reported market prices for instruments that are publicly traded and is classified as Level 2 within the fair value hierarchy.

### Fair Value Accounting under ASC 820

ASC 820 establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value into three levels as follows:

- Level 1 — quoted prices (unadjusted) in active markets for identical assets or liabilities that the Registrants have the ability to access as of the measurement date. The Registrants' financial assets and liabilities utilizing Level 1 inputs include active exchange-traded securities, energy derivatives and interest-bearing funds.

- Level 2 — inputs other than quoted prices included within Level 1 that are directly observable for the asset or liability or indirectly observable through corroboration with observable market data. The Registrants' financial assets and liabilities utilizing Level 2 inputs include exchange-based derivatives, and over the counter derivatives such as swaps, options and forward contracts.

- Level 3 — unobservable inputs for the asset or liability only used when there is little, if any, market activity for the asset or liability at the measurement date. The Registrants' financial assets and liabilities utilizing Level 3 inputs include infrequently-traded and non-exchange-based derivatives which are measured using present value pricing models.

In accordance with ASC 820, the Registrants determine the level in the fair value hierarchy within which each fair value measurement in its entirety falls, based on the lowest level input that is significant to the fair value measurement in its entirety.

76

*Recurring Fair Value Measurements*

Derivative assets and liabilities are carried at fair market value.

*GenOn*

The following tables present assets and liabilities measured and recorded at fair value on GenOn's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

| | As of December 31, 2013 | | | |
| | Fair Value | | | |
| | Level 1 [a] | Level 2 [a] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 141 | $ 507 | $ 3 | $ 651 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 25 | $ 149 | $ 7 | $ 181 |
| Other assets [b] | $ 37 | $ — | $ — | $ 37 |

(a) There were no transfers during the year ended December 31, 2013 between Levels 1 and 2.

(b) Relates to mutual funds held in a rabbi trust for non-qualified deferred compensation plans for some key and highly compensated employees.

| | As of December 31, 2012 | | | |
| | Fair Value | | | |
| | Level 1 [a] | Level 2 [a] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 139 | $ 946 | $ 31 | $ 1,116 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 52 | $ 253 | $ 14 | $ 319 |
| Interest rate contracts | — | 50 | — | 50 |
| Total liabilities | $ 52 | $ 303 | $ 14 | $ 369 |
| Other assets [b] | $ 21 | $ — | $ — | $ 21 |

(a) There were no transfers during the year ended December 31, 2012 between Levels 1 and 2.

(b) Relates to mutual funds held in a rabbi trust for non-qualified deferred compensation plans for some key and highly compensated employees.

The following tables reconcile the beginning and ending balances for derivatives that are recognized at fair value in GenOn's consolidated financial statements at least annually using significant unobservable inputs for the year ended December 31, 2013 and for the periods from December 15, 2012 through December 31, 2012 and from January 1, 2012 through December 14, 2012:

| | Successor | | Predecessor |
|---|---|---|---|
| | For the year ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) | | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) |
| | Derivatives [a] | | Derivatives [a] |
| | (In millions) | | (In millions) |
| Balance as of beginning of period [b] | $ 17 | $ 18 | $ (31) |
| Total gains and losses (realized/unrealized) included in earnings [c] | (17) | (3) | (37) |
| Purchases | (3) | 2 | — |
| Transfers out of Level 3 [d] | (1) | — | — |
| Balance as of end of period | $ (4) | $ 17 | $ (68) |
| The amount of the total gains/(losses) for the period included in earnings attributable to the change in unrealized derivatives relating to assets still held at end of period | $ — | $ 4 | $ (80) |

(a)   Consists of derivatives assets and liabilities, net.

(b)   The change in Level 3 balance is primarily driven by the change in accounting policy at the NRG Merger date to include all curves with broker-quoted coal contracts within the Level 2 designation.

(c)   Contracts entered into are reported with total gains and losses included in earnings in the predecessor periods.

(d)   Transfers out of Level 3 are related to the availability of external broker quotes and are valued as of the end of the reporting period.

*GenOn Americas Generation*

The following tables present assets and liabilities (including amounts with affiliates) measured and recorded at fair value on GenOn Americas Generation's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

| | As of December 31, 2013 | | | |
|---|---|---|---|---|
| | Fair Value | | | |
| | Level 1 [a] | Level 2 [a] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 153 | $ 575 | $ 7 | $ 735 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 74 | $ 226 | $ 8 | $ 308 |

(a)   There were no transfers during the year ended December 31, 2013 between Levels 1 and 2.

| | As of December 31, 2012 | | | |
|---|---|---|---|---|
| | Fair Value | | | |
| | Level 1 [a] | Level 2 [a] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 170 | $ 991 | $ 31 | $ 1,192 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 123 | $ 358 | $ 14 | $ 495 |

(a)   There were no transfers during the year ended December 31, 2012 between Levels 1 and 2.

78

The following tables reconcile the beginning and ending balances for GenOn Americas Generation's derivatives that are recognized at fair value in the consolidated financial statements at least annually using significant unobservable inputs for the year ended December 31, 2013 and for the periods from December 15, 2012 through December 31, 2012 and from January 1, 2012 through December 14, 2012:

| | Successor | | Predecessor |
|---|---|---|---|
| | **For the year ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** |
| | **Fair Value Measurement Using Significant Unobservable Inputs (Level 3)** | | **Fair Value Measurement Using Significant Unobservable Inputs (Level 3)** |
| | **Derivatives** [a] | | **Derivatives** [a] |
| | **(In millions)** | | **(In millions)** |
| Balance as of beginning of period [b] | $ 17 | $ 18 | $ (32) |
| Total gains and losses (realized/unrealized) included in earnings [c] | (17) | (3) | (33) |
| Purchases | — | 2 | — |
| Transfers out of Level 3 [d] | (1) | — | — |
| Balance as of end of period | $ (1) | $ 17 | $ (65) |
| The amount of the total gains/(losses) for the period included in earnings attributable to the change in unrealized derivatives relating to assets still held at end of period | $ — | $ 4 | $ (70) |

(a)   Consists of derivatives assets and liabilities, net.

(b)   The change in Level 3 balance is primarily driven by the change in accounting policy at the NRG Merger date to include all curves with broker-quoted coal contracts within the Level 2 designation.

(c)   Contracts entered into are reported with total gains and losses included in earnings in the predecessor periods.

(d) Transfers out of Level 3 are related to the availability of external broker quotes and are valued as of the end of the reporting period.

*GenOn Mid-Atlantic*

The following tables present assets and liabilities (including amounts with affiliates) measured and recorded at fair value on GenOn Mid-Atlantic's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

| | As of December 31, 2013 | | | |
|---|---|---|---|---|
| | Fair Value | | | |
| | **Level 1** [a] | **Level 2** [a] | **Level 3** | **Total** |
| | **(In millions)** | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 87 | $ 420 | $ — | $ 507 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 13 | $ 60 | $ — | $ 73 |

(a)   There were no transfers during the year ended December 31, 2013 between Levels 1 and 2.

| | As of December 31, 2012 | | | |
|---|---|---|---|---|
| | Fair Value | | | |
| | **Level 1** [a] | **Level 2** [a] | **Level 3** | **Total** |
| | **(In millions)** | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 63 | $ 778 | $ 8 | $ 849 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 16 | $ 138 | $ 1 | $ 155 |

(a)   There were no transfers during the year ended December 31, 2012 between Levels 1 and 2.

The following tables reconcile the beginning and ending balances for GenOn Mid-Atlantic's derivatives that are recognized at fair value in the consolidated financial statements at least annually using significant unobservable inputs for the year ended December 31, 2013 and for the periods from December 15, 2012 through December 31, 2012 and from January 1, 2012 through December 14, 2012:

| | Successor | | Predecessor |
|---|---|---|---|
| | **For the year ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** |
| | **Fair Value Measurement Using Significant Unobservable Inputs (Level 3)** | | **Fair Value Measurement Using Significant Unobservable Inputs (Level 3)** |
| | **Derivatives [a]** | | **Derivatives [a]** |
| | **(In millions)** | | **(In millions)** |
| Balance as of beginning of period [b] | $ 7 | $ 8 | $ (64) |
| Total gains and losses (realized/unrealized) included in earnings [c] | (7) | (1) | 3 |
| Balance as of end of period | $ — | $ 7 | $ (61) |
| The amount of the total gains/(losses) for the period included in earnings attributable to the change in unrealized derivatives relating to assets still held at end of period | $ — | $ 1 | $ (36) |

(a)   Consists of derivatives assets and liabilities, net.

(b)   The change in Level 3 balance is primarily driven by the change in accounting policy at the NRG Merger date to include all curves with broker-quoted coal contracts within the Level 2 designation.

(c)   Contracts entered into are reported with total gains and losses included in earnings in the predecessor periods.

Realized and unrealized gains and losses included in earnings that are related to energy derivatives are recorded in operating revenues and cost of operations.

### Derivative Fair Value Measurements

A portion of the Registrants' contracts are exchange-traded contracts with readily available quoted market prices. A majority of the Registrants' contracts are non-exchange-traded contracts valued using prices provided by external sources, primarily price quotations available through brokers or over-the-counter and on-line exchanges. For the majority of the Registrants' markets, quotes are from multiple sources. To the extent that the Registrants receive multiple quotes, prices reflect the average of the bid-ask mid-point prices obtained from all sources that the Registrants believe provide the most liquid market for the commodity. If the Registrants receive one quote, then the mid-point of the bid-ask spread for that quote is used. The terms for which such price information is available vary by commodity, region and product. A significant portion of the fair value of the Registrants' derivative portfolio is based on price quotes from brokers in active markets who regularly facilitate those transactions and the Registrants believe such price quotes are executable. The Registrants do not use third party sources that derive price based on proprietary models or market surveys. The remainder of the assets and liabilities represents contracts for which external sources or observable market quotes are not available. These contracts are valued based on various valuation techniques including but not limited to internal models based on a fundamental analysis of the market and extrapolation of observable market data with similar characteristics. Contracts valued with prices provided by models and other valuation techniques make up 0% of GenOn's derivative assets and 4% of GenOn's derivative liabilities, 1% of GenOn Americas Generation's derivative assets and 3% of GenOn Americas Generation's derivative liabilities and 0% of GenOn Mid-Atlantic's derivative assets and 0% of GenOn Mid-Atlantic's derivative liabilities.

The fair value of each contract is discounted using a risk free interest rate. In addition, the Registrants apply a credit reserve to reflect credit risk which is calculated based on published default probabilities. To the extent that the Registrants' net exposure under a specific master agreement is an asset, the Registrants use the counterparty's default swap rate. If the exposure under a specific master agreement is a liability, the Registrants use their default swap rate. The credit reserve is added to the discounted fair value to reflect the exit price that a market participant would be willing to receive to assume the Registrants' liabilities or that a market participant would be willing to pay for the Registrants' assets. The Registrants' credit reserves were as follows:

| | As of December 31, | | | |
|---|---|---|---|---|
| | **2013** | | **2012** | |
| | (In millions) | | (In millions) | |
| GenOn | $ | 1 | $ | 4 |
| GenOn Americas Generation | | 1 | | 4 |
| GenOn Mid-Atlantic | | 3 | | 4 |

The fair values in each category reflect the level of forward prices and volatility factors as of December 31, 2013, and may change as a result of changes in these factors. Management uses its best estimates to determine the fair value of commodity and derivative contracts the Registrants hold and sell. These estimates consider various factors including closing exchange and over-the-counter price quotations, time value, volatility factors and credit exposure. It is possible however, that future market prices could vary from those used in recording assets and liabilities from energy marketing and trading activities and such variations could be material.

Under the guidance of ASC 815, entities may choose to offset cash collateral paid or received against the fair value of derivative positions executed with the same counterparties under the same master netting agreements. The Registrants have chosen not to offset positions as defined in ASC 815. As of December 31, 2013, GenOn recorded $62 million of cash collateral paid and $56 million of cash collateral received on its balance sheet. As of December 31, 2013, GenOn Americas Generation recorded $50 million of cash collateral paid and $56 million of cash collateral received on its balance sheet. As of December 31, 2013, GenOn Mid-Atlantic had no outstanding cash collateral paid or received on its balance sheet.

### Concentration of Credit Risk

In addition to the credit risk discussion as disclosed in Note 2, *Summary of Significant Accounting Policies*, the following item is a discussion of the concentration of credit risk for the Registrants' financial instruments. Credit risk relates to the risk of loss resulting from non-performance or non-payment by counterparties pursuant to the terms of their contractual obligations. The Registrants monitor and manage credit risk through credit policies that include: (i) an established credit approval process; (ii) a daily monitoring of counterparties' credit limits; (iii) the use of credit mitigation measures such as margin, collateral, prepayment arrangements, or volumetric limits (iv) the use of payment netting agreements; and (v) the use of master netting agreements that allow for the netting of positive and negative exposures of various contracts associated with a single counterparty. Risks surrounding counterparty performance and credit could ultimately impact the amount and timing of expected cash flows. The Registrants seek to mitigate counterparty risk by having a diversified portfolio of counterparties. The Registrants also have credit protection within various agreements to call on additional collateral support if and when necessary. Cash margin is collected and held at the Registrants to cover the credit risk of the counterparty until positions settle.

As of December 31, 2013, counterparty credit exposure to a significant portion of GenOn's counterparties was $538 million and GenOn held no collateral (cash or letters of credit) against those positions, resulting in a net exposure of $538 million. Approximately 99% of GenOn's exposure before collateral is expected to roll off by the end of 2015. GenOn Americas Generation's counterparty credit exposure to a significant portion of counterparties was $527 million and GenOn Americas Generation held no collateral (cash or letters of credit) against those positions, resulting in a net exposure of $527 million. Approximately 100% of GenOn Americas Generation's exposure before collateral is expected to roll off by the end of 2015. GenOn Mid-Atlantic's counterparty credit exposure to a significant portion of counterparties was $361 million and GenOn Mid-Atlantic held no collateral (cash or letters of credit) against those positions, resulting in a net exposure of $361 million. Approximately 100% of GenOn Mid-Atlantic's exposure before collateral is expected to roll off by the end of 2015.

The following tables highlight the counterparty credit quality and the net counterparty credit exposure by industry sector. Net counterparty credit exposure is defined as the aggregate net asset position for the Registrants with counterparties where netting is permitted under the enabling agreement and includes all cash flow, mark-to-market and NPNS, and non-derivative transactions. As of December 31, 2013, the exposure is shown net of collateral held and includes amounts net of receivables or payables.

*GenOn*

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Financial institutions | 68% |
| Utilities, energy merchants, marketers and other | 12% |
| ISOs | 20% |
| Total | 100% |

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Investment grade | 98% |
| Non-rated | 2% |
| Total | 100% |

(a)   Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

GenOn has counterparty credit risk exposure to certain counterparties representing more than 10% of total net exposure discussed above and the aggregate of such counterparties was $326 million. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, GenOn does not anticipate a material impact on its financial position or results of operations from nonperformance by any of its counterparties.

*GenOn Americas Generation*

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Financial institutions | 69% |
| Utilities, energy merchants, marketers and other | 11% |
| ISOs | 20% |
| Total | 100% |

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Investment grade | 98% |
| Non-rated | 2% |
| Total | 100% |

(a)   Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

GenOn Americas Generation has counterparty credit risk exposure to certain counterparties representing more than 10% of total net exposure discussed above and the aggregate of such counterparties was $377 million. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, GenOn Americas Generation does not anticipate a material impact on its financial position or results of operations from nonperformance by any of its counterparties.

*GenOn Mid-Atlantic*

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Financial institutions | 100% |

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Investment grade | 100% |

(a)   Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

GenOn Mid-Atlantic has counterparty credit risk exposure to certain counterparties representing more than 10% of total net exposure discussed above and the aggregate of such counterparties was $335 million. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, GenOn Mid-Atlantic does not anticipate a material impact on its financial position or results of operations from nonperformance by any of its counterparties.

**Note 5 — Accounting for Derivative Instruments and Hedging Activities (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

ASC 815 requires the Registrants to recognize all derivative instruments on the balance sheet as either assets or liabilities and to measure them at fair value each reporting period unless they qualify for a NPNS exception. The Registrants may elect to designate certain derivatives as cash flow hedges, if certain conditions are met, and defer the effective portion of the change in fair value of the derivatives to accumulated OCI, until the hedged transactions occur and are recognized in earnings. The ineffective portion of a cash flow hedge is immediately recognized in earnings.

For derivatives that are not designated as cash flow hedges, the changes in the fair value will be immediately recognized in earnings. Certain derivative instruments may qualify for the NPNS exception and are therefore exempt from fair value accounting treatment. ASC 815 applies to the Registrants' energy related commodity contracts and interest rate swaps.

*Energy-Related Commodities*

To manage the commodity price risk associated with the Registrants' competitive supply activities and the price risk associated with wholesale power sales from the Registrants' electric generation facilities, the Registrants enter into a variety of derivative and non-derivative hedging instruments, utilizing the following:

- Forward contracts, which commit the Registrants to purchase or sell energy commodities or purchase fuels in the future.
- Futures contracts, which are exchange-traded standardized commitments to purchase or sell a commodity or financial instrument.
- Swap agreements, which require payments to or from counterparties based upon the differential between two prices for a predetermined contractual, or notional, quantity.
- Financial and non-financial option contracts, which convey to the option holder the right but not the obligation to purchase or sell a commodity.

The objectives for entering into derivative contracts used for economic hedging include:

- Fixing the price for a portion of anticipated future electricity sales that provides an acceptable return on the Registrants' electric generation operations.
- Fixing the price of a portion of anticipated fuel purchases for the operation of the Registrants' power plants.

GenOn, GenOn Americas Generation and GenOn Mid-Atlantic's trading and hedging activities are subject to limits within the risk management policy. These contracts are recognized on the balance sheet at fair value and changes in the fair value of these derivative financial instruments are recognized in earnings.

*GenOn*

As of December 31, 2013, GenOn's derivative assets and liabilities consisted primarily of the following:

- Forward and financial contracts for the purchase/sale of electricity and related products economically hedging GenOn's generation assets' forecasted output through 2017.
- Forward and financial contracts for the purchase of fuel commodities relating to the forecasted usage of GenOn's generation assets through 2015.

Also, as of December 31, 2013, GenOn had other energy-related contracts that did not meet the definition of a derivative instrument as follows:

- Load-following electric sale contracts extending through 2014;
- Power tolling contracts through 2014;
- Coal purchase contracts through 2020;
- Natural gas transportation contracts and storage agreements through 2023; and
- Coal transportation contracts through 2014.

*GenOn Americas Generation*

As of December 31, 2013, GenOn Americas Generation's derivative assets and liabilities consisted primarily of the following:

- Forward and financial contracts for the purchase/sale of electricity and related products economically hedging GenOn Americas Generation's generation assets' forecasted output through 2017.
- Forward and financial contracts for the purchase of fuel commodities relating to the forecasted usage of GenOn Americas Generation's generation assets through 2015.

Also, as of December 31, 2013, GenOn Americas Generation had other energy-related contracts that did not meet the definition of a derivative instrument as follows:

- Load-following electric sale contracts extending through 2014;
- Power tolling contracts through 2014;
- Natural gas transportation contracts and storage agreements through 2023; and
- Coal transportation contracts through 2014.

*GenOn Mid-Atlantic*

As of December 31, 2013, GenOn Mid-Atlantic's derivative assets and liabilities consisted primarily of the following:

- Forward and financial contracts for the purchase/sale of electricity and related products economically hedging GenOn Mid-Atlantic's generation assets' forecasted output through 2017.
- Forward and financial contracts for the purchase of fuel commodities relating to the forecasted usage of GenOn Mid-Atlantic's generation assets through 2015.

Also, as of December 31, 2013, GenOn Mid-Atlantic had other energy-related contracts that did not meet the definition of a derivative instrument as follows:

- Load-following electric sale contracts extending through 2014;
- Natural gas transportation contracts and storage agreements through 2023; and
- Coal transportation contracts through 2014.

### *Interest Rate Swaps (GenOn)*

In 2010, NRG Marsh Landing entered into interest rate protection agreements (interest rate swaps) in connection with its project financing, which have been designated as cash flow hedges. NRG Marsh Landing entered into the interest rate swaps to reduce the risks with respect to the variability of the interest rates for the term loans. On July 22, 2013, concurrent with the initial public offering of NRG Yield, Inc., GenOn sold its ownership interests in NRG Marsh Landing Holdings LLC to NRG Yield LLC, which included the assignment of the related interest rate swap liability.

### *Volumetric Underlying Derivative Transactions*

The following table summarizes the net notional volume buy/(sell) of the Registrants' open derivative transactions broken out by commodity, excluding those derivatives that qualified for the NPNS exception as of December 31, 2013, and December 31, 2012. Option contracts are reflected using delta volume. Delta volume equals the notional volume of an option adjusted for the probability that the option will be in-the-money at its expiration date.

| | | GenOn | | GenOn Americas Generation | | GenOn Mid-Atlantic | |
|---|---|---|---|---|---|---|---|
| | | Total Volume | | Total Volume | | Total Volume | |
| | | As of December 31, | | As of December 31, | | As of December 31, | |
| Commodity | Units | 2013 | 2012 | 2013 | 2012 | 2013 | 2012 |
| | | (In millions) | (In millions) | (In millions) | (In millions) | (In millions) | (In millions) |
| Coal | Short Ton | 6 | 5 | 4 | 4 | 4 | 4 |
| Natural Gas | MMBtu | (111) | (194) | (113) | (150) | (119) | (150) |
| Power | MWh | (26) | (43) | (14) | (22) | (14) | (22) |
| Interest | Dollars | $ — | $ 475 | $ — | $ — | $ — | $ — |

*Fair Value of Derivative Instruments*

The following tables summarize the fair value within the derivative instrument valuation on the balance sheet:

*GenOn*

| | Fair Value | | | |
|---|---|---|---|---|
| | Derivative Assets | | Derivative Liabilities | |
| | December 31, 2013 | December 31, 2012 | December 31, 2013 | December 31, 2012 |
| | (In millions) | | (In millions) | |
| **Derivatives Designated as Cash Flow Hedges**: | | | | |
| Interest rate contracts current | $ — | $ — | $ — | $ 9 |
| Interest rate contracts long-term | — | — | — | 41 |
| **Total Derivatives Designated as Cash Flow Hedges** | — | — | — | 50 |
| **Derivatives Not Designated as Cash Flow Hedges:** | | | | |
| Commodity contracts current | 469 | 604 | 163 | 236 |
| Commodity contracts long-term | 182 | 512 | 18 | 83 |
| **Total Derivatives Not Designated as Cash Flow Hedges** | 651 | 1,116 | 181 | 319 |
| **Total Derivatives** | $ 651 | $ 1,116 | $ 181 | $ 369 |

*GenOn Americas Generation*

| | Fair Value | | | |
|---|---|---|---|---|
| | Derivative Assets | | Derivative Liabilities | |
| | December 31, 2013 | December 31, 2012 | December 31, 2013 | December 31, 2012 |
| | (In millions) | | (In millions) | |
| **Derivatives Not Designated as Cash Flow Hedges**: | | | | |
| Commodity contracts current | $ 546 | $ 656 | $ 267 | $ 362 |
| Commodity contracts long-term | 189 | 536 | 41 | 133 |
| **Total Derivatives Not Designated as Cash Flow Hedges** | $ 735 | $ 1,192 | $ 308 | $ 495 |

*GenOn Mid-Atlantic*

| | Fair Value | | | |
|---|---|---|---|---|
| | Derivative Assets | | Derivative Liabilities | |
| | December 31, 2013 | December 31, 2012 | December 31, 2013 | December 31, 2012 |
| | (In millions) | | (In millions) | |
| **Derivatives Not Designated as Cash Flow Hedges**: | | | | |
| Commodity contracts current | $ 351 | $ 394 | $ 64 | $ 100 |
| Commodity contracts long-term | 156 | 455 | 9 | 55 |
| **Total Derivatives Not Designated as Cash Flow Hedges** | $ 507 | $ 849 | $ 73 | $ 155 |

The Registrants have elected to present derivative assets and liabilities on the balance sheet on a trade-by-trade basis and do no offset amounts at the counterparty master agreement level. In addition, collateral received or paid on the Registrants' derivative assets or liabilities are recorded on a separate line item on the balance sheet. The following tables summarize the offsetting of derivatives by counterparty master agreement level and collateral received or paid:

*GenOn*

| | Gross Amounts of Recognized Assets/Liabilities | Gross Amounts Not Offset in the Statement of Financial Position | | Net Amount |
|---|---|---|---|---|
| | | Derivative Instruments | Cash Collateral (Held)/Posted | |
| **December 31, 2013** | | (in millions) | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $      645 | $      (154) | $      (56) | $      435 |
| Derivative assets- affiliate | 6 | (3) | — | 3 |
| Derivative liabilities | (178) | 154 | — | (24) |
| Derivative liabilities- affiliate | (3) | 3 | — | — |
| **Total derivative instruments** | $      470 | $      — | $      (56) | $      414 |

*GenOn Americas Generation*

| | Gross Amounts of Recognized Assets/Liabilities | Gross Amounts Not Offset in the Statement of Financial Position | | Net Amount |
|---|---|---|---|---|
| | | Derivative Instruments | Cash Collateral (Held)/Posted | |
| **December 31, 2013** | | (in millions) | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $      643 | $      (154) | $      (56) | $      433 |
| Derivative assets- affiliate | 92 | (92) | — | — |
| Derivative liabilities | (178) | 154 | — | (24) |
| Derivative liabilities- affiliate | (130) | 92 | — | (38) |
| **Total derivative instruments** | $      427 | $      — | $      (56) | $      371 |

*GenOn Mid-Atlantic*

| | Gross Amounts of Recognized Assets/Liabilities | Gross Amounts Not Offset in the Statement of Financial Position | | Net Amount |
|---|---|---|---|---|
| | | Derivative Instruments | Cash Collateral (Held)/Posted | |
| **December 31, 2013** | | (in millions) | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $      358 | $      — | $      — | $      358 |
| Derivative assets- affiliate | 149 | (73) | — | 76 |
| Derivative liabilities | — | — | — | — |
| Derivative liabilities- affiliate | (73) | 73 | — | — |
| **Total derivative instruments** | $      434 | $      — | $      — | $      434 |

*GenOn*

| | Gross Amounts of Recognized Assets/Liabilities | Gross Amounts Not Offset in the Statement of Financial Position | | Net Amount |
|---|---|---|---|---|
| | | Derivative Instruments | Cash Collateral (Held)/Posted | |
| **December 31, 2012** | | (in millions) | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $      1,107 | $      (260) | $      (243) | $      604 |
| Derivative assets- affiliate | 9 | (9) | — | — |
| Derivative liabilities | (310) | 260 | 1 | (49) |
| Derivative liabilities- affiliate | (9) | 9 | — | — |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Total commodity contracts** | | 797 | | — | | (242) | 555 |
| **Interest rate contracts:** | | | | | | | |
| Derivative liabilities | | (50) | | — | | — | (50) |
| **Total derivative instruments** | $ | 747 | $ | — | $ | (242) | $ | 505 |

86

.

*GenOn Americas Generation*

|  | | Gross Amounts Not Offset in the Statement of Financial Position | | | | | |
|---|---|---|---|---|---|---|---|
| | | Gross Amounts of Recognized Assets/Liabilities | | Derivative Instruments | | Cash Collateral (Held)/Posted | Net Amount |
| **December 31, 2012** | | | | | (in millions) | | |
| **Commodity Contracts:** | | | | | | | |
| Derivative assets | $ | 1,107 | $ | (260) | $ | (243) | $ 604 |
| Derivative assets- affiliate | | 85 | | (85) | | — | — |
| Derivative liabilities | | (310) | | 260 | | 1 | (49) |
| Derivative liabilities- affiliate | | (185) | | 85 | | — | (100) |
| **Total derivative instruments** | $ | 697 | $ | — | $ | (242) | $ 455 |

*GenOn Mid-Atlantic*

|  | | Gross Amounts Not Offset in the Statement of Financial Position | | | | | |
|---|---|---|---|---|---|---|---|
| | | Gross Amounts of Recognized Assets/Liabilities | | Derivative Instruments | | Cash Collateral (Held)/Posted | Net Amount |
| **December 31, 2012** | | | | | (in millions) | | |
| **Commodity Contracts:** | | | | | | | |
| Derivative assets | $ | 636 | $ | (3) | $ | (57) | $ 576 |
| Derivative assets- affiliate | | 213 | | (152) | | — | 61 |
| Derivative liabilities | | (3) | | 3 | | — | — |
| Derivative liabilities- affiliate | | (152) | | 152 | | — | — |
| **Total derivative instruments** | $ | 694 | $ | — | $ | (57) | $ 637 |

### *Accumulated Other Comprehensive Loss (GenOn)*

The following table summarizes the effects on GenOn's accumulated OCI balance attributable to cash flow hedge derivatives, net of tax of zero dollars:

|  | Successor | | | Predecessor | |
|---|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | | (In millions) | |
| Accumulated OCI balance, beginning of period | $ 1 | $ — | | $ (34) | $ 21 |
| Recognized in OCI on interest rate derivatives | 19 | 1 | | (16) | (55) |
| Reclassified from accumulated OCI into earnings[a][b] | (2) | — | | (2) | — |
| Reversal as part of sale to NRG Yield LLC [d] | (18) | — | | — | — |
| Accumulated OCI balance, end of period | $ — | $ 1 | | $ (52) | $ (34) |
| Valuation adjustments | $ — | $ — | | $ — | $ 4 [c] |

(a)  Amounts reclassified from accumulated OCI into income and amounts recognized in income from the ineffective portion of cash flow hedges are recorded in interest expense.

(b)  All of the forecasted transactions (future interest payments) were deemed probable of occurring; therefore, no cash flow hedges were discontinued and no amount was recognized in GenOn's results of operations as a result of discontinued cash flow hedges.

(c)  Represents the default risk of the counterparties to these transactions and GenOn's own non-performance risk. The effect of these valuation adjustments is recorded in interest expense.

(d)  The reversal of accumulated OCI as part of the sale of NRG Marsh Landing to NRG Yield LLC resulted in the recognition of additional paid in capital.

Because a significant portion of the interest expense incurred by Marsh Landing during construction was capitalized, amounts included in accumulated other comprehensive loss associated with construction period interest payments were reclassified to property, plant and equipment and will be depreciated over the expected useful life of the Marsh Landing generating facility. Actual amounts reclassified into earnings could vary from the amounts currently recorded as a result of future changes in interest rates.

*Impact of Derivative Instruments on the Statement of Operations*

Unrealized gains and losses associated with changes in the fair value of derivative instruments not accounted for as cash flow hedges are reflected in current period earnings.

The following tables summarize the pre-tax effects of economic hedges that have not been designated as cash flow hedges and trading activity on the Registrants' statements of operations. These amounts are included within operating revenues and cost of operations.

*GenOn*

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | **Year Ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** | **Year Ended December 31, 2011** |
| | (In millions) | | (In millions) | |
| **Unrealized mark-to-market results** | | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (367) | $ (4) | $ (307) | $ (243) |
| Net unrealized gains/(losses) on open positions related to economic hedges | 40 | (5) | 166 | 465 |
| Total unrealized mark-to-market (losses)/gains for economic hedging activities | (327) | (9) | (141) | 222 |
| Reversal of previously recognized unrealized (gains)/losses on settled positions related to trading activity | (1) | (4) | (8) | 6 |
| Net unrealized gains/(losses) on open positions related to trading activity | 1 | — | 6 | (4) |
| Total unrealized mark-to-market (losses)/gains for trading activity | — | (4) | (2) | 2 |
| **Total unrealized (losses)/gains** | $ (327) | $ (13) | $ (143) | $ 224 |

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | **Year Ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** | **Year Ended December 31, 2011** |
| | (In millions) | | (In millions) | |
| Revenue from operations — energy commodities | $ (356) | $ (20) | $ (159) | $ 227 |
| Cost of operations | 29 | 7 | 16 | (3) |
| **Total impact to statement of operations** | $ (327) | $ (13) | $ (143) | $ 224 |

*GenOn Americas Generation*

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | **Year Ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** | **Year Ended December 31, 2011** |
| | (In millions) | | (In millions) | |
| **Unrealized mark-to-market results** | | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (296) | $ (2) | $ (241) | $ (220) |
| Net unrealized gains/(losses) on open positions related to economic hedges | 25 | (6) | 109 | 356 |
| Total unrealized mark-to-market (losses)/gains for economic hedging activities | (271) | (8) | (132) | 136 |
| Reversal of previously recognized unrealized (gains)/losses on settled positions related to trading activity | (1) | (4) | (8) | 6 |
| Net unrealized gains/(losses) on open positions related to trading activity | 1 | — | 6 | (4) |
| Total unrealized mark-to-market (losses)/gains for trading activity | — | (4) | (2) | 2 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Total unrealized (losses)/gains** | $ | (271) | $ | (12) | $ | (134) | $ | 138 |

88

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| Revenue from operations — energy commodities | $ (302) | $ (16) | $ (153) | $ 140 |
| Cost of operations | 31 | 4 | 19 | (2) |
| Total impact to statement of operations | $ (271) | $ (12) | $ (134) | $ 138 |

*GenOn Mid-Atlantic*

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| **Unrealized mark-to-market results** | | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (296) | $ (2) | $ (246) | $ (215) |
| Net unrealized gains/(losses) on open positions related to economic hedges | 35 | (5) | 131 | 335 |
| Total unrealized (losses)/gains | $ (261) | $ (7) | $ (115) | $ 120 |

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| Revenue from operations — energy commodities | $ (292) | $ (12) | $ (120) | $ 119 |
| Cost of operations | 31 | 5 | 5 | 1 |
| Total impact to statement of operations | $ (261) | $ (7) | $ (115) | $ 120 |

**Credit Risk Related Contingent Features (GenOn and GenOn Americas Generation)**

Certain of GenOn and GenOn Americas Generation's hedging agreements contain provisions that require the Registrants to post additional collateral if the counterparty determines that there has been deterioration in credit quality, generally termed "adequate assurance" under the agreements, or require the Registrants to post additional collateral if there were a one notch downgrade in the Registrants' credit rating. The collateral required for contracts that have adequate assurance clauses that are in net liability positions as of December 31, 2013, was $33 million for GenOn and GenOn Americas Generation. The collateral required for contracts with credit rating contingent features that are in a net liability position as of December 31, 2013, was $0.5 million for GenOn and GenOn Americas Generation. In addition, GenOn and GenOn Americas Generation are parties to certain marginable agreements under which they have net liability positions, but the counterparties have not called for collateral due, which is approximately $4 million as of December 31, 2013. At December 31, 2013, GenOn Mid-Atlantic did not have any financial instruments with credit-risk-related contingent features.

See Note 4, *Fair Value of Financial Instruments,* for discussion regarding concentration of credit risk.

**Note 6 — Inventory (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Inventory consisted of:

*GenOn*

|  | As of December 31, | |
|---|---|---|
|  | 2013 | 2012 |
|  | (In millions) | |
| Fuel oil | $ 162 | $ 120 |
| Coal | 144 | 170 |
| Spare parts | 131 | 129 |
| Other | 6 | 3 |
| Total Inventory | $ 443 | $ 422 |

*GenOn Americas Generation*

|  | As of December 31, | |
|---|---|---|
|  | 2013 | 2012 |
|  | (In millions) | |
| Fuel oil | $ 133 | $ 91 |
| Coal | 81 | 77 |
| Spare parts | 55 | 54 |
| Other | 1 | 1 |
| Total Inventory | $ 270 | $ 223 |

*GenOn Mid-Atlantic*

|  | As of December 31, | |
|---|---|---|
|  | 2013 | 2012 |
|  | (In millions) | |
| Fuel oil | $ 39 | $ 23 |
| Coal | 81 | 77 |
| Spare parts | 37 | 37 |
| Other | 1 | — |
| Total Inventory | $ 158 | $ 137 |

90

.

**Note 7 — Property, Plant and Equipment (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Major classes of property, plant, and equipment were as follows:

*GenOn*

| | As of December 31, | | | Depreciable Lives |
|---|---|---|---|---|
| | **2013** | | **2012** | |
| | (In millions) | | | |
| Facilities and equipment | $ 3,130 | $ | 2,953 | 2 - 34 Years |
| Land and improvements | 181 | | 185 | |
| Construction in progress | 113 | | 693 | |
| Total property, plant and equipment | 3,424 | | 3,831 | |
| Accumulated depreciation | (248) | | (1) | |
| Net property, plant and equipment | $ 3,176 | $ | 3,830 | |

*GenOn Americas Generation*

| | As of December 31, | | | Depreciable Lives |
|---|---|---|---|---|
| | **2013** | | **2012** | |
| | (In millions) | | | |
| Facilities and equipment | $ 1,213 | $ | 1,139 | 2 - 34 Years |
| Land and improvements | 74 | | 74 | |
| Construction in progress | 3 | | 9 | |
| Total property, plant and equipment | 1,290 | | 1,222 | |
| Accumulated depreciation | (96) | | (1) | |
| Net property, plant and equipment | $ 1,194 | $ | 1,221 | |

*GenOn Mid-Atlantic*

| | As of December 31, | | | Depreciable Lives |
|---|---|---|---|---|
| | **2013** | | **2012** | |
| | (In millions) | | | |
| Facilities and equipment | $ 1,045 | $ | 1,001 | 2 - 34 Years |
| Land and improvements | 16 | | 16 | |
| Construction in progress | 3 | | 5 | |
| Total property, plant and equipment | 1,064 | | 1,022 | |
| Accumulated depreciation | (77) | | (1) | |
| Net property, plant and equipment | $ 987 | $ | 1,021 | |

**Note 8 — Retirements, Mothballing or Long-Term Protective Layup of Generating Facilities (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*Facilities Announced for Deactivation Due to Returns on Investment (GenOn)*

The Registrants are subject to extensive environmental regulation by federal, state and local authorities under a variety of statutes, regulations and permits that address discharges into the air, water and soil, and the proper handling of solid, hazardous and toxic materials and waste. Complying with increasingly stringent environmental requirements involves significant capital and operating expenses. To the extent forecasted returns on investments necessary to comply with environmental regulations are insufficient for a particular facility, the Registrants plan to deactivate that facility. In determining the forecasted returns on investments, the Registrants factor in forecasted energy and capacity prices, expected capital expenditures, operating costs, property taxes and other factors. GenOn deactivated the following coal-fired units at the referenced times: Elrama units 1-3 (290 MW) June 2012, Niles unit 2 (110 MW) June 2012, Elrama unit 4 (170 MW) and Niles unit 1 (110 MW) October 2012, and all Titus coal units (245 MW) September 2013. The Registrants expect to deactivate the following generating capacity, primarily coal-fired units, at the referenced times: Portland (400 MW) June 2014, Shawville (597 MW) place in long-term protective layup in April 2015, Gilbert (98 MW) May 2015, Glen Gardner (160 MW) May 2015, and Werner (212 MW) May 2015.

*Potomac River Generating Facility*

During 2011, NRG Potomac River LLC entered into an agreement with the City of Alexandria, Virginia to remove permanently from service its 480 MW Potomac River generating facility. The agreement, which amends the Project Schedule and Agreement, dated July 2008 with the City of Alexandria, provides for the retirement of the Potomac River generating facility on October 1, 2012, subject to the determination of PJM that the retirement of the facility will not affect reliability and the consent of Potomac Electric Power Company. PJM made the necessary determination and in June 2012 Potomac Electric Power Company gave its consent. As a result, the Potomac River generating facility was retired in October 2012. Upon retirement of the Potomac River generating facility, all funds in the escrow account ($32 million) established under the July 2008 agreement were distributed to NRG Potomac River in October 2012. GenOn Mid-Atlantic therefore reversed $32 million of the previously recorded obligation under the 2008 agreement with the City of Alexandria as a reduction in cost of operations during the period from January 1, 2012 through December 14, 2012.

*Contra Costa Generating Facility (GenOn and GenOn Americas Generation)*

NRG Delta LLC entered into an agreement with PG&E in September 2009 for 675 MW at Contra Costa for the period from November 2011 through April 2013. At the end of the agreement GenOn Americas Generation retired the Contra Costa facility.

*Expenses, Property, Plant and Equipment, and Materials and Supplies Inventory Related to Deactivations*

In connection with the decision to deactivate the generating facilities, the Registrants evaluated their spare parts inventory and determined that there was excess inventory. GenOn, GenOn Americas Generation and GenOn Mid-Atlantic established a reserve of $35 million, $6 million and $4 million, respectively, recorded to operations and maintenance expense during the first quarter of 2012 relating to their excess inventory. In addition to the excess spare parts inventory reserve recorded in the first quarter of 2012, GenOn, GenOn Americas Generation and GenOn Mid-Atlantic incurred $18 million, $10 million and $9 million, respectively, during the period from January 1, 2012 through December 14, 2012 for costs to deactivate generating facilities, which is included in cost of operations. During the period from December 15, 2012 through December 31, 2012, GenOn, GenOn Americas Generation and GenOn Mid-Atlantic incurred $1 million, $1 million and $1 million, respectively, for these costs. At December 31, 2012, the aggregate carrying value of property, plant and equipment, net and spare parts for the generating facilities with an aggregate of 3,540 MW, and are expected to be deactivated in 2013, 2014 or 2015, was $115 million and $17 million, respectively, for GenOn.

If market conditions and/or environmental and regulatory factors or assumptions change in the future, forecasted returns on investments necessary to comply with environmental regulations could change resulting in possible incremental investments if returns improve or deactivation of additional generating units or facilities if returns deteriorate. Such deactivations could result in additional charges, including impairments, severance costs and other plant shutdown costs.

**Note 9 — Impairments (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

**2012 Impairments**

*Long-Lived Assets Impairments (GenOn)*

On July 20, 2012, GenOn entered into the NRG Merger Agreement with NRG Energy and a direct wholly-owned subsidiary of NRG. GenOn viewed the execution of the NRG Merger Agreement as a triggering event under accounting guidance and evaluated its long-lived assets for impairment.

For purposes of impairment testing, a long-lived asset must be grouped at the lowest level of identifiable cash flows. Each of GenOn's generating facilities is viewed as an individual asset group. Upon completion of the assessment, GenOn determined that the Portland and Titus generating facilities were impaired as of September 30, 2012, as the carrying values exceeded the undiscounted cash flows.

GenOn's review of the long-lived assets included assumptions about the following: (a) electricity, fuel and emissions prices, (b) capacity prices, (c) impact of environmental regulations, including costs of $CO_2$ allowances under a potential cap-and-trade program, (d) timing and extent of generating capacity additions and retirements and (e) future capital expenditure requirements related to the generating facilities.

GenOn's assumptions related to future prices of electricity, fuel, emission allowances, and capacity were based on observable market prices to the extent available. Longer term power and capacity prices were derived from proprietary fundamental market modeling and analysis. The long-term capacity prices were based on estimated revenue requirements needed to incentivize new generation when needed to maintain reliability standards. For markets with established capacity markets, such as PJM, these estimates are generally consistent with the current structures. The assumptions regarding electricity demand were based on forecasts available from each ISO or NERC region, as applicable. Assumptions for generating capacity additions and retirements included publicly available announcements, which take into account renewable sources of electricity, as well as the need for capacity to maintain reliability in the longer term. In addition, GenOn previously announced its plans for deactivation of the Portland and Titus generating facilities. See Note 8, *Retirements, Mothballing or Long-Term Protective Layup of Generating Facilities.*

GenOn recorded impairment losses of $37 million and $10 million during the third quarter of 2012 in the consolidated statement of operations to reduce the carrying values of the Portland and Titus generating facilities, respectively, to their estimated fair values of $17 million and $15 million, respectively. The measurements utilized to determine fair value of Portland and Titus for impairment were categorized in Level 3 as of September, 30, 2012.

**2011 Impairments**

*Granted Emission Credits*

In August 2011, the EPA finalized the CSAPR, which was intended to replace the CAIR starting in 2012. Under the CSAPR program, the EPA established new allowances for all of the new CSAPR programs and did not permit any carryover Acid Rain Program or CAIR allowances into the CSAPR trading programs. As a result, the $NO_x$ allowances from the CAIR program would not have been used. Accordingly, the Registrants thought that the CAIR $NO_x$ allowances would have no value after 2011. Similarly, the $SO_2$ allowances used for compliance in the CAIR program (which used the already existing Acid Rain Program allowances that would have continued to be usable for compliance with the Acid Rain Program) would not have been usable for compliance with the CSAPR $SO_2$ program and the Registrants thought they would have negligible value after 2011.

As a result of the CSAPR, GenOn, GenOn Americas Generation and GenOn Mid-Atlantic recorded impairment losses of $133 million, $128 million and $94 million, respectively, for the write-off of excess $NO_x$ and $SO_2$ emissions allowances during 2011.

As GenOn thought that CAIR $NO_x$ emissions allowances of $45 million would have no value after 2011, such allowances were fully impaired. The excess Acid Rain Program $SO_2$ emissions allowances of $91 million were impaired to their estimated fair value of $3 million based on their current market prices obtained from brokers. The excess Acid Rain Program $SO_2$ emission allowances were categorized in Level 3 in the fair value hierarchy.

As GenOn Americas Generation thought that CAIR $NO_x$ emission allowances of $43 million would have no value after 2011, such allowances were fully impaired. The excess Acid Rain Program $SO_2$ emission allowances of $86 million were impaired to their estimated fair value of $1 million based on their current market prices obtained from brokers. The excess Acid Rain Program $SO_2$ emission allowances were categorized in Level 3 in the fair value hierarchy.

As GenOn Mid-Atlantic thought that CAIR $NO_x$ emission allowances of $43 million would have no value after 2011, such allowances were fully impaired. The excess Acid Rain Program $SO_2$ emission allowances of $52 million were impaired to their estimated fair value of $1 million based on their current market prices obtained from brokers. The excess Acid Rain Program $SO_2$ emission allowances were categorized in Level 3 in the fair value hierarchy.

**Note 10 —Debt and Capital Leases (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Long-term debt and capital leases consisted of the following:

| | As of December 31, | | Interest Rate |
|---|---|---|---|
| | 2013 | 2012 | |
| | (In millions, except rates) | | |
| **GenOn Mid-Atlantic:** | | | |
| Chalk Point capital lease, due 2015 | $ 10 | $ 14 | 8.190 |
| Subtotal GenOn Mid-Atlantic | 10 | 14 | |
| **GenOn Americas Generation:** | | | |
| Senior unsecured notes, due 2021 | 503 | 509 | 8.500 |
| Senior unsecured notes, due 2031 | 435 | 437 | 9.125 |
| Subtotal GenOn Americas Generation [(a)] | 948 | 960 | |
| **GenOn Energy:** | | | |
| Senior unsecured notes, due 2014 | — | 617 | 7.625 |
| Senior unsecured notes, due 2017 | 782 | 800 | 7.875 |
| Senior unsecured notes, due 2018 | 780 | 801 | 9.500 |
| Senior unsecured notes, due 2020 | 621 | 631 | 9.875 |
| Other | 2 | 3 | |
| Subtotal GenOn Energy | 2,185 | 2,852 | |
| **Marsh Landing:** | | | |
| Senior secured term loan, due 2017 | — | 121 | L+2.50 [(b)] |
| Senior secured term loan, due 2023 | — | 269 | L+2.75 [(b)] |
| Subtotal Marsh Landing | — | 390 | |
| Subtotal | 3,133 | 4,202 | |
| Less current maturities | 5 | 32 | |
| Total long-term debt and capital leases | $ 3,133 | $ 4,170 | |

(a) This amount includes GenOn Mid-Atlantic.

(b)   L+ equals LIBOR plus x%.

Long-term debt includes the following premiums:

| | As of December 31, | |
|---|---|---|
| | 2013 | 2012[(a)] |
| | (In millions) | |
| **GenOn Americas Generation:** | | |
| Senior unsecured notes, due 2021 | $ 53 | $ 59 |
| Senior unsecured notes, due 2031 | 35 | 37 |
| **GenOn Energy:** | | |
| Senior unsecured notes, due 2014 | — | 42 |
| Senior unsecured notes, due 2017 | 58 | 75 |
| Senior unsecured notes, due 2018 | 104 | 126 |
| Senior unsecured notes, due 2020 | 71 | 81 |
| Total premium | $ 321 | $ 420 |

(a)   As of December 31, 2012, adjustments to fair value of debt represent adjustments recorded in connection with the NRG Merger.

*GenOn Energy (GenOn)*

*Senior Secured Term Loan Facility and Revolving Credit Facility.* In connection with the NRG Merger, the senior secured term loan was paid off and the revolving credit facility was terminated. See Note 18, *Commitments and Contingencies*, for discussion of GenOn's credit agreement with NRG.

Under the senior notes and the related indentures, the senior notes are the sole obligation of GenOn and are not guaranteed by any subsidiary or affiliate of GenOn. The senior notes are senior unsecured obligations of GenOn having no recourse to any subsidiary or affiliate of GenOn. The senior notes restrict the ability of GenOn and its subsidiaries to encumber their assets.

*Redemption of 2014 GenOn Senior Notes.* In June 2013, GenOn redeemed all of the 2014 Senior Notes with an aggregate outstanding principal amount of $575 million at a redemption percentage of 106.778% of face value, as well as any accrued and unpaid interest as of the redemption date. In connection with the redemption, an $11 million loss on the debt extinguishment of the 2014 Senior Notes was recorded during the three months ended June 30, 2013 which primarily consisted of a make whole premium payment offset by the write-off of unamortized premium.

The GenOn Senior Notes due 2014, which had a face value of $575 million, were recorded at their fair value of $617 million on the NRG Merger date. The related $42 million premium was being amortized to interest expense until the notes were redeemed in June 2013, as previously discussed.

*Senior Unsecured Notes, Due 2018 and 2020.* The senior notes and the related indentures restrict the ability of GenOn to incur additional liens and make certain restricted payments, including dividends and purchases of capital stock. At December 31, 2013, GenOn did not meet the consolidated debt ratio component of the restricted payments test and, therefore, the ability of GenOn to make restricted payments is limited to specified exclusions from the covenant, including up to $250 million of such restricted payments. The senior notes are subject to acceleration of GenOn's obligations thereunder upon the occurrence of certain events of default, including: (a) default in interest payment for 30 days, (b) default in the payment of principal or premium, if any, (c) failure after 90 days of specified notice to comply with any other agreements in the indenture, (d) certain cross-acceleration events, (e) failure by GenOn or its significant subsidiaries to pay certain final and non-appealable judgments after 90 days and (f) certain events of bankruptcy and insolvency.

The senior notes due 2018 and 2020 were recorded at their fair values of $801 million and $631 million, respectively, on the NRG Merger date. The $126 million and $81 million premiums, respectively, are being amortized to interest expense over the life of the related notes.

Prior to October 15, 2018, GenOn may redeem the senior notes due 2018, in whole or in part, at a redemption price equal to 100% of the principal amount plus a premium and accrued and unpaid interest. The premium is the greater of: (i) 1% of the principal amount of the notes; or (ii) the excess of the following: the present value of 100% of the note, plus interest payments due on the note through maturity, discounted at a Treasury rate plus 0.50% over the principal amount of the note.

Prior to October 15, 2015, GenOn may redeem the senior notes due 2020, in whole or in part, at a redemption price equal to 100% of the principal amount of the notes plus a premium and accrued and unpaid interest. The premium is the greater of: (i) 1% of the principal amount of the notes; or (ii) the excess of the following: the present value of 100% of the note, plus interest payments due on the note through maturity, discounted at a Treasury rate plus 0.50% over the principal amount of the note. In addition, on or after October 15, 2015, GenOn may redeem some or all of the notes at redemption prices expressed as percentages of principal amount as set forth in the following table, plus accrued and unpaid interest on the notes redeemed to the first applicable redemption rate:

| Redemption Period | Redemption Percentage |
| --- | --- |
| October 15, 2015 to October 14, 2016 | 104.938% |
| October 15, 2016 to October 14, 2017 | 103.292% |
| October 15, 2017 to October 14, 2018 | 101.646% |
| October 15, 2018 and thereafter | 100.000% |

*Senior Unsecured Notes, Due 2017.* The senior notes due 2017 of GenOn were recorded at their fair value $800 million on the NRG Merger date. The $75 million premium is being amortized to interest expense over the life of the related notes.

Prior to maturity, GenOn may redeem all or a part of the senior notes due 2017 at a redemption price equal to 100% of the notes plus a premium and accrued and unpaid interest. The premium is the greater of: (i) 1% of the principal amount of the notes; or (ii) the excess of the following: the present value of 100% of the note, plus interest payments due on the note through maturity, discounted at a Treasury rate plus 0.50% over the principal amount of the note.

***GenOn Americas Generation (GenOn and GenOn Americas Generation)***

*Senior Unsecured Notes.* The senior notes due 2021 and 2031 are senior unsecured obligations of GenOn Americas Generation having no recourse to any subsidiary or affiliate of GenOn Americas Generation. The senior notes due 2021 and 2031 of GenOn Americas Generation were recorded at their fair values of $509 million and $437 million, respectively, on the NRG Merger date. The $59 million and $37 million premiums, respectively, are being amortized to interest expense over the life of the related notes.

Prior to maturity, GenOn Americas Generation may redeem all or a part of the senior notes due 2021 and 2031 at a redemption price equal to 100% of the notes plus a premium and accrued and unpaid interest. The premium is the greater of: (i) the discounted present value of the then-remaining scheduled payments of principal and interest on the outstanding notes, discounted at a Treasury rate plus 0.375%, less the unpaid principal amount; and (ii) zero.

***Marsh Landing (GenOn)***

*Credit Facility.* In October 2010, Marsh Landing entered into a credit agreement for up to approximately $650 million of commitments to provide construction and permanent financing for the Marsh Landing generating facility. The credit facility consists of a $155 million tranche A senior secured term loan facility, due 2017, a $345 million tranche B senior secured term loan facility, due 2023, a $50 million senior secured letter of credit facility to support Marsh Landing's debt service reserve requirements and a $100 million senior secured letter of credit facility to support Marsh Landing's collateral requirements under its PPA with PG&E. Prior to the commercial operation date of the project, the collateral requirements under the PPA and construction contracts were met by a $165 million cash collateralized letter of credit facility entered into by GenOn Energy Holdings on behalf of Marsh Landing in September 2010.

In May 2013, Marsh Landing met the conditions under the credit agreement to convert the construction loan for the facility to a term loan which will amortize on a predetermined basis. Prior to term conversion, Marsh Landing drew the remaining funds available under the facility in order to pay costs due for construction. Marsh Landing also issued a $24 million letter of credit under the facility in support of its debt service requirements. Concurrently with the term conversion, the $80 million cash collateralized letter of credit issued by GenOn Energy Holdings on behalf of Marsh Landing in support of its collateral requirements under the PPA with PG&E was returned and the related letter of credit facility was terminated. On July 22, 2013, concurrent with the initial public offering of NRG Yield, Inc., GenOn sold its ownership interests in Marsh Landing Holdings LLC to NRG Yield LLC, including the Marsh Landing term loan, as further described in Note 17, *Related Party Transactions.*

***Capital Leases (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)***

Capital leases include a lease at GenOn Mid-Atlantic's Chalk Point generating facility for an 80 MW peaking unit. The annual principal payments under this lease are $5 million in 2014 and 2015.

***Restricted Net Assets (GenOn and GenOn Americas Generation)***

GenOn and GenOn Americas Generation and certain of their subsidiaries are holding companies and, as a result, GenOn and GenOn Americas Generation and such subsidiaries are dependent upon dividends, distributions and other payments from their respective subsidiaries to generate the funds necessary to meet their obligations. In particular, a substantial portion of the cash from GenOn's and GenOn Americas Generation's operations is generated by GenOn Mid-Atlantic. The ability of certain of GenOn's and GenOn Americas Generation's subsidiaries to pay dividends and make distributions is restricted under the terms of their debt or other agreements, including the operating leases of GenOn Mid-Atlantic for GenOn and GenOn Americas Generation and REMA for GenOn. Under their respective operating leases, GenOn Mid-Atlantic and REMA are not permitted to make any distributions and other restricted payments unless: (a) they satisfy the fixed charge coverage ratio for the most recently ended period of four fiscal quarters; (b) they are projected to satisfy the fixed charge coverage ratio for each of the two following periods of four fiscal quarters, commencing with the fiscal quarter in which such payment is proposed to be made; and (c) no significant lease default or event of default has occurred and is continuing. In the event of a default under the respective operating leases or if the respective restricted payment tests are not satisfied, GenOn Mid-Atlantic and REMA would not be able to distribute cash. At December 31, 2013, GenOn Mid-Atlantic and REMA did not satisfy the restricted payments test.

Pursuant to the terms of their respective lease agreements, GenOn Mid-Atlantic and REMA are restricted from, among other actions, (a) encumbering assets, (b) entering into business combinations or divesting assets, (c) incurring additional debt, (d) entering into transactions with affiliates on other than an arm's length basis or (e) materially changing their business. Therefore, at December 31, 2013, all of GenOn Mid-Atlantic's and REMA's net assets (excluding cash) were deemed restricted for purposes of Rule 4-08(e)(3)(ii) of Regulation S-X. As of December 31, 2013, restricted net assets for GenOn Mid-Atlantic and REMA had restricted net assets of $1,079 million and $(959) million, respectively.

*Consolidated Annual Maturities (GenOn and GenOn Americas Generation)*

Annual payments based on the maturities of GenOn's debt for the years ending after December 31, 2013 are as follows:

|  | (In millions) |
|---|---|
| 2017 | 725 |
| 2018 | 675 |
| Thereafter | 1,400 |
| Total | $ 2,800 |

Annual payments based on the maturities of GenOn Americas Generation's debt for the years ending after December 31, 2013 are as follows:

|  | (In millions) |
|---|---|
| 2019 and thereafter | 850 |
| Total | $ 850 |

## Note 11 — Asset Retirement Obligations (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)

The Registrants' AROs are primarily related to the future dismantlement of equipment on leased property and environmental obligations related to ash disposal, site closures and fuel storage facilities. In addition, the Registrants have also identified conditional AROs for asbestos removal and disposal, which are specific to certain power generation operations.

The following table represents the balance of ARO obligations as of December 31, 2012, along with the additions, reductions and accretion related to the Registrants' ARO obligations for the year ended December 31, 2013:

|  | GenOn | | GenOn Americas Generation | | GenOn Mid-Atlantic | |
|---|---|---|---|---|---|---|
|  |  | | (In millions) | | | |
| **Balance as of December 31, 2012** | $ | 172 | $ | 73 | $ | 25 |
| Additions |  | 2 |  | — |  | — |
| Spending for current obligations and other settlements |  | (5) |  | (1) |  | — |
| Accretion — expense |  | 10 |  | 4 |  | 2 |
| **Balance as of December 31, 2013** | $ | 179 | $ | 76 | $ | 27 |

97

.

**Note 12 — Benefit Plans and Other Postretirement Benefits (GenOn)**

*Defined Benefit Plans*

GenOn provides pension benefits to eligible non-union and union employees through various defined benefit pension plans. These benefits are based on pay, service history and age at retirement. Most pension benefits are provided through tax-qualified plans that are funded in accordance with the Employee Retirement Income Security Act of 1974 and Internal Revenue Service requirements. Certain executive pension benefits that cannot be provided by the tax-qualified plans are provided through unfunded non-tax-qualified plans. The measurement date for the defined benefit plans was December 31 for all periods presented unless otherwise noted. GenOn also provides certain medical care and life insurance benefits for eligible retired employees. The measurement date for these postretirement benefit plans was December 31 for all periods presented unless otherwise noted.

As a result of the application of pushdown accounting, GenOn's benefit plan obligations were remeasured at the time of the NRG Merger. See Note 3, *NRG Merger and Dispositions*.

The net periodic pension cost/credit related to GenOn's pension and other postretirement benefit plans include the following components:

| | Pension Benefits | | | |
|---|---|---|---|---|
| | Successor | | Predecessor | |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| Service cost benefits earned | $ 13 | $ 1 | $ 12 | $ 12 |
| Interest cost on benefit obligation | 25 | 1 | 23 | 23 |
| Expected return on plan assets | (31) | (1) | (30) | (29) |
| Net reclassifications from accumulated other comprehensive loss[a] | — | — | 9 | 4 |
| Curtailments | — | — | 1 | — |
| Special termination benefits | — | — | 1 | — |
| Net periodic benefit cost | $ 7 | $ 1 | $ 16 | $ 10 |

(a)   Net reclassifications include actuarial loss and prior service cost.

| | Other Postretirement Benefits | | | |
|---|---|---|---|---|
| | Successor | | Predecessor | |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| Service cost benefits earned | $ 1 | $ — | $ 1 | $ 1 |
| Interest cost on benefit obligation | 3 | — | 3 | 3 |
| Net reclassifications from accumulated other comprehensive loss[a] | — | — | (3) | (4) |
| Curtailments | — | — | 1 | — |
| Plan amendments | — | — | (3) | — |
| Unrecognized prior service cost | (1) | — | — | — |
| Net periodic benefit credit | $ 3 | $ — | $ (1) | $ — |

(a)   Net reclassifications include actuarial gain/loss and prior service credit.

98

.

A comparison of the pension benefit obligation, other postretirement benefit obligations and related plan assets for GenOn plans on a combined basis is as follows:

| | Tax-Qualified Pension Benefits | | | Non-Tax-Qualified Pension Benefits | | |
| | Successor | | Predecessor | Successor | | Predecessor |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | (In millions) | (In millions) | | (In millions) |
|---|---|---|---|---|---|---|
| Benefit obligation at beginning of period | $ 585 | $ 582 (a) | $ 523 | $ 14 | $ 14 (a) | $ 10 |
| Service cost | 13 | 1 | 12 | — | — | — |
| Interest cost | 25 | 1 | 22 | 1 | — | 1 |
| Actuarial (gain)/loss | (55) | 1 | 12 | — | — | — |
| Benefit payments | (22) | — | (18) | (2) | — | (1) |
| Curtailments | — | — | 1 | (1) | — | — |
| Plan amendments | — | — | — | — | — | — |
| Special termination benefits | — | — | 1 | — | — | — |
| Benefit obligation at end of period | 546 | 585 | 553 (a) | 12 | 14 | 10 (a) |
| Fair value of plan assets at beginning of period | 406 | 402 (a) | 353 | — | — | — |
| Actual return on plan assets | 67 | 4 | 32 | — | — | — |
| Employer contributions | 18 | — | 20 | 2 | — | 1 |
| Benefit payments | (22) | — | (18) | (2) | — | (1) |
| Fair value of plan assets at end of period | 469 | 406 | 387 | — | — | — |
| Funded status at end of period — excess of obligation over assets | $ (77) | $ (179) | $ (166) | $ (12) | $ (14) | $ (10) |

(a) As a result of the application of pushdown accounting, GenOn remeasured its pension benefit obligation and related plan assets at the time of the NRG Merger.

|  | Other Postretirement Benefits | | | | |
|---|---|---|---|---|---|
|  | Successor | | | Predecessor | |
|  | Year Ended December 31, 2013 | | December 15, 2012 through December 31, 2012 | | January 1, 2012 through December 14, 2012 |
|  | (In millions) | | | | (In millions) |
| Benefit obligation at beginning of period | $ | 87 | $ | 87 (a) | $ | 84 |
| Service cost | | 1 | | — | | 1 |
| Interest cost | | 3 | | — | | 3 |
| Participant contributions | | 1 | | — | | 2 |
| Actuarial (gain)/loss | | (7) | | — | | 4 |
| Benefit payments | | (7) | | — | | (7) |
| Curtailments | | — | | — | | 1 |
| Plan amendments | | (5) | | — | | (3) |
| Benefit obligation at end of period | | 73 | | 87 | | 85 (a) |
| Fair value of plan assets at beginning of period | | — | | — | | — |
| Employer contributions | | 6 | | — | | 5 |
| Participant contributions | | 1 | | — | | 2 |
| Benefit payments | | (7) | | — | | (7) |
| Fair value of plan assets at end of period | | — | | — | | — |
| Funded status at end of period — excess of obligation over assets | $ | (73) | $ | (87) | $ | (85) |

(a) As a result of the application of pushdown accounting, GenOn remeasured its postretirement benefit obligations at the time of the NRG Merger.

Amounts recognized in GenOn's balance sheets were as follows:

|  | Tax-Qualified Pension Benefits | | | | Non-Tax-Qualified Pension Benefits | | | | Other Postretirement Benefits | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | As of December 31, | | | | As of December 31, | | | | As of December 31, | | | |
|  | 2013 | | 2012 | | 2013 | | 2012 | | 2013 | | 2012 | |
|  | (In millions) | | | | (In millions) | | | | (In millions) | | | |
| Current liabilities | $ | — | $ | — | $ | (12) | $ | (1) | $ | (6) | $ | (6) |
| Non-current liabilities | $ | (77) | $ | (179) | $ | — | $ | (13) | $ | (67) | $ | (81) |

The accumulated benefit obligation exceeded the fair value of plan assets at December 31, 2013 and 2012 for the tax-qualified defined benefit pension plans. The total accumulated benefit obligation for the tax-qualified plans at December 31, 2013 and 2012 was $517 million and $543 million, respectively.

100

Amounts recognized in GenOn's other comprehensive income/loss and accumulated other comprehensive income/loss for the pension and other postretirement benefit plans were as follows:

| | Tax-Qualified Pension Benefits | | Non-Tax-Qualified Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|---|---|
| | Net Actuarial (Loss) Gain | Prior Service Cost | Net Actuarial Loss | Prior Service Cost | Net Actuarial (Loss) Gain | Prior Service Cost |
| | (In millions) | | | | | |
| **Predecessor** | | | | | | |
| Balance at December 31, 2011 | $ (136) | $ (2) | $ (3) | $ (1) | $ (3) | $ 10 |
| Unrealized loss | (10) | — | — | — | (4) | — |
| Reclassification to net periodic benefit cost/credit | 8 | 1 | — | — | — | (3) |
| Total recognized in OCI for the period | (2) | 1 | — | — | (4) | (3) |
| Balance at December 14, 2012[a] | $ (138) | $ (1) | $ (3) | $ (1) | $ (7) | $ 7 |
| **Successor** | | | | | | |
| Balance at December 15, 2012[a] | $ — | $ — | $ — | $ — | $ — | $ — |
| Unrealized gain | 1 | — | — | — | — | — |
| Total recognized in OCI for the period | 1 | — | — | — | — | — |
| Balance at December 31, 2012 | $ 1 | $ — | $ — | $ — | $ — | $ — |
| Unrealized gain | 91 | — | — | — | 7 | 5 |
| Reclassification to net periodic benefit cost/credit | — | (1) | — | — | — | (1) |
| Total recognized in OCI for the period | 91 | (1) | — | — | 7 | 4 |
| Balance at December 31, 2013 | $ 92 | $ (1) | $ — | $ — | $ 7 | $ 4 |

(a)   As a result of the application of pushdown accounting, the amounts remaining in accumulated other comprehensive loss at the time of the NRG Merger were eliminated.

The total net (gain)/loss recognized in net periodic benefit cost and other comprehensive income/loss for the pension plans for the year ended December 31, 2013, the period from December 15, 2012 through December 31, 2012, the period from January 1, 2012 through December 14, 2012 and the year ended December 31, 2011 were $(84) million, $0 million, $17 million and $88 million, respectively. The total net (gain)/loss recognized in net periodic benefit credit and other comprehensive income/loss for the other postretirement benefit plans for the year ended December 31, 2013, the period from December 15, 2012 through December 31, 2012, the period from January 1, 2012 through December 14, 2012 and the year ended December 31, 2011 were $(7) million, $0 million, $6 million and $11 million, respectively.

The estimated unrecognized gain for the pension and other postretirement benefit plans that will be amortized from accumulated other comprehensive loss to net period benefit cost during 2014 is approximately $6 million.

101

*Fair Value Hierarchy of Plan Assets*

GenOn's market-related value of its plan assets is the fair value of the assets. The fair values of GenOn's pension plan assets by asset category are as follows:

|  | As of December 31, 2013 | | As of December 31, 2012 | |
| --- | --- | --- | --- | --- |
|  | (In millions) | | | |
| **Asset Categories:** | | | | |
| Investment Funds: | | | | |
| U.S. equities | | 202 | | 173 |
| Non-U.S. equities | | 139 | | 118 |
| Fixed income securities | | 128 | | 115 |
| Total | $ | 469 | $ | 406 |

In accordance with ASC 820, GenOn determines the level in the fair value hierarchy within which each fair value measurement in its entirety falls, based on the lowest level input that is significant to the fair value measurement in its entirety. GenOn's assets are all classified within Level 2 of the fair value hierarchy. GenOn's plan assets consist of non-exchange-traded investment funds whose fair values reflect the net asset value of the funds based on the fair value of the fund's underlying securities. The underlying securities held by these funds are valued using quoted prices in active markets for identical or similar assets. GenOn elected the practical expedient under the accounting guidance to measure the fair value of certain funds that use net asset value per share. Certain investment funds require redemption notification of 30 days or less for which no adjustment was made to their net asset value. There are no investments categorized as Level 3.

*Assumptions*

The discount rates used at December 31, 2013 and 2012, were determined based on individual bond-matching models comprised of portfolios of high quality corporate bonds with projected cash flows and maturity dates reflecting the expected time horizon during which that benefit will be paid. Bonds included in the model portfolios are from a cross-section of different issuers, are AA-rated or better, and are non-callable so that the yield to maturity can be attained without intervening calls.

In determining the long-term rate of return for plan assets, GenOn evaluates historic and current market factors such as inflation and interest rates before determining long-term capital market assumptions. GenOn also considers the effects of diversification and portfolio rebalancing. To check for reasonableness and appropriateness, GenOn reviews data about other companies, including their historic returns.

For purposes of expense recognition prior to the NRG Merger, GenOn used a market-related value of assets that recognizes the difference between the expected return and the actual return on plan assets over a five-year period. Unrecognized asset gains or losses associated with GenOn's plan assets were recognized in the calculation of the market-related value of assets and subject to amortization in future periods.

The following table presents the significant assumptions used to calculate GenOn's benefit obligations:

| | Pension Benefits | | Other Postretirement Benefits | |
| | As of December 31, | | As of December 31, | |
| Weighted–Average Assumptions | 2013 | 2012 | 2013 | 2012 |
|---|---|---|---|---|
| Discount rate | 5.02% | 4.22% | 4.53% | 3.99% |
| Rate of compensation increase | 2.91% | 2.82% | N/A | N/A |

GenOn's assumed healthcare cost trend rates used for other postretirement benefit obligations are:

| | Other Postretirement Benefit Plans | |
| | As of December 31, | |
| Weighted–Average Assumptions | 2013 | 2012 |
|---|---|---|
| Assumed medical inflation for next year: | | |
| Before age 65 | 8.50% | 8.50% |
| Age 65 and after | 8.69% | 8.67% |
| Assumed ultimate medical inflation rate | 5.50% | 5.50% |
| Year in which ultimate rate is reached | 2019 | 2018 |

An annual increase or decrease of 1% in the assumed healthcare cost trend rates would correspondingly increase or decrease the postretirement benefit obligation at December 31, 2013 by $5 million.

The following table presents the significant assumptions used to calculate GenOn's benefit expense/credit:

| | Pension Plans | | | |
| | Successor | | Predecessor | |
| Weighted–Average Assumptions | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
|---|---|---|---|---|
| Discount rate | 4.22% | 4.25% | 4.56% | 5.12% |
| Rate of compensation increase | 2.82% | 2.82% | 2.79% | 2.81% |
| Expected return on plan assets | 7.50% | 7.50% | 8.25% | 8.25% |

| | Other Postretirement Benefit Plans | | | |
| | Successor | | Predecessor | |
| Weighted–Average Assumptions | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
|---|---|---|---|---|
| Discount rate | 3.99% | 4.01% | 4.26% | 4.80% |
| Rate of compensation increase | N/A | N/A | N/A | 3.00% |

GenOn's assumed healthcare cost trend rates used for other postretirement benefit net periodic benefit expense/credit are:

| | Successor | | Predecessor | |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| Weighted–Average Assumptions | | | | |
|---|---|---|---|---|
| Assumed medical inflation for next year: | | | | |
| Before age 65 | 8.50% | 8.50% | 7.50% | 8.00% |
| Age 65 and after | 8.67% | 8.67% | 7.71% | 8.20% |
| Assumed ultimate medical inflation rate | 5.50% | 5.50% | 5.50% | 5.50% |
| Year in which ultimate rate is reached | 2018 | 2018 | 2018 | 2018 |

An annual increase or decrease of 1% in the assumed healthcare cost trend rates would correspondingly increase or decrease the total annual service and interest cost components of net period benefit credit during 2013 by $5 million.

*Pension Plan Assets*

Pension plans' assets are managed solely in the interest of the plans' participants and their beneficiaries and are invested with the objective of earning the necessary returns to meet the time horizons of the accumulated and projected retirement benefit obligations. GenOn uses a mix of equities and fixed income investments intended to manage risk to a reasonable and prudent level. GenOn's risk tolerance is established through consideration of the plans' liabilities and funded status as well as corporate financial condition. Equity investments are diversified across U.S. and non-U.S. stocks. For U.S. stocks, GenOn employs both a passive and active approach by investing in index funds and actively managed funds. For non-U.S. stocks, GenOn is invested in both developed and emerging market equity funds. Fixed income investments are comprised of long-term U.S. government and corporate securities. Derivative securities can be used for diversification, risk-control and return enhancement purposes but may not be used for the purpose of leverage.

In the fourth quarter of 2011, GenOn adopted a new pension asset allocation methodology based on the results of a study completed by a third-party investment consulting firm. The methodology divides the pension plan assets into two primary portfolios: (i) return seeking assets, those assets intended to generate returns in excess of pension liability growth (U.S. and Non-U.S. equities) and (ii) liability-hedging assets, those assets intended to have characteristics similar to pension liabilities (fixed income securities). As GenOn's pension plans' funded status improves, the methodology actively moves the plan assets from return seeking assets toward liability-hedging assets.

The following table shows the target allocations for GenOn's plans and the percentage of fair value of plan assets by asset fund category (based on the nature of the underlying funds) for GenOn's qualified pension plans at December 31, 2013 and 2012:

| | | Percentage of Fair Value of Plan Assets as of December 31, | |
| --- | --- | --- | --- |
| | Target Allocations | 2013 | 2012 |
| U.S. equities | 42% | 43% | 43% |
| Non-U.S. equities | 28 | 29 | 29 |
| Fixed income securities | 30 | 28 | 28 |
| Total | 100% | 100% | 100% |

Investment risk and performance are monitored on an ongoing basis through quarterly portfolio reviews of each asset fund class to a related performance benchmark, if applicable, and annual pension liability measurements. Performance benchmarks adopted in the fourth quarter of 2011 are composed of the following indices:

| Asset Class | Index |
| --- | --- |
| U.S. equities | Dow Jones U.S. Total Stock Market Index |
| Non-U.S. equities | MSCI All Country World Ex-U.S. IMI Index |
| Fixed income securities | Barclays Capital Long Term Government/Credit Index |

*Expected Contributions and Benefit Payments*

GenOn expects to contribute approximately $56 million to the tax-qualified pension plans during 2014. In addition, GenOn expects to contribute approximately $12 million to the non-tax-qualified pension plans during 2014. As of December 31, 2013, GenOn has related rabbi trust investments of $14 million to fund future benefit payments of the non-tax-qualified pension plans.

GenOn's expected future benefit payments for each of the next five years, and in the aggregate for the five years thereafter, are as follows:

| | Pension Benefit Payments | | Other Postretirement Benefit | |
| | Tax-Qualified | Non-Tax-Qualified | Benefit Payments | Medicare Prescription Drug Reimbursements |
|---|---|---|---|---|
| | | (In millions) | | |
| 2014 | $ 24 | $ 12 | $ 6 | $ — |
| 2015 | 27 | — | 7 | — |
| 2016 | 29 | — | 6 | — |
| 2017 | 28 | — | 6 | — |
| 2018 | 30 | — | 6 | — |
| 2019 through 2023 | 184 | — | 30 | 1 |

### Employee Savings and Profit Sharing Plan

GenOn has employee savings plans under Sections 401(a) and 401(k) of the IRC whereby employees may contribute a portion of their eligible compensation to the employee savings plan, subject to limits under the IRC. GenOn also historically provided for a profit sharing arrangement for non-bargaining employees and some bargaining employees not accruing a benefit under the defined benefit pension plans, whereby GenOn contributed a fixed contribution of 2% of eligible pay per pay period and could make an annual discretionary contribution up to 3% of eligible pay based on GenOn's performance. Upon completion of the NRG Merger, NRG assumed GenOn's defined contribution 401(k) plans and amended the plan for the non-bargaining employees with NRG 401(k) plan features, effective January 1, 2013. On July 5, 2013, the GenOn defined contribution 401(k) plans were merged into the NRG 401(k) plan.

GenOn also sponsors non-qualified deferred compensation plans for key and highly compensated employees. GenOn's obligations under these plans were $22 million and the related rabbi trust investments were $31 million at December 31, 2013 and 2012, respectively. Upon completion of the NRG Merger, NRG assumed GenOn's non-qualified plans and their respective obligations.

Expense recognized for the matching, fixed profit sharing and discretionary profit sharing contributions for the year ended December 31, 2013, the period from December 15, 2012 through December 31, 2012, the period from January 1, 2012 through December 14, 2012 and the year ended December 31, 2011 were $4 million, $1 million, $30 million and $30 million, respectively.

### Note 13— Capital Structure (GenOn)

On December 14, 2012, NRG and GenOn completed the NRG Merger. Upon closing, each issued and outstanding share of GenOn's common stock automatically converted into the right to receive 0.1216 shares of common stock of NRG based on the NRG Merger Exchange Ratio. See Note 3, *NRG Merger and Dispositions*.

| | Common Stock |
| | (Shares in millions) |
|---|---|
| As of December 31, 2010 | 771 |
| Transactions under stock plans | 1 |
| As of December 31, 2011 | 772 |
| Transactions under stock plans | 2 |
| As of December 14, 2012 | 774 |
| Impact of NRG Merger | (774) |
| As of December 31, 2012[(a)] | — |

(a) There have been no common stock transactions subsequent to the NRG Merger.

**Note 14— Segment Reporting (GenOn and GenOn Americas Generation)**

GenOn previously had the following segments: Eastern PJM, Western PJM/MISO, California, Energy Marketing and Other Operations. GenOn Americas Generation previously had the following segments: Eastern PJM, Northeast, California, Energy Marketing and Other Operations. In the fourth quarter of 2012, in conjunction with the NRG Merger, GenOn and GenOn Americas Generation began reporting the following segments: East, South Central, West and Corporate. All GenOn Mid-Atlantic entities are included within the GenOn East segment. There are distinct components with separate operating results and management structures for each segment, which are based on the geographical location of the power generation operations. GenOn and GenOn Americas Generation have recast the data from prior periods to reflect this change in reportable segments to conform to the current year presentation.

*GenOn*

| Successor | Year Ended December 31, 2013 | | | | |
|---|---|---|---|---|---|
| | East | South Central | West | Corporate | Total |
| | | | (In millions) | | |
| **Operating revenues** | $    2,291 | $        7 | $      249 | $        9 | $    2,556 |
| Operating revenues - affiliate | (4) | 38 | 12 | 2 | 48 |
| Operating expenses (a) | 1,590 | 34 | 130 | 234 | 1,988 |
| Operating expenses - affiliate | 299 | 34 | 50 | (179) | 204 |
| Depreciation and amortization | 195 | 6 | 39 | 9 | 249 |
| Operating loss | 203 | (29) | 42 | (53) | 163 |
| Other income/(loss), net | 26 | — | — | (25) | 1 |
| Equity in earnings of unconsolidated affiliates/(loss) | — | 4 | — | — | 4 |
| Loss on debt extinguishment | — | — | — | (11) | (11) |
| Interest expense | (67) | — | (5) | (121) | (193) |
| Interest expense -affiliate | — | — | — | (12) | (12) |
| Income/(loss) before income taxes | 162 | (25) | 37 | (222) | (48) |
| Income tax benefit | — | — | — | (6) | (6) |
| **Net income/(loss)** | $      162 | $     (25) | $       37 | $    (216) | $      (42) |
| **Balance sheet** | | | | | |
| Equity investment in affiliate | $        — | $       17 | $        — | $        — | $       17 |
| Capital expenditures (b) | $      157 | $        3 | $       81 | $       39 | $      280 |
| Total assets | $    4,255 | $      179 | $      329 | $      971 | $    5,734 |

(a)   Corporate operating expenses include $70 million in acquisition-related costs.
(b)   Includes accruals.

| Successor | December 15, 2012 through December 31, 2012 | | | | |
|---|---|---|---|---|---|
| | East | South Central | West | Corporate | Total |
| | | | (In millions) | | |
| **Operating revenues** | $       66 | $        — | $        7 | $        — | $       73 |
| Operating expenses | 67 | 1 | 6 | 53 | 127 |
| Depreciation and amortization | 8 | — | 2 | — | 10 |
| Operating loss | (9) | (1) | (1) | (53) | (64) |
| Interest expense | — | — | — | (8) | (8) |
| Loss before income taxes | (9) | (1) | (1) | (61) | (72) |
| Income tax expense/(benefit) | — | — | — | — | — |
| **Net loss** | $       (9) | $       (1) | $       (1) | $      (61) | $      (72) |
| **Balance sheet** | | | | | |
| Equity investment in affiliate | $        — | $       19 | $        — | $        — | $       19 |
| Capital expenditures (a) | $       17 | $        8 | $       21 | $        1 | $       47 |
| Total assets | $    5,873 | $      250 | $    1,063 | $      233 | $    7,419 |

(a)   Includes accruals.

**Predecessor**

| | January 1, 2012 through December 14, 2012 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | East | | South Central | | West | | Corporate | | Total |
| | (In millions) | | | | | | | | |
| Operating revenues | $ | 2,153 | $ | 29 | $ | 379 | $ | 3 | $ 2,564 |
| Operating expenses | | 1,994 | | 16 | | 226 | | 14 | 2,250 |
| Depreciation and amortization | | 267 | | 9 | | 43 | | 20 | 339 |
| Impairment losses | | 47 | | — | | — | | — | 47 |
| Operating income/(loss) | | (155) | | 4 | | 110 | | (31) | (72) |
| Other income, net | | — | | 2 | | — | | 1 | 3 |
| Interest expense | | (1) | | — | | — | | (329) | (330) |
| Income/(loss) before income taxes | | (156) | | 6 | | 110 | | (359) | (399) |
| Income tax expense | | — | | — | | — | | 15 | 15 |
| Net income/(loss) | $ | (156) | $ | 6 | $ | 110 | $ | (374) | $ (414) |
| Capital expenditures[a] | $ | 251 | $ | 8 | $ | 284 | $ | 10 | 553 |

(a) Includes accruals.

**Predecessor**

| | Year Ended December 31, 2011 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | East | | South Central | | West | | Corporate | | Total |
| | (In millions) | | | | | | | | |
| Operating revenues | $ | 3,125 | $ | 37 | $ | 449 | $ | 3 | $ 3,614 |
| Operating expenses | | 2,428 | | 36 | | 371 | | 62 | 2,897 |
| Depreciation and amortization | | 291 | | 7 | | 44 | | 33 | 375 |
| Impairment losses | | 119 | | — | | 14 | | — | 133 |
| Operating income/(loss) | | 287 | | (6) | | 20 | | (92) | 209 |
| Other income/(loss), net | | — | | 6 | | — | | (2) | 4 |
| Interest (expense)/income | | (12) | | — | | 4 | | (371) | (379) |
| Loss on debt extinguishment and refinancing expense | | — | | — | | — | | (23) | (23) |
| Income/(loss) before income taxes | | 275 | | — | | 24 | | (488) | (189) |
| Income tax expense/(benefit) | | — | | — | | — | | — | — |
| Net income/(loss) | $ | 275 | $ | — | $ | 24 | $ | (488) | $ (189) |

*GenOn Americas Generation*

**Successor**

| | Year Ended December 31, 2013 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | East | | South Central | | West | | Corporate | | Total |
| | (In millions) | | | | | | | | |
| Operating revenues | $ | 2,258 | $ | — | $ | 170 | $ | — | $ 2,428 |
| Operating revenues—affiliate | | 87 | | 41 | | 5 | | — | 133 |
| Operating expenses | | 870 | | — | | 35 | | — | 905 |
| Operating expenses—affiliate | | 1,272 | | 41 | | 117 | | — | 1,430 |
| Depreciation and amortization | | 86 | | — | | 9 | | — | 95 |
| Operating income/(loss) | | 117 | | — | | 14 | | — | 131 |
| Other income/(loss), net | | — | | — | | — | | 1 | 1 |
| Equity in earnings of unconsolidated affiliates | | 0 | | 0 | | 0 | | 0 | 0 |
| Interest expense | | (5) | | — | | — | | (68) | (73) |
| Income/(loss) before income taxes | | 112 | | — | | 14 | | (67) | 59 |
| Income tax expense/(benefit) | | — | | — | | — | | — | — |
| Net income/(loss) | $ | 112 | $ | — | $ | 14 | $ | (67) | $ 59 |
| Balance sheet | | | | | | | | | |
| Capital expenditures[a] | $ | 66 | $ | — | $ | — | $ | — | $ 66 |
| Total assets | $ | 2,484 | $ | 17 | $ | 162 | $ | 300 | $ 2,963 |

(a) Includes accruals.

**Successor**

| | December 15, 2012 through December 31, 2012 | | | | | |
| | East | South Central | West | Corporate | Elimination | Total |
| --- | --- | --- | --- | --- | --- | --- |
| | (In millions) | | | | | |
| **Operating revenues** | $ 70 | $ — | $ 4 | $ — | $ — | $ 74 |
| Operating revenues—affiliate | 3 | — | — | — | — | 3 |
| Operating expenses | 29 | — | — | — | — | 29 |
| Operating expenses—affiliate | 42 | — | 1 | — | — | 43 |
| Depreciation and amortization | 4 | — | 1 | — | — | 5 |
| Operating income/(loss) | (2) | — | 2 | — | — | |
| Other income/(loss), net | — | — | — | — | — | — |
| Interest expense | — | — | — | (3) | — | (3) |
| Income/(loss) before income taxes | (2) | — | 2 | (3) | — | (3) |
| Income tax expense/(benefit) | — | — | — | — | — | |
| **Net income/(loss)** | $ (2) | $ — | $ 2 | $ (3) | $ — | $ (3) |
| **Balance sheet** | | | | | | |
| Capital expenditures[a] | $ 6 | $ — | $ — | $ — | $ — | $ 6 |
| **Total assets** | $ 2,451 | $ — | $ 172 | $ 1,126 | $ (363) | $ 3,386 |

(a) Includes accruals.

**Predecessor**

| | January 1, 2012 through December 14, 2012 | | | | | |
| | East | South Central | West | Corporate | Elimination | Total |
| --- | --- | --- | --- | --- | --- | --- |
| | (In millions) | | | | | |
| **Operating revenues** | $ 2,060 | $ 24 | $ 321 | $ — | $ — | $ 2,405 |
| Operating revenues—affiliate | 137 | 22 | 30 | — | — | 189 |
| Operating expenses | 950 | — | 123 | 2 | — | 1,075 |
| Operating expenses—affiliate | 1,143 | 30 | 195 | 1 | — | 1,369 |
| Depreciation and amortization | 136 | — | 14 | 5 | — | 155 |
| Impairment losses | — | — | — | — | — | — |
| Operating income/(loss) | (32) | 16 | 19 | (8) | — | (5) |
| Other income/(loss), net | — | — | — | — | — | — |
| Interest expense | (5) | — | — | (70) | — | (75) |
| Income/(loss) before income taxes | (37) | 16 | 19 | (78) | — | (80) |
| Income tax expense/(benefit) | — | — | — | — | — | — |
| **Net income/(loss)** | $ (37) | $ 16 | $ 19 | $ (78) | $ — | $ (80) |
| Capital expenditures[a] | $ 190 | $ — | $ — | $ — | $ — | $ 190 |

(a) Includes accruals.

**Predecessor**

| | Year Ended December 31, 2011 | | | | | |
| | East | South Central | West | Corporate | Elimination | Total |
| --- | --- | --- | --- | --- | --- | --- |
| | (In millions) | | | | | |
| **Operating revenues** | $ 2,793 | $ 22 | $ 200 | $ — | $ — | $ 3,015 |
| Operating revenues—affiliate | (87) | — | 10 | — | — | (77) |
| Operating expenses | 1,005 | — | 36 | 9 | — | 1,050 |
| Operating expenses—affiliate | 1,306 | 22 | 129 | (7) | — | 1,450 |
| Depreciation and amortization | 155 | — | 15 | 7 | — | 177 |
| Impairment losses | 114 | — | 14 | — | — | 128 |
| Operating income/(loss) | 126 | — | 16 | (9) | — | 133 |
| Other loss, net | — | — | (1) | — | — | (1) |
| Interest expense | (5) | — | (1) | (87) | — | (93) |
| Loss on debt extinguishment and refinancing expense | — | — | — | (23) | — | (23) |
| Income/(loss) before income taxes | 121 | — | 14 | (119) | — | 16 |
| Income tax expense/(benefit) | | | | | | |

| Net income/(loss) | $ | 121 | $ | 14 | $ | (119) | $ | 16 |

108

.

**Note 15 — Income Taxes (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*Income Taxes*

*GenOn*

GenOn's income tax (benefit)/provision consisted of the following:

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | **Year Ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** | **Year Ended December 31, 2011** |
| | (In millions) | | (In millions) | |
| Current tax (benefit)/provision: | | | | |
| Federal | $ (6) | $ — | $ 15 | $ (1) |
| State | — | — | — | 1 |
| Total current (benefit)/provision for income taxes | $ (6) | $ — | $ 15 | $ — |

A reconciliation of GenOn's federal statutory income tax provision to the effective income tax (benefit)/provision adjusted for permanent and other items during 2013, 2012 and 2011, is as follows:

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | **Year Ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** | **Year Ended December 31, 2011** |
| | (In millions, except percentages) | | (In millions, except percentages) | |
| Provision for income taxes based on U.S. federal statutory income tax rate | $ 2 | $ (25) | $ (140) | $ (66) |
| State and local income tax provision, net of federal income taxes | — | (1) | (9) | (8) |
| Change in deferred tax asset valuation allowance | (2) | 23 | 166 | 183 |
| Effect of equity-related transactions | — | 1 | (5) | (49) |
| Tax settlements | (6) | — | 6 [b] | (25) [a] |
| NRG Merger-related costs | — | 2 | — | — |
| Mirant/RRI Merger-related costs | — | — | — | (15) |
| Mirant/RRI Merger-related write-off of NOL and state and local income tax provision, net of federal income taxes | — | — | — | (3) |
| Mirant/RRI Merger-related write-off of NOL and other deferred tax assets | — | — | — | (21) |
| Other, net | — | — | (3) | 4 |
| Income tax (benefit)/provision | $ (6) | $ — | $ 15 | $ — |

(a) Settlements of tax disputes increased GenOn's tax basis in depreciable assets that had previously been written off as a result of Mirant's emergence from bankruptcy in 2006.

(b) Deferred tax attribute changes from 2002-2003 audit changes including effect of the CenterPoint tax allocation agreement.

109

.

The tax effects of temporary differences between the carrying amounts of assets and liabilities in GenOn's financial statements and their respective tax bases which give rise to deferred tax assets and liabilities are as follows:

| | As of December 31, | |
| --- | --- | --- |
| | 2013 | 2012 |
| | (In millions) | |
| **Deferred Tax Assets:** | | |
| Employee benefits | $ 134 | $ 149 |
| Pension and other postretirement benefits | 123 | 98 |
| Contingencies and other liabilities | — | — |
| Federal loss carryforwards | 384 | 375 |
| State loss carryforwards | 108 | 77 |
| Property and intangible assets | 1,563 | 1,594 |
| Out-of-market contracts fair value adjustment | 136 | 132 |
| Debt premium, net | 136 | 160 |
| Other | 117 | 41 |
| Subtotal | 2,701 | 2,626 |
| Valuation allowance | (2,672) | (2,324) |
| Net deferred tax assets | 29 | 302 |
| **Deferred Tax Liabilities:** | | |
| Derivative contracts | (29) | (297) |
| Debt discount, net | — | — |
| Other | — | (5) |
| Net deferred tax liabilities | (29) | (302) |
| Net deferred taxes | $ — | $ — |

### NOLs

As a result of the NRG Merger, GenOn experienced an ownership change as defined in IRC § 382. IRC § 382 provides, in general, that an ownership change occurs when there is a greater than 50-percentage point increase in ownership of a company's stock by new or existing stockholders who own (or are deemed to own under IRC § 382) 5% or more of the loss company's stock over a three year testing period. IRC § 382 limits the amount of pre-merger NOLs and built-in losses that can be used during any post-ownership change year to offset taxable income. GenOn has reduced the amount of federal NOLs that would have been available to offset post-merger taxable income based on a $62 million annual limitation by $2.3 billion. GenOn reduced the amount of state NOLs to the applicable size amount based upon state conformity to IRC § 382. In addition, based on the allocation of the provisional fair values in connection with the NRG Merger, GenOn reduced its tax basis in depreciable assets by $938 million for financial reporting purposes due to the inability to utilize future tax depreciation deductions that are limited as built-in losses under IRC § 382.

At December 31, 2013, GenOn's federal NOL carryforward for financial reporting was $1 billion with expiration dates from 2022 to 2032. Similarly, there is an aggregate amount of $1.4 billion of state NOL carryforwards with various expiration dates (based on a review of the application of apportionment factors and other state tax limitations).

The guidance related to accounting for income taxes requires that a valuation allowance be established when it is more-likely-than-not that all or a portion of a deferred tax asset will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn's past and anticipated future performance, the reversal of deferred tax liabilities and the implementation of tax planning strategies.

At December 31, 2013, GenOn's deferred tax assets reduced by a valuation allowance are completely offset by GenOn's deferred tax liabilities. Objective positive evidence is necessary to support a conclusion that a valuation allowance is not needed for all or a portion of deferred tax assets when significant negative evidence exists. GenOn evaluates this position quarterly and makes judgments based on the facts and circumstances at that time. GenOn thinks that the realization of future taxable income sufficient to utilize existing deferred tax assets is less than more-likely-than-not at this time.

### Tax Uncertainties

The recognition of contingent losses for tax uncertainties requires management to make significant assumptions about the expected outcomes of certain tax contingencies. Under the accounting guidance, GenOn must reflect in its income tax provision the full benefit of all positions that will be taken in GenOn's income tax returns, except to the extent that such positions are uncertain and fall below the benefit recognition requirements. In the event that GenOn determines that a tax position meets the uncertainty criteria, an additional liability or an adjustment to GenOn's NOLs, determined under the measurement criteria, will result. GenOn periodically reassesses the tax positions in its tax returns for open years based on the latest information available and determines whether any portion of the tax benefits reflected should be treated as unrecognized. A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows:

| | Successor | | | Predecessor |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2013 | | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | | (In millions) |
| Unrecognized tax benefits, beginning of period | $ | 6 | $ 6 | $ 5 |
| Increase based on tax positions related to the prior years | | — | — | 3 |
| Decrease due to settlements and payments | | (5) | — | (2) |
| Decrease as a result of lapse in the statute of limitations | | — | — | — |
| Unrecognized tax benefits, end of period | $ | 1 | $ 6 | $ 6 |

The unrecognized tax benefits included the review of tax positions relating to open tax years beginning in 2002 and continuing to the present. GenOn's major tax jurisdictions are the U.S. at the federal level and multiple state and local jurisdictions. Both the federal and state NOL carryforwards from any closed year are subject to examination until the year that such NOL carryforwards are utilized and that utilization year is closed for audit. GenOn does not anticipate any significant changes in its unrecognized tax benefits over the next 12 months. GenOn has not recognized any tax benefits for certain filing positions for which the outcome is uncertain and the effect is estimable.

Included in the unrecognized tax benefits balance at December 31, 2013 and 2012, GenOn had $1 million and $5 million, respectively, of unrecognized tax benefits that would affect the effective tax rate if they were recognized. GenOn's tax provision in each period includes interest and penalties related to unrecognized tax benefits. The amount recorded in GenOn's consolidated balance sheet for interest and penalties related to the unrecognized tax benefits at both December 31, 2013 and 2012 is $1 million.

GenOn continues to be subject to audit for multiple years by taxing authorities in various jurisdictions. Considerable judgment is required to determine the tax treatment of particular items that involve interpretations of complex tax laws. A tax liability is recorded for filing positions with respect to which the outcome is uncertain and the recognition criteria under the accounting guidance for uncertainty in income taxes has been met. Such liabilities are based on judgment and it can take many years to resolve a recorded liability such that the related filing position is no longer subject to question. GenOn has not recorded a liability for those proposed tax adjustments related to the current tax audits when GenOn continues to think its filing position meets the more-likely-than-not threshold prescribed in the accounting guidance related to accounting for uncertainty in income taxes. Any adverse outcomes arising from these matters could result in a material change in the amount of GenOn's deferred taxes.

GenOn ceased being a member of the CenterPoint consolidated tax group at September 30, 2002 and has been limited in GenOn's ability to use tax attributes generated during periods through that date. The Internal Revenue Service's audits of CenterPoint's federal income tax returns for the 1997 to 2002 tax reporting periods have been closed, subject to a review by the Internal Revenue Service of certain claims formally submitted by GenOn for the 2002 tax year. GenOn has a tax allocation agreement that addresses the allocation of taxes pertaining to GenOn's separation from CenterPoint. This agreement provides that GenOn may carryback net operating losses generated subsequent to September 30, 2002 to tax years when GenOn was part of CenterPoint's consolidated tax group. Any such carryback is subject to CenterPoint's consent and any existing statutory carryback limitations. For items relating to periods prior to September 30, 2002, GenOn will (a) recognize any net costs incurred by CenterPoint for settlement of temporary differences up to $15 million (of which zero had been recognized through December 31, 2013 and 2012) as an equity contribution and (b) recognize any net benefits realized by CenterPoint for settlement of temporary differences up to $1 million as an equity distribution. Generally, amounts for temporary differences in excess of the $15 million and $1 million thresholds will be settled in cash between GenOn and CenterPoint. Pursuant to this agreement, generally, taxes related to permanent differences are the responsibility of CenterPoint.

*GenOn Americas Generation*

As a result of the NRG Merger, GenOn experienced an ownership change as defined in IRC § 382. IRC § 382 provides, in general, that an ownership change occurs when there is a greater than 50-percentage point increase in ownership of a company's stock by new or existing stockholders who own (or are deemed to own under IRC § 382) 5% or more of the loss company's stock over a three year testing period. IRC § 382 limits the amount of pre-merger NOLs and built-in losses that can be used during any post-ownership change year to offset taxable income. The annual limitation on the amount of taxable income that can be offset by GenOn's pre-NRG Merger NOLs has been redetermined as of the date of the NRG Merger. GenOn Americas Generation's annual limitation on the amount of taxable income that can be offset by its pre-merger NOLs has also been redetermined as a consequence of the GenOn ownership change that resulted from the NRG Merger. GenOn Americas Generation has reduced to zero the amount of its pre-NRG Merger NOLs available to offset post-NRG Merger taxable income based on the expected limits determined in accordance with IRC § 382.

GenOn Americas Generation's income tax provision/(benefit) was $0 for 2011through 2013.

A reconciliation of GenOn Americas Generation's expected federal statutory income tax provision to the effective income tax provision adjusted for permanent and other items during 2013, 2012 and 2011, is as follows:

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | **Year Ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** | **Year Ended December 31, 2011** |
| | (In millions, except percentages) | | (In millions, except percentages) | |
| Provision (benefit) for income taxes based on U.S. federal statutory income tax rate | $ 22 | $ (1) | $ (28) | $ 5 |
| State and local income tax provision, net of federal income taxes | 6 | — | (4) | 5 |
| LLC income not subject to taxation | (28) | 1 | 32 | (10) |
| Income tax (benefit)/provision | $ — | $ — | $ — | $ — |

*Tax Uncertainties*

The recognition of contingent losses for tax uncertainties requires management to make significant assumptions about the expected outcomes of certain tax contingencies. Under the accounting guidance, GenOn Americas Generation must reflect in its income tax provision the full benefit of all positions that will be taken in GenOn Americas Generation's income tax returns, except to the extent that such positions are uncertain and fall below the benefit recognition requirements. In the event that GenOn Americas Generation determines that a tax position meets the uncertainty criteria, an additional liability or an adjustment to GenOn Americas Generation's NOLs, determined under the measurement criteria, will result. GenOn Americas Generation periodically reassesses the tax positions in its tax returns for open years based on the latest information available and determines whether any portion of the tax benefits reflected should be treated as unrecognized.

Both the federal and state NOL carryforwards from any closed year are subject to examination until the year that such NOL carryforwards are utilized and that utilization year is closed for audit. GenOn Americas Generation has not recorded any uncertain tax benefits.

*Pro Forma Income Tax Disclosures*

*GenOn Americas Generation*

GenOn Americas Generation is not subject to income taxes except for those subsidiaries of GenOn Americas Generation that are separate taxpayers. GenOn Americas, GenOn and NRG are otherwise directly responsible for income taxes related to GenOn Americas Generation's operations.

The pro forma income tax provision that would be reported if GenOn Americas Generation were to be allocated income taxes attributable to its operations was $0 for the year ended December 31, 2013, the period from December 15, 2012 through December 31, 2012, the period from January 1, 2012 through December 14, 2012 and the year ended December 31, 2011.

The following table presents the pro forma reconciliation of GenOn Americas Generation's federal statutory income tax provision for continuing operations adjusted for reorganization items to the pro forma effective tax provision:

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions, except percentages) | | (In millions, except percentages) | |
| Provision (benefit) for income taxes based on U.S. federal statutory income tax rate | 21 | (1) | (28) | 5 |
| State and local income tax provision (benefit), net of federal income taxes | 6 | — | (4) | 5 |
| Change in deferred tax asset valuation allowance | (27) | 2 | 32 | (74) |
| Mirant/RRI Merger-related write-off of NOLs | — | — | — | 83 |
| Tax settlement | — | — | — | (23) [a] |
| Other, net | — | — | — | 4 |
| Income tax provision | — | 1 | — | — |

(a) Settlement of tax disputes increased GenOn Americas Generation's tax basis in depreciable assets that previously had been written off as a result of Mirant's emergence from bankruptcy in 2006.

The tax effects of temporary differences between the carrying amounts of assets and liabilities in the consolidated balance sheets and their respective tax bases which give rise to the pro forma deferred tax assets and liabilities would be as follows:

| | As of December 31, | |
|---|---|---|
| | 2013 | 2012 |
| | (In millions) | |
| **Deferred Tax Assets:** | | |
| Pension and other postretirement benefits | $ 85 | $ — |
| Reserves | 124 | 23 |
| Loss carryforwards | 34 | 176 |
| Property and intangible assets | 1,602 | 817 |
| Out-of-market contracts fair value adjustment | 55 | 212 |
| Debt premium | 42 | 39 |
| Other, net | 37 | — |
| Subtotal | 1,979 | 1,267 |
| Valuation allowance | (1,936) | (990) |
| Net deferred tax assets | 43 | 277 |
| **Deferred Tax Liabilities:** | | |
| Derivative contract assets and liabilities | (43) | (276) |
| Other, net | — | (1) |
| Net deferred tax liabilities | (43) | (277) |
| Net deferred taxes | $ — | $ — |

The guidance related to accounting for income taxes requires that a valuation allowance be established when it is more–likely–than–not that all or a portion of a deferred tax asset will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn Americas Generation's past and anticipated future performance, the reversal of deferred tax liabilities and the implementation of tax planning strategies.

Objective positive evidence is necessary to support a conclusion that a valuation allowance is not needed for all or a portion of deferred tax assets when significant negative evidence exists. GenOn Americas Generation evaluates this position quarterly and makes its judgment based on the facts and circumstances at that time.

As a result of the NRG Merger, GenOn experienced an ownership change as defined in IRC § 382. IRC § 382 provides, in general, that an ownership change occurs when there is a greater than 50-percentage point increase in ownership of a company's stock by new or existing stockholders who own (or are deemed to own under IRC § 382) 5% or more of the loss company's stock over a three year testing period. IRC § 382 limits the amount of pre-merger NOLs that can be used during any post-ownership change year to offset taxable income. The annual limitation on the amount of taxable income that can be offset by GenOn's pre-NRG Merger NOLs has been redetermined as of the date of the NRG Merger. GenOn Americas Generation's annual limitation on the amount of taxable income that can be offset by its pre-merger pro forma NOLs has also been redetermined as a consequence of the GenOn ownership change that resulted from the NRG Merger. GenOn Americas Generation has reduced the amount of its pre-NRG Merger pro forma NOLs available to offset post-NRG Merger taxable income based on the expected limits determined in accordance with IRC § 382.

*GenOn Mid-Atlantic*

The following reflects a pro forma disclosure of the income tax provision that would be reported if GenOn Mid-Atlantic was to be allocated income taxes attributable to its operations. Pro forma income tax provision attributable to income before tax would consist of the following:

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| Current provision (benefit): | | | | |
| Federal | $ 45 | $ 1 | $ 10 | $ 3 |
| State | 12 | — | 1 | 1 |
| Deferred provision: | | | | |
| Federal | — | (1) | 3 | 21 |
| State | — | — | — | 5 |
| Total provision for income taxes | $ 57 | $ — | $ 14 | $ 30 |

The following table presents the pro forma reconciliation of GenOn Mid-Atlantic's federal statutory income tax provision for continuing operations adjusted for reorganization items to the pro forma effective tax provision:

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions, except percentages) | | (In millions, except percentages) | |
| Provision (benefit) for income taxes based on U.S. federal statutory income tax rate | $ 45 | $ — | $ 11 | $ 37 |
| State and local income taxes | 12 | — | 1 | 4 |
| Tax settlement | — | — | — | (11) [a] |
| Impairment of non-deductible goodwill | — | — | — | — |
| Other, net | — | — | 2 | — |
| Income tax provision | $ 57 | $ — | $ 14 | $ 30 |

(a) Settlement of tax disputes increased GenOn Mid-Atlantic's tax basis in depreciable assets that previously had been written off as a result of Mirant's emergence from bankruptcy in 2006.

The tax effects of temporary differences between the carrying amounts of assets and liabilities in the consolidated balance sheets and their respective tax bases which give rise to the pro forma deferred tax assets and liabilities would be as follows:

| | As of December 31, | |
| | 2013 | 2012 |
| | (In millions) | |
|---|---|---|
| **Deferred Tax Assets:** | | |
| Reserves | $  — | $      19 |
| Loss carryforwards | — | 1 |
| Property and intangible assets | 27 | 632 |
| Out-of-market contracts fair value adjustment | 108 | 212 |
| Other, net | 6 | 8 |
| Net deferred tax assets | 141 | 872 |
| **Deferred Tax Liabilities:** | | |
| Derivative contracts | — | (274) |
| Net deferred tax liabilities | — | (274) |
| Net deferred taxes | $      141 | $      598 |

*Pro Forma Tax Uncertainties*

GenOn Mid-Atlantic has not recorded any uncertain tax benefits.

**Note 16 — Stock-Based Compensation (GenOn)**

*Impact of NRG Merger*

Effective December 14, 2012, in connection with the consummation of the NRG Merger, the name of the GenOn Energy, Inc. 2010 Omnibus Incentive Plan was changed to NRG 2010 Stock Plan for GenOn Employees, or NRG GenOn LTIP. Pursuant to the NRG Merger Agreement, upon completion of the NRG Merger, the following occurred to GenOn's stock-based incentive awards:

  i.    each outstanding GenOn stock option that was granted under the NRG GenOn LTIP, the GenOn Energy, Inc. 2002 Long-Term Incentive Plan, the GenOn Energy, Inc. 2002 Stock Plan and the Mirant Corporation 2005 Omnibus Incentive Compensation Plan, collectively, the GenOn Plans, before 2012 vested in full (to the extent not already vested) and was converted into an option to purchase NRG common stock (with the number of shares and per share exercise price appropriately adjusted based on the NRG Merger Exchange Ratio), on the terms and conditions otherwise applicable to those options prior to the NRG Merger;

  ii.   each outstanding GenOn stock option that was granted under the GenOn Plans during 2012 was converted into an option to purchase NRG common stock (with the number of shares and per share exercise price appropriately adjusted based on the NRG Merger Exchange Ratio), on the terms and conditions (including vesting schedules and conditions) otherwise applicable to those options prior to the NRG Merger;

  iii.  each outstanding restricted stock unit that was granted under the GenOn Plans before 2012 has vested in full (to the extent not already vested) and was exchanged for shares of NRG common stock in the NRG Merger based on the NRG Merger Exchange Ratio; and

  iv.   each outstanding restricted stock unit that was granted under the GenOn Plans in 2012, to the extent it remained unvested immediately prior to the NRG Merger, was converted into unvested restricted stock units of NRG (with the number of shares subject to such restricted stock unit appropriately adjusted based on the NRG Merger Exchange Ratio), on the terms and conditions otherwise applicable to those restricted stock units.

As of December 31, 2012, all unvested stock options that were converted to options to purchase NRG common stock and restricted stock units that were converted to NRG restricted stock units were recorded in NRG's consolidated balance sheet.

The following disclosures relate to the predecessor periods and the conversion of GenOn stock options and restricted stock units only. All information regarding weighted average exercise price of stock options, weighted average grant date fair value of stock options granted and weighted average grant date fair value for restricted stock units is based on historical GenOn stock prices and includes no adjustments for the NRG Merger Exchange Ratio.

*Non-Qualified Stock Options*

GenOn granted service condition stock option awards to certain employees. Historically, stock options vested 33.33% per year for the three years and had a term of five years to ten years. GenOn recognized the related compensation expense on a straight-line basis over the requisite service period.

The weighted average grant date fair value per option granted was $1.07 and $1.68 for the period from January 1, 2012 to December 14, 2012 and the year ended December 31, 2011, respectively. The was no cash received from the exercise of options for the period of January 1, 2012 to December 14, 2012 and there was $3 million of cash received from the exercise of options for the year ended December 31, 2011. There was no intrinsic value of options exercised and no tax benefits realized, as a result of net operating loss carryforwards, for the period of January 1, 2012 to December 14, 2012 and the year ended December 31, 2011, respectively.

The fair value of GenOn's non-qualified stock options was estimated on the date of grant using the Black-Scholes option-pricing model. Significant assumptions used in the fair value model with respect to the GenOn's non-qualified stock options are summarized below:

| | January 1, 2012 through December 14, 2012 | | 2011 | |
| --- | --- | --- | --- | --- |
| | Range | Weighted Average | Range | Weighted Average |
| Expected volatility[a] | 50.5% | 50.5% | 45-55% | 47.2% |
| Expected term (in years)[b] | 5 | 5 | 5 | 5 |
| Risk-free rate[c] | 0.89% | 0.89% | 1.0-1.2% | 2.1% |

(a)   GenOn estimated volatility based on historical and implied volatility (as applicable) of its common stock.

(b)   The expected term is based on a binomial lattice model.

(c)   The risk-free rate for periods within the contractual term of the stock option is based on the U.S. Treasury yield curve in effect at the time of the grant.

*Time-based Restricted Stock Units and Performance-based Restricted Stock Units*

*Time-based Awards.* GenOn granted time-based restricted stock units to certain employees. These restricted stock units generally vested in three equal installments on each of the first, second and third anniversaries of the grant date. GenOn recognized the related compensation expense on a straight-line basis over the requisite service period. In addition, GenOn granted time-based restricted stock units to non-management members of the Board of Directors. These awards vested on the grant date and delivery of the underlying shares was deferred until the directorship terminated. During the period from January 1, 2012 to December 14, 2012, GenOn granted 3.2 million time-based restricted stock units.

*Performance-based Awards.* During the period from January 1, 2012 to December 14, 2012, GenOn granted 2.6 million performance-based restricted stock units to certain employees. These restricted stock units were linked to the 2012 short-term incentive plan performance goals, with performance measured in December 2012 to determine a multiplier between 0% and 200% of the targeted grant. These restricted stock units generally vested in three equal installments over a three-year period. GenOn recognized the related compensation expense on a straight-line basis over the requisite service period. In December 2012, the performance multiplier was determined to be 183% for the performance-based awards granted in 2012 and one-third of the restricted stock units vested at that time with the remaining unvested restricted stock units to vest in December 2013 and December 2014.

*General.* The grant date fair value of time-based and performance-based restricted stock units was equal to GenOn's closing stock price on the grant date.

The weighted average grant date fair value per restricted stock unit granted was $2.43 and $3.81 for the period from January 1, 2012 to December 14, 2012 and the year ended December 31, 2011, respectively. The fair value of vested restricted stock units was $8 million for the period from January 1, 2012 to December 14, 2012 and $0 for the year ended December 31, 2011.

*Compensation Expense*

GenOn recognized compensation expense in selling, general and administrative expense in the consolidated statements of operations related to stock-based compensation. Stock-based compensation expense was $19 million and $14 million for the period from January 1, 2012 to December 14, 2012 and the year ended December 31, 2011, respectively.

116

**Note 17 - Related Party Transactions (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*Services Agreement with NRG (GenOn)*

Subsequent to the NRG Merger (for the successor period), NRG provides GenOn, with various management, personnel and other services, which include human resources, regulatory and public affairs, accounting, tax, legal, information systems, treasury, risk management, commercial operations, and asset management, as set forth in the Services Agreement. The initial term of the Services Agreement was through December 31, 2013, with an automatic renewal absent a request for termination. The fee charged is determined based on a fixed amount as described in the Services Agreement and was calculated based on historical GenOn expenses prior to the NRG Merger. The annual fees under the Services Agreement are approximately $193 million. NRG charges these fees on a monthly basis, less amounts incurred directly by GenOn. Management has concluded that this method of charging overhead costs is reasonable. For the year ended December 31, 2013, GenOn recorded costs related to these services of $88 million.

*Administrative Services Provided by NRG for the Successor Period and Provided by GenOn Energy for the Predecessor Periods (GenOn Americas Generation and GenOn Mid-Atlantic)*

Prior to the NRG Merger, GenOn provided GenOn Americas Generation and GenOn Mid-Atlantic with various management, personnel and other services directly relating to their facilities. GenOn Americas Generation and GenOn Mid-Atlantic reimbursed GenOn for amounts equal to the costs of providing such services. In addition, GenOn's corporate overhead costs were allocated to its subsidiaries based on each operating subsidiary's planned operating expenses relative to all operating subsidiaries of GenOn. Subsequent to the NRG Merger, NRG provides GenOn Americas Generation and GenOn Mid-Atlantic with various management, personnel and other services consistent with those set forth in the Services Agreement discussed above between NRG and GenOn. GenOn's costs incurred under the Services Agreement with NRG are allocated to its subsidiaries based on each operating subsidiary's planned operating expenses relative to all operating subsidiaries of GenOn. These allocations and charges are not necessarily indicative of what would have been incurred had GenOn Americas Generation and GenOn Mid-Atlantic been unaffiliated entities. Management has concluded that this method of charging overhead costs is reasonable. Costs incurred by NRG and charged directly back to GenOn Americas and GenOn Mid-Atlantic are not considered to be affiliate costs for periods subsequent to the NRG Merger. Direct costs charged back to GenOn Americas Generation considered to be affiliate costs were $130 million and $137 million for the period from January 1, 2012 to December 14, 2012 and the year ended December 31, 2011, respectively. Direct costs charged back to GenOn Mid-Atlantic considered to be affiliate costs were $85 million and $83 million for the period from January 1, 2012 to December 14, 2012 and the year ended December 31, 2011, respectively.

The following costs were incurred under these arrangements:

*GenOn Americas Generation*

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| Allocated costs: | | | | |
| Cost of operations — affiliate | 9 | 2 | 50 | 48 |
| Selling, general and administrative — affiliate | 74 | 2 | 62 | 76 |
| Total | $ 83 | $ 4 | $ 112 | $ 124 |

*GenOn Mid-Atlantic*

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| Allocated costs: | | | | |
| Cost of operations — affiliate | 6 | 1 | 32 | 32 |
| Selling, general and administrative — affiliate | 64 | 2 | 39 | 49 |
| Total | $ 70 | $ 3 | $ 71 | $ 81 |

117

*Services Provided by GenOn Energy Management for the Predecessor Periods (GenOn Americas Generation and GenOn Mid-Atlantic)*

*GenOn Americas Generation*

Prior to the NRG Merger, GenOn Energy Management provided services to certain of GenOn's indirect operating subsidiaries through power, fuel supply and services agreements. The services included the bidding and dispatch of the generating units, fuel procurement and the execution of contracts, including economic hedges, to reduce price risk. These transactions were recorded as operating revenues — affiliate and cost of operations — affiliate, as appropriate, in the consolidated statements of operations. Amounts due from and to GenOn's indirect operating subsidiaries were recorded as accounts receivable — affiliate or accounts payables — affiliate, as appropriate. Substantially all energy marketing overhead expenses were allocated to GenOn's operating subsidiaries. For the year ended December 31, 2013, the period from January 1, 2012 through December 14, 2012 and for the year ended December 31, 2011, GenOn Americas Generation recorded a reduction to cost of operations — affiliate of $9 million, $22 million and $25 million, respectively, related to the allocations of energy marketing overhead expenses to affiliates that are not included in the GenOn Americas Generation consolidated statements of operations.

*GenOn Mid-Atlantic*

Prior to the NRG Merger, GenOn Mid-Atlantic received services from GenOn Energy Management which included the bidding and dispatch of the generating units, procurement of fuel and other products and the execution of contracts, including economic hedges, to reduce price risk. These transactions were recorded as operating revenues — affiliate and cost of operations — affiliate, as appropriate, in the consolidated statements of operations. Amounts due to and from GenOn Energy Management under the power, fuel supply and services agreements were recorded as accounts payables — affiliate or accounts receivables — affiliate, as appropriate. Under these agreements, GenOn Energy Management resold GenOn Mid-Atlantic's energy products in the PJM spot and forward markets and to other third parties. GenOn Mid-Atlantic was paid the amount received by GenOn Energy Management for such capacity and energy. GenOn Mid-Atlantic had counterparty credit risk in the event that GenOn Energy Management was unable to collect amounts owed from third parties for the resale of GenOn Mid-Atlantic's energy products. Substantially all energy marketing overhead expenses were allocated to GenOn's operating subsidiaries. For the year ended December 31, 2013, the period from January 1, 2012 through December 14, 2012 and the year ended December 31, 2011, GenOn Mid-Atlantic incurred $3 million, $4 million, and $4 million, respectively, of energy marketing overhead expense. These costs are included in cost of operations — affiliate in GenOn Mid-Atlantic's consolidated statements of operations.

### Credit Agreement with NRG (GenOn)

In connection with the closing of the NRG Merger, GenOn and GenOn Americas entered into a secured intercompany revolving credit agreement with NRG. This credit agreement provides for a $500 million revolving credit facility, all of which is available for revolving loans and letters of credit. At December 14, 2012, the letters of credit outstanding under GenOn's revolving credit facility, which was terminated in connection with the NRG Merger, were transferred to this credit agreement. At December 31, 2013, $349 million of letters of credit were outstanding under the NRG credit agreement for GenOn and of this amount, $258 million were issued on behalf of GenOn Americas Generation. See Note 10, *Debt and Capital Leases.* At December 31, 2013, no loans were outstanding under this credit agreement. In connection with the execution of the agreement, certain of GenOn's subsidiaries (guarantors) entered into a guarantee agreement pursuant to which these guarantors guaranteed amounts borrowed and obligations incurred under the credit agreement. The credit agreement has a three year maturity and is payable at maturity, subject to certain exceptions primarily related to asset sales not in the ordinary course of business and borrowings of debt. In addition, they are restricted from incurring additional liens on their assets. At GenOn's election, the interest rate per year applicable to the loans under the credit agreement will be determined by reference to either (i) the base rate plus 2.50% per year or (ii) the LIBOR rate plus 3.50% per year. In addition, the credit agreement contains customary covenants and events of default.

### Intercompany Cash Management Program (GenOn Americas Generation)

GenOn Americas Generation and certain of its subsidiaries participate in separate intercompany cash management programs whereby cash balances at GenOn Americas Generation and the respective participating subsidiaries are transferred to central concentration accounts to fund working capital and other needs of the respective participants. The balances under this program are reflected as notes receivable — affiliate or notes payable — affiliate, as appropriate. The notes are due on demand and accrue interest on the net position, which is payable quarterly, at a rate determined by GenOn Energy Holdings. At December 31, 2013 and 2012, GenOn Americas Generation had a net current notes receivable from GenOn Energy Holdings of $299 million and $198 million, respectively, related to its intercompany cash management program. For the year ended December 31, 2013, and for the periods from December 15, 2012 through December 31, 2012 and January 1, 2012 through December 14, 2012, GenOn Americas Generation earned an insignificant amount of net interest income related to these notes.

*Purchased Emission Allowances (GenOn Mid-Atlantic)*

GenOn Energy Management maintains an inventory of certain purchased emission allowances related to the Regional Greenhouse Gas Initiative on behalf of GenOn Mid-Atlantic. The emission allowances are sold by GenOn Energy Management to GenOn Mid-Atlantic as they are needed for operations. GenOn Mid-Atlantic purchases emission allowances from GenOn Energy Management at GenOn Energy Management's original cost to purchase the allowances. For allowances that have been purchased by GenOn Energy Management from a GenOn Energy affiliate, the price paid by GenOn Energy Management is determined by market indices.

Emission allowances purchased from GenOn Energy Management that were utilized during the year ended December 31, 2013, the periods from December 15, 2012 through December 31, 2012 and January 1, 2012 through December 14, 2012 and during the year ended December 31, 2011 were $17 million, $1 million, $20 million, and $26 million, respectively, and are recorded in cost of operations — affiliate in GenOn Mid-Atlantic's consolidated statements of operations.

*Operator of Leased Facilities (GenOn)*

See Note 18, Commitments and Contingencies, for a discussion of the GenOn leased facilities (Conemaugh and Keystone) that GenOn also operates.

*Sale of NRG Marsh Landing Holdings LLC to NRG Yield LLC (GenOn)*

On July 22, 2013, concurrent with the initial public offering of NRG Yield, Inc., GenOn sold its ownership interests in NRG Marsh Landing Holdings LLC to NRG Yield LLC for a purchase price of $199 million in cash plus the assumption of debt. The net assets of NRG Marsh Landing Holdings LLC were $168 million at the time of the sale resulting in the recognition of additional paid-in capital of $31 million.

The following table summarizes the net assets of Marsh Landing Holdings LLC sold to NRG Yield LLC:

| | Historical carrying amount |
|---|---|
| | (In millions) |
| **Assets** | |
| Other current and non-current assets | $ 52 |
| Property, plant and equipment | 666 |
| Total assets | $ 718 |
| **Liabilities** | |
| Other current and non-current liabilities | $ 50 |
| Long-term debt | 500 |
| Total liabilities | $ 550 |
| Net assets | $ 168 |

**Note 18— Commitments and Contingencies (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

**Commitments**

*GenOn Mid-Atlantic Operating Leases*

GenOn Mid-Atlantic leases a 100% interest in the Dickerson and Morgantown coal generation units and associated property through 2029 and 2034, respectively. GenOn Mid-Atlantic has an option to extend the leases. Any extensions of the respective leases would be for less than 75% of the economic useful life of the facility, as measured from the beginning of the original lease term through the end of the proposed remaining lease term. GenOn Mid-Atlantic accounts for these leases as operating leases and recognizes rent expense on a straight-line basis over the lease term. Rent expense totaled $41 million for the year ended December 31, 2013, $3 million for the period from December 15, 2012 through December 31, 2012, $92 million, for the period from January 1, 2012 through December 14, 2012 and $96 million for the year ended December 31, 2011. Rent expense is included in cost of operations. As of December 31, 2013 and 2012, GenOn Mid-Atlantic has paid $97 million and $30 million, respectively, of lease payments in excess of rent expense recognized, which is included in prepaid rent on the consolidated balance sheets. Of these amounts, $71 million and $30 million, respectively, is included in prepayments and other current assets (prepayments for GenOn).

For restrictions under these leases, see Note 10, *Debt and Capital Leases.*

As further described in Note 3, *NRG Merger and Dispositions*, as a result of pushdown accounting, GenOn Mid-Atlantic recorded the acquisition date fair value of the leasehold improvements of $382 million, classified in property, plant and equipment. In addition, GenOn Mid-Atlantic recorded the acquisition date fair value of the leasehold interests, net of the present value of the lease obligation, equal to an out-of-market liability of $604 million, classified in out-of-market contracts. This liability is amortized to rent expense on a straight-line basis over the term of the lease.

Future minimum lease commitments under the GenOn Mid-Atlantic operating leases for the years ending after December 31, 2013, are as follows:

|  | (In millions) |
|---|---:|
| 2014 | $       131 |
| 2015 | 110 |
| 2016 | 150 |
| 2017 | 144 |
| 2018 | 105 |
| Thereafter | 686 |
| Total | $    1,326 |

*REMA Operating Leases (GenOn)*

GenOn, through its subsidiary, REMA, leases a 100% interest in the Shawville coal generation facility through 2026, and expects to make payments under the Shawville lease through that date, and leases 16.45% and 16.67% interest in the Keystone and Conemaugh coal generation facilities, respectively, through 2034, and expects to make payments under the Keystone and Conemaugh leases through 2029. At the expiration of these leases, there are several renewal options related to fair value. GenOn accounts for these leases as operating leases and records lease expense on a straight-line basis over the lease term. Rent expense totaled $28 million, $2 million, $33 million and $35 million for the year ended December 31, 2013, for the period from December 15, 2012 through December 31, 2012, for the period from January 1, 2012 through December 14, 2012, and for the year ended December 31, 2011, respectively, and is included in cost of operations. As of December 31, 2013, GenOn has paid $22 million of lease payments in excess of rent expense recognized, which is included in prepayments on the consolidated balance sheets. There were no lease payments in excess of rent recognized as of December 31, 2012.

GenOn operates the Conemaugh and Keystone generating facilities under five‑year agreements that expire in December 2015 that, subject to certain provisions and notifications, could be terminated annually with one year's notice. GenOn is reimbursed by the other owners for the cost of direct services provided to the Conemaugh and Keystone facilities. Additionally, GenOn received fees of $11 million, $1 million, $9 million and $10 million for the year ended December 31, 2013, for the period from December 15, 2012 through December 31, 2012, for the period from January 1, 2012 through December 14, 2012, and for the year ended December 31, 2011, respectively. These fees received, which are recorded as a reductions in cost of operations, are primarily used to cover REMA's administrative support costs of providing these services.

For restrictions under these leases, see Note 10, *Debt and Capital Leases.*

As further described in Note 3, *NRG Merger and Dispositions*, as a result of pushdown accounting, GenOn recorded the acquisition date fair value of the leasehold improvements of $66 million, classified in property, plant and equipment.  In addition, GenOn recorded the acquisition date fair value of the leasehold interests, net of the present value of the lease obligation, equal to an out-of-market liability of $186 million, classified in out-of-market contracts. This liability is amortized to rent expense on a straight-line basis over the term of the lease.

Future minimum lease commitments under the REMA operating leases for the years ending after December 31, 2013, are as follows:

|  | (In millions) |
|---|---:|
| 2014 | $ 63 |
| 2015 | 56 |
| 2016 | 61 |
| 2017 | 63 |
| 2018 | 55 |
| Thereafter | 400 |
| Total | $ 698 |

During 2011, GenOn completed an analysis of the cost of environmental controls required for the Shawville generating facility, including the installation of cooling towers. After evaluation of the forecasted energy and capacity prices, expected capital expenditures, operating costs, property taxes and other factors, GenOn concluded that the forecasted returns on investments necessary to comply with the environmental regulations are insufficient. Accordingly, GenOn plans to place the coal-fired units at the Shawville generating facility, which are leased, in a long-term protective layup in April 2015. Under the lease agreement for Shawville, GenOn's obligations generally are to pay the required rent and to maintain the leased assets in accordance with the lease documentation, including in compliance with prudent competitive electric generating industry practice and applicable laws. GenOn will continue to evaluate options under the lease, including termination of the lease for economic obsolescence, keeping the facility in long-term protective layup during the term of the lease, or continuing operations with a different fuel. See Note 8, *Retirements, Mothballing or Long-Term Protective Layup of Generating Facilities*, for a discussion of other generating facilities that GenOn expects to deactivate in 2014, 2015 or 2016.

### Other Operating Leases

The Registrants have commitments under other operating leases with various terms and expiration dates. Included in other operating leases is GenOn's long-term lease for its corporate headquarters in Houston, Texas which expires in 2018. GenOn Mid-Atlantic has other operating leases which primarily relate to the Chalk Point generating facility. Rent expense for other operating leases is recorded to cost of operations or selling, general and administrative, as applicable, based on the nature of the lease.

The Registrants' rent expense associated with other operating leases was as follows:

|  | Successor | | | Predecessor | |
|---|---|---|---|---|---|
|  | 2013 | December 15, 2012 through December 31, 2012 | | January 1, 2012 through December 14, 2012 | 2011 |
|  | (In millions) | | | (In millions) | |
| GenOn | $ 17 | $ 1 | | $ 15 | $ 20 |
| GenOn Americas Generation | $ — | $ — | | $ 3 | 7 |
| GenOn Mid-Atlantic | $ — | $ — | | $ 3 | 7 |

121

Future minimum lease commitments under the Registrants' other operating leases for the years ending after December 31, 2013, are as follows:

| | GenOn[a] | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| | | (In millions) | |
| 2014 | $ 18 | $ 7 | $ 7 |
| 2015 | 16 | 6 | 6 |
| 2016 | 11 | 1 | 1 |
| 2017 | 10 | 1 | 1 |
| 2018 | 8 | 1 | 1 |
| Thereafter | 1 | 1 | 1 |
| Total | $ 64 | $ 17 | $ 17 |

(a) Amounts in the table exclude future sublease income of $4 million annually, associated with GenOn's long-term lease for its corporate headquarters in Houston, Texas.

### Fuel and Commodity Transportation Commitments

The Registrants have commitments under coal agreements and commodity transportation contracts, primarily related to natural gas and coal, of various quantities and durations. At December 31, 2013, the maximum remaining term under any individual fuel supply contract is 5 years and any transportation contract is 9 years.

As of December 31, 2013, the Registrants' commitments under such outstanding agreements are estimated as follows:

| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| | | (In millions) | |
| 2014 | $ 167 | $ 29 | $ 29 |
| 2015 | 122 | 4 | 4 |
| 2016 | 119 | 4 | 4 |
| 2017 | 108 | — | — |
| 2018 | 36 | — | — |
| Thereafter | 129 | — | — |
| Total | $ 681 | $ 37 | $ 37 |

### LTSA Commitments (GenOn)

LTSA commitments primarily relate to long-term service agreements that cover some periodic maintenance, including parts, on power generation turbines. The long-term maintenance agreements terminate from 2014 to 2038 based on turbine usage.

As of December 31, 2013, GenOn's commitments under such outstanding agreements are estimated as follows:

| | GenOn |
|---|---|
| | (In millions) |
| 2014 | $ 13 |
| 2015 | 14 |
| 2016 | 15 |
| 2017 | 14 |
| 2018 | 27 |
| Thereafter | 204 |
| Total | $ 287 |

*Other Commitments*

The Registrants have other commitments under contractual arrangements with various terms and expiration dates. The Registrants' other commitments primarily include the operation and maintenance agreement and the fly ash sales agreement entered into by GenOn Mid-Atlantic in connection with its ash beneficiation facility. The ash beneficiation facility agreements will expire in 2031. GenOn Mid-Atlantic has other similar agreements for gypsum. In addition to the GenOn Mid-Atlantic agreements, GenOn has other commitments which primarily relate to its southern California generating facilities.

As of December 31, 2013, the Registrants' other commitments are estimated as follows:

| | GenOn | | GenOn Americas Generation | | GenOn Mid-Atlantic |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| 2014 | $ | 18 | $ | 5 | $ | 5 |
| 2015 | | 7 | | 6 | | 6 |
| 2016 | | 6 | | 6 | | 6 |
| 2017 | | 6 | | 6 | | 6 |
| 2018 | | 6 | | 6 | | 6 |
| Thereafter | | 94 | | 94 | | 94 |
| Total | $ | 137 | $ | 123 | $ | 123 |

## Contingencies

Set forth below is a description of the Registrants' material legal proceedings. The Registrants believe that they have valid defenses to these legal proceedings and intend to defend them vigorously. The Registrants record reserves for estimated losses from contingencies when information available indicates that a loss is probable and the amount of the loss, or range of loss, can be reasonably estimated. In addition, legal costs are expensed as incurred. Management has assessed each of the following matters based on current information and made a judgment concerning its potential outcome, considering the nature of the claim, the amount and nature of damages sought, and the probability of success. Unless specified below, the Registrants are unable to predict the outcome of these legal proceedings or reasonably estimate the scope or amount of any associated costs and potential liabilities. As additional information becomes available, management adjusts its assessment and estimates of such contingencies accordingly. Because litigation is subject to inherent uncertainties and unfavorable rulings or developments, it is possible that the ultimate resolution of the Registrants' liabilities and contingencies could be at amounts that are different from currently recorded reserves and that such difference could be material.

In addition to the legal proceedings noted below, the Registrants are parties to other litigation or legal proceedings arising in the ordinary course of business. In management's opinion, the disposition of these ordinary course matters will not materially adversely affect the Registrants' respective consolidated financial position, results of operations, or cash flows.

*Global Warming (GenOn)*

In February 2008, the Native Village of Kivalina and the City of Kivalina, Alaska filed a suit in the U.S. District Court for the Northern District of California against GenOn and 23 other electric generating and oil and gas companies. The lawsuit sought damages of up to $400 million for the cost of relocating the village allegedly because of global warming caused by the greenhouse gas emissions of the defendants. In late 2009, the District Court ordered that the case be dismissed and the plaintiffs appealed. In September 2012, the U.S. Court of Appeals for the Ninth Circuit dismissed plaintiffs' appeal. In October 2012, the plaintiffs petitioned for *en banc* rehearing of the case; which petition was denied in November 2012. In February 2013, plaintiffs filed a petition with the U.S. Supreme Court seeking review of the decision from the U.S. Court of Appeals. On May 20, 2013, the U.S. Supreme Court denied plaintiffs petition, thereby ending the case.

*Actions Pursued by MC Asset Recovery (GenOn)*

With Mirant Corporation's emergence from bankruptcy protection in 2006, certain actions filed by GenOn Energy Holdings and some of its subsidiaries against third parties were transferred to MC Asset Recovery, a wholly owned subsidiary of GenOn Energy Holdings. MC Asset Recovery is governed by a manager who is independent of NRG and GenOn. MC Asset Recovery is a disregarded entity for income tax purposes.

123

Under the remaining action transferred to MC Asset Recovery, MC Asset Recovery seeks to recover damages from Commerzbank AG and various other banks, or the Commerzbank Defendants, for alleged fraudulent transfers that occurred prior to GenOn Energy Holdings' bankruptcy proceedings.  In December 2010, the U.S. District Court for the Northern District of Texas dismissed MC Asset Recovery's complaint against the Commerzbank Defendants.  In January 2011, MC Asset Recovery appealed the United States District Court's dismissal of its complaint against the Commerzbank Defendants to the U.S. Court of Appeals for the Fifth Circuit.  In March 2012, the U.S. Court of Appeals for the Fifth Circuit reversed the U.S. District Court's dismissal and reinstated MC Asset Recovery's amended complaint against the Commerzbank Defendants.  If MC Asset Recovery succeeds in obtaining any recoveries from the Commerzbank Defendants, the Commerzbank Defendants have asserted that they will seek to file claims in GenOn Energy Holdings' bankruptcy proceedings for the amount of those recoveries.  GenOn Energy Holdings would vigorously contest the allowance of any such claims.  If the Commerzbank Defendants were to receive an allowed claim as a result of a recovery by MC Asset Recovery on its claims against them, GenOn Energy Holdings would retain from the net amount recovered by MC Asset Recovery an amount equal to the dollar amount of the resulting allowed claim.

### Pending Natural Gas Litigation (GenOn)

GenOn is party to five lawsuits, several of which are class action lawsuits, in state and federal courts in Kansas, Missouri, Nevada and Wisconsin. These lawsuits were filed in the aftermath of the California energy crisis in 2000 and 2001 and the resulting FERC investigations and relate to alleged conduct to increase natural gas prices in violation of antitrust and similar laws. The lawsuits seek treble or punitive damages, restitution and/or expenses. The lawsuits also name as parties a number of energy companies unaffiliated with GenOn. In July 2011, the U.S. District Court for the District of Nevada, which is handling four of the five cases, granted the defendants' motion for summary judgment and dismissed all claims against GenOn in those cases. The plaintiffs appealed to the U.S. Court of Appeals for the Ninth Circuit. The Ninth Circuit reversed the decision of the U.S. District Court for the District of Nevada. On August 26, 2013, GenOn along with the other defendants in the lawsuit filed a petition for certiorari to the U.S. Supreme Court challenging the Ninth Circuit's decision. On December 2, 2013, the United States Supreme Court requested the views of the Solicitor General on the petition for certiorari. In September 2012, the State of Nevada Supreme Court, which is handling the remaining case, affirmed dismissal by the Eighth Judicial District Court for Clark County, Nevada of all plaintiffs' claims against GenOn. In February 2013, the plaintiffs filed a petition for certiorari to the U.S. Supreme Court. On June 24, 2013, the U.S. Supreme Court denied the petition for certiorari, thereby ending one of the five lawsuits. GenOn has agreed to indemnify CenterPoint against certain losses relating to these lawsuits.

### New Source Review Matters

The EPA and various states are investigating compliance of electric generating facilities with the pre-construction permitting requirements of the CAA known as "new source review." Since 2000, the EPA has made information requests concerning the Avon Lake, Canal, Chalk Point, Cheswick, Conemaugh, Dickerson, Elrama, Keystone, Morgantown, New Castle, Niles, Portland, Potomac River, Shawville and Titus generating facilities. The Registrants continue to correspond with the EPA regarding some of these requests. The EPA agreed to share information relating to its investigations with state environmental agencies. In January 2009, GenOn received an NOV from the EPA alleging that past work at its Shawville, Portland and Keystone generating facilities violated regulations regarding new source review. In June 2011, GenOn received an NOV from the EPA alleging that past work at the Niles and Avon Lake generating facilities violated regulations regarding new source review.

In December 2007, the NJDEP sued GenOn in the U.S. District Court for the Eastern District of Pennsylvania, alleging that new source review violations occurred at the Portland generating facility. The suit sought installation of "best available" control technologies for each pollutant, to enjoin GenOn from operating the generating facility if it is not in compliance with the CAA and civil penalties. The suit also named past owners of the plant as defendants, but the claims against the past owners were dismissed. In March 2009, the Connecticut Department of Energy and Environmental Protection became an intervening party to the suit. GenOn believes that the work listed by the EPA and the work subject to the NJDEP suit were conducted in compliance with applicable regulations. In July 2013, the court entered a Consent Decree which generally requires the cessation of coal combustion at Portland Units 1 and 2 and the payment of $1 million to benefit the environment in New Jersey and Connecticut. The entry of the Consent Decree resolved this matter.

124

*Cheswick Class Action Complaint (GenOn)*

In April 2012, a putative class action lawsuit was filed against GenOn in the Court of Common Pleas of Allegheny County, Pennsylvania alleging that emissions from the Cheswick generating facility have damaged the property of neighboring residents. GenOn disputes these allegations. Plaintiffs have brought nuisance, negligence, trespass and strict liability claims seeking both damages and injunctive relief. Plaintiffs seek to certify a class that consists of people who own property or live within one mile of the plant. In July 2012, GenOn removed the lawsuit to the U.S. District Court for the Western District of Pennsylvania. In October 2012, the court granted GenOn's motion to dismiss, which Plaintiffs appealed to the U.S. Court of Appeals for the Third Circuit. On June 25, 2013, the Third Circuit reversed the decision of the District Court. On September 3, 2013, GenOn filed a petition for rehearing with the Third Circuit which was subsequently denied on September 23, 2013. On January 8, 2014, the District Court has stayed the case pending the outcome of the Petition for Writ of Certiorari, which was filed in February 2014.

*Cheswick Monarch Mine NOV (GenOn)*

In 2008, the PADEP issued an NOV related to the Monarch mine located near the Cheswick generating facility. It has not been mined for many years. GenOn uses it for disposal of low-volume wastewater from the Cheswick generating facility and for disposal of leachate collected from ash disposal facilities. The NOV addresses the alleged requirement to maintain a minimum pumping volume from the mine. The PADEP indicated it will seek a civil penalty of approximately $200,000. GenOn contests the allegations in the NOV and has not agreed to such penalty. GenOn is currently planning capital expenditures in connection with wastewater from Cheswick and leachate from ash disposal facilities.

*Ormond Beach Alleged Federal Clean Water Act Violations (GenOn)*

In October 2012, the Wishtoyo Foundation, a California-based cultural and environmental advocacy organization, through its Ventura Coastkeeper Program, filed suit in the U.S. District Court for the Central District of California regarding alleged violations of the Clean Water Act associated with discharges of stormwater from the Ormond Beach generating facility. The Wishtoyo Foundation alleges that elevated concentrations of pollutants in stormwater discharged from the Ormond Beach generating facility were affecting adjacent aquatic resources in violation of (i) the Statewide General Industrial Stormwater permit (a general National Pollution Discharge Elimination System permit issued by the California State Water Resources Control Board that authorizes stormwater discharges from industrial facilities in California) and (ii) the state's Porter-Cologne Water Quality Control Act. The Wishtoyo Foundation further alleged that GenOn had not implemented effective stormwater control and treatment measures and that GenOn had not complied with the sampling and reporting requirements of the General Industrial Stormwater permit. GenOn settled this matter in May 2013 and agreed to make operational changes and pay $79,000 in legal fees, $65,000 for supplemental environmental projects and $15,000 for monitoring costs.

*Maryland Fly Ash Facilities*

NRG MD Ash Management has three fly ash facilities in Maryland: Faulkner, Westland and Brandywine. NRG MD Ash Management disposes of fly ash from the Morgantown and Chalk Point generating facilities at Brandywine. NRG MD Ash Management disposes of fly ash from the Dickerson generating facility at Westland. NRG MD Ash Management no longer disposes of fly ash at the Faulkner facility. As described below, the MDE had sued NRG MD Ash Management and GenOn Mid-Atlantic regarding Faulkner, Brandywine and Westland. The MDE also had threatened not to renew the water discharge permits for all three facilities.

*Faulkner Litigation.* In May 2008, the MDE sued GenOn Mid-Atlantic and NRG MD Ash Management in the Circuit Court for Charles County, Maryland alleging violations of Maryland's water pollution laws at Faulkner. The MDE contended that the operation of Faulkner had resulted in the discharge of pollutants that exceeded Maryland's water quality criteria and without the appropriate NPDES permit. The MDE also alleged that GenOn failed to perform certain sampling and reporting required under an applicable NPDES permit. The MDE complaint requested that the court (i) prohibit continuation of the alleged unpermitted discharges, (ii) require GenOn to cease from further disposal of any coal combustion byproducts at Faulkner and close and cap the existing disposal cells and (iii) assess civil penalties. In July 2008, GenOn filed a motion to dismiss the complaint, arguing that the discharges are permitted by a December 2000 Consent Order. In January 2011, the MDE dismissed without prejudice its complaint and informed GenOn that it intended to file a similar lawsuit in federal court. In May 2011, the MDE filed a complaint against GenOn Mid-Atlantic and NRG MD Ash Management in the U.S. District Court for the District of Maryland alleging violations at Faulkner of the Clean Water Act and Maryland's Water Pollution Control Law. The MDE contends that (i) certain of GenOn's water discharges are not authorized by the existing permit and (ii) operation of the Faulkner facility has resulted in discharges of pollutants that violate water quality criteria. The complaint asked the court to, among other things, (i) enjoin further disposal of coal ash; (ii) enjoin discharges that are not authorized by the existing permit; (iii) require numerous technical studies; (iv) impose civil penalties and (v) award MDE attorneys' fees. GenOn disputed these allegations.

125

.

*Brandywine Litigation.* In April 2010, the MDE filed a complaint against GenOn Mid-Atlantic and NRG MD Ash Management in the U.S. District Court for the District of Maryland asserting violations at Brandywine of the Clean Water Act and Maryland's Water Pollution Control Law. The MDE contended that the operation of Brandywine has resulted in discharges of pollutants that violate Maryland's water quality criteria. The complaint requested that the court, among other things, (i) enjoin further disposal of coal combustion waste at Brandywine, (ii) require GenOn to close and cap the existing open disposal cells within one year, (iii) impose civil penalties and (iv) award MDE attorneys' fees. In September 2010, four environmental advocacy groups became intervening parties in the proceeding.

*Westland Litigation.* In January 2011, the MDE informed GenOn that it intended to sue for alleged violations at Westland of Maryland's water pollution laws, which suit was filed in the U.S. District Court for the District of Maryland in December 2012.

*Permit Renewals.* In March 2011, the MDE tentatively determined to deny NRG MD Ash Management's application for the renewal of the water discharge permit for Brandywine, which could result in a significant increase in operating expenses for the Chalk Point and Morgantown generating facilities. The MDE also had indicated that it was planning to deny GenOn's applications for the renewal of the water discharge permits for Faulkner and Westland. Denial of the renewal of the water discharge permit for the latter facility could have resulted in a significant increase in operating expenses for GenOn Mid-Atlantic's Dickerson generating facility.

*Settlement.* In April 2013, NRG MD Ash Management and MDE signed a Consent Decree settling the disputes at each of the three ash facilities. GenOn agreed to pay a civil penalty of $1.9 million for alleged past violations and an additional $0.6 million (for agreed prospective penalties while GenOn implements the settlement). GenOn agreed to develop a technical solution which includes installing synthetic caps on the closed cells of each of the three ash facilities, for which $47 million has been reserved, and to remediate the sites. At this time, GenOn cannot reasonably estimate the upper range of its obligations for remediating the sites because GenOn has not (i) finished assessing each site including identifying the full impacts to both ground and surface water and the impacts to the surrounding habitat; (ii) finalized with the MDE the standards to which it must remediate; and (iii) identified the technologies required, if any, to meet the yet to be determined remediation standards at each site nor the timing of the design and installation of such technologies.

### Purported Class Actions related to July 22, 2012 Announcement of NRG Merger Agreement (GenOn)

GenOn was named as a defendant in eight purported class actions in Texas and Delaware, related to its announcement of its agreement for NRG to acquire all outstanding shares of GenOn. These cases were consolidated into one state court case in each of Delaware and Texas and a federal court case in Texas. The plaintiffs generally alleged breach of fiduciary duties, as well as conspiracy, aiding and abetting breaches of fiduciary duties. Plaintiffs generally sought to: be certified as a class; enjoin the merger; direct the defendants to exercise their fiduciary duties; rescind the acquisition and be awarded attorneys' fees and costs and other relief that the court deems appropriate. Plaintiffs also demanded that there be additional disclosures regarding the merger terms. On October 24, 2012, the parties to the Delaware state court case executed a Memorandum of Understanding to resolve the Delaware purported class action lawsuit. In March 2013, the parties finalized the settlement of the Delaware action. On June 3, 2013, the court approved the Delaware class action settlement thereby ending the Delaware lawsuit. The remaining Texas state and federal court cases were dismissed in July 2013 and August 2013, respectively, thereby ending these matters.

### Maryland Department of the Environment v. GenOn Chalk Point and GenOn Mid-Atlantic

In January 2013, Food & Water Watch, the Patuxent Riverkeeper and the Potomac Riverkeeper (together, Citizens Group) sent GenOn Mid-Atlantic a letter alleging that the Chalk Point, Dickerson and Morgantown generating facilities were violating the terms of three National Pollution Discharge Elimination System Permits by discharging nitrogen and phosphorous in excess of the limits in each permit. On March 21, 2013, the MDE sent GenOn Mid-Atlantic a similar letter with respect to the Chalk Point and Dickerson facilities, threatening to sue within 60 days if the facilities were not brought into compliance. On June 11, 2013, the Maryland Attorney General on behalf of the MDE filed a complaint in the U.S. District Court for the District of Maryland alleging violations of the Clean Water Act and Maryland environmental laws related to water. The lawsuit seeks injunctive relief and civil penalties in excess of $100,000.

126

*Chapter 11 Proceedings (GenOn and GenOn Americas Generation)*

In July 2003, and various dates thereafter, the Mirant Debtors filed voluntary petitions in the Bankruptcy Court for relief under Chapter 11 of the U.S. Bankruptcy Code. GenOn Energy Holdings and most of the other Mirant Debtors emerged from bankruptcy on January 3, 2006, when the Plan became effective. The remaining Mirant Debtors emerged from bankruptcy on various dates in 2007. Approximately 461,000 of the shares of GenOn Energy Holdings common stock to be distributed under the Plan have not yet been distributed and have been reserved for distribution with respect to claims disputed by the Mirant Debtors that have not been resolved. Upon the Mirant/RRI Merger, those reserved shares converted into a reserve for approximately 1.3 million shares of GenOn common stock. Upon the NRG Merger, those reserved shares converted into a reserve for approximately 159,000 shares of NRG common stock. Under the terms of the Plan, upon the resolution of such a disputed claim, the claimant will receive the same pro rata distributions of common stock, cash, or both as previously allowed claims, regardless of the price at which the common stock is trading at the time the claim is resolved. If the aggregate amount of any such payouts results in the number of reserved shares being insufficient, additional shares of common stock may be issued to address the shortfall.

*Texas Franchise Audit (GenOn)*

During the second quarter of 2013, GenOn settled the Texas Franchise tax dispute with the state relating to years 2001 through 2007. Prior to NRG Merger, the State of Texas issued franchise tax assessments against GenOn as a result of its audit indicating an underpayment of franchise tax of $72 million (including interest and penalties through June 30, 2013 of $29 million). These assessments relate primarily to a claim by Texas that would change the sourcing of intercompany receipts thereby increasing the amount of tax due. GenOn disagreed with most of the State's assessment and its determination and had accordingly accrued a portion of the liability but had protested the entire assessment. In June 2013, GenOn settled the matter with the State by agreeing to pay $11 million on issues arising from the audit, and reversed the remainder of the accrual. The reversal was recorded as a measurement period adjustment to the amounts recognized on the acquisition date.

**Note 19 — Regulatory Matters (GenOn, GenOn Americas Generation, GenOn Mid-Atlantic)**

The Registrants operate in a highly regulated industry and are subject to regulation by various federal and state agencies. As such, the Registrants are affected by regulatory developments at both the federal and state levels and in the regions in which they operate. In addition, the Registrants are subject to the market rules, procedures, and protocols of the various ISO markets in which they participate. These power markets are subject to ongoing legislative and regulatory changes that may impact the Registrants.

In addition to the regulatory proceedings noted below, the Registrants are a party to other regulatory proceedings arising in the ordinary course of business or have other regulatory exposure. In management's opinion, the disposition of these ordinary course matters will not materially adversely affect the Registrants' respective consolidated financial position, results of operations, or cash flows.

*East Region (GenOn)*

*RMR Agreements for Elrama and Niles* — In May 2012, GenOn filed with FERC an RMR rate schedule governing operation of unit 4 of the Elrama generating facility and unit 1 of the Niles generating facility. PJM determined that each of these units was needed past its planned deactivation date of June 1, 2012 to maintain transmission system reliability on the PJM system pending the completion of transmission upgrades. The RMR rate schedule sets forth the terms, conditions and cost-based rates under which GenOn operated the units for reliability purposes through September 30, 2012, the date PJM indicated the units would no longer be needed for reliability. In July 2012, FERC accepted GenOn's RMR rate schedule subject to hearing and settlement procedures. In the settlement discussions ordered by FERC, or in any subsequent hearing, GenOn's RMR rate schedule may be modified from that which was filed. The rates GenOn charged are subject to refund pending a ruling or settlement. GenOn filed a settlement of all outstanding issues in May 2013, which several parties are contesting. The matter is pending before FERC.

*Montgomery County Station Power Tax* — On December 20, 2013, NRG received a letter from Montgomery County, Maryland requesting payment of an energy tax for the consumption of station power at the Dickerson Facility over the last three years. The letter seeks payment in the amount of $14.6 million, which includes tax, interest and penalty. NRG is disputing the applicability of the tax and GenOn Mid-Atlantic, LLC filed suit against the County in Maryland Tax Court and the Circuit Court for Montgomery County on January 21, 2014. The parties jointly filed on February 25, 2014, to stay the Circuit Court proceeding pending resolution of the Tax Court proceeding. The Tax Court proceeding is still pending.

**Note 20 — Environmental Matters (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

The Registrants are subject to a wide range of environmental regulations in the development, ownership, construction and operation of projects. These laws and regulations generally require that governmental permits and approvals be obtained before construction and during operation of power plants. Environmental regulations have become increasingly stringent and the Registrants expect this trend to continue. The electric generation industry is likely to face new requirements to address various emissions, including greenhouse gases, as well as combustion byproducts, water discharge and use, and threatened and endangered species. In general, future laws and regulations are expected to require the addition of emissions controls or other environmental controls or to impose of certain restrictions on the operations of the Registrants' facilities, which could have a material effect on the Registrants' operations.

*Greenhouse Emissions*

In January 2014, EPA re-proposed the NSPS for $CO_2$ emissions from new fossil-fuel-fired electric generating units that had been previously proposed in April 2012. The re-proposed standards are 1,000 pounds of $CO_2$ per MWh for large gas units and 1,100 pounds of $CO_2$ per MWh for coal units and small gas units. Proposed standards are in effect until a final rule is published or another rule is re-proposed. In 2014, EPA intends to propose another rule that would require states to develop $CO_2$ standards that would apply to existing fossil-fueled generating facilities.

*Environmental Capital Expenditures*

Based on current rules, technology and plans based on proposed rules, GenOn estimates that environmental capital expenditures from 2014 through 2018 required to meet GenOn's regulatory environmental laws will be approximately $120 million for GenOn, which includes $12 million for GenOn Americas Generation, which was adjusted for the sale of Kendall on January 31, 2014. The amount for GenOn Americas Generation includes $6 million for GenOn Mid-Atlantic. These costs are primarily associated with controls to satisfy MATS at Conemaugh and $NO_x$ controls for Sayreville and Gilbert. In addition, although GenOn expects to place Shawville in long-term protective layup and reactivation remains a technical possibility, GenOn does not expect to make any further investment in environmental controls for this facility. Reactivation after a long-term protective layup would likely involve numerous new permits and substantial additional investment. The Registrants continue to explore cost effective compliance alternatives to further reduce costs.

*East Region*

The EPA and various states have been investigating compliance of electric generating facilities with the pre-construction permitting requirements of the CAA known as NSR. In January 2009, GenOn received an NOV from the EPA alleging that past work at Keystone, Portland and Shawville generating stations violated regulations regarding NSR. In June 2011, GenOn received an NOV from the EPA alleging that past work at Avon Lake and Niles generating stations violated NSR. In December 2007, the NJDEP filed suit alleging that NSR violations occurred at the Portland generating station, which was resolved pursuant to a July 2013 Consent Decree.

In 2008, the PADEP issued an NOV related to the inactive Monarch mine where low-volume wastewater from the Cheswick Generating Station and ash leachate were historically disposed. The NOV addresses the alleged requirement to maintain a minimum pumping volume from the mine. The PADEP indicated it will seek a civil penalty of approximately $200,000. GenOn contests the allegations in the NOV and has not agreed to such penalty. GenOn is currently planning capital expenditures in connection with wastewater from Cheswick and leachate from ash disposal facilities.

The MDE sued GenOn Mid-Atlantic and NRG MD Ash Management for alleged violations of water pollution laws at three fly ash disposal sites in Maryland: Faulkner (2008/2011), Brandywine (2010) and Westland (2012). On April 30, 2013, the court approved the consent decree resolving these issues. NRG MD Ash Management has since discontinued use of the Faulkner disposal site and opened a new, state of the art carbon burnout facility at the Morgantown plant that allows greater beneficial reuse (as a cement substitute).

The MDE has announced that it intends to promulgate for stringent regulations regarding $NO_x$ emissions, which could negatively affect some of our coal units in Maryland.

*RGGI* — In 2013, each of the RGGI member states finalized a rule that collectively reduced the $CO_2$ emissions cap from 165 million tons to 91 million tons in 2014 with a 2.5% reduction each year from 2015 to 2020. The Registrants expect earnings at their plants in Massachusetts, New York, and particularly those in Maryland, to be negatively affected. The extent to which they would be negatively affected depends on the price of the $CO_2$ emissions allowances, which in turn will be significantly influenced by future natural gas prices, power prices, generation resource mix, dispatch order, and any nuclear plant retirements.

For further discussion of these matters, refer to Note 18, *Commitments and Contingencies – Contingencies*.

**Note 21 — Guarantees (GenOn and GenOn Americas Generation)**

GenOn and GenOn Americas Generation and their respective subsidiaries enter into various contracts that include indemnification and guarantee provisions as a routine part of their business activities. Examples of these contracts include asset purchases and sale agreements, commodity sale and purchase agreements, retail contracts, EPC agreements, operation and maintenance agreements, service agreements, settlement agreements, and other types of contractual agreements with vendors and other third parties, as well as affiliates. These contracts generally indemnify the counterparty for tax, environmental liability, litigation and other matters, as well as breaches of representations, warranties and covenants set forth in these agreements. In some cases, GenOn's and GenOn Americas Generation's maximum potential liability cannot be estimated, since the underlying agreements contain no limits on potential liability.

The following table summarizes the maximum potential exposures that can be estimated for guarantees, indemnities, and other contingent liabilities by maturity:

*GenOn*

| Guarantees | By Remaining Maturity at December 31, | | | | | December 31, |
|---|---|---|---|---|---|---|
| | 2013 | | | | | 2012 |
| | Under 1 Year | 1-3 Years | 3-5 Years | Over 5 Years | Total | Total |
| | (In millions) | | | | | (In millions) |
| Letters of credit and surety bonds | $ 96 | $ 2 | $ — | $ — | $ 98 | $ 132 |
| Commercial sales arrangements | 76 | 15 | — | 151 | 242 | 289 |
| Other guarantees | 5 | 4 | — | 50 | 59 | 117 |
| Total guarantees | $ 177 | $ 21 | $ — | $ 201 | $ 399 | $ 538 |

*GenOn Americas Generation*

| Guarantees | By Remaining Maturity at December 31, | | | | | December 31, |
|---|---|---|---|---|---|---|
| | 2013 | | | | | 2012 |
| | Under 1 Year | 1-3 Years | 3-5 Years | Over 5 Years | Total | Total |
| | (In millions) | | | | | (In millions) |
| Surety bonds | $ 6 | $ — | $ — | $ — | $ 6 | $ 7 |
| Commercial sales arrangements | 8 | — | — | — | 8 | 16 |
| Total guarantees | $ 14 | $ — | $ — | $ — | $ 14 | $ 23 |

*Letters of credit and surety bonds* — As of December 31, 2013, GenOn and GenOn Americas Generation and their respective subsidiaries were contingently obligated for a total of $98 million and $6 million under surety bonds, respectively. In addition, $349 million of letters of credit were issued under the NRG credit agreement with GenOn. See Note 18, *Commitments and Contingencies.* Of those letters of credit, $258 million were issued on behalf of GenOn Americas Generation's subsidiaries and $108 million were issued on behalf of GenOn Mid-Atlantic. Most of these letters of credit are issued in support of their obligations to perform under commodity agreements and surety bonds are issued for financing or other arrangements. A majority of these surety bonds expire within one year of issuance, and it is typical for GenOn and GenOn Americas Generation to renew them on similar terms.

*Commercial sales arrangements* — In connection with the purchase and sale of fuel, emission allowances and power generation products to and from third parties with respect to the operation of some of GenOn's and GenOn Americas Generation's generation facilities in the U.S., they may be required to guarantee a portion of the obligations of certain of their subsidiaries. These obligations may include liquidated damages payments or other unscheduled payments. At December 31, 2013, GenOn is contingently obligated for a total of $103 million under such guarantees issued on behalf of GenOn Americas Generation's subsidiaries. GenOn and GenOn Americas Generation do not believe that they will be required to make any material payments under these commercial sales agreements.

*Other guarantees* — GenOn and GenOn Americas Generation have issued guarantees of obligations that their subsidiaries may incur as a provision for environmental site remediation, payment of debt obligations, rail car leases, performance under purchase, EPC and operating and maintenance agreements. In addition, at December 31, 2013, GenOn Energy Holdings has issued $9 million of guarantees on behalf of a GenOn Americas Generation subsidiary related to settlement agreement obligations. GenOn has also guaranteed some non-qualified benefits of CenterPoint's existing retirees at September 20, 2002. The estimated maximum potential amount of future payments under the CenterPoint guarantee is $50 million at December 31, 2013 (included in the table above) and $2 million is recorded in the GenOn balance sheet for this item. GenOn and GenOn Americas Generation do not believe that they will be required to make any material payments under these guarantees.

*Other indemnities* — Other indemnifications GenOn and GenOn Americas Generation have provided cover operational, tax, litigation and breaches of representations, warranties and covenants. GenOn and GenOn Americas Generation have also indemnified, on a routine basis in the ordinary course of business, financing parties, consultants or other vendors who have provided services to them. GenOn's and GenOn Americas Generation's maximum potential exposure under these indemnifications can range from a specified dollar amount to an indeterminate amount, depending on the nature of the transaction. Total maximum potential exposure under these indemnifications is not estimable due to uncertainty as to whether claims will be made or how they will be resolved. GenOn and GenOn Americas Generation do not believe that they will be required to make any material payments under these indemnity provisions.

Because many of the guarantees and indemnities GenOn and GenOn Americas Generation issue to third parties and affiliates do not limit the amount or duration of their obligations to perform under them, there exists a risk that GenOn or GenOn Americas Generation may have obligations in excess of the amounts described above. For those guarantees and indemnities that do not limit the liability exposure, it may not be possible to estimate what GenOn's or GenOn Americas Generation's liability would be, until a claim is made for payment or performance, due to the contingent nature of these contracts.

Schedule I

**GENON ENERGY, INC. (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED STATEMENTS OF OPERATIONS**

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | **For the Year Ended** **December 31, 2013** | **December 15, 2012** **through** **December 31, 2012** | **January 1, 2012** **through** **December 14, 2012** | **For the Year Ended** **December 31, 2011** |
| | **(In millions)** | | **(In millions)** | |
| **Operating Income/(Loss)** | $ — | $ — | $ — | $ — |
| **Other Income/(Expense)** | | | | |
| Equity in losses of consolidated subsidiaries | 17 | (69) | (260) | (44) |
| Other income/(expense), net | 74 | 4 | 79 | (1) |
| Interest expense | (140) | (7) | (217) | (144) |
| Total other income/(expense) | (49) | (72) | (398) | (189) |
| **Loss Before Income Taxes** | (49) | (72) | (398) | (189) |
| Income tax (benefit)/expense | (6) | — | 16 | — |
| **Net Income/(Loss)** | $ (43) | $ (72) | $ (414) | $ (189) |

See notes to condensed financial statements.

131

.

Schedule I

**GENON ENERGY, INC. (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**

**CONDENSED BALANCE SHEETS**

| | As of December 31, | | |
|---|---|---|---|
| | **2013** | | **2012** |
| | (In millions) | | |
| **ASSETS** | | | |
| **Current Assets** | | | |
| Cash and cash equivalents | $ | 621 | $ | 530 |
| Accounts receivable — affiliate | | 27 | | 10 |
| Notes receivable — affiliate | | 592 | | 1,119 |
| Interest receivable — affiliate | | — | | 125 |
| Taxes receivable and other current assets | | 7 | | 124 |
| Total current assets | | 1,247 | | 1,908 |
| **Other Assets** | | | |
| Investment in subsidiaries | | 346 | | 368 |
| Notes receivable — affiliate | | 1,025 | | 1,003 |
| Total other assets | | 1,371 | | 1,371 |
| **Total Assets** | $ | 2,618 | $ | 3,279 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | | |
| **Current Liabilities** | | | |
| Accrued taxes | $ | 6 | $ | 41 |
| Accrued expenses and other current liabilities | | 90 | | 31 |
| Total current liabilities | | 96 | | 72 |
| **Other Liabilities** | | | |
| Long-term debt | | 2,205 | | 2,849 |
| Other non-current liabilities | | 3 | | 1 |
| Total non-current liabilities | | 2,208 | | 2,850 |
| **Total Liabilities** | | 2,304 | | 2,922 |
| **Commitments and Contingencies** | | | |
| **Stockholder's Equity** | | | |
| Common stock: $0.001 par value, 1 share authorized and issued at December 31, 2013 and 2012 | | — | | — |
| Additional paid-in capital | | 327 | | 427 |
| Accumulated deficit | | (114) | | (72) |
| Accumulated other comprehensive income | | 101 | | 2 |
| **Total Stockholder's Equity** | | 314 | | 357 |
| **Total Liabilities and Stockholder's Equity** | $ | 2,618 | $ | 3,279 |

See notes to condensed financial statements.

132

-

**Schedule I**

**GENON ENERGY, INC. (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED STATEMENTS OF CASH FLOWS**

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | For the year ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | For the year ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| **Cash Flows from Operating Activities** | | | | |
| Net cash used by operating activities | $ 491 | $ (66) | $ (134) | $ (59) |
| **Cash Flows from Investing Activities** | | | | |
| Acquisition of businesses, net of cash acquired | — | — | — | — |
| Net Cash from sale of Marsh Landing | 175 | — | — | — |
| Issuance/(receipt) of notes receivables — affiliate | — | 25 | 46 | 137 |
| Cash retained by GenOn Energy Holdings | — | — | — | — |
| Increase in restricted cash, net | — | — | — | 286 |
| Net cash provided by investing activities | 175 | 25 | 46 | 423 |
| **Cash Flows from Financing Activities** | | | | |
| Proceeds from exercises of stock options | — | — | — | 3 |
| Payments of short and long-term debt | (575) | — | — | (285) |
| Net cash used by financing activities | (575) | — | — | (282) |
| **Net Increase/(Decrease) in Cash and Cash Equivalents** | 91 | (41) | (88) | 82 |
| **Cash and Cash Equivalents at Beginning of Period** | 530 | 571 | 659 | 577 |
| **Cash and Cash Equivalents at End of Period** | $ 621 | $ 530 | $ 571 | $ 659 |
| **Supplemental Disclosures** | | | | |
| Cash paid for interest, net of amounts capitalized | $ 138 | $ 50 | $ 169 | $ 224 |
| Cash paid for income taxes (net of refunds received) | $ — | $ — | $ 34 | $ (3) |
| **Supplemental Disclosures for Non–Cash Investing and Financing Activities** | | | | |
| Conversion to equity of notes receivables from subsidiaries | | $ — | $ — | $ — |
| Conversion to equity of notes payable to subsidiaries | | $ — | $ — | $ — |

See notes to condensed financial statements.

133

.

## GENON ENERGY, INC. (PARENT)
## NOTES TO CONDENSED FINANCIAL STATEMENTS

### 1.    Background and Basis of Presentation

*Background*

The condensed parent company financial statements have been prepared in accordance with Rule 12-04, Schedule I of Regulation S-X, as the restricted net assets of GenOn Energy Inc.'s subsidiaries exceed 25% of the consolidated net assets of GenOn Energy, Inc. These statements should be read in conjunction with the consolidated statements and notes thereto of the Registrants.

RRI Energy (a Delaware corporation) changed its name from Reliant Energy, Inc. effective May 2009 in connection with the sale of its retail business. GenOn changed its name from RRI Energy effective December 3, 2010 in connection with the merger with Mirant. "GenOn" refers to GenOn Energy, Inc. and, except where the context indicates otherwise, its subsidiaries, after giving effect to the Mirant/RRI Merger.

*NRG Merger*

On July 20, 2012, GenOn entered into the NRG Merger Agreement with NRG and a direct wholly-owned subsidiary of NRG. Upon the terms and subject to the conditions set forth in the NRG Merger Agreement, which was approved by the boards of directors of GenOn and NRG, a wholly-owned subsidiary of NRG merged with and into GenOn, with GenOn continuing as the surviving corporation and a wholly-owned subsidiary of NRG.

Upon closing of the NRG Merger, each issued and outstanding share of GenOn's common stock automatically converted into the right to receive 0.1216 shares of common stock of NRG based on the NRG Merger Exchange Ratio. All outstanding stock options (other than options granted in 2012) immediately vested and all outstanding stock options generally converted upon completion of the NRG Merger into stock options with respect to NRG common stock, after giving effect to the NRG Merger Exchange Ratio. In addition, all outstanding restricted stock units (other than restricted stock units granted in 2012) immediately vested and all outstanding restricted stock units were exchanged for the NRG Merger consideration. All outstanding stock options and unvested restricted stock units granted in 2012 will vest per the terms and conditions of the grant, and if the holder is terminated, upon the holder's termination date if the termination is as a result of the NRG Merger and within two years of the closing date. See Note 3, *NRG Merger and Dispositions,* to the Registrants' consolidated financial statements.

*Basis of Presentation*

Upon completion of the Mirant/RRI Merger, Mirant stockholders had a majority of the voting interest in the combined company. Although RRI Energy issued shares of RRI Energy common stock to Mirant stockholders to effect the Mirant/RRI Merger, the Mirant/RRI Merger was accounted for as a reverse acquisition under the acquisition method of accounting. Under the acquisition method of accounting, Mirant is treated as the accounting acquirer and RRI Energy is treated as the acquired company for financial reporting purposes. As such, the condensed financial statements of GenOn Energy, Inc. (parent) include the results of GenOn Energy, Inc. for the periods from December 3, 2010, and include the results of GenOn Energy Holdings (former parent) through December 2, 2010. The condensed financial statements presented herein for periods ended prior to the closing of the Mirant/RRI Merger (and any other financial information presented herein with respect to such pre-merger dates, unless otherwise specified) are the condensed financial statements and other financial information of Mirant.

Equity in income/loss of affiliates consists of earnings of direct subsidiaries of GenOn Energy, Inc. (parent).

*Predecessor and Successor Reporting*

Upon completion of the NRG Merger, NRG stockholders had a majority of the voting interest in the combined company. The NRG Merger is accounted for under the acquisition method of accounting. Under the acquisition method of accounting, NRG is treated as the accounting acquirer and GenOn is treated as the acquired company for financial reporting purposes. As such, the assets and liabilities of GenOn Energy, Inc. were recorded at their respective fair values as of the NRG Merger date. Fair value adjustments related to the NRG Merger have been pushed down to GenOn Energy, Inc., resulting in certain assets and liabilities of the Registrants being recorded at fair value at December 15, 2012. See Note 3, *NRG Merger,* to the Registrants' consolidated financial statements for further discussion.

As a result of the impact of pushdown accounting, the financial statements and certain note presentations separate GenOn Energy, Inc.'s presentations into two distinct periods, the period before the consummation of the NRG Merger (labeled predecessor) and the period after that date (labeled successor), to indicate the application of different basis of accounting between the periods presented.

### *Cash Dividends Received*

For the year ended December 31, 2013, the period from December 15, 2012 through December 31, 2012 and the period from January 1, 2012 through December 14, 2012, GenOn Energy, Inc. did not receive any cash dividends from its subsidiaries. For the year ended December 31, 2011, GenOn Energy, Inc. received cash dividends from its subsidiaries of $100 million.

## 2.   Long-Term Debt

For a discussion of GenOn Energy, Inc.'s long-term debt, see Note 10, *Debt and Capital Leases,* to the Registrants' consolidated financial statements.

Debt maturities of GenOn Energy, Inc. as of December 31, 2013 are (in millions):

| | |
|---|---|
| 2017 | 725 |
| 2018 | 675 |
| Thereafter | 550 |
| Total | $ 1,950 |

## 3.   Commitments, Contingencies and Guarantees

See Note 15, *Income Taxes* and Note 18, *Commitments and Contingencies* to the Registrants' consolidated financial statements for a detailed discussion of GenOn Energy, Inc.'s contingencies.

As of December 31, 2013, GenOn Energy, Inc. had $50 million of guarantees, which are included in Note 21, *Guarantees,* to the Registrants' consolidated financial statements.

135

**SCHEDULE II. VALUATION AND QUALIFYING ACCOUNTS**
**GENON ENERGY, INC. AND SUBSIDIARIES**

**For the Year Ended December 31, 2013, Periods from December 15, 2012 through**
**December 31, 2012 and from January 1, 2012**
**through December 14, 2012 and for the Year Ended December 31, 2011**

| | Balance at Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Provision for uncollectible accounts** [a] | | | | | |
| Successor | | | | | |
| Year Ended December 31, 2013 | $ 4 | $ — | $ — | $ (3) | $ 1 |
| December 15, 2012 through December 31, 2012 | $ 4 | $ — | $ — | $ — | $ 4 |
| **Predecessor** | | | | | |
| January 1, 2012 through December 14, 2012 | 48 | — | — | (43) [b] | 5 |
| Year Ended December 31, 2011 | 21 | 42 | — | (15) [b] | 48 |
| | | | | | |
| **Income tax valuation allowance, deducted from deferred tax assets** | | | | | |
| Successor | | | | | |
| Year Ended December 31, 2013 | $ 2,324 | $ — | $ 348 | $ — | $ 2,672 |
| December 15, 2012 through December 31, 2012 | $ 2,300 | $ — | $ 24 | $ — | $ 2,324 |
| **Predecessor** | | | | | |
| January 1, 2012 through December 14, 2012 | 1,819 | — | 165 | — | 1,984 |
| Year Ended December 31, 2011 | 1,636 | — | 183 | — | 1,819 |

(a)   Provision for uncollectible accounts represents credit reserves for derivative contract assets.

(b)   Deductions consisted primarily of reversals of credit reserves for derivative contract assets.

Schedule I

**GENON AMERICAS GENERATION, LLC (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED STATEMENTS OF OPERATIONS**

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | **For the Year Ended December 31, 2013** | **December 15, 2012 through December 31, 2013** | **January 1, 2012 through December 14, 2012** | **For the Year Ended December 31, 2011** |
| | (In millions) | | (In millions) | |
| **Operating Income** | $ — | $ — | $ — | $ — |
| **Other Income/(Expense)** | | | | |
| Equity in (losses)/earnings of consolidated subsidiaries | 123 | — | (11) | 102 |
| Other expense, net | — | — | — | — |
| Interest expense | (64) | (3) | (69) | (86) |
| Total other income/(expense) | 59 | (3) | (80) | 16 |
| **Income/(Loss) Before Income Taxes** | 59 | (3) | (80) | 16 |
| Income tax expense | — | — | — | — |
| **Net Income/(Loss)** | $ 59 | $ (3) | $ (80) | $ 16 |

See notes to condensed financial statements.

137

.

Schedule I

**GENON AMERICAS GENERATION, LLC (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED BALANCE SHEETS**

|  | As of December 31, | |
|  | 2013 | 2012 |
| --- | --- | --- |
|  | (In millions) | |
| **ASSETS** | | |
| **Current Assets** | | |
| Accounts receivable | $ 1 | $ 1 |
| Total current assets | 1 | 1 |
| **Property, Plant and Equipment** | | |
| In service | — | 11 |
| Under construction | — | 1 |
| Total property, plant and equipment | — | 12 |
| Less accumulated depreciation | — | (1) |
| Net property, plant and equipment | — | 11 |
| **Other Assets** | | |
| Investment in subsidiaries | 1,653 | 1,785 |
| Other non-current assets | — | 5 |
| Total other assets | 1,653 | 1,790 |
| **Total Assets** | $ 1,654 | $ 1,802 |
| **LIABILITIES AND MEMBER'S EQUITY** | | |
| **Current Liabilities** | | |
| Accounts payable — affiliate | $ — | $ 1 |
| Note payable — affiliate | 11 | 12 |
| Accrued expenses and other current liabilities | 16 | 16 |
| Total current liabilities | 27 | 29 |
| **Other Liabilities** | | |
| Long-term debt | 937 | 848 |
| Total non-current liabilities | 937 | 848 |
| **Total Liabilities** | 964 | 877 |
| **Commitments and Contingencies** | | |
| **Member's Equity** | | |
| Member's interest | 690 | 925 |
| Total member's equity | 690 | 925 |
| **Total Liabilities and Member's Equity** | $ 1,654 | $ 1,802 |

See notes to condensed financial statements.

138

-

Schedule I

**GENON AMERICAS GENERATION, LLC (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED STATEMENTS OF CASH FLOWS**

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | For the year ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | For the year ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| **Cash Flows from Operating Activities** | | | | |
| Net cash provided by operating activities | $        217 | $        — | $        215 | $        32 |
| **Cash Flows from Investing Activities** | | | | |
| Capitalized interest | (2) | — | (3) | (3) |
| Capital contributions | — | — | — | (30) |
| Net cash used by investing activities | (2) | — | (3) | (33) |
| **Cash Flows from Financing Activities** | | | | |
| (Payment)/issuance of notes payable — affiliate | — | — | — | 12 |
| Capital contributions | 70 | — | 18 | 474 |
| Distributions to member | (285) | — | (230) | (100) |
| Issuance/(payment) of short and long-term debt | — | — | — | (535) |
| Net cash used by financing activities | (215) | — | (212) | (149) |
| **Net Decrease in Cash and Cash Equivalents** | — | — | — | (150) |
| **Cash and Cash Equivalents at Beginning of Period** | — | — | — | 150 |
| **Cash and Cash Equivalents at End of Period** | $        — | $        — | $        — | $        — |
| | | | | |
| **Supplemental Disclosures** | | | | |
| Cash paid for interest, net of amounts capitalized | 73 | $        — | $        72 | $        94 |
| **Supplemental Disclosures for Non–Cash Investing and Financing Activities** | | | | |
| Conversion to equity of notes payable to subsidiaries | $        — | $        — | $        — | 2 |

See notes to condensed financial statements.

139

.

**GENON AMERICAS GENERATION, LLC (PARENT)**
**NOTES TO CONDENSED FINANCIAL STATEMENTS**

**1.    Background and Basis of Presentation**

*Background*

The condensed parent company financial statements have been prepared in accordance with Rule 12-04, Schedule I of Regulation S–X, as the restricted net assets of GenOn Americas Generation, LLC's subsidiaries exceed 25% of the consolidated net assets of GenOn Americas Generation, LLC. These statements should be read in conjunction with the consolidated statements and notes thereto of the Registrants.

GenOn Americas Generation, LLC is a Delaware limited liability company and indirect wholly-owned subsidiary of GenOn Energy, Inc.

RRI Energy (a Delaware corporation) changed its name from Reliant Energy, Inc. effective May 2009 in connection with the sale of its retail business. GenOn changed its name from RRI Energy effective December 3, 2010 in connection with the merger with Mirant. "GenOn" refers to GenOn Energy, Inc. and, except where the context indicates otherwise, its subsidiaries, after giving effect to the Mirant/RRI Merger.

*NRG Merger*

On July 20, 2012, GenOn entered into the NRG Merger Agreement with NRG and a direct wholly-owned subsidiary of NRG. Upon the terms and subject to the conditions set forth in the NRG Merger Agreement, which was approved by the boards of directors of GenOn and NRG, a wholly-owned subsidiary of NRG merged with and into GenOn, with GenOn continuing as the surviving corporation and a wholly-owned subsidiary of NRG.

Upon closing of the NRG Merger, each issued and outstanding share of GenOn's common stock automatically converted into the right to receive 0.1216 shares of common stock of NRG based on the NRG Merger Exchange Ratio. All outstanding stock options (other than options granted in 2012) immediately vested and all outstanding stock options generally converted upon completion of the NRG Merger into stock options with respect to NRG common stock, after giving effect to the NRG Merger Exchange Ratio. In addition, all outstanding restricted stock units (other than restricted stock units granted in 2012) immediately vested and all outstanding restricted stock units were exchanged for the NRG Merger consideration. All outstanding stock options and unvested restricted stock units granted in 2012 will vest per the terms and conditions of the grant, and if the holder is terminated, upon the holder's termination date if the termination is as a result of the NRG Merger and within two years of the closing date. See Note 3, *NRG Merger and Dispositions,* to the Registrants' consolidated financial statements.

*Basis of Presentation*

The condensed financial statements presented herein are the condensed financial statements and other financial information of GenOn Americas Generation, LLC.

Equity in income/loss of affiliates consists of earnings of direct subsidiaries of GenOn Americas Generation, LLC (parent).

*Predecessor and Successor Reporting*

Upon completion of the NRG Merger, NRG stockholders had a majority of the voting interest in the combined company. The NRG Merger is accounted for under the acquisition method of accounting. Under the acquisition method of accounting, NRG is treated as the accounting acquirer and GenOn is treated as the acquired company for financial reporting purposes. As such, the assets and liabilities of GenOn Americas Generation, LLC were recorded at their respective fair values as of the NRG Merger date. Fair value adjustments related to the NRG Merger have been pushed down to GenOn Americas Generation, LLC resulting in certain assets and liabilities of the Registrants being recorded at fair value at December 15, 2012. See Note 3, *NRG Merger,* to the Registrants' consolidated financial statements for further discussion.

As a result of the impact of pushdown accounting, the financial statements and certain note presentations separate GenOn Americas Generation's presentations into two distinct periods, the period before the consummation of the NRG Merger (labeled predecessor) and the period after that date (labeled successor), to indicate the application of different basis of accounting between the periods presented.

*Cash Dividends Received*

For the year ended December 31, 2013, GenOn Americas Generation, LLC received cash dividends from its subsidiaries of $285 million. During the period from December 15, 2012 through December 31, 2012, GenOn Americas Generation, LLC did not receive any cash dividends from its subsidiaries. During the period from January 1, 2012 through December 14, 2012 and for the year ended December 31, 2011, GenOn Americas Generation, LLC received cash dividends from its subsidiaries of $286 million and $137 million, respectively.

**2.    Long-Term Debt**

For a discussion of GenOn Americas Generation, LLC's long-term debt, see Note 10, *Debt and Capital Leases,* to the Registrants' consolidated financial statements.

Debt maturities of GenOn Americas Generation, LLC as of December 31, 2013 are (in millions):

| | | |
|---|---|---:|
| 2019 and thereafter | | 850 |
| Total | $ | 850 |

**3.    Commitments, Contingencies and Guarantees**

See Note 18, *Commitments and Contingencies,* to the Registrants' consolidated financial statements for a detailed discussion of GenOn Americas Generation, LLC's contingencies.

At December 31, 2013, GenOn Americas Generation, LLC did not have any guarantees.

141

**SCHEDULE II. VALUATION AND QUALIFYING ACCOUNTS**
**GENON AMERICAS GENERATION, LLC AND SUBSIDIARIES**

**For the Year Ended December 31, 2013, Periods from December 15, 2012 through**
**December 31, 2012 and from January 1, 2012**
**through December 14, 2012 and for the Year Ended December 31, 2011**

| | Balance at Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Provision for uncollectible accounts** [a] | | | | | |
| **Successor** | | | | | |
| Year Ended December 31, 2013 | $ 4 | $ — | $ — | $ (3) [b] | $ 1 |
| December 15, 2012 through December 31, 2012 | $ 4 | $ — | $ — | $ — | $ 4 |
| **Predecessor** | | | | | |
| January 1, 2012 through December 14, 2012 | 47 | — | — | (42) [b] | 5 |
| Year Ended December 31, 2011 | 19 | 41 | — | (13) [b] | 47 |

(a)   Provision for uncollectible accounts represents credit reserves for derivative contract assets.

(b)   Deductions consisted primarily of reversals of credit reserves for derivative contract assets.

**SCHEDULE II. VALUATION AND QUALIFYING ACCOUNTS**
**GENON MID-ATLANTIC, LLC AND SUBSIDIARIES**

**For the Year Ended December 31, 2013, Periods from December 15, 2012 through**
**December 31, 2012 and from January 1, 2012**
**through December 14, 2012 and for the Year Ended December 31, 2011**

| | Balance at Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Provision for uncollectible accounts** (a) | | | | | |
| **Successor** | | | | | |
| Year Ended December 31, 2013 | $ 4 | $ — | $ — | $ (3) | $ 1 |
| December 15, 2012 through December 31, 2012 | $ 4 | $ — | $ — | $ — (b) | $ 4 |
| **Predecessor** | | | | | |
| January 1, 2012 through December 14, 2012 | 47 | — | — | (42) (b) | 5 |
| Year Ended December 31, 2011 | 19 | 43 | — | (15) (b) | 47 |

(a)  Provision for uncollectible accounts represents credit reserves for derivative contract assets.

(b)  Deductions consisted primarily of reversals of credit reserves for derivative contract assets.

143

**GenOn Energy, Inc. Exhibit Index**

| Exhibit No. | Exhibit Name |
|---|---|
| 2.1 | Stock and Note Purchase Agreement by and among Mirant Asia-Pacific Ventures, Inc., Mirant Asia-Pacific Holdings, Inc., Mirant Sweden International AB (publ), and Tokyo Crimson Energy Holdings Corporation, dated at December 11, 2006 (Incorporated herein by reference to Exhibit 2.1 to the Mirant Corporation Current Report on Form 8-K filed December 13, 2006) |
| 2.3** | Agreement and Plan of Merger, dated as of July 20, 2012, by and among NRG Energy, Inc., Plus Merger Corporation and GenOn Energy, Inc. (Incorporated herein by reference to Exhibit 2.1 to the Registrant's Form 8-K filed July 23, 2012) |
| 3.1 | Fourth Amended and Restated Certificate of Incorporation of GenOn Energy, Inc., effective as of December 14, 2012 (Incorporated herein by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed December 14, 2012) |
| 3.2 | Eighth Amended and Restated By-Laws of GenOn Energy, Inc., effective as of December 14, 2012 (Incorporated herein by reference to Exhibit 3.2 to the Registrant's Current Report on Form 8-K filed December 14, 2012) |
| 4.1 | Form of Stock Certificate (Incorporated herein by reference to Exhibit 4.1 to the Registrant's Quarterly Report on Form 10-Q filed May 10, 2012) |
| 4.2 | Form of Rights Agreement between Reliant Resources, Inc. and The Chase Manhattan Bank, as Rights Agent, including a form of Rights Certificates, dated at January 15, 2001 (Incorporated herein by reference to Exhibit 4.2 to the Registrant's Registration Statement on Form S-1/A Amendment No. 8, Registration No. 333-48038) |
| 4.3 | Amendment No. 1 to Rights Agreement, by and between RRI Energy, Inc., JPMorgan Chase Bank, N.A., and Computershare Trust Company, N.A., dated at November 23, 2010 (Incorporated herein by reference to Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed November 24, 2010) |
| 4.4 | Senior Indenture between Reliant Energy, Inc. and Wilmington Trust Company, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed December 27, 2004) |
| 4.5 | First Supplemental Indenture relating to the 6.75% Senior Secured notes due 2014, among Reliant Energy, Inc., the Guarantors listed therein and Wilmington Trust Company, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed December 27, 2004) |
| 4.6 | Second Supplemental Indenture relating to the 6.75% Senior Secured notes due 2014, among Reliant Energy, Inc., the Guarantors listed therein and Wilmington Trust Company, dated at September 21, 2006 (Incorporated herein by reference to Exhibit 4.18 to the Registrant's Annual Report on Form 10-K filed February 28, 2007) |
| 4.7 | Third Supplemental Indenture relating to the 6.75% Senior Secured notes due 2014, among Reliant Energy, Inc., the Guarantors listed therein and Wilmington Trust Company, dated at December 1, 2006 (Incorporated herein by reference to Exhibit 4.3 to the Registrant's Current Report on Form 8-K filed December 7, 2006) |
| 4.8 | Sixth Supplemental Indenture relating to the 6.75% Senior Secured notes due 2014, among RRI Energy, Inc., the Guarantors listed therein and Wilmington Trust Company, dated at June 1, 2009 (Incorporated herein by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q filed November 5, 2009) |
| 4.9 | Seventh Supplemental Indenture relating to the 6.75% Senior Secured notes due 2014, between RRI Energy, Inc., the Guarantors listed therein and Wilmington Trust Company, dated at August 20, 2009 (Incorporated herein by reference to Exhibit 99.1 to the Registrant's Current Report on Form 8-K filed August 24, 2009) |
| 4.10 | Eighth Supplemental Indenture relating to the 6.75% Senior Secured notes due 2014, among RRI Energy, Inc., the Guarantors listed therein and Wilmington Trust Company, dated at December 1, 2009 (Incorporated herein by reference to Exhibit 4.9 to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 4.11 | Indenture between Orion Power Holdings, Inc. and Wilmington Trust Company, dated at April 27, 2000 (Incorporated herein by reference to Exhibit 4.1 to the Orion Power Holdings, Inc. Registration Statement on Form S-1, Registration No. 333-44118) |
| 4.12 | Fourth Supplemental Indenture relating to the 7.625% Senior notes due 2014, between Reliant Energy, Inc., the Guarantors listed therein and Wilmington Trust Company, dated at June 13, 2007 (Incorporated herein by reference to Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed June 15, 2007) |
| 4.13 | Fifth Supplemental Indenture relating to the 7.875% Senior notes due 2017, between Reliant Energy, Inc. and Wilmington Trust Company, dated at June 13, 2007 (Incorporated herein by reference to Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed June 15, 2007) |
| 4.14 | Indenture between Mirant Americas Generation, Inc. and Bankers Trust Company, as trustee, relating to Senior Notes, dated at May 1, 2001 (Incorporated herein by reference to Exhibit 4.1 to the Mirant Americas Generation, Inc. Registration Statement on Form S-4, Registration No. 333-63240) |
| 4.15 | Second Supplemental Indenture relating to Senior Notes 8.300% due 2011, between Mirant Americas Generation, Inc. and Bankers Trust Company, dated at May 1, 2001 (Incorporated herein by reference to Exhibit 4.3 to the Mirant Americas Generation, Inc. Registration Statement on Form S-4, Registration No. 333-63240) |

| | |
|---|---|
| 4.16 | Third Supplemental Indenture from Mirant Americas Generation, Inc. to Bankers Trust Company, relating to 9.125% Senior Notes due 2031, dated at May 1, 2001 (Incorporated herein by reference to Exhibit 4.4 to the Mirant Americas Generation, Inc. Registration Statement on Form S-4, Registration No. 333-63240) |
| 4.17 | Fifth Supplemental Indenture from Mirant Americas Generation, Inc. to Bankers Trust Company, relating to 8.50% Senior Note due 2021, dated at October 9, 2001 (Incorporated herein by reference to Exhibit 4.6 to the Mirant Americas Generation, Inc. Registration Statement on Form S-4/A Amendment No. 1, Registration No. 333-85124) |
| 4.18 | Form of Sixth Supplemental Indenture from Mirant Americas Generation, LLC to Bankers Trust Company, dated at November 1, 2001, relating to indenture dated May 1, 2001 (Incorporated herein by reference to Exhibit 4.6 to the Mirant Corporation Annual Report on Form 10–K filed February 27, 2009) |
| 4.19 | Seventh Supplemental Indenture from Mirant Americas Generation, LLC to Wells Fargo Bank, National Association, dated at January 3, 2006, relating to indenture dated May 1, 2001 (Incorporated herein by reference to Exhibit 4.1 to the Mirant Americas Generation, LLC Quarterly Report on Form 10-Q filed May 14, 2007) |
| 4.20 | Form of Senior Note Indenture among Mirant North America, LLC, Mirant North America Escrow, LLC, MNA Finance Corp. and Law Debenture Trust Company of New York, as trustee dated as of December 23, 2005 (Incorporated herein by reference to Exhibit 2.2 to the Mirant Corporation Annual Report on Form 10-K filed March 14, 2006) |
| 4.21 | Form of 8.625% Series A Pass Through Certificate (Incorporated herein by reference to Exhibit 4.1 to the Mirant Mid–Atlantic, LLC Registration Statement on Form S-4, Registration No. 333–61668) |
| 4.22 | Form of 9.125% Series B Pass Through Certificate (Incorporated herein by reference to Exhibit 4.2 to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333–61668) |
| 4.23 | Form of 10.060% Series C Pass Through Certificate (Incorporated herein by reference to Exhibit 4.3 to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333–61668) |
| 4.24(a) | Pass Through Trust Agreement A between Southern Energy Mid-Atlantic, LLC and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.4(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.24(b) | Schedule identifying substantially identical agreement to Pass Through Trust Agreement A (Incorporated herein by reference to Exhibit 4.4(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.25(a) | Participation Agreement (L1) among Southern Energy Mid-Atlantic, LLC, as Lessee, Dickerson OL1 LLC, as Owner Lessor, Wilmington Trust Company, as Owner Manager, SEMA OP3 LLC, as Owner Participant and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee and as Pass Through Trustee, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.5(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.25(b) | Schedule identifying substantially identical agreements to Participation Agreement (Incorporated herein by reference to Exhibit 4.5(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.26(a) | Participation Agreement (L1) among Southern Energy Mid-Atlantic, LLC, as Lessee, Morgantown OL1 LLC, as Owner Lessor, Wilmington Trust Company, as Owner Manager, SEMA OP1 LLC, as Owner Participant and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee and as Pass Through Trustee, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.6 (a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.26(b) | Schedule identifying substantially identical agreement to Participation Agreement (Incorporated herein by reference to Exhibit 4.6 (b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.27(a) | Facility Lease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, as Facility Lessee and Dickerson OL1 LLC, as Owner Lessor, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.7(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.27(b) | Schedule identifying substantially identical agreement to Facility Lease Agreement (Incorporated herein by reference to Exhibit 4.7(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.28(a) | Facility Lease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, as Facility Lessee and Morgantown OL1 LLC, as Owner Lessor, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.8(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.28(b) | Schedule identifying substantially identical agreement to Facility Lease Agreement (Incorporated herein by reference to Exhibit 4.8(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |

| | |
|---|---|
| 4.29(a) | Indenture of Trust, Mortgage and Security Agreement (L1) between Dickerson OL1 LLC, as Owner Lessor, and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.9(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.29(b) | Schedule identifying substantially identical agreement to Indenture of Trust, Mortgage and Security Agreement (Incorporated herein by reference to Exhibit 4.9(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.30(a) | Indenture of Trust, Mortgage and Security Agreement (L1) between Morgantown OL1 LLC, as Owner Lessor, and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.10(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.30(b) | Schedule identifying substantially identical agreement to Indenture of Trust, Mortgage and Security Agreement (Incorporated herein by reference to Exhibit 4.10(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.31(a) | Series A Lessor Note Due June 20, 2012 for Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.11(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.31(b) | Schedule identifying substantially identical notes to Lessor Notes (Incorporated herein by reference to Exhibit 4.11(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.32(a) | Series A Lessor Note Due June 30, 2008, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.12(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.32(b) | Schedule identifying substantially identical notes to Series A Lessor Notes (Incorporated herein by reference to Exhibit 4.12(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.33(a) | Series B Lessor Note Due June 30, 2015, for Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.13(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.33(b) | Schedule identifying substantially identical notes to Lessor Note (Incorporated herein by reference to Exhibit 4.13(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.34(a) | Series B Lessor Note Due June 30, 2017, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.14(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.34(b) | Schedule identifying substantially identical notes to Lessor Notes (Incorporated herein by reference to Exhibit 4.14(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.35(a) | Series C Lessor Note Due June 30, 2020, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.15(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.35(b) | Schedule identifying substantially identical notes to Lessor Notes (Incorporated herein by reference to Exhibit 4.15(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.36(a) | Supplemental Pass Through Trust Agreement A between Mirant Mid-Atlantic, LLC and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at June 29, 2001 (Incorporated herein by reference to Exhibit 4.17(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4/A Registration No. 333-61668) |
| 4.36(b) | Schedule identifying substantially identical agreements to Supplemental Pass Through Trust Agreement constituting Exhibit 4.36 (a) for Supplemental Pass Through Trust Agreement B between Mirant Mid-Atlantic, LLC and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at June 29, 2001, and Supplemental Pass Through Trust Agreement C between Mirant Mid-Atlantic, LLC and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at June 29, 2001 (Incorporated herein by reference to Exhibit 4.17(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4/A, Registration No. 333-61668) |
| 4.37 | Senior Notes Indenture, relating to the 9.50% Senior Notes Due 2018 and the 9.875% Senior Notes Due 2020, by GenOn Escrow Corp. and Wilmington Trust Company as trustee, dated at October 4, 2010 (Incorporated by reference to Exhibit 4.4 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 5, 2010) |
| 4.38 | Supplemental Indenture, relating to the 9.50% Senior Notes due 2018 and the 9.875% Senior Notes Due 2020, by GenOn Energy, Inc. and Wilmington Trust Company as trustee, dated at December 3, 2010 (Incorporated by reference to Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed December 7, 2010) |
| 4.39 | Amendment No. 2, dated as of December 14, 2012, to the Rights Agreement dated as of January 15, 2001 between RRI Energy, Inc., JP Morgan Chase and Computershare Trust Company, N.A., as successor to JP Morgan Chase rights agent (Incorporated herein by reference to Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed December 14, 2012) |

10.1.1(a)  Master Separation Agreement between Reliant Resources, Inc. and Reliant Energy, Incorporated, dated at December 31, 2000 (Incorporated herein by reference to Exhibit 10.1 to the CenterPoint Energy Houston Electric, LLC Quarterly Report on Form 10-Q filed May 14, 2001)

10.1.1(b)  Schedules to Master Separation Agreement between Reliant Resources, Inc. and Reliant Energy, Incorporated, dated at December 31, 2000 (Incorporated herein by reference to Exhibit 10.1B to the Registrant's Annual Report on Form 10-K filed February 25, 2010)

10.1.2(a)  Tax Allocation Agreement by and among Reliant Resources, Inc., Reliant Energy, Incorporated and its affiliate companies dated at December 31, 2000 (Incorporated herein by reference to Exhibit 10.8 to the CenterPoint Energy Houston Electric, LLC Quarterly Report on Form 10-Q filed May 14, 2001)

10.1.2(b)  Exhibit to Tax Allocation Agreement between Reliant Resources, Inc. and Reliant Energy, Incorporated, dated at December 31, 2000 (Incorporated herein by reference to Exhibit 10.2B to the Registrant's Annual Report on Form 10-K filed February 25, 2010)

10.1.3  Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2001A, Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed December 27, 2004)

10.1.4(a)  Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed December 27, 2004)

10.1.4(b)  Exhibit C Form of Supplement to Exhibit B to Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.5B to the Registrant's Annual Report on Form 10-K filed February 25, 2010)

10.1.5(a)  Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002B, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed December 27, 2004)

10.1.5(b)  Exhibit C Form of Supplement to Exhibit B to Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002B, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.6B to the Registrant's Annual Report on Form 10-K filed February 25, 2010)

10.1.6(a)  Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2003A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed December 27, 2004)

10.1.6(b)  Exhibit C Form of Supplement to Exhibit B to Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2003A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.7B to the Registrant's Annual Report on Form 10-K filed February 25, 2010)

10.1.7(a)  Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.6 to the Registrant's Current Report on Form 8-K filed December 27, 2004)

10.1.7(b)  Exhibit C Form of Supplement to Exhibit B to Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.8B to the Registrant's Annual Report on Form 10-K filed February 25, 2010)

10.1.8  Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2001A, among Reliant Energy Power Supply, LLC, Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and J.P. Morgan Trust Company, National Association, as trustee, dated at September 21, 2006 (Incorporated herein by reference to Exhibit 10.14 to the Registrant's Annual Report on Form 10-K filed February 28, 2007)

| 10.1.9 | Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002A, among Reliant Energy Power Supply, LLC, Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and J.P. Morgan Trust Company, National Association, as trustee, dated at September 21, 2006 (Incorporated herein by reference to Exhibit 10.15 to the Registrant's Annual Report on Form 10-K filed February 28, 2007) |
|---|---|
| 10.1.10 | Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002B, among Reliant Energy Power Supply, LLC, Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and J.P. Morgan Trust Company, National Association, as trustee, dated at September 21, 2006 (Incorporated herein by reference to Exhibit 10.16 to the Registrant's Annual Report on Form 10-K filed February 28, 2007) |
| 10.1.11 | Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2003A, among Reliant Energy Power Supply, LLC, Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and J.P. Morgan Trust Company, National Association, as trustee, dated at September 21, 2006 (Incorporated herein by reference to Exhibit 10.17 to the Registrant's Annual Report on Form 10-K filed February 28, 2007) |
| 10.1.12 | Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among Reliant Energy Power Supply, LLC, Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and J.P. Morgan Trust Company, National Association as trustee, dated at September 21, 2006 (Incorporated herein by reference to Exhibit 10.18 to the Registrant's Annual Report on Form 10-K filed February 28, 2007) |
| 10.1.13 | Second Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2001A, among Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at December 1, 2006 (Incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed December 7, 2006) |
| 10.1.14 | Second Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002A, among Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at December 1, 2006 (Incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed December 7, 2006) |
| 10.1.15 | Second Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002B, among Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at December 1, 2006 (Incorporated herein by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed December 7, 2006) |
| 10.1.16 | Second Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2003A, among Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at December 1, 2006 (Incorporated herein by reference to Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed December 7, 2006) |
| 10.1.17 | Third Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at December 1, 2006 (Incorporated herein by reference to Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed December 7, 2006) |
| 10.1.18 | Third Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2001A, among RRI Energy Solutions East, LLC, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at June 1, 2009 (Incorporated herein by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q filed November 5, 2009) |
| 10.1.19 | Third Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2002A, among, RRI Energy Solutions East, LLC, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at June 1, 2009 (Incorporated herein by reference to Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q filed November 5, 2009) |
| 10.1.20 | Third Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2002B, among RRI Energy Solutions East, LLC, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at June 1, 2009 (Incorporated herein by reference to Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q filed November 5, 2009) |

| | |
|---|---|
| 10.1.21 | Third Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2003A, among RRI Energy Solutions East, LLC, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at June 1, 2009 (Incorporated herein by reference to Exhibit 10.5 to the Registrant's Quarterly Report on Form 10-Q filed November 5, 2009) |
| 10.1.22 | Fourth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at June 1, 2009 (Incorporated herein by reference to Exhibit 10.6 to the Registrant's Quarterly Report on Form 10-Q filed November 5, 2009) |
| 10.1.23 | Fourth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002A, among RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at August 20, 2009 (Incorporated herein by reference to Exhibit 99.3 to the Registrant's Current Report on Form 8-K filed August 24, 2009) |
| 10.1.24 | Fourth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002B, among RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at August 20, 2009 (Incorporated herein by reference to Exhibit 99.4 to the Registrant's Current Report on Form 8-K filed August 24, 2009) |
| 10.1.25 | Fourth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2003A, among RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at August 20, 2009 (Incorporated herein by reference to Exhibit 99.5 to the Registrant's Current Report on Form 8-K filed August 24, 2009) |
| 10.1.26 | Fifth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenues Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at August 20, 2009 (Incorporated herein by reference to Exhibit 99.6 to the Registrant's Current Report on Form 8-K filed August 24, 2009) |
| 10.1.27 | Fifth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2001A, among RRI Energy Channelview LLC, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at December 1, 2009 (Incorporated herein by reference to Exhibit 10.29 to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.28 | Fifth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2002A, among RRI Energy Channelview LLC, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at December 1, 2009 (Incorporated herein by reference to Exhibit 10.30 to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.29 | Fifth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2002B, among RRI Energy Channelview LLC, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at December 1, 2009 (Incorporated herein by reference to Exhibit 10.31 to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.30 | Fifth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2003A, among RRI Energy Channelview LLC, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at December 1, 2009 (Incorporated herein by reference to Exhibit 10.32 to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.31 | Sixth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2004A, among RRI Energy Channelview LLC, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at December 1, 2009 (Incorporated herein by reference to Exhibit 10.33 to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.32(a) | Credit and Guaranty Agreement among Reliant Energy, Inc., as Borrower, the Other Loan Parties referred to therein as guarantors, the Other Lenders Party thereto, Deutsche Bank AG New York Branch, as Administrative Agent and Collateral Agent, Deutsche Bank Securities Inc. and J.P. Morgan Securities Inc., as Joint Lead Arrangers, Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch Capital Corporation and ABN AMRO Bank N.V., as Joint Bookrunners with respect to the Revolving Credit Facility and Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch Capital Corporation and Bear, Sterns & Co. Inc., as Joint Bookrunners with respect to the Pre-Funded L/C Facility, dated at June 12, 2007 (Incorporated herein by reference to Exhibit 1.1 to the Registrant's Current Report on Form 8-K filed June 15, 2007) |

| 10.1.32(b)† | Exhibits and Schedules to Credit and Guaranty Agreement among Reliant Energy, Inc., as Borrower, the Other Loan Parties referred to therein as guarantors, the Other Lenders Party thereto, Deutsche Bank AG New York Branch, as Administrative Agent and Collateral Agent, Deutsche Bank Securities Inc. and J.P. Morgan Securities Inc., as Joint Lead Arrangers, Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch Capital Corporation and ABN AMRO Bank N.V., as Joint Bookrunners with respect to the Revolving Credit Facility and Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch Capital Corporation and Bear, Sterns & Co. Inc., as Joint Bookrunners with respect to the Pre-Funded L/C Facility, dated at June 12, 2007 (Incorporated herein by reference to Exhibit 10.34B to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
|---|---|
| 10.1.33(a) | Pass Through Trust Agreement A between Reliant Energy Mid-Atlantic Power Holdings, LLC and Bankers Trust Company, made with respect to the formation of the Series A Pass Through Trust and the issuance of 8.554% Series A Pass Through Certificates, dated 2005 dated as of August 24, 2000 (Incorporated herein by reference to Exhibit 4.4a to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464) |
| 10.1.33(b) | Schedule identifying substantially identical agreements to Pass Through Trust Agreement constituting Exhibit 10.1.33(a) (Incorporated herein by reference to Exhibit 4.4b to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464) |
| 10.1.34 | Participation Agreement among Conemaugh Lessor Genco LLC, as Owner Lessor, Reliant Energy Mid-Atlantic Power Holdings, LLC, as Facility Lessee, Wilmington Trust Company, as Lessor Manager, PSEGR Conemaugh Generation, LLC, as Owner Participant, Bankers Trust Company, as Lease Indenture Trustee, and Bankers Trust Company, as Pass Through Trustee, dated at August 24, 2000 (Incorporated herein by reference to Exhibit 4.5a to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464) |
| 10.1.35 | Schedule identifying substantially identical agreements to Participation Agreement constituting Exhibit 10.1.34 (Incorporated herein by reference to Exhibit 4.5b to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464) |
| 10.1.36(a) | First Amendment to Participation Agreement constituting Exhibit 10.1.34, dated at November 15, 2001 (Incorporated herein by reference to Exhibit 10.20 to the Registrant's Annual Report on Form 10-K filed March 15, 2006) |
| 10.1.36(b) | Exhibit M to First Amendment to Participation Agreement constituting Exhibit 10.1.36(a), dated at November 15, 2001 (Incorporated herein by reference to Exhibit 10.41B to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.37 | Schedule identifying substantially identical agreements to First Amendment to Participation Agreement constituting Exhibit 10.1.36(a) (Incorporated herein by reference to Exhibit 10.21 to the Registrant's Annual Report on Form 10-K filed March 15, 2006) |
| 10.1.38 | Second Amendment to Participation Agreement, dated at June 18, 2003 (Incorporated herein by reference to Exhibit 10.22 to the Registrant's Annual Report on Form 10-K filed March 15, 2006) |
| 10.1.39 | Schedule identifying substantially identical agreements to Second Amendment to Participation Agreement constituting Exhibit 10.1.38 (Incorporated herein by reference to Exhibit 10.23 to the Registrant's Annual Report on Form 10-K filed March 15, 2006) |
| 10.1.40 | Guarantee by NRG Energy, Inc., as Guarantor, in favor of Reliant Energy, Inc., dated at February 28, 2009 (Incorporated herein by reference to Exhibit 10.84 to the Registrant's Annual Report on Form 10-K filed March 2, 2009) |
| 10.1.41 | Credit Agreement among Mirant North America, LLC, JPMorgan Chase Bank, N.A as Administrative Agent and Deutsche Bank Securities Inc. and Goldman Sachs Credit Partners L.P., as Co-Syndication Agents, dated at January 3, 2006 (Incorporated herein by reference to Exhibit 10.2 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 6, 2009) |
| 10.1.42(a) | Guaranty Agreement (Dickerson L1) between Southern Energy, Inc. and Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.21(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.1.42(b) | Schedule identifying substantially identical agreements to Guaranty Agreement constituting Exhibit 10.1.42(a) (Incorporated herein by reference to Exhibit 10.21(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.1.43(a) | Guaranty Agreement (Morgantown L1) between Southern Energy, Inc. and Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.22(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.1.43(b) | Schedule identifying substantially identical agreements to Guaranty Agreement constituting Exhibit 10.1.43(a) (Incorporated herein by reference to Exhibit 10.22(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |

| | |
|---|---|
| 10.1.44 | Credit Agreement by and among RRI Energy, Inc., JPMorgan Chase Bank, N.A., as administrative agent, Credit Suisse Securities (USA) LLC, Deutsche Bank Securities, Inc., Goldman Sachs Bank USA, Morgan Stanley Senior Funding, Inc., Royal Bank of Canada, The Royal Bank of Scotland plc, the other lenders from time to time party thereto and, from and after the closing date of the merger, Mirant Americas, Inc. (to be renamed GenOn Americas, Inc. on the closing date of the merger), dated at September 20, 2010 (Incorporated herein by reference to Exhibit 10.1 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 5, 2010) |
| 10.1.45 | Purchase Agreement by and among RRI Energy, Inc., Mirant Corporation, GenOn Escrow Corp. and J.P. Morgan Securities LLC, as representative of the several initial purchasers, dated at September 20, 2010 (Incorporated herein by reference to Exhibit 10.2 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 5, 2010) |
| 10.1.46 | Credit Agreement among Mirant Marsh Landing, LLC, the Royal Bank of Scotland PLC, as administrative agent and Deutsche Bank Trust Company Americas, as Collateral Agent and Depository Bank, dated as of October 8, 2010 |
| 10.1.47 | Security Agreement between Mirant Marsh Landing, LLC and Deutsche Bank Trust Company Americas, as Collateral Agent, dated as of October 8, 2010 |
| 10.1.48 | Pledge Agreement among Marsh Landing Holdings, LLC, Mirant Marsh Landing, LLC and Deutsche Bank Trust Company Americas, as Collateral Agent, dated at October 8, 2010 |
| 10.1.49 | Collateral Agency and Intercreditor Agreement among Mirant Marsh Landing, LLC, The Royal Bank of Scotland PLC, as administrative agent, and Deutsche Bank Trust Company Americas, as Collateral Agent and Depository Bank, dated at October 8, 2010 |
| 10.1.50 | Equity Contribution Agreement among Mirant Corporation, Mirant Marsh Landing, LLC, The Royal Bank of Scotland PLC, as administrative agent, and Deutsche Bank Trust Company Americas, as Collateral Agent, dated as of October 8, 2010 |
| 10.1.51 | Revolving Credit Agreement among GenOn Energy, Inc., as Borrower, GenOn Americas, Inc., as Borrower, the several lenders from time to time parties hereto, and NRG Energy, Inc., as Administrative Agent, dated as of December 14, 2012 |
| 10.3.1 | Facility Lease Agreement between Conemaugh Lessor Genco LLC and Reliant Energy Mid-Atlantic Power Holdings, LLC, dated at August 24, 2000 (Incorporated herein by reference to Exhibit 4.6a to the RRI Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464) |
| 10.3.2 | Schedule identifying substantially identical agreements to Facility Lease Agreement constituting Exhibit 10.3.1 (Incorporated herein by reference to Exhibit 4.6b to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464) |
| 10.3.3 | Lease Indenture of Trust, Mortgage and Security Agreement between Conemaugh Lessor Genco LLC, as Owner Lessor, and Bankers Trust Company, as Lease Indenture Trustee, dated at August 24, 2000 (Incorporated herein by reference to Exhibit 4.8a to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464) |
| 10.3.4 | Schedule identifying substantially identical agreements to Lease Indenture of Trust constituting Exhibit 10.3.3 (Incorporated herein by reference to Exhibit 4.8b to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464) |
| 10.3.5(a) | Facility Site Lease and Easement Agreement (L1) between Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC and Southern Energy MD Ash Management, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.5(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.5(b) | Schedule identifying substantially identical agreements to Facility Site Lease Agreement constituting Exhibit 10.3.12(a) (Incorporated herein by reference to Exhibit 10.5(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.6(a) | Facility Site Lease and Easement Agreement (L1) between Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC and Southern Energy MD Ash Management, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.6(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.6(b) | Schedule identifying substantially identical agreements to Facility Site Lease Agreement constituting Exhibit 10.3.13(a) (Incorporated herein by reference to Exhibit 10.6(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.7(a) | Facility Site Sublease Agreement (L1) between Southern Energy Mid-Atlantic, LLC and Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.7(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.3.7(b) | Schedule identifying substantially identical agreements to Facility Site Sublease Agreement constituting Exhibit 10.3.14(a) (Incorporated herein by reference to Exhibit 10.7(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |

10.3.8(a)    Facility Site Sublease Agreement (L1) between Southern Energy Mid-Atlantic, LLC and Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.8(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668)

10.3.8(b)    Schedule identifying substantially identical agreements to Facility Site Sublease Agreement constituting Exhibit 10.3.15(a) (Incorporated herein by reference to Exhibit 10.8(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668)

10.3.9(a)    Shared Facilities Agreement among Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC, and Dickerson OL4 LLC, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 10.15(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668)

10.3.9(b)    Shared Facilities Agreement among Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC, and Morgantown OL7 LLC, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 10.15(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668)

10.3.10(a)   Assignment and Assumption Agreement among Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC, and Dickerson OL4 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.16(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668)

10.3.10(b)   Assignment and Assumption Agreement among Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC, and Morgantown OL7 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.16(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668)

10.3.11(a)   Ownership and Operation Agreement among Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC, Dickerson OL4 LLC, and Southern Energy Mid‐Atlantic, LLC, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 10.17(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668)

10.3.11(b)   Ownership and Operation Agreement among Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC, Morgantown OL7 LLC, and Southern Energy Mid-Atlantic, LLC, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 10.17 (b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668)

10.3.12(a)   Facility Site Lease Agreement and Easement Agreement (L1) between Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC and Southern Energy MD Ash Management, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.5(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668)

10.3.12(b)   Schedule identifying substantially identical agreements to Facility Site Lease Agreement constituting Exhibit 10.3.12(a) (Incorporated herein by reference to Exhibit 10.5(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668)

10.3.13(a)   Facility Site Lease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC and Southern Energy MD Ash Management, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.6(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668)

10.3.13(b)   Schedule identifying substantially identical agreements to Facility Site Lease Agreement constituting Exhibit 10.3.13(a) (Incorporated herein by reference to Exhibit 10.6(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668)

10.3.14(a)   Facility Site Sublease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.7(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668)

10.3.14(b)   Schedule identifying substantially identical agreements to Facility Site Sublease Agreement constituting Exhibit 10.3.14(a) (Incorporated herein by reference to Exhibit 10.7b to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668)

10.3.15(a)   Facility Site Sublease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.8a to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668)

10.3.15(b)   Schedule identifying substantially identical agreements to Facility Site Sublease Agreement constituting Exhibit 10.3.15(a) (Incorporated herein by reference to Exhibit 10.8(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668)

| | |
|---|---|
| 10.4.1 | Agreement Regarding Prosecution of Litigation by and among Merrill Lynch Commodities, Inc., Merrill Lynch & Co., Inc., Reliant Energy Power Supply, LLC, RERH Holdings, LLC, Reliant Energy Retail Holdings, LLC, Reliant Energy Retail Services, LLC, RE Retail Receivables, LLC and Reliant Energy Solutions East, LLC, dated at February 28, 2009 (Incorporated herein by reference to Exhibit 10.85 to the Registrant's Annual Report on Form 10-K filed March 2, 2009) |
| 10.4.2† | Engineering, Procurement and Construction Agreement, dated at July 30, 2007, between Mirant Mid-Atlantic, LLC, Mirant Chalk Point LLC and Stone & Webster, Inc. (Incorporated herein by reference to Exhibit 10.1 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 6, 2009) |
| 10.4.3 | Settlement Agreement and Release by and among Mirant Corporation, PEPCO, and PEPCO Settling Parties dated at May 30, 2006 (Incorporated herein by reference to Exhibit 10.1 to the Mirant Corporation Current Report on Form 8-K filed May 31, 2006) |
| 10.4.4 | Engineering, Procurement and Construction Agreement between Mirant Marsh Landing, LLC and Kiewit Power Constructors Co., dated at May 6, 2010 (Incorporated herein by reference to Exhibit 10.2 to the Mirant Corporation Quarterly Report on Form 10-Q filed August 6, 2010) |
| 31.1A1* | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.2A1* | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.3A1* | Certification of Chief Accounting Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 32.A1* | Section 1350 Certification |
| 101* | Interactive Data File |

* Asterisk indicates exhibits filed herewith.

** This filing excludes schedules and exhibits pursuant to Item 601(b)(2) of Regulation S-K, which the registrant agrees to furnish supplementally to the Securities and Exchange Commission upon request by the Commission.

† The Registrant has requested confidential treatment for certain portions of this Exhibit pursuant to Rule 24b-2 under the Exchange Act.

## GenOn Americas Generation Exhibit Index

| Exhibit No. | Exhibit Name |
|---|---|
| 1.1 | Purchase Agreement, dated at October 3, 2001, among Mirant Americas Generation, Inc. and Salomon Smith Barney Inc., Banc of America Securities LLC, Blaylock & Partners, L.P., Scotia Capital (USA) Inc., TD Securities (USA) Inc. and Tokyo-Mitsubishi International plc, as Initial Purchaser (Incorporated herein by reference to Exhibit 1.1 to Registrant's Registration Statement on Form S-4/A Amendment No. 1, Registration No. 333-85124) |
| 2.1 | Purchase and Sale Agreement by and between Mirant Americas, Inc. and LS Power Acquisition Co. I, LLC, dated at January 15, 2007 (Incorporated herein by reference to Exhibit 2.1 to the Mirant Corporation Current Report on Form 8-K filed January 18, 2007) |
| 3.1 | Certificate of Formation for Mirant Americas Generation, LLC, filed with the Delaware Secretary of State dated at November 1, 2001 (Incorporated herein by reference to Exhibit 3.1 to Registrant's Quarterly Report on Form 10-Q filed November 9, 2001) |
| 3.2 | Certificate of Amendment to Certificate of Formation of Mirant Americas Generation, LLC, filed with the Delaware Secretary of State dated at December 3, 2010 (Incorporated herein by reference to Exhibit 3.2A1 to Registrant's Annual Report on Form 10-K filed March 1, 2011) |
| 3.3 | Second Amended and Restated Limited Liability Company Agreement for GenOn Americas Generation, LLC dated December 3, 2010 (Incorporated herein by reference to Exhibit 3.3A1 to Registrant's Annual Report on Form 10-K filed March 1, 2011) |
| 4.1 | Indenture between Mirant Americas Generation, Inc. and Bankers Trust Company, as trustee, relating to Senior Notes, dated at May 1, 2001 (Incorporated herein by reference to Exhibit 4.1 to the Registrant's Registration Statement on Form S-4, Registration No. 333-63240) |
| 4.2 | Second Supplemental Indenture relating to Senior Notes 8.300% due 2011, dated at May 1, 2001 (Incorporated herein by reference to Exhibit 4.3 to Registrant's Registration Statement on Form S-4, Registration No. 333-63240) |
| 4.3 | Third Supplemental Indenture from Mirant Americas Generation, Inc. to Bankers Trust Company as trustee, relating to 9.125% Senior Notes due 2031, dated at May 1, 2001 (Incorporated herein by reference to Exhibit 4.4 to Registrant's Registration Statement on Form S-4, Registration No. 333-63240) |
| 4.4 | Fifth Supplemental Indenture from Mirant Americas Generation, Inc. to Bankers Trust Company as trustee, dated at October 9, 2001 relating to 8.50% Senior Notes due 2021 (Incorporated herein by reference to Exhibit 4.6 to Registrant's Registration Statement on Form S-4/A Amendment No. 1, Registration No. 333-85124) |
| 4.5 | Form of Sixth Supplemental Indenture from Mirant Americas Generation LLC, to Bankers Trust Company as trustee, dated at November 1, 2001 relating to indenture dated May 1, 2008 (Incorporated herein by reference to Exhibit 4.6 to the Mirant Corporation Annual Report on Form 10-K filed February 27, 2009) |
| 4.6 | Form of Seventh Supplemental Indenture from Mirant Americas Generation LLC, to Wells Fargo Bank National Association as successor indenture trustee, dated at January 3, 2006 relating to indenture date May 1, 2008 (Incorporated herein by reference to Exhibit 4.1 to Registrant's Quarterly Report on Form 10-Q filed May 14, 2007) |
| 4.7 | Senior Note Indenture between Mirant North America, LLC, Mirant North America Escrow, LLC, MNA Finance Corp. and Law Debenture Trust Company of New York, as trustee (Incorporated herein by reference to Exhibit 4.2 to Mirant Corporation Annual Report on Form 10-K filed March 14, 2006) |
| 4.8 | Registration Rights Agreement, dated at October 9, 2001, among Mirant Americas Generation, Inc., Salomon Smith Barney Inc. and Banc of America Securities LLC, Blaylock & Partners, L.P., Scotia Capital (USA) Inc., TD Securities (USA) Inc. and Tokyo-Mitsubishi International plc, as Initial Purchasers (Incorporated herein by reference to Exhibit 4.8 to Registrant's Registration Statement on Form S-4/A Amendment No. 1, Registration No. 333-85124) |
| 10.1† | Engineering, Procurement and Construction Agreement, dated at July 30, 2007, between Mirant Mid-Atlantic, LLC, Mirant Chalk Point, LLC and Stone & Webster, Inc. (Incorporated herein by reference to Exhibit 10.1 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 6, 2009) |
| 10.2 | Membership Interest Purchase and Sale Agreement, dated at January 31, 2007, between Mirant New York, Inc. and Alliance Energy Renewables, LLC (Incorporated herein by reference to Exhibit 10.1 to Registrant's Quarterly Report on Form 10-Q filed May 14, 2007) |
| 10.3 | Settlement and Release of Claims Agreement, by and among the Mirant Parties, the California Parties and OMOI, dated at January 13, 2005 (Incorporated herein by reference to Exhibit 10.39 to the Mirant Corporation Annual Report on Form 10-K filed March 15, 2005) |
| 10.4 | Credit Agreement among Mirant North America, LLC, JPMorgan Chase Bank, N.A as administrative agent and Deutsche Bank Securities Inc. and Goldman Sachs Credit Partners L.P., as co-syndication agents, dated at January 3, 2006 (Incorporated herein by reference to Exhibit 10.2 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 6, 2009) |

| | |
|---|---|
| 10.5 | Administrative Services Agreement dated at January 3, 2006 by and between Mirant Americas Generation, LLC and Mirant Services, LLC (Incorporated herein by reference to Exhibit 10.5 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.6 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 among Mirant Americas Energy Marketing, LP, Mirant Bowline, LLC, Mirant Lovett, LLC, and Mirant NY-Gen, LLC (Incorporated herein by reference to Exhibit 10.6 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.7 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 among Mirant Americas Energy Marketing, LP, Mirant Canal, LLC, and Mirant Kendall, LLC (Incorporated herein by reference to Exhibit 10.7 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.8 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Chalk Point, LLC (Incorporated herein by reference to Exhibit 10.8 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.9 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Mid-Atlantic, LLC (Incorporated herein by reference to Exhibit 10.9 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.10 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Potomac River, LLC (Incorporated herein by reference to Exhibit 10.10 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.11 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 among Mirant Americas Energy Marketing, LP, Mirant Delta, LLC, and Mirant Potrero, LLC (Incorporated herein by reference to Exhibit 10.12 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.12 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Zeeland, LLC (Incorporated herein by reference to Exhibit 10.13 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.13 | Mirant Corporation 2005 Omnibus Incentive Compensation Plan, effective December 2005 (Incorporated herein by reference to Exhibit 10.1 to the Mirant Corporation Current Report on Form 8-K filed January 3, 2006) |
| 12.1 | Statement of Ratio Earnings to Fixed Charges (Incorporated herein by reference to Exhibit 12.1 to Registrant's Registration Statement on Form S-4/A Amendment No. 1, Registration No. 333-85124) |
| 31.1A2* | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.2A2* | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.3A2* | Certification of Chief Accounting Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 32.A2* | Section 1350 Certification |
| 101* | Interactive Data File |

\*   Asterisk indicates exhibits filed herewith.

†   The Registrant has requested confidential treatment for certain portions of this Exhibit pursuant to Rule 24b-2 under the Exchange Act.

**GenOn Mid-Atlantic Exhibit Index**

| Exhibit No. | Exhibit Name |
| --- | --- |
| 3.1 | Certificate of Formation of Southern Energy Mid-Atlantic, LLC, dated at July 12, 2000 (Incorporated herein by reference to Exhibit 3.1 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 3.2 | Certificate of Amendment to Certificate of Formation of Mirant Mid-Atlantic, LLC, filed with the Delaware Secretary of State dated at January 20, 2011 (Incorporated herein by reference to Exhibit 3.2A2 to Registrant's Annual Report on Form 10-K filed March 1, 2011) |
| 3.3 | Second Amended and Restated Limited Liability Company Agreement of GenOn Mid-Atlantic, LLC dated January 20, 2011 (Incorporated herein by reference to Exhibit 3.3A2 to Registrant's Annual Report on Form 10-K filed March 1, 2011) |
| 4.1 | Form of 8.625% Series A Pass Through Certificate (Incorporated herein by reference to Exhibit 4.1 to Mirant Mid-Atlantic, LLC's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.2 | Form of 9.125% Series B Pass Through Certificate (Incorporated herein by reference to Exhibit 4.2 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.3 | Form of 10.060% Series C Pass Through Certificate (Incorporated herein by reference to Exhibit 4.3 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.4(a) | Pass Through Trust Agreement A between Southern Energy Mid-Atlantic, LLC and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.4(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.4(b) | Schedule identifying substantially identical agreement to Pass Through Trust Agreement A constituting Exhibit 4.4(a) (Incorporated herein by reference to Exhibit 4.4(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.5(a) | Participation Agreement (L1) among Southern Energy Mid-Atlantic, LLC, as Lessee, Dickerson OL1 LLC, as Owner Lessor, Wilmington Trust Company, as Owner Manager, SEMA OP3 LLC, as Owner Participant and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee and as Pass Through Trustee, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.5(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.5(b) | Schedule identifying substantially identical agreements to Participation Agreement constituting Exhibit 4.5(a) (Incorporated herein by reference to Exhibit 4.5(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.6(a) | Participation Agreement (Morgantown L1) among Southern Energy Mid-Atlantic, LLC, as Lessee, Morgantown OL1 LLC, as Owner Lessor, Wilmington Trust Company, as Owner Manager, SEMA OP1 LLC, as Owner Participant and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee and as Pass Through Trustee, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.6(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.6(b) | Schedule identifying substantially identical agreements to Participation Agreement constituting Exhibit 4.6(a) hereto (Incorporated herein by reference to Exhibit 4.6(b) to Registrant's Form S-4 in Registration No. 333-61668) |
| 4.7(a) | Facility Lease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, as Facility Lessee, and Dickerson OL1 LLC, as Owner Lessor, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.7(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.7(b) | Schedule identifying substantially identical agreement to Facility Lease Agreement constituting Exhibit 4.7(a) (Incorporated herein by reference to Exhibit 4.7(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.8(a) | Facility Lease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, as Facility Lessee, and Morgantown OL1 LLC, as Owner Lessor, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.8(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.8(b) | Schedule identifying substantially identical agreement to Facility Lease Agreement constituting Exhibit 4.8(a) (Incorporated herein by reference to Exhibit 4.8(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.9(a) | Indenture of Trust, Mortgage and Security Agreement (L1) between Dickerson OL1 LLC, as Lessor, and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.9(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.9(b) | Schedule identifying substantially identical agreement to Indenture of Trust, Mortgage and Security Agreement constituting Exhibit 4.9(a) (Incorporated herein by reference to Exhibit 4.9(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |

| 4.10(a) | Indenture of Trust, Mortgage and Security Agreement (L1) between Morgantown OL1 LLC, as Lessor, and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.10(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| --- | --- |
| 4.10(b) | Schedule identifying substantially identical agreement to Indenture of Trust, Mortgage and Security Agreement constituting Exhibit 4.10(a) (Incorporated herein by reference to Exhibit 4.10(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.11(a) | Series A Lessor Note Due June 20, 2012 for Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.11(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.11(b) | Schedule identifying substantially identical notes to Lessor Notes constituting Exhibit 4.11(a) (Incorporated herein by reference to Exhibit 4.11(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.12(a) | Series A Lessor Note Due June 30, 2008, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.12(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.12(b) | Schedule identifying substantially identical notes to Series A Lessor Notes constituting Exhibit 4.12(a) (Incorporated herein by reference to Exhibit 4.12(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.13(a) | Series B Lessor Note Due June 30, 2015, for Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.13(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.13(b) | Schedule identifying substantially identical notes to Lessor Note constituting Exhibit 4.13(a) (Incorporated herein by reference to Exhibit 4.13(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.14(a) | Series B Lessor Note Due June 30, 2017, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.14(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.14(b) | Schedule identifying substantially identical notes to Lessor Notes constituting Exhibit 4.14(a) (Incorporated herein by reference to Exhibit 4.14(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.15(a) | Series C Lessor Note Due June 30, 2020, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.15(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.15(b) | Schedule identifying substantially identical notes to Lessor Notes constituting Exhibit 4.15(a) (Incorporated herein by reference to Exhibit 4.15(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.16 | Registration Rights Agreement, between Southern Energy Mid-Atlantic, LLC and Credit Suisse First Boston, acting for itself on behalf of the Purchasers, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.16 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.17(a) | Supplemental Pass Through Trust Agreement A between Mirant Mid-Atlantic, LLC, and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at June 29, 2001 (Incorporated herein by reference to Exhibit 4.17(a) to Registrant's Registration Statement on Form S-4/A Registration No. 333-61668) |
| 4.17(b) | Schedule identifying substantially identical agreements to Supplemental Pass Through Trust Agreement for Supplemental Pass Through Trust Agreement A between Mirant Mid-Atlantic, LLC and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at June 29, 2001, constituting Exhibit 4.17(a) (Incorporated herein by reference to Exhibit 4.17(b) to Registrant's Registration Statement on Form S-4/A, Registration No. 333-61668) |
| 10.1† | Engineering, Procurement and Construction Agreement, dated at July 30, 2007, between Mirant Mid-Atlantic, LLC, Mirant Chalk Point, LLC and Stone & Webster, Inc. (Incorporated herein by reference to Exhibit 10.1 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 6, 2009) |
| 10.2 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Services, LP and Mirant Mid-Atlantic, LLC (Incorporated herein by reference to Exhibit 10.17 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.3 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Chalk Point, LLC (Incorporated herein by reference to Exhibit 10.18 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.4 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Potomac River, LLC (Incorporated herein by reference to Exhibit 10.19 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |

10.5        Administrative Services Agreement dated at January 3, 2006 by and between Mirant Mid-Atlantic, LLC and Mirant Services, LLC (Incorporated herein by reference to Exhibit 10.20 to Registrant's Annual Report on Form 10-K filed March 31, 2006)

10.6(a)     Asset Purchase and Sale Agreement for Generating Plants and Related Assets by and between Potomac Electric Power Company and Southern Energy, Inc. dated at June 7, 2000 (Incorporated herein by reference to Exhibit 10.1(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668)

10.6(b)     Amendment No. 1 to Asset Purchase and Sale Agreement by and between Potomac Electric Power Company and Southern Energy, Inc. dated at September 18, 2000 (Incorporated herein by reference to Exhibit 10.1(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668)

10.6(c)     Amendment No. 2 to Asset Purchase and Sale Agreement by and between Potomac Electric Power Company and Southern Energy, Inc. dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.1(c) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668)

10.7(a)     Interconnection Agreement (Dickerson) by and between Potomac Electric Power Company and Southern Energy Mid-Atlantic, LLC dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.2(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668)

10.7(b)     Schedule identifying substantially identical agreements to Interconnection Agreement constituting Exhibit 10.7(a) hereto (Incorporated herein by reference to Exhibit 10.2(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668)

10.8(a)     Easement, License and Attachment Agreement (Dickerson Station) by and between Potomac Electric Power Company, Southern Energy Mid-Atlantic, LLC and Southern Energy MD Ash Management, LLC dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.3(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668)

10.8(b)     Schedule identifying substantially identical agreements to Easement, License and Attachment Agreement constituting Exhibit 10.8(a) (Incorporated herein by reference to Exhibit 10.3(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668)

10.9(a)     Bill of Sale (SEMA: Dickerson; Morgantown; RR Spur; Production Service Center) by Potomac Electric Power Company, for the benefit of Southern Energy Mid-Atlantic, LLC dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.4 (a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668)

10.9(b)     Schedule identifying substantially identical documents to Bill of Sale constituting Exhibit 10.9(a) hereto (Incorporated herein by reference to Exhibit 10.4(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668)

10.10(a)    Facility Site Lease and Easement Agreement (L1) among Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC and Southern Energy MD Ash Management, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.5(a) Registrant's Registration Statement on Form S-4, Registration No. 333-61668)

10.10(b)    Schedule identifying substantially identical agreements to Facility Site Lease Agreement constituting Exhibit 10.10(a) (Incorporated herein by reference to Exhibit 10.5(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668)

10.11(a)    Facility Site Lease and Easement Agreement (L1) among Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC and Southern Energy MD Ash Management, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.6(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668)

10.11(b)    Schedule identifying substantially identical agreements to Facility Site Lease Agreement constituting Exhibit 10.11(a) (Incorporated herein by reference to Exhibit 10.6(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668)

10.12(a)    Facility Site Sublease Agreement (L1) between Southern Energy Mid-Atlantic, LLC and Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.7(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668)

10.12(b)    Schedule identifying substantially identical agreements to Facility Site Sublease Agreement constituting Exhibit 10.12(a) (Incorporated herein by reference to Exhibit 10.7(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668)

10.13(a)    Facility Site Sublease Agreement (L1) between Southern Energy Mid-Atlantic, LLC and Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.8(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668)

10.13(b)    Schedule identifying substantially identical agreements to Facility Site Sublease Agreement constituting Exhibit 10.13(a) (Incorporated herein by reference to Exhibit 10.8(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668)

10.14       Capital Contribution Agreement by and between Southern Energy, Inc. and Southern Energy Mid-Atlantic, LLC dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.12 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668)

| 10.15 | Promissory Note between Southern Energy Mid-Atlantic, LLC and Southern Energy Peaker, LLC in the original principal amount of $71,110,000 dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.13 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
|---|---|
| 10.16 | Promissory Note between Southern Energy Mid-Atlantic, LLC and Southern Energy Potomac River, LLC in the original principal amount of $152,165,000 dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.14 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.17(a) | Shared Facilities Agreement among Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC and Dickerson OL4 LLC, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 10.15(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.17(b) | Shared Facilities Agreement among Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC and Morgantown OL7 LLC, dated at December 18, 2000 constituting Exhibit 10.17(a) (Incorporated herein by reference to Exhibit 10.15(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.18(a) | Assignment and Assumption Agreement among Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC, and Dickerson OL4 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.16(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.18(b) | Assignment and Assumption Agreement among Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC and Morgantown OL7 LLC, dated at December 19, 2000 constituting Exhibit 10.18(a) (Incorporated herein by reference to Exhibit 10.16(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.19(a) | Ownership and Operation Agreement between Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC, Dickerson OL4 LLC and Southern Energy Mid-Atlantic, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.17(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.19(b) | Ownership and Operation Agreement between Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC, Morgantown OL7 LLC, and Southern Energy Mid-Atlantic, LLC, dated at December 19, 2000 constituting Exhibit 10.19(a) (Incorporated herein by reference to Exhibit 10.17(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.20(a) | Guaranty Agreement (Dickerson L1) between Southern Energy, Inc. and Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.21(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.20(b) | Schedule identifying substantially identical agreements to Guaranty Agreement constituting Exhibit 10.20(a) (Incorporated herein by reference to Exhibit 10.21(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.21(a) | Guaranty Agreement (Morgantown L1) between Southern Energy, Inc. and Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.22(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.21(b) | Schedule identifying substantially identical agreements to Guaranty Agreement constituting Exhibit 10.21(a) (Incorporated herein by reference to Exhibit 10.22(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668) |
| 10.22 | Credit Agreement among Mirant North America, LLC, as Borrower, JPMorgan Chase Bank, N.A. as Administrative Agent and Deutsche Bank Securities Inc. and Goldman Sachs Credit Partners L.P., as Co-Syndication Agents, dated at January 3, 2006 (Incorporated herein by reference to Exhibit 10.2 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 6, 2009) |
| 31.1A3* | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.2A3* | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.3A3* | Certification of Chief Accounting Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 32.A3* | Section 1350 Certification |
| 101* | Interactive Data File |

\* Asterisk indicates exhibits filed herewith.

† The Registrant has requested confidential treatment for certain portions of this Exhibit pursuant to Rule 24b-2 under the Exchange Act.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

GENON ENERGY, INC.
(Registrant)

By:      /s/ DAVID W. CRANE

David W. Crane
*Chief Executive Officer*

Date: February 28, 2014

## GENON ENERGY, INC.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signatures | Title |
| --- | --- |
| /s/ DAVID W. CRANE | President and Chief Executive Officer and Director |
| David W. Crane | of GenOn Energy, Inc. (Principal Executive Officer) |
| Date: February 28, 2014 | |
| /s/ KIRKLAND B. ANDREWS | Executive Vice President and Chief Financial Officer |
| Kirkland B. Andrews | of GenOn Energy, Inc. (Principal Financial Officer) |
| Date: February 28, 2014 | |
| /s/ RONALD B. STARK | Vice President and Chief Accounting Officer |
| Ronald B. Stark | of GenOn Energy, Inc. (Principal Accounting Officer) |
| Date: February 28, 2014 | |

160

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

GENON AMERICAS GENERATION, LLC
(Registrant)

By:             /s/ DAVID W. CRANE

David W. Crane
*Chief Executive Officer*

Date: February 28, 2014

## GENON AMERICAS GENERATION, LLC

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| <u>Signatures</u> | <u>Title</u> |
|---|---|
| /s/ DAVID W. CRANE | President and Chief Executive Officer and Manager |
| David W. Crane | of GenOn Americas Generation, LLC |
| Date: February 28, 2014 | (Principal Executive Officer) |
| /s/ KIRKLAND B. ANDREWS | Executive Vice President and Chief Financial Officer |
| Kirkland B. Andrews | and Manager of GenOn Americas Generation, LLC |
| Date: February 28, 2014 | (Principal Financial Officer) |
| /s/ RONALD B. STARK | Vice President and Chief Accounting Officer |
| Ronald B. Stark | of GenOn Americas Generation, LLC |
| Date: February 28, 2014 | (Principal Accounting Officer) |

161

.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

GENON MID-ATLANTIC, LLC
(Registrant)

By:        /s/ DAVID W. CRANE

David W. Crane
*Chief Executive Officer*

Date: February 28, 2014

## GENON MID-ATLANTIC, LLC

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signatures | Title |
|---|---|
| /s/ DAVID W. CRANE<br>David W. Crane<br>Date: February 28, 2014 | President and Chief Executive Officer and Manager of GenOn Mid-Atlantic, LLC<br>(Principal Executive Officer) |
| /s/ KIRKLAND B. ANDREWS<br>Kirkland B. Andrews<br>Date: February 28, 2014 | Executive Vice President and Chief Financial Officer and Manager of GenOn Mid-Atlantic, LLC<br>(Principal Financial Officer) |
| /s/ RONALD B. STARK<br>Ronald B. Stark<br>Date: February 28, 2014 | Vice President and Chief Accounting Officer of GenOn Mid-Atlantic, LLC<br>(Principal Accounting Officer) |

162

**Supplemental Information to be Furnished with Reports Filed Pursuant to
Section 15(d) of the Act by Registrants Which Have Not Registered
Securities Pursuant to Section 12 of the Act**

No annual report or proxy materials has been sent to securities holders and no such report or proxy material is to be furnished to securities holders subsequent to the filing of the annual report on this Form 10-K.

163

**EXHIBIT 31.1 A1**

<div align="center">

**CERTIFICATION**

</div>

I, David W. Crane, certify that:

1.      I have reviewed this annual report on Form 10-K of GenOn Energy, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 28, 2014

/s/ DAVID W. CRANE
_____
David W. Crane
*Chief Executive Officer*
*(Principal Executive Officer)*

**EXHIBIT 31.1 A2**

**CERTIFICATION**

I, David W. Crane, certify that:

1.       I have reviewed this annual report on Form 10-K of GenOn Americas Generation, LLC;

2.       Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.       Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.       The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

      (a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

      (b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

      (c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

      (d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.       The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

      (a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      (b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 28, 2014

By:     /s/ DAVID W. CRANE
        David W. Crane
        *Chief Executive Officer*
        *(Principal Executive Officer)*

**EXHIBIT 31.1 A3**

**CERTIFICATION**

I, David W. Crane, certify that:

1.      I have reviewed this annual report on Form 10-K of GenOn Mid-Atlantic, LLC;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 28, 2014

By:      /s/ DAVID W. CRANE
         _____
         David W. Crane
         *Chief Executive Officer*
         *(Principal Executive Officer)*

**EXHIBIT 31.2 A1**

## CERTIFICATION

I, Kirkland B. Andrews, certify that:

1. I have reviewed this annual report on Form 10-K of GenOn Energy, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 28, 2014

By:    /s/ KIRKLAND B. ANDREWS
       _____
       *Kirkland B. Andrews*
       *Chief Financial Officer*
       *(Principal Financial Officer)*

**EXHIBIT 31.2 A2**

**CERTIFICATION**

I, Kirkland B. Andrews, certify that:

1.  I have reviewed this annual report on Form 10-K of GenOn Americas Generation, LLC;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 28, 2014

By:     /s/ KIRKLAND B. ANDREWS
        _____
        *Kirkland B. Andrews*
        *Chief Financial Officer*
        *(Principal Financial Officer)*

**EXHIBIT 31.2 A3**

**CERTIFICATION**

I, Kirkland B. Andrews, certify that:

1.  I have reviewed this annual report on Form 10-K of GenOn Mid-Atlantic, LLC;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 28, 2014

By:      /s/ KIRKLAND B. ANDREWS
_____
        *Kirkland B. Andrews*
        *Chief Financial Officer*
        *(Principal Financial Officer)*

**EXHIBIT 31.3A1**

## CERTIFICATION

I, Ronald B. Stark, certify that:

1.    I have reviewed this annual report on Form 10-K of GenOn Energy, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 28, 2014

By:      /s/ RONALD B. STARK
           Ronald B. Stark
           *Chief Accounting Officer*
           *(Principal Accounting Officer)*

**EXHIBIT 31.3A2**

**CERTIFICATION**

I, Ronald B. Stark, certify that:

1.    I have reviewed this annual report on Form 10-K of GenOn Americas Generation, LLC;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 28, 2014

By:    /s/ RONALD B. STARK
          Ronald B. Stark
          *Chief Accounting Officer*
          *(Principal Accounting Officer)*

**EXHIBIT 31.3 A3**

**CERTIFICATION**

I, Ronald B. Stark, certify that:

1.    I have reviewed this annual report on Form 10-K of GenOn Mid-Atlantic, LLC;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 28, 2014

By:      /s/ RONALD B. STARK
         _____
         Ronald B. Stark
         *Chief Accounting Officer*
         *(Principal Accounting Officer)*

EXHIBIT 32.A1

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of GenOn Energy, Inc. on Form 10-K for the year ended December 31, 2013, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), each of the undersigned officers of the Company certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)   The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date: February 28, 2014

/s/ DAVID W. CRANE
_____
David W. Crane
*Chief Executive Officer*
*(Principal Executive Officer)*

/s/ KIRKLAND B. ANDREWS
_____
Kirkland B. Andrews
*Chief Financial Officer*
*(Principal Financial Officer)*

/s/ RONALD B. STARK
_____
Ronald B. Stark
*Chief Accounting Officer*
*(Principal Accounting Officer)*

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of this Form 10-K or as a separate disclosure document.

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to GenOn Energy, Inc. and will be retained by GenOn Energy, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

EXHIBIT 32.A2

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of GenOn Americas Generation, LLC on Form 10-K for the year ended December 31, 2013, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), each of the undersigned officers of the Company certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)    The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date: February 28, 2014

/s/ DAVID W. CRANE
_____
David W. Crane
*Chief Executive Officer*
*(Principal Executive Officer)*

/s/ KIRKLAND B. ANDREWS
_____
Kirkland B. Andrews
Chief Financial Officer
*(Principal Financial Officer)*

/s/ RONALD B. STARK
_____
Ronald B. Stark
Chief Accounting Officer
*(Principal Accounting Officer)*

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of this Form 10-K or as a separate disclosure document.

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to GenOn Americas Generation, LLC and will be retained by GenOn Americas Generation, LLC and furnished to the Securities and Exchange Commission or its staff upon request.

**EXHIBIT 32.A3**

<div align="center">

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

</div>

In connection with the Annual Report of GenOn Mid-Atlantic, LLC on Form 10-K for the year ended December 31, 2013, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), each of the undersigned officers of the Company certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

    (1)   The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

    (2)   The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date: February 28, 2014

/s/ DAVID W. CRANE
_____
David W. Crane
*Chief Executive Officer*
*(Principal Executive Officer)*

/s/ KIRKLAND B. ANDREWS
_____
Kirkland B. Andrews
Chief Financial Officer
*(Principal Financial Officer)*

/s/ RONALD B. STARK
_____
Ronald B. Stark
Chief Accounting Officer
*(Principal Accounting Officer)*

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of this Form 10-K or as a separate disclosure document.

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to GenOn Mid-Atlantic, LLC and will be retained by GenOn Mid-Atlantic, LLC and furnished to the Securities and Exchange Commission or its staff upon request.

**Property, Plant, and Equipment (Tables)**

**12 Months Ended**

**Dec. 31, 2013**

Genon [Member]

**Property, Plant and Equipment [Line Items]**

[Schedule of major classes of property, plant, and equipment](#)

Major classes of property, plant, and equipment were as follows:

*GenOn*

|  | As of December 31, | | Depreciable Lives |
|---|---|---|---|
|  | **2013** | **2012** |  |
|  | (In millions) | | |
| Facilities and equipment | $ 3,130 | $ 2,953 | 2 - 34 Years |
| Land and improvements | 181 | 185 | |
| Construction in progress | 113 | 693 | |
|  Total property, plant and equipment | 3,424 | 3,831 | |
| Accumulated depreciation | (248) | (1) | |
|  Net property, plant and equipment | $ 3,176 | $ 3,830 | |

GenOn Americas Generation, LLC [Member]

**Property, Plant and Equipment [Line Items]**

[Schedule of major classes of property, plant, and equipment](#)  *GenOn Americas Generation*

|  | As of December 31, | | Depreciable Lives |
|---|---|---|---|
|  | **2013** | **2012** |  |
|  | (In millions) | | |
| Facilities and equipment | $ 1,213 | $ 1,139 | 2 - 34 Years |
| Land and improvements | 74 | 74 | |
| Construction in progress | 3 | 9 | |
|  Total property, plant and equipment | 1,290 | 1,222 | |
| Accumulated depreciation | (96) | (1) | |
|  Net property, plant and equipment | $ 1,194 | $ 1,221 | |

GenOn Mid-Atlantic, LLC [Member]

**Property, Plant and Equipment [Line Items]**

[Schedule of major classes of property, plant, and equipment](#)  *GenOn Mid-Atlantic*

|  | As of December 31, | | Depreciable Lives |
|---|---|---|---|
|  | **2013** | **2012** |  |
|  | (In millions) | | |
| Facilities and equipment | $ 1,045 | $ 1,001 | 2 - 34 Years |
| Land and improvements | 16 | 16 | |
| Construction in progress | 3 | 5 | |
|  Total property, plant and equipment | 1,064 | 1,022 | |
| Accumulated depreciation | (77) | (1) | |
|  Net property, plant and equipment | $ 987 | $ 1,021 | |

| **Fair Value of Financial Instruments (Details) (Successor [Member], USD $) In Millions, unless otherwise specified** | **Dec. 31, 2013** | **Dec. 31, 2012** |
|---|---|---|
| **Liabilities:** | | |
| Long and short-term debt | $ 3,133 | $ 4,202 |
| Carrying Amount | | |
| **Liabilities:** | | |
| Long and short-term debt | 3,120 | 4,185 |
| GenOn Americas Generation, LLC [Member] | | |
| **Liabilities:** | | |
| Long and short-term debt | 948 | 960 |
| GenOn Americas Generation, LLC [Member] \| Carrying Amount | | |
| **Liabilities:** | | |
| Long and short-term debt | 938 | 946 |
| GenOn Americas Generation, LLC [Member] \| Fair Value [Member] | | |
| **Liabilities:** | | |
| Long and short-term debt | | $ 967 |

| **Commitments and Contingencies (Tables)** | **12 Months Ended** **Dec. 31, 2013** |
|---|---|

**Commitments and Contingency [Line Items]**

<u>Future minimum lease commitments under operating leases</u>

Future minimum lease commitments under the Registrants' other operating leases for the years ending after December 31, 2013, are as follows:

| | GenOn[a] | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| | | (In millions) | |
| 2014 | $ 18 | $ 7 | $ 7 |
| 2015 | 16 | 6 | 6 |
| 2016 | 11 | 1 | 1 |
| 2017 | 10 | 1 | 1 |
| 2018 | 8 | 1 | 1 |
| Thereafter | 1 | 1 | 1 |
| Total | $ 64 | $ 17 | $ 17 |

<u>Rent expense associated with other operating leases</u>

The Registrants' rent expense associated with other operating leases was as follows:

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 |
| | (In millions) | | | |
| GenOn | $ 17 | $ 1 | $ 15 | $ 20 |
| GenOn Americas Generation | $ — | $ — | $ 3 | $ 7 |
| GenOn Mid-Atlantic | $ — | $ — | $ 3 | $ 7 |

<u>Other Commitments</u>

As of December 31, 2013, the Registrants' other commitments are estimated as follows:

| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| | | (In millions) | |
| 2014 | $ 18 | $ 5 | $ 5 |
| 2015 | 7 | 6 | 6 |
| 2016 | 6 | 6 | 6 |
| 2017 | 6 | 6 | 6 |
| 2018 | 6 | 6 | 6 |
| Thereafter | 94 | 94 | 94 |
| Total | $ 137 | $ 123 | $ 123 |

**GenOn Mid-Atlantic, LLC [Member]**

**Commitments and Contingency [Line Items]**

<u>Future minimum lease commitments under operating leases</u>

Future minimum lease commitments under the GenOn Mid-Atlantic operating leases for the years ending after December 31, 2013, are as follows:

| | (In millions) |
|---|---|
| 2014 | $ 131 |
| 2015 | 110 |
| 2016 | 150 |
| 2017 | 144 |
| 2018 | 105 |
| Thereafter | 686 |

| | |
|---|---|
| Total | $ 1,326 |

Rema [Member]

**Commitments and Contingency [Line Items]**

Future minimum lease commitments under operating leases

Future minimum lease commitments under the REMA operating leases for the years ending after December 31, 2013, are as follows:

| | (In millions) |
|---|---|
| 2014 | $ 63 |
| 2015 | 56 |
| 2016 | 61 |
| 2017 | 63 |
| 2018 | 55 |
| Thereafter | 400 |
| Total | $ 698 |

Long-term Service Agreements [Member]

**Commitments and Contingency [Line Items]**

Commitments under fuel, commodity transportation and LTSA contractual arrangements

As of December 31, 2013, GenOn's commitments under such outstanding agreements are estimated as follows:

| | GenOn |
|---|---|
| | (In millions) |
| 2014 | $ 13 |
| 2015 | 14 |
| 2016 | 15 |
| 2017 | 14 |
| 2018 | 27 |
| Thereafter | 204 |
| Total | $ 287 |

Fuel and Commodity Transportation Commitments [Member]

**Commitments and Contingency [Line Items]**

Commitments under fuel, commodity transportation and LTSA contractual arrangements

As of December 31, 2013, the Registrants' commitments under such outstanding agreements are estimated as follows:

| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| | | (In millions) | |
| 2014 | $ 167 | $ 29 | $ 29 |
| 2015 | 122 | 4 | 4 |
| 2016 | 119 | 4 | 4 |
| 2017 | 108 | — | — |
| 2018 | 36 | — | — |
| Thereafter | 129 | — | — |
| Total | $ 681 | $ 37 | $ 37 |

| Benefit Plans and Other Postretirement Benefits Disclosure (Details 4) (Pension Plan, Defined Benefit [Member], USD $) In Millions, unless otherwise specified | Dec. 31, 2013 Successor [Member] Level 1 [Member] | Dec. 31, 2013 Successor [Member] Level 2 [Member] | Dec. 31, 2013 Successor [Member] United States equities Level 1 [Member] | Dec. 31, 2013 Successor [Member] United States equities Level 2 [Member] | Dec. 31, 2013 Successor [Member] International Stocks [Member] Level 1 [Member] | Dec. 31, 2013 Successor [Member] International Stocks [Member] Level 2 [Member] | Dec. 31, 2013 Successor [Member] Fixed income securities Level 1 [Member] | Dec. 31, 2013 Successor [Member] Fixed income securities Level 2 [Member] | Dec. 31, 2012 Predecessor [Member] | Dec. 31, 2012 Predecessor [Member] Level 1 [Member] | De 2 [Me Le [Me |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Defined Benefit Plan, Plan Asset Measured at Fair Value [Abstract]** | | | | | | | | | | | |
| Fair value of plan assets | $ 0 | $ 469 | $ 0 | $ 202 | $ 0 | $ 139 | $ 0 | $ 128 | $ 406 | $ 0 | $ 406 |

**Fair Value of Financial Instruments (Details 2) (Successor [Member], USD $) In Millions, unless otherwise specified**

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative assets

Level 1 [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative liabilities

Other Assets

Level 1 [Member] | Commodity Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative assets

Derivative liabilities

Level 1 [Member] | Interest Rate Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative liabilities

Level 2 [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative liabilities

Other Assets

Level 2 [Member] | Commodity Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative assets

Derivative liabilities

Level 2 [Member] | Interest Rate Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative liabilities

Level 3 [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative liabilities

Other Assets

Level 3 [Member] | Commodity Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative assets

Derivative liabilities

Level 3 [Member] | Interest Rate Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative liabilities

Fair Value [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative liabilities

Other Assets

Fair Value [Member] | Commodity Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative assets

Derivative liabilities

Fair Value [Member] | Interest Rate Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative liabilities

Fair Value, Measurements, Recurring [Member] | Level 1 [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Other Assets

Fair Value, Measurements, Recurring [Member] | Level 1 [Member] | Commodity Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative assets

Derivative liabilities

Fair Value, Measurements, Recurring [Member] | Level 2 [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Other Assets

Fair Value, Measurements, Recurring [Member] | Level 2 [Member] | Commodity Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative assets

Derivative liabilities

Fair Value, Measurements, Recurring [Member] | Level 3 [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Other Assets

Fair Value, Measurements, Recurring [Member] | Level 3 [Member] | Commodity Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative assets

Derivative liabilities

Fair Value, Measurements, Recurring [Member] | Fair Value [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Other Assets

Fair Value, Measurements, Recurring [Member] | Fair Value [Member] | Commodity Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative assets

Derivative liabilities

Fair Value, Measurements, Recurring [Member] | GenOn Americas Generation, LLC [Member] | Level 1 [Member] | Commodity Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative assets

Derivative liabilities

Fair Value, Measurements, Recurring [Member] | GenOn Americas Generation, LLC [Member] | Level 2 [Member] | Commodity Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative assets

Derivative liabilities

Fair Value, Measurements, Recurring [Member] | GenOn Americas Generation, LLC [Member] | Level 3 [Member] | Commodity Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative assets

Derivative liabilities

Fair Value, Measurements, Recurring [Member] | GenOn Americas Generation, LLC [Member] | Fair Value [Member] | Commodity Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative assets

Derivative liabilities

Fair Value, Measurements, Recurring [Member] | GenOn Mid-Atlantic, LLC [Member] | Level 1 [Member] | Commodity Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative assets

Derivative liabilities

Fair Value, Measurements, Recurring [Member] | GenOn Mid-Atlantic, LLC [Member] | Level 2 [Member] | Commodity Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative assets

Derivative liabilities

Fair Value, Measurements, Recurring [Member] | GenOn Mid-Atlantic, LLC [Member] | Level 3 [Member] | Commodity Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative assets

Derivative liabilities

Fair Value, Measurements, Recurring [Member] | GenOn Mid-Atlantic, LLC [Member] | Fair Value [Member] | Commodity Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

Derivative assets

Derivative liabilities

[1] There were no transfers during the year ended December 31, 2012 between Levels 1 and 2.

[2] Relates to mutual funds held in a rabbi trust for non-qualified deferred compensation plans for some key and highly compensated employees.

[3] (a) There were no transfers during the year ended December 31, 2013 between Levels 1 and 2.

[4] (b)Relates to mutual funds held in a rabbi trust for non-qualified deferred compensation plans for some key and highly compensated employees.

[5] {F|ahBzfndlYmZpbGluZ3MtaHJkcmoLEgZYTUxEb2MiXlhCUkxEb2NHZW5JbmZvOjkyNTFkMDAwYmI3ZTRiMjk4MDY0NDY0MTRkOTc4YzRkfFRleHH

[6] {F|ahBzfndlYmZpbGluZ3MtaHJkcmoLEgZYTUxEb2MiXlhCUkxEb2NHZW5JbmZvOjkyNTFkMDAwYmI3ZTRiMjk4MDY0NDY0MTRkOTc4YzRkfFRleHH

[7] {F|ahBzfndlYmZpbGluZ3MtaHJkcmoLEgZYTUxEb2MiXlhCUkxEb2NHZW5JbmZvOjkyNTFkMDAwYmI3ZTRiMjk4MDY0NDY0MTRkOTc4YzRkfFRleHH

[8] {F|ahBzfndlYmZpbGluZ3MtaHJkcmoLEgZYTUxEb2MiXlhCUkxEb2NHZW5JbmZvOjkyNTFkMDAwYmI3ZTRiMjk4MDY0NDY0MTRkOTc4YzRkfFRleHH

| Stock-Based Compensation Stock-Based Compenation Disclosure (USD $) In Millions, except Share data, unless otherwise specified | 12 Months Ended | | | 0 Months Ended | | 12 Months Ended | | | 12 Months Ended | | 3 Months Ended | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Dec. 14, 2012 | Dec. 31, 2013 | Dec. 31, 2011 | Dec. 14, 2012 Time Based Restricted Stock Units Rsu [Member] | Dec. 14, 2012 Performance Shares [Member] | Dec. 14, 2012 Restricted Stock Units (RSUs) [Member] | Dec. 31, 2011 Restricted Stock Units (RSUs) [Member] | Dec. 14, 2012 Genon [Member] | Dec. 14, 2012 Weighted Average [Member] | Dec. 31, 2011 Weighted Average [Member] | Dec. 31, 2012 Minimum [Member] | Dec. 201 Minim [Mem] |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | | | | | | | | |
| Share-based Compensation Arrangement by Share-based Payment Award, Options, Grants in Period, Gross | | | | 3,200,000 | 2,600,000 | | | | | | | |
| Share-based Compensation Arrangement by Share-based Payment Award, Fair Value Assumptions, Expected Volatility Rate | 50.50% [1] | | | | | | | | 50.50% [1] | 47.20% [1] | | |
| Share-based Compensation Arrangement by Share-based Payment Award, Award Vesting Rights, Percentage | | 33.33% | | | | | | | | | | |
| Performance Multiplier Used | | | | | | | | | | | 183.00% | 0.00% |
| **Restricted stock units and Performance units activity [Roll Forward]** | | | | | | | | | | | | |
| Merger Stock Exchange Ratio | | | | | | | | 0.1216 | | | | |
| Share-based Compensation Arrangement by Share-based Payment Award, Equity Instruments Other than Options, Vested in Period, Total Fair Value | | | | | | $ 8 | $ 0 | | | | | |
| Share-based Compensation Arrangement by Share-based Payment Award, Award Vesting Period | | 3 years | | | | | | | | | | |
| Share-based Compensation Arrangement by Share-based Payment Award, Expiration Period | | | | | | | | | | | | |
| Share-based Compensation Arrangement by Share-based Payment Award, Options, Grants in Period, Weighted Average Grant Date Fair Value | $ 1.07 | $ 1.68 | | | | $ 2.43 | $ 3.81 | | | | | |
| Cash received from the exercise of options exercised | | | | 3 | | | | | | | | |
| Expected term (in years) | 5 years [2] | | | 5 years [2] | | | | | 5 years [2] | 5 years [2] | | |
| Risk Free Interest Rate | 0.89% [3] | | | | | | | | 0.89% [3] | 2.10% [3] | | |
| Share-based Compensation | $ 19 | $ 14 | | | | | | | | | | |

[1] (a)GenOn estimated volatility based on historical and implied volatility (as applicable) of its common stock.

[2] (b)The expected term is based on a binomial lattice model.

[3] (c)The risk-free rate for periods within the contractual term of the stock option is based on the U.S. Treasury yield curve in effect at the time of the grant.

| | | **12 Months Ended** |
|---|---|---|
| **Stock-Based Compensation** | | **Dec. 31, 2013** |
| **(Tables)** | | |

**Stock-Based Compensation Disclosure [Abstract]**

Summary of significant assumptions used in the fair value model with respect to the Company's NQSOs

Significant assumptions used in the fair value model with respect to the GenOn's non-qualified stock options are summarized below:

| | January 1, 2012 through December 14, 2012 | | 2011 | |
|---|---|---|---|---|
| | **Range** | **Weighted Average** | **Range** | **Weighted Average** |
| Expected volatility[a] | 50.5% | 50.5% | 45-55% | 47.2% |
| Expected term (in years)[b] | 5 | 5 | 5 | 5 |
| Risk-free rate[c] | 0.89% | 0.89% | 1.0-1.2% | 2.1% |

(a)  GenOn estimated volatility based on historical and implied volatility (as applicable) of its common stock.

(b)  The expected term is based on a binomial lattice model.

(c)  The risk-free rate for periods within the contractual term of the stock option is based on the U.S. Treasury yield curve in effect at the time of the grant.

**Nature of Business (Tables)**

**12 Months Ended**

**Dec. 31, 2013**

**Nature of Business [Line Items]**

Schedule of Global Generation Portfolio by Operating Segment

The following table summarizes GenOn's generation portfolio by operating segment.

| Generation Type | East | South Central | West | Total |
|---|---|---|---|---|
| Natural gas | 6,389 | 1,198 | 4,435 | 12,022 |
| Coal | 5,898 | — | — | 5,898 |
| Oil | 2,077 | — | — | 2,077 |
| Total generation capacity | 14,364 | 1,198 | 4,435 | 19,997 |

*(In MW)*

GenOn Americas Generation, LLC [Member]

**Nature of Business [Line Items]**

Schedule of Global Generation Portfolio by Operating Segment

The following table summarizes GenOn Americas Generation's portfolio by operating segment.

| Generation Type | East | West | Total |
|---|---|---|---|
| Natural gas | 2,938 | 1,029 | 3,967 |
| Coal | 2,433 | — | 2,433 |
| Oil | 1,452 | — | 1,452 |
| Total generation capacity | 6,823 | 1,029 | 7,852 |

*(In MW)*

GenOn Mid-Atlantic, LLC [Member]

**Nature of Business [Line Items]**

Schedule of Global Generation Portfolio by Operating Segment

GenOn Mid-Atlantic facilities consist of baseload, intermediate and peaking power generation facilities. The following table summarizes GenOn Mid-Atlantic's portfolio in the East region.

| Generation Type | East |
|---|---|
| Natural gas | 2,433 |
| Coal | 1,942 |
| Oil | 308 |
| Total generation capacity | 4,683 |

*(In MW)*

| Related Party Transactions (Details) (USD $) In Millions, unless otherwise specified | 1 Months Ended Jul. 31, 2013 | Dec. 31, 2013 | 12 Months Ended Dec. 31, 2013 GenOn Americas Generation, LLC [Member] | Dec. 31, 2013 Successor [Member] | Dec. 31, 2012 Successor [Member] | 0 Months Ended Dec. 31, 2012 Successor [Member] GenOn Mid-Atlantic, LLC [Member] | 12 Months Ended Dec. 31, 2013 Successor [Member] GenOn Mid-Atlantic, LLC [Member] | 0 Months Ended Dec. 31, 2012 Successor [Member] GenOn Mid-Atlantic, LLC [Member] GenOn Energy Management [Member] | 12 Months Ended Dec. 31, 2013 Successor [Member] GenOn Mid-Atlantic, LLC [Member] GenOn Energy Management [Member] | 0 Months Ended Dec. 31, 2012 Successor [Member] GenOn Americas Generation, LLC [Member] | 12 Months Ended Dec. 31, 2013 Successor [Member] GenOn Americas Generation, LLC [Member] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Related Party Transaction [Line Items]** | | | | | | | | | | | |
| Other Assets, Current | | | | | | | | | | | |
| Property, Plant and Equipment, Net | | | | 3,176 | | | 987 | | | | 1,194 |
| Total Assets | | | | 5,734 | 7,419 | | 1,872 | | | 3,386 | 2,963 |
| Other Liabilities | | | | | | | | | | | |
| Long-term Debt | 2,800 | 850 | | | | | | | | | |
| Liabilities | | | | 5,421 | | | 794 | | | | 2,272 |
| Annual fees under services agreement | | | | 88 | | | | | | | |
| Cost of operations | | | | | | 3 | 70 | | | 4 | 83 |
| Related Party Transaction, Selling, General and Administrative Expenses from Transactions with Related Party | | | | | | | | | | | |
| Increase (decrease) in energy marketing overhead expense | | | | | | | | | | | |
| Maximum borrowing capacity | | | | | | | | | | | |
| Amount of letters of credit transferred to intercompany credit agreement | | | | | | | | | | | |
| Term of Facility | | | | | | | | | | | |
| Debt instrument, interest rate over variable rate (as a percent) | | | | | | | | | | | |
| Basis points added to interest under LIBOR rate loans (as a percent) | | | | | | | | | | | |
| Current notes receivable from related party | | | | | | | | | | | |
| Utilized emissions allowances | | | | | | | | 1 | 17 | | |
| Payments to Acquire Businesses, Gross | | | | | | | | | | | |
| Business Combination, Recognized Identifiable Assets Acquired and Liabilities Assumed, Net | | | | | | | | | | | |
| Adjustments to Additional Paid in Capital, Other | $ 31 | | | $ (48) | | | | | | | |

| Benefit Plans and Other Postretirement Benefits Disclosure (Details 7) (USD $) In Millions, unless otherwise specified | 12 Months Ended Dec. 31, 2013 |
|---|---|
| Pension Benefits \| Tax Qualified Pension Benefits [Member] | |
| **Defined Benefit Plan, Estimated Future Employer Contributions [Abstract]** | |
| Employer expected contributions in next fiscal year | $ 56 |
| **Defined Benefit Plan, Expected Future Benefit Payments, Fiscal Year Maturity [Abstract]** | |
| 2013 | 24 |
| 2014 | 27 |
| 2015 | 29 |
| 2016 | 28 |
| 2017 | 30 |
| 2018-2022 | 184 |
| Pension Benefits \| Non Tax Qualified Pension Benefits [Member] | |
| **Defined Benefit Plan, Estimated Future Employer Contributions [Abstract]** | |
| Employer expected contributions in next fiscal year | 12 |
| Assets in trust to fund future benefits | 14 |
| **Defined Benefit Plan, Expected Future Benefit Payments, Fiscal Year Maturity [Abstract]** | |
| 2013 | 12 |
| 2014 | 0 |
| 2015 | 0 |
| 2016 | 0 |
| 2017 | 0 |
| 2018-2022 | 0 |
| Other Postretirement Benefit Plan, Defined Benefit [Member] | |
| **Defined Benefit Plan, Expected Future Benefit Payments, Fiscal Year Maturity [Abstract]** | |
| 2013 | 6 |
| 2014 | 7 |
| 2015 | 6 |
| 2016 | 6 |
| 2017 | 6 |
| 2018-2022 | 30 |
| **Postretirement Medical Plans with Prescription Drug Benefits [Abstract]** | |
| 2013 | 0 |
| 2014 | 0 |
| 2015 | 0 |
| 2016 | 0 |
| 2017 | 0 |
| 2018-2022 | $ 1 |

| Fair Value of Financial Instruments (Details 4) (USD $) In Millions, unless otherwise specified | Dec. 31, 2013 (12 Months Ended) | Dec. 31, 2013 Investment grade | Dec. 31, 2013 Non-rated | Dec. 31, 2013 Financial institutions | Dec. 31, 2013 Utilities, energy merchants, marketers and other | Dec. 31, 2013 ISOs | Dec. 31, 2013 GenOn Mid-Atlantic, LLC [Member] (12 Months Ended) | Dec. 31, 2013 GenOn Mid-Atlantic, LLC [Member] Investment grade | Dec. 31, 2013 GenOn Mid-Atlantic, LLC [Member] Financial institutions | Dec. 31, 2013 GenOn Americas Generation, LLC [Member] (12 Months Ended) | Dec. 31, 2013 GenOn Americas Generation LLC [Member] Investment grade |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Derivative fair value measurements [Abstract]** | | | | | | | | | | | |
| Percentage of contracts valued with prices provided by models and other valuation techniques to the total fair value of all derivative assets (as a percent) | 0.00% | | | | | | 0.00% | | | 1.00% | |
| Percentage of contracts valued with prices provided by models and other valuation techniques to the total fair value of all derivative liabilities (as a percent) | 4.00% | | | | | | 0.00% | | | 3.00% | |
| Credit reserve balance | | | | | | | | | | | |
| Cash collateral paid | 62 | | | | | | | | | 50 | |
| Cash collateral received | 56 | | | | | | | | | 56 | |
| **Concentration of credit risk [Abstract]** | | | | | | | | | | | |
| Counterparty credit exposure to a significant portion of counterparties | 538 | | | | | | 361 | | | 527 | |
| Counterparty credit exposure, collateral held, cash and letters of credit | 0 | | | | | | 0 | | | 0 | |
| Counterparty credit exposure, net | 538 | | | | | | 361 | | | 527 | |
| Percentage of credit risk roll-off by the end of 2013 (as a percent) | 99.00% | | | | | | 100.00% | | | 100.00% | |
| **Counterparty credit [Abstract]** | | | | | | | | | | | |
| Net Exposure (as a percent) | 100.00% [2] | 98.00% [2] | 2.00% [2] | 68.00% [2] | 12.00% [2] | 20.00% [2] | 100.00% [3] | 100.00% [3] | | 100.00% [4] | 98.00% |
| Counterparty credit risk exposure, threshold percentage | 10.00% | | | | | | 10.00% | | | 10.00% | |
| Counterparty credit risk exposure aggregate amount above threshold percentage | $ 326 | | | | | | $ 335 | | | $ 377 | |

[1]     Provision for uncollectible accounts represents credit reserves for derivative contract assets.

[2]     Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

[3]     )Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices

[4]     Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices

| Income Taxes (Narrative) (Details) (USD $) | 0 Months Ended Dec. 31, 2012 | 12 Months Ended Dec. 31, 2013 | 12 Months Ended Dec. 31, 2012 | Dec. 14, 2012 | Dec. 14, 2012 RRI Energy [Member] | Dec. 31, 2012 Internal Revenue Service (IRS) [Member] | Dec. 31, 2013 Internal Revenue Service (IRS) [Member] | Dec. 31, 2013 State and Local Jurisdiction [Member] | Dec. 31, 2012 Successor [Member] | Dec. 31, 2013 Successor [Member] | Dec. 201... Predec... [Mem... |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Loss Carryforwards [Line Items]** | | | | | | | | | | | |
| Change in Deferred Tax Assets Valuation Allowance | | | | | | | | | $23,000,000 | $(2,000,000) | $166,00... |
| Number of Percentage Point Increase in Stock Ownership Required for Ownership Change | | | | 50 | | | | | | | |
| Minimum percentage ownership of the loss company's stock required for stockholder to be included in ownership change measurement | | | | | 5.00% | | | | | | |
| Number of Years in Testing Period for Determining Ownership Change Measurement | 3 years | | | | | | | | | | |
| Reduction in NOLs determined in accordance with IRC Section 382 | | | 2,300,000,000 | | | | | | | | |
| Reduction Tax Basis Depreciable Assets | | | 938,000,000 | | | | | | | | |
| Annual limit for reducing federal NOLs determined in accordance with IRC Section 382 | | | | | | 62,000,000 | | | | | |
| Operating loss carryforwards | | | | | | | 1,000,000,000 | 1,400,000,000 | | | |
| Portion of unrecognized tax benefits that would impact effective tax rate | 5,000,000 | 1,000,000 | 5,000,000 | | | | | | | | |
| Unrecognized Tax Benefits Minimum Number of Months During Which Significant Changes are Not Anticipated | | 12 months | | | | | | | | | |
| Tax Contingencies - Maximum equity contribution - to recognize net costs incurred by CenterPoint to obtain temporary differences settlement | | | 15,000,000 | | | | | | | | |
| Tax Contingencies - Maximum equity distribution - to recognize any net benefits realized by CenterPoint for settlement of temporary differences | | | $1,000,000 | | | | | | | | |

| Schedule I Condensed Financial Information of Parent Company Only Disclosure (Details 3) (USD $) In Millions, unless otherwise specified | Dec. 31, 2012 Successor [Member] (0 Months Ended) | Dec. 31, 2013 Successor [Member] (12 Months Ended) | Dec. 14, 2012 Successor [Member] (12 Months Ended) | Dec. 14, 2012 Predecessor [Member] (12 Months Ended) | Dec. 31, 2011 Predecessor [Member] (12 Months Ended) | Dec. 31, 2012 Predecessor [Member] (12 Months Ended) | Dec. 31, 2012 GenOn Energy, Inc. Parent Company Successor [Member] (0 Months Ended) | Dec. 31, 2013 GenOn Energy, Inc. Parent Company Successor [Member] (12 Months Ended) | Dec. 14, 2012 GenOn Energy, Inc. Parent Company Successor [Member] | Dec. 31, 2012 GenOn Energy, Inc. Parent Company [Member] Successor [Member] Affiliated Entity [Member] (0 Months Ended) | Dec. 31, 2013 GenOn Energy, Inc. Parent Company [Member] Successor [Member] Affiliated Entity [Member] (12 Months Ended) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Flows from Operating Activities:** | | | | | | | | | | | |
| Net cash provided by operating activities | $ (152) | $ 532 | | $ 208 | $ 143 | | $ (66) | $ 491 | | | |
| **Cash Flows from Investing Activities:** | | | | | | | | | | | |
| Payments to Acquire Businesses, Net of Cash Acquired | 0 | 175 | | 0 | 0 | | 0 | 0 | | | |
| Interest Paid, Capitalized | | | | | | | | | | | |
| Capital Contributions | | | | | | | | | | | |
| Issuance (repayment) of notes receivables affiliate | | | | | | | | | | 25 | 0 |
| Cash Retained by Former Parent | | | | | | | | | | 0 | 0 |
| Increase (Decrease) in Restricted Cash | 6 | 18 | | 189 | 1,424 | | 0 | 0 | | | |
| Net cash provided by (used in) investing activities | (6) | (129) | | (352) | 971 | | 25 | 175 | | | |
| **Cash Flows from Financing Activities:** | | | | | | | | | | | |
| Payments for Repurchase of Common Stock | 0 | 0 | | 0 | 0 | | | | | | |
| Proceeds from exercises of stock options | | | | | | | 0 | 0 | | | |
| Proceeds from Issuance of Long-term Debt | 0 | 110 | | 283 | 107 | | | | | | |
| Proceeds from Notes Payable | | | | | | | | | | | |
| Capital contributions | | | | | | | | | | | |
| Distribution Made to Limited Liability Company (LLC) Member, Cash Distributions Paid | | | | | | | | | | | |
| Repayments of Debt | | | | | | | | | | | |
| Debt issuance costs | 0 | 0 | | 0 | (2) | | | | | | |
| Net cash provided by (used in) financing activities | 0 | (468) | | (412) | (1,970) | | 0 | (575) | | | |
| Net Increase (Decrease) in Cash and Cash Equivalents | (158) | (65) | | (556) | (856) | | (41) | 91 | | | |
| Cash and Cash Equivalents at Beginning of Period | | 825 | 983 | 1,539 | 2,395 | 825 | | 530 | 571 | | |
| Cash and Cash Equivalents at End of Period | 825 | 760 | 983 | 983 | 1,539 | 825 | 530 | 621 | 571 | | |
| **Supplemental Disclosures:** | | | | | | | | | | | |
| Cash paid for interest, net of amounts capitalized | 51 | 259 | | 279 | 382 | | 50 | 138 | | | |
| Cash paid for income taxes (net of refunds received) | 0 | (75) | | 11 | (9) | | 0 | 0 | | | |
| **Supplemental Disclosures for** | | | | | | | | | | | |

**Non-Cash Investing and Financing Activities:**

| | |
|---|---|
| Conversion of Notes Receivable to Equity | 0 |
| Conversion to equity of notes payable to subsidiaries | $ 0 |

| Commitments and Contingencies (Details 2) (USD $) | Dec. 31, 2013 Texas Franchise Audit [Member] | Dec. 31, 2013 GenOn Energy Holdings [Member] Chapter Eleven Proceedings [Member] | Jun. 30, 2013 Pending Natural Gas Litigation [Member] Pending Litigation [Member] lawsuit | Jul. 31, 2011 Pending Natural Gas Litigation [Member] Pending Litigation [Member] lawsuit | Dec. 31, 2013 Pending Natural Gas Litigation [Member] Pending Litigation [Member] lawsuit | Feb. 29, 2008 Global Warming [Member] Environmental Matters [Member] company | Jul. 31, 2013 New Source Review Matters [Member] Environmental Matters [Member] | Apr. 30, 2012 Cheswick Class Action [Member] Environmental Matters [Member] | Dec. 31, 2008 Cheswick Monarch Mine Novs [Member] Environmental Matters [Member] | Oct. ... Beach... Feder... Wa... [M... Envir... M... [M... |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1 Months Ended | | | 1 Months Ended | | | 12 Months Ended | |
| **Scrubber Contract Litigation [Abstract]** | | | | | | | | | | |
| Amount agreed to pay to settle a legal matter | | | | | | | $ 1,000,000 | | | |
| Reserved cash which was released | | | | | | | | | | |
| Capital expenditures for compliance with the Maryland Healthy Air Act | | | | | | | | | | |
| **Pending Natural Gas Litigation [Abstract]** | | | | | | | | | | |
| Number Lawsuits Filed | | | | | 5 | | | | | |
| Number of lawsuits dismissed | | | | 4 | | | | | | |
| Number Lawsuits which Court Affirmed Dismissed | | | 1 | | | | | | | |
| **Global Warming [Abstract]** | | | | | | | | | | |
| Number of Other Companies Named in Lawsuit Filed | | | | | | 23 | | | | |
| Maximum damages sought | | | | | | 400,000,000 | | | | |
| Maximum Distance from Plant Class Action Plaintiffs Live Work | | | | | | | | 1 | | |
| **Cheswick Monarch Mine NOV [Abstract]** | | | | | | | | | | |
| Minimum Civil Penalties which May be Assessed | | | | | | | | | 200,000 | |
| Legal Fees | | | | | | | | | | 79,00 |
| Supplemental Environmental Projects | | | | | | | | | | 65,00 |
| Monitoring Costs | | | | | | | | | | 15,00 |
| **Notice of Intent to File Citizens Suit [Abstract]** | | | | | | | | | | |
| Days to Comply | | | | | | | | | | |
| **Maryland Fly Ash Facilities [Abstract]** | | | | | | | | | | |
| Number of Fly Ash Facilities | | | | | | | | | | |
| Number of Fly Ash Facilities with Threat of Non Renewal of Water Discharge Permits | | | | | | | | | | |
| Amount accrued for alleged past violations | | | | | | | | | | |
| Amount accrued for alleged prospective violations | | | | | | | | | | |
| Amount accrued for estimated cost of proposed technical solution | | | | | | | | | | |
| **Brandywine [Abstract]** | | | | | | | | | | |

Period to close and cap existing open disposal cells

Number of intervening parties in the proceeding

**Ash Disposal Facility Closures [Abstract]**

Asset Retirement Obligation Deposit Assets

Number of Permits That Regulate Polution Discharge Elimination

**Environmental Remediation Obligations [Abstract]**

Estimated long-term liability for remediation costs

**Chapter Eleven Proceedings [Abstract]**

Common stock shares reserved for unresolved claims                    461,000

Common stock capital shares reserved converted into parent co. common

**Texas Franchise Audit [Abstract]**

Interest and penalties included in amount of appealed Texas franchise tax assessments         29,000,000

Texas franchise tax assessments Genon has protested and in administrative appeals process

Tax Adjustments, Settlements, and Unusual Provisions

**Purported class actions related to NRG Merger [Abstract]**

Number of consolidated court cases

| Schedule I Condensed Financial Information of Parent Company Only Disclosure (Details 4) (USD $) In Millions, except Share data, unless otherwise specified | 12 Months Ended | | |
| --- | --- | --- | --- |
| | Dec. 14, 2012 | Dec. 31, 2011 | Dec. 31, 2013 |
| **Debt maturities at December 31, 2012 are (in millions):** | | | |
| 2016 | | | $ 725 |
| 2017 | | | 675 |
| Thereafter | | | 1,400 |
| Long-term Debt | | | 2,800 |
| Genon [Member] | | | |
| **Notes to Parent Company financial statements [Abstract]** | | | |
| Number of shares of NRG common stock issued, for each share of GenOn common stock | 0.1216 | | |
| GenOn Americas Generation, LLC Parent Company [Member] | | | |
| **Notes to Parent Company financial statements [Abstract]** | | | |
| Cash dividends received from subsidiaries | 286 | 137 | |
| **Debt maturities at December 31, 2012 are (in millions):** | | | |
| Thereafter | | | 850 |
| Long-term Debt | | | 850 |
| GenOn Americas Generation, LLC Parent Company [Member] \| Genon [Member] | | | |
| **Notes to Parent Company financial statements [Abstract]** | | | |
| Number of shares of NRG common stock issued, for each share of GenOn common stock | 0.1216 | | |
| GenOn Energy, Inc. Parent Company [Member] | | | |
| **Notes to Parent Company financial statements [Abstract]** | | | |
| Cash dividends received from subsidiaries | | 100 | |
| Guarantee | | | 50 |
| **Debt maturities at December 31, 2012 are (in millions):** | | | |
| 2016 | | | 725 |
| 2017 | | | 675 |
| Thereafter | | | 550 |
| Long-term Debt | | | $ 1,950 |
| GenOn Energy, Inc. Parent Company [Member] \| Genon [Member] | | | |
| **Notes to Parent Company financial statements [Abstract]** | | | |
| Number of shares of NRG common stock issued, for each share of GenOn common stock | 0.1216 | | |

| Income Taxes (Details) (USD $) In Millions, unless otherwise specified | Dec. 31, 2013 | 0 Months Ended Dec. 31, 2012 Successor [Member] | 1 Months Ended Dec. 31, 2012 Successor [Member] | 12 Months Ended Dec. 31, 2013 Successor [Member] | 12 Months Ended Dec. 14, 2012 Predecessor [Member] | 12 Months Ended Dec. 31, 2011 Predecessor [Member] | 0 Months Ended Dec. 31, 2012 GenOn Americas Generation, LLC [Member] Successor [Member] | 12 Months Ended Dec. 31, 2013 GenOn Americas Generation, LLC [Member] Successor [Member] | 12 Months Ended Dec. 14, 2012 GenOn Americas Generation, LLC [Member] Predecessor [Member] | 12 Months Ended Dec. 31, 2011 GenOn Americas Generation, LLC [Member] Predecessor [Member] | 0 Months Ended Dec. 31, 2012 GenOn Mid-Atlantic LLC [Member] Successor [Member] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Current tax provision (benefit):** | | | | | | | | | | | |
| Federal | | | $ 0 | $ (6) | $ 15 | $ (1) | | | | | |
| State | | | 0 | 0 | 0 | 1 | | | | | |
| **Deferred tax provision (benefit):** | | | | | | | | | | | |
| Federal | | | | | | | | | | | |
| State | | | | | | | | | | | |
| Total provision (benefit) for income taxes | 0 | | 0 | (6) | 15 | | 0 | 0 | 0 | 0 | 0 |
| **Effective Income Tax Rate Reconciliation, Percent [Abstract]** | | | | | | | | | | | |
| Provision for income taxes based on United States federal statutory income tax rate | | | (25) | 2 | (140) | (66) | (1) | 22 | (28) | 5 | |
| State and local income tax provision, net of federal income taxes | | | (1) | 0 | (9) | (8) | 0 | 6 | (4) | 5 | |
| Income Tax Reconciliation, Tax Exempt Income | | | | | | | 1 | (28) | 32 | (10) | |
| Change in Deferred Tax Assets Valuation Allowance | | | 23 | (2) | 166 | 183 | | | | | |
| Effect of equity-related transactions | | | 1 | | (5) | (49) | | | | | |
| Tax settlements | | | 0 | 6 | (6) [1] | 25 [2] | | | | | |
| Impairment of non-deductible goodwill | | | | | | | | | | | |
| NRG Merger-related costs | | | 2 | 0 | 0 | 0 | | | | | |
| Mirant/RRI Merger-related costs | | | 0 | 0 | 0 | (15) | | | | | |
| Mirant/RRI Merger-related write-off of NOL and state and local income tax provision, net of federal income taxes | | | 0 | 0 | 0 | (3) | | | | | |
| Mirant/RRI Merger-related write-off of NOL and other deferred tax assets | | | 0 | 0 | 0 | (21) | | | | | |
| Other | | | 0 | 0 | (3) | 4 | | | | | |
| Total provision (benefit) for income taxes | 0 | | 0 | (6) | 15 | | 0 | 0 | 0 | 0 | 0 |
| **Deferred Tax Assets:** | | | | | | | | | | | |
| Employee benefits | 149 | | 149 | 134 | | | | | | | |
| Contingencies and other liabilities | 0 | | 0 | 0 | | | | | | | |
| Loss carryforwards | 77 | | 77 | 108 | | | | | | | |
| Property and intangible assets | 1,594 | | 1,594 | 1,563 | | | | | | | |
| Out-of-market contracts fair value adjustment | 132 | | 132 | 136 | | | | | | | |
| Debt premium, net | 160 | | 160 | 136 | | | | | | | |
| Other | 41 | | 41 | 117 | | | | | | | |
| Subtotal | 2,626 | | 2,626 | 2,701 | | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Valuation allowance | (2,324) [5] | (2,324) [5] | (2,672) [5] | | |
| Net deferred tax assets | 302 | 302 | 29 | | |
| **Deferred Tax Liabilities:** | | | | | |
| Derivative contract assets and liabilities | (297) | (297) | (29) | | |
| Debt discount, net | 0 | 0 | 0 | | |
| Other | (5) | (5) | 0 | | |
| Total deferred tax liabilities | (302) | (302) | (29) | | |
| Net deferred taxes | 0 | 0 | 0 | | |
| **Reconciliation of Unrecognized Tax Benefits, Excluding Amounts Pertaining to Examined Tax Returns [Roll Forward]** | | | | | |
| Balance at the beginning of the period | | 6 | 6 | 5 | |
| Increase due to prior year positions | | 0 | 0 | 3 | |
| Decrease due to settlements and payments | | 0 | (5) | (2) | |
| Decrease due to statute expirations | | 0 | 0 | 0 | |
| Balance at the end of the period | 6 | 6 | 1 | 6 | 5 |
| Unrecognized Tax Benefits, Income Tax Penalties and Interest Accrued | $ 1 | | | | |

[1] Deferred tax attribute changes from 2002-2003 audit changes including effect of the CenterPoint tax allocation agreement.

[2] Settlements of tax disputes increased GenOn's tax basis in depreciable assets that had previously been written off as a result of Mirant's emergence from bankruptcy in

[3] Settlement of tax disputes increased GenOn Americas Generation's tax basis in depreciable assets that previously had been written off as a result of Mirant's emergenc

[4] Settlement of tax disputes increased GenOn Mid-Atlantic's tax basis in depreciable assets that previously had been written off as a result of Mirant's emergence from t

[5] As of December 31, 2013 2012 (In millions)Deferred Tax Assets: Employee benefits$134 $149Pension and other postretirement benefits123 98Contingencies and oth premium, net136 160Other117 41Subtotal2,701 2,626Valuation allowance (2,672) (2,324)Net deferred tax assets29 302Deferred Tax Liabilities: Derivative contrac

| Benefit Plans and Other Postretirement Benefits Disclosure (Details 5) (USD $) In Millions, unless otherwise specified | 1 Months Ended | 12 Months Ended | | | 1 Months Ended | 12 Months Ended | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Dec. 31, 2012 Pension Plan, Defined Benefit [Member] | Dec. 14, 2012 Pension Plan, Defined Benefit [Member] | Dec. 31, 2013 Pension Plan, Defined Benefit [Member] | Dec. 31, 2011 Pension Plan, Defined Benefit [Member] | Dec. 31, 2012 Other Postretirement Benefit Plan, Defined Benefit [Member] | Dec. 31, 2012 Other Postretirement Benefit Plan, Defined Benefit [Member] | Dec. 14, 2012 Other Postretirement Benefit Plan, Defined Benefit [Member] | Dec. 31, 2013 Other Postretirement Benefit Plan, Defined Benefit [Member] | Dec. 31, 2011 Other Postretirement Benefit Plan, Defined Benefit [Member] | Dec. 31, ... Other ... [M... |
| **Defined Benefit Plan Disclosure [Line Items]** | | | | | | | | | | |
| Total amount recognized in (income) loss in net periodic benefit cost and other comprehensive income/loss | $ 0 | $ 17 | $ (84) | $ 88 | $ 0 | | $ 6 | $ (7) | $ 11 | |
| **Assumptions (Abstract)** | | | | | | | | | | |
| Discount rate used in calculating benefit obligations | | | | | | | | | | |
| Rate of compensation increase to calculate benefit obligations (as a percent) | | | | | | | | | | |
| Health Care Cost Trend Rate Assumed Other Postretirement Benefit Plan Obligations for Next Fiscal Year Before Age Sixty Five | | | | | | | | | | |
| Health Care Cost Trend Rate Assumed Other Postretirement Benefit Plan Obligations for Next Fiscal Year Age Sixty Five After | | | | | | | | | | |
| Defined Benefit Plan, Other Postretirement Benefit Plan Obligations Ultimate Health Care Cost Trend Rate | | | | | | | | | | |
| Defined Benefit Plan, Effect of One Percentage Point Increase on Accumulated Postretirement Benefit Obligation | | | | | | 5 | | | | |
| Discount rate to calculate net periodic benefit cost | | | | | | | | | | |
| Rate of compensation increase to calculate net periodic benefits cost (as a percent) | | | | | | | | | | |
| Expected long-term rate of return on plan assets (as a percent) | | | | | | | | | | |
| Defined Benefit Plan, Health Care Cost Trend Rate Assumed for Next Fiscal Year before Age Sixty Five | | | | | | | | | | 8. |
| Defined Benefit Plan, Health Care Cost Trend Rate Assumed for Next Fiscal Year Age Sixty Five after | | | | | | | | | | 8.0 |
| Year that Rate Reaches Ultimate Trend Rate Other Postretirement Benefit Plan Obligations | | | | | | | | | | 20 |
| Assumed ultimate medical inflation rate (as a percent) | | | | | | | | | | 5. |
| Effect of One Percentage Point increase or decrease on service and interest cost components | | | | | | $ 5 | | | | |

**Related Party Transactions**

**12 Months Ended**

**Dec. 31, 2013**

**Related Party Transactions [Abstract]**

Related Party Transactions

**(GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*Services Agreement with NRG (GenOn)*

Subsequent to the NRG Merger (for the successor period), NRG provides GenOn, with various management, personnel and other services, which include human resources, regulatory and public affairs, accounting, tax, legal, information systems, treasury, risk management, commercial operations, and asset management, as set forth in the Services Agreement. The initial term of the Services Agreement was through December 31, 2013, with an automatic renewal absent a request for termination. The fee charged is determined based on a fixed amount as described in the Services Agreement and was calculated based on historical GenOn expenses prior to the NRG Merger. The annual fees under the Services Agreement are approximately $193 million. NRG charges these fees on a monthly basis, less amounts incurred directly by GenOn. Management has concluded that this method of charging overhead costs is reasonable. For the year ended December 31, 2013, GenOn recorded costs related to these services of $88 million.

*Administrative Services Provided by NRG for the Successor Period and Provided by GenOn Energy for the Predecessor Periods (GenOn Americas Generation and GenOn Mid-Atlantic)*

Prior to the NRG Merger, GenOn provided GenOn Americas Generation and GenOn Mid-Atlantic with various management, personnel and other services directly relating to their facilities. GenOn Americas Generation and GenOn Mid-Atlantic reimbursed GenOn for amounts equal to the costs of providing such services. In addition, GenOn's corporate overhead costs were allocated to its subsidiaries based on each operating subsidiary's planned operating expenses relative to all operating subsidiaries of GenOn. Subsequent to the NRG Merger, NRG provides GenOn Americas Generation and GenOn Mid-Atlantic with various management, personnel and other services consistent with those set forth in the Services Agreement discussed above between NRG and GenOn. GenOn's costs incurred under the Services Agreement with NRG are allocated to its subsidiaries based on each operating subsidiary's planned operating expenses relative to all operating subsidiaries of GenOn. These allocations and charges are not necessarily indicative of what would have been incurred had GenOn Americas Generation and GenOn Mid-Atlantic been unaffiliated entities. Management has concluded that this method of charging overhead costs is reasonable. Costs incurred by NRG and charged directly back to GenOn Americas and GenOn Mid-Atlantic are not considered to be affiliate costs for periods subsequent to the NRG Merger. Direct costs charged back to GenOn Americas Generation considered to be affiliate costs were $130 million and $137 million for the period from January 1, 2012 to December 14, 2012 and the year ended December 31, 2011, respectively. Direct costs charged back to GenOn Mid-Atlantic considered to be affiliate costs were $85 million and $83 million for the period from January 1, 2012 to December 14, 2012 and the year ended December 31, 2011, respectively.

The following costs were incurred under these arrangements:

*GenOn Americas Generation*

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | **Year Ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** | **Year Ended December 31, 2011** |
| | (In millions) | | (In millions) | |
| Allocated costs: | | | | |
| Cost of operations — affiliate | 9 | 2 | 50 | 48 |
| Selling, general and administrative — affiliate | 74 | 2 | 62 | 76 |
| Total | $ 83 | $ 4 | $ 112 | $ 124 |

*GenOn Mid-Atlantic*

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | **December 15, 2012** | **January 1, 2012** | |
| | **Year Ended** | **through** | **through** | **Year Ended** |

|  | December 31, 2013 | December 31, 2012 | December 14, 2012 | December 31, 2011 |
|---|---|---|---|---|
|  | (In millions) | | (In millions) | |
| **Allocated costs:** | | | | |
| Cost of operations — affiliate | 6 | 1 | 32 | 32 |
| Selling, general and administrative — affiliate | 64 | 2 | 39 | 49 |
| Total | $ 70 | $ 3 | $ 71 | $ 81 |

*Services Provided by GenOn Energy Management for the Predecessor Periods (GenOn Americas Generation and GenOn Mid-Atlantic)*

*GenOn Americas Generation*

Prior to the NRG Merger, GenOn Energy Management provided services to certain of GenOn's indirect operating subsidiaries through power, fuel supply and services agreements. The services included the bidding and dispatch of the generating units, fuel procurement and the execution of contracts, including economic hedges, to reduce price risk. These transactions were recorded as operating revenues — affiliate and cost of operations — affiliate, as appropriate, in the consolidated statements of operations. Amounts due from and to GenOn's indirect operating subsidiaries were recorded as accounts receivable — affiliate or accounts payables — affiliate, as appropriate. Substantially all energy marketing overhead expenses were allocated to GenOn's operating subsidiaries. For the year ended December 31, 2013, the period from January 1, 2012 through December 14, 2012 and for the year ended December 31, 2011, GenOn Americas Generation recorded a reduction to cost of operations — affiliate of $9 million, $22 million and $25 million, respectively, related to the allocations of energy marketing overhead expenses to affiliates that are not included in the GenOn Americas Generation consolidated statements of operations.

*GenOn Mid-Atlantic*

Prior to the NRG Merger, GenOn Mid-Atlantic received services from GenOn Energy Management which included the bidding and dispatch of the generating units, procurement of fuel and other products and the execution of contracts, including economic hedges, to reduce price risk. These transactions were recorded as operating revenues — affiliate and cost of operations — affiliate, as appropriate, in the consolidated statements of operations. Amounts due to and from GenOn Energy Management under the power, fuel supply and services agreements were recorded as accounts payables — affiliate or accounts receivables — affiliate, as appropriate. Under these agreements, GenOn Energy Management resold GenOn Mid-Atlantic's energy products in the PJM spot and forward markets and to other third parties. GenOn Mid-Atlantic was paid the amount received by GenOn Energy Management for such capacity and energy. GenOn Mid-Atlantic had counterparty credit risk in the event that GenOn Energy Management was unable to collect amounts owed from third parties for the resale of GenOn Mid-Atlantic's energy products. Substantially all energy marketing overhead expenses were allocated to GenOn's operating subsidiaries. For the year ended December 31, 2013, the period from January 1, 2012 through December 14, 2012 and the year ended December 31, 2011, GenOn Mid-Atlantic incurred $3 million, $4 million, and $4 million, respectively, of energy marketing overhead expense. These costs are included in cost of operations — affiliate in GenOn Mid-Atlantic's consolidated statements of operations.

**Credit Agreement with NRG (GenOn)**

In connection with the closing of the NRG Merger, GenOn and GenOn Americas entered into a secured intercompany revolving credit agreement with NRG. This credit agreement provides for a $500 million revolving credit facility, all of which is available for revolving loans and letters of credit. At December 14, 2012, the letters of credit outstanding under GenOn's revolving credit facility, which was terminated in connection with the NRG Merger, were transferred to this credit agreement. At December 31, 2013, $349 million of letters of credit were outstanding under the NRG credit agreement for GenOn and of this amount, $258 million were issued on behalf of GenOn Americas Generation. See Note 10, *Debt and Capital Leases.* At December 31, 2013, no loans were outstanding under this credit agreement. In connection with the execution of the agreement, certain of GenOn's subsidiaries (guarantors) entered into a guarantee agreement pursuant to which these guarantors guaranteed amounts borrowed and obligations incurred under the credit agreement. The credit agreement has a three year maturity and is payable at maturity, subject to certain exceptions primarily related to asset sales not in the ordinary course of business and borrowings of debt. In addition, they are restricted from incurring additional liens on their assets. At GenOn's election, the interest rate per year applicable to the loans under the credit agreement will be determined by reference to either (i) the base rate plus 2.50% per year or (ii) the LIBOR rate plus 3.50% per year. In addition, the credit agreement contains customary covenants and events of default.

**Intercompany Cash Management Program (GenOn Americas Generation)**

GenOn Americas Generation and certain of its subsidiaries participate in separate intercompany cash management programs whereby cash balances at GenOn Americas Generation and the respective participating subsidiaries are transferred to central concentration accounts to fund working capital and other needs of the respective participants. The balances under this program are reflected as notes receivable — affiliate or notes payable — affiliate, as appropriate. The notes are due on demand and accrue interest on the net position, which is payable quarterly, at a rate determined by GenOn Energy Holdings. At December 31, 2013 and 2012, GenOn Americas Generation had a net current notes receivable from GenOn Energy Holdings of $299 million and $198 million, respectively, related to its intercompany cash management program. For the year ended December 31, 2013, and for the periods from December 15, 2012 through December 31, 2012 and January 1, 2012 through December 14, 2012, GenOn Americas Generation earned an insignificant amount of net interest income related to these notes.

### Purchased Emission Allowances (GenOn Mid-Atlantic)

GenOn Energy Management maintains an inventory of certain purchased emission allowances related to the Regional Greenhouse Gas Initiative on behalf of GenOn Mid-Atlantic. The emission allowances are sold by GenOn Energy Management to GenOn Mid-Atlantic as they are needed for operations. GenOn Mid-Atlantic purchases emission allowances from GenOn Energy Management at GenOn Energy Management's original cost to purchase the allowances. For allowances that have been purchased by GenOn Energy Management from a GenOn Energy affiliate, the price paid by GenOn Energy Management is determined by market indices.

Emission allowances purchased from GenOn Energy Management that were utilized during the year ended December 31, 2013, the periods from December 15, 2012 through December 31, 2012 and January 1, 2012 through December 14, 2012 and during the year ended December 31, 2011 were $17 million, $1 million, $20 million, and $26 million, respectively, and are recorded in cost of operations — affiliate in GenOn Mid-Atlantic's consolidated statements of operations.

### Operator of Leased Facilities (GenOn)

See Note 18, Commitments and Contingencies, for a discussion of the GenOn leased facilities (Conemaugh and Keystone) that GenOn also operates.

### Sale of NRG Marsh Landing Holdings LLC to NRG Yield LLC (GenOn)

On July 22, 2013, concurrent with the initial public offering of NRG Yield, Inc., GenOn sold its ownership interests in NRG Marsh Landing Holdings LLC to NRG Yield LLC for a purchase price of $199 million in cash plus the assumption of debt. The net assets of NRG Marsh Landing Holdings LLC were $168 million at the time of the sale resulting in the recognition of additional paid-in capital of $31 million.

The following table summarizes the net assets of Marsh Landing Holdings LLC sold to NRG Yield LLC:

|  | Historical carrying amount |  |
| --- | --- | --- |
|  | (In millions) |  |
| **Assets** |  |  |
| Other current and non-current assets | $ | 52 |
| Property, plant and equipment |  | 666 |
| Total assets | $ | 718 |
| **Liabilities** |  |  |
| Other current and non-current liabilities | $ | 50 |
| Long-term debt |  | 500 |
| Total liabilities | $ | 550 |
| Net assets | $ | 168 |

| Schedule I Condensed Financial Information of Parent Company Only Disclosure Schedule I Condensed Financial Information of Parent Company Only Disclosure (Tables) | 12 Months Ended Dec. 31, 2013 |
|---|---|

**Condensed Financial Information of Parent Company Only Disclosure [Abstract]**

Schedule of Maturities of Long-term Debt [Table Text Block]

Annual payments based on the maturities of GenOn's debt for the years ending after December 31, 2013 are as follows:

|  | (In millions) |
|---|---|
| 2017 | 725 |
| 2018 | 675 |
| Thereafter | 1,400 |
| Total | $ 2,800 |

GenOn Energy, Inc. Parent Company [Member]

**Condensed Financial Information of Parent Company Only Disclosure [Abstract]**

Schedule of Maturities of Long-term Debt [Table Text Block]

Debt maturities of GenOn Energy, Inc. as of December 31, 2013 are (in millions):

| 2017 | 725 |
|---|---|
| 2018 | 675 |
| Thereafter | 550 |
| Total | $ 1,950 |

GenOn Americas Generation, LLC Parent Company [Member]

**Condensed Financial Information of Parent Company Only Disclosure [Abstract]**

Schedule of Maturities of Long-term Debt [Table Text Block]

Debt maturities of GenOn Americas Generation, LLC as of December 31, 2013 are (in millions):

| 2019 and thereafter | 850 |
|---|---|
| Total | $ 850 |

**Benefit Plans and Other Postretirement Benefits Disclosure (Tables)**

**12 Months Ended**

**Dec. 31, 2013**

**Benefit Plans and Other Postretirement Benefits Disclosure [Abstract]**

Schedule of Defined Benefit Plans Disclosures

A comparison of the pension benefit obligation, other postretirement benefit obligations and related plan assets for GenOn plans on a combined basis is as follows:

| | Tax-Qualified Pension Benefits | | | Non-Tax-Qualified Pension Benefits | | |
|---|---|---|---|---|---|---|
| | Successor | | Predecessor | Successor | | Predecessor |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | (In millions) | (In millions) | | (In millions) |
| Benefit obligation at beginning of period | $ 585 | $ 582 [(a)] | $ 523 | $ 14 | $ 14 [(a)] | $ 10 |
| Service cost | 13 | 1 | 12 | — | — | — |
| Interest cost | 25 | 1 | 22 | 1 | — | 1 |
| Actuarial (gain)/loss | (55) | 1 | 12 | — | — | — |
| Benefit payments | (22) | — | (18) | (2) | — | (1) |
| Curtailments | — | — | 1 | (1) | — | — |
| Plan amendments | | — | — | — | — | — |
| Special termination benefits | | | 1 | — | — | — |
| Benefit obligation at end of period | 546 | 585 | 553 [(a)] | 12 | 14 | 10 [(a)] |
| Fair value of plan assets at beginning of period | 406 | 402 [(a)] | 353 | — | — | — |
| Actual return on plan assets | 67 | 4 | 32 | — | — | — |
| Employer contributions | 18 | — | 20 | 2 | — | 1 |
| Benefit payments | (22) | — | (18) | (2) | — | (1) |
| Fair value of plan assets at end of period | 469 | 406 | 387 | — | — | — |
| Funded status at end of period — excess of obligation over assets | $ (77) | $ (179) | $ (166) | $ (12) | $ (14) | $ (10) |

(a)   As a result of the application of pushdown accounting, GenOn remeasured its pension benefit obligation and related plan assets at the time of the NRG Merger.

| | Other Postretirement Benefits | | | |
|---|---|---|---|---|
| | Successor | | Predecessor | |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | |
| | (In millions) | | (In millions) | |
| Benefit obligation at beginning of period | $ 87 | $ 87 [a] | $ 84 | |
| Service cost | 1 | — | 1 | |
| Interest cost | 3 | — | 3 | |
| Participant contributions | 1 | — | 2 | |
| Actuarial (gain)/loss | (7) | — | 4 | |
| Benefit payments | (7) | — | (7) | |
| Curtailments | — | — | 1 | |
| Plan amendments | (5) | — | (3) | |
| Benefit obligation at end of period | 73 | 87 | 85 [a] | |
| Fair value of plan assets at beginning of period | — | — | — | |
| Employer contributions | 6 | — | 5 | |
| Participant contributions | 1 | — | 2 | |
| Benefit payments | (7) | — | (7) | |
| Fair value of plan assets at end of period | — | — | — | |
| Funded status at end of period — excess of obligation over assets | $ (73) | $ (87) | $ (85) | |

(a)   As a result of the application of pushdown accounting, GenOn remeasured its postretirement benefit obligations at the time of the NRG Merger.

Net annual periodic pension cost related to GenOn's domestic pension and other postretirement benefit plans

The net periodic pension cost/credit related to GenOn's pension and other postretirement benefit plans include the following components:

| | Pension Benefits | | | |
|---|---|---|---|---|
| | Successor | | Predecessor | |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| Service cost benefits earned | $ 13 | $ 1 | $ 12 | $ 12 |
| Interest cost on benefit obligation | 25 | 1 | 23 | 23 |
| Expected return on plan assets | (31) | (1) | (30) | (29) |
| Net reclassifications from accumulated other comprehensive loss[a] | — | — | 9 | 4 |
| Curtailments | — | — | 1 | — |
| Special termination benefits | — | — | 1 | — |
| Net periodic benefit cost | $ 7 | $ 1 | $ 16 | $ 10 |

(a)   Net reclassifications include actuarial loss and prior service cost.

| | Other Postretirement Benefits | | | |
|---|---|---|---|---|
| | Successor | | Predecessor | |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| Service cost benefits earned | $ 1 | $ — | $ 1 | $ 1 |
| Interest cost on benefit obligation | 3 | — | 3 | 3 |
| Net reclassifications from accumulated other comprehensive loss[a] | — | — | (3) | (4) |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Curtailments | — | | | | 1 | | — |
| Plan amendments | — | | — | | (3) | | — |
| Unrecognized prior service cost | (1) | | — | | — | | — |
| Net periodic benefit credit | $ | 3 | $ | — | $ | (1) | $ — |

(a)  Net reclassifications include actuarial gain/loss and prior service credit.

<p style="color:blue">Amounts recognized in GenOn's balance sheets</p>

Amounts recognized in GenOn's balance sheets were as follows:

| | Tax-Qualified Pension Benefits | | Non-Tax-Qualified Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|---|---|
| | As of December 31, | | As of December 31, | | As of December 31, | |
| | 2013 | 2012 | 2013 | 2012 | 2013 | 2012 |
| | (In millions) | | (In millions) | | (In millions) | |
| Current liabilities | $ — | $ — | $ (12) | $ (1) | $ (6) | $ (6) |
| Non-current liabilities | $ (77) | $ (179) | $ — | $ (13) | $ (67) | $ (81) |

<p style="color:blue">Amounts recognized in GenOn's accumulated other comprehensive income that have not yet been recognized as components of net periodic benefit cost</p>

Amounts recognized in GenOn's other comprehensive income/loss and accumulated other comprehensive income/loss for the pension and other postretirement benefit plans were as follows:

| | Tax-Qualified Pension Benefits | | Non-Tax-Qualified Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|---|---|
| | Net Actuarial (Loss) Gain | Prior Service Cost | Net Actuarial Loss | Prior Service Cost | Net Actuarial (Loss) Gain | Prior Service Cost |
| | (In millions) | | | | | |
| **Predecessor** | | | | | | |
| Balance at December 31, 2011 | $ (136) | $ (2) | $ (3) | $ (1) | $ (3) | $ 10 |
| Unrealized loss | (10) | — | — | — | (4) | — |
| Reclassification to net periodic benefit cost/credit | 8 | 1 | — | — | — | (3) |
| Total recognized in OCI for the period | (2) | 1 | — | — | (4) | (3) |
| Balance at December 14, 2012(a) | $ (138) | $ (1) | $ (3) | $ (1) | $ (7) | $ 7 |
| **Successor** | | | | | | |
| Balance at December 15, 2012(a) | $ — | $ — | $ — | $ — | $ — | $ — |
| Unrealized gain | 1 | — | — | — | — | — |
| Total recognized in OCI for the period | 1 | — | — | — | — | — |
| Balance at December 31, 2012 | $ 1 | $ — | $ — | $ — | $ — | $ — |
| Unrealized gain | 91 | — | — | — | 7 | 5 |
| Reclassification to net periodic benefit cost/credit | — | (1) | — | — | — | (1) |
| Total recognized in OCI for the period | 91 | (1) | — | — | 7 | 4 |
| Balance at December 31, 2013 | $ 92 | $ (1) | $ — | $ — | $ 7 | $ 4 |

(a)  As a result of the application of pushdown accounting, the amounts remaining in accumulated other comprehensive loss at the time of the NRG Merger were eliminated.

<p style="color:blue">Fair values of the Company's pension plan assets</p>

GenOn's market-related value of its plan assets is the fair value of the assets. The fair values of GenOn's pension plan assets by asset category are as follows:

| | As of December 31, 2013 | As of December 31, 2012 |
|---|---|---|
| | (In millions) | |

**Asset Categories:**

Investment Funds:

| | | | |
|---|---:|---|---:|
| U.S. equities | 202 | | 173 |
| Non-U.S. equities | 139 | | 118 |
| Fixed income securities | 128 | | 115 |
| Total | $ 469 | $ | 406 |

Significant assumptions used to calculate GenOn's benefit obligations

The following table presents the significant assumptions used to calculate GenOn's benefit expense/credit:

| | Pension Plans | | | |
|---|---|---|---|---|
| | Successor | | Predecessor | |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| **Weighted–Average Assumptions** | | | | |
| Discount rate | 4.22% | 4.25% | 4.56% | 5.12% |
| Rate of compensation increase | 2.82% | 2.82% | 2.79% | 2.81% |
| Expected return on plan assets | 7.50% | 7.50% | 8.25% | 8.25% |

| | Other Postretirement Benefit Plans | | | |
|---|---|---|---|---|
| | Successor | | Predecessor | |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| **Weighted–Average Assumptions** | | | | |
| Discount rate | 3.99% | 4.01% | 4.26% | 4.80% |
| Rate of compensation increase | N/A | N/A | N/A | 3.00% |

The following table presents the significant assumptions used to calculate GenOn's benefit obligations:

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | As of December 31, | | As of December 31, | |
| | 2013 | 2012 | 2013 | 2012 |
| **Weighted–Average Assumptions** | | | | |
| Discount rate | 5.02% | 4.22% | 4.53% | 3.99% |
| Rate of compensation increase | 2.91% | 2.82% | N/A | N/A |

Schedule of health care cost trend rates

GenOn's assumed healthcare cost trend rates used for other postretirement benefit obligations are:

| | Other Postretirement Benefit Plans | |
|---|---|---|
| | As of December 31, | |
| | 2013 | 2012 |
| **Weighted–Average Assumptions** | | |
| Assumed medical inflation for next year: | | |
| Before age 65 | 8.50% | 8.50% |
| Age 65 and after | 8.69% | 8.67% |
| Assumed ultimate medical inflation rate | 5.50% | 5.50% |
| Year in which ultimate rate is reached | 2019 | 2018 |

GenOn's assumed healthcare cost trend rates used for other postretirement benefit net periodic benefit expense/credit are:

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |

| Weighted–Average Assumptions | | | | |
|---|---|---|---|---|
| Assumed medical inflation for next year: | | | | |
| Before age 65 | 8.50% | 8.50% | 7.50% | 8.00% |
| Age 65 and after | 8.67% | 8.67% | 7.71% | 8.20% |
| Assumed ultimate medical inflation rate | 5.50% | 5.50% | 5.50% | 5.50% |
| Year in which ultimate rate is reached | 2018 | 2018 | 2018 | 2018 |

**GenON's pension plan assets weighted average allocation [Table Text Block]**

The following table shows the target allocations for GenOn's plans and the percentage of fair value of plan assets by asset fund category (based on the nature of the underlying funds) for GenOn's qualified pension plans at December 31, 2013 and 2012:

| | | Percentage of Fair Value of Plan Assets as of December 31, | |
|---|---|---|---|
| | Target Allocations | 2013 | 2012 |
| U.S. equities | 42% | 43% | 43% |
| Non-U.S. equities | 28 | 29 | 29 |
| Fixed income securities | 30 | 28 | 28 |
| Total | 100% | 100% | 100% |

**Schedule of performance benchmarks**

Performance benchmarks adopted in the fourth quarter of 2011 are composed of the following indices:

| Asset Class | Index |
|---|---|
| U.S. equities | Dow Jones U.S. Total Stock Market Index |
| Non-U.S. equities | MSCI All Country World Ex-U.S. IMI Index |
| Fixed income securities | Barclays Capital Long Term Government/Credit Index |

**Expected future benefit payments**

GenOn's expected future benefit payments for each of the next five years, and in the aggregate for the five years thereafter, are as follows:

| | Pension Benefit Payments | | Other Postretirement Benefit | |
|---|---|---|---|---|
| | Tax-Qualified | Non-Tax-Qualified | Benefit Payments | Medicare Prescription Drug Reimbursements |
| | (In millions) | | | |
| 2014 | $ 24 | $ 12 | $ 6 | $ — |
| 2015 | 27 | — | 7 | — |
| 2016 | 29 | — | 6 | — |
| 2017 | 28 | — | 6 | — |
| 2018 | 30 | — | 6 | — |
| 2019 through 2023 | 184 | — | 30 | 1 |

| Segment Reporting Segment Reporting (Details) (USD $) In Millions, unless otherwise specified | Dec. 31, 2011 (12 Months Ended) | Dec. 31, 2012 Successor [Member] (0 Months Ended) | Dec. 31, 2012 Successor [Member] (1 Months Ended) | Dec. 31, 2013 Successor [Member] (12 Months Ended) | Dec. 31, 2012 Successor Wholesale Power Generation East [Member] (1 Months Ended) | Dec. 31, 2013 Successor Wholesale Power Generation East [Member] (12 Months Ended) | Dec. 31, 2012 Successor Wholesale Power Generation South Central [Member] (1 Months Ended) | Dec. 31, 2013 Successor Wholesale Power Generation South Central [Member] (12 Months Ended) | Dec. 31, 2012 Successor Wholesale Power Generation West [Member] (1 Months Ended) | Dec. 31, 2013 Successor Wholesale Power Generation West [Member] (12 Months Ended) | Dec. 31, 2012 Successor Corporate Segment [Member] (1 Months Ended) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Segment Reporting Information [Line Items]** | | | | | | | | | | | |
| Revenues | | $ 73 | $ 73 | $ 2,604 | $ 66 | $ 2,291 | $ 0 | $ 7 | $ 7 | $ 249 | $ 0 |
| Operating expenses | | | 127 | 1,988 [1] | 67 | 1,590 [1] | 1 | 34 [1] | 6 | 130 [1] | 53 |
| Depreciation and amortization | | 10 | 10 | 249 | 8 | 195 | 0 | 6 | 2 | 39 | 0 |
| Impairment losses | 133 | 0 | | 0 | | | | | | | |
| Operating Income/(Loss) | | (64) | (64) | 163 | (9) | 203 | (1) | (29) | (1) | 42 | (53) |
| Other income/(loss), net | | 0 | | 1 [2] | | 26 [2] | | 0 [2] | | 0 [2] | |
| Income (Loss) from Equity Method Investments | | 0 | | 4 | | 0 | | 4 | | 0 | |
| Interest (expense)/income | | (8) | (8) | (193) | 0 | (67) | 0 | 0 | 0 | (5) | (8) |
| Gains (Losses) on Extinguishment of Debt | | 0 | | (11) | | 0 | | 0 | | 0 | |
| Income/(Loss) Before Income Taxes | | (72) | (72) | (48) | (9) | 162 | (1) | (25) | (1) | 37 | (61) |
| Income tax expense/(benefit) | | 0 | 0 | (6) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Income/(Loss) | | (72) | (72) | (42) | (9) | 162 | (1) | (25) | (1) | 37 | (61) |
| **Segment Reporting Information, Additional Information [Abstract]** | | | | | | | | | | | |
| Equity investments in affiliates | | 19 | 19 | 0 | | 19 | | 0 | | 0 | |
| Capital expenditures | | 47 [3] | 47 [3] | 280 [3] | 17 [3] | 157 [4] | 8 [3] | 3 [3] | 21 [3] | 81 [3] | 1 [3] |
| Total Assets | | $ 7,419 | $ 7,419 | $ 5,734 | $ 5,873 | $ 4,255 | $ 250 | $ 179 | $ 1,063 | $ 329 | $ 233 |

[1]     (a)Corporate operating expenses include $70 million in acquisition-related costs.
[2]     (b)
[3]     Includes accruals.
[4]     s

**Accounting for Derivative Instruments and Hedging Activities (Tables)**

**12 Months Ended**

**Dec. 31, 2013**

**Derivatives, Fair Value [Line Items]**

Disclosure of net notional volume buy/(sell) of entity derivative transactions

The following table summarizes the net notional volume buy/(sell) of the Registrants' open derivative transactions broken out by commodity, excluding those derivatives that qualified for the NPNS exception as of December 31, 2013, and December 31, 2012. Option contracts are reflected using delta volume. Delta volume equals the notional volume of an option adjusted for the probability that the option will be in-the-money at its expiration date.

| Commodity | Units | GenOn Total Volume As of December 31, | | GenOn Americas Generation Total Volume As of December 31, | | GenOn Mid-Atlantic Total Volume As of December 31, | |
|---|---|---|---|---|---|---|---|
| | | 2013 (In millions) | 2012 (In millions) | 2013 (In millions) | 2012 (In millions) | 2013 (In millions) | 2012 (In millions) |
| Coal | Short Ton | 6 | 5 | 4 | 4 | 4 | 4 |
| Natural Gas | MMBtu | (111) | (194) | (113) | (150) | (119) | (150) |
| Power | MWh | (26) | (43) | (14) | (22) | (14) | (22) |
| Interest | Dollars | $ — | $ 475 | $ — | $ — | $ — | $ — |

Schedule of derivative instruments in Statement of Financial Position, fair value

The following tables summarize the fair value within the derivative instrument valuation on the balance sheet:

*GenOn*

| | Fair Value | | | |
|---|---|---|---|---|
| | Derivative Assets | | Derivative Liabilities | |
| | December 31, 2013 | December 31, 2012 | December 31, 2013 | December 31, 2012 |
| | (In millions) | | (In millions) | |
| **Derivatives Designated as Cash Flow Hedges**: | | | | |
| Interest rate contracts current | $ — | $ — | $ — | $ 9 |
| Interest rate contracts long-term | — | — | — | 41 |
| **Total Derivatives Designated as Cash Flow Hedges** | — | — | — | 50 |
| **Derivatives Not Designated as Cash Flow Hedges:** | | | | |
| Commodity contracts current | 469 | 604 | 163 | 236 |
| Commodity contracts long-term | 182 | 512 | 18 | 83 |
| **Total Derivatives Not Designated as Cash Flow Hedges** | 651 | 1,116 | 181 | 319 |
| **Total Derivatives** | $ 651 | $ 1,116 | $ 181 | $ 369 |

Schedule of cash flow hedge OCI activity

The following table summarizes the effects on GenOn's accumulated OCI balance attributable to cash flow hedge derivatives, net of tax of zero dollars:

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| Accumulated OCI balance, beginning of period | $ 1 | $ — | $ (34) | $ 21 |
| Recognized in OCI on interest rate | | | | |

| | | | | |
|---|---|---|---|---|
| derivatives | 19 | 1 | (16) | (55) |
| Reclassified from accumulated OCI into earnings[a][b] | (2) | — | (2) | — |
| Reversal as part of sale to NRG Yield LLC [d] | (18) | — | — | — |
| Accumulated OCI balance, end of period | $ — | $ 1 | $ (52) | $ (34) |
| Valuation adjustments | $ — | $ — | $ — | $ 4 [c] |

(a)   Amounts reclassified from accumulated OCI into income and amounts recognized in income from the ineffective portion of cash flow hedges are recorded in interest expense.

(b)   All of the forecasted transactions (future interest payments) were deemed probable of occurring; therefore, no cash flow hedges were discontinued and no amount was recognized in GenOn's results of operations as a result of discontinued cash flow hedges.

(c)   Represents the default risk of the counterparties to these transactions and GenOn's own non-performance risk. The effect of these valuation adjustments is recorded in interest expense.

(d)   The reversal of accumulated OCI as part of the sale of NRG Marsh Landing to NRG Yield LLC resulted in the recognition of additional paid in capital.

Disclosure of pre-tax effects of economic hedges included in operating revenues and cost of operations

The following tables summarize the pre-tax effects of economic hedges that have not been designated as cash flow hedges and trading activity on the Registrants' statements of operations. These amounts are included within operating revenues and cost of operations.

*GenOn*

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| **Unrealized mark-to-market results** | | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (367) | $ (4) | $ (307) | $ (243) |
| Net unrealized gains/(losses) on open positions related to economic hedges | 40 | (5) | 166 | 465 |
| Total unrealized mark-to-market (losses)/gains for economic hedging activities | (327) | (9) | (141) | 222 |
| Reversal of previously recognized unrealized (gains)/losses on settled positions related to trading activity | (1) | (4) | (8) | 6 |
| Net unrealized gains/(losses) on open positions related to trading activity | 1 | — | 6 | (4) |
| Total unrealized mark-to-market (losses)/gains for trading activity | — | (4) | (2) | 2 |
| **Total unrealized (losses)/gains** | $ (327) | $ (13) | $ (143) | $ 224 |

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| Revenue from operations — energy commodities | $ (356) | $ (20) | $ (159) | $ 227 |
| Cost of operations | 29 | 7 | 16 | (3) |
| **Total impact to statement of operations** | $ (327) | $ (13) | $ (143) | $ 224 |

Schedule of Derivative Instruments in Statement of Financial Position, Fair Value [Table Text Block]

The following tables summarize the offsetting of derivatives by counterparty master agreement level and collateral received or paid:

*GenOn*

| | Gross Amounts of Recognized Assets/Liabilities | Gross Amounts Not Offset in the Statement of Financial Position | | Net Amount |
|---|---|---|---|---|
| | | Derivative Instruments | Cash Collateral (Held)/Posted | |
| **December 31, 2013** | | *(in millions)* | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $ 645 | $ (154) | $ (56) | $ 435 |
| Derivative assets- affiliate | 6 | (3) | — | 3 |
| Derivative liabilities | (178) | 154 | — | (24) |
| Derivative liabilities- affiliate | (3) | 3 | — | — |
| **Total derivative instruments** | $ 470 | $ — | $ (56) | $ 414 |

*GenOn Americas Generation*

| | Gross Amounts of Recognized Assets/Liabilities | Gross Amounts Not Offset in the Statement of Financial Position | | Net Amount |
|---|---|---|---|---|
| | | Derivative Instruments | Cash Collateral (Held)/Posted | |
| **December 31, 2013** | | *(in millions)* | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $ 643 | $ (154) | $ (56) | $ 433 |
| Derivative assets- affiliate | 92 | (92) | — | — |
| Derivative liabilities | (178) | 154 | — | (24) |
| Derivative liabilities- affiliate | (130) | 92 | — | (38) |
| **Total derivative instruments** | $ 427 | $ — | $ (56) | $ 371 |

*GenOn Mid-Atlantic*

| | Gross Amounts of Recognized Assets/Liabilities | Gross Amounts Not Offset in the Statement of Financial Position | | Net Amount |
|---|---|---|---|---|
| | | Derivative Instruments | Cash Collateral (Held)/Posted | |
| **December 31, 2013** | | *(in millions)* | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $ 358 | $ — | $ — | $ 358 |
| Derivative assets- affiliate | 149 | (73) | — | 76 |
| Derivative liabilities | — | — | — | — |
| Derivative liabilities- affiliate | (73) | 73 | — | — |
| **Total derivative instruments** | $ 434 | $ — | $ — | $ 434 |

*GenOn*

| | Gross Amounts of Recognized Assets/Liabilities | Gross Amounts Not Offset in the Statement of Financial Position | | Net Amount |
|---|---|---|---|---|
| | | Derivative Instruments | Cash Collateral (Held)/Posted | |
| **December 31, 2012** | | *(in millions)* | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $ 1,107 | $ (260) | $ (243) | $ 604 |
| Derivative assets- affiliate | 9 | (9) | — | — |
| Derivative liabilities | (310) | 260 | 1 | (49) |
| Derivative liabilities- affiliate | (9) | 9 | — | — |
| **Total commodity contracts** | 797 | — | (242) | 555 |
| **Interest rate contracts:** | | | | |
| Derivative liabilities | (50) | — | — | (50) |
| **Total derivative instruments** | $ 747 | $ — | $ (242) | $ 505 |

*GenOn Americas Generation*

Gross Amounts Not Offset in the Statement of Financial Position

| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
|---|---|---|---|---|
| **December 31, 2012** | | (in millions) | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $ 1,107 | $ (260) | $ (243) | $ 604 |
| Derivative assets- affiliate | 85 | (85) | — | — |
| Derivative liabilities | (310) | 260 | 1 | (49) |
| Derivative liabilities- affiliate | (185) | 85 | — | (100) |
| **Total derivative instruments** | $ 697 | $ — | $ (242) | $ 455 |

*GenOn Mid-Atlantic*

| | Gross Amounts Not Offset in the Statement of Financial Position | | | |
|---|---|---|---|---|
| | **Gross Amounts of Recognized Assets/Liabilities** | **Derivative Instruments** | **Cash Collateral (Held)/Posted** | **Net Amount** |
| **December 31, 2012** | | (in millions) | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $ 636 | $ (3) | $ (57) | $ 576 |
| Derivative assets- affiliate | 213 | (152) | — | 61 |
| Derivative liabilities | (3) | 3 | — | — |
| Derivative liabilities- affiliate | (152) | 152 | — | — |
| **Total derivative instruments** | $ 694 | $ — | $ (57) | $ 637 |

## GenOn Americas Generation, LLC [Member]

### Derivatives, Fair Value [Line Items]

Schedule of derivative instruments in Statement of Financial Position, fair value

*GenOn Americas Generation*

| | Fair Value | | | |
|---|---|---|---|---|
| | **Derivative Assets** | | **Derivative Liabilities** | |
| | **December 31, 2013** | **December 31, 2012** | **December 31, 2013** | **December 31, 2012** |
| | (In millions) | | (In millions) | |
| **Derivatives Not Designated as Cash Flow Hedges:** | | | | |
| Commodity contracts current | $ 546 | $ 656 | $ 267 | $ 362 |
| Commodity contracts long-term | 189 | 536 | 41 | 133 |
| **Total Derivatives Not Designated as Cash Flow Hedges** | $ 735 | $ 1,192 | $ 308 | $ 495 |

Disclosure of pre-tax effects of economic hedges included in operating revenues and cost of operations

*GenOn Mid-Atlantic*

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | **Year Ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** | **Year Ended December 31, 2011** |
| | (In millions) | | (In millions) | |
| **Unrealized mark-to-market results** | | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (296) | $ (2) | $ (246) | $ (215) |
| Net unrealized gains/(losses) on open positions related to economic hedges | 35 | (5) | 131 | 335 |
| **Total unrealized (losses)/gains** | $ (261) | $ (7) | $ (115) | $ 120 |

GenOn Mid-Atlantic, LLC
[Member]

**Derivatives, Fair Value [Line Items]**

Schedule of derivative instruments in Statement of Financial Position, fair value

*GenOn Mid-Atlantic*

| | Fair Value | | | |
| | Derivative Assets | | Derivative Liabilities | |
| | December 31, 2013 | December 31, 2012 | December 31, 2013 | December 31, 2012 |
| | (In millions) | | (In millions) | |
|---|---|---|---|---|
| **Derivatives Not Designated as Cash Flow Hedges**: | | | | |
| Commodity contracts current | $ 351 | $ 394 | $ 64 | $ 100 |
| Commodity contracts long-term | 156 | 455 | 9 | 55 |
| **Total Derivatives Not Designated as Cash Flow Hedges** | $ 507 | $ 849 | $ 73 | $ 155 |

Disclosure of pre-tax effects of economic hedges included in operating revenues and cost of operations

*GenOn Mid-Atlantic*

| | Successor | | Predecessor | |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
|---|---|---|---|---|
| **Unrealized mark-to-market results** | | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (296) | $ (2) | $ (246) | $ (215) |
| Net unrealized gains/(losses) on open positions related to economic hedges | 35 | (5) | 131 | 335 |
| **Total unrealized (losses)/gains** | $ (261) | $ (7) | $ (115) | $ 120 |

| | Successor | | Predecessor | |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
|---|---|---|---|---|
| Revenue from operations — energy commodities | $ (292) | $ (12) | $ (120) | $ 119 |
| Cost of operations | 31 | 5 | 5 | 1 |
| **Total impact to statement of operations** | $ (261) | $ (7) | $ (115) | $ 120 |

| Summary of Significant Accounting Policies (Details) (USD $) In Millions, unless otherwise specified | 1 Months Ended — Dec. 31, 2012 | 12 Months Ended — Dec. 14, 2012 | 12 Months Ended — Dec. 31, 2013 | 0 Months Ended — Dec. 31, 2012 | 12 Months Ended — Dec. 31, 2011 | Dec. 31, 2012 Successor [Member] | Dec. 31, 2013 Successor [Member] | Dec. 14, 2012 Predecessor [Member] | Dec. 31, 2011 Predecessor [Member] | Dec. 31, 2012 Predecessor [Member] | Dec. 31, 2012 GenOn Americas Generation [Member] (1 Months Ended) | Dec. 14, 2012 GenOn Americas Generation [Member] | Dec. 31, 2013 GenOn Americas Generation [Member] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Summary of Significant Accounting Policies Disclosure [Line Items]** | | | | | | | | | | | | | |
| Below Market Lease, Amortization Income, Next Twelve Months | | | $ 75 | | | | | | | | | | $ 28 |
| Finite-Lived Intangible Assets, Amortization Expense, Next Twelve Months | | | 24 | | | | | | | | | | 24 |
| Amortization of Intangible Assets | 1 | 5 | 25 | | 23 | | | | | | 1 | 3 | 21 |
| Amortization of Intangibles and Out of Market Contracts | 2 | 67 | 75 | | 45 | | | | | | 1 | 0 | 28 |
| Number of months beyond which company can not predict the holding of collateral (in months) | | | 12 months | | | | | | | | | | |
| Restricted cash | | | | | | | 0 | | | 18 | | | |
| Amount of interest capitalized | | | | | | 2 | 21 | 35 | 15 | | | | |
| Finite-Lived Intangible Assets, Amortization Expense, Year Two | | | 19 | | | | | | | | | | 19 |
| Finite-Lived Intangible Assets, Amortization Expense, Year Three | | | 22 | | | | | | | | | | 22 |
| Finite-Lived Intangible Assets, Amortization Expense, Year Four | | | 22 | | | | | | | | | | 22 |
| Finite-Lived Intangible Assets, Amortization Expense, after Year Five | | | 27 | | | | | | | | | | 27 |
| Below Market Lease, Amortization Income, Year Two | | | 76 | | | | | | | | | | 28 |
| out of market contracts, amortization, year three | | | 81 | | | | | | | | | | 28 |
| out of market contract, amortization, year four | | | 76 | | | | | | | | | | 28 |
| out of market contract, amortization, year five | | | $ 71 | | | | | | | | | | $ 28 |

| Benefit Plans and Other Postretirement Benefits Disclosure (Details 1) (USD $) In Millions, unless otherwise specified | 0 Months Ended Dec. 31, 2012 Successor [Member] | 12 Months Ended Dec. 31, 2013 Successor [Member] | 1 Months Ended Dec. 31, 2012 Successor Pension Plans, Defined Benefit [Member] | 12 Months Ended Dec. 31, 2013 Successor Pension Plans, Defined Benefit [Member] | 1 Months Ended Dec. 31, 2012 Successor Pension Plans, Defined Benefit Tax Qualified Pension Benefits [Member] | 12 Months Ended Dec. 31, 2013 Successor Pension Plans, Defined Benefit Tax Qualified Pension Benefits [Member] | 0 Months Ended Dec. 31, 2012 Successor Pension Plans, Defined Benefit Non Tax Qualified Pension Benefits [Member] | 1 Months Ended Dec. 31, 2012 Successor Pension Plans, Defined Benefit Non Tax Qualified Pension Benefits [Member] | 12 Months Ended Dec. 31, 2013 Successor Pension Plans, Defined Benefit Non Tax Qualified Pension Benefits [Member] | 1 Months Ended Dec. 31, 2012 Successor Other Postretirement Benefit Plan, Defined Benefit [Member] | 1 Months Ended Dec. 31, 2... Successor Other Postretirement Benefit Plan, Defined Benefit [Member...] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Defined Benefit Plan, Net Periodic Benefit Cost [Abstract]** | | | | | | | | | | | |
| Service cost benefits earned | | | $ 1 | $ 13 | $ 1 | $ 13 | | $ 0 | $ 0 | $ 0 | $ 1 |
| Interest cost on benefit obligation | | | 1 | 25 | 1 | 25 | | 0 | 1 | 0 | 3 |
| Expected return on plan assets | | | (1) | (31) | | | | | | | |
| Net reclassifications from accumulated other comprehensive loss | | | 0 | 0 | | | | | | 0 | 0 |
| Curtailments | 0 | 0 | 0 | 0 | | | | | | 0 | 0 |
| Special termination benefit | | | 0 | 0 | | | | | | | |
| Plan amendments | | | | | | | | | | 0 | 0 |
| Unrecognized prior period costs | | | | | | | | | | | (1) |
| Net periodic benefit cost | | | 1 | 7 | | | | | | 0 | 3 |
| **Defined Benefit Plan, Change in Benefit Obligation [Roll Forward]** | | | | | | | | | | | |
| Benefit obligation as of beginning of period | | | | | 582 | 585 | | 14 | 14 | 87 | 87 |
| Service cost | | | 1 | 13 | 1 | 13 | | 0 | 0 | 0 | 1 |
| Interest cost on benefit obligation | | | 1 | 25 | 1 | 25 | | 0 | 1 | 0 | 3 |
| Participant contributions | | | | | | | | | | 0 | 1 |
| Actuarial loss | | | | | 1 | (55) | | 0 | 0 | | (7) |
| Benefit payments | | | | | 0 | (22) | | 0 | (2) | 0 | (7) |
| Curtailments | | | | | 0 | 0 | | 0 | (1) | 0 | 0 |
| Plan amendments | | | | | | | | | | 0 | (5) |
| Special termination benefits | | | | | 0 | 0 | 0 | 0 | | | |
| Benefit obligation as of end of period | | | | | 585 | 546 | 14 | 14 | 12 | 87 | 73 |
| **Defined Benefit Plan, Change in Fair Value of Plan Assets [Roll Forward]** | | | | | | | | | | | |
| Fair value of plan assets as of beginning of period | | | | | 402 | 406 | | 0 | 0 | 0 | 0 |
| Actual return on plan assets | | | | | 4 | 67 | | 0 | 0 | | |
| Employer contributions | | | | | 0 | 18 | | 0 | 2 | 0 | 6 |
| Participant contributions | | | | | | | | | | 0 | 1 |
| Benefit payments | | | | | 0 | (22) | | 0 | (2) | 0 | (7) |
| Fair value of plan assets as of end of period | | | | | 406 | 469 | 0 | 0 | 0 | 0 | 0 |
| Funded status as of end of period — excess of obligation over assets | | | | | $ (179) | $ (77) | $ (14) | $ (14) | $ (12) | $ (87) | $ (73) |

| Property, Plant, and Equipment (Details) (USD $) In Millions, unless otherwise specified | Dec. 31, 2013 Successor [Member] | Dec. 31, 2013 Successor [Member] Facilities and equipment | Dec. 31, 2013 Successor [Member] Land and improvements | Dec. 31, 2013 Successor [Member] Construction in progress | Dec. 31, 2012 Predecessor [Member] | Dec. 31, 2012 Predecessor [Member] Facilities and equipment | Dec. 31, 2012 Predecessor [Member] Land and improvements | Dec. 31, 2012 Predecessor [Member] Construction in progress | Dec. 31, 2013 GenOn Americas Generation, LLC [Member] Successor [Member] | Dec. 31, 2013 GenOn Americas Generation, LLC [Member] Successor [Member] Facilities and equipment |
|---|---|---|---|---|---|---|---|---|---|---|
| **Property, Plant and Equipment [Line Items]** | | | | | | | | | | |
| Total property, plant and equipment | $ 3,424 | $ 3,130 | $ 181 | $ 113 | $ 3,831 | $ 2,953 | $ 185 | $ 693 | $ 1,290 | $ 1,21... |
| Accumulated depreciation | (248) | | | | (1) | | | | (96) | |
| Net property, plant and equipment | $ 3,176 | | | | $ 3,830 | | | | $ 1,194 | |
| Depreciable Lives | | | | | | | | | | |

**Related Party Transactions (Tables)**

**12 Months Ended**

**Dec. 31, 2013**

GenOn Americas Generation, LLC [Member]

**Related Party Transaction [Line Items]**

Summary of material related-party transactions with affiliates

The following costs were incurred under these arrangements:

*GenOn Americas Generation*

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | **Year Ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** | **Year Ended December 31, 2011** |
| | (In millions) | | (In millions) | |
| Allocated costs: | | | | |
| Cost of operations — affiliate | 9 | 2 | 50 | 48 |
| Selling, general and administrative — affiliate | 74 | 2 | 62 | 76 |
| Total | $ 83 | $ 4 | $ 112 | $ 124 |

GenOn Mid-Atlantic, LLC [Member]

**Related Party Transaction [Line Items]**

Summary of material related-party transactions with affiliates

*GenOn Mid-Atlantic*

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | **Year Ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** | **Year Ended December 31, 2011** |
| | (In millions) | | (In millions) | |
| Allocated costs: | | | | |
| Cost of operations — affiliate | 6 | 1 | 32 | 32 |
| Selling, general and administrative — affiliate | 64 | 2 | 39 | 49 |
| Total | $ 70 | $ 3 | $ 71 | $ 81 |

**Nature of Business**

**12 Months Ended**

**Dec. 31, 2013**

**Nature of Business (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*General*

GenOn is a wholesale generator with approximately 19,997 MW of net electric generating capacity located in the U.S.

GenOn Americas Generation is a wholesale generator with approximately 7,852 MW of net electric generating capacity located, in many cases, near major metropolitan areas. GenOn Americas Generation's electric generating capacity is part of the 19,997 MW of net electric generating capacity of GenOn.

GenOn Mid-Atlantic operates and owns or leases 4,683 MW of net electric generating capacity in Maryland, near Washington, D.C. GenOn Mid-Atlantic's electric generating capacity is part of the 7,852 MW of net electric generating capacity of GenOn Americas Generation. GenOn Mid-Atlantic's generating facilities serve the Eastern PJM markets.

GenOn Americas Generation and GenOn Mid-Atlantic are Delaware limited liability companies and indirect wholly-owned subsidiaries of GenOn. GenOn Mid-Atlantic is a wholly-owned subsidiary of GenOn North America and an indirect wholly-owned subsidiary of GenOn Americas Generation.

GenOn's generation facilities consist of baseload, intermediate and peaking power generation facilities. The following table summarizes GenOn's generation portfolio by operating segment.

| Generation Type | East | South Central | West | Total |
|---|---|---|---|---|
| | | **(In MW)** | | |
| Natural gas | 6,389 | 1,198 | 4,435 | 12,022 |
| Coal | 5,898 | — | — | 5,898 |
| Oil | 2,077 | — | — | 2,077 |
| Total generation capacity | 14,364 | 1,198 | 4,435 | 19,997 |

GenOn Americas Generation facilities consist of baseload, intermediate and peaking power generation facilities. The following table summarizes GenOn Americas Generation's portfolio by operating segment.

| Generation Type | East | West | Total |
|---|---|---|---|
| | | **(In MW)** | |
| Natural gas | 2,938 | 1,029 | 3,967 |
| Coal | 2,433 | — | 2,433 |
| Oil | 1,452 | — | 1,452 |
| Total generation capacity | 6,823 | 1,029 | 7,852 |

GenOn Mid-Atlantic facilities consist of baseload, intermediate and peaking power generation facilities. The following table summarizes GenOn Mid-Atlantic's portfolio in the East region.

| Generation Type | East |
|---|---|
| | **(In MW)** |
| Natural gas | 2,433 |
| Coal | 1,942 |
| Oil | 308 |
| Total generation capacity | 4,683 |

The Registrants sell power from their generation portfolio and offer capacity or similar products to retail electric providers and others, and provide ancillary services to support system reliability.

*NRG Merger*

On December 14, 2012, NRG completed the acquisition of GenOn with GenOn continuing as a wholly-

owned subsidiary of NRG. The NRG Merger is accounted for under the acquisition method of accounting. Fair value adjustments related to the NRG Merger have been pushed down to GenOn, GenOn Americas Generation and GenOn Mid-Atlantic, resulting in certain assets and liabilities of the Registrants being recorded at fair value at December 15, 2012. See Note 3, *NRG Merger and Dispositions,* for further discussion.

The Registrants' consolidated statements of operations subsequent to the NRG Merger include amortization expense relating to fair value adjustments and depreciation expense based on the fair value of the Registrants' property, plant and equipment. In addition, effective with the NRG Merger, the Registrants adopted accounting policies of NRG. Therefore, the Registrants' financial information prior to the NRG Merger is not comparable to its financial information subsequent to the NRG Merger.

As a result of the impact of pushdown accounting, the financial statements and certain note presentations separate the Registrants' presentations into two distinct periods, the period before the consummation of the NRG Merger (labeled predecessor) and the period after that date (labeled successor), to indicate the application of different basis of accounting between the periods presented.

| Retirements, Mothballing or Long-Term Protective Layup of Generating Facilities (Details) (USD $) In Millions, unless otherwise specified | 0 Months Ended Dec. 31, 2012 Generating facilities expected or scheduled to be deactivated | 12 Months Ended Dec. 31, 2012 Generating facilities expected or scheduled to be deactivated | Dec. 31, 2013 Generating facilities expected or scheduled to be deactivated MW | Oct. 31, 2012 Generating facilities expected or scheduled to be deactivated Niles Unit 1 MW | Jun. 30, 2012 Generating facilities expected or scheduled to be deactivated Niles Unit 2 MW | Jun. 30, 2012 Generating facilities expected or scheduled to be deactivated Elrama Units 1 to 3 MW | Oct. 31, 2012 Generating facilities expected or scheduled to be deactivated Elrama Unit 4 MW | Dec. 31, 2013 Generating facilities expected or scheduled to be deactivated Portland MW | Dec. 31, 2013 Generating facilities expected or scheduled to be deactivated Gilbert MW | Dec. 31, 2013 Generating facilities expected or scheduled to be deactivated Titus MW |
|---|---|---|---|---|---|---|---|---|---|---|
| **Expected Retirements, Mothballs or Long Term Protective Layups of Coal-Fired Facilities** | | | | | | | | | | |
| Electric generating capacity of facility (in megawatts) | | | 3,540 | 110 | 110 | 290 | 170 | 400 | 98 | 245 |
| Reserved cash which was released | | | | | | | | | | |
| Amount of operations and maintenance expense reduced | | | | | | | | | | |
| Inventory reserve | | 35 | | | | | | | | |
| Property, Plant and Equipment, net | | | 115 | | | | | | | |
| Materials and supplies | | | 17 | | | | | | | |
| Other costs to deactivate generating facilities, included in operations and maintenance expense | $ 1 | | | | | | | | | |

**Capital Structure (Tables)**

**12 Months Ended**
**Dec. 31, 2013**

**Capital Structure Disclosure [Abstract]**

Changes in GenOn's common shares outstanding

| | Common Stock (Shares in millions) |
|---|---|
| As of December 31, 2010 | 771 |
| Transactions under stock plans | 1 |
| As of December 31, 2011 | 772 |
| Transactions under stock plans | 2 |
| As of December 14, 2012 | 774 |
| Impact of NRG Merger | (774) |
| As of December 31, 2012[a] | — |

**Guarantees**

**12 Months Ended**

**Dec. 31, 2013**

**Guarantees [Abstract]**

Guarantees

**Guarantees (GenOn and GenOn Americas Generation)**

GenOn and GenOn Americas Generation and their respective subsidiaries enter into various contracts that include indemnification and guarantee provisions as a routine part of their business activities. Examples of these contracts include asset purchases and sale agreements, commodity sale and purchase agreements, retail contracts, EPC agreements, operation and maintenance agreements, service agreements, settlement agreements, and other types of contractual agreements with vendors and other third parties, as well as affiliates. These contracts generally indemnify the counterparty for tax, environmental liability, litigation and other matters, as well as breaches of representations, warranties and covenants set forth in these agreements. In some cases, GenOn's and GenOn Americas Generation's maximum potential liability cannot be estimated, since the underlying agreements contain no limits on potential liability.

The following table summarizes the maximum potential exposures that can be estimated for guarantees, indemnities, and other contingent liabilities by maturity:

*GenOn*

| | By Remaining Maturity at December 31, | | | | | December 31, |
|---|---|---|---|---|---|---|
| | 2013 | | | | | 2012 |
| **Guarantees** | **Under 1 Year** | **1-3 Years** | **3-5 Years** | **Over 5 Years** | **Total** | **Total** |
| | (In millions) | | | | | (In millions) |
| Letters of credit and surety bonds | $ 96 | $ 2 | $ — | $ — | $ 98 | $ 132 |
| Commercial sales arrangements | 76 | 15 | — | 151 | 242 | 289 |
| Other guarantees | 5 | 4 | — | 50 | 59 | 117 |
| Total guarantees | $ 177 | $ 21 | $ — | $ 201 | $ 399 | $ 538 |

*GenOn Americas Generation*

| | By Remaining Maturity at December 31, | | | | | December 31, |
|---|---|---|---|---|---|---|
| | 2013 | | | | | 2012 |
| **Guarantees** | **Under 1 Year** | **1-3 Years** | **3-5 Years** | **Over 5 Years** | **Total** | **Total** |
| | (In millions) | | | | | (In millions) |
| Surety bonds | $ 6 | $ — | $ — | $ — | $ 6 | $ 7 |
| Commercial sales arrangements | 8 | — | — | — | 8 | 16 |
| Total guarantees | $ 14 | $ — | $ — | $ — | $ 14 | $ 23 |

*Letters of credit and surety bonds* — As of December 31, 2013, GenOn and GenOn Americas Generation and their respective subsidiaries were contingently obligated for a total of $98 million and $6 million under surety bonds, respectively. In addition, $349 million of letters of credit were issued under the NRG credit agreement with GenOn. See Note 18, *Commitments and Contingencies*. Of those letters of credit, $258 million were issued on behalf of GenOn Americas Generation's subsidiaries and $108 million were issued on behalf of GenOn Mid-Atlantic. Most of these letters of credit are issued in support of their obligations to perform under commodity agreements and surety bonds are issued for financing or other arrangements. A majority of these surety bonds expire within one year of issuance, and it is typical for GenOn and GenOn Americas Generation to renew them on similar terms.

*Commercial sales arrangements* — In connection with the purchase and sale of fuel, emission

allowances and power generation products to and from third parties with respect to the operation of some of GenOn's and GenOn Americas Generation's generation facilities in the U.S., they may be required to guarantee a portion of the obligations of certain of their subsidiaries. These obligations may include liquidated damages payments or other unscheduled payments. At December 31, 2013, GenOn is contingently obligated for a total of $103 million under such guarantees issued on behalf of GenOn Americas Generation's subsidiaries. GenOn and GenOn Americas Generation do not believe that they will be required to make any material payments under these commercial sales agreements.

*Other guarantees* — GenOn and GenOn Americas Generation have issued guarantees of obligations that their subsidiaries may incur as a provision for environmental site remediation, payment of debt obligations, rail car leases, performance under purchase, EPC and operating and maintenance agreements. In addition, at December 31, 2013, GenOn Energy Holdings has issued $9 million of guarantees on behalf of a GenOn Americas Generation subsidiary related to settlement agreement obligations. GenOn has also guaranteed some non-qualified benefits of CenterPoint's existing retirees at September 20, 2002. The estimated maximum potential amount of future payments under the CenterPoint guarantee is $50 million at December 31, 2013 (included in the table above) and $2 million is recorded in the GenOn balance sheet for this item. GenOn and GenOn Americas Generation do not believe that they will be required to make any material payments under these guarantees.

*Other indemnities* — Other indemnifications GenOn and GenOn Americas Generation have provided cover operational, tax, litigation and breaches of representations, warranties and covenants. GenOn and GenOn Americas Generation have also indemnified, on a routine basis in the ordinary course of business, financing parties, consultants or other vendors who have provided services to them. GenOn's and GenOn Americas Generation's maximum potential exposure under these indemnifications can range from a specified dollar amount to an indeterminate amount, depending on the nature of the transaction. Total maximum potential exposure under these indemnifications is not estimable due to uncertainty as to whether claims will be made or how they will be resolved. GenOn and GenOn Americas Generation do not believe that they will be required to make any material payments under these indemnity provisions.

Because many of the guarantees and indemnities GenOn and GenOn Americas Generation issue to third parties and affiliates do not limit the amount or duration of their obligations to perform under them, there exists a risk that GenOn or GenOn Americas Generation may have obligations in excess of the amounts described above. For those guarantees and indemnities that do not limit the liability exposure, it may not be possible to estimate what GenOn's or GenOn Americas Generation's liability would be, until a claim is made for payment or performance, due to the contingent nature of these contracts.

**Environmental Matters**

**12 Months Ended**

**Dec. 31, 2013**

**Environmental Remediation Obligations [Abstract]**

Environmental Matters

**Environmental Matters (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

The Registrants are subject to a wide range of environmental regulations in the development, ownership, construction and operation of projects. These laws and regulations generally require that governmental permits and approvals be obtained before construction and during operation of power plants. Environmental regulations have become increasingly stringent and the Registrants expect this trend to continue. The electric generation industry is likely to face new requirements to address various emissions, including greenhouse gases, as well as combustion byproducts, water discharge and use, and threatened and endangered species. In general, future laws and regulations are expected to require the addition of emissions controls or other environmental controls or to impose of certain restrictions on the operations of the Registrants' facilities, which could have a material effect on the Registrants' operations.

*Greenhouse Emissions*

In January 2014, EPA re-proposed the NSPS for $CO_2$ emissions from new fossil-fuel-fired electric generating units that had been previously proposed in April 2012. The re-proposed standards are 1,000 pounds of $CO_2$ per MWh for large gas units and 1,100 pounds of $CO_2$ per MWh for coal units and small gas units. Proposed standards are in effect until a final rule is published or another rule is re-proposed. In 2014, EPA intends to propose another rule that would require states to develop $CO_2$ standards that would apply to existing fossil-fueled generating facilities.

*Environmental Capital Expenditures*

Based on current rules, technology and plans based on proposed rules, GenOn estimates that environmental capital expenditures from 2014 through 2018 required to meet GenOn's regulatory environmental laws will be approximately $120 million for GenOn, which includes $12 million for GenOn Americas Generation, which was adjusted for the sale of Kendall on January 31, 2014. The amount for GenOn Americas Generation includes $6 million for GenOn Mid-Atlantic. These costs are primarily associated with controls to satisfy MATS at Conemaugh and $NO_x$ controls for Sayreville and Gilbert. In addition, although GenOn expects to place Shawville in long-term protective layup and reactivation remains a technical possibility, GenOn does not expect to make any further investment in environmental controls for this facility. Reactivation after a long-term protective layup would likely involve numerous new permits and substantial additional investment. The Registrants continue to explore cost effective compliance alternatives to further reduce costs.

*East Region*

The EPA and various states have been investigating compliance of electric generating facilities with the pre-construction permitting requirements of the CAA known as NSR. In January 2009, GenOn received an NOV from the EPA alleging that past work at Keystone, Portland and Shawville generating stations violated regulations regarding NSR. In June 2011, GenOn received an NOV from the EPA alleging that past work at Avon Lake and Niles generating stations violated NSR. In December 2007, the NJDEP filed suit alleging that NSR violations occurred at the Portland generating station, which was resolved pursuant to a July 2013 Consent Decree.

In 2008, the PADEP issued an NOV related to the inactive Monarch mine where low-volume wastewater from the Cheswick Generating Station and ash leachate were historically disposed. The NOV addresses the alleged requirement to maintain a minimum pumping volume from the mine. The PADEP indicated it will seek a civil penalty of approximately $200,000. GenOn contests the allegations in the NOV and has not agreed to such penalty. GenOn is currently planning capital expenditures in connection with wastewater from Cheswick and leachate from ash disposal facilities.

The MDE sued GenOn Mid-Atlantic and NRG MD Ash Management for alleged violations of water pollution laws at three fly ash disposal sites in Maryland: Faulkner (2008/2011), Brandywine (2010) and Westland (2012). On April 30, 2013, the court approved the consent decree resolving these issues. NRG MD Ash Management has since discontinued use of the Faulkner disposal site and opened a new, state of the art carbon burnout facility at the Morgantown plant that allows greater beneficial reuse (as a cement substitute).

The MDE has announced that it intends to promulgate for stringent regulations regarding $NO_x$ emissions, which could negatively affect some of our coal units in Maryland.

*RGGI* — In 2013, each of the RGGI member states finalized a rule that collectively reduced the $CO_2$ emissions cap from 165 million tons to 91 million tons in 2014 with a 2.5% reduction each year from 2015 to 2020. The Registrants expect earnings at their plants in Massachusetts, New York, and particularly those in Maryland, to be negatively affected. The extent to which they would be negatively affected depends on the price of the $CO_2$ emissions allowances, which in turn will be significantly influenced by future natural gas prices, power prices, generation resource mix, dispatch order, and any nuclear plant retirements.

For further discussion of these matters, refer to Note 18, *Commitments and Contingencies – Contingencies.*

| Fair Value of Financial Instruments (Details 3) (Derivative [Member], USD $) In Millions, unless otherwise specified | 0 Months Ended Dec. 31, 2012 Successor [Member] | 12 Months Ended Dec. 31, 2013 Successor [Member] | 12 Months Ended Dec. 14, 2012 Successor [Member] | 12 Months Ended Dec. 14, 2012 Predecessor [Member] | 0 Months Ended Dec. 31, 2012 GenOn Americas Generation, LLC [Member] Successor [Member] | 12 Months Ended Dec. 31, 2013 GenOn Americas Generation, LLC [Member] Successor [Member] | Dec. 14, 2012 GenOn Americas Generation, LLC [Member] Successor [Member] | Dec. 14, 2012 GenOn Americas Generation, LLC [Member] Predecessor [Member] | 12 Months Ended Dec. 31, 2012 GenOn Mid-Atlantic, LLC [Member] Successor [Member] | 0 Months Ended Dec. 31, 2012 GenOn Mid-Atlantic, LLC [Member] Successor [Member] | 12 Months Ended Dec. 31, 2013 GenOn ... Mid-Atlantic, LLC [Member] Succe... |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Reconciliation of the beginning and ending balances for financial instruments that are recognized at fair value in the consolidated financial statements** | | | | | | | | | | | |
| Beginning Balance | | $ 17 | $ 18 [1],[2] | $ (31) [1],[2] | | $ 17 [1],[2] | $ 18 [1],[2] | $ (32) [1],[2] | | $ 7 [2],[3] | $ 8 [2] |
| Total gains and losses (realized/unrealized) included in earnings | (3) [2],[4] | (17) [2],[4] | | (37) [2],[4] | (3) [2],[4] | (17) [2],[4] | | (33) [2],[4] | (1) [1],[2] | (7) [1],[2] | |
| Purchases | | 2 [2] | (3) [2] | 0 [2] | | 2 [2] | 0 [2] | 0 [2] | | | |
| Transfers out of Level 3 | | 0 [2],[5] | (1) [2],[5] | 0 [2],[5] | | 0 [2],[5] | (1) [2],[5] | 0 [2],[5] | | | |
| Ending Balance | 17 [1],[2] | (4) [2] | 18 [1],[2] | (68) [2] | 17 [1],[2] | (1) [2] | 18 [1],[2] | (65) [2] | 7 [2],[3] | 0 [2] | 8 [2] |
| The amount of the total gains for the period included in earnings attributable to the change in unrealized gains relating to assets still held at end of period | $ 4 [2] | $ 0 [2] | | $ (80) [2] | $ 4 [2] | $ 0 [2] | | $ (70) [2] | $ 1 [2] | $ 0 [2] | |

[1] The change in Level 3 balance is primarily driven by the change in accounting policy at the NRG Merger date to include all curves with broker-quoted coal contracts w... designation.

[2] Consists of derivatives assets and liabilities, net.

[3] (c)Contracts entered into are reported with total gains and losses included in earnings in the predecessor periods.

[4] Contracts entered into are reported with total gains and losses included in earnings in the predecessor periods.

[5] Transfers out of Level 3 are related to the availability of external broker quotes and are valued as of the end of the reporting period.

**Segment Reporting (Tables)**

**12 Months Ended**

**Dec. 31, 2013**

**Segment Reporting [Abstract]**

Segment reporting information

*GenOn*

**Successor**

| | Year Ended December 31, 2013 | | | | |
|---|---|---|---|---|---|
| | East | South Central | West | Corporate | Total |
| | (In millions) | | | | |
| **Operating revenues** | $ 2,291 | $ 7 | $ 249 | $ 9 | $ 2,556 |
| Operating revenues - affiliate | (4) | 38 | 12 | 2 | 48 |
| Operating expenses [a] | 1,590 | 34 | 130 | 234 | 1,988 |
| Operating expenses - affiliate | 299 | 34 | 50 | (179) | 204 |
| Depreciation and amortization | 195 | 6 | 39 | 9 | 249 |
| Operating loss | 203 | (29) | 42 | (53) | 163 |
| Other income/(loss), net | 26 | — | — | (25) | 1 |
| Equity in earnings of unconsolidated affiliates/(loss) | — | 4 | — | — | 4 |
| Loss on debt extinguishment | — | — | — | (11) | (11) |
| Interest expense | (67) | — | (5) | (121) | (193) |
| Interest expense -affiliate | — | — | — | (12) | (12) |
| Income/(loss) before income taxes | 162 | (25) | 37 | (222) | (48) |
| Income tax benefit | — | — | — | (6) | (6) |
| **Net income/(loss)** | $ 162 | $ (25) | $ 37 | $ (216) | $ (42) |
| **Balance sheet** | | | | | |
| Equity investment in affiliate | $ — | $ 17 | $ — | $ — | $ 17 |
| Capital expenditures [b] | $ 157 | $ 3 | $ 81 | $ 39 | $ 280 |
| **Total assets** | $ 4,255 | $ 179 | $ 329 | $ 971 | $ 5,734 |

(a)   Corporate operating expenses include $70 million in acquisition-related costs.
(b)   Includes accruals.

**Successor**

| | December 15, 2012 through December 31, 2012 | | | | |
|---|---|---|---|---|---|
| | East | South Central | West | Corporate | Total |
| | (In millions) | | | | |
| **Operating revenues** | $ 66 | $ — | $ 7 | $ — | $ 73 |
| Operating expenses | 67 | 1 | 6 | 53 | 127 |
| Depreciation and amortization | 8 | — | 2 | — | 10 |
| Operating loss | (9) | (1) | (1) | (53) | (64) |
| Interest expense | — | — | — | (8) | (8) |
| Loss before income taxes | (9) | (1) | (1) | (61) | (72) |
| Income tax expense/(benefit) | — | — | — | — | — |
| **Net loss** | $ (9) | $ (1) | $ (1) | $ (61) | $ (72) |
| **Balance sheet** | | | | | |
| Equity investment in affiliate | $ — | $ 19 | $ — | $ — | $ 19 |
| Capital expenditures [a] | $ 17 | $ 8 | $ 21 | $ 1 | $ 47 |
| **Total assets** | $ 5,873 | $ 250 | $ 1,063 | $ 233 | $ 7,419 |

(a)   Includes accruals.

**Predecessor**

| | January 1, 2012 through December 14, 2012 | | | | |
|---|---|---|---|---|---|
| | East | South Central | West | Corporate | Total |
| | (In millions) | | | | |
| **Operating revenues** | $ 2,153 | $ 29 | $ 379 | $ 3 | $ 2,564 |
| Operating expenses | 1,994 | 16 | 226 | 14 | 2,250 |
| Depreciation and amortization | 267 | 9 | 43 | 20 | 339 |

| | | | | | |
|---|---|---|---|---|---|
| Impairment losses | 47 | | | | 47 |
| Operating income/(loss) | (155) | 4 | 110 | (31) | (72) |
| Other income, net | — | 2 | | 1 | 3 |
| Interest expense | (1) | — | — | (329) | (330) |
| Income/(loss) before income taxes | (156) | 6 | 110 | (359) | (399) |
| Income tax expense | — | — | — | 15 | 15 |
| **Net income/(loss)** | $ (156) | $ 6 | $ 110 | $ (374) | $ (414) |
| | | | | | |
| Capital expenditures[(a)] | $ 251 | $ 8 | $ 284 | $ 10 | $ 553 |

(a)   Includes accruals.

**Predecessor**

| | East | South Central | West | Corporate | Total |
|---|---|---|---|---|---|
| | | | **Year Ended December 31, 2011** | | |
| | | | (In millions) | | |
| **Operating revenues** | $ 3,125 | $ 37 | $ 449 | $ 3 | $ 3,614 |
| Operating expenses | 2,428 | 36 | 371 | 62 | 2,897 |
| Depreciation and amortization | 291 | 7 | 44 | 33 | 375 |
| Impairment losses | 119 | — | 14 | — | 133 |
| Operating income/(loss) | 287 | (6) | 20 | (92) | 209 |
| Other income/(loss), net | — | 6 | | (2) | 4 |
| Interest (expense)/income | (12) | — | 4 | (371) | (379) |
| Loss on debt extinguishment and refinancing expense | — | — | — | (23) | (23) |
| Income/(loss) before income taxes | 275 | — | 24 | (488) | (189) |
| Income tax expense/(benefit) | — | — | — | — | — |
| **Net income/(loss)** | $ 275 | $ — | $ 24 | $ (488) | $ (189) |

*GenOn Americas Generation*

**Successor**

| | East | South Central | West | Corporate | Total |
|---|---|---|---|---|---|
| | | | **Year Ended December 31, 2013** | | |
| | | | (In millions) | | |
| **Operating revenues** | $ 2,258 | $ — | $ 170 | $ — | $ 2,428 |
| Operating revenues—affiliate | 87 | 41 | 5 | | 133 |
| Operating expenses | 870 | — | 35 | — | 905 |
| Operating expenses—affiliate | 1,272 | 41 | 117 | — | 1,430 |
| Depreciation and amortization | 86 | | 9 | | 95 |
| Operating income/(loss) | 117 | — | 14 | | 131 |
| Other income/(loss), net | — | — | — | 1 | 1 |
| Equity in earnings of unconsolidated affiliates | 0 | 0 | 0 | 0 | 0 |
| Interest expense | (5) | — | — | (68) | (73) |
| Income/(loss) before income taxes | 112 | — | 14 | (67) | 59 |
| Income tax expense/(benefit) | — | — | — | — | — |
| **Net income/(loss)** | $ 112 | $ — | $ 14 | $ (67) | $ 59 |
| **Balance sheet** | | | | | |
| Capital expenditures[(a)] | $ 66 | $ — | $ — | $ — | $ 66 |
| **Total assets** | $ 2,484 | $ 17 | $ 162 | $ 300 | $ 2,963 |

(a)   Includes accruals.

**Successor**

| | East | South Central | West | Corporate | Elimination | Total |
|---|---|---|---|---|---|---|
| | | | **December 15, 2012 through December 31, 2012** | | | |
| | | | (In millions) | | | |
| **Operating revenues** | $ 70 | $ — | $ 4 | $ — | $ — | $ 74 |
| Operating revenues—affiliate | 3 | — | — | | — | 3 |
| Operating expenses | 29 | — | — | — | — | 29 |
| Operating expenses—affiliate | 42 | — | 1 | | | 43 |

| | | | | | | | |
|---|---:|---:|---:|---:|---:|---:|---:|
| Depreciation and amortization | 4 | — | 1 | — | — | 5 |
| Operating income/(loss) | (2) | — | 2 | — | — | — |
| Other income/(loss), net | — | — | — | — | — | — |
| Interest expense | — | — | — | (3) | — | (3) |
| Income/(loss) before income taxes | (2) | — | 2 | (3) | — | (3) |
| Income tax expense/(benefit) | — | — | — | — | — | — |
| **Net income/(loss)** | $ (2) | $ — | $ 2 | $ (3) | $ — | $ (3) |
| **Balance sheet** | | | | | | |
| Capital expenditures[(a)] | $ 6 | $ — | $ — | $ — | $ — | $ 6 |
| **Total assets** | $ 2,451 | $ — | $ 172 | $ 1,126 | $ (363) | $ 3,386 |

(a)  Includes accruals.

**Predecessor**

| | East | South Central | West | Corporate | Elimination | Total |
|---|---:|---:|---:|---:|---:|---:|
| | | | **January 1, 2012 through December 14, 2012** | | | |
| | | | **(In millions)** | | | |
| **Operating revenues** | $ 2,060 | $ 24 | $ 321 | $ — | $ — | $ 2,405 |
| Operating revenues—affiliate | 137 | 22 | 30 | — | — | 189 |
| Operating expenses | 950 | — | 123 | 2 | — | 1,075 |
| Operating expenses—affiliate | 1,143 | 30 | 195 | 1 | — | 1,369 |
| Depreciation and amortization | 136 | — | 14 | 5 | — | 155 |
| Impairment losses | — | — | — | — | — | — |
| Operating income/(loss) | (32) | 16 | 19 | (8) | — | (5) |
| Other income/(loss), net | — | — | — | — | — | — |
| Interest expense | (5) | — | — | (70) | — | (75) |
| Income/(loss) before income taxes | (37) | 16 | 19 | (78) | — | (80) |
| Income tax expense/(benefit) | — | — | — | — | — | — |
| **Net income/(loss)** | $ (37) | $ 16 | $ 19 | $ (78) | $ — | $ (80) |
| Capital expenditures[(a)] | $ 190 | $ — | $ — | $ — | $ — | $ 190 |

(a)  Includes accruals.

**Predecessor**

| | East | South Central | West | Corporate | Elimination | Total |
|---|---:|---:|---:|---:|---:|---:|
| | | | **Year Ended December 31, 2011** | | | |
| | | | **(In millions)** | | | |
| **Operating revenues** | $ 2,793 | $ 22 | $ 200 | $ — | $ — | $ 3,015 |
| Operating revenues—affiliate | (87) | — | 10 | — | — | (77) |
| Operating expenses | 1,005 | — | 36 | 9 | — | 1,050 |
| Operating expenses—affiliate | 1,306 | 22 | 129 | (7) | — | 1,450 |
| Depreciation and amortization | 155 | — | 15 | 7 | — | 177 |
| Impairment losses | 114 | — | 14 | — | — | 128 |
| Operating income/(loss) | 126 | — | 16 | (9) | — | 133 |
| Other loss, net | — | — | (1) | — | — | (1) |
| Interest expense | (5) | — | (1) | (87) | — | (93) |
| Loss on debt extinguishment and refinancing expense | — | — | — | (23) | — | (23) |
| Income/(loss) before income taxes | 121 | — | 14 | (119) | — | 16 |
| Income tax expense/(benefit) | — | — | — | — | — | — |
| **Net income/(loss)** | $ 121 | $ — | $ 14 | $ (119) | $ — | $ 16 |

**Schedule I Condensed Financial Information of Parent Company Only Disclosure**

GenOn Americas Generation, LLC Parent Company [Member]

[Schedule I CONDENSED FINANCIAL INFORMATION OF REGISTRANT](#)

**12 Months Ended**

**Dec. 31, 2013**

**GENON AMERICAS GENERATION, LLC (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED STATEMENTS OF OPERATIONS**

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | **For the Year Ended** **December 31, 2013** | **December 15, 2012 through December 31, 2013** | **January 1, 2012 through December 14, 2012** | **For the Year Ended December 31, 2011** |
| | (In millions) | | (In millions) | |
| **Operating Income** | $ — | $ — | $ — | $ — |
| **Other Income/(Expense)** | | | | |
| Equity in (losses)/earnings of consolidated subsidiaries | 123 | — | (11) | 102 |
| Other expense, net | — | — | — | — |
| Interest expense | (64) | (3) | (69) | (86) |
| Total other income/(expense) | 59 | (3) | (80) | 16 |
| **Income/(Loss) Before Income Taxes** | 59 | (3) | (80) | 16 |
| Income tax expense | — | — | — | — |
| **Net Income/(Loss)** | $ 59 | $ (3) | $ (80) | $ 16 |

See notes to condensed financial statements.

**GENON AMERICAS GENERATION, LLC (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED BALANCE SHEETS**

| | As of December 31, | |
|---|---|---|
| | **2013** | **2012** |
| | (In millions) | |
| **ASSETS** | | |
| **Current Assets** | | |
| Accounts receivable | $ 1 | $ 1 |
| Total current assets | 1 | 1 |
| **Property, Plant and Equipment** | | |
| In service | — | 11 |
| Under construction | — | 1 |
| Total property, plant and equipment | — | 12 |
| Less accumulated depreciation | — | (1) |
| Net property, plant and equipment | — | 11 |
| **Other Assets** | | |
| Investment in subsidiaries | 1,653 | 1,785 |
| Other non-current assets | — | 5 |
| Total other assets | 1,653 | 1,790 |
| **Total Assets** | $ 1,654 | $ 1,802 |

| | | |
|---|---|---|
| **LIABILITIES AND MEMBER'S EQUITY** | | |
| **Current Liabilities** | | |
| Accounts payable — affiliate | $ — | $ 1 |

| | | |
|---|---:|---:|
| Note payable — affiliate | 11 | 12 |
| Accrued expenses and other current liabilities | 16 | 16 |
| Total current liabilities | 27 | 29 |
| **Other Liabilities** | | |
| Long-term debt | 937 | 848 |
| Total non-current liabilities | 937 | 848 |
| **Total Liabilities** | 964 | 877 |
| **Commitments and Contingencies** | | |
| **Member's Equity** | | |
| Member's interest | 690 | 925 |
| Total member's equity | 690 | 925 |
| **Total Liabilities and Member's Equity** | $ 1,654 | $ 1,802 |

See notes to condensed financial statements.

### GENON AMERICAS GENERATION, LLC (PARENT)
### CONDENSED FINANCIAL INFORMATION OF REGISTRANT
### CONDENSED STATEMENTS OF CASH FLOWS

| | Successor | | Predecessor | |
|---|---:|---:|---:|---:|
| | **For the year ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** | **For the year ended December 31, 2011** |
| | (In millions) | | (In millions) | |
| **Cash Flows from Operating Activities** | | | | |
| **Net cash provided by operating activities** | $ 217 | $ — | $ 215 | $ 32 |
| **Cash Flows from Investing Activities** | | | | |
| Capitalized interest | (2) | — | (3) | (3) |
| Capital contributions | — | — | — | (30) |
| **Net cash used by investing activities** | (2) | — | (3) | (33) |
| **Cash Flows from Financing Activities** | | | | |
| (Payment)/issuance of notes payable — affiliate | — | — | — | 12 |
| Capital contributions | 70 | — | 18 | 474 |
| Distributions to member | (285) | — | (230) | (100) |
| Issuance/(payment) of short and long-term debt | — | — | — | (535) |
| **Net cash used by financing activities** | (215) | — | (212) | (149) |
| **Net Decrease in Cash and Cash Equivalents** | — | — | — | (150) |
| **Cash and Cash Equivalents at Beginning of Period** | — | — | — | 150 |
| **Cash and Cash Equivalents at End of Period** | $ — | $ — | $ — | $ — |
| | | | | |
| **Supplemental Disclosures** | | | | |
| Cash paid for interest, net of amounts capitalized | 73 | $ — | $ 72 | $ 94 |
| | | | | |
| **Supplemental Disclosures for Non–Cash Investing and Financing Activities** | | | | |
| Conversion to equity of notes payable to subsidiaries | $ — | $ — | $ — | $ 2 |

See notes to condensed financial statements.

**GENON AMERICAS GENERATION, LLC (PARENT)**
**NOTES TO CONDENSED FINANCIAL STATEMENTS**

1. **Background and Basis of Presentation**

   *Background*

   The condensed parent company financial statements have been prepared in accordance with Rule 12-04, Schedule I of Regulation S‑X, as the restricted net assets of GenOn Americas Generation, LLC's subsidiaries exceed 25% of the consolidated net assets of GenOn Americas Generation, LLC. These statements should be read in conjunction with the consolidated statements and notes thereto of the Registrants.

   GenOn Americas Generation, LLC is a Delaware limited liability company and indirect wholly-owned subsidiary of GenOn Energy, Inc.

   RRI Energy (a Delaware corporation) changed its name from Reliant Energy, Inc. effective May 2009 in connection with the sale of its retail business. GenOn changed its name from RRI Energy effective December 3, 2010 in connection with the merger with Mirant. "GenOn" refers to GenOn Energy, Inc. and, except where the context indicates otherwise, its subsidiaries, after giving effect to the Mirant/RRI Merger.

   *NRG Merger*

   On July 20, 2012, GenOn entered into the NRG Merger Agreement with NRG and a direct wholly-owned subsidiary of NRG. Upon the terms and subject to the conditions set forth in the NRG Merger Agreement, which was approved by the boards of directors of GenOn and NRG, a wholly-owned subsidiary of NRG merged with and into GenOn, with GenOn continuing as the surviving corporation and a wholly-owned subsidiary of NRG.

   Upon closing of the NRG Merger, each issued and outstanding share of GenOn's common stock automatically converted into the right to receive 0.1216 shares of common stock of NRG based on the NRG Merger Exchange Ratio. All outstanding stock options (other than options granted in 2012) immediately vested and all outstanding stock options generally converted upon completion of the NRG Merger into stock options with respect to NRG common stock, after giving effect to the NRG Merger Exchange Ratio. In addition, all outstanding restricted stock units (other than restricted stock units granted in 2012) immediately vested and all outstanding restricted stock units were exchanged for the NRG Merger consideration. All outstanding stock options and unvested restricted stock units granted in 2012 will vest per the terms and conditions of the grant, and if the holder is terminated, upon the holder's termination date if the termination is as a result of the NRG Merger and within two years of the closing date. See Note 3, *NRG Merger and Dispositions,* to the Registrants' consolidated financial statements.

   *Basis of Presentation*

   The condensed financial statements presented herein are the condensed financial statements and other financial information of GenOn Americas Generation, LLC.

   Equity in income/loss of affiliates consists of earnings of direct subsidiaries of GenOn Americas Generation, LLC (parent).

   *Predecessor and Successor Reporting*

   Upon completion of the NRG Merger, NRG stockholders had a majority of the voting interest in the combined company. The NRG Merger is accounted for under the acquisition method of accounting. Under the acquisition method of accounting, NRG is treated as the accounting acquirer and GenOn is treated as the acquired company for financial reporting purposes. As such, the assets and liabilities of GenOn Americas Generation, LLC were recorded at their respective fair values as of the NRG Merger date. Fair value adjustments related to the NRG Merger have been pushed down to GenOn Americas Generation, LLC resulting in certain assets and liabilities of the Registrants being recorded at fair value at December 15, 2012. See Note 3, *NRG Merger,* to the Registrants' consolidated financial statements for further discussion.

   As a result of the impact of pushdown accounting, the financial statements and certain note presentations separate GenOn Americas Generation's presentations into two distinct periods, the period before the consummation of the NRG Merger (labeled predecessor) and the period after that date (labeled successor), to indicate the application of different basis of accounting between the periods presented.

*Cash Dividends Received*

For the year ended December 31, 2013, GenOn Americas Generation, LLC received cash dividends from its subsidiaries of $285 million. During the period from December 15, 2012 through December 31, 2012, GenOn Americas Generation, LLC did not receive any cash dividends from its subsidiaries. During the period from January 1, 2012 through December 14, 2012 and for the year ended December 31, 2011, GenOn Americas Generation, LLC received cash dividends from its subsidiaries of $286 million and $137 million, respectively.

**Long-Term Debt**

For a discussion of GenOn Americas Generation, LLC's long-term debt, see Note 10, *Debt and Capital Leases,* to the Registrants' consolidated financial statements.

Debt maturities of GenOn Americas Generation, LLC as of December 31, 2013 are (in millions):

| | |
|---|---|
| 2019 and thereafter | 850 |
| Total | $   850 |

**Commitments, Contingencies and Guarantees**

See Note 18, *Commitments and Contingencies,* to the Registrants' consolidated financial statements for a detailed discussion of GenOn Americas Generation, LLC's contingencies.

At December 31, 2013, GenOn Americas Generation, LLC did not have any guarantees.

GenOn Energy, Inc. Parent Company [Member]

Schedule I CONDENSED FINANCIAL INFORMATION OF REGISTRANT

**CONDENSED STATEMENTS OF OPERATIONS**

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | **For the Year Ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** | **For the Year Ended December 31, 2011** |
| | (In millions) | | (In millions) | |
| **Operating Income/(Loss)** | $        — | $        — | $        — | $        — |
| **Other Income/(Expense)** | | | | |
| Equity in losses of consolidated subsidiaries | 17 | (69) | (260) | (44) |
| Other income/(expense), net | 74 | 4 | 79 | (1) |
| Interest expense | (140) | (7) | (217) | (144) |
| Total other income/(expense) | (49) | (72) | (398) | (189) |
| **Loss Before Income Taxes** | (49) | (72) | (398) | (189) |
| Income tax (benefit)/expense | (6) | — | 16 | — |
| **Net Income/(Loss)** | $      (43) | $      (72) | $     (414) | $     (189) |

See notes to condensed financial statements.

**GENON ENERGY, INC. (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**

**CONDENSED BALANCE SHEETS**

| | As of December 31, | |
|---|---|---|
| | **2013** | **2012** |
| | (In millions) | |
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $        621 | $        530 |
| Accounts receivable — affiliate | 27 | 10 |
| Notes receivable — affiliate | 592 | 1,119 |
| Interest receivable — affiliate | — | 125 |

| | | |
|---|---:|---:|
| Taxes receivable and other current assets | 2 | 124 |
| Total current assets | 1,247 | 1,908 |
| **Other Assets** | | |
| Investment in subsidiaries | 346 | 368 |
| Notes receivable — affiliate | 1,025 | 1,003 |
| Total other assets | 1,371 | 1,371 |
| **Total Assets** | $ 2,618 | $ 3,279 |

| LIABILITIES AND STOCKHOLDER'S EQUITY | | |
|---|---:|---:|
| **Current Liabilities** | | |
| Accrued taxes | $ 6 | $ 41 |
| Accrued expenses and other current liabilities | 90 | 31 |
| Total current liabilities | 96 | 72 |
| **Other Liabilities** | | |
| Long-term debt | 2,205 | 2,849 |
| Other non-current liabilities | 3 | 1 |
| Total non-current liabilities | 2,208 | 2,850 |
| **Total Liabilities** | 2,304 | 2,922 |
| **Commitments and Contingencies** | | |
| **Stockholder's Equity** | | |
| Common stock: $0.001 par value, 1 share authorized and issued at December 31, 2013 and 2012 | — | — |
| Additional paid-in capital | 327 | 427 |
| Accumulated deficit | (114) | (72) |
| Accumulated other comprehensive income | 101 | 2 |
| **Total Stockholder's Equity** | 314 | 357 |
| **Total Liabilities and Stockholder's Equity** | $ 2,618 | $ 3,279 |

See notes to condensed financial statements.

**GENON ENERGY, INC. (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED STATEMENTS OF CASH FLOWS**

| | Successor | | Predecessor | |
|---|---:|---:|---:|---:|
| | **For the year ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** | **For the year ended December 31, 2011** |
| | (In millions) | | (In millions) | |
| **Cash Flows from Operating Activities** | | | | |
| Net cash used by operating activities | $ 491 | $ (66) | $ (134) | $ (59) |
| **Cash Flows from Investing Activities** | | | | |
| Acquisition of businesses, net of cash acquired | — | — | — | — |
| Net Cash from sale of Marsh Landing | 175 | — | — | — |
| Issuance/(receipt) of notes receivables — affiliate | — | 25 | 46 | 137 |
| Cash retained by GenOn Energy Holdings | — | — | — | — |
| Increase in restricted cash, net | — | — | — | 286 |
| Net cash provided by investing activities | 175 | 25 | 46 | 423 |
| **Cash Flows from Financing Activities** | | | | |
| Proceeds from exercises of stock options | — | — | — | 3 |
| Payments of short and long-term debt | (575) | — | — | (285) |
| **Net cash used by financing activities** | (575) | — | | (282) |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Net Increase/(Decrease) in Cash and Cash Equivalents** | | 91 | | (41) | | (88) | 82 |
| **Cash and Cash Equivalents at Beginning of Period** | | 530 | | 571 | | 659 | 577 |
| **Cash and Cash Equivalents at End of Period** | $ | 621 | $ | 530 | $ | 571 | $ 659 |
| **Supplemental Disclosures** | | | | | | | |
| Cash paid for interest, net of amounts capitalized | $ | 138 | $ | 50 | $ | 169 | $ 224 |
| Cash paid for income taxes (net of refunds received) | $ | — | $ | — | $ | 34 | $ (3) |
| **Supplemental Disclosures for Non–Cash Investing and Financing Activities** | | | | | | | |
| Conversion to equity of notes receivables from subsidiaries | | $ | — | $ | — | $ | — |
| Conversion to equity of notes payable to subsidiaries | | $ | — | $ | — | $ | — |

See notes to condensed financial statements.

**GENON ENERGY, INC. (PARENT)**
**NOTES TO CONDENSED FINANCIAL STATEMENTS**

**1.    Background and Basis of Presentation**

*Background*

The condensed parent company financial statements have been prepared in accordance with Rule 12-04, Schedule I of Regulation S-X, as the restricted net assets of GenOn Energy Inc.'s subsidiaries exceed 25% of the consolidated net assets of GenOn Energy, Inc. These statements should be read in conjunction with the consolidated statements and notes thereto of the Registrants.

RRI Energy (a Delaware corporation) changed its name from Reliant Energy, Inc. effective May 2009 in connection with the sale of its retail business. GenOn changed its name from RRI Energy effective December 3, 2010 in connection with the merger with Mirant. "GenOn" refers to GenOn Energy, Inc. and, except where the context indicates otherwise, its subsidiaries, after giving effect to the Mirant/RRI Merger.

*NRG Merger*

On July 20, 2012, GenOn entered into the NRG Merger Agreement with NRG and a direct wholly-owned subsidiary of NRG. Upon the terms and subject to the conditions set forth in the NRG Merger Agreement, which was approved by the boards of directors of GenOn and NRG, a wholly-owned subsidiary of NRG merged with and into GenOn, with GenOn continuing as the surviving corporation and a wholly-owned subsidiary of NRG.

Upon closing of the NRG Merger, each issued and outstanding share of GenOn's common stock automatically converted into the right to receive 0.1216 shares of common stock of NRG based on the NRG Merger Exchange Ratio. All outstanding stock options (other than options granted in 2012) immediately vested and all outstanding stock options generally converted upon completion of the NRG Merger into stock options with respect to NRG common stock, after giving effect to the NRG Merger Exchange Ratio. In addition, all outstanding restricted stock units (other than restricted stock units granted in 2012) immediately vested and all outstanding restricted stock units were exchanged for the NRG Merger consideration. All outstanding stock options and unvested restricted stock units granted in 2012 will vest per the terms and conditions of the grant, and if the holder's termination date if the termination is as a result of the NRG Merger and within two years of the closing date. See Note 3, *NRG Merger and Dispositions,* to the Registrants' consolidated financial statements.

*Basis of Presentation*

Upon completion of the Mirant/RRI Merger, Mirant stockholders had a majority of the voting interest in the combined company. Although RRI Energy issued shares of RRI Energy common stock to Mirant stockholders to effect the Mirant/RRI Merger, the Mirant/RRI Merger was accounted for as a reverse

acquisition under the acquisition method of accounting. Under the acquisition method of accounting, Mirant is treated as the accounting acquirer and RRI Energy is treated as the acquired company for financial reporting purposes. As such, the condensed financial statements of GenOn Energy, Inc. (parent) include the results of GenOn Energy, Inc. for the periods from December 3, 2010, and include the results of GenOn Energy Holdings (former parent) through December 2, 2010. The condensed financial statements presented herein for periods ended prior to the closing of the Mirant/RRI Merger (and any other financial information presented herein with respect to such pre‑merger dates, unless otherwise specified) are the condensed financial statements and other financial information of Mirant.

Equity in income/loss of affiliates consists of earnings of direct subsidiaries of GenOn Energy, Inc. (parent).

### Predecessor and Successor Reporting

Upon completion of the NRG Merger, NRG stockholders had a majority of the voting interest in the combined company. The NRG Merger is accounted for under the acquisition method of accounting. Under the acquisition method of accounting, NRG is treated as the accounting acquirer and GenOn is treated as the acquired company for financial reporting purposes. As such, the assets and liabilities of GenOn Energy, Inc. were recorded at their respective fair values as of the NRG Merger date. Fair value adjustments related to the NRG Merger have been pushed down to GenOn Energy, Inc., resulting in certain assets and liabilities of the Registrants being recorded at fair value at December 15, 2012. See Note 3, *NRG Merger,* to the Registrants' consolidated financial statements for further discussion.

As a result of the impact of pushdown accounting, the financial statements and certain note presentations separate GenOn Energy, Inc.'s presentations into two distinct periods, the period before the consummation of the NRG Merger (labeled predecessor) and the period after that date (labeled successor), to indicate the application of different basis of accounting between the periods presented.

### Cash Dividends Received

For the year ended December 31, 2013, the period from December 15, 2012 through December 31, 2012 and the period from January 1, 2012 through December 14, 2012, GenOn Energy, Inc. did not receive any cash dividends from its subsidiaries. For the year ended December 31, 2011, GenOn Energy, Inc. received cash dividends from its subsidiaries of $100 million.

**Long-Term Debt**

For a discussion of GenOn Energy, Inc.'s long-term debt, see Note 10, *Debt and Capital Leases,* to the Registrants' consolidated financial statements.

Debt maturities of GenOn Energy, Inc. as of December 31, 2013 are (in millions):

| | |
|---|---:|
| 2017 | 725 |
| 2018 | 675 |
| Thereafter | 550 |
| Total | $   1,950 |

**Commitments, Contingencies and Guarantees**

See Note 15, *Income Taxes* and Note 18, *Commitments and Contingencies* to the Registrants' consolidated financial statements for a detailed discussion of GenOn Energy, Inc.'s contingencies.

As of December 31, 2013, GenOn Energy, Inc. had $50 million of guarantees, which are included in Note 21, *Guarantees,* to the Registrants' consolidated financial statements.

**SCHEDULE II.**
**VALUATION AND**
**QUALIFYING ACCOUNTS**

Dec. 31, 2012

12 Months Ended

**Dec. 31, 2012**
**GenOn Americas Generation, LLC [Member]**

**Valuation and Qualifying Accounts Disclosure [Line Items]**

Schedule of Valuation and Qualifying Accounts

**SCHEDULE II. VALUATION AND QUALIFYING ACCOUNTS**
**GENON ENERGY, INC. AND SUBSIDIARIES**

**For the Year Ended December 31, 2013, Periods from December 15, 2012 through**
**December 31, 2012 and from January 1, 2012**
**through December 14, 2012 and for the Year Ended December 31, 2011**

| | Balance at Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Provision for uncollectible accounts (a)** | | | | | |
| **Successor** | | | | | |
| Year Ended December 31, 2013 | $ 4 | $ — | $ — | $ (3) | $ 1 |
| December 15, 2012 through December 31, 2012 | $ 4 | $ — | $ — | $ — | $ 4 |
| **Predecessor** | | | | | |
| January 1, 2012 through December 14, 2012 | 48 | — | — | (43) (b) | 5 |
| Year Ended December 31, 2011 | 21 | 42 | — | (15) (b) | 48 |
| **Income tax valuation allowance, deducted from deferred tax assets** | | | | | |
| **Successor** | | | | | |
| Year Ended December 31, 2013 | $ 2,324 | $ — | $ 348 | $ — | $ 2,672 |
| December 15, 2012 through December 31, 2012 | $ 2,300 | $ — | $ 24 | $ — | $ 2,324 |
| **Predecessor** | | | | | |
| January 1, 2012 through December 14, 2012 | 1,819 | — | 165 | — | 1,984 |
| Year Ended December 31, 2011 | 1,636 | — | 183 | — | 1,819 |

(a) Provision for uncollectible accounts represents credit reserves for derivative contract assets.

(b) Deductions consisted primarily of reversals of credit reserves for derivative contract assets.

**SCHEDULE II. VALUATION AND QUALIFYING ACCOUNTS**
**GENON AMERICAS GENERATION, LLC AND SUBSIDIARIES**

**For the Year Ended December 31, 2013, Periods from December 15, 2012 through**
**December 31, 2012 and from January 1, 2012**
**through December 14, 2012 and for the Year Ended December 31, 2011**

| | Balance at Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Provision for uncollectible accounts (a)** | | | | | |
| **Successor** | | | | | |
| Year Ended December 31, 2013 | $ 4 | $ — | $ — | $ (3) (b) | $ 1 |
| December 15, 2012 through December 31, 2012 | $ 4 | $ — | $ — | $ — | $ 4 |
| **Predecessor** | | | | | |
| January 1, 2012 through December 14, 2012 | 47 | — | — | (42) (b) | 5 |
| Year Ended December 31, 2011 | 19 | 41 | — | (13) (b) | 47 |

(a) Provision for uncollectible accounts represents credit reserves for derivative contract assets.

(b) Deductions consisted primarily of reversals of credit reserves for derivative contract assets.

| CONSOLIDATED STATEMENT OF STOCKHOLDERS' EQUITY / MEMBER'S EQUITY (USD $) In Millions, unless otherwise specified | Total Predecessor [Member] | Predecessor [Member] GenOn Americas Generation, LLC [Member] | Predecessor [Member] GenOn Mid-Atlantic, LLC [Member] | Predecessor [Member] Common Stock [Member] | Predecessor [Member] Additional Paid-In Capital [Member] | Predecessor [Member] Accumulated Deficit [Member] | Predecessor [Member] Accumulated Other Comprehensive Income/(Loss) [Member] | Predecessor [Member] Member's Interest [Member] GenOn Americas Generation, LLC [Member] | Predecessor [Member] Member Interest [Member] GenOn Mid-Atlantic LLC [Member] |
|---|---|---|---|---|---|---|---|---|---|
| Balance at Dec. 31, 2010 | $ 5,434 | $ 3,573 | $ 3,892 | $ 1 | $ 7,432 | $ (1,974) | $ (25) | $ 3,573 | $ 3,892 |
| **Increase (Decrease) in Stockholders' Equity [Roll Forward]** | | | | | | | | | |
| Net Income/(Loss) | (189) | 16 | 105 | | | (189) | | 16 | 105 |
| Distributions to members | | | | | | | | | |
| Distributions to member | | | | | | | | | |
| Capital contributions | | | | | | | | | |
| Other comprehensive income | (145) | | | | | | (145) | | |
| Equity-based compensation | 17 | | | | 17 | | | | |
| Balance at Dec. 31, 2011 | 5,117 | | | 1 | 7,449 | (2,163) | (170) | | |
| **Increase (Decrease) in Stockholders' Equity [Roll Forward]** | | | | | | | | | |
| Net Income/(Loss) | (414) | (80) | 31 | | | (414) | | (80) | 31 |
| Distributions to members | | | | | | | | | |
| Distributions to member | | | | | | | | | |
| Capital contributions | | | | | | | | | |
| Other comprehensive income | (25) | | | | | | (25) | | |
| Equity-based compensation | 14 | | | | 14 | | | | |
| Balance at Dec. 14, 2012 [1] | 4,692 | 3,673 | 3,728 | 1 | 7,463 | (2,577) | (195) | 3,673 | 3,728 |
| **Increase (Decrease) in Stockholders' Equity [Roll Forward]** | | | | | | | | | |
| Net Income/(Loss) | | | | | | | | | |
| Balance at Dec. 31, 2012 | 207 | 3,965 | 3,927 | | | | | 3,965 | 3,927 |
| Balance at Dec. 15, 2012 | | | | | | | | | |
| **Increase (Decrease) in Stockholders' Equity [Roll Forward]** | | | | | | | | | |
| Net Income/(Loss) | | | | | | | | | |
| Distributions to members | | | | | | | | | |
| Other comprehensive income | | | | | | | | | |
| Balance at Dec. 31, 2012 | 207 | 3,965 | 3,927 | | | | | 3,965 | 3,927 |
| **Increase (Decrease) in Stockholders' Equity [Roll Forward]** | | | | | | | | | |
| Net Income/(Loss) | | | | | | | | | |
| Distributions to members | | | | | | | | | |
| Other comprehensive income | | | | | | | | | |
| Adjustments to Additional Paid in Capital, Other | | | | | | | | | |
| Balance at Dec. 31, 2013 | $ 1,078 [1] | | | | | | | | $ 1,078 [1] |

[1]   The differences in equity balances at December 14, 2012 and December 15, 2012 are due to the application of pushdown accounting reflecting the NRG Merge

**Summary of Significant Accounting Policies (Policies)**

**12 Months Ended**

**Dec. 31, 2013**

**Summary Of Significant Accounting Policies [Line Items]**

Principles of Consolidation and Basis of Presentation

*Basis of Presentation and Principles of Consolidation*

This is a combined annual report of the Registrants. The notes to the consolidated financial statements apply to the Registrants as indicated parenthetically next to each corresponding disclosure.

The Registrants' consolidated financial statements have been prepared in accordance with U.S. GAAP. The ASC, established by the FASB, is the source of authoritative U.S. GAAP to be applied by nongovernmental entities. In addition, the rules and interpretative releases of the SEC under authority of federal securities laws are also sources of authoritative U.S. GAAP for SEC registrants.

The consolidated financial statements include the Registrants' accounts and operations and those of their subsidiaries in which the Registrants have a controlling interest. All significant intercompany transactions and balances have been eliminated in consolidation. The usual condition for a controlling financial interest is ownership of a majority of the voting interests of an entity. However, a controlling financial interest may also exist through arrangements that do not involve controlling voting interests. As such, the Registrants apply the guidance of ASC 810, *Consolidations,* or ASC 810, to determine when an entity that is insufficiently capitalized or not controlled through its voting interests, referred to as a VIE, should be consolidated.

Predecessor and Successor Reporting

*Predecessor and Successor Reporting*

On December 14, 2012, NRG completed the acquisition of GenOn with GenOn continuing as a wholly-owned subsidiary of NRG. The NRG Merger is accounted for under the acquisition method of accounting. Fair value adjustments related to the NRG Merger have been pushed down to GenOn, GenOn Americas Generation, and GenOn Mid-Atlantic, resulting in certain assets and liabilities of the Registrants being recorded at fair value at December 15, 2012. See Note 3, *NRG Merger and Dispositions,* for further discussion.

The Registrants' consolidated statements of operations subsequent to the NRG Merger include amortization expense relating to fair value adjustments and depreciation expense based on the fair value of the Registrants' property, plant and equipment. In addition, effective with the NRG Merger, the Registrants adopted accounting policies of NRG. Therefore, the Registrants' financial information prior to the NRG Merger is not comparable to its financial information subsequent to the NRG Merger.

As a result of the impact of pushdown accounting, the financial statements and certain note presentations separate the Registrants' presentations into two distinct periods, the period before the consummation of the NRG Merger (labeled predecessor) and the period after that date (labeled successor), to indicate the application of different basis of accounting between the periods presented.

Cash and Cash Equivalents

*Cash and Cash Equivalents*

Cash and cash equivalents include highly liquid investments with an original maturity of three months or less at the time of purchase.

Funds Deposited by Counterparties

*Funds Deposited by Counterparties (GenOn)*

Funds deposited by counterparties consist of cash held by GenOn as a result of collateral posting obligations from GenOn's counterparties. Some amounts are segregated into separate accounts that are not contractually restricted but, based on GenOn's intentions, are not available for the payment of general corporate obligations. Depending on market fluctuations and the settlement of the underlying contracts, GenOn will refund this collateral to the hedge counterparties pursuant to the terms and conditions of the underlying trades. Since collateral requirements fluctuate daily and GenOn cannot predict if any collateral will be held for more than twelve months, the funds deposited by counterparties are classified as a current asset on GenOn's balance sheets, with an offsetting liability for this cash collateral received within current liabilities. Changes in funds deposited by counterparties are closely associated with GenOn's operating activities and are classified as an operating activity in GenOn's consolidated statements of cash flows.

Restricted Cash

*Restricted Cash*

Restricted cash consists primarily of funds held to satisfy the requirements of certain debt

agreements and funds held within the Registrants' projects that are restricted in their use. These funds are used to pay for current operating expenses and current debt service payments.

## Inventory

### Inventory

Inventory is valued at the lower of weighted average cost or market, and consists principally of fuel oil, coal and raw materials used to generate electricity or steam. The Registrants remove these inventories as they are used in the production of electricity or steam. Spare parts inventory is valued at a weighted average cost, since the Registrants expect to recover these costs in the ordinary course of business. The Registrants remove these inventories when they are used for repairs, maintenance or capital projects. Sales of inventory are classified as an operating activity in the consolidated statements of cash flows.

## Property, Plant and Equipment

### Property, Plant and Equipment

Property, plant and equipment are stated at cost; however impairment adjustments are recorded whenever events or changes in circumstances indicate that their carrying values may not be recoverable. Significant additions or improvements extending asset lives are capitalized as incurred, while repairs and maintenance that do not improve or extend the life of the respective asset are charged to expense as incurred. Depreciation is computed using the straight-line method over the estimated useful lives. Certain assets and their related accumulated depreciation amounts are adjusted for asset retirements and disposals with the resulting gain or loss included in cost of operations in the consolidated statements of operations.

## Asset Impairments

### Asset Impairments

Long-lived assets that are held and used are reviewed for impairment whenever events or changes in circumstances indicate carrying values may not be recoverable. Such reviews are performed in accordance with ASC 360. An impairment loss is recognized if the total future estimated undiscounted cash flows expected from an asset are less than its carrying value. An impairment charge is measured by the difference between an asset's carrying amount and fair value with the difference recorded in operating costs and expenses in the statements of operations. Fair values are determined by a variety of valuation methods, including appraisals, sales prices of similar assets and present value techniques.

## Intangible Assets

### Intangible Assets

Intangible assets represent contractual rights held by the Registrants. The Registrants recognize specifically identifiable intangible assets when specific rights and contracts are acquired. As of December 31, 2013 and 2012, the Registrants' intangible assets are comprised of $SO_2$ emission allowances and $CO_2$ emission credits held for compliance with RGGI that are held-for-use and are amortized to cost of operations based on straight line or units of production basis. The following table presents the Registrants' amortization of intangible assets for each of the past three years:

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| GenOn | $ 25 | $ 1 | $ 5 | $ 23 |
| GenOn Americas Generation | 21 | 1 | 3 | 9 |
| GenOn Mid-Atlantic | 18 | — | — | 5 |

The following table presents estimated amortization of the Registrants' intangible assets for each of the next five years:

| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
| --- | --- | --- | --- |
| | (In millions) | | |
| 2014 | $ 24 | $ 24 | $ 22 |
| 2015 | 19 | 19 | 17 |
| 2016 | 22 | 22 | 19 |
| 2017 | 22 | 22 | 21 |
| 2018 | 27 | 27 | 25 |

Intangible assets determined to have indefinite lives are not amortized, but rather are tested for impairment at least annually or more frequently if events or changes in circumstances indicate that such

acquired intangible assets have been determined to have finite lives and should now be amortized over their useful lives. The Registrants had no intangible assets with indefinite lives recorded as of December 31, 2013.

Emission allowances held-for-sale, which are included in other non-current assets on the Registrants' consolidated balance sheets, are not amortized; they are carried at the lower of cost or fair value and reviewed for impairment in accordance with ASC 360, *Property, Plant, and Equipment.*

Income Taxes

### *Income Taxes*

#### *GenOn*

GenOn is a wholly-owned subsidiary of NRG that exists as a corporate regarded entity for income tax purposes. As a result, GenOn, GenOn Americas and NRG have direct liability for the majority of the federal and state income taxes resulting from GenOn's operations. GenOn has allocated income taxes as if it were a single consolidated taxpayer using the liability method in accordance with ASC 740, which requires that GenOn use the asset and liability method of accounting for deferred income taxes and provide deferred income taxes for all significant temporary differences.

GenOn has two categories of income tax expense or benefit - current and deferred, as follows:

• Current income tax expense or benefit consists solely of current taxes payable less applicable tax credits, and

• Deferred income tax expense or benefit is the change in the net deferred income tax asset or liability, excluding amounts charged or credited to accumulated other comprehensive income.

To the extent that GenOn provides current tax expense or benefit, any related tax payable or receivable to NRG is reclassified to equity in the same period since GenOn does not have a tax sharing agreement with NRG.

GenOn reports some of its revenues and expenses differently for financial statement purposes than for income tax return purposes, resulting in temporary and permanent differences between GenOn's financial statements and income tax returns. The tax effects of such temporary differences are recorded as either deferred income tax assets or deferred income tax liabilities in GenOn's consolidated balance sheets. When necessary, deferred tax assets are reduced by a valuation allowance to reflect the amount that is estimated to be recoverable. In assessing the recoverability of the deferred tax assets, GenOn considers whether it is likely that some portion or all of the deferred tax assets will be realized.

The determination of a valuation allowance requires significant judgment as to the generation of taxable income during future periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn's past and anticipated future performance, the reversal of deferred tax liabilities and the implementation of tax planning strategies.

GenOn accounts for uncertain tax positions in accordance with ASC 740, which applies to all tax positions related to income taxes. Under ASC 740, tax benefits are recognized when it is more-likely-than-not that a tax position will be sustained upon examination by the authorities. The benefit recognized from a position that has surpassed the more-likely-than-not threshold is the largest amount of benefit that is more than 50% likely to be realized upon settlement. The Company recognizes interest and penalties accrued related to uncertain tax benefits as a component of income tax expense.

#### *GenOn Americas Generation*

GenOn Americas Generation and most of its subsidiaries are limited liability companies that are treated as branches of GenOn Americas for income tax purposes. As a result, GenOn Americas, GenOn and NRG have direct liability for the majority of the federal and state income taxes relating to GenOn Americas Generation's operations. Several of GenOn Americas Generation's subsidiaries exist as regarded corporate entities for income tax purposes. For the subsidiaries that continue to exist as corporate regarded entities, GenOn Americas Generation allocates current and deferred income taxes to each corporate regarded entity as if such entity were a single taxpayer utilizing the asset and liability method to account for income taxes. To the extent GenOn Americas Generation provides tax expense or benefit, any related tax payable or receivable to NRG is reclassified to equity in the same period since GenOn Americas Generation does not have a tax sharing agreement with NRG.

GenOn Americas Generation reports some of its revenues and expenses differently for financial statement purposes than for income tax return purposes for the regarded corporate entities, resulting in temporary and permanent differences between GenOn Americas Generation's financial statements and income tax returns. The tax effects of such temporary differences are recorded as either deferred income

tax assets or deferred income tax liabilities in GenOn Americas Generation's consolidated balance sheet. GenOn Americas Generation measures its deferred income tax assets and deferred income tax liabilities using income tax rates that are currently in effect. When necessary, deferred tax assets are reduced by a valuation allowance to reflect the amount that is estimated to be recoverable. In assessing the recoverability of the deferred tax assets, GenOn Americas Generation considers whether it is likely that some portion or all of the deferred tax assets will be realized. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities from a change in tax rates is recognized in income in the period that includes the enactment date.

The determination of a valuation allowance requires significant judgment as to the generation of taxable income during future periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn Americas Generation's past and anticipated future performance, the reversal of deferred tax liabilities and the implementation of tax planning strategies.

GenOn Americas Generation accounts for uncertain tax positions in accordance with ASC 740, which applies to all tax positions related to income taxes for the regarded corporate entities. Under ASC 740, tax benefits are recognized when it is more-likely-than-not that a tax position will be sustained upon examination by the authorities. The benefit recognized from a position that has surpassed the more-likely-than-not threshold is the largest amount of benefit that is more than 50% likely to be realized upon settlement. The Company recognizes interest and penalties accrued related to uncertain tax benefits as a component of income tax expense.

*GenOn Mid-Atlantic*

GenOn Mid-Atlantic and GenOn Mid-Atlantic's subsidiaries are limited liability companies that are treated as branches of GenOn Americas for income tax purposes. As such, GenOn, GenOn Americas and NRG have direct liability for the majority of the federal and state income taxes relating to GenOn Mid-Atlantic's operations.

### Revenue Recognition

*Energy* — Both physical and financial transactions are entered into to optimize the financial performance of the Registrants' generating facilities. Electric energy revenue is recognized upon transmission to the customer. Physical transactions, or the sale of generated electricity to meet supply and demand, are recorded on a gross basis in the Registrants' consolidated statements of operations. Financial transactions, or the buying and selling of energy for trading purposes, are recorded net within operating revenues in the consolidated statements of operations in accordance with ASC 815.

*Capacity* — Capacity revenues are recognized when contractually earned, and consist of revenues billed to a third party at either the market or a negotiated contract price for making installed generation capacity available in order to satisfy system integrity and reliability requirements.

*Natural Gas Sales (GenOn and GenOn Americas Generation)* — GenOn and GenOn Americas Generation record revenues from the sales of natural gas under the accrual method. These sales are sold at market-based prices. Sales that have been delivered but not billed by period end are estimated.

*PPAs (GenOn and GenOn Americas Generation)* — Certain of GenOn and GenOn Americas Generation's revenues are currently obtained through PPAs or other contractual arrangements. All of these PPAs are accounted for as operating leases in accordance with ASC 840, *Leases*, or ASC 840. ASC 840 requires minimum lease payments received to be amortized over the term of the lease and contingent rentals are recorded when the achievement of the contingency becomes probable. These leases have no minimum lease payments and all the rent is recorded as contingent rent on an actual basis when the electricity is delivered.

### Derivative Financial Instruments

The Registrants account for derivative financial instruments under ASC 815, which requires the Registrants to record all derivatives on the balance sheet at fair value unless they qualify for a NPNS exception. Changes in the fair value of non-hedge derivatives are immediately recognized in earnings. Changes in the fair value of derivatives accounted for as hedges, if elected for hedge accounting, are either:

• Recognized in earnings as an offset to the changes in the fair value of the related hedged assets, liabilities and firm commitments; and

• Deferred and recorded as a component of accumulated OCI until the hedge transactions occur

and are recognized in earnings.

The Registrants' primary derivative instruments are financial power and natural gas contracts, fuels purchase contracts, other energy related commodities, and interest rate instruments used to mitigate variability in earnings due to fluctuations in market prices and interest rates. On an ongoing basis, the Registrants assess the effectiveness of all derivatives that are designated as hedges for accounting purposes in order to determine that each derivative continues to be highly effective in offsetting changes in fair values or cash flows of hedged items. Internal analyses that measure the statistical correlation between the derivative and the associated hedged item determine the effectiveness of such an energy contract designated as a hedge. If it is determined that the derivative instrument is not highly effective as a hedge, hedge accounting will be discontinued prospectively. If the derivative instrument is terminated, the effective portion of this derivative deferred in accumulated OCI will be frozen until the underlying hedged item is delivered

Revenues and expenses on contracts that qualify for the NPNS exception are recognized when the underlying physical transaction is delivered. While these contracts are considered derivative financial instruments under ASC 815, they are not recorded at fair value, but on an accrual basis of accounting. If it is determined that a transaction designated as NPNS no longer meets the scope exception, the fair value of the related contract is recorded on the balance sheet and immediately recognized through earnings.

The Registrants' trading activities are subject to limits in accordance with the Risk Management Policy. These contracts are recognized on the balance sheet at fair value and changes in the fair value of these derivative financial instruments are recognized in earnings.

### Concentrations of Credit Risk

*Concentrations of Credit Risk*

Financial instruments which potentially subject the Registrants to concentrations of credit risk consist primarily of accounts receivable and derivatives. Certain accounts receivable and derivative instruments are concentrated within entities engaged in the energy industry. These industry concentrations may impact the Registrants' overall exposure to credit risk, either positively or negatively, in that the customers may be similarly affected by changes in economic, industry or other conditions. Receivables and other contractual arrangements are subject to collateral requirements under the terms of enabling agreements. However, the Registrants believe that the credit risk posed by industry concentration is offset by the diversification and creditworthiness of the Registrants' customer base. See Note 4, *Fair Value of Financial Instruments,* for a further discussion of derivative concentrations.

### Fair Value of Financial Instruments

*Fair Value of Financial Instruments*

The carrying amount of cash and cash equivalents, funds deposited by counterparties, receivables, accounts payables, and accrued liabilities approximate fair value because of the short-term maturity of these instruments. See Note 4, *Fair Value of Financial Instruments*, for a further discussion of fair value of financial instruments.

### Asset Retirement Obligations

*Asset Retirement Obligations*

The Registrants account for their AROs in accordance with ASC 410-20, *Asset Retirement Obligations,* or ASC 410-20. Retirement obligations associated with long-lived assets included within the scope of ASC 410-20 are those for which a legal obligation exists under enacted laws, statutes, and written or oral contracts, including obligations arising under the doctrine of promissory estoppel, and for which the timing and/or method of settlement may be conditional on a future event. ASC 410-20 requires an entity to recognize the fair value of a liability for an ARO in the period in which it is incurred and a reasonable estimate of fair value can be made.

Upon initial recognition of a liability for an ARO, the Registrants capitalize the asset retirement cost by increasing the carrying amount of the related long-lived asset by the same amount. Over time, the liability is accreted to its future value, while the capitalized cost is depreciated over the useful life of the related asset. See Note 11, *Asset Retirement Obligations,* for a further discussion of AROs.

### Pensions

*Pensions (GenOn)*

GenOn offers pension benefits through defined benefit pension plans. In addition, GenOn provides postretirement health and welfare benefits for certain groups of employees. GenOn accounts for pension and other postretirement benefits in accordance with ASC 715, *Compensation — Retirement Benefits.* GenOn recognizes the funded status of its defined benefit plans in the statement of financial position and records an offset for gains and losses as well as all prior service costs that have not been included as part of GenOn's net periodic benefit cost to other comprehensive income. The determination of GenOn's obligation and expenses for pension benefits is dependent on the selection of certain assumptions. These assumptions determined by management include the discount rate, the expected rate of return on plan

assets and the rate of future compensation increases. GenOn's actuarial consultants determine assumptions for such items as retirement age. The assumptions used may differ materially from actual results, which may result in a significant impact to the amount of pension obligation or expense recorded by GenOn.

GenOn measures the fair value of its pension assets in accordance with ASC 820, *Fair Value Measurements and Disclosures,* or ASC 820.

Business Combinations

### Business Combinations

The Registrants account for the business combinations in accordance with ASC 805, *Business Combinations,* or ASC 805. ASC 805 requires an acquirer to recognize and measure in its financial statements the identifiable assets acquired, the liabilities assumed, and any noncontrolling interest in the acquiree at fair value at the acquisition date. It also recognizes and measures the goodwill acquired or a gain from a bargain purchase in the business combination and determines what information to disclose to enable users of an entity's financial statements to evaluate the nature and financial effects of the business combination. In addition, transaction costs are expensed as incurred.

Use of Estimates

### Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements, disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from these estimates.

In recording transactions and balances resulting from business operations, the Registrants use estimates based on the best information available. Estimates are used for such items as plant depreciable lives, tax provisions, actuarially determined benefit costs, the valuation of energy commodity contracts, environmental liabilities, legal costs incurred in connection with recorded loss contingencies, and assets acquired and liabilities assumed in business combinations, among others. In addition, estimates are used to test long-lived assets for impairment and to determine the fair value of impaired assets. As better information becomes available or actual amounts are determinable, the recorded estimates are revised. Consequently, operating results can be affected by revisions to prior accounting estimates.

Reclassifications

### Reclassifications

Certain prior-year amounts have been reclassified for comparative purposes. The reclassifications did not affect results from operations. The Registrants reclassified certain balances from cash and cash equivalents to funds deposited by counterparties, which impacted cash flows from operations in the prior years.

GenOn and GenOn Americas Generation [Member]

**Summary Of Significant Accounting Policies [Line Items]**

Project Development Costs and Capitalized Interest

### Project Development Costs and Capitalized Interest (GenOn and GenOn Americas Generation)

Project development costs are expensed in the preliminary stages of a project and capitalized when the project is deemed to be commercially viable. Commercial viability is determined by one or a series of actions including, among others, Board of Director approval pursuant to a formal project plan that subjects the Registrants to significant future obligations that can only be discharged by the use of an asset of the Registrants.

Interest incurred on funds borrowed to finance capital projects is capitalized until the project under construction is ready for its intended use. The amounts of interest capitalized were as follows:

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| GenOn | $ 21 | $ 2 | $ 35 | $ 15 |
| GenOn Americas Generation | 2 | — | 3 | 3 |

When a project is available for operations, capitalized interest and project development costs are reclassified to property, plant and equipment and amortized on a straight-line basis over the estimated useful life of the project's related assets. Capitalized costs are charged to expense if a project is abandoned or management otherwise determines the costs to be unrecoverable.

## GenOn Americas Generation [Member]

**Summary Of Significant Accounting Policies [Line Items]**

Income Taxes

*GenOn Americas Generation*

GenOn Americas Generation and most of its subsidiaries are limited liability companies that are treated as branches of GenOn Americas for income tax purposes. As a result, GenOn Americas, GenOn and NRG have direct liability for the majority of the federal and state income taxes relating to GenOn Americas Generation's operations. Several of GenOn Americas Generation's subsidiaries exist as regarded corporate entities for income tax purposes. For the subsidiaries that continue to exist as corporate regarded entities, GenOn Americas Generation allocates current and deferred income taxes to each corporate regarded entity as if such entity were a single taxpayer utilizing the asset and liability method to account for income taxes. To the extent GenOn Americas Generation provides tax expense or benefit, any related tax payable or receivable to NRG is reclassified to equity in the same period since GenOn Americas Generation does not have a tax sharing agreement with NRG.

GenOn Americas Generation reports some of its revenues and expenses differently for financial statement purposes than for income tax return purposes for the regarded corporate entities, resulting in temporary and permanent differences between GenOn Americas Generation's financial statements and income tax returns. The tax effects of such temporary differences are recorded as either deferred income tax assets or deferred income tax liabilities in GenOn Americas Generation's consolidated balance sheet. GenOn Americas Generation measures its deferred income tax assets and deferred income tax liabilities using income tax rates that are currently in effect. When necessary, deferred tax assets are reduced by a valuation allowance to reflect the amount that is estimated to be recoverable. In assessing the recoverability of the deferred tax assets, GenOn Americas Generation considers whether it is likely that some portion or all of the deferred tax assets will be realized. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities from a change in tax rates is recognized in income in the period that includes the enactment date.

The determination of a valuation allowance requires significant judgment as to the generation of taxable income during future periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn Americas Generation's past and anticipated future performance, the reversal of deferred tax liabilities and the implementation of tax planning strategies.

GenOn Americas Generation accounts for uncertain tax positions in accordance with ASC 740, which applies to all tax positions related to income taxes for the regarded corporate entities. Under ASC 740, tax benefits are recognized when it is more-likely-than-not that a tax position will be sustained upon examination by the authorities. The benefit recognized from a position that is more-likely-than-not threshold is the largest amount of benefit that is more than 50% likely to be realized upon settlement. The Company recognizes interest and penalties accrued related to uncertain tax benefits as a component of income tax expense.

## GenOn Mid-Atlantic, LLC [Member]

**Summary Of Significant Accounting Policies [Line Items]**

Income Taxes

*GenOn Mid-Atlantic*

GenOn Mid-Atlantic and GenOn Mid-Atlantic's subsidiaries are limited liability companies that are treated as branches of GenOn Americas for income tax purposes. As such, GenOn, GenOn Americas and NRG have direct liability for the majority of the federal and state income taxes relating to GenOn Mid-Atlantic's operations.

| Guarantees (Details) (USD $) In Millions, unless otherwise specified | Dec. 31, 2013 Surety Bond [Member] | Dec. 31, 2013 Retirees Guarantee [Member] | Oct. 31, 2010 GenOn Marsh Landing [Member] Credit Agreement [Member] | Oct. 31, 2010 GenOn Marsh Landing [Member] Credit Agreement [Member] Senior Secured, Letter of Credit Facilities, Contract Requirements [Member] | Oct. 31, 2010 GenOn Marsh Landing [Member] Credit Agreement [Member] Senior Secured, Letter of Credit Facilities, Debt Service [Member] | Dec. 31, 2012 GenOn Energy Holdings [Member] Cash Collateralized Letters of Credit [Member] | Dec. 31, 2013 GenOn Americas Generation, LLC [Member] Surety Bond [Member] | Dec. 31, 2013 NRG Energy [Member] Letter of Credit [Member] Intercompany Credit Agreement [Member] | Dec. 31, 2013 NRG Energy [Member] GenOn Marsh Landing [Member] Letter of Credit [Member] Intercompany Credit Agreement [Member] | Dec. 3... NRG E... [Mem... Gen... Ame... Gener... LL... [Mem... Lett... Cr... [Mem... Interco... Cr... Agre... [Men... |
|---|---|---|---|---|---|---|---|---|---|---|
| **Maximum exposure for guarantees [Abstract]** | | | | | | | | | | |
| 1-3 Years | | | | | | | | | | |
| Under 1 Year | | | | | | | | | | |
| 3-5 Years | | | | | | | | | | |
| Over 5 Years | | | | | | | | | | |
| Guarantee | 98 | 50 | | | | | 6 | | | |
| Maximum borrowing capacity | | | 650 | 100 | 50 | 165 | | | | 500 |
| Amount of letters of credit transferred to intercompany credit agreement | | | | | | | | 349 | 108 | 258 |
| Fair value of guarantees | | $ 2 | | | | | | | | |

**Debt and Capital Leases (Tables)**

**Debt and Capital Leases [Line Items]**

Long-term debt and capital leases

**12 Months Ended**

Dec. 31, 2013          Dec. 31, 2012

Long-term debt and capital leases consisted of the following:

| | As of December 31, | | Interest Rate |
|---|---|---|---|
| | **2013** | **2012** | |
| | (In millions, except rates) | | |
| **GenOn Mid-Atlantic:** | | | |
| Chalk Point capital lease, due 2015 | $ 10 | $ 14 | 8.190 |
| Subtotal GenOn Mid-Atlantic | 10 | 14 | |
| **GenOn Americas Generation:** | | | |
| Senior unsecured notes, due 2021 | 503 | 509 | 8.500 |
| Senior unsecured notes, due 2031 | 435 | 437 | 9.125 |
| Subtotal GenOn Americas Generation (a) | 948 | 960 | |
| **GenOn Energy:** | | | |
| Senior unsecured notes, due 2014 | — | 617 | 7.625 |
| Senior unsecured notes, due 2017 | 782 | 800 | 7.875 |
| Senior unsecured notes, due 2018 | 780 | 801 | 9.500 |
| Senior unsecured notes, due 2020 | 621 | 631 | 9.875 |
| Other | 2 | 3 | |
| Subtotal GenOn Energy | 2,185 | 2,852 | |
| **Marsh Landing:** | | | |
| Senior secured term loan, due 2017 | — | 121 | L+2.50 (b) |
| Senior secured term loan, due 2023 | — | 269 | L+2.75 (b) |
| Subtotal Marsh Landing | — | 390 | |
| Subtotal | 3,133 | 4,202 | |
| Less current maturities | 5 | 32 | |
| Total long-term debt and capital leases | $3,128 | $4,170 | |

(a) This amount includes GenOn Mid-Atlantic.

(b)   L+ equals LIBOR plus x%.

Long-term debt includes the following premiums:

| | As of December 31, | |
|---|---|---|
| | 2013 | 2012 (a) |

**(In millions)**

| | | | |
|---|---|---|---|
| **GenOn Americas Generation:** | | | |
| Senior unsecured notes, due 2021 | $ | 53 | $ 59 |
| Senior unsecured notes, due 2031 | | 35 | 37 |
| **GenOn Energy:** | | | |
| Senior unsecured notes, due 2014 | | — | 42 |
| Senior unsecured notes, due 2017 | | 58 | 75 |
| Senior unsecured notes, due 2018 | | 104 | 126 |
| Senior unsecured notes, due 2020 | | 71 | 81 |
| Total premium | $ | 321 | $ 420 |

(a)   As of December 31, 2012, adjustments to fair value of debt represent adjustments recorded in connection with the NRG Merger.

Schedule of Maturities of Long-term Debt [Table Text Block]

Annual payments based on the maturities of GenOn's debt for the years ending after December 31, 2013 are as follows:

| | **(In millions)** |
|---|---|
| 2017 | 725 |
| 2018 | 675 |
| Thereafter | 1,400 |
| Total | $ 2,800 |

Senior Unsecured Notes 2020 [Member]

**Debt and Capital Leases [Line Items]**

Notes redemption period and redemption prices as percentage of principal amount

GenOn may redeem some or all of the notes at redemption prices expressed as percentages of principal amount as set forth in the following table, plus accrued and unpaid interest on the notes redeemed to the first applicable redemption rate:

| **Redemption Period** | **Redemption Percentage** |
|---|---|
| October 15, 2015 to October 14, 2016 | 104.938% |
| October 15, 2016 to October 14, 2017 | 103.292% |
| October 15, 2017 to October 14, 2018 | 101.646% |
| October 15, 2018 and thereafter | 100.000% |

GenOn Americas Generation, LLC Parent Company [Member]

**Debt and Capital Leases [Line Items]**

Schedule of Maturities of Long-term Debt [Table Text Block]

Debt maturities of GenOn Americas Generation, LLC as of December 31, 2013 are (in millions):

| | |
|---|---|
| 2019 and thereafter | 850 |
| Total | $ 850 |

**GenOn Energy, Inc. Parent Company [Member]**

**Debt and Capital Leases [Line Items]**

Schedule of Maturities of Long-term Debt [Table Text Block]

Debt maturities of GenOn Energy, Inc. as of December 31, 2013 are (in millions):

| | |
|---|---|
| 2017 | 725 |
| 2018 | 675 |
| Thereafter | 550 |
| Total | $1,950 |

**GenOn Americas Generation, LLC [Member]**

**Debt and Capital Leases [Line Items]**

Schedule of Maturities of Long-term Debt [Table Text Block]

Annual payments based on the maturities of GenOn Americas Generation's debt for the years ending after December 31, 2013 are as follows:

| | (In millions) |
|---|---|
| 2019 and thereafter | 850 |
| Total | $ 850 |

| NRG Merger (Details) (USD $) | Dec. 31, 2013 | Dec. 31, 2013 GenOn Mid-Atlantic, LLC [Member] | Dec. 14, 2012 GenOn Mid-Atlantic, LLC [Member] | Dec. 31, 2013 GenOn Americas Generation, LLC [Member] | Dec. 14, 2012 GenOn Americas Generation, LLC [Member] | Dec. 14, 2012 Genon [Member] | Dec. 31, 2013 Genon [Member] | Dec. 31, 2013 Predecessor [Member] | Dec. 201 Predec [Mem |
|---|---|---|---|---|---|---|---|---|---|
| | 12 Months Ended | 12 Months Ended | | 12 Months Ended | 12 Months Ended | 0 Months Ended | 12 Months Ended | | |
| **Business Acquisition [Line Items]** | | | | | | | | | |
| Proceeds from Sale of Property, Plant, and Equipment | | | | | | | | | |
| Business Combination, Consideration Transferred | | | | | | 2,200,000,000 | | | |
| **Merger-related Costs [Abstract]** | | | | | | | | | |
| Number of shares of NRG common stock issued, for each share of GenOn common stock | | | | | | 0.1216 | | | |
| **Provisional allocation of assets and liabilitiies:** | | | | | | | | | |
| Cash and Cash Equivalents, at Carrying Value | | 163,000,000 | | 171,000,000 | | 983,000,000 | | 825,000,000 | 983,00 |
| Derivative assets | | 863,000,000 | | 1,238,000,000 | | 1,157,000,000 | | | |
| Deferred income taxes | | | | | | 220,000,000 | | | |
| Other current and non-current liabilities | | 204,000,000 | | 671,000,000 | | 1,312,000,000 | | | |
| Out of market contracts and leases | | 540,000,000 | | 540,000,000 | | 1,064,000,000 | | | |
| Derivative liabilities | | 162,000,000 | | 529,000,000 | | 399,000,000 | | | |
| Deferred income tax liabilities | | | | | | 220,000,000 | | | |
| Acquisition date fair value of other liabilities, revised | | 231,000,000 | | | | | | | |
| Business Combination, Recognized Identifiable Assets Acquired and Liabilities Assumed, Cash and Equivalents | | 163,000,000 | | 171,000,000 | | 983,000,000 | | | |
| Other Assets | | 700,000,000 | | 1,509,000,000 | | 2,049,000,000 | | | |
| Business Combination, Provisional Information, Initial Acquisition Accounting Adjustment, Other Current and Non-current Assets | | (502,000,000) | | (531,000,000) | | (664,000,000) | | | |
| Acquisition Date Fair Value of Other Assets | | 198,000,000 | | 978,000,000 | | 1,385,000,000 | | | |
| Business Combination, Provisional Information, Initial Accounting Incomplete, Adjustment, Other Current and Noncurrent Assets | | (1,000,000) | | 31,000,000 | | | 28,000,000 | | |
| Acquisition Date Fair Value Of Current and Noncurrent Assets, Revised | | 197,000,000 | | 1,009,000,000 | | 1,413,000,000 | | | |
| Property, Plant and Equipment, net | | 2,399,000,000 | | 2,875,000,000 | | 6,286,000,000 | | 3,830,000,000 | |
| Business Combination, Provisional Information, Initial Acquisition Accounting Adjustment, Property, Plant and Equipment | | (1,178,000,000) | | (1,546,000,000) | | (2,350,000,000) | | | |
| Business Combination, Recognized Identifiable Assets | | | | | | | | | |

| Line Item | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Acquired and Liabilities Assumed, Property, Plant, and Equipment | | | 1,221,000,000 | | 1,329,000,000 | 3,936,000,000 | | |
| Business Combination, Provisional Information, Initial Accounting Incomplete, Adjustment, Property, Plant, and Equipment | | (199,000,000) | | (106,000,000) | | | (115,000,000) | |
| Acquisition Date Fair Value Of Property, Plant and Equipment, Revised | | | 1,022,000,000 | | 1,223,000,000 | 3,821,000,000 | | |
| Derivative Asset | | | 851,000,000 | | 1,226,000,000 | 1,143,000,000 | | |
| Business Combination, Provisional Information, Initial Acquisition Accounting Adjustment, Derivative Assets | | | 12,000,000 | | 12,000,000 | 14,000,000 | | |
| Deferred Tax Assets, Net of Valuation Allowance | | | | | | 220,000,000 | | |
| Total Assets | | | 4,113,000,000 | | 5,781,000,000 | 10,681,000,000 | | 7,419,000,000 |
| Business Combination, Provisional Information, Initial Acquisition Accounting Adjustment, Total Assets | | | (1,668,000,000) | | (2,065,000,000) | (3,000,000,000) | | |
| Business Combination, Recognized Identifiable Assets Acquired and Liabilities Assumed, Assets | | | 2,445,000,000 | | 3,716,000,000 | 7,681,000,000 | | |
| Business Combination, Provisional Information, Initial Accounting Incomplete, Adjustment, Financial Assets | | (200,000,000) | | (75,000,000) | | | (87,000,000) | |
| Acquisition date fair value of total assets, revised | | | 2,245,000,000 | | 3,641,000,000 | 7,594,000,000 | | |
| Other Liabilities | | | 198,000,000 | | 705,000,000 | 1,299,000,000 | | |
| Business Combination, Provisional Information, Initial Acquisition Accounting Adjustment, Other Current and Non-current Liabilities | | | 6,000,000 | | (34,000,000) | 13,000,000 | | |
| Business Combination, Provisional Information, Initial Accounting Incomplete, Adjustment, Other current and non-current liabilities | 27,000,000 | | | 32,000,000 | | | 54,000,000 | |
| Acquisition date fair value of other current and non current liabilities, revised | | | | | 703,000,000 | 1,366,000,000 | | |
| Out of Market Contracts | | | | | | 331,000,000 | | 1,124,000,000 |
| Business Combination, Provisional Information, Initial Acquisition Accounting Adjustment, Out of Market Contracts and Leases | | | 540,000,000 | | 540,000,000 | 733,000,000 | | |
| Business Combination, Provisional Information, Initial Accounting Incomplete, Adjustment, out of market contracts and leases | 64,000,000 | | | 64,000,000 | | | 62,000,000 | |
| Acquisition date fair value of out-of-market contracts and leases, revised | | | 604,000,000 | | 604,000,000 | 1,126,000,000 | | |
| Derivative liabilities | | | 172,000,000 | | 539,000,000 | 414,000,000 | | |
| Business Combination, Provisional Information, Initial Acquisition Accounting Adjustment, Derivative Liabilities | | | (10,000,000) | | (10,000,000) | (15,000,000) | | |
| Deferred Tax Liabilities, Gross | | | | | | 220,000,000 | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Debt and Capital Lease Obligations | | 14,000,000 | | 862,000,000 | 3,725,000,000 | | |
| Business Combination, Provisional Information, Initial Acquisition Accounting Adjustment, Long-term debt and capital leases | | | | 99,000,000 | 478,000,000 | | |
| Business Combination, Recognized Identifiable Assets Acquired and Liabilities Assumed, Noncurrent Liabilities, Long-term Debt | | 14,000,000 | | 961,000,000 | 4,203,000,000 | | |
| Business Combination, Provisional Information, Initial Accounting Incomplete, Adjustment, Long-term Debt and Capital Leases | | | | | | 3,000,000 | |
| Acquisition date fair value of long-term debt and capital leases, revised | | | | | 4,206,000,000 | | |
| Liabilities | | 384,000,000 | | 2,106,000,000 | 5,989,000,000 | | 7,212,000,000 |
| Business Combination, Provisional Information, Initial Acquisition Accounting Adjustment, Total Liabilities | | 536,000,000 | | 595,000,000 | 1,209,000,000 | | |
| Business Combination, Recognized Identifiable Assets Acquired and Liabilities Assumed, Liabilities | | 920,000,000 | | 2,701,000,000 | 7,198,000,000 | | |
| Business Combination, Provisional Information, Initial Accounting Incomplete, Adjustment, Financial Liabilities | 91,000,000 | | 96,000,000 | | | 119,000,000 | |
| Acquisition date fair value of total liabilities, revised | | 1,011,000,000 | | 2,797,000,000 | 7,317,000,000 | | |
| Net assets, carrying value | | 3,729,000,000 | | 3,675,000,000 | 4,692,000,000 | | |
| Business Combination, Provisional Information, Initial Acquisition Accounting Adjustment, Net Assets | | (2,204,000,000) | | (2,660,000,000) | (4,209,000,000) | | |
| Business Combination, Recognized Identifiable Assets Acquired and Liabilities Assumed, Net | | 1,525,000,000 | | 1,015,000,000 | 483,000,000 | | |
| Business Combination, Provisional Information, Initial Accounting Incomplete, Adjustment, Net Assets | (291,000,000) | | (171,000,000) | | | (206,000,000) | |
| Acquisition date fair value of net assets, revised | | $ 1,234,000,000 | | $ 844,000,000 | $ 277,000,000 | | |

[1]   There were no transfers during the year ended December 31, 2012 between Levels 1 and 2.

| Benefit Plans and Other Postretirement Benefits Disclosure (Details 6) (Pension Plans, Defined Benefit [Member]) | 12 Months Ended | | | 12 Months Ended | | | 12 Months Ended | | | 12 Months Ended | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Dec. 31, 2013 | Dec. 31, 2013 Successor [Member] | Dec. 31, 2012 Predecessor [Member] | Dec. 31, 2013 Domestic Stocks [Member] | Dec. 31, 2013 Domestic Stocks [Member] Successor [Member] | Dec. 31, 2012 Domestic Stocks [Member] Predecessor [Member] | Dec. 31, 2013 International Stocks [Member] | Dec. 31, 2013 International Stocks [Member] Successor | Dec. 31, 2012 International Stocks [Member] Predecessor | Dec. 31, 2013 Debt Securities [Member] | De 2 D Sec [Me Suc [Me |
| **Pension plan asset allocations** | | | | | | | | | | | |
| Target plan asset allocations | 100.00% | | | 42.00% | | | 28.00% | | | 30.00% | |
| Actual plan asset allocations | | 100.00% | 100.00% | | 43.00% | 43.00% | | 29.00% | 29.00% | | 28.0 |

| CONSOLIDATED STATEMENTS OF OPERATIONS (USD $) In Millions, unless otherwise specified | 0 Months Ended | | 12 Months Ended | | | 0 Months Ended | 12 Months Ended | | | 0 Months Ended | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Dec. 31, 2012 Successor [Member] | Dec. 14, 2012 Successor [Member] | Dec. 31, 2013 Successor [Member] | Dec. 14, 2012 Predecessor [Member] | Dec. 31, 2011 Predecessor [Member] | Dec. 31, 2012 GenOn Americas Generation, LLC [Member] Successor [Member] | Dec. 31, 2013 GenOn Americas Generation, LLC [Member] Successor [Member] | Dec. 14, 2012 GenOn Americas Generation, LLC [Member] Predecessor [Member] | Dec. 31, 2011 GenOn Americas Generation, LLC [Member] Predecessor [Member] | Dec. 31, 2012 GenOn Mid-Atlantic, LLC [Member] Successor [Member] | D... G... At... Su... [M... |
| **Operating Revenues** | | | | | | | | | | | |
| Operating Revenues | | | | | | | | | | | |
| Total operating revenues | 73 | | 2,604 | 2,564 | 3,614 | 77 | 2,561 | 2,594 | 2,938 | 28 | 879 |
| **Operating Costs and Expenses** | | | | | | | | | | | |
| Cost of operations | | | | | | | | | | | |
| Depreciation and amortization | 10 | | 249 | 339 | 375 | 5 | 95 | 155 | 177 | 4 | 77 |
| Impairment losses | 0 | | 0 | 47 | 133 | 0 | 0 | 0 | 128 | 0 | 0 |
| Selling, general and administrative | | | | | | | | | | | |
| Acquisition-related transaction and integration costs | 53 | 11 | 70 | | 0 | | | | | | |
| Total operating costs and expenses | 137 | | 2,441 | 2,636 | 3,405 | 77 | 2,430 | 2,599 | 2,805 | 27 | 747 |
| Operating Income/(Loss) | (64) | | 163 | (72) | 209 | 0 | 131 | (5) | 133 | 1 | 132 |
| **Other Income/(Expense)** | | | | | | | | | | | |
| Income (Loss) from Equity Method Investments | 0 | | 4 | | 0 | | | | | | |
| Other income/(expense), net | 0 | | 1 [1] | 3 | 4 | 0 | 1 | 0 | (1) | | |
| Interest expense | (8) | | (193) | (330) | (379) | (3) | (73) | (75) | (93) | | |
| Gains (Losses) on Extinguishment of Debt | 0 | | (11) | 0 | (23) | 0 | 0 | 0 | (23) | | |
| Total other income (expense), net | (8) | | (211) | (327) | (398) | (3) | (72) | (75) | (117) | 0 | (4) |
| Income/(Loss) Before Income Taxes | (72) | | (48) | (399) | (189) | (3) | 59 | (80) | 16 | 1 | 128 |
| Income tax expense/(benefit) | 0 | | (6) | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Income/(Loss) | $ (72) | | $ (42) | $ (414) | $ (189) | $ (3) | $ 59 | $ (80) | $ 16 | $ 1 | $ 1 |

[1]

| Income Taxes (Tables) | | 12 Months Ended | |
|---|---|---|---|
| | | Dec. 31, 2013 | Dec. 31, 2012 |

**Income Tax Examination [Line Items]**

Income tax provision (benefit) from continuing operations

*GenOn*

GenOn's income tax (benefit)/provision consisted of the following:

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| Current tax (benefit)/provision: | | | | |
| Federal | $ (6) | $ — | $ 15 | $ (1) |
| State | — | — | — | 1 |
| Total current (benefit)/provision for income taxes | $ (6) | $ — | $ 15 | $ — |

Reconciliation of the U.S. federal statutory rate to GenOn's effective rate from continuing operations

A reconciliation of GenOn's federal statutory income tax provision to the effective income tax (benefit)/provision adjusted for permanent and other items during 2013, 2012 and 2011, is as follows:

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions, except percentages) | | (In millions, except percentages) | |
| Provision for income taxes based on U.S. federal statutory income tax rate | $ 2 | $ (25) | $ (140) | $ (66) |
| State and local income tax provision, net of federal income taxes | — | (1) | (9) | (8) |
| Change in deferred tax asset valuation allowance | (2) | 23 | 166 | 183 |
| Effect of equity-related transactions | — | 1 | (5) | (49) |
| Tax settlements | (6) | — | 6 [(b)] | (25) [(a)] |
| NRG Merger-related costs | — | 2 | — | — |
| Mirant/RRI Merger-related costs | — | — | — | (15) |
| Mirant/RRI Merger-related write-off of NOL and state and local income tax provision, net of federal income taxes | — | — | — | (3) |
| Mirant/RRI Merger-related write-off of NOL and other deferred tax assets | — | — | — | (21) |
| Other, net | — | — | (3) | 4 |
| Income tax (benefit)/provision | $ (6) | $ — | $ 15 | $ — |

(a)

Company's deferred tax assets

The tax effects of temporary differences between the carrying amounts

and liabilities

of assets and liabilities in GenOn's financial statements and their respective tax bases which give rise to deferred tax assets and liabilities are as follows:

| | As of December 31, | |
|---|---|---|
| | 2013 | 2012 |
| | (In millions) | |
| **Deferred Tax Assets:** | | |
| Employee benefits | $    134 | $    149 |
| Pension and other postretirement benefits | 123 | 98 |
| Contingencies and other liabilities | — | — |
| Federal loss carryforwards | 384 | 375 |
| State loss carryforwards | 108 | 77 |
| Property and intangible assets | 1,563 | 1,594 |
| Out-of-market contracts fair value adjustment | 136 | 132 |
| Debt premium, net | 136 | 160 |
| Other | 117 | 41 |
| Subtotal | 2,701 | 2,626 |
| Valuation allowance | (2,672) | (2,324) |
| Net deferred tax assets | 29 | 302 |
| **Deferred Tax Liabilities:** | | |
| Derivative contracts | (29) | (297) |
| Debt discount, net | — | — |
| Other | — | (5) |
| Net deferred tax liabilities | (29) | (302) |
| Net deferred taxes | $    — | $    — |

Reconciliation of total amounts of uncertain tax benefits

GenOn periodically reassesses the tax positions in its tax returns for open years based on the latest information available and determines whether any portion of the tax benefits reflected should be treated as unrecognized. A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows:

| | Successor | | Predecessor |
|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | (In millions) |
| Unrecognized tax benefits, beginning of period | $    6 | $    6 | $    5 |
| Increase based on tax positions related to the prior years | — | — | 3 |
| Decrease due to settlements and payments | (5) | — | (2) |
| Decrease as a result of lapse in the statute of limitations | — | — | — |
| Unrecognized tax benefits, end of period | $    1 | $    6 | $    6 |

GenOn Americas Generation, LLC [Member]

**Income Tax Examination [Line Items]**

Income tax provision (benefit) from continuing operations

GenOn Americas Generation's income tax provision/(benefit) was $0 for 2011 through 2013.

Reconciliation of the U.S. federal statutory rate to GenOn's effective rate from continuing operations

A reconciliation of GenOn Americas Generation's expected federal statutory income tax provision to the effective income tax provision adjusted for permanent and other items during 2013, 2012 and 2011, is as follows:

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions, except percentages) | | (In millions, except percentages) | |
| Provision (benefit) for income taxes based on U.S. federal statutory income tax rate | $    22 | $    (1) | $    (28) | $    5 |

| | | | | | |
|---|---|---|---|---|---|
| State and local income tax provision, net of federal income taxes | 6 | — | | (4) | 5 |
| LLC income not subject to taxation | (28) | 1 | | 32 | (10) |
| Income tax (benefit)/provision | $ — | $ — | | $ — | $ — |

Company's deferred tax assets and liabilities

GenOn Mid-Atlantic, LLC [Member]

**Income Tax Examination [Line Items]**

Income tax provision (benefit) from continuing operations

The following reflects a pro forma disclosure of the income tax provision that would be reported if GenOn Mid-Atlantic was to be allocated income taxes attributable to its operations. Pro forma income tax provision attributable to income before tax would consist of the following:

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| Current provision (benefit): | | | | |
| Federal | $ 45 | $ 1 | $ 10 | $ 3 |
| State | 12 | — | 1 | 1 |
| Deferred provision: | | | | |
| Federal | — | (1) | 3 | 21 |
| State | — | — | — | 5 |
| Total provision for income taxes | $ 57 | $ — | $ 14 | $ 30 |

Reconciliation of the U.S. federal statutory rate to GenOn's effective rate from continuing operations

The following table presents the pro forma reconciliation of GenOn Mid-Atlantic's federal statutory income tax provision for continuing operations adjusted for reorganization items to the pro forma effective tax provision:

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions, except percentages) | | (In millions, except percentages) | |
| Provision (benefit) for income taxes based on U.S. federal statutory income tax rate | $ 45 | $ — | $ 11 | $ 37 |
| State and local income taxes | 12 | — | 1 | 4 |
| Tax settlement | — | — | — | (11) [(a)] |
| Impairment of non-deductible goodwill | — | — | — | — |
| Other, net | — | — | 2 | — |
| Income tax provision | $ 57 | $ — | $ 14 | $ 30 |

Company's deferred tax assets and liabilities

The tax effects of temporary differences between the carrying amounts of assets and liabilities in the consolidated balance sheets and their respective tax bases which give rise to the pro forma deferred tax assets and liabilities would be as follows:

| | As of December 31, | |
|---|---|---|
| | 2013 | 2012 |
| | (In millions) | |

**Deferred Tax Assets:**

| | | | |
|---|---|---|---|
| Reserves | $ | — $ | 19 |
| Loss carryforwards | | — | 1 |
| Property and intangible assets | | 27 | 632 |
| Out-of-market contracts fair value adjustment | | 108 | 212 |
| Other, net | | 6 | 8 |
| Net deferred tax assets | | 141 | 872 |
| **Deferred Tax Liabilities:** | | | |
| Derivative contracts | | — | (274) |
| Net deferred tax liabilities | | | (274) |
| Net deferred taxes | $ | 141 $ | 598 |

Pro Forma [Member] | GenOn
Americas Generation, LLC
[Member]

**Income Tax Examination
[Line Items]**

Income tax provision (benefit)
from continuing operations

*GenOn Americas Generation*

GenOn Americas Generation is not subject to income taxes except for those subsidiaries of GenOn Americas Generation that are separate taxpayers. GenOn Americas, GenOn and NRG are otherwise directly responsible for income taxes related to GenOn Americas Generation's operations.

The pro forma income tax provision that would be reported if GenOn Americas Generation were to be allocated income taxes attributable to its operations was $0 for the year ended December 31, 2013, the period from December 15, 2012 through December 31, 2012, the period from January 1, 2012 through December 14, 2012 and the year ended December 31, 2011.

Reconciliation of the U.S. federal
statutory rate to GenOn's
effective rate from continuing
operations

The following table presents the pro forma reconciliation of GenOn Americas Generation's federal statutory income tax provision for continuing operations adjusted for reorganization items to the pro forma effective tax provision:

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions, except percentages) | | (In millions, except percentages) | |
| Provision (benefit) for income taxes based on U.S. federal statutory income tax rate | 21 | (1) | (28) | 5 |
| State and local income tax provision (benefit), net of federal income taxes | 6 | — | (4) | 5 |
| Change in deferred tax asset valuation allowance | (27) | 2 | 32 | (74) |
| Mirant/RRI Merger-related write-off of NOLs | — | — | — | 83 |
| Tax settlement | — | — | — | (23) [a] |
| Other, net | — | — | — | 4 |
| Income tax provision | — | 1 | — | — |

(a) Settlement of tax disputes increased GenOn Americas Generation's tax basis in depreciable assets that previously had been written off as a result of Mirant's emergence from bankruptcy in 2006.

Company's deferred tax assets
and liabilities

The tax effects of temporary differences between the carrying amounts of assets and liabilities in the consolidated balance sheets and their respective tax bases which give rise to the pro forma deferred tax assets and liabilities would be as follows:

| | As of December 31, | |
|---|---|---|
| | 2013 | 2012 |
| | (In millions) | |
| **Deferred Tax Assets:** | | |
| Pension and other postretirement | | |

| | | |
|---|---:|---:|
| benefits | $ 85 | $ — |
| Reserves | 124 | 23 |
| Loss carryforwards | 34 | 176 |
| Property and intangible assets | 1,602 | 817 |
| Out-of-market contracts fair value adjustment | 55 | 212 |
| Debt premium | 42 | 39 |
| Other, net | 37 | — |
| Subtotal | 1,979 | 1,267 |
| Valuation allowance | (1,936) | (990) |
| Net deferred tax assets | 43 | 277 |
| **Deferred Tax Liabilities:** | | |
| Derivative contract assets and liabilities | (43) | (276) |
| Other, net | — | (1) |
| Net deferred tax liabilities | (43) | (277) |
| Net deferred taxes | $ — | $ — |

| CONSOLIDATED BALANCE SHEETS (Parenthetical) (USD $) In Millions, except Share data, unless otherwise specified | Dec. 31, 2013 | Dec. 31, 2012 |
|---|---|---|
| Successor [Member] | | |
| Accumulated amortization on intangible assets | | |
| Common stock, par value (in dollars per share) | $ 0.001 | |
| Common stock, shares authorized (in shares) | 1 | |
| Common stock, shares issued (in shares) | 1 | |
| Predecessor [Member] | | |
| Accumulated amortization on intangible assets | | 1 |
| Common stock, par value (in dollars per share) | | $ 0.001 |
| Common stock, shares authorized (in shares) | | 1 |
| Common stock, shares issued (in shares) | | 1 |
| GenOn Americas Generation, LLC [Member] \| Successor [Member] | | |
| Accumulated amortization on intangible assets | | |
| GenOn Americas Generation, LLC [Member] \| Predecessor [Member] | | |
| Accumulated amortization on intangible assets | | 1 |
| GenOn Mid-Atlantic, LLC [Member] \| Successor [Member] | | |
| Accumulated amortization on intangible assets | 0 | |
| GenOn Mid-Atlantic, LLC [Member] \| Predecessor [Member] | | |
| Accumulated amortization on intangible assets | | $ 0 |
| GenOn Energy, Inc. Parent Company [Member] \| Successor [Member] | | |
| Common stock, par value (in dollars per share) | $ 0.001 | |
| Common stock, shares authorized (in shares) | 1 | |
| Common stock, shares issued (in shares) | 1 | |
| GenOn Energy, Inc. Parent Company [Member] \| Predecessor [Member] | | |
| Preferred stock, par value (in dollars per share) | $ 0.001 | |
| Preferred stock, shares authorized (in shares) | 125,000,000 | |
| Preferred stock, shares issued (in shares) | 0 | |
| Common stock, par value (in dollars per share) | | $ 0.001 |
| Common stock, shares authorized (in shares) | | 2,000,000,000 |
| Common stock, shares issued (in shares) | | 771,692,734 |

| Accounting for Derivative Instruments and Hedging Activities (Details 2) (USD $) In Millions, unless otherwise specified | | 0 Months Ended | 1 Months Ended | 12 Months Ended | | | 0 Months Ended | 12 Months Ended | 0 Months Ended | 12 Months Ended | 0 Months Ended | 12 Months Ended |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Dec. 31, 2013 GenOn and GenOn Americas Generation [Member] | Dec. 31, 2012 Successor [Member] | Dec. 31, 2012 Successor [Member] | Dec. 31, 2013 Successor [Member] | Dec. 14, 2012 Successor [Member] | Dec. 31, 2012 Successor Revenue Expense From Operations [Member] | Dec. 31, 2013 Successor Revenue Expense From Operations [Member] | Dec. 31, 2012 Successor Cost of operations [Member] | Dec. 31, 2013 Successor Cost of operations [Member] | Dec. 31, 2012 Successor GenOn Americas Generation, LLC [Member] | Dec. 31, 2013 Successor GenOn Americas Generation, LLC [Member] |
| **Derivative [Line Items]** | | | | | | | | | | | |
| Accumulated Other Comprehensive Income (Loss), Cumulative Changes in Net Gain (Loss) from Cash Flow Hedges, Effect Net of Tax | | $ 1 | $ 1 | $ 0 | $ 0 | | | | | | |
| Derivative assets | | 1,116 | 1,116 | 651 | | | | | | | |
| **Unrealized mark-to-market results** | | | | | | | | | | | |
| Reversal of previously recognized unrealized losses/(gains) on settled positions related to economic hedges | | | (4) | (367) | | | | | | (2) | (296) |
| Net unrealized losses on open positions related to economic hedges | | | (5) | 40 | | | | | | (6) | 25 |
| Total unrealized mark-to-market gains/(losses) for economic hedging activities | | | (9) | (327) | | | | | | (8) | (271) |
| Reversal of previously recognized unrealized losses/(gains) on settled positions related to trading activity | | | (4) | (1) | | | | | | (4) | (1) |
| Net unrealized gains/(losses) on open positions related to trading activity | | | 0 | 1 | | | | | | 0 | 1 |
| Total unrealized mark-to-market gains/(losses) for trading activity | | | (4) | 0 | | | | | | (4) | 0 |
| Total unrealized gains/(losses) | | (13) | (13) | (327) | | (20) | (356) | 7 | 29 | (12) | (271) |
| **Impact of derivative instruments to statement of operations** | | | | | | | | | | | |
| Unrealized Gain (Loss) on Derivatives | | (13) | (13) | (327) | | (20) | (356) | 7 | 29 | (12) | (271) |
| **Credit Risk Related Contingent Features** | | | | | | | | | | | |
| Collateral required for contracts with adequate assurance clauses in net liability positions | 33 | | | | | | | | | | |
| Collateral required for contracts with credit rating contingent features in net liability position | 0 | | | | | | | | | | |
| Derivative Net Liability Postiions Collateral Due Not Called For Under Marginal Agreements | $ 4 | | | | | | | | | | |

| NRG Merger (Tables) | Dec. 31, 2013 | Dec. 31, 2013 Genon [Member] | GenOn An |
|---|---|---|---|

**Business Acquisition [Line Items]**

Fair Value, by Balance Sheet Grouping [Table Text Block]

*GenOn*

The estimated carrying values and fair values of GenOn and GenOn Americas Generation's debt are as follows:

*GenOn*

| | As of December 31, | | | |
|---|---|---|---|---|
| | **2013** | | **2012** | |
| | **Carrying Amount** | **Fair Value** | **Carrying Amount** | **Fair Value** |
| | **(In millions)** | | | |
| **Liabilities** | | | | |
| Long and short-term debt | $ 3,120 | $3,058 | $ 4,185 | $4,209 |

The fair value of long and short-term debt that is estimated using reported market prices for instruments that are publicly traded is classified as Level 2 within the fair value hierarchy. The fair value of non-publicly traded debt is based on the income approach valuation technique using current interest rates for similar instruments with equivalent credit quality and is classified as Level 3 within the fair value hierarchy.

*GenOn*

| | Historical carrying amount | Acquisition accounting adjustment | Acquisition-date fair value as reported in 2012 10-K | Measurement period adjustments | Revised acquisition-date fair value |
|---|---|---|---|---|---|
| | **(In millions)** | | | | |
| **Assets** | | | | | |
| Cash | $ 983 | $ — | $ 983 | $ — | $ 983 |
| Other current and non-current assets | 2,049 | (664) | 1,385 | 28 | 1,413 |
| Property, plant and equipment | 6,286 | (2,350) | 3,936 | (115) | 3,821 |
| Derivative assets | 1,143 | 14 | 1,157 | — | 1,157 |
| Deferred income taxes | 220 | — | 220 | — | 220 |
| Total assets | $ 10,681 | $ (3,000) | $ 7,681 | $ (87) | $ 7,594 |
| **Liabilities** | | | | | |
| Other current and non-current liabilities | $ 1,299 | $ 13 | $ 1,312 | $ 54 | $ 1,366 |
| Out-of-market contracts and leases | 331 | 733 | 1,064 | 62 | 1,126 |
| Derivative liabilities | 414 | (15) | 399 | — | 399 |
| Deferred income taxes | 220 | — | 220 | — | 220 |
| Long-term debt and capital leases | 3,725 | 478 | 4,203 | 3 | 4,206 |
| Total liabilities | $ 5,989 | $ 1,209 | $ 7,198 | $ 119 | $ 7,317 |
| Net assets | $ 4,692 | $ (4,209) | $ 483 | $ (206) | $ 277 |

*GenOn Americas*

| | | Carry Amo |
|---|---|---|
| **Liabilities** | | |
| Long and short-term debt | $ | |

The fair val estimated using instruments tha classified as Leve

| Asset Retirement Obligations (Details) (USD $) In Millions, unless otherwise specified | Dec. 31, 2013 Successor [Member] | Dec. 31, 2012 Successor [Member] | Dec. 31, 2013 GenOn Americas Generation, LLC [Member] Successor [Member] | 12 Months Ended Dec. 31, 2013 GenOn Mid-Atlantic, LLC [Member] Successor [Member] | Dec. 31, 2013 Genon [Member] | Dec. 31, 2013 GenOn Americas Generation [Member] |
|---|---|---|---|---|---|---|
| **Asset Retirement Obligations [Line Items]** | | | | | | |
| Asset Retirement Obligation, Liabilities Incurred | | | | $ 0 | $ 2 | $ 0 |
| **Asset Retirement Obligation, Roll Forward Analysis [Roll Forward]** | | | | | | |
| Balance at the beginning of the period | 179 | 172 | 73 | 25 | | |
| Balance at the end of the period | 179 | 172 | 76 | 27 | | |
| Asset Retirement Obligation, Liabilities Settled | | | | 0 | (5) | (1) |
| Accretion Expense | | | $ 4 | $ 2 | $ 10 | |

**Segment Reporting**

**12 Months Ended**

**Dec. 31, 2013**

**Segment Reporting [Abstract]**

Segment Reporting

**Segment Reporting (GenOn and GenOn Americas Generation)**

GenOn previously had the following segments: Eastern PJM, Western PJM/MISO, California, Energy Marketing and Other Operations. GenOn Americas Generation previously had the following segments: Eastern PJM, Northeast, California, Energy Marketing and Other Operations. In the fourth quarter of 2012, in conjunction with the NRG Merger, GenOn and GenOn Americas Generation began reporting the following segments: East, South Central, West and Corporate. All GenOn Mid-Atlantic entities are included within the GenOn East segment. There are distinct components with separate operating results and management structures for each segment, which are based on the geographical location of the power generation operations. GenOn and GenOn Americas Generation have recast the data from prior periods to reflect this change in reportable segments to conform to the current year presentation.

*GenOn*

| Successor | Year Ended December 31, 2013 | | | | |
|---|---|---|---|---|---|
| | East | South Central | West | Corporate | Total |
| | (In millions) | | | | |
| **Operating revenues** | $ 2,291 | $ 7 | $ 249 | $ 9 | $ 2,556 |
| Operating revenues - affiliate | (4) | 38 | 12 | 2 | 48 |
| Operating expenses [(a)] | 1,590 | 34 | 130 | 234 | 1,988 |
| Operating expenses - affiliate | 299 | 34 | 50 | (179) | 204 |
| Depreciation and amortization | 195 | 6 | 39 | 9 | 249 |
| Operating loss | 203 | (29) | 42 | (53) | 163 |
| Other income/(loss), net | 26 | — | — | (25) | 1 |
| Equity in earnings of unconsolidated affiliates/(loss) | — | 4 | — | — | 4 |
| Loss on debt extinguishment | — | — | — | (11) | (11) |
| Interest expense | (67) | — | (5) | (121) | (193) |
| Interest expense -affiliate | — | — | — | (12) | (12) |
| Income/(loss) before income taxes | 162 | (25) | 37 | (222) | (48) |
| Income tax benefit | — | — | — | (6) | (6) |
| **Net income/(loss)** | $ 162 | $ (25) | $ 37 | $ (216) | $ (42) |
| **Balance sheet** | | | | | |
| Equity investment in affiliate | $ — | $ 17 | $ — | $ — | $ 17 |
| Capital expenditures [(b)] | $ 157 | $ 3 | $ 81 | $ 39 | $ 280 |
| **Total assets** | $ 4,255 | $ 179 | $ 329 | $ 971 | $ 5,734 |

(a) Corporate operating expenses include $70 million in acquisition-related costs.
(b) Includes accruals

| Successor | December 15, 2012 through December 31, 2012 | | | | |
|---|---|---|---|---|---|
| | East | South Central | West | Corporate | Total |
| | (In millions) | | | | |
| **Operating revenues** | $ 66 | $ — | $ 7 | $ — | $ 73 |
| Operating expenses | 67 | 1 | 6 | 53 | 127 |
| Depreciation and amortization | 8 | — | 2 | — | 10 |
| Operating loss | (9) | (1) | (1) | (53) | (64) |
| Interest expense | — | — | — | (8) | (8) |
| Loss before income taxes | (9) | (1) | (1) | (61) | (72) |
| Income tax expense/(benefit) | — | — | — | — | — |
| **Net loss** | $ (9) | $ (1) | $ (1) | $ (61) | $ (72) |
| **Balance sheet** | | | | | |
| Equity investment in affiliate | $ — | $ 19 | $ — | $ — | $ 19 |

|  | East | South Central | West | Corporate | Total |
|---|---|---|---|---|---|
| Capital expenditures | $ 1 | $ 8 | $ 21 | $ | $ 47 |
| **Total assets** | $ 5,873 | $ 250 | $ 1,063 | $ 233 | $ 7,419 |

(a) Includes accruals.

**Predecessor** — January 1, 2012 through December 14, 2012

|  | East | South Central | West | Corporate | Total |
|---|---|---|---|---|---|
|  | | | (In millions) | | |
| **Operating revenues** | $ 2,153 | $ 29 | $ 379 | $ 3 | $ 2,564 |
| Operating expenses | 1,994 | 16 | 226 | 14 | 2,250 |
| Depreciation and amortization | 267 | 9 | 43 | 20 | 339 |
| Impairment losses | 47 | — | — | — | 47 |
| Operating income/(loss) | (155) | 4 | 110 | (31) | (72) |
| Other income, net | — | 2 | — | 1 | 3 |
| Interest expense | (1) | — | — | (329) | (330) |
| Income/(loss) before income taxes | (156) | 6 | 110 | (359) | (399) |
| Income tax expense | — | — | — | 15 | 15 |
| **Net income/(loss)** | $ (156) | $ 6 | $ 110 | $ (374) | $ (414) |
| Capital expenditures[a] | $ 251 | $ 8 | $ 284 | $ 10 | $ 553 |

(a) Includes accruals.

**Predecessor** — Year Ended December 31, 2011

|  | East | South Central | West | Corporate | Total |
|---|---|---|---|---|---|
|  | | | (In millions) | | |
| **Operating revenues** | $ 3,125 | $ 37 | $ 449 | $ 3 | $ 3,614 |
| Operating expenses | 2,428 | 36 | 371 | 62 | 2,897 |
| Depreciation and amortization | 291 | 7 | 44 | 33 | 375 |
| Impairment losses | 119 | — | 14 | — | 133 |
| Operating income/(loss) | 287 | (6) | 20 | (92) | 209 |
| Other income/(loss), net | — | 6 | — | (2) | 4 |
| Interest (expense)/income | (12) | — | 4 | (371) | (379) |
| Loss on debt extinguishment and refinancing expense | — | — | — | (23) | (23) |
| Income/(loss) before income taxes | 275 | — | 24 | (488) | (189) |
| Income tax expense/(benefit) | — | — | — | — | — |
| **Net income/(loss)** | $ 275 | $ — | $ 24 | $ (488) | $ (189) |

*GenOn Americas Generation*

**Successor** — Year Ended December 31, 2013

|  | East | South Central | West | Corporate | Total |
|---|---|---|---|---|---|
|  | | | (In millions) | | |
| **Operating revenues** | $ 2,258 | $ — | $ 170 | $ — | $ 2,428 |
| Operating revenues—affiliate | 87 | 41 | 5 | — | 133 |
| Operating expenses | 870 | — | 35 | — | 905 |
| Operating expenses—affiliate | 1,272 | 41 | 117 | — | 1,430 |
| Depreciation and amortization | 86 | — | 9 | — | 95 |
| Operating income/(loss) | 117 | — | 14 | — | 131 |
| Other income/(loss), net | — | — | — | 1 | 1 |
| Equity in earnings of unconsolidated affiliates | 0 | 0 | 0 | 0 | 0 |
| Interest expense | (5) | — | — | (68) | (73) |
| Income/(loss) before income taxes | 112 | — | 14 | (67) | 59 |
| Income tax expense/(benefit) | — | — | — | — | — |
| **Net income/(loss)** | $ 112 | $ — | $ 14 | $ (67) | $ 59 |
| **Balance sheet** | | | | | |
| Capital expenditures[a] | $ 66 | $ — | $ — | $ — | $ 66 |

| Total assets | $ | 2,484 | $ | 17 | $ | 962 | $ | 300 | $ | 2,963 |
|---|---|---|---|---|---|---|---|---|---|---|

(a)  Includes accruals.

**Successor**

| | | December 15, 2012 through December 31, 2012 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | East | South Central | West | Corporate | Elimination | Total |
| | | (In millions) | | | | |
| **Operating revenues** | $ 70 | $ — | $ 4 | $ — | $ — | $ 74 |
| Operating revenues—affiliate | 3 | — | — | — | — | 3 |
| Operating expenses | 29 | — | — | — | — | 29 |
| Operating expenses—affiliate | 42 | — | 1 | — | — | 43 |
| Depreciation and amortization | 4 | — | 1 | — | — | 5 |
| Operating income/(loss) | (2) | — | 2 | — | — | — |
| Other income/(loss), net | — | — | — | — | — | — |
| Interest expense | — | — | — | (3) | — | (3) |
| Income/(loss) before income taxes | (2) | — | 2 | (3) | — | (3) |
| Income tax expense/(benefit) | — | — | — | — | — | — |
| **Net income/(loss)** | $ (2) | $ — | $ 2 | $ (3) | $ — | $ (3) |
| **Balance sheet** | | | | | | |
| Capital expenditures[a] | $ 6 | $ — | $ — | $ — | $ — | $ 6 |
| **Total assets** | $ 2,451 | $ — | $ 172 | $ 1,126 | $ (363) | $ 3,386 |

(a)  Includes accruals.

**Predecessor**

| | | January 1, 2012 through December 14, 2012 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | East | South Central | West | Corporate | Elimination | Total |
| | | (In millions) | | | | |
| **Operating revenues** | $ 2,060 | $ 24 | $ 321 | $ — | $ — | $ 2,405 |
| Operating revenues—affiliate | 137 | 22 | 30 | — | — | 189 |
| Operating expenses | 950 | — | 123 | 2 | — | 1,075 |
| Operating expenses—affiliate | 1,143 | 30 | 195 | 1 | — | 1,369 |
| Depreciation and amortization | 136 | — | 14 | 5 | — | 155 |
| Impairment losses | — | — | — | — | — | — |
| Operating income/(loss) | (32) | 16 | 19 | (8) | — | (5) |
| Other income/(loss), net | — | — | — | — | — | — |
| Interest expense | (5) | — | — | (70) | — | (75) |
| Income/(loss) before income taxes | (37) | 16 | 19 | (78) | — | (80) |
| Income tax expense/(benefit) | — | — | — | — | — | — |
| **Net income/(loss)** | $ (37) | $ 16 | $ 19 | $ (78) | $ — | $ (80) |
| Capital expenditures[a] | $ 190 | $ — | $ — | $ — | $ — | $ 190 |

(a)  Includes accruals.

**Predecessor**

| | | Year Ended December 31, 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | East | South Central | West | Corporate | Elimination | Total |
| | | (In millions) | | | | |
| **Operating revenues** | $ 2,793 | $ 22 | $ 200 | $ — | $ — | $ 3,015 |
| Operating revenues—affiliate | (87) | — | 10 | — | — | (77) |
| Operating expenses | 1,005 | — | 36 | 9 | — | 1,050 |
| Operating expenses—affiliate | 1,306 | 22 | 129 | (7) | — | 1,450 |
| Depreciation and amortization | 155 | — | 15 | 7 | — | 177 |
| Impairment losses | 114 | — | 14 | — | — | 128 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Operating income/(loss) | | 126 | | — | | 16 | | (9) | | — | 133 |
| Other loss, net | | — | | — | | (1) | | — | | — | (1) |
| Interest expense | | (5) | | — | | (1) | | (87) | | — | (93) |
| Loss on debt extinguishment and refinancing expense | | — | | — | | — | | (23) | | — | (23) |
| Income/(loss) before income taxes | | 121 | | — | | 14 | | (119) | | — | 16 |
| Income tax expense/ (benefit) | | — | | — | | — | | — | | — | — |
| **Net income/(loss)** | $ | 121 | $ | — | $ | 14 | $ | (119) | $ | — | $ 16 |

**Fair Value of Financial Instruments (Tables)**

**12 Months Ended**

**Dec. 31, 2013**

**Fair Value, Balance Sheet Grouping, Financial Statement Captions [Line Items]**

Fair Value, by Balance Sheet Grouping [Table Text Block]

The estimated carrying values and fair values of GenOn and GenOn Americas Generation's debt are as follows:

*GenOn*

| | As of December 31, | | | |
|---|---|---|---|---|
| | 2013 | | 2012 | |
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| | (In millions) | | | |
| **Liabilities** | | | | |
| Long and short-term debt | $ 3,120 | $ 3,058 | $ 4,185 | $ 4,209 |

The fair value of long and short-term debt that is estimated using reported market prices for instruments that are publicly traded is classified as Level 2 within the fair value hierarchy. The fair value of non-publicly traded debt is based on the income approach valuation technique using current interest rates for similar instruments with equivalent credit quality and is classified as Level 3 within the fair value hierarchy.

*GenOn*

Assets and liabilities measured and recorded at fair value on the consolidated balance sheet on a recurring basis

The following tables present assets and liabilities measured and recorded at fair value on GenOn's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

| | As of December 31, 2013 | | | |
|---|---|---|---|---|
| | Fair Value | | | |
| | Level 1 [(a)] | Level 2 [(a)] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 141 | $ 507 | $ 3 | $ 651 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 25 | $ 149 | $ 7 | $ 181 |
| Other assets [(b)] | $ 37 | $ — | $ — | $ 37 |

(a) There were no transfers during the year ended December 31, 2013 between Levels 1 and 2.

(b) Relates to mutual funds held in a rabbi trust for non-qualified deferred compensation plans for some key and highly compensated employees.

| | As of December 31, 2012 | | | |
|---|---|---|---|---|
| | Fair Value | | | |
| | Level 1 [(a)] | Level 2 [(a)] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 139 | $ 946 | $ 31 | $ 1,116 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 52 | $ 253 | $ 14 | $ 319 |
| Interest rate contracts | — | 50 | — | 50 |
| Total liabilities | $ 52 | $ 303 | $ 14 | $ 369 |
| Other assets [(b)] | $ 21 | $ — | $ — | $ 21 |

(a) There were no transfers during the year ended December 31, 2012 between Levels 1 and 2.

(b) Relates to mutual funds held in a rabbi trust for non-qualified deferred compensation plans for some key and highly compensated employees.

**Derivatives and Fair Value [Text Block]**

The following tables reconcile the beginning and ending balances for derivatives that are recognized at fair value in GenOn's consolidated financial statements at least annually using significant unobservable inputs for the year ended December 31, 2013 and for the periods from December 15, 2012 through December 31, 2012 and from January 1, 2012 through December 14, 2012:

| | Successor | | Predecessor |
|---|---|---|---|
| | **For the year ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** |
| | **Fair Value Measurement Using Significant Unobservable Inputs (Level 3)** | | **Fair Value Measurement Using Significant Unobservable Inputs (Level 3)** |
| | **Derivatives** [(a)] | | **Derivatives** [(a)] |
| | **(In millions)** | | **(In millions)** |
| Balance as of beginning of period [(b)] | $ 17 | $ 18 | $ (31) |
| Total gains and losses (realized/unrealized) included in earnings [(c)] | (17) | (3) | (37) |
| Purchases | (3) | 2 | — |
| Transfers out of Level 3 [(d)] | (1) | — | — |
| Balance as of end of period | $ (4) | $ 17 | $ (68) |
| The amount of the total gains/(losses) for the period included in earnings attributable to the change in unrealized derivatives relating to assets still held at end of period | $ — | $ 4 | $ (80) |

(a)   Consists of derivatives assets and liabilities, net.

(b)   The change in Level 3 balance is primarily driven by the change in accounting policy at the NRG Merger date to include all curves with broker-quoted coal contracts within the Level 2 designation.

(c)   Contracts entered into are reported with total gains and losses included in earnings in the predecessor periods.

(d) Transfers out of Level 3 are related to the availability of external broker quotes and are valued as of the end of the reporting period.

**Schedule of credit risk**

The following tables highlight the counterparty credit quality and the net counterparty credit exposure by industry sector. Net counterparty credit exposure is defined as the aggregate net asset position for the Registrants with counterparties where netting is permitted under the enabling agreement and includes all cash flow, mark-to-market and NPNS, and non-derivative transactions. As of December 31, 2013, the exposure is shown net of collateral held and includes amounts net of receivables or payables.

*GenOn*

| Category | Net Exposure [(a)] (% of Total) |
|---|---|
| Financial institutions | 68% |
| Utilities, energy merchants, marketers and other | 12% |
| ISOs | 20% |
| Total | 100% |

| Category | Net Exposure [(a)] (% of Total) |
|---|---|
| Investment grade | 98% |
| Non-rated | 2% |
| Total | 100% |

(a)   Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

Schedule of credit reserve for derivative contract assets [Table Text Block]

The Registrants' credit reserves were as follows:

|  | As of December 31, | |
|  | 2013 | 2012 |
|  | (In millions) | (In millions) |
| GenOn | $ 1 | $ 4 |
| GenOn Americas Generation | 1 | 4 |
| GenOn Mid-Atlantic | 3 | 4 |

**GenOn Americas Generation, LLC [Member]**

**Fair Value, Balance Sheet Grouping, Financial Statement Captions [Line Items]**

Fair Value, by Balance Sheet Grouping [Table Text Block]

*GenOn Americas Generation*

|  | As of December 31, | | | |
|  | 2013 | | 2012 | |
|  | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
|  | (In millions) | | | |
| **Liabilities** | | | | |
| Long and short-term debt | $ 938 | $ 883 | $ 946 | $ 967 |

The fair value of long and short-term debt is estimated using reported market prices for instruments that are publicly traded and is classified as Level 2 within the fair value hierarchy.

Assets and liabilities measured and recorded at fair value on the consolidated balance sheet on a recurring basis

The following tables present assets and liabilities (including amounts with affiliates) measured and recorded at fair value on GenOn Americas Generation's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

|  | As of December 31, 2013 | | | |
|  | Fair Value | | | |
|  | Level 1 [a] | Level 2 [a] | Level 3 | Total |
|  | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 153 | $ 575 | $ 7 | $ 735 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 74 | $ 226 | $ 8 | $ 308 |

(a) There were no transfers during the year ended December 31, 2013 between Levels 1 and 2.

|  | As of December 31, 2012 | | | |
|  | Fair Value | | | |
|  | Level 1 [a] | Level 2 [a] | Level 3 | Total |
|  | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 170 | $ 991 | $ 31 | $ 1,192 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 123 | $ 358 | $ 14 | $ 495 |

(a) There were no transfers during the year ended December 31, 2012 between Levels 1 and 2.

Reconciliation of beginning and ending balances for financial instruments that are recognized at fair value in the consolidated financial statements at least annually using significant unobservable inputs

The following tables reconcile the beginning and ending balances for GenOn Americas Generation's derivatives that are recognized at fair value in the consolidated financial statements at least annually using significant unobservable inputs for the year ended December 31, 2013 and for the periods from December 15, 2012 through December 31, 2012 and from January 1, 2012 through December 14, 2012:

|  | Successor | Predecessor |
|  | December 15, | |

| | For the year ended December 31, 2013 | July 1, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
|---|---|---|---|
| | **Fair Value Measurement Using Significant Unobservable Inputs (Level 3)** | | **Fair Value Measurement Using Significant Unobservable Inputs (Level 3)** |
| | **Derivatives [a]** | | **Derivatives [a]** |
| | **(In millions)** | | **(In millions)** |
| Balance as of beginning of period [b] | $ 17 | $ 18 | $ (32) |
| Total gains and losses (realized/unrealized) included in earnings [c] | (17) | (3) | (33) |
| Purchases | — | 2 | — |
| Transfers out of Level 3 [d] | (1) | — | — |
| Balance as of end of period | $ (1) | $ 17 | $ (65) |
| The amount of the total gains/(losses) for the period included in earnings attributable to the change in unrealized derivatives relating to assets still held at end of period | $ — | $ 4 | $ (70) |

(a)   Consists of derivatives assets and liabilities, net.

(b)   The change in Level 3 balance is primarily driven by the change in accounting policy at the NRG Merger date to include all curves with broker-quoted coal contracts within the Level 2 designation.

(c)   Contracts entered into are reported with total gains and losses included in earnings in the predecessor periods.

(d) Transfers out of Level 3 are related to the availability of external broker quotes and are valued as of the end of the reporting period.

Schedule of credit risk

*GenOn Americas Generation*

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Financial institutions | 69% |
| Utilities, energy merchants, marketers and other | 11% |
| ISOs | 20% |
| Total | 100% |

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Investment grade | 98% |
| Non-rated | 2% |
| Total | 100% |

(a)   Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices

## GenOn Mid-Atlantic, LLC [Member]

### Fair Value, Balance Sheet Grouping, Financial Statement Captions [Line Items]

Assets and liabilities measured and recorded at fair value on the consolidated balance sheet on a recurring basis

The following tables present assets and liabilities (including amounts with affiliates) measured and recorded at fair value on GenOn Mid-Atlantic's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

| | As of December 31, 2013 | | | |
|---|---|---|---|---|
| | Fair Value | | | |
| | Level 1 [a] | Level 2 [a] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |

| | | | | |
|---|---|---|---|---|
| Commodity contracts | $ 87 | $ 420 | $ — | $ 507 |
| **Derivative liabilities:** | | | | |
| Commodity contracts | $ 13 | $ 60 | $ — | $ 73 |

(a) There were no transfers during the year ended December 31, 2013 between Levels 1 and 2.

|  | As of December 31, 2012 | | | |
|---|---|---|---|---|
|  | Fair Value | | | |
|  | Level 1 [(a)] | Level 2 [(a)] | Level 3 | Total |
|  | (In millions) | | | |
| **Derivative assets:** | | | | |
| Commodity contracts | $ 63 | $ 778 | $ 8 | $ 849 |
| **Derivative liabilities:** | | | | |
| Commodity contracts | $ 16 | $ 138 | $ 1 | $ 155 |

(a) There were no transfers during the year ended December 31, 2012 between Levels 1 and 2.

**Schedule of credit risk**

.

*GenOn Mid-Atlantic*

| Category | Net Exposure [(a)] (% of Total) |
|---|---|
| Financial institutions | 100% |

| Category | Net Exposure [(a)] (% of Total) |
|---|---|
| Investment grade | 100% |

(a) Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices

**Schedule of Derivative Instruments in Statement of Financial Position, Fair Value [Table Text Block]**

The following tables reconcile the beginning and ending balances for GenOn Mid-Atlantic's derivatives that are recognized at fair value in the consolidated financial statements at least annually using significant unobservable inputs for the year ended December 31, 2013 and for the periods from December 15, 2012 through December 31, 2012 and from January 1, 2012 through December 14, 2012:

|  | Successor | | Predecessor |
|---|---|---|---|
|  | For the year ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
|  | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) | | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) |
|  | Derivatives [(a)] | | Derivatives [(a)] |
|  | (In millions) | | (In millions) |
| Balance as of beginning of period [(b)] | $ 7 | $ 8 | $ (64) |
| Total gains and losses (realized/unrealized) included in earnings [(c)] | (7) | (1) | 3 |
| Balance as of end of period | $ — | $ 7 | $ (61) |
| The amount of the total gains/(losses) for the period included in earnings attributable to the change in unrealized derivatives relating to assets still held at end of period | $ — | $ 1 | $ (36) |

(a) Consists of derivatives assets and liabilities, net.

(b) The change in Level 3 balance is primarily driven by the change in accounting policy at the NRG Merger date to include all curves with broker-quoted coal contracts within the Level 2 designation.

(c) Contracts entered into are reported with total gains and losses included in earnings in the predecessor

periods.

**Stock-Based Compensation**

**12 Months Ended**

**Dec. 31, 2013**

**Share-based Compensation Arrangement by Share-based Payment Award [Line Items]**

Summary of significant assumptions used in the fair value model with respect to the Company's NQSOs

Significant assumptions used in the fair value model with respect to the GenOn's non-qualified stock options are summarized below:

| | January 1, 2012 through December 14, 2012 | | 2011 | |
| | Range | Weighted Average | Range | Weighted Average |
|---|---|---|---|---|
| Expected volatility[a] | 50.5% | 50.5% | 45-55% | 47.2% |
| Expected term (in years)[b] | 5 | 5 | 5 | 5 |
| Risk-free rate[c] | 0.89% | 0.89% | 1.0-1.2% | 2.1% |

(a) GenOn estimated volatility based on historical and implied volatility (as applicable) of its common stock.

(b) The expected term is based on a binomial lattice model.

(c) The risk-free rate for periods within the contractual term of the stock option is based on the U.S. Treasury yield curve in effect at the time of the grant.

Schedule of Share-based Compensation, Stock Options, Activity [Table Text Block]

**Stock-Based Compensation (GenOn)**

*Impact of NRG Merger*

Effective December 14, 2012, in connection with the consummation of the NRG Merger, the name of the GenOn Energy, Inc. 2010 Omnibus Incentive Plan was changed to NRG 2010 Stock Plan for GenOn Employees, or NRG GenOn LTIP. Pursuant to the NRG Merger Agreement, upon completion of the NRG Merger, the following occurred to GenOn's stock-based incentive awards:

    i.    each outstanding GenOn stock option that was granted under the NRG GenOn LTIP, the GenOn Energy, Inc. 2002 Long-Term Incentive Plan, the GenOn Energy, Inc. 2002 Stock Plan and the Mirant Corporation 2005 Omnibus Incentive Compensation Plan, collectively, the GenOn Plans, before 2012 vested in full (to the extent not already vested) and was converted into an option to purchase NRG common stock (with the number of shares and per share exercise price appropriately adjusted based on the NRG Merger Exchange Ratio), on the terms and conditions otherwise applicable to those options prior to the NRG Merger;

    ii.    each outstanding GenOn stock option that was granted under the GenOn Plans during 2012 was converted into an option to purchase NRG common stock (with the number of shares and per share exercise price appropriately adjusted based on the NRG Merger Exchange Ratio), on the terms and conditions (including vesting schedules and conditions) otherwise applicable to those options prior to the NRG Merger;

    iii.    each outstanding restricted stock unit that was granted under the GenOn Plans before 2012 has vested in full (to the extent not already vested) and was exchanged for shares of NRG common stock in the NRG Merger based on the NRG Merger Exchange Ratio; and

    iv.    each outstanding restricted stock unit that was granted under the GenOn Plans in 2012, to the extent it remained unvested immediately prior to the NRG Merger, was converted into unvested restricted stock units of NRG (with the number of shares subject to such restricted stock unit appropriately adjusted based on the NRG Merger Exchange Ratio), on the terms and conditions otherwise applicable to those restricted stock units.

As of December 31, 2012, all unvested stock options that were converted to options to purchase NRG common stock and restricted stock units that were converted to NRG restricted stock units were recorded in NRG's consolidated balance sheet.

The following disclosures relate to the predecessor periods and the conversion of GenOn stock options and restricted stock units only. All information regarding weighted average exercise price of stock options, weighted average grant date fair value of stock options granted and weighted average grant date fair value for restricted stock units is based on historical GenOn stock prices and includes no adjustments for the NRG Merger Exchange Ratio.

*Non-Qualified Stock Options*

GenOn granted service condition stock option awards to certain employees. Historically, stock

options vested 33.3% per year for the three years and had a term of five years to ten years. GenOn recognized the related compensation expense on a straight-line basis over the requisite service period.

The weighted average grant date fair value per option granted was $1.07 and $1.68 for the period from January 1, 2012 to December 14, 2012 and the year ended December 31, 2011, respectively. The was no cash received from the exercise of options for the period of January 1, 2012 to December 14, 2012 and there was $3 million of cash received from the exercise of options for the year ended December 31, 2011. There was no intrinsic value of options exercised and no tax benefits realized, as a result of net operating loss carryforwards, for the period of January 1, 2012 to December 14, 2012 and the year ended December 31, 2011, respectively.

The fair value of GenOn's non-qualified stock options was estimated on the date of grant using the Black-Scholes option-pricing model. Significant assumptions used in the fair value model with respect to the GenOn's non-qualified stock options are summarized below:

| | January 1, 2012 through December 14, 2012 | | 2011 | |
|---|---|---|---|---|
| | Range | Weighted Average | Range | Weighted Average |
| Expected volatility[a] | 50.5% | 50.5% | 45-55% | 47.2% |
| Expected term (in years)[b] | 5 | 5 | 5 | 5 |
| Risk-free rate[c] | 0.89% | 0.89% | 1.0-1.2% | 2.1% |

(a)   GenOn estimated volatility based on historical and implied volatility (as applicable) of its common stock.

(b)   The expected term is based on a binomial lattice model.

(c)   The risk-free rate for periods within the contractual term of the stock option is based on the U.S. Treasury yield curve in effect at the time of the grant.

### Time-based Restricted Stock Units and Performance-based Restricted Stock Units

*Time-based Awards.* GenOn granted time-based restricted stock units to certain employees. These restricted stock units generally vested in three equal installments on each of the first, second and third anniversaries of the grant date. GenOn recognized the related compensation expense on a straight-line basis over the requisite service period. In addition, GenOn granted time-based restricted stock units to non-management members of the Board of Directors. These awards vested on the grant date and delivery of the underlying shares was deferred until the directorship terminated. During the period from January 1, 2012 to December 14, 2012, GenOn granted 3.2 million time-based restricted stock units.

*Performance-based Awards.* During the period from January 1, 2012 to December 14, 2012, GenOn granted 2.6 million performance-based restricted stock units to certain employees. These restricted stock units were linked to the 2012 short-term incentive plan performance goals, with performance measured in December 2012 to determine a multiplier between 0% and 200% of the targeted grant. These restricted stock units generally vested in three equal installments over a three-year period. GenOn recognized the related compensation expense on a straight-line basis over the requisite service period. In December 2012, the performance multiplier was determined to be 183% for the performance-based awards granted in 2012 and one-third of the restricted stock units vested at that time with the remaining unvested restricted stock units to vest in December 2013 and December 2014.

*General.* The grant date fair value of time-based and performance-based restricted stock units was equal to GenOn's closing stock price on the grant date.

The weighted average grant date fair value per restricted stock unit granted was $2.43 and $3.81 for the period from January 1, 2012 to December 14, 2012 and the year ended December 31, 2011, respectively. The fair value of vested restricted stock units was $8 million for the period from January 1, 2012 to December 14, 2012 and $0 for the year ended December 31, 2011.

### Compensation Expense

GenOn recognized compensation expense in selling, general and administrative expense in the consolidated statements of operations related to stock-based compensation. Stock-based compensation expense was $19 million and $14 million for the period from January 1, 2012 to December 14, 2012 and the year ended December 31, 2011, respectively.

| **Benefit Plans and Other Postretirement Benefits Disclosure (Details 2) (USD $) In Millions, unless otherwise specified** | **Dec. 31, 2013** | **Dec. 31, 2012** |
|---|---|---|
| Pension Plans, Defined Benefit [Member] \| Tax Qualified Pension Benefits [Member] | | |
| **Defined Benefit Plan, Amounts Recognized in Balance Sheet [Abstract]** | | |
| Accumulated benefit obligation in excess of plan assets | $ 517 | $ 543 |
| Successor [Member] \| Pension Plans, Defined Benefit [Member] \| Tax Qualified Pension Benefits [Member] | | |
| **Defined Benefit Plan, Amounts Recognized in Balance Sheet [Abstract]** | | |
| Current liabilities | 0 | |
| Non-current liabilities | (77) | |
| Successor [Member] \| Pension Plans, Defined Benefit [Member] \| Non Tax Qualified Pension Benefits [Member] | | |
| **Defined Benefit Plan, Amounts Recognized in Balance Sheet [Abstract]** | | |
| Current liabilities | (12) | |
| Non-current liabilities | 0 | |
| Successor [Member] \| Other Postretirement Benefit Plan, Defined Benefit [Member] | | |
| **Defined Benefit Plan, Amounts Recognized in Balance Sheet [Abstract]** | | |
| Current liabilities | (6) | |
| Non-current liabilities | (67) | |
| Predecessor [Member] \| Pension Plans, Defined Benefit [Member] \| Tax Qualified Pension Benefits [Member] | | |
| **Defined Benefit Plan, Amounts Recognized in Balance Sheet [Abstract]** | | |
| Current liabilities | | 0 |
| Non-current liabilities | | (179) |
| Predecessor [Member] \| Pension Plans, Defined Benefit [Member] \| Non Tax Qualified Pension Benefits [Member] | | |
| **Defined Benefit Plan, Amounts Recognized in Balance Sheet [Abstract]** | | |
| Current liabilities | | (1) |
| Non-current liabilities | | (13) |
| Predecessor [Member] \| Other Postretirement Benefit Plan, Defined Benefit [Member] | | |
| **Defined Benefit Plan, Amounts Recognized in Balance Sheet [Abstract]** | | |
| Current liabilities | | (6) |
| Non-current liabilities | | $ (81) |

| CONSOLIDATED STATEMENTS OF CASH FLOWS (USD $) In Millions, unless otherwise specified | 0 Months Ended Dec. 31, 2012 Successor [Member] | 12 Months Ended Dec. 31, 2013 Successor [Member] | 12 Months Ended Dec. 31, 2013 Successor GenOn Americas Generation, LLC Parent Company [Member] | 0 Months Ended Dec. 31, 2012 Successor GenOn Americas Generation, LLC [Member] | 12 Months Ended Dec. 31, 2013 Successor GenOn Americas Generation, LLC [Member] | 0 Months Ended Dec. 31, 2012 Successor GenOn Mid-Atlantic, LLC [Member] | Dec. 31, 2013 Successor GenOn Mid-Atlantic, LLC [Member] | Dec. 31, 2013 Successor Non-affiliated Entity GenOn Americas Generation, LLC [Member] | Dec. 31, 2013 Successor Non-affiliated Entity GenOn Mid-Atlantic, LLC [Member] | Dec. 31, 2013 Successor Affiliated Entity GenOn Americas Generation, LLC Parent Company [Member] | Dec. 20.. Successor Affiliated Entity GenOn Americas Generation, LLC [Member] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Flows from Operating Activities** | | | | | | | | | | | |
| Net Income/(Loss) | $ (72) | $ (42) | $ 59 | $ (3) | $ 59 | $ 1 | $ 128 | | | | |
| **Adjustments to reconcile net income/(loss) to net cash provided by operating activities:** | | | | | | | | | | | |
| Depreciation and amortization | 10 | 249 | | 5 | 95 | 4 | 77 | | | | |
| Amortization of financing costs and debt discount/premiums | 4 | 72 | | 0 | (8) | | | | | | |
| Gains Losses on Extinguishment of Debt, Non Cash Portion | 0 | 28 | | | | | | | | | |
| Amortization of above and below Market Leases | (2) | (45) | | | | | | | | | |
| Amortization of unearned equity compensation | (6) | (9) | | | | 0 | (11) | | | | |
| Gain on disposals and sales of assets | 0 | 0 | | 0 | 0 | 0 | 7 | | | | |
| Other Asset Impairment Charges | 0 | 0 | | 0 | 0 | 0 | 0 | | | | |
| Changes in Derivatives | 13 | 310 | | 12 | 270 | 7 | 260 | | | | |
| Increase (Decrease) in Margin Deposits Outstanding | 0 | 0 | | | | | | | | | |
| Postretirement benefits curtailment (gain) loss | 0 | 0 | | | | | | | | | |
| Excess materials and supplies inventory reserve | 0 | 0 | | 0 | 0 | 0 | 0 | | | | |
| Lower of cost or market inventory adjustments | 0 | 0 | | 0 | 0 | 0 | 0 | | | | |
| Advance settlement of out-of-market contract obligation | 0 | 0 | | | | | | | | | |
| Potomac River settlement obligation and reversal | 0 | 0 | | 0 | 0 | 0 | 0 | | | | |
| Large scale remediation and settlement costs | 0 | 0 | | 0 | 0 | 0 | 0 | | | | |
| Other, net | 0 | 86 | | 0 | (36) | | | | | | |
| **Cash provided/(used) by changes in other working capital, net of acquisition and disposition effects:** | | | | | | | | | | | |
| Accounts receivable - trade | (10) | (59) | | | | | | (26) | 0 | | 0 |
| Inventory | (1) | (25) | | (4) | (47) | (4) | (21) | | | | |
| Prepayments and other current assets | (27) | 61 | | (19) | (6) | (32) | (69) | | | | |
| Accounts payable | (67) | 118 | | | | | | 1 | 0 | | 15 |
| Increase (Decrease) in Other Operating Liabilities | 18 | (71) | | 20 | 6 | 15 | (8) | | | | |
| Other assets and liabilities | (16) | 41 | | (19) | (4) | (16) | (102) | | | | |
| Net Cash Provided by Operating Activities | (152) | 532 | 217 | (114) | 310 | (25) | 261 | | | | |

**Cash Flows from Investing Activities:**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Acquisition of businesses, net of cash acquired | 0 | 175 | | | | | | | |
| Capital expenditures | (12) | (301) | | (4) | (55) | (3) | (44) | | |
| Proceeds from sale of assets, net | 0 | 0 | | 0 | | 0 | 0 | | |
| (Increase)/decrease in restricted cash, net | 6 | 18 | | 0 | | 0 | 0 | | |
| Decrease/(increase) in notes receivable - affiliate | | | | | | | | | (101) |
| Other | 0 | (21) | | 0 | (21) | | | | |
| Net cash provided by (used in) investing activities | (6) | (129) | (2) | 91 | (177) | (3) | (44) | | |
| **Cash Flows from Financing Activities** | | | | | | | | | |
| Proceeds from Notes Payable | | | | | | | | 0 | |
| Payment for treasury stock | 0 | 0 | | | | | | | |
| Proceeds from issuance of long-term debt | 0 | 110 | | | | | | | |
| Payment of debt issuance costs | 0 | 0 | | | | | | | |
| Payments for short and long-term debt | 0 | (578) | | 0 | (3) | 0 | (3) | | |
| Proceeds from Stock Options Exercised | 0 | 0 | | | | | | | |
| Increase/(decrease) of notes payable-affiliate | | | | | | | | | 0 |
| Capital contributions | | | | | | | | | 70 |
| Distributions to members | | | | | (209) | | | (285) | (285) |
| Repayments of Debt | | | 0 | | | | | | |
| Redemption of preferred stock in affiliate | | | | | | | | | 0 |
| Capital contributions | | | | | | | | (70) | |
| Net cash provided by (used in) financing activities | 0 | (468) | (215) | 0 | (218) | 0 | (288) | | |
| Net Increase (Decrease) in Cash and Cash Equivalents | (158) | (65) | 0 | (23) | (85) | (28) | (71) | | |
| Cash and Cash Equivalents at Beginning of Period | | 825 | 0 | | 148 | 135 | | | |
| Cash and Cash Equivalents at End of Period | 825 | 760 | 0 | 148 | 63 | 135 | 64 | | |
| **Supplemental Disclosures:** | | | | | | | | | |
| Interest paid, net of amount capitalized | 51 | 259 | 73 | 0 | 73 | | | | |
| Income taxes paid, net of refunds received | 0 | (75) | | 0 | 0 | 0 | 0 | | |
| **Non-cash investing and financing activities** | | | | | | | | | |
| Conversion to equity of notes payable to affiliate | | | | | | | | | 0 |
| Conversion of Notes Payable to Equity | | | 0 | | | | | | |
| Interest Paid, Capitalized | | | 2 | | | | | | |
| Capital Contributions to Unconsolidated Subsidiaries | | | $ 0 | | | | | | |

| CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS (USD $) In Millions, unless otherwise specified | 0 Months Ended | 12 Months Ended | | |
|---|---|---|---|---|
| | Dec. 31, 2012 Successor [Member] | Dec. 31, 2013 Successor [Member] | Dec. 14, 2012 Predecessor [Member] | Dec. 31, 2011 Predecessor [Member] |
| Net Income/(Loss) | $ (72) | $ (42) | $ (414) | $ (189) |
| **Other Comprehensive Income/(Loss), net of tax [Abstract]** | | | | |
| Unrealized (loss)/gain on derivatives | 1 | (1) | (18) | (55) |
| Available-for-sale securities | 0 | 0 | 0 | (1) |
| Defined benefit plans | 1 | 101 | (8) | (89) |
| Other, net | 0 | 0 | 1 | 0 |
| Other Comprehensive Income/(Loss) | 2 | 100 | (25) | (145) |
| Comprehensive Loss | $ (70) | $ 58 | $ (439) | $ (334) |

**Impairments**

**12 Months Ended**

**Dec. 31, 2013**

**Long Lived Assets Impairments**

Long-Lived Assets Impairments

**Impairments (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

**2012 Impairments**

 *Long-Lived Assets Impairments (GenOn)*

  On July 20, 2012, GenOn entered into the NRG Merger Agreement with NRG Energy and a direct wholly-owned subsidiary of NRG. GenOn viewed the execution of the NRG Merger Agreement as a triggering event under accounting guidance and evaluated its long-lived assets for impairment.

  For purposes of impairment testing, a long-lived asset must be grouped at the lowest level of identifiable cash flows. Each of GenOn's generating facilities is viewed as an individual asset group. Upon completion of the assessment, GenOn determined that the Portland and Titus generating facilities were impaired as of September 30, 2012, as the carrying values exceeded the undiscounted cash flows.

  GenOn's review of the long-lived assets included assumptions about the following: (a) electricity, fuel and emissions prices, (b) capacity prices, (c) impact of environmental regulations, including costs of $CO_2$ allowances under a potential cap-and-trade program, (d) timing and extent of generating capacity additions and retirements and (e) future capital expenditure requirements related to the generating facilities.

  GenOn's assumptions related to future prices of electricity, fuel, emission allowances, and capacity were based on observable market prices to the extent available. Longer term power and capacity prices were derived from proprietary fundamental market modeling and analysis. The long-term capacity prices were based on estimated revenue requirements needed to incentivize new generation when needed to maintain reliability standards. For markets with established capacity markets, such as PJM, these estimates are generally consistent with the current structures. The assumptions regarding electricity demand were based on forecasts available from each ISO or NERC region, as applicable. Assumptions for generating capacity additions and retirements included publicly available announcements, which take into account renewable sources of electricity, as well as the need for capacity to maintain reliability in the longer term. In addition, GenOn previously announced its plans for deactivation of the Portland and Titus generating facilities. See Note 8, *Retirements, Mothballing or Long-Term Protective Layup of Generating Facilities.*

  GenOn recorded impairment losses of $37 million and $10 million during the third quarter of 2012 in the consolidated statement of operations to reduce the carrying values of the Portland and Titus generating facilities, respectively, to their estimated fair values of $17 million and $15 million, respectively. The measurements utilized to determine fair value of Portland and Titus for impairment were categorized in Level 3 as of September, 30, 2012.

**2011 Impairments**

 *Granted Emission Credits*

  In August 2011, the EPA finalized the CSAPR, which was intended to replace the CAIR starting in 2012. Under the CSAPR program, the EPA established new allowances for all of the new CSAPR programs and did not permit any carryover Acid Rain Program or CAIR allowances into the CSAPR trading programs. As a result, the $NO_x$ allowances from the CAIR program would not have been used. Accordingly, the Registrants thought that the CAIR $NO_x$ allowances would have no value after 2011. Similarly, the $SO_2$ allowances used for compliance in the CAIR program (which used the already existing Acid Rain Program allowances that would have continued to be usable for compliance with the Acid Rain Program) would not have been usable for compliance with the CSAPR $SO_2$ program and the Registrants thought they would have negligible value after 2011.

  As a result of the CSAPR, GenOn, GenOn Americas Generation and GenOn Mid-Atlantic recorded impairment losses of $133 million, $128 million and $94 million, respectively, for the write-off of excess $NO_x$ and $SO_2$ emissions allowances during 2011.

  As GenOn thought that CAIR $NO_x$ emissions allowances of $45 million would have no value after 2011, such allowances were fully impaired. The excess Acid Rain Program $SO_2$ emissions allowances of $91 million were impaired to their estimated fair value of $3 million based on their current market prices obtained from brokers. The excess Acid Rain Program $SO_2$ emission allowances were categorized in Level 3 in the fair value hierarchy.

  As GenOn Americas Generation thought that CAIR $NO_x$ emission allowances of $43 million would

have no value after 2011, such allowances were fully impaired. The excess Acid Rain Program $SO_2$ emission allowances of $86 million were impaired to their estimated fair value of $1 million based on their current market prices obtained from brokers. The excess Acid Rain Program $SO_2$ emission allowances were categorized in Level 3 in the fair value hierarchy.

As GenOn Mid-Atlantic thought that CAIR $NO_x$ emission allowances of $43 million would have no value after 2011, such allowances were fully impaired. The excess Acid Rain Program $SO_2$ emission allowances of $52 million were impaired to their estimated fair value of $1 million based on their current market prices obtained from brokers. The excess Acid Rain Program $SO_2$ emission allowances were categorized in Level 3 in the fair value hierarchy.

| Document and Entity Information (USD $) | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2013 | Jun. 30, 2013 |

**Entity Information [Line Items]**

| | | |
|---|---|---|
| Entity Registrant Name | GenOn Energy, Inc. | |
| Entity Central Index Key | 0001126294 | |
| Document Type | 10-K | |
| Document Period End Date | Dec. 31, 2013 | |
| Current Fiscal Year End Date | --12-31 | |
| Amendment Flag | false | |
| Entity Filer Category | Non-accelerated Filer | |
| Document Fiscal Year Focus | 2013 | |
| Document Fiscal Period Focus | FY | |
| Entity Common Stock, Shares Outstanding | 1 | |
| Entity Well-known Seasoned Issuer | No | |
| Entity Voluntary Filers | Yes | |
| Entity Current Reporting Status | Yes | |
| Entity Public Float | | $ 0 |

GenOn Americas Generation, LLC [Member]

**Entity Information [Line Items]**

| | | |
|---|---|---|
| Entity Registrant Name | GENON AMERICAS GENERATION LLC | |
| Entity Central Index Key | 0001140761 | |
| Entity Filer Category | Non-accelerated Filer | |
| Entity Common Stock, Shares Outstanding | 0 | |
| Entity Public Float | | 0 |

GenOn Mid-Atlantic, LLC [Member]

**Entity Information [Line Items]**

| | | |
|---|---|---|
| Entity Registrant Name | GENON MID-ATLANTIC, LLC | |
| Entity Central Index Key | 0001138258 | |
| Entity Filer Category | Non-accelerated Filer | |
| Entity Common Stock, Shares Outstanding | 0 | |
| Entity Public Float | | $ 0 |

**Debt and Capital Leases**

**12 Months Ended**

**Dec. 31, 2013**

**Debt and Capital Leases Disclosure [Abstract]**

Debt and Capital Leases

**Debt and Capital Leases (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Long-term debt and capital leases consisted of the following:

| | As of December 31, | | Interest Rate |
|---|---|---|---|
| | **2013** | **2012** | |
| | **(In millions, except rates)** | | |
| **GenOn Mid-Atlantic:** | | | |
| Chalk Point capital lease, due 2015 | $ 10 | $ 14 | 8.190 |
| Subtotal GenOn Mid-Atlantic | 10 | 14 | |
| **GenOn Americas Generation:** | | | |
| Senior unsecured notes, due 2021 | 503 | 509 | 8.500 |
| Senior unsecured notes, due 2031 | 435 | 437 | 9.125 |
| Subtotal GenOn Americas Generation [(a)] | 948 | 960 | |
| **GenOn Energy:** | | | |
| Senior unsecured notes, due 2014 | — | 617 | 7.625 |
| Senior unsecured notes, due 2017 | 782 | 800 | 7.875 |
| Senior unsecured notes, due 2018 | 780 | 801 | 9.500 |
| Senior unsecured notes, due 2020 | 621 | 631 | 9.875 |
| Other | 2 | 3 | |
| Subtotal GenOn Energy | 2,185 | 2,852 | |
| **Marsh Landing:** | | | |
| Senior secured term loan, due 2017 | — | 121 | L+2.50 [(b)] |
| Senior secured term loan, due 2023 | — | 269 | L+2.75 [(b)] |
| Subtotal Marsh Landing | — | 390 | |
| Subtotal | 3,133 | 4,202 | |
| Less current maturities | 5 | 32 | |
| Total long-term debt and capital leases | $ 3,128 | $ 4,170 | |

(a) This amount includes GenOn Mid-Atlantic.

(b)   L+ equals LIBOR plus x%.

Long-term debt includes the following premiums:

| | As of December 31, | |
|---|---|---|
| | **2013** | **2012[(a)]** |
| | **(In millions)** | |
| **GenOn Americas Generation:** | | |
| Senior unsecured notes, due 2021 | $ 53 | $ 59 |
| Senior unsecured notes, due 2031 | 35 | 37 |
| **GenOn Energy:** | | |
| Senior unsecured notes, due 2014 | — | 42 |
| Senior unsecured notes, due 2017 | 58 | 75 |
| Senior unsecured notes, due 2018 | 104 | 126 |
| Senior unsecured notes, due 2020 | 71 | 81 |
| Total premium | $ 321 | $ 420 |

(a)   As of December 31, 2012, adjustments to fair value of debt represent adjustments recorded in connection with the NRG Merger.

***GenOn Energy (GenOn)***

*Senior Secured Term Loan Facility and Revolving Credit Facility.* In connection with the NRG

Merger, the senior secured term loan was paid off and the revolving credit facility was terminated. See Note 18, *Commitments and Contingencies*, for discussion of GenOn's credit agreement with NRG.

Under the senior notes and the related indentures, the senior notes are the sole obligation of GenOn and are not guaranteed by any subsidiary or affiliate of GenOn. The senior notes are senior unsecured obligations of GenOn having no recourse to any subsidiary or affiliate of GenOn. The senior notes restrict the ability of GenOn and its subsidiaries to encumber their assets.

*Redemption of 2014 GenOn Senior Notes.* In June 2013, GenOn redeemed all of the 2014 Senior Notes with an aggregate outstanding principal amount of $575 million at a redemption percentage of 106.778% of face value, as well as any accrued and unpaid interest as of the redemption date. In connection with the redemption, an $11 million loss on the debt extinguishment of the 2014 Senior Notes was recorded during the three months ended June 30, 2013 which primarily consisted of a make whole premium payment offset by the write-off of unamortized premium.

The GenOn Senior Notes due 2014, which had a face value of $575 million, were recorded at their fair value of $617 million on the NRG Merger date. The related $42 million premium was being amortized to interest expense until the notes were redeemed in June 2013, as previously discussed.

*Senior Unsecured Notes, Due 2018 and 2020.* The senior notes and the related indentures restrict the ability of GenOn to incur additional liens and make certain restricted payments, including dividends and purchases of capital stock. At December 31, 2013, GenOn did not meet the consolidated debt ratio component of the restricted payments test and, therefore, the ability of GenOn to make restricted payments is limited to specified exclusions from the covenant, including up to $250 million of such restricted payments. The senior notes are subject to acceleration of GenOn's obligations thereunder upon the occurrence of certain events of default, including: (a) default in interest payment for 30 days, (b) default in the payment of principal or premium, if any, (c) failure after 90 days of specified notice to comply with any other agreements in the indenture, (d) certain cross-acceleration events, (e) failure by GenOn or its significant subsidiaries to pay certain final and non-appealable judgments after 90 days and (f) certain events of bankruptcy and insolvency.

The senior notes due 2018 and 2020 were recorded at their fair values of $801 million and $631 million, respectively, on the NRG Merger date. The $126 million and $81 million premiums, respectively, are being amortized to interest expense over the life of the related notes.

Prior to October 15, 2018, GenOn may redeem the senior notes due 2018, in whole or in part, at a redemption price equal to 100% of the principal amount plus a premium and accrued and unpaid interest. The premium is the greater of: (i) 1% of the principal amount of the notes; or (ii) the excess of the following: the present value of 100% of the note, plus interest payments due on the note through maturity, discounted at a Treasury rate plus 0.50% over the principal amount of the note.

Prior to October 15, 2015, GenOn may redeem the senior notes due 2020, in whole or in part, at a redemption price equal to 100% of the principal amount of the notes plus a premium and accrued and unpaid interest. The premium is the greater of: (i) 1% of the principal amount of the notes; or (ii) the excess of the following: the present value of 100% of the note, plus interest payments due on the note through maturity, discounted at a Treasury rate plus 0.50% over the principal amount of the note. In addition, on or after October 15, 2015, GenOn may redeem some or all of the notes at redemption prices expressed as percentages of principal amount as set forth in the following table, plus accrued and unpaid interest on the notes redeemed to the first applicable redemption rate:

| Redemption Period | Redemption Percentage |
|---|---|
| October 15, 2015 to October 14, 2016 | 104.938% |
| October 15, 2016 to October 14, 2017 | 103.292% |
| October 15, 2017 to October 14, 2018 | 101.646% |
| October 15, 2018 and thereafter | 100.000% |

*Senior Unsecured Notes, Due 2017.* The senior notes due 2017 of GenOn were recorded at their fair value $800 million on the NRG Merger date. The $75 million premium is being amortized to interest expense over the life of the related notes.

Prior to maturity, GenOn may redeem all or a part of the senior notes due 2017 at a redemption price equal to 100% of the notes plus a premium and accrued and unpaid interest. The premium is the greater of: (i) 1% of the principal amount of the notes; or (ii) the excess of the following: the present value of 100% of the note, plus interest payments due on the note through maturity, discounted at a Treasury rate plus 0.50% over the principal amount of the note.

*GenOn Americas Generation (GenOn and GenOn Americas Generation)*

*Senior Unsecured Notes.* The senior notes due 2021 and 2031 are senior unsecured obligations of GenOn Americas Generation having no recourse to any subsidiary or affiliate of GenOn Americas Generation. The senior notes due 2021 and 2031 of GenOn Americas Generation were recorded at their fair values of $509 million and $437 million, respectively, on the NRG Merger date. The $59 million and $37 million premiums, respectively, are being amortized to interest expense over the life of the related notes.

Prior to maturity, GenOn Americas Generation may redeem all or a part of the senior notes due 2021 and 2031 at a redemption price equal to 100% of the notes plus a premium and accrued and unpaid interest. The premium is the greater of: (i) the discounted present value of the then-remaining scheduled payments of principal and interest on the outstanding notes, discounted at a Treasury rate plus 0.375%, less the unpaid principal amount; and (ii) zero.

**Marsh Landing (GenOn)**

*Credit Facility.* In October 2010, Marsh Landing entered into a credit agreement for up to approximately $650 million of commitments to provide construction and permanent financing for the Marsh Landing generating facility. The credit facility consists of a $155 million tranche A senior secured term loan facility, due 2017, a $345 million tranche B senior secured term loan facility, due 2023, a $50 million senior secured letter of credit facility to support Marsh Landing's debt service reserve requirements and a $100 million senior secured letter of credit facility to support Marsh Landing's collateral requirements under its PPA with PG&E. Prior to the commercial operation date of the project, the collateral requirements under the PPA and construction contracts were met by a $165 million cash collateralized letter of credit facility entered into by GenOn Energy Holdings on behalf of Marsh Landing in September 2010.

In May 2013, Marsh Landing met the conditions under the credit agreement to convert the construction loan for the facility to a term loan which will amortize on a predetermined basis. Prior to term conversion, Marsh Landing drew the remaining funds available under the facility in order to pay costs due for construction. Marsh Landing also issued a $24 million letter of credit under the facility in support of its debt service requirements. Concurrently with the term conversion, the $80 million cash collateralized letter of credit issued by GenOn Energy Holdings on behalf of Marsh Landing in support of its collateral requirements under the PPA with PG&E was returned and the related letter of credit facility was terminated. On July 22, 2013, concurrent with the initial public offering of NRG Yield, Inc., GenOn sold its ownership interests in Marsh Landing Holdings LLC to NRG Yield LLC, including the Marsh Landing term loan, as further described in Note 17, *Related Party Transactions.*

**Capital Leases (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Capital leases include a lease at GenOn Mid-Atlantic's Chalk Point generating facility for an 80 MW peaking unit. The annual principal payments under this lease are $5 million in 2014 and 2015.

**Restricted Net Assets (GenOn and GenOn Americas Generation)**

GenOn and GenOn Americas Generation and certain of their subsidiaries are holding companies and, as a result, GenOn and GenOn Americas Generation and such subsidiaries are dependent upon dividends, distributions and other payments from their respective subsidiaries to generate the funds necessary to meet their obligations. In particular, a substantial portion of the cash from GenOn's and GenOn Americas Generation's operations is generated by GenOn Mid-Atlantic. The ability of certain of GenOn's and GenOn Americas Generation's subsidiaries to pay dividends and make distributions is restricted under the terms of their debt or other agreements, including the operating leases of GenOn Mid-Atlantic for GenOn and GenOn Americas Generation and REMA for GenOn. Under their respective operating leases, GenOn Mid-Atlantic and REMA are not permitted to make any distributions and other restricted payments unless: (a) they satisfy the fixed charge coverage ratio for the most recently ended period of four fiscal quarters; (b) they are projected to satisfy the fixed charge coverage ratio for each of the two following periods of four fiscal quarters, commencing with the fiscal quarter in which such payment is proposed to be made; and (c) no significant lease default or event of default has occurred and is continuing. In the event of a default under the respective operating leases or if the respective restricted payment tests are not satisfied, GenOn Mid-Atlantic and REMA would not be able to distribute cash. At December 31, 2013, GenOn Mid-Atlantic and REMA did not satisfy the restricted payments test.

Pursuant to the terms of their respective lease agreements, GenOn Mid-Atlantic and REMA are restricted from, among other actions, (a) encumbering assets, (b) entering into business combinations or divesting assets, (c) incurring additional debt, (d) entering into transactions with affiliates on other than an arm's length basis or (e) materially changing their business. Therefore, at December 31, 2013, all of GenOn Mid-Atlantic's and REMA's net assets (excluding cash) were deemed restricted for purposes of Rule 4-08(e)(3)(ii) of Regulation S-X. As of December 31, 2013, restricted net assets for GenOn Mid-Atlantic and REMA had restricted net assets of $1,079 million and $(959) million, respectively.

***Consolidated Annual Maturities (GenOn and GenOn Americas Generation)***

Annual payments based on the maturities of GenOn's debt for the years ending after December 31, 2013 are as follows:

|  | **(In millions)** |
|---|---:|
| 2017 | 725 |
| 2018 | 675 |
| Thereafter | 1,400 |
| Total | $ 2,800 |

Annual payments based on the maturities of GenOn Americas Generation's debt for the years ending after December 31, 2013 are as follows:

|  | **(In millions)** |
|---|---:|
| 2019 and thereafter | 850 |
| Total | $ 850 |

| Commitments and Contingencies (Details) (USD $) In Millions, unless otherwise specified | 0 Months Ended | | 12 Months Ended | | |
|---|---|---|---|---|---|
| | Dec. 31, 2012 | Dec. 14, 2012 | Dec. 31, 2013 | Dec. 31, 2012 | Dec. 31, 2011 |
| **Other Commitments [Abstract]** | | | | | |
| 2013 | | | $ 18 | | |
| 2014 | | | 7 | | |
| 2015 | | | 6 | | |
| 2016 | | | 6 | | |
| 2017 | | | 6 | | |
| Thereafter | | | 94 | | |
| Total | | | 137 | | |
| GenOn Mid-Atlantic, LLC [Member] | | | | | |
| **Operating leases [Abstract]** | | | | | |
| Acquisition date fair value of leasehold improvements | | 382 | | | |
| Out-of-market value of the lease obligation | | 604 | | | |
| **Other Commitments [Abstract]** | | | | | |
| 2013 | | | 5 | | |
| 2014 | | | 6 | | |
| 2015 | | | 6 | | |
| 2016 | | | 6 | | |
| 2017 | | | 6 | | |
| Thereafter | | | 94 | | |
| Total | | | 123 | | |
| GenOn Americas Generation, LLC [Member] | | | | | |
| **Other Commitments [Abstract]** | | | | | |
| 2013 | | | 5 | | |
| 2014 | | | 6 | | |
| 2015 | | | 6 | | |
| 2016 | | | 6 | | |
| 2017 | | | 6 | | |
| Thereafter | | | 94 | | |
| Total | | | 123 | | |
| Rema [Member] | | | | | |
| **Future Minimum Lease Commitments** | | | | | |
| 2013 | | | 63 | | |
| 2014 | | | 56 | | |
| 2015 | | | 61 | | |
| 2016 | | | 63 | | |
| 2017 | | | 55 | | |
| Thereafter | | | 400 | | |
| Total | | | 698 | | |
| GenOn Mid-Atlantic, LLC [Member] | | | | | |
| **Operating leases [Abstract]** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Maximum Percentage of Economic Useful Life if Option to Extend Leases is Exercised under Operating Lease Arrangements | | | 75.00% | | |
| Rent Expense | 3 | 92 | 41 | | 96 |
| Lease Payments in Excess of Rent Expense Recognized | | | 97 | 30 | |
| Lease Payments in Excess of Rent Expense Recognized Included in Prepaid Expenses | | | 71 | 30 | |

**Future Minimum Lease Commitments**

| | |
|---|---|
| 2013 | 131 |
| 2014 | 110 |
| 2015 | 150 |
| 2016 | 144 |
| 2017 | 105 |
| Thereafter | 686 |
| Total | 1,326 |

Other property subject to operating lease [Member]

**Future Minimum Lease Commitments**

| | | |
|---|---|---|
| 2013 | 18 | [1] |
| 2014 | 16 | [1] |
| 2015 | 11 | [1] |
| 2016 | 10 | [1] |
| 2017 | 8 | [1] |
| Thereafter | 1 | [1] |
| Total | 64 | [1] |
| Operating Leases, Rent Expense, Sublease Rentals | 4 | |

Other property subject to operating lease [Member] | GenOn Mid-Atlantic, LLC [Member]

**Future Minimum Lease Commitments**

| | |
|---|---|
| 2013 | 7 |
| 2014 | 6 |
| 2015 | 1 |
| 2016 | 1 |
| 2017 | 1 |
| Thereafter | 1 |
| Total | 17 |

Other property subject to operating lease [Member] | GenOn Americas Generation, LLC [Member]

**Future Minimum Lease Commitments**

| | |
|---|---|
| 2013 | 7 |
| 2014 | 6 |
| 2015 | 1 |
| 2016 | 1 |
| 2017 | 1 |
| Thereafter | 1 |
| Total | 17 |

Other property subject to operating lease [Member] | Successor [Member]

**Operating leases [Abstract]**

| | | | | |
|---|---|---|---|---|
| Rent Expense | | | 17 | |

Other property subject to operating lease [Member] | Successor [Member] | GenOn Mid-Atlantic, LLC [Member]

**Operating leases [Abstract]**

| | | | | |
|---|---|---|---|---|
| Rent Expense | | | 0 | |

Other property subject to operating lease [Member] | Successor [Member] | GenOn Americas Generation, LLC [Member]

**Operating leases [Abstract]**

| | | | | |
|---|---|---|---|---|
| Rent Expense | | | 0 | |

Other property subject to operating lease [Member] | Predecessor [Member]

**Operating leases [Abstract]**

| | | | | |
|---|---|---|---|---|
| Rent Expense | 1 | 15 | | 20 |

Other property subject to operating lease [Member] | Predecessor [Member] | GenOn Mid-Atlantic, LLC [Member]

**Operating leases [Abstract]**

| | | | | |
|---|---|---|---|---|
| Rent Expense | 0 | 3 | | 7 |

Other property subject to operating lease [Member] | Predecessor [Member] | GenOn Americas Generation, LLC [Member]

**Operating leases [Abstract]**

| | | | | |
|---|---|---|---|---|
| Rent Expense | 0 | 3 | | 7 |

Keystone Conemaugh [Member] | Rema [Member]

**Operating leases [Abstract]**

| | | | | |
|---|---|---|---|---|
| Rent Expense | 2 | 33 | 28 | 35 |
| Lease Payments in Excess of Rent Expense Recognized | | | 22 | 0 |
| Acquisition date fair value of leasehold improvements | | 66 | | |
| Out-of-market value of the lease obligation | | 186 | | |
| Term of Agreements to Operate | | | | 5 |
| Term of Notice Required to Terminate Lease With Conditions | | | | 1 |
| Fee Received from Owners | 1 | 9 | 11 | 10 |

Conemaugh [Member] | Rema [Member]

**Operating leases [Abstract]**

| | | | | |
|---|---|---|---|---|
| Percentage Interest in Baseload Units Under Operating Lease Arrangements | | | 16.67% | |

Keystone [Member] | Rema [Member]

**Operating leases [Abstract]**

| | | | | |
|---|---|---|---|---|
| Percentage Interest in Baseload Units Under Operating Lease Arrangements | | | 16.45% | |

Shawville [Member] | Rema [Member]

**Operating leases [Abstract]**

| | | | | |
|---|---|---|---|---|
| Percentage Interest in Baseload Units Under Operating Lease Arrangements | | | 100.00% | |

Dickerson and Morgantown [Member] | GenOn Mid-Atlantic, LLC [Member]

**Operating leases [Abstract]**

Percentage Interest in Baseload Units Under Operating Lease Arrangements

100.00%

Fuel and Commodity Transportation Commitments [Member]

**Long-term Purchase Commitment [Abstract]**

| | |
|---|---|
| Maximum remaining term under individual fuel supply contract | 5 years |
| Maximum remaining term under individual transportation contract | 9 years |

**Minimum purchase commitments [Abstract]**

| | |
|---|---|
| 2013 | 167 |
| 2014 | 122 |
| 2015 | 119 |
| 2016 | 108 |
| 2017 | 36 |
| Thereafter | 129 |
| Total | 681 |

Fuel and Commodity Transportation Commitments [Member] | GenOn Mid-Atlantic, LLC [Member]

**Minimum purchase commitments [Abstract]**

| | |
|---|---|
| 2013 | 29 |
| 2014 | 4 |
| 2015 | 4 |
| 2016 | 0 |
| 2017 | 0 |
| Thereafter | 0 |
| Total | 37 |

Fuel and Commodity Transportation Commitments [Member] | GenOn Americas Generation, LLC [Member]

**Minimum purchase commitments [Abstract]**

| | |
|---|---|
| 2013 | 29 |
| 2014 | 4 |
| 2015 | 4 |
| 2016 | 0 |
| 2017 | 0 |
| Thereafter | 0 |
| Total | 37 |

Long-term Service Agreements [Member]

**Minimum purchase commitments [Abstract]**

| | |
|---|---|
| 2013 | 13 |
| 2014 | 14 |
| 2015 | 15 |
| 2016 | 14 |
| 2017 | 27 |
| Thereafter | 204 |
| Total | $ 287 |

[1] Amounts in the table exclude future sublease income of $4 million annually, associated with GenOn's long-term lease for its corporate headquarters in Houston, Texas.

| CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS (Parenthetical) (USD $) In Millions, unless otherwise specified | 12 Months Ended | 0 Months Ended | 12 Months Ended | |
|---|---|---|---|---|
| | Dec. 31, 2013 Successor [Member] | Dec. 31, 2012 Predecessor [Member] | Dec. 14, 2012 Predecessor [Member] | Dec. 31, 2011 Predecessor [Member] |
| Other Comprehensive Income/(Loss), Tax | $ 0 | $ 0 | $ 0 | $ 0 |

| Fair Value of Financial Instruments | 12 Months Ended |
|---|---|
| | **Dec. 31, 2013** |

**Fair Value of Financial Instruments Disclosure [Abstract]**

Fair Value of Financial Instruments

**Fair Value of Financial Instruments (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

For cash and cash equivalents, funds deposited by counterparties, accounts receivable, accounts payable, accrued liabilities, restricted cash, and cash collateral paid and received in support of energy risk management activities, the carrying amount approximates fair value because of the short-term maturity of those instruments and are classified as Level 1 within the fair value hierarchy.

The estimated carrying values and fair values of GenOn and GenOn Americas Generation's debt are as follows:

*GenOn*

| | As of December 31, | | | |
|---|---|---|---|---|
| | **2013** | | **2012** | |
| | **Carrying Amount** | **Fair Value** | **Carrying Amount** | **Fair Value** |
| | **(In millions)** | | | |
| **Liabilities** | | | | |
| Long and short-term debt | $ 3,120 | $ 3,058 | $ 4,185 | $ 4,209 |

The fair value of long and short-term debt that is estimated using reported market prices for instruments that are publicly traded is classified as Level 2 within the fair value hierarchy. The fair value of non-publicly traded debt is based on the income approach valuation technique using current interest rates for similar instruments with equivalent credit quality and is classified as Level 3 within the fair value hierarchy.

*GenOn Americas Generation*

| | As of December 31, | | | |
|---|---|---|---|---|
| | **2013** | | **2012** | |
| | **Carrying Amount** | **Fair Value** | **Carrying Amount** | **Fair Value** |
| | **(In millions)** | | | |
| **Liabilities** | | | | |
| Long and short-term debt | $ 938 | $ 883 | $ 946 | $ 967 |

The fair value of long and short-term debt is estimated using reported market prices for instruments that are publicly traded and is classified as Level 2 within the fair value hierarchy.

*Fair Value Accounting under ASC 820*

ASC 820 establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value into three levels as follows:

- Level 1 — quoted prices (unadjusted) in active markets for identical assets or liabilities that the Registrants have the ability to access as of the measurement date. The Registrants' financial assets and liabilities utilizing Level 1 inputs include active exchange-traded securities, energy derivatives and interest-bearing funds.

- Level 2 — inputs other than quoted prices included within Level 1 that are directly observable for the asset or liability or indirectly observable through corroboration with observable market data. The Registrants' financial assets and liabilities utilizing Level 2 inputs include exchange-based derivatives, and over the counter derivatives such as swaps, options and forward contracts.

- Level 3 — unobservable inputs for the asset or liability only used when there is little, if any, market activity for the asset or liability at the measurement date. The Registrants' financial assets and liabilities utilizing Level 3 inputs include infrequently-traded and non-exchange-based derivatives which are measured using present value pricing models.

In accordance with ASC 820, the Registrants determine the level in the fair value hierarchy within which each fair value measurement in its entirety falls, based on the lowest level input that is significant to the

fair value measurement in its entirety.

### Recurring Fair Value Measurements

Derivative assets and liabilities are carried at fair market value.

*GenOn*

The following tables present assets and liabilities measured and recorded at fair value on GenOn's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

| | As of December 31, 2013 | | | |
|---|---|---|---|---|
| | Fair Value | | | |
| | Level 1 [(a)] | Level 2 [(a)] | Level 3 | Total |
| | (In millions) | | | |
| **Derivative assets:** | | | | |
| Commodity contracts | $ 141 | $ 507 | $ 3 | $ 651 |
| **Derivative liabilities:** | | | | |
| Commodity contracts | $ 25 | $ 149 | $ 7 | $ 181 |
| | | | | |
| Other assets [(b)] | $ 37 | $ — | $ — | $ 37 |

(a)   There were no transfers during the year ended December 31, 2013 between Levels 1 and 2.

(b)   Relates to mutual funds held in a rabbi trust for non-qualified deferred compensation plans for some key and highly compensated employees.

| | As of December 31, 2012 | | | |
|---|---|---|---|---|
| | Fair Value | | | |
| | Level 1 [(a)] | Level 2 [(a)] | Level 3 | Total |
| | (In millions) | | | |
| **Derivative assets:** | | | | |
| Commodity contracts | $ 139 | $ 946 | $ 31 | $ 1,116 |
| **Derivative liabilities:** | | | | |
| Commodity contracts | $ 52 | $ 253 | $ 14 | $ 319 |
| Interest rate contracts | — | 50 | — | 50 |
| Total liabilities | $ 52 | $ 303 | $ 14 | $ 369 |
| | | | | |
| Other assets [(b)] | $ 21 | $ — | $ — | $ 21 |

(a)   There were no transfers during the year ended December 31, 2012 between Levels 1 and 2.

(b)   Relates to mutual funds held in a rabbi trust for non-qualified deferred compensation plans for some key and highly compensated employees.

The following tables reconcile the beginning and ending balances for derivatives that are recognized at fair value in GenOn's consolidated financial statements at least annually using significant unobservable inputs for the year ended December 31, 2013 and for the periods from December 15, 2012 through December 31, 2012 and from January 1, 2012 through December 14, 2012:

| | Successor | | Predecessor |
|---|---|---|---|
| | For the year ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) | | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) |
| | Derivatives [(a)] | | Derivatives [(a)] |
| | (In millions) | | (In millions) |
| Balance as of beginning of period [(b)] | $ 17 | $ 18 | $ (31) |
| Total gains and losses (realized/unrealized) included in earnings [(c)] | (17) | (3) | (37) |
| Purchases | (3) | 2 | — |

| | | | | | |
|---|---|---|---|---|---|
| Transfers out of Level 3 [d] | | (1) | | — | — |
| Balance as of end of period | $ | (4) | $ | 17 | $ (68) |
| The amount of the total gains/(losses) for the period included in earnings attributable to the change in unrealized derivatives relating to assets still held at end of period | $ | — | $ | 4 | $ (80) |

(a)   Consists of derivatives assets and liabilities, net.

(b)   The change in Level 3 balance is primarily driven by the change in accounting policy at the NRG Merger date to include all curves with broker-quoted coal contracts within the Level 2 designation.

(c)   Contracts entered into are reported with total gains and losses included in earnings in the predecessor periods.

(d)   Transfers out of Level 3 are related to the availability of external broker quotes and are valued as of the end of the reporting period.

*GenOn Americas Generation*

The following tables present assets and liabilities (including amounts with affiliates) measured and recorded at fair value on GenOn Americas Generation's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

| | As of December 31, 2013 | | | |
|---|---|---|---|---|
| | Fair Value | | | |
| | Level 1 [a] | Level 2 [a] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 153 | $ 575 | $ 7 | $ 735 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 74 | $ 226 | $ 8 | $ 308 |

(a)   There were no transfers during the year ended December 31, 2013 between Levels 1 and 2.

| | As of December 31, 2012 | | | |
|---|---|---|---|---|
| | Fair Value | | | |
| | Level 1 [a] | Level 2 [a] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 170 | $ 991 | $ 31 | $ 1,192 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 123 | $ 358 | $ 14 | $ 495 |

(a)   There were no transfers during the year ended December 31, 2012 between Levels 1 and 2.

The following tables reconcile the beginning and ending balances for GenOn Americas Generation's derivatives that are recognized at fair value in the consolidated financial statements at least annually using significant unobservable inputs for the year ended December 31, 2013 and for the periods from December 15, 2012 through December 31, 2012 and from January 1, 2012 through December 14, 2012:

| | Successor | | Predecessor |
|---|---|---|---|
| | For the year ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) | | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) |
| | Derivatives [a] | | Derivatives [a] |
| | (In millions) | | (In millions) |
| Balance as of beginning of period [b] | $ 17 | $ 18 | $ (32) |
| Total gains and losses (realized/unrealized) included in earnings [c] | (17) | (3) | (33) |
| Purchases | — | 2 | — |
| Transfers out of Level 3 [d] | (1) | — | — |

| | | | | | | |
|---|---|---|---|---|---|---|
| Balance as of end of period | $ | (1) | $ | 17 | $ | (65) |
| The amount of the total gains/(losses) for the period included in earnings attributable to the change in unrealized derivatives relating to assets still held at end of period | $ | — | $ | 4 | $ | (70) |

(a)    Consists of derivatives assets and liabilities, net.

(b)    The change in Level 3 balance is primarily driven by the change in accounting policy at the NRG Merger date to include all curves with broker-quoted coal contracts within the Level 2 designation.

(c)    Contracts entered into are reported with total gains and losses in earnings in the predecessor periods.

(d)    Transfers out of Level 3 are related to the availability of external broker quotes and are valued as of the end of the reporting period.

*GenOn Mid-Atlantic*

The following tables present assets and liabilities (including amounts with affiliates) measured and recorded at fair value on GenOn Mid-Atlantic's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

| | As of December 31, 2013 | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Fair Value** | | | | | | |
| | **Level 1**[a] | | **Level 2**[a] | | **Level 3** | | **Total** |
| | **(In millions)** | | | | | | |
| Derivative assets: | | | | | | | |
| Commodity contracts | $ | 87 | $ | 420 | $ | — | $ | 507 |
| Derivative liabilities: | | | | | | | |
| Commodity contracts | $ | 13 | $ | 60 | $ | — | $ | 73 |

(a)    There were no transfers during the year ended December 31, 2013 between Levels 1 and 2.

| | As of December 31, 2012 | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Fair Value** | | | | | | |
| | **Level 1**[a] | | **Level 2**[a] | | **Level 3** | | **Total** |
| | **(In millions)** | | | | | | |
| Derivative assets: | | | | | | | |
| Commodity contracts | $ | 63 | $ | 778 | $ | 8 | $ | 849 |
| Derivative liabilities: | | | | | | | |
| Commodity contracts | $ | 16 | $ | 138 | $ | 1 | $ | 155 |

(a)    There were no transfers during the year ended December 31, 2012 between Levels 1 and 2.

The following tables reconcile the beginning and ending balances for GenOn Mid-Atlantic's derivatives that are recognized at fair value in the consolidated financial statements at least annually using significant unobservable inputs for the year ended December 31, 2013 and for the periods from December 15, 2012 through December 31, 2012 and from January 1, 2012 through December 14, 2012:

| | Successor | | | | Predecessor | |
|---|---|---|---|---|---|---|
| | **For the year ended December 31, 2013** | | **December 15, 2012 through December 31, 2012** | | **January 1, 2012 through December 14, 2012** | |
| | **Fair Value Measurement Using Significant Unobservable Inputs (Level 3)** | | | | **Fair Value Measurement Using Significant Unobservable Inputs (Level 3)** | |
| | **Derivatives** [a] | | | | **Derivatives** [a] | |
| | **(In millions)** | | | | **(In millions)** | |
| Balance as of beginning of period [b] | $ | 7 | $ | 8 | $ | (64) |
| Total gains and losses (realized/unrealized) included in earnings [c] | | (7) | | (1) | | 3 |
| Balance as of end of period | $ | — | $ | 7 | $ | (61) |
| The amount of the total gains/(losses) for the period included in earnings attributable to the change in unrealized derivatives relating to | | | | | | |

assets still held at end of period                                   $ _____ $ _____ $ _____    (36)

(a)   Consists of derivatives assets and liabilities, net.

(b)   The change in Level 3 balance is primarily driven by the change in accounting policy at the NRG Merger date to include all curves with broker-quoted coal contracts within the Level 2 designation.

(c)   Contracts entered into are reported with total gains and losses included in earnings in the predecessor periods.

Realized and unrealized gains and losses included in earnings that are related to energy derivatives are recorded in operating revenues and cost of operations.

### Derivative Fair Value Measurements

A portion of the Registrants' contracts are exchange-traded contracts with readily available quoted market prices. A majority of the Registrants' contracts are non-exchange-traded contracts valued using prices provided by external sources, primarily price quotations available through brokers or over-the-counter and on-line exchanges. For the majority of the Registrants' markets, quotes are from multiple sources. To the extent that the Registrants receive multiple quotes, prices reflect the average of the bid-ask mid-point prices obtained from all sources that the Registrants believe provide the most liquid market for the commodity. If the Registrants receive one quote, then the mid-point of the bid-ask spread for that quote is used. The terms for which such price information is available vary by commodity, region and product. A significant portion of the fair value of the Registrants' derivative portfolio is based on price quotes from brokers in active markets who regularly facilitate those transactions and the Registrants believe such price quotes are executable. The Registrants do not use third party sources that derive price based on proprietary models or market surveys. The remainder of the assets and liabilities represents contracts for which external sources or observable market quotes are not available. These contracts are valued based on various valuation techniques including but not limited to internal models based on a fundamental analysis of the market and extrapolation of observable market data with similar characteristics. Contracts valued with prices provided by models and other valuation techniques make up 0% of GenOn's derivative assets and 4% of GenOn's derivative liabilities, 1% of GenOn Americas Generation's derivative assets and 3% of GenOn Americas Generation's derivative liabilities and 0% of GenOn Mid-Atlantic's derivative assets and 0% of GenOn Mid-Atlantic's derivative liabilities.

The fair value of each contract is discounted using a risk free interest rate. In addition, the Registrants apply a credit reserve to reflect credit risk which is calculated based on published default probabilities. To the extent that the Registrants' net exposure under a specific master agreement is an asset, the Registrants use the counterparty's default swap rate. If the exposure under a specific master agreement is a liability, the Registrants use their default swap rate. The credit reserve is added to the discounted fair value to reflect the exit price that a market participant would be willing to receive to assume the Registrants' liabilities or that a market participant would be willing to pay for the Registrants' assets. The Registrants' credit reserves were as follows:

|  | As of December 31, | | | |
|  | 2013 | | 2012 | |
|  | (In millions) | | (In millions) | |
|---|---|---|---|---|
| GenOn | $ | 1 | $ | 4 |
| GenOn Americas Generation |  | 1 |  | 4 |
| GenOn Mid-Atlantic |  | 3 |  | 4 |

The fair values in each category reflect the level of forward prices and volatility factors as of December 31, 2013, and may change as a result of changes in these factors. Management uses its best estimates to determine the fair value of commodity and derivative contracts the Registrants hold and sell. These estimates consider various factors including closing exchange and over-the-counter price quotations, time value, volatility factors and credit exposure. It is possible however, that future market prices could vary from those used in recording assets and liabilities from energy marketing and trading activities and such variations could be material.

Under the guidance of ASC 815, entities may choose to offset cash collateral paid or received against the fair value of derivative positions executed with the same counterparties under the same master netting agreements. The Registrants have chosen not to offset positions as defined in ASC 815. As of December 31, 2013, GenOn recorded $62 million of cash collateral paid and $56 million of cash collateral received on its balance sheet. As of December 31, 2013, GenOn Americas Generation recorded $50 million of cash collateral paid and $56 million of cash collateral received on its balance sheet. As of December 31, 2013, GenOn Mid-Atlantic had no outstanding cash collateral paid or received on its balance sheet.

### Concentration of Credit Risk

In addition to the credit risk discussion as disclosed in Note 2, *Summary of Significant Accounting*

*Policies*, the following item is a discussion of the concentration of credit risk for the Registrants' financial instruments. Credit risk relates to the risk of loss resulting from non-performance or non-payment by counterparties pursuant to the terms of their contractual obligations. The Registrants monitor and manage credit risk through credit policies that include: (i) an established credit approval process; (ii) a daily monitoring of counterparties' credit limits; (iii) the use of credit mitigation measures such as margin, collateral, prepayment arrangements, or volumetric limits (iv) the use of payment netting agreements; and (v) the use of master netting agreements that allow for the netting of positive and negative exposures of various contracts associated with a single counterparty. Risks surrounding counterparty performance and credit could ultimately impact the amount and timing of expected cash flows. The Registrants seek to mitigate counterparty risk by having a diversified portfolio of counterparties. The Registrants also have credit protection within various agreements to call on additional collateral support if and when necessary. Cash margin is collected and held at the Registrants to cover the credit risk of the counterparty until positions settle.

As of December 31, 2013, counterparty credit exposure to a significant portion of GenOn's counterparties was $538 million and GenOn held no collateral (cash or letters of credit) against those positions, resulting in a net exposure of $538 million. Approximately 99% of GenOn's exposure before collateral is expected to roll off by the end of 2015. GenOn Americas Generation's counterparty credit exposure to a significant portion of counterparties was $527 million and GenOn Americas Generation held no collateral (cash or letters of credit) against those positions, resulting in a net exposure of $527 million. Approximately 100% of GenOn Americas Generation's exposure before collateral is expected to roll off by the end of 2015. GenOn Mid-Atlantic's counterparty credit exposure to a significant portion of counterparties was $361 million and GenOn Mid-Atlantic held no collateral (cash or letters of credit) against those positions, resulting in a net exposure of $361 million. Approximately 100% of GenOn Mid-Atlantic's exposure before collateral is expected to roll off by the end of 2015.

The following tables highlight the counterparty credit quality and the net counterparty credit exposure by industry sector. Net counterparty credit exposure is defined as the aggregate net asset position for the Registrants with counterparties where netting is permitted under the enabling agreement and includes all cash flow, mark-to-market and NPNS, and non-derivative transactions. As of December 31, 2013, the exposure is shown net of collateral held and includes amounts net of receivables or payables.

*GenOn*

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Financial institutions | 68% |
| Utilities, energy merchants, marketers and other | 12% |
| ISOs | 20% |
| Total | 100% |

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Investment grade | 98% |
| Non-rated | 2% |
| Total | 100% |

(a)   Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

GenOn has counterparty credit risk exposure to certain counterparties representing more than 10% of total net exposure discussed above and the aggregate of such counterparties was $326 million. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, GenOn does not anticipate a material impact on its financial position or results of operations from nonperformance by any of its counterparties.

*GenOn Americas Generation*

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Financial institutions | 69% |
| Utilities, energy merchants, marketers and other | 11% |
| ISOs | 20% |
| Total | 100% |

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Investment grade | 98% |
| Non-rated | 2% |
| Total | 100% |

(a)    Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

GenOn Americas Generation has counterparty credit risk exposure to certain counterparties representing more than 10% of total net exposure discussed above and the aggregate of such counterparties was $377 million. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, GenOn Americas Generation does not anticipate a material impact on its financial position or results of operations from nonperformance by any of its counterparties.

*GenOn Mid-Atlantic*

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Financial institutions | 100% |

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Investment grade | 100% |

(a)    Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

GenOn Mid-Atlantic has counterparty credit risk exposure to certain counterparties representing more than 10% of total net exposure discussed above and the aggregate of such counterparties was $335 million. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, GenOn Mid-Atlantic does not anticipate a material impact on its financial position or results of operations from nonperformance by any of its counterparties.

| NRG Merger (Genon [Member]) | 12 Months Ended |
|---|---|
|  | Dec. 31, 2013 |

Genon [Member]

**Business Acquisition [Line Items]**

NRG Merger

**NRG Merger and Dispositions (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*Kendall Disposition (GenOn and GenOn Americas Generation)*

On January, 31, 2014, NRG North America LLC, a wholly owned subsidiary of GenOn Americas Generations, completed the sale of NRG Kendall LLC to Veolia Energy North America Holdings, Inc. for cash consideration of $50 million. There was no significant gain or loss recorded in results of operations of GenOn or GenOn Americas Generation during the first quarter of 2014 as the carrying value of the net assets of NRG Kendall LLC approximated fair value upon disposition.

*NRG Merger (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)*

On December 14, 2012, NRG completed the acquisition of GenOn.  Consideration for the acquisition was valued at $2.2 billion and was comprised of 0.1216 shares of NRG common stock for each outstanding share of GenOn, including restricted stock units outstanding on the acquisition date, except for fractional shares which were paid in cash.

The acquisition was recorded as a business combination, with identifiable assets acquired and liabilities assumed provisionally recorded at their estimated fair values on the acquisition date. The accounting for the business combination has been completed as of December 13, 2013. See Note 3, *NRG Merger*, in the Registrants' 2012 Form 10-K for additional information related to the NRG Merger.

The following tables summarize the historical carrying amounts, the acquisition accounting adjustments, the preliminary acquisition-date fair value and the measurement period adjustments through December 13, 2013 to the provisional allocation for assets acquired and liabilities assumed initially recorded in 2012 due to the ongoing evaluation of initial estimates during the measurement period.

*GenOn*

| | Historical carrying amount | Acquisition accounting adjustment | Acquisition-date fair value as reported in 2012 10-K | Measurement period adjustments | Revised acquisition-date fair value |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Assets** | | | | | |
| Cash | $ 983 | $ — | $ 983 | $ — | $ 983 |
| Other current and non-current assets | 2,049 | (664) | 1,385 | 28 | 1,413 |
| Property, plant and equipment | 6,286 | (2,350) | 3,936 | (115) | 3,821 |
| Derivative assets | 1,143 | 14 | 1,157 | — | 1,157 |
| Deferred income taxes | 220 | — | 220 | — | 220 |
| Total assets | $ 10,681 | $ (3,000) | $ 7,681 | $ (87) | $ 7,594 |
| **Liabilities** | | | | | |
| Other current and non-current liabilities | $ 1,299 | $ 13 | $ 1,312 | $ 54 | $ 1,366 |
| Out-of-market contracts and leases | 331 | 733 | 1,064 | 62 | 1,126 |
| Derivative liabilities | 414 | (15) | 399 | — | 399 |
| Deferred income taxes | 220 | — | 220 | — | 220 |
| Long-term debt and capital leases | 3,725 | 478 | 4,203 | 3 | 4,206 |
| Total liabilities | $ 5,989 | $ 1,209 | $ 7,198 | $ 119 | $ 7,317 |
| Net assets | $ 4,692 | $ (4,209) | $ 483 | $ (206) | $ 277 |

*GenOn Americas Generation*

| | Historical carrying amount | Acquisition accounting adjustment | Acquisition-date fair value as reported in 2012 10-K | Measurement period adjustments | Revised acquisition-date fair value |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Assets** | | | | | |
| Cash | $ 171 | $ — | $ 171 | $ — | $ 171 |
| Other current and non-current assets | 1,509 | (531) | 978 | 31 | 1,009 |
| Property, plant and equipment | 2,875 | (1,546) | 1,329 | (106) | 1,223 |
| Derivative assets | 1,226 | 12 | 1,238 | — | 1,238 |
| Total assets | $ 5,781 | $ (2,065) | $ 3,716 | $ (75) | $ 3,641 |
| **Liabilities** | | | | | |
| Other current and non-current liabilities | $ 705 | $ (34) | $ 671 | $ 32 | $ 703 |
| Out-of-market contracts and leases | — | 540 | 540 | 64 | 604 |
| Derivative liabilities | 539 | (10) | 529 | — | 529 |
| Long-term debt and capital leases | 862 | 99 | 961 | — | 961 |
| Total liabilities | $ 2,106 | $ 595 | $ 2,701 | $ 96 | $ 2,797 |
| Net assets | $ 3,675 | $ (2,660) | $ 1,015 | $ (171) | $ 844 |

*GenOn Mid-Atlantic*

| | Historical carrying amount | Acquisition accounting adjustment | Acquisition-date fair value as reported in 2012 10-K | Measurement period adjustments | Revised acquisition-date fair value |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Assets** | | | | | |
| Cash | $ 163 | $ — | $ 163 | $ — | $ 163 |
| Other current and non-current assets | 700 | (502) | 198 | (1) | 197 |
| Property, plant and equipment | 2,399 | (1,178) | 1,221 | (199) | 1,022 |
| Derivative assets | 851 | 12 | 863 | — | 863 |
| Total assets | $ 4,113 | $ (1,668) | $ 2,445 | $ (200) | $ 2,245 |
| **Liabilities** | | | | | |
| Other current and non-current liabilities | $ 198 | $ 6 | $ 204 | $ 27 | $ 231 |
| Out-of-market contracts and leases | — | 540 | 540 | 64 | 604 |
| Derivative liabilities | 172 | (10) | 162 | — | 162 |
| Long-term debt and capital leases | 14 | — | 14 | — | 14 |
| Total liabilities | $ 384 | $ 536 | $ 920 | $ 91 | $ 1,011 |
| Net assets | $ 3,729 | $ (2,204) | $ 1,525 | $ (291) | $ 1,234 |

      The estimated fair values of the property, plant and equipment were significantly lower than the book value, which reflects changes to expected market dynamics, including commodity prices, resulting in lower estimated cash flows and in some cases, shorter useful lives of the underlying assets. The measurement period adjustments for property, plant and equipment and out-of-market liabilities primarily reflect revisions of various estimates based on additional information available. In addition, measurement period adjustments were recorded for additional environmental reserves resulting from further review and revisions to various estimates. The difference between the historical tax basis of the assets and liabilities over the net amount assigned to the assets and liabilities in acquisition accounting was recorded as a net deferred tax asset. Based on cumulative pre-tax losses, a valuation allowance for the full amount of the net

deferred tax assets was also recorded.

**Income Taxes**

**Income Tax Disclosure [Abstract]**

Income Taxes

**Income Taxes (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*Income Taxes*

*GenOn*

GenOn's income tax (benefit)/provision consisted of the following:

| | Successor | | Predecessor | |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
|---|---|---|---|---|
| | (In millions) | | (In millions) | |
| Current tax (benefit)/provision: | | | | |
| Federal | $ (6) | $ — | $ 15 | $ (1) |
| State | — | — | — | 1 |
| Total current (benefit)/provision for income taxes | $ (6) | $ — | $ 15 | $ — |

A reconciliation of GenOn's federal statutory income tax provision to the effective income tax (benefit)/provision adjusted for permanent and other items during 2013, 2012 and 2011, is as follows:

| | Successor | | Predecessor | |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
|---|---|---|---|---|
| | (In millions, except percentages) | | (In millions, except percentages) | |
| Provision for income taxes based on U.S. federal statutory income tax rate | $ 2 | $ (25) | $ (140) | $ (66) |
| State and local income tax provision, net of federal income taxes | — | (1) | (9) | (8) |
| Change in deferred tax asset valuation allowance | (2) | 23 | 166 | 183 |
| Effect of equity-related transactions | — | 1 | (5) | (49) |
| Tax settlements | (6) | — | 6 [b] | (25) [a] |
| NRG Merger-related costs | — | 2 | — | — |
| Mirant/RRI Merger-related costs | — | — | — | (15) |
| Mirant/RRI Merger-related write-off of NOL and state and local income tax provision, net of federal income taxes | — | — | — | (3) |
| Mirant/RRI Merger-related write-off of NOL and other deferred tax assets | — | — | — | (21) |
| Other, net | — | — | (3) | 4 |
| Income tax (benefit)/provision | $ (6) | $ — | $ 15 | $ — |

(a)  Settlements of tax disputes increased GenOn's tax basis in depreciable assets that had previously been written off as a result of Mirant's emergence from bankruptcy in 2006.

(b)  Deferred tax attribute changes from 2002-2003 audit changes including effect of the CenterPoint tax allocation agreement.

The tax effects of temporary differences between the carrying amounts of assets and liabilities in GenOn's financial statements and their respective tax bases which give rise to deferred tax assets and liabilities are as follows:

| | As of December 31, | |
| --- | --- | --- |
| | 2013 | 2012 |
| | (In millions) | |
| **Deferred Tax Assets:** | | |
| Employee benefits | $ 134 | $ 149 |
| Pension and other postretirement benefits | 123 | 98 |
| Contingencies and other liabilities | — | — |
| Federal loss carryforwards | 384 | 375 |
| State loss carryforwards | 108 | 77 |
| Property and intangible assets | 1,563 | 1,594 |
| Out-of-market contracts fair value adjustment | 136 | 132 |
| Debt premium, net | 136 | 160 |
| Other | 117 | 41 |
| Subtotal | 2,701 | 2,626 |
| Valuation allowance | (2,672) | (2,324) |
| Net deferred tax assets | 29 | 302 |
| **Deferred Tax Liabilities:** | | |
| Derivative contracts | (29) | (297) |
| Debt discount, net | — | — |
| Other | — | (5) |
| Net deferred tax liabilities | (29) | (302) |
| Net deferred taxes | $ — | $ — |

### NOLs

As a result of the NRG Merger, GenOn experienced an ownership change as defined in IRC § 382. IRC § 382 provides, in general, that an ownership change occurs when there is a greater than 50-percentage point increase in ownership of a company's stock by new or existing stockholders who own (or are deemed to own under IRC § 382) 5% or more of the loss company's stock over a three year testing period. IRC § 382 limits the amount of pre-merger NOLs and built-in losses that can be used during any post-ownership change year to offset taxable income. GenOn has reduced the amount of federal NOLs that would have been available to offset post-merger taxable income based on a $62 million annual limitation by $2.3 billion. GenOn reduced the amount of state NOLs to the applicable size amount based upon state conformity to IRC § 382. In addition, based on the allocation of the provisional fair values in connection with the NRG Merger, GenOn reduced its tax basis in depreciable assets by $938 million for financial reporting purposes due to the inability to utilize future tax depreciation deductions that are limited as built-in losses under IRC § 382.

At December 31, 2013, GenOn's federal NOL carryforward for financial reporting was $1 billion with expiration dates from 2022 to 2032. Similarly, there is an aggregate amount of $1.4 billion of state NOL carryforwards with various expiration dates (based on a review of the application of apportionment factors and other state tax limitations).

The guidance related to accounting for income taxes requires that a valuation allowance be established when it is more-likely-than-not that all or a portion of a deferred tax asset will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn's past and anticipated future performance, the reversal of deferred tax liabilities and the implementation of tax planning strategies.

At December 31, 2013, GenOn's deferred tax assets reduced by a valuation allowance are completely offset by GenOn's deferred tax liabilities. Objective positive evidence is necessary to support a conclusion that a valuation allowance is not needed for all or a portion of deferred tax assets when significant negative evidence exists. GenOn evaluates this position quarterly and makes judgments based on the facts and circumstances at that time. GenOn thinks that the realization of future taxable income sufficient to utilize existing deferred tax assets is less than more-likely-than-not at this time.

*Tax Uncertainties*

The recognition of contingent losses for tax uncertainties requires management to make significant assumptions about the expected outcomes of certain tax contingencies. Under the accounting guidance, GenOn must reflect in its income tax provision the full benefit of all positions that will be taken in GenOn's income tax returns, except to the extent that such positions are uncertain and fall below the benefit recognition requirements. In the event that GenOn determines that a tax position meets the uncertainty criteria, an additional liability or an adjustment to GenOn's NOLs, determined under the measurement criteria, will result. GenOn periodically reassesses the tax positions in its tax returns for open years based on the latest information available and determines whether any portion of the tax benefits reflected should be treated as unrecognized. A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows:

| | Successor | | Predecessor |
|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | (In millions) |
| Unrecognized tax benefits, beginning of period | $ 6 | $ 6 | $ 5 |
| Increase based on tax positions related to the prior years | — | — | 3 |
| Decrease due to settlements and payments | (5) | — | (2) |
| Decrease as a result of lapse in the statute of limitations | — | — | — |
| Unrecognized tax benefits, end of period | $ 1 | $ 6 | $ 6 |

The unrecognized tax benefits included the review of tax positions relating to open tax years beginning in 2002 and continuing to the present. GenOn's major tax jurisdictions are the U.S. at the federal level and multiple state and local jurisdictions. Both the federal and state NOL carryforwards from any closed year are subject to examination until the year that such NOL carryforwards are utilized and that utilization year is closed for audit. GenOn does not anticipate any significant changes in its unrecognized tax benefits over the next 12 months. GenOn has not recognized any tax benefits for certain filing positions for which the outcome is uncertain and the effect is estimable.

Included in the unrecognized tax benefits balance at December 31, 2013 and 2012, GenOn had $1 million and $5 million, respectively, of unrecognized tax benefits that would affect the effective tax rate if they were recognized. GenOn's tax provision in each period includes interest and penalties related to unrecognized tax benefits. The amount recorded in GenOn's consolidated balance sheet for interest and penalties related to the unrecognized tax benefits at both December 31, 2013 and 2012 is $1 million.

GenOn continues to be subject to audit for multiple years by taxing authorities in various jurisdictions. Considerable judgment is required to determine the tax treatment of particular items that involve interpretations of complex tax laws. A tax liability is recorded for filing positions with respect to which the outcome is uncertain and the recognition criteria under the accounting guidance for uncertainty in income taxes has been met. Such liabilities are based on judgment and it can take many years to resolve a recorded liability such that the related filing position is no longer subject to question. GenOn has not recorded a liability for those proposed tax adjustments related to the current tax audits when GenOn continues to think its filing position meets the more-likely-than-not threshold prescribed in the accounting guidance related to accounting for uncertainty in income taxes. Any adverse outcomes arising from these matters could result in a material change in the amount of GenOn's deferred taxes.

GenOn ceased being a member of the CenterPoint consolidated tax group at September 30, 2002 and has been limited in GenOn's ability to use tax attributes generated during periods through that date. The Internal Revenue Service's audits of CenterPoint's federal income tax returns for the 1997 to 2002 tax reporting periods have been closed, subject to a review by the Internal Revenue Service of certain claims formally submitted by GenOn for the 2002 tax year. GenOn has a tax allocation agreement that addresses the allocation of taxes pertaining to GenOn's separation from CenterPoint. This agreement provides that GenOn may carryback net operating losses generated subsequent to September 30, 2002 to tax years when GenOn was part of CenterPoint's consolidated tax group. Any such carryback is subject to CenterPoint's consent and any existing statutory carryback limitations. For items relating to periods prior to September 30, 2002, GenOn will (a) recognize any net costs incurred by CenterPoint for settlement of temporary differences up to $15 million (of which zero had been recognized through December 31, 2013 and 2012) as an equity contribution and (b) recognize any net benefits realized by CenterPoint for settlement of temporary differences up to $1 million as an equity distribution. Generally, amounts for temporary

differences in excess of the $15 million and $1 million thresholds will be settled in cash between GenOn and CenterPoint. Pursuant to this agreement, generally, taxes related to permanent differences are the responsibility of CenterPoint.

*GenOn Americas Generation*

As a result of the NRG Merger, GenOn experienced an ownership change as defined in IRC § 382. IRC § 382 provides, in general, that an ownership change occurs when there is a greater than 50‑percentage point increase in ownership of a company's stock by new or existing stockholders who own (or are deemed to own under IRC § 382) 5% or more of the loss company's stock over a three year testing period. IRC § 382 limits the amount of pre-merger NOLs and built-in losses that can be used during any post-ownership change year to offset taxable income. The annual limitation on the amount of taxable income that can be offset by GenOn's pre-NRG Merger NOLs has been redetermined as of the date of the NRG Merger. GenOn Americas Generation's annual limitation on the amount of taxable income that can be offset by its pre-merger NOLs has also been redetermined as a consequence of the GenOn ownership change that resulted from the NRG Merger. GenOn Americas Generation has reduced to zero the amount of its pre-NRG Merger NOLs available to offset post-NRG Merger taxable income based on the expected limits determined in accordance with IRC § 382.

GenOn Americas Generation's income tax provision/(benefit) was $0 for 2011 through 2013.

A reconciliation of GenOn Americas Generation's expected federal statutory income tax provision to the effective income tax provision adjusted for permanent and other items during 2013, 2012 and 2011, is as follows:

|  | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
|  | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
|  | (In millions, except percentages) | | (In millions, except percentages) | |
| Provision (benefit) for income taxes based on U.S. federal statutory income tax rate | $ 22 | $ (1) | $ (28) | $ 5 |
| State and local income tax provision, net of federal income taxes | 6 | — | (4) | 5 |
| LLC income not subject to taxation | (28) | 1 | 32 | (10) |
| Income tax (benefit)/provision | $ — | $ — | $ — | $ — |

**Tax Uncertainties**

The recognition of contingent losses for tax uncertainties requires management to make significant assumptions about the expected outcomes of certain tax contingencies. Under the accounting guidance, GenOn Americas Generation must reflect in its income tax provision the full benefit of all positions that will be taken in GenOn Americas Generation's income tax returns, except to the extent that such positions are uncertain and fall below the benefit recognition requirements. In the event that GenOn Americas Generation determines that a tax position meets the uncertainty criteria, an additional liability or an adjustment to GenOn Americas Generation's NOLs, determined under the measurement criteria, will result. GenOn Americas Generation periodically reassesses the tax positions in its tax returns for open years based on the latest information available and determines whether any portion of the tax benefits reflected should be treated as unrecognized.

Both the federal and state NOL carryforwards from any closed year are subject to examination until the year that such NOL carryforwards are utilized and that utilization year is closed for audit. GenOn Americas Generation has not recorded any uncertain tax benefits.

**Pro Forma Income Tax Disclosures**

*GenOn Americas Generation*

GenOn Americas Generation is not subject to income taxes except for those subsidiaries of GenOn Americas Generation that are separate taxpayers. GenOn Americas, GenOn and NRG are otherwise directly responsible for income taxes related to GenOn Americas Generation's operations.

The pro forma income tax provision that would be reported if GenOn Americas Generation were to be

allocated income taxes attributable to its operations was $0 for the year ended December 31, 2013, the period from December 15, 2012 through December 31, 2012, the period from January 1, 2012 through December 14, 2012 and the year ended December 31, 2011.

The following table presents the pro forma reconciliation of GenOn Americas Generation's federal statutory income tax provision for continuing operations adjusted for reorganization items to the pro forma effective tax provision:

| | Successor | | Predecessor | |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| --- | --- | --- | --- | --- |
| | (In millions, except percentages) | | (In millions, except percentages) | |
| Provision (benefit) for income taxes based on U.S. federal statutory income tax rate | 21 | (1) | (28) | 5 |
| State and local income tax provision (benefit), net of federal income taxes | 6 | — | (4) | 5 |
| Change in deferred tax asset valuation allowance | (27) | 2 | 32 | (74) |
| Mirant/RRI Merger-related write-off of NOLs | — | — | — | 83 |
| Tax settlement | — | — | — | (23) [a] |
| Other, net | — | — | — | 4 |
| Income tax provision | — | 1 | — | — |

(a) Settlement of tax disputes increased GenOn Americas Generation's tax basis in depreciable assets that previously had been written off as a result of Mirant's emergence from bankruptcy in 2006.

The tax effects of temporary differences between the carrying amounts of assets and liabilities in the consolidated balance sheets and their respective tax bases which give rise to the pro forma deferred tax assets and liabilities would be as follows:

| | As of December 31, | |
| | 2013 | 2012 |
| --- | --- | --- |
| | (In millions) | |
| **Deferred Tax Assets:** | | |
| Pension and other postretirement benefits | $ 85 | $ — |
| Reserves | 124 | 23 |
| Loss carryforwards | 34 | 176 |
| Property and intangible assets | 1,602 | 817 |
| Out-of-market contracts fair value adjustment | 55 | 212 |
| Debt premium | 42 | 39 |
| Other, net | 37 | — |
| Subtotal | 1,979 | 1,267 |
| Valuation allowance | (1,936) | (990) |
| Net deferred tax assets | 43 | 277 |
| **Deferred Tax Liabilities:** | | |
| Derivative contract assets and liabilities | (43) | (276) |
| Other, net | — | (1) |
| Net deferred tax liabilities | (43) | (277) |
| Net deferred taxes | $ — | $ — |

The guidance related to accounting for income taxes requires that a valuation allowance be established when it is more‑likely‑than‑not that all or a portion of a deferred tax asset will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn Americas Generation's past and anticipated future performance, the reversal of deferred

tax liabilities and the implementation of tax planning strategies.

Objective positive evidence is necessary to support a conclusion that a valuation allowance is not needed for all or a portion of deferred tax assets when significant negative evidence exists. GenOn Americas Generation evaluates this position quarterly and makes its judgment based on the facts and circumstances at that time.

As a result of the NRG Merger, GenOn experienced an ownership change as defined in IRC § 382. IRC § 382 provides, in general, that an ownership change occurs when there is a greater than 50-percentage point increase in ownership of a company's stock by new or existing stockholders who own (or are deemed to own under IRC § 382) 5% or more of the loss company's stock over a three year testing period. IRC § 382 limits the amount of pre-merger NOLs that can be used during any post-ownership change year to offset taxable income. The annual limitation on the amount of taxable income that can be offset by GenOn's pre-NRG Merger NOLs has been redetermined as of the date of the NRG Merger. GenOn Americas Generation's annual limitation on the amount of taxable income that can be offset by its pre-merger pro forma NOLs has also been redetermined as a consequence of the GenOn ownership change that resulted from the NRG Merger. GenOn Americas Generation has reduced the amount of its pre-NRG Merger pro forma NOLs available to offset post-NRG Merger taxable income based on the expected limits determined in accordance with IRC § 382.

*GenOn Mid-Atlantic*

The following reflects a pro forma disclosure of the income tax provision that would be reported if GenOn Mid-Atlantic was to be allocated income taxes attributable to its operations. Pro forma income tax provision attributable to income before tax would consist of the following:

| | Successor | | | Predecessor | |
|---|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | | (In millions) | |
| Current provision (benefit): | | | | | |
| Federal | $ 45 | $ 1 | | $ 10 | $ 3 |
| State | 12 | — | | 1 | 1 |
| Deferred provision: | | | | | |
| Federal | — | (1) | | 3 | 21 |
| State | — | — | | — | 5 |
| Total provision for income taxes | $ 57 | $ — | | $ 14 | $ 30 |

The following table presents the pro forma reconciliation of GenOn Mid-Atlantic's federal statutory income tax provision for continuing operations adjusted for reorganization items to the pro forma effective tax provision:

| | Successor | | | Predecessor | |
|---|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions, except percentages) | | | (In millions, except percentages) | |
| Provision (benefit) for income taxes based on U.S. federal statutory income tax rate | $ 45 | $ — | | $ 11 | $ 37 |
| State and local income taxes | 12 | — | | 1 | 4 |
| Tax settlement | — | — | | — | (11) [a] |
| Impairment of non-deductible goodwill | — | — | | — | — |
| Other, net | — | — | | 2 | — |
| Income tax provision | $ 57 | $ — | | $ 14 | $ 30 |

(a) Settlement of tax disputes increased GenOn Mid-Atlantic's tax basis in depreciable assets that previously had been written off as a result of Mirant's emergence from bankruptcy in 2006.

The tax effects of temporary differences between the carrying amounts of assets and liabilities in the consolidated balance sheets and their respective tax bases which give rise to the pro forma deferred tax assets and liabilities would be as follows:

| | As of December 31, | |
|---|---|---|
| | 2013 | 2012 |
| | (In millions) | |
| **Deferred Tax Assets:** | | |
| Reserves | $ — | $ 19 |
| Loss carryforwards | — | 1 |
| Property and intangible assets | 27 | 632 |
| Out-of-market contracts fair value adjustment | 108 | 212 |
| Other, net | 6 | 8 |
| Net deferred tax assets | 141 | 872 |
| **Deferred Tax Liabilities:** | | |
| Derivative contracts | — | (274) |
| Net deferred tax liabilities | — | (274) |
| Net deferred taxes | $ 141 | $ 598 |

***Pro Forma Tax Uncertainties***

GenOn Mid-Atlantic has not recorded any uncertain tax benefits.

**Asset Retirement Obligations**

**12 Months Ended**

**Dec. 31, 2013**

**Asset Retirement Obligation Disclosure [Abstract]**

Asset Retirement Obligations

**Asset Retirement Obligations (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

The Registrants' AROs are primarily related to the future dismantlement of equipment on leased property and environmental obligations related to ash disposal, site closures and fuel storage facilities. In addition, the Registrants have also identified conditional AROs for asbestos removal and disposal, which are specific to certain power generation operations.

The following table represents the balance of ARO obligations as of December 31, 2012, along with the additions, reductions and accretion related to the Registrants' ARO obligations for the year ended December 31, 2013:

| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| | | (In millions) | |
| **Balance as of December 31, 2012** | $ 172 | $ 73 | $ 25 |
| Additions | 2 | — | — |
| Spending for current obligations and other settlements | (5) | (1) | — |
| Accretion — expense | 10 | 4 | 2 |
| **Balance as of December 31, 2013** | $ 179 | $ 76 | $ 27 |

| Schedule I Condensed Financial Information of Parent Company Only Disclosure Schedule I Condensed Financial Information of Parent Company Only Disclosure (Details) (USD $) In Millions, unless otherwise specified | 0 Months Ended Dec. 31, 2012 Successor [Member] | 1 Months Ended Dec. 31, 2012 Successor [Member] | 12 Months Ended Dec. 31, 2013 Successor [Member] | 12 Months Ended Dec. 14, 2012 Predecessor [Member] | 12 Months Ended Dec. 31, 2011 Predecessor [Member] | 0 Months Ended Dec. 31, 2012 GenOn Energy, Inc. Parent Company [Member] Successor [Member] | Dec. 31, 2013 GenOn Energy, Inc. Parent Company [Member] Successor [Member] | 12 Months Ended Dec. 14, 2012 GenOn Energy, Inc. Parent Company [Member] Predecessor [Member] | 12 Months Ended Dec. 31, 2011 GenOn Energy, Inc. Parent Company [Member] Predecessor [Member] | 0 Months Ended Dec. 31, 2012 GenOn Americas Generation, LLC Parent Company [Member] Successor [Member] | De... G... Am... Co... Suc... [Me... |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **CONSOLIDATED STATEMENTS OF OPERATIONS** | | | | | | | | | | | |
| Operating Income/(Loss) | $ (64) | $ (64) | $ 163 | $ (72) | $ 209 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| **Other Income (Expense), net:** | | | | | | | | | | | |
| Equity in earnings of consolidated subsidiaries | | | | | | | | | | | |
| Other income/(expense), net | 0 | | 1 [1] | 3 | 4 | 4 | 74 | 79 | (1) | 0 | 0 |
| Interest expense | (8) | (8) | (193) | (330) | (379) | (7) | (140) | (217) | (144) | (3) | (64) |
| Total other income (expense), net | (8) | | (211) | (327) | (398) | (72) | (49) | (398) | (189) | (3) | 59 |
| Income/(Loss) Before Income Taxes | (72) | (72) | (48) | (399) | (189) | (72) | (49) | (398) | (189) | (3) | 59 |
| Income tax expense/(benefit) | 0 | 0 | (6) | 15 | 0 | 0 | (6) | 16 | 0 | 0 | 0 |
| Net Income/(Loss) | $ (72) | $ (72) | $ (42) | $ (414) | $ (189) | $ (72) | $ (43) | $ (414) | $ (189) | $ (3) | $ 59 |

[1]

| Property, Plant, and Equipment | 12 Months Ended |
|---|---|
| | Dec. 31, 2013 |

**Property, Plant and Equipment [Abstract]**

Property, Plant, and Equipment

**Property, Plant and Equipment (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Major classes of property, plant, and equipment were as follows:

*GenOn*

| | As of December 31, | | Depreciable Lives |
|---|---|---|---|
| | **2013** | **2012** | |
| | (In millions) | | |
| Facilities and equipment | $ 3,130 | $ 2,953 | 2 - 34 Years |
| Land and improvements | 181 | 185 | |
| Construction in progress | 113 | 693 | |
| Total property, plant and equipment | 3,424 | 3,831 | |
| Accumulated depreciation | (248) | (1) | |
| Net property, plant and equipment | $ 3,176 | $ 3,830 | |

*GenOn Americas Generation*

| | As of December 31, | | Depreciable Lives |
|---|---|---|---|
| | **2013** | **2012** | |
| | (In millions) | | |
| Facilities and equipment | $ 1,213 | $ 1,139 | 2 - 34 Years |
| Land and improvements | 74 | 74 | |
| Construction in progress | 3 | 9 | |
| Total property, plant and equipment | 1,290 | 1,222 | |
| Accumulated depreciation | (96) | (1) | |
| Net property, plant and equipment | $ 1,194 | $ 1,221 | |

*GenOn Mid-Atlantic*

| | As of December 31, | | Depreciable Lives |
|---|---|---|---|
| | **2013** | **2012** | |
| | (In millions) | | |
| Facilities and equipment | $ 1,045 | $ 1,001 | 2 - 34 Years |
| Land and improvements | 16 | 16 | |
| Construction in progress | 3 | 5 | |
| Total property, plant and equipment | 1,064 | 1,022 | |
| Accumulated depreciation | (77) | (1) | |
| Net property, plant and equipment | $ 987 | $ 1,021 | |

| Inventory (Details) (USD $) In Millions, unless otherwise specified | Dec. 31, 2013 | Dec. 31, 2012 |
|---|---|---|
| **Inventory [Line Items]** | | |
| Fuel oil | $ 162 | $ 120 |
| Coal | 144 | 170 |
| Spare parts | 131 | 129 |
| Other | 6 | 3 |
| Total Inventory | 443 | 422 |
| GenOn Americas Generation, LLC [Member] | | |
| **Inventory [Line Items]** | | |
| Fuel oil | 133 | 91 |
| Coal | 81 | 77 |
| Spare parts | 55 | 54 |
| Other | 1 | 1 |
| Total Inventory | 270 | 223 |
| GenOn Mid-Atlantic, LLC [Member] | | |
| **Inventory [Line Items]** | | |
| Fuel oil | 39 | 23 |
| Coal | 81 | 77 |
| Spare parts | 37 | 37 |
| Other | 1 | 0 |
| Total Inventory | $ 158 | $ 137 |

**Accounting for Derivative Instruments and Hedging Activities**

**Derivative Instruments and Hedging Activities Disclosure [Abstract]**

Accounting for Derivative Instruments and Hedging Activities

**12 Months Ended**

**Dec. 31, 2013**

**Accounting for Derivative Instruments and Hedging Activities (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

ASC 815 requires the Registrants to recognize all derivative instruments on the balance sheet as either assets or liabilities and to measure them at fair value each reporting period unless they qualify for a NPNS exception. The Registrants may elect to designate certain derivatives as cash flow hedges, if certain conditions are met, and defer the effective portion of the change in fair value of the derivatives to accumulated OCI, until the hedged transactions occur and are recognized in earnings. The ineffective portion of a cash flow hedge is immediately recognized in earnings.

For derivatives that are not designated as cash flow hedges, the changes in the fair value will be immediately recognized in earnings. Certain derivative instruments may qualify for the NPNS exception and are therefore exempt from fair value accounting treatment. ASC 815 applies to the Registrants' energy related commodity contracts and interest rate swaps.

*Energy-Related Commodities*

To manage the commodity price risk associated with the Registrants' competitive supply activities and the price risk associated with wholesale power sales from the Registrants' electric generation facilities, the Registrants enter into a variety of derivative and non-derivative hedging instruments, utilizing the following:

- Forward contracts, which commit the Registrants to purchase or sell energy commodities or purchase fuels in the future.
- Futures contracts, which are exchange-traded standardized commitments to purchase or sell a commodity or financial instrument.
- Swap agreements, which require payments to or from counterparties based upon the differential between two prices for a predetermined contractual, or notional, quantity.
- Financial and non-financial option contracts, which convey to the option holder the right but not the obligation to purchase or sell a commodity.

The objectives for entering into derivative contracts used for economic hedging include:

- Fixing the price for a portion of anticipated future electricity sales that provides an acceptable return on the Registrants' electric generation operations.
- Fixing the price of a portion of anticipated fuel purchases for the operation of the Registrants' power plants.

GenOn, GenOn Americas Generation and GenOn Mid-Atlantic's trading and hedging activities are subject to limits within the risk management policy. These contracts are recognized on the balance sheet at fair value and changes in the fair value of these derivative financial instruments are recognized in earnings.

*GenOn*

As of December 31, 2013, GenOn's derivative assets and liabilities consisted primarily of the following:

- Forward and financial contracts for the purchase/sale of electricity and related products economically hedging GenOn's generation assets' forecasted output through 2017.
- Forward and financial contracts for the purchase of fuel commodities relating to the forecasted usage of GenOn's generation assets through 2015.

Also, as of December 31, 2013, GenOn had other energy-related contracts that did not meet the definition of a derivative instrument as follows:

- Load-following electric sale contracts extending through 2014;
- Power tolling contracts through 2014;

Coal purchase contracts through 2020;
- Natural gas transportation contracts and storage agreements through 2023; and
- Coal transportation contracts through 2014.

*GenOn Americas Generation*

As of December 31, 2013, GenOn Americas Generation's derivative assets and liabilities consisted primarily of the following:

- Forward and financial contracts for the purchase/sale of electricity and related products economically hedging GenOn Americas Generation's generation assets' forecasted output through 2017.
- Forward and financial contracts for the purchase of fuel commodities relating to the forecasted usage of GenOn Americas Generation's generation assets through 2015.

Also, as of December 31, 2013, GenOn Americas Generation had other energy-related contracts that did not meet the definition of a derivative instrument as follows:

- Load-following electric sale contracts extending through 2014;
- Power tolling contracts through 2014;
- Natural gas transportation contracts and storage agreements through 2023; and
- Coal transportation contracts through 2014.

*GenOn Mid-Atlantic*

As of December 31, 2013, GenOn Mid-Atlantic's derivative assets and liabilities consisted primarily of the following:

- Forward and financial contracts for the purchase/sale of electricity and related products economically hedging GenOn Mid-Atlantic's generation assets' forecasted output through 2017.
- Forward and financial contracts for the purchase of fuel commodities relating to the forecasted usage of GenOn Mid-Atlantic's generation assets through 2015.

Also, as of December 31, 2013, GenOn Mid-Atlantic had other energy-related contracts that did not meet the definition of a derivative instrument as follows:

- Load-following electric sale contracts extending through 2014;
- Natural gas transportation contracts and storage agreements through 2023; and
- Coal transportation contracts through 2014.

### Interest Rate Swaps (GenOn)

In 2010, NRG Marsh Landing entered into interest rate protection agreements (interest rate swaps) in connection with its project financing, which have been designated as cash flow hedges. NRG Marsh Landing entered into the interest rate swaps to reduce the risks with respect to the variability of the interest rates for the term loans. On July 22, 2013, concurrent with the initial public offering of NRG Yield, Inc., GenOn sold its ownership interests in NRG Marsh Landing Holdings LLC to NRG Yield LLC, which included the assignment of the related interest rate swap liability.

### Volumetric Underlying Derivative Transactions

The following table summarizes the net notional volume buy/(sell) of the Registrants' open derivative transactions broken out by commodity, excluding those derivatives that qualified for the NPNS exception as of December 31, 2013, and December 31, 2012. Option contracts are reflected using delta volume. Delta volume equals the notional volume of an option adjusted for the probability that the option will be in-the-money at its expiration date.

| | | GenOn | | GenOn Americas Generation | | GenOn Mid-Atlantic | |
|---|---|---|---|---|---|---|---|
| | | **Total Volume** | | **Total Volume** | | **Total Volume** | |
| | | **As of December 31,** | | **As of December 31,** | | **As of December 31,** | |
| | | **2013** | **2012** | **2013** | **2012** | **2013** | **2012** |
| **Commodity** | **Units** | (In millions) | (In millions) | (In millions) | (In millions) | (In millions) | (In millions) |
| Coal | Short Ton | 6 | 5 | 4 | 4 | 4 | 4 |
| Natural | | | | | | | |

| Gas | MMBtu | | (111) | | (194) | | (113) | | (150) | | (119) | | (150) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Power | MWh | | (26) | | (43) | | (14) | | (22) | | (14) | | (22) |
| Interest | Dollars | $ | — | $ | 475 | $ | — | $ | — | $ | — | $ | — |

*Fair Value of Derivative Instruments*

The following tables summarize the fair value within the derivative instrument valuation on the balance sheet:

*GenOn*

| | Fair Value | | | |
|---|---|---|---|---|
| | Derivative Assets | | Derivative Liabilities | |
| | December 31, 2013 | December 31, 2012 | December 31, 2013 | December 31, 2012 |
| | (In millions) | | (In millions) | |
| **Derivatives Designated as Cash Flow Hedges**: | | | | |
| Interest rate contracts current | $ — | $ — | $ — | $ 9 |
| Interest rate contracts long-term | — | — | — | 41 |
| **Total Derivatives Designated as Cash Flow Hedges** | — | — | — | 50 |
| **Derivatives Not Designated as Cash Flow Hedges:** | | | | |
| Commodity contracts current | 469 | 604 | 163 | 236 |
| Commodity contracts long-term | 182 | 512 | 18 | 83 |
| **Total Derivatives Not Designated as Cash Flow Hedges** | 651 | 1,116 | 181 | 319 |
| **Total Derivatives** | $ 651 | $ 1,116 | $ 181 | $ 369 |

*GenOn Americas Generation*

| | Fair Value | | | |
|---|---|---|---|---|
| | Derivative Assets | | Derivative Liabilities | |
| | December 31, 2013 | December 31, 2012 | December 31, 2013 | December 31, 2012 |
| | (In millions) | | (In millions) | |
| **Derivatives Not Designated as Cash Flow Hedges:** | | | | |
| Commodity contracts current | $ 546 | $ 656 | $ 267 | $ 362 |
| Commodity contracts long-term | 189 | 536 | 41 | 133 |
| **Total Derivatives Not Designated as Cash Flow Hedges** | $ 735 | $ 1,192 | $ 308 | $ 495 |

*GenOn Mid-Atlantic*

| | Fair Value | | | |
|---|---|---|---|---|
| | Derivative Assets | | Derivative Liabilities | |
| | December 31, 2013 | December 31, 2012 | December 31, 2013 | December 31, 2012 |
| | (In millions) | | (In millions) | |
| **Derivatives Not Designated as Cash Flow Hedges:** | | | | |
| Commodity contracts current | $ 351 | $ 394 | $ 64 | $ 100 |
| Commodity contracts long-term | 156 | 455 | 9 | 55 |
| **Total Derivatives Not Designated as Cash Flow Hedges** | $ 507 | $ 849 | $ 73 | $ 155 |

The Registrants have elected to present derivative assets and liabilities on the balance sheet on a trade-by-trade basis and do no offset amounts at the counterparty master agreement level. In addition,

collateral received or paid on the Registrants' derivative assets or liabilities are recorded on a separate line item on the balance sheet. The following tables summarize the offsetting of derivatives by counterparty master agreement level and collateral received or paid:

*GenOn*

|  | Gross Amounts of Recognized Assets/Liabilities | Gross Amounts Not Offset in the Statement of Financial Position | | Net Amount |
|---|---|---|---|---|
|  |  | Derivative Instruments | Cash Collateral (Held)/Posted |  |
| **December 31, 2013** | | (in millions) | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $ 645 | $ (154) | $ (56) | $ 435 |
| Derivative assets- affiliate | 6 | (3) | — | 3 |
| Derivative liabilities | (178) | 154 | — | (24) |
| Derivative liabilities- affiliate | (3) | 3 | — | — |
| **Total derivative instruments** | $ 470 | $ — | $ (56) | $ 414 |

*GenOn Americas Generation*

|  | Gross Amounts of Recognized Assets/Liabilities | Gross Amounts Not Offset in the Statement of Financial Position | | Net Amount |
|---|---|---|---|---|
|  |  | Derivative Instruments | Cash Collateral (Held)/Posted |  |
| **December 31, 2013** | | (in millions) | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $ 643 | $ (154) | $ (56) | $ 433 |
| Derivative assets- affiliate | 92 | (92) | — | — |
| Derivative liabilities | (178) | 154 | — | (24) |
| Derivative liabilities- affiliate | (130) | 92 | — | (38) |
| **Total derivative instruments** | $ 427 | $ — | $ (56) | $ 371 |

*GenOn Mid-Atlantic*

|  | Gross Amounts of Recognized Assets/Liabilities | Gross Amounts Not Offset in the Statement of Financial Position | | Net Amount |
|---|---|---|---|---|
|  |  | Derivative Instruments | Cash Collateral (Held)/Posted |  |
| **December 31, 2013** | | (in millions) | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $ 358 | $ — | $ — | $ 358 |
| Derivative assets- affiliate | 149 | (73) | — | 76 |
| Derivative liabilities | — | — | — | — |
| Derivative liabilities- affiliate | (73) | 73 | — | — |
| **Total derivative instruments** | $ 434 | $ — | $ — | $ 434 |

*GenOn*

|  | Gross Amounts of Recognized Assets/Liabilities | Gross Amounts Not Offset in the Statement of Financial Position | | Net Amount |
|---|---|---|---|---|
|  |  | Derivative Instruments | Cash Collateral (Held)/Posted |  |
| **December 31, 2012** | | (in millions) | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $ 1,107 | $ (260) | $ (243) | $ 604 |
| Derivative assets- affiliate | 9 | (9) | — | — |
| Derivative liabilities | (310) | 260 | 1 | (49) |
| Derivative liabilities- affiliate | (9) | 9 | — | — |
| **Total commodity contracts** | 797 | — | (242) | 555 |
| **Interest rate contracts:** | | | | |
| Derivative liabilities | (50) | — | — | (50) |

| Total derivative instruments | $ | 747 | $ | — | $ | (242) | $ | 505 |
|---|---|---|---|---|---|---|---|---|

*GenOn Americas Generation*

| | | | Gross Amounts Not Offset in the Statement of Financial Position | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Gross Amounts of Recognized Assets/Liabilities | | Derivative Instruments | | Cash Collateral (Held)/Posted | | Net Amount |
| **December 31, 2012** | | | | | (in millions) | | | |
| **Commodity Contracts:** | | | | | | | | |
| Derivative assets | $ | 1,107 | $ | (260) | $ | (243) | $ | 604 |
| Derivative assets- affiliate | | 85 | | (85) | | — | | — |
| Derivative liabilities | | (310) | | 260 | | 1 | | (49) |
| Derivative liabilities- affiliate | | (185) | | 85 | | | | (100) |
| **Total derivative instruments** | $ | 697 | $ | — | $ | (242) | $ | 455 |

*GenOn Mid-Atlantic*

| | | | Gross Amounts Not Offset in the Statement of Financial Position | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Gross Amounts of Recognized Assets/Liabilities | | Derivative Instruments | | Cash Collateral (Held)/Posted | | Net Amount |
| **December 31, 2012** | | | | | (in millions) | | | |
| **Commodity Contracts:** | | | | | | | | |
| Derivative assets | $ | 636 | $ | (3) | $ | (57) | $ | 576 |
| Derivative assets- affiliate | | 213 | | (152) | | — | | 61 |
| Derivative liabilities | | (3) | | 3 | | — | | — |
| Derivative liabilities- affiliate | | (152) | | 152 | | — | | — |
| **Total derivative instruments** | $ | 694 | $ | — | $ | (57) | $ | 637 |

### *Accumulated Other Comprehensive Loss (GenOn)*

The following table summarizes the effects on GenOn's accumulated OCI balance attributable to cash flow hedge derivatives, net of tax of zero dollars:

| | Successor | | | Predecessor | |
|---|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | | (In millions) | |
| Accumulated OCI balance, beginning of period | $ 1 | $ — | | $ (34) | $ 21 |
| Recognized in OCI on interest rate derivatives | 19 | 1 | | (16) | (55) |
| Reclassified from accumulated OCI into earnings[(a)(b)] | (2) | — | | (2) | — |
| Reversal as part of sale to NRG Yield LLC [(d)] | (18) | — | | — | — |
| Accumulated OCI balance, end of period | $ — | $ 1 | | $ (52) | $ (34) |
| Valuation adjustments | $ — | $ — | | $ — | $ 4 [(c)] |

(a) Amounts reclassified from accumulated OCI into income and amounts recognized in income from the ineffective portion of cash flow hedges are recorded in interest expense.

(b) All of the forecasted transactions (future interest payments) were deemed probable of occurring; therefore, no cash flow hedges were discontinued and no amount was recognized in GenOn's results of operations as a result of discontinued cash flow hedges.

(c) Represents the default risk of the counterparties to these transactions and GenOn's own non-performance risk. The effect of these valuation adjustments is recorded in interest expense.

(d) The reversal of accumulated OCI as part of the sale of NRG Marsh Landing to NRG Yield LLC resulted in the recognition of additional paid-in capital.

Because a significant portion of the interest expense incurred by Marsh Landing during construction was capitalized, amounts included in accumulated other comprehensive loss associated with construction period interest payments were reclassified to property, plant and equipment and will be depreciated over the expected useful life of the Marsh Landing generating facility. Actual amounts reclassified into earnings could vary from the amounts currently recorded as a result of future changes in interest rates.

### Impact of Derivative Instruments on the Statement of Operations

Unrealized gains and losses associated with changes in the fair value of derivative instruments not accounted for as cash flow hedges are reflected in current period earnings.

The following tables summarize the pre-tax effects of economic hedges that have not been designated as cash flow hedges and trading activity on the Registrants' statements of operations. These amounts are included within operating revenues and cost of operations.

*GenOn*

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| **Unrealized mark-to-market results** | | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (367) | $ (4) | $ (307) | $ (243) |
| Net unrealized gains/(losses) on open positions related to economic hedges | 40 | (5) | 166 | 465 |
| Total unrealized mark-to-market (losses)/gains for economic hedging activities | (327) | (9) | (141) | 222 |
| Reversal of previously recognized unrealized (gains)/losses on settled positions related to trading activity | (1) | (4) | (8) | 6 |
| Net unrealized gains/(losses) on open positions related to trading activity | 1 | — | 6 | (4) |
| Total unrealized mark-to-market (losses)/gains for trading activity | — | (4) | (2) | 2 |
| **Total unrealized (losses)/gains** | $ (327) | $ (13) | $ (143) | $ 224 |

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| Revenue from operations — energy commodities | $ (356) | $ (20) | $ (159) | $ 227 |
| Cost of operations | 29 | 7 | 16 | (3) |
| **Total impact to statement of operations** | $ (327) | $ (13) | $ (143) | $ 224 |

*GenOn Americas Generation*

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| **Unrealized mark-to-market results** | | | | |
| Reversal of previously recognized | | | | |

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| unrealized gains on settled positions related to economic hedges | $ (296) | $ (2) | $ (241) | $ (220) |
| Net unrealized gains/(losses) on open positions related to economic hedges | 25 | (6) | 109 | 356 |
| Total unrealized mark-to-market (losses)/gains for economic hedging activities | (271) | (8) | (132) | 136 |
| Reversal of previously recognized unrealized (gains)/losses on settled positions related to trading activity | (1) | (4) | (8) | 6 |
| Net unrealized gains/(losses) on open positions related to trading activity | 1 | — | 6 | (4) |
| Total unrealized mark-to-market (losses)/gains for trading activity | — | (4) | (2) | 2 |
| **Total unrealized (losses)/gains** | $ (271) | $ (12) | $ (134) | $ 138 |

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| Revenue from operations — energy commodities | $ (302) | $ (16) | $ (153) | $ 140 |
| Cost of operations | 31 | 4 | 19 | (2) |
| **Total impact to statement of operations** | $ (271) | $ (12) | $ (134) | $ 138 |

*GenOn Mid-Atlantic*

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| **Unrealized mark-to-market results** | | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (296) | $ (2) | $ (246) | $ (215) |
| Net unrealized gains/(losses) on open positions related to economic hedges | 35 | (5) | 131 | 335 |
| **Total unrealized (losses)/gains** | $ (261) | $ (7) | $ (115) | $ 120 |

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| Revenue from operations — energy commodities | $ (292) | $ (12) | $ (120) | $ 119 |
| Cost of operations | 31 | 5 | 5 | 1 |
| **Total impact to statement of operations** | $ (261) | $ (7) | $ (115) | $ 120 |

**Credit Risk Related Contingent Features (GenOn and GenOn Americas Generation)**

Certain of GenOn and GenOn Americas Generation's hedging agreements contain provisions that require the Registrants to post additional collateral if the counterparty determines that there has been deterioration in credit quality, generally termed "adequate assurance" under the agreements, or require the

Registrants to post additional collateral if there were a one notch downgrade in the Registrants' credit rating. The collateral required for contracts that have adequate assurance clauses that are in net liability positions as of December 31, 2013, was $33 million for GenOn and GenOn Americas Generation. The collateral required for contracts with credit rating contingent features that are in a net liability position as of December 31, 2013, was $0.5 million for GenOn and GenOn Americas Generation. In addition, GenOn and GenOn Americas Generation are parties to certain marginable agreements under which they have net liability positions, but the counterparties have not called for collateral due, which is approximately $4 million as of December 31, 2013. At December 31, 2013, GenOn Mid-Atlantic did not have any financial instruments with credit-risk-related contingent features.

See Note 4, *Fair Value of Financial Instruments,* for discussion regarding concentration of credit risk.

**Inventory**

**12 Months Ended**

**Dec. 31, 2013**

**Inventory Disclosure [Abstract]**

Inventory

**Inventory (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Inventory consisted of:

*GenOn*

| | As of December 31, | |
|---|---|---|
| | **2013** | **2012** |
| | **(In millions)** | |
| Fuel oil | $ 162 | $ 120 |
| Coal | 144 | 170 |
| Spare parts | 131 | 129 |
| Other | 6 | 3 |
| Total Inventory | $ 443 | $ 422 |

*GenOn Americas Generation*

| | As of December 31, | |
|---|---|---|
| | **2013** | **2012** |
| | **(In millions)** | |
| Fuel oil | $ 133 | $ 91 |
| Coal | 81 | 77 |
| Spare parts | 55 | 54 |
| Other | 1 | 1 |
| Total Inventory | $ 270 | $ 223 |

*GenOn Mid-Atlantic*

| | As of December 31, | |
|---|---|---|
| | **2013** | **2012** |
| | **(In millions)** | |
| Fuel oil | $ 39 | $ 23 |
| Coal | 81 | 77 |
| Spare parts | 37 | 37 |
| Other | 1 | — |
| Total Inventory | $ 158 | $ 137 |

| Retirements, Mothballing or Long-Term Protective Layup of Generating Facilities | 12 Months Ended<br><br>Dec. 31, 2013 |
|---|---|

**Retirements Mothballing or Long Term Protective Layup of Generating Facilities**

Retirements, Mothballing or Long-Term Protective Layup of Generating Facilities

**Retirements, Mothballing or Long-Term Protective Layup of Generating Facilities (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*Facilities Announced for Deactivation Due to Returns on Investment (GenOn)*

The Registrants are subject to extensive environmental regulation by federal, state and local authorities under a variety of statutes, regulations and permits that address discharges into the air, water and soil, and the proper handling of solid, hazardous and toxic materials and waste. Complying with increasingly stringent environmental requirements involves significant capital and operating expenses. To the extent forecasted returns on investments necessary to comply with environmental regulations are insufficient for a particular facility, the Registrants plan to deactivate that facility. In determining the forecasted returns on investments, the Registrants factor in forecasted energy and capacity prices, expected capital expenditures, operating costs, property taxes and other factors. GenOn deactivated the following coal-fired units at the referenced times: Elrama units 1-3 (290 MW) June 2012, Niles unit 2 (110 MW) June 2012, Elrama unit 4 (170 MW) and Niles unit 1 (110 MW) October 2012, and all Titus coal units (245 MW) September 2013. The Registrants expect to deactivate the following generating capacity, primarily coal-fired units, at the referenced times: Portland (400 MW) June 2014, Shawville (597 MW) place in long-term protective layup in April 2015, Gilbert (98 MW) May 2015, Glen Gardner (160 MW) May 2015, and Werner (212 MW) May 2015.

*Potomac River Generating Facility*

During 2011, NRG Potomac River LLC entered into an agreement with the City of Alexandria, Virginia to remove permanently from service its 480 MW Potomac River generating facility. The agreement, which amends the Project Schedule and Agreement, dated July 2008 with the City of Alexandria, provides for the retirement of the Potomac River generating facility on October 1, 2012, subject to the determination of PJM that the retirement of the facility will not affect reliability and the consent of Potomac Electric Power Company. PJM made the necessary determination and in June 2012 Potomac Electric Power Company gave its consent. As a result, the Potomac River generating facility was retired in October 2012. Upon retirement of the Potomac River generating facility, all funds in the escrow account ($32 million) established under the July 2008 agreement were distributed to NRG Potomac River in October 2012. GenOn Mid-Atlantic therefore reversed $32 million of the previously recorded obligation under the 2008 agreement with the City of Alexandria as a reduction in cost of operations during the period from January 1, 2012 through December 14, 2012.

*Contra Costa Generating Facility (GenOn and GenOn Americas Generation)*

NRG Delta LLC entered into an agreement with PG&E in September 2009 for 675 MW at Contra Costa for the period from November 2011 through April 2013. At the end of the agreement GenOn Americas Generation retired the Contra Costa facility.

*Expenses, Property, Plant and Equipment, and Materials and Supplies Inventory Related to Deactivations*

In connection with the decision to deactivate the generating facilities, the Registrants evaluated their spare parts inventory and determined that there was excess inventory. GenOn, GenOn Americas Generation and GenOn Mid-Atlantic established a reserve of $35 million, $6 million and $4 million, respectively, recorded to operations and maintenance expense during the first quarter of 2012 relating to their excess inventory. In addition to the excess spare parts inventory reserve recorded in the first quarter of 2012, GenOn, GenOn Americas Generation and GenOn Mid-Atlantic incurred $18 million, $10 million and $9 million, respectively, during the period from January 1, 2012 through December 14, 2012 for costs to deactivate generating facilities, which is included in cost of operations. During the period from December 15, 2012 through December 31, 2012, GenOn, GenOn Americas Generation and GenOn Mid-Atlantic incurred $1 million, $1 million and $1 million, respectively, for these costs. At December 31, 2012, the aggregate carrying value of property, plant and equipment, net and spare parts for the generating facilities with an aggregate of 3,540 MW, and are expected to be deactivated in 2013, 2014 or 2015, was $115 million and $17 million, respectively, for GenOn.

If market conditions and/or environmental and regulatory factors or assumptions change in the

future, forecasted returns on investments necessary to comply with environmental regulations could change resulting in possible incremental investments if returns improve or deactivation of additional generating units or facilities if returns deteriorate.  Such deactivations could result in additional charges, including impairments, severance costs and other plant shutdown costs.

| Debt and Capital Leases (Details) (USD $) In Millions, unless otherwise specified | Dec. 31, 2013 | 1 Months Ended Jun. 30, 2013 Senior Secured Notes 2014 [Member] | 3 Months Ended Sep. 30, 2013 Senior Secured Notes 2014 [Member] | 12 Months Ended Dec. 31, 2013 Capital Lease Obligations [Member] megawatt | Dec. 14, 2012 Predecessor [Member] | Dec. 31, 2011 Predecessor [Member] | Dec. 31, 2012 Predecessor [Member] | 0 Months Ended Dec. 31, 2012 Successor [Member] | 12 Months Ended Dec. 31, 2013 Successor [Member] | Dec. 31, 2013 Rema [Member] | Dec. 31, 2013 GenOn Americas Generation, LLC [Member] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Debt Instrument [Line Items]** | | | | | | | | | | | |
| Debt Instrument, Repurchased Face Amount | | | $ 575 | | | | | | | | |
| Redemption Price Percentage of Face Amount | | 1.06778 | | | | | | | | | |
| Gains (Losses) on Extinguishment of Debt | | | (11) | | 0 | (23) | | 0 | (11) | | |
| Unamortized debt premiums/ (discounts) | | | | | | | | 420 | 321 | | |
| Debt instrument, interest rate, stated percentage (as a percent) | | | | | | | | | | | |
| Debt instrument, interest rate over variable rate (as a percent) | | | | | | | | | | | |
| Variable rate basis for debt instruments | | | | | | | | | | | |
| Debt and Capital Lease Obligations | | | | | | | | 4,202 | 3,133 | | |
| Less current maturities | | | | | | | 32 | 32 | 5 | | |
| Long-term debt and capital leases | | | | | | | 4,170 | 4,170 | 3,128 | | |
| **Long-term Debt, Other Disclosures [Abstract]** | | | | | | | | | | | |
| Restricted payments amount allowed | | | | | | | | | | | |
| Number of days interest past due to constitute default | | | | | | | | | | | |
| Number of days after specified notice to comply with any other agreements in the indenture to constitute an event of default | | | | | | | | | | | |
| Number of days after failure to pay certain final and non appealable judgments to constitute an event of default | | | | | | | | | | | |
| Fair Value of debt | | | | | | | | | | | |
| Percentage of principal amount that is the base redemption price prior to maturity (as a percent) | | | | | | | | | | | |
| Percentage of principal amount paid as a premium on redemption of notes prior to maturity (as a percent) | | | | | | | | | | | |
| Percentage of principal amount | | | | | | | | | | | |

| | | | |
|---|---|---|---|
| used to determine premium on redemption prior to maturity (as a percent) | | | |
| Percentage above Treasury rate over the principal amount of the note used as a discount (as a percent) | | | |
| Redemption percentage, prior to maturity (as a percent) | | | |
| **Line of Credit Facility [Abstract]** | | | |
| Maximum borrowing capacity | | | |
| Principle amount of debt | | | |
| Cash collateral posted | | 538 | 399 |
| Letters of Credit Outstanding, Amount | | | |
| Issued Letters of Credit Returned Amount | | | |
| **Capital Leases [Abstract]** | | | |
| Capital leases due in 2014 | 5 | | |
| Electric generating capacity (in megawatts) | 80 | | |
| **Long-term Debt, Fiscal Year Maturity [Abstract]** | | | |
| 2016 | 725 | | |
| 2017 | 675 | | |
| Thereafter | 1,400 | | 850 |
| Long-term Debt | 2,800 | | 850 |
| Restricted Net Assets | | | $ (959) |

[1]     (a)As of December 31, 2012, adjustments to fair value of debt represent adjustments recorded in connection with the NRG Merger.

| Schedule I Condensed Financial Information of Parent Company Only Disclosure (Details 2) (USD $) In Millions, except Share data, unless otherwise specified | Dec. 31, 2013 | Dec. 31, 2012 | Dec. 14, 2012 | Dec. 31, 2011 | Dec. 31, 2010 |
|---|---|---|---|---|---|
| **Predecessor [Member]** | | | | | |
| **Current Assets:** | | | | | |
| Cash and Cash Equivalents, at Carrying Value | | $ 825 | $ 983 | $ 1,539 | $ 2,395 |
| Accounts Receivable, Net, Current | | 138 | | | |
| Total current assets | | 2,556 | | | |
| **Property, Plant and Equipment [Abstract]** | | | | | |
| In service | | 3,138 | | | |
| Under construction | | 693 | | | |
| Total property, plant and equipment | | 3,831 | | | |
| Accumulated depreciation | | (1) | | | |
| Net property, plant and equipment | | 3,830 | | | |
| **Noncurrent Assets:** | | | | | |
| Other non-current assets | | 234 | | | |
| Total Other Assets | | 1,033 | | | |
| Total Assets | | 7,419 | | | |
| **Current Liabilities:** | | | | | |
| Current portion of long-term debt, net of discount | | 32 | | | |
| Total current liabilities | | 1,160 | | | |
| **Noncurrent Liabilities:** | | | | | |
| Long-term debt, net of current portion | | 4,170 | | | |
| Other non-current liabilities | | 310 | | | |
| Total non-current liabilities | | 6,052 | | | |
| Liabilities | | 7,212 | | | |
| **Stockholders' Equity:** | | | | | |
| Common stock, par value $.001 per share, authorized 2.0 billion shares, issued 771,692,734 shares and 770,857,530 shares at December 31, 2011 and 2010, respectively | | 0 | | | |
| Additional paid-in capital | | 277 | | | |
| Accumulated deficit | | (72) | | | |
| Accumulated other comprehensive income | | 2 | | | |
| Total Liabilities and Stockholders' Equity | | 7,419 | | | |
| **Condensed Balance Sheets (Parenthetical)** | | | | | |
| Common stock, par value (in dollars per share) | | $ 0.001 | | | |
| Common stock, shares authorized (in shares) | | 1 | | | |
| Common stock, shares issued (in shares) | | 1 | | | |
| Predecessor [Member] | Affiliated Entity [Member] | | | | | |
| **Current Liabilities:** | | | | | |
| Accounts Payable, affiliate | | 6 | | | |

Predecessor [Member] | Non-affiliated Entity [Member]

**Current Liabilities:**

| | | | |
|---|---|---|---|
| Accounts Payable, affiliate | | 190 | |

Successor [Member]

**Current Assets:**

| | | | |
|---|---|---|---|
| Cash and Cash Equivalents, at Carrying Value | 760 | 825 | 983 |
| Accounts Receivable, Net, Current | 178 | | |
| Total current assets | 2,162 | | |

**Property, Plant and Equipment [Abstract]**

| | |
|---|---|
| In service | 3,311 |
| Under construction | 113 |
| Total property, plant and equipment | 3,424 |
| Accumulated depreciation | (248) |
| Net property, plant and equipment | 3,176 |

**Noncurrent Assets:**

| | | |
|---|---|---|
| Other non-current assets | 149 | |
| Total Other Assets | 396 | |
| Total Assets | 5,734 | 7,419 |

**Current Liabilities:**

| | | |
|---|---|---|
| Current portion of long-term debt, net of discount | 5 | 32 |
| Total current liabilities | 749 | |

**Noncurrent Liabilities:**

| | | |
|---|---|---|
| Long-term debt, net of current portion | 3,128 | 4,170 |
| Other non-current liabilities | 296 | |
| Total non-current liabilities | 4,672 | |
| Liabilities | 5,421 | |

**Stockholders' Equity:**

| | |
|---|---|
| Common stock, par value $.001 per share, authorized 2.0 billion shares, issued 771,692,734 shares and 770,857,530 shares at December 31, 2011 and 2010, respectively | 0 |
| Additional paid-in capital | 325 |
| Accumulated deficit | (114) |
| Accumulated other comprehensive income | 102 |
| Total Liabilities and Stockholders' Equity | 5,734 |

**Condensed Balance Sheets (Parenthetical)**

| | |
|---|---|
| Common stock, par value (in dollars per share) | $ 0.001 |
| Common stock, shares authorized (in shares) | 1 |
| Common stock, shares issued (in shares) | 1 |

Successor [Member] | Affiliated Entity [Member]

**Current Liabilities:**

| | |
|---|---|
| Accounts Payable, affiliate | 72 |

Successor [Member] | Non-affiliated Entity [Member]

**Current Liabilities:**

| | |
|---|---|
| Accounts Payable, affiliate | 187 |

GenOn Energy, Inc. Parent Company [Member] | Predecessor [Member]

**Current Assets:**

| | | | | |
|---|---|---|---|---|
| Cash and Cash Equivalents, at Carrying Value | 530 | 571 | 659 | 577 |
| Other Assets, Current | 124 | | | |
| Total current assets | 1,908 | | | |

**Noncurrent Assets:**

| | |
|---|---|
| Total Other Assets | 1,371 |
| Total Assets | 3,279 |

**Current Liabilities:**

| | |
|---|---|
| Taxes payable | 41 |
| Other Liabilities, Current | 31 |
| Total current liabilities | 72 |

**Noncurrent Liabilities:**

| | |
|---|---|
| Long-term debt, net of current portion | 2,849 |
| Other non-current liabilities | 1 |
| Total non-current liabilities | 2,850 |
| Liabilities | 2,922 |

**Stockholders' Equity:**

| | |
|---|---|
| Common stock, par value $.001 per share, authorized 2.0 billion shares, issued 771,692,734 shares and 770,857,530 shares at December 31, 2011 and 2010, respectively | 0 |
| Additional paid-in capital | 427 |
| Accumulated deficit | (72) |
| Accumulated other comprehensive income | 2 |
| Stockholders' Equity Attributable to Parent | 357 |
| Total Liabilities and Stockholders' Equity | 3,279 |

**Condensed Balance Sheets (Parenthetical)**

| | |
|---|---|
| Preferred stock, par value (in dollars per share) | $ 0.001 |
| Preferred stock, shares authorized (in shares) | 125,000,000 |
| Preferred stock, shares issued (in shares) | 0 |
| Common stock, par value (in dollars per share) | $ 0.001 |
| Common stock, shares authorized (in shares) | 2,000,000,000 |
| Common stock, shares issued (in shares) | 771,692,734 |

GenOn Energy, Inc. Parent Company [Member] | Predecessor [Member] | Affiliated Entity [Member]

**Current Assets:**

| | |
|---|---|
| Accounts Receivable, Net, Current | 10 |
| Notes receivable | 1,119 |
| Interest Receivable, Current | 125 |

**Noncurrent Assets:**

| | |
|---|---|
| Investments in affiliates | 368 |
| Notes receivables | 1,003 |

GenOn Energy, Inc. Parent Company [Member] | Successor [Member]

**Current Assets:**

| | | |
|---|---|---|
| Cash and Cash Equivalents, at Carrying Value | 621 | 530 | 571 |
| Other Assets, Current | 7 | | |

Total current assets | 1,247

**Noncurrent Assets:**

| | |
|---|---|
| Total Other Assets | 1,371 |
| Total Assets | 2,618 |

**Current Liabilities:**

| | |
|---|---|
| Taxes payable | 6 |
| Other Liabilities, Current | 90 |
| Total current liabilities | 96 |

**Noncurrent Liabilities:**

| | |
|---|---|
| Long-term debt, net of current portion | 2,205 |
| Other non-current liabilities | 3 |
| Total non-current liabilities | 2,208 |
| Liabilities | 2,304 |

**Stockholders' Equity:**

| | |
|---|---|
| Common stock, par value $.001 per share, authorized 2.0 billion shares, issued 771,692,734 shares and 770,857,530 shares at December 31, 2011 and 2010, respectively | 0 |
| Additional paid-in capital | 327 |
| Accumulated deficit | (114) |
| Accumulated other comprehensive income | 101 |
| Stockholders' Equity Attributable to Parent | 314 |
| Total Liabilities and Stockholders' Equity | 2,618 |

**Condensed Balance Sheets (Parenthetical)**

| | |
|---|---|
| Common stock, par value (in dollars per share) | $ 0.001 |
| Common stock, shares authorized (in shares) | 1 |
| Common stock, shares issued (in shares) | 1 |

GenOn Energy, Inc. Parent Company [Member] | Successor [Member] | Affiliated Entity [Member]

**Current Assets:**

| | |
|---|---|
| Accounts Receivable, Net, Current | 27 |
| Notes receivable | 592 |
| Interest Receivable, Current | 0 |

**Noncurrent Assets:**

| | |
|---|---|
| Investments in affiliates | 346 |
| Notes receivables | 1,025 |

GenOn Americas Generation, LLC Parent Company [Member] | Predecessor [Member]

**Current Assets:**

| | | | |
|---|---|---|---|
| Cash and Cash Equivalents, at Carrying Value | 0 | 0 | 150 |
| Accounts Receivable, Net, Current | 1 | | |
| Total current assets | 1 | | |

**Property, Plant and Equipment [Abstract]**

| | |
|---|---|
| In service | 11 |
| Under construction | 1 |
| Total property, plant and equipment | 12 |
| Accumulated depreciation | (1) |

Net property, plant and equipment | 11

**Noncurrent Assets:**

| | |
|---|---|
| Other non-current assets | 5 |
| Total Other Assets | 1,790 |
| Total Assets | 1,802 |

**Current Liabilities:**

| | |
|---|---|
| Accrued expenses and other current liabilities | 16 |
| Total current liabilities | 29 |

**Noncurrent Liabilities:**

| | |
|---|---|
| Long-term debt, net of current portion | 848 |
| Total non-current liabilities | 848 |
| Liabilities | 877 |

**Member's Equity: (Abstract) [Abstract]**

| | |
|---|---|
| Members' interest | 925 |
| Total member's equity | 925 |
| Total Liabilities and Member's Equity | 1,802 |

GenOn Americas Generation, LLC Parent Company [Member] | Predecessor [Member] | Affiliated Entity [Member]

**Noncurrent Assets:**

| | |
|---|---|
| Investments in affiliates | 1,785 |

**Current Liabilities:**

| | |
|---|---|
| Accounts Payable, affiliate | 1 |
| Note payable — affiliate | 12 |

GenOn Americas Generation, LLC Parent Company [Member] | Successor [Member]

**Current Assets:**

| | | | |
|---|---|---|---|
| Cash and Cash Equivalents, at Carrying Value | 0 | 0 | 0 |
| Accounts Receivable, Net, Current | 1 | | |
| Total current assets | 1 | | |

**Property, Plant and Equipment [Abstract]**

| | |
|---|---|
| In service | 0 |
| Under construction | 0 |
| Total property, plant and equipment | 0 |
| Accumulated depreciation | 0 |
| Net property, plant and equipment | 0 |

**Noncurrent Assets:**

| | |
|---|---|
| Other non-current assets | 0 |
| Total Other Assets | 1,653 |
| Total Assets | 1,654 |

**Current Liabilities:**

| | |
|---|---|
| Accrued expenses and other current liabilities | 16 |
| Total current liabilities | 27 |

**Noncurrent Liabilities:**

| | |
|---|---|
| Long-term debt, net of current portion | 937 |
| Total non-current liabilities | 937 |
| Liabilities | 964 |

**Member's Equity: (Abstract) [Abstract]**

| | |
|---|---|
| <u>Members' interest</u> | 690 |
| <u>Total member's equity</u> | 690 |
| <u>Total Liabilities and Member's Equity</u> | 1,654 |

GenOn Americas Generation, LLC Parent Company [Member] | Successor [Member] | Affiliated Entity [Member]

**Noncurrent Assets:**

| | |
|---|---|
| <u>Investments in affiliates</u> | 1,653 |

**Current Liabilities:**

| | |
|---|---|
| <u>Accounts Payable, affiliate</u> | 0 |
| <u>Note payable — affiliate</u> | $ 11 |

| Benefit Plans and Other Postretirement Benefits Benefit Plans and Other Postretirement Benefits Disclosure (Narrative) (Details) (USD $) In Millions, unless otherwise specified | 12 Months Ended Dec. 31, 2012 | Dec. 31, 2013 | 0 Months Ended Dec. 31, 2012 Employee Savings Fixed Profit Sharing and Discretionary Profit Sharing [Member] | Dec. 14, 2012 Employee Savings Fixed Profit Sharing and Discretionary Profit Sharing [Member] | 12 Months Ended Dec. 31, 2012 Employee Savings Fixed Profit Sharing and Discretionary Profit Sharing [Member] | Dec. 31, 2011 Employee Savings Fixed Profit Sharing and Discretionary Profit Sharing [Member] | Dec. 31, 2013 Non-Qualified Deferred Compensation Plans [Member] | Dec. 31, 2013 Pension Plans, Defined Benefit [Member] Tax Qualified Pension Benefits [Member] | Dec. 31, 2012 Pension Plans, Defined Benefit [Member] Tax Qualified Pension Benefits [Member] |
|---|---|---|---|---|---|---|---|---|---|
| **Defined Benefit Plan Disclosure [Line Items]** | | | | | | | | | |
| Pension and Other Postretirement Benefit Plans, Accumulated Other Comprehensive Income (Loss), Net Gains (Losses), before Tax | | $ 6 | | | | | | | |
| Accumulated benefit obligation in excess of plan assets | | | | | | | | 517 | 543 |
| Period for which difference between expected return and actual return on plan assets are to be recognized | 5 years | | | | | | | | |
| Rabbi trust investments | | | | | | | 31 | | |
| Fixed contribution percentage of employee's eligible pay per period contributed to plan by company | | | | | 2.00% | | | | |
| Annual discretionay contribution percentage of employee's eligible pay cotributed to plan by company based on company performance | | | | | 3.00% | | | | |
| Obligations | | | | | | | 22 | | |
| Expenses recognized | | | $ 4 | $ 1 | | $ 30 | | | |

| Impairments (Details) (USD $) In Millions, unless otherwise specified | 12 Months Ended Dec. 31, 2011 | 12 Months Ended Dec. 31, 2011 GenOn Americas Generation, LLC [Member] | 12 Months Ended Dec. 31, 2011 GenOn Mid-Atlantic, LLC [Member] | 3 Months Ended Sep. 30, 2012 Fair Value, Measurements, Nonrecurring [Member] Portland generating facility | Dec. 31, 2012 Fair Value, Measurements, Nonrecurring [Member] Portland generating facility | 3 Months Ended Sep. 30, 2012 Fair Value, Measurements, Nonrecurring [Member] Titus generating facility | Dec. 31, 2012 Fair Value, Measurements, Nonrecurring [Member] Titus generating facility | Dec. 31, 2011 Csapr Nitrogen Oxides Emissions Credits [Member] | 12 Months Ended Dec. 31, 2011 Csapr Nitrogen Oxides Emissions Credits [Member] GenOn Americas Generation, LLC [Member] | Dec. 31, 20.. Csapr Nitro.. Oxi.. Emis.. Cre.. [Men.. Gen.. Mi.. Atla.. LL.. Men.. |
|---|---|---|---|---|---|---|---|---|---|---|
| **Fair Value, Assets Measured on Non-recurring Basis** | | | | | | | | | | |
| Impairment losses | $ 133 | $ 128 | $ 94 | $ 37 | | $ 10 | | | | |
| Impairment charge on emission allowances | | | | | | | | 45 | 43 | 43 |
| Excess acid rain program carrying value of asset before impairment | | | | | | | | | | |
| Fair value of excess acid rain program | | | | | | | | | | |
| Total property, plant and equipment | | | | | $ 17 | | $ 15 | | | |

| **Summary of Significant Accounting Policies Capitalized Interest (Tables)** | **12 Months Ended** |
| --- | --- |
| | **Dec. 31, 2013** |

**Accounting Policies [Abstract]**

Schedule of Interest Cost Incurred [Table Text Block]

Interest incurred on funds borrowed to finance capital projects is capitalized until the project under construction is ready for its intended use. The amounts of interest capitalized were as follows:

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | **Year Ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** | **Year Ended December 31, 2011** |
| | **(In millions)** | | **(In millions)** | |
| GenOn | $ 21 | $ 2 | $ 35 | $ 15 |
| GenOn Americas Generation | 2 | — | 3 | 3 |

| Nature of Business (Details) | Dec. 31, 2013 MW | Dec. 31, 2013 In service [Member] MW | Dec. 31, 2013 In service East [Member] MW | Dec. 31, 2013 In service South Central [Member] MW | Dec. 31, 2013 In service West [Member] MW | Dec. 31, 2013 Natural Gas [Member] In service [Member] MW | Dec. 31, 2013 Natural Gas [Member] In service East [Member] MW | Dec. 31, 2013 Natural Gas [Member] In service South Central [Member] MW | Dec. 31, 2013 Natural Gas [Member] In service West [Member] MW | Dec. 31, 2013 Coal [Member] MW | Dec. 31, 2013 Coal [Member] In service East [Member] MW | Dec. 3... Coal [Member] In serv... South Central [Memb... MW |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Nature of Business [Line Items]** | | | | | | | | | | | | |
| Generation capacity (in MW) | 19,997 | 19,997 | 14,364 | 1,198 | 4,435 | 12,022 | 6,389 | 1,198 | 4,435 | 5,898 | 5,898 | 0 |
| **Merger [Abstract]** | | | | | | | | | | | | |
| Number of shares of NRG common stock issued, for each share of GenOn common stock | | | | | | | | | | | | |

| Capital Structure | **12 Months Ended** |
|---|---|
| | **Dec. 31, 2012** |

**Capital Structure Disclosure [Abstract]**

Capital Structure

**Capital Structure (GenOn)**

On December 14, 2012, NRG and GenOn completed the NRG Merger. Upon closing, each issued and outstanding share of GenOn's common stock automatically converted into the right to receive 0.1216 shares of common stock of NRG based on the NRG Merger Exchange Ratio. See Note 3, *NRG Merger and Dispositions*.

| | Common Stock (Shares in millions) |
|---|---|
| As of December 31, 2010 | 771 |
| Transactions under stock plans | 1 |
| As of December 31, 2011 | 772 |
| Transactions under stock plans | 2 |
| As of December 14, 2012 | 774 |
| Impact of NRG Merger | (774) |
| As of December 31, 2012[a] | — |

(a) There have been no common stock transactions subsequent to the NRG Merger.

| **Commitments and<br>Contingencies** | **12 Months Ended**<br>**Dec. 31, 2013** |

**Commitments and<br>Contingencies Disclosure<br>[Abstract]**

Commitments and Contingencies<br>Disclosure [Text Block]

**Commitments**

*GenOn Mid-Atlantic Operating Leases*

GenOn Mid-Atlantic leases a 100% interest in the Dickerson and Morgantown coal generation units and associated property through 2029 and 2034, respectively. GenOn Mid-Atlantic has an option to extend the leases. Any extensions of the respective leases would be for less than 75% of the economic useful life of the facility, as measured from the beginning of the original lease term through the end of the proposed remaining lease term. GenOn Mid-Atlantic accounts for these leases as operating leases and recognizes rent expense on a straight-line basis over the lease term. Rent expense totaled $41 million for the year ended December 31, 2013, $3 million for the period from December 15, 2012 through December 31, 2012, $92 million, for the period from January 1, 2012 through December 14, 2012 and $96 million for the year ended December 31, 2011. Rent expense is included in cost of operations. As of December 31, 2013 and 2012, GenOn Mid-Atlantic has paid $97 million and $30 million, respectively, of lease payments in excess of rent expense recognized, which is included in prepaid rent on the consolidated balance sheets. Of these amounts, $71 million and $30 million, respectively, is included in prepayments and other current assets (prepayments for GenOn).

For restrictions under these leases, see Note 10, *Debt and Capital Leases.*

As further described in Note 3, *NRG Merger and Dispositions*, as a result of pushdown accounting, GenOn Mid-Atlantic recorded the acquisition date fair value of the leasehold improvements of $382 million, classified in property, plant and equipment. In addition, GenOn Mid-Atlantic recorded the acquisition date fair value of the leasehold interests, net of the present value of the lease obligation, equal to an out-of-market liability of $604 million, classified in out-of-market contracts. This liability is amortized to rent expense on a straight-line basis over the term of the lease.

Future minimum lease commitments under the GenOn Mid-Atlantic operating leases for the years ending after December 31, 2013, are as follows:

|  | (In millions) |
|---|---|
| 2014 | $ 131 |
| 2015 | 110 |
| 2016 | 150 |
| 2017 | 144 |
| 2018 | 105 |
| Thereafter | 686 |
| Total | $ 1,326 |

*REMA Operating Leases (GenOn)*

GenOn, through its subsidiary, REMA, leases a 100% interest in the Shawville coal generation facility through 2026, and expects to make payments under the Shawville lease through that date, and leases 16.45% and 16.67% interest in the Keystone and Conemaugh coal generation facilities, respectively, through 2034, and expects to make payments under the Keystone and Conemaugh leases through 2029. At the expiration of these leases, there are several renewal options related to fair value. GenOn accounts for these leases as operating leases and records lease expense on a straight-line basis over the lease term. Rent expense totaled $28 million, $2 million, $33 million and $35 million for the year ended December 31, 2013, for the period from December 15, 2012 through December 31, 2012, for the period from January 1, 2012 through December 14, 2012, and for the year ended December 31, 2011, respectively, and is included in cost of operations. As of December 31, 2013, GenOn has paid $22 million of lease payments in excess of rent expense recognized, which is included in prepayments on the consolidated balance sheets. There were no lease payments in excess of rent recognized as of December 31, 2012.

GenOn operates the Conemaugh and Keystone generating facilities under five-year agreements that expire in December 2015 that, subject to certain provisions and notifications, could be terminated annually with one year's notice. GenOn is reimbursed by the other owners for the cost of direct services provided

to the Conemaugh and Keystone facilities. Additionally, GenOn received fees of $11 million, $1 million, $9 million and $10 million for the year ended December 31, 2013, for the period from December 15, 2012 through December 31, 2012, for the period from January 1, 2012 through December 14, 2012, and for the year ended December 31, 2011, respectively. These fees received, which are recorded as a reductions in cost of operations, are primarily used to cover REMA's administrative support costs of providing these services.

For restrictions under these leases, see Note 10, *Debt and Capital Leases.*

As further described in Note 3, *NRG Merger and Dispositions*, as a result of pushdown accounting, GenOn recorded the acquisition date fair value of the leasehold improvements of $66 million, classified in property, plant and equipment. In addition, GenOn recorded the acquisition date fair value of the leasehold interests, net of the present value of the lease obligation, equal to an out-of-market liability of $186 million, classified in out-of-market contracts. This liability is amortized to rent expense on a straight-line basis over the term of the lease.

Future minimum lease commitments under the REMA operating leases for the years ending after December 31, 2013, are as follows:

|  | (In millions) |
|---|---|
| 2014 | $ 63 |
| 2015 | 56 |
| 2016 | 61 |
| 2017 | 63 |
| 2018 | 55 |
| Thereafter | 400 |
| Total | $ 698 |

During 2011, GenOn completed an analysis of the cost of environmental controls required for the Shawville generating facility, including the installation of cooling towers. After evaluation of the forecasted energy and capacity prices, expected capital expenditures, operating costs, property taxes and other factors, GenOn concluded that the forecasted returns on investments necessary to comply with the environmental regulations are insufficient. Accordingly, GenOn plans to place the coal-fired units at the Shawville generating facility, which are leased, in a long-term protective layup in April 2015. Under the lease agreement for Shawville, GenOn's obligations generally are to pay the required rent and to maintain the leased assets in accordance with the lease documentation, including in compliance with prudent competitive electric generating industry practice and applicable laws. GenOn will continue to evaluate options under the lease, including termination of the lease for economic obsolescence, keeping the facility in long-term protective layup during the term of the lease, or continuing operations with a different fuel. See Note 8, *Retirements, Mothballing or Long-Term Protective Layup of Generating Facilities*, for a discussion of other generating facilities that GenOn expects to deactivate in 2014, 2015 or 2016.

### Other Operating Leases

The Registrants have commitments under other operating leases with various terms and expiration dates. Included in other operating leases is GenOn's long-term lease for its corporate headquarters in Houston, Texas which expires in 2018. GenOn Mid-Atlantic has other operating leases which primarily relate to the Chalk Point generating facility. Rent expense for other operating leases is recorded to cost of operations or selling, general and administrative, as applicable, based on the nature of the lease.

The Registrants' rent expense associated with other operating leases was as follows:

|  | Successor | | Predecessor | |
|---|---|---|---|---|
|  | 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | 2011 |
|  | (In millions) | | | |
| GenOn | $ 17 | $ 1 | $ 15 | $ 20 |
| GenOn Americas Generation | $ — | $ — | $ 3 | $ 7 |
| GenOn Mid-Atlantic | $ — | $ — | $ 3 | $ 7 |

Future minimum lease commitments under the Registrants' other operating leases for the years ending after December 31, 2013, are as follows:

| | GenOn[a] | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| | | (In millions) | |
| 2014 | $ 18 | $ 7 | $ 7 |
| 2015 | 16 | 6 | 6 |
| 2016 | 11 | 1 | 1 |
| 2017 | 10 | 1 | 1 |
| 2018 | 8 | 1 | 1 |
| Thereafter | 1 | 1 | 1 |
| Total | $ 64 | $ 17 | $ 17 |

(a)  Amounts in the table exclude future sublease income of $4 million annually, associated with GenOn's long-term lease for its corporate headquarters in Houston, Texas.

### Fuel and Commodity Transportation Commitments

The Registrants have commitments under coal agreements and commodity transportation contracts, primarily related to natural gas and coal, of various quantities and durations. At December 31, 2013, the maximum remaining term under any individual fuel supply contract is 5 years and any transportation contract is 9 years.

As of December 31, 2013, the Registrants' commitments under such outstanding agreements are estimated as follows:

| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| | | (In millions) | |
| 2014 | $ 167 | $ 29 | $ 29 |
| 2015 | 122 | 4 | 4 |
| 2016 | 119 | 4 | 4 |
| 2017 | 108 | — | — |
| 2018 | 36 | — | — |
| Thereafter | 129 | — | — |
| Total | $ 681 | $ 37 | $ 37 |

### LTSA Commitments (GenOn)

LTSA commitments primarily relate to long-term service agreements that cover some periodic maintenance, including parts, on power generation turbines. The long-term maintenance agreements terminate from 2014 to 2038 based on turbine usage.

As of December 31, 2013, GenOn's commitments under such outstanding agreements are estimated as follows:

| | GenOn |
|---|---|
| | (In millions) |
| 2014 | $ 13 |
| 2015 | 14 |
| 2016 | 15 |
| 2017 | 14 |
| 2018 | 27 |
| Thereafter | 204 |
| Total | $ 287 |

### Other Commitments

The Registrants have other commitments under contractual arrangements with various terms and expiration dates. The Registrants' other commitments primarily include the operation and maintenance

agreement and the fly ash sales agreement entered into by GenOn Mid-Atlantic in connection with its ash beneficiation facility. The ash beneficiation facility agreements will expire in 2031. GenOn Mid-Atlantic has other similar agreements for gypsum. In addition to the GenOn Mid-Atlantic agreements, GenOn has other commitments which primarily relate to its southern California generating facilities.

As of December 31, 2013, the Registrants' other commitments are estimated as follows:

|  | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
| --- | --- | --- | --- |
|  | (In millions) | | |
| 2014 | $  18 | $  5 | $  5 |
| 2015 | 7 | 6 | 6 |
| 2016 | 6 | 6 | 6 |
| 2017 | 6 | 6 | 6 |
| 2018 | 6 | 6 | 6 |
| Thereafter | 94 | 94 | 94 |
| Total | $  137 | $  123 | $  123 |

### Global Warming (GenOn)

In February 2008, the Native Village of Kivalina and the City of Kivalina, Alaska filed a suit in the U.S. District Court for the Northern District of California against GenOn and 23 other electric generating and oil and gas companies. The lawsuit sought damages of up to $400 million for the cost of relocating the village allegedly because of global warming caused by the greenhouse gas emissions of the defendants. In late 2009, the District Court ordered that the case be dismissed and the plaintiffs appealed. In September 2012, the U.S. Court of Appeals for the Ninth Circuit dismissed plaintiffs' appeal. In October 2012, the plaintiffs petitioned for *en banc* rehearing of the case; which petition was denied in November 2012. In February 2013, plaintiffs filed a petition with the U.S. Supreme Court seeking review of the decision from the U.S. Court of Appeals. On May 20, 2013, the U.S. Supreme Court denied plaintiffs petition, thereby ending the case.

### Actions Pursued by MC Asset Recovery (GenOn)

With Mirant Corporation's emergence from bankruptcy protection in 2006, certain actions filed by GenOn Energy Holdings and some of its subsidiaries against third parties were transferred to MC Asset Recovery, a wholly owned subsidiary of GenOn Energy Holdings. MC Asset Recovery is governed by a manager who is independent of NRG and GenOn. MC Asset Recovery is a disregarded entity for income tax purposes.

Under the remaining action transferred to MC Asset Recovery, MC Asset Recovery seeks to recover damages from Commerzbank AG and various other banks, or the Commerzbank Defendants, for alleged fraudulent transfers that occurred prior to GenOn Energy Holdings' bankruptcy proceedings. In December 2010, the U.S. District Court for the Northern District of Texas dismissed MC Asset Recovery's complaint against the Commerzbank Defendants. In January 2011, MC Asset Recovery appealed the United States District Court's dismissal of its complaint against the Commerzbank Defendants to the U.S. Court of Appeals for the Fifth Circuit. In March 2012, the U.S. Court of Appeals for the Fifth Circuit reversed the U.S. District Court's dismissal and reinstated MC Asset Recovery's amended complaint against the Commerzbank Defendants. If MC Asset Recovery succeeds in obtaining any recoveries from the Commerzbank Defendants, the Commerzbank Defendants have asserted that they will seek to file claims in GenOn Energy Holdings' bankruptcy proceedings for the amount of those recoveries. GenOn Energy Holdings would vigorously contest the allowance of any such claims. If the Commerzbank Defendants were to receive an allowed claim as a result of a recovery by MC Asset Recovery on its claims against them, GenOn Energy Holdings would retain from the net amount recovered by MC Asset Recovery an amount equal to the dollar amount of the resulting allowed claim.

### Pending Natural Gas Litigation (GenOn)

GenOn is party to five lawsuits, several of which are class action lawsuits, in state and federal courts in Kansas, Missouri, Nevada and Wisconsin. These lawsuits were filed in the aftermath of the California energy crisis in 2000 and 2001 and the resulting FERC investigations and relate to alleged conduct to increase natural gas prices in violation of antitrust and similar laws. The lawsuits seek treble or punitive damages, restitution and/or expenses. The lawsuits also name as parties a number of energy companies unaffiliated with GenOn. In July 2011, the U.S. District Court for the District of Nevada, which is handling four of the five cases, granted the defendants' motion for summary judgment and dismissed all claims

against GenOn in those cases. The plaintiffs appealed to the U.S. Court of Appeals for the Ninth Circuit. The Ninth Circuit reversed the decision of the U.S. District Court for the District of Nevada. On August 26, 2013, GenOn along with the other defendants in the lawsuit filed a petition for certiorari to the U.S. Supreme Court challenging the Ninth Circuit's decision. On December 2, 2013, the United States Supreme Court requested the views of the Solicitor General on the petition for certiorari. In September 2012, the State of Nevada Supreme Court, which is handling the remaining case, affirmed dismissal by the Eighth Judicial District Court for Clark County, Nevada of all plaintiffs' claims against GenOn. In February 2013, the plaintiffs filed a petition for certiorari to the U.S. Supreme Court. On June 24, 2013, the U.S. Supreme Court denied the petition for certiorari, thereby ending one of the five lawsuits. GenOn has agreed to indemnify CenterPoint against certain losses relating to these lawsuits.

### New Source Review Matters

The EPA and various states are investigating compliance of electric generating facilities with the pre-construction permitting requirements of the CAA known as "new source review." Since 2000, the EPA has made information requests concerning the Avon Lake, Canal, Chalk Point, Cheswick, Conemaugh, Dickerson, Elrama, Keystone, Morgantown, New Castle, Niles, Portland, Potomac River, Shawville and Titus generating facilities. The Registrants continue to correspond with the EPA regarding some of these requests. The EPA agreed to share information relating to its investigations with state environmental agencies. In January 2009, GenOn received an NOV from the EPA alleging that past work at its Shawville, Portland and Keystone generating facilities violated regulations regarding new source review. In June 2011, GenOn received an NOV from the EPA alleging that past work at the Niles and Avon Lake generating facilities violated regulations regarding new source review.

In December 2007, the NJDEP sued GenOn in the U.S. District Court for the Eastern District of Pennsylvania, alleging that new source review violations occurred at the Portland generating facility. The suit sought installation of "best available" control technologies for each pollutant, to enjoin GenOn from operating the generating facility if it is not in compliance with the CAA and civil penalties. The suit also named past owners of the plant as defendants, but the claims against the past owners were dismissed. In March 2009, the Connecticut Department of Energy and Environmental Protection became an intervening party to the suit. GenOn believes that the work listed by the EPA and the work subject to the NJDEP suit were conducted in compliance with applicable regulations. In July 2013, the court entered a Consent Decree which generally requires the cessation of coal combustion at Portland Units 1 and 2 and the payment of $1 million to benefit the environment in New Jersey and Connecticut. The entry of the Consent Decree resolved this matter.

### Cheswick Class Action Complaint (GenOn)

In April 2012, a putative class action lawsuit was filed against GenOn in the Court of Common Pleas of Allegheny County, Pennsylvania alleging that emissions from the Cheswick generating facility have damaged the property of neighboring residents. GenOn disputes these allegations. Plaintiffs have brought nuisance, negligence, trespass and strict liability claims seeking both damages and injunctive relief. Plaintiffs seek to certify a class that consists of people who own property or live within one mile of the plant. In July 2012, GenOn removed the lawsuit to the U.S. District Court for the Western District of Pennsylvania. In October 2012, the court granted GenOn's motion to dismiss, which Plaintiffs appealed to the U.S. Court of Appeals for the Third Circuit. On June 25, 2013, the Third Circuit reversed the decision of the District Court. On September 3, 2013, GenOn filed a petition for rehearing with the Third Circuit which was subsequently denied on September 23, 2013. On January 8, 2014, the District Court has stayed the case pending the outcome of the Petition for Writ of Certiorari, which was filed in February 2014.

### Cheswick Monarch Mine NOV (GenOn)

In 2008, the PADEP issued an NOV related to the Monarch mine located near the Cheswick generating facility. It has not been mined for many years. GenOn uses it for disposal of low-volume wastewater from the Cheswick generating facility and for disposal of leachate collected from ash disposal facilities. The NOV addresses the alleged requirement to maintain a minimum pumping volume from the mine. The PADEP indicated it will seek a civil penalty of approximately $200,000. GenOn contests the allegations in the NOV and has not agreed to such penalty. GenOn is currently planning capital expenditures in connection with wastewater from Cheswick and leachate from ash disposal facilities.

### Ormond Beach Alleged Federal Clean Water Act Violations (GenOn)

In October 2012, the Wishtoyo Foundation, a California-based cultural and environmental advocacy organization, through its Ventura Coastkeeper Program, filed suit in the U.S. District Court for the Central District of California regarding alleged violations of the Clean Water Act associated with discharges of stormwater from the Ormond Beach generating facility. The Wishtoyo alleges that elevated concentrations of pollutants in stormwater discharged from the Ormond Beach generating facility were affecting adjacent aquatic resources in violation of (i) the Statewide General Industrial Stormwater permit

(a general National Pollution Discharge Elimination System permit issued by the California State Water Resources Control Board that authorizes stormwater discharges from industrial facilities in California) and (ii) the state's Porter-Cologne Water Quality Control Act. The Wishtoyo Foundation further alleged that GenOn had not implemented effective stormwater control and treatment measures and that GenOn had not complied with the sampling and reporting requirements of the General Industrial Stormwater permit. GenOn settled this matter in May 2013 and agreed to make operational changes and pay $79,000 in legal fees, $65,000 for supplemental environmental projects and $15,000 for monitoring costs.

### Maryland Fly Ash Facilities

NRG MD Ash Management has three fly ash facilities in Maryland: Faulkner, Westland and Brandywine. NRG MD Ash Management disposes of fly ash from the Morgantown and Chalk Point generating facilities at Brandywine. NRG MD Ash Management disposes of fly ash from the Dickerson generating facility at Westland. NRG MD Ash Management no longer disposes of fly ash at the Faulkner facility. As described below, the MDE had sued NRG MD Ash Management and GenOn Mid-Atlantic regarding Faulkner, Brandywine and Westland. The MDE also had threatened not to renew the water discharge permits for all three facilities.

*Faulkner Litigation.* In May 2008, the MDE sued GenOn Mid-Atlantic and NRG MD Ash Management in the Circuit Court for Charles County, Maryland alleging violations of Maryland's water pollution laws at Faulkner. The MDE contended that the operation of Faulkner had resulted in the discharge of pollutants that exceeded Maryland's water quality criteria and without the appropriate NPDES permit. The MDE also alleged that GenOn failed to perform certain sampling and reporting required under an applicable NPDES permit. The MDE complaint requested that the court (i) prohibit continuation of the alleged unpermitted discharges, (ii) require GenOn to cease from further disposal of any coal combustion byproducts at Faulkner and close and cap the existing disposal cells and (iii) assess civil penalties. In July 2008, GenOn filed a motion to dismiss the complaint, arguing that the discharges are permitted by a December 2000 Consent Order. In January 2011, the MDE dismissed without prejudice its complaint and informed GenOn that it intended to file a similar lawsuit in federal court. In May 2011, the MDE filed a complaint against GenOn Mid-Atlantic and NRG MD Ash Management in the U.S. District Court for the District of Maryland alleging violations at Faulkner of the Clean Water Act and Maryland's Water Pollution Control Law. The MDE contends that (i) certain of GenOn's water discharges are not authorized by the existing permit and (ii) operation of the Faulkner facility has resulted in discharges of pollutants that violate water quality criteria. The complaint asked the court to, among other things, (i) enjoin further disposal of coal ash; (ii) enjoin discharges that are not authorized by the existing permit; (iii) require numerous technical studies; (iv) impose civil penalties and (v) award MDE attorneys' fees. GenOn disputed these allegations.

*Brandywine Litigation.* In April 2010, the MDE filed a complaint against GenOn Mid-Atlantic and NRG MD Ash Management in the U.S. District Court for the District of Maryland asserting violations at Brandywine of the Clean Water Act and Maryland's Water Pollution Control Law. The MDE contended that the operation of Brandywine has resulted in discharges of pollutants that violate Maryland's water quality criteria. The complaint requested that the court, among other things, (i) enjoin further disposal of coal combustion waste at Brandywine, (ii) require GenOn to close and cap the existing open disposal cells within one year, (iii) impose civil penalties and (iv) award MDE attorneys' fees. In September 2010, four environmental advocacy groups became intervening parties in the proceeding.

*Westland Litigation.* In January 2011, the MDE informed GenOn that it intended to sue for alleged violations at Westland of Maryland's water pollution laws, which suit was filed in the U.S. District Court for the District of Maryland in December 2012.

*Permit Renewals.* In March 2011, the MDE tentatively determined to deny NRG MD Ash Management's application for the renewal of the water discharge permit for Brandywine, which could result in a significant increase in operating expenses for the Chalk Point and Morgantown generating facilities. The MDE also had indicated that it was planning to deny GenOn's applications for the renewal of the water discharge permits for Faulkner and Westland. Denial of the renewal of the water discharge permit for the latter facility could have resulted in a significant increase in operating expenses for GenOn Mid-Atlantic's Dickerson generating facility.

*Settlement.* In April 2013, NRG MD Ash Management and MDE signed a Consent Decree settling the disputes at each of the three ash facilities. GenOn agreed to pay a civil penalty of $1.9 million for alleged past violations and an additional $0.6 million (for agreed prospective penalties while GenOn implements the settlement). GenOn agreed to develop a technical solution which includes installing synthetic caps on the closed cells of each of the three ash facilities, for which $47 million has been reserved, and to remediate the sites. At this time, GenOn cannot reasonably estimate the upper range of its obligations for remediating the sites because GenOn has not (i) finished assessing each site including identifying the full impacts to both ground and surface water and the impacts to the surrounding habitat; (ii) finalized with

the MDE the standards to which it must remediate; and (iii) identified the technologies required, if any, to meet the yet to be determined remediation standards at each site nor the timing of the design and installation of such technologies.

### Purported Class Actions related to July 22, 2012 Announcement of NRG Merger Agreement (GenOn)

GenOn was named as a defendant in eight purported class actions in Texas and Delaware, related to its announcement of its agreement for NRG to acquire all outstanding shares of GenOn. These cases were consolidated into one state court case in each of Delaware and Texas and a federal court case in Texas. The plaintiffs generally alleged breach of fiduciary duties, as well as conspiracy, aiding and abetting breaches of fiduciary duties. Plaintiffs generally sought to: be certified as a class; enjoin the merger; direct the defendants to exercise their fiduciary duties; rescind the acquisition and be awarded attorneys' fees and costs and other relief that the court deems appropriate. Plaintiffs also demanded that there be additional disclosures regarding the merger terms. On October 24, 2012, the parties to the Delaware state court case executed a Memorandum of Understanding to resolve the Delaware purported class action lawsuit. In March 2013, the parties finalized the settlement of the Delaware action. On June 3, 2013, the court approved the Delaware class action settlement thereby ending the Delaware lawsuit. The remaining Texas state and federal court cases were dismissed in July 2013 and August 2013, respectively, thereby ending these matters.

### Maryland Department of the Environment v. GenOn Chalk Point and GenOn Mid-Atlantic

In January 2013, Food & Water Watch, the Patuxent Riverkeeper and the Potomac Riverkeeper (together, Citizens Group) sent GenOn Mid-Atlantic a letter alleging that the Chalk Point, Dickerson and Morgantown generating facilities were violating the terms of three National Pollution Discharge Elimination System Permits by discharging nitrogen and phosphorous in excess of the limits in each permit. On March 21, 2013, the MDE sent GenOn Mid-Atlantic a similar letter with respect to the Chalk Point and Dickerson facilities, threatening to sue within 60 days if the facilities were not brought into compliance. On June 11, 2013, the Maryland Attorney General on behalf of the MDE filed a complaint in the U.S. District Court for the District of Maryland alleging violations of the Clean Water Act and Maryland environmental laws related to water. The lawsuit seeks injunctive relief and civil penalties in excess of $100,000.

### Chapter 11 Proceedings (GenOn and GenOn Americas Generation)

In July 2003, and various dates thereafter, the Mirant Debtors filed voluntary petitions in the Bankruptcy Court for relief under Chapter 11 of the U.S. Bankruptcy Code. GenOn Energy Holdings and most of the other Mirant Debtors emerged from bankruptcy on January 3, 2006, when the Plan became effective. The remaining Mirant Debtors emerged from bankruptcy on various dates in 2007. Approximately 461,000 of the shares of GenOn Energy Holdings common stock to be distributed under the Plan have not yet been distributed and have been reserved for distribution with respect to claims disputed by the Mirant Debtors that have not been resolved. Upon the Mirant/RRI Merger, those reserved shares converted into a reserve for approximately 1.3 million shares of GenOn common stock. Upon the NRG Merger, those reserved shares converted into a reserve for approximately 159,000 shares of NRG common stock. Under the terms of the Plan, upon the resolution of such a disputed claim, the claimant will receive the same pro rata distributions of common stock, cash, or both as previously allowed claims, regardless of the price at which the common stock is trading at the time the claim is resolved. If the aggregate amount of any such payouts results in the number of reserved shares being insufficient, additional shares of common stock may be issued to address the shortfall.

### Texas Franchise Audit (GenOn)

During the second quarter of 2013, GenOn settled the Texas Franchise tax dispute with the state relating to years 2001 through 2007. Prior to NRG Merger, the State of Texas issued franchise tax assessments against GenOn as a result of its audit indicating an underpayment of franchise tax of $72 million (including interest and penalties through June 30, 2013 of $29 million). These assessments relate primarily to a claim by Texas that would change the sourcing of intercompany receipts thereby increasing the amount of tax due. GenOn disagreed with most of the State's assessment and its determination and had accordingly accrued a portion of the liability but had protested the entire assessment. In June 2013, GenOn settled the matter with the State by agreeing to pay $11 million on issues arising from the audit, and reversed the remainder of the accrual. The reversal was recorded as a measurement period adjustment to the amounts recognized on the acquisition date.

**Guarantees (Tables)**

**12 Months Ended**
**Dec. 31, 2013**

**Guarantor Obligations [Line Items]**

Summary of estimated guarantees,
indemnity, and other contingent liability

The following table summarizes the maximum potential exposures that can be estimated for guarantees, indemnities, and other contingent liabilities by maturity:

*GenOn*

| Guarantees | Under 1 Year | | 1-3 Years | | 3-5 Years | | Over 5 Years | | Total | | December 31, 2012 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **By Remaining Maturity at December 31,** | | | | | | | | | | |
| | **2013** | | | | | | | | | | |
| | (In millions) | | | | | | | | | | (In millions) |
| Letters of credit and surety bonds | $ | 96 | $ | 2 | $ | — | $ | — | $ | 98 | $ | 132 |
| Commercial sales arrangements | | 76 | | 15 | | — | | 151 | | 242 | | 289 |
| Other guarantees | | 5 | | 4 | | — | | 50 | | 59 | | 117 |
| Total guarantees | $ | 177 | $ | 21 | $ | — | $ | 201 | $ | 399 | $ | 538 |

**GenOn Americas Generation, LLC [Member]**

**Guarantor Obligations [Line Items]**

Summary of estimated guarantees,
indemnity, and other contingent liability

*GenOn Americas Generation*

| Guarantees | Under 1 Year | | 1-3 Years | | 3-5 Years | | Over 5 Years | | Total | | December 31, 2012 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **By Remaining Maturity at December 31,** | | | | | | | | | | |
| | **2013** | | | | | | | | | | |
| | (In millions) | | | | | | | | | | (In millions) |
| Surety bonds | $ | 6 | $ | — | $ | — | $ | — | $ | 6 | $ | 7 |
| Commercial sales arrangements | | 8 | | — | | — | | — | | 8 | | 16 |
| Total guarantees | $ | 14 | $ | — | $ | — | $ | — | $ | 14 | $ | 23 |

**Asset Retirement Obligations
(Tables)**

**12 Months Ended
Dec. 31, 2013**

**Asset Retirement Obligation
Disclosure [Abstract]**

Schedule of Change in Asset Retirement
Obligation [Table Text Block]

     The following table represents the balance of ARO obligations as of December 31, 2012, along with the additions, reductions and accretion related to the Registrants' ARO obligations for the year ended December 31, 2013:

| | GenOn | | GenOn Americas Generation | | GenOn Mid-Atlantic | |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| **Balance as of December 31, 2012** | $ | 172 | $ | 73 | $ | 25 |
| Additions | | 2 | | — | | — |
| Spending for current obligations and other settlements | | (5) | | (1) | | — |
| Accretion — expense | | 10 | | 4 | | 2 |
| **Balance as of December 31, 2013** | $ | 179 | $ | 76 | $ | 27 |

## CONSOLIDATED
## BALANCE SHEETS (USD $)
**In Millions, unless otherwise specified**

| | Dec. 31, 2013 | Dec. 31, 2012 | Dec. 14, 2012 | Dec. 31, 2011 | Dec. 31, 2010 |
|---|---|---|---|---|---|
| **Current Assets** | | | | | |
| Inventory | $ 443 | $ 422 | | | |
| Cash collateral paid in support of energy risk management activities | 62 | | | | |
| **Current Liabilities** | | | | | |
| Cash collateral received in support of energy risk management activities | 56 | | | | |
| GenOn Americas Generation, LLC [Member] | | | | | |
| **Current Assets** | | | | | |
| Inventory | 270 | 223 | | | |
| Cash collateral paid in support of energy risk management activities | 50 | | | | |
| **Current Liabilities** | | | | | |
| Cash collateral received in support of energy risk management activities | 56 | | | | |
| GenOn Mid-Atlantic, LLC [Member] | | | | | |
| **Current Assets** | | | | | |
| Inventory | 158 | 137 | | | |
| Successor [Member] | | | | | |
| **Current Assets** | | | | | |
| Cash and cash equivalents | 760 | 825 | 983 | | |
| Funds deposited by counterparties | 56 | | | | |
| Restricted cash | 0 | | | | |
| Accounts receivable — trade, less allowance for doubtful accounts | 178 | | | | |
| Inventory | 443 | | | | |
| Cash collateral paid in support of energy risk management activities | 62 | | | | |
| Prepayments and other current assets | 194 | | | | |
| Total current assets | 2,162 | | | | |
| **Property, Plant and Equipment [Abstract]** | | | | | |
| In service | 3,311 | | | | |
| Under construction | 113 | | | | |
| Total property, plant and equipment | 3,424 | | | | |
| Less accumulated depreciation | (248) | | | | |
| Net property, plant and equipment | 3,176 | | | | |
| **Other Assets** | | | | | |
| Intangible assets, net of accumulated amortization | 65 | | | | |
| Deferred income taxes | 0 | | | | |
| Other non-current assets | 149 | | | | |
| Total other assets | 396 | | | | |
| Total Assets | 5,734 | 7,419 | | | |
| **Current Liabilities** | | | | | |
| Current portion of long-term debt and capital leases | 5 | 32 | | | |
| Deferred income taxes | 0 | | | | |

| | | | | |
|---|---|---|---|---|
| Cash collateral received in support of energy risk management activities | 56 | | | |
| Employee-related Liabilities, Current | 103 | | | |
| Taxes Payable, Current | 39 | | | |
| Other Accrued Liabilities, Current | 80 | | | |
| Total current liabilities | 749 | | | |
| **Other Liabilities** | | | | |
| Long-term debt and capital leases | 3,128 | 4,170 | | |
| Postretirement and other benefit obligations | 185 | | | |
| Out of Market Contracts | 1,045 | | | |
| Other non-current liabilities | 296 | | | |
| Total non-current liabilities | 4,672 | | | |
| Total Liabilities | 5,421 | | | |
| **Stockholders' Equity** | | | | |
| Common stock; $0.001 par value; 2.0 billion shares authorized; 771,692,734 shares issued at December 31, 2011 | 0 | | | |
| Additional paid-in capital | 325 | | | |
| Accumulated deficit | (114) | | | |
| Accumulated other comprehensive income | 102 | | | |
| Total Stockholders' Equity | 313 | 207 | 277 | [1] |
| Total Liabilities and Stockholders' Equity | 5,734 | | | |

Successor [Member] | GenOn Energy, Inc. Parent Company [Member]

| | | | |
|---|---|---|---|
| **Current Assets** | | | |
| Cash and cash equivalents | 621 | 530 | 571 |
| Total current assets | 1,247 | | |
| **Other Assets** | | | |
| Total other assets | 1,371 | | |
| Total Assets | 2,618 | | |
| **Current Liabilities** | | | |
| Other Liabilities, Current | 90 | | |
| Total current liabilities | 96 | | |
| **Other Liabilities** | | | |
| Long-term debt and capital leases | 2,205 | | |
| Other non-current liabilities | 3 | | |
| Total non-current liabilities | 2,208 | | |
| Total Liabilities | 2,304 | | |
| **Stockholders' Equity** | | | |
| Common stock; $0.001 par value; 2.0 billion shares authorized; 771,692,734 shares issued at December 31, 2011 | 0 | | |
| Additional paid-in capital | 327 | | |
| Accumulated deficit | (114) | | |
| Accumulated other comprehensive income | 101 | | |
| Total Liabilities and Stockholders' Equity | 2,618 | | |

Successor [Member] | GenOn Americas Generation, LLC [Member]

**Current Assets**

| | | | | |
|---|---|---|---|---|
| Cash and cash equivalents | 63 | 148 | 171 | |
| Inventory | 270 | | | |
| Cash collateral paid in support of energy risk management activities | 50 | | | |
| Prepayments and other current assets | 105 | | | |
| Total current assets | 1,484 | | | |
| **Property, Plant and Equipment [Abstract]** | | | | |
| In service | 1,287 | | | |
| Under construction | 3 | | | |
| Total property, plant and equipment | 1,290 | | | |
| Less accumulated depreciation | (96) | | | |
| Net property, plant and equipment | 1,194 | | | |
| **Other Assets** | | | | |
| Intangible assets, net of accumulated amortization | 64 | | | |
| Other non-current assets | 32 | | | |
| Total other assets | 285 | | | |
| Total Assets | 2,963 | 3,386 | | |
| **Current Liabilities** | | | | |
| Current portion of long-term debt and capital leases | 5 | | | |
| Cash collateral received in support of energy risk management activities | 56 | | | |
| Other Accrued Liabilities, Current | 93 | | | |
| Total current liabilities | 597 | | | |
| **Other Liabilities** | | | | |
| Long-term debt and capital leases | 943 | | | |
| Out of Market Contracts | 575 | | | |
| Other non-current liabilities | 116 | | | |
| Total non-current liabilities | 1,675 | | | |
| Total Liabilities | 2,272 | | | |
| **Member's Equity** | | | | |
| Members' interest | 691 | | | |
| Total member's equity | 691 | | | |
| Total Liabilities and Member's Equity | 2,963 | | | |
| **Stockholders' Equity** | | | | |
| Total Stockholders' Equity | 691 | 841 | 844 | [1] |
| Successor [Member] \| GenOn Mid-Atlantic, LLC [Member] | | | | |
| **Current Assets** | | | | |
| Cash and cash equivalents | 64 | 135 | 163 | |
| Inventory | 158 | | | |
| Prepayments and other current assets | 81 | | | |
| Total current assets | 693 | | | |
| **Property, Plant and Equipment [Abstract]** | | | | |
| In service | 1,061 | | | |
| Under construction | 3 | | | |
| Total property, plant and equipment | 1,064 | | | |
| Less accumulated depreciation | (77) | | | |
| Net property, plant and equipment | 987 | | | |

**Other Assets**

| | | | | |
|---|---|---|---|---|
| Intangible assets, net of accumulated amortization | 11 | | | |
| Prepaid Rent | 25 | | | |
| Total other assets | 192 | | | |
| Total Assets | 1,872 | | | |

**Current Liabilities**

| | |
|---|---|
| Current portion of long-term debt and capital leases | 5 |
| Cash collateral received in support of energy risk management activities | 0 |
| Other Accrued Liabilities, Current | 49 |
| Total current liabilities | 134 |

**Other Liabilities**

| | |
|---|---|
| Long-term debt and capital leases | 5 |
| Out of Market Contracts | 575 |
| Other non-current liabilities | 71 |
| Total non-current liabilities | 660 |
| Total Liabilities | 794 |
| Commitments and Contingencies | |

**Member's Equity**

| | |
|---|---|
| Members' interest | 1,078 |
| Total member's equity | 1,078 |
| Total Liabilities and Member's Equity | 1,872 |

**Stockholders' Equity**

| | | |
|---|---|---|
| Total Stockholders' Equity | 1,235 | 1,234 [1] |

Predecessor [Member]

**Current Assets**

| | | | | |
|---|---|---|---|---|
| Cash and cash equivalents | 825 | 983 | 1,539 | 2,395 |
| Funds deposited by counterparties | 140 | | | |
| Restricted cash | 18 | | | |
| Accounts receivable — trade, less allowance for doubtful accounts | 138 | | | |
| Inventory | 422 | | | |
| Cash collateral paid in support of energy risk management activities | 148 | | | |
| Prepayments and other current assets | 261 | | | |
| Total current assets | 2,556 | | | |

**Property, Plant and Equipment [Abstract]**

| | |
|---|---|
| In service | 3,138 |
| Under construction | 693 |
| Total property, plant and equipment | 3,831 |
| Less accumulated depreciation | (1) |
| Net property, plant and equipment | 3,830 |

**Other Assets**

| | |
|---|---|
| Intangible assets, net of accumulated amortization | 78 |
| Deferred income taxes | 209 |
| Other non-current assets | 234 |
| Total other assets | 1,033 |

| | | | | |
|---|---|---|---|---|
| Total Assets | 7,419 | | | |
| **Current Liabilities** | | | | |
| Current portion of long-term debt and capital leases | 32 | | | |
| Deferred income taxes | 209 | | | |
| Cash collateral received in support of energy risk management activities | 140 | | | |
| Employee-related Liabilities, Current | 155 | | | |
| Taxes Payable, Current | 62 | | | |
| Other Accrued Liabilities, Current | 75 | | | |
| Total current liabilities | 1,160 | | | |
| **Other Liabilities** | | | | |
| Long-term debt and capital leases | 4,170 | | | |
| Postretirement and other benefit obligations | 324 | | | |
| Out of Market Contracts | 1,124 | | | |
| Other non-current liabilities | 310 | | | |
| Total non-current liabilities | 6,052 | | | |
| Total Liabilities | 7,212 | | | |
| **Stockholders' Equity** | | | | |
| Common stock; $0.001 par value; 2.0 billion shares authorized; 771,692,734 shares issued at December 31, 2011 | 0 | | | |
| Additional paid-in capital | 277 | | | |
| Accumulated deficit | (72) | | | |
| Accumulated other comprehensive income | 2 | | | |
| Total Stockholders' Equity | 207 | 4,692 [1] | 5,117 | 5,434 |
| Total Liabilities and Stockholders' Equity | 7,419 | | | |

Predecessor [Member] | GenOn Energy, Inc. Parent Company [Member]

| | | | | |
|---|---|---|---|---|
| **Current Assets** | | | | |
| Cash and cash equivalents | 530 | 571 | 659 | 577 |
| Total current assets | 1,908 | | | |
| **Other Assets** | | | | |
| Total other assets | 1,371 | | | |
| Total Assets | 3,279 | | | |
| **Current Liabilities** | | | | |
| Other Liabilities, Current | 31 | | | |
| Total current liabilities | 72 | | | |
| **Other Liabilities** | | | | |
| Long-term debt and capital leases | 2,849 | | | |
| Other non-current liabilities | 1 | | | |
| Total non-current liabilities | 2,850 | | | |
| Total Liabilities | 2,922 | | | |
| **Stockholders' Equity** | | | | |
| Common stock; $0.001 par value; 2.0 billion shares authorized; 771,692,734 shares issued at December 31, 2011 | 0 | | | |
| Additional paid-in capital | 427 | | | |
| Accumulated deficit | (72) | | | |

| | | | | |
|---|---|---|---|---|
| Accumulated other comprehensive income | 2 | | | |
| Total Liabilities and Stockholders' Equity | 3,279 | | | |

**Predecessor [Member] | GenOn Americas Generation, LLC [Member]**

**Current Assets**

| | | | | |
|---|---|---|---|---|
| Cash and cash equivalents | 148 | 171 | 267 | 514 |
| Inventory | 223 | | | |
| Cash collateral paid in support of energy risk management activities | 91 | | | |
| Prepayments and other current assets | 99 | | | |
| Total current assets | 1,540 | | | |

**Property, Plant and Equipment [Abstract]**

| | |
|---|---|
| In service | 1,213 |
| Under construction | 9 |
| Total property, plant and equipment | 1,222 |
| Less accumulated depreciation | (1) |
| Net property, plant and equipment | 1,221 |

**Other Assets**

| | |
|---|---|
| Intangible assets, net of accumulated amortization | 76 |
| Other non-current assets | 13 |
| Total other assets | 625 |
| Total Assets | 3,386 |

**Current Liabilities**

| | |
|---|---|
| Current portion of long-term debt and capital leases | 5 |
| Cash collateral received in support of energy risk management activities | 140 |
| Other Accrued Liabilities, Current | 87 |
| Total current liabilities | 734 |

**Other Liabilities**

| | |
|---|---|
| Long-term debt and capital leases | 955 |
| Out of Market Contracts | 603 |
| Other non-current liabilities | 120 |
| Total non-current liabilities | 1,811 |
| Total Liabilities | 2,545 |
| Commitments and Contingencies | |

**Member's Equity**

| | |
|---|---|
| Members' interest | 841 |
| Total member's equity | 841 |
| Total Liabilities and Member's Equity | 3,386 |

**Stockholders' Equity**

| | | | | |
|---|---|---|---|---|
| Total Stockholders' Equity | 3,965 | 3,673 [1] | | 3,573 |

**Predecessor [Member] | GenOn Mid-Atlantic, LLC [Member]**

**Current Assets**

| | | | | |
|---|---|---|---|---|
| Cash and cash equivalents | 135 | 163 | 68 | 202 |
| Inventory | 137 | | | |
| Prepayments and other current assets | 46 | | | |
| Total current assets | 716 | | | |

**Property, Plant and Equipment [Abstract]**

| | |
|---|---|
| In service | 1,017 |
| Under construction | 5 |
| Total property, plant and equipment | 1,022 |
| Less accumulated depreciation | (1) |
| Net property, plant and equipment | 1,021 |

**Other Assets**

| | |
|---|---|
| Intangible assets, net of accumulated amortization | 11 |
| Prepaid Rent | 0 |
| Total other assets | 466 |
| Total Assets | 2,203 |

**Current Liabilities**

| | |
|---|---|
| Current portion of long-term debt and capital leases | 5 |
| Cash collateral received in support of energy risk management activities | 57 |
| Other Accrued Liabilities, Current | 46 |
| Total current liabilities | 226 |

**Other Liabilities**

| | |
|---|---|
| Long-term debt and capital leases | 9 |
| Out of Market Contracts | 603 |
| Other non-current liabilities | 75 |
| Total non-current liabilities | 742 |
| Total Liabilities | 968 |
| Commitments and Contingencies | |

**Member's Equity**

| | |
|---|---|
| Members' interest | 1,235 |
| Total member's equity | 1,235 |
| Total Liabilities and Member's Equity | 2,203 |

**Stockholders' Equity**

| | | | | | |
|---|---|---|---|---|---|
| Total Stockholders' Equity | 1,078 | [1] 3,927 | 3,728 | [1] | 3,892 |

Non-affiliated Entity [Member] | Successor [Member]

**Current Assets**

| | |
|---|---|
| Derivative Instruments | 464 |

**Other Assets**

| | |
|---|---|
| Derivative instruments | 181 |

**Current Liabilities**

| | |
|---|---|
| Accounts payable | 187 |
| Derivative instruments | 160 |

**Other Liabilities**

| | |
|---|---|
| Derivative instruments | 18 |

Non-affiliated Entity [Member] | Successor [Member] | GenOn Americas Generation, LLC [Member]

**Current Assets**

| | |
|---|---|
| Accounts receivable — trade, less allowance for doubtful accounts | 151 |
| Derivative Instruments | 462 |

**Other Assets**

Derivative instruments 181

**Current Liabilities**

Accounts payable 90

Derivative instruments 160

**Other Liabilities**

Derivative instruments 18

Non-affiliated Entity [Member] | Successor [Member] | GenOn Mid-Atlantic, LLC [Member]

**Current Assets**

Accounts receivable — trade, less allowance for doubtful accounts 4

Derivative Instruments 298

**Other Assets**

Derivative instruments 60

**Current Liabilities**

Accounts payable 16

Derivative instruments 0

Non-affiliated Entity [Member] | Predecessor [Member]

**Current Assets**

Derivative Instruments 596

**Other Assets**

Derivative instruments 511

**Current Liabilities**

Accounts payable 190

Derivative instruments 237

**Other Liabilities**

Derivative instruments 123

Non-affiliated Entity [Member] | Predecessor [Member] | GenOn Americas Generation, LLC [Member]

**Current Assets**

Accounts receivable — trade, less allowance for doubtful accounts 125

Derivative Instruments 596

**Other Assets**

Derivative instruments 511

**Current Liabilities**

Accounts payable 69

Derivative instruments 228

**Other Liabilities**

Derivative instruments 82

Non-affiliated Entity [Member] | Predecessor [Member] | GenOn Mid-Atlantic, LLC [Member]

**Current Assets**

Accounts receivable — trade, less allowance for doubtful accounts 4

Derivative Instruments 285

**Other Assets**

Derivative instruments 351

**Current Liabilities**

Accounts payable | 16

Derivative instruments | 3

Affiliated Entity [Member] | Successor [Member]

**Current Assets**

Derivative Instruments | 5

**Other Assets**

Derivative instruments | 1

**Current Liabilities**

Accounts payable | 72

Derivative instruments | 3

**Other Liabilities**

Derivative instruments | 0

Affiliated Entity [Member] | Successor [Member] | GenOn Energy, Inc. Parent Company [Member]

**Current Assets**

Accounts receivable — trade, less allowance for doubtful accounts | 27

Affiliated Entity [Member] | Successor [Member] | GenOn Americas Generation, LLC [Member]

**Current Assets**

Accounts receivable — trade, less allowance for doubtful accounts | 0

Note receivable — affiliate | 299

Derivative Instruments | 84

**Other Assets**

Derivative instruments | 8

**Current Liabilities**

Accounts payable | 86

Derivative instruments | 107

**Other Liabilities**

Derivative instruments | 23

Affiliated Entity [Member] | Successor [Member] | GenOn Mid-Atlantic, LLC [Member]

**Current Assets**

Accounts receivable — trade, less allowance for doubtful accounts | 35

Derivative Instruments | 53

**Other Assets**

Derivative instruments | 96

**Current Liabilities**

Accounts payable | 0

Derivative instruments | 64

**Other Liabilities**

Derivative instruments | 9

Affiliated Entity [Member] | Predecessor [Member]

**Current Assets**

Derivative Instruments | 8

**Other Assets**

Derivative instruments | 1

**Current Liabilities**

| | |
|---|---|
| Accounts payable | 6 |
| Derivative instruments | 8 |

**Other Liabilities**

| | |
|---|---|
| Derivative instruments | 1 |

Affiliated Entity [Member] | Predecessor [Member] | GenOn Energy, Inc. Parent Company [Member]

**Current Assets**

| | |
|---|---|
| Accounts receivable — trade, less allowance for doubtful accounts | 10 |

Affiliated Entity [Member] | Predecessor [Member] | GenOn Americas Generation, LLC [Member]

**Current Assets**

| | |
|---|---|
| Accounts receivable — trade, less allowance for doubtful accounts | 0 |
| Note receivable — affiliate | 198 |
| Derivative Instruments | 60 |

**Other Assets**

| | |
|---|---|
| Derivative instruments | 25 |

**Current Liabilities**

| | |
|---|---|
| Accounts payable | 71 |
| Derivative instruments | 134 |

**Other Liabilities**

| | |
|---|---|
| Derivative instruments | 51 |

Affiliated Entity [Member] | Predecessor [Member] | GenOn Mid-Atlantic, LLC [Member]

**Current Assets**

| | |
|---|---|
| Accounts receivable — trade, less allowance for doubtful accounts | 0 |
| Derivative Instruments | 109 |

**Other Assets**

| | |
|---|---|
| Derivative instruments | 104 |

**Current Liabilities**

| | |
|---|---|
| Accounts payable | 2 |
| Derivative instruments | 97 |

**Other Liabilities**

| | |
|---|---|
| Derivative instruments | $ 55 |

[1] The differences in equity balances at December 14, 2012 and December 15, 2012 are due to the application of pushdown accounting reflecting the NRG Merger.

| | 0 Months Ended | | 0 Months Ended | | | 12 Months Ended | | | 12 Months Ended | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SCHEDULE II. VALUATION AND QUALIFYING ACCOUNTS (Details) (USD $) In Millions, unless otherwise specified | Dec. 31, 2012 Successor [Member] Credit reserve for derivative contract assets | Dec. 31, 2013 Successor [Member] Credit reserve for derivative contract assets | Dec. 14, 2012 Successor [Member] Credit reserve for derivative contract assets | Dec. 31, 2012 Successor [Member] Income tax valuation allowance, deducted from deferred tax assets | Dec. 31, 2013 Successor [Member] Income tax valuation allowance, deducted from deferred tax assets | Dec. 14, 2012 Successor [Member] Income tax valuation allowance, deducted from deferred tax assets | Dec. 14, 2012 Predecessor [Member] Credit reserve for derivative contract assets | Dec. 31, 2011 Predecessor [Member] Credit reserve for derivative contract assets | Dec. 31, 2012 Predecessor [Member] Credit reserve for derivative contract assets | Dec. 14, 2012 Predecessor [Member] Income tax valuation allowance, deducted from deferred tax assets | Dec. 20... Predecessor [Member] Income tax valuation allowance deducted from deferred tax assets |
| **Movement in Valuation Allowances and Reserves [Roll Forward]** | | | | | | | | | | | |
| Balance at Beginning of Period | | $ 1 | $ 4 [1] | | $ 2,324 | $ 2,300 | | $ 21 [1] | $ 48 [1] | | $ 1,63 |
| Charged to Costs and Expenses | 0 [1] | | | 0 | | | 0 [1] | 42 [1] | | 0 | 0 |
| Charged to Other Accounts | 0 [1] | | | 24 | | | 0 [1] | 0 [1] | | 165 | 183 |
| Deductions | 0 [1] | | | 0 | | | (43) [1],[2] | (15) [1],[2] | | 0 | 0 |
| Balance at End of Period | $ 4 [1] | $ 1 | $ 4 [1] | | $ 2,324 | $ 2,300 | $ 5 [1] | | $ 48 [1] | $ 1,984 | |

[1] Provision for uncollectible accounts represents credit reserves for derivative contract assets.

[2] Deductions consisted primarily of reversals of credit reserves for derivative contract assets.

[3] Deductions consisted primarily of reversals of credit reserves for derivative contract assets

**Summary of Significant Accounting Policies**

**12 Months Ended**

**Dec. 31, 2013**

**Accounting Policies [Abstract]**

New Accounting Pronouncements, Policy [Policy Text Block]

*Recent Accounting Developments*

*ASU 2011-11* — Effective January 1, 2013, the Registrants adopted the provisions of ASU No. 2011-11, *Balance Sheet (Topic 210) Disclosures about Offsetting Assets and Liabilities*, or ASU No. 2011-11, and began providing enhanced disclosures regarding the effect or potential effect of netting arrangements on an entity's financial position by improving information about financial instruments and derivative instruments that either (1) offset in accordance with either ASC 210-20-45 or ASC 810-20-45 or (2) are subject to an enforceable master netting arrangement or similar agreement, irrespective of whether they are offset. Reporting entities are required to disclose both gross and net information about both instruments and transactions eligible for offset in the statement of financial position and instruments and transactions subject to an agreement similar to a master netting arrangement. The disclosures required by ASU No. 2011-10 are required to be adopted retroactively. As this guidance provides only disclosure requirements, the adoption of this standard did not impact the Registrants' results of operations, cash flows or financial position.

*ASU 2013-02 (GenOn)* - Effective January 1, 2013, the Company adopted the provisions of ASU No. 2013-02, *Other Comprehensive Income (Topic 220) Reporting of Amounts Reclassified Out of Accumulated Other Comprehensive Income*, or ASU No. 2013-02, and began reporting the effect of significant reclassifications out of accumulated other comprehensive income on the respective line items in net income within the notes to the financial statements if the amount being reclassified is required under U.S. GAAP to be reclassified in its entirety to net income in the same reporting period. For other amounts not required by U.S. GAAP to be reclassified in their entirety to net income in the same reporting period, an entity is required to cross-reference other disclosures which provide additional information about the amounts. The provisions of ASU No. 2013-02 are required to be adopted prospectively. As this guidance provides only presentation requirements, the adoption of this standard did not impact GenOn's results of operations, cash flows or financial position.

*Other* - The following accounting standard was issued in 2013 and was adopted January 1, 2014:

•    *ASU 2013-11* - In July 2013, the FASB issued ASU No. 2013-11, *Income Taxes (Topic 740) Presentation of an Unrecognized Tax Benefit When a Net Operating Loss Carryforward, a Similar Tax Loss, or a Tax Credit Carryforward Exists*, or ASU No. 2013-11. The amendments of ASU 2013-11 requires an entity to present an unrecognized tax benefit, or a portion of an unrecognized tax benefit, as a reduction of a deferred tax asset for a net operating loss, or NOL, a similar tax loss or tax credit carryforwards rather than a liability when the uncertain tax position would reduce the NOL or other carryforward under the tax law of the applicable jurisdiction and the entity intends to use the deferred tax asset for that purpose.  The guidance is effective for fiscal years, and interim periods within those years, beginning after December 15, 2013 with early adoption permitted. The adoption of this standard will not impact the Company's results of operations or cash flows.

Significant Accounting Policies [Text Block]

**Summary of Significant Accounting Policies (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*Basis of Presentation and Principles of Consolidation*

This is a combined annual report of the Registrants. The notes to the consolidated financial statements apply to the Registrants as indicated parenthetically next to each corresponding disclosure.

The Registrants' consolidated financial statements have been prepared in accordance with U.S. GAAP. The ASC, established by the FASB, is the source of authoritative U.S. GAAP to be applied by nongovernmental entities. In addition, the rules and interpretative releases of the SEC under authority of federal securities laws are also sources of authoritative U.S. GAAP for SEC registrants.

The consolidated financial statements include the Registrants' accounts and operations and those of their subsidiaries in which the Registrants have a controlling interest. All significant intercompany transactions and balances have been eliminated in consolidation. The usual condition for a controlling financial interest is ownership of a majority of the voting interests of an entity. However, a controlling financial interest may also exist through arrangements that do not involve controlling voting interests. As such, the Registrants apply the guidance of ASC 810, *Consolidations,* or ASC 810, to determine when an entity that is insufficiently capitalized or not controlled through its voting interests, referred to as a VIE, should be consolidated.

*Predecessor and Successor Reporting*

On December 14, 2012, NRG completed the acquisition of GenOn with GenOn continuing as a wholly-owned subsidiary of NRG. The NRG Merger is accounted for under the acquisition method of accounting. Fair value adjustments related to the NRG Merger have been pushed down to GenOn, GenOn Americas Generation, and GenOn Mid-Atlantic, resulting in certain assets and liabilities of the Registrants being recorded at fair value at December 15, 2012. See Note 3, *NRG Merger and Dispositions,* for further discussion.

The Registrants' consolidated statements of operations subsequent to the NRG Merger include amortization expense relating to fair value adjustments and depreciation expense based on the fair value of the Registrants' property, plant and equipment. In addition, effective with the NRG Merger, the Registrants adopted accounting policies of NRG. Therefore, the Registrants' financial information prior to the NRG Merger is not comparable to its financial information subsequent to the NRG Merger.

As a result of the impact of pushdown accounting, the financial statements and certain note presentations separate the Registrants' presentations into two distinct periods, the period before the consummation of the NRG Merger (labeled predecessor) and the period after that date (labeled successor), to indicate the application of different basis of accounting between the periods presented.

### Cash and Cash Equivalents

Cash and cash equivalents include highly liquid investments with an original maturity of three months or less at the time of purchase.

### Funds Deposited by Counterparties (GenOn)

Funds deposited by counterparties consist of cash held by GenOn as a result of collateral posting obligations from GenOn's counterparties. Some amounts are segregated into separate accounts that are not contractually restricted but, based on GenOn's intentions, are not available for the payment of general corporate obligations. Depending on market fluctuations and the settlement of the underlying contracts, GenOn will refund this collateral to the hedge counterparties pursuant to the terms and conditions of the underlying trades. Since collateral requirements fluctuate daily and GenOn cannot predict if any collateral will be held for more than twelve months, the funds deposited by counterparties are classified as a current asset on GenOn's balance sheets, with an offsetting liability for this cash collateral received within current liabilities. Changes in funds deposited by counterparties are closely associated with GenOn's operating activities and are classified as an operating activity in GenOn's consolidated statements of cash flows.

### Restricted Cash

Restricted cash consists primarily of funds held to satisfy the requirements of certain debt agreements and funds held within the Registrants' projects that are restricted in their use. These funds are used to pay for current operating expenses and current debt service payments.

### Inventory

Inventory is valued at the lower of weighted average cost or market, and consists principally of fuel oil, coal and raw materials used to generate electricity or steam. The Registrants remove these inventories as they are used in the production of electricity or steam. Spare parts inventory is valued at a weighted average cost, since the Registrants expect to recover these costs in the ordinary course of business. The Registrants remove these inventories when they are used for repairs, maintenance or capital projects. Sales of inventory are classified as an operating activity in the consolidated statements of cash flows.

### Property, Plant and Equipment

Property, plant and equipment are stated at cost; however impairment adjustments are recorded whenever events or changes in circumstances indicate that their carrying values may not be recoverable. Significant additions or improvements extending asset lives are capitalized as incurred, while repairs and maintenance that do not improve or extend the life of the respective asset are charged to expense as incurred. Depreciation is computed using the straight-line method over the estimated useful lives. Certain assets and their related accumulated depreciation amounts are adjusted for asset retirements and disposals with the resulting gain or loss included in cost of operations in the consolidated statements of operations.

### Asset Impairments

Long-lived assets that are held and used are reviewed for impairment whenever events or changes in circumstances indicate carrying values may not be recoverable. Such reviews are performed in accordance with ASC 360. An impairment loss is recognized if the total future estimated undiscounted cash flows expected from an asset are less than its carrying value. An impairment charge is measured by the difference between an asset's carrying amount and fair value with the difference recorded in operating

costs and expenses in the statements of operations. Fair values are determined by a variety of valuation methods, including appraisals, sales prices of similar assets and present value techniques.

### Project Development Costs and Capitalized Interest (GenOn and GenOn Americas Generation)

Project development costs are expensed in the preliminary stages of a project and capitalized when the project is deemed to be commercially viable. Commercial viability is determined by one or a series of actions including, among others, Board of Director approval pursuant to a formal project plan that subjects the Registrants to significant future obligations that can only be discharged by the use of an asset of the Registrants.

Interest incurred on funds borrowed to finance capital projects is capitalized until the project under construction is ready for its intended use. The amounts of interest capitalized were as follows:

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| GenOn | $ 21 | $ 2 | $ 35 | $ 15 |
| GenOn Americas Generation | 2 | — | 3 | 3 |

When a project is available for operations, capitalized interest and project development costs are reclassified to property, plant and equipment and amortized on a straight-line basis over the estimated useful life of the project's related assets. Capitalized costs are charged to expense if a project is abandoned or management otherwise determines the costs to be unrecoverable.

### Intangible Assets

Intangible assets represent contractual rights held by the Registrants. The Registrants recognize specifically identifiable intangible assets when specific rights and contracts are acquired. As of December 31, 2013 and 2012, the Registrants' intangible assets are comprised of $SO_2$ emission allowances and $CO_2$ emission credits held for compliance with RGGI that are held-for-use and are amortized to cost of operations based on straight line or units of production basis. The following table presents the Registrants' amortization of intangible assets for each of the past three years:

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| GenOn | $ 25 | $ 1 | $ 5 | $ 23 |
| GenOn Americas Generation | 21 | 1 | 3 | 9 |
| GenOn Mid-Atlantic | 18 | — | — | 5 |

The following table presents estimated amortization of the Registrants' intangible assets for each of the next five years:

| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
| --- | --- | --- | --- |
| | | (In millions) | |
| 2014 | $ 24 | $ 24 | $ 22 |
| 2015 | 19 | 19 | 17 |
| 2016 | 22 | 22 | 19 |
| 2017 | 22 | 22 | 21 |
| 2018 | 27 | 27 | 25 |

Intangible assets determined to have indefinite lives are not amortized, but rather are tested for impairment at least annually or more frequently if events or changes in circumstances indicate that such acquired intangible assets have been determined to have finite lives and should now be amortized over their useful lives. The Registrants had no intangible assets with indefinite lives recorded as of December 31, 2013.

Emission allowances held-for-sale, which are included in other non-current assets on the Registrants' consolidated balance sheets, are not amortized; they are carried at the lower of cost or fair value and reviewed for impairment in accordance with ASC 360, *Property, Plant, and Equipment.*

### *Out of Market Contracts*

In connection with the NRG Merger, acquired out-of-market contracts were pushed down to the Registrants, as applicable, and primarily relate to GenOn Mid-Atlantic and REMA leases and long-term natural gas transportation and storage contracts. These out-of-market contracts are amortized to operating revenues and cost of operations, as applicable, based on the nature of the contracts and over their contractual lives. The following table presents the Registrants' amortization of out-of-market contracts for each of the past three years:

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| GenOn | $ 75 | $ 2 | $ 67 | $ 45 |
| GenOn Americas Generation | 28 | 1 | — | — |
| GenOn Mid-Atlantic | 28 | 1 | — | — |

The following table summarizes the estimated amortization related to the Registrants' out-of-market contracts:

| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| | | (In millions) | |
| 2014 | $ 75 | $ 28 | $ 28 |
| 2015 | 76 | 28 | 28 |
| 2016 | 81 | 28 | 28 |
| 2017 | 76 | 28 | 28 |
| 2018 | 71 | 28 | 28 |

### *Income Taxes*

#### *GenOn*

GenOn is a wholly-owned subsidiary of NRG that exists as a corporate regarded entity for income tax purposes. As a result, GenOn, GenOn Americas and NRG have direct liability for the majority of the federal and state income taxes resulting from GenOn's operations. GenOn has allocated income taxes as if it were a single consolidated taxpayer using the liability method in accordance with ASC 740, which requires that GenOn use the asset and liability method of accounting for deferred income taxes and provide deferred income taxes for all significant temporary differences.

GenOn has two categories of income tax expense or benefit - current and deferred, as follows:

• Current income tax expense or benefit consists solely of current taxes payable less applicable tax credits, and

• Deferred income tax expense or benefit is the change in the net deferred income tax asset or liability, excluding amounts charged or credited to accumulated other comprehensive income.

To the extent that GenOn provides current tax expense or benefit, any related tax payable or receivable to NRG is reclassified to equity in the same period since GenOn does not have a tax sharing agreement with NRG.

GenOn reports some of its revenues and expenses differently for financial statement purposes than for income tax return purposes, resulting in temporary and permanent differences between GenOn's financial statements and income tax returns. The tax effects of such temporary differences are recorded as either deferred income tax assets or deferred income tax liabilities in GenOn's consolidated balance sheets. When necessary, deferred tax assets are reduced by a valuation allowance to reflect the amount that is estimated to be recoverable. In assessing the recoverability of the deferred tax assets, GenOn considers whether it is likely that some portion or all of the deferred tax assets will be realized.

The determination of a valuation allowance requires significant judgment as to the generation of taxable income during future periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn's past and anticipated future performance, the reversal of deferred tax liabilities and the implementation of tax planning strategies.

GenOn accounts for uncertain tax positions in accordance with ASC 740, which applies to all tax positions related to income taxes. Under ASC 740, tax benefits are recognized when it is more-likely-than-not that a tax position will be sustained upon examination by the authorities. The benefit recognized from a position that has surpassed the more-likely-than-not threshold is the largest amount of benefit that is more than 50% likely to be realized upon settlement. The Company recognizes interest and penalties accrued related to uncertain tax benefits as a component of income tax expense.

*GenOn Americas Generation*

GenOn Americas Generation and most of its subsidiaries are limited liability companies that are treated as branches of GenOn Americas for income tax purposes. As a result, GenOn Americas, GenOn and NRG have direct liability for the majority of the federal and state income taxes relating to GenOn Americas Generation's operations. Several of GenOn Americas Generation's subsidiaries exist as regarded corporate entities for income tax purposes. For the subsidiaries that continue to exist as corporate regarded entities, GenOn Americas Generation allocates current and deferred income taxes to each corporate regarded entity as if such entity were a single taxpayer utilizing the asset and liability method to account for income taxes. To the extent GenOn Americas Generation provides tax expense or benefit, any related tax payable or receivable to NRG is reclassified to equity in the same period since GenOn Americas Generation does not have a tax sharing agreement with NRG.

GenOn Americas Generation reports some of its revenues and expenses differently for financial statement purposes than for income tax return purposes for the regarded corporate entities, resulting in temporary and permanent differences between GenOn Americas Generation's financial statements and income tax returns. The tax effects of such temporary differences are recorded as either deferred income tax assets or deferred income tax liabilities in GenOn Americas Generation's consolidated balance sheet. GenOn Americas Generation measures its deferred income tax assets and deferred income tax liabilities using income tax rates that are currently in effect. When necessary, deferred tax assets are reduced by a valuation allowance to reflect the amount that is estimated to be recoverable. In assessing the recoverability of the deferred tax assets, GenOn Americas Generation considers whether it is likely that some portion or all of the deferred tax assets will be realized. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities from a change in tax rates is recognized in income in the period that includes the enactment date.

The determination of a valuation allowance requires significant judgment as to the generation of taxable income during future periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn Americas Generation's past and anticipated future performance, the reversal of deferred tax liabilities and the implementation of tax planning strategies.

GenOn Americas Generation accounts for uncertain tax positions in accordance with ASC 740, which applies to all tax positions related to income taxes for the regarded corporate entities. Under ASC 740, tax benefits are recognized when it is more-likely-than-not that a tax position will be sustained upon examination by the authorities. The benefit recognized from a position that has surpassed the more-likely-than-not threshold is the largest amount of benefit that is more than 50% likely to be realized upon settlement. The Company recognizes interest and penalties accrued related to uncertain tax benefits as a component of income tax expense.

*GenOn Mid-Atlantic*

GenOn Mid-Atlantic and GenOn Mid-Atlantic's subsidiaries are limited liability companies that are treated as branches of GenOn Americas for income tax purposes. As such, GenOn, GenOn Americas and NRG have direct liability for the majority of the federal and state income taxes relating to GenOn Mid-Atlantic's operations.

### Revenue Recognition

*Energy* — Both physical and financial transactions are entered into to optimize the financial performance of the Registrants' generating facilities. Electric energy revenue is recognized upon transmission to the customer. Physical transactions, or the sale of generated electricity to meet supply and demand, are recorded on a gross basis in the Registrants' consolidated statements of operations. Financial transactions, or the buying and selling of energy for trading purposes, are recorded net within

operating revenues in the consolidated statements of operations in accordance with ASC 815.

*Capacity* — Capacity revenues are recognized when contractually earned, and consist of revenues billed to a third party at either the market or a negotiated contract price for making installed generation capacity available in order to satisfy system integrity and reliability requirements.

*Natural Gas Sales (GenOn and GenOn Americas Generation)* — GenOn and GenOn Americas Generation record revenues from the sales of natural gas under the accrual method.  These sales are sold at market-based prices.  Sales that have been delivered but not billed by period end are estimated.

*PPAs (GenOn and GenOn Americas Generation)* — Certain of GenOn and GenOn Americas Generation's revenues are currently obtained through PPAs or other contractual arrangements. All of these PPAs are accounted for as operating leases in accordance with ASC 840, *Leases*, or ASC 840. ASC 840 requires minimum lease payments received to be amortized over the term of the lease and contingent rentals are recorded when the achievement of the contingency becomes probable. These leases have no minimum lease payments and all the rent is recorded as contingent rent on an actual basis when the electricity is delivered.

### Derivative Financial Instruments

The Registrants account for derivative financial instruments under ASC 815, which requires the Registrants to record all derivatives on the balance sheet at fair value unless they qualify for a NPNS exception. Changes in the fair value of non-hedge derivatives are immediately recognized in earnings. Changes in the fair value of derivatives accounted for as hedges, if elected for hedge accounting, are either:

•    Recognized in earnings as an offset to the changes in the fair value of the related hedged assets, liabilities and firm commitments; and

•    Deferred and recorded as a component of accumulated OCI until the hedge transactions occur and are recognized in earnings.

The Registrants' primary derivative instruments are financial power and natural gas contracts, fuels purchase contracts, other energy related commodities, and interest rate instruments used to mitigate variability in earnings due to fluctuations in market prices and interest rates. On an ongoing basis, the Registrants assess the effectiveness of all derivatives that are designated as hedges for accounting purposes in order to determine that each derivative continues to be highly effective in offsetting changes in fair values or cash flows of hedged items. Internal analyses that measure the statistical correlation between the derivative and the associated hedged item determine the effectiveness of such an energy contract designated as a hedge. If it is determined that the derivative instrument is not highly effective as a hedge, hedge accounting will be discontinued prospectively. If the derivative instrument is terminated, the effective portion of this derivative deferred in accumulated OCI will be frozen until the underlying hedged item is delivered

Revenues and expenses on contracts that qualify for the NPNS exception are recognized when the underlying physical transaction is delivered. While these contracts are considered derivative financial instruments under ASC 815, they are not recorded at fair value, but on an accrual basis of accounting. If it is determined that a transaction designated as NPNS no longer meets the scope exception, the fair value of the related contract is recorded on the balance sheet and immediately recognized through earnings.

The Registrants' trading activities are subject to limits in accordance with the Risk Management Policy. These contracts are recognized on the balance sheet at fair value and changes in the fair value of these derivative financial instruments are recognized in earnings.

### Concentrations of Credit Risk

Financial instruments which potentially subject the Registrants to concentrations of credit risk consist primarily of accounts receivable and derivatives. Certain accounts receivable and derivative instruments are concentrated within entities engaged in the energy industry. These industry concentrations may impact the Registrants' overall exposure to credit risk, either positively or negatively, in that the customers may be similarly affected by changes in economic, industry or other conditions. Receivables and other contractual arrangements are subject to collateral requirements under the terms of enabling agreements. However, the Registrants believe that the credit risk posed by industry concentration is offset by the diversification and creditworthiness of the Registrants' customer base. See Note 4, *Fair Value of Financial Instruments,* for a further discussion of derivative concentrations.

### Fair Value of Financial Instruments

The carrying amount of cash and cash equivalents, funds deposited by counterparties, receivables,

accounts payables, and accrued liabilities approximate fair value because of the short-term maturity of these instruments. See Note 4, *Fair Value of Financial Instruments*, for a further discussion of fair value of financial instruments.

### Asset Retirement Obligations

The Registrants account for their AROs in accordance with ASC 410-20, *Asset Retirement Obligations,* or ASC 410-20. Retirement obligations associated with long-lived assets included within the scope of ASC 410-20 are those for which a legal obligation exists under enacted laws, statutes, and written or oral contracts, including obligations arising under the doctrine of promissory estoppel, and for which the timing and/or method of settlement may be conditional on a future event. ASC 410-20 requires an entity to recognize the fair value of a liability for an ARO in the period in which it is incurred and a reasonable estimate of fair value can be made.

Upon initial recognition of a liability for an ARO, the Registrants capitalize the asset retirement cost by increasing the carrying amount of the related long-lived asset by the same amount. Over time, the liability is accreted to its future value, while the capitalized cost is depreciated over the useful life of the related asset. See Note 11, *Asset Retirement Obligations,* for a further discussion of AROs.

### Pensions (GenOn)

GenOn offers pension benefits through defined benefit pension plans. In addition, GenOn provides postretirement health and welfare benefits for certain groups of employees. GenOn accounts for pension and other postretirement benefits in accordance with ASC 715, *Compensation — Retirement Benefits.* GenOn recognizes the funded status of its defined benefit plans in the statement of financial position and records an offset for gains and losses as well as all prior service costs that have not been included as part of GenOn's net periodic benefit cost to other comprehensive income. The determination of GenOn's obligation and expenses for pension benefits is dependent on the selection of certain assumptions. These assumptions determined by management include the discount rate, the expected rate of return on plan assets and the rate of future compensation increases. GenOn's actuarial consultants determine assumptions for such items as retirement age. The assumptions used may differ materially from actual results, which may result in a significant impact to the amount of pension obligation or expense recorded by GenOn.

GenOn measures the fair value of its pension assets in accordance with ASC 820, *Fair Value Measurements and Disclosures,* or ASC 820.

### Business Combinations

The Registrants account for the business combinations in accordance with ASC 805, *Business Combinations,* or ASC 805. ASC 805 requires an acquirer to recognize and measure in its financial statements the identifiable assets acquired, the liabilities assumed, and any noncontrolling interest in the acquiree at fair value at the acquisition date. It also recognizes and measures the goodwill acquired or a gain from a bargain purchase in the business combination and determines what information to disclose to enable users of an entity's financial statements to evaluate the nature and financial effects of the business combination. In addition, transaction costs are expensed as incurred.

### Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements, disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from these estimates.

In recording transactions and balances resulting from business operations, the Registrants use estimates based on the best information available. Estimates are used for such items as plant depreciable lives, tax provisions, actuarially determined benefit costs, the valuation of energy commodity contracts, environmental liabilities, legal costs incurred in connection with recorded loss contingencies, and assets acquired and liabilities assumed in business combinations, among others. In addition, estimates are used to test long-lived assets for impairment and to determine the fair value of impaired assets. As better information becomes available or actual amounts are determinable, the recorded estimates are revised. Consequently, operating results can be affected by revisions to prior accounting estimates.

### Reclassifications

Certain prior-year amounts have been reclassified for comparative purposes. The reclassifications did not affect results from operations. The Registrants reclassified certain balances from cash and cash equivalents to funds deposited by counterparties, which impacted cash flows from operations in the prior years.

*Recent Accounting Developments*

*ASU 2011-11* — Effective January 1, 2013, the Registrants adopted the provisions of ASU No. 2011-11, *Balance Sheet (Topic 210) Disclosures about Offsetting Assets and Liabilities*, or ASU No. 2011-11, and began providing enhanced disclosures regarding the effect or potential effect of netting arrangements on an entity's financial position by improving information about financial instruments and derivative instruments that either (1) offset in accordance with either ASC 210-20-45 or ASC 810-20-45 or (2) are subject to an enforceable master netting arrangement or similar agreement, irrespective of whether they are offset. Reporting entities are required to disclose both gross and net information about both instruments and transactions eligible for offset in the statement of financial position and instruments and transactions subject to an agreement similar to a master netting arrangement. The disclosures required by ASU No. 2011-10 are required to be adopted retroactively. As this guidance provides only disclosure requirements, the adoption of this standard did not impact the Registrants' results of operations, cash flows or financial position.

*ASU 2013-02 (GenOn)* - Effective January 1, 2013, the Company adopted the provisions of ASU No. 2013-02, *Other Comprehensive Income (Topic 220) Reporting of Amounts Reclassified Out of Accumulated Other Comprehensive Income*, or ASU No. 2013-02, and began reporting the effect of significant reclassifications out of accumulated other comprehensive income on the respective line items in net income within the notes to the financial statements if the amount being reclassified is required under U.S. GAAP to be reclassified in its entirety to net income in the same reporting period. For other amounts not required by U.S. GAAP to be reclassified in their entirety to net income in the same reporting period, an entity is required to cross-reference other disclosures which provide additional information about the amounts. The provisions of ASU No. 2013-02 are required to be adopted prospectively. As this guidance provides only presentation requirements, the adoption of this standard did not impact GenOn's results of operations, cash flows or financial position.

*Other* - The following accounting standard was issued in 2013 and was adopted January 1, 2014:

• *ASU 2013-11* - In July 2013, the FASB issued ASU No. 2013-11, *Income Taxes (Topic 740) Presentation of an Unrecognized Tax Benefit When a Net Operating Loss Carryforward, a Similar Tax Loss, or a Tax Credit Carryforward Exists*, or ASU No. 2013-11. The amendments of ASU 2013-11 requires an entity to present an unrecognized tax benefit, or a portion of an unrecognized tax benefit, as a reduction of a deferred tax asset for a net operating loss, or NOL, a similar tax loss or tax credit carryforwards rather than a liability when the uncertain tax position would reduce the NOL or other carryforward under the tax law of the applicable jurisdiction and the entity intends to use the deferred tax asset for that purpose. The guidance is effective for fiscal years, and interim periods within those years, beginning after December 15, 2013 with early adoption permitted. The adoption of this standard will not impact the Company's results of operations or cash flows.

| | | | | | | | | | | 0 Months Ended | 1 Months Ended | 12 Months Ended |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Accounting for Derivative Instruments and Hedging Activities (Details) (USD $) In Millions, unless otherwise specified** | Dec. 31, 2013 | Dec. 31, 2012 | Dec. 31, 2013 Commodity Contract [Member] | Dec. 31, 2012 Commodity Contract [Member] | Dec. 31, 2013 GenOn Americas Generation, LLC [Member] | Dec. 31, 2012 GenOn Americas Generation, LLC [Member] | Dec. 31, 2013 GenOn Americas Generation, LLC [Member] Commodity Contract [Member] | Dec. 31, 2012 GenOn Mid-Atlantic, LLC [Member] | Dec. 31, 2013 GenOn Mid-Atlantic, LLC [Member] Commodity Contract [Member] | Dec. 31, 2012 Successor [Member] | Dec. 31, 2012 Successor [Member] | Dec. 201... Successor [Mem... |
| **Derivative [Line Items]** | | | | | | | | | | | | |
| Unrealized Gain (Loss) on Derivatives | | | | | | | | | | $ (13) | $ (13) | $ (327) |
| **Volumetric underlying derivative transactions [Abstract]** | | | | | | | | | | | | |
| Notional amount of interest rate derivatives | | | | | | | | | | | | |
| **Fair value of the derivative instrument** | | | | | | | | | | | | |
| Cash collateral paid | 62 | | | 50 | | | | | | | | 62 |
| Cash collateral received | (56) | | | (56) | | | | | | | | (56) |
| Derivative assets | | | | | | | | | | 1,116 | 1,116 | 651 |
| Derivative liabilities | | | | | | | | | | (369) | (369) | (181) |
| **Accumulated Other Comprehensive Income (Loss), Net of Tax [Abstract]** | | | | | | | | | | | | |
| Other comprehensive income (loss) attributable to cash flow hedge derivatives, tax | | | | | | | | | | | | 0 |
| Accumulated Other Comprehensive Income (Loss), Cumulative Changes in Net Gain (Loss) from Cash Flow Hedges, Effect Net of Tax | | | | | | | | | | 1 | 1 | 0 |
| Recognized in OCI on interest rate derivatives | | | | | | | | | | 1 | | 19 |
| Derivative Instruments, Gain (Loss) Reclassified from Accumulated OCI into Income, Effective Portion, Net | | | | | | | | | | 0 | [1],[2] | (2) |
| Valuation adjustments | | | | | | | | | | 0 | | 0 |
| Derivative Asset, Fair Value, Gross Liability | | | | | | | | | | | | |
| Derivative Asset, Fair Value, Amount Offset Against Collateral | | | | | | | | | | | | |
| Derivative Liability, Fair Value, Gross Asset | | | | | | | | | | | | |
| Derivative Liability, Fair Value, Amount Offset Against Collateral | | | | | | | | | | | | |
| Fair Value of Gross Derivative Assets and Liabilities Net | 747 | 470 | 797 | | 697 | 427 | 694 | 434 | | | | |
| Derivative Asset Fair Value | | | | | | | | | | | | |
| Gross Liability Net of Derivative Liability Fair Value Gross Asset | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Derivative, Collateral, Obligation to Return Cash Net of Derivative, Collateral, Right ot Reclaim Cash | (242) | (56) | (242) | (242) | (56) | (57) | 0 |
| Derivative Asset, Fair Value, Amount Offset Agains Collateral Net of Derivative Liability, Fair Value, Amount Offset Against Collateral | $ 505 | $ 414 | $ 555 | $ 455 | $ 371 | $ 637 | $ 434 |

[1]    Amounts reclassified from accumulated OCI into income and amounts recognized in income from the ineffective portion of cash flow hedges are recor

[2]    All of the forecasted transactions (future interest payments) were deemed probable of occurring; therefore, no cash flow hedges were discontinued and

[3]    Represents the default risk of the counterparties to these transactions and GenOn's own non-performance risk. The effect of these valuation adjustme

| Environmental Matters (Details) (USD $) | Dec. 31, 2013 | Dec. 31, 2013 GenOn Americas Generation, LLC [Member] | Dec. 31, 2013 GenOn Mid-Atlantic, LLC [Member] | 12 Months Ended Dec. 31, 2008 Cheswick Monarch Mine Novs [Member] Environmental Matters [Member] | Dec. 31, 2013 Maryland Fly Ash Facilities [Member] Environmental Matters [Member] GenOn Mid-Atlantic, LLC [Member] facility | Dec. 31, 2008 Maryland Fly Ash Facilities [Member] Environmental Matters [Member] GenOn Mid-Atlantic, LLC [Member] facility |
|---|---|---|---|---|---|---|
| **Site Contingency [Line Items]** | | | | | | |
| Estimated environmental capital expenditures over the next decade | $ 120,000,000 | $ 12,000,000 | $ 6,000,000 | | | |
| MinimumCivilPenaltiesWhichMayBeAssumed | | | | $ 200,000 | | |
| Number of Fly Ash Facilities | | | | | 3 | 3 |

| Benefit Plans and Other Postretirement Benefits Disclosure (Details 3) (USD $) In Millions, unless otherwise specified | 1 Months Ended Dec. 31, 2012 Pension Plans, Defined Benefit [Member] | Dec. 14, 2012 Pension Plans, Defined Benefit [Member] | 12 Months Ended Dec. 31, 2013 Pension Plans, Defined Benefit [Member] | Dec. 31, 2011 Pension Plans, Defined Benefit [Member] | 1 Months Ended Dec. 31, 2012 Other Postretirement Benefit Plan, Defined Benefit [Member] | Dec. 14, 2012 Other Postretirement Benefit Plan, Defined Benefit [Member] | Dec. 31, 2013 Other Postretirement Benefit Plan, Defined Benefit [Member] | Dec. 31, 2011 Other Postretirement Benefit Plan, Defined Benefit [Member] | Dec. 14, 2012 Predecessor [Member] | Dec. 2 Pred [Me |
|---|---|---|---|---|---|---|---|---|---|---|
| **Defined Benefit Plan, Amounts Recognized in Other Comprehensive Income (Loss) Accumulated Other Comprehensive Income (Loss) [Roll Forward]** | | | | | | | | | | |
| Beginning Balance | | | | | | | | | | |
| Deferred Benefits - Net (Loss) Gains | | | | | | | | | | |
| Deferred Benefits - Prior Service (Costs) Credits | | | | | | | | | | |
| Amortization - Net (Loss) Gains | | | | | | | | | | |
| Amortization - Prior Service (Costs) Credits | | | | | | | | | | |
| Total recognized in other comprehensive loss for the period | | | | | | | | | 8 | 89 |
| Ending Balance | | | | | | | | | | |
| Total amount recognized of (income) loss in net periodic benefit cost and other comprehensive income/loss | $ 0 | $ 17 | $ (84) | $ 88 | $ 0 | $ 6 | $ (7) | $ 11 | | |

**Regulatory Matters**

**12 Months Ended**

**Dec. 31, 2013**

**Regulatory Matters Disclosure [Abstract]**

Regulatory Matters

**Regulatory Matters (GenOn, GenOn Americas Generation, GenOn Mid-Atlantic)**

The Registrants operate in a highly regulated industry and are subject to regulation by various federal and state agencies. As such, the Registrants are affected by regulatory developments at both the federal and state levels and in the regions in which they operate. In addition, the Registrants are subject to the market rules, procedures, and protocols of the various ISO markets in which they participate. These power markets are subject to ongoing legislative and regulatory changes that may impact the Registrants.

In addition to the regulatory proceedings noted below, the Registrants are a party to other regulatory proceedings arising in the ordinary course of business or have other regulatory exposure. In management's opinion, the disposition of these ordinary course matters will not materially adversely affect the Registrants' respective consolidated financial position, results of operations, or cash flows.

*East Region (GenOn)*

*RMR Agreements for Elrama and Niles* — In May 2012, GenOn filed with FERC an RMR rate schedule governing operation of unit 4 of the Elrama generating facility and unit 1 of the Niles generating facility. PJM determined that each of these units was needed past its planned deactivation date of June 1, 2012 to maintain transmission system reliability on the PJM system pending the completion of transmission upgrades. The RMR rate schedule sets forth the terms, conditions and cost-based rates under which GenOn operated the units for reliability purposes through September 30, 2012, the date PJM indicated the units would no longer be needed for reliability. In July 2012, FERC accepted GenOn's RMR rate schedule subject to hearing and settlement procedures. In the settlement discussions ordered by FERC, or in any subsequent hearing, GenOn's RMR rate schedule may be modified from that which was filed. The rates GenOn charged are subject to refund pending a ruling or settlement. GenOn filed a settlement of all outstanding issues in May 2013, which several parties are contesting. The matter is pending before FERC.

*Montgomery County Station Power Tax* — On December 20, 2013, NRG received a letter from Montgomery County, Maryland requesting payment of an energy tax for the consumption of station power at the Dickerson Facility over the last three years. The letter seeks payment in the amount of $14.6 million, which includes tax, interest and penalty. NRG is disputing the applicability of the tax and GenOn Mid-Atlantic, LLC filed suit against the County in Maryland Tax Court and the Circuit Court for Montgomery County on January 21, 2014. The parties jointly filed on February 25, 2014, to stay the Circuit Court proceeding pending resolution of the Tax Court proceeding. The Tax Court proceeding is still pending.

| Capital Structure (Details) | 1 Months Ended | 12 Months Ended | |
|---|---|---|---|
| | Dec. 31, 2012 | Dec. 14, 2012 | Dec. 31, 2011 |
| Common Stock [Member] | | | |
| **Common Stock [Roll Forward]** | | | |
| Balance, common shares outstanding (in shares) | 774,000,000 | 772,000,000 | 771,000,000 |
| Transactions under stock plans (in shares) | | 2,000,000 | 1,000,000 |
| Issued in connection with Merger (in shares) | 774,000,000 | | |
| Balance, common shares outstanding (in shares) | 0 | 774,000,000 | 772,000,000 |
| Genon [Member] | | | |
| **Schedule of Capitalization [Line Items]** | | | |
| Number of shares of NRG common stock issued, for each share of GenOn common stock | | 0.1216 | |

| Inventory (Tables) | 12 Months Ended |
| --- | --- |
| | Dec. 31, 2013 |

**Genon [Member]**

**Inventory [Line Items]**

Schedule of inventory

Inventory consisted of:

*GenOn*

| | As of December 31, | |
| --- | --- | --- |
| | **2013** | **2012** |
| | (In millions) | |
| Fuel oil | $ 162 | $ 120 |
| Coal | 144 | 170 |
| Spare parts | 131 | 129 |
| Other | 6 | 3 |
| Total Inventory | $ 443 | $ 422 |

**GenOn Americas Generation, LLC [Member]**

**Inventory [Line Items]**

Schedule of inventory

*GenOn Americas Generation*

| | As of December 31, | |
| --- | --- | --- |
| | **2013** | **2012** |
| | (In millions) | |
| Fuel oil | $ 133 | $ 91 |
| Coal | 81 | 77 |
| Spare parts | 55 | 54 |
| Other | 1 | 1 |
| Total Inventory | $ 270 | $ 223 |

**GenOn Mid-Atlantic, LLC [Member]**

**Inventory [Line Items]**

Schedule of inventory

*GenOn Mid-Atlantic*

| | As of December 31, | |
| --- | --- | --- |
| | **2013** | **2012** |
| | (In millions) | |
| Fuel oil | $ 39 | $ 23 |
| Coal | 81 | 77 |
| Spare parts | 37 | 37 |
| Other | 1 | — |
| Total Inventory | $ 158 | $ 137 |

**Benefit Plans and Other
Postretirement Benefits**

**Benefit Plans and Other
Postretirement Benefits
Disclosure [Abstract]**

Benefit Plans and Other
Postretirement Benefits

**12 Months Ended
Dec. 31, 2013**

**Benefit Plans and Other Postretirement Benefits (GenOn)**

*Defined Benefit Plans*

GenOn provides pension benefits to eligible non-union and union employees through various defined benefit pension plans. These benefits are based on pay, service history and age at retirement. Most pension benefits are provided through tax-qualified plans that are funded in accordance with the Employee Retirement Income Security Act of 1974 and Internal Revenue Service requirements. Certain executive pension benefits that cannot be provided by the tax-qualified plans are provided through unfunded non-tax-qualified plans. The measurement date for the defined benefit plans was December 31 for all periods presented unless otherwise noted. GenOn also provides certain medical care and life insurance benefits for eligible retired employees. The measurement date for these postretirement benefit plans was December 31 for all periods presented unless otherwise noted.

As a result of the application of pushdown accounting, GenOn's benefit plan obligations were remeasured at the time of the NRG Merger. See Note 3, *NRG Merger and Dispositions*.

The net periodic pension cost/credit related to GenOn's pension and other postretirement benefit plans include the following components:

| | Pension Benefits | | | |
|---|---|---|---|---|
| | Successor | | Predecessor | |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| Service cost benefits earned | $ 13 | $ 1 | $ 12 | $ 12 |
| Interest cost on benefit obligation | 25 | 1 | 23 | 23 |
| Expected return on plan assets | (31) | (1) | (30) | (29) |
| Net reclassifications from accumulated other comprehensive loss[a] | — | — | 9 | 4 |
| Curtailments | — | — | 1 | — |
| Special termination benefits | — | — | 1 | — |
| Net periodic benefit cost | $ 7 | $ 1 | $ 16 | $ 10 |

(a)   Net reclassifications include actuarial loss and prior service cost.

| | Other Postretirement Benefits | | | |
|---|---|---|---|---|
| | Successor | | Predecessor | |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| | (In millions) | | (In millions) | |
| Service cost benefits earned | $ 1 | $ — | $ 1 | $ 1 |
| Interest cost on benefit obligation | 3 | — | 3 | 3 |
| Net reclassifications from accumulated other comprehensive loss[a] | — | — | (3) | (4) |
| Curtailments | — | — | 1 | — |
| Plan amendments | — | — | (3) | — |
| Unrecognized prior service cost | (1) | — | — | — |
| Net periodic benefit credit | $ 3 | $ — | $ (1) | $ — |

(a)   Net reclassifications include actuarial gain/loss and prior service credit.

A comparison of the pension benefit obligation, other postretirement benefit obligations and related plan assets for GenOn plans on a combined basis is as follows:

| | Tax-Qualified Pension Benefits | | | Non-Tax-Qualified Pension Benefits | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Successor | | Predecessor | Successor | | Predecessor |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | (In millions) | (In millions) | | (In millions) |
| Benefit obligation at beginning of period | $ 585 | $ 582 (a) | $ 523 | $ 14 | $ 14 (a) | $ 10 |
| Service cost | 13 | 1 | 12 | — | — | — |
| Interest cost | 25 | 1 | 22 | 1 | — | 1 |
| Actuarial (gain)/loss | (55) | 1 | 12 | — | — | — |
| Benefit payments | (22) | — | (18) | (2) | — | (1) |
| Curtailments | — | — | 1 | (1) | — | — |
| Plan amendments | — | — | — | — | — | — |
| Special termination benefits | — | — | 1 | — | — | — |
| Benefit obligation at end of period | 546 | 585 | 553 (a) | 12 | 14 | 10 (a) |
| Fair value of plan assets at beginning of period | 406 | 402 (a) | 353 | — | — | — |
| Actual return on plan assets | 67 | 4 | 32 | — | — | — |
| Employer contributions | 18 | — | 20 | 2 | — | 1 |
| Benefit payments | (22) | — | (18) | (2) | — | (1) |
| Fair value of plan assets at end of period | 469 | 406 | 387 | — | — | — |
| Funded status at end of period — excess of obligation over assets | $ (77) | $ (179) | $ (166) | $ (12) | $ (14) | $ (10) |

(a)   As a result of the application of pushdown accounting, GenOn remeasured its pension benefit obligation and related plan assets at the time of the NRG Merger.

| | Other Postretirement Benefits | | |
| --- | --- | --- | --- |
| | Successor | | Predecessor |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | (In millions) |
| Benefit obligation at beginning of period | $ 87 | $ 87 (a) | $ 84 |

| | | | | |
|---|---|---|---|---|
| Service cost | 1 | — | | 1 |
| Interest cost | 3 | — | | 3 |
| Participant contributions | 1 | — | | 2 |
| Actuarial (gain)/loss | (7) | — | | 4 |
| Benefit payments | (7) | — | | (7) |
| Curtailments | — | — | | 1 |
| Plan amendments | (5) | — | | (3) |
| Benefit obligation at end of period | 73 | 87 | | 85 [a] |
| Fair value of plan assets at beginning of period | — | — | | — |
| Employer contributions | 6 | — | | 5 |
| Participant contributions | 1 | — | | 2 |
| Benefit payments | (7) | — | | (7) |
| Fair value of plan assets at end of period | — | — | | — |
| Funded status at end of period — excess of obligation over assets | $ (73) | $ (87) | | $ (85) |

(a)   As a result of the application of pushdown accounting, GenOn remeasured its postretirement benefit obligations at the time of the NRG Merger.

Amounts recognized in GenOn's balance sheets were as follows:

| | Tax-Qualified Pension Benefits | | Non-Tax-Qualified Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|---|---|
| | As of December 31, | | As of December 31, | | As of December 31, | |
| | 2013 | 2012 | 2013 | 2012 | 2013 | 2012 |
| | (In millions) | | (In millions) | | (In millions) | |
| Current liabilities | $  — | $  — | $  (12) | $  (1) | $  (6) | $  (6) |
| Non-current liabilities | $  (77) | $  (179) | $  — | $  (13) | $  (67) | $  (81) |

The accumulated benefit obligation exceeded the fair value of plan assets at December 31, 2013 and 2012 for the tax-qualified defined benefit pension plans. The total accumulated benefit obligation for the tax-qualified plans at December 31, 2013 and 2012 was $517 million and $543 million, respectively.

Amounts recognized in GenOn's other comprehensive income/loss and accumulated other comprehensive income/loss for the pension and other postretirement benefit plans were as follows:

| | Tax-Qualified Pension Benefits | | Non-Tax-Qualified Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|---|---|
| | Net Actuarial (Loss) Gain | Prior Service Cost | Net Actuarial Loss | Prior Service Cost | Net Actuarial (Loss) Gain | Prior Service Cost |
| | (In millions) | | | | | |
| **Predecessor** | | | | | | |
| Balance at December 31, 2011 | $  (136) | $  (2) | $  (3) | $  (1) | $  (3) | $  10 |
| Unrealized loss | (10) | — | — | — | (4) | — |
| Reclassification to net periodic benefit cost/credit | 8 | 1 | — | — | — | (3) |
| Total recognized in OCI for the period | (2) | 1 | — | — | (4) | (3) |
| Balance at December 14, 2012[a] | $  (138) | $  (1) | $  (3) | $  (1) | $  (7) | $  7 |
| **Successor** | | | | | | |
| Balance at December 15, 2012[a] | $  — | $  — | $  — | $  — | $  — | $  — |
| Unrealized gain | 1 | — | — | — | — | — |
| Total recognized in OCI for the period | 1 | — | — | — | — | — |
| Balance at December 31, 2012 | $  1 | $  — | $  — | $  — | $  — | $  — |
| Unrealized gain | 91 | — | — | — | 7 | 5 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Reclassification to net periodic benefit cost/credit | | — | | (1) | | — | | — | | — | (1) |
| Total recognized in OCI for the period | | 91 | | (1) | | — | | — | | 7 | 4 |
| Balance at December 31, 2013 | $ | 92 | $ | (1) | $ | — | $ | — | $ | 7 | $ 4 |

(a)   As a result of the application of pushdown accounting, the amounts remaining in accumulated other comprehensive loss at the time of the NRG Merger were eliminated.

The total net (gain)/loss recognized in net periodic benefit cost and other comprehensive income/loss for the pension plans for the year ended December 31, 2013, the period from December 15, 2012 through December 31, 2012, the period from January 1, 2012 through December 14, 2012 and the year ended December 31, 2011 were $(84) million, $0 million, $17 million and $88 million, respectively. The total net (gain)/loss recognized in net periodic benefit credit and other comprehensive income/loss for the other postretirement benefit plans for the year ended December 31, 2013, the period from December 15, 2012 through December 31, 2012, the period from January 1, 2012 through December 14, 2012 and the year ended December 31, 2011 were $(7) million, $0 million, $6 million and $11 million, respectively.

The estimated unrecognized gain for the pension and other postretirement benefit plans that will be amortized from accumulated other comprehensive loss to net period benefit cost during 2014 is approximately $6 million.

*Fair Value Hierarchy of Plan Assets*

GenOn's market-related value of its plan assets is the fair value of the assets. The fair values of GenOn's pension plan assets by asset category are as follows:

| | As of December 31, 2013 | As of December 31, 2012 |
|---|---|---|
| | (In millions) | |
| **Asset Categories:** | | |
| Investment Funds: | | |
| U.S. equities | 202 | 173 |
| Non-U.S. equities | 139 | 118 |
| Fixed income securities | 128 | 115 |
| Total | $ 469 | $ 406 |

In accordance with ASC 820, GenOn determines the level in the fair value hierarchy within which each fair value measurement in its entirety falls, based on the lowest level input that is significant to the fair value measurement in its entirety. GenOn's assets are all classified within Level 2 of the fair value hierarchy. GenOn's plan assets consist of non-exchange-traded investment funds whose fair values reflect the net asset value of the funds based on the fair value of the fund's underlying securities. The underlying securities held by these funds are valued using quoted prices in active markets for identical or similar assets. GenOn elected the practical expedient under the accounting guidance to measure the fair value of certain funds that use net asset value per share. Certain investment funds require redemption notification of 30 days or less for which no adjustment was made to their net asset value. There are no investments categorized as Level 3.

*Assumptions*

The discount rates used at December 31, 2013 and 2012, were determined based on individual bond-matching models comprised of portfolios of high quality corporate bonds with projected cash flows and maturity dates reflecting the expected time horizon during which that benefit will be paid. Bonds included in the model portfolios are from a cross-section of different issuers, are AA-rated or better, and are non-callable so that the yield to maturity can be attained without intervening calls.

In determining the long-term rate of return for plan assets, GenOn evaluates historic and current market factors such as inflation and interest rates before determining long-term capital market assumptions. GenOn also considers the effects of diversification and portfolio rebalancing. To check for reasonableness and appropriateness, GenOn reviews data about other companies, including their historic returns.

For purposes of expense recognition prior to the NRG Merger, GenOn used a market-related value of assets that recognizes the difference between the expected return and the actual return on plan assets over a five-year period. Unrecognized asset gains or losses associated with GenOn's plan assets were recognized in the calculation of the market-related value of assets and subject to amortization in future periods.

The following table presents the significant assumptions used to calculate GenOn's benefit obligations:

| | Pension Benefits | | Other Postretirement Benefits | |
| | As of December 31, | | As of December 31, | |
| Weighted–Average Assumptions | 2013 | 2012 | 2013 | 2012 |
|---|---|---|---|---|
| Discount rate | 5.02% | 4.22% | 4.53% | 3.99% |
| Rate of compensation increase | 2.91% | 2.82% | N/A | N/A |

GenOn's assumed healthcare cost trend rates used for other postretirement benefit obligations are:

| | Other Postretirement Benefit Plans | |
| | As of December 31, | |
| Weighted–Average Assumptions | 2013 | 2012 |
|---|---|---|
| Assumed medical inflation for next year: | | |
| Before age 65 | 8.50% | 8.50% |
| Age 65 and after | 8.69% | 8.67% |
| Assumed ultimate medical inflation rate | 5.50% | 5.50% |
| Year in which ultimate rate is reached | 2019 | 2018 |

An annual increase or decrease of 1% in the assumed healthcare cost trend rates would correspondingly increase or decrease the postretirement benefit obligation at December 31, 2013 by $5 million.

The following table presents the significant assumptions used to calculate GenOn's benefit expense/credit:

| | Pension Plans | | | |
| | Successor | | Predecessor | |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| Weighted–Average Assumptions | | | | |
|---|---|---|---|---|
| Discount rate | 4.22% | 4.25% | 4.56% | 5.12% |
| Rate of compensation increase | 2.82% | 2.82% | 2.79% | 2.81% |
| Expected return on plan assets | 7.50% | 7.50% | 8.25% | 8.25% |

| | Other Postretirement Benefit Plans | | | |
| | Successor | | Predecessor | |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |
| Weighted–Average Assumptions | | | | |
|---|---|---|---|---|
| Discount rate | 3.99% | 4.01% | 4.26% | 4.80% |
| Rate of compensation increase | N/A | N/A | N/A | 3.00% |

GenOn's assumed healthcare cost trend rates used for other postretirement benefit net periodic benefit expense/credit are:

| | Successor | | Predecessor | |
| | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 | Year Ended December 31, 2011 |

**Weighted–Average Assumptions**

| Assumed medical inflation for next year: | | | | |
|---|---|---|---|---|
| Before age 65 | 8.50% | 8.50% | 7.50% | 8.00% |
| Age 65 and after | 8.67% | 8.67% | 7.71% | 8.20% |
| Assumed ultimate medical inflation rate | 5.50% | 5.50% | 5.50% | 5.50% |
| Year in which ultimate rate is reached | 2018 | 2018 | 2018 | 2018 |

An annual increase or decrease of 1% in the assumed healthcare cost trend rates would correspondingly increase or decrease the total annual service and interest cost components of net period benefit credit during 2013 by $5 million.

*Pension Plan Assets*

Pension plans' assets are managed solely in the interest of the plans' participants and their beneficiaries and are invested with the objective of earning the necessary returns to meet the time horizons of the accumulated and projected retirement benefit obligations. GenOn uses a mix of equities and fixed income investments intended to manage risk to a reasonable and prudent level. GenOn's risk tolerance is established through consideration of the plans' liabilities and funded status as well as corporate financial condition. Equity investments are diversified across U.S. and non-U.S. stocks. For U.S. stocks, GenOn employs both a passive and active approach by investing in index funds and actively managed funds. For non-U.S. stocks, GenOn is invested in both developed and emerging market equity funds. Fixed income investments are comprised of long-term U.S. government and corporate securities. Derivative securities can be used for diversification, risk-control and return enhancement purposes but may not be used for the purpose of leverage.

In the fourth quarter of 2011, GenOn adopted a new pension asset allocation methodology based on the results of a study completed by a third-party investment consulting firm. The methodology divides the pension plan assets into two primary portfolios: (i) return seeking assets, those assets intended to generate returns in excess of pension liability growth (U.S. and Non-U.S. equities) and (ii) liability-hedging assets, those assets intended to have characteristics similar to pension liabilities (fixed income securities). As GenOn's pension plans' funded status improves, the methodology actively moves the plan assets from return seeking assets toward liability-hedging assets.

The following table shows the target allocations for GenOn's plans and the percentage of fair value of plan assets by asset fund category (based on the nature of the underlying funds) for GenOn's qualified pension plans at December 31, 2013 and 2012:

| | | Percentage of Fair Value of Plan Assets as of December 31, | |
|---|---|---|---|
| | Target Allocations | 2013 | 2012 |
| U.S. equities | 42% | 43% | 43% |
| Non-U.S. equities | 28 | 29 | 29 |
| Fixed income securities | 30 | 28 | 28 |
| Total | 100% | 100% | 100% |

Investment risk and performance are monitored on an ongoing basis through quarterly portfolio reviews of each asset fund class to a related performance benchmark, if applicable, and annual pension liability measurements. Performance benchmarks adopted in the fourth quarter of 2011 are composed of the following indices:

| Asset Class | Index |
|---|---|
| U.S. equities | Dow Jones U.S. Total Stock Market Index |
| Non-U.S. equities | MSCI All Country World Ex-U.S. IMI Index |
| Fixed income securities | Barclays Capital Long Term Government/Credit Index |

*Expected Contributions and Benefit Payments*

GenOn expects to contribute approximately $56 million to the tax-qualified pension plans during 2014. In addition, GenOn expects to contribute approximately $12 million to the non-tax-qualified pension plans during 2014. As of December 31, 2013, GenOn has related rabbi trust investments of $14 million to fund

future benefit payments of the non-tax-qualified pension plans.

GenOn's expected future benefit payments for each of the next five years, and in the aggregate for the five years thereafter, are as follows:

| | Pension Benefit Payments | | Other Postretirement Benefit | |
| | Tax-Qualified | Non-Tax-Qualified | Benefit Payments | Medicare Prescription Drug Reimbursements |
|---|---|---|---|---|
| | | (In millions) | | |
| 2014 | $ 24 | $ 12 | $ 6 | $ — |
| 2015 | 27 | — | 7 | — |
| 2016 | 29 | — | 6 | — |
| 2017 | 28 | — | 6 | — |
| 2018 | 30 | — | 6 | — |
| 2019 through 2023 | 184 | — | 30 | 1 |

### *Employee Savings and Profit Sharing Plan*

GenOn has employee savings plans under Sections 401(a) and 401(k) of the IRC whereby employees may contribute a portion of their eligible compensation to the employee savings plan, subject to limits under the IRC. GenOn also historically provided for a profit sharing arrangement for non-bargaining employees and some bargaining employees not accruing a benefit under the defined benefit pension plans, whereby GenOn contributed a fixed contribution of 2% of eligible pay per pay period and could make an annual discretionary contribution up to 3% of eligible pay based on GenOn's performance. Upon completion of the NRG Merger, NRG assumed GenOn's defined contribution 401(k) plans and amended the plan for the non-bargaining employees with NRG 401(k) plan features, effective January 1, 2013. On July 5, 2013, the GenOn defined contribution 401(k) plans were merged into the NRG 401(k) plan.

GenOn also sponsors non-qualified deferred compensation plans for key and highly compensated employees. GenOn's obligations under these plans were $22 million and the related rabbi trust investments were $31 million at December 31, 2013 and 2012, respectively. Upon completion of the NRG Merger, NRG assumed GenOn's non-qualified plans and their respective obligations.

Expense recognized for the matching, fixed profit sharing and discretionary profit sharing contributions for the year ended December 31, 2013, the period from December 15, 2012 through December 31, 2012, the period from January 1, 2012 through December 14, 2012 and the year ended December 31, 2011 were $4 million, $1 million, $30 million and $30 million, respectively.

# Exhibit 64

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the Fiscal Year ended December 31, 2014.**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the Transition period from             to             .**

# GenOn Energy, Inc.

(Exact name of registrant as specified in its charter)

75-0655566 (I.R.S. Employer Identification No.)

Commission File Number: 001-16455

# GenOn Americas Generation, LLC

(Exact name of registrant as specified in its charter)

51-0390520 (I.R.S. Employer Identification No.)

Commission File Number: 333-63240

# GenOn Mid-Atlantic, LLC

(Exact name of registrant as specified in its charter)

58-2574140 (I.R.S. Employer Identification No.)

Commission File Number: 333-61668

**Delaware**
*(State or other jurisdiction of incorporation or organization)*

**211 Carnegie Center Princeton, New Jersey**                    **08540**
*(Address of principal executive offices)*                         *(Zip Code)*

**(609) 524-4500**
*(Registrants' telephone number, including area code)*
**Securities registered pursuant to Section 12(b) of the Act:**
**None**
**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined by Rule 405 of the Securities Act.

| | Yes | No |
|---|---|---|
| GenOn Energy, Inc. | ☐ | ☒ |
| GenOn Americas Generation, LLC | ☐ | ☒ |
| GenOn Mid-Atlantic, LLC | ☐ | ☒ |

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act.

| | Yes | No |
|---|---|---|
| GenOn Energy, Inc. | ☒ | ☐ |
| GenOn Americas Generation, LLC | ☒ | ☐ |
| GenOn Mid-Atlantic, LLC | ☒ | ☐ |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. (As a voluntary filer not subject to filing requirements, the registrant nevertheless filed all reports which would have been required to be filed by Section 15(d) of the Exchange Act during the preceding 12 months had the registrant been required to file reports pursuant to Section 15(d) of the Securities Exchange Act of 1934 solely as a result of having registered debt securities under the Securities Act of 1933.)

| | Yes | No |
|---|---|---|
| GenOn Energy, Inc. | ☐ | ☐ |
| GenOn Americas Generation, LLC | ☐ | ☐ |
| GenOn Mid-Atlantic, LLC | ☐ | ☐ |

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

| | Yes | No |
|---|---|---|
| GenOn Energy, Inc. | ☒ | ☐ |
| GenOn Americas Generation, LLC | ☒ | ☐ |
| GenOn Mid-Atlantic, LLC | ☒ | ☐ |

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

| | |
|---|---|
| GenOn Energy, Inc. | ☒ |
| GenOn Americas Generation, LLC | ☒ |
| GenOn Mid-Atlantic, LLC | ☒ |

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | Large accelerated filer | Accelerated filer | Non-accelerated filer | Smaller reporting company |
|---|---|---|---|---|
| GenOn Energy, Inc. | ☐ | ☐ | ☒ | ☐ |
| GenOn Americas Generation, LLC | ☐ | ☐ | ☒ | ☐ |
| GenOn Mid-Atlantic, LLC | ☐ | ☐ | ☒ | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).

| | Yes | No |
|---|---|---|
| GenOn Energy, Inc. | ☐ | ☒ |
| GenOn Americas Generation, LLC | ☐ | ☒ |
| GenOn Mid-Atlantic, LLC | ☐ | ☒ |

Each Registrant's outstanding equity interests are held by its respective parent and there are no equity interests held by nonaffiliates.

| Registrant | Parent |
|---|---|
| GenOn Energy, Inc. | NRG Energy, Inc. |
| GenOn Americas Generation, LLC | NRG Americas, Inc. |
| GenOn Mid-Atlantic, LLC | NRG North America, LLC |

This combined Form 10-K is separately filed by GenOn Energy, Inc., GenOn Americas Generation, LLC and GenOn Mid-Atlantic, LLC. Information

contained in this combined Form 10-K relating to GenOn Energy, Inc., GenOn Americas Generation, LLC and GenOn Mid-Atlantic, LLC is filed by such registrant on its own behalf and each registrant makes no representation as to information relating to registrants other than itself.

The registrants have not incorporated by reference any information into this Form 10-K from any annual report to securities holders, proxy statement or prospectus filed pursuant to 424(b) or (c) of the Securities Act.

NOTE: WHEREAS GENON ENERGY, INC., GENON AMERICAS GENERATION, LLC AND GENON MID-ATLANTIC, LLC MEET THE CONDITIONS SET FORTH IN GENERAL INSTRUCTION I(1)(a) AND (b) OF FORM 10-K, THIS COMBINED FORM 10-K IS BEING FILED WITH THE REDUCED DISCLOSURE FORMAT PURSUANT TO GENERAL INSTRUCTION I(2).

**TABLE OF CONTENTS**

| | |
|---|---|
| Glossary of Terms | 2 |
| PART I | 5 |
| Item 1 — Business | 5 |
| Item 1A — Risk Factors Related to the Registrants | 12 |
| Item 1B — Unresolved Staff Comments | 23 |
| Item 2 — Properties | 24 |
| Item 3 — Legal Proceedings | 25 |
| Item 4 — Mine Safety Disclosures | 25 |
| PART II | 26 |
| Item 5 — Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 26 |
| Item 6 — Selected Financial Data | 26 |
| Item 7 — Management's Narrative Analysis of the Results of Operations and Financial Condition | 27 |
| Item 7A — Quantitative and Qualitative Disclosures About Market Risk | 39 |
| Item 8 — Financial Statements and Supplementary Data | 41 |
| Item 9 — Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 42 |
| Item 9A — Controls and Procedures | 42 |
| Item 9B — Other Information | 42 |
| PART III | 43 |
| Item 10 — Directors, Executive Officers and Corporate Governance | 43 |
| Item 11 — Executive Compensation | 43 |
| Item 12 — Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 43 |
| Item 13 — Certain Relationships and Related Transactions, and Director Independence | 43 |
| Item 14 — Principal Accounting Fees and Services | 43 |
| PART IV | 44 |
| Item 15 — Exhibits, Financial Statement Schedules | 44 |
| EXHIBIT INDEX | 135 |

1

.

### Glossary of Terms

When the following terms and abbreviations appear in the text of this report, they have the meanings indicated below:

| | |
|---|---|
| Ancillary Services | Services that ensure reliability and support the transmission of electricity from generation sites to customer loads. Such services include regulation service, reserves and voltage support |
| ARO | Asset Retirement Obligation |
| ASC | The FASB Accounting Standards Codification, which the FASB established as the source of authoritative U.S. GAAP |
| ASU | Accounting Standards Updates – updates to the ASC |
| Bankruptcy Court | United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division |
| Baseload | Units expected to satisfy minimum baseload requirements of the system and produce electricity at an essentially constant rate and run continuously |
| CAIR | Clean Air Interstate Rule |
| CAISO | California Independent System Operator |
| CCGT | Combined Cycle Gas Turbine |
| CenterPoint | CenterPoint Energy, Inc. and its subsidiaries, on and after August 31, 2002, and Reliant Energy, Incorporated and its subsidiaries, prior to August 31, 2002 |
| CFTC | U.S. Commodity Futures Trading Commission |
| $CO_2$ | Carbon Dioxide |
| CSAPR | Cross-State Air Pollution Rule |
| CWA | Clean Water Act |
| Deactivation | Includes retirement, mothballing and long-term protective layup. In each instance, the deactivated unit cannot be currently called upon to generate electricity. |
| Dodd-Frank Act | Dodd-Frank Wall Street Reform and Consumer Protection Act |
| EPA | U.S. Environmental Protection Agency |
| EPC | Engineering, Procurement and Construction |
| Exchange Act | The Securities Exchange Act of 1934, as amended |
| FASB | Financial Accounting Standards Board |
| FERC | Federal Energy Regulatory Commission |
| GenOn | GenOn Energy, Inc. and, except where the context indicates otherwise, its subsidiaries |
| GenOn Americas Generation | GenOn Americas Generation, LLC and, except where the context indicates otherwise, its subsidiaries |
| GenOn Energy Holdings | GenOn Energy Holdings, Inc. and, except where the context indicates otherwise, its subsidiaries |
| GenOn Energy Management | GenOn Energy Management, LLC |
| GenOn Mid-Atlantic | GenOn Mid-Atlantic, LLC and, except where the context indicates otherwise, its subsidiaries, which include the coal generation units at two generating facilities under operating leases |
| GenOn Plans | Collectively, the NRG GenOn LTIP, The GenOn Energy, Inc. 2002 Long-Term Incentive Plan, the GenOn Energy, Inc. 2002 Stock Plan and the Mirant Corporation 2005 Omnibus Incentive Compensation Plan |
| GHG | Greenhouse Gases |
| IRC | Internal Revenue Code of 1986, as amended |
| IRC § | IRC Section |
| ISO | Independent System Operator, also referred to as RTO |
| ISO-NE | ISO New England Inc. |
| kWh | Kilowatt-hour |
| LIBOR | London Inter-Bank Offered Rate |
| Marsh Landing | NRG Marsh Landing, LLC (formerly known as GenOn Marsh Landing, LLC) |
| MATS | Mercury and Air Toxics Standards |
| MC Asset Recovery | MC Asset Recovery, LLC |

2

.

| | |
|---|---|
| MDE | Maryland Department of the Environment |
| Merit Order | A term used for the ranking of power stations in order of ascending marginal cost |
| Mirant | GenOn Energy Holdings, Inc. (formerly known as Mirant Corporation) and, except where the context indicates otherwise, its subsidiaries |
| Mirant/RRI Merger | The merger completed on December 3, 2010 pursuant to the Mirant/RRI Merger Agreement |
| Mirant Debtors | GenOn Energy Holdings, Inc. (formerly known as Mirant Corporation) and certain of its subsidiaries |
| MISO | Midcontinent Independent System Operator, Inc. |
| MMBtu | Million British Thermal Units |
| MOPR | Minimum Offer Price Rule |
| Mothballed | The unit has been removed from service and is unavailable for service, but has been laid up in a manner such that it can be brought back into service with an appropriate amount of notification, typically weeks or months |
| MW | Megawatt |
| MWh | Saleable megawatt hour net of internal/parasitic load megawatt-hour |
| NAAQS | National Ambient Air Quality Standards |
| NEPGA | New England Power Generators Association |
| Net Exposure | Counterparty credit exposure to GenOn, GenOn Americas Generation or GenOn Mid-Atlantic, as applicable, net of collateral |
| Net Generation | The net amount of electricity produced, expressed in kWhs or MWhs, that is the total amount of electricity generated (gross) minus the amount of electricity used during generation. |
| NERC | North American Electric Reliability Corporation |
| NOL | Net Operating Loss |
| NOV | Notice of Violation |
| $NO_x$ | Nitrogen Oxide |
| NPNS | Normal Purchase Normal Sale |
| NRG | NRG Energy, Inc. and, except where the context indicates otherwise, its subsidiaries |
| NRG Americas | NRG Americas, Inc. (formerly known as GenOn Americas, Inc.) |
| NRG GenOn LTIP | NRG 2010 Stock Plan for GenOn employees |
| NRG Merger | The merger completed on December 14, 2012 pursuant to the NRG Merger Agreement |
| NRG Merger Agreement | The agreement by and among NRG, GenOn and Plus Merger Corporation (a direct wholly-owned subsidiary of NRG) dated as of July 20, 2012 |
| NRG Merger Exchange Ratio | The right of GenOn Energy, Inc. stockholders to receive 0.1216 shares of common stock of NRG Energy, Inc. in the NRG Merger |
| NRG North America | NRG North America, LLC |
| NSPS | New Source Performance Standards |
| NYISO | New York Independent System Operator |
| NYMEX | New York Mercantile Exchange |
| NYSPSC | New York State Public Service Commission |
| OCI | Other Comprehensive Income |
| PADEP | Pennsylvania Department of Environmental Protection |
| Peaking | Units expected to satisfy demand requirements during the periods of greatest or peak load on the system |
| PG&E | Pacific Gas & Electric |
| PJM | PJM Interconnection, LLC |
| Plan | The plan of reorganization that was approved in conjunction with Mirant Corporation's emergence from bankruptcy protection on January 3, 2006 |
| PPA | Power Purchase Agreement |
| PUHCA | Public Utility Holding Company Act of 2005 |

3

| | |
|---|---|
| PURPA | Public Utility Regulatory Policies Act of 1978 |
| RCRA | Resource Conservation and Recovery Act of 1976 |
| Registrants | GenOn, GenOn Americas Generation and GenOn Mid-Atlantic, collectively |
| REMA | NRG REMA LLC (formerly known as GenOn REMA, LLC) |
| Repowering | Technologies utilized to replace, rebuild, or redevelop major portions of an existing electrical generating facility, not only to achieve a substantial emission reduction, but also to increase facility capacity, and improve system efficiency |
| RGGI | Regional Greenhouse Gas Initiative |
| RMR | Reliability Must-Run |
| RRI Energy | RRI Energy, Inc. |
| RTO | Regional Transmission Organization |
| SCR | Selective Catalytic Reduction |
| SEC | U.S. Securities and Exchange Commission |
| Securities Act | The Securities Act of 1933, as amended |
| $SO_2$ | Sulfur Dioxide |
| U.S. | United States of America |
| U.S. GAAP | Accounting principles generally accepted in the U.S. |
| VIE | Variable Interest Entity |

4

**PART I**

**Item 1 — Business (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

**General**

The Registrants are wholesale power generation subsidiaries of NRG, which is a competitive power company that produces, sells and delivers energy and energy services, primarily in major competitive power markets in the U.S. GenOn is an indirect wholly-owned subsidiary of NRG. GenOn was incorporated as a Delaware corporation on August 9, 2000, under the name Reliant Energy Unregco, Inc. GenOn Americas Generation and GenOn Mid-Atlantic are indirect wholly owned subsidiaries of GenOn. GenOn Americas Generation was formed as a Delaware limited liability company on November 1, 2001, under the name Mirant Americas Generation, LLC. GenOn Mid-Atlantic was formed as a Delaware limited liability company on July 12, 2000, under the name Southern Energy Mid-Atlantic, LLC. GenOn Mid-Atlantic is a wholly-owned subsidiary of NRG North America and an indirect wholly owned subsidiary of GenOn Americas Generation. The Registrants are engaged in the ownership and operation of power generation facilities; the trading of energy, capacity and related products; and the transacting in and trading of fuel and transportation services.

The Registrants' generation facilities are located in the U.S. and comprise generation facilities across the merit order. The sale of capacity and power from baseload and intermediate generation facilities accounts for a majority of the Registrants' generation revenues. In addition, the Registrants' generation portfolio provides each with opportunities to capture additional revenues by selling power during periods of peak demand, offering capacity or similar products, and providing ancillary services to support system reliability.

The following table summarizes the generation portfolio as of December 31, 2014, by Registrant:

| | (In MW) | | |
|---|---|---|---|
| **Generation Type** | **GenOn** | **GenOn Americas Generation** | **GenOn Mid-Atlantic** |
| Natural gas | 11,730 | 3,729 | 1,942 |
| Coal | 5,740 | 2,433 | 2,433 |
| Oil | 2,059 | 1,434 | 308 |
| Total generation capacity | 19,529 | 7,596 | 4,683 |

### *Seasonality and Price Volatility*

Annual and quarterly operating results of the Registrants' wholesale power generation segments can be significantly affected by weather and energy commodity price volatility. Significant other events, such as the demand for natural gas, interruptions in fuel supply infrastructure and relative levels of hydroelectric capacity can increase seasonal fuel and power price volatility. The Registrants derive a majority of its annual revenues in the months of May through October, when demand for electricity is generally at its highest in the Registrants core domestic markets. Further, power price volatility is generally higher in the summer months, traditionally the Registrants' most important season. The Registrants' second most important season is the winter months of December through March when volatility and price spikes in underlying delivered fuel prices have tended to drive seasonal electricity prices. The preceding factors related to seasonality and price volatility are fairly uniform across the Registrants' wholesale generation business segments.

### NRG Merger

On December 14, 2012, NRG completed the acquisition of GenOn. NRG issued, as consideration for the acquisition, 0.1216 shares of NRG common stock for each outstanding share of GenOn, including restricted stock units outstanding on the acquisition date, except for fractional shares which were paid in cash. See Item 15 — Note 3, *NRG Merger and Dispositions,* to the Consolidated Financial Statements for additional discussion.

The NRG Merger was accounted for by NRG using acquisition accounting and through the application of "push-down" accounting, the purchase price paid by NRG was allocated to the Registrants' assets, liabilities and equity as of the acquisition date. Accordingly, the successor financial statements reflect a new basis of accounting and predecessor and successor period financial results are presented, but not comparable.

The most significant impacts of the new basis of accounting during the successor periods were (i) reduced depreciation expense due to the step-down of depreciable assets, (ii) lower interest expense for the remaining life of long-term debt due to its revaluation and related debt premium amortization along with the repayment of the senior secured term loan due 2017, and (iii) reduced cost of operations due to the amortization of lease obligations and out-of-market contracts.

The results of operations for successor periods included herein reflect certain acquisition-related transaction and integration costs which are not expected to have a continuing impact on the results going forward, and those amounts are included within a separate line within the Registrants' consolidated results of operations.

**Competition**

Wholesale power generation is a capital-intensive, commodity-driven business with numerous industry participants. The Registrants compete on the basis of the location of their plants and ownership of portfolios of plants in various regions, which increases the stability and reliability of its energy revenues. Wholesale power generation is a regional business that is currently highly fragmented and diverse in terms of industry structure. As such, there is a wide variation in terms of the capabilities, resources, nature and identity of the companies the Registrants compete with depending on the market. Competitors include regulated utilities, other independent power producers, and power marketers or trading companies, including those owned by financial institutions, municipalities and cooperatives.

**Competitive Strengths**

The Registrants' power generation assets are diversified by fuel-type, dispatch level and region, which helps mitigate the risks associated with fuel price volatility and market demand cycles. The Registrants' baseload and intermediate facilities provide each with a significant source of cash flow, while the peaking facilities provide the Registrants with opportunities to capture upside potential that can arise from time to time during periods of high demand.

Many of the Registrants' generation assets are located within densely populated areas, which tend to have more robust wholesale pricing as a result of relatively favorable local supply-demand balance. The Registrants have generation assets located in or near the New York City, Washington, D.C., Baltimore, Pittsburgh, Los Angeles and San Francisco metropolitan areas and New Jersey. These facilities are often ideally situated for repowering or the addition of new capacity, because their location and existing infrastructure provide significant advantages over undeveloped sites.

**2014 Significant Events and Developments**

*Fuel Repowerings and Conversions*

The table below lists projected repowering and conversion projects at certain of the Registrants' facilities:

| Facility | Net Generation Capacity (MW) | Project Type | Fuel Type | Targeted COD |
|---|---|---|---|---|
| Avon Lake Units 7 and 9 | 732 | Natural Gas Conversion | Natural Gas | Summer 2016 |
| New Castle Units 3, 4 and 5 | 325 | Natural Gas Conversion | Natural Gas | Summer 2016 |
| Portland Units 1 and 2 | 401 | Ultra-Low Sulfur Diesel Conversion | Ultra-Low Sulfur Diesel | Summer 2016 |
| Shawville Units 1, 2, 3 and 4 | 597 | Natural Gas Conversion | Natural Gas | Summer 2016 |
| Total Fuel Repowerings and Conversions | 2,055 | | | |

6

.

**Coal Operations**

The following table summarizes GenOn's U.S. coal capacity and the corresponding revenues and average natural gas prices and positions resulting from coal hedge agreements extending beyond December 31, 2014, and through 2018 for the East region:

| East | 2015 | 2016 | 2017 | 2018 | Annual Average for 2015-2018 |
|---|---|---|---|---|---|
| | (Dollars in millions unless otherwise stated) | | | | |
| Net Coal Capacity (MW) [a] | 5,317 | 4,526 | 4,086 | 3,390 | 4,330 |
| Forecasted Coal Capacity (MW) [b] | 2,406 | 1,833 | 1,842 | 1,597 | 1,920 |
| Total Coal Sales (MW) [c] | 2,533 | 1,203 | 500 | — | 1,059 |
| Percentage Coal Capacity Sold Forward [d] | 105% | 66% | 27% | —% | 50% |
| Total Forward Hedged Revenues [e] | $ 1,205 | $ 594 | $ 191 | $ — | |
| Weighted Average Hedged Price ($ per MWh) [e] | $ 54.30 | $ 56.23 | $ 43.72 | $ — | |
| Average Equivalent Natural Gas Price ($ per MMBtu) [e] | $ 3.54 | $ 4.34 | $ 4.36 | $ — | |
| Gas Price Sensitivity Up $0.50/MMBtu on Coal Units | $ 57 | $ 71 | $ 94 | $ 97 | |
| Gas Price Sensitivity Down $0.50/MMBtu on Coal Units | $ 1 | $ (34) | $ (69) | $ (75) | |
| Heat Rate Sensitivity Up 1 MMBtu/MWh on Coal Units | $ 20 | $ 42 | $ 74 | $ 68 | |
| Heat Rate Sensitivity Down 1 MMBtu/MWh on Coal Units | $ 1 | $ (24) | $ (56) | $ (54) | |

(a)   Net Coal capacity represents nominal summer net MW capacity of power generated as adjusted for the Registrants' ownership position excluding capacity from inactive/mothballed units, see Item 2 - *Properties* for units scheduled to be deactivated.

(b)   Forecasted generation dispatch output (MWh) based on forward price curves as of December 31, 2014, which is then divided by number of hours in a given year to arrive at MW capacity. The dispatch takes into account planned and unplanned outage assumptions.

(c)   Includes amounts under power sales contracts and natural gas hedges. The forward natural gas quantities are reflected in equivalent MWh based on forward market implied heat rate as of December 31, 2014, and then combined with power sales to arrive at equivalent MWh hedged which is then divided by number of hours in given year to arrive at MW hedged. The Coal Sales include swaps and delta of options sold which is subject to change. For detailed information on the Registrants' hedging methodology through use of derivative instruments, see discussion in Item 15 - Note 5, *Accounting for Derivative Instruments and Hedging Activities*, to the Consolidated Financial Statements.

(d)   Percentage hedged is based on total Coal sales as described in (c) above divided by the forecasted Coal capacity.

(e)   Represents all U.S. Coal sales, including energy revenue and demand charges, excluding revenues derived from capacity auctions.

**Regulatory Matters**

As owners of power plants and participants in wholesale energy markets, certain of the Registrants' subsidiaries are subject to regulation by various federal and state government agencies. These include the CFTC and FERC, as well as other public utility commissions in certain states where the Registrants' generating assets are located. In addition, the Registrants are subject to the market rules, procedures and protocols of the various ISO markets in which they participate. The Registrants must also comply with the mandatory reliability requirements imposed by NERC and the regional reliability entities in the regions where they operate.

*National*

*Court Rejects FERC's Jurisdiction Over Demand Response* — On May 23, 2014, the U.S. Court of Appeals for the District of Columbia Circuit vacated FERC's rules (known as Order No. 745) that allow demand response resources to participate in FERC-jurisdictional energy markets. The Court of Appeals held that the Federal Power Act does not authorize FERC to exercise jurisdiction over demand response and that instead demand response is part of the retail market over which the states have jurisdiction. The specific order being challenged related to energy market compensation, but this ruling also calls into question whether demand response will be permitted to participate in the capacity markets in the future. The U.S. Court of Appeals for the District of Columbia Circuit issued a stay of its decision in order to allow the U.S. Supreme Court to consider the case. The U.S. Solicitor General, on behalf of FERC, filed a petition for a writ of certiorari on January 15, 2015.  On the same date, EnerNOC, Inc. and other private entities filed their own petition for a writ of certiorari in the matter. NRG filed a friend-of-the-court brief with the U.S. Supreme Court on February 17, 2015, supporting the U.S. Solicitor General's and EnerNOC's position and urging the U.S. Supreme Court to grant certiorari. The eventual outcome of this proceeding could result in refunds of payments made for non-jurisdictional services and resettlement of wholesale markets but it is not possible to estimate the impact on the Registrants at this time.

*East Region*

*PJM*

*New Jersey and Maryland's Generator Contracting Programs* — The New Jersey Board of Public Utilities and the Maryland Public Service Commission awarded long-term power purchase contracts to generation developers to encourage the construction of new generation capacity in the respective states. The constitutionality of the long-term contracts was challenged and the U.S. District Court for the District of New Jersey (in an October 25, 2013, decision) and the U.S. District Court for the District of Maryland (in an October 24, 2013, decision) found that the respective contracts violated the Supremacy Clause of the U.S. Constitution and were preempted. On June 30, 2014, the U.S. Court of Appeals for the Fourth Circuit affirmed the Maryland District Court's decision. On September 11, 2014, the U.S. Court of Appeals for the Third Circuit affirmed the New Jersey District Court's decision. Various parties have petitioned the Supreme Court for review of both cases. Any Supreme Court action may affect future capacity prices in PJM.

*Capacity Replacement* — On March 10, 2014, PJM filed at FERC to limit speculation in the forward capacity auction. Specifically, PJM proposed tariff changes that are designed to ensure that only capacity resources that are reasonably expected to be provided as a physical resource by the start of the delivery year can participate in the Base Residual Auction. These changes include the addition of a replacement capacity adjustment charge that is intended to remove the incentive to profit from replacing capacity commitments, an increase in deficiency penalties for non-performance, and a reduction in the number of incremental auctions from three to one. On May 9, 2014, FERC rejected PJM's proposed changes to address replacement capacity and incremental auction design, but established a Section 206 proceeding and technical conference to find a just-and-reasonable outcome. On August 18, 2014, PJM requested that FERC defer further action in the proceeding. Since the request, FERC has taken no action. The Section 206 proceeding and technical conference could have a material impact on future PJM capacity prices.

*Capacity Performance Proposal* — On December 14, 2014, PJM requested FERC approval to substantially revamp its capacity market. If approved by FERC, future annual capacity auctions would procure two categories of capacity resources: "Capacity Performance" resources and "Base Capacity" resources. Under the proposal, PJM would institute substantial new performance penalties on capacity performance resources that do not perform in real time during specified periods of high demand and substantially modify capacity bidding rules. Should the proposal be approved by FERC, it is likely to have a material impact on future PJM capacity prices.

*Capacity Import Limits* — On April 22, 2014, FERC approved PJM's proposal to add a limit on the amount of capacity from external resources that PJM can reliably import into PJM. The capacity import limit will be in effect for the 2017/2018 Base Residual Auction, may decrease the amount of capacity imports allowed into PJM as compared to recent auctions, and could have a material impact on future PJM capacity prices. On January 22, 2015, FERC denied rehearing.

*Reactive Power* — On November 20, 2014, FERC issued an Order to Show Cause under FPA Section 206 directing PJM to either revise its tariff to provide that a generation or non-generation resource owner will no longer receive reactive power capability payments after it has deactivated its unit and to clarify the treatment of reactive power capability payments for units transferred out of a fleet or show cause why it should not be required to do so. On December 22, 2014, PJM filed proposed tariff changes, and the matter remains pending at FERC. The Registrants' reactive power revenues may change as a result of this proceeding.

*Recovery of Costs of Capacity Agreements Secured Outside RPM Auctions* — On December 24, 2014, PJM submitted proposed revisions to the tariff to permit it to enter into and recover the costs of capacity agreements secured outside the RPM for the specific purpose of alleviating resource adequacy concerns during the 2015/2016 delivery year. On February 20, 2015, FERC rejected PJM's filing without prejudice to PJM refiling a fully specified and justified proposal.

*Demand Response Operability* — On May 9, 2014, FERC largely accepted PJM's proposed changes on demand response operability in an attempt to enhance the operational flexibility of demand response resources during the operating day. The approval of these changes will likely limit the amount of demand response resources eligible to participate in PJM. The matter is pending rehearing at FERC.

*PJM "Stop Gap" Demand Response Filing* — On January 14, 2015, PJM filed to implement "stop gap" rules governing the participation of demand response in the upcoming capacity auction (for the 2018/2019 delivery year), which will take effect only if the U.S. Supreme Court denies *certiorari* of the *EPSA v. FERC* decision.  Under the new rules, PJM would prohibit demand response from participating in PJM's capacity auction as supply-side resources.  Instead, PJM proposes to create a new product, termed "Wholesale Load Reduction," that would allow LSEs to bid reductions in demand, backed by physical demand response resources, into the auction.  Demand response resources participating as Wholesale Load Reduction would have a comparable impact on capacity clearing prices as demand response participating as supply, on a megawatt for megawatt basis.  The Registrants are opposing PJM's proposal.

*MOPR Litigation* — On April 12, 2011, FERC issued an order addressing a complaint filed by PJM Power Providers Group seeking to require PJM to address the potential adverse impacts of out-of-market generation on the PJM Reliability Pricing Model, capacity market, as well as PJM's subsequent submission seeking revisions to the capacity market design, in particular the MOPR. In its order, FERC generally strengthened the MOPR and the protections against market price distortion from out-of-market generation. On February 18, 2014, the Third Circuit Court of Appeals affirmed FERC's order.

*MOPR Revisions* — On December 7, 2012, PJM filed comprehensive revisions to its MOPR rules at FERC. On May 2, 2013, FERC accepted PJM's proposal in part and rejected it in part. Among other things, FERC approved the portions of the PJM proposal that exempt many new entrants from MOPR rules, including projects proposed by merchant generators, public power entities and certain self-supply entities. This exemption is subject to certain conditions designed to limit the financial incentive of such entities to suppress market prices. However, FERC rejected PJM's proposal to eliminate the unit specific review process and instead directed PJM to continue allowing units to demonstrate their actual costs and revenues and bid into the auction at that price. On June 3, 2013, NRG filed a request for rehearing of the FERC order and subsequently protested the manner in which PJM proposed to implement the FERC order. These challenges are both pending.

### New England (GenOn and GenOn Americas Generation)

*Performance Incentive Proposal* — On January 17, 2014, ISO-NE filed at FERC to revise its forward capacity market, or FCM, by making a resource's forward capacity market compensation dependent on resource output during short intervals of operating reserve scarcity. The ISO-NE proposal would replace the existing shortage event penalty structure with a new performance incentive, or PI, mechanism, resulting in capacity payments to resources that would be the combination of two components: (1) a base capacity payment and (2) a performance payment or charge. The performance payment or charge would be entirely dependent upon the resource's delivery of energy or operating reserves during scarcity conditions, and could be larger than the base payment.

On May 30, 2014, FERC found that most of the provisions in the ISO-NE proposal, with modifications, together with an increase to the reserve constraint penalty factors, provided a just and reasonable structure. FERC instituted a proceeding for further hearings and required ISO-NE to make a compliance filing to modify its proposal and adopt the increases to the reserve constraint penalty factors. The matter is pending rehearing at FERC.

*FCM Rules for 2014 Forward Capacity Auction* — On February 28, 2014, ISO-NE filed the results of FCA #8 with FERC. On September 16, 2014, FERC issued a notice stating that the FCA #8 results would go into effect by operation of law. Several parties requested rehearing of FERC's notice, which was rejected by FERC on procedural grounds. The matter was appealed to the U.S. Court of Appeals for the District of Columbia Circuit and remains pending.

*NEPGA Complaint* — On October 31, 2013, NEPGA filed a complaint against ISO-NE alleging that the tariff-set capacity prices during circumstances termed Insufficient Competition and Inadequate Supply and the tariff rules known as the Capacity Carry Forward Rule, components of the FCM, created unreasonable and unduly discriminatory price disparities between new and existing capacity resources. On November 25, 2013, ISO-NE submitted a proposal to raise the tariff-set administrative rates to $7.025/kW-month for Forward Capacity Auction 8. On January 24, 2014, FERC accepted ISO-NE's proposal to revamp its Insufficient Supply and Insufficient Competition rules, which resulted in a declaration of the Insufficient Competition condition and a $7.025/kW-month price to all existing resources. On February 24, 2014, NEPGA filed a request for rehearing. On January 30, 2015, NEPGA's request for rehearing was denied.

*Sloped Demand Curve Filing* — On May 30, 2014, FERC accepted the proposed tariff revisions discussed in the April 1, 2014 ISO-NE filing at FERC regarding the establishment of a sloped demand curve for use in the ISO-NE Forward Capacity Market. The accepted tariff changes include extending the period during which a market participant can lock-in the capacity price for a new resource from five to seven years, establishing a limited exemption for the buyer-side market mitigation rules for a set amount of renewable resources, and eliminating the administrative pricing rules. The shift away from the current vertical demand curve and accompanying proposed changes could have a material impact on the capacity prices in future auctions. The matter is still subject to rehearing at FERC.

### New York

*Demand Curve Reset and the Lower Hudson Valley Capacity Zone* — On May 27, 2014, FERC denied rehearing and phase-in requests regarding its August 13, 2013 order on the creation of the Lower Hudson Valley Capacity Zone. The NYISO had previously approved the creation of a new Lower Hudson Valley Capacity Zone in New York, as part of the NYISO's triennial adjustment of its capacity market parameters for the 2014-2017 periods. The State of New York, NYSPSC and Central Hudson Gas & Electric Corp. have challenged the FERC order before the U.S. Court of Appeals for the Second Circuit. The U.S. Court of Appeals for the Second Circuit held oral argument on September 12, 2014. The matter remains pending.

*NYSPSC Order Rescinding Danskammer Retirement* — On October 28, 2013, the NYSPSC took emergency action to rescind its approval for the 530 MW Danskammer facility to retire on October 30, 2013. The NYSPSC's stated goal was to allow the facility to return to service in order to constrain rate increases in New York. The NYSPSC approved the emergency order and granted an extension until March 17, 2014 for Helios Capital LLC to file its plan to operate or retire the unit. On March 28, 2014, the NYSPSC adopted the October 28, 2013 order as permanent rule. The return to service of this facility may affect capacity prices received by the Registrants for their resource in the Lower Hudson Valley Capacity Zone.

*Independent Power Producers of New York Complaint* — On May 10, 2013, a generator trade association in New York filed a complaint at FERC against the NYISO. The generators asked FERC to direct the NYISO to require that capacity from existing generation resources that would have exited the market but for out-of-market payments under RMR type agreements be excluded from the capacity market altogether or be offered at levels no lower than the resources' going-forward costs. The complaints point to the recent reliability services agreements entered into between the NYSPSC and generators as evidence that capacity market prices are being influenced by non-market considerations. The complainants seek to prevent below-cost offers from artificially suppressing prices in the New York Control Area Installed Capacity Spot Market Auction. The case is pending.

*Competitive Entry Exemption to Buyer-Side Mitigation Rules* — On December 4, 2014, pursuant to Section 206 of the FPA, a group of New York transmission owners filed a complaint seeking a competitive entry exemption to the current NYISO Buyer-Side Mitigation rules. On December 16, 2014, TDI USA Holdings Corporation filed a complaint under Section 206 against the NYISO claiming that the NYISO's application of the Mitigation Exemption Test under the Buyer-Side Mitigation Rules to TDI's Champlain Hudson 1,000 MW transmission line project is unjust and unreasonable and seeks an exemption from the Mitigation Exemption Test. On February 26, 2015, FERC granted the complaint filed by the New York transmission owners and directed the NYISO to adopt a competitive entry exemption into its tariff within 30 days. In a companion order issued on the same day, FERC rejected the TDI complaint on the grounds that TDI's concerns were adequately addressed by FERC's first order. Allowing a competitive entry exemption significantly degrades protections against uneconomic entry into the New York markets.

### Gulf Coast Region

### MISO (GenOn)

*MISO RMR Practices* — On July 5, 2013, AmerenEnergy Resources Generating Company, or Ameren, filed a complaint against MISO pertaining to the compensation for generators asked by MISO to provide service past their retirement date due to reliability concerns, or RMR Generators. Ameren asked FERC to require MISO to provide such generators their full cost of service as compensation and not merely cover the generator's incremental costs of operation going-forward costs. The Registrants supported the complaint. On July 22, 2014, FERC issued an order denying the complaint in part and granting it in part. FERC found that the Tariff was unjust and unreasonable because it did not allow RMR Generators to obtain compensation for their fixed costs. The matter is pending rehearing.

*MATS Waiver* — Indianapolis Power and Light Company, DTE Electric Company, MidAmerican Energy Company, Duke Energy Indiana, Inc., Consumers Energy Company, and Wisconsin Power & Light Company each separately requested a limited, one-time waiver from their obligations to meet the Resource Adequacy Requirement in the MISO tariff, addressing an approximate six-week gap between the EPA's MATS compliance deadline and the end of MISO's 2015-2016 capacity planning year. The EPA's MATS rules establish limits for HAPs emitted from, among other sources, existing and planned coal-fired generators and go into effect on April 16, 2015. Because the MISO capacity planning year runs from June 1 to May 31, there is a gap between the MATS-driven retirements in April and the MISO planning year in June. Any waiver of an LSE's resource adequacy obligations would have a detrimental effect on the value of capacity in the MISO market.

On October 15, 2014, FERC granted Indianapolis Power and Light Company's request for the limited, one-time waiver of MISO's must-offer requirement and the requirement to purchase replacement capacity for the period of April 16, 2016 to May 31, 2016.

On November 7, 2014, FERC denied without prejudice Consumers Energy's request for a limited waiver on the grounds that Consumers Energy failed to adequately demonstrate that the requested waiver would not cause undesirable consequences, such as harming third-parties. On November 18, 2014, Consumers Energy re-filed its request for a limited waiver. On February, 20, 2014, FERC granted Consumers Energy's request. Also on that day, FERC granted DTE, MidAmerican, and Duke Energy's requests for waivers. Wisconsin Power & Light's request is still pending before FERC. Unlike the other entities' requests of approximately six weeks, Wisconsin Power & Light's request is for a five-month waiver based on a consent decree among the company, the EPA, and the Sierra Club.

**Environmental Matters**

The Registrants are subject to a wide range of environmental regulations in the development, construction, ownership and operation of projects. These laws generally require that governmental permits and approvals be obtained before construction and during operation of power plants. Environmental laws have become increasingly stringent and the Registrants expect this trend to continue. The electric generation industry is likely to face new requirements to address various emissions, including GHGs, as well as combustion byproducts, water discharge and use, and threatened and endangered species. In general, future laws are expected to require the addition of emissions controls or other environmental quality equipment or the imposition of certain restrictions on the operations of the Registrants' facilities, which could have a material effect on the Registrants' operations. Complying with environmental laws involves significant capital and operating expenses. The Registrants decide to invest capital for environmental controls based on the relative certainty of the requirements, an evaluation of compliance options, and the expected economic returns on capital.

See Item 15 — Note 17, *Regulatory Matters,* Note 18, *Environmental Matters*, and Note 19, *Guarantees*, to the Consolidated Financial Statements.

### *Environmental Capital Expenditures*

Based on current rules, technology and plans based on proposed rules, GenOn estimates that environmental capital expenditures from 2015 through 2019 required to meet GenOn's regulatory environmental laws will be approximately $58 million for GenOn, which includes $15 million for GenOn Americas Generation. The estimate for GenOn Americas Generation includes $10 million for GenOn Mid-Atlantic. These costs are primarily associated with controls to satisfy MATS at Conemaugh, $NO_x$ controls for Sayreville and Gilbert, and the conversion of Shawville coal-fired Units 1, 2, 3 and 4 to natural gas. The Registrants continue to explore cost effective compliance alternatives to further reduce costs.

See Item 15 — Note 8, *Retirements, Mothballing or Long-Term Protective Layup of Generating Facilities,* to the Consolidated Financial Statements.

### *East Region*

*Maryland Environmental Regulations* — In October 2014, the MDE released a draft of a proposed regulation regarding $NO_x$ emissions from coal-fired electric generating units. The MDE draft regulation was proposed in the Maryland Register in December 2014. If finalized as proposed, the regulation would require by June 2020 the Registrants (at each of the three Dickerson coal-fired units and the Chalk Point coal-fired unit that does not have an SCR) to (1) install and operate an SCR; (2) retire the unit; or (3) convert the fuel source from coal to natural gas. The implementation of the MDE regulation could negatively affect certain of the Registrants' coal-fired units in Maryland.

*RGGI* — In 2013, each of the RGGI member states finalized a rule that collectively reduced the $CO_2$ emissions cap from 165 million tons to 91 million tons in 2014 with a 2.5% reduction each year from 2015 to 2020. The Registrants expect earnings at their plants in Massachusetts, New York, and particularly those in Maryland, to be negatively affected. The extent to which they would be negatively affected depends on the price of the $CO_2$ emissions allowances, which in turn will be significantly influenced by future natural gas prices, power prices, generation resource mix, dispatch order, and any nuclear plant retirements.

**Employees**

As of December 31, 2014, GenOn had 1,774 employees of which 602 employees were part of GenOn Americas Generation and 451 employees were part of GenOn Mid-Atlantic, approximately 64.8%, 69.3% and 70.7%, respectively, of whom were covered by bargaining agreements. During 2014, the Registrants did not experience any labor stoppages or labor disputes at any of their facilities.

### *Available Information*

The Registrants' annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports filed or furnished pursuant to section 13(a) or 15(d) of the Exchange Act are available free of charge through NRG's website, www.nrg.com, as soon as reasonably practicable after they are electronically filed with, or furnished to the SEC.

**Item 1A — Risk Factors**

The Registrants are subject to the following factors that could have a material adverse effect on their future performance, results of operations, financial condition and cash flows. In addition, such factors could affect their ability to service indebtedness and other obligations, to raise capital and could affect their future growth opportunities. Also, see *Cautionary Statement Regarding Forward Looking Information* and Item 7 — *Management's Narrative Analysis of the Results of Operations and Financial Condition* of this Form 10-K.

**Risks Related to the Operation of the Registrants' Businesses**

***GenOn is a wholly-owned subsidiary of NRG and is highly dependent on NRG for services under a master services agreement.***

GenOn relies on NRG for its administrative and management functions and services including human resources-related functions, accounting, tax administration, information systems, legal services, treasury and planning, operations and asset management, risk and commercial operations, and other support services under a management services agreement. GenOn anticipates continuing to rely upon NRG to provide many of these services. If NRG terminates the management services agreement or defaults in the performance of its obligations under the agreement, GenOn may be unable to contract with a substitute service provider on similar terms or at all, and the costs of substituting service providers may be substantial. In addition, in light of NRG's familiarity with GenOn's assets, a substitute service provider may not be able to provide the same level of service due to lack of preexisting synergies. If GenOn cannot locate a service provider that is able to provide it with substantially similar services as NRG does under the management services agreement on similar terms, it would likely have a material adverse effect on GenOn's business, financial condition, results of operation and cash flows.

***The interests of NRG as GenOn's equity holder may conflict with the interests of holders of debt.***

GenOn is owned and controlled by NRG. The interests of NRG may not in all cases be aligned with the interests of the holders of GenOn's debt or the debt and lease obligations of GenOn's subsidiaries. If GenOn encounters financial difficulties or becomes unable to pay its debts as they mature, NRG does not have any liability for any obligations under the GenOn notes or the notes and lease obligations of the GenOn subsidiaries. In addition, NRG may have an interest in pursuing acquisitions, divestitures, financings or other transactions that, in its judgment, could enhance its equity investments, even though such transactions might involve risks to GenOn's business or the holders of GenOn's and its subsidiaries' debt. Furthermore, NRG may own businesses that directly or indirectly compete with GenOn. NRG also may pursue acquisition opportunities that may be complementary to NRG's business, and as a result, those acquisition opportunities may not be available to GenOn.

***The Registrants' financial results are unpredictable because most of their generating facilities operate without long-term power sales agreements, and their revenues and results of operations depend on market and competitive forces that are beyond their control.***

The Registrants provide energy, capacity, ancillary and other energy services from their generating facilities in a variety of markets and to bi-lateral counterparties, including participating in wholesale energy markets, entering into tolling agreements, sales of resource adequacy and participation in capacity auctions. The Registrants revenues from selling capacity are a significant part of their overall revenues. The Registrants are not guaranteed recovery of their costs or any return on their capital investments through mandated rates.

The market for wholesale electric energy and energy services reflects various market conditions beyond the Registrants' control, including the balance of supply and demand, transmission congestion, competitors' marginal and long-term costs of production, the price of fuel, and the effect of market regulation. The price at which the Registrants can sell their output may fluctuate on a day-to-day basis, and their ability to transact may be affected by the overall liquidity in the markets in which the Registrants operate. These markets remain subject to regulations that limit their ability to raise prices during periods of shortage to the degree that would occur in a fully deregulated market. In addition, unlike most other commodities, electric energy can be stored only on a very limited basis and generally must be produced at the time of use. As a result, the wholesale power markets are subject to substantial price fluctuations over relatively short periods of time and can be unpredictable.

The Registrants' revenues, results of operations and cash flows are influenced by factors that are beyond their control, including those set forth above, as well as:

- the failure of market regulators to develop and maintain efficient mechanisms to compensate merchant generators for the value of providing capacity needed to meet demand;

- actions by regulators, ISOs, RTOs and other bodies that may artificially modify supply and demand levels and prevent capacity and energy prices from rising to the level necessary for recovery of the Registrants' costs, investment and an adequate return on investment;

- legal and political challenges to or changes in the rules used to calculate capacity payments in the markets in which the Registrants operate or the establishment of bifurcated markets, incentives, other market design changes or bidding requirements that give preferential treatment to new generating facilities over existing generating facilities or otherwise reduce capacity payments to existing generating facilities;

- the ability of wholesale purchasers of power to make timely payment for energy or capacity, which may be adversely affected by factors such as retail rate caps, refusals by regulators to allow utilities to recover fully their wholesale power costs and investments through rates, catastrophic losses and losses from investments by utilities in unregulated businesses;

- increases in prevailing market prices for fuel oil, coal, natural gas and emission allowances that may not be reflected in prices the Registrants receive for sales of energy;

- increases in electricity supply as a result of actions of the Registrants' current competitors or new market entrants, including the development of new generating facilities or alternative energy sources that may be able to produce electricity less expensively than the Registrants' generating facilities and improvements in transmission that allow additional supply to reach their markets;

- increases in credit standards, margin requirements, market volatility or other market conditions that could increase the Registrants' obligations to post collateral beyond amounts that are expected, including additional collateral costs associated with OTC hedging activities as a result of future OTC regulations adopted pursuant to the Dodd-Frank Act;

- decreases in energy consumption resulting from demand-side management programs such as automated demand response, which may alter the amount and timing of consumer energy use;

- the competitive advantages of certain competitors, including continued operation of older power facilities in strategic locations after recovery of historic capital costs from ratepayers;

- existing or future regulation of the markets in which the Registrants operate by FERC, ISOs and RTOs, including any price limitations and other mechanisms to address some of the price volatility or illiquidity in these markets or the physical stability of the system;

- the Registrants' obligation under any default sharing mechanisms in RTO and ISO markets, such mechanisms exist to spread the risk of defaults by transmission owning companies or other RTO members across all market participants;

- regulatory policies of state agencies that affect the willingness of the Registrants' customers to enter into long-term contracts generally, and contracts for capacity in particular;

- access to contractors and equipment;

- changes in the rate of growth in electricity usage as a result of such factors as national and regional economic conditions and implementation of conservation programs;

- seasonal variations in energy and natural gas prices, and capacity payments; and

- seasonal fluctuations in weather, in particular abnormal weather conditions.

As discussed above, the market for wholesale electric energy and energy services reflects various market conditions beyond the Registrants' control, including the balance of supply and demand, the Registrants' competitors' marginal and long-term costs of production, and the effect of market regulation. The Registrants cannot ensure that higher earnings or price increases will result from industry retirements of coal-fired generating facilities or that higher earnings from their remaining facilities will offset or more than offset reduced earnings from facility deactivations.

***Changes in the wholesale energy markets or in the Registrants generating facility operations could result in impairments or other charges.***

If the ongoing evaluation of the Registrants' business results in decisions to deactivate or dispose of additional facilities, the Registrants could have impairments or other charges. These evaluations involve significant judgments about the future. Actual future market prices, project costs and other factors could be materially different from current estimates.

***The Registrants are exposed to the risk of fuel cost volatility because they must pre-purchase coal and oil.***

Most of the Registrants' fuel contracts are at fixed prices with terms of two years or less. Although the Registrants purchase coal and oil based on expected requirements, they still face the risks of fuel price volatility if they require more or less fuel than expected.

The Registrants' cost of fuel may not reflect changes in energy and fuel prices in part because they must pre-purchase inventories of coal and oil for reliability and dispatch requirements, and thus the price of fuel may have been determined at an earlier date than the price of energy generated from the fuel. Similarly, the price the Registrants can obtain from the sale of energy may not rise at the same rate, or may not rise at all, to match a rise in fuel costs.

***The Registrants are exposed to the risk of their fuel providers and fuel transportation providers failing to perform.***

The Registrants purchase most of their coal from a limited number of suppliers. Because of a variety of operational issues, the Registrants' coal suppliers may not provide the contractual quantities on the dates specified within the agreements, or the deliveries may be carried over to future periods. Also, interruptions to planned or contracted deliveries to the Registrants' generating facilities can result from a lack of, or constraints in, coal transportation because of rail, river or road system disruptions, adverse weather conditions and other factors.

If the Registrants' coal suppliers do not perform in accordance with the agreements, the Registrants may have to procure higher priced coal in the market to meet their needs, or higher priced power in the market to meet their obligations. In addition, generally the Registrants' coal suppliers do not have investment grade credit ratings nor do they post collateral with the Registrants and, accordingly, the Registrants may have limited ability to collect damages in the event of default by such suppliers.

For the Registrants' oil-fired generating facilities, the Registrants typically purchase fuel from a limited number of suppliers. If the Registrants' oil suppliers do not perform in accordance with the agreements, the Registrants may have to procure higher priced oil in the market to meet their needs, or higher priced power in the market to meet their obligations. For the Registrants' gas-fired generating facilities, any curtailments or interruptions on transporting pipelines could result in curtailment of operations or increased fuel supply costs.

***The Operation of the Registrants' generating facilities involves risks that could result in disruption, curtailment or inefficiencies in their operations.***

The operation of the Registrants' generating facilities involves various operating risks, including, but not limited to:

- the output and efficiency levels at which those generating facilities perform;
- interruptions in fuel supply and quality of available fuel;
- disruptions in the delivery of electricity;
- adverse zoning;
- breakdowns or equipment failures (whether a result of age or otherwise);
- violations of permit requirements or changes in the terms of, or revocation of, permits;
- releases of pollutants to air, soil, surface water or groundwater;
- ability to transport and dispose of coal ash at reasonable prices;
- curtailments or other interruptions in natural gas supply;
- shortages of equipment or spare parts;
- labor disputes, including strikes, work stoppages and slowdowns;
- the aging workforce at many of the Registrants' facilities;
- operator errors;
- curtailment of operations because of transmission constraints;
- failures in the electricity transmission system, which may cause large energy blackouts;
- implementation of unproven technologies in connection with environmental improvements; and
- catastrophic events such as fires, explosions, floods, earthquakes, hurricanes or other similar occurrences.

These factors could result in a material decrease, or the elimination of, the revenues generated by the Registrants' facilities or a material increase in the Registrants' costs of operations.

14

*The Registrants operate in a limited number of markets and a significant portion of revenues are derived from the PJM market. The effect of adverse developments in the markets, especially the PJM market, may be greater on the Registrants than on more geographically diversified competitors.*

As of December 31, 2014, GenOn's generating capacity is 59% in PJM, 23% in CAISO, 10% in NYISO and ISO-NE, 6% in the Southeast and 2% in MISO, and GenOn Americas Generation's generating capacity is 62% in PJM, 13% in CAISO and 25% in NYISO and ISO-NE. As of December 31, 2014, all of GenOn Mid-Atlantic's generating capacity is in PJM. Adverse developments in these regions, especially in the PJM market, may adversely affect the Registrants. Further, the effect of such adverse regional developments may be greater on the Registrants than on more geographically diversified competitors.

*The Registrants are exposed to possible losses that may occur from the failure of a counterparty to perform according to the terms of a contractual arrangement, particularly in connection with non-collateralized power hedges with financial institutions.*

Failure of a counterparty to perform according to the terms of a contractual arrangement may result in losses to the Registrants. Specifically, GenOn Mid-Atlantic's credit exposures on power and gas hedges with financial institutions in excess of applicable collateral thresholds are senior unsecured obligations of such counterparties. Deterioration in the financial condition of such counterparties could result in their failure to pay amounts owed to GenOn Mid-Atlantic or to perform obligations or services owed to GenOn Mid-Atlantic beyond collateral posted.

*Policies at the national, regional and state levels to regulate GHG emissions, as well as climate change, could adversely impact the Registrants' results of operations, financial condition and cash flows.*

The impact of further legislation or regulation of GHGs on the Registrants' financial performance will depend on a number of factors, including the level of GHG standards, the extent to which mitigation is required, the applicability of offsets, and the extent to which the Registrants would be entitled to receive $CO_2$ emissions credits without having to purchase them in an auction or on the open market.

The Registrants operate generating units in Maryland, Massachusetts, and New York that are subject to RGGI, which is a regional cap and trade system. In February 2013, RGGI released a model rule that when adopted by the member states will reduce the number of allowances available and potentially increase the price of each allowance. Each of these states has finalized a rule that reduces the number of allowances, which the Registrants believe would increase the price of each allowance. These new rules could adversely impact the Registrants' results of operations, financial condition and cash flows.

The California $CO_2$ cap and trade program for electric generating units greater than 25 MW commenced in 2013. The impact on the Registrants depends on the cost of the allowances and the ability to pass these costs through to customers.

In January 2014, the EPA re-proposed the NSPS for $CO_2$ emissions from new fossil-fuel-fired electric generating units that had been previously proposed in April 2012. The re-proposed standards are 1,000 pounds of $CO_2$ per MWh for large gas units and 1,100 pounds of $CO_2$ per MWh for coal units and small gas units. Proposed standards are in effect until a final rule is published or another rule is re-proposed. In June 2014, the EPA proposed a rule that would require states to develop $CO_2$ standards that would apply to existing fossil-fueled generating facilities. Specifically, the EPA proposed state-specific rate-based goals for $CO_2$ emissions, as well as guidelines for states to follow in developing plans to achieve the state-specific goals. The EPA anticipates finalizing both of these rules in the summer of 2015.

Hazards customary to the power production industry include the potential for unusual weather conditions, which could affect fuel pricing and availability, the Registrants' route to market or access to customers, i.e., transmission and distribution lines, or critical plant assets. To the extent that climate change contributes to the frequency or intensity of weather related events, the Registrants' operations and planning process could be affected.

*Changes in technology may significantly affect the Registrants' generating business by making their generating facilities less competitive.*

The Registrants generate electricity using fossil fuels at large central facilities. This method results in economies of scale and lower costs than newer technologies such as fuel cells, microturbines, windmills and photovoltaic solar cells. It is possible that advances in those technologies, or governmental incentives for renewable energies, will reduce their costs to levels that are equal to or below that of most central station electricity production.

***The expected decommissioning and/or site remediation obligations of certain of the Registrants' generating facilities may negatively affect their cash flows.***

Some of the Registrants' generating facilities and related properties are subject to decommissioning and/or site remediation obligations that may require material expenditures. Furthermore, laws and regulations may change to impose material additional decommissioning and remediation obligations on the Registrants in the future.

***Terrorist attacks and/or cyber-attacks may result in the Registrants' inability to operate and fulfill their obligations, and could result in material repair costs.***

As power generators, the Registrants face heightened risk of terrorism, including cyber terrorism, either by a direct act against one or more of their generating facilities or an act against the transmission and distribution infrastructure that is used to transport the power. Although the entire industry is exposed to these risks, the Registrants' generating facilities and the transmission and distribution infrastructure located in the PJM market are particularly at risk because of the proximity to major population centers, including governmental and commerce centers.

The Registrants rely on information technology networks and systems to operate their generating facilities, engage in asset management activities, and process, transmit and store electronic information. Security breaches of this information technology infrastructure, including cyber-attacks and cyber terrorism, could lead to system disruptions, generating facility shutdowns or unauthorized disclosure of confidential information related to their employees, vendors and counterparties. Confidential information includes banking, vendor, counterparty and personal identity information.

Systemic damage to one or more of the Registrants' generating facilities and/or to the transmission and distribution infrastructure could result in the inability to operate in one or all of the markets the Registrants serve for an extended period of time. If the Registrants' generating facilities are shut down, they would be unable to respond to the ISOs and RTOs or fulfill their obligations under various energy and/or capacity arrangements, resulting in lost revenues and potential fines, penalties and other liabilities. Pervasive cyber-attacks across the industry could affect the ability of ISOs and RTOs to function in some regions. The cost to restore the Registrants' generating facilities after such an occurrence could be material.

***The Registrants' operations are subject to hazards customary to the power generating industry. The Registrants may not have adequate insurance to cover all of these hazards.***

Power generation involves hazardous activities, including acquiring, transporting and unloading fuel, operating large pieces of high-speed rotating equipment and delivering electricity to transmission and distribution systems. In addition to natural risks (such as earthquake, flood, storm surge, lightning, hurricane, tornado and wind), hazards (such as fire, explosion, collapse and machinery failure) are inherent risks in the Registrants' operations. The Registrants are also susceptible to terrorist attacks, including cyber-attacks, against their generating facilities or the transmission and distribution infrastructure that is used to transport their power. These hazards can cause significant injury to personnel or loss of life, severe damage to and destruction of property, plant and equipment, contamination of, or damage to, the environment and suspension of operations. The occurrence of any one of these events may result in one or more of the Registrants being named as a defendant in lawsuits asserting claims for substantial damages, environmental cleanup costs, personal injury and fines and/or penalties. The Registrants do not maintain specialized insurance for possible liability resulting from a cyber-attack on their systems that may shut down all or part of the transmission and distribution system. However, the Registrants maintain an amount of insurance protection that they consider adequate and customary for merchant power producers. The Registrants cannot assure that their insurance will be sufficient or effective under all circumstances and against all hazards or liabilities to which they may be subject.

***Lawsuits, regulatory proceedings and tax proceedings could adversely affect the Registrants' future financial results.***

From time to time, the Registrants are named as a party to, or their property is the subject of, lawsuits, regulatory proceedings or tax proceedings. The Registrants are currently involved in various proceedings which involve highly subjective matters with complex factual and legal questions. Their outcome is uncertain. Any claim that is successfully asserted against the Registrants could require significant expenditures by them. Even if the Registrants prevail, any proceedings could be costly and time-consuming, could divert the attention of management and key personnel from their business operations and could result in adverse changes in their insurance costs.

16

**Risks Related to Economic and Financial Market Conditions**

*The Registrants are exposed to systemic risk of the financial markets and institutions and the risk of non-performance of the individual lenders under GenOn's undrawn credit facilities.*

Maintaining sufficient liquidity in the Registrants' business for maintenance and operating expenditures, capital expenditures and collateral is crucial in order to mitigate the risk of future financial distress to the Registrants. Accordingly, GenOn maintains a revolving credit facility with NRG to manage its expected liquidity needs and contingencies.

*A negative market perception of the Registrants' value could impair their ability to issue or refinance debt.*

A sustained downturn in general economic conditions, including low power and commodity prices, could result in an actual or perceived weakness in the Registrants' overall financial health.

A negative market perception of the Registrants' value could result in their inability to obtain and maintain an appropriate credit rating. In this event, they may be unable to access debt markets or refinance future debt maturities, or they may be required to post additional collateral to operate their business.

*As financial institutions consolidate and operate under more restrictive capital constraints and regulations, including the Dodd-Frank Act, there could be less liquidity in the energy and commodity markets for hedge transactions and fewer creditworthy counterparties.*

The Registrants hedge economically a substantial portion of their PJM coal-fired generation and certain of their other generation. A significant portion of their hedges are financial swap transactions between GenOn Mid-Atlantic and financial counterparties that are senior unsecured obligations of such parties and do not require either party to post cash collateral, either for initial margin or for securing exposure as a result of changes in power or natural gas prices. Global financial institutions have been active participants in these energy and commodity markets. As global financial institutions consolidate and operate under more restrictive capital constraints and regulations, including the Dodd-Frank Act, there could be less liquidity in the energy and commodity markets, which could have a material adverse effect on the Registrants' ability to hedge economically and transact with creditworthy counterparties.

*The Registrants' business is subject to substantial governmental regulation and may be adversely affected by legislative or regulatory changes, as well as liability under, or any future inability to comply with, existing or future regulations or requirements.*

The Registrants' electric generation business is subject to extensive U.S. federal, state and local laws and regulation. Compliance with the requirements under these various regulatory regimes may cause the Registrants to incur significant additional costs, and failure to comply with such requirements could result in the shutdown of the non-complying facility, the imposition of liens, fines, and/or civil or criminal liability. Public utilities under the FPA are required to obtain FERC acceptance of their rate schedules for wholesale sales of electric energy, capacity and ancillary services. The Registrants' assets make wholesale sales of electric energy, capacity and ancillary services in interstate commerce and are public utilities for purposes of the FPA, unless otherwise exempt from such status. FERC's orders that grant market-based rate authority to wholesale power marketers reserve the right to revoke or revise that authority if FERC subsequently determines that the seller can exercise market power in transmission or generation, create barriers to entry, or engage in abusive affiliate transactions. In addition, public utilities are subject to FERC reporting requirements that impose administrative burdens and that, if violated, can expose such public utilities to criminal and civil penalties or other risks.

The Registrants' market-based sales will be subject to certain rules prohibiting manipulative or deceptive conduct, and if any of the Registrants' generating companies are deemed to have violated those rules, they will be subject to potential disgorgement of profits associated with the violation, penalties, suspension or revocation of market-based rate authority. If such generating companies were to lose their market-based rate authority, such companies would be required to obtain FERC's acceptance of a cost-of-service rate schedule and could become subject to the significant accounting, record-keeping, and reporting requirements that are imposed on utilities with cost-based rate schedules. This could have a material adverse effect on the rates the Registrants are able to charge for power from their facilities.

Most of the Registrants' assets are operating as Exempt Wholesale Generators as defined under the PUHCA, or Qualifying Facilities as defined under the PURPA, as amended, and therefore are exempt from certain regulation under the PUHCA and the PURPA. If a facility fails to maintain its status as an Exempt Wholesale Generator or a Qualifying Facility or there are legislative or regulatory changes revoking or limiting the exemptions to the PUHCA, then the Registrants may be subject to significant accounting, record-keeping, access to books and records and reporting requirements and failure to comply with such requirements could result in the imposition of penalties and additional compliance obligations.

Substantially all of the Registrants' generation assets are also subject to the reliability standards promulgated by the designated Electric Reliability Organization (currently the North American Electric Reliability Corporation, or NERC) and approved by FERC. If the Registrants fail to comply with the mandatory reliability standards, they could be subject to sanctions, including substantial monetary penalties and increased compliance obligations. The Registrants will also be affected by legislative and regulatory changes, as well as changes to market design, market rules, tariffs, cost allocations, and bidding rules that occur in the existing regional markets operated by RTOs or ISOs, such as PJM. The RTOs/ISOs that oversee most of the wholesale power markets impose, and in the future may continue to impose, mitigation, including price limitations, offer caps, and other mechanisms to address some of the volatility and the potential exercise of market power in these markets. These types of price limitations and other regulatory mechanisms may have a material adverse effect on the profitability of the Registrants' generation facilities acquired in the future that sell energy, capacity and ancillary products into the wholesale power markets. The regulatory environment for electric generation has undergone significant changes in the last several years due to state and federal policies affecting wholesale competition and the creation of incentives for the addition of large amounts of new renewable generation and, in some cases, transmission assets. These changes are ongoing, and the Registrants cannot predict the future design of the wholesale power markets or the ultimate effect that the changing regulatory environment will have on the Registrants' business. In addition, in some of these markets, interested parties have proposed to re-regulate the markets or require divestiture of electric generation assets by asset owners or operators to reduce their market share. Other proposals to re-regulate may be made and legislative or other attention to the electric power market restructuring process may delay or reverse the deregulation process. If competitive restructuring of the electric power markets is reversed, discontinued, or delayed, the Registrants' business prospects and financial results could be negatively impacted.

The CFTC, among other things, has regulatory authority over the trading of physical commodities, futures and other derivatives under the Commodity Exchange Act. The Dodd-Frank Act increased the CFTC's regulatory authority on matters related to futures and over-the-counter derivatives trading, including, but not limited to: trading practices, transaction reporting and recordkeeping, position limits, and market participant margin requirements. The Registrants have reached the conclusion that they are neither a swap dealer nor a major swap participant under the Dodd-Frank Act and have taken and will continue to take measures to otherwise comply with the Dodd-Frank Act.

The Registrants continuously monitor the ongoing efforts of the CFTC to implement the Dodd-Frank Act and to otherwise revise the rules and regulations applicable to the futures and over-the-counter derivatives markets. The CFTC's remaining efforts in this regard concern, among other things, the implementation of the Volcker rule and of other new rules relating to margin collateral and position limits for futures and other derivatives.  Such changes could negatively impact the Registrants' ability to hedge their portfolio in an efficient, cost-effective manner by, among other things, potentially limiting the Registrants' ability to utilize non-cash collateral for derivatives transactions and decreasing liquidity in the forward commodity and derivatives markets.  The Registrants expect that, in 2015, the CFTC will further clarify the scope of the Dodd-Frank Act and issue additional final rules.

***Many of the factors that cause changes in commodity prices are outside the Registrants' control and may materially increase their cost of producing power or lower the price at which they are able to sell their power.***

The Registrants' generating business is subject to changes in power prices and fuel and emission costs, and these commodity prices are influenced by many factors outside the Registrants' control, including weather, seasonal variation in supply and demand, market liquidity, transmission and transportation inefficiencies, availability of competitively priced alternative energy sources, demand for energy commodities, production of natural gas, coal and crude oil, natural disasters, wars, embargoes and other catastrophic events, and federal, state and environmental regulation and legislation. In addition, significant fluctuations in the price of natural gas may cause significant fluctuations in the price of electricity. Significant fluctuations in commodity prices may affect the financial results and financial position by increasing the cost of producing power and decreasing the amounts the Registrants receive from the sale of power.

***The Registrants' hedging activities will not fully protect them from fluctuations in commodity prices.***

The Registrants engage in hedging activities related to sales of electricity and purchases of fuel and emission allowances. The income and losses from these activities are recorded as operating revenues and cost of operations. The Registrants may use forward contracts and other derivative financial instruments to manage market risk and exposure to volatility in prices of electricity, coal, natural gas, emissions and oil. The effectiveness of these hedges is dependent upon the correlation between the forward contracts and the other derivative financial instruments used as a hedge and the market risk of the asset or assets being hedged. The Registrants cannot provide assurance that these strategies will be successful in managing their price risks, or that they will not result in net losses to the Registrants as a result of future volatility in electricity, fuel and emission markets. Actual power prices and fuel costs may differ from expectations.

18

The Registrants hedging activities include natural gas derivative financial instruments that they use to hedge economically power prices for their baseload generation. The effectiveness of these hedges is dependent upon the correlation between power and natural gas prices in the markets where the Registrants operate. If those prices are not sufficiently correlated, the Registrants' financial results and financial position could be adversely affected.

Additionally, GenOn and GenOn Americas Generation expect to have an open position in the market, within their established guidelines, resulting from their fuel and emissions management activities. To the extent open positions exist, fluctuating commodity prices can affect their financial results and financial position, either favorably or unfavorably. As a result of these and other factors, the Registrants cannot predict the outcome that risk management decisions may have on their business, operating results or financial position. Although management devotes considerable attention to these issues, their outcome is uncertain.

***The Registrants' policies and procedures cannot eliminate the risks associated with their hedging activities.***

The risk management procedures the Registrants have in place may not always be followed or may not always work as planned. If any of the employees were able to violate the system of internal controls, including the risk management policy, and engage in unauthorized hedging and related activities, it could result in significant penalties and financial losses. In addition, risk management tools and metrics such as value at risk, gross margin at risk, and stress testing are partially based on historic price movements. If price movements significantly or persistently deviate from historical behavior, risk limits may not fully protect the Registrants from significant losses.

***The Registrants' hedging and GenOn Americas Generation's fuel oil management activities may increase the volatility of the U.S. GAAP financial results.***

Derivatives from the Registrants' hedging and GenOn Americas Generation's fuel oil management activities are recorded on the balance sheets at fair value pursuant to the accounting guidance for derivative financial instruments. None of the Registrants' derivatives that are recorded at fair value are designated as hedges under this guidance, and changes in their fair values currently are recognized in earnings as unrealized gains or losses. As a result, the Registrants' U.S. GAAP financial results — including gross margin, operating income and balance sheet ratios — will, at times, be volatile and subject to fluctuations in value primarily because of changes in forward electricity and fuel prices.

**Risks Related to Governmental Regulation and Laws**

***The Registrants costs of compliance with environmental laws are significant and can affect their future operations and financial results.***

The Registrants are subject to extensive and evolving environmental laws, particularly in regard to their coal-fired facilities. Environmental laws, particularly with respect to air emissions, disposal of ash, wastewater discharge and cooling water systems, are generally becoming more stringent, which may require the Registrants to install controls or restrict their operations. Failure to comply with environmental requirements could require the Registrants to shut down or reduce production at their facilities or create liabilities. The Registrants incur significant costs in complying with these regulations and, if they fail to comply, could incur significant penalties. The Registrants' cost estimates for environmental compliance are based on existing regulations or their view of reasonably likely regulations and their assessment of the costs of labor and materials and the state of evolving technologies. The Registrants' decision to make these investments is often subject to future market conditions. Changes to the preceding factors, new or revised environmental regulations, litigation and new legislation and/or regulations, as well as other factors, could cause their actual costs to vary outside the range of their estimates, further constrain their operations, increase their environmental compliance costs and/or make it uneconomical to operate some of their facilities.

Federal, state and regional initiatives to regulate GHG emissions could have a material impact on the Registrants' financial performance and condition. The actual impact will depend on a number of factors, including the overall level of GHG reductions required under any such regulations, the final form of the regulations or legislation, and the price and availability of emission allowances if allowances are a part of any final regulatory framework.

The Registrants are required to surrender emission allowances equal to emissions of specific substances to operate their facilities. Surrender requirements may require purchase of allowances, which may be unavailable or only available at costs that would make it uneconomical to operate their facilities.

19

Certain environmental laws, including the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 and comparable state laws, impose strict and, in many circumstances, joint and several liability for costs of remediating contamination. Some of the Registrants' facilities have areas with known soil and/or groundwater contamination. The Registrants could be required to spend significant sums to remediate contamination, regardless of whether they caused such contamination, (a) if there are releases or discoveries of hazardous substances at their generating facilities, at disposal sites they currently use or have used, or at other locations for which they may be liable, or (b) if parties contractually responsible to them for contamination fail to or are unable to respond when claims or obligations regarding such contamination arise.

***The Registrants' coal-fired generating units produce certain byproducts that involve extensive handling and disposal costs and are subject to government regulation. Changes in these regulations, or their administration, by legislatures, state and federal regulatory agencies, or other bodies may affect the costs of handling and disposing of these byproducts.***

As a result of the coal combustion process, the Registrants produce significant quantities of ash at their coal-fired generating units that must be disposed of at sites permitted to handle ash. One of the Registrants' landfills in Maryland has reached design capacity and it is expected that another site in Maryland may reach full capacity in the next few years. As a result, the Registrants are developing new ash management facilities and have constructed a facility to prepare ash from certain of the Maryland facilities for beneficial uses. However, the costs associated with developing new ash management facilities could be material, and the amount of time to complete such developments could extend beyond the time when new facilities are needed. Likewise, the new facility for preparing ash for beneficial uses may not operate as expected; or the ash may not be marketed and sold as expected. Additionally, costs associated with third-party ash handling and disposal are material and could have an adverse effect on the Registrants' financial performance and condition.

The Registrants also produce gypsum as a byproduct of the $SO_2$ scrubbing process at their coal-fired generating facilities, much of which is sold to third parties for use in drywall production. Should their ability to sell such gypsum to third parties be restricted as a result of the lack of demand or otherwise, their gypsum disposal costs could rise materially.

The EPA has proposed two alternatives for regulating byproducts such as ash and gypsum. Under the first proposal, these byproducts would be regulated as solid wastes. Under the second proposal, these byproducts would have been regulated as "special wastes" in a manner similar to the regulation of hazardous waste with an exception for certain types of beneficial use of these byproducts. If these byproducts are regulated as special wastes, the cost of disposing of these byproducts would increase materially and may limit the Registrants' ability to recycle them for beneficial use.

***The Registrants' business is subject to complex government regulations. Changes in these regulations, or their administration, by legislatures, state and federal regulatory agencies, or other bodies may affect the prices at which the Registrants are able to sell the electricity they produce, the costs of operating their generating facilities or their ability to operate their facilities.***

The majority of the Registrants' generation is sold at market prices under market-based rate authority granted by FERC. If certain conditions are not met, FERC has the authority to withhold or rescind market-based rate authority and require sales to be made based on cost-of-service rates. A loss of the Registrants' market-based rate authority could have a materially negative impact on their generating business.

Even when market-based rate authority has been granted, FERC may impose various forms of market mitigation measures, including price caps and operating restrictions, when it determines that potential market power might exist and that the public interest requires such potential market power to be mitigated. In addition to direct regulation by FERC, most of the Registrants' facilities are subject to rules and terms of participation imposed and administered by various ISOs and RTOs. Although these entities are themselves ultimately regulated by FERC, they can impose rules, restrictions and terms of service that are quasi-regulatory in nature and can have a material adverse impact on the Registrants' business. For example, ISOs and RTOs may impose bidding and scheduling rules, both to curb the potential exercise of market power and to ensure market functions. Such actions may materially affect the Registrants' ability to sell and the price they receive for their energy, capacity and ancillary services.

To conduct the Registrants' business, they must obtain and periodically renew licenses, permits and approvals for their facilities. These licenses, permits and approvals can be in addition to any required environmental permits. No assurance can be provided that they will be able to obtain and comply with all necessary licenses, permits and approvals for these facilities.

Conflicts may occur between reliability needs and environmental rules, particularly with increasingly stringent environmental restrictions. Without a consent decree or adjustments to permit requirements, which require long lead times to obtain, the Registrants remain subject to environmental penalties or liabilities that may occur as a result of operating in compliance with reliability requirements. Further, the Registrants could be subject to citizen suits in these types of circumstances, even if they have received a consent decree or permit adjustment exempting them from environmental requirements.

20

The Registrants cannot predict whether the federal or state legislatures will adopt legislation relating to the restructuring of the energy industry. There are proposals in many jurisdictions that would either roll back or advance the movement toward competitive markets for the supply of electricity, at both the wholesale and retail levels. In addition, any future legislation favoring large, vertically integrated utilities and a concentration of ownership of such utilities could affect the Registrants' ability to compete successfully, and their business and results of operations could be adversely affected. Similarly, any regulations or laws that favor new generation over existing generation could adversely affect their business.

**Risks Related to Level of Indebtedness**

***The Registrants' substantial indebtedness and operating lease obligations could limit their ability to react to changes in the economy or the industry and prevent them from meeting or refinancing their obligations.***

At December 31, 2014, GenOn's consolidated indebtedness was $3.1 billion, GenOn Americas Generation's consolidated indebtedness was $934 million and GenOn Mid-Atlantic's consolidated indebtedness was $5 million. In addition, the present values of lease payments under the respective GenOn Mid-Atlantic and REMA operating leases were approximately $714 million and $397 million, respectively (assuming a 10% and 9.4% discount rate, respectively) and the termination values of the respective GenOn Mid-Atlantic and REMA operating leases were $978 million and $672 million, respectively.

The Registrants' substantial indebtedness and operating lease obligations could have important consequences for their liquidity, results of operations, financial position and prospects, including their ability to grow in accordance with their strategies. These consequences include the following:

- they may limit their ability to obtain additional debt for working capital, capital expenditures, debt service requirements, acquisitions and general corporate or other purposes;

- a substantial portion of their cash flows from operations must be dedicated to the payment of rent and principal and interest on their indebtedness and will not be available for other purposes, including for working capital, capital expenditures, acquisitions and other general corporate purposes;

- the debt service requirements of their indebtedness and their lease obligations could make it difficult for them to satisfy or refinance their financial obligations;

- certain of the Registrants' borrowings, including borrowings under the NRG credit agreement, are at variable rates of interest, exposing the Registrants to the risk of increased interest rates;

- they may limit their flexibility in planning for and reacting to changes in the industry;

- they may place the Registrants at a competitive disadvantage compared to other, less leveraged competitors;

- GenOn's and GenOn Americas Generation's credit agreement with NRG contains restrictive covenants that limit their ability to engage in activities that may be in their long-term best interest; and

- the Registrants may be more vulnerable in a downturn in general economic conditions or in their business and they may be unable to carry out capital expenditures that are important to their long-term growth or necessary to comply with environmental regulations.

***GenOn and its subsidiaries that are holding companies, including GenOn Americas Generation, may not have access to sufficient cash to meet their obligations if their subsidiaries, in particular GenOn Mid-Atlantic, are unable to make distributions.***

GenOn and certain of its subsidiaries, including GenOn Americas Generation and NRG Americas, are holding companies and, as a result, are dependent upon dividends, distributions and other payments from their operating subsidiaries to generate the funds necessary to meet their obligations. In particular, a substantial portion of the cash from their operations is generated by GenOn Mid-Atlantic. The ability of certain of their subsidiaries to pay dividends and make distributions is restricted under the terms of their debt or other agreements, including the operating leases of GenOn Mid-Atlantic and REMA. Under their respective operating leases, GenOn Mid-Atlantic and REMA are not permitted to make any distributions and other restricted payments unless: (a) they satisfy the fixed charge coverage ratio for the most recently ended period of four fiscal quarters; (b) they are projected to satisfy the fixed charge coverage ratio for each of the two following periods of four fiscal quarters, commencing with the fiscal quarter in which such payment is proposed to be made; and (c) no significant lease default or event of default has occurred and is continuing. In the event of a default under the respective operating leases or if the respective restricted payment tests are not satisfied, GenOn Mid-Atlantic and REMA would not be able to distribute cash. At December 31, 2014, GenOn Mid-Atlantic and REMA did not satisfy the restricted payments test.

***Each of GenOn and GenOn Americas Generation may be unable to generate sufficient cash to service their debt and leases and to post required amounts of cash collateral necessary to hedge economically market risk.***

The ability of each of GenOn or GenOn Americas Generation to pay principal and interest on their debt and the rent on their leases depends on their future operating performance. If their cash flows and capital resources are insufficient to allow them to make scheduled payments on their debt, GenOn or GenOn Americas Generation may have to reduce or delay capital expenditures, sell assets, restructure or refinance. There can be no assurance that the terms of their debt or leases will allow these alternative measures, that the financial markets will be available to them on acceptable terms or that such measures would satisfy their scheduled debt service and lease rent obligations. If either GenOn or GenOn Americas Generation do not comply with the payment and other material covenants under their debt and lease agreements, they could default under their debt or leases.

The Registrants' asset management activities may require them to post collateral either in the form of cash or letters of credit. Although the Registrants seek to structure transactions in a way that reduces their potential liquidity needs for collateral, they may be unable to execute their hedging strategy successfully if they are unable to post the amount of collateral required to enter into and support hedging contracts.

GenOn and GenOn Americas Generation are active participants in energy exchange and clearing markets, which require a per-contract initial margin to be posted. The initial margins are determined by the exchanges through the use of proprietary models that rely on a variety of inputs and factors, including market conditions. They have limited notice of any changes to the margin rates. Consequently, they are exposed to changes in the per unit margin rates required by the exchanges and could be required to post additional collateral on short notice.

***The terms of the Registrants' credit facilities and leases restrict their current and future operations, particularly their ability to respond to changes or take certain actions.***

The Registrants' credit facilities and leases contain a number of restrictive covenants that impose significant operating and financial restrictions on them and may limit their ability to engage in acts that may be in their long-term best interest, including restrictions on their ability to:

- incur additional indebtedness;
- pay dividends or make other distributions;
- prepay, redeem or repurchase certain debt;
- make loans and investments;
- sell assets;
- incur liens;
- enter into transactions with affiliates;
- enter into sale-leaseback transactions; and
- consolidate, merge or sell all or substantially all of their assets.

22

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING INFORMATION

This Annual Report on Form 10-K includes forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. The words "believe," "project," "anticipate," "plan," "expect," "intend," "estimate" and similar expressions are intended to identify forward-looking statements. These forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the Registrants' actual results, performance and achievements, or industry results, to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. These factors, risks and uncertainties include the following:

- General economic conditions, changes in the wholesale power markets and fluctuations in the cost of fuel;

- Volatile power supply costs and demand for power;

- Hazards customary to the power production industry and power generation operations such as fuel and electricity price volatility, unusual weather conditions, catastrophic weather-related or other damage to facilities, unscheduled generation outages, maintenance or repairs, unanticipated changes to fuel supply costs or availability due to higher demand, shortages, transportation problems or other developments, environmental incidents, or electric transmission or gas pipeline system constraints and the possibility that the Registrants may not have adequate insurance to cover losses as a result of such hazards;

- The effectiveness of the Registrants' risk management policies and procedures, and the ability of the Registrants' counterparties to satisfy their financial commitments;

- Counterparties' collateral demands and other factors affecting the Registrants' liquidity position and financial condition;

- The Registrants' ability to operate their businesses efficiently, manage capital expenditures and costs tightly, and generate earnings and cash flows from their asset-based businesses in relation to their debt and other obligations;

- The Registrants' ability to enter into contracts to sell power and procure fuel on acceptable terms and prices;

- The liquidity and competitiveness of wholesale markets for energy commodities;

- Government regulation, including compliance with regulatory requirements and changes in market rules, rates, tariffs and environmental laws and increased regulation of carbon dioxide and other GHG emissions;

- Price mitigation strategies and other market structures employed by ISOs or RTOs that result in a failure to adequately compensate the Registrants' generation units for all of their costs;

- The Registrants' ability to borrow additional funds and access capital markets, as well as GenOn's substantial indebtedness and the possibility that the Registrants may incur additional indebtedness going forward;

- Operating and financial restrictions placed on the Registrants and their subsidiaries that are contained in the indentures governing GenOn's outstanding notes, and in debt and other agreements of certain of the Registrants' subsidiaries and project affiliates generally;

- The Registrants' ability to implement their strategy of developing and building new power generation facilities;

- The Registrants' ability to implement their strategy of finding ways to meet the challenges of climate change, clean air and protecting natural resources while taking advantage of business opportunities;

- The Registrants' ability to implement their strategy of increasing the return on invested capital through operational performance improvements and a range of initiatives at plants and corporate offices to reduce costs or generate revenues;

- The Registrants' ability to successfully evaluate investments in new business and growth initiatives;

- The Registrants' ability to successfully integrate and manage any acquired businesses; and

- The Registrants' ability to develop and maintain successful partnering relationships.

Forward-looking statements speak only as of the date they were made, and the Registrants undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. The foregoing review of factors that could cause the Registrants' actual results to differ materially from those contemplated in any forward-looking statements included in this Annual Report on Form 10-K should not be construed as exhaustive.

**Item 1B — Unresolved Staff Comments**

None.

**Item 2 — Properties (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

   Listed below are descriptions of Registrants' interests in facilities, operations and/or projects owned or leased as of December 31, 2014. The MW figures provided represent nominal summer net megawatt capacity of power generated as adjusted for the Registrants' ownership position excluding capacity from inactive/mothballed units as of December 31, 2014. The following table summarizes the Registrants' power production and cogeneration facilities by region:

| Name and Location of Facility | Power Market | % Owned | Net Generation Capacity (MW) [a] | Primary Fuel-type |
|---|---|---|---|---|
| Chalk Point, Aquasco, MD [b] | PJM | 100.00 | 667 | Coal |
| Chalk Point, Aquasco, MD | PJM | 100.00 | 1,690 | Natural Gas |
| Dickerson, MD [b] | PJM | 100.00 [c] | 537 | Coal |
| Dickerson, MD | PJM | 100.00 [c] | 312 | Natural Gas |
| Morgantown, Newburg, MD | PJM | 100.00 [c] | 1,229 | Coal |
| Morgantown, Newburg, MD | PJM | 100.00 [c] | 248 | Oil |
| **Total GenOn Mid-Atlantic:** | | | **4,683** | |
| Bowline, West Haverstraw, NY | NYISO | 100.00 | 758 | Natural Gas |
| Canal, Sandwich, MA | ISO-NE | 100.00 | 1,112 | Oil |
| Martha's Vineyard, MA | ISO-NE | 100.00 | 14 | Oil |
| Pittsburg, CA | CAISO | 100.00 | 1,029 | Natural Gas |
| **Total GenOn Americas Generation:** | | | **7,596** | |
| Aurora, IL | PJM | 100.00 | 878 | Natural Gas |
| Avon Lake, OH [d] | PJM | 100.00 | 732 | Coal |
| Avon Lake, OH | PJM | 100.00 | 21 | Oil |
| Blossburg, PA | PJM | 100.00 | 19 | Natural Gas |
| Brunot Island, Pittsburgh, PA | PJM | 100.00 | 259 | Natural Gas |
| Cheswick, Springdale, PA | PJM | 100.00 | 565 | Coal |
| Choctaw, French Camp, MS | SERC-Entergy | 100.00 | 800 | Natural Gas |
| Conemaugh, New Florence, PA [e] | PJM | 16.45 | 280 | Coal |
| Conemaugh, New Florence, PA [e] | PJM | 16.45 | 2 | Oil |
| Coolwater, Dagget, CA [j] | CAISO | 100.00 | 636 | Natural Gas |
| Ellwood, Goleta, CA | CAISO | 100.00 | 54 | Natural Gas |
| Etiwanda, Rancho Cucamonga, CA | CAISO | 100.00 | 640 | Natural Gas |
| Gilbert, Milford, NJ [f] | PJM | 100.00 | 536 | Natural Gas |
| Glen Gardner, NJ [f] | PJM | 100.00 | 160 | Natural Gas |
| Hamilton, East Berlin, PA | PJM | 100.00 | 20 | Oil |
| Hunterstown CCGT, Gettysburg, PA | PJM | 100.00 | 810 | Natural Gas |
| Hunterstown CTS, Gettysburg, PA | PJM | 100.00 | 60 | Natural Gas |
| Keystone, Shelocta, PA [e] | PJM | 16.67 | 283 | Coal |
| Keystone, Shelocta, PA [e] | PJM | 16.67 | 2 | Oil |
| Mandalay, Oxnard, CA | CAISO | 100.00 | 560 | Natural Gas |
| Mountain, Mount Holly Springs, PA | PJM | 100.00 | 40 | Oil |
| New Castle, West Pittsburg, PA [d] | PJM | 100.00 | 325 | Coal |
| New Castle, West Pittsburg, PA | PJM | 100.00 | 3 | Oil |
| Niles, OH | PJM | 100.00 | 25 | Oil |
| Ormond Beach, Oxnard, CA | CAISO | 100.00 | 1,516 | Natural Gas |
| Orrtana, PA | PJM | 100.00 | 20 | Oil |

| | | | | |
|---|---|---|---|---|
| Osceola, Holopaw, FL [(g)] | FRCC | 100.00 | 463 | Natural Gas |
| Portland, Mount Bethel, PA [(h)] | PJM | 100.00 | 169 | Oil |
| Sayreville, NJ | PJM | 100.00 | 224 | Natural Gas |
| Seward, New Florence, PA | PJM | 100.00 | 525 | Coal |
| Shawnee, East Stroudsburg, PA | PJM | 100.00 | 20 | Oil |
| Shawville, PA [(e) (i)] | PJM | 100.00 | 597 | Coal |
| Shawville, PA [(e)] | PJM | 100.00 | 6 | Oil |
| Shelby County, Neoga, IL | MISO | 100.00 | 344 | Natural Gas |
| Titus, Birdsboro, PA | PJM | 100.00 | 31 | Oil |
| Tolna, Stewartstown, PA | PJM | 100.00 | 39 | Oil |
| Warren, PA | PJM | 100.00 | 57 | Natural Gas |
| Werner, South Amboy, NJ [(f)] | PJM | 100.00 | 212 | Oil |
| | | **Total GenOn:** | **19,529** | |

(a)   Actual capacity can vary depending on factors including weather conditions, operational conditions, and other factors.

(b)   On November 29, 2013, NRG submitted a notice of deactivation to retire Chalk Point Units 1 and 2 and Dickerson Units 1, 2, and 3 on May 31, 2017. The deactivation is based on draft environmental regulations that, if adopted, could require uneconomic capital investment and render the units uneconomic to operate going forward.

(c)   GenOn Mid-Atlantic leases 100% interests in the Dickerson and Morgantown coal generation units through facility lease agreements expiring in 2029 and 2034, respectively. GenOn Mid-Atlantic owns 312 MW and 248 MW of peaking capacity at the Dickerson and Morgantown generating facilities, respectively. GenOn Mid-Atlantic operates the Dickerson and Morgantown facilities.

(d)   NRG has announced its intention to continue operations at the Avon Lake and New Castle facilities, which are currently in operation and had been scheduled for deactivation in April 2015. NRG intends to add natural gas capabilities at these facilities, which is expected to be completed by the summer of 2016.

(e)   GenOn leases 100%, 16.67% and 16.45% interests in three Pennsylvania facilities (Shawville, Keystone and Conemaugh, respectively) through facility lease agreements expiring in 2026, 2034 and 2034, respectively. GenOn operates the Shawville, Keystone and Conemaugh facilities. The table includes GenOn's net share of the capacity of these facilities.

(f)   GenOn intends to deactivate net generation capacity at the following facilities:

| Facility | Expected Deactivation Date | Net Generation Capacity (MW) |
|---|---|---|
| Gilbert CT Units 1-4 | May 2015 | 98 |
| Glen Gardner Facility | May 2015 | 160 |
| Werner Facility | May 2015 | 210 |

(g)   NRG mothballed the Osceola facility (463 MW) effective January 1, 2015.

(h)   NRG mothballed Portland coal Units 1 and 2 (401 MW) effective June 1, 2014, and is expected to return those units to service no later than the summer of 2016 using ultra-low sulfur diesel.

(i)   GenOn intends to mothball the coal-fired Units 1, 2, 3 and 4 at the Shawville generating facility (597 MW) beginning on April 16, 2015, and then return those units to service no later than the summer of 2016 using natural gas.

(j)   The Coolwater facility (636 MW) was retired from service on January 1, 2015.

**Other Properties**

The Registrants own or lease oil and gas pipelines that serve its generating facilities. GenOn leases other offices. The Registrants believe that their properties are adequate for their present needs. Except for the Conemaugh and Keystone facilities, the Registrants' interest as of December 31, 2014 is 100% for each property. The Registrants have satisfactory title, rights and possession to their owned facilities, subject to exceptions, which, in their opinion, would not have a material adverse effect on the use or value of the facilities.

**Item 3 — Legal Proceedings (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

See Item 15 — Note 16, *Commitments and Contingencies,* to the Consolidated Financial Statements for discussion of the material legal proceedings to which the Registrants are a party.

**Item 4 — Mine Safety Disclosures (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Not applicable.

**PART II**

**Item 5 — Market for Registrants' Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

As a result of the NRG Merger, GenOn is a wholly-owned subsidiary of NRG. All of GenOn's common stock is held by its parent, NRG, and GenOn's common stock is not publicly traded. GenOn Americas Generation and GenOn Mid-Atlantic are indirect wholly-owned subsidiaries of NRG. All of GenOn Americas Generation's membership interests are held by its parent, NRG Americas. All of GenOn Mid-Atlantic's membership interests are held by its parent, NRG North America. GenOn Americas Generation's and GenOn Mid-Atlantic's membership interests are not publicly traded.

**Item 6 — Selected Financial Data (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Item 6 has been omitted from this report pursuant to the reduced disclosure format permitted by General Instruction I to Form 10-K.

.

**Item 7 — Management's Narrative Analysis of the Results of Operations and Financial Condition (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Reference is made to the Registrants' Consolidated Statements of Operations to this Annual Report on Form 10-K, which presents the results of the Registrants' operations for the years ended December 31, 2014 and 2013, and the periods from December 15, 2012 through December 31, 2012 and from January 1, 2012 through December 14, 2012, and also refer to Item 1 to this Form 10-K for additional discussion about the Registrants' business.

***Environmental Matters, Regulatory Matters and Legal Proceedings***

Details of environmental matters are presented in Item 15 — Note 18, *Environmental Matters*, to the Consolidated Financial Statements. Details of regulatory matters are presented in Item 15 — Note 17, *Regulatory Matters*, to the Consolidated Financial Statements. Details of legal proceedings are presented in Item 15 — Note 16, *Commitments and Contingencies*, to the Consolidated Financial Statements. Some of this information relates to costs that may be material to the Registrants' financial results.

**Consolidated Results of Operations**

*GenOn*

### *2014 Compared to 2013*

The following table provides selected financial information for GenOn:

| (In millions except otherwise noted) | For the Year Ended December 31, | | Change % |
|---|---|---|---|
| | **2014** | **2013** | |
| **Operating Revenues** | | | |
| Energy revenue [a] | $ 2,286 | $ 1,960 | 17 % |
| Capacity revenue [a] | 908 | 936 | (3)% |
| Mark-to-market for economic hedging activities | (150) | (356) | (58)% |
| Other revenues [b] | 46 | 64 | (28)% |
| Total operating revenues | 3,090 | 2,604 | 19 % |
| **Operating Costs and Expenses** | | | |
| Generation cost of sales [a] | 1,451 | 1,142 | 27 % |
| Mark-to-market for economic hedging activities | (3) | (29) | (90)% |
| Contract and emissions credit amortization | (26) | (14) | 86 % |
| Other cost of operations | 755 | 809 | (7)% |
| Total cost of operations | 2,177 | 1,908 | 14 % |
| Depreciation and amortization | 245 | 249 | (2)% |
| Impairment losses | 82 | — | N/A |
| Selling, general and administrative | 200 | 214 | (7)% |
| Acquisition-related transaction and integration costs | 4 | 70 | (94)% |
| Total operating costs and expenses | 2,708 | 2,441 | 11 % |
| Loss on sale of assets | (6) | — | N/A |
| **Operating Income** | 376 | 163 | 131 % |
| **Other Income/(Expense)** | | | |
| Other income, net | 1 | 1 | — % |
| Gain on sale of equity-method investment | 18 | — | 100 % |
| Interest expense | (198) | (205) | (3)% |
| Equity in earnings of unconsolidated affiliates | 1 | 4 | (75)% |
| Loss on debt extinguishment | — | (11) | (100)% |
| Total other expense | (178) | (211) | (16)% |
| **Income/(loss) before income tax expense** | 198 | (48) | N/A |
| Income tax(benefit)/expense | 6 | (6) | N/A |
| **Net Income/(Loss)** | $ 192 | $ (42) | N/A |
| **Business Metrics** | | | |
| Average natural gas price — Henry Hub ($/MMBtu) | 4.41 | 3.65 | 21 % |
| MWh sold (in thousands) | 31,374 | 29,336 | 7 % |
| MWh generated (in thousands) | 34,697 | 31,426 | 10 % |

(a)   Includes realized gains and losses from financially settled transactions.

(b)   Includes unrealized trading gains and losses.

N/A - Not Applicable

*Generation Gross Margin*

| (In millions) | Year Ended December 31, | | Change % |
|---|---|---|---|
| | 2014 | 2013 | |
| Energy revenue | $ 2,286 | $ 1,960 | 17 % |
| Capacity revenue | 908 | 936 | (3)% |
| Other revenues | 46 | 64 | (28)% |
| Generation revenue | 3,240 | 2,960 | 9 % |
| Generation cost of sales | 1,451 | 1,142 | 27 % |
| Generation gross margin | $ 1,789 | $ 1,818 | (2)% |

Generation gross margin was $1,789 million for the year ended December 31, 2014 and $1,818 million for the period from December 31, 2013. The changes during the period relate to:

| | (In millions) |
|---|---|
| Lower gross margin due to an 8% decrease in PJM hedged prices, partially offset by Bowline's placement into the new Hudson Valley Load Zone | $ (31) |
| Higher gross margin due primarily to a 7% increase in PJM capacity volumes | 25 |
| Lower gross margin as Marsh Landing reached commercial operations in May 2013 and was subsequently sold to NRG Yield, Inc. in July 2013 | (22) |
| Higher gross margin due to a 13% increase in generation due to weather conditions in the East, primarily on coal and oil units, offset by the sale of Kendall in January 2014 | 16 |
| Other | (17) |
| | $ (29) |

*Mark-to-market for Economic Hedging Activities*

Mark-to-market for economic hedging activities includes asset-backed hedges that have not been designated as cash flow hedges. The breakdown of gains and losses included in operating revenues and operating costs and expenses are as follows:

| (In millions) | Year Ended December 31, | |
|---|---|---|
| | 2014 | 2013 |
| **Mark-to-market results in operating revenues** | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (331) | $ (409) |
| Net unrealized gains on open positions related to economic hedges | 181 | 53 |
| **Total mark-to-market losses in operating revenues** | $ (150) | $ (356) |
| **Mark-to-market results in operating costs and expenses** | | |
| Reversal of previously recognized unrealized losses on settled positions related to economic hedges | 17 | 42 |
| Net unrealized losses on open positions related to economic hedges | (14) | (13) |
| **Total mark-to-market gains in operating costs and expenses** | $ 3 | $ 29 |

Mark-to-market results consist of unrealized gains and losses. The settlement of these transactions is reflected in the same caption as the items being hedged.

For the year ended December 31, 2014, the $150 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period partially offset by an increase in the value of forward sales of natural gas contracts as a result of decreases in natural gas prices. The $3 million gain in operating costs and expenses from economic hedge positions was driven by the reversal of previously recognized unrealized loss from fuel contracts that settled during the period partially offset by a decrease in the value of forward purchases of fuel contracts as a result of decreases in forward fuel prices.

For the year ended December 31, 2013, the $356 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period slightly offset by an increase in the value of forward sales of electricity and natural gas contracts as a result of decreases in forward power and natural gas prices. The $29 million gain in operating costs and expenses from economic hedge positions was driven by the reversal of previously recognized unrealized loss from fuel contracts that settled during the period partially offset by a decrease in the value of forward purchases of fuel contracts as a result of decreases in forward fuel prices.

In accordance with ASC 815, the following table represents the results of GenOn's financial and physical trading of energy commodities. The realized and unrealized financial and physical trading results are included in other operating revenues. GenOn's trading activities are subject to limits within its risk management policy.

| | Year Ended December | | | |
|---|---|---|---|---|
| (In millions) | | 2014 | | 2013 |
| Trading gains/(losses) | | | | |
| Realized | $ | 2 | $ | 10 |
| Unrealized | | (1) | | — |
| Total trading gains | $ | 1 | $ | 10 |

### Other Cost of Operations

Other cost of operations were $755 million for the year ended December 31, 2014 and $809 million for the year ended December 31, 2013. The decrease of $54 million was due primarily to decreased maintenance and project expenses, specifically for Morgantown and Seward where there were major outages in 2013 with none occurring in 2014, and from the sale of Kendall. The decrease is also attributable to lower property taxes due to a tax settlement for Bowline.

### Depreciation and Amortization

Depreciation and amortization expense was $245 million for the year ended December 31, 2014 and $249 million for the year ended December 31, 2013.

### Impairment Losses

Impairment losses of $82 million in 2014 reflect the impairment of property, plant and equipment at the Osceola and Coolwater facilities.

### Gain on Sale of Equity-Method Investment

The $18 million gain on sale of equity-method investment in 2014 reflects the gain on the sale of Sabine, which was sold in December 2014.

### Loss on Debt Extinguishment

A loss on debt extinguishment of $11 million was recorded in 2013, related to the redemption of the 2014 GenOn Senior Notes, and consisted of a make whole premium payment offset by the write-off of the remaining unamortized premium.

### Interest Expense

Interest expense was $198 million for the year ended December 31, 2014 and $205 million for the year ended December 31, 2013. The changes in the period were due to:

| | (In millions) |
|---|---|
| Increase in amortization of premium/discount | $ 14 |
| Decrease for 7.625% GenOn Senior Notes due 2014 redeemed in June 2013 | (21) |
| | $ (7) |

*GenOn Americas Generation*

### 2014 Compared to 2013

The following table provides selected financial information for GenOn Americas Generation:

| (In millions except otherwise noted) | | For the Year Ended December 31, | | Change % |
|---|---|---|---|---|
| | | 2014 | 2013 | |
| **Operating Revenues** | | | | |
| Energy revenue [a] | $ | 2,111 | $ 1,899 | 11 % |
| Capacity revenue [a] | | 894 | 869 | 3 % |
| Mark-to-market for economic hedging activities | | (118) | (302) | (61)% |
| Other revenues [b] | | 42 | 95 | (56)% |
| Total operating revenues | | 2,929 | 2,561 | 14 % |
| **Operating Costs and Expenses** | | | | |
| Generation cost of sales [a] | | 2,026 | 1,870 | 8 % |
| Mark-to-market for economic hedging activities | | 6 | (31) | (119)% |
| Contract and emissions credit amortization | | 11 | 20 | (45)% |
| Other cost of operations | | 342 | 387 | (12)% |
| Total cost of operations | | 2,385 | 2,246 | 6 % |
| Depreciation and amortization | | 72 | 95 | (24)% |
| Selling, general and administrative | | 88 | 89 | (1)% |
| Total operating costs and expenses | | 2,545 | 2,430 | 5 % |
| Loss on sale of assets | | (6) | — | N/A |
| **Operating Income** | | 378 | 131 | N/A |
| **Other Income/(Expense)** | | | | |
| Other expense, net | | 1 | 1 | — % |
| Interest expense | | (74) | (73) | 1 % |
| Total other expense | | (73) | (72) | 1 % |
| **Income before income tax expense** | | 305 | 59 | N/A |
| Income tax | | — | — | N/A |
| **Net Income** | $ | 305 | $ 59 | N/A |
| **Business Metrics** | | | | |
| Average natural gas price — Henry Hub ($/MMBtu) | | 4.41 | 3.65 | 21 % |
| MWh sold (in thousands) | | 12,394 | 9,931 | 25 % |
| MWh generated (in thousands) | | 12,440 | 10,071 | 24 % |

(a)   Includes realized gains and losses from financially settled transactions.

(b)   Includes unrealized trading gains and losses.

N/A - Not Applicable

31

.

*Generation Gross Margin*

| (In millions) | For the Year Ended December 31, | | Change % |
|---|---|---|---|
| | 2014 | 2013 | |
| Energy revenue | $ 2,111 | $ 1,899 | 11 % |
| Capacity revenue | 894 | 869 | 3 % |
| Other revenues | 42 | 95 | (56)% |
| Generation revenue | 3,047 | 2,863 | 6 % |
| Generation cost of sales | 2,026 | 1,870 | 8 % |
| Generation gross margin | $ 1,021 | $ 993 | 3 % |

Generation gross margin reflects the following pass-through amounts for GenOn Energy Management for services including the bidding and dispatch of the generating units, fuel procurement and the execution of contracts, including economic hedges, to reduce price risk:

| (In millions) | For the Year Ended December 31, | |
|---|---|---|
| | 2014 | 2013 |
| Energy revenue | $ 881 | $ 884 |
| Capacity revenue | 472 | 442 |
| Other revenues | 14 | 69 |
| Generation revenue | 1,367 | 1,395 |
| Generation cost of sales | (1,367) | (1,395) |
| Generation gross margin | $ — | $ — |

Generation gross margin was $1,021 million for the year ended December 31, 2014 and $993 million for the year ended December 31, 2013. The changes during the period relate to:

| | (In millions) |
|---|---|
| Higher gross margin due to a 16% increase in generation due to weather conditions as well as fewer outage hours during 2014 | $ 31 |
| Higher gross margin due to a 60% increase in realized energy prices in New York and New England and a 7% decrease in coal prices, offset by a 24% increase in natural gas prices and a 2% decrease in realized energy prices at GenOn Mid-Atlantic | 43 |
| Lower gross margin due to the fuel type used for increased generation at Canal, which was primarily on oil in 2014 as opposed to natural gas in 2013, as well as the sale of Kendall in January 2014 | (25) |
| Lower gross margin due to an 8% decrease in PJM capacity prices partially offset by higher New York capacity prices resulting from the creation of the Hudson Valley Load Zone | (18) |
| Other | (3) |
| | $ 28 |

*Mark-to-market for Economic Hedging Activities*

Mark-to-market for economic hedging activities includes asset-backed hedges that have not been designated as cash flow hedges. The breakdown of gains and losses included in operating revenues and operating costs and expenses are as follows:

| | For the Year Ended December 31, | |
| --- | --- | --- |
| (In millions) | 2014 | 2013 |
| **Mark-to-market results in operating revenues** | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (300) | $ (336) |
| Net unrealized gains on open positions related to economic hedges | 182 | 34 |
| **Total mark-to-market losses in operating revenues** | (118) | (302) |
| **Mark-to-market results in operating costs and expenses** | | |
| Reversal of previously recognized unrealized losses on settled positions related to economic hedges | 12 | 40 |
| Net unrealized losses on open positions related to economic hedges | (18) | (9) |
| **Total mark-to-market (losses)/gains in operating costs and expenses** | $ (6) | $ 31 |

Mark-to-market results consist of unrealized gains and losses. The settlement of these transactions is reflected in the same caption as the items being hedged.

For the year ended December 31, 2014, the $118 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period partially offset by an increase in the value of forward sales of natural gas contracts as a result of decreases in natural gas prices. The $6 million loss in operating costs and expenses from economic hedge positions was driven by a decrease in the value of forward purchases of fuel contracts as a result of decreases in forward fuel prices partially offset by the reversal of previously recognized unrealized losses from fuel contracts that settled during the period.

For the year ended December 31, 2013, the $302 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period slightly offset by an increase in the value of forward sales of electricity and natural gas contracts as a result of decreases in forward power and natural gas prices. The $31 million gain in operating costs and expenses from economic hedge positions was driven by the reversal of previously recognized unrealized loss from fuel contracts that settled during the period partially offset by a decrease in the value of forward purchases of fuel contracts as a result of decreases in forward fuel prices.

In accordance with ASC 815, the following table represents the results of GenOn Americas Generation's financial and physical trading of energy commodities. The realized and unrealized financial and physical trading results are included in other operating revenues. GenOn Americas Generation's trading activities are subject to limits within the risk management policy.

| | For the Year Ended December 31, | |
| --- | --- | --- |
| (In millions) | 2014 | 2013 |
| Trading gains/(losses) | | |
| Realized | $ 2 | $ 10 |
| Unrealized | (1) | — |
| Total trading gains | $ 1 | $ 10 |

*Other Cost of Operations*

Other cost of operations were $342 million for the year ended December 31, 2014 and $387 million for the year ended December 31, 2013. The changes during the period relate to:

| | (In millions) |
| --- | --- |
| Lower operating costs due to decreased maintenance and project expenses, specifically at Morgantown where there was a major outage in 2013 with none occurring in 2014 | $ 30 |
| Decrease in property tax expense associated with the decrease in property tax assessment for Bowline | 15 |
| | $ 45 |

*Depreciation and Amortization*

Depreciation and amortization expense was $72 million for the year ended December 31, 2014 and $95 million for the year ended December 31, 2013, as a result of assets that were deactivated in prior periods.

33

*GenOn Mid-Atlantic*

### 2014 Compared to 2013

The following table provides selected financial information for GenOn Mid-Atlantic:

| (In millions except otherwise noted) | | Year Ended December 31, | | | | Change % |
|---|---|---|---|---|---|---|
| | | 2014 | | 2013 | | |
| **Operating Revenues** | | | | | | |
| Energy revenue [a] | $ | 980 | $ | 863 | | 14 % |
| Capacity revenue [a] | | 281 | | 305 | | (8)% |
| Mark-to-market for economic hedging activities | | (192) | | (292) | | (34)% |
| Other revenues | | 14 | | 3 | | N/A |
| Total operating revenues | | 1,083 | | 879 | | 23 % |
| **Operating Costs and Expenses** | | | | | | |
| Generation cost of sales [a] | | 453 | | 340 | | 33 % |
| Mark-to-market for economic hedging activities | | 6 | | (31) | | (119)% |
| Contract and emissions credit amortization | | 10 | | 18 | | (44)% |
| Other cost of operations | | 259 | | 277 | | (6)% |
| Total cost of operations | | 728 | | 604 | | 21 % |
| Depreciation and amortization | | 50 | | 77 | | (35)% |
| Selling, general and administrative | | 64 | | 66 | | (3)% |
| Total operating costs and expenses | | 842 | | 747 | | 13 % |
| **Operating Income** | | 241 | | 132 | | 83 % |
| **Other Income/(Expense)** | | | | | | |
| Interest expense | | (5) | | (4) | | 25 % |
| Total other expense | | (5) | | (4) | | 25 % |
| **Income before income tax expense** | | 236 | | 128 | | 84 % |
| Income tax | | — | | — | | N/A |
| **Net Income** | $ | 236 | $ | 128 | | 84 % |
| **Business Metrics** | | | | | | |
| Average natural gas price — Henry Hub ($/MMBtu) | | 4.41 | | 3.65 | | 21 % |
| MWh sold (in thousands) | | 10,414 | | 7,950 | | 31 % |
| MWh generated (in thousands) | | 10,414 | | 7,950 | | 31 % |

(a)   Includes realized gains and losses from financially settled transactions.

N/A - Not Applicable

*Generation Gross Margin*

| (In millions) | For the Year Ended December 31, | | Change % |
| | 2014 | 2013 | |
|---|---|---|---|
| Energy revenue | $ 980 | $ 863 | 14 % |
| Capacity revenue | 281 | 305 | (8)% |
| Other revenues | 14 | 3 | N/A |
| Generation revenue | 1,275 | 1,171 | 9 % |
| Generation cost of sales | 453 | 340 | 33 % |
| Generation gross margin | $ 822 | $ 831 | (1)% |

Generation gross margin was $822 million for the year ended December 31, 2014 compared to $831 million for the year ended December 31, 2013. The changes during the period relate to:

| | (In millions) |
|---|---|
| Higher gross margin due to a 16% increase in generation due to weather conditions in the East as well as fewer outage hours in 2014 as well as a 7% decrease in coal prices, offset by a 2% decrease in realized energy prices | $ 16 |
| Lower gross margin offset due to a 5% decrease in capacity volumes and a 3% decrease in hedged capacity prices | (23) |
| Other | (2) |
| | $ (9) |

*Mark-to-market for Economic Hedging Activities*

Mark-to-market for economic hedging activities includes asset-backed hedges that have not been designated as cash flow hedges. The breakdown of gains and losses included in operating revenues and operating costs and expenses are as follows:

| (In millions) | For the Year Ended December 31, | |
| | 2014 | 2013 |
|---|---|---|
| **Mark-to-market results in operating revenues** | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (300) | $ (336) |
| Net unrealized gains on open positions related to economic hedges | 108 | 44 |
| **Total mark-to-market losses in operating revenues** | (192) | (292) |
| **Mark-to-market results in operating costs and expenses** | | |
| Reversal of previously recognized unrealized losses on settled positions related to economic hedges | 12 | 40 |
| Net unrealized losses on open positions related to economic hedges | (18) | (9) |
| **Total mark-to-market (losses)/gains in operating costs and expenses** | $ (6) | $ 31 |

Mark-to-market results consist of unrealized gains and losses. The settlement of these transactions is reflected in the same caption as the items being hedged.

For the year ended December 31, 2014, the $192 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period partially offset by an increase in the value of forward sales of natural gas contracts as a result of decreases in natural gas prices. The $6 million loss in operating costs and expenses from economic hedge positions was driven by a decrease in the value of forward purchases of fuel contracts as a result of decreases in forward fuel prices partially offset by the reversal of previously recognized unrealized losses from fuel contracts that settled during the period.

For the year ended December 31, 2013, the $292 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period slightly offset by an increase in the value of forward sales of electricity and natural gas contracts as a result of decreases in forward power and natural gas prices. The $31 million gain in operating costs and expenses from economic hedge positions was driven by the reversal of previously recognized unrealized loss from fuel contracts that settled during the period partially offset by a decrease in the value of forward purchases of fuel contracts as a result of decreases in forward fuel prices.

*Other Cost of Operations*

Other cost of operations were $259 million for the year ended December 31, 2014 and $277 million for the year ended December 31, 2013. The changes during the period were due to decreased maintenance and project expenses, specifically at Morgantown where there was a major outage in 2013 with none occurring in 2014.

*Depreciation and Amortization*

Depreciation and amortization expense was $50 million for the year ended December 31, 2014 and $77 million for the year ended December 31, 2013, as a result of assets that were deactivated in prior periods.

## Liquidity and Capital Resources

### Liquidity Position

As of December 31, 2014, and 2013, the Registrants' liquidity was comprised of the following:

|  | As of December 31, | |
|  | 2014 | 2013 |
| --- | --- | --- |
|  | (In millions) | |
| Cash and cash equivalents (GenOn excluding GenOn Mid-Atlantic and REMA) | $ 441 | $ 566 |
| Cash and cash equivalents (GenOn Mid-Atlantic) [a] | 157 | 64 |
| Cash and cash equivalents (REMA) [a] | 322 | 130 |
| Restricted cash | — | 17 |
| Total | 920 | 777 |
| Credit facility availability | 263 | 151 |
| Total liquidity | $ 1,183 | $ 928 |

(a) At December 31, 2014, GenOn Mid-Atlantic and REMA did not satisfy the restricted payment tests and therefore, could not use such funds to distribute cash and make other restricted payments.

Management believes that the Registrants' liquidity position and cash flows from operations will be adequate to finance operating, maintenance and capital expenditures and to fund debt service obligations and other liquidity commitments. Management continues to regularly monitor the Registrants' ability to finance the needs of its operating, financing and investing activity within the dictates of prudent balance sheet management. See additional information related to the Registrants' debt in Item 15 - Note 10, *Debt and Capital Leases*, to the Consolidated Financial Statements.

### Restricted Payments Tests

Of the $920 million of cash and cash equivalents of the Registrants' as of December 31, 2014, $157 million and $322 million were held by GenOn Mid-Atlantic and REMA, respectively. The ability of certain of GenOn's and GenOn Americas Generation's subsidiaries to pay dividends and make distributions is restricted under the terms of certain agreements, including the GenOn Mid-Atlantic and REMA operating leases. Under their respective operating leases, GenOn Mid-Atlantic and REMA are not permitted to make any distributions and other restricted payments unless: (a) they satisfy the fixed charge coverage ratio for the most recently ended period of four fiscal quarters; (b) they are projected to satisfy the fixed charge coverage ratio for each of the two following periods of four fiscal quarters, commencing with the fiscal quarter in which such payment is proposed to be made; and (c) no significant lease default or event of default has occurred and is continuing. In addition, prior to making a dividend or other restricted payment, REMA must be in compliance with the requirement to provide credit support to the owner lessors securing its obligation to pay scheduled rent under its leases. Based on GenOn Mid-Atlantic's and REMA's most recent calculations of these tests, GenOn Mid-Atlantic and REMA did not satisfy the restricted payments tests. As a result, as of December 31, 2014, GenOn Mid-Atlantic and REMA could not make distributions of cash and certain other restricted payments. Each of GenOn Mid-Atlantic and REMA may recalculate its fixed charge coverage ratios from time to time and, subject to compliance with the restricted payments test described above, make dividends or other restricted payments.

To the extent GenOn Mid-Atlantic or REMA are able to pay dividends to GenOn, the GenOn Senior Notes due 2018 and 2020 and the related indentures restrict the ability of GenOn to incur additional liens and make certain restricted payments, including dividends. In the event of a default or if restricted payment tests are not satisfied, GenOn would not be able to distribute cash to its parent, NRG. At December 31, 2014, GenOn met the consolidated debt ratio component of the restricted payments test.

*Credit Ratings*

Credit rating agencies rate a firm's public debt securities. These ratings are utilized by the debt markets in evaluating a firm's credit risk. Ratings influence the price paid to issue new debt securities by indicating to the market the Registrants' ability to pay principal and interest. Rating agencies evaluate a firm's industry, cash flow, leverage, liquidity, and hedge profile, among other factors, in their credit analysis of a firm's credit risk.

On October 20, 2014, Standard & Poor's lowered the issue ratings on the pass-through certificates of GenOn Mid-Atlantic.

The following table summarizes the Registrants' credit ratings as of December 31, 2014:

| | S&P | Moody's |
|---|---|---|
| GenOn 7.875% Senior Notes, due 2017 | B | B3 |
| GenOn 9.500% Senior Notes, due 2018 | B | B3 |
| GenOn 9.875% Senior Notes, due 2020 | B | B3 |
| GenOn Americas Generation 8.500% Senior Notes, due 2021 | B | Caa1 |
| GenOn Americas Generation 9.125% Senior Notes, due 2031 | B | Caa1 |

*Source of Liquidity*

The principal sources of liquidity for the Registrants' future operating and capital expenditures are expected to be derived from existing cash on hand and cash flows from operations. The Registrants' operating cash flows may be effected by, among other things, demand for electricity, the difference between the cost of fuel used to generate electricity and the market value of the electricity generated, commodity prices (including prices for electricity, emissions allowances, natural gas, coal and oil), operations and maintenance expenses in the ordinary course, planned and unplanned outages, terms with trade creditors, cash requirements for capital expenditures relating to certain facilities (including those necessary to comply with environmental regulations) and the potential impact of future environmental regulations.

*Uses of Liquidity*

The Registrants' requirements for liquidity and capital resources, other than for operating its facilities, can generally be categorized by the following: (i) debt service obligations, as described more fully in Item 15 — Note 10, *Debt and Capital Leases*, to the Consolidated Financial Statements; (ii) capital expenditures, including maintenance and environmental; and (iii) payments under the GenOn Mid-Atlantic and REMA operating leases.

**Capital Expenditures**

The following tables and descriptions summarize the Registrant's capital expenditures, excluding accruals, for maintenance, environmental, and growth for the year ended December 31, 2014, and the estimated capital expenditure forecast for 2015.

| | Maintenance | Environmental | Growth | Total |
|---|---|---|---|---|
| | | (in millions) | | |
| ***2014:*** | | | | |
| GenOn | 109 | 57 | 5 | 171 |
| GenOn Americas Generation | 32 | — | — | 32 |
| GenOn Mid-Atlantic | 16 | — | — | 16 |
| | | | | |
| ***2015 Forecast:*** | | | | |
| GenOn | 153 | 51 | 202 | 406 |
| GenOn Americas Generation | 68 | 12 | — | 80 |
| GenOn Mid-Atlantic | 29 | 10 | — | 39 |

The following table summarizes the Registrants' estimated environmental capital expenditures for the referenced periods by region:

| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| 2015 | $ 51 | $ 12 | $ 10 |
| 2016 | 6 | 3 | — |
| 2017 | 1 | — | — |
| Total [a] | $ 58 | $ 15 | $ 10 |

(a) The Registrants had no estimated environmental capital expenditures for years 2018 and 2019.

**Operating Leases**

GenOn Mid-Atlantic leases 100% interest in both the Dickerson and Morgantown coal units and associated property through 2029 and 2034, respectively, and has an option to extend the leases.  Any extensions of the respective leases would be for less than 75% of the economic useful life of the facility, as measured from the beginning of the original lease term through the end of the proposed remaining lease term.  The leases are accounted for as operating leases.  Although there is variability in the scheduled payment amounts over the lease term, rent expense is recognized for these leases on a straight-line basis.  The scheduled payment amounts for the leases are $110 million and $150 million for 2015 and 2016, respectively.  At December 31, 2014, the total notional minimum lease payments for the remaining term of the leases aggregated $1.2 billion and the aggregate termination value for the leases was approximately $978 million and generally decreases over time. In addition, the present value of lease payments at December 31, 2014, was approximately $714 million (assuming a 10% discount rate).  NRG provides letters of credit in support of GenOn Mid-Atlantic's lease obligations in an aggregate amount equal to the greatest of the next six months scheduled rent payments, 50% of the next 12 months scheduled rent payments or $83 million.

REMA leases 16.45% and 16.67% interests in the Conemaugh and Keystone coal facilities, respectively through 2034 and expects to make payments through 2029. REMA also leases a 100% interest in the Shawville coal facility through 2026 and expects to make payments through that date. At the expiration of these leases, there are several renewal options related to fair value. The leases are accounted for as operating leases. The scheduled payment amounts for the REMA leases are $56 million and $61 million for 2015 and 2016, respectively. At December 31, 2014, the total notional minimum lease payments for the remaining term of the leases aggregated $634 million and the aggregate termination value for the leases was approximately $672 million and generally decreases over time. In addition, the present value of lease payments at December 31, 2014 was approximately $397 million (assuming a 9.4% discount rate). NRG provides letters of credit in support of REMA's lease obligations to post rent reserves in an aggregate amount equal to the greater of the next six months scheduled rent payment or 50% of the next 12 months scheduled rent payments.

38

**Item 7A — Quantitative and Qualitative Disclosures About Market Risk (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

The Registrants are exposed to several market risks in their normal business activities. Market risk is the potential loss that may result from market changes associated with the Registrants' merchant power generation or with an existing or forecasted financial or commodity transaction. The types of risks the Registrants are exposed to are commodity price risk, interest rate risk and credit and performance risk. In order to manage commodity price and interest rate risks, the Registrants use various fixed-price forward purchase and sales contracts, futures and option contracts traded on NYMEX, and swaps and options traded in the over-the-counter financial markets to:

- Manage and hedge fixed-price purchase and sales commitments;
- Manage and hedge exposure to variable rate debt obligations;
- Reduce exposure to the volatility of cash market prices; and
- Hedge fuel requirements for the Registrants' generating facilities.

*Commodity Price Risk*

Commodity price risks result from exposures to changes in spot prices, forward prices, volatilities, and correlations between various commodities, such as natural gas, electricity, coal, oil, and emission credits. The Registrants manage the commodity price risk of their merchant generation operations by entering into various derivative or non-derivative instruments to hedge the variability in future cash flows from forecasted sales and purchases of electricity and fuel. These instruments include forwards, futures, swaps, and option contracts traded on various exchanges, such as NYMEX and Intercontinental Exchange, or ICE, as well as over-the-counter markets. The portion of forecasted transactions hedged may vary based upon management's assessment of market, weather, operation and other factors.

While some of the contracts the Registrants use to manage risk represent commodities or instruments for which prices are available from external sources, other commodities and certain contracts are not actively traded and are valued using other pricing sources and modeling techniques to determine expected future market prices, contract quantities, or both. The Registrants use their best estimates to determine the fair value of those derivative contracts. However, it is likely that future market prices could vary from those used in recording mark-to-market derivative instrument valuation, and such variations could be material.

*Interest Rate Risk*

As of December 31, 2014, GenOn's debt fair value was $2.7 billion and the carrying value was $3.1 billion. GenOn estimates that a 1% decrease in market interest rates would have increased the fair value of its long-term debt by $221 million. As of December 31, 2014, GenOn Americas Generation's debt fair value was $720 million and the carrying value was $929 million. GenOn Americas Generation estimates that a 1% decrease in market interest rates would have increased the fair value of its long-term debt by $120 million.

*Counterparty Credit Risk*

Credit risk relates to the risk of loss resulting from non-performance or non-payment by counterparties pursuant to the terms of their contractual obligations. The Registrants monitor and manage credit risk through credit policies that include: (i) an established credit approval process; (ii) a daily monitoring of counterparties' credit limits; (iii) the use of credit mitigation measures such as margin, collateral, prepayment arrangements, or volumetric limits; (iv) the use of payment netting agreements; and (v) the use of master netting agreements that allow for the netting of positive and negative exposures of various contracts associated with a single counterparty. Risks surrounding counterparty performance and credit could ultimately impact the amount and timing of expected cash flows. The Registrants seek to mitigate counterparty risk by having a diversified portfolio of counterparties. The Registrants also have credit protection within various agreements to call on additional collateral support if and when necessary. Cash margin is collected and held at the Registrants to cover the credit risk of the counterparty until positions settle.

As of December 31, 2014, counterparty credit exposure to a significant portion of GenOn's counterparties was $450 million and GenOn held $1 million of collateral against these positions, resulting in a net exposure of $450 million. Approximately 90% of GenOn's exposure before collateral is expected to roll off by the end of 2016. GenOn Americas Generation's counterparty credit exposure to a significant portion of counterparties was $445 million and GenOn Americas Generation held $1 million of collateral against those positions, resulting in a net exposure of $445 million. Approximately 90% of GenOn Americas Generation's exposure before collateral is expected to roll off by the end of 2016. GenOn Mid-Atlantic's counterparty credit exposure to a significant portion of counterparties was $107 million and GenOn Mid-Atlantic held no collateral (cash or letters of credit) against those positions, resulting in a net exposure of $107 million. Approximately $107 million of GenOn Mid-Atlantic's exposure before collateral is expected to roll off by the end of 2015.

The following tables highlight the credit quality and the net counterparty credit exposure by industry sector. Net counterparty credit exposure is defined as the aggregate net asset position for the Registrants with counterparties where netting is permitted under the enabling agreement and includes all cash flow, mark-to-market and NPNS, and non-derivative transactions. As of December 31, 2014, the exposure is shown net of collateral held and includes amounts net of receivables or payables.

*GenOn*

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Financial institutions | 86% |
| Utilities, energy merchants, marketers and other | 8% |
| ISOs | 6% |
| Total | 100% |

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Investment grade | 98% |
| Non-Investment grade | 2% |
| Total | 100% |

(a)   Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

GenOn has counterparty credit risk exposure to certain counterparties representing more than 10% of total net exposure discussed above and the aggregate of such counterparties was $361 million. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, GenOn does not anticipate a material impact on its financial position or results of operations from nonperformance by any of its counterparties.

*GenOn Americas Generation*

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Financial institutions | 87% |
| Utilities, energy merchants, marketers and other | 7% |
| ISOs | 6% |
| Total | 100% |

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Investment grade | 99% |
| Non-Investment grade | 1% |
| Total | 100% |

(a)   Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

GenOn Americas Generation has counterparty credit risk exposure to certain counterparties representing more than 10% of total net exposure discussed above and the aggregate of such counterparties was $361 million. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, GenOn Americas Generation does not anticipate a material impact on its financial position or results of operations from nonperformance by any of its counterparties.

*GenOn Mid-Atlantic*

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Financial institutions | 100% |

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Investment grade | 100% |

(a)   Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

GenOn Mid-Atlantic has counterparty credit risk exposure to certain counterparties representing more than 10% of total net exposure discussed above and the aggregate of such counterparties was $106 million. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, GenOn Mid-Atlantic does not anticipate a material impact on its financial position or results of operations from nonperformance by any of its counterparties.

### *Credit Risk Related Contingent Features*

Certain of the Registrants' hedging agreements contain provisions that require the Registrants to post additional collateral if the counterparty determines that there has been deterioration in credit quality, generally termed "adequate assurance" under the agreements, or require the Registrants to post additional collateral if there were a one notch downgrade in the Registrants' credit rating. The collateral required for contracts that have adequate assurance clauses that are in net liability positions as of December 31, 2014, was $21 million for GenOn and GenOn Americas Generation. The collateral required for contracts with credit rating contingent features that are in a net liability position as of December 31, 2014, was $1 million for GenOn and GenOn Americas Generation. In addition, GenOn and GenOn Americas Generation are parties to certain marginable agreements under which they have net liability positions, but the counterparties have not called for collateral due, which is approximately $10 million as of December 31, 2014. As of December 31, 2014, GenOn Mid-Atlantic did not have any financial instruments with credit risk related contingent features.

### Item 8 — Financial Statements and Supplementary Data (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)

The financial statements and schedules of the Registrants are listed in Part IV, Item 15 of this Form 10-K.

**Item 9 — Changes in and Disagreements with Accountants on Accounting and Financial Disclosure (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

None.

**Item 9A — Controls and Procedures (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

**Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures and Internal Control Over Financial Reporting**

Under the supervision and with the participation of the Registrants' management, including principal executive officer, principal financial officer and principal accounting officer, the Registrants conducted an evaluation of the effectiveness of the design and operation of disclosure controls and procedures, as such term is defined in Rules 13a-15(e) or 15d-15(e) of the Exchange Act. Based on this evaluation, the Registrants' principal executive officer, principal financial officer and principal accounting officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this annual report on Form 10-K. Management's reports on the Registrants' internal control over financial reporting are incorporated under the caption "Management's Report on Internal Control over Financial Reporting" of the Registrants' Annual Report on Form 10-K for the fiscal year ended December 31, 2014.

**Changes in Internal Control over Financial Reporting**

There were no changes in the Registrants' internal control over financial reporting (as such term is defined in Rule 13a-15(f) under the Exchange Act) that occurred in the fourth quarter of 2014 that materially affected, or are reasonably likely to materially affect, the Registrants' internal control over financial reporting.

**Inherent Limitations over Internal Controls**

The Registrants' internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with U.S. GAAP. The Registrants' internal control over financial reporting includes those policies and procedures that:

1. Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Registrants' assets;

2. Provide reasonable assurance that transactions are recorded as necessary to permit preparation of consolidated financial statements in accordance with U.S. GAAP, and that the Registrants' receipts and expenditures are being made only in accordance with authorizations of management and directors; and

3. Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Registrants' assets that could have a material effect on the consolidated financial statements.

Internal control over financial reporting cannot provide absolute assurance of achieving financial reporting objectives because of its inherent limitations, including the possibility of human error and circumvention by collusion or overriding of controls. Accordingly, even an effective internal control system may not prevent or detect material misstatements on a timely basis. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate.

**Management's Report on Internal Control Over Financial Reporting**

The Registrants' management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of the Registrants' management, including their principal executive officer, principal financial officer and principal accounting officer, the Registrants conducted an evaluation of the effectiveness of their internal control over financial reporting based on the framework in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on the Registrants' evaluation under the framework in Internal Control — Integrated Framework (2013), the Registrants' management concluded that their internal control over financial reporting was effective as of December 31, 2014.

**Item 9B — Other Information (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

None.

**PART III**

**Item 10 — Directors, Executive Officers and Corporate Governance**

Item 10 has been omitted from this report for the Registrants pursuant to the reduced disclosure format permitted by General Instruction I to Form 10-K.

**Item 11 — Executive Compensation**

Item 11 has been omitted from this report for the Registrants pursuant to the reduced disclosure format permitted by General Instruction I to Form 10-K.

**Item 12 — Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

Item 12 has been omitted from this report for the Registrants pursuant to the reduced disclosure format permitted by General Instruction I to Form 10-K.

**Item 13 — Certain Relationships and Related Transactions, and Director Independence**

Item 13 has been omitted from this report for the Registrants pursuant to the reduced disclosure format permitted by General Instruction I to Form 10-K.

**Item 14 — Principal Accounting Fees and Services (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

KPMG LLP conducts an integrated audit of NRG and its subsidiaries. Professional audit services and other services rendered by KPMG LLP subsequent to December 14, 2012 were allocated to the Registrants through the Services Agreement with NRG as described in Note 16, *Commitments and Contingencies*, to the Registrants' consolidated financial statements. As provided in the NRG Audit Committee Charter, the NRG Audit Committee pre-approved all audit services and permissible non-audit services provided by the independent auditor for the fiscal years 2013 and 2014.

The following table shows the aggregate fees related to the audit provided by KPMG LLP for fiscal years 2014 and 2013.

|  | 2014 | 2013 |
|---|---|---|
|  | (in thousands) | |
| Audit Fees[a] | $          923 | $          3,450 |

(a) Includes fees and expenses related to the audits of the Registrants' consolidated financial statements for 2014 and 2013 and the effectiveness of GenOn's internal controls over financial reporting for 2014 and 2013. This category also includes the review of financial statements included in the Registrants' Quarterly Reports on Form 10-Q, the audits of various subsidiary financial statements required by statute or regulation, and services that are normally provided by the independent auditors in connection with regulatory filings or engagements, consultations provided on audit and accounting matters that arose during, or as a result of, the audits or the reviews of interim financial statements, and the preparation of any written communications on internal control matters.

**PART IV**

**Item 15 — Exhibits, Financial Statement Schedules (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

(a)(1) Financial Statements

The following consolidated financial statements of GenOn Energy, Inc., GenOn Americas Generation, LLC and GenOn Mid-Atlantic, LLC and related notes thereto, together with the reports thereon of KPMG LLP, are included herein:

GenOn Energy, Inc.

Consolidated Statements of Operations

Consolidated Statements of Comprehensive Loss

Consolidated Balance Sheets

Consolidated Statements of Cash Flows

Consolidated Statement of Stockholder's Equity

GenOn Americas Generation, LLC

Consolidated Statements of Operations

Consolidated Balance Sheets

Consolidated Statements of Cash Flows

Consolidated Statement of Member's Equity

GenOn Mid-Atlantic, LLC

Consolidated Statements of Operations

Consolidated Balance Sheets

Consolidated Statements of Cash Flows

Consolidated Statement of Member's Equity

Combined Notes to Consolidated Financial Statements

(a)(2) Financial Statement Schedules

The following Consolidated Financial Statement Schedules of GenOn Energy, Inc., GenOn Americas Generation, LLC and GenOn Mid-Atlantic, LLC are filed as part of Item 15 of this report and should be read in conjunction with the Consolidated Financial Statements.

Schedule I — GenOn Energy, Inc. Financial Statements

Schedule I — GenOn Americas Generation, LLC Financial Statements

Schedule II — Valuation and Qualifying Accounts

All other schedules for which provision is made in the applicable accounting regulation of the Securities and Exchange Commission are not required under the related instructions or are inapplicable, and therefore, have been omitted.

(a)(3) Exhibits: See Exhibit Index submitted as a separate section of this report.

(b) Exhibits

See Exhibit Index submitted as a separate section of this report.

(c) Not applicable

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors
GenOn Energy, Inc.:


We have audited the accompanying consolidated balance sheets of GenOn Energy, Inc. and subsidiaries as of December 31, 2014 and 2013, and the related consolidated statements of operations, comprehensive income/(loss), cash flows, and stockholder's equity for each of the years in the two-year period ended December 31, 2014 and the periods from December 15, 2012 through December 31, 2012 (Successor) and January 1, 2012 through December 14, 2012 (Predecessor). In connection with our audits of the consolidated financial statements, we also have audited financial statement schedules "Schedule I. Condensed Financial Information of Registrant" and "Schedule II. Valuation and Qualifying Accounts." These consolidated financial statements and financial statement schedules are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedules based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of GenOn Energy, Inc. and subsidiaries as of December 31, 2014 and 2013, and the results of their operations and their cash flows for each of the years in the two-year period ended December 31, 2014 and the periods from December 15, 2012 through December 31, 2012 (Successor) and January 1, 2012 through December 14, 2012 (Predecessor) in conformity with U.S. generally accepted accounting principles. Also in our opinion, the related financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.


(signed) KPMG LLP


Philadelphia, Pennsylvania
February 27, 2015

<center>45</center>

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors
GenOn Americas Generation, LLC:

We have audited the accompanying consolidated balance sheets of GenOn Americas Generation, LLC and subsidiaries as of December 31, 2014 and 2013, and the related consolidated statements of operations, cash flows, and member's equity for each of the years in the two-year period ended December 31, 2014 and the periods from December 15, 2012 through December 31, 2012 (Successor) and January 1, 2012 through December 14, 2012 (Predecessor). In connection with our audits of the consolidated financial statements, we also have audited financial statement schedules "Schedule I. Condensed Financial Information of Registrant" and "Schedule II. Valuation and Qualifying Accounts." These consolidated financial statements and financial statement schedules are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedules based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of GenOn Americas Generation, LLC and subsidiaries as of December 31, 2014 and 2013, and the results of their operations and their cash flows for each of the years in the two-year period ended December 31, 2014 and the periods from December 15, 2012 through December 31, 2012 (Successor) and January 1, 2012 through December 14, 2012 (Predecessor) in conformity with U.S. generally accepted accounting principles. Also in our opinion, the related financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

(signed) KPMG LLP

Philadelphia, Pennsylvania
February 27, 2015

46

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors
GenOn Mid-Atlantic, LLC:

We have audited the accompanying consolidated balance sheets of GenOn Mid-Atlantic, LLC and subsidiaries as of December 31, 2014 and 2013, and the related consolidated statements of operations, cash flows, and member's equity for each of the years in the two-year period ended December 31, 2014 and the periods from December 15, 2012 through December 31, 2012 (Successor) and January 1, 2012 through December 14, 2012 (Predecessor). In connection with our audits of the consolidated financial statements, we also have audited financial statement schedule "Schedule II. Valuation and Qualifying Accounts." These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of GenOn Mid-Atlantic, LLC and subsidiaries as of December 31, 2014 and 2013, and the results of their operations and their cash flows for each of the years in the two-year period ended December 31, 2014 and the periods from December 15, 2012 through December 31, 2012 (Successor) and January 1, 2012 through December 14, 2012 (Predecessor) in conformity with U.S. generally accepted accounting principles. Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

(signed) KPMG LLP

Philadelphia, Pennsylvania
February 27, 2015

47

**GENON ENERGY, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | For the Year Ended December 31, 2014 | For the Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | | (In millions) |
| **Operating Revenues** | | | | |
| Operating revenue | $ 3,087 | $ 2,556 | $ 73 | $ 2,564 |
| Operating revenues - affiliate | 3 | 48 | — | — |
| Total operating revenues | 3,090 | 2,604 | 73 | 2,564 |
| **Operating Costs and Expenses** | | | | |
| Cost of operations | 1,759 | 1,715 | 66 | 2,073 |
| Cost of operations - affiliate | 418 | 193 | — | — |
| Depreciation and amortization | 245 | 249 | 10 | 339 |
| Impairment losses | 82 | — | — | 47 |
| Selling, general and administrative | 72 | 126 | 8 | 166 |
| Selling, general and administrative - affiliate | 128 | 88 | — | — |
| Acquisition-related transaction and integration costs | 4 | 70 | 53 | 11 |
| Total operating costs and expenses | 2,708 | 2,441 | 137 | 2,636 |
| Loss on sale of assets | (6) | — | — | — |
| **Operating Income/(Loss)** | 376 | 163 | (64) | (72) |
| **Other Income/(Expense)** | | | | |
| Equity in earnings of unconsolidated affiliates | 1 | 4 | — | — |
| Other income, net | 1 | 1 | — | 3 |
| Gain on sale of equity-method investment | 18 | — | — | — |
| Interest expense | (186) | (193) | (8) | (330) |
| Interest expense - affiliate | (12) | (12) | — | — |
| Loss on debt extinguishment and refinancing expense | — | (11) | — | — |
| Total other expense | (178) | (211) | (8) | (327) |
| **Income/(Loss) Before Income Taxes** | 198 | (48) | (72) | (399) |
| Income tax expense/(benefit) | 6 | (6) | — | 15 |
| **Net Income/(Loss)** | $ 192 | $ (42) | $ (72) | $ (414) |

See notes to Consolidated Financial Statements.

48

.

**GENON ENERGY, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME/(LOSS)**

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | For the Year Ended December 31, 2014 | For the Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | | (In millions) |
| **Net Income/(Loss)** | $ 192 | $ (42) | $ (72) | $ (414) |
| **Other Comprehensive (Loss)/Income, net of reclassifications, net of tax of $0:** | | | | |
| Unrealized (loss)/gain on derivatives | — | (1) | 1 | (18) |
| Defined benefit plans | (104) | 101 | 1 | (8) |
| Other, net | — | — | — | 1 |
| **Other Comprehensive (Loss)/Income** | (104) | 100 | 2 | (25) |
| **Comprehensive Income/(Loss)** | $ 88 | $ 58 | $ (70) | $ (439) |

See notes to Consolidated Financial Statements.

49

.

**GENON ENERGY, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

| | As of December 31, | |
| --- | --- | --- |
| | **2014** | **2013** |
| | (In millions) | |
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 920 | $ 760 |
| Funds deposited by counterparties | 54 | 56 |
| Current assets held-for-sale | — | 17 |
| Accounts receivable — trade | 120 | 178 |
| Inventory | 507 | 443 |
| Derivative instruments | 591 | 464 |
| Derivative instruments — affiliate | 11 | 5 |
| Cash collateral paid in support of energy risk management activities | 38 | 62 |
| Prepayments and other current assets | 150 | 177 |
| Total current assets | 2,391 | 2,162 |
| **Property, Plant and Equipment** | | |
| In service | 3,341 | 3,311 |
| Under construction | 140 | 113 |
| Total property, plant and equipment | 3,481 | 3,424 |
| Less accumulated depreciation | (436) | (248) |
| Net property, plant and equipment | 3,045 | 3,176 |
| **Other Assets** | | |
| Intangible assets, net of accumulated amortization of $66 and $34 | 72 | 65 |
| Derivative instruments | 195 | 181 |
| Derivative instruments — affiliate | 10 | 1 |
| Non-current assets held-for-sale | 17 | — |
| Other non-current assets | 184 | 149 |
| Total other assets | 478 | 396 |
| **Total Assets** | $ 5,914 | $ 5,734 |

See notes to Consolidated Financial Statements.

50

.

**GENON ENERGY, INC. AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS (Continued)**

| | As of December 31, | |
|---|---|---|
| | **2014** | **2013** |
| | (In millions) | |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| **Current Liabilities** | | |
| Current portion of long-term debt and capital leases | $ 10 | $ 5 |
| Accounts payable | 135 | 187 |
| Accounts payable — affiliate | 14 | 72 |
| Derivative instruments | 382 | 160 |
| Derivative instruments — affiliate | 35 | 3 |
| Cash collateral received in support of energy risk management activities | 54 | 56 |
| Accrued payroll | 79 | 103 |
| Accrued taxes | 48 | 39 |
| Accrued interest expense | 44 | 44 |
| Accrued expenses and other current liabilities | 67 | 80 |
| Total current liabilities | 868 | 749 |
| **Other Liabilities** | | |
| Long-term debt and capital leases | 3,120 | 3,128 |
| Postretirement and other benefit obligations | 207 | 185 |
| Derivative instruments | 69 | 18 |
| Derivative instruments — affiliate | 3 | — |
| Out-of-market contracts | 969 | 1,045 |
| Other non-current liabilities | 277 | 296 |
| Total non-current liabilities | 4,645 | 4,672 |
| **Total Liabilities** | 5,513 | 5,421 |
| **Commitments and Contingencies** | | |
| **Stockholder's Equity** | | |
| Common stock: $0.001 par value, 1 share authorized and issued at December 31, 2013 and 2014 | — | — |
| Additional paid-in capital | 325 | 325 |
| Accumulated deficit | 78 | (114) |
| Accumulated other comprehensive (loss)/income | (2) | 102 |
| Total Stockholder's Equity | 401 | 313 |
| **Total Liabilities and Stockholder's Equity** | $ 5,914 | $ 5,734 |

See notes to Consolidated Financial Statements.

51

.

## GENON ENERGY, INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | For the Year Ended December 31, 2014 | For the Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | | (In millions) |
| **Cash Flows from Operating Activities** | | | | |
| Net income/(loss) | $ 192 | $ (42) | $ (72) | $ (414) |
| Adjustments to reconcile net loss to net cash provided/(used) by operating activities: | | | | |
| Depreciation and amortization | 245 | 249 | 10 | 339 |
| Amortization of financing costs and debt discount/premiums | (58) | (72) | (4) | 16 |
| Loss on debt extinguishment | — | (28) | — | — |
| Amortization of out-of-market contracts and emission allowances | (38) | (45) | (2) | (45) |
| Amortization of unearned equity compensation | 6 | 9 | 6 | 19 |
| Loss/(gain) on disposals and sales of assets | 6 | — | — | (9) |
| Gain on sale of equity method investment | (18) | — | — | — |
| Impairment losses | 82 | — | — | 47 |
| Changes in derivative instruments | 152 | 310 | 13 | 143 |
| Postretirement benefits curtailment (gain) loss | — | — | — | 2 |
| Excess materials and supplies inventory reserve | — | — | — | 35 |
| Lower of cost or market inventory adjustments | 12 | — | — | 108 |
| Advance settlement of out-of-market contract obligation | — | — | — | (20) |
| Potomac River settlement obligation and reversal | — | — | — | (32) |
| Large scale remediation and settlement costs | — | — | — | (3) |
| Other, net | 24 | 86 | — | 3 |
| Cash provided/(used) by changes in other working capital, net of acquisition and disposition effects: | | | | |
| Accounts receivable - trade | 52 | (59) | (10) | 164 |
| Inventory | (76) | (25) | (1) | (56) |
| Prepayments and other current assets | 27 | 61 | (27) | (31) |
| Accounts payable | (127) | 118 | (67) | (111) |
| Accrued expenses and other current liabilities | (33) | (71) | 18 | 36 |
| Other assets and liabilities | (211) | 41 | (16) | 17 |
| **Net Cash Provided/(Used) by Operating Activities** | 237 | 532 | (152) | 208 |
| **Cash Flows from Investing Activities** | | | | |
| Net proceeds from sale of NRG Marsh Landing | — | 175 | — | — |
| Capital expenditures | (171) | (301) | (12) | (557) |
| Proceeds from sale of assets, net | 50 | — | — | 14 |
| Proceeds from sale of equity method investments | 35 | — | — | — |
| Decrease in restricted cash, net | — | 18 | 6 | 189 |
| Other | 10 | (21) | — | 2 |
| **Net Cash Used by Investing Activities** | (76) | (129) | (6) | (352) |
| **Cash Flows from Financing Activities** | | | | |
| Proceeds from issuance of long-term debt | — | 110 | — | 283 |
| Payments for short and long-term debt | (1) | (578) | — | (695) |
| **Net Cash Used by Financing Activities** | (1) | (468) | — | (412) |
| **Net Increase/(Decrease) in Cash and Cash Equivalents** | 160 | (65) | (158) | (556) |
| **Cash and Cash Equivalents at Beginning of Period** | 760 | 825 | 983 | 1,539 |
| **Cash and Cash Equivalents at End of Period** | $ 920 | $ 760 | $ 825 | $ 983 |
| **Supplemental Disclosures** | | | | |

| Interest paid, net of amount capitalized | $ | 240 | $ | 259 | $ | 51 | $ | 279 |
| Income taxes (received)/paid, net | $ | 3 | $ | (75) | $ | — | $ | 11 |

See notes to Consolidated Financial Statements.

52

**GENON ENERGY, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENT OF STOCKHOLDER'S EQUITY**

| | Common Stock | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Income/(Loss) | Total Stockholder's Equity |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Predecessor** | | | | | |
| **Balances as of December 31, 2011** | $ 1 | $ 7,449 | $ (2,163) | $ (170) | $ 5,117 |
| Net loss | — | — | (414) | — | (414) |
| Other comprehensive loss | — | — | — | (25) | (25) |
| Equity-based compensation | — | 14 | — | — | 14 |
| **Balances as of December 14, 2012**[a] | $ 1 | $ 7,463 | $ (2,577) | $ (195) | $ 4,692 |
| **Successor** | | | | | |
| **Balances as of December 15, 2012**[a] | $ — | $ 277 | $ — | $ — | $ 277 |
| Net loss | — | — | (72) | — | (72) |
| Other comprehensive income | — | — | — | 2 | 2 |
| **Balances as of December 31, 2012** | $ — | $ 277 | $ (72) | $ 2 | $ 207 |
| Net loss | — | — | (42) | — | (42) |
| Other comprehensive income | — | — | — | 100 | 100 |
| Sale of Marsh Landing to NRG | — | 48 | — | — | 48 |
| **Balances as of December 31, 2013** | $ — | $ 325 | $ (114) | $ 102 | $ 313 |
| Net income | — | — | 192 | — | 192 |
| Other comprehensive loss | — | — | — | (104) | (104) |
| **Balances as of December 31, 2014** | $ — | $ 325 | $ 78 | $ (2) | $ 401 |

(a)   The differences in equity balances at December 14, 2012 and December 15, 2012 are due to the application of pushdown accounting reflecting the NRG Merger.

See notes to Consolidated Financial Statements.

53

.

**GENON AMERICAS GENERATION, LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | For the Year Ended December 31, 2014 | For the Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | | (In millions) |
| **Operating Revenues** | | | | |
| Operating revenues | $ 2,869 | $ 2,428 | $ 74 | $ 2,405 |
| Operating revenues - affiliate | 60 | 133 | 3 | 189 |
| Total operating revenues | 2,929 | 2,561 | 77 | 2,594 |
| **Operating Costs and Expenses** | | | | |
| Cost of operations | 944 | 890 | 28 | 1,064 |
| Cost of operations - affiliate | 1,441 | 1,356 | 41 | 1,307 |
| Depreciation and amortization | 72 | 95 | 5 | 155 |
| Selling, general and administrative | 9 | 15 | 1 | 11 |
| Selling, general and administrative - affiliate | 79 | 74 | 2 | 62 |
| Total operating costs and expenses | 2,545 | 2,430 | 77 | 2,599 |
| Loss on sale of assets | (6) | — | — | — |
| **Operating Income/(Loss)** | 378 | 131 | — | (5) |
| **Other Income/(Expense)** | | | | |
| Other expense, net | 1 | 1 | — | — |
| Interest expense | (66) | (66) | (3) | (70) |
| Interest expense — affiliate | (8) | (7) | — | (5) |
| Total other expense | (73) | (72) | (3) | (75) |
| **Income/(Loss) Before Income Taxes** | 305 | 59 | (3) | (80) |
| Income tax | — | — | — | — |
| **Net Income/(Loss)** | $ 305 | $ 59 | $ (3) | $ (80) |

See notes to Consolidated Financial Statements.

54

.

**GENON AMERICAS GENERATION, LLC AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

| | As of December 31, | | |
|---|---|---|---|
| | **2014** | | **2013** |
| | (In millions) | | |
| **ASSETS** | | | |
| **Current Assets** | | | |
| Cash and cash equivalents | $ 103 | $ | 63 |
| Funds deposited by counterparties | 54 | | — |
| Accounts receivable | 106 | | 151 |
| Note receivable — affiliate | 331 | | 299 |
| Inventory | 318 | | 270 |
| Derivative instruments | 591 | | 462 |
| Derivative instruments — affiliate | 261 | | 84 |
| Cash collateral paid in support of energy risk management activities | 29 | | 50 |
| Prepayments and other current assets | 90 | | 105 |
| Total current assets | 1,883 | | 1,484 |
| **Property, Plant and Equipment** | | | |
| In service | 1,250 | | 1,287 |
| Under construction | 30 | | 3 |
| Total property, plant and equipment | 1,280 | | 1,290 |
| Less accumulated depreciation | (170) | | (96) |
| Net property, plant and equipment | 1,110 | | 1,194 |
| **Other Assets** | | | |
| Intangible assets, net of accumulated amortization of $66 and $34 | 72 | | 64 |
| Derivative instruments | 196 | | 181 |
| Derivative instruments — affiliate | 60 | | 8 |
| Other non-current assets | 111 | | 32 |
| Total other assets | 439 | | 285 |
| **Total Assets** | $ 3,432 | $ | 2,963 |

See notes to Consolidated Financial Statements.

55

**GENON AMERICAS GENERATION, LLC AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS (Continued)**

| | As of December 31, | |
|---|---|---|
| | 2014 | 2013 |
| | (In millions) | |
| **LIABILITIES AND MEMBER'S EQUITY** | | |
| **Current Liabilities** | | |
| Current portion of long-term debt and capital leases | $ 5 | $ 5 |
| Accounts payable | 50 | 90 |
| Accounts payable — affiliate | 23 | 86 |
| Derivative instruments | 382 | 160 |
| Derivative instruments — affiliate | 292 | 107 |
| Cash collateral received in support of energy risk management activities | 54 | 56 |
| Accrued expenses and other current liabilities | 93 | 93 |
| Total current liabilities | 899 | 597 |
| **Other Liabilities** | | |
| Long-term debt and capital leases | 929 | 943 |
| Derivative instruments | 69 | 18 |
| Derivative instruments — affiliate | 66 | 23 |
| Out-of-market contracts | 547 | 575 |
| Other non-current liabilities | 106 | 116 |
| Total non-current liabilities | 1,717 | 1,675 |
| **Total Liabilities** | 2,616 | 2,272 |
| **Commitments and Contingencies** | | |
| **Member's Equity** | | |
| Member's interest | 816 | 691 |
| Total Member's Equity | 816 | 691 |
| **Total Liabilities and Member's Equity** | $ 3,432 | $ 2,963 |

See notes to Consolidated Financial Statements.

56

.

**GENON AMERICAS GENERATION, LLC AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | For the Year Ended December 31, 2014 | For the Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | | (In millions) |
| **Cash Flows from Operating Activities** | | | | |
| Net income/(loss) | $          305 | $          59 | $          (3) | $          (80) |
| Adjustments to reconcile net income/(loss) to net cash provided/ (used) by operating activities: | | | | |
| Depreciation and amortization | 72 | 95 | 5 | 155 |
| Amortization of financing costs and debt discount/premiums | (9) | (8) | — | — |
| Amortization of out-of-market contracts and emission allowances | (16) | (9) | — | — |
| Loss on disposals and sales of assets | 6 | — | — | — |
| Changes in derivative instruments | 128 | 270 | 12 | 134 |
| Excess materials and supplies inventory reserve | — | — | — | 6 |
| Lower of cost or market inventory adjustments | 9 | — | — | 65 |
| Potomac River settlement obligation and reversal | — | — | — | (32) |
| Large scale remediation and settlement costs | — | — | — | (3) |
| Other, net | (35) | (36) | — | — |
| Cash provided/(used) by changes in other working capital, net of acquisition and disposition effects: | | | | |
| Accounts receivable – trade | 39 | (26) | (16) | 127 |
| Accounts receivable – affiliate | — | — | — | (9) |
| Inventory | (57) | (47) | (4) | (67) |
| Prepayments and other current assets | 15 | (6) | (19) | (23) |
| Accounts payable | (45) | 1 | (50) | (56) |
| Accounts payable - affiliate | 2 | 15 | (40) | 47 |
| Accrued expenses and other current liabilities | 1 | 6 | 20 | 8 |
| Other assets and liabilities | (115) | (4) | (19) | (2) |
| **Net Cash Provided/(Used) by Operating Activities** | 300 | 310 | (114) | 270 |
| **Cash Flows from Investing Activities** | | | | |
| Capital expenditures | (32) | (55) | (4) | (190) |
| Proceeds from sale of assets, net | 50 | — | — | 2 |
| Purchase of emission allowances, net of proceeds | — | (21) | — | — |
| Decrease in restricted cash, net | — | — | — | 197 |
| (Increase)/decrease in notes receivable - affiliate | (32) | (101) | 95 | (211) |
| **Net Cash (Used)/Provided by Investing Activities** | (14) | (177) | 91 | (202) |
| **Cash Flows from Financing Activities** | | | | |
| Payments for short and long-term debt | — | (3) | — | (4) |
| Decrease of notes payable-affiliate | — | — | — | 52 |
| Capital contributions | 74 | 70 | — | 18 |
| Distributions to member | (320) | (285) | — | (230) |
| **Net Cash (Used)/Provided by Financing Activities** | (246) | (218) | — | (164) |
| **Net Increase/(Decrease) in Cash and Cash Equivalents** | 40 | (85) | (23) | (96) |
| **Cash and Cash Equivalents at Beginning of Period** | 63 | 148 | 171 | 267 |
| **Cash and Cash Equivalents at End of Period** | $          103 | $          63 | $          148 | $          171 |
| **Supplemental Disclosures** | | | | |
| Interest paid, net of amount capitalized | $          75 | $          73 | $          — | $          72 |

See notes to Consolidated Financial Statements.

57

**GENON AMERICAS GENERATION, LLC SUBSIDIARIES**

**CONSOLIDATED STATEMENT OF MEMBER'S EQUITY**

| | Member's Interest | | Preferred Stock in Affiliate | | Total Member's Equity | |
|---|---|---|---|---|---|---|
| | | | **(In millions)** | | | |
| **Predecessor** | | | | | | |
| **Balances as of December 31, 2011** | $ | 3,965 | $ | — | $ | 3,965 |
| Net loss | | (80) | | — | | (80) |
| Distributions to member | | (230) | | — | | (230) |
| Capital contributions | | 18 | | — | | 18 |
| **Balances as of December 14, 2012[a]** | $ | 3,673 | $ | — | $ | 3,673 |
| **Successor** | | | | | | |
| **Balances as of December 15, 2012[a]** | $ | 844 | $ | — | $ | 844 |
| Net loss | | (3) | | — | | (3) |
| **Balances as of December 31, 2012** | $ | 841 | $ | — | $ | 841 |
| Net income | | 59 | | — | | 59 |
| Distributions to member | | (279) | | — | | (279) |
| Capital contributions | | 70 | | — | | 70 |
| **Balances as of December 31, 2013** | $ | 691 | $ | — | $ | 691 |
| Net income | | 305 | | — | | 305 |
| Distributions to member | | (320) | | — | | (320) |
| Non-cash capital contributions | | 66 | | — | | 66 |
| Capital contributions | | 74 | | — | | 74 |
| **Balances as of December 31, 2014** | $ | 816 | $ | — | $ | 816 |

(a)   The differences in equity balances at December 14, 2012 and December 15, 2012 are due to the application of pushdown accounting reflecting the NRG Merger.

See notes to Consolidated Financial Statements.

58

.

GENON MID-ATLANTIC, LLC AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | For the Year Ended December 31, 2014 | For the Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | | (In millions) |
| **Operating Revenues** | | | | |
| Operating revenues | $ (62) | $ 7 | $ (3) | $ 143 |
| Operating revenues — affiliate | 1,145 | 872 | 31 | 846 |
| Total operating revenues | 1,083 | 879 | 28 | 989 |
| **Operating Costs and Expenses** | | | | |
| Cost of operations | 678 | 583 | 8 | 202 |
| Cost of operations — affiliate | 50 | 21 | 13 | 592 |
| Depreciation and amortization | 50 | 77 | 4 | 114 |
| Selling, general and administrative | — | 2 | — | 7 |
| Selling, general and administrative — affiliate | 64 | 64 | 2 | 39 |
| Total operating costs and expenses | 842 | 747 | 27 | 954 |
| **Operating Income** | 241 | 132 | 1 | 35 |
| **Other Expense** | | | | |
| Interest expense | (2) | (1) | — | (1) |
| Interest expense — affiliate | (3) | (3) | — | (3) |
| Total other expense | (5) | (4) | — | (4) |
| **Income Before Income Taxes** | 236 | 128 | 1 | 31 |
| Income tax | — | — | — | — |
| **Net Income** | $ 236 | $ 128 | $ 1 | $ 31 |

See notes to Consolidated Financial Statements.

59

**GENON MID-ATLANTIC, LLC AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**

| | As of December 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| | (In millions) | |
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 157 | $ 64 |
| Accounts receivable — trade | 10 | 4 |
| Accounts receivable — affiliate | — | 35 |
| Inventory | 166 | 158 |
| Derivative instruments | 100 | 298 |
| Derivative instruments — affiliate | 141 | 53 |
| Prepayments and other current assets | 80 | 81 |
| Total current assets | 654 | 693 |
| **Property, Plant and Equipment** | | |
| In service | 1,075 | 1,061 |
| Under construction | 18 | 3 |
| Total property, plant and equipment | 1,093 | 1,064 |
| Less accumulated depreciation | (135) | (77) |
| Net property, plant and equipment | 958 | 987 |
| **Other Assets** | | |
| Intangible assets, net of accumulated amortization of $0 and $0 | 10 | 11 |
| Derivative instruments | — | 60 |
| Derivative instruments — affiliate | 141 | 96 |
| Other non-current assets | 87 | 25 |
| Total other assets | 238 | 192 |
| **Total Assets** | $ 1,850 | $ 1,872 |

See notes to Consolidated Financial Statements.

.

**GENON MID-ATLANTIC, LLC AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS (Continued)**

| | As of December 31, | |
|---|---|---|
| | **2014** | **2013** |
| | (In millions) | |
| **LIABILITIES AND MEMBER'S EQUITY** | | |
| **Current Liabilities** | | |
| Current portion of long-term debt and capital leases | $ 5 | $ 5 |
| Accounts payable | 27 | 16 |
| Accounts payable — affiliate | 14 | — |
| Derivative instruments | 1 | — |
| Derivative instruments — affiliate | 127 | 64 |
| Accrued taxes and other current liabilities | 53 | 49 |
| Total current liabilities | 227 | 134 |
| **Other Liabilities** | | |
| Long-term debt and capital leases | — | 5 |
| Derivative instruments — affiliate | 22 | 9 |
| Out-of-market contracts | 547 | 575 |
| Other non-current liabilities | 60 | 71 |
| Total non-current liabilities | 629 | 660 |
| **Total Liabilities** | 856 | 794 |
| **Commitments and Contingencies** | | |
| **Member's Equity** | | |
| Member's interest | 994 | 1,078 |
| Total Member's Equity | 994 | 1,078 |
| **Total Liabilities and Member's Equity** | $ 1,850 | $ 1,872 |

See notes to Consolidated Financial Statements.

.

**GENON MID-ATLANTIC, LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | For the Year Ended December 31, 2014 | For the Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | | (In millions) |
| **Cash Flows from Operating Activities** | | | | |
| Net income | $ 236 | $ 128 | $ 1 | $ 31 |
| Adjustments to reconcile net income to net cash provided/ (used) by operating activities: | | | | |
| Depreciation and amortization | 50 | 77 | 4 | 114 |
| Loss on disposals and sales of assets | — | 7 | — | — |
| Amortization of out-of-market contracts and emission allowances | 1 | (11) | — | — |
| Changes in derivative instruments | 202 | 260 | 7 | 115 |
| Excess materials and supplies inventory reserve | — | — | — | 4 |
| Lower of cost or market inventory adjustments | — | — | — | 65 |
| Potomac River settlement obligation and reversal | — | — | — | (32) |
| Large scale remediation and settlement costs | — | — | — | (3) |
| Cash provided/(used) by changes in other working capital, net of acquisition and disposition effects: | | | | |
| Accounts receivable - trade | (6) | — | (2) | 22 |
| Accounts receivable - affiliate | — | — | — | 10 |
| Inventory | (8) | (21) | (4) | (46) |
| Prepayments and other current assets | 34 | (69) | (32) | (16) |
| Accounts payable | 8 | — | 2 | 44 |
| Accounts payable - affiliate | 14 | — | — | (7) |
| Accrued expenses and other current liabilities | 4 | (8) | 15 | — |
| Other assets and liabilities | (106) | (102) | (16) | (11) |
| **Net Cash Provided/(Used) by Operating Activities** | $ 429 | 261 | (25) | 290 |
| **Cash Flows from Investing Activities** | | | | |
| Capital expenditures | (16) | (44) | (3) | (159) |
| Proceeds from the sales of assets | — | — | — | 1 |
| Decrease in restricted cash, net | — | — | — | 197 |
| **Net Cash (Used)/Provided by Investing Activities** | (16) | (44) | (3) | 39 |
| **Cash Flows from Financing Activities** | | | | |
| Payments for short and long-term debt | — | (3) | — | (4) |
| Distributions to member | (320) | (285) | — | (230) |
| **Net Cash Used by Financing Activities** | (320) | (288) | — | (234) |
| **Net Increase/(Decrease) in Cash and Cash Equivalents** | 93 | (71) | (28) | 95 |
| **Cash and Cash Equivalents at Beginning of Period** | 64 | 135 | 163 | 68 |
| **Cash and Cash Equivalents at End of Period** | $ 157 | $ 64 | $ 135 | $ 163 |

See notes to Consolidated Financial Statements.

62

.

**GENON MID-ATLANTIC, LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENT OF MEMBER'S EQUITY**

| | Member's Interest | | Preferred Stock in Affiliate | | Total Member's Equity | |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| **Predecessor** | | | | | | |
| **Balances as of December 31, 2011** | $ | 3,927 | $ | — | $ | 3,927 |
| Net income | | 31 | | — | | 31 |
| Distributions to member | | (230) | | — | | (230) |
| **Balances as of December 14, 2012**[(a)] | $ | 3,728 | $ | — | $ | 3,728 |
| **Successor** | | | | | | |
| **Balances as of December 15, 2012**[(a)] | $ | 1,234 | $ | — | $ | 1,234 |
| Net income | | 1 | | — | | 1 |
| **Balances as of December 31, 2012** | $ | 1,235 | $ | — | $ | 1,235 |
| Net income | | 128 | | — | | 128 |
| Distributions to member | | (285) | | — | | (285) |
| **Balances as of December 31, 2013** | $ | 1,078 | $ | — | $ | 1,078 |
| Net income | | 236 | | — | | 236 |
| Distributions to member | | (320) | | — | | (320) |
| **Balances as of December 31, 2014** | $ | 994 | $ | — | $ | 994 |

(a)   The differences in equity balances at December 14, 2012 and December 15, 2012 are due to the application of pushdown accounting reflecting the NRG Merger.

See notes to Consolidated Financial Statements.

63

.

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1 — Nature of Business (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

### General

GenOn Energy, Inc., a wholly owned subsidiary of NRG, is a wholesale generator engaged in the ownership and operation of power generation facilities, with approximately 19,529 MW of net electric generating capacity located in the U.S.

GenOn Americas Generation is a wholesale generator with approximately 7,596 MW of net electric generating capacity located, in many cases, near major metropolitan areas. GenOn Americas Generation's electric generating capacity is part of the 19,529 MW of net electric generating capacity of GenOn.

GenOn Mid-Atlantic operates and owns or leases 4,683 MW of net electric generating capacity in Maryland, near Washington, D.C. GenOn Mid-Atlantic's electric generating capacity is part of the 7,596 MW of net electric generating capacity of GenOn Americas Generation. GenOn Mid-Atlantic's generating facilities serve the Eastern PJM markets.

GenOn Americas Generation and GenOn Mid-Atlantic are Delaware limited liability companies and indirect wholly owned subsidiaries of GenOn. GenOn Mid-Atlantic is a wholly owned subsidiary of NRG North America and an indirect wholly owned subsidiary of GenOn Americas Generation.

GenOn's generation facilities consist of baseload, intermediate and peaking power generation facilities. The following table summarizes the generation portfolio by Registrant:

| | (In MW) | | |
| Generation Type | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| Natural gas | 11,730 | 3,729 | 1,942 |
| Coal | 5,740 | 2,433 | 2,433 |
| Oil | 2,059 | 1,434 | 308 |
| Total generation capacity | 19,529 | 7,596 | 4,683 |

The Registrants sell power from their generation portfolio and offer capacity or similar products to retail electric providers and others, and provide ancillary services to support system reliability.

### NRG Merger

On December 14, 2012, NRG completed the acquisition of GenOn with GenOn continuing as a wholly owned subsidiary of NRG. The NRG Merger is accounted for under the acquisition method of accounting. Fair value adjustments related to the NRG Merger have been pushed down to GenOn, GenOn Americas Generation and GenOn Mid-Atlantic, resulting in certain assets and liabilities of the Registrants being recorded at fair value at December 15, 2012. See Note 3, *NRG Merger and Dispositions,* for further discussion.

The Registrants' consolidated statements of operations subsequent to the NRG Merger include amortization expense relating to fair value adjustments and depreciation expense based on the fair value of the Registrants' property, plant and equipment. In addition, effective with the NRG Merger, the Registrants adopted accounting policies of NRG. Therefore, the Registrants' financial information prior to the NRG Merger is not comparable to its financial information subsequent to the NRG Merger.

As a result of the impact of pushdown accounting, the financial statements and certain note presentations separate the Registrants' presentations into two distinct periods, the period before the consummation of the NRG Merger (labeled predecessor) and the period after that date (labeled successor), to indicate the application of different basis of accounting between the periods presented.

**Note 2 — Summary of Significant Accounting Policies (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*Basis of Presentation and Principles of Consolidation*

This is a combined annual report of the Registrants. The notes to the consolidated financial statements apply to the Registrants as indicated parenthetically next to each corresponding disclosure.

The Registrants' consolidated financial statements have been prepared in accordance with U.S. GAAP. The ASC, established by the FASB, is the source of authoritative U.S. GAAP to be applied by nongovernmental entities. In addition, the rules and interpretative releases of the SEC under authority of federal securities laws are also sources of authoritative U.S. GAAP for SEC registrants.

The consolidated financial statements include the Registrants' accounts and operations and those of their subsidiaries in which the Registrants have a controlling interest. All significant intercompany transactions and balances have been eliminated in consolidation. The usual condition for a controlling financial interest is ownership of a majority of the voting interests of an entity. However, a controlling financial interest may also exist through arrangements that do not involve controlling voting interests. As such, the Registrants apply the guidance of ASC 810, *Consolidations,* or ASC 810, to determine when an entity that is insufficiently capitalized or not controlled through its voting interests, referred to as a VIE, should be consolidated.

*Predecessor and Successor Reporting*

On December 14, 2012, NRG completed the acquisition of GenOn with GenOn continuing as a wholly owned subsidiary of NRG. The NRG Merger is accounted for under the acquisition method of accounting. Fair value adjustments related to the NRG Merger have been pushed down to GenOn, GenOn Americas Generation, and GenOn Mid-Atlantic, resulting in certain assets and liabilities of the Registrants being recorded at fair value at December 15, 2012. See Note 3, *NRG Merger and Dispositions,* for further discussion.

The Registrants' consolidated statements of operations subsequent to the NRG Merger include amortization expense relating to fair value adjustments and depreciation expense based on the fair value of the Registrants' property, plant and equipment. In addition, effective with the NRG Merger, the Registrants adopted accounting policies of NRG. Therefore, the Registrants' financial information prior to the NRG Merger is not comparable to its financial information subsequent to the NRG Merger.

As a result of the impact of pushdown accounting, the financial statements and certain note presentations separate the Registrants' presentations into two distinct periods, the period before the consummation of the NRG Merger (labeled predecessor) and the period after that date (labeled successor), to indicate the application of different basis of accounting between the periods presented.

*Cash and Cash Equivalents*

Cash and cash equivalents include highly liquid investments with an original maturity of three months or less at the time of purchase.

*Funds Deposited by Counterparties (GenOn)*

Funds deposited by counterparties consist of cash held by GenOn as a result of collateral posting obligations from GenOn's counterparties. Some amounts are segregated into separate accounts that are not contractually restricted but, based on GenOn's intentions, are not available for the payment of general corporate obligations. Depending on market fluctuations and the settlement of the underlying contracts, GenOn will refund this collateral to the hedge counterparties pursuant to the terms and conditions of the underlying trades. Since collateral requirements fluctuate daily and GenOn cannot predict if any collateral will be held for more than twelve months, the funds deposited by counterparties are classified as a current asset on GenOn's balance sheets, with an offsetting liability for this cash collateral received within current liabilities. Changes in funds deposited by counterparties are closely associated with GenOn's operating activities and are classified as an operating activity in GenOn's consolidated statements of cash flows.

*Restricted Cash*

Restricted cash consists primarily of funds held to satisfy the requirements of certain debt agreements and funds held within the Registrants' projects that are restricted in their use. These funds are used to pay for current operating expenses and current debt service payments.

*Inventory*

Inventory is valued at the lower of weighted average cost or market, and consists principally of fuel oil, coal and raw materials used to generate electricity or steam. The Registrants remove these inventories as they are used in the production of electricity or steam. Spare parts inventory is valued at a weighted average cost, since the Registrants expect to recover these costs in the ordinary course of business. The Registrants remove these inventories when they are used for repairs, maintenance or capital projects. Sales of inventory are classified as an operating activity in the consolidated statements of cash flows. During the year ended December 31, 2014, the Registrants recorded a lower of weighted average cost or market adjustment related to fuel oil of $12 million related to GenOn, of which $9 million relates to GenOn Americas Generation and GenOn Mid-Atlantic.

*Property, Plant and Equipment*

Property, plant and equipment are stated at cost; however impairment adjustments are recorded whenever events or changes in circumstances indicate that their carrying values may not be recoverable. Significant additions or improvements extending asset lives are capitalized as incurred, while repairs and maintenance that do not improve or extend the life of the respective asset are charged to expense as incurred. Depreciation is computed using the straight-line method over the estimated useful lives. Certain assets and their related accumulated depreciation amounts are adjusted for asset retirements and disposals with the resulting gain or loss included in cost of operations in the consolidated statements of operations.

*Asset Impairments*

Long-lived assets that are held and used are reviewed for impairment whenever events or changes in circumstances indicate carrying values may not be recoverable. Such reviews are performed in accordance with ASC 360, *Property, Plant and Equipment*. An impairment loss is recognized if the total future estimated undiscounted cash flows expected from an asset are less than its carrying value. An impairment charge is measured by the difference between an asset's carrying amount and fair value with the difference recorded in operating costs and expenses in the statements of operations. Fair values are determined by a variety of valuation methods, including appraisals, sales prices of similar assets and present value techniques.

For further discussion of these matters, refer to Note 9, *Impairments*.

*Project Development Costs and Capitalized Interest (GenOn and GenOn Americas Generation)*

Project development costs are expensed in the preliminary stages of a project and capitalized when the project is deemed to be commercially viable. Commercial viability is determined by one or a series of actions including, among others, Board of Director approval pursuant to a formal project plan that subjects the Registrants to significant future obligations that can only be discharged by the use of an asset of the Registrants.

Interest incurred on funds borrowed to finance capital projects is capitalized until the project under construction is ready for its intended use. The amounts of interest capitalized were as follows:

| | Successor | | | Predecessor |
| | Year Ended December 31, 2014 | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | | (In millions) |
| GenOn | $        11 | $        21 | $        2 | $        35 |
| GenOn Americas Generation | 1 | 2 | — | 3 |

When a project is available for operations, capitalized interest and project development costs are reclassified to property, plant and equipment and amortized on a straight-line basis over the estimated useful life of the project's related assets. Capitalized costs are charged to expense if a project is abandoned or management otherwise determines the costs to be unrecoverable.

*Intangible Assets*

Intangible assets represent contractual rights held by the Registrants. The Registrants recognize specifically identifiable intangible assets when specific rights and contracts are acquired. As of December 31, 2014 and 2013, the Registrants' intangible assets are comprised of $SO_2$ emission allowances and $CO_2$ emission credits held for compliance with RGGI that are held-for-use and are amortized to cost of operations based on straight line or units of production basis. The following table presents the Registrants' amortization of intangible assets for each of the past three years:

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | Year Ended December 31, 2014 | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | | (In millions) |
| GenOn | $ 38 | $ 25 | $ 1 | $ 5 |
| GenOn Americas Generation | 33 | 21 | 1 | 3 |
| GenOn Mid-Atlantic | 29 | 18 | — | — |

The following table presents estimated amortization of the Registrants' intangible assets for each of the next five years:

| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| | | (In millions) | |
| 2015 | $ 44 | $ 44 | $ 35 |
| 2016 | 46 | 46 | 39 |
| 2017 | 46 | 46 | 40 |
| 2018 | 44 | 44 | 39 |
| 2019 | 43 | 43 | 38 |

Emission allowances held-for-sale, which are included in other non-current assets on the Registrants' consolidated balance sheets, are not amortized; they are carried at the lower of cost or fair value and reviewed for impairment in accordance with ASC 360, *Property, Plant, and Equipment*.

*Out of Market Contracts*

In connection with the NRG Merger, acquired out-of-market contracts were pushed down to the Registrants, as applicable, and primarily relate to GenOn Mid-Atlantic and REMA leases and long-term natural gas transportation and storage contracts. These out-of-market contracts are amortized to operating revenues and cost of operations, as applicable, based on the nature of the contracts and over their contractual lives. The following table presents the Registrants' amortization of out-of-market contracts for each of the past three years:

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | Year Ended December 31, 2014 | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | | (In millions) |
| GenOn | $ 78 | $ 75 | $ 2 | $ 67 |
| GenOn Americas Generation | 28 | 28 | 1 | — |
| GenOn Mid-Atlantic | 28 | 28 | 1 | — |

The following table summarizes the estimated amortization related to the Registrants' out-of-market contracts:

| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| | | (In millions) | |
| 2015 | $ 76 | $ 28 | $ 28 |
| 2016 | 81 | 28 | 28 |
| 2017 | 76 | 28 | 28 |
| 2018 | 71 | 28 | 28 |
| 2019 | 68 | 28 | 28 |

**Income Taxes**

*GenOn*

GenOn is a wholly owned subsidiary of NRG that exists as a corporate regarded entity for income tax purposes. As a result, GenOn, NRG Americas and NRG have direct liability for the majority of the federal and state income taxes resulting from GenOn's operations. GenOn has allocated income taxes as if it were a single consolidated taxpayer using the liability method in accordance with ASC 740, which requires that GenOn use the asset and liability method of accounting for deferred income taxes and provide deferred income taxes for all significant temporary differences.

GenOn has two categories of income tax expense or benefit - current and deferred, as follows:

• Current income tax expense or benefit consists solely of current taxes payable less applicable tax credits, and

• Deferred income tax expense or benefit is the change in the net deferred income tax asset or liability, excluding amounts charged or credited to accumulated other comprehensive income.

GenOn reports some of its revenues and expenses differently for financial statement purposes than for income tax return purposes, resulting in temporary and permanent differences between its financial statements and income tax returns. The tax effects of such temporary differences are recorded as either deferred income tax assets or deferred income tax liabilities in GenOn's consolidated balance sheets. GenOn measures its deferred income tax assets and deferred income tax liabilities using income tax rates that are currently in effect. A valuation allowance is recorded to reduce GenOn's net deferred tax assets to an amount that is more-likely-than-not to be realized.

The determination of a valuation allowance requires significant judgment as to the generation of taxable income during future periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn's past and anticipated future performance, the reversal of deferred tax liabilities and the implementation of tax planning strategies.

GenOn accounts for uncertain tax positions in accordance with ASC 740, which applies to all tax positions related to income taxes. Under ASC 740, tax benefits are recognized when it is more-likely-than-not that a tax position will be sustained upon examination by the authorities. The benefit recognized from a position that has surpassed the more-likely-than-not threshold is the largest amount of benefit that is more than 50% likely to be realized upon settlement. GenOn recognizes interest and penalties accrued related to uncertain tax benefits as a component of income tax expense.

*GenOn Americas Generation*

GenOn Americas Generation and most of its subsidiaries are limited liability companies that are treated as branches of GenOn Americas for income tax purposes. As a result, NRG Americas, GenOn and NRG have direct liability for the majority of the federal and state income taxes relating to GenOn Americas Generation's operations. Several of GenOn Americas Generation's subsidiaries exist as regarded corporate entities for income tax purposes. For the subsidiaries that continue to exist as corporate regarded entities, GenOn Americas Generation allocates current and deferred income taxes to each corporate regarded entity as if such entity were a single taxpayer utilizing the asset and liability method to account for income taxes.

GenOn Americas Generation reports some of its revenues and expenses differently for financial statement purposes than for income tax return purposes, resulting in temporary and permanent differences between its financial statements and income tax returns. The tax effects of such temporary differences are recorded as either deferred income tax assets or deferred income tax liabilities in GenOn Americas Generation's consolidated balance sheets. GenOn Americas Generation measures its deferred income tax assets and deferred income tax liabilities using income tax rates that are currently in effect. A valuation allowance is recorded to reduce GenOn Americas Generation's net deferred tax assets to an amount that is more-likely-than-not to be realized.

The determination of a valuation allowance requires significant judgment as to the generation of taxable income during future periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn Americas Generation's past and anticipated future performance, the reversal of deferred tax liabilities and the implementation of tax planning strategies.

GenOn Americas Generation accounts for uncertain tax positions in accordance with ASC 740, which applies to all tax positions related to income taxes. Under ASC 740, tax benefits are recognized when it is more-likely-than-not that a tax position will be sustained upon examination by the authorities. The benefit recognized from a position that has surpassed the more-likely-than-not threshold is the largest amount of benefit that is more than 50% likely to be realized upon settlement. GenOn Americas Generation recognizes interest and penalties accrued related to uncertain tax benefits as a component of income tax expense.

*GenOn Mid-Atlantic*

GenOn Mid-Atlantic and GenOn Mid-Atlantic's subsidiaries are limited liability companies that are treated as branches of NRG Americas for income tax purposes. As such, GenOn, NRG Americas and NRG have direct liability for the majority of the federal and state income taxes relating to GenOn Mid-Atlantic's operations.

### Revenue Recognition

*Energy* — Both physical and financial transactions are entered into to optimize the financial performance of the Registrants' generating facilities. Electric energy revenue is recognized upon transmission to the customer. Physical transactions, or the sale of generated electricity to meet supply and demand, are recorded on a gross basis in the Registrants' consolidated statements of operations. Financial transactions, or the buying and selling of energy for trading purposes, are recorded net within operating revenues in the consolidated statements of operations in accordance with ASC 815.

*Capacity* — Capacity revenues are recognized when contractually earned, and consist of revenues billed to a third party at either the market or a negotiated contract price for making installed generation capacity available in order to satisfy system integrity and reliability requirements.

*Natural Gas Sales (GenOn and GenOn Americas Generation)* — GenOn and GenOn Americas Generation record revenues from the sales of natural gas under the accrual method.  These sales are sold at market-based prices.  Sales that have been delivered but not billed by period end are estimated.

*PPAs (GenOn and GenOn Americas Generation)* — Certain of GenOn and GenOn Americas Generation's revenues are currently obtained through PPAs or other contractual arrangements. All of these PPAs are accounted for as operating leases in accordance with ASC 840, *Leases*, or ASC 840. ASC 840 requires minimum lease payments received to be amortized over the term of the lease and contingent rentals are recorded when the achievement of the contingency becomes probable. These leases have no minimum lease payments and all the rent is recorded as contingent rent on an actual basis when the electricity is delivered.

### Derivative Financial Instruments

The Registrants account for derivative financial instruments under ASC 815, which requires the Registrants to record all derivatives on the balance sheet at fair value unless they qualify for a NPNS exception. Changes in the fair value of non-hedge derivatives are immediately recognized in earnings. Changes in the fair value of derivatives accounted for as hedges, if elected for hedge accounting, are either:

- Recognized in earnings as an offset to the changes in the fair value of the related hedged assets, liabilities and firm commitments; and

- Deferred and recorded as a component of accumulated OCI until the hedge transactions occur and are recognized in earnings.

The Registrants' primary derivative instruments are financial power and natural gas contracts, fuels purchase contracts, other energy related commodities, and interest rate instruments used to mitigate variability in earnings due to fluctuations in market prices and interest rates. On an ongoing basis, the Registrants assess the effectiveness of all derivatives that are designated as hedges for accounting purposes in order to determine that each derivative continues to be highly effective in offsetting changes in fair values or cash flows of hedged items. Internal analyses that measure the statistical correlation between the derivative and the associated hedged item determine the effectiveness of such a contract designated as a hedge. If it is determined that the derivative instrument is not highly effective as a hedge, hedge accounting will be discontinued prospectively. If the derivative instrument is terminated, the effective portion of this derivative deferred in accumulated OCI will be frozen until the underlying hedged item is delivered

Revenues and expenses on contracts that qualify for the NPNS exception are recognized when the underlying physical transaction is delivered. While these contracts are considered derivative financial instruments under ASC 815, they are not recorded at fair value, but on an accrual basis of accounting. If it is determined that a transaction designated as NPNS no longer meets the scope exception, the fair value of the related contract is recorded on the balance sheet and immediately recognized through earnings.

The Registrants' trading activities are subject to limits in accordance with the Risk Management Policy. These contracts are recognized on the balance sheet at fair value and changes in the fair value of these derivative financial instruments are recognized in earnings.

*Concentrations of Credit Risk*

Financial instruments which potentially subject the Registrants to concentrations of credit risk consist primarily of accounts receivable and derivatives. Certain accounts receivable and derivative instruments are concentrated within entities engaged in the energy industry. These industry concentrations may impact the Registrants' overall exposure to credit risk, either positively or negatively, in that the customers may be similarly affected by changes in economic, industry or other conditions. Receivables and other contractual arrangements are subject to collateral requirements under the terms of enabling agreements. However, the Registrants believe that the credit risk posed by industry concentration is offset by the diversification and creditworthiness of the Registrants' customer base. See Note 4, *Fair Value of Financial Instruments,* for a further discussion of derivative concentrations.

*Fair Value of Financial Instruments*

The carrying amount of cash and cash equivalents, funds deposited by counterparties, receivables, accounts payable, and accrued liabilities approximate fair value because of the short-term maturity of these instruments. See Note 4, *Fair Value of Financial Instruments*, for a further discussion of fair value of financial instruments.

*Asset Retirement Obligations*

The Registrants account for their AROs in accordance with ASC 410-20, *Asset Retirement Obligations,* or ASC 410-20. Retirement obligations associated with long-lived assets included within the scope of ASC 410-20 are those for which a legal obligation exists under enacted laws, statutes, and written or oral contracts, including obligations arising under the doctrine of promissory estoppel, and for which the timing and/or method of settlement may be conditional on a future event. ASC 410-20 requires an entity to recognize the fair value of a liability for an ARO in the period in which it is incurred and a reasonable estimate of fair value can be made.

Upon initial recognition of a liability for an ARO, the Registrants capitalize the asset retirement cost by increasing the carrying amount of the related long-lived asset by the same amount. Over time, the liability is accreted to its future value, while the capitalized cost is depreciated over the useful life of the related asset. See Note 11, *Asset Retirement Obligations,* for a further discussion of AROs.

*Pensions (GenOn)*

GenOn offers pension benefits through defined benefit pension plans. In addition, GenOn provides postretirement health and welfare benefits for certain groups of employees. GenOn accounts for pension and other postretirement benefits in accordance with ASC 715, *Compensation — Retirement Benefits*. GenOn recognizes the funded status of its defined benefit plans in the statement of financial position and records an offset for gains and losses as well as all prior service costs that have not been included as part of GenOn's net periodic benefit cost to other comprehensive income. The determination of GenOn's obligation and expenses for pension benefits is dependent on the selection of certain assumptions. These assumptions determined by management include the discount rate, the expected rate of return on plan assets and the rate of future compensation increases. GenOn's actuarial consultants determine assumptions for such items as retirement age. The assumptions used may differ materially from actual results, which may result in a significant impact to the amount of pension obligation or expense recorded by GenOn.

GenOn measures the fair value of its pension assets in accordance with ASC 820, *Fair Value Measurements and Disclosures,* or ASC 820.

*Business Combinations*

The Registrants account for the business combinations in accordance with ASC 805, *Business Combinations,* or ASC 805. ASC 805 requires an acquirer to recognize and measure in its financial statements the identifiable assets acquired, the liabilities assumed, and any noncontrolling interest in the acquiree at fair value at the acquisition date. It also recognizes and measures the goodwill acquired or a gain from a bargain purchase in the business combination and determines what information to disclose to enable users of an entity's financial statements to evaluate the nature and financial effects of the business combination. In addition, transaction costs are expensed as incurred.

*Use of Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements, disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from these estimates. Certain prior year depreciation amounts have been recast to revise provisional purchase accounting estimates for the GenOn acquisition.

In recording transactions and balances resulting from business operations, the Registrants use estimates based on the best information available. Estimates are used for such items as plant depreciable lives, tax provisions, actuarially determined benefit costs, the valuation of energy commodity contracts, environmental liabilities, legal costs incurred in connection with recorded loss contingencies, and assets acquired and liabilities assumed in business combinations, among others. In addition, estimates are used to test long-lived assets for impairment and to determine the fair value of impaired assets. As better information becomes available or actual amounts are determinable, the recorded estimates are revised. Consequently, operating results can be affected by revisions to prior accounting estimates.

### Reclassifications

Certain prior-year amounts have been reclassified for comparative purposes. The reclassifications did not affect results from operations. The Registrants reclassified certain balances from cash and cash equivalents to funds deposited by counterparties, which impacted cash flows from operations in the prior years.

### Recent Accounting Developments

*ASU 2014-16* - In November 2014, the FASB issued ASU No. 2014-16, *Derivatives and Hedging (Topic 815): Determining Whether the Host Contract in a Hybrid Financial Instrument Issued in the Form of a Share Is More Akin to Debt or to Equity*, or ASU No. 2014-16. The amendments of ASU No. 2014-16 clarify how U.S. GAAP should be applied in determining whether the nature of a host contract is more akin to debt or equity and in evaluating whether the economic characteristics and risks of an embedded feature are "clearly and closely related" to its host contract. The guidance in ASU No. 2014-16 is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2015. Early adoption is permitted. The Registrants are currently evaluating the impact of the standard on the Registrants' results of operations, cash flows and financial position.

*ASU 2014-09* - In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers (Topic 606)*, or ASU No. 2014-09. The amendments of ASU No. 2014-09 complete the joint effort between the FASB and the International Accounting Standards Board, IASB, to develop a common revenue standard for U.S. GAAP and International Financial Reporting Standards, or IFRS, and to improve financial reporting. The guidance in ASU No. 2014-09 provides that an entity should recognize revenue to depict the transfer of goods or services provided and establishes the following steps to be applied by an entity: (1) identify the contract with a customer; (2) identify the performance obligations in the contract; (3) determine the transaction price; (4) allocate the transaction price to the performance obligations in the contract; and (5) recognize revenue when (or as) the entity satisfies the performance obligation. The guidance of ASU No. 2014-09 is effective for annual reporting periods beginning after December 15, 2016, including interim periods therein. Early adoption is not permitted. The Registrants are currently evaluating the impact of the standard on the Registrants' results of operations, cash flows and financial position.

*ASU 2013-11* - In July 2013, the FASB issued ASU No. 2013-11, *Income Taxes (Topic 740) Presentation of an Unrecognized Tax Benefit When a Net Operating Loss Carryforward, a Similar Tax Loss, or a Tax Credit Carryforward Exists*, or ASU No. 2013-11. The amendments of ASU No. 2013-11, which were adopted on January 1, 2014, require an entity to present an unrecognized tax benefit, or a portion of an unrecognized tax benefit, as a reduction of a deferred tax asset for a net operating loss, or NOL, a similar tax loss or tax credit carryforwards rather than a liability when the uncertain tax position would reduce the NOL or other carryforward under the tax law of the applicable jurisdiction and the entity intends to use the deferred tax asset for that purpose. The adoption of this standard did not impact the Registrants' results of operations or cash flows.

71

**Note 3 — NRG Merger and Dispositions (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*Sabine Disposition (GenOn)*

On December 2, 2014, GenOn, through its subsidiaries GenOn Sabine (Delaware), Inc. and GenOn Sabine (Texas), Inc., completed the sale of its 50% interest in Sabine Cogen, L.P., or Sabine, to Bayou Power, LLC, an affiliate of Rockland Capital, LLC. Sabine owns a 105 MW natural gas-fired cogeneration facility located in Texas. GenOn received cash consideration of $35 million at closing. A gain of $18 million was recognized as a result of the transaction and recorded within GenOn's consolidated statements of operations.

*Kendall Disposition (GenOn and GenOn Americas Generation)*

On January, 31, 2014, NRG North America LLC, a wholly owned subsidiary of GenOn Americas Generations, completed the sale of NRG Kendall LLC to Veolia Energy North America Holdings, Inc. for cash consideration of $50 million. There was a $6 million loss recorded in the consolidated results of operations of GenOn and GenOn Americas Generation during the first quarter of 2014.

*NRG Merger (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)*

On December 14, 2012, NRG completed the acquisition of GenOn. Consideration for the acquisition was valued at $2.2 billion and was comprised of 0.1216 shares of NRG common stock for each outstanding share of GenOn, including restricted stock units outstanding on the acquisition date, except for fractional shares which were paid in cash.

The acquisition was recorded as a business combination, with identifiable assets acquired and liabilities assumed provisionally recorded at their estimated fair values on the acquisition date. The accounting for the business combination has been completed as of December 13, 2013. See Note 3, *NRG Merger*, in the Registrants' Form 10-K for the year ended December 31, 2012 for additional information related to the NRG Merger.

The following tables summarize the historical carrying amounts, the acquisition accounting adjustments, the preliminary acquisition-date fair value and the measurement period adjustments through December 13, 2013 to the provisional allocation for assets acquired and liabilities assumed initially recorded in 2012 due to the ongoing evaluation of initial estimates during the measurement period.

*GenOn*

| | Historical carrying amount | | Acquisition accounting adjustment | | Acquisition-date fair value as reported in 2012 10-K | | Measurement period adjustments | | Revised acquisition-date fair value as reported in 2013 10-K |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (In millions) | | | | |
| **Assets** | | | | | | | | | |
| Cash | $ | 983 | $ | — | $ | 983 | $ | — | $ | 983 |
| Other current and non-current assets | | 2,049 | | (664) | | 1,385 | | 28 | | 1,413 |
| Property, plant and equipment | | 6,286 | | (2,350) | | 3,936 | | (115) | | 3,821 |
| Derivative assets | | 1,143 | | 14 | | 1,157 | | — | | 1,157 |
| Deferred income taxes | | 220 | | — | | 220 | | — | | 220 |
| Total assets | $ | 10,681 | $ | (3,000) | $ | 7,681 | $ | (87) | $ | 7,594 |
| **Liabilities** | | | | | | | | | |
| Other current and non-current liabilities | $ | 1,299 | $ | 13 | $ | 1,312 | $ | 54 | $ | 1,366 |
| Out-of-market contracts and leases | | 331 | | 733 | | 1,064 | | 62 | | 1,126 |
| Derivative liabilities | | 414 | | (15) | | 399 | | — | | 399 |
| Deferred income taxes | | 220 | | — | | 220 | | — | | 220 |
| Long-term debt and capital leases | | 3,725 | | 478 | | 4,203 | | 3 | | 4,206 |
| Total liabilities | $ | 5,989 | $ | 1,209 | $ | 7,198 | $ | 119 | $ | 7,317 |
| Net assets | $ | 4,692 | $ | (4,209) | $ | 483 | $ | (206) | $ | 277 |

*GenOn Americas Generation*

| | Historical carrying amount | | Acquisition accounting adjustment | | Acquisition-date fair value as reported in 2012 10-K | | Measurement period adjustments | | Revised acquisition-date fair value as reported in 2013 10-K |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (In millions) | | | | |
| **Assets** | | | | | | | | | |
| Cash | $ | 171 | $ | — | $ | 171 | $ | — | $ | 171 |
| Other current and non-current assets | | 1,509 | | (531) | | 978 | | 31 | | 1,009 |
| Property, plant and equipment | | 2,875 | | (1,546) | | 1,329 | | (106) | | 1,223 |
| Derivative assets | | 1,226 | | 12 | | 1,238 | | — | | 1,238 |
| Total assets | $ | 5,781 | $ | (2,065) | $ | 3,716 | $ | (75) | $ | 3,641 |
| **Liabilities** | | | | | | | | | |
| Other current and non-current liabilities | $ | 705 | $ | (34) | $ | 671 | $ | 32 | $ | 703 |
| Out-of-market contracts and leases | | — | | 540 | | 540 | | 64 | | 604 |
| Derivative liabilities | | 539 | | (10) | | 529 | | — | | 529 |
| Long-term debt and capital leases | | 862 | | 99 | | 961 | | — | | 961 |
| Total liabilities | $ | 2,106 | $ | 595 | $ | 2,701 | $ | 96 | $ | 2,797 |
| Net assets | $ | 3,675 | $ | (2,660) | $ | 1,015 | $ | (171) | $ | 844 |

*GenOn Mid-Atlantic*

| | Historical carrying amount | | Acquisition accounting adjustment | | Acquisition-date fair value as reported in 2012 10-K | | Measurement period adjustments | | Revised acquisition-date fair value as reported in 2013 10-K |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (In millions) | | | | |
| **Assets** | | | | | | | | | |
| Cash | $ | 163 | $ | — | $ | 163 | $ | — | $ | 163 |
| Other current and non-current assets | | 700 | | (502) | | 198 | | (1) | | 197 |
| Property, plant and equipment | | 2,399 | | (1,178) | | 1,221 | | (199) | | 1,022 |
| Derivative assets | | 851 | | 12 | | 863 | | — | | 863 |
| Total assets | $ | 4,113 | $ | (1,668) | $ | 2,445 | $ | (200) | $ | 2,245 |
| **Liabilities** | | | | | | | | | |
| Other current and non-current liabilities | $ | 198 | $ | 6 | $ | 204 | $ | 27 | $ | 231 |
| Out-of-market contracts and leases | | — | | 540 | | 540 | | 64 | | 604 |
| Derivative liabilities | | 172 | | (10) | | 162 | | — | | 162 |
| Long-term debt and capital leases | | 14 | | — | | 14 | | — | | 14 |
| Total liabilities | $ | 384 | $ | 536 | $ | 920 | $ | 91 | $ | 1,011 |
| Net assets | $ | 3,729 | $ | (2,204) | $ | 1,525 | $ | (291) | $ | 1,234 |

The estimated fair values of the property, plant and equipment were significantly lower than the book value, which reflects changes to expected market dynamics, including commodity prices, resulting in lower estimated cash flows and in some cases, shorter useful lives of the underlying assets. The measurement period adjustments for property, plant and equipment and out-of-market liabilities primarily reflect revisions of various estimates based on additional information available. In addition, measurement period adjustments were recorded for additional environmental reserves resulting from further review and revisions to various estimates. The difference between the historical tax basis of the assets and liabilities over the net amount assigned to the assets and liabilities in acquisition accounting was recorded as a net deferred tax asset. Based on cumulative pre-tax losses, a valuation allowance for the full amount of the net deferred tax assets was also recorded.

**Note 4 — Fair Value of Financial Instruments (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

For cash and cash equivalents, funds deposited by counterparties, accounts receivable, accounts payable, accrued liabilities, restricted cash, and cash collateral paid and received in support of energy risk management activities, the carrying amount approximates fair value because of the short-term maturity of those instruments and are classified as Level 1 within the fair value hierarchy.

The estimated carrying values and fair values of GenOn and GenOn Americas Generation's debt are as follows:

*GenOn*

| | As of December 31, | | | |
| | 2014 | | 2013 | |
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| | (In millions) | | | |
| **Liabilities** | | | | |
| Long and short-term debt | $      3,122 | $      2,706 | $      3,120 | $      3,058 |

The fair value of long and short-term debt that is estimated using reported market prices for instruments that are publicly traded is classified as Level 2 within the fair value hierarchy. The fair value of non-publicly traded debt is based on the income approach valuation technique using current interest rates for similar instruments with equivalent credit quality and is classified as Level 3 within the fair value hierarchy.

*GenOn Americas Generation*

| | As of December 31, | | | |
| | 2014 | | 2013 | |
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| | (In millions) | | | |
| **Liabilities** | | | | |
| Long and short-term debt | $      929 | $      720 | $      938 | $      883 |

The fair value of long and short-term debt is estimated using reported market prices for instruments that are publicly traded and is classified as Level 2 within the fair value hierarchy.

### Fair Value Accounting under ASC 820

ASC 820 establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value into three levels as follows:

- Level 1 — quoted prices (unadjusted) in active markets for identical assets or liabilities that the Registrants have the ability to access as of the measurement date. The Registrants' financial assets and liabilities utilizing Level 1 inputs include active exchange-traded securities, energy derivatives and interest-bearing funds.

- Level 2 — inputs other than quoted prices included within Level 1 that are directly observable for the asset or liability or indirectly observable through corroboration with observable market data. The Registrants' financial assets and liabilities utilizing Level 2 inputs include exchange-based derivatives, and over the counter derivatives such as swaps, options and forward contracts.

- Level 3 — unobservable inputs for the asset or liability only used when there is little, if any, market activity for the asset or liability at the measurement date. The Registrants' financial assets and liabilities utilizing Level 3 inputs include infrequently-traded and non-exchange-based derivatives which are measured using present value pricing models.

In accordance with ASC 820, the Registrants determine the level in the fair value hierarchy within which each fair value measurement in its entirety falls, based on the lowest level input that is significant to the fair value measurement in its entirety.

**Recurring Fair Value Measurements**

Derivative assets and liabilities are carried at fair market value.

*GenOn*

The following tables present assets and liabilities measured and recorded at fair value on GenOn's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

| | As of December 31, 2014 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Fair Value | | | | | | | |
| | Level 1 [a] | | Level 2 [a] | | Level 3 | | Total | |
| | (In millions) | | | | | | | |
| Derivative assets: | | | | | | | | |
| Commodity contracts | $ | 179 | $ | 582 | $ | 46 | $ | 807 |
| Derivative liabilities: | | | | | | | | |
| Commodity contracts | $ | 105 | $ | 371 | $ | 13 | $ | 489 |
| Other assets [b] | $ | 21 | $ | — | $ | — | $ | 21 |

(a)   There were no transfers during the year ended December 31, 2014 between Levels 1 and 2.

(b)   Relates to mutual funds held in a rabbi trust for non-qualified deferred compensation plans for some key and highly compensated employees.

| | As of December 31, 2013 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Fair Value | | | | | | | |
| | Level 1 [a] | | Level 2 [a] | | Level 3 | | Total | |
| | (In millions) | | | | | | | |
| Derivative assets: | | | | | | | | |
| Commodity contracts | $ | 141 | $ | 507 | $ | 3 | $ | 651 |
| Derivative liabilities: | | | | | | | | |
| Commodity contracts | $ | 25 | $ | 149 | $ | 7 | $ | 181 |
| Other assets [b] | $ | 37 | $ | — | $ | — | $ | 37 |

(a)   There were no transfers during the year ended December 31, 2013 between Levels 1 and 2.

(b)   Relates to mutual funds held in a rabbi trust for non-qualified deferred compensation plans for some key and highly compensated employees.

The following tables reconcile the beginning and ending balances for derivatives that are recognized at fair value in GenOn's consolidated financial statements at least annually using significant unobservable inputs for the year ended December 31, 2014 and 2013:

| | For the Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2014 | | 2013 | |
| | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) | | | |
| | Derivatives [a] | | | |
| | (In millions) | | | |
| Balance as of beginning of period | $ | (4) | $ | 17 |
| Total gains and losses (realized/unrealized) included in earnings | | 2 | | (17) |
| Purchases | | 35 | | (3) |
| Transfers out of Level 3 [b] | | — | | (1) |
| Balance as of end of period | $ | 33 | $ | (4) |
| The amount of the total losses for the period included in earnings attributable to the change in unrealized derivatives relating to assets still held at end of period | $ | (1) | $ | — |

(a)   Consists of derivatives assets and liabilities, net.

(b) Transfers out of Level 3 are related to the availability of external broker quotes and are valued as of the end of the reporting period.

*GenOn Americas Generation*

The following tables present assets and liabilities (including amounts with affiliates) measured and recorded at fair value on GenOn Americas Generation's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

| | As of December 31, 2014 | | | |
| --- | --- | --- | --- | --- |
| | Fair Value | | | |
| | Level 1 [(a)] | Level 2 [(a)] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 208 | $ 848 | $ 52 | $ 1,108 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 137 | $ 640 | $ 32 | $ 809 |

(a)   There were no transfers during the year ended December 31, 2014 between Levels 1 and 2.

| | As of December 31, 2013 | | | |
| --- | --- | --- | --- | --- |
| | Fair Value | | | |
| | Level 1 [(a)] | Level 2 [(a)] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 153 | $ 575 | $ 7 | $ 735 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 74 | $ 226 | $ 8 | $ 308 |

(a)   There were no transfers during the year ended December 31, 2013 between Levels 1 and 2.

The following tables reconcile the beginning and ending balances for GenOn Americas Generation's derivatives that are recognized at fair value in the consolidated financial statements at least annually using significant unobservable inputs for the year ended December 31, 2014 and 2013:

| | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) | |
| | Derivatives [(a)] | |
| | (In millions) | |
| Balance as of beginning of period | $ (1) | $ 17 |
| Total gains and losses (realized/unrealized) included in earnings | 1 | (17) |
| Purchases | 20 | — |
| Transfers out of Level 3 [(b)] | — | (1) |
| Balance as of end of period | $ 20 | $ (1) |
| The amount of the total gains/(losses) for the period included in earnings attributable to the change in unrealized derivatives relating to assets still held at end of period | $ — | $ — |

(a)   Consists of derivatives assets and liabilities, net.

(b)   Transfers out of Level 3 are related to the availability of external broker quotes and are valued as of the end of the reporting period.

76

.

*GenOn Mid-Atlantic*

The following tables present assets and liabilities (including amounts with affiliates) measured and recorded at fair value on GenOn Mid-Atlantic's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

| | As of December 31, 2014 | | | |
| | Fair Value | | | |
| | Level 1 [a] | Level 2 [a] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 145 | $ 211 | $ 26 | $ 382 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 71 | $ 73 | $ 6 | $ 150 |

(a)   There were no transfers during the year ended December 31, 2014 between Levels 1 and 2.

| | As of December 31, 2013 | | | |
| | Fair Value | | | |
| | Level 1 [a] | Level 2 [a] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 87 | $ 420 | $ — | $ 507 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 13 | $ 60 | $ — | $ 73 |

(a)   There were no transfers during the year ended December 31, 2013 between Levels 1 and 2.

The following tables reconcile the beginning and ending balances for GenOn Mid-Atlantic's derivatives that are recognized at fair value in the consolidated financial statements at least annually using significant unobservable inputs for the year ended December 31, 2014 and 2013:

| | For the Year Ended December 31, | |
| | 2014 | 2013 |
| | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) | |
| | Derivatives [a] | |
| | (In millions) | |
| Balance as of beginning of period | $ — | $ 7 |
| Total gains and losses (realized/unrealized) included in earnings | — | (7) |
| Purchases | 20 | — |
| Balance as of end of period | $ 20 | $ — |
| The amount of the total gains/(losses) for the period included in earnings attributable to the change in unrealized derivatives relating to assets still held at end of period | $ — | $ — |

(a)   Consists of derivatives assets and liabilities, net.

Realized and unrealized gains and losses included in earnings that are related to energy derivatives are recorded in operating revenues and cost of operations.

77

*Derivative Fair Value Measurements*

A portion of the Registrants' contracts are exchange-traded contracts with readily available quoted market prices. A majority of the Registrants' contracts are non-exchange-traded contracts valued using prices provided by external sources, primarily price quotations available through brokers or over-the-counter and on-line exchanges. For the majority of the Registrants' markets, quotes are from multiple sources. To the extent that the Registrants receive multiple quotes, prices reflect the average of the bid-ask mid-point prices obtained from all sources that the Registrants believe provide the most liquid market for the commodity. If the Registrants receive one quote, then the mid-point of the bid-ask spread for that quote is used. The terms for which such price information is available vary by commodity, region and product. A significant portion of the fair value of the Registrants' derivative portfolio is based on price quotes from brokers in active markets who regularly facilitate those transactions and the Registrants believe such price quotes are executable. The Registrants do not use third party sources that derive price based on proprietary models or market surveys. The remainder of the assets and liabilities represents contracts for which external sources or observable market quotes are not available. These contracts are valued based on various valuation techniques including but not limited to internal models based on a fundamental analysis of the market and extrapolation of observable market data with similar characteristics. Contracts valued with prices provided by models and other valuation techniques make up 6% of GenOn's derivative assets and 3% of GenOn's derivative liabilities, 5% of GenOn Americas Generation's derivative assets and 4% of GenOn Americas Generation's derivative liabilities and 7% of GenOn Mid-Atlantic's derivative assets and 4% of GenOn Mid-Atlantic's derivative liabilities.

The fair value of each contract is discounted using a risk free interest rate. In addition, the Registrants apply a credit reserve to reflect credit risk which is calculated based on published default probabilities. To the extent that the Registrants' net exposure under a specific master agreement is an asset, the Registrants use the counterparty's default swap rate. If the exposure under a specific master agreement is a liability, the Registrants use their default swap rate. The credit reserve is added to the discounted fair value to reflect the exit price that a market participant would be willing to receive to assume the Registrants' liabilities or that a market participant would be willing to pay for the Registrants' assets. The Registrants' credit reserves were as follows:

| | As of December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2014 | | 2013 | |
| | (In millions) | | (In millions) | |
| GenOn | $ | — | $ | 1 |
| GenOn Americas Generation | | — | | 1 |
| GenOn Mid-Atlantic | | 2 | | 3 |

The fair values in each category reflect the level of forward prices and volatility factors as of December 31, 2014, and may change as a result of changes in these factors. Management uses its best estimates to determine the fair value of commodity and derivative contracts the Registrants hold and sell. These estimates consider various factors including closing exchange and over-the-counter price quotations, time value, volatility factors and credit exposure. It is possible however, that future market prices could vary from those used in recording assets and liabilities from energy marketing and trading activities and such variations could be material.

Under the guidance of ASC 815, entities may choose to offset cash collateral paid or received against the fair value of derivative positions executed with the same counterparties under the same master netting agreements. The Registrants have chosen not to offset positions as defined in ASC 815. As of December 31, 2014, GenOn recorded $38 million of cash collateral paid and $54 million of cash collateral received on its balance sheet. As of December 31, 2014, GenOn Americas Generation recorded $29 million of cash collateral paid and $54 million of cash collateral received on its balance sheet. As of December 31, 2014, GenOn Mid-Atlantic had no outstanding cash collateral paid or received on its balance sheet.

78

*Concentration of Credit Risk*

In addition to the credit risk discussion as disclosed in Note 2, *Summary of Significant Accounting Policies*, the following item is a discussion of the concentration of credit risk for the Registrants' financial instruments. Credit risk relates to the risk of loss resulting from non-performance or non-payment by counterparties pursuant to the terms of their contractual obligations. The Registrants monitor and manage credit risk through credit policies that include: (i) an established credit approval process; (ii) a daily monitoring of counterparties' credit limits; (iii) the use of credit mitigation measures such as margin, collateral, prepayment arrangements, or volumetric limits (iv) the use of payment netting agreements; and (v) the use of master netting agreements that allow for the netting of positive and negative exposures of various contracts associated with a single counterparty. Risks surrounding counterparty performance and credit could ultimately impact the amount and timing of expected cash flows. The Registrants seek to mitigate counterparty risk by having a diversified portfolio of counterparties. The Registrants also have credit protection within various agreements to call on additional collateral support if and when necessary. Cash margin is collected and held at the Registrants to cover the credit risk of the counterparty until positions settle.

As of December 31, 2014, counterparty credit exposure to a significant portion of GenOn's counterparties was $450 million and GenOn held $1 million of collateral against those positions, resulting in a net exposure of $450 million. Approximately 90% of GenOn's exposure before collateral is expected to roll off by the end of 2016. GenOn Americas Generation's counterparty credit exposure to a significant portion of counterparties was $445 million and GenOn Americas Generation held $1 million of collateral against those positions, resulting in a net exposure of $445 million. Approximately 90% of GenOn Americas Generation's exposure before collateral is expected to roll off by the end of 2016. GenOn Mid-Atlantic's counterparty credit exposure to a significant portion of counterparties was $107 million and GenOn Mid-Atlantic held no collateral (cash or letters of credit) against those positions, resulting in a net exposure of $107 million. 100% of GenOn Mid-Atlantic's exposure before collateral is expected to roll off by the end of 2015.

The following tables highlight the counterparty credit quality and the net counterparty credit exposure by industry sector. Net counterparty credit exposure is defined as the aggregate net asset position for the Registrants with counterparties where netting is permitted under the enabling agreement and includes all cash flow, mark-to-market and NPNS, and non-derivative transactions. As of December 31, 2014, the exposure is shown net of collateral held and includes amounts net of receivables or payables.

*GenOn*

| Category | Net Exposure [a] (% of Total) |
| --- | --- |
| Financial institutions | 86% |
| Utilities, energy merchants, marketers and other | 8% |
| ISOs | 6% |
| Total | 100% |

| Category | Net Exposure [a] (% of Total) |
| --- | --- |
| Investment grade | 98% |
| Non-Investment grade | 2% |
| Total | 100% |

(a)   Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

GenOn has counterparty credit risk exposure to certain counterparties representing more than 10% of total net exposure discussed above and the aggregate of such counterparties was $361 million. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, GenOn does not anticipate a material impact on its financial position or results of operations from nonperformance by any of its counterparties.

*GenOn Americas Generation*

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Financial institutions | 87% |
| Utilities, energy merchants, marketers and other | 7% |
| ISOs | 6% |
| Total | 100% |

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Investment grade | 99% |
| Non-Investment grade | 1% |
| Total | 100% |

(a)    Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

GenOn Americas Generation has counterparty credit risk exposure to certain counterparties representing more than 10% of total net exposure discussed above and the aggregate of such counterparties was $361 million. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, GenOn Americas Generation does not anticipate a material impact on its financial position or results of operations from nonperformance by any of its counterparties.

*GenOn Mid-Atlantic*

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Financial institutions | 100% |

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Investment grade | 100% |

(a)    Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

GenOn Mid-Atlantic has counterparty credit risk exposure to certain counterparties representing more than 10% of total net exposure discussed above and the aggregate of such counterparties was $106 million. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, GenOn Mid-Atlantic does not anticipate a material impact on its financial position or results of operations from nonperformance by any of its counterparties.

**Note 5 — Accounting for Derivative Instruments and Hedging Activities (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

ASC 815 requires the Registrants to recognize all derivative instruments on the balance sheet as either assets or liabilities and to measure them at fair value each reporting period unless they qualify for a NPNS exception. The Registrants may elect to designate certain derivatives as cash flow hedges, if certain conditions are met, and defer the effective portion of the change in fair value of the derivatives to accumulated OCI, until the hedged transactions occur and are recognized in earnings. The ineffective portion of a cash flow hedge is immediately recognized in earnings.

For derivatives that are not designated as cash flow hedges, the changes in the fair value will be immediately recognized in earnings. Certain derivative instruments may qualify for the NPNS exception and are therefore exempt from fair value accounting treatment. ASC 815 applies to the Registrants' energy related commodity contracts and interest rate swaps.

### *Energy-Related Commodities*

To manage the commodity price risk associated with the Registrants' competitive supply activities and the price risk associated with wholesale power sales from the Registrants' electric generation facilities, the Registrants enter into a variety of derivative and non-derivative hedging instruments, utilizing the following:

- Forward contracts, which commit the Registrants to purchase or sell energy commodities or purchase fuels in the future.

- Futures contracts, which are exchange-traded standardized commitments to purchase or sell a commodity or financial instrument.

- Swap agreements, which require payments to or from counterparties based upon the differential between two prices for a predetermined contractual, or notional, quantity.

- Financial and non-financial option contracts, which convey to the option holder the right but not the obligation to purchase or sell a commodity.

The objectives for entering into derivative contracts used for economic hedging include:

- Fixing the price for a portion of anticipated future electricity sales that provides an acceptable return on the Registrants' electric generation operations.

- Fixing the price of a portion of anticipated fuel purchases for the operation of the Registrants' power plants.

GenOn, GenOn Americas Generation and GenOn Mid-Atlantic's trading and hedging activities are subject to limits within the risk management policy. These contracts are recognized on the balance sheet at fair value and changes in the fair value of these derivative financial instruments are recognized in earnings.

### *GenOn*

As of December 31, 2014, GenOn's derivative assets and liabilities consisted primarily of the following:

- Forward and financial contracts for the purchase/sale of electricity and related products economically hedging GenOn's generation assets' forecasted output through 2017.

- Forward and financial contracts for the purchase of fuel commodities relating to the forecasted usage of GenOn's generation assets through 2016.

Also, as of December 31, 2014, GenOn had other energy-related contracts that did not meet the definition of a derivative instrument as follows:

- Power tolling contracts through 2015;

- Coal purchase contracts through 2020;

- Power transmission contracts through 2019;

- Natural gas transportation contracts and storage agreements through 2023; and

- Coal transportation contracts through 2018.

*GenOn Americas Generation*

As of December 31, 2014, GenOn Americas Generation's derivative assets and liabilities consisted primarily of the following:

- Forward and financial contracts for the purchase/sale of electricity and related products economically hedging GenOn Americas Generation's generation assets' forecasted output through 2017.
- Forward and financial contracts for the purchase of fuel commodities relating to the forecasted usage of GenOn Americas Generation's generation assets through 2016.

Also, as of December 31, 2014, GenOn Americas Generation had other energy-related contracts that did not meet the definition of a derivative instrument as follows:

- Power tolling contracts through 2015;
- Power transmission contracts through 2019
- Natural gas transportation contracts and storage agreements through 2023; and
- Coal transportation contracts through 2018.

*GenOn Mid-Atlantic*

As of December 31, 2014, GenOn Mid-Atlantic's derivative assets and liabilities consisted primarily of the following:

- Forward and financial contracts for the purchase/sale of electricity and related products economically hedging GenOn Mid-Atlantic's generation assets' forecasted output through 2017.
- Forward and financial contracts for the purchase of fuel commodities relating to the forecasted usage of GenOn Mid-Atlantic's generation assets through 2016.

Also, as of December 31, 2014, GenOn Mid-Atlantic had other energy-related contracts that did not meet the definition of a derivative instrument as follows:

- Natural gas transportation contracts and storage agreements through 2023; and
- Coal transportation contracts through 2018.

### Interest Rate Swaps (GenOn)

In 2010, NRG Marsh Landing entered into interest rate protection agreements (interest rate swaps) in connection with its project financing, which have been designated as cash flow hedges. NRG Marsh Landing entered into the interest rate swaps to reduce the risks with respect to the variability of the interest rates for the term loans. On July 22, 2013, concurrent with the initial public offering of NRG Yield, Inc., GenOn sold its ownership interests in NRG Marsh Landing Holdings LLC to NRG Yield LLC, which included the assignment of the related interest rate swap liability.

### Volumetric Underlying Derivative Transactions

The following table summarizes the net notional volume buy/(sell) of the Registrants' open derivative transactions broken out by commodity, excluding those derivatives that qualified for the NPNS exception as of December 31, 2014, and December 31, 2013. Option contracts are reflected using delta volume. Delta volume equals the notional volume of an option adjusted for the probability that the option will be in-the-money at its expiration date.

| | | GenOn | | GenOn Americas Generation | | GenOn Mid-Atlantic | |
| | | Total Volume | | Total Volume | | Total Volume | |
| | | As of December 31, | | As of December 31, | | As of December 31, | |
| | | 2014 | 2013 | 2014 | 2013 | 2014 | 2013 |
| **Commodity** | **Units** | (In millions) | (In millions) | (In millions) | (In millions) | (In millions) | (In millions) |
| Coal | Short Ton | 8 | 6 | 5 | 4 | 5 | 4 |
| Natural Gas | MMBtu | (21) | (111) | (74) | (113) | (79) | (119) |
| Power | MWh | (36) | (26) | (16) | (14) | (15) | (14) |

The decrease in the natural gas position was the result of buying back a portion of the gas hedges and replacing them with power hedges, as well as the settlement of positions during the period.

*Fair Value of Derivative Instruments*

The following tables summarize the fair value within the derivative instrument valuation on the balance sheet:

*GenOn*

| | Fair Value | | | |
|---|---|---|---|---|
| | Derivative Assets | | Derivative Liabilities | |
| | December 31, 2014 | December 31, 2013 | December 31, 2014 | December 31, 2013 |
| | (In millions) | | (In millions) | |
| **Derivatives Not Designated as Cash Flow Hedges:** | | | | |
| Commodity contracts current | $ 602 | $ 469 | $ 417 | $ 163 |
| Commodity contracts long-term | 205 | 182 | 72 | 18 |
| **Total Derivatives Not Designated as Cash Flow Hedges** | $ 807 | $ 651 | $ 489 | $ 181 |

*GenOn Americas Generation*

| | Fair Value | | | |
|---|---|---|---|---|
| | Derivative Assets | | Derivative Liabilities | |
| | December 31, 2014 | December 31, 2013 | December 31, 2014 | December 31, 2013 |
| | (In millions) | | (In millions) | |
| **Derivatives Not Designated as Cash Flow Hedges**: | | | | |
| Commodity contracts current | $ 852 | $ 546 | $ 674 | $ 267 |
| Commodity contracts long-term | 256 | 189 | 135 | 41 |
| **Total Derivatives Not Designated as Cash Flow Hedges** | $ 1,108 | $ 735 | $ 809 | $ 308 |

*GenOn Mid-Atlantic*

| | Fair Value | | | |
|---|---|---|---|---|
| | Derivative Assets | | Derivative Liabilities | |
| | December 31, 2014 | December 31, 2013 | December 31, 2014 | December 31, 2013 |
| | (In millions) | | (In millions) | |
| **Derivatives Not Designated as Cash Flow Hedges**: | | | | |
| Commodity contracts current | $ 241 | $ 351 | $ 128 | $ 64 |
| Commodity contracts long-term | 141 | 156 | 22 | 9 |
| **Total Derivatives Not Designated as Cash Flow Hedges** | $ 382 | $ 507 | $ 150 | $ 73 |

The Registrants have elected to present derivative assets and liabilities on the balance sheet on a trade-by-trade basis and do not offset amounts at the counterparty master agreement level. In addition, collateral received or paid on the Registrants' derivative assets or liabilities are recorded on a separate line item on the balance sheet. The following tables summarize the offsetting of derivatives by counterparty master agreement level and collateral received or paid:

*GenOn*

| | | Gross Amounts Not Offset in the Statement of Financial Position | | |
|---|---|---|---|---|
| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
| **December 31, 2014** | | | | |
| **Commodity Contracts:** | (in millions) | | | |
| Derivative assets | $ 786 | $ (425) | $ (54) | $ 307 |
| Derivative assets- affiliate | 21 | (21) | — | — |
| Derivative liabilities | (451) | 425 | — | (26) |
| Derivative liabilities- affiliate | (38) | 21 | 17 | — |
| **Total derivative instruments** | $ 318 | $ — | $ (37) | $ 281 |

.

*GenOn Americas Generation*

| | Gross Amounts Not Offset in the Statement of Financial Position | | | |
|---|---|---|---|---|
| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
| **December 31, 2014** | | (in millions) | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $ 787 | $ (425) | $ (54) | $ 308 |
| Derivative assets- affiliate | 321 | (321) | — | — |
| Derivative liabilities | (451) | 425 | — | (26) |
| Derivative liabilities- affiliate | (358) | 321 | 17 | (20) |
| **Total derivative instruments** | $ 299 | $ — | $ (37) | $ 262 |

*GenOn Mid-Atlantic*

| | Gross Amounts Not Offset in the Statement of Financial Position | | | |
|---|---|---|---|---|
| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
| **December 31, 2014** | | (in millions) | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $ 100 | $ — | $ — | $ 100 |
| Derivative assets- affiliate | 282 | (149) | — | 133 |
| Derivative liabilities | (1) | — | — | (1) |
| Derivative liabilities- affiliate | (149) | 149 | — | — |
| **Total derivative instruments** | $ 232 | $ — | $ — | $ 232 |

*GenOn*

| | Gross Amounts Not Offset in the Statement of Financial Position | | | |
|---|---|---|---|---|
| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
| **December 31, 2013** | | (in millions) | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $ 645 | $ (154) | $ (56) | $ 435 |
| Derivative assets- affiliate | 6 | (3) | — | 3 |
| Derivative liabilities | (178) | 154 | — | (24) |
| Derivative liabilities- affiliate | (3) | 3 | — | — |
| **Total derivative instruments** | $ 470 | $ — | $ (56) | $ 414 |

*GenOn Americas Generation*

| | Gross Amounts Not Offset in the Statement of Financial Position | | | |
|---|---|---|---|---|
| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
| **December 31, 2013** | | (in millions) | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $ 643 | $ (154) | $ (56) | $ 433 |
| Derivative assets- affiliate | 92 | (92) | — | — |
| Derivative liabilities | (178) | 154 | — | (24) |
| Derivative liabilities- affiliate | (130) | 92 | — | (38) |
| **Total derivative instruments** | $ 427 | $ — | $ (56) | $ 371 |

*GenOn Mid-Atlantic*

| | **Gross Amounts of Recognized Assets/Liabilities** | Gross Amounts Not Offset in the Statement of Financial Position | | |
| --- | --- | --- | --- | --- |
| | | **Derivative Instruments** | **Cash Collateral (Held)/Posted** | **Net Amount** |
| **December 31, 2013** | | (in millions) | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $ 358 | $ — | $ — | $ 358 |
| Derivative assets- affiliate | 149 | (73) | — | 76 |
| Derivative liabilities | — | — | — | — |
| Derivative liabilities- affiliate | (73) | 73 | — | — |
| **Total derivative instruments** | $ 434 | $ — | $ — | $ 434 |

*Accumulated Other Comprehensive Loss (GenOn)*

The following table summarizes the effects on GenOn's accumulated OCI balance attributable to cash flow hedge derivatives, net of tax of zero dollars:

| | Successor | | | Predecessor |
| --- | --- | --- | --- | --- |
| | **Year Ended December 31, 2014** | **Year Ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** |
| | (In millions) | | | (In millions) |
| Accumulated OCI balance, beginning of period | $ — | $ 1 | $ — | $ (34) |
| Recognized in OCI on interest rate derivatives | — | 19 | 1 | (16) |
| Reclassified from accumulated OCI into earnings[(a)(b)] | — | (2) | — | (2) |
| Reversal as part of sale to NRG Yield LLC[(c)] | — | (18) | — | — |
| Accumulated OCI balance, end of period | $ — | $ — | $ 1 | $ (52) |

(a) Amounts reclassified from accumulated OCI into income and amounts recognized in income from the ineffective portion of cash flow hedges are recorded in interest expense.

(b) All of the forecasted transactions (future interest payments) were deemed probable of occurring; therefore, no cash flow hedges were discontinued and no amount was recognized in GenOn's results of operations as a result of discontinued cash flow hedges.

(c) The reversal of accumulated OCI as part of the sale of NRG Marsh Landing to NRG Yield LLC resulted in the recognition of additional paid in capital.

Because a significant portion of the interest expense incurred by Marsh Landing during construction was capitalized, amounts included in accumulated other comprehensive loss associated with construction period interest payments were reclassified to property, plant and equipment and will be depreciated over the expected useful life of the Marsh Landing generating facility. Actual amounts reclassified into earnings could vary from the amounts currently recorded as a result of future changes in interest rates.

85

*Impact of Derivative Instruments on the Statement of Operations*

Unrealized gains and losses associated with changes in the fair value of derivative instruments not accounted for as cash flow hedges are reflected in current period earnings.

The following tables summarize the pre-tax effects of economic hedges that have not been designated as cash flow hedges and trading activity on the Registrants' statements of operations. These amounts are included within operating revenues and cost of operations.

*GenOn*

| | Successor | | | Predecessor |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2014 | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | | (In millions) |
| **Unrealized mark-to-market results** | | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (314) | $ (367) | $ (4) | $ (307) |
| Net unrealized gains/(losses) on open positions related to economic hedges | 167 | 40 | (5) | 166 |
| Total unrealized mark-to-market losses for economic hedging activities | (147) | (327) | (9) | (141) |
| Reversal of previously recognized unrealized gains on settled positions related to trading activity | (1) | (1) | (4) | (8) |
| Net unrealized gains on open positions related to trading activity | — | 1 | — | 6 |
| Total unrealized mark-to-market losses for trading activity | (1) | — | (4) | (2) |
| **Total unrealized losses** | $ (148) | $ (327) | $ (13) | $ (143) |

| | Successor | | | Predecessor |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2014 | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | | (In millions) |
| Revenue from operations — energy commodities | $ (151) | $ (356) | $ (20) | $ (159) |
| Cost of operations | 3 | 29 | 7 | 16 |
| **Total impact to statement of operations** | $ (148) | $ (327) | $ (13) | $ (143) |

*GenOn Americas Generation*

| | Successor | | | Predecessor |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2014 | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | | (In millions) |
| **Unrealized mark-to-market results** | | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (288) | $ (296) | $ (2) | $ (241) |
| Net unrealized gains/(losses) on open positions related to economic hedges | 164 | 25 | (6) | 109 |
| Total unrealized mark-to-market losses for economic hedging activities | (124) | (271) | (8) | (132) |
| Reversal of previously recognized unrealized gains on settled positions related to trading activity | (1) | (1) | (4) | (8) |
| Net unrealized gains on open positions related to trading activity | — | 1 | — | 6 |
| Total unrealized mark-to-market losses for trading activity | (1) | — | (4) | (2) |
| **Total unrealized losses** | $ (125) | $ (271) | $ (12) | $ (134) |

|  | Successor | | | Predecessor |
|---|---|---|---|---|
|  | Year Ended December 31, 2014 | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
|  | (In millions) | | | (In millions) |
| Revenue from operations — energy commodities | $ (119) | $ (302) | $ (16) | $ (153) |
| Cost of operations | (6) | 31 | 4 | 19 |
| Total impact to statement of operations | $ (125) | $ (271) | $ (12) | $ (134) |

*GenOn Mid-Atlantic*

|  | Successor | | | Predecessor |
|---|---|---|---|---|
|  | Year Ended December 31, 2014 | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
|  | (In millions) | | | (In millions) |
| **Unrealized mark-to-market results** | | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (288) | $ (296) | $ (2) | $ (246) |
| Net unrealized gains/(losses) on open positions related to economic hedges | 90 | 35 | (5) | 131 |
| **Total unrealized losses** | $ (198) | $ (261) | $ (7) | $ (115) |

|  | Successor | | | Predecessor |
|---|---|---|---|---|
|  | Year Ended December 31, 2014 | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
|  | (In millions) | | | (In millions) |
| Revenue from operations — energy commodities | $ (192) | $ (292) | $ (12) | $ (120) |
| Cost of operations | (6) | 31 | 5 | 5 |
| **Total impact to statement of operations** | $ (198) | $ (261) | $ (7) | $ (115) |

**Credit Risk Related Contingent Features (GenOn and GenOn Americas Generation)**

Certain of GenOn and GenOn Americas Generation's hedging agreements contain provisions that require the Registrants to post additional collateral if the counterparty determines that there has been deterioration in credit quality, generally termed "adequate assurance" under the agreements, or require the Registrants to post additional collateral if there were a one notch downgrade in the Registrants' credit rating. The collateral required for contracts that have adequate assurance clauses that are in net liability positions as of December 31, 2014, was $21 million for GenOn and GenOn Americas Generation. The collateral required for contracts with credit rating contingent features that are in a net liability position as of December 31, 2014, was $1 million for GenOn and GenOn Americas Generation. In addition, GenOn and GenOn Americas Generation are parties to certain marginable agreements under which they have net liability positions, but the counterparties have not called for collateral due, which is approximately $10 million as of December 31, 2014. At December 31, 2014, GenOn Mid-Atlantic did not have any financial instruments with credit-risk-related contingent features.

See Note 4, *Fair Value of Financial Instruments,* for discussion regarding concentration of credit risk.

**Note 6 — Inventory (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Inventory consisted of:

*GenOn*

|  | As of December 31, | | | |
|  | 2014 | | 2013 | |
|  | (In millions) | | | |
|---|---|---|---|---|
| Fuel oil | $ | 211 | $ | 162 |
| Coal |  | 162 |  | 144 |
| Spare parts |  | 129 |  | 131 |
| Other |  | 5 |  | 6 |
| Total Inventory | $ | 507 | $ | 443 |

*GenOn Americas Generation*

|  | As of December 31, | | | |
|  | 2014 | | 2013 | |
|  | (In millions) | | | |
|---|---|---|---|---|
| Fuel oil | $ | 181 | $ | 133 |
| Coal |  | 82 |  | 81 |
| Spare parts |  | 54 |  | 55 |
| Other |  | 1 |  | 1 |
| Total Inventory | $ | 318 | $ | 270 |

*GenOn Mid-Atlantic*

|  | As of December 31, | | | |
|  | 2014 | | 2013 | |
|  | (In millions) | | | |
|---|---|---|---|---|
| Fuel oil | $ | 45 | $ | 39 |
| Coal |  | 82 |  | 81 |
| Spare parts |  | 38 |  | 37 |
| Other |  | 1 |  | 1 |
| Total Inventory | $ | 166 | $ | 158 |

88

.

**Note 7 — Property, Plant and Equipment (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Major classes of property, plant, and equipment were as follows:

*GenOn*

| | As of December 31, | | | | Depreciable Lives |
|---|---|---|---|---|---|
| | **2014** | | **2013** | | |
| | (In millions) | | | | |
| Facilities and equipment | $ | 3,048 | $ | 2,994 | 2 - 34 Years |
| Land and improvements | | 293 | | 317 | |
| Construction in progress | | 140 | | 113 | |
| Total property, plant and equipment | | 3,481 | | 3,424 | |
| Accumulated depreciation | | (436) | | (248) | |
| Net property, plant and equipment | $ | 3,045 | $ | 3,176 | |

*GenOn Americas Generation*

| | As of December 31, | | | | Depreciable Lives |
|---|---|---|---|---|---|
| | **2014** | | **2013** | | |
| | (In millions) | | | | |
| Facilities and equipment | $ | 1,123 | $ | 1,148 | 2 - 34 Years |
| Land and improvements | | 127 | | 139 | |
| Construction in progress | | 30 | | 3 | |
| Total property, plant and equipment | | 1,280 | | 1,290 | |
| Accumulated depreciation | | (170) | | (96) | |
| Net property, plant and equipment | $ | 1,110 | $ | 1,194 | |

*GenOn Mid-Atlantic*

| | As of December 31, | | | | Depreciable Lives |
|---|---|---|---|---|---|
| | **2014** | | **2013** | | |
| | (In millions) | | | | |
| Facilities and equipment | $ | 1,014 | $ | 950 | 2 - 34 Years |
| Land and improvements | | 61 | | 111 | |
| Construction in progress | | 18 | | 3 | |
| Total property, plant and equipment | | 1,093 | | 1,064 | |
| Accumulated depreciation | | (135) | | (77) | |
| Net property, plant and equipment | $ | 958 | $ | 987 | |

.

**Note 8 — Retirements, Mothballing or Long-Term Protective Layup of Generating Facilities (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*Facilities Announced for Deactivation Due to Returns on Investment (GenOn)*

The Registrants are subject to extensive environmental regulation by federal, state and local authorities under a variety of statutes, regulations and permits that address discharges into the air, water and soil, and the proper handling of solid, hazardous and toxic materials and waste. Complying with increasingly stringent environmental requirements involves significant capital and operating expenses. To the extent forecasted returns on investments necessary to comply with environmental regulations are insufficient for a particular facility, the Registrants plan to deactivate that facility. In determining the forecasted returns on investments, the Registrants factor in forecasted energy and capacity prices, expected capital expenditures, operating costs, property taxes and other factors. GenOn deactivated the following coal and natural gas units at the referenced times:

| Facility or Unit | Fuel-type | Net Generation Capacity (MW) | Deactivation Date |
|---|---|---|---|
| Osceola Facility [a] | Natural Gas | 463 | January 2015 |
| Coolwater Facility [b] | Natural Gas | 636 | January 2015 |
| Portland Units 1 and 2 [c] | Coal | 401 | June 2014 |
| Titus Coal Units | Coal | 245 | September 2013 |
| Niles Unit 1 | Coal | 110 | October 2012 |
| Elrama Unit 4 | Coal | 170 | October 2012 |
| Niles Unit 2 | Coal | 110 | June 2012 |
| Elrama Units 1 and 3 | Coal | 290 | June 2012 |

(a) NRG mothballed the Osceola facility effective January 1, 2015.

(b) The Coolwater facility was retired from service on January 1, 2015.

(c) NRG expects to return these units to service no later than the summer of 2016 using ultra-low sulfur diesel.

GenOn plans on deactivating the following coal and natural gas units at the referenced times:

| Facility or Unit | Fuel-type | Net Generation Capacity (MW) | Expected Deactivation Date |
|---|---|---|---|
| Shawville Units 1, 2, 3 and 4 [a] | Coal | 597 | April 2015 |
| Gilbert CT Units 1, 2, 3 and 4 | Natural Gas | 98 | May 2015 |
| Glen Gardner Facility | Natural Gas | 160 | May 2015 |
| Werner Facility | Oil | 210 | May 2015 |

(a) NRG expects to return these units to service no later than the summer of 2016 using natural gas.

*Potomac River Generating Facility*

During 2011, NRG Potomac River LLC entered into an agreement with the City of Alexandria, Virginia to remove permanently from service its 480 MW Potomac River generating facility. The agreement, which amends the Project Schedule and Agreement, dated July 2008 with the City of Alexandria, provides for the retirement of the Potomac River generating facility on October 1, 2012, subject to the determination of PJM that the retirement of the facility will not affect reliability and the consent of Potomac Electric Power Company. PJM made the necessary determination and in June 2012 Potomac Electric Power Company gave its consent. As a result, the Potomac River generating facility was retired in October 2012. Upon retirement of the Potomac River generating facility, all funds in the escrow account ($32 million) established under the July 2008 agreement were distributed to NRG Potomac River in October 2012. GenOn Mid-Atlantic therefore reversed $32 million of the previously recorded obligation under the 2008 agreement with the City of Alexandria as a reduction in cost of operations during the period from January 1, 2012 through December 14, 2012.

**Note 9 — Impairments (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*Long-Lived Assets Impairments (GenOn)*

*2014 Impairments*

*Coolwater* — During the fourth quarter of 2014, the Company determined that it would pursue retiring the 636 MW natural-gas fired Coolwater facility, in Dagget, California. The facility faced critical repairs on the cooling towers for Units 3 and 4 and, during the fourth quarter of 2014, did not receive any awards in a near-term capacity auction and no interest in a bilateral capacity deal. The Company considered this to be an indicator of impairment and performed an impairment test for these assets under ASC 360, *Property, Plant and Equipment*. The carrying amount of the assets was lower than the future net cash flows expected to be generated by the assets and as a result, the assets are considered to be impaired. The Company measured the impairment loss as the difference between the carrying amount and the fair value of the assets. The Company retired the Coolwater facility effective January 1, 2015. All remaining fixed assets of the station were written off resulting in an impairment loss of $22 million.

*Osceola* — During the third quarter of 2014, GenOn determined that it will pursue mothballing the 463 MW natural gas-fired Osceola facility, in Saint Cloud, Florida. GenOn considered this to be an indicator of impairment and performed an impairment test for these assets under ASC 360. The carrying amount of the assets was lower than the future net cash flows expected to be generated by the assets and as a result, the assets are considered to be impaired. GenOn measured the impairment loss as the difference between the carrying amount and the fair value of the assets. Due to the location of the facility, it was determined that the best indicator of fair value is the market value of the combustion turbines. GenOn recorded an impairment loss of approximately $60 million, which represents the excess of the carrying value over the fair market value.

*2012 Impairments*

On July 20, 2012, GenOn entered into the NRG Merger Agreement with NRG Energy and a direct wholly owned subsidiary of NRG. GenOn viewed the execution of the NRG Merger Agreement as a triggering event under accounting guidance and evaluated its long-lived assets for impairment.

For purposes of impairment testing, a long-lived asset must be grouped at the lowest level of identifiable cash flows. Each of GenOn's generating facilities is viewed as an individual asset group. Upon completion of the assessment, GenOn determined that the Portland and Titus generating facilities were impaired as of September 30, 2012, as the carrying values exceeded the undiscounted cash flows.

GenOn's review of the long-lived assets included assumptions about the following: (a) electricity, fuel and emissions prices, (b) capacity prices, (c) impact of environmental regulations, including costs of $CO_2$ allowances under a potential cap-and-trade program, (d) timing and extent of generating capacity additions and retirements and (e) future capital expenditure requirements related to the generating facilities.

GenOn's assumptions related to future prices of electricity, fuel, emission allowances, and capacity were based on observable market prices to the extent available. Longer term power and capacity prices were derived from proprietary fundamental market modeling and analysis. The long-term capacity prices were based on estimated revenue requirements needed to incentivize new generation when needed to maintain reliability standards. For markets with established capacity markets, such as PJM, these estimates are generally consistent with the current structures. The assumptions regarding electricity demand were based on forecasts available from each ISO or NERC region, as applicable. Assumptions for generating capacity additions and retirements included publicly available announcements, which take into account renewable sources of electricity, as well as the need for capacity to maintain reliability in the longer term. In addition, GenOn previously announced its plans for deactivation of the Portland and Titus generating facilities. See Note 8, *Retirements, Mothballing or Long-Term Protective Layup of Generating Facilities.*

GenOn recorded impairment losses of $37 million and $10 million during the third quarter of 2012 in the consolidated statement of operations to reduce the carrying values of the Portland and Titus generating facilities, respectively, to their estimated fair values of $17 million and $15 million, respectively. The measurements utilized to determine fair value of Portland and Titus for impairment were categorized in Level 3 as of September, 30, 2012.

91

**Note 10 —Debt and Capital Leases (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Long-term debt and capital leases consisted of the following:

| | As of December 31, | | Interest Rate % |
|---|---|---|---|
| | 2014 | 2013 | |
| | (In millions, except rates) | | |
| **GenOn Mid-Atlantic:** | | | |
| Chalk Point capital lease, due 2015 | $        5 | $        10 | 8.190 |
| Subtotal GenOn Mid-Atlantic | 5 | 10 | |
| **GenOn Americas Generation:** | | | |
| Senior unsecured notes, due 2021 | 496 | 503 | 8.500 |
| Senior unsecured notes, due 2031 | 433 | 435 | 9.125 |
| Subtotal GenOn Americas Generation [(a)] | 934 | 948 | |
| **GenOn Energy:** | | | |
| Senior unsecured notes, due 2017 | 766 | 782 | 7.875 |
| Senior unsecured notes, due 2018 | 757 | 780 | 9.500 |
| Senior unsecured notes, due 2020 | 610 | 621 | 9.875 |
| Other liability [(b)] | 60 | — | |
| GenOn capital lease | 3 | 2 | |
| Subtotal GenOn Energy | 2,196 | 2,185 | |
| Subtotal | 3,130 | 3,133 | |
| Less current maturities | 10 | 5 | |
| Total long-term debt and capital leases | $    3,120 | $    3,128 | |

(a)  This amount includes GenOn Mid-Atlantic.

(b)   The Long Term Service Agreement for the Hunterstown facility is accounted for as a debt financing liability in accordance with U.S. GAAP.

Long-term debt includes the following premiums:

| | As of December 31, | |
|---|---|---|
| | 2014 | 2013 |
| | (In millions) | |
| **GenOn Americas Generation:** | | |
| Senior unsecured notes, due 2021 | $        46 | $        53 |
| Senior unsecured notes, due 2031 | 33 | 35 |
| **GenOn Energy:** | | |
| Senior unsecured notes, due 2017 | 41 | 58 |
| Senior unsecured notes, due 2018 | 83 | 104 |
| Senior unsecured notes, due 2020 | 60 | 71 |
| Total premium | $    263 | $    321 |

*GenOn Energy (GenOn)*

*Senior Secured Term Loan Facility and Revolving Credit Facility.* In connection with the NRG Merger, the senior secured term loan was paid off and the revolving credit facility was terminated. See Note 16, *Commitments and Contingencies*, for discussion of GenOn's credit agreement with NRG.

Under the senior notes and the related indentures, the senior notes are the sole obligation of GenOn and are not guaranteed by any subsidiary or affiliate of GenOn. The senior notes are senior unsecured obligations of GenOn having no recourse to any subsidiary or affiliate of GenOn. The senior notes restrict the ability of GenOn and its subsidiaries to encumber their assets.

*Redemption of 2014 GenOn Senior Notes.* In June 2013, GenOn redeemed all of the 2014 Senior Notes with an aggregate outstanding principal amount of $575 million at a redemption percentage of 106.778% of face value, as well as any accrued and unpaid interest as of the redemption date. In connection with the redemption, an $11 million loss on the debt extinguishment of the 2014 Senior Notes was recorded during the three months ended June 30, 2013 which primarily consisted of a make whole premium payment offset by the write-off of unamortized premium.

The GenOn Senior Notes due 2014, which had a face value of $575 million, were recorded at their fair value of $617 million on the NRG Merger date. The related $42 million premium was being amortized to interest expense until the notes were redeemed in June 2013, as previously discussed.

*Senior Unsecured Notes, Due 2018 and 2020.* The senior notes and the related indentures restrict the ability of GenOn to incur additional liens and make certain restricted payments, including dividends and purchases of capital stock. At December 31, 2014, GenOn did not meet the consolidated debt ratio component of the restricted payments test and, therefore, the ability of GenOn to make restricted payments is limited to specified exclusions from the covenant, including up to $250 million of such restricted payments. The senior notes are subject to acceleration of GenOn's obligations thereunder upon the occurrence of certain events of default, including: (a) default in interest payment for 30 days, (b) default in the payment of principal or premium, if any, (c) failure after 90 days of specified notice to comply with any other agreements in the indenture, (d) certain cross-acceleration events, (e) failure by GenOn or its significant subsidiaries to pay certain final and non-appealable judgments after 90 days and (f) certain events of bankruptcy and insolvency.

The senior notes due 2018 and 2020 were recorded at their fair values of $801 million and $631 million, respectively, on the NRG Merger date. The $126 million and $81 million premiums, respectively, are being amortized to interest expense over the life of the related notes.

Prior to October 15, 2018, GenOn may redeem the senior notes due 2018, in whole or in part, at a redemption price equal to 100% of the principal amount plus a premium and accrued and unpaid interest. The premium is the greater of: (i) 1% of the principal amount of the notes; or (ii) the excess of the following: the present value of 100% of the note, plus interest payments due on the note through maturity, discounted at a Treasury rate plus 0.50% over the principal amount of the note.

Prior to October 15, 2015, GenOn may redeem the senior notes due 2020, in whole or in part, at a redemption price equal to 100% of the principal amount of the notes plus a premium and accrued and unpaid interest. The premium is the greater of: (i) 1% of the principal amount of the notes; or (ii) the excess of the following: the present value of 100% of the note, plus interest payments due on the note through maturity, discounted at a Treasury rate plus 0.50% over the principal amount of the note. In addition, on or after October 15, 2015, GenOn may redeem some or all of the notes at redemption prices expressed as percentages of principal amount as set forth in the following table, plus accrued and unpaid interest on the notes redeemed to the first applicable redemption rate:

| Redemption Period | Redemption Percentage |
|---|---|
| October 15, 2015 to October 14, 2016 | 104.938% |
| October 15, 2016 to October 14, 2017 | 103.292% |
| October 15, 2017 to October 14, 2018 | 101.646% |
| October 15, 2018 and thereafter | 100.000% |

*Senior Unsecured Notes, Due 2017.* The senior notes due 2017 of GenOn were recorded at their fair value of $800 million on the NRG Merger date. The $75 million premium is being amortized to interest expense over the life of the related notes.

Prior to maturity, GenOn may redeem all or a part of the senior notes due 2017 at a redemption price equal to 100% of the notes plus a premium and accrued and unpaid interest. The premium is the greater of: (i) 1% of the principal amount of the notes; or (ii) the excess of the following: the present value of 100% of the note, plus interest payments due on the note through maturity, discounted at a Treasury rate plus 0.50% over the principal amount of the note.

*GenOn Americas Generation (GenOn and GenOn Americas Generation)*

*Senior Unsecured Notes.* The senior notes due 2021 and 2031 are senior unsecured obligations of GenOn Americas Generation having no recourse to any subsidiary or affiliate of GenOn Americas Generation. The senior notes due 2021 and 2031 of GenOn Americas Generation were recorded at their fair values of $509 million and $437 million, respectively, on the NRG Merger date. The $59 million and $37 million premiums, respectively, are being amortized to interest expense over the life of the related notes.

Prior to maturity, GenOn Americas Generation may redeem all or a part of the senior notes due 2021 and 2031 at a redemption price equal to 100% of the notes plus a premium and accrued and unpaid interest. The premium is the greater of: (i) the discounted present value of the then-remaining scheduled payments of principal and interest on the outstanding notes, discounted at a Treasury rate plus 0.375%, less the unpaid principal amount; and (ii) zero.

*Marsh Landing (GenOn)*

*Credit Facility.* In October 2010, Marsh Landing entered into a credit agreement for up to approximately $650 million of commitments to provide construction and permanent financing for the Marsh Landing generating facility. The credit facility consists of a $155 million tranche A senior secured term loan facility, due 2017, a $345 million tranche B senior secured term loan facility, due 2023, a $50 million senior secured letter of credit facility to support Marsh Landing's debt service reserve requirements and a $100 million senior secured letter of credit facility to support Marsh Landing's collateral requirements under its PPA with PG&E. Prior to the commercial operation date of the project, the collateral requirements under the PPA and construction contracts were met by a $165 million cash collateralized letter of credit facility entered into by GenOn Energy Holdings on behalf of Marsh Landing in September 2010.

In May 2013, Marsh Landing met the conditions under the credit agreement to convert the construction loan for the facility to a term loan which will amortize on a predetermined basis. Prior to term conversion, Marsh Landing drew the remaining funds available under the facility in order to pay costs due for construction. Marsh Landing also issued a $24 million letter of credit under the facility in support of its debt service requirements. Concurrently with the term conversion, the $80 million cash collateralized letter of credit issued by GenOn Energy Holdings on behalf of Marsh Landing in support of its collateral requirements under the PPA with PG&E was returned and the related letter of credit facility was terminated. On July 22, 2013, concurrent with the initial public offering of NRG Yield, Inc., GenOn sold its ownership interests in Marsh Landing Holdings LLC to NRG Yield LLC, including the Marsh Landing term loan, as further described in Note 15, *Related Party Transactions*.

*Restricted Net Assets (GenOn and GenOn Americas Generation)*

GenOn and GenOn Americas Generation and certain of their subsidiaries are holding companies and, as a result, GenOn and GenOn Americas Generation and such subsidiaries are dependent upon dividends, distributions and other payments from their respective subsidiaries to generate the funds necessary to meet their obligations. In particular, a substantial portion of the cash from GenOn's and GenOn Americas Generation's operations is generated by GenOn Mid-Atlantic. The ability of certain of GenOn's and GenOn Americas Generation's subsidiaries to pay dividends and make distributions is restricted under the terms of their debt or other agreements, including the operating leases of GenOn Mid-Atlantic for GenOn and GenOn Americas Generation and REMA for GenOn. Under their respective operating leases, GenOn Mid-Atlantic and REMA are not permitted to make any distributions and other restricted payments unless: (a) they satisfy the fixed charge coverage ratio for the most recently ended period of four fiscal quarters; (b) they are projected to satisfy the fixed charge coverage ratio for each of the two following periods of four fiscal quarters, commencing with the fiscal quarter in which such payment is proposed to be made; and (c) no significant lease default or event of default has occurred and is continuing. In the event of a default under the respective operating leases or if the respective restricted payment tests are not satisfied, GenOn Mid-Atlantic and REMA would not be able to distribute cash. At December 31, 2014, GenOn Mid-Atlantic and REMA did not satisfy the restricted payments test.

Pursuant to the terms of their respective lease agreements, GenOn Mid-Atlantic and REMA are restricted from, among other actions, (a) encumbering assets, (b) entering into business combinations or divesting assets, (c) incurring additional debt, (d) entering into transactions with affiliates on other than an arm's length basis or (e) materially changing their business. Therefore, at December 31, 2014, all of GenOn Mid-Atlantic's and REMA's net assets (excluding cash) were deemed restricted for purposes of Rule 4-08(e)(3)(ii) of Regulation S-X. As of December 31, 2014, GenOn Mid-Atlantic and REMA had restricted net assets of $1,004 million and $(868) million, respectively.

*Consolidated Annual Maturities (GenOn and GenOn Americas Generation)*

Annual payments based on the maturities of GenOn's debt for the years ending after December 31, 2014 are as follows:

|  | (In millions) |
|---|---|
| 2015 | $ 10 |
| 2016 | 5 |
| 2017 | 770 |
| 2018 | 761 |
| 2019 | 4 |
| Thereafter | 1,580 |
| Total | $ 3,130 |

Annual payments based on the maturities of GenOn Americas Generation's debt for the years ending after December 31, 2014 are as follows:

|  | (In millions) |
|---|---|
| 2015 | $ 5 |
| 2016 | — |
| 2017 | — |
| 2018 | — |
| 2019 | — |
| Thereafter | 929 |
| Total | $ 934 |

## Note 11 — Asset Retirement Obligations (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)

The Registrants' AROs are primarily related to the future dismantlement of equipment on leased property and environmental obligations related to ash disposal, site closures and fuel storage facilities. In addition, the Registrants have also identified conditional AROs for asbestos removal and disposal, which are specific to certain power generation operations.

The following table represents the balance of ARO obligations as of December 31, 2013, along with the additions, reductions and accretion related to the Registrants' ARO obligations for the year ended December 31, 2014:

|  | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
|  | (In millions) | | |
| **Balance as of December 31, 2013** | $ 179 | $ 76 | $ 27 |
| Additions | — | — | — |
| Revisions in estimates for current obligations | (12) | (2) | (2) |
| Spending for current obligations and other settlements | (5) | — | — |
| Accretion — expense | 10 | 4 | 1 |
| **Balance as of December 31, 2014** | $ 172 | $ 78 | $ 26 |

95

.

**Note 12 — Benefit Plans and Other Postretirement Benefits (GenOn)**

*Defined Benefit Plans*

GenOn provides pension benefits to eligible non-union and union employees through various defined benefit pension plans. These benefits are based on pay, service history and age at retirement. Most pension benefits are provided through tax-qualified plans that are funded in accordance with the Employee Retirement Income Security Act of 1974 and Internal Revenue Service requirements. Certain executive pension benefits that cannot be provided by the tax-qualified plans are provided through unfunded non-tax-qualified plans. The measurement date for the defined benefit plans was December 31 for all periods presented unless otherwise noted. GenOn also provides certain medical care and life insurance benefits for eligible retired employees. The measurement date for these postretirement benefit plans was December 31 for all periods presented unless otherwise noted.

As a result of the application of pushdown accounting, GenOn's benefit plan obligations were remeasured at the time of the NRG Merger. See Note 3, *NRG Merger and Dispositions*. As part of the change in control associated with the GenOn acquisition, NRG decided to terminate/settle the nonqualified legacy GenOn Benefit Restoration Plan and Supplemental Executive Retirement Plan. Final settlement payments totaling $12 million were paid to remaining participants during 2014.

The net periodic pension (credit)/cost related to GenOn's pension and other postretirement benefit plans include the following components:

| | Pension Benefits | | | |
|---|---|---|---|---|
| | Successor | | | Predecessor |
| | Year Ended December 31, 2014 | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | | (In millions) |
| Service cost benefits earned | $ 10 | $ 13 | $ 1 | $ 12 |
| Interest cost on benefit obligation | 27 | 25 | 1 | 23 |
| Expected return on plan assets | (34) | (31) | (1) | (30) |
| Amortization of unrecognized net gain | (6) | — | — | — |
| Net reclassifications from accumulated other comprehensive loss[a] | — | — | — | 9 |
| Curtailments | — | — | — | 1 |
| Special termination benefits | — | — | — | 1 |
| Net periodic benefit (credit)/cost | $ (3) | $ 7 | $ 1 | $ 16 |

(a) Net reclassifications include actuarial loss and prior service cost.

| | Other Postretirement Benefits | | | |
|---|---|---|---|---|
| | Successor | | | Predecessor |
| | Year Ended December 31, 2014 | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | | (In millions) |
| Service cost benefits earned | $ 1 | $ 1 | $ — | $ 1 |
| Interest cost on benefit obligation | 3 | 3 | — | 3 |
| Net reclassifications from accumulated other comprehensive loss[a] | — | — | — | (3) |
| Curtailments | — | — | — | 1 |
| Plan amendments | — | — | — | (3) |
| Amortization of unrecognized prior service credit | (17) | (1) | — | — |
| Net periodic benefit (credit)/cost | $ (13) | $ 3 | $ — | $ (1) |

(a) Net reclassifications include actuarial gain/loss and prior service credit.

96

.

A comparison of the pension benefit obligation, other postretirement benefit obligations and related plan assets for GenOn plans on a combined basis is as follows:

| | Tax-Qualified Pension Benefits | | Non-Tax-Qualified Pension Benefits | |
| | Year Ended December 31, | | Year Ended December 31, | |
| | 2014 | 2013 | 2014 | 2013 |
| | (In millions) | | (In millions) | |
|---|---|---|---|---|
| Benefit obligation at beginning of period | $ 546 | $ 585 | $ 12 | $ 14 |
| Service cost | 10 | 13 | — | — |
| Interest cost | 27 | 25 | — | 1 |
| Actuarial loss/(gain) | 103 | (55) | — | — |
| Benefit payments | (26) | (22) | (12) | (2) |
| Curtailments | — | — | — | (1) |
| Benefit obligation at end of period | 660 | 546 | — | 12 |
| Fair value of plan assets at beginning of period | 469 | 406 | — | — |
| Actual return on plan assets | 49 | 67 | — | — |
| Employer contributions | 56 | 18 | 12 | 2 |
| Benefit payments | (26) | (22) | (12) | (2) |
| Fair value of plan assets at end of period | 548 | 469 | — | — |
| Funded status at end of period — excess of obligation over assets | $ (112) | $ (77) | $ — | $ (12) |

| | Other Postretirement Benefits | |
| | Year Ended December 31, | |
| | 2014 | 2013 |
| | (In millions) | |
|---|---|---|
| Benefit obligation at beginning of period | $ 73 | $ 87 |
| Service cost | 1 | 1 |
| Interest cost | 3 | 3 |
| Participant contributions | 2 | 1 |
| Actuarial loss/(gain) | 12 | (7) |
| Benefit payments | (8) | (7) |
| Plan amendments | (18) | (5) |
| Benefit obligation at end of period | 65 | 73 |
| Fair value of plan assets at beginning of period | — | — |
| Employer contributions | 6 | 6 |
| Participant contributions | 2 | 1 |
| Benefit payments | (8) | (7) |
| Fair value of plan assets at end of period | — | — |
| Funded status at end of period — excess of obligation over assets | $ (65) | $ (73) |

The accumulated benefit obligation exceeded the fair value of plan assets at December 31, 2014 and 2013 for the tax-qualified defined benefit pension plans. The total accumulated benefit obligation for the tax-qualified plans at December 31, 2014 and 2013 was $631 million and $517 million, respectively.

97

Amounts recognized in GenOn's balance sheets were as follows:

|  | Tax-Qualified Pension Benefits | | Non-Tax-Qualified Pension Benefits | | Other Postretirement Benefits | |
|  | As of December 31, | | As of December 31, | | As of December 31, | |
|  | 2014 | 2013 | 2014 | 2013 | 2014 | 2013 |
|  | (In millions) | | (In millions) | | (In millions) | |
|---|---|---|---|---|---|---|
| Current liabilities | $ — | $ — | $ — | $ (12) | $ (5) | $ (6) |
| Non-current liabilities | (112) | (77) | — | — | (60) | (67) |

Amounts recognized in GenOn's OCI and accumulated other comprehensive income/loss for the pension and other postretirement benefit plans were as follows:

|  | Tax-Qualified Pension Benefits | | Other Postretirement Benefits | |
|  | Net Actuarial (Loss) Gain | Prior Service Cost | Net Actuarial (Loss) Gain | Prior Service Cost |
|  | (In millions) | | | |
|---|---|---|---|---|
| Balance at December 31, 2012 | $ 1 | $ — | $ — | $ — |
| Unrealized gain | 91 | — | 7 | 5 |
| Reclassification to net periodic benefit cost/credit | — | (1) | — | (1) |
| Total recognized in OCI for the period | 91 | (1) | 7 | 4 |
| Balance at December 31, 2013 | $ 92 | $ (1) | $ 7 | $ 4 |
| Unrealized (loss)/gain | (87) | — | (12) | 18 |
| Amortization of net actuarial loss | (6) | — | — | — |
| Amortization of prior service cost | — | — | — | (17) |
| Total recognized in OCI for the period | (93) | — | (12) | 1 |
| Balance at December 31, 2014 | $ (1) | $ (1) | $ (5) | $ 5 |

The total net (gain)/loss recognized in net periodic benefit cost and OCI for the pension plans for the years ended December 31, 2014 and 2013, and the periods from December 15, 2012 through December 31, 2012, and January 1, 2012 through December 14, 2012 were $90 million, $(84) million, $0 million, and $17 million, respectively. The total net (gain)/loss recognized in net periodic benefit credit and OCI for the other postretirement benefit plans for the years ended December 31, 2014 and 2013, the periods from December 15, 2012 through December 31, 2012, and January 1, 2012 through December 14, 2012 were $(2) million, $(7) million, $0 million, and $6 million, respectively.

The estimated unrecognized loss for the pension and other postretirement benefit plans that will be amortized from accumulated other comprehensive income/loss to net period benefit cost during 2015 is approximately $1 million. The estimated unrecognized prior service credit for the pension and other postretirement benefit plans that will be amortized from accumulated other comprehensive income/loss to net period benefit cost during 2015 is approximately $4 million.

*Fair Value Hierarchy of Plan Assets*

GenOn's market-related value of its plan assets is the fair value of the assets. The fair values of GenOn's pension plan assets by asset category and their level within the fair value hierarchy are as follows:

| | Fair Value Measurements as of December 31, 2014 | | |
|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Observable Inputs (Level 2) | Total |
| | (In millions) | | |
| Common/collective trust investment — U.S. equity | $ — | $ 156 | $ 156 |
| Common/collective trust investment — non-U.S. equity | — | 80 | 80 |
| Common/collective trust investment — global equity | — | 52 | 52 |
| Common/collective trust investment — fixed income | — | 246 | 246 |
| Partnerships/Joint Ventures | — | 12 | 12 |
| Short-term investment fund | 2 | — | 2 |
| Total | $ 2 | $ 546 | $ 548 |

| | Fair Value Measurements as of December 31, 2013 | | |
|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Observable Inputs (Level 2) | Total |
| | (In millions) | | |
| Investment Funds: | | | |
| U.S. equities | $ — | $ 202 | $ 202 |
| Non-U.S. equities | — | 139 | 139 |
| Fixed income securities | — | 128 | 128 |
| Total | $ — | $ 469 | $ 469 |

In accordance with ASC 820, GenOn determines the level in the fair value hierarchy within which each fair value measurement in its entirety falls, based on the lowest level input that is significant to the fair value measurement in its entirety. The fair value of the common/collective trusts is valued at fair value which is equal to the sum of the market value of all of the fund's underlying investments, and is categorized as Level 2. Partnerships/joint ventures Level 2 investments consist primarily of a partnership which invests in emerging market equity securities. In 2013, GenOn's plan assets consisted of non-exchange-traded investment funds whose fair values reflected the net asset value of the funds based on the fair value of the fund's underlying securities. The underlying securities held by these funds were valued using quoted prices in active markets for identical or similar assets. GenOn elected the practical expedient under the accounting guidance to measure the fair value of certain funds that use net asset value per share. Certain investment funds require redemption notification of 30 days or less for which no adjustment was made to their net asset value. There are no investments categorized as Level 3.

*Assumptions*

GenOn sets the discount rate assumptions on an annual basis for each of its defined benefit retirement plans as of December 31. The discount rate assumptions represent the current rate at which the associated liabilities could be effectively settled at December 31. GenOn utilizes the Aon Hewitt AA Above Median, or AA-AM, yield curve to select the appropriate discount rate assumption for each retirement plan. The AA-M yield curve is a hypothetical AA yield curve represented by a series of annualized individual spot discount rates from 6 months to 99 years. Each bond issue used to build this yield curve must be non-callable, and have an average rating of AA when averaging all available Moody's Investor Services, Standard & Poor's and Fitch ratings.

For purposes of expense recognition prior to the NRG Merger, GenOn used a market-related value of assets that recognizes the difference between the expected return and the actual return on plan assets over a five-year period. Unrecognized asset gains or losses associated with GenOn's plan assets were recognized in the calculation of the market-related value of assets and subject to amortization in future periods.

The following table presents the significant assumptions used to calculate GenOn's benefit obligations:

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | As of December 31, | | As of December 31, | |
| **Weighted–Average Assumptions** | **2014** | **2013** | **2014** | **2013** |
| Discount rate | 4.18% | 5.02% | 3.86% | 4.53% |
| Rate of compensation increase | 2.97% | 2.91% | N/A | N/A |

GenOn's assumed healthcare cost trend rates used for other postretirement benefit obligations are:

| | Other Postretirement Benefit Plans | |
|---|---|---|
| | As of December 31, | |
| **Weighted–Average Assumptions** | **2014** | **2013** |
| Assumed medical inflation for next year: | | |
| Before age 65 | 8.60% | 8.50% |
| Age 65 and after | 8.10% | 8.69% |
| Assumed ultimate medical inflation rate | 5.00% | 5.50% |
| Year in which ultimate rate is reached | 2023 | 2019 |

An annual increase of 1% in the assumed healthcare cost trend rates would correspondingly increase the postretirement benefit obligation at December 31, 2014 by $7 million. An annual decrease of 1% in the assumed healthcare cost trend rates would correspondingly decrease the postretirement benefit obligation at December 31, 2014 by $6 million

The following tables present the significant assumptions used to calculate GenOn's benefit expense/credit:

| | Pension Plans | | | |
|---|---|---|---|---|
| | Successor | | | Predecessor |
| | **Year Ended December 31, 2014** | **Year Ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** |
| **Weighted–Average Assumptions** | | | | |
| Discount rate | 5.02% | 4.22% | 4.25% | 4.56% |
| Rate of compensation increase | 2.91% | 2.82% | 2.82% | 2.79% |
| Expected return on plan assets | 7.00% | 7.50% | 7.50% | 8.25% |

| | Other Postretirement Benefit Plans | | | |
|---|---|---|---|---|
| | Successor | | | Predecessor |
| | **Year Ended December 31, 2014** | **Year Ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** |
| **Weighted–Average Assumptions** | | | | |
| Discount rate | 4.53% | 3.99% | 4.01% | 4.26% |
| Rate of compensation increase | N/A | N/A | N/A | N/A |

100

GenOn's assumed healthcare cost trend rates used for other postretirement benefit net periodic benefit expense/credit are:

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | **Year Ended December 31, 2014** | **Year Ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** |
| **Weighted–Average Assumptions** | | | | |
| Assumed medical inflation for next year: | | | | |
| Before age 65 | 8.50% | 8.50% | 8.50% | 7.50% |
| Age 65 and after | 8.69% | 8.67% | 8.67% | 7.71% |
| Assumed ultimate medical inflation rate | 5.50% | 5.50% | 5.50% | 5.50% |
| Year in which ultimate rate is reached | 2019 | 2018 | 2018 | 2018 |

An annual increase or decrease of 1% in the assumed healthcare cost trend rates would correspondingly increase or decrease the total annual service and interest cost components of net period benefit credit during 2014 by less than $1 million.

*Pension Plan Assets*

Pension plans' assets are managed solely in the interest of the plans' participants and their beneficiaries and are invested with the objective of earning the necessary returns to meet the time horizons of the accumulated and projected retirement benefit obligations. GenOn uses a mix of equities and fixed income investments intended to manage risk to a reasonable and prudent level. GenOn's risk tolerance is established through consideration of the plans' liabilities and funded status as well as corporate financial condition. Equity investments are diversified across U.S. and non-U.S. stocks. For U.S. stocks, GenOn employs both a passive and active approach by investing in index funds and actively managed funds. For non-U.S. stocks, GenOn is invested in both developed and emerging market equity funds. Fixed income investments are comprised of long-term U.S. government and corporate securities. Derivative securities can be used for diversification, risk-control and return enhancement purposes but may not be used for the purpose of leverage.

GenOn's pension asset allocation methodology is based on the results of a study completed by a third-party investment consulting firm. The methodology divides the pension plan assets into two primary portfolios: (i) return seeking assets, those assets intended to generate returns in excess of pension liability growth (U.S. equity, Non-U.S. equity and global equity) and (ii) liability-hedging assets, those assets intended to have characteristics similar to pension liabilities (fixed income securities). As GenOn's pension plans' funded status improves, the methodology actively moves the plan assets from return seeking assets toward liability-hedging assets.

The target allocations for GenOn's pension plan assets were as follows for the year ended December 31, 2014:

| | |
|---|---|
| U.S. equities | 28% |
| Non-U.S. equities | 19% |
| Global equities | 10% |
| Fixed income securities | 43% |

Investment risk and performance are monitored on an ongoing basis through quarterly portfolio reviews of each asset fund class to a related performance benchmark, if applicable, and annual pension liability measurements. Performance benchmarks are composed of the following indices:

| Asset Class | Index |
|---|---|
| U.S. equities | Dow Jones U.S. Total Stock Market Index |
| Non-U.S. equities | MSCI All Country World Ex-U.S. IMI Index |
| Global equities | MSCI All Country World Index |
| Fixed income securities | Barclays Capital Long Term Government/Credit Index |

101

*Expected Contributions and Benefit Payments*

GenOn expects to contribute approximately $16 million to the tax-qualified pension plans during 2015.

GenOn's expected future benefit payments for each of the next five years, and in the aggregate for the five years thereafter, are as follows:

| | Tax-Qualified Pension Benefit Payments | Other Postretirement Benefit Payments |
|---|---|---|
| | (In millions) | |
| 2015 | $ 28 | $ 6 |
| 2016 | 30 | 6 |
| 2017 | 29 | 6 |
| 2018 | 31 | 6 |
| 2019 | 33 | 6 |
| 2020 through 2024 | 193 | 25 |

### *Employee Savings and Profit Sharing Plan*

GenOn has employee savings plans under Sections 401(a) and 401(k) of the IRC whereby employees may contribute a portion of their eligible compensation to the employee savings plan, subject to limits under the IRC. GenOn also historically provided for a profit sharing arrangement for non-bargaining employees and some bargaining employees not accruing a benefit under the defined benefit pension plans, whereby GenOn contributed a fixed contribution of 2% of eligible pay per pay period and could make an annual discretionary contribution up to 3% of eligible pay based on GenOn's performance. Upon completion of the NRG Merger, NRG assumed GenOn's defined contribution 401(k) plans and amended the plan for the non-bargaining employees with NRG 401(k) plan features, effective January 1, 2013. On July 5, 2013, the GenOn defined contribution 401(k) plans were merged into the NRG 401(k) plan.

GenOn also sponsors non-qualified deferred compensation plans for key and highly compensated employees. GenOn's obligations and the related rabbi trust investments under these plans were $20 million and $22 million at December 31, 2014 and 2013, respectively. Upon completion of the NRG Merger, NRG assumed GenOn's non-qualified plans and their respective obligations.

Expense recognized for the matching, fixed profit sharing and discretionary profit sharing contributions for the years ended December 31, 2014 and 2013, and for the periods from December 15, 2012 through December 31, 2012, and January 1, 2012 through December 14, 2012 were $0 million, $4 million, $1 million, and $30 million, respectively.

**Note 13 — Income Taxes (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*Income Taxes*

*GenOn*

GenOn's income tax expense/(benefit) consisted of the following:

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | **Year Ended December 31, 2014** | **Year Ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** |
| | **(In millions)** | | | **(In millions)** |
| Current tax expense/(benefit): | | | | |
| Federal | $           — | $          (6) | $           — | $          15 |
| State | 6 | — | — | — |
| Total current tax expense/(benefit) | $            6 | $          (6) | $           — | $          15 |

A reconciliation of GenOn's federal statutory income tax provision to the effective income tax expense/(benefit) adjusted for permanent and other items during 2014, 2013 and 2012, is as follows:

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | **Year Ended December 31, 2014** | **Year Ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** |
| | **(In millions, except percentages)** | | | **(In millions, except percentages)** |
| Income/(Loss) before income taxes | $         198 | $         (48) | $         (72) | $        (399) |
| Provision for income taxes based on U.S. federal statutory income tax rate | 70 | (17) | (25) | (140) |
| State and local income tax provision, net of federal income taxes | 14 | (24) | (1) | (9) |
| Change in deferred tax asset valuation allowance | (100) | — | 23 | 172 |
| Effect of equity-related transactions | — | — | 1 | (5) |
| NRG Merger-related costs | — | — | 2 | — |
| State rate change | 21 | 35 | — | — |
| Other, net | 1 | — | — | (3) |
| Income tax expense/(benefit) | $            6 | $          (6) | $           — | $          15 |

103

-

The tax effects of temporary differences between the carrying amounts of assets and liabilities in GenOn's financial statements and their respective tax bases which give rise to deferred tax assets and liabilities are as follows:

| | As of December 31, | | | |
|---|---|---|---|---|
| | | 2014 | | 2013 |
| | | (In millions) | | |
| **Deferred Tax Assets:** | | | | |
| Employee benefits | $ | 100 | $ | 134 |
| Pension and other postretirement benefits | | 113 | | 123 |
| Federal loss carryforwards | | 727 | | 384 |
| State loss carryforwards | | 125 | | 108 |
| Property and intangible assets | | 1,080 | | 1,563 |
| Derivative contracts | | 90 | | — |
| Out-of-market contracts fair value adjustment | | 381 | | 136 |
| Debt premium, net | | 123 | | 136 |
| Other | | 40 | | 117 |
| Subtotal | | 2,779 | | 2,701 |
| Valuation allowance | | (2,779) | | (2,672) |
| Net deferred tax assets | | — | | 29 |
| **Deferred Tax Liabilities:** | | | | |
| Derivative contracts | | — | | 29 |
| Net deferred tax liabilities | | — | | 29 |
| Net deferred taxes | $ | — | $ | — |

### Deferred tax assets and valuation allowance

*Net deferred tax balance* — As of December 31, 2014, and 2013, GenOn recorded a net deferred tax asset of $2.8 billion and $2.7 billion, respectively. Based on its assessment of positive and negative evidence, including available tax planning strategies, GenOn believes that it is more likely than not that a benefit will not be realized on $2.8 billion and $2.7 billion of tax assets as of December 31, 2014 and 2013, respectively, thus a valuation allowance has been recorded. GenOn estimates it will need to generate future taxable income of approximately $8.0 billion, to fully realize the net federal deferred tax asset before expiration commencing in 2032.

In connection with the accounting for the GenOn acquisition, GenOn recorded the realizable deferred tax assets and liabilities acquired, primarily consisting of net operating losses and other temporary differences. In addition, the excess of GenOn's historical tax basis of assets and liabilities over the amount assigned to the fair value of the assets acquired and liabilities assumed generated deferred tax assets and liabilities that were recorded on the acquisition date.

*NOL carryforwards* — At December 31, 2014, GenOn had tax effected cumulative domestic NOLs consisting of carryforwards for federal income tax purposes of $727 million and state of $125 million. GenOns pre-merger federal NOLs are limited to $62 million annually.

*Valuation allowance* — As of December 31, 2014, GenOn's tax effected valuation allowance was $2.8 billion, relating primarily to federal and state loss carryforwards as well as differences between book and tax basis of PP&E.

### Taxes Receivable and Payable

As of December 31, 2014, GenOn recorded a current tax payable of $3 million that represents a tax liability due for domestic state taxes.

### Uncertain tax benefits

GenOn has identified uncertain tax benefits whose after-tax value was $2 million that if recognized, would impact the GenOn's income tax expense.

GenOn recognizes interest and penalties related to uncertain tax benefits in income tax expense. During the year ended December 31, 2014, GenOn accrued interest of $1 million. For the year ended December 31, 2013, GenOn did not accrue interest. As of December 31, 2014 GenOn had cumulative interest and penalties related to these uncertain tax benefits of $1 million.

*Tax jurisdictions* — GenOn is no longer subject to U.S. federal income tax examinations for years prior to 2010. With few exceptions, state and local income tax examinations are no longer open for years before 2009.

The following table reconciles the total amounts of uncertain tax benefits:

| | As of December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2014** | | **2013** | |
| | **(In millions)** | | | |
| Balance as of January 1 | $ | 1 | $ | 6 |
| Increase due to prior year positions | | 1 | | — |
| Decrease due to settlements and payments | | — | | (5) |
| Uncertain tax benefits as of December 31 | $ | 2 | $ | 1 |

### GenOn Americas Generation

GenOn America's Generation is a wholly owned limited liability company, a disregarded entity, for federal and state income tax purposes. Therefore federal and state taxes are assessed at the parent level. Accordingly, no provision has been made for federal or state income taxes in the accompanying financial statements.

A reconciliation of GenOn Americas Generation's expected federal statutory income tax provision to the effective income tax provision adjusted for permanent and other items during 2014, 2013 and 2012, is as follows:

| | Successor | | | Predecessor |
| --- | --- | --- | --- | --- |
| | **Year Ended December 31, 2014** | **Year Ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** |
| | **(In millions, except percentages)** | | | **(In millions, except percentages)** |
| Income/(Loss) before income taxes | $ 305 | $ 59 | $ (3) | $ (80) |
| Provision (benefit) for income taxes based on U.S. federal statutory income tax rate | 107 | 21 | (1) | (28) |
| State and local income tax provision, net of federal income taxes | 18 | 6 | — | (4) |
| LLC income not subject to taxation | (115) | (48) | 1 | 32 |
| State rate change | (2) | 21 | — | — |
| Other | (8) | — | — | — |
| Income tax (benefit)/provision | $ — | $ — | $ — | $ — |

#### Uncertain tax benefits

GenOn Americas Generation does not have any uncertain tax benefits.

### Pro Forma Income Tax Disclosures

### GenOn Americas Generation

GenOn Americas Generation is not subject to income taxes except for those subsidiaries of GenOn Americas Generation that are separate taxpayers. NRG Americas, GenOn and NRG are otherwise directly responsible for income taxes related to GenOn Americas Generation's operations.

GenOn Americas Generation was not allocated income taxes attributable to its operations on a pro forma income tax provision basis for the years ended December 31, 2014 and 2013, the period from December 15, 2012 through December 31, 2012, and the period from January 1, 2012 through December 14, 2012.

The following table presents the pro forma reconciliation of GenOn Americas Generation's federal statutory income tax provision for continuing operations adjusted for reorganization items to the pro forma effective tax provision:

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | Year Ended December 31, 2014 | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions, except percentages) | | | (In millions, except percentages) |
| Income/(Loss) before income taxes | $ 305 | $ 59 | $ (3) | $ 80 |
| Provision (benefit) for income taxes based on U.S. federal statutory income tax rate | 107 | 22 | (1) | (28) |
| State and local income tax provision (benefit), net of federal income taxes | 18 | 6 | — | (4) |
| Change in deferred tax asset valuation allowance | (115) | (49) | 1 | 32 |
| State rate change | (2) | 21 | — | — |
| Other | (8) | — | — | — |
| Income tax provision | $ — | $ — | $ — | $ — |

The tax effects of temporary differences between the carrying amounts of assets and liabilities in the consolidated balance sheets and their respective tax bases which give rise to the pro forma deferred tax assets and liabilities would be as follows:

| | As of December 31, | |
|---|---|---|
| | 2014 | 2013 |
| | (In millions) | |
| **Deferred Tax Assets:** | | |
| Pension and other postretirement benefits | $ 85 | $ 85 |
| Reserves | 121 | 124 |
| Loss carryforwards | 14 | 34 |
| Property and intangible assets | 1,652 | 1,602 |
| Out-of-market contracts fair value adjustment | 34 | 55 |
| Debt premium | 38 | 42 |
| Other, net | 36 | 37 |
| Subtotal | 1,980 | 1,979 |
| Valuation allowance | (1,824) | (1,936) |
| Net deferred tax assets | 156 | 43 |
| **Deferred Tax Liabilities:** | | |
| Investment in Projects | 144 | 43 |
| Derivative contract assets and liabilities | 12 | — |
| Net deferred tax liabilities | 156 | 43 |
| Net deferred taxes | $ — | $ — |

*Deferred tax assets and valuation allowance*

*Net deferred tax balance* — As of December 31, 2014, and 2013, GenOn Americas Generation recorded a net deferred tax asset of $1.8 billion and $1.9 billion, respectively. Based on its assessment of positive and negative evidence, including available tax planning strategies, GenOn Americas believes that it is more likely than not that a benefit will not be realized on $1.8 billion and $1.9 billion of tax assets as of December 31, 2014 and 2013, respectively, thus a valuation allowance has been recorded. GenOn Americas Generation estimates it will need to generate future taxable income of approximately $5.1 billion, to fully realize the net federal deferred tax asset before expiration commencing in 2032.

In connection with the accounting for the GenOn acquisition, GenOn Americas Generation recorded the realizable deferred tax assets and liabilities acquired, primarily consisting of net operating losses and other temporary differences. In addition, the excess of GenOn's historical tax basis of assets and liabilities over the amount assigned to the fair value of the assets acquired and liabilities assumed generated deferred tax assets and liabilities that were recorded on the acquisition date.

*NOL carryforwards* — At December 31, 2014, GenOn Americas Generation had tax effected cumulative domestic NOLs consisting of carryforwards for federal income tax purposes of $14 million and state of $5 million. GenOn's pre-merger federal NOLs are limited to $62 million annually.

*Valuation allowance* — As of December 31, 2014, GenOn Americas Generation's tax effected valuation allowance was $1.8 billion, relating primarily to federal and state loss carryforwards as well as differences between book and tax basis of PP&E.

### Taxes Receivable and Payable

As of December 31, 2014, GenOn Americas Generation does not have a current tax receivable or payable.

### Uncertain tax benefits

GenOn Americas Generation does not have any uncertain tax benefits.

*GenOn Mid-Atlantic*

The following reflects a pro forma disclosure of the income tax provision that would be reported if GenOn Mid-Atlantic was to be allocated income taxes attributable to its operations. Pro forma income tax provision attributable to income before tax would consist of the following:

| | Successor | | | Predecessor |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2014 | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | | (In millions) |
| Current provision (benefit): | | | | |
| Federal | $ 82 | $ 45 | $ 1 | $ 10 |
| State | 11 | 12 | — | 1 |
| Deferred provision: | | | | |
| Federal | (5) | — | (1) | 3 |
| State | (1) | — | — | — |
| Total provision for income taxes | $ 87 | $ 57 | $ — | $ 14 |

The following table presents the pro forma reconciliation of GenOn Mid-Atlantic's federal statutory income tax provision for continuing operations adjusted for reorganization items to the pro forma effective tax provision:

| | Successor | | | Predecessor |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2014 | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions, except percentages) | | | (In millions, except percentages) |
| Income/(Loss) before income taxes | $ 236 | $ 128 | $ 1 | $ 31 |
| Provision (benefit) for income taxes based on U.S. federal statutory income tax rate | 82 | 45 | — | 11 |
| State and local income taxes | 11 | 12 | — | 1 |
| State rate change | (1) | — | — | — |
| Other, net | (5) | — | — | 2 |
| Income tax provision | $ 87 | $ 57 | $ — | $ 14 |

107

The tax effects of temporary differences between the carrying amounts of assets and liabilities in the consolidated balance sheets and their respective tax bases which give rise to the pro forma deferred tax assets and liabilities would be as follows:

| | As of December 31, | |
|---|---|---|
| | 2014 | 2013 |
| | (In millions) | |
| **Deferred Tax Assets:** | | |
| Reserves | $ 24 | $ 26 |
| Loss carryforwards on derivative contracts | 218 | — |
| Property and intangible assets | 45 | 27 |
| Out-of-market contracts fair value adjustment | 88 | 108 |
| Inventory reserves | 37 | 41 |
| Net deferred tax assets | 412 | 202 |
| **Deferred Tax Liabilities:** | | |
| Derivative contracts | 336 | 61 |
| Investment in projects | 25 | — |
| Net deferred tax liabilities | 361 | 61 |
| Net deferred taxes | $ 51 | $ 141 |

*Pro Forma Tax Uncertainties*

GenOn Mid-Atlantic does not have any uncertain tax benefits.

**Note 14 — Stock-Based Compensation (GenOn)**

*Impact of NRG Merger*

Effective December 14, 2012, in connection with the consummation of the NRG Merger, the name of the GenOn Energy, Inc. 2010 Omnibus Incentive Plan was changed to NRG 2010 Stock Plan for GenOn Employees, or NRG GenOn LTIP. Pursuant to the NRG Merger Agreement, upon completion of the NRG Merger, the following occurred to GenOn's stock-based incentive awards:

i.  each outstanding GenOn stock option that was granted under the NRG GenOn LTIP, the GenOn Energy, Inc. 2002 Long-Term Incentive Plan, the GenOn Energy, Inc. 2002 Stock Plan and the Mirant Corporation 2005 Omnibus Incentive Compensation Plan, collectively, the GenOn Plans, before 2012 vested in full (to the extent not already vested) and was converted into an option to purchase NRG common stock (with the number of shares and per share exercise price appropriately adjusted based on the NRG Merger Exchange Ratio), on the terms and conditions otherwise applicable to those options prior to the NRG Merger;

ii.  each outstanding GenOn stock option that was granted under the GenOn Plans during 2012 was converted into an option to purchase NRG common stock (with the number of shares and per share exercise price appropriately adjusted based on the NRG Merger Exchange Ratio), on the terms and conditions (including vesting schedules and conditions) otherwise applicable to those options prior to the NRG Merger;

iii.  each outstanding restricted stock unit that was granted under the GenOn Plans before 2012 has vested in full (to the extent not already vested) and was exchanged for shares of NRG common stock in the NRG Merger based on the NRG Merger Exchange Ratio; and

iv.  each outstanding restricted stock unit that was granted under the GenOn Plans in 2012, to the extent it remained unvested immediately prior to the NRG Merger, was converted into unvested restricted stock units of NRG (with the number of shares subject to such restricted stock unit appropriately adjusted based on the NRG Merger Exchange Ratio), on the terms and conditions otherwise applicable to those restricted stock units.

As of December 31, 2012, all unvested stock options that were converted to options to purchase NRG common stock and restricted stock units that were converted to NRG restricted stock units were recorded in NRG's consolidated balance sheet.

The following disclosures relate to the predecessor periods and the conversion of GenOn stock options and restricted stock units only. All information regarding weighted average exercise price of stock options, weighted average grant date fair value of stock options granted and weighted average grant date fair value for restricted stock units is based on historical GenOn stock prices and includes no adjustments for the NRG Merger Exchange Ratio.

### Non-Qualified Stock Options

GenOn granted service condition stock option awards to certain employees. Historically, stock options vested 33.33% per year for the three years and had a term of five years to ten years. GenOn recognized the related compensation expense on a straight-line basis over the requisite service period.

The weighted average grant date fair value per option granted was $1.07 for the period from January 1, 2012 to December 14, 2012. There was no cash received from the exercise of options for the period of January 1, 2012 to December 14, 2012. There was no intrinsic value of options exercised and no tax benefits realized, as a result of net operating loss carryforwards, for the period of January 1, 2012 to December 14, 2012.

The fair value of GenOn's non-qualified stock options was estimated on the date of grant using the Black-Scholes option-pricing model. Significant assumptions used in the fair value model with respect to the GenOn's non-qualified stock options are summarized below:

| | January 1, 2012 through December 14, 2012 | |
| --- | --- | --- |
| | Range | Weighted Average |
| Expected volatility[a] | 50.5% | 50.5% |
| Expected term (in years)[b] | 5 | 5 |
| Risk-free rate[c] | 0.89% | 0.89% |

(a)   GenOn estimated volatility based on historical and implied volatility (as applicable) of its common stock.

(b)   The expected term is based on a binomial lattice model.

(c)   The risk-free rate for periods within the contractual term of the stock option is based on the U.S. Treasury yield curve in effect at the time of the grant.

### Time-based Restricted Stock Units and Performance-based Restricted Stock Units

*Time-based Awards.* GenOn granted time-based restricted stock units to certain employees. These restricted stock units generally vested in three equal installments on each of the first, second and third anniversaries of the grant date. GenOn recognized the related compensation expense on a straight-line basis over the requisite service period. In addition, GenOn granted time-based restricted stock units to non-management members of the Board of Directors. These awards vested on the grant date and delivery of the underlying shares was deferred until the directorship terminated. During the period from January 1, 2012 to December 14, 2012, GenOn granted 3.2 million time-based restricted stock units.

*Performance-based Awards.* During the period from January 1, 2012 to December 14, 2012, GenOn granted 2.6 million performance-based restricted stock units to certain employees. These restricted stock units were linked to the 2012 short-term incentive plan performance goals, with performance measured in December 2012 to determine a multiplier between 0% and 200% of the targeted grant. These restricted stock units generally vested in three equal installments over a three-year period. GenOn recognized the related compensation expense on a straight-line basis over the requisite service period. In December 2012, the performance multiplier was determined to be 183% for the performance-based awards granted in 2012 and one-third of the restricted stock units vested at that time with the remaining unvested restricted stock units to vest in December 2013 and December 2014.

*General.* The grant date fair value of time-based and performance-based restricted stock units was equal to GenOn's closing stock price on the grant date.

The weighted average grant date fair value per restricted stock unit granted was $2.43 for the period from January 1, 2012 to December 14, 2012. The fair value of vested restricted stock units was $8 million for the period from January 1, 2012 to December 14, 2012.

### Compensation Expense

GenOn recognized compensation expense in selling, general and administrative expense in the consolidated statements of operations related to stock-based compensation. Stock-based compensation expense was $19 million for the period from January 1, 2012 to December 14, 2012.

**Note 15 - Related Party Transactions (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*Services Agreement with NRG (GenOn)*

NRG provides GenOn, with various management, personnel and other services, which include human resources, regulatory and public affairs, accounting, tax, legal, information systems, treasury, risk management, commercial operations, and asset management, as set forth in the Services Agreement. The initial term of the Services Agreement was through December 31, 2013, with an automatic renewal absent a request for termination. The fee charged is determined based on a fixed amount as described in the Services Agreement and was calculated based on historical GenOn expenses prior to the NRG Merger. The annual fees under the Services Agreement are approximately $193 million. NRG charges these fees on a monthly basis, less amounts incurred directly by GenOn. Management has concluded that this method of charging overhead costs is reasonable. For the year ended December 31, 2014 and 2013, GenOn recorded costs related to these services of $128 million and $88 million, respectively, as selling, general and administrative - affiliate.

*Administrative Services Provided by NRG for the Successor Period and Provided by GenOn Energy for the Predecessor Periods (GenOn Americas Generation and GenOn Mid-Atlantic)*

Prior to the NRG Merger, GenOn provided GenOn Americas Generation and GenOn Mid-Atlantic with various management, personnel and other services directly relating to their facilities. GenOn Americas Generation and GenOn Mid-Atlantic reimbursed GenOn for amounts equal to the costs of providing such services. In addition, GenOn's corporate overhead costs were allocated to its subsidiaries based on each operating subsidiary's planned operating expenses relative to all operating subsidiaries of GenOn. Subsequent to the NRG Merger, NRG provides GenOn Americas Generation and GenOn Mid-Atlantic with various management, personnel and other services consistent with those set forth in the Services Agreement discussed above between NRG and GenOn. GenOn's costs incurred under the Services Agreement with NRG are allocated to its subsidiaries based on each operating subsidiary's planned operating expenses relative to all operating subsidiaries of GenOn. These allocations and charges are not necessarily indicative of what would have been incurred had GenOn Americas Generation and GenOn Mid-Atlantic been unaffiliated entities. Management has concluded that this method of charging overhead costs is reasonable. Costs incurred by NRG and charged directly back to NRG Americas and GenOn Mid-Atlantic are not considered to be affiliate costs for periods subsequent to the NRG Merger. Direct costs charged back to GenOn Americas Generation considered to be affiliate costs were $130 million for the period from January 1, 2012 to December 14, 2012. Direct costs charged back to GenOn Mid-Atlantic considered to be affiliate costs were $85 million for the period from January 1, 2012 to December 14, 2012.

The following costs were incurred under these arrangements:

*GenOn Americas Generation*

| | Successor | | | Predecessor |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2014 | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | | (In millions) |
| Allocated costs: | | | | |
| Cost of operations — affiliate | $ 7 | $ 9 | $ 2 | $ 50 |
| Selling, general and administrative — affiliate | 79 | 74 | 2 | 62 |
| Total | $ 86 | $ 83 | $ 4 | $ 112 |

*GenOn Mid-Atlantic*

| | Successor | | | Predecessor |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2014 | Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | | |
| Allocated costs: | | | | |
| Cost of operations — affiliate | $ 4 | $ 6 | $ 1 | $ 32 |
| Selling, general and administrative — affiliate | 64 | 64 | 2 | 39 |
| Total | $ 68 | $ 70 | $ 3 | $ 71 |

*Services Provided by GenOn Energy Management for the Predecessor Periods (GenOn Americas Generation and GenOn Mid-Atlantic)*

*GenOn Americas Generation*

Prior to the NRG Merger, GenOn Energy Management provided services to certain of GenOn's indirect operating subsidiaries through power, fuel supply and services agreements. The services included the bidding and dispatch of the generating units, fuel procurement and the execution of contracts, including economic hedges, to reduce price risk. These transactions were recorded as operating revenues — affiliate and cost of operations — affiliate, as appropriate, in the consolidated statements of operations. Amounts due from and to GenOn's indirect operating subsidiaries were recorded as accounts receivable — affiliate or accounts payables — affiliate, as appropriate. Substantially all energy marketing overhead expenses were allocated to GenOn's operating subsidiaries. For the years ended December 31, 2014 and 2013, and the period from January 1, 2012 through December 14, 2012, GenOn Americas Generation recorded a reduction to cost of operations — affiliate of $8 million, $9 million, and $22 million, respectively, related to the allocations of energy marketing overhead expenses to affiliates that are not included in the GenOn Americas Generation consolidated statements of operations.

*GenOn Mid-Atlantic*

Prior to the NRG Merger, GenOn Mid-Atlantic received services from GenOn Energy Management which included the bidding and dispatch of the generating units, procurement of fuel and other products and the execution of contracts, including economic hedges, to reduce price risk. These transactions were recorded as operating revenues — affiliate and cost of operations — affiliate, as appropriate, in the consolidated statements of operations. Amounts due to and from GenOn Energy Management under the power, fuel supply and services agreements were recorded as accounts payables — affiliate or accounts receivables — affiliate, as appropriate. Under these agreements, GenOn Energy Management resold GenOn Mid-Atlantic's energy products in the PJM spot and forward markets and to other third parties. GenOn Mid-Atlantic was paid the amount received by GenOn Energy Management for such capacity and energy. GenOn Mid-Atlantic had counterparty credit risk in the event that GenOn Energy Management was unable to collect amounts owed from third parties for the resale of GenOn Mid-Atlantic's energy products. Substantially all energy marketing overhead expenses were allocated to GenOn's operating subsidiaries. For the years ended December 31, 2014 and 2013, and the period from January 1, 2012 through December 14, 2012, GenOn Mid-Atlantic incurred $1 million, $3 million, and $4 million, respectively, of energy marketing overhead expense. These costs are included in cost of operations — affiliate in GenOn Mid-Atlantic's consolidated statements of operations.

*Credit Agreement with NRG (GenOn)*

In connection with the closing of the NRG Merger, GenOn and NRG Americas entered into a secured intercompany revolving credit agreement with NRG.  This credit agreement provides for a $500 million revolving credit facility, all of which is available for revolving loans and letters of credit.  At December 14, 2012, the letters of credit outstanding under GenOn's revolving credit facility, which was terminated in connection with the NRG Merger, were transferred to this credit agreement. At December 31, 2014, $237 million of letters of credit were outstanding under the NRG credit agreement for GenOn and of this amount, $173 million were issued on behalf of GenOn Americas Generation. See Note 10, *Debt and Capital Leases.*  At December 31, 2014, no loans were outstanding under this credit agreement.  In connection with the execution of the agreement, certain of GenOn's subsidiaries, as guarantors, entered into a guarantee agreement pursuant to which these guarantors guaranteed amounts borrowed and obligations incurred under the credit agreement. The credit agreement has a three year maturity and is payable at maturity, subject to certain exceptions primarily related to asset sales not in the ordinary course of business and borrowings of debt. In addition, they are restricted from incurring additional liens on their assets. At GenOn's election, the interest rate per year applicable to the loans under the credit agreement will be determined by reference to either (i) the base rate plus 2.50% per year or (ii) the LIBOR rate plus 3.50% per year. In addition, the credit agreement contains customary covenants and events of default.

*Intercompany Cash Management Program (GenOn Americas Generation)*

GenOn Americas Generation and certain of its subsidiaries participate in separate intercompany cash management programs whereby cash balances at GenOn Americas Generation and the respective participating subsidiaries are transferred to central concentration accounts to fund working capital and other needs of the respective participants. The balances under this program are reflected as notes receivable — affiliate or notes payable — affiliate, as appropriate. The notes are due on demand and accrue interest on the net position, which is payable quarterly, at a rate determined by GenOn Energy Holdings. At December 31, 2014 and 2013, GenOn Americas Generation had a net current notes receivable from GenOn Energy Holdings of $331 million and $299 million, respectively, related to its intercompany cash management program. For the year ended December 31, 2014 and 2013, and for the periods from December 15, 2012 through December 31, 2012 and January 1, 2012 through December 14, 2012, GenOn Americas Generation earned an insignificant amount of net interest income related to these notes.

### GenOn Mid-Atlantic Distributions (GenOn Americas Generation and GenOn Mid-Atlantic)

For the year ended December 31, 2014, GenOn Mid-Atlantic made a distribution of $320 million to its parent, NRG North America LLC, who in turn made a distribution of $320 million to its parent, GenOn Americas Generation. GenOn Americas Generation subsequently made a distribution in the same amount, through its parent company, NRG Americas, Inc. to GenOn Energy Holdings, Inc., a subsidiary of GenOn.

For the year ended December 31, 2013, GenOn Mid-Atlantic made a distribution of $285 million to its parent, NRG North America LLC, who in turn made a distribution of $285 million to its parent, GenOn Americas Generation. GenOn Americas Generation subsequently made a distribution in the same amount, through its parent company, NRG Americas, Inc. to GenOn Energy Holdings, Inc., a subsidiary of GenOn.

### Purchased Emission Allowances (GenOn Mid-Atlantic)

GenOn Energy Management maintains an inventory of certain purchased emission allowances related to the Regional Greenhouse Gas Initiative on behalf of GenOn Mid-Atlantic. The emission allowances are sold by GenOn Energy Management to GenOn Mid-Atlantic as they are needed for operations. GenOn Mid-Atlantic purchases emission allowances from GenOn Energy Management at GenOn Energy Management's original cost to purchase the allowances. For allowances that have been purchased by GenOn Energy Management from a GenOn Energy affiliate, the price paid by GenOn Energy Management is determined by market indices.

Emission allowances purchased from GenOn Energy Management that were utilized during the year ended December 31, 2014 and 2013, the periods from December 15, 2012 through December 31, 2012 and January 1, 2012 through December 14, 2012 were $19 million, $17 million, $1 million, and $20 million, respectively, and are recorded in cost of operations — affiliate in GenOn Mid-Atlantic's consolidated statements of operations.

### Operator of Leased Facilities (GenOn)

See Note 16, *Commitments and Contingencies*, for a discussion of the GenOn leased facilities (Conemaugh and Keystone) that GenOn also operates.

### Sale of NRG Marsh Landing Holdings LLC to NRG Yield LLC (GenOn)

On July 22, 2013, concurrent with the initial public offering of NRG Yield, Inc., GenOn sold its ownership interests in NRG Marsh Landing Holdings LLC to NRG Yield LLC for a purchase price of $199 million in cash plus the assumption of debt. The net assets of NRG Marsh Landing Holdings LLC were $168 million at the time of the sale resulting in the recognition of additional paid-in capital of $31 million.

The following table summarizes the net assets of Marsh Landing Holdings LLC sold to NRG Yield LLC:

|  | Historical carrying amount |
| --- | --- |
|  | (In millions) |
| **Assets** | |
| Other current and non-current assets | $ 52 |
| Property, plant and equipment | 666 |
| Total assets | $ 718 |
| **Liabilities** | |
| Other current and non-current liabilities | $ 50 |
| Long-term debt | 500 |
| Total liabilities | $ 550 |
| Net assets | $ 168 |

**Note 16— Commitments and Contingencies (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

**Commitments**

*GenOn Mid-Atlantic Operating Leases*

GenOn Mid-Atlantic leases a 100% interest in the Dickerson and Morgantown coal generation units and associated property through 2029 and 2034, respectively. GenOn Mid-Atlantic has an option to extend the leases. Any extensions of the respective leases would be for less than 75% of the economic useful life of the facility, as measured from the beginning of the original lease term through the end of the proposed remaining lease term. GenOn Mid-Atlantic accounts for these leases as operating leases and recognizes rent expense on a straight-line basis over the lease term. Rent expense totaled $43 million and $41 million for the years ended December 31, 2014 and 2013, respectively, and $3 million for the period from December 15, 2012 through December 31, 2012, and $92 million, for the period from January 1, 2012 through December 14, 2012. Rent expense is included in cost of operations. As of December 31, 2014 and 2013, GenOn Mid-Atlantic has paid $157 million and $97 million, respectively, of lease payments in excess of rent expense recognized, which is included in prepaid rent on the consolidated balance sheets. Of these amounts, $71 million is included, for both 2014 and 2013, in prepayments and other current assets (prepayments for GenOn).

For restrictions under these leases, see Note 10, *Debt and Capital Leases.*

As further described in Note 3, *NRG Merger and Dispositions*, as a result of pushdown accounting, GenOn Mid-Atlantic recorded the acquisition date fair value of the leasehold improvements of $382 million, classified in property, plant and equipment. In addition, GenOn Mid-Atlantic recorded the acquisition date fair value of the leasehold interests, net of the present value of the lease obligation, equal to an out-of-market liability of $604 million, classified in out-of-market contracts. This liability is amortized to rent expense on a straight-line basis over the term of the lease.

Future minimum lease commitments under the GenOn Mid-Atlantic operating leases for the years ending after December 31, 2014, are as follows:

|  | (In millions) |
|---|---:|
| 2015 | $ 110 |
| 2016 | 150 |
| 2017 | 144 |
| 2018 | 105 |
| 2019 | 139 |
| Thereafter | 547 |
| Total | $ 1,195 |

*REMA Operating Leases (GenOn)*

GenOn, through its subsidiary, REMA, leases a 100% interest in the Shawville coal generation facility through 2026, and expects to make payments under the Shawville lease through that date, and leases 16.45% and 16.67% interest in the Keystone and Conemaugh coal generation facilities, respectively, through 2034, and expects to make payments under the Keystone and Conemaugh leases through 2029 in accordance with the terms of the leases. At the expiration of these leases, there are several renewal options related to fair value. GenOn accounts for these leases as operating leases and records lease expense on a straight-line basis over the lease term. Rent expense totaled $29 million, $28 million, $2 million, and $33 million for the years ended December 31, 2014 and 2013, and for the periods from December 15, 2012 through December 31, 2012 and from January 1, 2012 through December 14, 2012, respectively, and is included in cost of operations. GenOn has paid $41 million and $22 million of lease payments in excess of rent expense recognized, which is included in prepayments on the consolidated balance sheets as of December 31, 2014 and 2013, respectively.

GenOn operates the Conemaugh and Keystone generating facilities under 5-year agreements that expire in December 2015 that, subject to certain provisions and notifications, could be terminated annually with 1 year's notice. GenOn is reimbursed by the other owners for the cost of direct services provided to the Conemaugh and Keystone facilities. Additionally, GenOn received fees of $11 million, $11 million, $1 million, and $9 million for the years ended December 31, 2014 and 2013 and for the periods from December 15, 2012 through December 31, 2012, and from January 1, 2012 through December 14, 2012, respectively. These fees received, which are recorded as a reduction in cost of operations, are primarily used to cover REMA's administrative support costs of providing these services.

For restrictions under these leases, see Note 10, *Debt and Capital Leases.*

As further described in Note 3, *NRG Merger and Dispositions*, as a result of pushdown accounting, GenOn recorded the acquisition date fair value of the leasehold improvements of $66 million, classified in property, plant and equipment.  In addition, GenOn recorded the acquisition date fair value of the leasehold interests, net of the present value of the lease obligation, equal to an out-of-market liability of $186 million, classified in out-of-market contracts. This liability is amortized to rent expense on a straight-line basis over the term of the lease.

Future minimum lease commitments under the REMA operating leases for the years ending after December 31, 2014, are as follows:

|  | (In millions) |
| --- | ---: |
| 2015 | $ 56 |
| 2016 | 61 |
| 2017 | 63 |
| 2018 | 55 |
| 2019 | 65 |
| Thereafter | 334 |
| Total | $ 634 |

In late April 2014, GenOn notified PJM that it no longer intends to place coal-fired Units 1, 2, 3, and 4 at Shawville generating facility (597 MW) in long term protective layup, but instead will mothball those units beginning on April 16, 2015, and then return those units to service no later than June 1, 2016 using natural gas. Under the lease agreement for Shawville, GenOn's obligations generally are to pay the required rent and to maintain the leased assets in accordance with the lease documentation, including in compliance with prudent competitive electric generating industry practice and applicable laws. See Note 8, *Retirements, Mothballing or Long-Term Protective Layup of Generating Facilities*, for a discussion of other generating facilities that GenOn expects to mothball in 2015, 2016 or 2017.

### Other Operating Leases

The Registrants have commitments under other operating leases with various terms and expiration dates. Included in other operating leases is GenOn's long-term lease for its corporate headquarters in Houston, Texas which expires in 2018. GenOn Mid-Atlantic has other operating leases which primarily relate to the Chalk Point generating facility. Rent expense for other operating leases is recorded to cost of operations or selling, general and administrative, as applicable, based on the nature of the lease.

The Registrants' rent expense associated with other operating leases was as follows:

|  | Successor | | | Predecessor |
| --- | ---: | ---: | ---: | ---: |
|  | 2014 | 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
|  | (In millions) | | | (In millions) |
| GenOn | $ 12 | $ 17 | $ 1 | $ 15 |
| GenOn Americas Generation | $ — | $ — | $ — | $ 3 |
| GenOn Mid-Atlantic | $ — | $ — | $ — | $ 3 |

Future minimum lease commitments under the Registrants' other operating leases for the years ending after December 31, 2014, are as follows:

|  | GenOn [a] | GenOn Americas Generation | GenOn Mid-Atlantic |
| --- | ---: | ---: | ---: |
|  | (In millions) | | |
| 2015 | $ 20 | $ 8 | $ 8 |
| 2016 | 14 | 3 | 1 |
| 2017 | 14 | 2 | 2 |
| 2018 | 13 | 2 | 2 |
| 2019 | 2 | 2 | 2 |
| Thereafter | 19 | 1 | 1 |
| Total | $ 82 | $ 18 | $ 16 |

(a)   Amounts in the table exclude future sublease income of $17 million, associated with GenOn's long-term lease for its corporate headquarters in Houston, Texas.

*Fuel and Commodity Transportation Commitments*

The Registrants have commitments under coal agreements and commodity transportation contracts, primarily related to natural gas and coal, of various quantities and durations. At December 31, 2014, the maximum remaining term under any individual fuel supply contract is 5 years and any transportation contract is nine years.

As of December 31, 2014, the Registrants' commitments under such outstanding agreements are estimated as follows:

|  | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
|  | (In millions) | | |
| 2015 | $ 162 | $ 85 | $ 85 |
| 2016 | 83 | 14 | 14 |
| 2017 | 80 | 13 | 13 |
| 2018 | 15 | 13 | 13 |
| 2019 | 1 | — | — |
| Thereafter | 4 | — | — |
| Total | $ 345 | $ 125 | $ 125 |

### LTSA Commitments (GenOn)

LTSA commitments primarily relate to long-term service agreements that cover some periodic maintenance, including parts, on power generation turbines. The long-term maintenance agreements terminate from 2014 to 2038 based on turbine usage.

As of December 31, 2014, GenOn's commitments under such outstanding agreements are estimated as follows:

|  | GenOn |
|---|---|
|  | (In millions) |
| 2015 | $ 15 |
| 2016 | 12 |
| 2017 | 11 |
| 2018 | 14 |
| 2019 | 15 |
| Thereafter | 173 |
| Total | $ 240 |

### Other Commitments

The Registrants have other commitments under contractual arrangements with various terms and expiration dates. The Registrants' other commitments primarily include the operation and maintenance agreement and the fly ash sales agreement entered into by GenOn Mid-Atlantic in connection with its ash beneficiation facility. The ash beneficiation facility agreements will expire in 2031. GenOn Mid-Atlantic has other similar agreements for gypsum. In addition to the GenOn Mid-Atlantic agreements, GenOn has other commitments which primarily relate to its southern California generating facilities.

As of December 31, 2014, the Registrants' other commitments are estimated as follows

|  | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
|  | (In millions) | | |
| 2015 | $ 7 | $ 5 | $ 5 |
| 2016 | 6 | 6 | 6 |
| 2017 | 6 | 6 | 6 |
| 2018 | 6 | 6 | 6 |
| 2019 | — | — | — |
| Thereafter | — | — | — |
| Total | $ 25 | $ 23 | $ 23 |

**Contingencies**

Set forth below is a description of the Registrants' material legal proceedings. The Registrants believe that they have valid defenses to these legal proceedings and intend to defend them vigorously. The Registrants record reserves for estimated losses from contingencies when information available indicates that a loss is probable and the amount of the loss, or range of loss, can be reasonably estimated. In addition, legal costs are expensed as incurred. Management has assessed each of the following matters based on current information and made a judgment concerning its potential outcome, considering the nature of the claim, the amount and nature of damages sought, and the probability of success. Unless specified below, the Registrants are unable to predict the outcome of these legal proceedings or reasonably estimate the scope or amount of any associated costs and potential liabilities. As additional information becomes available, management adjusts its assessment and estimates of such contingencies accordingly. Because litigation is subject to inherent uncertainties and unfavorable rulings or developments, it is possible that the ultimate resolution of the Registrants' liabilities and contingencies could be at amounts that are different from currently recorded reserves and that such difference could be material.

In addition to the legal proceedings noted below, the Registrants are parties to other litigation or legal proceedings arising in the ordinary course of business. In management's opinion, the disposition of these ordinary course matters will not materially adversely affect the Registrants' respective consolidated financial position, results of operations, or cash flows.

### Actions Pursued by MC Asset Recovery (GenOn)

With Mirant Corporation's emergence from bankruptcy protection in 2006, certain actions filed by GenOn Energy Holdings and some of its subsidiaries against third parties were transferred to MC Asset Recovery, a wholly owned subsidiary of GenOn Energy Holdings. MC Asset Recovery is governed by a manager who is independent of NRG and GenOn. MC Asset Recovery is a disregarded entity for income tax purposes. Under the remaining action transferred to MC Asset Recovery, MC Asset Recovery seeks to recover damages from Commerzbank AG and various other banks, or the Commerzbank Defendants, for alleged fraudulent transfers that occurred prior to Mirant's bankruptcy proceedings. In December 2010, the U.S. District Court for the Northern District of Texas dismissed MC Asset Recovery's complaint against the Commerzbank Defendants. In January 2011, MC Asset Recovery appealed the District Court's dismissal of its complaint against the Commerzbank Defendants to the U.S. Court of Appeals for the Fifth Circuit. In March 2012, the Court of Appeals reversed the District Court's dismissal and reinstated MC Asset Recovery's amended complaint against the Commerzbank Defendants. If MC Asset Recovery succeeds in obtaining any recoveries from the Commerzbank Defendants, the Commerzbank Defendants have asserted that they will seek to file claims in Mirant's bankruptcy proceedings for the amount of those recoveries. GenOn Energy Holdings would vigorously contest the allowance of any such claims. If the Commerzbank Defendants were to receive an allowed claim as a result of a recovery by MC Asset Recovery on its claims against them, GenOn Energy Holdings would retain from the net amount recovered by MC Asset Recovery an amount equal to the dollar amount of the resulting allowed claim.

### Pending Natural Gas Litigation (GenOn)

GenOn is party to several lawsuits, certain of which are class action lawsuits, in state and federal courts in Kansas, Missouri, Nevada and Wisconsin. These lawsuits were filed in the aftermath of the California energy crisis in 2000 and 2001 and the resulting FERC investigations and relate to alleged conduct to increase natural gas prices in violation of antitrust and similar laws. The lawsuits seek treble or punitive damages, restitution and/or expenses. The lawsuits also name as parties a number of energy companies unaffiliated with NRG. In July 2011, the U.S. District Court for the District of Nevada, which is handling four of the five cases, granted the defendants' motion for summary judgment and dismissed all claims against GenOn in those cases. The plaintiffs appealed to the U.S. Court of Appeals for the Ninth Circuit. The Court of Appeals reversed the decision of the District Court. On August 26, 2013, GenOn along with the other defendants in the lawsuit filed a petition for a writ of certiorari to the U.S. Supreme Court challenging the Court of Appeals' decision. On July 1, 2014, the U.S. Supreme Court granted the petition for a writ of certiorari. On January 12, 2015, the U.S. Supreme Court heard oral argument and the case is pending.

In September 2012, the State of Nevada Supreme Court, which is handling the remaining case, affirmed dismissal by the Eighth Judicial District Court for Clark County, Nevada of all plaintiffs' claims against GenOn. In February 2013, the plaintiffs in the Nevada case filed a petition for a writ of certiorari to the U.S. Supreme Court. In June 2013, the U.S. Supreme Court denied the petition for a writ of certiorari, thereby ending one of the five lawsuits. GenOn has agreed to indemnify CenterPoint against certain losses relating to these lawsuits.

116

*Cheswick Class Action Complaint (GenOn)*

In April 2012, a putative class action lawsuit was filed against GenOn in the Court of Common Pleas of Allegheny County, Pennsylvania alleging that emissions from the Cheswick generating facility have damaged the property of neighboring residents. GenOn disputes these allegations. Plaintiffs have brought nuisance, negligence, trespass and strict liability claims seeking both damages and injunctive relief. Plaintiffs seek to certify a class that consists of people who own property or live within one mile of the plant. In July 2012, GenOn removed the lawsuit to the U.S. District Court for the Western District of Pennsylvania. In October 2012, the District Court granted GenOn's motion to dismiss, which plaintiffs appealed to the U.S. Court of Appeals for the Third Circuit. On August 20, 2013, the Court of Appeals reversed the decision of the District Court. On September 3, 2013, GenOn filed a petition for rehearing with the Court of Appeals which was subsequently denied. In February 2014, NRG filed a petition for a writ of certiorari to the U.S. Supreme Court seeking review and reversal of the Court of Appeals' decision. On June 2, 2014, the U.S. Supreme Court denied the petition for a writ of certiorari. Following the U.S. Supreme Court's denial of GenOn's petition for a writ of certiorari, the case continued to be litigated before the U.S. District Court for the Western District of Pennsylvania. After briefing by the parties on GenOn's motion to strike class allegations in the complaint, the court granted GenOn's motion, but allowed the plaintiffs the opportunity to re-file their complaint. On February 3, 2015, plaintiffs sought leave to file an amended complaint, which NRG is contesting.

*Cheswick Monarch Mine NOV (GenOn)*

In 2008, the PADEP issued an NOV related to the Monarch mine located near the Cheswick generating facility. It has not been mined for many years. GenOn discharged approved wastewaters into the Monarch mine including low-volume wastewater from the Cheswick generating facility and leachate collected from ash disposal facilities. The NOV addresses a permit requirement to pump a minimum water volume from the mine. On September 2, 2014, GenOn's subsidiary that owns the Cheswick generating facility, the Commonwealth of Pennsylvania and the PADEP entered into a Consent Order and Agreement resolving the NOV. Pursuant to that Consent Order and Agreement, GenOn will, among other things, cease wastewater discharges to the mine, construct a waste treatment facility and contribute $200,000 to the Indianola Mine Trust. GenOn is currently planning to incur capital expenditures in connection with wastewater from Cheswick and leachate from ash disposal facilities.

*Maryland Department of the Environment v. GenOn Chalk Point and GenOn Mid-Atlantic*

On January 25, 2013, Food & Water Watch, the Patuxent Riverkeeper and the Potomac Riverkeeper (together, the Citizens Group) sent GenOn Mid-Atlantic a letter alleging that the Chalk Point, Dickerson and Morgantown generating facilities were violating the terms of the three National Pollution Discharge Elimination System permits by discharging nitrogen and phosphorous in excess of the limits in each permit. On March 21, 2013, the MDE sent GenOn Mid-Atlantic a similar letter with respect to the Chalk Point and Dickerson facilities, threatening to sue within 60 days if the facilities were not brought into compliance. On June 11, 2013, the Maryland Attorney General on behalf of the MDE filed a complaint in the U.S. District Court for the District of Maryland alleging violations of the CWA and Maryland environmental laws related to water. The lawsuit is ongoing and seeks injunctive relief and civil penalties in excess of $100,000. The Registrants do not expect the resolution of this matter to have a material impact on the Registrants' consolidated financial position, results of operations, or cash flows.

*Chapter 11 Proceedings (GenOn and GenOn Americas Generation)*

In July 2003, and various dates thereafter, the Mirant Debtors filed voluntary petitions in the Bankruptcy Court for relief under Chapter 11 of the U.S. Bankruptcy Code. GenOn Energy Holdings and most of the other Mirant Debtors emerged from bankruptcy on January 3, 2006, when the Plan became effective. The remaining Mirant Debtors emerged from bankruptcy on various dates in 2007. Approximately 461,000 of the shares of GenOn Energy Holdings common stock to be distributed under the Plan have not yet been distributed and have been reserved for distribution with respect to claims disputed by the Mirant Debtors that have not been resolved. Upon the Mirant/RRI Merger, those reserved shares converted into a reserve for approximately 1.3 million shares of GenOn common stock. Upon the NRG Merger, those reserved shares converted into a reserve for approximately 159,000 shares of NRG common stock. Under the terms of the Plan, upon the resolution of such a disputed claim, the claimant will receive the same pro rata distributions of common stock, cash, or both as previously allowed claims, regardless of the price at which the common stock is trading at the time the claim is resolved. If the aggregate amount of any such payouts results in the number of reserved shares being insufficient, additional shares of common stock may be issued to address the shortfall.

**Note 17 — Regulatory Matters (GenOn, GenOn Americas Generation, GenOn Mid-Atlantic)**

The Registrants operate in a highly regulated industry and are subject to regulation by various federal and state agencies. As such, the Registrants are affected by regulatory developments at both the federal and state levels and in the regions in which they operate. In addition, the Registrants are subject to the market rules, procedures, and protocols of the various ISO and RTO markets in which they participate. These power markets are subject to ongoing legislative and regulatory changes that may impact the Registrants' wholesale business.

In addition to the regulatory proceedings noted below, the Registrants are parties to other regulatory proceedings arising in the ordinary course of business or have other regulatory exposure. In management's opinion, the disposition of these ordinary course matters will not materially adversely affect the Registrants' respective consolidated financial position, results of operations, or cash flows.

*National*

*Court Rejects FERC's Jurisdiction Over Demand Response* — On May 23, 2014, the U.S. Court of Appeals for the District of Columbia Circuit vacated FERC's rules (known as Order No. 745) that allow demand response resources to participate in FERC-jurisdictional energy markets. The Court of Appeals held that the Federal Power Act does not authorize FERC to exercise jurisdiction over demand response and that instead demand response is part of the retail market over which the states have jurisdiction. The specific order being challenged related to energy market compensation, but this ruling also calls into question whether demand response will be permitted to participate in the capacity markets in the future. The U.S. Court of Appeals for the District of Columbia Circuit issued a stay of its decision in order to allow the U.S. Supreme Court to consider the case. The U.S. Solicitor General, on behalf of FERC, filed a petition for a writ of certiorari on January 15, 2015.  On the same date, EnerNOC, Inc. and other private entities filed their own petition for a writ of certiorari in the matter. NRG filed a friend-of-the-court brief with the U.S. Supreme Court on February 17, 2015, supporting the U.S. Solicitor General's and EnerNOC's position and urging the U.S. Supreme Court to grant certiorari. The eventual outcome of this proceeding could result in refunds of payments made for non-jurisdictional services and resettlement of wholesale markets but it is not possible to estimate the impact on the Registrants at this time.

*East Region (GenOn)*

*RMR Agreements for Elrama and Niles* — In May 2012, GenOn filed with FERC an RMR rate schedule governing operation of unit 4 of the Elrama generating facility and unit 1 of the Niles generating facility. On December 8, 2014, FERC approved a contested settlement finalizing the payments associated with the RMR services provided. The Registrants have made appropriate refunds.

*Montgomery County Station Power Tax* — On December 20, 2013, NRG received a letter from Montgomery County, Maryland requesting payment of an energy tax for the consumption of station power at the Dickerson Facility over the previous three years.  Montgomery County seeks payment in the amount of $22 million, which includes tax, interest and penalties.  NRG is disputing the applicability of the tax. On December 17, 2014, the Maryland Tax Court heard oral arguments from the parties. Additional briefing is underway.

118

.

**Note 18 — Environmental Matters (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

The Registrants are subject to a wide range of environmental laws in the development, construction, ownership and operation of projects. These laws generally require that governmental permits and approvals be obtained before construction and during operation of power plants. Environmental laws have become increasingly stringent and the Registrants expect this trend to continue. The electric generation industry is likely to face new requirements to address various emissions, including GHG, as well as combustion byproducts, water discharge and use, and threatened and endangered species. In general, future laws are expected to require the addition of emissions controls or other environmental controls or to impose certain restrictions on the operations of the Registrants' facilities, which could have a material effect on the Registrants' operations.

The EPA finalized CSAPR in 2011, which was intended to replace CAIR in January 2012. In December 2011, the U.S. Court of Appeals for the District of Columbia Circuit stayed the implementation of CSAPR and then issued an opinion in August 2012 vacating CSAPR and keeping CAIR in place until the EPA could replace it. On April 29, 2014, the U.S. Supreme Court reversed and remanded the D.C. Circuit's decision. In October 2014, the D.C. Circuit lifted the stay of CSAPR. In response, the EPA issued an interim final rule in November 2014 to amend the CSAPR compliance dates. Accordingly, CSAPR replaced CAIR on January 1, 2015. On February 25, 2015, the D.C. Circuit held oral argument regarding several unresolved legal issues and the Registrants expect a decision in the second quarter of 2015. While the Registrants cannot predict the final outcome of the ongoing litigation, the Registrants believe their investment in pollution controls and cleaner technologies coupled with planned plant retirements should leave the fleet well positioned for compliance.

In December 2014, the EPA proposed making the NAAQS for ozone more stringent. The EPA anticipates promulgating a more stringent ozone NAAQS by October 2015. A more stringent NAAQS would obligate the states to develop plans to reduce NOx (an ozone precursor), which might affect some of the Registrants' units.

In February 2012, the EPA promulgated standards to control emissions of HAPs from coal and oil-fired electric generating units. The rule established limits for mercury, non-mercury metals, certain organics and acid gases, which limits must be met beginning in April 2015 (with some units getting a 1-year extension). In November 2014, the U.S. Supreme Court agreed to review the D.C. Circuit decision that denied the petitions seeking to vacate MATS but the review will be limited to whether the EPA unreasonably refused to consider costs in determining whether it is appropriate to regulate hazardous air pollutants emitted by electric generating units. The oral argument in the Supreme Court is scheduled for March 2015.

In January 2014, the EPA re-proposed the NSPS for $CO_2$ emissions from new fossil-fuel-fired electric generating units that had been previously proposed in April 2012. The re-proposed standards are 1,000 pounds of $CO_2$ per MWh for large gas units and 1,100 pounds of $CO_2$ per MWh for coal units and small gas units. Proposed standards are in effect until a final rule is published or another rule is re-proposed. In June 2014, the EPA proposed a rule that would require states to develop $CO_2$ emission standards that would apply to existing fossil-fueled generating facilities. Specifically, the EPA proposed state-specific rate-based standards for $CO_2$ emissions, as well as guidelines for states to follow in developing plans to achieve the state-specific goals. The EPA anticipates finalizing these rules in the summer of 2015.

*Water*

In August 2014, the EPA finalized the regulation regarding once through cooling from existing facilities to address impingement and entrainment concerns. The Registrants anticipate that more stringent requirements will be incorporated into some of their water discharge permits over the next several years.

*Byproducts, Wastes, Hazardous Materials and Contamination*

In December 2014, the EPA released a pre-publication version of a final rule that when published in the Federal Register will regulate byproducts of coal combustion (e.g., ash and gypsum) as solid wastes under the RCRA. In 2010, the EPA had proposed two alternatives. Under the first proposal, these byproducts would be regulated as solid wastes. Under the second proposal, these byproducts would have been regulated as "special wastes" in a manner similar to the regulation of hazardous waste with an exception for certain types of beneficial use of these byproducts. The second alternative would have imposed significantly more stringent requirements and materially increased the cost of disposal of coal combustion byproducts. The Registrants are evaluating the impact of the new rule on their results of operations, financial condition and cash flows.

119

*East Region*

In 2008, the PADEP issued an NOV related to the Monarch mine located near the Cheswick generating facility. It has not been mined for many years. GenOn discharged approved wastewaters into the Monarch mine including low-volume wastewater from the Cheswick generating facility and leachate collected from ash disposal facilities. The NOV addresses a permit requirement to pump a minimum water volume from the mine. On September 2, 2014, GenOn's subsidiary that owns the Cheswick generating facility, the Commonwealth of Pennsylvania and the PADEP entered into a Consent Order and Agreement resolving the NOV. Pursuant to that Consent Order and Agreement, GenOn will, among other things, cease wastewater discharges to the mine, construct a waste treatment facility and contribute $200,000 to the Indianola Mine Trust. GenOn is currently planning to incur capital expenditures in connection with wastewater from Cheswick and leachate from ash disposal facilities.

*Maryland Environmental Regulations* — In October 2014, the MDE released a draft of a proposed regulation regarding $NO_x$ emissions from coal-fired electric generating units. The MDE draft regulation was proposed in the Maryland Register in December 2014. If finalized as proposed, the regulation would require by June 2020 the Registrants (at each of the three Dickerson coal-fired units and the Chalk Point coal-fired unit that does not have an SCR) to (1) install and operate an SCR; (2) retire the unit; or (3) convert the fuel source from coal to natural gas. The implementation of the MDE regulation could negatively affect certain of the Registrants' coal-fired units in Maryland.

For further discussion of these matters, refer to Note 16, *Commitments and Contingencies – Contingencies.*

### Environmental Capital Expenditures

Based on current rules, technology and plans based on proposed rules, GenOn estimates that environmental capital expenditures from 2015 through 2019 required to meet GenOn's regulatory environmental laws will be approximately $58 million for GenOn, which includes $15 million for GenOn Americas Generation. The amount for GenOn Americas Generation includes $10 million for GenOn Mid-Atlantic.

## Note 19 — Guarantees (GenOn and GenOn Americas Generation)

GenOn and GenOn Americas Generation and their respective subsidiaries enter into various contracts that include indemnification and guarantee provisions as a routine part of their business activities. Examples of these contracts include asset purchases and sale agreements, commodity sale and purchase agreements, retail contracts, EPC agreements, operation and maintenance agreements, service agreements, settlement agreements, and other types of contractual agreements with vendors and other third parties, as well as affiliates. These contracts generally indemnify the counterparty for tax, environmental liability, litigation and other matters, as well as breaches of representations, warranties and covenants set forth in these agreements. In some cases, GenOn's and GenOn Americas Generation's maximum potential liability cannot be estimated, since the underlying agreements contain no limits on potential liability.

The following table summarizes the maximum potential exposures that can be estimated for guarantees, indemnities, and other contingent liabilities by maturity:

*GenOn*

| Guarantees | By Remaining Maturity at December 31, 2014 | | | | | | | | | | December 31, 2013 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Under 1 Year | | 1-3 Years | | 3-5 Years | | Over 5 Years | | Total | | Total | |
| | (In millions) | | | | | | | | | | (In millions) | |
| Letters of credit and surety bonds | $ | 81 | $ | 1 | $ | — | $ | — | $ | 82 | $ | 98 |
| Asset sales guarantee obligations | | 35 | | — | | — | | — | $ | 35 | | 0 |
| Commercial sales arrangements | | 37 | | 26 | | — | | 140 | | 203 | | 242 |
| Other guarantees | | 10 | | — | | — | | 47 | | 57 | | 59 |
| Total guarantees | $ | 163 | $ | 27 | $ | — | $ | 187 | $ | 377 | $ | 399 |

120

*GenOn Americas Generation*

| Guarantees | By Remaining Maturity at December 31, 2014 | | | | | December 31, 2013 |
|---|---|---|---|---|---|---|
| | Under 1 Year | 1-3 Years | 3-5 Years | Over 5 Years | Total | Total |
| | (In millions) | | | | | (In millions) |
| Surety bonds | $ 7 | $ — | $ — | $ — | $ 7 | $ 6 |
| Commercial sales arrangements | — | — | — | — | — | 8 |
| Total guarantees | $ 7 | $ — | $ — | $ — | $ 7 | $ 14 |

*Letters of credit and surety bonds* — As of December 31, 2014, GenOn and GenOn Americas Generation and their respective subsidiaries were contingently obligated for a total of $82 million and $7 million under surety bonds, respectively. In addition, $237 million of letters of credit were issued under the NRG credit agreement with GenOn. See Note 15, *Related Party Transactions*. Of those letters of credit, $173 million were issued on behalf of GenOn Americas Generation's subsidiaries and $0 million were issued on behalf of GenOn Mid-Atlantic. Most of these letters of credit are issued in support of their obligations to perform under commodity agreements and surety bonds are issued for obligations associated with future closure and maintenance of ash sites, as well as for financing or other arrangements. A majority of these surety bonds expire within one year of issuance, and it is typical for GenOn and GenOn Americas Generation to renew them on similar terms.

*Commercial sales arrangements* — In connection with the purchase and sale of fuel, emission allowances and power generation products to and from third parties with respect to the operation of some of GenOn's and GenOn Americas Generation's generation facilities in the U.S., they may be required to guarantee a portion of the obligations of certain of their subsidiaries. These obligations may include liquidated damages payments or other unscheduled payments. At December 31, 2014, GenOn is contingently obligated for a total of $101 million under such guarantees issued on behalf of GenOn Americas Generation's subsidiaries. GenOn and GenOn Americas Generation do not believe that they will be required to make any material payments under these commercial sales agreements.

*Other guarantees* — GenOn and GenOn Americas Generation have issued guarantees of obligations that their subsidiaries may incur as a provision for environmental site remediation, payment of debt obligations, rail car leases, performance under purchase, EPC and operating and maintenance agreements. In addition, at December 31, 2014, GenOn Energy Holdings has issued $4 million of guarantees on behalf of a GenOn Americas Generation subsidiary related to settlement agreement obligations. GenOn has also guaranteed some non-qualified benefits of CenterPoint's existing retirees at September 20, 2002. The estimated maximum potential amount of future payments under the CenterPoint guarantee is $56 million at December 31, 2014 (included in the table above) and $2 million is recorded in the GenOn balance sheet for this item. GenOn and GenOn Americas Generation do not believe that they will be required to make any material payments under these guarantees.

*Other indemnities* — Other indemnifications GenOn and GenOn Americas Generation have provided cover operational, tax, litigation and breaches of representations, warranties and covenants. GenOn and GenOn Americas Generation have also indemnified, on a routine basis in the ordinary course of business, financing parties, consultants or other vendors who have provided services to them. GenOn's and GenOn Americas Generation's maximum potential exposure under these indemnifications can range from a specified dollar amount to an indeterminate amount, depending on the nature of the transaction. Total maximum potential exposure under these indemnifications is not estimable due to uncertainty as to whether claims will be made or how they will be resolved. GenOn and GenOn Americas Generation do not believe that they will be required to make any material payments under these indemnity provisions.

Because many of the guarantees and indemnities GenOn and GenOn Americas Generation issue to third parties and affiliates do not limit the amount or duration of their obligations to perform under them, there exists a risk that GenOn or GenOn Americas Generation may have obligations in excess of the amounts described above. For those guarantees and indemnities that do not limit the liability exposure, it may not be possible to estimate what GenOn's or GenOn Americas Generation's liability would be, until a claim is made for payment or performance, due to the contingent nature of these contracts.

Schedule I

**GENON ENERGY, INC. (PARENT)**

**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED STATEMENTS OF OPERATIONS**

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | For the Year Ended December 31, 2014 | For the Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | | (In millions) |
| **Operating Income/(Loss)** | $ — | $ — | $ — | $ — |
| **Other Income/(Expense)** | | | | |
| Equity in losses of consolidated subsidiaries | 242 | 17 | (69) | (260) |
| Other income/(expense), net | 84 | 74 | 4 | 79 |
| Interest expense | (129) | (140) | (7) | (217) |
| Total other income/(expense) | 197 | (49) | (72) | (398) |
| **Loss Before Income Taxes** | 197 | (49) | (72) | (398) |
| Income tax (benefit)/expense | — | (6) | — | 16 |
| **Net Income/(Loss)** | $ 197 | $ (43) | $ (72) | $ (414) |

See notes to condensed financial statements.

122

.

Schedule I

**GENON ENERGY, INC. (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**

**CONDENSED BALANCE SHEETS**

| | As of December 31, | |
|---|---|---|
| | **2014** | **2013** |
| | (In millions) | |
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 490 | $ 621 |
| Accounts receivable — affiliate | — | 27 |
| Notes receivable — affiliate | 386 | 592 |
| Taxes receivable and other current assets | 214 | 7 |
| Total current assets | 1,090 | 1,247 |
| **Other Assets** | | |
| Investment in subsidiaries | 476 | 346 |
| Notes receivable — affiliate | 1,025 | 1,025 |
| Total other assets | 1,501 | 1,371 |
| **Total Assets** | $ 2,591 | $ 2,618 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| **Current Liabilities** | | |
| Accrued taxes | $ 1 | $ 6 |
| Accrued expenses and other current liabilities | 34 | 90 |
| Total current liabilities | 35 | 96 |
| **Other Liabilities** | | |
| Long-term debt | 2,148 | 2,205 |
| Other non-current liabilities | 2 | 3 |
| Total non-current liabilities | 2,150 | 2,208 |
| **Total Liabilities** | 2,185 | 2,304 |
| **Commitments and Contingencies** | | |
| **Stockholder's Equity** | | |
| Common stock: $0.001 par value, 1 share authorized and issued at December 31, 2014 and 2013 | — | — |
| Additional paid-in capital | 327 | 327 |
| Retained earnings | 83 | (114) |
| Accumulated other comprehensive income | (4) | 101 |
| **Total Stockholder's Equity** | 406 | 314 |
| **Total Liabilities and Stockholder's Equity** | $ 2,591 | $ 2,618 |

See notes to condensed financial statements.

123

.

Schedule I

**GENON ENERGY, INC. (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED STATEMENTS OF CASH FLOWS**

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | **For the year ended December 31, 2014** | **For the year ended December 31, 2013** | **December 15, 2012 through December 31, 2012** | **January 1, 2012 through December 14, 2012** |
| | (In millions) | | | (In millions) |
| **Cash Flows from Operating Activities** | | | | |
| Net cash used by operating activities | $ (165) | $ 491 | $ (66) | $ (134) |
| **Cash Flows from Investing Activities** | — | | | |
| Net cash form sale of Marsh Landing | — | 175 | — | — |
| Proceeds from sale of equity method investments | 35 | | | |
| Issuance/(receipt) of notes receivables — affiliate | — | — | 25 | 46 |
| Net cash provided by investing activities | 35 | 175 | 25 | 46 |
| **Cash Flows from Financing Activities** | | | | |
| Payments of short and long-term debt | (1) | (575) | — | — |
| Net cash used by financing activities | (1) | (575) | — | — |
| **Net Increase/(Decrease) in Cash and Cash Equivalents** | (131) | 91 | (41) | (88) |
| **Cash and Cash Equivalents at Beginning of Period** | 621 | 530 | 571 | 659 |
| **Cash and Cash Equivalents at End of Period** | $ 490 | $ 621 | $ 530 | $ 571 |
| **Supplemental Disclosures** | | | | |
| Cash paid for interest, net of amounts capitalized | $ 240 | $ 138 | $ 50 | $ 169 |
| Cash paid for income taxes (net of refunds received) | | $ — | $ — | $ 34 |

See notes to condensed financial statements.

124

.

## GENON ENERGY, INC. (PARENT)
### NOTES TO CONDENSED FINANCIAL STATEMENTS

**1.    Background and Basis of Presentation**

*Background*

The condensed parent company financial statements have been prepared in accordance with Rule 12-04, Schedule I of Regulation S-X, as the restricted net assets of GenOn Energy Inc.'s subsidiaries exceed 25% of the consolidated net assets of GenOn Energy, Inc. These statements should be read in conjunction with the consolidated statements and notes thereto of the Registrants.

RRI Energy (a Delaware corporation) changed its name from Reliant Energy, Inc. effective May 2009 in connection with the sale of its retail business. GenOn changed its name from RRI Energy effective December 3, 2010 in connection with the merger with Mirant. "GenOn" refers to GenOn Energy, Inc. and, except where the context indicates otherwise, its subsidiaries, after giving effect to the Mirant/RRI Merger.

*NRG Merger*

On July 20, 2012, GenOn entered into the NRG Merger Agreement with NRG and a direct wholly-owned subsidiary of NRG. Upon the terms and subject to the conditions set forth in the NRG Merger Agreement, which was approved by the boards of directors of GenOn and NRG, a wholly-owned subsidiary of NRG merged with and into GenOn, with GenOn continuing as the surviving corporation and a wholly-owned subsidiary of NRG.

Upon closing of the NRG Merger, each issued and outstanding share of GenOn's common stock automatically converted into the right to receive 0.1216 shares of common stock of NRG based on the NRG Merger Exchange Ratio. All outstanding stock options (other than options granted in 2012) immediately vested and all outstanding stock options generally converted upon completion of the NRG Merger into stock options with respect to NRG common stock, after giving effect to the NRG Merger Exchange Ratio. In addition, all outstanding restricted stock units (other than restricted stock units granted in 2012) immediately vested and all outstanding restricted stock units were exchanged for the NRG Merger consideration. All outstanding stock options and unvested restricted stock units granted in 2012 will vest per the terms and conditions of the grant, and if the holder is terminated, upon the holder's termination date if the termination is as a result of the NRG Merger and within two years of the closing date. See Note 3, *NRG Merger and Dispositions*, to the Registrants' consolidated financial statements.

*Basis of Presentation*

Upon completion of the Mirant/RRI Merger, Mirant stockholders had a majority of the voting interest in the combined company. Although RRI Energy issued shares of RRI Energy common stock to Mirant stockholders to effect the Mirant/RRI Merger, the Mirant/RRI Merger was accounted for as a reverse acquisition under the acquisition method of accounting. Under the acquisition method of accounting, Mirant is treated as the accounting acquirer and RRI Energy is treated as the acquired company for financial reporting purposes. As such, the condensed financial statements of GenOn Energy, Inc. (parent) include the results of GenOn Energy, Inc. for the periods from December 3, 2010, and include the results of GenOn Energy Holdings (former parent) through December 2, 2010. The condensed financial statements presented herein for periods ended prior to the closing of the Mirant/RRI Merger (and any other financial information presented herein with respect to such pre-merger dates, unless otherwise specified) are the condensed financial statements and other financial information of Mirant.

Equity in income/loss of affiliates consists of earnings of direct subsidiaries of GenOn Energy, Inc. (parent).

*Predecessor and Successor Reporting*

Upon completion of the NRG Merger, NRG stockholders had a majority of the voting interest in the combined company. The NRG Merger is accounted for under the acquisition method of accounting. Under the acquisition method of accounting, NRG is treated as the accounting acquirer and GenOn is treated as the acquired company for financial reporting purposes. As such, the assets and liabilities of GenOn Energy, Inc. were recorded at their respective fair values as of the NRG Merger date. Fair value adjustments related to the NRG Merger have been pushed down to GenOn Energy, Inc., resulting in certain assets and liabilities of the Registrants being recorded at fair value at December 15, 2012. See Note 3, *NRG Merger,* to the Registrants' consolidated financial statements for further discussion.

As a result of the impact of pushdown accounting, the financial statements and certain note presentations separate GenOn Energy, Inc.'s presentations into two distinct periods, the period before the consummation of the NRG Merger (labeled predecessor) and the period after that date (labeled successor), to indicate the application of different basis of accounting between the periods presented.

### *Cash Dividends Received*

For the year ended December 31, 2014 and 2013, the period from December 15, 2012 through December 31, 2012 and the period from January 1, 2012 through December 14, 2012, GenOn Energy, Inc. did not receive any cash dividends from its subsidiaries.

### 2.   Long-Term Debt

For a discussion of GenOn Energy, Inc.'s long-term debt, see Note 10, *Debt and Capital Leases,* to the Registrants' consolidated financial statements.

Debt maturities of GenOn Energy, Inc. as of December 31, 2014 are (in millions):

| | | |
|---|---|---:|
| 2017 | $ | 725 |
| 2018 | | 675 |
| Thereafter | | 550 |
| Total | $ | 1,950 |

### 3.   Commitments, Contingencies and Guarantees

See Note 13, *Income Taxes* and Note 16, *Commitments and Contingencies* to the Registrants' consolidated financial statements for a detailed discussion of GenOn Energy, Inc.'s contingencies.

As of December 31, 2014, GenOn Energy, Inc. had $57 million of guarantees, which are included in Note 19, *Guarantees,* to the Registrants' consolidated financial statements.

**SCHEDULE II. VALUATION AND QUALIFYING ACCOUNTS**
**GENON ENERGY, INC. AND SUBSIDIARIES**

**For the Years Ended December 31, 2014 and 2013,**
**Periods from December 15, 2012 through December 31, 2012**
**and from January 1, 2012 through December 14, 2012**

| | Balance at Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Provision for uncollectible accounts** [a] | | | | | |
| <u>Successor</u> | | | | | |
| Year Ended December 31, 2014 | $ 1 | $ — | $ — | $ (1) | — |
| Year Ended December 31, 2013 | 4 | — | — | (3) | 1 |
| December 15, 2012 through December 31, 2012 | 4 | — | — | — | 4 |
| <u>Predecessor</u> | | | | | |
| January 1, 2012 through December 14, 2012 | $ 48 | $ — | $ — | $ (43) [b] | $ 5 |
| | | | | | |
| **Income tax valuation allowance, deducted from deferred tax assets** | | | | | |
| <u>Successor</u> | | | | | |
| Year Ended December 31, 2014 | $ 2,672 | $ — | $ 107 | $ — | $ 2,779 |
| Year Ended December 31, 2013 | 2,324 | — | 348 | — | 2,672 |
| December 15, 2012 through December 31, 2012 | 2,300 | — | 24 | — | 2,324 |
| <u>Predecessor</u> | | | | | |
| January 1, 2012 through December 14, 2012 | $ 1,819 | $ — | $ 165 | $ — | $ 1,984 |

(a)   Provision for uncollectible accounts represents credit reserves for derivative contract assets.

(b)   Deductions consisted primarily of reversals of credit reserves for derivative contract assets.

127

Schedule I

**GENON AMERICAS GENERATION, LLC (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED STATEMENTS OF OPERATIONS**

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | For the Year Ended December 31, 2014 | For the Year Ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | | (In millions) |
| **Operating Income** | $ — | $ — | $ — | $ — |
| **Other Income/(Expense)** | | | | |
| Equity in (losses)/earnings of consolidated subsidiaries | 371 | 123 | — | (11) |
| Interest expense | (66) | (64) | (3) | (69) |
| Total other income/(expense) | 305 | 59 | (3) | (80) |
| **Income/(Loss) Before Income Taxes** | 305 | 59 | (3) | (80) |
| Income tax expense | — | — | — | — |
| **Net Income/(Loss)** | $ 305 | $ 59 | $ (3) | $ (80) |

See notes to condensed financial statements.

128

.

**Schedule I**

**GENON AMERICAS GENERATION, LLC (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED BALANCE SHEETS**

| | As of December 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| | (In millions) | |
| **ASSETS** | | |
| **Current Assets** | | |
| Accounts receivable | $ 2 | $ 1 |
| Total current assets | 2 | 1 |
| **Other Assets** | | |
| Investment in subsidiaries | 1,770 | 1,653 |
| Other non-current assets | — | — |
| Total other assets | 1,770 | 1,653 |
| **Total Assets** | $ 1,772 | $ 1,654 |
| **LIABILITIES AND MEMBER'S EQUITY** | | |
| **Current Liabilities** | | |
| Note payable — affiliate | $ 11 | $ 11 |
| Accrued expenses and other current liabilities | 16 | 16 |
| Total current liabilities | 27 | 27 |
| **Other Liabilities** | | |
| Long-term debt | 929 | 937 |
| Total non-current liabilities | 929 | 937 |
| **Total Liabilities** | 956 | 964 |
| **Commitments and Contingencies** | | |
| **Member's Equity** | | |
| Member's interest | 816 | 690 |
| Total member's equity | 816 | 690 |
| **Total Liabilities and Member's Equity** | $ 1,772 | $ 1,654 |

See notes to condensed financial statements.

129

.

Schedule I

**GENON AMERICAS GENERATION, LLC (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED STATEMENTS OF CASH FLOWS**

| | Successor | | | Predecessor |
| --- | --- | --- | --- | --- |
| | For the year ended December 31, 2014 | For the year ended December 31, 2013 | December 15, 2012 through December 31, 2012 | January 1, 2012 through December 14, 2012 |
| | (In millions) | | | (In millions) |
| **Cash Flows from Operating Activities** | | | | |
| Net cash provided by operating activities | $ 197 | $ 217 | $ — | $ 215 |
| **Cash Flows from Investing Activities** | | | | |
| Capitalized interest | (1) | (2) | — | (3) |
| Proceeds from sale of assets | 50 | — | — | — |
| Net cash used by investing activities | 49 | (2) | — | (3) |
| **Cash Flows from Financing Activities** | | | | |
| Capital contributions | 74 | 70 | — | 18 |
| Distributions to member | (320) | (285) | — | (230) |
| Net cash used by financing activities | (246) | (215) | — | (212) |
| **Net Decrease in Cash and Cash Equivalents** | — | — | — | — |
| **Cash and Cash Equivalents at Beginning of Period** | — | — | — | — |
| **Cash and Cash Equivalents at End of Period** | $ — | $ — | $ — | $ — |
| | | | | |
| **Supplemental Disclosures** | | | | |
| Cash paid for interest, net of amounts capitalized | 74 | 73 | $ — | $ 72 |

See notes to condensed financial statements.

130

.

## GENON AMERICAS GENERATION, LLC (PARENT)
## NOTES TO CONDENSED FINANCIAL STATEMENTS

### 1.    Background and Basis of Presentation

*Background*

The condensed parent company financial statements have been prepared in accordance with Rule 12-04, Schedule I of Regulation S-X, as the restricted net assets of GenOn Americas Generation, LLC's subsidiaries exceed 25% of the consolidated net assets of GenOn Americas Generation, LLC. These statements should be read in conjunction with the consolidated statements and notes thereto of the Registrants.

GenOn Americas Generation, LLC is a Delaware limited liability company and indirect wholly-owned subsidiary of GenOn Energy, Inc.

RRI Energy (a Delaware corporation) changed its name from Reliant Energy, Inc. effective May 2009 in connection with the sale of its retail business. GenOn changed its name from RRI Energy effective December 3, 2010 in connection with the merger with Mirant. "GenOn" refers to GenOn Energy, Inc. and, except where the context indicates otherwise, its subsidiaries, after giving effect to the Mirant/RRI Merger.

*NRG Merger*

On July 20, 2012, GenOn entered into the NRG Merger Agreement with NRG and a direct wholly-owned subsidiary of NRG. Upon the terms and subject to the conditions set forth in the NRG Merger Agreement, which was approved by the boards of directors of GenOn and NRG, a wholly-owned subsidiary of NRG merged with and into GenOn, with GenOn continuing as the surviving corporation and a wholly-owned subsidiary of NRG.

Upon closing of the NRG Merger, each issued and outstanding share of GenOn's common stock automatically converted into the right to receive 0.1216 shares of common stock of NRG based on the NRG Merger Exchange Ratio. All outstanding stock options (other than options granted in 2012) immediately vested and all outstanding stock options generally converted upon completion of the NRG Merger into stock options with respect to NRG common stock, after giving effect to the NRG Merger Exchange Ratio. In addition, all outstanding restricted stock units (other than restricted stock units granted in 2012) immediately vested and all outstanding restricted stock units were exchanged for the NRG Merger consideration. All outstanding stock options and unvested restricted stock units granted in 2012 will vest per the terms and conditions of the grant, and if the holder is terminated, upon the holder's termination date if the termination is as a result of the NRG Merger and within two years of the closing date. See Note 3, *NRG Merger and Dispositions,* to the Registrants' consolidated financial statements.

*Basis of Presentation*

The condensed financial statements presented herein are the condensed financial statements and other financial information of GenOn Americas Generation, LLC.

Equity in income/loss of affiliates consists of earnings of direct subsidiaries of GenOn Americas Generation, LLC (parent).

*Predecessor and Successor Reporting*

Upon completion of the NRG Merger, NRG stockholders had a majority of the voting interest in the combined company. The NRG Merger is accounted for under the acquisition method of accounting. Under the acquisition method of accounting, NRG is treated as the accounting acquirer and GenOn is treated as the acquired company for financial reporting purposes. As such, the assets and liabilities of GenOn Americas Generation, LLC were recorded at their respective fair values as of the NRG Merger date. Fair value adjustments related to the NRG Merger have been pushed down to GenOn Americas Generation, LLC resulting in certain assets and liabilities of the Registrants being recorded at fair value at December 15, 2012. See Note 3, *NRG Merger,* to the Registrants' consolidated financial statements for further discussion.

As a result of the impact of pushdown accounting, the financial statements and certain note presentations separate GenOn Americas Generation's presentations into two distinct periods, the period before the consummation of the NRG Merger (labeled predecessor) and the period after that date (labeled successor), to indicate the application of different basis of accounting between the periods presented.

*Cash Dividends and Distributions*

For the years ended December 31, 2014 and 2013, GenOn Americas Generation, LLC, received cash dividends from its subsidiaries of $320 million and $285 million. GenOn Americas Generation, subsequently made distributions in the same amount, through its parent company NRG Americas, Inc. to GenOn Energy Holdings, Inc., a subsidiary of GenOn. During the period from December 15, 2012 through December 31, 2012, GenOn Americas Generation, LLC did not receive any cash dividends from its subsidiaries. During the period from January 1, 2012 through December 14, 2012, GenOn Americas Generation, LLC received cash dividends from its subsidiaries of $286 million.

**2.    Long-Term Debt**

For a discussion of GenOn Americas Generation, LLC's long-term debt, see Note 10, *Debt and Capital Leases,* to the Registrants' consolidated financial statements.

Debt maturities of GenOn Americas Generation, LLC as of December 31, 2014 are (in millions):

| | |
|---|---:|
| 2019 and thereafter | 850 |
| Total | $     850 |

**3.    Commitments, Contingencies and Guarantees**

See Note 16, *Commitments and Contingencies,* to the Registrants' consolidated financial statements for a detailed discussion of GenOn Americas Generation, LLC's contingencies.

At December 31, 2014, GenOn Americas Generation, LLC did not have any guarantees.

132

**SCHEDULE II. VALUATION AND QUALIFYING ACCOUNTS**
**GENON AMERICAS GENERATION, LLC AND SUBSIDIARIES**

**For the Years Ended December 31, 2014 and 2013,**
**Periods from December 15, 2012 through December 31, 2012**
**and from January 1, 2012 through December 14, 2012**

| | Balance at Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Provision for uncollectible accounts** [a] | | | | | |
| **Successor** | | | | | |
| Year Ended December 31, 2014 | $ 1 | $ — | $ — | $ (1) | $ — |
| Year Ended December 31, 2013 | 4 | — | — | (3) [b] | 1 |
| December 15, 2012 through December 31, 2012 | 4 | — | — | — | 4 |
| **Predecessor** | | | | | |
| January 1, 2012 through December 14, 2012 | $ 47 | $ — | $ — | $ (42) [b] | $ 5 |

(a)   Provision for uncollectible accounts represents credit reserves for derivative contract assets.

(b)   Deductions consisted primarily of reversals of credit reserves for derivative contract assets.

133

.

SCHEDULE II. VALUATION AND QUALIFYING ACCOUNTS

**GENON MID-ATLANTIC, LLC AND SUBSIDIARIES**

For the Years Ended December 31, 2014 and 2013,
Periods from December 15, 2012 through December 31, 2012
and from January 1, 2012 through December 14, 2012

| | Balance at Beginning of Period | | Charged to Costs and Expenses | | Charged to Other Accounts | | Deductions | | Balance at End of Period |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (In millions) | | | | |
| **Provision for uncollectible accounts** [a] | | | | | | | | | |
| **Successor** | | | | | | | | | |
| Year Ended December 31, 2014 | $ | 1 | $ | — | $ | — | $ | (1) | $ | — |
| Year Ended December 31, 2013 | | 4 | | — | | — | | (3) | | 1 |
| December 15, 2012 through December 31, 2012 | | 4 | | — | | — | | — [b] | | 4 |
| **Predecessor** | | | | | | | | | |
| January 1, 2012 through December 14, 2012 | $ | 47 | $ | — | $ | — | $ | (42) [b] | $ | 5 |

(a)   Provision for uncollectible accounts represents credit reserves for derivative contract assets.

(b)   Deductions consisted primarily of reversals of credit reserves for derivative contract assets.

134

**GenOn Energy, Inc. Exhibit Index**

| Exhibit No. | Exhibit Name |
| --- | --- |
| 2.1 | Stock and Note Purchase Agreement by and among Mirant Asia-Pacific Ventures, Inc., Mirant Asia-Pacific Holdings, Inc., Mirant Sweden International AB (publ), and Tokyo Crimson Energy Holdings Corporation, dated at December 11, 2006 (Incorporated herein by reference to Exhibit 2.1 to the Mirant Corporation Current Report on Form 8-K filed December 13, 2006) |
| 2.2** | Agreement and Plan of Merger, dated as of July 20, 2012, by and among NRG Energy, Inc., Plus Merger Corporation and GenOn Energy, Inc. (Incorporated herein by reference to Exhibit 2.1 to the Registrant's Form 8-K filed July 23, 2012) |
| 3.1 | Fourth Amended and Restated Certificate of Incorporation of GenOn Energy, Inc., effective as of December 14, 2012 (Incorporated herein by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed December 14, 2012) |
| 3.2 | Eighth Amended and Restated By-Laws of GenOn Energy, Inc., effective as of December 14, 2012 (Incorporated herein by reference to Exhibit 3.2 to the Registrant's Current Report on Form 8-K filed December 14, 2012) |
| 4.1 | Form of Stock Certificate (Incorporated herein by reference to Exhibit 4.1 to the Registrant's Quarterly Report on Form 10-Q filed May 10, 2012) |
| 4.2 | Form of Rights Agreement between Reliant Resources, Inc. and The Chase Manhattan Bank, as Rights Agent, including a form of Rights Certificates, dated at January 15, 2001 (Incorporated herein by reference to Exhibit 4.2 to the Registrant's Registration Statement on Form S-1/A Amendment No. 8, Registration No. 333-48038) |
| 4.3 | Amendment No. 1 to Rights Agreement, by and between RRI Energy, Inc., JPMorgan Chase Bank, N.A., and Computershare Trust Company, N.A., dated at November 23, 2010 (Incorporated herein by reference to Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed November 24, 2010) |
| 4.4 | Senior Indenture between Reliant Energy, Inc. and Wilmington Trust Company, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed December 27, 2004) |
| 4.5 | First Supplemental Indenture relating to the 6.75% Senior Secured Notes due 2014, among Reliant Energy, Inc., the Guarantors listed therein and Wilmington Trust Company, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed December 27, 2004) |
| 4.6 | Second Supplemental Indenture relating to the 6.75% Senior Secured Notes due 2014, among Reliant Energy, Inc., the Guarantors listed therein and Wilmington Trust Company, dated at September 21, 2006 (Incorporated herein by reference to Exhibit 4.18 to the Registrant's Annual Report on Form 10-K filed February 28, 2007) |
| 4.7 | Third Supplemental Indenture relating to the 6.75% Senior Secured Notes due 2014, among Reliant Energy, Inc., the Guarantors listed therein and Wilmington Trust Company, dated at December 1, 2006 (Incorporated herein by reference to Exhibit 4.3 to the Registrant's Current Report on Form 8-K filed December 7, 2006) |
| 4.8 | Sixth Supplemental Indenture relating to the 6.75% Senior Secured Notes due 2014, among RRI Energy, Inc. and Wilmington Trust Company, dated at June 1, 2009 (Incorporated herein by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q filed November 5, 2009) |
| 4.9 | Seventh Supplemental Indenture relating to the 6.75% Senior Secured Notes due 2014, between RRI Energy, Inc. and Wilmington Trust Company, dated at August 20, 2009 (Incorporated herein by reference to Exhibit 99.1 to the Registrant's Current Report on Form 8-K filed August 24, 2009) |
| 4.10 | Eighth Supplemental Indenture relating to the 6.75% Senior Secured Notes due 2014, among RRI Energy, Inc., the Guarantors listed therein and Wilmington Trust Company, dated at December 1, 2009 (Incorporated herein by reference to Exhibit 4.9 to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 4.11 | Indenture between Orion Power Holdings, Inc. and Wilmington Trust Company, dated at April 27, 2000 (Incorporated herein by reference to Exhibit 4.1 to the Orion Power Holdings, Inc. Registration Statement on Form S-1, Registration No. 333-44118 filed August 18, 2000) |
| 4.12 | Fourth Supplemental Indenture relating to the 7.625% Senior Notes due 2014, between Reliant Energy, Inc. and Wilmington Trust Company, dated at June 13, 2007 (Incorporated herein by reference to Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed June 15, 2007) |
| 4.13 | Fifth Supplemental Indenture relating to the 7.875% Senior Notes due 2017, between Reliant Energy, Inc. and Wilmington Trust Company, dated at June 13, 2007 (Incorporated herein by reference to Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed June 15, 2007) |
| 4.14 | Indenture between Mirant Americas Generation, Inc. and Bankers Trust Company, as trustee, relating to Senior Notes, dated at May 1, 2001 (Incorporated herein by reference to Exhibit 4.1 to the Mirant Americas Generation, Inc. Registration Statement on Form S-4, Registration No. 333-63240 filed June 18, 2001) |

135

| | |
|---|---|
| 4.15 | Second Supplemental Indenture relating to Senior Notes 8.300% due 2011, between Mirant Americas Generation, Inc. and Bankers Trust Company, dated at May 1, 2001 (Incorporated herein by reference to Exhibit 4.3 to the Mirant Americas Generation, Inc. Registration Statement on Form S-4, Registration No. 333-63240 filed June 18, 2001) |
| 4.16 | Third Supplemental Indenture from Mirant Americas Generation, Inc. to Bankers Trust Company, relating to 9.125% Senior Notes due 2031, dated at May 1, 2001 (Incorporated herein by reference to Exhibit 4.4 to the Mirant Americas Generation, Inc. Registration Statement on Form S-4, Registration No. 333-63240) |
| 4.17 | Fifth Supplemental Indenture from Mirant Americas Generation, Inc. to Bankers Trust Company, relating to 8.50% Senior Note due 2021, dated at October 9, 2001 (Incorporated herein by reference to Exhibit 4.6 to the Mirant Americas Generation, Inc. Registration Statement on Form S-4/A Amendment No. 1, Registration No. 333-85124) |
| 4.18 | Form of Sixth Supplemental Indenture from Mirant Americas Generation, LLC to Bankers Trust Company, dated at November 1, 2001, relating to indenture dated May 1, 2001 (Incorporated herein by reference to Exhibit 4.6 to the Mirant Corporation Annual Report on Form 10-K filed February 27, 2009) |
| 4.19 | Seventh Supplemental Indenture from Mirant Americas Generation, LLC to Wells Fargo Bank, National Association, dated at January 3, 2006, relating to indenture dated May 1, 2001 (Incorporated herein by reference to Exhibit 4.1 to the Mirant Americas Generation, LLC Quarterly Report on Form 10-Q filed May 14, 2007) |
| 4.20 | Form of Senior Note Indenture among Mirant North America, LLC, Mirant North America Escrow, LLC, MNA Finance Corp. and Law Debenture Trust Company of New York, as trustee dated as of December 23, 2005 (Incorporated herein by reference to Exhibit 4.2 to the Mirant Corporation Annual Report on Form 10-K filed March 14, 2006) |
| 4.21 | Form of 8.625% Series A Pass Through Certificate (Incorporated herein by reference to Exhibit 4.1 to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.22 | Form of 9.125% Series B Pass Through Certificate (Incorporated herein by reference to Exhibit 4.2 to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.23 | Form of 10.060% Series C Pass Through Certificate (Incorporated herein by reference to Exhibit 4.3 to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.24(a) | Pass Through Trust Agreement A between Southern Energy Mid-Atlantic, LLC and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.4(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.24(b) | Schedule identifying substantially identical agreement to Pass Through Trust Agreement A (Incorporated herein by reference to Exhibit 4.4(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.25(a) | Participation Agreement (L1) among Southern Energy Mid-Atlantic, LLC, as Lessee, Dickerson OL1 LLC, as Owner Lessor, Wilmington Trust Company, as Owner Manager, SEMA OP3 LLC, as Owner Participant and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee and as Pass Through Trustee, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.5(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.25(b) | Schedule identifying substantially identical agreements to Participation Agreement (Incorporated herein by reference to Exhibit 4.5(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.26(a) | Participation Agreement (L1) among Southern Energy Mid-Atlantic, LLC, as Lessee, Morgantown OL1 LLC, as Owner Lessor, Wilmington Trust Company, as Owner Manager, SEMA OP1 LLC, as Owner Participant and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee and as Pass Through Trustee, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.6 (a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.26(b) | Schedule identifying substantially identical agreement to Participation Agreement (Incorporated herein by reference to Exhibit 4.6 (b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-6166 filed May 25, 2001) |
| 4.27(a) | Facility Lease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, as Facility Lessee and Dickerson OL1 LLC, as Owner Lessor, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.7(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.27(b) | Schedule identifying substantially identical agreement to Facility Lease Agreement (Incorporated herein by reference to Exhibit 4.7(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.28(a) | Facility Lease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, as Facility Lessee and Morgantown OL1 LLC, as Owner Lessor, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.8(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |

4.28(b)    Schedule identifying substantially identical agreement to Facility Lease Agreement (Incorporated herein by reference to Exhibit 4.8(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001)

4.29(a)    Indenture of Trust, Mortgage and Security Agreement (L1) between Dickerson OL1 LLC, as Owner Lessor, and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.9(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001)

4.29(b)    Schedule identifying substantially identical agreement to Indenture of Trust, Mortgage and Security Agreement (Incorporated herein by reference to Exhibit 4.9(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001)

4.30(a)    Indenture of Trust, Mortgage and Security Agreement (L1) between Morgantown OL1 LLC, as Owner Lessor, and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.10(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001)

4.30(b)    Schedule identifying substantially identical agreement to Indenture of Trust, Mortgage and Security Agreement (Incorporated herein by reference to Exhibit 4.10(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001)

4.31(a)    Series A Lessor Note Due June 20, 2012 for Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.11(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001)

4.31(b)    Schedule identifying substantially identical notes to Lessor Notes (Incorporated herein by reference to Exhibit 4.11(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001)

4.32(a)    Series A Lessor Note Due June 30, 2008, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.12(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001)

4.32(b)    Schedule identifying substantially identical notes to Series A Lessor Notes (Incorporated herein by reference to Exhibit 4.12(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001)

4.33(a)    Series B Lessor Note Due June 30, 2015, for Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.13(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001)

4.33(b)    Schedule identifying substantially identical notes to Series B Lessor Note (Incorporated herein by reference to Exhibit 4.13(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001)

4.34(a)    Series B Lessor Note Due June 30, 2017, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.14(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001)

4.34(b)    Schedule identifying substantially identical notes to Series B Lessor Notes (Incorporated herein by reference to Exhibit 4.14(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001)

4.35(a)    Series C Lessor Note Due June 30, 2020, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.15(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668)

4.35(b)    Schedule identifying substantially identical notes to Series C Lessor Notes (Incorporated herein by reference to Exhibit 4.15(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668)

4.36(a)    Supplemental Pass Through Trust Agreement A between Mirant Mid-Atlantic, LLC and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at June 29, 2001 (Incorporated herein by reference to Exhibit 4.17(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4/A Registration No. 333-61668 filed July 3, 2001)

4.36(b)    Schedule identifying substantially identical agreements to Supplemental Pass Through Trust Agreement constituting Exhibit 4.36 (a) (Incorporated herein by reference to Exhibit 4.17(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4/A, Registration No. 333-61668 filed July 3, 2001)

4.37    Senior Notes Indenture, relating to the 9.50% Senior Notes Due 2018 and the 9.875% Senior Notes Due 2020, by GenOn Escrow Corp. and Wilmington Trust Company as trustee, dated at October 4, 2010 (Incorporated by reference to Exhibit 4.4 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 5, 2010)

| 4.38 | Supplemental Indenture, relating to the 9.50% Senior Notes due 2018 and the 9.875% Senior Notes Due 2020, by and among GenOn Escrow Corp., GenOn Energy, Inc. and Wilmington Trust Company as trustee, dated at December 3, 2010 (Incorporated by reference to Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed December 7, 2010) |
|---|---|
| 4.39 | Amendment No. 2, dated as of December 14, 2012, to the Rights Agreement dated as of January 15, 2001 between RRI Energy, Inc., JP Morgan Chase and Computershare Trust Company, N.A., as successor to JP Morgan Chase Rights Agent (Incorporated herein by reference to Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed December 14, 2012) |
| 10.1.1(a) | Master Separation Agreement between Reliant Resources, Inc. and Reliant Energy, Incorporated, dated December 31, 2000 (Incorporated herein by reference to Exhibit 10.1 to the CenterPoint Energy Houston Electric, LLC Quarterly Report on Form 10-Q filed May 14, 2001) |
| 10.1.1(b) | Schedules to Master Separation Agreement between Reliant Resources, Inc. and Reliant Energy, Incorporated, dated at December 31, 2000 (Incorporated herein by reference to Exhibit 10.1B to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.2(a) | Tax Allocation Agreement by and among Reliant Resources, Inc., and its affiliated companies and Reliant Energy, Incorporated and its affiliate companies dated at December 31, 2000 (Incorporated herein by reference to Exhibit 10.8 to the CenterPoint Energy Houston Electric, LLC Quarterly Report on Form 10-Q filed May 14, 2001) |
| 10.1.2(b) | Exhibit to Tax Allocation Agreement between Reliant Resources, Inc. and Reliant Energy, Incorporated, dated December 31, 2000 (Incorporated herein by reference to Exhibit 10.2B to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.3 | Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2001A, Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed December 27, 2004) |
| 10.1.4(a) | Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed December 27, 2004) |
| 10.1.4(b) | Exhibit C Form of Supplement to Exhibit B to Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.5B to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.5(a) | Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002B, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed December 27, 2004) |
| 10.1.5(b) | Exhibit C Form of Supplement to Exhibit B to Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002B, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.6B to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.6(a) | Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2003A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed December 27, 2004) |
| 10.1.6(b) | Exhibit C Form of Supplement to Exhibit B to Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2003A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.7B to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.7(a) | Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.6 to the Registrant's Current Report on Form 8-K filed December 27, 2004) |

| | |
|---|---|
| 10.1.7(b) | Exhibit C Form of Supplement to Exhibit B to Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.8B to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.8 | Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2001A, among Reliant Energy Power Supply, LLC, Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and J.P. Morgan Trust Company, National Association, as trustee, dated at September 21, 2006 (Incorporated herein by reference to Exhibit 10.14 to the Registrant's Annual Report on Form 10-K filed February 28, 2007) |
| 10.1.9 | Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002A, among Reliant Energy Power Supply, LLC, Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and J.P. Morgan Trust Company, National Association, as trustee, dated at September 21, 2006 (Incorporated herein by reference to Exhibit 10.15 to the Registrant's Annual Report on Form 10-K filed February 28, 2007) |
| 10.1.10 | Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002B, among Reliant Energy Power Supply, LLC, Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and J.P. Morgan Trust Company, National Association, as trustee, dated at September 21, 2006 (Incorporated herein by reference to Exhibit 10.16 to the Registrant's Annual Report on Form 10-K filed February 28, 2007) |
| 10.1.11 | Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2003A, among Reliant Energy Power Supply, LLC, Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and J.P. Morgan Trust Company, National Association, as trustee, dated at September 21, 2006 (Incorporated herein by reference to Exhibit 10.17 to the Registrant's Annual Report on Form 10-K filed February 28, 2007) |
| 10.1.12 | Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among Reliant Energy Power Supply, LLC, Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and J.P. Morgan Trust Company, National Association as trustee, dated at September 21, 2006 (Incorporated herein by reference to Exhibit 10.18 to the Registrant's Annual Report on Form 10-K filed February 28, 2007) |
| 10.1.13 | Second Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2001A, among Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at December 1, 2006 (Incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed December 7, 2006) |
| 10.1.14 | Second Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002A, among Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at December 1, 2006 (Incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed December 7, 2006) |
| 10.1.15 | Second Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002B, among Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at December 1, 2006 (Incorporated herein by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed December 7, 2006) |
| 10.1.16 | Second Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2003A, among Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at December 1, 2006 (Incorporated herein by reference to Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed December 7, 2006) |
| 10.1.17 | Third Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at December 1, 2006 (Incorporated herein by reference to Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed December 7, 2006) |
| 10.1.18 | Third Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2001A, among RRI Energy Solutions East, LLC, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at June 1, 2009 (Incorporated herein by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q filed November 5, 2009) |

| | |
|---|---|
| 10.1.19 | Third Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2002A, among, RRI Energy Solutions East, LLC, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at June 1, 2009 (Incorporated herein by reference to Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q filed November 5, 2009) |
| 10.1.20 | Third Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2002B, among RRI Energy Solutions East, LLC, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at June 1, 2009 (Incorporated herein by reference to Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q filed November 5, 2009) |
| 10.1.21 | Third Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2003A, among RRI Energy Solutions East, LLC, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at June 1, 2009 (Incorporated herein by reference to Exhibit 10.5 to the Registrant's Quarterly Report on Form 10-Q filed November 5, 2009) |
| 10.1.22 | Fourth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among RRI Energy Solutions East, LLC, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at June 1, 2009 (Incorporated herein by reference to Exhibit 10.6 to the Registrant's Quarterly Report on Form 10-Q filed November 5, 2009) |
| 10.1.23 | Fourth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002A, among RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at August 20, 2009 (Incorporated herein by reference to Exhibit 99.3 to the Registrant's Current Report on Form 8-K filed August 24, 2009) |
| 10.1.24 | Fourth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002B, among RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at August 20, 2009 (Incorporated herein by reference to Exhibit 99.4 to the Registrant's Current Report on Form 8-K filed August 24, 2009) |
| 10.1.25 | Fourth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2003A, among RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at August 20, 2009 (Incorporated herein by reference to Exhibit 99.5 to the Registrant's Current Report on Form 8-K filed August 24, 2009) |
| 10.1.26 | Fifth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenues Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at August 20, 2009 (Incorporated herein by reference to Exhibit 99.6 to the Registrant's Current Report on Form 8-K filed August 24, 2009) |
| 10.1.27 | Fifth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2001A, among RRI Energy Channelview LP, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at December 1, 2009 (Incorporated herein by reference to Exhibit 10.29 to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.28 | Fifth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2002A, among RRI Energy Channelview LP, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at December 1, 2009 (Incorporated herein by reference to Exhibit 10.30 to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.29 | Fifth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2002B, among RRI Energy Channelview LP, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at December 1, 2009 (Incorporated herein by reference to Exhibit 10.31 to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.30 | Fifth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2003A, among RRI Energy Channelview LP, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at December 1, 2009 (Incorporated herein by reference to Exhibit 10.32 to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |

10.1.31      Sixth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2004A, among RRI Energy Channelview LP, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at December 1, 2009 (Incorporated herein by reference to Exhibit 10.33 to the Registrant's Annual Report on Form 10-K filed February 25, 2010)

10.1.32(a)      Credit and Guaranty Agreement among Reliant Energy, Inc., as Borrower, the Other Loan Parties referred to therein as guarantors, the Other Lenders Party thereto, Deutsche Bank AG New York Branch, as Administrative Agent and Collateral Agent, Deutsche Bank Securities Inc. and J.P. Morgan Securities Inc., as Joint Lead Arrangers, Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch Capital Corporation and ABN AMRO Bank N.V., as Joint Bookrunners with respect to the Revolving Credit Facility and Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch Capital Corporation and Bear, Sterns & Co. Inc., as Joint Bookrunners with respect to the Pre-Funded L/C Facility, dated at June 12, 2007 (Incorporated herein by reference to Exhibit 1.1 to the Registrant's Current Report on Form 8-K filed June 15, 2007)

10.1.32(b)†      Exhibits and Schedules to Credit and Guaranty Agreement among Reliant Energy, Inc., as Borrower, the Other Loan Parties referred to therein as guarantors, the Other Lenders Party thereto, Deutsche Bank AG New York Branch, as Administrative Agent and Collateral Agent, Deutsche Bank Securities Inc. and J.P. Morgan Securities Inc., as Joint Lead Arrangers, Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch Capital Corporation and ABN AMRO Bank N.V., as Joint Bookrunners with respect to the Revolving Credit Facility and Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch Capital Corporation and Bear, Sterns & Co. Inc., as Joint Bookrunners with respect to the Pre-Funded L/C Facility, dated at June 12, 2007 (Incorporated herein by reference to Exhibit 10.34B to the Registrant's Annual Report on Form 10-K filed February 25, 2010)

10.1.33(a)      Pass Through Trust Agreement A between Reliant Energy Mid-Atlantic Power Holdings, LLC and Bankers Trust Company, made with respect to the formation of the Series A Pass Through Trust and the issuance of 8.554% Series A Pass Through Certificates, due 2005 dated as of August 24, 2000 (Incorporated herein by reference to Exhibit 4.4a to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464 filed December 8, 2000)

10.1.33(b)      Schedule identifying substantially identical agreements to Pass Through Trust Agreement constituting Exhibit 10.1.33(a) (Incorporated herein by reference to Exhibit 4.4b to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464 filed December 8, 2000)

10.1.34      Participation Agreement among Conemaugh Lessor Genco LLC, as Owner Lessor, Reliant Energy Mid-Atlantic Power Holdings, LLC, as Facility Lessee, Wilmington Trust Company, as Lease Manager, PSEGR Conemaugh Generation, LLC, as Owner Participant, Bankers Trust Company, as Lease Indenture Trustee, and Bankers Trust Company, as Pass Through Trustee, dated at August 24, 2000 (Incorporated herein by reference to Exhibit 4.5a to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464 filed December 8, 2000)

10.1.35      Schedule identifying substantially identical agreements to Participation Agreement constituting Exhibit 10.1.34 (Incorporated herein by reference to Exhibit 4.5b to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464 filed December 8, 2000)

10.1.36(a)      First Amendment to Participation Agreement constituting Exhibit 10.1.34, dated at November 15, 2001 (Incorporated herein by reference to Exhibit 10.20 to the Registrant's Annual Report on Form 10-K filed March 15, 2006)

10.1.36(b)      Exhibit M to First Amendment to Participation Agreement constituting Exhibit 10.1.36(a), dated at November 15, 2001 (Incorporated herein by reference to Exhibit 10.41B to the Registrant's Annual Report on Form 10-K filed February 25, 2010)

10.1.37      Schedule identifying substantially identical agreements to First Amendment to Participation Agreement constituting Exhibit 10.1.36(a) (Incorporated herein by reference to Exhibit 10.21 to the Registrant's Annual Report on Form 10-K filed March 15, 2006)

10.1.38      Second Amendment to Participation Agreement, dated at June 18, 2003 (Incorporated herein by reference to Exhibit 10.22 to the Registrant's Annual Report on Form 10-K filed March 15, 2006)

10.1.39      Schedule identifying substantially identical agreements to Second Amendment to Participation Agreement constituting Exhibit 10.1.38 (Incorporated herein by reference to Exhibit 10.23 to the Registrant's Annual Report on Form 10-K filed March 15, 2006)

10.1.40      Guarantee by NRG Energy, Inc., as Guarantor, in favor of Reliant Energy, Inc., dated at February 28, 2009 (Incorporated herein by reference to Exhibit 10.84 to the Registrant's Annual Report on Form 10-K filed March 2, 2009)

10.1.41      Credit Agreement among Mirant North America, LLC, JPMorgan Chase Bank, N.A as Administrative Agent and Deutsche Bank Securities Inc. and Goldman Sachs Credit Partners L.P., as Co-Syndication Agents, dated at January 3, 2006 (Incorporated herein by reference to Exhibit 10.2 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 6, 2009)

10.1.42(a)   Guaranty Agreement (Dickerson L1) between Southern Energy, Inc. and Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.21(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001)

10.1.42(b)   Schedule identifying substantially identical agreements to Guaranty Agreement constituting Exhibit 10.1.42(a) (Incorporated herein by reference to Exhibit 10.21(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001)

10.1.43(a)   Guaranty Agreement (Morgantown L1) between Southern Energy, Inc. and Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.22(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001)

10.1.43(b)   Schedule identifying substantially identical agreements to Guaranty Agreement constituting Exhibit 10.1.43(a)  (Incorporated herein by reference to Exhibit 10.22(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 May 25, 2001)

10.1.44   Credit Agreement by and among RRI Energy, Inc., JPMorgan Chase Bank, N.A., as administrative agent, Credit Suisse Securities (USA) LLC, Deutsche Bank Securities, Inc., Goldman Sachs Bank USA, Morgan Stanley Senior Funding, Inc., Royal Bank of Canada, The Royal Bank of Scotland plc, the other lenders from time to time party thereto and, from and after the closing date of the merger, Mirant Americas, Inc. (to be renamed GenOn Americas, Inc. on the closing date of the merger), dated at September 20, 2010 (Incorporated herein by reference to Exhibit 10.1 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 5, 2010)

10.1.45   Purchase Agreement by and among RRI Energy, Inc., Mirant Corporation, GenOn Escrow Corp. and J.P. Morgan Securities LLC, as representative of the several initial purchasers, dated at September 20, 2010 (Incorporated herein by reference to Exhibit 10.2 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 5, 2010)

10.1.46   Credit Agreement among Mirant Marsh Landing, LLC, the Royal Bank of Scotland PLC, as administrative agent and Deutsche Bank Trust Company Americas, as Collateral Agent and Depository Bank, dated as of October 8, 2010 (Incorporated by reference to Exhibit 10.1.48 to the Registrant's Annual Report on Form 10-K filed March 1, 2011)

10.1.47   Security Agreement between Mirant Marsh Landing, LLC and Deutsche Bank Trust Company Americas, as Collateral Agent, dated as of October 8, 2010 (Incorporated by reference to Exhibit 10.1.49 to the Registrant's Annual Report on Form 10-K filed March 1, 2011)

10.1.48   Pledge Agreement among Marsh Landing Holdings, LLC, Mirant Marsh Landing, LLC and Deutsche Bank Trust Company Americas, as Collateral Agent, dated at October 8, 2010 (Incorporated by reference to Exhibit 10.1.50 to the Registrant's Annual Report on Form 10-K filed March 1, 2011)

10.1.49   Collateral Agency and Intercreditor Agreement among Mirant Marsh Landing, LLC, The Royal Bank of Scotland PLC, as administrative agent, and Deutsche Bank Trust Company Americas, as Collateral Agent and Depository Bank, dated at October 8, 2010 (Incorporated by reference to Exhibit 10.1.51 to the Registrant's Annual Report on Form 10-K filed March 1, 2011)

10.1.50   Equity Contribution Agreement among Mirant Corporation, Mirant Marsh Landing, LLC, The Royal Bank of Scotland PLC, as administrative agent, and Deutsche Bank Trust Company Americas, as Collateral Agent, dated as of October 8, 2010 (Incorporated by reference to Exhibit 10.1.52 to the Registrant's Annual Report on Form 10-K filed March 1, 2011)

10.1.51   Revolving Credit Agreement among GenOn Energy, Inc., as Borrower, GenOn Americas, Inc., as Borrower, the several lenders from time to time parties hereto, and NRG Energy, Inc., as Administrative Agent, dated as of December 14, 2012 (Incorporated by reference to Exhibit 10.1.51 to the Registrant's Annual Report on Form 10-K filed February 27, 2013)

10.2.1   Facility Lease Agreement between Conemaugh Lessor Genco LLC and Reliant Energy Mid-Atlantic Power Holdings, LLC, dated at August 24, 2000 (Incorporated herein by reference to Exhibit 4.6a to the RRI Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464 filed December 8, 2000)

10.2.2   Schedule identifying substantially identical agreements to Facility Lease Agreement constituting Exhibit 10.2.1 (Incorporated herein by reference to Exhibit 4.6b to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464 filed December 8, 2000)

10.2.3   Lease Indenture of Trust, Mortgage and Security Agreement between Conemaugh Lessor Genco LLC, as Owner Lessor, and Bankers Trust Company, as Lease Indenture Trustee, dated at August 24, 2000 (Incorporated herein by reference to Exhibit 4.8a to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464 filed December 8, 2000)

10.2.4   Schedule identifying substantially identical agreements to Lease Indenture of Trust constituting Exhibit 10.3.3 (Incorporated herein by reference to Exhibit 4.8b to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464 filed December 8, 2000)

| | |
|---|---|
| 10.2.5(a) | Facility Site Lease and Easement Agreement (L1) between Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC and Southern Energy MD Ash Management, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.5(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.5(b) | Schedule identifying substantially identical agreements to Facility Site Lease Agreement constituting Exhibit 10.2.5(a) (Incorporated herein by reference to Exhibit 10.5(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.6(a) | Facility Site Lease and Easement Agreement (L1) between Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC and Southern Energy MD Ash Management, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.6(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.6(b) | Schedule identifying substantially identical agreements to Facility Site Lease Agreement constituting Exhibit 10.2.6(a) (Incorporated herein by reference to Exhibit 10.6(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.7(a) | Facility Site Sublease Agreement (L1) between Southern Energy Mid-Atlantic, LLC and Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.7(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.7(b) | Schedule identifying substantially identical agreements to Facility Site Sublease Agreement constituting Exhibit 10.2.7(a) (Incorporated herein by reference to Exhibit 10.7(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.8(a) | Facility Site Sublease Agreement (L1) between Southern Energy Mid-Atlantic, LLC and Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.8(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.8(b) | Schedule identifying substantially identical agreements to Facility Site Sublease Agreement constituting Exhibit 10.2.8(a) (Incorporated herein by reference to Exhibit 10.8(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.9(a) | Shared Facilities Agreement among Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC, and Dickerson OL4 LLC, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 10.15(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.9(b) | Shared Facilities Agreement among Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC, and Morgantown OL7 LLC, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 10.15(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.10(a) | Assignment and Assumption Agreement among Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC, and Dickerson OL4 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.16(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.10(b) | Assignment and Assumption Agreement among Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC, and Morgantown OL7 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.16(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.11(a) | Ownership and Operation Agreement among Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC, Dickerson OL4 LLC, and Southern Energy Mid-Atlantic, LLC, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 10.17(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.11(b) | Ownership and Operation Agreement among Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC, Morgantown OL7 LLC, and Southern Energy Mid-Atlantic, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.17 (b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.3.1 | Agreement Regarding Prosecution of Litigation by and among Merrill Lynch Commodities, Inc., Merrill Lynch & Co., Inc., Reliant Energy Power Supply, LLC, RERH Holdings, LLC, Reliant Energy Retail Holdings, LLC, Reliant Energy Retail Services, LLC, RE Retail Receivables, LLC and Reliant Energy Solutions East, LLC, dated at February 28, 2009 (Incorporated herein by reference to Exhibit 10.85 to the Registrant's Annual Report on Form 10-K filed March 2, 2009) |
| 10.3.2† | Engineering, Procurement and Construction Agreement, dated at July 30, 2007, between Mirant Mid-Atlantic, LLC, Mirant Chalk Point LLC and Stone & Webster, Inc. (Incorporated herein by reference to Exhibit 10.1 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 6, 2009) |

| 10.3.3 | Settlement Agreement and Release by and among Mirant Corporation, PEPCO, and PEPCO Settling Parties dated at May 30, 2006 (Incorporated herein by reference to Exhibit 10.1 to the Mirant Corporation Current Report on Form 8-K filed May 31, 2006) |
| 10.3.4 | Engineering, Procurement and Construction Agreement between Mirant Marsh Landing, LLC and Kiewit Power Constructors Co., dated at May 6, 2010 (Incorporated herein by reference to Exhibit 10.2 to the Mirant Corporation Quarterly Report on Form 10-Q filed August 6, 2010) |
| 31.1A1* | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.2A1* | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.3A1* | Certification of Chief Accounting Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 32.A1* | Section 1350 Certification |
| 101* | Interactive Data File |

*  Asterisk indicates exhibits filed herewith.

** This filing excludes schedules and exhibits pursuant to Item 601(b)(2) of Regulation S-K, which the registrant agrees to furnish supplementally to the Securities and Exchange Commission upon request by the Commission.

†  The Registrant has requested confidential treatment for certain portions of this Exhibit pursuant to Rule 24b-2 under the Exchange Act.

144

## GenOn Americas Generation Exhibit Index

| Exhibit No. | Exhibit Name |
| --- | --- |
| 1.1 | Purchase Agreement, dated at October 3, 2001, among Mirant Americas Generation, Inc. and Salomon Smith Barney Inc., Banc of America Securities LLC, Blaylock & Partners, L.P., Scotia Capital (USA) Inc., TD Securities (USA) Inc. and Tokyo-Mitsubishi International plc, as Initial Purchasers (Incorporated herein by reference to Exhibit 1.1 to Registrant's Registration Statement on Form S-4/A Amendment No. 1, Registration No. 333-85124 filed May 7, 2002) |
| 2.1 | Purchase and Sale Agreement by and between Mirant Americas, Inc. and LS Power Acquisition Co. I, LLC, dated at January 15, 2007 (Incorporated herein by reference to Exhibit 2.1 to the Mirant Corporation Current Report on Form 8-K filed January 18, 2007) |
| 3.1 | Certificate of Formation for Mirant Americas Generation, LLC, filed with the Delaware Secretary of State dated at November 1, 2001 (Incorporated herein by reference to Exhibit 3.1 to Registrant's Quarterly Report on Form 10-Q filed November 9, 2001) |
| 3.2 | Certificate of Amendment to Certificate of Formation of Mirant Americas Generation, LLC, filed with the Delaware Secretary of State dated at December 3, 2010 (Incorporated herein by reference to Exhibit 3.2A1 to Registrant's Annual Report on Form 10-K filed March 1, 2011) |
| 3.3 | Second Amended and Restated Limited Liability Company Agreement for GenOn Americas Generation, LLC dated December 3, 2010 (Incorporated herein by reference to Exhibit 3.3A1 to Registrant's Annual Report on Form 10-K filed March 1, 2011) |
| 4.1 | Indenture between Mirant Americas Generation, Inc. and Bankers Trust Company, as trustee, relating to Senior Notes, dated at May 1, 2001 (Incorporated herein by reference to Exhibit 4.1 to the Registrant's Registration Statement on Form S-4, Registration No. 333-63240 filed June 18, 2001) |
| 4.2 | Second Supplemental Indenture relating to Senior Notes 8.300% due 2011, dated at May 1, 2001 (Incorporated herein by reference to Exhibit 4.3 to Registrant's Registration Statement on Form S-4, Registration No. 333-63240 filed June 18, 2001) |
| 4.3 | Third Supplemental Indenture from Mirant Americas Generation, Inc. to Bankers Trust Company as trustee, relating to 9.125% Senior Notes due 2031, dated at May 1, 2001 (Incorporated herein by reference to Exhibit 4.4 to Registrant's Registration Statement on Form S-4, Registration No. 333-63240 filed June 18, 2001) |
| 4.4 | Fifth Supplemental Indenture from Mirant Americas Generation, Inc. to Bankers Trust Company as trustee, dated at October 9, 2001 relating to 8.50% Senior Notes due 2021 (Incorporated herein by reference to Exhibit 4.6 to Registrant's Registration Statement on Form S-4/A Amendment No. 1, Registration No. 333-85124 filed May 7, 2002) |
| 4.5 | Form of Sixth Supplemental Indenture from Mirant Americas Generation LLC, to Bankers Trust Company as trustee, dated at November 1, 2001 relating to indenture dated May 1, 2001 (Incorporated herein by reference to Exhibit 4.6 to the Mirant Corporation Annual Report on Form 10-K filed February 27, 2009) |
| 4.6 | Form of Seventh Supplemental Indenture from Mirant Americas Generation LLC, to Wells Fargo Bank National Association as successor indenture trustee, dated at January 3, 2006 relating to indenture dated May 1, 2001(Incorporated herein by reference to Exhibit 4.1 to Registrant's Quarterly Report on Form 10-Q filed May 14, 2007) |
| 4.7 | Senior Note Indenture between Mirant North America, LLC, Mirant North America Escrow, LLC, MNA Finance Corp. and Law Debenture Trust Company of New York, as trustee dated December 23, 2005 (Incorporated herein by reference to Exhibit 4.2 to Mirant Corporation Annual Report on Form 10-K filed March 14, 2006) |
| 4.8 | Registration Rights Agreement, dated at October 9, 2001, among Mirant Americas Generation, Inc., Salomon Smith Barney Inc. and Banc of America Securities LLC, Blaylock & Partners, L.P., Scotia Capital (USA) Inc., TD Securities (USA) Inc. and Tokyo-Mitsubishi International plc, as Initial Purchasers (Incorporated herein by reference to Exhibit 4.8 to Registrant's Registration Statement on Form S-4/A Amendment No. 1, Registration No. 333-85124) |
| 10.1† | Engineering, Procurement and Construction Agreement, dated at July 30, 2007, between Mirant Mid-Atlantic, LLC, Mirant Chalk Point, LLC and Stone & Webster, Inc. (Incorporated herein by reference to Exhibit 10.1 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 6, 2009) |
| 10.2 | Membership Interest Purchase and Sale Agreement, dated at January 31, 2007, between Mirant New York, Inc. and Alliance Energy Renewables, LLC (Incorporated herein by reference to Exhibit 10.1 to Registrant's Quarterly Report on Form 10-Q filed May 14, 2007) |
| 10.3 | Settlement and Release of Claims Agreement, by and among the Mirant Parties, the California Parties and OMOI, dated at January 13, 2005 (Incorporated herein by reference to Exhibit 10.39 to the Mirant Corporation Annual Report on Form 10-K filed March 15, 2005) |

| 10.4 | Credit Agreement among Mirant North America, LLC, JPMorgan Chase Bank, N.A as administrative agent and Deutsche Bank Securities Inc. and Goldman Sachs Credit Partners L.P., as co-syndication agents, dated at January 3, 2006 (Incorporated herein by reference to Exhibit 10.2 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 6, 2009) |
|---|---|
| 10.5 | Administrative Services Agreement dated at January 3, 2006 by and between Mirant Americas Generation, LLC and Mirant Services, LLC (Incorporated herein by reference to Exhibit 10.5 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.6 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 among Mirant Americas Energy Marketing, LP, Mirant Bowline, LLC, Mirant Lovett, LLC, and Mirant NY-Gen, LLC (Incorporated herein by reference to Exhibit 10.6 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.7 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 among Mirant Americas Energy Marketing, LP, Mirant Canal, LLC, and Mirant Kendall, LLC (Incorporated herein by reference to Exhibit 10.7 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.8 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Chalk Point, LLC (Incorporated herein by reference to Exhibit 10.8 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.9 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Mid-Atlantic, LLC (Incorporated herein by reference to Exhibit 10.9 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.10 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Potomac River, LLC (Incorporated herein by reference to Exhibit 10.10 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.11 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 among Mirant Americas Energy Marketing, LP, Mirant Delta, LLC, and Mirant Potrero, LLC (Incorporated herein by reference to Exhibit 10.12 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.12 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Zeeland, LLC (Incorporated herein by reference to Exhibit 10.13 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.13 | Mirant Corporation 2005 Omnibus Incentive Compensation Plan, effective December 2005 (Incorporated herein by reference to Exhibit 10.1 to the Mirant Corporation Current Report on Form 8-K filed January 3, 2006) |
| 12.1 | Statement of Ratio Earnings to Fixed Charges (Incorporated herein by reference to Exhibit 12.1 to Registrant's Registration Statement on Form S-4/A Amendment No. 1, Registration No. 333-85124 filed May 7, 2002) |
| 31.1A2* | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.2A2* | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.3A2* | Certification of Chief Accounting Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 32.A2* | Section 1350 Certification |
| 101* | Interactive Data File |

\* Asterisk indicates exhibits filed herewith.

† The Registrant has requested confidential treatment for certain portions of this Exhibit pursuant to Rule 24b-2 under the Exchange Act.

146

.

**GenOn Mid-Atlantic Exhibit Index**

| Exhibit No. | Exhibit Name |
|---|---|
| 3.1 | Certificate of Formation of Southern Energy Mid-Atlantic, LLC, dated at July 12, 2000 (Incorporated herein by reference to Exhibit 3.1 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 3.2 | Certificate of Amendment to Certificate of Formation of Mirant Mid-Atlantic, LLC, filed with the Delaware Secretary of State dated at January 20, 2011 (Incorporated herein by reference to Exhibit 3.2A2 to Registrant's Annual Report on Form 10-K filed March 1, 2011) |
| 3.3 | Second Amended and Restated Limited Liability Company Agreement of GenOn Mid-Atlantic, LLC dated January 20, 2011 (Incorporated herein by reference to Exhibit 3.3A2 to Registrant's Annual Report on Form 10-K filed March 1, 2011) |
| 4.1 | Form of 8.625% Series A Pass Through Certificate (Incorporated herein by reference to Exhibit 4.1 to Mirant Mid-Atlantic, LLC's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.2 | Form of 9.125% Series B Pass Through Certificate (Incorporated herein by reference to Exhibit 4.2 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.3 | Form of 10.060% Series C Pass Through Certificate (Incorporated herein by reference to Exhibit 4.3 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.4(a) | Pass Through Trust Agreement A between Southern Energy Mid-Atlantic, LLC and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.4(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.4(b) | Schedule identifying substantially identical agreement to Pass Through Trust Agreement A constituting Exhibit 4.4(a) (Incorporated herein by reference to Exhibit 4.4(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.5(a) | Participation Agreement (L1) among Southern Energy Mid-Atlantic, LLC, as Lessee, Dickerson OL1 LLC, as Owner Lessor, Wilmington Trust Company, as Owner Manager, SEMA OP3 LLC, as Owner Participant and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee and as Pass Through Trustee, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.5(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.5(b) | Schedule identifying substantially identical agreements to Participation Agreement constituting Exhibit 4.5(a) (Incorporated herein by reference to Exhibit 4.5(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.6(a) | Participation Agreement (Morgantown L1) among Southern Energy Mid-Atlantic, LLC, as Lessee, Morgantown OL1 LLC, as Owner Lessor, Wilmington Trust Company, as Owner Manager, SEMA OP1 LLC, as Owner Participant and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee and as Pass Through Trustee, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.6(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.6(b) | Schedule identifying substantially identical agreements to Participation Agreement constituting Exhibit 4.6(a) hereto (Incorporated herein by reference to Exhibit 4.6(b) to Registrant's Form S-4 in Registration No. 333-61668 filed May 25, 2001) |
| 4.7(a) | Facility Lease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, as Facility Lessee, and Dickerson OL1 LLC, as Owner Lessor, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.7(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.7(b) | Schedule identifying substantially identical agreement to Facility Lease Agreement constituting Exhibit 4.7(a) (Incorporated herein by reference to Exhibit 4.7(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.8(a) | Facility Lease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, as Facility Lessee, and Morgantown OL1 LLC, as Owner Lessor, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.8(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.8(b) | Schedule identifying substantially identical agreement to Facility Lease Agreement constituting Exhibit 4.8(a) (Incorporated herein by reference to Exhibit 4.8(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.9(a) | Indenture of Trust, Mortgage and Security Agreement (L1) between Dickerson OL1 LLC, as Lessor, and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.9(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.9(b) | Schedule identifying substantially identical agreement to Indenture of Trust, Mortgage and Security Agreement constituting Exhibit 4.9(a) (Incorporated herein by reference to Exhibit 4.9(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |

| 4.10(a) | Indenture of Trust, Mortgage and Security Agreement (L1) between Morgantown OL1 LLC, as Lessor, and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.10(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
|---|---|
| 4.10(b) | Schedule identifying substantially identical agreement to Indenture of Trust, Mortgage and Security Agreement constituting Exhibit 4.10(a) (Incorporated herein by reference to Exhibit 4.10(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.11(a) | Series A Lessor Note Due June 30, 2012 for Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.11(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.11(b) | Schedule identifying substantially identical notes to Lessor Notes constituting Exhibit 4.11(a) (Incorporated herein by reference to Exhibit 4.11(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.12(a) | Series A Lessor Note Due June 30, 2008, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.12(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.12(b) | Schedule identifying substantially identical notes to Series A Lessor Notes constituting Exhibit 4.12(a) (Incorporated herein by reference to Exhibit 4.12(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.13(a) | Series B Lessor Note Due June 30, 2015, for Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.13(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.13(b) | Schedule identifying substantially identical notes to Lessor Note constituting Exhibit 4.13(a) (Incorporated herein by reference to Exhibit 4.13(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668filed May 25, 2001) |
| 4.14(a) | Series B Lessor Note Due June 30, 2017, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.14(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.14(b) | Schedule identifying substantially identical notes to Lessor Notes constituting Exhibit 4.14(a) (Incorporated herein by reference to Exhibit 4.14(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.15(a) | Series C Lessor Note Due June 30, 2020, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.15(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.15(b) | Schedule identifying substantially identical notes to Lessor Notes constituting Exhibit 4.15(a) (Incorporated herein by reference to Exhibit 4.15(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.16 | Registration Rights Agreement, between Southern Energy Mid-Atlantic, LLC and Credit Suisse First Boston, acting for itself on behalf of the Purchasers, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.16 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.17(a) | Supplemental Pass Through Trust Agreement A between Mirant Mid-Atlantic, LLC, and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at June 29, 2001 (Incorporated herein by reference to Exhibit 4.17(a) to Registrant's Registration Statement on Form S-4/A Registration No. 333-61668 filed July 3, 2001) |
| 4.17(b) | Schedule identifying substantially identical agreements to Supplemental Pass Through Trust Agreement A between Mirant Mid-Atlantic, LLC and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at June 29, 2001, constituting Exhibit 4.17(a) (Incorporated herein by reference to Exhibit 4.17(b) to Registrant's Registration Statement on Form S-4/A, Registration No. 333-61668 filed July 3, 2001) |
| 10.1† | Engineering, Procurement and Construction Agreement, dated at July 30, 2007, between Mirant Mid-Atlantic, LLC, Mirant Chalk Point, LLC and Stone & Webster, Inc. (Incorporated herein by reference to Exhibit 10.1 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 6, 2009) |
| 10.2 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Mid-Atlantic, LLC (Incorporated herein by reference to Exhibit 10.17 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.3 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Chalk Point, LLC (Incorporated herein by reference to Exhibit 10.18 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.4 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Potomac River, LLC (Incorporated herein by reference to Exhibit 10.19 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |

148

.

| | |
|---|---|
| 10.5 | Administrative Services Agreement dated at January 3, 2006 by and between Mirant Mid-Atlantic, LLC and Mirant Services, LLC (Incorporated herein by reference to Exhibit 10.20 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.6(a) | Asset Purchase and Sale Agreement for Generating Plants and Related Assets by and between Potomac Electric Power Company and Southern Energy, Inc. dated at June 7, 2000 (Incorporated herein by reference to Exhibit 10.1(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.6(b) | Amendment No. 1 to Asset Purchase and Sale Agreement by and between Potomac Electric Power Company and Southern Energy, Inc. dated at September 18, 2000 (Incorporated herein by reference to Exhibit 10.1(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.6(c) | Amendment No. 2 to Asset Purchase and Sale Agreement by and between Potomac Electric Power Company and Southern Energy, Inc. dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.1(c) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.7(a) | Interconnection Agreement (Dickerson) by and between Potomac Electric Power Company and Southern Energy Mid-Atlantic, LLC dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.2(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.7(b) | Schedule identifying substantially identical agreements to Interconnection Agreement constituting Exhibit 10.7(a) hereto (Incorporated herein by reference to Exhibit 10.2(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.8(a) | Easement, License and Attachment Agreement (Dickerson Station) by and between Potomac Electric Power Company, Southern Energy Mid-Atlantic, LLC and Southern Energy MD Ash Management, LLC dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.3(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.8(b) | Schedule identifying substantially identical agreements to Easement, License and Attachment Agreement constituting Exhibit 10.8(a) (Incorporated herein by reference to Exhibit 10.3(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.9(a) | Bill of Sale (SEMA: Dickerson; Morgantown; RR Spur; Production Service Center) by Potomac Electric Power Company, for the benefit of Southern Energy Mid-Atlantic, LLC dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.4 (a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.9(b) | Schedule identifying substantially identical documents to Bill of Sale constituting Exhibit 10.9(a) hereto (Incorporated herein by reference to Exhibit 10.4(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.10(a) | Facility Site Lease and Easement Agreement (L1) among Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC and Southern Energy MD Ash Management, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.5(a) Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.10(b) | Schedule identifying substantially identical agreements to Facility Site Lease Agreement constituting Exhibit 10.10(a) (Incorporated herein by reference to Exhibit 10.5(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.11(a) | Facility Site Lease and Easement Agreement (L1) among Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC and Southern Energy MD Ash Management, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.6(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.11(b) | Schedule identifying substantially identical agreements to Facility Site Lease Agreement constituting Exhibit 10.11(a) (Incorporated herein by reference to Exhibit 10.6(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.12(a) | Facility Site Sublease Agreement (L1) between Southern Energy Mid-Atlantic, LLC and Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.7(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.12(b) | Schedule identifying substantially identical agreements to Facility Site Sublease Agreement constituting Exhibit 10.12(a) (Incorporated herein by reference to Exhibit 10.7(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.13(a) | Facility Site Sublease Agreement (L1) between Southern Energy Mid-Atlantic, LLC and Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.8(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.13(b) | Schedule identifying substantially identical agreements to Facility Site Sublease Agreement constituting Exhibit 10.13(a) (Incorporated herein by reference to Exhibit 10.8(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.14 | Capital Contribution Agreement by and between Southern Energy, Inc. and Southern Energy Mid-Atlantic, LLC dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.12 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |

| 10.15 | Promissory Note between Southern Energy Mid-Atlantic, LLC and Southern Energy Peaker, LLC in the original principal amount of $71,110,000 dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.13 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
|---|---|
| 10.16 | Promissory Note between Southern Energy Mid-Atlantic, LLC and Southern Energy Potomac River, LLC in the original principal amount of $152,165,000 dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.14 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.17(a) | Shared Facilities Agreement among Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC and Dickerson OL4 LLC, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 10.15(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.17(b) | Shared Facilities Agreement among Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC and Morgantown OL7 LLC, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 10.15(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.18(a) | Assignment and Assumption Agreement between Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC, and Dickerson OL4 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.16(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.18(b) | Assignment and Assumption Agreement among Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC and Morgantown OL7 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.16(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.19(a) | Ownership and Operation Agreement between Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC, Dickerson OL4 LLC and Southern Energy Mid-Atlantic, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.17(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.19(b) | Ownership and Operation Agreement between Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC, Morgantown OL7 LLC, and Southern Energy Mid-Atlantic, LLC, dated at December 19, 2000 constituting Exhibit 10.19(a) (Incorporated herein by reference to Exhibit 10.17(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.20(a) | Guaranty Agreement (Dickerson L1) between Southern Energy, Inc. and Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.21(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.20(b) | Schedule identifying substantially identical agreements to Guaranty Agreement constituting Exhibit 10.20(a) (Incorporated herein by reference to Exhibit 10.21(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.21(a) | Guaranty Agreement (Morgantown L1) between Southern Energy, Inc. and Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.22(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.21(b) | Schedule identifying substantially identical agreements to Guaranty Agreement constituting Exhibit 10.21(a) (Incorporated herein by reference to Exhibit 10.22(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.22 | Credit Agreement among Mirant North America, LLC, as Borrower, JPMorgan Chase Bank, N.A. as Administrative Agent and Deutsche Bank Securities Inc. and Goldman Sachs Credit Partners L.P., as Co-Syndication Agents, dated at January 3, 2006 (Incorporated herein by reference to Exhibit 10.2 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 6, 2009) |
| 31.1A3* | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.2A3* | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.3A3* | Certification of Chief Accounting Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 32.A3* | Section 1350 Certification |
| 101* | Interactive Data File |

\* Asterisk indicates exhibits filed herewith.

† The Registrant has requested confidential treatment for certain portions of this Exhibit pursuant to Rule 24b-2 under the Exchange Act.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

GENON ENERGY, INC.
(Registrant)

By:      /s/ DAVID CRANE

David Crane
*Chief Executive Officer*

Date: February 27, 2015

## GENON ENERGY, INC.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signatures | Title |
|---|---|
| /s/ DAVID CRANE | President and Chief Executive Officer and Director |
| David Crane | of GenOn Energy, Inc. (Principal Executive Officer) |
| Date: February 27, 2015 | |
| | Executive Vice President and Chief Financial Officer |
| /s/ KIRKLAND B. ANDREWS | |
| Kirkland B. Andrews | of GenOn Energy, Inc. (Principal Financial Officer) |
| Date: February 27, 2015 | |
| /s/ RONALD B. STARK | Vice President and Chief Accounting Officer |
| Ronald B. Stark | of GenOn Energy, Inc. (Principal Accounting Officer) |
| Date: February 27, 2015 | |

151

.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

<div align="right">

GENON AMERICAS GENERATION, LLC
(Registrant)


By:           /s/ DAVID CRANE

David Crane
*Chief Executive Officer*

</div>

Date: February 27, 2015

## GENON AMERICAS GENERATION, LLC

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| **Signatures** | **Title** |
|---|---|
| /s/ DAVID CRANE | President and Chief Executive Officer and Manager |
| David Crane | of GenOn Americas Generation, LLC |
| Date: February 27, 2015 | (Principal Executive Officer) |
| | |
| | Executive Vice President and Chief Financial Officer |
| /s/ KIRKLAND B. ANDREWS | |
| Kirkland B. Andrews | and Manager of GenOn Americas Generation, LLC |
| Date: February 27, 2015 | (Principal Financial Officer) |
| | |
| /s/ RONALD B. STARK | Vice President and Chief Accounting Officer |
| Ronald B. Stark | of GenOn Americas Generation, LLC |
| Date: February 27, 2015 | (Principal Accounting Officer) |

<div align="center">152</div>

.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

GENON MID-ATLANTIC, LLC
(Registrant)

By:        /s/ DAVID CRANE

David Crane
*Chief Executive Officer*

Date: February 27, 2015

## GENON MID-ATLANTIC, LLC

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signatures | Title |
|---|---|
| /s/ DAVID CRANE<br>David Crane<br>Date: February 27, 2015 | President and Chief Executive Officer and Manager<br>of GenOn Mid-Atlantic, LLC<br>(Principal Executive Officer) |
| /s/ KIRKLAND B. ANDREWS<br>Kirkland B. Andrews<br>Date: February 27, 2015 | Executive Vice President and Chief Financial Officer<br>and Manager of GenOn Mid-Atlantic, LLC<br>(Principal Financial Officer) |
| /s/ RONALD B. STARK<br>Ronald B. Stark<br>Date: February 27, 2015 | Vice President and Chief Accounting Officer<br>of GenOn Mid-Atlantic, LLC<br>(Principal Accounting Officer) |

153

.

**Supplemental Information to be Furnished with Reports Filed Pursuant to**
**Section 15(d) of the Act by Registrants Which Have Not Registered**
**Securities Pursuant to Section 12 of the Act**

No annual report or proxy materials has been sent to securities holders and no such report or proxy material is to be furnished to securities holders subsequent to the filing of the annual report on this Form 10-K.

154

**EXHIBIT 31.1 A1**

**CERTIFICATION**

I, David Crane, certify that:

1.    I have reviewed this annual report on Form 10-K of GenOn Energy, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2015

/s/ DAVID CRANE
_____

David Crane

*Chief Executive Officer*

*(Principal Executive Officer)*

**EXHIBIT 31.1 A2**

**CERTIFICATION**

I, David Crane, certify that:

1.    I have reviewed this annual report on Form 10-K of GenOn Americas Generation, LLC;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2015

By:    /s/ DAVID CRANE
       David Crane
       *Chief Executive Officer*
       *(Principal Executive Officer)*

**EXHIBIT 31.1 A3**

**CERTIFICATION**

I, David Crane, certify that:

1.    I have reviewed this annual report on Form 10-K of GenOn Mid-Atlantic, LLC;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2015

By:      /s/ DAVID CRANE
         David Crane
         *Chief Executive Officer*
         *(Principal Executive Officer)*

**EXHIBIT 31.2 A1**

**CERTIFICATION**

I, Kirkland B. Andrews, certify that:

1.  I have reviewed this annual report on Form 10-K of GenOn Energy, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2015

By:  /s/ KIRKLAND B. ANDREWS

*Kirkland B. Andrews*
*Chief Financial Officer*
*(Principal Financial Officer)*

**EXHIBIT 31.2 A2**

**CERTIFICATION**

I, Kirkland B. Andrews, certify that:

1.  I have reviewed this annual report on Form 10-K of GenOn Americas Generation, LLC;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2015

By:    /s/ KIRKLAND B. ANDREWS
_____
        *Kirkland B. Andrews*
        *Chief Financial Officer*
        *(Principal Financial Officer)*

**EXHIBIT 31.2 A3**

### CERTIFICATION

I, Kirkland B. Andrews, certify that:

1.  I have reviewed this annual report on Form 10-K of GenOn Mid-Atlantic, LLC;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2015

By:     /s/ KIRKLAND B. ANDREWS
_____
        *Kirkland B. Andrews*
        *Chief Financial Officer*
        *(Principal Financial Officer)*

**EXHIBIT 31.3A1**

<div align="center">

**CERTIFICATION**

</div>

I, Ronald B. Stark, certify that:

1.    I have reviewed this annual report on Form 10-K of GenOn Energy, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2015

By:      /s/ RONALD B. STARK
_____
         Ronald B. Stark
         *Chief Accounting Officer*
         *(Principal Accounting Officer)*

**EXHIBIT 31.3A2**

**CERTIFICATION**

I, Ronald B. Stark, certify that:

1.    I have reviewed this annual report on Form 10-K of GenOn Americas Generation, LLC;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2015

By:    /s/ RONALD B. STARK
       _____
       Ronald B. Stark
       *Chief Accounting Officer*
       *(Principal Accounting Officer)*

**EXHIBIT 31.3 A3**

**CERTIFICATION**

I, Ronald B. Stark, certify that:

1.     I have reviewed this annual report on Form 10-K of GenOn Mid-Atlantic, LLC;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2015

By:     /s/ RONALD B. STARK
_____

Ronald B. Stark
*Chief Accounting Officer*
*(Principal Accounting Officer)*

EXHIBIT 32.A1

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of GenOn Energy, Inc. on Form 10-K for the year ended December 31, 2014, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), each of the undersigned officers of the Company certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)  The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)  The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date: February 27, 2015

/s/ DAVID CRANE
—————————————————
David Crane
*Chief Executive Officer*
*(Principal Executive Officer)*

/s/ KIRKLAND B. ANDREWS
—————————————————
Kirkland B. Andrews
*Chief Financial Officer*
*(Principal Financial Officer)*

/s/ RONALD B. STARK
—————————————————
Ronald B. Stark
*Chief Accounting Officer*
*(Principal Accounting Officer)*

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of this Form 10-K or as a separate disclosure document.

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to GenOn Energy, Inc. and will be retained by GenOn Energy, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

EXHIBIT 32.A2

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of GenOn Americas Generation, LLC on Form 10-K for the year ended December 31, 2014, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), each of the undersigned officers of the Company certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)   The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date: February 27, 2015

<div style="margin-left:40%;">

/s/ DAVID CRANE
_____
David Crane
*Chief Executive Officer*
*(Principal Executive Officer)*


/s/ KIRKLAND B. ANDREWS
_____
Kirkland B. Andrews
Chief Financial Officer
*(Principal Financial Officer)*


/s/ RONALD B. STARK
_____
Ronald B. Stark
Chief Accounting Officer
*(Principal Accounting Officer)*

</div>

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of this Form 10-K or as a separate disclosure document.

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to GenOn Americas Generation, LLC and will be retained by GenOn Americas Generation, LLC and furnished to the Securities and Exchange Commission or its staff upon request.

EXHIBIT 32.A3

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of GenOn Mid-Atlantic, LLC on Form 10-K for the year ended December 31, 2014, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), each of the undersigned officers of the Company certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)   The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date: February 27, 2015

/s/ DAVID CRANE
———————————————
David Crane
*Chief Executive Officer*
*(Principal Executive Officer)*

/s/ KIRKLAND B. ANDREWS
———————————————
Kirkland B. Andrews
Chief Financial Officer
*(Principal Financial Officer)*

/s/ RONALD B. STARK
———————————————
Ronald B. Stark
Chief Accounting Officer
*(Principal Accounting Officer)*

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of this Form 10-K or as a separate disclosure document.

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to GenOn Mid-Atlantic, LLC and will be retained by GenOn Mid-Atlantic, LLC and furnished to the Securities and Exchange Commission or its staff upon request.

# Exhibit 65

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the Fiscal Year ended December 31, 2015.**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the Transition period from                    to                    .**

# GenOn Energy, Inc.

(Exact name of registrant as specified in its charter)

75-0655566 (I.R.S. Employer Identification No.)

Commission File Number: 001-16455

# GenOn Americas Generation, LLC

(Exact name of registrant as specified in its charter)

51-0390520 (I.R.S. Employer Identification No.)

Commission File Number: 333-63240

# GenOn Mid-Atlantic, LLC

(Exact name of registrant as specified in its charter)

58-2574140 (I.R.S. Employer Identification No.)

Commission File Number: 333-61668

**Delaware**
*(State or other jurisdiction of incorporation or organization)*

**211 Carnegie Center Princeton, New Jersey**      **08540**
*(Address of principal executive offices)*      *(Zip Code)*

**(609) 524-4500**

*(Registrants' telephone number, including area code)*

**Securities registered pursuant to Section 12(b) of the Act:**
**None**

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined by Rule 405 of the Securities Act.

| | | |
|---|---|---|
| GenOn Energy, Inc. | ☐ Yes | ☒ No |
| GenOn Americas Generation, LLC | ☐ Yes | ☒ No |
| GenOn Mid-Atlantic, LLC | ☐ Yes | ☒ No |

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act.

| | | |
|---|---|---|
| GenOn Energy, Inc. | ☒ Yes | ☐ No |
| GenOn Americas Generation, LLC | ☒ Yes | ☐ No |
| GenOn Mid-Atlantic, LLC | ☒ Yes | ☐ No |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. (As a voluntary filer not subject to filing requirements, the registrant nevertheless filed all reports which would have been required to be filed by Section 15(d) of the Exchange Act during the preceding 12 months had the registrant been required to file reports pursuant to Section 15(d) of the Securities Exchange Act of 1934 solely as a result of having registered debt securities under the Securities Act of 1933.)

GenOn Energy, Inc.                          ☐ Yes      ☐ No

GenOn Americas Generation, LLC              ☐ Yes      ☐ No

GenOn Mid-Atlantic, LLC                     ☐ Yes      ☐ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

GenOn Energy, Inc.                          ☒ Yes      ☐ No

GenOn Americas Generation, LLC              ☒ Yes      ☐ No

GenOn Mid-Atlantic, LLC                     ☒ Yes      ☐ No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

GenOn Energy, Inc.                          ☒

GenOn Americas Generation, LLC              ☒

GenOn Mid-Atlantic, LLC                     ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

|  | Large accelerated filer | Accelerated filer | Non-accelerated filer | Smaller reporting company |
|---|---|---|---|---|
| GenOn Energy, Inc. | ☐ | ☐ | ☒ | ☐ |
| GenOn Americas Generation, LLC | ☐ | ☐ | ☒ | ☐ |
| GenOn Mid-Atlantic, LLC | ☐ | ☐ | ☒ | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).

GenOn Energy, Inc.                          ☐ Yes      ☒ No

GenOn Americas Generation, LLC              ☐ Yes      ☒ No

GenOn Mid-Atlantic, LLC                     ☐ Yes      ☒ No

Each Registrant's outstanding equity interests are held by its respective parent and there are no equity interests held by nonaffiliates.

| Registrant | Parent |
|---|---|
| GenOn Energy, Inc. | NRG Energy, Inc. |
| GenOn Americas Generation, LLC | NRG Americas, Inc. |
| GenOn Mid-Atlantic, LLC | NRG North America, LLC |

This combined Form 10-K is separately filed by GenOn Energy, Inc., GenOn Americas Generation, LLC and GenOn Mid-Atlantic, LLC. Information

contained in this combined Form 10-K relating to GenOn Energy, Inc., GenOn Americas Generation, LLC and GenOn Mid-Atlantic, LLC is filed by such registrant on its own behalf and each registrant makes no representation as to information relating to registrants other than itself.

The registrants have not incorporated by reference any information into this Form 10-K from any annual report to securities holders, proxy statement or prospectus filed pursuant to 424(b) or (c) of the Securities Act.

NOTE: WHEREAS GENON ENERGY, INC., GENON AMERICAS GENERATION, LLC AND GENON MID-ATLANTIC, LLC MEET THE CONDITIONS SET FORTH IN GENERAL INSTRUCTION I(1)(a) AND (b) OF FORM 10-K, THIS COMBINED FORM 10-K IS BEING FILED WITH THE REDUCED DISCLOSURE FORMAT PURSUANT TO GENERAL INSTRUCTION I(2).

## TABLE OF CONTENTS

| | |
|---|---:|
| Glossary of Terms | 2 |
| PART I | 5 |
| Item 1 — Business | 5 |
| Item 1A — Risk Factors Related to the Registrants | 13 |
| Item 1B — Unresolved Staff Comments | 25 |
| Item 2 — Properties | 26 |
| Item 3 — Legal Proceedings | 27 |
| Item 4 — Mine Safety Disclosures | 27 |
| PART II | 28 |
| Item 5 — Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 28 |
| Item 6 — Selected Financial Data | 28 |
| Item 7 — Management's Narrative Analysis of the Results of Operations and Financial Condition | 29 |
| Item 7A — Quantitative and Qualitative Disclosures About Market Risk | 45 |
| Item 8 — Financial Statements and Supplementary Data | 46 |
| Item 9 — Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 47 |
| Item 9A — Controls and Procedures | 47 |
| Item 9B — Other Information | 47 |
| PART III | 48 |
| Item 10 — Directors, Executive Officers and Corporate Governance | 48 |
| Item 11 — Executive Compensation | 48 |
| Item 12 — Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 48 |
| Item 13 — Certain Relationships and Related Transactions, and Director Independence | 48 |
| Item 14 — Principal Accounting Fees and Services | 48 |
| PART IV | 49 |
| Item 15 — Exhibits, Financial Statement Schedules | 49 |
| EXHIBIT INDEX | 133 |

1

.

## Glossary of Terms

When the following terms and abbreviations appear in the text of this report, they have the meanings indicated below:

| | |
|---|---|
| ARO | Asset Retirement Obligation |
| ASC | The FASB Accounting Standards Codification, which the FASB established as the source of authoritative U.S. GAAP |
| ASU | Accounting Standards Updates – updates to the ASC |
| Average realized prices | Volume-weighted average power prices, net of average fuel costs and reflecting the impact of settled hedges |
| Bankruptcy Court | United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division |
| Baseload | Units expected to satisfy minimum baseload requirements of the system and produce electricity at an essentially constant rate and run continuously |
| CAIR | Clean Air Interstate Rule |
| CAISO | California Independent System Operator |
| CCGT | Combined Cycle Gas Turbine |
| CenterPoint | CenterPoint Energy, Inc. and its subsidiaries, on and after August 31, 2002, and Reliant Energy, Incorporated and its subsidiaries, prior to August 31, 2002 |
| CFTC | U.S. Commodity Futures Trading Commission |
| $CO_2$ | Carbon Dioxide |
| CSAPR | Cross-State Air Pollution Rule |
| CWA | Clean Water Act |
| D.C. Circuit | U.S. Court of Appeals for the District of Columbia Circuit |
| Deactivation | Includes retirement, mothballing and long-term protective layup. In each instance, the deactivated unit cannot be currently called upon to generate electricity. |
| Dodd-Frank Act | Dodd-Frank Wall Street Reform and Consumer Protection Act |
| Economic gross margin | Sum of energy revenue, capacity revenue and other revenue, less cost of sales |
| EPA | U.S. Environmental Protection Agency |
| EPC | Engineering, Procurement and Construction |
| Exchange Act | The Securities Exchange Act of 1934, as amended |
| FASB | Financial Accounting Standards Board |
| FCM | Forward Capacity Market |
| FERC | Federal Energy Regulatory Commission |
| FPA | Federal Power Act |
| GenOn | GenOn Energy, Inc. and, except where the context indicates otherwise, its subsidiaries |
| GenOn Americas Generation | GenOn Americas Generation, LLC and, except where the context indicates otherwise, its subsidiaries |
| GenOn Energy Holdings | GenOn Energy Holdings, Inc. and, except where the context indicates otherwise, its subsidiaries |
| GenOn Energy Management | GenOn Energy Management, LLC |
| GenOn Mid-Atlantic | GenOn Mid-Atlantic, LLC and, except where the context indicates otherwise, its subsidiaries, which include the coal generation units at two generating facilities under operating leases |
| GenOn Plans | Collectively, the NRG GenOn LTIP, The GenOn Energy, Inc. 2002 Long-Term Incentive Plan, the GenOn Energy, Inc. 2002 Stock Plan and the Mirant Corporation 2005 Omnibus Incentive Compensation Plan |
| GHG | Greenhouse Gases |
| HAPs | Hazardous Air Pollutants |
| ICAP | New York Installed Capacity |
| IRC | Internal Revenue Code of 1986, as amended |
| IRC § | IRC Section |
| ISO | Independent System Operator, also referred to as RTO |

2

.

| | |
|---|---|
| ISO-NE | ISO New England Inc. |
| kWh | Kilowatt-hour |
| LIBOR | London Inter-Bank Offered Rate |
| Marsh Landing | NRG Marsh Landing project |
| MATS | Mercury and Air Toxics Standards |
| MC Asset Recovery | MC Asset Recovery, LLC |
| MDE | Maryland Department of the Environment |
| Merit Order | A term used for the ranking of power stations in order of ascending marginal cost |
| Mirant | GenOn Energy Holdings, Inc. (formerly known as Mirant Corporation) and, except where the context indicates otherwise, its subsidiaries |
| Mirant/RRI Merger | The merger completed on December 3, 2010 pursuant to the Mirant/RRI Merger Agreement |
| Mirant Debtors | GenOn Energy Holdings, Inc. (formerly known as Mirant Corporation) and certain of its subsidiaries |
| MISO | Midcontinent Independent System Operator, Inc. |
| MMBtu | Million British Thermal Units |
| MOPR | Minimum Offer Price Rule |
| Mothballed | The unit has been removed from service and is unavailable for service, but has been laid up in a manner such that it can be brought back into service with an appropriate amount of notification, typically weeks or months |
| MW | Megawatt |
| MWh | Saleable megawatt hour net of internal/parasitic load megawatt-hour |
| NAAQS | National Ambient Air Quality Standards |
| NEPGA | New England Power Generators Association |
| Net Exposure | Counterparty credit exposure to GenOn, GenOn Americas Generation or GenOn Mid-Atlantic, as applicable, net of collateral |
| Net Generation | The net amount of electricity produced, expressed in kWhs or MWhs, that is the total amount of electricity generated (gross) minus the amount of electricity used during generation. |
| NERC | North American Electric Reliability Corporation |
| NextEra | NextEra Energy Resources, LLC |
| NOL | Net Operating Loss |
| NOV | Notice of Violation |
| $NO_x$ | Nitrogen Oxide |
| NPDES | National Pollution Discharge Elimination System |
| NPNS | Normal Purchase Normal Sale |
| NRG | NRG Energy, Inc. and, except where the context indicates otherwise, its subsidiaries |
| NRG Americas | NRG Americas, Inc. (formerly known as GenOn Americas, Inc.) |
| NRG GenOn LTIP | NRG 2010 Stock Plan for GenOn employees |
| NRG Merger | The merger completed on December 14, 2012 pursuant to the NRG Merger Agreement |
| NRG Merger Agreement | The agreement by and among NRG, GenOn and Plus Merger Corporation (a direct wholly-owned subsidiary of NRG) dated as of July 20, 2012 |
| NRG Merger Exchange Ratio | The right of GenOn Energy, Inc. stockholders to receive 0.1216 shares of common stock of NRG Energy, Inc. in the NRG Merger |
| NSPS | New Source Performance Standards |
| NYISO | New York Independent System Operator |
| NYMEX | New York Mercantile Exchange |
| NYSPSC | New York State Public Service Commission |
| OCI | Other Comprehensive Income/ (Loss) |
| PADEP | Pennsylvania Department of Environmental Protection |

3

.

| | |
|---|---|
| Peaking | Units expected to satisfy demand requirements during the periods of greatest or peak load on the system |
| PJM | PJM Interconnection, LLC |
| Plan | The plan of reorganization that was approved in conjunction with Mirant Corporation's emergence from bankruptcy protection on January 3, 2006 |
| PPM | Parts Per Million |
| PSCs | Public Service Commissions |
| PUHCA | Public Utility Holding Company Act of 2005 |
| PURPA | Public Utility Regulatory Policies Act of 1978 |
| RCRA | Resource Conservation and Recovery Act of 1976 |
| Registrants | GenOn, GenOn Americas Generation and GenOn Mid-Atlantic, collectively |
| REMA | NRG REMA LLC (formerly known as GenOn REMA, LLC) |
| Repowering | Technologies utilized to replace, rebuild, or redevelop major portions of an existing electrical generating facility, not only to achieve a substantial emission reduction, but also to increase facility capacity, and improve system efficiency |
| RGGI | Regional Greenhouse Gas Initiative |
| RMR | Reliability Must-Run |
| RRI Energy | RRI Energy, Inc. |
| RTO | Regional Transmission Organization |
| SCR | Selective Catalytic Reduction |
| SEC | U.S. Securities and Exchange Commission |
| Securities Act | The Securities Act of 1933, as amended |
| $SO_2$ | Sulfur Dioxide |
| SSR | System Support Resource |
| U.S. | United States of America |
| U.S. GAAP | Accounting principles generally accepted in the U.S. |

4

# PART I

### Item 1 — Business (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)

### General

The Registrants are wholesale power generation subsidiaries of NRG, which is a competitive power company that produces, sells and delivers energy and energy services, primarily in major competitive power markets in the U.S. GenOn is an indirect wholly-owned subsidiary of NRG. GenOn was incorporated as a Delaware corporation on August 9, 2000, under the name Reliant Energy Unregco, Inc. GenOn Americas Generation and GenOn Mid-Atlantic are indirect wholly owned subsidiaries of GenOn. GenOn Americas Generation was formed as a Delaware limited liability company on November 1, 2001, under the name Mirant Americas Generation, LLC. GenOn Mid-Atlantic was formed as a Delaware limited liability company on July 12, 2000, under the name Southern Energy Mid-Atlantic, LLC. GenOn Mid-Atlantic is a wholly-owned subsidiary of NRG North America and an indirect wholly owned subsidiary of GenOn Americas Generation. The Registrants are engaged in the ownership and operation of power generation facilities; the trading of energy, capacity and related products; and the transacting in and trading of fuel and transportation services.

The Registrants' generation facilities are located in the U.S. and comprise generation facilities across the merit order. The sale of capacity and power from baseload and intermediate generation facilities accounts for a majority of the Registrants' generation revenues. In addition, the Registrants' generation portfolio provides each with opportunities to capture additional revenues by selling power during periods of peak demand, offering capacity or similar products, and providing ancillary services to support system reliability.

The following table summarizes the generation portfolio as of December 31, 2015, by Registrant:

| | (In MW) | | |
|---|---|---|---|
| Generation Type | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
| Natural gas[a] | 10,763 | 4,118 | 1,942 |
| Coal[b] | 5,143 | 2,433 | 2,433 |
| Oil[c] | 1,847 | 1,434 | 308 |
| Total generation capacity | 17,753 | 7,985 | 4,683 |

(a) GenOn's natural gas generation portfolio does not include 463 MW related to Osceola, which was mothballed on January 1, 2015, 636 MW related to Coolwater, which was retired on January 1, 2015, 160 MW related to Glen Gardner, which was retired on May 1, 2015, and 98 MW related to Gilbert, which was retired on May 1, 2015.

(b) GenOn's coal generation portfolio does not included 597 MW related to Shawville, which was mothballed on May 31, 2015, and 401 MW related to Portland, which was deactivated on December 1, 2015.

(c) GenOn's oil generation portfolio does not included 212 MW related to Werner, which was retired on May 1, 2015.

### Seasonality and Price Volatility

Annual and quarterly operating results of the Registrants' wholesale power generation segments can be significantly affected by weather and energy commodity price volatility. Significant other events, such as the demand for natural gas, interruptions in fuel supply infrastructure and relative levels of hydroelectric capacity can increase seasonal fuel and power price volatility. The preceding factors related to seasonality and price volatility are fairly uniform across the Registrants' wholesale generation business.

### Competition

Wholesale power generation is a capital-intensive, commodity-driven business with numerous industry participants. The Registrants compete on the basis of the location of their plants and ownership of portfolios of plants in various regions, which increases the stability and reliability of their energy revenues. Wholesale power generation is a regional business that is currently highly fragmented and diverse in terms of industry structure. As such, there is a wide variation in terms of the capabilities, resources, nature and identity of the companies the Registrants compete with depending on the market. Competitors include regulated utilities, other independent power producers, and power marketers or trading companies, including those owned by financial institutions, municipalities and cooperatives.

**Competitive Strengths**

The Registrants' power generation assets are diversified by fuel-type, dispatch level and region, which helps mitigate the risks associated with fuel price volatility and market demand cycles. The Registrants' baseload and intermediate facilities provide each with a significant source of cash flow, while the peaking facilities provide the Registrants with opportunities to capture upside potential that can arise from time to time during periods of high demand.

Many of the Registrants' generation assets are located within densely populated areas, which tend to have more robust wholesale pricing as a result of relatively favorable local supply-demand balance. The Registrants have generation assets located in or near the New York City, Washington, D.C., Baltimore, Pittsburgh, Los Angeles and San Francisco metropolitan areas and New Jersey. These facilities are often ideally situated for repowering or the addition of new capacity, because their location and existing infrastructure provide significant advantages over undeveloped sites.

**2015 Significant Events and Developments**

*Dispositions*

In the fourth quarter of 2015, GenOn entered into two separate agreements to sell 100% of its interest in Seward Generation, LLC, or Seward, and Shelby County Energy Center, LLC, or Shelby. Seward and Shelby own and operate a 525 MW coal-fired facility and a 352 MW natural gas-fired facility, respectively. The sale of Seward was completed on February 2, 2016 and the sale of Shelby is expected to be completed during the first quarter of 2016. See Item 15 — Note 3, *Dispositions,* to the Consolidated Financial Statements for further discussion.

*Fuel Repowerings and Conversions*

The table below lists projected repowering and conversion projects at certain of the Registrants' facilities:

| Facility | Net Generation Capacity (MW) | Project Type | Fuel Type | Targeted COD |
|---|---|---|---|---|
| New Castle Units 3, 4 and 5 | 325 | Natural Gas Conversion | Natural Gas | Summer 2016 |
| Shawville Units 1, 2, 3 and 4 | 597 | Natural Gas Conversion | Natural Gas | Fall 2016 |
| Total Fuel Repowerings and Conversions | 922 | | | |

**Coal Operations**

The following table summarizes GenOn's U.S. coal capacity and the corresponding revenues and average natural gas prices and positions resulting from coal hedge agreements extending beyond December 31, 2015, and through 2019:

| | 2016 | 2017 | 2018 | 2019 | Annual Average for 2016-2019 |
|---|---|---|---|---|---|
| | *(Dollars in millions unless otherwise stated)* | | | | |
| Net Coal Capacity (MW) [a] | 4,409 | 4,198 | 4,198 | 3,492 | 4,074 |
| Forecasted Coal Capacity (MW) [b] | 2,256 | 2,007 | 1,656 | 1,368 | 1,822 |
| Total Coal Sales (MW) [c] | 1,827 | 1,153 | 217 | — | 799 |
| Percentage Coal Capacity Sold Forward [d] | 81% | 57% | 13% | — | 38% |
| Total Forward Hedged Revenues [e] | $ 828 | $ 439 | $ 57 | $ — | |
| Weighted Average Hedged Price ($ per MWh) [e] | $ 51.58 | $ 43.42 | $ 30.19 | $ — | |
| Average Equivalent Natural Gas Price ($ per MMBtu) [e] | $ 3.29 | $ 3.15 | $ 2.83 | $ — | |
| Gas Price Sensitivity Up $0.50/MMBtu on Coal Units | $ 85 | $ 120 | $ 154 | $ 123 | |
| Gas Price Sensitivity Down $0.50/MMBtu on Coal Units | $ (47) | $ (79) | $ (106) | $ (84) | |
| Heat Rate Sensitivity Up 1 MMBtu/MWh on Coal Units | $ 34 | $ 44 | $ 66 | $ 62 | |
| Heat Rate Sensitivity Down 1 MMBtu/MWh on Coal Units | $ (27) | $ (34) | $ (50) | $ (46) | |

(a) Net coal capacity represents nominal summer net MW capacity of power generated as adjusted for the Registrants' ownership position excluding capacity from inactive/mothballed units, see Item 2 - *Properties* for units scheduled to be deactivated.

(b) Forecasted generation dispatch output (MWh) based on forward price curves as of December 31, 2015, which is then divided by number of hours in a given year to arrive at MW capacity. The dispatch takes into account planned and unplanned outage assumptions.

(c) Includes amounts under power sales contracts and natural gas hedges. The forward natural gas quantities are reflected in equivalent MWh based on forward market implied heat rate as of December 31, 2015, and then combined with power sales to arrive at equivalent MWh hedged which is then divided by number of hours in given year to arrive at MW hedged. The coal sales include swaps and delta of options sold which is subject to change. For detailed information on the Registrants' hedging methodology through use of derivative instruments, see discussion in Item 15 - Note 5, *Accounting for Derivative Instruments and Hedging Activities*, to the Consolidated Financial Statements.

(d) Percentage hedged is based on total coal sales as described in (c) above divided by the forecasted coal capacity.

(e) Represents all U.S. coal sales, including energy revenue and demand charges, excluding revenues derived from capacity auctions.

**Regulatory Matters**

As owners of power plants and participants in wholesale energy markets, certain of the Registrants' subsidiaries are subject to regulation by various federal and state government agencies. These include the CFTC and FERC, as well as other public utility commissions in certain states where the Registrants' generating assets are located. In addition, the Registrants are subject to the market rules, procedures and protocols of the various ISO markets in which they participate. The Registrants must also comply with the mandatory reliability requirements imposed by NERC and the regional reliability entities in the regions where they operate.

*National*

*U.S. Supreme Court Agrees to Consider the Constitutionality of Maryland's Generator Contracting Programs* — On October 19, 2015, the U.S. Supreme Court agreed to hear a case challenging the constitutionality of certain state-directed procurements of new electric generating facilities. The case involves the authority of the Maryland Public Service Commission to direct load-serving utilities in the state to enter into long-term power purchase contracts with a generation developer to encourage the construction of new generation capacity in Maryland. The constitutionality of the long-term contracts was challenged in the U.S. District Court for the District of Maryland, which, in an October 24, 2013, decision, found that the contracts violated the Supremacy Clause of the U.S. Constitution because they were both conflict preempted and field preempted by the FPA and the authority that the FPA granted to FERC. On June 30, 2014, the U.S. Court of Appeals for the Fourth Circuit affirmed the District Court's decision. A case arising out of New Jersey and raising similar issues was decided by the U.S. Court of Appeals for the Third Circuit, which also determined that the state-mandated contracts were preempted. After the Supreme Court granted certiorari in the Maryland case, NRG filed a friend-of-the-court brief urging the Court to uphold the right of states to incentivize new generation by directing utilities in the state to enter into long-term contracts — but noted that FERC has both the authority and the statutory obligation to protect wholesale markets by requiring that bids in the wholesale markets reflect costs and by ensuring that uneconomic entry does not distort auction outcomes. The Supreme Court heard oral argument on February 24, 2016. The outcome of this litigation could have broad impacts on whether and how states require utilities to contract with new generation resources, as well as how such contracted resources interact with the FERC-jurisdictional wholesale markets.

7

*U.S. Supreme Court Allows FERC to Retain Jurisdiction Over Demand Response* — On January 25, 2016, the U.S. Supreme Court issued a 6-2 decision affirming FERC's ability to exercise jurisdiction over demand response resources seeking to voluntarily participate in the wholesale markets. Additionally, the Supreme Court upheld FERC's preferred scheme for pricing demand response in the energy market. This case arose out of a May 23, 2014, decision by the D.C. Circuit which vacated FERC's rules (known as Order No. 745) that set the compensation level for demand response resources participating in the FERC-jurisdictional energy markets. The Court of Appeals had held that the FPA does not authorize FERC to exercise jurisdiction over demand response and that instead demand response is part of the retail market over which the states have jurisdiction. With the Supreme Court's decision, FERC will resume exercising jurisdiction over demand response, which the Registrants view as a positive for their wholesale business.

### *East*

### *PJM*

*PJM Auction Results* — On August 21, 2015, PJM announced the results of its 2018/2019 Base Residual Auction, officially integrating the new Capacity Performance product into the market. GenOn cleared approximately 8,610 MWs of Capacity Performance product and 464 MWs of Base Capacity product in the 2018/2019 Base Residual Auction. GenOn's expected capacity revenues from the 2018/2019 Base Residual Auction are approximately $565 million. GenOn Americas Generation (including GenOn Mid-Atlantic) cleared approximately 3,801 MWs of Capacity Performance product and 58 MWs of Base Capacity product in the 2018/2019 Base Residual Auction. GenOn Americas Generation's (including GenOn Mid-Atlantic) expected capacity revenues from the 2018/2019 Base Residual Auction are approximately $232 million. PJM announced the results of its Transitional Capacity Auctions for the 2016/2017 and 2017/2018 delivery years, respectively, on August 31, 2015, and September 9, 2015. GenOn cleared approximately 850 MWs of Capacity Performance product in the 2016/2017 Transactional Capacity Auction, and 5,897 MWs of Capacity Performance product in the 2017/2018 Transitional Capacity Auctions. GenOn Americas Generation (including GenOn Mid-Atlantic) cleared approximately 2,501 MWs of Capacity Performance product in the 2017/2018 Transitional Capacity Auctions. GenOn and GenOn Americas Generation (including GenOn Mid-Atlantic) expect an approximate $170 million and $50 million increase in PJM capacity revenue, respectively, from 2016/2017 to 2018/2019 due to the Capacity Performance product.

The tables below provide a detailed description of the Registrant's Base Residual Auction results:

### *GenOn:*

| Zone | Base Capacity Product | | Capacity Performance Product | |
|------|------------------------|------------------------|------------------------------|------------------------|
| | Cleared Capacity (MW)[1] | Price ($/MW-day) | Cleared Capacity (MW)[1] | Price ($/MW-day) |
| COMED | — | $200.21 | 579 | $215.00 |
| EMAAC | 91 | $210.63 | 424 | $225.42 |
| MAAC | 67 | $149.98 | 6,431 | $164.77 |
| RTO | 306 | $149.98 | 1,176 | $164.77 |
| Total | 464 | | 8,610 | |

(1) Includes imports.

### *GenOn Americas Generation & GenOn Mid-Atlantic:*

| Zone | Base Capacity Product | | Capacity Performance Product | |
|------|------------------------|------------------------|------------------------------|------------------------|
| | Cleared Capacity (MW)[1] | Price ($/MW-day) | Cleared Capacity (MW)[1] | Price ($/MW-day) |
| MAAC [2] | 58 | $149.98 | 3,801 | $164.77 |
| Total | 58 | | 3,801 | |

(1) Includes imports.
(2) Plants that participate in the PJM auctions for GenOn Americas Generation are solely those operated by GenOn Mid-Atlantic.

*Capacity Performance Rehearings* — On June 9, 2015, FERC approved changes to PJM's capacity market. Major elements of the approved changes to the Capacity Performance framework include the calculation of the bid cap, elimination of the 2.5% holdback for short lead-time resources, and substantial performance penalties on Capacity Performance resources that do not perform in real time during specific periods of high demand. The rules mandate that underperformance penalties be paid to units that over perform during those periods of high demand. The Registrants' actual revenues will be the combination of the revenues based on the cleared auction MWs plus the net of any over and under performance of the Registrants' fleet. On July 9, 2015, multiple parties, including the Registrants, filed requests for rehearings at FERC regarding the framework of the new annual capacity auctions. Rehearing is pending.

In addition, multiple parties sought clarification on whether demand resources could participate in the Capacity Performance Transition Auctions. On July 22, 2015, FERC issued an order allowing demand response and energy efficiency resources to participate in the Capacity Performance Transition Auctions. Rehearing is pending.

*Capacity Replacement* — On March 10, 2014, PJM filed at FERC to limit speculation in the forward capacity auction. Specifically, PJM proposed tariff changes that are designed to ensure that only capacity resources that are reasonably expected to be provided as a physical resource by the start of the delivery year can participate in the Base Residual Auction. These changes include the addition of a replacement capacity adjustment charge that is intended to remove the incentive to profit from replacing capacity commitments, an increase in deficiency penalties for non-performance, and a reduction in the number of incremental auctions from three to one. On May 9, 2014, FERC rejected PJM's proposed changes to address replacement capacity and incremental auction design, but established a Section 206 proceeding and technical conference to find a just-and-reasonable outcome. On August 18, 2014, PJM requested that FERC defer further action in the proceeding. Since the request, FERC has taken no action. The Section 206 proceeding and technical conference could have a material impact on future PJM capacity prices.

*Reactive Power* — On November 20, 2014, FERC issued an Order to Show Cause under FPA Section 206 directing PJM to either revise its tariff to provide that a generation or non-generation resource owner will no longer receive reactive power capability payments after it has deactivated its unit and to clarify the treatment of reactive power capability payments for units transferred out of a fleet or show cause why it should not be required to do so. On December 22, 2014, PJM filed proposed tariff changes, and the matter remains pending at FERC. The Registrants' reactive power revenues may change as a result of this proceeding.

*Demand Response Operability* — On May 9, 2014, FERC largely accepted PJM's proposed changes on demand response operability in an attempt to enhance the operational flexibility of demand response resources during the operating day. The approval of these changes will likely limit the amount of demand response resources eligible to participate in PJM. The matter is pending rehearing at FERC.

*MOPR Revisions* — On May 2, 2013, FERC accepted PJM's proposal to substantially revise its Minimum Offer Price Rule. Among other things, FERC approved the portions of the PJM proposal that exempt many new entrants from demonstrating that their proposed projects are economic, as well as providing a similar exemption from public power entities and certain self-supply entities. This exemption is subject to certain conditions designed to limit the financial incentive of such entities to suppress market prices. On June 3, 2013, NRG filed a request for rehearing of the FERC order and subsequently protested the manner in which PJM proposed to implement the FERC order. On October 15, 2015, FERC denied the requests for rehearing and accepted PJM's compliance filing. NRG, along with other parties, filed a petition for review of FERC's decision with the D.C. Circuit.

*AEP and FirstEnergy Ohio Contracts* — FirstEnergy and AEP, through their regulated Ohio utilities, have sought approval at the Public Utility Commission of Ohio of a capacity market "swap" where FirstEnergy's and AEP's "merchant" resources would recover the full costs of their generation facilities through a non-bypassable surcharge applicable to all Ohio retail customers. Evidence introduced in the Ohio proceeding suggests that these contracts could impose more than $1,000 per Ohio retail customer in excess costs over the next eight years. A coalition of consumer and supply groups are opposing the proposed contracts before the Public Utility Commission of Ohio. Additionally, NRG and numerous other coalition members have filed a complaint at FERC questioning whether FirstEnergy and AEP have the regulatory approvals necessary to enter into above-market contracts with their generation affiliates without further FERC review. That complaint is pending at FERC.

*New England (GenOn and GenOn Americas Generation)*

*Performance Incentive Proposal* — On January 17, 2014, ISO-NE filed at FERC to revise its forward capacity market, or FCM, by making a resource's forward capacity market compensation dependent on resource output during short intervals of operating reserve scarcity. The ISO-NE proposal would replace the existing shortage event penalty structure with a new performance incentive, or PI, mechanism, resulting in capacity payments to resources that would be the combination of two components: (1) a base capacity payment and (2) a performance payment or charge. The performance payment or charge would be entirely dependent upon the resource's delivery of energy or operating reserves during scarcity conditions, and could be larger than the base payment.

On May 30, 2014, FERC found that most of the provisions in the ISO-NE proposal, with modifications, together with an increase to the reserve constraint penalty factors, provided a just and reasonable structure. FERC instituted a proceeding for further hearings and required ISO-NE to make a compliance filing to modify its proposal and adopt the increases to the reserve constraint penalty factors. FERC denied rehearing. The New England Power Generators Association filed a petition for review of FERC's decision with the D.C. Circuit.

*FCM Rules for 2014 Forward Capacity Auction* — On February 28, 2014, ISO-NE filed with FERC the results of Forward Capacity Auction 8. On September 16, 2014, FERC issued a notice stating that the Forward Capacity Auction 8 results would go into effect by operation of law. Several parties requested rehearing of FERC's notice. FERC rejected those requests on legal and procedural grounds. A petition for review of FERC's decision was filed with the D.C. Circuit. NRG, along with other parties, filed a brief in support of FERC. An adverse decision could call into question the capacity revenues associated with the 2017/2018 delivery year.

*Sloped Demand Curve Filing* — On May 30, 2014, FERC accepted the proposed tariff revisions discussed in the April 1, 2014 ISO-NE filing at FERC regarding the establishment of a sloped demand curve for use in the ISO-NE Forward Capacity Market. The accepted tariff changes include extending the period during which a market participant can lock-in the capacity price for a new resource from five to seven years, establishing a limited exemption for the buyer-side market mitigation rules for a set amount of renewable resources, and eliminating the administrative pricing rules. The shift away from the current vertical demand curve and accompanying proposed changes could have a material impact on the capacity prices in future auctions as well as an impact on resources that have a price lock-in. FERC denied rehearing. NRG, along with other generators, filed a petition for review of FERC's decision with the D.C. Circuit.

In December 2015, FERC voluntarily requested a remand from the D.C. Circuit. FERC also instituted a FPA Section 206 proceeding, directing ISO-NE to submit tariff revisions by March 31, 2016, providing for zonal sloped demand curves to be implemented beginning in Forward Capacity Auction 11. The ultimate outcome of this proceeding will affect the market design governing future capacity auctions in New England.

*New York*

*Competitive Entry Exemption to Buyer-Side Mitigation Rules* — On December 4, 2014, pursuant to Section 206 of the FPA, a group of New York transmission owners filed a complaint seeking a competitive entry exemption to the current NYISO buyer-side mitigation rules. On December 16, 2014, TDI USA Holdings Corporation filed a complaint under Section 206 of the FPA against the NYISO claiming that the NYISO's application of the Mitigation Exemption Test under the buyer-side mitigation rules to TDI's Champlain Hudson 1,000 MW transmission line project is unjust and unreasonable and seeks an exemption from the Mitigation Exemption Test. On February 26, 2015, FERC granted the complaint filed by the New York transmission owners and directed the NYISO to adopt a competitive entry exemption into its tariff within 30 days. In a companion order issued on the same day, FERC rejected the TDI complaint on the grounds that TDI's concerns were adequately addressed by FERC's first order. On March 30, 2015, NRG filed a request for rehearing. On August 4, 2015, FERC granted in part and denied in part the rehearing requests and conditionally accepted NYISO's compliance filing subject to revisions clarifying that the competitive entry exemption is not available for generator or unforced capacity deliverability rights projects that are members of the completed class years.

*Revisions to the Buyer-Side Mitigation Rules* — On May 8, 2015, several New York entities, including the NYSPSC, filed a complaint against the NYISO under Section 206 of the FPA seeking revisions to the buyer-side market power mitigation measures of the NYISO tariff. The parties requested FERC to find that the current buyer-side mitigation rules are unjust and unreasonable because they prevent the ICAP market from functioning properly and that the rules should apply only to a limited subset of generation facilities. NRG protested the complaint. On October 9, 2015, FERC held that certain renewables and self-supply resources should be exempt from buyer-side mitigation rules and ordered the NYISO to submit a compliance filing. On February 5, 2016, FERC denied rehearing. The NYISO has yet to issue its compliance filing addressing FERC's order to develop exemptions for certain renewables and self-supply resources. The eventual disposition of this case could impact the ability of uneconomic resources to enter the New York market.

*Independent Power Producers of New York (IPPNY) Complaint* — On May 10, 2013, as amended on March 25, 2014, a generator trade association in New York filed a complaint at FERC against the NYISO. The generators asked FERC to direct the NYISO to require that capacity from existing generation resources that would have exited the market but for out-of-market payments under RMR-type agreements be excluded from the capacity market altogether or be offered at levels no lower than the resources' going-forward costs. The complaints point to the recent reliability services agreements entered into between the NYSPSC and generators as evidence that capacity market prices are being influenced by non-market considerations.

On March 19, 2015, FERC denied IPPNY's complaint and directed NYISO to establish a stakeholder process to consider whether there are circumstances that warrant the adoption of buyer-side mitigation rules in the rest-of-state, and whether mitigation measures would need to be in place to address any price suppressing effects of repowering agreements. On June 17, 2015, NYISO filed its compliance report describing the outcome of the stakeholder process on concluding that buyer-side mitigation measures in the rest-of-state are not warranted. On November 16, 2015, FERC directed the NYISO to provide additional information. On December 16, 2015, NYISO filed responses to FERC's request. Rehearing is pending. Failure to implement buyer-side mitigation measures could result in uneconomic entry, which artificially decreases capacity prices below competitive market levels.

### Gulf Coast

### MISO (GenOn)

*Complaints regarding the 2015/2016 Planning Resource Auction* — In May 2015, the Illinois Attorney General, Public Citizen, Inc., and Southwestern Electric Cooperative, Inc. filed complaints against MISO on the grounds that the results of the MISO 2015/2016 Planning Resource Auction resulted in unjust and unreasonable prices, specifically the auction clearing price in Zone 4. NRG, on behalf of itself and GenOn, filed comments providing its view on the rationale for the market outcome.

On June 30, 2015, the Illinois Energy Consumers filed a complaint with FERC under Section 206 of the FPA regarding MISO's Planning Resource Auction tariff provisions, stating that the current MISO tariff does not produce just and reasonable results. The complaint suggests specific tariff modifications to address these alleged deficiencies, particularly as to the initial reference level price and the failure of the MISO tariff to count capacity sold in neighboring capacity markets toward meeting local clearing requirements in effect for the zones where capacity is physically located. On October 20, 2015, FERC held a technical conference on MISO's Planning Resource Auction, which in part addressed changes to MISO's auction design.

On December 31, 2015, FERC issued an order directing MISO to change key portions of its capacity market tariff, including restricting the ability of suppliers to place offers up to a MISO-developed opportunity cost. FERC mandated several changes to the auction, to be in place before the next planning resource auction in 2016.  MISO is pursuing its own stakeholder reforms process to create different rules and implement price formation reforms as to its restructured retail market zones, including Zone 4. FERC expressly declined to rule on the portion of the complaint addressing the outcome of the 2015 Zone 4 auction, and instead stated that its investigation into the conduct of the auction remained pending. Rehearing is pending.

*Revisions to MISO Capacity Construct* — On November 20, 2015, FERC issued a final order denying the NRG's request for rehearing of a 2012 FERC order approving the MISO capacity construct. NRG filed a petition for review of FERC's decision with the D.C. Circuit on the grounds that FERC's order denies merchant generators in MISO's footprint any reasonable opportunity to recover their fixed costs. The eventual outcome of this proceeding could impact MISO's attempts to redesign its capacity markets and thereby affect the value of NRG's uncontracted assets within the MISO footprint.

## Environmental Matters

The Registrants are subject to a wide range of environmental laws in the development, construction, ownership and operation of projects. These laws generally require that governmental permits and approvals be obtained before construction and during operation of power plants. Environmental laws have become increasingly stringent and the Registrants expect this trend to continue. The electric generation industry is facing new requirements regarding GHGs, combustion byproducts, water discharge and use, and threatened and endangered species. Future laws may require the addition of emissions controls or other environmental controls or impose restrictions on the operations of the Registrants' facilities, which could have a material effect on the Registrants' operations. Complying with environmental laws involves significant capital and operating expenses. The Registrants decide to invest capital for environmental controls based on the relative certainty of the requirements, an evaluation of compliance options, and the expected economic returns on capital.

A number of regulations with the potential to affect the Registrants and their facilities are in development, under review or have been recently promulgated by the EPA, including ESPS/NSPS for GHGs, NAAQS revisions and implementation and effluent guidelines. The Registrants are currently reviewing the outcome and any resulting impact of recently promulgated regulations and cannot fully predict such impact until legal challenges are resolved.

*Ozone NAAQS* — On October 26, 2015, the EPA promulgated a rule that reduces the ozone NAAQS to 0.070 ppm. This more stringent NAAQS will obligate the states to develop plans to reduce $NO_x$ (an ozone precursor), which could affect some of the Registrants' units.

*Clean Power Plan* — The national and international attention (including the Paris Agreement) in recent years on GHG emissions has resulted in federal and state legislative and regulatory action. In October 2015, the EPA finalized the Clean Power Plan, or CPP, addressing GHG emissions from existing EGUs. The CPP rule faces numerous legal challenges that likely will take several years to resolve. On February 9, 2016, the U.S. Supreme Court stayed the CPP.

*Effluent Limitations Guidelines* — In November 2015, the EPA promulgated a rule revising the Effluent Limitations Guidelines for Steam Electric Generating Facilities, which will impose more stringent requirements (as individual permits are renewed) for wastewater streams from flue gas desulfurization, fly ash, bottom ash, and flue gas mercury control. The Registrants estimate that it would cost approximately $50 million over the next six years to comply with this rule at the Registrants' coal-fired plants. This regulation has been challenged and is subject to legal uncertainty. The Registrants decide to invest capital for environmental controls based on: the certainty of regulations; evaluation of different technologies; options to convert to gas; and the expected economic returns on the capital. Over the next several years, the Registrants will decide whether to proceed with these investments at each of the plants as permits are renewed based on, among other things, the legal certainty of the regulation and market conditions at that time.

See Item 15 — Note 16, *Regulatory Matters,* Note 17, *Environmental Matters*, and Note 18, *Guarantees*, to the Consolidated Financial Statements.

### East

*Maryland Environmental Regulations* — In December 2014, MDE proposed a regulation regarding $NO_x$ emissions from coal-fired electric generating units, which had it been finalized would have required by 2020 the Registrants (at each of the three Dickerson coal-fired units and the Chalk Point coal-fired unit that does not have an SCR) to either (1) install and operate an SCR; (2) retire the unit; or (3) convert the fuel source from coal to natural gas. In early 2015, the State of Maryland decided not to finalize the regulation as proposed. In November 2015, MDE finalized revised regulations to address future $NO_x$ reductions, which although more stringent than previous regulations, will not cause the Registrants to spend capital to comply. As a result of the new regulations, on February 29, 2016, the Registrants notified PJM that they were withdrawing the standing deactivation notices for Dickerson Units 1, 2 and 3 and Chalk Point Units 1 and 2.

*RGGI* — The Registrants operate generating units in Maryland, Massachusetts and New York that are subject to RGGI, which is a regional cap and trade system. In 2013, each of these states finalized a rule that reduced and will continue to reduce the number of allowances, which the Registrants believe will increase the price of each allowance. The nine RGGI states are re-evaluating the program and may alter the rules to further reduce the number of allowances. The 2013 rules and/or revisions being currently contemplated could adversely impact the Registrants' results of operations, financial condition and cash flows.

### Environmental Capital Expenditures

GenOn estimates that environmental capital expenditures from 2016 through 2020 required to comply with environmental laws will be approximately $68 million for GenOn, which includes $12 million for GenOn Americas Generation. The estimate for GenOn Americas Generation includes $9 million for GenOn Mid-Atlantic. The majority of these costs will be expended by the end of 2016.

See Item 15 — Note 8, *Retirements or Mothballing of Generating Facilities,* to the Consolidated Financial Statements.

## Employees

As of December 31, 2015, GenOn had 1,689 employees of which 595 employees were part of GenOn Americas Generation and 440 employees were part of GenOn Mid-Atlantic, approximately 64.8%, 68.9% and 70.9% respectively, of whom were covered by bargaining agreements. During 2015, the Registrants did not experience any labor stoppages or labor disputes at any of their facilities.

### Available Information

The Registrants' annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports filed or furnished pursuant to section 13(a) or 15(d) of the Exchange Act are available free of charge through NRG's website, www.nrg.com, as soon as reasonably practicable after they are electronically filed with, or furnished to the SEC.

## Item 1A — Risk Factors

The Registrants are subject to the following factors that could have a material adverse effect on their future performance, results of operations, financial condition and cash flows. In addition, such factors could affect their ability to service indebtedness and other obligations, to raise capital and could affect their future growth opportunities. Also, see *Cautionary Statement Regarding Forward Looking Information* and Item 7 — *Management's Narrative Analysis of the Results of Operations and Financial Condition* of this Form 10-K.

### Risks Related to the Operation of the Registrants' Businesses

#### GenOn is a wholly-owned subsidiary of NRG and is highly dependent on NRG for services under a master services agreement.

GenOn relies on NRG for its administrative and management functions and services including human resources-related functions, accounting, tax administration, information systems, legal services, treasury and planning, operations and asset management, risk and commercial operations, and other support services under a management services agreement. GenOn anticipates continuing to rely upon NRG to provide many of these services. If NRG terminates the management services agreement or defaults in the performance of its obligations under the agreement, GenOn may be unable to contract with a substitute service provider on similar terms or at all, and the costs of substituting service providers may be substantial. In addition, in light of NRG's familiarity with GenOn's assets, a substitute service provider may not be able to provide the same level of service due to lack of preexisting synergies. If GenOn cannot locate a service provider that is able to provide it with substantially similar services as NRG does under the management services agreement on similar terms, it would likely have a material adverse effect on GenOn's business, financial condition, results of operation and cash flows.

#### The interests of NRG as GenOn's equity holder may conflict with the interests of holders of debt.

GenOn is owned and controlled by NRG. The interests of NRG may not in all cases be aligned with the interests of the holders of GenOn's debt or the debt and lease obligations of GenOn's subsidiaries. If GenOn encounters financial difficulties or becomes unable to pay its debts as they mature, NRG does not have any liability for any obligations under the GenOn notes or the notes and lease obligations of the GenOn subsidiaries. In addition, NRG may have an interest in pursuing acquisitions, divestitures, financings or other transactions that, in its judgment, could enhance its equity investments, even though such transactions might involve risks to GenOn's business or the holders of GenOn's and its subsidiaries' debt. Furthermore, NRG may own businesses that directly or indirectly compete with GenOn. NRG also may pursue acquisition opportunities that may be complementary to NRG's business, and as a result, those acquisition opportunities may not be available to GenOn.

#### The Registrants' financial results are unpredictable because most of their generating facilities operate without long-term power sales agreements, and their revenues and results of operations depend on market and competitive forces that are beyond their control.

The Registrants provide energy, capacity, ancillary and other energy services from their generating facilities in a variety of markets and to bi-lateral counterparties, including participating in wholesale energy markets, entering into tolling agreements, sales of resource adequacy and participation in capacity auctions. The Registrants' revenues from selling capacity are a significant part of their overall revenues. The Registrants are not guaranteed recovery of their costs or any return on their capital investments through mandated rates.

The market for wholesale electric energy and energy services reflects various market conditions beyond the Registrants' control, including the balance of supply and demand, transmission congestion, competitors' marginal and long-term costs of production, the price of fuel, and the effect of market regulation. The price at which the Registrants can sell their output may fluctuate on a day-to-day basis, and their ability to transact may be affected by the overall liquidity in the markets in which the Registrants operate. These markets remain subject to regulations that limit their ability to raise prices during periods of shortage to the degree that would occur in a fully deregulated market. In addition, unlike most other commodities, electric energy can be stored only on a very limited basis and generally must be produced at the time of use. As a result, the wholesale power markets are subject to substantial price fluctuations over relatively short periods of time and can be unpredictable.

The Registrants' revenues, results of operations and cash flows are influenced by factors that are beyond their control, including those set forth above, as well as:

- the failure of market regulators to develop and maintain efficient mechanisms to compensate merchant generators for the value of providing capacity needed to meet demand;

- actions by regulators, ISOs, RTOs and other bodies that may artificially modify supply and demand levels and prevent capacity and energy prices from rising to the level necessary for recovery of the Registrants' costs, investment and an adequate return on investment;

- environmental regulations and legislation;

- legal and political challenges to or changes in the rules used to calculate capacity payments in the markets in which the Registrants operate or the establishment of bifurcated markets, incentives, other market design changes or bidding requirements that give preferential treatment to new generating facilities over existing generating facilities or otherwise reduce capacity payments to existing generating facilities;

- the ability of wholesale purchasers of power to make timely payment for energy or capacity, which may be adversely affected by factors such as retail rate caps, refusals by regulators to allow utilities to recover fully their wholesale power costs and investments through rates, catastrophic losses and losses from investments by utilities in unregulated businesses;

- increases in prevailing market prices for fuel oil, coal, natural gas and emission allowances that may not be reflected in prices the Registrants receive for sales of energy;

- increases in electricity supply as a result of actions of the Registrants' current competitors or new market entrants, including the development of new generating facilities or alternative energy sources that may be able to produce electricity less expensively than the Registrants' generating facilities and improvements in transmission that allow additional supply to reach their markets;

- increases in credit standards, margin requirements, market volatility or other market conditions that could increase the Registrants' obligations to post collateral beyond amounts that are expected, including additional collateral costs associated with OTC hedging activities as a result of future OTC regulations adopted pursuant to the Dodd-Frank Act;

- decreases in energy consumption resulting from demand-side management programs such as automated demand response, which may alter the amount and timing of consumer energy use;

- the competitive advantages of certain competitors, including continued operation of older power facilities in strategic locations after recovery of historic capital costs from ratepayers;

- existing or future regulation of the markets in which the Registrants operate by FERC, ISOs and RTOs, including any price limitations, non-performance penalties and other mechanisms to address some of the price volatility or illiquidity in these markets or the physical stability of the system;

- the Registrants' obligation under any default sharing mechanisms in RTO and ISO markets, such mechanisms exist to spread the risk of defaults by transmission owning companies or other RTO members across all market participants;

- regulatory policies of state agencies that affect the willingness of the Registrants' customers to enter into long-term contracts generally, and contracts for capacity in particular;

- access to contractors and equipment;

- changes in the rate of growth in electricity usage as a result of such factors as national and regional economic conditions and implementation of conservation programs;

- seasonal variations in energy and natural gas prices, and capacity payments; and

- seasonal fluctuations in weather, in particular abnormal weather conditions.

As discussed above, the market for wholesale electric energy and energy services reflects various market conditions beyond the Registrants' control, including the balance of supply and demand, the Registrants' competitors' marginal and long-term costs of production, and the effect of market regulation. The Registrants cannot ensure that higher earnings or price increases will result from industry retirements of coal-fired generating facilities or that higher earnings from their remaining facilities will offset or more than offset reduced earnings from facility deactivations.

***Changes in the wholesale energy markets or in the Registrants' generating facility operations could result in impairments or other charges.***

If the ongoing evaluation of the Registrants' business results in decisions to deactivate or dispose of additional facilities, the Registrants could have impairments or other charges. These evaluations involve significant judgments about the future. Actual future market prices, project costs and other factors could be materially different from current estimates.

14

.

***The Registrants are exposed to the risk of fuel cost volatility because they must pre-purchase coal and oil.***

Most of the Registrants' fuel contracts are at fixed prices with terms of two years or less. Although the Registrants purchase coal and oil based on expected requirements, they still face the risks of fuel price volatility if they require more or less fuel than expected.

The Registrants' cost of fuel may not reflect changes in energy and fuel prices in part because they must pre-purchase inventories of coal and oil for reliability and dispatch requirements, and thus the price of fuel may have been determined at an earlier date than the price of energy generated from the fuel. Similarly, the price the Registrants can obtain from the sale of energy may not rise at the same rate, or may not rise at all, to match a rise in fuel costs.

***The Registrants are exposed to the risk of their fuel providers and fuel transportation providers failing to perform.***

The Registrants purchase most of their coal from a limited number of suppliers. Because of a variety of operational issues, the Registrants' coal suppliers may not provide the contractual quantities on the dates specified within the agreements, or the deliveries may be carried over to future periods. Also, interruptions to planned or contracted deliveries to the Registrants' generating facilities can result from a lack of, or constraints in, coal transportation because of rail, river or road system disruptions, adverse weather conditions and other factors.

If the Registrants' coal suppliers do not perform in accordance with the agreements, the Registrants may have to procure higher priced coal in the market to meet their needs, or higher priced power in the market to meet their obligations. In addition, generally the Registrants' coal suppliers do not have investment grade credit ratings nor do they post collateral with the Registrants and, accordingly, the Registrants may have limited ability to collect damages in the event of default by such suppliers.

For the Registrants' oil-fired generating facilities, the Registrants typically purchase fuel from a limited number of suppliers. If the Registrants' oil suppliers do not perform in accordance with the agreements, the Registrants may have to procure higher priced oil in the market to meet their needs, or higher priced power in the market to meet their obligations. For the Registrants' gas-fired generating facilities, any curtailments or interruptions on transporting pipelines could result in curtailment of operations or increased fuel supply costs.

***The Operation of the Registrants' generating facilities involves risks that could result in disruption, curtailment or inefficiencies in their operations.***

The operation of the Registrants' generating facilities involves various operating risks, including, but not limited to:

- the output and efficiency levels at which those generating facilities perform;
- interruptions in fuel supply and quality of available fuel;
- disruptions in the delivery of electricity;
- adverse zoning;
- breakdowns or equipment failures (whether a result of age or otherwise);
- violations of permit requirements or changes in the terms of, or revocation of, permits;
- releases of pollutants to air, soil, surface water or groundwater;
- ability to transport and dispose of coal ash at reasonable prices;
- curtailments or other interruptions in natural gas supply;
- shortages of equipment or spare parts;
- labor disputes, including strikes, work stoppages and slowdowns;
- the aging workforce at many of the Registrants' facilities;
- operator errors;
- curtailment of operations because of transmission constraints;
- failures in the electricity transmission system, which may cause large energy blackouts;
- implementation of unproven technologies in connection with environmental improvements; and
- catastrophic events such as fires, explosions, floods, earthquakes, hurricanes or other similar occurrences.

These factors could result in a material decrease, or the elimination of, the revenues generated by the Registrants' facilities or a material increase in the Registrants' costs of operations.

***The Registrants operate in a limited number of markets and a significant portion of revenues are derived from the PJM market. The effect of adverse developments in the markets, especially the PJM market, may be greater on the Registrants than on more geographically diversified competitors.***

As of December 31, 2015, GenOn's generating capacity is 59% in PJM, 21% in CAISO, 12% in NYISO and ISO-NE and 6% in MISO, and GenOn Americas Generation's generating capacity is 59% in PJM, 13% in CAISO and 28% in NYISO and ISO-NE. As of December 31, 2015, all of GenOn Mid-Atlantic's generating capacity is in PJM. Adverse developments in these regions, especially in the PJM market, may adversely affect the Registrants. Further, the effect of such adverse regional developments may be greater on the Registrants than on more geographically diversified competitors.

***The integration of the Capacity Performance product into the PJM market could lead to substantial changes in capacity income and non-performance penalties, which could have a material adverse effect on the Registrants' results of operations, financial condition and cash flows.***

On June 9, 2015, FERC approved changes to PJM's capacity market. Major elements of the approved changes to the Capacity Performance framework include the calculation of the bid cap, elimination of the 2.5% holdback for short lead-time resources, and substantial performance penalties on Capacity Performance resources that do not perform in real time during specific periods of high demand. The Registrants' Capacity Performance resources may not perform as planned, and the Registrants may experience substantial changes in capacity income and non-performance penalties, which could have a material adverse effect on the Registrants' results of operations, financial condition and cash flows.

***The Registrants are exposed to possible losses that may occur from the failure of a counterparty to perform according to the terms of a contractual arrangement, particularly in connection with non-collateralized power hedges with financial institutions.***

Failure of a counterparty to perform according to the terms of a contractual arrangement may result in losses to the Registrants. Specifically, GenOn Mid-Atlantic's credit exposures on power and gas hedges with financial institutions in excess of applicable collateral thresholds are senior unsecured obligations of such counterparties. Deterioration in the financial condition of such counterparties could result in their failure to pay amounts owed to GenOn Mid-Atlantic or to perform obligations or services owed to GenOn Mid-Atlantic beyond collateral posted.

***Changes in technology may significantly affect the Registrants' generating business by making their generating facilities less competitive.***

The Registrants generate electricity using fossil fuels at large central facilities. This method results in economies of scale and lower costs than newer technologies such as fuel cells, microturbines, windmills and photovoltaic solar cells. It is possible that advances in those technologies, or governmental incentives for renewable energies, will reduce their costs to levels that are equal to or below that of most central station electricity production.

***The expected decommissioning and/or site remediation obligations of certain of the Registrants' generating facilities may negatively affect their cash flows.***

Some of the Registrants' generating facilities and related properties are subject to decommissioning and/or site remediation obligations that may require material expenditures. Furthermore, laws and regulations may change to impose material additional decommissioning and remediation obligations on the Registrants in the future.

***Terrorist attacks and/or cyber-attacks may result in the Registrants' inability to operate and fulfill their obligations, and could result in material repair costs.***

As power generators, the Registrants face heightened risk of terrorism, including cyber terrorism, either by a direct act against one or more of their generating facilities or an act against the transmission and distribution infrastructure that is used to transport the power. Although the entire industry is exposed to these risks, the Registrants' generating facilities and the transmission and distribution infrastructure located in the PJM market are particularly at risk because of the proximity to major population centers, including governmental and commerce centers.

The Registrants rely on information technology networks and systems to operate their generating facilities, engage in asset management activities, and process, transmit and store electronic information. Security breaches of this information technology infrastructure, particularly through cyber-attacks and cyber terrorism, including by computer hackers, foreign governments and cyber terrorists, could lead to system disruptions, generating facility shutdowns or unauthorized disclosure of confidential information related to their employees, vendors and counterparties. Confidential information includes banking, vendor, counterparty and personal identity information.

Systemic damage to one or more of the Registrants' generating facilities and/or to the transmission and distribution infrastructure could result in the inability to operate in one or all of the markets the Registrants serve for an extended period of time. If the Registrants' generating facilities are shut down, they would be unable to respond to the ISOs and RTOs or fulfill their obligations under various energy and/or capacity arrangements, resulting in lost revenues and potential fines, penalties and other liabilities. Pervasive cyber-attacks across the industry could affect the ability of ISOs and RTOs to function in some regions. The cost to restore the Registrants' generating facilities after such an occurrence could be material.

***The Registrants' operations are subject to hazards customary to the power generating industry. The Registrants may not have adequate insurance to cover all of these hazards.***

Power generation involves hazardous activities, including acquiring, transporting and unloading fuel, operating large pieces of high-speed rotating equipment and delivering electricity to transmission and distribution systems. In addition to natural risks (such as earthquake, flood, storm surge, lightning, hurricane, tornado and wind), hazards (such as fire, explosion, collapse and machinery failure) are inherent risks in the Registrants' operations. The Registrants are also susceptible to terrorist attacks, including cyber-attacks, against their generating facilities or the transmission and distribution infrastructure that is used to transport their power. These hazards can cause significant injury to personnel or loss of life, severe damage to and destruction of property, plant and equipment, contamination of, or damage to, the environment and suspension of operations. The occurrence of any one of these events may result in one or more of the Registrants being named as a defendant in lawsuits asserting claims for substantial damages, environmental cleanup costs, personal injury and fines and/or penalties. The Registrants do not maintain specialized insurance for possible liability resulting from a cyber-attack on their systems that may shut down all or part of the transmission and distribution system. However, the Registrants maintain an amount of insurance protection that they consider adequate and customary for merchant power producers. The Registrants cannot assure that their insurance will be sufficient or effective under all circumstances and against all hazards or liabilities to which they may be subject.

***Lawsuits, regulatory proceedings and tax proceedings could adversely affect the Registrants' future financial results.***

From time to time, the Registrants are named as a party to, or their property is the subject of, lawsuits, regulatory proceedings or tax proceedings. The Registrants are currently involved in various proceedings which involve highly subjective matters with complex factual and legal questions. Their outcome is uncertain. Any claim that is successfully asserted against the Registrants could require significant expenditures by them. Even if the Registrants prevail, any proceedings could be costly and time-consuming, could divert the attention of management and key personnel from their business operations and could result in adverse changes in their insurance costs.

### Risks Related to Economic and Financial Market Conditions

***The Registrants are exposed to systemic risk of the financial markets and institutions and the risk of non-performance of the individual lenders under GenOn's undrawn credit facilities.***

Maintaining sufficient liquidity in the Registrants' business for maintenance and operating expenditures, capital expenditures and collateral is crucial in order to mitigate the risk of future financial distress to the Registrants. Accordingly, GenOn maintains a revolving credit facility with NRG to manage its expected liquidity needs and contingencies.

***A negative market perception of the Registrants' value could impair their ability to issue or refinance debt.***

A sustained downturn in general economic conditions, including low power and commodity prices, could result in an actual or perceived weakness in the Registrants' overall financial health.

A negative market perception of the Registrants' value could result in their inability to obtain and maintain an appropriate credit rating. In this event, they may be unable to access debt markets or refinance future debt maturities, or they may be required to post additional collateral to operate their business.

17

***Adverse economic conditions could adversely affect the Registrants' business, financial condition, results of operations and cash flows.***

Adverse economic conditions and declines in wholesale energy prices, partially resulting from adverse economic conditions, may impact the Registrants' earnings. The breadth and depth of these negative economic conditions had a wide-ranging impact on the U.S. business environment, including the Registrants' businesses. In addition, adverse economic conditions also reduce the demand for energy commodities. This reduced demand continues to impact the key domestic wholesale energy markets the Registrants serve. The combination of lower demand for power and increased supply of natural gas has put downward price pressure on wholesale energy markets in general, further impacting the Registrants' results. In general, economic and commodity market conditions will continue to impact the Registrants' unhedged future energy margins, liquidity, earnings growth and overall financial condition.

***As financial institutions consolidate and operate under more restrictive capital constraints and regulations, including the Dodd-Frank Act, there could be less liquidity in the energy and commodity markets for hedge transactions and fewer creditworthy counterparties.***

The Registrants hedge economically a substantial portion of their PJM coal-fired generation and certain of their other generation. A significant portion of their hedges are financial swap transactions between GenOn Mid-Atlantic and financial counterparties that are senior unsecured obligations of such parties and do not require either party to post cash collateral, either for initial margin or for securing exposure as a result of changes in power or natural gas prices. Global financial institutions have been active participants in these energy and commodity markets. As global financial institutions consolidate and operate under more restrictive capital constraints and regulations, including the Dodd-Frank Act, there could be less liquidity in the energy and commodity markets, which could have a material adverse effect on the Registrants' ability to hedge economically and transact with creditworthy counterparties.

***Many of the factors that cause changes in commodity prices are outside the Registrants' control and may materially increase their cost of producing power or lower the price at which they are able to sell their power.***

The Registrants' generating business is subject to changes in power prices and fuel and emission costs, and these commodity prices are influenced by many factors outside the Registrants' control, including weather, seasonal variation in supply and demand, market liquidity, transmission and transportation inefficiencies, availability of competitively priced alternative energy sources, demand for energy commodities, production of natural gas, coal and crude oil, natural disasters, wars, embargoes and other catastrophic events, and federal, state and environmental regulation and legislation. In addition, significant fluctuations in the price of natural gas may cause significant fluctuations in the price of electricity. Significant fluctuations in commodity prices may affect the financial results and financial position by increasing the cost of producing power and decreasing the amounts the Registrants receive from the sale of power.

***The Registrants' hedging activities will not fully protect them from fluctuations in commodity prices.***

The Registrants engage in hedging activities related to sales of electricity and purchases of fuel and emission allowances. The income and losses from these activities are recorded as operating revenues and cost of operations. The Registrants may use forward contracts and other derivative financial instruments to manage market risk and exposure to volatility in prices of electricity, coal, natural gas, emissions and oil. The effectiveness of these hedges is dependent upon the correlation between the forward contracts and the other derivative financial instruments used as a hedge and the market risk of the asset or assets being hedged. The Registrants cannot provide assurance that these strategies will be successful in managing their price risks, or that they will not result in net losses to the Registrants as a result of future volatility in electricity, fuel and emission markets. Actual power prices and fuel costs may differ from expectations.

The Registrants hedging activities include natural gas derivative financial instruments that they use to hedge economically power prices for their baseload generation. The effectiveness of these hedges is dependent upon the correlation between power and natural gas prices in the markets where the Registrants operate. If those prices are not sufficiently correlated, the Registrants' financial results and financial position could be adversely affected.

Additionally, GenOn and GenOn Americas Generation expect to have an open position in the market, within their established guidelines, resulting from their fuel and emissions management activities. To the extent open positions exist, fluctuating commodity prices can affect their financial results and financial position, either favorably or unfavorably. As a result of these and other factors, the Registrants cannot predict the outcome that risk management decisions may have on their business, operating results or financial position. Although management devotes considerable attention to these issues, their outcome is uncertain.

*The Registrants' policies and procedures cannot eliminate the risks associated with their hedging activities.*

The risk management procedures the Registrants have in place may not always be followed or may not always work as planned. If any of the employees were able to violate the system of internal controls, including the risk management policy, and engage in unauthorized hedging and related activities, it could result in significant penalties and financial losses. In addition, risk management tools and metrics such as value at risk, gross margin at risk, and stress testing are partially based on historic price movements. If price movements significantly or persistently deviate from historical behavior, risk limits may not fully protect the Registrants from significant losses.

*The Registrants' hedging and GenOn Americas Generation's fuel oil management activities may increase the volatility of the Registrants' U.S. GAAP financial results.*

Derivatives from the Registrants' hedging and GenOn Americas Generation's fuel oil management activities are recorded on the balance sheets at fair value pursuant to the accounting guidance for derivative financial instruments. None of the Registrants' derivatives that are recorded at fair value are designated as hedges under this guidance, and changes in their fair values currently are recognized in earnings as unrealized gains or losses. As a result, the Registrants' U.S. GAAP financial results — including gross margin, operating income and balance sheet ratios — will, at times, be volatile and subject to fluctuations in value primarily because of changes in forward electricity and fuel prices.

**Risks Related to Governmental Regulation and Laws**

*Policies at the national, regional and state levels to regulate GHG emissions, as well as climate change, could adversely impact the Registrants' results of operations, financial condition and cash flows.*

On October 23, 2015, the EPA promulgated the final GHG emissions rules for new and existing fossil-fuel-fired electric generating units. The impact of further legislation or regulation of GHGs on the Registrants' financial performance will depend on a number of factors, including the level of GHG standards, the extent to which mitigation is required, the applicability of offsets, and the extent to which the Registrants would be entitled to receive $CO_2$ emissions credits without having to purchase them in an auction or on the open market.

The Registrants operate generating units in Maryland, Massachusetts and New York that are subject to RGGI, which is a regional cap and trade system. In 2013, each of these states finalized a rule that reduced and will continue to reduce the number of allowances, which the Registrants believe will increase the price of each allowance. The nine RGGI states are re-evaluating the program and may alter the rules to further reduce the number of allowances. The 2013 rules and/or revisions being currently contemplated could adversely impact the Registrants' results of operations, financial condition and cash flows.

California has a $CO_2$ cap and trade program for electric generating units greater than 25 MW. The impact on the Registrants depends on the cost of the allowances and the ability to pass these costs through to customers.

On October 26, 2015, the EPA promulgated a rule that reduces the ozone NAAQS to 0.070 ppm. This more stringent NAAQS will obligate the states to develop plans to reduce $NO_x$ (an ozone precursor), which could affect some of the Registrants' units. EPA guidance for these plans is expected in late 2016.

Hazards customary to the power production industry include the potential for unusual weather conditions, which could affect fuel pricing and availability, the Registrants' route to market or access to customers, i.e., transmission and distribution lines, or critical plant assets. To the extent that climate change contributes to the frequency or intensity of weather related events, the Registrants' operations and planning process could be affected.

19

***The Registrants' business is subject to substantial governmental regulation and may be adversely affected by legislative or regulatory changes, as well as liability under, or any future inability to comply with, existing or future regulations or requirements.***

The Registrants' electric generation business is subject to extensive U.S. federal, state and local laws and regulation. Compliance with the requirements under these various regulatory regimes may cause the Registrants to incur significant additional costs, and failure to comply with such requirements could result in the shutdown of the non-complying facility, the imposition of liens, fines, and/or civil or criminal liability. Public utilities under the FPA are required to obtain FERC acceptance of their rate schedules for wholesale sales of electric energy, capacity and ancillary services. The Registrants' assets make wholesale sales of electric energy, capacity and ancillary services in interstate commerce and are public utilities for purposes of the FPA, unless otherwise exempt from such status. FERC's orders that grant market-based rate authority to wholesale power marketers reserve the right to revoke or revise that authority if FERC subsequently determines that the seller can exercise market power in transmission or generation, create barriers to entry, or engage in abusive affiliate transactions. In addition, public utilities are subject to FERC reporting requirements that impose administrative burdens and that, if violated, can expose such public utilities to criminal and civil penalties or other risks.

The Registrants' market-based sales will be subject to certain rules prohibiting manipulative or deceptive conduct, and if any of the Registrants' generating companies are deemed to have violated those rules, they will be subject to potential disgorgement of profits associated with the violation, penalties, suspension or revocation of market-based rate authority. If such generating companies were to lose their market-based rate authority, such companies would be required to obtain FERC's acceptance of a cost-of-service rate schedule and could become subject to the significant accounting, record-keeping, and reporting requirements that are imposed on utilities with cost-based rate schedules. This could have a material adverse effect on the rates the Registrants are able to charge for power from their facilities.

Most of the Registrants' assets are operating as Exempt Wholesale Generators as defined under the PUHCA, or Qualifying Facilities as defined under the PURPA, as amended, and therefore are exempt from certain regulation under the PUHCA and the PURPA. If a facility fails to maintain its status as an Exempt Wholesale Generator or a Qualifying Facility or there are legislative or regulatory changes revoking or limiting the exemptions to the PUHCA, then the Registrants may be subject to significant accounting, record-keeping, access to books and records and reporting requirements and failure to comply with such requirements could result in the imposition of penalties and additional compliance obligations.

Substantially all of the Registrants' generation assets are also subject to the reliability standards promulgated by the designated Electric Reliability Organization (currently NERC) and approved by FERC. If the Registrants fail to comply with the mandatory reliability standards, they could be subject to sanctions, including substantial monetary penalties and increased compliance obligations. The Registrants will also be affected by legislative and regulatory changes, as well as changes to market design, market rules, tariffs, cost allocations, and bidding rules that occur in the existing regional markets operated by RTOs or ISOs, such as PJM. The RTOs/ISOs that oversee most of the wholesale power markets impose, and in the future may continue to impose, mitigation, including price limitations, offer caps, and other mechanisms to address some of the volatility and the potential exercise of market power in these markets. These types of price limitations and other regulatory mechanisms may have a material adverse effect on the profitability of the Registrants' generation facilities acquired in the future that sell energy, capacity and ancillary products into the wholesale power markets. The regulatory environment for electric generation has undergone significant changes in the last several years due to state and federal policies affecting wholesale competition and the creation of incentives for the addition of large amounts of new renewable generation and, in some cases, transmission assets. These changes are ongoing, and the Registrants cannot predict the future design of the wholesale power markets or the ultimate effect that the changing regulatory environment will have on the Registrants' business. In addition, in some of these markets, interested parties have proposed to re-regulate the markets or require divestiture of electric generation assets by asset owners or operators to reduce their market share. Other proposals to re-regulate may be made and legislative or other attention to the electric power market restructuring process may delay or reverse the deregulation process. If competitive restructuring of the electric power markets is reversed, discontinued, or delayed, the Registrants' business prospects and financial results could be negatively impacted.

The CFTC, among other things, has regulatory oversight authority over the trading of swaps, futures and many commodities under the Commodity Exchange Act, or CEA. Since 2010, there have been a number of reforms to the regulation of the derivatives markets, both in the U.S. and internationally. These regulations, and any further changes thereto, or adoption of additional regulations, including any regulations relating to position limits on futures and other derivatives or relating to margin for derivatives, could negatively impact the Registrants' ability to hedge their portfolio in an efficient, cost-effective manner by, among other things, potentially decreasing liquidity in the forward commodity and derivatives markets or limiting the Registrants' ability to utilize non-cash collateral for derivatives transactions.

***The Registrants' businesses are subject to physical, market and economic risks relating to potential effects of climate change.***

Climate change may produce changes in weather or other environmental conditions, including temperature or precipitation levels, and thus may impact consumer demand for electricity. In addition, the potential physical effects of climate change, such as increased frequency and severity of storms, floods and other climatic events, could disrupt the Registrants' operations and cause them to incur significant costs in preparing for or responding to these effects. These or other meteorological changes could lead to increased operating costs, capital expenses or power purchase costs. Climate change could also affect the availability of a secure and economical supply of water in some locations, which is essential for the continued operation of the Registrants' generation plants.

GHG regulation could increase the cost of electricity, particularly power generated by fossil fuels, and such increases could have a depressive effect on regional economies. Reduced economic and consumer activity in the Registrants' service areas — both generally and specific to certain industries and consumers accustomed to previously lower cost power-could reduce demand for the power the Registrants generate.

***The Registrants costs of compliance with environmental laws are significant and can affect their future operations and financial results.***

The Registrants are subject to extensive and evolving environmental laws, particularly in regard to their coal-fired facilities. Environmental laws, particularly with respect to air emissions, disposal of ash, wastewater discharge and cooling water systems, are generally becoming more stringent, which may require the Registrants to install controls or restrict their operations. Failure to comply with environmental requirements could require the Registrants to shut down or reduce production at their facilities or create liabilities. The Registrants incur significant costs in complying with these regulations and, if they fail to comply, could incur significant penalties. The Registrants' cost estimates for environmental compliance are based on existing regulations or their view of reasonably likely regulations and their assessment of the costs of labor and materials and the state of evolving technologies. The Registrants' decision to make these investments is often subject to future market conditions. Changes to the preceding factors, new or revised environmental regulations, litigation and new legislation and/or regulations, as well as other factors, could cause their actual costs to vary outside the range of their estimates, further constrain their operations, increase their environmental compliance costs and/or make it uneconomical to operate some of their facilities.

Federal, state and regional initiatives to regulate GHG emissions could have a material impact on the Registrants' financial performance and condition. The actual impact will depend on a number of factors, including the overall level of GHG reductions required under any such regulations, the final form of the regulations or legislation, and the price and availability of emission allowances if allowances are a part of any final regulatory framework.

The Registrants are required to surrender emission allowances equal to emissions of specific substances to operate their facilities. Surrender requirements may require purchase of allowances, which may be unavailable or only available at costs that would make it uneconomical to operate their facilities.

Certain environmental laws, including the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 and comparable state laws, impose strict and, in many circumstances, joint and several liability for costs of remediating contamination. Some of the Registrants' facilities have areas with known soil and/or groundwater contamination. The Registrants could be required to spend significant sums to remediate contamination, regardless of whether they caused such contamination, (a) if there are releases or discoveries of hazardous substances at their generating facilities, at disposal sites they currently use or have used, or at other locations for which they may be liable, or (b) if parties contractually responsible to them for contamination fail to or are unable to respond when claims or obligations regarding such contamination arise.

21

***The Registrants' coal-fired generating units produce certain byproducts that involve extensive handling and disposal costs and are subject to government regulation. Changes in these regulations, or their administration, by legislatures, state and federal regulatory agencies, or other bodies may affect the costs of handling and disposing of these byproducts.***

As a result of the coal combustion process, the Registrants produce significant quantities of ash at their coal-fired generating units that must be beneficially used or disposed of at sites permitted to handle ash. One of the Registrants' landfills in Maryland has reached design capacity and it is expected that another site in Maryland may reach full capacity in the next few years. As a result, the Registrants are further developing existing and new ash management facilities. However, the costs associated with developing new ash management facilities could be material, and the amount of time to complete such developments could extend beyond the time when new facilities are needed. Likewise, the facility for preparing ash for beneficial uses may not operate as expected; or the ash may not be marketed and sold as expected. Additionally, costs associated with third-party ash handling and disposal are material and could have a material adverse effect on the Registrants' financial performance and condition.

The Registrants also produce gypsum as a byproduct of the $SO_2$ scrubbing process at their coal-fired generating facilities, much of which is sold to third parties for use in drywall production. Should their ability to sell such gypsum to third parties be restricted as a result of the lack of demand or otherwise, their gypsum disposal costs could rise materially.

In April 2015, the EPA finalized the rule regulating byproducts of coal combustion (e.g., ash and gypsum) as solid wastes under the RCRA. The Registrants are evaluating the impact of the new rule on their results of operations, financial condition and cash flows and have accrued their environmental and asset retirement obligations under the rule based on current estimates as of December 31, 2015.

***The Registrants' business is subject to complex government regulations. Changes in these regulations, or their administration, by legislatures, state and federal regulatory agencies, or other bodies may affect the prices at which the Registrants are able to sell the electricity they produce, the costs of operating their generating facilities or their ability to operate their facilities.***

The majority of the Registrants' generation is sold at market prices under market-based rate authority granted by FERC. If certain conditions are not met, FERC has the authority to withhold or rescind market-based rate authority and require sales to be made based on cost-of-service rates. A loss of the Registrants' market-based rate authority could have a materially negative impact on their generating business.

Even when market-based rate authority has been granted, FERC may impose various forms of market mitigation measures, including price caps and operating restrictions, when it determines that potential market power might exist and that the public interest requires such potential market power to be mitigated. In addition to direct regulation by FERC, most of the Registrants' facilities are subject to rules and terms of participation imposed and administered by various ISOs and RTOs. Although these entities are themselves ultimately regulated by FERC, they can impose rules, restrictions and terms of service that are quasi-regulatory in nature and can have a material adverse impact on the Registrants' business. For example, ISOs and RTOs may impose bidding and scheduling rules, both to curb the potential exercise of market power and to ensure market functions. Such actions may materially affect the Registrants' ability to sell and the price they receive for their energy, capacity and ancillary services.

To conduct the Registrants' business, they must obtain and periodically renew licenses, permits and approvals for their facilities. These licenses, permits and approvals can be in addition to any required environmental permits. No assurance can be provided that they will be able to obtain and comply with all necessary licenses, permits and approvals for their facilities.

Conflicts may occur between reliability needs and environmental rules, particularly with increasingly stringent environmental restrictions. Without a consent decree or adjustments to permit requirements, which require long lead times to obtain, the Registrants remain subject to environmental penalties or liabilities that may occur as a result of operating in compliance with reliability requirements. Further, the Registrants could be subject to citizen suits in these types of circumstances, even if they have received a consent decree or permit adjustment exempting them from environmental requirements.

The Registrants cannot predict whether the federal or state legislatures will adopt legislation relating to the restructuring of the energy industry. There are proposals in many jurisdictions that would either roll back or advance the movement toward competitive markets for the supply of electricity, at both the wholesale and retail levels. In addition, any future legislation favoring large, vertically integrated utilities and a concentration of ownership of such utilities could affect the Registrants' ability to compete successfully, and their business and results of operations could be adversely affected. Similarly, any regulations or laws that favor new generation over existing generation could adversely affect their business.

**Risks Related to Level of Indebtedness**

***The Registrants' substantial indebtedness and operating lease obligations could limit their ability to react to changes in the economy or the industry and prevent them from meeting or refinancing their obligations.***

At December 31, 2015, GenOn's consolidated indebtedness was $2.8 billion and GenOn Americas Generation's consolidated indebtedness was $752 million. In addition, the present values of lease payments under the respective GenOn Mid-Atlantic and REMA operating leases were approximately $672 million and $376 million, respectively (assuming a 10% and 9.4% discount rate, respectively) and the termination values of the respective GenOn Mid-Atlantic and REMA operating leases were $946 million and $649 million, respectively.

The Registrants' substantial indebtedness and operating lease obligations could have important consequences for their liquidity, results of operations, financial position and prospects, including their ability to grow in accordance with their strategies. These consequences include the following:

- they may limit their ability to obtain additional debt for working capital, capital expenditures, debt service requirements, acquisitions and general corporate or other purposes;

- a substantial portion of their cash flows from operations must be dedicated to the payment of rent and principal and interest on their indebtedness and will not be available for other purposes, including for working capital, capital expenditures, acquisitions and other general corporate purposes;

- the debt service requirements of their indebtedness and their lease obligations could make it difficult for them to satisfy or refinance their financial obligations;

- certain of the Registrants' borrowings, including borrowings under the NRG credit agreement, are at variable rates of interest, exposing the Registrants to the risk of increased interest rates;

- they may limit their flexibility in planning for and reacting to changes in the industry;

- they may place the Registrants at a competitive disadvantage compared to other, less leveraged competitors;

- GenOn's and GenOn Americas Generation's credit agreement with NRG contains restrictive covenants that limit their ability to engage in activities that may be in their long-term best interest; and

- the Registrants may be more vulnerable in a downturn in general economic conditions or in their business and they may be unable to carry out capital expenditures that are important to their long-term growth or necessary to comply with environmental regulations.

***GenOn and its subsidiaries that are holding companies, including GenOn Americas Generation, may not have access to sufficient cash to meet their obligations if their subsidiaries, in particular GenOn Mid-Atlantic, are unable to make distributions.***

GenOn and certain of its subsidiaries, including GenOn Americas Generation and NRG Americas, are holding companies and, as a result, are dependent upon dividends, distributions and other payments from their operating subsidiaries to generate the funds necessary to meet their obligations. In particular, a substantial portion of the cash from their operations is generated by GenOn Mid-Atlantic. The ability of certain of their subsidiaries to pay dividends and make distributions is restricted under the terms of their debt or other agreements, including the operating leases of GenOn Mid-Atlantic and REMA. Under their respective operating leases, GenOn Mid-Atlantic and REMA are not permitted to make any distributions and other restricted payments unless: (a) they satisfy the fixed charge coverage ratio for the most recently ended period of four fiscal quarters; (b) they are projected to satisfy the fixed charge coverage ratio for each of the two following periods of four fiscal quarters, commencing with the fiscal quarter in which such payment is proposed to be made; and (c) no significant lease default or event of default has occurred and is continuing. In the event of a default under the respective operating leases or if the respective restricted payment tests are not satisfied, GenOn Mid-Atlantic and REMA would not be able to distribute cash. At December 31, 2015, GenOn Mid-Atlantic and REMA did not satisfy the restricted payments test.

***Each of GenOn and GenOn Americas Generation may be unable to generate sufficient cash to service their debt and leases and to post required amounts of cash collateral necessary to hedge economically market risk.***

The ability of each of GenOn or GenOn Americas Generation to pay principal and interest on their debt and the rent on their leases depends on their future operating performance. If their cash flows and capital resources are insufficient to allow them to make scheduled payments on their debt, GenOn or GenOn Americas Generation may have to reduce or delay capital expenditures, sell assets, restructure or refinance. There can be no assurance that the terms of their debt or leases will allow these alternative measures, that the financial markets will be available to them on acceptable terms or that such measures would satisfy their scheduled debt service and lease rent obligations. If either GenOn or GenOn Americas Generation do not comply with the payment and other material covenants under their debt and lease agreements, they could default under their debt or leases.

The Registrants' asset management activities may require them to post collateral either in the form of cash or letters of credit. Although the Registrants seek to structure transactions in a way that reduces their potential liquidity needs for collateral, they may be unable to execute their hedging strategy successfully if they are unable to post the amount of collateral required to enter into and support hedging contracts.

GenOn and GenOn Americas Generation are active participants in energy exchange and clearing markets, which require a per-contract initial margin to be posted. The initial margins are determined by the exchanges through the use of proprietary models that rely on a variety of inputs and factors, including market conditions. They have limited notice of any changes to the margin rates. Consequently, they are exposed to changes in the per unit margin rates required by the exchanges and could be required to post additional collateral on short notice.

***The terms of the Registrants' credit facilities and leases restrict their current and future operations, particularly their ability to respond to changes or take certain actions.***

The Registrants' credit facilities and leases contain a number of restrictive covenants that impose significant operating and financial restrictions on them and may limit their ability to engage in acts that may be in their long-term best interest, including restrictions on their ability to:

- incur additional indebtedness;

- pay dividends or make other distributions;

- prepay, redeem or repurchase certain debt;

- make loans and investments;

- sell assets;

- incur liens;

- enter into transactions with affiliates;

- enter into sale-leaseback transactions; and

- consolidate, merge or sell all or substantially all of their assets.

24

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING INFORMATION

This Annual Report on Form 10-K includes forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. The words "believe," "project," "anticipate," "plan," "expect," "intend," "estimate" and similar expressions are intended to identify forward-looking statements. These forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the Registrants' actual results, performance and achievements, or industry results, to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. These factors, risks and uncertainties include the following:

- General economic conditions, changes in the wholesale power markets and fluctuations in the cost of fuel;

- Volatile power supply costs and demand for power;

- Hazards customary to the power production industry and power generation operations such as fuel and electricity price volatility, unusual weather conditions, catastrophic weather-related or other damage to facilities, unscheduled generation outages, maintenance or repairs, unanticipated changes to fuel supply costs or availability due to higher demand, shortages, transportation problems or other developments, environmental incidents, or electric transmission or gas pipeline system constraints and the possibility that the Registrants may not have adequate insurance to cover losses as a result of such hazards;

- The effectiveness of the Registrants' risk management policies and procedures, and the ability of the Registrants' counterparties to satisfy their financial commitments;

- Counterparties' collateral demands and other factors affecting the Registrants' liquidity position and financial condition;

- The Registrants' ability to operate their businesses efficiently, manage capital expenditures and costs tightly, and generate earnings and cash flows from their asset-based businesses in relation to their debt and other obligations;

- The Registrants' ability to enter into contracts to sell power and procure fuel on acceptable terms and prices;

- The liquidity and competitiveness of wholesale markets for energy commodities;

- Government regulation, including compliance with regulatory requirements and changes in market rules, rates, tariffs and environmental laws and increased regulation of carbon dioxide and other GHG emissions;

- Price mitigation strategies and other market structures employed by ISOs or RTOs that result in a failure to adequately compensate the Registrants' generation units for all of their costs;

- The Registrants' ability to mitigate forced outage risk as they become subject to capacity performance in PJM and new performance incentives in ISO-NE;

- The Registrants' ability to borrow additional funds and access capital markets, as well as GenOn's substantial indebtedness and the possibility that the Registrants may incur additional indebtedness going forward;

- Operating and financial restrictions placed on the Registrants and their subsidiaries that are contained in the indentures governing GenOn's outstanding notes, and in debt and other agreements of certain of the Registrants' subsidiaries and project affiliates generally;

- The Registrants' ability to implement their strategy of developing and building new power generation facilities;

- The Registrants' ability to implement their strategy of finding ways to meet the challenges of climate change, clean air and protecting natural resources while taking advantage of business opportunities;

- The Registrants' ability to implement their strategy of increasing the return on invested capital through operational performance improvements and a range of initiatives at plants and corporate offices to reduce costs or generate revenues;

- The Registrants' ability to successfully evaluate investments in new business and growth initiatives;

- The Registrants' ability to successfully integrate and manage any acquired businesses; and

- The Registrants' ability to develop and maintain successful partnering relationships.

Forward-looking statements speak only as of the date they were made, and the Registrants undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. The foregoing review of factors that could cause the Registrants' actual results to differ materially from those contemplated in any forward-looking statements included in this Annual Report on Form 10-K should not be construed as exhaustive.

## Item 1B — Unresolved Staff Comments

None.

**Item 2 — Properties (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Listed below are descriptions of Registrants' interests in facilities, operations and/or projects owned or leased as of December 31, 2015. The MW figures provided represent nominal summer net megawatt capacity of power generated as adjusted for the Registrants' ownership position excluding capacity from inactive/mothballed units as of December 31, 2015. The following table summarizes the Registrants' power production and cogeneration facilities by region:

| Name and Location of Facility | Power Market | % Owned | Net Generation Capacity (MW) [a] | Primary Fuel-type |
|---|---|---|---|---|
| Chalk Point, Aquasco, MD [b] | PJM | 100.00 | 667 | Coal |
| Chalk Point, Aquasco, MD | PJM | 100.00 | 1,648 | Natural Gas |
| Chalk Point, Aquasco, MD | PJM | 100.00 | 42 | Oil |
| Dickerson, MD [b] | PJM | 100.00 [c] | 537 | Coal |
| Dickerson, MD | PJM | 100.00 [c] | 294 | Natural Gas |
| Dickerson, MD | PJM | 100.00 [c] | 18 | Oil |
| Morgantown, Newburg, MD | PJM | 100.00 [c] | 1,229 | Coal |
| Morgantown, Newburg, MD | PJM | 100.00 [c] | 248 | Oil |
| | **Total GenOn Mid-Atlantic:** | | **4,683** | |
| | | | | |
| Bowline, West Haverstraw, NY | NYISO | 100.00 | 1,147 | Natural Gas |
| Canal, Sandwich, MA | ISO-NE | 100.00 | 1,112 | Oil |
| Martha's Vineyard, MA | ISO-NE | 100.00 | 14 | Oil |
| Pittsburg, CA | CAISO | 100.00 | 1,029 | Natural Gas |
| | **Total GenOn Americas Generation:** | | **7,985** | |
| | | | | |
| Aurora, IL | PJM | 100.00 | 878 | Natural Gas |
| Avon Lake, OH [d] | PJM | 100.00 | 732 | Coal |
| Avon Lake, OH | PJM | 100.00 | 21 | Oil |
| Blossburg, PA | PJM | 100.00 | 19 | Natural Gas |
| Brunot Island, Pittsburgh, PA | PJM | 100.00 | 244 | Natural Gas |
| Brunot Island, Pittsburgh, PA | PJM | 100.00 | 15 | Oil |
| Cheswick, Springdale, PA | PJM | 100.00 | 565 | Coal |
| Choctaw, French Camp, MS | SERC-Entergy | 100.00 | 800 | Natural Gas |
| Conemaugh, New Florence, PA [e] | PJM | 16.45 | 280 | Coal |
| Conemaugh, New Florence, PA [e] | PJM | 16.45 | 2 | Oil |
| Ellwood, Goleta, CA | CAISO | 100.00 | 54 | Natural Gas |
| Etiwanda, Rancho Cucamonga, CA | CAISO | 100.00 | 640 | Natural Gas |
| Gilbert, Milford, NJ | PJM | 100.00 | 438 | Natural Gas |
| Hamilton, East Berlin, PA | PJM | 100.00 | 20 | Oil |
| Hunterstown CCGT, Gettysburg, PA | PJM | 100.00 | 810 | Natural Gas |
| Hunterstown CTS, Gettysburg, PA | PJM | 100.00 | 60 | Natural Gas |
| Keystone, Shelocta, PA [e] | PJM | 16.67 | 283 | Coal |
| Keystone, Shelocta, PA [e] | PJM | 16.67 | 2 | Oil |
| Mandalay, Oxnard, CA | CAISO | 100.00 | 560 | Natural Gas |
| Mountain, Mount Holly Springs, PA | PJM | 100.00 | 40 | Oil |
| New Castle, West Pittsburg, PA [f] | PJM | 100.00 | 325 | Coal |
| New Castle, West Pittsburg, PA | PJM | 100.00 | 3 | Oil |
| Niles, OH | PJM | 100.00 | 25 | Oil |
| Ormond Beach, Oxnard, CA | CAISO | 100.00 | 1,516 | Natural Gas |

| | | | | |
|---|---|---|---|---|
| Orrtana, PA | PJM | 100.00 | 20 | Oil |
| Portland, Mount Bethel, PA [(g)] | PJM | 100.00 | 169 | Oil |
| Sayreville, NJ | PJM | 100.00 | 217 | Natural Gas |
| Seward, New Florence, PA [(h)] | PJM | 100.00 | 525 | Coal |
| Shawnee, East Stroudsburg, PA | PJM | 100.00 | 20 | Oil |
| Shawville, PA [(e)(i)] | PJM | 100.00 | 6 | Oil |
| Shelby County, Neoga, IL [(h)] | MISO | 100.00 | 352 | Natural Gas |
| Titus, Birdsboro, PA | PJM | 100.00 | 31 | Oil |
| Tolna, Stewartstown, PA | PJM | 100.00 | 39 | Oil |
| Warren, PA | PJM | 100.00 | 57 | Natural Gas |
| | **Total GenOn:** | | 17,753 | |

(a)   Actual capacity can vary depending on factors including weather conditions, operational conditions, and other factors.

(b)   On February 29, 2016, NRG notified PJM that it was withdrawing the standing deactivation notices for Chalk Point Units 1 and 2 and Dickerson Units 1, 2 and 3

(c)   GenOn Mid-Atlantic leases 100% interests in the Dickerson and Morgantown coal generation units through facility lease agreements expiring in 2029 and 2034, respectively. GenOn Mid-Atlantic owns 312 MW and 248 MW of peaking capacity at the Dickerson and Morgantown generating facilities, respectively. GenOn Mid-Atlantic operates the Dickerson and Morgantown facilities.

(d)   GenOn intends to deactivate net generation capacity at the Avon Lake Unit 7 which has net generation capacity of 94 MW in April 2016. In 2015, GenOn suspended its plans to add natural gas capabilities to the Avon Lake facility.

(e)   GenOn leases 100%, 16.67% and 16.45% interests in three Pennsylvania facilities (Shawville, Keystone and Conemaugh, respectively) through facility lease agreements expiring in 2026, 2034 and 2034, respectively. GenOn operates the Shawville, Keystone and Conemaugh facilities. The table includes GenOn's net share of the capacity of these facilities.

(f)   GenOn has announced its intention to continue operations at the New Castle facility, which is currently in operation. GenOn intends to add natural gas capabilities at this facility, which is expected to be completed by the summer of 2016.

(g)   GenOn deactivated Portland coal Units 1 and 2 (401 MW) effective December 1, 2015.

(h)   These facilities are classified as Held For Sale as of December 31, 2015. Seward was sold on February 2, 2016, and the Shelby sale is expected to close during the first quarter of 2016.

(i)   GenOn mothballed the coal-fired Units 1, 2, 3 and 4 at the Shawville generating facility (597 MW) beginning in May 2015, with plans to return those units to service no later than the fall of 2016 using natural gas.


## Other Properties

The Registrants own or lease oil and gas pipelines that serve its generating facilities. GenOn leases other offices. The Registrants believe that their properties are adequate for their present needs. Except for the Conemaugh and Keystone facilities, the Registrants' interest as of December 31, 2015 is 100% for each property. The Registrants have satisfactory title, rights and possession to their owned facilities, subject to exceptions, which, in their opinion, would not have a material adverse effect on the use or value of the facilities.


## Item 3 — Legal Proceedings (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)

See Item 15 — Note 15, *Commitments and Contingencies*, to the Consolidated Financial Statements for discussion of the material legal proceedings to which the Registrants are a party.


## Item 4 — Mine Safety Disclosures (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)

Not applicable.

**PART II**

**Item 5 — Market for Registrants' Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

As a result of the NRG Merger, GenOn is a wholly owned subsidiary of NRG. All of GenOn's common stock is held by its parent, NRG, and GenOn's common stock is not publicly traded. GenOn Americas Generation and GenOn Mid-Atlantic are indirect wholly owned subsidiaries of GenOn. All of GenOn Americas Generation's membership interests are held by its parent, NRG Americas. All of GenOn Mid-Atlantic's membership interests are held by its parent, NRG North America. GenOn Americas Generation's and GenOn Mid-Atlantic's membership interests are not publicly traded.

**Item 6 — Selected Financial Data (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Item 6 has been omitted from this report pursuant to the reduced disclosure format permitted by General Instruction I to Form 10-K.

28

**Item 7 — Management's Narrative Analysis of the Results of Operations and Financial Condition (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Reference is made to the Registrants' Consolidated Statements of Operations to this Annual Report on Form 10-K, which presents the results of the Registrants' operations for the years ended December 31, 2015, 2014, and 2013. Also refer to Item 1 to this Form 10-K for additional discussion about the Registrants' business.

### Environmental Matters, Regulatory Matters and Legal Proceedings

Details of environmental matters are presented in Item 15 — Note 17, *Environmental Matters*, to the Consolidated Financial Statements. Details of regulatory matters are presented in Item 15 — Note 16, *Regulatory Matters*, to the Consolidated Financial Statements. Details of legal proceedings are presented in Item 15 — Note 15, *Commitments and Contingencies*, to the Consolidated Financial Statements. Some of this information relates to costs that may be material to the Registrants' financial results.

### Electricity Prices

The following tables summarize average on-peak power prices for each of the major markets in which the Registrants operate for the years ended December 31, 2015, and 2014. Average on-peak power prices decreased primarily due to the decrease in natural gas prices for the year ended December 31, 2015, as compared to the same period in 2014.

| | Average on Peak Power Price ($/MWh) [a] | |
|---|---|---|
| | For the year ended December 31, | |
| | **2015** | **2014** |
| MISO - Louisiana Hub [b] | $ 34.55 | $ 48.72 |
| NY J/NYC | 46.42 | 71.72 |
| NY A/West NY | 42.07 | 58.16 |
| NEPOOL | 48.25 | 75.28 |
| PEPCO (PJM) | 46.48 | 70.69 |
| PJM West Hub | 41.97 | 61.15 |
| CAISO - NP15 | 35.50 | 49.27 |
| CAISO - SP15 | 32.45 | 48.39 |

(a) Average on peak power prices based on real time settlement prices as published by the respective ISOs.
(b) Region also transacts in PJM - West Hub.

### Economic Gross Margin

The Registrants evaluate their operating performance using the measure of economic gross margin, which is not a GAAP measure and may not be comparable to other companies' presentations or deemed more useful than the GAAP information provided elsewhere in this report. The Registrants believe that economic gross margin is useful to investors as it is a key operational measure reviewed by the Registrants' chief operating decision maker. Economic gross margin is defined as the sum of energy revenue, capacity revenue and other revenue, less cost of sales.

The economic gross margin does not include mark-to-market gains or losses on economic hedging activities, contract amortization, emission credit amortization, or other operating costs.

**Consolidated Results of Operations**

*GenOn*

*2015 Compared to 2014*

The following table provides selected financial information for GenOn:

| (In millions except otherwise noted) | | For the Year Ended December 31, | | Change % |
|---|---|---|---|---|
| | | 2015 | 2014 | |
| **Operating Revenues** | | | | |
| Energy revenue [a] | $ | 1,637 | $ 2,286 | (28)% |
| Capacity revenue [a] | | 802 | 908 | (12)% |
| Mark-to-market for economic hedging activities | | (112) | (150) | (25)% |
| Other revenues [b] | | 44 | 46 | (4)% |
| Total operating revenues | | 2,371 | 3,090 | (23)% |
| **Operating Costs and Expenses** | | | | |
| Generation cost of sales [a] | | 995 | 1,451 | (31)% |
| Mark-to-market for economic hedging activities | | 68 | (3) | N/M |
| Contract and emissions credit amortization | | (31) | (26) | 19 % |
| Operations and maintenance | | 656 | 671 | (2)% |
| Other cost of operations | | 91 | 84 | 8 % |
| Total cost of operations | | 1,779 | 2,177 | (18)% |
| Depreciation and amortization | | 215 | 245 | (12)% |
| Impairment losses | | 170 | 82 | 107 % |
| General and administrative | | 194 | 200 | (3)% |
| Acquisition-related transaction and integration costs | | — | 4 | (100)% |
| Total operating costs and expenses | | 2,358 | 2,708 | (13)% |
| Loss on sale of assets | | — | (6) | (100)% |
| **Operating Income** | | 13 | 376 | (97)% |
| **Other Income/(Expense)** | | | | |
| Other income, net | | 6 | 1 | N/M |
| Gain on sale of equity-method investment | | — | 18 | (100)% |
| Interest expense | | (202) | (198) | 2 % |
| Equity in earnings of unconsolidated affiliates | | — | 1 | (100)% |
| Gain on debt extinguishment | | 65 | — | N/M |
| Total other expense | | (131) | (178) | (26)% |
| **(Loss)/Income before income tax expense** | | (118) | 198 | N/M |
| Income tax (benefit)/expense | | (3) | 6 | (150)% |
| **Net (Loss)/Income** | $ | (115) | $ 192 | N/M |
| **Business Metrics** | | | | |
| Average natural gas price — Henry Hub ($/MMBtu) | $ | 2.66 | $ 4.41 | (40)% |
| MWh sold (in thousands) | | 29,620 | 34,972 | (15)% |
| MWh generated (in thousands) | | 29,727 | 35,420 | (16)% |

(a)   Includes realized gains and losses from financially settled transactions.

(b)   Includes unrealized trading gains and losses.

N/M - Not Meaningful

*Economic Gross Margin*

| (In millions) | Year Ended December 31, | | Change % |
|---|---|---|---|
| | 2015 | 2014 | |
| Energy revenue | $ 1,637 | $ 2,286 | (28)% |
| Capacity revenue | 802 | 908 | (12)% |
| Other revenues | 44 | 46 | (4)% |
| Generation revenue | 2,483 | 3,240 | (23)% |
| Cost of fuel | 904 | 1,394 | (35)% |
| Other cost of sales | 91 | 57 | 60 % |
| Economic gross margin | $ 1,488 | $ 1,789 | (17)% |

Economic gross margin was $1,488 million for the year ended December 31, 2015 and $1,789 million for the year ended December 31, 2014. The changes during the period relate to:

| | (In millions) |
|---|---|
| Lower gross margin due to a 14% decrease in generation due to prior year winter weather conditions in the East, partially offset by increased generation at Hunterstown, Avon Lake, Choctaw and Ormond Beach | $ (116) |
| Lower gross margin due to a decrease in contracted capacity volumes primarily due to the retirement of Coolwater and Osceola in 2015, combined with lower contracted capacity prices in CAISO driven primarily by the expiration of certain tolling arrangements, which were replaced with lower priced resource adequacy agreements | (57) |
| Lower gross margin due to a 3% decrease in PJM cleared auction capacity prices and a 6% decrease in PJM cleared auction capacity volumes | (54) |
| Lower gross margin due to a 17% decrease in average realized energy prices, partially offset by a 49% decrease in fuel costs due to significantly lower natural gas prices in 2015 | (33) |
| Lower gross margin due to higher purchased capacity to meet capacity supply obligations for deactivated units | (26) |
| Lower gross margin due to the retirement of Coolwater and the sale of Kendall | (20) |
| Lower gross margin due to adjustments for fuel oil inventory resulting from the further decline in fuel prices through 2015 | (7) |
| Other | 12 |
| | $ (301) |

*Mark-to-market for Economic Hedging Activities*

Mark-to-market for economic hedging activities includes asset-backed hedges that have not been designated as cash flow hedges. The breakdown of gains and losses included in operating revenues and operating costs and expenses are as follows:

| (In millions) | Year Ended December 31, | |
|---|---|---|
| | 2015 | 2014 |
| **Mark-to-market results in operating revenues** | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (208) | $ (331) |
| Net unrealized gains on open positions related to economic hedges | 96 | 181 |
| **Total mark-to-market losses in operating revenues** | $ (112) | $ (150) |
| **Mark-to-market results in operating costs and expenses** | | |
| Reversal of previously recognized unrealized losses on settled positions related to economic hedges | 10 | 17 |
| Net unrealized losses on open positions related to economic hedges | (78) | (14) |
| **Total mark-to-market (losses)/gains in operating costs and expenses** | $ (68) | $ 3 |

Mark-to-market results consist of unrealized gains and losses. The settlement of these transactions is reflected in the same caption as the items being hedged.

For the year ended December 31, 2015, the $112 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period partially offset by an increase in the value of forward sales of electricity contracts as a result of decreases in power prices. The $68 million loss in operating costs and expenses from economic hedge positions was driven by a decrease in the value of forward purchases of fuel contracts as a result of decreases in forward fuel prices, partially offset by the reversal of previously recognized unrealized loss from fuel contracts that settled during the period.

For the year ended December 31, 2014, the $150 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period, partially offset by an increase in the value of forward sales of natural gas contracts as a result of decreases in forward natural gas prices. The $3 million gain in operating costs and expenses from economic hedge positions was driven by the reversal of previously recognized unrealized losses from fuel contracts that settled during the period, partially offset by a decrease in the value of forward purchases of fuel contracts as a result of decreases in forward fuel prices.

In accordance with ASC 815, the following table represents the results of GenOn's financial and physical trading of energy commodities. The realized and unrealized financial and physical trading results are included in other operating revenues. GenOn's trading activities are subject to limits within its risk management policy.

| (In millions) | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2015 | | 2014 | |
| Trading gains/(losses) | | | | |
| Realized | $ | — | $ | 2 |
| Unrealized | | — | | (1) |
| Total trading gains | $ | — | $ | 1 |

32

### Operations and Maintenance

Operations and maintenance was $656 million for the year ended December 31, 2015, and $671 million for the year ended December 31, 2014. The decrease of $15 million was due primarily to increased outage hours at Chalk Point, New Castle and Cheswick during the prior year and the retirement of Coolwater in January of 2015, partially offset by increased outages at Bowline and Canal during the current year.

### Other Cost of Operations

Other cost of operations was $91 million for the year ended December 31, 2015, and $84 million for the year ended December 31, 2014. The increase of $7 million was due primarily for favorable adjustments to AROs related to Shawville and Maryland ash in 2014 as a result in changes in estimates, partially offset by a property tax settlement received in 2015 for Morgantown and lower property tax rates for GenOn Mid-Atlantic.

### Depreciation and Amortization

Depreciation and amortization expense was $215 million for the year ended December 31, 2015, and $245 million for the year ended December 31, 2014, primarily driven by accelerated depreciation expense in the prior year for assets that were deactivated in 2015.

### Impairment Losses

Impairment losses of $170 million for the year ended December 31, 2015, primarily reflect an impairment of property, plant, and equipment of $134 million related to the Seward facility, $20 million related to the suspension of the oil conversion project at Portland, $8 million related to oil tanks located at the Pittsburg facility, and $8 million related to certain equipment. Impairment losses of $82 million for the year ended December 31, 2014, reflect the impairment of property, plant and equipment at the Osceola and Coolwater facilities. These losses are further described in Item 15 — Note 9, *Impairments*.

### Gain on Sale of Equity-Method Investment

The $18 million gain on sale of equity-method investment for the year ended December 31, 2014, reflects the gain on the sale of Sabine, which was sold in December 2014.

### Gain on Debt Extinguishment

The $65 million gain on debt extinguishment for the year ended December 31, 2015, is driven by the repurchase of GenOn senior notes due 2017, 2018 and 2020 and GenOn Americas Generation senior notes due 2021 and 2031 at a price below par value, combined with the write-off of unamortized premium balances. The debt reductions of senior unsecured notes executed in 2015 will result in annual future interest savings of approximately $25 million for GenOn, which includes $14 million of annual interest savings for GenOn Americas Generation.

*GenOn Americas Generation*

**2015 Compared to 2014**

The following table provides selected financial information for GenOn Americas Generation:

| (In millions except otherwise noted) | For the Year Ended December 31, | | Change % |
|---|---|---|---|
| | 2015 | 2014 | |
| **Operating Revenues** | | | |
| Energy revenue [a] | $ 1,483 | $ 2,111 | (30)% |
| Capacity revenue [a] | 823 | 894 | (8)% |
| Mark-to-market for economic hedging activities | (66) | (118) | (44)% |
| Other revenues [b] | 25 | 42 | (40)% |
| Total operating revenues | 2,265 | 2,929 | (23)% |
| **Operating Costs and Expenses** | | | |
| Generation cost of sales [a] | 1,541 | 2,026 | (24)% |
| Mark-to-market for economic hedging activities | 57 | 6 | N/M |
| Contract and emissions credit amortization | — | 11 | (100)% |
| Operations and maintenance | 310 | 291 | 7 % |
| Other cost of operations | 52 | 51 | 2 % |
| Total cost of operations | 1,960 | 2,385 | (18)% |
| Depreciation and amortization | 74 | 72 | 3 % |
| Impairment losses | 8 | — | N/M |
| General and administrative | 81 | 88 | (8)% |
| Total operating costs and expenses | 2,123 | 2,545 | (17)% |
| Loss on sale of assets | — | (6) | (100)% |
| **Operating Income** | 142 | 378 | (62)% |
| **Other Income/(Expense)** | | | |
| Other income, net | 2 | 1 | 100 % |
| Interest expense | (70) | (74) | (5)% |
| Gain on debt extinguishment | 42 | — | N/M |
| Total other expense | (26) | (73) | (64)% |
| **Income before income tax expense** | 116 | 305 | (62)% |
| Income tax | — | — | N/M |
| **Net Income** | $ 116 | $ 305 | (62)% |
| **Business Metrics** | | | |
| Average natural gas price — Henry Hub ($/MMBtu) | $ 2.66 | $ 4.41 | (40)% |
| MWh sold (in thousands) | 8,992 | 12,394 | (27)% |
| MWh generated (in thousands) | 9,094 | 12,440 | (27)% |

(a)   Includes realized gains and losses from financially settled transactions.

(b)   Includes unrealized trading gains and losses.

N/M - Not Meaningful

*Economic Gross Margin*

| (In millions) | | For the Year Ended December 31, | | Change % |
| --- | --- | --- | --- | --- |
| | | 2015 | 2014 | |
| Energy revenue | $ | 1,483 | $ 2,111 | (30)% |
| Capacity revenue | | 823 | 894 | (8)% |
| Other revenues | | 25 | 42 | (40)% |
| Generation revenue | | 2,331 | 3,047 | (23)% |
| Cost of fuel | | 474 | 434 | 9 % |
| Other cost of sales | | 1,067 | 1,592 | (33)% |
| Economic gross margin | $ | 790 | $ 1,021 | (23)% |

Economic gross margin reflects the following pass-through amounts for GenOn Energy Management for services including the bidding and dispatch of the generating units, fuel procurement and the execution of contracts, including economic hedges, to reduce price risk:

| (In millions) | | For the Year Ended December 31, | |
| --- | --- | --- | --- |
| | | 2015 | 2014 |
| Energy revenue | $ | 665 | $ 881 |
| Capacity revenue | | 415 | 472 |
| Other revenues | | 11 | 14 |
| Generation revenue | | 1,091 | 1,367 |
| Cost of fuel | | (67) | 198 |
| Other cost of sales | | (1,024) | (1,565) |
| Economic gross margin | $ | — | $ — |

Economic gross margin was $790 million for the year ended December 31, 2015, and $1,021 million for the year ended December 31, 2014. The changes during the period relate to:

| | | (In millions) |
| --- | --- | --- |
| Lower gross margin at GenOn Mid-Atlantic due to a 31% decrease in generation as a result of prior year winter weather conditions and an increase in planned and unplanned outage hours in 2015 | $ | (187) |
| Lower gross margin at GenOn Mid-Atlantic due to a 8% decrease in average realized prices, partially offset by a 25% decrease in fuel costs due to significantly lower natural gas prices in 2015 | | (37) |
| Lower gross margin due to a 6% decrease in PJM cleared auction capacity prices and a 6% decrease in PJM cleared auction capacity volumes | | (35) |
| Lower gross margin due to a 30% decrease in generation at Canal due to increased planned outage hours in 2015 | | (24) |
| Lower gross margin due to adjustments for fuel oil inventory resulting from the further decline in fuel prices through 2015 | | (8) |
| Lower gross margin due to higher purchased capacity to meet capacity supply obligations for deactivated units | | (6) |
| Higher gross margin due to decrease in fuel costs as natural gas prices dropped by 45% in New York and New England, partially offset by a 8% decrease in average realized prices | | 61 |
| Higher gross margin due to increased capacity contracts for Bowline partially offset by a 14% decrease in contracted capacity prices in New York during 2015 | | 10 |
| Other | | (5) |
| | $ | (231) |

*Mark-to-market for Economic Hedging Activities*

Mark-to-market for economic hedging activities includes asset-backed hedges that have not been designated as cash flow hedges. The breakdown of gains and losses included in operating revenues and operating costs and expenses are as follows:

| (In millions) | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| **Mark-to-market results in operating revenues** | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (205) | $ (300) |
| Net unrealized gains on open positions related to economic hedges | 139 | 182 |
| **Total mark-to-market losses in operating revenues** | (66) | (118) |
| **Mark-to-market results in operating costs and expenses** | | |
| Reversal of previously recognized unrealized losses on settled positions related to economic hedges | 12 | 12 |
| Net unrealized losses on open positions related to economic hedges | (69) | (18) |
| **Total mark-to-market losses in operating costs and expenses** | $ (57) | $ (6) |

Mark-to-market results consist of unrealized gains and losses. The settlement of these transactions is reflected in the same caption as the items being hedged.

For the year ended December 31, 2015, the $66 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period partially offset by an increase in the value of forward sales of electricity contracts as a result of decreases in power prices. The $57 million loss in operating costs and expenses from economic hedge positions was driven by a decrease in the value of forward purchases of fuel contracts as a result of decreases in forward fuel prices partially offset by the reversal of previously recognized unrealized losses from fuel contracts that settled during the period.

For the year ended December 31, 2014, the $118 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period, partially offset by an increase in the value of forward sales of natural gas contracts as a result of decreases in natural gas prices. The $6 million loss in operating costs and expenses from economic hedge positions was driven by a decrease in the value of forward purchases of fuel contracts as a result of decreases in forward fuel prices, partially offset by the reversal of previously recognized unrealized losses from fuel contracts that settled during the period.

In accordance with ASC 815, the following table represents the results of GenOn Americas Generation's financial and physical trading of energy commodities. The realized and unrealized financial and physical trading results are included in other operating revenues. GenOn Americas Generation's trading activities are subject to limits within the risk management policy.

| (In millions) | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| **Trading gains/(losses)** | | |
| Realized | $ — | $ 2 |
| Unrealized | — | (1) |
| Total trading gains | $ — | $ 1 |

*Operations and Maintenance*

Operations and maintenance was $310 million for the year ended December 31, 2015 and $291 million for the year ended December 31, 2014. The increase of $19 million was primarily due to increased outage hours at Bowline and Canal during the current year, partially offset by decreased outage hours at Chalk Point during the current year and lower variable costs due to lower generation.

***Impairment Losses***

Impairment losses of $8 million for the year ended December 31, 2015, reflect the impairment of oil tanks at the Pittsburg facility.

***Gain on Debt Extinguishment***

The $42 million gain on debt extinguishment for the year ended December 31, 2015, is driven by the repurchase of GenOn Americas Generation senior notes due 2021 and 2031 at a price below par value, combined with the write-off of unamortized premium balances. The debt reductions of senior unsecured notes executed in 2015 will result in annual future interest savings of approximately $14 million for GenOn Americas Generation.

*GenOn Mid-Atlantic*

### 2015 Compared to 2014

The following table provides selected financial information for GenOn Mid-Atlantic:

| (In millions except otherwise noted) | Year Ended December 31, | | | | Change % |
|---|---|---|---|---|---|
| | | 2015 | | 2014 | |
| **Operating Revenues** | | | | | |
| Energy revenue [a] | $ | 623 | $ | 980 | (36)% |
| Capacity revenue [a] | | 249 | | 281 | (11)% |
| Mark-to-market for economic hedging activities | | (27) | | (192) | (86)% |
| Other revenues | | 11 | | 14 | (21)% |
| Total operating revenues | | 856 | | 1,083 | (21)% |
| **Operating Costs and Expenses** | | | | | |
| Generation cost of sales [a] | | 325 | | 453 | (28)% |
| Mark-to-market for economic hedging activities | | 50 | | 6 | N/M |
| Contract and emissions credit amortization | | — | | 10 | (100)% |
| Operations and maintenance | | 212 | | 217 | (2)% |
| Other cost of operations | | 38 | | 42 | (10)% |
| Total cost of operations | | 625 | | 728 | (14)% |
| Depreciation and amortization | | 65 | | 50 | 30 % |
| General and administrative | | 58 | | 64 | (9)% |
| Total operating costs and expenses | | 748 | | 842 | (11)% |
| **Operating Income** | | 108 | | 241 | (55)% |
| **Other Income/(Expense)** | | | | | |
| Interest expense | | (4) | | (5) | (20)% |
| Total other expense | | (4) | | (5) | (20)% |
| **Income before income tax expense** | | 104 | | 236 | (56)% |
| Income tax | | — | | — | N/M |
| **Net Income** | $ | 104 | $ | 236 | (56)% |
| **Business Metrics** | | | | | |
| Average natural gas price — Henry Hub ($/MMBtu) | $ | 2.66 | $ | 4.41 | (40)% |
| MWh sold (in thousands) | | 7,213 | | 10,414 | (31)% |
| MWh generated (in thousands) | | 7,197 | | 10,414 | (31)% |

(a)   Includes realized gains and losses from financially settled transactions.

N/M - Not Meaningful

38

.

*Economic Gross Margin*

| (In millions) | For the Year Ended December 31, | | Change % |
| --- | --- | --- | --- |
| | 2015 | 2014 | |
| Energy revenue | $ 623 | $ 980 | (36)% |
| Capacity revenue | 249 | 281 | (11)% |
| Other revenues | 11 | 14 | (21)% |
| Generation revenue | 883 | 1,275 | (31)% |
| Cost of fuel | 288 | 429 | (33)% |
| Other costs of sales | 37 | 24 | 54 % |
| Economic gross margin | $ 558 | $ 822 | (32)% |

Economic gross margin was $558 million for the year ended December 31, 2015, compared to $822 million for the year ended December 31, 2014. The changes during the period relate to:

| | (In millions) |
| --- | --- |
| Lower gross margin due to a 31% decrease in generation due to prior year winter weather conditions and as a result of an increase in planned and unplanned outages in 2015 | $ (187) |
| Lower gross margin due to a 8% decrease in average realized prices, partially offset by a 25% decrease in fuel costs due to significantly lower natural gas prices in 2015 | (37) |
| Lower gross margin due to a 6% decrease in PJM cleared auction capacity prices, and a 6% decrease in PJM cleared auction capacity volumes | (33) |
| Other | (7) |
| | $ (264) |

*Mark-to-market for Economic Hedging Activities*

Mark-to-market for economic hedging activities includes asset-backed hedges that have not been designated as cash flow hedges. The breakdown of gains and losses included in operating revenues and operating costs and expenses are as follows:

| (In millions) | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| **Mark-to-market results in operating revenues** | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (129) | $ (300) |
| Net unrealized gains on open positions related to economic hedges | 102 | 108 |
| **Total mark-to-market losses in operating revenues** | (27) | (192) |
| **Mark-to-market results in operating costs and expenses** | | |
| Reversal of previously recognized unrealized losses on settled positions related to economic hedges | 13 | 12 |
| Net unrealized losses on open positions related to economic hedges | (63) | (18) |
| **Total mark-to-market losses in operating costs and expenses** | $ (50) | $ (6) |

Mark-to-market results consist of unrealized gains and losses. The settlement of these transactions is reflected in the same caption as the items being hedged.

For the year ended December 31, 2015, the $27 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period partially offset by an increase in the value of forward sales of electricity contracts as a result of decreases in power prices. The $50 million loss in operating costs and expenses from economic hedge positions was driven by a decrease in the value of forward purchases of fuel contracts as a result of decreases in forward fuel prices partially offset by the reversal of previously recognized unrealized losses from fuel contracts that settled during the period.

For the year ended December 31, 2014, the $192 million loss in operating revenues from economic hedge positions was driven by the reversal of previously recognized unrealized gains from electricity and natural gas contracts that settled during the period, partially offset by an increase in the value of forward sales of natural gas contracts as a result of decreases in natural gas prices. The $6 million loss in operating costs and expenses from economic hedge positions was driven by a decrease in the value of forward purchases of fuel contracts as a result of decreases in forward fuel prices, partially offset by the reversal of previously recognized unrealized losses from fuel contracts that settled during the period.

### Operations and Maintenance

Operations and maintenance was $212 million for the year ended December 31, 2015, and $217 million for the year ended December 31, 2014. The decrease of $5 million was primarily due to decreased outage hours at Chalk Point during the current year and lower variable costs resulting from less generation during the current year, partially offset by increased outage hours at Morgantown during the current year.

### Other Cost of Operations

Other cost of operations was $38 million for the year ended December 31, 2015, and $42 million for the year ended December 31, 2014. The decrease of $4 million was primarily due to lower property tax rates in 2015 and a property tax settlement received in 2015 for Morgantown.

### Depreciation and Amortization

Depreciation and amortization expense was $65 million for the year ended December 31, 2015, and $50 million for the year ended December 31, 2014, primarily driven by the acceleration of depreciation on certain assets.

**Liquidity and Capital Resources**

*Liquidity Position*

As of December 31, 2015, and 2014, the Registrants' liquidity was comprised of the following:

| | As of December 31, | | | |
|---|---|---|---|---|
| | 2015 | | 2014 | |
| | (In millions) | | | |
| Cash and cash equivalents: | | | | |
| GenOn excluding GenOn Mid-Atlantic and REMA | $ | 174 | $ | 441 |
| GenOn Mid-Atlantic [(a)] | | 299 | | 157 |
| REMA [(a)] | | 192 | | 322 |
| Total | | 665 | | 920 |
| Credit facility availability | | 222 | | 263 |
| Total liquidity | $ | 887 | $ | 1,183 |

(a) At December 31, 2015, GenOn Mid-Atlantic and REMA did not satisfy the restricted payment tests and therefore, could not use such funds to distribute cash and make other restricted payments.

Management believes that the Registrants' liquidity position and cash flows from operations will be adequate to finance current operating, maintenance and capital expenditures, debt service obligations and other liquidity commitments.

As disclosed in Item 15 — Note 10, *Debt and Capital Leases*, to the Consolidated Financial Statements, certain of GenOn's senior unsecured notes mature in 2017 and 2018. If GenOn is not able to refinance these notes prior to their maturities, it may have an adverse impact on GenOn's financial position. GenOn will consider all options available to it, including refinancing the notes, potential sales of certain generating assets or issuances of new debt securities. Given current economic and market conditions, including the depressed commodity markets, GenOn may be unable to complete these actions on a timely basis or on satisfactory terms or at all. These actions also may not be sufficient to enable GenOn to continue to satisfy its related cash commitments as they become due.

GenOn's financial position also continues to be adversely affected by a sustained decline in natural gas prices and its resulting effect on wholesale power prices. In addition, GenOn Mid-Atlantic and REMA are currently unable to make distributions of cash and certain other restricted payments to GenOn. If gas and power prices remain depressed, GenOn may be unable to generate sufficient cash flow from operations to meets its long-term liquidity requirements, including operating, maintenance and capital expenditures and debt service payments.

NRG, GenOn's parent company, has no obligation to provide any financial support other than as described in Item 15 — Note 14, *Related Party Transactions*, to the Consolidated Financial Statements.

Management continues to regularly monitor the ability of GenOn Americas Generation and GenOn Mid-Atlantic to finance the needs of its long-term operating, financing and investing activities.

*Restricted Payments Tests*

Of the $665 million of cash and cash equivalents of the Registrants' as of December 31, 2015, $299 million and $192 million were held by GenOn Mid-Atlantic and REMA, respectively. The ability of certain of GenOn's and GenOn Americas Generation's subsidiaries to pay dividends and make distributions is restricted under the terms of certain agreements, including the GenOn Mid-Atlantic and REMA operating leases.  Under their respective operating leases, GenOn Mid-Atlantic and REMA are not permitted to make any distributions and other restricted payments unless: (a) they satisfy the fixed charge coverage ratio for the most recently ended period of four fiscal quarters; (b) they are projected to satisfy the fixed charge coverage ratio for each of the two following periods of four fiscal quarters, commencing with the fiscal quarter in which such payment is proposed to be made; and (c) no significant lease default or event of default has occurred and is continuing.  In addition, prior to making a dividend or other restricted payment, REMA must be in compliance with the requirement to provide credit support to the owner lessors securing its obligation to pay scheduled rent under its leases. Based on GenOn Mid-Atlantic's and REMA's most recent calculations of these tests, GenOn Mid-Atlantic and REMA did not satisfy the restricted payments tests. As a result, as of December 31, 2015, GenOn Mid-Atlantic and REMA could not make distributions of cash and certain other restricted payments. Each of GenOn Mid-Atlantic and REMA may recalculate its fixed charge coverage ratios from time to time and, subject to compliance with the restricted payments test described above, make dividends or other restricted payments.

41

.

To the extent GenOn Mid-Atlantic or REMA are able to pay dividends to GenOn, the GenOn Senior Notes due 2018 and 2020 and the related indentures restrict the ability of GenOn to incur additional liens and make certain restricted payments, including dividends. In the event of a default or if restricted payment tests are not satisfied, GenOn would not be able to distribute cash to its parent, NRG. At December 31, 2015, GenOn did not meet the consolidated debt ratio component of the restricted payments test.

### Credit Ratings

Credit rating agencies rate a firm's public debt securities. These ratings are utilized by the debt markets in evaluating a firm's credit risk. Ratings influence the price paid to issue new debt securities by indicating to the market the Registrants' ability to pay principal and interest. Rating agencies evaluate a firm's industry, cash flow, leverage, liquidity, and hedge profile, among other factors, in their credit analysis of a firm's credit risk.

On October 2, 2015, Standard & Poor's lowered its corporate credit ratings on GenOn, GenOn Mid-Atlantic, REMA and GenOn Americas Generation to CCC+ from B-. The ratings outlook for GenOn, GenOn Mid-Atlantic, REMA and GenOn Americas Generation is stable. Standard & Poor's also lowered the issue ratings on the GenOn senior notes, the pass-through certificates at GenOn Mid-Atlantic and the GenOn Americas Generation senior notes to B- from B. The issue rating on the pass-through certificates of REMA was lowered by Standard & Poor's to B from B+. Additionally, on September 5, 2015, Moody's lowered its outlook for GenOn, GenOn Mid-Atlantic, REMA and GenOn Americas Generation to negative.

The following table summarizes the Registrants' credit ratings as of December 31, 2015:

|  | S&P | Moody's |
|---|---|---|
| GenOn 7.875% Senior Notes, due 2017 | B- | B3 |
| GenOn 9.500% Senior Notes, due 2018 | B- | B3 |
| GenOn 9.875% Senior Notes, due 2020 | B- | B3 |
| GenOn Americas Generation 8.500% Senior Notes, due 2021 | B- | Caa1 |
| GenOn Americas Generation 9.125% Senior Notes, due 2031 | B- | Caa1 |

### Sources of Liquidity

The principal sources of liquidity for the Registrants' future operating and capital expenditures are expected to be derived from existing cash on hand, cash flows from operations and the intercompany revolving credit agreement with NRG, described more fully in Item 15—Note 14, *Related Party Transactions*. The Registrants' operating cash flows may be affected by, among other things, demand for electricity, the difference between the cost of fuel used to generate electricity and the market value of the electricity generated, commodity prices (including prices for electricity, emissions allowances, natural gas, coal and oil), operations and maintenance expenses in the ordinary course, planned and unplanned outages, terms with trade creditors, cash requirements for capital expenditures relating to certain facilities (including those necessary to comply with environmental regulations) and the potential impact of future environmental regulations.

### Uses of Liquidity

The Registrants' requirements for liquidity and capital resources, other than for operating its facilities, can generally be categorized by the following: (i) debt service obligations, as described more fully in Item 15 — Note 10, *Debt and Capital Leases*, to the Consolidated Financial Statements; (ii) capital expenditures, including maintenance and environmental; and (iii) payments under the GenOn Mid-Atlantic and REMA operating leases.

**Debt Reduction**

GenOn's senior notes are due in 2017, 2018 and 2021, and GenOn Americas Generation's senior notes are due in 2021 and 2031. The Registrants may from time to time seek to retire or purchase their outstanding debt through cash purchases and/or exchange offers, open market purchases, privately negotiated transactions or otherwise, depending on prevailing market conditions, the Registrants' liquidity requirements, contractual restrictions and other factors. The following table lists the repurchase of senior notes in 2015 in open market purchases:

| Senior Note Repurchases | Principal Redeemed (in millions) | Cash Paid for Principal (in millions) | Average early redemption percentage |
|---|---|---|---|
| **GenOn Energy, Inc.** | | | |
| 7.875% senior notes due 2017 | $33 | $31 | 95.17% |
| 9.500% senior notes due 2018 | 25 | 23 | 90.95% |
| 9.875% senior notes due 2020 | 61 | 51 | 83.85% |
| **GenOn Americas Generation LLC** | | | |
| 8.500% senior notes due 2021 | 84 | 71 | 84.91% |
| 9.125% senior notes due 2031 | 71 | 55 | 77.02% |
| | $274 | $231 | |

**Capital Expenditures**

The following tables and descriptions summarize the Registrants' capital expenditures, excluding accruals, for maintenance, environmental, and fuel conversions/additions for the year ended December 31, 2015, and the estimated capital expenditure forecast for 2016.

| | Maintenance | Environmental | Growth | Total |
|---|---|---|---|---|
| | **(in millions)** | | | |
| ***Total cash capital expenditures for the year ended December 31, 2015*** | | | | |
| GenOn | 139 | 36 | 79 | 254 |
| GenOn Americas Generation | 70 | 4 | — | 74 |
| GenOn Mid-Atlantic | 38 | 1 | — | 39 |
| ***Total cash capital expenditures forecasted for the year ended December 31, 2016*** | | | | |
| GenOn | 152 | 62 | 120 | 334 |
| GenOn Americas Generation | 64 | 12 | — | 76 |
| GenOn Mid-Atlantic | 61 | 9 | — | 70 |

The following table summarizes the Registrants' estimated environmental capital expenditures for the referenced periods by region:

| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| 2016 | $ 62 | $ 12 | $ 9 |
| 2017 | 1 | — | — |
| 2018 | — | — | — |
| 2019 | 2 | — | — |
| 2020 | 3 | — | — |
| Total | $ 68 | $ 12 | $ 9 |

**Operating Leases**

GenOn Mid-Atlantic leases 100% interest in both the Dickerson and Morgantown coal units and associated property through 2029 and 2034, respectively, and has an option to extend the leases.  Any extensions of the respective leases would be for less than 75% of the economic useful life of the facility, as measured from the beginning of the original lease term through the end of the proposed remaining lease term.  The leases are accounted for as operating leases.  Although there is variability in the scheduled payment amounts over the lease term, rent expense is recognized for these leases on a straight-line basis.  The scheduled payment amounts for the leases are $150 million and $144 million for 2016 and 2017, respectively.  At December 31, 2015, the total notional minimum lease payments for the remaining term of the leases aggregated $1.1 billion and the aggregate termination value for the leases was approximately $946 million and generally decreases over time. In addition, the present value of lease payments at December 31, 2015, was approximately $672 million (assuming a 10% discount rate).  NRG provides letters of credit in support of GenOn Mid-Atlantic's lease obligations in an aggregate amount equal to the greatest of the next six months scheduled rent payments, 50% of the next 12 months scheduled rent payments or $129 million.

REMA leases 16.45% and 16.67% interests in the Conemaugh and Keystone coal facilities, respectively through 2034 and expects to make payments through 2029. REMA also leases a 100% interest in the Shawville facility through 2026 and expects to make payments through that date. At the expiration of these leases, there are several renewal options related to fair value. The leases are accounted for as operating leases. The scheduled payment amounts for the REMA leases are $61 million and $63 million for 2016 and 2017, respectively. At December 31, 2015, the total notional minimum lease payments for the remaining term of the leases aggregated $578 million and the aggregate termination value for the leases was approximately $649 million and generally decreases over time. In addition, the present value of lease payments at December 31, 2015, was approximately $376 million (assuming a 9.4% discount rate). NRG provides letters of credit in support of REMA's lease obligations to post rent reserves in an aggregate amount equal to the greater of the next six months scheduled rent payments or 50% of the next 12 months scheduled rent payments.

44

**Item 7A — Quantitative and Qualitative Disclosures About Market Risk (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

The Registrants are exposed to several market risks in their normal business activities. Market risk is the potential loss that may result from market changes associated with the Registrants' merchant power generation or with an existing or forecasted financial or commodity transaction. The types of risks the Registrants are exposed to are commodity price risk, interest rate risk and credit and performance risk. In order to manage commodity price, the Registrants use various fixed-price forward purchase and sales contracts, futures and option contracts traded on NYMEX, and swaps and options traded in the over-the-counter financial markets to:

• Manage and hedge fixed-price purchase and sales commitments;

• Reduce exposure to the volatility of cash market prices; and

• Hedge fuel requirements for the Registrants' generating facilities.

*Commodity Price Risk*

Commodity price risks result from exposures to changes in spot prices, forward prices, volatilities, and correlations between various commodities, such as natural gas, electricity, coal, oil, and emission credits. The Registrants manage the commodity price risk of their merchant generation operations by entering into various derivative or non-derivative instruments to hedge the variability in future cash flows from forecasted sales and purchases of electricity and fuel. These instruments include forwards, futures, swaps, and option contracts traded on various exchanges, such as NYMEX and Intercontinental Exchange, or ICE, as well as over-the-counter markets. The portion of forecasted transactions hedged may vary based upon management's assessment of market, weather, operation and other factors.

While some of the contracts the Registrants use to manage risk represent commodities or instruments for which prices are available from external sources, other commodities and certain contracts are not actively traded and are valued using other pricing sources and modeling techniques to determine expected future market prices, contract quantities, or both. The Registrants use their best estimates to determine the fair value of those derivative contracts. However, it is likely that future market prices could vary from those used in recording mark-to-market derivative instrument valuation, and such variations could be material.

*Interest Rate Risk*

As of December 31, 2015, GenOn's debt fair value was $2.0 billion and the carrying value was $2.8 billion. GenOn estimates that a 1% decrease in market interest rates would have increased the fair value of its long-term debt by $164 million. As of December 31, 2015, GenOn Americas Generation's debt fair value was $500 million and the carrying value was $752 million. GenOn Americas Generation estimates that a 1% decrease in market interest rates would have increased the fair value of its long-term debt by $104 million.

*Counterparty Credit Risk*

Credit risk relates to the risk of loss resulting from non-performance or non-payment by counterparties pursuant to the terms of their contractual obligations. The Registrants monitor and manage credit risk through credit policies that include: (i) an established credit approval process; (ii) a daily monitoring of counterparties' credit limits; (iii) the use of credit mitigation measures such as margin, collateral, prepayment arrangements, or volumetric limits; (iv) the use of payment netting agreements; and (v) the use of master netting agreements that allow for the netting of positive and negative exposures of various contracts associated with a single counterparty. Risks surrounding counterparty performance and credit could ultimately impact the amount and timing of expected cash flows. The Registrants seek to mitigate counterparty risk by having a diversified portfolio of counterparties. The Registrants also have credit protection within various agreements to call on additional collateral support if and when necessary. Cash margin is collected and held at the Registrants to cover the credit risk of the counterparty until positions settle.

As of December 31, 2015, counterparty credit exposure to a significant portion of GenOn's counterparties was $351 million and GenOn held $33 million of collateral against these positions, resulting in a net exposure of $321 million. Approximately 97% of GenOn's exposure before collateral is expected to roll off by the end of 2017. GenOn Americas Generation's counterparty credit exposure to a significant portion of counterparties was $347 million and GenOn Americas Generation held $33 million of collateral against those positions, resulting in a net exposure of $316 million. Approximately 97% of GenOn Americas Generation's exposure before collateral is expected to roll off by the end of 2017. GenOn Mid-Atlantic's counterparty credit exposure to a significant portion of counterparties was $12 million and GenOn Mid-Atlantic held no collateral (cash or letters of credit) against those positions, resulting in a net exposure of $12 million. Approximately 100% of GenOn Mid-Atlantic's exposure before collateral is expected to roll off by the end of 2016.

The following tables highlight the credit quality and the net counterparty credit exposure by industry sector. Net counterparty credit exposure is defined as the aggregate net asset position for the Registrants with counterparties where netting is permitted under the enabling agreement and includes all cash flow, mark-to-market and NPNS, and non-derivative transactions. As of December 31, 2015, the exposure is shown net of collateral held and includes amounts net of receivables or payables.

| Category | Net Exposure [a] (% of Total) | | |
| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| Financial institutions | 68% | 69% | —% |
| Utilities, energy merchants, marketers and other | 18% | 17% | —% |
| ISOs | 14% | 14% | 100% |
| Total as of December 31, 2015 | 100% | 100% | 100% |

| Category | Net Exposure [a] (% of Total) | | |
| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| Investment grade | 99% | 99% | 100% |
| Non- investment grade | 1% | 1% | —% |
| Total as of December 31, 2015 | 100% | 100% | 100% |

(a)   Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

The Registrants have counterparty credit risk exposure to certain counterparties, each of which represent more than 10% of their respective total net exposure discussed above. The aggregate of such counterparties' exposure was $257 million, $257 million and $12 million for GenOn, GenOn Americas Generation and GenOn Mid-Atlantic, respectively. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, the Registrants do not anticipate a material impact on their financial position or results of operations from nonperformance by any of their counterparties.

### Credit Risk Related Contingent Features

Certain of the Registrants' hedging agreements contain provisions that require the Registrants to post additional collateral if the counterparty determines that there has been deterioration in credit quality, generally termed "adequate assurance" under the agreements, or require the Registrants to post additional collateral if there were a one notch downgrade in the Registrants' credit rating. The collateral required for contracts that have adequate assurance clauses that are in net liability positions as of December 31, 2015, was $66 million for GenOn and GenOn Americas Generation. As of December 31, 2015, no collateral was required for contracts with credit rating contingent features that are in a net liability position for GenOn and GenOn Americas Generation. GenOn and GenOn Americas Generation are also party to certain marginable agreements under which no collateral was due as of December 31, 2015. As of December 31, 2015, GenOn Mid-Atlantic did not have any financial instruments with credit risk related contingent features.

### Item 8 — Financial Statements and Supplementary Data (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)

The financial statements and schedules of the Registrants are listed in Part IV, Item 15 of this Form 10-K.

**Item 9 — Changes in and Disagreements with Accountants on Accounting and Financial Disclosure (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

None.

**Item 9A — Controls and Procedures (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

**Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures and Internal Control Over Financial Reporting**

Under the supervision and with the participation of the Registrants' management, including principal executive officer, principal financial officer and principal accounting officer, the Registrants conducted an evaluation of the effectiveness of the design and operation of disclosure controls and procedures, as such term is defined in Rules 13a-15(e) or 15d-15(e) of the Exchange Act. Based on this evaluation, the Registrants' principal executive officer, principal financial officer and principal accounting officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this annual report on Form 10-K. Management's reports on the Registrants' internal control over financial reporting are incorporated under the caption "Management's Report on Internal Control over Financial Reporting" of the Registrants' Annual Report on Form 10-K for the fiscal year ended December 31, 2015.

**Changes in Internal Control over Financial Reporting**

There were no changes in the Registrants' internal control over financial reporting (as such term is defined in Rule 13a-15(f) under the Exchange Act) that occurred in the fourth quarter of 2015 that materially affected, or are reasonably likely to materially affect, the Registrants' internal control over financial reporting.

**Inherent Limitations over Internal Controls**

The Registrants' internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with U.S. GAAP. The Registrants' internal control over financial reporting includes those policies and procedures that:

1. Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Registrants' assets;

2. Provide reasonable assurance that transactions are recorded as necessary to permit preparation of consolidated financial statements in accordance with U.S. GAAP, and that the Registrants' receipts and expenditures are being made only in accordance with authorizations of management and directors; and

3. Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Registrants' assets that could have a material effect on the consolidated financial statements.

Internal control over financial reporting cannot provide absolute assurance of achieving financial reporting objectives because of its inherent limitations, including the possibility of human error and circumvention by collusion or overriding of controls. Accordingly, even an effective internal control system may not prevent or detect material misstatements on a timely basis. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate.

**Management's Report on Internal Control Over Financial Reporting**

The Registrants' management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of the Registrants' management, including their principal executive officer, principal financial officer and principal accounting officer, the Registrants conducted an evaluation of the effectiveness of their internal control over financial reporting based on the framework in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on the Registrants' evaluation under the framework in *Internal Control — Integrated Framework (2013)*, the Registrants' management concluded that their internal control over financial reporting was effective as of December 31, 2015.

**Item 9B — Other Information (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

None.

PART III

## Item 10 — Directors, Executive Officers and Corporate Governance

Item 10 has been omitted from this report for the Registrants pursuant to the reduced disclosure format permitted by General Instruction I to Form 10-K.

## Item 11 — Executive Compensation

Item 11 has been omitted from this report for the Registrants pursuant to the reduced disclosure format permitted by General Instruction I to Form 10-K.

## Item 12 — Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

Item 12 has been omitted from this report for the Registrants pursuant to the reduced disclosure format permitted by General Instruction I to Form 10-K.

## Item 13 — Certain Relationships and Related Transactions, and Director Independence

Item 13 has been omitted from this report for the Registrants pursuant to the reduced disclosure format permitted by General Instruction I to Form 10-K.

## Item 14 — Principal Accounting Fees and Services (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)

KPMG LLP conducts an integrated audit of NRG and its subsidiaries. Professional audit services and other services rendered by KPMG LLP subsequent to December 14, 2012, were allocated to the Registrants through the Services Agreement with NRG as described in Item 15 —Note 15, *Commitments and Contingencies*, to the Registrants' Consolidated Financial Statements. As provided in the NRG Audit Committee Charter, the NRG Audit Committee pre-approved all audit services and permissible non-audit services provided by the independent auditor for the fiscal years 2015 and 2014.

The following table shows the aggregate fees related to the audit provided by KPMG LLP for fiscal years 2015 and 2014.

|  | 2015 | 2014 |
|---|---|---|
|  | (in thousands) | |
| Audit Fees[a] | $      928 | $      923 |

(a)   Includes fees and expenses related to the audits of the Registrants' consolidated financial statements for 2015 and 2014 and the effectiveness of GenOn's internal controls over financial reporting for 2015 and 2014. This category also includes the review of financial statements included in the Registrants' Quarterly Reports on Form 10-Q for the applicable fiscal year, the audits of various subsidiary financial statements required by statute or regulation, and services that are normally provided by the independent auditors in connection with regulatory filings or engagements, consultations provided on audit and accounting matters that arose during, or as a result of, the audits or the reviews of interim financial statements, and the preparation of any written communications on internal control matters.

48

.

**PART IV**

**Item 15 — Exhibits, Financial Statement Schedules (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

(a)(1) Financial Statements

The following consolidated financial statements of GenOn Energy, Inc., GenOn Americas Generation, LLC and GenOn Mid-Atlantic, LLC and related notes thereto, together with the reports thereon of KPMG LLP, are included herein:

GenOn Energy, Inc.

Consolidated Statements of Operations — Years ended December 31, 2015, 2014, and 2013

Consolidated Statements of Comprehensive (Loss)/Income — Years ended December 31, 2015, 2014, and 2013

Consolidated Balance Sheets — As of December 31, 2015, and 2014

Consolidated Statements of Cash Flows — Years ended December 31, 2015, 2014, and 2013

Consolidated Statement of Stockholder's Equity — Years ended December 31, 2015, 2014, and 2013

GenOn Americas Generation, LLC

Consolidated Statements of Operations — Years ended December 31, 2015, 2014, and 2013

Consolidated Balance Sheets — As of December 31, 2015 and 2014

Consolidated Statements of Cash Flows — Years ended December 31, 2015, 2014, and 2013

Consolidated Statement of Member's Equity — Years ended December 31, 2015, 2014, and 2013

GenOn Mid-Atlantic, LLC

Consolidated Statements of Operations — Years ended December 31, 2015, 2014, and 2013

Consolidated Balance Sheets — As of December 31, 2015 and 2014

Consolidated Statements of Cash Flows — Years ended December 31, 2015, 2014, and 2013

Consolidated Statement of Member's Equity — Years ended December 31, 2015, 2014, and 2013

Combined Notes to Consolidated Financial Statements

(a)(2) Financial Statement Schedules

The following Consolidated Financial Statement Schedules of GenOn Energy, Inc., GenOn Americas Generation, LLC and GenOn Mid-Atlantic, LLC are filed as part of Item 15 of this report and should be read in conjunction with the Consolidated Financial Statements.

Schedule I — GenOn Energy, Inc. Financial Statements

Schedule I — GenOn Americas Generation, LLC Financial Statements

Schedule II — Valuation and Qualifying Accounts

All other schedules for which provision is made in the applicable accounting regulation of the Securities and Exchange Commission are not required under the related instructions or are inapplicable, and therefore, have been omitted.

(a)(3) Exhibits: See Exhibit Index submitted as a separate section of this report.

(b) Exhibits

See Exhibit Index submitted as a separate section of this report.

(c) Not applicable

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors
GenOn Energy, Inc.:

We have audited the accompanying consolidated balance sheets of GenOn Energy, Inc. and subsidiaries as of December 31, 2015 and 2014, and the related consolidated statements of operations, comprehensive (loss)/income, cash flows, and stockholder's equity for each of the years in the three-year period ended December 31, 2015. In connection with our audits of the consolidated financial statements, we also have audited financial statement schedules "Schedule I. Condensed Financial Information of Registrant" and "Schedule II. Valuation and Qualifying Accounts." These consolidated financial statements and financial statement schedules are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedules based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of GenOn Energy, Inc. and subsidiaries as of December 31, 2015 and 2014, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2015 in conformity with U.S. generally accepted accounting principles. Also in our opinion, the related financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

(signed) KPMG LLP

Philadelphia, Pennsylvania
February 29, 2016

50

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors
GenOn Americas Generation, LLC:

We have audited the accompanying consolidated balance sheets of GenOn Americas Generation, LLC and subsidiaries as of December 31, 2015 and 2014, and the related consolidated statements of operations, cash flows, and member's equity for each of the years in the three-year period ended December 31, 2015. In connection with our audits of the consolidated financial statements, we also have audited financial statement schedules "Schedule I. Condensed Financial Information of Registrant" and "Schedule II. Valuation and Qualifying Accounts." These consolidated financial statements and financial statement schedules are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedules based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of GenOn Americas Generation, LLC and subsidiaries as of December 31, 2015 and 2014, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2015 in conformity with U.S. generally accepted accounting principles. Also in our opinion, the related financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

(signed) KPMG LLP

Philadelphia, Pennsylvania
February 29, 2016

51

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors
GenOn Mid-Atlantic, LLC:

We have audited the accompanying consolidated balance sheets of GenOn Mid-Atlantic, LLC and subsidiaries as of December 31, 2015 and 2014, and the related consolidated statements of operations, cash flows, and member's equity for each of the years in the three-year period ended December 31, 2015. In connection with our audits of the consolidated financial statements, we also have audited financial statement schedule "Schedule II. Valuation and Qualifying Accounts." These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of GenOn Mid-Atlantic, LLC and subsidiaries as of December 31, 2015 and 2014, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2015 in conformity with U.S. generally accepted accounting principles. Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

(signed) KPMG LLP

Philadelphia, Pennsylvania
February 29, 2016

52

**GENON ENERGY, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | For the Year Ended December 31, 2015 | For the Year Ended December 31, 2014 | For the Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| **Operating Revenues** | | | |
| Operating revenue | $ 2,365 | $ 3,087 | $ 2,556 |
| Operating revenues - affiliate | 6 | 3 | 48 |
| Total operating revenues | 2,371 | 3,090 | 2,604 |
| **Operating Costs and Expenses** | | | |
| Cost of operations | 1,537 | 1,759 | 1,715 |
| Cost of operations - affiliate | 242 | 418 | 193 |
| Depreciation and amortization | 215 | 245 | 249 |
| Impairment losses | 170 | 82 | — |
| General and administrative | 10 | 72 | 126 |
| General and administrative - affiliate | 184 | 128 | 88 |
| Acquisition-related transaction and integration costs | — | 4 | 70 |
| Total operating costs and expenses | 2,358 | 2,708 | 2,441 |
| Loss on sale of assets | — | (6) | — |
| **Operating Income** | 13 | 376 | 163 |
| **Other Income/(Expense)** | | | |
| Equity in earnings of unconsolidated affiliates | — | 1 | 4 |
| Other income, net | 6 | 1 | 1 |
| Gain on sale of equity-method investment | — | 18 | — |
| Interest expense | (191) | (186) | (193) |
| Interest expense - affiliate | (11) | (12) | (12) |
| Gain/(loss) on debt extinguishment | 65 | — | (11) |
| Total other expense | (131) | (178) | (211) |
| **(Loss)/Income Before Income Taxes** | (118) | 198 | (48) |
| Income tax (benefit)/expense | (3) | 6 | (6) |
| **Net (Loss)/Income** | $ (115) | $ 192 | $ (42) |

See notes to Consolidated Financial Statements.

53

.

**GENON ENERGY, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE (LOSS)/INCOME**

| | For the Year Ended December 31, 2015 | | For the Year Ended December 31, 2014 | | For the Year Ended December 31, 2013 | |
|---|---|---|---|---|---|---|
| | (In millions) | | | | | |
| Net (Loss)/Income | $ | (115) | $ | 192 | $ | (42) |
| Other Comprehensive (Loss)/Income, net of reclassifications, net of tax of $0: | | | | | | |
| Unrealized loss on derivatives | | — | | — | | (1) |
| Defined benefit plans | | (14) | | (104) | | 101 |
| Other Comprehensive (Loss)/Income | | (14) | | (104) | | 100 |
| Comprehensive (Loss)/Income | $ | (129) | $ | 88 | $ | 58 |

See notes to Consolidated Financial Statements.

54

**GENON ENERGY, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

|  | As of December 31, | |
|---|---|---|
|  | 2015 | 2014 |
|  | (In millions) | |
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 665 | $ 920 |
| Funds deposited by counterparties | 51 | 54 |
| Accounts receivable — trade | 97 | 120 |
| Inventory | 448 | 507 |
| Derivative instruments | 544 | 591 |
| Derivative instruments — affiliate | 30 | 11 |
| Cash collateral paid in support of energy risk management activities | 48 | 38 |
| Prepaid rent and other current assets | 139 | 150 |
| Current assets held-for-sale | 6 | — |
| Total current assets | 2,028 | 2,391 |
| **Property, Plant and Equipment** | | |
| In service | 3,281 | 3,341 |
| Under construction | 164 | 140 |
| Total property, plant and equipment | 3,445 | 3,481 |
| Less accumulated depreciation | (614) | (436) |
| Net property, plant and equipment | 2,831 | 3,045 |
| **Other Assets** | | |
| Intangible assets, net of accumulated amortization of $40 and $66 | 74 | 72 |
| Derivative instruments | 154 | 195 |
| Derivative instruments — affiliate | 1 | 10 |
| Other non-current assets | 253 | 201 |
| Non-current assets held-for-sale | 105 | — |
| Total other assets | 587 | 478 |
| **Total Assets** | $ 5,446 | $ 5,914 |

See notes to Consolidated Financial Statements.

55

.

GENON ENERGY, INC. AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS (Continued)

| | As of December 31, | |
|---|---|---|
| | 2015 | 2014 |
| | (In millions) | |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| **Current Liabilities** | | |
| Current portion of long-term debt and capital leases | $ 4 | $ 10 |
| Accounts payable | 112 | 135 |
| Accounts payable — affiliate | 71 | 14 |
| Derivative instruments | 465 | 382 |
| Derivative instruments — affiliate | 10 | 35 |
| Cash collateral received in support of energy risk management activities | 51 | 54 |
| Accrued payroll | 48 | 79 |
| Accrued taxes | 58 | 48 |
| Accrued interest expense | 39 | 44 |
| Accrued expenses and other current liabilities | 56 | 67 |
| Current liabilities held-for-sale | 2 | — |
| Total current liabilities | 916 | 868 |
| **Other Liabilities** | | |
| Long-term debt and capital leases | 2,762 | 3,120 |
| Postretirement and other benefit obligations | 199 | 207 |
| Derivative instruments | 102 | 69 |
| Derivative instruments — affiliate | 14 | 3 |
| Out-of-market contracts | 892 | 969 |
| Other non-current liabilities | 285 | 277 |
| Non-current liabilities held-for-sale | 4 | — |
| Total non-current liabilities | 4,258 | 4,645 |
| **Total Liabilities** | 5,174 | 5,513 |
| **Commitments and Contingencies** | | |
| **Stockholder's Equity** | | |
| Common stock: $0.001 par value, 1 share authorized and issued at December 31, 2015 and 2014 | — | — |
| Additional paid-in capital | 325 | 325 |
| (Accumulated deficit) / retained earnings | (37) | 78 |
| Accumulated other comprehensive loss | (16) | (2) |
| Total Stockholder's Equity | 272 | 401 |
| **Total Liabilities and Stockholder's Equity** | $ 5,446 | $ 5,914 |

See notes to Consolidated Financial Statements.

56

.

**GENON ENERGY, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | For the Year Ended December 31, 2015 | For the Year Ended December 31, 2014 | For the Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| **Cash Flows from Operating Activities** | | | |
| Net (loss)/income | $ (115) | $ 192 | $ (42) |
| Adjustments to reconcile net (loss)/income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 215 | 245 | 249 |
| Amortization of debt premiums | (58) | (58) | (72) |
| Gain on debt extinguishment | (65) | — | (28) |
| Amortization of out-of-market contracts and emission allowances | (70) | (38) | (45) |
| Amortization of unearned equity compensation | 2 | 6 | 9 |
| Loss on and sale of assets | — | 6 | — |
| Gain on sale of equity method investment | — | (18) | — |
| Impairment losses | 170 | 82 | — |
| Changes in derivative instruments | 180 | 152 | 310 |
| Lower of cost or market inventory adjustments | 19 | 12 | — |
| Other, net | (10) | 24 | 86 |
| Cash provided/(used) by changes in other working capital: | | | |
| Accounts receivable - trade | 23 | 52 | (59) |
| Inventory | 33 | (76) | (25) |
| Prepayments and other current assets | 29 | 27 | 61 |
| Accounts payable | (38) | (127) | 118 |
| Accrued expenses and other current liabilities | 20 | (33) | (71) |
| Other assets and liabilities | (94) | (211) | 41 |
| **Net Cash Provided by Operating Activities** | 241 | 237 | 532 |
| **Cash Flows from Investing Activities** | | | |
| Net proceeds from sale of NRG Marsh Landing | — | — | 175 |
| Capital expenditures | (254) | (171) | (301) |
| Proceeds from sale of assets, net | — | 50 | — |
| Proceeds from sale of equity method investments | — | 35 | — |
| Decrease in restricted cash, net | — | — | 18 |
| Other | (5) | 10 | (21) |
| **Net Cash Used by Investing Activities** | (259) | (76) | (129) |
| **Cash Flows from Financing Activities** | | | |
| Proceeds from issuance of long-term debt | — | — | 110 |
| Payments for short and long-term debt | (237) | (1) | (578) |
| **Net Cash Used by Financing Activities** | (237) | (1) | (468) |
| **Net (Decrease)/Increase in Cash and Cash Equivalents** | (255) | 160 | (65) |
| **Cash and Cash Equivalents at Beginning of Period** | 920 | 760 | 825 |
| **Cash and Cash Equivalents at End of Period** | $ 665 | $ 920 | $ 760 |
| **Supplemental Disclosures** | | | |
| Interest paid, net of amount capitalized | $ 248 | $ 240 | $ 259 |
| Income taxes (received)/paid, net | $ 4 | $ 3 | $ (75) |

See notes to Consolidated Financial Statements.

**GENON ENERGY, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENT OF STOCKHOLDER'S EQUITY**

| | Common Stock | | Additional Paid-In Capital | | (Accumulated Deficit) / Retained Earnings | | Accumulated Other Comprehensive Income/(Loss) | | Total Stockholder's Equity | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (In millions) | | | | | |
| **Balances as of December 31, 2012** | $ | — | $ | 277 | $ | (72) | $ | 2 | $ | 207 |
| Net loss | | — | | — | | (42) | | — | | (42) |
| Other comprehensive income | | — | | — | | — | | 100 | | 100 |
| Sale of Marsh Landing to NRG | | — | | 48 | | — | | — | | 48 |
| **Balances as of December 31, 2013** | $ | — | $ | 325 | $ | (114) | $ | 102 | $ | 313 |
| Net income | | — | | — | | 192 | | — | | 192 |
| Other comprehensive loss | | — | | — | | — | | (104) | | (104) |
| **Balances as of December 31, 2014** | $ | — | $ | 325 | $ | 78 | $ | (2) | $ | 401 |
| Net loss | | — | | — | | (115) | | — | | (115) |
| Other comprehensive loss | | — | | — | | — | | (14) | | (14) |
| **Balances as of December 31, 2015** | $ | — | $ | 325 | $ | (37) | $ | (16) | $ | 272 |

See notes to Consolidated Financial Statements.

58

.

**GENON AMERICAS GENERATION, LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | For the Year Ended December 31, 2015 | | For the Year Ended December 31, 2014 | | For the Year Ended December 31, 2013 | |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| **Operating Revenues** | | | | | | |
| Operating revenues | $ | 2,176 | $ | 2,869 | $ | 2,428 |
| Operating revenues - affiliate | | 89 | | 60 | | 133 |
| Total operating revenues | | 2,265 | | 2,929 | | 2,561 |
| **Operating Costs and Expenses** | | | | | | |
| Cost of operations | | 840 | | 944 | | 890 |
| Cost of operations - affiliate | | 1,120 | | 1,441 | | 1,356 |
| Depreciation and amortization | | 74 | | 72 | | 95 |
| Impairment losses | | 8 | | — | | — |
| General and administrative | | — | | 9 | | 15 |
| General and administrative - affiliate | | 81 | | 79 | | 74 |
| Total operating costs and expenses | | 2,123 | | 2,545 | | 2,430 |
| Loss on sale of assets | | — | | (6) | | — |
| **Operating Income** | | 142 | | 378 | | 131 |
| **Other Income/(Expense)** | | | | | | |
| Other income, net | | 2 | | 1 | | 1 |
| Interest expense | | (64) | | (66) | | (66) |
| Interest expense — affiliate | | (6) | | (8) | | (7) |
| Gain on debt extinguishment | | 42 | | — | | — |
| Total other expense | | (26) | | (73) | | (72) |
| **Income Before Income Taxes** | | 116 | | 305 | | 59 |
| Income tax | | — | | — | | — |
| **Net Income** | $ | 116 | $ | 305 | $ | 59 |

See notes to Consolidated Financial Statements.

59

.

**GENON AMERICAS GENERATION, LLC AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2015 | | 2014 |
| | (In millions) | | |
| **ASSETS** | | | |
| **Current Assets** | | | |
| Cash and cash equivalents | $ | 246 | $ | 103 |
| Funds deposited by counterparties | | 51 | | 54 |
| Accounts receivable | | 86 | | 106 |
| Note receivable — affiliate | | 331 | | 331 |
| Inventory | | 289 | | 318 |
| Derivative instruments | | 545 | | 591 |
| Derivative instruments — affiliate | | 316 | | 261 |
| Cash collateral paid in support of energy risk management activities | | 39 | | 29 |
| Prepaid rent and other current assets | | 84 | | 90 |
| Total current assets | | 1,987 | | 1,883 |
| **Property, Plant and Equipment** | | | |
| In service | | 1,331 | | 1,250 |
| Under construction | | 29 | | 30 |
| Total property, plant and equipment | | 1,360 | | 1,280 |
| Less accumulated depreciation | | (244) | | (170) |
| Net property, plant and equipment | | 1,116 | | 1,110 |
| **Other Assets** | | | |
| Intangible assets, net of accumulated amortization of $40 and $66 | | 73 | | 72 |
| Derivative instruments | | 154 | | 196 |
| Derivative instruments — affiliate | | 81 | | 60 |
| Other non-current assets | | 131 | | 111 |
| Total other assets | | 439 | | 439 |
| **Total Assets** | $ | 3,542 | $ | 3,432 |

See notes to Consolidated Financial Statements.

60

.

**GENON AMERICAS GENERATION, LLC AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS (Continued)**

| | As of December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| | (In millions) | |
| **LIABILITIES AND MEMBER'S EQUITY** | | |
| **Current Liabilities** | | |
| Current portion of long-term debt and capital leases | $ — | $ 5 |
| Accounts payable | 48 | 50 |
| Accounts payable — affiliate | 109 | 23 |
| Derivative instruments | 465 | 382 |
| Derivative instruments — affiliate | 272 | 292 |
| Cash collateral received in support of energy risk management activities | 51 | 54 |
| Accrued expenses and other current liabilities | 104 | 93 |
| Total current liabilities | 1,049 | 899 |
| **Other Liabilities** | | |
| Long-term debt and capital leases | 752 | 929 |
| Derivative instruments | 102 | 69 |
| Derivative instruments — affiliate | 80 | 66 |
| Out-of-market contracts | 520 | 547 |
| Other non-current liabilities | 107 | 106 |
| Total non-current liabilities | 1,561 | 1,717 |
| **Total Liabilities** | 2,610 | 2,616 |
| **Commitments and Contingencies** | | |
| **Member's Equity** | | |
| Member's interest | 932 | 816 |
| Total Member's Equity | 932 | 816 |
| **Total Liabilities and Member's Equity** | $ 3,542 | $ 3,432 |

See notes to Consolidated Financial Statements.

61

.

**GENON AMERICAS GENERATION, LLC AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | For the Year Ended December 31, 2015 | | For the Year Ended December 31, 2014 | | For the Year Ended December 31, 2013 |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Cash Flows from Operating Activities** | | | | | |
| Net income | $ | 116 | $ | 305 | $ | 59 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | | |
| Depreciation and amortization | | 74 | | 72 | | 95 |
| Amortization of debt premiums | | (9) | | (9) | | (8) |
| Gain on debt extinguishment | | (42) | | — | | — |
| Amortization of out-of-market contracts and emission allowances | | (27) | | (16) | | (9) |
| Loss on and sale of assets | | — | | 6 | | — |
| Changes in derivative instruments | | 122 | | 128 | | 270 |
| Impairment losses | | 8 | | — | | — |
| Lower of cost or market inventory adjustments | | 17 | | 9 | | — |
| Other, net | | (10) | | (35) | | (36) |
| Cash provided/(used) by changes in other working capital: | | | | | |
| Accounts receivable – trade | | 20 | | 39 | | (26) |
| Inventory | | 12 | | (57) | | (47) |
| Prepayments and other current assets | | 6 | | 15 | | (6) |
| Accounts payable | | — | | (45) | | 1 |
| Accounts payable - affiliate | | 86 | | 2 | | 15 |
| Accrued expenses and other current liabilities | | 11 | | 1 | | 6 |
| Other assets and liabilities | | (36) | | (115) | | (4) |
| **Net Cash Provided by Operating Activities** | | 348 | | 300 | | 310 |
| **Cash Flows from Investing Activities** | | | | | |
| Capital expenditures | | (74) | | (32) | | (55) |
| Proceeds from sale of assets, net | | — | | 50 | | — |
| Purchase of emission allowances, net of proceeds | | — | | — | | (21) |
| Increase in notes receivable - affiliate | | — | | (32) | | (101) |
| **Net Cash Used by Investing Activities** | | (74) | | (14) | | (177) |
| **Cash Flows from Financing Activities** | | | | | |
| Payments for short and long-term debt | | (131) | | — | | (3) |
| Capital contributions | | — | | 74 | | 70 |
| Distributions to member | | — | | (320) | | (285) |
| **Net Cash Used by Financing Activities** | | (131) | | (246) | | (218) |
| **Net Increase/(Decrease) in Cash and Cash Equivalents** | | 143 | | 40 | | (85) |
| **Cash and Cash Equivalents at Beginning of Period** | | 103 | | 63 | | 148 |
| **Cash and Cash Equivalents at End of Period** | $ | 246 | $ | 103 | $ | 63 |
| **Supplemental Disclosures** | | | | | |
| Interest paid, net of amount capitalized | $ | 76 | $ | 75 | $ | 73 |

See notes to Consolidated Financial Statements.

62

.

**GENON AMERICAS GENERATION, LLC SUBSIDIARIES**

**CONSOLIDATED STATEMENT OF MEMBER'S EQUITY**

| | Total Member's Equity |
|---|---:|
| **Balances as of December 31, 2012** | $  841 |
| Net income | 59 |
| Distributions to member | (279) |
| Capital contributions | 70 |
| **Balances as of December 31, 2013** | $  691 |
| Net income | 305 |
| Distributions to member | (320) |
| Non-cash capital contributions | 66 |
| Capital contributions | 74 |
| **Balances as of December 31, 2014** | $  816 |
| Net income | 116 |
| **Balances as of December 31, 2015** | 932 |

See notes to Consolidated Financial Statements.

63

**GENON MID-ATLANTIC, LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | For the Year Ended December 31, 2015 | | For the Year Ended December 31, 2014 | | For the Year Ended December 31, 2013 | |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| **Operating Revenues** | | | | | | |
| Operating revenues | $ | 11 | $ | (62) | $ | 7 |
| Operating revenues — affiliate | | 845 | | 1,145 | | 872 |
| Total operating revenues | | 856 | | 1,083 | | 879 |
| **Operating Costs and Expenses** | | | | | | |
| Cost of operations | | 506 | | 678 | | 583 |
| Cost of operations — affiliate | | 119 | | 50 | | 21 |
| Depreciation and amortization | | 65 | | 50 | | 77 |
| General and administrative | | — | | — | | 2 |
| General and administrative — affiliate | | 58 | | 64 | | 64 |
| Total operating costs and expenses | | 748 | | 842 | | 747 |
| **Operating Income** | | 108 | | 241 | | 132 |
| **Other Expense** | | | | | | |
| Interest expense | | (1) | | (2) | | (1) |
| Interest expense — affiliate | | (3) | | (3) | | (3) |
| Total other expense | | (4) | | (5) | | (4) |
| **Income Before Income Taxes** | | 104 | | 236 | | 128 |
| Income tax | | — | | — | | — |
| **Net Income** | $ | 104 | $ | 236 | $ | 128 |

See notes to Consolidated Financial Statements.

64

.

**GENON MID-ATLANTIC, LLC AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**

| | | As of December 31, | |
| --- | --- | --- | --- |
| | | 2015 | 2014 |
| | | (In millions) | |
| **ASSETS** | | | |
| **Current Assets** | | | |
| Cash and cash equivalents | $ | 299 | $ 157 |
| Accounts receivable — trade | | 2 | 10 |
| Inventory | | 172 | 166 |
| Derivative instruments | | — | 100 |
| Derivative instruments — affiliate | | 269 | 141 |
| Prepaid rent and other current assets | | 79 | 80 |
| Total current assets | | 821 | 654 |
| **Property, Plant and Equipment** | | | |
| In service | | 1,099 | 1,075 |
| Under construction | | 26 | 18 |
| Total property, plant and equipment | | 1,125 | 1,093 |
| Less accumulated depreciation | | (200) | (135) |
| Net property, plant and equipment | | 925 | 958 |
| **Other Assets** | | | |
| Intangible assets, net of accumulated amortization of $0 and $0 | | 13 | 10 |
| Derivative instruments — affiliate | | 83 | 141 |
| Other non-current assets | | 125 | 87 |
| Total other assets | | 221 | 238 |
| **Total Assets** | $ | 1,967 | $ 1,850 |

See notes to Consolidated Financial Statements.

65

.

**GENON MID-ATLANTIC, LLC AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS (Continued)**

| | As of December 31, | |
|---|---|---|
| | **2015** | **2014** |
| | (In millions) | |
| **LIABILITIES AND MEMBER'S EQUITY** | | |
| **Current Liabilities** | | |
| Current portion of long-term debt and capital leases | $  — | $  5 |
| Accounts payable | 21 | 27 |
| Accounts payable — affiliate | 8 | 14 |
| Derivative instruments | — | 1 |
| Derivative instruments — affiliate | 163 | 127 |
| Accrued taxes | 44 | 29 |
| Accrued environmental liabilities | 27 | 21 |
| Accrued expenses and other current liabilities | 4 | 3 |
| Total current liabilities | 267 | 227 |
| **Other Liabilities** | | |
| Derivative instruments — affiliate | 32 | 22 |
| Out-of-market contracts | 520 | 547 |
| Other non-current liabilities | 50 | 60 |
| Total non-current liabilities | 602 | 629 |
| **Total Liabilities** | 869 | 856 |
| **Commitments and Contingencies** | | |
| **Member's Equity** | | |
| Member's interest | 1,098 | 994 |
| **Total Member's Equity** | 1,098 | 994 |
| **Total Liabilities and Member's Equity** | $  1,967 | $  1,850 |

See notes to Consolidated Financial Statements.

66

.

**GENON MID-ATLANTIC, LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | For the Year Ended December 31, 2015 | For the Year Ended December 31, 2014 | For the Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| **Cash Flows from Operating Activities** | | | |
| Net income | $ 104 | $ 236 | $ 128 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 65 | 50 | 77 |
| Loss on disposals and sales of assets | — | — | 7 |
| Amortization of out-of-market contracts and emission allowances | (27) | 1 | (11) |
| Changes in derivative instruments | 75 | 202 | 260 |
| Lower of cost or market inventory adjustments | 6 | — | — |
| Cash provided/(used) by changes in other working capital: | | | |
| Accounts receivable - trade | 8 | (6) | — |
| Inventory | (12) | (8) | (21) |
| Prepayments and other current assets | 2 | 34 | (69) |
| Accounts payable | — | 8 | (21) |
| Accounts payable - affiliate | (6) | 14 | — |
| Accrued expenses and other current liabilities | 22 | 4 | (8) |
| Other assets and liabilities | (51) | (106) | (102) |
| **Net Cash Provided by Operating Activities** | $ 186 | 429 | 261 |
| **Cash Flows from Investing Activities** | | | |
| Capital expenditures | (39) | (16) | (44) |
| **Net Cash Used by Investing Activities** | (39) | (16) | (44) |
| **Cash Flows from Financing Activities** | | | |
| Payments for short and long-term debt | (5) | — | (3) |
| Distributions to member | — | (320) | (285) |
| **Net Cash Used by Financing Activities** | (5) | (320) | (288) |
| **Net Increase/(Decrease) in Cash and Cash Equivalents** | 142 | 93 | (71) |
| **Cash and Cash Equivalents at Beginning of Period** | 157 | 64 | 135 |
| **Cash and Cash Equivalents at End of Period** | $ 299 | $ 157 | $ 64 |

See notes to Consolidated Financial Statements.

67

.

**GENON MID-ATLANTIC, LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENT OF MEMBER'S EQUITY**

| | | Total Member's Equity |
|---|---|---|
| **Balances as of December 31, 2012** | $ | 1,235 |
| Net income | | 128 |
| Distributions to member | | (285) |
| **Balances as of December 31, 2013** | $ | 1,078 |
| Net income | | 236 |
| Distributions to member | | (320) |
| **Balances as of December 31, 2014** | $ | 994 |
| Net income | | 104 |
| **Balances as of December 31, 2015** | $ | 1,098 |

See notes to Consolidated Financial Statements.

68

.

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1 — Nature of Business (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*General*

GenOn Energy, Inc., a wholly owned subsidiary of NRG, is a wholesale generator engaged in the ownership and operation of power generation facilities, with approximately 17,753 MW of net electric generating capacity located in the U.S.

GenOn Americas Generation is a wholesale power generator with approximately 7,985 MW of net electric generating capacity located, in many cases, near major metropolitan areas. GenOn Americas Generation's electric generating capacity is part of the 17,753 MW of net electric generating capacity of GenOn.

GenOn Mid-Atlantic operates and owns or leases 4,683 MW of net electric generating capacity in Maryland, near Washington, D.C. GenOn Mid-Atlantic's electric generating capacity is part of the 7,985 MW of net electric generating capacity of GenOn Americas Generation. GenOn Mid-Atlantic's generating facilities serve the Eastern PJM markets.

GenOn Americas Generation and GenOn Mid-Atlantic are Delaware limited liability companies and indirect wholly owned subsidiaries of GenOn. GenOn Mid-Atlantic is a wholly owned subsidiary of NRG North America and an indirect wholly owned subsidiary of GenOn Americas Generation. The following illustrates the ownership structure of the Registrants as of December 31, 2015:



GenOn's generation facilities consist of baseload, intermediate and peaking power generation facilities. The following table summarizes the generation portfolio by Registrant:

| Generation Type | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| | | (In MW) | |
| Natural gas | 10,763 | 4,118 | 1,942 |
| Coal | 5,143 | 2,433 | 2,433 |
| Oil | 1,847 | 1,434 | 308 |
| Total generation capacity | 17,753 | 7,985 | 4,683 |

The Registrants sell power from their generation portfolio and offer capacity or similar products to retail electric providers and others, and provide ancillary services to support system reliability.

### NRG Merger

On December 14, 2012, NRG completed the acquisition of GenOn with GenOn continuing as a wholly owned subsidiary of NRG. The NRG Merger was accounted for under the acquisition method of accounting. Fair value adjustments related to the NRG Merger have been pushed down to GenOn, GenOn Americas Generation and GenOn Mid-Atlantic, resulting in certain assets and liabilities of the Registrants being recorded at fair value at December 15, 2012.

The Registrants' consolidated statements of operations subsequent to the NRG Merger include amortization expense relating to fair value adjustments and depreciation expense based on the fair value of the Registrants' property, plant and equipment. In addition, effective with the NRG Merger, the Registrants adopted accounting policies of NRG.

## Note 2 — Summary of Significant Accounting Policies (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)

### Basis of Presentation and Principles of Consolidation

This is a combined annual report of the Registrants. The notes to the consolidated financial statements apply to the Registrants as indicated parenthetically next to each corresponding disclosure.

The Registrants' consolidated financial statements have been prepared in accordance with U.S. GAAP. The ASC, established by the FASB, is the source of authoritative U.S. GAAP to be applied by nongovernmental entities. In addition, the rules and interpretative releases of the SEC under authority of federal securities laws are also sources of authoritative U.S. GAAP for SEC registrants.

The consolidated financial statements include the Registrants' accounts and operations and those of their subsidiaries in which the Registrants have a controlling interest. All significant intercompany transactions and balances have been eliminated in consolidation. The usual condition for a controlling financial interest is ownership of a majority of the voting interests of an entity. However, a controlling financial interest may also exist through arrangements that do not involve controlling voting interests. As such, the Registrants apply the guidance of ASC 810, *Consolidations,* or ASC 810, to determine when an entity that is insufficiently capitalized or not controlled through its voting interests, referred to as a VIE, should be consolidated.

### Cash and Cash Equivalents

Cash and cash equivalents include highly liquid investments with an original maturity of three months or less at the time of purchase.

### Funds Deposited by Counterparties (GenOn and GenOn Americas Generation)

Funds deposited by counterparties consist of cash held by GenOn as a result of collateral posting obligations from GenOn's counterparties. Some amounts are segregated into separate accounts that are not contractually restricted but, based on GenOn's intentions, are not available for the payment of general corporate obligations. Depending on market fluctuations and the settlement of the underlying contracts, GenOn will refund this collateral to the hedge counterparties pursuant to the terms and conditions of the underlying trades. Since collateral requirements fluctuate daily and GenOn cannot predict if any collateral will be held for more than twelve months, the funds deposited by counterparties are classified as a current asset on GenOn's balance sheets, with an offsetting liability for this cash collateral received within current liabilities. Changes in funds deposited by counterparties are closely associated with GenOn's operating activities and are classified as an operating activity in GenOn's consolidated statements of cash flows.

### Inventory

Inventory is valued at the lower of weighted average cost or market, and consists principally of fuel oil, coal and raw materials used to generate electricity or steam. The Registrants remove these inventories as they are used in the production of electricity or steam. Spare parts inventory is valued at a weighted average cost, since the Registrants expect to recover these costs in the ordinary course of business. The Registrants remove these inventories when they are used for repairs, maintenance or capital projects. Sales of inventory are classified as an operating activity in the consolidated statements of cash flows. During the year ended December 31, 2015, the Registrants recorded a lower of weighted average cost or market adjustment related to fuel oil of $19 million related to GenOn, of which $17 million relates to GenOn Americas Generation and $6 million relates to GenOn Mid-Atlantic.

*Property, Plant and Equipment*

Property, plant and equipment are stated at cost; however impairment adjustments are recorded whenever events or changes in circumstances indicate that their carrying values may not be recoverable. Significant additions or improvements extending asset lives are capitalized as incurred, while repairs and maintenance that do not improve or extend the life of the respective asset are charged to expense as incurred. Depreciation is computed using the straight-line method over the estimated useful lives. Certain assets and their related accumulated depreciation amounts are adjusted for asset retirements and disposals with the resulting gain or loss included in cost of operations in the consolidated statements of operations.

*Asset Impairments*

Long-lived assets that are held and used are reviewed for impairment whenever events or changes in circumstances indicate carrying values may not be recoverable. Such reviews are performed in accordance with ASC 360, *Property, Plant and Equipment*. An impairment loss is recognized if the total future estimated undiscounted cash flows expected from an asset are less than its carrying value. An impairment charge is measured by the difference between an asset's carrying amount and fair value with the difference recorded in operating costs and expenses in the statements of operations. Fair values are determined by a variety of valuation methods, including appraisals, sales prices of similar assets and present value techniques.

For further discussion of these matters, refer to Note 9, *Impairments*.

*Capitalized Interest (GenOn and GenOn Americas Generation)*

Interest incurred on funds borrowed to finance capital projects is capitalized until the project under construction is ready for its intended use. The amounts of interest capitalized were as follows:

|  | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
|  | (In millions) | | |
| GenOn | $ 5 | $ 11 | $ 21 |
| GenOn Americas Generation | 2 | 1 | 2 |

When a project is available for operations, capitalized interest and project development costs are reclassified to property, plant and equipment and depreciated on a straight-line basis over the estimated useful life of the project's related assets. Capitalized costs are charged to expense if a project is abandoned or management otherwise determines the costs to be unrecoverable.

*Intangible Assets*

Intangible assets represent contractual rights held by the Registrants. The Registrants recognize specifically identifiable intangible assets when specific rights and contracts are acquired. As of December 31, 2015, and 2014, the Registrants' intangible assets are comprised of $SO_2$ emission allowances and $CO_2$ emission credits held for compliance with RGGI that are held-for-use and are amortized to cost of operations based on straight line or units of production basis. The following table presents the Registrants' amortization of intangible assets for each of the past three years:

|  | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
|  | (In millions) | | |
| GenOn | $ 39 | $ 38 | $ 25 |
| GenOn Americas Generation | 32 | 33 | 21 |
| GenOn Mid-Atlantic | 27 | 29 | 18 |

The following table presents estimated amortization of the Registrants' intangible assets for each of the next five years:

|  | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
|  | (In millions) | | |
| 2016 | $ 45 | $ 42 | $ 3 |
| 2017 | 2 | — | — |
| 2018 | 1 | — | — |
| 2019 | 1 | — | — |
| 2020 | 1 | — | — |

### Out of Market Contracts

In connection with the NRG Merger, acquired out-of-market contracts were pushed down to the Registrants, as applicable, and primarily relate to GenOn Mid-Atlantic and REMA leases and long-term natural gas transportation and storage contracts. These out-of-market contracts are amortized to operating revenues and cost of operations, as applicable, based on the nature of the contracts and over their contractual lives. The following table presents the Registrants' amortization of out-of-market contracts for each of the past three years:

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| GenOn | $ 79 | $ 78 | $ 75 |
| GenOn Americas Generation | 28 | 28 | 28 |
| GenOn Mid-Atlantic | 28 | 28 | 28 |

The following table summarizes the estimated amortization related to the Registrants' out-of-market contracts:

| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| | | (In millions) | |
| 2016 | $ 81 | $ 28 | $ 28 |
| 2017 | 76 | 28 | 28 |
| 2018 | 71 | 28 | 28 |
| 2019 | 68 | 28 | 28 |
| 2020 | 68 | 28 | 28 |

### Income Taxes

#### GenOn

GenOn is a wholly owned subsidiary of NRG that exists as a corporate regarded entity for income tax purposes. As a result, GenOn, NRG Americas and NRG have direct liability for the majority of the federal and state income taxes resulting from GenOn's operations. GenOn has allocated income taxes as if it were a single consolidated taxpayer using the liability method in accordance with ASC 740, which requires that GenOn use the asset and liability method of accounting for deferred income taxes and provide deferred income taxes for all significant temporary differences.

GenOn has two categories of income tax expense or benefit - current and deferred, as follows:

• Current income tax expense or benefit consists solely of current taxes payable less applicable tax credits, and

• Deferred income tax expense or benefit is the change in the net deferred income tax asset or liability, excluding amounts charged or credited to accumulated other comprehensive income.

GenOn reports some of its revenues and expenses differently for financial statement purposes than for income tax return purposes, resulting in temporary and permanent differences between its financial statements and income tax returns. The tax effects of such temporary differences are recorded as either deferred income tax assets or deferred income tax liabilities in GenOn's consolidated balance sheets. GenOn measures its deferred income tax assets and deferred income tax liabilities using income tax rates that are currently in effect. A valuation allowance is recorded to reduce GenOn's net deferred tax assets to an amount that is more-likely-than-not to be realized.

The determination of a valuation allowance requires significant judgment as to the generation of taxable income during future periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn's past and projected pre-tax book earnings, the reversal of deferred tax liabilities and the implementation of tax planning strategies.

GenOn accounts for uncertain tax positions in accordance with ASC 740, which applies to all tax positions related to income taxes. Under ASC 740, tax benefits are recognized when it is more-likely-than-not that a tax position will be sustained upon examination by the authorities. The benefit recognized from a position that has surpassed the more-likely-than-not threshold is the largest amount of benefit that is more than 50% likely to be realized upon settlement. GenOn recognizes interest and penalties accrued related to uncertain tax benefits as a component of income tax expense.

*GenOn Americas Generation*

GenOn Americas Generation and most of its subsidiaries are limited liability companies that are treated as branches of GenOn Americas for income tax purposes. As a result, NRG Americas, GenOn and NRG have direct liability for the majority of the federal and state income taxes relating to GenOn Americas Generation's operations. Several of GenOn Americas Generation's subsidiaries exist as regarded corporate entities for income tax purposes. For the subsidiaries that continue to exist as corporate regarded entities, GenOn Americas Generation allocates current and deferred income taxes to each corporate regarded entity as if such entity were a single taxpayer utilizing the asset and liability method to account for income taxes.

GenOn Americas Generation reports some of its revenues and expenses differently for financial statement purposes than for income tax return purposes, resulting in temporary and permanent differences between its financial statements and income tax returns. The tax effects of such temporary differences are recorded as either deferred income tax assets or deferred income tax liabilities in GenOn Americas Generation's consolidated balance sheets. GenOn Americas Generation measures its deferred income tax assets and deferred income tax liabilities using income tax rates that are currently in effect. A valuation allowance is recorded to reduce GenOn Americas Generation's net deferred tax assets to an amount that is more-likely-than-not to be realized.

The determination of a valuation allowance requires significant judgment as to the generation of taxable income during future periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn Americas Generation's past and projected pre-tax book earnings, the reversal of deferred tax liabilities and the implementation of tax planning strategies.

GenOn Americas Generation accounts for uncertain tax positions in accordance with ASC 740, which applies to all tax positions related to income taxes. Under ASC 740, tax benefits are recognized when it is more-likely-than-not that a tax position will be sustained upon examination by the authorities. The benefit recognized from a position that has surpassed the more-likely-than-not threshold is the largest amount of benefit that is more than 50% likely to be realized upon settlement. GenOn Americas Generation recognizes interest and penalties accrued related to uncertain tax benefits as a component of income tax expense.

*GenOn Mid-Atlantic*

GenOn Mid-Atlantic and GenOn Mid-Atlantic's subsidiaries are limited liability companies that are treated as branches of NRG Americas for income tax purposes. As such, GenOn, NRG Americas and NRG have direct liability for the majority of the federal and state income taxes relating to GenOn Mid-Atlantic's operations.

### Revenue Recognition

*Energy* — Both physical and financial transactions are entered into to optimize the financial performance of the Registrants' generating facilities. Electric energy revenue is recognized upon transmission to the customer. Physical transactions, or the sale of generated electricity to meet supply and demand, are recorded on a gross basis in the Registrants' consolidated statements of operations. Financial transactions, or the buying and selling of energy for trading purposes, are recorded net within operating revenues in the consolidated statements of operations in accordance with ASC 815.

*Capacity* — Capacity revenues are recognized when contractually earned, and consist of revenues billed to a third party at either the market or a negotiated contract price for making installed generation capacity available in order to satisfy system integrity and reliability requirements.

*Natural Gas Sales (GenOn and GenOn Americas Generation)* — GenOn and GenOn Americas Generation record revenues from the sales of natural gas under the accrual method.  These sales are sold at market-based prices.  Sales that have been delivered but not billed by period end are estimated.

### Derivative Financial Instruments

The Registrants account for derivative financial instruments under ASC 815, which requires the Registrants to record all derivatives on the balance sheet at fair value unless they qualify for a NPNS exception. Changes in the fair value of derivatives are immediately recognized in earnings.

The Registrants' primary derivative instruments are financial power and natural gas contracts, fuels purchase contracts, and other energy related commodities used to mitigate variability in earnings due to fluctuations in market prices.

Revenues and expenses on contracts that qualify for the NPNS exception are recognized when the underlying physical transaction is delivered. While these contracts are considered derivative financial instruments under ASC 815, they are not recorded at fair value, but on an accrual basis of accounting. If it is determined that a transaction designated as NPNS no longer meets the scope exception, the fair value of the related contract is recorded on the balance sheet and immediately recognized through earnings.

The Registrants' trading activities are subject to limits in accordance with the Risk Management Policy. These contracts are recognized on the balance sheet at fair value and changes in the fair value of these derivative financial instruments are recognized in earnings.

### Concentrations of Credit Risk

Financial instruments which potentially subject the Registrants to concentrations of credit risk consist primarily of accounts receivable and derivatives. Certain accounts receivable and derivative instruments are concentrated within entities engaged in the energy industry. These industry concentrations may impact the Registrants' overall exposure to credit risk, either positively or negatively, in that the customers may be similarly affected by changes in economic, industry or other conditions. Receivables and other contractual arrangements are subject to collateral requirements under the terms of enabling agreements. However, the Registrants believe that the credit risk posed by industry concentration is offset by the diversification and creditworthiness of the Registrants' customer base. See Note 4, *Fair Value of Financial Instruments,* for a further discussion of derivative concentrations.

### Fair Value of Financial Instruments

The carrying amount of cash and cash equivalents, funds deposited by counterparties, receivables, accounts payable, and accrued liabilities approximate fair value because of the short-term maturity of these instruments. See Note 4, *Fair Value of Financial Instruments*, for a further discussion of fair value of financial instruments.

### Asset Retirement Obligations

The Registrants account for their AROs in accordance with ASC 410-20, *Asset Retirement Obligations,* or ASC 410-20. Retirement obligations associated with long-lived assets included within the scope of ASC 410-20 are those for which a legal obligation exists under enacted laws, statutes, and written or oral contracts, including obligations arising under the doctrine of promissory estoppel, and for which the timing and/or method of settlement may be conditional on a future event. ASC 410-20 requires an entity to recognize the fair value of a liability for an ARO in the period in which it is incurred and a reasonable estimate of fair value can be made.

Upon initial recognition of a liability for an ARO, the Registrants capitalize the asset retirement cost by increasing the carrying amount of the related long-lived asset by the same amount. Over time, the liability is accreted to its future value, while the capitalized cost is depreciated over the useful life of the related asset. See Note 11, *Asset Retirement Obligations,* for a further discussion of AROs.

### Pensions (GenOn)

GenOn offers pension benefits through defined benefit pension plans. In addition, GenOn provides postretirement health and welfare benefits for certain groups of employees. GenOn accounts for pension and other postretirement benefits in accordance with ASC 715, *Compensation — Retirement Benefits.* GenOn recognizes the funded status of its defined benefit plans in the statement of financial position and records an offset for gains and losses as well as all prior service costs that have not been included as part of GenOn's net periodic benefit cost to other comprehensive income. The determination of GenOn's obligation and expenses for pension benefits is dependent on the selection of certain assumptions. These assumptions determined by management include the discount rate, the expected rate of return on plan assets and the rate of future compensation increases. GenOn's actuarial consultants determine assumptions for such items as retirement age. The assumptions used may differ materially from actual results, which may result in a significant impact to the amount of pension obligation or expense recorded by GenOn.

GenOn measures the fair value of its pension assets in accordance with ASC 820, *Fair Value Measurements and Disclosures,* or ASC 820.

On December 31, 2014, NRG merged 8 qualified pension plans into 2 separate qualified pension plans, the NRG Pension Plan for Bargained Employees and the NRG Pension Plan. The GenOn Mirant Bargaining Unit Pension Plan, GenOn First Energy Pension Plan, GenOn Duquesne Pension Plan, and GenOn REMA Pension Plan were merged into the NRG Pension Plan for Bargained Employees. The GenOn Mirant Pension Plan was merged into the NRG Pension Plan for Non-Bargained Employees and renamed the NRG Pension Plans. These actions were conducted to simplify internal administration of the plans, reduce regulatory filings, and lower fees paid to outside vendors as part of the management services agreement. The benefits provided to current participants in the Plans were not impacted and GenOn remains obligated for its respective pension liabilities.

### Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements, disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from these estimates.

In recording transactions and balances resulting from business operations, the Registrants use estimates based on the best information available. Estimates are used for such items as plant depreciable lives, tax provisions, actuarially determined benefit costs, the valuation of energy commodity contracts, environmental liabilities, legal costs incurred in connection with recorded loss contingencies, and assets acquired and liabilities assumed in business combinations, among others. In addition, estimates are used to test long-lived assets for impairment and to determine the fair value of impaired assets. As better information becomes available or actual amounts are determinable, the recorded estimates are revised. Consequently, operating results can be affected by revisions to prior accounting estimates.

### Reclassifications

Certain prior-year amounts have been reclassified for comparative purposes. The reclassifications did not affect results from operations, net assets or cash flows.

### Recent Accounting Developments

*ASU 2016-01* - In January 2016, the FASB issued ASU No. 2016-01, Financial Instruments - Overall (Subtopic 825-10): Recognition and Measurement of Financial Assets and Financial Liabilities, or ASU No. 2016-01. The amendments of ASU No. 2016-01 eliminate available-for-sale classification of equity investments and require that equity investments (except those accounted for under the equity method of accounting, or those that result in consolidation of the investee) to be generally measured at fair value with changes in fair value recognized in net income. Further, the amendments require that financial assets and financial liabilities to be presented separately in the notes to the financial statements, grouped by measurement category and form of financial asset.  The guidance in ASU No. 2016-01 is effective for financial statements issued for fiscal years beginning after December 15, 2017, and interim periods within those annual periods. The Registrants are currently evaluating the impact of the standard on the Registrants' results of operations, cash flows and financial position.

*ASU 2015-17* — In November 2015, the FASB issued ASU No. 2015-17, *Income Taxes (Topic 740): Balance Sheet Classification of Deferred Taxes*, or ASU No. 2015-17. The amendments of ASU No. 2015-17 require that deferred tax liabilities and assets, as well as any related valuation allowance, be presented as noncurrent in a classified statement of financial position. The guidance in ASU No. 2015-17 is effective for financial statements issued for fiscal years beginning after December 15, 2016, and interim periods within those annual periods. The amendments may be applied either prospectively to all deferred tax liabilities and assets or retrospectively to all periods presented. Early adoption is permitted. The Registrants' adopted ASU No. 2015-17 for the year ended December 31, 2015 and elected to apply the amendments retrospectively. The adoption did not have any impact on the Registrants' results of operations, cash flows, or net assets.

*ASU 2015-02* — In February 2015, the FASB issued ASU No. 2015-02, *Consolidation (Topic 810): Amendments to the Consolidation Analysis*, or ASU No. 2015-02. The amendments of ASU No. 2015-02 were issued in an effort to minimize situations under previously existing guidance in which a reporting entity was required to consolidate another legal entity in which that reporting entity did not have: (1) the ability through contractual rights to act primarily on its own behalf; (2) ownership of the majority of the legal entity's voting rights; or (3) the exposure to a majority of the legal entity's economic benefits. ASU 2015-02 affects reporting entities that are required to evaluate whether they should consolidate certain legal entities. All legal entities are subject to reevaluation under the revised consolidation model. The guidance in ASU No. 2015-02 is effective for periods beginning after December 15, 2015. Early adoption is permitted. The Registrants adopted the standard effective January 1, 2015, and the adoption of this standard did not impact the Registrants' results of operations, cash flows or financial position.

*ASU 2014-16* — In November 2014, the FASB issued ASU No. 2014-16, *Derivatives and Hedging (Topic 815): Determining Whether the Host Contract in a Hybrid Financial Instrument Issued in the Form of a Share Is More Akin to Debt or to Equity*, or ASU No. 2014-16. The amendments of ASU No. 2014-16 clarify how U.S. GAAP should be applied in determining whether the nature of a host contract is more akin to debt or equity and in evaluating whether the economic characteristics and risks of an embedded feature are "clearly and closely related" to its host contract. The guidance in ASU No. 2014-16 is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2015. Early adoption is permitted. The Registrants adopted the standard effective January 1, 2015 and the adoption of this standard did not impact the Registrants' results of operations, cash flows or financial position.

75

*ASU 2014-09* — In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers (Topic 606)*, or ASU No. 2014-09. The amendments of ASU No. 2014-09 complete the joint effort between the FASB and the International Accounting Standards Board, or IASB, to develop a common revenue standard for U.S. GAAP and International Financial Reporting Standards, or IFRS, and to improve financial reporting. The guidance in ASU No. 2014-09 provides that an entity should recognize revenue to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled to in exchange for the goods or services provided and establishes the following steps to be applied by an entity: (1) identify the contract with a customer; (2) identify the performance obligations in the contract; (3) determine the transaction price; (4) allocate the transaction price to the performance obligations in the contract; and (5) recognize revenue when (or as) the entity satisfies the performance obligation. In August 2015, the FASB issued ASU 2015-14, which formally deferred the effective date by one year to make the guidance of ASU No. 2014-09 effective for annual reporting periods beginning after December 15, 2017, including interim periods therein. Early adoption is permitted, but not prior to the original effective date, which was for annual reporting periods beginning after December 15, 2016. The Registrants are currently evaluating the impact of the standard on the Registrants' results of operations, cash flows and financial position.

**Note 3 — Dispositions (GenOn and GenOn Americas Generation)**

### Seward Disposition (GenOn)

On November 24, 2015, GenOn entered into an agreement with Robindale Energy Services, Inc. to sell 100% of its interest in Seward Generation, LLC, or Seward, for cash consideration of $75 million. Seward owns a 525 MW coal-fired facility in Pennsylvania. The transaction triggered an impairment indicator as the sale price was less than the carrying amount of the assets and, as a result, the assets were considered to be impaired. GenOn measured the impairment loss as the difference between the carrying amount of the assets and the agreed-upon sale price. GenOn recorded an impairment loss of $134 million in its consolidated results of operations for the year ended December 31, 2015, to reduce the carrying amount of the assets held for sale to the fair market value. At December 31, 2015, GenOn had $5 million of current assets, $83 million of non-current assets, $1 million of current liabilities and $4 million of non-current liabilities classified as held for sale for Seward on its balance sheet. On February 2, 2016, GenOn completed the sale of Seward. For further discussion on this impairment, refer to Note 9 — *Impairments*.

### Shelby Disposition (GenOn)

On November 9, 2015, GenOn entered into an agreement with Rockland Power Partners II, LP to sell 100% of its interest in the Shelby County Energy Center, LLC, or Shelby for cash consideration of $46 million. Shelby owns a 352 MW natural gas-fired facility located in Illinois. At December 31, 2015, GenOn had $1 million of current assets, $22 million of non-current assets, and $1 million of current liabilities classified as held for sale for Shelby on its balance sheet. The sale is expected to be completed in March of 2016 and the transaction is expected to result in a gain recognized in GenOn's consolidated results of operations during the first quarter of 2016.

### Sabine Disposition (GenOn)

On December 2, 2014, GenOn, through its subsidiaries GenOn Sabine (Delaware), Inc. and GenOn Sabine (Texas), Inc., completed the sale of its 50% interest in Sabine Cogen, L.P., or Sabine, to Bayou Power, LLC, an affiliate of Rockland Capital, LLC. Sabine owns a 105 MW natural gas-fired cogeneration facility located in Texas. GenOn received cash consideration of $35 million at closing. A gain of $18 million was recognized as a result of the transaction and recorded within GenOn's consolidated statements of operations.

### Kendall Disposition (GenOn and GenOn Americas Generation)

On January, 31, 2014, NRG North America LLC, a wholly owned subsidiary of GenOn Americas Generations, completed the sale of NRG Kendall LLC to Veolia Energy North America Holdings, Inc. for cash consideration of $50 million. There was a $6 million loss recorded in the consolidated results of operations of GenOn and GenOn Americas Generation during the first quarter of 2014.

**Note 4 — Fair Value of Financial Instruments (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

For cash and cash equivalents, funds deposited by counterparties, accounts receivable, accounts payable, accrued liabilities, and cash collateral paid and received in support of energy risk management activities, the carrying amount approximates fair value because of the short-term maturity of those instruments and are classified as Level 1 within the fair value hierarchy.

The estimated carrying values and fair values of GenOn and GenOn Americas Generation's debt are as follows:

*GenOn*

| | As of December 31, | | | |
| | 2015 | | 2014 | |
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| | (In millions) | | | |
| **Liabilities** | | | | |
| Long and short-term debt | $ 2,764 | $ 2,043 | $ 3,122 | $ 2,706 |

The fair value of long and short-term debt that is estimated using reported market prices for instruments that are publicly traded is classified as Level 2 within the fair value hierarchy. The fair value of non-publicly traded debt is based on the income approach valuation technique using current interest rates for similar instruments with equivalent credit quality and is classified as Level 3 within the fair value hierarchy.

*GenOn Americas Generation*

| | As of December 31, | | | |
| | 2015 | | 2014 | |
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| | (In millions) | | | |
| **Liabilities** | | | | |
| Long and short-term debt | $ 752 | $ 500 | $ 929 | $ 720 |

The fair value of long and short-term debt is estimated using reported market prices for instruments that are publicly traded and is classified as Level 2 within the fair value hierarchy.

### Fair Value Accounting under ASC 820

ASC 820 establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value into three levels as follows:

- Level 1 — quoted prices (unadjusted) in active markets for identical assets or liabilities that the Registrants have the ability to access as of the measurement date. The Registrants' financial assets and liabilities utilizing Level 1 inputs include active exchange-traded securities, energy derivatives and interest-bearing funds.

- Level 2 — inputs other than quoted prices included within Level 1 that are directly observable for the asset or liability or indirectly observable through corroboration with observable market data. The Registrants' financial assets and liabilities utilizing Level 2 inputs include exchange-based derivatives, and over the counter derivatives such as swaps, options and forward contracts.

- Level 3 — unobservable inputs for the asset or liability only used when there is little, if any, market activity for the asset or liability at the measurement date. The Registrants' financial assets and liabilities utilizing Level 3 inputs include infrequently-traded and non-exchange-based derivatives which are measured using present value pricing models.

In accordance with ASC 820, the Registrants determine the level in the fair value hierarchy within which each fair value measurement in its entirety falls, based on the lowest level input that is significant to the fair value measurement in its entirety.

***Recurring Fair Value Measurements***

Derivative assets and liabilities are carried at fair market value.

*GenOn*

The following tables present assets and liabilities measured and recorded at fair value on GenOn's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

| | As of December 31, 2015 | | | |
| | Fair Value | | | |
| | Level 1 [(a)] | Level 2 [(a)] | Level 3 | Total |
| | (In millions) | | | |
| **Derivative assets:** | | | | |
| Commodity contracts | $ 192 | $ 535 | $ 2 | $ 729 |
| **Derivative liabilities:** | | | | |
| Commodity contracts | $ 157 | $ 420 | $ 14 | $ 591 |
| Other assets [(b)] | $ 14 | $ — | $ — | $ 14 |

(a)   There were no transfers during the year ended December 31, 2015, between Levels 1 and 2.

(b)   Relates to mutual funds held in a rabbi trust for non-qualified deferred compensation plans for some key and highly compensated employees.

| | As of December 31, 2014 | | | |
| | Fair Value | | | |
| | Level 1 [(a)] | Level 2 [(a)] | Level 3 | Total |
| | (In millions) | | | |
| **Derivative assets:** | | | | |
| Commodity contracts | $ 179 | $ 582 | $ 46 | $ 807 |
| **Derivative liabilities:** | | | | |
| Commodity contracts | $ 105 | $ 371 | $ 13 | $ 489 |
| Other assets [(b)] | $ 21 | $ — | $ — | $ 21 |

(a)   There were no transfers during the year ended December 31, 2014, between Levels 1 and 2.

(b)   Relates to mutual funds held in a rabbi trust for non-qualified deferred compensation plans for some key and highly compensated employees.

The following tables reconcile the beginning and ending balances for derivatives that are recognized at fair value in GenOn's consolidated financial statements at least annually using significant unobservable inputs for the years ended December 31, 2015, and 2014:

| | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) | |
| | Derivatives [a] | |
| | (In millions) | |
| Balance as of beginning of period | $ 33 | $ (4) |
| Total gains and losses (realized/unrealized) included in earnings | (40) | 2 |
| Purchases | (5) | 35 |
| Balance as of end of period | $ (12) | $ 33 |
| The amount of the total losses for the period included in earnings attributable to the change in unrealized derivatives relating to assets still held at end of period | $ (8) | $ (1) |

(a)   Consists of derivatives assets and liabilities, net.

*GenOn Americas Generation*

The following tables present assets and liabilities (including amounts with affiliates) measured and recorded at fair value on GenOn Americas Generation's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

| | As of December 31, 2015 | | | |
| --- | --- | --- | --- | --- |
| | Fair Value | | | |
| | Level 1 [a] | Level 2 [a] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 285 | $ 796 | $ 15 | $ 1,096 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 170 | $ 735 | $ 14 | $ 919 |

(a)   There were no transfers during the year ended December 31, 2015, between Levels 1 and 2.

| | As of December 31, 2014 | | | |
| --- | --- | --- | --- | --- |
| | Fair Value | | | |
| | Level 1 [a] | Level 2 [a] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 208 | $ 848 | $ 52 | $ 1,108 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 137 | $ 640 | $ 32 | $ 809 |

(a)   There were no transfers during the year ended December 31, 2014, between Levels 1 and 2.

The following tables reconcile the beginning and ending balances for GenOn Americas Generation's derivatives that are recognized at fair value in the consolidated financial statements at least annually using significant unobservable inputs for the years ended December 31, 2015, and 2014:

| | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) | |
| | Derivatives [a] | |
| | (In millions) | |
| Balance as of beginning of period | $ 20 | $ (1) |
| Total gains and losses (realized/unrealized) included in earnings | (20) | 1 |
| Purchases | 1 | 20 |
| Balance as of end of period | $ 1 | $ 20 |

(a)   Consists of derivatives assets and liabilities, net.

There were no gains or losses for the years ended December 31, 2015 and 2014 included in earnings attributable to the change in unrealized derivatives relating to assets still held at the end of the period.

*GenOn Mid-Atlantic*

The following tables present assets and liabilities (including amounts with affiliates) measured and recorded at fair value on GenOn Mid-Atlantic's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

| | As of December 31, 2015 | | | |
| --- | --- | --- | --- | --- |
| | Fair Value | | | |
| | Level 1 [a] | Level 2 [a] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 175 | $ 175 | $ 2 | $ 352 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 58 | $ 137 | $ — | $ 195 |

(a)   There were no transfers during the year ended December 31, 2015, between Levels 1 and 2.

| | As of December 31, 2014 | | | |
| --- | --- | --- | --- | --- |
| | Fair Value | | | |
| | Level 1 [a] | Level 2 [a] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 145 | $ 211 | $ 26 | $ 382 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 71 | $ 73 | $ 6 | $ 150 |

(a)   There were no transfers during the year ended December 31, 2014, between Levels 1 and 2.

The following tables reconcile the beginning and ending balances for GenOn Mid-Atlantic's derivatives that are recognized at fair value in the consolidated financial statements at least annually using significant unobservable inputs for the years ended December 31, 2015, and 2014:

| | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) | |
| | Derivatives [a] | |
| | (In millions) | |
| Balance as of beginning of period | $ 20 | $ — |
| Total gains and losses (realized/unrealized) included in earnings | (20) | — |
| Purchases | 2 | 20 |
| Balance as of end of period | $ 2 | $ 20 |

(a)   Consists of derivatives assets and liabilities, net.

There were no gains or losses for the years ended December 31, 2015 and 2014 included in earnings attributable to the change in unrealized derivatives relating to assets still held at the end of the period.

Realized and unrealized gains and losses included in earnings that are related to energy derivatives are recorded in operating revenues and cost of operations.

*Derivative Fair Value Measurements*

A portion of the Registrants' contracts are exchange-traded contracts with readily available quoted market prices. A majority of the Registrants' contracts are non-exchange-traded contracts valued using prices provided by external sources, primarily price quotations available through brokers or over-the-counter and on-line exchanges. For the majority of the Registrants' markets, quotes are from multiple sources. To the extent that the Registrants receive multiple quotes, prices reflect the average of the bid-ask mid-point prices obtained from all sources that the Registrants believe provide the most liquid market for the commodity. If the Registrants receive one quote, then the mid-point of the bid-ask spread for that quote is used. The terms for which such price information is available vary by commodity, region and product. A significant portion of the fair value of the Registrants' derivative portfolio is based on price quotes from brokers in active markets who regularly facilitate those transactions and the Registrants believe such price quotes are executable. The Registrants do not use third party sources that derive price based on proprietary models or market surveys. The remainder of the assets and liabilities represents contracts for which external sources or observable market quotes are not available. These contracts are valued based on various valuation techniques including but not limited to internal models based on a fundamental analysis of the market and extrapolation of observable market data with similar characteristics. Contracts valued with prices provided by models and other valuation techniques make up 0% of GenOn's derivative assets and 2% of GenOn's derivative liabilities, 1% of GenOn Americas Generation's derivative assets and 2% of GenOn Americas Generation's derivative liabilities and 1% of GenOn Mid-Atlantic's derivative assets and 0% of GenOn Mid-Atlantic's derivative liabilities.

The Registrants' significant positions classified as Level 3 include physical and financial power and physical coal executed in illiquid markets as well as financial transmission rights, or FTRs. The significant unobservable inputs used in developing fair value include illiquid power and coal location pricing, which is derived as a basis to liquid locations. The basis spread is based on observable market data when available or derived from historic prices and forward market prices from similar observable markets when not available. For FTRs, the Registrants use the most recent auction prices to derive the fair value.

The following tables quantify the significant unobservable inputs used in developing the fair value of the Registrants' Level 3 positions as of December 31, 2015, and December 31, 2014:

*GenOn*

| Significant Unobservable Inputs | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | December 31, 2015 | | | | |
| | Fair Value | | | | Input/Range | | |
| | Assets | Liabilities | Valuation Technique | Significant Unobservable Input | Low | High | Weighted Average |
| | | | | (In millions) | | | |
| Power Contracts | $        1 | $        — | Discounted Cash Flow | Forward Market Price (per MWh) | $        22 | $        67 | $        42 |
| Coal Contracts | — | 12 | Discounted Cash Flow | Forward Market Price (per ton) | 28 | 45 | 35 |
| FTRs | 1 | 2 | Discounted Cash Flow | Auction Prices (per MWh) | — | 3 | 1 |
| | $        2 | $        14 | | | | | |

| Significant Unobservable Inputs | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | December 31, 2014 | | | | |
| | Fair Value | | | | Input/Range | | |
| | Assets | Liabilities | Valuation Technique | Significant Unobservable Input | Low | High | Weighted Average |
| | | | | (In millions) | | | |
| Power Contracts | $        39 | $        5 | Discounted Cash Flow | Forward Market Price (per MWh) | $        18 | $        68 | $        46 |
| Coal Contracts | 3 | 1 | Discounted Cash Flow | Forward Market Price (per ton) | 53 | 56 | 54 |
| FTRs | 4 | 7 | Discounted Cash Flow | Auction Prices (per MWh) | (10) | 3 | (1) |
| | $        46 | $        13 | | | | | |

*GenOn Americas Generation*

| Significant Unobservable Inputs | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | December 31, 2015 | | | | |
| | Fair Value | | | | Input/Range | | |
| | Assets | Liabilities | Valuation Technique | Significant Unobservable Input | Low | High | Weighted Average |
| | | | | (In millions) | | | |
| Power Contracts | $        1 | $        — | Discounted Cash Flow | Forward Market Price (per MWh) | $        22 | $        67 | $        42 |
| Coal Contracts | 12 | 12 | Discounted Cash Flow | Forward Market Price (per ton) | 28 | 45 | 35 |
| FTRs | 2 | 2 | Discounted Cash Flow | Auction Prices (per MWh) | — | 3 | 1 |
| | $        15 | $        14 | | | | | |

| | Significant Unobservable Inputs | | | | | | |
|---|---|---|---|---|---|---|---|
| | December 31, 2014 | | | | | | |
| | Fair Value | | Valuation Technique | Significant Unobservable Input | Input/Range | | |
| | Assets | Liabilities | | | Low | High | Weighted Average |
| | | | | (In millions) | | | |
| Power Contracts | $ 39 | $ 18 | Discounted Cash Flow | Forward Market Price (per MWh) | $ 18 | $ 68 | $ 46 |
| Coal Contracts | 3 | 3 | Discounted Cash Flow | Forward Market Price (per ton) | 53 | 56 | 54 |
| FTRs | 10 | 11 | Discounted Cash Flow | Auction Prices (per MWh) | (1) | 1 | — |
| | $ 52 | $ 32 | | | | | |

*GenOn Mid-Atlantic*

| | Significant Unobservable Inputs | | | | | | |
|---|---|---|---|---|---|---|---|
| | December 31, 2015 | | | | | | |
| | Fair Value | | Valuation Technique | Significant Unobservable Input | Input/Range | | |
| | Assets | Liabilities | | | Low | High | Weighted Average |
| | | | | (In millions) | | | |
| Power Contracts | $ 2 | $ — | Discounted Cash Flow | Forward Market Price (per MWh) | $ 22 | $ 67 | $ 42 |
| | $ 2 | $ — | | | | | |

| | Significant Unobservable Inputs | | | | | | |
|---|---|---|---|---|---|---|---|
| | December 31, 2014 | | | | | | |
| | Fair Value | | Valuation Technique | Significant Unobservable Input | Input/Range | | |
| | Assets | Liabilities | | | Low | High | Weighted Average |
| | | | | (In millions) | | | |
| Power Contracts | $ 26 | $ 5 | Discounted Cash Flow | Forward Market Price (per MWh) | $ 24 | $ 68 | $ 47 |
| FTRs | — | 1 | Discounted Cash Flow | Auction Prices (per MWh) | (1) | 1 | — |
| | $ 26 | $ 6 | | | | | |

The following table provides sensitivity of fair value measurements to increases/(decreases) in significant unobservable inputs as of December 31, 2015, and December 31, 2014:

| Significant Unobservable Input | Position | Change In Input | Impact on Fair Value Measurement |
|---|---|---|---|
| Forward Market Price Power/Coal | Buy | Increase/(Decrease) | Higher/(Lower) |
| Forward Market Price Power/Coal | Sell | Increase/(Decrease) | Lower/(Higher) |
| FTR Prices | Buy | Increase/(Decrease) | Higher/(Lower) |
| FTR Prices | Sell | Increase/(Decrease) | Lower/(Higher) |

The fair value of each contract is discounted using a risk free interest rate. In addition, the Registrants apply a non-performance/credit reserve to reflect credit risk which is calculated based on published default probabilities. To the extent that the Registrants' net exposure under a specific master agreement is an asset, the Registrants use the counterparty's default swap rate. If the exposure under a specific master agreement is a liability, the Registrants use their default swap rate. The credit reserve is added to the discounted fair value to reflect the exit price that a market participant would be willing to receive to assume the Registrants' liabilities or that a market participant would be willing to pay for the Registrants' assets. The Registrants' (non-performance)/credit reserves were as follows:

| | As of December 31, | | |
|---|---|---|---|
| | 2015 | | 2014 |
| | (In millions) | | |
| GenOn | $ | (1) $ | — |
| GenOn Americas Generation | | — | — |
| GenOn Mid-Atlantic | | 4 | 2 |

The fair values in each category reflect the level of forward prices and volatility factors as of December 31, 2015, and may change as a result of changes in these factors. Management uses its best estimates to determine the fair value of commodity and derivative contracts the Registrants hold and sell. These estimates consider various factors including closing exchange and over-the-counter price quotations, time value, volatility factors and credit exposure. It is possible however, that future market prices could vary from those used in recording assets and liabilities from energy marketing and trading activities and such variations could be material.

Under the guidance of ASC 815, entities may choose to offset cash collateral paid or received against the fair value of derivative positions executed with the same counterparties under the same master netting agreements. The Registrants have chosen not to offset positions as defined in ASC 815. As of December 31, 2015, GenOn recorded $48 million of cash collateral paid, which includes $36 million of collateral paid to NRG, and $51 million of cash collateral received on its balance sheet. As of December 31, 2015, GenOn Americas Generation recorded $39 million of cash collateral paid, which includes $36 million of collateral paid to NRG, and $51 million of cash collateral received on its balance sheet. As of December 31, 2015, GenOn Mid-Atlantic had no outstanding cash collateral paid or received on its balance sheet.

### Concentration of Credit Risk

In addition to the credit risk discussion as disclosed in Note 2, *Summary of Significant Accounting Policies*, the following item is a discussion of the concentration of credit risk for the Registrants' financial instruments. Credit risk relates to the risk of loss resulting from non-performance or non-payment by counterparties pursuant to the terms of their contractual obligations. The Registrants monitor and manage credit risk through credit policies that include: (i) an established credit approval process; (ii) a daily monitoring of counterparties' credit limits; (iii) the use of credit mitigation measures such as margin, collateral, prepayment arrangements, or volumetric limits; (iv) the use of payment netting agreements; and (v) the use of master netting agreements that allow for the netting of positive and negative exposures of various contracts associated with a single counterparty. Risks surrounding counterparty performance and credit could ultimately impact the amount and timing of expected cash flows. The Registrants seek to mitigate counterparty risk by having a diversified portfolio of counterparties. The Registrants also have credit protection within various agreements to call on additional collateral support if and when necessary. Cash margin is collected and held at the Registrants to cover the credit risk of the counterparty until positions settle.

As of December 31, 2015, counterparty credit exposure to a significant portion of GenOn's counterparties was $351 million and GenOn held $33 million of collateral against those positions, resulting in a net exposure of $321 million. Approximately 97% of GenOn's exposure before collateral is expected to roll off by the end of 2017. GenOn Americas Generation's counterparty credit exposure to a significant portion of counterparties was $347 million and GenOn Americas Generation held $33 million of collateral against those positions, resulting in a net exposure of $316 million. Approximately 97% of GenOn Americas Generation's exposure before collateral is expected to roll off by the end of 2017. GenOn Mid-Atlantic's counterparty credit exposure to a significant portion of counterparties was $12 million and GenOn Mid-Atlantic held no collateral (cash or letters of credit) against those positions, resulting in a net exposure of $12 million. 100% of GenOn Mid-Atlantic's exposure before collateral is expected to roll off by the end of 2016.

The following tables highlight the counterparty credit quality and the net counterparty credit exposure by industry sector. Net counterparty credit exposure is defined as the aggregate net asset position for the Registrants with counterparties where netting is permitted under the enabling agreement and includes all cash flow, mark-to-market and NPNS, and non-derivative transactions. As of December 31, 2015, the exposure is shown net of collateral held and includes amounts net of receivables or payables.

| Category | Net Exposure [a] (% of Total) | | |
| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
| --- | --- | --- | --- |
| Financial institutions | 68% | 69% | —% |
| Utilities, energy merchants, marketers and other | 18% | 17% | —% |
| ISOs | 14% | 14% | 100% |
| Total | 100% | 100% | 100% |

| Category | Net Exposure [a] (% of Total) | | |
| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
| --- | --- | --- | --- |
| Investment grade | 99% | 99% | 100% |
| Non-Investment grade | 1% | 1% | —% |
| Total | 100% | 100% | 100% |

(a) Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

The Registrants have counterparty credit risk exposure to certain counterparties representing more than 10% of total net exposure discussed above. The aggregate of such counterparties was $257 million, $257 million, and $12 million for GenOn, GenOn Americas Generation and GenOn Mid-Atlantic, respectively. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, the Registrants do not anticipate a material impact on their financial position or results of operations from nonperformance by any of their counterparties.

### Note 5 — Accounting for Derivative Instruments and Hedging Activities (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)

ASC 815 requires the Registrants to recognize all derivative instruments on the balance sheet as either assets or liabilities and to measure them at fair value each reporting period unless they qualify for a NPNS exception.

Certain derivative instruments may qualify for the NPNS exception and are therefore exempt from fair value accounting treatment. ASC 815 applies to the Registrants' energy related commodity contracts.

#### Energy-Related Commodities

To manage the commodity price risk associated with the Registrants' competitive supply activities and the price risk associated with wholesale power sales from the Registrants' electric generation facilities, the Registrants enter into a variety of derivative and non-derivative hedging instruments, utilizing the following:

- Forward contracts, which commit the Registrants to purchase or sell energy commodities or purchase fuels in the future.
- Futures contracts, which are exchange-traded standardized commitments to purchase or sell a commodity or financial instrument.
- Swap agreements, which require payments to or from counterparties based upon the differential between two prices for a predetermined contractual, or notional, quantity.
- Financial and non-financial option contracts, which convey to the option holder the right but not the obligation to purchase or sell a commodity.

The objectives for entering into derivative contracts used for economic hedging include:

- Fixing the price for a portion of anticipated future electricity sales that provides an acceptable return on the Registrants' electric generation operations.
- Fixing the price of a portion of anticipated fuel purchases for the operation of the Registrants' power plants.

GenOn, GenOn Americas Generation and GenOn Mid-Atlantic's trading and hedging activities are subject to limits within the risk management policy. These contracts are recognized on the balance sheet at fair value and changes in the fair value of these derivative financial instruments are recognized in earnings.

*GenOn*

As of December 31, 2015, GenOn's derivative assets and liabilities consisted primarily of the following:

- Forward and financial contracts for the purchase/sale of electricity and related products economically hedging GenOn's generation assets' forecasted output through 2019.
- Forward and financial contracts for the purchase of fuel commodities relating to the forecasted usage of GenOn's generation assets through 2018.

Also, as of December 31, 2015, GenOn had other energy-related contracts that did not meet the definition of a derivative instrument as follows:

- Power transmission contracts through 2019;
- Natural gas transportation contracts and storage agreements through 2027; and
- Coal transportation contracts through 2018.

*GenOn Americas Generation*

As of December 31, 2015, GenOn Americas Generation's derivative assets and liabilities consisted primarily of the following:

- Forward and financial contracts for the purchase/sale of electricity and related products economically hedging GenOn Americas Generation's generation assets' forecasted output through 2019.
- Forward and financial contracts for the purchase of fuel commodities relating to the forecasted usage of GenOn Americas Generation's generation assets through 2018.

Also, as of December 31, 2015, GenOn Americas Generation had other energy-related contracts that did not meet the definition of a derivative instrument as follows:

- Power transmission contracts through 2019;
- Natural gas transportation contracts and storage agreements through 2023; and
- Coal transportation contracts through 2018.

*GenOn Mid-Atlantic*

As of December 31, 2015, GenOn Mid-Atlantic's derivative assets and liabilities consisted primarily of the following:

- Forward and financial contracts for the purchase/sale of electricity and related products economically hedging GenOn Mid-Atlantic's generation assets' forecasted output through 2018.
- Forward and financial contracts for the purchase of fuel commodities relating to the forecasted usage of GenOn Mid-Atlantic's generation assets through 2016.

Also, as of December 31, 2015, GenOn Mid-Atlantic had other energy-related contracts that did not meet the definition of a derivative instrument as follows:

- Natural gas transportation contracts and storage agreements through 2023; and
- Coal transportation contracts through 2018.

*Volumetric Underlying Derivative Transactions*

The following table summarizes the net notional volume buy/(sell) of the Registrants' open derivative transactions broken out by commodity, excluding those derivatives that qualified for the NPNS exception as of December 31, 2015, and December 31, 2014. Option contracts are reflected using delta volume. Delta volume equals the notional volume of an option adjusted for the probability that the option will be in-the-money at its expiration date.

| | | GenOn | | GenOn Americas Generation | | GenOn Mid-Atlantic | |
| | | Total Volume | | Total Volume | | Total Volume | |
| | | As of December 31, | | As of December 31, | | As of December 31, | |
| Commodity | Units | 2015 | 2014 | 2015 | 2014 | 2015 | 2014 |
| | | (In millions) | (In millions) | (In millions) | (In millions) | (In millions) | (In millions) |
| Coal | Short Ton | 7 | 8 | 3 | 5 | 3 | 5 |
| Natural Gas | MMBtu | 191 | (21) | 2 | (74) | (10) | (79) |
| Power | MWh | (49) | (36) | (20) | (16) | (18) | (15) |

The change in the natural gas position was the result of buying natural gas to convert fixed price natural gas hedges into fixed price power hedges, as well as the settlement of positions during the period.

*Fair Value of Derivative Instruments*

The following tables summarize the fair value within the derivative instrument valuation on the balance sheet:

*GenOn*

| | Fair Value | | | |
| | Derivative Assets | | Derivative Liabilities | |
| | December 31, 2015 | December 31, 2014 | December 31, 2015 | December 31, 2014 |
| | (In millions) | | (In millions) | |
| **Derivatives Not Designated as Cash Flow Hedges:** | | | | |
| Commodity contracts current | $ 574 | $ 602 | $ 475 | $ 417 |
| Commodity contracts long-term | 155 | 205 | 116 | 72 |
| **Total Derivatives Not Designated as Cash Flow Hedges** | $ 729 | $ 807 | $ 591 | $ 489 |

*GenOn Americas Generation*

| | Fair Value | | | |
| | Derivative Assets | | Derivative Liabilities | |
| | December 31, 2015 | December 31, 2014 | December 31, 2015 | December 31, 2014 |
| | (In millions) | | (In millions) | |
| **Derivatives Not Designated as Cash Flow Hedges:** | | | | |
| Commodity contracts current | $ 861 | $ 852 | $ 737 | $ 674 |
| Commodity contracts long-term | 235 | 256 | 182 | 135 |
| **Total Derivatives Not Designated as Cash Flow Hedges** | $ 1,096 | $ 1,108 | $ 919 | $ 809 |

87

*GenOn Mid-Atlantic*

| | Fair Value | | | |
| | Derivative Assets | | Derivative Liabilities | |
| | December 31, 2015 | December 31, 2014 | December 31, 2015 | December 31, 2014 |
| | (In millions) | | (In millions) | |
|---|---|---|---|---|
| **Derivatives Not Designated as Cash Flow Hedges**: | | | | |
| Commodity contracts current | $ 269 | $ 241 | $ 163 | $ 128 |
| Commodity contracts long-term | 83 | 141 | 32 | 22 |
| **Total Derivatives Not Designated as Cash Flow Hedges** | $ 352 | $ 382 | $ 195 | $ 150 |

    The Registrants have elected to present derivative assets and liabilities on the balance sheet on a trade-by-trade basis and do not offset amounts at the counterparty master agreement level. In addition, collateral received or paid on the Registrants' derivative assets or liabilities are recorded on a separate line item on the balance sheet. The following tables summarize the offsetting of derivatives by counterparty master agreement level and collateral received or paid:

*GenOn*

| | | Gross Amounts Not Offset in the Statement of Financial Position | | |
| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
| **December 31, 2015** | | | | |
| **Commodity Contracts:** | (in millions) | | | |
|---|---|---|---|---|
| Derivative assets | $ 698 | $ (485) | $ (51) | $ 162 |
| Derivative assets- affiliate | 31 | (24) | — | 7 |
| Derivative liabilities | (567) | 485 | — | (82) |
| Derivative liabilities- affiliate | (24) | 24 | — | — |
| **Total derivative instruments** | $ 138 | $ — | $ (51) | $ 87 |

| | | Gross Amounts Not Offset in the Statement of Financial Position | | |
| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
| **December 31, 2014** | | | | |
| **Commodity Contracts:** | (in millions) | | | |
|---|---|---|---|---|
| Derivative assets | $ 786 | $ (425) | $ (54) | $ 307 |
| Derivative assets- affiliate | 21 | (21) | — | — |
| Derivative liabilities | (451) | 425 | — | (26) |
| Derivative liabilities- affiliate | (38) | 21 | 17 | — |
| **Total derivative instruments** | $ 318 | $ — | $ (37) | $ 281 |

*GenOn Americas Generation*

| | | Gross Amounts Not Offset in the Statement of Financial Position | | |
| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
| **December 31, 2015** | | | | |
| **Commodity Contracts:** | (in millions) | | | |
|---|---|---|---|---|
| Derivative assets | $ 699 | $ (485) | $ (51) | $ 163 |
| Derivative assets- affiliate | 397 | (352) | — | 45 |
| Derivative liabilities | (567) | 485 | — | (82) |
| Derivative liabilities- affiliate | (352) | 352 | — | — |
| **Total derivative instruments** | $ 177 | $ — | $ (51) | $ 126 |

|  | | Gross Amounts Not Offset in the Statement of Financial Position | | |
| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
|---|---|---|---|---|
| **December 31, 2014** | | | | |
| **Commodity Contracts:** | | (in millions) | | |
| Derivative assets | $ 787 | $ (425) | $ (54) | $ 308 |
| Derivative assets- affiliate | 321 | (321) | — | — |
| Derivative liabilities | (451) | 425 | — | (26) |
| Derivative liabilities- affiliate | (358) | 321 | 17 | (20) |
| **Total derivative instruments** | $ 299 | $ — | $ (37) | $ 262 |

*GenOn Mid-Atlantic*

|  | | Gross Amounts Not Offset in the Statement of Financial Position | | |
| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
|---|---|---|---|---|
| **December 31, 2015** | | | | |
| **Commodity Contracts:** | | (in millions) | | |
| Derivative assets- affiliate | 352 | (195) | — | 157 |
| Derivative liabilities- affiliate | (195) | 195 | — | — |
| **Total derivative instruments** | $ 157 | $ — | $ — | $ 157 |

|  | | Gross Amounts Not Offset in the Statement of Financial Position | | |
| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
|---|---|---|---|---|
| **December 31, 2014** | | | | |
| **Commodity Contracts:** | | (in millions) | | |
| Derivative assets | $ 100 | $ — | $ — | $ 100 |
| Derivative assets- affiliate | 282 | (149) | — | 133 |
| Derivative liabilities | (1) | — | — | (1) |
| Derivative liabilities- affiliate | (149) | 149 | — | — |
| **Total derivative instruments** | $ 232 | $ — | $ — | $ 232 |

### Accumulated Other Comprehensive Loss (GenOn)

The following table summarizes the effects on GenOn's accumulated OCI balance attributable to cash flow hedge derivatives, net of tax of zero dollars:

|  | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| Accumulated OCI balance, beginning of period | $ — | $ — | $ 1 |
| Recognized in OCI on interest rate derivatives | — | — | 19 |
| Reclassified from accumulated OCI into earnings[a][b] | — | — | (2) |
| Reversal as part of sale to NRG Yield LLC[c] | — | — | (18) |
| Accumulated OCI balance, end of period | $ — | $ — | $ — |

(a)   Amounts reclassified from accumulated OCI into income and amounts recognized in income from the ineffective portion of cash flow hedges are recorded in interest expense.

(b)   All of the forecasted transactions (future interest payments) were deemed probable of occurring; therefore, no cash flow hedges were discontinued and no amount was recognized in GenOn's results of operations as a result of discontinued cash flow hedges.

(c)   The reversal of accumulated OCI as part of the sale of NRG Marsh Landing to NRG Yield LLC resulted in the recognition of additional paid in capital.

*Impact of Derivative Instruments on the Statement of Operations*

Unrealized gains and losses associated with changes in the fair value of derivative instruments are reflected in current period earnings.

The following tables summarize the pre-tax effects of economic hedges and trading activity on the Registrants' statements of operations. These amounts are included within operating revenues and cost of operations.

*GenOn*

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| **Unrealized mark-to-market results** | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (198) | $ (314) | $ (367) |
| Net unrealized gains on open positions related to economic hedges | 18 | 167 | 40 |
| Total unrealized mark-to-market losses for economic hedging activities | (180) | (147) | (327) |
| Reversal of previously recognized unrealized gains on settled positions related to trading activity | — | (1) | (1) |
| Net unrealized gains on open positions related to trading activity | — | — | 1 |
| Total unrealized mark-to-market losses for trading activity | — | (1) | — |
| **Total unrealized losses** | $ (180) | $ (148) | $ (327) |

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| Revenue from operations — energy commodities | $ (112) | $ (151) | $ (356) |
| Cost of operations | (68) | 3 | 29 |
| **Total impact to statement of operations** | $ (180) | $ (148) | $ (327) |

*GenOn Americas Generation*

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| **Unrealized mark-to-market results** | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (193) | $ (288) | $ (296) |
| Net unrealized gains on open positions related to economic hedges | 70 | 164 | 25 |
| Total unrealized mark-to-market losses for economic hedging activities | (123) | (124) | (271) |
| Reversal of previously recognized unrealized gains on settled positions related to trading activity | — | (1) | (1) |
| Net unrealized gains on open positions related to trading activity | — | — | 1 |
| Total unrealized mark-to-market losses for trading activity | — | (1) | — |
| **Total unrealized losses** | $ (123) | $ (125) | $ (271) |

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| Revenue from operations — energy commodities | $ (66) | $ (119) | $ (302) |
| Cost of operations | (57) | (6) | 31 |
| **Total impact to statement of operations** | $ (123) | $ (125) | $ (271) |

*GenOn Mid-Atlantic*

| | Year Ended December 31, 2015 | | Year Ended December 31, 2014 | | Year Ended December 31, 2013 | |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| **Unrealized mark-to-market results** | | | | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ | (116) | $ | (288) | $ | (296) |
| Net unrealized gains on open positions related to economic hedges | | 39 | | 90 | | 35 |
| **Total unrealized losses** | $ | (77) | $ | (198) | $ | (261) |

| | Year Ended December 31, 2015 | | Year Ended December 31, 2014 | | Year Ended December 31, 2013 | |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| Revenue from operations — energy commodities | $ | (27) | $ | (192) | $ | (292) |
| Cost of operations | | (50) | | (6) | | 31 |
| **Total impact to statement of operations** | $ | (77) | $ | (198) | $ | (261) |

### Credit Risk Related Contingent Features (GenOn and GenOn Americas Generation)

Certain of GenOn and GenOn Americas Generation's hedging agreements contain provisions that require the Registrants to post additional collateral if the counterparty determines that there has been deterioration in credit quality, generally termed "adequate assurance" under the agreements, or require the Registrants to post additional collateral if there were a one notch downgrade in the Registrants' credit rating. The collateral required for contracts that have adequate assurance clauses that are in net liability positions as of December 31, 2015, was $66 million for GenOn and GenOn Americas Generation. As of December 31, 2015, no collateral was required for contracts with credit rating contingent features that are in a net liability position for GenOn and GenOn Americas Generation. GenOn and GenOn Americas Generation are also party to certain marginable agreements under which no collateral was due as of December 31, 2015. At December 31, 2015, GenOn Mid-Atlantic did not have any financial instruments with credit-risk-related contingent features.

See Note 4, *Fair Value of Financial Instruments,* for discussion regarding concentration of credit risk.

### Note 6 — Inventory (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)

Inventory consisted of:

*GenOn*

| | As of December 31, | | | |
|---|---|---|---|---|
| | 2015 | | 2014 | |
| | (In millions) | | | |
| Fuel oil | $ | 161 | $ | 211 |
| Coal | | 154 | | 162 |
| Spare parts | | 127 | | 129 |
| Other | | 6 | | 5 |
| Total Inventory | $ | 448 | $ | 507 |

During the year ended December 31, 2015, GenOn recorded a lower of weighted average cost or market adjustment related to fuel oil of $19 million. Additionally, GenOn wrote down certain equipment to its fair value resulting in an impairment of $8 million during the year ended December 31, 2015.

*GenOn Americas Generation*

|  | As of December 31, | | | |
|---|---|---|---|---|
|  | **2015** | | **2014** | |
|  | (In millions) | | | |
| Fuel oil | $ | 134 | $ | 181 |
| Coal | | 97 | | 82 |
| Spare parts | | 57 | | 54 |
| Other | | 1 | | 1 |
| Total Inventory | $ | 289 | $ | 318 |

During the year ended December 31, 2015, GenOn Americas Generation recorded a lower of weighted average cost or market adjustment related to fuel oil of $17 million.

*GenOn Mid-Atlantic*

|  | As of December 31, | | | |
|---|---|---|---|---|
|  | **2015** | | **2014** | |
|  | (In millions) | | | |
| Fuel oil | $ | 33 | $ | 45 |
| Coal | | 97 | | 82 |
| Spare parts | | 41 | | 38 |
| Other | | 1 | | 1 |
| Total Inventory | $ | 172 | $ | 166 |

During the year ended December 31, 2015, GenOn Mid-Atlantic recorded a lower of weighted average cost or market adjustment related to fuel oil of $6 million.

**Note 7 — Property, Plant and Equipment (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Major classes of property, plant, and equipment were as follows:

*GenOn*

|  | As of December 31, | | | | Depreciable Lives |
|---|---|---|---|---|---|
|  | **2015** | | **2014** | | |
|  | (In millions) | | | | |
| Facilities and equipment | $ | 2,989 | $ | 3,048 | 2 - 34 Years |
| Land and improvements | | 292 | | 293 | |
| Construction in progress | | 164 | | 140 | |
| Total property, plant and equipment | | 3,445 | | 3,481 | |
| Accumulated depreciation | | (614) | | (436) | |
| Net property, plant and equipment | $ | 2,831 | $ | 3,045 | |

*GenOn Americas Generation*

|  | As of December 31, | | | | Depreciable Lives |
|---|---|---|---|---|---|
|  | **2015** | | **2014** | | |
|  | (In millions) | | | | |
| Facilities and equipment | $ | 1,192 | $ | 1,123 | 2 - 34 Years |
| Land and improvements | | 139 | | 127 | |
| Construction in progress | | 29 | | 30 | |
| Total property, plant and equipment | | 1,360 | | 1,280 | |
| Accumulated depreciation | | (244) | | (170) | |
| Net property, plant and equipment | $ | 1,116 | $ | 1,110 | |

92

*GenOn Mid-Atlantic*

| | As of December 31, | | | Depreciable Lives |
|---|---|---|---|---|
| | 2015 | | 2014 | |
| | (In millions) | | | |
| Facilities and equipment | $ 1,037 | $ | 1,014 | 2 - 34 Years |
| Land and improvements | 62 | | 61 | |
| Construction in progress | 26 | | 18 | |
| Total property, plant and equipment | 1,125 | | 1,093 | |
| Accumulated depreciation | (200) | | (135) | |
| Net property, plant and equipment | $ 925 | $ | 958 | |

The Registrants recorded long-lived asset impairments during 2015, as further described in Note 9, *Impairments*.

### Note 8 — Retirements or Mothballing of Generating Facilities (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)

*Facilities Announced for Deactivation Due to Returns on Investment (GenOn)*

The Registrants are subject to extensive environmental regulation by federal, state and local authorities under a variety of statutes, regulations and permits that address discharges into the air, water and soil, and the proper handling of solid, hazardous and toxic materials and waste. Complying with increasingly stringent environmental requirements involves significant capital and operating expenses. To the extent forecasted returns on investments necessary to comply with environmental regulations are insufficient for a particular facility, the Registrants plan to deactivate that facility. In determining the forecasted returns on investments, the Registrants factor in forecasted energy and capacity prices, expected capital expenditures, operating costs, property taxes and other factors. GenOn deactivated the following coal and natural gas units at the referenced times:

| Facility or Unit | Fuel-type | Net Generation Capacity (MW) | Deactivation Date |
|---|---|---|---|
| Shawville Units 1, 2, 3 and 4 [a] | Coal | 597 | May 2015 |
| Gilbert CT Units 1, 2, 3 and 4 | Natural Gas | 98 | May 2015 |
| Glen Gardner Facility | Natural Gas | 160 | May 2015 |
| Werner Facility | Oil | 212 | May 2015 |
| Osceola Facility | Natural Gas | 463 | January 2015 |
| Coolwater Facility | Natural Gas | 636 | January 2015 |
| Portland Units 1 and 2 | Coal | 401 | June 2014 |
| Titus Coal Units | Coal | 245 | September 2013 |

(a) GenOn expects to return these units to service no later than the fall of 2016 using natural gas.

GenOn plans on deactivating the following coal units at the referenced times:

| Facility or Unit | Fuel-type | Net Generation Capacity (MW) | Expected Deactivation Date |
|---|---|---|---|
| Avon Lake Unit 7 | Coal | 94 | April 2016 |

**Note 9 — Impairments (GenOn and GenOn Americas Generation)**

*Long-Lived Assets Impairments (GenOn and GenOn Americas Generation)*

*2015 Impairments*

*Seward (GenOn)* — As described in Note 3, *Dispositions,* on November 24, 2015, GenOn entered into an agreement with Robindale Energy Services, Inc. to sell 100% of its interest in Seward for cash consideration of $75 million. The transaction triggered an impairment indicator as the sale price was less than the carrying amount of the assets, and, as a result, the assets were considered to be impaired. GenOn measured the impairment loss as the difference between the carrying amount of the assets and the agreed-upon sale price. GenOn recorded an impairment loss of $134 million in the consolidated results of operations of GenOn for the year ended December 31, 2015 to reduce the carrying amount of the assets held for sale to the fair market value.

*Portland (GenOn)* — During the fourth quarter of 2015, the oil conversion project at the Portland facility was suspended indefinitely. In connection with the project suspension, GenOn wrote off the balance of fixed assets associated with the project and recorded expected losses on related contracts totaling $20 million.

*Spare Parts (GenOn)* — During the fourth quarter of 2015, GenOn wrote down certain equipment to its fair value resulting in an impairment of $8 million during the year ended December 31, 2015.

*Pittsburg (GenOn and GenOn Americas Generation)* — GenOn owns oil tanks and associated land located near its Pittsburg facility that were subject to a purchase option. The option was terminated during the fourth quarter of 2015 and, accordingly, the oil tanks were considered to be impaired. GenOn recorded an impairment of $8 million to reduce the carrying amount of the oil tanks to reflect the fair market value.

*2014 Impairments*

*Coolwater (GenOn)* — During the fourth quarter of 2014, GenOn determined that it would pursue retiring the 636 MW natural-gas fired Coolwater facility, in Dagget, California. The facility faced critical repairs on the cooling towers for Units 3 and 4 and, during the fourth quarter of 2014, did not receive any awards in a near-term capacity auction and no interest in a bilateral capacity deal. GenOn considered this to be an indicator of impairment and performed an impairment test for these assets under ASC 360. The carrying amount of the assets was higher than the future net cash flows expected to be generated by the assets and as a result, the assets were considered to be impaired. GenOn measured the impairment loss as the difference between the carrying amount and the fair value of the assets. GenOn retired the Coolwater facility effective January 1, 2015. All remaining fixed assets of the station were written off resulting in an impairment loss of $22 million recognized during the year ended December 31, 2014.

*Osceola (GenOn)* — During the third quarter of 2014, GenOn determined that it would mothball the 463 MW natural gas-fired Osceola facility, in Saint Cloud, Florida. GenOn considered this to be an indicator of impairment and performed an impairment test for these assets under ASC 360. The carrying amount of the assets was higher than the future net cash flows expected to be generated by the assets and as a result, the assets were considered to be impaired. GenOn measured the impairment loss as the difference between the carrying amount and the fair value of the assets. Due to the location of the facility, it was determined that the best indicator of fair value is the market value of the combustion turbines. GenOn recorded an impairment loss of approximately $60 million during the year ended December 31, 2014, which represents the excess of the carrying value over the fair market value.

**Note 10 —Debt and Capital Leases (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Long-term debt and capital leases consisted of the following:

| | As of December 31, | | Interest Rate % |
|---|---|---|---|
| | **2015** | **2014** | |
| | (In millions, except rates) | | |
| **GenOn Mid-Atlantic:** | | | |
| Chalk Point capital lease, due 2015 | $          — | $          5 | 8.190 |
| Subtotal GenOn Mid-Atlantic | — | 5 | |
| **GenOn Americas Generation:** | | | |
| Senior unsecured notes, due 2021 | 398 | 496 | 8.500 |
| Senior unsecured notes, due 2031 | 354 | 433 | 9.125 |
| Subtotal GenOn Americas Generation [(a)] | 752 | 929 | |
| **GenOn Energy:** | | | |
| Senior unsecured notes, due 2017 | 714 | 766 | 7.875 |
| Senior unsecured notes, due 2018 | 708 | 757 | 9.500 |
| Senior unsecured notes, due 2020 | 534 | 610 | 9.875 |
| Other [(b)] | 56 | 60 | |
| GenOn capital lease | 2 | 3 | |
| Subtotal GenOn Energy | 2,014 | 2,196 | |
| Subtotal | 2,766 | 3,130 | |
| Less current maturities | 4 | 10 | |
| Total long-term debt and capital leases | $     2,762 | $     3,120 | |

(a)  This amount excludes GenOn Mid-Atlantic.

(b)   The Long Term Service Agreement for the Hunterstown facility is accounted for as a debt financing liability in accordance with U.S. GAAP.

Long-term debt includes the following premiums:

| | As of December 31, | |
|---|---|---|
| | **2015** | **2014** |
| | (In millions) | |
| **GenOn Americas Generation:** | | |
| Senior unsecured notes, due 2021 | $          32 | $          46 |
| Senior unsecured notes, due 2031 | 25 | 33 |
| **GenOn Energy:** | | |
| Senior unsecured notes, due 2017 | 23 | 41 |
| Senior unsecured notes, due 2018 | 59 | 83 |
| Senior unsecured notes, due 2020 | 44 | 60 |
| Total premium | $          183 | $          263 |

*GenOn Energy (GenOn)*

Under the senior notes and the related indentures, the senior notes are the sole obligation of GenOn and are not guaranteed by any subsidiary or affiliate of GenOn. The senior notes are senior unsecured obligations of GenOn having no recourse to any subsidiary or affiliate of GenOn. The senior notes restrict the ability of GenOn and its subsidiaries to encumber their assets.

*Repurchase of 2017 GenOn Senior Notes.* In the fourth quarter of 2015, GenOn repurchased $33 million of the 2017 Senior Notes at an average price of $95.17, plus any accrued and unpaid interest as of the repurchase date. In connection with the repurchase, a $3 million gain on debt extinguishment of the 2017 Senior Notes was recorded during the year ended December 31, 2015, which primarily consisted of the discount on repurchase of $2 million and write-off of unamortized premium of $1 million.

*Repurchase of 2018 GenOn Senior Notes.* In the fourth quarter of 2015, GenOn repurchased $25 million of the 2018 Senior Notes at an average price of $90.95, plus any accrued and unpaid interest as of the repurchase date. In connection with the repurchase, a $5 million gain on debt extinguishment of the 2018 Senior Notes was recorded during the year ended December 31, 2015, which primarily consisted of the discount on repurchase of $2 million and write-off of unamortized premium of $3 million.

*Repurchase of 2020 GenOn Senior Notes.* In the fourth quarter of 2015, GenOn repurchased $61 million of the 2020 Senior Notes at an average price of $83.85, plus any accrued and unpaid interest as of the repurchase date. In connection with the repurchase, a $15 million gain on debt extinguishment of the 2020 Senior Notes was recorded during the year ended December 31, 2015, which primarily consisted of the discount on repurchase of $10 million and write-off of unamortized premium of $5 million.

*Redemption of 2014 GenOn Senior Notes.* In June 2013, GenOn redeemed all of the 2014 Senior Notes with an aggregate outstanding principal amount of $575 million at a redemption percentage of 106.778% of face value, as well as any accrued and unpaid interest as of the redemption date. In connection with the redemption, an $11 million loss on the debt extinguishment of the 2014 Senior Notes was recorded during the year ended December 31, 2013, which primarily consisted of a make whole premium payment offset by the write-off of unamortized premium.

*Senior Unsecured Notes, Due 2018 and 2020.* The senior notes and the related indentures restrict the ability of GenOn to incur additional liens and make certain restricted payments, including dividends and purchases of capital stock. At December 31, 2015, GenOn did not meet the consolidated debt ratio component of the restricted payments test and, therefore, the ability of GenOn to make restricted payments is limited to specified exclusions from the covenant, including up to $250 million of such restricted payments. The senior notes are subject to acceleration of GenOn's obligations thereunder upon the occurrence of certain events of default, including: (a) default in interest payment for 30 days, (b) default in the payment of principal or premium, if any, (c) failure after 90 days of specified notice to comply with any other agreements in the indenture, (d) certain cross-acceleration events, (e) failure by GenOn or its significant subsidiaries to pay certain final and non-appealable judgments after 90 days and (f) certain events of bankruptcy and insolvency.

Prior to October 15, 2018, GenOn may redeem the senior notes due 2018, in whole or in part, at a redemption price equal to 100% of the principal amount plus a premium and accrued and unpaid interest. The premium is the greater of: (i) 1% of the principal amount of the notes; or (ii) the excess of the following: the present value of 100% of the note, plus interest payments due on the note through maturity, discounted at a Treasury rate plus 0.50% over the principal amount of the note.

GenOn may redeem some or all of the senior notes due 2020 at redemption prices expressed as percentages of principal amount as set forth in the following table, plus accrued and unpaid interest on the notes redeemed to the first applicable redemption rate:

| Redemption Period | Redemption Percentage |
| --- | --- |
| October 15, 2015 to October 14, 2016 | 104.938% |
| October 15, 2016 to October 14, 2017 | 103.292% |
| October 15, 2017 to October 14, 2018 | 101.646% |
| October 15, 2018 and thereafter | 100.000% |

96

.

*Senior Unsecured Notes, Due 2017.* Prior to maturity, GenOn may redeem all or a part of the senior notes due 2017 at a redemption price equal to 100% of the notes plus a premium and accrued and unpaid interest. The premium is the greater of: (i) 1% of the principal amount of the notes; or (ii) the excess of the following: the present value of 100% of the note, plus interest payments due on the note through maturity, discounted at a Treasury rate plus 0.50% over the principal amount of the note.

*Credit Agreement with NRG (GenOn).* As described in Note 14, *Related Party Transactions*, GenOn is party to a secured intercompany revolving credit agreement with NRG. This credit agreement provides for a $500 million revolving credit facility, available for revolving loans and letters of credit. At December 31, 2015, $278 million of letters of credit and no borrowings were outstanding under the NRG credit agreement.

**GenOn Americas Generation (GenOn and GenOn Americas Generation)**

*Repurchase of 2021 GenOn Americas Generation Senior Unsecured Notes.* In the fourth quarter of 2015, GenOn repurchased $84 million of the 2021 Senior Notes at an average price of $84.91, plus any accrued and unpaid interest as of the repurchase date. In connection with the repurchase, a $20 million gain on debt extinguishment of the 2021 Senior Notes was recorded during the year ended December 31, 2015, which primarily consisted of the discount on repurchase of $13 million and write-off of unamortized premium of $7 million.

*Repurchase of 2031 GenOn Americas Generation Senior Unsecured Notes.* In November 2015, GenOn repurchased $71 million of the 2031 Senior Notes at an average price of $77.02, plus any accrued and unpaid interest as of the repurchase date. In connection with the repurchase, a $22 million gain on debt extinguishment of the 2031 Senior Notes was recorded during the year ended December 31, 2015, which primarily consisted of the discount on repurchase of $16 million and write-off of unamortized premium of $6 million.

*Senior Unsecured Notes.* The senior notes due 2021 and 2031 are senior unsecured obligations of GenOn Americas Generation having no recourse to any subsidiary or affiliate of GenOn Americas Generation. Prior to maturity, GenOn Americas Generation may redeem all or a part of the senior notes due 2021 and 2031 at a redemption price equal to 100% of the notes plus a premium and accrued and unpaid interest. The premium is the greater of: (i) the discounted present value of the then-remaining scheduled payments of principal and interest on the outstanding notes, discounted at a Treasury rate plus 0.375%, less the unpaid principal amount; and (ii) zero.

**Restricted Net Assets (GenOn and GenOn Americas Generation)**

GenOn and GenOn Americas Generation and certain of their subsidiaries are holding companies and, as a result, GenOn and GenOn Americas Generation and such subsidiaries are dependent upon dividends, distributions and other payments from their respective subsidiaries to generate the funds necessary to meet their obligations. In particular, a substantial portion of the cash from GenOn's and GenOn Americas Generation's operations is generated by GenOn Mid-Atlantic. The ability of certain of GenOn's and GenOn Americas Generation's subsidiaries to pay dividends and make distributions is restricted under the terms of their debt or other agreements, including the operating leases of GenOn Mid-Atlantic for GenOn and GenOn Americas Generation and REMA for GenOn. Under their respective operating leases, GenOn Mid-Atlantic and REMA are not permitted to make any distributions and other restricted payments unless: (a) they satisfy the fixed charge coverage ratio for the most recently ended period of four fiscal quarters; (b) they are projected to satisfy the fixed charge coverage ratio for each of the two following periods of four fiscal quarters, commencing with the fiscal quarter in which such payment is proposed to be made; and (c) no significant lease default or event of default has occurred and is continuing. In the event of a default under the respective operating leases or if the respective restricted payment tests are not satisfied, GenOn Mid-Atlantic and REMA would not be able to distribute cash. At December 31, 2015, GenOn Mid-Atlantic and REMA did not satisfy the restricted payments test.

Pursuant to the terms of their respective lease agreements, GenOn Mid-Atlantic and REMA are restricted from, among other actions, (a) encumbering assets, (b) entering into business combinations or divesting assets, (c) incurring additional debt, (d) entering into transactions with affiliates on other than an arm's length basis or (e) materially changing their business. Therefore, at December 31, 2015, all of GenOn Mid-Atlantic's and REMA's net assets (excluding cash) were deemed restricted for purposes of Rule 4-08(e)(3)(ii) of Regulation S-X. As of December 31, 2015, GenOn Mid-Atlantic and REMA had restricted net assets of $1,100 million and $(1,112) million, respectively.

*Consolidated Annual Maturities (GenOn and GenOn Americas Generation)*

Annual payments based on the maturities of GenOn's debt and capital leases for the years ending after December 31, 2015, are as follows:

|  | | (In millions) |
|---|---|---|
| 2016 | $ | 4 |
| 2017 | | 696 |
| 2018 | | 653 |
| 2019 | | 4 |
| 2020 | | 494 |
| Thereafter | | 732 |
| Total | $ | 2,583 |

Annual payments based on the maturities of GenOn Americas Generation's debt for the years ending after December 31, 2015, are as follows:

|  | | (In millions) |
|---|---|---|
| 2016 | $ | — |
| 2017 | | — |
| 2018 | | — |
| 2019 | | — |
| 2020 | | — |
| Thereafter | | 695 |
| Total | $ | 695 |

## Note 11 — Asset Retirement Obligations (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)

The Registrants' AROs are primarily related to the future dismantlement of equipment on leased property and environmental obligations related to ash disposal, site closures and fuel storage facilities. In addition, the Registrants have also identified conditional AROs for asbestos removal and disposal, which are specific to certain power generation operations.

The following table represents the balance of ARO obligations as of December 31, 2014, along with the additions, reductions and accretion related to the Registrants' ARO obligations for the year ended December 31, 2015:

|  | | GenOn | | GenOn Americas Generation | | GenOn Mid-Atlantic |
|---|---|---|---|---|---|---|
|  | | | | (In millions) | | |
| **Balance as of December 31, 2014** | $ | 172 | $ | 78 | $ | 26 |
| Additions | | 7 | | 1 | | — |
| Revisions in estimates for current obligations | | (4) | | (2) | | (1) |
| Spending for current obligations and other settlements | | (2) | | — | | — |
| Accretion — expense | | 14 | | 5 | | 2 |
| **Balance as of December 31, 2015** | $ | 187 | $ | 82 | $ | 27 |

98

.

**Note 12 — Benefit Plans and Other Postretirement Benefits (GenOn)**

*Defined Benefit Plans*

GenOn provides pension benefits to eligible non-union and union employees through various defined benefit pension plans. These benefits are based on pay, service history and age at retirement. Most pension benefits are provided through tax-qualified plans that are funded in accordance with the Employee Retirement Income Security Act of 1974 and Internal Revenue Service requirements. Certain executive pension benefits that cannot be provided by the tax-qualified plans are provided through unfunded non-tax-qualified plans. The measurement date for the defined benefit plans was December 31 for all periods presented unless otherwise noted. GenOn also provides certain medical care and life insurance benefits for eligible retired employees. The measurement date for these postretirement benefit plans was December 31 for all periods presented unless otherwise noted. On December 31, 2014, NRG merged 8 qualified pension plans into 2 separate qualified pension plans, the NRG Pension Plan for Bargained Employees and the NRG Pension Plan. The GenOn Mirant Bargaining Unit Pension Plan, GenOn First Energy Pension Plan, GenOn Duquesne Pension Plan, and GenOn REMA Pension Plan were merged into the NRG Pension Plan for Bargained Employees. The GenOn Mirant Pension Plan was merged into the NRG Pension Plan for Non-Bargained Employees and renamed the NRG Pension Plans. These actions were conducted to simplify internal administration of the plans, reduce regulatory filings, and lower fees paid to outside vendors as part of the management services agreement. The benefits provided to current participants in the Plans were not impacted and GenOn remains obligated for its respective pension liabilities.

As part of the change in control associated with the NRG Merger, NRG decided to terminate/settle the nonqualified legacy GenOn Benefit Restoration Plan and Supplemental Executive Retirement Plan. Final settlement payments totaling $12 million were paid to remaining participants during 2014.

The net periodic pension (credit)/cost related to GenOn's pension and other postretirement benefit plans include the following components:

| | Pension Benefits | | | | | |
| | Year Ended December 31, 2015 | | Year Ended December 31, 2014 | | Year Ended December 31, 2013 | |
| | (In millions) | | | | | |
| Service cost benefits earned | $ | 10 | $ | 10 | $ | 13 |
| Interest cost on benefit obligation | | 27 | | 27 | | 25 |
| Expected return on plan assets | | (35) | | (34) | | (31) |
| Amortization of unrecognized net loss/(gain) | | 1 | | (6) | | — |
| Net periodic benefit cost/(credit) | $ | 3 | $ | (3) | $ | 7 |

| | Other Postretirement Benefits | | | | | |
| | Year Ended December 31, 2015 | | Year Ended December 31, 2014 | | Year Ended December 31, 2013 | |
| | (In millions) | | | | | |
| Service cost benefits earned | $ | 1 | $ | 1 | $ | 1 |
| Interest cost on benefit obligation | | 3 | | 3 | | 3 |
| Amortization of unrecognized prior service credit | | (4) | | (17) | | (1) |
| Net periodic benefit (credit)/cost | $ | — | $ | (13) | $ | 3 |

A comparison of the pension benefit obligation, other postretirement benefit obligations and related plan assets for GenOn plans on a combined basis is as follows:

| | Tax-Qualified Pension Benefits | | | | Non-Tax-Qualified Pension Benefits | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Year Ended December 31, | | | | Year Ended December 31, | | | |
| | 2015 | | 2014 | | 2015 | | 2014 | |
| | (In millions) | | | | (In millions) | | | |
| Benefit obligation at beginning of period | $ | 660 | $ | 546 | $ | — | $ | 12 |
| Service cost | | 10 | | 10 | | — | | — |
| Interest cost | | 27 | | 27 | | — | | — |
| Actuarial (gain)/loss | | (33) | | 103 | | — | | — |
| Benefit payments | | (39) | | (26) | | — | | (12) |
| Benefit obligation at end of period | | 625 | | 660 | | — | | — |
| Fair value of plan assets at beginning of period | | 548 | | 469 | | — | | — |
| Actual return on plan assets | | (17) | | 49 | | — | | — |
| Employer contributions | | 14 | | 56 | | — | | 12 |
| Benefit payments | | (39) | | (26) | | — | | (12) |
| Fair value of plan assets at end of period | | 506 | | 548 | | — | | — |
| Funded status at end of period — excess of obligation over assets | $ | (119) | $ | (112) | $ | — | $ | — |

| | Other Postretirement Benefits | | | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, | | | |
| | 2015 | | 2014 | |
| | (In millions) | | | |
| Benefit obligation at beginning of period | $ | 65 | $ | 73 |
| Service cost | | 1 | | 1 |
| Interest cost | | 3 | | 3 |
| Participant contributions | | 1 | | 2 |
| Actuarial (gain)/loss | | (8) | | 12 |
| Benefit payments | | (7) | | (8) |
| Plan amendments | | (1) | | (18) |
| Benefit obligation at end of period | | 54 | | 65 |
| Fair value of plan assets at beginning of period | | — | | — |
| Employer contributions | | 6 | | 6 |
| Participant contributions | | 1 | | 2 |
| Benefit payments | | (7) | | (8) |
| Fair value of plan assets at end of period | | — | | — |
| Funded status at end of period — excess of obligation over assets | $ | (54) | $ | (65) |

The accumulated benefit obligation exceeded the fair value of plan assets at December 31, 2015, and 2014 for the tax-qualified defined benefit pension plans. The total accumulated benefit obligation for the tax-qualified plans at December 31, 2015, and 2014 was $608 million and $631 million, respectively.

Amounts recognized in GenOn's balance sheets were as follows:

| | Tax-Qualified Pension Benefits | | Other Postretirement Benefits | |
| --- | --- | --- | --- | --- |
| | As of December 31, | | As of December 31, | |
| | 2015 | 2014 | 2015 | 2014 |
| | (In millions) | | (In millions) | |
| Current liabilities | $ — | $ — | $ (5) | $ (5) |
| Non-current liabilities | (119) | (112) | (49) | (60) |

Amounts recognized in GenOn's OCI and accumulated other comprehensive income/loss for the pension and other postretirement benefit plans were as follows:

| | Tax-Qualified Pension Benefits | | Other Postretirement Benefits | |
| --- | --- | --- | --- | --- |
| | Net Actuarial (Loss) Gain | Prior Service Cost | Net Actuarial (Loss) Gain | Prior Service Cost |
| | (In millions) | | | |
| Balance as of December 31, 2013 | $ 92 | $ (1) | $ 7 | $ 4 |
| Unrealized (loss)/gain | (87) | — | (12) | 18 |
| Amortization of net actuarial loss | (6) | — | — | — |
| Amortization of prior service cost | — | — | — | (17) |
| Total recognized in OCI for the period | (93) | — | (12) | 1 |
| Balance as of December 31, 2014 | $ (1) | $ (1) | $ (5) | $ 5 |
| Unrealized (loss)/gain | $ (20) | $ — | $ 8 | $ 1 |
| Amortization of net actuarial gain | 1 | — | — | — |
| Amortization of prior service cost | — | — | — | (4) |
| Total recognized in OCI for the period | (19) | — | 8 | (3) |
| Balance as of December 31, 2015 | $ (20) | $ (1) | $ 3 | $ 2 |

The total net (gain)/loss recognized in net periodic benefit cost and OCI for the pension plans for the years ended December 31, 2015, 2014, and 2013 were $22 million, $90 million, and $(84) million, respectively. The total net (gain)/loss recognized in net periodic benefit credit and OCI for the other postretirement benefit plans for the years ended December 31, 2015, 2014, and 2013 were $(6) million, $(2) million, and $(7) million, respectively.

The estimated unrecognized loss for the pension and other postretirement benefit plans that will be amortized from accumulated other comprehensive income/loss to net period benefit cost during 2016 is approximately $1 million. The estimated unrecognized prior service credit for the pension and other postretirement benefit plans that will be amortized from accumulated other comprehensive income/loss to net period benefit cost during 2016 is approximately $(1) million.

*Fair Value Hierarchy of Plan Assets*

GenOn's market-related value of its plan assets is the fair value of the assets. The fair values of GenOn's pension plan assets by asset category and their level within the fair value hierarchy are as follows:

| | Fair Value Measurements as of December 31, 2015 | | |
| --- | --- | --- | --- |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Observable Inputs (Level 2) | Total |
| | (In millions) | | |
| Common/collective trust investment — U.S. equity | $ — | $ 142 | $ 142 |
| Common/collective trust investment — non-U.S. equity | — | 82 | 82 |
| Common/collective trust investment — global equity | — | 49 | 49 |
| Common/collective trust investment — fixed income | — | 220 | 220 |
| Partnerships/Joint Ventures | — | 10 | 10 |
| Short-term investment fund | 3 | — | 3 |
| Total | $ 3 | $ 503 | $ 506 |

| | Fair Value Measurements as of December 31, 2014 | | |
| --- | --- | --- | --- |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Observable Inputs (Level 2) | Total |
| | (In millions) | | |
| Common/collective trust investment — U.S. equity | $ — | $ 156 | $ 156 |
| Common/collective trust investment — non-U.S. equity | — | 80 | 80 |
| Common/collective trust investment — global equity | — | 52 | 52 |
| Common/collective trust investment — fixed income | — | 246 | 246 |
| Partnerships/Joint Ventures | — | 12 | 12 |
| Short-term investment fund | 2 | — | 2 |
| Total | $ 2 | $ 546 | $ 548 |

In accordance with ASC 820, GenOn determines the level in the fair value hierarchy within which each fair value measurement in its entirety falls, based on the lowest level input that is significant to the fair value measurement in its entirety. The fair value of the common/collective trusts is valued at fair value which is equal to the sum of the market value of all of the fund's underlying investments, and is categorized as Level 2. Partnerships/joint ventures Level 2 investments consist primarily of a partnership which invests in emerging market equity securities. There are no investments categorized as Level 3.

*Assumptions*

GenOn sets the discount rate assumptions on an annual basis for each of its defined benefit retirement plans as of December 31. The discount rate assumptions represent the current rate at which the associated liabilities could be effectively settled at December 31. GenOn utilizes the Aon Hewitt AA Above Median, or AA-AM, yield curve to select the appropriate discount rate assumption for each retirement plan. The AA-M yield curve is a hypothetical AA yield curve represented by a series of annualized individual spot discount rates from 6 months to 99 years. Each bond issue used to build this yield curve must be non-callable, and have an average rating of AA when averaging all available Moody's Investor Services, Standard & Poor's and Fitch ratings.

The following table presents the significant assumptions used to calculate GenOn's benefit obligations:

| | Pension Benefits | | Other Postretirement Benefits | |
| --- | --- | --- | --- | --- |
| | As of December 31, | | As of December 31, | |
| | 2015 | 2014 | 2015 | 2014 |
| **Weighted–Average Assumptions** | | | | |
| Discount rate | 4.54% | 4.18% | 4.16% | 3.86% |
| Rate of compensation increase | 3.00% | 2.97% | N/A | N/A |

GenOn's assumed healthcare cost trend rates used for other postretirement benefit obligations are:

| Weighted–Average Assumptions | Other Postretirement Benefit Plans | |
|---|---|---|
| | As of December 31, | |
| | 2015 | 2014 |
| Assumed medical inflation for next year: | | |
| Before age 65 | 7.25% | 8.60% |
| Age 65 and after | 9.00% | 8.10% |
| Assumed ultimate medical inflation rate | 5.00% | 5.00% |
| Year in which ultimate rate is reached | 2025 | 2023 |

An annual increase of 1% in the assumed healthcare cost trend rates would correspondingly increase the postretirement benefit obligation at December 31, 2015, by $5 million. An annual decrease of 1% in the assumed healthcare cost trend rates would correspondingly decrease the postretirement benefit obligation at December 31, 2015, by $4 million

The following tables present the significant assumptions used to calculate GenOn's benefit expense/credit:

| Weighted–Average Assumptions | Pension Plans | | |
|---|---|---|---|
| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
| Discount rate | 4.18% | 5.02% | 4.22% |
| Rate of compensation increase | 2.97% | 2.91% | 2.82% |
| Expected return on plan assets | 6.41% | 7.00% | 7.50% |

| Weighted–Average Assumptions | Other Postretirement Benefit Plans | | |
|---|---|---|---|
| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
| Discount rate | 3.86% | 4.53% | 3.99% |

GenOn's assumed healthcare cost trend rates used for other postretirement benefit net periodic benefit expense/credit are:

| Weighted–Average Assumptions | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| Assumed medical inflation for next year: | | | |
| Before age 65 | 8.60% | 8.50% | 8.50% |
| Age 65 and after | 8.10% | 8.69% | 8.67% |
| Assumed ultimate medical inflation rate | 5.00% | 5.50% | 5.50% |
| Year in which ultimate rate is reached | 2023 | 2019 | 2018 |

An annual increase or decrease of 1% in the assumed healthcare cost trend rates would correspondingly increase or decrease the total annual service and interest cost components of net period benefit credit during 2015 by less than $1 million.

In 2016, GenOn will change the approach utilized to estimate the service cost and interest cost components of net periodic benefit cost for pension and postretirement benefit plans. Historically, GenOn estimated these components by using a single weighted average discount rate derived from the yield curve used to measure the benefit obligation. GenOn will elect to use a spot rate approach in the estimation of the components of benefit cost by applying specific spot rates along the yield curve to the relevant projected cash flows, as this provides a better estimate of service and interest costs. This is considered a change in estimate and, accordingly, will account for it prospectively starting in 2016. This change does not affect the measurement of GenOn's total benefit obligation.

*Pension Plan Assets*

Pension plans' assets are managed solely in the interest of the plans' participants and their beneficiaries and are invested with the objective of earning the necessary returns to meet the time horizons of the accumulated and projected retirement benefit obligations. GenOn uses a mix of equities and fixed income investments intended to manage risk to a reasonable and prudent level. GenOn's risk tolerance is established through consideration of the plans' liabilities and funded status as well as corporate financial condition. Equity investments are diversified across U.S. and non-U.S. stocks. For U.S. stocks, GenOn employs both a passive and active approach by investing in index funds and actively managed funds. For non-U.S. stocks, GenOn is invested in both developed and emerging market equity funds. Fixed income investments are comprised of long-term U.S. government and corporate securities. Derivative securities can be used for diversification, risk-control and return enhancement purposes but may not be used for the purpose of leverage. The assets for the NRG Pension Plan for Bargained Employees and the NRG Pension Plan are in a single qualified trust. At the time of the plan mergers, the fair value of the assets from the prior plans were allocated on a pro-rata basis based on the benefit obligations on January 1, 2015 and will continue to be allocated on this basis at each reporting date.

GenOn's pension asset allocation methodology is based on the results of a study completed by a third-party investment consulting firm. The methodology divides the pension plan assets into two primary portfolios: (i) return seeking assets, those assets intended to generate returns in excess of pension liability growth (U.S. equity, non-U.S. equity, global equity, and emerging market equity) and (ii) liability-hedging assets, those assets intended to have characteristics similar to pension liabilities (fixed income securities). As GenOn's pension plans' funded status improves, the methodology actively moves the plan assets from return seeking assets toward liability-hedging assets. GenOn employs a building block approach to determining the long-term rate of return for plan assets, with proper consideration given to diversification and rebalancing. Historical markets are studied and long-term historical relationships between equities and fixed income are preserved, consistent with the widely accepted capital market principle that assets with higher volatility generate a greater return over the long run. Current factors such as inflation and interest rates are evaluated before long-term capital assumptions are determined. Peer data and historical returns are reviewed to check for reasonableness and appropriateness.

The target allocations for GenOn's pension plan assets were as follows for the year ended December 31, 2015:

| | |
|---|---|
| U.S. equities | 27% |
| Non-U.S. equities | 15% |
| Global equities | 10% |
| Emerging market equities | 3% |
| Fixed income securities | 45% |

Investment risk and performance are monitored on an ongoing basis through quarterly portfolio reviews of each asset fund class to a related performance benchmark, if applicable, and annual pension liability measurements. Performance benchmarks are composed of the following indices:

| Asset Class | Index |
|---|---|
| U.S. equities | Dow Jones U.S. Total Stock Market Index |
| Non-U.S. equities | MSCI All Country World Ex-U.S. IMI Index |
| Global equities | MSCI World Index |
| Emerging market equities | MSCI Emerging Markets Index |
| Fixed income securities | Barclays Capital Long Term Government/Credit Index & Barclays US Aggregate Bond Index |

*Expected Contributions and Benefit Payments*

GenOn expects to contribute approximately $16 million to the tax-qualified pension plans during 2016.

GenOn's expected future benefit payments for each of the next five years, and in the aggregate for the five years thereafter, are as follows:

|  | Tax-Qualified Pension Benefit Payments | Other Postretirement Benefit Payments |
|---|---|---|
|  | (In millions) | |
| 2016 | $ 29 | $ 5 |
| 2017 | 31 | 5 |
| 2018 | 32 | 6 |
| 2019 | 34 | 5 |
| 2020 | 35 | 5 |
| 2021 through 2025 | 194 | 18 |

### *Employee Savings and Profit Sharing Plan*

GenOn has employee savings plans under Sections 401(a) and 401(k) of the IRC whereby employees may contribute a portion of their eligible compensation to the employee savings plan, subject to limits under the IRC. GenOn also historically provided for a profit sharing arrangement for non-bargaining employees and some bargaining employees not accruing a benefit under the defined benefit pension plans, whereby GenOn contributed a fixed contribution of 2% of eligible pay per pay period and could make an annual discretionary contribution up to 3% of eligible pay based on GenOn's performance. Upon completion of the NRG Merger, NRG assumed GenOn's defined contribution 401(k) plans and amended the plan for the non-bargaining employees with NRG 401(k) plan features, effective January 1, 2013. On July 5, 2013, the GenOn defined contribution 401(k) plans were merged into the NRG 401(k) plan.

GenOn also sponsors non-qualified deferred compensation plans for key and highly compensated employees. GenOn's obligations and the related rabbi trust investments under these plans were $15 million and $20 million at December 31, 2015, and 2014, respectively. Upon completion of the NRG Merger, NRG assumed GenOn's non-qualified plans and their respective obligations.

Expense recognized for the matching, fixed profit sharing and discretionary profit sharing contributions were $0 million for the years ended December 31, 2015, and 2014, and $4 million for the year ended December 31, 2013.

**Note 13 — Income Taxes (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*Income Taxes*

*GenOn*

GenOn's income tax (benefit)/expense consisted of the following:

|  | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
|  | (In millions) | | |
| Current |  |  |  |
| U.S. Federal | $ — | $ — | $ (6) |
| State | (3) | 6 | — |
| Total — current | (3) | 6 | (6) |
| Deferred |  |  |  |
| U.S. Federal | — | — | — |
| State | — | — | — |
| Total — deferred | — | — | — |
| Total income tax (benefit)/expense | (3) | 6 | (6) |
| Effective tax rate | 2.5% | 3% | 12.5% |

A reconciliation of GenOn's federal statutory income tax provision to the effective income tax (benefit)/expense adjusted for permanent and other items during 2015, 2014 and 2013, is as follows:

|  | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
|  | (In millions, except percentages) | | |
| (Loss)/Income before income taxes | $ (118) | $ 198 | $ (48) |
| Provision for income taxes based on U.S. federal statutory income tax rate | (42) | 70 | (17) |
| State and local income tax provision, net of federal income taxes | (3) | 14 | (24) |
| Change in deferred tax asset valuation allowance | 16 | (100) | — |
| State rate change | 26 | 21 | 35 |
| Other, net | — | 1 | — |
| Income tax (benefit)/expense | $ (3) | $ 6 | $ (6) |

106

.

The tax effects of temporary differences between the carrying amounts of assets and liabilities in GenOn's financial statements and their respective tax bases which give rise to deferred tax assets and liabilities are as follows:

| | As of December 31, | | | |
| --- | --- | --- | --- | --- |
| | | 2015 | | 2014 |
| | | (In millions) | | |
| **Deferred Tax Assets:** | | | | |
| Employee benefits | $ | 76 | $ | 100 |
| Pension and other postretirement benefits | | — | | 113 |
| Federal loss carryforwards | | 664 | | 727 |
| State loss carryforwards | | 214 | | 125 |
| Property and intangible assets | | 931 | | 1,080 |
| Derivative contracts | | 470 | | 90 |
| Out-of-market contracts fair value adjustment | | 378 | | 381 |
| Debt premium, net | | 92 | | 123 |
| Other | | 20 | | 40 |
| Subtotal | | 2,845 | | 2,779 |
| Valuation allowance | | (2,464) | | (2,779) |
| Net deferred tax assets | | 381 | | — |
| **Deferred Tax Liabilities:** | | | | |
| Pension and other postretirement benefits | | 381 | | — |
| Net deferred tax liabilities | | 381 | | — |
| Net deferred taxes | $ | — | $ | — |

*Deferred tax assets and valuation allowance*

*Net deferred tax balance* — As of December 31, 2015, and 2014, GenOn recorded a net deferred tax asset of $2.5 billion and $2.8 billion, respectively. Based on its assessment of positive and negative evidence, including available tax planning strategies, GenOn believes that it is more likely than not that a benefit will not be realized on $2.5 billion and $2.8 billion of tax assets as of December 31, 2015, and 2014, respectively, thus a valuation allowance has been recorded.

In connection with the accounting for the NRG Merger, GenOn recorded the realizable deferred tax assets and liabilities acquired, primarily consisting of net operating losses and other temporary differences. In addition, the excess of GenOn's historical tax basis of assets and liabilities over the amount assigned to the fair value of the assets acquired and liabilities assumed generated deferred tax assets and liabilities that were recorded on the acquisition date.

*NOL carryforwards* — At December 31, 2015, GenOn had tax effected cumulative domestic NOLs consisting of carryforwards for federal income tax purposes of $664 million and state of $214 million. GenOn's pre-merger federal NOLs are limited to $62 million annually. GenOn estimates it will need to generate future taxable income to fully realize the net federal deferred tax asset before expiration commencing in 2032.

*Valuation allowance* — As of December 31, 2015, GenOn's tax effected valuation allowance was $2.5 billion, relating primarily to federal and state loss carryforwards as well as differences between book and tax basis of PP&E.

*Uncertain tax benefits*

GenOn does not have any uncertain tax benefits.

GenOn recognizes interest and penalties related to uncertain tax benefits in income tax expense. During the year ended December 31, 2015, GenOn did not accrue interest. For the year ended December 31, 2014, GenOn accrued interest of $1 million. As of December 31, 2015 GenOn has no cumulative interest and penalties.

*Tax jurisdictions* — GenOn is no longer subject to U.S. federal income tax examinations for years prior to 2010. With few exceptions, state and local income tax examinations are no longer open for years before 2009.

The following table reconciles the total amounts of uncertain tax benefits:

| | As of December 31, | |
|---|---|---|
| | 2015 | 2014 |
| | (In millions) | |
| Balance as of January 1 | $ 2 | $ 1 |
| Increase due to prior year positions | — | 1 |
| Decrease due to prior year positions | (2) | — |
| Uncertain tax benefits as of December 31 | $ — | $ 2 |

*GenOn Americas Generation*

GenOn America's Generation is a wholly owned limited liability company, a disregarded entity, for federal and state income tax purposes. Therefore federal and state taxes are assessed at the parent level. Accordingly, no provision has been made for federal or state income taxes in the accompanying financial statements.

A reconciliation of GenOn Americas Generation's expected federal statutory income tax provision to the effective income tax provision adjusted for permanent and other items during 2015, 2014 and 2013, is as follows:

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| Income before income taxes | $ 116 | $ 305 | $ 59 |
| Provision for income taxes based on U.S. federal statutory income tax rate | 41 | 107 | 21 |
| State and local income tax provision, net of federal income taxes | 10 | 18 | 6 |
| LLC income not subject to taxation | (51) | (115) | (48) |
| State rate change | — | (2) | 21 |
| Other | — | (8) | — |
| Income tax provision | $ — | $ — | $ — |

### Uncertain tax benefits

GenOn Americas Generation does not have any uncertain tax benefits.

## Pro Forma Income Tax Disclosures

*GenOn Americas Generation*

GenOn Americas Generation is not subject to income taxes except for those subsidiaries of GenOn Americas Generation that are separate taxpayers. NRG Americas, GenOn and NRG are otherwise directly responsible for income taxes related to GenOn Americas Generation's operations.

GenOn Americas Generation was not allocated income taxes attributable to its operations on a pro forma income tax provision basis for the years ended December 31, 2015, 2014, and 2013.

The following table presents the pro forma reconciliation of GenOn Americas Generation's federal statutory income tax provision for continuing operations adjusted for reorganization items to the pro forma effective tax provision:

| | Year Ended December 31, 2015 | | Year Ended December 31, 2014 | | Year Ended December 31, 2013 | |
| --- | ---: | --- | ---: | --- | ---: | --- |
| | | | (In millions) | | | |
| Income before income taxes | $ | 116 | $ | 305 | $ | 59 |
| Provision for income taxes based on U.S. federal statutory income tax rate | | 41 | | 107 | | 22 |
| State and local income tax provision (benefit), net of federal income taxes | | 10 | | 18 | | 6 |
| Change in deferred tax asset valuation allowance | | (51) | | (115) | | (49) |
| State rate change | | — | | (2) | | 21 |
| Other | | — | | (8) | | — |
| Income tax provision | $ | — | $ | — | $ | — |

The tax effects of temporary differences between the carrying amounts of assets and liabilities in the consolidated balance sheets and their respective tax bases which give rise to the pro forma deferred tax assets and liabilities would be as follows:

| | As of December 31, | | | |
| --- | --- | ---: | --- | ---: |
| | | 2015 | | 2014 |
| | | (In millions) | | |
| **Deferred Tax Assets:** | | | | |
| Pension and other postretirement benefits | $ | 85 | $ | 85 |
| Reserves | | 119 | | 121 |
| Loss carryforwards | | 3 | | 14 |
| Property and intangible assets | | 1,495 | | 1,652 |
| Out-of-market contracts fair value adjustment | | 47 | | 34 |
| Derivative contract assets and liabilities | | 166 | | — |
| Debt premium | | 28 | | 38 |
| Other, net | | 20 | | 36 |
| Subtotal | | 1,963 | | 1,980 |
| Valuation allowance | | (1,963) | | (1,824) |
| Net deferred tax assets | | — | | 156 |
| **Deferred Tax Liabilities:** | | | | |
| Investment in Projects | | — | | 144 |
| Derivative contract assets and liabilities | | — | | 12 |
| Net deferred tax liabilities | | — | | 156 |
| Net deferred taxes | $ | — | $ | — |

### Deferred tax assets and valuation allowance

*Net deferred tax balance* — As of December 31, 2015, and 2014, GenOn Americas Generation recorded a net deferred tax asset of $2.0 billion and $1.8 billion, respectively. Based on its assessment of positive and negative evidence, including available tax planning strategies, GenOn Americas believes that it is more likely than not that a benefit will not be realized on $2.0 billion and $1.8 billion of tax assets as of December 31, 2015, and 2014, respectively, thus a valuation allowance has been recorded.

In connection with the accounting for the GenOn acquisition, GenOn Americas Generation recorded the realizable deferred tax assets and liabilities acquired, primarily consisting of historical tax basis of assets and liabilities over the amount assigned to the fair value of the assets acquired and liabilities assumed.

*NOL carryforwards* — At December 31, 2015, GenOn Americas Generation had tax effected cumulative domestic NOLs consisting of carryforwards for federal income tax purposes of $3 million and state of $3 million. GenOn's pre-merger federal NOLs are limited to $62 million annually. GenOn Americas Generation estimates it will need to generate future taxable income to fully realize the net federal deferred tax asset before expiration commencing in 2032.

*Valuation allowance* — As of December 31, 2015, GenOn Americas Generation's tax effected valuation allowance was $2.0 billion, relating primarily to differences between book and tax basis of PP&E.

### Taxes Receivable and Payable

As of December 31, 2015, GenOn Americas Generation does not have a current tax receivable or payable.

### Uncertain tax benefits

GenOn Americas Generation does not have any uncertain tax benefits.

*GenOn Mid-Atlantic*

The following reflects a pro forma disclosure of the income tax provision that would be reported if GenOn Mid-Atlantic was to be allocated income taxes attributable to its operations. Pro forma income tax provision attributable to income before tax would consist of the following:

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| Current provision (benefit): | | | |
| Federal | $ 36 | $ 82 | $ 45 |
| State | 6 | 11 | 12 |
| Deferred provision: | | | |
| Federal | — | (5) | — |
| State | — | (1) | — |
| Total provision for income taxes | $ 42 | $ 87 | $ 57 |

The following table presents the pro forma reconciliation of GenOn Mid-Atlantic's federal statutory income tax provision for continuing operations adjusted for reorganization items to the pro forma effective tax provision:

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions, except percentages) | | |
| Income before income taxes | $ 104 | $ 236 | $ 128 |
| Provision for income taxes based on U.S. federal statutory income tax rate | 36 | 82 | 45 |
| State and local income taxes | 6 | 11 | 12 |
| State rate change | — | (1) | — |
| Other, net | — | (5) | — |
| Income tax provision | $ 42 | $ 87 | $ 57 |

110

.

The tax effects of temporary differences between the carrying amounts of assets and liabilities in the consolidated balance sheets and their respective tax bases which give rise to the pro forma deferred tax assets and liabilities would be as follows:

| | As of December 31, | |
| | 2015 | 2014 |
| | (In millions) | |
|---|---|---|
| **Deferred Tax Assets:** | | |
| Reserves | $ 22 | $ 24 |
| Loss carryforwards on derivative contracts | 218 | 218 |
| Property and intangible assets | 31 | 45 |
| Out-of-market contracts fair value adjustment | 77 | 88 |
| Inventory reserves | 38 | 37 |
| Net deferred tax assets | 386 | 412 |
| **Deferred Tax Liabilities:** | | |
| Derivative contracts | 305 | 336 |
| Investment in projects | 25 | 25 |
| Net deferred tax liabilities | 330 | 361 |
| Net deferred taxes | $ 56 | $ 51 |

*Pro Forma Tax Uncertainties*

GenOn Mid-Atlantic does not have any uncertain tax benefits.

## Note 14 - Related Party Transactions (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)

### Services Agreement with NRG (GenOn)

NRG provides GenOn with various management, personnel and other services, which include human resources, regulatory and public affairs, accounting, tax, legal, information systems, treasury, risk management, commercial operations, and asset management, as set forth in the Services Agreement. The initial term of the Services Agreement was through December 31, 2013, with an automatic renewal absent a request for termination. The fee charged is determined based on a fixed amount as described in the Services Agreement and was calculated based on historical GenOn expenses prior to the NRG Merger. The annual fees under the Services Agreement are approximately $193 million. NRG charges these fees on a monthly basis, less amounts incurred directly by GenOn. Management has concluded that this method of charging overhead costs is reasonable. For the years ended December 31, 2015, and 2014, GenOn recorded costs related to these services of $184 million and $128 million, respectively, as general and administrative - affiliate.

### Administrative Services Provided by NRG (GenOn Americas Generation and GenOn Mid-Atlantic)

NRG provides GenOn Americas Generation and GenOn Mid-Atlantic with various management, personnel and other services consistent with those set forth in the Services Agreement discussed above between NRG and GenOn. GenOn's costs incurred under the Services Agreement with NRG are allocated to its subsidiaries based on each operating subsidiary's planned operating expenses relative to all operating subsidiaries of GenOn. These allocations and charges are not necessarily indicative of what would have been incurred had GenOn Americas Generation and GenOn Mid-Atlantic been unaffiliated entities. Management has concluded that this method of charging overhead costs is reasonable.

The following costs were incurred under these arrangements:

*GenOn Americas Generation*

|  | Year Ended December 31, 2015 | | Year Ended December 31, 2014 | | Year Ended December 31, 2013 | |
|---|---|---|---|---|---|---|
|  | (In millions) | | | | | |
| Allocated costs: | | | | | | |
| Cost of operations — affiliate | $ | 3 | $ | 7 | $ | 9 |
| Selling, general and administrative — affiliate | | 81 | | 79 | | 74 |
| Total | $ | 84 | $ | 86 | $ | 83 |

*GenOn Mid-Atlantic*

|  | Year Ended December 31, 2015 | | Year Ended December 31, 2014 | | Year Ended December 31, 2013 | |
|---|---|---|---|---|---|---|
|  | (In millions) | | | | | |
| Allocated costs: | | | | | | |
| Cost of operations — affiliate | $ | 1 | $ | 4 | $ | 6 |
| Selling, general and administrative — affiliate | | 58 | | 64 | | 64 |
| Total | $ | 59 | $ | 68 | $ | 70 |

### Credit Agreement with NRG (GenOn)

GenOn and NRG Americas are party to a secured intercompany revolving credit agreement with NRG. This credit agreement provides for a $500 million revolving credit facility, all of which is available for revolving loans and letters of credit. At December 31, 2015, $278 million of letters of credit were outstanding under the NRG credit agreement for GenOn. Of this amount, $227 million were issued on behalf of GenOn Americas Generation, which includes $131 million issued on behalf of GenOn Mid-Atlantic. At December 31, 2015, no loans were outstanding under this credit agreement. Certain of GenOn's subsidiaries, as guarantors, are subject to a guarantee agreement pursuant to which these guarantors guaranteed amounts borrowed and obligations incurred under the credit agreement. The guarantors are restricted from incurring additional liens on certain of their assets. The credit agreement is payable at maturity, subject to certain exceptions primarily related to asset sales not in the ordinary course of business and borrowings of debt. The initial maturity of the credit agreement was December 2015. The agreement was amended in December 2015 to extend the maturity through December of 2018. At GenOn's election, the interest rate per year applicable to the loans under the credit agreement will be determined by reference to either (i) the base rate plus 2.50% per year or (ii) the LIBOR rate plus 3.50% per year. In addition, the credit agreement contains customary covenants and events of default.

### Intercompany Cash Management Program (GenOn Americas Generation)

GenOn Americas Generation and certain of its subsidiaries participate in separate intercompany cash management programs whereby cash balances at GenOn Americas Generation and the respective participating subsidiaries are transferred to central concentration accounts to fund working capital and other needs of the respective participants. The balances under this program are reflected as notes receivable — affiliate and accounts receivable — affiliate or notes payable — affiliate and accounts payable — affiliate, as appropriate. The notes are due on demand and notes receivable — affiliate and notes payable — affiliate accrue interest on the net position, which is payable quarterly, at a rate determined by GenOn Energy Holdings. At December 31, 2015 and 2014, GenOn Americas Generation had a net current notes receivable — affiliate from GenOn Energy Holdings of $331 million related to its intercompany cash management program. For the years ended December 31, 2015, 2014, and 2013, GenOn Americas Generation earned an insignificant amount of net interest income related to these notes. Additionally, at December 31, 2015, and 2014, GenOn Americas Generation had an accounts payable — affiliate of $41 million and an accounts receivable — affiliate of $118 million, respectively, with GenOn Energy Holdings.

*GenOn Mid-Atlantic Distributions (GenOn Americas Generation and GenOn Mid-Atlantic)*

For the year ended December 31, 2014, GenOn Mid-Atlantic made a distribution of $320 million to its parent, NRG North America LLC, who in turn made a distribution of $320 million to its parent, GenOn Americas Generation. GenOn Americas Generation subsequently made a distribution in the same amount, through its parent company, NRG Americas, Inc. to GenOn Energy Holdings, Inc., a subsidiary of GenOn.

*Purchased Emission Allowances (GenOn Mid-Atlantic)*

GenOn Energy Management maintains an inventory of certain purchased emission allowances related to the Regional Greenhouse Gas Initiative on behalf of GenOn Mid-Atlantic. The emission allowances are sold by GenOn Energy Management to GenOn Mid-Atlantic as they are needed for operations. GenOn Mid-Atlantic purchases emission allowances from GenOn Energy Management at GenOn Energy Management's original cost to purchase the allowances. For allowances that have been purchased by GenOn Energy Management from a GenOn Energy affiliate, the price paid by GenOn Energy Management is determined by market indices.

Emission allowances purchased from GenOn Energy Management that were utilized during the years ended December 31, 2015, 2014, and 2013 were $27 million, $19 million, and $17 million, respectively, and are recorded in cost of operations — affiliate in GenOn Mid-Atlantic's consolidated statements of operations.

*Operator of Leased Facilities (GenOn)*

See Note 15, *Commitments and Contingencies*, for a discussion of the GenOn leased facilities (Conemaugh and Keystone) that GenOn also operates.

## Note 15— Commitments and Contingencies (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)

**Commitments**

*GenOn Mid-Atlantic Operating Leases*

GenOn Mid-Atlantic leases a 100% interest in the Dickerson and Morgantown coal generation units and associated property through 2029 and 2034, respectively. GenOn Mid-Atlantic has an option to extend the leases. Any extensions of the respective leases would be for less than 75% of the economic useful life of the facility, as measured from the beginning of the original lease term through the end of the proposed remaining lease term. GenOn Mid-Atlantic accounts for these leases as operating leases and recognizes rent expense on a straight-line basis over the lease term. Rent expense totaled $43 million, $43 million, and $41 million for the years ended December 31, 2015, 2014, and 2013 respectively, net of annual amortization of the out-of-market liability of $28 million. Rent expense is included in cost of operations. As of December 31, 2015 and 2014, GenOn Mid-Atlantic has paid $196 million and $157 million, respectively, of lease payments in excess of rent expense recognized, which is included in prepaid rent and other current assets and other non-current assets on the consolidated balance sheets. Of these amounts, $71 million is included, for both 2015 and 2014, in prepaid rent and other current assets.

For restrictions under these leases, see Note 10, *Debt and Capital Leases*.

As a result of pushdown accounting, GenOn Mid-Atlantic recorded the acquisition date fair value of the leasehold improvements of $382 million, classified in property, plant and equipment.  In addition, GenOn Mid-Atlantic recorded the acquisition date fair value of the leasehold interests, net of the present value of the lease obligation, equal to an out-of-market liability of $604 million, classified in out-of-market contracts. This liability is amortized to rent expense on a straight-line basis over the term of the lease.

Future minimum lease commitments under the GenOn Mid-Atlantic operating leases for the years ending after December 31, 2015, are as follows:

|  | (In millions) |
|---|---|
| 2016 | $ 150 |
| 2017 | 144 |
| 2018 | 105 |
| 2019 | 139 |
| 2020 | 105 |
| Thereafter | 442 |
| Total | $ 1,085 |

*REMA Operating Leases (GenOn)*

GenOn, through its subsidiary, REMA, leases a 100% interest in the Shawville generation facility through 2026, and expects to make payments under the Shawville lease through that date, and leases 16.45% and 16.67% interests in the Keystone and Conemaugh coal generation facilities, respectively, through 2034, and expects to make payments under the Keystone and Conemaugh leases through 2029 in accordance with the terms of the leases. At the expiration of these leases, there are several renewal options related to fair value. GenOn accounts for these leases as operating leases and records lease expense on a straight-line basis over the lease term. Rent expense totaled $29 million, $29 million, and $28 million for the years ended December 31, 2015, 2014, and 2013, respectively, net of annual amortization of out-of-market liability of $11 million. Rent expense is included in cost of operations. GenOn has paid $61 million and $41 million of lease payments in excess of rent expense recognized, which is included in prepaid rent and other current assets and other non-current assets on the consolidated balance sheets as of December 31, 2015 and 2014, respectively. Of these amounts, $41 million is included, for both 2015 and 2014, in prepaid rent and other current assets (prepayments for GenOn).

GenOn operates the Conemaugh and Keystone generating facilities under 5-year agreements that initially expired in December 2015 and were renewed through December 2020. Under certain provisions and notifications, the agreements could be terminated annually with 1 year's notice. GenOn is reimbursed by the other owners for the cost of direct services provided to the Conemaugh and Keystone facilities. Additionally, GenOn received fees of $11 million for each of the years ended December 31, 2015, 2014, and 2013.

For restrictions under these leases, see Note 10, *Debt and Capital Leases.*

As a result of pushdown accounting, GenOn recorded the acquisition date fair value of the leasehold improvements of $66 million, classified in property, plant and equipment. In addition, GenOn recorded the acquisition date fair value of the leasehold interests, net of the present value of the lease obligation, equal to an out-of-market liability of $186 million, classified in out-of-market contracts. This liability is amortized to rent expense on a straight-line basis over the term of the lease.

Future minimum lease commitments under the REMA operating leases for the years ending after December 31, 2015, are as follows:

|  | (In millions) |
| --- | --- |
| 2016 | $ 61 |
| 2017 | 63 |
| 2018 | 55 |
| 2019 | 65 |
| 2020 | 56 |
| Thereafter | 278 |
| Total | $ 578 |

In May 2015, GenOn mothballed Units 1, 2, 3, and 4 at Shawville generating facility (597 MW) with plans to return those units to service no later than the summer of 2016 using natural gas. Under the lease agreement for Shawville, GenOn's obligations generally are to pay the required rent and to maintain the leased assets in accordance with the lease documentation, including in compliance with prudent competitive electric generating industry practice and applicable laws.

*Other Operating Leases*

The Registrants have commitments under other operating leases with various terms and expiration dates. Included in other operating leases is GenOn's long-term lease for offices in Houston, Texas which expires in 2018. GenOn Mid-Atlantic has other operating leases which primarily relate to the Chalk Point generating facility. Rent expense for other operating leases is recorded to cost of operations or general and administrative, as applicable, based on the nature of the lease.

The Registrants' rent expense associated with other operating leases was as follows:

|  | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
| --- | --- | --- | --- |
|  | (In millions) | | |
| GenOn | $ 15 | $ 12 | $ 17 |
| GenOn Americas Generation | $ 1 | — | — |
| GenOn Mid-Atlantic | $ 1 | — | — |

Future minimum lease commitments under the Registrants' other operating leases for the years ending after December 31, 2015, are as follows:

| | GenOn[(a)] | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| | | (In millions) | |
| 2016 | $ 16 | $ 3 | $ 2 |
| 2017 | 14 | 2 | 2 |
| 2018 | 11 | 2 | 2 |
| 2019 | 3 | 2 | 2 |
| 2020 | 1 | 1 | — |
| Thereafter | 14 | — | — |
| Total | $ 59 | $ 10 | $ 8 |

(a)   Amounts in the table exclude future sublease income of $13 million associated with GenOn's long-term lease for its corporate headquarters in Houston, Texas.

### Fuel and Commodity Transportation Commitments

The Registrants have commitments under coal agreements and commodity transportation contracts, primarily related to natural gas and coal, of various quantities and durations. At December 31, 2015, the maximum remaining term under any individual fuel supply contract is three years and any transportation contract is eight years.

As of December 31, 2015, the Registrants' commitments under such outstanding agreements are estimated as follows:

| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| | | (In millions) | |
| 2016 | $ 139 | $ 55 | $ 55 |
| 2017 | 88 | 13 | 13 |
| 2018 | 73 | 13 | 13 |
| 2019 | 1 | — | — |
| 2020 | 1 | — | — |
| Thereafter | 3 | — | — |
| Total | $ 305 | $ 81 | $ 81 |

### LTSA Commitments (GenOn)

LTSA commitments primarily relate to long-term service agreements that cover some periodic maintenance, including parts, on power generation turbines. The long-term maintenance agreements terminate from 2037 to 2039 based on turbine usage.

As of December 31, 2015, GenOn's commitments under such outstanding agreements are estimated as follows:

| | GenOn |
|---|---|
| | (In millions) |
| 2016 | $ 30 |
| 2017 | 13 |
| 2018 | 12 |
| 2019 | 26 |
| 2020 | 14 |
| Thereafter | 209 |
| Total | $ 304 |

115

.

*Other Commitments*

The Registrants have other commitments under contractual arrangements with various terms and expiration dates. The Registrants' other commitments primarily include the operation and maintenance agreement and the fly ash sales agreement entered into by GenOn Mid-Atlantic in connection with its ash beneficiation facility. The ash beneficiation facility agreements will expire in 2031. GenOn Mid-Atlantic has other similar agreements for gypsum. In addition to the GenOn Mid-Atlantic agreements, GenOn has other commitments which primarily relate to its southern California generating facilities.

As of December 31, 2015, the Registrants' other commitments are estimated as follows

| | GenOn | | GenOn Americas Generation | | GenOn Mid-Atlantic | |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| 2016 | $ | 2 | $ | 2 | $ | 2 |
| 2017 | | 3 | | 3 | | 3 |
| 2018 | | 3 | | 3 | | 3 |
| 2019 | | 3 | | 3 | | 3 |
| 2020 | | 3 | | 3 | | 3 |
| Thereafter | | 50 | | 50 | | 50 |
| Total | $ | 64 | $ | 64 | $ | 64 |

## Contingencies

The Registrants' material legal proceedings are described below. The Registrants believe that they have valid defenses to these legal proceedings and intend to defend them vigorously. The Registrants record reserves for estimated losses from contingencies when information available indicates that a loss is probable and the amount of the loss, or range of loss, can be reasonably estimated. In addition, legal costs are expensed as incurred. Management has assessed each of the following matters based on current information and made a judgment concerning its potential outcome, considering the nature of the claim, the amount and nature of damages sought, and the probability of success. Unless specified below, the Registrants are unable to predict the outcome of these legal proceedings or reasonably estimate the scope or amount of any associated costs and potential liabilities. As additional information becomes available, management adjusts its assessment and estimates of such contingencies accordingly. Because litigation is subject to inherent uncertainties and unfavorable rulings or developments, it is possible that the ultimate resolution of the Registrants' liabilities and contingencies could be at amounts that are different from their currently recorded reserves and that such difference could be material.

In addition to the legal proceedings noted below, the Registrants are parties to other litigation or legal proceedings arising in the ordinary course of business. In management's opinion, the disposition of these ordinary course matters will not materially adversely affect the Registrants' respective consolidated financial position, results of operations, or cash flows.

*Actions Pursued by MC Asset Recovery (GenOn)* — With Mirant Corporation's emergence from bankruptcy protection in 2006, certain actions filed by GenOn Energy Holdings and some of its subsidiaries against third parties were transferred to MC Asset Recovery, a wholly owned subsidiary of GenOn Energy Holdings. MC Asset Recovery is governed by a manager who is independent of NRG and GenOn. MC Asset Recovery is a disregarded entity for income tax purposes. Under the remaining action transferred to MC Asset Recovery, MC Asset Recovery seeks to recover damages from Commerzbank AG and various other banks, or the Commerzbank Defendants, for alleged fraudulent transfers that occurred prior to Mirant's bankruptcy proceedings. In December 2010, the U.S. District Court for the Northern District of Texas dismissed MC Asset Recovery's complaint against the Commerzbank Defendants. In January 2011, MC Asset Recovery appealed the District Court's dismissal of its complaint against the Commerzbank Defendants to the U.S. Court of Appeals for the Fifth Circuit. In March 2012, the Court of Appeals reversed the District Court's dismissal and reinstated MC Asset Recovery's amended complaint against the Commerzbank Defendants. On December 10, 2015, the District Court granted the Commerzbank Defendants' motion for summary judgment. On December 29, 2015, MC Asset Recovery filed a notice to appeal this ruling. If MC Asset Recovery succeeds in obtaining any recoveries from the Commerzbank Defendants, the Commerzbank Defendants have asserted that they will seek to file claims in Mirant's bankruptcy proceedings for the amount of those recoveries. GenOn Energy Holdings would vigorously contest the allowance of any such claims. If the Commerzbank Defendants were to receive an allowed claim as a result of a recovery by MC Asset Recovery on its claims against them, GenOn Energy Holdings would retain from the net amount recovered by MC Asset Recovery an amount equal to the dollar amount of the resulting allowed claim.

*Natural Gas Litigation (GenOn)* — GenOn is party to several lawsuits, certain of which are class action lawsuits, in state and federal courts in Kansas, Missouri, Nevada and Wisconsin. These lawsuits were filed in the aftermath of the California energy crisis in 2000 and 2001 and the resulting FERC investigations and relate to alleged conduct to increase natural gas prices in violation of state antitrust law and similar laws. The lawsuits seek treble or punitive damages, restitution and/or expenses. The lawsuits also name as parties a number of energy companies unaffiliated with NRG. In July 2011, the U.S. District Court for the District of Nevada, which was handling four of the five cases, granted the defendants' motion for summary judgment and dismissed all claims against GenOn in those cases. The plaintiffs appealed to the U.S. Court of Appeals for the Ninth Circuit which reversed the decision of the District Court. GenOn along with the other defendants in the lawsuit filed a petition for a writ of certiorari to the U.S. Supreme Court challenging the Court of Appeals' decision and the Supreme Court granted the petition. On April 21, 2015, the Supreme Court affirmed the Ninth Circuit's holding that plaintiffs' state antitrust law claims are not field-preempted by the federal Natural Gas Act and the Supremacy Clause of the U.S. Constitution. The Supreme Court left open whether the claims were preempted on the basis of conflict preemption. The U.S. Supreme Court directed that the case be remanded to the U.S. District Court for the District of Nevada. The case is proceeding in that court. GenOn has agreed to indemnify CenterPoint against certain losses relating to these lawsuits.

In September 2012, the State of Nevada Supreme Court, which was handling the remaining case, affirmed dismissal by the Eighth Judicial District Court for Clark County, Nevada of all plaintiffs' claims against GenOn. In February 2013, the plaintiffs in the Nevada case filed a petition for a writ of certiorari to the U.S. Supreme Court. In June 2013, the Supreme Court denied the petition for a writ of certiorari, thereby ending one of the five lawsuits.

*Maryland Department of the Environment v. GenOn Chalk Point and GenOn Mid-Atlantic* — On January 25, 2013, Food & Water Watch, the Patuxent Riverkeeper and the Potomac Riverkeeper (together, the Citizens Group) sent GenOn Mid-Atlantic a letter alleging that the Chalk Point, Dickerson and Morgantown generating facilities were violating the terms of the three National Pollution Discharge Elimination System permits by discharging nitrogen and phosphorous in excess of the limits in each permit. On March 21, 2013, the MDE sent GenOn Mid-Atlantic a similar letter with respect to the Chalk Point and Dickerson generating facilities, threatening to sue within 60 days if the generating facilities were not brought into compliance. On June 11, 2013, the Maryland Attorney General on behalf of the MDE filed a complaint in the U.S. District Court for the District of Maryland alleging violations of the CWA and Maryland environmental laws related to water. The lawsuit is ongoing and seeks injunctive relief and civil penalties in excess of $100,000. The Registrants do not expect the resolution of this matter to have a material impact on the Registrants' consolidated financial position, results of operations, or cash flows.

*Chapter 11 Proceedings (GenOn and GenOn Americas Generation)* — In July 2003, and various dates thereafter, the Mirant Debtors filed voluntary petitions in the Bankruptcy Court for relief under Chapter 11 of the U.S. Bankruptcy Code. GenOn Energy Holdings and most of the other Mirant Debtors emerged from bankruptcy on January 3, 2006, when the Plan became effective. The remaining Mirant Debtors emerged from bankruptcy on various dates in 2007. Approximately 461,000 of the shares of GenOn Energy Holdings common stock to be distributed under the Plan have not yet been distributed and have been reserved for distribution with respect to claims disputed by the Mirant Debtors that have not been resolved. Upon the Mirant/RRI Merger, those reserved shares converted into a reserve for approximately 1.3 million shares of GenOn common stock. Upon the NRG Merger, those reserved shares converted into a reserve for approximately 159,000 shares of NRG common stock. Under the terms of the Plan, upon the resolution of such a disputed claim, the claimant will receive the same pro rata distributions of common stock, cash, or both as previously allowed claims, regardless of the price at which the common stock is trading at the time the claim is resolved. If the aggregate amount of any such payouts results in the number of reserved shares being insufficient, additional shares of common stock may be issued to address the shortfall.

*Potomac River Environmental Investigation* — In March 2013, NRG Potomac River LLC received notice that the District of Columbia Department of Environment (now renamed the Department of Energy and Environment, or DOEE) was investigating potential discharges to the Potomac River originating from the Potomac River Generating facility site, a site where the generation facility is no longer in operation. In connection with that investigation, DOEE served a civil subpoena on NRG Potomac River LLC requesting information related to the site and potential discharges occurring from the site. NRG Potomac River LLC provided various responsive materials. In January 2016, DOEE advised NRG Potomac River that DOEE believed various environmental violations had occurred as a result of discharges DOEE believes occurred to the Potomac River from the Potomac River Generating facility site and as a result of associated failures to accurately or sufficiently report such discharges. DOEE has indicated it believes that penalties are appropriate in light of the violations. The Registrants are currently reviewing the information provided by DOEE.

**Note 16 — Regulatory Matters (GenOn, GenOn Americas Generation, GenOn Mid-Atlantic)**

The Registrants operate in a highly regulated industry and are subject to regulation by various federal and state agencies. As such, the Registrants are affected by regulatory developments at both the federal and state levels and in the regions in which they operate. In addition, the Registrants are subject to the market rules, procedures, and protocols of the various ISO and RTO markets in which they participate. These power markets are subject to ongoing legislative and regulatory changes that may impact the Registrants' wholesale business.

In addition to the regulatory proceedings noted below, the Registrants are parties to other regulatory proceedings arising in the ordinary course of business or have other regulatory exposure. In management's opinion, the disposition of these ordinary course matters will not materially adversely affect the Registrants' respective consolidated financial position, results of operations, or cash flows.

*National*

*U.S. Supreme Court Agrees to Consider the Constitutionality of Maryland's Generator Contracting Programs* — On October 19, 2015, the U.S. Supreme Court agreed to hear a case challenging the constitutionality of certain state-directed procurements of new electric generating facilities. The case involves the authority of the Maryland Public Service Commission to direct load-serving utilities in the state to enter into long-term power purchase contracts with a generation developer to encourage the construction of new generation capacity in Maryland. The constitutionality of the long-term contracts was challenged in the U.S. District Court for the District of Maryland, which, in an October 24, 2013, decision, found that the contracts violated the Supremacy Clause of the U.S. Constitution because they were both conflict preempted and field preempted by the FPA and the authority that the FPA granted to FERC. On June 30, 2014, the U.S. Court of Appeals for the Fourth Circuit affirmed the District Court's decision. A case arising out of New Jersey and raising similar issues was decided by the U.S. Court of Appeals for the Third Circuit, which also determined that the state-mandated contracts were preempted. After the Supreme Court granted certiorari in the Maryland case, NRG filed a friend-of-the-court brief urging the Court to uphold the right of states to incentivize new generation by directing utilities in the state to enter into long-term contracts — but noted that FERC has both the authority and the statutory obligation to protect wholesale markets by requiring that bids in the wholesale markets reflect costs and by ensuring that uneconomic entry does not distort auction outcomes. The Supreme Court heard oral argument on February 24, 2016. The outcome of this litigation could have broad impacts on whether and how states require utilities to contract with new generation resources, as well as how such contracted resources interact with the FERC-jurisdictional wholesale markets.

*U.S. Supreme Court Allows FERC to Retain Jurisdiction Over Demand Response* — On January 25, 2016, the U.S. Supreme Court issued a 6-2 decision affirming FERC's ability to exercise jurisdiction over demand response resources seeking to voluntarily participate in the wholesale markets. Additionally, the Supreme Court upheld FERC's preferred scheme for pricing demand response in the energy market. This case arose out of a May 23, 2014, decision by the D.C. Circuit which vacated FERC's rules (known as Order No. 745) that set the compensation level for demand response resources participating in the FERC-jurisdictional energy markets. The Court of Appeals had held that the FPA does not authorize FERC to exercise jurisdiction over demand response and that instead demand response is part of the retail market over which the states have jurisdiction. With the Supreme Court's decision, FERC will resume exercising jurisdiction over demand response, which the Registrants view as a positive for their wholesale business.

*East*

*Montgomery County Station Power Tax* — On December 20, 2013, NRG received a letter from Montgomery County, Maryland requesting payment of an energy tax for the consumption of station power at the Dickerson Facility over the previous three years. Montgomery County seeks payment in the amount of $22 million, which includes tax, interest and penalties. NRG disputed the applicability of the tax. On December 11, 2015, the Maryland Tax Court reversed Montgomery County's assessment. Montgomery County has filed an appeal.

**Note 17 — Environmental Matters (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

The Registrants are subject to a wide range of environmental laws in the development, construction, ownership and operation of projects. These laws generally require that governmental permits and approvals be obtained before construction and during operation of power plants. Environmental laws have become increasingly stringent and the Registrants expect this trend to continue. The electric generation industry is facing new requirements regarding GHGs, combustion byproducts, water discharge and use, and threatened and endangered species. In general, future laws are expected to require the addition of emissions controls or other environmental controls or to impose certain restrictions on the operations of the Registrants' facilities, which could have a material effect on the Registrants' operations.

The EPA finalized CSAPR in 2011, which was intended to replace CAIR in January 2012, to address certain states' obligations to reduce emissions so that downwind states can achieve federal air quality standards. In December 2011, the D.C. Circuit stayed the implementation of CSAPR and then vacated CSAPR in August 2012 but kept CAIR in place until the EPA could replace it. In April 2014, the U.S. Supreme Court reversed and remanded the D.C. Circuit's decision. In October 2014, the D.C. Circuit lifted the stay of CSAPR. In response, the EPA in November 2014 amended the CSAPR compliance dates. Accordingly, CSAPR replaced CAIR on January 1, 2015. On July 28, 2015, the D.C. Circuit held that the EPA had exceeded its authority by requiring certain reductions that were not necessary for downwind states to achieve federal standards. Although the D.C. Circuit kept the rule in place, the court ordered the EPA to revise the Phase 2 (or 2017) (i) $SO_2$ budgets for four states and (ii) ozone-season $NO_x$ budgets for 11 states including Maryland, New Jersey, New York, Ohio and Pennsylvania. The EPA is currently reviewing the decision. In December 2015, the EPA proposed the CSAPR Update Rule using the 2008 Ozone NAAQS, which would reduce the total amount of ozone season $NO_x$ as compared with the previously utilized 1997 Ozone NAAQS. If finalized, this proposal would reduce future $NO_x$ allocations and/or current banked allowances. While the Registrants cannot predict the final outcome of this rulemaking, the Registrants believe their investment in pollution controls and cleaner technologies leave the fleet well positioned for compliance.

In February 2012, the EPA promulgated standards (the MATS rule) to control emissions of HAPs from coal and oil-fired electric generating units. The rule established limits for mercury, non-mercury metals, certain organics and acid gases, which limits had to be met beginning in April 2015 (with some units getting a 1-year extension). In June 2015, the U.S. Supreme Court issued a decision in the case of *Michigan v. EPA*, and held that the EPA unreasonably refused to consider costs when it determined that it was "appropriate and necessary" to regulate HAPs emitted by electric generating units. The U.S. Supreme Court did not vacate the MATS rule but rather remanded it to the D.C. Circuit for further proceedings. In November 2015, the EPA proposed a supplemental finding that including a consideration of cost does not alter the EPA's previous determination that it is appropriate and necessary to regulate air toxics, including mercury from power plants. In December 2015, the D.C. Circuit remanded the rule to the EPA without vacatur. While the Registrants cannot predict the final outcome of this rulemaking, the Registrants believe that because they have already invested in pollution controls and cleaner technologies, their fleet is well positioned to comply with the MATS rule.

### Water

In August 2014, the EPA finalized the regulation regarding the use of water for once through cooling at existing facilities to address impingement and entrainment concerns. The Registrants anticipate that more stringent requirements will be incorporated into some of their water discharge permits over the next several years as NPDES permits are renewed.

### Byproducts, Wastes, Hazardous Materials and Contamination

In April 2015, the EPA finalized the rule regulating byproducts of coal combustion (e.g., ash and gypsum) as solid wastes under the RCRA. The Registrants have evaluated the impact of the new rule on their results of operations, financial condition and cash flows and have accrued their environmental and asset retirement obligations under the rule based on current estimates as of December 31, 2015.

### East

*Maryland Environmental Regulations* — In December 2014, MDE proposed a regulation regarding $NO_x$ emissions from coal-fired electric generating units, which had it been finalized would have required by 2020 the Registrants (at each of the three Dickerson coal-fired units and the Chalk Point coal-fired unit that does not have an SCR) to either (1) install and operate an SCR; (2) retire the unit; or (3) convert the fuel source from coal to natural gas. In early 2015, the State of Maryland decided not to finalize the regulation as proposed. In November 2015, MDE finalized revised regulations to address future $NO_x$ reductions, which although more stringent than previous regulations, will not cause the Registrants to spend capital to comply. As a result of the new regulations, on February 29, 2016, the Registrants notified PJM that they were withdrawing the standing deactivation notices for Dickerson Units 1, 2 and 3 and Chalk Point Units 1 and 2.

For further discussion of these matters, refer to Note 15, *Commitments and Contingencies – Contingencies*.

### Environmental Capital Expenditures

GenOn estimates that environmental capital expenditures from 2016 through 2020 required to comply with environmental laws will be approximately $68 million for GenOn, which includes $12 million for GenOn Americas Generation. The amount for GenOn Americas Generation includes $9 million for GenOn Mid-Atlantic. The majority of these costs will be expended by the end of 2016.

**Note 18 — Guarantees (GenOn and GenOn Americas Generation)**

GenOn and GenOn Americas Generation and their respective subsidiaries enter into various contracts that include indemnification and guarantee provisions as a routine part of their business activities. Examples of these contracts include asset purchases and sale agreements, commodity sale and purchase agreements, retail contracts, EPC agreements, operation and maintenance agreements, service agreements, settlement agreements, and other types of contractual agreements with vendors and other third parties, as well as affiliates. These contracts generally indemnify the counterparty for tax, environmental liability, litigation and other matters, as well as breaches of representations, warranties and covenants set forth in these agreements. In some cases, GenOn's and GenOn Americas Generation's maximum potential liability cannot be estimated, since the underlying agreements contain no limits on potential liability.

The following table summarizes the maximum potential exposures that can be estimated for guarantees, indemnities, and other contingent liabilities by maturity:

*GenOn*

| Guarantees | By Remaining Maturity at December 31, | | | | | December 31, |
| | 2015 | | | | | 2014 |
| | Under 1 Year | 1-3 Years | 3-5 Years | Over 5 Years | Total | Total |
| | (In millions) | | | | | (In millions) |
|---|---|---|---|---|---|---|
| Letters of credit and surety bonds | $ 350 | $ — | $ — | $ — | $ 350 | $ 319 |
| Other guarantees | — | — | — | 46 | 46 | 57 |
| Total guarantees | $ 350 | $ — | $ — | $ 46 | $ 396 | $ 376 |

*GenOn Americas Generation*

| Guarantees | By Remaining Maturity at December 31, | | | | | December 31, |
| | 2015 | | | | | 2014 |
| | Under 1 Year | 1-3 Years | 3-5 Years | Over 5 Years | Total | Total |
| | (In millions) | | | | | (In millions) |
|---|---|---|---|---|---|---|
| Letters of credit and surety bonds | $ 229 | $ — | $ — | $ — | $ 229 | $ 180 |
| Total guarantees | $ 229 | $ — | $ — | $ — | $ 229 | $ 180 |

*Letters of credit and surety bonds* — As of December 31, 2015, GenOn and GenOn Americas Generation and their respective subsidiaries were contingently obligated for a total of $72 million and $2 million under surety bonds, respectively. In addition, GenOn had $278 million of letters of credit that were issued under the NRG credit agreement. See Note 14, *Related Party Transactions.* Of those letters of credit, $227 million were issued on behalf of GenOn Americas Generation's subsidiaries and $131 million were issued on behalf of GenOn Mid-Atlantic. Most of these letters of credit and surety bonds are issued in support of their obligations to perform under commodity agreements and obligations associated with future closure and maintenance of ash sites, as well as for financing or other arrangements. A majority of these letters of credit and surety bonds expire within one year of issuance, and it is typical for the Registrants to renew them on similar terms.

*Other guarantees* — GenOn and GenOn Americas Generation have issued guarantees of obligations that their subsidiaries may incur as a provision for environmental site remediation, payment of debt obligations, rail car leases, performance under purchase, EPC and operating and maintenance agreements. GenOn and GenOn Americas Generation do not believe that they will be required to make any material payments under these guarantees.

*Other indemnities* — Other indemnifications GenOn and GenOn Americas Generation have provided cover operational, tax, litigation and breaches of representations, warranties and covenants. GenOn and GenOn Americas Generation have also indemnified, on a routine basis in the ordinary course of business, financing parties, consultants or other vendors who have provided services to them. GenOn's and GenOn Americas Generation's maximum potential exposure under these indemnifications can range from a specified dollar amount to an indeterminate amount, depending on the nature of the transaction. Total maximum potential exposure under these indemnifications is not estimable due to uncertainty as to whether claims will be made or how they will be resolved. GenOn and GenOn Americas Generation do not believe that they will be required to make any material payments under these indemnity provisions.

Because many of the guarantees and indemnities GenOn and GenOn Americas Generation issue to third parties and affiliates do not limit the amount or duration of their obligations to perform under them, there exists a risk that GenOn or GenOn Americas Generation may have obligations in excess of the amounts described above. For those guarantees and indemnities that do not limit the liability exposure, it may not be possible to estimate what GenOn's or GenOn Americas Generation's liability would be, until a claim is made for payment or performance, due to the contingent nature of these contracts.

Schedule I

**GENON ENERGY, INC. (PARENT)**

**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED STATEMENTS OF OPERATIONS**

| | For the Year Ended December 31, 2015 | For the Year Ended December 31, 2014 | For the Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| **Operating Income/(Loss)** | $ — | $ — | $ — |
| **Other Income/(Expense)** | | | |
| Equity in losses of consolidated subsidiaries | (98) | 242 | 17 |
| Other income/(expense), net | 85 | 84 | 74 |
| Gain on debt extinguishment | 23 | — | — |
| Interest expense | (128) | (129) | (140) |
| Total other income/(expense) | (118) | 197 | (49) |
| **(Loss)/Income Before Income Taxes** | (118) | 197 | (49) |
| Income tax expense/(benefit) | (3) | — | (6) |
| **Net (Loss)/Income** | $ (115) | $ 197 | $ (43) |

See notes to condensed financial statements.

122

.

Schedule I

**GENON ENERGY, INC. (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**

**CONDENSED BALANCE SHEETS**

| | As of December 31, | |
|---|---|---|
| | 2015 | 2014 |
| | (In millions) | |
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 226 | $ 490 |
| Notes receivable — affiliate | 300 | 386 |
| Taxes receivable and other current assets | 254 | 214 |
| Total current assets | 780 | 1,090 |
| **Other Assets** | | |
| Investment in subsidiaries | 456 | 476 |
| Notes receivable — affiliate | 1,025 | 1,025 |
| Total other assets | 1,481 | 1,501 |
| **Total Assets** | $ 2,261 | $ 2,591 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| **Current Liabilities** | | |
| Accrued taxes | $ 1 | $ 1 |
| Accrued expenses and other current liabilities | 31 | 39 |
| Total current liabilities | 32 | 40 |
| **Other Liabilities** | | |
| Long-term debt | 1,956 | 2,148 |
| Other non-current liabilities | 1 | 2 |
| Total non-current liabilities | 1,957 | 2,150 |
| **Total Liabilities** | 1,989 | 2,190 |
| **Commitments and Contingencies** | | |
| **Stockholder's Equity** | | |
| Common stock: $0.001 par value, 1 share authorized and issued at December 31, 2015 and 2014 | — | — |
| Additional paid-in capital | 325 | 325 |
| (Accumulated deficit) / retained earnings | (37) | 78 |
| Accumulated other comprehensive loss | (16) | (2) |
| **Total Stockholder's Equity** | 272 | 401 |
| **Total Liabilities and Stockholder's Equity** | $ 2,261 | $ 2,591 |

See notes to condensed financial statements.

123

.

Schedule I

**GENON ENERGY, INC. (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED STATEMENTS OF CASH FLOWS**

| | For the Year Ended December 31, 2015 | | For the Year Ended December 31, 2014 | | For the Year Ended December 31, 2013 | |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| **Cash Flows from Operating Activities** | | | | | | |
| Net cash used by operating activities | $ | (159) | $ | (165) | $ | 491 |
| **Cash Flows from Investing Activities** | | | | | | |
| Net cash from sale of Marsh Landing | | — | | — | | 175 |
| Proceeds from sale of equity method investments | | — | | 35 | | — |
| Net cash provided by investing activities | | — | | 35 | | 175 |
| **Cash Flows from Financing Activities** | | | | | | |
| Payments of short and long-term debt | | (105) | | (1) | | (575) |
| Net cash used by financing activities | | (105) | | (1) | | (575) |
| **Net (Decrease)/Increase in Cash and Cash Equivalents** | | (264) | | (131) | | 91 |
| **Cash and Cash Equivalents at Beginning of Period** | | 490 | | 621 | | 530 |
| **Cash and Cash Equivalents at End of Period** | $ | 226 | $ | 490 | $ | 621 |
| | | | | | | |
| **Supplemental Disclosures** | | | | | | |
| Cash paid for interest, net of amounts capitalized | $ | 176 | $ | 240 | $ | 138 |
| Cash paid for income taxes (net of refunds received) | $ | — | $ | — | $ | — |

See notes to condensed financial statements.

124

.

<div align="right">**Schedule I**</div>

<div align="center">

**GENON ENERGY, INC. (PARENT)**
**NOTES TO CONDENSED FINANCIAL STATEMENTS**

</div>

## 1.   Background and Basis of Presentation

*Background*

The condensed parent company financial statements have been prepared in accordance with Rule 12-04, Schedule I of Regulation S-X, as the restricted net assets of GenOn Energy Inc.'s subsidiaries exceed 25% of the consolidated net assets of GenOn Energy, Inc. These statements should be read in conjunction with the consolidated statements and notes thereto of the Registrants.

RRI Energy (a Delaware corporation) changed its name from Reliant Energy, Inc. effective May 2009 in connection with the sale of its retail business. GenOn changed its name from RRI Energy effective December 3, 2010 in connection with the merger with Mirant. "GenOn" refers to GenOn Energy, Inc. and, except where the context indicates otherwise, its subsidiaries, after giving effect to the Mirant/RRI Merger.

*Basis of Presentation*

The condensed financial statements herein are the condensed financial statements and other financial information of GenOn Energy, Inc.

Equity in income/loss of affiliates consists of earnings of direct subsidiaries of GenOn Energy, Inc. (parent).

*Cash Dividends Received*

For the year ended December 31, 2015, 2014 and 2013, GenOn Energy, Inc. did not receive any cash dividends from its subsidiaries.

## 2.   Long-Term Debt

For a discussion of GenOn Energy, Inc.'s long-term debt, see Note 10, *Debt and Capital Leases,* to the Registrants' consolidated financial statements.

Debt maturities of GenOn Energy, Inc. as of December 31, 2015 are:

|  | (In millions) |
|---|---:|
| 2016 | $ — |
| 2017 | 692 |
| 2018 | 649 |
| 2019 | — |
| 2020 | 489 |
| Total | $ 1,830 |

## 3.   Commitments, Contingencies and Guarantees

See Note 13, *Income Taxes* and Note 15, *Commitments and Contingencies* to the Registrants' consolidated financial statements for a detailed discussion of GenOn Energy, Inc.'s contingencies.

As of December 31, 2015, GenOn Energy, Inc. had $46 million of guarantees, which are included in Note 18, *Guarantees,* to the Registrants' consolidated financial statements.

### SCHEDULE II. VALUATION AND QUALIFYING ACCOUNTS
### GENON ENERGY, INC. AND SUBSIDIARIES

**For the Years Ended December 31, 2015, 2014, and 2013**

| | Balance at Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Provision for uncollectible accounts** [a] | | | | | |
| Year Ended December 31, 2015 | $ — | $ — | $ — | $ (1) | (1) |
| Year Ended December 31, 2014 | 1 | — | — | (1) | — |
| Year Ended December 31, 2013 | 4 | — | — | (3) | 1 |
| | | | | | |
| **Income tax valuation allowance, deducted from deferred tax assets** | | | | | |
| Year Ended December 31, 2015 | $ 2,779 | $ 16 | $ — | $ (331) | $ 2,464 |
| Year Ended December 31, 2014 | 2,672 | — | 107 | — | 2,779 |
| Year Ended December 31, 2013 | 2,324 | — | 348 | — | 2,672 |

(a)   Provision for uncollectible accounts represents credit reserves for derivative contract assets.

126

.

**Schedule I**

**GENON AMERICAS GENERATION, LLC (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED STATEMENTS OF OPERATIONS**

| | For the Year Ended December 31, 2015 | For the Year Ended December 31, 2014 | For the Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| **Operating (Loss)/Income** | $ — | $ — | $ — |
| **Other Income/(Expense)** | | | |
| Equity in earnings of consolidated subsidiaries | 138 | 371 | 123 |
| Gain on debt extinguishment | 42 | — | — |
| Interest expense | (64) | (66) | (64) |
| Total other income/(expense) | 116 | 305 | 59 |
| **Income Before Income Taxes** | 116 | 305 | 59 |
| Income tax expense | — | — | — |
| **Net Income** | $ 116 | $ 305 | $ 59 |

See notes to condensed financial statements.

127

.

**Schedule I**

**GENON AMERICAS GENERATION, LLC (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED BALANCE SHEETS**

| | As of December 31, | |
|---|---|---|
| | 2015 | 2014 |
| | (In millions) | |
| **ASSETS** | | |
| **Current Assets** | | |
| Accounts receivable | $ — | $ 2 |
| Total current assets | — | 2 |
| **Other Assets** | | |
| Investment in subsidiaries | 1,907 | 1,770 |
| Total other assets | 1,907 | 1,770 |
| **Total Assets** | $ 1,907 | $ 1,772 |
| | | |
| **LIABILITIES AND MEMBER'S EQUITY** | | |
| **Current Liabilities** | | |
| Accounts payable — affiliate | $ 199 | $ — |
| Note payable — affiliate | 11 | 11 |
| Accrued expenses and other current liabilities | 13 | 16 |
| Total current liabilities | 223 | 27 |
| **Other Liabilities** | | |
| Long-term debt | 752 | 929 |
| Total non-current liabilities | 752 | 929 |
| **Total Liabilities** | 975 | 956 |
| **Commitments and Contingencies** | | |
| **Member's Equity** | | |
| Member's interest | 932 | 816 |
| Total member's equity | 932 | 816 |
| **Total Liabilities and Member's Equity** | $ 1,907 | $ 1,772 |

See notes to condensed financial statements.

128

.

Schedule I

**GENON AMERICAS GENERATION, LLC (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED STATEMENTS OF CASH FLOWS**

| | For the Year Ended December 31, 2015 | | For the Year Ended December 31, 2014 | | For the Year Ended December 31, 2013 | |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| **Cash Flows from Operating Activities** | | | | | | |
| Net cash provided by operating activities | $ | 128 | $ | 197 | $ | 217 |
| **Cash Flows from Investing Activities** | | | | | | |
| Capitalized interest | | (2) | | (1) | | (2) |
| Proceeds from sale of assets | | — | | 50 | | — |
| Net cash used by investing activities | | (2) | | 49 | | (2) |
| **Cash Flows from Financing Activities** | | | | | | |
| Capital contributions | | — | | 74 | | 70 |
| Distributions to member | | — | | (320) | | (285) |
| Payments of short and long-term debt | | (126) | | — | | — |
| Net cash used by financing activities | | (126) | | (246) | | (215) |
| **Net Increase/(Decrease) in Cash and Cash Equivalents** | | — | | — | | — |
| **Cash and Cash Equivalents at Beginning of Period** | | — | | — | | — |
| **Cash and Cash Equivalents at End of Period** | $ | — | $ | — | $ | — |
| | | | | | | |
| **Supplemental Disclosures** | | | | | | |
| Cash paid for interest, net of amounts capitalized | | 76 | | 74 | $ | 73 |

See notes to condensed financial statements.

129

.

<div align="right">**Schedule I**</div>

<div align="center">

**GENON AMERICAS GENERATION, LLC (PARENT)**
**NOTES TO CONDENSED FINANCIAL STATEMENTS**

</div>

**1.    Background and Basis of Presentation**

*Background*

The condensed parent company financial statements have been prepared in accordance with Rule 12-04, Schedule I of Regulation S-X, as the restricted net assets of GenOn Americas Generation, LLC's subsidiaries exceed 25% of the consolidated net assets of GenOn Americas Generation, LLC. These statements should be read in conjunction with the consolidated statements and notes thereto of the Registrants.

GenOn Americas Generation, LLC is a Delaware limited liability company and indirect wholly-owned subsidiary of GenOn Energy, Inc.

RRI Energy (a Delaware corporation) changed its name from Reliant Energy, Inc. effective May 2009 in connection with the sale of its retail business. GenOn changed its name from RRI Energy effective December 3, 2010 in connection with the merger with Mirant. "GenOn" refers to GenOn Energy, Inc. and, except where the context indicates otherwise, its subsidiaries, after giving effect to the Mirant/RRI Merger.

*Basis of Presentation*

The condensed financial statements presented herein are the condensed financial statements and other financial information of GenOn Americas Generation, LLC.

Equity in income/loss of affiliates consists of earnings of direct subsidiaries of GenOn Americas Generation, LLC (parent).

*Cash Dividends and Distributions*

For the years ended December 31, 2015, 2014, and 2013, GenOn Americas Generation, LLC, received cash dividends from its subsidiaries of $0 million, $320 million and $285 million. GenOn Americas Generation, subsequently made distributions in the same amount, through its parent company NRG Americas, Inc. to GenOn Energy Holdings, Inc., a subsidiary of GenOn.

**2.    Long-Term Debt**

For a discussion of GenOn Americas Generation, LLC's long-term debt, see Note 10, *Debt and Capital Leases,* to the Registrants' consolidated financial statements.

Debt maturities of GenOn Americas Generation, LLC as of December 31, 2015 are:

|  | (In millions) |
|---|---|
| 2021 and thereafter | 695 |
| Total | $ 695 |

**3.    Commitments, Contingencies and Guarantees**

See Note 15, *Commitments and Contingencies,* to the Registrants' consolidated financial statements for a detailed discussion of GenOn Americas Generation, LLC's contingencies.

At December 31, 2015, GenOn Americas Generation, LLC did not have any guarantees.

<div align="center">130</div>

**SCHEDULE II. VALUATION AND QUALIFYING ACCOUNTS**
**GENON AMERICAS GENERATION, LLC AND SUBSIDIARIES**

**For the Years Ended December 31, 2015, 2014, and 2013**

| | Balance at Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Provision for uncollectible accounts** [a] | | | | | |
| Year Ended December 31, 2015 | $ — | $ — | $ — | $ — | $ — |
| Year Ended December 31, 2014 | 1 | — | — | (1) | — |
| Year Ended December 31, 2013 | 4 | — | — | (3) | 1 |

(a)   Provision for uncollectible accounts represents credit reserves for derivative contract assets.

131

**SCHEDULE II. VALUATION AND QUALIFYING ACCOUNTS**

**GENON MID-ATLANTIC, LLC AND SUBSIDIARIES**

**For the Years Ended December 31, 2015, 2014, and 2013**

| | Balance at Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Provision for uncollectible accounts** (a) | | | | | |
| Year Ended December 31, 2015 | $ 2 | $ — | $ — | $ 2 | $ 4 |
| Year Ended December 31, 2014 | 3 | — | — | (1) | 2 |
| Year Ended December 31, 2013 | 4 | — | — | (1) | 3 |

(a)   Provision for uncollectible accounts represents credit reserves for derivative contract assets.

132

.

**GenOn Energy, Inc. Exhibit Index**

| Exhibit No. | Exhibit Name |
|---|---|
| 2.1 | Stock and Note Purchase Agreement by and among Mirant Asia-Pacific Ventures, Inc., Mirant Asia-Pacific Holdings, Inc., Mirant Sweden International AB (publ), and Tokyo Crimson Energy Holdings Corporation, dated at December 11, 2006 (Incorporated herein by reference to Exhibit 2.1 to the Mirant Corporation Current Report on Form 8-K filed December 13, 2006) |
| 2.2** | Agreement and Plan of Merger, dated as of July 20, 2012, by and among NRG Energy, Inc., Plus Merger Corporation and GenOn Energy, Inc. (Incorporated herein by reference to Exhibit 2.1 to the Registrant's Form 8-K filed July 23, 2012) |
| 3.1 | Fourth Amended and Restated Certificate of Incorporation of GenOn Energy, Inc., effective as of December 14, 2012 (Incorporated herein by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed December 14, 2012) |
| 3.2 | Eighth Amended and Restated By-Laws of GenOn Energy, Inc., effective as of December 14, 2012 (Incorporated herein by reference to Exhibit 3.2 to the Registrant's Current Report on Form 8-K filed December 14, 2012) |
| 4.1 | Form of Stock Certificate (Incorporated herein by reference to Exhibit 4.1 to the Registrant's Quarterly Report on Form 10-Q filed May 10, 2012) |
| 4.2 | Form of Rights Agreement between Reliant Resources, Inc. and The Chase Manhattan Bank, as Rights Agent, including a form of Rights Certificates, dated at January 15, 2001 (Incorporated herein by reference to Exhibit 4.2 to the Registrant's Registration Statement on Form S-1/A Amendment No. 8, Registration No. 333-48038) |
| 4.3 | Amendment No. 1 to Rights Agreement, by and between RRI Energy, Inc., JPMorgan Chase Bank, N.A., and Computershare Trust Company, N.A., dated at November 23, 2010 (Incorporated herein by reference to Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed November 24, 2010) |
| 4.4 | Senior Indenture between Reliant Energy, Inc. and Wilmington Trust Company, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed December 27, 2004) |
| 4.5 | Indenture between Orion Power Holdings, Inc. and Wilmington Trust Company, dated at April 27, 2000 (Incorporated herein by reference to Exhibit 4.1 to the Orion Power Holdings, Inc. Registration Statement on Form S-1, Registration No. 333-44118 filed August 18, 2000) |
| 4.6 | Fifth Supplemental Indenture relating to the 7.875% Senior Notes due 2017, between Reliant Energy, Inc. and Wilmington Trust Company, dated at June 13, 2007 (Incorporated herein by reference to Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed June 15, 2007) |
| 4.7 | Indenture between Mirant Americas Generation, Inc. and Bankers Trust Company, as trustee, relating to Senior Notes, dated at May 1, 2001 (Incorporated herein by reference to Exhibit 4.1 to the Mirant Americas Generation, Inc. Registration Statement on Form S-4, Registration No. 333-63240 filed June 18, 2001) |
| 4.8 | Third Supplemental Indenture from Mirant Americas Generation, Inc. to Bankers Trust Company, relating to 9.125% Senior Notes due 2031, dated at May 1, 2001 (Incorporated herein by reference to Exhibit 4.4 to the Mirant Americas Generation, Inc. Registration Statement on Form S-4, Registration No. 333-63240) |
| 4.9 | Fifth Supplemental Indenture from Mirant Americas Generation, Inc. to Bankers Trust Company, relating to 8.50% Senior Note due 2021, dated at October 9, 2001 (Incorporated herein by reference to Exhibit 4.6 to the Mirant Americas Generation, Inc. Registration Statement on Form S-4/A Amendment No. 1, Registration No. 333-85124) |
| 4.10 | Form of Sixth Supplemental Indenture from Mirant Americas Generation, LLC to Bankers Trust Company, dated at November 1, 2001, relating to indenture dated May 1, 2001 (Incorporated herein by reference to Exhibit 4.6 to the Mirant Corporation Annual Report on Form 10-K filed February 27, 2009) |
| 4.11 | Seventh Supplemental Indenture from Mirant Americas Generation, LLC to Wells Fargo Bank, National Association, dated at January 3, 2006, relating to indenture dated May 1, 2001 (Incorporated herein by reference to Exhibit 4.1 to the Mirant Americas Generation, LLC Quarterly Report on Form 10-Q filed May 14, 2007) |
| 4.12 | Form of 8.625% Series A Pass Through Certificate (Incorporated herein by reference to Exhibit 4.1 to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.13 | Form of 9.125% Series B Pass Through Certificate (Incorporated herein by reference to Exhibit 4.2 to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.14 | Form of 10.060% Series C Pass Through Certificate (Incorporated herein by reference to Exhibit 4.3 to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.15(a) | Pass Through Trust Agreement A between Southern Energy Mid-Atlantic, LLC and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.4(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |

| | |
|---|---|
| 4.15(b) | Schedule identifying substantially identical agreement to Pass Through Trust Agreement A (Incorporated herein by reference to Exhibit 4.4(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.16(a) | Participation Agreement (L1) among Southern Energy Mid-Atlantic, LLC, as Lessee, Dickerson OL1 LLC, as Owner Lessor, Wilmington Trust Company, as Owner Manager, SEMA OP3 LLC, as Owner Participant and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee and as Pass Through Trustee, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.5(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.16(b) | Schedule identifying substantially identical agreements to Participation Agreement (Incorporated herein by reference to Exhibit 4.5(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.17(a) | Participation Agreement (L1) among Southern Energy Mid-Atlantic, LLC, as Lessee, Morgantown OL1 LLC, as Owner Lessor, Wilmington Trust Company, as Owner Manager, SEMA OP1 LLC, as Owner Participant and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee and as Pass Through Trustee, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.6 (a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.17(b) | Schedule identifying substantially identical agreement to Participation Agreement (Incorporated herein by reference to Exhibit 4.6 (b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-6166 filed May 25, 2001) |
| 4.18(a) | Facility Lease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, as Facility Lessee and Dickerson OL1 LLC, as Owner Lessor, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.7(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.18(b) | Schedule identifying substantially identical agreement to Facility Lease Agreement (Incorporated herein by reference to Exhibit 4.7(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.19(a) | Facility Lease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, as Facility Lessee and Morgantown OL1 LLC, as Owner Lessor, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.8(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.19(b) | Schedule identifying substantially identical agreement to Facility Lease Agreement (Incorporated herein by reference to Exhibit 4.8(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.20(a) | Indenture of Trust, Mortgage and Security Agreement (L1) between Dickerson OL1 LLC, as Owner Lessor, and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.9(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.20(b) | Schedule identifying substantially identical agreement to Indenture of Trust, Mortgage and Security Agreement (Incorporated herein by reference to Exhibit 4.9(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.21(a) | Indenture of Trust, Mortgage and Security Agreement (L1) between Morgantown OL1 LLC, as Owner Lessor, and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.10(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.21(b) | Schedule identifying substantially identical agreement to Indenture of Trust, Mortgage and Security Agreement (Incorporated herein by reference to Exhibit 4.10(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.22(a) | Series A Lessor Note Due June 20, 2012 for Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.11(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.22(b) | Schedule identifying substantially identical notes to Lessor Notes (Incorporated herein by reference to Exhibit 4.11(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.23(a) | Series A Lessor Note Due June 30, 2008, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.12(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.23(b) | Schedule identifying substantially identical notes to Series A Lessor Notes (Incorporated herein by reference to Exhibit 4.12(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |

| | |
|---|---|
| 4.24(a) | Series B Lessor Note Due June 30, 2015, for Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.13(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.24(b) | Schedule identifying substantially identical notes to Series B Lessor Note (Incorporated herein by reference to Exhibit 4.13(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.25(a) | Series B Lessor Note Due June 30, 2017, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.14(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.25(b) | Schedule identifying substantially identical notes to Series B Lessor Notes (Incorporated herein by reference to Exhibit 4.14(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.26(a) | Series C Lessor Note Due June 30, 2020, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.15(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.26(b) | Schedule identifying substantially identical notes to Series C Lessor Notes (Incorporated herein by reference to Exhibit 4.15(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668) |
| 4.27(a) | Supplemental Pass Through Trust Agreement A between Mirant Mid-Atlantic, LLC and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at June 29, 2001 (Incorporated herein by reference to Exhibit 4.17(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4/A Registration No. 333-61668 filed July 3, 2001) |
| 4.27(b) | Schedule identifying substantially identical agreements to Supplemental Pass Through Trust Agreement constituting Exhibit 4.36 (a) (Incorporated herein by reference to Exhibit 4.17(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4/A, Registration No. 333-61668 filed July 3, 2001) |
| 4.28 | Senior Notes Indenture, relating to the 9.50% Senior Notes Due 2018 and the 9.875% Senior Notes Due 2020, by GenOn Escrow Corp. and Wilmington Trust Company as trustee, dated at October 4, 2010 (Incorporated by reference to Exhibit 4.4 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 5, 2010) |
| 4.29 | Supplemental Indenture, relating to the 9.50% Senior Notes due 2018 and the 9.875% Senior Notes Due 2020, by and among GenOn Escrow Corp., GenOn Energy, Inc. and Wilmington Trust Company as trustee, dated at December 3, 2010 (Incorporated by reference to Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed December 7, 2010) |
| 4.30 | Amendment No. 2, dated as of December 14, 2012, to the Rights Agreement dated as of January 15, 2001 between RRI Energy, Inc., JP Morgan Chase and Computershare Trust Company, N.A., as successor to JP Morgan Chase Rights Agent (Incorporated herein by reference to Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed December 14, 2012) |
| 10.1.1(a) | Master Separation Agreement between Reliant Resources, Inc. and Reliant Energy, Incorporated, dated at December 31, 2000 (Incorporated herein by reference to Exhibit 10.1 to the CenterPoint Energy Houston Electric, LLC Quarterly Report on Form 10-Q filed May 14, 2001) |
| 10.1.1(b) | Schedules to Master Separation Agreement between Reliant Resources, Inc. and Reliant Energy, Incorporated, dated at December 31, 2000 (Incorporated herein by reference to Exhibit 10.1B to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.2(a) | Tax Allocation Agreement by and among Reliant Resources, Inc., and its affiliated companies and Reliant Energy, Incorporated and its affiliate companies dated at December 31, 2000 (Incorporated herein by reference to Exhibit 10.8 to the CenterPoint Energy Houston Electric, LLC Quarterly Report on Form 10-Q filed May 14, 2001) |
| 10.1.2(b) | Exhibit to Tax Allocation Agreement between Reliant Resources, Inc. and Reliant Energy, Incorporated, dated at December 31, 2000 (Incorporated herein by reference to Exhibit 10.2B to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.3 | Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2001A, Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed December 27, 2004) |
| 10.1.4(a) | Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed December 27, 2004) |

135

.

10.1.4(b)    Exhibit C Form of Supplement to Exhibit B to Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.5B to the Registrant's Annual Report on Form 10-K filed February 25, 2010)

10.1.5(a)    Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002B, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed December 27, 2004)

10.1.5(b)    Exhibit C Form of Supplement to Exhibit B to Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002B, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.6B to the Registrant's Annual Report on Form 10-K filed February 25, 2010)

10.1.6(a)    Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2003A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed December 27, 2004)

10.1.6(b)    Exhibit C Form of Supplement to Exhibit B to Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2003A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.7B to the Registrant's Annual Report on Form 10-K filed February 25, 2010)

10.1.7(a)    Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.6 to the Registrant's Current Report on Form 8-K filed December 27, 2004)

10.1.7(b)    Exhibit C Form of Supplement to Exhibit B to Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among Reliant Energy, Inc., the Subsidiary Guarantors defined therein and J.P. Morgan Trust Company, National Association, as trustee, dated at December 22, 2004 (Incorporated herein by reference to Exhibit 10.8B to the Registrant's Annual Report on Form 10-K filed February 25, 2010)

10.1.8    Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2001A, among Reliant Energy Power Supply, LLC, Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and J.P. Morgan Trust Company, National Association, as trustee, dated at September 21, 2006 (Incorporated herein by reference to Exhibit 10.14 to the Registrant's Annual Report on Form 10-K filed February 28, 2007)

10.1.9    Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002A, among Reliant Energy Power Supply, LLC, Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and J.P. Morgan Trust Company, National Association, as trustee, dated at September 21, 2006 (Incorporated herein by reference to Exhibit 10.15 to the Registrant's Annual Report on Form 10-K filed February 28, 2007)

10.1.10    Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002B, among Reliant Energy Power Supply, LLC, Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and J.P. Morgan Trust Company, National Association, as trustee, dated at September 21, 2006 (Incorporated herein by reference to Exhibit 10.16 to the Registrant's Annual Report on Form 10-K filed February 28, 2007)

10.1.11    Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2003A, among Reliant Energy Power Supply, LLC, Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and J.P. Morgan Trust Company, National Association, as trustee, dated at September 21, 2006 (Incorporated herein by reference to Exhibit 10.17 to the Registrant's Annual Report on Form 10-K filed February 28, 2007)

10.1.12    Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among Reliant Energy Power Supply, LLC, Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and J.P. Morgan Trust Company, National Association, as trustee, dated at September 21, 2006 (Incorporated herein by reference to Exhibit 10.18 to the Registrant's Annual Report on Form 10-K filed February 28, 2007)

10.1.13     Second Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2001A, among Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at December 1, 2006 (Incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed December 7, 2006)

10.1.14     Second Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002A, among Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at December 1, 2006 (Incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed December 7, 2006)

10.1.15     Second Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002B, among Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at December 1, 2006 (Incorporated herein by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed December 7, 2006)

10.1.16     Second Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2003A, among Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at December 1, 2006 (Incorporated herein by reference to Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed December 7, 2006)

10.1.17     Third Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among Reliant Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at December 1, 2006 (Incorporated herein by reference to Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed December 7, 2006)

10.1.18     Third Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2001A, among RRI Energy Solutions East, LLC, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at June 1, 2009 (Incorporated herein by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q filed November 5, 2009)

10.1.19     Third Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2002A, among RRI Energy Solutions East, LLC, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at June 1, 2009 (Incorporated herein by reference to Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q filed November 5, 2009)

10.1.20     Third Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2002B, among RRI Energy Solutions East, LLC, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at June 1, 2009 (Incorporated herein by reference to Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q filed November 5, 2009)

10.1.21     Third Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2003A, among RRI Energy Solutions East, LLC, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at June 1, 2009 (Incorporated herein by reference to Exhibit 10.5 to the Registrant's Quarterly Report on Form 10-Q filed November 5, 2009)

10.1.22     Fourth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among RRI Energy Solutions East, LLC, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Trust Company, N.A., as trustee, dated at June 1, 2009 (Incorporated herein by reference to Exhibit 10.6 to the Registrant's Quarterly Report on Form 10-Q filed November 5, 2009)

10.1.23     Fourth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002A, among RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at August 20, 2009 (Incorporated herein by reference to Exhibit 99.3 to the Registrant's Current Report on Form 8-K filed August 24, 2009)

10.1.24     Fourth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2002B, among RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at August 20, 2009 (Incorporated herein by reference to Exhibit 99.4 to the Registrant's Current Report on Form 8-K filed August 24, 2009)

| 10.1.25 | Fourth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (Reliant Energy Seward, LLC Project), Series 2003A, among RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at August 20, 2009 (Incorporated herein by reference to Exhibit 99.5 to the Registrant's Current Report on Form 8-K filed August 24, 2009) |
| --- | --- |
| 10.1.26 | Fifth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenues Bonds (Reliant Energy Seward, LLC Project), Series 2004A, among RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at August 20, 2009 (Incorporated herein by reference to Exhibit 99.6 to the Registrant's Current Report on Form 8-K filed August 24, 2009) |
| 10.1.27 | Fifth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2001A, among RRI Energy Channelview LP, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at December 1, 2009 (Incorporated herein by reference to Exhibit 10.29 to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.28 | Fifth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2002A, among RRI Energy Channelview LP, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at December 1, 2009 (Incorporated herein by reference to Exhibit 10.30 to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.29 | Fifth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2002B, among RRI Energy Channelview LP, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at December 1, 2009 (Incorporated herein by reference to Exhibit 10.31 to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.30 | Fifth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2003A, among RRI Energy Channelview LP, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at December 1, 2009 (Incorporated herein by reference to Exhibit 10.32 to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.31 | Sixth Supplemental Guarantee Agreement relating to Pennsylvania Economic Development Financing Authority's Exempt Facilities Revenue Bonds (RRI Energy Seward, LLC Project), Series 2004A, among RRI Energy Channelview LP, RRI Energy, Inc., the Subsidiary Guarantors as defined in the Guarantee Agreement and The Bank of New York Mellon Trust Company, N.A., as trustee, dated at December 1, 2009 (Incorporated herein by reference to Exhibit 10.33 to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.32(a) | Credit and Guaranty Agreement among Reliant Energy, Inc., as Borrower, the Other Loan Parties referred to therein as guarantors, the Other Lenders Party thereto, Deutsche Bank AG New York Branch, as Administrative Agent and Collateral Agent, Deutsche Bank Securities Inc. and J.P. Morgan Securities Inc., as Joint Lead Arrangers, Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch Capital Corporation and ABN AMRO Bank N.V., as Joint Bookrunners with respect to the Revolving Credit Facility and Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch Capital Corporation and Bear, Sterns & Co. Inc., as Joint Bookrunners with respect to the Pre-Funded L/C Facility, dated at June 12, 2007 (Incorporated herein by reference to Exhibit 1.1 to the Registrant's Current Report on Form 8-K filed June 15, 2007) |
| 10.1.32(b)† | Exhibits and Schedules to Credit and Guaranty Agreement among Reliant Energy, Inc., as Borrower, the Other Loan Parties referred to therein as guarantors, the Other Lenders Party thereto, Deutsche Bank AG New York Branch, as Administrative Agent and Collateral Agent, Deutsche Bank Securities Inc. and J.P. Morgan Securities Inc., as Joint Lead Arrangers, Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch Capital Corporation and ABN AMRO Bank N.V., as Joint Bookrunners with respect to the Revolving Credit Facility and Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch Capital Corporation and Bear, Sterns & Co. Inc., as Joint Bookrunners with respect to the Pre-Funded L/C Facility, dated at June 12, 2007 (Incorporated herein by reference to Exhibit 10.34B to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.33(a) | Pass Through Trust Agreement A between Reliant Energy Mid-Atlantic Power Holdings, LLC and Bankers Trust Company, made with respect to the formation of the Series A Pass Through Trust and the issuance of 8.554% Series A Pass Through Certificates, due 2005 dated as of August 24, 2000 (Incorporated herein by reference to Exhibit 4.4a to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464 filed December 8, 2000) |
| 10.1.33(b) | Schedule identifying substantially identical agreements to Pass Through Trust Agreement constituting Exhibit 10.1.33(a) (Incorporated herein by reference to Exhibit 4.4b to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464 filed December 8, 2000) |

| | |
|---|---|
| 10.1.34 | Participation Agreement among Conemaugh Lessor Genco LLC, as Owner Lessor, Reliant Energy Mid-Atlantic Power Holdings, LLC, as Facility Lessee, Wilmington Trust Company, as Lessor Manager, PSEGR Conemaugh Generation, LLC, as Owner Participant, Bankers Trust Company, as Lease Indenture Trustee, and Bankers Trust Company, as Pass Through Trustee, dated at August 24, 2000 (Incorporated herein by reference to Exhibit 4.5a to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464 filed December 8, 2000) |
| 10.1.35 | Schedule identifying substantially identical agreements to Participation Agreement constituting Exhibit 10.1.34 (Incorporated herein by reference to Exhibit 4.5b to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464 filed December 8, 2000) |
| 10.1.36(a) | First Amendment to Participation Agreement constituting Exhibit 10.1.34, dated at November 15, 2001 (Incorporated herein by reference to Exhibit 10.20 to the Registrant's Annual Report on Form 10-K filed March 15, 2006) |
| 10.1.36(b) | Exhibit M to First Amendment to Participation Agreement constituting Exhibit 10.1.36(a), dated at November 15, 2001 (Incorporated herein by reference to Exhibit 10.41B to the Registrant's Annual Report on Form 10-K filed February 25, 2010) |
| 10.1.37 | Schedule identifying substantially identical agreements to First Amendment to Participation Agreement constituting Exhibit 10.1.36(a) (Incorporated herein by reference to Exhibit 10.21 to the Registrant's Annual Report on Form 10-K filed March 15, 2006) |
| 10.1.38 | Second Amendment to Participation Agreement, dated at June 18, 2003 (Incorporated herein by reference to Exhibit 10.22 to the Registrant's Annual Report on Form 10-K filed March 15, 2006) |
| 10.1.39 | Schedule identifying substantially identical agreements to Second Amendment to Participation Agreement constituting Exhibit 10.1.38 (Incorporated herein by reference to Exhibit 10.23 to the Registrant's Annual Report on Form 10-K filed March 15, 2006) |
| 10.1.40 | Guarantee by NRG Energy, Inc., as Guarantor, in favor of Reliant Energy, Inc., dated at February 28, 2009 (Incorporated herein by reference to Exhibit 10.84 to the Registrant's Annual Report on Form 10-K filed March 2, 2009) |
| 10.1.41(a) | Guaranty Agreement (Dickerson L1) between Southern Energy, Inc. and Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.21(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.1.41(b) | Schedule identifying substantially identical agreements to Guaranty Agreement constituting Exhibit 10.1.42(a) (Incorporated herein by reference to Exhibit 10.21(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.1.42(a) | Guaranty Agreement (Morgantown L1) between Southern Energy, Inc. and Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.22(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.1.42(b) | Schedule identifying substantially identical agreements to Guaranty Agreement constituting Exhibit 10.1.43(a) (Incorporated herein by reference to Exhibit 10.22(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.1.43 | Purchase Agreement by and among RRI Energy, Inc., Mirant Corporation, GenOn Escrow Corp. and J.P. Morgan Securities LLC, as representative of the several initial purchasers, dated at September 20, 2010 (Incorporated herein by reference to Exhibit 10.2 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 5, 2010) |
| 10.1.44(a) | Revolving Credit Agreement among GenOn Energy, Inc., as Borrower, GenOn Americas, Inc., as Borrower, the several lenders from time to time parties hereto, and NRG Energy, Inc., as Administrative Agent, dated as of December 14, 2012 (Incorporated herein by reference to Exhibit 10.1.51 to the Registrant's Annual Report on Form 10-K filed February 27, 2013) |
| 10.1.44(b)* | Amendment No. 1 to Revolving Credit Agreement by and among GenOn Energy, Inc., NRG Americas, Inc. (f/k/a GenOn Americas, Inc.), the subsidiary guarantors thereto and NRG Energy, Inc., dated as of December 13, 2015. |
| 10.2.1 | Facility Lease Agreement between Conemaugh Lessor Genco LLC and Reliant Energy Mid-Atlantic Power Holdings, LLC, dated at August 24, 2000 (Incorporated herein by reference to Exhibit 4.6a to the RRI Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464 filed December 8, 2000) |
| 10.2.2 | Schedule identifying substantially identical agreements to Facility Lease Agreement constituting Exhibit 10.2.1 (Incorporated herein by reference to Exhibit 4.6b to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464 filed December 8, 2000) |
| 10.2.3 | Lease Indenture of Trust, Mortgage and Security Agreement between Conemaugh Lessor Genco LLC, as Owner Lessor, and Bankers Trust Company, as Lease Indenture Trustee, dated at August 24, 2000 (Incorporated herein by reference to Exhibit 4.8a to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464 filed December 8, 2000) |

.

| | |
|---|---|
| 10.2.4 | Schedule identifying substantially identical agreements to Lease Indenture of Trust constituting Exhibit 10.3.3 (Incorporated herein by reference to Exhibit 4.8b to the Reliant Energy Mid-Atlantic Power Holdings, LLC Registration Statement on Form S-4, Registration No. 333-51464 filed December 8, 2000) |
| 10.2.5(a) | Facility Site Lease and Easement Agreement (L1) between Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC and Southern Energy MD Ash Management, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.5(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.5(b) | Schedule identifying substantially identical agreements to Facility Site Lease Agreement constituting Exhibit 10.2.5(a) (Incorporated herein by reference to Exhibit 10.5(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.6(a) | Facility Site Lease and Easement Agreement (L1) between Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC and Southern Energy MD Ash Management, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.6(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.6(b) | Schedule identifying substantially identical agreements to Facility Site Lease Agreement constituting Exhibit 10.2.6(a) (Incorporated herein by reference to Exhibit 10.6(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.7(a) | Facility Site Sublease Agreement (L1) between Southern Energy Mid-Atlantic, LLC and Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.7(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.7(b) | Schedule identifying substantially identical agreements to Facility Site Sublease Agreement constituting Exhibit 10.2.7(a) (Incorporated herein by reference to Exhibit 10.7(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.8(a) | Facility Site Sublease Agreement (L1) between Southern Energy Mid-Atlantic, LLC and Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.8(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.8(b) | Schedule identifying substantially identical agreements to Facility Site Sublease Agreement constituting Exhibit 10.2.8(a) (Incorporated herein by reference to Exhibit 10.8(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.9(a) | Shared Facilities Agreement among Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC, and Dickerson OL4 LLC, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 10.15(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.9(b) | Shared Facilities Agreement among Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC, and Morgantown OL7 LLC, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 10.15(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.10(a) | Assignment and Assumption Agreement among Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC, and Dickerson OL4 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.16(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.10(b) | Assignment and Assumption Agreement among Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC, and Morgantown OL7 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.16(b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.11(a) | Ownership and Operation Agreement among Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC, Dickerson OL4 LLC, and Southern Energy Mid-Atlantic, LLC, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 10.17(a) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.2.11(b) | Ownership and Operation Agreement among Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC, Morgantown OL7 LLC, and Southern Energy Mid-Atlantic, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.17 (b) to the Mirant Mid-Atlantic, LLC Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.3.1 | Agreement Regarding Prosecution of Litigation by and among Merrill Lynch Commodities, Inc., Merrill Lynch & Co., Inc., Reliant Energy Power Supply, LLC, RERH Holdings, LLC, Reliant Energy Retail Holdings, LLC, Reliant Energy Retail Services, LLC, RE Retail Receivables, LLC and Reliant Energy Solutions East, LLC, dated at February 28, 2009 (Incorporated herein by reference to Exhibit 10.85 to the Registrant's Annual Report on Form 10-K filed March 2, 2009) |

| 10.3.2† | Engineering, Procurement and Construction Agreement, dated at July 30, 2007, between Mirant Mid-Atlantic, LLC, Mirant Chalk Point LLC and Stone & Webster, Inc. (Incorporated herein by reference to Exhibit 10.1 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 6, 2009) |
| 10.3.3 | Settlement Agreement and Release by and among Mirant Corporation, PEPCO, and PEPCO Settling Parties dated at May 30, 2006 (Incorporated herein by reference to Exhibit 10.1 to the Mirant Corporation Current Report on Form 8-K filed May 31, 2006) |
| 31.1A1* | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.2A1* | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.3A1* | Certification of Chief Accounting Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 32.A1* | Section 1350 Certification |
| 101* | Interactive Data File |

\* Asterisk indicates exhibits filed herewith.

\*\* This filing excludes schedules and exhibits pursuant to Item 601(b)(2) of Regulation S-K, which the registrant agrees to furnish supplementally to the Securities and Exchange Commission upon request by the Commission.

† The Registrant has requested confidential treatment for certain portions of this Exhibit pursuant to Rule 24b-2 under the Exchange Act.

141

.

**GenOn Americas Generation Exhibit Index**

| Exhibit No. | Exhibit Name |
| --- | --- |
| 1.1 | Purchase Agreement, dated at October 3, 2001, among Mirant Americas Generation, Inc. and Salomon Smith Barney Inc., Banc of America Securities LLC, Blaylock & Partners, L.P., Scotia Capital (USA) Inc., TD Securities (USA) Inc. and Tokyo-Mitsubishi International plc, as Initial Purchasers (Incorporated herein by reference to Exhibit 1.1 to Registrant's Registration Statement on Form S-4/A Amendment No. 1, Registration No. 333-85124 filed May 7, 2002) |
| 2.1 | Purchase and Sale Agreement by and between Mirant Americas, Inc. and LS Power Acquisition Co. I, LLC, dated at January 15, 2007 (Incorporated herein by reference to Exhibit 2.1 to the Mirant Corporation Current Report on Form 8-K filed January 18, 2007) |
| 3.1 | Certificate of Formation for Mirant Americas Generation, LLC, filed with the Delaware Secretary of State dated at November 1, 2001 (Incorporated herein by reference to Exhibit 3.1 to Registrant's Quarterly Report on Form 10-Q filed November 9, 2001) |
| 3.2 | Certificate of Amendment to Certificate of Formation of Mirant Americas Generation, LLC, filed with the Delaware Secretary of State dated at December 3, 2010 (Incorporated herein by reference to Exhibit 3.2A1 to Registrant's Annual Report on Form 10-K filed March 1, 2011) |
| 3.3 | Second Amended and Restated Limited Liability Company Agreement for GenOn Americas Generation, LLC dated December 3, 2010 (Incorporated herein by reference to Exhibit 3.3A1 to Registrant's Annual Report on Form 10-K filed March 1, 2011) |
| 4.1 | Indenture between Mirant Americas Generation, Inc. and Bankers Trust Company, as trustee, relating to Senior Notes, dated at May 1, 2001 (Incorporated herein by reference to Exhibit 4.1 to the Registrant's Registration Statement on Form S-4, Registration No. 333-63240 filed June 18, 2001) |
| 4.2 | Third Supplemental Indenture from Mirant Americas Generation, Inc. to Bankers Trust Company as trustee, relating to 9.125% Senior Notes due 2031, dated at May 1, 2001 (Incorporated herein by reference to Exhibit 4.4 to Registrant's Registration Statement on Form S-4, Registration No. 333-63240 filed June 18, 2001) |
| 4.3 | Fifth Supplemental Indenture from Mirant Americas Generation, Inc. to Bankers Trust Company as trustee, dated at October 9, 2001 relating to 8.50% Senior Notes due 2021 (Incorporated herein by reference to Exhibit 4.6 to Registrant's Registration Statement on Form S-4/A Amendment No. 1, Registration No. 333-85124 filed May 7, 2002) |
| 4.4 | Form of Sixth Supplemental Indenture from Mirant Americas Generation LLC, to Bankers Trust Company as trustee, dated at November 1, 2001 relating to indenture dated May 1, 2001 (Incorporated herein by reference to Exhibit 4.6 to the Mirant Corporation Annual Report on Form 10-K filed February 27, 2009) |
| 4.5 | Form of Seventh Supplemental Indenture from Mirant Americas Generation LLC, to Wells Fargo Bank National Association as successor indenture trustee, dated at January 3, 2006 relating to indenture dated May 1, 2001(Incorporated herein by reference to Exhibit 4.1 to Registrant's Quarterly Report on Form 10-Q filed May 14, 2007) |
| 4.6 | Registration Rights Agreement, dated at October 9, 2001, among Mirant Americas Generation, Inc., Salomon Smith Barney Inc. and Banc of America Securities LLC, Blaylock & Partners, L.P., Scotia Capital (USA) Inc., TD Securities (USA) Inc. and Tokyo-Mitsubishi International plc, as Initial Purchasers (Incorporated herein by reference to Exhibit 4.8 to Registrant's Registration Statement on Form S-4/A Amendment No. 1, Registration No. 333-85124) |
| 10.1† | Engineering, Procurement and Construction Agreement, dated at July 30, 2007, between Mirant Mid-Atlantic, LLC, Mirant Chalk Point, LLC and Stone & Webster, Inc. (Incorporated herein by reference to Exhibit 10.1 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 6, 2009) |
| 10.2 | Membership Interest Purchase and Sale Agreement, dated at January 31, 2007, between Mirant New York, Inc. and Alliance Energy Renewables, LLC (Incorporated herein by reference to Exhibit 10.1 to Registrant's Quarterly Report on Form 10-Q filed May 14, 2007) |
| 10.3 | Settlement and Release of Claims Agreement, by and among the Mirant Parties, the California Parties and OMOI, dated at January 13, 2005 (Incorporated herein by reference to Exhibit 10.39 to the Mirant Corporation Annual Report on Form 10-K filed March 15, 2005) |
| 10.4 | Administrative Services Agreement dated at January 3, 2006 by and between Mirant Americas Generation, LLC and Mirant Services, LLC (Incorporated herein by reference to Exhibit 10.5 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.5 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 among Mirant Americas Energy Marketing, LP, Mirant Bowline, LLC, Mirant Lovett, LLC, and Mirant NY-Gen, LLC (Incorporated herein by reference to Exhibit 10.6 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |

| | |
|---|---|
| 10.6 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 among Mirant Americas Energy Marketing, LP, Mirant Canal, LLC, and Mirant Kendall, LLC (Incorporated herein by reference to Exhibit 10.7 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.7 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Chalk Point, LLC (Incorporated herein by reference to Exhibit 10.8 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.8 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Mid-Atlantic, LLC (Incorporated herein by reference to Exhibit 10.9 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.9 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Potomac River, LLC (Incorporated herein by reference to Exhibit 10.10 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.10 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 among Mirant Americas Energy Marketing, LP, Mirant Delta, LLC, and Mirant Potrero, LLC (Incorporated herein by reference to Exhibit 10.12 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.11 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Zeeland, LLC (Incorporated herein by reference to Exhibit 10.13 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 12.1 | Statement of Ratio Earnings to Fixed Charges (Incorporated herein by reference to Exhibit 12.1 to Registrant's Registration Statement on Form S-4/A Amendment No. 1, Registration No. 333-85124 filed May 7, 2002) |
| 31.1A2* | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.2A2* | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.3A2* | Certification of Chief Accounting Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 32.A2* | Section 1350 Certification |
| 101* | Interactive Data File |

\*  Asterisk indicates exhibits filed herewith.

†  The Registrant has requested confidential treatment for certain portions of this Exhibit pursuant to Rule 24b-2 under the Exchange Act.

**GenOn Mid-Atlantic Exhibit Index**

| Exhibit No. | Exhibit Name |
| --- | --- |
| 3.1 | Certificate of Formation of Southern Energy Mid-Atlantic, LLC, dated at July 12, 2000 (Incorporated herein by reference to Exhibit 3.1 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 3.2 | Certificate of Amendment to Certificate of Formation of Mirant Mid-Atlantic, LLC, filed with the Delaware Secretary of State dated at January 20, 2011 (Incorporated herein by reference to Exhibit 3.2A2 to Registrant's Annual Report on Form 10-K filed March 1, 2011) |
| 3.3 | Second Amended and Restated Limited Liability Company Agreement of GenOn Mid-Atlantic, LLC dated January 20, 2011 (Incorporated herein by reference to Exhibit 3.3A2 to Registrant's Annual Report on Form 10-K filed March 1, 2011) |
| 4.1 | Form of 8.625% Series A Pass Through Certificate (Incorporated herein by reference to Exhibit 4.1 to Mirant Mid-Atlantic, LLC's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.2 | Form of 9.125% Series B Pass Through Certificate (Incorporated herein by reference to Exhibit 4.2 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.3 | Form of 10.060% Series C Pass Through Certificate (Incorporated herein by reference to Exhibit 4.3 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.4(a) | Pass Through Trust Agreement A between Southern Energy Mid-Atlantic, LLC and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.4(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.4(b) | Schedule identifying substantially identical agreement to Pass Through Trust Agreement A constituting Exhibit 4.4(a) (Incorporated herein by reference to Exhibit 4.4(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.5(a) | Participation Agreement (L1) among Southern Energy Mid-Atlantic, LLC, as Lessee, Dickerson OL1 LLC, as Owner Lessor, Wilmington Trust Company, as Owner Manager, SEMA OP3 LLC, as Owner Participant and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee and as Pass Through Trustee, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.5(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.5(b) | Schedule identifying substantially identical agreements to Participation Agreement constituting Exhibit 4.5(a) (Incorporated herein by reference to Exhibit 4.5(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.6(a) | Participation Agreement (Morgantown L1) among Southern Energy Mid-Atlantic, LLC, as Lessee, Morgantown OL1 LLC, as Owner Lessor, Wilmington Trust Company, as Owner Manager, SEMA OP1 LLC, as Owner Participant and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee and as Pass Through Trustee, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.6(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.6(b) | Schedule identifying substantially identical agreements to Participation Agreement constituting Exhibit 4.6(a) hereto (Incorporated herein by reference to Exhibit 4.6(b) to Registrant's Form S-4 in Registration No. 333-61668 filed May 25, 2001) |
| 4.7(a) | Facility Lease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, as Facility Lessee, and Dickerson OL1 LLC, as Owner Lessor, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.7(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.7(b) | Schedule identifying substantially identical agreement to Facility Lease Agreement constituting Exhibit 4.7(a) (Incorporated herein by reference to Exhibit 4.7(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.8(a) | Facility Lease Agreement (L1) between Southern Energy Mid-Atlantic, LLC, as Facility Lessee, and Morgantown OL1 LLC, as Owner Lessor, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.8(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.8(b) | Schedule identifying substantially identical agreement to Facility Lease Agreement constituting Exhibit 4.8(a) (Incorporated herein by reference to Exhibit 4.8(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.9(a) | Indenture of Trust, Mortgage and Security Agreement (L1) between Dickerson OL1 LLC, as Lessor, and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.9(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.9(b) | Schedule identifying substantially identical agreement to Indenture of Trust, Mortgage and Security Agreement constituting Exhibit 4.9(a) (Incorporated herein by reference to Exhibit 4.9(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |

| | |
|---|---|
| 4.10(a) | Indenture of Trust, Mortgage and Security Agreement (L1) between Morgantown OL1 LLC, as Lessor, and State Street Bank and Trust Company of Connecticut, National Association, as Lease Indenture Trustee, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.10(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.10(b) | Schedule identifying substantially identical agreement to Indenture of Trust, Mortgage and Security Agreement constituting Exhibit 4.10(a) (Incorporated herein by reference to Exhibit 4.10(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.11(a) | Series A Lessor Note Due June 30, 2012 for Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.11(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.11(b) | Schedule identifying substantially identical notes to Lessor Notes constituting Exhibit 4.11(a) (Incorporated herein by reference to Exhibit 4.11(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.12(a) | Series A Lessor Note Due June 30, 2008, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.12(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.12(b) | Schedule identifying substantially identical notes to Series A Lessor Notes constituting Exhibit 4.12(a) (Incorporated herein by reference to Exhibit 4.12(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.13(a) | Series B Lessor Note Due June 30, 2015, for Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.13(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.13(b) | Schedule identifying substantially identical notes to Lessor Note constituting Exhibit 4.13(a) (Incorporated herein by reference to Exhibit 4.13(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668filed May 25, 2001) |
| 4.14(a) | Series B Lessor Note Due June 30, 2017, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.14(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.14(b) | Schedule identifying substantially identical notes to Lessor Notes constituting Exhibit 4.14(a) (Incorporated herein by reference to Exhibit 4.14(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.15(a) | Series C Lessor Note Due June 30, 2020, for Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 4.15(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.15(b) | Schedule identifying substantially identical notes to Lessor Notes constituting Exhibit 4.15(a) (Incorporated herein by reference to Exhibit 4.15(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.16 | Registration Rights Agreement, between Southern Energy Mid-Atlantic, LLC and Credit Suisse First Boston, acting for itself on behalf of the Purchasers, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 4.16 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 4.17(a) | Supplemental Pass Through Trust Agreement A between Mirant Mid-Atlantic, LLC, and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at June 29, 2001 (Incorporated herein by reference to Exhibit 4.17(a) to Registrant's Registration Statement on Form S-4/A Registration No. 333-61668 filed July 3, 2001) |
| 4.17(b) | Schedule identifying substantially identical agreements to Supplemental Pass Through Trust Agreement A between Mirant Mid-Atlantic, LLC and State Street Bank and Trust Company of Connecticut, National Association, as Pass Through Trustee, dated at June 29, 2001, constituting Exhibit 4.17(a) (Incorporated herein by reference to Exhibit 4.17(b) to Registrant's Registration Statement on Form S-4/A, Registration No. 333-61668 filed July 3, 2001) |
| 10.1† | Engineering, Procurement and Construction Agreement, dated at July 30, 2007, between Mirant Mid-Atlantic, LLC, Mirant Chalk Point, LLC and Stone & Webster, Inc. (Incorporated herein by reference to Exhibit 10.1 to the Mirant Corporation Quarterly Report on Form 10-Q filed November 6, 2009) |
| 10.2 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Mid-Atlantic, LLC (Incorporated herein by reference to Exhibit 10.17 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.3 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Chalk Point, LLC (Incorporated herein by reference to Exhibit 10.18 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.4 | Power Sale, Fuel Supply and Services Agreement dated at January 3, 2006 by and between Mirant Americas Energy Marketing, LP and Mirant Potomac River, LLC (Incorporated herein by reference to Exhibit 10.19 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |

145

.

| | |
|---|---|
| 10.5 | Administrative Services Agreement dated at January 3, 2006 by and between Mirant Mid-Atlantic, LLC and Mirant Services, LLC (Incorporated herein by reference to Exhibit 10.20 to Registrant's Annual Report on Form 10-K filed March 31, 2006) |
| 10.6(a) | Asset Purchase and Sale Agreement for Generating Plants and Related Assets by and between Potomac Electric Power Company and Southern Energy, Inc. dated at June 7, 2000 (Incorporated herein by reference to Exhibit 10.1(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.6(b) | Amendment No. 1 to Asset Purchase and Sale Agreement by and between Potomac Electric Power Company and Southern Energy, Inc. dated at September 18, 2000 (Incorporated herein by reference to Exhibit 10.1(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.6(c) | Amendment No. 2 to Asset Purchase and Sale Agreement by and between Potomac Electric Power Company and Southern Energy, Inc. dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.1(c) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.7(a) | Interconnection Agreement (Dickerson) by and between Potomac Electric Power Company and Southern Energy Mid-Atlantic, LLC dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.2(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.7(b) | Schedule identifying substantially identical agreements to Interconnection Agreement constituting Exhibit 10.7(a) hereto (Incorporated herein by reference to Exhibit 10.2(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.8(a) | Easement, License and Attachment Agreement (Dickerson Station) by and between Potomac Electric Power Company, Southern Energy Mid-Atlantic, LLC and Southern Energy MD Ash Management, LLC dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.3(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.8(b) | Schedule identifying substantially identical agreements to Easement, License and Attachment Agreement constituting Exhibit 10.8(a) (Incorporated herein by reference to Exhibit 10.3(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.9(a) | Bill of Sale (SEMA: Dickerson; Morgantown; RR Spur; Production Service Center) by Potomac Electric Power Company, for the benefit of Southern Energy Mid-Atlantic, LLC dated December 19, 2000 (Incorporated herein by reference to Exhibit 10.4 (a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.9(b) | Schedule identifying substantially identical documents to Bill of Sale constituting Exhibit 10.9(a) hereto (Incorporated herein by reference to Exhibit 10.4(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.10(a) | Facility Site Lease and Easement Agreement (L1) among Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC and Southern Energy MD Ash Management, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.5(a) Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.10(b) | Schedule identifying substantially identical agreements to Facility Site Lease Agreement constituting Exhibit 10.10(a) (Incorporated herein by reference to Exhibit 10.5(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.11(a) | Facility Site Lease and Easement Agreement (L1) among Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC and Southern Energy MD Ash Management, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.6(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.11(b) | Schedule identifying substantially identical agreements to Facility Site Lease Agreement constituting Exhibit 10.11(a) (Incorporated herein by reference to Exhibit 10.6(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.12(a) | Facility Site Sublease Agreement (L1) between Southern Energy Mid-Atlantic, LLC and Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.7(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.12(b) | Schedule identifying substantially identical agreements to Facility Site Sublease Agreement constituting Exhibit 10.12(a) (Incorporated herein by reference to Exhibit 10.7(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.13(a) | Facility Site Sublease Agreement (L1) between Southern Energy Mid-Atlantic, LLC and Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.8(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.13(b) | Schedule identifying substantially identical agreements to Facility Site Sublease Agreement constituting Exhibit 10.13(a) (Incorporated herein by reference to Exhibit 10.8(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.14 | Capital Contribution Agreement by and between Southern Energy, Inc. and Southern Energy Mid-Atlantic, LLC dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.12 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |

| 10.15 | Promissory Note between Southern Energy Mid-Atlantic, LLC and Southern Energy Peaker, LLC in the original principal amount of $71,110,000 dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.13 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| --- | --- |
| 10.16 | Promissory Note between Southern Energy Mid-Atlantic, LLC and Southern Energy Potomac River, LLC in the original principal amount of $152,165,000 dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.14 to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.17(a) | Shared Facilities Agreement among Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC and Dickerson OL4 LLC, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 10.15(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.17(b) | Shared Facilities Agreement among Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC and Morgantown OL7 LLC, dated at December 18, 2000 (Incorporated herein by reference to Exhibit 10.15(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.18(a) | Assignment and Assumption Agreement between Southern Energy Mid-Atlantic, LLC, Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC, and Dickerson OL4 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.16(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.18(b) | Assignment and Assumption Agreement among Southern Energy Mid-Atlantic, LLC, Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC and Morgantown OL7 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.16(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.19(a) | Ownership and Operation Agreement between Dickerson OL1 LLC, Dickerson OL2 LLC, Dickerson OL3 LLC, Dickerson OL4 LLC and Southern Energy Mid-Atlantic, LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.17(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.19(b) | Ownership and Operation Agreement between Morgantown OL1 LLC, Morgantown OL2 LLC, Morgantown OL3 LLC, Morgantown OL4 LLC, Morgantown OL5 LLC, Morgantown OL6 LLC, Morgantown OL7 LLC, and Southern Energy Mid-Atlantic, LLC, dated at December 19, 2000 constituting Exhibit 10.19(a) (Incorporated herein by reference to Exhibit 10.17(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.20(a) | Guaranty Agreement (Dickerson L1) between Southern Energy, Inc. and Dickerson OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.21(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.20(b) | Schedule identifying substantially identical agreements to Guaranty Agreement constituting Exhibit 10.20(a) (Incorporated herein by reference to Exhibit 10.21(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.21(a) | Guaranty Agreement (Morgantown L1) between Southern Energy, Inc. and Morgantown OL1 LLC, dated at December 19, 2000 (Incorporated herein by reference to Exhibit 10.22(a) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 10.21(b) | Schedule identifying substantially identical agreements to Guaranty Agreement constituting Exhibit 10.21(a) (Incorporated herein by reference to Exhibit 10.22(b) to Registrant's Registration Statement on Form S-4, Registration No. 333-61668 filed May 25, 2001) |
| 31.1A3* | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.2A3* | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 31.3A3* | Certification of Chief Accounting Officer pursuant to Rule 13a-14(a) under the Exchange Act |
| 32.A3* | Section 1350 Certification |
| 101* | Interactive Data File |

\* Asterisk indicates exhibits filed herewith.

† The Registrant has requested confidential treatment for certain portions of this Exhibit pursuant to Rule 24b-2 under the Exchange Act.

147

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

<div align="right">

GENON ENERGY, INC.
(Registrant)


By:       /s/ MAURICIO GUTIERREZ

Mauricio Gutierrez
*Chief Executive Officer*

</div>

Date: February 29, 2016


**GENON ENERGY, INC.**

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| <u>Signatures</u> | <u>Title</u> |
|---|---|
| /s/ MAURICIO GUTIERREZ | President and Chief Executive Officer and Director |
| Mauricio Gutierrez | of GenOn Energy, Inc. (Principal Executive Officer) |
| Date: February 29, 2016 | |
| | Executive Vice President and Chief Financial Officer |
| /s/ KIRKLAND B. ANDREWS | |
| Kirkland B. Andrews | of GenOn Energy, Inc. (Principal Financial Officer) |
| Date: February 29, 2016 | |
| /s/ DAVID CALLEN | Senior Vice President and Chief Accounting Officer |
| David Callen | of GenOn Energy, Inc. (Principal Accounting Officer) |
| Date: February 29, 2016 | |

148

.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

GENON AMERICAS GENERATION, LLC
(Registrant)


By:           /s/ MAURICIO GUTIERREZ

Mauricio Gutierrez
*Chief Executive Officer*

Date: February 29, 2016

**GENON AMERICAS GENERATION, LLC**

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signatures | Title |
|---|---|
| /s/ MAURICIO GUTIERREZ | President and Chief Executive Officer and Manager |
| Mauricio Gutierrez | of GenOn Americas Generation, LLC |
| Date: February 29, 2016 | (Principal Executive Officer) |
| | |
| | Executive Vice President and Chief Financial Officer |
| /s/ KIRKLAND B. ANDREWS | |
| Kirkland B. Andrews | and Manager of GenOn Americas Generation, LLC |
| Date: February 29, 2016 | (Principal Financial Officer) |
| | |
| /s/ DAVID CALLEN | Senior Vice President and Chief Accounting Officer |
| David Callen | of GenOn Americas Generation, LLC |
| Date: February 29, 2016 | (Principal Accounting Officer) |

149

.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

GENON MID-ATLANTIC, LLC
(Registrant)

By:       /s/ MAURICIO GUTIERREZ

Mauricio Gutierrez
*Chief Executive Officer*

Date: February 29, 2016

**GENON MID-ATLANTIC, LLC**

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| <u>Signatures</u> | <u>Title</u> |
|---|---|
| /s/ MAURICIO GUTIERREZ | President and Chief Executive Officer and Manager of GenOn Mid-Atlantic, LLC |
| Mauricio Gutierrez | |
| Date: February 29, 2016 | (Principal Executive Officer) |
| | Executive Vice President and Chief Financial Officer |
| /s/ KIRKLAND B. ANDREWS | |
| Kirkland B. Andrews | and Manager of GenOn Mid-Atlantic, LLC |
| Date: February 29, 2016 | (Principal Financial Officer) |
| /s/ DAVID CALLEN | Senior Vice President and Chief Accounting Officer |
| David Callen | of GenOn Mid-Atlantic, LLC |
| Date: February 29, 2016 | (Principal Accounting Officer) |

150

.

**Supplemental Information to be Furnished with Reports Filed Pursuant to**
**Section 15(d) of the Act by Registrants Which Have Not Registered**
**Securities Pursuant to Section 12 of the Act**

No annual report or proxy materials has been sent to securities holders and no such report or proxy material is to be furnished to securities holders subsequent to the filing of the annual report on this Form 10-K.

151

**EXHIBIT 31.1 A1**

## CERTIFICATION

I, Mauricio Gutierrez, certify that:

1.       I have reviewed this annual report on Form 10-K of GenOn Energy, Inc.;

2.       Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.       Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.       The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)       Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)       Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)       Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)       Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.       The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)       All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)       Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 29, 2016

/s/ MAURICIO GUTIERREZ
Mauricio Gutierrez
*Chief Executive Officer*
*(Principal Executive Officer)*

**EXHIBIT 31.1 A2**

**CERTIFICATION**

I, Mauricio Gutierrez, certify that:

1.    I have reviewed this annual report on Form 10-K of GenOn Americas Generation, LLC;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 29, 2016

By:    /s/ MAURICIO GUTIERREZ
       Mauricio Gutierrez
       *Chief Executive Officer*
       *(Principal Executive Officer)*

**EXHIBIT 31.1 A3**

**CERTIFICATION**

I, Mauricio Gutierrez, certify that:

1.      I have reviewed this annual report on Form 10-K of GenOn Mid-Atlantic, LLC;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 29, 2016

By:      /s/ MAURICIO GUTIERREZ
         Mauricio Gutierrez
         *Chief Executive Officer*
         *(Principal Executive Officer)*

**EXHIBIT 31.2 A1**

**CERTIFICATION**

I, Kirkland B. Andrews, certify that:

1.  I have reviewed this annual report on Form 10-K of GenOn Energy, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 29, 2016

By:     /s/ KIRKLAND B. ANDREWS
        _____
        *Kirkland B. Andrews*
        *Chief Financial Officer*
        *(Principal Financial Officer)*

**EXHIBIT 31.2 A2**

**CERTIFICATION**

I, Kirkland B. Andrews, certify that:

1.  I have reviewed this annual report on Form 10-K of GenOn Americas Generation, LLC;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 29, 2016

By:     /s/ KIRKLAND B. ANDREWS
————————————————————————
        *Kirkland B. Andrews*
        *Chief Financial Officer*
        *(Principal Financial Officer)*

**EXHIBIT 31.2 A3**

**CERTIFICATION**

I, Kirkland B. Andrews, certify that:

1. I have reviewed this annual report on Form 10-K of GenOn Mid-Atlantic, LLC;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 29, 2016

By:     /s/ KIRKLAND B. ANDREWS
        _____
        *Kirkland B. Andrews*
        *Chief Financial Officer*
        *(Principal Financial Officer)*

**EXHIBIT 31.3A1**

**CERTIFICATION**

I, David Callen, certify that:

1.    I have reviewed this annual report on Form 10-K of GenOn Energy, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 29, 2016

By:        /s/ DAVID CALLEN
           _____
           David Callen
           *Chief Accounting Officer*
           *(Principal Accounting Officer)*

**EXHIBIT 31.3A2**

**CERTIFICATION**

I, David Callen, certify that:

1.  I have reviewed this annual report on Form 10-K of GenOn Americas Generation, LLC;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 29, 2016

By:      /s/ DAVID CALLEN
         _____

         David Callen
         *Chief Accounting Officer*
         *(Principal Accounting Officer)*

**EXHIBIT 31.3 A3**

**CERTIFICATION**

I, David Callen, certify that:

1.    I have reviewed this annual report on Form 10-K of GenOn Mid-Atlantic, LLC;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 29, 2016

By:        /s/ DAVID CALLEN
           _____
           David Callen
           *Chief Accounting Officer*
           *(Principal Accounting Officer)*

EXHIBIT 32.A1

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of GenOn Energy, Inc. on Form 10-K for the year ended December 31, 2015, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), each of the undersigned officers of the Company certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

    (1)   The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

    (2)   The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date: February 29, 2016

/s/ MAURICIO GUTIERREZ
_____
Mauricio Gutierrez
*Chief Executive Officer*
*(Principal Executive Officer)*

/s/ KIRKLAND B. ANDREWS
_____
Kirkland B. Andrews
*Chief Financial Officer*
*(Principal Financial Officer)*

/s/ DAVID CALLEN
_____
David Callen
*Chief Accounting Officer*
*(Principal Accounting Officer)*

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of this Form 10-K or as a separate disclosure document.

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to GenOn Energy, Inc. and will be retained by GenOn Energy, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

EXHIBIT 32.A2

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of GenOn Americas Generation, LLC on Form 10-K for the year ended December 31, 2015, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), each of the undersigned officers of the Company certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)   The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date: February 29, 2016

/s/ MAURICIO GUTIERREZ
_____
Mauricio Gutierrez
*Chief Executive Officer*
*(Principal Executive Officer)*

/s/ KIRKLAND B. ANDREWS
_____
Kirkland B. Andrews
Chief Financial Officer
*(Principal Financial Officer)*

/s/ DAVID CALLEN
_____
David Callen
Chief Accounting Officer
*(Principal Accounting Officer)*

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of this Form 10-K or as a separate disclosure document.

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to GenOn Americas Generation, LLC and will be retained by GenOn Americas Generation, LLC and furnished to the Securities and Exchange Commission or its staff upon request.

EXHIBIT 32.A3

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of GenOn Mid-Atlantic, LLC on Form 10-K for the year ended December 31, 2015, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), each of the undersigned officers of the Company certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)   The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date: February 29, 2016

/s/ MAURICIO GUTIERREZ
_____
Mauricio Gutierrez
*Chief Executive Officer*
*(Principal Executive Officer)*

/s/ KIRKLAND B. ANDREWS
_____
Kirkland B. Andrews
Chief Financial Officer
*(Principal Financial Officer)*

/s/ DAVID CALLEN
_____
David Callen
Chief Accounting Officer
*(Principal Accounting Officer)*

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of this Form 10-K or as a separate disclosure document.

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to GenOn Mid-Atlantic, LLC and will be retained by GenOn Mid-Atlantic, LLC and furnished to the Securities and Exchange Commission or its staff upon request.

**Exhibit 10.1.44(b)**
*Execution Version*

## AMENDMENT NO. 1 TO REVOLVING CREDIT AGREEMENT

This AMENDMENT NO. 1 TO REVOLVING CREDIT AGREEMENT (this "Amendment") is entered into as of December 13, 2015, by and among GENON ENERGY, INC., a Delaware corporation (the "Company"), NRG AMERICAS, INC. (f/k/a GENON AMERICAS, INC.), a Delaware corporation ("NAI", each of NAI and the Company, a "Borrower" and, together, the "Borrowers"), the Subsidiary Guarantors set forth on the signature pages hereto and NRG ENERGY, INC., a Delaware corporation, as administrative agent (the "Administrative Agent") and as a lender (the "Lender"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Credit Agreement (as defined below).

## RECITALS

WHEREAS, the Borrowers, the Administrative Agent and the Lender have entered into that certain Revolving Credit Agreement, dated as of December 14, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"); and

WHEREAS, the Borrowers have requested that the Administrative Agent and Lender amend certain provisions of the Credit Agreement, and the Administrative Agent and Lender agree to such amendments upon the terms and subject to the conditions set forth herein.

NOW THEREFORE, in consideration of the foregoing recitals, the mutual agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**SECTION 1.** **Amendment**.   Effective as of the Effective Time (as defined below):

(a)   Section 1.1 of the Credit Agreement is hereby amended by amending and restating the definition of "Termination Date" as follows:

"Termination Date": the sixth anniversary of the Closing Date.

**SECTION 2.**  **Conditions to Effectiveness**. This Amendment shall become effective at the time (the "Effective Time") that the Administrative Agent shall have received a copy of this Amendment, duly executed by the Borrowers, the Administrative Agent and the Lender.

**SECTION 3.**  **Reference to and Effect Upon the Credit Agreement.**

(a)   Except as specifically set forth above, the Credit Agreement and the other Loan Documents shall remain in full force and effect and are hereby ratified and confirmed.

(b)   Upon the effectiveness of this Amendment, each reference in the Credit Agreement to "this Agreement", "herein", "hereof" and words of like import and each reference in the Credit Agreement and the Loan Documents to the Credit Agreement shall mean the Credit Agreement as amended hereby.

**SECTION 4.**  **Reaffirmation**. Each Subsidiary Guarantor, by its execution of this Amendment, hereby (a) consents and agrees to the terms and conditions of this Amendment and (b) acknowledges and reaffirms all of its obligations, agreements, covenants, liabilities and undertakings under each of the Loan Documents as amended hereby to which it is a party and acknowledges and agrees that subsequent to, and after taking account of the provisions of this Amendment, each such Loan Document as amended hereby is and shall remain in full force and effect in accordance with the terms thereof.

Amendment No. 1 to Revolving Credit Agreement

**SECTION 5.   GOVERNING LAW**. **THIS AMENDMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

[Signature Pages Follow]

2

Amendment No. 1 to Revolving Credit Agreement

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed and delivered by their respective duly authorized officers as of the date first written above.

GENON ENERGY, INC., as a Borrower


By: /s/ Glen Mackey
Name: Glen Mackey
Title: Vice President


NRG AMERICAS, INC. (f/k/a GENON AMERICAS, INC.), as a Borrower


By: /s/ Glen Mackey
Name: Glen Mackey
Title: Vice President


NRG Energy, Inc., as Administrative Agent and Lender


By: /s/ Christopher Sotos
Name: Christopher Sotos
Title: Senior Vice President, Strategy and Mergers and Acquisitions


Amendment No. 1 to Revolving Credit Agreement

Subsidiary Guarantors:

GENON ASSET MANAGEMENT, LLC
GENON AMERICAS PROCUREMENT, INC.
GENON SPECIAL PROCUREMENT, INC.

By: /s/ Rachel Smith
    Name: Rachel Smith
    Title: Treasurer

MIRANT INTELLECTUAL ASSET
MANAGEMENT AND MARKETING, LLC
MNA FINANCE CORP.
RRI ENERGY BROADBAND, INC.
RRI ENERGY COMMUNICATIONS, INC.
RRI ENERGY TRADING EXCHANGE, INC.
RRI ENERGY VENTURES, INC.
NRG NORTH AMERICA LLC
NRG POWER GENERATION ASSETS LLC
NRG POWER GENERATION LLC

By: /s/ Christopher S. Sotos
    Name: Christopher S. Sotos
    Title: President & Treasurer

Amendment No. 1 to Revolving Credit Agreement

GENON ENERGY HOLDINGS INC.
MIRANT NEW YORK SERVICES, LLC
MIRANT POWER PURCHASE, LLC
RRI ENERGY SERVICES, LLC
NRG CALIFORNIA NORTH LLC
NRG CANAL LLC
NRG DELTA, LLC
GENON ENERGY SERVICES, LLC
NRG FLORIDA GP LLC
GENON KEY/CON FUELS, LLC
GENON MID-ATLANTIC DEVELOPMENT, LLC
NRG NORTHEAST GENERATION, INC.
NRG NORTHEAST HOLDINGS, INC.
NRG POTRERO LLC
NRG POWER MIDWEST GP LLC
GENON POWER OPERATING SERVICES MIDWEST, INC.
NRG SABINE (DELAWARE), INC.
NRG SABINE (TEXAS), INC.
NRG WHOLESALE GENERATION GP LLC

By: /s/ Christopher S. Sotos
    Name: Christopher S. Sotos
    Title: Treasurer

NRG POWER MIDWEST LP
By: its General Partner: NRG POWER MIDWEST GP LLC

By: /s/ Christopher S. Sotos
    Name: Christopher S. Sotos
    Title: Treasurer

Amendment No. 1 to Revolving Credit Agreement

| Document and Entity Information - USD ($) | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2015 | Jun. 30, 2014 |

**Entity Information [Line Items]**

| | | |
|---|---|---|
| Entity Registrant Name | GenOn Energy, Inc. | |
| Entity Central Index Key | 0001126294 | |
| Document Type | 10-K | |
| Document Period End Date | Dec. 31, 2015 | |
| Current Fiscal Year End Date | --12-31 | |
| Amendment Flag | false | |
| Entity Filer Category | Non-accelerated Filer | |
| Document Fiscal Year Focus | 2015 | |
| Document Fiscal Period Focus | FY | |
| Entity Common Stock, Shares Outstanding | 1 | |
| Entity Well-known Seasoned Issuer | No | |
| Entity Voluntary Filers | Yes | |
| Entity Current Reporting Status | Yes | |
| Entity Public Float | | $ 0 |
| GenOn Americas Generation, LLC [Member] | | |

**Entity Information [Line Items]**

| | | |
|---|---|---|
| Entity Registrant Name | GENON AMERICAS GENERATION LLC | |
| Entity Central Index Key | 0001140761 | |
| Entity Filer Category | Non-accelerated Filer | |
| Entity Common Stock, Shares Outstanding | 0 | |
| Entity Public Float | | 0 |
| GenOn Mid-Atlantic, LLC [Member] | | |

**Entity Information [Line Items]**

| | | |
|---|---|---|
| Entity Registrant Name | GENON MID-ATLANTIC, LLC | |
| Entity Central Index Key | 0001138258 | |
| Entity Filer Category | Non-accelerated Filer | |
| Entity Common Stock, Shares Outstanding | 0 | |
| Entity Public Float | | $ 0 |

| CONSOLIDATED STATEMENTS OF OPERATIONS - USD ($) $ in Millions | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| **Operating Revenues** | | | |
| Total operating revenues | $ 2,371 | $ 3,090 | $ 2,604 |
| **Operating Costs and Expenses** | | | |
| Depreciation and amortization | 215 | 245 | 249 |
| Impairment losses | 170 | 82 | 0 |
| Acquisition-related transaction and integration costs | 0 | 4 | 70 |
| Total operating costs and expenses | 2,358 | 2,708 | 2,441 |
| Disposal Group, Not Discontinued Operation, Gain (Loss) on Disposal | 0 | (6) | 0 |
| Operating Income/(Loss) | 13 | 376 | 163 |
| **Other Income/(Expense)** | | | |
| Income (Loss) from Equity Method Investments | 0 | 1 | 4 |
| Other income/(expense), net | 6 | 1 | 1 |
| Gain on sale of equity-method investment | 0 | 18 | 0 |
| Gains (Losses) on Extinguishment of Debt | 65 | 0 | (11) |
| Total other income (expense), net | (131) | (178) | (211) |
| Income/(Loss) Before Income Taxes | (118) | 198 | (48) |
| Income tax expense/(benefit) | (3) | 6 | (6) |
| Net Income/(Loss) | (115) | 192 | (42) |
| GenOn Americas Generation, LLC [Member] | | | |
| **Operating Revenues** | | | |
| Total operating revenues | 2,265 | 2,929 | 2,561 |
| **Operating Costs and Expenses** | | | |
| Depreciation and amortization | 74 | 72 | 95 |
| Impairment losses | 8 | 0 | 0 |
| Total operating costs and expenses | 2,123 | 2,545 | 2,430 |
| Disposal Group, Not Discontinued Operation, Gain (Loss) on Disposal | 0 | (6) | 0 |
| Operating Income/(Loss) | 142 | 378 | 131 |
| **Other Income/(Expense)** | | | |
| Other income/(expense), net | 2 | 1 | 1 |
| Gains (Losses) on Extinguishment of Debt | 42 | 0 | 0 |
| Total other income (expense), net | (26) | (73) | (72) |
| Income/(Loss) Before Income Taxes | 116 | 305 | 59 |
| Income tax expense/(benefit) | 0 | 0 | 0 |
| Net Income/(Loss) | 116 | 305 | 59 |
| GenOn Mid-Atlantic, LLC [Member] | | | |
| **Operating Revenues** | | | |
| Total operating revenues | 856 | 1,083 | 879 |
| **Operating Costs and Expenses** | | | |
| Depreciation and amortization | 65 | 50 | 77 |
| Total operating costs and expenses | 748 | 842 | 747 |
| Operating Income/(Loss) | 108 | 241 | 132 |

**Other Income/(Expense)**

| | | | |
|---|---|---|---|
| Total other income (expense), net | (4) | (5) | (4) |
| Income/(Loss) Before Income Taxes | 104 | 236 | 128 |
| Income tax expense/(benefit) | 0 | 0 | 0 |
| Net Income/(Loss) | 104 | 236 | 128 |

Non-affiliated Entity [Member]

**Operating Revenues**

| | | | |
|---|---|---|---|
| Total operating revenues | 2,365 | 3,087 | 2,556 |

**Operating Costs and Expenses**

| | | | |
|---|---|---|---|
| Cost of operations | 1,537 | 1,759 | 1,715 |
| Selling, general and administrative | 10 | 72 | 126 |

**Other Income/(Expense)**

| | | | |
|---|---|---|---|
| Interest expense | (191) | (186) | (193) |

Non-affiliated Entity [Member] | GenOn Americas Generation, LLC [Member]

**Operating Revenues**

| | | | |
|---|---|---|---|
| Total operating revenues | 2,176 | 2,869 | 2,428 |

**Operating Costs and Expenses**

| | | | |
|---|---|---|---|
| Cost of operations | 840 | 944 | 890 |
| Selling, general and administrative | 0 | 9 | 15 |

**Other Income/(Expense)**

| | | | |
|---|---|---|---|
| Interest expense | (64) | (66) | (66) |

Non-affiliated Entity [Member] | GenOn Mid-Atlantic, LLC [Member]

**Operating Revenues**

| | | | |
|---|---|---|---|
| Total operating revenues | 11 | (62) | 7 |

**Operating Costs and Expenses**

| | | | |
|---|---|---|---|
| Cost of operations | 506 | 678 | 583 |
| Selling, general and administrative | 0 | 0 | 2 |

**Other Income/(Expense)**

| | | | |
|---|---|---|---|
| Interest expense | (1) | (2) | (1) |

Affiliated Entity [Member]

**Operating Revenues**

| | | | |
|---|---|---|---|
| Total operating revenues | 6 | 3 | 48 |

**Operating Costs and Expenses**

| | | | |
|---|---|---|---|
| Cost of operations | 242 | 418 | 193 |
| Selling, general and administrative | 184 | 128 | 88 |

**Other Income/(Expense)**

| | | | |
|---|---|---|---|
| Interest expense | (11) | (12) | (12) |

Affiliated Entity [Member] | GenOn Americas Generation, LLC [Member]

**Operating Revenues**

| | | | |
|---|---|---|---|
| Total operating revenues | 89 | 60 | 133 |

**Operating Costs and Expenses**

| | | | |
|---|---|---|---|
| Cost of operations | 1,120 | 1,441 | 1,356 |
| Selling, general and administrative | 81 | 79 | 74 |

**Other Income/(Expense)**

| | | | |
|---|---|---|---|
| Interest expense | (6) | (8) | (7) |

Affiliated Entity [Member] | GenOn Mid-Atlantic, LLC [Member]

**Operating Revenues**

Total operating revenues

| | | |
|---|---|---|
| 845 | 1,145 | 872 |

**Operating Costs and Expenses**

| | | | |
|---|---|---|---|
| Cost of operations | 119 | 50 | 21 |
| Selling, general and administrative | 58 | 64 | 64 |

**Other Income/(Expense)**

| | | | |
|---|---|---|---|
| Interest expense | $ (3) | $ (3) | $ (3) |

| CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS - USD ($) $ in Millions | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| Net Income/(Loss) | $ (115) | $ 192 | $ (42) |
| **Other Comprehensive Income/(Loss), net of tax [Abstract]** | | | |
| Unrealized (loss)/gain on derivatives | 0 | 0 | (1) |
| Defined benefit plans | (14) | (104) | 101 |
| Other Comprehensive Income/(Loss) | (14) | (104) | 100 |
| Comprehensive Loss | $ (129) | $ 88 | $ 58 |

| CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS (Parenthetical) - USD ($) $ in Millions | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| **Statement of Comprehensive Income [Abstract]** | | | |
| Other Comprehensive Income/(Loss), Tax | $ 0 | $ 0 | $ 0 |

## CONSOLIDATED
## BALANCE SHEETS - USD
($)
$ in Millions

| | Dec. 31, 2015 | Dec. 31, 2014 |
|---|---|---|
| **Current Assets** | | |
| Cash and cash equivalents | $ 665 | $ 920 |
| Funds deposited by counterparties | 51 | 54 |
| Current assets held-for-sale | 4 | 0 |
| Accounts receivable — trade, less allowance for doubtful accounts | 97 | 120 |
| Inventory | 448 | 507 |
| Derivative, Collateral, Right to Reclaim Cash | 48 | 38 |
| Prepayments and other current assets | 139 | 150 |
| Total current assets | 2,028 | 2,391 |
| **Property, Plant and Equipment [Abstract]** | | |
| In service | 3,281 | 3,341 |
| Construction in Progress, Gross | 164 | 140 |
| Total property, plant and equipment | 3,445 | 3,481 |
| Less accumulated depreciation | (614) | (436) |
| Net property, plant and equipment | 2,831 | 3,045 |
| **Other Assets** | | |
| Intangible assets, net of accumulated amortization | 74 | 72 |
| Other non-current assets | 253 | 201 |
| Disposal Group, Including Discontinued Operation, Assets, Noncurrent | 105 | 0 |
| Assets, Noncurrent | 587 | 478 |
| Total Assets | 5,446 | 5,914 |
| **Current Liabilities** | | |
| Current portion of long-term debt and capital leases | 4 | 10 |
| Cash collateral received in support of energy risk management activities | 51 | 54 |
| Employee-related Liabilities, Current | 48 | 79 |
| Taxes Payable, Current | 58 | 48 |
| Interest Payable, Other Accrued Liabilities and Other Liabilities, Current | 39 | 44 |
| Other Accrued Liabilities, Current | 56 | 67 |
| Disposal Group, Including Discontinued Operation, Liabilities, Current | 2 | 0 |
| Total current liabilities | 916 | 868 |
| **Other Liabilities** | | |
| Long-term debt and capital leases | 2,762 | 3,120 |
| Postretirement and other benefit obligations | 199 | 207 |
| Out of Market Contracts | 892 | 969 |
| Other non-current liabilities | 285 | 277 |
| Total non-current liabilities | 4,258 | 4,645 |
| Total Liabilities | 5,174 | 5,513 |
| **Stockholders' Equity** | | |
| Common stock; $0.001 par value; 2.0 billion shares authorized; 771,692,734 shares issued at December 31, 2011 | 0 | 0 |
| Additional paid-in capital | 325 | 325 |

| | | |
|---|---|---|
| Accumulated deficit | (37) | 78 |
| Accumulated other comprehensive income | (16) | (2) |
| Total Stockholders' Equity | 272 | 401 |
| Total Liabilities and Stockholders' Equity | 5,446 | 5,914 |
| GenOn Americas Generation, LLC [Member] | | |
| **Current Assets** | | |
| Cash and cash equivalents | 246 | 103 |
| Funds deposited by counterparties | 51 | 54 |
| Inventory | 289 | 318 |
| Derivative, Collateral, Right to Reclaim Cash | 39 | 29 |
| Prepayments and other current assets | 84 | 90 |
| Total current assets | 1,987 | 1,883 |
| **Property, Plant and Equipment [Abstract]** | | |
| In service | 1,331 | 1,250 |
| Construction in Progress, Gross | 29 | 30 |
| Total property, plant and equipment | 1,360 | 1,280 |
| Less accumulated depreciation | (244) | (170) |
| Net property, plant and equipment | 1,116 | 1,110 |
| **Other Assets** | | |
| Intangible assets, net of accumulated amortization | 73 | 72 |
| Other non-current assets | 131 | 111 |
| Assets, Noncurrent | 439 | 439 |
| Total Assets | 3,542 | 3,432 |
| **Current Liabilities** | | |
| Current portion of long-term debt and capital leases | 0 | 5 |
| Cash collateral received in support of energy risk management activities | 51 | 54 |
| Taxes Payable, Current | 0 | |
| Other Accrued Liabilities, Current | 104 | 93 |
| Total current liabilities | 1,049 | 899 |
| **Other Liabilities** | | |
| Long-term debt and capital leases | 752 | 929 |
| Out of Market Contracts | 520 | 547 |
| Other non-current liabilities | 107 | 106 |
| Total non-current liabilities | 1,561 | 1,717 |
| Total Liabilities | 2,610 | 2,616 |
| **Member's Equity** | | |
| Members' interest | 932 | 816 |
| Total member's equity | 932 | 816 |
| Total Liabilities and Member's Equity | 3,542 | 3,432 |
| **Stockholders' Equity** | | |
| Total Stockholders' Equity | 932 | 816 |
| GenOn Mid-Atlantic, LLC [Member] | | |
| **Current Assets** | | |
| Cash and cash equivalents | 299 | 157 |
| Inventory | 172 | 166 |
| Derivative, Collateral, Right to Reclaim Cash | 0 | |

| | | |
|---|---:|---:|
| Prepayments and other current assets | 79 | 80 |
| Total current assets | 821 | 654 |
| **Property, Plant and Equipment [Abstract]** | | |
| In service | 1,099 | 1,075 |
| Construction in Progress, Gross | 26 | 18 |
| Total property, plant and equipment | 1,125 | 1,093 |
| Less accumulated depreciation | (200) | (135) |
| Net property, plant and equipment | 925 | 958 |
| **Other Assets** | | |
| Intangible assets, net of accumulated amortization | 13 | 10 |
| Other non-current assets | 125 | 87 |
| Assets, Noncurrent | 221 | 238 |
| Total Assets | 1,967 | 1,850 |
| **Current Liabilities** | | |
| Current portion of long-term debt and capital leases | 0 | 5 |
| Cash collateral received in support of energy risk management activities | 0 | |
| Taxes Payable, Current | 44 | 29 |
| Accrued Environmental Loss Contingencies, Current | 27 | 21 |
| Other Accrued Liabilities, Current | 4 | 3 |
| Total current liabilities | 267 | 227 |
| **Other Liabilities** | | |
| Out of Market Contracts | 520 | 547 |
| Other non-current liabilities | 50 | 60 |
| Total non-current liabilities | 602 | 629 |
| Total Liabilities | 869 | 856 |
| **Member's Equity** | | |
| Members' interest | 1,098 | 994 |
| Total member's equity | 1,098 | 994 |
| Total Liabilities and Member's Equity | 1,967 | 1,850 |
| **Stockholders' Equity** | | |
| Total Stockholders' Equity | 1,098 | 994 |
| Non-affiliated Entity [Member] | | |
| **Current Assets** | | |
| Derivative Instruments | 544 | 591 |
| **Other Assets** | | |
| Derivative instruments | 154 | 195 |
| **Current Liabilities** | | |
| Accounts payable | 112 | 135 |
| Derivative instruments | 465 | 382 |
| **Other Liabilities** | | |
| Derivative instruments | 102 | 69 |
| Non-affiliated Entity [Member] | GenOn Americas Generation, LLC [Member] | | |
| **Current Assets** | | |
| Accounts receivable — trade, less allowance for doubtful accounts | 86 | 106 |
| Derivative Instruments | 545 | 591 |

**Other Assets**

| | | |
|---|---|---|
| Derivative instruments | 154 | 196 |

**Current Liabilities**

| | | |
|---|---|---|
| Accounts payable | 48 | 50 |
| Derivative instruments | 465 | 382 |

**Other Liabilities**

| | | |
|---|---|---|
| Derivative instruments | 102 | 69 |

**Non-affiliated Entity [Member] | GenOn Mid-Atlantic, LLC [Member]**

**Current Assets**

| | | |
|---|---|---|
| Accounts receivable — trade, less allowance for doubtful accounts | 2 | 10 |
| Derivative Instruments | 0 | 100 |

**Current Liabilities**

| | | |
|---|---|---|
| Accounts payable | 21 | 27 |
| Derivative instruments | 0 | 1 |

**Affiliated Entity [Member]**

**Current Assets**

| | | |
|---|---|---|
| Derivative Instruments | 30 | 11 |

**Other Assets**

| | | |
|---|---|---|
| Derivative instruments | 1 | 10 |

**Current Liabilities**

| | | |
|---|---|---|
| Accounts payable | 71 | 14 |
| Derivative instruments | 10 | 35 |

**Other Liabilities**

| | | |
|---|---|---|
| Derivative instruments | 14 | 3 |

**Affiliated Entity [Member] | GenOn Americas Generation, LLC [Member]**

**Current Assets**

| | | |
|---|---|---|
| Note receivable — affiliate | 331 | 331 |
| Derivative Instruments | 316 | 261 |

**Other Assets**

| | | |
|---|---|---|
| Derivative instruments | 81 | 60 |

**Current Liabilities**

| | | |
|---|---|---|
| Accounts payable | 109 | 23 |
| Derivative instruments | 272 | 292 |

**Other Liabilities**

| | | |
|---|---|---|
| Derivative instruments | 80 | 66 |

**Affiliated Entity [Member] | GenOn Mid-Atlantic, LLC [Member]**

**Current Assets**

| | | |
|---|---|---|
| Derivative Instruments | 269 | 141 |

**Other Assets**

| | | |
|---|---|---|
| Derivative instruments | 83 | 141 |

**Current Liabilities**

| | | |
|---|---|---|
| Accounts payable | 8 | 14 |
| Derivative instruments | 163 | 127 |

**Other Liabilities**

| | | |
|---|---|---|
| Derivative instruments | $ 32 | $ 22 |

| CONSOLIDATED BALANCE SHEETS (Parenthetical) - USD ($) $ in Millions | Dec. 31, 2015 | Dec. 31, 2014 |
|---|---|---|
| Accumulated amortization on intangible assets | $ 40 | $ 66 |
| Common stock, par value (in dollars per share) | $ 0.001 | $ 0.001 |
| Common stock, shares authorized (in shares) | 1 | 1 |
| Common stock, shares issued (in shares) | 1 | 1 |
| GenOn Americas Generation, LLC [Member] | | |
| Accumulated amortization on intangible assets | $ 40 | $ 66 |
| GenOn Mid-Atlantic, LLC [Member] | | |
| Accumulated amortization on intangible assets | $ 0 | $ 0 |
| GenOn Energy, Inc. Parent Company [Member] | | |
| Common stock, par value (in dollars per share) | $ 0.001 | $ 0.001 |
| Common stock, shares authorized (in shares) | 1 | 2,000,000,000.0 |
| Common stock, shares issued (in shares) | 1 | 771,692,734 |

| CONSOLIDATED STATEMENTS OF CASH FLOWS - USD ($) $ in Millions | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| **Cash Flows from Operating Activities** | | | |
| Net Income/(Loss) | $ (115) | $ 192 | $ (42) |
| **Adjustments to reconcile net income/(loss) to net cash provided by operating activities:** | | | |
| Depreciation and amortization | 215 | 245 | 249 |
| Amortization of financing costs and debt discount/premiums | 58 | 58 | 72 |
| Gains (Losses) on Extinguishment of Debt | (65) | 0 | 11 |
| Gains Losses on Extinguishment of Debt, Non Cash Portion | (65) | 0 | (28) |
| Amortization of Intangibles and Out of Market Contracts | 70 | 38 | 45 |
| Share-based Compensation | 2 | 6 | 9 |
| Gain on disposals and sales of assets | 0 | 6 | 0 |
| Equity Method Investment, Realized Gain (Loss) on Disposal | 0 | (18) | 0 |
| Other Asset Impairment Charges | (170) | (82) | 0 |
| Changes in Derivatives | 180 | 152 | 310 |
| Inventory Write-down | 19 | 12 | 0 |
| Other, net | (10) | 24 | 86 |
| **Cash provided/(used) by changes in other working capital, net of acquisition and disposition effects:** | | | |
| Accounts receivable - trade | 23 | 52 | (59) |
| Inventory | 33 | (76) | (25) |
| Prepayments and other current assets | 29 | 27 | 61 |
| Accounts payable | (38) | (127) | 118 |
| Increase (Decrease) in Other Operating Liabilities | 20 | (33) | (71) |
| Other assets and liabilities | (94) | (211) | 41 |
| Net Cash Provided by Operating Activities | 241 | 237 | 532 |
| **Cash Flows from Investing Activities:** | | | |
| Acquisition of businesses, net of cash acquired | 0 | 0 | 175 |
| Capital expenditures | (254) | (171) | (301) |
| Proceeds from sale of assets, net | 0 | 50 | 0 |
| Proceeds from Sale of Equity Method Investments | 0 | 35 | 0 |
| (Increase)/decrease in restricted cash, net | 0 | 0 | 18 |
| Other | (5) | 10 | (21) |
| Net cash provided by (used in) investing activities | (259) | (76) | (129) |
| **Cash Flows from Financing Activities** | | | |
| Proceeds from issuance of long-term debt | 0 | 0 | 110 |
| Payments for short and long-term debt | (237) | (1) | (578) |
| Net cash provided by (used in) financing activities | (237) | (1) | (468) |
| Net Increase (Decrease) in Cash and Cash Equivalents | (255) | 160 | (65) |
| Cash and Cash Equivalents at Beginning of Period | 920 | 760 | 825 |
| Cash and Cash Equivalents at End of Period | 665 | 920 | 760 |
| **Supplemental Disclosures:** | | | |
| Interest paid, net of amount capitalized | 248 | 240 | 259 |

| | | | |
|---|---|---|---|
| Income taxes paid, net of refunds received | 4 | 3 | (75) |

**GenOn Americas Generation, LLC [Member]**

**Cash Flows from Operating Activities**

| | | | |
|---|---|---|---|
| Net Income/(Loss) | 116 | 305 | 59 |

**Adjustments to reconcile net income/(loss) to net cash provided by operating activities:**

| | | | |
|---|---|---|---|
| Depreciation and amortization | 74 | 72 | 95 |
| Amortization of financing costs and debt discount/premiums | 9 | 9 | 8 |
| Gains (Losses) on Extinguishment of Debt | (42) | 0 | 0 |
| Amortization of Intangibles and Out of Market Contracts | 27 | 16 | 9 |
| Gain on disposals and sales of assets | 0 | (6) | 0 |
| Other Asset Impairment Charges | (8) | 0 | 0 |
| Changes in Derivatives | 122 | 128 | 270 |
| Inventory Write-down | 17 | 9 | 0 |
| Other, net | (10) | (35) | (36) |

**Cash provided/(used) by changes in other working capital, net of acquisition and disposition effects:**

| | | | |
|---|---|---|---|
| Inventory | (12) | 57 | 47 |
| Prepayments and other current assets | (6) | (15) | 6 |
| Increase (Decrease) in Other Operating Liabilities | 11 | 1 | 6 |
| Other assets and liabilities | 36 | 115 | 4 |
| Net Cash Provided by Operating Activities | 348 | 300 | 310 |

**Cash Flows from Investing Activities:**

| | | | |
|---|---|---|---|
| Capital expenditures | (74) | (32) | (55) |
| Proceeds from sale of assets, net | 0 | (50) | 0 |
| Other | 0 | 0 | 21 |
| Net cash provided by (used in) investing activities | (74) | (14) | (177) |

**Cash Flows from Financing Activities**

| | | | |
|---|---|---|---|
| Payments for short and long-term debt | (131) | 0 | (3) |
| Net cash provided by (used in) financing activities | (131) | (246) | (218) |
| Net Increase (Decrease) in Cash and Cash Equivalents | 143 | 40 | (85) |
| Cash and Cash Equivalents at Beginning of Period | 103 | 63 | 148 |
| Cash and Cash Equivalents at End of Period | 246 | 103 | 63 |

**Supplemental Disclosures:**

| | | | |
|---|---|---|---|
| Interest paid, net of amount capitalized | 76 | 75 | 73 |

**GenOn Mid-Atlantic, LLC [Member]**

**Cash Flows from Operating Activities**

| | | | |
|---|---|---|---|
| Net Income/(Loss) | 104 | 236 | 128 |

**Adjustments to reconcile net income/(loss) to net cash provided by operating activities:**

| | | | |
|---|---|---|---|
| Depreciation and amortization | 65 | 50 | 77 |
| Amortization of Intangibles and Out of Market Contracts | 27 | (1) | 11 |
| Gain on disposals and sales of assets | 0 | 0 | (7) |
| Changes in Derivatives | 75 | 202 | 260 |
| Inventory Write-down | 6 | 0 | 0 |

**Cash provided/(used) by changes in other working capital, net of acquisition and disposition effects:**

| | | | |
|---|---|---|---|
| Inventory | 12 | 8 | 21 |
| Prepayments and other current assets | (2) | (34) | 69 |
| Increase (Decrease) in Other Operating Liabilities | 22 | 4 | (8) |
| Other assets and liabilities | 51 | 106 | 102 |
| Net Cash Provided by Operating Activities | 186 | 429 | 261 |
| **Cash Flows from Investing Activities:** | | | |
| Capital expenditures | (39) | (16) | (44) |
| Net cash provided by (used in) investing activities | (39) | (16) | (44) |
| **Cash Flows from Financing Activities** | | | |
| Payments for short and long-term debt | (5) | 0 | (3) |
| Net cash provided by (used in) financing activities | (5) | (320) | (288) |
| Net Increase (Decrease) in Cash and Cash Equivalents | 142 | 93 | (71) |
| Cash and Cash Equivalents at Beginning of Period | 157 | 64 | 135 |
| Cash and Cash Equivalents at End of Period | 299 | 157 | 64 |

Non-affiliated Entity [Member] | GenOn Americas Generation, LLC [Member]

**Cash provided/(used) by changes in other working capital, net of acquisition and disposition effects:**

| | | | |
|---|---|---|---|
| Accounts receivable - trade | (20) | (39) | 26 |
| Accounts payable | 0 | (45) | 1 |

Non-affiliated Entity [Member] | GenOn Mid-Atlantic, LLC [Member]

**Cash provided/(used) by changes in other working capital, net of acquisition and disposition effects:**

| | | | |
|---|---|---|---|
| Accounts receivable - trade | (8) | 6 | 0 |
| Accounts payable | 0 | 8 | 0 |

Affiliated Entity [Member] | GenOn Americas Generation, LLC [Member]

**Cash provided/(used) by changes in other working capital, net of acquisition and disposition effects:**

| | | | |
|---|---|---|---|
| Accounts payable | 86 | 2 | 15 |
| **Cash Flows from Investing Activities:** | | | |
| Decrease/(increase) in notes receivable - affiliate | 0 | 32 | 101 |
| **Cash Flows from Financing Activities** | | | |
| Proceeds from Contributions from Affiliates | | 74 | 70 |
| Distributions to members | | (320) | (279) |

Affiliated Entity [Member] | GenOn Mid-Atlantic, LLC [Member]

**Cash provided/(used) by changes in other working capital, net of acquisition and disposition effects:**

| | | | |
|---|---|---|---|
| Accounts payable | $ (6) | 14 | 0 |
| **Cash Flows from Financing Activities** | | | |
| Distributions to members | | $ (320) | (285) |

GenOn Mid-Atlantic, LLC [Member] | GenOn Americas Generation, LLC [Member]

**Cash Flows from Financing Activities**

| | | | |
|---|---|---|---|
| Distributions to members | | | $ (285) |

| CONSOLIDATED STATEMENT OF STOCKHOLDERS' EQUITY / MEMBER'S EQUITY - USD ($) $ in Millions | Total | GenOn Americas Generation, LLC [Member] | GenOn Mid-Atlantic, LLC [Member] | Common Stock [Member] | Additional Paid-In Capital [Member] | Retained Earnings [Member] | Accumulated Other Comprehensive Income/(Loss) [Member] | Affiliated Entity [Member] GenOn Americas Generation, LLC [Member] | Affiliated Entity [Member] GenOn Mid-Atlantic, LLC [Member] | Affiliated Entity [Member] Member's Interest [Member] GenOn Americas Generation, LLC [Member] | Affiliated Entity [Member] Member's Interest [Member] GenOn Mid-Atlantic, LLC [Member] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance at Dec. 31, 2012 | $ 207 | $ 841 | $ 1,235 | $ 0 | $ 277 | $ (72) | $ 2 | | | | |
| **Increase (Decrease) in Stockholders' Equity [Roll Forward]** | | | | | | | | | | | |
| Net Income/(Loss) | (42) | 59 | 128 | | | | | | | | |
| Distributions to members | | | | | | | | $ (279) | $ (285) | | $ 285 |
| Proceeds from Contributions from Affiliates | | | | | | | | 70 | $ 70 | | |
| Other comprehensive income | 100 | | | | | | | | | | |
| Adjustments to Additional Paid in Capital, Other | (48) | | | | (48) | | | | | | |
| Balance at Dec. 31, 2013 | 313 | 691 | 1,078 | 0 | 325 | (114) | 102 | | | | |
| **Increase (Decrease) in Stockholders' Equity [Roll Forward]** | | | | | | | | | | | |
| Net Income/(Loss) | 192 | 305 | 236 | | | | | | | | |
| Distributions to members | | | | | | | | (320) | $ (320) | 320 | 320 |
| Proceeds from Contributions from Affiliates | | | | | | | | 74 | | 74 | |
| Capital Contributions Non-Cash | | | | | | | | $ 66 | | | |
| Other comprehensive income | (104) | | | | | | | | | | |
| Balance at Dec. 31, 2014 | 401 | 816 | 994 | 0 | 325 | 78 | (2) | | | | |
| **Increase (Decrease) in Stockholders' Equity [Roll Forward]** | | | | | | | | | | | |
| Net Income/(Loss) | (115) | 116 | 104 | | | | | | | | |
| Distributions to members | | | | | | | | | | 0 | $ 0 |
| Proceeds from Contributions from Affiliates | | | | | | | | | | $ 0 | |
| Other comprehensive income | (14) | | | | | | | | | | |
| Balance at Dec. 31, 2015 | $ 272 | $ 932 | $ 1,098 | $ 0 | $ 325 | $ (37) | $ (16) | | | | |

**Nature of Business**

**12 Months Ended**

**Dec. 31, 2015**

**Nature of Business Disclosure [Abstract]**

Nature of Business

**Nature of Business (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*General*

GenOn Energy, Inc., a wholly owned subsidiary of NRG, is a wholesale generator engaged in the ownership and operation of power generation facilities, with approximately 17,753 MW of net electric generating capacity located in the U.S.

GenOn Americas Generation is a wholesale power generator with approximately 7,985 MW of net electric generating capacity located, in many cases, near major metropolitan areas. GenOn Americas Generation's electric generating capacity is part of the 17,753 MW of net electric generating capacity of GenOn.

GenOn Mid-Atlantic operates and owns or leases 4,683 MW of net electric generating capacity in Maryland, near Washington, D.C. GenOn Mid-Atlantic's electric generating capacity is part of the 7,985 MW of net electric generating capacity of GenOn Americas Generation. GenOn Mid-Atlantic's generating facilities serve the Eastern PJM markets.

GenOn Americas Generation and GenOn Mid-Atlantic are Delaware limited liability companies and indirect wholly owned subsidiaries of GenOn. GenOn Mid-Atlantic is a wholly owned subsidiary of NRG North America and an indirect wholly owned subsidiary of GenOn Americas Generation. The following illustrates the ownership structure of the Registrants as of December 31, 2015:



(a) – Registrant

GenOn's generation facilities consist of baseload, intermediate and peaking power generation facilities. The following table summarizes the generation portfolio by Registrant:

| | | (In MW) | |
| --- | --- | --- | --- |
| **Generation Type** | **GenOn** | **GenOn Americas Generation** | **GenOn Mid-Atlantic** |
| Natural gas | 10,763 | 4,118 | 1,942 |
| Coal | 5,143 | 2,433 | 2,433 |
| Oil | 1,847 | 1,434 | 308 |
| Total generation capacity | 17,753 | 7,985 | 4,683 |

The Registrants sell power from their generation portfolio and offer capacity or similar products to retail electric providers and others, and provide ancillary services to support system reliability.

*NRG Merger*

On December 14, 2012, NRG completed the acquisition of GenOn with GenOn continuing as a wholly owned subsidiary of NRG. The NRG Merger was accounted for under the acquisition method of accounting. Fair value adjustments related to the NRG Merger have been pushed down to GenOn, GenOn Americas Generation and GenOn Mid-Atlantic, resulting in certain assets and liabilities of the Registrants being recorded at fair value at December 15, 2012.

The Registrants' consolidated statements of operations subsequent to the NRG Merger include amortization expense relating to fair value adjustments and depreciation expense based on the fair value of the Registrants' property, plant and equipment. In addition, effective with the NRG Merger, the Registrants adopted accounting policies of NRG.

**Summary of Significant Accounting Policies**

**12 Months Ended**

**Dec. 31, 2015**

**Accounting Policies [Abstract]**

New Accounting Pronouncements, Policy [Policy Text Block]

*Recent Accounting Developments*

*ASU 2016-01* - In January 2016, the FASB issued ASU No. 2016-01, Financial Instruments - Overall (Subtopic 825-10): Recognition and Measurement of Financial Assets and Financial Liabilities, or ASU No. 2016-01. The amendments of ASU No. 2016-01 eliminate available-for-sale classification of equity investments and require that equity investments (except those accounted for under the equity method of accounting, or those that result in consolidation of the investee) to be generally measured at fair value with changes in fair value recognized in net income. Further, the amendments require that financial assets and financial liabilities to be presented separately in the notes to the financial statements, grouped by measurement category and form of financial asset. The guidance in ASU No. 2016-01 is effective for financial statements issued for fiscal years beginning after December 15, 2017, and interim periods within those annual periods. The Registrants are currently evaluating the impact of the standard on the Registrants' results of operations, cash flows and financial position.

*ASU 2015-17* — In November 2015, the FASB issued ASU No. 2015-17, *Income Taxes (Topic 740): Balance Sheet Classification of Deferred Taxes*, or ASU No. 2015-17. The amendments of ASU No. 2015-17 require that deferred tax liabilities and assets, as well as any related valuation allowance, be presented as noncurrent in a classified statement of financial position. The guidance in ASU No. 2015-17 is effective for financial statements issued for fiscal years beginning after December 15, 2016, and interim periods within those annual periods. The amendments may be applied either prospectively to all deferred tax liabilities and assets or retrospectively to all periods presented. Early adoption is permitted. The Registrants' adopted ASU No. 2015-17 for the year ended December 31, 2015 and elected to apply the amendments retrospectively. The adoption did not have any impact on the Registrants' results of operations, cash flows, or net assets.

*ASU 2015-02* — In February 2015, the FASB issued ASU No. 2015-02, *Consolidation (Topic 810): Amendments to the Consolidation Analysis*, or ASU No. 2015-02. The amendments of ASU No. 2015-02 were issued in an effort to minimize situations under previously existing guidance in which a reporting entity was required to consolidate another legal entity in which that reporting entity did not have: (1) the ability through contractual rights to act primarily on its own behalf; (2) ownership of the majority of the legal entity's voting rights; or (3) the exposure to a majority of the legal entity's economic benefits. ASU No. 2015-02 affects reporting entities that are required to evaluate whether they should consolidate certain legal entities. All legal entities are subject to reevaluation under the revised consolidation model. The guidance in ASU No. 2015-02 is effective for periods beginning after December 15, 2015. Early adoption is permitted. The Registrants adopted the standard effective January 1, 2015, and the adoption of this standard did not impact the Registrants' results of operations, cash flows or financial position.

*ASU 2014-16* — In November 2014, the FASB issued ASU No. 2014-16, *Derivatives and Hedging (Topic 815): Determining Whether the Host Contract in a Hybrid Financial Instrument Issued in the Form of a Share Is More Akin to Debt or to Equity*, or ASU No. 2014-16. The amendments of ASU No. 2014-16 clarify how U.S. GAAP should be applied in determining whether the nature of a host contract is more akin to debt or equity and in evaluating whether the economic characteristics and risks of an embedded feature are "clearly and closely related" to its host contract. The guidance in ASU No. 2014-16 is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2015. Early adoption is permitted. The Registrants adopted the standard effective January 1, 2015 and the adoption of this standard did not impact the Registrants' results of operations, cash flows or financial position.

*ASU 2014-09* — In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers (Topic 606)*, or ASU No. 2014-09. The amendments of ASU No. 2014-09 complete the joint effort between the FASB and the International Accounting Standards Board, or IASB, to develop a common revenue standard for U.S. GAAP and International Financial Reporting Standards, or IFRS, and to improve financial reporting. The guidance in ASU No. 2014-09 provides that an entity should recognize revenue to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled to in exchange for the goods or services provided and establishes the following steps to be applied by an entity: (1) identify the contract with a customer; (2) identify the performance obligations in the contract; (3) determine the transaction price; (4) allocate the transaction price to the performance obligations in the contract; and (5) recognize revenue when (or as) the entity satisfies the performance obligation. In August 2015, the FASB issued ASU 2015-14, which formally deferred the effective date by one year to make the guidance of ASU No. 2014-09 effective for annual reporting periods beginning after December 15, 2017, including interim periods therein. Early

adoption is permitted, but not prior to the original effective date, which was for annual reporting periods beginning after December 15, 2016. The Registrants are currently evaluating the impact of the standard on the Registrants' results of operations, cash flows and financial position.

Significant Accounting Policies [Text Block]

**Summary of Significant Accounting Policies (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

### *Basis of Presentation and Principles of Consolidation*

This is a combined annual report of the Registrants. The notes to the consolidated financial statements apply to the Registrants as indicated parenthetically next to each corresponding disclosure.

The Registrants' consolidated financial statements have been prepared in accordance with U.S. GAAP. The ASC, established by the FASB, is the source of authoritative U.S. GAAP to be applied by nongovernmental entities. In addition, the rules and interpretative releases of the SEC under authority of federal securities laws are also sources of authoritative U.S. GAAP for SEC registrants.

The consolidated financial statements include the Registrants' accounts and operations and those of their subsidiaries in which the Registrants have a controlling interest. All significant intercompany transactions and balances have been eliminated in consolidation. The usual condition for a controlling financial interest is ownership of a majority of the voting interests of an entity. However, a controlling financial interest may also exist through arrangements that do not involve controlling voting interests. As such, the Registrants apply the guidance of ASC 810, *Consolidations,* or ASC 810, to determine when an entity that is insufficiently capitalized or not controlled through its voting interests, referred to as a VIE, should be consolidated.

### *Cash and Cash Equivalents*

Cash and cash equivalents include highly liquid investments with an original maturity of three months or less at the time of purchase.

### *Funds Deposited by Counterparties (GenOn and GenOn Americas Generation)*

Funds deposited by counterparties consist of cash held by GenOn as a result of collateral posting obligations from GenOn's counterparties. Some amounts are segregated into separate accounts that are not contractually restricted but, based on GenOn's intentions, are not available for the payment of general corporate obligations. Depending on market fluctuations and the settlement of the underlying contracts, GenOn will refund this collateral to the hedge counterparties pursuant to the terms and conditions of the underlying trades. Since collateral requirements fluctuate daily and GenOn cannot predict if any collateral will be held for more than twelve months, the funds deposited by counterparties are classified as a current asset on GenOn's balance sheets, with an offsetting liability for this cash collateral received within current liabilities. Changes in funds deposited by counterparties are closely associated with GenOn's operating activities and are classified as an operating activity in GenOn's consolidated statements of cash flows.

### *Inventory*

Inventory is valued at the lower of weighted average cost or market, and consists principally of fuel oil, coal and raw materials used to generate electricity or steam. The Registrants remove these inventories as they are used in the production of electricity or steam. Spare parts inventory is valued at a weighted average cost, since the Registrants expect to recover these costs in the ordinary course of business. The Registrants remove these inventories when they are used for repairs, maintenance or capital projects. Sales of inventory are classified as an operating activity in the consolidated statements of cash flows. During the year ended December 31, 2015, the Registrants recorded a lower of weighted average cost or market adjustment related to fuel oil of $19 million related to GenOn, of which $17 million relates to GenOn Americas Generation and $6 million relates to GenOn Mid-Atlantic.

### *Property, Plant and Equipment*

Property, plant and equipment are stated at cost; however impairment adjustments are recorded whenever events or changes in circumstances indicate that their carrying values may not be recoverable. Significant additions or improvements extending asset lives are capitalized as incurred, while repairs and maintenance that do not improve or extend the life of the respective asset are charged to expense as incurred. Depreciation is computed using the straight-line method over the estimated useful lives. Certain assets and their related accumulated depreciation amounts are adjusted for asset retirements and disposals with the resulting gain or loss included in cost of operations in the consolidated statements of operations.

### *Asset Impairments*

Long-lived assets that are held and used are reviewed for impairment whenever events or changes in

circumstances indicate carrying values may not be recoverable. Such reviews are performed in accordance with ASC 360, *Property, Plant and Equipment*. An impairment loss is recognized if the total future estimated undiscounted cash flows expected from an asset are less than its carrying value. An impairment charge is measured by the difference between an asset's carrying amount and fair value with the difference recorded in operating costs and expenses in the statements of operations. Fair values are determined by a variety of valuation methods, including appraisals, sales prices of similar assets and present value techniques.

For further discussion of these matters, refer to Note 9, *Impairments*.

### Capitalized Interest (GenOn and GenOn Americas Generation)

Interest incurred on funds borrowed to finance capital projects is capitalized until the project under construction is ready for its intended use. The amounts of interest capitalized were as follows:

|  | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
|  | (In millions) | | |
| GenOn | $ 5 | $ 11 | $ 21 |
| GenOn Americas Generation | 2 | 1 | 2 |

When a project is available for operations, capitalized interest and project development costs are reclassified to property, plant and equipment and depreciated on a straight-line basis over the estimated useful life of the project's related assets. Capitalized costs are charged to expense if a project is abandoned or management otherwise determines the costs to be unrecoverable.

### Intangible Assets

Intangible assets represent contractual rights held by the Registrants. The Registrants recognize specifically identifiable intangible assets when specific rights and contracts are acquired. As of December 31, 2015, and 2014, the Registrants' intangible assets are comprised of $SO_2$ emission allowances and $CO_2$ emission credits held for compliance with RGGI that are held-for-use and are amortized to cost of operations based on straight line or units of production basis. The following table presents the Registrants' amortization of intangible assets for each of the past three years:

|  | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
|  | (In millions) | | |
| GenOn | $ 39 | $ 38 | $ 25 |
| GenOn Americas Generation | 32 | 33 | 21 |
| GenOn Mid-Atlantic | 27 | 29 | 18 |

The following table presents estimated amortization of the Registrants' intangible assets for each of the next five years:

|  | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
|  | (In millions) | | |
| 2016 | $ 45 | $ 42 | $ 3 |
| 2017 | 2 | — | — |
| 2018 | 1 | — | — |
| 2019 | 1 | — | — |
| 2020 | 1 | — | — |

### Out of Market Contracts

In connection with the NRG Merger, acquired out-of-market contracts were pushed down to the Registrants, as applicable, and primarily relate to GenOn Mid-Atlantic and REMA leases and long-term natural gas transportation and storage contracts. These out-of-market contracts are amortized to operating revenues and cost of operations, as applicable, based on the nature of the contracts and over their contractual lives. The following table presents the Registrants' amortization of out-of-market contracts for each of the past three years:

|  | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
|  | (In millions) | | |
| GenOn | $ 79 | $ 78 | $ 75 |
| GenOn Americas Generation | 28 | 28 | 28 |
| GenOn Mid-Atlantic | 28 | 28 | 28 |

The following table summarizes the estimated amortization related to the Registrants' out-of-market contracts:

|  | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
|  | (In millions) | | |
| 2016 | $ 81 | $ 28 | $ 28 |
| 2017 | 76 | 28 | 28 |
| 2018 | 71 | 28 | 28 |
| 2019 | 68 | 28 | 28 |
| 2020 | 68 | 28 | 28 |

### Income Taxes

#### GenOn

GenOn is a wholly owned subsidiary of NRG that exists as a corporate regarded entity for income tax purposes. As a result, GenOn, NRG Americas and NRG have direct liability for the majority of the federal and state income taxes resulting from GenOn's operations. GenOn has allocated income taxes as if it were a single consolidated taxpayer using the liability method in accordance with ASC 740, which requires that GenOn use the asset and liability method of accounting for deferred income taxes and provide deferred income taxes for all significant temporary differences.

GenOn has two categories of income tax expense or benefit - current and deferred, as follows:

•    Current income tax expense or benefit consists solely of current taxes payable less applicable tax credits, and

•    Deferred income tax expense or benefit is the change in the net deferred income tax asset or liability, excluding amounts charged or credited to accumulated other comprehensive income.

GenOn reports some of its revenues and expenses differently for financial statement purposes than for income tax return purposes, resulting in temporary and permanent differences between its financial statements and income tax returns. The tax effects of such temporary differences are recorded as either deferred income tax assets or deferred income tax liabilities in GenOn's consolidated balance sheets. GenOn measures its deferred income tax assets and deferred income tax liabilities using income tax rates that are currently in effect. A valuation allowance is recorded to reduce GenOn's net deferred tax assets to an amount that is more-likely-than-not to be realized.

The determination of a valuation allowance requires significant judgment as to the generation of taxable income during future periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn's past and projected pre-tax book earnings, the reversal of deferred tax liabilities and the implementation of tax planning strategies.

GenOn accounts for uncertain tax positions in accordance with ASC 740, which applies to all tax positions related to income taxes. Under ASC 740, tax benefits are recognized when it is more-likely-than-not that a tax position will be sustained upon examination by the authorities. The benefit recognized from a position that has surpassed the more-likely-than-not threshold is the largest amount of benefit that is more than 50% likely to be realized upon settlement. GenOn recognizes interest and penalties accrued related to uncertain tax benefits as a component of income tax expense.

#### GenOn Americas Generation

GenOn Americas Generation and most of its subsidiaries are limited liability companies that are

treated as branches of GenOn Americas for income tax purposes. As a result, NRG Americas, GenOn and NRG have direct liability for the majority of the federal and state income taxes relating to GenOn Americas Generation's operations. Several of GenOn Americas Generation's subsidiaries exist as regarded corporate entities for income tax purposes. For the subsidiaries that continue to exist as corporate regarded entities, GenOn Americas Generation allocates current and deferred income taxes to each corporate regarded entity as if such entity were a single taxpayer utilizing the asset and liability method to account for income taxes.

GenOn Americas Generation reports some of its revenues and expenses differently for financial statement purposes than for income tax return purposes, resulting in temporary and permanent differences between its financial statements and income tax returns. The tax effects of such temporary differences are recorded as either deferred income tax assets or deferred income tax liabilities in GenOn Americas Generation's consolidated balance sheets. GenOn Americas Generation measures its deferred income tax assets and deferred income tax liabilities using income tax rates that are currently in effect. A valuation allowance is recorded to reduce GenOn Americas Generation's net deferred tax assets to an amount that is more-likely-than-not to be realized.

The determination of a valuation allowance requires significant judgment as to the generation of taxable income during future periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn Americas Generation's past and projected pre-tax book earnings, the reversal of deferred tax liabilities and the implementation of tax planning strategies.

GenOn Americas Generation accounts for uncertain tax positions in accordance with ASC 740, which applies to all tax positions related to income taxes. Under ASC 740, tax benefits are recognized when it is more-likely-than-not that a tax position will be sustained upon examination by the authorities. The benefit recognized from a position that has surpassed the more-likely-than-not threshold is the largest amount of benefit that is more than 50% likely to be realized upon settlement. GenOn Americas Generation recognizes interest and penalties accrued related to uncertain tax benefits as a component of income tax expense.

*GenOn Mid-Atlantic*

GenOn Mid-Atlantic and GenOn Mid-Atlantic's subsidiaries are limited liability companies that are treated as branches of NRG Americas for income tax purposes. As such, GenOn, NRG Americas and NRG have direct liability for the majority of the federal and state income taxes relating to GenOn Mid-Atlantic's operations.

### Revenue Recognition

*Energy* — Both physical and financial transactions are entered into to optimize the financial performance of the Registrants' generating facilities. Electric energy revenue is recognized upon transmission to the customer. Physical transactions, or the sale of generated electricity to meet supply and demand, are recorded on a gross basis in the Registrants' consolidated statements of operations. Financial transactions, or the buying and selling of energy for trading purposes, are recorded net within operating revenues in the consolidated statements of operations in accordance with ASC 815.

*Capacity* — Capacity revenues are recognized when contractually earned, and consist of revenues billed to a third party at either the market or a negotiated contract price for making installed generation capacity available in order to satisfy system integrity and reliability requirements.

*Natural Gas Sales (GenOn and GenOn Americas Generation)* — GenOn and GenOn Americas Generation record revenues from the sales of natural gas under the accrual method. These sales are sold at market-based prices. Sales that have been delivered but not billed by period end are estimated.

### Derivative Financial Instruments

The Registrants account for derivative financial instruments under ASC 815, which requires the Registrants to record all derivatives on the balance sheet at fair value unless they qualify for a NPNS exception. Changes in the fair value of derivatives are immediately recognized in earnings.

The Registrants' primary derivative instruments are financial power and natural gas contracts, fuels purchase contracts, and other energy related commodities used to mitigate variability in earnings due to fluctuations in market prices.

Revenues and expenses on contracts that qualify for the NPNS exception are recognized when the underlying physical transaction is delivered. While these contracts are considered derivative financial instruments under ASC 815, they are not recorded at fair value, but on an accrual basis of accounting. If it is determined that a transaction designated as NPNS no longer meets the scope exception, the fair value of the related contract is recorded on the balance sheet and immediately recognized through earnings.

The Registrants' trading activities are subject to limits in accordance with the Risk Management Policy. These contracts are recognized on the balance sheet at fair value and changes in the fair value of these derivative financial instruments are recognized in earnings.

### Concentrations of Credit Risk

Financial instruments which potentially subject the Registrants to concentrations of credit risk consist primarily of accounts receivable and derivatives. Certain accounts receivable and derivative instruments are concentrated within entities engaged in the energy industry. These industry concentrations may impact the Registrants' overall exposure to credit risk, either positively or negatively, in that the customers may be similarly affected by changes in economic, industry or other conditions. Receivables and other contractual arrangements are subject to collateral requirements under the terms of enabling agreements. However, the Registrants believe that the credit risk posed by industry concentration is offset by the diversification and creditworthiness of the Registrants' customer base. See Note 4, *Fair Value of Financial Instruments,* for a further discussion of derivative concentrations.

### Fair Value of Financial Instruments

The carrying amount of cash and cash equivalents, funds deposited by counterparties, receivables, accounts payable, and accrued liabilities approximate fair value because of the short-term maturity of these instruments. See Note 4, *Fair Value of Financial Instruments*, for a further discussion of fair value of financial instruments.

### Asset Retirement Obligations

The Registrants account for their AROs in accordance with ASC 410-20, *Asset Retirement Obligations,* or ASC 410-20. Retirement obligations associated with long-lived assets included within the scope of ASC 410-20 are those for which a legal obligation exists under enacted laws, statutes, and written or oral contracts, including obligations arising under the doctrine of promissory estoppel, and for which the timing and/or method of settlement may be conditional on a future event. ASC 410-20 requires an entity to recognize the fair value of a liability for an ARO in the period in which it is incurred and a reasonable estimate of fair value can be made.

Upon initial recognition of a liability for an ARO, the Registrants capitalize the asset retirement cost by increasing the carrying amount of the related long-lived asset by the same amount. Over time, the liability is accreted to its future value, while the capitalized cost is depreciated over the useful life of the related asset. See Note 11, *Asset Retirement Obligations,* for a further discussion of AROs.

### Pensions (GenOn)

GenOn offers pension benefits through defined benefit pension plans. In addition, GenOn provides postretirement health and welfare benefits for certain groups of employees. GenOn accounts for pension and other postretirement benefits in accordance with ASC 715, *Compensation — Retirement Benefits.* GenOn recognizes the funded status of its defined benefit plans in the statement of financial position and records an offset for gains and losses as well as all prior service costs that have not been included as part of GenOn's net periodic benefit cost to other comprehensive income. The determination of GenOn's obligation and expenses for pension benefits is dependent on the selection of certain assumptions. These assumptions determined by management include the discount rate, the expected rate of return on plan assets and the rate of future compensation increases. GenOn's actuarial consultants determine assumptions for such items as retirement age. The assumptions used may differ materially from actual results, which may result in a significant impact to the amount of pension obligation or expense recorded by GenOn.

GenOn measures the fair value of its pension assets in accordance with ASC 820, *Fair Value Measurements and Disclosures,* or ASC 820.

On December 31, 2014, NRG merged 8 qualified pension plans into 2 separate qualified pension plans, the NRG Pension Plan for Bargained Employees and the NRG Pension Plan. The GenOn Mirant Bargaining Unit Pension Plan, GenOn First Energy Pension Plan, GenOn Duquesne Pension Plan, and GenOn REMA Pension Plan were merged into the NRG Pension Plan for Bargained Employees. The GenOn Mirant Pension Plan was merged into the NRG Pension Plan for Non-Bargained Employees and renamed the NRG Pension Plans. These actions were conducted to simplify internal administration of the plans, reduce regulatory filings, and lower fees paid to outside vendors as part of the management services agreement. The benefits provided to current participants in the Plans were not impacted and GenOn remains obligated for its respective pension liabilities.

### Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted

in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements, disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from these estimates.

In recording transactions and balances resulting from business operations, the Registrants use estimates based on the best information available. Estimates are used for such items as plant depreciable lives, tax provisions, actuarially determined benefit costs, the valuation of energy commodity contracts, environmental liabilities, legal costs incurred in connection with recorded loss contingencies, and assets acquired and liabilities assumed in business combinations, among others. In addition, estimates are used to test long-lived assets for impairment and to determine the fair value of impaired assets. As better information becomes available or actual amounts are determinable, the recorded estimates are revised. Consequently, operating results can be affected by revisions to prior accounting estimates.

### Reclassifications

Certain prior-year amounts have been reclassified for comparative purposes. The reclassifications did not affect results from operations, net assets or cash flows.

### Recent Accounting Developments

*ASU 2016-01* - In January 2016, the FASB issued ASU No. 2016-01, Financial Instruments - Overall (Subtopic 825-10): Recognition and Measurement of Financial Assets and Financial Liabilities, or ASU No. 2016-01. The amendments of ASU No. 2016-01 eliminate available-for-sale classification of equity investments and require that equity investments (except those accounted for under the equity method of accounting, or those that result in consolidation of the investee) to be generally measured at fair value with changes in fair value recognized in net income. Further, the amendments require that financial assets and financial liabilities to be presented separately in the notes to the financial statements, grouped by measurement category and form of financial asset. The guidance in ASU No. 2016-01 is effective for financial statements issued for fiscal years beginning after December 15, 2017, and interim periods within those annual periods. The Registrants are currently evaluating the impact of the standard on the Registrants' results of operations, cash flows and financial position.

*ASU 2015-17* — In November 2015, the FASB issued ASU No. 2015-17, *Income Taxes (Topic 740): Balance Sheet Classification of Deferred Taxes*, or ASU No. 2015-17. The amendments of ASU No. 2015-17 require that deferred tax liabilities and assets, as well as any related valuation allowance, be presented as noncurrent in a classified statement of financial position. The guidance in ASU No. 2015-17 is effective for financial statements issued for fiscal years beginning after December 15, 2016, and interim periods within those annual periods. The amendments may be applied either prospectively to all deferred tax liabilities and assets or retrospectively to all periods presented. Early adoption is permitted. The Registrants' adopted ASU No. 2015-17 for the year ended December 31, 2015 and elected to apply the amendments retrospectively. The adoption did not have any impact on the Registrants' results of operations, cash flows, or net assets.

*ASU 2015-02* — In February 2015, the FASB issued ASU No. 2015-02, *Consolidation (Topic 810): Amendments to the Consolidation Analysis*, or ASU No. 2015-02. The amendments of ASU No. 2015-02 were issued in an effort to minimize situations under previously existing guidance in which a reporting entity was required to consolidate another legal entity in which that reporting entity did not have: (1) the ability through contractual rights to act primarily on its own behalf; (2) ownership of the majority of the legal entity's voting rights; or (3) the exposure to a majority of the legal entity's economic benefits. ASU No. 2015-02 affects reporting entities that are required to evaluate whether they should consolidate certain legal entities. All legal entities are subject to reevaluation under the revised consolidation model. The guidance in ASU No. 2015-02 is effective for periods beginning after December 15, 2015. Early adoption is permitted. The Registrants adopted the standard effective January 1, 2015, and the adoption of this standard did not impact the Registrants' results of operations, cash flows or financial position.

*ASU 2014-16* — In November 2014, the FASB issued ASU No. 2014-16, *Derivatives and Hedging (Topic 815): Determining Whether the Host Contract in a Hybrid Financial Instrument Issued in the Form of a Share Is More Akin to Debt or to Equity*, or ASU No. 2014-16. The amendments of ASU No. 2014-16 clarify how U.S. GAAP should be applied in determining whether the nature of a host contract is more akin to debt or equity and in evaluating whether the economic characteristics and risks of an embedded feature are "clearly and closely related" to its host contract. The guidance in ASU No. 2014-16 is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2015. Early adoption is permitted. The Registrants adopted the standard effective January 1, 2015 and the adoption of this standard did not impact the Registrants' results of operations, cash flows or financial position.

*ASU 2014-09* — In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with*

*Customers (Topic 606)*, or ASU No. 2014-09. The amendments of ASU No. 2014-09 complete the joint effort between the FASB and the International Accounting Standards Board, or IASB, to develop a common revenue standard for U.S. GAAP and International Financial Reporting Standards, or IFRS, and to improve financial reporting. The guidance in ASU No. 2014-09 provides that an entity should recognize revenue to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled to in exchange for the goods or services provided and establishes the following steps to be applied by an entity: (1) identify the contract with a customer; (2) identify the performance obligations in the contract; (3) determine the transaction price; (4) allocate the transaction price to the performance obligations in the contract; and (5) recognize revenue when (or as) the entity satisfies the performance obligation. In August 2015, the FASB issued ASU 2015-14, which formally deferred the effective date by one year to make the guidance of ASU No. 2014-09 effective for annual reporting periods beginning after December 15, 2017, including interim periods therein. Early adoption is permitted, but not prior to the original effective date, which was for annual reporting periods beginning after December 15, 2016. The Registrants are currently evaluating the impact of the standard on the Registrants' results of operations, cash flows and financial position.

| Dispositions | 12 Months Ended |
|---|---|
| | Dec. 31, 2015 |

**Business Acquisition [Line Items]**

Business Combination Disclosure

**Dispositions (GenOn and GenOn Americas Generation)**

*Seward Disposition (GenOn)*

On November 24, 2015, GenOn entered into an agreement with Robindale Energy Services, Inc. to sell 100% of its interest in Seward Generation, LLC, or Seward, for cash consideration of $75 million. Seward owns a 525 MW coal-fired facility in Pennsylvania. The transaction triggered an impairment indicator as the sale price was less than the carrying amount of the assets and, as a result, the assets were considered to be impaired. GenOn measured the impairment loss as the difference between the carrying amount of the assets and the agreed-upon sale price. GenOn recorded an impairment loss of $134 million in its consolidated results of operations for the year ended December 31, 2015, to reduce the carrying amount of the assets held for sale to the fair market value. At December 31, 2015, GenOn had $5 million of current assets, $83 million of non-current assets, $1 million of current liabilities and $4 million of non-current liabilities classified as held for sale for Seward on its balance sheet. On February 2, 2016, GenOn completed the sale of Seward. For further discussion on this impairment, refer to Note 9 — *Impairments*.

*Shelby Disposition (GenOn)*

On November 9, 2015, GenOn entered into an agreement with Rockland Power Partners II, LP to sell 100% of its interest in the Shelby County Energy Center, LLC, or Shelby for cash consideration of $46 million. Shelby owns a 352 MW natural gas-fired facility located in Illinois. At December 31, 2015, GenOn had $1 million of current assets, $22 million of non-current assets, and $1 million of current liabilities classified as held for sale for Shelby on its balance sheet. The sale is expected to be completed in March of 2016 and the transaction is expected to result in a gain recognized in GenOn's consolidated results of operations during the first quarter of 2016.

*Sabine Disposition (GenOn)*

On December 2, 2014, GenOn, through its subsidiaries GenOn Sabine (Delaware), Inc. and GenOn Sabine (Texas), Inc., completed the sale of its 50% interest in Sabine Cogen, L.P., or Sabine, to Bayou Power, LLC, an affiliate of Rockland Capital, LLC. Sabine owns a 105 MW natural gas-fired cogeneration facility located in Texas. GenOn received cash consideration of $35 million at closing. A gain of $18 million was recognized as a result of the transaction and recorded within GenOn's consolidated statements of operations.

*Kendall Disposition (GenOn and GenOn Americas Generation)*

On January, 31, 2014, NRG North America LLC, a wholly owned subsidiary of GenOn Americas Generations, completed the sale of NRG Kendall LLC to Veolia Energy North America Holdings, Inc. for cash consideration of $50 million. There was a $6 million loss recorded in the consolidated results of operations of GenOn and GenOn Americas Generation during the first quarter of 2014.

| Fair Value of Financial Instruments | 12 Months Ended |
|---|---|
| | **Dec. 31, 2015** |

**Fair Value Disclosures [Abstract]**

Fair Value of Financial Instruments

**Fair Value of Financial Instruments (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

For cash and cash equivalents, funds deposited by counterparties, accounts receivable, accounts payable, accrued liabilities, and cash collateral paid and received in support of energy risk management activities, the carrying amount approximates fair value because of the short-term maturity of those instruments and are classified as Level 1 within the fair value hierarchy.

The estimated carrying values and fair values of GenOn and GenOn Americas Generation's debt are as follows:

*GenOn*

| | As of December 31, | | | |
|---|---|---|---|---|
| | 2015 | | 2014 | |
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| | (In millions) | | | |
| **Liabilities** | | | | |
| Long and short-term debt | $ 2,764 | $ 2,043 | $ 3,122 | $ 2,706 |

The fair value of long and short-term debt that is estimated using reported market prices for instruments that are publicly traded is classified as Level 2 within the fair value hierarchy. The fair value of non-publicly traded debt is based on the income approach valuation technique using current interest rates for similar instruments with equivalent credit quality and is classified as Level 3 within the fair value hierarchy.

*GenOn Americas Generation*

| | As of December 31, | | | |
|---|---|---|---|---|
| | 2015 | | 2014 | |
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| | (In millions) | | | |
| **Liabilities** | | | | |
| Long and short-term debt | $ 752 | $ 500 | $ 929 | $ 720 |

The fair value of long and short-term debt is estimated using reported market prices for instruments that are publicly traded and is classified as Level 2 within the fair value hierarchy.

### Fair Value Accounting under ASC 820

ASC 820 establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value into three levels as follows:

- Level 1 — quoted prices (unadjusted) in active markets for identical assets or liabilities that the Registrants have the ability to access as of the measurement date. The Registrants' financial assets and liabilities utilizing Level 1 inputs include active exchange-traded securities, energy derivatives and interest-bearing funds.

- Level 2 — inputs other than quoted prices included within Level 1 that are directly observable for the asset or liability or indirectly observable through corroboration with observable market data. The Registrants' financial assets and liabilities utilizing Level 2 inputs include exchange-based derivatives, and over the counter derivatives such as swaps, options and forward contracts.

- Level 3 — unobservable inputs for the asset or liability only used when there is little, if any, market activity for the asset or liability at the measurement date. The Registrants' financial assets and liabilities utilizing Level 3 inputs include infrequently-traded and non-exchange-based derivatives which are measured using present value pricing models.

In accordance with ASC 820, the Registrants determine the level in the fair value hierarchy within which

each fair value measurement in its entirety falls, based on the lowest level input that is significant to the fair value measurement in its entirety.

### *Recurring Fair Value Measurements*

Derivative assets and liabilities are carried at fair market value.

*GenOn*

The following tables present assets and liabilities measured and recorded at fair value on GenOn's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

| | As of December 31, 2015 | | | |
|---|---|---|---|---|
| | Fair Value | | | |
| | Level 1 [(a)] | Level 2 [(a)] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 192 | $ 535 | $ 2 | $ 729 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 157 | $ 420 | $ 14 | $ 591 |
| Other assets [(b)] | $ 14 | $ — | $ — | $ 14 |

(a)   There were no transfers during the year ended December 31, 2015, between Levels 1 and 2.

(b)   Relates to mutual funds held in a rabbi trust for non-qualified deferred compensation plans for some key and highly compensated employees.

| | As of December 31, 2014 | | | |
|---|---|---|---|---|
| | Fair Value | | | |
| | Level 1 [(a)] | Level 2 [(a)] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 179 | $ 582 | $ 46 | $ 807 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 105 | $ 371 | $ 13 | $ 489 |
| Other assets [(b)] | $ 21 | $ — | $ — | $ 21 |

(a)   There were no transfers during the year ended December 31, 2014, between Levels 1 and 2.

(b)   Relates to mutual funds held in a rabbi trust for non-qualified deferred compensation plans for some key and highly compensated employees.

The following tables reconcile the beginning and ending balances for derivatives that are recognized at fair value in GenOn's consolidated financial statements at least annually using significant unobservable inputs for the years ended December 31, 2015, and 2014:

| | For the Year Ended December 31, | |
|---|---|---|
| | 2015 | 2014 |
| | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) | |
| | Derivatives [(a)] | |
| | (In millions) | |
| Balance as of beginning of period | $ 33 | $ (4) |
| Total gains and losses (realized/unrealized) included in earnings | (40) | 2 |
| Purchases | (5) | 35 |
| Balance as of end of period | $ (12) | $ 33 |
| The amount of the total losses for the period included in earnings attributable to the change in unrealized derivatives relating to assets still held at end of period | $ (8) | $ (1) |

(a)   Consists of derivatives assets and liabilities, net.

*GenOn Americas Generation*

The following tables present assets and liabilities (including amounts with affiliates) measured and

recorded at fair value on GenOn Americas Generation's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

| | As of December 31, 2015 | | | |
|---|---|---|---|---|
| | Fair Value | | | |
| | Level 1[(a)] | Level 2[(a)] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 285 | $ 796 | $ 15 | $ 1,096 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 170 | $ 735 | $ 14 | $ 919 |

(a)   There were no transfers during the year ended December 31, 2015, between Levels 1 and 2.

| | As of December 31, 2014 | | | |
|---|---|---|---|---|
| | Fair Value | | | |
| | Level 1[(a)] | Level 2[(a)] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 208 | $ 848 | $ 52 | $ 1,108 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 137 | $ 640 | $ 32 | $ 809 |

(a)   There were no transfers during the year ended December 31, 2014, between Levels 1 and 2.

The following tables reconcile the beginning and ending balances for GenOn Americas Generation's derivatives that are recognized at fair value in the consolidated financial statements at least annually using significant unobservable inputs for the years ended December 31, 2015, and 2014:

| | For the Year Ended December 31, | |
|---|---|---|
| | 2015 | 2014 |
| | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) | |
| | Derivatives [(a)] | |
| | (In millions) | |
| Balance as of beginning of period | $ 20 | $ (1) |
| Total gains and losses (realized/unrealized) included in earnings | (20) | 1 |
| Purchases | 1 | 20 |
| Balance as of end of period | $ 1 | $ 20 |

(a)   Consists of derivatives assets and liabilities, net.

There were no gains or losses for the years ended December 31, 2015 and 2014 included in earnings attributable to the change in unrealized derivatives relating to assets still held at the end of the period.

*GenOn Mid-Atlantic*

The following tables present assets and liabilities (including amounts with affiliates) measured and recorded at fair value on GenOn Mid-Atlantic's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

| | As of December 31, 2015 | | | |
|---|---|---|---|---|
| | Fair Value | | | |
| | Level 1[(a)] | Level 2[(a)] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 175 | $ 175 | $ 2 | $ 352 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 58 | $ 137 | $ — | $ 195 |

(a)   There were no transfers during the year ended December 31, 2015, between Levels 1 and 2.

| | As of December 31, 2014 | | | |
|---|---|---|---|---|
| | **Fair Value** | | | |
| | **Level 1** [(a)] | **Level 2** [(a)] | **Level 3** | **Total** |
| | **(In millions)** | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 145 | $ 211 | $ 26 | $ 382 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 71 | $ 73 | $ 6 | $ 150 |

(a)   There were no transfers during the year ended December 31, 2014, between Levels 1 and 2.

The following tables reconcile the beginning and ending balances for GenOn Mid-Atlantic's derivatives that are recognized at fair value in the consolidated financial statements at least annually using significant unobservable inputs for the years ended December 31, 2015, and 2014:

| | For the Year Ended December 31, | |
|---|---|---|
| | **2015** | **2014** |
| | **Fair Value Measurement Using Significant Unobservable Inputs (Level 3)** | |
| | **Derivatives** [(a)] | |
| | **(In millions)** | |
| Balance as of beginning of period | $ 20 | $ — |
| Total gains and losses (realized/unrealized) included in earnings | (20) | — |
| Purchases | 2 | 20 |
| Balance as of end of period | $ 2 | $ 20 |

(a)   Consists of derivatives assets and liabilities, net.

There were no gains or losses for the years ended December 31, 2015 and 2014 included in earnings attributable to the change in unrealized derivatives relating to assets still held at the end of the period.

Realized and unrealized gains and losses included in earnings that are related to energy derivatives are recorded in operating revenues and cost of operations.

### *Derivative Fair Value Measurements*

A portion of the Registrants' contracts are exchange-traded contracts with readily available quoted market prices. A majority of the Registrants' contracts are non-exchange-traded contracts valued using prices provided by external sources, primarily price quotations available through brokers or over-the-counter and on-line exchanges. For the majority of the Registrants' markets, quotes are from multiple sources. When the Registrants receive multiple quotes, prices reflect the average of the bid-ask mid-point prices obtained from all sources that the Registrants believe provide the most liquid market for the commodity. If the Registrants receive one quote, then the mid-point of the bid-ask spread for that quote is used. The terms for which such price information is available vary by commodity, region and product. A significant portion of the fair value of the Registrants' derivative portfolio is based on price quotes from brokers in active markets who regularly facilitate those transactions and the Registrants believe such price quotes are executable. The Registrants do not use third party sources that derive price based on proprietary models or market surveys. The remainder of the assets and liabilities represents contracts for which external sources or observable market quotes are not available. These contracts are valued based on various valuation techniques including but not limited to internal models based on a fundamental analysis of the market and extrapolation of observable market data with similar characteristics. Contracts valued with prices provided by models and other valuation techniques make up 0% of GenOn's derivative assets and 2% of GenOn's derivative liabilities, 1% of GenOn Americas Generation's derivative assets and 2% of GenOn Americas Generation's derivative liabilities and 1% of GenOn Mid-Atlantic's derivative assets and 0% of GenOn Mid-Atlantic's derivative liabilities.

The Registrants' significant positions classified as Level 3 include physical and financial power and physical coal executed in illiquid markets as well as financial transmission rights, or FTRs. The significant unobservable inputs used in developing fair value include illiquid power and coal location pricing, which is derived as a basis to liquid locations. The basis spread is based on observable market data when available or derived from historic prices and forward market prices from similar observable markets when not available. For FTRs, the Registrants use the most recent auction prices to derive the fair value.

The following tables quantify the significant unobservable inputs used in developing the fair value of the Registrants' Level 3 positions as of December 31, 2015, and December 31, 2014:

*GenOn*

| | | Significant Unobservable Inputs | | | | | |
|---|---|---|---|---|---|---|---|
| | | December 31, 2015 | | | | | |
| | Fair Value | | | | Input/Range | | |
| | Assets | Liabilities | Valuation Technique | Significant Unobservable Input | Low | High | Weighted Average |
| | | | | (In millions) | | | |
| Power Contracts | $ 1 | $ — | Discounted Cash Flow | Forward Market Price (per MWh) | $ 22 | $ 67 | $ 42 |
| Coal Contracts | — | 12 | Discounted Cash Flow | Forward Market Price (per ton) | 28 | 45 | 35 |
| FTRs | 1 | 2 | Discounted Cash Flow | Auction Prices (per MWh) | — | 3 | 1 |
| | $ 2 | $ 14 | | | | | |

| | | Significant Unobservable Inputs | | | | | |
|---|---|---|---|---|---|---|---|
| | | December 31, 2014 | | | | | |
| | Fair Value | | | | Input/Range | | |
| | Assets | Liabilities | Valuation Technique | Significant Unobservable Input | Low | High | Weighted Average |
| | | | | (In millions) | | | |
| Power Contracts | $ 39 | $ 5 | Discounted Cash Flow | Forward Market Price (per MWh) | $ 18 | $ 68 | $ 46 |
| Coal Contracts | 3 | 1 | Discounted Cash Flow | Forward Market Price (per ton) | 53 | 56 | 54 |
| FTRs | 4 | 7 | Discounted Cash Flow | Auction Prices (per MWh) | (10) | 3 | (1) |
| | $ 46 | $ 13 | | | | | |

*GenOn Americas Generation*

| | | Significant Unobservable Inputs | | | | | |
|---|---|---|---|---|---|---|---|
| | | December 31, 2015 | | | | | |
| | Fair Value | | | | Input/Range | | |
| | Assets | Liabilities | Valuation Technique | Significant Unobservable Input | Low | High | Weighted Average |
| | | | | (In millions) | | | |
| Power Contracts | $ 1 | $ — | Discounted Cash Flow | Forward Market Price (per MWh) | $ 22 | $ 67 | $ 42 |
| Coal Contracts | 12 | 12 | Discounted Cash Flow | Forward Market Price (per ton) | 28 | 45 | 35 |
| FTRs | 2 | 2 | Discounted Cash Flow | Auction Prices (per MWh) | — | 3 | 1 |
| | $ 15 | $ 14 | | | | | |

| | | Significant Unobservable Inputs | | | | | |
|---|---|---|---|---|---|---|---|
| | | December 31, 2014 | | | | | |
| | Fair Value | | | | Input/Range | | |
| | Assets | Liabilities | Valuation Technique | Significant Unobservable Input | Low | High | Weighted Average |
| | | | | (In millions) | | | |
| Power | | | Discounted | Forward Market | | | |

| | Assets | Liabilities | Valuation Technique | Significant Unobservable Input | Low | High | Weighted Average |
|---|---|---|---|---|---|---|---|
| Contracts | $ 39 | $ 18 | Cash Flow | Price (per MWh) | $ 18 | $ 68 | $ 46 |
| Coal Contracts | 3 | 3 | Discounted Cash Flow | Forward Market Price (per ton) | 53 | 56 | 54 |
| FTRs | 10 | 11 | Discounted Cash Flow | Auction Prices (per MWh) | (1) | 1 | — |
| | $ 52 | $ 32 | | | | | |

*GenOn Mid-Atlantic*

| | Significant Unobservable Inputs | | | | | | |
|---|---|---|---|---|---|---|---|
| | December 31, 2015 | | | | | | |
| | Fair Value | | | | Input/Range | | |
| | Assets | Liabilities | Valuation Technique | Significant Unobservable Input | Low | High | Weighted Average |
| | | | | (In millions) | | | |
| Power Contracts | $ 2 | $ — | Discounted Cash Flow | Forward Market Price (per MWh) | $ 22 | $ 67 | $ 42 |
| | $ 2 | $ — | | | | | |

| | Significant Unobservable Inputs | | | | | | |
|---|---|---|---|---|---|---|---|
| | December 31, 2014 | | | | | | |
| | Fair Value | | | | Input/Range | | |
| | Assets | Liabilities | Valuation Technique | Significant Unobservable Input | Low | High | Weighted Average |
| | | | | (In millions) | | | |
| Power Contracts | $ 26 | $ 5 | Discounted Cash Flow | Forward Market Price (per MWh) | $ 24 | $ 68 | $ 47 |
| FTRs | — | 1 | Discounted Cash Flow | Auction Prices (per MWh) | (1) | 1 | — |
| | $ 26 | $ 6 | | | | | |

The following table provides sensitivity of fair value measurements to increases/(decreases) in significant unobservable inputs as of December 31, 2015, and December 31, 2014:

| Significant Unobservable Input | Position | Change In Input | Impact on Fair Value Measurement |
|---|---|---|---|
| Forward Market Price Power/Coal | Buy | Increase/(Decrease) | Higher/(Lower) |
| Forward Market Price Power/Coal | Sell | Increase/(Decrease) | Lower/(Higher) |
| FTR Prices | Buy | Increase/(Decrease) | Higher/(Lower) |
| FTR Prices | Sell | Increase/(Decrease) | Lower/(Higher) |

The fair value of each contract is discounted using a risk free interest rate. In addition, the Registrants apply a non-performance/credit reserve to reflect credit risk which is calculated based on published default probabilities. To the extent that the Registrants' net exposure under a specific master agreement is an asset, the Registrants use the counterparty's default swap rate. If the exposure under a specific master agreement is a liability, the Registrants use their default swap rate. The credit reserve is added to the discounted fair value to reflect the exit price that a market participant would be willing to receive to assume the Registrants' liabilities or that a market participant would be willing to pay for the Registrants' assets. The Registrants' (non-performance)/credit reserves were as follows:

| | As of December 31, | |
|---|---|---|
| | 2015 | 2014 |
| | (In millions) | |
| GenOn | $ (1) | $ — |
| GenOn Americas Generation | — | — |

The fair values in each category reflect the level of forward prices and volatility factors as of December 31, 2015, and may change as a result of changes in these factors. Management uses its best estimates to determine the fair value of commodity and derivative contracts the Registrants hold and sell. These estimates consider various factors including closing exchange and over-the-counter price quotations, time value, volatility factors and credit exposure. It is possible however, that future market prices could vary from those used in recording assets and liabilities from energy marketing and trading activities and such variations could be material.

Under the guidance of ASC 815, entities may choose to offset cash collateral paid or received against the fair value of derivative positions executed with the same counterparties under the same master netting agreements. The Registrants have chosen not to offset positions as defined in ASC 815. As of December 31, 2015, GenOn recorded $48 million of cash collateral paid, which includes $36 million of collateral paid to NRG, and $51 million of cash collateral received on its balance sheet. As of December 31, 2015, GenOn Americas Generation recorded $39 million of cash collateral paid, which includes $36 million of collateral paid to NRG, and $51 million of cash collateral received on its balance sheet. As of December 31, 2015, GenOn Mid-Atlantic had no outstanding cash collateral paid or received on its balance sheet.

### *Concentration of Credit Risk*

In addition to the credit risk discussion as disclosed in Note 2, *Summary of Significant Accounting Policies*, the following item is a discussion of the concentration of credit risk for the Registrants' financial instruments. Credit risk relates to the risk of loss resulting from non-performance or non-payment by counterparties pursuant to the terms of their contractual obligations. The Registrants monitor and manage credit risk through credit policies that include: (i) an established credit approval process; (ii) a daily monitoring of counterparties' credit limits; (iii) the use of credit mitigation measures such as margin, collateral, prepayment arrangements, or volumetric limits; (iv) the use of payment netting agreements; and (v) the use of master netting agreements that allow for the netting of positive and negative exposures of various contracts associated with a single counterparty. Risks surrounding counterparty performance and credit could ultimately impact the amount and timing of expected cash flows. The Registrants seek to mitigate counterparty risk by having a diversified portfolio of counterparties. The Registrants also have credit protection within various agreements to call on additional collateral support if and when necessary. Cash margin is collected and held at the Registrants to cover the credit risk of the counterparty until positions settle.

As of December 31, 2015, counterparty credit exposure to a significant portion of GenOn's counterparties was $351 million and GenOn held $33 million of collateral against those positions, resulting in a net exposure of $321 million. Approximately 97% of GenOn's exposure before collateral is expected to roll off by the end of 2017. GenOn Americas Generation's counterparty credit exposure to a significant portion of counterparties was $347 million and GenOn Americas Generation held $33 million of collateral against those positions, resulting in a net exposure of $316 million. Approximately 97% of GenOn Americas Generation's exposure before collateral is expected to roll off by the end of 2017. GenOn Mid-Atlantic's counterparty credit exposure to a significant portion of counterparties was $12 million and GenOn Mid-Atlantic held no collateral (cash or letters of credit) against those positions, resulting in a net exposure of $12 million. 100% of GenOn Mid-Atlantic's exposure before collateral is expected to roll off by the end of 2016.

The following tables highlight the counterparty credit quality and the net counterparty credit exposure by industry sector. Net counterparty credit exposure is defined as the aggregate net asset position for the Registrants with counterparties where netting is permitted under the enabling agreement and includes all cash flow, mark-to-market and NPNS, and non-derivative transactions. As of December 31, 2015, the exposure is shown net of collateral held and includes amounts net of receivables or payables.

|  | Net Exposure [a] (% of Total) | | |
| --- | --- | --- | --- |
| **Category** | **GenOn** | **GenOn Americas Generation** | **GenOn Mid-Atlantic** |
| Financial institutions | 68% | 69% | —% |
| Utilities, energy merchants, marketers and other | 18% | 17% | —% |
| ISOs | 14% | 14% | 100% |
| Total | 100% | 100% | 100% |

Net Exposure [a]

| Category | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| | | (% of Total) | |
| Investment grade | 99% | 99% | 100% |
| Non-Investment grade | 1% | 1% | —% |
| Total | 100% | 100% | 100% |

(a)   Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

The Registrants have counterparty credit risk exposure to certain counterparties representing more than 10% of total net exposure discussed above. The aggregate of such counterparties was $257 million, $257 million, and $12 million for GenOn, GenOn Americas Generation and GenOn Mid-Atlantic, respectively. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, the Registrants do not anticipate a material impact on their financial position or results of operations from nonperformance by any of their counterparties.

| | |
|---|---|
| **Accounting for Derivative Instruments and Hedging Activities** | **12 Months Ended**<br><br>**Dec. 31, 2015** |

**Derivative Instruments and Hedging Activities Disclosure [Abstract]**

Accounting for Derivative Instruments and Hedging Activities

**Accounting for Derivative Instruments and Hedging Activities (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

ASC 815 requires the Registrants to recognize all derivative instruments on the balance sheet as either assets or liabilities and to measure them at fair value each reporting period unless they qualify for a NPNS exception.

Certain derivative instruments may qualify for the NPNS exception and are therefore exempt from fair value accounting treatment. ASC 815 applies to the Registrants' energy related commodity contracts.

*Energy-Related Commodities*

To manage the commodity price risk associated with the Registrants' competitive supply activities and the price risk associated with wholesale power sales from the Registrants' electric generation facilities, the Registrants enter into a variety of derivative and non-derivative hedging instruments, utilizing the following:

- Forward contracts, which commit the Registrants to purchase or sell energy commodities or purchase fuels in the future.
- Futures contracts, which are exchange-traded standardized commitments to purchase or sell a commodity or financial instrument.
- Swap agreements, which require payments to or from counterparties based upon the differential between two prices for a predetermined contractual, or notional, quantity.
- Financial and non-financial option contracts, which convey to the option holder the right but not the obligation to purchase or sell a commodity.

The objectives for entering into derivative contracts used for economic hedging include:

- Fixing the price for a portion of anticipated future electricity sales that provides an acceptable return on the Registrants' electric generation operations.
- Fixing the price of a portion of anticipated fuel purchases for the operation of the Registrants' power plants.

GenOn, GenOn Americas Generation and GenOn Mid-Atlantic's trading and hedging activities are subject to limits within the risk management policy. These contracts are recognized on the balance sheet at fair value and changes in the fair value of these derivative financial instruments are recognized in earnings.

*GenOn*

As of December 31, 2015, GenOn's derivative assets and liabilities consisted primarily of the following:

- Forward and financial contracts for the purchase/sale of electricity and related products economically hedging GenOn's generation assets' forecasted output through 2019.
- Forward and financial contracts for the purchase of fuel commodities relating to the forecasted usage of GenOn's generation assets through 2018.

Also, as of December 31, 2015, GenOn had other energy-related contracts that did not meet the definition of a derivative instrument as follows:

- Power transmission contracts through 2019;
- Natural gas transportation contracts and storage agreements through 2027; and
- Coal transportation contracts through 2018.

*GenOn Americas Generation*

As of December 31, 2015, GenOn Americas Generation's derivative assets and liabilities consisted

primarily of the following:

- Forward and financial contracts for the purchase/sale of electricity and related products economically hedging GenOn Americas Generation's generation assets' forecasted output through 2019.
- Forward and financial contracts for the purchase of fuel commodities relating to the forecasted usage of GenOn Americas Generation's generation assets through 2018.

Also, as of December 31, 2015, GenOn Americas Generation had other energy-related contracts that did not meet the definition of a derivative instrument as follows:

- Power transmission contracts through 2019;
- Natural gas transportation contracts and storage agreements through 2023; and
- Coal transportation contracts through 2018.

*GenOn Mid-Atlantic*

As of December 31, 2015, GenOn Mid-Atlantic's derivative assets and liabilities consisted primarily of the following:

- Forward and financial contracts for the purchase/sale of electricity and related products economically hedging GenOn Mid-Atlantic's generation assets' forecasted output through 2018.
- Forward and financial contracts for the purchase of fuel commodities relating to the forecasted usage of GenOn Mid-Atlantic's generation assets through 2016.

Also, as of December 31, 2015, GenOn Mid-Atlantic had other energy-related contracts that did not meet the definition of a derivative instrument as follows:

- Natural gas transportation contracts and storage agreements through 2023; and
- Coal transportation contracts through 2018.

### *Volumetric Underlying Derivative Transactions*

The following table summarizes the net notional volume buy/(sell) of the Registrants' open derivative transactions broken out by commodity, excluding those derivatives that qualified for the NPNS exception as of December 31, 2015, and December 31, 2014. Option contracts are reflected using delta volume. Delta volume equals the notional volume of an option adjusted for the probability that the option will be in-the-money at its expiration date.

| | | GenOn | | GenOn Americas Generation | | GenOn Mid-Atlantic | |
|---|---|---|---|---|---|---|---|
| | | Total Volume | | Total Volume | | Total Volume | |
| | | As of December 31, | | As of December 31, | | As of December 31, | |
| Commodity | Units | 2015 | 2014 | 2015 | 2014 | 2015 | 2014 |
| | | (In millions) | (In millions) | (In millions) | (In millions) | (In millions) | (In millions) |
| Coal | Short Ton | 7 | 8 | 3 | 5 | 3 | 5 |
| Natural Gas | MMBtu | 191 | (21) | 2 | (74) | (10) | (79) |
| Power | MWh | (49) | (36) | (20) | (16) | (18) | (15) |

The change in the natural gas position was the result of buying natural gas to convert fixed price natural gas hedges into fixed price power hedges, as well as the settlement of positions during the period.

### *Fair Value of Derivative Instruments*

The following tables summarize the fair value within the derivative instrument valuation on the balance sheet:

*GenOn*

| | Fair Value | | | |
|---|---|---|---|---|
| | Derivative Assets | | Derivative Liabilities | |
| | December | December | December | December |

| | December 31, 2015 | December 31, 2014 | December 31, 2015 | December 31, 2014 |
|---|---|---|---|---|
| | (In millions) | | (In millions) | |
| **Derivatives Not Designated as Cash Flow Hedges:** | | | | |
| Commodity contracts current | $ 574 | $ 602 | $ 475 | $ 417 |
| Commodity contracts long-term | 155 | 205 | 116 | 72 |
| **Total Derivatives Not Designated as Cash Flow Hedges** | $ 729 | $ 807 | $ 591 | $ 489 |

*GenOn Americas Generation*

| | Fair Value | | | |
|---|---|---|---|---|
| | Derivative Assets | | Derivative Liabilities | |
| | December 31, 2015 | December 31, 2014 | December 31, 2015 | December 31, 2014 |
| | (In millions) | | (In millions) | |
| **Derivatives Not Designated as Cash Flow Hedges:** | | | | |
| Commodity contracts current | $ 861 | $ 852 | $ 737 | $ 674 |
| Commodity contracts long-term | 235 | 256 | 182 | 135 |
| **Total Derivatives Not Designated as Cash Flow Hedges** | $ 1,096 | $ 1,108 | $ 919 | $ 809 |

*GenOn Mid-Atlantic*

| | Fair Value | | | |
|---|---|---|---|---|
| | Derivative Assets | | Derivative Liabilities | |
| | December 31, 2015 | December 31, 2014 | December 31, 2015 | December 31, 2014 |
| | (In millions) | | (In millions) | |
| **Derivatives Not Designated as Cash Flow Hedges:** | | | | |
| Commodity contracts current | $ 269 | $ 241 | $ 163 | $ 128 |
| Commodity contracts long-term | 83 | 141 | 32 | 22 |
| **Total Derivatives Not Designated as Cash Flow Hedges** | $ 352 | $ 382 | $ 195 | $ 150 |

The Registrants have elected to present derivative assets and liabilities on the balance sheet on a trade-by-trade basis and do not offset amounts at the counterparty master agreement level. In addition, collateral received or paid on the Registrants' derivative assets or liabilities are recorded on a separate line item on the balance sheet. The following tables summarize the offsetting of derivatives by counterparty master agreement level and collateral received or paid:

*GenOn*

| | | Gross Amounts Not Offset in the Statement of Financial Position | | |
|---|---|---|---|---|
| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
| **December 31, 2015** | | | | |
| **Commodity Contracts:** | | (in millions) | | |
| Derivative assets | $ 698 | $ (485) | $ (51) | $ 162 |
| Derivative assets- affiliate | 31 | (24) | — | 7 |
| Derivative liabilities | (567) | 485 | — | (82) |
| Derivative liabilities- affiliate | (24) | 24 | — | — |
| **Total derivative instruments** | $ 138 | $ — | $ (51) | $ 87 |

| | | Gross Amounts Not Offset in the Statement of Financial Position | |
|---|---|---|---|
| | Gross Amounts | | Cash |

| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
|---|---|---|---|---|
| **December 31, 2014** | | (in millions) | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $ 786 | $ (425) | $ (54) | $ 307 |
| Derivative assets- affiliate | 21 | (21) | — | — |
| Derivative liabilities | (451) | 425 | — | (26) |
| Derivative liabilities- affiliate | (38) | 21 | 17 | — |
| **Total derivative instruments** | $ 318 | $ — | $ (37) | $ 281 |

*GenOn Americas Generation*

| | Gross Amounts Not Offset in the Statement of Financial Position | | |
|---|---|---|---|
| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
|---|---|---|---|---|
| **December 31, 2015** | | (in millions) | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $ 699 | $ (485) | $ (51) | $ 163 |
| Derivative assets- affiliate | 397 | (352) | — | 45 |
| Derivative liabilities | (567) | 485 | — | (82) |
| Derivative liabilities- affiliate | (352) | 352 | — | — |
| **Total derivative instruments** | $ 177 | $ — | $ (51) | $ 126 |

| | Gross Amounts Not Offset in the Statement of Financial Position | | |
|---|---|---|---|
| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
|---|---|---|---|---|
| **December 31, 2014** | | (in millions) | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $ 787 | $ (425) | $ (54) | $ 308 |
| Derivative assets- affiliate | 321 | (321) | — | — |
| Derivative liabilities | (451) | 425 | — | (26) |
| Derivative liabilities- affiliate | (358) | 321 | 17 | (20) |
| **Total derivative instruments** | $ 299 | $ — | $ (37) | $ 262 |

*GenOn Mid-Atlantic*

| | Gross Amounts Not Offset in the Statement of Financial Position | | |
|---|---|---|---|
| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
|---|---|---|---|---|
| **December 31, 2015** | | (in millions) | | |
| **Commodity Contracts:** | | | | |
| Derivative assets- affiliate | 352 | (195) | — | 157 |
| Derivative liabilities- affiliate | (195) | 195 | — | — |
| **Total derivative instruments** | $ 157 | $ — | $ — | $ 157 |

| | Gross Amounts Not Offset in the Statement of Financial Position | | |
|---|---|---|---|
| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
|---|---|---|---|---|
| **December 31, 2014** | | (in millions) | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $ 100 | $ — | $ — | $ 100 |
| Derivative assets- affiliate | 282 | (149) | — | 133 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Derivative liabilities | | (1) | | | | | | (1) |
| Derivative liabilities- affiliate | | (149) | | 149 | | — | | — |
| **Total derivative instruments** | $ | 232 | $ | — | $ | — | $ | 232 |

### *Accumulated Other Comprehensive Loss (GenOn)*

The following table summarizes the effects on GenOn's accumulated OCI balance attributable to cash flow hedge derivatives, net of tax of zero dollars:

| | Year Ended December 31, 2015 | | Year Ended December 31, 2014 | | Year Ended December 31, 2013 | |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| Accumulated OCI balance, beginning of period | $ | — | $ | — | $ | 1 |
| Recognized in OCI on interest rate derivatives | | — | | — | | 19 |
| Reclassified from accumulated OCI into earnings[(a)(b)] | | — | | — | | (2) |
| Reversal as part of sale to NRG Yield LLC[(c)] | | — | | — | | (18) |
| Accumulated OCI balance, end of period | $ | — | $ | — | $ | — |

(a)   Amounts reclassified from accumulated OCI into income and amounts recognized in income from the ineffective portion of cash flow hedges are recorded in interest expense.

(b)   All of the forecasted transactions (future interest payments) were deemed probable of occurring; therefore, no cash flow hedges were discontinued and no amount was recognized in GenOn's results of operations as a result of discontinued cash flow hedges.

(c)   The reversal of accumulated OCI as part of the sale of NRG Marsh Landing to NRG Yield LLC resulted in the recognition of additional paid in capital.

### *Impact of Derivative Instruments on the Statement of Operations*

Unrealized gains and losses associated with changes in the fair value of derivative instruments are reflected in current period earnings.

The following tables summarize the pre-tax effects of economic hedges and trading activity on the Registrants' statements of operations. These amounts are included within operating revenues and cost of operations.

*GenOn*

| | Year Ended December 31, 2015 | | Year Ended December 31, 2014 | | Year Ended December 31, 2013 | |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| **Unrealized mark-to-market results** | | | | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ | (198) | $ | (314) | $ | (367) |
| Net unrealized gains on open positions related to economic hedges | | 18 | | 167 | | 40 |
| Total unrealized mark-to-market losses for economic hedging activities | | (180) | | (147) | | (327) |
| Reversal of previously recognized unrealized gains on settled positions related to trading activity | | — | | (1) | | (1) |
| Net unrealized gains on open positions related to trading activity | | — | | — | | 1 |
| Total unrealized mark-to-market losses for trading activity | | — | | (1) | | — |
| **Total unrealized losses** | $ | (180) | $ | (148) | $ | (327) |

| | Year Ended December 31, 2015 | | Year Ended December 31, 2014 | | Year Ended December 31, 2013 | |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| Revenue from operations — energy commodities | $ | (112) | $ | (151) | $ | (356) |
| Cost of operations | | (68) | | 3 | | 29 |
| **Total impact to statement of operations** | $ | (180) | $ | (148) | $ | (327) |

*GenOn Americas Generation*

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| **Unrealized mark-to-market results** | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (193) | $ (288) | $ (296) |
| Net unrealized gains on open positions related to economic hedges | 70 | 164 | 25 |
| Total unrealized mark-to-market losses for economic hedging activities | (123) | (124) | (271) |
| Reversal of previously recognized unrealized gains on settled positions related to trading activity | — | (1) | (1) |
| Net unrealized gains on open positions related to trading activity | — | — | 1 |
| Total unrealized mark-to-market losses for trading activity | — | (1) | — |
| **Total unrealized losses** | $ (123) | $ (125) | $ (271) |

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| Revenue from operations — energy commodities | $ (66) | $ (119) | $ (302) |
| Cost of operations | (57) | (6) | 31 |
| **Total impact to statement of operations** | $ (123) | $ (125) | $ (271) |

*GenOn Mid-Atlantic*

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| **Unrealized mark-to-market results** | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (116) | $ (288) | $ (296) |
| Net unrealized gains on open positions related to economic hedges | 39 | 90 | 35 |
| **Total unrealized losses** | $ (77) | $ (198) | $ (261) |

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| Revenue from operations — energy commodities | $ (27) | $ (192) | $ (292) |
| Cost of operations | (50) | (6) | 31 |
| **Total impact to statement of operations** | $ (77) | $ (198) | $ (261) |

### Credit Risk Related Contingent Features (GenOn and GenOn Americas Generation)

Certain of GenOn and GenOn Americas Generation's hedging agreements contain provisions that require the Registrants to post additional collateral if the counterparty determines that there has been deterioration in credit quality, generally termed "adequate assurance" under the agreements, or require the Registrants to post additional collateral if there were a one notch downgrade in the Registrants' credit rating. The collateral required for contracts that have adequate assurance clauses that are in net liability positions as of December 31, 2015, was $66 million for GenOn and GenOn Americas Generation. As of December 31, 2015, no collateral was required for contracts with credit rating contingent features that are in a net liability position for GenOn and GenOn Americas Generation. GenOn and GenOn Americas

Generation are also party to certain marginable agreements under which no collateral was due as of December 31, 2015. At December 31, 2015, GenOn Mid-Atlantic did not have any financial instruments with credit-risk-related contingent features.

See Note 4, *Fair Value of Financial Instruments,* for discussion regarding concentration of credit risk.

**Inventory**

**12 Months Ended**

**Dec. 31, 2015**

**Inventory Disclosure [Abstract]**

Inventory

**Inventory (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Inventory consisted of:

*GenOn*

|  | As of December 31, | |
|---|---|---|
|  | **2015** | **2014** |
|  | (In millions) | |
| Fuel oil | $ 161 | $ 211 |
| Coal | 154 | 162 |
| Spare parts | 127 | 129 |
| Other | 6 | 5 |
| Total Inventory | $ 448 | $ 507 |

During the year ended December 31, 2015, GenOn recorded a lower of weighted average cost or market adjustment related to fuel oil of $19 million. Additionally, GenOn wrote down certain equipment to its fair value resulting in an impairment of $8 million during the year ended December 31, 2015.

*GenOn Americas Generation*

|  | As of December 31, | |
|---|---|---|
|  | **2015** | **2014** |
|  | (In millions) | |
| Fuel oil | $ 134 | $ 181 |
| Coal | 97 | 82 |
| Spare parts | 57 | 54 |
| Other | 1 | 1 |
| Total Inventory | $ 289 | $ 318 |

During the year ended December 31, 2015, GenOn Americas Generation recorded a lower of weighted average cost or market adjustment related to fuel oil of $17 million.

*GenOn Mid-Atlantic*

|  | As of December 31, | |
|---|---|---|
|  | **2015** | **2014** |
|  | (In millions) | |
| Fuel oil | $ 33 | $ 45 |
| Coal | 97 | 82 |
| Spare parts | 41 | 38 |
| Other | 1 | 1 |
| Total Inventory | $ 172 | $ 166 |

During the year ended December 31, 2015, GenOn Mid-Atlantic recorded a lower of weighted average cost or market adjustment related to fuel oil of $6 million.

| Property, Plant, and Equipment | 12 Months Ended |
|---|---|
| | Dec. 31, 2015 |

**Property, Plant and Equipment [Abstract]**

Property, Plant, and Equipment

**Property, Plant and Equipment (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Major classes of property, plant, and equipment were as follows:

*GenOn*

| | As of December 31, | | Depreciable Lives |
|---|---|---|---|
| | 2015 | 2014 | |
| | (In millions) | | |
| Facilities and equipment | $ 2,989 | $ 3,048 | 2 - 34 Years |
| Land and improvements | 292 | 293 | |
| Construction in progress | 164 | 140 | |
| Total property, plant and equipment | 3,445 | 3,481 | |
| Accumulated depreciation | (614) | (436) | |
| Net property, plant and equipment | $ 2,831 | $ 3,045 | |

*GenOn Americas Generation*

| | As of December 31, | | Depreciable Lives |
|---|---|---|---|
| | 2015 | 2014 | |
| | (In millions) | | |
| Facilities and equipment | $ 1,192 | $ 1,123 | 2 - 34 Years |
| Land and improvements | 139 | 127 | |
| Construction in progress | 29 | 30 | |
| Total property, plant and equipment | 1,360 | 1,280 | |
| Accumulated depreciation | (244) | (170) | |
| Net property, plant and equipment | $ 1,116 | $ 1,110 | |

*GenOn Mid-Atlantic*

| | As of December 31, | | Depreciable Lives |
|---|---|---|---|
| | 2015 | 2014 | |
| | (In millions) | | |
| Facilities and equipment | $ 1,037 | $ 1,014 | 2 - 34 Years |
| Land and improvements | 62 | 61 | |
| Construction in progress | 26 | 18 | |
| Total property, plant and equipment | 1,125 | 1,093 | |
| Accumulated depreciation | (200) | (135) | |
| Net property, plant and equipment | $ 925 | $ 958 | |

The Registrants recorded long-lived asset impairments during 2015, as further described in Note 9, *Impairments*.

| **Retirements, Mothballing or Long-Term Protective Layup of Generating Facilities** | **12 Months Ended**<br>**Dec. 31, 2015** |

**Retirements Mothballing or Long Term Protective Layup of Generating Facilities**

Retirements, Mothballing or Long-Term Protective Layup of Generating Facilities

**Retirements or Mothballing of Generating Facilities (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*Facilities Announced for Deactivation Due to Returns on Investment (GenOn)*

The Registrants are subject to extensive environmental regulation by federal, state and local authorities under a variety of statutes, regulations and permits that address discharges into the air, water and soil, and the proper handling of solid, hazardous and toxic materials and waste. Complying with increasingly stringent environmental requirements involves significant capital and operating expenses. To the extent forecasted returns on investments necessary to comply with environmental regulations are insufficient for a particular facility, the Registrants plan to deactivate that facility. In determining the forecasted returns on investments, the Registrants factor in forecasted energy and capacity prices, expected capital expenditures, operating costs, property taxes and other factors. GenOn deactivated the following coal and natural gas units at the referenced times:

| Facility or Unit | Fuel-type | Net Generation Capacity (MW) | Deactivation Date |
|---|---|---|---|
| Shawville Units 1, 2, 3 and 4 [a] | Coal | 597 | May 2015 |
| Gilbert CT Units 1, 2, 3 and 4 | Natural Gas | 98 | May 2015 |
| Glen Gardner Facility | Natural Gas | 160 | May 2015 |
| Werner Facility | Oil | 212 | May 2015 |
| Osceola Facility | Natural Gas | 463 | January 2015 |
| Coolwater Facility | Natural Gas | 636 | January 2015 |
| Portland Units 1 and 2 | Coal | 401 | June 2014 |
| Titus Coal Units | Coal | 245 | September 2013 |

(a) GenOn expects to return these units to service no later than the fall of 2016 using natural gas.

GenOn plans on deactivating the following coal units at the referenced times:

| Facility or Unit | Fuel-type | Net Generation Capacity (MW) | Expected Deactivation Date |
|---|---|---|---|
| Avon Lake Unit 7 | Coal | 94 | April 2016 |

**Impairments**

**12 Months Ended**

**Dec. 31, 2015**

**Long Lived Assets Impairments**

Long-Lived Assets Impairments

**Impairments (GenOn and GenOn Americas Generation)**

*Long-Lived Assets Impairments (GenOn and GenOn Americas Generation)*

*2015 Impairments*

*Seward (GenOn)* — As described in Note 3, *Dispositions,* on November 24, 2015, GenOn entered into an agreement with Robindale Energy Services, Inc. to sell 100% of its interest in Seward for cash consideration of $75 million. The transaction triggered an impairment because the sale price was less than the carrying amount of the assets, and, as a result, the assets were considered to be impaired. GenOn measured the impairment loss as the difference between the carrying amount of the assets and the agreed-upon sale price. GenOn recorded an impairment loss of $134 million in the consolidated results of operations of GenOn for the year ended December 31, 2015 to reduce the carrying amount of the assets held for sale to the fair market value.

*Portland (GenOn)* — During the fourth quarter of 2015, the oil conversion project at the Portland facility was suspended indefinitely. In connection with the project suspension, GenOn wrote off the balance of fixed assets associated with the project and recorded expected losses on related contracts totaling $20 million.

*Spare Parts (GenOn)* — During the fourth quarter of 2015, GenOn wrote down certain equipment to its fair value resulting in an impairment of $8 million during the year ended December 31, 2015.

*Pittsburg (GenOn and GenOn Americas Generation)* — GenOn owns oil tanks and associated land located near its Pittsburg facility that were subject to a purchase option. The option was terminated during the fourth quarter of 2015 and, accordingly, the oil tanks were considered to be impaired. GenOn recorded an impairment of $8 million to reduce the carrying amount of the oil tanks to reflect the fair market value.

*2014 Impairments*

*Coolwater (GenOn)* — During the fourth quarter of 2014, GenOn determined that it would pursue retiring the 636 MW natural-gas fired Coolwater facility, in Dagget, California. The facility faced critical repairs on the cooling towers for Units 3 and 4 and, during the fourth quarter of 2014, did not receive any awards in a near-term capacity auction and no interest in a bilateral capacity deal. GenOn considered this to be an indicator of impairment and performed an impairment test for these assets under ASC 360, *Property, Plant and Equipment.* The carrying amount of the assets was higher than the future net cash flows expected to be generated by the assets and as a result, the assets were considered to be impaired. GenOn measured the impairment loss as the difference between the carrying amount and the fair value of the assets. GenOn retired the Coolwater facility effective January 1, 2015. All remaining fixed assets of the station were written off resulting in an impairment loss of $22 million recognized during the year ended December 31, 2014.

*Osceola (GenOn)* — During the third quarter of 2014, GenOn determined that it would mothball the 463 MW natural gas-fired Osceola facility, in Saint Cloud, Florida. GenOn considered this to be an indicator of impairment and performed an impairment test for these assets under ASC 360. The carrying amount of the assets was higher than the future net cash flows expected to be generated by the assets and as a result, the assets were considered to be impaired. GenOn measured the impairment loss as the difference between the carrying amount and the fair value of the assets. Due to the location of the facility, it was determined that the best indicator of fair value is the market value of the combustion turbines. GenOn recorded an impairment loss of approximately $60 million during the year ended December 31, 2014, which represents the excess of the carrying value over the fair market value.

**Debt and Capital Leases**

**12 Months Ended**

**Dec. 31, 2015**

**Debt and Capital Lease Obligations [Abstract]**

Debt and Capital Leases

**Debt and Capital Leases (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

Long-term debt and capital leases consisted of the following:

| | As of December 31, | | Interest Rate % |
|---|---|---|---|
| | 2015 | 2014 | |
| | (In millions, except rates) | | |
| **GenOn Mid-Atlantic:** | | | |
| Chalk Point capital lease, due 2015 | $ — | $ 5 | 8.190 |
| Subtotal GenOn Mid-Atlantic | — | 5 | |
| **GenOn Americas Generation:** | | | |
| Senior unsecured notes, due 2021 | 398 | 496 | 8.500 |
| Senior unsecured notes, due 2031 | 354 | 433 | 9.125 |
| Subtotal GenOn Americas Generation [a] | 752 | 929 | |
| **GenOn Energy:** | | | |
| Senior unsecured notes, due 2017 | 714 | 766 | 7.875 |
| Senior unsecured notes, due 2018 | 708 | 757 | 9.500 |
| Senior unsecured notes, due 2020 | 534 | 610 | 9.875 |
| Other [b] | 56 | 60 | |
| GenOn capital lease | 2 | 3 | |
| Subtotal GenOn Energy | 2,014 | 2,196 | |
| Subtotal | 2,766 | 3,130 | |
| Less current maturities | 4 | 10 | |
| Total long-term debt and capital leases | $ 2,762 | $ 3,120 | |

(a) This amount excludes GenOn Mid-Atlantic.

(b) The Long Term Service Agreement for the Hunterstown facility is accounted for as a debt financing liability in accordance with U.S. GAAP.

Long-term debt includes the following premiums:

| | As of December 31, | |
|---|---|---|
| | 2015 | 2014 |
| | (In millions) | |
| **GenOn Americas Generation:** | | |
| Senior unsecured notes, due 2021 | $ 32 | $ 46 |
| Senior unsecured notes, due 2031 | 25 | 33 |
| **GenOn Energy:** | | |
| Senior unsecured notes, due 2017 | 23 | 41 |
| Senior unsecured notes, due 2018 | 59 | 83 |
| Senior unsecured notes, due 2020 | 44 | 60 |
| Total premium | $ 183 | $ 263 |

***GenOn Energy (GenOn)***

Under the senior notes and the related indentures, the senior notes are the sole obligation of GenOn and are not guaranteed by any subsidiary or affiliate of GenOn. The senior notes are senior unsecured obligations of GenOn having no recourse to any subsidiary or affiliate of GenOn. The senior notes restrict the ability of GenOn and its subsidiaries to encumber their assets.

*Repurchase of 2017 GenOn Senior Notes.* In the fourth quarter of 2015, GenOn repurchased $33 million of the 2017 Senior Notes at an average price of $95.17, plus any accrued and unpaid interest as of the repurchase date. In connection with the repurchase, a $3 million gain on debt extinguishment of the

2017 Senior Notes was recorded during the year ended December 31, 2015, which primarily consisted of the discount on repurchase of $2 million and write-off of unamortized premium of $1 million.

*Repurchase of 2018 GenOn Senior Notes.* In the fourth quarter of 2015, GenOn repurchased $25 million of the 2018 Senior Notes at an average price of $90.95, plus any accrued and unpaid interest as of the repurchase date. In connection with the repurchase, a $5 million gain on debt extinguishment of the 2018 Senior Notes was recorded during the year ended December 31, 2015, which primarily consisted of the discount on repurchase of $2 million and write-off of unamortized premium of $3 million.

*Repurchase of 2020 GenOn Senior Notes.* In the fourth quarter of 2015, GenOn repurchased $61 million of the 2020 Senior Notes at an average price of $83.85, plus any accrued and unpaid interest as of the repurchase date. In connection with the repurchase, a $15 million gain on debt extinguishment of the 2020 Senior Notes was recorded during the year ended December 31, 2015, which primarily consisted of the discount on repurchase of $10 million and write-off of unamortized premium of $5 million.

*Redemption of 2014 GenOn Senior Notes.* In June 2013, GenOn redeemed all of the 2014 Senior Notes with an aggregate outstanding principal amount of $575 million at a redemption percentage of 106.778% of face value, as well as any accrued and unpaid interest as of the redemption date. In connection with the redemption, an $11 million loss on the debt extinguishment of the 2014 Senior Notes was recorded during the year ended December 31, 2013, which primarily consisted of a make whole premium payment offset by the write-off of unamortized premium.

*Senior Unsecured Notes, Due 2018 and 2020.* The senior notes and the related indentures restrict the ability of GenOn to incur additional liens and make certain restricted payments, including dividends and purchases of capital stock. At December 31, 2015, GenOn did not meet the consolidated debt ratio component of the restricted payments test and, therefore, the ability of GenOn to make restricted payments is limited to specified exclusions from the covenant, including up to $250 million of such restricted payments. The senior notes are subject to acceleration of GenOn's obligations thereunder upon the occurrence of certain events of default, including: (a) default in interest payment for 30 days, (b) default in the payment of principal or premium, if any, (c) failure after 90 days of specified notice to comply with any other agreements in the indenture, (d) certain cross-acceleration events, (e) failure by GenOn or its significant subsidiaries to pay certain final and non-appealable judgments after 90 days and (f) certain events of bankruptcy and insolvency.

Prior to October 15, 2018, GenOn may redeem the senior notes due 2018, in whole or in part, at a redemption price equal to 100% of the principal amount plus a premium and accrued and unpaid interest. The premium is the greater of: (i) 1% of the principal amount of the notes; or (ii) the excess of the following: the present value of 100% of the note, plus interest payments due on the note through maturity, discounted at a Treasury rate plus 0.50% over the principal amount of the note.

GenOn may redeem some or all of the senior notes due 2020 at redemption prices expressed as percentages of principal amount as set forth in the following table, plus accrued and unpaid interest on the notes redeemed to the first applicable redemption rate:

| Redemption Period | Redemption Percentage |
|---|---|
| October 15, 2015 to October 14, 2016 | 104.938% |
| October 15, 2016 to October 14, 2017 | 103.292% |
| October 15, 2017 to October 14, 2018 | 101.646% |
| October 15, 2018 and thereafter | 100.000% |

*Senior Unsecured Notes, Due 2017.* Prior to maturity, GenOn may redeem all or a part of the senior notes due 2017 at a redemption price equal to 100% of the notes plus a premium and accrued and unpaid interest. The premium is the greater of: (i) 1% of the principal amount of the notes; or (ii) the excess of the following: the present value of 100% of the note, plus interest payments due on the note through maturity, discounted at a Treasury rate plus 0.50% over the principal amount of the note.

*Credit Agreement with NRG (GenOn).* As described in Note 14, *Related Party Transactions*, GenOn is party to a secured intercompany revolving credit agreement with NRG. This credit agreement provides for a $500 million revolving credit facility, available for revolving loans and letters of credit. At December 31, 2015, $278 million of letters of credit and no borrowings were outstanding under the NRG credit agreement.

***GenOn Americas Generation (GenOn and GenOn Americas Generation)***

*Repurchase of 2021 GenOn Americas Generation Senior Unsecured Notes.* In the fourth quarter of 2015, GenOn repurchased $84 million of the 2021 Senior Notes at an average price of $84.91, plus any accrued and unpaid interest as of the repurchase date. In connection with the repurchase, a $20 million gain on debt extinguishment of the 2021 Senior Notes was recorded during the year ended December 31, 2015, which primarily consisted of the discount on repurchase of $13 million and write-off of unamortized premium of $7 million.

*Repurchase of 2031 GenOn Americas Generation Senior Unsecured Notes.* In November 2015, GenOn repurchased $71 million of the 2031 Senior Notes at an average price of $77.02, plus any accrued and unpaid interest as of the repurchase date. In connection with the repurchase, a $22 million gain on debt extinguishment of the 2031 Senior Notes was recorded during the year ended December 31, 2015, which primarily consisted of the discount on repurchase of $16 million and write-off of unamortized premium of $6 million.

*Senior Unsecured Notes.* The senior notes due 2021 and 2031 are senior unsecured obligations of GenOn Americas Generation having no recourse to any subsidiary or affiliate of GenOn Americas Generation. Prior to maturity, GenOn Americas Generation may redeem all or a part of the senior notes due 2021 and 2031 at a redemption price equal to 100% of the notes plus a premium and accrued and unpaid interest. The premium is the greater of: (i) the discounted present value of the then-remaining scheduled payments of principal and interest on the outstanding notes, discounted at a Treasury rate plus 0.375%, less the unpaid principal amount; and (ii) zero.

### Restricted Net Assets (GenOn and GenOn Americas Generation)

GenOn and GenOn Americas Generation and certain of their subsidiaries are holding companies and, as a result, GenOn and GenOn Americas Generation and such subsidiaries are dependent upon dividends, distributions and other payments from their respective subsidiaries to generate the funds necessary to meet their obligations. In particular, a substantial portion of the cash from GenOn's and GenOn Americas Generation's operations is generated by GenOn Mid-Atlantic. The ability of certain of GenOn's and GenOn Americas Generation's subsidiaries to pay dividends and make distributions is restricted under the terms of their debt or other agreements, including the operating leases of GenOn Mid-Atlantic for GenOn and GenOn Americas Generation and REMA for GenOn. Under their respective operating leases, GenOn Mid-Atlantic and REMA are not permitted to make any distributions and other restricted payments unless: (a) they satisfy the fixed charge coverage ratio for the most recently ended period of four fiscal quarters; (b) they are projected to satisfy the fixed charge coverage ratio for each of the two following periods of four fiscal quarters, commencing with the fiscal quarter in which such payment is proposed to be made; and (c) no significant lease default or event of default has occurred and is continuing. In the event of a default under the respective operating leases or if the respective restricted payment tests are not satisfied, GenOn Mid-Atlantic and REMA would not be able to distribute cash. At December 31, 2015, GenOn Mid-Atlantic and REMA did not satisfy the restricted payments test.

Pursuant to the terms of their respective lease agreements, GenOn Mid-Atlantic and REMA are restricted from, among other actions, (a) encumbering assets, (b) entering into business combinations or divesting assets, (c) incurring additional debt, (d) entering into transactions with affiliates on other than an arm's length basis or (e) materially changing their business. Therefore, at December 31, 2015, all of GenOn Mid-Atlantic's and REMA's net assets (excluding cash) were deemed restricted for purposes of Rule 4-08(e)(3)(ii) of Regulation S-X. As of December 31, 2015, GenOn Mid-Atlantic and REMA had restricted net assets of $1,100 million and $(1,112) million, respectively.

### Consolidated Annual Maturities (GenOn and GenOn Americas Generation)

Annual payments based on the maturities of GenOn's debt and capital leases for the years ending after December 31, 2015, are as follows:

|  | (In millions) |
| --- | ---: |
| 2016 | $ 4 |
| 2017 | 696 |
| 2018 | 653 |
| 2019 | 4 |
| 2020 | 494 |
| Thereafter | 732 |
| Total | $ 2,583 |

Annual payments based on the maturities of GenOn Americas Generation's debt for the years ending

after December 31, 2015, are as follows:

|  | (In millions) |
|---|---|
| 2016 | $ — |
| 2017 | — |
| 2018 | — |
| 2019 | — |
| 2020 | — |
| Thereafter | 695 |
| Total | $ 695 |

**Asset Retirement Obligations**

**12 Months Ended**

**Dec. 31, 2015**

**Asset Retirement Obligation Disclosure [Abstract]**

Asset Retirement Obligations

**Asset Retirement Obligations (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

The Registrants' AROs are primarily related to the future dismantlement of equipment on leased property and environmental obligations related to ash disposal, site closures and fuel storage facilities. In addition, the Registrants have also identified conditional AROs for asbestos removal and disposal, which are specific to certain power generation operations.

The following table represents the balance of ARO obligations as of December 31, 2014, along with the additions, reductions and accretion related to the Registrants' ARO obligations for the year ended December 31, 2015:

| | GenOn | | GenOn Americas Generation | | GenOn Mid-Atlantic | |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| **Balance as of December 31, 2014** | $ | 172 | $ | 78 | $ | 26 |
| Additions | | 7 | | 1 | | — |
| Revisions in estimates for current obligations | | (4) | | (2) | | (1) |
| Spending for current obligations and other settlements | | (2) | | — | | — |
| Accretion — expense | | 14 | | 5 | | 2 |
| **Balance as of December 31, 2015** | $ | 187 | $ | 82 | $ | 27 |

| Benefit Plans and Other Postretirement Benefits | 12 Months Ended |
|---|---|
| | Dec. 31, 2015 |

**Benefit Plans and Other Postretirement Benefits Disclosure [Abstract]**

Benefit Plans and Other Postretirement Benefits

**Benefit Plans and Other Postretirement Benefits (GenOn)**

*Defined Benefit Plans*

GenOn provides pension benefits to eligible non-union and union employees through various defined benefit pension plans. These benefits are based on pay, service history and age at retirement. Most pension benefits are provided through tax-qualified plans that are funded in accordance with the Employee Retirement Income Security Act of 1974 and Internal Revenue Service requirements. Certain executive pension benefits that cannot be provided by the tax-qualified plans are provided through unfunded non-tax-qualified plans. The measurement date for the defined benefit plans was December 31 for all periods presented unless otherwise noted. GenOn also provides certain medical care and life insurance benefits for eligible retired employees. The measurement date for these postretirement benefit plans was December 31 for all periods presented unless otherwise noted. On December 31, 2014, NRG merged 8 qualified pension plans into 2 separate qualified pension plans, the NRG Pension Plan for Bargained Employees and the NRG Pension Plan. The GenOn Mirant Bargaining Unit Pension Plan, GenOn First Energy Pension Plan, GenOn Duquesne Pension Plan, and GenOn REMA Pension Plan were merged into the NRG Pension Plan for Bargained Employees. The GenOn Mirant Pension Plan was merged into the NRG Pension Plan for Non-Bargained Employees and renamed the NRG Pension Plans. These actions were conducted to simplify internal administration of the plans, reduce regulatory filings, and lower fees paid to outside vendors as part of the management services agreement. The benefits provided to current participants in the Plans were not impacted and GenOn remains obligated for its respective pension liabilities.

As part of the change in control associated with the NRG Merger, NRG decided to terminate/settle the nonqualified legacy GenOn Benefit Restoration Plan and Supplemental Executive Retirement Plan. Final settlement payments totaling $12 million were paid to remaining participants during 2014.

The net periodic pension (credit)/cost related to GenOn's pension and other postretirement benefit plans include the following components:

| | Pension Benefits | | |
|---|---|---|---|
| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
| | (In millions) | | |
| Service cost benefits earned | $ 10 | $ 10 | $ 13 |
| Interest cost on benefit obligation | 27 | 27 | 25 |
| Expected return on plan assets | (35) | (34) | (31) |
| Amortization of unrecognized net loss/(gain) | 1 | (6) | — |
| Net periodic benefit cost/(credit) | $ 3 | $ (3) | $ 7 |

| | Other Postretirement Benefits | | |
|---|---|---|---|
| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
| | (In millions) | | |
| Service cost benefits earned | $ 1 | $ 1 | $ 1 |
| Interest cost on benefit obligation | 3 | 3 | 3 |
| Amortization of unrecognized prior service credit | (4) | (17) | (1) |
| Net periodic benefit (credit)/cost | $ — | $ (13) | $ 3 |

A comparison of the pension benefit obligation, other postretirement benefit obligations and related plan assets for GenOn plans on a combined basis is as follows:

| Tax-Qualified Pension | Non-Tax-Qualified Pension |
|---|---|

| | Benefits | | | Benefits | |
|---|---|---|---|---|---|
| | **Year Ended December 31,** | | | **Year Ended December 31,** | |
| | **2015** | **2014** | | **2015** | **2014** |
| | (In millions) | | | (In millions) | |
| Benefit obligation at beginning of period | $ 660 | $ 546 | $ | — | $ 12 |
| Service cost | 10 | 10 | | — | — |
| Interest cost | 27 | 27 | | — | — |
| Actuarial (gain)/loss | (33) | 103 | | — | — |
| Benefit payments | (39) | (26) | | — | (12) |
| Benefit obligation at end of period | 625 | 660 | | — | — |
| Fair value of plan assets at beginning of period | 548 | 469 | | — | — |
| Actual return on plan assets | (17) | 49 | | — | — |
| Employer contributions | 14 | 56 | | — | 12 |
| Benefit payments | (39) | (26) | | — | (12) |
| Fair value of plan assets at end of period | 506 | 548 | | — | — |
| Funded status at end of period — excess of obligation over assets | $ (119) | $ (112) | $ | — | $ — |

| | **Other Postretirement Benefits** | |
|---|---|---|
| | **Year Ended December 31,** | |
| | **2015** | **2014** |
| | (In millions) | |
| Benefit obligation at beginning of period | $ 65 | $ 73 |
| Service cost | 1 | 1 |
| Interest cost | 3 | 3 |
| Participant contributions | 1 | 2 |
| Actuarial (gain)/loss | (8) | 12 |
| Benefit payments | (7) | (8) |
| Plan amendments | (1) | (18) |
| Benefit obligation at end of period | 54 | 65 |
| Fair value of plan assets at beginning of period | — | — |
| Employer contributions | 6 | 6 |
| Participant contributions | 1 | 2 |
| Benefit payments | (7) | (8) |
| Fair value of plan assets at end of period | — | — |
| Funded status at end of period — excess of obligation over assets | $ (54) | $ (65) |

The accumulated benefit obligation exceeded the fair value of plan assets at December 31, 2015, and 2014 for the tax-qualified defined benefit pension plans. The total accumulated benefit obligation for the tax-qualified plans at December 31, 2015, and 2014 was $608 million and $631 million, respectively.

Amounts recognized in GenOn's balance sheets were as follows:

| | **Tax-Qualified Pension Benefits** | | **Other Postretirement Benefits** | |
|---|---|---|---|---|
| | **As of December 31,** | | **As of December 31,** | |
| | **2015** | **2014** | **2015** | **2014** |
| | (In millions) | | (In millions) | |
| Current liabilities | $ — | $ — | $ (5) | $ (5) |
| Non-current liabilities | (119) | (112) | (49) | (60) |

Amounts recognized in GenOn's OCI and accumulated other comprehensive income/loss for the pension and other postretirement benefit plans were as follows:

| | Tax-Qualified Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | Net Actuarial (Loss) Gain | Prior Service Cost | Net Actuarial (Loss) Gain | Prior Service Cost |
| | (In millions) | | | |
| Balance as of December 31, 2013 | $ 92 | $ (1) | $ 7 | $ 4 |
| Unrealized (loss)/gain | (87) | — | (12) | 18 |
| Amortization of net actuarial loss | (6) | — | — | — |
| Amortization of prior service cost | — | — | — | (17) |
| Total recognized in OCI for the period | (93) | — | (12) | 1 |
| Balance as of December 31, 2014 | $ (1) | $ (1) | $ (5) | $ 5 |
| Unrealized (loss)/gain | $ (20) | $ — | $ 8 | $ 1 |
| Amortization of net actuarial gain | 1 | — | — | — |
| Amortization of prior service cost | — | — | — | (4) |
| Total recognized in OCI for the period | (19) | — | 8 | (3) |
| Balance as of December 31, 2015 | $ (20) | $ (1) | $ 3 | $ 2 |

The total net (gain)/loss recognized in net periodic benefit cost and OCI for the pension plans for the years ended December 31, 2015, 2014, and 2013 were $22 million, $90 million, and $(84) million, respectively. The total net (gain)/loss recognized in net periodic benefit credit and OCI for the other postretirement benefit plans for the years ended December 31, 2015, 2014, and 2013 were $(6) million, $(2) million, and $(7) million, respectively.

The estimated unrecognized loss for the pension and other postretirement benefit plans that will be amortized from accumulated other comprehensive income/loss to net period benefit cost during 2016 is approximately $1 million. The estimated unrecognized prior service credit for the pension and other postretirement benefit plans that will be amortized from accumulated other comprehensive income/loss to net period benefit cost during 2016 is approximately $(1) million.

*Fair Value Hierarchy of Plan Assets*

GenOn's market-related value of its plan assets is the fair value of the assets. The fair values of GenOn's pension plan assets by asset category and their level within the fair value hierarchy are as follows:

| | Fair Value Measurements as of December 31, 2015 | | |
|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Observable Inputs (Level 2) | Total |
| | (In millions) | | |
| Common/collective trust investment — U.S. equity | $ — | $ 142 | $ 142 |
| Common/collective trust investment — non-U.S. equity | — | 82 | 82 |
| Common/collective trust investment — global equity | — | 49 | 49 |
| Common/collective trust investment — fixed income | — | 220 | 220 |
| Partnerships/Joint Ventures | — | 10 | 10 |
| Short-term investment fund | 3 | — | 3 |
| Total | $ 3 | $ 503 | $ 506 |

| | Fair Value Measurements as of December 31, 2014 | | |
|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Observable Inputs (Level 2) | Total |
| | (In millions) | | |
| Common/collective trust investment — U.S. equity | $ — | $ 156 | $ 156 |
| Common/collective trust investment — non-U.S. equity | — | 80 | 80 |

| | | | |
|---|---|---|---|
| Common/collective trust investment — global equity | | 52 | 52 |
| Common/collective trust investment — fixed income | — | 246 | 246 |
| Partnerships/Joint Ventures | — | 12 | 12 |
| Short-term investment fund | 2 | — | 2 |
| Total | $ 2 | $ 546 | $ 548 |

In accordance with ASC 820, GenOn determines the level in the fair value hierarchy within which each fair value measurement in its entirety falls, based on the lowest level input that is significant to the fair value measurement in its entirety. The fair value of the common/collective trusts is valued at fair value which is equal to the sum of the market value of all of the fund's underlying investments, and is categorized as Level 2. Partnerships/joint ventures Level 2 investments consist primarily of a partnership which invests in emerging market equity securities. There are no investments categorized as Level 3.

*Assumptions*

GenOn sets the discount rate assumptions on an annual basis for each of its defined benefit retirement plans as of December 31. The discount rate assumptions represent the current rate at which the associated liabilities could be effectively settled at December 31. GenOn utilizes the Aon Hewitt AA Above Median, or AA-AM, yield curve to select the appropriate discount rate assumption for each retirement plan. The AA-M yield curve is a hypothetical AA yield curve represented by a series of annualized individual spot discount rates from 6 months to 99 years. Each bond issue used to build this yield curve must be non-callable, and have an average rating of AA when averaging all available Moody's Investor Services, Standard & Poor's and Fitch ratings.

The following table presents the significant assumptions used to calculate GenOn's benefit obligations:

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | As of December 31, | | As of December 31, | |
| **Weighted–Average Assumptions** | 2015 | 2014 | 2015 | 2014 |
| Discount rate | 4.54% | 4.18% | 4.16% | 3.86% |
| Rate of compensation increase | 3.00% | 2.97% | N/A | N/A |

GenOn's assumed healthcare cost trend rates used for other postretirement benefit obligations are:

| | Other Postretirement Benefit Plans | |
|---|---|---|
| | As of December 31, | |
| **Weighted–Average Assumptions** | 2015 | 2014 |
| Assumed medical inflation for next year: | | |
| Before age 65 | 7.25% | 8.60% |
| Age 65 and after | 9.00% | 8.10% |
| Assumed ultimate medical inflation rate | 5.00% | 5.00% |
| Year in which ultimate rate is reached | 2025 | 2023 |

An annual increase of 1% in the assumed healthcare cost trend rates would correspondingly increase the postretirement benefit obligation at December 31, 2015, by $5 million. An annual decrease of 1% in the assumed healthcare cost trend rates would correspondingly decrease the postretirement benefit obligation at December 31, 2015, by $4 million

The following tables present the significant assumptions used to calculate GenOn's benefit expense/credit:

| | Pension Plans | | |
|---|---|---|---|
| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
| **Weighted–Average Assumptions** | | | |
| Discount rate | 4.18% | 5.02% | 4.22% |

| | | | |
|---|---|---|---|
| Rate of compensation increase | 2.99% | 2.91% | 2.82% |
| Expected return on plan assets | 6.41% | 7.00% | 7.50% |

| | Other Postretirement Benefit Plans | | |
|---|---|---|---|
| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
| **Weighted–Average Assumptions** | | | |
| Discount rate | 3.86% | 4.53% | 3.99% |

GenOn's assumed healthcare cost trend rates used for other postretirement benefit net periodic benefit expense/credit are:

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| **Weighted–Average Assumptions** | | | |
| Assumed medical inflation for next year: | | | |
| Before age 65 | 8.60% | 8.50% | 8.50% |
| Age 65 and after | 8.10% | 8.69% | 8.67% |
| Assumed ultimate medical inflation rate | 5.00% | 5.50% | 5.50% |
| Year in which ultimate rate is reached | 2023 | 2019 | 2018 |

An annual increase or decrease of 1% in the assumed healthcare cost trend rates would correspondingly increase or decrease the total annual service and interest cost components of net period benefit credit during 2015 by less than $1 million.

In 2016, GenOn will change the approach utilized to estimate the service cost and interest cost components of net periodic benefit cost for pension and postretirement benefit plans. Historically, GenOn estimated these components by using a single weighted average discount rate derived from the yield curve used to measure the benefit obligation. GenOn will elect to use a spot rate approach in the estimation of the components of benefit cost by applying specific spot rates along the yield curve to the relevant projected cash flows, as this provides a better estimate of service and interest costs. This is considered a change in estimate and, accordingly, will account for it prospectively starting in 2016. This change does not affect the measurement of GenOn's total benefit obligation.

*Pension Plan Assets*

Pension plans' assets are managed solely in the interest of the plans' participants and their beneficiaries and are invested with the objective of earning the necessary returns to meet the time horizons of the accumulated and projected retirement benefit obligations. GenOn uses a mix of equities and fixed income investments intended to manage risk to a reasonable and prudent level. GenOn's risk tolerance is established through consideration of the plans' liabilities and funded status as well as corporate financial condition. Equity investments are diversified across U.S. and non-U.S. stocks. For U.S. stocks, GenOn employs both a passive and active approach by investing in index funds and actively managed funds. For non-U.S. stocks, GenOn is invested in both developed and emerging market equity funds. Fixed income investments are comprised of long-term U.S. government and corporate securities. Derivative securities can be used for diversification, risk-control and return enhancement purposes but may not be used for the purpose of leverage. The assets for the NRG Pension Plan for Bargained Employees and the NRG Pension Plan are in a single qualified trust. At the time of the plan mergers, the fair value of the assets from the prior plans were allocated on a pro-rata basis based on the benefit obligations on January 1, 2015 and will continue to be allocated on this basis at each reporting date.

GenOn's pension asset allocation methodology is based on the results of a study completed by a third-party investment consulting firm. The methodology divides the pension plan assets into two primary portfolios: (i) return seeking assets, those assets intended to generate returns in excess of pension liability growth (U.S. equity, non-U.S. equity, global equity, and emerging market equity) and (ii) liability-hedging assets, those assets intended to have characteristics similar to pension liabilities (fixed income securities). As GenOn's pension plans' funded status improves, the methodology actively moves the plan assets from return seeking assets toward liability-hedging assets. GenOn employs a building block approach to determining the long-term rate of return for plan assets, with proper consideration given to diversification and rebalancing. Historical markets are studied and long-term historical relationships between equities and fixed income are preserved, consistent with the widely accepted capital market principle that assets with higher volatility generate a greater return over the long run. Current factors such as inflation and interest rates are evaluated before long-term capital assumptions are determined. Peer data

and historical returns are reviewed to check for reasonableness and appropriateness.

The target allocations for GenOn's pension plan assets were as follows for the year ended December 31, 2015:

| | |
|---|---|
| U.S. equities | 27% |
| Non-U.S. equities | 15% |
| Global equities | 10% |
| Emerging market equities | 3% |
| Fixed income securities | 45% |

Investment risk and performance are monitored on an ongoing basis through quarterly portfolio reviews of each asset fund class to a related performance benchmark, if applicable, and annual pension liability measurements. Performance benchmarks are composed of the following indices:

| Asset Class | Index |
|---|---|
| U.S. equities | Dow Jones U.S. Total Stock Market Index |
| Non-U.S. equities | MSCI All Country World Ex-U.S. IMI Index |
| Global equities | MSCI World Index |
| Emerging market equities | MSCI Emerging Markets Index |
| Fixed income securities | Barclays Capital Long Term Government/Credit Index & Barclays US Aggregate Bond Index |

*Expected Contributions and Benefit Payments*

GenOn expects to contribute approximately $16 million to the tax-qualified pension plans during 2016.

GenOn's expected future benefit payments for each of the next five years, and in the aggregate for the five years thereafter, are as follows:

| | Tax-Qualified Pension Benefit Payments | Other Postretirement Benefit Payments |
|---|---|---|
| | (In millions) | |
| 2016 | $ 29 | $ 5 |
| 2017 | 31 | 5 |
| 2018 | 32 | 6 |
| 2019 | 34 | 5 |
| 2020 | 35 | 5 |
| 2021 through 2025 | 194 | 18 |

*Employee Savings and Profit Sharing Plan*

GenOn has employee savings plans under Sections 401(a) and 401(k) of the IRC whereby employees may contribute a portion of their eligible compensation to the employee savings plan, subject to limits under the IRC. GenOn also historically provided for a profit sharing arrangement for non-bargaining employees and some bargaining employees not accruing a benefit under the defined benefit pension plans, whereby GenOn contributed a fixed contribution of 2% of eligible pay per pay period and could make an annual discretionary contribution up to 3% of eligible pay based on GenOn's performance. Upon completion of the NRG Merger, NRG assumed GenOn's defined contribution 401(k) plans and amended the plan for the non-bargaining employees with NRG 401(k) plan features, effective January 1, 2013. On July 5, 2013, the GenOn defined contribution 401(k) plans were merged into the NRG 401(k) plan.

GenOn also sponsors non-qualified deferred compensation plans for key and highly compensated employees. GenOn's obligations and the related rabbi trust investments under these plans were $15 million and $20 million at December 31, 2015, and 2014, respectively. Upon completion of the NRG Merger, NRG assumed GenOn's non-qualified plans and their respective obligations.

Expense recognized for the matching, fixed profit sharing and discretionary profit sharing contributions were $0 million for the years ended December 31, 2015, and 2014, and $4 million for the year ended December 31, 2013.

**Income Taxes**

**12 Months Ended**

**Dec. 31, 2015**

**Income Tax Disclosure [Abstract]**

Income Taxes

**Income Taxes (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*Income Taxes*

*GenOn*

GenOn's income tax (benefit)/expense consisted of the following:

|  | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
|  | (In millions) | | |
| Current |  |  |  |
| U.S. Federal | $ — | $ — | $ (6) |
| State | (3) | 6 | — |
| Total — current | (3) | 6 | (6) |
| Deferred |  |  |  |
| U.S. Federal | — | — | — |
| State | — | — | — |
| Total — deferred | — | — | — |
| Total income tax (benefit)/expense | (3) | 6 | (6) |
| Effective tax rate | 2.5% | 3% | 12.5% |

A reconciliation of GenOn's federal statutory income tax provision to the effective income tax (benefit)/expense adjusted for permanent and other items during 2015, 2014 and 2013, is as follows:

|  | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
|  | (In millions, except percentages) | | |
| (Loss)/Income before income taxes | $ (118) | $ 198 | $ (48) |
| Provision for income taxes based on U.S. federal statutory income tax rate | (42) | 70 | (17) |
| State and local income tax provision, net of federal income taxes | (3) | 14 | (24) |
| Change in deferred tax asset valuation allowance | 16 | (100) | — |
| State rate change | 26 | 21 | 35 |
| Other, net | — | 1 | — |
| Income tax (benefit)/expense | $ (3) | $ 6 | $ (6) |

The tax effects of temporary differences between the carrying amounts of assets and liabilities in GenOn's financial statements and their respective tax bases which give rise to deferred tax assets and liabilities are as follows:

|  | As of December 31, | |
|---|---|---|
|  | 2015 | 2014 |
|  | (In millions) | |
| **Deferred Tax Assets:** |  |  |
| Employee benefits | $ 76 | $ 100 |
| Pension and other postretirement benefits | — | 113 |
| Federal loss carryforwards | 664 | 727 |
| State loss carryforwards | 214 | 125 |
| Property and intangible assets | 931 | 1,080 |

| | | |
|---|---|---|
| Derivative contracts | 470 | 90 |
| Out-of-market contracts fair value adjustment | 378 | 381 |
| Debt premium, net | 92 | 123 |
| Other | 20 | 40 |
| Subtotal | 2,845 | 2,779 |
| Valuation allowance | (2,464) | (2,779) |
| Net deferred tax assets | 381 | — |
| **Deferred Tax Liabilities:** | | |
| Pension and other postretirement benefits | 381 | — |
| Net deferred tax liabilities | 381 | — |
| Net deferred taxes | $  — | $  — |

### Deferred tax assets and valuation allowance

*Net deferred tax balance* — As of December 31, 2015, and 2014, GenOn recorded a net deferred tax asset of $2.5 billion and $2.8 billion, respectively. Based on its assessment of positive and negative evidence, including available tax planning strategies, GenOn believes that it is more likely than not that a benefit will not be realized on $2.5 billion and $2.8 billion of tax assets as of December 31, 2015, and 2014, respectively, thus a valuation allowance has been recorded.

In connection with the accounting for the NRG Merger, GenOn recorded the realizable deferred tax assets and liabilities acquired, primarily consisting of net operating losses and other temporary differences. In addition, the excess of GenOn's historical tax basis of assets and liabilities over the amount assigned to the fair value of the assets acquired and liabilities assumed generated deferred tax assets and liabilities that were recorded on the acquisition date.

*NOL carryforwards* — At December 31, 2015, GenOn had tax effected cumulative domestic NOLs consisting of carryforwards for federal income tax purposes of $664 million and state of $214 million. GenOn's pre-merger federal NOLs are limited to $62 million annually. GenOn estimates it will need to generate future taxable income to fully realize the net federal deferred tax asset before expiration commencing in 2032.

*Valuation allowance* — As of December 31, 2015, GenOn's tax effected valuation allowance was $2.5 billion, relating primarily to federal and state loss carryforwards as well as differences between book and tax basis of PP&E.

### Uncertain tax benefits

GenOn does not have any uncertain tax benefits.

GenOn recognizes interest and penalties related to uncertain tax benefits in income tax expense. During the year ended December 31, 2015, GenOn did not accrue interest. For the year ended December 31, 2014, GenOn accrued interest of $1 million. As of December 31, 2015 GenOn has no cumulative interest and penalties.

*Tax jurisdictions* — GenOn is no longer subject to U.S. federal income tax examinations for years prior to 2010. With few exceptions, state and local income tax examinations are no longer open for years before 2009.

The following table reconciles the total amounts of uncertain tax benefits:

| | As of December 31, | | | |
|---|---|---|---|---|
| | **2015** | | **2014** | |
| | (In millions) | | | |
| Balance as of January 1 | $ | 2 | $ | 1 |
| Increase due to prior year positions | | — | | 1 |
| Decrease due to prior year positions | | (2) | | — |
| Uncertain tax benefits as of December 31 | $ | — | $ | 2 |

### GenOn Americas Generation

GenOn America's Generation is a wholly owned limited liability company, a disregarded entity, for federal and state income tax purposes. Therefore federal and state taxes are assessed at the parent level.

Accordingly, no provision has been made for federal or state income taxes in the accompanying financial statements.

A reconciliation of GenOn Americas Generation's expected federal statutory income tax provision to the effective income tax provision adjusted for permanent and other items during 2015, 2014 and 2013, is as follows:

|  | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
|  | (In millions) | | |
| Income before income taxes | $ 116 | $ 305 | $ 59 |
| Provision for income taxes based on U.S. federal statutory income tax rate | 41 | 107 | 21 |
| State and local income tax provision, net of federal income taxes | 10 | 18 | 6 |
| LLC income not subject to taxation | (51) | (115) | (48) |
| State rate change | — | (2) | 21 |
| Other | — | (8) | — |
| Income tax provision | $ — | $ — | $ — |

### Uncertain tax benefits

GenOn Americas Generation does not have any uncertain tax benefits.

### Pro Forma Income Tax Disclosures

#### GenOn Americas Generation

GenOn Americas Generation is not subject to income taxes except for those subsidiaries of GenOn Americas Generation that are separate taxpayers. NRG Americas, GenOn and NRG are otherwise directly responsible for income taxes related to GenOn Americas Generation's operations.

GenOn Americas Generation was not allocated income taxes attributable to its operations on a pro forma income tax provision basis for the years ended December 31, 2015, 2014, and 2013.

The following table presents the pro forma reconciliation of GenOn Americas Generation's federal statutory income tax provision for continuing operations adjusted for reorganization items to the pro forma effective tax provision:

|  | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
|  | (In millions) | | |
| Income before income taxes | $ 116 | $ 305 | $ 59 |
| Provision for income taxes based on U.S. federal statutory income tax rate | 41 | 107 | 22 |
| State and local income tax provision (benefit), net of federal income taxes | 10 | 18 | 6 |
| Change in deferred tax asset valuation allowance | (51) | (115) | (49) |
| State rate change | — | (2) | 21 |
| Other | — | (8) | — |
| Income tax provision | $ — | $ — | $ — |

The tax effects of temporary differences between the carrying amounts of assets and liabilities in the consolidated balance sheets and their respective tax bases which give rise to the pro forma deferred tax assets and liabilities would be as follows:

|  | As of December 31, | |
|---|---|---|
|  | 2015 | 2014 |
|  | (In millions) | |
| **Deferred Tax Assets:** | | |
| Pension and other postretirement benefits | $ 85 | $ 85 |
| Reserves | 119 | 121 |

| | | |
|---|---|---|
| Loss carryforwards | 3 | 14 |
| Property and intangible assets | 1,495 | 1,652 |
| Out-of-market contracts fair value adjustment | 47 | 34 |
| Derivative contract assets and liabilities | 166 | — |
| Debt premium | 28 | 38 |
| Other, net | 20 | 36 |
| Subtotal | 1,963 | 1,980 |
| Valuation allowance | (1,963) | (1,824) |
| Net deferred tax assets | — | 156 |
| **Deferred Tax Liabilities:** | | |
| Investment in Projects | — | 144 |
| Derivative contract assets and liabilities | — | 12 |
| Net deferred tax liabilities | — | 156 |
| Net deferred taxes | $        — | $        — |

### Deferred tax assets and valuation allowance

*Net deferred tax balance* — As of December 31, 2015, and 2014, GenOn Americas Generation recorded a net deferred tax asset of $2.0 billion and $1.8 billion, respectively. Based on its assessment of positive and negative evidence, including available tax planning strategies, GenOn Americas believes that it is more likely than not that a benefit will not be realized on $2.0 billion and $1.8 billion of tax assets as of December 31, 2015, and 2014, respectively, thus a valuation allowance has been recorded.

In connection with the accounting for the GenOn acquisition, GenOn Americas Generation recorded the realizable deferred tax assets and liabilities acquired, primarily consisting of historical tax basis of assets and liabilities over the amount assigned to the fair value of the assets acquired and liabilities assumed.

*NOL carryforwards* — At December 31, 2015, GenOn Americas Generation had tax effected cumulative domestic NOLs consisting of carryforwards for federal income tax purposes of $3 million and state of $3 million. GenOn's pre-merger federal NOLs are limited to $62 million annually. GenOn Americas Generation estimates it will need to generate future taxable income to fully realize the net federal deferred tax asset before expiration commencing in 2032.

*Valuation allowance* — As of December 31, 2015, GenOn Americas Generation's tax effected valuation allowance was $2.0 billion, relating primarily to differences between book and tax basis of PP&E.

### Taxes Receivable and Payable

As of December 31, 2015, GenOn Americas Generation does not have a current tax receivable or payable.

### Uncertain tax benefits

GenOn Americas Generation does not have any uncertain tax benefits.

### GenOn Mid-Atlantic

The following reflects a pro forma disclosure of the income tax provision that would be reported if GenOn Mid-Atlantic was to be allocated income taxes attributable to its operations. Pro forma income tax provision attributable to income before tax would consist of the following:

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | | (In millions) | |
| Current provision (benefit): | | | |
| Federal | $        36 | $        82 | $        45 |
| State | 6 | 11 | 12 |
| Deferred provision: | | | |
| Federal | — | (5) | — |
| State | — | (1) | — |
| Total provision for income taxes | $        42 | $        87 | $        57 |

The following table presents the pro forma reconciliation of GenOn Mid-Atlantic's federal statutory income tax provision for continuing operations adjusted for reorganization items to the pro forma effective tax provision:

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions, except percentages) | | |
| Income before income taxes | $ 104 | $ 236 | $ 128 |
| Provision for income taxes based on U.S. federal statutory income tax rate | 36 | 82 | 45 |
| State and local income taxes | 6 | 11 | 12 |
| State rate change | — | (1) | — |
| Other, net | — | (5) | — |
| Income tax provision | $ 42 | $ 87 | $ 57 |

The tax effects of temporary differences between the carrying amounts of assets and liabilities in the consolidated balance sheets and their respective tax bases which give rise to the pro forma deferred tax assets and liabilities would be as follows:

| | As of December 31, | |
|---|---|---|
| | 2015 | 2014 |
| | (In millions) | |
| **Deferred Tax Assets:** | | |
| Reserves | $ 22 | $ 24 |
| Loss carryforwards on derivative contracts | 218 | 218 |
| Property and intangible assets | 31 | 45 |
| Out-of-market contracts fair value adjustment | 77 | 88 |
| Inventory reserves | 38 | 37 |
| Net deferred tax assets | 386 | 412 |
| **Deferred Tax Liabilities:** | | |
| Derivative contracts | 305 | 336 |
| Investment in projects | 25 | 25 |
| Net deferred tax liabilities | 330 | 361 |
| Net deferred taxes | $ 56 | $ 51 |

### *Pro Forma Tax Uncertainties*

GenOn Mid-Atlantic does not have any uncertain tax benefits.

**Related Party Transactions**

**12 Months Ended**

**Dec. 31, 2015**

**Related Party Transactions [Abstract]**

Related Party Transactions

**Related Party Transactions (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

*Services Agreement with NRG (GenOn)*

NRG provides GenOn with various management, personnel and other services, which include human resources, regulatory and public affairs, accounting, tax, legal, information systems, treasury, risk management, commercial operations, and asset management, as set forth in the Services Agreement. The initial term of the Services Agreement was through December 31, 2013, with an automatic renewal absent a request for termination. The fee charged is determined based on a fixed amount as described in the Services Agreement and was calculated based on historical GenOn expenses prior to the NRG Merger. The annual fees under the Services Agreement are approximately $193 million. NRG charges these fees on a monthly basis, less amounts incurred directly by GenOn. Management has concluded that this method of charging overhead costs is reasonable. For the years ended December 31, 2015, and 2014, GenOn recorded costs related to these services of $184 million and $128 million, respectively, as general and administrative - affiliate.

*Administrative Services Provided by NRG (GenOn Americas Generation and GenOn Mid-Atlantic)*

NRG provides GenOn Americas Generation and GenOn Mid-Atlantic with various management, personnel and other services consistent with those set forth in the Services Agreement discussed above between NRG and GenOn. GenOn's costs incurred under the Services Agreement with NRG are allocated to its subsidiaries based on each operating subsidiary's planned operating expenses relative to all operating subsidiaries of GenOn. These allocations and charges are not necessarily indicative of what would have been incurred had GenOn Americas Generation and GenOn Mid-Atlantic been unaffiliated entities. Management has concluded that this method of charging overhead costs is reasonable.

The following costs were incurred under these arrangements:

*GenOn Americas Generation*

| | Year Ended December 31, 2015 | | Year Ended December 31, 2014 | | Year Ended December 31, 2013 | |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| Allocated costs: | | | | | | |
| Cost of operations — affiliate | $ | 3 | $ | 7 | $ | 9 |
| Selling, general and administrative — affiliate | | 81 | | 79 | | 74 |
| Total | $ | 84 | $ | 86 | $ | 83 |

*GenOn Mid-Atlantic*

| | Year Ended December 31, 2015 | | Year Ended December 31, 2014 | | Year Ended December 31, 2013 | |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| Allocated costs: | | | | | | |
| Cost of operations — affiliate | $ | 1 | $ | 4 | $ | 6 |
| Selling, general and administrative — affiliate | | 58 | | 64 | | 64 |
| Total | $ | 59 | $ | 68 | $ | 70 |

*Credit Agreement with NRG (GenOn)*

GenOn and NRG Americas are party to a secured intercompany revolving credit agreement with NRG. This credit agreement provides for a $500 million revolving credit facility, all of which is available for revolving loans and letters of credit. At December 31, 2015, $278 million of letters of credit were outstanding under the NRG credit agreement for GenOn. Of this amount, $227 million were issued on behalf of GenOn Americas Generation, which includes $131 million issued on behalf of GenOn Mid-Atlantic. At December 31, 2015, no loans were outstanding under this credit agreement. Certain of GenOn's

subsidiaries, as guarantors, are subject to a guarantee agreement pursuant to which these guarantors guaranteed amounts borrowed and obligations incurred under the credit agreement. The guarantors are restricted from incurring additional liens on certain of their assets. The credit agreement is payable at maturity, subject to certain exceptions primarily related to asset sales not in the ordinary course of business and borrowings of debt. The initial maturity of the credit agreement was December 2015. The agreement was amended in December 2015 to extend the maturity through December of 2018. At GenOn's election, the interest rate per year applicable to the loans under the credit agreement will be determined by reference to either (i) the base rate plus 2.50% per year or (ii) the LIBOR rate plus 3.50% per year. In addition, the credit agreement contains customary covenants and events of default.

### Intercompany Cash Management Program (GenOn Americas Generation)

GenOn Americas Generation and certain of its subsidiaries participate in separate intercompany cash management programs whereby cash balances at GenOn Americas Generation and the respective participating subsidiaries are transferred to central concentration accounts to fund working capital and other needs of the respective participants. The balances under this program are reflected as notes receivable — affiliate and accounts receivable — affiliate or notes payable — affiliate and accounts payable — affiliate, as appropriate. The notes are due on demand and notes receivable — affiliate and notes payable — affiliate accrue interest on the net position, which is payable quarterly, at a rate determined by GenOn Energy Holdings. At December 31, 2015 and 2014, GenOn Americas Generation had a net current notes receivable — affiliate from GenOn Energy Holdings of $331 million related to its intercompany cash management program. For the years ended December 31, 2015, 2014, and 2013, GenOn Americas Generation earned an insignificant amount of net interest income related to these notes. Additionally, at December 31, 2015, and 2014, GenOn Americas Generation had an accounts payable — affiliate of $41 million and an accounts receivable — affiliate of $118 million, respectively, with GenOn Energy Holdings.

### GenOn Mid-Atlantic Distributions (GenOn Americas Generation and GenOn Mid-Atlantic)

For the year ended December 31, 2014, GenOn Mid-Atlantic made a distribution of $320 million to its parent, NRG North America LLC, who in turn made a distribution of $320 million to its parent, GenOn Americas Generation. GenOn Americas Generation subsequently made a distribution in the same amount, through its parent company, NRG Americas, Inc. to GenOn Energy Holdings, Inc., a subsidiary of GenOn.

### Purchased Emission Allowances (GenOn Mid-Atlantic)

GenOn Energy Management maintains an inventory of certain purchased emission allowances related to the Regional Greenhouse Gas Initiative on behalf of GenOn Mid-Atlantic. The emission allowances are sold by GenOn Energy Management to GenOn Mid-Atlantic as they are needed for operations. GenOn Mid-Atlantic purchases emission allowances from GenOn Energy Management at GenOn Energy Management's original cost to purchase the allowances. For allowances that have been purchased by GenOn Energy Management from a GenOn Energy affiliate, the price paid by GenOn Energy Management is determined by market indices.

Emission allowances purchased from GenOn Energy Management that were utilized during the years ended December 31, 2015, 2014, and 2013 were $27 million, $19 million, and $17 million, respectively, and are recorded in cost of operations — affiliate in GenOn Mid-Atlantic's consolidated statements of operations.

### Operator of Leased Facilities (GenOn)

See Note 15, *Commitments and Contingencies*, for a discussion of the GenOn leased facilities (Conemaugh and Keystone) that GenOn also operates.

| Commitments and Contingencies | 12 Months Ended |
|---|---|
| | Dec. 31, 2015 |

**Commitments and Contingencies Disclosure [Abstract]**

Commitments and Contingencies Disclosure [Text Block]

**Commitments**

### GenOn Mid-Atlantic Operating Leases

GenOn Mid-Atlantic leases a 100% interest in the Dickerson and Morgantown coal generation units and associated property through 2029 and 2034, respectively. GenOn Mid-Atlantic has an option to extend the leases. Any extensions of the respective leases would be for less than 75% of the economic useful life of the facility, as measured from the beginning of the original lease term through the end of the proposed remaining lease term. GenOn Mid-Atlantic accounts for these leases as operating leases and recognizes rent expense on a straight-line basis over the lease term. Rent expense totaled $43 million, $43 million, and $41 million for the years ended December 31, 2015, 2014, and 2013 respectively, net of annual amortization of the out-of-market liability of $28 million. Rent expense is included in cost of operations. As of December 31, 2015 and 2014, GenOn Mid-Atlantic has paid $196 million and $157 million, respectively, of lease payments in excess of rent expense recognized, which is included in prepaid rent and other current assets and other non-current assets on the consolidated balance sheets. Of these amounts, $71 million is included, for both 2015 and 2014, in prepaid rent and other current assets.

For restrictions under these leases, see Note 10, *Debt and Capital Leases.*

As a result of pushdown accounting, GenOn Mid-Atlantic recorded the acquisition date fair value of the leasehold improvements of $382 million, classified in property, plant and equipment. In addition, GenOn Mid-Atlantic recorded the acquisition date fair value of the leasehold interests, net of the present value of the lease obligation, equal to an out-of-market liability of $604 million, classified in out-of-market contracts. This liability is amortized to rent expense on a straight-line basis over the term of the lease.

Future minimum lease commitments under the GenOn Mid-Atlantic operating leases for the years ending after December 31, 2015, are as follows:

| | (In millions) |
|---|---|
| 2016 | $ 150 |
| 2017 | 144 |
| 2018 | 105 |
| 2019 | 139 |
| 2020 | 105 |
| Thereafter | 442 |
| Total | $ 1,085 |

### REMA Operating Leases (GenOn)

GenOn, through its subsidiary, REMA, leases a 100% interest in the Shawville generation facility through 2026, and expects to make payments under the Shawville lease through that date, and leases 16.45% and 16.67% interests in the Keystone and Conemaugh coal generation facilities, respectively, through 2034, and expects to make payments under the Keystone and Conemaugh leases through 2029 in accordance with the terms of the leases. At the expiration of these leases, there are several renewal options related to fair value. GenOn accounts for these leases as operating leases and records lease expense on a straight-line basis over the lease term. Rent expense totaled $29 million, $29 million, and $28 million for the years ended December 31, 2015, 2014, and 2013, respectively, net of annual amortization of out-of-market liability of $11 million. Rent expense is included in cost of operations. GenOn has paid $61 million and $41 million of lease payments in excess of rent expense recognized, which is included in prepaid rent and other current assets and other non-current assets on the consolidated balance sheets as of December 31, 2015 and 2014, respectively. Of these amounts, $41 million is included, for both 2015 and 2014, in prepaid rent and other current assets (prepayments for GenOn).

GenOn operates the Conemaugh and Keystone generating facilities under 5-year agreements that initially expired in December 2015 and were renewed through December 2020. Under certain provisions and notifications, the agreements could be terminated annually with 1 year's notice. GenOn is reimbursed by the other owners for the cost of direct services provided to the Conemaugh and Keystone facilities.

Additionally, GenOn received fees of $11 million for each of the years ended December 31, 2015, 2014, and 2013.

For restrictions under these leases, see Note 10, *Debt and Capital Leases.*

As a result of pushdown accounting, GenOn recorded the acquisition date fair value of the leasehold improvements of $66 million, classified in property, plant and equipment.  In addition, GenOn recorded the acquisition date fair value of the leasehold interests, net of the present value of the lease obligation, equal to an out-of-market liability of $186 million, classified in out-of-market contracts. This liability is amortized to rent expense on a straight-line basis over the term of the lease.

Future minimum lease commitments under the REMA operating leases for the years ending after December 31, 2015, are as follows:

|  | (In millions) |
|---|---|
| 2016 | $ 61 |
| 2017 | 63 |
| 2018 | 55 |
| 2019 | 65 |
| 2020 | 56 |
| Thereafter | 278 |
| Total | $ 578 |

In May 2015, GenOn mothballed Units 1, 2, 3, and 4 at Shawville generating facility (597 MW) with plans to return those units to service no later than the summer of 2016 using natural gas. Under the lease agreement for Shawville, GenOn's obligations generally are to pay the required rent and to maintain the leased assets in accordance with the lease documentation, including in compliance with prudent competitive electric generating industry practice and applicable laws.

### Other Operating Leases

The Registrants have commitments under other operating leases with various terms and expiration dates. Included in other operating leases is GenOn's long-term lease for offices in Houston, Texas which expires in 2018. GenOn Mid-Atlantic has other operating leases which primarily relate to the Chalk Point generating facility. Rent expense for other operating leases is recorded to cost of operations or general and administrative, as applicable, based on the nature of the lease.

The Registrants' rent expense associated with other operating leases was as follows:

|  | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
|  | (In millions) | | |
| GenOn | $ 15 | $ 12 | $ 17 |
| GenOn Americas Generation | $ 1 | — | — |
| GenOn Mid-Atlantic | $ 1 | — | — |

Future minimum lease commitments under the Registrants' other operating leases for the years ending after December 31, 2015, are as follows:

|  | GenOn (a) | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
|  | (In millions) | | |
| 2016 | $ 16 | $ 3 | $ 2 |
| 2017 | 14 | 2 | 2 |
| 2018 | 11 | 2 | 2 |
| 2019 | 3 | 2 | 2 |
| 2020 | 1 | 1 | — |
| Thereafter | 14 | — | — |
| Total | $ 59 | $ 10 | $ 8 |

(a) Amounts in the table exclude future sublease income of $75 million associated with GenOn's long-term lease for its corporate headquarters in Houston, Texas.

### *Fuel and Commodity Transportation Commitments*

The Registrants have commitments under coal agreements and commodity transportation contracts, primarily related to natural gas and coal, of various quantities and durations. At December 31, 2015, the maximum remaining term under any individual fuel supply contract is three years and any transportation contract is eight years.

As of December 31, 2015, the Registrants' commitments under such outstanding agreements are estimated as follows:

|  | GenOn | | GenOn Americas Generation | | GenOn Mid-Atlantic | |
|---|---|---|---|---|---|---|
|  |  | | (In millions) | |  | |
| 2016 | $ | 139 | $ | 55 | $ | 55 |
| 2017 |  | 88 |  | 13 |  | 13 |
| 2018 |  | 73 |  | 13 |  | 13 |
| 2019 |  | 1 |  | — |  | — |
| 2020 |  | 1 |  | — |  | — |
| Thereafter |  | 3 |  | — |  | — |
| Total | $ | 305 | $ | 81 | $ | 81 |

### *LTSA Commitments (GenOn)*

LTSA commitments primarily relate to long-term service agreements that cover some periodic maintenance, including parts, on power generation turbines. The long-term maintenance agreements terminate from 2037 to 2039 based on turbine usage.

As of December 31, 2015, GenOn's commitments under such outstanding agreements are estimated as follows:

|  | GenOn | |
|---|---|---|
|  | (In millions) | |
| 2016 | $ | 30 |
| 2017 |  | 13 |
| 2018 |  | 12 |
| 2019 |  | 26 |
| 2020 |  | 14 |
| Thereafter |  | 209 |
| Total | $ | 304 |

### *Other Commitments*

The Registrants have other commitments under contractual arrangements with various terms and expiration dates. The Registrants' other commitments primarily include the operation and maintenance agreement and the fly ash sales agreement entered into by GenOn Mid-Atlantic in connection with its ash beneficiation facility. The ash beneficiation facility agreements will expire in 2031. GenOn Mid-Atlantic has other similar agreements for gypsum. In addition to the GenOn Mid-Atlantic agreements, GenOn has other commitments which primarily relate to its southern California generating facilities.

As of December 31, 2015, the Registrants' other commitments are estimated as follows

|  | GenOn | | GenOn Americas Generation | | GenOn Mid-Atlantic | |
|---|---|---|---|---|---|---|
|  |  | | (In millions) | |  | |
| 2016 | $ | 2 | $ | 2 | $ | 2 |
| 2017 |  | 3 |  | 3 |  | 3 |
| 2018 |  | 3 |  | 3 |  | 3 |
| 2019 |  | 3 |  | 3 |  | 3 |

| | | | |
|---|---|---|---|
| 2020 | 3 | 3 | 3 |
| Thereafter | 50 | 50 | 50 |
| Total | $ 64 | $ 64 | $ 64 |

**Contingencies**

The Registrants' material legal proceedings are described below. The Registrants believe that they have valid defenses to these legal proceedings and intend to defend them vigorously. The Registrants record reserves for estimated losses from contingencies when information available indicates that a loss is probable and the amount of the loss, or range of loss, can be reasonably estimated. In addition, legal costs are expensed as incurred. Management has assessed each of the following matters based on current information and made a judgment concerning its potential outcome, considering the nature of the claim, the amount and nature of damages sought, and the probability of success. Unless specified below, the Registrants are unable to predict the outcome of these legal proceedings or reasonably estimate the scope or amount of any associated costs and potential liabilities. As additional information becomes available, management adjusts its assessment and estimates of such contingencies accordingly. Because litigation is subject to inherent uncertainties and unfavorable rulings or developments, it is possible that the ultimate resolution of the Registrants' liabilities and contingencies could be at amounts that are different from their currently recorded reserves and that such difference could be material.

In addition to the legal proceedings noted below, the Registrants are parties to other litigation or legal proceedings arising in the ordinary course of business. In management's opinion, the disposition of these ordinary course matters will not materially adversely affect the Registrants' respective consolidated financial position, results of operations, or cash flows.

*Actions Pursued by MC Asset Recovery (GenOn)* — With Mirant Corporation's emergence from bankruptcy protection in 2006, certain actions filed by GenOn Energy Holdings and some of its subsidiaries against third parties were transferred to MC Asset Recovery, a wholly owned subsidiary of GenOn Energy Holdings. MC Asset Recovery is governed by a manager who is independent of NRG and GenOn. MC Asset Recovery is a disregarded entity for income tax purposes. Under the remaining action transferred to MC Asset Recovery, MC Asset Recovery seeks to recover damages from Commerzbank AG and various other banks, or the Commerzbank Defendants, for alleged fraudulent transfers that occurred prior to Mirant's bankruptcy proceedings. In December 2010, the U.S. District Court for the Northern District of Texas dismissed MC Asset Recovery's complaint against the Commerzbank Defendants. In January 2011, MC Asset Recovery appealed the District Court's dismissal of its complaint against the Commerzbank Defendants to the U.S. Court of Appeals for the Fifth Circuit. In March 2012, the Court of Appeals reversed the District Court's dismissal and reinstated MC Asset Recovery's amended complaint against the Commerzbank Defendants. On December 10, 2015, the District Court granted the Commerzbank Defendants' motion for summary judgment. On December 29, 2015, MC Asset Recovery filed a notice to appeal this ruling. If MC Asset Recovery succeeds in obtaining any recoveries from the Commerzbank Defendants, the Commerzbank Defendants have asserted that they will seek to file claims in Mirant's bankruptcy proceedings for the amount of those recoveries. GenOn Energy Holdings would vigorously contest the allowance of any such claims. If the Commerzbank Defendants were to receive an allowed claim as a result of a recovery by MC Asset Recovery on its claims against them, GenOn Energy Holdings would retain from the net amount recovered by MC Asset Recovery an amount equal to the dollar amount of the resulting allowed claim.

*Natural Gas Litigation (GenOn)* — GenOn is party to several lawsuits, certain of which are class action lawsuits, in state and federal courts in Kansas, Missouri, Nevada and Wisconsin. These lawsuits were filed in the aftermath of the California energy crisis in 2000 and 2001 and the resulting FERC investigations and relate to alleged conduct to increase natural gas prices in violation of state antitrust law and similar laws. The lawsuits seek treble or punitive damages, restitution and/or expenses. The lawsuits also name as parties a number of energy companies unaffiliated with NRG. In July 2011, the U.S. District Court for the District of Nevada, which was handling four of the five cases, granted the defendants' motion for summary judgment and dismissed all claims against GenOn in those cases. The plaintiffs appealed to the U.S. Court of Appeals for the Ninth Circuit which reversed the decision of the District Court. GenOn along with the other defendants in the lawsuit filed a petition for a writ of certiorari to the U.S. Supreme Court challenging the Court of Appeals' decision and the Supreme Court granted the petition. On April 21, 2015, the Supreme Court affirmed the Ninth Circuit's holding that plaintiffs' state antitrust law claims are not field-preempted by the federal Natural Gas Act and the Supremacy Clause of the U.S. Constitution. The Supreme Court left open whether the claims were preempted on the basis of conflict preemption. The U.S. Supreme Court directed that the case be remanded to the U.S. District Court for the District of Nevada. The case is proceeding in that court. GenOn has agreed to indemnify CenterPoint against certain losses relating to these lawsuits.

In September 2012, the State of Nevada Supreme Court, which was handling the remaining case,

affirmed dismissal by the Eighth Judicial District Court for Clark County, Nevada of all plaintiffs' claims against GenOn. In February 2013, the plaintiffs in the Nevada case filed a petition for a writ of certiorari to the U.S. Supreme Court. In June 2013, the Supreme Court denied the petition for a writ of certiorari, thereby ending one of the five lawsuits.

*Maryland Department of the Environment v. GenOn Chalk Point and GenOn Mid-Atlantic* — On January 25, 2013, Food & Water Watch, the Patuxent Riverkeeper and the Potomac Riverkeeper (together, the Citizens Group) sent GenOn Mid-Atlantic a letter alleging that the Chalk Point, Dickerson and Morgantown generating facilities were violating the terms of the three National Pollution Discharge Elimination System permits by discharging nitrogen and phosphorous in excess of the limits in each permit. On March 21, 2013, the MDE sent GenOn Mid-Atlantic a similar letter with respect to the Chalk Point and Dickerson generating facilities, threatening to sue within 60 days if the generating facilities were not brought into compliance. On June 11, 2013, the Maryland Attorney General on behalf of the MDE filed a complaint in the U.S. District Court for the District of Maryland alleging violations of the CWA and Maryland environmental laws related to water. The lawsuit is ongoing and seeks injunctive relief and civil penalties in excess of $100,000. The Registrants do not expect the resolution of this matter to have a material impact on the Registrants' consolidated financial position, results of operations, or cash flows.

*Chapter 11 Proceedings (GenOn and GenOn Americas Generation)* — In July 2003, and various dates thereafter, the Mirant Debtors filed voluntary petitions in the Bankruptcy Court for relief under Chapter 11 of the U.S. Bankruptcy Code. GenOn Energy Holdings and most of the other Mirant Debtors emerged from bankruptcy on January 3, 2006, when the Plan became effective. The remaining Mirant Debtors emerged from bankruptcy on various dates in 2007. Approximately 461,000 of the shares of GenOn Energy Holdings common stock to be distributed under the Plan have not yet been distributed and have been reserved for distribution with respect to claims disputed by the Mirant Debtors that have not been resolved. Upon the Mirant/RRI Merger, those reserved shares converted into a reserve for approximately 1.3 million shares of GenOn common stock. Upon the NRG Merger, those reserved shares converted into a reserve for approximately 159,000 shares of NRG common stock. Under the terms of the Plan, upon the resolution of such a disputed claim, the claimant will receive the same pro rata distributions of common stock, cash, or both as previously allowed claims, regardless of the price at which the common stock is trading at the time the claim is resolved. If the aggregate amount of any such payouts results in the number of reserved shares being insufficient, additional shares of common stock may be issued to address the shortfall.

*Potomac River Environmental Investigation* — In March 2013, NRG Potomac River LLC received notice that the District of Columbia Department of Environment (now renamed the Department of Energy and Environment, or DOEE) was investigating potential discharges to the Potomac River originating from the Potomac River Generating facility site, a site where the generation facility is no longer in operation. In connection with that investigation, DOEE served a civil subpoena on NRG Potomac River LLC requesting information related to the site and potential discharges occurring from the site. NRG Potomac River LLC provided various responsive materials. In January 2016, DOEE advised NRG Potomac River that DOEE believed various environmental violations had occurred as a result of discharges DOEE believes occurred to the Potomac River from the Potomac River Generating facility site and as a result of associated failures to accurately or sufficiently report such discharges. DOEE has indicated it believes that penalties are appropriate in light of the violations. The Registrants are currently reviewing the information provided by DOEE.

**Regulatory Matters**

**12 Months Ended**

**Dec. 31, 2015**

**Regulatory Matters Disclosure [Abstract]**

Regulatory Matters

**Regulatory Matters (GenOn, GenOn Americas Generation, GenOn Mid-Atlantic)**

The Registrants operate in a highly regulated industry and are subject to regulation by various federal and state agencies. As such, the Registrants are affected by regulatory developments at both the federal and state levels and in the regions in which they operate. In addition, the Registrants are subject to the market rules, procedures, and protocols of the various ISO and RTO markets in which they participate. These power markets are subject to ongoing legislative and regulatory changes that may impact the Registrants' wholesale business.

In addition to the regulatory proceedings noted below, the Registrants are parties to other regulatory proceedings arising in the ordinary course of business or have other regulatory exposure. In management's opinion, the disposition of these ordinary course matters will not materially adversely affect the Registrants' respective consolidated financial position, results of operations, or cash flows.

*National*

*U.S. Supreme Court Agrees to Consider the Constitutionality of Maryland's Generator Contracting Programs* — On October 19, 2015, the U.S. Supreme Court agreed to hear a case challenging the constitutionality of certain state-directed procurements of new electric generating facilities. The case involves the authority of the Maryland Public Service Commission to direct load-serving utilities in the state to enter into long-term power purchase contracts with a generation developer to encourage the construction of new generation capacity in Maryland. The constitutionality of the long-term contracts was challenged in the U.S. District Court for the District of Maryland, which, in an October 24, 2013, decision, found that the contracts violated the Supremacy Clause of the U.S. Constitution because they were both conflict preempted and field preempted by the FPA and the authority that the FPA granted to FERC. On June 30, 2014, the U.S. Court of Appeals for the Fourth Circuit affirmed the District Court's decision. A case arising out of New Jersey and raising similar issues was decided by the U.S. Court of Appeals for the Third Circuit, which also determined that the state-mandated contracts were preempted. After the Supreme Court granted certiorari in the Maryland case, NRG filed a friend-of-the-court brief urging the Court to uphold the right of states to incentivize new generation by directing utilities in the state to enter into long-term contracts — but noted that FERC has both the authority and the statutory obligation to protect wholesale markets by requiring that bids in the wholesale markets reflect costs and by ensuring that uneconomic entry does not distort auction outcomes. The Supreme Court heard oral argument on February 24, 2016. The outcome of this litigation could have broad impacts on whether and how states require utilities to contract with new generation resources, as well as how such contracted resources interact with the FERC-jurisdictional wholesale markets.

*U.S. Supreme Court Allows FERC to Retain Jurisdiction Over Demand Response* — On January 25, 2016, the U.S. Supreme Court issued a 6-2 decision affirming FERC's ability to exercise jurisdiction over demand response resources seeking to voluntarily participate in the wholesale markets. Additionally, the Supreme Court upheld FERC's preferred scheme for pricing demand response in the energy market. This case arose out of a May 23, 2014, decision by the D.C. Circuit which vacated FERC's rules (known as Order No. 745) that set the compensation level for demand response resources participating in the FERC-jurisdictional energy markets. The Court of Appeals had held that the FPA does not authorize FERC to exercise jurisdiction over demand response and that instead demand response is part of the retail market over which the states have jurisdiction. With the Supreme Court's decision, FERC will resume exercising jurisdiction over demand response, which the Registrants view as a positive for their wholesale business.

*East*

*Montgomery County Station Power Tax* — On December 20, 2013, NRG received a letter from Montgomery County, Maryland requesting payment of an energy tax for the consumption of station power at the Dickerson Facility over the previous three years. Montgomery County seeks payment in the amount of $22 million, which includes tax, interest and penalties. NRG disputed the applicability of the tax. On December 11, 2015, the Maryland Tax Court reversed Montgomery County's assessment. Montgomery County has filed an appeal.

**Environmental Matters**

**Environmental Remediation Obligations [Abstract]**

Environmental Matters

**Environmental Matters (GenOn, GenOn Americas Generation and GenOn Mid-Atlantic)**

The Registrants are subject to a wide range of environmental laws in the development, construction, ownership and operation of projects. These laws generally require that governmental permits and approvals be obtained before construction and during operation of power plants. Environmental laws have become increasingly stringent and the Registrants expect this trend to continue. The electric generation industry is facing new requirements regarding GHGs, combustion byproducts, water discharge and use, and threatened and endangered species. In general, future laws are expected to require the addition of emissions controls or other environmental controls or to impose certain restrictions on the operations of the Registrants' facilities, which could have a material effect on the Registrants' operations.

The EPA finalized CSAPR in 2011, which was intended to replace CAIR in January 2012, to address certain states' obligations to reduce emissions so that downwind states can achieve federal air quality standards. In December 2011, the D.C. Circuit stayed the implementation of CSAPR and then vacated CSAPR in August 2012 but kept CAIR in place until the EPA could replace it. In April 2014, the U.S. Supreme Court reversed and remanded the D.C. Circuit's decision. In October 2014, the D.C. Circuit lifted the stay of CSAPR. In response, the EPA in November 2014 amended the CSAPR compliance dates. Accordingly, CSAPR replaced CAIR on January 1, 2015. On July 28, 2015, the D.C. Circuit held that the EPA had exceeded its authority by requiring certain reductions that were not necessary for downwind states to achieve federal standards. Although the D.C. Circuit kept the rule in place, the court ordered the EPA to revise the Phase 2 (or 2017) (i) $SO_2$ budgets for four states and (ii) ozone-season $NO_x$ budgets for 11 states including Maryland, New Jersey, New York, Ohio and Pennsylvania. The EPA is currently reviewing the decision. In December 2015, the EPA proposed the CSAPR Update Rule using the 2008 Ozone NAAQS, which would reduce the total amount of ozone season $NO_x$ as compared with the previously utilized 1997 Ozone NAAQS. If finalized, this proposal would reduce future $NO_x$ allocations and/or current banked allowances. While the Registrants cannot predict the final outcome of this rulemaking, the Registrants believe their investment in pollution controls and cleaner technologies leave the fleet well positioned for compliance.

In February 2012, the EPA promulgated standards (the MATS rule) to control emissions of HAPs from coal and oil-fired electric generating units. The rule established limits for mercury, non-mercury metals, certain organics and acid gases, which limits had to be met beginning in April 2015 (with some units getting a 1-year extension). In June 2015, the U.S. Supreme Court issued a decision in the case of *Michigan v. EPA*, and held that the EPA unreasonably refused to consider costs when it determined that it was "appropriate and necessary" to regulate HAPs emitted by electric generating units. The U.S. Supreme Court did not vacate the MATS rule but rather remanded it to the D.C. Circuit for further proceedings. In November 2015, the EPA proposed a supplemental finding that including a consideration of cost does not alter the EPA's previous determination that it is appropriate and necessary to regulate air toxics, including mercury from power plants. In December 2015, the D.C. Circuit remanded the rule to the EPA without vacatur. While the Registrants cannot predict the final outcome of this rulemaking, the Registrants believe that because they have already invested in pollution controls and cleaner technologies, their fleet is well positioned to comply with the MATS rule.

*Water*

In August 2014, the EPA finalized the regulation regarding the use of water for once through cooling at existing facilities to address impingement and entrainment concerns. The Registrants anticipate that more stringent requirements will be incorporated into some of their water discharge permits over the next several years as NPDES permits are renewed.

*Byproducts, Wastes, Hazardous Materials and Contamination*

In April 2015, the EPA finalized the rule regulating byproducts of coal combustion (e.g., ash and gypsum) as solid wastes under the RCRA. The Registrants have evaluated the impact of the new rule on their results of operations, financial condition and cash flows and have accrued their environmental and asset retirement obligations under the rule based on current estimates as of December 31, 2015.

*East*

*Maryland Environmental Regulations* — In December 2014, MDE proposed a regulation regarding $NO_x$ emissions from coal-fired electric generating units, which had it been finalized would have required

by 2020 the Registrants (at each of the three Dickerson coal-fired units and the Chalk Point coal-fired unit that does not have an SCR) to either (1) install and operate an SCR; (2) retire the unit; or (3) convert the fuel source from coal to natural gas. In early 2015, the State of Maryland decided not to finalize the regulation as proposed. In November 2015, MDE finalized revised regulations to address future $NO_x$ reductions, which although more stringent than previous regulations, will not cause the Registrants to spend capital to comply. As a result of the new regulations, on February 29, 2016, the Registrants notified PJM that they were withdrawing the standing deactivation notices for Dickerson Units 1, 2 and 3 and Chalk Point Units 1 and 2.

For further discussion of these matters, refer to Note 15, *Commitments and Contingencies – Contingencies.*

### Environmental Capital Expenditures

GenOn estimates that environmental capital expenditures from 2016 through 2020 required to comply with environmental laws will be approximately $68 million for GenOn, which includes $12 million for GenOn Americas Generation. The amount for GenOn Americas Generation includes $9 million for GenOn Mid-Atlantic. The majority of these costs will be expended by the end of 2016.

**Guarantees**

**12 Months Ended**

**Dec. 31, 2015**

**Guarantees [Abstract]**

Guarantees

Guarantees (GenOn and GenOn Americas Generation)

GenOn and GenOn Americas Generation and their respective subsidiaries enter into various contracts that include indemnification and guarantee provisions as a routine part of their business activities. Examples of these contracts include asset purchases and sale agreements, commodity sale and purchase agreements, retail contracts, EPC agreements, operation and maintenance agreements, service agreements, settlement agreements, and other types of contractual agreements with vendors and other third parties, as well as affiliates. These contracts generally indemnify the counterparty for tax, environmental liability, litigation and other matters, as well as breaches of representations, warranties and covenants set forth in these agreements. In some cases, GenOn's and GenOn Americas Generation's maximum potential liability cannot be estimated, since the underlying agreements contain no limits on potential liability.

The following table summarizes the maximum potential exposures that can be estimated for guarantees, indemnities, and other contingent liabilities by maturity:

*GenOn*

| Guarantees | By Remaining Maturity at December 31, | | | | | December 31, 2014 |
| | 2015 | | | | | |
| | Under 1 Year | 1-3 Years | 3-5 Years | Over 5 Years | Total | Total |
| | | | (In millions) | | | (In millions) |
| Letters of credit and surety bonds | $ 350 | $ — | $ — | $ — | $ 350 | $ 319 |
| Other guarantees | — | — | — | 46 | 46 | 57 |
| Total guarantees | $ 350 | $ — | $ — | $ 46 | $ 396 | $ 376 |

*GenOn Americas Generation*

| Guarantees | By Remaining Maturity at December 31, | | | | | December 31, 2014 |
| | 2015 | | | | | |
| | Under 1 Year | 1-3 Years | 3-5 Years | Over 5 Years | Total | Total |
| | | | (In millions) | | | (In millions) |
| Letters of credit and surety bonds | $ 229 | $ — | $ — | $ — | $ 229 | $ 180 |
| Total guarantees | $ 229 | $ — | $ — | $ — | $ 229 | $ 180 |

*Letters of credit and surety bonds* — As of December 31, 2015, GenOn and GenOn Americas Generation and their respective subsidiaries were contingently obligated for a total of $72 million and $2 million under surety bonds, respectively. In addition, GenOn had $278 million of letters of credit that were issued under the NRG credit agreement. See Note 14, *Related Party Transactions*. Of those letters of credit, $227 million were issued on behalf of GenOn Americas Generation's subsidiaries and $131 million were issued on behalf of GenOn Mid-Atlantic. Most of these letters of credit and surety bonds are issued in support of their obligations to perform under commodity agreements and obligations associated with future closure and maintenance of ash sites, as well as for financing or other arrangements. A majority of these letters of credit and surety bonds expire within one year of issuance, and it is typical for the Registrants to renew them on similar terms.

*Other guarantees* — GenOn and GenOn Americas Generation have issued guarantees of obligations that their subsidiaries may incur as a provision for environmental site remediation, payment of debt obligations, rail car leases, performance under purchase, EPC and operating and maintenance agreements. GenOn and GenOn Americas Generation do not believe that they will be required to make any material

payments under these guarantees.

*Other indemnities* — Other indemnifications GenOn and GenOn Americas Generation have provided cover operational, tax, litigation and breaches of representations, warranties and covenants. GenOn and GenOn Americas Generation have also indemnified, on a routine basis in the ordinary course of business, financing parties, consultants or other vendors who have provided services to them. GenOn's and GenOn Americas Generation's maximum potential exposure under these indemnifications can range from a specified dollar amount to an indeterminate amount, depending on the nature of the transaction. Total maximum potential exposure under these indemnifications is not estimable due to uncertainty as to whether claims will be made or how they will be resolved. GenOn and GenOn Americas Generation do not believe that they will be required to make any material payments under these indemnity provisions.

Because many of the guarantees and indemnities GenOn and GenOn Americas Generation issue to third parties and affiliates do not limit the amount or duration of their obligations to perform under them, there exists a risk that GenOn or GenOn Americas Generation may have obligations in excess of the amounts described above. For those guarantees and indemnities that do not limit the liability exposure, it may not be possible to estimate what GenOn's or GenOn Americas Generation's liability would be, until a claim is made for payment or performance, due to the contingent nature of these contracts.

**Schedule I Condensed Financial Information of Parent Company Only Disclosure**

**12 Months Ended**

**Dec. 31, 2015**

GenOn Americas Generation, LLC
Parent Company [Member]

Schedule I CONDENSED FINANCIAL INFORMATION OF REGISTRANT

**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED STATEMENTS OF OPERATIONS**

| | For the Year Ended December 31, 2015 | For the Year Ended December 31, 2014 | For the Year Ended December 31, 2013 |
|---|---|---|---|
| | | (In millions) | |
| **Operating (Loss)/Income** | $ — | $ — | $ — |
| **Other Income/(Expense)** | | | |
| Equity in earnings of consolidated subsidiaries | 138 | 371 | 123 |
| Gain on debt extinguishment | 42 | — | |
| Interest expense | (64) | (66) | (64) |
| Total other income/(expense) | 116 | 305 | 59 |
| **Income Before Income Taxes** | 116 | 305 | 59 |
| Income tax expense | — | — | — |
| **Net Income** | $ 116 | $ 305 | $ 59 |

See notes to condensed financial statements.

**GENON AMERICAS GENERATION, LLC (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED BALANCE SHEETS**

| | As of December 31, 2015 | As of December 31, 2014 |
|---|---|---|
| | (In millions) | |
| **ASSETS** | | |
| **Current Assets** | | |
| Accounts receivable | $ — | $ 2 |
| Total current assets | — | 2 |
| **Other Assets** | | |
| Investment in subsidiaries | 1,907 | 1,770 |
| Total other assets | 1,907 | 1,770 |
| **Total Assets** | $ 1,907 | $ 1,772 |
| | | |
| **LIABILITIES AND MEMBER'S EQUITY** | | |
| **Current Liabilities** | | |
| Accounts payable — affiliate | $ 199 | $ — |
| Note payable — affiliate | 11 | 11 |
| Accrued expenses and other current liabilities | 13 | 16 |
| Total current liabilities | 223 | 27 |
| **Other Liabilities** | | |
| Long-term debt | 752 | 929 |
| Total non-current liabilities | 752 | 929 |
| **Total Liabilities** | 975 | 956 |
| **Commitments and Contingencies** | | |
| **Member's Equity** | | |

| | | | |
|---|---|---:|---:|
| Member's interest | | 932 | 816 |
| Total member's equity | | 932 | 816 |
| **Total Liabilities and Member's Equity** | | $ 1,907 | $ 1,772 |

See notes to condensed financial statements.

### GENON AMERICAS GENERATION, LLC (PARENT)
### CONDENSED FINANCIAL INFORMATION OF REGISTRANT
### CONDENSED STATEMENTS OF CASH FLOWS

| | For the Year Ended December 31, | For the Year Ended December 31, | For the Year Ended December 31, |
|---|---:|---:|---:|
| | 2015 | 2014 | 2013 |
| | | (In millions) | |
| **Cash Flows from Operating Activities** | | | |
| Net cash provided by operating activities | $ 128 | $ 197 | $ 217 |
| **Cash Flows from Investing Activities** | | | |
| Capitalized interest | (2) | (1) | (2) |
| Proceeds from sale of assets | — | 50 | — |
| Net cash used by investing activities | (2) | 49 | (2) |
| **Cash Flows from Financing Activities** | | | |
| Capital contributions | — | 74 | 70 |
| Distributions to member | — | (320) | (285) |
| Payments of short and long-term debt | (126) | — | — |
| Net cash used by financing activities | (126) | (246) | (215) |
| **Net Increase/(Decrease) in Cash and Cash Equivalents** | — | — | — |
| **Cash and Cash Equivalents at Beginning of Period** | — | — | — |
| **Cash and Cash Equivalents at End of Period** | $ — | $ — | $ — |
| | | | |
| **Supplemental Disclosures** | | | |
| Cash paid for interest, net of amounts capitalized | 76 | 74 | $ 73 |

See notes to condensed financial statements.

### GENON AMERICAS GENERATION, LLC (PARENT)
### NOTES TO CONDENSED FINANCIAL STATEMENTS

**1.    Background and Basis of Presentation**

   *Background*

   The condensed parent company financial statements have been prepared in accordance with Rule 12-04, Schedule I of Regulation S-X, as the restricted net assets of GenOn Americas Generation, LLC's subsidiaries exceed 25% of the consolidated net assets of GenOn Americas Generation, LLC. These statements should be read in conjunction with the consolidated statements and notes thereto of the Registrants.

   GenOn Americas Generation, LLC is a Delaware limited liability company and indirect wholly-owned subsidiary of GenOn Energy, Inc.

   RRI Energy (a Delaware corporation) changed its name from Reliant Energy, Inc. effective May 2009 in connection with the sale of its retail business. GenOn changed its name from RRI Energy effective December 3, 2010 in connection with the merger with Mirant. "GenOn" refers to GenOn Energy, Inc. and, except where the context indicates otherwise, its subsidiaries, after giving effect to the Mirant/RRI Merger.

   *Basis of Presentation*

   The condensed financial statements presented herein are the condensed financial statements and other financial information of GenOn Americas Generation, LLC.

Equity in income/loss of affiliates consists of earnings of direct subsidiaries of GenOn Americas Generation, LLC (parent).

### Cash Dividends and Distributions

For the years ended December 31, 2015, 2014, and 2013, GenOn Americas Generation, LLC, received cash dividends from its subsidiaries of $0 million, $320 million and $285 million. GenOn Americas Generation, subsequently made distributions in the same amount, through its parent company NRG Americas, Inc. to GenOn Energy Holdings, Inc., a subsidiary of GenOn.

### Long-Term Debt

For a discussion of GenOn Americas Generation, LLC's long-term debt, see Note 10, *Debt and Capital Leases,* to the Registrants' consolidated financial statements.

Debt maturities of GenOn Americas Generation, LLC as of December 31, 2015 are:

|  | (In millions) |
|---|---|
| 2021 and thereafter | 695 |
| Total | $ 695 |

### Commitments, Contingencies and Guarantees

See Note 15, *Commitments and Contingencies,* to the Registrants' consolidated financial statements for a detailed discussion of GenOn Americas Generation, LLC's contingencies.

At December 31, 2015, GenOn Americas Generation, LLC did not have any guarantees.

GenOn Energy, Inc. Parent Company [Member]

Schedule I CONDENSED FINANCIAL INFORMATION OF REGISTRANT

## CONDENSED STATEMENTS OF OPERATIONS

|  | For the Year Ended December 31, 2015 | For the Year Ended December 31, 2014 | For the Year Ended December 31, 2013 |
|---|---|---|---|
|  | (In millions) | | |
| **Operating Income/(Loss)** | $ — | $ — | $ — |
| **Other Income/(Expense)** | | | |
| Equity in losses of consolidated subsidiaries | (98) | 242 | 17 |
| Other income/(expense), net | 85 | 84 | 74 |
| Gain on debt extinguishment | 23 | — | — |
| Interest expense | (128) | (129) | (140) |
| Total other income/(expense) | (118) | 197 | (49) |
| **(Loss)/Income Before Income Taxes** | (118) | 197 | (49) |
| Income tax expense/(benefit) | (3) | — | (6) |
| **Net (Loss)/Income** | $ (115) | $ 197 | $ (43) |

See notes to condensed financial statements.

**GENON ENERGY, INC. (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**

## CONDENSED BALANCE SHEETS

|  | As of December 31, | |
|---|---|---|
|  | 2015 | 2014 |
|  | (In millions) | |
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 226 | $ 490 |
| Notes receivable — affiliate | 300 | 386 |
| Taxes receivable and other current assets | 254 | 214 |
| Total current assets | 780 | 1,090 |

**Other Assets**

| | | | | |
|---|---|---:|---|---:|
| Investment in subsidiaries | | 456 | | 476 |
| Notes receivable — affiliate | | 1,025 | | 1,025 |
| Total other assets | | 1,481 | | 1,501 |
| **Total Assets** | $ | 2,261 | $ | 2,591 |

### LIABILITIES AND STOCKHOLDER'S EQUITY

**Current Liabilities**

| | | | | |
|---|---|---:|---|---:|
| Accrued taxes | $ | 1 | $ | 1 |
| Accrued expenses and other current liabilities | | 31 | | 39 |
| Total current liabilities | | 32 | | 40 |
| **Other Liabilities** | | | | |
| Long-term debt | | 1,956 | | 2,148 |
| Other non-current liabilities | | 1 | | 2 |
| Total non-current liabilities | | 1,957 | | 2,150 |
| **Total Liabilities** | | 1,989 | | 2,190 |

**Commitments and Contingencies**

**Stockholder's Equity**

| | | | | |
|---|---|---:|---|---:|
| Common stock: $0.001 par value, 1 share authorized and issued at December 31, 2015 and 2014 | | — | | — |
| Additional paid-in capital | | 325 | | 325 |
| (Accumulated deficit) / retained earnings | | (37) | | 78 |
| Accumulated other comprehensive loss | | (16) | | (2) |
| **Total Stockholder's Equity** | | 272 | | 401 |
| **Total Liabilities and Stockholder's Equity** | $ | 2,261 | $ | 2,591 |

See notes to condensed financial statements.

**GENON ENERGY, INC. (PARENT)**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED STATEMENTS OF CASH FLOWS**

| | For the Year Ended December 31, | | For the Year Ended December 31, | | For the Year Ended December 31, | |
|---|---|---|---|---|---|---|
| | **2015** | | **2014** | | **2013** | |
| | | | **(In millions)** | | | |
| **Cash Flows from Operating Activities** | | | | | | |
| Net cash used by operating activities | $ | (159) | $ | (165) | $ | 491 |
| **Cash Flows from Investing Activities** | | | | | | |
| Net cash from sale of Marsh Landing | | — | | — | | 175 |
| Proceeds from sale of equity method investments | | — | | 35 | | — |
| Net cash provided by investing activities | | — | | 35 | | 175 |
| **Cash Flows from Financing Activities** | | | | | | |
| Payments of short and long-term debt | | (105) | | (1) | | (575) |
| Net cash used by financing activities | | (105) | | (1) | | (575) |
| **Net (Decrease)/Increase in Cash and Cash Equivalents** | | (264) | | (131) | | 91 |
| **Cash and Cash Equivalents at Beginning of Period** | | 490 | | 621 | | 530 |
| **Cash and Cash Equivalents at End of Period** | $ | 226 | $ | 490 | $ | 621 |
| | | | | | | |
| **Supplemental Disclosures** | | | | | | |
| Cash paid for interest, net of amounts capitalized | $ | 176 | $ | 240 | $ | 138 |
| Cash paid for income taxes (net of refunds received) | $ | — | $ | — | $ | — |

See notes to condensed financial statements.

**GENON ENERGY, INC. (PARENT)**
**NOTES TO CONDENSED FINANCIAL STATEMENTS**

**1.    Background and Basis of Presentation**

### Background

The condensed parent company financial statements have been prepared in accordance with Rule 12-04, Schedule I of Regulation S-X, as the restricted net assets of GenOn Energy Inc.'s subsidiaries exceed 25% of the consolidated net assets of GenOn Energy, Inc. These statements should be read in conjunction with the consolidated statements and notes thereto of the Registrants.

RRI Energy (a Delaware corporation) changed its name from Reliant Energy, Inc. effective May 2009 in connection with the sale of its retail business. GenOn changed its name from RRI Energy effective December 3, 2010 in connection with the merger with Mirant. "GenOn" refers to GenOn Energy, Inc. and, except where the context indicates otherwise, its subsidiaries, after giving effect to the Mirant/RRI Merger.

### Basis of Presentation

The condensed financial statements herein are the condensed financial statements and other financial information of GenOn Energy, Inc.

Equity in income/loss of affiliates consists of earnings of direct subsidiaries of GenOn Energy, Inc. (parent).

### Cash Dividends Received

For the year ended December 31, 2015, 2014 and 2013, GenOn Energy, Inc. did not receive any cash dividends from its subsidiaries.

**Long-Term Debt**

For a discussion of GenOn Energy, Inc.'s long-term debt, see Note 10, *Debt and Capital Leases,* to the Registrants' consolidated financial statements.

Debt maturities of GenOn Energy, Inc. as of December 31, 2015 are:

|  | (In millions) |
|---|---:|
| 2016 | $      — |
| 2017 | 692 |
| 2018 | 649 |
| 2019 | — |
| 2020 | 489 |
| Total | $   1,830 |

**Commitments, Contingencies and Guarantees**

See Note 13, *Income Taxes* and Note 15, *Commitments and Contingencies* to the Registrants' consolidated financial statements for a detailed discussion of GenOn Energy, Inc.'s contingencies.

As of December 31, 2015, GenOn Energy, Inc. had $46 million of guarantees, which are included in Note 18, *Guarantees,* to the Registrants' consolidated financial statements.

**SCHEDULE II.**
**VALUATION AND**
**QUALIFYING ACCOUNTS**

**12 Months Ended**

**Dec. 31, 2015**

**Valuation and Qualifying Accounts**
**Disclosure [Line Items]**

Schedule of Valuation and Qualifying
Accounts

**SCHEDULE II. VALUATION AND QUALIFYING ACCOUNTS**
**GENON ENERGY, INC. AND SUBSIDIARIES**

**For the Years Ended December 31, 2015, 2014, and 2013**

| | Balance at Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Provision for uncollectible accounts [a]** | | | | | |
| Year Ended December 31, 2015 | $ — | $ — | $ — | $ (1) | (1) |
| Year Ended December 31, 2014 | 1 | — | — | (1) | — |
| Year Ended December 31, 2013 | 4 | — | — | (3) | 1 |
| **Income tax valuation allowance, deducted from deferred tax assets** | | | | | |
| Year Ended December 31, 2015 | $ 2,779 | $ 16 | $ — | $ (331) | $ 2,464 |
| Year Ended December 31, 2014 | 2,672 | — | 107 | — | 2,779 |
| Year Ended December 31, 2013 | 2,324 | — | 348 | — | 2,672 |

(a)   Provision for uncollectible accounts represents credit reserves for derivative contract assets.

**GenOn Americas Generation, LLC**
**[Member]**

**Valuation and Qualifying Accounts**
**Disclosure [Line Items]**

Schedule of Valuation and Qualifying
Accounts

**SCHEDULE II. VALUATION AND QUALIFYING ACCOUNTS**
**GENON AMERICAS GENERATION, LLC AND SUBSIDIARIES**

**For the Years Ended December 31, 2015, 2014, and 2013**

| | Balance at Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Provision for uncollectible accounts [a]** | | | | | |
| Year Ended December 31, 2015 | $ — | $ — | $ — | $ — | $ — |
| Year Ended December 31, 2014 | 1 | — | — | (1) | — |
| Year Ended December 31, 2013 | 4 | — | — | (3) | 1 |

(a)   Provision for uncollectible accounts represents credit reserves for derivative contract assets.

**GenOn Mid-Atlantic, LLC [Member]**
**Valuation and Qualifying Accounts**
**Disclosure [Line Items]**

Schedule of Valuation and Qualifying
Accounts

**GENON MID-ATLANTIC, LLC AND SUBSIDIARIES**

**For the Years Ended December 31, 2015, 2014, and 2013**

| | Balance at | Charged |
|---|---|---|

| | Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Provision for uncollectible accounts** [a] | | | | | |
| Year Ended December 31, 2015 | $ 2 | $ — | $ — | $ 2 | $ 4 |
| Year Ended December 31, 2014 | 3 | — | — | (1) | 2 |
| Year Ended December 31, 2013 | 4 | — | — | (1) | 3 |

(a)   Provision for uncollectible accounts represents credit reserves for derivative contract assets.

**Summary of Significant
Accounting Policies (Policies)**

**12 Months Ended**

**Dec. 31, 2015**

**Summary Of Significant
Accounting Policies [Line
Items]**

Principles of Consolidation and
Basis of Presentation

### Basis of Presentation and Principles of Consolidation

This is a combined annual report of the Registrants. The notes to the consolidated financial statements apply to the Registrants as indicated parenthetically next to each corresponding disclosure.

The Registrants' consolidated financial statements have been prepared in accordance with U.S. GAAP. The ASC, established by the FASB, is the source of authoritative U.S. GAAP to be applied by nongovernmental entities. In addition, the rules and interpretative releases of the SEC under authority of federal securities laws are also sources of authoritative U.S. GAAP for SEC registrants.

The consolidated financial statements include the Registrants' accounts and operations and those of their subsidiaries in which the Registrants have a controlling interest. All significant intercompany transactions and balances have been eliminated in consolidation. The usual condition for a controlling financial interest is ownership of a majority of the voting interests of an entity. However, a controlling financial interest may also exist through arrangements that do not involve controlling voting interests. As such, the Registrants apply the guidance of ASC 810, *Consolidations,* or ASC 810, to determine when an entity that is insufficiently capitalized or not controlled through its voting interests, referred to as a VIE, should be consolidated.

Cash and Cash Equivalents

### Cash and Cash Equivalents

Cash and cash equivalents include highly liquid investments with an original maturity of three months or less at the time of purchase.

Inventory

### Inventory

Inventory is valued at the lower of weighted average cost or market, and consists principally of fuel oil, coal and raw materials used to generate electricity or steam. The Registrants remove these inventories as they are used in the production of electricity or steam. Spare parts inventory is valued at a weighted average cost, since the Registrants expect to recover these costs in the ordinary course of business. The Registrants remove these inventories when they are used for repairs, maintenance or capital projects. Sales of inventory are classified as an operating activity in the consolidated statements of cash flows. During the year ended December 31, 2015, the Registrants recorded a lower of weighted average cost or market adjustment related to fuel oil of $19 million related to GenOn, of which $17 million relates to GenOn Americas Generation and $6 million relates to GenOn Mid-Atlantic.

Property, Plant and Equipment

### Property, Plant and Equipment

Property, plant and equipment are stated at cost; however impairment adjustments are recorded whenever events or changes in circumstances indicate that their carrying values may not be recoverable. Significant additions or improvements extending asset lives are capitalized as incurred, while repairs and maintenance that do not improve or extend the life of the respective asset are charged to expense as incurred. Depreciation is computed using the straight-line method over the estimated useful lives. Certain assets and their related accumulated depreciation amounts are adjusted for asset retirements and disposals with the resulting gain or loss included in cost of operations in the consolidated statements of operations.

Asset Impairments

### Asset Impairments

Long-lived assets that are held and used are reviewed for impairment whenever events or changes in circumstances indicate carrying values may not be recoverable. Such reviews are performed in accordance with ASC 360, *Property, Plant and Equipment*. An impairment loss is recognized if the total future estimated undiscounted cash flows expected from an asset are less than its carrying value. An impairment charge is measured by the difference between an asset's carrying amount and fair value with the difference recorded in operating costs and expenses in the statements of operations. Fair values are determined by a variety of valuation methods, including appraisals, sales prices of similar assets and present value techniques.

Intangible Assets

### Intangible Assets

Intangible assets represent contractual rights held by the Registrants. The Registrants recognize

specifically identifiable intangible assets when specific rights and contracts are acquired. As of December 31, 2015, and 2014, the Registrants' intangible assets are comprised of $SO_2$ emission allowances and $CO_2$ emission credits held for compliance with RGGI that are held-for-use and are amortized to cost of operations based on straight line or units of production basis. The following table presents the Registrants' amortization of intangible assets for each of the past three years:

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| GenOn | $ 39 | $ 38 | $ 25 |
| GenOn Americas Generation | 32 | 33 | 21 |
| GenOn Mid-Atlantic | 27 | 29 | 18 |

The following table presents estimated amortization of the Registrants' intangible assets for each of the next five years:

| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| | (In millions) | | |
| 2016 | $ 45 | $ 42 | $ 3 |
| 2017 | 2 | — | — |
| 2018 | 1 | — | — |
| 2019 | 1 | — | — |
| 2020 | 1 | — | — |

Out of Market Contracts [Policy Text Block]

### Out of Market Contracts

In connection with the NRG Merger, acquired out-of-market contracts were pushed down to the Registrants, as applicable, and primarily relate to GenOn Mid-Atlantic and REMA leases and long-term natural gas transportation and storage contracts. These out-of-market contracts are amortized to operating revenues and cost of operations, as applicable, based on the nature of the contracts and over their contractual lives. The following table presents the Registrants' amortization of out-of-market contracts for each of the past three years:

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| GenOn | $ 79 | $ 78 | $ 75 |
| GenOn Americas Generation | 28 | 28 | 28 |
| GenOn Mid-Atlantic | 28 | 28 | 28 |

The following table summarizes the estimated amortization related to the Registrants' out-of-market contracts:

| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| | (In millions) | | |
| 2016 | $ 81 | $ 28 | $ 28 |
| 2017 | 76 | 28 | 28 |
| 2018 | 71 | 28 | 28 |
| 2019 | 68 | 28 | 28 |
| 2020 | 68 | 28 | 28 |

### Income Taxes

#### Income Taxes

##### GenOn

GenOn is a wholly owned subsidiary of NRG that exists as a corporate regarded entity for income tax purposes. As a result, GenOn, NRG Americas and NRG have direct liability for the majority of the federal and state income taxes resulting from GenOn's operations. GenOn has allocated income taxes as if it were a

single consolidated taxpayer using the liability method in accordance with ASC 740, which requires that GenOn use the asset and liability method of accounting for deferred income taxes and provide deferred income taxes for all significant temporary differences.

GenOn has two categories of income tax expense or benefit - current and deferred, as follows:

• Current income tax expense or benefit consists solely of current taxes payable less applicable tax credits, and

• Deferred income tax expense or benefit is the change in the net deferred income tax asset or liability, excluding amounts charged or credited to accumulated other comprehensive income.

GenOn reports some of its revenues and expenses differently for financial statement purposes than for income tax return purposes, resulting in temporary and permanent differences between its financial statements and income tax returns. The tax effects of such temporary differences are recorded as either deferred income tax assets or deferred income tax liabilities in GenOn's consolidated balance sheets. GenOn measures its deferred income tax assets and deferred income tax liabilities using income tax rates that are currently in effect. A valuation allowance is recorded to reduce GenOn's net deferred tax assets to an amount that is more-likely-than-not to be realized.

The determination of a valuation allowance requires significant judgment as to the generation of taxable income during future periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn's past and projected pre-tax book earnings, the reversal of deferred tax liabilities and the implementation of tax planning strategies.

GenOn accounts for uncertain tax positions in accordance with ASC 740, which applies to all tax positions related to income taxes. Under ASC 740, tax benefits are recognized when it is more-likely-than-not that a tax position will be sustained upon examination by the authorities. The benefit recognized from a position that has surpassed the more-likely-than-not threshold is the largest amount of benefit that is more than 50% likely to be realized upon settlement. GenOn recognizes interest and penalties accrued related to uncertain tax benefits as a component of income tax expense.

*GenOn Americas Generation*

GenOn Americas Generation and most of its subsidiaries are limited liability companies that are treated as branches of GenOn Americas for income tax purposes. As a result, NRG Americas, GenOn and NRG have direct liability for the majority of the federal and state income taxes relating to GenOn Americas Generation's operations. Several of GenOn Americas Generation's subsidiaries exist as regarded corporate entities for income tax purposes. For the subsidiaries that continue to exist as corporate regarded entities, GenOn Americas Generation allocates current and deferred income taxes to each corporate regarded entity as if such entity were a single taxpayer utilizing the asset and liability method to account for income taxes.

GenOn Americas Generation reports some of its revenues and expenses differently for financial statement purposes than for income tax return purposes, resulting in temporary and permanent differences between its financial statements and income tax returns. The tax effects of such temporary differences are recorded as either deferred income tax assets or deferred income tax liabilities in GenOn Americas Generation's consolidated balance sheets. GenOn Americas Generation measures its deferred income tax assets and deferred income tax liabilities using income tax rates that are currently in effect. A valuation allowance is recorded to reduce GenOn Americas Generation's net deferred tax assets to an amount that is more-likely-than-not to be realized.

The determination of a valuation allowance requires significant judgment as to the generation of taxable income during future periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn Americas Generation's past and projected pre-tax book earnings, the reversal of deferred tax liabilities and the implementation of tax planning strategies.

GenOn Americas Generation accounts for uncertain tax positions in accordance with ASC 740, which applies to all tax positions related to income taxes. Under ASC 740, tax benefits are recognized when it is more-likely-than-not that a tax position will be sustained upon examination by the authorities. The benefit recognized from a position that has surpassed the more-likely-than-not threshold is the largest amount of benefit that is more than 50% likely to be realized upon settlement. GenOn Americas Generation recognizes interest and penalties accrued related to uncertain tax benefits as a component of income tax expense.

*GenOn Mid-Atlantic*

GenOn Mid-Atlantic and GenOn Mid-Atlantic's subsidiaries are limited liability companies that are

treated as branches of NRG Americas for income tax purposes. As such, GenOn, NRG Americas and NRG have direct liability for the majority of the federal and state income taxes relating to GenOn Mid-Atlantic's operations.

## Revenue Recognition

*Energy* — Both physical and financial transactions are entered into to optimize the financial performance of the Registrants' generating facilities. Electric energy revenue is recognized upon transmission to the customer. Physical transactions, or the sale of generated electricity to meet supply and demand, are recorded on a gross basis in the Registrants' consolidated statements of operations. Financial transactions, or the buying and selling of energy for trading purposes, are recorded net within operating revenues in the consolidated statements of operations in accordance with ASC 815.

*Capacity* — Capacity revenues are recognized when contractually earned, and consist of revenues billed to a third party at either the market or a negotiated contract price for making installed generation capacity available in order to satisfy system integrity and reliability requirements.

*Natural Gas Sales (GenOn and GenOn Americas Generation)* — GenOn and GenOn Americas Generation record revenues from the sales of natural gas under the accrual method. These sales are sold at market-based prices. Sales that have been delivered but not billed by period end are estimated.

## Derivative Financial Instruments

The Registrants account for derivative financial instruments under ASC 815, which requires the Registrants to record all derivatives on the balance sheet at fair value unless they qualify for a NPNS exception. Changes in the fair value of derivatives are immediately recognized in earnings.

The Registrants' primary derivative instruments are financial power and natural gas contracts, fuels purchase contracts, and other energy related commodities used to mitigate variability in earnings due to fluctuations in market prices.

Revenues and expenses on contracts that qualify for the NPNS exception are recognized when the underlying physical transaction is delivered. While these contracts are considered derivative financial instruments under ASC 815, they are not recorded at fair value, but on an accrual basis of accounting. If it is determined that a transaction designated as NPNS no longer meets the scope exception, the fair value of the related contract is recorded on the balance sheet and immediately recognized through earnings.

The Registrants' trading activities are subject to limits in accordance with the Risk Management Policy. These contracts are recognized on the balance sheet at fair value and changes in the fair value of these derivative financial instruments are recognized in earnings.

## Concentrations of Credit Risk

Financial instruments which potentially subject the Registrants to concentrations of credit risk consist primarily of accounts receivable and derivatives. Certain accounts receivable and derivative instruments are concentrated within entities engaged in the energy industry. These industry concentrations may impact the Registrants' overall exposure to credit risk, either positively or negatively, in that the customers may be similarly affected by changes in economic, industry or other conditions. Receivables and other contractual arrangements are subject to collateral requirements under the terms of enabling agreements. However, the Registrants believe that the credit risk posed by industry concentration is offset by the diversification and creditworthiness of the Registrants' customer base. See Note 4, *Fair Value of Financial Instruments,* for a further discussion of derivative concentrations.

## Fair Value of Financial Instruments

The carrying amount of cash and cash equivalents, funds deposited by counterparties, receivables, accounts payable, and accrued liabilities approximate fair value because of the short-term maturity of these instruments. See Note 4, *Fair Value of Financial Instruments*, for a further discussion of fair value of financial instruments.

## Asset Retirement Obligations

The Registrants account for their AROs in accordance with ASC 410-20, *Asset Retirement Obligations,* or ASC 410-20. Retirement obligations associated with long-lived assets included within the scope of ASC 410-20 are those for which a legal obligation exists under enacted laws, statutes, and written or oral contracts, including obligations arising under the doctrine of promissory estoppel, and for which the timing and/or method of settlement may be conditional on a future event. ASC 410-20 requires an entity to recognize the fair value of a liability for an ARO in the period in which it is incurred and a

reasonable estimate of fair value can be made.

Upon initial recognition of a liability for an ARO, the Registrants capitalize the asset retirement cost by increasing the carrying amount of the related long-lived asset by the same amount. Over time, the liability is accreted to its future value, while the capitalized cost is depreciated over the useful life of the related asset. See Note 11, *Asset Retirement Obligations,* for a further discussion of AROs.

Pensions

### Pensions (GenOn)

GenOn offers pension benefits through defined benefit pension plans. In addition, GenOn provides postretirement health and welfare benefits for certain groups of employees. GenOn accounts for pension and other postretirement benefits in accordance with ASC 715, *Compensation — Retirement Benefits.* GenOn recognizes the funded status of its defined benefit plans in the statement of financial position and records an offset for gains and losses as well as all prior service costs that have not been included as part of GenOn's net periodic benefit cost to other comprehensive income. The determination of GenOn's obligation and expenses for pension benefits is dependent on the selection of certain assumptions. These assumptions determined by management include the discount rate, the expected rate of return on plan assets and the rate of future compensation increases. GenOn's actuarial consultants determine assumptions for such items as retirement age. The assumptions used may differ materially from actual results, which may result in a significant impact to the amount of pension obligation or expense recorded by GenOn.

GenOn measures the fair value of its pension assets in accordance with ASC 820, *Fair Value Measurements and Disclosures,* or ASC 820.

On December 31, 2014, NRG merged 8 qualified pension plans into 2 separate qualified pension plans, the NRG Pension Plan for Bargained Employees and the NRG Pension Plan. The GenOn Mirant Bargaining Unit Pension Plan, GenOn First Energy Pension Plan, GenOn Duquesne Pension Plan, and GenOn REMA Pension Plan were merged into the NRG Pension Plan for Bargained Employees. The GenOn Mirant Pension Plan was merged into the NRG Pension Plan for Non-Bargained Employees and renamed the NRG Pension Plans.

Use of Estimates

### Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements, disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from these estimates.

In recording transactions and balances resulting from business operations, the Registrants use estimates based on the best information available. Estimates are used for such items as plant depreciable lives, tax provisions, actuarially determined benefit costs, the valuation of energy commodity contracts, environmental liabilities, legal costs incurred in connection with recorded loss contingencies, and assets acquired and liabilities assumed in business combinations, among others. In addition, estimates are used to test long-lived assets for impairment and to determine the fair value of impaired assets. As better information becomes available or actual amounts are determinable, the recorded estimates are revised. Consequently, operating results can be affected by revisions to prior accounting estimates.

Reclassifications

### Reclassifications

Certain prior-year amounts have been reclassified for comparative purposes. The reclassifications did not affect results from operations, net assets or cash flows.

New Accounting Pronouncements, Policy [Policy Text Block]

### Recent Accounting Developments

*ASU 2016-01* - In January 2016, the FASB issued ASU No. 2016-01, Financial Instruments - Overall (Subtopic 825-10): Recognition and Measurement of Financial Assets and Financial Liabilities, or ASU No. 2016-01. The amendments of ASU No. 2016-01 eliminate available-for-sale classification of equity investments and require that equity investments (except those accounted for under the equity method of accounting, or those that result in consolidation of the investee) to be generally measured at fair value with changes in fair value recognized in net income. Further, the amendments require that financial assets and financial liabilities to be presented separately in the notes to the financial statements, grouped by measurement category and form of financial asset. The guidance in ASU No. 2016-01 is effective for financial statements issued for fiscal years beginning after December 15, 2017, and interim periods within those annual periods. The Registrants are currently evaluating the impact of the standard on the Registrants' results of operations, cash flows and financial position.

*ASU 2015-17 —* In November 2015, the FASB issued ASU No. 2015-17, *Income Taxes (Topic 740):*

*Balance Sheet Classification of Deferred Taxes*, or ASU No. 2015-17. The amendments of ASU No. 2015-17 require that deferred tax liabilities and assets, as well as any related valuation allowance, be presented as noncurrent in a classified statement of financial position. The guidance in ASU No. 2015-17 is effective for financial statements issued for fiscal years beginning after December 15, 2016, and interim periods within those annual periods. The amendments may be applied either prospectively to all deferred tax liabilities and assets or retrospectively to all periods presented. Early adoption is permitted. The Registrants' adopted ASU No. 2015-17 for the year ended December 31, 2015 and elected to apply the amendments retrospectively. The adoption did not have any impact on the Registrants' results of operations, cash flows, or net assets.

*ASU 2015-02* — In February 2015, the FASB issued ASU No. 2015-02, *Consolidation (Topic 810): Amendments to the Consolidation Analysis*, or ASU No. 2015-02. The amendments of ASU No. 2015-02 were issued in an effort to minimize situations under previously existing guidance in which a reporting entity was required to consolidate another legal entity in which that reporting entity did not have: (1) the ability through contractual rights to act primarily on its own behalf; (2) ownership of the majority of the legal entity's voting rights; or (3) the exposure to a majority of the legal entity's economic benefits. ASU No. 2015-02 affects reporting entities that are required to evaluate whether they should consolidate certain legal entities. All legal entities are subject to reevaluation under the revised consolidation model. The guidance in ASU No. 2015-02 is effective for periods beginning after December 15, 2015. Early adoption is permitted. The Registrants adopted the standard effective January 1, 2015, and the adoption of this standard did not impact the Registrants' results of operations, cash flows or financial position.

*ASU 2014-16* — In November 2014, the FASB issued ASU No. 2014-16, *Derivatives and Hedging (Topic 815): Determining Whether the Host Contract in a Hybrid Financial Instrument Issued in the Form of a Share Is More Akin to Debt or to Equity*, or ASU No. 2014-16. The amendments of ASU No. 2014-16 clarify how U.S. GAAP should be applied in determining whether the nature of a host contract is more akin to debt or equity and in evaluating whether the economic characteristics and risks of an embedded feature are "clearly and closely related" to its host contract. The guidance in ASU No. 2014-16 is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2015. Early adoption is permitted. The Registrants adopted the standard effective January 1, 2015 and the adoption of this standard did not impact the Registrants' results of operations, cash flows or financial position.

*ASU 2014-09* — In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers (Topic 606)*, or ASU No. 2014-09. The amendments of ASU No. 2014-09 complete the joint effort between the FASB and the International Accounting Standards Board, or IASB, to develop a common revenue standard for U.S. GAAP and International Financial Reporting Standards, or IFRS, and to improve financial reporting. The guidance in ASU No. 2014-09 provides that an entity should recognize revenue to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled to in exchange for the goods or services provided and establishes the following steps to be applied by an entity: (1) identify the contract with a customer; (2) identify the performance obligations in the contract; (3) determine the transaction price; (4) allocate the transaction price to the performance obligations in the contract; and (5) recognize revenue when (or as) the entity satisfies the performance obligation. In August 2015, the FASB issued ASU 2015-14, which formally deferred the effective date by one year to make the guidance of ASU No. 2014-09 effective for annual reporting periods beginning after December 15, 2017, including interim periods therein. Early adoption is permitted, but not prior to the original effective date, which was for annual reporting periods beginning after December 15, 2016. The Registrants are currently evaluating the impact of the standard on the Registrants' results of operations, cash flows and financial position.

GenOn and GenOn Americas Generation [Member]

**Summary Of Significant Accounting Policies [Line Items]**

Funds Deposited by Counterparties

***Funds Deposited by Counterparties (GenOn and GenOn Americas Generation)***

Funds deposited by counterparties consist of cash held by GenOn as a result of collateral posting obligations from GenOn's counterparties. Some amounts are segregated into separate accounts that are not contractually restricted but, based on GenOn's intentions, are not available for the payment of general corporate obligations. Depending on market fluctuations and the settlement of the underlying contracts, GenOn will refund this collateral to the hedge counterparties pursuant to the terms and conditions of the underlying trades. Since collateral requirements fluctuate daily and GenOn cannot predict if any collateral will be held for more than twelve months, the funds deposited by counterparties are classified as a current asset on GenOn's balance sheets, with an offsetting liability for this cash collateral received within current

liabilities. Changes in funds deposited by counterparties are closely associated with GenOn's operating activities and are classified as an operating activity in GenOn's consolidated statements of cash flows.

**Project Development Costs and Capitalized Interest**

*Capitalized Interest (GenOn and GenOn Americas Generation)*

Interest incurred on funds borrowed to finance capital projects is capitalized until the project under construction is ready for its intended use. The amounts of interest capitalized were as follows:

|  | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
|  | (In millions) | | |
| GenOn | $ 5 | $ 11 | $ 21 |
| GenOn Americas Generation | 2 | 1 | 2 |

When a project is available for operations, capitalized interest and project development costs are reclassified to property, plant and equipment and depreciated on a straight-line basis over the estimated useful life of the project's related assets. Capitalized costs are charged to expense if a project is abandoned or management otherwise determines the costs to be unrecoverable.

**GenOn Americas Generation [Member]**

**Summary Of Significant Accounting Policies [Line Items]**

**Income Taxes**

*GenOn Americas Generation*

GenOn Americas Generation and most of its subsidiaries are limited liability companies that are treated as branches of GenOn Americas for income tax purposes. As a result, NRG Americas, GenOn and NRG have direct liability for the majority of the federal and state income taxes relating to GenOn Americas Generation's operations. Several of GenOn Americas Generation's subsidiaries exist as regarded corporate entities for income tax purposes. For the subsidiaries that continue to exist as corporate regarded entities, GenOn Americas Generation allocates current and deferred income taxes to each corporate regarded entity as if such entity were a single taxpayer utilizing the asset and liability method to account for income taxes.

GenOn Americas Generation reports some of its revenues and expenses differently for financial statement purposes than for income tax return purposes, resulting in temporary and permanent differences between its financial statements and income tax returns. The tax effects of such temporary differences are recorded as either deferred income tax assets or deferred income tax liabilities in GenOn Americas Generation's consolidated balance sheets. GenOn Americas Generation measures its deferred income tax assets and deferred income tax liabilities using income tax rates that are currently in effect. A valuation allowance is recorded to reduce GenOn Americas Generation's net deferred tax assets to an amount that is more-likely-than-not to be realized.

The determination of a valuation allowance requires significant judgment as to the generation of taxable income during future periods in which those temporary differences are deductible. In making this determination, management considers all available positive and negative evidence affecting specific deferred tax assets, including GenOn Americas Generation's past and projected pre-tax book earnings, the reversal of deferred tax liabilities and the implementation of tax planning strategies.

GenOn Americas Generation accounts for uncertain tax positions in accordance with ASC 740, which applies to all tax positions related to income taxes. Under ASC 740, tax benefits are recognized when it is more-likely-than-not that a tax position will be sustained upon examination by the authorities. The benefit recognized from a position that has surpassed the more-likely-than-not threshold is the largest amount of benefit that is more than 50% likely to be realized upon settlement. GenOn Americas Generation recognizes interest and penalties accrued related to uncertain tax benefits as a component of income tax expense.

**GenOn Mid-Atlantic, LLC [Member]**

**Summary Of Significant Accounting Policies [Line Items]**

*GenOn Mid-Atlantic*

GenOn Mid-Atlantic and GenOn Mid-Atlantic's subsidiaries are limited liability companies that are treated as branches of NRG Americas for income tax purposes. As such, GenOn, NRG Americas and NRG have direct liability for the majority of the federal and state income taxes relating to GenOn Mid-Atlantic's operations.

**Nature of Business (Tables)**

**12 Months Ended**

**Dec. 31, 2015**

**Nature of Business [Line Items]**

Schedule of Global Generation Portfolio by Operating Segment

The following table summarizes the generation portfolio by Registrant:

|  | (In MW) | | |
|---|---|---|---|
| **Generation Type** | **GenOn** | **GenOn Americas Generation** | **GenOn Mid-Atlantic** |
| Natural gas | 10,763 | 4,118 | 1,942 |
| Coal | 5,143 | 2,433 | 2,433 |
| Oil | 1,847 | 1,434 | 308 |
| Total generation capacity | 17,753 | 7,985 | 4,683 |

| **Summary of Significant Accounting Policies Capitalized Interest (Tables)** | **12 Months Ended** |
| --- | --- |
| | **Dec. 31, 2015** |

**Summary of Significant Accounting Policies [Abstract]**

**Finite-lived Intangible Assets Amortization Expense [Table Text Block]**

The following table presents the Registrants' amortization of intangible assets for each of the past three years:

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
| --- | --- | --- | --- |
| | (In millions) | | |
| GenOn | $ 39 | $ 38 | $ 25 |
| GenOn Americas Generation | 32 | 33 | 21 |
| GenOn Mid-Atlantic | 27 | 29 | 18 |

**Schedule of Finite-Lived Intangible Assets, Future Amortization Expense [Table Text Block]**

The following table presents estimated amortization of the Registrants' intangible assets for each of the next five years:

| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
| --- | --- | --- | --- |
| | (In millions) | | |
| 2016 | $ 45 | $ 42 | $ 3 |
| 2017 | 2 | — | — |
| 2018 | 1 | — | — |
| 2019 | 1 | — | — |
| 2020 | 1 | — | — |

**Amortization of Out of Market Contracts [Table Text Block]**

The following table presents the Registrants' amortization of out-of-market contracts for each of the past three years:

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
| --- | --- | --- | --- |
| | (In millions) | | |
| GenOn | $ 79 | $ 78 | $ 75 |
| GenOn Americas Generation | 28 | 28 | 28 |
| GenOn Mid-Atlantic | 28 | 28 | 28 |

**Schedule of Out of Market Contracts, Future Amortization [Table Text Block]**

The following table summarizes the estimated amortization related to the Registrants' out-of-market contracts:

| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
| --- | --- | --- | --- |
| | (In millions) | | |
| 2016 | $ 81 | $ 28 | $ 28 |
| 2017 | 76 | 28 | 28 |
| 2018 | 71 | 28 | 28 |
| 2019 | 68 | 28 | 28 |
| 2020 | 68 | 28 | 28 |

**GenOn and GenOn Americas Generation [Member]**

**Summary of Significant Accounting Policies [Line Items]**

**Schedule of Interest Cost Incurred [Table Text Block]**

The amounts of interest capitalized were as follows:

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
| --- | --- | --- | --- |

**(In millions)**

| | | | | | |
|---|---|---|---|---|---|
| GenOn | $ | 5 | $ 11 | $ | 21 |
| GenOn Americas Generation | | 2 | 1 | | 2 |

| **Fair Value of Financial Instruments (Tables)** | **12 Months Ended**<br>**Dec. 31, 2015** |

**Fair Value, Balance Sheet Grouping, Financial Statement Captions [Line Items]**

Fair Value, by Balance Sheet Grouping [Table Text Block]

The estimated carrying values and fair values of GenOn and GenOn Americas Generation's debt are as follows:

*GenOn*

| | As of December 31, | | | |
| | 2015 | | 2014 | |
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| | (In millions) | | | |
| **Liabilities** | | | | |
| Long and short-term debt | $ 2,764 | $ 2,043 | $ 3,122 | $ 2,706 |

*GenOn*

Assets and liabilities measured and recorded at fair value on the consolidated balance sheet on a recurring basis

The following tables present assets and liabilities measured and recorded at fair value on GenOn's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

| | As of December 31, 2015 | | | |
| | Fair Value | | | |
| | Level 1 [(a)] | Level 2 [(a)] | Level 3 | Total |
| | (In millions) | | | |
| **Derivative assets:** | | | | |
| Commodity contracts | $ 192 | $ 535 | $ 2 | $ 729 |
| **Derivative liabilities:** | | | | |
| Commodity contracts | $ 157 | $ 420 | $ 14 | $ 591 |
| Other assets [(b)] | $ 14 | $ — | $ — | $ 14 |

(a)   There were no transfers during the year ended December 31, 2015, between Levels 1 and 2.

(b)   Relates to mutual funds held in a rabbi trust for non-qualified deferred compensation plans for some key and highly compensated employees.

| | As of December 31, 2014 | | | |
| | Fair Value | | | |
| | Level 1 [(a)] | Level 2 [(a)] | Level 3 | Total |
| | (In millions) | | | |
| **Derivative assets:** | | | | |
| Commodity contracts | $ 179 | $ 582 | $ 46 | $ 807 |
| **Derivative liabilities:** | | | | |
| Commodity contracts | $ 105 | $ 371 | $ 13 | $ 489 |
| Other assets [(b)] | $ 21 | $ — | $ — | $ 21 |

(a)   There were no transfers during the year ended December 31, 2014, between Levels 1 and 2.

(b)   Relates to mutual funds held in a rabbi trust for non-qualified deferred compensation plans for some key and highly compensated employees.

Derivatives and Fair Value [Text Block]

The following tables reconcile the beginning and ending balances for derivatives that are recognized at fair value in GenOn's consolidated financial statements at least annually using significant unobservable inputs for the years ended December 31, 2015, and 2014:

| For the Year Ended December 31, | |
| 2015 | 2014 |
| Fair Value Measurement Using Significant Unobservable Inputs (Level 3) | |

| | Derivatives [a] |
|---|---|
| | **(In millions)** |
| Balance as of beginning of period | $ 33 $ (4) |
| Total gains and losses (realized/unrealized) included in earnings | (40) 2 |
| Purchases | (5) 35 |
| Balance as of end of period | $ (12) $ 33 |
| The amount of the total losses for the period included in earnings attributable to the change in unrealized derivatives relating to assets still held at end of period | $ (8) $ (1) |

(a) Consists of derivatives assets and liabilities, net.

**Fair Value Inputs, Assets, Quantitative Information [Table Text Block]**

The following tables quantify the significant unobservable inputs used in developing the fair value of the Registrants' Level 3 positions as of December 31, 2015, and December 31, 2014:

*GenOn*

| | Significant Unobservable Inputs | | | | | | |
|---|---|---|---|---|---|---|---|
| | **December 31, 2015** | | | | | | |
| | **Fair Value** | | | | **Input/Range** | | |
| | **Assets** | **Liabilities** | **Valuation Technique** | **Significant Unobservable Input** | **Low** | **High** | **Weighted Average** |
| | | | | **(In millions)** | | | |
| Power Contracts | $ 1 | $ — | Discounted Cash Flow | Forward Market Price (per MWh) | $ 22 | $ 67 | $ 42 |
| Coal Contracts | — | 12 | Discounted Cash Flow | Forward Market Price (per ton) | 28 | 45 | 35 |
| FTRs | 1 | 2 | Discounted Cash Flow | Auction Prices (per MWh) | — | 3 | 1 |
| | $ 2 | $ 14 | | | | | |

| | Significant Unobservable Inputs | | | | | | |
|---|---|---|---|---|---|---|---|
| | **December 31, 2014** | | | | | | |
| | **Fair Value** | | | | **Input/Range** | | |
| | **Assets** | **Liabilities** | **Valuation Technique** | **Significant Unobservable Input** | **Low** | **High** | **Weighted Average** |
| | | | | **(In millions)** | | | |
| Power Contracts | $ 39 | $ 5 | Discounted Cash Flow | Forward Market Price (per MWh) | $ 18 | $ 68 | $ 46 |
| Coal Contracts | 3 | 1 | Discounted Cash Flow | Forward Market Price (per ton) | 53 | 56 | 54 |
| FTRs | 4 | 7 | Discounted Cash Flow | Auction Prices (per MWh) | (10) | 3 | (1) |
| | $ 46 | $ 13 | | | | | |

**Fair Value Inputs, Sensitivity Analysis [Table Text Block]**

The following table provides sensitivity of fair value measurements to increases/(decreases) in significant unobservable inputs as of December 31, 2015, and December 31, 2014:

| Significant Unobservable Input | Position | Change In Input | Impact on Fair Value Measurement |
|---|---|---|---|
| Forward Market Price Power/Coal | Buy | Increase/ (Decrease) | Higher/(Lower) |
| | | Increase/ | |

| | | | |
|---|---|---|---|
| Forward Market Price Power/Coal | Sell | (Decrease) | Lower/(Higher) |
| FTR Prices | Buy | Increase/(Decrease) | Higher/(Lower) |
| FTR Prices | Sell | Increase/(Decrease) | Lower/(Higher) |

**Schedule of credit reserve for derivative contract assets [Table Text Block]**

The Registrants' (non-performance)/credit reserves were as follows:

| | As of December 31, | |
|---|---|---|
| | 2015 | 2014 |
| | (In millions) | |
| GenOn | $ (1) | $ — |
| GenOn Americas Generation | — | — |
| GenOn Mid-Atlantic | 4 | 2 |

**Schedule of credit risk**

The following tables highlight the counterparty credit quality and the net counterparty credit exposure by industry sector. Net counterparty credit exposure is defined as the aggregate net asset position for the Registrants with counterparties where netting is permitted under the enabling agreement and includes all cash flow, mark-to-market and NPNS, and non-derivative transactions. As of December 31, 2015, the exposure is shown net of collateral held and includes amounts net of receivables or payables.

| | Net Exposure [a] (% of Total) | | |
|---|---|---|---|
| Category | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
| Financial institutions | 68% | 69% | —% |
| Utilities, energy merchants, marketers and other | 18% | 17% | —% |
| ISOs | 14% | 14% | 100% |
| Total | 100% | 100% | 100% |

| | Net Exposure [a] (% of Total) | | |
|---|---|---|---|
| Category | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
| Investment grade | 99% | 99% | 100% |
| Non-Investment grade | 1% | 1% | —% |
| Total | 100% | 100% | 100% |

(a)   Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

**GenOn Americas Generation, LLC [Member]**

**Fair Value, Balance Sheet Grouping, Financial Statement Captions [Line Items]**

Fair Value, by Balance Sheet Grouping [Table Text Block]

*GenOn Americas Generation*

| | As of December 31, | | | |
|---|---|---|---|---|
| | 2015 | | 2014 | |
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| | (In millions) | | | |
| **Liabilities** | | | | |
| Long and short-term debt | $ 752 | $ 500 | $ 929 | $ 720 |

**Assets and liabilities measured and recorded at fair value on the consolidated balance sheet on a recurring basis**

The following tables present assets and liabilities (including amounts with affiliates) measured and recorded at fair value on GenOn Americas Generation's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

| | As of December 31, 2015 |
|---|---|

| | Fair Value | | | |
|---|---|---|---|---|
| | Level 1 [a] | Level 2 [a] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 285 | $ 796 | $ 15 | $ 1,096 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 170 | $ 735 | $ 14 | $ 919 |

(a)   There were no transfers during the year ended December 31, 2015, between Levels 1 and 2.

| | As of December 31, 2014 | | | |
|---|---|---|---|---|
| | Fair Value | | | |
| | Level 1 [a] | Level 2 [a] | Level 3 | Total |
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 208 | $ 848 | $ 52 | $ 1,108 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 137 | $ 640 | $ 32 | $ 809 |

(a)   There were no transfers during the year ended December 31, 2014, between Levels 1 and 2.

Reconciliation of beginning and ending balances for financial instruments that are recognized at fair value in the consolidated financial statements at least annually using significant unobservable inputs

The following tables reconcile the beginning and ending balances for GenOn Americas Generation's derivatives that are recognized at fair value in the consolidated financial statements at least annually using significant unobservable inputs for the years ended December 31, 2015, and 2014:

| | For the Year Ended December 31, | |
|---|---|---|
| | 2015 | 2014 |
| | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) | |
| | Derivatives [a] | |
| | (In millions) | |
| Balance as of beginning of period | $ 20 | $ (1) |
| Total gains and losses (realized/unrealized) included in earnings | (20) | 1 |
| Purchases | 1 | 20 |
| Balance as of end of period | $ 1 | $ 20 |

(a)   Consists of derivatives assets and liabilities, net.

Fair Value Inputs, Assets, Quantitative Information [Table Text Block]

*GenOn Americas Generation*

| | Significant Unobservable Inputs | | | | | | |
|---|---|---|---|---|---|---|---|
| | December 31, 2015 | | | | | | |
| | Fair Value | | | | Input/Range | | |
| | Assets | Liabilities | Valuation Technique | Significant Unobservable Input | Low | High | Weighted Average |
| | (In millions) | | | | | | |
| Power Contracts | $ 1 | $ — | Discounted Cash Flow | Forward Market Price (per MWh) | $ 22 | $ 67 | $ 42 |
| Coal Contracts | 12 | 12 | Discounted Cash Flow | Forward Market Price (per ton) | 28 | 45 | 35 |
| FTRs | 2 | 2 | Discounted Cash Flow | Auction Prices (per MWh) | — | 3 | 1 |
| | $ 15 | $ 14 | | | | | |

| | Significant Unobservable Inputs | | |

December 31, 2014

| | Fair Value | | | | Input/Range | | |
| | Assets | Liabilities | Valuation Technique | Significant Unobservable Input | Low | High | Weighted Average |
|---|---|---|---|---|---|---|---|
| | | | | (In millions) | | | |
| Power Contracts | $ 39 | $ 18 | Discounted Cash Flow | Forward Market Price (per MWh) | $ 18 | $ 68 | $ 46 |
| Coal Contracts | 3 | 3 | Discounted Cash Flow | Forward Market Price (per ton) | 53 | 56 | 54 |
| FTRs | 10 | 11 | Discounted Cash Flow | Auction Prices (per MWh) | (1) | 1 | — |
| | $ 52 | $ 32 | | | | | |

**GenOn Mid-Atlantic, LLC [Member]**

**Fair Value, Balance Sheet Grouping, Financial Statement Captions [Line Items]**

Assets and liabilities measured and recorded at fair value on the consolidated balance sheet on a recurring basis

*GenOn Mid-Atlantic*

The following tables present assets and liabilities (including amounts with affiliates) measured and recorded at fair value on GenOn Mid-Atlantic's consolidated balance sheet on a recurring basis and their level within the fair value hierarchy:

| | As of December 31, 2015 | | | |
| | Fair Value | | | |
| | Level 1 [(a)] | Level 2 [(a)] | Level 3 | Total |
|---|---|---|---|---|
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 175 | $ 175 | $ 2 | $ 352 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 58 | $ 137 | $ — | $ 195 |

(a)   There were no transfers during the year ended December 31, 2015, between Levels 1 and 2.

| | As of December 31, 2014 | | | |
| | Fair Value | | | |
| | Level 1 [(a)] | Level 2 [(a)] | Level 3 | Total |
|---|---|---|---|---|
| | (In millions) | | | |
| Derivative assets: | | | | |
| Commodity contracts | $ 145 | $ 211 | $ 26 | $ 382 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 71 | $ 73 | $ 6 | $ 150 |

(a)   There were no transfers during the year ended December 31, 2014, between Levels 1 and 2.

Reconciliation of beginning and ending balances for financial instruments that are recognized at fair value in the consolidated financial statements at least annually using significant unobservable inputs

The following tables reconcile the beginning and ending balances for GenOn Mid-Atlantic's derivatives that are recognized at fair value in the consolidated financial statements at least annually using significant unobservable inputs for the years ended December 31, 2015, and 2014:

| | For the Year Ended December 31, | |
| | 2015 | 2014 |
|---|---|---|
| | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) | |
| | Derivatives [(a)] | |
| | (In millions) | |
| Balance as of beginning of period | $ 20 | $ — |
| Total gains and losses (realized/unrealized) included in earnings | (20) | — |

| | | | |
|---|---|---:|---:|
| Purchases | | 2 | 20 |
| Balance as of end of period | | $ 2 | $ 20 |

(a) Consists of derivatives assets and liabilities, net.

**Fair Value Inputs, Assets, Quantitative Information [Table Text Block]**

*GenOn Mid-Atlantic*

| | Significant Unobservable Inputs | | | | | | |
|---|---|---|---|---|---|---|---|
| | **December 31, 2015** | | | | | | |
| | **Fair Value** | | | | **Input/Range** | | |
| | **Assets** | **Liabilities** | **Valuation Technique** | **Significant Unobservable Input** | **Low** | **High** | **Weighted Average** |
| | | | | **(In millions)** | | | |
| Power Contracts | $ 2 | $ — | Discounted Cash Flow | Forward Market Price (per MWh) | $ 22 | $ 67 | $ 42 |
| | $ 2 | $ — | | | | | |

| | Significant Unobservable Inputs | | | | | | |
|---|---|---|---|---|---|---|---|
| | **December 31, 2014** | | | | | | |
| | **Fair Value** | | | | **Input/Range** | | |
| | **Assets** | **Liabilities** | **Valuation Technique** | **Significant Unobservable Input** | **Low** | **High** | **Weighted Average** |
| | | | | **(In millions)** | | | |
| Power Contracts | $ 26 | $ 5 | Discounted Cash Flow | Forward Market Price (per MWh) | $ 24 | $ 68 | $ 47 |
| FTRs | — | 1 | Discounted Cash Flow | Auction Prices (per MWh) | (1) | 1 | — |
| | $ 26 | $ 6 | | | | | |

**Accounting for Derivative Instruments and Hedging Activities (Tables)**

**12 Months Ended**

**Dec. 31, 2015**

**Derivatives, Fair Value [Line Items]**

Disclosure of net notional volume buy/(sell) of entity derivative transactions

The following table summarizes the net notional volume buy/(sell) of the Registrants' open derivative transactions broken out by commodity, excluding those derivatives that qualified for the NPNS exception as of December 31, 2015, and December 31, 2014. Option contracts are reflected using delta volume. Delta volume equals the notional volume of an option adjusted for the probability that the option will be in-the-money at its expiration date.

| | | GenOn | | GenOn Americas Generation | | GenOn Mid-Atlantic | |
|---|---|---|---|---|---|---|---|
| | | Total Volume | | Total Volume | | Total Volume | |
| | | As of December 31, | | As of December 31, | | As of December 31, | |
| | | 2015 | 2014 | 2015 | 2014 | 2015 | 2014 |
| Commodity | Units | (In millions) | (In millions) | (In millions) | (In millions) | (In millions) | (In millions) |
| Coal | Short Ton | 7 | 8 | 3 | 5 | 3 | 5 |
| Natural Gas | MMBtu | 191 | (21) | 2 | (74) | (10) | (79) |
| Power | MWh | (49) | (36) | (20) | (16) | (18) | (15) |

Schedule of derivative instruments in Statement of Financial Position, fair value

The following tables summarize the fair value within the derivative instrument valuation on the balance sheet:

*GenOn*

| | Fair Value | | | |
|---|---|---|---|---|
| | Derivative Assets | | Derivative Liabilities | |
| | December 31, 2015 | December 31, 2014 | December 31, 2015 | December 31, 2014 |
| | (In millions) | | (In millions) | |
| **Derivatives Not Designated as Cash Flow Hedges:** | | | | |
| Commodity contracts current | $ 574 | $ 602 | $ 475 | $ 417 |
| Commodity contracts long-term | 155 | 205 | 116 | 72 |
| **Total Derivatives Not Designated as Cash Flow Hedges** | $ 729 | $ 807 | $ 591 | $ 489 |

Schedule of Derivative Instruments in Statement of Financial Position, Fair Value [Table Text Block]

The following tables summarize the offsetting of derivatives by counterparty master agreement level and collateral received or paid:

*GenOn*

| | | Gross Amounts Not Offset in the Statement of Financial Position | | |
|---|---|---|---|---|
| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
| December 31, 2015 | (in millions) | | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $ 698 | $ (485) | $ (51) | $ 162 |
| Derivative assets- affiliate | 31 | (24) | — | 7 |
| Derivative liabilities | (567) | 485 | — | (82) |
| Derivative liabilities- affiliate | (24) | 24 | — | — |
| **Total derivative instruments** | $ 138 | $ — | $ (51) | $ 87 |

| | Gross Amounts Not Offset in the Statement of Financial Position | | |
|---|---|---|---|
| | Gross Amounts of Recognized | Derivative | Cash Collateral |

| | Assets/Liabilities | Instruments | (Held)/Posted | Net Amount |
|---|---|---|---|---|
| | | (in millions) | | |
| **December 31, 2014** | | | | |
| **Commodity Contracts:** | | | | |
| Derivative assets | $ 786 | $ (425) | $ (54) | $ 307 |
| Derivative assets- affiliate | 21 | (21) | — | — |
| Derivative liabilities | (451) | 425 | — | (26) |
| Derivative liabilities- affiliate | (38) | 21 | 17 | — |
| **Total derivative instruments** | $ 318 | $ — | $ (37) | $ 281 |

*GenOn Americas Generation*

| | Gross Amounts Not Offset in the Statement of Financial Position | | | |
|---|---|---|---|---|
| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
| **December 31, 2015** | | | | |
| **Commodity Contracts:** | | (in millions) | | |
| Derivative assets | $ 699 | $ (485) | $ (51) | $ 163 |
| Derivative assets- affiliate | 397 | (352) | — | 45 |
| Derivative liabilities | (567) | 485 | — | (82) |
| Derivative liabilities- affiliate | (352) | 352 | — | — |
| **Total derivative instruments** | $ 177 | $ — | $ (51) | $ 126 |

| | Gross Amounts Not Offset in the Statement of Financial Position | | | |
|---|---|---|---|---|
| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
| **December 31, 2014** | | | | |
| **Commodity Contracts:** | | (in millions) | | |
| Derivative assets | $ 787 | $ (425) | $ (54) | $ 308 |
| Derivative assets- affiliate | 321 | (321) | — | — |
| Derivative liabilities | (451) | 425 | — | (26) |
| Derivative liabilities- affiliate | (358) | 321 | 17 | (20) |
| **Total derivative instruments** | $ 299 | $ — | $ (37) | $ 262 |

*GenOn Mid-Atlantic*

| | Gross Amounts Not Offset in the Statement of Financial Position | | | |
|---|---|---|---|---|
| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
| **December 31, 2015** | | | | |
| **Commodity Contracts:** | | (in millions) | | |
| Derivative assets- affiliate | 352 | (195) | — | 157 |
| Derivative liabilities- affiliate | (195) | 195 | — | — |
| **Total derivative instruments** | $ 157 | $ — | $ — | $ 157 |

| | Gross Amounts Not Offset in the Statement of Financial Position | | | |
|---|---|---|---|---|
| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
| **December 31, 2014** | | | | |
| **Commodity Contracts:** | | (in millions) | | |
| Derivative assets | $ 100 | $ — | $ — | $ 100 |
| Derivative assets- affiliate | 282 | (149) | — | 133 |
| Derivative liabilities | (1) | — | — | (1) |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Derivative liabilities- affiliate | | (149) | | 149 | | | — |
| **Total derivative instruments** | $ | 232 | $ | — | $ | — | $ 232 |

Schedule of cash flow hedge OCI activity

The following table summarizes the effects on GenOn's accumulated OCI balance attributable to cash flow hedge derivatives, net of tax of zero dollars:

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| Accumulated OCI balance, beginning of period | $ — | $ — | $ 1 |
| Recognized in OCI on interest rate derivatives | — | — | 19 |
| Reclassified from accumulated OCI into earnings[a][b] | — | — | (2) |
| Reversal as part of sale to NRG Yield LLC[c] | — | — | (18) |
| Accumulated OCI balance, end of period | $ — | $ — | $ — |

(a) Amounts reclassified from accumulated OCI into income and amounts recognized in income from the ineffective portion of cash flow hedges are recorded in interest expense.

(b) All of the forecasted transactions (future interest payments) were deemed probable of occurring; therefore, no cash flow hedges were discontinued and no amount was recognized in GenOn's results of operations as a result of discontinued cash flow hedges.

(c) The reversal of accumulated OCI as part of the sale of NRG Marsh Landing to NRG Yield LLC resulted in the recognition of additional paid in capital.

Disclosure of pre-tax effects of economic hedges included in operating revenues and cost of operations

The following tables summarize the pre-tax effects of economic hedges and trading activity on the Registrants' statements of operations. These amounts are included within operating revenues and cost of operations.

*GenOn*

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| **Unrealized mark-to-market results** | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (198) | $ (314) | $ (367) |
| Net unrealized gains on open positions related to economic hedges | 18 | 167 | 40 |
| Total unrealized mark-to-market losses for economic hedging activities | (180) | (147) | (327) |
| Reversal of previously recognized unrealized gains on settled positions related to trading activity | — | (1) | (1) |
| Net unrealized gains on open positions related to trading activity | — | — | 1 |
| Total unrealized mark-to-market losses for trading activity | — | (1) | — |
| **Total unrealized losses** | $ (180) | $ (148) | $ (327) |

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| Revenue from operations — energy commodities | $ (112) | $ (151) | $ (356) |
| Cost of operations | (68) | 3 | 29 |
| **Total impact to statement of operations** | $ (180) | $ (148) | $ (327) |

GenOn Americas Generation, LLC [Member]

**Derivatives, Fair Value [Line Items]**

Schedule of derivative instruments in *GenOn Americas Generation*

Statement of Financial Position, fair value

| | Fair Value | | | |
| | Derivative Assets | | Derivative Liabilities | |
| | December 31, 2015 | December 31, 2014 | December 31, 2015 | December 31, 2014 |
| | (In millions) | | (In millions) | |
|---|---|---|---|---|
| **Derivatives Not Designated as Cash Flow Hedges:** | | | | |
| Commodity contracts current | $ 861 | $ 852 | $ 737 | $ 674 |
| Commodity contracts long-term | 235 | 256 | 182 | 135 |
| **Total Derivatives Not Designated as Cash Flow Hedges** | $ 1,096 | $ 1,108 | $ 919 | $ 809 |

Disclosure of pre-tax effects of economic hedges included in operating revenues and cost of operations

*GenOn Americas Generation*

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
| | (In millions) | | |
|---|---|---|---|
| **Unrealized mark-to-market results** | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (193) | $ (288) | $ (296) |
| Net unrealized gains on open positions related to economic hedges | 70 | 164 | 25 |
| Total unrealized mark-to-market losses for economic hedging activities | (123) | (124) | (271) |
| Reversal of previously recognized unrealized gains on settled positions related to trading activity | — | (1) | (1) |
| Net unrealized gains on open positions related to trading activity | — | — | 1 |
| Total unrealized mark-to-market losses for trading activity | — | (1) | — |
| **Total unrealized losses** | $ (123) | $ (125) | $ (271) |

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
| | (In millions) | | |
|---|---|---|---|
| Revenue from operations — energy commodities | $ (66) | $ (119) | $ (302) |
| Cost of operations | (57) | (6) | 31 |
| **Total impact to statement of operations** | $ (123) | $ (125) | $ (271) |

GenOn Mid-Atlantic, LLC [Member]

**Derivatives, Fair Value [Line Items]**

Schedule of derivative instruments in Statement of Financial Position, fair value

*GenOn Mid-Atlantic*

| | Fair Value | | | |
| | Derivative Assets | | Derivative Liabilities | |
| | December 31, 2015 | December 31, 2014 | December 31, 2015 | December 31, 2014 |
| | (In millions) | | (In millions) | |
|---|---|---|---|---|
| **Derivatives Not Designated as Cash Flow Hedges:** | | | | |
| Commodity contracts current | $ 269 | $ 241 | $ 163 | $ 128 |
| Commodity contracts long-term | 83 | 141 | 32 | 22 |
| **Total Derivatives Not Designated as Cash Flow Hedges** | $ 352 | $ 382 | $ 195 | $ 150 |

*GenOn Mid-Atlantic*

**Disclosure of pre-tax effects of economic hedges included in operating revenues and cost of operations**

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | | (In millions) | |
| **Unrealized mark-to-market results** | | | |
| Reversal of previously recognized unrealized gains on settled positions related to economic hedges | $ (116) | $ (288) | $ (296) |
| Net unrealized gains on open positions related to economic hedges | 39 | 90 | 35 |
| **Total unrealized losses** | $ (77) | $ (198) | $ (261) |

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | | (In millions) | |
| Revenue from operations — energy commodities | $ (27) | $ (192) | $ (292) |
| Cost of operations | (50) | (6) | 31 |
| **Total impact to statement of operations** | $ (77) | $ (198) | $ (261) |

**Inventory (Tables)**

**12 Months Ended**
**Dec. 31, 2015**

Genon [Member]
**Inventory [Line Items]**
Schedule of inventory

Inventory consisted of:

*GenOn*

| | As of December 31, | | | |
|---|---|---|---|---|
| | **2015** | | **2014** | |
| | (In millions) | | | |
| Fuel oil | $ | 161 | $ | 211 |
| Coal | | 154 | | 162 |
| Spare parts | | 127 | | 129 |
| Other | | 6 | | 5 |
| Total Inventory | $ | 448 | $ | 507 |

GenOn Americas Generation, LLC [Member]
**Inventory [Line Items]**
Schedule of inventory

*GenOn Americas Generation*

| | As of December 31, | | | |
|---|---|---|---|---|
| | **2015** | | **2014** | |
| | (In millions) | | | |
| Fuel oil | $ | 134 | $ | 181 |
| Coal | | 97 | | 82 |
| Spare parts | | 57 | | 54 |
| Other | | 1 | | 1 |
| Total Inventory | $ | 289 | $ | 318 |

During the year ended December 31, 2015, GenOn Americas Generation recorded a lower of weighted average cost or market adjustment related to fuel oil of $17 million.

GenOn Mid-Atlantic, LLC [Member]
**Inventory [Line Items]**
Schedule of inventory

*GenOn Mid-Atlantic*

| | As of December 31, | | | |
|---|---|---|---|---|
| | **2015** | | **2014** | |
| | (In millions) | | | |
| Fuel oil | $ | 33 | $ | 45 |
| Coal | | 97 | | 82 |
| Spare parts | | 41 | | 38 |
| Other | | 1 | | 1 |
| Total Inventory | $ | 172 | $ | 166 |

During the year ended December 31, 2015, GenOn Mid-Atlantic recorded a lower of weighted average cost or market adjustment related to fuel oil of $6 million.

| Property, Plant, and Equipment (Tables) | 12 Months Ended Dec. 31, 2015 |
|---|---|

**Genon [Member]**

**Property, Plant and Equipment [Line Items]**

Schedule of major classes of property, plant, and equipment

Major classes of property, plant, and equipment were as follows:

*GenOn*

| | As of December 31, | | Depreciable Lives |
|---|---|---|---|
| | **2015** | **2014** | |
| | (In millions) | | |
| Facilities and equipment | $ 2,989 | $ 3,048 | 2 - 34 Years |
| Land and improvements | 292 | 293 | |
| Construction in progress | 164 | 140 | |
| Total property, plant and equipment | 3,445 | 3,481 | |
| Accumulated depreciation | (614) | (436) | |
| Net property, plant and equipment | $ 2,831 | $ 3,045 | |

**GenOn Americas Generation, LLC [Member]**

**Property, Plant and Equipment [Line Items]**

Schedule of major classes of property, plant, and equipment

*GenOn Americas Generation*

| | As of December 31, | | Depreciable Lives |
|---|---|---|---|
| | **2015** | **2014** | |
| | (In millions) | | |
| Facilities and equipment | $ 1,192 | $ 1,123 | 2 - 34 Years |
| Land and improvements | 139 | 127 | |
| Construction in progress | 29 | 30 | |
| Total property, plant and equipment | 1,360 | 1,280 | |
| Accumulated depreciation | (244) | (170) | |
| Net property, plant and equipment | $ 1,116 | $ 1,110 | |

**GenOn Mid-Atlantic, LLC [Member]**

**Property, Plant and Equipment [Line Items]**

Schedule of major classes of property, plant, and equipment

*GenOn Mid-Atlantic*

| | As of December 31, | | Depreciable Lives |
|---|---|---|---|
| | **2015** | **2014** | |
| | (In millions) | | |
| Facilities and equipment | $ 1,037 | $ 1,014 | 2 - 34 Years |
| Land and improvements | 62 | 61 | |
| Construction in progress | 26 | 18 | |
| Total property, plant and equipment | 1,125 | 1,093 | |
| Accumulated depreciation | (200) | (135) | |
| Net property, plant and equipment | $ 925 | $ 958 | |

The Registrants recorded long-lived asset impairments during 2015, as further described in Note 9, *Impairments*.

**Retirements, Mothballing or Long-Term Protective Layup of Generating Facilities Plants Deactivated (Tables)**

**12 Months Ended**

**Dec. 31, 2015**

**Property, Plant and Equipment [Abstract]**

**Schedule of Deactivated Plants [Table Text Block]**

GenOn deactivated the following coal and natural gas units at the referenced times:

| Facility or Unit | Fuel-type | Net Generation Capacity (MW) | Deactivation Date |
|---|---|---|---|
| Shawville Units 1, 2, 3 and 4 [a] | Coal | 597 | May 2015 |
| Gilbert CT Units 1, 2, 3 and 4 | Natural Gas | 98 | May 2015 |
| Glen Gardner Facility | Natural Gas | 160 | May 2015 |
| Werner Facility | Oil | 212 | May 2015 |
| Osceola Facility | Natural Gas | 463 | January 2015 |
| Coolwater Facility | Natural Gas | 636 | January 2015 |
| Portland Units 1 and 2 | Coal | 401 | June 2014 |
| Titus Coal Units | Coal | 245 | September 2013 |

**Schedule of Plants to be Deactivated [Table Text Block]**

GenOn plans on deactivating the following coal units at the referenced times:

| Facility or Unit | Fuel-type | Net Generation Capacity (MW) | Expected Deactivation Date |
|---|---|---|---|
| Avon Lake Unit 7 | Coal | 94 | April 2016 |

**Debt and Capital Leases
(Tables)**

**12 Months Ended**

**Dec. 31, 2015**

**Debt and Capital Leases [Line Items]**

Long-term debt and capital leases

Long-term debt and capital leases consisted of the following:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | **2015** | **2014** | **Interest Rate %** |
| | (In millions, except rates) | | |
| **GenOn Mid-Atlantic:** | | | |
| Chalk Point capital lease, due 2015 | $ — | $ 5 | 8.190 |
| Subtotal GenOn Mid-Atlantic | — | 5 | |
| **GenOn Americas Generation:** | | | |
| Senior unsecured notes, due 2021 | 398 | 496 | 8.500 |
| Senior unsecured notes, due 2031 | 354 | 433 | 9.125 |
| Subtotal GenOn Americas Generation [a] | 752 | 929 | |
| **GenOn Energy:** | | | |
| Senior unsecured notes, due 2017 | 714 | 766 | 7.875 |
| Senior unsecured notes, due 2018 | 708 | 757 | 9.500 |
| Senior unsecured notes, due 2020 | 534 | 610 | 9.875 |
| Other [b] | 56 | 60 | |
| GenOn capital lease | 2 | 3 | |
| Subtotal GenOn Energy | 2,014 | 2,196 | |
| Subtotal | 2,766 | 3,130 | |
| Less current maturities | 4 | 10 | |
| Total long-term debt and capital leases | $ 2,762 | $ 3,120 | |

(a) This amount excludes GenOn Mid-Atlantic.

(b) The Long Term Service Agreement for the Hunterstown facility is accounted for as a debt financing liability in accordance with U.S. GAAP.

Long-term debt includes the following premiums:

| | As of December 31, | |
| --- | --- | --- |
| | **2015** | **2014** |
| | (In millions) | |
| **GenOn Americas Generation:** | | |
| Senior unsecured notes, due 2021 | $ 32 | $ 46 |
| Senior unsecured notes, due 2031 | 25 | 33 |
| **GenOn Energy:** | | |
| Senior unsecured notes, due 2017 | 23 | 41 |
| Senior unsecured notes, due 2018 | 59 | 83 |
| Senior unsecured notes, due 2020 | 44 | 60 |
| Total premium | $ 183 | $ 263 |

Schedule of Maturities of Long-term Debt [Table Text Block]

Annual payments based on the maturities of GenOn's debt and capital leases for the years ending after December 31, 2015, are as follows:

| | (In millions) |
| --- | --- |
| 2016 | $ 4 |
| 2017 | 696 |
| 2018 | 653 |
| 2019 | 4 |
| 2020 | 494 |
| Thereafter | 732 |
| Total | $ 2,583 |

Senior Unsecured Notes 2020 [Member]

**Debt and Capital Leases [Line Items]**

Notes redemption period and redemption prices as percentage of principal amount

GenOn may redeem some or all of the senior notes due 2020 at redemption prices expressed as percentages of principal amount as set forth in the following table, plus accrued and unpaid interest on the notes redeemed to the first applicable redemption rate:

| Redemption Period | Redemption Percentage |
|---|---|
| October 15, 2015 to October 14, 2016 | 104.938% |
| October 15, 2016 to October 14, 2017 | 103.292% |
| October 15, 2017 to October 14, 2018 | 101.646% |
| October 15, 2018 and thereafter | 100.000% |

GenOn Americas Generation, LLC Parent Company [Member]

**Debt and Capital Leases [Line Items]**

Schedule of Maturities of Long-term Debt [Table Text Block]

Debt maturities of GenOn Americas Generation, LLC as of December 31, 2015 are:

| | (In millions) |
|---|---|
| 2021 and thereafter | 695 |
| Total | $    695 |

GenOn Energy, Inc. Parent Company [Member]

**Debt and Capital Leases [Line Items]**

Schedule of Maturities of Long-term Debt [Table Text Block]

Debt maturities of GenOn Energy, Inc. as of December 31, 2015 are:

| | (In millions) |
|---|---|
| 2016 | $    — |
| 2017 | 692 |
| 2018 | 649 |
| 2019 | — |
| 2020 | 489 |
| Total | $    1,830 |

GenOn Americas Generation, LLC [Member]

**Debt and Capital Leases [Line Items]**

Schedule of Maturities of Long-term Debt [Table Text Block]

Annual payments based on the maturities of GenOn Americas Generation's debt for the years ending after December 31, 2015, are as follows:

| | (In millions) |
|---|---|
| 2016 | $    — |
| 2017 | — |
| 2018 | — |
| 2019 | — |
| 2020 | — |
| Thereafter | 695 |
| Total | $    695 |

**Asset Retirement Obligations (Tables)**

**12 Months Ended**

**Dec. 31, 2015**

**Asset Retirement Obligation Disclosure [Abstract]**

Schedule of Change in Asset Retirement Obligation [Table Text Block]

The following table represents the balance of ARO obligations as of December 31, 2014, along with the additions, reductions and accretion related to the Registrants' ARO obligations for the year ended December 31, 2015:

| | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
| | | (In millions) | |
| **Balance as of December 31, 2014** | $ 172 | $ 78 | $ 26 |
| Additions | 7 | 1 | — |
| Revisions in estimates for current obligations | (4) | (2) | (1) |
| Spending for current obligations and other settlements | (2) | — | — |
| Accretion — expense | 14 | 5 | 2 |
| **Balance as of December 31, 2015** | $ 187 | $ 82 | $ 27 |

**Benefit Plans and Other Postretirement Benefits Disclosure (Tables)**

**12 Months Ended**

**Dec. 31, 2015**

**Benefit Plans and Other Postretirement Benefits Disclosure [Abstract]**

Schedule of Defined Benefit Plans Disclosures

A comparison of the pension benefit obligation, other postretirement benefit obligations and related plan assets for GenOn plans on a combined basis is as follows:

| | Tax-Qualified Pension Benefits | | Non-Tax-Qualified Pension Benefits | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, | | Year Ended December 31, | |
| | 2015 | 2014 | 2015 | 2014 |
| | (In millions) | | (In millions) | |
| Benefit obligation at beginning of period | $ 660 | $ 546 | $ — | $ 12 |
| Service cost | 10 | 10 | — | — |
| Interest cost | 27 | 27 | — | — |
| Actuarial (gain)/loss | (33) | 103 | — | — |
| Benefit payments | (39) | (26) | — | (12) |
| Benefit obligation at end of period | 625 | 660 | — | — |
| Fair value of plan assets at beginning of period | 548 | 469 | — | — |
| Actual return on plan assets | (17) | 49 | — | — |
| Employer contributions | 14 | 56 | — | 12 |
| Benefit payments | (39) | (26) | — | (12) |
| Fair value of plan assets at end of period | 506 | 548 | — | — |
| Funded status at end of period — excess of obligation over assets | $ (119) | $ (112) | $ — | $ — |

| | Other Postretirement Benefits | |
| --- | --- | --- |
| | Year Ended December 31, | |
| | 2015 | 2014 |
| | (In millions) | |
| Benefit obligation at beginning of period | $ 65 | $ 73 |
| Service cost | 1 | 1 |
| Interest cost | 3 | 3 |
| Participant contributions | 1 | 2 |
| Actuarial (gain)/loss | (8) | 12 |
| Benefit payments | (7) | (8) |
| Plan amendments | (1) | (18) |
| Benefit obligation at end of period | 54 | 65 |
| Fair value of plan assets at beginning of period | — | — |
| Employer contributions | 6 | 6 |
| Participant contributions | 1 | 2 |
| Benefit payments | (7) | (8) |
| Fair value of plan assets at end of period | — | — |
| Funded status at end of period — excess of obligation over assets | $ (54) | $ (65) |

Net annual periodic pension cost related to GenOn's domestic pension and other

The net periodic pension (credit)/cost related to GenOn's pension and other postretirement benefit plans include the following components:

postretirement benefit plans

| | Pension Benefits | | |
|---|---|---|---|
| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
| | (In millions) | | |
| Service cost benefits earned | $ 10 | $ 10 | $ 13 |
| Interest cost on benefit obligation | 27 | 27 | 25 |
| Expected return on plan assets | (35) | (34) | (31) |
| Amortization of unrecognized net loss/(gain) | 1 | (6) | — |
| Net periodic benefit cost/(credit) | $ 3 | $ (3) | $ 7 |

| | Other Postretirement Benefits | | |
|---|---|---|---|
| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
| | (In millions) | | |
| Service cost benefits earned | $ 1 | $ 1 | $ 1 |
| Interest cost on benefit obligation | 3 | 3 | 3 |
| Amortization of unrecognized prior service credit | (4) | (17) | (1) |
| Net periodic benefit (credit)/cost | $ — | $ (13) | $ 3 |

**Amounts recognized in GenOn's balance sheets**

Amounts recognized in GenOn's balance sheets were as follows:

| | Tax-Qualified Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | As of December 31, | | As of December 31, | |
| | 2015 | 2014 | 2015 | 2014 |
| | (In millions) | | (In millions) | |
| Current liabilities | $ — | $ — | $ (5) | $ (5) |
| Non-current liabilities | (119) | (112) | (49) | (60) |

**Amounts recognized in GenOn's accumulated other comprehensive income that have not yet been recognized as components of net periodic benefit cost**

Amounts recognized in GenOn's OCI and accumulated other comprehensive income/loss for the pension and other postretirement benefit plans were as follows:

| | Tax-Qualified Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | Net Actuarial (Loss) Gain | Prior Service Cost | Net Actuarial (Loss) Gain | Prior Service Cost |
| | (In millions) | | | |
| Balance as of December 31, 2013 | $ 92 | $ (1) | $ 7 | $ 4 |
| Unrealized (loss)/gain | (87) | — | (12) | 18 |
| Amortization of net actuarial loss | (6) | — | — | — |
| Amortization of prior service cost | — | — | — | (17) |
| Total recognized in OCI for the period | (93) | — | (12) | 1 |
| Balance as of December 31, 2014 | $ (1) | $ (1) | $ (5) | $ 5 |
| Unrealized (loss)/gain | $ (20) | $ — | $ 8 | $ 1 |
| Amortization of net actuarial gain | 1 | — | — | — |
| Amortization of prior service cost | — | — | — | (4) |
| Total recognized in OCI for the period | (19) | — | 8 | (3) |
| Balance as of December 31, 2015 | $ (20) | $ (1) | $ 3 | $ 2 |

**Fair values of the Company's pension plan assets**

GenOn's market-related value of its plan assets is the fair value of the assets. The fair values of GenOn's pension plan assets by asset category and their level within the

fair value hierarchy are as follows:

| | Fair Value Measurements as of December 31, 2015 | | |
|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Observable Inputs (Level 2) | Total |
| | (In millions) | | |
| Common/collective trust investment — U.S. equity | $ — | $ 142 | $ 142 |
| Common/collective trust investment — non-U.S. equity | — | 82 | 82 |
| Common/collective trust investment — global equity | — | 49 | 49 |
| Common/collective trust investment — fixed income | — | 220 | 220 |
| Partnerships/Joint Ventures | — | 10 | 10 |
| Short-term investment fund | 3 | — | 3 |
| Total | $ 3 | $ 503 | $ 506 |

| | Fair Value Measurements as of December 31, 2014 | | |
|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Observable Inputs (Level 2) | Total |
| | (In millions) | | |
| Common/collective trust investment — U.S. equity | $ — | $ 156 | $ 156 |
| Common/collective trust investment — non-U.S. equity | — | 80 | 80 |
| Common/collective trust investment — global equity | — | 52 | 52 |
| Common/collective trust investment — fixed income | — | 246 | 246 |
| Partnerships/Joint Ventures | — | 12 | 12 |
| Short-term investment fund | 2 | — | 2 |
| Total | $ 2 | $ 546 | $ 548 |

The target allocations for GenOn's pension plan assets were as follows for the year ended December 31, 2015:

| | |
|---|---|
| U.S. equities | 27% |
| Non-U.S. equities | 15% |
| Global equities | 10% |
| Emerging market equities | 3% |
| Fixed income securities | 45% |

<u>Significant assumptions used to calculate GenOn's benefit obligations</u>

The following tables present the significant assumptions used to calculate GenOn's benefit expense/credit:

| | Pension Plans | | |
|---|---|---|---|
| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
| **Weighted–Average Assumptions** | | | |
| Discount rate | 4.18% | 5.02% | 4.22% |
| Rate of compensation increase | 2.97% | 2.91% | 2.82% |
| Expected return on plan assets | 6.41% | 7.00% | 7.50% |

**Other Postretirement Benefit Plans**

|  | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| **Weighted–Average Assumptions** | | | |
| Discount rate | 3.86% | 4.53% | 3.99% |

The following table presents the significant assumptions used to calculate GenOn's benefit obligations:

|  | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
|  | As of December 31, | | As of December 31, | |
|  | 2015 | 2014 | 2015 | 2014 |
| **Weighted–Average Assumptions** | | | | |
| Discount rate | 4.54% | 4.18% | 4.16% | 3.86% |
| Rate of compensation increase | 3.00% | 2.97% | N/A | N/A |

GenOn's assumed healthcare cost trend rates used for other postretirement benefit net periodic benefit expense/credit are:

|  | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| **Weighted–Average Assumptions** | | | |
| Assumed medical inflation for next year: | | | |
| Before age 65 | 8.60% | 8.50% | 8.50% |
| Age 65 and after | 8.10% | 8.69% | 8.67% |
| Assumed ultimate medical inflation rate | 5.00% | 5.50% | 5.50% |
| Year in which ultimate rate is reached | 2023 | 2019 | 2018 |

GenOn's assumed healthcare cost trend rates used for other postretirement benefit obligations are:

|  | Other Postretirement Benefit Plans | |
|---|---|---|
|  | As of December 31, | |
|  | 2015 | 2014 |
| **Weighted–Average Assumptions** | | |
| Assumed medical inflation for next year: | | |
| Before age 65 | 7.25% | 8.60% |
| Age 65 and after | 9.00% | 8.10% |
| Assumed ultimate medical inflation rate | 5.00% | 5.00% |
| Year in which ultimate rate is reached | 2025 | 2023 |

Performance benchmarks are composed of the following indices:

| Asset Class | Index |
|---|---|
| U.S. equities | Dow Jones U.S. Total Stock Market Index |
| Non-U.S. equities | MSCI All Country World Ex-U.S. IMI Index |
| Global equities | MSCI World Index |
| Emerging market equities | MSCI Emerging Markets Index |
| Fixed income securities | Barclays Capital Long Term Government/Credit Index & Barclays US Aggregate Bond Index |

GenOn's expected future benefit payments for each of the next five years, and in the aggregate for the five years thereafter, are as follows:

|  | Tax-Qualified Pension | Other Postretirement |
|---|---|---|

Schedule of health care cost trend rates

Schedule of performance benchmarks

Expected future benefit payments

|  | Benefit Payments | | Benefit Payments |
|---|---|---|---|
|  | (In millions) | | |
| 2016 | $ | 29 | $ 5 |
| 2017 | | 31 | 5 |
| 2018 | | 32 | 6 |
| 2019 | | 34 | 5 |
| 2020 | | 35 | 5 |
| 2021 through 2025 | | 194 | 18 |

**Income Taxes (Tables)**

**12 Months Ended**

**Dec. 31, 2015**

**Income Tax Examination [Line Items]**

Income tax provision (benefit) from continuing operations

*GenOn*

GenOn's income tax (benefit)/expense consisted of the following:

|  | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
|  | (In millions) | | |
| Current | | | |
| U.S. Federal | $ — | $ — | $ (6) |
| State | (3) | 6 | — |
| Total — current | (3) | 6 | (6) |
| Deferred | | | |
| U.S. Federal | — | — | — |
| State | — | — | — |
| Total — deferred | — | — | — |
| Total income tax (benefit)/expense | (3) | 6 | (6) |
| Effective tax rate | 2.5% | 3% | 12.5% |

Reconciliation of the U.S. federal statutory rate to GenOn's effective rate from continuing operations

A reconciliation of GenOn's federal statutory income tax provision to the effective income tax (benefit)/expense adjusted for permanent and other items during 2015, 2014 and 2013, is as follows:

|  | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
|  | (In millions, except percentages) | | |
| (Loss)/Income before income taxes | $ (118) | $ 198 | $ (48) |
| Provision for income taxes based on U.S. federal statutory income tax rate | (42) | 70 | (17) |
| State and local income tax provision, net of federal income taxes | (3) | 14 | (24) |
| Change in deferred tax asset valuation allowance | 16 | (100) | — |
| State rate change | 26 | 21 | 35 |
| Other, net | — | 1 | — |
| Income tax (benefit)/expense | $ (3) | $ 6 | $ (6) |

Company's deferred tax assets and liabilities

The tax effects of temporary differences between the carrying amounts of assets and liabilities in GenOn's financial statements and their respective tax bases which give rise to deferred tax assets and liabilities are as follows:

|  | As of December 31, | |
|---|---|---|
|  | 2015 | 2014 |
|  | (In millions) | |
| **Deferred Tax Assets:** | | |
| Employee benefits | $ 76 | $ 100 |
| Pension and other postretirement benefits | — | 113 |
| Federal loss carryforwards | 664 | 727 |
| State loss carryforwards | 214 | 125 |
| Property and intangible assets | 931 | 1,080 |
| Derivative contracts | 470 | 90 |
| Out-of-market contracts fair value adjustment | 378 | 381 |
| Debt premium, net | 92 | 123 |

| | 2015 | 2014 |
|---|---|---|
| Other | 20 | 40 |
| Subtotal | 2,845 | 2,779 |
| Valuation allowance | (2,464) | (2,779) |
| Net deferred tax assets | 381 | — |
| **Deferred Tax Liabilities:** | | |
| Pension and other postretirement benefits | 381 | — |
| Net deferred tax liabilities | 381 | — |
| Net deferred taxes | $ — | $ — |

**Reconciliation of total amounts of uncertain tax benefits**

The following table reconciles the total amounts of uncertain tax benefits:

| | As of December 31, | |
|---|---|---|
| | 2015 | 2014 |
| | (In millions) | |
| Balance as of January 1 | $ 2 | $ 1 |
| Increase due to prior year positions | — | 1 |
| Decrease due to prior year positions | (2) | — |
| Uncertain tax benefits as of December 31 | $ — | $ 2 |

**GenOn Americas Generation, LLC [Member]**

**Income Tax Examination [Line Items]**

**Reconciliation of the U.S. federal statutory rate to GenOn's effective rate from continuing operations**

A reconciliation of GenOn Americas Generation's expected federal statutory income tax provision to the effective income tax provision adjusted for permanent and other items during 2015, 2014 and 2013, is as follows:

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| Income before income taxes | $ 116 | $ 305 | $ 59 |
| Provision for income taxes based on U.S. federal statutory income tax rate | 41 | 107 | 21 |
| State and local income tax provision, net of federal income taxes | 10 | 18 | 6 |
| LLC income not subject to taxation | (51) | (115) | (48) |
| State rate change | — | (2) | 21 |
| Other | — | (8) | — |
| Income tax provision | $ — | $ — | $ — |

**GenOn Mid-Atlantic, LLC [Member]**

**Income Tax Examination [Line Items]**

**Income tax provision (benefit) from continuing operations**

The following reflects a pro forma disclosure of the income tax provision that would be reported if GenOn Mid-Atlantic was to be allocated income taxes attributable to its operations. Pro forma income tax provision attributable to income before tax would consist of the following:

| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
| | (In millions) | | |
| Current provision (benefit): | | | |
| Federal | $ 36 | $ 82 | $ 45 |
| State | 6 | 11 | 12 |
| Deferred provision: | | | |
| Federal | — | (5) | — |
| State | — | (1) | — |
| Total provision for income taxes | $ 42 | $ 87 | $ 57 |

Reconciliation of the U.S. federal statutory rate to GenOn's effective rate from continuing operations

The following table presents the pro forma reconciliation of GenOn Mid-Atlantic's federal statutory income tax provision for continuing operations adjusted for reorganization items to the pro forma effective tax provision:

| | Year Ended December 31, 2015 | | Year Ended December 31, 2014 | | Year Ended December 31, 2013 | |
|---|---|---|---|---|---|---|
| | (In millions, except percentages) | | | | | |
| Income before income taxes | $ | 104 | $ | 236 | $ | 128 |
| Provision for income taxes based on U.S. federal statutory income tax rate | | 36 | | 82 | | 45 |
| State and local income taxes | | 6 | | 11 | | 12 |
| State rate change | | — | | (1) | | — |
| Other, net | | — | | (5) | | — |
| Income tax provision | $ | 42 | $ | 87 | $ | 57 |

Company's deferred tax assets and liabilities

The tax effects of temporary differences between the carrying amounts of assets and liabilities in the consolidated balance sheets and their respective tax bases which give rise to the pro forma deferred tax assets and liabilities would be as follows:

| | As of December 31, | | | |
|---|---|---|---|---|
| | 2015 | | 2014 | |
| | (In millions) | | | |
| **Deferred Tax Assets:** | | | | |
| Reserves | $ | 22 | $ | 24 |
| Loss carryforwards on derivative contracts | | 218 | | 218 |
| Property and intangible assets | | 31 | | 45 |
| Out-of-market contracts fair value adjustment | | 77 | | 88 |
| Inventory reserves | | 38 | | 37 |
| Net deferred tax assets | | 386 | | 412 |
| **Deferred Tax Liabilities:** | | | | |
| Derivative contracts | | 305 | | 336 |
| Investment in projects | | 25 | | 25 |
| Net deferred tax liabilities | | 330 | | 361 |
| Net deferred taxes | $ | 56 | $ | 51 |

Pro Forma [Member] | GenOn Americas Generation, LLC [Member]

**Income Tax Examination [Line Items]**

Reconciliation of the U.S. federal statutory rate to GenOn's effective rate from continuing operations

The following table presents the pro forma reconciliation of GenOn Americas Generation's federal statutory income tax provision for continuing operations adjusted for reorganization items to the pro forma effective tax provision:

| | Year Ended December 31, 2015 | | Year Ended December 31, 2014 | | Year Ended December 31, 2013 | |
|---|---|---|---|---|---|---|
| | (In millions) | | | | | |
| Income before income taxes | $ | 116 | $ | 305 | $ | 59 |
| Provision for income taxes based on U.S. federal statutory income tax rate | | 41 | | 107 | | 22 |
| State and local income tax provision (benefit), net of federal income taxes | | 10 | | 18 | | 6 |
| Change in deferred tax asset valuation allowance | | (51) | | (115) | | (49) |
| State rate change | | — | | (2) | | 21 |
| Other | | — | | (8) | | — |
| Income tax provision | $ | — | $ | — | $ | — |

Company's deferred tax assets and liabilities

The tax effects of temporary differences between the carrying amounts of assets and liabilities in the consolidated balance sheets and their respective tax bases which give rise to

The pro forma deferred tax assets and liabilities would be as follows:

| | As of December 31, | |
| | 2015 | 2014 |
| | (In millions) | |
| **Deferred Tax Assets:** | | |
| Pension and other postretirement benefits | $ 85 | $ 85 |
| Reserves | 119 | 121 |
| Loss carryforwards | 3 | 14 |
| Property and intangible assets | 1,495 | 1,652 |
| Out-of-market contracts fair value adjustment | 47 | 34 |
| Derivative contract assets and liabilities | 166 | — |
| Debt premium | 28 | 38 |
| Other, net | 20 | 36 |
| Subtotal | 1,963 | 1,980 |
| Valuation allowance | (1,963) | (1,824) |
| Net deferred tax assets | — | 156 |
| **Deferred Tax Liabilities:** | | |
| Investment in Projects | — | 144 |
| Derivative contract assets and liabilities | — | 12 |
| Net deferred tax liabilities | — | 156 |
| Net deferred taxes | $ — | $ — |

**Related Party Transactions (Tables)**

**12 Months Ended**

**Dec. 31, 2015**

GenOn Americas Generation, LLC [Member]

**Related Party Transaction [Line Items]**

Summary of material related-party transactions with affiliates

The following costs were incurred under these arrangements:

*GenOn Americas Generation*

|  | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
|  | (In millions) | | |
| Allocated costs: | | | |
| Cost of operations — affiliate | $ 3 | $ 7 | $ 9 |
| Selling, general and administrative — affiliate | 81 | 79 | 74 |
| Total | $ 84 | $ 86 | $ 83 |

GenOn Mid-Atlantic, LLC [Member]

**Related Party Transaction [Line Items]**

Summary of material related-party transactions with affiliates

*GenOn Mid-Atlantic*

|  | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
|  | (In millions) | | |
| Allocated costs: | | | |
| Cost of operations — affiliate | $ 1 | $ 4 | $ 6 |
| Selling, general and administrative — affiliate | 58 | 64 | 64 |
| Total | $ 59 | $ 68 | $ 70 |

**Commitments and Contingencies (Tables)**

**12 Months Ended**

**Dec. 31, 2015**

**Commitments and Contingency [Line Items]**

**Future minimum lease commitments under operating leases**

Future minimum lease commitments under the Registrants' other operating leases for the years ending after December 31, 2015, are as follows:

|  | GenOn[a] | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
|  |  | (In millions) |  |
| 2016 | $ 16 | $ 3 | $ 2 |
| 2017 | 14 | 2 | 2 |
| 2018 | 11 | 2 | 2 |
| 2019 | 3 | 2 | 2 |
| 2020 | 1 | 1 | — |
| Thereafter | 14 | — | — |
| Total | $ 59 | $ 10 | $ 8 |

(a) Amounts in the table exclude future sublease income of $13 million associated with GenOn's long-term lease for its corporate headquarters in Houston, Texas.

**Rent expense associated with other operating leases**

The Registrants' rent expense associated with other operating leases was as follows:

|  | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|---|
|  |  | (In millions) |  |
| GenOn | $ 15 | $ 12 | $ 17 |
| GenOn Americas Generation | $ 1 | — | — |
| GenOn Mid-Atlantic | $ 1 | — | — |

**Other Commitments**

As of December 31, 2015, the Registrants' other commitments are estimated as follows

|  | GenOn | GenOn Americas Generation | GenOn Mid-Atlantic |
|---|---|---|---|
|  |  | (In millions) |  |
| 2016 | $ 2 | $ 2 | $ 2 |
| 2017 | 3 | 3 | 3 |
| 2018 | 3 | 3 | 3 |
| 2019 | 3 | 3 | 3 |
| 2020 | 3 | 3 | 3 |
| Thereafter | 50 | 50 | 50 |
| Total | $ 64 | $ 64 | $ 64 |

**GenOn Mid-Atlantic, LLC [Member]**

**Commitments and Contingency [Line Items]**

**Future minimum lease commitments under operating leases**

Future minimum lease commitments under the GenOn Mid-Atlantic operating leases for the years ending after December 31, 2015, are as follows:

|  | (In millions) |
|---|---|
| 2016 | $ 150 |
| 2017 | 144 |
| 2018 | 105 |
| 2019 | 139 |

| | | |
|---|---|---:|
| 2020 | | 105 |
| Thereafter | | 442 |
| Total | $ | 1,085 |

Rema [Member]

**Commitments and Contingency [Line Items]**

Future minimum lease commitments under operating leases

Future minimum lease commitments under the REMA operating leases for the years ending after December 31, 2015, are as follows:

| | | (In millions) |
|---|---|---:|
| 2016 | $ | 61 |
| 2017 | | 63 |
| 2018 | | 55 |
| 2019 | | 65 |
| 2020 | | 56 |
| Thereafter | | 278 |
| Total | $ | 578 |

Long-term Service Agreements [Member]

**Commitments and Contingency [Line Items]**

Commitments under fuel, commodity transportation and LTSA contractual arrangements

As of December 31, 2015, GenOn's commitments under such outstanding agreements are estimated as follows:

| | | GenOn (In millions) |
|---|---|---:|
| 2016 | $ | 30 |
| 2017 | | 13 |
| 2018 | | 12 |
| 2019 | | 26 |
| 2020 | | 14 |
| Thereafter | | 209 |
| Total | $ | 304 |

Fuel and Commodity Transportation Commitments [Member]

**Commitments and Contingency [Line Items]**

Commitments under fuel, commodity transportation and LTSA contractual arrangements

As of December 31, 2015, the Registrants' commitments under such outstanding agreements are estimated as follows:

| | | GenOn | | GenOn Americas Generation | | GenOn Mid-Atlantic |
|---|---|---:|---|---:|---|---:|
| | | | | (In millions) | | |
| 2016 | $ | 139 | $ | 55 | $ | 55 |
| 2017 | | 88 | | 13 | | 13 |
| 2018 | | 73 | | 13 | | 13 |
| 2019 | | 1 | | — | | — |
| 2020 | | 1 | | — | | — |
| Thereafter | | 3 | | — | | — |
| Total | $ | 305 | $ | 81 | $ | 81 |

| | 12 Months Ended |
|---|---|
| **Guarantees (Tables)** | **Dec. 31, 2015** |

**Guarantor Obligations [Line Items]**

Summary of estimated guarantees, indemnity, and other contingent liability

The following table summarizes the maximum potential exposures that can be estimated for guarantees, indemnities, and other contingent liabilities by maturity:

*GenOn*

| Guarantees | By Remaining Maturity at December 31, 2015 | | | | | December 31, 2014 |
|---|---|---|---|---|---|---|
| | Under 1 Year | 1-3 Years | 3-5 Years | Over 5 Years | Total | Total |
| | (In millions) | | | | | (In millions) |
| Letters of credit and surety bonds | $ 350 | $ — | $ — | $ — | $ 350 | $ 319 |
| Other guarantees | — | — | — | 46 | 46 | 57 |
| Total guarantees | $ 350 | $ — | $ — | $ 46 | $ 396 | $ 376 |

GenOn Americas Generation, LLC [Member]

**Guarantor Obligations [Line Items]**

Summary of estimated guarantees, indemnity, and other contingent liability

*GenOn Americas Generation*

| Guarantees | By Remaining Maturity at December 31, 2015 | | | | | December 31, 2014 |
|---|---|---|---|---|---|---|
| | Under 1 Year | 1-3 Years | 3-5 Years | Over 5 Years | Total | Total |
| | (In millions) | | | | | (In millions) |
| Letters of credit and surety bonds | $ 229 | $ — | $ — | $ — | $ 229 | $ 180 |
| Total guarantees | $ 229 | $ — | $ — | $ — | $ 229 | $ 180 |

| **Schedule I Condensed Financial Information of Parent Company Only Disclosure Schedule I Condensed Financial Information of Parent Company Only Disclosure (Tables)** | **12 Months Ended** |
|---|---|
| | **Dec. 31, 2015** |

Schedule of Maturities of Long-term Debt [Table Text Block]

Annual payments based on the maturities of GenOn's debt and capital leases for the years ending after December 31, 2015, are as follows:

|  | (In millions) |
|---|---|
| 2016 | $ 4 |
| 2017 | 696 |
| 2018 | 653 |
| 2019 | 4 |
| 2020 | 494 |
| Thereafter | 732 |
| Total | $ 2,583 |

GenOn Energy, Inc. Parent Company [Member]

Schedule of Maturities of Long-term Debt [Table Text Block]

Debt maturities of GenOn Energy, Inc. as of December 31, 2015 are:

|  | (In millions) |
|---|---|
| 2016 | $ — |
| 2017 | 692 |
| 2018 | 649 |
| 2019 | — |
| 2020 | 489 |
| Total | $ 1,830 |

GenOn Americas Generation, LLC Parent Company [Member]

Schedule of Maturities of Long-term Debt [Table Text Block]

Debt maturities of GenOn Americas Generation, LLC as of December 31, 2015 are:

|  | (In millions) |
|---|---|
| 2021 and thereafter | 695 |
| Total | $ 695 |

| Nature of Business (Details) - In service [Member] | Dec. 31, 2015 MW |
|---|---|
| **Nature of Business [Line Items]** | |
| Power Generation Capacity, Megawatts | 17,753 |
| Natural Gas [Member] | |
| **Nature of Business [Line Items]** | |
| Power Generation Capacity, Megawatts | 10,763 |
| Coal [Member] | |
| **Nature of Business [Line Items]** | |
| Power Generation Capacity, Megawatts | 5,143 |
| Oil [Member] | |
| **Nature of Business [Line Items]** | |
| Power Generation Capacity, Megawatts | 1,847 |
| GenOn Mid-Atlantic, LLC [Member] | |
| **Nature of Business [Line Items]** | |
| Power Generation Capacity, Megawatts | 4,683 |
| GenOn Mid-Atlantic, LLC [Member] \| Natural Gas [Member] | |
| **Nature of Business [Line Items]** | |
| Power Generation Capacity, Megawatts | 1,942 |
| GenOn Mid-Atlantic, LLC [Member] \| Coal [Member] | |
| **Nature of Business [Line Items]** | |
| Power Generation Capacity, Megawatts | 2,433 |
| GenOn Mid-Atlantic, LLC [Member] \| Oil [Member] | |
| **Nature of Business [Line Items]** | |
| Power Generation Capacity, Megawatts | 308 |
| GenOn Americas Generation, LLC [Member] | |
| **Nature of Business [Line Items]** | |
| Power Generation Capacity, Megawatts | 7,985 |
| GenOn Americas Generation, LLC [Member] \| Natural Gas [Member] | |
| **Nature of Business [Line Items]** | |
| Power Generation Capacity, Megawatts | 4,118 |
| GenOn Americas Generation, LLC [Member] \| Coal [Member] | |
| **Nature of Business [Line Items]** | |
| Power Generation Capacity, Megawatts | 2,433 |
| GenOn Americas Generation, LLC [Member] \| Oil [Member] | |
| **Nature of Business [Line Items]** | |
| Power Generation Capacity, Megawatts | 1,434 |

| Summary of Significant Accounting Policies (Details) - USD ($) $ in Millions | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| **Summary of Significant Accounting Policies Disclosure [Line Items]** | | | |
| Inventory Write-down | $ 19 | $ 12 | $ 0 |
| Below Market Lease, Amortization Income, Next Twelve Months | 81 | | |
| Finite-Lived Intangible Assets, Amortization Expense, Next Twelve Months | 45 | | |
| Amortization of Intangible Assets | 39 | 38 | 25 |
| Amortization of Intangibles and Out of Market Contracts | (70) | (38) | (45) |
| Out of Market Contracts Amortization Expense | 79 | 78 | 75 |
| Amount of interest capitalized | 5 | 11 | 21 |
| Finite-Lived Intangible Assets, Amortization Expense, Year Two | 2 | | |
| Finite-Lived Intangible Assets, Amortization Expense, Year Three | 1 | | |
| Finite-Lived Intangible Assets, Amortization Expense, Year Four | 1 | | |
| Finite-Lived Intangible Assets, Amortization Expense, after Year Five | 1 | | |
| Below Market Lease, Amortization Income, Year Two | 76 | | |
| out of market contracts, amortization, year three | 71 | | |
| out of market contract, amortization, year four | 68 | | |
| out of market contract, amortization, year five | $ 68 | | |
| Genon [Member] | | | |
| **Summary of Significant Accounting Policies Disclosure [Line Items]** | | | |
| Number of months beyond which company can not predict the holding of collateral (in months) | 12 months | | |
| GenOn Americas Generation [Member] | | | |
| **Summary of Significant Accounting Policies Disclosure [Line Items]** | | | |
| Below Market Lease, Amortization Income, Next Twelve Months | $ 28 | | |
| Below Market Lease, Amortization Income, Year Two | 28 | | |
| out of market contracts, amortization, year three | 28 | | |
| out of market contract, amortization, year four | 28 | | |
| out of market contract, amortization, year five | 28 | | |
| GenOn Americas Generation [Member] | | | |
| **Summary of Significant Accounting Policies Disclosure [Line Items]** | | | |
| Below Market Lease, Amortization Income, Next Twelve Months | 28 | | |
| Finite-Lived Intangible Assets, Amortization Expense, Next Twelve Months | 42 | | |
| Amortization of Intangible Assets | 32 | 33 | 21 |
| Out of Market Contracts Amortization Expense | 28 | 28 | 28 |
| Finite-Lived Intangible Assets, Amortization Expense, Year Two | 0 | | |
| Finite-Lived Intangible Assets, Amortization Expense, Year Three | 0 | | |
| Finite-Lived Intangible Assets, Amortization Expense, Year Four | 0 | | |
| Finite-Lived Intangible Assets, Amortization Expense, after Year Five | 0 | | |
| Below Market Lease, Amortization Income, Year Two | 28 | | |
| out of market contracts, amortization, year three | 28 | | |
| out of market contract, amortization, year four | 28 | | |
| out of market contract, amortization, year five | 28 | | |

GenOn Americas Generation, LLC [Member]

**Summary of Significant Accounting Policies Disclosure [Line Items]**

| | | | |
|---|---|---|---|
| Inventory Write-down | 17 | 9 | 0 |
| Amortization of Intangibles and Out of Market Contracts | (27) | (16) | (9) |
| Amount of interest capitalized | 2 | 1 | 2 |

GenOn Mid-Atlantic, LLC [Member]

**Summary of Significant Accounting Policies Disclosure [Line Items]**

| | | | |
|---|---|---|---|
| Inventory Write-down | 6 | 0 | 0 |
| Finite-Lived Intangible Assets, Amortization Expense, Next Twelve Months | 3 | | |
| Amortization of Intangible Assets | 27 | 29 | 18 |
| Amortization of Intangibles and Out of Market Contracts | (27) | 1 | (11) |
| Out of Market Contracts Amortization Expense | 28 | $ 28 | $ 28 |
| Finite-Lived Intangible Assets, Amortization Expense, Year Two | 0 | | |
| Finite-Lived Intangible Assets, Amortization Expense, Year Three | 0 | | |
| Finite-Lived Intangible Assets, Amortization Expense, Year Four | 0 | | |
| Finite-Lived Intangible Assets, Amortization Expense, after Year Five | $ 0 | | |

| Dispositions Disposition (Details) $ in Millions | Nov. 25, 2015 USD ($) | Nov. 10, 2015 USD ($) | Dec. 03, 2014 USD ($) | 1 Months Ended Jan. 31, 2014 USD ($) | 12 Months Ended Dec. 31, 2015 USD ($) | Dec. 31, 2014 USD ($) | Dec. 31, 2013 USD ($) | Nov. 24, 2015 MW | Nov. 09, 2015 MW | Dec. 02, 2014 MW |
|---|---|---|---|---|---|---|---|---|---|---|
| **Income Statement, Balance Sheet and Additional Disclosures by Disposal Groups, Including Discontinued Operations [Line Items]** | | | | | | | | | | |
| Proceeds from Sale of Equity Method Investments | | | | | $ 0 | $ 35 | $ 0 | | | |
| Asset Impairment Charges | | | | | 170 | 82 | 0 | | | |
| Disposal Group, Including Discontinued Operation, Other Assets, Current | | | | | 6 | 0 | | | | |
| Disposal Group, Including Discontinued Operation, Assets, Noncurrent | | | | | 105 | 0 | | | | |
| Disposal Group, Including Discontinued Operation, Liabilities, Current | | | | | 2 | 0 | | | | |
| Disposal Group, Including Discontinued Operation, Liabilities, Noncurrent | | | | | 4 | 0 | | | | |
| Equity Method Investment, Realized Gain (Loss) on Disposal | | | | | 0 | 18 | 0 | | | |
| Disposal Group, Not Discontinued Operation, Gain (Loss) on Disposal | | | | | 0 | $ (6) | $ 0 | | | |
| Shelby County Energy Center, LLC [Member] | | | | | | | | | | |
| **Income Statement, Balance Sheet and Additional Disclosures by Disposal Groups, Including Discontinued Operations [Line Items]** | | | | | | | | | | |
| Proceeds from Sale of Equity Method Investments | | $ 46 | | | | | | | | |
| Disposal Group, Including Discontinued Operation, Other Assets, Current | | | | | 1 | | | | | |
| Disposal Group, Including Discontinued Operation, Assets, Noncurrent | | | | | 22 | | | | | |
| Disposal Group, Including Discontinued Operation, Liabilities, Current | | | | | 1 | | | | | |
| Seward Generating Station [Member] | | | | | | | | | | |
| **Income Statement, Balance Sheet and Additional Disclosures by Disposal Groups, Including Discontinued Operations [Line Items]** | | | | | | | | | | |
| Proceeds from Sale of Equity Method Investments | $ 75 | | | | | | | | | |
| Asset Impairment Charges | | | | | 134 | | | | | |

| | | |
|---|---|---|
| Disposal Group, Including Discontinued Operation, Other Assets, Current | | 5 |
| Disposal Group, Including Discontinued Operation, Assets, Noncurrent | | 83 |
| Disposal Group, Including Discontinued Operation, Liabilities, Current | | 1 |
| Disposal Group, Including Discontinued Operation, Liabilities, Noncurrent | | 4 |
| Sabine CoGen, LP [Member] | | |
| **Income Statement, Balance Sheet and Additional Disclosures by Disposal Groups, Including Discontinued Operations [Line Items]** | | |
| Proceeds from Sale of Equity Method Investments | $ 35 | |
| Equity Method Investment, Realized Gain (Loss) on Disposal | $ 18 | |
| Equity Method Investment, Ownership Percentage | | 50.00% |
| Power Generation Capacity, Megawatts \| MW | | 105 |
| Shelby County Energy Center, LLC [Member] | | |
| **Income Statement, Balance Sheet and Additional Disclosures by Disposal Groups, Including Discontinued Operations [Line Items]** | | |
| Equity Method Investment, Ownership Percentage | | 100.00% |
| Power Generation Capacity, Megawatts \| MW | | 352 |
| Seward Generating Station [Member] | | |
| **Income Statement, Balance Sheet and Additional Disclosures by Disposal Groups, Including Discontinued Operations [Line Items]** | | |
| Equity Method Investment, Ownership Percentage | | 100.00% |
| Power Generation Capacity, Megawatts \| MW | | 525 |
| Kendall [Member] | | |
| **Income Statement, Balance Sheet and Additional Disclosures by Disposal Groups, Including Discontinued Operations [Line Items]** | | |
| Proceeds from Sale of Property, Plant, and Equipment | $ 50 | |
| Disposal Group, Not Discontinued Operation, Gain (Loss) on Disposal | $ 6 | |
| Equipment [Member] | | |

**Income Statement, Balance Sheet and
Additional Disclosures by Disposal
Groups, Including Discontinued
Operations [Line Items]**

Asset Impairment Charges                                    $ 8

| **Fair Value of Financial Instruments (Details) - USD ($)** **$ in Millions** | **Dec. 31, 2015** | **Dec. 31, 2014** |
|---|---|---|
| **Fair Value, Balance Sheet Grouping, Financial Statement Captions [Line Items]** | | |
| Long and short-term debt | $ 2,766 | $ 3,130 |
| Level 2 [Member] | | |
| **Fair Value, Balance Sheet Grouping, Financial Statement Captions [Line Items]** | | |
| Long and short-term debt | 2,043 | 2,706 |
| Carrying Amount | | |
| **Fair Value, Balance Sheet Grouping, Financial Statement Captions [Line Items]** | | |
| Long and short-term debt | 2,764 | 3,122 |
| GenOn Americas Generation, LLC [Member] | | |
| **Fair Value, Balance Sheet Grouping, Financial Statement Captions [Line Items]** | | |
| Long and short-term debt | [1] 752 | 929 |
| GenOn Americas Generation, LLC [Member] \| Level 2 [Member] | | |
| **Fair Value, Balance Sheet Grouping, Financial Statement Captions [Line Items]** | | |
| Long and short-term debt | 500 | 720 |
| GenOn Americas Generation, LLC [Member] \| Carrying Amount | | |
| **Fair Value, Balance Sheet Grouping, Financial Statement Captions [Line Items]** | | |
| Long and short-term debt | 752 | 929 |
| GenOn Mid-Atlantic, LLC [Member] | | |
| **Fair Value, Balance Sheet Grouping, Financial Statement Captions [Line Items]** | | |
| Long and short-term debt | $ 0 | $ 5 |

[1] (a) This amount excludes GenOn Mid-Atlantic.

| Fair Value of Financial Instruments (Details 2 - Recurring FV) - USD ($) $ in Millions | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 |
| **Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]** | | |
| Derivative, Collateral, Right to Reclaim Cash | $ 48 | $ 38 |
| Derivative, Collateral, Obligation to Return Cash | 51 | 54 |
| Genon [Member] | | |
| **Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]** | | |
| Fair Value, Assets And Liabilities, Level 1 to Level 2 Transfers, Amount | 0 | 0 |
| Fair Value, Assets And Liabilities, Level 2 to Level 1 Transfers, Amount | 0 | 0 |
| GenOn Americas Generation [Member] | | |
| **Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]** | | |
| Fair Value, Assets And Liabilities, Level 1 to Level 2 Transfers, Amount | 0 | 0 |
| Fair Value, Assets And Liabilities, Level 2 to Level 1 Transfers, Amount | 0 | 0 |
| GenOn Americas Generation, LLC [Member] | | |
| **Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]** | | |
| Derivative, Collateral, Right to Reclaim Cash | 39 | 29 |
| Derivative, Collateral, Obligation to Return Cash | 51 | 54 |
| GenOn Mid-Atlantic, LLC [Member] | | |
| **Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]** | | |
| Fair Value, Assets And Liabilities, Level 1 to Level 2 Transfers, Amount | 0 | 0 |
| Fair Value, Assets And Liabilities, Level 2 to Level 1 Transfers, Amount | 0 | 0 |
| Derivative, Collateral, Right to Reclaim Cash | 0 | |
| Derivative, Collateral, Obligation to Return Cash | 0 | |
| Fair Value, Measurements, Recurring [Member] | | |
| **Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]** | | |
| Other Assets | 14 [1] | 21 [2] |
| Fair Value, Measurements, Recurring [Member] \| Commodity Contract [Member] | | |
| **Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]** | | |
| Derivative assets | 729 | 807 |
| Derivative liabilities | 591 | 489 |
| Fair Value, Measurements, Recurring [Member] \| Level 1 [Member] | | |
| **Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]** | | |
| Other Assets | 14 [1], [3] | 21 [2], [4] |
| Fair Value, Measurements, Recurring [Member] \| Level 1 [Member] \| Commodity Contract [Member] | | |

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

| | | | | |
|---|---|---|---|---|
| Derivative assets | 192 | [3] | 179 | [4] |
| Derivative liabilities | 157 | [3] | 105 | [4] |

Fair Value, Measurements, Recurring [Member] | Level 2 [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

| | | | | |
|---|---|---|---|---|
| Other Assets | 0 | [1], [3] | 0 | [2], [4] |

Fair Value, Measurements, Recurring [Member] | Level 2 [Member] | Commodity Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

| | | | | |
|---|---|---|---|---|
| Derivative assets | 535 | [3] | 582 | [4] |
| Derivative liabilities | 420 | [3] | 371 | [4] |

Fair Value, Measurements, Recurring [Member] | Level 3 [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

| | | | | |
|---|---|---|---|---|
| Other Assets | 0 | [1] | 0 | [2] |

Fair Value, Measurements, Recurring [Member] | Level 3 [Member] | Commodity Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

| | | | |
|---|---|---|---|
| Derivative assets | 2 | | 46 |
| Derivative liabilities | 14 | | 13 |

Fair Value, Measurements, Recurring [Member] | GenOn Americas Generation, LLC [Member] | Commodity Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

| | | | |
|---|---|---|---|
| Derivative assets | 1,096 | | 1,108 |
| Derivative liabilities | 919 | | 809 |

Fair Value, Measurements, Recurring [Member] | GenOn Americas Generation, LLC [Member] | Level 1 [Member] | Commodity Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

| | | | | |
|---|---|---|---|---|
| Derivative assets | 285 | [5] | 208 | [6] |
| Derivative liabilities | 170 | [5] | 137 | [6] |

Fair Value, Measurements, Recurring [Member] | GenOn Americas Generation, LLC [Member] | Level 2 [Member] | Commodity Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

| | | | | |
|---|---|---|---|---|
| Derivative assets | 796 | [5] | 848 | [6] |
| Derivative liabilities | 735 | [5] | 640 | [6] |

Fair Value, Measurements, Recurring [Member] | GenOn Americas Generation, LLC [Member] | Level 3 [Member] | Commodity Contract [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

| | | |
|---|---|---|
| Derivative assets | 15 | 52 |
| Derivative liabilities | 14 | 32 |

**Fair Value, Measurements, Recurring [Member] | GenOn Mid-Atlantic, LLC [Member] | Commodity Contract [Member]**

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

| | | |
|---|---|---|
| Derivative assets | 352 | 382 |
| Derivative liabilities | 195 | 150 |

**Fair Value, Measurements, Recurring [Member] | GenOn Mid-Atlantic, LLC [Member] | Level 1 [Member] | Commodity Contract [Member]**

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

| | | | | |
|---|---|---|---|---|
| Derivative assets | 175 | [7] | 145 | [8] |
| Derivative liabilities | 58 | [7] | 71 | [8] |

**Fair Value, Measurements, Recurring [Member] | GenOn Mid-Atlantic, LLC [Member] | Level 2 [Member] | Commodity Contract [Member]**

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

| | | | | |
|---|---|---|---|---|
| Derivative assets | 175 | [7] | 211 | [8] |
| Derivative liabilities | 137 | [7] | 73 | [8] |

**Fair Value, Measurements, Recurring [Member] | GenOn Mid-Atlantic, LLC [Member] | Level 3 [Member] | Commodity Contract [Member]**

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

| | | |
|---|---|---|
| Derivative assets | 2 | 26 |
| Derivative liabilities | 0 | 6 |

Derivative [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

| | | | |
|---|---|---|---|
| Fair Value Assets, Measured on Recurring Basis Gain (Loss) Included in Earnings | [9] | (8) | (1) |

Derivative [Member] | GenOn Americas Generation, LLC [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

| | | |
|---|---|---|
| Fair Value Assets, Measured on Recurring Basis Gain (Loss) Included in Earnings | 0 | 0 |

Derivative [Member] | GenOn Mid-Atlantic, LLC [Member]

**Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]**

| | | |
|---|---|---|
| Fair Value Assets, Measured on Recurring Basis Gain (Loss) Included in Earnings | $ 0 | $ 0 |

[1] (b)Relates to mutual funds held in a rabbi trust for non-qualified deferred compensation plans for some key and highly compensated employees.

[2] Relates to mutual funds held in a rabbi trust for non-qualified deferred compensation plans for some key and highly compensated employees.

[3] (a) There were no transfers during the year ended December 31, 2015, between Levels 1 and 2.

[4] There were no transfers during the year ended December 31, 2014, between Levels 1 and 2.

[5] There were no transfers during the year ended December 31, 2015, between Levels 1 and 2.

[6] There were no transfers during the year ended December 31, 2014, between Levels 1 and 2.

[7] There were no transfers during the year ended December 31, 2015, between Levels 1 and 2.

[8] There were no transfers during the year ended December 31, 2014, between Levels 1 and 2.

[9] Consists of derivatives assets and liabilities, net.

| Fair Value of Financial Instruments (Details 3 - Level 3 Inputs) - Derivative [Member] - USD ($) $ in Millions | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 |
| **Reconciliation of the beginning and ending balances for financial instruments that are recognized at fair value in the consolidated financial statements** | | |
| Beginning Balance | [1] $ 33 | $ (4) |
| Total gains and losses (realized/unrealized) included in earnings | [1] (40) | 2 |
| Purchases | [1] (5) | 35 |
| Ending Balance | [1] (12) | 33 |
| The amount of the total gains for the period included in earnings attributable to the change in unrealized gains relating to assets still held at end of period | [1] (8) | (1) |
| GenOn Americas Generation, LLC [Member] | | |
| **Reconciliation of the beginning and ending balances for financial instruments that are recognized at fair value in the consolidated financial statements** | | |
| Beginning Balance | [2] 20 | (1) |
| Total gains and losses (realized/unrealized) included in earnings | [2] (20) | 1 |
| Purchases | [2] 1 | 20 |
| Ending Balance | [2] 1 | 20 |
| The amount of the total gains for the period included in earnings attributable to the change in unrealized gains relating to assets still held at end of period | 0 | 0 |
| GenOn Mid-Atlantic, LLC [Member] | | |
| **Reconciliation of the beginning and ending balances for financial instruments that are recognized at fair value in the consolidated financial statements** | | |
| Beginning Balance | [3] 20 | 0 |
| Total gains and losses (realized/unrealized) included in earnings | [3] (20) | 0 |
| Purchases | [3] 2 | 20 |
| Ending Balance | [3] 2 | 20 |
| The amount of the total gains for the period included in earnings attributable to the change in unrealized gains relating to assets still held at end of period | $ 0 | $ 0 |

[1] Consists of derivatives assets and liabilities, net.

[2] Consists of derivatives assets and liabilities, net.

[3] Consists of derivatives assets and liabilities, net.

| Fair Value of Financial Instruments Disclosure Fair Value of Financial Instruments (Details 4 - Derivative FV Measurements) $ / T in Millions, $ / MWh in Millions, $ in Millions | Dec. 31, 2015 USD ($) $ / MWh $ / T | Dec. 31, 2014 USD ($) $ / MWh $ / T | Dec. 31, 2013 USD ($) | Dec. 31, 2012 USD ($) |
|---|---|---|---|---|
| **Fair Value Inputs, Assets, Quantitative Information [Line Items]** | | | | |
| Derivative Asset, Fair Value Determined Using Valuation Techniques, Percentage | 0.00% | | | |
| Derivative Liability, Fair Value Determined Using Valuation Techniques, Percentage | 2.00% | | | |
| Derivative, Collateral, Right to Reclaim Cash | $ 48 | $ 38 | | |
| Derivative, Collateral, Obligation to Return Cash | $ 51 | 54 | | |
| GenOn Americas Generation, LLC [Member] | | | | |
| **Fair Value Inputs, Assets, Quantitative Information [Line Items]** | | | | |
| Derivative Asset, Fair Value Determined Using Valuation Techniques, Percentage | 1.00% | | | |
| Derivative Liability, Fair Value Determined Using Valuation Techniques, Percentage | 2.00% | | | |
| Derivative, Collateral, Right to Reclaim Cash | $ 39 | 29 | | |
| Derivative, Collateral, Obligation to Return Cash | $ 51 | 54 | | |
| GenOn Mid-Atlantic, LLC [Member] | | | | |
| **Fair Value Inputs, Assets, Quantitative Information [Line Items]** | | | | |
| Derivative Asset, Fair Value Determined Using Valuation Techniques, Percentage | 1.00% | | | |
| Derivative Liability, Fair Value Determined Using Valuation Techniques, Percentage | 0.00% | | | |
| Derivative, Collateral, Right to Reclaim Cash | $ 0 | | | |
| Derivative, Collateral, Obligation to Return Cash | 0 | | | |
| Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | | | | |
| **Fair Value Inputs, Assets, Quantitative Information [Line Items]** | | | | |
| Derivative Asset, Fair Value, Gross Asset | 729 | 807 | | |
| Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | Fair Value, Inputs, Level 3 [Member] | | | | |
| **Fair Value Inputs, Assets, Quantitative Information [Line Items]** | | | | |
| Derivative Asset, Fair Value, Gross Asset | 2 | 46 | | |
| Derivative Liability, Fair Value, Gross Liability | 14 | 13 | | |
| Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | GenOn Americas Generation, LLC [Member] | | | | |
| **Fair Value Inputs, Assets, Quantitative Information [Line Items]** | | | | |
| Derivative Asset, Fair Value, Gross Asset | 1,096 | 1,108 | | |
| Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | GenOn Americas Generation, LLC [Member] | Fair Value, Inputs, Level 3 [Member] | | | | |
| **Fair Value Inputs, Assets, Quantitative Information [Line Items]** | | | | |
| Derivative Asset, Fair Value, Gross Asset | 15 | 52 | | |
| Derivative Liability, Fair Value, Gross Liability | 14 | 32 | | |
| Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | GenOn Mid-Atlantic, LLC [Member] | | | | |
| **Fair Value Inputs, Assets, Quantitative Information [Line Items]** | | | | |
| Derivative Asset, Fair Value, Gross Asset | 352 | 382 | | |

Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | GenOn Mid-Atlantic, LLC [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative Asset, Fair Value, Gross Asset | 2 | 26 |
| Derivative Liability, Fair Value, Gross Liability | 0 | 6 |

Power Contracts [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative Asset, Fair Value, Gross Asset | 1 | 39 |
| Derivative Liability, Fair Value, Gross Liability | $ 0 | $ 5 |

Power Contracts [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | Minimum [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative, Forward Price | $ / MWh | 22 | 18 |

Power Contracts [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | Maximum [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative, Forward Price | $ / MWh | 67 | 68 |

Power Contracts [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | Weighted Average [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative, Forward Price | $ / MWh | 42 | 46 |

Power Contracts [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | GenOn Americas Generation, LLC [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative Asset, Fair Value, Gross Asset | $ 1 | $ 39 |
| Derivative Liability, Fair Value, Gross Liability | $ 0 | $ 18 |

Power Contracts [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | GenOn Americas Generation, LLC [Member] | Minimum [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative, Forward Price | $ / MWh | 22 | 18 |

Power Contracts [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | GenOn Americas Generation, LLC [Member] | Maximum [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative, Forward Price | $ / MWh | 67 | 68 |

Power Contracts [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | GenOn Americas Generation, LLC [Member] | Weighted Average [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative, Forward Price | $ / MWh | 42 | 46 |

Power Contracts [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | GenOn Mid-Atlantic, LLC [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative Asset, Fair Value, Gross Asset | $ 2 | $ 26 |
| Derivative Liability, Fair Value, Gross Liability | $ 0 | $ 5 |

Power Contracts [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | GenOn Mid-Atlantic, LLC [Member] | Minimum [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative, Forward Price | $ / MWh | 22 | 24 |

Power Contracts [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | GenOn Mid-Atlantic, LLC [Member] | Maximum [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative, Forward Price | $ / MWh | 67 | 68 |

Power Contracts [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | GenOn Mid-Atlantic, LLC [Member] | Weighted Average [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative, Forward Price | $ / MWh | 42 | 47 |

Coal Contract [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative Asset, Fair Value, Gross Asset | $ 0 | $ 3 |
| Derivative Liability, Fair Value, Gross Liability | $ 12 | $ 1 |

Coal Contract [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | Minimum [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative, Forward Price | $ / T | 28 | 53 |

Coal Contract [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | Maximum [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative, Forward Price | $ / T | 45 | 56 |

Coal Contract [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | Weighted Average [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative, Forward Price | $ / T | 35 | 54 |

Coal Contract [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | GenOn Americas Generation, LLC [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative Asset, Fair Value, Gross Asset | $ 12 | $ 3 |
| Derivative Liability, Fair Value, Gross Liability | $ 12 | $ 3 |

Coal Contract [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | GenOn Americas Generation, LLC [Member] | Minimum [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative, Forward Price | $ / T | 28 | 53 |

Coal Contract [Member] | Commodity Contract [Member] | Fair Value, Measurements,

Recurring [Member] | GenOn Americas Generation, LLC [Member] | Maximum [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative, Forward Price | $ / T | 45 | 56 |

Coal Contract [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | GenOn Americas Generation, LLC [Member] | Weighted Average [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative, Forward Price | $ / T | 35 | 54 |

Financial Transmission Rights [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative Asset, Fair Value, Gross Asset | $ 1 | $ 4 |
| Derivative Liability, Fair Value, Gross Liability | $ 2 | $ 7 |

Financial Transmission Rights [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | Minimum [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative, Auction Price | $ / MWh | 0 | (10) |

Financial Transmission Rights [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | Maximum [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative, Auction Price | $ / MWh | 3 | 3 |

Financial Transmission Rights [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | Weighted Average [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative, Auction Price | $ / MWh | 1 | (1) |

Financial Transmission Rights [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | GenOn Americas Generation, LLC [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative Asset, Fair Value, Gross Asset | $ 2 | $ 10 |
| Derivative Liability, Fair Value, Gross Liability | $ 2 | $ 11 |

Financial Transmission Rights [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | GenOn Americas Generation, LLC [Member] | Minimum [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative, Auction Price | $ / MWh | 0 | (1) |

Financial Transmission Rights [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | GenOn Americas Generation, LLC [Member] | Maximum [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | |
|---|---|---|
| Derivative, Auction Price | $ / MWh | 3 | 1 |

Financial Transmission Rights [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | GenOn Americas Generation, LLC [Member] | Weighted Average [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

Derivative, Auction Price | $ / MWh | 1 | 0 | | |

Financial Transmission Rights [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | GenOn Mid-Atlantic, LLC [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

| | | | | |
|---|---|---|---|---|
| Derivative Asset, Fair Value, Gross Asset | $ 0 | | | |
| Derivative Liability, Fair Value, Gross Liability | $ 1 | | | |

Financial Transmission Rights [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | GenOn Mid-Atlantic, LLC [Member] | Minimum [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

Derivative, Auction Price | $ / MWh | (1)

Financial Transmission Rights [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | GenOn Mid-Atlantic, LLC [Member] | Maximum [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

Derivative, Auction Price | $ / MWh | 1

Financial Transmission Rights [Member] | Commodity Contract [Member] | Fair Value, Measurements, Recurring [Member] | GenOn Mid-Atlantic, LLC [Member] | Weighted Average [Member] | Fair Value, Inputs, Level 3 [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

Derivative, Auction Price | $ / MWh | 0

Credit reserve for derivative contract assets [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

Valuation Allowances and Reserves, Balance | [1] $ (1) | $ 0 | $ (1) | $ (4)

Credit reserve for derivative contract assets [Member] | GenOn Americas Generation, LLC [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

Valuation Allowances and Reserves, Balance | [2] 0 | 0 | (1) | (4)

Credit reserve for derivative contract assets [Member] | GenOn Mid-Atlantic, LLC [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

Valuation Allowances and Reserves, Balance | [3] (4) | $ (2) | $ (3) | $ (4)

NRG [Member]

**Fair Value Inputs, Assets, Quantitative Information [Line Items]**

Derivative, Collateral, Right to Reclaim Cash | $ 36

[1] Provision for uncollectible accounts represents credit reserves for derivative contract assets.

[2] Provision for uncollectible accounts represents credit reserves for derivative contract assets.

[3] Provision for uncollectible accounts represents credit reserves for derivative contract assets.

| | Fair Value of Financial Instruments (Details 5 - Credit Risk) $ in Millions | 12 Months Ended |
|---|---|---|
| | | Dec. 31, 2015 USD ($) |

**Concentration of credit risk [Abstract]**

| | |
|---|---|
| Counterparty credit exposure to a significant portion of counterparties | $ 351 |
| Counterparty credit exposure, collateral held, cash and letters of credit | 33 |
| Counterparty credit exposure, net | $ 321 |
| Percentage of credit risk roll-off by the end of 2013 (as a percent) | 97.00% |

**Counterparty credit [Abstract]**

| | |
|---|---|
| Net Exposure (as a percent) | 100.00% [1] |
| Counterparty credit risk exposure, threshold percentage | 10.00% |
| Counterparty credit risk exposure aggregate amount above threshold percentage | $ 257 |

Investment grade

**Counterparty credit [Abstract]**

| | |
|---|---|
| Net Exposure (as a percent) | 99.00% [1] |

Non-rated

**Counterparty credit [Abstract]**

| | |
|---|---|
| Net Exposure (as a percent) | 1.00% [1] |

Financial institutions

**Counterparty credit [Abstract]**

| | |
|---|---|
| Net Exposure (as a percent) | 68.00% [1] |

Utilities, energy merchants, marketers and other

**Counterparty credit [Abstract]**

| | |
|---|---|
| Net Exposure (as a percent) | 18.00% [1] |

ISOs

**Counterparty credit [Abstract]**

| | |
|---|---|
| Net Exposure (as a percent) | 14.00% [1] |

GenOn Mid-Atlantic, LLC [Member]

**Concentration of credit risk [Abstract]**

| | |
|---|---|
| Counterparty credit exposure to a significant portion of counterparties | $ 12 |
| Counterparty credit exposure, collateral held, cash and letters of credit | 0 |
| Counterparty credit exposure, net | $ 12 |
| Percentage of credit risk roll-off by the end of 2013 (as a percent) | 100.00% |

**Counterparty credit [Abstract]**

| | |
|---|---|
| Net Exposure (as a percent) | 100.00% [1] |
| Counterparty credit risk exposure aggregate amount above threshold percentage | $ 12 |

GenOn Mid-Atlantic, LLC [Member] | Investment grade

**Counterparty credit [Abstract]**

| | |
|---|---|
| Net Exposure (as a percent) | 100.00% [1] |

GenOn Mid-Atlantic, LLC [Member] | Non-rated

**Counterparty credit [Abstract]**

| | |
|---|---|
| Net Exposure (as a percent) | 0.00% [1] |

GenOn Mid-Atlantic, LLC [Member] | Financial institutions

**Counterparty credit [Abstract]**

Net Exposure (as a percent)        0.00%    [1]

GenOn Mid-Atlantic, LLC [Member] | Utilities, energy merchants, marketers and other

**Counterparty credit [Abstract]**

Net Exposure (as a percent)        0.00%    [1]

GenOn Mid-Atlantic, LLC [Member] | ISOs

**Counterparty credit [Abstract]**

Net Exposure (as a percent)        100.00%    [1]

GenOn Americas Generation, LLC [Member]

**Concentration of credit risk [Abstract]**

| | |
|---|---|
| Counterparty credit exposure to a significant portion of counterparties | $ 347 |
| Counterparty credit exposure, collateral held, cash and letters of credit | 33 |
| Counterparty credit exposure, net | $ 316 |
| Percentage of credit risk roll-off by the end of 2013 (as a percent) | 97.00% |

**Counterparty credit [Abstract]**

| | | |
|---|---|---|
| Net Exposure (as a percent) | 100.00% | [1] |
| Counterparty credit risk exposure aggregate amount above threshold percentage | $ 257 | |

GenOn Americas Generation, LLC [Member] | Investment grade

**Counterparty credit [Abstract]**

Net Exposure (as a percent)        99.00%    [1]

GenOn Americas Generation, LLC [Member] | Non-rated

**Counterparty credit [Abstract]**

Net Exposure (as a percent)        1.00%    [1]

GenOn Americas Generation, LLC [Member] | Financial institutions

**Counterparty credit [Abstract]**

Net Exposure (as a percent)        69.00%    [1]

GenOn Americas Generation, LLC [Member] | Utilities, energy merchants, marketers and other

**Counterparty credit [Abstract]**

Net Exposure (as a percent)        17.00%    [1]

GenOn Americas Generation, LLC [Member] | ISOs

**Counterparty credit [Abstract]**

Net Exposure (as a percent)        14.00%    [1]

[1] Counterparty credit exposure excludes transportation contracts because of the unavailability of market prices.

| Accounting for Derivative Instruments and Hedging Activities Disclosure Accounting for Derivative Instruments and Hedging Activities (Volumetric Underlying) (Details) - USD ($) $ in Millions | Dec. 31, 2015 | Dec. 31, 2014 |
|---|---|---|
| Long [Member] | Coal [Member] | Short Ton [Member] | | |
| **Derivative [Line Items]** | | |
| Derivative, Notional Amount | $ (7) | $ (8) |
| Long [Member] | Natural Gas [Member] | MMbtu [Member] | | |
| **Derivative [Line Items]** | | |
| Derivative, Notional Amount | (191) | |
| Long [Member] | GenOn Americas Generation, LLC [Member] | Coal [Member] | Short Ton [Member] | | |
| **Derivative [Line Items]** | | |
| Derivative, Notional Amount | (3) | (5) |
| Long [Member] | GenOn Americas Generation, LLC [Member] | Natural Gas [Member] | MMbtu [Member] | | |
| **Derivative [Line Items]** | | |
| Derivative, Notional Amount | (2) | |
| Long [Member] | GenOn Mid-Atlantic, LLC [Member] | Coal [Member] | Short Ton [Member] | | |
| **Derivative [Line Items]** | | |
| Derivative, Notional Amount | (3) | (5) |
| Short [Member] | Natural Gas [Member] | MMbtu [Member] | | |
| **Derivative [Line Items]** | | |
| Derivative, Notional Amount | | (21) |
| Short [Member] | Power [Member] | M Wh [Member] | | |
| **Derivative [Line Items]** | | |
| Derivative, Notional Amount | (49) | (36) |
| Short [Member] | GenOn Americas Generation, LLC [Member] | Natural Gas [Member] | MMbtu [Member] | | |
| **Derivative [Line Items]** | | |
| Derivative, Notional Amount | | (74) |
| Short [Member] | GenOn Americas Generation, LLC [Member] | Power [Member] | M Wh [Member] | | |
| **Derivative [Line Items]** | | |
| Derivative, Notional Amount | (20) | (16) |
| Short [Member] | GenOn Mid-Atlantic, LLC [Member] | Natural Gas [Member] | MMbtu [Member] | | |
| **Derivative [Line Items]** | | |
| Derivative, Notional Amount | (10) | (79) |
| Short [Member] | GenOn Mid-Atlantic, LLC [Member] | Power [Member] | M Wh [Member] | | |
| **Derivative [Line Items]** | | |
| Derivative, Notional Amount | $ (18) | $ (15) |

| Accounting for Derivative Instruments and Hedging Activities Disclosure Accounting for Derivative Instruments and Hedging Activities (FV of Derivative Assets and Liabilities) - Not Designated as Hedging Instrument [Member] - USD ($) $ in Millions | Dec. 31, 2015 | Dec. 31, 2014 |
|---|---|---|
| **Derivative [Line Items]** | | |
| Derivative Asset, Fair Value, Gross Asset | $ 729 | $ 807 |
| Derivative Liability, Fair Value, Gross Liability | 591 | 489 |
| Commodity Contract Current [Member] | | |
| **Derivative [Line Items]** | | |
| Derivative Asset, Fair Value, Gross Asset | 574 | 602 |
| Derivative Liability, Fair Value, Gross Liability | 475 | 417 |
| Commodity Contract Non Current [Member] | | |
| **Derivative [Line Items]** | | |
| Derivative Asset, Fair Value, Gross Asset | 155 | 205 |
| Derivative Liability, Fair Value, Gross Liability | 116 | 72 |
| GenOn Mid-Atlantic, LLC [Member] | | |
| **Derivative [Line Items]** | | |
| Derivative Asset, Fair Value, Gross Asset | 352 | 382 |
| Derivative Liability, Fair Value, Gross Liability | 195 | 150 |
| GenOn Mid-Atlantic, LLC [Member] | Commodity Contract Current [Member] | | |
| **Derivative [Line Items]** | | |
| Derivative Asset, Fair Value, Gross Asset | 269 | 241 |
| Derivative Liability, Fair Value, Gross Liability | 163 | 128 |
| GenOn Mid-Atlantic, LLC [Member] | Commodity Contract Non Current [Member] | | |
| **Derivative [Line Items]** | | |
| Derivative Asset, Fair Value, Gross Asset | 83 | 141 |
| Derivative Liability, Fair Value, Gross Liability | 32 | 22 |
| GenOn Americas Generation, LLC [Member] | | |
| **Derivative [Line Items]** | | |
| Derivative Asset, Fair Value, Gross Asset | 1,096 | 1,108 |
| Derivative Liability, Fair Value, Gross Liability | 919 | 809 |
| GenOn Americas Generation, LLC [Member] | Commodity Contract Current [Member] | | |
| **Derivative [Line Items]** | | |
| Derivative Asset, Fair Value, Gross Asset | 861 | 852 |
| Derivative Liability, Fair Value, Gross Liability | 737 | 674 |
| GenOn Americas Generation, LLC [Member] | Commodity Contract Non Current [Member] | | |
| **Derivative [Line Items]** | | |
| Derivative Asset, Fair Value, Gross Asset | 235 | 256 |
| Derivative Liability, Fair Value, Gross Liability | $ 182 | $ 135 |

| Accounting for Derivative Instruments and Hedging Activities Disclosure Accounting for Derivative Instruments and Hedging Activities (Gross Amounts not Offset in BS) (Details) - USD ($) $ in Millions | | 12 Months Ended | | |
|---|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 | Dec. 31, 2012 |
| **Derivative [Line Items]** | | | | |
| Derivative, Collateral, Obligation to Return Cash | $ 51 | $ 54 | | |
| Derivative, Collateral, Right to Reclaim Cash | 48 | 38 | | |
| Fair Value of Gross Derivative Assets and Liabilities Net | | 318 | | |
| Derivative Asset Fair Value Gross Net Of Derivative Liability Fair Value Gross Asset | | 0 | | |
| Derivative, Collateral, Obligation to Return Cash Net of Derivative, Collateral, Right ot Reclaim Cash | | 37 | | |
| Derivative Asset, Fair Value, Amount Offset Agains Collateral Net of Derivative Liability, Fair Value, Amount Offset Against Collateral | | 281 | | |
| **Accumulated Other Comprehensive Income (Loss), Net of Tax [Abstract]** | | | | |
| Accumulated Other Comprehensive Income (Loss), Cumulative Changes in Net Gain (Loss) from Cash Flow Hedges, Effect Net of Tax | 0 | 0 | $ 0 | $ 1 |
| Other Comprehensive Income (Loss), Unrealized Gain (Loss) on Derivatives Arising During Period, Net of Tax | 0 | 0 | 19 | |
| Derivative Instruments, Gain (Loss) Reclassified from Accumulated OCI into Income, Effective Portion, Net [1], [2] | 0 | 0 | (2) | |
| Other Comprehensive Income (Loss), Reclassification Adjustment from AOCI on Derivatives, Net of Tax [3] | 0 | 0 | $ (18) | |
| Commodity Contract [Member] | | | | |
| **Derivative [Line Items]** | | | | |
| Fair Value of Gross Derivative Assets and Liabilities Net | 138 | | | |
| Derivative Asset Fair Value Gross Liability Net Of Derivative Liability Fair Value Gross Asset | 0 | | | |
| Derivative, Collateral, Obligation to Return Cash Net of Derivative, Collateral, Right ot Reclaim Cash | 51 | | | |
| Derivative Asset, Fair Value, Amount Offset Agains Collateral Net of Derivative Liability, Fair Value, Amount Offset Against Collateral | 87 | | | |
| Commodity Contract [Member] | Non-affiliated Entity [Member] | | | | |
| **Derivative [Line Items]** | | | | |
| Derivative Asset, Fair Value, Gross Asset | 698 | 786 | | |
| Derivative Asset, Fair Value, Gross Liability | 485 | 425 | | |
| Derivative, Collateral, Obligation to Return Cash | 51 | 54 | | |
| Derivative Asset, Fair Value, Amount Offset Against Collateral | 162 | 307 | | |
| Derivative Liability, Fair Value, Gross Liability | 567 | 451 | | |
| Derivative Liability, Fair Value, Gross Asset | 485 | 425 | | |
| Derivative, Collateral, Right to Reclaim Cash | 0 | 0 | | |
| Derivative Liability, Fair Value, Amount Offset Against Collateral | 82 | 26 | | |

Commodity Contract [Member] | Affiliated Entity [Member]

**Derivative [Line Items]**

| | | |
|---|---|---|
| Derivative Asset, Fair Value, Gross Asset | 31 | 21 |
| Derivative Asset, Fair Value, Gross Liability | 24 | 21 |
| Derivative, Collateral, Obligation to Return Cash | 0 | 0 |
| Derivative Asset, Fair Value, Amount Offset Against Collateral | 7 | 0 |
| Derivative Liability, Fair Value, Gross Liability | 24 | 38 |
| Derivative Liability, Fair Value, Gross Asset | 24 | 21 |
| Derivative, Collateral, Right to Reclaim Cash | 0 | 17 |
| Derivative Liability, Fair Value, Amount Offset Against Collateral | 0 | 0 |

GenOn Mid-Atlantic, LLC [Member]

**Derivative [Line Items]**

| | | |
|---|---|---|
| Derivative, Collateral, Obligation to Return Cash | 0 | |
| Derivative, Collateral, Right to Reclaim Cash | 0 | |
| Fair Value of Gross Derivative Assets and Liabilities Net | | 232 |
| Derivative Asset Fair Value Gross Liability Net Of Derivative Liability Fair Value Gross Asset | | 0 |
| Derivative, Collateral, Obligation to Return Cash Net of Derivative, Collateral, Right ot Reclaim Cash | | 0 |
| Derivative Asset, Fair Value, Amount Offset Agains Collateral Net of Derivative Liability, Fair Value, Amount Offset Against Collateral | | 232 |

GenOn Mid-Atlantic, LLC [Member] | Commodity Contract [Member]

**Derivative [Line Items]**

| | | |
|---|---|---|
| Fair Value of Gross Derivative Assets and Liabilities Net | 157 | |
| Derivative Asset Fair Value Gross Liability Net Of Derivative Liability Fair Value Gross Asset | 0 | |
| Derivative, Collateral, Obligation to Return Cash Net of Derivative, Collateral, Right ot Reclaim Cash | 0 | |
| Derivative Asset, Fair Value, Amount Offset Agains Collateral Net of Derivative Liability, Fair Value, Amount Offset Against Collateral | 157 | |

GenOn Mid-Atlantic, LLC [Member] | Commodity Contract [Member] | Non-affiliated Entity [Member]

**Derivative [Line Items]**

| | | |
|---|---|---|
| Derivative Asset, Fair Value, Gross Asset | | 100 |
| Derivative Asset, Fair Value, Gross Liability | | 0 |
| Derivative, Collateral, Obligation to Return Cash | | 0 |
| Derivative Asset, Fair Value, Amount Offset Against Collateral | | 100 |
| Derivative Liability, Fair Value, Gross Liability | | 1 |
| Derivative Liability, Fair Value, Gross Asset | | 0 |
| Derivative, Collateral, Right to Reclaim Cash | | 0 |
| Derivative Liability, Fair Value, Amount Offset Against Collateral | | 1 |

GenOn Mid-Atlantic, LLC [Member] | Commodity Contract [Member] | Affiliated Entity [Member]

**Derivative [Line Items]**

| | | |
|---|---|---|
| Derivative Asset, Fair Value, Gross Asset | 352 | 282 |
| Derivative Asset, Fair Value, Gross Liability | 195 | 149 |
| Derivative, Collateral, Obligation to Return Cash | 0 | 0 |

| | | |
|---|---|---|
| Derivative Asset, Fair Value, Amount Offset Against Collateral | 157 | 133 |
| Derivative Liability, Fair Value, Gross Liability | 195 | 149 |
| Derivative Liability, Fair Value, Gross Asset | 195 | 149 |
| Derivative, Collateral, Right to Reclaim Cash | 0 | 0 |
| Derivative Liability, Fair Value, Amount Offset Against Collateral | 0 | 0 |

**GenOn Americas Generation, LLC [Member]**

**Derivative [Line Items]**

| | | |
|---|---|---|
| Derivative, Collateral, Obligation to Return Cash | 51 | 54 |
| Derivative, Collateral, Right to Reclaim Cash | 39 | 29 |
| Fair Value of Gross Derivative Assets and Liabilities Net | | 299 |
| Derivative Asset Fair Value Gross Liability Net Of Derivative Liability Fair Value Gross Asset | | 0 |
| Derivative, Collateral, Obligation to Return Cash Net of Derivative, Collateral, Right ot Reclaim Cash | | 37 |
| Derivative Asset, Fair Value, Amount Offset Agains Collateral Net of Derivative Liability, Fair Value, Amount Offset Against Collateral | | 262 |

**GenOn Americas Generation, LLC [Member] | Commodity Contract [Member]**

**Derivative [Line Items]**

| | | |
|---|---|---|
| Fair Value of Gross Derivative Assets and Liabilities Net | 177 | |
| Derivative Asset Fair Value Gross Liability Net Of Derivative Liability Fair Value Gross Asset | 0 | |
| Derivative, Collateral, Obligation to Return Cash Net of Derivative, Collateral, Right ot Reclaim Cash | 51 | |
| Derivative Asset, Fair Value, Amount Offset Agains Collateral Net of Derivative Liability, Fair Value, Amount Offset Against Collateral | 126 | |

**GenOn Americas Generation, LLC [Member] | Commodity Contract [Member] | Non-affiliated Entity [Member]**

**Derivative [Line Items]**

| | | |
|---|---|---|
| Derivative Asset, Fair Value, Gross Asset | 699 | 787 |
| Derivative Asset, Fair Value, Gross Liability | 485 | 425 |
| Derivative, Collateral, Obligation to Return Cash | 51 | 54 |
| Derivative Asset, Fair Value, Amount Offset Against Collateral | 163 | 308 |
| Derivative Liability, Fair Value, Gross Liability | 567 | 451 |
| Derivative Liability, Fair Value, Gross Asset | 485 | 425 |
| Derivative, Collateral, Right to Reclaim Cash | 0 | 0 |
| Derivative Liability, Fair Value, Amount Offset Against Collateral | 82 | 26 |

**GenOn Americas Generation, LLC [Member] | Commodity Contract [Member] | Affiliated Entity [Member]**

**Derivative [Line Items]**

| | | |
|---|---|---|
| Derivative Asset, Fair Value, Gross Asset | 397 | 321 |
| Derivative Asset, Fair Value, Gross Liability | 352 | 321 |
| Derivative, Collateral, Obligation to Return Cash | 0 | 0 |
| Derivative Asset, Fair Value, Amount Offset Against Collateral | 45 | 0 |
| Derivative Liability, Fair Value, Gross Liability | 352 | 358 |
| Derivative Liability, Fair Value, Gross Asset | 352 | 321 |
| Derivative, Collateral, Right to Reclaim Cash | 0 | 17 |

Derivative Liability, Fair Value, Amount Offset Against Collateral                    $ 0        $ 20

[1] All of the forecasted transactions (future interest payments) were deemed probable of occurring; therefore, no cash flow hedges were discontinued and no amount was recognized in GenOn's results of operations as a result of discontinued cash flow hedges.

[2] Amounts reclassified from accumulated OCI into income and amounts recognized in income from the ineffective portion of cash flow hedges are recorded in interest expense.

[3] The reversal of accumulated OCI as part of the sale of NRG Marsh Landing to NRG Yield LLC resulted in the recognition of additional paid in capital.

| Accounting for Derivative Instruments and Hedging Activities (Details 2) - USD ($) $ in Millions | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| **Derivative [Line Items]** | | | |
| Other Comprehensive Income (Loss), Unrealized Gain (Loss) on Derivatives Arising During Period, Tax [1],[2] | $ 0 | | |
| **Unrealized mark-to-market results** | | | |
| Reversal of previously recognized unrealized losses/(gains) on settled positions related to economic hedges | (198) | $ (314) | $ (367) |
| Net unrealized losses on open positions related to economic hedges | 18 | 167 | 40 |
| Total unrealized mark-to-market gains/(losses) for economic hedging activities | (180) | (147) | (327) |
| Reversal of previously recognized unrealized losses/(gains) on settled positions related to trading activity | 0 | (1) | (1) |
| Net unrealized gains/(losses) on open positions related to trading activity | 0 | 0 | 1 |
| Total unrealized mark-to-market gains/(losses) for trading activity | 0 | (1) | 0 |
| Total unrealized gains/(losses) | (180) | (148) | (327) |
| **Impact of derivative instruments to statement of operations** | | | |
| Unrealized Gain (Loss) on Derivatives | (180) | (148) | (327) |
| **Credit Risk Related Contingent Features** | | | |
| Collateral required for contracts with credit rating contingent features in net liability position | 0 | | |
| Derivative Net Liability Postiions Collateral Due Not Called For Under Marginable Agreements | 0 | | |
| Revenue Expense From Operations [Member] | | | |
| **Unrealized mark-to-market results** | | | |
| Total unrealized gains/(losses) | (112) | (151) | (356) |
| **Impact of derivative instruments to statement of operations** | | | |
| Unrealized Gain (Loss) on Derivatives | (112) | (151) | (356) |
| Cost of operations | | | |
| **Unrealized mark-to-market results** | | | |
| Total unrealized gains/(losses) | (68) | 3 | 29 |
| **Impact of derivative instruments to statement of operations** | | | |
| Unrealized Gain (Loss) on Derivatives | (68) | 3 | 29 |
| GenOn Americas Generation, LLC [Member] | | | |
| **Unrealized mark-to-market results** | | | |
| Reversal of previously recognized unrealized losses/(gains) on settled positions related to economic hedges | (193) | (288) | (296) |
| Net unrealized losses on open positions related to economic hedges | 70 | 164 | 25 |
| Total unrealized mark-to-market gains/(losses) for economic hedging activities | (123) | (124) | (271) |
| Reversal of previously recognized unrealized losses/(gains) on settled positions related to trading activity | 0 | (1) | (1) |
| Net unrealized gains/(losses) on open positions related to trading activity | 0 | 0 | 1 |
| Total unrealized mark-to-market gains/(losses) for trading activity | 0 | (1) | 0 |
| Total unrealized gains/(losses) | (123) | (125) | (271) |
| **Impact of derivative instruments to statement of operations** | | | |

| | | | |
|---|---|---|---|
| Unrealized Gain (Loss) on Derivatives | (123) | (125) | (271) |

**Credit Risk Related Contingent Features**

| | | | |
|---|---|---|---|
| Collateral required for contracts with credit rating contingent features in net liability position | 0 | | |
| Derivative Net Liability Postiions Collateral Due Not Called For Under Marginable Agreements | 0 | | |

**GenOn Americas Generation, LLC [Member] | Revenue Expense From Operations [Member]**

**Unrealized mark-to-market results**

| | | | |
|---|---|---|---|
| Total unrealized gains/(losses) | (66) | (119) | (302) |

**Impact of derivative instruments to statement of operations**

| | | | |
|---|---|---|---|
| Unrealized Gain (Loss) on Derivatives | (66) | (119) | (302) |

**GenOn Americas Generation, LLC [Member] | Cost of operations**

**Unrealized mark-to-market results**

| | | | |
|---|---|---|---|
| Total unrealized gains/(losses) | (57) | (6) | 31 |

**Impact of derivative instruments to statement of operations**

| | | | |
|---|---|---|---|
| Unrealized Gain (Loss) on Derivatives | (57) | (6) | 31 |

**GenOn Mid-Atlantic, LLC [Member]**

**Unrealized mark-to-market results**

| | | | |
|---|---|---|---|
| Reversal of previously recognized unrealized losses/(gains) on settled positions related to economic hedges | 116 | 288 | 296 |
| Net unrealized losses on open positions related to economic hedges | 39 | 90 | 35 |
| Total unrealized gains/(losses) | (77) | (198) | (261) |

**Impact of derivative instruments to statement of operations**

| | | | |
|---|---|---|---|
| Unrealized Gain (Loss) on Derivatives | (77) | (198) | (261) |

**GenOn Mid-Atlantic, LLC [Member] | Revenue Expense From Operations [Member]**

**Unrealized mark-to-market results**

| | | | |
|---|---|---|---|
| Total unrealized gains/(losses) | (27) | (192) | (292) |

**Impact of derivative instruments to statement of operations**

| | | | |
|---|---|---|---|
| Unrealized Gain (Loss) on Derivatives | (27) | (192) | (292) |

**GenOn Mid-Atlantic, LLC [Member] | Cost of operations**

**Unrealized mark-to-market results**

| | | | |
|---|---|---|---|
| Total unrealized gains/(losses) | (50) | (6) | 31 |

**Impact of derivative instruments to statement of operations**

| | | | |
|---|---|---|---|
| Unrealized Gain (Loss) on Derivatives | (50) | $ (6) | $ 31 |

**GenOn and GenOn Americas Generation [Member]**

**Credit Risk Related Contingent Features**

| | | | |
|---|---|---|---|
| Collateral required for contracts with adequate assurance clauses in net liability positions | $ 66 | | |

[1] All of the forecasted transactions (future interest payments) were deemed probable of occurring; therefore, no cash flow hedges were discontinued and no amount was recognized in GenOn's results of operations as a result of discontinued cash flow hedges.

[2] Amounts reclassified from accumulated OCI into income and amounts recognized in income from the ineffective portion of cash flow hedges are recorded in interest expense.

| Inventory (Details) - USD ($) $ in Millions | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| **Inventory [Line Items]** | | | |
| Inventory Write-down | $ 19 | $ 12 | $ 0 |
| Fuel oil | 161 | 211 | |
| Coal | 154 | 162 | |
| Spare parts | 127 | 129 | |
| Other | 6 | 5 | |
| Total Inventory | 448 | 507 | |
| Asset Impairment Charges | 170 | 82 | 0 |
| GenOn Americas Generation, LLC [Member] | | | |
| **Inventory [Line Items]** | | | |
| Inventory Write-down | 17 | 9 | 0 |
| Fuel oil | 134 | 181 | |
| Coal | 97 | 82 | |
| Spare parts | 57 | 54 | |
| Other | 1 | 1 | |
| Total Inventory | 289 | 318 | |
| Asset Impairment Charges | 8 | 0 | 0 |
| GenOn Mid-Atlantic, LLC [Member] | | | |
| **Inventory [Line Items]** | | | |
| Inventory Write-down | 6 | 0 | $ 0 |
| Fuel oil | 33 | 45 | |
| Coal | 97 | 82 | |
| Spare parts | 41 | 38 | |
| Other | 1 | 1 | |
| Total Inventory | 172 | $ 166 | |
| Equipment [Member] | | | |
| **Inventory [Line Items]** | | | |
| Asset Impairment Charges | $ 8 | | |

| Property, Plant, and Equipment (Details) - USD ($) $ in Millions | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 |
| **Property, Plant and Equipment [Line Items]** | | |
| Total property, plant and equipment | $ 3,445 | $ 3,481 |
| Construction in Progress, Gross | 164 | 140 |
| Accumulated depreciation | (614) | (436) |
| Net property, plant and equipment | 2,831 | 3,045 |
| Facilities and equipment | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Total property, plant and equipment | 2,989 | 3,048 |
| Land and improvements | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Total property, plant and equipment | 292 | 293 |
| GenOn Americas Generation, LLC [Member] | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Total property, plant and equipment | 1,360 | 1,280 |
| Construction in Progress, Gross | 29 | 30 |
| Accumulated depreciation | (244) | (170) |
| Net property, plant and equipment | 1,116 | 1,110 |
| GenOn Americas Generation, LLC [Member] | Facilities and equipment | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Total property, plant and equipment | 1,192 | 1,123 |
| GenOn Americas Generation, LLC [Member] | Land and improvements | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Total property, plant and equipment | 139 | 127 |
| GenOn Mid-Atlantic, LLC [Member] | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Total property, plant and equipment | 1,125 | 1,093 |
| Construction in Progress, Gross | 26 | 18 |
| Accumulated depreciation | (200) | (135) |
| Net property, plant and equipment | 925 | 958 |
| GenOn Mid-Atlantic, LLC [Member] | Facilities and equipment | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Total property, plant and equipment | 1,037 | 1,014 |
| GenOn Mid-Atlantic, LLC [Member] | Land and improvements | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Total property, plant and equipment | $ 62 | $ 61 |
| Maximum [Member] | Facilities and equipment | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Depreciable Lives | 34 years | |
| Maximum [Member] | Office furnishings and equipment | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Depreciable Lives | 19 years | |

Maximum [Member] | GenOn Americas Generation, LLC [Member] | Facilities and equipment

**Property, Plant and Equipment [Line Items]**

Depreciable Lives                                                               34 years

Maximum [Member] | GenOn Americas Generation, LLC [Member] | Office furnishings and equipment

**Property, Plant and Equipment [Line Items]**

Depreciable Lives                                                               12 years

Maximum [Member] | GenOn Mid-Atlantic, LLC [Member] | Facilities and equipment

**Property, Plant and Equipment [Line Items]**

Depreciable Lives                                                               34 years

Maximum [Member] | GenOn Mid-Atlantic, LLC [Member] | Office furnishings and equipment

**Property, Plant and Equipment [Line Items]**

Depreciable Lives                                                               12 years

Minimum [Member] | Facilities and equipment

**Property, Plant and Equipment [Line Items]**

Depreciable Lives                                                               3 years

Minimum [Member] | Office furnishings and equipment

**Property, Plant and Equipment [Line Items]**

Depreciable Lives                                                               2 years

Minimum [Member] | GenOn Americas Generation, LLC [Member] | Facilities and equipment

**Property, Plant and Equipment [Line Items]**

Depreciable Lives                                                               5 years

Minimum [Member] | GenOn Americas Generation, LLC [Member] | Office furnishings and equipment

**Property, Plant and Equipment [Line Items]**

Depreciable Lives                                                               2 years

Minimum [Member] | GenOn Mid-Atlantic, LLC [Member] | Facilities and equipment

**Property, Plant and Equipment [Line Items]**

Depreciable Lives                                                               5 years

Minimum [Member] | GenOn Mid-Atlantic, LLC [Member] | Office furnishings and equipment

**Property, Plant and Equipment [Line Items]**

Depreciable Lives                                                               2 years

| **Retirements, Mothballing or<br>Long-Term Protective Layup<br>of Generating Facilities<br>(Details)** | **Dec. 31, 2015<br>MW** | |
|---|---|---|
| Generating Facilities Expected or Scheduled to be Deactivated [Member] \| Shawville [Member] | | |
| **Expected Retirements, Mothballs or Long Term Protective Layups of Coal-Fired Facilities** | | |
| Power Generation Capacity, Megawatts | 94 | |
| Generating facilities expected or scheduled to be deactivated \| Shawville [Member] | | |
| **Expected Retirements, Mothballs or Long Term Protective Layups of Coal-Fired Facilities** | | |
| Power Generation Capacity, Megawatts | 597 | [1] |
| Generating facilities expected or scheduled to be deactivated \| Gilbert | | |
| **Expected Retirements, Mothballs or Long Term Protective Layups of Coal-Fired Facilities** | | |
| Power Generation Capacity, Megawatts | 98 | [2] |
| Generating facilities expected or scheduled to be deactivated \| Glen Gardner | | |
| **Expected Retirements, Mothballs or Long Term Protective Layups of Coal-Fired Facilities** | | |
| Power Generation Capacity, Megawatts | 160 | [3] |
| Generating facilities expected or scheduled to be deactivated \| Werner [Member] | | |
| **Expected Retirements, Mothballs or Long Term Protective Layups of Coal-Fired Facilities** | | |
| Power Generation Capacity, Megawatts | 212 | [4] |
| Generating facilities expected or scheduled to be deactivated \| Osceola facility [Member] | | |
| **Expected Retirements, Mothballs or Long Term Protective Layups of Coal-Fired Facilities** | | |
| Power Generation Capacity, Megawatts | 463 | |
| Generating facilities expected or scheduled to be deactivated \| Coolwater [Member] | | |
| **Expected Retirements, Mothballs or Long Term Protective Layups of Coal-Fired Facilities** | | |
| Power Generation Capacity, Megawatts | 636 | |
| Generating facilities expected or scheduled to be deactivated \| Portland \| Units 1 and 2 [Member] | | |
| **Expected Retirements, Mothballs or Long Term Protective Layups of Coal-Fired Facilities** | | |
| Power Generation Capacity, Megawatts | 401 | [5] |
| Generating facilities expected or scheduled to be deactivated \| Titus | | |
| **Expected Retirements, Mothballs or Long Term Protective Layups of Coal-Fired Facilities** | | |
| Power Generation Capacity, Megawatts | 245 | |

[1] GenOn expects to return these units to service no later than the fall of 2016 using natural gas.

[2] .

[3] .

[4] .

[5] .

| Impairments (Details) $ in Millions | Nov. 25, 2015 USD ($) | Dec. 31, 2014 USD ($) | 3 Months Ended Sep. 30, 2014 USD ($) MW | Dec. 31, 2015 USD ($) MW | 12 Months Ended Dec. 31, 2014 USD ($) | Dec. 31, 2013 USD ($) | Nov. 24, 2015 MW |
|---|---|---|---|---|---|---|---|
| **Impaired Long-Lived Assets Held and Used [Line Items]** | | | | | | | |
| Proceeds from Sale of Equity Method Investments | | | | $ 0 | $ 35 | $ 0 | |
| Asset Impairment Charges | | | | $ 170 | $ 82 | $ 0 | |
| Seward Generating Station [Member] | | | | | | | |
| **Impaired Long-Lived Assets Held and Used [Line Items]** | | | | | | | |
| Equity Method Investment, Ownership Percentage | | | | | | | 100.00% |
| Power Generation Capacity, Megawatts | MW | | | | | | | 525 |
| Coolwater [Member] | | | | | | | |
| **Impaired Long-Lived Assets Held and Used [Line Items]** | | | | | | | |
| Power Generation Capacity, Megawatts | MW | | | 636 | | | | |
| Osceola facility [Member] | | | | | | | |
| **Impaired Long-Lived Assets Held and Used [Line Items]** | | | | | | | |
| Power Generation Capacity, Megawatts | MW | | 463 | | | | | |
| Portland [Member] | | | | | | | |
| **Impaired Long-Lived Assets Held and Used [Line Items]** | | | | | | | |
| Asset Impairment Charges | | | | $ 20 | | | |
| Osceola facility [Member] | | | | | | | |
| **Impaired Long-Lived Assets Held and Used [Line Items]** | | | | | | | |
| Asset Impairment Charges | | | $ 60 | | | | |
| Coolwater [Member] | | | | | | | |
| **Impaired Long-Lived Assets Held and Used [Line Items]** | | | | | | | |
| Asset Impairment Charges | | $ 22 | | | | | |
| Pittsburg [Member] | | | | | | | |
| **Impaired Long-Lived Assets Held and Used [Line Items]** | | | | | | | |
| Asset Impairment Charges | | | | 8 | | | |
| Seward Generating Station [Member] | | | | | | | |
| **Impaired Long-Lived Assets Held and Used [Line Items]** | | | | | | | |
| Proceeds from Sale of Equity Method Investments | $ 75 | | | | | | |
| Asset Impairment Charges | | | | $ 134 | | | |

| Debt and Capital Leases<br>Debt and Capital Leases<br>(Debt Summary - Details 1) -<br>USD ($)<br>$ in Millions | Dec. 31, 2015 | Dec. 31, 2014 |
|---|---|---|
| **Debt Instrument [Line Items]** | | |
| Debt and Capital Lease Obligations | $ 2,766 | $ 3,130 |
| Long-term Debt and Capital Lease Obligations, Current | 4 | 10 |
| Long-term Debt and Capital Lease Obligations | 2,762 | 3,120 |
| Debt Instrument, Unamortized Discount (Premium), Net | (183) | (263) |
| Capital Lease Obligations [Member] | | |
| **Debt Instrument [Line Items]** | | |
| Debt and Capital Lease Obligations | 2 | 3 |
| Other Debt Obligations [Member] | | |
| **Debt Instrument [Line Items]** | | |
| Debt and Capital Lease Obligations | [1] 56 | 60 |
| Senior Notes [Member] \| Senior Unsecured Notes 2017 [Member] | | |
| **Debt Instrument [Line Items]** | | |
| Debt and Capital Lease Obligations | $ 714 | 766 |
| Debt Instrument, Interest Rate, Stated Percentage | 7.875% | |
| Debt Instrument, Unamortized Discount (Premium), Net | $ 23 | 41 |
| Senior Notes [Member] \| Senior Unsecured Notes 2018 [Member] | | |
| **Debt Instrument [Line Items]** | | |
| Debt and Capital Lease Obligations | $ 708 | 757 |
| Debt Instrument, Interest Rate, Stated Percentage | 9.50% | |
| Debt Instrument, Unamortized Discount (Premium), Net | $ 59 | 83 |
| Senior Notes [Member] \| Senior Unsecured Notes 2020 [Member] | | |
| **Debt Instrument [Line Items]** | | |
| Debt and Capital Lease Obligations | $ 534 | 610 |
| Debt Instrument, Interest Rate, Stated Percentage | 9.875% | |
| Debt Instrument, Unamortized Discount (Premium), Net | $ 44 | 60 |
| GenOn Mid-Atlantic, LLC [Member] | | |
| **Debt Instrument [Line Items]** | | |
| Debt and Capital Lease Obligations | 0 | 5 |
| Long-term Debt and Capital Lease Obligations, Current | 0 | 5 |
| GenOn Mid-Atlantic, LLC [Member] \| Capital Lease Obligations [Member] | | |
| **Debt Instrument [Line Items]** | | |
| Debt and Capital Lease Obligations | $ 0 | 5 |
| Debt Instrument, Interest Rate, Stated Percentage | 8.19% | |
| GenOn Americas Generation, LLC [Member] | | |
| **Debt Instrument [Line Items]** | | |
| Debt and Capital Lease Obligations | [2] $ 752 | 929 |
| Long-term Debt and Capital Lease Obligations, Current | 0 | 5 |
| Long-term Debt and Capital Lease Obligations | $ 752 | 929 |
| GenOn Americas Generation, LLC [Member] \| Senior Unsecured Notes 2021 [Member] | | |

**Debt Instrument [Line Items]**

| | | |
|---|---|---|
| Debt Instrument, Interest Rate, Stated Percentage | 8.50% | |

GenOn Americas Generation, LLC [Member] | Senior Unsecured Notes 2031 [Member]

**Debt Instrument [Line Items]**

| | | |
|---|---|---|
| Debt Instrument, Interest Rate, Stated Percentage | 9.125% | |

GenOn Americas Generation, LLC [Member] | Senior Notes [Member] | Senior Unsecured Notes 2021 [Member]

**Debt Instrument [Line Items]**

| | | |
|---|---|---|
| Debt and Capital Lease Obligations | $ 398 | 496 |
| Debt Instrument, Unamortized Discount (Premium), Net | 32 | 46 |

GenOn Americas Generation, LLC [Member] | Senior Notes [Member] | Senior Unsecured Notes 2031 [Member]

**Debt Instrument [Line Items]**

| | | |
|---|---|---|
| Debt and Capital Lease Obligations | 354 | 433 |
| Debt Instrument, Unamortized Discount (Premium), Net | 25 | 33 |

GenOn Energy [Member]

**Debt Instrument [Line Items]**

| | | |
|---|---|---|
| Debt and Capital Lease Obligations | $ 2,014 | $ 2,196 |

[1] b)The Long Term Service Agreement for the Hunterstown facility is accounted for as a debt financing liability in accordance with U.S. GAAP.

[2] (a) This amount excludes GenOn Mid-Atlantic.

| Debt and Capital Leases Debt and Capital Leases (GenOn Debt - Details 2) $ in Millions | 1 Months Ended Jun. 30, 2013 USD ($) | 3 Months Ended Jun. 30, 2013 USD ($) | 12 Months Ended | | |
|---|---|---|---|---|---|
| | | | Dec. 31, 2015 USD ($) | Dec. 31, 2014 USD ($) | Dec. 31, 2013 USD ($) |
| **Debt Instrument [Line Items]** | | | | | |
| Gains (Losses) on Extinguishment of Debt | | | $ 65 | $ 0 | $ (11) |
| Debt Instrument, Unamortized Discount (Premium), Net | | | (183) | (263) | |
| **Senior Secured Notes 2014 [Member]** | | | | | |
| **Debt Instrument [Line Items]** | | | | | |
| Debt Instrument, Principal Amount Repurchased | $ 575 | $ 575 | | | |
| Redemption Price Percentage of Face Amount | 1.06778 | | | | |
| Gains (Losses) on Extinguishment of Debt | | $ (11) | | | |
| **Senior Unsecured Notes 2018 [Member]** | | | | | |
| **Debt Instrument [Line Items]** | | | | | |
| Debt Instrument, Principal Amount Repurchased | | | 25 | | |
| Debt Instrument, Redemption Price | | | 0 | | |
| Gains (Losses) on Extinguishment of Debt | | | (5) | | |
| Discount on Repurchase of Debt | | | 2 | | |
| Write-off of Unamortized Premium | | | 3 | | |
| **Senior Unsecured Notes 2020 [Member]** | | | | | |
| **Debt Instrument [Line Items]** | | | | | |
| Debt Instrument, Principal Amount Repurchased | | | 61 | | |
| Debt Instrument, Redemption Price | | | 0 | | |
| Gains (Losses) on Extinguishment of Debt | | | (15) | | |
| Discount on Repurchase of Debt | | | 10 | | |
| Write-off of Unamortized Premium | | | 5 | | |
| **Senior Unsecured Notes 2017 [Member]** | | | | | |
| **Debt Instrument [Line Items]** | | | | | |
| Debt Instrument, Principal Amount Repurchased | | | 33 | | |
| Debt Instrument, Redemption Price | | | 0 | | |
| Gains (Losses) on Extinguishment of Debt | | | (3) | | |
| Discount on Repurchase of Debt | | | 2 | | |
| Write-off of Unamortized Premium | | | $ 1 | | |
| **Senior Notes [Member] \| Senior Unsecured Notes 2018 And 2020 [Member]** | | | | | |
| **Debt Instrument [Line Items]** | | | | | |
| Credit Agreement Interest, Past Due Covenant Restriction | | | 30 days | | |
| Credit Agreement, Covenant Failure to Comply Agreements Default | | | 90 days | | |
| Credit Agreement, Covenant Failure to Comply Judgements Default | | | 90 days | | |
| **Senior Notes [Member] \| Senior Unsecured Notes 2018 [Member]** | | | | | |
| **Debt Instrument [Line Items]** | | | | | |
| Debt Instrument, Unamortized Discount (Premium), Net | | | $ 59 | 83 | |

| | | |
|---|---|---|
| Percentage of Principal Amount That is Base Redemption Price, Prior to Maturity | 100.00% | |
| Percentage of Face Amount, Senior Notes Paid as Premium on Redemption | 1.00% | |
| Percentage Of Principal Amount Used To Determine Premium On Redemption, Prior To Maturity | 100.00% | |
| Premium Percentage of Principal of Senior Notes, Discount Factor | 0.50% | |
| **Senior Notes [Member] \| Senior Unsecured Notes 2020 [Member]** | | |
| **Debt Instrument [Line Items]** | | |
| Debt Instrument, Unamortized Discount (Premium), Net | $ 44 | 60 |
| **Senior Notes [Member] \| Senior Unsecured Notes 2017 [Member]** | | |
| **Debt Instrument [Line Items]** | | |
| Debt Instrument, Unamortized Discount (Premium), Net | $ 23 | $ 41 |
| **Senior Notes [Member] \| Senior Unsecured Notes 2014 and 2017 [Member]** | | |
| **Debt Instrument [Line Items]** | | |
| Percentage of Principal Amount That is Base Redemption Price, Prior to Maturity | 100.00% | |
| Percentage of Face Amount, Senior Notes Paid as Premium on Redemption | 1.00% | |
| Percentage Of Principal Amount Used To Determine Premium On Redemption, Prior To Maturity | 100.00% | |
| Premium Percentage of Principal of Senior Notes, Discount Factor | 0.50% | |
| **Maximum [Member] \| Senior Notes [Member] \| Senior Unsecured Notes 2018 And 2020 [Member]** | | |
| **Debt Instrument [Line Items]** | | |
| Credit Agreement, Covenant Restricted Payments Amount Allowed | $ 250 | |
| **Redemption Period From October 15, 2015 to October 14, 2016 [Member] \| Senior Notes [Member] \| Senior Unsecured Notes 2020 [Member]** | | |
| **Debt Instrument [Line Items]** | | |
| Redemption Price As Percentage Of Principal Amount, Prior To Maturity | 104.938% | |
| **Redemption Period From October 15, 2016 to October 14, 2017 [Member] \| Senior Notes [Member] \| Senior Unsecured Notes 2020 [Member]** | | |
| **Debt Instrument [Line Items]** | | |
| Redemption Price As Percentage Of Principal Amount, Prior To Maturity | 103.292% | |
| **Redemption Period From October 15, 2017 to October 14, 2018 [Member] \| Senior Notes [Member] \| Senior Unsecured Notes 2020 [Member]** | | |
| **Debt Instrument [Line Items]** | | |
| Redemption Price As Percentage Of Principal Amount, Prior To Maturity | 101.646% | |
| **Redemption Period From October 15, 2018 And Thereafter [Member] \| Senior Notes [Member] \| Senior Unsecured Notes 2020 [Member]** | | |
| **Debt Instrument [Line Items]** | | |

| Redemption Price As Percentage Of Principal Amount, Prior To Maturity | 100.00% |

| Debt and Capital Leases<br>Debt and Capital Leases<br>(GAG Debt - Details 3) - USD<br>($)<br>$ in Millions | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| **Debt Instrument [Line Items]** | | | |
| Debt Instrument, Unamortized Discount (Premium), Net | $ (183) | $ (263) | |
| Gains (Losses) on Extinguishment of Debt | 65 | 0 | $ (11) |
| GenOn Americas Generation, LLC [Member] | | | |
| **Debt Instrument [Line Items]** | | | |
| Gains (Losses) on Extinguishment of Debt | 42 | 0 | $ 0 |
| GenOn Americas Generation, LLC [Member] \| Senior Unsecured Notes 2021 [Member] | | | |
| **Debt Instrument [Line Items]** | | | |
| Debt Instrument, Principal Amount Repurchased | 84 | | |
| Debt Instrument, Redemption Price | 0 | | |
| Gains (Losses) on Extinguishment of Debt | (20) | | |
| Discount on Repurchase of Debt | 13 | | |
| Write-off of Unamortized Premium | 7 | | |
| GenOn Americas Generation, LLC [Member] \| Senior Unsecured Notes 2031 [Member] | | | |
| **Debt Instrument [Line Items]** | | | |
| Debt Instrument, Principal Amount Repurchased | 71 | | |
| Debt Instrument, Redemption Price | 0 | | |
| Gains (Losses) on Extinguishment of Debt | (22) | | |
| Discount on Repurchase of Debt | 16 | | |
| Write-off of Unamortized Premium | 6 | | |
| GenOn Americas Generation, LLC [Member] \| Senior Notes [Member] \| Senior Unsecured Notes 2021 [Member] | | | |
| **Debt Instrument [Line Items]** | | | |
| Debt Instrument, Unamortized Discount (Premium), Net | 32 | 46 | |
| GenOn Americas Generation, LLC [Member] \| Senior Notes [Member] \| Senior Unsecured Notes 2031 [Member] | | | |
| **Debt Instrument [Line Items]** | | | |
| Debt Instrument, Unamortized Discount (Premium), Net | $ 25 | $ 33 | |
| GenOn Americas Generation, LLC [Member] \| Senior Notes [Member] \| Senior Unsecured Notes due 2021 and 2031 [Member] | | | |
| **Debt Instrument [Line Items]** | | | |
| Percentage of Principal Amount That is Base Redemption Price, Prior to Maturity | 100.00% | | |
| Premium Percentage of Principal of Senior Notes, Discount Factor | 0.375% | | |

| Debt and Capital Leases (Restricted Net Assets and Annual Maturities - Details 4) $ in Millions | Dec. 31, 2015 USD ($) |
|---|---|
| **Debt Instrument [Line Items]** | |
| Long-term Debt, Maturities, Repayments of Principal in Next Twelve Months | $ 4 |
| Long-term Debt, Maturities, Repayments of Principal in Year Two | 696 |
| Long-term Debt, Maturities, Repayments of Principal in Year Three | 653 |
| Long-term Debt, Maturities, Repayments of Principal in Year Four | 4 |
| Long-term Debt, Maturities, Repayments of Principal in Year Five | 494 |
| Thereafter | 732 |
| Long-term Debt | 2,583 |
| GenOn Mid-Atlantic, LLC [Member] | |
| **Debt Instrument [Line Items]** | |
| Restricted Net Assets | 1,100 |
| Rema [Member] | |
| **Debt Instrument [Line Items]** | |
| Restricted Net Assets | (1,112) |
| GenOn Americas Generation, LLC [Member] | |
| **Debt Instrument [Line Items]** | |
| Long-term Debt, Maturities, Repayments of Principal in Next Twelve Months | 0 |
| Long-term Debt, Maturities, Repayments of Principal in Year Two | 0 |
| Long-term Debt, Maturities, Repayments of Principal in Year Three | 0 |
| Long-term Debt, Maturities, Repayments of Principal in Year Four | 0 |
| Long-term Debt, Maturities, Repayments of Principal in Year Five | 0 |
| Thereafter | 695 |
| Long-term Debt | $ 695 |

| Asset Retirement Obligations (Details) $ in Millions | 12 Months Ended Dec. 31, 2015 USD ($) |
|---|---|
| Genon [Member] | |
| **Asset Retirement Obligation, Roll Forward Analysis [Roll Forward]** | |
| Balance at the beginning of the period | $ 172 |
| Asset Retirement Obligation, Liabilities Incurred | 7 |
| Asset Retirement Obligation, Revision of Estimate | (4) |
| Asset Retirement Obligation, Liabilities Settled | 2 |
| Accretion Expense | 14 |
| Balance at the end of the period | 187 |
| GenOn Americas Generation, LLC [Member] | |
| **Asset Retirement Obligation, Roll Forward Analysis [Roll Forward]** | |
| Balance at the beginning of the period | 78 |
| Asset Retirement Obligation, Liabilities Incurred | 1 |
| Asset Retirement Obligation, Revision of Estimate | (2) |
| Asset Retirement Obligation, Liabilities Settled | 0 |
| Accretion Expense | 5 |
| Balance at the end of the period | 82 |
| GenOn Mid-Atlantic, LLC [Member] | |
| **Asset Retirement Obligation, Roll Forward Analysis [Roll Forward]** | |
| Balance at the beginning of the period | 26 |
| Asset Retirement Obligation, Liabilities Incurred | 0 |
| Asset Retirement Obligation, Revision of Estimate | (1) |
| Asset Retirement Obligation, Liabilities Settled | 0 |
| Accretion Expense | 2 |
| Balance at the end of the period | $ 27 |

| Benefit Plans and Other Postretirement Benefits Benefit Plans and Other Postretirement Benefits Disclosure (Narrative) (Details) - USD ($) $ in Millions | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| **Defined Benefit Plan Disclosure [Line Items]** | | | |
| Pension and Other Postretirement Benefit Plans, Accumulated Other Comprehensive Income (Loss), Net Gains (Losses), before Tax | $ 1 | | |
| Defined Benefit Plan, Future Amortization of Prior Service Cost (Credit) | $ (1) | | |
| Employee Savings Fixed Profit Sharing and Discretionary Profit Sharing [Member] | | | |
| **Defined Benefit Plan Disclosure [Line Items]** | | | |
| Fixed contribution percentage of employee's eligible pay per period contributed to plan by company | 2.00% | | |
| Annual discretionay contribution percentage of employee's eligible pay cotributed to plan by company based on company performance | 3.00% | | |
| Expenses recognized | $ 0 | $ 0 | $ 4 |
| Supplemental Employee Retirement Plan [Member] | | | |
| **Defined Benefit Plan Disclosure [Line Items]** | | | |
| Defined Benefit Plan, Actuarial Gain (Loss) | 12 | | |
| Pension Plans, Defined Benefit [Member] | Tax Qualified Pension Benefits [Member] | | | |
| **Defined Benefit Plan Disclosure [Line Items]** | | | |
| Defined Benefit Plan, Accumulated Benefit Obligation | $ 608 | $ 631 | |
| Minimum [Member] | | | |
| **Defined Benefit Plan Disclosure [Line Items]** | | | |
| Aon Hewitt Above Median Yield Curve Discount Rate Years | 6 months | | |
| Maximum [Member] | | | |
| **Defined Benefit Plan Disclosure [Line Items]** | | | |
| Aon Hewitt Above Median Yield Curve Discount Rate Years | 99 years | | |

| Benefit Plans and Other Postretirement Benefits Disclosure (Details 1) - USD ($) $ in Millions | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| Pension Plans, Defined Benefit [Member] | | | |
| **Defined Benefit Plan, Net Periodic Benefit Cost [Abstract]** | | | |
| Service cost benefits earned | $ (10) | $ (10) | $ (13) |
| Interest cost on benefit obligation | 27 | 27 | 25 |
| Expected return on plan assets | (35) | (34) | (31) |
| Net periodic benefit cost | 3 | (3) | 7 |
| **Defined Benefit Plan, Change in Benefit Obligation [Roll Forward]** | | | |
| Service cost | 10 | 10 | 13 |
| Interest cost on benefit obligation | 27 | 27 | 25 |
| Actuarial loss | 1 | (6) | 0 |
| **Defined Benefit Plan, Change in Fair Value of Plan Assets [Roll Forward]** | | | |
| Fair value of plan assets as of beginning of period | 548 | | |
| Fair value of plan assets as of end of period | 506 | 548 | |
| Pension Plans, Defined Benefit [Member] \| Tax Qualified Pension Benefits [Member] | | | |
| **Defined Benefit Plan, Net Periodic Benefit Cost [Abstract]** | | | |
| Service cost benefits earned | (10) | (10) | |
| Interest cost on benefit obligation | 27 | 27 | |
| **Defined Benefit Plan, Change in Benefit Obligation [Roll Forward]** | | | |
| Benefit obligation as of beginning of period | 660 | 546 | |
| Service cost | 10 | 10 | |
| Interest cost on benefit obligation | 27 | 27 | |
| Actuarial loss | 33 | (103) | |
| Benefit payments | (39) | (26) | |
| Benefit obligation as of end of period | 625 | 660 | 546 |
| **Defined Benefit Plan, Change in Fair Value of Plan Assets [Roll Forward]** | | | |
| Fair value of plan assets as of beginning of period | 548 | 469 | |
| Actual return on plan assets | (17) | 49 | |
| Employer contributions | 14 | 56 | |
| Benefit payments | (39) | (26) | |
| Fair value of plan assets as of end of period | 506 | 548 | 469 |
| Funded status as of end of period — excess of obligation over assets | (119) | (112) | |
| Pension Plans, Defined Benefit [Member] \| Non Tax Qualified Pension Benefits [Member] | | | |
| **Defined Benefit Plan, Net Periodic Benefit Cost [Abstract]** | | | |
| Service cost benefits earned | 0 | 0 | |
| Interest cost on benefit obligation | 0 | 0 | |
| **Defined Benefit Plan, Change in Benefit Obligation [Roll Forward]** | | | |
| Benefit obligation as of beginning of period | 0 | 12 | |
| Service cost | 0 | 0 | |
| Interest cost on benefit obligation | 0 | 0 | |

| | | | |
|---|---|---|---|
| Actuarial loss | 0 | 0 | |
| Benefit payments | 0 | (12) | |
| Benefit obligation as of end of period | 0 | 0 | 12 |
| **Defined Benefit Plan, Change in Fair Value of Plan Assets [Roll Forward]** | | | |
| Fair value of plan assets as of beginning of period | 0 | 0 | |
| Actual return on plan assets | 0 | 0 | |
| Employer contributions | 0 | 12 | |
| Benefit payments | 0 | (12) | |
| Fair value of plan assets as of end of period | 0 | 0 | 0 |
| Funded status as of end of period — excess of obligation over assets | 0 | 0 | |
| Other Postretirement Benefit Plan [Member] | | | |
| **Defined Benefit Plan, Net Periodic Benefit Cost [Abstract]** | | | |
| Service cost benefits earned | (1) | (1) | (1) |
| Interest cost on benefit obligation | 3 | 3 | 3 |
| Unrecognized prior period costs | (4) | (17) | (1) |
| Net periodic benefit cost | 0 | (13) | 3 |
| **Defined Benefit Plan, Change in Benefit Obligation [Roll Forward]** | | | |
| Benefit obligation as of beginning of period | 65 | 73 | |
| Service cost | 1 | 1 | 1 |
| Interest cost on benefit obligation | 3 | 3 | 3 |
| Participant contributions | 1 | 2 | |
| Actuarial loss | 8 | (12) | |
| Benefit payments | (7) | (8) | |
| Plan amendments | (1) | (18) | |
| Benefit obligation as of end of period | 54 | 65 | 73 |
| **Defined Benefit Plan, Change in Fair Value of Plan Assets [Roll Forward]** | | | |
| Fair value of plan assets as of beginning of period | 0 | 0 | |
| Employer contributions | 6 | 6 | |
| Participant contributions | 1 | 2 | |
| Benefit payments | (7) | (8) | |
| Fair value of plan assets as of end of period | 0 | 0 | $ 0 |
| Funded status as of end of period — excess of obligation over assets | $ (54) | $ (65) | |

| Benefit Plans and Other Postretirement Benefits Disclosure (Details 2) - USD ($) $ in Millions | Dec. 31, 2015 | Dec. 31, 2014 |
|---|---|---|
| Pension Plans, Defined Benefit [Member] \| Tax Qualified Pension Benefits [Member] | | |
| **Defined Benefit Plan, Amounts Recognized in Balance Sheet [Abstract]** | | |
| Current liabilities | $ 0 | $ 0 |
| Non-current liabilities | 119 | 112 |
| Other Postretirement Benefit Plan [Member] | | |
| **Defined Benefit Plan, Amounts Recognized in Balance Sheet [Abstract]** | | |
| Current liabilities | 5 | 5 |
| Non-current liabilities | $ 49 | $ 60 |

| Benefit Plans and Other Postretirement Benefits Disclosure (Details 3) - USD ($) $ in Millions | 12 Months Ended | | |
| --- | --- | --- | --- |
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| **Defined Benefit Plan, Amounts Recognized in Other Comprehensive Income (Loss) Accumulated Other Comprehensive Income (Loss) [Roll Forward]** | | | |
| Total recognized in other comprehensive loss for the period | $ 14 | $ 104 | $ (101) |
| Pension Plans, Defined Benefit [Member] | | | |
| **Defined Benefit Plan, Amounts Recognized in Other Comprehensive Income (Loss) Accumulated Other Comprehensive Income (Loss) [Roll Forward]** | | | |
| Total amount recognized of (income) loss in net periodic benefit cost and other comprehensive income/loss | 22 | 90 | (84) |
| Pension Plans, Defined Benefit [Member] \| Tax Qualified Pension Benefits [Member] \| Net (Loss) Gain [Member] | | | |
| **Defined Benefit Plan Disclosure [Line Items]** | | | |
| Other Comprehensive Income (Loss), Pension and Other Postretirement Benefit Plans, Net Unamortized Gain (Loss) Arising During Period, before Tax | (20) | (87) | |
| Defined Benefit Plan, Amortization of Gains (Losses) | 1 | (6) | |
| Other Comprehensive (Income) Loss, Amortization Adjustment from AOCI, Pension and Other Postretirement Benefit Plans, for Net Prior Service Cost (Credit), before Tax | 0 | 0 | |
| Other Comprehensive (Income) Loss, Pension and Other Postretirement Benefit Plans, Adjustment, before Tax | (19) | (93) | |
| **Defined Benefit Plan, Amounts Recognized in Other Comprehensive Income (Loss) Accumulated Other Comprehensive Income (Loss) [Roll Forward]** | | | |
| Pension and Other Postretirement Benefit Plans, Accumulated Other Comprehensive Income (Loss), Net Gains (Losses), before Tax | (20) | (1) | 92 |
| Pension Plans, Defined Benefit [Member] \| Tax Qualified Pension Benefits [Member] \| Prior Service (Cost) Credit | | | |
| **Defined Benefit Plan Disclosure [Line Items]** | | | |
| Other Comprehensive Income (Loss), Pension and Other Postretirement Benefit Plans, Net Unamortized Gain (Loss) Arising During Period, before Tax | 0 | 0 | |
| Defined Benefit Plan, Amortization of Gains (Losses) | 0 | 0 | |
| Other Comprehensive (Income) Loss, Amortization Adjustment from AOCI, Pension and Other Postretirement Benefit Plans, for Net Prior Service Cost (Credit), before Tax | 0 | 0 | |
| Other Comprehensive (Income) Loss, Pension and Other Postretirement Benefit Plans, Adjustment, before Tax | 0 | 0 | |
| **Defined Benefit Plan, Amounts Recognized in Other Comprehensive Income (Loss) Accumulated Other Comprehensive Income (Loss) [Roll Forward]** | | | |
| Pension and Other Postretirement Benefit Plans, Accumulated Other Comprehensive Income (Loss), Net Gains (Losses), before Tax | (1) | (1) | (1) |
| Other Postretirement Benefit Plan [Member] | | | |
| **Defined Benefit Plan, Amounts Recognized in Other Comprehensive Income (Loss) Accumulated Other Comprehensive Income (Loss) [Roll Forward]** | | | |
| Total amount recognized of (income) loss in net periodic benefit cost and other comprehensive income/loss | (6) | (2) | (7) |
| Other Postretirement Benefit Plan [Member] \| Net (Loss) Gain [Member] | | | |
| **Defined Benefit Plan Disclosure [Line Items]** | | | |

| | | | |
|---|---|---|---|
| Other Comprehensive Income (Loss), Pension and Other Postretirement Benefit Plans, Net Unamortized Gain (Loss) Arising During Period, before Tax | 8 | (12) | |
| Defined Benefit Plan, Amortization of Gains (Losses) | 0 | 0 | |
| Other Comprehensive (Income) Loss, Amortization Adjustment from AOCI, Pension and Other Postretirement Benefit Plans, for Net Prior Service Cost (Credit), before Tax | 0 | 0 | |
| Other Comprehensive (Income) Loss, Pension and Other Postretirement Benefit Plans, Adjustment, before Tax | 8 | (12) | |
| **Defined Benefit Plan, Amounts Recognized in Other Comprehensive Income (Loss) Accumulated Other Comprehensive Income (Loss) [Roll Forward]** | | | |
| Pension and Other Postretirement Benefit Plans, Accumulated Other Comprehensive Income (Loss), Net Gains (Losses), before Tax | 3 | (5) | 7 |
| Other Postretirement Benefit Plan [Member] \| Prior Service (Cost) Credit | | | |
| **Defined Benefit Plan Disclosure [Line Items]** | | | |
| Other Comprehensive Income (Loss), Pension and Other Postretirement Benefit Plans, Net Unamortized Gain (Loss) Arising During Period, before Tax | 1 | 18 | |
| Defined Benefit Plan, Amortization of Gains (Losses) | 0 | 0 | |
| Other Comprehensive (Income) Loss, Amortization Adjustment from AOCI, Pension and Other Postretirement Benefit Plans, for Net Prior Service Cost (Credit), before Tax | (4) | (17) | |
| Other Comprehensive (Income) Loss, Pension and Other Postretirement Benefit Plans, Adjustment, before Tax | (3) | 1 | |
| **Defined Benefit Plan, Amounts Recognized in Other Comprehensive Income (Loss) Accumulated Other Comprehensive Income (Loss) [Roll Forward]** | | | |
| Pension and Other Postretirement Benefit Plans, Accumulated Other Comprehensive Income (Loss), Net Gains (Losses), before Tax | $ 2 | $ 5 | $ 4 |

| Benefit Plans and Other Postretirement Benefits Disclosure (Details 4) - Pension Plan [Member] - USD ($) $ in Millions | Dec. 31, 2015 | Dec. 31, 2014 |
|---|---|---|
| **Defined Benefit Plan, Plan Asset Measured at Fair Value [Abstract]** | | |
| Fair value of plan assets | $ 506 | $ 548 |
| Level 1 [Member] | | |
| **Defined Benefit Plan, Plan Asset Measured at Fair Value [Abstract]** | | |
| Fair value of plan assets | 3 | 2 |
| Level 2 [Member] | | |
| **Defined Benefit Plan, Plan Asset Measured at Fair Value [Abstract]** | | |
| Fair value of plan assets | 503 | 546 |
| Common Trust Investment US Equity Securities [Member] | | |
| **Defined Benefit Plan, Plan Asset Measured at Fair Value [Abstract]** | | |
| Fair value of plan assets | 142 | 156 |
| Common Trust Investment US Equity Securities [Member] | Level 1 [Member] | | |
| **Defined Benefit Plan, Plan Asset Measured at Fair Value [Abstract]** | | |
| Fair value of plan assets | 0 | 0 |
| Common Trust Investment US Equity Securities [Member] | Level 2 [Member] | | |
| **Defined Benefit Plan, Plan Asset Measured at Fair Value [Abstract]** | | |
| Fair value of plan assets | 142 | 156 |
| Common Trust Investment Non US Equity Securities [Member] | | |
| **Defined Benefit Plan, Plan Asset Measured at Fair Value [Abstract]** | | |
| Fair value of plan assets | 82 | 80 |
| Common Trust Investment Non US Equity Securities [Member] | Level 1 [Member] | | |
| **Defined Benefit Plan, Plan Asset Measured at Fair Value [Abstract]** | | |
| Fair value of plan assets | 0 | 0 |
| Common Trust Investment Non US Equity Securities [Member] | Level 2 [Member] | | |
| **Defined Benefit Plan, Plan Asset Measured at Fair Value [Abstract]** | | |
| Fair value of plan assets | 82 | 80 |
| Common Trust Investment Global Equity [Member] | | |
| **Defined Benefit Plan, Plan Asset Measured at Fair Value [Abstract]** | | |
| Fair value of plan assets | 49 | 52 |
| Common Trust Investment Global Equity [Member] | Level 1 [Member] | | |
| **Defined Benefit Plan, Plan Asset Measured at Fair Value [Abstract]** | | |
| Fair value of plan assets | 0 | 0 |
| Common Trust Investment Global Equity [Member] | Level 2 [Member] | | |
| **Defined Benefit Plan, Plan Asset Measured at Fair Value [Abstract]** | | |
| Fair value of plan assets | 49 | 52 |
| Common Trust Investment Fixed Income Securities [Member] | | |
| **Defined Benefit Plan, Plan Asset Measured at Fair Value [Abstract]** | | |
| Fair value of plan assets | 220 | 246 |
| Common Trust Investment Fixed Income Securities [Member] | Level 1 [Member] | | |
| **Defined Benefit Plan, Plan Asset Measured at Fair Value [Abstract]** | | |

| | | |
|---|---|---|
| Fair value of plan assets | 0 | 0 |

Common Trust Investment Fixed Income Securities [Member] | Level 2 [Member]

**Defined Benefit Plan, Plan Asset Measured at Fair Value [Abstract]**

| | | |
|---|---|---|
| Fair value of plan assets | 220 | 246 |

Partnership [Member]

**Defined Benefit Plan, Plan Asset Measured at Fair Value [Abstract]**

| | | |
|---|---|---|
| Fair value of plan assets | 10 | 12 |

Partnership [Member] | Level 1 [Member]

**Defined Benefit Plan, Plan Asset Measured at Fair Value [Abstract]**

| | | |
|---|---|---|
| Fair value of plan assets | 0 | 0 |

Partnership [Member] | Level 2 [Member]

**Defined Benefit Plan, Plan Asset Measured at Fair Value [Abstract]**

| | | |
|---|---|---|
| Fair value of plan assets | 10 | 12 |

Short-term Investments [Member]

**Defined Benefit Plan, Plan Asset Measured at Fair Value [Abstract]**

| | | |
|---|---|---|
| Fair value of plan assets | 3 | 2 |

Short-term Investments [Member] | Level 1 [Member]

**Defined Benefit Plan, Plan Asset Measured at Fair Value [Abstract]**

| | | |
|---|---|---|
| Fair value of plan assets | 3 | 2 |

Short-term Investments [Member] | Level 2 [Member]

**Defined Benefit Plan, Plan Asset Measured at Fair Value [Abstract]**

| | | |
|---|---|---|
| Fair value of plan assets | $ 0 | $ 0 |

| Benefit Plans and Other Postretirement Benefits Disclosure (Details 5) - USD ($) $ in Millions | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| Pension Plans, Defined Benefit [Member] | | | |
| **Defined Benefit Plan Disclosure [Line Items]** | | | |
| Total amount recognized of (income) loss in net periodic benefit cost and other comprehensive income/loss | $ 22 | $ 90 | $ (84) |
| **Assumptions (Abstract)** | | | |
| Discount rate used in calculating benefit obligations | 4.54% | 4.18% | |
| Rate of compensation increase to calculate benefit obligations (as a percent) | 3.00% | 2.97% | |
| Discount rate to calculate net periodic benefit cost | 4.18% | 5.02% | 4.22% |
| Rate of compensation increase to calculate net periodic benefit cost (as a percent) | 2.97% | 2.91% | 2.82% |
| Expected long-term rate of return on plan assets (as a percent) | 6.41% | 7.00% | 7.50% |
| Other Postretirement Benefit Plan [Member] | | | |
| **Defined Benefit Plan Disclosure [Line Items]** | | | |
| Total amount recognized of (income) loss in net periodic benefit cost and other comprehensive income/loss | $ (6) | $ (2) | $ (7) |
| **Assumptions (Abstract)** | | | |
| Discount rate used in calculating benefit obligations | 4.16% | 3.86% | |
| Defined Benefit Plan, Effect of One Percentage Point Increase on Accumulated Postretirement Benefit Obligation | $ 5 | | |
| Discount rate to calculate net periodic benefit cost | 3.86% | 4.53% | 3.99% |
| Effect of One Percentage Point increase or decrease on service and interest cost components | $ 1 | | |
| Defined Benefit Plan, Effect of One Percentage Point Decrease on Accumulated Postretirement Benefit Obligation | $ 4 | | |
| Net Period Benefit Cost/Credit [Member] | Other Postretirement Benefit Plan [Member] | | | |
| **Assumptions (Abstract)** | | | |
| Assumed ultimate medical inflation rate (as a percent) | 5.00% | 5.50% | 5.50% |
| Defined Benefit Plan, Year that Rate Reaches Ultimate Trend Rate | 2023 | 2019 | 2018 |
| Net Period Benefit Cost/Credit [Member] | Before age 65 [Member] | Other Postretirement Benefit Plan [Member] | | | |
| **Defined Benefit Plan Disclosure [Line Items]** | | | |
| Defined Benefit Plan, Health Care Cost Trend Rate Assumed for Next Fiscal Year | 8.60% | 8.50% | 8.50% |
| Net Period Benefit Cost/Credit [Member] | Age 65 and after [Member] | Other Postretirement Benefit Plan [Member] | | | |
| **Defined Benefit Plan Disclosure [Line Items]** | | | |
| Defined Benefit Plan, Health Care Cost Trend Rate Assumed for Next Fiscal Year | 8.10% | 8.69% | 8.67% |
| Postretirement Benefit Obligation [Member] | Other Postretirement Benefit Plan [Member] | | | |
| **Assumptions (Abstract)** | | | |
| Assumed ultimate medical inflation rate (as a percent) | 5.00% | 5.00% | |
| Defined Benefit Plan, Year that Rate Reaches Ultimate Trend Rate | 2025 | 2023 | |
| Postretirement Benefit Obligation [Member] | Before age 65 [Member] | Other Postretirement Benefit Plan [Member] | | | |

**Defined Benefit Plan Disclosure [Line Items]**

| | | |
|---|---|---|
| Defined Benefit Plan, Health Care Cost Trend Rate Assumed for Next Fiscal Year | 7.25% | 8.60% |

Postretirement Benefit Obligation [Member] | Age 65 and after [Member] | Other Postretirement Benefit Plan [Member]

**Defined Benefit Plan Disclosure [Line Items]**

| | | |
|---|---|---|
| Defined Benefit Plan, Health Care Cost Trend Rate Assumed for Next Fiscal Year | 9.00% | 8.10% |

| Benefit Plans and Other Postretirement Benefits Disclosure (Details 6) - USD ($) $ in Millions | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| Pension Plans, Defined Benefit [Member] | | | |
| **Defined Benefit Plan Disclosure [Line Items]** | | | |
| Defined Benefit Plan, Assumptions Used Calculating Net Periodic Benefit Cost, Discount Rate | 4.18% | 5.02% | 4.22% |
| Other Postretirement Benefit Plan [Member] | | | |
| **Defined Benefit Plan Disclosure [Line Items]** | | | |
| Defined Benefit Plan, Assumptions Used Calculating Net Periodic Benefit Cost, Discount Rate | 3.86% | 4.53% | 3.99% |
| Effect of One Percentage Point increase or decrease on service and interest cost components | $ 1 | | |
| Domestic Stocks [Member] \| Pension Plans, Defined Benefit [Member] | | | |
| **Pension plan asset allocations** | | | |
| Target plan asset allocations | 27.00% | | |
| Non US Equity Securities [Member] \| Pension Plans, Defined Benefit [Member] | | | |
| **Pension plan asset allocations** | | | |
| Target plan asset allocations | 15.00% | | |
| Global Equities [Member] \| Pension Plans, Defined Benefit [Member] | | | |
| **Pension plan asset allocations** | | | |
| Target plan asset allocations | 10.00% | | |
| Emerging Market Equities [Member] \| Pension Plans, Defined Benefit [Member] | | | |
| **Pension plan asset allocations** | | | |
| Target plan asset allocations | 3.00% | | |
| Fixed Income Securities [Member] \| Pension Plans, Defined Benefit [Member] | | | |
| **Pension plan asset allocations** | | | |
| Target plan asset allocations | 45.00% | | |

| Benefit Plans and Other Postretirement Benefits Disclosure (Details 7) - USD ($) $ in Millions | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| Pension Benefits \| Tax Qualified Pension Benefits [Member] | | | |
| **Defined Benefit Plan, Estimated Future Employer Contributions [Abstract]** | | | |
| Employer expected contributions in next fiscal year | $ 16 | | |
| **Defined Benefit Plan, Expected Future Benefit Payments, Fiscal Year Maturity [Abstract]** | | | |
| 2013 | 29 | | |
| 2014 | 31 | | |
| 2015 | 32 | | |
| 2016 | 34 | | |
| 2017 | 35 | | |
| 2018-2022 | 194 | | |
| Other Postretirement Benefit Plan [Member] | | | |
| **Defined Benefit Plan, Expected Future Benefit Payments, Fiscal Year Maturity [Abstract]** | | | |
| 2013 | 5 | | |
| 2014 | 5 | | |
| 2015 | 6 | | |
| 2016 | 5 | | |
| 2017 | 5 | | |
| 2018-2022 | 18 | | |
| Employee Savings Fixed Profit Sharing and Discretionary Profit Sharing [Member] | | | |
| **Defined Benefit Plan Disclosure [Line Items]** | | | |
| Other Labor-related Expenses | 0 | $ 0 | $ 4 |
| Non-Qualified Deferred Compensation Plans [Member] | | | |
| **Defined Benefit Plan Disclosure [Line Items]** | | | |
| Deferred Compensation Liability, Current and Noncurrent | $ 15 | $ 20 | |

| Income Taxes Income Taxes (GenOn - Details 1) - USD ($) $ in Millions | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| **Operating Loss Carryforwards [Line Items]** | | | |
| Current Federal Tax Expense (Benefit) | $ 0 | $ 0 | $ (6) |
| Current State and Local Tax Expense (Benefit) | (3) | 6 | 0 |
| Income Tax Expense (Benefit) | (3) | 6 | (6) |
| Current Income Tax Expense (Benefit) | (3) | 6 | (6) |
| Income (Loss) from Continuing Operations before Income Taxes, Extraordinary Items, Noncontrolling Interest | (118) | 198 | (48) |
| Effective Income Tax Rate Reconciliation at Federal Statutory Income Tax Rate, Amount | (42) | 70 | (17) |
| Effective Income Tax Rate Reconciliation, State and Local Income Taxes, Amount | (3) | 14 | (24) |
| Effective Income Tax Rate Reconciliation, Change in Deferred Tax Assets Valuation Allowance, Amount | 16 | (100) | 0 |
| Effective Income Tax Rate Reconciliation, Change in Enacted Tax Rate, Amount | 26 | 21 | 35 |
| Effective Income Tax Rate Reconciliation, Other Adjustments, Amount | 0 | 1 | 0 |
| **Deferred Income Taxes and Other Assets [Abstract]** | | | |
| Deferred Tax Assets, Tax Deferred Expense, Compensation and Benefits, Employee Benefits | 76 | 100 | |
| Deferred Tax Assets, Tax Deferred Expense Compensation and Benefits Pensions and Other Postretirement Benefits | 0 | 113 | |
| Deferred Tax Assets, Operating Loss Carryforwards, Domestic | 664 | 727 | |
| Deferred Tax Assets, Operating Loss Carryforwards, State and Local | 214 | 125 | |
| Deferred Tax Assets, Property Intangible Assets | 931 | 1,080 | |
| Deferred Tax Assets, Derivative Instruments | 470 | 90 | |
| Deferred Tax Assets, Out of Market Contracts, Fair Value Adjustment | 378 | 381 | |
| Deferred Tax Assets Financing Arrangements | 92 | 123 | |
| Deferred Tax Assets, Other | 20 | 40 | |
| Deferred Tax Assets, Gross | 2,845 | 2,779 | |
| Deferred Tax Assets, Valuation Allowance | 2,464 | 2,779 | |
| Deferred Tax Assets, Net of Valuation Allowance | 381 | 0 | |
| **Deferred Income Taxes and Other Liabilities [Abstract]** | | | |
| Deferred Tax Liabilities, Derivatives | 381 | 0 | |
| Deferred Tax Liabilities, Net | 381 | 0 | |
| Deferred Tax Assets, Net | 0 | 0 | |
| Deferred Federal Income Tax Expense (Benefit) | 0 | 0 | 0 |
| Deferred State and Local Income Tax Expense (Benefit) | 0 | 0 | 0 |
| Deferred Income Tax Expense (Benefit) | $ 0 | $ 0 | $ 0 |
| Effective Income Tax Rate Reconciliation, Percent | 2.50% | 3.00% | 12.50% |

| Income Taxes Income Taxes (GenOn DTA, Val Allowance, UTB - Details 2) - USD ($) $ in Millions | 12 Months Ended | | |
| --- | --- | --- | --- |
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| **Operating Loss Carryforwards [Line Items]** | | | |
| DeferredTaxAssetNetBeforeValuationAllowance | $ 2,500 | $ 2,800 | |
| Deferred Tax Assets, Valuation Allowance | 2,464 | 2,779 | |
| Taxes Payable, Current | 58 | 48 | |
| Unrecognized Tax Benefits, Interest on Income Taxes Expense | | 1 | |
| Unrecognized Tax Benefits | 0 | 2 | $ 1 |
| Unrecognized Tax Benefits, Increase Resulting from Prior Period Tax Positions | 0 | 1 | |
| Unrecognized Tax Benefits, Decrease Resulting from Settlements with Taxing Authorities | (2) | $ 0 | |
| Domestic Tax Authority [Member] | | | |
| **Operating Loss Carryforwards [Line Items]** | | | |
| Operating Loss Carryforwards | 700 | | |
| Pre-Merger Operating Loss Carryforwards | 62 | | |
| State and Local Jurisdiction [Member] | | | |
| **Operating Loss Carryforwards [Line Items]** | | | |
| Operating Loss Carryforwards | $ 214 | | |

| Income Taxes Income Taxes (GAG - Details 3) - USD ($) $ in Millions | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| **Operating Loss Carryforwards [Line Items]** | | | |
| Income (Loss) from Continuing Operations before Income Taxes, Extraordinary Items, Noncontrolling Interest | $ (118) | $ 198 | $ (48) |
| Effective Income Tax Rate Reconciliation at Federal Statutory Income Tax Rate, Amount | (42) | 70 | (17) |
| Effective Income Tax Rate Reconciliation, State and Local Income Taxes, Amount | (3) | 14 | (24) |
| Effective Income Tax Rate Reconciliation, Change in Enacted Tax Rate, Amount | 26 | 21 | 35 |
| Effective Income Tax Rate Reconciliation, Other Adjustments, Amount | 0 | 1 | 0 |
| Income Tax Expense (Benefit) | (3) | 6 | (6) |
| GenOn Americas Generation, LLC [Member] | | | |
| **Operating Loss Carryforwards [Line Items]** | | | |
| Income (Loss) from Continuing Operations before Income Taxes, Extraordinary Items, Noncontrolling Interest | 116 | 305 | 59 |
| Effective Income Tax Rate Reconciliation at Federal Statutory Income Tax Rate, Amount | 41 | 107 | 21 |
| Effective Income Tax Rate Reconciliation, State and Local Income Taxes, Amount | 10 | 18 | 6 |
| Effective Income Tax Rate Reconciliation, Tax Exempt Income, Amount | 51 | 115 | 48 |
| Effective Income Tax Rate Reconciliation, Change in Enacted Tax Rate, Amount | 0 | (2) | 21 |
| Effective Income Tax Rate Reconciliation, Other Adjustments, Amount | 0 | (8) | 0 |
| Income Tax Expense (Benefit) | $ 0 | $ 0 | $ 0 |

| Income Taxes Income Taxes (Proforma GAG - Details 4) - USD ($) $ in Millions | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| **Operating Loss Carryforwards [Line Items]** | | | |
| Taxes Payable, Current | $ 58 | $ 48 | |
| Income (Loss) from Continuing Operations before Income Taxes, Extraordinary Items, Noncontrolling Interest | (118) | 198 | $ (48) |
| Effective Income Tax Rate Reconciliation at Federal Statutory Income Tax Rate, Amount | (42) | 70 | (17) |
| Effective Income Tax Rate Reconciliation, State and Local Income Taxes, Amount | (3) | 14 | (24) |
| Effective Income Tax Rate Reconciliation, Change in Deferred Tax Assets Valuation Allowance, Amount | 16 | (100) | 0 |
| Effective Income Tax Rate Reconciliation, Change in Enacted Tax Rate, Amount | 26 | 21 | 35 |
| Effective Income Tax Rate Reconciliation, Other Adjustments, Amount | 0 | 1 | 0 |
| Income Tax Expense (Benefit) | (3) | 6 | (6) |
| **Deferred Income Taxes and Other Assets [Abstract]** | | | |
| Deferred Tax Assets, Tax Deferred Expense Compensation and Benefits Pensions and Other Postretirement Benefits | 0 | 113 | |
| Deferred Tax Assets, Property Intangible Assets | 931 | 1,080 | |
| Deferred Tax Assets, Out of Market Contracts, Fair Value Adjustment | 378 | 381 | |
| Deferred Tax Assets, Derivative Instruments | 470 | 90 | |
| Deferred Tax Assets Financing Arrangements | 92 | 123 | |
| Deferred Tax Assets, Other | 20 | 40 | |
| Deferred Tax Assets, Gross | 2,845 | 2,779 | |
| Deferred Tax Assets, Valuation Allowance | 2,464 | 2,779 | |
| Deferred Tax Assets, Net of Valuation Allowance | 381 | 0 | |
| **Deferred Income Taxes and Other Liabilities [Abstract]** | | | |
| Deferred Tax Liabilities, Derivatives | 381 | 0 | |
| Deferred Tax Liabilities, Net | 381 | 0 | |
| Deferred Tax Assets, Net | 0 | 0 | |
| DeferredTaxAssetNetBeforeValuationAllowance | 2,500 | 2,800 | |
| GenOn Americas Generation, LLC [Member] | | | |
| **Operating Loss Carryforwards [Line Items]** | | | |
| Income Taxes Receivable, Current | 0 | | |
| Taxes Payable, Current | 0 | | |
| Income (Loss) from Continuing Operations before Income Taxes, Extraordinary Items, Noncontrolling Interest | 116 | 305 | 59 |
| Effective Income Tax Rate Reconciliation at Federal Statutory Income Tax Rate, Amount | 41 | 107 | 21 |
| Effective Income Tax Rate Reconciliation, State and Local Income Taxes, Amount | 10 | 18 | 6 |
| Effective Income Tax Rate Reconciliation, Change in Enacted Tax Rate, Amount | 0 | (2) | 21 |
| Effective Income Tax Rate Reconciliation, Other Adjustments, Amount | 0 | (8) | 0 |
| Income Tax Expense (Benefit) | 0 | 0 | 0 |
| Pro Forma [Member] | GenOn Americas Generation, LLC [Member] | | | |
| **Operating Loss Carryforwards [Line Items]** | | | |
| Income (Loss) from Continuing Operations before Income Taxes, Extraordinary Items, Noncontrolling Interest | 116 | 305 | 59 |

| | | | |
|---|---|---|---|
| Effective Income Tax Rate Reconciliation at Federal Statutory Income Tax Rate, Amount | 41 | 107 | 22 |
| Effective Income Tax Rate Reconciliation, State and Local Income Taxes, Amount | 10 | 18 | 6 |
| Effective Income Tax Rate Reconciliation, Change in Deferred Tax Assets Valuation Allowance, Amount | (51) | (115) | (49) |
| Effective Income Tax Rate Reconciliation, Change in Enacted Tax Rate, Amount | 0 | (2) | 21 |
| Effective Income Tax Rate Reconciliation, Other Adjustments, Amount | 0 | (8) | 0 |
| Income Tax Expense (Benefit) | 0 | 0 | $ 0 |
| **Deferred Income Taxes and Other Assets [Abstract]** | | | |
| Deferred Tax Assets, Tax Deferred Expense Compensation and Benefits Pensions and Other Postretirement Benefits | 85 | 85 | |
| Deferred Tax Assets, Tax Deferred Expense, Reserves and Accruals, Contingencies | 119 | 121 | |
| Deferred Tax Assets, Operating Loss Carryforwards | 3 | 14 | |
| Deferred Tax Assets, Property Intangible Assets | 1,495 | 1,652 | |
| Deferred Tax Assets, Out of Market Contracts, Fair Value Adjustment | 47 | 34 | |
| Deferred Tax Assets, Derivative Instruments | 166 | 0 | |
| Deferred Tax Assets Financing Arrangements | 28 | 38 | |
| Deferred Tax Assets, Other | 20 | 36 | |
| Deferred Tax Assets, Gross | 1,963 | 1,980 | |
| Deferred Tax Assets, Valuation Allowance | 1,963 | 1,824 | |
| Deferred Tax Assets, Net of Valuation Allowance | 0 | 156 | |
| **Deferred Income Taxes and Other Liabilities [Abstract]** | | | |
| Deferred Tax Liabilities, Derivatives | 0 | 12 | |
| Deferred Tax Liabilities, Investment in Noncontrolled Affiliates | 0 | 144 | |
| Deferred Tax Liabilities, Net | 0 | 156 | |
| Deferred Tax Assets, Net | 0 | 0 | |
| DeferredTaxAssetNetBeforeValuationAllowance | 2,000 | $ 1,800 | |
| Domestic Tax Authority [Member] | | | |
| **Deferred Income Taxes and Other Liabilities [Abstract]** | | | |
| Operating Loss Carryforwards | 700 | | |
| Pre-Merger Operating Loss Carryforwards | 62 | | |
| Domestic Tax Authority [Member] \| Pro Forma [Member] | | | |
| **Deferred Income Taxes and Other Liabilities [Abstract]** | | | |
| Pre-Merger Operating Loss Carryforwards | 62 | | |
| Domestic Tax Authority [Member] \| Pro Forma [Member] \| GenOn Americas Generation, LLC [Member] | | | |
| **Deferred Income Taxes and Other Liabilities [Abstract]** | | | |
| Operating Loss Carryforwards | 0 | | |
| State and Local Jurisdiction [Member] | | | |
| **Deferred Income Taxes and Other Liabilities [Abstract]** | | | |
| Operating Loss Carryforwards | 214 | | |
| State and Local Jurisdiction [Member] \| Pro Forma [Member] \| GenOn Americas Generation, LLC [Member] | | | |
| **Deferred Income Taxes and Other Liabilities [Abstract]** | | | |
| Operating Loss Carryforwards | $ 3 | | |

| Income Taxes Income Taxes (GMA - Details 5) - USD ($) $ in Millions | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| **Operating Loss Carryforwards [Line Items]** | | | |
| Current Federal Tax Expense (Benefit) | $ 0 | $ 0 | $ (6) |
| Current State and Local Tax Expense (Benefit) | (3) | 6 | 0 |
| Deferred Federal Income Tax Expense (Benefit) | 0 | 0 | 0 |
| Deferred State and Local Income Tax Expense (Benefit) | 0 | 0 | 0 |
| Income Tax Expense (Benefit) | (3) | 6 | (6) |
| Income (Loss) from Continuing Operations before Income Taxes, Extraordinary Items, Noncontrolling Interest | (118) | 198 | (48) |
| Effective Income Tax Rate Reconciliation at Federal Statutory Income Tax Rate, Amount | (42) | 70 | (17) |
| Effective Income Tax Rate Reconciliation, State and Local Income Taxes, Amount | (3) | 14 | (24) |
| Effective Income Tax Rate Reconciliation, Change in Enacted Tax Rate, Amount | 26 | 21 | 35 |
| Effective Income Tax Rate Reconciliation, Other Adjustments, Amount | 0 | 1 | 0 |
| **Deferred Income Taxes and Other Assets [Abstract]** | | | |
| Deferred Tax Assets, Property Intangible Assets | 931 | 1,080 | |
| Deferred Tax Assets, Out of Market Contracts, Fair Value Adjustment | 378 | 381 | |
| Deferred Tax Assets, Other | 20 | 40 | |
| Deferred Tax Assets, Gross | 2,845 | 2,779 | |
| **Deferred Income Taxes and Other Liabilities [Abstract]** | | | |
| Deferred Tax Liabilities, Derivatives | 381 | 0 | |
| Deferred Tax Liabilities, Net | 381 | 0 | |
| Deferred Tax Assets, Net | 0 | 0 | |
| GenOn Mid-Atlantic, LLC [Member] | | | |
| **Operating Loss Carryforwards [Line Items]** | | | |
| Income Tax Expense (Benefit) | 0 | 0 | 0 |
| Income (Loss) from Continuing Operations before Income Taxes, Extraordinary Items, Noncontrolling Interest | 104 | 236 | 128 |
| Pro Forma [Member] | GenOn Mid-Atlantic, LLC [Member] | | | |
| **Operating Loss Carryforwards [Line Items]** | | | |
| Current Federal Tax Expense (Benefit) | 36 | 82 | 45 |
| Current State and Local Tax Expense (Benefit) | 6 | 11 | 12 |
| Deferred Federal Income Tax Expense (Benefit) | 0 | (5) | 0 |
| Deferred State and Local Income Tax Expense (Benefit) | 0 | (1) | 0 |
| Income Tax Expense (Benefit) | 42 | 87 | 57 |
| Income (Loss) from Continuing Operations before Income Taxes, Extraordinary Items, Noncontrolling Interest | 104 | 236 | 128 |
| Effective Income Tax Rate Reconciliation at Federal Statutory Income Tax Rate, Amount | 36 | 82 | 45 |
| Effective Income Tax Rate Reconciliation, State and Local Income Taxes, Amount | 6 | 11 | 12 |
| Effective Income Tax Rate Reconciliation, Change in Enacted Tax Rate, Amount | 0 | (1) | 0 |
| Effective Income Tax Rate Reconciliation, Other Adjustments, Amount | 0 | (5) | $ 0 |
| **Deferred Income Taxes and Other Assets [Abstract]** | | | |
| Deferred Tax Assets, Tax Deferred Expense, Reserves and Accruals, Contingencies | 22 | 24 | |

| | | |
|---|---|---|
| Deferred Tax Assets, Operating Loss Carryforwards | 218 | 218 |
| Deferred Tax Assets, Property Intangible Assets | 31 | 45 |
| Deferred Tax Assets, Out of Market Contracts, Fair Value Adjustment | 77 | 88 |
| Deferred Tax Assets, Other | 38 | 37 |
| Deferred Tax Assets, Gross | 386 | 412 |
| **Deferred Income Taxes and Other Liabilities [Abstract]** | | |
| Deferred Tax Liabilities, Derivatives | 305 | 336 |
| Deferred Tax Liabilities, Investment in Noncontrolled Affiliates | 25 | 25 |
| Deferred Tax Liabilities, Net | 330 | 361 |
| Deferred Tax Assets, Net | $ 56 | $ 51 |

| Related Party Transactions (Details) - USD ($) $ in Millions | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| **Related Party Transaction [Line Items]** | | | |
| Annual fees under services agreement | $ 184 | $ 128 | |
| GenOn Mid-Atlantic, LLC [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Cost of operations | 59 | 68 | $ 70 |
| GenOn Americas Generation, LLC [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Cost of operations | 84 | 86 | 83 |
| Cash Distribution paid to Parent Company | | 320 | |
| GenOn Americas Generation, LLC [Member] \| GenOn Energy Holdings [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Current notes receivable from related party | 331 | 331 | |
| Allocated cost of operations [Member] \| GenOn Mid-Atlantic, LLC [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Cost of operations | 1 | 4 | 6 |
| Allocated cost of operations [Member] \| GenOn Americas Generation, LLC [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Cost of operations | 3 | 7 | 9 |
| Allocated Selling, General and Administrative [Member] \| GenOn Mid-Atlantic, LLC [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Related Party Transaction, Selling, General and Administrative Expenses from Transactions with Related Party | 58 | 64 | 64 |
| Allocated Selling, General and Administrative [Member] \| GenOn Americas Generation, LLC [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Related Party Transaction, Selling, General and Administrative Expenses from Transactions with Related Party | 81 | $ 79 | $ 74 |
| Letter of Credit [Member] \| Intercompany Credit Agreement [Member] \| NRG Energy [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Amount of letters of credit transferred to intercompany credit agreement | 278 | | |
| Letter of Credit [Member] \| Intercompany Credit Agreement [Member] \| GenOn Americas Generation, LLC [Member] \| NRG Energy [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Line of Credit Facility, Maximum Borrowing Capacity | 500 | | |
| Amount of letters of credit transferred to intercompany credit agreement | $ 227 | | |
| Debt instrument, interest rate over variable rate (as a percent) | 2.50% | | |
| Basis points added to interest under LIBOR rate loans (as a percent) | 3.50% | | |
| Letter of Credit [Member] \| Intercompany Credit Agreement [Member] \| GenOn Mid-Atlantic [Member] \| NRG Energy [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Amount of letters of credit transferred to intercompany credit agreement | $ 131 | | |

Annual [Domain]

**Related Party Transaction [Line Items]**

Annual fees under services agreement                                    $ 193

| Related Party Transactions Related Party Transactions (Emissions and Marsh - Details 2) - USD ($) $ in Millions | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| **Related Party Transaction [Line Items]** | | | |
| Adjustments to Additional Paid in Capital, Other | | | $ 48 |
| Property, Plant and Equipment, Net | $ 2,831 | $ 3,045 | |
| Assets | 5,446 | 5,914 | |
| Liabilities | 5,174 | 5,513 | |
| GenOn Americas Generation, LLC [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Property, Plant and Equipment, Net | 1,116 | 1,110 | |
| Assets | 3,542 | 3,432 | |
| Liabilities | 2,610 | 2,616 | |
| GenOn Americas Generation, LLC [Member] \| GenOn Energy Holdings [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Interest Income, Related Party | 0 | 0 | 0 |
| Notes Receivable, Related Parties, Current | 331 | 331 | |
| Due to Affiliate, Current | 41 | 0 | |
| Due from Affiliate, Current | 0 | 118 | |
| GenOn Mid-Atlantic, LLC [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Property, Plant and Equipment, Net | 925 | 958 | |
| Assets | 1,967 | 1,850 | |
| Liabilities | 869 | 856 | |
| GenOn Mid-Atlantic, LLC [Member] \| GenOn Energy Management [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Utilized Emissions Allowances | $ 27 | $ 19 | $ 17 |

| Commitments and Contingencies (Details) $ in Millions | 12 Months Ended | | | |
| --- | --- | --- | --- | --- |
| | Dec. 31, 2015 USD ($) MW | Dec. 31, 2014 USD ($) | Dec. 31, 2013 USD ($) | Dec. 14, 2012 USD ($) |
| **Other Commitments [Abstract]** | | | | |
| Other Commitment, Due in Next Twelve Months | $ 2 | | | |
| Other Commitment, Due in Second Year | 3 | | | |
| Other Commitment, Due in Third Year | 3 | | | |
| Other Commitment, Due in Fourth Year | 3 | | | |
| Other Commitment, Due in Fifth Year | 3 | | | |
| Thereafter | 50 | | | |
| Total | 64 | | | |
| GenOn Mid-Atlantic, LLC [Member] | | | | |
| **Operating leases [Abstract]** | | | | |
| Acquisition date fair value of leasehold improvements | | | | $ 382 |
| **Other Commitments [Abstract]** | | | | |
| Other Commitment, Due in Next Twelve Months | 2 | | | |
| Other Commitment, Due in Second Year | 3 | | | |
| Other Commitment, Due in Third Year | 3 | | | |
| Other Commitment, Due in Fourth Year | 3 | | | |
| Other Commitment, Due in Fifth Year | 3 | | | |
| Thereafter | 50 | | | |
| Total | 64 | | | |
| Off-market Lease, Unfavorable | | | | 604 |
| GenOn Americas Generation, LLC [Member] | | | | |
| **Other Commitments [Abstract]** | | | | |
| Other Commitment, Due in Next Twelve Months | 2 | | | |
| Other Commitment, Due in Second Year | 3 | | | |
| Other Commitment, Due in Third Year | 3 | | | |
| Other Commitment, Due in Fourth Year | 3 | | | |
| Other Commitment, Due in Fifth Year | 3 | | | |
| Thereafter | 50 | | | |
| Total | 64 | | | |
| Rema [Member] | | | | |
| **Future Minimum Lease Commitments** | | | | |
| Operating Leases, Future Minimum Payments Due, Next Twelve Months | 61 | | | |
| Operating Leases, Future Minimum Payments, Due in Two Years | 63 | | | |
| Operating Leases, Future Minimum Payments, Due in Three Years | 55 | | | |
| Operating Leases, Future Minimum Payments, Due in Four Years | 65 | | | |
| Operating Leases, Future Minimum Payments, Due in Five Years | 56 | | | |
| Thereafter | 278 | | | |
| Total | $ 578 | | | |
| GenOn Mid-Atlantic, LLC [Member] | | | | |
| **Operating leases [Abstract]** | | | | |

| | | | |
|---|---|---|---|
| Maximum Percentage of Economic Useful Life if Option to Extend Leases is Exercised under Operating Lease Arrangements | 75.00% | | |
| Rent Expense | $ 43 | $ 43 | $ 41 |
| Lease Payments in Excess of Rent Expense Recognized | 196 | 157 | |
| Lease Payments in Excess of Rent Expense Recognized Included in Prepaid Expenses | 71 | 71 | |
| **Future Minimum Lease Commitments** | | | |
| Operating Leases, Future Minimum Payments Due, Next Twelve Months | 150 | | |
| Operating Leases, Future Minimum Payments, Due in Two Years | 144 | | |
| Operating Leases, Future Minimum Payments, Due in Three Years | 105 | | |
| Operating Leases, Future Minimum Payments, Due in Four Years | 139 | | |
| Operating Leases, Future Minimum Payments, Due in Five Years | 105 | | |
| Thereafter | 442 | | |
| Total | 1,085 | | |
| **Other Commitments [Abstract]** | | | |
| Off-market Lease, Unfavorable | 28 | | |
| Other property subject to operating lease [Member] | | | |
| **Operating leases [Abstract]** | | | |
| Rent Expense | 15 | 12 | 17 |
| **Future Minimum Lease Commitments** | | | |
| Operating Leases, Future Minimum Payments Due, Next Twelve Months | [1] 16 | | |
| Operating Leases, Future Minimum Payments, Due in Two Years | [1] 14 | | |
| Operating Leases, Future Minimum Payments, Due in Three Years | [1] 11 | | |
| Operating Leases, Future Minimum Payments, Due in Four Years | [1] 3 | | |
| Operating Leases, Future Minimum Payments, Due in Five Years | [1] 1 | | |
| Thereafter | [1] 14 | | |
| Total | [1] 59 | | |
| Operating Leases, Rent Expense, Sublease Rentals | 13 | | |
| Other property subject to operating lease [Member] \| GenOn Mid-Atlantic, LLC [Member] | | | |
| **Operating leases [Abstract]** | | | |
| Rent Expense | 1 | 0 | 0 |
| **Future Minimum Lease Commitments** | | | |
| Operating Leases, Future Minimum Payments Due, Next Twelve Months | 2 | | |
| Operating Leases, Future Minimum Payments, Due in Two Years | 2 | | |
| Operating Leases, Future Minimum Payments, Due in Three Years | 2 | | |
| Operating Leases, Future Minimum Payments, Due in Four Years | 2 | | |
| Operating Leases, Future Minimum Payments, Due in Five Years | 0 | | |
| Thereafter | 0 | | |
| Total | 8 | | |
| Other property subject to operating lease [Member] \| GenOn Americas Generation, LLC [Member] | | | |
| **Operating leases [Abstract]** | | | |
| Rent Expense | 1 | 0 | 0 |
| **Future Minimum Lease Commitments** | | | |

| | | | |
|---|---|---|---|
| Operating Leases, Future Minimum Payments Due, Next Twelve Months | 3 | | |
| Operating Leases, Future Minimum Payments, Due in Two Years | 2 | | |
| Operating Leases, Future Minimum Payments, Due in Three Years | 2 | | |
| Operating Leases, Future Minimum Payments, Due in Four Years | 2 | | |
| Operating Leases, Future Minimum Payments, Due in Five Years | 1 | | |
| Thereafter | 0 | | |
| Total | 10 | | |
| **Keystone Conemaugh [Member] \| Rema [Member]** | | | |
| **Operating leases [Abstract]** | | | |
| Rent Expense | 29 | 29 | 28 |
| Lease Payments in Excess of Rent Expense Recognized | 61 | 41 | |
| Lease Payments in Excess of Rent Expense Recognized Included in Prepaid Expenses | $ 41 | 41 | |
| Acquisition date fair value of leasehold improvements | | | 66 |
| Term of Agreements to Operate | 5 years | | |
| Term of Notice Required to Terminate Lease With Conditions | 1 year | | |
| Fee Received from Owners | $ 11 | $ 11 | $ 11 |
| **Other Commitments [Abstract]** | | | |
| Off-market Lease, Unfavorable | $ 11 | | $ 186 |
| **Conemaugh [Member] \| Rema [Member]** | | | |
| **Operating leases [Abstract]** | | | |
| Percentage Interest in Baseload Units Under Operating Lease Arrangements | 16.67% | | |
| **Keystone [Member] \| Rema [Member]** | | | |
| **Operating leases [Abstract]** | | | |
| Percentage Interest in Baseload Units Under Operating Lease Arrangements | 16.45% | | |
| **Shawville [Member] \| Rema [Member]** | | | |
| **Operating leases [Abstract]** | | | |
| Percentage Interest in Baseload Units Under Operating Lease Arrangements | 100.00% | | |
| **Dickerson and Morgantown [Member] \| GenOn Mid-Atlantic, LLC [Member]** | | | |
| **Operating leases [Abstract]** | | | |
| Percentage Interest in Baseload Units Under Operating Lease Arrangements | 100.00% | | |
| **Fuel and Commodity Transportation Commitments [Member]** | | | |
| **Long-term Purchase Commitment [Abstract]** | | | |
| Maximum remaining term under individual fuel supply contract | 3 years | | |
| Maximum remaining term under individual transportation contract | 8 years | | |
| **Minimum purchase commitments [Abstract]** | | | |
| Unrecorded Unconditional Purchase Obligation, Due in Next Twelve Months | $ 139 | | |
| Unrecorded Unconditional Purchase Obligation, Due within Two Years | 88 | | |
| Unrecorded Unconditional Purchase Obligation, Due within Three Years | 73 | | |
| Unrecorded Unconditional Purchase Obligation, Due within Four Years | 1 | | |
| Unrecorded Unconditional Purchase Obligation, Due within Five Years | 1 | | |
| Thereafter | 3 | | |
| Total | 305 | | |
| **Fuel and Commodity Transportation Commitments [Member] \| GenOn Mid-Atlantic, LLC [Member]** | | | |
| **Minimum purchase commitments [Abstract]** | | | |

| | |
|---|---|
| Unrecorded Unconditional Purchase Obligation, Due in Next Twelve Months | 55 |
| Unrecorded Unconditional Purchase Obligation, Due within Two Years | 13 |
| Unrecorded Unconditional Purchase Obligation, Due within Three Years | 13 |
| Unrecorded Unconditional Purchase Obligation, Due within Four Years | 0 |
| Unrecorded Unconditional Purchase Obligation, Due within Five Years | 0 |
| Thereafter | 0 |
| Total | 81 |
| Fuel and Commodity Transportation Commitments [Member] \| GenOn Americas Generation, LLC [Member] | |
| **Minimum purchase commitments [Abstract]** | |
| Unrecorded Unconditional Purchase Obligation, Due in Next Twelve Months | 55 |
| Unrecorded Unconditional Purchase Obligation, Due within Two Years | 13 |
| Unrecorded Unconditional Purchase Obligation, Due within Three Years | 13 |
| Unrecorded Unconditional Purchase Obligation, Due within Four Years | 0 |
| Unrecorded Unconditional Purchase Obligation, Due within Five Years | 0 |
| Thereafter | 0 |
| Total | 81 |
| Long-term Service Agreements [Member] | |
| **Minimum purchase commitments [Abstract]** | |
| Unrecorded Unconditional Purchase Obligation, Due in Next Twelve Months | 30 |
| Unrecorded Unconditional Purchase Obligation, Due within Two Years | 13 |
| Unrecorded Unconditional Purchase Obligation, Due within Three Years | 12 |
| Unrecorded Unconditional Purchase Obligation, Due within Four Years | 26 |
| Unrecorded Unconditional Purchase Obligation, Due within Five Years | 14 |
| Thereafter | 209 |
| Total | $ 304 |
| Shawville [Member] \| Generating Facilities Deactivated [Member] | |
| **Commitments [Line Items]** | |
| Power Generation Capacity, Megawatts \| MW | [2] 597 |

[1] Amounts in the table exclude future sublease income of $13 million associated with GenOn's long-term lease for its corporate headquarters in Houston, Texas.

[2] GenOn expects to return these units to service no later than the fall of 2016 using natural gas.

| Commitments and Contingencies (Details 2) - USD ($) | 1 Months Ended | | | |
|---|---|---|---|---|
| | Mar. 31, 2013 | Dec. 31, 2015 | Dec. 14, 2012 | Dec. 02, 2010 |
| GenOn Energy Holdings [Member] \| Chapter Eleven Proceedings [Member] | | | | |
| **Chapter Eleven Proceedings [Abstract]** | | | | |
| Common stock shares reserved for unresolved claims | | 461,000 | | |
| MDE v. GenOn Chalk Point and GenOn Mid-Atlantic [Member] \| GenOn Mid-Atlantic, LLC [Member] \| Environmental Matters [Member] | | | | |
| **Contingency [Line Items]** | | | | |
| Minimum Civil Penalties which May be Assessed | $ 100,000 | | | |
| Mirant RRI Energy Merger [Member] \| GenOn Energy Holdings [Member] \| Chapter Eleven Proceedings [Member] | | | | |
| **Chapter Eleven Proceedings [Abstract]** | | | | |
| Common stock capital shares reserved converted into parent co. common | | | | 1,300,000 |
| NRG Merger [Member] \| GenOn Energy Holdings [Member] \| Chapter Eleven Proceedings [Member] | | | | |
| **Chapter Eleven Proceedings [Abstract]** | | | | |
| Common stock shares reserved for unresolved claims | | | 159,000 | |

| Regulatory Matters Regulatory Matters (Details) (Details) $ in Millions | Dec. 20, 2013 USD ($) |
|---|---|
| Genon [Member] | |
| **Regulatory Matters [Line Items]** | |
| Regulatory payments sought | $ 22 |

| Environmental Matters (Details) $ in Millions | Dec. 31, 2015 USD ($) |
|---|---|
| **Site Contingency [Line Items]** | |
| Estimated environmental capital expenditures over the next decade | $ 68 |
| GenOn Americas Generation, LLC [Member] | |
| **Site Contingency [Line Items]** | |
| Estimated environmental capital expenditures over the next decade | 12 |
| GenOn Mid-Atlantic, LLC [Member] | |
| **Site Contingency [Line Items]** | |
| Estimated environmental capital expenditures over the next decade | $ 9 |

**Guarantees (Details) - USD ($)**
**$ in Millions**

| | Dec. 31, 2015 | Dec. 31, 2014 |
|---|---|---|
| **Maximum exposure for guarantees [Abstract]** | | |
| Under 1 Year | $ 350 | |
| 1-3 Years | 0 | |
| 3-5 Years | 0 | |
| Over 5 Years | 46 | |
| Guarantee | 396 | $ 376 |
| Letters Of Credit And Surety Bonds [Member] | | |
| **Maximum exposure for guarantees [Abstract]** | | |
| Under 1 Year | 350 | |
| 1-3 Years | 0 | |
| 3-5 Years | 0 | |
| Over 5 Years | 0 | |
| Guarantee | 350 | 319 |
| Guarantee Type, Other [Member] | | |
| **Maximum exposure for guarantees [Abstract]** | | |
| Under 1 Year | 0 | |
| 1-3 Years | 0 | |
| 3-5 Years | 0 | |
| Over 5 Years | 46 | |
| Guarantee | 46 | 57 |
| Surety Bond [Member] | | |
| **Maximum exposure for guarantees [Abstract]** | | |
| Guarantee | 72 | |
| GenOn Americas Generation, LLC [Member] | | |
| **Maximum exposure for guarantees [Abstract]** | | |
| Under 1 Year | 229 | |
| 1-3 Years | 0 | |
| 3-5 Years | 0 | |
| Over 5 Years | 0 | |
| Guarantee | 229 | 180 |
| GenOn Americas Generation, LLC [Member] | Letters Of Credit And Surety Bonds [Member] | |
| **Maximum exposure for guarantees [Abstract]** | | |
| Guarantee | 229 | |
| GenOn Americas Generation, LLC [Member] | Surety Bond [Member] | |
| **Maximum exposure for guarantees [Abstract]** | | |
| Under 1 Year | 229 | |
| 1-3 Years | 0 | |
| 3-5 Years | 0 | |
| Over 5 Years | 0 | |
| Guarantee | 2 | $ 180 |
| NRG Energy [Member] | Letter of Credit [Member] | Intercompany Credit Agreement [Member] |
| **Maximum exposure for guarantees [Abstract]** | | |

Amount of letters of credit transferred to intercompany credit agreement | 278

NRG Energy [Member] | GenOn Americas Generation [Member] | Letter of Credit [Member] | Intercompany Credit Agreement [Member]

**Maximum exposure for guarantees [Abstract]**

Amount of letters of credit transferred to intercompany credit agreement | 131

NRG Energy [Member] | GenOn Americas Generation, LLC [Member] | Letter of Credit [Member] | Intercompany Credit Agreement [Member]

**Maximum exposure for guarantees [Abstract]**

Amount of letters of credit transferred to intercompany credit agreement | $ 227

| Schedule I Condensed Financial Information of Parent Company Only Disclosure Schedule I Condensed Financial Information of Parent Company Only Disclosure (Details) - USD ($) $ in Millions | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| **CONSOLIDATED STATEMENTS OF OPERATIONS** | | | |
| Operating Income/(Loss) | $ 13 | $ 376 | $ 163 |
| **Other Income (Expense), net:** | | | |
| Other income/(expense), net | 6 | 1 | 1 |
| Gains (Losses) on Extinguishment of Debt | 65 | 0 | (11) |
| Total other income (expense), net | (131) | (178) | (211) |
| Income/(Loss) Before Income Taxes | (118) | 198 | (48) |
| Income tax expense/(benefit) | (3) | 6 | (6) |
| Net Income/(Loss) | (115) | 192 | (42) |
| GenOn Energy, Inc. Parent Company [Member] | | | |
| **CONSOLIDATED STATEMENTS OF OPERATIONS** | | | |
| Operating Income/(Loss) | 0 | 0 | 0 |
| **Other Income (Expense), net:** | | | |
| Other income/(expense), net | 85 | 84 | 74 |
| Gains (Losses) on Extinguishment of Debt | 23 | 0 | 0 |
| Interest expense | 128 | 129 | 140 |
| Total other income (expense), net | (118) | 197 | (49) |
| Income/(Loss) Before Income Taxes | (118) | 197 | (49) |
| Income tax expense/(benefit) | (3) | 0 | (6) |
| Net Income/(Loss) | (115) | 197 | (43) |
| GenOn Americas Generation, LLC Parent Company [Member] | | | |
| **CONSOLIDATED STATEMENTS OF OPERATIONS** | | | |
| Operating Income/(Loss) | 0 | 0 | 0 |
| **Other Income (Expense), net:** | | | |
| Other income/(expense), net | 42 | 0 | 0 |
| Interest expense | (64) | (66) | (64) |
| Total other income (expense), net | 116 | 305 | 59 |
| Income/(Loss) Before Income Taxes | 116 | 305 | 59 |
| Income tax expense/(benefit) | 0 | 0 | 0 |
| Net Income/(Loss) | 116 | 305 | 59 |
| Affiliated Entity [Member] | | | |
| **Other Income (Expense), net:** | | | |
| Interest expense | (11) | (12) | (12) |
| Affiliated Entity [Member] \| GenOn Energy, Inc. Parent Company [Member] | | | |
| **Other Income (Expense), net:** | | | |
| Equity in earnings of consolidated subsidiaries | (98) | 242 | 17 |

Affiliated Entity [Member] | GenOn Americas Generation, LLC Parent Company [Member]

**Other Income (Expense), net:**

| | | | |
|---|---|---|---|
| Equity in earnings of consolidated subsidiaries | $ 138 | $ 371 | $ 123 |

| Schedule I Condensed Financial Information of Parent Company Only Disclosure (Details 2) - USD ($) $ / shares in Units, $ in Millions | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 | Dec. 31, 2012 |
|---|---|---|---|---|
| **Condensed Financial Statements, Captions [Line Items]** | | | | |
| Guarantee | $ 396 | $ 376 | | |
| **Current Assets:** | | | | |
| Cash and Cash Equivalents, at Carrying Value | 665 | 920 | $ 760 | $ 825 |
| Accounts Receivable, Net, Current | 97 | 120 | | |
| Total current assets | 2,028 | 2,391 | | |
| **Noncurrent Assets:** | | | | |
| Other Assets, Noncurrent | 253 | 201 | | |
| Assets, Noncurrent | 587 | 478 | | |
| Total Assets | 5,446 | 5,914 | | |
| **Current Liabilities:** | | | | |
| Other Accrued Liabilities, Current | 56 | 67 | | |
| Total current liabilities | 916 | 868 | | |
| **Noncurrent Liabilities:** | | | | |
| Long-term debt, net of current portion | 2,762 | 3,120 | | |
| Other non-current liabilities | 285 | 277 | | |
| Total non-current liabilities | 4,258 | 4,645 | | |
| Liabilities | 5,174 | 5,513 | | |
| **Stockholders' Equity:** | | | | |
| Common stock, par value $.001 per share, authorized 2.0 billion shares, issued 771,692,734 shares and 770,857,530 shares at December 31, 2011 and 2010, respectively | 0 | 0 | | |
| Additional paid-in capital | 325 | 325 | | |
| Accumulated deficit | (37) | 78 | | |
| Accumulated other comprehensive income | (16) | (2) | | |
| Total Liabilities and Stockholders' Equity | $ 5,446 | $ 5,914 | | |
| **Condensed Balance Sheets (Parenthetical)** | | | | |
| Common stock, par value (in dollars per share) | $ 0.001 | $ 0.001 | | |
| Common stock, shares authorized (in shares) | 1 | 1 | | |
| Common stock, shares issued (in shares) | 1 | 1 | | |
| **Affiliated Entity [Member]** | | | | |
| **Current Liabilities:** | | | | |
| Accounts Payable, Current | $ 71 | $ 14 | | |
| **Non-affiliated Entity [Member]** | | | | |
| **Current Liabilities:** | | | | |
| Accounts Payable, Current | 112 | 135 | | |
| **GenOn Energy, Inc. Parent Company [Member]** | | | | |
| **Condensed Financial Statements, Captions [Line Items]** | | | | |
| Guarantee | 46 | | | |

**Current Assets:**

| | | | | |
|---|---|---|---|---|
| Cash and Cash Equivalents, at Carrying Value | 226 | 490 | 621 | 530 |
| Other Assets, Current | 254 | 214 | | |
| Total current assets | 780 | 1,090 | | |

**Noncurrent Assets:**

| | | |
|---|---|---|
| Assets, Noncurrent | 1,481 | 1,501 |
| Total Assets | 2,261 | 2,591 |

**Current Liabilities:**

| | | |
|---|---|---|
| Taxes payable | 1 | 1 |
| Other Accrued Liabilities, Current | 31 | 39 |
| Total current liabilities | 32 | 40 |

**Noncurrent Liabilities:**

| | | |
|---|---|---|
| Long-term debt, net of current portion | 1,956 | 2,148 |
| Other non-current liabilities | 1 | 2 |
| Total non-current liabilities | 1,957 | 2,150 |
| Liabilities | 1,989 | 2,190 |

**Stockholders' Equity:**

| | | |
|---|---|---|
| Common stock, par value $.001 per share, authorized 2.0 billion shares, issued 771,692,734 shares and 770,857,530 shares at December 31, 2011 and 2010, respectively | 0 | 0 |
| Additional paid-in capital | 325 | 325 |
| Accumulated deficit | (37) | 78 |
| Accumulated other comprehensive income | (16) | (2) |
| Stockholders' Equity Attributable to Parent | 272 | 401 |
| Total Liabilities and Stockholders' Equity | $ 2,261 | $ 2,591 |

**Condensed Balance Sheets (Parenthetical)**

| | | |
|---|---|---|
| Common stock, par value (in dollars per share) | $ 0.001 | $ 0.001 |
| Common stock, shares authorized (in shares) | 1 | 2,000,000,000.0 |
| Common stock, shares issued (in shares) | 1 | 771,692,734 |

GenOn Energy, Inc. Parent Company [Member] | Affiliated Entity [Member]

**Current Assets:**

| | | |
|---|---|---|
| Notes receivable | $ 300 | $ 386 |

**Noncurrent Assets:**

| | | |
|---|---|---|
| Investments in affiliates | 456 | 476 |
| Notes receivables | 1,025 | 1,025 |

GenOn Americas Generation, LLC Parent Company [Member]

**Condensed Financial Statements, Captions [Line Items]**

| | |
|---|---|
| Guarantee | 0 |

**Current Assets:**

| | | | | |
|---|---|---|---|---|
| Cash and Cash Equivalents, at Carrying Value | 0 | 0 | $ 0 | $ 0 |
| Accounts Receivable, Net, Current | 0 | 2 | | |
| Total current assets | 0 | 2 | | |

**Noncurrent Assets:**

| | | |
|---|---|---|
| Assets, Noncurrent | 1,907 | 1,770 |
| Total Assets | 1,907 | 1,772 |

**Current Liabilities:**

| | | |
|---|---|---|
| Other Accrued Liabilities, Current | 13 | 16 |
| Total current liabilities | 223 | 27 |
| **Noncurrent Liabilities:** | | |
| Long-term debt, net of current portion | 752 | 929 |
| Total non-current liabilities | 752 | 929 |
| Liabilities | 975 | 956 |
| **Member's Equity: (Abstract) [Abstract]** | | |
| Members' interest | 932 | 816 |
| Total member's equity | 932 | 816 |
| Total Liabilities and Member's Equity | 1,907 | 1,772 |
| GenOn Americas Generation, LLC Parent Company [Member] \| Affiliated Entity [Member] | | |
| **Noncurrent Assets:** | | |
| Investments in affiliates | 1,907 | 1,770 |
| **Current Liabilities:** | | |
| Accounts Payable, Current | 199 | 0 |
| Note payable — affiliate | $ 11 | $ 11 |

| Schedule I Condensed Financial Information of Parent Company Only Disclosure (Details 3) - USD ($) $ in Millions | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| **Condensed Financial Statements, Captions [Line Items]** | | | |
| Long-term Debt, Maturities, Repayments of Principal in Next Twelve Months | $ 4 | | |
| **Cash Flows from Operating Activities:** | | | |
| Net cash provided by operating activities | 241 | $ 237 | $ 532 |
| **Cash Flows from Investing Activities:** | | | |
| Proceeds from Sale of Equity Method Investments | 0 | 35 | 0 |
| Net cash provided by (used in) investing activities | (259) | (76) | (129) |
| **Cash Flows from Financing Activities:** | | | |
| Net cash provided by (used in) financing activities | (237) | (1) | (468) |
| Net Increase (Decrease) in Cash and Cash Equivalents | (255) | 160 | (65) |
| Cash and Cash Equivalents at Beginning of Period | 920 | 760 | 825 |
| Cash and Cash Equivalents at End of Period | 665 | 920 | 760 |
| **Supplemental Disclosures:** | | | |
| Cash paid for interest, net of amounts capitalized | 248 | 240 | 259 |
| Cash paid for income taxes (net of refunds received) | 4 | 3 | (75) |
| Long-term Debt, Maturities, Repayments of Principal in Year Two | 696 | | |
| Long-term Debt, Maturities, Repayments of Principal in Year Three | 653 | | |
| Long-term Debt, Maturities, Repayments of Principal in Year Four | 4 | | |
| Long-term Debt, Maturities, Repayments of Principal in Year Five | 494 | | |
| GenOn Energy, Inc. Parent Company [Member] | | | |
| **Condensed Financial Statements, Captions [Line Items]** | | | |
| Long-term Debt, Maturities, Repayments of Principal in Next Twelve Months | 0 | | |
| Long-term Debt | 1,830 | | |
| Cash Dividends Paid to Parent Company | 0 | 0 | 0 |
| **Cash Flows from Operating Activities:** | | | |
| Net cash provided by operating activities | (159) | (165) | 491 |
| **Cash Flows from Investing Activities:** | | | |
| Proceeds from Sales of Business, Affiliate and Productive Assets | 0 | 0 | 175 |
| Net cash provided by (used in) investing activities | 0 | 35 | 175 |
| **Cash Flows from Financing Activities:** | | | |
| Repayments of Debt | 105 | 1 | 575 |
| Net cash provided by (used in) financing activities | (105) | (1) | (575) |
| Net Increase (Decrease) in Cash and Cash Equivalents | (264) | (131) | 91 |
| Cash and Cash Equivalents at Beginning of Period | 490 | 621 | 530 |
| Cash and Cash Equivalents at End of Period | 226 | 490 | 621 |
| **Supplemental Disclosures:** | | | |
| Cash paid for interest, net of amounts capitalized | 176 | 240 | 138 |
| Cash paid for income taxes (net of refunds received) | 0 | 0 | 0 |
| Long-term Debt, Maturities, Repayments of Principal in Year Two | 692 | | |
| Long-term Debt, Maturities, Repayments of Principal in Year Three | 649 | | |

| | | | |
|---|---|---|---|
| Long-term Debt, Maturities, Repayments of Principal in Year Four | 0 | | |
| Long-term Debt, Maturities, Repayments of Principal in Year Five | 489 | | |
| **GenOn Americas Generation, LLC Parent Company [Member]** | | | |
| **Condensed Financial Statements, Captions [Line Items]** | | | |
| Long-term Debt | 695 | | |
| Cash Dividends Paid to Parent Company | 0 | 320 | 285 |
| **Cash Flows from Operating Activities:** | | | |
| Net cash provided by operating activities | 128 | 197 | 217 |
| **Cash Flows from Investing Activities:** | | | |
| Interest Paid, Capitalized | 2 | 1 | 2 |
| Capital Contributions | 0 | (50) | 0 |
| Net cash provided by (used in) investing activities | (2) | 49 | (2) |
| **Cash Flows from Financing Activities:** | | | |
| Repayments of Debt | 126 | 0 | 0 |
| Net cash provided by (used in) financing activities | (126) | (246) | (215) |
| Net Increase (Decrease) in Cash and Cash Equivalents | 0 | 0 | 0 |
| Cash and Cash Equivalents at Beginning of Period | 0 | 0 | 0 |
| Cash and Cash Equivalents at End of Period | 0 | 0 | 0 |
| **Supplemental Disclosures:** | | | |
| Cash paid for interest, net of amounts capitalized | 76 | 74 | 73 |
| **GenOn Americas Generation, LLC Parent Company [Member] | Affiliated Entity [Member]** | | | |
| **Cash Flows from Financing Activities:** | | | |
| Capital contributions | 0 | (74) | (70) |
| Distributions to members | $ 0 | $ (320) | $ (285) |

| Schedule I Condensed Financial Information of Parent Company Only Disclosure (Details 4) - USD ($) $ in Millions | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| **Notes to Parent Company financial statements [Abstract]** | | | |
| Guarantee | $ 396 | $ 376 | |
| **Long-term Debt, Fiscal Year Maturity [Abstract]** | | | |
| Long-term Debt, Maturities, Repayments of Principal in Year Three | 653 | | |
| Long-term Debt, Maturities, Repayments of Principal in Year Four | 4 | | |
| Thereafter | 732 | | |
| GenOn Americas Generation, LLC Parent Company [Member] | | | |
| **Notes to Parent Company financial statements [Abstract]** | | | |
| Cash Dividends Paid to Parent Company | 0 | $ 320 | $ 285 |
| Guarantee | 0 | | |
| **Long-term Debt, Fiscal Year Maturity [Abstract]** | | | |
| Thereafter | 695 | | |
| Long-term Debt | $ 695 | | |

| SCHEDULE II.<br>VALUATION AND<br>QUALIFYING ACCOUNTS<br>(Details) - USD ($)<br>$ in Millions | | 12 Months Ended | | |
|---|---|---|---|---|
| | | Dec. 31,<br>2015 | Dec. 31,<br>2014 | Dec. 31,<br>2013 |
| Credit reserve for derivative contract assets | | | | |
| **Movement in Valuation Allowances and Reserves [Roll Forward]** | | | | |
| Balance at Beginning of Period | [1] | $ 0 | $ (1) | $ (4) |
| Charged to Costs and Expenses | [1] | 0 | 0 | 0 |
| Charged to Other Accounts | [1] | 0 | 0 | 0 |
| Deductions | [1] | 1 | 1 | 3 |
| Balance at End of Period | [1] | (1) | 0 | (1) |
| Income tax valuation allowance, deducted from deferred tax assets | | | | |
| **Movement in Valuation Allowances and Reserves [Roll Forward]** | | | | |
| Balance at Beginning of Period | | (2,779) | (2,672) | (2,324) |
| Charged to Costs and Expenses | | 16 | 0 | 0 |
| Charged to Other Accounts | | 0 | 107 | 348 |
| Deductions | | 331 | 0 | 0 |
| Balance at End of Period | | (2,464) | (2,779) | (2,672) |
| GenOn Americas Generation, LLC [Member] \| Credit reserve for derivative contract assets | | | | |
| **Movement in Valuation Allowances and Reserves [Roll Forward]** | | | | |
| Balance at Beginning of Period | [2] | 0 | (1) | (4) |
| Charged to Costs and Expenses | [2] | 0 | 0 | 0 |
| Charged to Other Accounts | [2] | 0 | 0 | 0 |
| Deductions | [2] | 0 | 1 | 3 |
| Balance at End of Period | [2] | 0 | 0 | (1) |
| GenOn Mid-Atlantic, LLC [Member] \| Credit reserve for derivative contract assets | | | | |
| **Movement in Valuation Allowances and Reserves [Roll Forward]** | | | | |
| Balance at Beginning of Period | [3] | (2) | (3) | (4) |
| Charged to Costs and Expenses | [3] | 0 | 0 | 0 |
| Charged to Other Accounts | [3] | 0 | 0 | 0 |
| Deductions | [3] | (2) | 1 | 1 |
| Balance at End of Period | [3] | $ (4) | $ (2) | $ (3) |

[1] Provision for uncollectible accounts represents credit reserves for derivative contract assets.

[2] Provision for uncollectible accounts represents credit reserves for derivative contract assets.

[3] Provision for uncollectible accounts represents credit reserves for derivative contract assets.