# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| GENON ENERGY, INC., *et al.*,[1] | Case No. 17-33695 (DRJ) |
| Debtors. | (Jointly Administered)[2] |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. § 1127(b) MODIFYING THE THIRD AMENDED JOINT PLAN OF REORGANIZATION OF GENON ENERGY, INC. AND ITS DEBTOR AFFILIATES

> **A HEARING WILL BE CONDUCTED ON THIS MATTER ON APRIL 5, 2018 AT 2:30 PM PREVAILING CENTRAL TIME IN COURTROOM 400, 4th FLOOR, UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, 515 RUSK STREET, HOUSTON, TEXAS 77002.**

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: GenOn Energy, Inc. (5566); GenOn Americas Generation, LLC (0520); GenOn Americas Procurement, Inc. (8980); GenOn Asset Management, LLC (1966); GenOn Capital Inc. (0053); GenOn Energy Holdings, Inc. (8156); GenOn Energy Management, LLC (1163); GenOn Energy Services, LLC (8220); GenOn Fund 2001 LLC (0936); GenOn Mid-Atlantic Development, LLC (9458); GenOn Power Operating Services MidWest, Inc. (3718); GenOn Special Procurement, Inc. (8316); Hudson Valley Gas Corporation (3279); Mirant Asia-Pacific Ventures, LLC (1770); Mirant Intellectual Asset Management and Marketing, LLC (3248); Mirant International Investments, Inc. (1577); Mirant New York Services, LLC (N/A); Mirant Power Purchase, LLC (8747); Mirant Wrightsville Investments, Inc. (5073); Mirant Wrightsville Management, Inc. (5102); MNA Finance Corp. (8481); NRG Americas, Inc. (2323); NRG Bowline LLC (9347); NRG California North LLC (9965); NRG California South GP LLC (6730); NRG California South LP (7014); NRG Canal LLC (5569); NRG Delta LLC (1669); NRG Florida GP, LLC (6639); NRG Florida LP (1711); NRG Lovett Development I LLC (6327); NRG Lovett LLC (9345); NRG New York LLC (0144); NRG North America LLC (4609); NRG Northeast Generation, Inc. (9817); NRG Northeast Holdings, Inc. (9148); NRG Potrero LLC (1671); NRG Power Generation Assets LLC (6390); NRG Power Generation LLC (6207); NRG Power Midwest GP LLC (6833); NRG Power Midwest LP (1498); NRG Sabine (Delaware), Inc. (7701); NRG Sabine (Texas), Inc. (5452); NRG San Gabriel Power Generation LLC (0370); NRG Tank Farm LLC (5302); NRG Wholesale Generation GP LLC (6495); NRG Wholesale Generation LP (3947); NRG Willow Pass LLC (1987); Orion Power New York GP, Inc. (4975); Orion Power New York LP, LLC (4976); Orion Power New York, L.P. (9521); RRI Energy Broadband, Inc. (5569); RRI Energy Channelview (Delaware) LLC (9717); RRI Energy Channelview (Texas) LLC (5622); RRI Energy Channelview LP (5623); RRI Energy Communications, Inc. (6444); RRI Energy Services Channelview LLC (5620); RRI Energy Services Desert Basin, LLC (5991); RRI Energy Services, LLC (3055); RRI Energy Solutions East, LLC (1978); RRI Energy Trading Exchange, Inc. (2320); and RRI Energy Ventures, Inc. (7091). The Debtors' service address is: 804 Carnegie Center, Princeton, New Jersey 08540.

[2]     These chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 4].

#90662676v4

> **IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY-ONE DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING.  YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**
>
> **REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion").

## Introduction

1.     Out of an abundance of caution, the Debtors seek to modify the *Third Amended Joint Plan of Reorganization of Genon Energy, Inc. and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") [Docket No. 1250] to incorporate a Third-Party Sale Transaction,[3] on the terms set forth in that certain asset purchase agreement, entered into by Debtors NRG Wholesale Generation LP and RRI Energy Services, LLC (collectively, "Sellers"), and Kestrel Acquisition, LLC (an affiliate of Platinum Equity Capital Partners IV, L.P. ("Platinum")) ("Buyer"), attached hereto as **Exhibit B** (the "APA").  The APA provides for the sale of the 810 MW Hunterstown Generating Facility in Gettysburg, Pennsylvania ("Hunterstown") for a base purchase price of approximately $498 million.  The Debtors have obtained the support and agreement of all necessary parties with rights as to Third-Party Sale Transactions, entry into which has already been approved pursuant to the confirmed Plan.  Accordingly, the Debtors believe that they are already authorized to enter into and consummate the APA under the Plan.  Notwithstanding the foregoing, as an accommodation

---

[3]     All terms used herein but not otherwise defined shall have the meanings ascribed in the Plan or the APA, as applicable.

to the Buyer and in an abundance of caution, the Debtors seek to modify the Plan, and submit that such modification of the Plan by incorporating the APA is necessary to implement the Plan, appropriate under section 1127(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and will enhance the value of the Debtors' estates.

2.          The Debtors filed these chapter 11 cases with a prepetition restructuring support agreement (the "RSA") supported by the overwhelming consensus of their primary stakeholders, including their non-Debtor parent, NRG Energy, Inc. ("NRG"), and holders of over ninety percent in principal amount of the prepetition unsecured notes issued by GenOn Energy, Inc. ("GenOn") and GenOn Americas Generation, LLC ("GAG"), respectively.

3.          In tandem with the restructuring transactions contemplated by the RSA and the Plan, and to maximize the value of their estates, the Debtors have pursued a marketing process for the sale of certain strategic assets, as confirmed by this Court. *See Order (I) Approving Marketing Process Procedures, (II) Authorizing the Debtors to pay the Fees and Expenses of the Noteholder Advisors, and (III) Granting Related Relief* (the "Marketing Procedures Order") [Docket No. 862]. In furtherance of the Debtors' value-maximizing goals, the Confirmation Order and Plan authorize the Debtors to take all actions necessary or appropriate to consummate any Third-Party Sale Transactions.  Plan at Art. IV.B.

4.          The proposed Plan modification is appropriate under section 1127(b) of the Bankruptcy Code.  The Debtors believe that the Plan provides all necessary authority to modify the Plan Supplement to include the APA and to enter into and consummate the Third Party Sale Transaction set forth in the APA.  Nonetheless, the APA requires that the Debtors seek the relief requested in this Motion in an abundance of caution to provide comfort to the Buyer under the APA.  As a result, the circumstances here warrant modification.  The APA will allow the Debtors

3

to realize substantial value from proceeds of the sale and will provide enhanced recoveries to creditors under the Plan.  Accordingly, the Debtors respectfully request that the Court enter an order approving modification of the Plan under section 1127(b) of the Bankruptcy Code, and confirming, in an abundance of caution, that the APA constitutes a Third-Party Sale Transaction for purposes of, and entitled to the benefits and protections under, the Plan and Confirmation Order.

## Relief Requested

5.    The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A**, (a) permitting the proposed modification of the Plan, (b) expressly incorporating the APA as part of the Plan Supplement, (c) finding that the APA constitutes a Third-Party Sale Transaction under the Plan that is free and clear of any Liens, Claims, Interests and encumbrances pursuant to sections 363 and 1123 of the Bankruptcy Code, and entitled to all benefits and protections under the Plan and Confirmation Order, and (d) granting related relief.

## Jurisdiction and Venue

6.    The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012 (the "Amended Standing Order").  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4

#90662676v4

7.    The statutory bases for the relief requested herein are sections 105(a) and 1127(b) of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002(a)(5) and 3019, and rule 2002-1(a)(5) of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

### Background

8.    On June 14, 2017 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Mark A. McFarland in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed on June 14, 2017 [Docket No. 19].

9.    On August 31, 2017, the Debtors filed their *Motion for Entry of an Order (I) Approving Marketing Process Procedures, (II) Authorizing the Debtors to Pay the Fees and Expenses of the Noteholder Advisors, and (III) Granting Related Relief* (the "Marketing Procedures Motion") [Docket No. 686].  In consultation with certain stakeholders, the Debtors determined that certain strategic sale transactions might enhance the value of the estates.  As such, the Debtors sought and obtained this Court's approval to pursue those strategic sale transactions in the Marketing Procedures Order.  The APA is the result of the marketing process the Debtors described in the Marketing Procedures Motion.

10.    The Marketing Procedures Motion contemplated the sale of Hunterstown. Marketing Procedures Motion ¶ 7.  The Debtors widely marketed the assets identified in the Marketing Procedures Motion, including Hunterstown, as part of two separate marketing phases. During the second phase of the marketing process, for which bids were due on January 12, 2018

#90662676v4

(*i.e.*, post-confirmation), the Debtors received 17 bids from 14 different parties altogether. Ultimately, Platinum emerged as the successful bidder for Hunterstown.[4]

11.     On December 12, 2017, the Court entered an order confirming the Plan (the "Confirmation Order") [Docket No. 1250].  The Confirmation Order and the Plan explicitly provide for Third-Party Sale Transactions as a means of implementation.  *See* Plan at Art. IV.B. The Plan authorizes the Debtors to take all actions necessary to consummate any Third-Party Sale Transactions pursuant to the terms of the Plan, any Third-Party Sale Transaction Documents, and the Confirmation Order, including the APA.  Nonetheless, in an abundance of caution, the APA requires that the Debtors shall obtain entry of an order modifying the Plan to incorporate the APA.[5] The Debtors seek to ensure that the APA is treated as a Third-Party Sale Transaction under Article IV, Section B of the Plan, and that the assets will be transferred free and clear of any Liens, Claims, Interests and encumbrances pursuant to sections 363 and 1123 of the Bankruptcy Code.

12.     The material terms of the APA are set forth below:[6]

| APA Provision | Summary Description |
|---|---|
| **APA Parties** (Preamble) | • Kestrel Acquisition, LLC (an affiliate of Platinum Equity Capital Partners IV, L.P.) as Purchaser.<br>• NRG Wholesale Generation LP ("NRGWG") and RRI Energy Services, LLC ("RRI") as Sellers. |
| **Purchase Price** (§§2.03, 2.05(c)) | • $498 million base purchase price plus working capital adjustment (capped at $35 million). |
| **Parent Contribution** (§§4.08(a), 10.03(a)) | • Full equity commitment provided by Platinum Equity Capital Partners IV, L.P.<br>• Limited Guarantee by Platinum Equity Capital Partners IV, L.P. in favor of Sellers for the reverse termination fee. |
| **Bid Protections** (§§ 10.03(a), 11.09) | • Specific performance to enforce the Platinum Equity Capital Partners IV, L.P. equity commitment.<br>• 5% reverse termination fee. |

---

[4]     The APA is the culmination of the best and final bids received for Hunterstown as a result of that marketing and negotiation process.

[5]     As of the date hereof, the Debtors remain in ongoing negotiations with respect to certain other assets of the Debtors and are in discussions with potential bidders related thereto.

[6]     Any summary of any terms of the APA contained in this Motion is qualified in its entirety by reference to the provisions of the APA  The APA will control in the event of any inconsistency between this Motion and the APA.

| APA Provision | Summary Description |
|---|---|
|  | • Limited Guarantee by Platinum Equity Capital Partners IV, L.P. in favor of Sellers for the reverse termination fee. |
| **Acquired Assets** (§§2.01(a), (b)) | All assets owned, held or used primarily in the operation of the Hunterstown CCGT facility by NRGWG and its Affiliates, including:<br>• deposits and expenses that have been prepaid by NRGWG or its affiliates, but excluding any prepaid deposits/expenses attributable to Excluded Assets;<br>• working capital assets;<br>• inventories (as set forth in disclosure schedules);<br>• owned real property and all improvements located thereon;<br>• transferred easements;<br>• tangible personal property;<br>• the Assumed Contracts (as defined in the APA);<br>• (to the extent transferrable) all government and regulatory permits;<br>• records relating to the Hunterstown CCGT facility;<br>• IP used primarily in connection with the Hunterstown CCGT facility;<br>• emissions allowances held by Sellers that are allocated to the Hunterstown CCGT facility;<br>• causes of actions against third parties related to or arising from any Assumed Liability or the ownership and operation of the Hunterstown CCGT facility;<br>• warranties against manufacturers or vendors (to the extent they are transferrable);<br>• goodwill (to the extent related to the ownership and operation of the Hunterstown CCGT facility); and<br>• vehicles, tools and equipment used in connection with the plant (other than certain excluded assets).<br>RRI will also sell and assign to Purchaser the TETCO Contracts. |
| **Assumed Liabilities** (§2.01(d)) | Purchaser agrees to assume and become responsible for the following liabilities of the Sellers (other than the Excluded Liabilities), whether arising prior to or after the Closing Date, and thereafter pay, perform, and discharge when due all such liabilities, including:<br>• all liabilities of each Seller under the Assumed Contracts (including the TETCO Contracts) other than relating to breaches by such Seller or its Affiliates prior to the Closing;<br>• all liabilities with respect to the Transferred Permits other than relating to breaches by either Seller or its Affiliates prior to the Closing;<br>• all liabilities of each Seller with respect to ordering or purchase of Inventories;<br>• all liabilities under (a) the New CBA and (b) the CBA (i) to provide retiree welfare benefits to Transferred Union Employees, and (ii) for earned but unused vacation, sick leave, and other paid time off entitlements attributable to each Transferred Union Employee;<br>• all liabilities under the New CBA that are assumed by Purchaser in accordance with the APA;<br>• all earned but unused vacation, sick leave, and other paid time off entitlements attributable to those Transferred Employees who are not Transferred Union Employees;<br>• all liabilities arising under Environmental Laws with respect to the Purchased Assets;<br>• liabilities listed on the working capital schedule;<br>• transfer taxes (other than relating to any pre-Closing asset transfers); and<br>• property taxes on the Purchased Assets allocable to taxable periods (or portions thereof) beginning on or after the Closing Date. |
| **Employment Provisions** (§7.04) | • New CBA to be put in place with the same terms, conditions and obligations as the CBA, except that (x) the New CBA will expressly provide that Purchaser and its Affiliates have no obligation to provide the accrued benefit as of the Closing of each Transferred Union Employee under the defined benefit plan(s) provided to such |

7

| APA Provision | Summary Description |
|---|---|
| | employee by NRG or its Affiliates and (y) pension benefits currently described in the CBA and accruing for services after the Closing by provided after the Closing under a new defined benefit pension plan established by Purchaser or its Affiliates.<br>• Employees covered under the New CBA to receive offers of employment from Purchaser.<br>• As of the Closing Date, transferred employees will no longer be active in such Seller's benefits plans.<br>• Sellers will bear any costs related to severance payment claims arising out of Purchaser's decision to not extend an offer of employment. |
| **Closing Conditions** (§§8.01-8.11, 9.01-9.06) | Purchaser Conditions Precedent:<br>• Sellers Fundamental Reps brought down to de minimis inaccuracies standard. Non-fundamental reps brought down to MAE standard.<br>• Sellers shall have performed and complied in all material respects with the covenants of the agreement.<br>• Sellers shall have delivered an officer's closing certificate.<br>• There shall not be any Order or Law prohibiting the transactions.<br>• Certain governmental/regulatory approvals shall have been obtained (FERC, FCC, HSR, PADEP, municipal and others as specified on disclosure schedules to the agreement).<br>• Sellers shall have made the required closing deliveries (transaction documents, etc.).<br>• The bondholder consent shall be in full force and effect.<br>• The Bankruptcy Court shall have entered a Final Order in form and substance acceptable to Sellers and Purchaser approving modification of the Plan and confirming that the APA constitutes a third party sale transaction entitled to the benefits and protections of the Plan and Confirmation Order.<br>• Sellers shall have satisfied any cure claims.<br>Seller Conditions Precedent:<br>• Purchaser Fundamental Reps brought down to de minimis inaccuracies standard. Non-fundamental reps brought down to MAE standard.<br>• Purchaser shall have performed and complied in all material respects with the covenants of the agreement.<br>• Purchaser shall have delivered an officer's closing certificate.<br>• There shall not be any Order or Law prohibiting the transactions.<br>• All governmental/regulatory approvals shall have been obtained (FERC, HSR, PADEP, as set forth in disclosure schedules to the agreement).<br>• Purchaser shall have made the required closing deliveries (transaction documents, etc.) |
| **Representations, Warranties and Covenants** (Article III, (Article V) | Seller Reps & Warranties, Covenants:<br>• Standard representations and warranties for a transaction of this nature, including legal existence, authority, regulatory approvals, brokers, real and personal property, environmental matters, tax matters, affiliate transactions, among others.<br>• Standard covenants for a transaction of this nature, including conduct of business, financing cooperation, replacement of security, cure claims, casualty, condemnation and tax matters, among others. |
| **Excluded Assets** (§2.01(c)) | Sellers shall not sell, assign, transfer, convey or deliver to Purchaser, and Purchaser shall not purchase, acquire, or accept, any right title, and interest in or to certain assets, including:<br>• each Seller's rights under the transaction documents;<br>• insurance policies relating to the Purchased Assets;<br>• books and records of each Seller records relating to the plant;<br>• organizational documents, qualifications to do business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, blank stock certificates, and other documents relating to the organization, maintenance and existence of Sellers or any |

8

| APA Provision | Summary Description |
|---|---|
| | of their Affiliate;<br>• contracts other than the Assumed Contracts, permits other than the Transferred Permits, and IP or IP licenses not included in Purchased Assets;<br>• all shares of capital stock or other equity interests of Sellers or any of their Affiliates or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of Sellers or any of their Affiliates;<br>• all claims that either Seller may have against any third party solely with respect to any Excluded Assets or Excluded Liabilities;<br>• tax refunds, credits, abatements or similar offsets against Taxes that relate, in each case, to Excluded Tax Liabilities;<br>• all Tax Returns of, or filed by, either Seller or its Affiliates for any Excluded Tax Liability;<br>• all of each Seller's right, title and interest in any real property other than the Owned Real Property and the Transferred Easements;<br>• all Seller Employee Plans and all assets under or relating to any Seller Employee Plan;<br>• all of each Seller's right, title and interest in, to and under the assets owned, used or held for use exclusively in the operation of the Choctaw Plant;<br>• certain specifed contracts and vehicles; and<br>• all cash and cash equivalents of Sellers and their Affiliates as of the Closing Date. |
| **Excluded Liabilities** (§2.01(e)) | Sellers, NRG and their respective Affiliates shall retain, and shall be responsible for paying, performing, and discharging when due (except, as applicable, with respect to claims by third parties to the extent nonpayment thereof is permitted pursuant to applicable bankruptcy Law), and Purchaser shall not assume or have any responsibility for, any Liabilities of Sellers or NRG or their respective Affiliates, including the following:<br>• indebtedness and all transaction expenses (fees incurred by Sellers with respect to the transaction and bonuses or other payments and taxes with respect to present and former employees that become due and payable prior to or as a result of the transactions, but excluding transfer taxes);<br>• liabilities arising out of or related to any of the excluded assets (or assets that are otherwise not the Purchased Assets);<br>• liabilities under the existing CBA (other than (i) to provide retiree welfare benefits to Transferred Union Employees and (ii) for earned but unused vacation, sick leave, and other paid time off entitlements attributable to each Transferred Union Employee);<br>• pension liabilities related to pre-Closing employment;<br>• taxes, including those related to the ownership and operation of the purchased assets related to pre-Closing periods;<br>• all cure claims; and<br>• all workers compensation claims arising before Closing. |
| **Termination Provisions** (§§10.01, 10.03) | The APA may be terminated by:<br>• Mutual written consent<br>By either Purchaser or Sellers if:<br>• the Closing does not occur by July 30, 2018; provided that such termination date may be extended by Purchaser in its sole discretion by notice to Sellers, to September 30, 2018, and, if so extended by Purchaser, such date shall be subject to further extension to a date no later than December 31, 2018 if one or more governmental or regulatory approvals have not been obtained and such approvals are the only unwaived conditions precedent to Closing;<br>• a Final Order or any law is enacted or other action taken prohibiting the transactions; or<br>• if terminable pursuant to casualty or condemnation provisions (occurrence of loss greater than 10% of purchase price). |

9

| APA Provision | Summary Description |
|---|---|
| | By Purchaser if:<br>&bull; there has been a material Seller breach of the APA, subject to 30 day cure right (if possible to cure).<br>By Sellers if:<br>&bull; there has been a material Purchaser breach of the APA, subject to 30 day cure right (if possible to cure); or<br>&bull; Purchaser fails to consummate the transactions on or within 2 business days of the date Closing was required to have occurred.<br>The reverse termination fee is payable if Sellers terminate pursuant to the last two bullets, above. |
| **Limitation on Shopping** (§5.09) | &bull; Exclusivity provision from signing to Closing, except for transactions related to the Excluded Assets. |

## Basis for Relief

### A.  The Plan Modifications Are Appropriate under Section 1127(b) of the Bankruptcy Code.

13.     Section 1127(b) provides for the post-confirmation modification of a plan:

> The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

14.     In addition, the Plan provides that:

> [s]ubject to the limitations contained in the Plan and consistent with the approval rights set forth in the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan and the Restructuring Support Agreement, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in

#90662676v4

such matters as may be necessary to carry out the purposes and intent of the Plan.

Article XI, Section A.

15.     As outlined above, the Debtors undertook the marketing process in consultation with key stakeholders.  The Debtors and their stakeholders previously determined to engage in certain strategic sale transactions, encompassing the assets sold pursuant to the APA.  Article IV, Section B of the Plan further provides that Third-Party Sale Transactions are one of the means for implementation of the Plan:

> [o]n or after the Confirmation Date, the Debtors and the Purchasers, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate any Third-Party Sale Transactions pursuant to the terms of the Plan, any Third-Party Sale Transaction Documents, and the Confirmation Order, and any such Third-Party Sale Transactions shall be free and clear of any Liens, Claims, Interests, and encumbrances pursuant to sections 363 and 1123 of the Bankruptcy Code as of the earlier of the Sale Closing Date and the Effective Date.

16.     The Plan, as confirmed, provides that post-Confirmation, the Debtors may enter into and consummate Third-Party Sale Transactions, subject to certain "negative consent" rights held by the Consenting GenOn Noteholders.  More specifically, under the Plan, no Third-Party Sale Transaction may be agreed to or consummated by the Debtors if "Consenting GenOn Noteholders holding over fifty percent (50%) in principal amount of the GenOn Notes then held by all Consenting GenOn Noteholders," reasonably object.  Here, the negative consent right will not be implicated with respect to the APA, as the Debtors have already obtained agreements from the requisite majority of Consenting GenOn Noteholders not to exercise their negative consent rights as to the APA, pursuant to that certain *Third-Party Sale Transaction Consent Agreement* dated as of February 22, 2018 (the "Consent Agreement").  As such, the Debtors are authorized to enter into the APA under the Plan as a Third-Party Sale Transaction, and the parties affected by

11

the APA have already consented to its execution.  Moreover, consummation of the APA is conditioned upon the Court entering an order approving the proposed Plan modifications.

17.     The Debtors submit that modifying the Plan to incorporate and confirm the APA as a Third-Party Sale Transaction is appropriate under section 1127(b) of the Bankruptcy Code to the extent such provision is applicable.

18.     *First*, the modification does not implicate sections 1122 (classification of claims or interests) or 1123 (contents of a plan).  The proposed modification does not adversely change the terms of the existing Plan, and does not affect the Plan's classification scheme or otherwise affect the mandatory or discretionary contents of a plan as set forth in section 1123.  The proposed modification merely incorporates an additional sale agreement for particular property, which was already contemplated under the Plan.

19.     *Second*, the proposed modification is appropriate under section 1129 of the Bankruptcy Code.  The Court has already determined that the Debtors' Plan met the requirements of section 1129 of the Bankruptcy Code.  *See* Confirmation Order at ¶ 15.  And, the proposed modification, in turn, does not materially affect any of the already-established criteria for plan confirmation.  The proposed modification simply consummates a Third-Party Sale Transaction, an action not only contemplated, but also specifically authorized under the Plan.

20.     The Debtors submit that in light of the above, the sale of Hunterstown under the APA will not adversely affect the rights of other creditors under the Plan or as protected in the Confirmation Order.  The APA merely provides additional value for the Debtors' estates—an outcome that will benefit of all affected parties.  The proposed modification, therefore, should be approved.

**B.     The Plan Modifications Are Appropriate under Section 1127(c) of the Bankruptcy Code.**

21.     Pursuant to the section 1127(b) of the Bankruptcy Code, "[t]he proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified."  11 U.S.C. § 1127(c).  This requirement to comply with section 1125 of the Bankruptcy Code, however, does not necessarily mandate resolicitation of a Plan.  *In re Cellular Information Sys., Inc.*, 171 B.R. 926, 929 n.6 (Bankr. S.D.N.Y. 1994) ("I find that such changes are nonmaterial modifications which do not require resolicitation of the respective impaired classes of creditors and equity security holders").  Indeed, further disclosure is only necessary where a proposed plan modification materially and adversely affects a claimant's treatment.  *See Resolution Trust Corp. v. Best Prods. Co.*, 177 B.R. 791, 802 (S.D.N.Y. 1995) (noting that the key inquiry was whether the modification materially altered the plan so that a claimant's treatment was adversely affected); *Enron Corp. v. The New Power Co. (In re The New Power Co.)*, 438 F.3d 1113, 1118 (11th Cir. 2006) ("[A]s an initial matter, we consider whether there was any material and adverse modifications from the First Amended Plan.").

22.     A proposed plan modification will be considered material "if it so affects a creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance."  *In re Am. Solar Corp.*, 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988) (citing 8 Collier on Bankruptcy, ¶ 3019.03 (15th ed. 1987)).  Thus, a "clear and obvious improvement to the position of the creditors affected by the modification" will not require resolicitation of the modified plan.  *In re Concrete Designers, Inc.*, 173 B.R. 354, 356 (Bankr. S.D. Ohio 1994).  This reading of section 1127(c) is entirely consistent with the disclosure requirements in section 1125 because a modification that is not material is, "by definition, one which will not affect an investor's voting decision," and thus, "additional disclosure would serve no purpose."  *In re Am. Solar Corp.*, 90 B.R. at 824.

#90662676v4

23.     Here, the proposed modifications do not materially or adversely affect the interest of any claimant in these chapter 11 cases.  Indeed, the Plan, as confirmed, contemplated the Debtors' entry into Third-Party Sale Transactions.  Under the Plan, only one group of claimants, the Consenting GenOn Noteholders, has the ability to object to such Third-Party Sales Transactions.  And, as previously discussed, the Debtors' have already obtained agreements from the requisite majority of Consenting GenOn Noteholders not to exercise their negative consent rights as to the APA.  In other words, the only party whose interests could be affected by the APA has already approved it.  The proposed modification, therefore, is proper under sections 1125 and 1127(c) of the Bankruptcy Code and should be approved.

C.     **The Proposed Modifications Are Consistent with the Consenting GenOn Noteholders' Rights under the Plan.**

24.     A Third-Party Sale Transaction is defined under the Plan as:

> a sale of one or more of the assets of the Debtors, Interests in the Debtors owning such assets, or the New Common Stock to one or more third parties, including any Third-Party GAG Sale Transactions, as agreed to or consummated by the Debtors prior to the Effective Date, in consultation with the GenOn Steering Committee, NRG, and, with respect to Third-Party GAG Sale Transactions, the GAG Steering Committee; *provided* that (i) no Third-Party GAG Sale Transaction shall be agreed to or consummated on or prior to the Effective Date if reasonably objected to by (a) the GAG Steering Committee or (b) Consenting GenOn Noteholders holding over fifty percent (50%) in principal amount of the GenOn Notes then held by all Consenting GenOn Noteholders; and (ii) no Third-Party Sale Transaction that is not a Third-Party GAG Sale Transaction shall be agreed to or consummated on or prior to the Effective Date if reasonably objected to by Consenting GenOn Noteholders holding over fifty percent (50%) in principal amount of the GenOn Notes then held by all Consenting GenOn Noteholders.

Plan at Art. I.A. ¶ 226.

25.     As previously described, Consenting GenOn Noteholders have a negative consent right over Third-Party Sale Transactions under the Plan.  If exercised, this negative consent right

would allow Consenting GenOn Noteholders holding the requisite principal amount of GenOn Notes to object to the APA.  As mentioned above, however, the requisite Consenting GenOn Noteholders support the APA and have entered into the Consent Agreement, under which they have agreed not to exercise this negative consent right with respect to the Third-Party Sale Transaction contemplated under the APA.

### Notice

26.     The Debtors will provide notice of this Motion to:  (a) the Office of the U.S. Trustee for the Southern District of Texas; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) Wilmington Trust Company, as indenture trustee for the GenOn Energy, Inc. 7.875% Senior Notes due 2017, 9.50% Senior Notes due 2018, and 9.875% Senior Notes due 2020, (collectively, the "GenOn Notes"), and counsel thereto; (d) Wilmington Savings Fund Society, FSB, as successor indenture trustee for the GenOn Americas Generation, LLC 8.50% Senior Notes due 2021 and 9.125% Senior Notes due 2031, (collectively, the "GAG Notes"), and counsel thereto; (e) NRG Energy, Inc., as administrative agent under the Debtors' secured prepetition revolving facility due 2018 (the "Revolver"), and counsel thereto; (f) U.S. Bank National Association, as collateral trustee under the Revolver; (g) Davis Polk & Wardwell LLP, as counsel to an ad hoc committee of GenOn Notes; (h) Quinn Emanuel Urquhart & Sullivan, LLP, as counsel to an ad hoc steering committee of GAG Notes; (i) the United States Attorney's Office for the Southern District of Texas; (j) the Internal Revenue Service; (k) the United States Securities and Exchange Commission; (l) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (m) the state attorneys general for states in which the Debtors conduct business; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice is required.

#90662676v4

## **No Prior Request**

27.     No prior request for the relief sought in this Motion has been made to this or any

other court.

[*Remainder of page intentionally left blank.*]

#90662676v4

WHEREFORE, the Debtors respectfully request entry of an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other relief as is just and proper.

Dated:  March 8, 2018
Houston, Texas

/s/ *Zack A. Clement*

Zack A. Clement (Texas Bar No. 04361550)
**ZACK A. CLEMENT PLLC**
3753 Drummond Street
Houston, Texas 77025
Telephone:     (832) 274-7629
Email:            zack.clement@icloud.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
David R. Seligman, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
W. Benjamin Winger (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:            james.sprayregen@kirkland.com
                   david.seligman@kirkland.com
                   steven.serajeddini@kirkland.com
                   benjamin.winger@kirkland.com

-and-

AnnElyse Scarlett Gibbons (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:            annelyse.gibbons@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

#90662676v4