# <u>Exhibit A</u>

## Littlefield Declaration

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENON ENERGY, INC., *et al.*,[1] | ) | Case No. 17-33695 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 1481, 1622, 1623, 1624** |

---

## DECLARATION OF ASHLEY LITTLEFIELD IN SUPPORT OF DEBTORS' REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR OBJECTION TO CERTAIN PROOFS OF CLAIM (NATURAL GAS LITIGATION)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: GenOn Energy, Inc. (5566); GenOn Americas Generation, LLC (0520); GenOn Americas Procurement, Inc. (8980); GenOn Asset Management, LLC (1966); GenOn Capital Inc. (0053); GenOn Energy Holdings, Inc. (8156); GenOn Energy Management, LLC (1163); GenOn Energy Services, LLC (8220); GenOn Fund 2001 LLC (0936); GenOn Mid-Atlantic Development, LLC (9458); GenOn Power Operating Services MidWest, Inc. (3718); GenOn Special Procurement, Inc. (8316); Hudson Valley Gas Corporation (3279); Mirant Asia-Pacific Ventures, LLC (1770); Mirant Intellectual Asset Management and Marketing, LLC (3248); Mirant International Investments, Inc. (1577); Mirant New York Services, LLC (N/A); Mirant Power Purchase, LLC (8747); Mirant Wrightsville Investments, Inc. (5073); Mirant Wrightsville Management, Inc. (5102); MNA Finance Corp. (8481); NRG Americas, Inc. (2323); NRG Bowline LLC (9347); NRG California North LLC (9965); NRG California South GP LLC (6730); NRG California South LP (7014); NRG Canal LLC (5569); NRG Delta LLC (1669); NRG Florida GP, LLC (6639); NRG Florida LP (1711); NRG Lovett Development I LLC (6327); NRG Lovett LLC (9345); NRG New York LLC (0144); NRG North America LLC (4609); NRG Northeast Generation, Inc. (9817); NRG Northeast Holdings, Inc. (9148); NRG Potrero LLC (1671); NRG Power Generation Assets LLC (6390); NRG Power Generation LLC (6207); NRG Power Midwest GP LLC (6833); NRG Power Midwest LP (1498); NRG Sabine (Delaware), Inc. (7701); NRG Sabine (Texas), Inc. (5452); NRG San Gabriel Power Generation LLC (0370); NRG Tank Farm LLC (5302); NRG Wholesale Generation GP LLC (6495); NRG Wholesale Generation LP (3947); NRG Willow Pass LLC (1987); Orion Power New York GP, Inc. (4975); Orion Power New York LP, LLC (4976); Orion Power New York, L.P. (9521); RRI Energy Broadband, Inc. (5569); RRI Energy Channelview (Delaware) LLC (9717); RRI Energy Channelview (Texas) LLC (5622); RRI Energy Channelview LP (5623); RRI Energy Communications, Inc. (6444); RRI Energy Services Channelview LLC (5620); RRI Energy Services Desert Basin, LLC (5991); RRI Energy Services, LLC (3055); RRI Energy Solutions East, LLC (1978); RRI Energy Trading Exchange, Inc. (2320); and RRI Energy Ventures, Inc. (7091). The Debtors' service address is: 804 Carnegie Center, Princeton, New Jersey 08540.

I, Ashley Littlefield, make this Declaration pursuant to 28 U.S.C. § 1746 and state:

1.      I am a partner with the law firm of Kirkland & Ellis LLP, attorneys of record in the in this matter for Debtors GenOn Energy, Inc. *et al.* ("GenOn"). I respectfully submit this Declaration in Support of Debtors' Reply Memorandum in Further Support of Their Objection to Certain Proofs of Claim (Natural Gas Litigation).

2.      Attached hereto as Exhibit 1 is a true and correct copy of excerpts of the transcript for the status hearing for the motion to stay held on October 19, 2017 in *In re GenOn Energy, Inc., et al.*, 17-33695 (DRJ).

3.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts of the transcript for the motion to allow claims hearing held on November 1, 2017 in *In re GenOn Energy, Inc., et al.*, 17-33695 (DRJ).

4.      Attached hereto as Exhibit 3 is a true and correct copy of excerpts of the transcript for the status and scheduling hearing held on April 25, 2018 in *In re GenOn Energy, Inc., et al.*, 17-33695 (DRJ).

5.      Attached hereto as Exhibit 4 is a true and correct copy of excerpts of the transcript for the status hearing held on March 30, 2018 in *In re GenOn Energy, Inc., et al.*, 17-33695 (DRJ).

6.      Attached hereto as Exhibit 5 is a true and correct copy of the court Order granting and denying various motions entered as Docket No. 2957 in *In re Western States Wholesale Natural Gas Antitrust Litigation*, MDL 1566: 2:03-cv-01431-RCJ (PAL) (August 22, 2017).

7.      Attached hereto as Exhibit 6 is a true and correct copy of the Journal Entry Memorializing Rulings on Defendants' Motion for Partial Summary Judgement in *Associated Wholesale Grocers Inc. v. United Egg Producers and Moark, LLC and Moark Egg Corp. v. CNW Foods, Inc.*, 10-CV-2171 Division III (October 3, 2013).

8.     Attached hereto as Exhibit 7 is a true and correct copy of the Order Re: Defendants'
Motion to Dismiss (Doc. #960) entered as Docket No. 1517 in *In re Western States Wholesale
Natural Gas Antitrust Litigation*, MDL 1566: 2:03-cv-01431-RCJ (PAL) (February 23, 2009).

9.     Attached hereto as Exhibit 8 is a true and correct copy of the Order Re: Defendants'
Motion to Dismiss (Doc. #869) entered as Docket No. 1530 in *In re Western States Wholesale
Natural Gas Antitrust Litigation*, MDL 1566: 2:03-cv-01431-RCJ (PAL) (February 26, 2009).

10.     Attached hereto as Exhibit 9 is a true and correct copy of the court Order granting
Plaintiffs' Motion to Reconsider entered as Docket No. 2416 in *In re Western States Wholesale
Natural Gas Antitrust Litigation*, MDL 1566: 2:03-cv-01431-RCJ (PAL) (May 24, 2016).

11.     Attached hereto as Exhibit 10 is a true and correct copy of the Amended Class
Action Complaint entered as Docket No. 1952 in *In re Western States Wholesale Natural Gas
Antitrust Litigation*, MDL 1566: 2:03-cv-01431-RCJ (PAL) (July 2, 2010).

12.     Attached hereto as Exhibit 11 is a true and correct copy of the Plaintiff LearJet's
Motion for Class Certification and Memorandum in Support entered as Docket No. 2308 in *In re
Western States Wholesale Natural Gas Antitrust Litigation*, MDL 1566: 2:03-cv-01431-RCJ
(PAL) (March 7, 2016).

13.     Attached hereto as Exhibit 12 is a true and correct copy of the Plaintiff Heartland
Regional Medical Center's Motion For Class Certification And Memorandum In Support entered
as Docket No. 2309 in *In re Western States Wholesale Natural Gas Antitrust Litigation*, MDL
1566: 2:03-cv-01431-RCJ (PAL) (March 7, 2016).

14.     Attached hereto as Exhibit 13 is a true and correct copy of the court Order denying
and granting various motions entered as Docket No. 2832 in *In re Western States Wholesale
Natural Gas Antitrust Litigation*, MDL 1566: 2:03-cv-01431-RCJ (PAL) (March 30, 2017).

15.     Attached hereto as Exhibit 14 is a true and correct copy of the Notice of Plaintiffs' Payment of Rule 23(F) Appeal Fee entered as Docket No. 2913 in *In re Western States Wholesale Natural Gas Antitrust Litigation*, MDL 1566: 2:03-cv-01431-RCJ (PAL) (June 20, 2017).

16.     Attached hereto as Exhibit 15 is a true and correct copy of the court order granting and denying various motions entered as Docket No. 2987 in *In re Western States Wholesale Natural Gas Antitrust Litigation*, MDL 1566: 2:03-cv-01431-RCJ (PAL) (November 20, 2017).


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May 25, 2018, in San Diego, California.

Ashley Littlefield

4

## <u>Exhibit 1</u>

**Excerpts Of The Transcript From The October 19, 2017 Hearing**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| IN RE: | § CASE NO. 17-33695-H1-11 |
| | § HOUSTON, TEXAS |
| GENON ENERGY, INC., ET AL, | § THURSDAY, |
| | § OCTOBER 19, 2017 |
| DEBTORS. | § 11;36 A.M. TO 12:47 P.M. |

<u>STATUS HEARING / MOTION TO STAY</u>

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

FOR THE PARTIES:                SEE NEXT PAGE

COURT RECORDER:                 LINH THU DO

<u>TRANSCRIPTION SERVICE BY</u>:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office) ◊ (281) 277-0946 (fax)
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>APPEARANCES</u>:

```
FOR THE DEBTORS:              ANNA ROTMAN, ESQ.
                             RACHEL MORGAN, ESQ.
                             KIRKLAND & ELLIS, LLP
                             600 TRAVIS ST., STE. 3300
                             HOUSTON, TX  77002

                             ZACK CLEMENT, ESQ.
                             ZACK A. CLEMENT PLLC
                             3753 DRUMMOND
                             HOUSTON, TX  77025

                             JEREMY EVANS, ESQ.
                             KIRKLAND & ELLIS, LLP
                             601 LEXINGTON AVENUE
                             NEW YORK, NY  10022

                             DAVID SELIGMAN, ESQ.
                             KIRKLAND & ELLIS, LLP
                             300 N. LASALLE
                             CHICAGO, IL  60654

FOR MIDWEST CLASS:            TREY MONSOUR, ESQ.
                             RUSSELL JONES, ESQ.
                             ANDREW J. ENNIS, ESQ.

FOR REORGANIZED FLI           CHARLES RUBIO, ESQ.
                             DIAMOND MCCARTHY LLP
                             909 FANNIN ST., STE. 1500
                             HOUSTON, TX  77010

FOR WISCONSIN CLASS:          (VIA TELEPHONE)
                             SAMUEL WISOTZKEY, ESQ.
                             MELINDA BIALZIK, ESQ.
                             KOHNER MANN & KAILAS SC
                             4650 NORTH PORT WASHINGTON RD.
                             MILWAUKEE, WI  53212

FOR GENON AD HOC GROUP OF     (VIA TELEPHONE)
HOLDERS OF SENIOR NOTES:      MICHAEL ROSANO, ESQ.
                             DAVIS POLK & WARDWELL LLP
                             450 LEXINGTON AVENUE
                             NEW YORK, NY  10017
```

1          HOUSTON, TEXAS; THURSDAY, OCTOBER 19, 2017; 11:36 A.M.

2              THE COURT:  Let me go to the 11:15 matters, Case

3     No. 17-33695, GenOn Energy, Inc.  I'll take appearances,

4     please.

5              Thank you.

6              Mr. Clement, good morning.  Go ahead, whenever

7     you're ready.

8              MR. CLEMENT:  Shall I go ahead?

9              THE COURT:  Please.

10             MR. CLEMENT:  Good morning, Your Honor.  Zack

11    Clement, Anna Rotman, Jeremy Evans, and Rachel Morgan, on

12    behalf of GenOn Energy.

13             THE COURT:  All right.  Thank you.  Good morning,

14    folks.

15             Mr. Monsour, good to see you.

16             MR. MONSOUR:  Likewise, Your Honor.  Good morning,

17    Your Honor.  Trey Monsour, Russ Jones, and Andrew J. Ennis

18    from Polsinelli, on behalf of the Natural -- excuse me -- on

19    behalf of the Natural Gas Litigation Midwest Class Plaintiffs.

20             THE COURT:  All right.  Thank you.  Good morning,

21    gentlemen.

22             Mr. Rubio.

23             MR. RUBIO:  Good morning, Your Honor.  Charles Rubio

24    on behalf of Reorganized FLI.

25             THE COURT:  Thank you.

1    me to do or not, and hopefully, I never have to figure that

2    issue out.  But if they were to ask me, obviously, that's a

3    request that I'm going -- that I'm going to honor.  And I only

4    throw that out there simply because I don't know if it had

5    been thought about, talked about, all of that.  But absent

6    that, you know, I want a process that continues to move

7    forward, that is within my control.

8            And so, coming back to where we started --

9            MR. JONES:  Uh-huh.

10           THE COURT:  -- asking for a stay until -- you know,

11   an indefinite time period, based upon events I can't control,

12   which I can't foresee, controlled by courts that I don't have

13   the ability to call up and say, hey, guys, what's going on.

14   That's -- you know, that's just relief that I'm -- like I

15   said, it's a non-starter, it's something that I just resist

16   with every fiber of my being.

17           Doing what's efficient is something that I try to do

18   every day.  And so I -- that may seem, well, those are in

19   conflict with one another.  I don't know if they are or not.

20   But I've tried to think about it, not from a, well, I want to

21   wait until the very end and get certainty before I do anything

22   because that's going to put -- you know, unless the debtor

23   were to stand up and say, we're going to effectively carve you

24   out of the bankruptcy case, and we'll deal with you

25   separately, and we'll -- you know, we can add some language to

1    do all of that.  And I'm not suggesting that they do that, I'm

2    not -- I'm just saying they could do that, if they wanted to.

3         MR. JONES:  Which is what we thought we had with the

4    -- with the stay-lift order.

5         THE COURT:  Yeah, I will tell you that is -- you

6    know, that's one of those strategic things that I have done

7    and seen many times.  That was never contemplated by the

8    debtors, I'll just tell you that.  I've made that offer as a

9    debtor's lawyer many times to plaintiffs' lawyers.  And in

10   fact, at some point, I did it so many times that the

11   plaintiffs bar in Houston started hiring me to represent them.

12   So I can just tell you that was never the thought process that

13   the debtors were going through.  And I don't think there's

14   anything wrong with that.  I mean, you know, I see where that

15   goes, and I see where it comes from.

16        MR. JONES:  Uh-huh.

17        THE COURT:  But as we think through this, you know,

18   I want to do the most efficient thing.  And if -- you know, if

19   it's appropriate for a class proof of claim to be on file, and

20   you can get me comfortable that you have the requisite

21   authority to do such a thing -- because I think most of them -

22   - I mean, I've dismissed a host of them, especially in the

23   energy-related cases, because you see that come up a lot.

24        But most of them, quite honestly, were because the

25   counsel on behalf of the putative classes hadn't thought

1    through the issues, and they were -- this is Jones' words, you

2    know, they were lazy about what they did, and so they thought

3    they could -- you know, they just, well, we'll just file this

4    and not worry about it, it's enough, and we can always fix it

5    later on.  Well, you know, sometimes, it doesn't work quite

6    that way.

7          And so what I'm telling you is that, to date, I

8    haven't seen it done right.  And I don't know whether you

9    would do it right, I don't know if you and I agree on what's

10   right or not.  But thus far, I've just -- I've never seen it -

11   -

12          MR. JONES:  Right.

13          THE COURT:  -- done right.  And so I never had to

14   get to the substantive issues because there was just this --

15          MR. JONES:  Right.

16          THE COURT:  -- glaring deficiency in everything that

17   I looked at.  But I'm not -- you know, I'm not against it.

18          I just need to understand, you know, number one,

19   because, when you put your name on that thing -- you know,

20   one, there's always a problem with lawyers signing proofs of

21   claim, anyway.  I mean, that's just always a really dangerous

22   thing because you get into issues of, you know, authority and

23   waiving privilege.  I mean, it's just -- it's a horrible thing

24   to do, but a lot of people do it, and a lot of people get away

25   with it, and it's all just fine.

1    one thing that I was a little concerned about, when you said,

2    I don't want to stop the -- I don't want to grant an

3    indefinite stay, this class certification issue is like a

4    pretrial issue to the underlying litigation.  You're not going

5    to ever get to the trial until the class certification is

6    resolved.  So it's not an --

7            THE COURT:  Right.

8            MR. MONSOUR:  -- indefinite stay on this Court that

9    the Court has already imposed, by the stay order, in

10   liquidating the claim.  I mean, that -- those deadlines are

11   already established by an agreed order.  So we're not asking

12   that that be pushed back even farther.  I mean, the pretrial,

13   which is the class certification, is going to be determined

14   before that is, and that's not going to hold up the plan, so

15   the class certification shouldn't hold up the plan.

16           THE COURT:  Yeah.  I wasn't focused just on the

17   plan.  I mean, you -- and let me make the argument.  So, you

18   know, you're a good plaintiffs' firm.  And you're saying, you

19   know, our damages are a billion dollars, and in the back of

20   your mind, you know, you've got your -- you've got your damage

21   model that you've shared with everybody, and then you have

22   your real damage model.

23           MR. MONSOUR:  Uh-huh.

24           THE COURT:  And I've got that, I've lived that life.

25           And so someone stands up in a confirmation process

1       that's got another agenda, and says, wait a minute, there's a

2       feasibility issue here because there's a billion dollars.  And

3       if we look at -- you know, if we look at the waterfall or the

4       financials or whatever it is, a billion dollars bust.

5              We're now -- you know, now I'm in a position that I

6       can't -- you know, I can't do anything, or I've got to go

7       through, you know, some sort of really odd estimation

8       procedure, which I know is done, but it's -- if we don't deal

9       with the issue of whether or not a class proof of claim can

10      even be filed -- and I'm -- because I've separated in my own

11      mind -- and maybe improperly so -- I've separated in my own

12      mind dealing with the motion to allow a class proof of claim

13      and dealing with what you do with that proof of claim.

14             MR. MONSOUR:  Let me speak to the concerns you've

15      raised --

16             THE COURT:  Yeah, please.

17             MR. MONSOUR:  -- because those were the very

18      concerns we discussed --

19             THE COURT:  Okay.

20             MR. MONSOUR:  -- when we were negotiating the stay

21      order.  And feasibility issues were -- are what's being

22      preserved because, when we wrote the -- when we first

23      negotiated the stay order, we discussed these very issues of

24      feasibility.  And when we had the order agreed to -- and it --

25      I think it's relatively clear, I think debtors' counsel knew

1       what they were doing, we're going to liquidate the claim, and

2       that claim is going to be liquidated outside of the Bankruptcy

3       Court, whatever that number is, whether it's zero or zillion

4       dollars.  Before we can collect it, we're going to have to

5       come back to the Bankruptcy Court.  Okay.  We all understood

6       that, we're big boys.

7                    THE COURT:  Right.

8                    MR. MONSOUR:  And so we knew that that could be a

9       potential issue.  And then, when the disclosure statement came

10      out, we initially -- our comments were, we're impaired, we

11      don't want the estimation procedure to somehow trick us

12      because we now have a claim that you've agreed to via stay

13      order, it's going to liquidated outside the bankruptcy case --

14                   THE COURT:  Right.

15                   MR. MONSOUR:  -- and we addressed these issues, and

16      we came to language that was suitable, and preserved those

17      other issues like feasibility for confirmation.

18                   And then we have the Farmland defendants, which are

19      not our group, but another group of plaintiffs, that have

20      entered a similar order to us.  And they're saying, we are

21      going to challenge feasibility.  So you may get some challenge

22      to feasibility on the very issue that you're concerned about.

23                   THE COURT:  Right.

24                   MR. MONSOUR:  And the reason why the class

25      certification issue doesn't necessarily have to be determined

1          THE COURT:  I went to look up something else.  It

2     was --

3          MS. ROTMAN:  Oh, okay.

4          THE COURT:  It was 296, right?

5          MS. ROTMAN:  Yes, I believe so.

6          MR. MONSOUR:  296.

7          THE COURT:  Okay.  Let me get -- I'll put that back

8     up.

9          MS. ROTMAN:  Okay.

10          THE COURT:  All right.  So Paragraph 9?

11          MS. ROTMAN:  So Paragraph 9 --

12          THE COURT:  All right.

13          MS. ROTMAN:  -- there you are, at the top of the

14     page.  First sentence:

15               "By entering into this agreed order, the debtors,

16               including the MDL debtors, are not waiving, and will

17               not be deemed to have waived any available claims of

18               causes of action, including at law, equity, or

19               otherwise, in respect to the MDL suits, or

20               claimants' rights in this bankruptcy proceeding."

21          So I would focus the Court on that last clause.  We

22     didn't waive any of our rights in this bankruptcy proceeding;

23     we only agreed to lift the stay.  We didn't agree that this

24     Court loses jurisdiction to address anything.  And I think the

25     Court is on the same page with us on that.

1           At the time that the lift-stay order was entered

2    into, there was no class; that was the state of play.  And

3    there still isn't any class.  I would hasten to emphasize for

4    the Court that the MDL plaintiffs already had a shot at an

5    Article III Court, they got knocked out.  When we get to the

6    substance, we can talk about what we think the Ninth Circuit

7    will do, and why we don't think, by just granting the

8    interlocutory appeal, it's a slam dunk for them.

9           But let's remember the state of play.  When the RSA

10   was negotiated, when the creditors signed up to it and made

11   concessions, there was no certified class.

12           THE COURT:  Right.

13           MS. ROTMAN:  Now they are asking for a motion for

14   allowance of the class proofs of claim.  We've objected on the

15   procedure and on the substance.

16           And just to preview, on the procedure -- and I think

17   this is what the Court was getting at, there is a question of,

18   first, whether the claimants authorized counsel to file this

19   class proof of claim on their behalf.  And there also is, of

20   course, the question about the applicability of Rule 7023 to a

21   contested matter because this wasn't done as an adversary.  So

22   those are issues that we will be prepared to address with the

23   Court at the appropriate hearing.

24           Btu those are issues that the Court can absolutely

25   address, without having to get to the merits.  And in fact, it

1          MR. JONES:  Thank you, Your Honor.

2          MR. SELIGMAN:  Thank you, Your Honor.

3          THE COURT OFFICER:  All rise.

4       (Proceedings adjourned at 12:47 a.m.)

5                    * * * * *

6          *I certify that the foregoing is a correct transcript*

7    *to the best of my ability produced from the electronic sound*

8    *recording of the proceedings in the above-entitled matter.*

9       */S./  MARY D. HENRY* _____

10   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

11   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET\*\*D-337*

12   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

13   *JTT TRANSCRIPT #57570*

14   *DATE:  OCTOBER 20, 2017*

15

16

17

18

19

20

21

22

23

24

25

## Exhibit 2

**Excerpts Of The Transcript From The November 1, 2017 Hearing**

1            IN THE UNITED STATES BANKRUPTCY COURT

2           FOR THE SOUTHERN DISTRICT OF TEXAS

3                    HOUSTON DIVISION

4  IN RE:                    §      CASE NO. 17-33695-H2-11
                             §      HOUSTON, TEXAS
5  GENON ENERGY, INC., ET AL,  §    WEDNESDAY,
                             §      NOVEMBER 1, 2017
6              DEBTORS.       §      3:40 P.M. TO 5:13 P.M.

7

8              MOTION TO ALLOW CLAIMS HEARING

9         BEFORE THE HONORABLE DAVID R. JONES
              UNITED STATES BANKRUPTCY JUDGE

10

11                   APPEARANCES:

12      FOR THE PARTIES:    SEE NEXT PAGE

13      COURT RECORDER:     LINHTHU DO

14

15

16

17

18

19

20           TRANSCRIPTION SERVICE BY:

21      JUDICIAL TRANSCRIBERS OF TEXAS, LLC
              935 ELDRIDGE ROAD, #144
22              SUGAR LAND, TEXAS 77478
         Tel: 281-277-5325 ▼ Fax: 281-277-0946
23           www.judicialtranscribers.com

24

25    Proceedings recorded by electronic sound recording;
         transcript produced by transcription service.

```
 1                          APPEARANCES:

 2
    FOR THE DEBTORS:               ANNA ROTMAN, ESQ.
 3                                 ZACK CLEMENT, ESQ.
                                   JEREMY EVANS, ESQ.
 4                                 RACHEL MORGAN, ESQ.
                                   KIRKLAND & ELLIS, LLP
 5                                 600 TRAVIS ST. STE. 3300
                                   HOUSTON, TEXAS  77002
 6                                 713-835-3748

 7  FOR THE DEBTORS:               DAVID R. SELIGMAN, ESQ.
                                   KIRKLAND & ELLIS, LLP
 8                                 300 N. LaSalle
                                   Chicago, IL  60654
 9                                 312-862-2000

10  FOR THE DEBTORS:               MARK ROEBECK, ESQ.
                                   KELLEY DRYE & WARREN
11                                 Washington Harbour
                                   Suite 400
12                                 3050 K Street, N.W.
                                   Washington, D.C.  20007
13                                 (202) 342-8400

14  FOR THE NATURAL GAS
    LITIGATION MIDWEST
15  CLASS PLAINTIFFS:              TREY A. MONSOUR, ESQ.
                                   RUSSELL S. JONES, JR., ESQ.
16                                 POLSINELLI PC
                                   1000 Louisiana Street
17                                 53rd Floor
                                   Houston, TX  77002
18                                 713-374-1643

19

20

21

22

23

24

25
```

3

1                                 INDEX

2                                                        PAGE

3    Court's ruling                                        63

4

5    EXHIBITS:                               Offered    Received

6    Class Claimants:

7        3                                       8          8
         4                                       8          8
8        5                                       8          8
         6                                       8          8
9        7                                       8          8

10   Debtor's:

11       1-4                                     47         47
         14                                      48         48
12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1     HOUSTON, TEXAS; WEDNESDAY, NOVEMBER 1, 2017; 3:40 P.M.

2          THE COURT:  Let me call Case No. 37-33695, GenOn

3     Energy, Inc.  And, folks, whenever you're ready I'll take

4     your appearances.  We'll start first in the courtroom.

5          MR. CLEMENT:  Good afternoon, Your Honor.  For

6     GenOn Energy here in the courtroom Zach Clement and from

7     Kirkland & Ellis Anna Rotman, Jeremy Evans, and Rachel

8     Morgan.  Also on the phone, David Seligman.  I believe he's

9     on the phone.  And also Mark Roebeck of Kelley Drye,

10    litigation counsel for GenOn.

11         THE COURT:  All right.  Thank you.  Folks on the

12    telephone, just given the sheer number of people that are on

13    the line, although a number of them are getting off, I've

14    activated the hand raising feature.  If you wish to speak,

15    you need to use the star five on your telephone.  We'll

16    continue with appearances in the courtroom.

17         MR. JONES:  Thank you, Your Honor, good afternoon,

18    Russell Jones and Trey Monsour of Polsinelli on behalf of

19    the Midwestern Class Plaintiffs and the individual

20    claimants.

21         THE COURT:  All right.  Thank you, sir.  Good

22    afternoon, gentlemen.

23         All right.  Anybody on the telephone wish to make

24    an appearance?

25         If you do, press star five on your telephone.  All

```
 1              THE COURT:  See, I disagree.  But --
 2              MR. MONSOUR:  But it wasn't -- it's not to hide
 3   the ball it's just we looked at it from a practical
 4   perspective of costs and --
 5              THE COURT:  In any of those cases, is there any
 6   decision where certification had actually been denied?
 7              MR. MONSOUR:  No.
 8              THE COURT:  See, that's a big difference to me.
 9              MR. MONSOUR:  And our -- and it goes back to the
10   notice issue and why we had filed the stay motion.
11              THE COURT:  Right.
12              MR. MONSOUR:  We're not asking you to change the
13   existence and the lay of the land.  But if you look at Rule
14   3008 it only gives us one year to ask this Court to
15   reconsider.  And if we don't do it within that year, we're
16   forever barred.  And we have the excusable neglect standard
17   but if you look at 3008 and you look at 9024 and Rule 60(c)
18   which it references, we don't have an unlimited period of
19   time and that's a problem.  Because what if the 9th Circuit
20   doesn't rule until 13 months, that's what we're trying to
21   protect against, is not letting the bankruptcy be some sort
22   of trick process that's going to impact those claimants.
23              THE COURT:  I mean, at some point doesn't it have
24   to?  I mean, at some point the bankruptcy has to have an
25   effect.  I mean, this doesn't just simply stay out there
```

1  forever.

2         MR. MONSOUR:  But the claim liquidation -- let's

3  assume there wasn't the class, let's assume the class is

4  denied and the 14 claims are allowed.  They're not going to

5  be adjudicated until the Court, not the bankruptcy court,

6  liquidates the claims.

7         So isn't -- that's the final determination date

8  for liquidation and then we come back to this Court for

9  allowance.  So if the class certification issue were to have

10 occurred before that, this Court's not going to make a

11 determination on those proofs of claim until after it's

12 liquidated anyway.  And quite candidly the case could be

13 very well closed before the district court actually

14 liquidate the claims.

15        THE COURT:  So let me go back to what you said,

16 which was just news to me.  I want to understand because I

17 think you're wrong.

18        So do we agree that 3008 itself makes no reference

19 to any time period at all?

20        MR. JONES:  That's right.  It says --

21        MR. MONSOUR:  It's 9340, Your Honor.

22        THE COURT:  If you would just go with me, I

23 promise you I don't open my mouth without having gone

24 through this.

25        MR. JONES:  It says reasonable time, that's

1        THE COURT:  All right.  Thank you, everyone, safe

2  travels.

3        MR. JONES:  Thank you, Your Honor.

4        THE CLERK:  All rise.

5    (Proceedings concluded at 5:13 p.m.)

6                      * * * * *

7        *I certify that the foregoing is a correct*

8  *transcript to the best of my ability produced from the*

9  *electronic sound recording of the proceedings in the above-*

10 *entitled matter.*

11 */S/ MARY D. HENRY*

12 *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

13 *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**D-337*

14 *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

15 *JTT TRANSCRIPT #57539*

16 *DATE:  NOVEMBER 5, 2017*

17

18

19

20

21

22

23

24

25

# Exhibit 3

**Excerpts Of The Transcript From The April 25, 2018 Hearing**

1              IN THE UNITED STATES BANKRUPTCY COURT

2              FOR THE SOUTHERN DISTRICT OF TEXAS

3                        HOUSTON DIVISION

4   IN RE:                        §      CASE NO. 17-33695-H2-11
                                  §      HOUSTON, TEXAS
5   GENON ENERGY, INC., ET AL,    §      WEDNESDAY,
                                  §      APRIL 25, 2018
6              DEBTORS.           §      9:26 A.M. TO 12:02 P.M.

7

                     STATUS/SCHEDULING CONFERENCE
8
            BEFORE THE HONORABLE DAVID R. JONES
9                UNITED STATES BANKRUPTCY JUDGE

10

11                        APPEARANCES:

12        FOR THE PARTIES:     SEE NEXT PAGE

13        COURT CLERK:         ALBERT ALONZO

14        COURT RECORDER:      RUTH GUERRERO

15

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21        JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                935 ELDRIDGE ROAD, #144
22               SUGAR LAND, TEXAS 77478
          Tel: 281-277-5325 ▼ Fax: 281-277-0946
23              www.judicialtranscribers.com

24
       Proceedings recorded by electronic sound recording;
25        transcript produced by transcription service.

```
1                          APPEARANCES:

2
   FOR THE DEBTORS:              MARK E. MCKANE, ESQ.
3                                ASHLEY LITTLEFIELD, ESQ.
                                 KIRKLAND & ELLIS
4                                555 CALIFORNIA STREET
                                 SAN FRANCISCO, CA  94104
5                                415-439-1400

6                                ZACK A. CLEMENT, ESQ.
                                 ZACK A CLEMENT PLLC
7                                3753 DRUMMOND
                                 HOUSTON, TEXAS  77025
8                                832-274-7629

9                                BENJAMIN WINGER, ESQ.
                                 KIRKLAND ELLIS, LLP
10                               300 N. LASALLE
                                 CHICAGO, IL  60654
11                               312-862-2000

12

13   FOR REORGANIZED FLI:        CHARLES M. RUDIO, ESQ.
                                 DIAMOND MCCARTHY, LLP
14                               909 FANNIN STREET
                                 SUITE 1500
15                               HOUSTON, TEXAS  77010
                                 713-333-5127
16
                                 IKE DEAL, ESQ.
17                               (NO INFORMATION PROVIDED)

18                               TOM BROW, ESQ.
                                 (NO INFORMATION PROVIDED)
19

20   FOR WISCONSIN PLAINTIFFS:   ROBERT L. GEGIOS, ESQ.
                                 RYAN BILLINGS, ESQ.
21                               KOHNER MANN & KAILAS
                                 WASHINGTON BUILDING
22                               BARNABAS BUSINESS CENTER
                                 4650 N PORT WASHINGTON ROAD
23                               MILWAUKEE, WISCONSIN  53212
                                 414-962-5110
24

25
```

1                    (APPEARANCES CONTINUED):

2

 FOR THE OWNER LESSORS:          ROBERT B. BRUNER, ESQ.
3                                NORTON ROSE FULBRIGHT
                                 1301 MCKINNEY, SUITE 5100
4                                HOUSTON, TEXAS  77010
                                 713-651-5216
5

6  FOR THE MIDWEST PLAINTIFFS:    JENNIFER GILLE BACON, ESQ.
                                 TREY A. MONSOUR, ESQ.
7                                POLSINELLI, PC
                                 1000 LOUISIANA STREET
8                                FIFTY-THIRD FLOOR
                                 HOUSTON, TEXAS  77002
9                                713-374-1643

10

                      (ALSO APPEARING TELEPHONICALLY):

11

12 FOR THE OWNER LESSORS:          TYSON LOMAZOW, ESQ.
                                 MILBANK TWEED HADLEY & MCCLOY
13                               28 LIBERTY STREET
                                 NEW YORK, NY  10005
14                               232-530-5000

15

16

17

18

19

20

21

22

23

24

25

4

1        HOUSTON, TEXAS; WEDNESDAY, APRIL 25, 2018; 9:26 A.M.

2            THE COURT:  Let me go to the three matters -- four

3    matters that we have set at 9:30 in Case Number 17-33695,

4    GenOn Energy, Inc.

5            We'll take appearances when you're ready.

6        (Pause in the proceedings.)

7            THE COURT:  Mr. Rubio?

8            MR. RUBIO:  Good morning, Judge Jones.

9    Charles Rubio, from the law firm Diamond McCarthy, on behalf

10   of Farmland.  With me in the courtroom is Ike Deal

11   (phonetic) and Tom Brow (phonetic) who are antitrust counsel

12   for Farmland.

13           THE COURT:  Okay.  Thank you.  Good morning,

14   everyone.

15           MR. SPEAKER:  Good morning.

16           MR. GEGIOS:  Good morning, Your Honor.  My name's

17   Robert Gegios.  I'm joined by Ryan Billings.  We're from

18   Wisconsin with the firm of Kohner Mann and Kailas, and we

19   represent the Wisconsin Plaintiffs.

20           THE COURT:  All right.  Thank you.  Good morning.

21           MR. BRUNER:  Good morning, Your Honor.  Bob Bruner

22   of Norton Rose Fulbright, on behalf the Owner Lessors.  And

23   I believe co-counsel, Tyson Lomazow with Milbank, will be on

24   the phone.

25           THE COURT:  All right.  Thank you.  I'll come back

1          THE COURT:  Sure.

2          MS. BACON:  -- on any of this.

3          THE COURT:  I got it.

4          MS. BACON:  I just -- it is very difficult.  I

5  feel like we can completely protect our client's interest,

6  et cetera, so.

7          THE COURT:  No, I got it.

8          MS. BACON:  Well, we'll talk about that too.

9          THE COURT:  All I'm -- all I can tell you is

10  that -- if you decide on a process like this is the --

11  having brought that to my attention and me telling you that

12  I am sensitive to the impact that anything that I do here

13  has on folks who are not here, I get it.  And while I --

14  it's -- they took away my magic wand, but I can -- what I'm

15  telling you is that I'm willing to go as far as my grant of

16  authority will go in making the findings and being very

17  clear about the process and what it does and doesn't

18  constitute.

19          Now obviously, folks of a higher pay grade than me

20  can say, "Jones may have said that, but that's not what he

21  meant."  And I -- there's not a whole lot I can do about

22  that and I recognize that.

23          MS. BACON:  I know.  Well, thank you, Your Honor,

24  for your time.

25          THE COURT:  No, that's -- thank you.  This is

1          MR. MCKANE:  Good morning again, Your Honor.  And

2     for the Record, Mark McKane of Kirkland and Ellis.

3          Thanks to the efforts and constructive efforts on

4     both sides, we believe we have agreed-upon language.

5          THE COURT:  Okay.

6          MR. MCKANE:  And for the Court's ease, I think we

7     can email that language to you as well.

8          THE COURT:  That would be terrific.  That way I

9     don't have to -- there's no interpretive issue.

10          MR. MCKANE:   The vagaries of the wi-fi.

11          THE COURT:  Got it.

12          MR. MCKANE:  But I can read it.

13          THE COURT:  All right.

14          MR. MCKANE:  And I won't do a dramatic reading:

15     (Laughter.)

16          MR. MCKANE:  "The issue is whether the Bankruptcy

17      Court may or should adjudicate the claims objection,

18      taking into account any issues of jurisdiction,

19      authority, prior pending case doctrine, due process,

20      comity, abstention or potential collateral impact of

21      this Court's decision."

22          THE COURT:  That seems very clear to me and I get

23     it.  All right.

24          MR. MCKANE:  All right.  So, Your Honor, with

25     that, we actually have agreed on a briefing schedule --

1          THE COURT:  Okay.

2          MR. MCKANE:  And so it can be packaged, put a bow

3   on it and attach your ruling and move forward.

4          THE COURT:  All fine with me.  All right.

5          MR. MCKANE:  Thank you, Your Honor.

6          THE COURT:  Anything else we need to talk about

7   today?

8      (No verbal response.)

9          THE COURT:  All right.  Safe travels home

10  everybody.  We'll be adjourned.  Thank you.

11          (Proceeding adjourned at 12:01 p.m.)

12                    *  *  *  *  *

13          *I certify that the foregoing is a correct*

14  *transcript to the best of my ability produced from the*

15  *electronic sound recording of the proceedings in the above-*

16  *entitled matter.*

17  */S/ MARY D. HENRY*

18  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

19  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

20  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

21  *JTT TRANSCRIPT #58612*

22  *DATE FILED:  APRIL 27, 2018*

23

24

25

## <u>Exhibit 4</u>

**Excerpts Of The Transcript From The March 30, 2018 Hearing**

1           IN THE UNITED STATES BANKRUPTCY COURT

2          FOR THE SOUTHERN DISTRICT OF TEXAS

3                  HOUSTON DIVISION

4    IN RE:                      §      CASE NO. 17-33695-H2-11
                                 §      HOUSTON, TEXAS
5    GENON ENERGY, INC. ET AL    §      FRIDAY,
                                 §      MARCH 30, 2018
6        DEBTOR.                 §      11:09 A.M. TO 12:00 P.M.

7

8                       STATUS HEARING

        BEFORE THE HONORABLE DAVID R. JONES
9            UNITED STATES BANKRUPTCY JUDGE

10

11
                        APPEARANCES:
12
             FOR THE PARTIES:    SEE NEXT PAGE
13
             COURT RECORDER:     LINHTHU DO
14
             COURT CLERK:        LINHTHU DO
15

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21         JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                935 ELDRIDGE ROAD, #144
22               SUGAR LAND, TEXAS 77478
            Tel: 281-277-5325 ▼ Fax: 281-277-0946
23              www.judicialtranscribers.com

24
        Proceedings recorded by electronic sound recording;
25         transcript produced by transcription service.

2

1                              <u>APPEARANCES</u>:

2

3   FOR DEBTORS:                ZACK A. CLEMENT, ESQ.
                                Zack A. Clement PLCC
4                               3753 Drummond
                                Houston, TX  77025
5
                                MARK E. MCKANE, ESQ.
6                               ASHLEY E. LITTLEFIELD, ESQ.
                                W. BENJAMIN WINGER, ESQ.
7                               Kirkland and Ellis
                                555 California Street
8                               San Francisco, CA 94104

9                               MARK R. ROBECK, ESQ.
                                Kelley Drye & Warren, LLP
10                              515 Post Oak Blvd.
                                Suite 900
11                              Houston, TX  77027

12

13  FOR REOGANIZED FLI, INC.:   CHARLES M. RUBIO, ESQ.
                                MICHAEL D. FRITZ, ESQ.
14                              Diamond McCarthy, LLP
                                909 Fannin Street
15                              Houston, TX  77010

16
    FOR FLI/FARMLAND:           ISAAC L. DIEL, ESQ.
17                              Sharp McQueen, PA
                                419 N. Kansas Avenue
18                              Liberal, KS  97905

19                              THOMAS H. BRILL, ESQ.
                                Law Offices of Thomas
20                                H. Brill
                                8012 State Line Rd.
21                              Suite 102
                                Leawood, KS  66208
22

23

24

25

1

2                        <u>APPEARANCES, CONT'D</u>

3

FOR NATURAL GAS LITIGATION        TREY A. MONSOUR, ESQ.
4    MIDWEST PLAINTIFFS:            Polsinelli PC
                                    1000 Louisiana Street
5                                   53rd Floor
                                    Houston, TX  77002
6
                                    JENNIFER G. BACON, ESQ.
7                                   ANDREW J. ENNIS, ESQ.
                                    Polsinelli PC
8                                   900 W. 48th Place
                                    Suite 900
9                                   Kansas City, MO  64112

10

FOR WISCONSIN MDL                  MELINDA A. BIALZIK, ESQ.
11    PLAINTIFFS:                   Kohner Mann & Kailas SC
                                    4650 N. Port Washington Rd.
12                                  Milwaukee, WI  53212

13

FOR GENON STEERING COMMITTEE:      JAMES I. MCCLAMMY, ESQ
14                                  Davis Polk & Wardwell, LLP
                                    450 Lexington Avenue
15                                  New York, NY  10017

16

17

18

19

20

21

22

23

24

25

1

2          HOUSTON, TEXAS; FRIDAY, MARCH 30, 2018; 11:09 A.M.

3              THE COURT:  On the 11:00 o'clock Docket we have

4    Case No. 17-33695, GenOn Energy, Inc.  We'll start with

5    appearances first in the courtroom, please.

6              MR. CLEMENT:  Good morning, Your Honor.

7              THE COURT:  Good morning.

8              MR. CLEMENT:  For GenOn, Zack Clement.  And from

9    Kirkland & Ellis, Mark McKane, Ashley Littlefield, and Ben

10   Winger.  And from Kelley Drye, Mark Robeck.

11             THE COURT:  All right, thank you.  Good morning,

12   folks.

13             Mr. Rubio?

14             MR. RUBIO:  Good morning, Judge Jones.  Charles

15   Rubio on behalf of Reorganized FLI, also known as Farmland.

16   With me in the courtroom is my associate Michael Fritz.  We

17   also have Isaac Diel and Tom Brill who are lead counsel for

18   Farmland in the antitrust litigation.

19             THE COURT:  All right.  Thank you.  Good morning,

20   everybody.

21             MR. MONSOUR:  Good morning, Your Honor, Trey

22   Monsour, Jennifer Bacon and Andrew Ennis from the Polsinelli

23   law firm on behalf of the Northwest Plaintiffs.

24             THE COURT:  All right, thank you.

25             MR. MONSOUR:  Thank you.

             THE COURT:  Good morning everybody.

1   really 212 million.  It is really half a billion or is it

2   really less.  So that's something we'll engage.

3          THE COURT:  Yeah the numbers issues, at least in

4   my mind, ought to come later.

5          MR. MCKANE:  Yes.

6          THE COURT:  It would, you know it would seem to

7   me -- because while I will treat them all individually, my

8   guess is if you convince me, for instance, on a statute of

9   limitations argument and, you know, there aren't individual

10  tolling issues or something else, then my guess is that will

11  be a -- just as I like data points, I know that you-all like

12  data points as well -- is that will then start to define

13  where it goes.

14         And so maybe the conversation ought to be is that

15  you pick the simplest one with respect to an issue that

16  gives everybody clarity.  And my guess is -- and I know this

17  has tremendous numbers involved.  This has a lot of value

18  which means, you know, my guess is whatever it is I do one

19  way or another isn't going to be accepted.

20         So we're going to make trips up stairs and perhaps

21  even to New Orleans -- which is how the process should work.

22  You know, it might be worth having a conversation that okay

23  let's pick a test.  Let's see what happens and then, you

24  know, everybody agree that, you know, the loser is going to

25  appeal no matter what and that we ought to be talking about

1  action -- I just had this conversation with Ike and Tom.  I

2  believe they said five or six other live Defendants.  And

3  they can confirm that number for me.

4          So those are the other Defendants that this case

5  would proceed against really regardless of what happens.

6          THE COURT:  Where I was -- what I was thinking

7  about was have you-all given some thought to bifurcating in

8  a way that would allow you to -- again I'm not trying to

9  push this in any direction.  I'm just trying to figure out

10 what makes -- what makes sense.  Is to bifurcate the

11 litigation against all of the none-bankruptcy Defendants, if

12 you will, and the trial of a proof of claim and, you know,

13 negotiate a resolution that says whatever happens in the

14 Bankruptcy Court will not be used for any purpose in any

15 other Court.  And that gives you some insulation and also,

16 quite frankly, probably makes this easier to deal with.

17         Again, I'm not trying to push it in any direction

18 and I want what makes sense.  But, you know, that's

19 something, you know, if I didn't think it was a good idea, I

20 wouldn't have said it.

21         But, you know that's something that quite frankly

22 ought to be, you know, ought to be something like that just

23 to -- you know, you may say Jones is going to understand

24 when we present out our case that this really does need to

25 go back and the proof of claim doesn't matter.

1   does as a sword.

2           THE COURT:  Right.

3           MS. BACON:  And we all know that.  So it's more

4   danger for us -- let's put it -- let's be fair -- is the

5   risk of having conflicting -- either conflicting judgments

6   because these issues are going to be considered.  I think

7   the Farmland case is going to get out of the box and go.

8   And many, you know, the issues will be raised there.

9           So we have a risk of that.  We also have a risk of

10  any decision made with respect to the Debtor is going to be

11  used by the other nine defense groups against -- if

12  possible --

13          THE COURT:  Let me ask you --

14          MS. BACON:  -- and that worries us.

15          THE COURT:  Sure.  Let me ask you a question.  And

16  I did this routinely as when I stood where you're standing.

17  Is I have written into numerous orders, gotten Judges all

18  over the country to sign orders that had the limitation in

19  it that I mentioned to Mr. Rubio and I have never seen

20  anybody successfully undo that.

21          Now you may have and I again I did read that.  I

22  am sensitive to that.  And to me, I just think that's an

23  easy fix, but if somebody has -- somebody says you know

24  Jones that doesn't work any more because, you know, you

25  haven't practiced in seven years and the world has changed,

1   hand back that -- the "spider web," as you call it.

2           MR. MCKANE:  Thank you for your time today

3   especially today.  Thank you, Your Honor.

4           THE COURT:  All right, everyone have a good

5   holiday.  We'll be adjourned.

6           COURTROOM CLERK:  All rise.

7       (Proceeding adjourned at 12:00 p.m.)

8                       * * * * *

9        *I certify that the foregoing is a correct*

10  *transcript to the best of my ability produced from the*

11  *electronic sound recording of the proceedings in the above-*

12  *entitled matter.*

13  */S/ MARY D. HENRY*

14  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

15  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

16  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

17  *JTT TRANSCRIPT #58486*

18  *DATE FILED:  APRIL 11, 2018*

19

20

21

22

23

24

25

## <u>Exhibit 5</u>

**Order Granting And Denying Various Motions Entered As Docket No. 2957
In *In re Western States Wholesale Natural Gas Antitrust Litigation***

FILED ____ RECEIVED
____ ENTERED ____ SERVED ON
COUNSEL/PARTIES OF RECORD

AUG 2 2 2017

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re WESTERN STATES WHOLESALE NATURAL GAS ANTITRUST LITIGATION | 2:03-cv-01431-RCJ-PAL<br>MDL No. 1566<br>**ORDER** |
| REORGANIZED FLI, INC. et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>WILLIAMS COMPANIES. et al.,<br><br>Defendants. | 2:05-cv-01331-RCJ-PAL |
| LEARJET, INC. et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>ONEOK, INC. et al.,<br><br>Defendants. | 2:06-cv-00233-RCJ-PAL |

1 of 22

SINCLAIR OIL CORP.,

        Plaintiff,

   vs.

E PRIME INC. et al.,

        Defendants.

2:06-cv-00267-RCJ-PAL

SINCLAIR OIL CORP.,

        Plaintiff,

   vs.

ONEOK ENERGY SERVICES CO., L.P.,

        Defendant.

2:06-cv-00282-RCJ-PAL

BRECKENRIDGE BREWERY OF COLORADO, LLC et al.,

        Plaintiffs,

   vs.

ONEOK INC. et al.,

        Defendants.

2:06-cv-01351-RCJ-PAL

HEARTLAND REGIONAL MEDICAL CENTER et al.,

        Plaintiffs,

   vs.

ONEOK, INC. et al.,

        Defendants.

2:07-cv-00987-RCJ-PAL

| | | |
|---|---|---|
| 1 | ARANDELL CORP. et al., | ) |
| 2 | Plaintiffs, | ) |
| 3 | vs. | ) 2:07-cv-01019-RCJ-PAL |
| 4 | XCEL ENERGY INC. et al., | ) |
| 5 | Defendants. | ) |
| 6 | NEWPAGE WISCONSIN SYSTEM INC., | ) |
| 7 | Plaintiff, | ) |
| 8 | vs. | ) 2:09-cv-00915-RCJ-PAL |
| 9 | CMS ENERGY RESOURCE | ) |
| 10 | MANAGEMENT CO. et al., | ) |
| 11 | Defendants. | ) |
| 12 | | ) |

These consolidated cases arise out of the energy crisis of 2000–2002. Plaintiffs (retail buyers of natural gas) allege that Defendants (natural gas traders) manipulated the price of natural gas by reporting false information to price indices published by trade publications and by engaging in "wash sales." Approximately forty motions are pending before the Court, including the final group of dispositive motions before remand to the transferor districts for trial.

## I. PROCEDURAL HISTORY

In 2003, the Judicial Panel on Multidistrict Litigation ("JPML") transferred seven class action cases from various districts in California to this District under 28 U.S.C. § 1407 as Multidistrict Litigation ("MDL") Case No. 1566, assigning Judge Pro to preside. Since then, the JPML has transferred in several more actions from various districts throughout the United States. Between 2003 and 2015, Judge Pro ruled on many motions to remand, to dismiss, and for summary judgment. He also approved several class settlements. Several parties settled on their

1    own. One or more of the cases have been to the Court of Appeals twice and to the Supreme

2    Court once. In 2007, the Court of Appeals reversed several dismissals under the filed rate

3    doctrine and remanded for further proceedings. In 2013, the Court of Appeals reversed several

4    summary judgment orders, ruling that the Natural Gas Act did not preempt state law anti-trust

5    claims and that certain Wisconsin- and Missouri-based Defendants should not have been

6    dismissed for lack of personal jurisdiction. The Supreme Court granted certiorari as to

7    preemption under the Natural Gas Act and affirmed. The case was soon thereafter reassigned to

8    this Court when Judge Pro retired. The Court has issued several dispositive orders and has

9    denied class certification in applicable cases. Eight of the eighteen consolidated cases remain

10   open, the others having been variously settled, dismissed, or remanded to state courts.

11   ## II.     MOTIONS TO RECONSIDER

12         Plaintiff Sinclair Oil Corp. asks the Court to correct an alleged clerical error in the

13   Court's March 30, 2017 order. In the introduction to its ruling on cross-motions for summary

14   judgment on the issue of release, the Court wrote that material issues of fact remained as to

15   whether Sinclair Oil had received sufficient notice of the settlements in the NYMEX case. But

16   the Court thereafter closely analyzed the issue, finding that the release indeed precluded the

17   present claims and that there had been sufficient notice of the settlements. Defendant ONEOK

18   Energy Services Co., L.P. ("OESC") has responded that it has no objection to a clarification to

19   the effect that the Court misspoke in its introductory remarks but intended to grant its motion

20   (and the joinder thereto filed by Defendants e prime, inc. and Xcel Energy Inc.[1]), as indicated in

21   both the analysis following the introduction and the "conclusion" section of the order.

22

23

24
_____

1 These two Defendants have filed a separate motion under Rule 60(a) to this effect.

1    Defendants are correct. The Court will amend the previous order under Rule 60(a) to remove the

2    final sentence of the first paragraph of Part III.B.

3    **III.    SUMMARY JUDGMENT MOTIONS**

4            A court must grant summary judgment when "the movant shows that there is no genuine

5    dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

6    Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson*

7    *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if

8    there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See*

9    *id.* A principal purpose of summary judgment is "to isolate and dispose of factually unsupported

10   claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

11           In determining summary judgment, a court uses a burden-shifting scheme. The moving

12   party must first satisfy its initial burden. "When the party moving for summary judgment would

13   bear the burden of proof at trial, it must come forward with evidence which would entitle it to a

14   directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v.*

15   *Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation and internal quotation marks

16   omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

17   defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

18   an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

19   party failed to make a showing sufficient to establish an element essential to that party's case on

20   which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.

21           If the moving party fails to meet its initial burden, summary judgment must be denied and

22   the court needn't consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398

23   U.S. 144 (1970). If the moving party meets its initial burden, the burden then shifts to the

24   nonmoving party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the nonmoving party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50. Notably, facts are only viewed in the light most favorable to the nonmoving party where there is a genuine dispute about those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). That is, even where the underlying claim contains a reasonableness test, where a party's evidence is so clearly contradicted by the record as a whole that no reasonable jury could believe it, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

A.    **Motions Nos. 2745, 2764**

Responses to these motions are due two weeks after completion of depositions of certain expert witnesses. (*See* Orders, ECF Nos. 2786, 2797). Those depositions were expected to have been completed by March 10, 2017. (*See* Order No. 2786). No responses to Motions Nos. 2745

1    or 2764 appear to have been filed, however. The Court will therefore deny those motions

2    without prejudice at this time.

3        **B.    Motion No. 2740**

4        Defendants in the '233 Case have moved for summary judgment against the "full

5    consideration" remedy under Kansas law. Defendants note that the Kansas Restraint of Trade

6    Act ("KRTA") was amended in 2013 to replace the "full consideration" measure of damages

7    with a triple damages remedy. *Compare* Kan. Stat. Ann. § 50-115 (repealed), *with id.* § 50-

8    161(b) (2013). The question is whether the amendment applies retroactively to claims arising

9    before the amendment. Defendants are correct that under Kansas law, changes to substantive

10    rights apply only prospectively, but changes to remedies alone apply retroactively:

11          It is the law of this state that a statute which merely changes a remedy is not
invalid, as there are no vested rights in any particular remedy. While generally
12          statutes will not be construed to give them retroactive application unless it appears
that such was the legislative intent, nevertheless when a change of law merely
13          affects the remedy or law of procedure, all rights of action will be enforced under
the new procedure without regard to whether they accrued before or after such
14          change of law and without regard to whether or not the suit has been instituted,
unless there is a saving clause as to existing litigation.

15    *Jones v. Garrett*, 386 P.2d 194, 199 (Kan. 1963); *accord Nitchals v. Williams*, 590 P.2d 582, 587

16    (Kan. 1979). Defendants note that two courts to address the retroactivity of the repeal of the

17    "full consideration" remedy have found that the repeal is retroactive under Kansas law. *See In re*

18    *Polyurethane Foam Antitrust Litig.*, 998 F. Supp. 2d 625, 640 (N.D. Ohio 2014); *Assoc.*

19    *Wholesale Grocers, Inc. v. United Egg Producers*, No. 10-cv-2171, at 4 (Kan. Dist. Ct.,

20    Wyandotte Cnty. Oct. 3, 2013).

21        Plaintiffs respond that the amendment to KTRA disclaimed any retroactive effect, i.e.,

22    that it contains a saving clause of the type mentioned by the *Jones* Court. The Court disagrees.

23    The saving clause applies only to causes of action themselves, not to remedies:

24

1                 K.S.A. 50-163 and the amendments to K.S.A. 50-101 and 50-112 by this
        act shall be applied retroactively to any choses in action or defenses premised on
2        any provision of the Kansas restraint of trade act amended or repealed by this act,
       and any such choses in action or defenses that have accrued as of the effective date
3        of this act shall be abated, *but causes of action that were pending in any court before*
       *the effective date of this act, shall not be abated.* All other non-remedial provisions
4        of this section shall be applied prospectively.

5   Kan. Stat. Ann. § 50-164 (2013) (emphasis added).

6          The now-repealed "full consideration" remedy was formerly found at section 50-115.

7   Section 50-164 does not mention section 50-115. Section 50-164 provides that certain new

8   substantive standards for antitrust claims found in section 50-163, as well as the amended

9   substantive standards found in sections 50-101 and 50-112, apply retroactively (against the

10   default rule of prospective-only application of changes to substantive rights), but that any other

11   *non-remedial* changes shall be applied only prospectively (in accordance with the default rule).

12   Normally, no saving clause is required under Kansas law to rescue causes of action against

13   retroactive effect. In the case of the 2013 KRTA amendments, however, one was needed,

14   because the amendments were made retroactive to causes of action accrued but not yet pending.

15   But the saving clause under section 50-164 does not indicate that amendments to remedies (such

16   as the repeal of section 50-115) are to be applied only prospectively. That is enough to find the

17   repeal of section 50-115 to apply to pre-amendment claims under Kansas law. And the final

18   sentence of section 50-164 goes further, to avoid any confusion. In clarifying that all other "non-

19   remedial" provisions of § 6 of KRTA are prospective, the amendment strongly implies that any

20   amendments to remedial provisions are to be applied retroactively in accordance with the default

21   rule under Kansas law.

22          Plaintiffs also argue that the language "causes of action that were pending in any court

23   before the effective date of this act, shall not be abated" means that the repeal of the "full

24   consideration remedy" does not apply to this case. *See id.* The Court disagrees. The non-

1  abatement clause of section 50-164 concerns the retroactivity of claims, not remedies. It

2  provides that claims that were substantively viable only under the previous versions of the

3  relevant statutes *and which were pending before the 2013 amendments* remain viable, whereas

4  claims that were substantively viable only under the previous versions of the relevant statutes

5  and which accrued before the 2013 amendments, *but which were not pending at the time of the*

6  *2013 amendments*, are retroactively nonviable. Section 50-164 discusses only the retroactivity of

7  changes to substantive standards governing antitrust claims under KRTA. It does not discuss the

8  retroactivity of remedies under the 2013 KRTA amendments. Its silence on the retroactivity of

9  remedies plus the default rule under *Jones* is enough to decide the issue, and as noted, section

10  50-164 provides a further (unnecessary) implication that amendments to remedial provisions are

11  to be applied retroactively by qualifying the catch-all provision with the term "non-remedial."

12       Plaintiffs also argue that however this Court may interpret the effects of the amendments,

13  the Kansas Court of Appeals has held that the repeal of section 50-115 was not retroactive. The

14  Court disagrees. The first opinion cited is unpublished and is therefore not precedential under

15  Kansas law. It is still potentially persuasive, but the opinion turned on whether a Kansas district

16  court had properly decertified a class and only briefly mentioned section 50-115, not addressing

17  the issues the Court has addressed directly, *supra*. *See generally O'Brien v. Leegin Creative*

18  *Leather Prods., Inc.*, No. 188,908, 2014 WL 1362657 (Kan. Ct. App. Apr. 4, 2014). The next

19  case is published, but that case does not address the retroactivity of the repeal of the "full

20  consideration" remedy. *See generally Smith v. Philip Morris Cos., Inc.*, 335 P.3d 644 (Kan. Ct.

21  App. 2014). Although the *Smith* court briefly addressed the amendments and noted that the pre-

22  2013 KRTA applied to that case because it had been pending before the amendments, those facts

23  are only briefly mentioned, and the issue is not discussed, i.e., the relevant issues do not appear

24  to have been litigated. *See id.* 652–63.

There being no binding authority addressing the issue directly, the Court finds that the best interpretation of Kansas law is that the 2013 repeal of the "full consideration" remedy under KRTA is retroactive to all cases. A contrary conclusion would require the Court to read words into section 50-164 and ignore other words therein, or to countermand the law distinguishing the retroactivity of rights versus remedies as clearly stated by the Kansas Supreme Court. Accordingly, the Court grants the motion for summary judgment on this issue.

### C. Motion No. 2741

The remaining Defendants in the '1019 and '915 Cases move for summary judgment based on res judicata and/or release against Arandell Corp. and NewPage Wisconsin System, Inc. (collectively, "Hedged Plaintiffs") based on release under a settlement agreement reached in a consolidated class action brought in the Southern District of New York ("the NYMEX Case"). The Amended Consolidated Class Action Complaint ("ACCAC") in the NYMEX Case alleged that the defendants had manipulated the prices of natural gas futures and options on the New York Mercantile Exchange ("NYMEX") between January 1, 2000 and December 31, 2002 by reporting inaccurate, misleading, and false trading information, including artificial volume and price information, to trade publications that compile and publish such information. The Complaints here make the same allegations within the NYMEX relevant time period. (*Compare* Second Am. Compl. ¶¶ 1–9, ECF No. 190 in Case No. 2:07-cv-1019, *and* Compl. ¶¶ 1–9, ECF No. 39-3, at 13 in Case No. 2:09-cv-915, *with* Am. Consol. Class Action Compl. ¶¶ 5, 60–70, ECF No. 2300-1). Several movants were also defendants under the ACCAC.[2] The plaintiff

_____

2 A comparison of the remaining Defendants to the defendants in the NYMEX action indicates that Williams Merchant Services Co., LLC; Dynegy Illinois, Inc.; DMT GP, LLC; Dynegy GP, Inc.; El Paso Corp.; Northern States Power Co.; and Xcel Energy Inc. were not defendants in the NYMEX Case. (*Compare* Mot. Summ. J. 2 n.1, ECF No. 2741, *with* Ex. A to Am. Consol. Class Action Compl., ECF No. 2300-1). These Defendants are therefore not entitled to summary

1   class in the NYMEX Case was defined as persons who had bought or sold natural gas futures or

2   options on NYMEX during the relevant times. Hedged Plaintiffs were part of the NYMEX class

3   because they directed their agent Kaztex to purchase NYMEX natural gas contracts during the

4   relevant time period. (*See* Treis Dep. 144–45, 148, 167 & Exs. 112, 115, ECF No. 2741-8

5   (showing NYMEX natural gas contracts purchases by Arandell for each month between

6   November 2001 and December 2002, except April 2002); Krolikowski Dep 53–54, ECF No.

7   2743 (testifying that NewPage Wisconsin System bought NYMEX natural gas contracts

8   purchases through Stora Enso Financial Services during the relevant time period)).

9         On May 24, 2006, the court in the NYMEX Case entered a Final Judgment and Order of

10   Dismissal ("the First Settlement Order") with an expanded plaintiff class definition reaching

11   back to June 1, 1999. The first group of settling class members was to receive a total of nearly

12   $73 million. On June 15, 2007, the court in the NYMEX Case entered a Final Judgment and

13   Order of Dismissal ("the Second Settlement Order") with a similarly defined plaintiff class. The

14   second group of settling class members was to receive a total of nearly $28 million. Paragraph 6

15   of the First Settlement Order and Paragraph 5 of the Second Settlement Order provided for

16   releases of the parties from further litigation:

17            The Released Parties are finally and forever released and discharged from
any manner of claims . . . and causes of action in law, admiralty, or equity, whether

18      class, individual, or otherwise in nature . . . whether known or unknown, suspected
or unsuspected, whether concealed or hidden, or in law, admiralty, or equity, that

19      the Representative Plaintiffs and other members of the Class who have not timely
opted out of the settlement and excluded themselves from the Class ("Settling

20      Plaintiffs''), or any of them, individually, or as a class (whether or not they make a
claim upon or participate in the Settlement Funds), ever had, now have or hereafter

21      can, shall or may have, against the Released Parties arising from or relating in any
way to trading in NYMEX Natural Gas Contracts (including purchasing, selling, or

22

23   judgment under the res judicata or release theories of the present motion. These Defendants may

24   move to reconsider if they have evidence of relationships to released NYMEX defendants, e.g.,
via succession or merger.

holding any NYMEX Natural Gas Contract, or taking or making delivery of physical natural gas pursuant to any NYMEX Natural Gas Contract, or any combination thereof, whether as a hedger or speculator), whether or not asserted in the Action, including without limitation, claims which (a) arise from *or relate in any way to any conduct complained of in any complaint filed in the Action*, (b) have been asserted or could have been asserted in any state or federal court or any other judicial or arbitral forum against the Released Parties or any one of them, (c) arise under *or relate to any federal or state commodity price manipulation law, any state or federal unfair or deceptive business or trade practices law, or other law or regulation, or common law, including, without limitation, the Commodity Exchange Act, 7 U.S.C. § 1 et seq., the federal antitrust laws (as that term is defined in 15 U.S.C. § 12), or state antitrust laws* and/or (d) the claims brought in this Action. The Settling Plaintiffs, and each of them, are hereby enjoined from asserting any such claims against the Released Parties.

(First Settlement Order ¶ 6(a), at 4–6, ECF No. 2300-5 (emphases added; footnote omitted)).

The omitted footnote defines "Released Parties" as, *inter alia*, the settling defendants and their

predecessors and successors. (*See id.* 4 n.3, at 4–5). The release language of the Second

Settlement Order is the same in relevant respects. (*See* Second Settlement Order ¶ 5(a), at 4–5,

ECF No. 2300-7).

As the Court has ruled previously, these releases bar the present claims against those

movants who were defendants in the NYMEX Case as against any Plaintiffs who were members

of the settlement class, received sufficient notice, and did not opt out. The NYMEX court found

that notice to the class had been sufficient and that the settlements were fair and reasonable, and

movants provide evidence that the NYMEX Case claims administrator mailed notices to Hedged

Plaintiffs' NYMEX broker, Kaztex. (*See* Glenn Aff. & Exs. 1, 5, ECF No. 2741-11). There is no

evidence that Hedged Plaintiffs opted out of the class.

Hedged Plaintiffs argue that they cannot have received sufficient notice via "pass

through" notice to Kaztex. Unlike Sinclair Oil Co. previously argued, Hedged Plaintiffs do not

appear to deny that they had a relationship with Kaztex when the notice was given to Kaztex.

The question is whether notice to Kaztex was a constitutionally reasonable attempt at notice. A

broker has a fiduciary duty to notify parties like Hedged Defendants of such matters. Hedged

Plaintiffs argue that movants have adduced no evidence that they made any attempt in the

NYMEX litigation to identify the customers behind Kaztex's trades, and that their failure to do

so but merely to rely on notice to the broker itself was constitutionally unreasonable. But the

NYMEX court explicitly found that Rule 23 and due process had been satisfied with respect to

class member notification. "Normally we will satisfy ourselves that the party received the

requisite notice, opportunity to be heard, and adequate representation by referencing the state

court's findings." *Hesse v. Sprint Corp.*, 598 F.3d 581, 588 (9th Cir. 2010) (citing *Epstein v.*

*MCA, Inc.*, 179 F.3d 641, 648 (9th Cir. 1999) (noting that certifying courts' determinations on

such issues are not subject to collateral review) (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S.

797, 809 (1985))). Hedged Plaintiffs' remedy is to move to intervene in the NYMEX action for

the purpose of filing a Rule 60(b) motion as to the notice issue. Only if such a motion were

granted could this Court reexamine the notice issue in the present context.

The Court has rejected the argument that the NYMEX Case concerned harm to natural

gas *futures traders* via Defendants' acts, i.e., the artificial inflation of futures prices via reporting

false prices and engaging in wash trades, whereas the present case concerns harm to natural gas

*consumers* due to those acts. The release language of the Settlements is broad enough to

preclude the present claims. The release clause releases OESC and other settling defendants

from "any manner of claims . . . and causes of action" by settling plaintiffs:

> *relating in any way* to trading in NYMEX Natural Gas Contracts . . . *including*
> *without limitation, claims which . . . relate in any way to any conduct complained*
> *of in any complaint filed in the Action* [or which] *arise under or relate to any* federal
> or state commodity price manipulation law, any state or federal unfair or deceptive
> business or trade practices law, or other law or regulation, or common law,
> including, without limitation . . . *state antitrust laws.*

(First Settlement Order ¶ 6(a), at 4–6 (emphases added; footnote omitted)).  The language of the release is of course broader than the natural release as a matter of law that would have resulted from the settlement under ordinary principles of claim preclusion, otherwise the release would serve no purpose.  And the language of the release here is extremely broad.  It releases Defendants from the present claims, because they arise out of alleged conduct relating to conduct complained of in the NYMEX Case.  The Court now rejects Hedged Plaintiffs' similar argument that they did not purchase NYMEX natural gas contracts because they simply participated in a Kaztex hedging program under which Kaztex did so.  The release is broad enough to cover Hedged Plaintiffs' claims, and the evidence noted, *supra*, shows that Kaztex purchased natural gas contracts on behalf of Hedged Plaintiffs.  Plaintiffs' argument is further undermined by their own argument in opposition to Motion No. 2744 that they were direct purchasers of natural gas or natural gas contracts for the purposes of Wisconsin's "full consideration" statute despite using Kaztex or others as middlemen.

### D.  Motions Nos. 2744, 2754

The Williams Cos., Inc.; Williams Merchant Services Co, LLC; and Williams Gas Marketing, Inc. move for summary judgment in the '1019 and '915 Cases because they sold no natural gas (or natural gas contracts) directly to any Plaintiffs during the relevant time period. Movants note that the Court of Appeals upheld Judge Pro's ruling in this case that Wisconsin law permits a "full consideration" remedy only where a plaintiff directly purchased the commodity. *See In re W. States Wholesale Natural Gas Litig.*, 715 F.3d 716, 745–47 & n.28 (9th Cir. 2013) (citing Wis. Stat. § 133.14 and finding the result too clear to certify to the Wisconsin Supreme Court) ("We agree with the district court's conclusion that the statutory text at issue is unambiguous. . . . There is no provision authorizing recovery by indirect purchasers or other non-parties to the voided contract.").  But even assuming movants have satisfied their initial

burden, Plaintiffs have adduced evidence of movants' sales of natural gas to Plaintiffs through their purchasing agents such as Kaztex. It is largely the same evidence, such as the Krolikowski deposition, that movants adduced in support of their summary judgment motion based on res judicata and release to show that Plaintiffs *had* in fact purchased natural gas from them, in order to show that Plaintiffs were member of the NYMEX class.

In reply, movants argue that Plaintiffs do not deny that movants did not sell natural gas to any Plaintiff during the relevant time period, but only to purchasing agents such as Kaztex. But that does not appear to be Plaintiffs' argument. Plaintiffs argue (contrary to their argument in opposition to Motion No. 2741) that the sales to Kaztex and WPS were not *to* those brokers but *through* them to Plaintiffs. The evidence is unclear enough to be interpreted that way by a reasonable jury. Assuming that a jury believed that the nature of the transactions between movants and Plaintiffs were sales directly between them that were simply facilitated by an agent such as Kaztex or WPS—the Court cannot rule this out based on the evidence—the Court of Appeals' ruling requiring a direct sale does not preclude the full consideration remedy under Wisconsin law.

**E.  Motion No. 2746**

Defendants in the '233, '987, '1019, '915, and '1351 Cases move for summary judgment for failure to establish an antitrust conspiracy. An antitrust conspiracy under the Clayton Act requires an agreement. But an agreement need not be explicit. The Supreme Court has noted that coincidental changes in price structures at the same time by multiple competitors with no legitimate explanation may be enough to imply an agreement in restraint of trade under the Clayton Act. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n.4 (2007). Although "lawful parallel conduct fails to bespeak unlawful agreement," *id.* at 556, and parallel conduct may just as easily indicate competitive behavior as anticompetitive behavior, *see In re Musical*

*Instruments & Equip. Antitrust Litig.*, 789 F.3d 1186, 1193 (9th Cir. 2015), parallel conduct is not irrelevant to showing a conspiracy. An antitrust plaintiff may show a conspiracy via parallel conduct combined with "plus factors" under the totality of the circumstances. *Id.* at 1194 (citing *In re Citric Acid Litig.*, 191 F.3d 1090, 1102 (9th Cir. 1999)) ("Whereas parallel conduct is as consistent with independent action as with conspiracy, plus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action."). Examples of economic activity that tends to imply an agreement include extreme action against self-interests, decisions made closely enough in time that agreement is more likely than coincidence or market-based reaction, or agency reports finding the relevant type of agreement. *See id.* at 1194–98.

The Court first rejects Plaintiffs' argument that Defendants' behavior, i.e., wash trading and churning, was "inherently conspiratorial." It may have been inherently wrongful under the antitrust laws as to each individual Defendant, but only an actual agreement to do something unlawful with another party is inherently conspiratorial. Defendant companies cannot have individually "conspired" with themselves. Only an agreement between the companies constitutes a conspiracy. But the evidence of wash trades *between Defendants*—which Defendants do not appear to dispute—implies an antitrust conspiracy. That is more than isolated parallel conduct. Plaintiffs correctly note that all that is required is a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). The concept of "wash trades" or "churning," i.e., artificial price manipulation by a seller, is totally contrary to the goal of market competition. Unlike parallel *lawful* activity, at best, the present case involved parallel *unlawful* activity. Parallel unlawful activity strongly implies a "conscious commitment to a common scheme designed to achieve an unlawful objective." *See id.* In such a case, each competitor benefits from both his

own and his competitors' anticompetitive behavior. Indeed, in wash trades between competitors, they do so via a series of collusive trades. Plaintiffs have produced a summary diagram on page 61 of their opposition that neatly illustrates the "web of conspiracy" between Defendants based on wash trades. The Court will not grant summary judgment for failure to adduce evidence of any explicit agreement. It is virtually impossible that industry members such as Defendants did not realize the anticompetitive effects of the wash trades they were engaging in with one another.

### F.    Motion No. 2748

Defendants in the '233, '987, '1019, '915, and '1351 Cases move for summary judgment based on lack of "antitrust standing," i.e., proximate cause under § 4 of the Clayton Act. Movants argue that damages must be limited to those arising out of direct purchases of natural gas from movants, not any purchases from third-party suppliers. The Court disagrees that the doctrine of proximate cause under the Clayton Act is so stringent. The Supreme Court has ruled that although the text of 15 U.S.C. § 15 could be read so broadly as to permit actions for damages no matter how remotely connected to an antitrust violation, the purpose of the Clayton Act was to protect consumers from paying excessive prices due to monopolistic behavior in accordance with common law principles, and a court must therefore "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them" in light of those principles, particularly the principle of "proximate cause." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters ("AGC")*, 459 U.S. 519, 529–36 (1983). Accordingly, there is no "black-letter rule that will dictate the result in every case," *id.* at 536; rather, a court must bear in mind that "the Sherman Act was enacted to assure customers the benefits of price competition, and our prior cases have emphasized the central interest in protecting the economic freedom of participants in the relevant market," *id.* at 538.

In *AGC*, the plaintiff "was neither a consumer nor a competitor in the market in which trade was restrained," and it was "not clear whether the [plaintiff's] interests would be served or disserved by enhanced competition in the market." *Id.* at 539. Here, by contrast, it is indisputable that Plaintiffs were consumers in the market that Defendants allegedly manipulated, and that Plaintiffs' interests would have been better served by enhanced competition in that market, i.e., without Defendants' alleged manipulative practices that artificially increased prices.

Also, the "chain of causation" here is not attenuated, as it was in *AGC*. *Id.* at 540. There, a labor union claimed harm to its "vaguely defined . . . business activities" based on the defendant's coercion of landowners to divert business to nonunion contractors. *Id.* at 540–41. The loss of potential union dues due to contractors' disincentive to unionize (or employees' disincentive to join union shops) due to the coercion against the landowners was held to be too remote. *Id.* at 541 & n.46. Only the coerced landowners themselves potentially had any harm direct enough to implicate antitrust standing. *Id.* at 541. Here, by contrast, even if Plaintiffs did not purchase directly from Defendants—a genuinely disputed issue—they purchased natural gas at a price that had been inflated by Defendants' alleged anticompetitive practices. That kind of harm is not so attenuated so as to break the chain of proximate cause required under § 4. *See, e.g., Reiter v. Sonotone Corp.*, 442 U.S. 330, 342 (1979) ("The essence of the antitrust laws is to ensure fair price competition in an open market. Here, where petitioner alleges a wrongful deprivation of her money because the price of the hearing aid she bought was artificially inflated by reason of respondents' anticompetitive conduct, she has alleged an injury . . . under § 4 [of the Clayton Act]."). The Court denies the motion.

**G.     Motions Nos. 2761 and 2762**

All remaining Defendants in the '987 and '233 Cases have moved for summary judgment under the respective statutes of limitations. Defendants argue Plaintiffs brought their claims

1    more than four and three years, respectively, after the alleged misconduct. *See* Mo. Rev. Stat.

2    § 416.131(2); Kan. Stat. § 60-512(2). Defendants note that the original complaint in the '987

3    Case was filed on March 22, 2007, but that Plaintiffs have never alleged that the injury occurred

4    any later than October 2002, and they currently allege the latest date of injury as February 2002.

5    Absent equitable tolling, therefore, the claims are time-barred under Missouri law. Defendants

6    note that the original complaint in the '233 Case was filed on September 26, 2005, but that

7    Plaintiffs allege the latest date of injury as February 2002. Absent equitable tolling, therefore,

8    the claims are time-barred under Kansas law.

9         Because the statute of limitations is an affirmative defense, Defendants have the burden

10   of proving it, so in the context of summary judgment they must produce evidence that would

11   entitle them to a directed verdict if unrebutted at trial. They adduce approximately 100 pre-

12   March 22, 2003 and pre-September 26, 2002 newspaper articles, press releases, and other

13   publicly available materials indicating the controversy over manipulative, Enron-style "wash

14   trading" and other practices, including a Federal Energy Regulatory Commission ("FERC")

15   order from February 2002 indicating the opening of an investigation into the manipulation of

16   electricity and natural gas prices by Enron or any other company. The other newspaper articles

17   indicate that many other companies, including many of the Defendants in this case, were being

18   investigated by the SEC for this kind of behavior.

19        Plaintiffs respond that they filed their respective lawsuits within four and three years of

20   when the offending conduct could have been reasonably discovered, because FERC's report

21   concerning the alleged antitrust violations was not published until March 26, 2003. The Court

22   finds that Plaintiffs have satisfied their shifted burden (even assuming the burden has shifted to

23   them) to create a genuine issue of material fact as to when they should reasonably have known of

24   the underlying conduct in this case. The March 26, 2003 FERC report was the first indication

1  that Defendants had in fact conspired to make false reports of trades to manipulate prices.

2  Moreover, Defendants had withheld information and given misleading responses during the

3  investigation to hide their activities, in some cases being fined for it by FERC. Prior to that,

4  Plaintiffs might have only been guessing based on newspaper articles. A reasonable jury could

5  decide the issue in Plaintiffs' favor, and the Court therefore denies the motions.

6  **IV.    MOTION FOR HEARING AND MOTION TO SEVER**

7         Reliant Energy, Inc. and Reliant Energy Services, Inc. (collectively, "Debtors") have

8  filed a notice of bankruptcy. Debtors are Defendants in four of the remaining eight cases (Nos.

9  2:06-cv-233, 2:07-cv-987, 2:07-cv-1019, and 2:09-cv-915). In each of those four cases,

10  additional Defendants remain. Those remaining Defendants have asked the Court for a hearing

11  to determine how those four cases should proceed. No separate hearing is necessary to resolve

12  this issue. The automatic stay under 11 U.S.C. § 362 presumably prevents any continued

13  litigation by or against Debtors until further action by the Bankruptcy Court, but it does not

14  prevent continuing litigation by or against other Defendants. Nor is there any utility in formally

15  severing the claims against Debtors.

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

**CONCLUSION**

IT IS HEREBY ORDERED that the Motions to File Supplemental Briefs (ECF Nos. 2798, 2824, 2828) and the Motions to Strike (ECF Nos. 2710, 2818) are DENIED as moot.

IT IS FURTHER ORDERED that the Motion for Order Limiting Defendants' Seriatim Filing of Dispositive Motions (ECF No. 2689), the Motion to Defer State Specific Rulings and Remand Cases to Transferor Courts (ECF No. 2843), the Motions to Strike (ECF Nos. 2901, 2909), the Motion for Hearing (ECF No. 2921), and the Motion to Sever (ECF No. 2915) are DENIED.

IT IS FURTHER ORDERED that the Motions to File Surreply (ECF No. 2836, 2866, 2900), the Motion for Leave to File Excess Pages (ECF No. 2849), and the Motion to Extend Time and Exceed Page Limits (ECF No. 2879) are GRANTED.

IT IS FURTHER ORDERED that the Motions to Seal (ECF Nos. 2738, 2742, 2749, 2750, 2854, 2857, 2860, 2864, 2889) are GRANTED.

IT IS FURTHER ORDERED that the Motions to Reconsider (ECF Nos. 2839, 2840, 2841) are DENIED, and the Motion to Reconsider (ECF No. 2852) is GRANTED. The Order (ECF No. 2832) is AMENDED under Rule 60(a) to remove the final sentence of the first paragraph of Part III.B.

IT IS FURTHER ORDERED that the Motion for Summary Judgment (ECF No. 2740) is GRANTED.

IT IS FURTHER ORDERED that the Motion for Summary Judgment (ECF No. 2741) is GRANTED IN PART and DENIED IN PART. The motion is granted, except as to Williams Merchant Services Co., LLC; Dynegy Illinois, Inc.; DMT GP, LLC; Dynegy GP, Inc.; El Paso Corp.; Northern States Power Co.; and Xcel Energy Inc.

1       IT IS FURTHER ORDERED that the Motions for Summary Judgment (ECF Nos. 2744,

2  2746, 2748, 2754, 2761, 2762) are DENIED.

3       IT IS FURTHER ORDERED that the Motions for Summary Judgment (ECF Nos. 2745,

4  2764) are DENIED without prejudice.

5       IT IS FURTHER ORDERED that the parties shall file a joint status report within

6  fourteen (14) days addressing: (1) the refiling, mootness, waiver, etc. of Motions Nos. 2745 and

7  2764; and (2) any matters (apart from motions to reconsider anything in the present order) that

8  remain to be addressed in this Court before remand to the transferor courts.

9       IT IS SO ORDERED.

10  Dated this 22nd day of ~~July~~, 2017.

11     *August*

12

13                            ROBERT C. JONES
                            United States District Judge

14

15

16

17

18

19

20

21

22

23

24

## Exhibit 6

**Journal Entry Memorializing Rulings on Defendants' Motion for Partial Summary Judgement in *Associated Wholesale Grocers Inc. v. United Egg Producers and Moark, LLC and Moark Egg Corp. v. CNW Foods, Inc.*, 10-CV-2171 Division III (October 3, 2013)**

IN THE DISTRICT COURT OF WYANDOTTE COUNTY, KANSAS
TWENTY-NINTH JUDICIAL DISTRICT

| | | |
|---|---|---|
| ASSOCIATED WHOLESALE GROCERS, INC., et al., | ) ) ) | |
| Plaintiffs and Counter-Defendants, | ) ) ) | |
| v. | ) ) | |
| UNITED EGG PRODUCERS, et al., | ) ) | |
| Defendants, | ) ) | |
| and | ) ) | Case No. 10-CV-2171 Division III |
| MOARK, LLC and MOARK EGG CORPORATION, | ) ) ) | |
| Defendants, Counter-Plaintiffs, and Third-Party Plaintiffs, | ) ) ) ) | |
| v. | ) ) | |
| CNW FOODS, INC., et al., | ) ) ) | |
| Third-Party Defendants. | ) | |

## JOURNAL ENTRY MEMORIALIZING RULINGS ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

On May 10, 2013, Defendants filed a Motion for Partial Summary Judgment against Plaintiffs' claims for full consideration damages. Plaintiffs filed an opposition to that motion on June 3, 2013. Defendants filed a reply in further support of the motion on June 14, 2013.

On June 17, 2013, a hearing was held on the motion. The Court has considered Defendants' Motion for Partial Summary Judgment, the briefs in support of and in opposition to the motion, and the arguments of respective counsel. The Court makes these findings of fact and conclusions of law.

Prior to April 2013, the Kansas Restraint of Trade Act ("KRTA") allowed any person injured or damaged by a trust or combination in violation of K.S.A. 50-112 or 50-113 to sue for and recover "the full consideration or sum paid by such person" for such goods. K.S.A. 50-115.

In April 2013, the Kansas Legislature passed Senate Bill No. 124, which amended the KRTA. Among other things, Senate Bill No. 124 repealed K.S.A. 50-115, thereby eliminating "full consideration" damages. Senate Bill No. 124, at Sec. 7. Instead, Senate Bill No. 124 allows an individual to recover "treble the actual damages sustained." *Id.* at Sec. 5. Senate Bill No. 124's Section 6 addressed whether certain specified changes made by Senate Bill No. 124 would apply to lawsuits already on file:

> Section 1 and the amendments to K.S.A. 50-101 and 50-112 by this act shall be applied retroactively to any choses in action or defenses premised on any provision of the Kansas restraint of trade act amended or repealed by this act, and any such choses in action or defenses that have accrued as of the effective date of this act shall be abated, but causes of action that were pending in any court before the effective date of this act, shall not be abated. All other non-remedial provisions of this section shall be applied prospectively.

Senate Bill No. 124 became effective on April 18, 2013. Plaintiffs filed this litigation in December 2010, allege that Defendants violated the KRTA and seek full consideration damages for these violations.

Defendants contend that Plaintiffs are barred from seeking "full consideration" damages under the amended KRTA. In support of this conclusion, Defendants cite Kansas Supreme Court precedent holding that remedial changes to a statute apply retroactively. *See, e.g., Jones v. Garrett*, 192 Kan. 109, 115, 386 P.2d 194, 199 (1963); *accord In re Tax Appeal of Alsop Sand Co., Inc.*, 265 Kan. 510, 523-24, 962 P.2d 435, 445 (1998); *State v. Ford*, 262 Kan. 206, 208, 936 P.2d 255, 257 (1997); *Olathe Cmty. Hosp. v. Kansas Corp. Comm'n*, 232 Kan. 161, 166, 652

2

P.2d 726, 730 (1982); *Nitchals v. Williams*, 225 Kan. 285, 291, 590 P.2d 582, 587 (1979); *see also Southwestern Bell Tel. Co. v. Kansas Corp. Comm'n*, 29 Kan. App. 2d 414, 422, 29 P.3d 424, 429 (Kan. Ct. App. 2001). Defendants maintain, and Plaintiffs do not dispute, that K.S.A. 50-115, the "full consideration" damages provision, was remedial in nature.     Thus, in Defendants' view, the Kansas legislature's repeal of K.S.A. 50-115 applies to Plaintiffs' claims here.

Plaintiffs allege the plain language of the statute does not support the dismissal of full consideration damages from this lawsuit, which was pending in a court prior to the April 2013 effective date of the Act.   Plaintiffs allege that their KRTA cause of action is based on Defendants' violation of K.S.A. 50-101 and 50-112 and this chose in action cannot be "abated" by this change in the law.  Plaintiffs cite to the Kansas Supreme Court's decision in *Matter of Marriage of Peak*, 244 Kan. 662, 665, 772 P.2d 775, 778 (1989), which held that the common and ordinary meaning of the word abate is to reduce or lessen: "Webster's New Collegiate Dictionary 2 (5th ed. 1977) defines 'abate,' in pertinent part, as 'a: to reduce in degree or intensity: ... b: to reduce in value or amount: make less ... 3: DEDUCT, OMIT.'"  *See also Valadex v. Emmis, Commc'ns*, 290 Kan. 472, 480, 229 P.3d 389, 396 (2010); *Foor v. State*, 196 Kan. 618, 620, 413 P.2d 719, 721 (1966); *Barnes v. Bd. of Cnty. Comm'rs of Cowley Cnty.*, 47 Kan. App. 2d 353, 354, 274 P.3d 697, 698 (2012), *petition for review denied* (Apr. 8, 2013); *Hill v. City of Topeka*, 188 P.3d 977, at *5 (Kan. Ct. App. Aug. 1, 2008).  Plaintiffs argue that by eliminating full consideration damages from this pending lawsuit, Defendants seek to abate or lessen Plaintiffs' chose in action.

Plaintiffs additionally argue that the clause in Section 6 of Senate Bill No. 124 stating that "causes of action that were pending in any court before the effective date of this act, shall

3

not be abated" is a savings clause evidencing the Kansas Legislature's intent to exclude pending litigation from any changes contained in this Senate Bill. Plaintiffs cite to Kansas Supreme Court authority holding that the purpose of a savings clause is to ensure that existing causes of action are unaffected by subsequent changes in the law. *See Halley v. Barnabe*, 271 Kan. 652, 658, 24 P.3d 140, 144 (2001) (citing *Davis v. Hughes*, 229 Kan. 91, 101, 622 P.2d 641, 650 (1981)); *Jones v. Garrett*, 192 Kan. 109, 115, 386 P.2d 194, 199 (1963).

In response, Defendants point out that Section 6, by its own terms, only applies to "Section 1 and the amendments to K.S.A. 50-101 and 50-112"; the motion before the Court, in contrast, relies on Section 7 of Senate Bill No. 124, which in pertinent part repealed the "full consideration" remedy previously codified at K.S.A. 50-115. Defendants therefore maintain that Section 6 does not apply to the "full consideration" repeal.

After reviewing the arguments and authorities by all parties, the Court finds that because Section 6 of Senate Bill No. 124 does not reference Section 7 of Senate Bill No. 124 or K.S.A. 50-115, and because remedial changes to a statute apply retroactively under Kansas Supreme Court precedent, the Kansas legislature's repeal of K.S.A. 50-115 applies here and bars Plaintiffs' claims for full consideration damages.

The Court therefore orders as follows:

1) Defendants' Motion for Partial Summary Judgment is granted, and judgment is entered against Plaintiffs and in Defendants' favor on Plaintiffs' claims for full consideration damages.

2) Plaintiffs' oral motion requesting that the Court make the requisite findings for interlocutory appeal under K.S.A. 60-2102(c) is denied.

4

IT IS SO ORDERED.

_____
DANIEL A. DUNCAN
Judge of the District Court

Dated: _____

DB04/0811541.0002/9519302 1 PF06

JOINTLY SUBMITTED AND APPROVED BY:

Daniel D. Crabtree KS #10903
STINSON MORRISON HECKER LLP
1201 Walnut, Suite 2900
Kansas City, MO 64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
dcrabtree@stinson.com

Nathan P. Eimer – *admitted pro hac vice*
Vanessa G. Jacobsen – *admitted pro hac vice*
Arin C. Aragona – *admitted pro hac vice*
Travis A. Kennedy – *admitted pro hac vice*
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Facsimile: (312) 692-1718
neimer@eimerstahl.com
vjacobsen@eimerstahl.com
aaragona@eimerstahl.com
tkennedy@eimerstahl.com

*Attorneys for Defendants, Counter-Plaintiffs and
Third-Party Plaintiffs Moark, LLC and Moark Egg
Corporation, and Defendants Land O'Lakes, Inc.
and Norco Ranch, Inc.*

6

*Rachel E. Schwartz by Dan Cotter, with permission*

**STUEVE SIEGEL HANSON LLP**
Patrick J. Stueve, KS Bar # 13847
Rachel E. Schwartz, KS Bar # 21782
Steve Six, KS Bar # 16151
Barrett J. Vahle -*admitted pro hac vice*
Bradley T. Wilders -*admitted pro hac vice*
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7110
Facsimile: (816) 714-7101
stueve@stuevesiegel.com
schwartz@stuevesiegel.com
six@stuevesiegel.com
vahle@stuevesiegel.com
wilders@stuevesiegel.com


**TOMASIC & REHORN**
Rick Rehorn, KS Bar # 13382
PO Box 171855
Kansas City, KS 66117-0855
Telephone: (913) 371-5750
Facsimile: (913) 713-0065
rick@tomasicrehorn.com

*Attorneys for Plaintiffs and Third-Party Defendants*

7

## **Exhibit 7**

**Order Re: Defendants' Motion To Dismiss (Doc. #960) Entered As Docket No. 1517 In *In re Western States Wholesale Natural Gas Antitrust Litigation***

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

IN RE: WESTERN STATES            )    MDL 1566
WHOLESALE NATURAL GAS            )    2:03-CV-01431-PMP-PAL
ANTITRUST LITIGATION             )    BASE FILE
_____  )
                                 )
J.P. MORGAN TRUST COMPANY,       )
NATIONAL ASSOCIATION, in its     )    2:05-CV-01331-PMP-PAL
capacity as Trustee of the FI    )
LIQUIDATING TRUST,               )
                                 )
                Plaintiff,       )    ORDER RE: DEFENDANTS' MOTION
                                 )    TO DISMISS (Doc. #960)
v.                               )
                                 )
THE WILLIAMS COMPANIES, INC., et )
al.,                             )
                                 )
                Defendants.      )
_____  )

Presently before this Court is Specially Appearing Defendants CMS Energy

Corporation, Duke Energy Carolinas, LLC, and Reliant Energy, Inc.'s Motion to Dismiss

for Lack of Personal Jurisdiction (Doc. #960)[1] with Joint Memorandum (Doc. #963).

Defendants filed separate volumes of exhibits (Doc. #968, #974, #976) in support.[2]

Plaintiff filed Oppositions (Doc. #1080, #1083, #1106) and supporting appendices (Doc.

#1081, #1084, #1125, #1126, #1142).  Defendants filed Replies (Doc. #1176, #1185,

#1189).

_____

[1]  Document numbers refer to the base file, 2:03-CV-01431-PMP-PAL, unless otherwise noted.

[2]  Defendants Reliant Energy, Inc. and Reliant Energy Services, Inc. also entered into a
stipulation of fact (Doc. #1054) with Plaintiff.

## I. BACKGROUND

This case is one of many in consolidated Multidistrict Litigation arising out of the energy crisis of 2000-2001. Plaintiff originally filed this action in the District Court of Wyandotte County, Kansas. (Notice of Removal, [2:05-CV-01331-PMP-PAL, Doc. #1] at 2.) Defendants removed the case to the United States District Court for the District of Kansas. (Id.) The Judicial Panel on Multidistrict Litigation entered a Transfer Order pursuant to 28 U.S.C. § 1407 centralizing the foregoing action in this Court for coordinated or consolidated pretrial proceedings.

Plaintiff J.P. Morgan Trust Company Association ("J.P. Morgan") is the trustee for reorganized FLI, Inc. ("FLI"), a Kansas corporation with its principal place of business in Kansas City, Missouri. (Id. at 3.) J.P. Morgan brings this suit in its capacity as FLI's trustee. FLI is a successor in interest to Farmland Industries, Inc., a Kansas corporation, with its principal place of business in Kansas. (Id. at 3-4.) According to the Amended Complaint, Defendants are natural gas companies that buy, sell, transport, and store natural gas, including their own and their affiliates' production, in the United States and in the State of Kansas. (Id. at 4-33.) In this litigation, Plaintiff alleges Defendants conspired to engage in anti-competitive activities with the intent to manipulate and artificially increase the price of natural gas for consumers. (Am. Compl. [2:05-CV-01331-PMP-PAL, Doc. #11] at 4-43.) Specifically, Plaintiff alleges Defendants, directly and through their affiliates, conspired to manipulate the natural gas market by knowingly delivering false reports concerning trade information to trade indices and engaging in wash trades, in violation of Kansas Statutes Annotated § 50-101, et seq. (Id.)

The Amended Complaint's allegations are directed generally at two types of Defendants: the natural gas companies that actually engaged in natural gas sales and the related reporting of allegedly manipulated gas prices to the trade indices, and those companies' parent corporations. The Amended Complaint does not allege the parent

company Defendants themselves engaged in natural gas trading and price reporting. Rather, the Amended Complaint alleges these Defendants are the parent companies of subsidiaries which engage in such activity generally, and which also made natural gas sales in Kansas during the relevant time period.

Plaintiff seeks to establish personal jurisdiction over the parent company Defendants based on their out-of-forum activities directed at Kansas along with their subsidiaries' and affiliates' contacts within Kansas.  According to the Amended Complaint, the parent company Defendants dominated and controlled their respective subsidiaries and the parent company Defendants "entered into a combination and conspiracy . . . which tended to prevent full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas."  (Id. at 4, 7, 11, 14, 16, 18, 21, 25, 27, 29, 30.)  Plaintiff alleges the parent company Defendants intended their actions to have a direct, substantial, and foreseeable effect on commerce in the State of Kansas. (Id. at 4, 7, 11, 14, 16-18, 21, 25, 27, 29-30.)  According to the Amended Complaint, the parent company Defendants "made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas, and those policies and decisions were implemented on an operational level by affiliates . . . in the United States and in Kansas."  (Id. at 5, 7-8, 12, 14, 17, 19, 21-22, 25-26, 28-29, 31.)

Parent company Defendants CMS Energy Corporation, Duke Energy Carolinas, LLC, and Reliant Energy, Inc. now move to dismiss, arguing this Court lacks personal jurisdiction over them.  According to these Defendants, they conduct no business in Kansas and have no other contacts supporting general or specific jurisdiction.  Defendants also argue they cannot be subject to jurisdiction in Kansas based on their subsidiaries' contacts with the forum because their subsidiaries are not their agents or alter egos.  Defendants thus argue exercising personal jurisdiction in this case would violate constitutional due process

1   requirements.

2          Plaintiff responds that Defendants' subsidiaries have submitted to jurisdiction in

3   Kansas and Defendants are subject to personal jurisdiction through agency and alter ego

4   principles based on their subsidiaries' contacts with the forum.  Additionally, Plaintiff

5   requests the Court defer ruling until after the magistrate judge resolves certain jurisdictional

6   discovery disputes, or to delay ruling on the jurisdictional question until merits discovery is

7   completed because the jurisdictional questions are intertwined with the merits.

8   **II.  LEGAL STANDARDS**

9          "When a defendant moves to dismiss for lack of personal jurisdiction, the

10  plaintiff bears the burden of demonstrating that the court has jurisdiction over the

11  defendant."  Pebble Beach Co. v. Caddy, 453 F.3d 1151, 1154 (9th Cir. 2006).  To meet this

12  burden, a plaintiff must demonstrate that personal jurisdiction over a defendant is (1)

13  permitted under the applicable state's long-arm statute and (2) that the exercise of

14  jurisdiction does not violate federal due process.  Id.  The Court must analyze whether

15  personal jurisdiction exists over each defendant separately.  Harris Rutsky & Co. Ins.

16  Servs., Inc. v. Bell & Clements Ltd., 328 F.3d 1122, 1130 (9th Cir. 2003).

17         Where the issue is before the Court on a motion to dismiss based on affidavits

18  and discovery materials without an evidentiary hearing, the plaintiff must make "a prima

19  facie showing of facts supporting jurisdiction through its pleadings and affidavits to avoid

20  dismissal."  Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co., 284 F.3d 1114,

21  1119 (9th Cir. 2002).  The Court accepts as true any uncontroverted allegations in the

22  complaint and resolves any conflicts between the facts contained in the parties' evidence in

23  the plaintiff's favor.  Id.  However, for personal jurisdiction purposes, a court "may not

24  assume the truth of allegations in a pleading which are contradicted by affidavit."

25  Alexander v. Circus Circus Enters., Inc., 972 F.2d 261, 262 (9th Cir. 1992) (quotation

26  omitted).

In diversity cases such as this, "a federal court applies the personal jurisdiction rules of the forum state provided the exercise of jurisdiction comports with due process." Scott v. Breeland, 792 F.2d 925, 927 (9th Cir. 1986). However, "federal law is controlling on the issue of due process under the United States Constitution." Data Disc, Inc. v. Sys. Tech. Assoc., Inc., 557 F.2d 1280, 1286 n.3 (9th Cir. 1977); see also Dole Food Co., Inc. v. Watts, 303 F.3d 1104, 1110 (9th Cir. 2002). Therefore, the Court will apply law from the United States Court of Appeals for the Ninth Circuit in deciding whether jurisdiction is appropriate under the Due Process Clause. See In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d 1171, 1174 (D.C. Cir. 1987) (concluding that "the transferee court [should] be free to decide a federal claim in the manner it views as correct without deferring to the interpretation of the transferor circuit"); Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir. 1993) (holding that "a transferee federal court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit").

To satisfy federal due process standards, a nonresident defendant must have "minimum contacts" with the forum state so that the assertion of jurisdiction does not offend traditional notions of fair play and substantial justice. Pebble Beach Co., 453 F.3d at 1155 (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 315 (1945)). A federal district court may exercise either general or specific personal jurisdiction. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15 (1984).

To establish general personal jurisdiction, the plaintiff must demonstrate the defendant has sufficient contacts to "constitute the kind of continuous and systematic general business contacts that 'approximate physical presence.'" Glencore Grain, 284 F.3d at 1124 (quoting Bancroft & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1086 (9th Cir. 2000), modified, Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme, 433 F.3d 1199, 1207 (9th Cir. 2006)). Courts consider such factors as whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets,

designates an agent for service of process, holds a license, or is incorporated there. Bancroft, 223 F.3d at 1086. "[A] defendant whose contacts are substantial, continuous, and systematic is subject to a court's general jurisdiction even if the suit concerns matters not arising out of his contacts with the forum." Glencore Grain, 284 F.3d at 1123 (citing Helicopteros, 466 U.S. at 415 n.9).

A nonresident defendant's contacts with the forum state may permit the exercise of specific jurisdiction if: (1) the defendant has performed some act or transaction within the forum or purposefully availed himself of the privileges of conducting activities within the forum, (2) the plaintiff's claim arises out of or results from the defendant's forum-related activities, and (3) the exercise of jurisdiction over the defendant is reasonable. Pebble Beach Co., 453 F.3d at 1155-56. "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law." Omeluk v. Langsten Slip & Batbyggeri A/S, 52 F.3d 267, 270 (9th Cir. 1995).

Under the first prong of the "minimum contacts test," the plaintiff must establish either that the defendant "(1) purposefully availed himself of the privilege of conducting his activities in the forum, or (2) purposefully directed his activities toward the forum." Pebble Beach Co., 453 F.3d at 1155. "Evidence of availment is typically action taking place in the forum that invokes the benefits and protections of the laws in the forum." Id. Evidence of direction usually consists of conduct taking place outside the forum that the defendant directs at the forum. Id. at 1155-56.

The purposeful direction aspect of the first prong is satisfied when a foreign act is both aimed at and has effect in the forum. Id. In other words, the defendant "must have (1) committed an intentional act, which was (2) expressly aimed at the forum state, and (3) caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state." Id. To satisfy the third element of this test, the plaintiff must establish the defendant's conduct was "expressly aimed" at the forum; a "mere foreseeable

6

effect" in the forum state is insufficient. Id. The "express aiming" requirement is satisfied when the defendant is alleged to have engaged in wrongful conduct "individually targeting a known forum resident." Bancroft, 223 F.3d at 1087.

The second prong of the specific jurisdiction test requiring that the contacts constituting purposeful availment or purposeful direction give rise to the current action is measured in terms of "but for" causation. Id. at 1088. "If the plaintiff establishes both prongs one and two, the defendant must come forward with a 'compelling case' that the exercise of jurisdiction would not be reasonable." Boschetto v. Hansing, 539 F.3d 1011, 1016 (9th Cir. 2008) (quotation omitted).

**A. Alter Ego**

A "parent-subsidiary relationship alone is insufficient to attribute the contacts of the subsidiary to the parent for jurisdictional purposes." Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1134. However, a subsidiary's contacts may be imputed to its parent for personal jurisdiction purposes where the subsidiary is the parent's alter ego. Id.

To demonstrate a parent and its subsidiary are alter egos, the plaintiff must establish a prima facie case that the two companies share "such unity of interest and ownership" that the companies' separateness no longer exists and "failure to disregard [their separate identities] would result in fraud or injustice." Doe v. Unocal Corp., 248 F.3d 915, 926 (9th Cir. 2001) (quotation omitted). To demonstrate a unity of interest warranting disregard of corporate separateness, the plaintiff must show the parent controls its subsidiary to such a degree as to render the subsidiary a "mere instrumentality" of its parent. Id. (quotation omitted). Typically, this would involve showing the parent controls the subsidiary's internal affairs or daily operations. Kramer Motors, Inc. v. British Leyland, Ltd., 628 F.2d 1175, 1177 (9th Cir. 1980).

A parent corporation may be involved directly in certain aspects of its wholly owned subsidiary's affairs without subjecting itself to alter ego status. For example, a

parent may provide financing to its subsidiary so long as it maintains corporate formalities and properly documents loans and capital contributions to its subsidiaries, and it may act as its subsidiary's guarantor. Doe, 248 F.3d at 927-28. Additionally, a parent may refer to its subsidiaries as divisions of the parent in annual reports. Id. at 928. Further, a parent may review and approve major decisions, place its own directors on the subsidiary's board, and share offices and staff with its wholly owned subsidiary without being considered its alter ego. Id.; Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1135.

In sum, a parent may involve itself directly in its subsidiary's activities without becoming an alter ego "so long as that involvement is consistent with the parent's investor status." Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1135 (quotation omitted). Activities consistent with investor status include "'monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures[.]'" Doe, 248 F.3d at 926 (quoting United States v. Bestfoods, 524 U.S. 61, 72 (1998)).

In addition to showing lack of corporate separateness, the plaintiff also must show that failure to disregard the corporate form would promote fraud or injustice. The fraud or injustice must relate to the forming of the corporation or abuse of the corporate form, not a fraud or injustice generally. Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean-Up Serv., Inc., 736 F.2d 516, 524-25 n.12 (9th Cir. 1984). For example, undercapitalization at the subsidiary's inception may be evidence of the parent's fraudulent intent. Id. However, a corporation that once was capitalized adequately but "subsequently fell upon bad financial times" does not support a finding of fraud or injustice. Id. at 525. Further, evidence that the corporation existed as an ongoing enterprise engaged in legitimate business suggests no fraudulent intent or injustice to support piercing the corporate veil. Seymour v. Hull & Moreland Eng'g, 605 F.2d 1105, 1113 (9th Cir. 1979).

///

An inability to collect on a judgment "does not, by itself, constitute an inequitable result."[3]
Id.

### B. Agency

A subsidiary's contacts also may be imputed to its parent for personal jurisdiction purposes where the subsidiary is the parent's general agent in the forum. Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1134. A subsidiary is its parent's agent for purposes of attributing its forum-related contacts to the parent if the subsidiary "performs services that are 'sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.'" Doe, 248 F.3d at 928 (quoting Chan v. Society Expeditions, Inc., 39 F.3d 1398, 1405 (9th Cir. 1994)). The ultimate inquiry is whether the subsidiary's presence in the forum "substitutes" for its parent's presence. Id. at 928-29 (quotation omitted).

Where the parent is merely a holding company, the subsidiary's forum-related contacts are not done as the parent's agent because the holding company "could simply hold another type of subsidiary" as an investment and thus the subsidiary conducts business not as the parent's agent but as its investment. Id. at 929. "Where, on the other hand, the subsidiaries are created by the parent, for tax or corporate finance purposes, there is no basis for distinguishing between the business of the parent and the business of the subsidiaries." Id. (quotation omitted). The inquiry as to whether a subsidiary is its parent's general agent in the forum is "a pragmatic one." Gallagher v. Mazda Motor of Am., Inc.,

---

[3] Kansas employs a similar alter ego test. Under Kansas law, corporations are alter egos "when there is such domination of finances, policy, and practices that the controlled corporation has no separate mind, will, or existence of its own and is but a business conduit for its principal." Dean Operations, Inc. v. One Seventy Assocs., 896 P.2d 1012, 1016 (Kan. 1995). Additionally, the party seeking to pierce the corporate veil must show that "allowing the legal fiction of separateness of the corporate structures results in an injustice. The corporate entity may be disregarded where it is used as a mere subterfuge, as an implement for fraud or illegality, or to work an injustice, or where necessary to achieve equity." Id. at 1020.

9

781 F. Supp. 1079, 1085 n.10 (E.D. Pa. 1992).

For example, where a Japanese parent company was engaged in the manufacture of watches, its subsidiaries that acted as its sole sales agents in America were "almost by definition . . . doing for their parent what their parent would otherwise have to do on its own." Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd., 508 F. Supp. 1322, 1342 (E.D.N.Y. 1981). The Bulova court thus attributed the subsidiaries' contacts to the parent company. Id.; see also Chan, 39 F.3d at 1405-06 (remanding to the district court for additional findings of fact regarding agency where the German parent corporation owned and operated cruise ships and its local subsidiary marketed cruises and chartered cruise ships and sold the cruise ticket to the plaintiffs out of which the claims arose); Modesto City Schs. v. Riso Kagaku Corp., 157 F. Supp. 2d 1128, 1135 (E.D. Cal. 2001) (holding subsidiary was parent's agent for personal jurisdiction purposes where subsidiary acted as sole conduit for marketing and selling parent's products in the United States).

In contrast, where the parent company owned a subsidiary mining company's stock but did not itself engage in the business of gold mining, imputing the subsidiary's forum contacts to the parent was not appropriate. Sonora Diamond Corp. v. Superior Court, 99 Cal. Rptr. 2d 824, 840-41 (Ct. App. 2000). As the Sonora Diamond court explained, had the parent company owned "the rights to the gold and used Sonora Mining as the operating and marketing entity," then perhaps general jurisdiction over the parent company would be appropriate because under those circumstances the parent company "could not reap the benefits of its rights unless it or someone else removed and sold the ore." Id. But where the parent simply held the mining company as an investment, the subsidiary's forum-related contacts could not be imputed to the parent company. Id.

Likewise, in Doe, the Ninth Circuit concluded a foreign company's subsidiaries were not its general agents in California because the plaintiffs presented no evidence that in the absence of the California subsidiaries' involvement in petrochemical and chemical

operations, the parent would have conducted and controlled those operations. <u>Doe</u>, 248 F.3d at 929. The Court reached this conclusion even though the parent company issued consolidated reporting, referred to a subsidiary in an annual report as its "US unit," and stated that use of the subsidiary "would enable it to expand its marketing network and produce higher value-added specialty products in the United States." <u>Id.</u>

## III. CMS ENERGY CORPORATION

CMS Energy Corporation ("CMS") is a Michigan corporation with its principal place of business in Jackson, Michigan. (Joint Supplemental Mem. of Defs. CMS Energy Corp., Duke Energy Carolinas, LLC, & Reliant Energy, Inc. in Supp. of Mots. to Dismiss for Lack of Pers. Juris. (Doc. #963), The CMS Defendants' App. of Facts in Supp. of the Joint Mot. to Dismiss for Lack of Pers. Juris. ["Sep. CMS App."], Ex. A at 1.) CMS conducts no business and has never been qualified to do business in Kansas. (<u>Id.</u>) CMS has no office, mailing address, telephone number, bank account, or property in Kansas. (<u>Id.</u>) It has no employees in Kansas, has never paid taxes there, and has never directly advertised to Kansas residents. (<u>Id.</u>)

CMS does not itself engage in natural gas trading, production, sales, purchases, distribution, or transportation. (<u>Id.</u> at 1-2.) CMS also does not report or publish natural gas trade information to any trade publication. (<u>Id.</u>) Rather, CMS is a holding company that owns subsidiaries operating in various sectors of the power and energy industries, two of which engage in natural gas trading and price reporting. (<u>Id.</u> at 1-2, Ex. B at 1.) One such indirect subsidiary is CMS Marketing, Services and Trading Company ("MST"), a Michigan corporation, that changed its name to CMS Energy Resource Management Company in 2004. (Sep. CMS App., Ex. A at 2-3.) MST is a subsidiary of CMS Enterprises Company, a wholly owned subsidiary of CMS. (App. to Pls.' Joint Opp'n to CMS's Renewed Mot. to Dismiss for Lack of Pers. Juris (Doc. #1081) ["Pls.' CMS App."], Ex. B at 2.) The other is CMS Field Services, Inc. ("Field Services"), a Michigan

11

corporation with its principal place of business in Oklahoma.  (Sep. CMS App., Ex. A at 3.)
In July 2003, Cantera Natural Gas, LLC purchased Field Services.  (Id. at 4.)  While CMS
owned it, Field Services was a wholly owned subsidiary of CMS Gas Transmission
Company, which is a wholly owned subsidiary of CMS Enterprises Company, a wholly
owned subsidiary of CMS.  (Pls.' CMS App., Ex. B at 2-3.)

CMS shared at least one officer or director position with MST and Field
Services.  For example, MST's President and Chief Operating Officer from 1999 to 2001
was a CMS officer.  (Pls.' CMS App., Ex. D at CMS-KS-001858.)  Field Services'
President from 1998 to 2001 also was a CMS officer.  (Id.)  MST, Field Services, and CMS
maintain separate bank accounts and separate books and records, however, CMS reports
Field Services' and MST's operations on CMS's consolidated financial reports.  (Sep. CMS
App., Ex. A at 2-4.)  CMS's primary source of cash is dividends and other distributions
from its subsidiaries.  (Pls.' CMS App., Ex. A at CMS-KS-003534.)  CMS did not make
financial guarantees on its subsidiaries' behalf, but CMS's wholly owned subsidiary, CMS
Enterprises Company, did.  (Sep. Vol. of Evid. in Supp. of the CMS Defs.' App. of Facts in
Supp. of the Joint Mot. to Dismiss for Lack of Pers. Juris. ["CMS Sep. Vol. Evid."] (Doc.
#976), Ex. 2 at 141; Pls.' CMS App., Ex. A at CMS-KS-003544, Ex. E at CMS-KS-002106,
Ex. G at CMS-KS-001130, CMS-KS-001146.)

CMS entered into Service and Management Agreements with Field Services and
MST under which CMS agreed to provide various services, including general
administrative services, accounting, statistical and financial, risk management, tax, internal
auditing, information management, legal communications, engineering, public affairs, and
human resources services.  (App. of Docs. Filed Under Seal (Doc. #1142) ["Ex. M"], Ex.
M, Service and Management Agreement.)  Pursuant to these agreements, Field Services and
MST appointed CMS as their "managing agent . . . to manage and direct the business" of
Field Services and MST "subject to the general supervision and control of the Board of

Directors and officers" of Field Services and MST, respectively.  (Id. at 5.)

CMS's powers under the agreements include establishing corporate polices and procedures with respect to all operations except those specifically excluded by the agreement, including making tax and regulatory filings; opening and closing bank accounts, purchasing and maintaining insurance; buying, selling, leasing or encumbering assets; employing, laying off, or dismissing employees; and conducting litigation.  (Id. at 5-6.)  The agreements precluded CMS from engaging in certain activities, such as selling, leasing, or otherwise disposing of all of Field Services' or MST's assets; incurring indebtedness other than indebtedness to trade creditors in the ordinary course of business; forming partnerships or joint ventures; or taking any other "extraordinary corporate action," without prior approval of Field Services' or MST's boards of directors.  (Id. at 8.)  In exchange, Field Services and MST paid CMS an annual consulting fee and reimbursed CMS for direct expenses.  (Id. at 9.)

In addition to the Service Agreements, CMS entered into Royalty and Licensing Agreements with Field Services and MST pursuant to which Field Services and MST could use the CMS Energy trade name and service marks.  (Ex. M, Royalty and Licensing Agreement.)  In return, Field Services and MST agreed to pay a royalty fee.  (Id. at 3, C-1.)

In its 1999 annual report, CMS described itself as--

> a leading international integrated energy company acquiring, developing and operating energy facilities and providing energy services in major growth markets.  CMS Energy provides a complete range of international energy expertise from energy production to consumption.  CMS Energy intends to pursue its global growth by making energy investments that provide expansion opportunities for multiple CMS Energy businesses.

(Pls.' CMS App., Ex. C at CMS-KS-001006.)  Similarly, in its 2000 annual report, CMS described itself as "an integrated energy company with a strong asset base enhanced by an active marketing services and trading capability."  (Pls.' CMS App., Ex. D at CMS-KS-001795.)  CMS has stated that its "vision" was to be "an integrated energy company with a

strong asset base, supplemented with an active marketing, services and trading capability." (Pls.' CMS App., Ex. E at CMS-KS-002109.)

Additionally, CMS has stated that it "intends to integrate the skills and assets of its business units to obtain optimal returns and to provide expansion opportunities." (Id.; see also Pls.' CMS App., Ex. C at CMS-KS-001006 (stating CMS "intends to use its marketing, services and trading business to improve the return on CMS Energy's other business assets").) In a 2001 filing with the Securities and Exchange Commission ("SEC"), CMS stated that it "intends to use CMS MST to focus on wholesale customers such as municipals, cooperative electric companies and industrial and commercial customers." (Pls.' CMS App., Ex. E at CMS-KS-002072.) CMS also stated that it, "through its subsidiary CMS MST, engages in trading activities." (Id. at CMS-KS-002162.)

In its 2000 annual report, CMS identifies certain market risks to which it is exposed including "interest rates, currency exchange rates, and certain commodity and equity security prices." (Pls.' CMS App., Ex. D at CMS-KS-001874.) In response to these risks, CMS has implemented an "enterprise-wide" risk management policy. (Id.) The policy is implemented by CMS's Risk Committee which "review[s] the corporate commodity position and ensure[s] that net corporate exposures are within the economic risk tolerance levels established by the Board of Directors." (Id.) The Risk Committee is comprised of CMS business unit managers and is chaired by CMS's Chief Risk Officer. (Pls.' CMS App., Ex. E at CMS-KS-002107.)

CMS controls commodity-related risk primarily through its Risk Management Policy. (Ex. M, CMS Energy Risk Management Policy.) CMS's Board of Directors has "ultimate authority" over the Risk Management Policy. (Id. at 6.) Determination of the "levels and types of risk" CMS will accept lies within the Executive Oversight Committee's authority. (Id.) The Executive Oversight Committee consists of CMS's Chief Executive Officer, President and Chief Operating Officer, and Senior Vice President and Chief

Financial Officer. (Id. at 3.) MST's President has the responsibility of "authoriz[ing] the individuals within [MST] responsible for executing derivative transactions on its behalf and on behalf of CMS Energy and . . . establish[ing] appropriate trading limits for said individuals." (Id.) These limits are subject to approval by the CMS Risk Committee. (Id.) The Risk Committee is comprised of CMS's Senior Vice President and Chief Financial Officer, the president of each business unit, CMS's Vice President of Risk Management, and other individuals representing departments with certain transactional authority. (Id. at 4.)

The Risk Management Policy assigns to each business unit an amount of dollars the Risk Committee has authorized to be at risk known as "VaR." (Id. at 12.) VaR is "the total dollars that the business unit could expect to lose, in one day's time, if energy commodity prices move in a magnitude equal to historical observations against the business unit." (Id.) Each business unit must monitor and report its operations to the Risk Management Group to ensure it does not exceed its allotted VaR. (Id.) The Risk Management Group consists of certain individuals within CMS Enterprises Company responsible for collecting and reporting all of CMS's business units' books into a single portfolio. (Id. at 4.) The business unit must take action to correct violations of this limit within one or two days or the Risk Management Group will provide notice to the Executive Oversight Committee, which notifies the Authorized Trading Group of what action must be taken to correct the violation. (Id. at 12.) The Authorized Trading Group is the "entity within CMS Energy authorized to negotiate for and enter into derivative agreements" on CMS's behalf. (Id. at 2.) The Risk Management Policy assigns this responsibility to MST. (Id.)

The Risk Management Policy contains similar constraints for earnings at risk for each business unit as well as limits designed to minimize the total financial loss CMS or its business units may incur. (Id. at 13.) Should those limits be reached, "all activity related to

15

that transaction, book of transactions or the business unit entering into said transaction shall immediately cease and no new transactions will be entered into unless specifically authorized by the [Executive Oversight Committee]." (Id.) The business unit may not resume business activity until authorized by the Executive Oversight Committee. (Id.)

The Executive Oversight Committee establishes that portion of CMS's earnings which may be exposed to energy commodity risk. (Id. at 18.) The Risk Committee then allocates this limit across the various business units. (Id.) Should CMS's earnings at risk exceed the set amount, the Risk Management Group "immediately" notifies the Authorized Trading Group, the Risk Committee, and the Executive Oversight Committee. (Id. at 20.) Within twenty-four hours, the Risk Management Group and the Authorized Trading Group must recommend actions to correct the situation. (Id.) Within forty-eight hours of receiving the recommendation, the Executive Oversight Committee directs the Risk Management Group and Authorized Trading Group of what actions to take. (Id.) While CMS set overall limits, each subsidiary "operate[s] their businesses how they see fit within those parameters." (CMS Sep. Vol. Evid., Ex. 2 at 113.)

The Risk Management Policy requires each business unit to create its own aggregate risk reports on a daily basis. (Ex. M, Risk Management Policy at 6, 12.) These reports are provided to the head of the business unit and CMS's Vice President for Risk Management. (Id.) Under the policy, CMS was to perform an audit at least annually to ensure compliance. (Id. at 14.) Violations of the policy are grounds for terminating an employee. (Id. at 17.) In 2001 and 2002, CMS "identified a number of deficiencies in MST's systems of internal accounting controls." (Pls.' CMS App., Ex. A at CMS-KS-003560.) In response, CMS senior management and the CMS Audit Committee responded by replacing some personnel, deploying additional accounting personnel, and implementing changes to MST's internal accounting controls. (Id.)

///

16

In filings with the SEC, CMS disclosed that it had notified appropriate governmental authorities "that some employees at CMS MST and CMS Field Services appeared to have provided inaccurate information regarding natural gas trades to various energy industry publications which compile and report index prices. CMS Energy is cooperating with investigations by the Commodity Futures Trading Commission, Department of Justice and [the Federal Energy Regulatory Commission] regarding this matter." (Id.)  In 2005 filings with the SEC, CMS indicated that MST engaged in "round-trip trading transactions (simultaneous, prearranged commodity trading transactions in which energy commodities were sold and repurchased at the same price)," and the Department of Justice was investigating CMS.  (Pls.' CMS App., Ex. I at CMS-KS-010797.)  CMS also disclosed that, pursuant to existing indemnification policies, it was advancing legal defense costs to two former Field Services employees in a civil injunction action filed by the Commodity Futures Trading Commission ("CFTC").  (Id. at CMS-KS-010798.)

In November 2003, MST and Field Services entered into a settlement with the CFTC.  (Pls.' CMS App., Ex. B.)  The CFTC found that from November 2000 through September 2002, MST and Field Services reported false natural gas trade information to price and volume reporting firms.  (Id. at 2-3.)  Under the settlement, MST and Field Services agreed to cease and desist from further violations and to pay a $16 million penalty. (Id. at 5.)  Additionally, MST, Field Services, CMS, and Cantera Natural Gas, Inc. agreed to cooperate with the investigation, by, among other things, preserving records, fully complying with inquiries or requests for records, producing witnesses, and assisting in locating prior employees.  (Id. at 6-7.)  CMS, MST, and Field Services also agreed not to make any public statement denying the CFTC's findings.  (Id. at 7.)

By October 2002, Field Services ceased submitting natural gas price reports to trade publications.  (Sep. CMS App., Ex. C at 5.)  In January 2003, MST sold a major

portion of its wholesale natural gas trading book to a third party. (Pls.' CMS App., Ex. A at CMS-KS-003478.) By 2003, CMS had "eliminated virtually all of the business of [MST]." (Pls.' CMS App., Ex. J at CMS-KS-008608.) After that time, MST's remaining business "focuses on buying the fuel needed by [CMS's] domestic independent power plants and selling the uncontracted energy they produce." (Id.)

Plaintiff does not contend this Court may assert personal jurisdiction over CMS based on CMS's own contacts with Kansas. (Pls.' Joint Opp'n to CMS Energy Corporation's Mot. to Dismiss for Lack of Pers. Juris. (Doc. #1080) at 4-5.) Consequently, CMS is subject to personal jurisdiction in Kansas only if the forum acts of its subsidiaries, Field Services or MST, are attributable to it through alter ego or agency principles.[4]

**A. Alter Ego**

Plaintiff has failed to establish a prima facie case of personal jurisdiction based on MST or Field Services being CMS's alter ego. CMS indirectly wholly owns both subsidiaries. The companies did not share offices and had only one overlapping officer or director. CMS did not make financial guarantees on MST's or Field Services' behalf. The companies maintained separate books and records. Although MST and Field Services were permitted to use the CMS trade name and service marks, they had to pay a royalty fee to do so.

Under the Services and Management Agreements, CMS provided corporate services to MST and Field Services and acted as the subsidiaries' managing agent. However, MST and Field Services contractually were required to pay for those services, and CMS's activities were subject to the control of the subsidiaries' boards of directors. The Services and Management Agreements set forth certain actions CMS could not undertake as managing agent without the prior written approval of the subsidiaries' boards

---

[4] The Court will assume that if Field Services' and/or MST's forum-related acts are attributable to CMS, the Kansas long-arm statute is satisfied.

of directors.  Such restrictions are inconsistent with alter ego status.

CMS's promulgation of general policies for its subsidiaries is consistent with its indirect investor status.  CMS, as an investor up the corporate chain, is entitled to monitor Field Services' and MST's performance and limit the risk to its investment that it is willing to accept.  Consequently, any daily reporting of information from Field Services and MST to CMS is in accord with CMS's investor oversight role.  No evidence suggests CMS gave daily control commands to Field Services or MST.  Rather, the record demonstrates that, consistent with its investor status, CMS set general policies and guidelines regarding certain overall limits, such as limits on VaR and earnings at risk.  Plaintiff presents no evidence that CMS played a role in the day-to-day conduct of Field Services' and MST's operational business.  For example, with respect to natural gas trading, while CMS set overall limits on certain metrics, CMS had no role in making the day-to-day decisions of who Field Services or MST was to trade with, when, for what amount of natural gas, and at what price.  Although the Risk Management Policy permitted CMS to cease any subsidiary business activity when certain limits were exceeded, Plaintiff presents no evidence CMS ever did so, much less that it did so on a daily basis with respect to Field Services and MST.  Plaintiff also presents no evidence CMS had any role in Field Services' or MST's price reporting to indices.

Even if Plaintiff had established a lack of corporate separateness, Plaintiff has not established a fraud or injustice would result if the Court failed to pierce the corporate veil.  Plaintiff contends it would be unjust to permit CMS to reap the benefits of Field Services' and MST's alleged unlawful behavior by enjoying profits from its indirect subsidiaries' trading activities while escaping liability for their alleged misconduct.  However, the alleged illegal price manipulation cannot itself constitute the fraud or injustice necessary to pierce the corporate veil.  Rather, CMS must have had some fraudulent intent at Field Services' or MST's inception or some later abuse of the corporate form such that failing to

treat the entities as one would be inequitable. Plaintiff presents no evidence Field Services or MST was undercapitalized at its inception. Further, the fact that the two companies operated as legitimate businesses for years suggests a lack of fraudulent intent or perpetration of a fraud through use of the corporate structure on the parent's part.

Plaintiff's fear that it may not be able to collect on a judgment in this action against Field Services or MST does not constitute fraud or injustice to support piercing the corporate veil. The Court therefore finds Plaintiff has not met its burden of establishing Field Services or MST is CMS's alter ego, and the Court will not attribute these subsidiaries' contacts with Kansas to CMS for purposes of determining personal jurisdiction based on alter ego principles.

**B. Agency**

Plaintiff has failed to establish a prima facie case that Field Services or MST was CMS's general agent in Kansas. CMS's business is not purely a holding company in the sense that it does not passively hold stock in companies from an unrelated range of businesses. CMS describes itself as an integrated energy company and has referred to the synergistic benefits of its trading business line with the business lines of other subsidiaries it owns.

Although CMS identifies natural gas trading and marketing as one of its business segments, Plaintiff has not established that Field Services' or MST's sales of natural gas in Kansas were sufficiently important to CMS that if Field Services or MST did not make the sales in Kansas, CMS would have done so itself. CMS did not conduct any operational business itself. Natural gas trading activity was a separate business segment operated through an indirect subsidiary. Further, CMS subsequently sold Field Services, and MST ceased natural gas trading and reporting, suggesting that these subsidiaries' trading activities were not sufficiently important to CMS that it would perform the activities itself if its indirect subsidiaries did not do so on its behalf.

20

Moreover, Plaintiff has presented no evidence that Field Services' and MST's natural gas sales in Kansas in particular were sufficiently important to CMS's business that CMS would have performed the sales in Kansas itself absent its subsidiaries' representation in the forum. See Modesto City Schs., 157 F. Supp. 2d at 1135 (noting twenty percent of parent's products were sold through subsidiary which acted as parent's "sole conduit for marketing and selling its products in the United States"); Bulova Watch Co., Inc., 508 F. Supp. at 1344 (noting that sixty percent of parent's products were sold as exports and the United States was the parent company's largest export market through its New York subsidiaries' sales in the United States). Consequently, Plaintiff has not shown that Field Services' or MST's Kansas natural gas sales played a significant role in CMS's "'organizational life'" such that it acted as a substitute for CMS in the forum. Bulova Watch Co., Inc., 508 F. Supp. at 1344. The Court therefore will not attribute Field Services' and MST's Kansas contacts to CMS under agency principles.[5]

---

[5] The result would be the same under general Kansas agency law. In Kansas, an agent has express authority if "the principal has delegated authority to the agent by words which expressly authorize the agent to do a delegable act." Mohr v. State Bank of Stanley, 734 P.2d 1071, 1075 (Kan. 1987) (quotation omitted). An agent has implied authority if "from the facts and circumstances of the particular case, it appears there was an implied intention to create an agency; in which event, the relation may be held to exist, notwithstanding either a denial by the alleged principal or whether the parties understood it to be an agency." Id. (quotation omitted). Where an agent lacks actual authority, either express or implied, an agent may possess apparent or "ostensible" agency. Town Ctr. Shopping Ctr., LLC v. Premier Mortg. Funding, Inc., 148 P.3d 565, 569 (Kan. Ct. App. 2006). "An ostensible or apparent agency may exist if a principal has intentionally or by want of ordinary care induced and permitted third persons to believe a person is his or her agent even though no authority, either express or implied, has been actually conferred upon the agent." Id. (quotation omitted). To determine whether an agent had apparent authority, the court considers the principal's intentional acts or words to a third party and whether those acts or words "reasonably induced the third party to believe that an agency relationship existed." Id. (citing Mohr, 734 P.2d at 1076).

Here, Plaintiff has presented evidence that CMS delegated to MST the authority to conduct derivative trading on CMS's behalf under the Risk Management Policy. However, Plaintiff has presented no evidence MST engaged in derivative transactions in Kansas pursuant to this authority. Additionally, Plaintiff has presented a comment in an SEC filing that CMS engages in trading activity "through" MST. The statement is not an express authorization for MST to sell natural gas on CMS's behalf as CMS's agent with authority to bind CMS. Rather, it describes CMS's business line

The Court will not attribute Field Services' or MST's contacts with the forum to CMS, and CMS has no contacts of its own sufficient to support personal jurisdiction. The Court therefore will grant CMS's motion to dismiss for lack of personal jurisdiction.

**IV.  DUKE ENERGY CAROLINAS, LLC**

Duke Energy Carolinas, LLC ("DEC") is a North Carolina limited liability company formerly known as Duke Energy Corporation, a North Carolina corporation. (Joint Supplemental Mem. of Defs. CMS Energy Corp., Duke Energy Carolinas, LLC, & Reliant Energy, Inc. in Supp. of Mots. to Dismiss for Lack of Pers. Juris. (Doc. #963), Separate App. of Facts Regarding Duke Energy Carolinas, LLC ["Sep. DEC App."], Ex. A at 1.)  Duke Energy Corporation converted to a limited liability company and renamed itself DEC in April 2006.  (Renewed Mot. to Dismiss for Lack of Pers. Juris. (Doc. #872) ["DEC Mot."], Ex. A at 2.)  DEC primarily engages in the business of generating, transmitting, distributing, and selling electric energy in North and South Carolina.  (Id. at 3.)

DEC does not maintain offices, conduct business, own property, or maintain a bank account in Kansas.  (Sep. DEC App., Ex. A at 2, Ex. C at 2, Ex. D at 2.)  DEC has not applied for or received a certificate of authority to transact business in Kansas and has no registered agent for service of process in Kansas.  (Sep. DEC App., Ex. B at 2.)

DEC wholly owns Duke Capital Corporation, which in turn wholly owns Pan Energy Corp.  (App. to Pls.' Joint Opp'n to Duke Energy Carolinas, LLC's Mot. to Dismiss for Lack of Pers. Juris. (Doc. #1084) ["Pls.' DEC App."], Ex. F.)  Pan Energy Corp. wholly owns Duke Energy Services, Inc., which wholly owns Duke Energy Natural Gas Corporation.  (Id.)  Duke Energy Natural Gas Corporation wholly owns DETMI

operationally conducted through its subsidiary.  Plaintiff presents no other evidence that CMS expressly delegated trading authority on CMS's behalf to MST.  As to apparent agency, Plaintiff has presented evidence that CMS permitted Field Services and MST to use the "CMS" name and logo in marketing natural gas in Kansas.  However, Plaintiff has presented no evidence that anyone relied on an apparent agency relationship between CMS and Field Services or MST.

22

Management, Inc. (Id.) DETMI Management, Inc. owns a sixty percent interest in Duke Energy Trade and Marketing, LLC ("DETM"), a Defendant in this action and the subsidiary whose contacts with Kansas Plaintiff seeks to attribute to DEC. (DEC Mot., Ex. C at 2.) Mobil Natural Gas, Inc. ("MNGI"), an indirect subsidiary of Exxon Mobil Corporation, owns the other forty percent of DETM. (Id. at 2-3.)

DETM was created in 1996 as a Delaware limited liability company pursuant to a limited liability company agreement and limited partnership agreement. (Pls.' DEC App., Ex. E at 34-35; App. of Docs. Filed Under Seal (Doc. #1125) ["Sealed DEC App."], Ex. L at DEMDL000383; DEC Separate Vol. of Evid. in Supp. of the Separate App. of Facts Regarding Duke Energy Carolinas, LCC (Doc. #968) ["DEC Separate Vol. Evid."], Ex. 7.) The company now known as DETM originally was called PanEnergy Trading and Marketing Services, LLC, and was created by an agreement between PTMSI Management, Inc. and MNGI. (DEC Separate Vol. Evid., Ex. 7 at 1, 6, 7, 10.) PTMSI Management, Inc.'s parent company at the time was PanEnergy Corp. (Id. at 7, 10.) PanEnergy Corp. was acquired by Duke Energy Corporation in 1997 and PanEnergy Trading and Marketing Services, LLC was renamed to DETM. (DEC Separate Vol. Evid., Ex. 9 at 2.) DETM is engaged in the purchase and sale of natural gas and electricity at wholesale. (DEC Mot., Ex. C at 3.) DETM concedes personal jurisdiction in this action. (Pls.' DEC App., Ex. A at 2.)

DETM is run by a Management Committee consisting of three representatives from the Duke Energy side and two representatives from the Exxon Mobil side. (Sealed DEC App., Ex. L at DEMDL000400.) The Management Committee acts through the delegation of certain responsibilities and authority to the managing member, which in 2001 and 2002 was DETMI Management, Inc. (Id.) Although DETMI Management, Inc. was the managing member, and through its majority status on the committee could outvote the MNGI members on certain matters, the limited liability company agreement mandated that

some actions required unanimous approval by the Management Committee.  (DEC Separate Vol. Evid., Ex. 7 at 17, 24, 26-27.)  In at least one instance, the MNGI members refused to agree to a business plan supported by the DETMI Management, Inc. members.  (Pls.' DEC App., Ex. E at 67-69.)

No DEC director serves as an officer or director for DETM.  (DEC Mot., Ex. A at 4.)  In DEC's 2000 annual report, DEC identified a "management team" which includes Jim W. Mogg ("Mogg"), Chief Executive Officer of Duke Energy Field Services; Kirk B. Michael ("Michael"), Vice President and Chief Financial Officer for Finance and Planning; James Donnell ("Donnell"), President and Chief Executive Officer for Duke Energy North America; and Ronald Green ("Green"), President and Chief Executive Officer for Duke/Fluor Daniel.  (Pls.' DEC App., Ex. B at DEMDL001901.)  Mogg, Michael, Donnell, and Green were members of the DETM Management Committee at one point or another. (Sealed DEC App., Ex. L at DEMDL001702, DEMDL001706, DEMDL001711.)

DEC and DETM maintain separate corporate records.  (DEC Mot., Ex. A at 4.) DEC provided corporate services to DETM, including administering employee health insurance, human resources, computer technology, legal services, and credit risk management.  (Pls.' DEC App., Ex. A at 4-5.)  Throughout the relevant time period, DETM regularly used, and was permitted to use, the "Duke Energy" and "Mobil" logos.  (Id. at 5.) DETM did not have any agency agreements or power of attorney for DEC, and did not register to do business on DEC's behalf in Kansas during the relevant time period.  (Id.)

DETM was financed through a $150 million funding facility, of which DETMI Management, Inc. provided sixty percent and MNGI funded the other forty percent.  (DEC Separate Vol. Evid., Ex. 3 at 35.)  In DETM's financial statements, it twice indicated that DEC was responsible for providing operational interest-free contributions, on a proportionate basis with Exxon Mobil, to fund DETM's operations.  (Sealed DEC App., Ex. L at DEMDL00383, DEMDL00400.)  According to Richard McGee ("McGee"), former

general counsel for energy services for DEC and current president of DEC's international

business, these statements were a mistake, as PanEnergy Corp., not DEC, is responsible for

making contributions under the funding facility agreement. (Pls.' DEC App., Ex. E at 6,

138-40.) DEC's consolidated financial reports reflected sixty percent of DETM's profits

and losses during the relevant time period. (Pls.' DEC App., Ex A at 6.)

DEC describes itself, collectively with its subsidiaries, as "an integrated energy

and energy services provider with the ability to offer physical delivery and management of

both electricity and natural gas throughout the U.S. and abroad." (Pls.' DEC App., Ex. B at

DEMDL001846.) DEC provides these services through various "business segments," one

of which includes DETM's natural gas trading. (Id.) DEC describes its business strategy as

"develop[ing] integrated energy businesses in targeted regions where Duke Energy's

extensive capabilities in developing energy assets, operating electricity, natural gas and

NGL plants, optimizing commercial operations and managing risk can provide

comprehensive energy solutions for customers and create superior value for shareholders."

(Id.)

DEC has created "[c]omprehensive risk management polices" to monitor and

manage market, commodity price, credit, and other risks to which DEC and its subsidiaries

are exposed. (Id. at DEMDL001854-55.) As part of its risk management policies, DEC

monitors certain metrics, such as value-at risk ("VAR") and daily earnings at risk ("DER")

on a daily basis. (Id. at DEMDL001855.) DEC has several committees which perform risk

management, including the Corporate Risk Management Committee, the Energy Risk

Management Committee, and the Financial Risk Management Committee. (Pls.' DEC

App., Ex. E at 80.) DEC appointed the members of each of these committees. (Id.)

Through these polices and committees, DEC sets overall risk guidelines for its subsidiaries.

For example, DEC adopted a Code of Business Ethics which applied to every

DEC subsidiary. (Pls.' DEC App., Ex. J, Ex. E at 100-01.) This policy mandated

compliance with applicable antitrust laws.  (Pls.' DEC App., Ex. J at 12.)  This policy was implemented and supervised by DEC's Corporate Compliance Committee.  (Id. at 15.)  The Corporate Compliance Committee was responsible for updating the code, establishing education programs for employees about ethics and compliance issues, providing guidance under the code, monitoring and auditing compliance, reporting periodically to management and the Audit Committee of DEC's Board of Directors, and reporting violations to the appropriate governmental authorities.  (Id.)  DETM either incorporated this policy by reference or adopted a similar policy.  (Pls.' DEC App., Ex. E at 115-16.)

DEC also has a Corporate Credit Risk policy.  (Sealed DEC App., Ex. L at DEMDL001382, DEMDL001388.)  Under this policy, DEC's Chief Risk Officer chairs the Risk Management Committee.  (Id.)  The Risk Management Committee meets at least monthly and is responsible for reviewing business trends and credit exposure, monitoring compliance with the policy, identifying where new policies are needed, and ensuring "consistent and mutually reinforcing credit and market risk management strategies through various corporate risk policies and associated guidelines for implementing policy."  (Id.)  The policy also sets forth the duties of the Chief Credit Officer, which includes the ability to "stop business activity that would increase credit exposure, as is necessary, to protect Duke Energy's balance sheet."  (Id.)  The Chief Credit Officer reports to the Chief Risk Officer.  (Id.)

DEC has a Corporate Risk Management Committee consisting of DEC's chief financial officer and DEC Policy Committee members.  (Id. at DEMDL001488.)  This Committee establishes "comprehensive risk management policies to monitor and control identified risks."  (Id.)  DEC's Corporate Risk Management Committee delegates some responsibilities to the Energy Risk Management Committee and the Financial Risk Management Committee, but retains oversight responsibilities.  (Id.)  The Energy Risk Management Committee has responsibility for overseeing energy risk management

practices and recommending energy commodity exposure limits, subject to approval by the Corporate Risk Management Committee.  (Id.)  The Financial Risk Management Committee is responsible for managing risks related to interest rates, foreign currency, and credit.  (Id.)

Within DETM, "[u]ltimate risk control responsibility resides with the DETM Management Committee."  (Id. at DEMDL001489.)  The DETM Management Committee oversees the risk management and control function and approves policies and controls for DETM.  For example, DETM adopted its own Risk Management and Trading Policies and Controls.  (Id. at DEMDL001484.)  DETM's Management Committee "delegates the day-to-day overview of the risk management and control function" to the DEC Energy Risk Management Committee.  (Id. at DEMDL001489.)  "However, overall responsibility for DETM's performance targets, business plans and approved risk levels remains with the Management Committee."  (Id.)  Although DETM's Risk Management and Trading Policies and Controls states that the Management Committee delegates "day-to-day overview" to the DEC Energy Risk Management Committee, it describes the Energy Risk Management Committee's functions as meeting "at least monthly" to establish risk management policies, controls, and practices, and overseeing and approving excesses of overall limits.  (Id. at DEMDL001489-90.)  When it comes to operational control, the policy vests that authority in DETM Senior Management.  (Id. at DEMDL001490.)  DETM Senior Management is responsible for "[d]evelopment of trading strategies; [a]ctive management of trading within overall limits; [a]llocation of limits to traders and/or books; [e]nforcing the risk control environment; [a]dvocating new limits and products; and [a]dvocating exceptions or revisions to policy when appropriate."  (Id.)  Beneath DETM Senior Management, the origination and trading groups actually conduct the transactions with customers.  (Id.)

///

27

DEC's Energy Risk Management Committee is not responsible for managing energy price risk for DETM. (DEC Separate Vol. Evid., Ex. 10 at DEMDL001569.) Instead, DETM manages its own energy price risk pursuant to its own risk management policy. (Id.) However, that policy is subject to approval by the Corporate Risk Management Committee. (Id.) In similar fashion, DETM decides whether to extend credit, subject to the Financial Risk Committee's Credit Quality Guidelines. (Id. at DEMDL001495.) According to McGee, DEC's risk management policies "would have applied to DETM only to the extent that . . . the management committee of DETM had adopted a policy that was similar to this or [DETMI,] in discharging its responsibilities as a managing member of DETM . . . adopt[ed] policies that it saw fit in connection with discharging those duties." (Pls.' DEC App., Ex. E at 100.) These policies "were either largely consistent with or in some cases maybe identical to some of" DEC's policies. (Id.)

At a July 2000 DETM management committee meeting, the MNGI representative expressed some concern that certain personnel now working for DETM would be shared between DETM and Duke Energy North America, LLC. (Sealed DEC App., Ex. L at DEMDL001707.) Specifically, the MNGI representative was concerned that because DETM senior managers "would have dual responsibilities, working for both DETM and Duke Energy or Duke affiliates, [they] would face conflicts because their compensation is based on performance of two entities with differing Duke ownership shares." (Id.) At a September 2001 DETM management committee meeting, the Exxon Mobil representative "objected to the way the business had been run including a perceived lack of separation between [Duke Energy North America] and DETMI." (Id. at DEMDL001718.)

In May 2002, DETM's outside auditor, Deloitte & Touche, sent a letter to the DETM management committee highlighting certain areas of concern. (Id. at DEMDL002687.) Among the concerns Deloitte & Touche highlighted was that DETM's operations were "highly integrated into the overall strategy of Duke Energy North America

('DENA').  There are instances where the distinctiveness between DETM and other affiliates of its owners could be enhanced."[6]  (Id. at DEMDL002692.)

In September 2003, the CFTC entered into a settlement with DETM regarding allegations that DETM manipulated the natural gas market.  (DEC Mot., Ex. F.)  The CFTC found that from January 2000 through August 2002, DETM's Houston office reported to price reporting firms false price and volume information regarding natural gas transactions.  (Id. at 2-3.)  As part of the settlement, DETM agreed to cease and desist from any future violations, and agreed to pay a $28 million fine.  (Id. at 5.)  Additionally, both DETM and Duke Energy Corporation (DEC's predecessor) agreed to cooperate in any future investigations arising out of this investigation, to preserve records, to produce documents when requested, and to provide assistance in locating and contacting any prior employees.  (Id.)  DETM and Duke Energy Corporation also agreed not to publicly deny the CFTC's findings of fact.  (Id. at 6.)  DEC attorneys and senior executives participated in internal investigations into DETM's price reporting activities.  (Pls.' DEC App., Ex. A at 6.)

In April 2003, DEC announced that two of its subsidiaries, Duke Energy North America and Duke Energy Merchants, would cease proprietary trading of natural gas and power.  (DEC Mot., Ex. G.)  DETM also ceased speculative natural gas trading in 2003.  (Pls.' DEC App., Ex. A at 5.)  After that time, DETM continued to buy and sell natural gas "for the purpose of meeting and hedging its obligations to supply gas-fired power plants owned by Duke Energy North America, Inc. and other affiliates and to meet natural gas supply commitments it has made."  (Id.)  By the end of 2004, DEC "made substantial progress on winding down" the DETM joint venture with Exxon Mobil, and had "completed or signed transactions to sell about 90 percent of that business."  (Pls.' DEC

_____

[6]  DEC objects to the admission of the Deloitte & Touche letter as inadmissible hearsay. Because consideration of the letter does not affect the outcome of this decision, the Court will deny DEC's objection.

App., Ex. G.)

Plaintiff concedes it is not contending this Court may assert personal jurisdiction over DEC based on DEC's own contacts with Kansas.  (Pls.' Joint Opp'n to Duke Energy Carolinas, LLC's Mot. to Dismiss for Lack of Pers. Juris. (Doc. #1083) at 5.) Consequently, DEC is subject to personal jurisdiction in Kansas only if the forum acts of its subsidiary, DETM, are attributable to it through alter ego or agency principles.[7]

**A.  Alter Ego**

Plaintiff has failed to establish a prima facie case of personal jurisdiction based on DETM being DEC's alter ego.  DEC indirectly owns only sixty percent of DETM. DETM thus is neither DEC's direct subsidiary nor its wholly owned subsidiary.  The companies did not share offices and had virtually no overlapping officers or directors.  That other officers and directors of other DEC subsidiaries may have overlapped or that DEC identified certain DETM Management Committee members as part of an overall "management team" does not indicate a lack of separateness between DEC and DETM. Likewise, the fact that MNGI and/or Deloitte & Touche perceived a possible lack of separateness between DETM and Duke Energy North America does not establish a lack of separateness between DETM and DEC.  Nor does the possibility that DEC was responsible for making contributions under the funding facility or that DEC provided corporate services, such as legal or human resources support.

Plaintiff has presented no evidence that DEC controlled DETM's daily operations.  Under the limited liability company agreement, DETMI Management, Inc. was the managing agent, not DEC.  And as to DETMI Management, Inc., it did not have complete control over DETM as the MNGI representatives' approval was required for any material decisions.  In at least one instance, DETMI Management, Inc. was unable to

---

[7] The Court will assume that if DETM's forum-related acts are attributable to DEC, the Kansas long-arm statute is satisfied.

implement the business plan it desired because it could not obtain the approval of the

MNGI representatives on the Management Committee.

DEC's promulgation of general policies for its subsidiaries is consistent with its

indirect investor status.  DEC, as an investor up the corporate chain, is entitled to monitor

DETM's performance.  Consequently, any daily reporting of information from DETM to

DEC is in accord with DEC's investor oversight role.  No evidence suggests DEC gave

daily control commands to DETM or even to DETMI Management, Inc.  Rather, the record

demonstrates that, consistent with its investor status, DEC set general policies and

guidelines regarding best policies and practices, as well as certain overall limits, such as

limits on credit risk.  However, DEC's broad policies applied to DETM only to the extent

DETM's Management Committee adopted those policies, in whole or in part, through

DETMI Management, Inc.'s status as a majority member.

Moreover, DETM's delegation of certain risk management oversight to DEC's

Energy Risk Management Committee does not demonstrate daily control.  The Energy Risk

Management Committee meets "at least monthly," and is responsible for establishing risk

managing practices and controls, monitoring daily reports, and overseeing and approving

any excesses of a risk limit.  (Sealed DEC App., Ex. L at DEMDL001490.)  The Energy

Risk Management Committee thus established broad guidelines under which DETM

operated and became involved, if ever, only when overall limits were exceeded.  Actual

operational decisions, such as developing trading strategy, actively managing trading within

overall limits, allocating limits among traders, and enforcing risk control, were the

responsibility of DETM Senior Management.

Further, with respect to DETM's day-to-day conduct of its business within these

guidelines, Plaintiff presents no evidence DEC had any role.  For example, with respect to

natural gas trading, while DEC set overall limits on certain metrics, DEC had no role in

making the day-to-day decisions of who DETM was to trade with, when, for what amount

of natural gas, and at what price. Plaintiff also presents no evidence DEC had any role in DETM's price reporting to indices. Plaintiff presents evidence that DEC policies granted DEC's chief credit officer with veto power over any DETM business activity, but Plaintiff presents no evidence that authority ever was exercised over DETM generally or particularly with respect to any natural gas trades in Kansas or anywhere else.

Even if Plaintiff had established a lack of corporate separateness, Plaintiff has not established a fraud or injustice would result if the Court failed to pierce the corporate veil. Plaintiff contends it would be unjust to permit DEC to reap the benefits of DETM's alleged unlawful behavior by enjoying profits from DETM's trading activities while escaping liability for DETM's alleged misconduct. However, the alleged illegal price manipulation cannot itself constitute the fraud or injustice necessary to pierce the corporate veil. Rather, DEC must have had some fraudulent intent at DETM's inception or some later abuse of the corporate form such that failing to treat the entities as one would be inequitable. Plaintiff presents no evidence DETM was undercapitalized at its inception. DEC was not involved in forming DETM and became its indirect parent through DEC's acquisition of DETM's ultimate parent, PanEnergy Corp. Further, the fact that DETM operated as a legitimate business for years suggests a lack of fraudulent intent or perpetration of a fraud through use of the corporate structure on the parent's part.

Plaintiff's fear that it may not be able to collect on a judgment in this action against DETM does not constitute fraud or injustice to support piercing the corporate veil. The Court therefore finds Plaintiff has not met its burden of establishing DETM is DEC's alter ego, and the Court will not attribute DETM's contacts with Kansas to DEC for purposes of determining personal jurisdiction based on alter ego principles.

**B. Agency**

Plaintiff has failed to establish a prima facie case that DETM was DEC's general agent in Kansas. DEC's primary business is the generation and supply of electricity to end

users in North and South Carolina.  DEC also acts as a holding company, but it is not purely a holding company in the sense that it does not passively hold stock in companies from an unrelated range of businesses.  DEC has described itself as a "an integrated energy and energy services provider with the ability to offer physical delivery and management of both electricity and natural gas throughout the U.S. and abroad."  (Pls.' DEC App., Ex. B at DEMDL001846.)

In practice, DEC itself does not perform these activities beyond the generation and transmission of electricity in North and South Carolina, but holds the shares of various subsidiaries which either engage in those activities or which in turn own subsidiaries which perform those business operations.  Among these business operations was DEC's North American Wholesale Energy business segment, which included DETM's natural gas-related activities.  (Id.)

Although DEC identifies natural gas trading and marketing as one of its business segments, Plaintiff has not established that DETM's sales of natural gas in Kansas were sufficiently important to DEC that if DETM did not make the sales in Kansas, DEC would have done so itself.  DEC's primary business was electricity generation and transmission in North and South Carolina.  Natural gas trading activity was a separate, fragmented component of one of DEC's other business segments operated through an indirect, partially owned subsidiary.  Further, the fact that DETM subsequently ceased natural gas trading in 2003 suggests that DETM's trading activities were not sufficiently important to DEC that it would perform the activities itself if DETM did not do so on its behalf.

Moreover, Plaintiff has presented no evidence that DETM's natural gas sales in Kansas in particular were sufficiently important to DEC's business that DEC would have performed the sales in Kansas itself absent its subsidiary's representation in the forum.  See Modesto City Schs., 157 F. Supp. 2d at 1135; Bulova Watch Co., Inc., 508 F. Supp. at 1344.  Consequently, Plaintiff has not shown that DETM's Kansas natural gas sales played

a significant role in DEC's "'organizational life'" such that it acted as a substitute for DEC in the forum.[8] <u>Bulova Watch Co., Inc.</u>, 508 F. Supp. at 1344.  The Court therefore will not attribute DETM's Kansas contacts to DEC for personal jurisdiction purposes based on agency principles.

The Court will not attribute DETM's contacts with the forum to DEC, and DEC has no contacts of its own sufficient to support personal jurisdiction.  The Court therefore will grant DEC's motion to dismiss for lack of personal jurisdiction.

# V.  RELIANT ENERGY, INC.

Defendant Reliant Energy, Inc. ("REI") is a Delaware corporation with its principal place of business in Texas.  (Def. Reliant Energy, Inc.'s Mot. to Dismiss for Lack of Pers. Juris. (Doc. #869), Ex. A ["Jines Decl."] at 2.)  REI as it currently exists came into being in response to changes in Texas regulatory laws.  (<u>Id.</u>)  The company formerly known as Reliant Energy, Incorporated divided itself into CenterPoint Energy, Inc. ("CenterPoint") and Reliant Resources, Inc. ("RRI").  (<u>Id.</u>)  After CenterPoint divested itself of its RRI stock, the two companies became separate entities and RRI changed its name to REI, the Defendant in this action.  (<u>Id.</u> at 2-3.)  Under the Master Separation Agreement resulting in RRI's existence as a separate entity, RRI agreed that it would indemnify, defend, and hold harmless Reliant Energy, Incorporated, and in certain cases, that it would cause its subsidiaries to do so as well, for liabilities arising out of RRI and its subsidiaries' business operations, including business operations that pre-dated the agreement.  (App. of Docs. Filed Under Seal ["Sealed REI App."] (Doc. #1126), Ex. E at REILJ012883, Ex. F at REILJ009719.)

---

[8]  The result would be the same under general Kansas agency law. Plaintiff presents no evidence of any manifestation by DEC to DETM that DETM may act on DEC's account.  Although Plaintiff has presented evidence DEC permitted DETM to market natural gas using the "Duke Energy" name and logo, Plaintiff has not presented any evidence that any third party relied on an apparent agency between DEC and DETM.

REI is a holding company that does not itself buy, sell, or transport natural gas, nor does it report natural gas prices to any price reporting firms or price index publishers. (Jines Decl. at 3-4; Joint Supplemental Mem. of Defs. CMS Energy Corp., Duke Energy Carolinas, LLC, & Reliant Energy, Inc. in Supp. of Mots. to Dismiss for Lack of Pers. Juris. (Doc. #963), Reliant Energy, Inc.'s App. in Supp. of Its Mots. to Dismiss for Lack of Pers. Juris. ["REI App."], Ex. B at 2.)  REI does not have any offices, employees, property, bank accounts, phone listings, or mailing addresses in Kansas . (REI App., Ex. C at 2, Ex. D at 2, Ex. E at 2.)  REI has never sold or traded natural gas in Kansas.  (REI App., Ex. B at 2, Ex. F at 2.)  REI paid taxes in Kansas in 2001 and 2002 for business done in Kansas by its subsidiary, Reliant Energy Solutions, LLC.  (Sealed REI App., Ex. D at 122-23; REI App., Ex. F at 2.)  REI did so because under relevant state and federal tax law, Reliant Energy Solutions, LLC is disregarded for tax purposes, requiring REI to file the returns in its own name.  (REI App., Ex. F at 2.)  Other than advertising in publications available nationwide, REI has not directed advertising specifically towards Kansas.  (REI App., Ex. G at 2.)

REI has a wholly owned subsidiary, Reliant Energy Services, Inc. ("RES"). (Jines Decl. at 3.)  RES formerly was known as NorAm Energy Services, Inc., and it already existed as a subsidiary of NorAm Energy Corp. when a company called Houston Industries Incorporated acquired NorAm Energy Corp. in 1997.  (REI & RES's Stip. of Fact in Connection With Pers. Juris. Disc. (Doc. #1054) ["Stip."] at 2.)  In 1999, Houston Industries Incorporated changed its name to Reliant Energy, Incorporated and NorAm Energy Services, Inc. changed its name to RES.  (Id.)  On December 31, 2000, RES became REI's wholly owned subsidiary through the Master Separation Agreement between REI and Centerpoint.  (Id.)

RES concedes personal jurisdiction in Kansas.  (Id.)  However, RES did not have any agency agreements or powers of attorney for REI, nor did it register or file as a foreign corporation to do business in Kansas on REI's behalf.  (Id. at 3.)

1    REI and RES share physical offices in Texas.  (Sealed REI App., Ex. D at

2    163-64.)  REI and its subsidiaries, including RES, share some common officers and

3    directors.  (Sealed REI App., Ex. B.)  For example, Michael Jines ("Jines") was an officer

4    for REI, RES, and several other REI subsidiaries, including some for which he could not

5    recall the subsidiary's name.  (Sealed REI App., Ex. D at 15-19, 107-110.)  At his

6    deposition, Jines stated his duties and responsibilities as an officer and director of those

7    subsidiaries would be "no different" than his duties and responsibilities as REI's general

8    counsel.  (Id. at 119-20.)  As RES's one hundred percent owner, REI nominates and elects

9    the directors for RES.  (Id. at 88-89.)

10   At the present time, REI and RES have no employees of their own.  (Id. at 248,

11   288-89.)  Rather, Reliant Energy Corporate Services ("RECS"), an REI subsidiary, acts as

12   the payroll entity for REI and all of its subsidiaries.  (Id. at 9-10.)  RECS employs personnel

13   who provide services to REI and RES.  (Id. at 10.)  For example, lawyers employed by

14   RECS provide legal services to REI and all of its subsidiaries.  (Id. at 111-13.)  RECS also

15   provides accounting, finance, legal, human resources, and facilities management services to

16   REI and its subsidiaries.  (Id. at 20.)  As part of these services, RECS prepares separate

17   financial documents, including tax filings, for RES.  (Id. at 56-57, 267.)  REI permitted

18   RES to use the "Reliant Resources" and "Reliant Energy" trademarks and trade names

19   during the relevant period.  (Stip. at 3.)

20   In terms of financial dealings between REI and its subsidiaries, the subsidiaries

21   are funded by borrowing from or receiving equity capital infusions from REI.  (Sealed REI

22   App., Ex. D at 239-40.)  In turn, REI receives either loan repayments or dividends when

23   money is transferred from the subsidiaries to REI.  (Id. at 291-92.)  REI received dividends

24   from RES during the relevant time period.  (Stip. at 4.)  In some circumstances, REI

25   provides guarantees to third parties in transactions involving REI subsidiaries.  (Sealed REI

26   App., Ex. D at 204-05.)  REI agreed to be RES's guarantor when RES's counterparties

required it.  (Stip. at 2.)  In setting forth its financial guarantee policy, REI (then RRI)

described RES as a "business unit."  (Sealed REI App., Ex. H at REILJ010083.)

Although describing itself as a holding company, REI does not passively hold

stock in its subsidiaries and leave them to operate on their own.  Rather, REI establishes

overall policies and guidelines for its subsidiaries, establishes a capital structure, and issues

consolidated financial reports.  (Sealed REI App., Ex. D at 131.)  Among the guidelines

REI requires its subsidiaries to follow is a policy for best principles and practices.  (Sealed

REI App., Ex. I at REILJ012703.)  This policy requires compliance with applicable laws

and regulations, and requires that all transactions be for a bona fide business purpose and be

reported accurately.  (Id.)  The best practices policy prohibits wash sales and fictitious

transactions.  (Id. at REILJ012704.)  This policy applied to RES during the relevant period.

(Sealed REI App., Ex. N at 93.)

Additionally, REI sets certain risk control limits on its subsidiaries.  For example,

REI set limits on RES's value at risk ("VAR").  (Sealed REI App., Ex. F at REILJ009749.)

REI's board of directors sets the overall limit on VAR.  (Id.)  The Audit Committee of

REI's board meets at least three times a year to approve the risk control organization

structure, approve the overall risk control policy, monitor compliance with trading limits,

and review risk control issues.  (Id. at REILJ009752.)

REI also has a Risk Oversight Committee consisting of REI and subsidiary

officers which allocates VAR to various business segments, including RES.  (Sealed REI

App., Ex. M at 17, Ex. F at REILJ009752.)  The Risk Oversight Committee meets at least

monthly to monitor compliance, review daily position reports for trading and marketing

activity, recommend to REI's board of directors adjustments to trading limits, approve new

trading activity, monitor information systems related to risk management, and place

guidelines and limits on hedging activity.  (Sealed REI App., Ex. F at REILJ009752-53.)

Management for each business segment then allocates risk limits among individual traders

within the limits set by the Risk Oversight Committee.  (Id. at REILJ009754.)  RES allocates VAR to its "head book traders" who in turn authorize other traders to execute trades.  (Sealed REI App., Ex. M at 17.)  Thus, the VAR limit set by REI was "an overall limit."  (Sealed REI App., Ex. N at 155.)  RES would engage in multiple transactions in one day, and the limit set by REI was evaluated against the net result of a set of RES's transactions or activities.  (Id.)

REI oversight of its subsidiaries includes daily reporting of mark-to-market valuation,[9] VAR, and "other risk measurement metrics."  (Sealed REI App., Ex. L.)  RES's VAR is reported daily to REI's Risk Oversight Committee.  (Sealed REI App., Ex. M at 17.)  Additionally, violations of any risk limits are reported to the business segment management as well as to the appropriate committees.  (Sealed REI App., Ex. F at REILJ009754.)  While the reports from the subsidiary to the various committees may occur daily, communications from REI down to the subsidiaries occurs "only to the extent that the activity ended up in a violation."  (Sealed REI App., Ex. N at 156.)  For example, if RES exceeded its VAR limit, an REI officer may inform RES management and inquire as to what RES management intended to do to correct the situation.  (Id.)  However, "in terms of the day-to-day buying and selling of gas or power, [REI officers have] limited or no interaction."  (Id.)

In November 2003, the CFTC entered into a settlement with RES regarding the CFTC's allegations that RES violated the Commodities Exchange Act.  (Decl. of William E. Fischer (Doc. #1104), Ex. B, Jines Ex. 4.)  According to the settlement, the CFTC found RES's Houston offices made false price reports regarding natural gas transactions from 1999 through May 2002.  (Id. at 4-5.)  Additionally, the CFTC found RES engaged in wash trades in 2000.  (Id. at 6-7.)  As part of the settlement, RES and REI agreed to entry of the

---

[9]  "Mark-to-market" means the value of a contract relative to current market prices.  (Sealed REI App., Ex. N at 128.)

order finding violations, as well as requiring RES to cease and desist from its misconduct, imposing an $18 million civil penalty on RES, and requiring RES and REI to undertake certain activities.  (Id. at 7-9.)  Specifically, REI agreed to cooperate with the CFTC in the future, including preserving and producing records regarding the reporting of price or trade volumes in natural gas transactions and producing RES and REI employees to provide assistance in any trial, proceeding, or investigation related to the CFTC's investigation.  (Id. at 8-9.)  Additionally, REI agreed not to make any public statements denying the CFTC's findings in the order.  (Id. at 9.)  Jines represented both RES and REI relating to the CFTC's investigation and the terms of the CFTC's order.  (Sealed REI App., Ex. D at 41-44.)

RES stopped speculative gas trading in March 2003.  (Stip. at 3.)  Since then, RES "has continued to buy and sell natural gas for the purpose of meeting and hedging its obligations to supply gas-fired power plants owned by Reliant Energy Power Generation, Inc. and other RES affiliates, and to meet gas supply commitments it has made."  (Id.)

Plaintiff concedes it is not contending this Court may assert personal jurisdiction over REI based on REI's own contacts with Kansas.  (Pls.' Joint Opp'n to Reliant Energy, Inc.'s Mot. to Dismiss for Lack of Pers. Juris. (Doc. #1106) at 4-5.)  Consequently, REI is subject to personal jurisdiction in Kansas only if the forum acts of its subsidiary, RES, are attributable to it through alter ego or agency principles.[10]

**A.  Alter Ego**

Plaintiff has failed to establish a prima facie case of personal jurisdiction based on RES being REI's alter ego.  REI provided financing to RES and in return received loan repayments and/or dividends, but no evidence in the record suggests REI failed to maintain corporate formalities or to properly document these loans and capital contributions.  Rather, the evidence indicates RECS prepared separate books and records for RES and REI.

---

[10]  The Court will assume that if RES's forum-related acts are attributable to REI, the Kansas long-arm statute is satisfied.

REI's conduct in acting as a guarantor for RES also does not support an alter ego finding, and the evidence presented on this point suggests the opposite. REI had in place specific policies regarding when it would consider acting as its subsidiary's guarantor, suggesting that the two corporations and their counterparties viewed the two as separate entities not liable for the other's obligations except where they contractually agreed to such an arrangement. Further, REI's reference to RES as a "business unit" in a report does not suggest RES was REI's mere instrumentality. Nor does the fact that the two companies shared office space and staff.

REI's oversight of RES is consistent with the parent's investor status. As one hundred percent owner of RES's shares, REI was entitled to nominate and elect RES's board of directors. Additionally, REI is entitled as an investor to monitor RES's performance. Consequently, the daily reporting of information from RES to REI is consistent with REI's investor oversight role. Although REI received daily reporting from RES, no evidence suggests REI gave daily control commands to RES. Rather, the record demonstrates that, consistent with its investor status, REI set general policies and guidelines regarding best policies and practices, as well as certain overall limits, such as the limit on VAR. However, when it came to RES's day-to-day conduct of its business within these guidelines, REI had little to no role. For example, with respect to natural gas trading, while REI set overall limits on certain metrics, REI had no role in making the day-to-day decisions of who RES was to trade with, when, for what amount of natural gas, and at what price. Only when RES exceeded REI's overall limits would REI become involved by inquiring of its subsidiary what it intended to do to correct any violations. Plaintiff also presents no evidence REI had any role in RES's price reporting to indices.

Finally, Plaintiff's reference to the Master Separation Agreement does not support a finding of alter ego. That RRI/REI agreed with Reliant Energy, Incorporated that it and its subsidiaries would assume liability for those business operations which would

remain with RRI/REI post-separation does not mean REI agreed it would waive personal jurisdiction with respect to claims made by other persons not a party to that contract, or that it, as opposed to the relevant subsidiary, was liable for any particular claim.

Even if Plaintiff had established a lack of corporate separateness, Plaintiff has not established a fraud or injustice would result if the Court failed to pierce the corporate veil. Plaintiff contends it would be unjust to permit REI to reap the benefits of RES's alleged unlawful behavior by enjoying profits from RES's trading activities while escaping liability for RES's alleged misconduct. However, the alleged illegal price manipulation cannot itself constitute the fraud or injustice necessary to pierce the corporate veil. Rather, REI must have had some fraudulent intent at RES's inception or some later abuse of the corporate form such that failing to treat the entities as one would be inequitable. Plaintiff presents no evidence RES was undercapitalized at its inception. RES was formed years before REI became its parent company, and thus REI was not even involved in capitalizing RES at its inception. Further, the fact that RES operated as a legitimate business for years suggests a lack of fraudulent intent or perpetration of a fraud through use of the corporate structure on the parent's part.

Plaintiff's fear that it may not be able to collect on a judgment in this action against RES does not constitute fraud or injustice to support piercing the corporate veil. The Court therefore finds Plaintiff has not met its burden of establishing RES is REI's alter ego, and the Court will not attribute RES's contacts with Kansas to REI for purposes of determining personal jurisdiction based on alter ego principles.

**B. Agency**

Plaintiff has failed to establish a prima facie case that RES was REI's general agent in Kansas. REI's business is not purely as a holding company in the sense that it does not passively hold stock in companies from an unrelated range of businesses. REI (then RRI) has described itself as a "provider of electricity and energy services with a focus on

the competitive segments of the electric power industry in the United States and Europe."

(Sealed REI App., Ex. K at REILJ009826.)  REI describes its business as acquiring,

developing, and operating electric power generation facilities; trading and marketing power,

natural gas, and other energy-related commodities; and providing retail electric services in

Texas.  (Id.)  REI has asserted in public filings that its--

> trading, marketing, and risk management skills complement [its]
> generation positions.  The combination provides greater scale and skill
> associated with the management of our fuel and power positions,
> sophisticated commercial insights and an understanding of the key
> regions in which we participate, and a wider range of ways in which
> we participate in the market and are able to meet customer needs.

(Id.)

In practice, REI itself does not perform these activities, but, as Jines stated in his

deposition, REI "holds the shares of the different subsidiaries that are actually engaged in

the different business operations of [REI]."  (Sealed REI App., Ex. D at 129-30.)  Among

those business operations was REI's "wholesale" group, which included a variety of

subsidiaries involved in wholesale-related activities, including RES's natural gas-related

activities.  (Id. at 285-86.)

Although REI identifies natural gas trading and marketing as one of its business

lines, Plaintiff has not established that RES's sales of natural gas in Kansas were

sufficiently important to REI that if RES did not make the sales in Kansas, REI would have

done so itself.  As the California Court of Appeal found in evaluating this same question

involving a similar lawsuit against REI and RES in California, "[t]his portion of the energy

business appears to be sufficiently fragmentary so that [REI] could have operated without

the assistance of RES."  Reliant Energy, Inc. v. Superior Court, No. D049988, 2007 WL

4329488, at *18 (Cal. Ct. App. 2007) (unpublished).  Further, the fact that REI

subsequently ceased "proprietary trading activities" due to a significant trading loss arising

from "the extreme volatility in natural gas prices" suggests that RES's trading activities

1    were not sufficiently important to REI that it would perform the activities itself if RES did

2    not do so on its behalf.  (Sealed REI App., Ex. G.)

3          Moreover, Plaintiff has presented no evidence that RES's natural gas sales in

4    Kansas in particular were sufficiently important to REI's business that REI would have

5    performed the sales in Kansas itself absent its subsidiary's representation in the forum.  See

6    Modesto City Schs., 157 F. Supp. 2d at 1135; Bulova Watch Co., Inc., 508 F. Supp. at

7    1344.  Consequently, Plaintiff has not shown that RES's Kansas natural gas sales played a

8    significant role in REI's "'organizational life'" such that it acted as a substitute for REI in

9    the forum.  Bulova Watch Co., Inc., 508 F. Supp. at 1344.

10         The Court acknowledges that the California Court of Appeal upheld a state trial

11   court's ruling that RES was REI's agent in California for natural gas trading activity during

12   the relevant time period.  Reliant Energy, Inc., 2007 WL 4329488, at *17.  Although arising

13   out of the same factual background and involving the same parent and subsidiary, the ruling

14   is distinguishable on several grounds.  The evidence presented to the California state court

15   indicated REI had several significant contacts with California whereas Plaintiff concedes

16   REI has no contacts with Kansas, as reflected in the evidence before this Court.  According

17   to the evidence in Reliant, REI owned another subsidiary that had purchased natural-gas-

18   fueled power plants located in California.  Id. at *2.  Additionally, REI obtained a

19   certificate of qualification to do business and designated an agent for service of process in

20   California, acted as guarantor on seven agreements between RES and California utilities,

21   engaged in a marketing campaign in the state, subleased a small office in Sacramento which

22   was used by a lobbyist, and employed an individual who allegedly engaged in illegal

23   churning and wash trades in California.  Id. at *3-4.

24         In accord with this Court's ruling, the California Court of Appeal specifically

25   rejected RES was REI's agent under the same test the Ninth Circuit employs to determine

26   whether a subsidiary is its parent's agent for personal jurisdiction purposes.  Compare id. at

                                      43

*17-18, with Doe, 248 F.3d at 928.  The California Court of Appeal referred to this test as the "representative services doctrine."  Reliant Energy, Inc., 2007 WL 4329488, at *17-18.  While finding RES was not REI's agent under the representative services doctrine, the Reliant court concluded RES was REI's agent in California under general agency principles based on REI's control over RES.  Id. at *15-17.  Although not calling it the "representative services doctrine," the Ninth Circuit has set forth that test as the applicable one for due process purposes.  The California Court of Appeal's reference to other agency principles goes beyond the applicable agency test for exercising personal jurisdiction consistent with due process as set forth in controlling precedent for this Court.

Moreover, in making its finding under general agency principles, the California Court of Appeal relied on evidence not presented to this Court and not relevant to REI's contacts with Kansas.  For example, the Reliant court considered the fact that RES made a daily report to REI of the California power plant's hedging activities, "regarding the coordination of power generation and supply of natural gas," and RES's trading activities impacted that supply of natural gas.  Id. at *16.  Additionally, evidence in the record permitted an inference that the employee who allegedly engaged in wash trades and churning in California was an REI (then RRI) employee.  Id.

The California Court of Appeal also found REI's setting and raising of overall limits such as VAR to be significant evidence of REI's daily control of RES.  However, as explained above, the evidence before this Court indicates REI sets overall limits but does not involve itself in RES's day-to-day decisions as to what actions to take within those limits.  That RES violated those limits and requested a higher limit, to which REI agreed, is not evidence of day-to-day control.  It is evidence of a change in the overall limit under which RES was to perform its day-to-day operations.

To the extent the setting and changing of VAR and other limits constitutes day-to-day control, Plaintiff has not demonstrated that REI's setting or altering of overall limits

on any metric constituted day-to-day interference with RES's sales in Kansas. Plaintiff has presented no evidence that REI's oversight impacted RES's daily decisions regarding whether, when, to whom, in what volume, or at what price RES decided to sell natural gas in Kansas. While daily oversight of trading activities may have been significant in the Reliant case where an employee of REI or one of its subsidiaries allegedly engaged in illegal trading activity in California, REI's daily oversight mechanisms as presented to this Court do not suggest a significant level of control over RES's Kansas sales activity. Because Plaintiff has not established a prima facie case that RES acted as REI's agent in Kansas, the Court will not attribute RES's Kansas contacts to REI on this basis.[11]

The Court will not attribute RES's contacts with the forum to REI, and REI has no contacts of its own sufficient to support personal jurisdiction. The Court therefore will grant REI's motion to dismiss for lack of personal jurisdiction.

## VI.  REQUEST FOR DEFERRED DECISION

Plaintiff suggests that because the personal jurisdiction question is intertwined with the merits, the Court should defer ruling on the personal jurisdiction issue until after merits discovery is completed. Plaintiff relies on Data Disc, Inc., 557 F.2d at 1285 n.2. However, Data Disc, Inc. states that where the jurisdictional issues are intertwined with the merits, the Court may require the plaintiff to establish "only . . . a prima facie showing of jurisdictional facts with affidavits and perhaps discovery materials." Id. As the Court is considering the personal jurisdiction issue on the basis of affidavits and documentary evidence without holding an evidentiary hearing, the Court is following Data Disc, Inc. by holding Plaintiff to this standard, and is not requiring Plaintiff to meet the higher burden of

---

[11] The result would be the same under general Kansas agency law. Plaintiff has presented no evidence of any express or implied manifestation from REI to RES that RES may act as REI's agent in Kansas. As to apparent agency, Plaintiff has presented evidence that REI permitted RES to use the "Reliant" name and logo in marketing natural gas in Kansas. However, Plaintiff has presented no evidence that anyone relied on an apparent agency relationship between REI and RES.

demonstrating personal jurisdiction by a preponderance of the evidence, as Plaintiff would have to do at an evidentiary hearing or at trial.  Id.

Moreover, Plaintiff has not convinced the Court that further discovery would produce a different result.  Although Plaintiff contends DEC obstructed jurisdictional discovery regarding its participation in the conspiracy, DEC provided Plaintiff with every DEC document which DEC provided to the CFTC in conjunction with the CFTC's investigation of DETM's natural gas trading activity in the relevant time period.  (Mem. of Defs. Duke Energy Carolinas, LLC & Duke Energy Trading & Marketing, LLC in Opp'n to Pls.' Mot. to Compel Disc. (Doc. #935) ["Opp'n to Mot. Compel"], Ex. B at 2; Tr. of Proceedings (Doc. #1138) at 55.)  The documents provided to the CFTC consisted almost entirely of DETM documents.  (Opp'n to Mot. Compel, Ex. B at 2; Tr. of Proceedings at 55.)  The only DEC documents consisted of general risk management policies and board of director meeting minutes, which DEC has provided to Plaintiff.  (Opp'n to Mot. Compel, Ex. B at 2; Tr. of Proceedings at 55-56.)

REI also answered Plaintiff's discovery on the issue of conspiracy as it relates to REI.  REI had no documents related to communications between REI and the other Defendants about natural gas prices and had no documents in which REI directed a subsidiary's communications, price reporting, or trading.  (Partial Tr. (Doc. #1128) at 49-50.)  REI objected to the extent that Plaintiff sought every communication made by its subsidiary, RES, to other alleged co-conspirators.  Such communications would not demonstrate REI's participation in a conspiracy, and thus would not demonstrate REI was a member of a conspiracy directed at Kansas.[12]

///

_____

[12]  CMS objected to discovery related to the conspiracy theory.  The Court is unable to determine from the record whether CMS searched its own records and advised Plaintiffs it had no responsive documents as its co-Defendants have done.

The Court has denied Plaintiff's motion to compel discovery raising these issues. (Pls.' Mot. to Compel Disc. from Def. CMS Energy Corp. (Doc. #904); Pls.' Mot. to Compel Disc. from Def. CMS Energy Corp. (Doc. #906); Pls.' Mot. to Compel Disc. from Defs. Duke Energy Carolinas, LLC & Duke Energy Trading & Marketing, LLC (Doc. #898) & Mem. in Supp. (Doc. #899); Pls.' Mot. to Compel Disc. from Def. Reliant Energy, Inc. (Doc. #910) & Mem. in Supp. (Doc. #911); Order (Doc. #1240).) Plaintiff seeks further discovery on the conspiracy theory of personal jurisdiction, a theory of questionable legitimacy. See Chirila v. Conforte, 47 F. App'x 838, 842, 2002 WL 31105149, at *3 (9th Cir. 2002) (unpublished). In any event, nothing suggests further discovery will establish Defendants CMS, DEC, or REI participated in a conspiracy targeting known Kansas residents. The Court therefore will decline Plaintiff's request to defer the personal jurisdiction issue to be resolved with the merits.

## VII. CONCLUSION

IT IS THEREFORE ORDERED that Specially Appearing Defendants CMS Energy Corporation, Duke Energy Carolinas, LLC, and Reliant Energy, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction (Doc. #960) is hereby GRANTED. Defendants CMS Energy Corporation, Duke Energy Carolinas, LLC, and Reliant Energy, Inc. are hereby dismissed from this action for lack of personal jurisdiction.

DATED: February 23, 2009

_____
PHILIP M. PRO
United States District Judge

47

<u>**Exhibit 8**</u>

**Order Re: Defendants' Motion To Dismiss (Doc. #869) Entered As Docket No. 1530 In *In re Western States Wholesale Natural Gas Antitrust Litigation***

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| IN RE: WESTERN STATES WHOLESALE NATURAL GAS ANTITRUST LITIGATION | MDL 1566 2:03-CV-01431-PMP-PAL BASE FILE |
| _____ | |
| ARANDELL CORP., et al., | 2:07-CV-01019-PMP-PAL |
| Plaintiffs, | |
| v. | |
| XCEL ENERGY, INC., et al., | ORDER RE: DEFENDANT'S MOTION TO DISMISS (Doc. #869) |
| Defendants. | |
| _____ | |

Presently before this Court is Defendant Reliant Energy, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction (Doc. #869),[1] filed on March 3, 2008. Plaintiffs filed an Opposition (Doc. #1103) and supporting declaration (Doc. #1104) on June 4, 2008. Defendant Reliant Energy, Inc. filed a Reply (Doc. #1185) on June 24, 2008.

I.      **BACKGROUND**

     **A. Procedural Background**

     This case is one of many in consolidated Multidistrict Litigation arising out of the energy crisis of 2000-2001. Plaintiffs originally filed this action in the Circuit Court, Dane County, Wisconsin. (Notice of Removal [Doc. #2 in 2:07-CV-01019-PMP-PAL], Compl.) Defendants removed the case to the United States District Court for the District of Wisconsin. (Id.) The Judicial Panel on Multidistrict Litigation entered a Transfer Order

_____

[1] Document numbers refer to the base file, 2:03-CV-01431-PMP-PAL, unless otherwise noted.

pursuant to 28 U.S.C. § 1407 centralizing the foregoing action in this Court for coordinated or consolidated pretrial proceedings.

Plaintiffs Arandell Corporation, Merrick's, Inc., Safety-Kleen Systems, Inc., Sargento Foods, Inc., and Ladish Co., Inc. are Wisconsin corporations. (Corrected Second Am. Compl. [Doc. #190 in 2:07-CV-01019-PMP-PAL][2] at 5-6.) According to the Corrected Second Amended Complaint ("SAC"), Defendants are natural gas companies that buy, sell, transport, and store natural gas, including their own and their affiliates' production, in the United States and in the State of Wisconsin. (Id. at 6-51.) In this litigation, Plaintiffs allege Defendants conspired to engage in anti-competitive activities with the intent to manipulate and artificially increase the price of natural gas for consumers. (Id.) Specifically, Plaintiffs allege Defendants, directly and through their affiliates, conspired to manipulate the natural gas market by knowingly delivering false reports concerning trade information to trade indices and engaging in wash trades, in violation of Wisconsin Statutes chapter 133. (Id.)

The SAC asserts two causes of action. Count one arises under Wisconsin Statutes § 133.14, which voids contracts to which an antitrust conspirator is a party and allows recovery of payments made pursuant to such a contract. (Id. at 54-56.) Count two seeks trebled actual damages under Wisconsin Statutes § 133.18 for Defendants' alleged antitrust violations. (Id. at 56-57.)

The SAC's allegations are directed generally at two types of Defendants: the natural gas companies that actually engaged in natural gas sales and the related reporting of allegedly manipulated gas prices to the trade indices, and those companies' parent corporations. The SAC does not allege the parent company Defendants themselves engaged

---

[2] Plaintiffs' Second Amended Complaint is located at docket number 847 in the base file. Plaintiffs filed the Corrected Second Amended Complaint only in the individual case file.

in natural gas trading and price reporting.  Rather, the SAC alleges these Defendants are the

parent companies of subsidiaries which engage in such activity generally, and which also

made natural gas sales in Wisconsin during the relevant time period.

Plaintiffs seek to establish personal jurisdiction over the parent company

Defendants based on their out-of-forum activities directed at Wisconsin along with their

subsidiaries' and affiliates' contacts within Wisconsin.  According to the SAC, the parent

company Defendants dominated and controlled their respective subsidiaries and the parent

company Defendants "entered into a combination and conspiracy . . . which tended to

prevent full and free competition in the trading and sale of natural gas, or which tended to

advance or control the market prices of natural gas."  (Id. at 6-7, 9, 14-15, 18-19, 23, 26-27,

30-31, 35-36.)  Plaintiffs allege the parent company Defendants intended their actions to

have a direct, substantial, and foreseeable effect on commerce in the State of Wisconsin.

(Id. at 7, 10, 15, 19, 23-24, 27, 31, 36.)  According to the SAC, the parent company

Defendants "made strategic marketing policies and decisions concerning natural gas and the

reporting of natural gas trade information to reporting firms for use in the calculation of

natural gas price indices that affected the market prices of natural gas, and those policies

and decisions were implemented on an operational level by affiliates . . . in the United

States and in Wisconsin."  (Id. at 8, 10, 15, 19, 24, 27-28, 32, 36.)

Defendant Reliant Energy, Inc. ("REI") now moves to dismiss, arguing this Court

lacks personal jurisdiction over REI.  According to REI, it conducts no business in

Wisconsin and has no other contacts supporting general or specific jurisdiction.  REI also

argues it cannot be subject to jurisdiction in Wisconsin based on its subsidiary's contacts

with the forum because its subsidiary is not its agent or alter ego, and Wisconsin would not

support the conspiracy theory of jurisdiction.  REI thus argues personal jurisdiction does not

exist under the Wisconsin long-arm statute, and even if it did, exercising personal

jurisdiction in this case would violate constitutional due process requirements.

Plaintiffs respond that REI's subsidiary has submitted to jurisdiction in Wisconsin and REI is subject to personal jurisdiction based on agency and alter ego principles based on its subsidiary's contacts. Additionally, Plaintiffs argue that because Wisconsin's antitrust statutes contemplate imposing liability on an antitrust conspirator who performs acts outside of Wisconsin that have an impact in Wisconsin, the Court has personal jurisdiction over REI under Wisconsin's long-arm statute.

**B. Facts Related to Personal Jurisdiction**

Defendant REI is a Delaware corporation with its principal place of business in Texas. (Def. Reliant Energy, Inc.'s Mot. to Dismiss for Lack of Pers. Juris. (Doc. #869), Ex. A ["Jines Decl."] at 2.) REI as it currently exists came into being in response to changes in Texas regulatory laws. (Id.) The company formerly known as Reliant Energy, Incorporated divided itself into CenterPoint Energy, Inc. ("CenterPoint") and Reliant Resources, Inc. ("RRI"). (Id.) After CenterPoint divested itself of its RRI stock, the two companies became separate entities and RRI changed its name to REI, the Defendant in this action. (Id. at 2-3.) Under the Master Separation Agreement resulting in RRI's existence as a separate entity, RRI agreed that it would indemnify, defend, and hold harmless Reliant Energy, Incorporated, and in certain cases, that it would cause its subsidiaries to do so as well, for liabilities arising out of RRI and its subsidiaries' business operations, including business operations that pre-dated the agreement. (App. of Docs. Filed Under Seal ["Sealed App."] (Doc. #1126), Ex. E at REILJ012883, Ex. F at REILJ009719.)

REI is a holding company that does not itself buy, sell, or transport natural gas, nor does it report natural gas prices to any price reporting firms or price index publishers. (Jines Decl. at 3-4; Joint Supplemental Mem. of Defs. CMS Energy Corp., Duke Energy Carolinas, LLC, and Reliant Energy, Inc. in Supp. of Mots. to Dismiss for Lack of Pers. Juris. (Doc. #963), Reliant Energy, Inc.'s App. in Supp. of Its Mots. to Dismiss for Lack of Pers. Juris. ["REI App."], Ex. B at 2.) REI does not have any offices, employees, property,

4

bank accounts, phone listings, or mailing addresses in Wisconsin. (Jines Decl. at 3; REI App., Ex. C at 2, Ex. D at 2, Ex. E at 2.) REI does not pay taxes in Wisconsin and has never sold or traded natural gas in Wisconsin. (Jines Decl. at 3; REI App., Ex. B at 2, Ex. F at 2.) REI has not itself conducted any business in Wisconsin. (Jines Decl. at 3.) Other than advertising in publications available nationwide, REI has not directed advertising specifically towards Wisconsin. (REI App., Ex. G at 2.)

REI has a wholly owned subsidiary, Reliant Energy Services, Inc. ("RES"). (Jines Decl. at 3.) RES sold millions of dollars worth of natural gas to the Wisconsin Public Service Corporation and Integrys Energy Services, Inc., Wisconsin corporations, and had a natural gas supply agreement with the Wisconsin Electric Power Company ("WEPCO") and Wisconsin Gas, LLC, during the 2000 to 2002 time period. (Decl. of Andy Hess (Doc. #1089); Revised Decl. of Kristie J. Wiegand, Revised Decl. of Julie Baumgart (Doc. #1131); Notice of Filing of Docs. Under Seal (Doc. #1180); Notice of Filing of Docs. Under Seal (Doc. #1184); Decl. of Timothy J. McCollow (Doc. #993); Decl. of William E. Fischer (Doc. #1097), Second Decl. of James H. Voss.) State of Wisconsin billing records show RES also sold thousands of dollars of natural gas from July 2001 to June 2002 to the State of Wisconsin. (Decl. of William E. Fischer (Doc. #1104) ["Fischer Decl."], Ex. B, Jines Ex. 16.) Plaintiff Ladish Co., Inc. ("Ladish") purchased over $19 million in natural gas from RES between January 2000 and August 2002. (Id., Jines Ex. 11.)

According to Ladish's accounting manager, RES marketed itself under the name "Reliant Energy" in making these sales. (Id.) Timothy J. McCollow ("McCollow"), a former WEPCO employee, likewise avers that Reliant-related companies sold gas to WEPCO using a common logo. (Decl. of Timothy J. McCollow at 4.) McCollow avers that several Reliant marketing employees traveled to Wisconsin and personally met with WEPCO employees, including McCollow. (Id.) McCollow also states that he and his co-workers spoke with Reliant marketing personnel on a nearly daily basis when WEPCO

actively was seeking to purchase natural gas.  (Id.)

REI and RES share physical offices in Texas.  (Sealed App., Ex. D at 163-64.)
REI and its subsidiaries, including RES, share some common officers and directors.
(Sealed App., Ex. B.)  For example, Michael Jines ("Jines") was an officer for REI, RES,
and several other REI subsidiaries, including some for which he could not recall the
subsidiary's name.  (Sealed App., Ex. D at 15-19, 107-110.)  At his deposition, Jines stated
his duties and responsibilities as an officer and director of those subsidiaries would be "no
different" than his duties and responsibilities as REI's general counsel.  (Id. at 119-20.)  As
RES's one hundred percent owner, REI nominates and elects the directors for RES.  (Id. at
88-89.)

At the present time, REI and RES have no employees of their own.  (Id. at 248,
288-89.)  Rather, Reliant Energy Corporate Services ("RECS"), an REI subsidiary, acts as
the payroll entity for REI and all of its subsidiaries.  (Id. at 9-10.)  RECS employs personnel
who provide services to REI and RES.  (Id. at 10.)  For example, lawyers employed by
RECS provide legal services to REI and all of its subsidiaries.  (Id. at 111-13.)  RECS also
provides accounting, finance, legal, human resources, and facilities management services to
REI and its subsidiaries.  (Id. at 20.)  As part of these services, RECS prepares separate
financial documents, including tax filings, for RES.  (Id. at 56-57, 267.)

In terms of financial dealings between REI and its subsidiaries, the subsidiaries
are funded by borrowing from or receiving equity capital infusions from REI.  (Id. at
239-40.)  In turn, REI receives either loan repayments or dividends when money is
transferred from the subsidiaries to REI.  (Id. at 291-92.)  In some circumstances, REI
provides guarantees to third parties in transactions involving REI subsidiaries.  (Id. at 204-
05.)  REI agreed to be RES's guarantor in an agreement in 2001 with a Wisconsin company.
(Fischer Decl., Jines Ex. 17.)  In setting forth its financial guarantee policy, REI (then RRI)
described RES as a "business unit."  (Sealed App., Ex. H at REILJ010083.)

Although describing itself as a holding company, REI does not passively hold stock in its subsidiaries and leave them to operate on their own. Rather, REI establishes overall policies and guidelines for its subsidiaries, establishes a capital structure, and issues consolidated financial reports. (Sealed App., Ex. D at 131.) Among the guidelines REI requires its subsidiaries to follow is a policy for best principles and practices. (Sealed App., Ex. I at REILJ012703.) This policy requires compliance with applicable laws and regulations, and requires that all transactions be for a bona fide business purpose and be reported accurately. (Id.) The best practices policy prohibits wash sales and fictitious transactions. (Id. at REILJ012704.) This policy applied to RES during the relevant period. (Sealed App., Ex. N at 93.)

Additionally, REI sets certain risk control limits on its subsidiaries. For example, REI set limits on RES's value at risk ("VAR"). (Sealed App., Ex. F at REILJ009749.) REI's board of directors sets the overall limit on VAR. (Id.) The Audit Committee of REI's board meets at least three times a year to approve the risk control organization structure, approve the overall risk control policy, monitor compliance with trading limits, and review risk control issues. (Id. at REILJ009752.)

REI also has a Risk Oversight Committee consisting of REI and subsidiary officers which allocates VAR to various business segments, including RES. (Sealed App., Ex. M at 17, Ex. F at REILJ009752.) The Risk Oversight Committee meets at least monthly to monitor compliance, review daily position reports for trading and marketing activity, recommend to REI's board of directors adjustments to trading limits, approve new trading activity, monitor information systems related to risk management, and place guidelines and limits on hedging activity. (Sealed App., Ex. F at REILJ009752-53.) Management for each business segment then allocates risk limits among individual traders within the limits set by the Risk Oversight Committee. (Id. at REILJ009754.) RES allocates VAR to its "head book traders" who in turn authorize other traders to execute

trades.  (Sealed App., Ex. M at 17.)  Thus, the VAR limit set by REI was "an overall limit." (Sealed App., Ex. N at 155.)  RES would engage in multiple transactions in one day, and the limit set by REI was evaluated against the net result of a set of RES's transactions or activities.  (Id.)

REI oversight of its subsidiaries includes daily reporting of mark-to-market valuation,[3] VAR, and "other risk measurement metrics."  (Sealed App., Ex. L.)  RES's VAR is reported daily to REI's Risk Oversight Committee.  (Sealed App., Ex. M at 17.) Additionally, violations of any risk limits are reported to the business segment management as well as to the appropriate committees.  (Sealed App., Ex. F at REILJ009754.)  While the reports from the subsidiary to the various committees may occur daily, communications from REI down to the subsidiaries occurs "only to the extent that the activity ended up in a violation."  (Sealed App., Ex. N at 156.)  For example, if RES exceeded its VAR limit, an REI officer may inform RES management and inquire as to what RES management intended to do to correct the situation.  (Id.)  However, "in terms of the day-to-day buying and selling of gas or power, [REI officers have] limited or no interaction."  (Id.)

In November 2003, the Commodity Futures Trading Commission ("CFTC") entered into a settlement with RES regarding the CFTC's allegations that RES violated the Commodities Exchange Act.  (Fischer Decl., Ex. B, Jines Ex. 4.)  According to the settlement, the CFTC found RES's Houston offices made false price reports regarding natural gas transactions from 1999 through May 2002.  (Id. at 4-5.)  Additionally, the CFTC found RES engaged in wash trades in 2000.  (Id. at 6-7.)  As part of the settlement, RES and REI agreed to entry of the order finding violations, as well as requiring RES to cease and desist from its misconduct, imposing an $18 million civil penalty on RES, and requiring RES and REI to undertake certain activities.  (Id. at 7-9.)  Specifically, REI agreed to

---

[3] "Mark-to-market" means the value of a contract relative to current market prices.  (Sealed App., Ex. N at 128.)

cooperate with the CFTC in the future, including preserving and producing records regarding the reporting of price or trade volumes in natural gas transactions and producing RES and REI employees to provide assistance in any trial, proceeding, or investigation related to the CFTC's investigation.  (Id. at 8-9.)  Additionally, REI agreed not to make any public statements denying the CFTC's findings in the order.  (Id. at 9.)  Jines represented both RES and REI relating to the CFTC's investigation and the terms of the CFTC's order. (Sealed App., Ex. D at 41-44.)

The parties now dispute the significance of these contacts under the Wisconsin long-arm statute.  The parties also dispute whether this Court's exercise of personal jurisdiction over REI would violate constitutional due process requirements.

## II.    PERSONAL JURISDICTION

"When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant."  Pebble Beach Co. v. Caddy, 453 F.3d 1151, 1154 (9th Cir. 2006).  To meet this burden, a plaintiff must demonstrate that personal jurisdiction over a defendant is (1) permitted under the applicable state's long-arm statute and (2) that the exercise of jurisdiction does not violate federal due process.  Id.  The Court must analyze whether personal jurisdiction exists over each defendant separately.  Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd., 328 F.3d 1122, 1130 (9th Cir. 2003).

Where the issue is before the Court on a motion to dismiss based on affidavits and discovery materials without an evidentiary hearing, the plaintiff must make "a prima facie showing of facts supporting jurisdiction through its pleadings and affidavits to avoid dismissal."  Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co., 284 F.3d 1114, 1119 (9th Cir. 2002).  The Court accepts as true any uncontroverted allegations in the complaint and resolves any conflicts between the facts contained in the parties' evidence in the plaintiff's favor.  Id.  However, for personal jurisdiction purposes, a court "may not

1   assume the truth of allegations in a pleading which are contradicted by affidavit."

2   Alexander v. Circus Circus Enters., Inc., 972 F.2d 261, 262 (9th Cir. 1992) (quotation

3   omitted).

4          In diversity cases such as this, "a federal court applies the personal jurisdiction

5   rules of the forum state provided the exercise of jurisdiction comports with due process."

6   Scott v. Breeland, 792 F.2d 925, 927 (9th Cir. 1986).  However, "federal law is controlling

7   on the issue of due process under the United States Constitution."  Data Disc, Inc. v. Sys.

8   Tech. Assoc., Inc., 557 F.2d 1280, 1286 n.3 (9th Cir. 1977); see also Dole Food Co., Inc. v.

9   Watts, 303 F.3d 1104, 1110 (9th Cir. 2002).  Therefore, the Court will apply law from the

10  United States Court of Appeals for the Ninth Circuit in deciding whether jurisdiction is

11  appropriate under the Due Process Clause.  See In re Korean Air Lines Disaster of Sept. 1,

12  1983, 829 F.2d 1171, 1174 (D.C. Cir. 1987) (concluding that "the transferee court [should]

13  be free to decide a federal claim in the manner it views as correct without deferring to the

14  interpretation of the transferor circuit"); Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir.

15  1993) (holding that "a transferee federal court should apply its interpretations of federal

16  law, not the constructions of federal law of the transferor circuit").

17         To satisfy federal due process standards, a nonresident defendant must have

18  "minimum contacts" with the forum state so that the assertion of jurisdiction does not

19  offend traditional notions of fair play and substantial justice.  Pebble Beach Co., 453 F.3d at

20  1155 (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 315 (1945)).  A federal district

21  court may exercise either general or specific personal jurisdiction.  See Helicopteros

22  Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15 (1984).

23         To establish general personal jurisdiction, the plaintiff must demonstrate the

24  defendant has sufficient contacts to "constitute the kind of continuous and systematic

25  general business contacts that 'approximate physical presence.'"  Glencore Grain, 284 F.3d

26  at 1124 (quoting Bancroft & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1086 (9th

10

Cir. 2000), modified, Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme, 433 F.3d 1199, 1207 (9th Cir. 2006)). Courts consider such factors as whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there. Bancroft, 223 F.3d at 1086. "[A] defendant whose contacts are substantial, continuous, and systematic is subject to a court's general jurisdiction even if the suit concerns matters not arising out of his contacts with the forum." Glencore Grain, 284 F.3d at 1123 (citing Helicopteros, 466 U.S. at 415 n.9).

A nonresident defendant's contacts with the forum state may permit the exercise of specific jurisdiction if: (1) the defendant has performed some act or transaction within the forum or purposefully availed himself of the privileges of conducting activities within the forum, (2) the plaintiff's claim arises out of or results from the defendant's forum-related activities, and (3) the exercise of jurisdiction over the defendant is reasonable. Pebble Beach Co., 453 F.3d at 1155-56. "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law." Omeluk v. Langsten Slip & Batbyggeri A/S, 52 F.3d 267, 270 (9th Cir. 1995).

Under the first prong of the "minimum contacts test," the plaintiff must establish either that the defendant "(1) purposefully availed himself of the privilege of conducting his activities in the forum, or (2) purposefully directed his activities toward the forum." Pebble Beach Co., 453 F.3d at 1155. "Evidence of availment is typically action taking place in the forum that invokes the benefits and protections of the laws in the forum." Id. Evidence of direction usually consists of conduct taking place outside the forum that the defendant directs at the forum. Id. at 1155-56.

The purposeful direction aspect of the first prong is satisfied when a foreign act is both aimed at and has effect in the forum. Id. In other words, the defendant "must have (1) committed an intentional act, which was (2) expressly aimed at the forum state, and (3)

11

1  caused harm, the brunt of which is suffered and which the defendant knows is likely to be

2  suffered in the forum state." <u>Id.</u> To satisfy the third element of this test, the plaintiff must

3  establish the defendant's conduct was "expressly aimed" at the forum; a "mere foreseeable

4  effect" in the forum state is insufficient. <u>Id.</u> The "express aiming" requirement is satisfied

5  when the defendant is alleged to have engaged in wrongful conduct "individually targeting

6  a known forum resident." <u>Bancroft</u>, 223 F.3d at 1087.

7          The second prong of the specific jurisdiction test requiring that the contacts

8  constituting purposeful availment or purposeful direction give rise to the current action is

9  measured in terms of "but for" causation. <u>Id.</u> at 1088. "If the plaintiff establishes both

10  prongs one and two, the defendant must come forward with a 'compelling case' that the

11  exercise of jurisdiction would not be reasonable." <u>Boschetto v. Hansing</u>, 539 F.3d 1011,

12  1016 (9th Cir. 2008) (quotation omitted).

13          No evidence in the record demonstrates REI itself had any contacts with

14  Wisconsin other than acting as a guarantor on a single contract between RES and a

15  Wisconsin entity. A single contact does not support general jurisdiction. Plaintiffs' claims

16  do not arise out of that contract and thus specific jurisdiction also does not exist based on

17  this single contact. Consequently, REI is subject to personal jurisdiction in Wisconsin only

18  if the forum acts of its subsidiary, RES, are attributable to it through principles of alter ego,

19  agency, or a conspiracy theory of personal jurisdiction.[4]

20      **A. Alter Ego**

21          A "parent-subsidiary relationship alone is insufficient to attribute the contacts of

22  the subsidiary to the parent for jurisdictional purposes." <u>Harris Rutsky & Co. Ins. Servs.,</u>

23  <u>Inc.</u>, 328 F.3d at 1134. However, a subsidiary's contacts may be imputed to its parent for

24  personal jurisdiction purposes where the subsidiary is the parent's alter ego. <u>Id.</u>

25

26          [4] The Court will assume that if RES's forum-related acts are attributable to REI, the Wisconsin
long-arm statute is satisfied.

12

To demonstrate a parent and its subsidiary are alter egos, the plaintiff must establish a prima facie case that the two companies share "such unity of interest and ownership" that the companies' separateness no longer exists and "failure to disregard [their separate identities] would result in fraud or injustice." Doe v. Unocal Corp., 248 F.3d 915, 926 (9th Cir. 2001) (quotation omitted). To demonstrate a unity of interest warranting disregard of corporate separateness, the plaintiff must show the parent controls its subsidiary to such a degree as to render the subsidiary a "mere instrumentality" of its parent. Id. (quotation omitted). Typically, this would involve showing the parent controls the subsidiary's internal affairs or daily operations. Kramer Motors, Inc. v. British Leyland, Ltd., 628 F.2d 1175, 1177 (9th Cir. 1980).[5]

A parent corporation may be involved directly in certain aspects of its wholly owned subsidiary's affairs without subjecting itself to alter ego status. For example, a parent may provide financing to its subsidiary so long as it maintains corporate formalities and properly documents loans and capital contributions to its subsidiaries, and it may act as its subsidiary's guarantor. Doe, 248 F.3d at 927-28. Additionally, a parent may refer to its subsidiaries as divisions of the parent in annual reports. Id. at 928. Further, a parent may review and approve major decisions, place its own directors on the subsidiary's board, and share offices and staff with its wholly owned subsidiary without being considered its alter ego. Id.; Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1135.

///

---

[5] Wisconsin utilizes similar principles. In Wisconsin, the party attempting to pierce the corporate veil must show the subsidiary corporation "has no separate existence of its own and is the mere instrumentality of the shareholder and the corporate form is used to evade an obligation, to gain an unjust advantage or to commit an injustice." Wiebke v. Richardson & Sons, Inc., 265 N.W.2d 571, 573 (Wis. 1978). To the extent Wisconsin would look to the law of the state of incorporation to determine alter ego status, Delaware has similar requirements. See Maloney-Refaie v. Bridge at Sch., Inc., 958 A.2d 871, 881 (Del. Ch. 2008); In re Sunstates Corp. Shareholder Litig., 788 A.2d 530, 534 (Del. Ch. 2001).

In sum, a parent may involve itself directly in its subsidiary's activities without becoming an alter ego "so long as that involvement is consistent with the parent's investor status." Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1135 (quotation omitted). Activities consistent with investor status include "'monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures[.]'" Doe, 248 F.3d at 926 (quoting United States v. Bestfoods, 524 U.S. 61, 72 (1998)).

In addition to showing lack of corporate separateness, the plaintiff also must show that failure to disregard the corporate form would promote fraud or injustice. The fraud or injustice must relate to the forming of the corporation or abuse of the corporate form, not a fraud or injustice generally. Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean-Up Serv., Inc., 736 F.2d 516, 524-25 n.12 (9th Cir. 1984). For example, undercapitalization at the subsidiary's inception may be evidence of the parent's fraudulent intent. Id. However, a corporation that once was capitalized adequately but "subsequently fell upon bad financial times" does not support a finding of fraud or injustice. Id. at 525. Further, evidence that the corporation existed as an ongoing enterprise engaged in legitimate business suggests no fraudulent intent or injustice to support piercing the corporate veil. Seymour v. Hull & Moreland Eng'g, 605 F.2d 1105, 1113 (9th Cir. 1979). An inability to collect on a judgment "does not, by itself, constitute an inequitable result." Id.

Plaintiffs have failed to establish a prima facie case of personal jurisdiction based on RES being REI's alter ego. REI provided financing to RES and in return received loan repayments and/or dividends, but no evidence in the record suggests REI failed to maintain corporate formalities or to properly document these loans and capital contributions. Rather, the evidence indicates RECS prepared separate books and records for RES and REI.

///

REI's conduct in acting as a guarantor for RES also does not support an alter ego finding, and the evidence presented on this point suggests the opposite. REI had in place specific policies regarding when it would consider acting as its subsidiary's guarantor, suggesting that the two corporations and their counterparties viewed the two as separate entities not liable for the other's obligations except where they contractually agreed to such an arrangement. Further, REI's reference to RES as a "business unit" in a report does not suggest RES was REI's mere instrumentality. Nor does the fact that the two companies shared office space and staff.

REI's oversight of RES is consistent with the parent's investor status. As one hundred percent owner of RES's shares, REI was entitled to nominate and elect RES's board of directors. Additionally, REI is entitled as an investor to monitor RES's performance. Consequently, the daily reporting of information from RES to REI is consistent with REI's investor oversight role. Although REI received daily reporting from RES, no evidence suggests REI gave daily control commands to RES. Rather, the record demonstrates that, consistent with its investor status, REI set general policies and guidelines regarding best policies and practices, as well as certain overall limits, such as the limit on VAR. However, when it came to RES's day-to-day conduct of its business within these guidelines, REI had little to no role. For example, with respect to natural gas trading, while REI set overall limits on certain metrics, REI had no role in making the day-to-day decisions of who RES was to trade with, when, for what amount of natural gas, and at what price. Only when RES exceeded REI's overall limits would REI become involved by inquiring of its subsidiary what it intended to do to correct any violations. Plaintiffs also present no evidence REI had any role in RES's price reporting to indices.

Even if Plaintiffs had established a lack of corporate separateness, Plaintiffs have not established a fraud or injustice would result if the Court failed to pierce the corporate veil. Plaintiffs contend it would be unjust to permit REI to reap the benefits of RES's

alleged unlawful behavior by enjoying profits from RES's trading activities while escaping liability for RES's alleged misconduct. However, the alleged illegal price manipulation cannot itself constitute the fraud or injustice necessary to pierce the corporate veil. Rather, REI must have had some fraudulent intent at RES's inception or some later abuse of the corporate form such that failing to treat the entities as one would be inequitable. Plaintiffs present no evidence RES was undercapitalized at its inception. Further, the fact that RES operated as a legitimate business for years suggests a lack of fraudulent intent or perpetration of a fraud through use of the corporate structure on the parent's part.

Plaintiffs' fear that they may not be able to collect on a judgment in this action against RES does not constitute fraud or injustice to support piercing the corporate veil. The Court therefore finds Plaintiffs have not met their burden of establishing RES is REI's alter ego, and the Court will not attribute RES's contacts with Wisconsin to REI for purposes of determining personal jurisdiction based on alter ego principles.

**B. Agency**

A subsidiary's contacts also may be imputed to its parent for personal jurisdiction purposes where the subsidiary is the parent's general agent in the forum. Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1134. A subsidiary is its parent's agent for purposes of attributing its forum-related contacts to the parent if the subsidiary "performs services that are 'sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.'" Doe, 248 F.3d at 928 (quoting Chan v. Society Expeditions, Inc., 39 F.3d 1398, 1405 (9th Cir. 1994)). The ultimate inquiry is whether the subsidiary's presence in the forum "substitutes" for its parent's presence. Id. at 928-29 (quotation omitted).

Where the parent is merely a holding company, the subsidiary's forum-related contacts are not done as the parent's agent because the holding company "could simply hold another type of subsidiary" as an investment and thus the subsidiary conducts business not

as the parent's agent but as its investment.  Id. at 929.  "Where, on the other hand, the subsidiaries are created by the parent, for tax or corporate finance purposes, there is no basis for distinguishing between the business of the parent and the business of the subsidiaries."  Id. (quotation omitted).  The inquiry as to whether a subsidiary is its parent's general agent in the forum is "a pragmatic one."  Gallagher v. Mazda Motor of Am., Inc., 781 F. Supp. 1079, 1085 n.10 (E.D. Pa. 1992).

For example, where a Japanese parent company was engaged in the manufacture of watches, its subsidiaries that acted as its sole sales agents in America were "almost by definition . . . doing for their parent what their parent would otherwise have to do on its own."  Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd., 508 F. Supp. 1322, 1342 (E.D.N.Y. 1981).  The Bulova court thus attributed the subsidiaries' contacts to the parent company.  Id.; see also Chan, 39 F.3d at 1405-06 (remanding to the district court for additional findings of fact regarding agency where the German parent corporation owned and operated cruise ships and its local subsidiary marketed cruises and chartered cruise ships and sold the cruise ticket to the plaintiffs out of which the claims arose); Modesto City Schs. v. Riso Kagaku Corp., 157 F. Supp. 2d 1128, 1135 (E.D. Cal. 2001) (holding subsidiary was parent's agent for personal jurisdiction purposes where subsidiary acted as sole conduit for marketing and selling parent's products in the United States).

In contrast, where the parent company owned a subsidiary mining company's stock but did not itself engage in the business of gold mining, imputing the subsidiary's forum contacts to the parent was not appropriate.  Sonora Diamond Corp. v. Superior Court, 99 Cal. Rptr. 2d 824, 840-41 (Ct. App. 2000).  As the Sonora Diamond court explained, had the parent company owned "the rights to the gold and used Sonora Mining as the operating and marketing entity," then perhaps general jurisdiction over the parent company would be appropriate because under those circumstances the parent company "could not reap the benefits of its rights unless it or someone else removed and sold the ore."  Id.  But where

the parent simply held the mining company as an investment, the subsidiary's forum-related contacts could not be imputed to the parent company.  Id.

Likewise, in Doe, the Ninth Circuit concluded a foreign company's subsidiaries were not its general agents in California because the plaintiffs presented no evidence that in the absence of the California subsidiaries' involvement in petrochemical and chemical operations, the parent would have conducted and controlled those operations.  Doe, 248 F.3d at 929.  The Court reached this conclusion even though the parent company issued consolidated reporting, referred to a subsidiary in an annual report as its "US unit," and stated that use of the subsidiary "would enable it to expand its marketing network and produce higher value-added specialty products in the United States."  Id.

Plaintiffs have failed to establish a prima facie case that RES was REI's general agent in Wisconsin.  REI's business is not purely as a holding company in the sense that it does not passively hold stock in companies from an unrelated range of businesses.  REI (then RRI) has described itself as a "provider of electricity and energy services with a focus on the competitive segments of the electric power industry in the United States and Europe."  (Sealed App., Ex. K at REILJ009826.)  REI describes its business as acquiring, developing, and operating electric power generation facilities; trading and marketing power, natural gas, and other energy-related commodities; and providing retail electric services in Texas.  (Id.)  REI has asserted in public filings that its--

> trading, marketing, and risk management skills complement [its] generation positions.  The combination provides greater scale and skill associated with the management of our fuel and power positions, sophisticated commercial insights and an understanding of the key regions in which we participate, and a wider range of ways in which we participate in the market and are able to meet customer needs.

(Id.)

In practice, REI itself does not perform these activities, but, as Jines stated in his deposition, REI "holds the shares of the different subsidiaries that are actually engaged in

18

the different business operations of [REI]."  (Sealed App., Ex. D at 129-30.)  Among those business operations was REI's "wholesale" group, which included a variety of subsidiaries involved in wholesale-related activities, including RES's natural gas-related activities.  (Id. at 285-86.)

Although REI identifies natural gas trading and marketing as one of its business lines, Plaintiffs have not established that RES's sales of natural gas in Wisconsin were sufficiently important to REI that if RES did not make the sales in Wisconsin, REI would have done so itself.  As the California Court of Appeal found in evaluating this same question involving a similar lawsuit against REI and RES in California, "[t]his portion of the energy business appears to be sufficiently fragmentary so that [REI] could have operated without the assistance of RES."  Reliant Energy, Inc. v. Superior Court, No. D049988, 2007 WL 4329488, at *18 (Cal. Ct. App. 2007) (unpublished).  Further, the fact that REI subsequently ceased "proprietary trading activities" due to a significant trading loss arising from "the extreme volatility in natural gas prices" suggests that RES's trading activities were not sufficiently important to REI that it would perform the activities itself if RES did not do so on its behalf.  (Sealed App., Ex. G.)

Moreover, Plaintiffs have presented no evidence that RES's natural gas sales in Wisconsin in particular were sufficiently important to REI's business that REI would have performed the sales in Wisconsin itself absent its subsidiary's representation in the forum. See Modesto City Schs., 157 F. Supp. 2d at 1135 (noting twenty percent of parent's products were sold through subsidiary which acted as parent's "sole conduit for marketing and selling its products in the United States"); Bulova Watch Co., Inc., 508 F. Supp. at 1344 (noting that sixty percent of parent's products were sold as exports and the United States was the parent company's largest export market through its New York subsidiaries' sales in the United States).  Consequently, Plaintiffs have not shown that RES's Wisconsin natural gas sales played a significant role in REI's "'organizational life'" such that it acted as a

substitute for REI in the forum. Bulova Watch Co., Inc., 508 F. Supp. at 1344.

The Court acknowledges that the California Court of Appeal upheld a state trial court's ruling that RES was REI's agent in California for natural gas trading activity during the relevant time period. Reliant Energy, Inc., 2007 WL 4329488, at *17. Although arising out of the same factual background and involving the same parent and subsidiary, the ruling is distinguishable on several grounds. The evidence presented to the California state court indicated REI had many more significant contacts with California than the single contact REI had with Wisconsin as reflected in the evidence before this Court. According to the evidence in Reliant, REI owned another subsidiary that had purchased natural-gas-fueled power plants located in California. Id. at *2. Additionally, REI obtained a certificate of qualification to do business and designated an agent for service of process in California, acted as guarantor on seven agreements between RES and California utilities, engaged in a marketing campaign in the state, subleased a small office in Sacramento which was used by a lobbyist, and employed an individual who allegedly engaged in illegal churning and wash trades in California. Id. at *3-4.

In accord with this Court's ruling, the California Court of Appeal specifically rejected RES was REI's agent under the same test the Ninth Circuit employs to determine whether a subsidiary is its parent's agent for personal jurisdiction purposes. Compare id. at *17-18, with Doe, 248 F.3d at 928. The California Court of Appeal referred to this test as the "representative services doctrine." Reliant Energy, Inc., 2007 WL 4329488, at *17-18. While finding RES was not REI's agent under the representative services doctrine, the Reliant court concluded RES was REI's agent in California under general agency principles based on REI's control over RES. Id. at *15-17. Although not calling it the "representative services doctrine," the Ninth Circuit has set forth that test as the applicable one for due process purposes. The California Court of Appeal's reference to other agency principles goes beyond the applicable agency test for exercising personal jurisdiction consistent with

20

due process as set forth in controlling precedent for this Court.

Moreover, in making its finding under general agency principles, the California Court of Appeal relied on evidence not presented to this Court and not relevant to REI's contacts with Wisconsin. For example, the Reliant court considered the fact that RES made a daily report to REI of the California power plant's hedging activities, "regarding the coordination of power generation and supply of natural gas," and RES's trading activities impacted that supply of natural gas. Id. at *16. Additionally, evidence in the record permitted an inference that the employee who allegedly engaged in wash trades and churning in California was an REI (then RRI) employee. Id.

The California Court of Appeal also found REI's setting and raising of overall limits such as VAR to be significant evidence of REI's daily control of RES. However, as explained above, the evidence before this Court indicates REI sets overall limits but does not involve itself in RES's day-to-day decisions as to what actions to take within those limits. That RES violated those limits and requested a higher limit, to which REI agreed, is not evidence of day-to-day control. It is evidence of a change in the overall limit under which RES was to perform its day-to-day operations.

To the extent the setting and changing of VAR and other limits constitutes day-to-day control, Plaintiffs have not demonstrated that REI's setting or altering of overall limits on any metric constituted day-to-day interference with RES's sales in Wisconsin. Plaintiffs have presented no evidence that REI's oversight impacted RES's daily decisions regarding whether, when, to whom, in what volume, or at what price RES decided to sell natural gas in Wisconsin. While daily oversight of trading activities may have been significant in the Reliant case where an employee of REI or one of its subsidiaries allegedly engaged in illegal trading activity in California, REI's daily oversight mechanisms as presented to this Court do not suggest a significant level of control over RES's Wisconsin sales activity. Because Plaintiffs have not established a prima facie case that RES acted as

REI's agent in Wisconsin, the Court will not attribute RES's Wisconsin contacts to REI on this basis.[6]

### C. Conspiracy Theory

The conspiracy theory of personal jurisdiction is based on the premise that a conspirator's acts in furtherance of a conspiracy are attributable to the other members of the conspiracy. Textor v. Bd. of Regents of N. Ill. Univ., 711 F.2d 1387, 1392 (7th Cir. 1983). Consequently, some courts attribute a conspirator's in-forum acts to his co-conspirators for personal jurisdiction purposes.

The Ninth Circuit has not expressly accepted or rejected the conspiracy theory of personal jurisdiction. In its only published opinion addressing the issue, the Ninth Circuit noted that the two district court opinions upon which the plaintiff relied required the plaintiff either to allege specific overt acts in the forum state that furthered the conspiracy, or to allege substantial acts in furtherance of the conspiracy in the forum and that the co-conspirator knew or should have known his co-conspirator would perform those acts in the forum. Underwager v. Channel 9 Australia, 69 F.3d 361, 364 (9th Cir. 1995). Without expressing any opinion on the validity of the conspiracy theory of personal jurisdiction, the Ninth Circuit concluded the plaintiff alleged no facts suggesting a conspiracy and failed to

---

[6] The result would be the same under general Wisconsin agency law. In Wisconsin, an express agency relationship exists "only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act." Johnson v. Minn. Mut. Life Ins. Co., 445 N.W.2d 736, 738 (Wis. Ct. App. 1989) (quotation omitted). Wisconsin also recognizes apparent agency upon a showing of "(1) acts by the agent or principal justifying belief in the agency; (2) knowledge of such acts by the parties sought to be held; and (3) reliance on the apparent agency consistent with ordinary care and practice." Id. at 739.

Here, Plaintiffs have presented no evidence of any express manifestation from REI to RES that RES may act as REI's agent in Wisconsin. As to apparent agency, Plaintiffs have presented evidence that REI permitted RES to use the "Reliant" name and logo in marketing natural gas in Wisconsin. However, Plaintiffs have presented no evidence that anyone relied on an apparent agency relationship between REI and RES. Plaintiffs do not identify any evidence in the record supporting such reliance. None of the affiants who purchased natural gas from RES averred that they relied upon RES's status as REI's apparent agent.

dispute the defendants' claims that they did not know certain acts would take place in the forum.  Id.  The Court therefore affirmed the district court's dismissal for lack of personal jurisdiction.  Id.

Since this case, the Ninth Circuit has noted that "a great deal of doubt" surrounds the conspiracy theory's legitimacy.  Chirila v. Conforte, 47 F. App'x 838, 842, 2002 WL 31105149, at *3 (9th Cir. 2002) (unpublished).  Some courts have adopted it.[7]  Others have rejected its application as inconsistent with due process.[8]  Still others follow the Ninth Circuit's lead in Underwager and decline to address whether the theory comports with due process, but find the plaintiff failed to meet the test even if it applied.  See Melea, Ltd. v. Jawer SA, 511 F.3d 1060, 1070 (10th Cir. 2007); Glaros v. Perse, 628 F.2d 679, 682 (1st Cir. 1980).

Although not in the personal jurisdiction context, the Ninth Circuit has rejected a similar conspiracy theory in the venue context.  Piedmont Label Co. v. Sun Garden Packing Co., 598 F.2d 491 (9th Cir. 1979) (rejecting conspiracy theory of venue).  In Piedmont, the Ninth Circuit considered whether venue in an antitrust action could be based "solely on allegations that a defendant was a member of a conspiracy and that a co-conspirator performed acts in the forum district."  Id. at 492.  The plaintiff argued that because a

---

[7] See, e.g., Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020, 1031-32 (D.C. Cir. 1997) (applying theory but finding no personal jurisdiction); Textor, 711 F.2d at 1392-93 (applying Illinois long-arm statute); Res. Ventures, Inc. v. Res. Mgmt. Int'l, Inc., 42 F. Supp. 2d 423, 434 (D. Del. 1999); Santana Prods., Inc. v. Bobrick Washroom Equip., 14 F. Supp. 2d 710, 718 (M.D. Pa. 1998); see also Roy v. Brahmbhatt, No. 07-5082 (PGS), 2008 WL 5054096, at *7 (D.N.J. 2008) (unpublished) (collecting cases).

[8] See, e.g., Silver Valley Partners, LLC v. De Motte, 400 F. Supp. 2d 1262, 1268 (W.D. Wash. 2005); Karsten Mfg. Corp. v. U.S. Golf Ass'n, 728 F. Supp. 1429, 1434 (D. Ariz. 1990); Kipperman v. McCone, 422 F. Supp. 860, 873 n.14 (N.D. Cal. 1976); Ploense v. Electrolux Home Prods, Inc., 882 N.E.2d 653, 666-68 (Ill. App. Ct. 2007); Mansour v. Super Ct. of Orange County, 46 Cal. Rptr. 2d 191, 196-98 (Ct. App. 1995); Hewitt v. Hewitt, 896 P.2d 1312, 1315-16 (Wash. Ct. App. 1995); Nat'l Indus. Sand Ass'n v. Gibson, 897 S.W.2d 769, 773 (Tex. 1995); see also Roy, 2008 WL 5054096, at *7 (collecting cases).

conspirator committed acts in the venue and a conspirator acts as his co-conspirator's agent, a defendant who otherwise had not conducted business in the forum could be said to have an agent and "transacted business" there under the relevant venue statutes.  Id. at 492-93. Based on United States Supreme Court dictum casting doubt on the conspiracy theory of venue under the Clayton Act, the Ninth Circuit concluded that deeming a conspirator an agent of his co-conspirators would expand the venue statute beyond what Congress contemplated.  Id. at 494-95.

Piedmont is of limited value to the question in this case, as Piedmont was focused on the plaintiff's attempt to expand a specific venue statute contrary to congressional intent. To the extent Piedmont cautions against freely attributing one party's acts to another, existing personal jurisdiction law already provides that this Court must examine each defendant's contacts with the forum individually.  Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1130.

It is unclear whether and under what conditions the Ninth Circuit would find it consistent with due process to attribute a conspirator's forum-related contacts to his co-conspirators for personal jurisdiction purposes.  However, general due process considerations still would apply to outline the contours of a conspiracy theory of personal jurisdiction, if one is to exist at all.

Under these principles, the Court concludes that to the extent a conspiracy theory of personal jurisdiction is viable, it must be limited to the context of specific jurisdiction and cannot support general jurisdiction.  To hold otherwise would create satellite litigation regarding conspiracies completely unrelated to the underlying claims simply to establish personal jurisdiction.  Such a trial-within-a-trial situation based on an already tenuous basis to attribute a third party's contacts to a defendant to support personal jurisdiction is untenable.

///

Within the specific jurisdiction analysis, a plaintiff must establish the defendant purposefully availed himself of the forum. An allegation that a particular defendant caused or contributed to an effect in the forum state, by itself, is insufficient, even if it is foreseeable that the defendant's conduct would have an effect in the forum. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 296 (1980). The defendant, not his co-conspirator, must choose to direct his activities at the forum in causing the effect in the forum. Hanson v. Denckla, 357 U.S. 235, 253 (1958) ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State."). Consequently, a co-conspirator's activity directed at the forum, even if in furtherance of a conspiracy of which the foreign defendant is a member, cannot constitute purposeful direction at the forum by the foreign defendant. The Court thus concludes that allegations of specific acts committed by a co-conspirator in the forum in furtherance of the conspiracy, alone, are insufficient to establish minimum contacts by a defendant who otherwise has no contacts with the forum.

Additionally, a "forseeable effect" in the forum state is inadequate to show the purposeful direction necessary to establish specific jurisdiction. Pebble Beach, 453 F.3d at 1155. Consequently, a defendant's mere awareness or ability to foresee in-forum effects from his out-of-forum conduct is insufficient to establish minimum contacts with the forum. Rather, under established Ninth Circuit law regarding specific jurisdiction, a foreign defendant expressly aims his conduct at the forum when he is alleged to have engaged in wrongful conduct "individually targeting a known forum resident." Bancroft, 223 F.3d at 1087. The Court thus concludes that if a conspiracy theory of jurisdiction is viable, a plaintiff must set forth non-conclusory allegations that the defendant was a member of a conspiracy, that the defendant's or his co-conspirator's acts in furtherance of the conspiracy caused harm in the forum, and that the conspiracy individually targeted a known forum resident.

Absent requiring this sort of purposeful direction at the forum, the conspiracy theory of personal jurisdiction "threatens to confuse the standards applicable to personal jurisdiction and those applicable to liability." Melea, Ltd., 511 F.3d at 1070. Personal jurisdiction is more restrictive than the scope of liability on a particular claim. A state "does not acquire [personal] jurisdiction by being the 'center of gravity' of the controversy, or the most convenient location for litigation." Hanson, 357 U.S. at 254. That a particular court lacks personal jurisdiction over a member of a conspiracy does not immunize the defendant from liability, it merely affects in what forum the plaintiff may seek to enforce that liability. Ploense, 882 N.E.2d at 668.

Here, Plaintiffs' SAC does not allege REI purposefully availed itself of Wisconsin by individually targeting known Wisconsin residents. Rather, the SAC alleges a nationwide conspiracy to manipulate natural gas prices resulting in inflated prices generally, including in Wisconsin. The mere likelihood that the price manipulation allegedly occurring in other states foreseeably would affect natural gas prices in Wisconsin does not amount to purposeful direction at Wisconsin. Other conspirators, not REI, chose to sell natural gas at allegedly inflated prices to customers in Wisconsin. The SAC does not allege the conspirators made an agreement specifically regarding Wisconsin or its residents. While other alleged conspirators such as RES may have purposefully directed their conduct at known Wisconsin residents, the SAC contains no non-conclusory allegations that REI purposefully did so.[9]

Plaintiffs argue that Wisconsin has expanded its antitrust laws to reach conduct which impacts Wisconsin "even if the illegal activity resulting in those impacts occurred

---

[9] The SAC contains only one allegation regarding any direction towards Wisconsin: "Reliant Energy, Inc., f/k/a Reliant Resources, Inc.'s actions were intended to have, and did have, a direct, substantial and reasonably foreseeable effect on commerce in Wisconsin during the Relevant Time Period." (Corrected Second Am. Compl. at 35-36.)

predominantly or exclusively outside this state." <u>Olstad v. Microsoft Corp.</u>, 700 N.W.2d 139, 158 (Wis. 2005). Plaintiffs thus contend Wisconsin must have meant to acquire personal jurisdiction over foreign antitrust co-conspirators whose out-of-forum acts impact Wisconsin.

This confuses liability with personal jurisdiction. While REI may be liable under Wisconsin antitrust law for its alleged illegal conduct, that does not automatically equate to Wisconsin having personal jurisdiction over REI. If Wisconsin does not have personal jurisdiction over a particular defendant, it must depend on other states to enforce its antitrust laws. Even if Wisconsin would adopt the conspiracy theory of personal jurisdiction for purposes of its long-arm statute, the exercise of personal jurisdiction by this Court still must comport with due process of law.

Moreover, Plaintiffs have failed to present evidence that REI was a member of any conspiracy directed at known Wisconsin targets. Although Plaintiffs contend they were not permitted to conduct discovery on the conspiracy issue, and thus the Court should not allow REI to argue no evidence of conspiracy exists, REI answered Plaintiffs' discovery on the issue of conspiracy as it relates to REI. REI had no documents related to communications between REI and the other Defendants about natural gas prices and had no documents in which REI directed a subsidiary's communications, price reporting, or trading. (Partial Tr. (Doc. #1128) at 49-50.) REI objected to the extent that Plaintiffs sought every communication made by its subsidiary, RES, to other alleged co-conspirators. Such communications would not demonstrate REI's participation in a conspiracy, and thus would not demonstrate REI was a member of a conspiracy directed at Wisconsin.

Plaintiffs have not convinced the Court that further discovery would produce a different result. The Court therefore will decline Plaintiffs' request to defer the personal jurisdiction issue to be resolved with the merits. Because Plaintiffs have failed to allege Defendant REI purposefully directed its activities at a known forum resident, and because

Plaintiffs have failed to present any evidence of REI's participation in any such conspiracy, the Court will grant Defendant REI's motion to dismiss for lack of personal jurisdiction.

       The Court will not attribute RES's contacts with the forum to REI, and REI has no contacts of its own sufficient to support personal jurisdiction. The Court therefore will grant REI's motion to dismiss for lack of personal jurisdiction.

## III.    CONCLUSION

       IT IS THEREFORE ORDERED that Defendant Reliant Energy, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction (Doc. #869) is hereby GRANTED. Defendant Reliant Energy, Inc. is hereby dismissed from this action for lack of personal jurisdiction.

DATED: February 26, 2009

 

_____
PHILIP M. PRO
United States District Judge

28

## Exhibit 9

**Order Granting Plaintiffs' Motion To Reconsider Entered As Docket No. 2416
In *In re Western States Wholesale Natural Gas Antitrust Litigation***

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re WESTERN STATES WHOLESALE NATURAL GAS ANTITRUST LITIGATION | 2:03-cv-01431-RCJ-PAL<br>MDL No. 1566<br><br>**ORDER** |
| ARANDELL CORP. et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>XCEL ENERGY INC. et al.,<br><br>Defendants. | 2:07-cv-01019-RCJ-PAL |
| REORGANIZED FLI, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>WILLIAMS COMPANIES, INC. et al.,<br><br>Defendants. | 2:05-cv-01331-RCJ-PAL |

These consolidated cases arise out of the energy crisis of 2000–2002. Plaintiffs (retail buyers of natural gas) allege that Defendants (natural gas traders) manipulated the price of natural gas by reporting false information to price indices published by trade publications and

engaging in wash sales. Pending before the Court are a motion to reconsider and two motions for summary judgment.

## I.   PROCEDURAL HISTORY

In 2003, the Judicial Panel on Multidistrict Litigation ("JPML") transferred seven class action cases from various districts in California to this District under 28 U.S.C. § 1407 as Multidistrict Litigation ("MDL") Case No. 1566, assigning Judge Pro to preside. Since then, the JPML has transferred in several more actions from various districts throughout the United States. Between 2003 and 2015, Judge Pro ruled on many motions to remand, to dismiss, and for summary judgment. He also approved several class settlements. Several parties settled on their own. One or more of the cases have been to the Court of Appeals twice and to the Supreme Court once. In 2007, the Court of Appeals reversed several dismissals under the filed rate doctrine and remanded for further proceedings. In 2013, the Court of Appeals reversed several summary judgment orders, ruling that the Natural Gas Act did not preempt state law anti-trust claims and that certain Wisconsin- and Missouri-based Defendants should not have been dismissed for lack of personal jurisdiction. The Supreme Court granted certiorari as to preemption under the Natural Gas Act and affirmed. The case was soon thereafter reassigned to this Court when Judge Pro retired. The Court granted three motions to dismiss for lack of personal jurisdiction. Plaintiffs have asked the Court to reconsider that order, and Defendants in two of the actions have separately moved for summary judgment.

## II.   SUMMARY JUDGMENT STANDARDS

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson*

1    *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if

2    there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See*

3    *id.*  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported

4    claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

5         In determining summary judgment, a court uses a burden-shifting scheme.  The moving

6    party must first satisfy its initial burden.  "When the party moving for summary judgment would

7    bear the burden of proof at trial, it must come forward with evidence which would entitle it to a

8    directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v.*

9    *Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation and internal quotation marks

10   omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or

11   defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

12   an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

13   party failed to make a showing sufficient to establish an element essential to that party's case on

14   which that party will bear the burden of proof at trial.  *See Celotex Corp.*, 477 U.S. at 323–24.

15        If the moving party fails to meet its initial burden, summary judgment must be denied and

16   the court needn't consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398

17   U.S. 144 (1970).  If the moving party meets its initial burden, the burden then shifts to the

18   nonmoving party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v.*

19   *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute,

20   the nonmoving party need not establish a material issue of fact conclusively in its favor. It is

21   sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

22   parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

23   *Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid

24

summary judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50. Notably, facts are only viewed in the light most favorable to the nonmoving party where there is a genuine dispute about those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). That is, even where the underlying claim contains a reasonableness test, where a party's evidence is so clearly contradicted by the record as a whole that no reasonable jury could believe it, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

## III. ANALYSIS

### A. Motion to Reconsider

Plaintiffs Briggs & Stratton Corp. and Carthage College (collectively, "Movants") ask the Court to reconsider its dismissals of Defendants Reliant Energy, Inc. ("New Reliant"), CMS Energy Corp. ("CMS"), and Cantera Gas Co. ("Cantera"). Movants do not ask the Court to reconsider as to Defendant Duke Energy Carolinas, LLC, because they have tentatively settled with that Defendant.

1    Movants argue that Defendants failed to note in their previous motion that Movants were

2    not yet parties to the case when Judge Pro granted the previous motions to dismiss for lack of

3    personal jurisdiction.  Movants note that the allegations in the Third Amended Complaint

4    ("TAC") (by which they joined the case) are the same as those in the Second Amended

5    Complaint ("SAC") against which Judge Pro granted motions to dismiss as against Wisconsin

6    Plaintiffs.  Movants note that Defendants never moved against Movants as to the TAC, however,

7    but only against other Plaintiffs as to the SAC, and although the similarity of the allegations

8    might lead the Court to rule similarly to Judge Pro, the Court of Appeals in fact reversed Judge

9    Pro's grant of Defendants' motions to dismiss for lack of personal jurisdiction as to those

10   Plaintiffs who appealed.

11   In response, Defendants note that Movants were parties to the appeal decided in 2013 but

12   that they did not appeal the personal jurisdiction dismissal orders.  Defendants note that the

13   personal jurisdiction issue concerns a defendant's contacts with a forum state, not a defendant's

14   contacts with any particular plaintiff, and that each plaintiff need not therefore be given an

15   opportunity to argue the issue for himself.

16   The Court agrees with Movants that neither Judge Pro's dismissal as to the SAC only

17   (and not as to the TAC whereby Movants joined as Plaintiffs) nor Movants' failure to raise the

18   personal jurisdiction issue on appeal after joining the appeal (apparently for some other reason,

19   as they would not have had standing to appeal a personal jurisdiction dismissal not entered

20   against them) did not result in the direct loss of the issue as to Movants.  Defendants also note,

21   however, that the Court of Appeals reversed the dismissal orders as to AEPES because Judge Pro

22   had relied only on allegations concerning direct natural gas sales without considering broader

23   allegations of anticompetitive behavior directed at Wisconsin (and Missouri).  *See In re W. States*

24

1   *Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716, 742 (9th Cir. 2013).  Defendants argue

2   that Judge Pro did consider allegations of anticompetitive behavior in the dismissal orders at

3   issue here, however, and that even if those rulings did not apply to Movants' substantively

4   identical allegations in the TAC under the law of the case doctrine, the Court should adopt Judge

5   Pro's reasoning anew.  That would appear sensible at first glance, but as Movants correctly note,

6   the Court of Appeals ruled that the allegations in the SAC (which the parties appear to agree are

7   substantively identical to those in the TAC in relevant respects) were sufficient to support

8   personal jurisdiction.  Therefore, even if Judge Pro conducted the required analysis as to

9   Defendants that he did not conduct as to AEPES, the Court of Appeals has already declared the

10  outcome, i.e., that the SAC's (and hence the TAC's) allegations concerning personal jurisdiction

11  over Defendants in Wisconsin are sufficient.  The Court therefore reconsiders and denies the

12  motions to dismiss.

13          **B.      Motions for Summary Judgment**

14          **1.      CES's Motion**

15          CenterPoint Energy Services, Inc. ("CES") is a Defendant in Case No. 2:07-cv-1019,

16  which is Western District of Wisconsin Case No. 2:07-cv-76, the same case at issue as to the

17  motion to reconsider addressed, *supra*. (*See* Third Am. Compl. in Case No. 2:07-cv-1019, ECF

18  No. 1846).  CES asks the Court to grant it summary judgment against the TAC.  CES notes that

19  it is implicated only in six paragraphs of the TAC. (*See id.* ¶¶ 55–60, at 37–41).  CES argues that

20  it is not alleged to have engaged in any anticompetitive activity or other wrongdoing in or

21  directed to Wisconsin.  Rather, it is only alleged to be affiliated with Defendant Reliant Energy

22  Services, Inc. ("RES").

23

24

CES explains that during the first one-third of the Relevant Time Period (January 1, 2000 to October 31, 2002, (*see id.* ¶ 1)), CES and RES were subsidiaries of the previous Reliant Energy, Inc. ("Old Reliant"); CES was a natural gas distributor, and RES was involved in wholesale energy and trading. RES became a subsidiary of a new corporation ("New Reliant") with the same name as Old Reliant during the Relevant Time Period, and CES became a subsidiary of CenterPoint Energy, Inc. ("CenterPoint"). Thereafter, the only corporate relationships between any of these entities were between CES and its parent CenterPoint and between RES and its parent New Reliant. Moreover, CES argues, Plaintiffs have not alleged that CES has ever manipulated, participated in a conspiracy to manipulate, or become the subject of any government investigation into the manipulation of the price of natural gas in Wisconsin during the Relevant Time Period.

The TAC includes the following allegations against CES: (1) Plaintiff Ladish Co., Inc. purchased natural gas from CES, (*id.* ¶ 14); (2) CES was formerly known as Reliant Energy Retail, Inc., CenterPoint Energy Marketing, Inc., and CenterPoint Energy Gas Services, Inc., (*id.* ¶¶ 55, 60); (3) CES is a Delaware corporation with its principal place of business in Texas, (*id.* ¶ 60); and (4) during the Relevant Time Period, CES was a subsidiary of Old Reliant and sold natural gas at unlawfully inflated prices directly to Ladish Co. for use in Wisconsin, as well as to many other members of the class, (*id.*). In other words, CES is accused in the TAC of selling natural gas in Wisconsin at unlawfully inflated prices. Unlike the other Defendants listed in the TAC, CES is not accused of unlawfully inflating or conspiring to unlawfully inflate the price of the natural gas, reporting false prices, engaging in wash trades, being investigated for anticompetitive activities, or having been aware of such conduct. Nor does the TAC accuse CES of having done any of these things under any of its former names.

The claim against CES is made under the Wisconsin Antitrust Act, which states, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is illegal." Wis. Stat. § 133.03(1). A contract is in restraint of trade if it unreasonably limits competition in any business. *See Milwaukee Linen Supply Co. v. Ring*, 246 N.W. 567, 568 (Wis. 1933). Such a contract is illegal if it is unreasonable, meaning it "is greater than is required for the protection of the person for whose benefit the restraint is imposed" or "imposes undue hardship upon the person restricted." *See Journal Co. v. Bundy*, 37 N.W.2d. 89, 92 (Wis. 1949) (quoting *id.* (quoting Restatement (First) of Contracts §§ 513–15)). CES argues that simply selling natural gas is not an anticompetitive activity in restraint of trade, and that the conduct of RES cannot be imputed to CES.

Plaintiffs note in response that Judge Pro denied CES's motion to dismiss for failure to state a claim that made the same arguments as against the SAC. But the substance of Judge Pro's order makes clear that he simultaneously permitted amendment of the SAC to add Plaintiffs and substantive amendments to the allegations against CES. (*See* Order 2, ECF No. 1834). Although Judge pro addressed some arguments against permitting amendment as futile, he listed but did not address the substance of CES's argument that neither the SAC nor the TAC stated a claim against CES. It is therefore not fair to say that Judge Pro rejected the arguments made in the present motion such that the law of the case is dispositive.

In any case, the sufficiency of the allegations is not the issue under the present motion, but the production of evidence sufficient to support a verdict. Plaintiffs have adduced excerpts of the deposition of Eric Sullivan, the "person most knowledgeable" deponent for CES, wherein he admits that in addition to simply selling gas to Wisconsin customers, CES provided management services whereby it would allow its customers to "lock in" prices for future

purchases, that CES traded financial instruments to accomplish this, and that these instruments were financial swaps with RES, its exclusive trading partner for such instruments. (*See* Sullivan Dep. 97–98, 108–09, 116–17, 163–64, 224–26, 259, 262–65, ECF No. 2354-3). The Court finds that this is not enough to create a genuine issue of material fact sufficient to support a verdict under section 133.03(1). Sullivan distinguished pure trading from trades "paired with a physical gas contract . . . to lock in a cost of gas for the customer," (*id.* 117:6–10), and he also explained that CES entered into swap agreements with its supplier RES in order to protect itself against changing prices after locking in prices with customers, and that CES didn't concern itself with whether RES itself traded directly in natural gas in order to hedge itself against its own risk, (*id.* 259:11–19). There is no evidence that CES participated in a conspiracy or direct acts in restraint of trade. Although a jury could find that CES's price swaps with RES (if reported and published as if they had constituted natural gas sales, as has apparently occurred in other cases) may have caused an increase in the market price of natural gas by artificially inflating the perceived demand, *see E&J Gallo Winery v. EnCana Energy Servs.*, No. CV F 03-5412, 2008 WL 4224492 (E.D. Cal. Sept. 12, 2008), there is no evidence adduced showing that CES knowingly engaged in swaps in conspiracy with RES (a critical element of § 133.03(1), as with the Sherman Anti-Trust Act, 15 U.S.C. § 1) with the purpose of increasing the price of natural gas (as opposed to the legitimate purpose of securing itself against rising rates after locking in prices to its customers), knew that RES or others were engaged in such behavior, or even reported its swaps with RES as sales.

### 2. Oneok's Motion

Oneok, Inc. and Oneok Energy Services Co., LP, formerly known as Oneok Energy Marketing & Trading Co. (collectively, "Oneok"), are Defendants in Case No. 2:05-cv-1331,

which is District of Kansas Case No. 2:05-cv-2389. (*See* Am. Compl., ECF No. 11 in Case No. 2:05-cv-1331). Oneok asks the Court to grant it summary judgment against the Amended Complaint ("AC"), arguing that the claims are precluded either directly or as released under a settlement agreement reached in a consolidated class action brought in the Southern District of New York ("the NYMEX Case"). The Court determines the motion on the issue of release, not claim preclusion.

The Amended Consolidated Class Action Complaint ("ACCAC") in the NYMEX Case alleged that the defendants had manipulated the prices of natural gas futures and options on the New York Mercantile Exchange ("NYMEX") between January 1, 2000 and December 31, 2002 by reporting inaccurate, misleading, and false trading information, including artificial volume and price information, to trade publications that compile and publish such information. The AC here makes the same allegations. (*Compare* Am. Compl. ¶¶ 46–54, *with* Am. Consol. Class Action Compl. ¶¶ 5, 60–70, ECF No. 2300-1). Oneok was a Defendant under the ACCAC. The plaintiff class in the NYMEX Case was defined as persons who had bought or sold natural gas futures or options on NYMEX during the relevant times. On May 24, 2006, the court in the NYMEX case entered a Final Judgment and Order of Dismissal ("the First Settlement Order") with an expanded plaintiff class definition reaching back to June 1, 1999. The first group of settling class members was to receive a total of nearly $73 million. On June 15, 2007, the court in the NYMEX case entered a Final Judgment and Order of Dismissal ("the Second Settlement Order") with a similarly defined plaintiff class. The second group of settling class members was to receive a total of nearly $28 million. Paragraph 6 of the First Settlement Order and Paragraph 5 of the Second Settlement Order provided for releases of the parties from further litigation:

> The Released Parties are finally and forever released and discharged from
> any manner of claims . . . and causes of action in law, admiralty, or equity,

whether class, individual, or otherwise in nature . . . whether known or unknown, suspected or unsuspected, whether concealed or hidden, or in law, admiralty, or equity, that the Representative Plaintiffs and other members of the Class who have not timely opted out of the settlement and excluded themselves from the Class ("Settling Plaintiffs''), or any of them, individually, or as a class (whether or not they make a claim upon or participate in the Settlement Funds), ever had, now have or hereafter can, shall or may have, against the Released Parties arising from or relating in any way to trading in NYMEX Natural Gas Contracts (including purchasing, selling, or holding any NYMEX Natural Gas Contract, or taking or making delivery of physical natural gas pursuant to any NYMEX Natural Gas Contract, or any combination thereof, whether as a hedger or speculator), whether or not asserted in the Action, including without limitation, claims which (a) arise from *or relate in any way to any conduct complained of in any complaint filed in the Action*, (b) have been asserted or could have been asserted in any state or federal court or any other judicial or arbitral forum against the Released Parties or any one of them, (c) arise under *or relate to any federal or state commodity price manipulation law, any state or federal unfair or deceptive business or trade practices law, or other law or regulation, or common law, including, without limitation, the Commodity Exchange Act, 7 U.S.C. § 1 et seq., the federal antitrust laws (as that term is defined in 15 U.S.C. § 12), or state antitrust laws* and/or (d) the claims brought in this Action. The Settling Plaintiffs, and each of them, are hereby enjoined from asserting any such claims against the Released Parties.

(First Settlement Order ¶ 6(a), at 4–6, ECF No. 2300-5 (emphases added; footnote omitted)). The omitted footnote defines "Released Parties" as, *inter alia*, the settling defendants and their predecessors and successors. (*See id.* 4 n.3, at 4–5). The release language of the Second Settlement Order is the same in relevant respects. (*See* Second Settlement Order ¶ 5(a), at 4–5, ECF No. 2300-7).

These releases would seem to bar the present claims against Oneok. Both Oneok entities were Defendants in the NYMEX case. (*See* Am. Consol. Class Action Compl. ¶¶ 39–40). Plaintiff in the present case is Reorganized Farmland, Inc., as successor-in-interest to previous Plaintiff J.P. Morgan Trust Co., N.A., as trustee of the FI Liquidating Trust ("Farmland"). Farmland was a member of the NYMEX class according to uncontroversial facts admitted by Farmland's "person most knowledgeable" deponent. (*See* Schuck Dep. 54–56, ECF No. 2300-10

(noting that Farmland entered into natural gas futures contracts on NYMEX in 2000 and 2001)). The NYMEX court found that notice to the class had been sufficient and that the settlements were fair and reasonable, and Oneok provides evidence that the claims administrator mailed both notices to Farmland's agent, (*see* Glenn Aff., ECF No. 2300-11; Young Aff., ECF No. 2300-12), and also mailed the second notice to Farmland itself, (*see* Young Aff.). There is no evidence that Farmland opted out of the class.

In response, Farmland argues that the NYMEX Case concerned harm to natural gas *futures traders* via Defendants' acts, i.e., the artificial inflation of futures prices via reporting false prices and engaging in wash trades, whereas the present case concerns harm to natural gas *consumers* due to those acts. That is the long and short of Farmland's argument, and the Court rejects it. The release language of the Settlements is easily broad enough to preclude the present claims. The release clause releases Oneok and other settling defendants from "any manner of claims . . . and causes of action" by settling plaintiffs:

> *relating in any way* to trading in NYMEX Natural Gas Contracts . . . *including . . . claims which . . . relate in any way to any conduct complained of in any complaint filed in the Action* [or which] *arise under or relate to any* federal or state commodity price manipulation law, any state or federal unfair or deceptive business or trade practices law, or other law or regulation, or common law, including, without limitation . . . *state antitrust laws*.

(First Settlement Order ¶ 6(a), at 4–6 (emphases added; footnote omitted)). The language of the release is of course broader than the natural release as a matter of law that would have resulted from the settlement under ordinary principles of claim preclusion, otherwise the release would serve no purpose. And the language of the release here is extremely broad. It releases Oneok from the present claims even without recourse to any of its "catch-all" provisions, because it explicitly releases Oneok from any claims that arise under any state antitrust laws. Even if the release were not so specific as to state antitrust claims, it releases Oneok as to any claims relating

in any way to any conduct complained of in the ACCAC, and, as noted *supra*, the AC here and the ACCAC in the NYMEX action both complain of Oneok's alleged manipulation of NYMEX futures prices via the reporting of inaccurate, misleading, and false trading information, including artificial volume and price information, to trade publications that compile and publish such information. (*Compare* Am. Compl. ¶¶ 46–54, *with* Am. Consol. Class Action Compl. ¶¶ 5, 60–70).

Nor is the affirmative defense of release waived. Oneok pled the defense of "Release" as its thirtieth affirmative defense in its initial Answer. (*See* Answer 15, ECF No. 85 in Case No. 2:05-cv-1331). The nature of the defense was all Oneok was required to state in order to preserve it. *See, e.g.*, *Rockwell Automation, Inc. v. Beckhoff Automation, LLC*, 23 F. Supp. 3d 1236, 1241–42 (D. Nev. 2014) (Jones, J.). Moreover, the Answer went beyond simply identifying the nature of the defense. It identified the alleged release as being based on Farmland not having opted out of the settlement class in the NYMEX Case, which it identified by name and case number. This pleading would satisfy Rule 8(c) even if the Court of Appeals were to adopt a rule applying the strictures of *Iqbal* and *Twombly* to affirmative defenses, which no court of appeals has done to this Court's knowledge.

///

///

///

///

///

///

///

1

**CONCLUSION**

2    IT IS HEREBY ORDERED that the Motion to Reconsider (ECF No. 2277) is

3    GRANTED.

4    IT IS FURTHER ORDERED that the Order (ECF No. 2270) is VACATED, and the

5    Motions to Dismiss (ECF Nos. 2248, 2249, 2250) are DENIED.

6    IT IS FURTHER ORDERED that the Motions for Summary Judgment (ECF Nos. 2286,

7    2299) are GRANTED.

8    IT IS SO ORDERED.

9    Dated this 23rd day of May, 2016.

10

11    _____

12    ROBERT C. JONES
     United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

## Exhibit 10

**Amended Class Action Complaint Entered As Docket No. 1952 In *In re Western States Wholesale Natural Gas Antitrust Litigation***

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| WESTERN STATES WHOLESALE | ) | MDL Docket No. 1566 |
| NATURAL GAS ANTITRUST | ) | |
| LITIGATION | ) | Base Case File No. CV-S-03-1431 |
| _____ | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | Case No.: CV-S-09-0915-PMP (PAL) |
| NEWPAGE WISCONSIN SYSTEM INC., | ) | |
| | ) | W.D. Wis. Case No. 09-C-240-C |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| CMS ENERGY RESOURCE MANAGEMENT | ) | |
| COMPANY (f/k/a CMS Marketing Services and | ) | |
| Trading Company), CMS ENERGY | ) | |
| CORPORATION (a/k/a CMS Energy), CANTERA | ) | |
| GAS COMPANY (f/k/a CMS Field Services, Inc.), | ) | |
| XCEL ENERGY INC., NORTHERN STATES | ) | |
| POWER COMPANY, CENTERPOINT | ) | |
| ENERGY SERVICES, INC. (f/k/a Reliant Energy | ) | |
| Retail, Inc.),CORAL ENERGY RESOURCES, | ) | |
| L.P., DUKE ENERGY TRADING AND | ) | |
| MARKETING, L.L.C., DYNEGY ILLINOIS | ) | |
| INC. (f/k/a Dynegy, Inc.) , DMT G.P. L.L.C. | ) | |
| (successor to DMT Holdings, L.P.) (a/k/a Dynegy | ) | |
| DMT G.P., L.L.C.), DYNEGY GP INC., | ) | |
| DYNEGY MARKETING AND TRADE, | ) | |
| E PRIME, INC., EL PASO CORPORATION, | ) | |
| EL PASO MARKETING, L.P. (f/k/a El Paso | ) | |
| Merchant Energy, L.P.),ONEOK ENERGY | ) | |
| SERVICES COMPANY, L.P. (f/k/a Oneok Energy | ) | |
| Marketing and Trading Company, L.P.), | ) | |
| ONEOK, INC., RELIANT ENERGY SERVICES, | ) | |
| INC., THE WILLIAMS COMPANIES, INC., | ) | |
| WILLIAMS POWERCOMPANY, INC. | ) | |
| (f/k/a Williams Energy Marketing & Trading), | ) | |
| And WILLIAMS MERCHANT SERVICES | ) | |
| COMPANY, INC., | ) | |
| Defendants. | ) | |
| | ) | |

---
## AMENDED CLASS ACTION COMPLAINT
---

The plaintiff, NewPage Wisconsin System Inc. (hereinafter "NewPage"), on behalf of itself and all others similarly situated, by its attorneys, for its amended complaint pursuant to the Court's Order dated June 4, 2010, alleges as follows:

1.      This is a class action pursuant to the Wisconsin Antitrust Act (Wis. Stat. ch. 133), brought by NewPage on behalf of itself and of a class consisting of all industrial and commercial direct purchasers of natural gas for their own use or consumption between January 1, 2000, and October 31, 2002 (the "Relevant Time Period"), and which gas was used or consumed by them in Wisconsin.  Excluded from the Class are (a) entities that purchased natural gas for resale (to the extent of such purchase for resale); (b) entities that purchased natural gas for generation of electricity for the purpose of sale (to the extent of such purchase for generation); (c) entities that purchased natural gas from entities that sold natural gas at rates approved by the Wisconsin Public Service Commission (to the extent of such purchases at such approved rates); (d) defendants and their predecessors, affiliates and subsidiaries; and (e) the federal government and its agencies.

## NATURAL GAS AND WISCONSIN COMMERCE

2.      Each year, Wisconsin consumes over 350,000,000 thousand cubic feet (Mcf) of natural gas.  That translates (depending on the price) to an expense to the Wisconsin economy of between 1.75 and 3.5 billion dollars per year, in a state that has a total gross domestic product (total value of goods and services produced in the state) of only 215 billion dollars per year. During the Relevant Time Period, Wisconsin consumed over one billion Mcf of natural gas.

3.       Natural gas plays a primary role in the Wisconsin economy, as it is used as a heating fuel for many buildings, generates a substantial percentage of the electricity consumed, and is the primary energy source for many industries (including such major Wisconsin industries as the metal working, food processing, brewing and dairy processing industries). As then President Bush said in a speech given in Appleton, Wisconsin, in 2004, "[n]atural gas is absolutely vital for many manufacturers in Wisconsin."

4.       Wisconsin produces no natural gas. All natural gas consumed in Wisconsin is produced elsewhere. Additionally, most companies that trade in natural gas, including trading natural gas that is consumed in Wisconsin, do not have their principal places of business or trading desks located in Wisconsin. Because of this, a conspiracy relating to natural gas prices has a greater impact on Wisconsin commerce than such a conspiracy would have on commerce in many other states. A conspiracy to manipulate natural gas prices, while economically benefiting the economies of some other states—such as Texas, Oklahoma and other states where producers and traders of natural gas tend to concentrate—has only negative consequences in Wisconsin.

5.       The price manipulation conspiracy engaged in by the defendants during the Relevant Time Period had a profoundly negative impact on commercial entities in Wisconsin. For example, according to the Energy Information Agency, the city gate price for natural gas in Wisconsin increased from a price of $2.94 Mcf in January 2000, to a price of $9.92 Mcf in January 2001. The average monthly price for natural gas commercial consumers in Wisconsin (including institutional consumers but not industrial consumers) increased from $5.03 per Mcf in January 2000, to $11.05 per Mcf in January 2001. On information and belief, this was a historically unprecedented change in prices, which cannot be explained by a shortage of natural

gas, or an increase in demand for natural gas. According to the Energy Information Agency, this change in prices resulted in the average annual price for commercial consumers increasing from a price per Mcf of $4.84 in 1999, to $6.32 in 2000, and then to $7.55 in 2001. Because of this, Wisconsin commercial consumers paid over one hundred million dollars more for natural gas in just 2001 compared to 2000. The conspiracy engaged in by the defendants also increased price volatility in the natural gas market, which caused commercial entities in Wisconsin to incur greater expenses associated with hedging natural gas costs. The conspiracy injured Wisconsin commercial entities in Wisconsin, including NewPage, by, among other things, depriving them of the right and ability to make risk management, resource allocation and other financial decisions relating to natural gas, in a full and free competitive market.

<u>**OVERVIEW OF CAUSES OF ACTION**</u>

6.      NewPage alleges in this case two causes of action, the first under Wis. Stat. § 133.14 (Wisconsin's "Full Consideration Antitrust Statute") and the second under Wis. Stat. § 133.18 (Wisconsin's "Treble Damages Antitrust Statute").

7.      Under the first cause of action, NewPage seeks a declaratory judgment that certain natural gas contracts and agreements made during the Relevant Time Period are void pursuant to Wis. Stat. § 133.14. The grounds for such a ruling are that during the Relevant Time Period the defendants were members of a conspiracy prohibited by Wis. Stat. § 133.03. Specifically, the defendants are sellers of natural gas, and during the Relevant Time Period each of them conspired to restrain trade or commerce relating to natural gas. As such, the contracts or agreements that relate to Wisconsin for the sale of natural gas that were made by the defendants while in the conspiracy—which contracts or agreements were founded upon, were the result of, grew out of or were connected with the conspiracy, either directly or indirectly—are void

pursuant to Wis. Stat. § 133.14. The plaintiff requests that the Court formally declare those contracts or agreements void pursuant to Wis. Stat. § 806.04, Wisconsin's Uniform Declaratory Judgment Act.

8.      Wis. Stat. § 133.14 further provides that because the defendants were members of a conspiracy prohibited by Wis. Stat. § 133.03, none of them may recover on, or benefit from, any such void contract. Furthermore, under the second sentence of Wis. Stat. § 133.14, the plaintiff and the class members it sues on behalf of are entitled to recover from the defendants the payments they made for natural gas during the Relevant Time Period, to the full extent that the defendants benefited from those payments. Wis. Stat. § 133.03 and § 133.14 are remedial, punitive statutes, which were created by the Wisconsin legislature to deter companies from engaging in price collusion, so as to protect the free market system. The legislature wanted to deter price collusion so that the benefits of free market lower prices—which benefits can and should flow to the public—are not denied by unlawful collusion. Because the defendants violated Wis. Stat. § 133.03 and because those agreements are void under Wis. Stat. § 133.14, plaintiff and the class members it sues on behalf of are entitled to recover from the defendants in this action the full amount of the payments the plaintiff and class members made for natural gas during the Relevant Time Period, to the full extent the defendants benefited from those payments.

9.      Under the second separate and independent cause of action, the plaintiff alleges that the defendants violated Wis. Stat. § 133.03. Specifically, the defendants are sellers of natural gas, and during the Relevant Time Period, the defendants violated Wis. Stat. § 133.03 by conspiring to restrain trade or commerce relating to natural gas. The plaintiff and the class members it sues on behalf of were injured by such conduct. As such, NewPage and the class are

entitled pursuant to Wis. Stat. § 133.18 to recover three times the damages they sustained from the defendants, reduced after trebling by any payments actually recovered by them through their claim under Wis. Stat. § 133.14.

10.     Although the federal government, through the Federal Energy Regulatory Commission, regulates a small portion of sales of natural gas in the United States, NewPage herein does not seek to recover damages for any sales the price of which is set via a regulatory procedure by the Federal Energy Regulatory Commission.  The natural gas transactions that are the subject of this case were deregulated pursuant to various statutory provisions (*see,* The Natural Gas Policy Act of 1978 (NGPA), 15 U.S.C. § 3301(21) (1994) (first sales are defined in § 2(21)); Section 601(a)(1)(C) of the NGPA, as amended by the Natural Gas Wellhead Decontrol Act of 1989, Pub. L. No. 101-60) (no FERC jurisdiction over first sales); The Energy Policy Act of 1992, 15 U.S. Code § 3431 and pursuant to Federal Energy Regulatory Commission Order No. 547, 61 FERC 61281 (November 30, 1992), Order No. 636, 57 FERC 30939 (April 8, 1992, and Order No. 636-A, 57 FERC 36128 (August 12, 1992)).

## PLAINTIFF

11.     Plaintiff NewPage Wisconsin System Inc. (f/k/a Stora Enso North America Corp. and Stora Enso Consolidated Papers, Inc. and successor by merger to Consolidated Papers, Inc.) (hereinafter "NewPage"), is a corporation organized and existing under the laws of the State of Wisconsin, with its principal office located in Miamisburg, Ohio, and its principal Wisconsin office located at 510 High Street, Wisconsin Rapids, Wisconsin  54495.

12.     NewPage is a manufacturer of coated paper and other paper products which, during the Relevant Time Period, owned and operated paper mills in Wisconsin Rapids, Biron, Stevens Point, Niagara, Kimberly and Whiting, Wisconsin.  It also owned and operated during

the Relevant Time Period the Mead Hotel in Wisconsin Rapids, Wisconsin. NewPage is, on information and belief, one of the largest users of natural gas in the state of Wisconsin, each year purchasing several million dollars worth of natural gas for its operations. During the Relevant Time Period, NewPage purchased natural gas from defendant CMS Energy Resource Management Company (f/k/a CMS Marketing Services and Trading Company). NewPage also had an agency relationship with Kaztex Energy Management ("Kaztex"). During the Relevant Time Period, Kaztex purchased on NewPage's behalf natural gas directly from a number of defendants in this case, on information and belief, including, but not necessarily limited to, Coral Energy Resources, LP, Duke Energy Trading and Marketing, LLC, Dynegy Marketing & Trade, El Paso Marketing, L.P., Oneok Energy Services Company, LP, and CMS Energy Resource Management Company.

## DEFENDANTS AND CO-CONSPIRATORS

A.      **The ONEOK Defendants: ONEOK Inc. and ONEOK Energy Marketing and Trading Company, L.P.**

13.      Defendant ONEOK Inc. is a Delaware corporation which has its principal place of business in Tulsa, Oklahoma. ONEOK Inc. wholly owns defendant ONEOK Energy Marketing and Trading Company, L.P., and other affiliates or divisions that regularly sold natural gas consumed in Wisconsin, and to Wisconsin businesses. On information and belief, grounds exist for disregarding the corporate fiction between ONEOK Inc. and its subsidiary ONEOK Energy Marketing and Trading Company, L.P. based on such cases as *Weibke v. Richardson & Sons, Inc.*, 83 Wis. 2d 359, 363, 265 N.W.2d 571(1978); *Consumer's Co-op. of Walworth County v. Olsen*, 142 Wis. 2d 465, 476, 419 N.W.2d 211 (1988); *Cemetery Services, Inc. v. Wisconsin Dept. of Regulation and Licensing*, 221 Wis. 2d 817, 827, 586 N.W.2d 191 (Ct. App. 1998); and *Conservatorship of Prom v. Sumitomo Rubber Industries, Ltd.*, 224 Wis. 2d 743, 760-61, 592

N.W.2d 657 (Ct. App. 1999). ONEOK Inc. buys, sells, transports, and stores natural gas, including its own and its affiliates' production, in the United States and in Wisconsin.

14. Defendant ONEOK Inc., directly and through affiliates it owns and controls, made arrangements, contracts, and agreements, and entered into a combination and conspiracy between the defendants which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas. ONEOK Inc.'s actions were intended to have, and did have, a direct, substantial and reasonably foreseeable effect on commerce in Wisconsin during the Relevant Time Period. On information and belief, during the Relevant Time Period ONEOK either directly or indirectly through one of its controlled affiliates, engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information. In furtherance of such unlawful arrangements, contracts, agreements, and combination and conspiracy, ONEOK Inc.'s officers or directors, including "Senior Management Team" member Christopher R. Skoog, President of ONEOK Energy Marketing and Trading Company, agreed to arrangements, contracts, agreements, and a combination and conspiracy which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas that its affiliates sold. During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy, ONEOK Inc.'s officers or directors, including "Senior Management Team" member Christopher R. Skoog, President of ONEOK Energy Marketing and Trading Company, made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas, and those policies and decisions were implemented on an operational level

by affiliates, such as ONEOK Energy Marketing and Trading Company, L.P., in the United States and in Wisconsin.

15.     Personal jurisdiction exists over ONEOK Inc. based upon the activities of its corporate affiliates, in particular ONEOK Energy Marketing and Trading Company, L.P., that traded and sold natural gas in the United States and to Wisconsin-based companies during the Relevant Time Period.  ONEOK, Inc. and its affiliates consistently have presented a common corporate image to customers in the United States and in Wisconsin through their marketing efforts and materials.  In October, 2002, ONEOK, Inc. and ONEOK Energy Marketing and Trading, L.P., paid $3 million in civil penalties to the United States Commodity Futures Trading Commission to settle charges of false reporting of natural gas prices during the time period from at least July 2000 to October 2002.

16.     Defendant ONEOK Energy Marketing and Trading Company, L.P., is a Delaware limited partnership in good standing and has its principal place of business in Tulsa, Oklahoma. ONEOK Energy Marketing and Trading Company, L.P., is wholly owned and controlled by defendant ONEOK, Inc. concerning both the conduct of its business generally within Wisconsin and in particular its conduct in furtherance of defendants' unlawful arrangements, contracts, agreements, combination and conspiracy.  During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, combination and conspiracy, one or more officers or directors of ONEOK, Inc., including "Senior Management Team" member Christopher R. Skoog, President of ONEOK Energy Marketing and Trading Company, made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which ONEOK Energy Marketing and Trading

Company, L.P. sold in Wisconsin and elsewhere. ONEOK Energy Marketing and Trading Company, LP., buys, sells, stores, and transports natural gas, including its own or its affiliates' production, in the United States and in Wisconsin.

### B. The Williams Defendants: The Williams Companies, Inc., Williams Power Company, Inc. (f/n/a Williams Energy Marketing & Trading) and Williams Merchant Services Company, Inc.

17.     Defendant The Williams Companies, Inc. is a Delaware corporation in good standing and has its principal place of business in Tulsa, Oklahoma. The Williams Companies, Inc. wholly owns and controls Williams Power Company, Inc., Williams Merchant Services Company, Inc. and other affiliates or divisions that regularly sold natural gas consumed in Wisconsin, and to Wisconsin businesses. On information and belief, grounds exist for disregarding the corporate fiction between The Williams Defendants based on such cases as *Weibke, Consumer's Co-op., Cemetery Services,* and *Conservatorship of Prom.* The Williams Companies, Inc. through its affiliates, buys, sells and transports natural gas, including its own or its affiliates' production, in the United States and in Wisconsin.

18.     Defendant The Williams Companies, Inc. directly and through affiliates it owns and controls, made arrangements, contracts, and agreements, and entered into a combination and conspiracy between the defendants which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas. On information and belief, during the Relevant Time Period, The Williams Companies, either directly or indirectly through one of its controlled affiliates, engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information. The Williams Companies, Inc.'s actions were intended to have, and did have, a direct, substantial and reasonably foreseeable effect on commerce in Wisconsin during the Relevant Time Period. In

furtherance of such unlawful arrangements, contracts, agreements, and combination and conspiracy, The Williams Companies, Inc.'s officers or directors, such as William E. Hobbs, President and Chief Executive Officer of Williams Power Company, Inc., agreed to arrangements, contracts, agreements, and a combination and conspiracy which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas that its affiliates sold in the United States and in Wisconsin.  During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy, The Williams Companies, Inc.'s officers or directors, such as William E. Hobbs, President and Chief Executive Officer of Williams Power Company, Inc., made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas, and those policies and decisions were implemented on an operational level by affiliates, such as Williams Power Company, Inc. and Williams Merchant Services Company, Inc. in the United States and in Wisconsin.

19.    Personal jurisdiction exists over The Williams Companies, Inc. based upon the activities of its corporate affiliates, in particular Williams Merchant Services Company, Inc. and Williams Power Company, Inc., that traded and sold natural gas in the United States and to Wisconsin companies during the Relevant Time Period.  The Williams Companies, Inc. and its affiliates consistently have presented a common corporate image to customers in the United States and in Wisconsin through their marketing efforts and materials.  William E. Hobbs, President and Chief Executive Officer of Williams Power Company, Inc., is "Senior Officer" of The Williams Companies, Inc.  The Williams Companies, Inc. and Williams Power Company, Inc. Company paid $20 million in civil penalties in July, 2003 to the United States Commodity

Futures Trading Commission to settle charges of attempting to manipulate natural gas price indices. On December 17, 2004, a former trader of Williams Energy Marketing & Trading Company, Thomas J. Pool, pled guilty to conspiring with other Williams' traders to provide false natural gas price data to reporting firms from mid-1998 through mid-2002 for the purpose of manipulating monthly price indices of natural gas. As part of his plea agreement, he admitted that he had the ability to influence the market price of natural gas in interstate commerce, that the published index price of natural gas was artificial in that it did not reflect the legitimate forces of supply and demand, that his conduct was the cause of the artificial price, and that he intended to cause the artificial price. Mr. Pool admitted that most of the trades he reported while an employee of Williams were deliberately fabricated. Mr. Pool admitted creating fictitious natural gas trades at the behest of his supervisor.

20.     On May 20, 2005, another former trader of Williams Energy Marketing & Trading Company, Brion Scott McKenna, pled guilty to conspiring with other Williams' traders to provide false natural gas price data to reporting firms, *Inside FERC's Gas Market Report* and *NGI's Bidweek Survey*, from September, 2000 to June 30, 2002 for the purpose of manipulating published index prices of natural gas in the West Coast, East Coast, Gulf Coast and Rocky Mountain regions of the United States. Mr. McKenna admitted in his Plea Agreement to successfully manipulating the index prices of natural gas on February 1, 2001 at the following locations: Columbia Gas Transmission Corp. at Appalachia; Florida Gas Transmission Co. pipeline at Zones 2 and 3; Natural Gas Pipeline Co. of America pipeline at Louisiana; Transcontinental Gas Pipeline Corp. at Zone 2; and Transco Zone 6 Market Center. Mr. McKenna admitted in his Plea Agreement that by reporting false trades, he intended to influence the price published by *Inside FERC* and *NGI* at each location for which he reported, and to the

extent that his false trade information was included in the respective index calculations, the published index prices did not reflect the legitimate forces of supply and demand. Mr. McKenna admitted that most of the trades he reported were deliberately fabricated, and that he would routinely circulate a spreadsheet containing fictitious trades for input from other traders. Mr. Thomas Pool, another Williams trader, has admitted as part of his plea agreement that he was trained and directed by his supervisors to undertake and cover-up the manipulation of natural gas prices. In February 2006, Williams Power Company, Inc. agreed to pay $50 million to the Justice Department to settle claims relating to its artificially jacking up natural gas prices in 2000 and 2001. In its agreement with the Justice Department, Williams Power Company, Inc. acknowledged responsibility for the actions of its former employees in its energy trading operation. In 2006 Williams Power Company, Inc. also agreed to pay $290 million to resolve a class action lawsuit alleging that the company improperly booked millions of dollars in profits for its energy marketing and trading division during the Relevant Time Period. In 2006 Williams Power Company, Inc.'s former trader and operations manager Daryl Brown pleaded guilty in connection with a scheme to manipulate prices. Brown pleaded guilty to one count of manipulation of the price of a commodity in interstate commerce in violation of the Commodity Exchange Act, admitting that throughout the Relevant Time Period he conspired to report false trades to Platts' *Inside FERC's Gas Market Report* and to NGI's *Bidweek Survey* in order to affect published indexes.

21. Defendant Williams Merchant Services Company, Inc., is a Delaware corporation in good standing and has its principal place of business in Tulsa, Oklahoma. Williams Merchant Services Company, Inc. is wholly owned and controlled by its parent company, The Williams Companies, Inc. a Delaware corporation with headquarters in Tulsa, Oklahoma. Williams

Merchant Services Company, Inc. wholly owns and controls Williams Power Company, Inc. Williams Merchant Services Company, Inc. is wholly owned and controlled by The Williams Companies, Inc., concerning both the conduct of its business generally within Wisconsin and in particular its conduct in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy. During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy, one or more officers or directors of The Williams Companies, Inc., such as William E. Hobbs, President and Chief Executive Officer of Williams Power Company, Inc., made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which Williams Merchant Services Company, Inc. or its affiliate Williams Power Company, Inc. sold in Wisconsin and elsewhere. Williams Merchant Services Company, Inc. buys, sells, stores and transports natural gas, including its own or its affiliates' production, in the United States and in Wisconsin.

22. Defendant Williams Power Company, Inc. (f/k/a Williams Energy Marketing & Trading) is a Delaware corporation in good standing and has its principal place of business in Tulsa, Oklahoma. Defendant Williams Power Company, Inc. is wholly owned and controlled by Williams Merchant Services Company, Inc., which in turn is wholly owned and controlled by its parent, defendant The Williams Companies, Inc. Defendant Williams Power Company, Inc. is wholly owned and controlled by defendants, Williams Merchant Services Company, Inc. and The Williams Companies, Inc., concerning both the conduct of its business generally within Wisconsin and in particular its conduct in furtherance of defendants' unlawful arrangements, contracts, agreements, combination and conspiracy. During the Relevant Time Period and in

furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy, officers and directors of The Williams Companies, Inc. and Williams Merchant Services Company, Inc., such as William E. Hobbs, President and Chief Executive Officer of Williams Power Company, Inc., made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which Williams Power Company, Inc. sold in Wisconsin and elsewhere. Defendant Williams Power Company, Inc. buys, sells, and transports natural gas, including its own or its affiliates' production, in the United States and in Wisconsin.

### C.  The AEP Co-Conspirators:  American Electric Power Company and AEP Energy Services, Inc.

23.     Co-conspirator American Electric Power Company is a New York corporation in good standing and has its principal place of business in Columbus, Ohio. American Electric Power Company wholly owned and controlled during the Relevant Time Period its subsidiary AEP Energy Services, Inc., an Ohio corporation with its principal place of business in Columbus, Ohio. On information and belief, grounds exist for disregarding the corporate fiction between the AEP co-conspirators based on such cases as *Weibke, Consumer's Co-op., Cemetery Services,* and *Conservatorship of Prom.* American Electric Power Company buys, sells and transports electricity and natural gas, including its own and its affiliates' production, in the United States and in Wisconsin.

24.     Co-conspirator American Electric Power Company, directly and through affiliates it owns and controls, made arrangements, contracts, and agreements, and entered into a combination and conspiracy between the defendants and their co-conspirators which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or

control the market prices of natural gas. On information and belief, during the Relevant Time Period, American Electric Power Company, either directly or indirectly through one of its controlled affiliates, engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information. American Electric Power Company's actions were intended to have, and did have, a direct, substantial and reasonably foreseeable effect on commerce in Wisconsin during the Relevant Time Period. In furtherance of such unlawful arrangements, contracts, agreements, and combination and conspiracy, American Electric Power Company's officers or directors agreed to arrangements, contracts, agreements, and a combination and conspiracy which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas that its affiliates sold in the United States or in Wisconsin. During the Relevant Time Period and in furtherance of defendants' and their co-conspirators' unlawful arrangements, contracts, agreements, and combination and conspiracy, American Electric Power Company's officers or directors, made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas, and those policies and decisions were implemented on an operational level by affiliates, such as AEP Energy Services, Inc. According to a FERC Report, American Electric Power Company and AEP Energy Services, Inc. traders were instructed by their superiors to adjust the prices and volumes of trades they had made and, in some cases, to report trades that never occurred, because it was common practice in the industry.

25. American Electric Power Company through its corporate affiliates, in particular AEP Energy Services, Inc., sold natural gas in the United States and in Wisconsin during the

Relevant Time Period. AEP Energy Services, Inc. entered into a long term GISB natural gas supply agreement with Wisconsin Electric Power Company during the Relevant Time Period, and sold natural gas to Wisconsin Electric Power Company pursuant to that agreement. American Electric Power Company, and its affiliates consistently have presented a common corporate image to customers in the United States and in Wisconsin through their marketing efforts and materials.

26.     Co-conspirator AEP Energy Services, Inc. is an Ohio corporation in good standing and has its principal place of business in Columbus, Ohio. AEP Energy Services, Inc. is wholly owned and controlled by its parent, American Electric Power Company, an Ohio corporation with headquarters in Columbus, Ohio. AEP Energy Services, Inc. is wholly owned and controlled by co-conspirator American Electric Power Company concerning both the conduct of its business generally within Wisconsin and in particular its conduct in furtherance of defendants' and their co-conspirators' unlawful arrangements, contracts, agreements, and combination and conspiracy. During the Relevant Time Period and in furtherance of defendants' and their co-conspirators' unlawful agreements, one or more officers or directors of American Electric Power Company, Inc. made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which AEP Energy Services, Inc. sold. AEP Energy Services, Inc. bought, sold and transported natural gas during the Relevant Time Period, including its own or its affiliates' production, in the United States and in Wisconsin. In September 2005, the CFTC filed a civil action against Joseph Foley, a former trader employed by American Electric Power Company and AEP Energy Services, Inc. The complaint alleges that from November 2000 through September 2002, Foley engaged in a

pervasive and widespread scheme involving his directing those he supervised to deliver to market index publishers false reports concerning natural gas trades. As part of Foley's scheme, at one of the trading desks owned by either American Electrical Power Company or its affiliate AEP Energy Services, Inc., the traders maintained electronic spreadsheets entitled "IFERC Bogus" and "Joe Mama" to record false trades. American Electrical Power Company or AEP Energy Services, Inc. rewarded Foley for the funds he brought into the companies based on his reporting false trades, awarding him over $2 million in bonus compensation in 2002. In January 2005, American Electric Power Company and AEP Energy Services, Inc. paid $30 million in civil penalties to the CFTC to settle charges of false reporting and attempted manipulation of natural gas prices. AEP Energy Services, Inc. also paid $30 million in civil penalties to the United States Department of Justice while acknowledging and accepting responsibility for submitting knowingly inaccurate trade information for its Gulf Natural Gas Trading Desk, and for two other trading desks covering the Northeast and Mid-Continent regions.

27. AEP Energy Services, Inc. entered into a long term GISB natural gas supply agreement with Wisconsin Electric Power Company during the Relevant Time Period, and sold natural gas to Wisconsin Electric Power Company pursuant to that agreement.

28. Co-conspirator American Electric Power Company, Inc. is liable for the debts and obligations of its wholly owned subsidiary AEP Energy Services, Inc. Throughout the Relevant Time Period, American Electric Power Company, Inc. was aware of the illegal behavior being engaged in by its subsidiary, had the power to and could have prevented the illegal behavior, and did nothing to stop the illegal behavior, while at the same time adding hundreds of millions of dollars in profits from its subsidiary to its consolidated financials. Shortly after the subsidiary's illegal behavior became public, on October 10, 2002, American Electric Power Company, Inc.'s

Chairman, President and CEO E. Linn Draper announced "a significant down sizing of our trading and marketing operations" (*i.e.,* AEP Energy Services, Inc.). On information and belief, the way in which the subsidiary was created and capitalized, and the parent company's moves discontinuing operations, have left the subsidiary with insufficient assets to pay the judgment that was foreseeable when American Electric Power Company, Inc. first became aware of, or should have become aware of, the illegal behavior engaged in by its subsidiary.

**D.    The Duke Defendants and Co-Conspirators:  Duke Energy Carolinas, LLC (f/k/a Duke Energy Corporation) and Duke Energy Trading and Marketing Company, L.L.C.**

29.    Co-conspirator Duke Energy Carolinas, LLC (f/k/a Duke Energy Corporation) is a North Carolina corporation with its principal place of business in Charlotte, North Carolina. During all relevant times Duke Energy Corporation wholly owned and controlled its subsidiary, Duke Energy Trading and Marketing Company, L.L.C., a Delaware limited liability corporation with its principal place of business in Houston, Texas. On information and belief, grounds exist for disregarding the corporate fiction between the Duke Defendants and co-conspirators based on such cases as *Weibke, Consumer's Co-op., Cemetery Services,* and *Conservatorship of Prom.* Duke Energy Corporation wholly owned and controlled Duke Energy Trading and Marketing Company, L.L.C., and other affiliates that regularly sold natural gas consumed in Wisconsin, and to Wisconsin businesses.

30.    Co-conspirator Duke Energy Corporation directly and through affiliates it dominated and controlled, made arrangements, contracts, and agreements, and entered into a combination and conspiracy between the defendants and their co-conspirators' which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas. Duke Energy Corporation's actions were intended to

have, and did have, a direct, substantial and reasonably foreseeable effect on commerce in Wisconsin during the Relevant Time Period. On information and belief, during the Relevant Time Period Duke Energy Corporation, either directly or indirectly through one of its controlled affiliates, engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information. In furtherance of such unlawful arrangements, contracts, agreements, and combination and conspiracy, Duke Energy Corporation's officers or directors agreed to arrangements, contracts, agreements, and a combination and conspiracy which prevented full and free competition or which tended to advance or control the market prices of natural gas that its affiliates sold in the United States and in Wisconsin. During the Relevant Time Period and in furtherance of defendants' and their co-conspirators' unlawful arrangements, contracts, agreements, and combination and conspiracy, Duke Energy Corporation's officers or directors made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas, and those policies and decisions were implemented on an operational level by affiliates, such as Duke Energy Trading and Marketing Company, L.L.C., in the United States and in Wisconsin.

31. Duke Energy Carolinas, LLC, Corporation through the activities of its corporate affiliates, in particular Duke Energy Trading and Marketing, L.L.C., traded and sold natural gas in the United States and in Wisconsin during the Relevant Time Period. Duke Energy Corporation and/or its affiliate Duke Energy Trading and Marketing, L.L.C., entered into a long term GISB natural gas supply agreement with Wisconsin Electric Power Company during the Relevant Time Period, and sold natural gas to Wisconsin Electric Power Company pursuant to that agreement. Duke Energy Corporation and its affiliates consistently have presented a

common corporate image to customers in the United States and in Wisconsin, through their marketing efforts and materials. In September, 2003, Duke Energy Corporation and Duke Energy Trading and Marketing, L.L.C. paid $28 million in civil penalties to the United States Commodity Futures Trading Commission to settle charges of false reporting and attempted manipulation of natural gas prices.

32.     Defendant Duke Energy Trading and Marketing Company, L.L.C. is a Delaware limited liability corporation registered as a foreign corporation in Wisconsin, with its principal place of business in Houston, Texas. Duke Energy Trading and Marketing Company, L.L.C. is wholly owned and controlled by its parent, Duke Energy Corporation, a Delaware corporation with its principal place of business in Charlotte, North Carolina. Duke Energy Trading and Marketing Company, L.L.C. marketed natural gas to customers across North America. Duke Energy Trading and Marketing Company, L.L.C. is wholly owned and controlled by co-conspirator Duke Energy Corporation concerning both the conduct of its business relating to the Wisconsin market and in particular its conduct in furtherance of defendants' and their co-conspirators' unlawful arrangements, contracts, agreements, and combination and conspiracy. During the Relevant Time Period and in furtherance of defendants' and their co-conspirators' unlawful arrangements, contracts, agreements, and combination and conspiracy, one or more officers or directors of Duke Energy Corporation made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which Duke Energy Trading and Marketing Company, L.L.C. sold in Wisconsin and elsewhere. In February 2005, the Commodity Futures Trading Commission filed a civil action in the United States District Court for the Southern District of Texas, against Michael Whitney, a former

energy trader of Duke Energy Trading and Marketing Company, alleging that Whitney submitted or caused to be submitted false or misleading or knowingly inaccurate price and volume information to *Gas Daily* and other price compilers, concerning natural gas transactions which he executed between June, 2001 and August, 2002. Duke Energy Trading and Marketing Company, L.L.C. buys, sells, stores, and transports natural gas, including its own or its affiliates' production, in the United States and in Wisconsin.

33.     In February 2005, pursuant to a grand jury investigation, the United States indicted former Duke executives Timothy Kramer and Todd Reid on 20 counts of conspiracy, circumvention of controls and falsification of books, wire fraud, violation of honest services act, and mail fraud relating to natural gas trades occurring during the Relevant Time Period. Timothy Kramer was Vice President of Financial Portfolio Management for Duke Energy and an officer of Duke Energy Trading and Marketing Company, L.L.C., and several other Duke Energy subsidiaries.  Todd Reid was Senior Vice President of Duke Energy Trading and Marketing Company, L.L.C., and also an officer of several other subsidiaries of Duke Energy.  During the Relevant Time Period, Kramer and Reid engaged in what was known as a "round trip trades" or "sleeve trades," which are pre-arranged transactions involving natural gas contracts whereby there is a simultaneous purchase and sale of natural gas between the same parties, for the same volume and term, at the same price, with no contemplation of the payment of money by either party.  For the year 2001, a year in which Kramer and Reid made numerous round trip and sleeve trades, Duke Energy paid bonuses (in cash and in Duke Energy stock) of $5,000,000 to Reid and $4,000,000 to Kramer.  The indictment indicates that from March 2001 to August 2002, Kramer and Reid knowingly did combine, conspire and agree with each other and other unknown persons to commit wire fraud, and that as part of their conspiracy between themselves and other

unknown persons they caused the execution of over 500 false round trip natural gas trades. The precise identity of the unknown persons who conspired and agreed with Kramer and Reid is unknown to NewPage, but on information and belief, they are the defendants and the non-defendant co-conspirators named herein. In large part based on Kramer and Reid's actions, Duke Energy's earnings for the last three quarters of 2001 and first quarter of 2002 overstated earnings by approximately $54 million.

34. Co-conspirator Duke Energy Carolinas, LLC (f/k/a Duke Energy Corporation) is liable for the debts and obligations of its wholly owned subsidiary Duke Energy Trading and Marketing Company, L.L.C. Throughout the Relevant Time Period, Duke Energy Corporation was aware of the illegal behavior being engaged in by its subsidiary, had the power to and could have prevented the illegal behavior, and did nothing to stop the illegal behavior, while at the same time adding hundreds of millions of dollars in profits from its subsidiary to its consolidated financials. Shortly after the subsidiary's illegal behavior became public, on April 11, 2003, Duke Energy Corporation's President and CEO Fred Fowler announced the closing of all Duke proprietary trading groups. On information and belief, the way in which the subsidiary was created and capitalized, and the parent company's moves discontinuing operations, and relating to discontinuing operations, have left the subsidiary with insufficient assets to pay the judgment that was foreseeable when Duke Energy Corporation first became aware of, or should have become aware of, the illegal behavior engaged in by its subsidiary.

**E.** **The Dynegy Defendants: Dynegy Illinois Inc. (f/k/a Dynegy Inc.), Dynegy GP Inc., DMT G.P. L.L.C. (successor to DMT Holdings, L.P.), and Dynegy Marketing & Trade.**

35. Defendant Dynegy Illinois Inc. (f/k/a Dynegy Inc.) is an Illinois corporation in good standing with its principal place of business in Houston, Texas. Dynegy Illinois Inc. wholly owns and controls defendant Dynegy Marketing & Trade, a Colorado general partnership

in good standing with its principal place of business in Houston, Texas. Dynegy Marketing & Trade is wholly owned and controlled by its general partners, defendants Dynegy GP Inc. and DMT G.P., L.L.C. (successor to DMT Holdings, L.P.). On information and belief, grounds exist for disregarding the corporate fiction between the Dynegy Defendants based on the rules normally relating to partnerships and such cases as *Weibke, Consumer's Co-op., Cemetery Services,* and *Conservatorship of Prom.* Dynegy Marketing & Trade was one of the largest natural gas marketers in the United States and in 2001, Dynegy Marketing & Trade's natural gas sales averaged 8.2 billion cubic feet per day. Dynegy Marketing & Trade regularly conducted business in Wisconsin during the Relevant Time Period. Dynegy Marketing & Trade entered into a long term GISB natural gas supply agreement with Wisconsin Electric Power Company during the Relevant Time Period, and sold natural gas to Wisconsin Electric Power Company pursuant to that agreement.

36. Defendant Dynegy Marketing & Trade made arrangements, contracts, and agreements, and entered into a combination and conspiracy between the defendants which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas. Dynegy Marketing & Trade's actions were intended to have, and did have, a direct, substantial and reasonably foreseeable effect on commerce in Wisconsin during the Relevant Time Period. On information and belief, during the Relevant Time Period Dynegy Marketing & Trade, either directly or indirectly through one of its controlled affiliates, engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information. In furtherance of such unlawful arrangements, contracts, agreements, and combination and conspiracy, Dynegy Marketing & Trade's officers or directors, such as Stephan W. Bergstrom and Dan W. Ryser, and employees,

such as Michelle Valencia, a former senior trader, agreed to arrangements, contracts, agreements, and a combination and conspiracy which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas that its affiliates sold in the United States and in Wisconsin. During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy, Dynegy Marketing & Trade's officers or directors, such as Stephan W. Bergstrom and Dan W. Ryser, and employees, such as Michelle Valencia, a former senior trader, made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which Dynegy Marketing & Trade sold in Wisconsin and elsewhere, and those policies and decisions were implemented on an operational level by Dynegy Marketing & Trade's employees.

37.     On September 25, 2002, Dynegy announced that 15 of its employees had engaged in reporting false data to price compilers. Dynegy Marketing & Trade's employees have stated the manner by which they reported trades to industry publications was similar to the way in which it was done at their previous companies, and that this illegal practice was "common practice in the industry" during the Relevant Time Period.

38.     In July 2005, acting on the results of a grand jury investigation, the United States indicted former Dynegy Marketing & Trade natural gas trader Michelle Marie Valencia and former El Paso Corporation trader Greg Singleton, alleging that they—in conspiracy with each other and with other unknown persons—made numerous false reports of natural gas trades to index publishers. The precise identity of the other unknown persons who were involved in the conspiracy are currently unknown to NewPage, but on information and belief, they are the

defendants and the non-defendant co-conspirators identified herein. The indictment of Valencia and Singleton indicates that the false information they reported to publications affected and tended to affect index prices, and thereby the price of natural gas in countless transactions all across the United States, which potentially cost consumers of natural gas great sums of money. As part of the conspiracy alleged in the indictment, Singleton and Valencia discussed what trades they did and did not intend to report to index publications, they agreed to report at least one trade between El Paso and Dynegy that was not real, they agreed not to report one or more natural gas trades between Dynegy and El Paso that were in fact real trades, and they caused other employees of Dynegy and El Paso to report fictitious gas trades to *NGI* and *Inside FERC*. In a second superseding indictment relating to Valencia filed in March 2006, the United States alleged that when Valencia reported false information to *Inside FERC* and *Natural Gas Intelligence* in 2000 and 2001, she affected and tended to affect index prices, and thereby the price of natural gas paid by consumers. In August 2006, Valencia of Dynegy was convicted of seven counts of wire fraud relating to reporting false natural gas trades, and Singleton of El Paso was convicted of a count of wire fraud relating to reporting false natural gas trades.

39.     In December, 2002, Dynegy Marketing & Trade and West Coast Power LLC, paid $5 million in civil penalties to the United States Commodity Future Trading Commission to settle charges of false reporting and attempted manipulation of natural gas prices. The charges included that Dynegy Marketing & Trade and West Coast Power LLC conspired together to report false offsetting trades. By reporting offsetting trades, the companies intended to make their false trades look more believable to the index publishers.

40.     Defendant Dynegy Illinois Inc. (f/k/a Dynegy Inc.) is liable for the debts and obligations of its wholly owned and controlled subsidiaries Dynegy GP Inc., DMT G.P., L.L.C.

(successor to DMT Holdings, L.P.) and Dynegy Marketing & Trade. Throughout the Relevant Time Period, Dynegy Illinois Inc. was aware of the illegal behavior being engaged in by its subsidiaries, had the power to and could have prevented the illegal behavior, and did nothing to stop the illegal behavior, while at the same time adding millions of dollars in profits from its subsidiaries to its consolidated financials. Shortly after the subsidiary's illegal behavior became public, on October 16, 2002, Dynegy Illinois Inc.'s interim CEO Dan Dienstbier announced that Dynegy Illinois Inc. was abandoning its merchant energy operation. On information and belief, the way in which the subsidiary was created and capitalized, and the moves relating to discontinuing its operations, have left the subsidiary with insufficient assets to pay the judgment that was foreseeable when Dynegy Illinois Inc. first became aware of, or should have become aware of, the illegal behavior engaged in by its subsidiary.

**F.**     **The El Paso Defendants: El Paso Corporation and El Paso Marketing, L.P. (f/k/a El Paso Merchant Energy, L.P.)**

41.     Defendant El Paso Corporation is a Delaware corporation in good standing with its principal place of business in Houston, Texas. El Paso consistently described itself during the Relevant Time Period as North America's leading provider of natural gas services. El Paso Corporation wholly owns and controls its subsidiary, El Paso Marketing, L.P. (f/k/a El Paso Merchant Energy, L.P.), a Delaware limited partnership with its principal place of business in Houston, Texas. On information and belief, grounds exist for disregarding the corporate fiction between the El Paso Defendants based on the rules relating to partnerships generally and such cases as *Weibke, Consumer's Co-op., Cemetery Services,* and *Conservatorship of Prom.* El Paso Corporation buys, sells, stores, and transports natural gas, including its own or its affiliates' production, in the United States and in Wisconsin.

42.     Defendant El Paso Corporation, directly and through affiliates it owns and controls, made arrangements, contracts, and agreements, and entered into a combination and conspiracy between the defendants which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas. El Paso Corporation's actions were intended to have, and did have, a direct, substantial and reasonably foreseeable effect on commerce in Wisconsin during the Relevant Time Period.  On information and belief, during the Relevant Time Period El Paso Corporation, either directly or indirectly through one of its controlled affiliates, engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information.  In furtherance of such unlawful arrangements, contracts, agreements, and combination and conspiracy, El Paso Corporation's officers or directors, such as Ralph Eads, Executive Vice President of El Paso, agreed to arrangements, contracts, agreements, and to a combination and conspiracy which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas that its affiliates sold in the United States and in Wisconsin.  During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy, El Paso Corporation's officers or directors, such as Ralph Eads, Executive Vice President, made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas, and those policies and decisions were implemented on an operational level by affiliates, such as El Paso Merchant Energy, L.P., in the United States and in Wisconsin.

43.     Personal jurisdiction exists over El Paso Corporation based upon the activities of its corporate affiliates, in particular El Paso Merchant Energy, L.P., that traded and sold natural

gas in the United States and in Wisconsin during the Relevant Time Period. El Paso Merchant Energy, L.P. entered into a long term GISB natural gas supply agreement with Wisconsin Electric Power Company during the Relevant Time Period, and sold natural gas to Wisconsin Electric Power Company pursuant to that agreement. El Paso Corporation and its affiliates consistently have presented a common corporate image to customers in the United States and in Wisconsin through their marketing efforts and materials. In March 2003, El Paso Corporation and El Paso Merchant Energy, L.P., paid $20 million in civil penalties to the United States Commodity Futures Trading Commission to settle charges of false reporting and attempted manipulation of natural gas prices. In November 2004, three former natural gas traders of El Paso Merchant Energy, L.P., Donald E. Burwell, James P. Phillips, and Greg Singleton, were charged by the United States Department of Justice, U.S. Attorney's Office for the Southern District of Texas, based on a grand jury indictment, with conspiracy, false reporting, and wire fraud related to the transmission of allegedly inaccurate trade reports to industry price compilers which used the reported trades to calculate the index price of natural gas. El Paso trader Todd Gelger was sentenced to two years in federal prison following his conviction for reporting false information related to natural gas trades. El Paso trader Donald E. Burwell pled guilty in February 2006, to false reporting of natural gas trades. In the indictment relating to Burwell the grand jury charged that he and other traders with whom he combined, conspired and agreed reported false trading information, which affected index prices, and thereby, the price of natural gas in countless transactions around the country, and potentially cost consumers of natural gas great sums of money.

44.     In July 2005, acting on a grand jury investigation, the United States indicted former El Paso Corporation trader Greg Singleton, along with former Dynegy Marketing &

Trade natural gas trader Michelle Marie Valencia, alleging that during the Relevant Time Period they engaged in a conspiracy—with each other and with other unknown persons—to make numerous false reports of natural gas trades to index publishers. The precise identity of the other unknown persons who were involved in the conspiracy are currently unknown to NewPage, but on information and belief, they are the defendants and the non-defendant co-conspirators named below. Their indictment indicates that the false information they reported to publications affected and tended to affect index prices, and thereby the price of natural gas in countless transactions all across the United States, which potentially cost consumers of natural gas great sums of money. As part of the conspiracy alleged in the indictment, they discussed what trades they did and did not intend to report to index publications, they agreed to report at least one trade between El Paso and Dynegy that was not real, they agreed not to report one or more natural gas trades between Dynegy and El Paso that were in fact real trades, and they caused other employees of Dynegy and El Paso to report fictitious gas trades to NGI and Inside FERC. In August 2006, Valencia of Dynegy was convicted of seven counts of wire fraud relating to reporting false natural gas trades, and Singleton of El Paso was convicted of a count of wire fraud relating to reporting false natural gas trades. In December 2003, El Paso trader Todd Geiger, a former vice president of El Paso, pled guilty to reporting 48 fake trades in November 2003 to the publication *Inside FERC*. Geiger admitted in court that he knew the trades were false and that the index was used to price natural gas. In October 2004, four former El Paso Corporation natural gas traders (Christopher Bakkenist, Donald Guilbault, William Ham and Dallas Dean) each pleaded guilty to making false reports used to calculate the index price of natural gas during the Relevant Time Period.

45.     Defendant El Paso Merchant Energy, L.P. is a Delaware limited partnership with its principal place of business in Houston, Texas.  El Paso Merchant Energy, L.P. is wholly owned and controlled by its parent company, El Paso Corporation, a Delaware corporation with its principal place of business in Houston, Texas. El Paso Merchant Energy, L.P. is wholly owned and controlled by defendant El Paso Corporation concerning both the conduct of its business generally within Wisconsin and in particular its conduct in furtherance of defendants' unlawful arrangements, contracts, agreements, combination and conspiracy.  During the Relevant Time Period and in furtherance of defendants' unlawful agreements, officers or directors of El Paso Corporation, such as Ralph Eads, Executive Vice President of El Paso Corporation and President of El Paso's Merchant Energy Group, made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which El Paso Merchant Energy, LP. sold in Wisconsin and elsewhere. El Paso Merchant Energy, L.P. buys, sells and transports natural gas, including its own or its affiliates' production, in the United States and in Wisconsin.

### G.     The CMS Defendants: CMS Energy Resource Management Company (f/k/a CMS Marketing Services and Trading Company); CMS Energy Corporation; and Cantera Gas Company (f/k/a CMS Field Services, Inc.)

46.     Defendant CMS Energy Resource Management Company (hereinafter "CMS ERM/MST") is a Michigan corporation with its principal place of business in Jackson, Michigan.

47.     During the Relevant Time Period, CMS ERM/MST was wholly owned and controlled by its ultimate parent company, Defendant CMS Energy Corporation.  On information and belief, CMS Energy Corporation was directly involved during the Relevant Time Period in the day-to-day natural gas trading operations of its subsidiaries, defendant CMS ERM/MST, and

- 31 -

defendant CMS Field Services, Inc. During the Relevant Time Period and in furtherance of defendants' unlawful agreements, officers or directors of CMS Energy Corporation, such as Victor J. Fryling, President and Chief Operating Officer, made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which CMS ERM/MST sold. On information and belief, grounds exist for disregarding the corporate fiction between CMS ERM/MST, CMS Field Services, Inc., and CMS Energy Corporation. CMS Energy Corporation throughout the Relevant Time Period represented itself as a fully integrated energy company, that—rather than being a passive holding company—marketed and sold natural gas throughout the United States, including in Wisconsin.

48. CMS ERM/MST marketed, sold and transported natural gas during the Relevant Time Period in Wisconsin. Specifically, CMS ERM/MST contracted with and sold millions of dollars of natural gas to plaintiff NewPage during the Relevant Time Period. CMS ERM/MST knew when it contracted with NewPage during the Relevant Time Period that the natural gas it sold to NewPage would be burned, used or otherwise consumed by NewPage in its paper mills in Wisconsin. CMS ERM/MST entered into a Base Contract for Short-term Sale and Purchase of Natural Gas with NewPage during the Relevant Time Period. Phil Marsalese, an employee of CMS ERM/MST, during the Relevant Time Period regularly contacted NewPage employees at NewPage's office in Wisconsin Rapids, Wisconsin—including NewPage employees Thomas Riemer and Wayne Krolikowski—regarding NewPage's purchasing natural gas from CMS ERM/MST, for use at NewPage's facilities in Wisconsin Rapids, Wisconsin.

49. During the Relevant Time Period, CMS ERM/MST targeted the Wisconsin market (and specific large users of natural gas in Wisconsin, including NewPage) and CMS

ERM/MST's marketing personnel traveled to and marketed gas in Wisconsin (including to NewPage, Wisconsin Gas Company, Wisconsin Electric Power Company, Wisconsin Public Service Corporation and WPS Energy Services). CMS ERM/MST purposely directed its marketing activities and its sales efforts at particular Wisconsin gas consumers (including NewPage). During the Relevant Time Period, CMS ERM/MST also sold millions of dollars of natural gas to subsidiaries of Wisconsin Energy Corporation (Wisconsin Gas Company and Wisconsin Electric Power Company), by far the largest purchasers of natural gas in the state of Wisconsin, and knew during that time that practically all of that gas it sold to those companies was consumed in Wisconsin. CMS ERM/MST knew during that time that practically all of that gas it sold to Wisconsin Gas Company and Wisconsin Electric Power Company (a/k/a "WEPCO") was consumed in Wisconsin because CMS ERM/MST knew Wisconsin was the service territory served by those two companies. During the Relevant Time Period CMS ERM/MST had an evergreen gas supply agreement with WEPCO. CMS ERM/MST gas marketing personnel—including such CMS ERM/MST employees as Ann Burke, Steve Husband, George Hass and Gary Skarb—travelled to Wisconsin and met directly with personnel at WEPCO, including WEPCO employee Tim McCollow, on a regular basis. Additionally, during the Relevant Time Period, CMS marketing personnel would contact personnel at WEPCO, including WEPCO employee Tim McCollow, and his co-workers at WEPCO via phone on a regular basis for the purpose of marketing natural gas and related services to WEPCO.

50. When in Wisconsin, CMS marketing personnel—including such CMS ERM/MST employees as Ann Burke, Steve Husband, George Hass and Gary Skarb—also met with personnel of Wisconsin Gas Company for the purpose of selling natural gas and natural gas

related services (transportation and storage) to that company during the Relevant Time Period. Wisconsin Gas Company had a long-term natural gas supply contract with CMS ERM/MST that was in effect during at least part of the Relevant Time Period.

51.     During the Relevant Time Period, CMS ERM/MST gas marketing also talked to major gas purchasers in Wisconsin—including such companies as WEPCO, Wisconsin Gas Company, Wisconsin Public Service Corporation and WPS Energy Services—about transportation services through the Guardian Pipeline—a pipeline that runs from Illinois into Wisconsin—and CMS ERM/MST's involvement with its affiliate in the planning and construction of that pipeline, and how that pipeline would benefit WEPCO and other major gas users in Wisconsin once it became operational.

52.     During the Relevant Time Period, CMS ERM/MST shipped over ANR Pipeline Company's pipelines in Wisconsin over 190,000 Dth of natural gas, which gas was delivered on information and belief to CMS ERM/MST's customers in Green Bay, Wisconsin, including Wisconsin Public Service Corporation (a Wisconsin corporation based in Green Bay, Wisconsin that purchased approximately $3MM worth of gas from CMS ERM/MST during the Relevant Time Period), and Integrys Energy Services, Inc (a Wisconsin corporation f/k/a WPS Energy Services, Inc. based in Green Bay, Wisconsin, which purchased approximately $27MM worth of natural gas from CMS ERM/MST during the Relevant Time Period). CMS ERM/MST held title to that natural gas during the time that gas was transported from Louisiana to CMS ERM/MST's customers in Green Bay, Wisconsin.

53.     Cantera Gas Company (f/k/a CMS Field Services, Inc., Inc.) at all relevant times was a Michigan corporation in good standing during the Relevant Time Period with its principal place of business in Tulsa, Oklahoma. CMS Field Services, Inc. was wholly owned and

controlled during the Relevant Time Period by its parent, CMS Energy Corporation, a Michigan corporation with its principal place of business in Jackson, Michigan.  CMS Field Services, Inc. changed its name after the Relevant Time Period to CMS Continental Natural Gas, Inc., and later to Cantera Gas Company. CMS Field Services, Inc. was wholly owned and controlled by CMS Energy Corporation concerning both the conduct of its business generally within Wisconsin and in particular its conduct in furtherance of defendants' unlawful arrangements, contracts, agreements, combination and conspiracy.  During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy, one or more officers or directors of CMS Energy Corporation, such as Victor J. Fryling, President and Chief Operating Officer, made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which CMS Field Services, Inc. and CMS ERM/MST sold.  On or about February 1, 2005, the Commodity Futures Trading Commission filed a civil action in United States District Court for the Northern District of Oklahoma, against Jeffrey A. Bradley (formerly the manager of marketing for CMS Field Services, Inc.), and Robert L. Martin (formerly the director of gas supply for CMS Field Services, Inc.) alleging that they conspired to submit false or misleading or knowingly inaccurate price and volume information to *Gas Daily* and other price compilers, between January, 2001 and October, 2002.  In one telephone conversation between Bradley and Martin, these men "openly discussed a plan to 'make up some numbers and turn them into the reporting firms.'"  Further details regarding the conspiracy are set forth in *U.S. Commodity Futures Trading Commission v. Bradley,* 408 F. Supp. 2d 1214, 1221 (N.D. Okla. 2005)(decision denying defendants' motion to dismiss, based on the defendants' characterization of facts, which

the court found at least in part "disingenuous, at best"); *U.S. Commodity Futures Trading Commission v. Bradley,* 2006 WL 2045847 (N.D. Okla.)(decision denying defendant Robert Martin's motion for summary judgment). CMS Field Services, Inc. marketed, sold, and transported natural gas during the Relevant Time Period in Wisconsin.

54. In November, 2003, CMS ERM/MST, along with its parent company CMS Energy Corporation, and its affiliated company CMS Field Services, Inc., paid $16 million in civil penalties to the United States Commodity Futures Trading Commission to settle charges of false reporting and attempted manipulation of natural gas prices.

55. During the Relevant Time Period, on information and belief, CMS ERM/MST had a supply contract with Kaztex Energy Management, and Kaztex—as agent for numerous Wisconsin customers, including the Plaintiff and class members—purchased natural gas from CMS ERM/MST. During the Relevant Time Period, CMS ERM/MST knew that Kaztex was not an end user of natural gas. During the Relevant Time Period, CMS ERM/MST knew that Kaztex purchased natural gas on behalf of numerous Wisconsin industrial and commercial end users of natural gas.

**H.** **The Reliant Defendants and Co-Conspirators:  Reliant Energy, Inc. (f/k/a Reliant Resources, Inc.), Reliant Energy Services, Inc., and CenterPoint Energy Services, Inc. (f/k/a "Reliant Energy Retail, Inc."),**

56.     Co-conspirator Reliant Energy, Inc. is a Delaware corporation in good standing with it principal place of business in Houston, Texas.  Reliant Energy, Inc. changed its name from Reliant Resources, Inc. in April, 2004.  Reliant Resources Inc. was created as a subsidiary of Reliant Energy Incorporated sometime after 1999 in order to comply with the passage of the Texas Electric Choice Act, which required Reliant Energy Incorporated to split its regulated and unregulated businesses.  The end result of that effort was that Reliant Energy Incorporated's business was split between Reliant Energy, Inc. and CenterPoint Energy, Inc., which process was completed in October, 2002.  Prior to the split and during the Relevant Time Period, Reliant Energy, Inc. (f/k/a Reliant Resources Inc.) and CenterPoint Energy Services, Inc. (f/k/a Reliant Energy Retail, Inc.), were wholly owned and controlled subsidiaries of Reliant Energy, Incorporated.   Reliant Energy, Inc. (f/k/a Reliant Resources, Inc.), is the successor in liability from Reliant Energy Incorporated.  Reliant Energy, Inc. (f/k/a Reliant Resources, Inc.), wholly owned and controlled its subsidiary Reliant Energy Services, Inc. during the Relevant Time Period, a Delaware corporation with its principal place of business in Houston, Texas.  Reliant Energy, Inc. (f/k/a Reliant Resources, Inc.), buys, sells, and transports natural gas in the United States and in Wisconsin.  On information and belief, grounds exist for disregarding the corporate fiction between the Reliant Defendants based on such cases as *Weibke, Consumer's Co-op., Cemetery Services,* and *Conservatorship of Prom.*

57.     Reliant Energy, Inc. (f/k/a Reliant Resources, Inc.), directly and through affiliates it owns and controls, made arrangements, contracts, and agreements, and entered into a combination and conspiracy between the defendants which prevented full and free competition in

the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas. The actions of Reliant Energy, Inc. (f/k/a Reliant Resources, Inc.) were intended to have, and did have, a direct, substantial and reasonably foreseeable effect on commerce in Wisconsin during the Relevant Time Period. On information and belief, during the Relevant Time Period Reliant Energy, Inc., either directly or indirectly through one of its controlled affiliates, engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information. In furtherance of such unlawful arrangements, contracts, agreements, and combination and conspiracy, the officers or directors of Reliant Energy, Inc., (f/k/a Reliant Resources, Inc.), such as Joe Bob Perkins, Executive Vice President and Group President, Wholesale Businesses in 2000 and 2001, agreed to arrangements, contracts, agreements, and a combination and conspiracy which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas that its affiliates sold in the United States and in Wisconsin. During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy, the officers or directors of Reliant Energy, Inc. (f/k/a Reliant Resources, Inc.), such as Joe Bob Perkins, Executive Vice President and Group President, Wholesale Businesses in 2000 and 2001, made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which was sold, and those policies and decisions were implemented on an operational level by affiliates, such as Reliant Energy Services, Inc.

58.     Reliant Energy, Inc. (f/k/a Reliant Resources, Inc.), through the activities of its corporate affiliates, in particular Reliant Energy Services, Inc., traded and sold natural gas in the

United States and in Wisconsin during the Relevant Time Period. Reliant Energy, Inc. entered into a long term GISB natural gas supply agreement with Wisconsin Electric Power Company during the Relevant Time Period, and sold natural gas to Wisconsin Electric Power Company pursuant to that agreement. Reliant Energy, Inc. (f/k/a Reliant Resources, Inc.) and its affiliates consistently have presented a common corporate image to customers in the United States and in Wisconsin through their marketing efforts and materials.

59. Defendant Reliant Energy Services, Inc. is a Delaware corporation registered as a foreign corporation in good standing in Wisconsin during the Relevant Time Period with its principal place of business in Houston, Texas. Reliant Energy Services, Inc. is wholly owned and controlled during the Relevant Time Period by its parent, Reliant Energy, Inc. (f/k/a Reliant Resources, Inc.), a Delaware corporation with its principal place of business in Houston, Texas. Reliant Energy Services, Inc. is wholly owned and controlled by defendant Reliant Energy, Inc. (f/k/a Reliant Resources, Inc.) concerning both the conduct of it business generally within Wisconsin and in particular its conduct in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy. Reliant Energy Services, Inc. buys, sells, and transports natural gas in the United States and in Wisconsin. On information and belief, during the Relevant Time Period Reliant Energy Services, Inc. sold natural gas to many members of the class, both itself and through middlemen, for use in Wisconsin. In November 2003, Reliant Energy Services, Inc. paid an $18 million civil penalty to the United States Commodity Futures Trading Commission to settle charges of false reporting and attempted manipulation of natural gas prices, including charges of wash sales. The precise identity of the other parties that engaged in wash sales transactions with Reliant, are currently unknown to NewPage, but on information and belief are the other defendants in this action and the non-

defendant co-conspirators named below. In November 2004, a former natural gas trader of Reliant Energy Services, Inc., Jerry A. Futch, was charged by the United States Department of Justice, U.S. Attorney's Office in the Southern District of Texas, based on a grand jury indictment for reporting false trades in 2000 and 2001 to industry price compilers which used the reported trades to calculate *Inside FERC*'s index price of natural gas. In 2005, Futch pled guilty to one count of delivering knowingly inaccurate reports concerning market information that affected and tended to affect the price of natural gas in interstate commerce.

60. Reliant Energy, Inc. (f/k/a Reliant Resources, Inc.), is liable for the debts and obligations of its wholly owned and controlled subsidiary Reliant Energy Services, Inc. and for the actions of CenterPoint Energy Services, Inc. (f/k/a Reliant Energy Retail, Inc.) during the Relevant Time Period. Throughout the Relevant Time Period, Reliant Energy, Inc. was aware of the illegal behavior being engaged in by its subsidiaries, had the power to and could have prevented the illegal behavior, and did nothing to stop the illegal behavior, while at the same time adding millions of dollars in profits from its subsidiaries to its consolidated financials. On information and belief, the way in which the subsidiaries were created and capitalized, and the parent company's moves relating to discontinuing operations, have left the subsidiaries with insufficient assets to pay the judgment that was foreseeable when Reliant Energy Inc. first became aware of, or should have become aware of, the illegal behavior engaged in by its subsidiaries.

61. Defendant CenterPoint Energy Services, Inc., f/k/a Reliant Energy Retail, Inc., is a corporation organized and existing under the laws of the State of Delaware, registered to do business in the State of Wisconsin, with its principal place of business located at 1111 Louisiana, Houston, Texas. CenterPoint Energy Services, Inc. was formerly known as CenterPoint Energy

Marketing, Inc., CenterPoint Energy Gas Services, Inc., and Reliant Energy Retail, Inc. During the Relevant Time Period, CenterPoint Energy Services, Inc. was a wholly owned subsidiary of Reliant Energy, Incorporated and sold natural gas at unlawfully inflated prices directly to the plaintiff Ladish Co., Inc. for use in Wisconsin, and to many other members of the class, both itself and through middlemen. Personal jurisdiction exists over CenterPoint Energy Services based upon its activities and on the activities of its corporate affiliates, that traded and sold natural gas in the United States and in Wisconsin during the Relevant Time Period.

## I.   Coral Energy Resources, L.P.

62.     Defendant Coral Energy Resources, L.P. is a Delaware limited partnership in good standing with its principal place of business in Houston, Texas. Coral Energy Resources, L.P. is wholly owned and controlled by Coral Energy Holdings, L.P., and is an affiliate of Shell Oil Company, and Shell Trading Gas and Power Company. Coral Energy Resources, L.P. was one of the largest natural gas marketers in the United States and conducted natural gas marketing operations at eastern and western power and natural gas trading hubs for the Eastern and Western United States during the Relevant Time Period. Coral Energy Resources sells 100% of its parent companies' natural gas production. Coral Energy Resources, L.P. regularly conducts business in Wisconsin. Coral Energy Resources, L.P. entered into a long term GISB natural gas supply agreement with Wisconsin Electric Power Company during the Relevant Time Period, and sold natural gas to Wisconsin Electric Power Company pursuant to that agreement.

63.     Defendant Coral Energy Resources, L.P. made arrangements, contracts, and agreements, and entered into a combination and conspiracy between the defendants which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas. Coral Energy Resources, L.P.'s actions were

intended to have, and did have, a direct, substantial and reasonably foreseeable effect on commerce in Wisconsin during the Relevant Time Period.  On information and belief, during the Relevant Time Period Coral Energy Resources, L.P., either directly or indirectly through one of its controlled affiliates, engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information.  In furtherance of such unlawful arrangements, contracts, agreements, and combination and conspiracy, Coral Energy Resources, L.P.'s officers, directors and/or employees agreed to arrangements, contracts, agreements, and a combination and conspiracy which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas that its affiliates sold in the United States and in Wisconsin.  During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy, Coral Energy Resources, L.P.'s officers, directors, and/or employees made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which Coral Energy Resources, L.P. sold in Wisconsin and elsewhere, and those policies and decisions were implemented on an operational level by Coral Energy Resources, L.P.'s employees in the United States and in Wisconsin.  In July 2004, Coral Energy Resources, L.P. paid $30 million in civil penalties to the United States Commodity Futures Trading Commission to settle charges of false reporting and attempted manipulation of natural gas prices.  In March 2005, Coral Energy Resources, L.P. agreed to pay $3.5 million to resolve a dispute with the CFTC regarding whether it had sufficiently investigated, or accurately reported the results of its investigation, into trader false reporting of trades to index publishers during the Relevant Time Period.  On information and belief, Coral and its affiliates engaged in

- 42 -

nearly 150 wash trades during the Relevant Time Period. In February 2005, the CFTC filed federal civil injunction actions against Dennette Johnson, Courtney Cubbison Moore, Robert Harp, Anthony Dizona, John Tracy and Kelly Dyer—all employees or former employees of Shell Trading Gas and Power Company—seeking to bar their attempting to manipulate the price of natural gas in interstate commerce by reporting biased information to price reporting companies. Johnson, Moore, Harp, Dizona, Tracy and Dyer would regularly circulate an e-mail with directions to the traders to report prices in such a way that it would benefit either the positions of Shell Trading Gas and Power Company or Coral Energy Resources, L.P., to which the traders at Shell Trading Gas and Power Company provided services. This was done with the intent to manipulate prices during the Relevant Time Period. Further details regarding the conspiracy are set forth in *U.S. Commodity Futures Trading Commission v. Johnson,* 408 F. Supp. 2d 259 (S.D. Tex. 2005)(decision denying defendants' motion to dismiss).

**J.** **The Xcel Defendants: Xcel Energy, Inc., E prime Inc. and Northern States Power Company**

64. Defendant Xcel Energy, Inc., is a Minnesota corporation in good standing with its principal place of business in Minneapolis, Minnesota. Xcel Energy, Inc., wholly owned and controlled during the Relevant Time Period its subsidiary, E prime Inc., a Colorado corporation with its principal place of business in Denver, Colorado, its subsidiary Northern States Power Company, a Wisconsin corporation with its principal place of business in Eau Claire, Wisconsin, and NRG Energy, Inc., a Delaware corporation with its principal place of business in Minneapolis, Minnesota. On information and belief, grounds exist for disregarding the corporate fiction between the Xcel Defendants based on such cases as *Weibke, Consumer's Co-op., Cemetery Services,* and *Conservatorship of Prom.* Xcel Energy, Inc., and its affiliates or

divisions engaged in energy marketing and trading, and transportation, storage, and marketing of natural gas in Wisconsin during the Relevant Time Period.

65.     Defendant Xcel Energy, Inc., during the Relevant Time Period was one of the largest power companies in the United States.  Xcel Energy, Inc. directly and through affiliates it owns and controls, made arrangements, contracts, and agreements, and entered into a combination and conspiracy between the defendants which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas.  Xcel Energy, Inc.'s actions were intended to have, and did have, a direct, substantial and reasonably foreseeable effect on commerce in Wisconsin, during the Relevant Time Period.  On information and belief, during the Relevant Time Period Xcel Energy, Inc., either directly or indirectly through one of its controlled affiliates, engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information.  In furtherance of such unlawful arrangements, contracts, agreements, and combination and conspiracy, Xcel Energy, Inc.'s officers or directors, agreed to arrangements, contracts, agreements, and a combination and conspiracy which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas which its affiliates sold in the United States and in Wisconsin.  During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy, Xcel Energy, Inc.'s officers or directors, made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which was sold, and those policies and decisions were implemented on an operational level by affiliates, such as E prime Inc., in the United States and in Wisconsin.

66. Personal jurisdiction exists over Xcel Energy, Inc., based upon the activities of its corporate affiliates, in particular E prime Inc., Northern States Power Company and NRG Energy, Inc., which traded and sold natural gas in the United States and in Wisconsin during the Relevant Time Period. Xcel Energy, Inc., and its affiliates consistently have presented a common corporate image to customers in the United States and in Wisconsin through their marketing efforts and materials.

67. During the Relevant Time Period, Xcel Energy, Inc. owned and controlled NRG Energy, Inc. ("NRG"). NRG was formed in 1992 as a subsidiary of Northern States Power, which in 2000 was merged into New Century Energies, Inc., to form Xcel Energy, Inc. In 2001, NRG was one of the largest power companies worldwide, and sold natural gas to companies located in Wisconsin. In 2003, NRG commenced voluntary petitions under Chapter 11 of the bankruptcy code, and in November 2003, the bankruptcy court entered an order confirming NRG's plan of reorganization. From at least August 2001 through May 2002 (*i.e.*, during the time NRG was owned and controlled by Xcel Energy, Inc.), NRG traders knowingly delivered false trade reports to price index compilers such as *Gas Daily* for the purpose of influencing the price of natural gas in interstate commerce. In July 2004, the CFTC commenced an action against NRG seeking a permanent injunction precluding NRG from making false trade reports.

68. Defendant E prime Inc. is a Colorado corporation in good standing with its principal place of business in Denver, Colorado. E prime Inc. is wholly owned and controlled by its parent company, Xcel Energy, Inc., a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. E prime Inc. is wholly owned and controlled by defendant Xcel Energy, Inc., concerning both the conduct of its business generally within Wisconsin and in particular its conduct in furtherance of defendants' unlawful arrangements, contracts,

agreements, combination and conspiracy.  During the Relevant Time Period and in furtherance of defendants' unlawful agreements, officers or directors of Excel Energy, Inc., made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which E prime Inc. sold in Wisconsin and elsewhere.  E prime Inc. provided during the Relevant Time Period natural gas marketing, storage and risk management services to industrial, commercial, and utility energy users and also engaged in energy trading in the United States and in Wisconsin.  E prime Inc. entered into a long term GISB natural gas supply agreement with WE Energies (or one or more of its subsidiaries) during the Relevant Time Period, and on information and belief sold natural gas to WE Energies (or one or more of its subsidiaries) pursuant to that agreement.  In January 2004, Xcel Energy, Inc., and E prime Inc., paid $16 million in civil penalties to the United States Commodity Futures Trading Commission to settle charges of false reporting and attempted manipulation of natural gas prices.

69.     Defendant Northern States Power Company is a Wisconsin corporation with its principal place of business in Eau Claire Wisconsin.  Northern States Power Company is wholly owned and controlled by its parent company, Xcel Energy, Inc., a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.  Northern States Power Company is wholly owned and controlled by defendant Xcel Energy, Inc., concerning both the conduct of its business generally within Wisconsin and in particular its conduct in furtherance of defendants' unlawful arrangements, contracts, agreements, combination and conspiracy.  During the Relevant Time Period and in furtherance of defendants' unlawful agreements, officers or directors of Excel Energy, Inc., made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of

natural gas price indices that affected the market prices of natural gas which Northern States Power Company sold in Wisconsin and elsewhere. Northern States Power Company provided during the Relevant Time Period natural gas marketing, storage and risk management services to industrial, commercial, and utility energy users and also engaged in energy trading in the United States and in Wisconsin. In January 2004, Northern States Power Company affiliated companies Xcel Energy, Inc., and E prime Inc., paid $16 million in civil penalties to the United States Commodity Futures Trading Commission to settle charges of false reporting and attempted manipulation of natural gas prices.

## **ALLEGATIONS COMMON TO ALL DEFENDANTS**

70.     The unlawful arrangements, contracts, agreements, combination and conspiracy set forth in this Complaint have been committed by defendants and were ordered and performed by their officers, directors, agents, employees or representatives while actively engaged in the management, direction, control or transaction of defendants' business or affairs. At least by the summer of 2000, by their marketplace behavior and agreement as to pricing, defendants and the unnamed co-conspirators began and worked together to fraudulently increase the retail price of natural gas paid by commercial entities in Wisconsin. This fraudulent agreement is evidenced by, among other things, the daily exchange of price information by and among defendants and the unnamed co-conspirators and the use of computer software programs and websites (including Enron Online) by defendants and the unnamed co-conspirators, to collusively and artificially inflate the retail price of natural gas paid by commercial entities in Wisconsin. Traders at the defendants knew during the Relevant Time Period that price information being posted on Enron Online was inaccurate information, and rather than disregard that information, or report the inaccuracies, the traders went along with Enron's inaccurate price postings, frequently passed

along those inaccurate postings to price index publishers, and themselves reported new inaccurate trade information to the publishers of indices so as to manipulate market prices.

71.     In September 2002, five major traders and their companies, including Dynegy Marketing & Trade, CMS ERM/MST, Williams Energy Marketing & Trading, El Paso Merchant Energy, L.P., and American Electric Power Company, admitted that they provided falsified information to *Gas Daily* and *Inside FERC*.  The purpose and effect of these actions was to collusively and artificially inflate the price of natural gas paid by commercial entities in Wisconsin above competitive levels, forcing commercial entity natural gas consumers in Wisconsin to pay much more for natural gas than they should have paid.

72.     Upon information and belief, defendants were in regular and virtually continuous contact with one another, including regular and extremely frequent communications with respect to the spot price of natural gas and natural gas futures contracts.

73.     Traders overstated prices to the reporting firms, which in turn published price data that incorporate the overstated prices.  This pervasive false reporting in the natural gas market fed into the marketplace over and over again.

74.     Defendants, directly or through their subsidiaries, affiliates, or agents, planned and executed a scheme designed to cause price instability and increase volatility in spot prices and thereby manipulate the price of natural gas futures.  Defendants' unlawful conduct produced exorbitant illegal profits.

75.     According to the CFTC, Platts' published indices had a financial impact upon billions of dollars worth of natural gas transactions during the Relevant Time Period.   Between November 2000 and October 2002, more than three-quarters of the trades some of the defendants submitted to Platts were knowingly false or misleading.

76.     Not all companies in the natural gas industry engaged in the illegal behavior in which the defendants engaged during the Relevant Time Period.  For instance, on information and belief, BP Energy Company was a major trader of natural gas in the United States during the Relevant Time Period, and established an effective program that ensured that the trading reports that BP Energy Company provided to publishers of price indices were accurate.  The illegal behavior engaged in by the defendants was neither inevitable, nor natural, but was instead the result of a conscious decision by the defendants to collusively manipulate the markets to their advantage.

77.     The behavior engaged in by the defendants and co-conspirators that forms the basis of this suit was not routine business behavior, but was instead highly illegal behavior that has resulted in the criminal conviction or indictment of numerous industry insiders.  This illegal behavior, and the hundreds of millions of dollars in lucre that has flowed to the defendants during the Relevant Time Period due to their engaging and permitting this illegal behavior, was only possible because the defendants agreed to report their false trades to the industry publications and newsletters identified above, and to structure their contracts such that those contracts were pegged to the false reports contained in those publications and newsletters.  It was known in the natural gas producing and trading industry that these markets were susceptible to manipulation, and the defendants avoided taking steps to ensure that effective compliance and reporting programs were in place to prevent false reporting from occurring.  Traders and executives at the defendant companies knew prior to the Relevant Time Period that false reporting could occur, knew early in the Relevant Time Period that Enron and many traders throughout the industry were engaging in false reporting, and rather than reporting such, or

resisting such, agreed to go along with the practice, which caused substantial damages to the plaintiff class in this case.

78.    Various other persons, entities, companies and corporations not named as defendants, and not otherwise identified above as co-conspirators, including some whose identities are presently unknown, participated as co-conspirators with defendants in the violations alleged herein and have made statements and performed acts in furtherance of those violations in the United States and elsewhere that had a direct, substantial, and reasonably foreseeable effect on commerce in Wisconsin.  These other co-conspirators include, but are not limited to, Enron Energy Services, Inc. and Enron Power Marketing, Inc., which paid a $35 million civil penalty (May 2004) to the CFTC; Aquila Merchant Services, Inc., which paid a $26.5 million civil penalty (June 2004) to the CFTC; Calpine Energy Services, L.P., which paid a $1.5 million civil penalty (January 2004) to the CFTC; Cinergy Marketing & Trading, LP, which paid a $3 million civil penalty (November, 2004) to the CFTC; Dominion Resources, Inc., which paid a $4.25 million civil penalty (September 2006) to the CFTC; Entergy Koch Trading L.P., which paid $3 million civil penalty (January 2004) to the CFTC; WD Energy Services Inc., f/k/a EnCana Energy Services, Inc., which paid a $20 million civil penalty (July 2003) to the CFTC; Enserco Energy, Inc., which paid a $3 million civil penalty (July 2003) to the CFTC; Entergy Koch Trading, L.P., which paid a $3 million civil penalty (January 2004) to the CFTC; Mirant Americas Energy Marketing, L.P., which paid a $12.5 million civil penalty (December 2004) to the CFTC; NRG Energy, Inc.; Western Gas Resources, Inc., which paid a $7 million civil penalty (July 2004) to the CFTC; Sempra Energy, including affiliate Sempra Energy Trading, and their respective officers, directors, and employees.

79.     The CFTC order relating to WD Energy Services indicates that at least one of WD Energy Services' employees discussed false reporting with traders at two other energy companies.   While NewPage does not know the precise identity of the other two energy companies, on information and belief, those two companies are defendants in this case.

80.     Traders at Mirant Energy Marketing, L.P. conspired with one or more traders at Cinergy Corporation to make false reports of trades to market reporters so as to manipulate prices during the time period from January 2000 to early 2001.  Specifically, Michael Whalen (a trader with Cinergy) had a telephone conversation with Christopher McDonald (a trader with Americas Energy Marketing, L.P.), wherein they conspired about how they should report false trades to *Inside FERC* to manipulate market prices, and how to make such reports believable, with Whalen saying to McDonald "hey, do you want to fax me . . . exactly what you guys are going to write down so its more believable . . . I'll just write the exact opposite."  These actions lead the CFTC to file a civil federal injunctive action against Whalen and McDonald and other traders at Mirant.

81.     In another example, between May 2000 and October 2002, Matthew Reed, Darrell Danyluk and Shawn McLaughlin engaged in false reporting and attempted manipulation of natural gas prices while employed by Enserco Energy Services.  Reed continued to engage in coordinated false reporting after he left Enserco, and became a trader at Concord Energy LLC. While at Enserco, Reed in Colorado and Danyluk in Calgary coordinated on an almost daily basis how they wanted to report fictitious trades to numerous reporting firms, including *Gas Daily,* and *National Gas Intelligence*.  Reed and Danyluk called this their "double dipping" scheme and perpetrated their scheme on reporting firms by portraying the Colorado and Calgary offices as separate trading operations when they were not.  These actions lead the CFTC to file a

civil federal injunctive action against Reed, Danyluk, McLaughlin and Concord Energy, LLC in February 2005.

82.     While each of the two causes of action stated in this complaint are distinct and separate causes of action—with different elements and different available remedies—under each cause of action NewPage alleges that the defendants engaged in a conspiracy to manipulate prices as prohibited by Wis. Stat. § 133.03.  As stated in further detail above and below, the defendants during the Relevant Time Period did the following:

a.  The defendants engaged in "wash sales."  A "wash sale" is an agreement by which Company A would agree with Company B that Company A would agree to sell a certain amount of natural gas at a certain price to Company B, and that in return Company B would sell roughly the same amount of natural gas at roughly the some price to Company A.  By doing this, Company A and Company B would create the illusion of higher demand, and a higher volume of sales, in the market place, and would thus achieve their objective of increasing or otherwise manipulate the price of natural gas sold in interstate commerce.

b.  The defendants agreed with each other to make and knowingly made false reports of natural gas trades to trade publications (such as *Gas Daily* and *Inside FERC*), knowing that those publications use those reports to report market prices and volumes, and knowing that by doing such they could manipulate markets to the detriment of natural gas buyers.

c.  The defendants through the actions of their employees violated numerous criminal statutes which prohibit wash trades and which prohibit the false reporting of market information.

d.  The illegal, criminal behavior of the defendants was widespread in the industry, and was well known to be occurring by traders in the industry throughout the Relevant Time Period.

## JURISDICTION AND VENUE

83.     The resolution of this matter in Wood County is appropriate and permitted by Wis. Stat. § 801.50 because Wood County is a County in which the claim arose, and one or more of the defendants does or do substantial business in Wood County.  NewPage was damaged in Wood County, as that is the location at which it paid more for natural gas than it should have. During the Relevant Time Period, CMS ERM/MST actively marketed natural gas in Wood County, on information and belief, CMS ERM/MST held title to gas transported in Wood County and gas sold by CMS ERM/MST was consumed in Wood County.

84.     This Court has personal jurisdiction over the defendants consistent with the due process clause of the United States Constitution, and pursuant to Wis. Stat. § 801.05, because:

a.  Pursuant to Wis. Stat. § 801.05(1), defendant Northern States Power Company is organized and exists pursuant to Wisconsin law.

b.  Pursuant to Wis. Stat. § 801.05(1)(d), each of the defendants has engaged in substantial and not isolated activities within the State of Wisconsin.

c.  Pursuant to Wis. Stat. § 801.05(2), Wis. Stat. ch. 133, and *Microsoft v. Olstad*, 284 Wis.2d 224 (2005), this action is and may be brought under Wisconsin Statutes that specifically confer grounds for personal jurisdiction over conspirators in antitrust cases, even if all acts of the defendant conspirators occurred outside of Wisconsin.

d. Pursuant to Wis. Stat. 801.05(4), each of the defendants directly or through an agent thereof committed one or more acts or omissions outside of Wisconsin, which caused an injury to person or property within Wisconsin, and during the Relevant Time Period, the defendants (either directly or on their behalf by others) carried out solicitation or service activities in Wisconsin, and natural gas sold or otherwise handled by the defendants was used or consumed in Wisconsin.

e. Pursuant to Wis. Stat. § 801.05(5)(c), this action arises out of a promise made to NewPage, or to a third party for the benefit of NewPage, by a defendant to deliver or to receive natural gas in Wisconsin.

f. Pursuant to Wis. Stat. § 801.05(5)(e), because this action relates to natural gas actually received by NewPage in Wisconsin from one or more of the defendants.

## RELEVANT STATUTORY SECTIONS

85. This case involves the following four sections in Wisconsin's Antitrust Statute (Wis. Stat. ch. 133): §§ 133.01, 133.03, 133.14 and 133.18.

86. Wis. Stat. § 133.01 provides:

**Legislative intent.**

The intent of this chapter is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition. It is the intent of the legislature that this chapter be interpreted in a manner which gives the most liberal construction to achieve the aim of competition. It is the intent of the legislature to make competition the fundamental economic policy of this state and, to that end, state regulatory agencies shall regard the public interest as

- 54 -

requiring the preservation and promotion of the maximum level of competition in any regulated industry consistent with the other public interest goals established by the legislature.

87. Wis. Stat. § 133.03 provides:

**Unlawful contracts; conspiracies.**

(1) Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is illegal.

88. Wisconsin's "Full Consideration Antitrust Statute, Wis. Stat. § 133.14, provides:

**Illegal contracts void; recovery.**

All contracts or agreements made by any person while a member of any combination or conspiracy prohibited by s. 133.03, and which contract or agreement is founded upon, is the result of, grows out of or is connected with any violation of such section, either directly or indirectly, shall be void and no recovery thereon or benefit therefrom may be had by or for such person. Any payment made upon, under or pursuant to such contract or agreement to or for the benefit of any person may be recovered from any person who received or benefited from such payment in an action by the party making any such payment or the heirs, personal representative or assigns of the party.

89. Wisconsin's "Treble Damages Antitrust Statute," Wis. Stat. § 133.18, in relevant part provides:

(1) . . . [A]ny person injured, directly or indirectly, by reason of anything prohibited by this chapter may sue therefore and shall recover threefold the damages sustained by the person and the cost of the suit, including reasonable attorney fees.

90. Finally, Wisconsin's Uniform Declaratory Judgments Act, Wis. Stat. § 806.04, provides: "Courts of record within their respective jurisdictions shall have the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed."

91.     NewPage discovered the facts constituting its causes of action under Wis. Stat. Ch. 133 less than six years before the filing of this action.  For this reason, among others, including principles of tolling, this complaint is timely filed pursuant to Wis. Stat. § 133.18.

## CLASS ACTION

92.     NewPage brings this action both on behalf of itself and on behalf of a class consisting of all industrial and commercial direct purchasers of natural gas for their own use or consumption during the Relevant Time Period, and which gas was used or consumed by them in Wisconsin.  Excluded from the Class are (a) entities that purchased natural gas for resale (to the extent of such purchase for resale); (b) entities that purchased natural gas for generation of electricity for the purpose of sale (to the extent of such purchase for generation); (c) entities that purchased natural gas from entities that sold natural gas at rates approved by the Wisconsin Public Service Commission (to the extent of such purchases at such approved rates); (d) defendants and their predecessors, affiliates and subsidiaries; and (e) the federal government and its agencies.

93.     This action is brought and may be properly maintained as a class action pursuant to Wis. Stat. § 803.08.

94.     The class in this case is so numerous that joinder of all members is impracticable. On information and belief the class is very numerous, numbering in the hundreds or thousands, and it would be impractical to bring all members of the class before the Court.

95.     There exists questions of common and general interest to all members of the class, including, but not limited to:  (a) whether the defendants engaged in a conspiracy in violation of Wis. Stat. § 133.03; (b) whether NewPage and those Wisconsin purchasers of natural gas similarly situated are entitled to a "full consideration" recovery pursuant to Wis. Stat. § 133.14;

and (c) whether NewPage and those Wisconsin purchasers of natural gas similarly situated are entitled to recover treble damages pursuant to Wis. Stat. § 133.18.

96.     The claims of the proposed representative party are typical of the claims of the class.

97.     NewPage is able to and will fairly and adequately represent the interests of the members of the class.

## COUNT I:  WIS. STAT. § 133.14 CLAIM

As and for its first cause of action, NewPage alleges as follows:

98.     NewPage incorporates by reference the allegations in all of the preceding numbered paragraphs.

99.     NewPage is an industrial user of natural gas that has operations in Wisconsin.

100.    During the Relevant Time Period, NewPage entered into agreements to purchase natural gas for use in Wisconsin.

101.    During the Relevant Time Period, the defendants were sellers of natural gas, and entered into contracts or agreements during the Relevant Time Period to sell natural gas for use or resale in Wisconsin.

102.    During the Relevant Time Period, the defendants were each a member of a conspiracy prohibited by Wis. Stat. § 133.03.

103.    While member(s) of a conspiracy prohibited by Wis. Stat. § 133.03, the defendants made agreements to sell natural gas which was purchased by NewPage and one or more of the class members, and those agreements were the result of, grew out of or were connected with a violation of Wis. Stat. § 133.03.  Specifically, each of the defendants during the Relevant Time Period conspired to restrain trade or commerce relating to natural gas, and they

received or benefited from the payments made by NewPage pursuant to NewPage's natural gas purchase agreements.

104.    The actions of the conspiracy resulted in NewPage paying inflated prices for natural gas during the Relevant Time Period.  During the Relevant Time Period, natural gas prices in Wisconsin more than doubled.  NewPage paid higher prices for natural gas than they otherwise would have paid if the defendants' conspiracy had not existed.  The actual product around which the conspiracy centered was sold to purchasers in Wisconsin.  The conspiracy also injured members of the class in Wisconsin, including NewPage, by among other things, depriving them of the right and ability to make risk management, resource allocation and other financial decisions relating to natural gas, in a full and free competitive market.

105.    Because of the defendants' conspiracy in violation of § 133.03, the contracts or agreements the defendants entered into during the Relevant Time Period, which contracts or agreements were founded upon, are the result of or which grew out of or is connected with the defendants' violation of Wis. Stat. § 133.03, are void under the first sentence of Wis. Stat. § 133.14.  Furthermore, under the second sentence of Wis. Stat. § 133.14, NewPage is entitled to recover from the defendants in this action the payments they made upon, under or pursuant to those void contracts or agreements, which payments were made either directly to any of the defendants, or to or for the benefit of any defendant, if and as the defendants benefited from those payments.

## COUNT II:  WIS. STAT. § 133.18 CLAIM

As and for its second cause of action, NewPage alleges as follows:

106.    NewPage incorporates by reference the allegations in all of the preceding numbered paragraphs.

107.   The defendants engaged in conduct prohibited by Wis. Stat. ch. 133.  Specifically, the defendants violated Wis. Stat. § 133.03 during the Relevant Time Period by making contracts or engaging in a combination or conspiracy in restraint of trade or commerce relating to natural gas.

108.   NewPage was injured by the defendants' violation of Wis. Stat. § 133.03, in that NewPage paid higher prices for natural gas during the Relevant Time Period than it would have if the defendants had not violated Wis. Stat. § 133.03.  Thus, NewPage is entitled to recover treble damages, pursuant to Wis. Stat. § 133.18.

## **FRAUDULENT CONCEALMENT**

109.   Plaintiff had neither actual nor constructive knowledge that the defendants and their co-conspirators were violating the antitrust laws of Wisconsin, or of facts which might have led to the discovery thereof until years after the wrongdoing occurred.  Defendants and co-conspirators engaged in a secret conspiracy that did not give rise to facts that would put plaintiff or the Class on inquiry notice that there was a conspiracy to manipulate natural gas prices.  Plaintiff could not have discovered the existence of the conspiracy, the fact of its injuries, or any of the violations alleged herein by the exercise of due diligence until years after the wrongdoing occurred.

110.   Furthermore, plaintiff could not have discovered any of the violations at an earlier time than it did despite its exercise of due diligence because of the deceptive practices and techniques of secrecy employed by defendants and their co-conspirators to avoid detection of and fraudulently to conceal such violations.  Prior to its discovery of defendants' conspiracy and related wrongdoing, plaintiff was not aware of defendants' activities of reporting false trade information and prices for natural gas due to the false statements and misrepresentations by

defendants and their co-conspirators that their prices for natural gas were very competitive and independently determined.

111.    At all relevant times, defendants and their co-conspirators affirmatively concealed the existence of their illegal arrangements, contracts, agreements, combination and conspiracy and thereby tolled the statute of limitations.  Plaintiff did not discover and could not have discovered defendants' unlawful conduct at an earlier date by the exercise of due diligence because defendants and their co-conspirators affirmatively and fraudulently concealed the existence of their arrangements, contracts, agreements, combination and conspiracy from plaintiff.  Defendants' and their co-conspirators' documents and information demonstrate their attempts to fraudulently conceal their illegal conspiracy through various acts, including the following:

> a.  Some or all defendants and their co-conspirators conducted private, secret telephone communications, e-mails, and discussions in the United States in order to confine knowledge of their unlawful arrangements, contracts, agreements, combination and conspiracy to a discrete group of individuals;
>
> b.  some or all defendants and their co-conspirators secretly coordinated the day-to-day conduct of the conspiracy, such as decisions regarding prices for natural gas and sending trade information to reporting firms;
>
> c.  some or all defendants destroyed records and notes of their unlawful telephone communications, e-mails, discussions, and agreements to conceal their illegal conduct;

d.  some or all defendants and their co-conspirators falsely and fraudulently represented to IFERC, Gas Daily, and others that their prices and volumes for natural gas were honest, competitive, and independently determined;

e.  some or all defendants utilized methods of communication in propagating their scheme that were difficult to trace and that tended to preserve the secrecy of their antitrust violations;

f.  some or all defendants and their co-conspirators took care to conceal their meetings and discussions regarding price manipulation;

g.  some or all defendants and their co-conspirators misrepresented themselves and their counter-parties to avoid detection by the trade publications;

h.  some or all defendants and their co-conspirators falsely and fraudulently represented to the trade publications that the transactions they and their counterparties had reported to the trade publications were accurate;

i.  some or all defendants and their co-conspirators falsely and fraudulently represented to the public that their false reporting and wash trading had no effect on natural gas prices; and

j.  some or all defendants and their co-conspirators falsely represented to the government that they had not engaged in false reports or natural gas wash trades.

112.    In addition, defendants' agreements, combination and conspiracy were self-concealing.  Defendants did not disclose their collusive misconduct to plaintiff.  In addition, defendants concealed their combination and conspiracy each time their employees reported false

and misleading price and volume information to trade publications. At times, defendants even agreed with other defendants or co-conspirators to report each other as counterparties to false or misleading transactions in an effort to avoid detection by the trade publications and others.

113. Furthermore, the data necessary to evaluate whether defendants had manipulated natural gas prices through false reporting and wash trading and the impact of such conduct on gas prices involved non-public and/or proprietary information in defendants' control that was not provided to plaintiffs.

114. To date, plaintiff has identified a number of specific instances in which defendants fraudulently concealed their illegal conduct and its effects on natural gas prices. The following non-exhaustive list provides some examples of the manner in which defendants and their co-conspirators attempted to fraudulently conceal their illegal conspiracy:

      a. Destruction of documents. At least some defendants likely destroyed documents detailing their conspiracy to manipulate natural gas prices. For example, testimony given in criminal proceedings relating to false reporting by El Paso employees demonstrates that supervisors at El Paso, including James Brooks, instructed their subordinates, including Alison Rietze and Randall Richards, to destroy any communications between El Paso and the trade publications.

      b. Concealment of meetings and discussions. At least some defendants and co-conspirators concealed their meetings and discussions regarding natural gas price manipulation. For example, traders employed by various defendants, including but not limited to traders at CMS, at times refused to discuss the manipulation of natural gas prices and their conspiracy over

the phone because they knew they were talking on recorded phone lines. Similarly, Bo Collins, an El Paso employee, warned various executives, officers, or employees of El Paso that they should not discuss false reporting via email because of possible legal consequences.

c. Misrepresentation to avoid detection by trade publications. At least some defendants and co-conspirators coordinated with counterparties specifically to prevent the trade publications from uncovering the conspiracy. For example, Michelle Valencia, a trader at Dynegy, instructed other Dynegy employees to represent themselves as employees of West Coast Power LLC, a Dynegy affiliate, when reporting false transactions to trade publications to avoid detection. Michelle Valencia also coordinated transactions that did not occur with Rick Anderssen, a trader employed by a co-conspirator, and together reported false counterparty information to avoid suspicion by the trade publications.

d. Misrepresentations to investigative authorities and the public. At least some defendants and co-conspirators falsely represented to the government and the public that they had not engaged in false reports or natural gas wash trades during the relevant time period. For example, Scott Thompson, a former Williams trader, fraudulently explained to FBI agents that he had not made false reports to trade publications. In addition, although CMS represented to the public and the federal government that it had not engaged in natural gas wash trades, CMS employees recognized that these representations were not accurate and

that they knew that Tamela Pallas, then chief executive officer of CMS Marketing Services & Trading, had entered into at least one natural gas wash trade with Pat Strange, a former Reliant trader. CMS also revealed that certain high-ranking individuals had left its employ because of activity relating to round-trip trading, even while CMS continued to deny that it engaged in any wrongdoing. Further, various defendants entered into offsetting natural gas transactions with other defendants or co-conspirators, despite having represented to the government and the public that they had not engaged in natural gas wash trades.

e. Press releases and other statements attempting to minimize the effect of defendants' illegal conduct. At least some defendants and co-conspirators explained that they had no reason to believe that their false reporting or wash trading had any effect on market prices. For example, in a January 13, 2003 press release, El Paso stated that it had no evidence that its subsidiary's reporting to Inside FERC resulted in an unrepresentative price index.

115. Plaintiff asserts that, as a result of the fraudulent concealment of the defendants' and co-conspirators' conspiracy and related wrongdoing, it did not discover, or have reason to discover, the facts constituting its causes of action until years after such wrongdoing occurred, and less than six years before the filing of its original complaint.

## DEMAND FOR JUDGMENT

WHEREFORE, NewPage, on behalf of itself and all others similarly situated, demands judgment against defendants as follows:

A.    That the Court certify the class as described herein and permit this action to proceed as a class action with NewPage designated as the representative of the class;

B.    A declaration pursuant to Wis. Stat. § 133.14 and Wis. Stat § 806.04 that the above-described contracts and agreements that the defendants entered into during the Relevant Time Period are void, and further that the defendants are jointly and severally liable pursuant to Wis. Stat. § 133.14 to NewPage and members of the class for repayment of the amounts paid for natural gas during the Relevant Time Period as the defendants benefited from those payments, in an amount to be determined at trial;

C.    Pursuant to Wis. Stat. § 133.18(1)(a), an award of three times actual damages sustained by NewPage and members of the class, in an amount to be determined at trial, reduced after trebling by any amount actually recovered under the § 133.14 claim for the same injury.

D.    An award of the costs and disbursements of this action, including class notice costs and interest;

E.    An award of attorneys' fees pursuant to Wis. Stat. § 133.18(1)(a), or as otherwise may be permitted by Wisconsin law, for the services herein rendered by class counsel;

F.    Pre-judgment and post-judgment interest in the full amount as may be permitted by law; and

G.    Any and all other relief to which NewPage and members of the class are entitled, in equity or at law, under the laws of the State of Wisconsin.

## DEMAND FOR JURY TRIAL

Plaintiff requests trial by jury of all issues so triable.

## REQUEST FOR EXPEDITED PROCEEDINGS

Wis. Stat. § 133.18(5) provides:

> Each civil action under this chapter and each motion or other proceeding in such action shall be expedited in every way and shall be heard at the earliest practicable date.

Pursuant to Wis. Stat. § 133.18(5), NewPage requests that this action and all motions and proceedings in this action be expedited, consistent with the intent and remedial goals of the Wisconsin legislature as expressed in Wis. Stat. §§ 133.01 and 133.18(5).

Dated this 2nd day of July, 2010.

KOHNER, MANN & KAILAS, S.C.,
Attorneys for NewPage Wisconsin System Inc.

By: ___ /s/ Robert L. Gegios _____
      Robert L. Gegios
      State Bar No. 1002906
      Alexander T. Pendleton
      State Bar No. 1011759
      William E. Fischer
      State Bar No. 1045725
      KOHNER, MANN & KAILAS, S.C.
      Barnabas Business Center
      4650 N. Port Washington Road
      Milwaukee, WI 53212-1059
      Telephone:   (414) 962-5110
      Facsimile:   (414) 962-8725

**<u>Exhibit 11</u>**

**Plaintiff LearJet's Motion For Class Certification And Memorandum In Support Entered As Docket No. 2308 In *In re Western States Wholesale Natural Gas Antitrust Litigation***

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | | |
|---|---|---|
| IN RE: WESTERN STATES | ) | MDL DOCKET NO. 1566 |
| WHOLESALE NATURAL GAS | ) | |
| ANTITRUST LITIGATION. | ) | Base Case File No. 2:03-CV-01431- |
| | ) | RCJ-PAL |
| _____ | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| *Learjet, et al. v. ONEOK, Inc., et al.* | ) | 2:06-CV-00233-RCJ-PAL |
| | ) | |
| _____ | ) | |

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
## AND MEMORANDUM IN SUPPORT

# TABLE OF CONTENTS

MOTION FOR CLASS CERTIFICATION...................................................................1

MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION ....................2

I.      INTRODUCTION ............................................................................................2

II.     LEGAL STANDARD FOR CLASS CERTIFICATION ..................................4

III.    BACKGROUND ..............................................................................................5

        A.      THE PARTIES AND MEMBERS OF THE CLASS.....................................5

        B.      PLAINTIFFS' CAUSES OF ACTION .........................................................6

        C.      THE NATURAL GAS MARKET .................................................................7

                1.      STRUCTURE AND DYNAMICS OF THE NATURAL GAS MARKET .......................8

                2.      PLAINTIFFS AND THEIR CLASS PURCHASED NATURAL GAS AT PRICES
                        BASED ON OR AFFECTED BY PUBLISHED INDEX PRICES................................9

                3.      PLAINTIFFS PAID ARTIFICIALLY INFLATED PRICES FOR NATURAL GAS
                        BECAUSE DEFENDANTS COLLUSIVELY MANIPULATED PUBLISHED
                        PRICE INDICES. ........................................................................10

        D.      OPERATION AND EFFECT OF THE CONSPIRACY TO MANIPULATE NATURAL
                GAS PRICES .....................................................................................11

        E.      EVIDENCE OF CONSPIRACY DEVELOPED THROUGH DISCOVERY ...........................14

                1.      COLLUSIVE WASH TRADING BY DEFENDANTS...........................................14

                2.      DEFENDANTS KNEW THAT THEIR CO-CONSPIRATORS WERE
                        MANIPULATING THE INDICES ...................................................................17

                3.      DEFENDANTS RECORDED PHONE CONVERSATIONS SHOWING
                        MANIPULATION OF THE NATURAL GAS INDICES .......................................18

        F.      GOVERNMENT INVESTIGATION, GUILTY PLEAS, AND CIVIL
                AND CRIMINAL PENALTIES ..................................................................20

IV.     ARGUMENT: THIS CASE MEETS ALL THE REQUIREMENTS FOR
        CERTIFICATION AS A CLASS ACTION.....................................................21

        A.      CLASS CERTIFICATION STANDARD .....................................................21

        B.      PLAINTIFFS MEET THE REQUIREMENTS OF FED. R. CIV. P. 23(a)...........................22

|   |   | 1. | THE CLASS IS SO NUMEROUS THAT JOINDER OF ALL MEMBERS IS IMPRACTICABLE. | 22 |
|   |   | 2. | THIS CASE INVOLVES QUESTIONS OF LAW AND FACT COMMON TO THE CLASS. | 23 |
|   |   | 3. | THE REPRESENTATIVE PLAINTIFFS' CLAIMS ARE TYPICAL OF THE CLAIMS OF THE CLASS. | 25 |
|   |   | 4. | PLAINTIFFS WILL FAIRLY AND ADEQUATELY REPRESENT THE CLASS. | 27 |
|   |   | 5. | THE PROPOSED CLASS IS ASCERTAINABLE. | 28 |
|   | C. | | THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF FED. R. CIV. P. 23(b)(3). | 30 |
|   |   | 1. | COMMON QUESTIONS OF LAW AND FACT PREDOMINATE OVER INDIVIDUAL QUESTIONS. | 30 |
|   |   |   | a. The Existence of an Arrangement or Combination to Manipulate Prices is a Predominant Common Question. | 31 |
|   |   |   | b. The Impact of the Arrangement or Combination on Natural Gas Purchasers is a Predominant Common Question Under Either an Overcharge Theory or the Kansas Full Consideration Remedy. | 33 |
|   |   |   | c. The Method for Calculating Damages is a Predominant Common Question. | 38 |
|   |   | 2. | A CLASS ACTION IS SUPERIOR TO OTHER AVAILABLE METHODS FOR ADJUDICATING THE CONTROVERSY. | 41 |
|   | D. | | HORIZONTAL PRICE-FIXING CASES ARE ROUTINELY CERTIFIED AS CLASS ACTIONS. | 42 |
|   | E. | | THIS COURT HAS RECOGNIZED THAT SIMILAR CASES MEET THE REQUIREMENTS OF RULE 23 AND SHOULD LIKEWISE CERTIFY THIS CASE. | 43 |
| V. | | | CONCLUSION | 44 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ............................................................. 29, 30, 43, 44

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
133 S.Ct. 1184 (2013) ................................................................5

*Arandell Corp., et al. v. Xcel Energy, Inc., et al.*,
Case No. 2:07-cv-01019-PMP-PAL (D. Nev.) ............................ 12, 19, 20

*Californians for Disability Rights, Inc. v. California Dept. of Transp.*,
249 F.R.D. 334 (N.D. Cal. 2008) ......................................................22

*Coleman through Bunn v. D.C.*,
306 F.R.D. 68 (D.D.C. 2015) ...........................................................30

*Comcast Corp. v. Behrend*,
133 S.Ct. 1426 (2013) .............................................................4, 38

*Dennis v. Saks & Co.*,
1975 WL 909 (S.D.N.Y. Jul. 10, 1975) .................................................24

*E&J Gallo Winery v. EnCana Corp.*,
503 F.3d 1027 (9th Cir. 2007) ......................................................9, 11

*E&J Gallo Winery v. EnCana Energy Servs., Inc.*,
2008 WL 4224492 (E.D. Cal., Sept. 12, 2008) ...........................................9

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ...........................................................5

*Estate of Garrison v. Warner Bros., Inc.*,
1996 WL 407849 (C.D. Cal. 1996) ..................................................26, 32

*Gen. Tel. Co. of the SW v. Falcon*, 457 U.S. 147 (1982) .........................................23

*Giles v. St. Charles Health Sys., Inc.*,
294 F.R.D. 585 (D. Or. 2013) ..........................................................38

*Halliburton Co. v. Erica P. John Fund, Inc.*,
134 S.Ct. 2398 (2014) ................................................................30

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ................................................23, 27, 31, 41

*Hawaii v. Standard Oil Co.*,
  405 U.S. 251 (1972) ...........................................................................................4

*Horn v. Associated Wholesale Grocers, Inc.*,
  555 F.2d 270 (10th Cir. 1977) .............................................................................22

*In re Air Cargo Shipping Services Antitrust Litig.*,
  2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) .............................................. 34, 37

*In re Aluminum Phosphide Antitrust Litig.*,
  160 F.R.D. 609 (D. Kan. 1995) ............................................................................25

*In re Carbon Black Antitrust Litig.*,
  2005 WL 102966 (D. Mass. Jan. 18, 2005) ..................................... 26, 33, 43

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  308 F.R.D. 606 (N.D. Cal. 2015) ...................................................... 4, 28, 34, 37

*In re Cement and Concrete Antitrust Litig.*,
  1979 WL 1595 (D. Ariz. Mar. 9, 1979) ............................................. 32, 33, 42

*In re Chlorine & Caustic Soda Antitrust Litig.*,
  116 F.R.D. 622 (E.D. Pa. 1987) ...........................................................................26

*In re Chocolate Confectionary Antitrust Litig.*,
  289 F.R.D. 200 (M.D. Pa. 2012) .........................................................................34

*In re Citric Acid Antitrust Litig.*,
  1996 WL 655791 (N.D. Cal. 1996) ................................. 26, 31, 32, 34, 40, 43

*In re Commercial Tissue Products*,
  183 F.R.D. 589 (N.D. Fla. 1998) .........................................................................43

*In re Corrugated Container Antitrust Litig.*,
  80 F.R.D. 244 (S.D. Tex. 1978) ...........................................................................24

*In re Domestic Air Transp. Antitrust Litig.*,
  137 F.R.D. 677 (N.D. Ga. 1991) .........................................................................43

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
  256 F.R.D. 82 (D. Conn. 2009) ................................................................. 34, 38

*In re Flat Glass Antitrust Litig.*,
  191 F.R.D. 472 (W.D. Penn. 1999) ................................................... 27, 35, 43

*In re High-Tech Employee Antitrust Litig.*,
  985 F. Supp. 2d 1167 (N.D. Cal. 2013) ...............................................................24

*In re Linerboard Antitrust Litig.*,
    203 F.R.D. 197 (E.D. Pa. 2001) ................................................................................40

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    202 F.R.D. 12 (D.D.C. 2001) ................................................................... 31, 42, 43

*In re Master Key Antitrust Litig.*,
    70 F.R.D. 23 (D. Conn. 1975) .................................................................................24

*In re Monosodium Glutamate Antitrust Litig.*,
    205 F.R.D. 229 (D. Minn. 2001) .............................................................................24

*In re NASDAQ Market-Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y. 1996) ............................................................................31

*In re Nexium Antitrust Litig.*,
    777 F.3d 9 (1st Cir. 2015) .......................................................................................31

*In re Optical Disk Drive Antitrust Litig.*,
    2016 WL 467444 (N.D. Cal. Feb. 8, 2016) ...........................................................42

*In re Plastic Cutlery Antitrust Litig.*,
    1998 WL 135703 (E.D. Pa. Mar. 20, 1998) ..........................................................43

*In re Playmobil Antitrust Litig.*,
    35 F. Supp. 2d 231 (E.D.N.Y. 1998) ......................................................................24

*In re Plywood Anti-Trust Litig.*,
    76 F.R.D. 570 (E.D. La. 1976) ................................................................................24

*In re Potash Antitrust Litig.*,
    159 F.R.D. 682 (D. Minn. 1995) .............................................................................43

*In re Rubber Chems. Antitrust Litig.*,
    232 F.R.D. 346 (N.D. Cal. 2005) ................................................ 4, 22, 26, 31, 32, 33, 40, 42

*In re Sodium Gluconate Antitrust Litig.*,
    Master File No. C 97-4142 CW (N.D. Cal. 1997) (Ennis Decl. Ex. C-2) .............42

*In re Sorbates Direct Purchaser Antitrust Litig.*,
    Case No. C 98-4886 (N.D. Cal. 2002) (Ennis Decl. Ex. C-1) ..............................42

*In re Sugar Antitrust Litig*,
    559 F.2d 481 (9th Cir. 1977) ..................................................................................32

*In re Sugar Indus. Antitrust Litig.*,
    1976 WL 1374 (N.D. Cal. 1976) ............................................................... 24, 31, 32

*In re Sugar Indus. Antitrust Litig.*,
   73 F.R.D. 322 (E.D. Pa. 1976) .................................................................. 24, 40

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2012 WL 253298 (N.D. Cal. Jan. 26, 2012) ................................................ 29

*In re Urethane Antitrust Litig.*,
   237 F.R.D. 440 (D. Kan. 2006) ................................................................... 24

*In re Urethane Antitrust Litig.*,
   251 F.R.D. 629 (D. Kan. 2008) .............................................................. 23, 26

*In re Urethane Antitrust Litig.*,
   768 F.3d 1245 (10th Cir. 2014) ................................................................... 31

*In re Vitamins Antitrust Litig.*,
   209 F.R.D. 251 (D.D.C. 2002) ............................................................... 38, 43

*In re W. States Wholesale Nat. Gas Antitrust Litig.*,
   633 F. Supp. 2d 1151 (D. Nev. 2007) ..................................................... 39, 43

*In re Wirebound Boxes Antitrust Litig.*,
   128 F.R.D. 268 (D. Minn. 1989) ................................................................ 43

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
   305 F.R.D. 164 (N.D. Cal. 2015) ............................................................... 24

*Kohen v. Pac. Inv. Mgmt. Co.*,
   571 F.3d 672 (7th Cir. 2009) ...................................................................... 29

*Lerwill v. Inflight Motion Pictures, Inc.*,
   582 F.2d 507 (9th Cir. 1978) ................................................................ 27, 41

*Leyva v. Medline Indus. Inc.*,
   716 F.3d 510 (9th Cir. 2013) ...................................................................... 40

*Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*,
   244 F.3d 1152 (9th Cir. 2001) .............................................................. 31, 41

*McCluskey v. Trustees of Red Dot Corp. Employee Stock Ownership Plan & Trust*,
   268 F.R.D. 670 (W.D. Wash. 2010) ........................................................... 22

*Northwestern Fruit Co. v. A. Levy & J. Zentner Co.*,
   116 F.R.D. 384 (E.D. Cal. 1986) .................................................... 24, 26, 41, 43

*O'Brien v. Leegin Creative Leather Products, Inc.*,
    2014 WL 1362657 (Kan. Ct. App. Apr. 4, 2014) ..........................................38, 39

*Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*,
    188 F.R.D. 365 (D. Or. 1998) ..........................................................24, 30

*Premier Pork, Inc. v. Rhone-Poulenc, S.A.*,
    Mem. Decision and J. Entry on Plaintiff's Mot. for Class Certification, Case
    No. 00-C-3, at 4 (District Court of Scott County, Kansas, May 1, 2004) ..............................27

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015) ..............................................................40

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979) ..................................................................4, 42

*Serrano v. 180 Connect, Inc.*,
    478 F.3d 1018 (9th Cir. 2007) ............................................................22

*Smith v. Philip Morris Co., Inc.*,
    Case No. 00-CV-26, at 6 (Kan. D. Ct. Seward County 2001) (Ennis Decl. Ex.
    C-3).........................................................................................26

*Spann v. J.C. Penney Corp.*,
    307 F.R.D. 508 (C.D. Cal. 2015) ..........................................................40

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives and Composites*,
    209 F.R.D. 159 (C.D. Cal. 2002) ..........................................................25

*United States v. Socony Vacuum Oil Co.*,
    310 U.S. 150 (1940) ......................................................................38

*United States v. Valencia*,
    600 F.3d 389 (5th Cir. 2010) ............................................................19

*Wal–Mart Stores, Inc. v. Dukes*,
    131 S.Ct. 2541 (2011) ................................................................4, 23

*Weinberger v. Thornton*,
    114 F.R.D. 599 (S.D. Cal. 1986)..........................................................25

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969) ......................................................................4

## Statutes, Rules & Regulations

28 U.S.C. § 1332(d) ..........................................................................22

Fed. R. Civ. P. 23 ..................................................... 1, 4, 5, 21, 27, 28, 32, 42, 43

Fed. R. Civ. P. 23(a)............................................................. 1, 3, 21, 22, 23, 25, 30, 44

Fed. R. Civ. P. 23(a)(1) ..........................................................................................22

Fed. R. Civ. P. 23(a)(2) ..........................................................................................23

Fed. R. Civ. P. 23(a)(3) ..........................................................................................25

Fed. R. Civ. P. 23(a)(4) ..........................................................................................27

Fed. R. Civ. P. 23(b) ........................................................................................21, 33

Fed. R. Civ. P. 23(b)(3) ................................................ 1, 3, 21, 30, 33, 40, 41, 44

Fed. R. Civ. P. 23(e)................................................................................................43

Fed. R. Civ. P. 30(b)(6) ..........................................................................................15

K.S.A. §§ 50-101 et seq. ...........................................................................................2

K.S.A. § 50–112.................................................................................. 6, 31, 37, 38

K.S.A. § 50-115.............................................................................2, 6, 7, 31, 38, 39

K.S.A. § 50-161 ..................................................................................................2, 7

K.S.A. § 50-164 ........................................................................................................6

K.S.A. § 50-515 ......................................................................................................37

## Other Authorities

C. Wright et al., *Federal Practice & Procedure* (2d ed. 1986 & Supp. 2005) ...........................24

"Final Report on Price Manipulation in Western Markets," Federal Energy
    Regulatory Commission, March 2003................................................. 11, 13, 15, 17

*Newberg on Class Actions,* 4th ed. § 3.5 (2008)..........................................................22

## MOTION FOR CLASS CERTIFICATION

Pursuant to Fed. R. Civ. P. 23, plaintiffs move this Court for an Order certifying this case as a class action, the class being defined as:

All industrial and commercial direct purchasers of natural gas for their own use or consumption during the Relevant Time Period, and which gas was used or consumed by them in Kansas. Excluded from the Class are (a) entities that purchased natural gas for resale (to the extent of such purchase for resale); (b) entities that purchased natural gas for generation of electricity for the purpose of sale (to the extent of such purchase for generation); (c) defendants and their predecessors, affiliates and subsidiaries; and (d) the federal government and its agencies.

The "relevant time period" is January 2000 through February 2002.[1]  As set forth in Plaintiffs' Memorandum in Support, the proposed class meets the requirements for class certification under Fed. R. Civ. P. 23(a) and 23(b)(3).

Plaintiffs base this Motion on the expert reports of Dr. Michael Harris and Dr. Mark Dwyer, the Declarations of Gregory M. Bentz, Russell S. Jones, Jr., Jennifer Gille Bacon, Donald Barry, Gary McCallister, Von Heinz, Andrew Ennis, and the named plaintiffs, the pleadings and other documents on file and in the accompanying Compendium,[2] and all other written or oral arguments that they may present to the Court.

---

[1] The evidence shows the collusive conduct here continued beyond February 2002, and the Amended Complaint alleges a class period of January 2, 2000 through October 31, 2002. To the extent plaintiffs seek full consideration recovery under K.S.A. § 50-115, the class period in the Amended Complaint is correct. To the extent plaintiffs and the class are required to show overcharges in order to prove antitrust impact, however, based on the data reviewed to date by plaintiffs' experts, it currently appears that the impact of the conspiracy may have ended by March 2002. Recently obtained Kansas Gas Marketing data, as well as other data sets identified by plaintiffs' experts that are not yet usable, may change this later impact period. If so, plaintiffs' experts will promptly file a supplemental report, and plaintiffs reserve the right to extend the impact period beyond February 2002, if necessary.

[2] Plaintiffs' concurrently-filed Compendium of Exhibits contains all of the declarations and exhibits referred to in this Memorandum.

1

## MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

## I.    INTRODUCTION

Defendants and their co-conspirators colluded to harm American consumers on a massive scale.  Their unprecedented and pervasive conduct dramatically raised the price of natural gas to consumers nationwide, including plaintiffs and their Kansas class.  Defendants achieved their ends by manipulating published price indices that commercial and industrial consumers relied on to inform their purchasing decisions.  The result: natural gas prices were pushed to historic highs.

This is a straightforward horizontal price-fixing class action in which plaintiffs allege that defendants[3] and others arranged, agreed, combined or conspired to manipulate the price of natural gas sold to industrial and commercial users in the State of Kansas between January 1, 2000 and March 1, 2002.  Defendants' conduct violated Kansas's Restraint of Trade Act, K.S.A. §§ 50-101 et seq., entitling plaintiffs and the members of the class to recover either the full consideration paid for the price-fixed natural gas under K.S.A. § 50-115, or in the alternative, treble damages under K.S.A. § 50-161.

Defendants' conspiracy was possible because of a unique feature of the natural gas market during the class period – the nearly universal dependence by commercial and industrial natural gas users on price indices published by a few trade publications to guide their purchase price decisions.  Because those indices depended largely on self-reporting, they were readily

---

[3] Defendants include ONEOK, Inc., ONEOK Energy Marketing and Trading Co., L.P., Kansas Gas Marketing Co., The Williams Companies, Inc., Williams Merchant Services Co., Inc., Williams Energy Marketing & Trading, American Electric Power Co., AEP Energy Services, Inc., Duke Energy Carolinas, L.L.C. (f/k/a Duke Energy Corp.), Duke Energy Trading and Marketing Company, L.L.C., Dynegy Marketing & Trade, El Paso Corp., El Paso Merchant Energy, L.P., CMS Energy Corp., CMS Marketing Services & Trading Co., CMS Field Services, Reliant Energy, Inc., Reliant Energy Services, Inc., Coral Energy Resources, L.P., Xcel Energy, Inc., and e prime, Inc.

Recently, two of these defendants have reached a settlement with plaintiffs in the Kansas, Wisconsin, and Missouri class actions, the terms of which are being finalized for presentation to the Court.  See Footnote 56 *infra*.

subject to manipulation by major industry players. Even though plaintiffs and class members thought the indices reflected actual market conditions, and made their price decisions accordingly, the indices had in fact been manipulated and artificially inflated through a widespread conspiracy among defendants and others.

The Second Amended Complaint ("Amended Complaint") alleges that defendants, acting together and in concert with others, falsely reported trade data and engaged in wash trades, churning and other illegal activities that manipulated the prices paid by plaintiffs and the other class members. (Am. Compl. ¶¶ 46-57.) It further alleges that defendants' conduct manipulated, distorted and artificially increased the prices of natural gas based on pricing indices compiled by a handful of trade publications, and plaintiffs and the class members bought natural gas at prices affected by those same manipulated indices. Because defendants' collusive index manipulation caused these higher prices, class members paid hundreds of millions of dollars more than they should have for natural gas during the relevant time period.

This action readily satisfies the requirements for class certification of Rules 23(a) and (b)(3). The class, which numbers in the thousands, is so numerous that joinder of all members would be impractical. Questions of law and fact are common to the members of the class. The claims asserted by the representative plaintiffs are typical of the claims of all class members. Plaintiffs and their counsel will fairly and adequately represent the interests of the class. The common issues – relating to the existence and effect of the alleged price-fixing conspiracy – predominate over any individual issues, and a class action is superior to other available methods for the fair and efficient adjudication of this case. As a practical matter, a class action is the only feasible way to vindicate the rights of the thousands of Kansas class members that plaintiffs seek to represent.

## II.     LEGAL STANDARD FOR CLASS CERTIFICATION

The Supreme Court has long recognized that antitrust class actions are a vital component of antitrust enforcement.  *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979) ("[t]hese private suits provide a significant supplement to the limited resources available to the Department of Justice for enforcing the antitrust laws and deterring violations."); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262 (1972) ("Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress.  This system depends on strong competition for its health and vigor, and strong competition depends, in turn, on compliance with antitrust legislation."); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130-31 (1969) ("the purpose of giving private parties treble-damage and injunctive remedies was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws.")

"Courts therefore 'resolve doubts in these actions in favor of certifying the class.'" *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 612 (N.D. Cal. 2015) (quoting *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005)).  Indeed, "a class-action lawsuit is the most fair and efficient means of enforcing the law where antitrust violations have been continuous, widespread, and detrimental to as yet unidentified consumers." *In re Rubber Chems*, 232 F.R.D. at 350.

In deciding motions to certify a class, courts must conduct a "rigorous analysis" of whether the plaintiffs have satisfied the requirements of Rule 23.  *Wal–Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011).  "Rigorous analysis" frequently entails "some overlap with the merits of ... plaintiff's underlying claim," which "cannot be helped." *Id.*; *see also Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (2013).  However, "Rule 23 grants courts "no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S.Ct. 1184, 1194–95 (2013) ("Merits questions may be considered to

the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites ... are satisfied."); *see Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011) (district court may examine the merits of the underlying claim "only inasmuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims. To hold otherwise would turn class certification into a mini-trial.") (citations omitted).

## III. BACKGROUND

### A. THE PARTIES AND MEMBERS OF THE CLASS

Plaintiff Learjet, Inc. ("Learjet") is a Wichita, Kansas based manufacturer of jet aircraft. Learjet, through an affiliated entity, bought natural gas during the relevant time period from defendants and others, and used that gas to operate its jet aircraft manufacturing facilities in Wichita. (Am. Compl. ¶ 4; Tab 17, Fletcher Decl. ¶ 3.)

Plaintiff Topeka Unified School District 501 (the "District") is the public school district for Topeka, Kansas. (Am. Compl. ¶ 5.) The District bought natural gas from, among others, defendants ONEOK Energy Marketing and Trading Company and Kansas Gas Marketing Company and used the gas to heat its schools and other facilities. (Tab 27, Zima Decl. ¶ 2.) The District bought natural gas directly from defendants and others at prices based on published index prices during the relevant time period. (*Id.* ¶ 3.)

Defendants are (or were during the relevant time period) engaged in the business of marketing natural gas. Defendants or their corporate affiliates, along with co-conspirators and other natural gas marketers, sold natural gas to plaintiffs or members of the class.

The class currently consists of all industrial and commercial direct purchasers[4] of natural gas for their own use or consumption in Kansas between January 1, 2000 and March 1, 2002.[5] The class members primarily used natural gas to heat schools, hospitals, factories, stores, offices and other facilities, or, at times, as a source of energy used to make products. According to the United States Energy Information Administration ("EIA"), over 95,000 commercial and industrial entities bought natural gas in Kansas during the relevant time period. (Tab 16, Ennis Decl. Ex. E.)

### B. PLAINTIFFS' CAUSES OF ACTION

Plaintiffs seek recovery, on behalf of themselves and the class, for defendants' violations of the Kansas Restraint of Trade Act. K.S.A. § 50-112 provides:

> All arrangements, contracts, agreements, trusts, or combinations between persons made with a view or which tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state, . . . and all arrangements, contracts, agreements, trusts or combinations between persons, designed or which tend to advance, reduce or control the price or the cost to the producer or to the consumer of any such products or articles, . . . or any other services, are hereby declared to be against public policy, unlawful and void.

Plaintiffs seek damages under K.S.A. § 50-115, which provides:[6]

> [A]ny person injured or damaged by any such arrangement, contract, agreement, trust or combination, described in K.S.A. 50-112 . . . may sue for and recover in any court of competent jurisdiction in this state, of any person, the full consideration or sum paid by such person for any goods, wares, merchandise and articles included in or advanced or controlled in price by such combination . . . .

Thus, to recover under Kansas law, plaintiffs must prove (1) an arrangement, contract, agreement or combination between persons (2) that tended to manipulate or artificially influence the price

---

[4] A "direct purchaser" is an entity that bought natural gas for its own use or consumption directly from a natural gas production, marketing or trading company, such as, but not necessarily limited to, defendants.

[5] *See supra* at 1, n.1.

[6] Although K.S.A. § 50-115 was repealed in 2013, it continues to apply to actions, like this one, on file at the time of its repeal. *See* K.S.A. § 50-164.

of natural gas, and (3) that plaintiffs were injured by purchasing natural gas at manipulated prices. (*Id.*) Under § 50-115, once plaintiffs prove the elements of liability, they are entitled to recover "the full consideration or sum paid" for the gas. Plaintiffs will prove these elements with evidence common to the class members, making this action suitable for certification as a class action.

Plaintiffs alternatively seek recovery under the Kansas Restraint of Trade Act's treble damages provisions. K.S.A. § 50-161 provides:

> [A]ny person who may be damaged or injured by any agreement, monopoly, trust, conspiracy or combination which is declared unlawful by the Kansas restraint of trade act shall have a cause of action against any person casing such damage or injury. Such action may be brought by any person who is injured in such person's business or property by reason of anything forbidden or declared unlawful by the Kansas restraint of trade act, regardless of whether such injured person dealt directly or indirectly with the defendant. The plaintiff in any action commenced hereunder . . . may sue for and recover treble the actual damages sustained.

Under these provisions, the class members' damages will be based in the alternative on the difference between the prices they paid and the prices they would have paid but for defendants' manipulative and collusive conduct.

## C. THE NATURAL GAS MARKET

Natural gas is a fungible commodity. (Tab 2, Harris Decl. ¶ 49.)[7] Gas from one field is interchangeable with gas from another, and natural gas can be moved through a network of pipelines throughout the United States. (*Id.* ¶¶ 22 and 49.) As a commodity, one molecule of natural gas is perfectly substitutable for another, and natural gas is sold subject to standardized pricing terms. (*Id.* ¶¶ 49-50.) The market in which this commodity is sold is subject to the same or similar market fundamentals. (*Id.* ¶ 53.) Natural gas purchase contracts are for the most part

---

[7] All references to the declarations of Dr. Harris or Dr. Dwyer in this Memorandum refer to their respective declarations captioned for the *Learjet* action and dated March 7, 2016.

standard by industry design, and set gas prices at a dollar amount per standard unit because of the fungible nature of the commodity.  (*Id.* ¶¶ 28, 50). [8]

<h4 style="text-align:center">1.    STRUCTURE AND DYNAMICS OF THE NATURAL GAS MARKET</h4>

Natural gas is brought out of the ground by producers, then sold by natural gas marketers (like defendants and their affiliates) to buyers who arrange to have the gas transported to them through interstate and intra-state pipelines.  (*Id.* ¶¶ 22-24.)  During the relevant time period, defendants and other gas marketers were major providers of natural gas that typically bought, sold, and traded gas across all the major trading locations, or "hubs," throughout the country.  (*Id.* ¶ 24.)  Commercial and industrial users like plaintiffs and the class members bought natural gas directly from natural gas marketers, paying a pipeline or a local distribution company separately for transportation or distribution services.  (*Id.* ¶¶ 23-24).

Natural gas is traded and priced at locations throughout the United States, including production areas, pipeline interconnections, centralized hubs, and utility "city gates." (*Id.* ¶ 22).  A map showing major natural gas hubs and pricing centers is included in the accompanying Compendium.  (Ennis Decl. Ex. F.)  During the relevant time period, five major hubs served as pricing points in Kansas: Southern Star Central (formerly known as Williams Pipeline Co.), Panhandle Eastern, Northern Natural Demarc, ANR SW, and Northern Natural Mid 10-13. (Harris Decl. ¶ 33.)

---

[8] Gas volumes are usually expressed in MCFs (thousand cubic feet) or MMcf (million cubic feet).  Gas is often bought and sold based on the amount of energy potential in the volume of gas, expressed as MMBtu (millions of British thermal units, or Btus).  One MCF of natural gas is generally considered to contain one MMBtu of energy potential, so that one MCF and one MMBtu generally represent the same volume of gas.

## 2. PLAINTIFFS AND THEIR CLASS PURCHASED NATURAL GAS AT PRICES BASED ON OR AFFECTED BY PUBLISHED INDEX PRICES.

Plaintiffs and the class bought natural gas in 2000-2002 at prices pegged to or affected by natural gas indices published by a few industry publications (collectively, the "Trade Publications").[9] (Am. Compl. ¶¶ 49-54.) The Trade Publications surveyed buyers and sellers to obtain data on natural gas sales and used that data to calculate pricing indices for gas sold and delivered at particular locations. (Harris Decl. ¶¶ 30-31.) During the relevant time period, defendants and their co-conspirators provided the Trade Publications with price and volume figures for transactions for delivery at specific pricing or delivery locations. (Am. Compl. ¶ 47-49.) The Trade Publications compiled this data and published daily and monthly pricing indices for natural gas based on the data received from traders. (Harris Decl. ¶ 31.) As far as buyers knew, these indices reflected the market price for natural gas at a particular location at a particular time. (*Id.* ¶¶ 29-31.)

During the relevant time period, these pricing indices set or directly affected the prices at which plaintiffs and class members bought natural gas. (*Id.* ¶¶ 20-21.) As the Ninth Circuit observed in a related case, "[b]uyers and sellers relied on these indices to determine the market price for natural gas transactions." *E&J Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1031 (9th Cir. 2007). Plaintiffs and class members used three pricing methods for buying natural gas: prices tied to monthly Trade Publication indices, fixed price contracts, or prices indexed to daily market references like *Gas Daily* or NYMEX. (Harris Decl. ¶ 10); (Tab 6, Dwyer Decl. ¶¶3-4).

---

[9] The Trade Publications include *Gas Daily* and *Inside FERC Gas Market Report* ("*Inside FERC*"), both published by Platt's, a division of McGraw-Hill. *Gas Daily*, which publishes a daily price index, and *Inside FERC*, which publishes a monthly index, are the most widely used indices in the industry. The other major Trade Publication components are *Natural Gas Intelligence*, *BTU Daily* and *Natural Gas Week,* all newsletters that calculate and publish index prices for natural gas. (Am. Compl. ¶ 47.) *See E&J Gallo Winery v. EnCana Energy Servs., Inc.*, 2008 WL 4224492 (E.D. Cal., Sept. 12, 2008).

Plaintiffs bought most of their gas based on the pricing indices under pricing terms referencing a particular index for a particular location, e.g., "Inside FERC Southern Star Central + $0.31 per MMBtu." Therefore, as the published (and manipulated) price indices at a location changed, the price for natural gas under a contract pegged to those indices likewise changed. (Harris Decl. ¶ 50). Similarly, contracts for sale of a stated quantity of gas at a stated price, for example 240 Mcf at $6.72 each, were also priced based largely on price indices, and therefore would inevitably be influenced by changes in such indices. (*See id.* ¶ 51.)

### 3.   PLAINTIFFS PAID ARTIFICIALLY INFLATED PRICES FOR NATURAL GAS BECAUSE DEFENDANTS COLLUSIVELY MANIPULATED PUBLISHED PRICE INDICES.

The Amended Petition alleges that defendants collusively manipulated index prices by reporting false or inaccurate information to the Trade Publications. (Am. Compl. ¶ 52.) In addition, defendants engaged in collusive and manipulative trading tactics, such as wash trading and churning, which not only operated to directly manipulate index prices, but also created false impressions about supply and demand in the natural gas market. (*Id.* ¶¶ 49-53; Harris Decl. ¶¶ 37-39.) Defendants' coordinated reporting of false or inaccurate price or volume information directly affected the published indices because the indices were designed to reflect the weighted average of actual prices at particular locations. (Harris Decl. ¶ 29.) Therefore, altering trading prices or volumes skewed the index away from a true reflection of actual market conditions. (*see id.* ¶ 39.) Similarly, reporting completely fictitious trades, with fabricated price and volume figures, moved indices away from the actual state of the market. (*Id.* ¶¶ 20 and 36-40.) The direct result of this collusive conduct was a huge spike in the Trade Publication index prices during the class period. (*Id.* ¶ 35.) Because plaintiffs purchased natural gas at prices based on, pegged to, or affected by the Trade Publication indices that defendants manipulated, plaintiffs

paid more for natural gas than they would have absent defendants' collusive manipulative conduct. (Am. Compl. ¶ 57.)

### D. OPERATION AND EFFECT OF THE CONSPIRACY TO MANIPULATE NATURAL GAS PRICES

Plaintiffs allege that defendants engaged in an arrangement, combination, or conspiracy to manipulate natural gas prices through a number of illegal practices that not only controlled, but artificially inflated, indices used to price Kansas natural gas sales to plaintiffs and their class. (*Id.* ¶ 49.) These allegations – which need not be proved at this stage – are nonetheless supported by substantial evidence.

In March 2003, FERC staff issued its "Final Report on Price Manipulation in Western Markets" ("FERC Report").[10] The FERC Report considered, in detail, manipulative practices by various companies, and concluded:

> The process for reporting natural gas price indices was fundamentally flawed and must be fixed. Traders had the ability and incentive to manipulate the published indices *and they did so.* Given the degree of systematic manipulation described in this chapter, the published indices could not possibly be accurate based solely on the publisher's editorial judgment, the traders' feel for the market, or the hope that competing traders could offset each other's false reporting. Staff began the investigation looking for evidence of energy price manipulation in the West. *Staff found evidence of manipulation (direct and indirect) of the published natural gas price indices at significant trading points all over the United States.*

(Ennis Decl. Ex. A at III-54) (emphasis added); *see also Gallo*, 503 F.3d at 1031-32. FERC's investigation also revealed that defendants' manipulative trading conduct had a direct impact on the price of natural gas throughout the United States. (Ennis Decl. Ex. A-3 at III-54.)

The FERC Report documented false reporting in the form of reporting fictitious trades, altering the volume or price component of actual trades, reporting transactions "observed" in the market, and even reporting based on an individual trader's "sense of the market." (*Id.* Ex A-3 at

---

[10] Selected relevant chapters of the FERC Report appear in the Compendium as Ex. A to Declaration of Andrew J. Ennis.

III-3-III-15.)   According to that report, at least five of the current defendants – AEP, CMS, Dynegy, El Paso, and Williams –admitted to FERC that they had engaged in false or inaccurate reporting of trading information to the Trade Publications.  (*Id*. Ex. A-3 at III-2.)[11]  For example, FERC concluded that ninety-nine percent (99%) of defendant El Paso's reported trades from its Mid-Continent trading desk were phony in that they did not represent actual trades.  (*Id*. Ex. A-3 at III-13.)  Often, this false reporting was accomplished with the direct help of a coconspirator. For example, in December 2002, Dynegy and another company, West Coast Power LLC, settled charges that Dynergy caused West Coast to submit information "misrepresenting that West Coast was a counterparty to fictitious trades."[12]  There is substantial evidence that traders working for Dynegy, El Paso, and co-conspirator Encana exchanged information that they would each report to the trade publications.

FERC also concluded that defendants manipulated price indices through collusive and manipulative trading practices.  One such practice was wash trading.  A "wash trade" is a prearranged pair of trades of the same goods between the same parties, involving no economic risk and no net change in beneficial ownership.  (*Id*. Ex. A-4 at VII-1; Harris Decl. ¶ 37.)  Wash trades expose the parties to no monetary risk and serve no legitimate business purposes.  (Ennis Decl. Ex. A-4 at VII-1.)  Wash trading is inherently collusive because it necessarily relies on an agreement between two parties, i.e., Trader A agrees to sell to Trader B a stated quantity of gas at a stated price, and Trader B agrees to sell an equal quantity back to Trader A at the same

---

[11]  Subsequent discovery has shown that all defendants participated in false reporting to the Trade Publications.  *See infra* at 14-20.

[12]  CFTC Press Release, *Dynegy Marketing & Trade and West Coast Power LLC Pay $5 Million to Settle CFTC Charges of Attempted Manipulation and False Reporting*, Dec. 19, 2002.

price.[13]  Reports of wash trades to the Trade Publications, like other false or inaccurate reports, directly impacted price indices and gave a false impression of volatility in the market by suggesting that certain companies were more active than they actually were.  (Harris Decl. ¶¶ 36-37; 39.)  Market participants were thus misled about the volume of trading activity and volatility in the market.  (*Id.* ¶ 39.)

Beyond that, wash trades provided defendants with a method of manipulating price indices without detection, because Trade Publications were more likely to rely on reported wash trades in calculating price indices, in that wash trades seemingly presented actual trades with actual counterparties.  (*Id.* ¶ 37.)  Thus, these inherently collusive wash trades also served to validate the widespread false reporting by defendants and their co-conspirators.  (*Id.*).  Defendants CMS Marketing Services & Trading Company, CMS Field Services, Dynegy Marketing & Trade, Reliant Energy Services, Inc., and Williams Energy Marketing & Trading have publicly admitted to making wash trades.  (Am. Compl. ¶ 49.)[14]

The Amended Petition also alleges that defendants manipulated the price of gas by "churning."  (*Id.*)  "Churning" refers to a pattern of successive bursts of trading activities within a short period of time, usually involving several times the volume of natural gas actually needed by the company.  (Harris Decl. ¶ 38.)  Churning gives the appearance of increased market volatility and therefore directly impacts prices.[15]  (*Id.*)  Because published indices report a

---

[13] This Court has expressly acknowledged the inherently collusive nature of wash trades and pointed to plaintiffs' allegations of wash trading as indicative of a conspiracy.  *See Order* (denying defendants' motion to dismiss for failure to state a claim), *Arandell Corp., et al. v. Xcel Energy, Inc., et al.*, Case No. 2:07-cv-01019-PMP-PAL, Doc. No. 179.

[14] Discovery has shown that all defendants have engaged in offsetting transactions.  *See infra* at 14-20.

[15] The FERC Report extensively documents churning through Enron Online ("EOL"). EOL functioned such that it was either the buyer or seller in every natural gas trade made through EOL.  (*See* Ennis Decl. Ex. A-2 at II-26.)  During most of the relevant time period, virtually every gas trader had an EOL screen.  (Ennis Decl. Ex. A-2 at II-31.)  Because EOL was

midpoint or average price for a day's trading, churning activities would necessarily bias the reported midpoint or average prices.  (Ennis Decl. Ex. A-2 at II-30.)

E.      **EVIDENCE OF CONSPIRACY DEVELOPED THROUGH DISCOVERY**

Discovery to date has confirmed the widespread conspiracy among Defendants to manipulate the gas price indices.

1.      **Collusive Wash Trading by Defendants**

Wash trading occurs when two companies agree to enter into offsetting transactions that result in no net change in ownership position for the purpose of manipulating the gas pricing indices. Because a wash trade requires two participants, it is inherently collusive. Discovery to date has produced extensive evidence of wash trading by defendants.

- In March 2002, the CEO of Reliant told analysts on a conference call that 20% of the company's trading volume in 2001 was the result of wash trades with CMS and three other firms.[16]  According to a Reliant press release issued the same day, wash trading "had the effect of increasing revenues by about 10 percent" between 1999 and 2001.[17]  Reliant's CEO blamed the wash trading on the actions of "some misguided employees."[18]   Following the disclosures about wash trading at Reliant, two high level Reliant offers were forced to resign.[19]  Reliant later acknowledged that 1.3% of its natural gas trading volume in dollars in 2001 was

---

so widely used and provided real-time access to information, the entire market could observe churning and the resulting pronounced price movement on EOL.  (*Id.*)

[16] Ennis Decl. Ex. G-1, Reliant Resources says "no value" trades upped revenue, Reuters, May 13, 2002.

[17] *Id.*, Reliant Resources, Inc. Press Release, *Reliant Resources Announces Preliminary Findings*, PR Newswire, May 13, 2002.

[18] *Id.*

[19] *Id.*, Reliant, CMS executives quit amid scrutiny, Gas Daily, May 17, 2002.

the result of wash trades.[20]   In deposition testimony, Reliant's corporate representative admitted that Reliant conducted wash trades.[21]

- According to the 2003 FERC Report, CMS, Dynegy, Williams, and Reliant all admitted to engaging in wash trades.[22]

- Duke business records produced to the SEC show that Duke participated in hundreds of wash trades from November 2000 through February 2002 with counterparties that included AEP, CMS, Dynegy, El Paso, ONEOK, Reliant, and Williams.[23]

- El Paso business records produced SEC show that El Paso participated in wash trades between April 2000 and February 2002 with counterparties that included Reliant and Williams, among others.[24]

- Williams's business records show more than a hundred wash trades between January 2000 and May 2002 with counterparties that included AEP, El Paso, Duke, ONEOK, and Reliant.[25]   Audio recordings reflect conversations between Williams traders and traders from other gas companies about the practice of false reporting and wash trading.   For example, in a March 2001 recorded phone conversation.   Williams trader Thomas Pool conspired with El Paso trader Keith Cooper to conduct a wash trade. Cooper explained: "I mean, it's buying and

---

[20] Ennis Decl. Ex. D, Reliant Resources, Inc.'s Response to Interrogatory No. 3, *In the Matter of Certain Trading by Energy and Power Marketing Firms*, Before the U.S. Commodity Futures Trading Commission, RELMDL0001996.

[21] Ennis Decl. Ex. G-1, Rule 30(b)(6) Deposition of Suzanne Lynn Kupiec, May 8, 2009 ("Kupiec Dep."), 213:5-23.

[22] *Id.* Ex. A-4 at VII-1.

[23] Ennis Decl. Ex. G-2, DE MDL 04750 to 04780.

[24] Ennis Decl. Ex. G-3, EP-SEC000083.

[25] Ennis Decl. Ex. G-4, WGM-MDL00008516 to 8523.

selling El Paso at the same price, if you wouldn't mind doing that." Pool replied: "Yeah, I'd do it for ya. . . . At what [price]?" Cooper: "$2.47. And you're just buying and selling at the same price from El Paso." Pool later added: "I may need to do this with you someday too." Cooper: "Just let me know."[26]

- Dynegy business records show that Dynegy engaged in wash trading with CMS between December 2001 and May 2002.[27] Dynegy business records produced as part of FERC's investigation show that Dynegy participated in wash trades with Williams and ONEOK among others between April 2000 and November 2002.[28]

- In a June 2001 recorded phone conversation, CMS trader Sean Sasko told a colleague that he had "a weird thing for you"—which he explained was a "buy/sell with Reliant" where CMS would "buy it from [Reliant] and sell it back to them at the same price."[29] "This is just a paperwork transaction," Sasko explained.[30]

- e prime trader Donald Krattenmaker gave deposition testimony that e prime managers approved of "wash trades" made by traders at e prime during his time at the company.[31]

---

[26] *Id.*, Recorded Conversation, Thomas Pool and Keither Cooper, Mar. 1, 2001, WGM-MDL00010927.

[27] Ennis Decl. Ex. G-5, DMT-MDL 0031369.

[28] *Id.*, DMT-MDL 0010281 to 10282.

[29] Ennis Decl. Ex. G-6, Recorded Conversation, Sean Sasko at CMS, Jun. 2001, CMS CH11 190062 8-44-32.a.wav.

[30] *Id.*

[31] Ennis Decl. Ex. G-7, Deposition of Donald Krattenmaker, Jan. 27, 2016 ("Krattenmaker Dep."), 67:19-68:13.

## 2. Defendants Knew That Their Co-Conspirators Were Manipulating the Indices

Evidence developed through discovery demonstrates that defendants knew that price manipulation was widespread among gas traders and that "everybody" in the industry was submitting false information to the price indices. This is significant because defendants could only know this if they had communicated with traders for other companies about reporting practices. The evidence shows that traders communicated frequently and openly about manipulation of the indices.

- The 2003 FERC Report noted that "[m]any traders acknowledged that false reporting was done openly in the industry."[32]

- On November 18, 2002, the manager at *Gas Daily* in charge of maintaining the publication's natural gas price index, Michelle Markey, testified before a California state senate committee hearing that "[c]ommon practice was to exaggerate your transactions to the price reporters, report more volume, reporting a higher price than that was actually transacted."[33]  Markey testified in this case that false reporting to trade publications was "occasionally discussed" and "joked about" and that she doesn't remember traders expressing shock, amazement, or surprise at the fact that inaccurate reporting occurred.[34]

---

[32] Ennis Decl. Ex. A-5, FERC Report at ES-6.

[33] Ennis Decl. Ex. A-3, FERC Report at III-32.

[34] Ennis Decl. Ex. G-8, Deposition of Michelle Markey, Jul. 29, 2009, 37:19-38:19.

- ePrime trader Donald Krattenmaker testified that he learned about inaccurate reporting practices in the industry with other traders at industry events for gas traders, such as Gas Fair and Gas Mart.[35]

- Duke trader Michael Whitney, who in 2008 agreed to pay a $55,000 civil penalty to the CFTC for manipulating natural gas prices,[36] gave testimony that manipulating index prices "was a pretty widely talked about thing" that "pretty much everybody" in the industry was doing.[37] Manipulation, according to Whitney, was "a common industry theme."[38]

- AEP trader Todd Lambert testified that the head trader at AEP, Eric Van der Walde, told him that "everybody lies about their indexes."[39] Another AEP trader, Randy Turturice, testified that false reporting to the indices was understood to be "standard industry practice" within AEP and that the practice was discussed openly in front of Van der Walde.[40]

### 3. Defendants Recorded Phone Conversations Showing Manipulation of the Natural Gas Indices

Defendants have produced hundreds of hours of recorded trader conversations from 2000-2002. These recorded conversations demonstrate that defendants employees were actively

---

[35] Ennis Decl. Ex. G-7, Deposition of Donald Krattenmaker, Jan. 27, 2016 ("Krattenmaker Dep."), 58:12-62:13.

[36] CFTC Press Release, *Former Duke Energy Trader Michael Whitney to Pay a $55,000 Penalty in Natural Gas False Reporting Case*, Mar. 6, 2008, http://www.cftc.gov/PressRoom/PressReleases/pr5465-08 (last visited Feb. 19, 2016).

[37] Ennis Decl. Ex. G-9, Deposition of Michael Whitney, Jul. 18, 2009 ("Whitney Dep."), 67:21-69:13.

[38] *Id.*, Whitney Dep. 70:12-23.

[39] Ennis Decl. Ex. G-10, Deposition of Todd Lambert, Jun. 19, 2009 ("Lambert Dep."), 144:7-15.

[40] *Id.*, Deposition of Randy Turturice, Jul. 20, 2009 ("Turturice Dep."), 122:15-123:7.

working in concert to manipulate price information submitted to the natural gas price indices.

Examples include:

- In a series of recorded phone conversations, Dynegy trader Michelle Valencia conspired with traders at other firms to submit false information to gas indices. For example, on August 30, 2000, Valencia conspired with El Paso trader Greg Singleton to "run up" prices reported to *Gas Daily*.

    *Singleton: So I mean, those, those guys have to try to get index as low as they can and they have to try to get the Gas Daily's back up. That's what I think they have to do.*

    *Valencia: So I'm going to be on the same side then. I'm gonna be trying to run up the daily price.*

    *Singleton: That's great. I appreciate it.*

    *Valencia: So we should be liking each other then.*

    *Singleton: Yeah.*[41]

In 2006, a jury in federal court found both Valencia and Singleton guilty of committing wire fraud.[42] Both convictions were upheld on appeal to the Fifth Circuit.[43]

Defendants' collusive manipulation resulted in a historically unprecedented change in the price of natural gas during the relevant time period.[44] (Am. Compl. ¶¶ 53-54, 57, 67.) Plaintiffs have alleged that this sharp increase in price indices was the direct and intended result of

---

[41] Ennis Decl. Ex. G-11, Recorded Conversation, Singleton to Valencia, Aug. 30, 2000, E-GRY100, E-GH0032682^08301102.

[42] *United States v. Valencia*, 600 F.3d 389, 402 (5th Cir. 2010).

[43] *Id.* at 434.

[44] This Court noted that plaintiffs' allegations of a historically unprecedented change in prices, when coupled with plaintiffs' allegations of defendants' false reporting and failure to prevent or disregard false reporting, indicated a conspiracy among the defendants to manipulate published price indices. *See Order* (denying defendants' motion to dismiss for failure to state a claim), *Arandell Corp., et al. v. Xcel Energy, Inc., et al.*, Case No. 2:07-cv-01019-PMP-PAL, Doc. No. 179. *Learjet* plaintiffs made similar allegations regarding the dramatic increase in prices resulting from defendants' manipulative and collusive conduct. (Am. Compl. ¶¶ 53-54, 57, 67.)

defendants' collusive actions. (*Id.*) This dramatic increase in price indices caused plaintiffs to pay significantly more for natural gas during the relevant time period than they would have paid absent defendants' conspiracy to manipulate prices. (*Id.* ¶ 67.)

### F.   GOVERNMENT INVESTIGATION, GUILTY PLEAS, AND CIVIL AND CRIMINAL PENALTIES

Defendants' unlawful actions led to investigations by the DOJ and the CFTC, and substantial civil and criminal penalties being imposed on defendants:[45]

- *AEP Defendants* – $60 million in civil and criminal penalties as a result of their manipulation of natural gas price indices; three AEP traders entered guilty pleas to resolve criminal charges stemming from their false reporting and market manipulation. (Ennis Decl. Ex. B-1.)

- *CMS Defendants* – $16 million in civil penalties to the CFTC; at least two former CMS traders individually disciplined. (*Id.* Ex. B-2.)[46]

- *Coral Energy* – $30 million in civil penalties to the CFTC, and an additional $3.5 million to FERC; several former Coral traders were also separately disciplined. (*Id.* Ex. B-3.)[47]

- *Duke Energy* – $28 million in civil penalties to the CFTC; at least one former Duke Energy trader was disciplined, and three former Duke traders faced federal indictment; at least one pleaded guilty and admitted his role in the trading scheme. (*Id.* Ex. B-4.)

- *Dynegy Defendants* – $5 million in civil penalties to the CFTC; one former Dynegy trader was convicted on several counts of wire fraud relating to instances of false reporting of natural gas prices. The charges against this trader included allegations that

---

[45] This Court has previously found that defendants' alleged pervasive illegal market manipulation does not fall within the "wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *See Order* (denying defendants' motion to dismiss for failure to state a claim), *Arandell Corp., et al. v. Xcel Energy, Inc., et al.*, Case No. 2:07-cv-01019-PMP-PAL, Doc. No. 179. Rather, this Court noted that such pervasive illegal behavior is indicative of a conspiracy among the defendants. *Id.* *Learjet* plaintiffs made similar allegations regarding defendants' pervasive and unified illegal conduct. (Am. Compl. ¶¶ 46-57.)

[46] Some CMS traders even admitted in voice recordings that they and their companies manipulated natural gas prices. One CMS trader acknowledged that "everybody" at CMS has reported false information to *Gas Daily*. (*See* Ennis Decl. Ex. D, Thompson 10-21-02-11-19-34.)

[47] An email explains that Coral supervisors required false reporting from their employees. (*See* Ennis Decl. Ex. D, CER 0004580.)

she and an El Paso trader conspired to manipulate the price of natural gas. (*Id*. Ex. B-5.)[48]

- *El Paso Defendants* – $20 million in civil penalties to the CFTC; several former El Paso traders were convicted of multiple counts of wire fraud, false reporting, and conspiracy relating to their reporting of false or inaccurate natural gas trading information; six other El Paso traders entered guilty pleas to avoid prosecution. (*Id*. Ex. B-6.)

- *ONEOK Defendants* – $3 million in civil penalties to the CFTC. (*Id*. Ex. B-7.)

- *Reliant Defendants* – $18 million in civil penalties to the CFTC; at least one former Reliant trader pled guilty to criminal charges. (*Id*. Ex. B-8.)[49]

- *Williams Defendants* – $20 million in civil penalties to the CFTC, and Williams Power Company, Inc. paid a $50 million criminal penalty to the DOJ; three Williams traders pled guilty to criminal charges. (*Id*. Ex. B-9.)[50]

- *Xcel Defendants* – $16 million in civil penalties to the CFTC. (*Id*. Ex. B-10.)

## IV. ARGUMENT: THIS CASE MEETS ALL THE REQUIREMENTS FOR CERTIFICATION AS A CLASS ACTION.

### A. CLASS CERTIFICATION STANDARD

The Court should certify a class under Fed. R. Civ. P. 23 where: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). In addition, Fed. R. Civ. P. 23(b) requires the party seeking certification to meet one of three subsections of that rule. Plaintiffs seek certification under Fed. R. Civ. P. 23(b)(3), because the questions of law or fact common to

---

[48] Specifically, the Superseding Indictments of Greg Singleton (El Paso) and Michelle Valencia (Dynegy) allege that these individuals agreed, on or about July 28, 2000, to not report actual trades between Dynegy and El Paso and to report false trades on or about August 30, 2000. (Ennis Decl. Exs. B-5 & B-6.)

[49] Reliant Resources, Inc. has admitted to engaging in wash trades. (Ennis Decl. Ex. D, RELMDL 0001995.)

[50] The Williams defendants have identified certain transactions with El Paso Merchant Energy, LP that may amount to wash trades. (*See* Ennis Decl. Ex. D, WGM-MDL-00008501-03; 05-06; 09-12.)

the class predominate over questions affecting only individual class members and a class action is superior to other available methods for adjudicating the controversy.

### B. PLAINTIFFS MEET THE REQUIREMENTS OF FED. R. CIV. P. 23(a).

#### 1. THE CLASS IS SO NUMEROUS THAT JOINDER OF ALL MEMBERS IS IMPRACTICABLE.

There is no serious dispute here that plaintiffs and their class meet Rule 23(a)'s basic requirements. The class is clearly "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "It is a long-standing rule that 'impractical' does not mean 'impossible' rather, impracticability means only 'the difficulty or inconvenience of joining all members of the class.'" *McCluskey v. Trustees of Red Dot Corp. Employee Stock Ownership Plan & Trust*, 268 F.R.D. 670, 674 (W.D. Wash. 2010) (quoting *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913 (9th Cir. 1964)).

Plaintiffs need not allege the precise number or identity of class members. *In re Rubber Chems.*, 232 F.R.D. at 350-51; *Californians for Disability Rights, Inc. v. California Dept. of Transp.*, 249 F.R.D. 334, 346 (N.D. Cal. 2008) ("there is no bright-line rule as to how many class members are required to be sufficiently numerous"). Courts have generally found that the numerosity requirement is satisfied when there are more than forty class members. *Horn v. Associated Wholesale Grocers, Inc.*, 555 F.2d 270, 275 (10th Cir. 1977) (41-46 class members); *Californians for Disability Rights,* 249 F.R.D. at 346; 1 R. Newberg, *Newberg on Class Actions,* 4th ed. § 3.5 (2008).[51] The EIA reported that between 2000 and 2002, Kansas had between 86,000 and 88,000 commercial consumers, and between 8,800 and 9,900 industrial consumers.

---

[51] Defendants removed this action to federal court under the Class Action Fairness Act ("CAFA"), which requires at least 100 class members and an aggregate of $5,000,000 in damages. *See* 28 U.S.C. § 1332(d); *see also Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1020-21 (9th Cir. 2007). Defendants' removal under CAFA is a concession that plaintiffs' proposed class is sufficiently numerous to satisfy Rule 23(a)(1).

(Ennis. Decl. Ex. E.)   The proposed class thus readily satisfies the numerosity requirement of Rule 23(a).

## 2.   THIS CASE INVOLVES QUESTIONS OF LAW AND FACT COMMON TO THE CLASS.

The second requirement for class certification under Rule 23(a) is the existence of common questions of law or fact.   Fed. R. Civ. P. 23(a)(2).   Rule 23(a)(2) is construed permissively.   *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).   "All questions of fact and law need not be common . . . .   The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class."   *Id.*   Indeed, the existence of even a single common question is sufficient to satisfy Rule 23(a)(2).   *Dukes*, 131 S.Ct. at 2556 ("We quite agree that for purposes of Rule 23(a)(2) [e]ven a single [common] question will do[.]" (internal quotation marks omitted)).

A "common issue" is one that can be proved with common proof, i.e., proof that when admitted applies to all class members equally, removing the need for each class member to prove the issue.   *Gen. Tel. Co. of the SW v. Falcon*, 457 U.S. 147, 155 (1982) ("Class relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'").   In considering price-fixing cases like this one, courts typically look to three primary common issues: (1) a violation of the antitrust laws, (2) plaintiffs suffered some injury resulting from the violation, and (3) the methodology of determining damages.   *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 634 (D. Kan. 2008).   Each of these elements is subject to common proof in this case.   There can be no genuine dispute that the antitrust violation is proved using proof common to all plaintiffs.   Likewise, because defendants manipulated the price indices that formed the basis for

the manipulated prices each plaintiff ultimately paid for natural gas, the proof of impact is common to all plaintiffs. (Harris Decl. ¶¶ 44-56.) Finally, as described by Drs. Harris and Dwyer, the methodology for establishing the ultimate measure of damages relies on proof common to all plaintiffs. (*Id.* ¶¶ 72-76; Dwyer ¶ 18.)

"Where an antitrust conspiracy has been alleged, courts have consistently held that the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist." *In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013) (internal quotation marks omitted); *see also Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 183 (N.D. Cal. 2015); *In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 447 (D. Kan. 2006); *Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 188 F.R.D. 365, 373 (D. Or. 1998) ("[w]hen the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected.") (citations omitted); *Northwestern Fruit Co. v. A. Levy & J. Zentner Co.*, 116 F.R.D. 384, 386 (E.D. Cal. 1986) ("In the absence of class certification, . . . each individual plaintiff would have to prove the same conspiracy, and would necessarily resort to the same evidence to do so."); 7A C. Wright et al., *Federal Practice & Procedure* § 1763, at 204 & n.11 (2d ed. 1986 & Supp. 2005) (observing that "[t]he claimed existence of a conspiracy to fix prices . . . in violation of the antitrust laws has been found to present common questions.").[52]

---

[52] *Accord* the following price-fixing suits: *In re Corrugated Container Antitrust Litig.*, 80 F.R.D. 244, 247 (S.D. Tex. 1978); *In re Plywood Anti-Trust Litig.*, 76 F.R.D. 570 (E.D. La. 1976); *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322 (E.D. Pa. 1976); *In re Sugar Indus.*, 1976 WL 1374; *In re Master Key Antitrust Litig.*, 70 F.R.D. 23 (D. Conn. 1975); *Dennis v. Saks & Co.*, 1975 WL 909 (S.D.N.Y. Jul. 10, 1975); *see also In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. 229, at 232 (D. Minn. 2001) ("Common questions are often found in antitrust price-fixing conspiracy cases, because by their nature, these cases deal with common legal and factual questions about the existence, scope and effect of the alleged conspiracy.") (citations and internal quotations omitted); *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, at 240

Here, questions of law and fact are common to the class.  They include:

(a) whether defendants and their co-conspirators manipulated the price paid for natural gas in Kansas by falsely reporting price and volume information, engaging in wash trades, churning, or otherwise artificially causing demand to appear high;

(b) whether defendants and their co-conspirators entered into arrangements, combinations or agreements to manipulate the price of natural gas sold in Kansas;

(c) whether defendants and other sellers took advantage of the manipulation to charge excessive, supra-competitive prices for the sale of natural gas in Kansas;

(d) whether plaintiffs and other members of the class paid manipulated prices for natural gas and were thereby injured as a result of defendants' unlawful conduct; and

(e) the method of determining the damages suffered by plaintiffs and other members of the class.

These issues present an overwhelming common core of questions focusing on the central issue in this action – the existence and effect of the alleged conspiracy.  Plaintiffs' claims here plainly satisfy the commonality requirement of Fed. R. Civ. P. 23(a).

### 3.   THE REPRESENTATIVE PLAINTIFFS' CLAIMS ARE TYPICAL OF THE CLAIMS OF THE CLASS.

The third requirement for maintaining a class action under Rule 23(a) is that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The typicality requirement ensures "that the interests of the named representatives align with those of the class."  *Weinberger v. Thornton*, 114 F.R.D. 599, 603 (S.D. Cal. 1986).  Courts "liberally construe[]" the typicality requirement.  *See Thomas &*

---

(E.D.N.Y. 1998) (collecting case law; explaining that courts generally find commonality requirement satisfied in cases where the complaint alleges price fixing); *In re Aluminum Phosphide Antitrust Litig.*, 160 F.R.D. 609, at 613 (D. Kan. 1995) (finding commonality requirement satisfied in antitrust price-fixing case).

*Thomas Rodmakers, Inc. v. Newport Adhesives and Composites*, 209 F.R.D. 159, 164 (C.D. Cal. 2002). Courts hold that "a representative's claim will be deemed typical when its 'injuries arise from the same events or course of conduct as do the injuries that form the basis of the class claims,' and 'are based on the same legal theory' as those of the absent class members." *In re Carbon Black Antitrust Litig.*, 2005 WL 102966, at *12 (D. Mass. Jan. 18, 2005) (quoting *In re Bank of Boston Corp. Sec. Litig.*, 762 F. Supp. 1525, 1532 (D. Mass 1991)); *In re Urethane*, 251 F.R.D. at 634.[53]

Typicality exists even if the named plaintiffs purchased a product at different prices in different ways. In such cases:

> [T]he named class members' claims, as well as the claims of the proposed classes, arise from the alleged price-fixing scheme perpetrated by defendants. The overarching scheme is the linchpin of plaintiffs' amended complaint, regardless of the product purchased, the market involved or the price ultimately paid. Furthermore, the various products purchased and the different amount of damage sustained by individual plaintiffs do not negate a finding of typicality, provided the cause of those injuries arises from a common wrong.

---

[53] Courts have generally found the typicality requirement to be satisfied in cases involving horizontal price-fixing conspiracies. *See In re Chlorine & Caustic Soda Antitrust Litig.*, 116 F.R.D. 622, 626 (E.D. Pa. 1987) ("In order to prevail on the merits in this case the plaintiffs will have to prove the same major elements that the absent members for the class would have to prove. . . . As such, the claims of the plaintiffs . . . are typical . . . ."; *see also In re Rubber Chems.*, 232 F.R.D. at 351 (typicality "will be established by plaintiffs and all class members alleging the same antitrust violations by defendants") (citations omitted); *In re Citric Acid Antitrust Litig.*, 1996 WL 655791, at *3 (N.D. Cal. 1996) ("The alleged underlying course of conduct in this case is defendants' conspiracy to fix the price of citric acid and to allocate customers among themselves . . . . The legal theory that plaintiffs rely on is antitrust liability. Because plaintiffs and all class members share these claims and this theory, the representatives' claims are typical of all."); *Estate of Garrison v. Warner Bros., Inc.*, 1996 WL 407849, at *2 (C.D. Cal. 1996) ("Typicality in the antitrust context will be established by plaintiffs and all class members alleging the same antitrust violations by the defendants") (citation omitted); *Northwestern Fruit Co.*, 116 F.R.D. at 388 (typicality requirement met "since plaintiffs and all other class members must prove the same conspiracy and its effectuation by the defendants."); *Smith v. Philip Morris Co., Inc.*, Case No. 00-CV-26, at 6 (Kan. D. Ct. Seward County 2001) (noting, in certifying a class under the Kansas full-consideration statute, that "[a] conspiracy to raise, fix or maintain the price of goods in commerce, when that conspiracy acts to raise, fix, or maintain the price of those goods when purchased at retail creates typicality between class representative and the members of the proposed class.") (Ennis Decl. Ex. C-3); 1 ABA Section of Antitrust Law, *Antitrust Law Developments* 932 (5th ed. 2002) (typicality normally satisfied in price-fixing claims).

*Flat Glass*, 191 F.R.D. at 480; *Premier Pork, Inc. v. Rhone-Poulenc, S.A.*, Mem. Decision and J. Entry on Plaintiff's Mot. for Class Certification, Case No. 00-C-3, at 4 (District Court of Scott County, Kansas, May 1, 2004) (citing *In re Aluminum Phosphide Antitrust Litig.*, 160 F.R.D. 609 (N.D. Miss. 1993) (noting that differences in the methods of purchase, kinds of products purchased among class members, differences in prices, varying competitive environments, differences in the distribution chain are not a bar to a finding of typicality). (Ennis Decl. Ex. C-4.)

The named plaintiffs, like their proposed class, purchased natural gas during the class period directly from defendants and other marketers at prices affected by the alleged conspiracy. Like their class, they allege that defendants engaged in collusive conduct in violation of the Kansas antitrust laws. As such, the named plaintiffs' claims are identical to those of the class and are necessarily typical of those of the class. The typicality requirement of Fed. R. Civ. P. 23 is readily satisfied.

### 4. PLAINTIFFS WILL FAIRLY AND ADEQUATELY REPRESENT THE CLASS.

The fourth requirement of Rule 23 mandates that the representative plaintiffs fairly and adequately represent the class. Fed. R. Civ. P. 23(a)(4). A plaintiff shows that it adequately represents the class by demonstrating that it has no conflicts of interest with the proposed class. In addition, the plaintiff must show class counsel is qualified and competent. *Hanlon*, 150 F.3d at 1020; *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978).

Plaintiffs here meet both requirements. First, the class representatives' claims arise from the same events and course of conduct that give rise to the claims of the class members. Plaintiffs and the other class members were overcharged for natural gas and have a mutual interest in establishing defendants' liability and in recovering damages for the overcharges. Plaintiffs seek relief substantially identical to that sought by every other class member, i.e., full

consideration or treble damages. There are no actual or potential conflicts of interest between the representative plaintiffs and the members of the class. Accordingly, the interests of the representative plaintiffs and the putative class members in recovering the overcharges align.

As shown by their Declarations, plaintiffs accept and are ready to carry out their responsibilities to the class members. (Zima Decl. ¶ 4; Fletcher Decl. ¶ 4.) Plaintiffs have also retained capable and experienced counsel to represent the class. As shown by the Declarations of Jennifer Gille Bacon, Donald Barry, Gregory M. Bentz, Von Heinz, Gary D. McCallister, and Russell S. Jones, Jr., plaintiffs' counsel have defended or successfully prosecuted numerous antitrust class actions throughout the United States. Polsinelli and its predecessors alone have represented parties in more than 200 class actions. (Tab 9, Russell Jones Decl. ¶ 4.) Plaintiffs' counsel will prosecute this action vigorously, and there is no serious dispute that they satisfy the adequacy requirement of Rule 23.

### 5.    THE PROPOSED CLASS IS ASCERTAINABLE.

A class is "ascertainable" if "the description of the class is "'definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member.'" *In re Cathode Ray Tube*, 308 F.R.D. at 614 (quoting *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998)). Here, Plaintiffs' class definition is objective and definite:  it comprises Kansas industrial and commercial consumers of natural gas that purchased their gas directly from a natural gas production, marketing, or trading company during the class period.

Class members can be identified at least three different ways. First, defendants' own data provides this information; both Dr. Harris and Dr. Dwyer have relied on this data for their antitrust input studies. (*See, e.g.,* Harris Decl. ¶¶ 14 and 59-75). Because of the unique nature of natural gas distribution, industrial and commercial users typically could only receive the gas they purchased from marketing and trading companies through transmission lines owned by local

distribution companies, or LDCs. (Tab 29, Bentz Decl. ¶ 5.) These LDCs have records for the class period that identify entities that purchased "transport only" gas, which is necessarily gas sold to industrial and commercial end-use customers (*Id.* ¶¶ 4-5.)

The identity of class members may also be shown from separate business records generated by LDCs. These records are provided to marketers supplying gas to class members, and those marketers in turn provide them to class members. For example, monthly Natural Gas Reconciliation Imbalance Analysis reports, prepared by LDC St. Joseph Power & Light, were given to named Plaintiff Northwest Missouri State University in the Missouri case by its gas marketer, Utilicorp Energy Services. (Ennis Decl. Ex. H-1, A. Martin Dep., pp. 10, 19, 55-56; Ennis Decl. Ex. H-2, Depo. Ex. 9107.) These reports show the volume of gas purchased by the class member daily and the total purchases each month. (Ennis Decl. Ex. H-1, A. Martin Dep., pp. 58; Ennis Decl. Ex. H-2, Depo. Ex. 9107.) There are thus objective methods of determining the class membership.

The possibility that the class may contain some class members who lack standing or were not harmed by defendants' conduct does not preclude class certification. *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672 (7th Cir. 2009) ("a class will often include persons who have not been injured by the defendant's conduct . . . [but] [s]uch a possibility or indeed inevitability does not preclude class certification"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 253298, at *1-3 (N.D. Cal. Jan. 26, 2012) (refusing to decertify a class on ascertainablility grounds where the class definition was based on "objective criteria" and observing that "[n]umerous courts have held that a class can be certified even if its membership is unclear or overbroad.").

## C. THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF FED. R. CIV. P. 23(b)(3).

After determining that the proposed class satisfies Fed. R. Civ. P. 23(a), the Court should certify a class under Fed. R. Civ. P. 23(b)(3) if it "finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." "Judicial economy and fairness are the focus of the predominance and superiority requirements." *Oregon Laborers-Employers*, 188 F.R.D. at 375 (citations omitted). The proposed class readily meets the predominance and superiority requirements.

### 1. Common questions of law and fact predominate over individual questions.

Rule 23(b)(3)'s requirement that common issues predominate over individual issues tests "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Plaintiffs need not show that there are no questions affecting only individual members—only that individual questions do not "overwhelm" the common ones. *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2412 (2014). Indeed, the fact that "the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate." *Id.* "At the weighing step, the Court must keep in mind that 'common liability issues are typically far more important and contested and the individual damage calculations often formulaic.'" *Coleman through Bunn v. D.C.*, 306 F.R.D. 68, 85 (D.D.C. 2015) (quoting Newberg on Class Actions § 4:54 (5th ed. 2014)).

As the overwhelming weight of authority, including Supreme Court cases, has held, predominance is "readily met" in antitrust price-fixing cases. *Amchem*, 521 U.S. at 626. In

determining whether common questions predominate in a price-fixing case, "the focus of this court should be principally on issues of liability." *In re Sugar Indus. Antitrust Litig.*, 1976 WL 1374, at \*22 (N.D. Cal. May 21, 1976); *see also In re Nexium Antitrust Litig.*, 777 F.3d 9, 21 (1st Cir. 2015) ("Where common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain.") (quotation marks and alteration omitted); *Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001); *Hanlon*, 150 F.3d at 1022 ("common nucleus of facts and potential legal remedies dominates this litigation."); *In re Citric Acid*, 1996 WL 655791, at \*6. Here, the primary issues of liability, and the primary issues to be tried, are the existence of an arrangement, conspiracy or combination to manipulate prices and the impact of that conspiracy on plaintiffs and class members through their purchases of gas at artificial, manipulated prices. *See* K.S.A. §§ 50-108, 50-115. These are common issues.

Common questions need only predominate; they need not be dispositive of the litigation as a whole. *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 29 (D.D.C. 2001). The predominance standard is met "unless it is clear that individual issues will overwhelm the common questions and render the class action valueless." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y. 1996).

> **a.  The Existence of an Arrangement or Combination to Manipulate Prices is a Predominant Common Question.**

Courts recognize the existence of a conspiracy among defendants as the predominant issue common to all plaintiffs in horizontal price-fixing cases:  "In price-fixing cases, courts have regarded the existence of a conspiracy as the overriding issue even when the market involves diversity in products, marketing, and prices." *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1255 (10th Cir. 2014); *see also In re Rubber Chems.*, 232 F.R.D. at 352 ("the Court notes

that the great weight of authority suggests that the dominant issues in cases like this are whether the charged conspiracy existed and whether price-fixing occurred") (internal quotation marks omitted); *In re Cement and Concrete Antitrust Litig.*, 1979 WL 1595, at *2 (D. Ariz. Mar. 9 1979) ("the asserted nationwide price-fixing conspiracy presents questions of law and fact common to the class members which predominate over any questions affecting only individual members"); *In re Sugar Indus.*, 1976 WL 1374, at *23 ("It is the allegedly unlawful horizontal price-fixing arrangement among defendants that, in its broad outlines, comprises the predominating, unifying common interest as to these purported Plaintiff representatives and all potential class members."). District courts in the Ninth Circuit and elsewhere have held that the conspiracy issue alone is sufficient to satisfy the Fed. R. Civ. P. 23 predominance requirement. *See, e.g.*, *In re Rubber Chems.*, 232 F.R.D. at 352; *In re Citric Acid*, 1996 WL 655791, at *8.

And courts have uniformly found predominant common questions of law or fact with respect to the existence, scope, and effect of an alleged antitrust price-fixing combination. *In re Citric Acid*, 1996 WL 655791, at *6 (common questions include whether there was a conspiracy, whether prices were fixed pursuant to the conspiracy, and whether the prices plaintiffs paid were higher than they should have been); *In re Sugar Antitrust Litig,*, 559 F.2d 481, 483 (9th Cir. 1977) (noting "there is almost a rebuttable presumption that such a class action should be allowed where there is a plausible claim of violation of the Sherman Act."); *Estate of Garrison*, 1996 WL 407849, at *3 ("Antitrust price fixing conspiracy cases by their nature deal with common legal and factual questions of the existence, scope and effect of the alleged conspiracy.") (citations omitted).

Here common proof will show the nature and extent of defendants' conspiracy. *See supra* at 10-21 (detailing the extensive proof available of defendants' conspiracy to manipulate

the natural gas pricing indices, and thus the market itself). Common issues relating to the existence of an anticompetitive combination or arrangement predominate over any questions arguably affecting only individual class members because the combination is the central issue in the case. Each plaintiff does not have to prove separately the existence of the arrangement or combination; once it is proved for one, it is proved for all. If the class members were forced to file separate actions, each class member would offer the same evidence to establish the existence of the same conspiracy. This is precisely what Rule 23(b) was designed to avoid.

> **b.** **The Impact of the Arrangement or Combination on Natural Gas Purchasers is a Predominant Common Question Under Either an Overcharge Theory or the Kansas Full Consideration Remedy.**

Here the anticompetitive effect of defendants' conspiracy, i.e., defendants' manipulation of natural gas prices, will also be established by common proof. As the FERC, CFTC and DOJ investigations established, defendants' illicit conduct directly impacted pricing indices, thereby causing class members significant economic harm by distorting market signals and forcing them to pay higher prices for natural gas. Courts have repeatedly held that where a defendant is alleged to have participated in a price-fixing conspiracy, impact will be presumed, and the Rule 23(b)(3) predominance requirement is thus satisfied. *In re Carbon Black*, 2005 WL 102966, at *15 ("in a price fixing conspiracy case, [impact] is often a fair assumption"); *In re Rubber Chems.*, 232 F.R.D. at 352 ("[B]ecause the gravamen of a price-fixing claim is that the price in a given market is artificially high, there is a presumption that an illegal price-fixing scheme impacts upon all purchasers of a price-fixed product in a conspiratorially affected market") (citations omitted); *In re Cement and Concrete*, 1979 WL 1595, at *3 ("Courts have consistently held that an illegal price fixing scheme presumptively impacts upon all purchasers of a price fixed product in a conspiratorially affected market.") (citations omitted).

33

Even in the absence of a presumption, courts require only that the class representative present "a reasonable method for determining, on a classwide basis, the alleged antitrust activity's impact on class members." *In re Cathode Ray Tube*, 308 F.R.D. at 625. Critically, "[t]his is a question of methodology, not merit. . . . the Court cannot undertake a full merits analysis at this point, and should avoid engaging in a battle of the experts." *Id.* "At the class certification stage, the plaintiffs need not definitively prove that each class member has suffered an injury-in-fact. Instead they must only demonstrate that any such 'impact is capable of proof at trial through evidence that is common to the class rather than individual to its members.'" *In re Air Cargo Shipping Services Antitrust Litig.*, 2014 WL 7882100 at*41 (E.D.N.Y. Oct. 15, 2014). Moreover, courts routinely certify classes despite contentions by defendants that the "complexity of the market" precludes common proof of impact. "Diversity of products and pricing does not necessarily mean that plaintiffs cannot show class-wide impact . . . ." *In re Citric Acid*, 1996 WL 655791 at *6.

Antitrust impact can be established here through proof that the defendants conspired to inflate the reported index prices, because those prices were either directly used as a benchmark for actual prices, or at a minimum were the starting point for individual price negotiations between buyers and sellers. *See In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200 (M.D. Pa. 2012) ("the court concurs that list prices are quite relevant to the underlying claims because Direct Purchasers allege that Defendants colluded to increase list prices, thereby raising the starting point for price negotiations, ultimately inflating the prices paid."); *EPDM*, 256 F.R.D. at 90 ("This evidence of a standardized pricing structure, which (in light of the alleged conspiracy) presumably establishes an artificially inflated baseline from which any individualized negotiations would proceed, provides generalized proof of class-wide impact.");

*In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 486 (W.D. Penn. 1999) ("[E]ven though some plaintiffs negotiated prices, if plaintiffs can establish that the base price from which these negotiations occurred was inflated, this would establish at least the fact of damage, even if the extent of the damage by each plaintiff varied.").

### (1)    Overcharge Theory

Plaintiffs can establish impact here through common proof under an overcharge theory. Although there are still discovery issues outstanding (and some materials produced as late as last week that have not been thoroughly reviewed), plaintiffs' experts, Dr. Michael Harris and Dr. Mark Dwyer, have nevertheless developed a workable model showing classwide antitrust impact. Dr. Harris, who has extensive experience in this area, demonstrates that the question of impact – whether class members were injured by the price-fixing conspiracy – will be proved with evidence common to all class members. (Harris Decl. ¶ 13.) He explains that "it is clear that class members are similarly situated given: the fungible nature and thus standardized pricing of natural gas; the inability to develop unique terms of exchange for the provision of natural gas as a commodity; the underlying reality that the market in which class members purchased the gas is not segmented by unique and different economic, market, industry, or institutional fundamentals." (*Id.* ¶ 56.) Instead, all "class members purchased in a market that is defined . . . by the same fundamentals." *Id.* Thus, the defendants' conduct would have had a common impact across class members. *Id.*

Drs. Harris and Dwyer demonstrate the actual antitrust impact of the alleged price fixing arrangement through economic modeling with data common to the class. (*Id.* ¶¶ 12-14; Dwyer Decl. ¶¶ 9-11.) Dr. Harris concludes, after considering and incorporating Dr. Dwyer's analysis, that all or nearly all Kansas industrial and commercial purchasers of natural gas during the relevant time period were forced to participate in a market distorted by illegal manipulation and

to pay inflated prices, thereby suffering antitrust impact, as a result of defendants' illegal arrangement. (Harris Decl. ¶¶ 9, 44-56.) He specifically addresses class members who purchased natural gas pursuant to contracts tied to published monthly price indices. (*Id.* ¶ 9.) Dr. Harris has successfully created "but-for" monthly pricing indices that isolate and remove the false price reports made by defendants and their co-conspirators. (*Id.* ¶¶ 59-75.) Comparing this "but-for" index price, one purged of false reports, to the false manipulated index prices to which all class members' purchases were ultimately tied, demonstrates the classwide impact of the conspiracy. As Dr. Harris concludes (Harris Decl. ¶ 74.):

> Based on the results shown in Exhibit 8, [showing the "but-for" index reconstruction and the calculated distortions] and Dr. Dwyer's results, coupled with the purchasing patterns of the class members, the vast majority of the class members included in the Defendants' data that we were able to analyze were impacted in the context of an overcharge theory.

Thus "all, or nearly all, of the class members in Kansas were impacted by Defendants' conduct." (*Id.* ¶ 76.)

Dr. Dwyer has separately conducted a regression analysis for proposed class members that purchased natural gas pursuant to fixed price monthly transactions, daily indexed transactions, or transactions tied to NYMEX. (Dwyer Decl. ¶¶ 5, 8.) He, too, has concluded that the collusive manipulation of the monthly price indices identified by Dr. Harris affected these fixed-price and NYMEX-based tranactions. (*Id.* ¶ 71.) But he has also determined that defendants' and co-conspirators' wash trading and churning activities adversely affected them as well. (*Id.* ¶¶ 70, 135-139.) Dr. Dwyer's analysis, incorporated into Dr. Harris's declaration, shows antitrust impact in the form of increased prices that affected the vast majority of the proposed class. Again, in Dr. Harris's words, based on these combined analyses "all, or nearly, all" of the proposed class members were impacted by the defendants' conspiracy in the form of overcharges. (Harris Decl. ¶ 76.)

Antitrust impact is thus demonstrated by reliable economic modeling that both experts recognize is common to the class. (Harris Decl. ¶ 76; Dwyer Decl. ¶ 139.) These conclusions readily meet plaintiffs' burden to present a "reasonable method" to show classwide common impact. *See In re Cathode Ray Tube*, 308 F.R.D. at 625. These conclusions are well-reasoned and based on an extensive analysis of the Kansas natural gas market.[54]

Importantly, although plaintiffs can show sustained antitrust impact for their class, impact would be shown even if plaintiffs or class members had purchased gas at an overcharged price for only one instance during the class period. "[P]laintiffs do not have to show that each class member suffered an overcharge on each and every purchase they made. Rather, it is enough if they provide sufficient evidence to demonstrate that substantially all class members were overcharged at least once." *In re Air Cargo Shipping Antitrust Litig.,* 2014 WL 7882100 at *45.

Finally, these economic models are conservative. Even though Dr. Dwyer found that the manipulated monthly pricing indices affected the following months' actual prices (Dwyer Decl. ¶ 71), Dr. Harris assumed in his "but-for" pricing model that the actual prices paid for natural gas each month were valid transactions that had not been influenced by defendants' earlier manipulation (Harris Decl. ¶ 68.) Thus the classwide impact here is, if anything, understated.

### (2)      Full Consideration Remedy

Proof of the antitrust impact is especially straightforward under the full consideration provisions of the Kansas antitrust statute. Kansas allows persons injured or damaged by arrangements "designed or which tend to advance, reduce or control the price" to recover the "full consideration or sum paid" for the affected product. K.S.A. §§ 50-112, 50-115. For full consideration under K.S.A. § 50-515, once the conspiracy itself is shown, impact is established,

---

[54] Further, Dr. Dwyer concludes that natural gas prices throughout the United States are interdependent, such that any manipulation beyond the borders of Kansas would affect the class members as well. (Dwyer Decl. ¶¶ 24-49.)

and all that needs to be determined is the amount paid by class members for natural gas. (Harris Decl. ¶¶ 57, 75.) As discussed, common evidence establishes defendants' conspiracy to control at the very least the price of natural gas by manipulating the price indices. Mere price manipulation is an antitrust violation, *see United States v. Socony Vacuum Oil Co.*, 310 U.S. 150 (1940), and common proof shows that this manipulation alone provides the requisite antitrust impact to plaintiffs and their class. *See O'Brien v. Leegin Creative Leather Products, Inc.*, 2014 WL 1362657, at *8 (Kan. Ct. App. Apr. 4, 2014) ("If the class members can show a violation of K.S.A. 50–112, then they do not have to show that the price they paid was specifically higher or lower than it otherwise might have been—K.S.A. 50–115 provides that they may recover the purchase price paid for the goods.").

### c. The Method for Calculating Damages is a Predominant Common Question.

Likewise, common *methods* can be used to quantify the injury suffered by plaintiffs and the class members. The Court's role at this stage in the litigation in assessing the proposed methods of proving damages is limited; the inquiry is simply whether Plaintiffs' damages model is "workable." *See Giles v. St. Charles Health Sys., Inc.*, 294 F.R.D. 585, 595 (D. Or. 2013) ("*Comcast* does not act as a bar to class actions where the plaintiffs provide a workable damages model."); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 100 (D. Conn. 2009) ("The real question . . . is whether the plaintiffs have established a workable multiple regression equation, not whether plaintiffs' model actually works [.]")

Again, the method for determining full-consideration damages under K.S.A. § 50-115 is straightforward; one simply needs to determine the amount class members paid for the gas they bought at manipulated prices. *See In re Vitamin Antitrust Litig.*, J. Entry for Class Certification, Master Case No. 98-C-4574, at 6 (discussing predominance, the court notes that "[i]ndeed

[calculating damages] may be easier and more common in this case because Kansas allows the 'full consideration' or 'price paid' damages to be awarded for an antitrust violation.") (Dist. Ct. of Wyandotte County, Kansas Mar. 10, 2006). (Ennis Decl. Ex. C-5.); *See also O'Brien*, 2014 WL 1362657, at *8 (Kan. Ct. App. 2014).

Plaintiffs need not prove the amount of overcharge to obtain full consideration damages under K.S.A. § 50-115. *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 633 F. Supp. 2d 1151, 1160 (D. Nev. 2007) ("Awarding full consideration damages under the Kansas antitrust statutes would not require the Court to make 'an assessment of what rates would have been charged.'"). Rather, calculating "full consideration" damages requires only that plaintiffs establish the "sum paid by such person for any goods, wares, merchandise and articles included in or advanced or controlled in price by such combination[.]" K.S.A. § 50-115; *see also O'Brien*, 2014 WL 1362657, at *8 (Kansas antitrust statute does not require a showing "that the price paid was specifically higher or lower than it otherwise might have been").

For the alternative treble damages remedy, Dr. Harris has developed a model for computing actual damages on a class-wide basis by reconstructing the Trade Publications indices without including the wash trades, falsely reported trades, and churning. (Harris Decl. ¶¶ 67-75.) As part of this analysis, Dr. Harris (a) identifies the defendants' actual and bona fide natural gas transactions from defendants' data; (b) identifies the price index locations and months in which false reporting occurred by comparing the actual trades with reports of trades given to the Trade Publications; (c) replicates the published index prices using the underlying data provided by McGraw Hill and Intelligence Press; and (d) creates a but-for natural gas price index by recreating the published index using the defendants' actual natural gas transactions. (*Id.*) For example, using the LDC records plaintiffs have obtained showing the date and amount of

"transport only" natural gas purchases (Tab 29, Bentz Decl. ¶¶ 4-5), plaintiffs will be able to match these purchases with the overcharges established by Dr. Harris's reconstructed pricing indices and Dr. Dwyer's regression-derived model.  As Dr. Harris concludes (Harris Decl. ¶ 76):

> Based on economic theory and analysis it is … my opinion that there exist commonly accepted and straightforward methods for determining and measuring the amount of artificiality in prices and thus the damages incurred by class members.  The methods and analysis used to measure damages is also common to class members.

This is exactly the sort of mechanical calculation favored in class action damages actions.

Finally, even if the *amount* of damages sustained by each class member did present an individual issue, it is well-established that such differences do not preclude class certification. *See, e.g.*, *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013) ("In this circuit, however, damage calculations alone cannot defeat certification." (internal quotation marks omitted)); *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 986 (9th Cir. 2015) (same); *Spann v. J.C. Penney Corp.*, 307 F.R.D. 508, 529 (C.D. Cal. 2015) ("courts uniformly h[o]ld that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations." (internal quotation marks omitted)); *In re Sugar Indus.*, 73 F.R.D. at 354 ("If this Court were to adopt defendants' argument and deny [the] class [action] because the computation of damages on . . . an individual basis destroys the 'predominance' requirement of Rule 23(b)(3), it would be tantamount to encouraging wrongdoers to commit great antitrust violations on many consumers in small amounts so as to raise the spectre of unmanageability to defeat a class action.").  Courts repeatedly reject the assertion in price-fixing cases that individual questions as to the amount of damages defeat class certification.  *See, e.g.*, *In re Sugar Indus.*, 73 F.R.D. at 346-48; *In re Rubber Chems.*, 232 F.R.D. at 352; *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 217 n.13 (E.D. Pa. 2001); *see also In re Citric Acid*, 1996 WL 655791, at *6-8.

## 2. A CLASS ACTION IS SUPERIOR TO OTHER AVAILABLE METHODS FOR ADJUDICATING THE CONTROVERSY.

Certification of a case is appropriate if class treatment "is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). The Rule requires the Court to consider four factors: (a) the class members' interests in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action. (*Id.*) Prosecuting this action as a class action is clearly superior to other methods of adjudicating this matter.

The alternative to a class action, i.e., many duplicative individual actions, would be inefficient and unfair. Numerous individual actions would be expensive and time-consuming and create the danger of conflicting decisions as to similarly-situated entities. *Lerwill*, 582 F.2d at 512. Further, it would deprive many class members of any practical means of redress. Because prosecution of an antitrust conspiracy case against economically powerful defendants is difficult and expensive, class members with all but the largest claims would likely choose not to pursue their cases. *See Las Vegas Sands, Inc.*, 244 F.3d at 1163. Absent class certification, most class members would be effectively foreclosed from pursuing their claims. *Hanlon*, 150 F.3d at 1023 ("many claims [that] could not be successfully asserted individually . . . would not only unnecessarily burden the judiciary, but would prove uneconomic for potential plaintiffs."); *Northwestern Fruit Co.*, 116 F.R.D. at 389 ("Multiple lawsuits . . . would be costly and inefficient, and the exclusion of every class member that cannot afford separate representation would be neither 'fair' nor an 'adjudication' of their claims."). Both sides in this case will realize significant savings if this case is litigated just once.

Therefore, the proposed class satisfies the superiority requirement of Fed. R. Civ. P. 23.

**D.    HORIZONTAL PRICE-FIXING CASES ARE ROUTINELY CERTIFIED AS CLASS ACTIONS.**

Well-established public policy relating to antitrust class actions, as well as the particular facts of this case, support certifying this matter as a class action.  The Supreme Court has repeatedly emphasized the importance of private enforcement of antitrust laws and the importance of class actions to this enforcement.  *E.g.*, *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979).  Courts in this Circuit have reaffirmed this core principle:

> Class actions play an important role in the private enforcement of antitrust actions.  For this reason, courts resolve doubts in these actions in favor of certifying the class.  Courts have stressed that price-fixing cases are appropriate for class certification because a class-action lawsuit is the most fair and efficient means of enforcing the law where antitrust violations have been continuous, widespread, and detrimental to as yet unidentified consumers.

*In re Rubber Chems.*, 232 F.R.D. at 350 (internal citations and quotations omitted); *see also In re Lorazepam & Clorazepate*, 202 F.R.D. at 21-22; *In re Cement and Concrete*, 1979 WL 1595, at *3 (claimants and the public "benefit from a class action and expeditious adjudication of the issues involved since class actions 'reenforce the regulatory scheme by providing an additional deterrent beyond that afforded either by public enforcement or by single-party private enforcement.'") (citation omitted).

District courts in the Ninth Circuit consistently grant class certification in horizontal price-fixing cases.  *See, e.g.*, *In re Optical Disk Drive Antitrust Litig.*, 2016 WL 467444 (N.D. Cal. Feb. 8, 2016); *In re Rubber Chems.*, 232 F.R.D. at 349; *In re Sorbates Direct Purchaser Antitrust Litig.*, Case No. C 98-4886 (N.D. Cal. 2002) (Ennis Decl. Ex. C-1); *In re Sodium Gluconate Antitrust Litig.*, Master File No. C 97-4142 CW (N.D. Cal. 1997) (Ennis Decl. Ex. C-

2); *In re Citric Acid*, 1996 WL 655791, at *8 (N.D. Cal. 1996).[55]  This Court should do so as well.

> ### E.    THIS COURT HAS RECOGNIZED THAT SIMILAR CASES MEET THE REQUIREMENTS OF RULE 23 AND SHOULD LIKEWISE CERTIFY THIS CASE.

This Court has already certified a settlement class in the ongoing California natural gas litigation, which is based on the same conspiracy to manipulate natural gas prices among the same defendants at issue here.[56]  In fact, the CMS Defendants, Coral, Dynegy, and the Williams Defendants all stipulated to certification in those actions, thereby stipulating that the requirements of Rule 23 were met.[57]  Those stipulations, and this Court's reasoning in certifying those cases as class actions, should apply equally here.[58]

A class cannot be certified for settlement purposes where certification for trial purposes would be inappropriate.  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (holding

---

[55] Other federal courts do the same.  *See, e.g.*, *In re Carbon Black*, 2005 WL 102966, at *22; *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 254 (D.D.C. 2002); *In re Lorazepam*, 202 F.R.D. at 14 (D.D.C. 2001); *In re Flat Glass*, 191 F.R.D. at 475; *In re Commercial Tissue Products*, 183 F.R.D. 589, 590 (N.D. Fla. 1998); *In re Plastic Cutlery Antitrust Litig.*, 1998 WL 135703, at *1 (E.D. Pa. Mar. 20, 1998); *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 693 (D. Minn. 1995); *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 681 (N.D. Ga. 1991); *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 268, 272 (D. Minn. 1989); *Northwestern Fruit Co.*, 116 F.R.D. at 388.

[56] This Court has already certified settlement classes in *Texas-Ohio Energy, Inc. v. CenterPoint Energy, Inc.*, No. CV-S-04-0465-PMP-PAL; *Fairhaven Power Company v. EnCana Corp.*, No. CV-S-05-0243-PMP-PAL; *Abelman Art Glass Co. v. EnCana Corp.*, No. CV-S-05-0437-PMP-LRL; *Utility Savings & Refund Services, Inc. v. Reliant Energy Services, Inc.*, No. CV-S-5-05-0110-PMP-LRL; and *Ever-Bloom, Inc. v. AEP Energy Services, Inc.*, No. CV-S-05-0808-PMP.

[57] Other defendants in the present action participated in and did not object to the *In re Western States* settlement, while purporting to have the settlement and the Court's findings deemed "not precedential."

[58] At the mediation on February 1, 2016, a settlement of the claims in this MDL action was reached between the named plaintiffs both individually and as class representatives in the Kansas, Missouri and Wisconsin class actions and defendants Duke Energy Carolinas, L.L.C. and its affiliate Duke Energy Trading and Marketing Company, L.L.C. and American Electric Power Company and its affiliate AEP Energy Services, Inc.  The parties to the settlements are documenting the settlement terms.  They will soon be presenting this partial settlement of this case to the Court for approval under Rule 23(e).

that to certify a settlement class Courts must undertake the same analysis required to certify a class for trial purposes). Accordingly, even in a settlement class context, the requirements of Rules 23(a) and (b)(3) must be met. (*Id.*)

In certifying the settlement class involving California plaintiffs, this Court noted that the claims in that case arose from defendants causing natural gas prices "to increase by conducting prearranged 'wash trades' (the contemporaneous purchase and sale of the same amount of natural gas at the same price) and by reporting false price and volume information to trade publications that compile natural gas price indices." *See In re Western States Wholesale Natural Gas Antitrust Litig.*, 2:03-cv-01431-PMP-PAL, Doc. No. 510, *Order Preliminarily Approving Settlements, Certifying a Settlement Class, and Authorizing Dissemination of Notice,* at 2-3. The class definition certified for settlement purposes in the California cases was even broader than the definition sought here, but still included the type of purchasers at issue in this case – direct purchasers for their own use or consumption. (*Id.* at 4.) This Court expressly held that the California class cases satisfied each of the elements of class certification. (Id.) at 4-5. This Court ultimately held that "the prerequisites to a class action under Federal Rule of Civil Procedure 23(a) have been satisfied . . ." and that the cases "may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3)." (*Id.*)

Because this Court has previously certified similar classes suing for damages suffered in the same conspiracy among the same defendants, *Amchem* counsels certification here.

## V. CONCLUSION

For these reasons stated, the Court should certify the proposed class.

Dated: March 7, 2016

       */s/ Gregory M. Bentz*

| | |
|---|---|
| Russell S. Jones, Jr. | (KS 70214) |
| Jennifer Gille Bacon | (KS 70279) |
| Gregory M. Bentz | (KS 70358) |

Polsinelli PC
900 West 48th Place, Suite 900
Kansas City, Missouri 64112
Telephone:  816-753-1000
Fax:  816-753-1536

Von S. Heinz                       (NV 859)
Lewis Roca Rothgerber Christie LLP
3993 Howard Hughes Pkwy., Suite 600
Las Vegas, Nevada 89169
Telephone:  702-949-8200
Fax:  702-949-8398

Gary D. McCallister              (KS 08928)
McCallister Law Group, LLC
120 N. LaSalle Street, Suite 2800
Chicago, Illinois  60602
Telephone:  312-345-0611
Fax:  312-345-0612

Donald D. Barry                 (KS 6250)
Barry Law Offices, LLC
5340 S.W. 17th Street
P.O. Box 4816
Topeka, Kansas 66604
Telephone:  785-273-3151
Fax:  785-273-5115

Eric I. Unrein                   (KS 16042)
Frieden, Unrein, Forbes & Biggs, LLP
555 S. Kansas Ave., Suite 3030
Topeka, Kansas 66603
Telephone:  785-354-1100
Fax:  785-354-1113

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of March, 2016, a true and correct copy of the foregoing was electronically served on counsel for all parties properly registered to receive notice via the Court's CM/ECF system.

_/s/ Gregory M. Bentz_

## **Exhibit 12**

**Plaintiff Heartland Regional Medical Center's Motion For Class Certification
And Memorandum In Support Entered As Docket No. 2309 In *In re Western
States Wholesale Natural Gas Antitrust Litigation***

Jennifer Gille Bacon
Gregory M. Bentz
Russell S. Jones, Jr.
Dennis D. Palmer
Polsinelli PC
900 West 48th Place, Suite 900
Kansas City, Missouri 64112
Phone:  (816) 753-1000
Fax:  (816) 753-1536

 [Additional counsel listed below]

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| IN RE: WESTERN STATES | ) | MDL DOCKET NO. 1566 |
| WHOLESALE NATURAL GAS | ) | |
| ANTITRUST LITIGATION. | ) | Base Case File No. 2:03-CV-01431- |
| | ) | RCJ-PAL |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| *Heartland Regional Medical Center, et al.* | ) | 2:07-CV-00987-PMP-PAL |
| *v.  ONEOK, Inc., et al.* | ) | |
| | ) | |
| | ) | |

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**
**AND MEMORANDUM IN SUPPORT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

MOTION FOR CLASS CERTIFICATION ................................................................. 1

MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION ..................... 2

I.     INTRODUCTION ................................................................................................ 2

II.    LEGAL STANDARD FOR CLASS CERTIFICATION ...................................................... 4

III.   BACKGROUND ................................................................................................. 5

      A.   THE PARTIES AND MEMBERS OF THE CLASS ............................................... 5

      B.   PLAINTIFFS' CAUSES OF ACTION ............................................................. 6

      C.   THE NATURAL GAS MARKET .................................................................... 7

           1.   STRUCTURE AND DYNAMICS OF THE NATURAL GAS MARKET ................ 8

           2.   PLAINTIFFS AND THEIR CLASS PURCHASED NATURAL GAS AT PRICES BASED ON OR AFFECTED BY PUBLISHED INDEX PRICES. ......................................... 8

           3.   PLAINTIFFS PAID ARTIFICIALLY INFLATED PRICES FOR NATURAL GAS BECAUSE DEFENDANTS COLLUSIVELY MANIPULATED PUBLISHED PRICE INDICES. 10

      D.   OPERATION AND EFFECT OF THE CONSPIRACY TO MANIPULATE NATURAL GAS PRICES ........................................................................ 10

      E.   EVIDENCE OF CONSPIRACY DEVELOPED THROUGH DISCOVERY ................ 13

           1.   COLLUSIVE WASH TRADING BY DEFENDANTS ................................ 13

           2.   DEFENDANTS KNEW THAT THEIR CO-CONSPIRATORS WERE MANIPULATING THE INDICES .......................................................... 16

           3.   DEFENDANTS RECORDED PHONE CONVERSATIONS SHOWING MANIPULATION OF THE NATURAL GAS INDICES ................................ 18

      F.   GOVERNMENT INVESTIGATION, GUILTY PLEAS, AND CIVIL AND CRIMINAL PENALTIES ........................................................................ 19

IV.   ARGUMENT: THIS CASE MEETS ALL THE REQUIREMENTS FOR CERTIFICATION AS A CLASS ACTION ....................................................... 21

      A.   CLASS CERTIFICATION STANDARD .......................................................... 21

B.    Plaintiffs Meet the Requirements of Fed. R. Civ. P. 23(a). .............................21

      1.    The class is so numerous that joinder of all members is impracticable. ...............................................................................................21

      2.    This case involves questions of law and fact common to the class. ....22

      3.    The representative plaintiffs' claims are typical of the claims of the class..................................................................................................25

      4.    Plaintiffs will fairly and adequately represent the class...................26

      5.    The proposed class is ascertainable. ..........................................................27

C.    The Proposed Class Satisfies the Requirements of Fed. R. Civ. P. 23(b)(3). ....29

      1.    Common questions of law and fact predominate over individual questions.......................................................................................................29

            a.    The Existence of an Arrangement or Combination to Manipulate Prices is a Predominant Common Question...............................................30

            b.    The Impact of the Arrangement or Combination on Natural Gas Purchasers is a Predominant Common Question Under an Overcharge Theory. ...................................................................................32

            c.    The Method for Calculating Damages is a Predominant Common Question. .............................................................................................36

      2.    A class action is superior to other available methods for adjudicating the controversy. ..................................................................38

D.    Horizontal Price-Fixing Cases Are Routinely Certified as Class Actions.......................................................................................................39

E.    This Court Has Recognized That Similar Cases Meet the Requirements of Rule 23 and Should Likewise Certify This Case. ...........................................41

V.    CONCLUSION ...................................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Abelman Art Glass Co. v. EnCana Corp.*,
    No. CV-S-05-0437-PMP-LRL..............................................................................41

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ............................................................... 29, 30, 41, 42

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
    133 S.Ct. 1184 (2013) ...................................................................................4

*Arandell Corp., et al. v. Xcel Energy, Inc., et al.*,
    Case No. 2:07-cv-01019-PMP-PAL, Doc. No. 179 ..................................... 12, 19

*Californians for Disability Rights, Inc. v. California Dept. of Transp.*,
    249 F.R.D. 334 (N.D. Cal. 2008) ...................................................................22

*Coleman through Bunn v. D.C.*,
    306 F.R.D. 68 (D.D.C. 2015)..........................................................................29

*Comcast Corp. v. Behrend*,
    133 S.Ct. 1426 (2013) ..............................................................................4, 37

*Dennis v. Saks & Co.*,
    1975 WL 909 (S.D.N.Y. 1975)........................................................................24

*E&J Gallo Winery v. EnCana Corp.*,
    503 F.3d 1027 (9th Cir. 2007) ...................................................................9, 11

*E&J Gallo Winery v. EnCana Energy Servs., Inc.*,
    2008 WL 4224492 (E.D. Cal., Sept. 12, 2008)....................................................8

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ...........................................................................5

*Estate of Garrison v. Warner Bros., Inc.*,
    1996 WL 407849 (C.D. Cal. 1996)............................................................26, 31

*Ever-Bloom, Inc. v. AEP Energy Services, Inc.*,
    No. CV-S-05-0808-PMP .............................................................................41

*Fairhaven Power Company v. EnCana Corp.*,
    No. CV-S-05-0243-PMP-PAL.......................................................................41

*Gen. Tel. Co. of the Southwest*,
    457 U.S. 147, 155 (1982) ............................................................................. 23

*Giles v. St. Charles Health Sys., Inc.*,
    294 F.R.D. 585 (D. Or. 2013) ...................................................................... 37

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S.Ct. 2398 (2014) ................................................................................. 29

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ..................................................... 22, 26, 30, 39

*Harris v. Palm Springs Alpine Estates, Inc.*,
    329 F.2d 909 (9th Cir. 1964) ....................................................................... 21

*Hawaii v. Standard Oil Co.*,
    405 U.S. 251 (1972) ...................................................................................... 4

*Horn v. Associated Wholesale Grocers, Inc.*,
    555 F.2d 270 (10th Cir. 1977) ..................................................................... 22

*In re Air Cargo Shipping Services Antitrust Litig.*,
    2014 WL 7882100 at*41 (E.D.N.Y. 2014) .............................................. 33, 36

*In re Aluminum Phosphide Antitrust Litig.*,
    160 F.R.D. 609 (D. Kan. 1995) .................................................................... 24

*In re Bank of Boston Corp. Sec. Litig.*,
    762 F. Supp. 1525 (D. Mass 1991) .............................................................. 25

*In re Carbon Black Antitrust Litig.*,
    Civ. No. 03-10191-DPW, 2005 WL 102966 (D. Mass. Jan. 18, 2005) ............. 25, 32, 40

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    308 F.R.D. 606 (N.D. Cal. 2015) ....................................................... 4, 27, 33, 36

*In re Cement and Concrete Antitrust Litig.*,
    1979 WL 1595 (D. Ariz. 1979) ........................................................... 31, 32, 40

*In re Chlorine & Caustic Soda Antitrust Litig.*,
    116 F.R.D. 622 (E.D. Pa. 1987) ................................................................... 25

*In re Chocolate Confectionary Antitrust Litig.*,
    289 F.R.D. 200 (M.D. Pa. 2012) ................................................................. 33

*In re Citric Acid Antitrust Litig.*,
    1996 WL 655791 (N.D. Cal. 1996) ....................................... 25, 30, 31, 33, 38, 40

*In re Commercial Tissue Products*,
    183 F.R.D. 589 (N.D. Fla. 1998) ............................................................40

*In re Corrugated Container Antitrust Litig.*,
    80 F.R.D. 244 (S.D. Tex. 1978).............................................................24

*In re Domestic Air Transp. Antitrust Litig.*,
    137 F.R.D. 677 (N.D. Ga. 1991).............................................................40

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
    256 F.R.D. 82 (D. Conn. 2009)........................................................ 33, 37

*In re Flat Glass Antitrust Litig.*,
    191 F.R.D. 472 (W.D. Penn. 1999)................................................ 26, 34, 40

*In re High-Tech Employee Antitrust Litig.*,
    985 F. Supp. 2d 1167 (N.D. Cal. 2013)...................................................23

*In re Linerboard Antitrust Litig.*,
    203 F.R.D. 197 (E.D. Pa. 2001)............................................................38

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    202 F.R.D. 12 (D.D.C. 2001)......................................................... 30, 40

*In re Master Key Antitrust Litig.*,
    70 F.R.D. 23 (D. Conn. 1975)..............................................................24

*In re Monosodium Glutamate Antitrust Litig.*,
    205 F.R.D. 229 (D. Minn. 2001)...........................................................24

*In re NASDAQ Market-Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y. 1996) ..........................................................30

*In re Nexium Antitrust Litig.*,
    777 F.3d 9 (1st Cir. 2015)...................................................................30

*In re Optical Disk Drive Antitrust Litig.*,
    Case No. 3:10-md-2143 RS, 2016 WL 467444 (N.D. Cal. Feb. 8, 2016) ............40

*In re Plastic Cutlery Antitrust Litig.*,
    1998 WL 135703 (E.D. Pa. Mar. 20, 1998) ..............................................40

*In re Playmobil Antitrust Litig.*,
    35 F. Supp. 2d 231 (E.D.N.Y. 1998).......................................................24

*In re Plywood Anti-Trust Litig.*,
    76 F.R.D. 570 (E.D. La. 1976)..............................................................24

*In re Potash Antitrust Litig.*,
    159 F.R.D. 682 (D. Minn. 1995)..............................................................................40

*In re Rubber Chems. Antitrust Litig.*,
    232 F.R.D. 346 (N.D. Cal. 2005).......................................... 4, 22, 25, 31, 32, 38, 40

*In re Sodium Gluconate Antitrust Litig.*,
    Master File No. C 97-4142 CW (N.D. Cal. 1997) (Ennis Decl. Ex. C-2).............................40

*In re Sorbates Direct Purchaser Antitrust Litig.*,
    Case No. C 98-4886 (N.D. Cal. 2002) (Ennis Decl. Ex. C-1)................................40

*In re Sugar Antitrust Litig*,
    559 F.2d 481 (9th Cir. 1977) ..............................................................................31

*In re Sugar Indus.*,
    1976 WL 1374 .................................................................................. 24, 30, 31

*In re Sugar Indus. Antitrust Litig.*,
    73 F.R.D. 322 (E.D. Pa. 1976).................................................................. 24, 38

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. M 07-1827 SI, 2012 WL 253298 (N.D. Cal. Jan. 26, 2012)...........................28

*In re Urethane Antitrust Litig.*,
    237 F.R.D. 440 (D. Kan. 2006).............................................................................23

*In re Urethane Antitrust Litig.*,
    251 F.R.D. 629 (D. Kan. 2008)...................................................................... 23, 25

*In re Urethane Antitrust Litig.*,
    768 F.3d 1245 (10th Cir. 2014)...........................................................................31

*In re Vitamins Antitrust Litig.*,
    209 F.R.D. 251 (D.D.C. 2002).............................................................................40

*In re Western States Wholesale Natural Gas Antitrust Litig.*,
    2:03-cv-01431-PMP-PAL, Doc. No. 510..............................................................42

*In re Wirebound Boxes Antitrust Litig.*,
    128 F.R.D. 268 (D. Minn. 1989)..........................................................................40

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
    305 F.R.D. 164 (N.D. Cal. 2015)..........................................................................23

*Kohen v. Pac. Inv. Mgmt. Co.*,
    571 F.3d 672 (7th Cir. 2009) ..............................................................................28

*Lerwill v. Inflight Motion Pictures, Inc.*,
  582 F.2d 507 (9th Cir. 1978) ......................................................................... 26, 39

*Leyva v. Medline Indus. Inc.*,
  716 F.3d 510 (9th Cir. 2013) ............................................................................... 38

*Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*,
  244 F.3d 1152 (9th Cir. 2001) ...................................................................... 30, 39

*McCluskey v. Trustees of Red Dot Corp. Employee Stock Ownership Plan & Trust*,
  268 F.R.D. 670 (W.D. Wash. 2010) .................................................................... 21

*Northwestern Fruit Co. v. A. Levy & J. Zentner Co.*,
  116 F.R.D. 384 (E.D. Cal. 1986) ...................................................... 24, 26, 39, 40

*O'Connor v. Boeing N. Am., Inc.*,
  184 F.R.D. 311 (C.D. Cal. 1998) ........................................................................ 27

*Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*,
  188 F.R.D. 365 (D. Or. 1998) ...................................................................... 23, 29

*Pulaski & Middleman, LLC v. Google, Inc.*,
  802 F.3d 979 (9th Cir. 2015) ............................................................................... 38

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979) ....................................................................................... 4, 40

*Serrano v. 180 Connect, Inc.*,
  478 F.3d 1018 (9th Cir. 2007) ............................................................................ 22

*Spann v. J.C. Penney Corp.*,
  307 F.R.D. 508 (C.D. Cal. 2015) ........................................................................ 38

*Texas-Ohio Energy, Inc. v. CenterPoint Energy, Inc.*,
  No. CV-S-04-0465-PMP-PAL .............................................................................. 41

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives and Composites*,
  209 F.R.D. 159 (C.D. Cal. 2002) ........................................................................ 25

*United States v. Valencia*,
  600 F.3d 389 (5th Cir. 2010) ........................................................................ 18, 19

*Utility Savings & Refund Services, Inc. v. Reliant Energy Services, Inc.*,
  No. CV-S-5-05-0110-PMP-LRL ........................................................................... 41

*Wal–Mart Stores, Inc. v. Dukes*,
 131 S.Ct. 2541 (2011) ..................................................................................4, 22

*Weinberger v. Thornton*,
 114 F.R.D. 599 (S.D. Cal. 1986).....................................................................25

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
 395 U.S. 100 (1969) ...........................................................................................4

## Statutes

28 U.S.C. § 1332(d) ...........................................................................................22

Fed. R. Civ. P. 23............................................... 1, 4, 5, 21, 26, 27, 31, 39, 41

Fed. R. Civ. P. 23(a)........................................... 1, 3, 21, 22, 25, 29, 41, 42

Fed. R. Civ. P. 23(a)(1) ................................................................................21, 22

Fed. R. Civ. P. 23(a)(2) .........................................................................................22

Fed. R. Civ. P. 23(a)(3) .........................................................................................25

Fed. R. Civ. P. 23(a)(4) .........................................................................................26

Fed. R. Civ. P. 23(b) .......................................................................................21, 32

Fed. R. Civ. P. 23(b)(3)........................................ 1, 3, 21, 29, 32, 38, 39, 41, 42

Fed. R. Civ. P. 23(e)..............................................................................................41

Fed. R. Civ. P. 30(b)(6)........................................................................................14

Mo. Rev. Stat. § 416.031, et seq. .........................................................................2

Mo. Rev. Stat. § 416.031.1 ...................................................................................6

Mo. Rev. Stat. § 416.121 ...................................................................................6, 7

## Other Authorities

1 R. Newberg, *Newberg on Class Actions* .....................................................22, 29

7A C. Wright et al., *Federal Practice & Procedure* § 1763, at 204 (2d ed. 1986 &
 Supp. 2005)......................................................................................................24

"Final Report on Price Manipulation in Western Markets" ("FERC Report") ................ 11, 14, 17

## MOTION FOR CLASS CERTIFICATION

Pursuant to Fed. R. Civ. P. 23, plaintiffs move this Court for an Order certifying this case as a class action, the class being defined as follows:

> All industrial and commercial direct purchasers of natural gas for their own use or consumption during the Relevant Time Period, and which gas was used or consumed by them in Missouri. Excluded from the Class are (a) entities that purchased natural gas for resale (to the extent of such purchase for resale); (b) entities that purchased natural gas for generation of electricity for the purpose of sale (to the extent of such purchase for generation); (c) defendants and their predecessors, affiliates and subsidiaries; and (d) the federal government and its agencies.

The "relevant time period" is January 1, 2000 through February 2002. [1] As set forth in Plaintiffs' Memorandum in Support, the proposed class meets the requirements for class certification under Fed. R. Civ. P. 23(a) and 23(b)(3).

Plaintiffs base this Motion on the expert reports of Dr. Michael Harris and Dr. Mark Dwyer, the Declarations of Gregory M. Bentz, Russell S. Jones, Jr., Jennifer Gille Bacon, Donald Barry, Von Heinz, Andrew Ennis, and the named plaintiffs, the pleadings and other documents on file and in the accompanying Compendium,[2] and all other written or oral arguments that they may present to the Court.

---

[1] The evidence shows that defendants' collusive conduct continued beyond February 2002, and the Amended Complaint alleges a class period of January 1, 2000 through October 31, 2002. Based on the data reviewed to date by plaintiffs' experts, it currently appears that the impact of the conspiracy may have ended by March 2002. However, recently obtained Kansas Gas Marketing data, as well as other data sets identified by plaintiffs' experts that are not yet usable, may change this impact period. If so, plaintiffs' experts will promptly file a supplemental report, and plaintiffs reserve the right to extend the impact period beyond February 2002.

[2] Plaintiffs' concurrently-filed Compendium of Exhibits contains all of the declarations and exhibits referred to in this Memorandum.

## MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

## I.    INTRODUCTION

Defendants and their co-conspirators colluded to harm American consumers on a massive scale.  Their unprecedented and pervasive conduct dramatically raised the price of natural gas to consumers nationwide, including plaintiffs and their Missouri class.  Defendants achieved their ends by manipulating published price indices that commercial and industrial consumers relied on to inform their purchasing decisions.  The result: natural gas prices were pushed to historic highs.

This is a straightforward horizontal price-fixing class action in which plaintiffs allege that defendants[3] and others arranged, agreed, combined or conspired to manipulate the price of natural gas sold to industrial and commercial users in the State of Missouri between January 1, 2000 and March 1, 2002.[4]  Defendants' conduct violated Missouri's state antitrust laws, Mo. Rev. Stat. § 416.031, et seq., entitling plaintiffs and the members of the class to recover three times the unlawful overcharge.  Defendants' conspiracy was possible because of a unique feature of the natural gas market during the class period – the nearly universal dependence by commercial and industrial natural gas users on price indices published by a few trade publications to guide their purchase price decisions.  Because those indices depended largely on self-reporting, they were readily subject to manipulation by major industry players.  Even though plaintiffs and class members thought the indices reflected actual market conditions, and made

---

[3] Defendants include ONEOK, Inc., ONEOK Energy Marketing and Trading Co., L.P., Kansas Gas Marketing Co., The Williams Companies, Inc., Williams Merchant Services Co., Inc., Williams Energy Marketing & Trading, American Electric Power Company, AEP Energy Services, Inc., Duke Energy Carolinas, L.L.C. (f/k/a Duke Energy Corp.), Duke Energy Trading and Marketing Co., L.L.C., Dynegy Marketing & Trade, El Paso Corp., El Paso Merchant Energy, L.P., CMS Energy Corp., CMS Marketing Services & Trading Co., CMS Field Services, Reliant Energy, Inc., Reliant Energy Services, Inc., Coral Energy Resources, L.P., Xcel Energy, Inc., and e prime, Inc.

[4] *See supra* at 1, n.1.

2

their price decisions accordingly, the indices had in fact been manipulated and artificially inflated through a widespread conspiracy among defendants and others.

The Amended Complaint for Damages ("Amended Complaint") (*Heartland* Docket Doc. 24) alleges that defendants, acting together and in concert with others, falsely reported trade data and engaged in wash trades, churning and other illegal activities that manipulated prices paid by plaintiffs and the other class members. (Am. Compl. ¶¶ 49-52.) Defendants' conduct manipulated, distorted and artificially increased the prices of natural gas based on pricing indices compiled by a handful of trade publications, and plaintiffs and the class members, bought natural gas at prices affected by those same manipulated indices. (Am. Compl. ¶¶ 53, 54.) Because defendants' collusive index manipulation caused these higher prices, class members paid hundreds of millions of dollars more than they should have for natural gas during the relevant time period.

This action readily satisfies the requirements for class certification of Rules 23(a) and (b)(3). The class, which numbers in the thousands, is so numerous that joinder of all members would be impractical. Questions of law and fact are common to the members of the class. The claims asserted by the representative plaintiffs are typical to the claims of all class members. Plaintiffs and their counsel will fairly and adequately represent the interests of the class. The common issues – relating to the existence and effect of the alleged price-fixing conspiracy – predominate over any individual issues, and a class action is superior to other available methods for the fair and efficient adjudication of this case. As a practical matter, a class action is the only feasible way to vindicate the rights of the thousands of Missouri class members that plaintiffs seek to represent.

## II.    LEGAL STANDARD FOR CLASS CERTIFICATION

The Supreme Court has long recognized that antitrust class actions are a vital component of antitrust enforcement. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979) ("[t]hese private suits provide a significant supplement to the limited resources available to the Department of Justice for enforcing the antitrust laws and deterring violations."); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262 (1972) ("Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress.  This system depends on strong competition for its health and vigor, and strong competition depends, in turn, on compliance with antitrust legislation."); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130-31 (1969) ("the purpose of giving private parties treble-damage and injunctive remedies was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws.")

"Courts therefore 'resolve doubts in these actions in favor of certifying the class.'" *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 612 (N.D. Cal. 2015) (quoting *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005)).  Indeed, "a class-action lawsuit is the most fair and efficient means of enforcing the law where antitrust violations have been continuous, widespread, and detrimental to as yet unidentified consumers." *In re Rubber Chems*, 232 F.R.D. at 350.

In deciding motions to certify a class, courts must conduct a "rigorous analysis" of whether the plaintiffs have satisfied the requirements of Rule 23.  *Wal–Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011).  "Rigorous analysis" frequently entails "some overlap with the merits of ... plaintiff's underlying claim," which "cannot be helped." *Id.*; *see also Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (2013).  However, "Rule 23 grants courts "no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S.Ct. 1184, 1194–95 (2013) ("Merits questions may be considered to

the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites ... are satisfied."); *see Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011) (district court may examine the merits of the underlying claim "only inasmuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims. To hold otherwise would turn class certification into a mini-trial.") (citations omitted).

## III. BACKGROUND

### A. THE PARTIES AND MEMBERS OF THE CLASS

Plaintiff Heartland Regional Medical Center ("Heartland") is located in St. Joseph, Missouri and is the primary hospital for the city of St. Joseph and several smaller surrounding communities. Heartland purchased natural gas during the relevant time period at prices pegged to published indices to heat its hospital and outpatient clinic buildings. Heartland purchased gas that was pegged to published price indices. (Tab 20, David Jones Decl. ¶ 2.)

During the class period, plaintiff Prime Tanning Corporation ("Prime Tanning") was a well-known leather tanning operation with its principal place of physical operations in St. Joseph, Missouri. Prime Tanning purchased natural gas to heat its facilities and to provide fuel for certain operations in the leather tanning process. Prime Tanning purchased natural gas at prices that were pegged during the relevant time period to published price indices. (Tab 24, Ream Decl. ¶ 2.)

Plaintiff Northwest Missouri State University ("NWMSU") is a publicly funded university with its principal location in Maryville, Missouri. NWMSU purchased natural gas directly from one or more of the defendants during the relevant period.

Defendants are (or were during the relevant time period) engaged in the business of marketing natural gas. Defendants or their corporate affiliates, along with co-conspirators and other natural gas marketers, sold natural gas to plaintiffs or members of the class.

The class consists of all industrial and commercial direct purchasers[5] of natural gas for their own use or consumption in Missouri from January 1, 2000 through February 2002. The class members primarily used natural gas to heat schools, hospitals, factories, stores, offices and other facilities, or, at times, as a source of energy used to make products. According to the United States Energy Information Administration ("EIA"), over 135,000 commercial and industrial entities bought natural gas in Missouri each year during the relevant time period. (Tab 16, Ennis Decl. Ex. E.)

### B.    PLAINTIFFS' CAUSES OF ACTION

Plaintiffs seek recovery, on behalf of themselves and the class, for defendants' violations of Missouri antitrust law. Mo. Rev. Stat. § 416.031.1 provides that "[e]very contract, combination or conspiracy in restraint of trade or commerce in this state is unlawful."

Plaintiffs seek treble damages under Mo. Rev. Stat. § 416.121. That section states:

Any person, including the state, who is injured in his business or property by reason of anything forbidden or declared unlawful by sections 416.011 to 416.161 may sue therefor in any circuit court of this state in which the defendant or defendants, or any of them, reside, or have any officer, agent or representative, or in which any such defendant, or any agent, officer or representative may be found. Such person may:

(1) Sue for damages sustained by him, and if the judgment is for the plaintiff he shall be awarded threefold damages by him sustained and reasonable attorneys' fees as determined by the court, together with the costs of suit; and

---

[5] A "direct purchaser" is an entity that bought natural gas for its own use or consumption directly from a natural gas production, marketing or trading company, such as, but not necessarily limited to, defendants, without the gas first having been sold to a local distribution company.

(2) Bring proceedings to enjoin the unlawful practices, and if decree is for the plaintiff he shall be awarded reasonable attorneys' fees as determined by the court, together with the costs of the suit.

Thus, to recover under Missouri law, plaintiffs must prove (1) a contract, combination, or conspiracy in restraint of trade or commerce between persons (2) that tended to manipulate or artificially influence the price of natural gas, and (3) that plaintiffs were injured by purchasing natural gas at manipulated prices. *Id.* Under § 416.121, once plaintiffs prove the elements of liability, they are entitled to recover threefold the damages they sustained in overpaying for natural gas. *Id.* Plaintiffs will prove these elements with evidence common to the class members, making this action suitable for certification as a class action.

### C.   THE NATURAL GAS MARKET

Natural gas is a fungible commodity. (Tab 3, Harris Decl. ¶ 49.)[6] Gas from one field is interchangeable with gas from another, and natural gas can be moved through a network of pipelines throughout the United States. (*Id.* ¶ 22.) As a commodity, one molecule of natural gas is perfectly substitutable for another, and natural gas is sold subject to standardized pricing terms. (*Id.* ¶¶ 49-50.) The market in which this commodity is sold is subject to the same or similar market fundamentals. (*Id.* ¶ 53.) Natural gas purchase contracts are for the most part standard by industry design, and set gas prices at a dollar amount per standard unit because of the fungible nature of the commodity. (*Id.* ¶¶ 28, 50).[7]

---

[6] All references to the declarations of Dr. Harris or Dr. Dwyer in this Memorandum refer to their respective declarations captioned for the *Learjet* action and dated March 7, 2016.

[7] Gas volumes are usually expressed in MCFs (thousand cubic feet) or MMcf (million cubic feet). Gas is often bought and sold based on the amount of energy potential in the volume of gas, expressed as MMBtu (millions of British thermal units, or Btus). One MCF of natural gas is generally considered to contain one MMBtu of energy potential, so that one MCF and one MMBtu generally represent the same volume of gas.

### 1. Structure and dynamics of the natural gas market

Natural gas is brought out of the ground by producers, then sold by natural gas marketers (like defendants and their affiliates) to buyers who arrange to have the gas transported to them through interstate and intra-state pipelines.  (*Id.* ¶¶ 22-24.)  During the relevant time period, defendants and other gas marketers were major providers of natural gas that typically bought, sold, and traded gas across all the major trading locations, or "hubs," throughout the country. (*Id.* ¶ 24.)  Commercial and industrial users like plaintiffs and the class members bought natural gas directly from natural gas marketers, paying a pipeline or a local distribution company separately for transportation or distribution services.  (*Id.* ¶¶ 23-24.)

Natural gas is traded and priced at locations throughout the United States, including production areas, pipeline interconnections, centralized hubs, and utility "city gates."  (*Id.* ¶ 22).  A map showing major natural gas hubs and pricing centers is included in the accompanying Compendium.  (Ennis Decl. Ex. F.)  During the relevant time period, several major hubs served as pricing points in Missouri.  (Harris Decl. ¶ 33.)

### 2. Plaintiffs and their class purchased natural gas at prices based on or affected by published index prices.

Plaintiffs and the class bought natural gas in 2000-2002 at prices pegged to or affected by natural gas indices published by a few industry publications (collectively, the "Trade Publications").[8]  (Am. Compl. ¶¶ 49-54.)  The Trade Publications surveyed buyers and sellers to obtain data on natural gas sales and used that data to calculate pricing indices for gas sold and

---

[8] The Trade Publications include *Gas Daily* and *Inside FERC Gas Market Report* ("*Inside FERC*"), both published by Platt's, a division of McGraw-Hill.  *Gas Daily*, which publishes a daily price index, and *Inside FERC*, which publishes a monthly index, are the most widely used indices in the industry.  The other major Trade Publication components are *Natural Gas Intelligence*, *BTU Daily* and *Natural Gas Week,* all newsletters that calculate and publish index prices for natural gas.  (Am. Compl. ¶ 47.)  *See E&J Gallo Winery v. EnCana Energy Servs., Inc.*, 2008 WL 4224492 (E.D. Cal., Sept. 12, 2008).

delivered at particular locations. (Harris Decl. ¶¶ 30-31.) During the relevant time period, defendants and their co-conspirators provided the Trade Publications with price and volume figures for transactions for delivery at specific pricing or delivery locations. (Am. Compl. ¶ 47-50.) The Trade Publications compiled this data and published daily and monthly pricing indices for natural gas based on the data received from traders. (Harris Decl. ¶ 31.) As far as buyers knew, these indices reflected the market price for natural gas at a particular location at a particular time. (*Id.* ¶¶ 29-31.)

During the relevant time period, these pricing indices set or directly affected the prices at which plaintiffs and class members bought natural gas. (*Id.* ¶¶ 20-21.) As the Ninth Circuit observed in a related case, "[b]uyers and sellers relied on these indices to determine the market price for natural gas transactions." *E&J Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1031 (9th Cir. 2007). Plaintiffs and class members used three pricing methods for buying natural gas: prices tied to monthly Trade Publication indices, fixed price contracts, or prices indexed to daily market references like *Gas Daily* or NYMEX. (Harris Decl. ¶ 10); (Tab 7, Dwyer Decl. ¶¶ 3-4). Plaintiffs bought most of their gas based on the pricing indices under pricing terms referencing a particular index for a particular location, e.g., "Inside FERC Southern Star Central + $0.31 per MMBtu." Therefore, as the published (and manipulated) price indices at a location changed, the price for natural gas under a contract pegged to those indices likewise changed. (Harris Decl. ¶ 50). Similarly, contracts for sale of a stated quantity of gas at a stated price, for example 240 Mcf at $6.72 each, were also priced based largely on price indices, and therefore would inevitably be influenced by changes in such indices. (*See* Harris Decl. ¶ 51.)

3. **Plaintiffs paid artificially inflated prices for natural gas because defendants collusively manipulated published price indices.**

The Amended Petition alleges that defendants collusively manipulated index prices by reporting false or inaccurate information to the Trade Publications. (Am. Compl. ¶ 52.) In addition, defendants engaged in collusive and manipulative trading tactics, such as wash trading and churning, which not only operated to directly manipulate index prices, but also created false impressions about supply and demand in the natural gas market. (*Id.* ¶¶ 49-53; Harris Decl. ¶¶ 37-39.) Defendants' coordinated reporting of false or inaccurate price or volume information directly affected the published indices because the indices were designed to reflect the weighted average of actual prices at particular locations. (Harris Decl. ¶ 29.) Therefore, altering trading prices or volumes skewed the index away from a true reflection of actual market conditions. (*Id.* ¶ 39.) Similarly, reporting completely fictitious trades, with fabricated price and volume figures, moved indices away from the actual state of the market. (*Id.* ¶¶ 20 and 36-40.) The direct result of this collusive conduct was a huge spike in the Trade Publication index prices during the class period. (*Id.* ¶ 35.) Because plaintiffs purchased natural gas at prices based on, pegged to, or affected by the Trade Publication indices that defendants manipulated, plaintiffs paid more for natural gas than they would have absent defendants' collusive manipulative conduct. (Am. Compl. ¶ 57.)

D. **OPERATION AND EFFECT OF THE CONSPIRACY TO MANIPULATE NATURAL GAS PRICES**

Plaintiffs allege that defendants engaged in an arrangement, combination, or conspiracy to manipulate natural gas prices through a number of illegal practices that not only controlled, but artificially inflated, indices used to price Missouri natural gas sales to plaintiffs and their class. (*Id.* ¶ 57.) These allegations – which need not be proved at this stage – are nonetheless supported by substantial evidence.

In March 2003, FERC staff issued its "Final Report on Price Manipulation in Western Markets" ("FERC Report").[9]  The FERC Report considered, in detail, manipulative practices by various companies, and concluded:

> The process for reporting natural gas price indices was fundamentally flawed and must be fixed.  Traders had the ability and incentive to manipulate the published indices *and they did so.*  Given the degree of systematic manipulation described in this chapter, the published indices could not possibly be accurate based solely on the publisher's editorial judgment, the traders' feel for the market, or the hope that competing traders could offset each other's false reporting.  Staff began the investigation looking for evidence of energy price manipulation in the West.  *Staff found evidence of manipulation (direct and indirect) of the published natural gas price indices at significant trading points all over the United States.*

(Ennis Decl. Ex. A at III-54) (emphasis added); *see also Gallo*, 503 F.3d at 1031-32.  FERC's investigation also revealed that defendants' manipulative trading conduct had a direct impact on the price of natural gas throughout the United States.  (Ennis Decl. Ex. A-3 at III-54.)

The FERC Report documented false reporting in the form of reporting fictitious trades, altering the volume or price component of actual trades, reporting transactions "observed" in the market, and even reporting based on an individual trader's "sense of the market."  (*Id.* Ex A-3 at III-3-III-15.)  According to that report, at least five of the current defendants – AEP, CMS, Dynegy, El Paso, and Williams – admitted to FERC that they had engaged in false or inaccurate reporting of trading information to the Trade Publications.  (*Id.* Ex. A-3 at III-2.)[10]  For example, FERC concluded that ninety-nine percent (99%) of defendant El Paso's reported trades from its Mid-Continent trading desk were phony in that they did not represent actual trades.  (*Id.*, Ex. A-3 at III-13.)  Often, this false reporting was accomplished with the direct help of a coconspirator.  For example, in December 2002, Dynegy and another company, West Coast Power LLC, settled

---

[9] Selected relevant chapters of the FERC Report appear in the Compendium as Ex. A to Declaration of Andrew J. Ennis.

[10] Subsequent discovery has shown that all defendants participated in false reporting to the Trade Publications.  *See infra* at 14-20.

charges that Dynergy caused West Coast to submit information "misrepresenting that West Coast was a counterparty to fictitious trades."[11] There is substantial evidence that traders working for Dynegy, El Paso, and co-conspirator Encana exchanged information that they would each report to the trade publications.

FERC also concluded that defendants manipulated price indices through collusive and manipulative trading practices. One such practice was wash trading. A "wash trade" is a prearranged pair of trades of the same goods between the same parties, involving no economic risk and no net change in beneficial ownership. (*Id.* Ex. A-4 at VII-1; Harris Decl. ¶ 37.) Wash trades expose the parties to no monetary risk and serve no legitimate business purposes. (Ennis Decl. Ex. A-4 at VII-1.) Wash trading is inherently collusive because it necessarily relies on an agreement between two parties, i.e., Trader A agrees to sell to Trader B a stated quantity of gas at a stated price, and Trader B agrees to sell an equal quantity back to Trader A at the same price.[12] Reports of wash trades to the Trade Publications, like other false or inaccurate reports, directly impacted price indices and gave a false impression of volatility in the market by suggesting that certain companies were more active than they actually were. (Harris Decl. ¶¶ 36-37; 39.) Market participants were thus misled about the volume of trading activity and volatility in the market. (*Id.* ¶ 39.)

Beyond that, wash trades provided defendants with a method of manipulating price indices without detection, because Trade Publications were more likely to rely on reported wash trades in calculating price indices, in that wash trades seemingly presented actual trades with

---

[11] CFTC Press Release, *Dynegy Marketing & Trade and West Coast Power LLC Pay $5 Million to Settle CFTC Charges of Attempted Manipulation and False Reporting*, Dec. 19, 2002.

[12] This Court has expressly acknowledged the inherently collusive nature of wash trades and pointed to plaintiffs' allegations of wash trading as indicative of a conspiracy. *See Order* (denying defendants' motion to dismiss for failure to state a claim), *Arandell Corp., et al. v. Xcel Energy, Inc., et al.*, Case No. 2:07-cv-01019-PMP-PAL, Doc. No. 179.

actual counterparties. (*Id.* ¶ 37.) Thus, these inherently collusive wash trades also served to validate the widespread false reporting by defendants and their co-conspirators. (*Id.*). Defendants CMS Marketing Services & Trading Company, CMS Field Services, Dynegy Marketing & Trade, Reliant Energy Services, Inc., and Williams Energy Marketing & Trading have publicly admitted to making wash trades. (Am. Compl. ¶ 50.)[13]

The Amended Petition also alleges that defendants manipulated the price of gas by "churning." (*Id.*) "Churning" refers to a pattern of successive bursts of trading activities within a short period of time, usually involving several times the volume of natural gas actually needed by the company. (Harris Decl. ¶ 38.) Churning gives the appearance of increased market volatility and therefore directly impacts prices.[14] (*Id.*) Because published indices report a midpoint or average price for a day's trading, churning activities would necessarily bias the reported midpoint or average prices. (Ennis Decl. Ex. A-2 at II-30.)

### E.  EVIDENCE OF CONSPIRACY DEVELOPED THROUGH DISCOVERY

Discovery to date has confirmed the widespread conspiracy among Defendants to manipulate the gas price indices.

#### 1.  COLLUSIVE WASH TRADING BY DEFENDANTS

Wash trading occurs when two companies agree to enter into offsetting transactions that result in no net change in ownership position for the purpose of manipulating the gas pricing

---

[13] Discovery has shown that all defendants have engaged in offsetting transactions. *See infra* at 14-20.

[14] The FERC Report extensively documents churning through Enron Online ("EOL"). EOL functioned such that it was either the buyer or seller in every natural gas trade made through EOL. (*See* Ennis Decl. Ex. A-2 at II-26.) During most of the relevant time period, virtually every gas trader had an EOL screen. (Ennis Decl. Ex. A-2. at II-31.) Because EOL was so widely used and provided real-time access to information, the entire market could observe churning and the resulting pronounced price movement on EOL. (*Id.*)

indices. Because a wash trade requires two participants, it is inherently collusive. Discovery to date has produced extensive evidence of wash trading by defendants.

- In March 2002, the CEO of Reliant told analysts on a conference call that 20% of the company's trading volume in 2001 was the result of wash trades with CMS and three other firms.[15] According to a Reliant press release issued the same day, wash trading "had the effect of increasing revenues by about 10 percent" between 1999 and 2001.[16] Reliant's CEO blamed the wash trading on the actions of "some misguided employees."[17] Following the disclosures about wash trading at Reliant, two high level Reliant offers were forced to resign.[18] Reliant later acknowledged that 1.3% of its natural gas trading volume in dollars in 2001 was the result of wash trades.[19] In deposition testimony, Reliant's corporate representative admitted that Reliant conducted wash trades.[20]

- According to the 2003 FERC Report, CMS, Dynegy, Williams, and Reliant all admitted to engaging in wash trades.[21]

- Duke business records produced to the SEC show that Duke participated in hundreds of wash trades from November 2000 through February 2002 with

---

[15] Ennis Decl. Ex. G-1, Reliant Resources says "no value" trades upped revenue, Reuters, May 13, 2002.

[16] *Id.*, Reliant Resources, Inc. Press Release, *Reliant Resources Announces Preliminary Findings*, PR Newswire, May 13, 2002.

[17] *Id.*

[18] *Id.*, Reliant, CMS executives quit amid scrutiny, Gas Daily, May 17, 2002.

[19] Ennis Decl. Ex. D, Ennis Decl. Ex. D, Reliant Resources, Inc.'s Response to Interrogatory No. 3, *In the Matter of Certain Trading by Energy and Power Marketing Firms*, Before the U.S. Commodity Futures Trading Commission, RELMDL0001996.

[20] Ennis Decl. Ex. G-1, Rule 30(b)(6) Deposition of Suzanne Lynn Kupiec, May 8, 2009 ("Kupiec Dep."), 213:5-23.

[21] *Id.*, Ex. A-4 at VII-1.

counterparties that included AEP, CMS, Dynegy, El Paso, ONEOK, Reliant, and Williams.[22]

- El Paso business records produced SEC show that El Paso participated in wash trades between April 2000 and February 2002 with counterparties that included Reliant and Williams, among others.[23]

- Williams's business records show more than a hundred wash trades between January 2000 and May 2002 with counterparties that included AEP, El Paso, Duke, ONEOK, and Reliant.[24]   Audio recordings reflect conversations between Williams traders and traders from other gas companies about the practice of false reporting and wash trading.   For example, in a March 2001 recorded phone conversation.   Williams trader Thomas Pool conspired with El Paso trader Keith Cooper to conduct a wash trade. Cooper explained: "I mean, it's buying and selling El Paso at the same price, if you wouldn't mind doing that."  Pool replied: "Yeah, I'd do it for ya. . . . At what [price]?"  Cooper: "$2.47. And you're just buying and selling at the same price from El Paso."  Pool later added: "I may need to do this with you someday too."  Cooper: "Just let me know."[25]

- Dynegy business records show that Dynegy engaged in wash trading with CMS between December 2001 and May 2002.[26]  Dynegy business records produced as

---

[22] Ennis Decl. Ex. G-2, DE MDL 04750 to 04780.

[23] Ennis Decl. Ex. G-3, EP-SEC000083.

[24] Ennis Decl. Ex. G-4, WGM-MDL00008516 to 8523.

[25] *Id.*, Recorded Conversation, Thomas Pool and Keither Cooper, Mar. 1, 2001, WGM-MDL00010927.

[26] Ennis Decl. Ex. G-5, DMT-MDL 0031369.

part of FERC's investigation show that Dynegy participated in wash trades with Williams and ONEOK among others between April 2000 and November 2002.[27]

- In a June 2001 recorded phone conversation, CMS trader Sean Sasko told a colleague that he had "a weird thing for you"—which he explained was a "buy/sell with Reliant" where CMS would "buy it from [Reliant] and sell it back to them at the same price."[28] "This is just a paperwork transaction," Sasko explained.[29]

- e prime trader Donald Krattenmaker gave deposition testimony that e prime managers approved of "wash trades" made by traders at e prime during his time at the company.[30]

### 2. DEFENDANTS KNEW THAT THEIR CO-CONSPIRATORS WERE MANIPULATING THE INDICES

Evidence developed through discovery demonstrates that defendants knew that price manipulation was widespread among gas traders and that "everybody" in the industry was submitting false information to the price indices. This is significant because defendants could only know this if they had communicated with traders for other companies about reporting practices. The evidence shows that traders communicated frequently and openly about manipulation of the indices.

- The 2003 FERC Report noted that "[m]any traders acknowledged that false reporting was done openly in the industry."[31]

---

[27] *Id.*, DMT-MDL 0010281 to 10282.

[28] Ennis Decl. Ex. G-6, Recorded Conversation, Sean Sasko at CMS, Jun. 2001, CMS CH11 190062 8-44-32.a.wav.

[29] *Id.*

[30] Ennis Decl. Ex. G-7, Deposition of Donald Krattenmaker, Jan. 27, 2016 ("Krattenmaker Dep."), 67:19-68:13.

- On November 18, 2002, the manager at *Gas Daily* in charge of maintaining the publication's natural gas price index, Michelle Markey, testified before a California state senate committee hearing that "[c]ommon practice was to exaggerate your transactions to the price reporters, report more volume, reporting a higher price than that was actually transacted."[32]  Markey testified in this case that false reporting to trade publications was "occasionally discussed" and "joked about" and that she doesn't remember traders expressing shock, amazement, or surprise at the fact that inaccurate reporting occurred.[33]

- eprime trader Donald Krattenmaker testified that he learned about inaccurate reporting practices in the industry with other traders at industry events for gas traders, such as Gas Fair and Gas Mart.[34]

- Duke trader Michael Whitney, who in 2008 agreed to pay a $55,000 civil penalty to the CFTC for manipulating natural gas prices,[35] gave testimony that manipulating index prices "was a pretty widely talked about thing" that "pretty much everybody" in the industry was doing.[36]  Manipulation, according to Whitney, was "a common industry theme."[37]

---

[31] Ennis Decl. Ex. A-5, FERC Report at ES-6.

[32] Ennis Decl. Ex. A-3, FERC Report at III-32.

[33] Ennis Decl. Ex. G-8, Deposition of Michelle Markey, Jul. 29, 2009, 37:19-38:19.

[34] Ennis Decl. Ex. G-7, Deposition of Donald Krattenmaker, Jan. 27, 2016 ("Krattenmaker Dep."), 58:12-62:13.

[35] CFTC Press Release, *Former Duke Energy Trader Michael Whitney to Pay a $55,000 Penalty in Natural Gas False Reporting Case*, Mar. 6, 2008, http://www.cftc.gov/PressRoom/PressReleases/pr5465-08 (last visited Feb. 19, 2016).

[36] Ennis Decl. Ex. G-9, Deposition of Michael Whitney, Jul. 18, 2009 ("Whitney Dep."), 67:21-69:13.

[37] *Id.*, Whitney Dep. 70:12-23.

- AEP trader Todd Lambert testified that the head trader at AEP, Eric Van der Walde, told him that "everybody lies about their indexes."[38] Another AEP trader, Randy Turturice, testified that false reporting to the indices was understood to be "standard industry practice" within AEP and that the practice was discussed openly in front of Van der Walde.[39]

### 3. DEFENDANTS RECORDED PHONE CONVERSATIONS SHOWING MANIPULATION OF THE NATURAL GAS INDICES

Defendants have produced hundreds of hours of recorded trader conversations from 2000-2002. These recorded conversations demonstrate that defendants employees were actively working in concert to manipulate price information submitted to the natural gas price indices. Examples include:

- In a series of recorded phone conversations, Dynegy trader Michelle Valencia conspired with traders at other firms to submit false information to gas indices. For example, on August 30, 2000, Valencia conspired with El Paso trader Greg Singleton to "run up" prices reported to *Gas Daily*.

  *Singleton: So I mean, those, those guys have to try to get index as low as they can and they have to try to get the Gas Daily's back up. That's what I think they have to do.*

  *Valencia: So I'm going to be on the same side then. I'm gonna be trying to run up the daily price.*

  *Singleton: That's great. I appreciate it.*

  *Valencia: So we should be liking each other then.*

---

[38] Ennis Decl. Ex. G-10, Deposition of Todd Lambert, Jun. 19, 2009 ("Lambert Dep."), 144:7-15.

[39] *Id.*, Deposition of Randy Turturice, Jul. 20, 2009 ("Turturice Dep."), 122:15-123:7.

Singleton: Yeah.[40]

In 2006, a jury in federal court found both Valencia and Singleton guilty of committing wire fraud.[41]  Both convictions were upheld on appeal to the Fifth Circuit.[42]

Defendants' collusive manipulation resulted in a historically unprecedented change in the price of natural gas during the relevant time period.[43]  (Am. Compl. ¶¶ 53-54, 57, 67.)  Plaintiffs have alleged that this sharp increase in price indices was the direct and intended result of defendants' collusive actions.  (*Id.*)  This dramatic increase in price indices caused plaintiffs to pay significantly more for natural gas during the relevant time period than they would have paid absent defendants' conspiracy to manipulate prices.  (*Id.* ¶ 67.)

## F.   GOVERNMENT INVESTIGATION, GUILTY PLEAS, AND CIVIL AND CRIMINAL PENALTIES

Defendants' unlawful actions led to investigations by the DOJ and the CFTC, and substantial civil and criminal penalties being imposed on defendants:[44]

---

[40] Ennis Decl. Ex. G-11, Recorded Conversation, Singleton to Valencia, Aug. 30, 2000, E-GRY100, E-GH0032682^08301102.

[41] *United States v. Valencia*, 600 F.3d 389, 402 (5th Cir. 2010).

[42] *Id.* at 434.

[43] This Court noted that plaintiffs' allegations of a historically unprecedented change in prices, when coupled with plaintiffs' allegations of defendants' false reporting and failure to prevent or disregard false reporting, indicated a conspiracy among the defendants to manipulate published price indices.  *See Order* (denying defendants' motion to dismiss for failure to state a claim), *Arandell Corp., et al. v. Xcel Energy, Inc., et al.*, Case No. 2:07-cv-01019-PMP-PAL, Doc. No. 179.  *Heartland* plaintiffs made similar allegations regarding the dramatic increase in prices resulting from defendants' manipulative and collusive conduct.  (Am. Compl. ¶¶ 54-55, 57, 67.)

[44] This Court has previously found that defendants' alleged pervasive illegal market manipulation does not fall within the "wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *See Order* (denying defendants' motion to dismiss for failure to state a claim), *Arandell Corp., et al. v. Xcel Energy, Inc., et al.*, Case No. 2:07-cv-01019-PMP-PAL, Doc. No. 179.  Rather, this Court noted that such pervasive illegal behavior is indicative of a conspiracy among the defendants.  *Id.  Heartland* plaintiffs made similar allegations regarding defendants' pervasive and unified illegal conduct.  (Am. Compl. ¶¶ 47-57.)

- *AEP Defendants* – $60 million in civil and criminal penalties as a result of their manipulation of natural gas price indices; three AEP traders entered guilty pleas to resolve criminal charges stemming from their false reporting and market manipulation. (Ennis Decl. Ex. B-1.)

- *CMS Defendants* – $16 million in civil penalties to the CFTC; at least two former CMS traders individually disciplined. (*Id*. Ex. B-2.)[45]

- *Coral Energy* – $30 million in civil penalties to the CFTC, and an additional $3.5 million to FERC; several former Coral traders were also separately disciplined. (*Id*. Ex. B-3.)[46]

- *Duke Energy* – $28 million in civil penalties to the CFTC; at least one former Duke Energy trader was disciplined, and three former Duke traders faced federal indictment; at least one pleaded guilty and admitted his role in the trading scheme. (*Id*. Ex. B-4.)

- *Dynegy Defendants* – $5 million in civil penalties to the CFTC; one former Dynegy trader was convicted on several counts of wire fraud relating to instances of false reporting of natural gas prices. The charges against this trader included allegations that she and an El Paso trader conspired to manipulate the price of natural gas. (*Id*. Ex. B-5.)[47]

- *El Paso Defendants* – $20 million in civil penalties to the CFTC; several former El Paso traders were convicted of multiple counts of wire fraud, false reporting, and conspiracy relating to their reporting of false or inaccurate natural gas trading information; six other El Paso traders entered guilty pleas to avoid prosecution. (*Id*. Ex. B-6.)

- *ONEOK Defendants* – $3 million in civil penalties to the CFTC. (*Id*. Ex. B-7.)

- *Reliant Defendants* – $18 million in civil penalties to the CFTC; at least one former Reliant trader pled guilty to criminal charges. (*Id*. Ex. B-8.)[48]

- *Williams Defendants* – $20 million in civil penalties to the CFTC, and Williams Power Company, Inc. paid a $50 million criminal penalty to the DOJ; three Williams traders pled guilty to criminal charges. (*Id*. Ex. B-9.)[49]

---

[45] Some CMS traders even admitted in voice recordings that they and their companies manipulated natural gas prices. One CMS trader acknowledged that "everybody" at CMS has reported false information to *Gas Daily*. (*See* Ennis Decl. Ex. D, Thompson 10-21-02-11-19-34.)

[46] An email explains that Coral supervisors required false reporting from their employees. (*See* Ennis Decl. Ex. D, CER 0004580.)

[47] Specifically, the Superseding Indictments of Greg Singleton (El Paso) and Michelle Valencia (Dynegy) allege that these individuals agreed, on or about July 28, 2000, to not report actual trades between Dynegy and El Paso and to report false trades on or about August 30, 2000. (Ennis Decl. Exs. B-5 & B-6.)

[48] Reliant Resources, Inc. has admitted to engaging in wash trades. (Ennis Decl. Ex. D, RELMDL 0001995.)

- *Xcel Defendants* – $16 million in civil penalties to the CFTC. (*Id.* Ex. B-10.)

## IV. ARGUMENT: THIS CASE MEETS ALL THE REQUIREMENTS FOR CERTIFICATION AS A CLASS ACTION.

### A. CLASS CERTIFICATION STANDARD

The Court should certify a class under Fed. R. Civ. P. 23 where: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). In addition, Fed. R. Civ. P. 23(b) requires the party seeking certification to meet one of three subsections of that rule. Plaintiffs seek certification under Fed. R. Civ. P. 23(b)(3), because the questions of law or fact common to the class predominate over questions affecting only individual class members and a class action is superior to other available methods for adjudicating the controversy.

### B. PLAINTIFFS MEET THE REQUIREMENTS OF FED. R. CIV. P. 23(a).

#### 1. The class is so numerous that joinder of all members is impracticable.

There is no serious dispute here that plaintiffs and their class meet Rule 23(a)'s basic requirements. The class is clearly "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "It is a long-standing rule that 'impractical' does not mean 'impossible' rather, impracticability means only 'the difficulty or inconvenience of joining all members of the class.'" *McCluskey v. Trustees of Red Dot Corp. Employee Stock Ownership Plan & Trust*, 268 F.R.D. 670, 674 (W.D. Wash. 2010) (quoting *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913 (9th Cir. 1964)).

---

[49] The Williams defendants have identified certain transactions with El Paso Merchant Energy, LP that may amount to wash trades. (*See* Ennis Decl. Ex. D, WGM-MDL-00008501-03; 05-06; 09-12.)

Plaintiffs need not allege the precise number or identity of class members. *In re Rubber Chems.*, 232 F.R.D. at 350-51; *Californians for Disability Rights, Inc. v. California Dept. of Transp.*, 249 F.R.D. 334, 346 (N.D. Cal. 2008) ("there is no bright-line rule as to how many class members are required to be sufficiently numerous"). Courts have generally found that the numerosity requirement is satisfied when there are more than forty class members. *Horn v. Associated Wholesale Grocers, Inc.*, 555 F.2d 270, 275 (10th Cir. 1977) (41-46 class members); *Californians for Disability Rights,* 249 F.R.D. at 346; 1 R. Newberg, *Newberg on Class Actions,* 4th ed. § 3.5 (2008).[50] The EIA reported that between 2000 and 2002, Missouri had over 135,000 commercial and industrial consumers. (Ennis. Decl. Ex. E.) The proposed class thus readily satisfies the numerosity requirement of Rule 23(a).

### 2. This case involves questions of law and fact common to the class.

The second requirement for class certification under Rule 23(a) is the existence of common questions of law or fact. Fed. R. Civ. P. 23(a)(2). Rule 23(a)(2) is construed permissively. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). "All questions of fact and law need not be common . . . . The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.* Indeed, the existence of even a single common question is sufficient to satisfy Rule 23(a)(2). *Dukes*, 131 S.Ct. at 2556 ("We quite agree that for purposes of Rule 23(a)(2) [e]ven a single [common] question will do[.]" (internal quotation marks omitted)).

---

[50] Defendants removed this action to federal court under the Class Action Fairness Act ("CAFA"), which requires at least 100 class members and an aggregate of $5,000,000 in damages. *See* 28 U.S.C. § 1332(d); *see also Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1020-21 (9th Cir. 2007). Defendants' removal under CAFA is a concession that plaintiffs' proposed class is sufficiently numerous to satisfy Rule 23(a)(1).

A "common issue" is one that can be proved with common proof, i.e., proof that when admitted applies to all class members equally, removing the need for each class member to prove the issue. *Gen. Tel. Co. of the Southwest*, 457 U.S. 147, 155 (1982) ("Class relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'"). In considering price-fixing cases like this one, courts typically look to three primary common issues: (1) a violation of the antitrust laws, (2) plaintiffs suffered some injury resulting from the violation, and (3) the methodology of determining damages. *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 634 (D. Kan. 2008). Each of these elements is subject to common proof in this case. There can be no genuine dispute that the antitrust violation is proved using proof common to all plaintiffs. Likewise, because defendants manipulated the price indices that formed the basis for the manipulated prices each plaintiff ultimately paid for natural gas, the proof of impact is common to all plaintiffs. (Harris Decl. ¶¶ 45-56.) Finally, as described by Drs. Harris and Dwyer, the methodology for establishing the ultimate measure of damages relies on proof common to all plaintiffs. (*Id.* ¶¶ 68-74, Concl.; Dwyer ¶ 9.)

"Where an antitrust conspiracy has been alleged, courts have consistently held that the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist." *In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013) (internal quotation marks omitted); *see also Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 183 (N.D. Cal. 2015); *In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 447 (D. Kan. 2006); *Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 188 F.R.D. 365, 373 (D. Or. 1998) ("[w]hen the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or

more of the elements of that cause of action will be common to all of the persons affected.") (citations omitted); *Northwestern Fruit Co. v. A. Levy & J. Zentner Co.*, 116 F.R.D. 384, 386 (E.D. Cal. 1986) ("In the absence of class certification, . . . each individual plaintiff would have to prove the same conspiracy, and would necessarily resort to the same evidence to do so."); 7A C. Wright et al., *Federal Practice & Procedure* § 1763, at 204 & n.11 (2d ed. 1986 & Supp. 2005) (observing that "[t]he claimed existence of a conspiracy to fix prices . . . in violation of the antitrust laws has been found to present common questions.").[51]

Here, questions of law and fact are common to the class. They include:

(a) whether defendants and their co-conspirators manipulated the price paid for natural gas in Missouri by falsely reporting price and volume information, engaging in wash trades, churning, or otherwise artificially causing demand to appear high;

(b) whether defendants and their co-conspirators entered into arrangements, combinations or agreements to manipulate the price of natural gas sold in Missouri;

(c) whether defendants and other sellers took advantage of the manipulation to charge excessive, supra-competitive prices for the sale of natural gas in Missouri;

(d) whether plaintiffs and other members of the class paid manipulated prices for natural gas and were thereby injured as a result of defendants' unlawful conduct; and

---

[51] *Accord* the following price-fixing suits: *In re Corrugated Container Antitrust Litig.*, 80 F.R.D. 244, 247 (S.D. Tex. 1978); *In re Plywood Anti-Trust Litig.*, 76 F.R.D. 570 (E.D. La. 1976); *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322 (E.D. Pa. 1976); *In re Sugar Indus.*, 1976 WL 1374; *In re Master Key Antitrust Litig.*, 70 F.R.D. 23 (D. Conn. 1975); *Dennis v. Saks & Co.*, 1975 WL 909 (S.D.N.Y. 1975); *see also In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. 229, at 232 (D. Minn. 2001) ("Common questions are often found in antitrust price-fixing conspiracy cases, because by their nature, these cases deal with common legal and factual questions about the existence, scope and effect of the alleged conspiracy.") (citations and internal quotations omitted); *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, at 240 (E.D.N.Y. 1998) (collecting case law; explaining that courts generally find commonality requirement satisfied in cases where the complaint alleges price fixing); *In re Aluminum Phosphide Antitrust Litig.*, 160 F.R.D. 609, at 613 (D. Kan. 1995) (finding commonality requirement satisfied in antitrust price-fixing case).

(e) the method of determining the damages suffered by plaintiffs and other members of the class.

These issues present an overwhelming common core of questions focusing on the central issue in this action – the existence and effect of the alleged conspiracy. Plaintiffs' claims here plainly satisfy the commonality requirement of Fed. R. Civ. P. 23(a).

### 3. The representative plaintiffs' claims are typical of the claims of the class.

The third requirement for maintaining a class action under Rule 23(a) is that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement ensures "that the interests of the named representatives align with those of the class." *Weinberger v. Thornton*, 114 F.R.D. 599, 603 (S.D. Cal. 1986). Courts "liberally construe[]" the typicality requirement. *See Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives and Composites*, 209 F.R.D. 159, 164 (C.D. Cal. 2002). Courts hold that "a representative's claim will be deemed typical when its 'injuries arise from the same events or course of conduct as do the injuries that form the basis of the class claims,' and 'are based on the same legal theory' as those of the absent class members." *In re Carbon Black Antitrust Litig.*, Civ. No. 03-10191-DPW, 2005 WL 102966, at *12 (D. Mass. Jan. 18, 2005) (quoting *In re Bank of Boston Corp. Sec. Litig.*, 762 F. Supp. 1525, 1532 (D. Mass 1991)); *In re Urethane*, 251 F.R.D. at 634.[52]

---

[52] Courts have generally found the typicality requirement to be satisfied in cases involving horizontal price-fixing conspiracies. *See In re Chlorine & Caustic Soda Antitrust Litig.*, 116 F.R.D. 622, 626 (E.D. Pa. 1987) ("In order to prevail on the merits in this case the plaintiffs will have to prove the same major elements that the absent members for the class would have to prove. . . . As such, the claims of the plaintiffs . . . are typical . . . ."; *see also In re Rubber Chems.*, 232 F.R.D. at 351 (typicality "will be established by plaintiffs and all class members alleging the same antitrust violations by defendants") (citations omitted); *In re Citric Acid Antitrust Litig.*, 1996 WL 655791, at *3 (N.D. Cal. 1996) ("The alleged underlying course of conduct in this case is defendants' conspiracy to fix the price of citric acid and to allocate customers among themselves . . . . The legal theory that plaintiffs rely on is antitrust liability.

Typicality exists even if the named plaintiffs purchased a product at different prices in different ways. In such cases:

> [T]he named class members' claims, as well as the claims of the proposed classes, arise from the alleged price-fixing scheme perpetrated by defendants. The overarching scheme is the linchpin of plaintiffs' amended complaint, regardless of the product purchased, the market involved or the price ultimately paid. Furthermore, the various products purchased and the different amount of damage sustained by individual plaintiffs do not negate a finding of typicality, provided the cause of those injuries arises from a common wrong.

*Flat Glass*, 191 F.R.D. at 480.

The named plaintiffs, like their proposed class, purchased natural gas during the class period directly from defendants and other marketers at prices affected by the alleged conspiracy. Like their class, they allege that defendants engaged in collusive conduct in violation of the Missouri antitrust laws. As such, the named plaintiffs' claims are identical to those of the class and are necessarily typical of those of the class. The typicality requirement of Fed. R. Civ. P. 23 is readily satisfied.

### 4. Plaintiffs will fairly and adequately represent the class.

The fourth requirement of Rule 23 mandates that the representative plaintiffs fairly and adequately represent the class. Fed. R. Civ. P. 23(a)(4). A plaintiff shows that it adequately represents the class by demonstrating that it has no conflicts of interest with the proposed class. In addition, the plaintiff must show class counsel is qualified and competent. *Hanlon*, 150 F.3d at 1020; *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978).

---

Because plaintiffs and all class members share these claims and this theory, the representatives' claims are typical of all."); *Estate of Garrison v. Warner Bros., Inc.*, 1996 WL 407849, at *2 (C.D. Cal. 1996) ("Typicality in the antitrust context will be established by plaintiffs and all class members alleging the same antitrust violations by the defendants") (citation omitted); *Northwestern Fruit Co.*, 116 F.R.D. at 388 (typicality requirement met "since plaintiffs and all other class members must prove the same conspiracy and its effectuation by the defendants."); 1 ABA Section of Antitrust Law, *Antitrust Law Developments* 932 (5th ed. 2002) (typicality normally satisfied in price-fixing claims).

Plaintiffs here meet both requirements.  First, the class representatives' claims arise from the same events and course of conduct that give rise to the claims of the class members. Plaintiffs and the other class members were overcharged for natural gas and have a mutual interest in establishing defendants' liability and in recovering damages for the overcharges. Plaintiffs seek relief substantially identical to that sought by every other class member, i.e., treble damages.  There are no actual or potential conflicts of interest between the representative plaintiffs and the members of the class.  Accordingly, the interests of the representative plaintiffs and the putative class members in recovering the overcharges align.

As shown by their Declarations, plaintiffs accept and are ready to carry out their responsibilities to the class members.  (Ream Decl. ¶ 4; David Jones Decl. ¶ 4; *see also* Ennis Decl. Ex. H-1.).  Plaintiffs have also retained capable and experienced counsel to represent the class.  As shown by the Declarations of Jennifer Gille Bacon, Donald Barry, Gregory M. Bentz, Von Heinz, and Russell S. Jones, Jr., plaintiffs' counsel have defended or successfully prosecuted numerous antitrust class actions throughout the United States.  Polsinelli and its predecessors alone have represented parties in more than 200 class actions.  (Tab 9, Russell Jones Decl. ¶ 6 at Ex. 2.)  Plaintiffs' counsel will prosecute this action vigorously, and there is no serious dispute that they satisfy the adequacy requirement of Rule 23.

### 5.     The proposed class is ascertainable.

A class is "ascertainable" if "the description of the class is '"definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member."'" *In re Cathode Ray Tube*, 308 F.R.D. at 614 (quoting *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998)).  Here, Plaintiffs' class definition is objective and definite:  it comprises Missouri industrial and commercial consumers of natural gas that purchased their gas directly from a natural gas production, marketing, or trading company during the class period.

Class members can be identified at least three different ways. First, defendants' own data provides this information; both Dr. Harris and Dr. Dwyer have relied on this data for their antitrust input studies. (*See, e.g.,* Harris Decl. ¶ 14). Because of the unique nature of natural gas distribution, industrial and commercial users typically could only receive the gas they purchased from marketing and trading companies through transmission lines owned by local distribution companies, or LDCs. (Tab 29, Bentz Decl. ¶ 5.) These LDCs have records for the class period that identify entities that purchased "transport only" gas, which is necessarily gas sold to industrial and commercial end-use customers (*Id.* ¶¶ 4-5).

The identity of class members may also be shown from separate business records generated by LDCs. These records are provided to marketers supplying gas to class members, and those marketers in turn provide them to class members. For example, monthly Natural Gas Reconciliation Imbalance Analysis reports, prepared by LDC St. Joseph Power & Light, were given to named Plaintiff Northwest Missouri State University in the Missouri case by its gas marketer, Utilicorp Energy Services. (Ennis Decl. Ex. H-1, A. Martin Dep., pp. 10, 19, 55-56; Ennis Decl. Ex. H-2, Depo. Ex. 9107.) These reports show the volume of gas purchased by the class member daily and the total purchases each month. (Ennis Decl. Ex. H-1, A. Martin Dep., pp. 58; Ennis Decl. Ex. H-2, Depo. Ex. 9107.) There are thus objective methods of determining the class membership.

The possibility that the class may contain some class members who lack standing or were not harmed by defendants' conduct does not preclude class certification. *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672 (7th Cir. 2009) ("a class will often include persons who have not been injured by the defendant's conduct . . . [but] [s]uch a possibility or indeed inevitability does not preclude class certification"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2012 WL 253298, at *1-3 (N.D. Cal. Jan. 26, 2012) (refusing to decertify a class on ascertainablility

grounds where the class definition was based on "objective criteria" and observing that "[n]umerous courts have held that a class can be certified even if its membership is unclear or overbroad.").

## C. THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF FED. R. CIV. P. 23(b)(3).

After determining that the proposed class satisfies Fed. R. Civ. P. 23(a), the Court should certify a class under Fed. R. Civ. P. 23(b)(3) if it "finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." "Judicial economy and fairness are the focus of the predominance and superiority requirements." *Oregon Laborers-Employers*, 188 F.R.D. at 375 (citations omitted). The proposed class readily meets the predominance and superiority requirements.

### 1. COMMON QUESTIONS OF LAW AND FACT PREDOMINATE OVER INDIVIDUAL QUESTIONS.

Rule 23(b)(3)'s requirement that common issues predominate over individual issues tests "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Plaintiffs need not show that there are no questions affecting only individual members—only that individual questions do not "overwhelm" the common ones. *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2412 (2014). Indeed, the fact that "the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate." *Id.* "At the weighing step, the Court must keep in mind that 'common liability issues are typically far more important and contested and the individual damage calculations often formulaic.'" *Coleman through Bunn v. D.C.*, 306 F.R.D. 68, 85 (D.D.C. 2015) *(*quoting Newberg on Class Actions § 4:54 (5th ed. 2014)).

As the overwhelming weight of authority, including Supreme Court cases, has held, predominance is "readily met" in antitrust price-fixing cases.  *Amchem*, 521 U.S. at 626.  In determining whether common questions predominate in a price-fixing case, "the focus of this court should be principally on issues of liability."  *In re Sugar Indus.*, 1976 WL 1374, at \*22 (N.D. Cal. May 21, 1976); *see also In re Nexium Antitrust Litig.*, 777 F.3d 9, 21 (1st Cir. 2015) ("Where common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain.") (quotation marks and alteration omitted); *Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001); *Hanlon*, 150 F.3d at 1022 ("common nucleus of facts and potential legal remedies dominates this litigation."); *In re Citric Acid*, 1996 WL 655791, at \*6.  Here, the primary issues of liability, and the primary issues to be tried, are the existence of an arrangement, conspiracy or combination to manipulate prices and the impact of that conspiracy on plaintiffs and class members through their purchases of gas at artificial, manipulated prices.  These are common issues.

Common questions need only predominate; they need not be dispositive of the litigation as a whole.  *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 29 (D.D.C. 2001).  The predominance standard is met "unless it is clear that individual issues will overwhelm the common questions and render the class action valueless."  *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y. 1996).

### a. The Existence of an Arrangement or Combination to Manipulate Prices is a Predominant Common Question.

Courts recognize the existence of a conspiracy among defendants as the predominant issue common to all plaintiffs in horizontal price-fixing cases:  "In price-fixing cases, courts have regarded the existence of a conspiracy as the overriding issue even when the market

involves diversity in products, marketing, and prices." *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1255 (10th Cir. 2014); *see also In re Rubber Chems.,* 232 F.R.D. at 352 ("the Court notes that the great weight of authority suggests that the dominant issues in cases like this are whether the charged conspiracy existed and whether price-fixing occurred") (internal quotation marks omitted); *In re Cement and Concrete Antitrust Litig.*, 1979 WL 1595, at *2 (D. Ariz. 1979) ("the asserted nationwide price-fixing conspiracy presents questions of law and fact common to the class members which predominate over any questions affecting only individual members"); *In re Sugar Indus.*, 1976 WL 1374, at *23 ("It is the allegedly unlawful horizontal price-fixing arrangement among defendants that, in its broad outlines, comprises the predominating, unifying common interest as to these purported Plaintiff representatives and all potential class members."). District courts in the Ninth Circuit and elsewhere have held that the conspiracy issue alone is sufficient to satisfy the Fed. R. Civ. P. 23 predominance requirement. *See, e.g.*, *In re Rubber Chems.,* 232 F.R.D. at 352; *In re Citric Acid*, 1996 WL 655791, at *8.

And courts have uniformly found predominant common questions of law or fact with respect to the existence, scope, and effect of an alleged antitrust price-fixing combination. *In re Citric Acid*, 1996 WL 655791, at *6 (common questions include whether there was a conspiracy, whether prices were fixed pursuant to the conspiracy, and whether the prices plaintiffs paid were higher than they should have been); *In re Sugar Antitrust Litig,*, 559 F.2d 481, 483 (9th Cir. 1977) (noting "there is almost a rebuttable presumption that such a class action should be allowed where there is a plausible claim of violation of the Sherman Act."); *Estate of Garrison*, 1996 WL 407849, at *3 ("Antitrust price fixing conspiracy cases by their nature deal with common legal and factual questions of the existence, scope and effect of the alleged conspiracy.") (citations omitted).

Here common proof will show the nature and extent of defendants' conspiracy. See *supra* at 10-20 (detailing the extensive proof available of defendants' conspiracy to manipulate the natural gas pricing indices, and thus the market itself). Common issues relating to the existence of an anticompetitive combination or arrangement predominate over any questions arguably affecting only individual class members because the combination is the central issue in the case. Each plaintiff does not have to prove separately the existence of the arrangement or combination; once it is proved for one, it is proved for all. If the class members were forced to file separate actions, each class member would offer the same evidence to establish the existence of the same conspiracy. This is precisely what Rule 23(b) was designed to avoid.

> **b.** **The Impact of the Arrangement or Combination on Natural Gas Purchasers is a Predominant Common Question Under an Overcharge Theory.**

Here the anticompetitive effect of defendants' conspiracy, i.e., defendants' manipulation of natural gas prices, will also be established by common proof. As the FERC, CFTC and DOJ investigations established, defendants' illicit conduct directly impacted pricing indices, thereby causing class members significant economic harm by distorting market signals and forcing them to pay higher prices for natural gas. Courts have repeatedly held that where a defendant is alleged to have participated in a price-fixing conspiracy, impact will be presumed, and the Rule 23(b)(3) predominance requirement is thus satisfied. *In re Carbon Black*, 2005 WL 102966, at *15 ("in a price fixing conspiracy case, [impact] is often a fair assumption"); *In re Rubber Chems.*, 232 F.R.D. at 352 ("[B]ecause the gravamen of a price-fixing claim is that the price in a given market is artificially high, there is a presumption that an illegal price-fixing scheme impacts upon all purchasers of a price-fixed product in a conspiratorially affected market") (citations omitted); *In re Cement and Concrete*, 1979 WL 1595, at *3 ("Courts have

consistently held that an illegal price fixing scheme presumptively impacts upon all purchasers of a price fixed product in a conspiratorially affected market.") (citations omitted).

Even in the absence of a presumption, courts require only that the class representative present "a reasonable method for determining, on a classwide basis, the alleged antitrust activity's impact on class members." *In re Cathode Ray Tube*, 308 F.R.D. at 625. Critically, "[t]his is a question of methodology, not merit. . . . the Court cannot undertake a full merits analysis at this point, and should avoid engaging in a battle of the experts." *Id.* "At the class certification stage, the plaintiffs need not definitively prove that each class member has suffered an injury-in-fact. Instead they must only demonstrate that any such 'impact is capable of proof at trial through evidence that is common to the class rather than individual to its members.'" *In re Air Cargo Shipping Services Antitrust Litig.*, 2014 WL 7882100 at*41 (E.D.N.Y. 2014). Moreover, courts routinely certify classes despite contentions by defendants that the "complexity of the market" precludes common proof of impact. "Diversity of products and pricing does not necessarily mean that plaintiffs cannot show class-wide impact . . . ." *In re Citric Acid*, 1996 WL 655791 at *6.

Antitrust impact can be established here through proof that the defendants conspired to inflate the reported index prices, because those prices were either directly used as a benchmark for actual prices, or at a minimum were the starting point for individual price negotiations between buyers and sellers. *See In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200 (M.D. Pa. 2012) ("the court concurs that list prices are quite relevant to the underlying claims because Direct Purchasers allege that Defendants colluded to increase list prices, thereby raising the starting point for price negotiations, ultimately inflating the prices paid."); *EPDM*, 256 F.R.D. at 90 ("This evidence of a standardized pricing structure, which (in light of the alleged

conspiracy) presumably establishes an artificially inflated baseline from which any individualized negotiations would proceed, provides generalized proof of class-wide impact."); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 486 (W.D. Penn. 1999) ("[E]ven though some plaintiffs negotiated prices, if plaintiffs can establish that the base price from which these negotiations occurred was inflated, this would establish at least the fact of damage, even if the extent of the damage by each plaintiff varied.").

Plaintiffs can establish impact here through common proof under an overcharge theory. Although there are still discovery issues outstanding (and some materials produced as late as last week that have not been thoroughly reviewed), plaintiffs' experts, Dr. Michael Harris and Dr. Mark Dwyer, have nevertheless developed a workable model showing classwide antitrust impact. Dr. Harris, who has extensive experience in this area, demonstrates that the question of impact – whether class members were injured by the price-fixing conspiracy – will be proved with evidence common to all class members. (Harris Decl. ¶ 13.) He explains that "it is clear that class members are similarly situated given: the fungible nature and thus standardized pricing of natural gas; the inability to develop unique terms of exchange for the provision of natural gas as a commodity; and the underlying reality that the market in which class members purchased the gas is not segmented by unique and different economic, market, industry, or institutional fundamentals." (Harris Decl. ¶ 56.) Instead, all "class members purchased in a market that is defined . . . by the same fundamentals." (*Id.*) Thus, the defendants' conduct would have had a common impact across class members. (*Id.*)

Drs. Harris and Dwyer demonstrate the actual antitrust impact of the alleged price fixing arrangement through economic modeling with data common to the class. (*Id.* ¶¶ 12-14; Dwyer Decl. ¶¶ 9-18.) Dr. Harris concludes, after considering and incorporating Dr. Dwyer's analysis,

that all or nearly all Missouri industrial and commercial purchasers of natural gas during the relevant time period were forced to participate in a market distorted by illegal manipulation and to pay inflated prices, thereby suffering antitrust impact, as a result of defendants' illegal arrangement. (Harris Decl. ¶¶ 45-56.) He specifically addresses class members who purchased natural gas pursuant to contracts tied to published monthly price indices. (*Id.* ¶ 9.) Dr. Harris has successfully created "but-for" monthly pricing indices that isolate and remove the false price reports made by defendants and their co-conspirators. (*Id.* ¶¶ 57-75.) Comparing this "but-for" index price, one purged of false reports, to the false manipulated index prices to which all class members' purchases were ultimately tied, demonstrates the classwide impact of the conspiracy. As Dr. Harris concludes (*Id.* ¶ 73.):

> Based on the results in Exhibit 8 [showing the "but-for" index reconstruction and the calculated distortions], and Dr. Dwyer's results, coupled with the purchasing patterns of the class members, the vast majority of the class members included in the Defendants' data that we were able to analyze were impacted in the context of an overcharge theory.

Thus "all, or nearly all, of the class members in Kansas were impacted by Defendants' conduct." (*Id.* at p. 35.)

Dr. Dwyer has separately conducted a regression analysis for proposed class members that purchased natural gas pursuant to fixed price monthly transactions, daily indexed transactions, or transactions tied to NYMEX. (Dwyer Decl. ¶¶ 5, 9.) He, too, has concluded that the collusive manipulation of the monthly price indices identified by Dr. Harris affected these fixed-price and NYMEX-based transactions. (*Id.* ¶ 71.) But he has also determined that defendants' and co-conspirators' wash trading and churning activities adversely affected them as well. (*Id.* ¶¶ 70, 135-139.) Dr. Dwyer's analysis, incorporated into Dr. Harris's declaration, shows antitrust impact in the form of increased prices that affected the vast majority of the proposed class. Again, in Dr. Harris's words, based on these combined analyses "all or nearly

all" of the proposed class members were impacted by the defendants' conspiracy in the form of overcharges.  (Harris Decl. at p. 35.)

Antitrust impact is thus demonstrated by reliable economic modeling that both experts recognize is common to the class.  (Harris Decl. at p. 35; Dwyer Decl. ¶ 139.)  These conclusions readily meet plaintiffs' burden to present a "reasonable method" to show classwide common impact.  *See In re Cathode Ray Tube*, 308 F.R.D. at 625.  These conclusions are well-reasoned and based on an extensive analysis of the Missouri natural gas market.[53]

Importantly, impact is shown even where plaintiffs and class members purchased gas at an overcharged price for only one instance during the class period.  "[P]laintiffs do not have to show that each class member suffered an overcharge on each and every purchase they made.  Rather, it is enough if they provide sufficient evidence to demonstrate that substantially all class members were overcharged at least once."  *In re Air Cargo Shipping Antitrust Litig.,* 2014 WL 7882100 at *45.

Finally, these economic models are conservative.  Even though Dr. Dwyer found that the manipulated monthly pricing indices affected the following months' actual prices (Dwyer Decl. ¶ 71), Dr. Harris assumed in his "but-for" pricing model that the actual prices paid for natural gas each month were valid transactions that had not been influenced by defendants' earlier manipulation (Harris Decl. ¶ 67.)  Thus the classwide impact here is, if anything, understated.

### c.  The Method for Calculating Damages is a Predominant Common Question.

Likewise, common *methods* can be used to quantify the injury suffered by plaintiffs and the class members.  The Court's role at this stage in the litigation in assessing the proposed

---

[53] Further, Dr. Dwyer concludes that natural gas prices throughout the United States are interdependent, such that any manipulation beyond the borders of Missouri would affect the class members as well.  (Dwyer Decl. ¶¶ 24-49.)

methods of proving damages is limited; the inquiry is simply whether Plaintiffs' damages model is "workable."  *See Giles v. St. Charles Health Sys., Inc.*, 294 F.R.D. 585, 595 (D. Or. 2013) ("*Comcast* does not act as a bar to class actions where the plaintiffs provide a workable damages model."); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 100 (D. Conn. 2009) ("The real question . . . is whether the plaintiffs have established a workable multiple regression equation, not whether plaintiffs' model actually works [.]")

Dr. Harris has developed a model for computing actual damages on a class-wide basis by reconstructing the Trade Publications indices without including the wash trades, falsely reported trades, and churning.  (Harris Decl. ¶¶ 67-74.)  As part of this analysis, Dr. Harris (a) identifies the defendants' actual and bona fide natural gas transactions from defendants' data; (b) identifies the price index locations and months in which false reporting occurred by comparing the actual trades with reports of trades given to the Trade Publications; (c) replicates the published index prices using the underlying data provided by McGraw Hill and Intelligence Press; and (d) creates a but-for natural gas price index by recreating the published index using the defendants' actual natural gas transactions.  (*Id.*)  For example, using the LDC records plaintiffs have obtained showing the date and amount of "transport only" natural gas purchases (Tab 29, Bentz Decl. ¶¶ 4-5), plaintiffs will be able to match these purchases with the overcharges established by Dr. Harris's reconstructed pricing indices and Dr. Dwyer's regression-derived model.  As Dr. Harris concludes (Harris Decl. at p. 35):

> Based on economic theory and analysis it is … my opinion that there exist commonly accepted and straightforward methods for determining and measuring the amount of artificiality in prices and thus the damages incurred by class members.  The methods and analysis used to measure damages is also common to class members.

This is exactly the sort of mechanical calculation favored in class action damages actions.

Finally, even if the *amount* of damages sustained by each class member did present an individual issue, it is well-established that such differences do not preclude class certification. *See, e.g.*, *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013) ("In this circuit, however, damage calculations alone cannot defeat certification." (internal quotation marks omitted)); *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 986 (9th Cir. 2015) (same); *Spann v. J.C. Penney Corp.*, 307 F.R.D. 508, 529 (C.D. Cal. 2015) ("courts uniformly h[o]ld that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations." (internal quotation marks omitted)); *In re Sugar Indus.*, 73 F.R.D. at 354 ("If this Court were to adopt defendants' argument and deny [the] class [action] because the computation of damages on . . . an individual basis destroys the 'predominance' requirement of Rule 23(b)(3), it would be tantamount to encouraging wrongdoers to commit great antitrust violations on many consumers in small amounts so as to raise the spectre of unmanageability to defeat a class action."). Courts repeatedly reject the assertion in price-fixing cases that individual questions as to the amount of damages defeat class certification. *See, e.g.*, *In re Sugar Indus.*, 73 F.R.D. at 346-48; *In re Rubber Chems.*, 232 F.R.D. at 352; *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 217 n.13 (E.D. Pa. 2001); *see also In re Citric Acid*, 1996 WL 655791, at *6-8.

### 2. A class action is superior to other available methods for adjudicating the controversy.

Certification of a case is appropriate if class treatment "is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). The Rule requires the Court to consider four factors: (a) the class members' interests in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the

desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action. (*Id.*) Prosecuting this action as a class action is clearly superior to other methods of adjudicating this matter.

The alternative to a class action, i.e., many duplicative individual actions, would be inefficient and unfair. Numerous individual actions would be expensive and time-consuming and create the danger of conflicting decisions as to similarly-situated entities. *Lerwill*, 582 F.2d at 512. Further, it would deprive many class members of any practical means of redress. Because prosecution of an antitrust conspiracy case against economically powerful defendants is difficult and expensive, class members with all but the largest claims would likely choose not to pursue their cases. *See Las Vegas Sands, Inc.*, 244 F.3d at 1163. Absent class certification, most class members would be effectively foreclosed from pursuing their claims. *Hanlon*, 150 F.3d at 1023 ("many claims [that] could not be successfully asserted individually . . . would not only unnecessarily burden the judiciary, but would prove uneconomic for potential plaintiffs."); *Northwestern Fruit Co.*, 116 F.R.D. at 389 ("Multiple lawsuits . . . would be costly and inefficient, and the exclusion of every class member that cannot afford separate representation would be neither 'fair' nor an 'adjudication' of their claims."). Both sides in this case will realize significant savings if this case is litigated just once.

Therefore, the proposed class satisfies the superiority requirement of Fed. R. Civ. P. 23.

### D. HORIZONTAL PRICE-FIXING CASES ARE ROUTINELY CERTIFIED AS CLASS ACTIONS.

Well-established public policy relating to antitrust class actions, as well as the particular facts of this case, support certifying this matter as a class action. The Supreme Court has repeatedly emphasized the importance of private enforcement of antitrust laws and the

importance of class actions to this enforcement. *E.g.*, *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979). Courts in this Circuit have reaffirmed this core principle:

> Class actions play an important role in the private enforcement of antitrust actions. For this reason, courts resolve doubts in these actions in favor of certifying the class. Courts have stressed that price-fixing cases are appropriate for class certification because a class-action lawsuit is the most fair and efficient means of enforcing the law where antitrust violations have been continuous, widespread, and detrimental to as yet unidentified consumers.

*In re Rubber Chems.*, 232 F.R.D. at 350 (internal citations and quotations omitted); *see also In re Lorazepam & Clorazepate*, 202 F.R.D. at 21-22; *In re Cement and Concrete*, 1979 WL 1595, at *3 (claimants and the public "benefit from a class action and expeditious adjudication of the issues involved since class actions 'reenforce the regulatory scheme by providing an additional deterrent beyond that afforded either by public enforcement or by single-party private enforcement.'") (citation omitted).

District courts in the Ninth Circuit consistently grant class certification in horizontal price-fixing cases. *See, e.g.*, *In re Optical Disk Drive Antitrust Litig.*, Case No. 3:10-md-2143 RS, 2016 WL 467444 (N.D. Cal. Feb. 8, 2016); *In re Rubber Chems.*, 232 F.R.D. at 349; *In re Sorbates Direct Purchaser Antitrust Litig.*, Case No. C 98-4886 (N.D. Cal. 2002) (Ennis Decl. Ex. C-1); *In re Sodium Gluconate Antitrust Litig.*, Master File No. C 97-4142 CW (N.D. Cal. 1997) (Ennis Decl. Ex. C-2); *In re Citric Acid*, 1996 WL 655791, at *8 (N.D. Cal. 1996).[54] This Court should do so as well.

---

[54] Other federal courts do the same. *See, e.g.*, *In re Carbon Black*, 2005 WL 102966, at *22; *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 254 (D.D.C. 2002); *In re Lorazepam*, 202 F.R.D. at 14 (D.D.C. 2001); *In re Flat Glass*, 191 F.R.D. at 475; *In re Commercial Tissue Products*, 183 F.R.D. 589, 590 (N.D. Fla. 1998); *In re Plastic Cutlery Antitrust Litig.*, 1998 WL 135703, at *1 (E.D. Pa. Mar. 20, 1998); *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 693 (D. Minn. 1995); *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 681 (N.D. Ga. 1991); *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 268, 272 (D. Minn. 1989); *Northwestern Fruit Co.*, 116 F.R.D. at 388.

## E.    THIS COURT HAS RECOGNIZED THAT SIMILAR CASES MEET THE REQUIREMENTS OF RULE 23 AND SHOULD LIKEWISE CERTIFY THIS CASE.

This Court has already certified a settlement class in the ongoing California natural gas litigation, which is based on the same conspiracy to manipulate natural gas prices among the same defendants at issue here.[55]  In fact, the CMS Defendants, Coral, Dynegy, and the Williams Defendants all stipulated to certification in those actions, thereby stipulating that the requirements of Rule 23 were met.[56]  Those stipulations, and this Court's reasoning in certifying those cases as class actions, should apply equally here.[57]

A class cannot be certified for settlement purposes where certification for trial purposes would be inappropriate.  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (holding that to certify a settlement class Courts must undertake the same analysis required to certify a class for trial purposes).  Accordingly, even in a settlement class context, the requirements of Rules 23(a) and (b)(3) must be met.  (*Id.*)

In certifying the settlement class involving California plaintiffs, this Court noted that the claims in that case arose from defendants causing natural gas prices "to increase by conducting prearranged 'wash trades' (the contemporaneous purchase and sale of the same amount of

---

[55] This Court has already certified settlement classes in *Texas-Ohio Energy, Inc. v. CenterPoint Energy, Inc.*, No. CV-S-04-0465-PMP-PAL; *Fairhaven Power Company v. EnCana Corp.*, No. CV-S-05-0243-PMP-PAL; *Abelman Art Glass Co. v. EnCana Corp.*, No. CV-S-05-0437-PMP-LRL; *Utility Savings & Refund Services, Inc. v. Reliant Energy Services, Inc.*, No. CV-S-5-05-0110-PMP-LRL; and *Ever-Bloom, Inc. v. AEP Energy Services, Inc.*, No. CV-S-05-0808-PMP.

[56] Other defendants in the present action participated in and did not object to the *In re Western States* settlement, while purporting to have the settlement and the Court's findings deemed "not precedential."

[57] At the mediation on February 1, 2016, a settlement of the claims in this MDL action was reached between the named plaintiffs both individually and as class representatives in the Kansas, Missouri and Wisconsin class actions and defendants Duke Energy Trading and Marketing Company, L.L.C. and American Electric Power Company and its affiliate AEP Energy Services, Inc.  The parties to the settlements are documenting the settlement terms.  They will soon be presenting this partial settlement of this case to the Court for approval under Rule 23(e).

natural gas at the same price) and by reporting false price and volume information to trade publications that compile natural gas price indices." *See In re Western States Wholesale Natural Gas Antitrust Litig.*, 2:03-cv-01431-PMP-PAL, Doc. No. 510, *Order Preliminarily Approving Settlements, Certifying a Settlement Class, and Authorizing Dissemination of Notice,* at 2-3. The class definition certified for settlement purposes in the California cases was even broader than the definition sought here, but still included the type of purchasers at issue in this case – direct purchasers for their own use or consumption. (*Id.* at 4.) This Court expressly held that the California class cases satisfied each of the elements of class certification. (Id.) at 4-5. This Court ultimately held that "the prerequisites to a class action under Federal Rule of Civil Procedure 23(a) have been satisfied . . ." and that the cases "may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3)." (*Id.*)

Because this Court has previously certified similar classes suing for damages suffered in the same conspiracy among the same defendants, *Amchem* counsels certification here.

## V.      CONCLUSION

For these reasons stated, the Court should certify the proposed class.

Respectfully submitted,

  /s/ Gregory M. Bentz
Russell S. Jones, Jr.                    (KS 70214)
Jennifer Gille Bacon                     (KS 70279)
Gregory M. Bentz                         (KS 70358)
Polsinelli PC
900 West 48th Place, Suite 900
Kansas City, Missouri 64112
Telephone:  816-753-1000
Fax:  816-753-1536

R. Dan Boulware                          (MO 24289)
Polsinelli PC
3101 Frederick Avenue
St. Joseph, Missouri  64506
Telephone:  816-364-2117
Facsimile:  816-279-3977

Donald D. Barry                          (KS 6250)
Barry Law Offices, LLC
5340 SW 17th St.
P.O. Box 4816
Topeka, Kansas  66604
Telephone:  785-273-3151
Fax:  785-273-5115

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of March, 2016, a true and correct copy of the foregoing was electronically served on counsel for all parties properly registered to receive notice via the Court's CM/ECF system.

_/s/ Gregory M. Bentz_

## <u>Exhibit 13</u>

**Order Denying And Granting Various Motions Entered As Docket No. 2832
In *In re Western States Wholesale Natural Gas Antitrust Litigation***

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

_____ )
In re WESTERN STATES WHOLESALE     )       2:03-cv-01431-RCJ-PAL
NATURAL GAS ANTITRUST           )         MDL No. 1566
LITIGATION                     )          **ORDER**
_____ )
                               )
REORGANIZED FLI, INC. et al.,        )
                               )
           Plaintiffs,              )
                               )
        vs.                     )       2:05-cv-01331-RCJ-PAL
                               )
WILLIAMS COMPANIES. et al.,       )
                               )
           Defendants.           )
_____ )
                               )
LEARJET, INC. et al.,             )
                               )
           Plaintiffs,              )
                               )
        vs.                     )       2:06-cv-00233-RCJ-PAL
                               )
ONEOK, INC. et al.,              )
                               )
           Defendants.           )
_____ )

1     ——————————————— )

2     SINCLAIR OIL CORP.,          )
                                    )

                  Plaintiff,        )

3                                   )

        vs.                    )         2:06-cv-00267-RCJ-PAL

4                                   )

    E PRIME INC. et al.,            )

5                                   )

                  Defendants.      )

6     ——————————————— )

                                  )

7     SINCLAIR OIL CORP.,          )

                                  )

8                   Plaintiff,        )

                                  )

9         vs.                    )         2:06-cv-00282-RCJ-PAL

                                  )

10    ONEOK ENERGY SERVICES CO., L.P., )

                                  )

11                 Defendant.       )

    ——————————————— )

12                                   )

    BRECKENRIDGE BREWERY OF     )

13    COLORADO, LLC et al.,        )

                                  )

14                 Plaintiffs,      )

                                  )

15        vs.                    )         2:06-cv-01351-RCJ-PAL

                                  )

16    ONEOK INC. et al.,           )

                                  )

17                 Defendants.      )

    ——————————————— )

18                                   )

    HEARTLAND REGIONAL MEDICAL   )

19    CENTER et al.,             )

                                  )

20                 Plaintiffs,      )

                                  )

21        vs.                    )         2:07-cv-00987-RCJ-PAL

                                  )

22    ONEOK, INC. et al.,          )

                                  )

23                 Defendants.      )

    ——————————————— )

24

|   |   |   |
|---|---|---|
| _____ | ) | |
| ARANDELL CORP. et al., | ) | |
| Plaintiffs, | ) | |
| vs. | ) | 2:07-cv-01019-RCJ-PAL |
| XCEL ENERGY INC. et al., | ) | |
| Defendants. | ) | |
| _____ | ) | |
| NEWPAGE WISCONSIN SYSTEM INC., | ) | |
| Plaintiff, | ) | |
| vs. | ) | 2:09-cv-00915-RCJ-PAL |
| CMS ENERGY RESOURCE MANAGEMENT CO. et al., | ) | |
| Defendants. | ) | |
| _____ | ) | |

These consolidated cases arise out of the energy crisis of 2000–2002.  Plaintiffs (retail buyers of natural gas) allege that Defendants (natural gas traders) manipulated the price of natural gas by reporting false information to price indices published by trade publications and by engaging in "wash sales."  Four motions for class certification, six motions for summary judgment, fourteen motions to strike expert opinions or briefs, a motion to amend complaints, a motion to reconsider an order of the magistrate judge, a motion to seal, and a motion for suggestion of remand of five of the eight remaining actions (the class actions) to their respective transferor courts are pending before the Court.

## I.    PROCEDURAL HISTORY

In 2003, the Judicial Panel on Multidistrict Litigation ("JPML") transferred seven class action cases from various districts in California to this District under 28 U.S.C. § 1407 as

1    Multidistrict Litigation ("MDL") Case No. 1566, assigning Judge Pro to preside.  Since then, the

2    JPML has transferred in several more actions from various districts throughout the United States.

3    Between 2003 and 2015, Judge Pro ruled on many motions to remand, to dismiss, and for

4    summary judgment.  He also approved several class settlements.  Several parties settled on their

5    own.  One or more of the cases have been to the Court of Appeals twice and to the Supreme

6    Court once.  In 2007, the Court of Appeals reversed several dismissals under the filed rate

7    doctrine and remanded for further proceedings.  In 2013, the Court of Appeals reversed several

8    summary judgment orders, ruling that the Natural Gas Act did not preempt state law anti-trust

9    claims and that certain Wisconsin- and Missouri-based Defendants should not have been

10   dismissed for lack of personal jurisdiction.  The Supreme Court granted certiorari as to

11   preemption under the Natural Gas Act and affirmed.  The case was soon thereafter reassigned to

12   this Court when Judge Pro retired.  The Court has issued several orders on motions to dismiss

13   and for summary judgment.  Eight of the eighteen consolidated cases remain open, the others

14   having been variously settled, dismissed, or remanded to state courts.

15   **II.    MOTIONS TO STRIKE**

16          The motions are based primarily upon the opposing sides' arguments (which are in turn

17   based on opinions by their own experts) that the other side's experts have used unreliable

18   methods, have made poor assumptions, etc.  The main problem with these kinds of arguments is

19   that the Court requires expert assistance to understand the issues in the first instance.  An

20   opposing expert's opinion may be helpful in understanding the issues, as well.  Some degree of

21   debate and uncertainty as to the issues may exist, and the Court must determine class

22   certification (and juries must eventually determine liability) based on the relevant legal standards

23   having considered the expert evidence provided by all proffered witnesses who have more

24

expertise in some relevant area than a layman and whose testimony will be helpful to the Court in understanding the issues.  Finally, the Court notes that it does not require and will not consider any expert's opinion on the law itself.

### A.    Motions Nos. 2547 and 2548

Defendants in the '233, '987, '1019, '915, and '1351 Cases ("the Class Actions") ask the Court to strike the expert opinions of Dr. Mark Dwyer and his colleague Dr. Michael Harris. The Court denies the motions.  It does not matter whether the experts used a reliable definition of "churning" but whether their "testimony is the product of reliable principles and methods [they have] reliably applied . . . to the facts of the case." Fed. R. Evid. 702.  FERC's or others' definition of "churning" for regulatory or industry purposes may or may not overlap completely or partially with Dwyer's and Harris's understandings of the term.  But so long as they have reliably applied reliable principles and methods to determine that Defendants' activity— whatever it was and whether it falls within anyone's definition of "churning"— had the effect of artificially inflating natural gas prices or some other effect that could reasonably support a verdict in Plaintiffs' favor under the antitrust laws at issue, their testimony is not objectionable under Rule 702 based on unreliability.  Defendants argue that Dwyer and Harris did not sufficiently establish causal relationships between trades and price increases or even separate legitimate, non-manipulative rapid trades from manipulative rapid trades.  But Defendants are able to argue (and counter with other experts) as to the depth of their analysis and as to their alleged prior inconsistent statements as to definitions they have used during the litigation. Dwyer and Harris may testify as to the pace of trading and their opinions as to the effect it had on prices.  Defendants can argue as to whether Plaintiffs have any evidence of individual or concerted intent to manipulate prices.

**B.     Motion No. 2620**

Plaintiffs in the Class Actions ask the Court to strike the expert opinions of Dr. Michelle Burtis.  The Court denies the motion.  Dr. Burtis's alleged antagonism towards class actions may be relevant to impeachment for bias, but it does not disqualify her as an expert.  Plaintiffs' objection to Dr. Burtis is mainly over her disagreement with their own expert, Dr. Harris, as to whether individual trades should be examined for legitimacy versus conspiracy before concluding a conspiracy.  The Court does not need either side's experts to address that issue. The Court will not strike Dr. Burtis's testimony but will not rely on any of her legal conclusions just as it will not rely on legal conclusions made by any expert.  The Court will consider her expert testimony where it is helpful to class certification.

**C.     Motion No. 2621**

Plaintiffs in the Class Actions ask the Court to strike the expert opinions of Michael De Laval.  Plaintiffs mainly attack De Laval's lack of academic credentials in the field of economics and argue that his experience trading in the wholesale energy market is not relevant.  The Court disagrees.  The experience of an actual natural gas trader may be very valuable to understanding the impact of Defendants' actions on price fluctuations.  In some respects, it may even be more valuable than the opinions of economics experts who have never actually traded natural gas.  An actual trader who witnesses trades and price fluctuations as they happen may have a perspective that cannot be replicated by a cold, after-the-fact mathematical analysis.  That is not to say that his testimony will be more important or helpful than that of any particular economist's, but it is certainly relevant and helpful enough for him to give expert testimony in this case.  The Court finds that his testimony, along with the testimony of experts in other areas, will aid in understanding the issues and evidence.

**D.    Motion No. 2622**

Plaintiffs in the Class Actions ask the Court to strike the expert opinions of Dr. Christopher L. Cavanagh.  They argue that he has wrongly impugned the methods of one of their own experts, Dr. Dwyer.  They also argue that his methods are unreliable because he makes incorrect assumptions about the natural gas market.  The Court will not exclude his testimony for these reasons.  As noted, the Court will consider his testimony and Dr. Dwyer's, as well as their criticisms of one another's methods, in determining the relevant legal issues.

**E.    Motion No. 2623**

Plaintiffs in the Class Actions ask the Court to strike the expert opinions of Dr. Randall Heeb, Ph. D.  They argue that his testimony is based on a misunderstanding of Plaintiffs' theory of collusion and is based on unreliable methods.  Plaintiffs argue that Dr. Heeb concludes there was no illegal collusion because the evidence does not show that Defendants acted identically at all times with respect to price reporting, but Plaintiffs note that a conspiracy can exist even though not all members of the conspiracy participate in it in the exact same way at the exact same time and that some members of the conspiracy may in fact be at cross purposes at various times based on their individual interests.  The Court agrees with Plaintiffs' statement of the law, but it will not strike Dr. Heeb's testimony altogether simply because his conclusions imply his belief in an incorrect legal standard.  As with other experts who have a flawed understanding of the law or, more accurately, who have exceeded the limits of their expertise by opining on the law at all (which probably includes most of the experts in this case), Dr. Heeb offers some amount of valuable expertise to the Court, and the Court will not strike his testimony.

///

///

**F.      Motion No. 2624**

Plaintiffs in the Class Actions ask the Court to strike the expert opinions of Dr. Hendrik Bessembinder, Ph. D.  They argue that his opinions contradict opinions he offered in 2007 as a witness for the CFTC.  The Court notes that this is legitimate evidence of bias for impeachment purposes but is not a basis to strike his testimony as altogether unreliable.  Plaintiffs also argue that Dr. Bessembinder's analysis of "wash trading" and "churning" is not made in the context of Rule 23 standards.  But it is this Court's function to analyze expert testimony against the standards of Rule 23.  No proffered expert in the case is a legal expert as to Rule 23 (or even an attorney to the Court's knowledge), so such an analysis is not expected; it would be beyond the scope of his or her expertise.  The Court does not need that kind of expert testimony.  It needs expert factual testimony, and Dr. Bessembinder, like the other experts in the case, provides some.

**G.      Motion No. 2625**

Plaintiffs in the Class Actions ask the Court to strike the expert declaration of Bob Broxson (attached as Exhibit 3 to Dr. Bessembinder's expert report) for largely the same reasons they move to strike the testimony of Drs. Burtis and Cavanagh, i.e., his attacks on Plaintiffs' own experts.  Broxson is an expert in natural gas procurement, marketing, transportation, and trading, having worked in the industry for 35 years and testified as an expert in several cases, (*see* Broxson Decl. 5 & apps. A–B, ECF No. 2465, at 52), and his testimony, limited to his area of expertise, will be helpful to the Court.

**H.      Motions Nos. 2644 and 2645**

Defendants in the Class Actions ask the Court to strike the expert opinions of George L. Donkin and Dr. Merrill J. Bateman.  The Court grants the motion to strike their testimony in part

based on untimeliness. As noted, their testimony was offered only in reply to Defendants' objections to the class certification motions and Defendants therefore were not able to depose them by June 24, 2016, as contemplated by the Scheduling Order, or to provide expert testimony in response. The evidence therefore cannot be considered, *see, e.g.*, *Tovar v. U.S. Postal Serv.*, 3 F.3d 1271, 1273 n.3 (9th Cir. 1993), except as relevant to rebutting evidence in the opposition briefs. The Court will not strike the testimnony (as relevant to rebutting evidence in opposition to the motions for class certification) for unreliability, however. Again, movants argue that the experts' testimony is unreliable because it is in conflict with (and criticizes) the methods and conclusions of their own experts. The Court again rejects this argument, as it has done consistently as to experts on both sides.

**I.     Motion No. 2650**

Defendants in the '1351 Case ask the Court to strike certain evidence offered by Plaintiffs in opposition to Defendants' Motion for Summary Judgment (ECF No. 2399). (*See* Opp'n, ECF No. 2638). The Court denies the motion as moot because it denies the motion for summary judgment without relying on any of the challenged evidence. *See infra*.

**J.     Motion No. 2651**

Defendants in the Class Actions ask the Court to strike the declarations of Dr. Merrill J. Bateman and George Donkin submitted with Plaintiffs' reply briefs or for leave to file a surresponse. The Court grants the motion in part for the reason it granted Motions Nos. 2644 and 2645 in part. *See supra*. The Court will not permit a surresponse but will strike the expert testimony, except as relevant to rebuttal of expert testimony adduced by Defendants in opposition to the relevant motions.

///

**K.  Motion No. 2679**

Plaintiffs in the Class Actions ask the Court to strike the declarations of Drs. Joseph Kalt, Michelle Burtis, and Christopher Cavanagh filed on November 2, 2016.  Plaintiffs first argue the declarations are untimely.  The Court agrees and grants the motion.  The issue is largely moot, however, because the November 4, 2016 declarations were proffered as support for a requested surresponse with respect to the motions for class certification.  The Court has denied leave to file a surresponse and has rendered one unnecessary by striking the untimely expert testimony of Dr. Merrill J. Bateman and George Donkin as to support for class certification.

**L.  Motion No. 2767**

Defendants in the '1019 and '915 Cases ask the Court to strike Plaintiffs' Opposition (ECF No. 2737) to Defendants' Motion for Summary Judgment (ECF No. 2694).  The Court denies the motion.  The opposition is in excess of the local page limits, but the briefings in these consolidated cases are voluminous in general.  To the extent leave is required for the oversized brief, the Court grants it.  The Court denies the motion as moot on the merits of the admissibility of the challenged evidence, because the Court does not rely on that evidence in denying summary judgment. *See infra.*

**III.  SUMMARY JUDGMENT MOTIONS**

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See*

*id.* A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court uses a burden-shifting scheme. The moving party must first satisfy its initial burden. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation and internal quotation marks omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.

If the moving party fails to meet its initial burden, summary judgment must be denied and the court needn't consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). If the moving party meets its initial burden, the burden then shifts to the nonmoving party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the nonmoving party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the

1    assertions and allegations of the pleadings and set forth specific facts by producing competent

2    evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S.

3    at 324.

4            At the summary judgment stage, a court's function is not to weigh the evidence and

5    determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477

6    U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are

7    to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely

8    colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

9    Notably, facts are only viewed in the light most favorable to the nonmoving party where there is

10   a genuine dispute about those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007).  That is, even

11   where the underlying claim contains a reasonableness test, where a party's evidence is so clearly

12   contradicted by the record as a whole that no reasonable jury could believe it, "a court should not

13   adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

14       **A.      Motion No. 2399**

15           E prime Energy Marketing, Inc. ("EPEM") and Xcel Energy Inc. ("XE") move for

16   defensive summary judgment in the '1351 Case (*Breckenridge Brewery of Colo., LLC v. OneOK,*

17   *Inc.*).  Movants argue there is no evidence EPEM traded natural gas commodities or reported

18   trades to industry publications during the relevant time period (January 1, 2000 to October 31,

19   2002) ("the RTP"), and therefore neither EPEM nor XE (EPEM's former parent company) can

20   be liable under the Colorado Antitrust Act of 1992, Colo. Rev. Stat. section ("CRS") 6-4-101 *et*

21   *seq.*

22           Even assuming Movants have satisfied their initial burden on summary judgment,

23   however, Plaintiffs have satisfied their shifted burden to provide evidence of EPEM's sale of

24

natural gas to Plaintiffs during the RTP.  E prime, Inc.'s Rule 30(a)(6) deponent testified that EPEM purchased natural gas from e prime, Inc. for sale to customers by EPEM personnel. (Figoli Dep. 117–19, ECF No. 2638-3).  Plaintiffs have adduced copies of natural gas sales contracts between EPEM and BBI Acquisition Co. and between EPEM and Breckenridge Brewery of Colo., LLC on August 29 and 24, 2001, respectively, both effective for one year beginning September 1, 2001. (Suppl. Smith Decl. ¶¶ 6, 8 & Exs. 3, 5, ECF No. 2638-9).  The Court denies the motion for summary judgment.

### B.    Motions Nos. 2436 and 2709

OneOK Energy Services Co., L.P. ("OESC"), formerly known as OneOK Energy Marketing and Trading Co., moves for summary judgment against Sinclair Oil Corp. ("Sinclair") in the '282 Case (*Sinclair Oil Corp. v. OneOK Energy Services Co., L.P.*) based on res judicata and/or release based on release under a settlement agreement reached in a consolidated class action brought in the Southern District of New York ("the NYMEX Case").  Sinclair has counter-moved for summary judgment on the res judicata and release issues.  The Court denies both motions, as material issues of fact remain as to notice to Sinclair of the NYMEX settlements.

The Amended Consolidated Class Action Complaint ("ACCAC") in the NYMEX Case alleged that the defendants had manipulated the prices of natural gas futures and options on the New York Mercantile Exchange ("NYMEX") between January 1, 2000 and December 31, 2002 by reporting inaccurate, misleading, and false trading information, including artificial volume and price information, to trade publications that compile and publish such information.  The Complaint here makes the same allegations. (*Compare* Compl. ¶¶ 2–5, *with* Am. Consol. Class Action Compl. ¶¶ 5, 60–70, ECF No. 2300-1).  OESC was a Defendant under the ACCAC.  The

plaintiff class in the NYMEX Case was defined as persons who had bought or sold natural gas

futures or options on NYMEX during the relevant times. Plaintiff was a member of the NYMEX

class according to facts it has admitted. (*See* Am. Resps. to Reqs. for Adm. 2–3, ECF No. 2437-6

("Sinclair admits that it traded in NYMEX contracts during the Relevant Time Period.")).

On May 24, 2006, the court in the NYMEX Case entered a Final Judgment and Order of

Dismissal ("the First Settlement Order") with an expanded plaintiff class definition reaching

back to June 1, 1999. The first group of settling class members was to receive a total of nearly

$73 million. On June 15, 2007, the court in the NYMEX Case entered a Final Judgment and

Order of Dismissal ("the Second Settlement Order") with a similarly defined plaintiff class. The

second group of settling class members was to receive a total of nearly $28 million. Paragraph 6

of the First Settlement Order and Paragraph 5 of the Second Settlement Order provided for

releases of the parties from further litigation:

> The Released Parties are finally and forever released and discharged from
> any manner of claims . . . and causes of action in law, admiralty, or equity, whether
> class, individual, or otherwise in nature . . . whether known or unknown, suspected
> or unsuspected, whether concealed or hidden, or in law, admiralty, or equity, that
> the Representative Plaintiffs and other members of the Class who have not timely
> opted out of the settlement and excluded themselves from the Class ("Settling
> Plaintiffs''), or any of them, individually, or as a class (whether or not they make a
> claim upon or participate in the Settlement Funds), ever had, now have or hereafter
> can, shall or may have, against the Released Parties arising from or relating in any
> way to trading in NYMEX Natural Gas Contracts (including purchasing, selling, or
> holding any NYMEX Natural Gas Contract, or taking or making delivery of
> physical natural gas pursuant to any NYMEX Natural Gas Contract, or any
> combination thereof, whether as a hedger or speculator), whether or not asserted in
> the Action, including without limitation, claims which (a) arise from *or relate in
> any way to any conduct complained of in any complaint filed in the Action*, (b) have
> been asserted or could have been asserted in any state or federal court or any other
> judicial or arbitral forum against the Released Parties or any one of them, (c) arise
> under *or relate to any federal or state commodity price manipulation law, any state
> or federal unfair or deceptive business or trade practices law, or other law or
> regulation, or common law, including, without limitation, the Commodity
> Exchange Act, 7 U.S.C. § 1 et seq., the federal antitrust laws (as that term is defined
> in 15 U.S.C. § 12), or state antitrust laws* and/or (d) the claims brought in this

Action. The Settling Plaintiffs, and each of them, are hereby enjoined from asserting any such claims against the Released Parties.

(First Settlement Order ¶ 6(a), at 4–6, ECF No. 2300-5 (emphases added; footnote omitted)). The omitted footnote defines "Released Parties" as, *inter alia*, the settling defendants and their predecessors and successors. (*See id.* 4 n.3, at 4–5). The release language of the Second Settlement Order is the same in relevant respects. (*See* Second Settlement Order ¶ 5(a), at 4–5, ECF No. 2300-7).

These releases would seem to bar the present claims against OESC, which was a defendant in the NYMEX Case. (*See* Am. Consol. Class Action Compl. ¶¶ 39–40). The NYMEX court found that notice to the class had been sufficient and that the settlements were fair and reasonable, and OESC provides evidence that the NYMEX Case claims administrator mailed notices to both of Sinclair's NYMEX brokers, ABN AMRO and Smith Barney, (*see* Glenn Aff., ECF No. 2437-8). There is no evidence that Sinclair opted out of the class. Sinclair, however, argues that it had no relationship with the brokers to whom notice was mailed since 2003, before it even filed the ACCAC in the NYMEX Case. (*See* Johnson Aff. ¶¶ 5–6, ECF No. 2520-1). It also argues that this was known to the settlement administrator, so notice to its previous brokers was not reasonable. The Court finds that service upon a party's broker at the time of the relevant trades was reasonable. A broker has a fiduciary duty to notify a former client of such notice. If the broker fails to do so, the client may have a fiduciary claim against the broker, but he has no argument that notice to the broker of record was not a reasonable attempt to notify him of the relevant information.

The Court has also rejected the argument in granting a similar summary judgment motion in the '1331 Case, (*see* Order 9–13, ECF No. 2416), that the NYMEX Case concerned harm to natural gas *futures traders* via Defendants' acts, i.e., the artificial inflation of futures prices via

reporting false prices and engaging in wash trades, whereas the present case concerns harm to natural gas *consumers* due to those acts. The release language of the Settlements is broad enough to preclude the present claims. The release clause releases OESC and other settling defendants from "any manner of claims . . . and causes of action" by settling plaintiffs:

> *relating in any way* to trading in NYMEX Natural Gas Contracts . . . *including without limitation, claims which . . . relate in any way to any conduct complained of in any complaint filed in the Action* [or which] *arise under or relate to any* federal or state commodity price manipulation law, any state or federal unfair or deceptive business or trade practices law, or other law or regulation, or common law, including, without limitation . . . *state antitrust laws.*

(First Settlement Order ¶ 6(a), at 4–6 (emphases added; footnote omitted)). The language of the release is of course broader than the natural release as a matter of law that would have resulted from the settlement under ordinary principles of claim preclusion, otherwise the release would serve no purpose. And the language of the release here is extremely broad. It releases OESC from the present claims, because they arise out of alleged conduct relating to conduct complained of in the NYMEX Case. As noted *supra*, the Complaint here and the ACCAC in the NYMEX Case both complain of OESC's alleged manipulation of NYMEX futures prices via the reporting of inaccurate, misleading, and false trading information, including artificial volume and price information, to trade publications that compile and publish such information. (*Compare* Compl. ¶¶ 2–5, *with* Am. Consol. Class Action Compl. ¶¶ 5, 60–70).

Sinclair notes that:

> A settlement agreement may preclude a party from bringing a related claim in the future "even though the claim was not presented and might not have been presentable in the class action," but only where the released claim is "based on the identical factual predicate as that underlying the claims in the settled class action."

*Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) (quoting *Williams v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir. 2008) and *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287 (9th

Cir. 1992)).  The claims in the Complaint are based on the "identical factual predicate" as the claims in the NYMEX Case, i.e., the alleged manipulation of natural gas prices via false reporting of trading information to various trade publications.  The NYMEX class complained of having paid inflated prices for NYMEX natural gas contracts or taking delivery of natural gas itself pursuant to such a contract, whereas Sinclair complains of having paid inflated prices due to having purchased natural gas directly from OESC.

Sinclair also argues that the NYMEX class representatives did not adequately represent Sinclair's interests. *See Hesse*, 598 F.3d at 588.  But Sinclair provides no evidence indicating that none of the named plaintiffs had potential claims based on having directly purchased natural gas in addition to having purchased natural gas futures.  Without such evidence, the Court cannot find that the named plaintiffs in the NYMEX Case did not adequately represent class members who potentially had such claims.  And OESC has shown in reply that the claim is simply false; at least one of the named plaintiffs in the NYMEX Case, Cornerstone Propane Partners, L.P., alleged in its complaint that it had marketed natural gas in the United States, and its SEC filings indicate that it not only bought and sold propane (which is produced from natural gas) but also bought and sold natural gas itself during the RTP and in fact only purchased futures contracts for the purpose of managing its exposure to fluctuations in the purchase prices of natural gas and crude oil. (*See* ECF Nos. 2552-8 to 2552-9).

Furthermore, unlike in *Hesse*, here the judgment in the class action expressly found that the interests of the NYMEX class were adequately represented by both counsel and the named plaintiffs. (*See* First Settlement Order ¶ 2(a)(iv)–(v)).  The Court cannot undermine this express finding. *See Hesse*, 598 F.3d at 588 (citing *Epstein v. MCA, Inc. (Epstein II)*, 179 F.3d 641, 643, 648–50 (9th Cir. 1999)).

Defendants e prime, inc. ("e prime") and Xcel Energy Inc. ("Xcel Energy") (collectively, "e prime Defendants") have joined the motion.  e prime was a settling Defendant in the NYMEX Case.  Xcel Energy is and was e prime's parent company, and it is therefore included in the definition of "Released Parties." (*See* First Settlement Order ¶ 6(a) & n.3).  Sinclair makes no separate arguments against e prime Defendants, and it appears to agree that they are similarly situated to OESC with respect to the present issues.  The Court grants the joinder, as well.

### C.    Motion No. 2508

All remaining Defendants move for defensive summary judgment in the '1019 Case (*Arandell Corp. v. Xcel Energy, Inc.*) against all claims brought by Briggs & Stratton Corp. ("BSC") and Carthage College ("CC") (collectively, "Plaintiffs") based on release and res judicata.  The Court denies the motion.  Movants (or their parents and subsidiaries, who were also covered by the releases)[1] were defendants in the NYMEX case. (*See* Am. Consol. Class Action Compl. ¶¶ 28, 32–33, 41, 45–46).  Plaintiffs were members of the NYMEX class because they purchased NYMEX Natural Gas Contracts within the Relevant Time Period. (*See* Mourand Dep., 57–62, ECF No. 2509-7; Hoare Dep. 102–09, ECF No. 2509-8).  Finally, Plaintiffs purportedly received notice of the NYMEX settlements through their broker, Kaztex Energy Management, Inc., and did not opt out. (*See* Glenn Aff. & Ex. 5, ECF No. 2509-9; Young Aff. & Ex. 5, ECF No. 2509-10).  But as Plaintiffs note, Kaztex only received notice in its capacity as a class member itself, not as Plaintiffs' agent.  Indeed, Defendants and Kaztex itself have always

---

1 The Williams Cos., Inc., Williams Merchant Services, LLC (f/k/a Williams Merchant Services, Inc.), Williams Gas Marketing, Inc. (f/k/a Williams Power Co., Inc. and Williams Energy Marketing & Trading); Dynegy Ill. Inc., DMT G.P. L.L.C., Dynegy GP Inc., Dynegy Marketing & Trade; El Paso Corp. and El Paso Merchant Energy, L.P.; CMS Energy Corp., Cantera Gas Co., CMS Marketing Services & Trading Co., Reliant Energy, Inc. (n/k/a RRI Energy, Inc.), Reliant Energy Services, Inc. (n/k/a RRI Energy Services, LLC), Northern States Power Co., and Xcel Energy Inc.

denied that Kaztex was Plaintiffs' agent, and in the present motion, Defendants attempt to qualify their claim of Kaztex's agency as limited to the present motion. The Court will not grant summary judgment under these circumstances, where notice to Plaintiffs of the NYMEX settlements is so factually uncertain.

### D. Motion No. 2555

Defendants in the '233, '987, '1019, '0915, '1351, and '1331 Cases move for summary judgment under the Supremacy Clause, specifically, conflict preemption. The Court denies the motion. The Supreme Court has already affirmed the Court of Appeals' ruling that the claims in the present cases are not preempted under the doctrine of field preemption. The Court agrees with Plaintiffs that although Defendants use the term "conflict preemption," they in substance mainly reargue the issue of field preemption, although as limited to the practice of "churning."

Moreover, there is no conflict preemption, here. "[C]onflict pre-emption exists where compliance with both state and federal law is impossible, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *ONEOK, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1596 (2015) (citations and internal quotation marks omitted). Defendants argue that conflict preemption applies to the state law claims here insofar as state law makes "churning" (rapid, high-volume trading activity) unlawful, because the Federal Energy Regulatory Commission ("FERC") has opined that the practice does not violate the Natural Gas Act or attendant regulations.

But the fact that federal law permits a given practice does not mean that compliance with federal law is made impossible by stricter state laws, at least not where the federal law does not explicitly prohibit stricter state regulation, and Defendants do not argue that federal law expressly prohibits the kinds of state law regulation at issue here. *See, e.g.*, *Yung Kim v. Gen.*

*Motors, LLC*, 99 F. Supp. 3d 1096, 1106 (C.D. Cal. 2015). Nor does potential liability for churning obstruct the purposes or objectives of Congress. The opinion of FERC with respect to whether one violates federal law by "churning" therefore has no bearing on whether conflict preemption applies here. The Court's task is to determine by reference to the statutes and regulations themselves whether the federal and state laws impose inconsistent obligations or whether the state laws obstruct congressional objectives. Defendants have not pointed to any federal statutes or regulations in conflict with the state laws at issue. Even if FERC had found in some other case that "churning" was *mandated* by federal law, that would not determine this Court's ruling on the conflict preemption issue in the present case. It would still be for this Court to determine whether there were any conflict between the state laws against "churning" and federal law, e.g., whether federal law mandated "churning." The FERC's opinion would only be potentially persuasive. The only authority put forth in Defendants' favor as to the preemption of the kinds of state laws at issue here is a pre-*ONEOK* ruling by the Nevada Supreme Court in which it found that certain Nevada antitrust claims were *field* preempted, not *conflict* preempted, *see State ex rel. Johnson v. Reliant Energy, Inc.*, 289 P.3d 1186, 1193 (Nev. 2012), a ruling entirely abrogated, in any case, by the U.S. Supreme Court's decision to the contrary in this very case.

### E.     Motion No. 2694

Northern States Power Co.-Wisconsin ("NSP") moves for defensive summary judgment in the '1019 Case (*Arandell Corp. v. Xcel Energy, Inc.*) and the '915 Case (*NewPage Wisconsin System, Inc. v. CMS Energy Resources Management Co.*), arguing that there is no evidence it traded natural gas commodities on the wholesale market or reported any trades to any industry

publication and that as a "Local Distribution Company" under Wisconsin law, it was prohibited from doing either.

Even assuming NSP has satisfied its initial burden on summary judgment, however, Plaintiffs have satisfied their shifted burden to provide evidence of NSP's sale of natural gas to Plaintiffs during the RTP. (*See* Hess Decl., ECF No. 2737-32; Billings Decl. ¶¶ 37–40 & Exs. JJ–MM, ECF No. 2737-3). There is evidence adduced that during the RTP, Integrys Energy Services, Inc. purchased tens of thousands of dollars' worth of natural gas from NSP, (Hess Decl. ¶¶ 1–3, ECF No. 2737-32), that in 2001 NewPage Wisconsin System, Inc. was purchasing its natural gas from WPS, (Krolikowski Dep. 67, ECF No. 2737-33), that Merrick's, Inc. was purchasing its natural gas from WPS at some point in time, (Morris Dep. 10, ECF No. 2737-34), that between 2000 and 2002, Sargento bought its natural gas from WPS, (Link Dep. 29–31, ECF No. 2737-35), and that NewPage Wisconsin System, Inc. had purchased several thousand dollars' worth of natural gas from NSP between 2000 and 2002, (Invoice List, ECF No. 2737-36).

## IV. CLASS CERTIFICATION

In order to obtain class certification under Rule 23, plaintiffs must satisfy two sets of criteria. First, plaintiffs must show each of the following:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

*Rodriguez v. Hayes*, 591 F.3d 1105, 1121–22 (9th Cir. 2010) (citing Fed. R. Civ. P. 23(a)). Second, plaintiffs must show at least one of the following:

(1) prosecuting separate actions by or against individual class members would create a risk of:

> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(1)–(3); *see Hayes*, 591 U.S. at 1122. A district court should not address the merits of a case directly when determining certification under Rule 23, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78 (1974) (holding that a class action plaintiff cannot argue the merits of his case to circumvent the Rule 23 certification requirements), except to the extent that determining the certification motion requires probing the merits, in which case the court must address any relevant merits issues, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–52 (2011).

If the certification requirements are satisfied, a court should not refuse to certify simply because it believes the case should be dismissed or summarily adjudicated in favor of the defendant.

### A.      Motion No. 2308

Plaintiffs in the '233 Case ask the Court to certify the following class:

> All industrial and commercial direct purchasers of natural gas for their own use or consumption during the Relevant Time Period, and which gas was used or consumed by them in Kansas.  Excluded from the Class are (a) entities that purchased natural gas for resale (to the extent of such purchase for resale); (b) entities that purchased natural gas for generation of electricity for the purpose of sale (to the extent of such purchase for generation); (c) defendants and their predecessors, affiliates and subsidiaries; and (d) the federal government and its agencies.

The "relevant time period" is January 2000 through February 2002.

### 1.      Rule 23(a)

### a.      Numerosity

The Court finds the numerosity requirement to be satisfied.  There were thousands of industrial consumers and tens of thousands of commercial consumers of natural gas in Kansas during the relevant time period. (*See* Ennis Decl. ¶ 8 & Ex. E, ECF No. 2315-16, 2315-19, at 89).

### b.      Commonality and Typicality

The Court finds that although there are surely some questions of law and fact common to some members of the class and other questions of law and fact common to other members of the class, the Court is not convinced that there are questions of law and fact common to all members of the class.  The class members have similar allegations under Kansas law—that they purchased natural gas for their own consumption the price of which had been unlawfully inflated by Defendants' actions in violation of the Kansas Restraint of Trade Act.  Plaintiffs' claims are also typical of the class members' claims in this regard.  Plaintiffs Learjet, Inc.; Cross Oil Refining &

Marketing, Inc.; and Topeka Unified School District 501, like the proposed class members, are industrial or commercial users of natural gas who purchased natural gas in Kansas for their own use in that state.

But, as Defendants note, the different purchasing strategies used by Plaintiffs and class members will require individualized examination of whether each class member was harmed, both factually (a standing issue) and legally (an antitrust law issue).  So although it may be the case that some subset of the proposed class has been harmed, and that several subclasses (though yet undefined) of that subset have been harmed in the same way such that their damages can be calculated using some yet undetermined number of common methods, the class as currently defined does not satisfy the commonality requirement. *See Dukes*, 564 U.S. at 350 ("Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor.  That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.").

Defendants also argue that some Plaintiffs are subject to claim preclusion and release defenses that not all putative class members are, i.e., based on the settlements in the NYMEX Case.  The Court finds that this also weighs against class certification.  The Court has variously granted or denied motions for summary judgment based on this defense based on the particular facts presented, e.g., whether a broker who received notice was an agent of the class member.  If all Plaintiffs in a given class action were to be eliminated via such a defense, a court could either require substitution of one or more class representatives not subject to the defense.  That possibility alleviates the typicality concerns.  But the commonality concerns would remain.  A trial court or jury would potentially have to sift through thousands of records of notice and

resolve thousands of agency issues to determine whether a given class member were properly

notified of the NYMEX settlements and therefore bound by the attendant releases.

### c.     Adequacy of Representation

The Court finds that counsel is competent to represent the class.  (*See* Bacon Decl. ¶¶ 3–

4, 6, ECF No. 2315-10 (attesting that she is a 41-year attorney and former President of the

Missouri Bar who has been involved with many of the 130-plus class actions her firm has

prosecuted); Barry Decl. ¶ 3, ECF No. 2315-15 (attesting that he is a 52-year attorney with

significant antitrust litigation experience); Bentz Decl. ¶¶ 3, 6, ECF No. 2315-11 (attesting that

he is a 34-year attorney who has been involved with many of the 130-plus class actions his firm

has prosecuted); Heinz Decl. ¶ 5, ECF No. 2315-13 (attesting that he is currently litigating two

other class actions in this District); McCallister Decl. ¶¶ 3, 5, 8, ECF No. 2315-14 (attesting that

he is a 42-year attorney and former President of the Kansas Trial Lawyers Association who has

prosecuted over a dozen antitrust and class actions with his current firm); Jones Decl. ¶¶ 3, 6,

ECF No. 2315-9 (attesting that he is a 37-year attorney who has been involved with many of the

250-plus class actions (some of which were antitrust cases) his firm has prosecuted)).  The Court

also finds that there is no evidence of any conflicts of interest between Plaintiffs and the class.

### 2.     Rule 23(b)(3)

Under Rule 23(b)(3), questions of law or fact common to class members must

"predominate" over questions affecting individual members, and a class action must be

"superior" to other available methods for fairly and efficiently adjudicating the controversy.

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S.

591, 623 (1997).  Factors to be considered as to the superiority requirement include the class

members' interests in individually controlling separate actions, the extent and nature of any litigation already begun by class members, the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and the likely difficulties in managing a class action.  The fact that a defendant may be able to eliminate one or more plaintiffs or class members due to individual issues does not cause individual questions to predominate. *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014).  "Private damage claims by numerous individuals arising out of concerted antitrust violations may or may not involve predominating common questions." Fed. R. Civ. P. 23(b)(3) advisory committee's note to 1966 amendment, subdivision (b)(3).

Where "the damages for individual class members will entail a straightforward calculation," those individual issues are considered "relatively easy" and will not defeat the fact that the class members' harm stems from common acts of a defendant. *Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001) (reversing Judge Pro's denial of class certification).  That is not the case here.  As counsel for Defendants noted at the hearing, class members in these cases are not small consumers whose damages constitute a straightforward calculation of units of product purchased times some amount by which the retail price was wrongly inflated.  Rather, they were sophisticated industrial and commercial consumers who used varying and complex strategies for purchasing natural gas such that it is difficult to calculate their damages in most cases.  In many cases, there are no damages at all.  And Plaintiffs' own experts have used different methods to calculate injury, resulting in disparate estimations of what percentage of class members were even harmed.  Although there are some common questions of law and fact, they do not predominate over individual issues.

### B.     Motion No. 2309

Plaintiffs in the '987 Case ask the Court to certify the following class:

> All industrial and commercial direct purchasers of natural gas for their own use or consumption during the Relevant Time Period, and which gas was used or consumed by them in Missouri.  Excluded from the Class are (a) entities that purchased natural gas for resale (to the extent of such purchase for resale); (b) entities that purchased natural gas for generation of electricity for the purpose of sale (to the extent of such purchase for generation); (c) defendants and their predecessors, affiliates and subsidiaries; and (d) the federal government and its agencies.

The "relevant time period" is January 1, 2000 through February 2002.

### 1.     Rule 23(a)

#### a.     Numerosity

The Court finds the numerosity requirement to be satisfied.  There were thousands of industrial consumers and over a hundred-thousand commercial consumers of natural gas in Missouri during the relevant time period. (*See* Ennis Decl. ¶ 8 & Ex. E, ECF No. 2315-16, 2315-19, at 89).

#### b.     Commonality and Typicality

The Court finds the commonality and typicality requirements not to be satisfied for the reasons given as to the motion in the '233 Case. *See supra.*

#### c.     Adequacy of Representation

The Court finds that counsel is competent to represent the class.  (*See* Bacon Decl. ¶¶ 3–4, 6, ECF No. 2315-10 (attesting that she is a 41-year attorney and former President of the Missouri Bar who has been involved with many of the 130-plus class actions her firm has prosecuted); Barry Decl. ¶ 3, ECF No. 2315-15 (attesting that he is a 52-year attorney with significant antitrust litigation experience); Bentz Decl. ¶¶ 3, 6, ECF No. 2315-11 (attesting that he is a 34-year attorney who has been involved with many of the 130-plus class actions his firm

1    has prosecuted); Heinz Decl. ¶ 5, ECF No. 2315-13 (attesting that he is currently litigating two

2    other class actions in this District); Jones Decl. ¶¶ 3, 6, ECF No. 2315-9 (attesting that he is a 37-

3    year attorney who has been involved with many of the 250-plus class actions (some of which

4    were antitrust cases) his firm has prosecuted)).  The Court also finds that there is no evidence of

5    any conflicts of interest between Plaintiffs and the class.

6              **2.**    **Rule 23(b)(3)**

7              The Court finds that the predominance and superiority requirements of Rule 23(b)(3) are

8    not met in this case for the same reasons given as to the '233 Case, *supra.*

9    **C.**    **Motion No. 2310**

10             Plaintiffs in the '1351 Case ask the Court to certify the following class:

11                  All industrial and commercial purchasers of natural gas for their own use or
12             consumption that bought from defendants Xcel Energy, Inc., e prime Energy
               Marketing, or their corporate affiliates during the Relevant Time Period, and
13             which gas was used or consumed by them in Colorado.  Excluded from the Class
               are (a) entities that purchased natural gas for resale (to the extent of such purchase
14             for resale); (b) entities that purchased natural gas for generation of electricity for
               the purpose of sale (to the extent of such purchase for generation); (c) defendants
15             and their predecessors, affiliates and subsidiaries; and (d) the federal government
               and its agencies.

16   The "relevant time period" is January 1, 2000 through February 2002.

17             **1.**    **Rule 23(a)**

18             **a.**    **Numerosity**

19             The Court finds the numerosity requirement to be satisfied.  There were thousands of

20   industrial consumers and over a hundred-thousand commercial consumers of natural gas in

21   Colorado during the relevant time period. (*See* Ennis Decl. ¶ 8 & Ex. E, ECF No. 2315-16, 2315-

22   19, at 89).

23   ///

24

### b.    Commonality and Typicality

The Court finds the commonality and typicality requirements not to be satisfied for the reasons given as to the motion in the '233 Case. *See supra.*

### c.    Adequacy of Representation

The Court finds that counsel is competent to represent the class.  (*See* Bacon Decl. ¶¶ 3–4, 6, ECF No. 2315-10 (attesting that she is a 41-year attorney and former President of the Missouri Bar who has been involved with many of the 130-plus class actions her firm has prosecuted); Barry Decl. ¶ 3, ECF No. 2315-15 (attesting that he is a 52-year attorney with significant antitrust litigation experience); Bentz Decl. ¶¶ 3, 6, ECF No. 2315-11 (attesting that he is a 34-year attorney who has been involved with many of the 130-plus class actions his firm has prosecuted); Heinz Decl. ¶ 5, ECF No. 2315-13 (attesting that he is currently litigating two other class actions in this District); Jones Decl. ¶¶ 3, 6, ECF No. 2315-9 (attesting that he is a 37-year attorney who has been involved with many of the 250-plus class actions (some of which were antitrust cases) his firm has prosecuted)).  The Court also finds that there is no evidence of any conflicts of interest between Plaintiffs and the class.

### 2.    Rule 23(b)(3)

The Court finds that the predominance and superiority requirements of Rule 23(b)(3) are not met in this case for the same reasons given as to the '233 Case, *supra.*

### D.    Motion No. 2311

Plaintiffs in the '1019 and '915 Cases ask the Court to certify the following class:

> All industrial and commercial purchasers of natural gas for their own use or consumption during the Relevant Time Period, and which gas was used or consumed by them in Wisconsin.  Excluded from the Class are (a) entities that purchased natural gas for resale (to the extent of such purchase for resale); (b) entities that purchased natural gas for generation of electricity for the purpose of sale (to the extent of such purchase for generation); (c) entities that purchased

natural gas from entities that sold natural gas at rates approved by the Wisconsin Public Service Commission (to the extent of such purchases at such approved rates); (d) defendants and their predecessors, affiliates and subsidiaries; and (e) the federal government and its agencies.

The "relevant time period" is January 1, 2000 through October 31, 2002.

### 1.    Rule 23(a)

#### a.    Numerosity

The Court finds the numerosity requirement to be satisfied.  There were thousands of industrial consumers and over a hundred-thousand commercial consumers of natural gas in Wisconsin during the relevant time period. (*See* Ennis Decl. ¶ 8 & Ex. E, ECF No. 2315-16, 2315-19, at 89).

#### b.    Commonality and Typicality

The Court finds the commonality and typicality requirements not to be satisfied for the reasons given as to the motion in the '233 Case. *See supra.*

#### c.    Adequacy of Representation

The Court finds that counsel is competent to represent the class.  (*See* Bacon Decl. ¶¶ 3–4, 6, ECF No. 2315-10 (attesting that she is a 41-year attorney and former President of the Missouri Bar who has been involved with many of the 130-plus class actions her firm has prosecuted); Gegios Decl. ¶¶ 3, 6, ECF No. 2315-12 (attesting that he is a 36-year attorney who has been involved in many class actions since 1984, including at least two antitrust class actions); Jones Decl. ¶¶ 3, 6, ECF No. 2315-9 (attesting that he is a 37-year attorney who has been involved with many of the 250-plus class actions (some of which were antitrust cases) his firm has prosecuted)).  The Court also finds that there is no evidence of any conflicts of interest between Plaintiffs and the class.

///

**2.    Rule 23(b)(3)**

The Court finds that the predominance and superiority requirements of Rule 23(b)(3) are not met in these cases for the same reasons given as to the '233 Case, *supra*.

## V.    MOTION TO AMEND

> A party may amend its pleading once as a matter of course within . . . 21 days after serving it, or . . . if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier. . . . In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires.

Fed. R. Civ. P. 15(a)(1)–(2).  As noted by Judge Pro in previously denying a motion to amend, however, a deadline to amend pleadings set by scheduling order may only be amended for good cause. *See* Fed. R. Civ. P. 16(b)(3)(B)(vii), (b)(4).

Sinclair has requested leave to amend the complaints in the '267 and '282 cases to delete five claims, make additional allegations as to six claims, and to add two claims under Wyoming law.  Sinclair has not shown that it has been diligent in making this request or that the fact and law upon which the new claims lie were not reasonably available to it until it made the motion. *See  United States v. Dang*, 488 F.3d 1135, 1142–43 (9th Cir. 2007); *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992) (citing Fed. R. Civ. P. 16 advisory committee's note to 1983 amendment).  Amendment at this stage would also be extraordinarily disruptive and prejudicial to Defendants.  That weighs against a good cause finding, although prejudice need not be found to deny an untimely amendment. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1295 (9th Cir. 2000).  Discovery is now nearly closed after several years of litigation, all dispositive motions have been filed, and the Court via the present order is making what will likely be its penultimate dispositive rulings in these cases before remand to the transferor courts for trial.

Movant has not shown good cause for such a late amendment. As Defendants note, Sinclair may voluntarily dismiss some of its claims without obtaining leave to amend. Because the dismissal stage of the litigation is over, repleading claims that have survived to the summary judgment stage would be superfluous, and a request to replead any dismissed claim would in substance constitute a motion to reconsider a previous dismissal. The only purpose of the present motion is to add the constitutional and statutory claims under Wyoming law. But Sinclair has made no showing that those claims are based on new evidence or theories not reasonably available to Sinclair before certain deposition and expert testimony obtained in 2016 leading Sinclair to think that causes of action under Article X, Section 8 of the Wyoming Constitution or section 40-4-101 of the Wyoming Statutes had suddenly become viable. Section 40-4-101 makes it unlawful to "prevent competition or to control or influence production or prices." Wyo. Stat. § 40-4-101. The Wyoming Constitution prohibits the "consolidation or combination of corporations of any kind whatever to prevent competition, to control or influence productions or prices thereof." Wyo. Const. art. X, § 8. The kind of activity those provisions make unlawful as relevant to the present case, i.e., price manipulation, has been the core basis of the '267 and '282 Cases since they were filed in 2005. The complaints in those cases are both premised on Defendants having acted alone and in tandem to inflate natural gas prices. (*See* Compl. ¶ 4, ECF No. 1 in Case No. 2:06-cv-267; Compl. ¶ 3, ECF No. 1 in Case No. 2:06-cv-282).

## VI.    MOTION TO RECONSIDER A RULING OF THE MAGISTRATE JUDGE

Rule 72(a) permits a district court judge to modify or set aside a magistrate judge's non-dispositive ruling that is clearly erroneous or contrary to law:

> When a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide, the magistrate judge must

promptly conduct the required proceedings and, when appropriate, issue a written order stating the decision. A party may serve and file objections to the order within 14 days after being served with a copy. A party may not assign as error a defect in the order not timely objected to. The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.

Fed. R. Civ. P. 72(a); *see also* Local R. IB 3-1(a). Rule 72(a) institutes an abuse of discretion standard. *See Grimes v. City and Cnty. of S.F.*, 951 F.2d 236, 241 (9th Cir. 1991) (citing *United States v. BNS Inc.*, 858 F.2d 456, 464 (9th Cir. 1988) ("We still must determine, however, whether the court abused its discretion in issuing its order based on the facts before it which are supported by the record. Under the abuse of discretion standard, we cannot simply substitute our judgment for that of the district court, but must be left with the definite and firm conviction that the court committed a clear error of judgment in reaching its conclusion after weighing the relevant factors.")).

Movants ask the Court to reverse the order of the Magistrate Judge denying their motion to compel Reliant Energy, Inc. to provide certain discovery. Movants have adduced a transcript of the hearing before the Magistrate Judge. The Court has reviewed the entire transcript of the hearing on the motion to compel, as well as the previously adduced excerpts of the transcript of Ms. Kupieck's deposition and does not find that the Magistrate Judge erred in denying the motion. The Magistrate Judge recounted the extensive discovery she had provided Plaintiffs, including granting a previous motion to compel the deposition of Ms. Kupieck, whose deposition led to the most recent motion to compel. The Magistrate Judge did not err in concluding that Ms. Kupieck's testimony did not indicate the existence of the kinds of documents Movants have sought to compel Defendants to produce, but that Movants were simply unhappy with their failure to obtain sought-after admissions from Ms. Kupieck.

*///*

## VII.    MOTION FOR SUGGESTION OF REMAND

Movants ask the Court to suggest to the JPML under JPML Rule 10.1(b) that it remand the Class Actions back to the transferor courts.  Plaintiffs note the Class Actions involve state law antitrust claims under four different states' laws and argue they are therefore better addressed by the transferor courts.  They argue that the JPML typically defers to a transferee court's recommendation of remand. *See In re Franklin Nat'l Bank Sec. Litig.*, 407 F. Supp. 248, 248 (J.P.M.L. 1976) ("Generally, the Panel gives great deference to a transferee judge's suggestion that an action pending before him for Section 1407 treatment is ripe for remand.").  Fact and class discovery has closed in the Class Actions.  The parties will soon finish merits expert depositions.  The Court will not suggest remand of the Class Actions before making summary judgment and class certification rulings where the same conduct by many of the same Defendants forms the basis for Plaintiffs' claims under similar state laws.

///

///

///

///

///

///

///

///

///

///

///

# CONCLUSION

IT IS HEREBY ORDERED that the Motions for Summary Judgment (ECF Nos. 2399, 2508, 2555, 2694, 2709), Motions for Class Certification (ECF Nos. 2308, 2309, 2310, 2311), the Motions to Strike (ECF Nos. 2547, 2548, 2620, 2621, 2622, 2623, 2624, 2625), the Motion to Reconsider (ECF No. 2772) and Motion to File a Reply (ECF No. 2796), the Motion to File a Surresponse (ECF No. 2718), the Motion to Amend (ECF No. 2454), and the Motion for Suggestion of Remand (ECF No. 2765) are DENIED.

IT IS FURTHER ORDERED that the Motion to Seal (ECF No. 2766), the Motion to Strike (ECF No. 2679), the Motion for Summary Judgment (ECF No. 2436), and the Joinder to Motion No. 2436 (ECF No. 2444), are GRANTED.

IT IS FURTHER ORDERED that the Motions to Strike (ECF Nos. 2644, 2645, 2651) are GRANTED IN PART AND DENIED IN PART.

IT IS FURTHER ORDERED that the Motion to Strike (ECF No. 2650) is DENIED as moot.

IT IS FURTHER ORDERED that the Motion to Strike (ECF No. 2767) is DENIED IN PART and DENIED as moot in part.

IT IS SO ORDERED.

Dated this 30th day of March, 2017.

_____
ROBERT C. JONES
United States District Judge

## <u>Exhibit 14</u>

**Notice Of Plaintiffs' Payment Of Rule 23(F) Appeal Fee Entered As Docket No. 2913 In *In re Western States Wholesale Natural Gas Antitrust Litigation***

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| IN RE: WESTERN STATES WHOLESALE NATURAL GAS ANTITRUST LITIGATION. | )<br>)<br>)<br>) | MDL DOCKET NO. 1566<br><br>Base Case File No.<br>2:03-CV-1431-RCJ-PAL |

IN RE: WESTERN STATES ) MDL DOCKET NO. 1566
WHOLESALE NATURAL GAS )
ANTITRUST LITIGATION. ) Base Case File No.
) 2:03-CV-1431-RCJ-PAL
)
_____ )
)
THIS DOCUMENT RELATES TO: )
)
*Learjet, Inc., et al. v. ONEOK, Inc., et al.* ) 2:06-CV-00233-RCJ-PAL
)
*Arandell Corporation, et al.* ) 2:07-CV-01019-RCJ-PAL
*v. Xcel Energy Inc., et al.* )
)
*Heartland Regional Medical Center, et al.* ) 2:07-CV-00987-RCJ-PAL
*v. ONEOK, Inc., et al.* )
)
*Breckenridge Brewery of Colorado, LLC,* ) 2:06-CV-01351-RCJ-PAL
*et al. v. ONEOK, Inc., et al.* )
)
*NewPage Wisconsin System, Inc.,* ) 2:09-CV-00915-RCJ-PAL
*v. CMS Energy Resource Management* )
*Company, et al.* )

## NOTICE OF PLAINTIFFS' PAYMENT OF RULE 23(F) APPEAL FEE

On June 13, 2017, the United States Court of Appeals for the Ninth Circuit granted

Plaintiffs' Rule 23(f) Petition for Permission to Appeal from this Court's Order Denying Class

Certification, ECF No. 2832. *See* June 13, 2017 Order, Ninth Circuit Case No. 17-80063, ECF

No. 6, attached hereto as Exhibit A. The Court of Appeals has thus ordered Plaintiffs to pay this

Court the required $505 appeal fee, in accordance with Fed. R. App. P. 5(d)(1)(A), which

provides that "[w]ithin 14 days after the entry of the order granting permission to appeal, the

appellant must: (A) pay the district clerk all required fees . . . ." *See id.*; *see also* June 14, 2017

Docketing Letter, Ninth Circuit Case No. 17-16227, ECF No. 2-4, excerpted and attached hereto

as Exhibit B.

Federal Rule of Appellate Procedure 5(d) also provides, however, that a "notice of appeal need not be filed." To comply with these rules, this paper and its attachments are being filed under the "Notice of Appeal" event under this Court's ECF system, to facilitate payment via ECF of the required $505 appeal fee under Fed. R. App. P. 5(d)(1)(A).

Under Federal Rule of Appellate Procedure 12(b) and Ninth Circuit Local Rule 3-2, a Representation Statement is also attached.

Dated:  June 20, 2017                              Respectfully submitted,

                                                    /s/ Gregory M. Bentz
                                                   Russell S. Jones
                                                   Jennifer G. Bacon
                                                   Gregory M. Bentz
                                                   Andrew J. Ennis
                                                   POLSINELLI PC
                                                   900 W. 48th Place, Suite 900
                                                   Kansas City, MO  64112
                                                   Telephone:     (816) 753-1000
                                                   Facsimile:     (816) 753-1536

                                                   Von S. Heinz
                                                   Brian Blakley
                                                   LEWIS ROCA ROTHGERBER CHRISTIE  LLP
                                                   3993 Howard Hughes Parkway, Suite 600
                                                   Las Vegas, NV  89169

                                                   *Counsel for Plaintiffs Breckenridge*
                                                   *Brewery, LLC, et al., Learjet Inc., et al.,*
                                                   *Heartland Health, et al., Arandell Corp., et*
                                                   *al, and NewPage Wisconsin System, Inc., et*
                                                   *al.*

                                                   Robert L. Gegios
                                                   Ryan M. Billings
                                                   Melinda A. Bialzik
                                                   Amy I. Washburn
                                                   KOHNER, MANN & KAILAS, SC
                                                   Barnabas Business Center
                                                   4650 N. Port Washington Road
                                                   Milwaukee, WI  53212
                                                   Telephone:     (414) 962-5110
                                                   Facsimile:     (414) 962-8725

*Counsel for Plaintiffs Arandell Corp., et al and NewPage Wisconsin System, et al.*

Donald D. Barry
BARRY LAW OFFICES, LLC
5340 SW 17th Street
P.O. Box 4816
Topeka, KS  66604
Telephone:     (785) 273-3151
Facsimile:     (785) 273-5115

*Counsel for Plaintiffs Breckenridge Brewery, et al., Heartland Health, et al., Learjet, Inc., et al., Arandell Corp., et al., and NewPage Wisconsin System, et al.,*

Gary D. McCallister
MCCALLISTER LAW GROUP, LLC
120 North LaSalle Street, Suite 2800
Chicago, IL  60602
Telephone:     (312) 345-0611
Facsimile:     (312) 345-0612

Eric I. Unrein
FRIEDEN, UNREIN, FORBES & BIGGS, LLP
1414 SW Ashworth Place, Suite 201
Topeka, KS 66604
Telephone:     (785) 354-1100
Facsimile:     (785) 354-1113

*Counsel for Plaintiffs Learjet, Inc., et al.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of June, 2017, a true and correct copy of the foregoing and its attachments were electronically served on counsel for all parties properly registered to receive notice via the Court's CM/ECF system.

*/s/ Gregory M. Bentz*

## <u>Exhibit 15</u>

**Order Granting And Denying Various Motions Entered As Docket No. 2987
In *In re Western States Wholesale Natural Gas Antitrust Litigation***

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

_____
                                        )
In re WESTERN STATES WHOLESALE          )        2:03-cv-01431-RCJ-PAL
NATURAL GAS ANTITRUST                    )           MDL No. 1566
LITIGATION                              )              **ORDER**
_____ )
                                        )
REORGANIZED FLI, INC. et al.,           )
                                        )
              Plaintiffs,               )
                                        )
      vs.                               )        2:05-cv-01331-RCJ-PAL
                                        )
WILLIAMS COMPANIES. et al.,             )
                                        )
              Defendants.               )
_____ )
                                        )
LEARJET, INC. et al.,                   )
                                        )
              Plaintiffs,               )
                                        )
      vs.                               )        2:06-cv-00233-RCJ-PAL
                                        )
ONEOK, INC. et al.,                     )
                                        )
              Defendants.               )
_____ )

1 of 9

1

SINCLAIR OIL CORP.,                          )
                                             )
2                                            )
          Plaintiff,                         )
3                                            )
      vs.                                    )        2:06-cv-00267-RCJ-PAL
4                                            )
E PRIME INC. et al.,                         )
5                                            )
          Defendants.                        )
6 _____           )
                                             )
7 SINCLAIR OIL CORP.,                        )
                                             )
8         Plaintiff,                         )
                                             )
9     vs.                                    )        2:06-cv-00282-RCJ-PAL
                                             )
10 ONEOK ENERGY SERVICES CO., L.P.,          )
                                             )
11        Defendant.                         )
                                             )
12 _____          )
                                             )
BRECKENRIDGE BREWERY OF                       )
13 COLORADO, LLC et al.,                     )
                                             )
14        Plaintiffs,                        )
                                             )
15    vs.                                    )        2:06-cv-01351-RCJ-PAL
                                             )
16 ONEOK INC. et al.,                        )
                                             )
17        Defendants.                        )
18 _____          )
                                             )
HEARTLAND REGIONAL MEDICAL                    )
19 CENTER et al.,                            )
                                             )
20        Plaintiffs,                        )
                                             )
21    vs.                                    )        2:07-cv-00987-RCJ-PAL
                                             )
22 ONEOK, INC. et al.,                       )
                                             )
23        Defendants.                        )
24 _____          )

ARANDELL CORP. et al.,                )
                                       )
        Plaintiffs,                    )
                                       )
    vs.                                )        2:07-cv-01019-RCJ-PAL
                                       )
XCEL ENERGY INC. et al.,               )
                                       )
        Defendants.                    )
_____)
                                       )
NEWPAGE WISCONSIN SYSTEM INC.,         )
                                       )
        Plaintiff,                     )
                                       )
    vs.                                )        2:09-cv-00915-RCJ-PAL
                                       )
CMS ENERGY RESOURCE                    )
MANAGEMENT CO. et al.,                 )
                                       )
        Defendants.                    )
_____)

        These consolidated cases arise out of the energy crisis of 2000–2002.  Plaintiffs (retail

buyers of natural gas) allege that Defendants (natural gas traders) manipulated the price of

natural gas by reporting false information to price indices published by trade publications and by

engaging in "wash sales."  Several motions are pending before the Court.

I.      PROCEDURAL HISTORY

        In 2003, the Judicial Panel on Multidistrict Litigation ("JPML") transferred seven class

action cases from various districts in California to this District under 28 U.S.C. § 1407 as

Multidistrict Litigation ("MDL") Case No. 1566, assigning Judge Pro to preside.  Since then, the

JPML has transferred in several more actions from various districts throughout the United States.

Between 2003 and 2015, Judge Pro ruled on many motions to remand, to dismiss, and for

summary judgment.  He also approved several class settlements.  Several parties settled on their

own.  One or more of the cases have been to the Court of Appeals twice and to the Supreme

Court once.  In 2007, the Court of Appeals reversed several dismissals under the filed rate doctrine and remanded for further proceedings.  In 2013, the Court of Appeals reversed several summary judgment orders, ruling that the Natural Gas Act did not preempt state law anti-trust claims and that certain Wisconsin- and Missouri-based Defendants should not have been dismissed for lack of personal jurisdiction.  The Supreme Court granted certiorari as to preemption under the Natural Gas Act and affirmed.  The case was soon thereafter reassigned to this Court when Judge Pro retired.  The Court has issued several dispositive orders and has denied class certification in applicable cases.  The Court recently ruled on approximately forty motions, including the final group of dispositive motions.  Two motions to reconsider and several other motions are pending before the Court.

## II.     MOTIONS TO RECONSIDER

### A.     Motion No. 2959

Defendants Xcel Energy Inc. ("Xcel"), Northern States Power Co. ("N. States"), Dynegy Illinois, Inc. ("DII"), DMT GP, LLC ("DMT"), Dynegy GP, Inc. ("DGI"), El Paso Corp. ("El Paso"), and Williams Merchant Services Co. ("Williams") ask the Court to reconsider denial of their motion for summary judgment in the '1019 and '915 Cases based on release and/or res judicata via the settlements in a consolidated class action brought in the Southern District of New York, No. 03-cv-6186 ("the NYMEX Case").  The Court granted the motion as to several Defendants but denied the motion as to movants because the Court was not satisfied that movants were parties to the NYMEX Case or parents, subsidiaries, successors, etc. of parties to the NYMEX Case covered by the release.  The Court invited the present motions to reconsider if movants could provide such evidence or point out to the Court such evidence already in the record.

Movants note that the Court reconsidered the release arguments of Xcel, El Paso, and Williams after a previous round of summary judgment motions under similar circumstances. (*See* Order 2–3, Nov. 16, 2016, ECF No. 2671 (noting that the relevant Plaintiff had affirmatively alleged the corporate relationships at issue in the relevant pleading)). Movants are correct that Plaintiffs in the '1019 and '915 Cases have also judicially admitted several corporate relationships via their respective pleadings. (*See* Third Am. Compl. ¶ 25 (Williams), ¶ 45 (El Paso), ¶ 67 (Xcel), ¶ 68 (N. States), ECF No. 1846, attached as Ex. 1 to Mot. Recon., ECF No. 2959; Am. Class Action Compl. ¶ 21 (Williams), ¶ 41 (El Paso), ¶ 68 (Xcel), ¶ 69 (N. States), ECF No. 1953, attached as Ex. 2 to Mot. Recon., ECF No. 2959). The Court therefore finds that Williams, El Paso, Xcel, and N. States were released.

Movants also adduce the testimony of DII's Rule 30(b)(6) deponent that DII, DMT, and DGI were related to Dynegy Marketing & Trade, which was a "Settling Defendant" in the NYMEX Case. (*See* Jolley Dep. 49, ECF No. 2959-7 (attesting that DII is the parent of Dynegy Holdings, Inc., which in turn is the parent of DGI, a general partner in Dynegy Marketing & Trade, and that Dynegy Holdings, Inc. also owns DMT)). In other words, DGI was a general partner of a Settling Defendant (Dynegy Marketing & Trade), DII was DGI's "grandparent," and DMT shared a parent with DGI. The Court must examine whether these entities are released based on their relationships to Dynegy Marketing & Trade. The relevant language of the release is:

> "Released Parties" shall mean the Settling Defendants, the Settling Defendants' predecessors, the Settling Defendants' successors, and the present or former members, principals, officers, directors, employees, agents, assigns, attorneys, insurers, shareholders, advisors, parents, subsidiaries, affiliates, joint ventures, partnerships, and associates (as defined in SEC Rule 12b-2 . . .) of the Settling Defendants, the Settling Defendants' predecessors, and/or the Settling Defendants' successors, in any capacity related to the Settling Defendants and their predecessors and successors, but not in any capacity related to any of the non-settling defendants; and each of their assigns, representatives, heirs, executors, and

administrators (and present or former members, principals, officers, directors, employees, agents, assigns, attorneys, insurers, shareholders, advisors, parents, subsidiaries, affiliates, joint ventures, partnerships, or associates of all such parents, subsidiaries, affiliates, joint ventures, partnerships, or associates in any capacity related to the Settling Defendants and their predecessors and successors, but not in any capacity related to any of the non-settling defendants).

(First Settlement Order 4–5 n.3, ECF No. 2300-5).

First, according to Jolley's testimony, DGI was a partner of Dynegy Marketing & Trade. It was therefore released as a member of a Settling Defendant.

Second, DII was the parent of the parent of DGI. Under the release, parents of parents of Settling Defendants, as well as parents of members of Settling Defendants, were released. But DII was *the parent* of a parent (Dynegy Holdings, Inc.) of a member (DGI) of a Settling Defendant (Dynegy Marketing & Trade). There is no language in the release indicating that it is infinitely recursive, i.e., that it includes parents of parents of members, etc., ad infinitum. There is a single recursive clause, "and each of their assigns, representatives . . . ." DII therefore only falls under the definition of "Released Parties" if "parents" under the language of the release was intended to include parents of parents. The Court finds that it was. The term "corporate parent" means "[a] corporation that has a controlling legal interest in another corporation." Black's Law Dictionary 418 (10th ed. 2014). The essential characteristic of a "parent" entity is its control over the other entity, not the degree to which it is separated from the controlled entity via corporate formalities.

Third, DMT is a subsidiary of DMT Holdings, which is in turn a subsidiary of Dynegy Holdings, Inc., which in turn is a parent of DGI, which in turn is a member of a Settling Defendant (Dynegy Marketing & Trade). Under the release, subsidiaries of parents of Settling Defendants are released. It would therefore be clear that DMT is released if DGI were itself a Settling Defendant, because DMT is a (grand)subsidiary of DGI's parent (Dynegy Holdings,

Inc.). But DGI is not a Settling Defendant. Rather, it is a member of a Settling Defendant (Dynegy Marketing & Trade). The release cannot reasonably be read to include (grand)subsidiaries of parents of members of Settling Defendants. As noted, the release is not infinitely recursive.

**B. Motion No. 2962**

The remaining Defendants ask the Court to reconsider its March 2017 denial of summary judgment in the '1019 Case based on its finding that that there remained a genuine issue of material fact as to whether Plaintiffs Carthage College and Briggs & Stratton received sufficient notice of the NYMEX settlement. The Court was unsure at the time whether Plaintiffs' broker Kaztex, who had received the notice, had a duty to notify Plaintiffs. Movants note that in its recent August 2017 order addressing a similar motion, the Court ruled that the case law indicated that the NYMEX court's finding that constitutionally sufficient notice had been provided was not amenable to collateral attack here. (*See* Order, 13, ECF No. 2957 (citing *Hesse v. Sprint Corp.*, 598 F.3d 581, 588 (9th Cir. 2010) (citing *Epstein v. MCA, Inc.*, 179 F.3d 641, 648 (9th Cir. 1999) (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985))))).

Plaintiffs argue that in the case of movants, it previously appeared that Kaztex had only received notice in its capacity as a class member itself, not as Plaintiffs' agent, and that the record has not changed in that regard. But movants correctly note in reply that the reason the Court recently granted summary judgment on this issue despite any potential fact issues concerning notice was because any such fact issues were precluded; under the case law, the NYMEX court's findings that notice to class members had been sufficient was simply not collaterally attackable here. The factual distinction Plaintiffs ask the Court to recognize may be valid, but the Court would have to ignore *Hesse* in order to address it. The Court is not free to do so and finds that it must reconsider.

## III.    MOTIONS TO CERTIFY ORDER FOR INTERLOCUTORY APPEAL

Several Defendants in the '1019, '915, and '1351 Cases ask the Court to certify its March 30, 2017 denials of summary judgment for interlocutory appeal under 28 U.S.C. § 1292(b).  The Court denies the motion.  The immediate appeal of the denial of summary judgment would not likely advance the termination of the present litigation but is more likely to delay it.  These cases are already over a decade old.  They have been to the Court of Appeals twice and to the Supreme Court once, and they have outlasted the tenure of the district judge originally assigned to hear them.  The Court intends to conclude the consolidated pretrial proceedings and remand to the transferor courts in the most expeditious manner possible.  The Court will not certify these issues for interlocutory appeal based on the speculation that the Court of Appeals may choose to hear those issues together with the pending appeals.  At a minimum, even if the Court of Appeals chose to do that, it would almost certainly extend the time to determine the pending appeals.

## IV.    MOTION FOR SUGGESTION OF REMAND

Plaintiffs in the class action cases (the '233, '1019, '987, '1351, and '915 Cases) have asked the Court to issue a suggestion of remand to the JPML.  *See* J.P.M.L. Rule 10.1(b)(i).  The Court solicited the motion at an August 9, 2017 fairness hearing, indicating that Plaintiffs should file it after briefing was completed on Motions for Summary Judgment Nos. 2745 and 2764.  The parties agree that those motions are moot.  Two appeals are pending concerning the Court's denial of class certification and the Court's dismissal of claims against Defendant CenterPoint Energy Services, Inc.  Plaintiffs ask the Court to enter a proposed order that does not simply suggest remand but rather: (1) stays the actions in this Court; (2) stays or denies without prejudice (it is not clear) the pending motions to reconsider, for consideration by the transferor courts after remand; (3) suggests to the JPML that the cases be remanded after the mandates issue in the pending appeals; and (4) is entered into the docket but not submitted to the JPML

until the mandates issue from the Court of Appeals. (*See* Proposed Order, ECF No. 2961-1). The Court will not enter the proposed order. If Plaintiffs themselves do not believe the class action cases should be immediately remanded, the Court will not issue a suggestion of remand. Plaintiffs implicitly admit that the Court should not suggest remand until the pending appeals are decided. That being the case, the Court will not enter a superfluous order indicating what it may do in the future. The Court agrees with Defendants that upon issuing the present order, it should simply stay the cases and await the Court of Appeals' rulings in the two pending appeals.

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion for Leave to File Supplemental Brief (ECF No. 2946) and the Motion to Reconsider (ECF No. 2962) are GRANTED.

IT IS FURTHER ORDERED that the Motion to Reconsider (ECF No. 2959) is GRANTED IN PART and DENIED IN PART. Xcel Energy Inc.; Northern States Power Co.; Dynegy Illinois, Inc.; Dynegy GP, Inc.; El Paso Corp.; and Williams Merchant Services Co. are entitled to summary judgment based on release, but DMT GP, LLC is not.

IT IS FURTHER ORDERED that the Motions to Certify (ECF Nos. 2967, 2968) and the Motion for Suggestion of Remand (ECF No. 2961) are DENIED.

IT IS FURTHER ORDERED that the consolidated cases are STAYED, and the parties shall notify the Court upon the issuance of the Court of Appeals' rulings in Appeals Nos. 16-17099 and 17-16227.

IT IS SO ORDERED.

Dated this  20th day of November, 2017.

_____
ROBERT C. JONES
United States District Judge

9 of 9